If the General Partner (or liquidating trustee or other representative) has received a prior written notice that a distribution of Securities to be made pursuant to clause (iii) of the preceding sentence of this Section 11.2(b) would cause a Material Adverse Effect on the Limited Partner, the General Partner (or liquidating trustee or other representative) shall distribute such Securities to a third Person designated in such notice by the Limited Partner.

(c)     <u>Time for Liquidation, etc</u>.  A reasonable time period shall be allowed for the orderly winding up and liquidation of the assets of the Fund and the discharge of liabilities to creditors so as to enable the General Partner (or liquidating trustee or other representative) to seek to minimize potential losses upon such liquidation.  The provisions of this Agreement shall remain in full force and effect during the period of winding up and, subject to Section 13.11, shall terminate upon the filing of a Notice of Dissolution of the Fund with the Registrar of Exempted Limited Partnerships as provided in Section 11.4.

11.3  <u>Clawback</u>.  Subject to Sections 2.5 and 9.2, if, after giving effect to all distributions made pursuant to Sections 6.3 and 11.2, but before giving effect to this Section 11.3, with respect to any Limited Partner other than a Defaulting Limited Partner, either

(a)     the General Partner has received distributions pursuant to Sections 6.3 and 11.2 attributable to such Limited Partner that exceed 20% (or in the event of any increases or reductions to such percentage, calculated with the the applicable increased or reduced percentages) of the excess of (*i*) the cumulative amount distributed to the Limited Partner and to the General Partner attributable to the Limited Partner pursuant to this Section 6.3 over (*ii*) the Capital Contributions of the Limited Partner described in Section 6.3(a), or

(b)     the distributions received by such Limited Partner pursuant to Sections 6.3 and 11.2 are not sufficient to provide such Limited Partner with an 8% annualized effective internal rate of return on the Capital Contributions of such Limited Partner used to fund (*i*) the cost of Portfolio Investments (computed from the due dates specified in the applicable Drawdown Notices until the dates distributions are made pursuant to Sections 6.3 and 11.2) and (*ii*) Organizational Expenses and Fund Expenses (computed from the due dates specified in the applicable Drawdown Notices until the dates distributions are made pursuant to Sections 6.3 and 11.2),

then, subject to the next sentence, the General Partner shall contribute to the Fund the lesser of

(A)     the greater of the amount of the excess of such distributions over such 20% (or other applicable increased or reduced percentages) described in clause (a) and the amount of the shortfall described in clause (b), and

(B)     the amount of distributions received by the General Partner pursuant to Sections 6.3 and 11.2 attributable to the Limited Partner, less the sum of (*I*) the

*Confidential*

AP0501

maximum amount of Tax Distributions that were made or that could have been made to the General Partner (assuming that the Fund had sufficient Distributable Cash therefor and had made no other distributions), (2) the additional tax liability that would have been incurred by the General Partner (or any Person whose tax liability is determined by reference to the income of the General Partner), based on the assumptions used in computing Tax Distributions, if each Security distributed in kind to the General Partner had been sold by the General Partner immediately after distribution for its value (as determined for purposes of Section 6.7), and (3) the amount of any payment made by, or distributions deemed to have been distributed to, the General Partner pursuant to Section 6.12, in the case of each of subclauses (1), (2) and (3), relating to the General Partner's right to receive distributions pursuant to Sections 6.3 and 11.2 attributable to the Limited Partner,

and the Fund shall, subject to Section 6.12 and applicable law, distribute such amount to the Limited Partner. The General Partner's obligation under this Section 11.3 with respect to the Limited Partner shall, subject to applicable law, first be satisfied by distributing to the Limited Partner the proceeds of liquidation of the assets in the Segregated Reserve Account up to the amount of such obligation; to the extent such proceeds exceed such obligation, such excess shall, subject to applicable law, be distributed to the General Partner, and to the extent such obligation is not satisfied by such proceeds, the General Partner shall contribute to the Fund an amount sufficient to satisfy the balance of such obligation. Contributions pursuant to this Section 11.3 shall be made by or on behalf of the General Partner either in cash or, at the election of the General Partner, by the return of Securities previously distributed to the General Partner by the Fund valued at their Value at the time returned to the Fund, *provided* that such Securities shall be Marketable Securities in the hands of the Limited Partner (assuming the Limited Partner has no other interest in the Portfolio Company to which such Marketable Securities relate). The members of the General Partner shall execute a separate several (but not joint) guarantee in favor of the Fund in respect of the obligations of the General Partner under this Section 11.3 (the "Clawback Guarantee"), the form of which is attached hereto as **Exhibit B**. The General Partner hereby covenants and agrees to maintain in the operative agreements among its members an obligation on the part of each of its members, severally, but not jointly, to contribute to the General Partner an amount equal to such member's *pro rata* share of the General Partner's obligations under this Section 11.3, and of the General Partner to contribute such amount to the Fund.

11.4 Dissolution. Following the completion of the foregoing provisions of this Article XI, the General Partner (or the liquidating trustee or other representative referred to in Section 11.2(a)) shall execute, acknowledge and cause to be filed a Notice of Dissolution of the Fund with the Registrar of Exempted Limited Partnerships of the Cayman Islands, *provided* that the winding up of the Fund will not be deemed complete and such Notice of Dissolution will not be filed by the General Partner (or such

*Confidential*

AP0502

liquidating trustee or other representative) prior to the third anniversary of the last day of the Term unless otherwise required by law.

# ARTICLE XII

# AMENDMENTS; POWER OF ATTORNEY

12.1 <u>Amendments</u>.

(a)    <u>General</u>.  Any modifications of or amendments to this Agreement duly adopted in accordance with the terms of this Agreement may be executed in accordance with Section 12.2.  The terms and provisions of this Agreement (including any provision calling for the consent, approval, review or waiver of the members of the Advisory Committee) may be modified or amended at any time and from time to time with the written consent of the General Partner and the Limited Partner. For the avoidance of doubt, for purposes of applying Section 12.1, a modification or amendment of a capitalized term defined in this Agreement does not constitute a modification or amendment of the provisions in which such defined term is used and shall not otherwise be considered to alter the terms or application of such provision.

(b)    <u>Certain Amendments Not Requiring Limited Partner Consent</u>. Notwithstanding anything to the contrary in this Agreement, the General Partner may, without the consent of the Limited Partner:

(i)    enter into agreements with Persons that are Transferees pursuant to the terms of this Agreement, providing in substance that such Transferees will be bound by this Agreement and will become Substitute Partners;

(ii)    amend this Agreement as may be required to implement a Transfer of the Limited Partner's interest or the admission of any Substitute Partner in accordance with the terms of this Agreement;

(iii)    amend this Agreement (*A*) to satisfy any requirements, conditions, guidelines or opinions contained in any opinion, directive, order, ruling or regulation of the SEC, the Internal Revenue Service or any other U.S. federal or state or non-U.S. governmental agency, or in any U.S. federal or state or non-U.S. statute, compliance with which the General Partner deems to be in the best interest of the Fund, or (*B*) to change the name of the Fund;

(iv)    amend this Agreement as may be necessary or advisable to comply with the Advisers Act, with the SEC and the FCC Rules, and any anti-money laundering or anti-terrorist laws, rules, regulations, directives or special measures;

*Confidential*

AP0503

(v)      amend this Agreement to cure any ambiguity or correct or supplement any provision hereof that may be incomplete or inconsistent with any other provision hereof, so long as such amendment under this clause (v) does not adversely affect the interest of the Limited Partner; and

(vi)      amend this Agreement in accordance with Sections 2.5, 4.3 and 4.5.

(c)      Notices of Amendments.  Within a reasonable period of time after the adoption of any amendment in accordance with this Section 12.1, the General Partner shall send to the Limited Partner a copy of such amendment or a written notice describing such amendment.

(d)      Execution of Amendments.  Upon obtaining such approvals required by this Agreement and without further action or execution by any other Person, including the Limited Partner, (i) any amendment to this Agreement may be implemented and reflected in a writing executed solely by the General Partner and (ii) the Limited Partner shall be deemed a party to and bound by such amendment of this Agreement.

12.2  Power of Attorney.  To the fullest extent permitted by applicable law, the Limited Partner does hereby irrevocably constitute and appoint the General Partner and its officers, or the successor thereof as general partner of the Fund and its officers, with full power of substitution, the true and lawful attorney-in-fact and agent of such Partner, to execute, acknowledge, verify, swear to, deliver, record and file, in its or its assignee's name, place and stead, all instruments, documents and certificates that may from time to time be required by the laws of the Cayman Islands, the United States, the State of Delaware, the State of New York, any other jurisdiction in which the Fund conducts or plans to conduct business, or any political subdivision or agency thereof, to effectuate, implement and continue the valid existence and investment and other activities of the Fund, including the power and authority to execute, verify, swear to, acknowledge, deliver, record and file:

(a)      all certificates and other instruments, including any amendments to this Agreement or to the Certificate, that the General Partner determines to be appropriate to (i) form, qualify or continue the Fund as an exempted limited partnership (or a partnership in which the limited partners have limited liability) in the Cayman Islands and all other jurisdictions in which the Fund conducts or plans to conduct business and (ii) admit such Partner as the Limited Partner in the Fund;

(b)      all instruments that the General Partner determines to be appropriate to reflect any amendment to this Agreement or the Certificate (i) to satisfy any requirements, conditions, guidelines or opinions contained in any opinion, directive, order, ruling or regulation of the SEC, the Internal Revenue Service, or any other U.S. federal or state or non-U.S. governmental agency, or in any U.S. federal or state or non-U.S. statute, compliance with which the General Partner deems to be in the best interest of the Fund,

*Confidential*

70

(*ii*) to change the name of the Fund or (*iii*) to cure any ambiguity or correct or supplement any provision hereof that may be incomplete or inconsistent with any other provision herein contained so long as such amendment under this clause (iii) does not adversely affect the interest of the Limited Partner;

(c) all instruments that the General Partner determines to be appropriate in connection with the formation or operation of any Alternative Investment Fund and the Transfer of the Limited Partner's interest in the Fund to any such Alternative Investment Fund, including the admission of the Limited Partner to any such Alternative Investment Fund;

(d) all conveyances and other instruments that the General Partner determines to be appropriate to reflect and effect the dissolution, winding up and termination of the Fund in accordance with the terms of this Agreement, including the filing of a Notice of Dissolution as provided for in Article XI;

(e) all instruments relating to (*i*) Transfers of interests in the Fund or the admission of Substitute Partners, (*ii*) the treatment of a Defaulting Partner or (*iii*) any change in the Capital Commitment of the Limited Partner, all in accordance with the terms of this Agreement;

(f) all amendments to this Agreement duly approved and adopted in accordance with this Agreement;

(g) certificates of assumed name and such other certificates and instruments as may be necessary under the fictitious or assumed name statutes from time to time in effect in the Cayman Islands and in all jurisdictions in which the Fund conducts or plans to conduct investment or other activities;

(h) all instruments that the General Partner determines to be appropriate in connection with forming and operating an investment vehicle and the Transfer of the Limited Partner's interest in the Fund to such investment vehicle, including the admission of the Limited Partner to such investment vehicle, all as contemplated by Section 10.1(h) hereof and by section 5.10 of the Subscription Agreement; and

(i) with the consent of the Limited Partner, any other instruments determined by the General Partner to be necessary or appropriate in connection with the proper conduct of the investment or other activities of the Fund and that do not adversely affect the interest of the Limited Partner.

Such attorney-in-fact and agent shall not, however, have the right, power or authority to amend or modify this Agreement, when acting in such capacities, except to the extent authorized herein. The Limited Partner hereby agrees not to revoke this power of attorney. To the fullest extent permitted by law, this power of attorney shall survive and not be

*Confidential*

AP0505

affected by the dissolution, bankruptcy, disability or incapacity of the Limited Partner and shall extend to the Limited Partner's successors and assigns. To the fullest extent permitted by applicable law, this power of attorney may be exercised by such attorney-in-fact and agent for the Limited Partner by a single signature of the General Partner acting as attorney-in-fact with or without listing the Limited Partner executing an instrument. Any Person dealing with the Fund may conclusively presume and rely upon the fact that any instrument referred to above, executed by such attorney-in-fact and agent, is authorized and binding, without further inquiry. If required, the Limited Partner shall execute and deliver to the General Partner, within five Business Days after receipt of a request therefor, such further designations, powers of attorney or other instruments as the General Partner shall determine to be necessary for the purposes hereof consistent with the provisions of this Agreement, including as required by any applicable state statute or other similar legal requirement. This power of attorney granted hereby is intended to secure a proprietary interest of the General Partner and the performance of the obligations of each relevant Limited Partner under this Agreement.

## ARTICLE XIII

### MISCELLANEOUS

13.1 <u>Notices</u>. Each notice relating to this Agreement shall be in writing and shall be delivered (*a*) in person, by registered or certified mail or by private courier, overnight or next-day express mail, or (*b*) by fax, email or other electronic means (including posting notices on an online investor reporting website, with notification by email), with such confirmation as the General Partner deems appropriate under the circumstances. All notices to the Limited Partner shall be delivered to it at the address, email address or fax number set forth on the Limited Partner's Subscription Agreement (including the Exhibits thereto), or to such other address, email address or fax number as the Limited Partner shall have furnished to the Fund in writing. All notices to the General Partner shall be delivered to the General Partner at Reynolds & Reynolds, 6700 Hollister, Houston, TX 77040, attn. Robert Burnett, with a copy to Robert Brockman, 333 West Friar Tuck Lane, Houston, TX 77024, Attention: Chief Compliance Officer, or such other address or addresses, email address or addresses, or fax number or numbers, as the Fund or the General Partner shall have furnished to the Limited Partner in writing. The Limited Partner may designate a new address for notices by giving written notice to that effect to the General Partner. Unless otherwise specifically provided in this Agreement, a notice given in accordance with the foregoing clause (a) shall be deemed to have been effectively given give Business Days after such notice is mailed by registered or certified mail, return receipt requested, and one Business Day after such notice is sent by FedEx or other one-day service provider, to the proper address, or at the time delivered when delivered in person or by private courier. A notice given in accordance with the foregoing clause (b) to the General Partner or to the Limited Partner by fax, email or other electronic

*Confidential*

AP0506

means shall be deemed to have been effectively given when sent without error notice on the first Business Day after being sent.

13.2 <u>Counterparts; Signatures</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which taken together shall constitute a single agreement. Any signature on the signature page of this Agreement may be an original or a fax or electronically transmitted signature.

13.3 <u>Table of Contents and Headings; Terms Generally</u>. The table of contents and the headings of the articles, sections and subsections of this Agreement are inserted for convenience of reference only and shall not be deemed to constitute a part hereof or affect the interpretation hereof. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. When the words "include," "includes" and "including" are followed by a list of one or more items, such list shall be deemed to be illustrative only and shall not be deemed to be an exclusive listing. The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (*a*) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (*b*) all references herein to Articles and Sections shall be construed to refer to Articles and Sections of this Agreement unless otherwise stated herein, (*c*) the words "discretion" and "sole discretion" shall be construed to have the same meaning and effect and (*d*) the word "or" shall be construed to be used in the inclusive sense of "and/or."

13.4 <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of the Partners, the Initial Limited Partner and the Covered Persons, and shall be binding upon the parties, and, subject to Section 10.1, their respective successors, permitted assigns and, in the case of individual Covered Persons, heirs and legal representatives.

13.5 <u>Severability</u>. Every term and provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity shall not affect the validity of the remainder of this Agreement.

13.6 <u>Further Actions</u>. The Limited Partner shall execute and deliver such other certificates, agreements and documents, and take such other actions, as may reasonably be requested by the General Partner in connection with the formation of the Fund and the achievement of its purposes or to give effect to the provisions of this Agreement, in each case as are not inconsistent with the terms and provisions of this Agreement, including any documents that the General Partner determines to be necessary or appropriate to form, qualify or continue the Fund as a limited partnership in all jurisdictions in which the Fund conducts or plans to conduct its investment and other activities and all such

*Confidential*

AP0507

agreements, certificates, tax statements and other documents as may be required to be filed by or on behalf of the Fund.

13.7 <u>Determinations of the Partners</u>. To the fullest extent permitted by law and notwithstanding any other provision of this Agreement or in any other agreement contemplated herein or applicable provisions of law or equity or otherwise, whenever in this Agreement a Partner is permitted or required to make a decision, consent, vote, make a judgment or take an action (*a*) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, such Partner shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Fund or any other Person, or (*b*) in its "good faith" or under another express standard, such Partner shall act under such express standard and shall not be subject to any other or different standard. If any questions should arise with respect to the operation of the Fund that are not specifically provided for in this Agreement or the Partnership Law, or with respect to the interpretation of this Agreement, the General Partner is hereby authorized to make a final determination with respect to any such question and to interpret this Agreement in good faith, and its determination and interpretation so made shall be final and binding on all parties, absent manifest error. Notwithstanding any other provision of this Agreement, including the preceding provisions of this Section 13.7, the Partners shall comply with the implied contractual covenant of good faith and fair dealing. To the fullest extent permitted by applicable law, the parties hereto acknowledge that the terms of this Agreement are the result of negotiations, and therefore agree that this Agreement shall be construed without regard to, or aid of, any canon or rule requiring construction against the party causing this Agreement to be drafted.

13.8 <u>Non-Waiver</u>. No provision of this Agreement shall be deemed to have been waived unless such waiver is given in writing, and no such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor such waiver was given.

13.9 <u>Applicable Law</u>. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE CAYMAN ISLANDS. The Partners hereby submit to the nonexclusive jurisdiction of the courts of the Cayman Islands and to the courts of the jurisdiction in which the principal office of the General Partner is located (and, if the principal office is located in the United States, of the federal district court having jurisdiction over the location of the principal office) for the resolution of all matters pertaining to the enforcement and interpretation of this Agreement.

*Confidential*

AP0508

13.10    Confidentiality.

(a)    General. The Limited Partner shall keep confidential and shall not disclose (and shall cause its representatives (including its representatives on the Advisory Committee), to keep confidential and not disclose), without the prior written consent of the General Partner any information with respect to the Fund, any Related Investment Fund, any Portfolio Company or any Affiliate of any of the foregoing, *provided* that the Limited Partner may disclose any such information:

(i)    as has become generally available to the public other than as a result of the breach of this Section 13.10 by the Limited Partner or any agent or Affiliate of the Limited Partner;

(ii)    as may be required to be included in any report, statement or testimony required to be submitted to any municipal, state or national regulatory body having jurisdiction over the Limited Partner, *provided* that the Limited Partner shall, to the extent permitted by applicable law, give prior notice thereof to the General Partner to enable the Fund, the General Partner or the Manager to seek a protective order or similar relief;

(iii)    as may be required in response to any summons or subpoena or in connection with any litigation, *provided* that the Limited Partner shall, to the extent permitted by applicable law, give prior notice thereof to the General Partner to enable the Fund, the General Partner or the Manager to seek a protective order or similar relief;

(iv)    to the extent necessary in order to comply with any law, order, regulation or ruling applicable to the Limited Partner, *provided* that the Limited Partner shall, to the extent permitted by applicable law, give prior notice thereof to the General Partner to enable the Fund, the General Partner or the Manager to seek a protective order or similar relief;

(v)    to its employees, directors and professional advisors (including the Limited Partner's auditors and counsel), *provided* that such Persons are advised of the confidentiality obligations contained herein;

(vi)    as may be required in connection with an audit by any taxing authority;

(vii)    that constitutes the "tax treatment" or "tax structure" of the Fund. As used in this paragraph, the term "tax treatment" refers to the purported or claimed U.S. federal income tax treatment and the term "tax structure" refers to any fact that may be relevant to understanding the purported or claimed U.S. federal income tax treatment, *provided* that, for the avoidance of doubt, except to the extent otherwise established in published guidance by the U.S. Internal Revenue Service, "tax treatment" or "tax structure" shall not include the following (and thus disclosure of the following shall not be permitted

*Confidential*

AP0509

under this Section 13.10(a)(vii)): (*A*) the name of, or contact information for, or any other similar identifying information regarding the Fund, any Related Investment Fund or any of their investments (including the names of any employees or affiliates thereof), (*B*) any performance information relating to the Fund or any Related Investment Fund and (*C*) any other information not related to the tax structure or tax treatment of the Fund. Nothing in this Section 13.10(a)(vii) shall limit the ability of the Limited Partner to make any disclosure to the Limited Partner's tax advisors or to the U.S. Internal Revenue Service or any other taxing authority.

(b)    <u>General Partner Disclosure or Non-Disclosure</u>.  Notwithstanding any other provision of this Agreement, to the fullest extent permitted by applicable law, the General Partner shall have the right to keep confidential from the Limited Partner for such period of time as the General Partner determines is reasonable (*i*) any information that the General Partner reasonably believes to be in the nature of trade secrets and (*ii*) any other information (*A*) the disclosure of which the General Partner believes is not in the best interest of the Fund or could damage the Fund or any Related Investment Fund or any of their investments or (*B*) that the Fund, any Related Investment Fund, the General Partner, the Manager or any of their Affiliates, or the officers, employees or directors of any of the foregoing, is required by law or by agreement with a third Person to keep confidential. For the avoidance of doubt, the General Partner may disclose any information concerning the Fund or the Limited Partner necessary to comply with applicable laws and regulations, including any anti-money laundering or anti-terrorist laws or regulations, and the Limited Partner shall provide the General Partner, promptly upon request, all information that the General Partner reasonably deems necessary to comply with such laws and regulations.

13.11    <u>Survival of Certain Provisions</u>.  Sections 6.11, 6.12 and 13.10 and Article IX shall survive the termination or expiration of this Agreement and the dissolution, winding up and termination of the Fund and the withdrawal of any Partner.

13.12    <u>Entire Agreement</u>.    This Agreement and the Subscription Agreements constitute the entire agreement among the Partners and between the Partners and the Initial Limited Partner with respect to the subject matter hereof and supersede any prior agreement or understanding among them with respect to such subject matter. The representations and warranties of the Fund, the General Partner and the Limited Partner in and the other provisions of the Subscription Agreement shall survive the execution and delivery of this Agreement.

13.13    <u>No Third Party Beneficiaries</u>.  Except with respect to the Covered Persons a person which is not a party to this Agreement shall not have any rights under the Contracts (rights of Third Parties) Law, 2014 (as amended) to enforce any term of this Agreement. Notwithstanding any other provision of this Agreement, including the foregoing, the consent of or notice to any person who is not a party to this Agreement shall not be required for any termination, rescission or agreement to any variation, waiver, assignment, novation, release or settlement under this Agreement at any time.

*Confidential*

AP0510

No Partner nor any Covered Person shall have any duty or obligation to any creditor of the Fund to make any contributions to the Fund pursuant to Section 5.2 or any other provision of this Agreement or to cause the General Partner to deliver to any Partner a Drawdown Notice.

13.14    <u>Compliance with Anti-Money Laundering Requirements</u>. Notwithstanding any other provision of this Agreement to the contrary, the General Partner, in its own name and on behalf of the Fund, shall be authorized without the consent of any Person, including any other Partner, to take such action as it determines in its sole discretion to be necessary or advisable to comply with any anti-money laundering or anti-terrorist laws, rules, regulations, directives or special measures, including the actions contemplated by the Subscription Agreement.

13.15    <u>No Political Contributions by Fund</u>. No money or property of the Fund shall be paid, used or offered (*a*) to aid any political party, committee or organization, or any other entity organized for political purposes, or (*b*) to aid any candidate for political office, or in connection with any election (including any referendum or proposed constitutional amendment) or for any political purpose whatever, or (*c*) for lobbying in connection with legislation or regulations.

13.16    <u>Currency</u>. The term "dollar" and the symbol "$," wherever used in this Agreement, shall mean the United States dollar.

*Confidential*

AP0511

**EXHIBIT 2**

AP0512

Execution Version

## MASTER TRANSACTION AGREEMENT

This Master Transaction Agreement (this "Agreement"), dated as of July 1, 2019 (the "Effective Date"), is by and among Falcata Tech Investments Fund I, L.P., a Cayman Islands exempted limited partnership (the "Fund"), FTI GP I, LLC, a Delaware limited liability company (the "General Partner"), Point Investments Ltd., a Bermuda corporation (the "Limited Partner"), Falcata Capital LLC, a Delaware limited liability company (the "Manager"), Robert T. Brockman ("Brockman Sr."), Robert T. Brockman II ("Brockman Jr."; and together with Brockman Sr., the "Brockmans"), Robert D. Burnett ("Burnett"), Norman T. Barras ("Barras"), William A. Hiers III ("Hiers"), and Matthew T. Zachary ("Zachary") (collectively, the "Parties" and each, a "Party"). Capitalized terms used herein without definition have the meaning set forth in the Fund's Amended and Restated Exempted Limited Partnership Agreement dated as of April 20, 2018 (as amended, the "Fund LPA").

## RECITALS

A. The Limited Partner is the sole limited partner of the Fund; and the General Partner is the sole general partner of the Fund. As of the date hereof, (i) the Limited Partner has made aggregate Capital Contributions to the Fund of $83,612,562 (of which $74,626,866 constituted Capital Contributions of the Limited Partner used to fund the cost of Portfolio Investments) and (ii) the General Partner has made aggregate capital contributions to the Fund of $395,772.

B. Burnett and the Brockmans are the sole owners of the Manager.

C. Burnett, Brockman Sr. and Barras are the sole Class A Members of the General Partner; Hiers and Zachary are the sole Class B Members of the General Partner; and there are no other equity holders of the General Partner.

D. Brockman Sr. has not made any capital contribution to the General Partner.

E. Burnett, Brockman Sr. and Brockman Jr. have made capital contributions to the Manager equal to $10,000, $10,000 and $980,000, respectively.

F. The Parties wish to amend the Fund LPA, the organizational documents of the Manager and the General Partner, the Management Agreement, dated as of April 20, 2018, among the Fund, the General Partner and the Manager (the "Management Agreement"), and the Subscription Agreement between the Limited Partner and the Fund, dated April 20, 2018 (the "Subscription Agreement"; and together with the Fund LPA, the organizational documents of the Manager and the General Partner, and the Management Agreement, collectively, the "Underlying Documents").

G. The Fund and the Limited Partner desire for the Fund to sell all of its assets and for the Fund to liquidate as soon as is commercially practicable (as reasonably determined by the General Partner and the Manager taking into account relevant market, financial, business and other factors but in all cases subject to the terms of this Agreement), understanding that none of the Fund, the General Partner nor the Limited Partner wishes for the Fund to sell Portfolio Investments at stressed or discounted sale prices (the date when all of the Portfolio Investments of the Fund have been sold for cash and/or Marketable Securities, the "Complete Exit Date") (for the avoidance of doubt, the Fund may own only "Temporary Investments" after the Complete Exit Date).

AP0513

H.  The Parties wish to terminate the Fund's Investment Period and to take certain other actions described herein and, to the extent any one or more of the actions described herein are inconsistent with any Underlying Document(s) and/or other agreements among any one or more of the Parties, to amend such Underlying Documents and/or such other agreements to permit and take such actions.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, the Parties hereby agree that the Underlying Documents are (notwithstanding any other provision of the Underlying Documents and/or other agreements among any one or more of the Parties to the contrary) hereby amended as follows:

1.  **Fund LPA and Management Agreement**.

1.1.  <u>Investment Period</u>.  The Investment Period is hereby terminated.  Notwithstanding anything in the Fund LPA or any other Underlying Document to the contrary, without the consent of the Limited Partner (which consent may be withheld in its sole and absolute discretion), the Fund shall not be permitted to make any further investments (whether funded through Capital Contributions or reinvestment of Distributable Cash) other than (a) Temporary Investments and (b) one or more Follow-On Investments with respect to XpressDocs Holdings, Inc. not to exceed US$11,000,000 (Eleven Million US Dollars) in the aggregate (the "<u>Follow-on Cap</u>").

1.2.  <u>Management Fees</u>.

1.2.1.  Notwithstanding anything else to the contrary in any Underlying Document, from and after the Effective Date, the Management Fee shall be equal to the amounts specified in <u>Schedule 1</u> attached hereto.  The Management Fee shall be payable quarterly in advance (pro-rated and refundable for any partial quarters).  Notwithstanding the foregoing, for the period beginning on July 1, 2019 and ending on June 30, 2020, the Management Fee shall be payable according to the following schedule: (a) for the quarter beginning on July 1, 2019 and ending on September 30, 2019, the Management Fee shall be equal to $2,575,000 (the "<u>Initial Management Fee</u>") and (b) the Management Fee payable for the three subsequent quarters shall be equal to $625,000 per quarter.  The General Partner, the Fund, the Manager and the Limited Partner hereby acknowledge and agree that the Fund currently has cash on hand sufficient to pay one hundred percent (100%) of the Initial Management Fee and that the Fund shall not require an additional Capital Contribution from the Limited Partner after the date hereof to pay such amount.

1.2.2.  In the event that the Fund Transfers any Portfolio Investments, then the Management Fee shall be reduced (but not increased) to an amount equal to the then applicable Management Fee set forth in <u>Schedule 1</u> multiplied by the New Management Fee Percentage, subject to a minimum annual Management Fee of $500,000 for any period prior to June 30, 2026.  The "<u>New Management Fee Percentage</u>" is a fraction (expressed as a percentage) measured immediately after the Transfer of any Portfolio Investment where (x) the numerator equals the cost of the remaining Portfolio Investments of the Fund measured immediately after the applicable Transfer and (y) the denominator equals the total aggregate cost of all Portfolio Investments of the Fund (whether or not any such Portfolio Investments were subsequently Transferred by the Fund).

AP0514

1.3.   <u>Fund Expenses</u>. From and after the Effective Date, the Manager and the General Partner shall be solely responsible for and shall bear all Fund Expenses; provided, however, that the Fund shall still be responsible for and shall bear (a) the Management Fee as set forth in Section 1.2 of this Agreement and (b) any Damages to the extent provided in Section 9.1(a) of the Fund LPA, and taxes and other governmental charges levied on the Fund (the amounts in clauses (a) and (b) are referred to herein as "<u>Continuing Fund Expenses</u>").

1.4.   <u>Capital Calls</u>. Unless the Limited Partner otherwise consents (which consent may be withheld in the Limited Partner's sole and absolute discretion), neither the General Partner nor the Fund shall be permitted to issue Drawdown Notices nor shall the Limited Partner be required to fund any Drawdown except for Capital Contributions made for Continuing Fund Expenses and Follow-On Investments (subject to the Follow-on Cap). For the avoidance of doubt, (a) the foregoing shall not alter the obligations of the Partners to return distributions pursuant to Section 9.2 of the Fund LPA and (b) Drawdown Notices and Drawdowns shall be made pro rata amongst the General Partner and the Limited Partner based on their respective initial Capital Commitments specified in Section 5.1 of the Fund LPA.

1.5.   <u>Term</u>. Unless the Limited Partner otherwise consents (which consent may be withheld in the Limited Partner's sole and absolute discretion), the Fund, the General Partner and the Manager shall use their reasonable best efforts to effect the sale of all or substantially all of the assets of the Fund as soon as commercially practicable but in any event no later than the date falling seven (7) years after the Effective Date (the "<u>Wind-Up Deadline</u>"), with the goal of obtaining the best and highest price therefor from a buyer(s) that the General Partner reasonably determines has the financial wherewithal to consummate such transaction(s). Following the sale of all or substantially all of the assets the Fund, the General Partner shall wind-up, liquidate and dissolve the Fund as contemplated by Section 11.2 of the Fund LPA.

1.6.   <u>Removal</u>. If the Complete Exit Date has not occurred on or prior to the Wind-Up Deadline, then the Limited Partner may, in its sole and absolute discretion, (a) remove the General Partner as the Fund's general partner and appoint a replacement general partner of the Fund and (b) remove the Manager and appoint a replacement manager of the Fund. In the event that the General Partner is removed as the Fund's general partner pursuant to this Section 1.6, then the provisions of Section 2.5 of the Fund LPA shall apply to such removal; provided, however, that the 50% reduction set forth in Section 2.5(c) of the LPA shall not apply and the General Partner shall be entitled to receive all distributions that otherwise would have been distributable to it pursuant to the Fund LPA (as modified by Section 1.7 of this Agreement) as if it had not been removed.

1.7.   <u>Revised Carried Interest Calculation</u>.

    1.7.1.  If the Complete Exit Date occurs:

        (a) on or before the fourth anniversary of the Effective Date, and substantially all cash and other assets held by the Fund are distributed to the Partners within ninety (90) calendar days of the Complete Exit Date (or, if certain of the proceeds from the sale of Portfolio Investments are subject to escrow, at least eighty-five (85%) of the gross sales price (inclusive of such escrowed funds) from such sale are distributed to the Partners in cash and/or Marketable Securities within ninety (90) days of the Complete Exit Date and the remaining proceeds are distributed to the Partners in

-3-

AP0515

cash and/or Marketable Securities promptly following release from escrow), then clauses (b), (c) and (d) of Section 6.3 of Fund LPA shall be disregarded and, after the Limited Partner receives cumulative distributions in an amount equal to all Capital Contributions made by the Limited Partner, then the Limited Partner shall receive 70% of all distributions in excess of such amount and the General Partner shall receive 30% of all distributions in excess of such amount (i.e., the General Partner shall receive its Carried Interest allocation (at a rate of 30%) without requiring the Limited Partner to receive the 8% preferred return as contemplated by Section 6.3(b) of the existing Fund LPA);

(b) after the fourth anniversary of the Effective Date but on or before the fifth anniversary of the Effective Date, and substantially all cash and other assets held by the Fund are distributed to the Partners within ninety (90) calendar days of the Complete Exit Date (or, if certain of the proceeds from the sale of Portfolio Investments are subject to escrow, at least eighty-five (85%) of the gross sales price (inclusive of such escrowed funds) from such sale are distributed to the Partners in cash and/or Marketable Securities within ninety (90) days of the Complete Exit Date and the remaining proceeds are distributed to the Partners in cash and/or Marketable Securities promptly following release from escrow), then (i) the reference to "8%" in Section 6.3(b) of the Fund LPA shall be replaced with "2%" and (ii) the references in clauses (c) and (d) of Section 6.3 to "20%" and "80%" shall be replaced with references "30%" and "70%", respectively;

(c) after the fifth anniversary of the Effective Date but on or before the sixth anniversary of the Effective Date, and substantially all cash and other assets held by the Fund are distributed to the Partners within ninety (90) calendar days of the Complete Exit Date (or, if certain of the proceeds from the sale of Portfolio Investments are subject to escrow, at least eighty-five (85%) of the gross sales price (inclusive of such escrowed funds) from such sale are distributed to the Partners in cash and/or Marketable Securities within ninety (90) days of the Complete Exit Date and the remaining proceeds are distributed to the Partners in cash and/or Marketable Securities promptly following release from escrow), then (i) the reference to "8%" in Section 6.3(b) of the Fund LPA shall be replaced with "5%" and (ii) the references in clauses (c) and (d) of Section 6.3 to "20%" and "80%" shall be replaced with references "30%" and "70%", respectively;

(d) after the sixth anniversary of the Effective Date but on or before the Wind-Up Deadline, and substantially all cash and other assets held by the Fund are distributed to the Partners within ninety (90) calendar days of the Complete Exit Date (or, if certain of the proceeds from the sale of Portfolio Investments are subject to escrow, at least eighty-five (85%) of the gross sales price (inclusive of such escrowed funds) from such sale are distributed to the Partners in cash and/or Marketable Securities within ninety (90) days of the Complete Exit Date and the remaining proceeds are distributed to the Partners in cash and/or Marketable Securities promptly following release from escrow), then the references in clauses (c) and (d) of Section 6.3 to "20%" and "80%" shall be replaced with references "30%" and "70%", respectively; or

-4-

AP0516

(e) after the Wind-Up Deadline, then the Carried Interest distributions shall not be subject to modification by this Agreement and Section 6.3 of the Fund LPA shall be in full force and effect as provided in the Fund LPA as it existed immediately prior to the adoption of the Standstill (defined below).

1.7.2.  If some but not all of the Portfolio Investments are sold prior to the sixth anniversary of the Effective Date, then that portion (if any) of such proceeds that may be subject to the revised Carried Interest allocations shall instead be held in escrow by the Fund (to the extent that the General Partner may be entitled to receive same) and such escrowed amounts shall be later released to the Limited Partner and/or General Partner once it is determined whether the General Partner and/or the Limited Partner (as applicable) is entitled to some or all of such amount(s).

1.7.3.  Notwithstanding the portion of Section 6.3 under the heading "Reduction of Carried Interest Allocation", the Limited Partner shall not be permitted to reduce the applicable percentage allocation of Carried Interest as set forth in such section.

1.8.  <u>Special Removal Conduct</u>.  If any Party (other than the Limited Partner) materially breaches any provision of this Agreement, which breach has not been cured (to the extent curable) within thirty (30) days after the earlier of (x) written notice from the Limited Partner of such breach and (y) either the General Partner or the Manager having actual knowledge of an intentional breach of this Agreement, then the Limited Partner may (x) remove the General Partner as the Fund's general partner and appoint a replacement general partner of the Fund and (y) remove the Manager and appoint a replacement manager of the Fund.  For the avoidance of doubt, a material breach of any provision of Sections 2.1 through 2.6 of this Agreement (inclusive) shall not be curable for purpose of this Section 1.8.

1.9.  <u>Veto on Certain Sales</u>.  The Fund shall not, without the prior written consent of the Limited Partner (which consent may be withheld in its sole and absolute discretion), either (x) Transfer less than all of the Portfolio Investments or (y) Transfer the Portfolio Investments for an aggregate purchase price that is less than the aggregate Capital Contributions of the Limited Partner to the Fund measured as of the time of the consummation of such sale.

1.10.  <u>Indemnification</u>.  For the avoidance of doubt, the Brockmans shall only be deemed Covered Persons eligible for indemnification pursuant to Section 9.1 of the Fund LPA for Claims relating to or arising out of transactions that took place prior to the Effective Date, subject to compliance with the requirements of Section 9.1 of the Fund LPA.

1.11.  <u>Change of Control</u>.  Notwithstanding Section 10.1(e) of the Fund LPA, to the extent that the actions described herein may constitute a Transfer of the General Partner's interest in the Fund, the Limited Partner consents to such Transfer. Further, to the extent that any of the actions described herein may be deemed an "assignment" (within the meaning of the Advisers Act) of the General Partner's interest in the Fund or of the Manager's obligations under the Management Agreement, the Limited Partner has reviewed and approved such assignment as contemplated by Section 205(a) of the Advisers Act.

AP0517

2. **Organization Documents of the Fund, General Partner and Manager**.

2.1.   Redemption of Brockman Sr.'s Interest in the Manager. Effective as of the Effective Date, the Manager hereby redeems all of the membership interests in the Manager held by Brockman Sr. for $14,201.

2.2.   Redemption of Brockman Jr.'s Interest in the Manager. Effective as of the Effective Date, the Manager hereby redeems all of the membership interests in the Manager held by Brockman Jr. for $1,322,740.

2.3.   Manager Ownership/Participation in Management Fees etc. The Brockmans shall not be entitled to receive and shall not participate in, in each case directly or indirectly, any portion of the profits or losses of the Manager, including without limitation the Management Fees, allocable to and/or arising from any period on or after December 31, 2018 (the "Separation Date"). From and after the Effective Date, the Brockmans shall cease to own and shall not be permitted to own (directly or indirectly) any equity or economic interest in the Manager.

2.4.   Participation in the Management of the Fund, General Partner and Manager. From and after the Effective Date, the Brockmans shall not participate, directly or indirectly, in the management or governance of the Fund, the General Partner or the Manager (whether as a manager, officer or otherwise).

2.5.   Redemption of Brockman Sr.'s Interest in the General Partner. Effective as of the Effective Date, the General Partner hereby redeems all of the membership interests of Brockman Sr. in the General Partner for $1 (One US Dollar).

2.6.   General Partner Ownership/Participation in Carried Interests etc.   From and after the Separation Date, the Brockmans shall not be entitled to receive and shall not participate in, whether directly or indirectly, any portion of the profits or losses of the General Partner, including without limitation the Carried Interest. From and after the Effective Date, the Brockmans shall cease to own and shall not be permitted to own (directly or indirectly) any equity or economic interest in the General Partner.

2.7.   Transactions with the Brockmans. The Brockmans shall not, directly or indirectly, enter into any transactions with the Fund or its Portfolio Investments. The Brockmans shall use their best efforts to reduce and eliminate any and all transactions, whether direct or indirect, with the Manager and/or the General Partner; provided that to the extent any such transactions cannot be eliminated then such transactions shall be (a) in writing and (b) on arm's-length and market terms, and the General Partner and the Manager shall provide copies of all such agreements (and any amendments thereto) to the Limited Partner.

2.8.   Activities of the General Partner and the Manager. From and after the date hereof, (a) the General Partner shall have no business or other activities other than acting as the general partner of the Fund and activities incidental thereto and (b) the Manager shall have no business or other activities other than acting as the manager of the Fund and activities incidental thereto. For the avoidance of doubt, the foregoing shall in no way prohibit Affiliates of the General Partner or the Manager, including but not limited to Burnett and any other principal or employee of the General Partner, the Manager or their respective Affiliates, from conducting

AP0518

any other business or activity, including but not limited to providing investment advisory services to private investment funds.

3. **Standstill Agreement**. As of the Effective Date, that certain letter agreement dated February 7, 2019 (as amended) by and among the Fund, the Limited Partner, the General Partner, the Manager and the other parties thereto is hereby terminated (the "Standstill").

4. **Representations and Warranties of the Parties**. Each Party (as to itself only), severally and not jointly, represents and warrants to the other Parties as of the date hereof as follows:

4.1. <u>Authorization of Agreement</u>. Such Party is (a) an individual or (b) an entity duly organized validly existing and in good standing under the laws of the jurisdiction of its organization. Such Party has the full right, power and authority to enter into, and to consummate the transactions contemplated by, this Agreement and otherwise to carry out its respective obligations hereunder, and the execution and delivery of, and performance by such Party of its obligations contemplated by, this Agreement have been duly authorized by all necessary corporate or similar action on the part of such Party, to the extent applicable. This Agreement constitutes a valid and legally binding obligation of such Party, enforceable against such Party in accordance with its terms.

4.2. <u>No Conflicts</u>. Neither the execution and delivery of this Agreement, nor the consummation of the transaction contemplated hereby, does or will (a) if such Party is not an individual, violate any provision of such Party's organizational documents, (b) conflict with, violate or constitute a default under any agreement, credit facility, debt or other instrument or understanding to which such Party is bound, or (c) violate any statute, regulation, rule, injunction, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency, or court to which such Party is subject.

4.3. <u>Consents</u>. No authorization, consent, approval or other order of, or declaration to or filing with, any governmental agency or body or other person is required for the valid authorization, execution, delivery or performance by such Party of this Agreement or the consummation of the transaction contemplated hereby.

5. **Releases**.

In partial consideration of the Fund, the Limited Partner, the Manager and the General Partner entering into this Agreement, each of the Brockmans, on behalf of himself and his heirs, executors, administrators, successors and/or assigns (collectively, the "Releasors"), hereby releases, effective as of the date of this Agreement, (a) the Fund, the Limited Partner, the Manager and the General Partner and (b) each and every director, manager, officer, employee, member, owner, agent and/or attorney of the Fund, the Limited Partner, the Manager and/or the General Partner and any of the heirs, executors, administrators, successors and assigns of any of those persons (each person described in the foregoing clauses (a) and (b), a "Releasee"), from any and all actions, causes of action, suits, debts, obligations, liabilities, contracts, controversies, agreements, promises, damages, judgments, claims or demands whatsoever, of whatever kind and based on whatever legal theory, that any Releasor ever had, now has or hereafter can, shall or may have against any Releasee, for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to and including the date of this Agreement; provided that, notwithstanding the foregoing, none of the Brockmans releases or waives any rights to which he is entitled under this Agreement.

-7-

AP0519

6. **Miscellaneous.**

This Agreement shall be governed by and interpreted in accordance with the laws of the State of Delaware, excluding its conflicts of laws principles. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which taken together shall constitute a single agreement. This Agreement may not be assigned or delegated by any party without the consent in writing of the other parties. This Agreement may not be amended, and no provision may be waived, without the consent in writing of the other parties. This Agreement constitutes the entire agreement among the parties regarding the subject matter hereof. If any provision of this Agreement is not fully valid and enforceable, then such provision will be valid and enforceable the fullest extent permitted and such invalidity or unenforceability shall not affect any other provision hereof. The parties hereto will take all further actions reasonably necessary to effect the intent and purposes hereof. The parties hereto agree that nothing in this Agreement shall affect the Limited Partner's status as a limited partner or cause the Limited Partner to be considered a general partner of the Fund.

**[SIGNATURE PAGES FOLLOW]**

AP0520

**EXHIBIT 3**

AP0521

| | |
|---|---|
| **From:** | asutton@falcatacapital.com |
| **Sent:** | Thursday, July 2, 2020 8:38 AM |
| **To:** | 'Alexanders Bermuda'; ''Glenn Ferguson'' |
| **Subject:** | RE: Q3 Management Fee Call - Falcata Tech Investment Fund I LP |
| **Attachments:** | Falcata Capital Call #9.pdf |

Gentlemen

Just a gentle reminder the capital call due July 1, 2020 has not been received
If you have remitted, please provide tracking information

Best

Andrew

---

Andrew Sutton
ASutton@FalcataCapital.com
+1.917.561.5614

**From:** asutton@falcatacapital.com <asutton@falcatacapital.com>
**Sent:** Tuesday, June 16, 2020 1:34 PM
**To:** 'Alexanders Bermuda' <jafw@alexanders.bm>; ''Glenn Ferguson'' <glenn@fclawyers.com.au>
**Cc:** 'Robert Burnett' <RBurnett@FalcataCapital.com>
**Subject:** Q3 Management Fee Call - Falcata Tech Investment Fund I LP

Gentlemen

Please find attached the capital call notice for Q3 2020 management fees
The call is due July 1

Hope you are safe and well

B.r.
Andrew

---

Andrew Sutton
ASutton@FalcataCapital.com
+1.917.561.5614

1

AP0522

# **EXHIBIT 4**

AP0523

**Falcata Capital LLC**
**10000 Memorial Dr.**
**Suite 200**
**Houston, TX 77024**

August 4, 2020

Point Investments Ltd.
Suite 539, 48 Par-La-Ville Road
Hamilton HM11 Bermuda
Attn: Evatt Tamine, Director
etamine@tangarra.com

Re: Falcata Tech Investment Fund – Notice of Default

Dear Mr. Tamine:

This letter is being delivered to you as the representative of Point Investments Ltd. ("Point") as set forth in the books and records of Falcata Tech Investment Fund I, L.P., a Cayman Islands Exempted Limited Partnership (the "Fund"), and in in accordance with Section 13.1 of the Fund's Amended and Restated Exempted Limited Partnership Agreement, dated April 20, 2018 (as amended by that certain Master Transaction Agreement dated July 1, 2019, the "LPA"). Terms used herein but not otherwise defined shall have the meaning set forth in the LPA.

By this letter, Falcata Capital LLC, as manager of the Fund (the "Manager") and as the authorized delegate of FTI GP I LLC, the Fund's general partner (the "General Partner") hereby gives notice to Point, as the limited partner of the Fund, pursuant to Section 5.4(a) of the LPA, that Point has failed to make Capital Contributions required to be made to the Fund pursuant to the terms of the LPA.

Pursuant to the enclosed Capital Call #9, Point was required to make a Capital Contribution to the Fund in an amount equal to $625,000 on or prior to July 1, 2020 (the "Default Amount"). In addition to failing to make such Capital Contribution, Point has also failed to respond to a second notice issued to Point via the enclosed email dated July 2, 2020, reminding Point of its obligations to respond to Capital Call #9. Point was required to fund Capital Call #9 on or before July 1, 2020.

Pursuant to Section 5.4(a) of the LPA, Point has five business days from the date of this notice to remedy this default by funding in full the Default Amount. Such Default Amount shall be payable in accordance with the wire instructions set forth in the enclosed Capital Call #9. If this failure to make a Capital Contribution has not been cured by the end of such five business day period, then Point will be designated as in Default by the Manager, as the authorized delegate

AP0524

of the General Partner. In the event that Point is designated as in Default, Point shall be a Defaulting Partner and shall be subject to any and all of the rights and remedies afforded to the General Partner and the Fund under the LPA. The General Partner hereby reserves all rights under the LPA and related agreements, and at law.

Sincerely,

Robert Burnett
Managing Member
Falcata Capital LLC

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | **Chapter 15** |
| **POINT INVESTMENTS, LTD. (IN LIQUIDATION)** | **Case No. 22-10261 (JKS)** |
| **Debtor in a Foreign Proceeding.** [1] | |
| **FTI GP I, LLC on behalf of FALCATA TECH INVESTMENT FUND I, L.P.,** | |
| **Plaintiff,** | |
| **v.** | **Adv. Proc. No. 23-50122 (JKS)** |
| **POINT INVESTMENTS, LTD.,** | **Re: A.D.I. 10** |
| **Defendant.** | |

## PRETRIAL CONFERENCE ORDER

 **IT IS HEREBY ORDERED** that a pretrial conference has been scheduled in the above-captioned case for the following date and time:

| DATE | TIME |
|---|---|
| April 12, 2023 | 10:00 a.m. (ET) |

Dated: March 6th, 2023
Wilmington, Delaware

**J. KATE STICKLES**
**UNITED STATES BANKRUPTCY JUDGE**

---

[1]     Debtor Point Investments, Ltd. (the "Debtor") is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769.  The Debtor's registered office is located at Chancery Hall, 1st Floor, 52 Reid Street, Hamilton HM 12, Bermuda.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| **POINT INVESTMENTS, LTD.**<br>**(IN LIQUIDATION),** | **Case No. 22-10261 (JKS)** |
| Debtor in a Foreign Proceeding.[1] | **Hearing Date:**<br>**April 18, 2023 at 10:00 a.m. (ET)**<br><br>**Objection Deadline:**<br>**April 6, 2023 at 4:00 p.m. (ET)** |

## MOTION OF FTI GP I, LLC
## ON BEHALF OF FALCATA TECH INVESTMENT
## FUND I, L.P. FOR DETERMINATION THAT THERE IS NO AUTOMATIC
## STAY, OR IN THE ALTERNATIVE SEEKING RELIEF
## FROM THE AUTOMATIC STAY TO PROCEED WITH ADVERSARY PROCEEDING

FTI GP I, LLC (the "General Partner") on behalf of Falcata Tech Investment Fund I, L.P.

(the "Fund"), by and through its undersigned counsel, respectfully submits this motion for an order

pursuant sections 105(a), 1520(a), and 362(d) of title 11 of the United States Code (the

"Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), and Rule 4001-1 of the Local Rules of the United States Bankruptcy Court for the District

of Delaware (the "Local Rules") for a determination that there is no stay of the adversary

proceeding entitled *FTI GP I, LLC on behalf of Falcata Tech Investment Fund I, L.P. v. Point*

*Investments, Ltd.*, Adv. Proc. No. 23-50122 (JKS) (the "Adversary Proceeding") currently pending

in this Court, or in the alternative, seeking relief from the stay arising under section 1520(a) of the

Bankruptcy Code.  In support of the Motion, the General Partner states as follows:

---

[1] Point Investments, Ltd. ("Point") is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769.  Point's registered office is located at Chancery Hall, 1st Floor, 52 Reid Street, Hamilton HM 12, Bermuda.

-1-

## **BACKGROUND**

1.      On September 16, 2020, the registered owner of Point Investments, Ltd.'s ("Point") common shares, Spanish Steps Holdings Ltd., filed a petition in the Supreme Court of Bermuda seeking a just and equitable winding up of Point's affairs (the "Wind-up Petition") under the Bermuda Companies Act 1981 (as amended), as supplemented by common law, governing the liquidation of companies in Bermuda, and the Companies (Winding-Up) Rules 1982 (as amended) (the "Bermuda Proceeding").  *See Verified Petition For (I) Recognition Of Foreign Main Proceeding, (II) Recognition Of Foreign Representatives, And (III) Related Relief Under Chapter 15* [ECF No. 3] (the "Chapter 15 Petition") ¶ 17.  On October 29, 2021, the Supreme Court of Bermuda appointed Andrew Childe and Richard Lewis of FFP Limited and Mathew Clingerman of Krys & Associates (Bermuda) Ltd. as the Joint Provisional Liquidators of Point.  *Id.*  On February 18, 2022, the Supreme Court of Bermuda granted the Wind Up Petition.  *Id.* at ¶ 19.

2.      On March 29, 2022 (the "Chapter 15 Petition Date"), Point filed the Chapter 15 Petition for Recognition in this Court.  As set forth in the Chapter 15 Petition, Point sought recognition under chapter 15 of the Bankruptcy Code in order to prevent the Internal Revenue Service from levying and seizing Point's assets located in the United States.  *Id.* at ¶ 3.  Point did not provide notice to or serve the General Partner or the Fund with the Chapter 15 Petition.

3.      On April 22, 2022, the Court entered the *Order Granting Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Related Relief Under Chapter 15* (the "Recognition Order") [ECF No. 34].  In relevant part, the Recognition Order provides that "[a]ll relief protections afforded to foreign main proceedings under section 1520 of the Bankruptcy Code is hereby granted to the Bermuda Proceeding, the Debtor [Point], the Debtor's property located within the United States and the foreign

AP0528

representatives, as applicable."  Recognition Order ¶ 5.  Point did not provide notice to or serve the General Partner or the Fund with the Recognition Order.

4.      Prior to the Chapter 15 Petition Date, on or about April 20, 2018, Point became a limited partner of the Fund when it entered into an agreement to purchase and subscribe to an interest as limited partner in the Fund with a capital contribution, which was accepted on behalf of the Fund by the General Partner.  As a limited partner, Point agreed to be bound by the terms and conditions set forth in the Amended and Restated Exempted Limited Partnership Agreement, dated April 20, 2018 (the "<u>Limited Partnership Agreement</u>") and the Master Transaction Agreement, dated July 1, 2019 (the "<u>Master Transaction Agreement</u>", and with the Limited Partnership Agreement, the "<u>Fund Agreements</u>").  *See* Case No. 23-50122 ("<u>AP</u>") ECF No. 1, Exs. 1 & 2.

5.      The Fund Agreements set forth obligations for Point, as limited partner, and rights and remedies that the General Partner can exercise in the event of Point's default under the Fund Agreements.  *See* Limited Partnership Agreement §§ 5.2(d), 5.4(a); Master Transaction Agreement, §§ 1.2, 1.3.

6.      On June 16, 2020, the manager of the Fund, Falcata Capital LLC (the "<u>Manager</u>"), sent Point a demand letter requesting a Capital Contribution in the amount of $625,000 due on July 1, 2020 in accordance with the procedures set forth in the Fund Agreements (the "<u>July Capital Contribution</u>").

7.      On August 4, 2020, following Point's failure to make the July Capital Contribution, the Manager sent Point a default letter (the "<u>Default Notice</u>") stating that Point had not paid the July Capital Contribution as required under the Limited Partnership Agreement (the "<u>Default</u>"), and in accordance therewith, Point had five business days to cure the Default.  The Default Notice further stated that if Point failed to pay the Capital Contribution within five days from the date of

AP0529

the Default Notice, Point would be designated as in Default by the Manager, and would be "subject to any all of the rights and remedies afforded to the General Partner and the Fund under the Limited Partnership Agreement." *See* AP ECF No. 1, Ex. 4.

8.      Point failed to pay the July Capital Contribution in accordance with the Default Notice, and as a result, Point is in default under the Fund Agreements.

9.      On March 3, 2023, the General Partner commenced the Adversary Proceeding, pursuant to Bankruptcy Rule 7001, which seeks to fix and liquidate amounts owed to the Fund as a result of Point's prepetition breaches of the Limited Partnership Agreement and the Master Transaction Agreement, as well as limited declaratory relief as to the contractual obligations between the parties. *See* ECF No. 45.

10.     On March 21, 2023, following the General Partner's request to Point for it to accept service of the Adversary Proceeding, Point asserted, *inter alia*, that the Adversary Proceeding violated the section 362 automatic stay and the moratorium in the Bermuda Proceeding. Any such claim is incorrect as set forth in this motion, so the General Partner makes this motion to proceed with the Adversary Proceeding before this Court.[2]

### RELIEF REQUESTED AND BASIS THEREFOR

11.     By this Motion, the General Partner respectfully requests that the Court enter an order determining that no stay of the Adversary Proceeding exists, or in the alternative, to the extent that the Court determines that the stay arising by operation of section 1520(a)(1) of the Bankruptcy Code applies to the Adversary Proceeding, granting limited relief from the automatic

---

[2] For the avoidance of doubt, the commencement of the Adversary Proceeding in Delaware does not breach the provisions of section 167(4) of the Bermuda Companies Act 1981, which includes the Bermuda moratorium. The provisions do not apply to proceedings in courts outside Bermuda. *See* Dicey, Morris & Collins on the Conflict of Laws 16th Ed., section 30-124 (discussing the functionally equivalent section 130 of the UK Insolvency Act 1986); *Re Vocalion (Foreign) Ltd [1932] 2 Ch. 196; Mazur Media Ltd. v Mazzur Media GbmH  [2004] 1 W.L.R. 2966.*

AP0530

stay for the purpose of administering the Adversary Proceeding so as to liquidate the General
Partner's claim and obtain declaratory relief as to the contractual obligations between the parties.
Additionally, to the extent applicable, the General Partner seeks a waiver of Bankruptcy Rule
4001(a)(3).

## BASIS FOR RELIEF

**A.**     **There is No Automatic Stay in a Chapter 15 Proceeding, and the Stay Authorized
Pursuant to Section 1520(a)(1) Under the Recognition Order Does Not Enjoin the
Adversary Proceeding.**

12.     An ancillary proceeding commenced under chapter 15 of the Bankruptcy Code does
not invoke section 362 in the same manner as a proceeding commenced under sections 301, 302,
or 303 of title 11. 11 U.S.C. 362(a). Indeed, by virtue of the ancillary nature of a chapter 15
proceeding and the in rem nature of the court's jurisdiction, the stay afforded under section
1520(a)(1) of the Bankruptcy Code is limited to actions against property of Point within the
territorial jurisdiction of the United States—which is not at issue in the Adversary Proceeding. *See*
11 U.S.C. 1520(a)(1).

13.     As an initial matter, section 362(a) of the Bankruptcy Code does not, by its terms,
apply in a chapter 15 proceeding as it is limited in its application to "a petition filed under section
301, 302, or 303 of [title 11 of the United States Code], . . ." 11 U.S.C. § 362(a). As a proceeding
commenced under chapter 15 of the Bankruptcy Code is not a petition under sections 301, 302, or
303 of the Bankruptcy Code, the stay under section 362 simply does not arise at the same time or
to the same extent in a chapter 15 petition. *See, e.g.*, *In re Pro-Fit Holdings Ltd.*, 391 B.R. 850,
862 (Bankr. C.D. Cal. 2008) ("Except in a chapter 15 case, the automatic stay applies from the
moment that a bankruptcy case is filed."); *In re Petition of Shimmin*, No. 22-10039-JDL, 2022 WL
9575491, at *1 n.2 (Bankr. W.D. Okla. Oct. 14, 2022) ("Unlike the filing of cases under Chapters
7, 11, 12, 13 and involuntary bankruptcies, the filing of a Petition under Chapter 15 does not

AP0531

impose the automatic stay under section 362(a)."); *In re Worldwide Educ. Services, Inc.*, 494 B.R. 494, 497 (Bankr. C.D. Cal. 2013) ("[T]he filing of the Chapter 15 petition by the Liquidator does not effectuate the automatic stay in bankruptcy . . . ." (citations omitted)).

14.     Instead, in a chapter 15 proceeding, it is the grant of recognition of a foreign main proceeding under 11 U.S.C. §1520(a)(l) that gives rise to the application of a limited stay under section 362 that is restricted to Point and the property of Point within the territorial jurisdiction of the United States.  Section 1520(a) provides:

> (a) Upon recognition of a foreign proceeding that is a foreign main proceeding—
>
>> (1) sections 361 and 362 apply with respect to the debtor **and the property of the debtor that is within the territorial jurisdiction of the United States**;
>>  . . .

11 U.S.C. § 1520(a) (emphasis added).

15.     Indeed, the court in *In re JSC Bank*, 434 B.R. 334 (Bankr. S.D.N.Y. 2010), provides useful insight into the scope of the stay arising pursuant to section 1520(a).  There, the bankruptcy court concluded:

> The phrase "within the territorial jurisdiction of the United States," as defined in section 1502(8), highlights the in rem nature of jurisdiction in a chapter 15 case and refers to tangible property within the territory of the United States and intangible property deemed under applicable nonbankruptcy law to be located within this country. *See* 11 U.S.C. § 1502(8). The definition is a source of clarity with respect to the intended scope of the automatic stay in a chapter 15 case — it applies only to property within the United States. As such, this territorial delineation serves to eliminate any doubt as to the extent of the authority of the bankruptcy court over property of a foreign debtor.

*Id.* at 342 (emphasis added).  *See also In re Agrokor d.d.*, 591 B.R. 163, 187 (Bankr. S.D.N.Y. 2018) ("Section 1520(a)(1) provides that the automatic stay will apply to all the debtor's property *that is located within the territorial jurisdiction of the United States*.  The statute refers specifically to the property of the debtor, as opposed to the property of the estate, since there is no estate in a Chapter 15 case . . . Despite this difference, the automatic effect of recognition of a foreign main

-6-

AP0532

proceeding under section 1520(a) is an imposition of a stay on any action regarding the debtor's property located in the United States." (citations omitted)).

16.     Here, the Adversary Proceeding does not run afoul of the in rem nature of section 1510(a).  Rather, it seeks limited declaratory relief as to the contractual obligations between the parties and to fix and liquidate the General Partner's claim arising out of the Default, but not to recover that claim from assets located in the United States.

17.     Moreover, section 1509(b) provides that:

> If the court grants recognition under section 1517, and subject to any limitations that the court may impose consistent with the policy of this chapter [chapter 15] – (1) the foreign representative has the capacity to sue and be sued in a court in the United States . . . .

11 U.S.C. §1509(b).

## B.     Even if the Stay Authorized Under Section 1520(a) Applies, the Adversary Proceeding is Not a Violation under Section 362.

18.     Even assuming arguendo that this Court were to determine that the Adversary Proceeding somehow conflicts with the limited stay arising under section 1520(a) although it is not against property "within the territorial jurisdiction of the United States," an adversary proceeding commenced under Bankruptcy Rule 7001 is not a violation of the automatic stay under section 362 of the Bankruptcy Code.

19.     The majority of bankruptcy courts, including courts in this district, hold that "the Code implicitly permits the filing of suit in the bankruptcy court against a debtor without violating the automatic stay." *Nat'l City Bank of Minneapolis v. Lapides (In re Transcolor Corp.)*, 296 B.R. 343, 358 (Bankr. D. Md. 2003) (citations omitted).  *See also Civic Ctr. Square, Inc. v. Ford (In re Roxford Foods, Inc.)*, 12 F. 3d 875, 878 (9th Cir. 1993) ("[T]he automatic stay [is not] applicable to a suit commenced in the same court where the bankruptcy was pending."); *Kesar, Inc. v. Uni-Marts, LLC (In re Uni-Marts, LLC)*, 405 B.R. 113, 129 (Bankr. D. Del. 2009) (collecting cases

-7-

adopting the majority view that the commencement of an adversary proceeding in the court where the bankruptcy proceeding is pending does not result in a violation of the stay under section 362).

20.      It was Point who made the decision to commence the Chapter 15 Petition in this Court, and the authority is clear that an adversary proceeding commenced pursuant to Rule 7001 is not a violation of the section 362 stay, particularly where, like here, the proceeding is equivalent to filing of a proof of claim.  Indeed, it should  not be lost on the Court that the General Partner's claims arising out of and related to Point's Default must be liquidated as a part of the winding up of its affairs at some juncture, and the Adversary Proceeding is designed to do exactly that by liquidating the General Partner's (a Delaware entity's) claim.  As such, the Court should determine that the Adversary Proceeding is not subject to the automatic stay or the stay under section 1520(a)(1).

## C.      **Cause Exists Under Section 362(d)(1) of the Bankruptcy Code.**

21.      Finally, even assuming arguendo that the Court were to determine that the Adversary Proceeding constitutes an action against property of the debtor that is within the territorial jurisdiction of the United States—which it does not; and it constitutes a violation of the automatic stay, even though applicable authority directs that it does not; "cause" exists under section 362(d)(1) for relief from the stay.

22.      As discussed *supra*, the grant of recognition of a foreign proceeding under 11 U.S.C. §1520(a)(l) gives rise to the application of the stay imposed under 11 U.S.C. §362 in respect to the debtor and its property located within the territorial jurisdiction of the United States.

23.      "The procedure for obtaining a court order for relief from the U.S. automatic stay under subsections (d) through (g) of section 362 applies in a chapter 15 case." *In re Manley Toys Ltd.*, No. 16-15374 (JNP), 2020 WL1580244, at *5 (Bankr. D.N.J. March 31, 2020) (citation omitted).

-8-

24.     A bankruptcy court has authority to terminate, annul, lift or condition the stay under 11 U.S.C. § 362(d).  After notice and a hearing, the court shall grant relief to a party in interest from the stay for "cause" pursuant to section 362(d)(l).  Except for lack of adequate protection, "cause" is not defined by § 362(d)(l), but it is a "flexible concept, is fact intensive, and is to be determined on a case-by-case basis upon consideration of the totality of the circumstances."  *In re Scarborough-St. James Corp.*, 535 B.R. 60, 67 (Bankr. D. Del. 2015) (citing *Tribune Media Servs., Inc. v. Warren Beatty (In re Tribune, Co.)*, 418 B.R. 116, 126 (Bankr. D. Del. 2009)). Further, the stay imposed under section 362 "is not meant to be absolute, and in appropriate instances relief may be granted."  *In re SCO Grp., Inc*., 395 B.R. 852, 856 (Bankr. D. Del. 2007) (citing *Wedgewood Inv. Fund, Ltd. v. Wedgewood Realty Grp., Ltd. (In re Wedgewood)*, 878 F.2d 693, 697 (3d Cir. 1989)).

25.     Courts typically evaluate whether cause exists under the *In re Rexene Prods. Co.* test, which includes:

> (a)  Whether any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit;
>
> (b)  Whether the hardship to the [non-bankrupt party] by maintenance of the stay considerably outweighs the hardship of the debtor; and
>
> (c)  Whether the creditor has a probability of prevailing on the merits.

*Izzarelli v. Rexene Prods. Co. (In re Rexene Prods. Co.),* 141 B.R. 574, 576 (Bankr. D. Del. 1992); *see also In re Abeinsa Holding, Inc.*, 2016 WL 53867039, at *2 (Bankr. D. Del. Oct. 6, 2016) (applying factors).[3]

---

[3]  Additionally, this Court has also considered general policies underlying the section 362 stay when deciding whether to grant stay relief including: (i) whether relief would result in a partial or complete resolution of the issues; (ii) lack of any connection with or interference with the bankruptcy case; (iii) whether the other proceeding involves the debtor as a fiduciary; (iv) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (v) whether the debtor's insurer has assumed full responsibility for defending it; (vi) whether the action primarily involves third parties; (vii)

AP0535

(i)  **Application of the *Rexene* Factors Shows that "Cause" Exists Under Section 362(d)(1) for Relief From the Automatic Stay.**

*Factor 1 -- Continuing the Adversary Proceeding Will Not Cause Any Great Prejudice to Point or its Estate.*

26.  Allowing the Adversary Proceeding to continue will not prejudice Point because the relief sought against Point will not materially impact or stall Point's Chapter 15 recognition proceeding as Point has already been granted recognition. Rather, the Adversary Proceeding will aid in a more expedient timeline to determine Point's and Falcata's rights, remedies, and allocated assets under the Limited Partnership Agreement. Thus, the first *Rexene* factor favors modifying the stay.

*Factor 2 -- The Hardship to the General Partner Greatly Outweighs Any Hardship to Point.*

27.  The hardship to the General Partner that would result from the Adversary Proceeding not moving forward greatly outweighs any hardship Point may experience by litigating the Complaint. The breach of contract addressed in the complaint must be formally resolved in order to determine the rights of the parties and failing to litigate the Adversary Proceeding at this stage would only postpone the inevitable and increase undue burdens of time and expense for both parties. Thus, the second *Rexene* factor also favors modifying the stay.

*Factor 3 – The General Partner has a strong Probability of Prevailing on the Claims in the Adversary Proceeding.*

---

whether litigation in another forum would prejudice the interests of other creditors; (viii) whether the judgment claims arising from the other action is subject to equitable subordination; (ix) whether the moving party's success in the other proceeding would result in a judicial lien avoidable by the debtor; (x) the interest of judicial economy and the expeditious and economical resolution of litigation; (xi) whether the parties are ready for trial in the other proceeding; and (xii) impact of the stay on the parties and the balance of harm. *In re The SCO Group, Inc.*, 395 B.R. 852, 857 (citing *In re Sonnax Indus., Inc. v. Tri Component Prods. Corp.*, 907 F.2d 1280, 1287 (2d Cir. 1990)).

AP0536

28.     Not only do the General Partner's claims in the Adversary Proceeding hold merit; they without doubt have a strong likelihood of success.  The claims derive from the express language of the Limited Partnership Agreement, and the default at issue thereunder can be proven with direct support as set forth in the Adversary Complaint and the exhibits attached thereto.  Quite simply, Point was obligated to make the July Capital Contribution and it failed to, even after due notice.  Although Point may dispute certain aspects of the default and the rights and remedies to be pursued following default, there is ample evidentiary support already submitted with the General Partner's Adversary Complaint, and no similar evidence to refute such claims.  Thus, the third *Rexene* factor also favors modifying the stay.

**D.    Waiver of the 14-Day Stay Under Rule 4001 of the Federal Rules of Bankruptcy Procedure.**

29.     Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure provides, "[a]n order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  *See* Fed. R. Bankr. P. 4001(a)(3).  As stated herein, the General Partner has, during the pendency of this matter, incurred and will continue to incur significant fees and expenses necessary to protect its rights with respect to the Fund Agreements.  Accordingly, the General Partner submits that the waiver of the 14-day stay pursuant to Rule 4001(a)(3) is necessary under the facts and circumstances of this case.

## CONCLUSION

WHEREFORE, for all the foregoing reasons, the General Partner respectfully requests that the Court (a) enter an order confirming that no stay of this Adversary Proceeding exists, or in the alternative, (b) grant relief from the stay arising under section 1520(a) of the Bankruptcy Code for "cause" and (c) grant such further relief as the Court deems just and proper.

-11-

Dated: March 23, 2023

By: _Eric D. Schwartz_____

Eric D. Schwartz (No.3134)
Daniel B. Butz (No. 4227)
Evanthea Hammer (No. 7061)
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899
Telephone: (302) 658-9200
Email: eschwartz@morrisnichols.com
       dbutz@morrisnichols.com
       ehammer@morrisnichols.com

-and-

Paul Werner (admitted *pro hac vice*)
A. Joseph Jay III (admitted *pro hac vice*)
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
2099 Pennsylvania Avenue NW, Suite 100
Washington, D.C. 20006-6801
Telephone: (202) 747-1900
Email: pwerner@sheppardmullin.com
      jjay@sheppardmullin.com

-and-

Edward H. Tillinghast, III (admitted *pro hac vice*)
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
30 Rockefeller Plaza
New York, New York 10112-0015
Telephone: (212) 653-8700
Email: etillinghast@sheppardmullin.com

*Attorneys for FTI GP I, LLC on behalf of Falcata Tech Investment Fund I, L.P.*

AP0538

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 15 |
| | ) | |
| Point Investments, Ltd., Debtor in a | ) | Case No. 22-10261 (TMH) |
| Foreign Proceeding | ) | |
| | ) | |
| Debtors. | ) | |

## ORDER OF REASSIGNMENT OF JUDGE

AND NOW, this 27th day of March 2023, it is hereby ORDERED that the above

Chapter 15 case (and all associated cases including adversary proceedings) is REASSIGNED

to the Honorable Thomas M. Horan for all further proceedings and dispositions.[1]

_Laurie Selber Silverstein_
Laurie Selber Silverstein
Chief Judge

---

[1] When filing papers, please include the initials of the Judge assigned to the case.

AP0539

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| POINT INVESTMENTS, LTD. (IN LIQUIDATION),[1] | Case No. 22-10261 (TMH) |
| Debtor in a Foreign Proceeding. | **Hearing Date: April 18, 2023 at 10:00 a.m. (ET)** |
| | **Objection Deadline: April 10, 2023 at 4:00 p.m. (ET)** |

## MOTION OF THE FOREIGN REPRESENTATIVES FOR ENTRY OF AN ORDER ENFORCING THE AUTOMATIC STAY AND FOR DAMAGES

Andrew Childe and Richard Lewis of FFP Limited, and Mathew Clingerman of Kroll Bermuda Ltd. (the "Foreign Representatives"), in their capacity as the foreign representatives of Point Investments, Ltd. (the "Debtor") in respect of the winding up proceeding pending before the Supreme Court of Bermuda (the "Bermuda Court"), Commercial Court, Case 2020: No. 300 (the "Bermuda Proceeding"), by and through the undersigned counsel, hereby move, pursuant to sections 362 and 1520 of title 11 of the United States Code (the "Bankruptcy Code") for entry of an order, substantially in the form attached hereto as **Exhibit A**, (i) enforcing the automatic stay against FTI GP I, LLC (the "General Partner"), and (ii) ordering the General Partner to pay the Foreign Representatives' fees and costs (including attorneys' fees) in connection with this Motion, the Discovery Motion (as defined below), and the Adversary Proceeding (as defined below) in light of the General Partner's willful violation of the automatic stay. In support of this Motion, the Foreign Representatives respectfully state as follows:

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

## PRELIMINARY STATEMENT

1.      The Foreign Representatives bring this Motion to enforce the protections of the automatic stay and prevent a potential creditor from circumventing the Debtor's orderly liquidation in Bermuda to the detriment of the Debtor's other stakeholders. The General Partner is the general partner of Falcata Tech Investment Fund I, L.P. ("Falcata"), an investment fund for which the Debtor is the sole limited partner. The General Partner recently commenced an adversary proceeding against the Debtor seeking monetary damages and declaratory relief without first seeking relief from the automatic stay or any determination that the stay was not applicable. *See FTI GPI I, LLC v. Point Investments, Ltd.*, Adv. Proc. No. 23-50122 (TMH) (Bankr. D. Del.) (the "Adversary Proceeding"). The General Partner alleges that the Debtor is in breach of Falcata's LPA and MTA (each as defined herein) based on events that occurred in July 2020—well before the commencement of the Bermuda Proceeding or this Chapter 15 case. As such, the Adversary Proceeding falls squarely within the scope of proceedings that are expressly barred by section 362(a)(1) of the Bankruptcy Code.

2.      In Chapter 15 cases, the automatic stay serves to channel claims against the debtor to the debtor's foreign main proceeding—just as the automatic stay in a Chapter 11 case serves to channel claims against the debtor to the Chapter 11 case. Unlike in a Chapter 11 case, there is no bankruptcy estate in a Chapter 15 case and no process whereby creditors file claims and receive a distribution—that is supposed to occur in the foreign main proceeding. In clear violation of principles of cross-border insolvency and Chapter 15, the Adversary Proceeding is an attempt to circumvent the Debtor's foreign main proceeding (the Bermuda Proceeding)—a liquidation process which will afford the General Partner the opportunity to lodge any potential claims against the Debtor and receive a distribution should such claims be adjudicated in its favor. Indeed, as a matter of Bermuda law, the General Partner is required to seek the Bermuda Court's permission

2

before commencing any proceeding against the Debtor, such as the Adversary Proceeding. The General Partner failed to do so and thus is also in violation of foreign law.

    3.    Despite this brazen violation, the General Partner has previously sought to (improperly) invoke Bermuda law when doing so would provide it with a litigation advantage. In particular, the General Partner has refused to produce documents to the Foreign Representatives in response to certain discovery demands, arguing that the Foreign Representatives are limited in what they can seek in discovery from the General Partner as a matter of Bermuda law. The General Partner is wrong that Bermuda law restricts the Foreign Representatives' ability to seek documents in this Chapter 15 case, as shown in the *Motion of the Foreign Representative for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521, Fed. R. Bankr. P. 2004, and Local Rule 2004-1* (the "Discovery Motion") filed contemporaneously herewith. While the Court need not decide that issue to determine this Motion, the General Partner's litigation tactics, including its selective invocation of Bermuda law and attempt to evade the Foreign Representatives' valid discovery efforts by commencing the Adversary Proceeding, further support enforcing the automatic stay.

    4.    In an attempt to consensually resolve these issues, the Foreign Representatives notified the General Partner in writing of its violation of the automatic stay and Bermuda law on March 21, 2023, and demanded that the Adversary Proceeding be withdrawn by March 23, 2023. The Foreign Representatives also advised the General Partner that it would have the opportunity to assert a claim in connection with the Debtor's claim adjudication process that will be administered under Bermuda law. In response, the General Partner hastily filed a motion on March 23, 2023 [D.I. 47] (the "Relief from Stay Motion")[2] belatedly seeking a determination that the

---

[2] In addition to bringing this Motion, the Foreign Representatives will be filing an objection to the Relief from Stay Motion.

AP0542

automatic stay does not apply or, in the alternative, modification of the automatic stay to allow the adversary proceeding to continue. By filing the Relief from Stay Motion, the General Partner has effectively conceded that it should have sought this Court's permission *before* commencing the Adversary Proceeding. As of the date hereof, the General Partner has not withdrawn the Adversary Proceeding.

5.     For all these reasons, and those set forth below, the Court should declare the Adversary Proceeding void *ab initio* and in violation of the automatic stay, consistent with the long-standing practice of courts in the United States to decline adjudicating creditor claims that are appropriately filed and litigated in a foreign bankruptcy proceeding.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b)(2).

7.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

8.     Pursuant to Local Rule 9013-1(f), the Foreign Representatives confirm their consent to the entry of a final order or judgment by the Court with respect to this Motion if it is determined that this Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

9.     The statutory predicates for the relief requested herein are sections 362 and 1520 of the Bankruptcy Code.

AP0543

# BACKGROUND

## I. General Background

10.     The Debtor is a private investment fund incorporated in Bermuda. On September 16, 2020, a petition with the Bermuda Court was filed seeking a winding up of the Debtor. The Foreign Representatives were appointed as joint provisional liquidators by the Bermuda Court on October 29, 2021 (the "Appointment Order"). On February 18, 2022, the Bermuda Court granted an amended petition and issued an order providing for the Debtor to "be wound up under the provisions of the Companies Act 1981 (Act)" (the "Bermuda Companies Act") and granted related relief (the "Winding Up Order").[3] Pursuant to the terms of the Appointment Order and the Winding Up Order, the Foreign Representatives were vested with certain powers, including investigating the affairs of the Debtor and obtaining information related to the Debtor's assets.

11.     On March 29, 2022, the Foreign Representatives, on behalf of the Debtor, filed a voluntary petition for relief under Chapter 15 of the Bankruptcy Code (the "Chapter 15 Case"). A detailed description of the facts and circumstances surrounding the Chapter 15 Case is set forth in the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Related Relief Under Chapter 15* [D.I. 3] (the "Verified Petition"), the *Declaration of Lilla Zuill Pursuant to 28 U.S.C. § 1746* [D.I. 4] (the "Zuill Declaration"), and the *Declaration of Adam M. Lavine Pursuant to 28 U.S.C. § 1746* [D.I. 5] (the "Lavine Declaration"). Further support for this Motion is set forth in the *Declaration of Andrew Childe in Support of (I) Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1 and (II) Motion to Enforce*

---

[3] A copy of the Winding Up Order is attached as **Exhibit 1** to the Verified Petition.

AP0544

*the Automatic Stay and for Damages* (the "Childe Declaration") filed contemporaneously herewith.

12.     On April 22, 2022, the Court entered the *Order Granting Petition For (I) Recognition Of Foreign Main Proceeding, (II) Recognition Of Foreign Representatives, And (III) Related Relief Under Chapter 15* [D.I. 34] (the "Recognition Order"). Among other things, the Recognition Order recognized the Bermuda Proceeding as a foreign main proceeding and recognized the Foreign Representatives as authorized to act on behalf of the Debtor in the Chapter 15 Case and in the United States. The Recognition Order also provides: "All relief and protection afforded to foreign main proceedings under section 1520 of the Bankruptcy Code is hereby granted to the Bermuda Proceeding, the Debtor, the Debtor's property located within the United States, and the foreign representatives, as applicable." Recognition Order, ¶ 5.

13.     On August 15, 2022, the Bermuda Court appointed the Foreign Representatives as joint permanent liquidators of the Debtor. *See Status Report Regarding Appointment of Foreign Representatives as Permanent Liquidators of the Debtor* [D.I. 41].

14.      Further background information regarding the Debtor's affairs, the Bermuda Proceeding, and the basis for this Chapter 15 Case is set forth in the Verified Petition, the Zuill Declaration, and the Lavine Declaration.

## II.     Falcata Background

15.     Falcata is an exempted limited partnership organized under the laws of the Cayman Islands. *See* Adv. Comp. Ex. 1 (LPA) (Recitals). Falcata was created to acquire, hold, and dispose of securities in the emerging technologies industry and commenced operations after execution of that certain Amended and Restated Exempted Limited Partnership Agreement dated April 20, 2018 (the "LPA"), which governs the affairs of Falcata. *See id*. at Section 1.3. Under the LPA, the General Partner serves as the general partner of Falcata and its affiliate, Falcata Capital LLC

6

AP0545

(the "Manager", and together with Falcata and the General Partner, the "Falcata Parties"), serves as manager of Falcata. *See id*. (Definitions).

16.     The terms of the partnership were amended pursuant to that certain Master Transaction Agreement dated July 1, 2019 (the "MTA"). According to the MTA, the MTA was executed because "[Falcata] and the [Debtor] desire[d] for [Falcata] to sell all of its assets and for [Falcata] to liquidate as soon as commercially practicable." Adv. Comp. Ex. 2 (MTA) Recital G.

17.     As set forth in greater detail in the Discovery Motion, the Foreign Representatives sought discovery from the Falcata Parties pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and section 1521(a)(4) of the Bankruptcy Code. The Falcata Parties resisted this discovery and commenced the Adversary Proceeding against the Debtor by filing a Complaint with this Court [Adv. Pr. D.I. 1] (the "Adversary Complaint"). The Adversary Complaint alleges that the Debtor breached its obligations under the LPA and MTA by allegedly failing to make a capital contribution payment requested by the Manager on June 16, 2020 (the "July 2020 Capital Contribution"). Adv. Compl. ¶¶ 36-41, 50-52, 59-61. The Adversary Complaint also seeks declaratory relief that the Debtor is a "Defaulting Partner" under the LPA as a result of the alleged failure to make the July 2020 Capital Contribution. *Id*. at ¶¶ 62-70.

18.     The General Partner did not seek this Court's permission to lift the automatic stay prior to filing the Adversary Complaint.

19.     On March 21, 2023, counsel to the Foreign Representatives sent a letter to the General Partner (the "Stay Violation Letter"), attached hereto as **Exhibit B**, warning that the commencement of the Adversary Proceeding constituted a willful violation of the automatic stay pursuant to sections 1520 and 362(a) of the Bankruptcy Code and demanding that the Adversary Complaint be withdrawn no later than March 23, 2023.

AP0546

20.     On March 23, 2023, the General Partner filed the Relief from Stay Motion seeking a determination that the automatic stay does not apply to the Adversary Proceeding or alternatively, modification of the automatic stay to permit the Adversary Proceeding to continue.

21.     As of the date hereof, the General Partner has not withdrawn the Adversary Complaint.

## III.     The Claims Process in the Bermuda Proceeding

22.     As detailed above, the Bermuda Court entered the Winding Up Order on February 18, 2022. Pursuant to section 167(4) of the Bermuda Companies Act, upon entry of the Winding Up Order an automatic stay of actions and proceedings against the Debtor was put into effect, similar to the automatic stay under section 362 of the Bankruptcy Code. *See* Zuill Decl. ¶ 16.

23.     On June 15, 2022, the Foreign Representatives noticed the first meeting of creditors and the first meeting of contributories in accordance with their statutory obligations under the Bermuda Companies Act. *See* Childe Decl. ¶ 5; *see also* Foreign Representatives' Status Report [D.I. 37]; Zuill Decl. ¶¶ 17, 21 (discussing the first meeting of creditors and contributories). As a potential creditor, the Foreign Representatives provided notice to Falcata, though its Cayman Islands counsel, of the first meeting of creditors. Childe Decl. ¶ 6. Falcata elected not to appear at the meeting. *Id*. Falcata likewise failed to submit a proof of debt for voting purposes in advance of that meeting. *Id*.

24.     In accordance with their obligations, the Foreign Representatives intend to give notice to potential creditors, including Falcata, requesting they file proofs of debt in the Bermuda Proceeding. *Id*. at ¶ 7. Should it wish to do so, Falcata will have the opportunity to assert any claim(s) against the Debtor in connection with the Debtor's claims adjudication process to be administered pursuant to Bermuda law. *Id*. The Foreign Representatives also intend to notice the deadlines for the claims adjudication process in this Chapter 15 Case. *Id*.

AP0547

## RELIEF REQUESTED

25.     By this Motion, the Foreign Representatives respectfully request entry of the Proposed Order (i) declaring the Adversary Proceeding void *ab initio*, (ii) ordering the General Partner to pay the Foreign Representatives' fees and costs (including attorneys' and other professionals' fees) in connection with this Motion, the Discovery Motion, and the Adversary Proceeding, and (iii) granting related relief.

## BASIS FOR RELIEF

**I.      The Adversary Proceeding Violates the Automatic Stay**

**A.      The Adversary Proceeding Violates Sections 1520 and 362(a)(1) of the Bankruptcy Code**

26.     Among the core purposes of Chapter 15 is the "fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor" as well as the "protection and maximization of the value of the [foreign] debtor's assets." 11 U.S.C. § 1501(a)(3), (4); *see also In re ABC Learning Centres Ltd.*, 728 F.3d 301, 305 (3d Cir. 2013) (quoting H.R. Rep. No. 109–31(1) at 105)); *accord In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194, at *3 (Bankr. D. Del. Nov. 20, 2012).

27.     To that end, Chapter 15 contains numerous provisions aimed at the protection of a foreign debtor and its assets. In particular, section 1520(a)(1) of the Bankruptcy Code provides that, upon recognition of a proceeding as a foreign main proceeding, the automatic stay of section 362 of the Bankruptcy Code applies "with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States." 11 U.S.C. § 1520(a)(1); *see also In re Irish Bank Resol. Corp. Ltd.*, Case No. 13-12159 (CSS), 2014 WL 9953792, at *18 (Bankr. D. Del. Apr. 30, 2014), *aff'd*, 538 B.R. 692 (D. Del. 2015) ("[T]riggering the automatic stay upon filing of recognition is one of the fundamental purposes of recognition."); *In re ABC Learning*

9

AP0548

*Centres Ltd.*, 445 B.R. 318, 336 (Bankr. D. Del. 2010), *on reconsideration in part* (Jan. 21, 2011)

("Recognizing [proceedings] as foreign main proceedings triggers the automatic stay of 362."),

*subsequently aff'd*, 728 F.3d 301 (3d Cir. 2013); *In re JSC BTA Bank*, 434 B.R. 334, 343 (Bankr.

S.D.N.Y. 2010) (holding that "the stay arising in a Chapter 15 case upon recognition of a foreign

main proceeding applies to the debtor within the United States *for all purposes*") (emphasis

added).[4]

28.     The automatic stay provided under section 362 is "one of the most fundamental

protections granted to the debtor under the Bankruptcy Code." *Izzarelli v. Rexene Products Co.*

(*In re Rexene Products Co.*), 141 B.R. 574, 576 (Bankr. D. Del.1992) (citing *Midlantic Nat'l Bank

v. New Jersey Dept. Of Envtl. Prot.*, 474 U.S. 494, 503 (1986) *reh'g denied* 475 U.S. 1090. It

serves several purposes, including providing "a debtor a breathing spell from creditors by stopping

all collection efforts and all foreclosure actions" as well as protecting creditors "by preventing

particular creditors from acting unilaterally to obtain payment from a debtor to the detriment of

other creditors." *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506, 509 (3d Cir. 1997) (citing

*Maritime Elec. Co., Inc. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991)).

29.     Relevant here, section 362(a)(1) of the Bankruptcy Code operates as a stay of "the

commencement or continuation . . . of a judicial, administrative, or other action or proceeding

---

[4] In the Relief from Stay Motion, the General Partner adopts a tortured interpretation of section 1520, effectively arguing that section 362 only applies to actions against property of the debtor located in the United States but not actions against the debtor that concern foreign property. This argument should be rejected based on a plain reading of section 1520, which expressly provides that the automatic stay under section 362 applies "with respect to *the debtor and* the property of the debtor that is located in the territorial jurisdiction of the United States." 11 U.S.C. § 1520(a)(1) (emphasis added); *see also In re JSC BTA Bank*, 434 B.R. 334, 343 (Bankr. S.D.N.Y. 2010) ("the best reading of section 1520(a)(1) … is that the stay arising in a chapter 15 case upon recognition of a foreign main proceeding *applies to the debtor within the United States for all purposes* and may extend to the debtor as to proceedings in other jurisdictions for purposes of protecting property of the debtor that is within the territorial jurisdiction of the United States") (emphasis added).

AP0549

against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1). Applying section 362(a)(1), courts have found that the commencement of an adversary proceeding in a Chapter 15 case against a foreign representative or foreign debtor is subject to the automatic stay. *See In re Irish Bank Resol. Corp. Ltd.*, No. BR 13-12159-CSS, 2019 WL 4740249, at *8 (D. Del. Sept. 27, 2019) (affirming bankruptcy court's decision that automatic stay prohibited prospective adversary proceeding to remove foreign representatives); *In re Nortel Networks UK Ltd.*, 538 B.R. 699, 704 (Bankr. D. Del. 2015) (automatic stay prevented adversary proceeding asserting prepetition claims against chapter 15 debtors).[5]

30.    In fact, the United States Bankruptcy Court for the Western District of North Carolina recently held that the protections of the automatic stay made applicable under section 1520 of the Bankruptcy Code barred the filing of a class action adversary proceeding against a Chapter 15 debtor. *See In re Sibaham Ltd*., No. 19-31537, 2020 WL 2731870, at *1 (Bank. W.D.N.C. 2020) ("As a result [of section 1520], the commencement of any legal proceedings against [the UK debtor] within the territorial jurisdiction of the United States is barred"). The Court went on to state that "the application of the automatic stay to the Class Action Lawsuit is consistent with the intended purpose of the automatic stay, which not only provides the UK Debtor respite from creditors and their collection efforts but also protects creditors by preventing particular creditors from acting unilaterally to the detriment of other creditors." *Id*. at *2.

---

[5] In each of the cases cited, the party seeking to bring an adversary proceeding appropriately requested relief from the automatic stay *prior* to commencing any proceeding against the foreign debtor or foreign representative. Here, the General Partner brazenly decided to not request relief from the stay prior to filing the Adversary Proceeding as it knew discovery deadlines were impending and the Foreign Representatives intended to move to compel.

AP0550

31.     Here, the Adversary Proceeding fits squarely within the type of proceedings that are subject to the automatic stay. Specifically, the General Partner seeks monetary damages and declaratory relief based on allegations that the Debtor breached its obligations under the LPA and MTA by failing to provide the July 2020 Capital Contribution. Given that these allegations relate to conduct that occurred prior to the commencement of the Bermuda Proceeding as well as this Chapter 15 Case, the Adversary Proceeding is barred by section 362(a)(1) of the Bankruptcy Code and should not be allowed to proceed. *See Nortel Networks UK Ltd.*, 538 B.R. at 703 ("It is equally clear that the automatic stay does, indeed, apply to the pre-Petition claims ….."). Staying the Adversary Proceeding is also consistent with the fundamental purposes of the automatic stay—to provide the Debtor with a breathing spell and to protect other stakeholders in Bermuda against unilateral action by a claimant.

32.     Accordingly, this Court should enforce the automatic stay in this Chapter 15 Case and declare the Adversary Proceeding void *ab initio*. *See Mar. Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1206 (3d Cir. 1991), *reh'g granted and opinion vacated* (Jan. 10, 1992)*, opinion reinstated on reh'g* (Mar. 24, 1992) ("Absent relief from the stay, judicial actions and proceedings against the debtor are void *ab initio*.").

### B.     Principles of International Comity and Cross-Border Insolvency Law Reinforce the Applicability of the Automatic Stay to the Adversary Proceeding

33.     Pursuant to section 167(4) of the Bermuda Companies Act, a statutory stay of actions and proceedings against the Debtor is currently in effect in Bermuda. *See* Zuill Decl. ¶ 16. By filing the Adversary Proceeding within the Debtor's Chapter 15 Case, the General Partner is: (i) violating Bermuda law to the detriment of the Debtor's other creditors; and (ii) effectively usurping the power of the Bermuda Court to adjudicate creditor claims.

AP0551

34.     The Court should not permit the Adversary Proceeding to continue, as doing so would be inconsistent with the principles of comity that underlie the purposes of Chapter 15. *See* 11 U.S.C. § 1501 (listing as an objective of Chapter 15, "cooperation between courts of the United States . . . and the courts and other competent authorities of foreign countries involved in cross-border insolvency cases."); *see also In re Energy Coal S.P.A.*, 582 B.R. 619, 627 (Bankr. D. Del. 2018) ("Particularly in the bankruptcy context, American courts have long recognized the need to extend comity to foreign bankruptcy proceedings, because the equitable and orderly distribution of a debtor's property requires assembling all claims against the limited asset in a single proceeding…."); *In re Artimm, S.r.L.*, 335 B.R. 149, 161 (Bankr. C.D. Cal. 2005) ("Deference to foreign insolvency proceedings will often facilitate the distribution of the debtor's assets in an equitable, orderly, efficient, and systematic manner, rather than in a haphazard, erratic, or piecemeal fashion.").

35.     Indeed, citing principles of international comity, multiple courts have refused to adjudicate creditor claims in the United States against a foreign debtor that is the subject of a foreign bankruptcy proceeding. *See In re Energy Coal S.P.A.*, 582 B.R. 619, 629 (Bankr. D. Del. 2018) ("U.S. bankruptcy courts have not hesitated to require foreign creditors to file their claims and to litigate in our courts if they wish a distribution from a U.S. Debtor's estate. It is equally appropriate to expect U.S. creditors to file and litigate their claims in a foreign main bankruptcy case.") (quoting *In re Artimm, S.r.L.*, 335 B.R. at 165); *In re Marconi PLC,* 363 B.R. 361, 365 (S.D.N.Y. 2007) (former section 304 "does not permit the filing by domestic creditors of adversary proceedings to establish claims against a foreign bankrupt"); *see also JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 424 (2d Cir. 2005) ("We have repeatedly

13

AP0552

held that U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding.").

36.     More generally, courts in Chapter 15 cases routinely provide deference to foreign court and foreign proceedings, "so long as the foreign proceedings are procedurally fair and … do not contravene the laws or public policy of the United States." *In re Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 114 (Bankr. S.D.N.Y. 2012) (citing *Altos Hornos*, 412 F.3d at 424); *see also Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir. 1999) ("[W]e will afford comity to foreign bankruptcies only if those proceedings do not violate the laws or public policy of the United States and if the foreign court abides by fundamental standards of procedural fairness") (citations and quotations omitted).

37.     In determining whether the foreign proceedings are procedurally fair, bankruptcy courts have considered the following factors:

> (1) Whether creditors of the same class are treated equally in the distribution of assets; (2) whether the liquidators are considered fiduciaries and are held accountable to the court; (3) whether creditors have the rights to submit claims which, if denied, can be submitted to a bankruptcy court for adjudication; (4) whether the liquidators are required to give notice to potential claimants; (5) whether there are provisions for creditors meetings; (6) whether a foreign country's insolvency laws favor its own citizens; (7) whether all assets are marshalled before one body for centralized distribution; and (8) whether there are provisions for an automatic stay and for the lifting of such stays to facilitate the centralization of claims.

*Id*. at 249.

38.     Here, there can be no question that the Bermuda Proceeding is anything but procedurally fair and having the claims asserted in the Adversary Proceeding adjudicated in the Bermuda Proceeding would not be manifestly contrary to public policy of the United States. To be sure:

AP0553

a. The Foreign Representatives "are obliged to realize the assets of the company and apply them *pari passu* in satisfaction of the company's admitted debts. Where there is a surplus of assets, the assets must be distributed amongst the contributories in accordance with their rights and interests in the Company." Zuill Decl. ¶ 22.

b. The Foreign Representatives "are officers of the Bermuda Court and are subject to control and supervision of that court [and] are also fiduciaries and are required to be independent from the management of the company, as well as independent from the company's creditors and contributories." *Id.* ¶ 18.

c. The Foreign Representatives "will call for proofs of debt and any person claiming to be a creditor (including future and contingent creditors) may prove. The liquidators must notify all known creditors and must advertise notice of a date by which debts must be lodged…. In the event a proof of debt is rejected by the liquidators, the creditor may appeal to the Bermuda Court." *Id.* ¶ 22.

39. Accordingly, declaring the Adversary Proceeding a violation of the automatic stay is supported by well-established principles of comity and cross-border insolvency law.

## II. The General Partner's Willful Violation of the Automatic Stay Necessitates an Award of Damages Equal to the Foreign Representatives' Fees and Costs

40. Section 362(k) of the Bankruptcy Code provides, in relevant part, that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1);[6] s*ee also Duby v. United States (In re Duby)*, 451 B.R. 664 (B.A.P. 1st Cir. 2011) (finding that debtors do not need to suffer actual damages to be awarded attorneys' fees for willful violations of the automatic stay). "[E]ven innocent and well-grounded violations of the automatic stay should give rise to recovery of attorneys' fees when a debtor is required to resort to a court action to vindicate rights." *In re Rodriguez*, 2012 WL 589553, *4 (Bankr. D.N.J. Feb. 22, 2012) (quoting *In re McNeil*, 128 B.R. 603, 614 (Bankr. E.D. Pa. 1991)).

---

[6] The term "individual" in section 362(k) of the Bankruptcy Code includes corporate debtors. *See In re Atl. Bus. & Cmty. Dev. Corp.*, 901 F.2d 325, 329 (3d Cir. 1990) (citing *Budget Service Co. v. Better Homes of Va.*, 804 F.2d 289, 292 (4th Cir. 1985)).

AP0554

Damages pursuant to section 362(k) of the Bankruptcy Code are available in Chapter 15 cases. *See, e.g.*, *In re Polymanov*, 571 BR. 24, 42 (Bankr. S.D.N.Y. 2017) (noting that Chapter 15 petitioner "has recourse under section 362(k) for any damages he may sustain in the event it is proven that [third party] willfully violated the automatic stay.").

41.      "To succeed on a 'willful' stay-violation claim, the debtor must prove: (1) a violation of the stay occurred; (2) the creditor had knowledge of the bankruptcy case when acting; and (3) the violation caused actual damages." *Marzullo v. Rubin*, 2014 WL 3844676, *2 (Bankr. D.N.J. Aug. 14, 2014) (citing *Lienhard v. Leighton Ambulance Assoc. (In re Lienhard)*, 498 B.R. 443, 450 (Bankr. M.D. Pa. 2013)). Willfulness "can be satisfied by showing simply that the offending party knew about a debtor's bankruptcy but proceeded with the stay violation nonetheless." *In re Miller*, 447 B.R. 425, 433 (Bankr. E.D. Pa. 2011). The Third Circuit has held that a willful stay violation occurs "when a creditor violates the stay with knowledge that the bankruptcy petition has been filed . . . [w]illfulness does not require that the creditor intend to violate the automatic stay provision, rather it requires that the acts which violate the stay be intentional." *Lansdale Fam. Rest., Inc. v. Weis Food Svc. (In re Lansdale Fam. Rest., Inc.)*, 977 F.2d 826, 829 (3d Cir. 1992); *see also In re Montgomery Ward, LLC*, 292 B.R. 49, 57 (Bankr. D. Del. 2003) ("No specific intent requirement exists."); *In re Dean*, 490 B.R. 662, 673 (Bankr. M.D. Pa. 2013) ("A creditor who presumes to 'unilaterally determine the scope and effect of the automatic stay' does so at his peril.").

42.      Here, as set forth above, the General Partner has violated the automatic stay by filing the Adversary Complaint without first seeking a determination that the automatic stay does not apply or, alternatively relief from the stay. Such a violation was willful because the General Partner was aware of the Chapter 15 Case and did not seek this Court's permission to commence

AP0555

the proceeding beforehand. Moreover, to the extent there was any doubt, the Foreign Representatives informed the General Partner that its actions violated the automatic stay by sending the Stay Violation Letter. Despite this warning, the General Partner has still failed to withdraw the Adversary Complaint.

43.     Instead, the General Partner has effectively conceded that it acted improperly by filing belatedly the Relief from Stay Motion. And while the General Partner has sought relief from the stay, it has not demonstrated in the Relief from Stay Motion why such relief should apply retroactively. *See In re Rupari Holding Corp.*, 573 B.R. 111 (Bankr. D. Del. 2017) (discussing circumstances necessary to obtain retroactive stay relief). Accordingly, the General Partner should still be liable for damages stemming from its willful violation of the automatic stay even if it prevails in obtaining relief from the stay.

44.     The Debtor has suffered damages by the filing of the Adversary Complaint as the Foreign Representatives[7] and their attorneys have been forced to, among other things: (i) analyze the Adversary Complaint and responses thereto; (ii) draft and prosecute this Motion; and (iii) draft and prosecute the Discovery Motion. Because the General Partners' actions constitute a willful violation of the automatic stay, the Foreign Representatives are entitled to an award of damages. In this case, those damages equal the Foreign Representatives' reasonable fees and costs (including attorneys' and other professionals' fees) related to the prosecution of this Motion and defending the Adversary Proceeding, at a minimum.  The Adversary Complaint also necessitated the filing of the Discovery Motion and, thus, the prosecution of the Discovery Motion has caused the Foreign

---

[7] The Foreign Representatives are professionals employed by FFP Limited and Kroll Bermuda Ltd. that bill on an hourly basis, and they are assisted by other professionals at FFP limited and Kroll Bermuda Ltd.

AP0556

Representatives damages in the amount of their associated fees and costs for such Discovery Motion. Such damages should also be awarded.[8]

## NOTICE

45.     Notice of this Motion will be provided to the following parties, through their counsel, if represented: (a) counsel to the General Partner; (b) the Office of the United States Trustee for the District of Delaware; and (c) all parties requesting notice pursuant to Rule 2002.

## CONCLUSION

WHEREFORE, the Foreign Representatives respectfully request that the Court enter the Proposed Order (i) declaring the Adversary Proceeding void *ab initio*, (ii) ordering the General Partner to pay the Foreign Representatives' fees and costs (including attorneys' and other professionals' fees) in connection with this Motion, the Discovery Motion, and the Adversary Proceeding, and (iii) granting the Foreign Representative such other and further relief as the Court deems proper.

---

[8] In the alternative, the Foreign Representatives' fees and costs associated with the Discovery Motion may be awarded as punitive damages.  11 U.S.C. § 362(k).

AP0557

Dated: March 27, 2023
      Wilmington, Delaware

Respectfully submitted,

*/s/ Stephen J. Astringer*
**KOBRE & KIM LLP**
Jacob R. Kirkham (No. 5768)
Stephen J. Astringer (No. 6375)
600 North King Street, Suite 501
Wilmington, Delaware 19801
Telephone: (302) 518-6451
Facsimile: (302) 518-6461
jacob.kirkham@kobrekim.com
stephen.astringer@kobrekim.com

-and-

Adriana Riviere-Badell (admitted *pro hac vice*)
Evelyn Baltodano Sheehan (admitted *pro hac vice*)
201 South Biscayne Boulevard, Suite 1900
Miami, Florida 33131
Telephone: (305) 967-6100
Facsimile: (305) 967-6120
adriana.riviere-badell@kobrekim.com
evelyn.sheehan@kobrekim.com

-and-

Adam M. Lavine (admitted *pro hac vice*)
800 Third Avenue
New York, New York 10022
Telephone: (212) 380-2580
Facsimile: (212) 488-1220
Adam.lavine@kobrekim.com

*Counsel to the Foreign Representatives*

AP0558

# **EXHIBIT B**

Stay Violation Letter

AP0559

# KOBRE & KIM

800 THIRD AVENUE
NEW YORK, NEW YORK 10022
WWW.KOBREKIM.COM
TEL +1 212 488 1200

March 21, 2023

**BY EMAIL AND FIRST-CLASS MAIL**

Eric D. Schwartz
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899
eschwartz@morrisnichols.com

Edward H. Tillinghast, III
Sheppard, Mullin, Richter & Hampton LLP
30 Rockefeller Plaza
New York, New York 10112
etillinghast@sheppardmullin.com

  Re: Notice of Automatic Stay Violation by FTI GP I, LLC (the "**General Partner**")

Counsel:

  We write on behalf of Andrew Childe and Richard Lewis of FFP Limited, and Mathew Clingerman of Kroll Bermuda Ltd. (the "Foreign Representatives"), in their capacity as the foreign representatives of Point Investments, Ltd. (the "Debtor"). As you know, the Debtor is the subject of a Bermuda winding-up proceeding (the "Bermuda Proceeding") as well as a Chapter 15 bankruptcy case pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

  We were shocked and dismayed by your clients' decision to commence a purported adversary proceeding against the Debtor on the same day that we were expecting to receive additional information from you in response to the Foreign Representatives' pending discovery requests. The timing of the adversary proceeding indicates that it was clearly commenced as a litigation tactic aimed at avoiding discovery obligations. We are also alarmed by your clients' apparent unwillingness to engage in a good faith commercial dialogue concerning normalizing the relations between the Debtor and Falcata Tech Investment Fund I, L.P. ("Falcata"), particularly where the General Partner of Falcata owes the Debtor various duties under applicable law.

Page 2

In response to your clients' recent actions, we write to advise you in writing that, as set forth below, the commencement of Adversary Pro. No. 23-50122 (the "Adversary Proceeding") constitutes a violation of: (i) the automatic stay applicable to the Debtor pursuant to sections 362 and 1520 of the Bankruptcy Code; and (ii) the stay of actions against the Debtor pursuant to section 167(4) of the Bermuda Companies Act.

**Accordingly, the Foreign Representatives hereby demand that you withdraw the Adversary Proceeding within two (2) business days of this letter. Failure to do so will result in the Foreign Representatives taking appropriate judicial action, including seeking an award of fees and costs for the General Partner's willful violation of the automatic stay. _See_ 11 U.S.C. § 362(k); _In re Atl. Bus. & Cmty. Corp._, 901 F.2d 325, 329 (3d Cir. 1990).**

## I.  Relevant Background

On February 18, 2022, the Supreme Court of Bermuda issued an order (the "Winding Up Order") requiring the Debtor to be wound up under the provisions of the Bermuda Companies Act 1981.  Pursuant to section 167(4) of the Bermuda Companies Act, "[w]hen a winding-up order has been made or a provisional liquidator has been appointed, no action or proceeding shall be proceeded with or commenced against the company except by leave of the Court and subject to such terms as the Court may impose."  Bermuda Companies Act s.167(4).

On March 29, 2022, the Foreign Representatives filed a verified chapter 15 petition with the Bankruptcy Court seeking recognition of the Bermuda Proceeding and related relief [D.I. 3]. On April 22, 2022, the Bankruptcy Court recognized the Bermuda Proceeding as a "foreign main proceeding" under section 1517 of the Bankruptcy Code and entered the _Order Granting Petition For (I) Recognition Of Foreign Main Proceeding, (II) Recognition Of Foreign Representatives, And (III) Related Relief Under Chapter 15_ [D.I. 34] (the "Recognition Order").

The Recognition Order grants the Debtor with, among other things, "all relief and protection afforded to foreign main proceedings under section 1520 of the Bankruptcy Code . . . ." Recognition Order ¶ 5.  This includes the application of the automatic stay provisions of section 362 of Bankruptcy Code to the Debtor.  _See_ 11 U.S.C. 1520(a)(1); _In re ABC Learning. Centres Ltd._, 445 B.R. 318, 336 (Bankr. D. Del. 2010), _on reconsideration in part_ (Jan. 21, 2011) ("Recognizing [proceedings] as foreign main proceedings triggers the automatic stay of 362."), _subsequently aff'd_, 728 F.3d 301 (3d Cir. 2013).  In turn, section 362 of the Bankruptcy Code stays "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1).

## II.  The Commencement of the Adversary Proceeding Constitutes a Willful Violation of the Automatic Stay

In the Adversary Proceeding, the General Partner alleges that the Debtor is in breach of the Amended and Restated Limited Partnership Agreement, dated April 20, 2018, and the Master Transaction Agreement, dated July 1, 2019, based on events that occurred in July 2020—well before entry of the Winding Up Order or Recognition Order. As such, the Adversary Proceeding

falls squarely within the scope of proceedings that are expressly barred by section 362(a)(1) of the Bankruptcy Code. *See In re Irish Bank Resol. Corp. Ltd.*, No. BR 13-12159-CSS, 2019 WL 4740249 (D. Del. Sept. 27, 2019); *In re Nortel Networks UK Ltd.*, 538 B.R. 699 (Bankr. D. Del. 2015); *see also Sibaham Ltd.*, No. 19-31537, 2020 WL 2731870 (Bankr. W.D.N.C. 2020).

Please be aware that a willful violation of the automatic stay allows the Foreign Representative to "recover actual damages, including costs and attorneys' fees, and in appropriate circumstances, . . . punitive damages." 11 U.S.C. 362(k). Should you continue to violate the automatic stay, the Foreign Representatives will have no choice but to seek available remedies from the Bankruptcy Court. The Foreign Representatives also fully reserve their rights to pursue all available remedies including under Bermuda law.

In accordance with their obligations, the Foreign Representatives intend to give notice to potential creditors, including Falcata, requesting they file proofs of debt in the Bermuda Proceeding. Should it wish to do so, Falcata will have the opportunity to assert any claim(s) against the Debtor in connection with the Debtor's claims adjudication process to be administered pursuant to Bermuda law.

\*   \*   \*

In case there is any doubt, and as we understand has been previously communicated by our clients to yours, the Foreign Representatives remain willing to discuss a funding of the alleged missed capital calls by the Debtor's prior management. However, they cannot do so while your clients are in clear violation of United States and Bermuda law.

We look forward to your cooperation on this matter.

Respectfully,

/s/ *Adam M. Lavine*
Adam M. Lavine
KOBRE & KIM LLP
800 Third Avenue
New York, NY 10022
(212) 488-1200
Adam.Lavine@kobrekim.com

*Attorney for the Foreign Representatives*

Page 4

CC:    Paul Werner (via email)
       A. Joseph Jay (via email)
       Meghan Stuer (via email)
       Evan Williams (via email)
       Alyssa Paddock (via email)
       Daniel B. Butz (via email)
       Evanthea Hammer (via email)
       Marc Kish (via email)
       Christopher Levers (via email)
       Nour Khaleq (via email)
       Peter Tyers-Smith (via email)
       Adriana Riviere-Badell (via email)
       Adam Lavine (via email)
       Ilona Groark (via email)
       Stephen J. Astringer (via email)

AP0563

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| POINT INVESTMENTS, LTD.<br>(IN LIQUIDATION),[1] | Case No. 22-10261 (TMH) |
| Debtor in a Foreign Proceeding. | **Objection Deadline: April 11, 2023 at 4:00 p.m. (ET)**<br>**Hearing Date: April 18, 2023 at 10:00 a.m. (ET)**<br><br>**Re: D.I. 53 and 54** |

## MOTION OF THE FOREIGN REPRESENTATIVES FOR ENTRY OF AN ORDER AUTHORIZING THEM TO REDACT AND FILE UNDER SEAL CERTAIN INFORMATION CONTAINED IN (I) THE MOTION OF THE FOREIGN REPRESENTATIVES FOR ENTRY OF AN ORDER TO CONDUCT DISCOVERY PURSUANT TO 11 U.S.C. § 1521(a)(4), FED. R. BANKR. P. 2004, AND LOCAL RULE 2004-1 AND (II) THE DECLARATION OF ANDREW CHILDE

Andrew Childe and Richard Lewis of FFP Limited, and Mathew Clingerman of Kroll Bermuda Ltd. (the "Foreign Representatives"), in their capacity as the foreign representatives of Point Investments, Ltd. (the "Debtor") in respect of the winding up proceeding pending before the Supreme Court of Bermuda, Commercial Court, Case 2020: No. 300 (the "Bermuda Proceeding"), by and through the undersigned counsel, hereby move (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), pursuant to section 107(b) of title 11 of the United States Code (the "Bankruptcy Code"); Rule 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and Rule 9018-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States District Court for the District of Delaware (the "Local Rules"): (i) authorizing the Foreign Representatives to redact and file under seal certain Confidential Information (as defined below) related to the (a) *Motion of the Foreign*

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

AP0564

*Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4),*
*Fed. R. Bankr. P. 2004, and Local Rule 2004-1* (the "Discovery Motion")[2] [D.I. 53], and
(b) *Declaration of Andrew Childe in Support of (I) Motion of Foreign Representatives for Entry*
*of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004,*
*and Local Rule 2004-1, and (II) Motion of the Foreign Representatives for Entry of an Order*
*Enforcing the Automatic Stay and for Damages* [D.I. 54] (collectively, the "Proposed Sealed
Documents"); (ii) directing that the Proposed Sealed Documents and related Confidential
Information remain under seal; and (iii) granting related relief. In support of this Motion, the
Foreign Representatives, by and through their undersigned counsel, respectfully represent:

## JURISDICTION AND VENUE

1.       This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and
1334 and the *Amended Standing Order of Reference* from the United States District Court for the
District of Delaware, dated as of February 29, 2012. This is a core proceeding under 28 U.S.C.
§ 157(b). Under Local Rule 9013-1(f), the Foreign Representatives consent to entry of a final order
under Article III of the United States Constitution. Venue of this case and the Motion in this district
is proper under 28 U.S.C. §§ 1408 and 1409.

2.       The statutory predicates for the relief requested herein are Bankruptcy Code section
107(b), Bankruptcy Rule 9018, and Local Rule 9018-1.

## BACKGROUND

3.       The applicable background is contained within the Discovery Motion, including the
details of the Chapter 15 case, the Bermuda Proceeding, and the Debtor's interest in Falcata. All
facts contained therein are incorporated by reference.

---

[2] Capitalized terms used herein but not defined shall have the meanings ascribed in the Discovery Motion.

4.     The Proposed Sealed Documents contain confidential commercial information concerning the financial affairs of Falcata and the Debtor's interest in Falcata, including information related to investment(s) made by the General Partner of Falcata and potential financial returns to the Debtor following a potential sale of certain Falcata assets (collectively, the "Confidential Information"). The Foreign Representatives will provide unredacted versions of the Proposed Sealed Documents to the Court, the U.S. Trustee, and counsel to the Falcata Parties on a confidential basis.

## RELIEF REQUESTED

5.     By this Motion, the Foreign Representatives seek entry of the Proposed Order: (i) authorizing the Foreign Representatives to redact and to file under seal the Proposed Sealed Documents; (ii) directing that the Proposed Sealed Documents, and related Confidential Information, remain under seal; and (iii) granting related relief.

## BASIS FOR RELIEF

6.     Section 107(b)(1) of the Bankruptcy Code provides:

> (b) On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may—
>
> > (1) protect an entity with respect to a trade secret or confidential research, development, or commercial information . . .

11 U.S.C. § 107(b)(1). *See also Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.)*, 21 F.3d 24, 27 (2d Cir. 1994) ("[I]f the information fits any of the specified categories, the court is *required* to protect a requesting interested party and has no discretion to deny the application."). Bankruptcy Rule 9018 allows this Court to "make any order which justice requires" with regard to the protection of, among other things, "commercial information." *See In re Global Crossing, Ltd.*, 295 B.R. 720, 725 (Bankr. S.D.N.Y. 2003) (determining that the purpose

AP0566

of Bankruptcy Rule 9018 "is to protect business entities from disclosure of information that could reasonably be expected to cause the entity commercial injury."). Unlike Rule 26(c) of the Federal Rules of Civil Procedure, "good cause" is not required under Bankruptcy Code section 107(b) or Bankruptcy Rule 9018. *Orion Pictures*, 21 F.3d at 27-28.

7.      Commercial information has been interpreted to mean "information which would result in an 'unfair advantage to competitors by providing them information as to the commercial operations of the debtor.'" *In re Alterra Healthcare Corp.*, 353 B.R. 66, 75 (Bankr. D. Del. 2006) (quoting *Orion Pictures*, 21 F.3d at 27-28). Thus, confidential commercial information may take different forms. *See, e.g.*, *Gowan v. Westford Asset Mgmt. LLC (In re Dreier LLP)*, 485 B.R. 823-24 (Bankr. S.D.N.Y. 2013) (finding investment strategies to be commercial information); *Borders*, 462 B.R. at 50 (finding information contained in a share purchase agreement to be commercial information).

8.      Here, the information set forth in portions of the Proposed Sealed Documents contains confidential commercial information concerning the financial affairs of Falcata and the Debtor's interest in Falcata, including information related to investment(s) made by the General Partner of Falcata and potential financial returns to the Debtor following a potential sale of certain Falcata assets. Disclosure of such confidential information may, among other things, impact a sale of Falcata's assets and, as a result, the Debtor's return on its investment in Falcata. Moreover, the Confidential Information may be subject to the confidentiality provisions contained in Falcata's Amended and Restated Exempted Limited Partnership Agreement dated April 20, 2018, attached to the Discovery Motion as **Exhibit B**.

9. For the foregoing reasons, the Foreign Representatives submit that the Confidential Information contained in the Proposed Sealed Documents satisfies Bankruptcy Code section 107(b) and the public disclosure of such information is likely to harm the parties in interest.

## CERTIFICATION OF COUNSEL

10. Pursuant to Local Rule 9018-1(d), undersigned counsel certifies that prior to filing this Motion, counsel to the Foreign Representatives met and conferred with counsel to the Falcata Parties and have reached agreement regarding the scope of the proposed redactions.

## NOTICE

11. Notice of this Motion will be provided to the following parties, through their counsel, if represented: (a) counsel to the Falcata Parties; (b) the Office of the United States Trustee for the District of Delaware; and (c) all parties requesting notice pursuant to Rule 2002.

## NO PRIOR REQUEST

12. No prior motion for the relief requested herein has been made to this or any other court.

**WHEREFORE**, the Foreign Representatives respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A,** granting the relief requested in the Motion and such other and further relief as the Court deems appropriate.

Dated: March 30, 2023
      Wilmington, Delaware

Respectfully submitted,

*/s/ Stephen J. Astringer*

**KOBRE & KIM LLP**
Jacob R. Kirkham (No. 5768)
Stephen J. Astringer (No. 6375)
600 North King Street, Suite 501
Wilmington, Delaware 19801
Telephone: (302) 518-6451
Facsimile: (302) 518-6461
jacob.kirkham@kobrekim.com
stephen.astringer@kobrekim.com

-and-

Adriana Riviere-Badell (admitted *pro hac vice*)
Evelyn Baltodano Sheehan (admitted *pro hac vice*)
201 South Biscayne Boulevard, Suite 1900
Miami, Florida 33131
Telephone: (305) 967-6100
Facsimile: (305) 967-6120
adriana.riviere-badell@kobrekim.com
evelyn.sheehan@kobrekim.com

-and-

Adam M. Lavine (admitted *pro hac vice*)
800 Third Avenue
New York, New York 10022
Telephone: (212) 380-2580
Facsimile: (212) 488-1220
adam.lavine@kobrekim.com

*Counsel to the Foreign Representatives*

AP0569

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| POINT INVESTMENTS, LTD. (IN LIQUIDATION),[1] | Case No. 22-10261 (TMH) |
| Debtor in a Foreign Proceeding. | **Hearing Date: April 18, 2023 at 10:00 a m. (ET)** |
| | **Objection Deadline: April 10, 2023 at 4:00 p.m. (ET)** |

## MOTION OF THE FOREIGN REPRESENTATIVES FOR ENTRY OF AN ORDER TO CONDUCT DISCOVERY PURSUANT TO 11 U.S.C. § 1521(a)(4), FED. R. BANKR. P. 2004, AND LOCAL RULE 2004-1

Andrew Childe and Richard Lewis of FFP Limited, and Mathew Clingerman of Kroll Bermuda Ltd. (the "Liquidators" or "Foreign Representatives"), in their capacity as the joint liquidators and foreign representatives of Point Investments, Ltd. (the "Debtor") in respect of the winding up proceeding pending before the Supreme Court of Bermuda (the "Bermuda Court"), Commercial Court, Case 2020: No. 300 (the "Bermuda Proceeding"), by and through the undersigned counsel, hereby move, pursuant to section 1521(a)(4) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules" or "Rules"), and Rule 2004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), authorizing the issuance of, and directing compliance with subpoenas, containing discovery requests substantially in the form attached to the Proposed Order as **Exhibit 1** (the "Subpoenas"), for the production of documents and testimony from each of FTI GP I, LLC (the "General Partner"), Falcata Capital LLC (the "Manager"), and Falcata Tech Investment Fund

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

I L.P. ("Falcata", and together with the General Partner and the Manager, the "Falcata Parties"). In support of this Motion, the Foreign Representatives rely upon the *Declaration of Andrew Childe in Support of (I) Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1 and (II) Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay* (the "Childe Declaration") filed contemporaneously herewith. In further support of the Motion, the Foreign Representatives respectfully state as follows:

## PRELIMINARY STATEMENT

1.     Through this Motion, the Foreign Representatives seek authorization to issue the Subpoenas to the Falcata Parties. The information requested in the Subpoenas is critical to the effective discharge of the Foreign Representatives' duties in the Bermuda Proceeding and is consistent with this Court's prior order authorizing the Foreign Representatives "to seek discovery [and] examine witnesses . . . concerning the Debtor's assets, affairs, rights, obligations, or liabilities." *Order Granting Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Related Relief Under Chapter 15* [D.I. 34] (the "Recognition Order").

2.     The Debtor is the sole limited partner of Falcata. Prior to the appointment of the Liquidators, former management of the Debtor elected not to make a capital contribution to Falcata for the limited purpose of meeting management fees. Following their appointment, the Foreign Representatives commenced an investigation into: (a) the reasons for, and circumstances surrounding, the alleged missed capital contribution; (b) the General Partner's subsequent decision to declare the Debtor a "defaulting partner"; and (c) the consummation and purpose of the Master Transaction Agreement, dated July 1, 2019 (discussed further below).

2

3.     Without conceding that the Debtor was ever properly designated as a "defaulting partner," the Foreign Representatives attempted to engage with the Falcata Parties to seek information and to normalize the Debtor's commercial relationship with the Falcata Parties. Indeed, the Foreign Representatives even offered to discuss funding of the alleged missed capital call as well as future capital calls.

4.     The Falcata Parties have rebuffed the Foreign Representatives at every turn. They failed to disclose relevant information requested by the Foreign Representatives, and now, the General Partner has commenced affirmative litigation against the Debtor in willful violation of the automatic stay.[2]

5.     The Falcata Parties' motivations appear to be two-fold. *First*, the Falcata Parties appear to have commenced the Adversary Proceeding as a means of avoiding their discovery obligations under section 1521(a)(4) and Rule 2004. *Second*, the Falcata Parties wish to weaponize the Debtor's alleged prepetition default as a means to generate a windfall for the General Partner. Indeed, a representative of the Falcata Parties has indicated that the General Partner intends to exercise certain draconian remedies against the Debtor that would result in the General Partner paying to itself ███████████ ███████████ ███████ amounts otherwise payable to the Debtor as Falcata's limited partner. In other words, the General Partner—whose primary role is to manage Falcata's investment and who, in comparison to the Debtor, supplied a relatively small amount of capital—appears to maintain that it is entitled to significant amounts of the total realizable value of Falcata's assets, including amounts that arise from the Debtor's principal investment (in addition to the millions the General Partner and Manager have generated in various

---

[2] Contemporaneously herewith, the Foreign Representatives have filed the *Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay* (the "<u>Stay Motion</u>"). As set forth in the Stay Motion, the General Partner willfully violated the automatic stay by commencing the action captioned as, *FTI GPI I, LLC v. Point Investments, Ltd.*, Adv. Proc. No. 23-50122 (TMH) (Bankr. D. Del.) (the "<u>Adversary Proceeding</u>").

3

fees). The General Partner's position appears to be based on a tortured reading of Falcata's limited partnership agreement and a misapprehension of Cayman Islands law.

6.      But the Court need not—and should not—determine the merits of this Cayman Islands law issue. Instead, the Court need only consider whether, as a matter of U.S. bankruptcy law, the Foreign Representatives are entitled to discovery from the Falcata Parties concerning the topics set forth in the Subpoenas, including those concerning the alleged missed capital call, the purported default, and the Falcata Parties' plans with respect to its treatment of the Debtor on account of its capital investment.

7.      All such topics concern the assets and affairs of the Debtor. Therefore, for that reason, and those set forth more fully below, the Court should authorize the issuance of the Subpoenas and the Falcata Parties' compliance therewith.

## JURISDICTION AND VENUE

8.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b)(2).

9.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     Pursuant to Local Rule 9013-1(f), the Foreign Representatives confirm their consent to the entry of a final order or judgment by the Court with respect to this Motion if it is determined that this Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

11.     The statutory predicates for the relief requested herein are section 1521(a)(4) of the Bankruptcy Code, Bankruptcy Rules 2014 and 9016, and Local Rule 2004-1.

4

## BACKGROUND

### I.    General Background

12.    The Debtor is a private investment fund incorporated in Bermuda. On September 16, 2020, a petition was filed with the Bermuda Court seeking a winding up of the Debtor. The Foreign Representatives were appointed as joint provisional liquidators by the Bermuda Court on October 29, 2021 (the "Appointment Order"). On February 18, 2022, the Bermuda Court granted an amended petition and issued an order providing for the Debtor to "be wound up under the provisions of the Companies Act 1981 (Act)" (the "Bermuda Companies Act") and granted related relief (the "Winding Up Order").[3]

13.    Pursuant to the terms of the Appointment Order and the Winding Up Order, the Foreign Representatives are vested with certain powers, including investigating the affairs of the Debtors and obtaining information related to the Debtor's assets.

14.    On March 29, 2022, the Foreign Representatives filed a voluntary petition for relief under Chapter 15 of the Bankruptcy Code (the "Chapter 15 Case"). A detailed description of the facts and circumstances surrounding the Chapter 15 Case is set forth in the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Related Relief Under Chapter 15* [D.I. 3] (the "Verified Petition"), the *Declaration of Lilla Zuill Pursuant to 28 U.S.C. § 1746* [D.I. 4] (the "Zuill Declaration"), and the *Declaration of Adam M. Lavine Pursuant to 28 U.S.C. § 1746* [D.I. 5] (the "Lavine Declaration").

15.    On April 22, 2022, the Court entered the Recognition Order. Among other things, the Recognition Order recognized the Bermuda Proceeding as a foreign main proceeding and recognized the Foreign Representatives as authorized to act on behalf of the Debtor in the Chapter

---

[3] A copy of the Winding Up Order is attached as **Exhibit 1** to the Verified Petition.

AP0574

15 Case and in the United States. The Recognition Order also provides that the Foreign Representatives "are entitled to seek discovery, examine witnesses, seek and take evidence, and deliver or obtain information concerning the Debtor's assets, affairs, rights, obligations, or liabilities pursuant to section 1521(a)(4) of the Bankruptcy Code." *See* Recognition Order ¶ 6.

16.     On August 15, 2022, the Bermuda Court appointed the Foreign Representatives as joint permanent liquidators of the Debtor. *See Status Report Regarding Appointment of Foreign Representatives as Permanent Liquidators of the Debtor* [D.I. 41].

## II.     **Falcata Background**

17.     Falcata is an exempted limited partnership organized under the laws of the Cayman Islands. Falcata was created to acquire, hold, and dispose of securities in the emerging technologies industry and commenced operations after execution of the Amended and Restated Exempted Limited Partnership Agreement dated April 20, 2018 (the "LPA"), which governs Falcata's affairs. Attached hereto as **Exhibit B** is a true and correct copy of the LPA. The LPA is governed by Cayman Islands law.

18.     Though the LPA was drafted in a way which contemplates multiple limited partners, there was never a limited partner other than the Debtor. The General Partner is likewise the only general partner of Falcata and is responsible for its management, control, and operation. *See* LPA § 2.1. The Manager is affiliated with the General Partner and, among other things, provides portfolio management and administrative services to Falcata for a fee. *See* LPA § 7.1(a).

19.     Under the terms of the LPA, the Debtor committed to providing funding of $1 billion to Falcata. *See* LPA § 5.1. As of the date hereof, the Debtor has provided aggregate capital contributions of approximately ███████ Upon information and belief, Falcata has made several investments, and currently has one primary investment: ████████████████ ████████ (the "Investment").

6

20.    The terms of the Partnership were amended pursuant to that certain Master Transaction Agreement dated July 1, 2019 (the "MTA"). Attached hereto as **Exhibit C** is a true and correct copy of the MTA. According to the MTA, the MTA was executed because "[Falcata] and the [Debtor] desire[d] for [Falcata] to sell all of its assets and for [Falcata] to liquidate as soon as [was] commercially practicable . . . ." *See* MTA Recital G. Among other things, the MTA required management fees to be paid to the Manager according to a schedule set out in the MTA. *See* MTA § 1.21.

21.    On August 4, 2020, Robert Burnett, the Managing Member of the Manager, sent a letter to Evatt Tamine,[4] purporting to give notice under the LPA that the Debtor failed to make a capital contribution of $625,000 on July 1, 2020 to cover applicable management fees (the "Burnett Letter"). The Burnett Letter claimed that because the Debtor failed to make this payment, it would be deemed to be a "defaulting partner" under the LPA. Upon information and belief, no further demands for subsequent capital contributions have been made.

### III.    The Discovery Requests

####     A.    The Foreign Representatives' Informal Requests for Information

22.    Following their appointment in October 2021, the Foreign Representatives contacted the Falcata Parties[5] on November 3, 2021, providing a copy of the Appointment Order and requesting certain information related to the Debtor's interest in Falcata.[6] In December 2021, Cayman Islands counsel for the Falcata Parties told the Foreign Representatives that because the

---

[4] Mr. Tamine is a former director of the Debtor. *See* Verified Petition, ¶¶ 15-16.
[5] As noted above, the Manager and General Partner are affiliates and act on behalf of Falcata. At different times, individuals have stated they are acting on behalf of Falcata, the Manager, and/or the General Partner. Similarly, at times, counsel has advised that they represent all the Falcata Parties, or, at times, the Manager and the General Partner. Counsel has also indicated that it was producing documents in response to the Discovery Requests (defined below) on behalf of all of its clients. For the purposes of this Motion, the Foreign Representatives assume that all negotiations occurred with the Falcata Parties unless explicitly stated.
[6] Similar to the appointment of a trustee under the Bankruptcy Code, under Bermuda law, the Foreign Representatives are empowered to investigate the affairs of a debtor.

AP0576

Debtor was designated as a "defaulting partner" under the LPA, it was not entitled to this information. Over the next year, the parties exchanged correspondence and engaged in discussions regarding the Foreign Representatives' information requests, the purported default, and potential consensual resolutions. Without conceding that the Debtor was ever properly designated as a "defaulting partner," the Foreign Representatives offered to discuss a funding of the alleged missed capital call as well as subsequent capital contributions. Childe Decl. ¶ 8.

23.     In response, it was indicated to the Foreign Representatives that, as a result of the Debtor's alleged status as a "defaulting partner," the General Partner would seek to retain significant amounts of the total value of Falcata's assets, including amounts that arise from the Debtor's principal investment. Examples were provided to the Foreign Representatives, which indicated that this windfall to the General Partner would exceed ████████—an amount in excess of 50% of the realizable value of Falcata's investments in those examples. The Foreign Representatives have therefore sought information from the Falcata Parties to understand the basis for the General Partner to retain such amounts, to enable the Foreign Representatives to assess if they are justified or otherwise. Thereafter, the Falcata Parties failed to provide adequate legal support for the position that the General Partner may be entitled to such a windfall, and also refused to provide any detail about the calculation it would employ when determining the waterfall of payments owed to the Debtor or others after a sale of the Investment. *Id.* ¶ 9.

**B.     The Foreign Representatives' Document Requests and the Falcata Parties' Deficient Responses Thereto**

24.     Reaching impasse, on December 9, 2022, counsel to the Foreign Representatives sent a letter (the "December 9 Letter") to U.S. counsel to the Falcata Parties enclosing document

AP0577

requests and interrogatories (the "Discovery Requests").[7] A copy of the December 9 Letter and

corresponding Discovery Requests is attached hereto as **Exhibit D**.

25.     Each of the Discovery Requests specifically relates to the assets, liabilities, and

affairs of the Debtor. Among other things, the Discovery Requests sought information related to a

potential sale of the Investment, Falcata's current financials, the purported default, and the basis

for the Falcata Parties' positions as to the effect of the purported default. More specifically, the

Discovery Requests seek the following:

> a.     Documents related to the governance and finances of Falcata. *See*
>        Discovery Requests 1, 2, 3, 4, 8, and 14.
>
> b.     Documents and communications with third parties concerning the Debtor's
>        assets. *See* Discovery Requests 5 and 6.
>
> c.     Documents and communications with the Debtor or its former
>        representatives (*i.e.*, excluding the Foreign Representatives). *See* Discovery
>        Request 7.
>
> d.     Documents and communications related to the Investment, including its
>        potential sale and any corresponding distribution of sale proceeds. *See*
>        Discovery Requests 10, 11, 12, 15, and 16.
>
> e.     Documents and communications related to the General Partner's decision
>        to declare the Debtor a defaulting partner and the purported effects thereof.
>        *See* Discovery Requests 9 and 13.

26.     Pursuant to the requirements of Local Rule 2004-1, counsel to the Foreign

Representatives sought to meet and confer with counsel to the Falcata Parties, who, despite

undersigned counsel's requests, did not substantively respond until January 9, 2023 (the "January 9

Letter"). A copy of the January 9 Letter is attached hereto as **Exhibit E**. The January 9 Letter failed

to respond to the Discovery Requests on a request-by-request basis, vaguely asserted privilege,

and claimed that the Debtor was not entitled to any information because of the purported default.

---

[7] The Discovery Requests are identical to those contained in the Subpoena attached to the Proposed Order as **Exhibit 1**.

AP0578

27.     A meet and confer did not occur until January 18, 2023, more than a month after the December 9 Letter. During the meet and confer, counsel to the Falcata Parties asserted that the Foreign Representative would not be entitled to documents in the Chapter 15 Case unless the Foreign Representatives were entitled to those documents under Bermuda law. Counsel to the Falcata Parties agreed to make rolling productions beginning on February 15, 2023 and would substantially complete its production by March 3, 2023. On January 25, 2023, counsel to the Foreign Representatives sent a letter (the "January 25 Letter") to counsel to the Falcata Parties memorializing the meet and confer and responding to the Falcata Parties' position regarding the applicability of Bermuda law. A copy of the January 25 Letter is attached hereto as **Exhibit F**.

28.     As set forth in the January 25 Letter, the Foreign Representatives' entitlement to the information in the Document Requests is not grounded in the LPA, MTA, or foreign law. The Foreign Representatives are entitled to such information pursuant to the express terms of the Recognition Order, section 1521(a)(4) of the Bankruptcy Code, and Rule 2004. Counsel to the Falcata Parties indicated that they would consider this position and make rolling productions. During the next month, counsel to the Falcata Parties continued to demur on the applicability of foreign law, despite repeated promises that they would shortly take a position.[8]

29.     On February 15, 2023, the Falcata Parties made a production of 12 documents (including 4 duplicates and 3 completely blank documents). On February 17, 2023, the Falcata made a production of 139 documents (including approximately 55 duplicates). Instead of producing native files with metadata, these productions were made in PDF form. On February 27, 2023, the parties held an additional meet and confer, where counsel to the Falcata

---

[8] To date, the General Partner has still not articulated a valid reason for why foreign law should trump the Recognition Order, section 1521(a)(4) of the Bankruptcy Code, and Rule 2004.

AP0579

Parties agreed to propose search terms, consider custodians, enter into an ESI protocol, and respond to the Discovery Requests on a request-by-request basis.

30.     Instead of abiding by this agreement or producing any documents, *without warning*, on March 3, 2023, the General Partner initiated the Adversary Proceeding against the Debtor. Among other things, the Adversary Proceeding seeks a declaratory judgment that the General Partner does not need to provide information to the Foreign Representatives under the terms of the Cayman-Islands-law-governed LPA.

## RELIEF REQUESTED

31.     By this Motion, and pursuant to the Recognition Order, section 1521(a)(4) of the Bankruptcy Code, and Rule 2004, the Foreign Representatives respectfully request entry of the Proposed Order:

a.      Authorizing the Foreign Representatives to issue the Subpoenas to each of the Falcata Parties;

b.      Requiring each of the Falcata Parties to produce documents in response to each Document Request contained in the Subpoenas within 10 days after the service of such Subpoenas; and

c.      Directing that each of the Falcata Parties submit to an examination under oath on such date and time as designated in writing by the Foreign Representatives on not less than 20 days' notice.

## BASIS FOR RELIEF

**I.      The Foreign Representatives Are Entitled to Discovery Under Section 1521(a)(4) of the Bankruptcy Code, Rule 2004, and the Recognition Order**

32.     The Recognition Order provides that the Foreign Representatives "are entitled to seek discovery, examine witnesses, seek and take evidence, and deliver or obtain information concerning the Debtor's assets, affairs, rights, obligations, or liabilities pursuant to section 1521(a)(4) of the Bankruptcy Code." *See* Recognition Order ¶ 6.

AP0580

33. Section 1521(a)(4) of the Bankruptcy Code, in turn, provides that:

> Upon recognition of a foreign proceeding . . . where necessary to effectuate the purpose of [Chapter 15] and to protect the assets of the debtor or the interests of creditors, the court may, at the request of the foreign representative, grant any applicate relief, including . . . providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities.

11 U.S.C. § 1521(a)(4). *See also* 1 Collier on Bankruptcy 13.07 (16th ed. 2020) ("Section 1521(a)(4) authorizes the court to give the foreign representative the power to engage in discovery, without the necessity of opening formal litigation. This broad power of examination gives the foreign representative investigative powers similar to a trustee."). "By its terms, [section 1521(a)(4)] enables a Foreign Representative to take broad discovery concerning the property and affairs of a debtor." *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 471 B.R. 342, 346 (Bankr. S.D.N.Y. 2012). *See also In re Three Arrows Cap. Ltd.*, 647 B.R. 440, 451 (Bankr. S.D.N.Y. Dec. 6, 2022) (noting that "one of the key purposes of Bankruptcy Rule 2004 discovery is to allow those representing or administering a debtor's estate to ascertain the extent of the debtor's liabilities and assets."). Moreover, "[r]equests for discovery in chapter 15 need not concern assets in the U.S. to be permissible under § 1521(a)(4)." *In re Markus*, 607 B.R. 379, 389 (Bankr. S.D.N.Y. 2019).

34. In interpreting the scope of section 1521(a)(4) of the Bankruptcy Code, courts have held that Rule 2004 is "either directly applicable to Chapter 15 cases or, in the alternative, delineate relief which can be granted by the court." *In re Platinum Partners Value Arbitrage Fund L.P.*, 583 B.R. 803, 810 (Bankr. S.D.N.Y. 2018), *aff'd*, *CohnReznick LLP v. Foreign Representatives of Platinum Partners Value Arbitrage Fund LP* (*In re Platinum Partners Value Arbitrage Fund LP*), 2018 WL 3207119 (S.D.N.Y. June 29, 2018). Bankruptcy Rule 2004(a) provides that "[o]n motion of any party in interest, the court may order the examination of any entity." Fed. R. Bankr. P.

AP0581

2004(a). Such an examination may concern "the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate." Fed. R. Bankr. P. 2004(b).

35.     The purpose of a Rule 2004 examination is to "'discover the nature and extent of the bankruptcy estate' in order to distribute debtor's assets for the benefit of its creditors." *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 626 (Bankr. D. Del. 2016) (quoting *In re Washington Mut., Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009)). "Legitimate goals of Rule 2004 examinations include 'discovering assets, examining transactions, and determining whether wrongdoing has occurred.'" *In re Washington Mut., Inc.*, 408 B.R. at 50 (quoting *In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002)). "Potential examinees include 'third parties that possess knowledge of the debtor's acts, conduct, liabilities or financial condition which relate to the administration of the bankruptcy estate.'" *In re Millennium Lab Holdings II, LLC*, 562 B.R. at 626 (quoting *In re E.W. Resort Dev. V, L.P., L.L.L.P.*, Case No. 10–10452 (BLS), 2014 WL 4537500, at *7 (Bankr. D. Del. Sept. 12, 2014)).

36.     "A Rule 2004 examination 'is commonly recognized as more in the nature of a 'fishing expedition.'" *In re Washington Mut., Inc.*, 408 B.R. at 50 (quoting *In re Bennett Funding Grp., Inc.*, 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996)). "The scope of a Rule 2004 examination is 'unfettered and broad.'" *Id* at 49. (quoting *In re Bennett Funding Grp., Inc.*, 203 B.R. at 28).

37.     In the Chapter 15 context, courts routinely grant the discovery requests of foreign representatives pursuant to Rule 2004 or section 1521(a)(4) of the Bankruptcy Code because "'one of the main purposes of Chapter 15 is to assist a foreign representative in the administration of the foreign estate,' and Rule 2004 proceedings are one of the mechanisms by which bankruptcy courts provide such assistance." *Krys v. Paul, Weiss, Rifkind, Wharton & Garrison, LLP (In re China*

AP0582

*Med. Techs., Inc.*), 539 B.R. 643, 649 (S.D.N.Y. 2015) (quoting *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 471 B.R. 342, 347). *See, e.g.*, *In re Three Arrows Cap., Ltd.*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. Dec. 6, 2022); *In re Platinum Partners Value Arbitrage Fund L.P.*, 583 B.R. at 811-12 (permitting foreign representatives to conduct discovery pursuant to sections 542(e), 1521(a)(4), and 1521(a)(7) of the Bankruptcy Code and Bankruptcy Rule 2004); *In re Comair Ltd.*, Case No. 21-10298 (JLG), 2021 WL 5312988, at *9 (Bankr. S.D.N.Y. Nov. 21, 2021) (permitting discovery pursuant to section 1521(a)(4) of the Bankruptcy Code and noting that "[s]ince the Foreign Representative can obtain the discovery he seeks pursuant to section 1521(a)(4), the discussion of the application of Rule 2004 in chapter 15 cases is academic."); *In re Petroforte Brasileiro de Petroleo Ltda.*, 542 B.R. 899, 911 (Bankr. S.D. Fla. 2015) (finding that a foreign representative was entitled to discovery under section 1521(a)(4) of the Bankruptcy Code or Rule 2004); *In re Saad Invs. Fin. Co. (No. 5) Ltd.*, Case No. 09-13985 (KG) (Bankr. D. Del. August 14, 2014) (authorizing discovery pursuant to section 1521(a)(4) of the Bankruptcy Code); *See also In re Sibaham Ltd.*, Case No. 19-31537, 2020 WL 2731870, at *4 (Bankr. W.D.N.C. May 4, 2020) (noting that Chapter 15 discovery, like all discretionary relief under § 1521, is one-sided, as it can only be granted "at the request of the foreign representative.") (quoting 11 U.S.C. § 1521(a)); *In re Fairfield Sentry Ltd. Litig.*, 458 B.R. 665, 679, n.5 (Bankr. S.D.N.Y. 2011) (in considering the purpose of Chapter 15, noting that not "all Chapter 15 cases require assets of the debtor in the United States. To the contrary, section 1521(a)(4), for example, allows for discovery in the United States whether or not a debtor has assets here.").

38.     Here, each of the Discovery Requests directed to the Falcata Parties concerns the Debtor's "assets, affairs, rights, obligation or liabilities," consistent with section 1521(a)(4) of the Bankruptcy Code. The Falcata Parties have never argued otherwise, whether in their January 9

AP0583

Letter or elsewhere. Accordingly, the Court should enter the Proposed Order and require the Falcata Parties' compliance with the Subpoenas.

## II.      Foreign Law Does Not Preclude Discovery

39.      Contrary to the positions taken by the Falcata Parties during the meet and confer process, foreign law does not preclude the discovery sought by the Foreign Representatives, particularly where the Foreign Representatives are expressly authorized to take such discovery pursuant to section 1521(a)(4) of the Bankruptcy Code, Rule 2004, and the Recognition Order.

40.      *In re Platinum Partners Value Arbitrage Fund L.P.* is instructive in this regard. There, duly recognized foreign representatives of a Cayman Islands investment fund sought discovery from the debtor's auditor pursuant to section 1521(a)(4) of the Bankruptcy Code and Rule 2004. *In re Platinum Partners Value Arbitrage Fund L.P.*, 583 B.R. at 808-09. The auditor resisted discovery, claiming, among other things, "that foreign representatives may not avail themselves of broader discovery rights than they allegedly would otherwise enjoy under the laws of their home forum." *Id.* at 812. The auditor claimed that the foreign representatives sought documents whose discovery were prohibited under Cayman Islands law. *Id.* Judge Chapman rejected this argument, finding that foreign law could not preclude the foreign representatives' discovery requests because "the relief sought under [the m]otion derives exclusively from the provisions of the Bankruptcy Code" and "clearly falls within the scope of" section 1521(a)(4) and Rule 2004. *Id.* at 821.

41.      The same is undoubtedly true here. The Falcata Parties have asserted that the Foreign Representatives are not entitled to any information regarding Falcata because of a purported default under the LPA, which is governed by Cayman Islands law. *See* Complaint [Adv. Pr. Docket No. 1] (the "Adversary Complaint"). During the parties' meet and confers, counsel to

AP0584

the Falcata Parties also made vague allusions to the scope of discovery being limited by Bermuda law.

42.     But the Foreign Representatives are entitled to broad discovery regarding the Debtor's assets under section 1521(a)(4) of the Bankruptcy Code and Rule 2004, irrespective of any foreign law. *See In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 471 B.R. at 346 ("By its terms, [section 1521(a)(4) of the Bankruptcy Code], enables a Foreign Representative to take broad discovery concerning the property and affairs of a debtor."). To hold otherwise would be to undermine the entire purpose of Chapter 15: to "provide[] for the recognition of a foreign proceeding and an ancillary proceeding to provide assistance thereto." *Id. See also In re ABC Learning Centres Ltd.*, 728 F.3d 301, 306 (3d Cir. 2013) ("The Model Law[9] reflects a universalism approach to transnational insolvency. It treats the multinational bankruptcy as a single process in the foreign main proceeding, with other courts assisting in that single proceeding."). Therefore, the Court need not consider Bermuda law or Cayman Islands law when considering this Motion.

## III.    The "Pending Proceeding" Rule Does Not Apply

43.     The Foreign Representatives anticipate the Falcata Parties will raise the "pending proceeding" rule as a basis for contesting this Motion—after all, the Falcata Parties have entirely

---

[9] The United Nations Commission on International Trade Law Model Law on Cross–Border Insolvency ("Model Law") serves as the basis for Chapter 15. *See In re Elpida Memory, Inc.*, Case No. 12–10947(CSS), 2012 WL 6090194, at *3 (Bankr. D. Del. Nov. 20, 2012) ("The purpose of Chapter 15 is to adopt the Model Law with the objective of encouraging and increasing the cooperation between U.S. courts and authorities and foreign courts and authorities in cross-border insolvency cases; providing greater certainty and consistency in the law for trade and investment; promoting fair and efficient administration of cross-border insolvencies while protecting the interests of all creditors and other interested parties, including the debtor; protecting and maximizing the value of a debtor's assets; and facilitating the rescue of financially troubled businesses."); *Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 30 (2d. Cir. 2017) ("In the interests of uniformity and efficiency, Chapter 15 provides for the coordination of domestic and foreign proceedings into a single bankruptcy and . . . allows foreign representatives appointed in connection with foreign proceedings to seek recognition of those proceedings in United States courts as a means of requesting United States assistance in administering the main liquidation.").

AP0585

ceased any efforts to engage in the Rule 2004 discovery process since the filing of the Adversary Complaint. As set forth below, the pending proceeding rule does not apply.

44.     "The 'pending proceeding' rule states 'that once an adversary proceeding or contested matter has been commenced, discovery is made pursuant to Federal Rules of Bankruptcy Procedure 7026 *et seq.*, rather than by a [Rule] 2004 examination.'" *In re Washington Mut., Inc.*, 408 B.R. at 50 (quoting *In re Bennett Funding Group, Inc.*, 203 B.R. at 28). "The rule reflects a concern that a party to litigation could circumvent an adversary's rights by using Rule 2004 rather than civil discovery to obtain documents or information relevant to the other proceeding." *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 471 B.R. at 347.

45.     The pending proceeding rule is not absolute. For example, where the Rule 2004 discovery sought is unrelated to a pending proceeding or relates to parties not subject to the pending proceeding, it should be permitted. *E.g.*, *In re Washington Mut., Inc.*, 408 B.R. at 51. Courts have also refused to apply the pending proceeding rule where discovery was sought prior to a pending proceeding. *See, e.g.*, *In re Braxton*, 516 B.R. 787, 795 (E.D.N.C. 2014); *In re Ramadan*, Case No. 11–02734–8–SWH, 2012 WL 1230272, *3 (Bankr. E.D.N.C. Apr. 12, 2012).

46.     The pending proceeding rule should not apply here for several reasons. First, as set forth in the Stay Motion, the Adversary Proceeding is void *ab initio* because it violates the automatic stay. *See Mar. Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1206 (3d Cir. 1991), *reh'g granted and opinion vacated* (Jan. 10, 1992)*, opinion reinstated on reh'g* (Mar. 24, 1992) ("Absent relief from the stay, judicial actions and proceedings against the debtor are void *ab initio*."). Because the Adversary Proceeding is void, there is no pending proceeding.[10]

---

[10] The fact that, after discovery, there may be a dispute between the Foreign Representative and the Falcata Parties regarding the import of the Debtor's purported default is not sufficient to invoke the pending proceeding rule. *In re Platinum Partners Value Arbitrage Fund L.P.*, 583 B.R. at 821, n.66 ("the pending proceeding rule does not bar relief for potential litigation.") (citing *In re Glitnir*, 2011 WL 3652764, at *5 & n.12).

AP0586

47.     Second, even if the Court does not dismiss the Adversary Proceeding, the Discovery Requests predate the filing of the Adversary Complaint by nearly three months. The Foreign Representatives complied with their obligations under Local Rule 2004-1 and sought to confer with the Falcata Parties in good faith. In response, the Falcata Parties engaged in a pattern of delay leading to the filing of the Adversary Complaint in direct response to the Discovery Requests. The Falcata Parties are attempting to evade their legitimate discovery obligations by manufacturing a pending proceeding, presumably to limit the discovery available to the Foreign Representatives. The Falcata Parties should not be rewarded for this behavior and permitted to hide behind the pending proceeding rule, particularly where the Discovery Requests were issued in advance of the filing of the Adversary Complaint. *See Braxton*, 516 B.R. at 795 (refusing to apply pending proceeding rule where Rule 2004 examination was requested before any litigation was pending).

48.     Third, one of the proposed Subpoenas is directed toward the Manager, whereas the Adversary Complaint was filed by the General Partner, on behalf of Falcata. The Manager constitutes a legal entity that is distinct from both Falcata and its General Partner. Indeed, the Manager is separately tasked with, among other things, providing portfolio management and administrative services to Falcata for a fee. *See LPA* § 7.1(a). Thus, at a minimum, Rule 2004 discovery must be permitted to proceed against the Manager because the Manager is not a party to the Adversary Proceeding. *See In re Washington Mut., Inc.*, 408 B.R. at 51; *see also Braxton*, 516 B.R. at 795; *In re Buick*, 174 B.R. 299, 305 (Bankr. D. Colo. 1994) (noting that "even after the trustee has commenced adversary proceeding(s), the trustee may conduct Rule 2004 examinations of entities which are not parties to or are not affected by the pending adversary proceeding(s)"); *In re Blinder, Robinson, & Co., Inc.,* 127 B.R. 267, 275 (D. Col. 1991) ("Entities not affected by the

18

AP0587

adversary proceeding do not require the greater protections afforded under the Federal Rules, and the Trustee should be permitted to examine them under Rule 2004").

49.     Fourth, many of the Discovery Requests concern matters that are not directly related to the claims asserted by the General Partner in the Adversary Proceeding. The General Partner seemingly concedes as much by acknowledging that "the rights and remedies to be pursued following default" are separate from the Adversary Proceeding. *See Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination That There is No Automatic Stay, or in the Alternative Seeking Relief From the Automatic Stay to Proceed With Adversary Proceeding* [D.I. 47] ¶ 28. As such, even if the Court were to determine that the pending proceeding rule applied, such rule would not apply to all Discovery Requests. For example, the rule would not apply to Discovery Requests 15 and 16, which concern the bases for the General Partner's suggestion that, as a result of the Debtor's alleged status as a "defaulting partner," the General Partner may seek to retain significant amounts arising from the Debtor's principal investment. *In re Jasper Pellets, LLC*, 647 B.R. 151, 156 (Bankr. D.S.C. 2022) ("courts have recognized that this rule does not apply to parties not affected by and issues not raised in pending adversary proceedings."). *See, e.g.*, *In re Bennett Funding Grp.*, 647 B.R. at 29 ("Discovery of evidence *related* to the pending proceeding must be accomplished in accord with more restrictive provisions of [the Federal Rules of Bankruptcy Procedure], while *unrelated* discovery should not be subject to those rules simply because there is an adversary proceeding pending."); *In re Buick*, 174 B.R. at 306 (permitting a creditor to conduct discovery under Rule 2004 "regarding issues in addition to or beyond the scope of its pending adversary proceeding(s), or the trustee's pending adversary proceeding(s).").

AP0588

50. For all these reasons, the Court should grant the Proposed Order and require the Falcata Parties to produce documents in response to each request set forth in the Subpoenas and sit for an examination.

## CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 2004-1

51. In accordance with Local Rule 2004-1, prior to filing this Motion, counsel to the Foreign Representatives conferred with counsel to the Falcata Parties to arrange for cooperative document productions and examinations pursuant to Rule 2004 including meet and confers on January 18, 2023 and February 27, 2023. Although certain limited documents were produced, *see* ¶ 29, the majority of discovery issues remain outstanding. Rather than continue discussions, the Falcata Parties commenced the Adversary Proceeding.

## RESERVATION OF RIGHTS

52. The Foreign Representatives reserve all rights to request, pursuant to Rule 2004, section 1521(b) of the Bankruptcy Code, or otherwise, additional documents or examination of any party.

## NO PRIOR REQUEST

53. No previous motion or application for the relief sought herein has been made to this or any other court.

## NOTICE

54. Notice of this Motion will be provided to the following parties, through their counsel, if represented: (a) counsel to the Falcata Parties; (b) the Office of the United States Trustee for the District of Delaware; and (c) all parties requesting notice pursuant to Rule 2002.

AP0589

## **CONCLUSION**

WHEREFORE, the Foreign Representatives respectfully request that the Court enter the

Proposed Order, in the form of which is attached as **Exhibit A** hereto (a) permitting the Foreign

Representatives to conduct discovery pursuant to section 1521 of the Bankruptcy Code and Rule

2004, and (b) grant such other and further relief as is just and proper.

Dated: March 27, 2023
      Wilmington, Delaware

Respectfully submitted,

/s/     *Stephen J. Astringer*
**KOBRE & KIM LLP**
Jacob R. Kirkham (No. 5768)
Stephen J. Astringer (No. 6375)
600 North King Street, Suite 501
Wilmington, Delaware 19801
Telephone: (302) 518-6451
Facsimile: (302) 518-6461
jacob.kirkham@kobrekim.com
stephen.astringer@kobrekim.com

-and-

Adriana Riviere-Badell (admitted *pro hac vice*)
Evelyn Baltodano Sheehan (admitted *pro hac vice*)
201 South Biscayne Boulevard, Suite 1900
Miami, Florida 33131
Telephone: (305) 967-6100
Facsimile: (305) 967-6120
adriana.riviere-badell@kobrekim.com
evelyn.sheehan@kobrekim.com

-and-

Adam M. Lavine (admitted *pro hac vice*)
800 Third Avenue
New York, New York 10022
Telephone: (212) 380-2580
Facsimile: (212) 488-1220
adam.lavine@kobrekim.com

*Counsel to the Foreign Representatives*

AP0590

**EXHIBIT E**

January 9 Letter

AP0591

# SheppardMullin

Sheppard, Mullin, Richter & Hampton LLP
30 Rockefeller Plaza
New York, New York 10112-0015
212.653.8700 main
212.653.8701 fax
www.sheppardmullin.com


Edward H. Tillinghast, III
212.634.3050 direct
etillinghast@sheppardmullin.com

January 9, 2023

*Via E-Mail*

Stephen J. Astringer, Esq.
stephen.astringer@kobrekim.com
Kobre & Kim
600 North King Street, Suite 501
Wilmington, Delaware 19801

**Re:    Falcata Tech Investment Fund I, L.P.**

Dear Stephen:

We write on behalf of Falcata Capital LLC (the "Manager") and FTI GP I, LLC (the "General Partner") in response to your letter dated December 9, 2022 (the "Letter") with regard to your client, Point Investments, Ltd. ("Point"), and information pertaining to Falcata Tech Investment Fund I, L.P. (the "Fund"). This response is an effort in accordance with the Local Rules to resolve the issues our respective clients have with respect to the discovery sought in conjunction with the Letter, and we would like to arrange a meet and confer call within the next several days to further discuss your requests.

We have reviewed the Letter and related draft of anticipated discovery requests. As a general matter, Point's discovery requests are, *inter alia*, overreaching, seek information about irrelevant matters, seek documents that do not exist, does not recognize that Point is, in accordance with the Amended and Restated Exempted Limited Partnership Agreement dated April 20, 2018 (the "Agreement"), no longer entitled to treatment as a partner of the Fund due to its default as noticed in the Notice of Default the Manager sent to Point on August 4, 2020 (and therefore attempt to circumvent the terms of the Agreement), are duplicative, and request documents that are subject to the attorney client and work product privileges.

As you will be aware from the correspondence exchanged with your Cayman office, Section 5.4(a) of the Agreement provides that "If the Limited Partner fails to make, in a timely manner, all or any portion of any Capital Contribution or any other amount required to be funded by the Limited Partner [thereunder], and such failure continues for five Business Days after receipt of written notice thereof from the General Partner . . . then the Limited Partner may be designated by the General Partner in its sole discretion as in Default under this Agreement . . . and shall thereafter be subject to the provisions of this Section 5.4." Upon Point's designation as a Defaulting Partner, among the other consequences set forth in the Agreement, Point shall be treated for the purposes of sections 5.2, 8.1, 8.2 and 8.3 as no longer a partner (*See* Agreement § 5.4(d)).

As a result of Point's default, it is not entitled to the documents sought in the proposed Document Request or responses to the Interrogatories.

AP0592

**Sheppard**Mullin

Moreover, Document Request Numbers 5, 6, 9, 15 (other than the Agreement), and 16, and Interrogatory Numbers 1, 6 and 8 include privileged documents. Finally, the information sought in Interrogatory Number 7 does not exist at this time.

However, in an effort to reach an amicable arrangement concerning the discovery sought by the Letter, our clients are willing to produce the following categories of documents (excluding any privileged documents) concerning and relating to Point's default under the Agreement:

(a) Document Request Numbers 2 and 3 for the period prior to August 2020 when Point became a Defaulting Partner;

(b) Document Request Numbers 7 and 8;

(c) With regard to Interrogatory Number 5, a list of any monies paid by Point to the Fund, the General Partner and/or the Manager until Point's default in August 2020; and

(d) Any other documents concerning Point's default under the Agreement (with the exception of any privileged documents).

We are available to meet and confer in a telephonic or Zoom call at mutually agreeable times on January 11, 16, 17 or 18, 2023.

This letter and our good faith discussions are without prejudice to all of our clients' rights and interests, including, but not limited to, other objections to the discovery sought by the Letter and the various substantial claims the Fund has against Point.

Sincerely,

Edward H. Tillinghast, III
For SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

AP0593

**<u>EXHIBIT F</u>**

January 25 Letter

AP0594

# KOBRE & KIM

600 NORTH KING STREET, SUITE 501
WILMINGTON, DELAWARE 19801
WWW.KOBREKIM.COM
TEL +1 302 518 6460

January 25, 2023

*Via Email*

Edward H. Tillinghast, III
Sheppard, Mullin, Richter & Hampton LLP
30 Rockefeller Plaza
New York, NY 10112
etillinghast@sheppardmullin.com

> **Re:** ***In re Point Investments, Ltd. (In Liquidation)*, Case No. 22-10261-JKS (Bankr. D. Del.)**

Dear Mr. Tillinghast:

This letter memorializes the meet and confer held on January 18, 2023 (the "Meet and Confer") regarding our letter dated December 9, 2022 (the "Discovery Letter")[1] and your reply dated January 9, 2023 (the "Reply Letter"). By this letter, we also seek to resolve (if we can) certain open discovery matters.

## I.  Initial Productions, Privilege Logs, and Depositions

Thank you for confirming that your clients will produce the documents identified in your Reply Letter, together with a document-by-document privilege log, and that your clients will make witnesses available for depositions at the appropriate time.

During our Meet and Confer, you were not able to provide a time frame for the production of documents identified in your Reply Letter. Given that the Foreign Representatives' discovery requests were served in early December 2022, we request that you commence your productions on a rolling basis by February 15, 2023, and that you substantially complete your initial production of documents identified in your Reply Letter by March 3, 2023. Please confirm that you will comply with these dates, or explain why you cannot do so, by January 31, 2022.

---

[1] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Discovery Letter.

**AMERICAS** (NEW YORK, DELAWARE, MIAMI, SAN FRANCISCO, SÃO PAULO, WASHINGTON DC)
**APAC** (HONG KONG, SEOUL, SHANGHAI), **CARIBBEAN** (BVI, CAYMAN ISLANDS), **EMEA** (CYPRUS, DUBAI, LONDON, TEL AVIV)

KOBRE & KIM REFERS TO KOBRE & KIM LLP, A NEW YORK LIMITED LIABILITY PARTNERSHIP.            AP0595

January 25, 2023
Page 2

## II.    Disagreements Concerning the Scope of Production

During the Meet and Confer, you set out your clients' position that various categories of documents would be withheld on the basis that the Foreign Representatives are not entitled to documents in this Chapter 15 case unless those documents would be available to them under Bermuda law. We disagree with this position.

On April 22, 2022, the Court entered the *Order Granting Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Related Relief Under Chapter 15* [D.I. 34] (the "Recognition Order"). The Recognition Order states:

> The [Joint Liquidators] are entitled to seek discovery, examine witnesses, seek and take evidence, and deliver or obtain information concerning [Point's] assets, affairs, rights, obligations, or liabilities pursuant to section 1521(a)(4) of the Bankruptcy Code.

Section 1521(a)(4), in turn, provides as follows:

> Upon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including—
> . . . .
> (4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities . . . .

As such, the Foreign Representatives are entitled to discovery regarding Point's assets, liabilities, and financial affairs under the express terms of the Recognition Order, section 1521(a)(4) of the Bankruptcy Code, and Rule 2004 of the Federal Rules of Bankruptcy Procedure.[2] Point's interest in Falcata is undoubtedly one if its assets, and therefore, the discovery requests which have been propounded are clearly within the proper scope of discovery in this Chapter 15 case. Indeed, your clients have not challenged, whether in your Reply Letter or during the Meet and Confer, any of our clients' document requests on the basis that they do not concern Point's assets, liabilities, or financial affairs.

Your argument that Bermuda law should trump the express terms of the Bankruptcy Code and Rules was considered and rejected by the bankruptcy court in *In re Platinum Partners Value Arbitrage Fund L.P.*, 583 B.R. 803 (Bankr. S.D.N.Y. 2018). There, joint liquidators were appointed by the Grand Court of the Cayman Islands who were recognized as foreign

---

[2] *See generally In re AJW Offshore Ltd.*, 488 B.R. 551, 564 (Bankr. E.D.N.Y. 2013) (permitting foreign representative to conduct discovery under Rule 2004); *In re Millennium Global Emerging Credit Master Fund Ltd.*, 471 B.R. 342, 347 (Bankr. S.D.N.Y. 2012) ("By its terms, this provision enables a Foreign Representative to take broad discovery concerning the property and affairs of a debtor."); *In re Fairfield Sentry Ltd. Litigation*, 458 B.R. 665, 679 n.5 (S.D.N.Y. 2011) ("section 1521(a)(4), for example, allows for discovery in the United States whether or not a debtor has assets here."); *In re Pro-Fit International Ltd.*, 391 B.R. 850, 860 (Bankr. C.D. Cal. 2008) (same).

January 25, 2023
Page 3

representatives in a Chapter 15 case. The foreign representatives sought discovery from an auditor who claimed that Chapter 15 could not enlarge a debtor's information rights beyond what was available in its home jurisdiction. The Court disagreed, holding that the foreign representatives were entitled to the discovery sought. In light of the *Platinum Partners* decision and the express provisions of the Bankruptcy Code and Rules cited above, we ask that you reconsider your position regarding the scope of available discovery in a Chapter 15 case.

Further, as we articulated during the Meet and Confer, Point's alleged status as a defaulting partner under an LPA governed by Cayman Islands has no bearing on the scope of discovery available in this Chapter 15 case. Foreign law cannot supplant the express provisions of the Bankruptcy Code and Rules, as set out above. To hold otherwise would undermine a core tenant of Chapter 15; namely, that the bankruptcy courts should, in accordance with the laws of the United States, provide assistance to duly-appointed foreign representatives. *See Krys v. Paul, Weiss, Rifkind, Wharton & Garrison, LLP* (*In re China Med. Techs., Inc.*), 539 B.R. 643, 649 (S.D.N.Y. 2015) ("'one of the main purposes of Chapter 15 is to assist a foreign representative in the administration of the foreign estate,' and Rule 2004 proceedings are one of the mechanisms by which bankruptcy courts provide such assistance.") (citing *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 471 B.R. at 347).

In sum, the discovery sought by the Foreign Representatives is consistent with the Recognition Order, section 1521(a)(4) of the Bankruptcy Code, and Bankruptcy Rule 2004, and foreign law does not limit the Foreign Representatives' rights in the United States in this regard.[3]

We therefore request that you confirm by January 31, 2023 whether you intend to withhold any documents on the basis of foreign law and, if so, the specific documents or categories of documents that you intend to withhold, together with a description of the foreign law that you claim is relevant. We reserve all rights to seek the Court's intervention.

\*　　\*　　\*

We are available to discuss further to avoid unnecessary motion practice before the Bankruptcy Court.

Sincerely,

*/s/ Stephen J. Astringer*

Stephen J. Astringer (#6375)
+ 1 302 518 6460

---

[3] The Foreign Representatives also disagree with your position that Bermuda law precludes them from obtaining these documents and reserve all rights with respect to Bermuda law.

January 25, 2023
Page 4

CC:    Evan Williams (via email)
          Joseph Jay (via email)
          Marc Kish (via email)
          Christopher Levers (via email)
          Nour Khaleq (via email)
          Peter Tyers-Smith (via email)
          Adriana Riviere-Badell (via email)
          Adam Lavine (via email)
          Ilona Groark (via email)

AP0598

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| POINT INVESTMENTS, LTD. (IN LIQUIDATION),[1] | Case No. 22-10261 (TMH) |
| Debtor in a Foreign Proceeding. | |

**DECLARATION OF ANDREW CHILDE IN SUPPORT OF (I) MOTION OF THE FOREIGN REPRESENTATIVES FOR ENTRY OF AN ORDER TO CONDUCT DISCOVERY PURSUANT TO 11 U.S.C. § 1521(a)(4), FED. R. BANKR. P. 2004, AND LOCAL RULE 2004-1 AND (II) MOTION OF THE FOREIGN REPRESENTATIVES FOR ENTRY OF AN ORDER ENFORCING THE AUTOMATIC STAY AND FOR DAMAGES**

I, Andrew Childe of FFP Limited, in my capacity as one of the Joint Liquidators and foreign representatives of Point Investments, Ltd. (the "Debtor"), make this declaration (this "Declaration") pursuant to 28 U.S.C. § 1746 and state:

1.      I am over the age of 18 and, if called upon, could testify as to the matters set forth in this statement.

2.      I, along with Richard Lewis of FFP Limited and Mathew Clingerman of Kroll Bermuda Ltd. (collectively the "Liquidators" or "Foreign Representatives") are the joint liquidators and foreign representatives of the Debtor in respect of the winding up proceeding pending before the Supreme Court of Bermuda (the "Bermuda Court"), Commercial Court, Case 2020: No. 300 (the "Bermuda Proceeding").

3.      I submit this Declaration in support of the *Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr.*

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-la-Ville Road, Hamilton, HM 11, Bermuda.

*P. 2004, and Local Rule 2004-1* (the "Discovery Motion") and the *Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay* (the "Stay Motion").[2]

4.      The statements made in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by other professionals and/or employees working under my supervision, or my opinion based on my experience, knowledge, and information concerning the Debtor. I declare the following statements are true to the best of my knowledge, information, and belief formed after a reasonable inquiry under the circumstances.

## I.      Claims Process in the Bermuda Proceeding

5.      On June 15, 2022, the Foreign Representatives noticed the first meeting of creditors and the first meeting of contributories in accordance with their statutory obligations under the Bermuda Companies Act.

6.      The Foreign Representatives provided notice to Falcata, though its Cayman Islands counsel, of the first meeting of creditors. Falcata elected not to appear at the meeting. Falcata likewise failed to submit a proof of debt for voting purposes in advance of that meeting.

7.      In accordance with their obligations, the Foreign Representatives intend to give notice to potential creditors, including Falcata, requesting they file proofs of debt in the Bermuda Proceeding.  Should it wish to do so, Falcata will have the opportunity to assert any claim(s) against the Debtor in connection with the Debtor's claims adjudication process to be administered pursuant to Bermuda law. The Foreign Representatives intend to notice the deadlines for the claims adjudication process in this Chapter 15 Case.

---

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Discovery Motion or Stay Motion, as applicable.

AP0600

## II.     The Foreign Representatives' Informal Requests for Information

8.     Following the Foreign Representatives' appointment in October 2021, the Foreign Representatives contacted the Falcata Parties on November 3, 2021, providing a copy of the Appointment Order and requesting certain information related to the Debtor's interest in Falcata. In December 2021, Cayman Islands counsel for the Falcata Parties told the Foreign Representatives that because the Debtor was designated as a "defaulting partner" under the LPA, it was not entitled to this information. Over the next year, the parties exchanged correspondence regarding the Foreign Representatives' information requests, the purported default, and potential consensual resolutions. Without conceding that the Debtor was ever properly designated as a "defaulting partner," the Foreign Representatives offered to discuss funding the alleged missed capital call as well as subsequent capital contributions.

9.     It was indicated to me that, as a result of the Debtor's alleged status as a "defaulting partner," the General Partner would seek to retain significant amounts of the total realizable value of Falcata's assets, including amounts that arise from the Debtor's principal investment. Examples were provided to me, which indicated that this windfall to the General Partner would exceed ██████ —an amount in excess of 50% of the realizable value of Falcata's investments in those examples. The Foreign Representatives have therefore sought information from the Falcata Parties to understand the bases for the General Partner to retain such amounts, so that the Foreign Representatives could assess if those bases were justified or otherwise. Thereafter, the Falcata Parties failed to provide adequate legal support for the position that the General Partner may be entitled to such a windfall, and also refused to provide any detail about the calculation it would employ when determining the waterfall of payments owed to the Debtor or others after a sale of Falcata's primary Investment.

AP0601

I certify under penalty of perjury under the laws of the United States that, to the best of my

knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 27th day of March, 2023
Park City, Utah

Andrew Childe, in his capacity as one of the Joint
Liquidators and Foreign Representatives of Point
Investments Ltd.

4

AP0602

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 15 |
| **POINT INVESTMENTS, LTD.**<br>**(IN LIQUIDATION),** | Case No. 22-10261 (TMH) |
| Debtor in a Foreign Proceeding.[1] | Re: D.I. 53 |

## OBJECTION OF FTI GP I, LLC ON BEHALF OF FALCATA TECH INVESTMENT FUND I, L.P. TO MOTION OF THE FOREIGN REPRESENTATIVES FOR ENTRY OF AN ORDER TO CONDUCT DISCOVERY PURSUANT TO 11 U.S.C. § 1521(a)(4), FED. R. BANKR. P. 2004, AND LOCAL RULE 2004-1

FTI GP I, LLC (the "General Partner") on behalf of Falcata Tech Investment Fund I, L.P. (the "Fund"), by and through their undersigned counsel, respectfully submit this objection (the "Objection") to the *Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1* (the "Motion") (ECF No. 58), filed by the appointed Foreign Representatives Andrew Childe, Richard Lewis, and Matthew Clingerman (collectively, the "Foreign Representatives") of Chapter 15 debtor Point Investments, Ltd. (the "Debtor") on March 27, 2023, seeking an order directing the General Partner and the Fund to produce to the Foreign Representatives certain requested documents and respond to certain interrogatories (the "Rule 2004 Discovery Requests") pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure ("Rule 2004") in this case.

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is located at Chancery Hall, 1st Floor, 52 Reid Street, Hamilton HM 12, Bermuda.

## PRELIMINARY STATEMENT

1.     The Motion seeks Rule 2004 discovery concerning disputes in the relationship between the Debtor, the General Partner, and the Fund (collectively, the "Parties").  Such disputes between the Parties are the subject of an adversary proceeding pending in this case before this Court, and the Debtor's overly broad Rule 2004 discovery requests are thus precluded by the pending proceeding rule that is well established in this district as well as others.  *See* Case No. 23-50122 ("AP") (ECF No. 1) (the "Adversary Proceeding").

2.     All of the issues raised in the Rule 2004 Discovery Requests arise solely from the binding and unambiguous terms of two agreements by which the Parties agreed to be bound: the Amended and Restated Exempted Limited Partnership Agreement, dated April 20, 2018 (the "Limited Partnership Agreement") and the Master Transaction Agreement, dated July 1, 2019 (the "Master Transaction Agreement," and, together with the Limited Partnership Agreement, the "Fund Agreements").  Similarly, the disputes under the Fund Agreements form the crux of the complaint filed on March 3, 2023 (before the Debtor's Motion) by the General Partner on behalf of the Fund (the "Complaint") in the Adversary Proceeding.[2]

3.     As a matter of law, Rule 2004 discovery is not available and cannot be used to circumvent the applicable provisions of the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure when discovery is available through related, pending litigation. While the "pending proceeding" rule is not absolute, this district has held that when an adversary proceeding before the court is pending, the relevant inquiry is whether the Rule 2004 examination will lead to discovery of evidence *related* or *unrelated* to the pending proceeding.

---

[2] The General Partner is the authorized representative of the Fund.  *See* section 33(1) of the Exempted Limited Partnership Act (2021 Revision) of the Cayman Islands which provides that: "*legal proceedings by or against an exempted limited partnership may be instituted by or against any one or more of the general partners* only."  This is further confirmed by the Limited Partnership Agreement, which provides that the Fund may bring proceedings "*acting by the General Partner*."  *See* Limited Partnership Agreement, §1.6.

AP0604

Here, it is unmistakably clear that the Rule 2004 Discovery Requests would lead to evidence related to the Adversary Proceeding. The Debtor correctly anticipated an objection on the basis of the pending proceeding rule, however, the Debtor failed to state a legally valid reason why the rule should not apply.

4. The Debtor falsely claims in the Motion that the General Partner's motivations for initiating the Adversary Proceeding are twofold: (i) to avoid discovery obligations under Section 1521(a)(4) of the Bankruptcy Code and Rule 2004, and (ii) to "weaponize the Debtor's alleged prepetition default as a means to generate a windfall for the General Partner." *See* Motion, ¶ 5. These allegations are wholly without merit and contradict the Fund Agreements to which the Debtor agreed. With respect to the first point, the Adversary Proceeding was commenced *prior* to the Debtor filing the Motion, which it hurriedly filed simultaneously with the filing of the Second Stay Motion (as defined below). The General Partner fully anticipates seeking and being the recipient of discovery procedures via the Adversary Proceeding in accordance with the Federal Rules of Bankruptcy Procedure 7026 *et seq.*, rather than under Rule 2004, and as a showing of its good faith, it voluntarily delivered certain documents to the Debtor before the Adversary Proceeding and the Motion were filed.

5. The Debtor's second point, that the General Partner seeks to "weaponize the Debtor's alleged prepetition default as a means to generate a windfall for the General Partner," fails, but is also a claim only appropriate for the Adversary Proceeding. As clearly set forth in the Adversary Proceeding, the General Partner is seeking absolutely no remedies other than those clearly and unambiguously agreed to by the Parties in the Fund Agreements. *See generally*, Complaint; Limited Partnership Agreement §§ 5.2(d), 5.4(a), 5.4(d), 5.4(e); Master Transaction Agreement, §§ 1.2, 1.3. In attempting to bring arguments that belong in the "pending

AP0605

proceeding" itself to the Motion for Rule 2004 discovery's preliminary statement, the Debtor itself acknowledges and participates in the legitimacy of, and need for, the Adversary Proceeding.

6.      The Motion should be denied because the General Partner, on behalf of the Fund, and the Debtor are parties to the Adversary Proceeding and each of the Rule 2004 Discovery Requests, on their face, relate to the claims set forth in the Complaint, satisfying the rule that evidence related to a pending proceeding cannot be sought in accordance with Rule 2004.[3]  The Debtor claims that the Rule 2004 Discovery Requests are appropriately sought, consistent with section 1521(a)(4), to ascertain the Debtor's "assets, affairs, rights, obligations, or liabilities." *See* Motion, ¶ 38.  This contention is utterly belied by the facts.  To wit, because the Fund Agreements encompass the entirety of the Parties' relationship, the Adversary Proceeding will quite literally allow the Parties to ascertain the full extent of the Debtor's assets, affairs, rights, obligations, and liabilities as they relate to the Fund, thereby obviating the need for the improper, unnecessary, costly and unduly burdensome Rule 2004 Discovery Requests.

## **BACKGROUND**

7.      On September 16, 2020, the registered owner of the Debtor's common shares, Spanish Steps Holdings Ltd. ("Spanish Steps"), filed a petition in the Supreme Court of Bermuda under the Bermuda Companies Act 1981 (as amended) as supplemented by common law, governing the liquidation of companies in Bermuda and, along with the Companies (Winding-Up) Rules 1982 (as amended) (the "Bermuda Proceeding") seeking a winding up of the Debtor's affairs (the "Wind-up Petition").  *See Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Related Relief Under Chapter*

---

[3] Because the Adversary Proceeding seeks declaratory judgment, it is required to be brought by an adversary proceeding under Bankruptcy Rule 7001(9).

AP0606

*15* (ECF No. 3) (the "Chapter 15 Petition") ¶ 17.  On October 29, 2021, the Supreme Court of Bermuda appointed the Foreign Representatives as the Joint Provisional Liquidators of the Debtor.  *Id.*  On February 18, 2022, the Supreme Court of Bermuda granted the Wind-up Petition. *Id.* at ¶ 19.

8.     On March 29, 2022 (the "Chapter 15 Petition Date"), the Debtor filed the Chapter 15 Petition for Recognition in this Court.

9.     On April 22, 2022, the Court entered the *Order Granting Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Related Relief Under Chapter 15*  (the "Recognition Order") (ECF No. 34).  In relevant part, the Recognition Order provides that "[a]ll relief protections afforded to foreign main proceedings under section 1520 of the Bankruptcy Code are hereby granted to the Bermuda Proceeding, the Debtor, the Debtor's property located within the United States and the foreign representatives, as applicable."  Recognition Order ¶ 5.

10.    Prior to the Chapter 15 Petition Date, on or about April 20, 2018, the Debtor became a limited partner of the Fund when it entered into an agreement to purchase and subscribe to an interest as limited partner in the Fund with a capital contribution, which was accepted on behalf of the Fund by the General Partner.  As a limited partner, the Debtor agreed to be bound by the terms and conditions set forth in the Limited Partnership Agreement.

11.    The Fund Agreements set forth obligations for the Debtor, as limited partner, and rights and remedies that the General Partner can exercise in the event of a limited partner's default under the Fund Agreements.  *See* Limited Partnership Agreement §§ 5.2(d), 5.4(a), 5.4(d), 5.4(e); Master Transaction Agreement, §§ 1.2, 1.3.

AP0607

12.     On June 16, 2020, the manager of the Fund, Falcata Capital LLC (the "<u>Manager</u>"), sent the Debtor a demand letter requesting a Capital Contribution in the amount of $625,000 due on July 1, 2020 in accordance with the procedures set forth in the Fund Agreements (the "<u>July Capital Contribution</u>").

13.     On August 4, 2020, following the Debtor's failure to meet the July Capital Contribution, the Manager sent the Debtor a default letter (the "<u>Default Notice</u>") stating that the Debtor had not paid the July Capital Contribution as required under the Limited Partnership Agreement (the "<u>Default</u>"), and in accordance therewith, the Debtor had five business days to cure the Default. The Default Notice further stated that if the Debtor failed to pay the Capital Contribution within five days from the date of the Default Notice, it would be deemed in Default by the Manager, and would be "subject to any all of the rights and remedies afforded to the General Partner and the Fund under the Limited Partnership Agreement." *See* AP (ECF No. 1, Ex. 4). The Debtor admits to this Default in the Motion. *See* Motion ¶ 2.

14.     The Debtor failed to pay the July Capital Contribution in accordance with the Default Notice, is therefore in default under both of the Fund Agreements, and was properly designated as a Defaulting Partner. *See* Limited Partnership Agreement §§ 5.2(d), 5.4(a).

15.     On March 3, 2023, the General Partner commenced the Adversary Proceeding on behalf of the Fund, pursuant to Bankruptcy Rule 7001, which seeks declaratory relief as to the contractual obligations between the parties and to fix amounts owed to the Fund as a result of the Debtor's breaches of the Fund Agreements. *See* ECF No. 45; AP (ECF No. 1). On March 23, 2023, the General Partner filed the *Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination That There Is No Automatic Stay, or in the Alternative*

*Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding* (the "Stay Motion") (ECF No. 47).

16.     The Complaint seeks declaratory judgment relief and to adjudicate liability resulting from the Debtor's failure to make the July Capital Contribution and the rights that arise therefrom under the Fund Agreements.  *See* Complaint, ¶¶ 45-70.  The Debtor admits to this failure in the Motion and in other court filings, which constitutes a "default" under the express terms of the Limited Partnership Agreement.  *See* Complaint, ¶¶ 36-40; *see also* Motion ¶ 2.  As set forth more fully in the Complaint, a "default" under the Fund Agreements triggers a host of contractually agreed upon consequences, including, but not limited to, loss of consent rights, loss of information rights, monetary deductions, and monetary damages.  *See generally*, Complaint; Limited Partnership Agreement §§ 5.2(d), 5.4(a), 5.4(d), 5.4(e); Master Transaction Agreement, §§ 1.2, 1.3.  However, the Parties do not agree on how those contractual consequences actually manifest.  This issue and lack of agreement necessitated the filing of the Adversary Proceeding.

17.     On March 27, 2023, the Debtor filed the Motion and, instead of responding to the Stay Motion as is procedurally proper, filed the separate *Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and For Damages* (the "Second Stay Motion") (ECF No. 52).  The General Partner is responding to the Second Stay Motion in a separate objection filed contemporaneously herewith.[4]

---

[4] The factual statements submitted by the General Partner responding to the Second Stay Motion are incorporated herein by reference.

AP0609

## ARGUMENT

## THE MOTION FOR RULE 2004
## DISCOVERY SHOULD BE DENIED AS PROCEDURALLY
## IMPROPER PURSUANT TO THE PENDING PROCEEDING RULE.

18.     The Rule 2004 Discovery Requests set forth in the Motion are improper because they will directly and improperly interfere with the Adversary Proceeding.  While the Court may, on a Rule 2004 motion, "order the examination of any entity" into "the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate," Fed. R. Bankr. P. 2004(a)-(b), even Rule 2004 examinations have limits.  *See, e.g., In re Washington Mut., Inc.,* 408 B.R. 45, 51 (Bankr. D. Del. 2009); *In re Enron Corp.,* 281 B.R. 836, 840 (Bankr. S.D.N.Y. 1991); (citing *In re Bd. of Dirs. of Hopewell Int'l Ins., Ltd.,* 258 B.R. 580,587 (Bankr. S.D.N.Y. 2001)).

19.     One well-established limitation precludes parties from obtaining discovery through Rule 2004 when proceedings are pending in another forum.  "The 'pending proceeding' rule states 'that once an adversary proceeding or contested matter has been commenced, discovery is made pursuant to Federal Rules of Bankruptcy Procedure 7026 *et seq*., rather than by a Rule 2004 examination'."  *In re Washington Mut., Inc.,* 408 B.R. at 50 (citing *In re Bennett Funding Group, Inc.,* 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996)); *see also Enron,* 281 B.R. at 840; *In re 2435 Plainfield Ave., Inc.,* 223 B.R. 440, 455–56 (Bankr.D.N.J.1998) (collecting cases); *Intercontinental Enters., Inc. v. Keller (In re Blinder, Robinson & Co., Inc.),* 127 B.R. 267, 274 (D.Colo.1991) (*quoting In re Valley Forge Plaza Assocs.,* 109 B.R. 669, 674–75 (Bankr.E.D.Pa.1990)).

20.     Courts have previously observed that "[t]he 'pending proceeding' rule reflects a concern that a party to litigation could circumvent his adversary's rights by using Rule 2004

-8-

rather than civil discovery to obtain documents or information relevant to the lawsuit." *In re Glitnir,* 2011 WL 365 2764, at *4. The pending proceeding rule recognizes the material difference between Rule 2004 discovery and discovery in civil litigation. Discovery in civil litigation "provide[s] greater protection to adverse parties" through safeguards that are not in place for discovery conducted under Rule 2004. *In re Glitnir,* 2011 WL 3652764, at *4; *see also In re Enron,* 281 B.R. at 840; *In re Bennett,* 203 B.R. at 28 (explaining that Rule 2004 "is meant to give the inquiring party broad power to investigate the estate, [and] does not provide the procedural safeguards offered by'' the Federal Rules of Civil Procedure or equivalent procedural rules governing state court proceedings).

21. Prohibition on the use of Rule 2004 examinations once an adversary proceeding has commenced is not absolute, however, and this Court adopted the test from *Bennett Funding* to address the competing concerns:

> In this Court's view, the proper approach is that of *Bennett Funding*. Where a party requests a Rule 2004 examination and an adversary proceeding or other litigation in another forum is pending between the parties, the relevant inquiry is whether the Rule 2004 examination will lead to discovery of evidence related to the pending proceeding or whether the requested examination seeks to discover evidence unrelated to the pending proceeding.

*In re Washington Mut., Inc.,* 408 B.R. at 51 (citing *In re Bennett,* 203 B.R. at 29); *see also In re Enron Corp.,* 281 B.R. at 841.

22. The Motion raises precisely the concerns that the pending proceeding rule was designed to address. Its sole purpose is to take discovery to assess the merits of the disputes between the Parties and the core of the Complaint is exactly the same as the subject of the examination sought in this forum – a determination of the assets, rights, and remedies of the Parties following the Debtor's default. *See* Motion ¶ 7. The proposed Rule 2004 Discovery

-9-

Requests appended to the Motion relate directly and unambiguously to the claims set forth in the Adversary Proceeding.  In *Washington Mutual*, the court found that the pending proceeding rule did not apply because the adversary proceeding at issue there sought declaratory judgments that the movant owned a number of disputed assets, while that debtor's Rule 2004 motion sought production of documents and depositions relating to business tort claims, fraudulent transfer claims, and other claims that were not related to the adversary proceeding or assets forming the subject of the adversary proceeding.  *See In re Washington Mut., Inc.,* 408 B.R. at 52.  The facts here could not be more different than those in *Washington Mutual*.

23.     Discovery directed at assessing the claims in the Adversary Proceeding and any related claims under the Fund Agreements to determine the Parties rights fall squarely within the scope of any examination that would violate the pending proceeding rule.  Any attempt to obtain the information "could not avoid delving into issues that would be raised in the [pending] proceeding and therefore . . . could not comply with [the pending proceeding rule]."  *In re Enron Corp.,* 281 B.R. at 841- 842 (discussing *In re Bennett,* 203 B.R. at 29-30).  In fact, in this case, the Adversary Proceeding needs to go forward in order for the Parties to accurately assess their respective rights, remedies, assets and obligations that are in dispute and the subject of the Motion.  Allowing the Rule 2004 Discovery Requests to proceed would effectively render the pending proceeding rule meaningless.

24.     The legal authority and factual bases on which the Debtor relies in support of its argument that the Rule 2004 Discovery Requests will not offend the pending proceeding rule are unavailing.

25.     The Debtor claims the General Partner has "entirely ceased efforts to engage in the Rule 2004 discovery process since the filing of the Adversary Complaint."  *See* Motion ¶ 43.

-10-

This is a spurious assertion that seeks to impugn the General Partner's integrity for merely complying with the rules of civil discovery. Moreover, the assertion incorporates the Debtor's erroneous characterization of pre-Motion document requests and correspondence as "Discovery Requests." The Motion even goes so far as to contend that, with regard to the *pre-Motion informal discovery requests*, (which under the Limited Partnership Agreement, include information the Debtor is not entitled to following its designation as a Defaulting Partner), the "Foreign Representatives' entitlement to the information in the Document Requests is not grounded in the LPA [the Limited Partnership Agreement], MTA [the Master Transaction Agreement], or foreign law. . . . the Foreign Representatives are entitled to such information pursuant to the express terms of the Recognition Order, section 1521(a)(4) of the Bankruptcy Code, and Rule 2004." *See* Motion ¶¶ 24, 28. The Debtor provides no legal basis for the assertion that informal document requests could be supported by Rule 2004.

26. As noted above, the Debtor's Motion attempts to pre-empt the application of the pending proceeding rule; however, those arguments are also unavailing. First, the Debtor contends that the Adversary Proceeding is void because it violates the automatic stay. This argument lacks merit and, as set forth above, will be met with a separate objection to the Second Stay Motion the General Partner will file contemporaneously herewith.

27. Second, the Debtor claims that the pending proceeding rule should not apply because the "Discovery Requests" predate the filing of the Adversary Complaint by nearly three months. This is a baseless argument for multiple reasons. Courts generally agree that the pending proceeding rule does not state *if* an adversary proceeding has been *previously* commenced, Rule 2004 discovery is available; rather, the rule is "*once* an adversary proceeding or contested matter is commenced, discovery should be pursued under the Federal Rules of Civil

-11-

Procedure and not by Rule 2004." (emphasis added). *In re Sunedison, Inc., 572 B.R. 482, 490 (Bankr. S.D.N.Y. 2017)*. To support its assertion, the Debtor cites to one non-binding decision from a North Carolina District Court. *See* Motion ¶ 47. There, the court found that the pending proceeding rule did not apply to a defendant who was *ordered* to appear for a Rule 2004 examination *before* any litigation was pending. *See In re Braxton*, 516 B.R. 787, 795 (E.D.N.C. 2014). That case, however, is factually distinguishable from the matter at bar. Here, as evidenced by the Court's docket, the Adversary Proceeding was commenced on March 3, 2023, and the Debtor's Motion was filed on March 27, 2023. The Court should not countenance the Debtor's mischaracterization of the facts. It is indeed notable that the Debtor has failed to cite to any case law that considers informal communication of information requests prior to motion practice to be formal discovery requests subject to Rule 2004 or any other Federal Rules, because no such case law exists.

28. Third, the Debtor claims that one of the proposed subpoenas is directed toward the Manager of the Fund, and the Manager is not party to the Adversary Complaint that was filed by the General Partner, on behalf of the Fund. The Debtor cites to case law holding that "the trustee may conduct Rule 2004 examinations of entities which are not parties to *or are not affected by the pending adversary proceeding(s)*" (emphasis added). *See* Motion ¶ 48; *In re Buick*, 174 B.R. 299, 305 (Bankr. D. Colo. 1994). The Debtor further argues that the pending proceeding rule should not apply to the Manager because it is not a party to the Adversary Proceeding. However, the Debtor conveniently ignores the second part of the holding in *Buick*, which provides that the pending proceeding rule can still apply when an entity is not party to, but is still affected by the pending adversary proceeding. *See* Motion ¶ 48. The Manager's actions and decisions are clearly implicated in the plain text of the Complaint (*see, e.g.* Complaint, ¶ 39),

AP0614

and in order for the Adversary Proceeding to reach a decision it is inevitable that the Manager will be implicated in, affected by, and subject to any discovery processes sought in the Adversary Proceeding under Federal Rule of Bankruptcy Procedure 7026 *et seq*.

29.     Finally, the Debtor claims that the Rule 2004 Discovery Requests concern matters that are not directly related to the claims asserted in the Adversary Proceeding. *See* Motion ¶ 49. The Debtor cites to the same theme and rule central to this Objection: "discovery of evidence related to the pending proceeding must be accomplished in accord with the more restrictive provisions of the [Federal Rules of Bankruptcy Procedure], while unrelated discovery should not be subject to those rules simply because there is an adversary proceeding pending." *In re Bennett Funding Grp*., 647 B.R. at 29; *See* Motion ¶ 49.  Contrary to the Debtor's assertion, every Rule 2004 Discovery Request relates to the Fund Agreements: the default thereunder; the disputed results of such default – legally and monetarily; communication around such default; and the relationship and rights of the Parties.  This includes requests such as Document Request No 8: "Documents concerning . . . amounts owed by the Fund to the Debtor or by the Debtor to the Fund . . ." that can only be ascertained once the dispute set forth in the Adversary Proceeding is decided.  The Debtor specifically contends that the pending proceeding rule does not apply to Discovery Request Nos. 15 and 16, "which concern the bases for the General Partner's suggestion that, as a result of the Debtor's alleged status as a 'defaulting partner,' the General Partner may seek to retain significant amounts arising from the Debtor's principal investment." *See* Motion, ¶ 49.  That contention is unfounded.  The General Partner is seeking relief recognizing the enforcement of its rights under the Fund Agreements in the Adversary Proceeding.  An outcome in the Adversary Proceeding would determine applicable remedies available to the General Partner as a result of the Debtor's status as a "defaulting partner."

AP0615

30.     The information sought in the Motion overlaps entirely with the Adversary Proceeding and the Debtor's purported purpose for seeking the Rule 2004 discovery, *i.e.*, determining the Debtor's assets, affairs, rights, obligations, and liabilities as they relate to the Fund, cannot only be fully and thoroughly established by determination of the Complaint in the Adversary Proceeding, but will not be ascertainable absent the Adversary Proceeding in light of the current disputes between the Parties.

## <u>CONCLUSION</u>

WHEREFORE, for all the foregoing reasons, the General Partner, the Fund and the Manager respectfully request that the Court deny the Motion and direct discovery procedures to take place in accordance with the Federal Rules of Bankruptcy Procedure applicable to the Adversary Proceeding.

AP0616

Dated: April 14, 2023

By: _/s/ Eric D. Schwartz_____
    Eric D. Schwartz (No. 3134)
    Daniel B. Butz (No. 4227)
    Evanthea Hammer (No. 7061)
    Morris, Nichols, Arsht & Tunnell LLP
    1201 North Market Street, 16th Floor
    P.O. Box 1347
    Wilmington, DE 19899
    Telephone: (302) 658-9200
    Email: eschwartz@morrisnichols.com
          dbutz@morrisnichols.com
          ehammer@morrisnichols.com

    -and-

    Paul Werner (admitted *pro hac vice*)
    A. Joseph Jay III (admitted *pro hac vice*)
    SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
    2099 Pennsylvania Avenue NW, Suite 100
    Washington, D.C. 20006-6801
    Telephone: (202) 747-1900
    Email: pwerner@sheppardmullin.com
          jjay@sheppardmullin.com

    -and-

    Edward H. Tillinghast, III (admitted *pro hac vice*)
    SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
    30 Rockefeller Plaza
    New York, New York 10112-0015
    Telephone: (212) 653-8700
    Email: etillinghast@sheppardmullin.com

    *Attorneys for FTI GP I, LLC on behalf of Falcata Tech Investment Fund I, L.P.*

-15-

AP0617

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| POINT INVESTMENTS, LTD. (IN LIQUIDATION),[1] | Case No. 22-10261 (TMH) |
| | **Hearing Date: April 27, 2023 at 10:00 a.m. (ET)** |
| Debtor in a Foreign Proceeding. | **Re: [D.I. 47]** |

## FOREIGN REPRESENTATIVES' OBJECTION TO MOTION OF FTI GP I, LLC ON BEHALF OF FALCATA TECH INVESTMENT FUND I, L.P. FOR DETERMINATION THAT THERE IS NO AUTOMATIC STAY, OR IN THE ALTERNATIVE, SEEKING RELIEF FROM THE AUTOMATIC STAY TO PROCEED WITH ADVERSARY PROCEEDING

Andrew Childe and Richard Lewis of FFP Limited, and Mathew Clingerman of Kroll Bermuda Ltd. (the "Foreign Representatives"), in their capacity as the foreign representatives of Point Investments, Ltd. (the "Debtor"), in respect of the winding up proceeding pending before the Supreme Court of Bermuda (the "Bermuda Court"), Commercial Court, Case 2020: No. 300 (the "Bermuda Proceeding"), by and through the undersigned counsel, hereby file this objection (the "Objection") to the *Motion of FTI GP I, LLC, on Behalf of Falcata Tech Investment Fund I, L.P., for Determination that there is No Automatic Stay, or in the Alternative Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding* [D.I. 47] (the "Relief from Stay Motion"). In support of this Objection, the Foreign Representatives submit (i) the *Declaration of Andrew Childe in Support of Foreign Representatives' Objection to Motion of FTI GP I, LLC, on Behalf of Falcata Tech Investment Fund I, L.P. for Determination that there is No Automatic Stay, or in the Alternative, Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding* (the "Childe Declaration"); and (ii) the *Declaration of Jayson Wood in Support of*

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

*Foreign Representatives' Objection to Motion of FTI GP I, LLC, on Behalf of Falcata Tech Investment Fund I, L.P., for Determination that there is No Automatic Stay, or in the Alternative, Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding* (the "<u>Wood Declaration</u>"), each filed contemporaneously herewith. In support of this Objection, the Foreign Representatives respectfully state as follows:

**<u>PRELIMINARY STATEMENT</u>**

1.      Through the Relief from Stay Motion, FTI GP I, LLC (the "<u>General Partner</u>") asks this Court to hold that the automatic stay—one of the most fundamental protections afforded to a foreign debtor under Chapter 15—does not apply to the General Partner's commencement of an adversary proceeding that seeks to adjudicate the General Partner's pre-petition claim. Alternatively, the General Partner belatedly seeks relief from the automatic stay to permit it to prosecute the Adversary Proceeding to the detriment of the Debtor and other creditors that are abiding by the Debtor's liquidation process overseen by the Bermuda Court. The Relief from Stay Motion should be denied.

2.      As set forth in the Foreign Representatives' Stay Enforcement Motion,[2] the Adversary Proceeding is barred by the automatic stay because it is the exact type of proceeding—one that seeks to determine a foreign creditor's prepetition claim—that courts have long refused to adjudicate based on principles of comity. The General Partner asks this Court to adopt a tortured interpretation of section 1520 of the Bankruptcy Code, arguing (incorrectly) that the broad protection of the automatic stay somehow applies only to property of the Debtor in the United States but does not bar a proceeding against the Debtor in the United States that concerns foreign

---

[2] *See Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and for Damages* [D.I. 52] (the "<u>Stay Enforcement Motion</u>"). Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Stay Enforcement Motion.

AP0619

property. This absurd reading runs contrary to the express terms of section 1520, which provides that the stay is applicable to both the Debtor *and* property of the Debtor located in the United States. The General Partner's position also conflicts with decisions interpreting section 1520—including cases the General Partner itself cites for support.

3.     The General Partner's argument that the "home court" rule permits the filing of its adversary proceeding also misses the mark. The "home court" rule is a doctrine used in Chapter 7 and Chapter 11 cases. It provides that a creditor's commencement of an adversary proceeding against a debtor does not violate the automatic stay because an adversary proceeding under those circumstances is equivalent to filing a proof of claim. Unlike in Chapter 7 and Chapter 11 cases where creditors file proofs of claim against a debtor in the home bankruptcy court, there is no bankruptcy estate or claims process in a Chapter 15 proceeding. That process is overseen by the foreign court—in this case the Bermuda Court—which is properly considered the "home court." Thus, the "home court" rule does not permit the filing of the Adversary Proceeding.

4.     Relief from the automatic stay is also unwarranted. The General Partner falls far short of satisfying its burden of demonstrating a *prima facie* case for lifting the automatic stay. Moreover, a balancing of the equities decisively weighs in favor of maintaining the stay. The Debtor would face significant prejudice if the stay were modified and the Foreign Representatives were forced to litigate prepetition claims in multiple jurisdictions worldwide, as opposed to claims being centralized in Bermuda. The General Partner will face no comparable harm by liquidating its claim through the Bermuda Proceeding—just like all other creditors of the Debtor. The General Partner's unfounded assertion that it has a likelihood of success on the merits is belied by a myriad of jurisdictional, factual, and legal issues—including complex issues of Cayman and Bermuda law—that would arise in litigating the Adversary Proceeding. Finally, the nascent nature of the

3

Adversary Proceeding (where motions testing the sufficiency of the complaint have not yet been filed and discovery has not been conducted) also weighs in favor of denying relief from the automatic stay. For all these reasons, and those set forth below, the Relief from Stay Motion should be denied.

## BACKGROUND

5.      Background information regarding the Debtor, the Bermuda Proceeding, the Chapter 15 Case, and the Adversary Proceeding is set forth in the Stay Enforcement Motion and incorporated by reference herein.

## ARGUMENT

**I.      The Automatic Stay Is A Fundamental And Broad Protection That Was Afforded To The Debtor Upon Recognition And Bars The Adversary Proceeding**

**A.      The Plain Text Of Section 1520 And Decisions Interpreting This Provision Make Clear That The Automatic Stay Bars the Adversary Proceeding**

6.      The General Partner incorrectly contends that "by virtue of the ancillary nature of a chapter 15 proceeding and the in rem nature of the court's jurisdiction, the stay afforded under section 1520(a)(1) of the Bankruptcy Code is limited to actions against property of Point within the territorial jurisdiction of the United States..." Relief from Stay Mot. ¶ 12. This argument ignores the express terms of the Bankruptcy Code and the Recognition Order, and likewise is at odds with cases applying section 1520. Therefore, it should be rejected.

7.      As set forth in the Stay Enforcement Motion, this Court entered the Recognition Order on April 22, 2022 [D.I. 34] recognizing the Bermuda Proceeding as a "foreign main proceeding" pursuant to section 1517 of the Bankruptcy Code. *See* Recognition Order ¶ 3. As such, there can be no dispute that the protections of the automatic stay went into effect at that time pursuant to section 1520 of the Bankruptcy Code. *See* 11 U.S.C. § 1520(a)(1); *In re Irish Bank Resol. Corp. Ltd.*, No. 13-BK-12159 (CSS), 2014 WL 9953792, at *18 (Bankr. D. Del. Apr. 30,

AP0621

2014), *aff'd*, 538 B.R. 692 (D. Del. 2015) ("Pursuant to § 1520, recognizing the Liquidation Proceedings as foreign main proceedings triggers the automatic stay of § 362").

8.      The express language of the Bankruptcy Code is clear that these protections apply not only to the Debtor's *property* located within the territorial jurisdiction of the United States but to *the Debtor itself. See* 11 U.S.C. § 1520(a)(1) ("Upon recognition…[section] 362 appl[ies] *to the debtor and* property of the debtor that is within the territorial jurisdiction of the United States") (emphasis added); *see also In re O'Reilly*, 598 B.R. 784, 790 (Bankr. W.D. Pa. 2019) ("[U]pon 'recognition' of a foreign 'main proceeding,' the automatic stay … applies with respect to *both* the debtor and property of the debtor that is within the territorial jurisdiction of the United States") (emphasis added).[3]

9.      Applying section 1520, courts have found that upon recognition, "the commencement of *any legal proceedings* against [the foreign debtor] within the territorial jurisdiction of the United States is barred." *In re Sibaham Ltd.,* No. 19-BK-31537, 2020 WL 2731870, at *1 (Bankr. W.D.N.C. May 4, 2020) (emphasis added); *see also In re Irish Bank Resol. Corp. Ltd.*, No. 13-BK-12159 (CSS), 2019 WL 4740249, at *4 (D. Del. Sept. 27, 2019) (affirming bankruptcy court's decision that the automatic stay applied to an adversary proceeding that did not assert claims against property of the debtor). At bottom, the General Partner's interpretation is wholly unsupported by the express terms of the Bankruptcy Code and "disregards the international origins and purposes of chapter 15 and leads to absurd consequences that could not have been

---

[3] The Recognition Order itself also makes clear that the automatic stay applies to both the Debtor and the Debtor's property located within the territorial jurisdiction of the United States, providing that:

> All relief and protection afforded to foreign main proceedings under section 1520 of the Bankruptcy Code is hereby granted to the Bermuda Proceeding, *the Debtor*, *the Debtor's property located in the United States*, and the foreign representatives, as applicable.

Recognition Order ¶ 5 (emphasis added).

AP0622

intended by Congress or the international experts in insolvency law who drafted the Model Law on Cross-border insolvency on which chapter 15 is based." *In re JSC BTA Bank*, 434 B.R. 334, 336 (Bankr. S.D.N.Y. 2010).

10.     In an attempt to support its position, the General Partner relies on *In re JSC Bank*, where the United States Bankruptcy Court for the Southern District of New York considered whether the automatic stay arising under section 1520 barred a creditor from proceeding with arbitration in Switzerland. *Id*. at 334. But the Court in *JSC Bank* did not find that the automatic stay in a Chapter 15 case applies *only* to property of a debtor in the United States or make any findings that would support such interpretation. Instead, the Court held that the automatic stay in a Chapter 15 case "applies to [a] debtor within the United States for *all purposes*, and may extend to the debtor as to proceedings in other jurisdictions for purposes of protecting property of debtor that is within territorial jurisdiction of the United States, but does not apply globally to all proceedings against [a] debtor." *See id*. at 334 (emphasis added).

11.     In fact, the Court in *JSC Bank* acknowledges the distinction between the applicability of the stay to *property of the debtor* and to *the debtor itself. Id.* at 342 (finding that, with respect to property of the debtor, the automatic stay "applies only to property within the United States … [which] serves to eliminate any doubt as to the extent of the authority of the bankruptcy court over *property* of a foreign debtor" but finding that "[s]uch obvious precision appears to be lacking with respect to the application of the automatic stay in a chapter 15 case to the *foreign debtor itself*") (emphasis added). After undertaking a fulsome analysis of section 1520, the Court concluded that:

> [T]he best reading of section 1520(a)(1) … is that the stay arising in
> a chapter 15 case upon recognition of a foreign main proceeding
> applies to the debtor within the United States for *all purposes* and
> may extend to the debtor as to proceedings in other jurisdictions for

6

> purposes of protecting property of the debtor that is within the
> territorial jurisdiction of the United States.

*Id*. at 343 (emphasis added). Accordingly, the General Partner's interpretation of Section 1520 is

squarely at odds with *JSC Bank*.

12.     For all these reasons, the General Partner's flawed interpretation of section 1520 of

the Bankruptcy Code should be rejected, and the Court should hold that the automatic stay applies

to the Adversary Proceeding.

**B.     The So-Called "Home Court" Rule Does Not Apply To An Adversary
        Proceeding In A Chapter 15 Case Because Bermuda Is The "Home Court"**

13.     The General Partner next argues that the Adversary Proceeding is not barred by the

automatic stay because "[t]he majority of bankruptcy courts, including courts in this district, hold

that 'the Code implicitly permits the filing of suit in the bankruptcy court against debtor without

violating the automatic stay.'" Relief from Stay Mot. ¶ 19. The General Partner is wrong. While

courts have adopted the so-called "home court" rule in Chapter 7 and Chapter 11 cases, that rule

simply does not apply in Chapter 15 cases.

14.     The rationale underlying the home court rule is that the "filing of an adversary

proceeding against a debtor in the home bankruptcy court is equivalent to the filing of a proof of

claim in the Debtor's bankruptcy case and, therefore, does not violate the automatic stay." *In re*

*Uni Marts, LLC*, 405 B.R. 113, 129 (Bankr. D. Del. 2009). Courts have thus permitted adversary

proceedings brought in a Chapter 7 or Chapter 11 case because "[h]aving such litigation go forward

in what can be termed the home court centralizes all actions against the debtor in one forum under

the control of one court and thereby aids the home court in protecting the debtor and creditors and

in efficiently administering the estate." *In re Bird*, 229 B.R. 90, 95 (Bankr. S.D.N.Y. 1999).

15.     However, unlike in a Chapter 7 or Chapter 11 case, a Chapter 15 case is an ancillary

proceeding to the foreign main proceeding. The bankruptcy court overseeing a Chapter 15

AP0624

proceeding is *not* the debtor's "home court"—the court overseeing the foreign proceeding is. In this case, the Debtor's "home court" is Bermuda, where creditors will be permitted to file proofs of claim and receive distributions in a process overseen by the Bermuda Court. *See* Wood Decl. ¶¶ 13-19 (discussing claims process in Bermuda). As such, the rationale underlying the home court rule does not apply here. Indeed, the General Partner cites no cases (nor can it) where a bankruptcy court has applied the home court rule to permit an adversary proceeding in a Chapter 15 case. Accordingly, the "home court" rule does not provide a basis for the General Partner's commencement of the Adversary Proceeding in violation of the automatic stay.

## II. The General Partner Has Failed To Meet Its Burden, And No Cause Exists To Lift The Automatic Stay

### A. The General Partner Has Failed To Make A *Prima Facie* Case That The Stay Should Be Lifted

16. The General Partner seeks relief under section 362(d)(1) of the Bankruptcy Code, which enables a party in interest to request relief from the automatic stay upon a showing of "cause." 11 U.S.C. § 362(d)(1). The party seeking stay relief under section 362(d)(1) of the Bankruptcy Code "must initially produce evidence establishing 'cause' for the relief he requests." *In re Touloumis*, 170 B.R. 825, 828 (Bankr. S.D.N.Y. 1994). A showing of "cause" is a fact-specific inquiry, in which the movant must substantiate its case with an evidentiary showing of a factual and legal right to the relief it seeks. *See In re RNI Wind Down Corp.*, 348 B.R. 286, 299–300 (Bankr. D. Del. 2006) (denying stay relief motion where movant failed to move supporting declaration and documentation into the record and finding that, even if declaration and supporting documents had been admitted into evidence, such evidence was insufficient to make a *prima facie* case to lift the stay); *In re Touloumis*, 170 B.R. at 828 ("[T]he movant must initially produce evidence establishing 'cause' for the relief he requests.") (citations omitted).

AP0625

17.     Failure to prove a *prima facie* case requires denial of the requested relief. *See In re Aleris Int'l, Inc.*, 456 B.R. 35, 46-47 (Bankr. D. Del. 2011) (quoting *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285 (2d. Cir. 1990)) ("If the movant fails to make an initial showing of cause, however, the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection."); *In re DBSI, Inc.*, 432 B.R. 126, 134 (Bankr. D. Del. 2010) (denying lift from stay motion where the bank failed to make a *prima facie* showing). Only after the moving party establishes a *prima facie* case for "cause" does the burden shift to the debtor to disprove its existence. *Burger Boys, Inc. v. South St. Seaport Ltd. P'ship (In re Burger Boys, Inc.)*, 183 B.R. 682, 687 (S.D.N.Y. 1994) (citing 11 U.S.C. § 362(g)(1)); *In re Touloumis*, 170 B.R. at 828.

18.     Here, the General Partner fails to submit evidence demonstrating why "cause" exists to lift the automatic stay. Indeed, the only attachments to the Relief from Stay Motion are the proposed form of order and notice of hearing, and the General Partner did not submit any supporting declaration. The Relief from Stay Motion itself contains only three perfunctory paragraphs attempting to explain why cause exists that rely on conclusory and unsubstantiated statements, which is plainly insufficient to satisfy the General Partner's burden.  *See In re Texaco Inc.*, 81 B.R. 820, 829 (Bankr. S.D.N.Y. 1988) ("Conclusory statements that a continuance of the stay will cause irreparable harm or that injury will occur if relief is denied are insufficient to establish cause."). For these reasons, the Relief from Stay Motion should be denied based on the lack of support and the General Partner's failure to make out a *prima facie* case.

**B.    The *Rexene* Factors Weigh Against Lifting The Automatic Stay**

19.     Separate and apart from its failure to provide any evidentiary support, the General Partner fails to show that "[the] balance of hardships from not obtaining relief tips significantly in its favor." *See In re Aleris Int'l, Inc.*, 456 B.R. at 47. "The three prongs of the balancing test are

(1) whether any great prejudice to either the bankrupt estate or the debtor will result from lifting the stay, (2) whether the hardship to the non-bankrupt party by the maintenance of the stay considerably outweighs the hardship to the debtor if the stay is lifted, and (3) whether it is probable that the creditor will prevail on the merits of its case against the debtor." *Id.* at 47-48 (citation omitted).

20.     When applying these factors, courts place an "emphasis on whether lifting the automatic stay will imped[e] the orderly administration of the debtor's estate." *In re DBSI, Inc.*, 407 B.R. 159, 167 (Bankr. D. Del. 2009). Where, as here, "the movant is an unsecured creditor, the policies underlying the automatic stay weigh against granting the relief requested." *In re Residential Cap., LLC*, No. 12-BK-12020 (MG), 2012 WL 3249641, at *3 (Bankr. S.D.N.Y. Aug. 7, 2012); *In re Leibowitz*, 147 B.R. 341, 345 (Bankr .S.D.N.Y. 1992) ("[T]he general rule is that claims that are not viewed as secured in the context of section 362(d)(1) should not be granted relief from the stay unless extraordinary circumstances are established to justify such relief."); *see also* Wood Decl. ¶ 10 (discussing exceptional circumstances for lifting the stay under Bermuda law).

### (1)     Factor 1 – The Debtor And Its Other Creditors Will Suffer Great Prejudice From Lifting The Stay

21.     The General Partner contends that lifting the automatic stay to permit the Adversary Proceeding to continue "will not prejudice [the Debtor] because the relief sought against [the Debtor] will not materially impact or stall [the Debtor's] Chapter 15 recognition proceeding as [the Debtor] has already been granted recognition." Relief from Stay Mot. ¶ 26. This argument misses the mark. In the context of a Chapter 15 case, the question is not whether lifting the automatic stay will impact the Chapter 15 recognition process, but whether lifting the automatic stay will negatively impact the Debtor and its other creditors.

AP0627

22.     Here, the prejudice to the Debtor of modifying the stay is clear. If the General Partner were allowed to prosecute its pre-petition claims against the Debtor ahead of other creditors, other parties would be more likely to file similar actions to adjudicate claims against the Debtor outside of Bermuda. This "floodgate" concern is "the very state of affairs the automatic stay was enacted to prevent." *See Lawrence v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, No. 09-50026 (REG), 2010 WL 4630327, at *5 (S.D.N.Y. Nov 8, 2010); *see also In re Residential Cap., LLC*, No. 12-BK-12020 (MG), 2012 WL 3249641, at *2 (Bankr. S.D.N.Y. Aug. 7, 2012) ("The automatic stay is intended to 'allow the bankruptcy court to centralize all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas.'"); *see also* Wood Decl. ¶¶ 9-10 (discussing importance of channeling claims to the Bermuda Proceeding).

23.     Further, the General Partner's argument that modifying the stay "will aid in a more expedient timeline to determine [the Debtor's] and Falcata's rights . . ." conflicts with the primary purposes of this Chapter 15 Case. Relief from Stay Mot. ¶ 26. The purpose of the automatic stay is to "prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor." *In re Irish Bank Resol. Corp. Ltd.*, No. 13-BK-12159 (CSS), 2014 WL 9953792, at *18  (quoting *Ass'nc. of St. Croix Condo. Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir.1982)).  In direct contravention of these purposes, Falcata effectively concedes that, by commencing the Adversary Proceeding, it is seeking special treatment not currently available to other creditors of the Debtor, precisely because it wishes to expedite the resolution of its claim.  This is not a sound basis for seeking relief from the stay, and, in any event, the Adversary Proceeding raises complex

11

issues of foreign law that can be more efficiently resolved in other jurisdictions as explained in Paragraphs 33-39, *infra*.

24.     In sum, authorizing the relief requested in the Motion would have a prejudicial effect on the Debtor and the Bermuda Proceeding, as it would allow a creditor to liquidate its claim outside of the Bermuda claims process, which may incentivize other creditors to do the same, resulting in increased costs to the Debtor. *See* Childe Decl. ¶ 5. On the other hand, maintaining the automatic stay merely keeps the General Partner on an equal footing with the other creditors in the Bermuda Proceeding and promotes an efficient claims process by channeling claims to Bermuda. Indeed, Courts in Bermuda have emphasized the importance of the automatic stay triggered under Section 167(4) of the Companies Act in channeling claims against a debtor into its winding up proceeding. *See* Wood Decl. ¶ 9.

25.     For these reasons, lifting the stay would impede the orderly liquidation of the Debtor being undertaken in Bermuda, thus causing prejudice to the Debtor and its other stakeholders.

### (2)     Factor 2 – The General Partner Will Suffer Minimal, If Any, Hardship If the Stay Is Maintained

26.     The General Partner fails to articulate—let alone substantiate with evidence—the potential hardship it would suffer if the stay is maintained and it were treated like any other creditor in the Bermuda Proceeding. Instead, the General Partner makes the conclusory statement that the "hardship to the General Partner that would result from the Adversary Proceeding not moving forward greatly outweighs any hardship [the Debtor] may experience by litigating the Complaint." Relief from Stay Mot. ¶ 27. Without specifying more, the General Partner plainly has failed to show how the continued maintenance of the automatic stay "considerably outweighs" the hardship to the Debtor if the stay is lifted. *See In re Aleris Int'l, Inc.*, 456 B.R. at 48 (finding that creditor

AP0629

failed to show that its continued dispossession of equipment would cause it greater hardship than the hardship on the Debtor if the stay were lifted and the Debtor was dispossessed).

27.     As set forth in the Stay Enforcement Motion and the Wood Declaration, the General Partner remains free to pursue its claims against the Debtor through the Debtor's winding up proceeding in Bermuda. Stay Enforcement Mot. ¶ 24; Wood Decl. ¶ 10, 13-19. To that end, the Foreign Representatives will be noticing the deadline for creditors to file and prove proofs of debt. *Id*. Further, the Bermuda Proceeding is a fundamentally fair process that will afford the General Partner the opportunity to have its rights fairly adjudicated. *See* Stay Enforcement Mot. ¶¶ 37-39. Indeed, under Bermuda Law, the Foreign Representatives are required to examine any proof of debt submitted by the General Partner on behalf of Falcata and determine whether to admit or reject such debt in whole or in part. *See* Wood Decl. ¶¶ 14-17. Should the General Partner disagree with the Foreign Representatives' determination, it is permitted to make an application to appeal such determination to the Bermuda Court. *See id*. at 17. The General Partner has not articulated any specific reason why it would be prejudiced by pursuing its claims in the Bermuda Proceeding. Therefore, the second factor does not weigh in favor of modifying the automatic stay.

### (3)     Factor 3 – It Is Improbable That The General Partner Will Prevail On The Merits

#### a.     The Adversary Proceeding Is In Its Initial Stages

28.     Despite the Adversary Proceeding being in its nascent stages, the General Partner maintains that it has a strong likelihood of success on the merits. But the fact that the Adversary Proceeding was just recently commenced weighs heavily in favor of maintaining the automatic stay. *See In re Sonnax Indus., Inc.*, 907 F.2d at 1287 (affirming district court's decision to deny relief from stay due, in part, to the fact that "the litigation in state court has not progressed even to the discovery stage"); *Arnold Dev., Inc. v. Collins (In re Collins)*, 118 B.R. 35, 38 (Bankr. D.

AP0630

Md.1990) (declining to lift stay when the parties in the state court proceeding had not yet begun discovery); *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 2017 WL 7156341 (D.P.R. July 19, 2017) (denying relief from stay where "the Litigation is in its very early stages—an initial dispositive motion is pending, and no class certification or discovery proceedings have been initiated—and the parties are far from ready for trial."); *cf. with In re SCO Grp., Inc.,* 395 B.R. 852 (Bankr. D. Del. 2007) (finding cause existed to lift stay where litigation had been pending for *four years* and was *ready for trial* immediately prior to commencement of bankruptcy case).

29.     It is simply too early in the Adversary Proceeding for this Court to determine that the General Partner has a strong likelihood of success on the merits. *See Stevenson v. Beard*, No. 3:16-CV-3079-TWR-RBM, 2020 WL 7227210, at *3 (S.D. Cal. Dec. 7, 2020) (denying motion for relief from stay because "[a]t this early stage of litigation, it is difficult to determine Plaintiff's likelihood of success on the merits of his claims."). Indeed, there has been no motion practice to test the sufficiency of the Adversary Complaint, discovery has not been conducted, and the Adversary Proceeding is nowhere near trial. *See In re Residential Cap., LLC*, No. 12-BK-12020 (MG), 2012 WL 3249641, at *4 (Bankr. S.D.N.Y. Aug. 7, 2012) (denying motion to lift stay where "[t]here has been no motion practice addressing the sufficiency of the pleadings or of the evidence supporting the claims, counterclaims or defenses ... [d]iscovery, trial preparation and, absent a settlement, trial all remain to be done."). In fact, the Adversary Complaint is not even verified and, thus, the General Partner's assertion that its claims "without doubt have a strong likelihood of success" (*see* Relief from Stay Mot. ¶ 28) is based entirely on unsubstantiated allegations in the Adversary Complaint.

AP0631

### b. *Jurisdictional Issues Make It Improbable That The General Partner Will Be Successful*

30.     In determining likelihood of success on the merits, the General Partner must also demonstrate that this Court has jurisdiction over the claims asserted in the Adversary Complaint. *See In re Irish Bank Resol. Corp. Ltd.*, No. 13-BK-12159 (CSS), 2019 WL 4740249, at *7 (D. Del. Sept. 27, 2019) ("Issues of personal and subject matter jurisdiction … are proper considerations as part of assessing the third prong of this standard."). As a threshold matter, the General Partner concedes that its claims are "not against property [of the Debtor] 'within the territorial jurisdiction of the United States'" (Relief from Stay Mot. ¶ 18) and that the claims do not fall within the "in rem nature of the court's jurisdiction" (*id.* at ¶ 12). The General Partner further concedes that the Adversary Proceeding is a non-core proceeding. *See* Adv. Comp. ¶ 10 ("This adversary proceeding is a non-core proceeding under 28 U.S.C. § 157(c)"). Accordingly, the only basis for this Court's subject matter jurisdiction would be "related to" non-core jurisdiction.

31.     Even assuming the General Partner can establish that this Court has "related to" jurisdiction (which the General Partner has not done, and the Foreign Representatives do not concede), the Court may be required to abstain from exercising jurisdiction or may exercise its discretion to do so. *See In re Fairfield Sentry Ltd. Litig.*, 458 B.R. 665, 689 (S.D.N.Y. 2011) ("The Court need not address whether 'related to' jurisdiction exists in these cases because even if it does, the Bankruptcy Court must reconsider abstaining from hearing these cases…"). Indeed, mandatory abstention is likely required under the circumstances, as would be set out by the Foreign Representatives in any motion to dismiss filed in the Adversary Proceeding.[4] *See generally*,

---

[4] Under 28 U.S.C. § 1334(c)(2), a court must abstain if (1) the proceeding is based on a state law claim or cause of action; (2) the claim or cause of action is "related to" a case under title 11, but does not "arise under" title 11 and does not "arise in" a case under title 11; (3) federal courts would not have jurisdiction over the claim but for its relation to a bankruptcy case; (4) an action "is commenced" in a forum of appropriate jurisdiction; and (5) the action can be "timely adjudicated" in a forum of appropriate jurisdiction. *See Stoe v. Flaherty*, 436 F.3d 209, 213 (3d Cir. 2006), as

AP0632

*Principal Growth Strategies, LLC v. AGH Parent LLC*, 615 B.R. 529, 539 (D. Del. 2020) (discussing mandatory and permissive abstention in relation to Chapter 15 case and granting motion for mandatory abstention). Alternatively, the Court may permissively abstain based on principles of international comity. *Id.*

32.     Moreover, given the non-core nature of the Adversary Proceeding, lifting the automatic stay would not serve "the interests of judicial economy and the expeditious and economical resolution of litigation." *In re Sonnax Indus., Inc.*, 907 F.2d at 1286. This is because, absent consent of the parties, the Bankruptcy Court can only submit recommended findings of fact and conclusions of law to the District Court. *See e.g.*, *In re Nw. Airlines Corp.*, 384 B.R. 51, 57 (S.D.N.Y. 2008) ("With respect to non-core proceedings, unless the parties agree otherwise, the bankruptcy court can only recommend findings of fact and conclusions of law … [that] are subject to de novo review by the district court."). Accordingly, interests of judicial efficiency weigh against having this Court adjudicate the Adversary Proceeding because it cannot enter a final order absent both parties' consent.[5]

> c.   *The Adversary Proceeding Raises Complex Foreign Law Issues And The General Partner Has Failed To Show A Likelihood Of Success Under Foreign Law*

33.     Finally, the merits of the claims in the Adversary Proceeding are far more complex than the General Partner makes them out to be and implicate issues of foreign law. Further, even

---

amended (Mar. 17, 2006). All of these requirements appear to be present (or conceded) given that (1) the claims are based on non-bankruptcy law governing the LPA and MTA, including the law of Cayman Islands and Delaware, respectively; (2) the General Partner alleges "related to" jurisdiction; (3) diversity jurisdiction is not alleged to be present, and it likely cannot be established given that Falcata maintains the same citizenship of its partners (*i.e.*, the Debtor) (*see Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 419 (3d Cir. 2010) ("[A] partnership, as an unincorporated entity, takes on the citizenship of each of its partners"); (4) an action is pending in Bermuda (*i.e.*, the Bermuda Proceeding); and (5) Falcata's claim can be timely adjudicated in the Bermuda Proceeding through the ordinary proof of debt process.

[5] For the avoidance of doubt, nothing in this Objection or the Stay Enforcement Motion shall be deemed to constitute the Foreign Representative's consent to the Bankruptcy Court entering a final order in the Adversary Proceeding.

AP0633

if the General Partner were successful in the Adversary Complaint, this Court could not issue complete relief to the parties.

> (i)    As Cayman Islands Law Makes Clear, This Is Not a Simple Breach of Contract Case

34.    The Adversary Complaint alleges that the Debtor breached its obligations under the LPA, which is governed by the law of the Cayman Islands, and MTA by allegedly failing to make a capital contribution in July 2020 in the amount of $625,000 (the "July 2020 Capital Contribution"). Adv. Compl. ¶¶ 36-41, 50-52, 59-61. This capital contribution was requested on account of management fees, not for sums needed to fund or maintain Falcata's portfolio investments that have been in wind-down since July 2019. *See* Childe Decl. ¶ 6; MTA (Recital G) (providing that Falcata and the Debtor desire for Falcata to sell its assets and liquidate). Moreover, the amount of the Debtor's contribution to Falcata on the date of the request for the July 2020 Capital Contribution was well in excess of such requested capital contribution. *See* Childe Decl. ¶ 6. Thus, there was plainly more than adequate invested capital to cover such expenses. *Id.*[6] Nevertheless, the General Partner alleges that the Debtor is a "Defaulting Partner" by citing to provisions of the LPA, but without analyzing what the terms actually mean and how they operate in the specific context of the relationship between the General Partner and the Debtor.

35.    To determine whether the General Partner has properly designated the Debtor as a "Defaulting Partner," a court must consider not only the express terms of the LPA and the MTA, but also whether the General Partner acted in accordance with its duties to the Debtor—the sole limited partner of Falcata—under various sources of Cayman Islands law. Those sources include:

---

[6] As set forth in the *Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1* [D.I. 53, 58] (the "Discovery Motion"), the Foreign Representatives have sought information related to, among other things, Falcata's financial performance, which the General Partner has inexplicably refused to provide.

AP0634

(i) the Cayman Island's Exempted Limited Partnership Act, attached as **Exhibit A** to the Wood Declaration, which governs exempted limited partnerships in the Cayman Islands, (ii) principles of equity and common law as they relate to exempted limited partnerships, and (iii) Cayman's law of trusts, given that the General Partner holds all property and rights of Falcata on trust for the benefit of the Debtor. *See* Wood Decl. ¶ 20. Such law should be analyzed in light of the Debtor's status as the *sole* limited partner of Falcata and thus the *only* entity to which the General Partner owes duties. *Id.*

36.     The reason a court must look to these other sources of Cayman Islands law is because the General Partner is not a simple commercial counterparty to the LPA, but has substantially broader and more complex obligations. *Id.* at ¶ 21. As the general partner of a Cayman Islands exempted limited partnership, the General Partner acts as a statutory trustee for the benefit of the limited partners, such as the Debtor. *Id.* The General Partner also owes fiduciary duties to the Debtor, including a duty to act in good faith and in the Debtor's interests, and it owes other duties arising in equity and common law in accordance with Cayman Islands partnership law. *Id.* These duties include a duty of utmost good faith, a duty to account, a duty to avoid conflicts of interest, and certain irreducible core duties as trustee, for example a duty to exercise fiduciary powers for the benefit of the beneficiaries of a statutory trust. *Id.* These duties are enforceable by the Debtor as the sole limited partner. *Id.*

37.     In this case, the Foreign Representatives submit that the purported designation of the Debtor as a "Defaulting Partner," was invalid and a breach by the General Partner of its fiduciary obligations to the Debtor under these various sources of Cayman Islands law. The Debtor is Falcata's sole limited partner and the General Partner is supposed to be acting for the benefit of the Debtor as the sole beneficiary of the statutory trust (*i.e.*, Falcata). The General Partner's

AP0635

decision to default the Debtor cannot have been taken for the benefit of any other beneficiary (*i.e.*, other limited partners) because the Debtor is the only beneficiary. Thus, the General Partner has apparently disregarded the Debtor's interest (the sole interest that it is supposed to act on behalf of) and taken steps that benefit no one but itself. Moreover, the General Partner has completely shut out the Foreign Representatives from obtaining information regarding, amongst other things, the General Partner's efforts to liquidate its assets (as it is required to do pursuant to the MTA) and to disclose what it plans to do with any capital gains made on the assets acquired with the Debtor's capital. Accordingly, under Cayman Islands law, the designation of the Debtor as a "Defaulting Partner" is invalid because the General Partner failed to exercise its powers appropriately and—what's more—the Debtor has viable counterclaims against the General Partner for breaching its duties.

38.     In addition, even if its designation of the Debtor as a defaulting partner was valid, as a statutory trustee, the General Partner cannot simply surrender its discretion and decision making powers to this Court by filing for declaratory relief. *See* Wood Decl. ¶ 23. Indeed, should the Bankruptcy Court decide to lift the stay to permit the Adversary Proceeding to go forward, it would need to consider complex questions regarding Cayman's law of trusts to determine whether it even has authority to declare that the General Partner may seek rights and remedies under section 5.4 of the LPA. The Bankruptcy Court would have to consider, as a matter of Cayman law, whether it is a breach of the General Partner's duties to Falcata and to the Debtor to have sought to surrender its decision making powers to the Bankruptcy Court in the manner in which it has.

39.     At bottom, the General Partner's apparent selfish and capricious actions make it unlikely that it will succeed on any claims against the Debtor in light of various principles of

AP0636

Cayman's exempted limited partnership, trust, and common law. The General Partner's reliance on mere principles of contract law paint only part of the picture.

> (ii)    *As A Matter of Bermuda Law, This Court Cannot Issue Complete Relief Because the Debtor's Setoff Rights Will Be Litigated in the Bermuda Proceeding*

40.    Lastly, to completely liquidate the General Partner's claim in the Adversary Proceeding, a court would need to consider, as a matter of Bermuda law, amounts that may be set-off against the General Partner's claims. *See* Wood Decl. ¶ 16. Indeed, the General Partner's claim is likely subject to set-off against certain amounts, including partnership expenses that the Debtor paid on behalf of the General Partner and/or Falcata in June 2017 and June 2018 that total more than the July 2020 Capital Contribution, among other expenses. *See* Childe Decl. ¶ 7; Wood Decl. ¶ 16. Ironically, this would require that the General Partner provide the Foreign Representatives with documents and information related to its claim and potential setoff amounts—documents that the Foreign Representatives have sought for months but the General Partner has refused to provide as set forth in the Foreign Representatives' Discovery Motion. Again, the proper forum for any liability and any set-off to be considered is the Debtor's claim process in Bermuda, where there is a mechanism for the General Partner to submit a proof of debt, have its claim evaluated by the Foreign Representatives, and appeal any decision to the Bermuda Court. Wood Decl. ¶¶ 14-15. There is simply no reason for this Court to step into the shoes of the Bermuda Court here.

41.    In sum, if the Adversary Proceeding were to go forward the Court would be required to resolve complex issues of Cayman and Bermuda law that are best left to foreign courts. Simply determining that the Debtor breached the LPA and MTA and is a "Defaulting Partner" as a matter of contractual interpretation would not resolve the issues between the Debtor and the General Partner. These facts unquestionably militate against lifting the stay. *See In re Residential*

AP0637

*Cap., LLC,* No. 12-BK-12020 (MG), 2012 WL 3249641, at *4 (Bankr. S.D.N.Y. Aug. 7, 2012) (denying relief from stay where "lifting the stay would not bring about a resolution of the issues").

### (4) Other Factors Considered by Courts Weigh in Favor of Maintaining the stay.

42. In addition to the three factors discussed in *Rexene*, courts have considered several other factors in determining whether relief from the automatic stay is appropriate.[7] The factors that are relevant plainly weigh in favor of maintaining the stay for many reasons discussed above. To summarize:

### (i) Adversary Proceeding Would Not Resolve The Issues Between the General Partner and the Debtor

43. As discussed in Paragraphs 33-41, *supra*, the Adversary Proceeding would not lead to a full resolution of the issues between the General Partner and the Debtor. Liquidating the General Partner's contractual damages claim is not as simple as the General Partner portrays it to be, and such claim implicates complex issues of Cayman and Bermuda law, including counterclaims for breach of duty and setoff, that are best decided holistically through the Debtor's ongoing liquidation in Bermuda.

### (ii) Interference With The Debtor's Winding Up Proceeding

44. As discussed in Paragraphs 21-25, *supra*, permitting the Adversary Proceeding to continue would impede the Debtor's ongoing liquidation process in Bermuda where claims are

---

[7] These factors include (i) whether relief would result in a partial or complete resolution of the issues; (ii) lack of any connection with or interference with the bankruptcy case; (iii) whether the other proceeding involves the debtor as a fiduciary; (iv) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (v) whether the debtor's insurer has assumed full responsibility for defending it; (vi) whether the action primarily involves third parties; (vii) whether litigation in another forum would prejudice the interests of other creditors; (viii) whether the judgment claims arising from the other action is subject to equitable subordination; (ix) whether the moving party's success in the other proceeding would result in a judicial lien avoidable by the debtor; (x) the interest of judicial economy and the expeditious and economical resolution of litigation; (xi) whether the parties are ready for trial in the other proceeding; and (xii) impact of the stay on the parties and the balance of harm. *In re SCO Grp., Inc.*, 395 B.R. at 857 (Bankr. D. Del. 2007) (citing *In re Sonnax Indus., Inc. v. Tri Component Prods. Corp.*, 907 F.2d at 1287).

AP0638

being channeled and may incentivize other parties to bring actions against the Debtor outside of Bermuda. The General Partner has not provided any justification for why it should be excepted from following the Debtor's orderly process in Bermuda to resolve its claim against the Debtor.

   *(iii) Specialized Tribunal With Necessary Expertise*

  45. The Bermuda Court overseeing the Debtor's winding up proceeding has the necessary expertise to liquidate Falcata's claim. Should the General Partner submit a proof of debt on behalf of Falcata and disagree with the Foreign Representatives determination of whether to admit or reject such debt in whole or in part, the General Partner has the right to make an application to appeal such determination to the Bermuda Court. *See* Wood Decl. ¶ 14.

   *(iv) Prejudice to Other Creditors*

  46. As discussed in Paragraphs 21-25, permitting the Adversary Proceeding to continue would prejudice other creditors that are abiding by the claims process in Bermuda and may incentivize other creditors to bring actions against the Debtor outside of Bermuda. The Adversary Proceeding could have an impact on distributions to other creditors and the General Partner's claim should thus be determined by the Bermuda Court.

   *(v) Judicial Economy and Expeditious and Economical Resolution of Litigation*

  47. As discussed in Paragraph 32, *supra*, judicial economy concerns weigh against lifting the stay. The Adversary Proceeding is a non-core matter and the Court cannot enter any final orders without the parties consent, but instead can only submit proposed findings of fact and conclusions of law to the District Court for *de novo* review. Further, the claims brought in the Adversary Proceeding do not involve issues of United States bankruptcy law and lifting the stay would thus result in an inefficient use of judicial resources because it does not require specialized knowledge of the Bankruptcy Court. *See In re Money Centers of Am., Inc.*, 579 B.R. 710, 715

AP0639

(S.D.N.Y. 2016) (holding cause existed to withdraw the reference because "it is a waste of judicial resources for a court of specialized bankruptcy knowledge to administer a case that does not require application of that knowledge.").

> (vi)     *Whether the Parties Are Ready for Trial*

48.     As discussed in Paragraphs 28-29, *supra*, the Adversary Proceeding was just recently commenced and has not progressed past its initial stages. The parties have not tested the sufficiency of the Adversary Complaint nor have they commenced discovery and are not close to being ready for trial.

> (vii)     *Impact of the Stay and Balance of the Harm*

49.     As discussed in Paragraphs 21-27, *supra*, the General Partner has not articulated specific reasons of why maintaining the stay would result in any hardship or provided any evidence. On the other hand, lifting the stay would impede the Debtor's liquidation in Bermuda and cause prejudice to the Debtor. The balance of harms weighs in favor of maintaining the stay.

## CONCLUSION

For these reasons, the Foreign Representatives respectfully request that the Court deny the Relief from Stay Motion.

AP0640

Dated: April 14, 2023
      Wilmington, Delaware

Respectfully submitted,

*/s/ Stephen J. Astringer*
**KOBRE & KIM LLP**
Jacob R. Kirkham (No. 5768)
Stephen J. Astringer (No. 6375)
600 North King Street, Suite 501
Wilmington, Delaware 19801
Telephone: (302) 518-6451
Facsimile: (302) 518-6461
jacob.kirkham@kobrekim.com
stephen.astringer@kobrekim.com

-and-

Adriana Riviere-Badell (admitted *pro hac vice*)
Evelyn Baltodano Sheehan (admitted *pro hac vice*)
201 South Biscayne Boulevard, Suite 1900
Miami, Florida 33131
Telephone: (305) 967-6100
Facsimile: (305) 967-6120
adriana.riviere-badell@kobrekim.com
evelyn.sheehan@kobrekim.com

-and-

Adam M. Lavine (admitted *pro hac vice*)
800 Third Avenue
New York, New York 10022
Telephone: (212) 380-2580
Facsimile: (212) 488-1220
Adam.lavine@kobrekim.com

*Counsel to the Foreign Representatives*

AP0641

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| POINT INVESTMENTS, LTD. (IN LIQUIDATION),[1] | Case No. 22-10261 (TMH) |
| Debtor in a Foreign Proceeding. | |

### DECLARATION OF ANDREW CHILDE
### IN SUPPORT OF FOREIGN REPRESENTATIVES'
### OBJECTION TO MOTION OF FTI GP I, LLC ON BEHALF OF
### FALCATA TECH INVESTMENT FUND I, L.P. FOR DETERMINATION THAT
### THERE IS NO AUTOMATIC STAY, OR IN THE ALTERNATIVE, SEEKING RELIEF
### FROM THE AUTOMATIC STAY TO PROCEED WITH ADVERSARY PROCEEDING

I, Andrew Childe of FFP Limited, in my capacity as one of the Joint Liquidators and foreign representatives of Point Investments, Ltd. (the "Debtor"), make this declaration (this "Declaration") pursuant to 28 U.S.C. § 1746 and state:

1.    I am over the age of 18 and, if called upon, could testify as to the matters set forth in this statement.

2.    I, along with Richard Lewis of FFP Limited and Mathew Clingerman of Kroll Bermuda Ltd. are the joint liquidators and foreign representatives of the Debtor in respect of the winding up proceeding pending before the Supreme Court of Bermuda, Commercial Court, Case 2020: No. 300.

3.    I submit this Declaration in support of the *Foreign Representatives' Objection to Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination*

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-la-Ville Road, Hamilton, HM 11, Bermuda.

*that there is no Automatic Stay, or in the Alternative, Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding* (the "Objection").[2]

4.  The statements made in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by other professionals and/or employees working under my supervision, or my opinion based on my experience, knowledge, and information concerning the Debtor. I declare the following statements are true to the best of my knowledge, information, and belief formed after a reasonable inquiry under the circumstances.

5.  I believe authorizing the stay-relief requested by the General Partner would have a prejudicial effect on the Debtor and the Bermuda Proceeding. Allowing a creditor to liquidate its claim outside of the ongoing process in Bermuda may incentivize other creditors to do the same, resulting in increased costs to the Debtor.

6.  The July 2020 Capital Contribution was requested on account of management fees, not for sums needed to fund or maintain Falcata's portfolio investments that I understand to have been in wind-down since July 2019. Moreover, the amount of the Debtor's contribution to Falcata on the date of the request for the July 2020 Capital Contribution was well in excess of such requested capital contribution, so there was more than adequate invested capital to cover such expenses.

7.  It is my understanding that the Debtor paid partnership expenses on behalf of the General Partner and/or Falcata in June 2017 and June 2018 that total more than the July 2020 Capital Contribution, among other expenses.

---

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Objection.

AP0643

I certify under penalty of perjury under the laws of the United States that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

*[Remainder of Page Intentionally Left Blank]*

3

Executed this 14th day of April, 2023
Park City, Utah

_____
Andrew Childe, in his capacity as one of the Joint
Liquidators and Foreign Representatives of Point
Investments Ltd.

AP0645

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 15 |
| POINT INVESTMENTS, LTD. (IN LIQUIDATION),[1] | Case No. 22-10261 (TMH) |
| Debtor in Foreign Proceedings. | |

### DECLARATION OF JAYSON WOOD IN SUPPORT OF FOREIGN REPRESENTATIVES' OBJECTION TO MOTION OF FTI GP I, LLC ON BEHALF OF FALCATA TECH INVESTMENT FUND I, L.P. FOR DETERMINATION THAT THERE IS NO AUTOMATIC STAY, OR IN THE ALTERNATIVE, SEEKING RELIEF FROM THE AUTOMATIC STAY TO PROCEED WITH ADVERSARY PROCEEDING

I, Jayson Wood, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States that the following is true and correct:

1.      I am an attorney duly admitted to practice in Bermuda and I am a Partner at Harneys (Bermuda) Limited, a Bermuda legal practice located at Rose Cottage, 18 Parliament Street, Hamilton HM 12, Bermuda. I am serving as Bermuda counsel to Andrew Childe and Richard Lewis of FFP Limited, and Mathew Clingerman of Kroll Bermuda Ltd. (collectively, the "Foreign Representatives"), in their capacity as the foreign representatives of Point Investments, Ltd. (the "Debtor") in respect of the winding-up proceedings commenced pursuant to section 161(g) of the Bermuda Companies Act 1981 (As amended) (the "Bermuda Companies Act") and the Companies (Winding Up) Rules 1982 (the "Winding Up Rules"), and pending before the Supreme Court of Bermuda (the "Bermuda Court"), Commercial Court, Case 2020: No. 300 (the "Bermuda Proceeding").

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

1

AP0646

2.      This declaration (the "Declaration") includes statements of my view of Bermuda and Cayman Islands law or statements of fact. Where the matters stated in this Declaration are statements regarding Bermuda or Cayman Islands law, such statements represent my view of Bermuda and Cayman Islands law as a member of the Bar Associations of Bermuda and the Cayman Islands and based on my experience practicing in these jurisdictions. Where the matters stated in this Declaration are statements of fact that are within my personal knowledge, they are true. Where the matters stated in this Declaration that are statements of fact are not within my personal knowledge, they are derived, as appropriate, from documents maintained by the Registrars of Companies of Bermuda and the Cayman Islands, from the records maintained by me as a result of advising the Debtor in connection with the Bermuda Proceeding, and/or from information supplied to me by or on behalf of the Debtor and are true to the best of my knowledge, information, and belief. I am over 18 years of age, and if I were called upon to testify, I could and would testify competently to the facts set forth herein.

3.      I submit this Declaration in support of the *Foreign Representative's Objection to Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination That There is no Automatic Stay, or in the Alternative, Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding* (the "Objection"),[2] filed contemporaneously herewith.

**PERSONAL BACKGROUND AND QUALIFICATIONS**

4.      I graduated from the University of Tasmania with an LLB in 1987. I was admitted to the Bermuda Bar in 2016 and the Cayman Islands Bar in 2009. I have also been admitted to practice in Tasmania (1989), Queensland (1995), England and Wales (not practicing) (2007), and

---

[2] Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Objection.

2

the British Virgin Islands (2007). I am a member in good standing of the Bermuda Bar Association and the Cayman Islands Bar Association.

5.    I am the head of the litigation and insolvency practice of Harneys (Bermuda) Limited. I have regularly appeared as lead counsel before the Bermuda Court since 2016 and have considerable experience in matters related to Bermuda insolvency and liquidation law. A number of cases in which I have appeared are reported in the Bermuda law reports. I am a member of the Restructuring and Insolvency Specialists Association of Bermuda (RISA Bermuda).

6.    I have advised companies, creditors, and liquidators on a large number of winding-up proceedings and corporate cross-border restructurings, including obtaining the Bermuda Court's sanction for a complex debt restructuring for China Singyes Solar Technologies Holdings Limited, acting for the company and provisional liquidators (appointed for restructuring purposes) in the matter of Z-Obee Holdings Limited, advising a creditor and subsequently the liquidators of a number of Pacific Andes entities connected with the high-profile US$1.6 billion debt restructuring involving multiple proceedings in the US, Hong Kong, Cayman Islands and Bermuda, and acting as Bermuda Counsel to the Committee of Unsecured Creditors in the parallel debt restructuring of Seadrill Limited in the US and Bermuda, to name a few.

7.    Similarly, I have extensive experience practicing in the Cayman Islands and have done so since 2009, including advising provisional liquidators in relation to the Cayman Islands restructuring of over US$1 billion in debts and liabilities of China Lumena New Materials Corp., advising Kaisa Group Holdings Ltd, one of the largest property developers in China, in its restructuring involving schemes of arrangement in the Cayman Islands in relation to US$2.5 billion of offshore debts, and acting for the largest creditor in Suntech Power Holdings Co. Ltd's

AP0648

US$1.1 billion provisional liquidation and debt restructuring in the Cayman Islands, among other representations.

**STATEMENT OF BERMUDA LAW AND PRACTICE**

**A.      Importance of the Bermuda Stay Under Section 167(4) of the Companies Act**

8.      Pursuant to section 167(4) of the Bermuda Companies Act, upon entry of a winding up order an automatic stay of actions and proceedings against the Debtor was put into effect, which I understand to be similar to the automatic stay under section 362 of the Bankruptcy Code. In addition, under section 166(2) of the Bermuda Companies Act, any attachments, sequestration, distress or execution against the estate or effects of the company after the commencement of the winding up shall be void to all intents.

9.      Bermuda Court has repeatedly emphasized the importance of the stay arising under Section 167(4) of the Bermuda Companies Act in channeling claims against the Debtor to the Bermuda Proceeding. *See Xena Investments Ltd. v. New Stream Capital Fund Limited* [2011] SC (Bda) 4 Com (26 January 2011) (denying creditor's application to lift stay and stating "[i]t is clear from all the authorities that there is a strong presumption against allowing unsecured creditors to establish their debts by ordinary writ action . . . [t]he effect of lifting the stay would be to give the Plaintiff priority over other account owners of the same class, contrary to the rationale underlying section167(4).").

10.      Bermuda Court will typically only lift the stay under exceptional circumstances, and will <u>not</u> typically permit a creditor to lift the stay to adjudicate its claim in another forum separate from the proof of debt process conducted by liquidators of a debtor. In relation to claims by a potential creditor against a Bermuda company in liquidation which involve matters such as the interpretation of contractual terms and an assessment of the conduct of the parties to determine whether such conduct falls within those terms or is a breach, such claims are commonly dealt with

4

by the Bermuda Court as a matter of course through the proof of debt process (discussed below) unless there are exceptional circumstances. In this respect, the Bermuda Judges apply foreign law principles to disputes before the Bermuda Court.

11.     No provision of Bermuda statutory law limits the application of this stay to the territory of Bermuda and insofar as I am aware there are no written decisions of the Bermuda Court that opine on whether or not the stay takes effect outside of Bermuda. Where there is a lack of local precedent, it is usual for the Bermuda Court to seek guidance from the decisions of other common law jurisdictions. In an insolvency context, decisions of the Grand Court of the Cayman Islands are often referenced by the Supreme Court of Bermuda since both jurisdictions have similar statutes. Additionally, such jurisdictions are generally categorized as "offshore" and almost invariably there will be cross-border elements in each liquidation scenario since the company's assets will rarely all be situated in the offshore place of incorporation.

12.     In the Cayman Islands, the position is that the statutory stay imposed under section 97(1) of the Cayman Islands Companies Act, which is in substantially the same terms as section 167(4), does have extraterritorial effect. *See Re Madison Niche Opportunities Fund Ltd (in Liquidation)* [2017 (2) CILR Note 2] and [Unreported, Smellie CJ, 25 April 2016] at ¶ 11; *Re Ardent Harmony Fund Inc. (in Official Liquidation)* [Unreported, Smellie CJ, 31 May 2016] at ¶ 7. I consider it likely that the Bermuda Court would adopt the position of the Grand Court of the Cayman Islands as regards the extraterritorial effect of the stay under section 167(4). However, it must be noted that the practical implementation of the stay outside of Bermuda requires the liquidation to be recognized extraterritorially, such as through the Debtor's Chapter 15 Case.

**B.     Bermuda Claims Process**

13.     Under the Bermuda Companies Act and Winding Up Rules, the court-supervised liquidation of a company—such as the just and equitable winding-up of the Debtor—involves a

5

collective judicial proceeding concerning the adjustment and enforcement of debts for the benefit of the general body of creditors and contributories. After a winding-up order is made, the provisional liquidators are obliged to call the first meetings of creditors and contributories, at which time a vote is taken for the appointment of a permanent liquidator, which is made by further application to the Bermuda Court. A committee of inspection made up of certain creditors and/or contributories may also be appointed to work alongside the liquidators. Unless the Bermuda Court otherwise directs, the meetings of creditors and contributories under section 171 of the Bermuda Companies Act shall be held within three months after the date of the winding-up order (*see* Rule 85(1) of the Winding Up Rules). The dates of such meetings shall be fixed by the provisional liquidators who shall give notice in the prescribed form stating the time, date, and place of the meeting to the creditors and contributories.

14.     Under Bermuda law, the liquidators will call for proofs of debt and any person claiming to be a creditor (including future and contingent creditors) may prove. The liquidators must notify all known creditors and must advertise notice of a date by which debts must be lodged, which shall be not less than 14 days from the date of notice. In the event a proof of debt is rejected by the liquidators, the creditor may appeal to the Bermuda Court. Any creditor who fails to lodge its proof of debt is excluded from any distribution (*see* Rule 73 of the Winding Up Rules).

15.     The liquidators are required to examine every proof of debt lodged and the grounds of the debt. The liquidators must admit or reject every proof of debt, in whole or in part, in writing or require further evidence in support of it. If the liquidators reject a proof it must shall state in writing to the creditor the grounds of the rejection (*see* Rule 74 of the Winding Up Rules).

16.     As part of determining whether to admit or reject a proof of debt, in whole or in part, the liquidators may take into account whether a creditor owes the Debtor any monies and may

AP0651

"setoff" such amount from the creditor's debt. In my view, the General Partner's claim is likely subject to set-off against certain amounts, including partnership expenses that I understand the Debtor paid on behalf of the General Partner and/or Falcata in June 2017 and June 2018 that total more than the July 2020 Capital Contribution, among other expenses.

17. If a creditor is dissatisfied with the decision of the liquidators in respect of a proof of debt, the Court may, on the application of the creditor, reverse or vary the decision; provided that notice of such application is given before the expiration of twenty-one days from the date of the service of the notice of rejection (*see* Rule 75 of the Winding Up Rules).

18. Liquidators are obliged to realize the assets of the company and apply them *pari passu* in satisfaction of the company's admitted debts. Where there is a surplus of assets, the assets must be distributed amongst the contributories in accordance with their rights and interests in the company (*see* Bermuda Companies Act § 225).

19. Once all assets are realized and distributions made, the liquidators must notify all creditors who proved and all contributories of their intention to apply for release. Any creditor or contributory may attend and address the Bermuda Court on whether the liquidators ought to be released (*see* Bermuda Companies Act § 178 and Rule 150 of the Winding Up Rules).

## STATEMENT OF CAYMAN LAW AND PRACTICE

20. In my view, to determine whether the General Partner has properly designated the Debtor as a "Defaulting Partner", a court must consider not only the express terms of the LPA and the MTA, but also whether the General Partner acted in accordance with its duties to the Debtor under various sources of Cayman Islands law. Those sources include: (i) the Cayman Island's Exempted Limited Partnership Act (the "ELPA"), attached hereto as **Exhibit A**, which governs exempted limited partnerships in the Cayman Islands, (ii) principles of equity and common law as they relate to exempted limited partnerships, and (iii) Cayman Island's law of trusts, given that the

AP0652

General Partner holds all property and rights of Falcata on trust for the benefit of the Debtor. Such law should be analyzed in light of the fact Debtor's status as the *sole* limited partner of Falcata and thus the *only* entity to which the General Partner owes duties.

21.     Under Cayman Islands law, the General Partner is not a simple commercial counterparty to the LPA, but has substantially broader and more complex obligations. As the general partner of a Cayman Islands exempted limited partnership, the General Partner acts as a statutory trustee for the benefit of the limited partners under s.16(1) of the ELPA. The General Partner owes fiduciary duties under s.19(1) of the ELPA to act in good faith and in the interests of the limited partner as well as broader fiduciary duties that apply in equity and common law to general partners under Cayman Islands partnership law. These duties include a duty of utmost good faith, a duty to account, a duty to avoid conflicts of interest, and certain irreducible core duties as trustee, for example a duty to exercise fiduciary powers for the benefit of the beneficiaries of the statutory trust. These duties are enforceable by the Debtor as the sole limited partner. *See Kuwait Ports Authority et al -v- Port Link GP Ltd et al*., CICA (Civil) Appeal Nos 2 and 3 of 2022 – Judgment 20 January 2023 at 56.

22.     In my view, there is a reasonable basis to conclude that any purported designation of the Debtor as a "Defaulting Partner", was invalid and a breach by the General Partner of its fiduciary obligations under these various sources of Cayman Islands law based on the facts presented.

23.     Even if its designation of the Debtor as a defaulting partner was valid, as a statutory trustee, the General Partner cannot simply surrender its discretion and decision making powers to the court. In my view, there are complex questions of the Cayman Island's law of trusts related to whether the Court has authority to declare that the General Partner may seek rights and remedies

AP0653

under section 5.4 of the LPA. Further, as a matter of Cayman Islands law, it should be considered whether it is a breach of the General Partner's duties to Falcata and to the Debtor to have sought to surrender its decision making powers to the Court in the manner in which it has.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this 14th day of April 2023 in
Hamilton, Bermuda

Jayson Wood

9

# EXHIBIT A

Cayman Islands Exempted Limited Partnership Act

**CAYMAN ISLANDS**



# EXEMPTED LIMITED PARTNERSHIP ACT

### (2021 Revision)

Supplement No. 3 published with Legislation Gazette No. 9 of 29th January, 2021

.

AP0656

## PUBLISHING DETAILS

Law 5 of 2014 consolidated with Laws 10 of 2017, 31 of 2020 and as amended by Law 56 of 2020.

Revised under the authority of the *Law Revision Act (2020 Revision)*.

Originally enacted —
     Law 5 of 2014-11th April, 2014
     Law 10 of 2017-27th March, 2017
     Law 31 of 2020-1st July, 2020
     Law 56 of 2020-7th December, 2020.

Consolidated and revised this 31st day of December, 2020.



Exempted Limited Partnership Act (2021 Revision)                Arrangement of Sections

**CAYMAN ISLANDS**



# EXEMPTED LIMITED PARTNERSHIP ACT

**(2021 Revision)**

## Arrangement of Sections

| Section | | Page |
|---|---|---|
| 1. | Short title | 5 |
| 2. | Interpretation | 5 |
| 3. | Saving of rules of equity and common law | 7 |
| 4. | Constitution | 8 |
| 5. | When licence not required | 9 |
| 6. | Name and registered office | 9 |
| 7. | Establishment | 10 |
| 8. | Registrar | 10 |
| 9. | Registration | 10 |
| 10. | Changes in registered particulars | 11 |
| 11. | Failure to file statement | 12 |
| 12. | Copies of certificates | 12 |
| 13. | Express fees | 12 |
| 14. | Modification of general law | 13 |
| 15. | Agreement may specify delegation of authority | 13 |
| 16. | Property | 13 |
| 17. | Rights, property and proceeds to vest in incoming partner | 14 |
| 18. | Transactions with the exempted limited partnership | 14 |
| 19. | General partner to act in good faith | 14 |
| 20. | Liability of limited partner | 15 |
| 21. | Accounts | 16 |
| 22. | Information regarding condition of partnership | 17 |
| 23. | Differences decided by general partner | 17 |
| 24. | Establishment, regulation of boards, committees | 18 |
| 25. | Failure to perform | 18 |



Arrangement of Sections                          Exempted Limited Partnership Act (2021 Revision)

26.   Agreement as to benefits ................................................................ 19
27.   Execution considered valid ............................................................. 19
28.   Power of attorney ........................................................................... 20
29.   Register of limited partnership interests.......................................... 20
30.   Maintenance of records .................................................................. 21
31.   Registration of security interests..................................................... 21
32.   Transfer of partnership interests ..................................................... 22
33.   Proceedings ................................................................................... 24
34.   Return of contributions ................................................................... 25
35.   Manner in which partnership may not be dissolved .......................... 25
36.   Dissolution ..................................................................................... 26
37.   Registrar may strike off register ..................................................... 29
38.   Tax undertaking .............................................................................. 30
39.   Annual return ................................................................................. 31
40.   Re-registration ............................................................................... 31
41.   De-registration pursuant to partnership agreement ........................ 32
42.   Registration of foreign limited partnerships..................................... 32
43.   De-registration for continuation in another jurisdiction.................... 35
44.   Certificate of de-registration........................................................... 37
45.   Notice of de-registration................................................................. 38
46.   Certificate of good standing ........................................................... 39
47.   Electronic business ........................................................................ 39
48.   Regulations .................................................................................... 39
49.   Recovery of penalties ..................................................................... 39
50.   *Repeal* of the Exempted Limited Partnership Law (2013 Revision) and savings ...................... 40

**ENDNOTES**                                                                        **41**

Table of Legislation history:......................................................................... 41

Exempted Limited Partnership Act (2021 Revision)                                    Section 1

**CAYMAN ISLANDS**



# EXEMPTED LIMITED PARTNERSHIP ACT

## (2021 Revision)

---

**Short title**

**1**.    This Act may be cited as the *Exempted Limited Partnership Act (2021 Revision)*.

**Interpretation**

**2**.    In this Act —

"**certified translator**" means a person whose interpretation or translation competence has been tested and approved by a professional association or governmental body or any other person determined by the Registrar;

"**commitment**" means cash, property, services rendered or other assets which a partner agrees to contribute to the capital of an exempted limited partnership in its capacity as partner but does not include any moneys agreed to be lent to an exempted limited partnership;

"**Companies Law**" means the *Companies Act (2021 Revision)*;

"**contribution**" means cash, property, services or other assets which a partner contributes to the capital of an exempted limited partnership in its capacity as partner but does not include any moneys lent by a partner to an exempted limited partnership;

"**court**" means the Grand Court;

"**dual foreign name**" means an additional name in any language not utilising the Roman alphabet, utilising any letters, characters, script, accents and other diacritical marks, and which does not have to be a translation or transliteration of the name in the Roman alphabet;

---



"**exempted limited partnership**" means —

(a)   a partnership formed and registered under section 9(1); or

(b)   a partnership that before the commencement of this Act was formed and registered under the *Exempted Limited Partnership Act (2021 Revision)*;

"**general partner**" means a person who is named as such in the statement filed pursuant to section 9 or 10(2) and if more than one shall mean each general partner, unless this Act otherwise provides;

"**general partnership interest**" means the partnership interest of a general partner in that person's capacity as such;

"**insolvency of the exempted limited partnership**" means that the general partner is unable to pay the debts and obligations of the exempted limited partnership, otherwise than in respect of liabilities to partners on account of their partnership interests, in the ordinary course of business as they fall due out of the assets of the exempted limited partnership, without recourse to the separate assets of the general partner not contributed or committed to the exempted limited partnership and "**insolvent**" shall be construed accordingly;

"**limited partner**" means a person who has become a limited partner in accordance with section 4(2) or otherwise pursuant to section 32;

"**limited partnership interest**" means the partnership interest of a limited partner in that person's capacity as such;

"**majority of limited partners**" means a majority or number of limited partners, or class or category of limited partners, or other persons, whether parties to the partnership agreement or otherwise including the general partner, required by or specified, either generally or in respect of a particular matter, in the partnership agreement and calculated in the manner specified in the partnership agreement, but if no such majority or manner is specified in the partnership agreement any required majority of the limited partners shall be a simple majority of the limited partners calculated by reference to the value of the contributions of the limited partners at the time of determination;

"**overseas company**" means a company, body corporate or corporate entity existing under the law of a jurisdiction outside of the Islands;

"**part**" means, in relation to a partnership interest, a proportionate part of that partnership interest, comprising both the rights, and the obligations under the partnership agreement and this Act but without prejudice to the liability of a general partner under section 4(2);

"**partner**" means a limited partner or a general partner;

"**partnership agreement**" means any agreement of the partners which provides for the establishment of, and regulates the affairs of, an exempted limited partnership, the conduct of its business and the rights and obligations of the partners amongst themselves;



"**partnership interest**" means the interest of a partner in an exempted limited partnership in respect of profit, capital and voting or other rights, benefits or obligations to which that partner is entitled or subject pursuant to the partnership agreement or this Act;

"**Partnership Law**" means the *Partnership Act (2013 Revision);*

"**public in the Islands**" excludes any exempted or ordinary non-resident company registered under the *Companies Act (2021 Revision),* a foreign company registered pursuant to Part IX of the *Companies Act (2021 Revision),* a foreign limited partnership registered under section 42, any company acting as general partner of a partnership registered under section 9(1) or any director or officer of the same acting in that capacity or the trustee of any trust registered or capable of registration under section 74 of the *Trusts Act (2021 Revision)* acting in that capacity;

"**qualifying general partner**" means a general partner of an exempted limited partnership that satisfies paragraph (a), (b), (c) or (d) of section 4(4);

"**registered office provider**" means in relation to an exempted limited partnership the person who provides the registered office for that exempted limited partnership;

"**Registrar**" means the Registrar of Exempted Limited Partnerships appointed in accordance with section 8;

"**security interest**" means a legal mortgage, an equitable mortgage, charge or other form of security interest granted with respect to a partnership interest or part thereof whether or not governed by the laws of the Islands;

"**signature**" includes a facsimile of a signature however reproduced and a digital signature;

"**special economic zone business**" means any type of business authorised to be carried on in a special economic zone pursuant to any Law in force in the Islands; and

"**translated name**" means a translation or transliteration of an exempted limited partnership's dual foreign name into the English language provided by either a person licensed to provide the exempted limited partnership's registered office in the Islands or a certified translator, together with a statement as to the foreign language in which the dual foreign name is written.

### Saving of rules of equity and common law

**3**.    The rules of equity and of common law applicable to partnerships as modified by the *Partnership Act (2013 Revision)* but excluding sections 31, 45 to 54 and 56 to 57 shall apply to an exempted limited partnership, except where they are inconsistent with the express provisions of this Act.



**Constitution**

**4**.  (1)  An exempted limited partnership may be formed for any lawful purpose to be carried out and undertaken either in or from within the Islands or elsewhere upon the terms, with the rights and powers, and subject to the conditions, limitations, restrictions and liabilities mentioned in this Act but an exempted limited partnership shall not undertake business with the public in the Islands other than so far as may be necessary for the carrying on of the business of that exempted limited partnership exterior to the Islands.

  (2)  An exempted limited partnership shall consist of one or more persons called general partners who shall, in the event that the assets of the exempted limited partnership are inadequate, be liable for all debts and obligations of the exempted limited partnership, and one or more persons called limited partners who shall not be liable for the debts or obligations of the exempted limited partnership save as provided in the partnership agreement and to the extent specified in sections 20(1) and 34(1), but a general partner, without derogation from that general partner's position as such, may, in addition, take an interest as a limited partner in the exempted limited partnership.

  (3)  A body corporate, with or without limited liability, and a partnership whether in the name of the partnership and whether or not an exempted limited partnership, may be a general or limited partner of an exempted limited partnership.

  (4)  Any one or more of the limited partners and general partners of an exempted limited partnership may be resident, domiciled, established, incorporated or registered under the laws of the Islands or outside of the Islands but at least one general partner shall —

    (a)  if an individual, be resident in the Islands;

    (b)  if a company, be registered under the *Companies Act (2021 Revision)* or registered pursuant to Part IX of the *Companies Act (2021 Revision)*;

    (c)  if a partnership, be registered pursuant to section 9(1) or 42, as applicable; or

    (d)  if any other person, be registered under any other Law or regulation as may be prescribed.

  (5)  A limited partner, or person with analogous status, of a partnership which is the general partner of an exempted limited partnership shall not, by virtue of that fact alone, be taken to be a general partner of the exempted limited partnership.

  (6)  A limited partner of an exempted limited partnership shall not cease to have the benefit of limited liability by reason only of the partnership ceasing to have a qualifying general partner.



Exempted Limited Partnership Act (2021 Revision)                                    Section 5

**When licence not required**

**5**.  A person who acts as a general partner of an exempted limited partnership is not, by virtue solely of so acting, required to be licensed under the *Local Companies (Control) Act (2019 Revision)* and shall not require a trust company licence under the *Banks and Trust Companies Act (2021 Revision)*, a mutual fund administrator's licence under the *Mutual Funds Act (2021 Revision)*, a licence under the *Companies Management Act (2021 Revision)* or a licence under the *Trade and Business Licensing Act (2021 Revision)*.

**Name and registered office**

**6**.  (1)  Every exempted limited partnership shall have a name which —

   (a)  shall include the words "Limited Partnership" or the letters "L.P." or "LP";

   (b)  may include the name of any general partner or limited partner or any derivation thereof; and

   (c)  in the case of an exempted limited partnership carrying on special economic zone business, shall include the words "special economic zone" or the letters "SEZ",

   in each case which may be preceded by or followed with a dual or foreign name, but no exempted limited partnership shall have a name or translated name which, because it is identical or similar to the name of any other entity or it falsely suggests the patronage of or a connection with some person or authority or it suggests that the exempted limited partnership is licensed whether in the Islands or elsewhere to carry on any type or class of business when it is not in fact so licensed or because of any other reason, is calculated or likely to mislead.

   (2)  Every exempted limited partnership shall have a registered office situated in the Islands for the service of process and to which all notices and communications may be addressed.

   (3)  The registered office of an exempted limited partnership shall be the same as the address of a person licensed by the Authority under the *Banks and Trust Companies Act (2021 Revision)*, the *Companies Management Act (2021 Revision)* or the *Mutual Funds Act (2021 Revision)* except where the registered office was at a different address immediately prior to the date of commencement of this Act and remains at that address on or after the date of commencement of this Act.

   (4)  For the purpose of subsection (3) the Authority means the Cayman Islands Monetary Authority established under section 5(1) of the *Monetary Authority Act (2020 Revision)*, and includes a person acting under the Authority's authorisation.



Section 7                                             Exempted Limited Partnership Act (2021 Revision)

**Establishment**

**7**.   A partnership, limited or otherwise, shall not be an exempted limited partnership unless registered as such under section 9(1).

**Registrar**

**8**.   The Registrar of Companies appointed under the *Companies Act (2021 Revision)* shall be the Registrar of Exempted Limited Partnerships.

**Registration**

**9**.   (1)   The registration of an exempted limited partnership shall be effected by payment to the Registrar of a registration fee of an amount that the Cabinet shall, from time to time, by regulation prescribe and by filing with the Registrar a statement signed, subject to section 11, by or on behalf of a general partner containing —

    (a)   the name or dual foreign name and translated name of the exempted limited partnership;

    (b)   the general nature of the business of the exempted limited partnership;

    (c)   the address in the Islands of the registered office of the exempted limited partnership;

    (d)   the term, if any, for which the exempted limited partnership is entered into or, if for unlimited duration, a statement to that effect and the date of its commencement;

    (e)   the full name and address of the general partner and, if more than one of each of them, specifying each of them as a general partner and

        (i)   in the case of a corporate general partner, there shall be filed with the statement a certificate of incorporation and a certificate of good standing (or similar documents under the laws of the jurisdiction of incorporation) or a certificate of registration and a certificate of good standing under Part IX of the *Companies Act (2021 Revision)*;

        (ii)   in the case of a general partner which is a partnership registered under this Act, there shall be filed with the statement a certificate of registration and a certificate of good standing or certified copies thereof; and

        (iii)   in the case of a general partner who is an individual there shall be filed with the statement photographic evidence of that person's identity and evidence of that person's residential address in the Islands; and

    (f)   a declaration that the exempted limited partnership shall not undertake business with the public in the Islands other than so far as may be necessary for the carrying on of the business of that exempted limited partnership exterior to the Islands.



Exempted Limited Partnership Act (2021 Revision)                                   Section 10

(2)   The Registrar shall maintain a record of each exempted limited partnership registered under this Act and all the statements filed in relation to the exempted limited partnership, which records and statements shall be kept open to public inspection during all usual business hours.

(3)   An exempted limited partnership's dual foreign name shall only be entered on the record if its translated name conforms with the provisions of section 6(1).

(4)   If the exempted limited partnership does not conform with section 6(1) then the dual foreign name and the translated name shall not be entered on the record.

(5)   The Registrar shall issue a certificate of registration under the Registrar's hand and seal of office as soon as the registration of the statement pursuant to subsection (1) has been effected.

(6)   A limited partner of an exempted limited partnership formed after the 15th July, 1991 shall not have the benefit of limited liability until the date indicated on the certificate referred to in subsection (5) issued by the Registrar, and a partnership registered in accordance with section 40(1) shall obtain the benefit of limited liability under this Act with effect from that date but subject to section 40(2).

(7)   A certificate issued under subsection (5) shall be conclusive evidence that compliance has been made with all the requirements of this Act in respect of the formation and registration of an exempted limited partnership but subject to section 40(2).

(8)   Notwithstanding subsections (1) and (5), the Registrar may refuse to accept the registration of an exempted limited partnership and refuse to issue a certificate of registration in any case where, in the Registrar's opinion, the name or translated name of the proposed exempted limited partnership is in contravention of section 6(1).

## Changes in registered particulars

**10**.   (1)   Without prejudice to subsection (2), if, during the continuance of an exempted limited partnership, any change is made or occurs in any matter specified in paragraphs (a) to (e) of section 9(1), a statement signed, subject to section 11, by a general partner specifying the nature of the change shall, within sixty days of the change, be filed with the Registrar.

(2)   A statement signed in accordance with subsection (1) in respect of any arrangement or transaction consequent upon which any person will be removed, replaced or admitted as a general partner in any exempted limited partnership, shall, within fifteen days of the arrangement or transaction, be filed with the Registrar and, until the statement is so filed, the arrangement or transaction shall, for the purposes of this Act and the partnership agreement, not be effective to remove, replace or admit that person as a general partner of the exempt limited partnership and with respect to a replacement or admitted general partner



the documentation required by subsection 9(1)(e)(i), (ii) or (iii) of this Act shall be provided as the case may require.

(3)   Save with the written consent of any person thereby affected, no arrangement or transaction shall take effect to the extent that it seeks to relieve or discharge a general partner from the obligations of a general partner with regard to any debt or obligation of the exempted limited partnership to a person incurred before the arrangement or transaction takes effect.

(4)   If default is made in compliance with this section, each general partner in default shall incur a penalty of two hundred dollars for each day that the default continues which penalty shall be a debt due to the Registrar and the general partner shall indemnify any person who thereby suffers any loss.

(5)   The name or translated name of an exempted limited partnership shall not be changed so as to contravene section 6(1) and the Registrar may refuse to accept a statement under subsection (1) which, in the Registrar's opinion, seeks to effect such a change.

**Failure to file statement**

**11**.  If a person required by section 9(1), section 10(1) or (2) or section 36, or by the partnership agreement to execute and file a statement or notice fails to do so, any other partner, and any assignee of a partnership interest who is or may be affected by the failure or refusal may petition the court to direct a person the court sees fit to sign the statement and file the same on behalf of the person in default.

**Copies of certificates**

**12**.  (1)   Any person may require a certified copy of the certificate of registration, a certificate of good standing or a copy of or extract from any registered statement filed in relation to the exempted limited partnership to be certified as a true copy by the Registrar on payment of a fee the Cabinet may by regulation prescribe.

(2)   A certificate of registration, a certificate of good standing or a copy of or extract from a registered statement filed with the Registrar issued under this Act, if certified by the Registrar to be a true copy, shall be received in evidence in all legal proceedings.

**Express fees**

**13**.  (1)   The Registrar, on receipt of —

(a)   an application for registration under section 9 or section 42; or

(b)   an application for any certificate, other than a certificate under section 9(5), which the Registrar is authorised to provide under this Act,

which is accompanied by an express fee of an amount specified in subsection (2), shall complete the transaction for which the application has been made by —

        (i)    the end of the working day, where the application and all fees are received by 12 noon; or

        (ii)   12 noon on the following working day, where the application and all fees are received after 12 noon.

(2)   The express fee referred to in subsection (1) is —

       (a)   four hundred dollars for an application referred to in paragraph (a) of subsection (1); and

       (b)   one hundred dollars for an application referred to in paragraph (b) of subsection (1).

### Modification of general law

**14**.  (1)   A limited partner shall not take part in the conduct of the business of an exempted limited partnership in its capacity as a limited partner.

     (2)   All letters, contracts, deeds, instruments or documents whatsoever shall be entered into by or on behalf of the general partner (or any agent or delegate of the general partner) on behalf of the exempted limited partnership.

### Agreement may specify delegation of authority

**15**.  Where an exempted limited partnership has more than one general partner and this Act gives an authority, consent or power but not an obligation or liability, to the general partner, the partnership agreement may specify which general partner is entitled to exercise that authority, consent or power to the exclusion of any other general partner.

### Property

**16**.  (1)   Any rights or property of every description of the exempted limited partnership, including all choses in action and any right to make capital calls and receive the proceeds thereof that is conveyed to or vested in or held on behalf of any one or more of the general partners or which is conveyed into or vested in the name of the exempted limited partnership shall be held or deemed to be held by the general partner and if more than one then by the general partners jointly, upon trust as an asset of the exempted limited partnership in accordance with the terms of the partnership agreement.

     (2)   Any debt or obligation incurred by a general partner in the conduct of the business of an exempted limited partnership shall be a debt or obligation of the exempted limited partnership.

     (3)   The assets of an exempted limited partnership, or any class of assets, may be the subject of a floating charge, whether or not the partners of the exempted limited partnership, or any of them, are companies, overseas companies or bodies corporate.



**Rights, property and proceeds to vest in incoming partner**

**17**. (1)   On the admission or substitution of any general partner or general partners, in this subsection referred to as an "incoming general partner", in accordance with the terms of the partnership agreement and this Act, all rights or property of every description of the exempted limited partnership, including all choses in action and any right to make capital calls and receive the proceeds thereof, held or deemed to be held by the general partner or general partners in accordance with the foregoing subsection, in this subsection referred to as the "existing general partners", shall vest without the requirement for further formalities in the incoming general partner and any continuing existing general partners and shall be held by it or them in accordance with this Act.

(2)   On the withdrawal of a general partner in accordance with the terms of the partnership agreement and this Act —

(a)   all rights or property of every description of the exempted limited partnership, including all choses in action and any right to make capital calls and receive the proceeds thereof, shall vest without the requirement for further actions or formalities in the remaining general partner or general partners and shall be held by it or them in accordance with this Act; and

(b)   subject to section 10(3), the remaining general partner or general partners shall be liable for and the property of the exempted limited partnership held by them in accordance with this Act shall be subject to all mortgages, charges or security interests and all contracts, obligations, claims, debts and liabilities of the exempted limited partnership.

**Transactions with the exempted limited partnership**

**18**.   Subject to any express or implied term of the partnership agreement to the contrary and to the duty imposed upon a general partner by section 19(1), a partner may lend money to, borrow from and transact other business with the exempted limited partnership so that an asset, debt or obligation of the exempted limited partnership shall thereby be created and with or without interest or security as the general partner shall determine, and shall have the same rights and obligations with respect thereto as a person who is not a partner, but the obligations of the exempted limited partnership to repay a debt to a general partner shall, at all times, be subordinated to the claims of secured and unsecured creditors of the exempted limited partnership.

**General partner to act in good faith**

**19**. (1)   A general partner shall act at all times in good faith and, subject to any express provisions of the partnership agreement to the contrary, in the interests of the exempted limited partnership.

(2)   Subject to any express provisions of the partnership agreement to the contrary, a limited partner of an exempted limited partnership in that capacity does not



owe any fiduciary duty in exercising any of its rights or authorities or otherwise in performing any of its obligations under the partnership agreement to the exempted limited partnership or any other partner.

## Liability of limited partner

**20**. (1)  If a limited partner takes part in the conduct of the business of an exempted limited partnership in its dealings with persons who are not partners, that limited partner shall be liable, in the event of the insolvency of the exempted limited partnership, for all debts and obligations of that exempted limited partnership incurred during the period that that limited partner participates in the conduct of the business as though that limited partner were, for that period, a general partner, but that limited partner shall be liable only to a person who transacts business with the exempted limited partnership during the period with actual knowledge of that limited partner's participation and who then reasonably believed the limited partner to be a general partner.

(2)  A limited partner does not take part in the conduct of the business of an exempted limited partnership within the meaning of this section by —

(a)  holding an office or interest in, or having a contractual relationship with, a general partner or being a contractor for or an agent or employee of the exempted limited partnership or of a general partner or acting as a director, officer or shareholder of a corporate general partner;

(b)  consulting with and advising a general partner or consenting or withholding consent to any action proposed, in the manner contemplated by the partnership agreement, with respect to the business of the exempted limited partnership;

(c)  investigating, reviewing, approving or being advised as to the accounts or business affairs of the exempted limited partnership or exercising any right conferred by this Act;

(d)  acting as surety or guarantor for the exempted limited partnership either generally or in respect of specific obligations;

(e)  approving or disapproving an amendment to the partnership agreement;

(f)  calling, requesting, attending or participating in any meeting of the partners;

(g)  taking any action that results in the winding up or the dissolution of the exempted limited partnership;

(h)  taking any action required or permitted by the partnership agreement or by law to bring, pursue, settle or terminate any action or proceedings brought pursuant to section 33(2);

(i)  appointing a person to serve on any board or committee of the exempted limited partnership, a general partner or a limited partner or removing a person therefrom;



(j)   serving on any board or committee of the exempted limited partnership, a general partner, the limited partners or the partners, or by appointing, electing or otherwise participating in the choice of a representative or any other person to serve on any board or committee, or by acting as a member of any board or committee either directly or by or through any representative or other person, including giving advice or consenting, or refusing to consent, to any action proposed by the general partner on behalf of the exempted limited partnership and exercising any powers or authorities or performing any obligations as a member of that board or committee in the manner contemplated by the partnership agreement;

(k)   serving on the board of directors or a committee of, consulting with or advising or being an officer, director, shareholder, partner, member, manager, trustee, agent or employee of, or by being a fiduciary or contractor for, any person in which the exempted limited partnership has an interest or any person providing management, consultation, custody or other services or other products for, to or on behalf of, or otherwise having a business or other relationship with, the exempted limited partnership or a general partner of the exempted limited partnership; or

(l)   voting as a limited partner on —

(i)    the winding up and dissolution of the exempted limited partnership;

(ii)   the purchase, sale, exchange, lease, mortgage, pledge or other acquisition or transfer of any asset by or of the exempted limited partnership;

(iii)  the incurrence or renewal of indebtedness by the exempted limited partnership;

(iv)   a change in the nature of the business of the exempted limited partnership;

(v)    the admission, removal or withdrawal of a general or limited partner and the continuation of business of the exempted limited partnership thereafter; or

(vi)   transactions in which one or more of the general partners have an actual or potential conflict of interest with one or more of the limited partners.

(3)   Subsection (2) shall not import any implication that the possession or exercise of any other power by a limited partner will necessarily constitute the taking part by that limited partner in the business of the exempted limited partnership.

**Accounts**

**21**.   (1)   A general partner shall keep or cause to be kept proper books of account including, where applicable, material underlying documentation including contracts and invoices, with respect to —

Exempted Limited Partnership Act (2021 Revision)                                Section 22

    (a)    all sums of money received and expended by the exempted limited partnership and matters in respect of which the receipt of expenditure takes place;

    (b)    all sales and purchases of goods by the exempted limited partnership; and

    (c)    the assets and liabilities of the exempted limited partnership.

(2)    For the purposes of subsection (1), proper books of account shall not be deemed to be kept if there are not kept such books as are necessary to give a true and fair view of the business and financial condition of the exempted limited partnership and to explain its transactions.

(3)    Where the general partner keeps the books of account described in subsection (1) at any place other than at the registered office of the exempted limited partnership or at any other place within the Islands, the general partner shall, upon service of an order or notice by the Tax Information Authority pursuant to the *Tax Information Authority Act (2021 Revision)*, make available, in electronic form or any other medium, at its registered office copies of its books of account, or any part or parts thereof, as are specified in the order or notice.

(4)    A general partner shall cause all books of account required to be kept under subsection (1) to be retained for a minimum period of five years from the date on which they are prepared.

(5)    A person who, being a general partner, knowingly and wilfully contravenes subsection (1) or (4) shall be subject to a penalty of five thousand dollars.

(6)    A person who, being a general partner, defaults in complying with an order or notice under subsection (3) without reasonable excuse, shall incur a penalty of five thousand dollars and a further penalty of one hundred dollars for every day during which the non-compliance continues.

### Information regarding condition of partnership

**22**.    Subject to any express or implied term of the partnership agreement, each limited partner may demand and shall receive from a general partner true and full information regarding the state of the business and financial condition of the exempted limited partnership.

### Differences decided by general partner

**23**.    Any difference arising as to matters connected with the business of the exempted limited partnership shall be decided by the general partner, and, if more than one, by a majority of the general partners as is provided in the partnership agreement.



**Establishment, regulation of boards, committees**

**24**. (1)  Where a partnership agreement contains provisions for the establishment and regulation of any boards or committees of an exempted limited partnership, its partners or any class or category of those partners, or representatives of any of the partners, including —

    (a)  the establishment and constitution of boards or committees;

    (b)  the manner and terms of appointment and removal of the members of boards or committees;

    (c)  the powers, rights, authorities, obligations and duties of the members of boards or committees;

    (d)  the regulation of the proceedings of boards or committees; and

    (e)  the rights of the members and former members of boards or committees to exculpation or to be indemnified out of the assets of the exempted limited partnership,

then, subject to the express provisions of the partnership agreement, any person duly appointed to be a member of any board or committee in accordance with those provisions shall be deemed to have notice of and shall have the benefit of those provisions which shall not be unenforceable by any person in that person's own right by reason only that the person is not a party to the partnership agreement.

(2)  Subject to any express provisions of the partnership agreement to the contrary, a member of any board or committee referred to in subsection (1) does not owe any fiduciary duty in exercising any of its rights or authorities, or otherwise in performing any of its obligations, as a member of the board or committee to the exempted limited partnership or any partner.

**Failure to perform**

**25**. (1)  If a partnership agreement provides that where a partner fails to perform any of its obligations under, or otherwise breaches the provisions of, the partnership agreement that partner may be subject to or suffer remedies for, or consequences of, the failure or breach specified in the partnership agreement or otherwise applicable under any law then those remedies or consequences shall not be unenforceable solely on the basis that they are penal in nature.

(2)  The remedies or consequences under subsection (1) may include but are not limited to any one or more of the following —

    (a)  reducing, eliminating or forfeiting the defaulting partner's partnership interest in the exempted limited partnership or any rights of the defaulting partner under the partnership agreement;

    (b)  subordinating the defaulting partner's partnership interest to the interests of non-defaulting partners;



Exempted Limited Partnership Act (2021 Revision)                                    Section 26

    (c)  effecting a forced sale or forfeiture of the defaulting partner's partnership interest;

    (d)  arranging for the lending by other partners or other persons to the defaulting partner of the amount necessary to meet the defaulting partner's commitment;

    (e)  providing for the fixing of the value of the defaulting partner's partnership interest by appraisal or by formula and the redemption or sale of the defaulting partner's partnership interest at that value; or

    (f)  exercising any other remedy or consequence specified in the partnership agreement or available under any applicable laws.

(3)  Subject to the general partner's duty under section 19(1), a general partner shall not be liable for its decision to impose or for imposing any remedies or consequences upon any partner, or for its decision not to do so and references in this subsection to a partnership interest shall for the avoidance of doubt also be construed as including any part thereof.

### Agreement as to benefits

**26**.  A person who has executed the partnership agreement of an exempted limited partnership or who is named or otherwise identified, including as a class, in the partnership agreement shall not be deemed to be or otherwise construed as a partner of the exempted limited partnership if —

    (a)  that person has executed the partnership agreement solely in order to take the benefit of a provision of, or assume an obligation under, the partnership agreement otherwise than as a partner; or

    (b)  where, on a proper construction of the partnership agreement, the parties did not intend the person to be a partner of the exempted limited partnership.

### Execution considered valid

**27**.  (1)  Any partnership agreement, any agreement pursuant to which any person agrees to make any commitment or contribution to an exempted limited partnership as a partner and any agreement, contract, deed, instrument including any instrument under seal or document entered into by or on behalf of the general partner for itself in the case of the partnership agreement or otherwise on behalf of the exempted limited partnership is executed validly by the parties thereto where it is executed in any manner contemplated by the parties thereto, including, without limitation —

    (a)  where the complete agreement, contract, deed, instrument or document is executed; or

    (b)  where any signature or execution page to the agreement, contract, deed, instrument or document is executed, whether or not the agreement,



Case 1:23-cv-00630-CFC   Document 12-3   Filed 08/23/23   Page 175 of 280 PageID #: 742

contract, deed, instrument or document is at the time in its final form, and which is attached by, or on behalf of, the relevant party to, or otherwise with the relevant party's express or implied authority to, the agreement, contract, deed, instrument or document,

if the agreement, contract, deed, instrument or document is executed in conformity with this Act or any other Law of the Islands applicable to execution of the agreement, contract, deed, instrument or document.

(2)   Subsection (1) shall apply to agreements, contracts, deeds, instruments including instruments under seal or other documents regardless of whether they were made before, on or after the commencement of this subsection and no agreement, contract, deed, instrument, including instruments under seal, or other document made before the commencement of this subsection shall be invalid if it satisfies the requirements of subsection (1).

## Power of attorney

**28**.   (1)   For the purposes of the *Powers of Attorney Act (1996 Revision)* and section 8 of the *Property (Miscellaneous Provisions) Act (2017 Revision)* where a partnership agreement purports to create or grant a power of attorney, including an irrevocable power of attorney, that power shall be deemed validly to have been executed as a deed and if required duly witnessed on execution of the partnership agreement by or on behalf of the donor of the power or on adherence thereto by the donor of the power pursuant to section 32 without demonstration or satisfaction of any further formalities regarding its execution.

(2)   Subsection (1) applies equally to every partnership agreement entered into prior to as well as after the commencement of this Act.

## Register of limited partnership interests

**29**.   (1)   Subject to subsection (2) the general partner shall maintain or cause to be maintained in the country or territory that the general partner may determine a register of limited partners which shall contain the name and address of each person who is a limited partner of the exempted limited partnership, the date on which a person became a limited partner and the date on which a person ceased to be a limited partner, and the register shall be updated within twenty-one days of the date of any change in the particulars therein.

(2)   The general partner shall maintain or cause to be maintained at the registered office of the exempted limited partnership a record of the address at which the register of limited partners is maintained, which record shall be updated within twenty-one days of the date of any change in the particulars therein.

(3)   The register of limited partners and the record of the address at which the register of limited partners is maintained shall be open to inspection during all usual business hours in the place where the register or record is maintained by —



Exempted Limited Partnership Act (2021 Revision)                                    Section 30

      (a)   subject to any express or implied term of the partnership agreement, all partners; and

      (b)   any other person with the consent of the general partner.

  (4)   The register of limited partners shall be *prima facie* evidence of the matters which are directed by this Act to be inserted therein.

  (5)   Where the register of limited partners is kept at a place other than the registered office of the exempted limited partnership, the general partner shall make available at the registered office, in electronic form or any other medium, the register of limited partners upon service of an order or notice by the Tax Information Authority pursuant to the *Tax Information Authority Act* (*2021 Revision*).

  (6)   A person who, being a general partner, defaults in complying with subsection (1) or (2), commits an offence and is liable on summary conviction to a fine of ten thousand dollars for each day that the default continues and shall indemnify any person who thereby suffers any loss.

  (7)   A person who, being a general partner, defaults in complying with an order or notice under subsection (5) without reasonable excuse, shall incur a penalty of five hundred dollars and a further penalty of one hundred dollars for every day during which that non-compliance continues.

## Maintenance of records

**30**.  (1)   The general partner shall maintain or cause to be maintained in any country or territory that the general partner may determine, a record of the amount and date of the contribution or contributions of each limited partner and the amount and date of any payment representing a return of the whole or any part of the contribution of any limited partner, which record shall be updated within twenty-one days of the date of any change in the particulars therein.

  (2)   Subsections (4), (5), (6) and (7) of section 29 shall apply to the records required to be maintained pursuant to this section.

  (3)   The records maintained pursuant to this section shall be open to inspection during all usual business hours in the place where the records are maintained by any person with the consent of the general partner.

## Registration of security interests

**31**.  (1)   The general partner shall maintain or cause to be maintained at the registered office, a register of security interests in which shall be registered each security interest in relation to which a valid notice has been served in accordance with section 32(9).

  (2)   The register of security interests under subsection (1) shall contain the identity of the grantor and grantee, the partnership interest or part thereof subject to the



Section 32                                    Exempted Limited Partnership Act (2021 Revision)

security interest and the date on which notice of the security interest was validly served in accordance with section 32(9).

(3)   The register described in subsection (1) may be inspected by any person during all usual business hours.

(4)   Any security interest over the whole or any part of a limited partnership interest shall have priority according to the time that the written notice is validly served at the registered office of the exempted limited partnership in accordance with section 32(9).

(5)   If default is made by a general partner in the maintenance of the register described in subsection (1), each general partner in default shall incur a penalty of twenty-five dollars for each day that the default continues.

**Transfer of partnership interests**

**32**.  (1)   A partnership interest is transferable in whole or in part in accordance with the provisions of the partnership agreement and this section.

(2)   Subject to the partnership agreement, a person may become a partner of an exempted limited partnership either by executing and delivering the partnership agreement or any supplement thereto or counterpart thereof together with the general partner, by acceding to the partnership agreement in accordance with its terms or upon the transfer of all or part of a partnership interest in accordance with this section, each of which is for this section referred to as an "admission", and in each case without the consent of the limited partners.

(3)   Where the requirements for or conditions to an admission contained in the partnership agreement have been complied with in accordance with their terms or, to the extent permitted by the partnership agreement, waived, any person, however admitted, shall without the requirement for any further actions or formalities, be deemed to have adhered to and agreed to be bound by the terms and conditions of the partnership agreement and shall have the rights and be subject to the obligations contained in the partnership agreement and this Act as if the person and all existing partners had together duly executed and delivered the partnership agreement.

(4)   The provisions of subsection (3) shall apply to every transfer or purported transfer of a partnership interest in whole or in part and each admission of a person as a partner of an exempted limited partnership prior to, as well as after, the commencement of this Act.

(5)   Section 6 of the *Property (Miscellaneous Provisions) Act (2017 Revision)* shall not apply to partnership interests.

(6)   Subject to the partnership agreement, no limited partner may —

(a)   transfer; or

(b)   grant any security interest in,

---



the whole or any part of that person's limited partnership interest except with the written consent of the general partner given prior to, or simultaneously with, the transfer or grant.

(7)  Subject to the partnership agreement and this Act, a general partner may transfer or grant a security interest in the whole or any part of that person's general partnership interest with the written consent of any other general partner given prior to, or simultaneously with, the transfer or grant.

(8)  Subject to the partnership agreement —

(a)  the transferee of a general partnership interest or part thereof shall be admitted as a general partner in place of and subject to section 10(2) to the exclusion of, or in addition to, as the case may be, the transferor in respect of the general partnership interest or part thereof transferred but —

(i)  the transferee shall not be liable for any obligation of the exempted limited partnership incurred before the transferee is so admitted unless otherwise agreed in writing by the transferor and the transferee; and

(ii)  the transferor shall remain liable for any obligation of the exempted limited partnership incurred before the transferor ceased to be a general partner unless otherwise agreed in writing by the transferor, the transferee and the person to whom the obligation is owed; and

(b)  the transferee of a limited partnership interest or part thereof shall be admitted as a limited partner, wholly or partly, as the case may be, in place of and to the exclusion of the transferor in respect of the limited partnership interest or part thereof transferred but, unless otherwise agreed in writing by the transferor, the transferee and the general partner, the transferee shall not assume any liability of the transferor pursuant to section 20(1) or section 34(1) and no transfer shall relieve the transferor of any liability under those subsections.

(9)  Written notice of the grant of a security interest over the whole or any part of a limited partnership interest shall be given by the grantor or the grantee to the exempted limited partnership at its registered office.

(10)  A notice under subsection (9) is not validly given unless it specifies the agreement pursuant to which the security interest is granted including the date thereof and the parties thereto, the identity of the grantor and grantee of the security interest, and the partnership interest or part thereof that is subject to that security interest.

(11)  Nothing in this section shall prevent a partner from assigning or otherwise disposing of, whether absolutely or by way of security in any manner permitted by law, any right, debt or other chose in action arising under a partnership agreement but no assignment or other disposition may, subject to the partnership agreement, be made without the consent of the general partner or, in the case of



an assignment or disposition by a general partner, the consent of any other general partner given prior to, or simultaneously with, the assignment or disposition.

(12) A partnership agreement may provide that, as against any other partner, any assignment or other disposition by a partner of any right, debt or other chose in action arising under a partnership agreement shall confer economic rights only and for the purposes of this section "**economic rights**" are —

    (a) any rights to make and enforce capital calls, to receive the proceeds thereof and to enforce payment of, and receive any sums payable to the partner including the rights on the winding up and dissolution of the exempted limited partnership;

    (b) the right to receive a share of profits of the exempted limited partnership or a share of the property on its winding up and dissolution;

    (c) the right to an account for the purpose of ascertaining the amount or share of any of the foregoing; and

    (d) any other rights that are expressly stated in the partnership agreement to be assignable.

(13) Any consent of a general partner required by this section may, subject to any express provision of the partnership agreement to the contrary, be withheld in the general partner's sole discretion.

(14) Any notice of any assignment or other disposition referred to in subsection (11) that may be required or permitted to be given to any one or more of the other general partners of an exempted limited partnership shall, notwithstanding any other rule of law or equity, be deemed to have been so given if given to the exempted limited partnership.

**Proceedings**

**33**. (1) Subject to subsection (3), legal proceedings by or against an exempted limited partnership may be instituted by or against any one or more of the general partners only, and a limited partner shall not be a party to or named in the proceedings.

    (2) If the court considers it just and equitable any person or a general partner shall have the right to join in or otherwise institute proceedings against any one or more of the limited partners who may be liable under section 20(1) or to enforce the return of the contribution, if any, required by section 34(1).

    (3) A limited partner may bring an action on behalf of an exempted limited partnership if any one or more of the general partners with authority to do so have, without cause, failed or refused to institute proceedings.

    (4) If any action taken pursuant to subsection (3) is successful, in whole or in part, as a result of a judgment, compromise or settlement of any action, the court may



Exempted Limited Partnership Act (2021 Revision)                                    Section 34

award any limited partner bringing any action reasonable expenses, including attorney's fees, from any recovery in any action or from an exempted limited partnership.

## Return of contributions

**34**. (1)  If a limited partner receives a payment representing a return of any part of that person's contribution or is released from any outstanding obligation in respect of that person's commitment and at the time that the payment was made or the release effected —

   (a)  the exempted limited partnership is insolvent including where the payment or release causes the insolvency; and

   (b)  the limited partner has actual knowledge of the insolvency of the exempted limited partnership,

   then for a period of six months commencing on the date of that payment or release but not thereafter, the limited partner shall be liable to the exempted limited partnership for the amount of the payment or the due performance of the released obligation in respect of that person's commitment in each case to the extent that the repayment or performance of the released obligation is necessary to discharge a debt or obligation of the exempted limited partnership incurred during the period that the contribution or commitment represented an asset of the exempted limited partnership.

   (2)  Any amount required to be repaid pursuant to this section shall, unless the partnership agreement specifies otherwise, bear simple interest at the rate of ten per cent per annum, calculated on a daily basis.

   (3)  The partnership agreement may specify —

   (a)  that no interest shall apply;

   (b)  that a different rate of interest, including a compound rate shall apply; or

   (c)  a different basis for calculating interest payable.

## Manner in which partnership may not be dissolved

**35**.  Subject to any express or implied term of the partnership agreement to the contrary —

   (a)  an exempted limited partnership shall not be dissolved nor the partnership agreement terminated by —

      (i)  changes in, additions to or substitutions of any one or more of the partners;

      (ii)  the transfer of the whole or part of the partnership interest of a limited partner;

      (iii)  the death, bankruptcy, dissolution, removal, withdrawal or winding up of a limited partner or a limited partner's withdrawal or



    redemption of, or repurchase by the partnership of, any limited partnership interest;

(iv)  the incapacity of a limited partner;

(v)  any one or more of the limited partners granting a mortgage, charge or other form of security interest over the whole or part of that peson's partnership interest;

(vi)  the sale, exchange, lease, mortgage, pledge or other transfer of any of the assets of the exempted limited partnership; or

(vii)  a de-registration of the exempted limited partnership pursuant to section 41 or 43; and

(b)  a limited partner shall not be entitled to wind up and dissolve the partnership by notice.

## Dissolution

**36**.  (1)  An exempted limited partnership shall be voluntarily wound up in accordance with the provisions of the partnership agreement —

(a)  at the time or upon the occurrence of any event specified in the partnership agreement; or

(b)  unless otherwise specified in the partnership agreement, upon the passing of a resolution of all the general partners and a two-thirds majority of limited partners.

(2)  Upon the completion of the winding up of an exempted limited partnership, the general partner or other person appointed as liquidator in accordance with the provisions of subsection (12) shall file a notice of dissolution with the Registrar and subject to section 37, an exempted limited partnership shall not be dissolved by an act of the partners or otherwise until a notice of dissolution signed by a general partner or liquidator has been filed with the Registrar.

(3)  Except to the extent that the provisions are not consistent with this Act, and in the event of any inconsistencies, this Act shall prevail, and subject to any express provisions of this Act to the contrary, the provisions of Part V of the *Companies Act (2021 Revision)* and the *Companies Winding Up Rules, 2018* shall apply to the winding up of an exempted limited partnership and for this purpose —

(a)  references in Part V to a company shall include references to an exempted limited partnership;

(b)  the limited partners shall be treated as if they were shareholders of a company and references to contributories in Part V shall be construed accordingly, except that the application of the provisions shall not cause a limited partner to be subject to any greater liability than that limited partner

would otherwise bear under this Act, but for the application of this paragraph;

(c)  references in Part V to a director or officer of a company shall include references to the general partner of an exempted limited partnership;

(d)  except for sections 123, excluding subsection (1)(b) and (c), 129, 140, 145, and 147 of the *Companies Act (2021 Revision),* Part V shall not apply to a voluntary dissolution and winding up under subsection (1);

(e)  in the case of a voluntary winding-up of an exempted limited partnership under subsection (1) where the partnership was registered under section 9 prior to 11th May 2009, the necessary time period for compliance with the requirements of section 123 (1) of the *Companies Act (2021 Revision)* shall be at least twenty-eight days prior to the final distribution of the assets of the exempted limited partnership to partners rather than within twenty-eight days of the commencement of its voluntary winding-up;

(f)  the Insolvency Rules Committee established pursuant to the *Companies Act (2021 Revision)* shall have the power to make rules and prescribe forms for the purpose of giving effect to this section or its interpretation; and

(g)  on application by a partner, creditor or liquidator, the court may make orders and give directions for the winding up and dissolution of an exempted limited partnership as may be just and equitable.

(4)  Notwithstanding that any order or direction has been made pursuant to subsection (3)(g) or that the winding up of an exempted limited partnership has commenced, a creditor who has security over the whole or part of the assets of the exempted limited partnership is entitled to enforce that person's security without the leave of the court and without reference to the general partner or any liquidator appointed to wind up the exempted limited partnership.

(5)  Where a liquidator sells assets on behalf of a secured creditor of an exempted limited partnership, the liquidator is entitled to deduct from the proceeds of sale a reasonable sum by way of remuneration.

(6)  Where an exempted limited partnership is being wound up and a liquidator is appointed, the Registrar shall within 28 days of the appointment be notified of the name and business address of the liquidator.

(7)  The general partner or its legal representative shall promptly serve notice on all limited partners informing the limited partners of —

(a)  the death;

(b)  the commencement of liquidation, bankruptcy or dissolution proceedings; or

(c)  the withdrawal, removal or making of a winding up or dissolution order,

in relation to the sole or last remaining qualifying general partner and in this section each event is referred to an "event of withdrawal".



Section 36                                      Exempted Limited Partnership Act (2021 Revision)

(8)   If default is made in compliance with this section, each general partner or its legal representative, in default shall incur a penalty of twenty-five dollars for each day that the default continues, which penalty shall be a debt due to the Registrar.

(9)   Unless the partnership agreement provides otherwise, if a new qualifying general partner is not elected within ninety days after the service of notice of an event of withdrawal in accordance with subsection (7), in this section referred to as "the automatic wind up date", the exempted limited partnership shall be wound up in accordance with the partnership agreement or the orders or directions the court may make or give in accordance with subsection (3)(g).

(10)  The winding up of an exempted limited partnership shall be deemed to commence upon the earlier to occur of any of the following —

      (a)   the passing of a resolution for winding up;

      (b)   subject to subsection (9), the automatic wind up date;

      (c)   the expiry of the period fixed for the duration of the exempted limited partnership by the partnership agreement;

      (d)   the occurrence of an event provided by the partnership agreement upon which the exempted limited partnership is to be wound up; or

      (e)   where a winding up order has been made, the presentation of the petition for winding up.

(11)  In the event that an exempted limited partnership is required to be wound up in accordance with the provisions of subsection (9) then the date of commencement of winding up shall be the date falling ninety days after the service of notice of an event of withdrawal.

(12)  If a majority of limited partners specified in the partnership agreement as being entitled to vote to elect a new general partner in accordance with the terms of the partnership agreement elects one or more new qualifying general partners by the automatic winding up date —

      (a)   the exempted limited partnership shall not be required to be wound up and dissolved; and

      (b)   the business of the exempted limited partnership may be resumed and continued as provided for in the partnership agreement or any subsequent agreement.

(13)  Following the commencement of the winding up of an exempted limited partnership its affairs shall be wound up by the general partner or other person appointed pursuant to the partnership agreement unless the court otherwise orders on the application of any partner, creditor or liquidator of the exempted limited partnership pursuant to subsection (3)(g).



### Registrar may strike off register

**37**. (1)  Where the Registrar has reasonable cause to believe that an exempted limited partnership is not carrying on business or is not in operation, the Registrar may strike the exempted limited partnership off the register and the exempted limited partnership shall thereupon be dissolved.

(2)  A request on behalf of the general partner to strike the exempted limited partnership off the register shall be accompanied by a fee in the amount prescribed by the Cabinet by regulation.

(3)  Where an exempted limited partnership is being wound up, and the Registrar has reasonable cause to believe either that no liquidator is acting, or that the affairs of the exempted limited partnership are fully wound up, the Registrar may strike the exempted limited partnership off the register and the exempted limited partnership shall thereupon be dissolved without the need for a notice of dissolution to be filed pursuant to section 36(2).

(4)  The Registrar shall immediately publish a notice in the Gazette to the effect that the exempted limited partnership in question has been struck off the register, the date on which it has been struck off and the reason therefor.

(5)  A general partner, limited partner or creditor who objects to an exempted limited partnership being struck off the register pursuant to this section, on the grounds that the exempted limited partnership was at the time it was struck off the register carrying on business, in operation or otherwise, may make an application to the court for the name of the exempted limited partnership to be restored to the register.

(6)  An application under subsection (5) shall be made —

    (a)  within two years of the date upon which the name of the exempted limited partnership was struck off the register; or

    (b)  within a period that the Cabinet may by order allow but which shall not exceed ten years of the date upon which the name of the exempted limited partnership was struck off the register.

(7)  The court, if satisfied that the exempted limited partnership was, at the time that it was struck off the register, carrying on business, in operation or otherwise, may order that the name of the exempted limited partnership be restored to the register upon —

    (a)  payment by the applicant of a reinstatement fee;

    (b)  payment by the applicant of any other accrued outstanding fees; and

    (c)  any other terms and conditions which the court considers just.

(8)  The reinstatement fee referred to in subsection (7) shall be the same as the fee paid by the exempted limited partnership upon initial registration.



(9)   Where an order is made under subsection (7) the exempted limited partnership is deemed to have continued in existence as if it had not been struck off.

(10)  The court may, in addition or subsequent to, an order made under subsection (7), by order give directions and make provision for, as far as possible, placing the exempted limited partnership and all other persons affected from the name of the exempted limited partnership being struck off the register, in the same position as if the name of the exempted limited partnership had not been struck off the register.

(11)  The striking off the register of any exempted limited partnership under this Act shall not affect the liability, if any, of any general partner or limited partner of the exempted limited partnership, and the liability shall continue and may be enforced as if the exempted limited partnership had at all times continued to be in existence.

(12)  An act performed or thing done by the Registrar under this section shall not attract any liability.

**Tax undertaking**

**38**.  (1)   The Financial Secretary may, on application by a general partner, give an undertaking in respect of any exempted limited partnership that a law which is hereafter enacted in the Islands imposing any tax to be levied on profits or income or gains or appreciations shall not apply to the exempted limited partnership or to any partner thereof in respect of the operations or assets of the exempted limited partnership or the partnership interest of a partner therein.

(2)   Any undertaking given under subsection (1) may provide, in addition, that the aforesaid taxes and any tax in the nature of estate duty or inheritance tax shall not be payable in respect of the obligations of the exempted limited partnership or the interests of the partners therein.

(3)   Any undertaking as aforesaid may be for a period not exceeding fifty years from the date of the approval of the application and may be in the form determined by the Financial Secretary.

(4)   The Financial Secretary shall prepare and present to the Cabinet, a report of all applications made and granted pursuant to this section on a monthly basis.

(5)   The first report due to be prepared pursuant to subsection (4) shall be presented to the Cabinet on the date specified by the Cabinet by Order.



Exempted Limited Partnership Act (2021 Revision)                    Section 39

**Annual return**

**39**. (1)  An exempted limited partnership shall, in January in every year, file with the Registrar a return signed by or on behalf of a general partner certifying that the exempted limited partnership has, during the prior calendar year, complied with section 10(1) and that there has been no breach of the declaration given in accordance with paragraph (f) of section 9(1) and pay to the Registrar an annual fee of the amount that the Cabinet shall, from time to time, by regulation prescribe.

(2)  The annual fee payable and the return due to be filed under subsection (1) shall be tendered at the same time.

(3)  An exempted limited partnership which fails to comply with subsection (1) shall —

(a)  where the annual fee is paid or the return is filed between 1st April and 30th June, incur a penalty of 33.33% of the annual fee;

(b)  where the annual fee and penalties are paid or the return is filed between 1st July and 30th September, incur a penalty 66.67% of the annual fee; and

(c)  where the annual fee and penalties are paid or the return is filed between 1st October and 31st December, incur a penalty 100% of the annual fee.

(4)  A penalty specified in subsection (3) shall be a debt due to the Registrar.

**Re-registration**

**40**. (1)  Any partnership registered under the *Limited Partnership Law (Revised)* prior to its **repeal** or sections 45 to 54 and 56 to 57 of the *Partnership Act (2013 Revision)* or any Law amending or replacing the same shall not be affected by this Act but shall continue to be governed by that law.

(2)  A partnership described in subsection (1) and any partnership established under the laws of a jurisdiction other than the Islands, in this section referred to as a "registered partnership", may, at any time, upon —

(a)  effecting the amendments to the partnership agreement as shall be necessary to comply with this Act, if any;

(b)  paying a fee of the amount that the Cabinet may by regulation prescribe; and

(c)  filing the statement required by section 9(1),

be registered under this Act and, with effect from the date indicated on the certificate of registration issued by the Registrar pursuant to section 9(5), shall be governed exclusively thereafter as an exempted limited partnership in accordance with this Act.

(3)  With effect from the date indicated on the certificate of registration described in subsection (2), the exempted limited partnership and the partnership interests of



the parties therein and their rights and liabilities, as against any person who is not a partner, shall cease to be governed by the **repealed** *Limited Partnership Law (Revised)*, or sections 45 to 54 and 56 to 57 of the *Partnership Act (2013 Revision)* or the laws of any other jurisdiction, as the case may be, save in respect of any act or omission occurring before that date which shall continue to be governed by the law of the other jurisdiction.

(4)  Without prejudice to the foregoing generality such registration shall not operate to —

(a)  create a new legal entity;

(b)  affect the property previously acquired by or on behalf of the exempted limited partnership;

(c)  affect any act or thing done prior to registration or the rights, powers, authorities, functions or obligations of the exempted limited partnership, any partner or any other person prior thereto; or

(d)  render defective any legal proceedings by or against the exempted limited partnership or any partner or any other person,

and any legal proceedings that could have been continued or commenced by or against the exempted limited partnership or any partner or any other person before its registration hereunder may, notwithstanding registration, be continued or commenced after registration and in respect of which the law of the other jurisdiction shall be of application.

(5)  With effect from the date indicated on the certificate of registration described in subsection (2), all property of every description, including all choses in action and any right to make capital calls of the registrant partnership shall be the property of the exempted limited partnership to be held in accordance with section 16(1).

### De-registration pursuant to partnership agreement

**41**.  A general partner of an exempted limited partnership may at any time terminate the registration of an applicant partnership as an exempted limited partnership, if termination of registration is permitted under the terms of the partnership agreement, by filing a written notice of termination of registration with the Registrar together with written confirmation that the action is authorised by the partnership agreement.

### Registration of foreign limited partnerships

**42**.  (1)  In this section —

"**foreign limited partnership**" means a limited partnership or limited liability partnership established in a recognised jurisdiction outside the Islands.

"**recognised jurisdiction**" is one that is prescribed as such by the Cabinet in regulations made under this Act; and

Exempted Limited Partnership Act (2021 Revision)                                    Section 42

"**relevant authority**" means the national, state or local government authority, registry or other body in the recognised jurisdiction that is responsible for forming or establishing the foreign limited partnership.

(2) Subject to subsection (3), a foreign limited partnership may apply to be registered pursuant to this section in order to act as the general partner of an exempted limited partnership.

(3) A foreign limited partnership may be registered by the Registrar upon payment to the Registrar of a registration fee of the amount the Cabinet by regulation, prescribes and by filing with the Registrar certified copies of —

(a) its certificate of formation in its jurisdiction of establishment or the equivalent document issued by the relevant authority as evidence of its formation; and

(b) a certificate of good standing issued by the relevant authority.

(4) If the certificate of good standing required under subsection (3)(b) is unavailable from the relevant authority, then the foreign limited partnership is required to file with the Registrar, a declaration signed by a person authorised to act on behalf of the foreign limited partnership stating that the foreign limited partnership is in good standing with the relevant authority.

(5) Neither certificate of good standing under subsection (3)(b) nor the declaration under subsection (4) shall be dated earlier than one month prior to the date of its delivery to the Registrar, and shall be accompanied by a statement signed by or on behalf of the foreign limited partnership specifying —

(a) the name, dual foreign name and the translated name, if applicable, of the foreign limited partnership;

(b) the jurisdiction in which it is established;

(c) whether the foreign limited partnership is deemed to be a separate legal person under the laws of the jurisdiction in which it is established and, if so, the full name and address of any managing member or other person, if not identified in paragraph (f), who immediately controls or directs the affairs of the foreign limited partnership;

(d) the address of its registered office in its jurisdiction of formation or establishment;

(e) the names and addresses of some one or more than one person resident in the Islands authorised to accept on its behalf service of process and any notices required to be served on it; and

(f) the full name and address of any general partners of the foreign limited partnership, if applicable.

(6) A foreign limited partnership shall, in January of each year, pay to the revenues of the Islands an annual fee in the amount and in the manner the Cabinet by regulation, prescribes.



Section 42                                    Exempted Limited Partnership Act (2021 Revision)

(7)  A foreign limited partnership that defaults in paying the annual fee specified in subsection (6) shall incur a penalty of —

(a)  33.33% of the annual fee specified in subsection (6) if the fee and penalty are paid between the 1st April and the 30th June;

(b)  66.67% of the annual fee specified in subsection (6) if the fee and penalty are paid between the 1st July and the 30th September; and

(c)  100% of the annual fee specified in subsection (6) if the fee and penalty are paid between the 1st October and the 31st December.

(8)  A penalty specified in subsection (7) is a debt due to the Registrar.

(9)  Upon compliance with subsections (3), (4) and (5) the Registrar shall issue a certificate of registration under the Registrar's hand and seal of office to the foreign limited partnership.

(10)  A certificate of registration of a foreign limited partnership issued under subsection (9) is conclusive evidence that compliance has been made with all requirements of this Act in respect of registration.

(11)  If any change is made in any details contained in the statement filed under subsection (5), a statement signed by or on behalf of the foreign limited partnership specifying the nature of the change shall, within sixty days of the change, be filed with the Registrar.

(12)  If default is made in compliance with subsection (11), each foreign limited partnership shall incur a penalty of two hundred dollars for each day that the default continues which shall be a debt due to the Registrar and the foreign partnership shall indemnify any person who thereby suffers any loss.

(13)  Any process or notice required to be served on a foreign limited partnership is sufficiently served if addressed to any person whose name has been delivered to the Registrar under subsection (5) and left at or sent by post to the address which has been so delivered.

(14)  A document may be served on the foreign limited partnership by leaving it at or sending it by post to any place of business established by the foreign limited partnership in the Islands.

(15)  An instrument executed by or on behalf of a foreign limited partnership outside the Islands is, and is to be treated as, a deed or instrument under seal —

(a)  if it is —

(i)  sealed; or

(ii)  expressed to be, or is expressed to be executed as, or otherwise makes clear on its face it is intended to be, a deed; and

(b)  if it is executed in conformity with any requirement imposed by —



Exempted Limited Partnership Act (2021 Revision)                                     Section 43

    (i) the laws of the jurisdiction in which the foreign limited partnership was established; and

    (ii) its partnership agreement or equivalent governing document.

(16) An instrument executed in accordance with subsection (15) meets any requirement of any law that the instrument is, and is to be treated as, a deed or instrument executed under seal.

(17) The execution of an instrument in accordance with subsection (15)(a) and the fact that it was executed in accordance with subsection (15)(b) may be proved by the affidavit or solemn declaration of a witness to the execution of the instrument sworn or made before a notary public or any other person qualified to administer oaths in any jurisdiction.

(18) If any foreign limited partnership ceases to be a general partner of an exempted limited partnership it shall forthwith notify the Registrar and from the date on which notice is given, the obligation of the foreign limited partnership to deliver any document to the Registrar ceases.

(19) Notwithstanding subsection (18) if the Registrar is satisfied by any other means that a foreign limited partnership has ceased to be a general partner of an exempted limited partnership the Registrar may close the file of the foreign limited partnership and thereupon the obligation of the foreign limited partnership to deliver any document to the Registrar ceases.

(20) A general partner of a foreign limited partnership shall not be deemed to have established a place of business in the Islands or commenced carrying on business in the Islands pursuant to Part IX of the *Companies Act (2021 Revision)* by virtue solely of so acting.

### De-registration for continuation in another jurisdiction

**43**. (1) A general partner on behalf of an exempted limited partnership which proposes to be registered by way of continuation as a partnership, body corporate or any other form of entity under the laws of any jurisdiction outside the Islands, in this section referred to as an "applicant", may apply to the Registrar for the exempted limited partnership, in this section referred to as the "applicant partnership", to be de-registered in the Islands.

(2) The Registrar shall de-register an applicant partnership if —

  (a) the applicant proposes to register the applicant partnership by way of continuation in a jurisdiction which permits or does not prohibit the transfer of the applicant partnership in the manner provided in this section referred to as a "relevant jurisdiction";

  (b) the applicant has paid to the Registrar a fee equal to three times the annual fee that would have been payable pursuant to section 39(1) in the January immediately preceding the application for de-registration;



(c)  the applicant has filed with the Registrar notice of any —

    (i)  change in the name or dual foreign name;

    (ii)  change in the applicant partnership; and

    (iii)  change in its proposed registered office or agent for service of process in the relevant jurisdiction;

(d)  no petition or other similar proceeding has been filed and remains outstanding or order made or resolution adopted to wind up, dissolve or liquidate the applicant partnership in any jurisdiction and no time or event has occurred upon which the applicant partnership is to be wound up;

(e)  no receiver, trustee or administrator or other similar person has been appointed in any jurisdiction and is acting in respect of the applicant partnership, its affairs or its property or any part thereof;

(f)  no scheme, order, compromise or other similar arrangement has been entered into or made whereby the rights of creditors of the applicant partnership are and continue to be suspended or restricted;

(g)  the applicant partnership is not insolvent;

(h)  an application for de-registration is *bona fide* and not intended to defraud creditors or the limited partners of the applicant partnership;

(i)  the applicant has delivered to the Registrar an undertaking signed by an authorised signatory of the applicant that notice of the transfer has been or will be given within twenty-one days to the secured creditors of the applicant partnership;

(j)  any consent or approval to the transfer required by any contract or undertaking entered into or given by the applicant partnership has been obtained, released or waived, as the case may be;

(k)  the transfer is permitted by and has been approved in accordance with the partnership agreement of the applicant partnership;

(l)  the laws of the relevant jurisdiction with respect to transfer have been or will be complied with;

(m)  the applicant partnership, if licensed or registered under the *Banks and Trust Companies Act (2021 Revision)*, the *Companies Management Act (2021Revision)*, the *Insurance Act, 2010 [Law 32 of 2010]*, the *Mutual Funds Act (2021 Revision)*, the *Private Funds Act (2021 Revision)* or the *Securities Investment Business Act (2020 Revision)*, has obtained consent of the Cayman Islands Monetary Authority to the transfer;

(n)  the applicant partnership will upon registration under the laws of the relevant jurisdiction continue as a partnership, body corporate or other form of entity;



Exempted Limited Partnership Act (2021 Revision)                                    Section 44

    (o)   the applicant partnership is in good standing with the registrar and all outstanding fees due to be paid in relation to the applicant partnership to the Registrar are paid; and

    (p)   the Registrar is not aware of any other reason why it would be against the public interest to de-register the applicant partnership.

(3)   Paragraphs (d), (e), (f), (g), (h), (j), (k), (l) and (n) of subsection (2) may be satisfied by filing with the Registrar a voluntary declaration or affidavit of an authorised signatory of the applicant to the effect that, having made due enquiry, the Registrar is of the opinion that the requirements of those paragraphs have been met.

(4)   A declaration or affidavit under subsection (3) shall include a statement of the assets and liabilities of the applicant partnership.

(5)   The statement under subsection (4) shall be based on an assessment of the assets and liabilities of the applicant partnership as at the date of the declaration or affidavit or the date as close as is practicable to the foregoing date.

(6)   An authorised signatory of the applicant, who makes a declaration or affidavit under subsection (3) without reasonable grounds commits an offence and is liable on summary conviction to a fine of fifteen thousand dollars and to imprisonment for five years.

(7)   The Registrar may, upon request from an applicant, where the Registrar is satisfied that the applicant has complied with subsection (2), de-register the applicant partnership.

(8)   Section 41 does not apply to an applicant partnership under this section.

### Certificate of de-registration

**44**.  (1)   Upon the termination of registration of a partnership under section 41, the Registrar shall issue a certificate under the Registrar's hand and seal of office that the registration of the partnership as an exempted limited partnership has been terminated and specifying the date of termination; and shall enter in the register of exempted limited partnerships the date of termination of the registration of the partnership under section 41.

(2)   Upon de-registration of an applicant partnership under section 43, the Registrar shall issue a certificate under the Registrar's hand and seal of office that the applicant partnership has satisfied the de-registration requirements under section 43 and been de-registered as an exempted limited partnership and specifying the date of de-registration and shall enter in the register of exempted limited partnerships the date of de-registration of the applicant partnership under section 43.

(3)   From the commencement of the date of termination of registration under section 41 or de-registration under section 43 the applicant partnership shall



cease to be an exempted limited partnership for all purposes under this Act and in the case of de-registration under section 43 shall continue as a partnership, body corporate or other entity under the laws of the relevant jurisdiction.

(4)  From the commencement of the date of termination of registration of a partnership under section 41 the applicant partnership becomes a general partnership under the *Partnership Act (2013 Revision)* and in the case of an applicant partnership de-registered under section 43, the applicant partnership de-registered shall not by virtue of that de-registration alone cease to be a partnership, body corporate or other entity under the laws of the relevant jurisdiction.

(5)  This section shall not operate, in relation to an applicant partnership de-registered under section 43 and continued as a partnership under the laws of the relevant jurisdiction —

(a)  to create a new legal entity unless otherwise provided by the laws of the relevant jurisdiction;

(b)  to prejudice or affect the identity or continuity of the applicant partnership as previously constituted unless otherwise provided by the laws of the relevant jurisdiction;

(c)  to affect the property of any applicant partnership;

(d)  to affect any appointment made, resolution passed or any other act or thing done in relation to the applicant partnership pursuant to a power conferred by the partnership agreement of the applicant partnership or by the laws of the Islands;

(e)  except to the extent provided by or pursuant to section 43 and this section, to affect the rights, powers, authorities, functions and liabilities or obligations of the applicant partnership or any other person unless otherwise provided by the laws of the relevant jurisdiction; or

(f)  to render defective any legal proceedings by or against the applicant partnership, and any legal proceedings that could have been continued or commenced by or against the applicant partnership before its de-registration under this Act may, notwithstanding the de-registration, be continued or commenced by or against the applicant partnership after de-registration.

**Notice of de-registration**

**45**.  The Registrar shall give notice in the Gazette of the termination of registration of a partnership under section 41 or the de-registration of an applicant partnership under section 43 and, in the case of de-registration under section 43, the jurisdiction under the laws of which the applicant partnership has been registered by way of continuation and the name of the applicant partnership, if changed.

Exempted Limited Partnership Act (2021 Revision)                              Section 46

### Certificate of good standing

**46**. (1) The Registrar may on application made by —

    (a)    an exempted limited partnership; or

    (b)    a foreign limited partnership registered under section 42,

issue a certificate of good standing to the exempted limited partnership or the foreign limited partnership that is in good standing in accordance with subsection (2).

    (2)    A certificate of good standing is evidence of the fact that the exempted limited partnership is in good standing on the date that the certificate of good standing is issued.

    (3)    An exempted limited partnership is deemed to be in good standing if all fees and penalties under this Act have been paid and the Registrar has no knowledge that the exempted limited partnership is in default under this Act.

### Electronic business

**47**.    Nothing in this Act shall prohibit an exempted limited partnership from offering, by electronic means, and subsequently supplying, real or personal property, services or information from a place of business in the Islands or through an internet service provider or other electronic service provider located in the Islands.

### Regulations

**48**.    The Cabinet may make Regulations in respect of exempted limited partnerships prescribing —

    (a)    the duties to be performed by the Registrar for the purposes of this Act;

    (b)    the forms to be used for the purposes of this Act;

    (c)    the fees payable to the Registrar in respect of filings or certifications or otherwise pursuant to this Act; and

    (d)    generally, the conduct and regulation of registration under this Act and any matters incidental thereto.

### Recovery of penalties

**49**. (1)    Notwithstanding any provision of this Act which prescribes a specific *per diem* penalty in respect of a default of any obligation to make a filing, to serve a notice or to maintain a record set out in this Act the Registrar may, in any case where the aggregate *per diem* penalty has exceeded the amount of one thousand dollars and the Registrar is satisfied that the failure is not due to wilful default, accept payment of a penalty of one thousand dollars in lieu thereof.

    (2)    Without prejudice to the powers exercisable by the Registrar under this Act, all sums that the Registrar is entitled to recover by way of fees or penalties are



recoverable either summarily as a civil debt, or as a simple contract debt, in any court of competent jurisdiction.

### *Repeal* of the Exempted Limited Partnership Law (2013 Revision) and savings

**50**.   (1)   The *Exempted Limited Partnership Law (2013 Revision)* is **repealed**.

(2)   The **repeal** of the *Exempted Partnership Law (2013 Revision)* shall not affect any exempted limited partnership registered under the **repealed** *Exempted Limited Partnership Law (2013 Revision)* and a provision in any document referring to the **repealed** *Exempted Limited Partnership Law (2013 Revision)* or its revision shall, so far as may be necessary for preserving its effect, be construed as referring to the corresponding provision in this Act.

**Publication in consolidated and revised form authorised by the Cabinet this 5th day of January, 2021.**

**Kim Bullings**
*Clerk of the Cabinet*



Exempted Limited Partnership Act (2021 Revision)                    ENDNOTES

## ENDNOTES

### Table of Legislation history:

| SL # | Law # | Legislation | Commencement | Gazette |
|---|---|---|---|---|
|  | 56/2020 | Citation of Acts of Parliament Act, 2020 | 3-Dec-2020 | LG89/2020/s1 |
|  | 31/2020 | Exempted Limited Partnership (Amendment)Law, 2020 | 7-Jul-2020 | LG49/2020/s7 |
|  |  | **Exempted Limited Partnership Law (2018 Revision)** | 16-Mar-2018 | GE22/2018/s15 |
|  | 10/2017 | Exempted Limited Partnership (Amendment) Law, 2017 | 5-Jun-2017 | G12/2017/s7 |
|  | 5/2014 | Exempted Limited Partnership Law, 2014 | 2-Jul-2014 | GE48/2014/s1 |



ENDNOTES                                    Exempted Limited Partnership Act (2021 Revision)

Exempted Limited Partnership Act (2021 Revision)                                    ENDNOTES



ENDNOTES                                    Exempted Limited Partnership Act (2021 Revision)

(Price: $8.80)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | **Chapter 15** |
| **POINT INVESTMENTS, LTD. (IN LIQUIDATION),** | **Case No. 22-10261 (TMH)** |
| **Debtor in a Foreign Proceeding.**[1] | **D.I. 52** |

### OBJECTION OF FTI GP I, LLC ON BEHALF OF FALCATA TECH INVESTMENT FUND I, L.P. TO THE MOTION OF THE FOREIGN REPRESENTATIVES FOR ENTRY OF AN ORDER ENFORCING THE AUTOMATIC STAY AND FOR DAMAGES

FTI GP I, LLC, a Delaware limited liability company (the "General Partner"), on behalf of Falcata Tech Investment Fund I, L.P. (the "Fund"), a Cayman Islands exempted limited partnership, by and through its undersigned counsel, respectfully submits this objection (the "Objection") to the *Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and For Damages* [ECF No. 52] (the "Motion"). In support of the Objection, the General Partner submits the (i) *Declaration of Robert Burnett in Support of Objection of FTI GP I, LLC on behalf of Falcata Tech Investment Fund I, L.P. to the Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and For Damages* (the "Burnett Declaration"), and (ii) *Declaration of Nicholas John Miles in Support of Objection of FTI GP I, LLC on behalf of Falcata Tech Investment Fund I, L.P. to the Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and For Damages* (the "Miles Declaration"). In further support of the Objection, the General Partner states as follows:

---

[1] Point Investments, Ltd. (the "Debtor") is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is located at c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

## PRELIMINARY STATEMENT

1.      For almost three years, the Debtor has blatantly evaded the consequences of its clear defaults under both the Limited Partnership Agreement (as defined herein) and the Master Transaction Agreement (as defined herein), and is now attempting to manipulate the protections provided by title 11 of the United States Code (the "Bankruptcy Code") and applicable Bermuda law to run out the clock on the statute of limitations period in connection with its defaults under the Master Transaction Agreement and the Limited Partnership Agreement (collectively, the "Fund Agreements"), at a minimum. This Court should not tolerate such gamesmanship.

2.      The General Partner and the Fund must have a remedy for the Debtor's defaults on its obligations under these agreements, and it belies any semblance of equity or fairness to condone the Debtor's scheme to deny the General Partner and the Fund a forum to timely adjudicate its claims against the Debtor.  The General Partner cannot file a claim in the Bermuda Proceeding (as defined herein) because, despite commencing such proceeding nearly three years ago, the Debtor has not provided the Fund, the General Partner or the Manager with the opportunity to lodge a claim in the Bermuda Proceeding for the purposes of adjudication.  Moreover, the General Partner cannot file suit in Bermuda in connection with the Debtor's defaults because there is a statutory stay as to parties subject to the jurisdiction of the Bermuda court on bringing such claims.  Thus, the General Partner is unable to timely assert its rights and remedies in Bermuda.

3.      The Fund Agreements (as defined herein) provide that the General Partner will submit to the nonexclusive jurisdiction of the courts of the Cayman Islands and to the courts of the jurisdiction in which the principal office of the General Partner is located, which is Texas. However, out of an abundance of caution and to avoid any issues with the automatic stay under section 362 of the Bankruptcy Code outside of this Court, the General Partner commenced the

-2-

AP0701

Adversary Proceeding (as defined herein) against the Debtor in *this* Court, the same court where the above-captioned chapter 15 case (the "<u>Chapter 15 Case</u>") is pending. Indeed, the overwhelming legal authority in both Delaware and elsewhere provides that the Bankruptcy Code permits the filing of a suit, such as the Adversary Proceeding, in the bankruptcy court against a debtor without violating the automatic stay.

4. However, instead of allowing the General Partner to assert its claims in this Court, the court where the Debtor submitted to jurisdiction, in connection with the Debtor's defaults under the Fund Agreements, the Debtor is now playing a game of "heads I win, tails you lose" by arguing that section 362 of the Bankruptcy Code applies to the Chapter 15 Case, while ignoring the applications of section 362 under Delaware bankruptcy law that clearly permit the filing of the Adversary Proceeding (as defined herein) in this Court. The issue is simple--if section 362 applies to the Chapter 15 Case, then <u>*all*</u> of section 362's applications must also apply. The Debtor cannot pick and choose which aspects of section 362 it wants to apply to this Chapter 15 Case, and then ignore those that do not redound to its benefit.

5. In yet another improper maneuver, the Debtor is attempting to use principles of comity to argue that the Adversary Proceeding cannot be adjudicated in this Court, but rather, this Court must defer to the Bermuda Proceeding – a forum where, as previously mentioned, the General Partner cannot assert its claims as a result of the Debtor's actions and inactions – to handle the claims set forth in the Adversary Proceeding. However, the Debtor ignores the clear authority which provides that United States federal courts will only extend comity to a foreign court *whenever the foreign court has proper jurisdiction* and when the enforcement of comity does not prejudice the rights of United States citizens. To be clear, the Bermuda Proceeding does <u>not</u> have jurisdiction over either the General Partner or the Fund under applicable law because neither is a

-3-

AP0702

Bermuda citizen, neither has received a dividend in the Bermuda Proceeding, neither has filed a proof of claim in the Bermuda Proceeding, and neither has taken any procedural steps in the Bermuda Proceeding. Moreover, the rights of the General Partner would be grossly prejudiced if the Adversary Proceeding were to be deferred to the Bermuda Proceeding where the General Partner would not be able to even timely assert its claims, let alone have them adjudicated in that forum due to the statutory stay, the lack of the opportunity to lodge a claim in the Bermuda Proceeding for the purposes of adjudication, and the pending limitations period.

6. With the expiration of the applicable statute of limitations for the Debtor's default under the Fund Agreements quickly approaching, the time for the General Partner to protect its rights in connection with such default may soon run out. Through the Bermuda Proceeding and the Chapter 15 Case, the Debtor is attempting to devise a scheme whereby it uses the statutory stay in Bermuda and the automatic stay under section 362 of the Bankruptcy Code to prevent the General Partner from timely filing a suit to assert its rights and claims while simultaneously not commencing a claims process in both fora. By design, this scheme deprives the General Partner (as well as other creditors) of yet another avenue to assert its claims and rights against the Debtor. Indeed, the Motion is simply the latest maneuver in the Debtor's scheme to close all doors for the General Partner to assert its claims and rights. However, as provided herein, the Adversary Proceeding that was commenced against the Debtor in *this* Court, is proper, is not violative of the automatic stay under section 362, and should be permitted to proceed in this Court.

## BACKGROUND

**A.** **The Limited Partnership Agreement and Master Transaction Agreement**

7. On or about April 20, 2018, the Debtor became a limited partner of the Fund when it entered into an agreement to purchase and subscribe to an interest as limited partner in the Fund

-4-

with a capital contribution of $1,000,000,000.00, which was accepted on behalf of the Fund by the General Partner. *See* Burnett Decl. ¶ 18. As a limited partner, the Debtor agreed to be bound by the terms and conditions set forth in a certain Amended and Restated Exempted Limited Partnership Agreement, dated April 20, 2018 (the "Limited Partnership Agreement") and a certain Master Transaction Agreement, dated July 1, 2019 (the "Master Transaction Agreement"). *See id.* at ¶ 19.

8.      The Fund Agreements set forth the obligations of the Debtor, as limited partner, including its obligations to timely make regular Capital Contributions.[2] *See* Limited Partnership Agreement §§ 5.2(d), 5.4(a); Master Transaction Agreement, §§ 1.2, 1.3.

9.      The Limited Partnership Agreement also provides the rights and remedies that the General Partner can exercise in the event of the Debtor's default under the Fund Agreements, including the Debtor's failure to timely make a Capital Contribution. *See* Limited Partnership Agreement § 5.4.

10.      The Limited Partnership Agreement further provides that the Limited Partnership Agreement and the rights and obligations of the parties thereunder are governed by and construed and enforced in accordance with the laws of the Cayman Islands, and that the partners, including the General Partner and the Debtor, submit to the nonexclusive jurisdiction of the courts of the Cayman Islands and to the courts of the jurisdiction in which the principal office of the General Partner is located (and, if the principal office is located in the United States, of the federal district court having jurisdiction over the location of the principal office) for the resolution of all matters

---

[2] The Limited Partnership Agreement defines "Capital Contribution" as: "the capital contributed pursuant to a single Drawdown or the aggregate capital so contributed, as the context may require, by such Partner to the Fund pursuant to this Agreement . . . .". The Master Transaction Agreement incorporates the Limited Partnership Agreement's definition of "Capital Contribution." *See* Master Transaction Agreement ("Capitalized terms used herein without definition have the meaning set forth in the [Limited Partnership Agreement] . . . .").

pertaining to the enforcement and interpretation of the Limited Partnership Agreement. *See id.* at § 13.9. The General Partner's principal office is located in Houston, Texas. *See* Burnett Decl. ¶ 16. Neither the General Partner, nor the Fund has any presence in Bermuda, and it does not do business in Bermuda. *See id.* at ¶ 6.

11. The Master Transaction Agreement amended the Limited Partnership Agreement in certain respects. *See id.* at ¶ 12. The Master Transaction Agreement provides that it shall be governed by an interpreted in accordance with the law of the State of Delaware, excluding conflicts of law principles. *See* Master Transaction Agreement § 6; Burnett Decl. ¶ 17.

12. The Master Transaction Agreement did not alter the Debtor's contractual obligations to make Capital Contributions. *See id.* at § 1.4; Burnett Decl. ¶ 12.

**B.** **The Debtor's Defaults Under the Limited Partnership Agreement and the Master Transaction Agreement**

13. On June 16, 2020, the manager of the Fund, Falcata Capital LLC, a Delaware limited liability company (the "Manager"), with authority delegated by the General Partner, sent the Debtor a demand letter requesting a Capital Contribution in the amount of $625,000 due on July 1, 2020 in accordance with the procedures set forth in the Fund Agreements (the "July Capital Contribution"). *See* Burnett Decl. ¶ 20. The Debtor did not pay the July Capital Contribution as requested. *See id.* at ¶ 21.

14. On August 4, 2020, following the Debtor's failure to make the July Capital Contribution, the Manager sent the Debtor a default notice (the "Default Notice") stating that the Debtor had not paid the July Capital Contribution as required under both the Limited Partnership Agreement and the Master Transaction Agreement (the "Default"), and in accordance therewith, the Debtor had five business days to cure the Default. *See id.* at ¶ 22. The Default Notice further stated that if the Debtor failed to pay the Capital Contribution within five days from the date of the

-6-

Default Notice, the Debtor would be designated as in Default by the Manager, and would be "subject to any all of the rights and remedies afforded to the General Partner and the Fund under the Limited Partnership Agreement." *See id.*

15.     The Debtor failed to pay the July Capital Contribution in accordance with the Default Notice, and as a result, the Debtor is in default under the Fund Agreements. *See id.* at ¶ 23.

16.     The statute of limitations under applicable law for the General Partner, on behalf of the Fund, to timely commence an action in connection with the Default with respect to the default under the Limited Partnership Agreement and the Master Transaction Agreement is three years from the date the Debtor first failed to make a timely payment under the Fund Agreements, *i.e.*, July/August 2023. *See* 10 *Del. C.* § 8106.

**C.      The Debtor Commences the Bermuda Proceeding**

17.     On September 16, 2020, shortly after the Debtor's defaults under the Fund Agreements, the registered owner of the Debtor's common shares, Spanish Steps Holdings Ltd., filed a petition in the Supreme Court of Bermuda under the Bermuda Companies Act  (the "Bermuda Proceeding") allegedly seeking a winding up of the Debtor's affairs (the "Wind-up Petition"). *See Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Related Relief Under Chapter 15* [ECF No. 3] (the "Chapter 15 Petition") ¶ 17.

18.     On October 29, 2021, the Supreme Court of Bermuda appointed Andrew Childe and Richard Lewis of FFP Limited and Mathew Clingerman of Krys & Associates (Bermuda) Ltd. (together, the "Foreign Representatives") as the Joint Provisional Liquidators of the Debtor. *Id.* On February 18, 2022, the Supreme Court of Bermuda granted the Wind-Up Petition, and issued

AP0706

an order (the "Wind-up Order"), which, among other things, converted the winding up of the Debtor's affairs to a liquidation. *Id.* at ¶ 19.

19.     None of the Fund, the General Partner nor the Manager were provided with notice of the Wind-Up Petition or of the Wind-up Order. *See* Burnett Decl. ¶ 27.  Moreover, the Debtor, whether through its Foreign Representatives or otherwise, has not provided the Fund, the General Partner or the Manager with the opportunity to lodge a claim in the Bermuda Proceeding for the purposes of adjudication such that none of those entities have been accepted as a creditor in those proceedings. *See id.* In other words, the Fund, the Manager and the General Partner have not participated in the Bermuda Proceeding such that they cannot be said to have submitted themselves to the jurisdiction of the Bermuda Court.  *See id.*

**D.    The Debtor Commences the Chapter 15 Case**

20.     On March 29, 2022 (the "Chapter 15 Petition Date"), the Debtor filed the Chapter 15 Petition for Recognition in this Court.  As set forth in the Chapter 15 Petition, the Debtor sought recognition under chapter 15 of the Bankruptcy Code in order to prevent the Internal Revenue Service from levying and seizing the Debtor's assets located in the United States. [ECF No. 1].

21.     The Debtor did not provide notice to or serve the General Partner, the Fund, or the Manager with the Chapter 15 Petition.  *See Affidavit of Service* [ECF No. 30]; Burnett Decl. ¶ 28.

22.     On April 22, 2022, the Court entered the *Order Granting Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Related Relief Under Chapter 15* (the "Recognition Order") [ECF No. 34].  In relevant part, the Recognition Order provides that "[a]ll relief protections afforded to foreign main proceedings under section 1520 of the Bankruptcy Code is hereby granted to the Bermuda Proceeding, the

AP0707

Debtor, the Debtor's property located within the United States and the foreign representatives, as applicable." Recognition Order ¶ 5.

23.     The Debtor did not provide notice to or serve the General Partner, the Fund, or the Manager with the Recognition Order. *See Affidavit of Service* [ECF No. 36]; Burnett Decl. ¶ 28.

24.     On March 3, 2023, less than four months before the expiration of the applicable statute of limitations period for the default of the Master Transaction Agreement and the Limited Partnership Agreement, the General Partner commenced the adversary proceeding pending before this Court [Adv. Pro. No. 23-50122]  (the "Adversary Proceeding"), pursuant to Bankruptcy Rule 7001, which seeks declaratory judgment as to the contractual obligations between the parties and to fix and liquidate amounts owed to the Fund as a result of the Default and the Debtor's prepetition breaches of the Fund Agreements. *See* ECF No. 45.[3]

25.     On March 21, 2023, following the General Partner's request for the Debtor to accept service of the summons and complaint in the Adversary Proceeding, the Debtor sent a letter to counsel to the General Partner, whereby the Debtor asserted, *inter alia*, that the Adversary Proceeding violated the automatic stay under sections 362 and 1520 of the Bankruptcy Code. *See* Motion ¶ 19.

26.     On March 23, 2023, the General Partner filed the *Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination That There is No Automatic Stay, or in the Alternative Seeking Relief From the Automatic Stay to Proceed With Adversary Proceeding* [ECF No. 47] (the "Stay Confirmation Motion").  The Stay Confirmation Motion seeks entry of an order confirming that no stay of the Adversary Proceeding exists, or in the alternative, to the extent that the Court determines that the stay arising by operation of section 1520(a)(1) of

---

[3] Because the Adversary Proceeding seeks declaratory judgment, it is required to be brought by adversary proceeding under Bankruptcy Rule 7001(9).

AP0708

the Bankruptcy Code applies to the Adversary Proceeding, granting limited relief from the automatic stay for the purpose of administering the Adversary Proceeding so as to liquidate the General Partner's claim and obtain declaratory relief as to the contractual obligations between the parties.

27.     On March 27, 2023, rather than responding to the Stay Confirmation Motion, the Debtor filed the Motion, whereby the Debtor seeks an order (i) enforcing the automatic stay against the General Partner, (ii) declaring the Adversary Proceeding void *ab initio*, and (iii) ordering the General Partner to pay the Debtor's fees (including attorneys' and other professionals' fees) in connection with the Motion, the *Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1*, and the Adversary Proceeding.

28.     Further, the Motion provides that, despite the Bermuda Proceeding having commenced nearly three years ago, the Debtor states that the Foreign Representatives intend to give notice to potential creditors, including the General Partner and the Fund, requesting they file proofs of debt in the Bermuda, and that Foreign Representatives also intend to notice the deadlines for the claims adjudication process in this Chapter 15 Case.  *See* Motion ¶ 24.

## ARGUMENT

### A.     The Commencement of the Adversary Proceeding in This Court Is Not a Violation of the Automatic Stay Under Section 362 of the Bankruptcy Code

29.     In the Motion, the Debtor states that "section 1520(a)(1) of the Bankruptcy Code provides that, upon recognition of a proceeding as a foreign main proceeding, **the automatic stay of section 362 of the Bankruptcy Code applies** 'with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States.'" *See* Motion ¶ 27 (emphasis added).  The Debtor is correct in that section 1520(a)(1) of the Bankruptcy Code

-10-

provides, in relevant part, that "[u]pon recognition of a foreign proceeding that is a foreign main proceeding . . . **section[ ]** . . . **362 appl[ies]** with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States." *See* 11 U.S.C.§ 1520(a)(1) (emphasis added).[4] Accordingly, the clear statutory language of section 1520(a)(1) provides that section 362 applies with respect to a debtor, such as the Debtor, in a foreign proceeding that has been recognized by a court in the United States, such as the Bermuda Proceeding.[5]

30. Given that section 362 explicitly applies with respect to the Debtor, this Court must follow its own clear precedent concerning section 362 in connection with the commencement of adversary proceedings. This Court, and courts elsewhere, have routinely found that the Bankruptcy Code permits the filing of a suit in the bankruptcy court against a debtor without violating the automatic stay. *See, e.g., Allied Dev. of Ala. LLC v. Forever 21, Inc., et al. (In re Forever 21, Inc.*), 623 B.R. 53, 62-63 (Bankr. D. Del. 2020) (concluding that the creditor's claims in the subject adversary proceeding against the debtor that arose out of a contract involving the debtor were not barred by the automatic stay); *Charan Trading Corp. et al. v. Uni-Marts, LLC et al. (In re Uni-Marts, LLC*), 399 B.R. 400, 418 (Bankr. D. Del. 2009) (agreeing with the reasoning of the majority of courts to address the issue that the filing of an adversary proceeding against a debtor in its bankruptcy case does not violate the automatic stay); *Sharf v. BC Liquidating*, LLC, No. 14–cv–7320, 2015 WL 5093097, at *4 (E.D.N.Y. Aug. 28, 2015) ("Under this 'home court' rule, courts have refused to find a violation of § 362 [if an action to assert a prepetition claim is

---

[4] The Recognition Order provides that "[a]ll relief protections afforded to foreign main proceedings under section 1520 of the Bankruptcy Code is hereby granted to the Bermuda Proceeding, the Debtor, the Debtor's property located within the United States and the foreign representatives, as applicable." *See* Recognition Order ¶ 5. Accordingly, pursuant to the terms of the Recognition Order, section 362 of the Bankruptcy Code applies to the Debtor and the Debtor's property located in the United States.

[5] In *In re Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96 (Bankr. S.D.N.Y. 2012), the court held that the section 1520(a)(1) stay applies to "property of the debtor that is within the United States." *See Cozumel Caribe,* 482 B.R. at 111 n.12.

-11-

commenced in the bankruptcy court where the debtor's bankruptcy case is pending] because application of the automatic stay to litigation in the bankruptcy court where the debtor's case is pending does not serve any of the purposes underlying the automatic stay."); *Maxwell Real Estate Inv., LLC, et al. v. Liberty Asset Mgmt. Corp. (In re Liberty Asset Mgmt. Corp.),* No. CC–16–1273, 2017 WL 1100586, at *5 (B.A.P. 9th Cir. Mar. 21, 2017) (agreeing with the bankruptcy court that the automatic stay does not preclude creditors from asserting their claims in either the main bankruptcy case or an adversary proceeding); *Cowin v. Countrywide Home Loans, Inc. et. al. (In re Cowin)*, 538 B.R. 721, 733 (S.D. Tex. 2015) ("Overwhelming authority supports the conclusion that the home bankruptcy court is uniquely situated and that applying the automatic stay to actions filed in the home bankruptcy court would ignore these unique features, undermine the stay's intended purposes, and cause absurd results"); *Cellceutix Corp. v. Nickless, et al., (In re Formatech, Inc.)*, 496 B.R. 26 (Bankr. D. Mass. 2013) (agreeing with the majority view that the automatic stay does not prohibit the commencement of an adversary proceeding against a debtor (or its trustee) in the bankruptcy court where the debtor's bankruptcy case is pending); *Nat'l City Bank of Minneapolis v. Lapides, et al., (In re Transcolor Corp.)*, 296 B.R. 343 (Bankr. D. Md. 2003) (finding that the Bankruptcy Code implicitly permits the filing of suit in the bankruptcy court against a debtor without violating the automatic stay because such suits are the equivalent to the filing of claims against the estate which are allowable despite the automatic stay); *Civic Ctr. Square, Inc. v. Ford et al. (In re Roxford Foods, Inc.)*, 12 F.3d 875, 878 (9th Cir. 1993) ("[T]he automatic stay [is] inapplicable to a suit commenced in the same court where the bankruptcy was pending"); *Prewitt v. North Coat Vill., Ltd. (In re North Coast Vill, Ltd.)*, 135 B.R. 641, 643 (B.A.P. 9th Cir. 1992) ("[T]he stay does not apply to proceedings commenced against the debtor in the bankruptcy court where the debtor's bankruptcy is pending . . . the application of the stay to

-12-

proceedings against the debtor in the home bankruptcy court would be illogical and would not serve the purposes underlying the automatic stay"); *Lighthouse Bluffs Corp. v. Arteus Enter., Ltd. (In re Atreus Enter., Ltd.)*, 120 B.R. 341 (Bankr. S.D.N.Y.1990) (finding that the subject adversary proceeding against the debtor was not enjoined under 11 U.S.C. § 362 from proceeding in the bankruptcy court).[6]

31.     In short, because the General Partner sued the Debtor, in *this* Court, there is no violation of the automatic stay. That is precisely why the General Partner commenced the Adversary Proceeding in *this* Court, rather than in the Southern District of Texas, which, but for the filing of the Chapter 15 Petition, would have been a permitted location to commence an action against the Debtor under the Limited Partnership Agreement. If the General Partner had commenced an action in connection with the Default in Texas in accordance with the terms of the Limited Partnership Agreement, then a lifting or a modification of the automatic stay may have been necessary, and that would likely trigger a statute of limitations issue. However, that is not what happened here. Here, the General Partner commenced the Adversary Proceeding in the Debtor's "home court," *i.e.*, _this_ Court. Such an action is clearly not a violation of section 362 pursuant to the overwhelming authority in this Court and elsewhere.[7]

---

[6] Although not cited in the Motion, there is some non-binding case law that states that the underlying rationale for allowing actions to proceed against a debtor in its home court does not exist when a United States court is presiding over an ancillary proceeding, with the "home court" being the foreign main proceeding. S*ee Armco Inc. et al. v. N. Atlantic Ins. Co. Ltd. (In re Bird)*, 229 B.R. 90, 95-96 (Bankr. S.D.N.Y. 1999). However, such case law is not relevant here because it applied the since-repealed section 304, rather than the provisions of chapter 15, such as section 1520(a)(1). As provided herein, section 1520(a)(1), unlike former section 304, explicitly applies section 362 upon recognition of a foreign main proceeding, together with its applications and analyses conducted by numerous courts, with respect to a debtor, such as the Debtor. Therefore, while courts who applied former section 304 may not have had to analyze section 362, this Court must take into account all applications of section 362, including those such as the "home court" rule that permit the filing of adversary proceedings against a debtor in the same bankruptcy court where the debtor's bankruptcy case is pending.

[7] As an aside, section 1509(b)(1) provides that upon the recognition of a foreign proceeding "the foreign representative has the capacity to sue and be sued in a court in the United States." *See* 11 U.S.C. § 1509(b)(1). Accordingly, because the foreign representative acts on behalf of a debtor in a chapter 15 case, it follows that a debtor, such as the Debtor, also has the capacity to be sued in a court in the United States, such as this Court. *See, e.g., In re Ace Track Co., Ltd.*,

-13-

AP0712

32.    In the Motion, the Debtor is attempting to enforce the automatic stay provided in sections 362 and 1520(a)(1), emphasizing that such provisions apply here.  Yet, the Debtor fails to contend with the long line of cases addressing section 362 that have continuously found that an adversary proceeding against a debtor commenced in the same court where such debtor's bankruptcy case is pending is not a violation of the automatic stay.  The Debtor cannot have it both ways.  If the Debtor wishes for section 362 to apply, then it must adhere to the "home court" rule that the vast majority of courts follow, including this Court.  Importantly, the "home court" rule does not distinguish between chapter 15 cases and cases under other chapters of the Bankruptcy Code.

33.    Additionally, in the Motion, by ignoring the well-established "home court" rule, the Debtor appears to be incorrectly expanding the limited automatic stay that applies in a chapter 15 case.  Courts have noted that in a chapter 15 case, the section 1520 automatic stay is much smaller and more limited than in a case under a different chapter of the Bankruptcy Code.  *See, e.g., In re JSC BTA Bank*, 434 B.R. 334, 345 (Bankr. S.D.N.Y. 2010) (finding that, in the chapter 15 context, the bankruptcy court only possesses the power to stay a limited subset of actions against a debtor); *see also In re Pro-Fit Holdings Ltd.*, 391 B.R. 850 (Bankr. C. D. Cal. 2008) (noting that, unlike cases filed under other chapters of the Bankruptcy Code, the automatic stay of §1520 applies only in a limited manner).  Because the automatic stay in a chapter 15 case is smaller and more limited than in cases under different chapters of the Bankruptcy Code, it is completely illogical to argue, as the Debtor does, that the stay in the Chapter 15 Case is so broad and expansive that it does not have to follow the "home court" rule.  The "home court" rule applies to the more

---

556 B.R. 887, 916 n.25 (Bankr. N.D. Ill. 2016) (finding that chapter 15 as a whole is drafted so as to have the foreign representative as the party with the right to seek relief on behalf of the debtor, which makes a foreign representative— at the very least—a sort of guardian ad litem of the debtor for the purposes of the chapter 15 case).

-14-

expansive automatic stay in a chapter 11 or a chapter 7 case, and therefore it must also apply to the much smaller and more limited automatic stay in the Chapter 15 Case.

34.     The Debtor further argues in the Motion that, by filing the Adversary Proceeding in this Court, the General Partner is violating Bermuda law to the detriment of the Debtor's other creditors because a statutory stay of actions and proceedings against the Debtor is currently in effect in Bermuda pursuant to section 167(4) of the Bermuda Companies Act. *See* Stay Enforcement Motion ¶ 33.  However, for the avoidance of doubt, the commencement of the Adversary Proceeding here does not breach the provisions of section 167(4) of the Bermuda Companies Act 1981.  The provisions do not apply to proceedings in courts outside Bermuda.  *See* Dicey, Morris & Collins on the Conflict of Laws 16th Ed., section 30-124 (discussing the functionally equivalent section 130 of the UK Insolvency Act 1986); *In re Oriental Inland Steam Co; Ex p Scinde Railway Co* (1874) LR 9 Ch App 557 at p 559; *Re Vocalion (Foreign) Ltd [1932] 2 Ch. 196; Bloom and others v Harms Offshore AHT "Taurus" GmbH Co KG and another [2010] 2 WLR 349.  See* Miles Decl. ¶ 22.

35.     Moreover, none of the cases the Debtor relies on to support its assertion that the Adversary Proceeding violates the automatic stay are apposite.  For example, the Debtor relies on *In re Irish Bank Resol. Corp. Ltd.*, No. BR 13-12159-CSS, 2019 WL 4740249  (D. Del. Sept. 27, 2019), to assert that the commencement of an adversary proceeding in a chapter 15 case against certain entities including a foreign debtor is subject to the automatic stay.  *See* Stay Enforcement Motion ¶ 29.  However, *Irish Bank* dealt with a suit against a chapter 15 debtor's foreign representative in his individual capacity, and the subject complaint sought relief in the form of modification of the relevant recognition order to remove such foreign representative.  *See Irish Bank Resol. Corp. Ltd.*, 2019 WL 4740249, at *6.  Here, on the other hand, the General Partner is

-15-

not asserting a claim against the Foreign Representatives in their individual capacities, nor is it attempting to modify the Recognition Order in any way. Rather, the General Partner, through the Adversary Proceeding, is asserting claims against the Debtor itself. As stated above, section 1520(a)(1) provides that section 362 applies with respect to a debtor, such as the Debtor, and the clear precedent states that section 362 permits the filing of an adversary proceeding against a debtor in the same court in which such debtor's bankruptcy case is pending. Moreover, in *Irish Bank*, the Foreign Representatives were seeking an expansion of the section 362 stay to apply to non-debtors. *See id.* at *5. Accordingly, *Irish Bank* is unavailing.

36.    The Debtor also relies on *In re Nortel Networks UK Ltd.*, 538 B.R. 699 (Bankr. D. Del. 2015), but that case is not factually analogous because it does not involve a creditor commencing an adversary proceeding against a foreign debtor. Instead, *Nortel Networks* dealt with a third-party impleader complaint filed against certain foreign debtors by their debtor-affiliates in the United States. Further, in *Nortel Networks*, the applicable foreign proceeding had substantially completed an informal claim process, and an order setting the bar date for the formal proof of claim process in the foreign proceeding had been established. *See id.* at 703. Accordingly, the subject creditor in *Nortel Networks* had a remedy to adjudicate any pre-petition claims that it had against the foreign debtors. In fact, the court in *Nortel Networks* explicitly stated that any party seeking pre-petition claims against the foreign debtors could file claims in the foreign court pursuant to the established claims process in such court. *See id.* at 704. However, here, there is no established claims process in the Bermuda Proceeding, and the General Partner has no such remedy to adjudicate its rights and claims against the Debtor in Bermuda because, despite the Bermuda Proceeding having been pending for nearly three years, the Debtor has still not commenced a formal or informal claims process in that forum. In fact, the Debtor has asserted in

-16-

the Motion that it *intends* to give notice to potential creditors, including the General Partner and the Fund requesting they file proofs of debt in the Bermuda Proceeding, and that it *intends* notice a claims adjudication process in this Chapter 15 Case. *See* Motion ¶ 24.

37.     Furthermore, the court in *Nortel Networks* did not address, nor was it asked to address, the well-established "home court" exception to the automatic stay because the impleader motion and adversary proceeding at issue related solely to acts that occurred after the petition date. Indeed, this issue was not briefed before the bankruptcy court. In *Nortel Networks*, relying heavily on *In re Spansion, Inc.*, 418 B.R. 84, 88, 91 (Bankr. D. Del. 2009), *vacated on other grounds sub nom. Samsung Elecs. Co. v. Ad Hoc Consortium of Floating Rate Noteholders*, No. 09-0836, 2010 WL 2636115 (D. Del. June 29, 2010) ("*Spansion*"), the subject foreign representative argued that allowing the action to proceed would force them to litigate prepetition claims because the actions were based on a continuing course of conduct.  However, *Spansion* is also distinguishable and does not refute the well-established "home court" exception to the automatic stay because in that case, the action against the foreign debtor seeking to be stayed was a proceeding commenced in the United States International Trade Commission, not an adversary proceeding filed in the same court where the subject chapter 15 case was pending.

38.     Therefore, this Court cannot rely on *Nortel Networks* because:  (i) the established claims process in the foreign proceeding in *Nortel Networks* in no way resembles the claims process, or the severe lack thereof, in the Bermuda Proceeding; and (ii) it is not responsive or in line with the well-established precedent in this Court on the "home court" exception to the automatic stay.

39.     The Debtor also relies on *In re Sibaham Ltd.*, No. 19-31537, 2020 WL 2731870 (Bank. W.D.N.C. 2020), in claiming that the automatic stay made applicable under section 1520

AP0716

of the Bankruptcy Code bars the filing of an adversary proceeding against a chapter 15 debtor. *See* Motion ¶ 30. However, *Sibaham*, a non-Third Circuit, unpublished decision, dealt with a non-certified class action lawsuit against a foreign debtor. Further, the court in *Sibaham,* in applying the automatic stay to the class action lawsuit, reasoned that prohibiting such class action lawsuit was necessary to protect other creditors from prejudice solely because "the costs imposed by importing the class action device into the bankruptcy claims allowance process are significant and usually prohibitive. Class litigation is inherently more time-consuming than the expedited bankruptcy procedure for resolving contested matters, and may gum up the works of efficient estate administration and prejudice other creditors by delaying and reducing the distribution." *See Sibaham Ltd*., 2020 WL 2731870, at *2 (internal citations omitted). The Adversary Proceeding is not a class action lawsuit, and thus the concerns of the court in *Sibaham* in prohibiting the class action lawsuit (because it was a non-certified class action and not a single claimant) are not relevant or applicable here. Specifically, adjudicating the Adversary Proceeding in this Court does not prejudice other creditors because, unlike a class action lawsuit, the Adversary Proceeding will follow the expedited bankruptcy procedures, thus negating any concerns of delay in the distribution process.

40. Moreover, as clearly set forth herein, this Court's case law has already permitted the filing of an adversary proceeding against a debtor in the court administering such debtor's bankruptcy proceeding. *See e.g., Forever 21, Inc*., 623 B.R. at 62; *Uni-Marts, LLC*, 399 B.R. at 418. The *Sibaham* case was clearly cherry picked by the Debtor in an attempt to distract the Court from the prevailing precedent by bringing in a non-Delaware case that is not controlling and is not remotely analogous. The Court should therefore wholly disregard this case.

-18-

41.     Accordingly, the commencement of the Adversary Proceeding against the Debtor in this Court is not a violation of the automatic stay under section 362 pursuant to the overwhelming authority in this Court and elsewhere.[8]

**B.      Principals of International Comity Do Not Support Adjudicating the Adversary Proceeding in Bermuda Because Bermuda Does Not Have Proper Jurisdiction and Such Adjudication Would Severely Prejudice the General Partner**

42.     The Debtor also argues that this Court should not permit the Adversary Proceeding to continue, as doing so would be inconsistent with the principles of comity that underlie the purposes of chapter 15.  *See* Stay Enforcement Motion ¶ 34.  As a preliminary issue, the Debtor's argument is not appropriate at this time and should instead be adjudicated in the context of a dispositive motion in the Adversary Proceeding.  That notwithstanding, whether the Adversary Proceeding is adjudicated now or in the future, the Debtor's argument lacks merit.

43.     First, the Debtor fails to mention that Federal courts in the United States generally extend comity to a foreign court **whenever the foreign court had proper jurisdiction** and enforcement does not prejudice the rights of United States citizens or violate domestic public policy.  *See, e.g., In re Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 114 (Bankr. S.D.N.Y. 2012); *see also In re Sino–Forest Corp.*, 501 B.R. 655, 663 (Bankr. S.D.N.Y. 2013) (granting comity to the subject foreign court in part because the court reached a reasoned decision that it had the jurisdiction to grant the requested relief ).

---

[8]  Additionally, numerous other courts have permitted adversary proceedings to be filed against a debtor in chapter 15 cases. *See*, e.g., *Col. Bankers Life Ins. Co. v. PB Life and Annuity Co., Ltd*, Adv. Pro. No. 22-01149 (Bankr S.D.N.Y. 2022); *Wolverine Energy and Infrastructure Inc. v. ENT Capital Corp.*, Adv. Proc. No. 20-3455 (Bankr. S.D. Tex. 2020); *Girobank, N.V et al., v. Trade Fin. Tr. et al.*, Adv. Proc. No. 20-01321 (Bankr. S.D.N.Y. 2020); *Volo Logistics, LLC et al. v. Varig Logistica, S.A.*, Adv. Proc. No. 20-01243 (Bankr. S.D. Fla. 2020); *Aircraft Engine Lease Fin., Inc. v. Alitalia Societa Aerea Italiana S.P.A. in extraordinary admin.*, Adv. Proc. No. 18-01578, (Bankr. S.D.N.Y. 2018); *Dohrn v. Sanjel (USA), Inc.*, Adv. Proc. No. 16-05043 (Bankr. W.D. Tex. 2016); *Pelton et al., v. Sanjel (USA), Inc.*, Adv. Proc. No. 16-05029 (Bankr. W.D. Tex. 2016); *CT Inv. Mgmt. Co., LLC v. Cozumel Caribe, S.A. de C.V.* Adv. Proc. No. 11-02936 (Bankr. S.D.N.Y. 2011); *Hoak et al., v. Rock Well Petroleum, Inc*., Adv. Pro. No. 09-02014 (Bankr. D. Wy. 2009).

AP0718

44.     Here, the court in the Bermuda Proceeding does not have jurisdiction over either the General Partner or the Fund under applicable law.[9]  Further, (i) the Limited Partnership Agreement is governed by and construed and enforced in accordance with the laws of the Cayman Islands and the Master Transaction Agreement is governed by and in accordance with the laws of the State of Delaware, and thus neither of the Fund Agreements are governed by Bermuda law, (ii) neither the General Partner nor the Fund have any operations in Bermuda, (iii) the Debtor, whether through its Foreign Representatives or otherwise, has not provided the Fund, the General Partner or the Manager with the opportunity to lodge a claim in the Bermuda Proceeding for the purposes of adjudication, (iv) neither the Fund, the General Partner or the Manager have participated in the Bermuda Proceeding such that they cannot be said to have submitted themselves to the jurisdiction of the Bermuda Court, and (v) nether  the Fund, the General Partner or the Manager have consented to the jurisdiction of the Bermuda Proceeding.  *See In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 374 (Bankr. S.D.N.Y. 2014) (finding that the creditor was not subject to the jurisdiction of the foreign court because it refused to consent to such jurisdiction). Accordingly, the Bermuda Proceeding does not have "proper jurisdiction" to adjudicate the Adversary Proceeding as is required for such an extension of comity.[10]

---

[9]  Under applicable Bermuda law, neither the General Partner nor the Fund are amenable to the personal jurisdiction of the Bermuda court because neither has received a dividend in the Bermuda winding up (*Ex p Robertson, Re Morton* (1875) LR 20 Eq 733); and neither has lodged a proof of claim in the Bermuda winding up, *Rubin v Eurofinance SA, New Cap Reinsurance Corp Ltd (in liq) v Grant* [2012] UKSC 46, [2012] 2 BCLC 682).  Indeed, neither has taken any procedural step in the Bermuda winding up consistent only with acceptance of the rules under which the court operates (*Stichting Shell Pensioenfonds* [2015] 1 BCLC at [31]).  *See* Miles Decl. ¶ 23.  In fact, neither the Fund or the General Partner were provided with notice or service of the Wind-Up Petition or the Wind-Up Order in the Bermuda Proceeding.  *See* Burnett Decl. ¶ 27.

[10]  As an aside, the doctrine of abstention under 28 U.S.C. § 1334(c) does not apply to the Adversary Proceeding. With regard to mandatory abstention, even if there is a "timely" motion filed, because there is no pending non-bankruptcy action in connection with the defaults under the Fund Agreements, mandatory abstention is not available. This Court has repeatedly found that mandatory abstention does not apply to an action for the simple reason that there is no pending state action, an explicit statutory requirement under section 1334(c)(2).  *See, e.g., In re PSA, Inc.*, No. 02–5565, 2003 WL 22938894, at *3 (Bankr. D. Del. Dec. 8, 2003).  Further, 28 U.S.C. § 1334(c)(1) provides that "**Except with respect to a case under chapter 15 of title 11**, nothing in this section prevents a district court in the

AP0719

45.     Moreover, enforcement of comity to the Bermuda Proceeding would severely prejudice the General Partner, a Delaware limited liability company, because it would deprive the General Partner, as well as the Fund, of any remedy in connection with the Default of the Master Transaction Agreement and the Limited Partnership Agreement.  Specifically, even though the Bermuda Proceeding has been pending for nearly three years, the Debtor, whether through its Foreign Representatives or otherwise, has not provided the Fund, the General Partner or the Manager with the opportunity to lodge a claim, including a claim arising out of the Defaults of the Master Transaction Agreement and the Limited Partnership Agreement, in the Bermuda Proceeding for the purposes of adjudication such that none of those entities have been accepted as a creditor in those proceedings.  Further, pursuant to section 167(4) of the Bermuda Companies Act 1981, there is currently a statutory stay of the commencement of any action or proceeding against the Debtor in Bermuda.  Thus, if the Adversary Proceeding was deferred to the Bermuda Proceeding under the principles of comity, the General Partner would have no way to assert its claim arising out of the Debtor's defaults of the Master Transaction Agreement and the Limited Partnership Agreement due in large part to the Debtor's delay in commencing a claims process in the Bermuda Proceeding.  Courts have found that comity will not be granted if it would result in prejudice to United States citizens.  *See In re PT Bakrie Telecom Tbk*, 628 B.R. 859, 879 (Bankr. S.D.N.Y. 2021); *see also In re Oi S.A.*, 587 B.R. 253, 268 (Bankr. S.D.N.Y. 2018) (finding that, in granting post-recognition relief, a court must incorporate the principal of comity in its

---

interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11." *See* 28 U.S.C. § 1334(c)(1) (emphasis added).  In interpreting section 1334(c)(1), multiple courts in the Third Circuit have explicitly stated that a court cannot permissibly abstain from hearing a proceeding in chapter 15 cases. *See, e.g., In re Zhejiang Topoint Photovoltaic Co., Ltd.*, No. 16–01873, 2017 WL 6539481, at *4 (Bankr. D.N.J. Dec. 19, 2017); *see also Abrams v. General Nutrition Companies, Inc*., No. 06–1820, 2006 WL 2739642, at *7 (D.N.J. Sep. 25, 2006) ("The only exception to this Court's ability to exercise discretionary abstention is that it cannot abstain from hearing a case 'under' chapter 15 of the Bankruptcy Code").  Accordingly, any argument that this Court should permissibly abstain from hearing the Adversary Proceeding is without merit.

consideration of whether to grant additional assistance to a foreign debtor, and in doing so must assure the protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in the relevant foreign proceeding). Prejudice and severe inconvenience to the General Partner could not be clearer here because, through the Debtor's gamesmanship, the General Partner cannot assert a claim in the Bermuda Proceeding, and it was quickly running out of time to assert a claim for the Default of under the Fund Agreements.

46. Indeed, it is precisely because the General Partner cannot seek the relief and bring the claims set forth in the Adversary Proceeding in the Bermuda Proceeding that relief in this Court is necessary. *See Octaviar*, 511 B.R. at 374 (finding that the subject relief in the United States court was necessary because the moving party could not bring the subject claims in the foreign proceeding).[11]

47. In the Motion, the Debtor relies on *In re Energy Coal S.P.A.*, 582 B.R. 619 (Bankr. D. Del. 2018), to argue that this Court should refuse to adjudicate creditor claims in the United States against a foreign debtor that is the subject of a foreign bankruptcy proceeding. *See* Motion, ¶ 35. However, the court in *Energy Coal* permitted the liquidation of the subject claim in the United States and found that such a result "[struck] an appropriate balance." *See Energy Coal*,

---

[11] The General Partner notes that section 108(c) does apply to chapter 15 cases. *See e.g., In re Bankruptcy Estate of Norske Skogindustrier ASA*, 629 B.R. 717, 739 (Bankr. S.D.N.Y. 2021) ("Section 108's tolling provision therefore applies in a chapter 15 case by virtue of § 103(a) . . . it is clear that section 108 applies generally in chapter 15 cases"). However, section 108(c) only tolls the applicable statute of limitations period for 30 days after a notice of the termination or expiration of the stay under section 362 with respect to such claim. *See* 11 U.S.C. § 108(c). Thus, the General Partner would need to wait for a notice of the termination or expiration of the automatic stay, which, based on the Debtor's prior conduct, would likely occur after the expiration of the statute of limitations period for the default of the Master Transaction Agreement, if at all, and even then it would only extend the statute of limitations period for a minimal amount of time. Thus, the tolling provision of section 108(c) does not assuage or limit the severe prejudice that the General Partner faces in the event that the Adversary Proceeding is forced to be adjudicated in the Bermuda Proceeding that lacks a claims process.

-22-

582 B.R. at 629. Therefore, following *Energy Coal*, in order to strike an appropriate balance here, the claims in the Adversary Proceeding should be heard and determined in this Court.

48. The Debtor also relies on *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418 (2d Cir. 2005), to claim that this Court should not adjudicate the claims in the Adversary Proceeding, citing principles of international comity. However, the Debtor fails to provide the full picture of how the court in *Altos Hornos* discussed the concept of international comity. The court in *Altos Hornos* explicitly stated that "[i]nternational comity . . . involves . . . the discretion of a national court to decline to exercise jurisdiction over a case before it when that case is pending in a foreign court **with proper jurisdiction**." *See id.* at 424 (emphasis added). As stated herein, the Bermuda Proceeding does not have jurisdiction over the General Partner and the Fund, and therefore, under the principles of international comity, comity should not extend to the Bermuda Proceeding in connection with the Adversary Proceeding.[12] Further, international comity does not support a determination that forces a United States citizen to submit to jurisdiction in a foreign country to pursue a claim in a non-existent claims adjudication process or otherwise. *See PT Bakrie Telecom Tbk*, 628 B.R. at 877 (finding that the requirement of protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in a foreign proceeding, consistent with the principles of comity, is satisfied when creditors are given adequate notice of the timing and procedures for filing claims, and such procedures do not create additional burdens for a foreign creditor seeking to file a claim); *Oi S.A.*, 587 B.R. at 268 (finding

---

[12] The Debtor also relies on *In re Marconi PLC*, 363 B.R. 361 (S.D.N.Y. 2007), but this case is not applicable here because it applies the since-repealed section 304, rather than the provisions of chapter 15, and it does even mention principles of international comity. Accordingly, the Debtor's reliance on this case for its assertion that principles of international comity indicate that this Court should not adjudicate the Adversary Proceeding, which is in the context of a chapter 15 proceeding, is misguided, at best.

-23-

AP0722

that prejudice and inconvenience against United States claim holders was avoided because of the

established claims adjudication process in the foreign proceeding that was far along in its process).

49.     Accordingly, principles of international comity do not support deferring to the

Bermuda Proceeding, a foreign proceeding without  jurisdiction over the General Partner and the

Fund, to adjudicate the Adversary Proceeding.[13]

**C.     The Foreign Representatives Should Not Be Awarded Damages Because There Was No Violation of the Automatic Stay, and Even if There Was a Violation, the General Partner Did Not Willfully Violate the Automatic Stay Under Applicable Law**

50.     In the Motion, the Debtor brazenly accuses the General Partner of willfully

violating the automatic stay by filing the Adversary Complaint in this Court without first seeking

a determination that the automatic stay does not apply or alternatively, relief from the stay.  *See*

Motion ¶ 42.  However, this accusation is meritless because, as provided herein, the filing of the

Adversary Proceeding against the Debtor in *this* Court is not a violation of the automatic stay.  The

Debtor's argument that the General Partner willfully violated the automatic stay is therefore moot

and of no relevance.

51.     Even assuming *arguendo* that this Court were to find that the filing of the Adversary

Proceeding in this Court violated the automatic stay, following controlling law in the Third Circuit,

an alleged violation of the automatic stay is not "willful" when the law governing such alleged

---

[13] The Debtor also baselessly states in the Motion that "declaring the Adversary Proceeding a violation of the automatic stay is supported by well-established principles of comity and cross-border insolvency law."  *See* Motion ¶ 39.  The Debtor provides no support for this assertion, and there is no authority in the Third Circuit or elsewhere that provides that principles of comity and cross-border insolvency law support a finding that an action commenced in a United States bankruptcy court is a violation of the automatic stay under section 362 of the Bankruptcy Code.  Rather, as clearly provided herein, principles of comity and cross-border insolvency law merely state that United States courts usually extend comity to a foreign court whenever such foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy.  There is no mention of the automatic stay, nor is there any indication that principles of comity have stated that an adversary proceeding filed in a bankruptcy proceeding's home court is a violation of the automatic stay.  As set forth above, the relevant authority clearly and overwhelmingly provides that the Adversary Proceeding filed in this Court is not a violation of the automatic stay.

violation was "sufficiently uncertain." *See In re Aleckna*, 13 F.4th 337, 341-44 (3d Cir. 2021)*; see also In re Uni Med. Ctr.*, 973 F.2d 1065, 1088 (3d Cir. 1992) (finding that the subject actions taken in reliance on statutory direction and case law support, were not "willful" because the relevant authority involved very close and complex legal questions, and the party was justified in standing firm in his position and in litigating these issues vigorously); *In re 15375 Mem'l Corp.*, 382 B.R. 652, 694 (Bankr. D. Del. 2008) (rev'd on other grounds) (finding that the "willfulness" element of section 362(k) was negated because the non-debtor party had persuasive legal authority for its position and a good faith belief in the validity of its action); *In re Conf. of African Union First Colored Methodist Protestant Church*, 184 B.R. 207, 217 (Bankr. D. Del. 1995) (finding that there was no willful violation of the automatic stay because the court found that, not only did the non-debtor parties have persuasive legal authority for their position, but such parties' view of the law was clearly a correct one).

52.     Here, given the ample controlling authority in this Court, and other courts, supporting the conclusion that the commencement of the Adversary Proceeding against the Debtor in this Court is not a violation of the automatic stay under section 362, it is far from credible for the Debtor to argue that the law, at a minimum, is clear and without question that the filing of an adversary proceeding against a debtor in the same court as such debtor's pending bankruptcy case violates the automatic stay.  With the abundance of authority in support of the position that the filing of the Adversary Proceeding against the Debtor in this Court did <u>not</u> violate the automatic stay, there is no viable argument that any alleged or potential violation of the automatic stay was "willful".

AP0724

## **CONCLUSION**

WHEREFORE, for all the foregoing reasons, the General Partner respectfully requests that

the Court (a) deny the Stay Enforcement Motion in its entirety, and (b) grant such further relief as

the Court deems just and proper.

Dated: April 14, 2023

By: _/s/ Eric D. Schwartz_____
    Eric D. Schwartz (No. 3134)
    Daniel B. Butz (No. 4227)
    Evanthea Hammer (No. 7061)
    Morris, Nichols, Arsht & Tunnell LLP
    1201 North Market Street, 16th Floor
    P.O. Box 1347
    Wilmington, DE 19899
    Telephone: (302) 658-9200
    Email: eschwartz@morrisnichols.com
        dbutz@morrisnichols.com
        ehammer@morrisnichols.com

    -and-

    Paul Werner (admitted *pro hac vice*)
    A. Joseph Jay III (admitted *pro hac vice*)
    SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
    2099 Pennsylvania Avenue NW, Suite 100
    Washington, D.C. 20006-6801
    Telephone: (202) 747-1900
    Email: pwerner@sheppardmullin.com
        jjay@sheppardmullin.com

    -and-

    Edward H. Tillinghast, III (admitted *pro hac vice*)
    SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
    30 Rockefeller Plaza
    New York, New York 10112-0015
    Telephone: (212) 653-8700
    Email: etillinghast@sheppardmullin.com

    *Attorneys for FTI GP I, LLC on behalf of Falcata*
    *Tech Investment Fund I, L.P.*

-26-

AP0725

# Exhibit 1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| **POINT INVESTMENTS, LTD.** **(IN LIQUIDATION)** | Case No. 22-10261 (TMH) |
| **Debtor in a Foreign Proceeding.**[1] | |

**DECLARATION OF ROBERT BURNETT IN SUPPORT OF OBJECTION OF FTI GP I, LLC ON BEHALF OF FALCATA TECH INVESTMENT FUND I, L.P. TO THE MOTION OF THE FOREIGN REPRESENTATIVES FOR ENTRY OF AN ORDER ENFORCING THE AUTOMATIC STAY AND FOR DAMAGES**

1.      I, Robert Burnett, make this declaration (the "Declaration") under penalty of perjury:

2.      I am over the age of 18 and, if called upon, could testify as to the matters set forth in this Declaration.

3.      I am the Co-founder and President of Falcata Capital LLC, which is the manager of Falcata Tech Investment Fund I, L.P. (the "Fund") with authority delegated to it by FTI GP I, LLC (the "General Partner"), the general partner of the Fund.  I am also the managing member of the General Partner.  I have a background in corporate finance and treasury, and I have been involved with corporate acquisitions for over 20 years.  Prior to founding Falcata Capital LLC (the "Manager"), I held several positions at Reynolds and Reynolds including Treasurer and Senior Vice President of Corporate Development overseeing Reynolds' merger and acquisition activities and managing many of its operating companies.

---

[1] Debtor Point Investments, Ltd. (the "Debtor") is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769.  The Debtor's registered office is at Vallis Building, 4th Floor, 58 Par-La Ville Road, , Hamilton HM 11, Bermuda.

AP0727

4.      I submit this Declaration in support of the *Objection of FTI GP I, LLC on behalf of Falcata Tech Investment Fund I, L.P. to the Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and For Damages* (the "Objection").[2]

5.      The statements made in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by other professionals and/or employees working under my supervision, or my opinion based on my experience, knowledge, and information concerning the General Partner and the Fund.  I declare the following statements are true to the best of my knowledge, information, and belief formed after a reasonable inquiry under the circumstances.

### Operative Provisions of the<br>Limited Partnership Agreement and Master Transaction Agreement

6.      The General Partner is a Delaware limited liability company, while the Fund is a Cayman Islands exempted limited partnership.  Neither the General Partner, nor the Fund has any physical presence in Bermuda and it does not do business in Bermuda.

7.      On April 20, 2018, the General Partner and Manager entered into by the Limited Partnership Agreement.  A true and correct copy of the Limited Partnership Agreement is attached hereto as **Exhibit A**.

8.      On July 1, 2019, without limitation, the Fund, the General Partner, the Debtor, the Manager, entered into the Master Transaction Agreement.  A true and correct copy of the Master Transaction Agreement is attached hereto as **Exhibit B**.

9.      The Limited Partnership Agreement generally provides the rights, remedies and responsibilities of the entities involved with the Fund, including the General Partner as well as any limited partners.

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Objection.

AP0728

10.     After a limited partner is admitted to the Fund, the limited partner has certain

obligations, such as making regular Capital Contributions.   Section 5.2(d) of the Limited

Partnership Agreement provides:

> Each Partner shall pay the Capital Contributions determined in
> accordance with the provisions of this Section 5.2(d) and specified
> in the relevant Drawdown Notice, as the same may be revised
> pursuant to Section 5.2(c), by wire transfer in immediately available
> funds to the account specified therein. The required Capital
> Contribution of each Partner shall be made no later than the
> Drawdown Date specified in such Drawdown Notice and shall equal
> such Partner's pro rata share (based on Capital Commitments of all
> the Partners), in each case up to an amount not to exceed such
> Partner's Remaining Capital Commitment.

11.     The Limited Partnership Agreement defines "Capital Contribution" as: "the capital

contributed pursuant to a single Drawdown or the aggregate capital so contributed, as the context

may require, by such Partner to the Fund pursuant to this Agreement . . . ."

12.     The Master Transaction Agreement amended the Limited Partnership Agreement

in certain respects, and further provides that the Debtor, as the Limited Partner, is responsible for

Capital Contributions.  *See* Exhibit B, Sections 1.2, 1.3.

13.     The Master Transaction Agreement incorporates the Limited Partnership

Agreement's definition of "Capital Contribution."   *See* Master Transaction Agreement

("Capitalized terms used herein without definition have the meaning set forth in the [Limited

Partnership Agreement] . . . .")

14.     The Limited Partnership Agreement also provides the procedure and remedies

available to the General Partner in the event the Limited Partner fails to make a Capital

Contribution.  Section 5.4 of the Limited Partnership Agreement states:

> If the Limited Partner fails to make, in a timely manner, all or any
> portion of any Capital Contribution or any other amount required to
> be funded by the Limited Partner hereunder, and such failure

-3-

AP0729

continues for five Business Days after receipt of written notice thereof from the General Partner, or the Limited Partner purports to Transfer all or any part of its interest in the Fund other than in accordance with this Agreement (a "Default"), then the Limited Partner may be designated by the General Partner in its sole discretion as in Default under this Agreement (a "Defaulting Partner") and shall thereafter be subject to the provisions of this Section 5.4.

15.     Additionally, Section 13.9 of the Limited Partnership Agreement provides that the Limited Partnership Agreement and the rights and obligations of the parties thereunder are governed by and construed and enforced in accordance with the laws of the Cayman Islands, and that the partners submit to the nonexclusive jurisdiction of the courts of the Cayman Islands and to the courts of the jurisdiction in which the principal office of the General Partner is located (and, if the principal office is located in the United States, of the federal district court having jurisdiction over the location of the principal office) for the resolution of all matters pertaining to the enforcement and interpretation of the Limited Partnership Agreement.

16.     The General Partner's principal office is located in Houston, Texas.

17.     Finally, Section 6 of the Master Transaction Agreement provides the agreement shall be governed by and interpreted in accordance with the law of the State of Delaware, excluding conflicts of law principles.

### The Debtor Becomes the Fund's Limited Partner and the Defaults<br>Under the Limited Partnership Agreement and the Master Transaction Agreement

18.     On April 20, 2018, the Debtor became the Limited Partner of the Fund when it entered into an agreement to purchase and subscribe to an interest as limited partner in the Fund with a Capital Contribution of $1,000,000,000.00, which was accepted on behalf of the Fund by the General Partner.

-4-

AP0730

19. As the Limited Partner, the Debtor agreed to be bound by the terms and conditions set forth in the Limited Partnership Agreement and the Master Transaction Agreement.

20. On June 16, 2020, the Manager sent the Debtor a Demand Letter requesting a Capital Contribution in the amount of $625,000 due on July 1, 2020 in accordance with the procedures set forth in the Fund Agreements (the "July Capital Contribution").

21. The Debtor did not pay the July Capital Contribution.

22. On August 4, 2020, following the Debtor's failure to make the July Capital Contribution, the Manager sent the Debtor a default letter (the "Default Notice") stating that the Debtor had not paid the Capital Contribution as required under both the Limited Partnership Agreement and the Master Transaction Agreement (the "Default"), and, in accordance therewith, the Debtor had five business days to cure the Default. The Default Notice further stated that if the Debtor failed to pay the Capital Contribution within five days from the date of the Default Notice, the Debtor would be designated as in Default by the Manager, and would be "subject to any and all of the rights and remedies afforded to the General Partner and the Fund under the [Limited Partnership Agreement]." A true and correct copy of the August 4, 2020 Default Notice is attached hereto as **Exhibit C**.

23. The Debtor failed to pay the July Capital Contribution in accordance with the Default Notice, and as a result, the Debtor is in default under the Fund Agreements.

24. I am informed that the statute of limitations under applicable law for the General Partner, on behalf of the Fund, to timely commence an action in connection with the Default with respect to the default under the Limited Partnership Agreement and the Master Transaction Agreement is three years from the date the Debtor first failed to make a timely payment under the Fund Agreements, *i.e.*, July/August 2023.

AP0731

25.     On September 16, 2020, shortly after the Debtor's defaults under the Fund Agreements, I am informed that the registered owner of the Debtor's common shares, Spanish Steps Holdings Ltd., filed a petition in the Supreme Court of Bermuda under the Bermuda Companies Act  (the "Bermuda Proceeding") allegedly seeking a winding up of the Debtor's affairs (the "Wind-up Petition").

26.     I am further informed that the Supreme Court of Bermuda appointed Andrew Childe and Richard Lewis of FFP Limited and Mathew Clingerman of Krys & Associates (Bermuda) Ltd. as the Joint Provisional Liquidators on October 29, 2021.  In addition, I am informed that on February 18, 2022, the Supreme Court of Bermuda granted the Wind Up Petition, and issued an order (the "Wind-up Order"), which, among other things, converted the winding up of the Debtor's affairs to a liquidation.

27.     None of the Fund, the General Partner nor the Manager were provided with notice of the Wind-Up Petition or of the Wind-up Order.  Moreover, the Debtor, whether through its Foreign Representatives or otherwise, has not provided the Fund, the General Partner or the Manager with the opportunity to lodge a claim in the Bermuda Proceeding for the purposes of adjudication such that none of those entities have been accepted as a creditor in those proceedings. In other words, the Fund, the General Partner have not participated in the Bermuda Proceeding such that they cannot be said to have submitted themselves to the jurisdiction of the Bermuda Court.

28.     I am informed that the Debtor initiated this chapter 15 proceeding on March 29, 2022.  I am further informed that on the same day, the Debtor filed the Chapter 15 Petition in the United States Bankruptcy Court for the District of Delaware (the "Court").  The Court granted the Chapter 15 Petition on April 22, 2022 and entered the Recognition Order.  Neither the General

-6-

Partner, the Fund nor the Manager received notice of the chapter 15 filing. Nor did the Debtor serve or provide the General Partner, the Fund or the Manager with notice of the Recognition Order.

 Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: April 14, 2023   /s/ _Robert Burnett_
          Robert Burnett

AP0733

## Exhibit A

**Limited Partnership Agreement**

AP0734

*Execution Version*

# FALCATA TECH INVESTMENT FUND I, L.P.

AMENDED AND RESTATED EXEMPTED
LIMITED PARTNERSHIP AGREEMENT

Dated April 20, 2018

**THE LIMITED PARTNERSHIP INTERESTS (THE "INTEREST") OF FALCATA TECH INVESTMENT FUND I, L.P. HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE SECURITIES LAWS OF ANY STATE OR ANY OTHER APPLICABLE SECURITIES LAWS IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. THE INTEREST MUST BE ACQUIRED FOR INVESTMENT PURPOSES ONLY AND IS SUBJECT TO SIGNIFICANT RESTRICTIONS ON TRANSFERABILITY. THE INTEREST MAY NOT BE OFFERED FOR SALE, PLEDGED, CHARGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT, ANY APPLICABLE U.S. STATE SECURITIES LAWS AND ANY OTHER APPLICABLE SECURITIES LAWS AND THE TERMS AND CONDITIONS OF THIS LIMITED PARTNERSHIP AGREEMENT, INCLUDING SECTION 10.1(a) HEREOF. THEREFORE, THE PURCHASER OF THE INTEREST WILL BE REQUIRED TO BEAR THE RISK OF ITS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.**

AP0735

Table of Contents

Page

ARTICLE I

GENERAL PROVISIONS

| | | |
|---|---|---|
| 1.1 | Definitions | 1 |
| 1.2 | Name and Registered Office | 13 |
| 1.3 | Purposes | 14 |
| 1.4 | Term | 14 |
| 1.5 | Fiscal Year | 14 |
| 1.6 | Powers | 14 |
| 1.7 | Specific Authorization | 16 |
| 1.8 | Amendment and Restatement of Agreement; Admission of the Limited Partner | 16 |
| 1.9 | Expenses | 17 |
| 1.10 | Register | 17 |
| 1.11 | Cayman Register | 17 |

ARTICLE II

THE GENERAL PARTNER

| | | |
|---|---|---|
| 2.1 | Management of the Fund, etc | 18 |
| 2.2 | Reliance by Third Parties | 18 |
| 2.3 | Conflicts of Interest, etc | 18 |
| 2.4 | Liability of the General Partner and Other Covered Persons | 22 |
| 2.5 | Removal of the General Partner | 23 |

ARTICLE III

THE LIMITED PARTNERS

| | | |
|---|---|---|
| 3.1 | No Participation in Management; Voting, etc | 25 |
| 3.2 | Limitation of Liability | 25 |
| 3.3 | Bankruptcy, Dissolution or Withdrawal of the Limited Partner | 25 |
| 3.4 | Advisory Committee | 25 |

ARTICLE IV

INVESTMENTS

| | | |
|---|---|---|
| 4.1 | Investments in Portfolio Companies | 28 |
| 4.2 | Investment Restrictions | 30 |
| 4.4 | Temporary Investments | 30 |
| 4.5 | Related Investment Funds | 31 |

ARTICLE V

CAPITAL COMMITMENTS; CAPITAL CONTRIBUTIONS

| | | |
|---|---|---|
| 5.1 | Capital Commitments | 36 |
| 5.2 | Capital Contributions | 36 |

AP0736

Table of Contents (continued)

|  |  | Page |
|---|---|---|
| 5.3 | Return of Unused Capital Contributions | 37 |
| 5.4 | Defaulting Partners | 38 |
| 5.5 | Early Termination of Investment Period | 40 |

## ARTICLE VI

### CAPITAL ACCOUNTS; DISTRIBUTIONS; ALLOCATIONS; WITHHOLDING

| 6.1 | Capital Accounts | 41 |
|---|---|---|
| 6.2 | Adjustments to Capital Accounts | 41 |
| 6.3 | Distributions Attributable to Portfolio Investments | 41 |
| 6.4 | Distributions of Temporary Investment Income | 43 |
| 6.5 | Tax Distributions | 43 |
| 6.6 | General Distribution Provisions | 44 |
| 6.7 | Distributions in Kind | 45 |
| 6.8 | Negative Capital Accounts | 45 |
| 6.9 | No Withdrawal of Capital | 46 |
| 6.10 | Allocations to Capital Accounts | 46 |
| 6.11 | Tax Allocations and Other Tax Matters | 46 |
| 6.12 | Withholding | 48 |
| 6.13 | Segregated Reserve Account | 51 |

## ARTICLE VII

### THE MANAGER

| 7.1 | Appointment of the Manager | 52 |
|---|---|---|
| 7.2 | Management Fee | 53 |

## ARTICLE VIII

### BOOKS AND RECORDS; REPORTS TO PARTNERS; ETC.

| 8.1 | Maintenance of Books and Records | 54 |
|---|---|---|
| 8.2 | Audits and Reports | 54 |
| 8.3 | Annual Meeting | 56 |
| 8.4 | Tax Information | 56 |

## ARTICLE IX

### INDEMNIFICATION

| 9.1 | Indemnification of Covered Persons | 56 |
|---|---|---|
| 9.2 | Return of Certain Distributions to Fund Indemnification | 58 |
| 9.3 | Other Sources of Recovery | 59 |
| 9.4 | Indemnification Agreements for Covered Persons | 60 |

AP0737

Table of Contents (continued)

Page

## ARTICLE X

### TRANSFERS

10.1   Transfers by Partners .................................................................................................61

## ARTICLE XI

### WINDING UP AND DISSOLUTION OF THE FUND

11.1   Commencement of Winding-Up ...................................................................................65
11.2   Winding Up .................................................................................................................66
11.3   Clawback ....................................................................................................................67
11.4   Dissolution ..................................................................................................................68

## ARTICLE XII

### AMENDMENTS; POWER OF ATTORNEY

12.1   Amendments ...............................................................................................................69
12.2   Power of Attorney .......................................................................................................70

## ARTICLE XIII

### MISCELLANEOUS

13.1   Notices ........................................................................................................................72
13.2   Counterparts; Signatures ............................................................................................73
13.3   Table of Contents and Headings; Terms Generally ...................................................73
13.4   Successors and Assigns ..............................................................................................73
13.5   Severability .................................................................................................................73
13.6   Further Actions ...........................................................................................................73
13.7   Determinations of the Partners ...................................................................................74
13.8   Non-Waiver .................................................................................................................74
13.9   Applicable Law ...........................................................................................................74
13.10  Confidentiality ............................................................................................................75
13.11  Survival of Certain Provisions ...................................................................................76
13.12  Entire Agreement; Most Favored Nations Provision .................................................76
13.13  No Third Party Beneficiaries ......................................................................................76
13.14  Compliance with Anti-Money Laundering Requirements ..........................................77
13.15  No Political Contributions by Fund ............................................................................77
13.16  Currency ......................................................................................................................77

## EXHIBITS

Exhibit A – Management Agreement
Exhibit B – Clawback Guarantee

AP0738

# FALCATA TECH INVESTMENT FUND I, L.P.

This AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT of Falcata Tech Investment Fund I, L.P., a Cayman Islands exempted limited partnership acting through its general partner, (the "Fund"), is executed and delivered as a deed on April 20, 2018, by and among FTI GP I, LLC, as the general partner of the Fund, the Initial Limited Partner and the Person listed in the Cayman Register (as amended or supplemented from time to time) as the limited partner of the Fund. Capitalized terms used herein without definition have the meanings specified in Section 1.1. References herein to the Fund shall, wherever the context requires, mean the General Partner acting in its capacity as such (and in its personal capacity) on behalf of the Fund.

## R E C I T A L S:

WHEREAS, the Fund is an exempted limited partnership registered under the Partnership Law pursuant to a Statement filed with the Registrar of Exempted Limited Partnerships in the Cayman Islands on December 14, 2017 (as amended or amended and restated from time to time, the "Certificate") and since its formation has been governed by the Limited Partnership Agreement of the Fund, dated December 14, 2017 (the "Original Agreement"); and

WHEREAS, the General Partner, the Initial Limited Partner and the Limited Partner admitted on the date hereof desire to amend and restate the Original Agreement in its entirety and to enter into this Agreement;

NOW, THEREFORE, the parties hereto hereby agree to continue the Fund and hereby amend and restate the Original Agreement, which is replaced and superseded in its entirety by this Agreement, as follows:

## ARTICLE I

### GENERAL PROVISIONS

1.1  Definitions. As used herein the following terms have the meanings set forth below:

"Adjustment Date" shall mean the last day of each Fiscal Year and any other date that the General Partner determines in its sole discretion to be appropriate for an interim closing of the Fund's books.

*Confidential*

AP0739

"Advisers Act" shall mean the U.S. Investment Advisers Act of 1940, as amended from time to time, and the rules and regulations of the SEC promulgated thereunder.

"Advisory Committee" shall have the meaning set forth in Section 3.4(a).

"AEOI" means one or more of the following, as the context requires, (*a*) : sections 1471 to 1474 of the US Internal Revenue Code of 1986 and any associated legislation, regulations or guidance, commonly referred to as the US Foreign Account Tax Compliance Act ("**FATCA**"), the Common Reporting Standard issued by the Organisation for Economic Cooperation and Development or similar legislation, regulations or guidance enacted in any other jurisdiction which seeks to implement equivalent tax reporting and/or withholding tax regimes, (*b*) any intergovernmental agreement, treaty or any other arrangement between the Cayman Islands and the US or any other jurisdiction (including between any government bodies in each relevant jurisdiction), entered into to facilitate, implement, comply with or supplement the legislation, regulations or guidance described in paragraph 1; and (c) any legislation, regulations or guidance implemented in the Cayman Islands to give effect to the matters outlined in clauses (a) or (b) of this definition.

"Affiliate" shall mean, with respect to any specified Person, a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the Person specified, *provided* that Portfolio Companies (and portfolio companies of any Alternative Investment Funds) and Related Investment Funds shall be deemed not to be "Affiliates" of the Manager, the General Partner or the Fund, *provided, further*, that for the purposes of Section 4.2(a), Portfolio Companies (other than any two or more Portfolio Companies holding Securities the value of which are determined by reference to the results of operations of the same underlying business) shall be deemed not to be "Affiliates" of one another, *provided, further*, that each of the Co-Founders shall be deemed to be an "Affiliate" of the Manager and the General Partner for so long as such Co-Founder is affiliated with the Manager or any of its Affiliates and, *provided, finally*, that the Manager shall be deemed to be an Affiliate of the General Partner and *vice-versa*, and that for so long as one or more of the Co-Founders is employed by Reynolds, the Manager and the General Partner shall be deemed to affiliates of Reynolds, and *vice-versa*.

"Agreement" shall mean this Amended and Restated Exempted Limited Partnership Agreement, but not including any exhibits hereto, as amended, supplemented, restated or otherwise modified from time to time.

"Alternative Investment Fund" shall have the meaning set forth in Section 4.5(d).

"Annual Meeting" shall have the meaning set forth in Section 8.3.

"Available Assets" shall mean, as of any date, the excess of (*a*) the cash, cash equivalent items, Securities or other property to be distributed pursuant to Section 6.7 and Temporary Investments held by the Fund over (*b*) the sum of the amount of such items as the General Partner reasonably determines to be necessary or appropriate for the payment of the Fund's expenses, liabilities and other obligations (whether fixed or contingent, current or future), or for the establishment of appropriate reserves for such expenses, liabilities and obligations as may arise, including the maintenance of adequate working capital for the continued conduct of the Fund's investment activities and operations and amounts in respect of the exercise price of options, warrants and similar securities or instruments purchased or received or anticipated to be purchased or received in connection with Portfolio Investments.

"Bridge Investment" shall have the meaning set forth in Section 4.2(b).

"Business Day" shall mean any day other than (*a*) Saturday and Sunday and (*b*) any other day on which banks located in Houston, Texas or Bermuda are required or authorized by law to remain closed.

"Capital Account" shall have the meaning set forth in Section 6.1.

"Capital Commitment" shall mean, with respect to the Limited Partner, the amount set forth on the Subscription Agreement of such Limited Partner as accepted by the General Partner on behalf of the Fund, or acquired by a Substitute Partner, as such amount may be adjusted in accordance with the terms of this Agreement and, with respect to the General Partner, the amount set forth in Section 5.1 with respect to the General Partner.

"Capital Contribution" shall mean, with respect to any Partner, the capital contributed pursuant to a single Drawdown or the aggregate capital so contributed, as the context may require, by such Partner to the Fund pursuant to this Agreement, unless such capital is not treated as a Capital Contribution by the express terms of this Agreement.

"Carried Interest" shall have the meaning set forth in Section 6.3(d).

"Cayman Islands" shall mean the Cayman Islands, British West Indies.

"Cayman Record" shall have the meaning set forth in Section 1.11.

"Cayman Register" shall have the meaning set forth in Section 1.11.

"Certificate" shall have the meaning set forth in the recitals hereto.

"Claims" shall have the meaning set forth in Section 9.1(a).

*Confidential*

3

AP0741

"Clawback Guarantee" shall have the meaning set forth in Section 11.3.

"Closing" shall mean the Initial Closing and any other closing of the sale of interests in any Parallel Fund in accordance with the partnership agreement or other governing documents of such Parallel Fund.

"Co-Founders" shall mean Bob Brockman and Robert Burnett.

"Co-Investment Fund" shall have the meaning set forth in Section 4.5(b)(i).

"Co-Investors" shall have the meaning set forth in Section 4.5(b)(ii).

"Code" shall mean the U.S. Internal Revenue Code of 1986, as amended from time to time.

"Communications Act" shall mean the U.S. Communications Act of 1934, as amended from time to time.

"Covered Person" shall mean the General Partner, the Manager and each of their respective Affiliates; each of the current and former shareholders, officers, directors, employees, partners, members, managers agents and other representatives of any of the foregoing; the Limited Partner (and, with respect to Claims or Damages arising out of or relating to the Limited Partner's interest in the Fund, each of the Limited Partner's officers, directors, employees, partners, members, managers, agents and other representatives); each Person serving, or who has served, as a member of the Advisory Committee (and, with respect to Claims or Damages arising out of or relating to such service only, the limited partner that such Person represents and each of such limited partner's officers, directors, employees, partners, members, managers, agents and other representatives); and any other Person designated by the General Partner as a Covered Person who serves at the request of the General Partner or the Manager on behalf of the Fund.

"Damages" shall have the meaning set forth in Section 9.1(a).

"Default" shall have the meaning set forth in Section 5.4(a).

"Defaulted Amount" shall have the meaning set forth in Section 5.4(b).

"Defaulted Capital Commitment" shall have the meaning set forth in Section 5.4(c).

"Defaulting Partner" shall have the meaning set forth in Section 5.4(a).

"Disabling Conduct" shall mean, with respect to any Person other than the Limited Partner and voting members of the Advisory Committee, (*a*) a material violation of this Agreement; (*b*) fraud, willful malfeasance or Gross Negligence by or of such Person;

AP0742

(*c*) reckless disregard of duties by such Person in the conduct of such Person's office; (*d*) a willful and material violation of law by such Person; (*e*) a determination by a court of competent jurisdiction or admission by consent or plea of *nolo contendere*, that such Person has committed an indictable offense or a felony or equivalent; and with respect to the Limited Partner and each voting member of the Advisory Committee, fraud or willful malfeasance by or of such Person.

"Distributable Cash" shall mean cash received by the Fund from the sale or other disposition of, or dividends, interest or other income from or in respect of, a Portfolio Investment, or otherwise received by the Fund from any source (other than Capital Contributions, other payments made by the Partners pursuant to this Agreement and Temporary Investment Income and amounts deposited in the Segregated Reserve Account or any income earned thereon), to the extent that such cash constitutes Available Assets.

"DOL" shall mean the U.S. Department of Labor, or any governmental agency that succeeds to the powers and functions thereof.

"DOL Regulations" shall mean the regulations of the DOL included within 29 C.F.R. section 2510.3-101.

"Drawdown Date" shall have the meaning set forth in Section 5.2(a).

"Drawdown Notice" shall have the meaning set forth in Section 5.2(a).

"Drawdowns" shall mean the Capital Contributions made or to be made to the Fund pursuant to Section 5.2 from time to time by the Partners pursuant to a Drawdown Notice.

"ECI" shall mean income that is "effectively connected with the conduct of a trade or business within the United States" within the meaning of sections 871 and 882 of the Code (other than by reason of section 897 of the Code).

"Event of Withdrawal" shall mean, with respect to the General Partner or otherwise as specified under the Partnership Law, the death, commencement of liquidation, bankruptcy or dissolution proceedings, or the withdrawal, removal or making of a winding up or dissolution order, of the General Partner or such other Person as specified under the Partnership Law.

"FCC" shall mean the U.S. Federal Communications Commission, or any governmental entity that succeeds to the powers and functions thereof.

"FCC Rules" shall mean the rules, regulations or written policies of the FCC (*a*) that limit or restrict ownership in Media Companies on the basis of ownership in

*Confidential*

AP0743

other Media Companies or under which the Fund's ownership of a Media Company may be attributed to the Limited Partner (or the Limited Partner's ownership of another Media Company may be subject to limitation or restriction as a result of the ownership by the Fund of such Media Company or another Media Company), including the rules, regulations or written policies of the FCC that provide for the insulation from such attributable interests in Media Companies, or (*b*) that limit or restrict ownership of Media Companies by non-U.S. persons (as defined by the FCC), as such rules, regulations or written policies may be modified from time to time.

"Fee Income" shall mean 100% of the sum of all directors' fees, transaction fees, investment banking fees, break-up fees, advisory fees, monitoring fees or other similar fees received by the Manager, the General Partner or any of their respective Affiliates, net of any unreimbursed expenses incurred by the Manager or any of its Affiliates in connection with the consummation, holding or disposition of a Portfolio Investment or the termination of an unconsummated investment. For these purposes, directors' fees shall include the Value, on the date of exercise of any options, warrants and other non-cash compensation paid, granted or otherwise conveyed for services as members of boards of directors of Portfolio Companies received by the Manager, the General Partner or any of their respective Affiliates, including any employees thereof. Notwithstanding any other provision of this Agreement, the Manager, the General Partner and their respective Affiliates will use commercially reasonable efforts not to charge directors' fees, transaction fees, investment banking fees, break-up fees, advisory fees, monitoring fees or other similar fees.

"Final Admission Date" shall mean the last day of the twelfth calendar month following the month in which the Initial Closing occurs.

"Fiscal Year" shall have the meaning set forth in Section 1.5.

"Follow-On Investment" shall mean an investment by the Fund in Securities of (*a*) a Portfolio Company in which the Fund holds Securities at the time of investment or (*b*) a Person whose business is related or complementary to that of (and is or will be under common management with) a Portfolio Company.

"Fund" shall have the meaning set forth in the preamble hereto.

"Fund Expenses" shall mean the costs, expenses and liabilities that are incurred by or arise out of the operation and activities of the Fund, as determined by the General Partner in its sole discretion, including: (*a*) the Management Fee; (*b*) reasonable fees and expenses relating to consummated Portfolio Investments, unconsummated investments and Temporary Investments, including the evaluation, acquisition, holding and disposition thereof, to the extent that such fees and expenses are not reimbursed by a Portfolio Company or other third Person; (*c*) reasonable interest on and fees and expenses related to or arising from any Indebtedness of the Fund; (*d*) reasonable

*Confidential*

6

AP0744

premiums for insurance protecting the Fund and any Covered Persons from liabilities to third Persons in connection with the Fund's investment and other activities; (*e*) reasonable legal, custodial, administration, auditing, accounting, regulatory and compliance expenses, including expenses associated with (*i*) the preparation of the Fund's financial statements, tax returns and Schedule K-1s, and the representation of the Fund or the Partners by the tax matters partner and (*ii*) U.S. Treasury forms and AEOI compliance, in each case as relates specifically to the Fund and its Portfolio Companies, but excluding, for the avoidance of doubt, the costs of the Manager's general compliance with the Adviser's Act, such as preparation and updating of Form ADV; (*f*) reasonable banking and consulting expenses; (*g*) reasonable appraisal and valuation expenses; (*h*) reasonable expenses related to organizing Persons through or in which Portfolio Investments may be made; (*i*) reasonable expenses of the Advisory Committee; (*j*) except as otherwise provided in Section 6.12, taxes and other governmental charges, fees and duties payable by the Fund; (*l*) Damages; (*m*) costs of reporting to the Partners and to governmental authorities with respect to the Partners, the Fund or the Fund's activities and investments; (*n*) reasonable costs of the Annual Meeting; (*o*) reasonable costs of winding up and liquidating the Fund; and (*p*) all reasonable annual registration fees and registered office fees and expenses, but not including Organizational Expenses.

"General Partner" shall mean FTI GP I, LLC, a Delaware limited liability company, in its capacity as the general partner of the Fund, or any additional or successor general partner admitted to the Fund as a general partner thereof in accordance with the terms hereof, in its capacity as a general partner of the Fund, in each case as the context requires.

"Gross Negligence" shall, notwithstanding section 13.9, have the meaning given such term under the laws of the U.S. State of Delaware.

"Initial Closing" shall mean the closing of the sale on April 20, 2018 of the interests in the Fund.

"Initial Limited Partner" shall mean Falcata Capital LLC.

"Investment Company Act" shall mean the U.S. Investment Company Act of 1940, as amended from time to time, and the rules and regulations of the SEC promulgated thereunder.

"Investment Objectives" shall have the meaning set forth in Section 1.3.

"Investment Period" shall mean the period commencing on the date of the Initial Closing and ending on the earliest to occur of (*a*) the fifth anniversary of the last day of the month of the Initial Closing, (*b*) the first date on which all Remaining Capital Commitments (net of amounts reasonably reserved by the General Partner for the

payment of Fund Expenses throughout the Term and the funding of Follow-On Investments and investments with respect to which commitments have been made) are zero and (*c*) the date of any early termination of the Investment Period pursuant to Section 5.5.

"<u>Limited Partner</u>" shall mean the Person admitted as a limited partner of the Fund, which limited partner shall be listed in the Cayman Register, and shall include its successors and permitted assigns to the extent admitted to the Fund as limited partners in accordance with the terms hereof, in their capacities as limited partners of the Fund, and shall exclude any Person that ceases to be a Partner in accordance with the terms hereof

"<u>Management Agreement</u>" shall have the meaning set forth in Section 7.1.

"<u>Management Fee</u>" shall have the meaning set forth in Section 7.2.

"<u>Manager</u>" shall mean Falcata Capital LLC, a Delaware limited liability company, in its capacity as the manager of the Fund, or any additional or successor manager appointed by the Fund as a manager thereof in accordance with the terms hereof, in its capacity as a manager of the Fund, in each case as the context requires.

"<u>Manager Expenses</u>" shall mean the costs and expenses incurred by the Manager in providing for its and the General Partner's normal operating overhead, including salaries of the Manager's employees, rent and other expenses incurred in maintaining the Manager's place of business, but not including Organizational Expenses or Fund Expenses.

"<u>Marketable Securities</u>" shall mean Securities that are (*a*) tradable on an established U.S. national or non-U.S. securities exchange or (*b*) reported through NASDAQ or a comparable established non-U.S. over-the-counter trading system, in each case that the General Partner determines in good faith are marketable at a price approximating their Value within a reasonable period of time and are not subject to restrictions on transfer (taking into account only such Securities) under the Securities Act or other applicable securities laws or subject to contractual restrictions on transfer.

"<u>Material Adverse Effect</u>" shall mean (*a*) a violation of a statute, rule, order, directive, regulation or governmental administrative policy of a U.S. federal or state or non-U.S. governmental authority or stock exchange regulatory organization applicable to a Partner that is reasonably likely to have a material adverse effect on a Portfolio Company or any Affiliate thereof or on the Fund, any Related Investment Fund, the General Partner, the Manager or any of their respective Affiliates or on any Partner or any Affiliate of any such Partner, (*b*) an occurrence that is reasonably likely to subject a Portfolio Company or any Affiliate thereof or the Fund, the General Partner, the Manager or any of their respective Affiliates or any Partner or any Affiliate of any such

*Confidential*

AP0746

Partner to any material non-tax regulatory requirement to which it would not otherwise be subject, or that is reasonably likely to materially increase any such regulatory requirement beyond what it would otherwise have been, or (*c*) a violation of any written policy of the Limited Partner that the General Partner has agreed in writing on or prior to the date of the Limited Partner's admission to the Fund is likely to have a material adverse effect on the Limited Partner (and such policy remains in effect as of the date on which a determination of material adverse effect is being made).

"Media Company" shall mean any Person that, directly or indirectly, owns, controls or operates a broadcast radio or television station, a cable television system, or a "daily newspaper" (as such term is defined in the FCC Rules), a "broadband radio," any other communications facility operated pursuant to a license granted by the FCC and subject to the provisions of section 310(b) of the Communications Act, or any other business that is subject to the FCC Rules.

"NASDAQ" shall mean the automated screen-based quotation and trade execution system operated by The Nasdaq Stock Market LLC or any successor thereto.

"Non-U.S. Partner" shall mean the Limited Partner, which (*a*) (*i*) is not a "United States person" within the meaning of section 7701(a)(30) of the Code.

"Notice of Dissolution" shall mean a notice of dissolution as provided for in the Partnership Law.

"Organizational Expenses" shall mean all reasonable costs and expenses directly or indirectly incurred in connection with the formation and organization of, and sale of interests in, the Fund or otherwise relating thereto, as determined in good faith by the General Partner, including out-of-pocket legal, accounting, printing, travel and filing fees and expenses.

"Original Agreement" shall have the meaning set forth in the recitals hereto.

"Parallel Fund" shall have the meaning set forth in Section 4.5(c).

"Partners" shall mean the General Partner and the Limited Partner.

"Partnership Law" shall mean the Exempted Limited Partnership Law (2012 Revision) of the Cayman Islands, as amended, and any successor to such statute.

"Payment Date" shall have the meaning set forth in Section 7.2.

"Period" shall mean, for the first Period, the period commencing on the date of the Initial Closing and ending on the next Adjustment Date; and for each subsequent Period shall mean the period commencing on the day after an Adjustment Date and ending on the next Adjustment Date.

*Confidential*

9

AP0747

"Person" shall mean any individual or entity, including a corporation, partnership, association, limited liability company, limited liability partnership, joint-stock company, trust, unincorporated association, government or governmental agency or authority.

"Portfolio Company" shall mean an entity in which a Portfolio Investment is made, whether directly or indirectly, and continues to be held, by the Fund.

"Portfolio Company Indemnitor" shall have the meaning assigned to such term in Section 9.3.

"Portfolio Investments" shall mean debt or equity investments (other than Temporary Investments) made by the Fund.

"Post-Distribution Value" shall mean with respect to Marketable Securities (*a*) that are primarily traded on a securities exchange, the average of their closing sale prices on the principal securities exchange on which they are traded for each Business Day during the period commencing on the date of the relevant distribution and ending on the tenth Business Day after the date of such distribution or, if no sales occurred on any such day, the mean between the closing "bid" and "asked" prices on such day and (*b*) the principal market for which is or is deemed to be the over-the-counter market, the average of their closing sales prices on each Business Day during the period specified in clause (a) above, as published by NASDAQ or any similar organization, or if such price is not so published on any such day, the mean between their closing "bid" and "asked" prices, if available, on such day, which prices may be obtained from any reputable pricing service, broker or dealer.

"Pre-Existing Investment" shall have the meaning set forth in Section 2.3(b).

"Prime Rate" shall mean the rate of interest published from time to time in *The Wall Street Journal*, Eastern Edition (or any successor publication thereto), designated therein as the prime rate, or if not so published, the rate of interest publicly announced from time to time by any money center bank as its prime rate in effect at its principal office, as identified in writing by the General Partner to the Limited Partner.

"Proceeding" shall have the meaning set forth in Section 9.1(a).

"Register" shall have the meaning set forth in Section 1.10.

"Related Investment Funds" shall mean all Co-Investment Funds, Parallel Funds and Alternative Investment Funds established by the General Partner or any of its Affiliates pursuant to this Agreement or the governing document of the relevant Co-Investment Fund, Parallel Fund or Alternative Investment Fund, as the context requires.

*Confidential*

AP0748

"Remaining Capital Commitment" shall mean, with respect to any Partner, determined at any date, the amount of such Partner's Capital Commitment decreased by such Partner's Capital Contributions and increased by all distributions from the Fund to such Partner up to the aggregate amount of such Partner's Capital Contributions (*a*) returned without being used by the Fund, (*b*) as provided in Section 4.1(d), (*c*) returned in connection with the admission of a subsequent closing partner (or similar member) to any Parallel Fund or (*d*) used to pay Fund Expenses or Organizational Expenses, *provided* that if the date of determination with respect to a Partner is after delivery of a Drawdown Notice but before the related Drawdown Date, the amount specified as payable by such Partner in such Drawdown Notice (as the same may be amended by a subsequent Drawdown Notice related thereto) shall not be included in such Partner's Remaining Capital Commitment unless, in the case of a Drawdown Notice for a Portfolio Investment, such Portfolio Investment is abandoned.

"Removal Conduct" shall mean (*a*) a determination by a court of competent jurisdiction, or admission by consent or plea of *nolo contendere* by the General Partner, the Manager or any Co-Founder that such Person has (*i*) committed a material violation of this Agreement or (*ii*) in the performance of the General Partner's obligations under this Agreement (*A*) committed fraud, (*B*) acted with Gross Negligence or engaged in willful malfeasance or (*C*) committed a violation of law that has resulted in a Material Adverse Effect or (*b*) a conviction of the General Partner, the Manager or any of the Co-Founders by a court of competent jurisdiction of, or admission by consent or plea of *nolo contendere* to, an indictable offense or a felony or equivalent that has resulted in a Material Adverse Effect.

"Reynolds" shall mean The Reynolds and Reynolds Company.

"SEC" shall mean the U.S. Securities and Exchange Commission.

"Securities" shall mean shares of capital stock, partnership interests, limited liability company interests, warrants, options, bonds, notes, debentures and other equity and debt securities of whatever kind of any Person, whether readily marketable or not.

"Securities Act" shall mean the U.S. Securities Act of 1933, as amended from time to time, and the rules and regulations of the SEC promulgated thereunder.

"Segregated Reserve Account" shall have the meaning set forth in Section 6.13.

"Sharing Percentage" shall mean, with respect to any Partner and any Portfolio Investment or Temporary Investment, a fraction, expressed as a percentage, (*a*) the numerator of which is the Capital Contributions of such Partner used to fund the cost of such Portfolio Investment or Temporary Investment and (*b*) the denominator of which is the aggregate amount of the Capital Contributions of all of the Partners used to fund the cost of such Portfolio Investment or Temporary Investment.

*Confidential*

11

AP0749

"Subscription Agreement" shall mean the Subscription Agreement entered into by the Limited Partner in connection with its purchase of an interest in the Fund.

"Substitute Partner" shall have the meaning set forth in Section 10.1(d).

"Successor Fund" shall have the meaning set forth in Section 2.3(a).

"Tax Distributions" shall have the meaning set forth in Section 6.5.

"Temporary Investment" shall mean investments in (*a*) cash or cash equivalents, (*b*) marketable direct obligations issued or unconditionally guaranteed by the United States, or issued by any agency thereof, maturing within one year from the date of acquisition thereof, (*c*) money market instruments, commercial paper or other short-term debt obligations having at the date of purchase by the Fund the highest or second highest rating obtainable from either Standard & Poor's Ratings Services or Moody's Investors Services, Inc., or their respective successors, (*d*) interest bearing accounts at a registered broker-dealer, (*e*) money market mutual funds, (*f*) certificates of deposit maturing within one year from the date of acquisition thereof issued by commercial banks incorporated under the laws of the United States or any state thereof or the District of Columbia, or organized under the laws of a non-U.S. country, which banks have branches in the United States, or (*g*) overnight repurchase agreements with primary Federal Reserve Bank dealers collateralized by direct U.S. Government obligations or (*h*) pooled investment funds or accounts that invest only in Securities or instruments of the type described in (a) through (d). For the avoidance of doubt, Temporary Investments may be held at, managed by, or purchased from, any Person that satisfies the foregoing requirements.

"Temporary Investment Income" shall mean cash received by the Fund attributable to any net earnings on a Temporary Investment (other than a Temporary Investment acquired with the proceeds of the disposition of, or with income from, any Portfolio Investment).

"Term" shall have the meaning set forth in Section 1.4.

"Third Party Co-Investor" shall have the meaning set forth in Section 4.5(b)(i).

"Transfer" shall mean a direct or indirect transfer in any form, including a sale, assignment, conveyance, pledge, charge, mortgage, encumbrance, securitization, hypothecation or other disposition, any purported severance or alienation of any beneficial interest (including the creation of any derivative or synthetic interest), or the act of so doing, as the context requires.

"Transferee" shall have the meaning set forth in Section 10.1(b)(i).

AP0750

"Transferor" shall have the meaning set forth in Section 10.1(b)(i).

"Treasury Regulations" shall mean the regulations of the U.S. Treasury Department issued pursuant to the Code.

"Unrealized Loss" shall mean, with respect to any Portfolio Investment other than a Bridge Investment as of any date of determination, the excess, if any, of its cost over its carrying value as of such date.

"Value" shall mean (*a*) with respect to Marketable Securities (*i*) that are primarily traded on a securities exchange, the average of their closing sale prices on the principal securities exchange on which they are traded for each Business Day during the period commencing five days prior to the date of the relevant distribution or date of determination and ending on the last day prior to the date of such distribution or, if no sales occurred on any such day, the mean between the closing "bid" and "asked" prices on such day and (*ii*) the principal market for which is or is deemed to be the over-the-counter market, the average of their closing sales prices on each Business Day during such period, as published by NASDAQ or any similar organization, or if such price is not so published on any such day, the mean between their closing "bid" and "asked" prices, if available, on such day, which prices may be obtained from any reputable pricing service, broker or dealer and (*b*) with respect to all other Securities or other assets of or interests in the Fund, other than cash, the fair value determined by the General Partner in good faith considering all factors, information and data deemed to be pertinent, including unusual or limited trading volume, prices obtained by private transfers of Securities of the applicable Portfolio Company by other holders of such Securities, prices obtained from purchasers in placements of such Securities or the Securities of similar issuers, estimates of liquidation value, changes in the prospects of such Portfolio Company, liquidity of the Securities and variations in value due to the size of a block of Securities, *provided* that, for purposes of the dissolution of the Fund pursuant to Article XI, with respect to the Securities and other assets described in clause (b) above that are distributed in kind, such value shall have been approved by the Limited Partner, or, if not so approved, by an independent nationally recognized investment banking, accounting or other appraisal firm selected by the General Partner and approved by the Limited Partner.

### 1.2    Name and Registered Office.

(a)    Name.  The name of the Fund is Falcata Tech Investment Fund I, L.P.  Upon the termination of the Fund, all of the Fund's right, title and interest in and to the use of the name "Falcata Tech Investment Fund I, L.P." or "Falcata" and any variation thereof, including any name to which the name of the Fund may be changed, shall become the property of the General Partner or the Manager, and the Limited Partner shall have no right, title or interest in and to the use of any such name.

*Confidential*

AP0751

(b)     Registered Office.  The registered office of the Fund in the Cayman Islands is located at Walkers Corporate Limited, Cayman Corporate Centre, 27 Hospital Road, George Town, Grand Cayman KY1-9008, Cayman Islands and the registered agent for service of process on the Fund at such address is Walkers Corporate Limited, Cayman Corporate Centre, 27 Hospital Road, George Town, Grand Cayman KY1-9008, Cayman Islands.  At any time, the General Partner may designate another registered agent or registered office in the Cayman Islands.

1.3   Purposes.  The purposes of the Fund are (*a*) to seek long-term capital appreciation by acquiring, holding and disposing of Securities in Persons in the emerging technologies industry, primarily in the United States and Canada (the "Investment Objectives"), in accordance with and subject to the other provisions of this Agreement, (*b*) to engage in such other activities as the General Partner deems necessary, advisable, convenient or incidental to the foregoing and (*c*) to engage in any other lawful acts or activities consistent with the foregoing for which limited partnerships may be formed under the Partnership Law, *provided* that the Fund shall not undertake business with the public in the Cayman Islands (other than so far as may be necessary to carry on the activities of the Fund exterior to the Cayman Islands).

1.4   Term.  The term of the Fund commenced on December 14, 2017 and shall continue, unless the Fund is sooner wound-up and dissolved, until the tenth anniversary of the Initial Closing, *provided* that, unless the Fund is wound-up sooner dissolved, the term of the Fund may be extended by the General Partner with the consent of the Advisory Committee for up to three successive periods of one year each (such term, including any such extensions, being referred to as the "Term").  Notwithstanding the expiration of the Term, the Fund shall continue in existence until the filing of a Notice of Dissolution of the Fund in accordance with Section 11.4.

1.5   Fiscal Year.  The fiscal year of the Fund shall end on the 31st day of December in each year (the "Fiscal Year").  Except as otherwise required by law, the Fund shall have the same Fiscal Year for financial and partnership accounting purposes.

1.6   Powers.  Subject to the other provisions of this Agreement, the Fund acting by the General Partner shall be and hereby is authorized and empowered to do or cause to be done any and all acts determined by the General Partner to be necessary, advisable, convenient or incidental in furtherance of the purposes of the Fund, without any further act, approval or vote of any Person, including the Limited Partner; and without limiting the generality of the foregoing, the Fund (and the General Partner on behalf of the Fund) is hereby authorized and empowered:

(a)     to acquire, hold, Transfer, manage, vote and own Securities and any other assets held by the Fund, in accordance with and subject to the Investment Objectives;

*Confidential*

AP0752

(b)    to establish, maintain or close one or more offices outside the Cayman Islands and in connection therewith to rent or acquire office space and to engage personnel;

(c)    to open, maintain and close bank, brokerage and money market accounts, to draw checks or other orders for the payment of moneys, to exchange U.S. dollars held by the Fund into non-U.S. currencies and vice-versa, to enter into currency forward and futures contracts and to hedge with respect to Portfolio Investments held or proposed to be acquired (but not for speculative purposes, and the Fund may not sell any Securities or other assets short or enter into a similar transaction for a purpose other than to hedge currency exposure or manage duration), and to invest such funds as are temporarily not otherwise required for Fund purposes in Temporary Investments;

(d)    to set aside funds for reasonable reserves, anticipated contingencies and working capital, including for expenses and liabilities of the Fund and amounts in respect of the exercise price of options, warrants and similar securities or instruments purchased or received or anticipated to be purchased or received in connection with Portfolio Investments;

(e)    to bring, defend, settle and dispose of Proceedings;

(f)    to engage or discharge consultants, custodians, attorneys, placement agents, accountants and other agents and employees, including Persons that may be the Limited Partner or Affiliates thereof or Affiliates of the General Partner, *provided* that the terms of any such engagement with an Affiliate of the General Partner are no less favorable to the Fund than could be obtained in arm's-length negotiations with unrelated third Persons for similar services, and to authorize each such agent and employee (who may be designated as officers) to act for and on behalf of the Fund;

(g)    to (*i*) retain the Manager to render investment advisory and managerial services to the Fund as contemplated by Section 7.1, *provided* that such retention shall not relieve the General Partner of any of its obligations hereunder, (*ii*) execute, deliver and perform its obligations under the Management Agreement and (*iii*) with the consent of the Limited Partner, amend or supplement such agreement;

(h)    to execute, deliver and perform its obligations under contracts and agreements of every kind, and amendments thereto, necessary or incidental to the offer and sale of interests in the Fund, to the acquisition, holding and Transfer of Securities, or otherwise to the accomplishment of the Fund's purposes, and to take or omit to take such other actions in connection with such offer and sale, with such acquisition, holding or Transfer, or with the investment and other activities of the Fund, as may be necessary, advisable, convenient or incidental to further the purposes of the Fund;

(i)    to borrow money and to issue guarantees, to enter into agreements with respect to obligations of the Fund or one or more Portfolio Companies, to pledge or charge

assets of the Fund and to enter into any instrument or arrangements in connection therewith, including entering into any pledge, charge, security, lien, assignment or indemnity agreement and any modification, extension or renewal thereof;

(j)     to prepare and file all tax returns of the Fund; to make such elections under the Code (including an election under section 743(e) or 754 of the Code) and other relevant tax laws as to the treatment of items of Fund income, gain, loss, deduction and credit, and as to all other relevant matters, as the General Partner deems necessary or appropriate; and, subject to Section 8.1, to select the method of accounting and bookkeeping procedures to be used by the Fund;

(k)     to take all action that may be necessary, advisable, convenient or incidental for the continuation of the Fund's valid existence as an exempted limited partnership under the Partnership Law (including making such filings with the Registrar of Exempted Limited Partnerships in the Cayman Islands as are necessary to continue the registration of the Fund as an exempted limited partnership under and to comply with the Partnership Law) and in each other jurisdiction in which such action is necessary to protect the limited liability of the Limited Partner or to enable the Fund, consistent with such limited liability, to conduct the investment and other activities in which it is engaged; and

(l)     to carry on any other activities necessary to, in connection with, or incidental to any of the foregoing or the Fund's investment and other activities.

1.7     <u>Specific Authorization</u>.     Notwithstanding any other provision of this Agreement, the Fund, and the General Partner on behalf of the Fund, may execute, deliver and perform the Management Agreement, the Clawback Guarantee, the Subscription Agreement and any amendments to such agreements, all without any further act, approval or vote of any Partner or other Person. The General Partner is hereby authorized to enter into and perform on behalf of the Fund the agreements described in the immediately preceding sentence, but such authorization shall not be deemed a restriction on the power of the General Partner to enter into other agreements on behalf of the Fund (subject to any other restrictions expressly set forth in this Agreement).

1.8     <u>Amendment and Restatement of Agreement; Admission of the Limited Partner</u>.     The parties hereto hereby agree to continue the Fund and hereby amend and restate the Original Agreement, which is replaced and superseded in its entirety by this Agreement. Immediately following the admission of the Limited Partner on the date of the Initial Closing, the Initial Limited Partner shall cease to be a partner of the Fund and the Fund shall return the original capital contribution made by the Initial Limited Partner, who shall have no further rights or claims against, or obligations as a partner of, the Fund. A Person shall be admitted at the Initial Closing as a limited partner of the Fund at the time that (*a*) this Agreement or a counterpart hereof is executed by or on behalf of such Person and a Subscription Agreement or a counterpart thereof is executed by or on behalf of such Person and by the General Partner on behalf of the Fund and (*b*) such Person is

*Confidential*

AP0754

listed by the General Partner as the limited partner of the Fund on the Register. The General Partner shall inscribe, or arrange the inscription of, the names of the Limited Partner in the Cayman Register, and shall update the Cayman Register as necessary to accurately reflect the information therein in accordance with the Partnership Law. After the Initial Closing, Persons shall be admitted as limited partners of the Fund as provided in Article X.

1.9 <u>Expenses</u>. All Organizational Expenses and Fund Expenses shall be paid by or out of the assets of the Fund. To the extent that any of the General Partner, the Manager, a Related Investment Fund or any of their respective Affiliates pays any Organizational Expenses or Fund Expenses, the Fund shall reimburse such Person upon request. Manager Expenses shall not be borne by the Fund.

1.10 <u>Register</u>. The General Partner shall cause to be maintained in the principal office of the Manager a register setting forth the name, address and amount of the Capital Commitment of each Partner and such other information as the General Partner may deem necessary or desirable (the "<u>Register</u>"). The Register shall not be part of this Agreement. The General Partner shall from time to time update the Register as necessary to accurately reflect the information therein. Any reference in this Agreement to the Register shall be deemed a reference to the Register as in effect from time to time. Subject to the terms of this Agreement, the General Partner may take any action authorized hereunder in respect of the Register without any need to obtain the consent of any other Partner. No action of the Limited Partner shall be required to amend or update the Register. Subject to applicable law, the General Partner shall deliver a copy of the Register to each Partner that submits a written request to the General Partner that the General Partner provide such Partner with a copy of the Register for any purpose reasonably related to such Partner's interest as a partner in the Fund.

1.11 <u>Cayman Register and the Cayman Record</u>. The General Partner shall cause to be maintained a register of limited partnership interests of the Fund which shall include, as required by the Partnership Law, the name and address of each Limited Partner, the date on which a person became a Limited Partner and the date on which a person ceased to be a Limited Partner (the "<u>Cayman Register</u>"). The General Partner shall further cause to be maintained a record of the amount and date of the contribution or contributions of each Limited Partner and the amount and date of any payment representing a return of the whole or any part of the contribution of any Limited Partner (the "<u>Cayman Record</u>"). The Cayman Register and the Cayman Record shall not be part of this Agreement. The General Partner shall cause the Cayman Register or the Cayman Record, as the case may be, to be amended from time to time to reflect any change in the particulars therein within twenty-one days of the date of such change, or otherwise in accordance with the Partnership Law. Any reference in this Agreement to the Cayman Register or the Cayman Record shall be deemed a reference to the Cayman Register or the Cayman Record as in effect from time to time. Subject to the terms of this Agreement,

*Confidential*

AP0755

the General Partner may take any action authorized hereunder in respect of the Cayman Register or the Cayman Record without any need to obtain the consent of any other Partner. No action of the Limited Partner shall be required to amend or update the Cayman Register or the Cayman Record.

## ARTICLE II

## THE GENERAL PARTNER

2.1 <u>Management of the Fund, etc.</u> The management, control and operation of and the determination of policy with respect to the Fund and its investment and other activities shall be vested exclusively in the General Partner (acting directly or through its duly appointed agents), which is hereby authorized and empowered on behalf and in the name of the Fund and in its own name, if necessary or appropriate, but subject to the other provisions of this Agreement, to carry out any and all of the purposes of the Fund and to perform all acts and enter into and perform all contracts and other undertakings that it may deem necessary, advisable, convenient or incidental thereto, including organizing any Related Investment Funds. The General Partner may exercise on behalf of the Fund, and may delegate to the Manager, all of the powers set forth in Sections 1.6 and 1.7, *provided* that the management and the conduct of the activities of the Fund shall remain the sole responsibility of the General Partner, and all decisions relating to the selection and disposition of the Fund's investments shall be made exclusively by the General Partner in accordance with this Agreement.

2.2 <u>Reliance by Third Parties</u>. In dealing with the General Partner and its duly appointed agents, including the Manager, no Person shall be required to inquire as to the General Partner's or any such agent's authority to bind the Fund.

2.3 <u>Conflicts of Interest, etc.</u>

(a) <u>Sponsorship of Successor Funds</u>. Until the earlier of (*i*) the date on which at least 75% of the aggregate Capital Commitments of the Non-Defaulting Partners have been contributed to the Fund or committed in writing to make Portfolio Investments, used to pay Organizational Expenses and Fund Expenses, or reserved for the funding of Follow-On Investments, the refinancing of any outstanding Bridge Investments and the payment of Organizational Expenses and Fund Expenses, and (*ii*) the last day of the Investment Period, neither the General Partner nor any of its Affiliates will admit investors to any pooled multiple-investment vehicle (other than the Fund, any Related Investment Funds and any entity formed in connection with a Portfolio Investment) having investment objectives and strategies substantially similar to the Investment Objectives of the Fund (a "<u>Successor Fund</u>") without the consent of the Limited Partner.

AP0756

(b)    Personal Investments. During the Term, neither the General Partner nor any of its Affiliates may acquire, invest in or hold Securities of any Portfolio Company, or any Securities that would be required to be offered to the Fund pursuant to Section 2.3(c), without the consent of the Advisory Committee, *provided* that the foregoing restriction shall not apply to (*i*) Securities held by the General Partner and its Affiliates through the General Partner, the Fund, any Related Investment Fund or any Successor Fund or (*ii*) Securities of a Portfolio Company that were received as a distribution from the Fund, any Related Investment Fund or any Successor Fund or that were granted or paid to the General Partner, the Manager or any of their respective Affiliates in such Person's capacity as a director of such Portfolio Company or an Affiliate thereof (it being understood that for the purposes of the definition of "Fee Income" any such Securities shall be treated as included in directors' fees), and *provided, further*, that nothing in this Section 2.3(b) shall prohibit any Affiliate of the General Partner from acquiring, investing in, reinvesting in, holding or disposing of Securities of a Person or an Affiliate of a Person (*A*) in which such Affiliate of the General Partner either holds an investment, or as to which such Affiliate of the General Partner has entered into a prior written commitment to invest, prior to the Initial Closing (or, in the case of any Person that becomes an Affiliate of the General Partner after the date of the Initial Closing, prior to the date on which such Person becomes such an Affiliate) (any such investment by an Affiliate of the General Partner being referred to as a "Pre-Existing Investment"), (*B*) as a limited partner or other passive investor in a public or private investment vehicle or (*C*) that are held in an account or trust maintained for the benefit of, or owned by, any Person, *provided* that such Person does not exercise investment discretion with respect to such Securities.

(c)    Allocation of Deal Flow. The Limited Partners acknowledges and agrees that the Co-Founders are currently employed by Reynolds, and while it is not expected that Reynolds will make investments outside its existing core strategies and the Fund does not intend to target investments within the Reynolds existing core strategies, it is possible that Reynolds may in the future make an investment that might otherwise be suitable for the Fund and that such investment by Reynolds shall not be considered an investment opportunity for the Fund. Except as otherwise permitted by immediately preceding sentence and Section 4.5, during the Investment Period any investment opportunity, other than Pre-Existing Investments, that is presented to the General Partner or any of its Affiliates and that the General Partner determines in good faith to be suitable and appropriate for the Fund and consistent with the Investment Objectives will be offered by the General Partner to the Fund, and the General Partner shall cause its Affiliates to offer any such investment opportunities to the Fund, to the extent that the Fund has available Remaining Capital Commitments net of reserves, including amounts reserved for (*i*) payment of Organizational Expenses and Fund Expenses throughout the Term, (*ii*) funding of Follow-On Investments and (*iii*) funding of any written commitments of the Fund, sufficient to enable the Fund effectively to participate in such investment opportunity. Notwithstanding the foregoing, with the consent of the Limited Partner, the Fund may co-invest with a Successor Fund in any investment opportunity offered to the

AP0757

Fund, and the General Partner may allocate such portion of such investment opportunity to such Successor Fund as the General Partner believes to be fair and reasonable, *provided* that any such co-investment shall be subject to the co-investment conditions set forth in Section 4.5(b)(ii), and *provided, further,* the Fund shall not make an initial investment in a Person in which Reynolds, the General Partner or a Successor Fund or their respective Affiliates own Securities without the consent of the Limited Partner, the Limited Partner hereby acknowledging and agreeing that the first Portfolio Investment made by the Fund will be the acquisition of XpressDocs acquired form Reynolds.

(d)     Transactions with Affiliates.  The Limited Partner hereby acknowledges and agrees to the following: (*i*) the Fund may enter into contracts and transactions with any of the General Partner and its Affiliates and (*ii*) the General Partner and its Affiliates may enter into contracts and transactions with the Fund and with any Portfolio Company, *provided*, in each case, that (*A*) such contract or transaction is authorized by this Agreement or (*B*) such contract or transaction has been approved by the Limited Partner. Notwithstanding anything in this Agreement to the contrary and except as provided in the last proviso of Section 2.3(c), without the consent of the Limited Partner, the Fund shall not (*w*) sell any Security to or purchase any Security from the General Partner, a Successor Fund or their respective Affiliates, (*x*) sell or purchase any Security in a transaction in which the General Partner or one of its Affiliates is acting as "broker," as such term is used in section 206(3) of the Advisers Act, for another Person, (*y*) consent to the "assignment" (as defined under the Advisers Act) of any management agreement referred to in Section 7.1 or (*z*) enter into any other transaction in which the Advisers Act requires the consent of the Fund as client.  Notwithstanding the foregoing, the consent of the Advisory Committee or the Limited Partner shall not be required under this Section 2.3(d) with respect to any payments of or arrangements with respect to Fee Income and the Limited Partner hereby consents to loans made by Reynolds to any Portfolio Company, *provided* such loans are on terms no less favorable to the Portfolio Company than would be a comparable loan provided by the third-party commercial lender in which case the consent of the Limited Partner shall be required.

(e)     Devotion of Time.  During the Investment Period, the General Partner and the Manager shall cause the Co-Founders, for so long as they are employed by the Manager or any of its Affiliates, to devote substantially all of their business time and efforts to the investment and other activities of the Fund and any Related Investment Funds. Notwithstanding the foregoing, each of the Co-Founders may (*i*) for so long as each remains an employ of The Reynolds and Reynolds Company, devote such time and efforts to the business of The Reynolds and Reynolds Company as they shall deem reasonably necessary to the affairs of such company, (*ii*) devote such time and efforts as they deem reasonably necessary to the affairs of any Successor Funds and any Pre-Existing Investments, (*iii*) serve on boards of directors of public and private companies and retain fees for such services for such Co-Founder's own account (other than fees that constitute Fee Income), (*iv*) engage in such civic, professional, industry and charitable activities as

*Confidential*

20

AP0758

such Co-Founder shall choose, (*v*) conduct and manage such Co-Founder's personal and family investment activities and *(vi)* engage in any other activities approved by the Limited Partner. After the end of the Investment Period, the General Partner and the Manager shall, and shall cause each of the Co-Founders for so long as each such Co-Founder is affiliated with or employed by the Manager or any of its Affiliates to, devote such time to the Fund and any Related Investment Fund as is reasonably required to conduct the investment and other activities of the Fund and such Related Investment Fund. Subject to the foregoing and to the other provisions of this Agreement, the General Partner, the Manager, the Co-Founders and their respective Affiliates may engage independently or with others in other investments or business ventures of any kind.

    (f)    <u>Other Potential Conflicts of Interest</u>.

    (i)    While the General Partner and the Manager intend to avoid situations involving conflicts of interest, the Limited Partner acknowledges that there may be situations in which the interests of the Fund, in a Portfolio Company or otherwise, may conflict with the interests of any Related Investment Fund, any Successor Fund, the General Partner, the Manager, the Co-Founders or their respective Affiliates. The Limited Partner agrees that the activities of any Related Investment Fund, any Successor Fund, the General Partner, the Manager, the Co-Founders and their respective Affiliates expressly authorized by this Section 2.3 or in any other provision of this Agreement may be engaged in by such Related Investment Fund, such Successor Fund, the General Partner, the Manager, the Co-Founders or any such Affiliate, as the case may be, and will not, in any case or in the aggregate, be deemed a breach of this Agreement or any other agreement contemplated herein or any duty that might be owed by any such Person to the Fund or to any Partner at law or in equity or otherwise.

    (ii)    On any matter involving a conflict of interest not provided for in this Section 2.3 or elsewhere in this Agreement, (*A*) each of the General Partner and the Manager will be guided by its good faith judgment as to the best interests of the Fund and shall take such actions as are determined by the General Partner or the Manager, as the case may be, to be necessary or appropriate to ameliorate such conflicts of interest and (*B*) the General Partner or the Manager will consult with the Advisory Committee with respect to any matter as to which the General Partner determines in good faith that such a conflict of interest exists. If the General Partner or the Manager consults with the Advisory Committee with respect to a matter giving rise to a conflict of interest, and if the Advisory Committee waives such conflict of interest or the General Partner or the Manager acts in a manner, or pursuant to standards or procedures, approved by the Advisory Committee with respect to such conflict of interest, then none of the Related Investment Funds, the Successor Funds, the General Partner, the Manager, the Co-Founders or any of their respective Affiliates shall have any liability to the Fund or any Partner for such actions in respect of such matter taken in good faith by them, including actions in the pursuit of their own interests, and such actions shall not constitute a breach

AP0759

of this Agreement or any other agreement contemplated herein or of any duty or obligation of such Person at law or in equity or otherwise.

2.4 <u>Liability of the General Partner and Other Covered Persons</u>.

(a) <u>General</u>. The General Partner has the liabilities specified under the Partnership Law, except as otherwise modified herein to the extent permitted by applicable law, to (*i*) Persons other than the Fund and the other Partners and (*ii*) the Fund and the other Partners. To the fullest extent permitted by law and notwithstanding any other provision of this Agreement or in any other agreement contemplated herein or applicable provisions of law or equity or otherwise, no Covered Person shall be liable to the Fund or any Partner, and each Partner does hereby release such Covered Person, for any act or omission, including any mistake of fact or error in judgment, taken, suffered or made by such Covered Person in good faith and in the belief that such act or omission is in or is not contrary to the best interests of the Fund and is within the scope of authority granted to such Covered Person by this Agreement or in any other agreement contemplated herein, *provided* that such act or omission does not constitute Disabling Conduct by the Covered Person. No Partner shall be liable to the Fund or any Partner for any action taken by any other Partner. The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of a Covered Person otherwise existing at law or in equity and to the extent permitted by law, are agreed by the Partners to replace such other duties and liabilities of such Covered Person.

(b) <u>Reliance</u>. A Covered Person shall incur no liability to the Fund or any Partner in acting in good faith upon any signature or writing believed by such Covered Person to be genuine, may rely in good faith on a certificate signed by an executive officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge, and may rely in good faith on an opinion of counsel selected by such Covered Person with respect to legal matters, except to the extent that such belief, reliance or selection constituted Disabling Conduct by the Covered Person. Each Covered Person may act directly or through such Covered Person's agents or attorneys. Each Covered Person may consult with counsel, appraisers, engineers, accountants and other skilled Persons selected by such Covered Person and shall not be liable to the Fund or any Partner for anything done, suffered or omitted in good faith in reliance upon the advice of any of such Persons, *provided* that such selection, action or omission does not constitute Disabling Conduct. No Covered Person shall be liable to the Fund or any Partner for any error of judgment made in good faith by an officer or employee of such Covered Person, *provided* that such error does not constitute Disabling Conduct of such Covered Person.

(c) <u>General Partner Not Liable for Return of Capital Contributions</u>. Except as provided in Section 11.3, neither the General Partner nor any of its Affiliates shall be liable for the return of the Capital Contributions of any Partner, and such return shall be made solely from Available Assets of the Fund, if any, and the Limited Partner hereby waives

AP0760

any and all claims that it may have against the General Partner or any Affiliate thereof in this regard.

     2.5  <u>Removal of the General Partner</u>. The General Partner shall promptly notify the Limited Partner in writing of any Removal Conduct. The General Partner may be removed as the general partner of the Fund within 120 days after such notice by the written election of the Limited Partner, at which time a replacement general partner of the Fund shall be designated by the written election of the Limited Partner, *provided* that any such replacement general partner shall be a Person permitted by applicable law. The General Partner shall file, or cause to be filed, a Section 10 Statement with the Cayman Islands Registrar of Exempted Limited Partnerships or any other document required to be filed pursuant to the Partnership Law to give effect to the provisions of this section 2.5. Upon such election and the filing of the Section 10 Statement:

     (a)    the General Partner shall thereupon become, without any further action being required of any Person, a Limited Partner and shall cease being the general partner of the Fund, but shall not thereafter be obligated to fund any Capital Contributions other than Fund Expenses (*i*) relating to Portfolio Investments made prior to the removal of the replaced General Partner or (*ii*) arising out of or relating to its activities during the period prior to the removal of the replaced General Partner as the general partner of the Fund or otherwise arising out of the replaced General Partner's service as general partner of the Fund;

     (b)    the replacement general partner of the Fund shall be admitted to the Fund as a general partner of the Fund pursuant to Section 2.5(a) and shall promptly amend this Agreement without any further action, approval or vote of any Person, including any other Partner, to reflect (*i*) the admission of such replacement general partner, (*ii*) the removal of the General Partner as the general partner of the Fund, (*iii*) the removal of any obligations or limitations that expressly relate to any Affiliates of the replaced General Partner, including in its capacity as a Limited Partner and (*iv*) the change of the name of the Fund so that it does not include the words "Falcata Tech Investment Fund I" or "Falcata" or any variation thereof, including any name to which the name of the Fund may have been changed;

     (c)    the replaced General Partner shall thereafter be entitled to receive all distributions that otherwise would have been distributable to it pursuant to this Agreement as if it had not been removed as the general partner of the Fund with respect to Portfolio Investments made by the Fund on or before the effective date of the removal of the replaced General Partner and without regard to Portfolio Investments made, or fees and expenses incurred, thereafter, except that amounts otherwise distributable to the General Partner pursuant to clauses (c) and (d) of Section 6.3 shall be reduced by 50%. For the avoidance of doubt, such reduction shall not constitute damages with respect to any act or omission. The Limited Partner preserves the right to pursue the General Partner for any legal claims

*Confidential*

AP0761

relating to or arising out of the investment or other activities of the Fund or otherwise relating to or arising out of this Agreement.

(d)     the replaced General Partner and its Affiliates shall continue to be Covered Persons and to be entitled to indemnification hereunder pursuant to Section 9.1, but only with respect to Damages (*i*) relating to Portfolio Investments made prior to the removal of the replaced General Partner or (*ii*) arising out of or relating to their activities during the period prior to the removal of the replaced General Partner as the general partner of the Fund or otherwise arising out of the replaced General Partner's service as general partner of the Fund or any Related Investment Fund;

(e)     Section 11.3 shall be applied to the replaced General Partner (and all calculations thereunder shall be made) as though the only Portfolio Investments, Organizational Expenses and Fund Expenses were those made and incurred prior to the effective date of the removal of the replaced General Partner;

(f)     any amounts held in the Segregated Reserve Account shall be transferred to an escrow account established in the name of the Fund at a bank selected by the replacement general partner for such purpose, and such escrow account shall constitute the Segregated Reserve Account and amounts deposited therein shall be held, applied and released as provided in Sections 6.13 and 11.2(b) and not used for any other purpose;

(g)     for all other purposes of this Agreement, the replacement general partner of the Fund shall be deemed to be the "General Partner" hereunder and shall be deemed to be admitted as the general partner of the Fund without any further action, approval or vote of any Person, including any other Partner, upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, effective immediately prior to the removal of the replaced General Partner and shall continue the investment and other activities of the Fund without dissolution; and

(h)     the appointment of the Manager pursuant to Article VII, the right of the Manager to receive future installments of the Management Fee and any management agreement between the Fund and the Manager pursuant to Article VII shall terminate.

2.6     <u>Modifications Relating to the Governing Documents of the General Partner</u>. The General Partner agrees that it will not (*a*) amend the provisions of the limited liability agreement governing the allocation, distribution and vesting of the Carried Interest or (*b*) increase the allocation of the Carried Interest to the Co-Founders, except as otherwise permitted by such limited liability agreement, in each case without the prior written consent of the Limited Partner.

2.7     <u>Bankruptcy, Dissolution or Withdrawal of the General Partner</u>. The eneral Partner or its legal representative shall promptly serve notice on all Limited Partners informing them of an Event of Withdrawal. Upon the occurrence of any Event of

AP0762

Withdrawal the Fund shall be wound-up and dissolved as provided in Article XI and in accordance with the Partnership Law, unless a new qualifying general partner is elected by the Limited Partner within ninety days after the service if notice of an event of withdrawal and the assignee is admitted as a replacement general partner of the Fund pursuant to Section 10.1(e). The General Partner shall take no action to accomplish its voluntary dissolution. The General Partner shall not withdraw as general partner of the Fund prior to the dissolution of the Fund except pursuant to Section 10.1(e).

## ARTICLE III

### THE LIMITED PARTNERS

3.1   No Participation in Management; Voting, etc.   The Limited Partner shall not take part in the conduct of the activities of the Fund or in the management or control of the Fund's investment or other activities, transact any business in the Fund's name, deal with any Person on behalf of the Fund who or that is not a Partner or have the power to sign documents for or otherwise bind the Fund. Except as expressly provided herein and in the Partnership Law, the Limited Partner shall not have the right to vote for the election, removal or replacement of the General Partner. No provision of this Agreement shall obligate the Limited Partner to refer investments to the Fund or restrict any investments that the Limited Partner may make. The exercise by the Limited Partner of any right conferred herein shall not be construed to constitute participation by the Limited Partner in the conduct of the business of the Fund or in the control of the investment or other activities of the Fund so as to make the Limited Partner liable as a general partner for the debts and obligations of the Fund for purposes of the Partnership Law or otherwise. For the avoidance of doubt, to the fullest extent permitted by applicable law, this Agreement shall not create any fiduciary duty on the part of the Limited Partner to the Fund or any other Partner.

3.2   Limitation of Liability.   Except as may otherwise be required by the Partnership Law or as expressly provided for herein, the liability of the Limited Partner is limited to its Capital Commitment.

3.3   Bankruptcy, Dissolution or Withdrawal of the Limited Partner.   The bankruptcy, dissolution or withdrawal of the Limited Partner shall not in and of itself dissolve or terminate the Fund. The Limited Partner shall not withdraw from the Fund prior to the dissolution of the Fund except pursuant to Section 4.5(c)(iii) or 10.1.

3.4   Advisory Committee.

(a)   Appointment of Members, etc.   If a Parallel Fund is established, the General Partner shall establish, no later than 30 days after the establishment of such Parallel Fund, a single advisory committee (the "Advisory Committee") for the Fund and certain Related

*Confidential*

25

AP0763

Investment Funds, appointed by the General Partner and may from time to time appoint one or more additional voting members to the Advisory Committee with the consent of the Limited Partner. If a Parallel Fund is not established, all references in this Agreement to the consent of the Advisory Committee shall be deemed to mean the consent of the Limited Partner. If the Advisory Committee is formed, a representative of the Limited Partner shall be a voting member of the Advisory Committee. Each other voting member of the Advisory Committee shall be a representative of a limited partner (or similar member) of the Parallel Fund, *provided* that no such limited partner shall have more than one representative on the Advisory Committee. Each member who is a representative of a limited partner may be required to designate in writing to the General Partner one or more alternate representatives; such alternates shall have authority to act in the place of such member in the event that such member is unavailable for any reason to participate in any vote, consent or other action of the Advisory Committee. The General Partner shall have the right to appoint one representative of the General Partner to serve as a non-voting member and the Chairman of the Advisory Committee. Any member of the Advisory Committee may resign by giving the General Partner 30 days' prior written notice, and shall be deemed removed if the limited partner that the member represents (*i*) becomes a Defaulting Partner (or a defaulting partner of the applicable Parallel Fund), (*ii*) assigns in excess of 50% of its interest in the Fund (or such Parallel Fund) to a Person that is not an Affiliate of such limited partner, (*iii*) removes or replaces such member upon notice to the General Partner or (i*v*) is notified that such member has been removed upon the recommendation of the General Partner with the consent of the Limited Partner. For the avoidance of doubt, upon the death or resignation of a voting member of the Advisory Committee or the removal of such member upon the recommendation of the General Partner or the limited partner that such member represents prior to the expiration of such member's term, the limited partner that such member represents may appoint a replacement for such member for the balance of such term. Upon the deemed removal of a voting member of the Advisory Committee, the General Partner may appoint a replacement for the balance of such member's term. Upon the expiration of the term of a voting member of the Advisory Committee, the General Partner may reappoint such member for an additional term or appoint a replacement member.

(b)     Scope of Authority. The Advisory Committee shall be authorized to (*i*) consent to, approve, review or waive any matter requiring the consent, approval, review or waiver of the Advisory Committee, including transactions requiring the approval of the Fund as client pursuant to section 206(3) or any other provision of the Advisers Act, as set forth in this Agreement, *provided* that any matter for which the affirmative or negative consent or approval of the Advisory Committee is required under this Agreement or that may be waived by the Advisory Committee under this Agreement may instead be consented to, approved or waived by the Limited Partner, which action will be effective as if such consent, approval or waiver were given by the Advisory Committee and (*ii*) provide such advice and counsel as is requested by the General Partner or required pursuant to this Agreement in connection with potential conflicts of interest, valuation matters and other

*Confidential*

AP0764

matters relating to the Fund and any Related Investment Funds. The Advisory Committee shall constitute a committee of the Fund and shall neither conduct any business on behalf of the Fund with Persons who or that are not Partners nor take any part in the control or management of the Fund, nor shall it have any power or authority to act for or on behalf of the Fund, and all investment decisions, as well as all responsibility for the management of the Fund, shall rest with the General Partner. For the avoidance of doubt, the Advisory Committee shall not, nor shall any member thereof, constitute a general partner of the Fund and no action undertaken by the Advisory Committee, nor any action by any member thereof, shall constitute participation in the control of the investment or other activities of the Fund under the Partnership Law. Except for those matters for which the consent, approval, review or waiver of the Advisory Committee is required by this Agreement, any actions taken by the Advisory Committee shall be advisory only, and none of the General Partner, the Manager or any of their respective Affiliates shall be required or otherwise bound to act in accordance with any decision, action or comment of the Advisory Committee or any of its members. Notwithstanding anything to the contrary in this Agreement, in no event shall a member of the Advisory Committee be permitted to take any action that would result in the Limited Partner being considered a general partner of the Fund by agreement, estoppel, as a result of the performance of such member's duties or otherwise. Under no circumstances may members of the Advisory Committee communicate with any third party in connection with the investment activities of the Fund, other than the General Partner in its capacity as a general partner or the Limited Partner in its capacity as Limited Partner.

(c)  <u>Other Activities of the Members</u>. The Partners acknowledge that the members of the Advisory Committee (*i*) will not be obligated, to the fullest extent permitted by applicable law, to act in a fiduciary capacity with respect to the Fund and any Related Investment Funds or any Partner, other than to act in accordance with the implied contractual covenant of good faith and fair dealing, (*ii*) have substantial responsibilities in addition to their Advisory Committee activities and are not obligated to devote any fixed portion of their time to the activities of the Advisory Committee and (*iii*) other than any non-voting member appointed by the General Partner, will not be subject to the restrictions set forth in Section 2.3 and will not be prohibited from engaging in activities that compete or conflict with those of the Fund or any Related Investment Fund, nor shall any such restrictions apply to any of their respective Affiliates.

(d)  <u>Meetings</u>. Regular meetings of the Advisory Committee shall be held at least annually, commencing after the formation of the Advisory Committee, upon not less than 30 days' prior written notice by the General Partner to the members of the Advisory Committee. Special meetings of the Advisory Committee may be called either by the General Partner or by the Limited Partner at any time to consider matters for which the consent, approval, review or waiver of the Advisory Committee is required by this Agreement or is requested by the General Partner or by the Limited Partner. Notice of each such special meeting shall be given by telephone, hand delivery or air courier service

*Confidential*

AP0765

or sent by fax or other electronic means to each member of the Advisory Committee at least five Business Days prior to the date on which the meeting is to be held. Attendance at any meeting of the Advisory Committee shall constitute waiver of such notice. The quorum for a meeting of the Advisory Committee shall be a majority of its voting members, which majority must include the member representing the Limited Partner. Members of the Advisory Committee may participate in a meeting of the Advisory Committee by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other. All actions taken by the Advisory Committee shall be by a vote of a majority of the voting members present who do not abstain from such vote, which majority must include the member representing the Limited Partner, at a meeting thereof at which a quorum is present or by a written consent setting forth the action so taken and approved by a majority of the voting members of the Advisory Committee, which majority must include the member representing the Limited Partner. Except as expressly provided in this Section 3.4, the Advisory Committee shall conduct its business in such manner and by such procedures as a majority of its members deems appropriate, which majority must include the member representing the Limited Partner.

(e)    <u>Fees and Expenses, etc</u>.  The members of the Advisory Committee shall serve without compensation, but shall be reimbursed by the Fund for all reasonable out-of-pocket expenses incurred in attending meetings of the Advisory Committee. The members of the Advisory Committee shall be indemnified by the Fund as provided in Section 9.1.

# ARTICLE IV

## INVESTMENTS

### 4.1    <u>Investments in Portfolio Companies</u>.

(a)    <u>Portfolio Investments</u>.  The General Partner will seek to obtain opportunities for the Fund to make Portfolio Investments in accordance with the Investment Objectives. Prior to making a new Portfolio Investment, the General Partner shall provide a description of such investment to the Limited Partner, which description shall include a preliminary indication of the anticipated purchase price and acquisition structure of the investment, and obtain the written consent of the Limited Partner with respect to such investment prior the commencement of substantial due diligence relating thereto; the Limited Partner may at any time waive the application of this obligation to any or all future Portfolio Investments. The Limited Partner shall, within 10 Business Days after receipt of such information, either provide such consent or notify the General Partner that it declines to consent; *provided*, however that in the absence of any such consent or notice within such 10 Business Day period, the General Partner may commence such due diligence. The Limited Partner hereby acknowledges and agrees that it has approved the acquisition by the Fund of XpressDocs from Reynolds for a purchase price of approximately $180 million. The General Partner shall endeavor to cause the Fund to sell,

*Confidential*

28

refinance or otherwise dispose of each Portfolio Investment within five years after such Portfolio Investment is first acquired by the Fund, and if not so disposed of within such five year period, shall in any event cause the Fund to so dispose of such Portfolio Investment within eight years after such Portfolio Investment is first acquired by the Fund, unless the Limited Partner otherwise consents that the Fund may continue to hold such Portfolio Investment for up to two additional years, or for such other holding period with the consent of the Limited Partner.

(b)     Bridge Investments. The Fund may provide interim financing to, or make investments that are intended to be of a temporary nature in Securities of, any Portfolio Company or any subsidiary thereof in connection with or subsequent to a Portfolio Investment by the Fund in such Portfolio Company (each a "Bridge Investment"), provided that the cost of all Portfolio Investments, including Bridge Investments, in any Portfolio Company shall not exceed 35% of aggregate Capital Commitments. The General Partner may increase the Partners' Remaining Capital Commitments with respect to Distributable Cash received by the Fund in respect of a Bridge Investment repaid, refinanced or otherwise disposed of prior to the 18-month anniversary of the date on which such Bridge Investment was made, in an amount up to and in proportion to the Capital Contributions of the Partners with respect to such Bridge Investment. In the event that a Bridge Investment is not repaid, refinanced or otherwise disposed of prior to the 18-month anniversary of the date that such Bridge Investment was made, such Bridge Investment shall cease to be treated as a Bridge Investment on such 18-month anniversary, shall be treated as a Portfolio Investment that is not a Bridge Investment and any amounts theretofore distributed pursuant to Section 6.4(b) with respect to such Bridge Investment shall thereafter be taken into account in determining subsequent distributions under Section 6.3 with respect to such Portfolio Investment so that each Partner receives, to the extent possible, the aggregate amount of distributions that it would have received had such Bridge Investment been deemed to be a Portfolio Investment that is not a Bridge Investment for purposes of this Agreement from and after the date that such Bridge Investment was made.

(c)     Investments Following Termination of Investment Period.  Following the termination of the Investment Period, no new Portfolio Investments will be made by the Fund, *provided* that Remaining Capital Commitments may be drawn down from time to time following the termination of the Investment Period to (*i*) complete investments with respect to which a commitment has been made or a written proposal to invest has been submitted or with respect to which a transaction was contemplated by the terms of Securities held by the Fund as of the end of the Investment Period and (*ii*) for a period not to exceed three years thereafter fund Follow-On Investments in an aggregate amount not to exceed 15% of aggregate Capital Commitments.

(d)     Reinvestment. The General Partner may increase the Partners' Remaining Capital Commitments by an amount equal to all or any portion of (*i*) Distributable Cash received by the Fund in respect of a Portfolio Investment prior to the 18-month anniversary

*Confidential*

AP0767

of the Fund's acquisition of such Portfolio Investment, up to and in proportion to the Capital Contributions of the Partners with respect to such Portfolio Investment and (*ii*) Distributable Cash received by the Fund and distributed to the Partners in an amount equal to Capital Contributions made by the Partners to pay Fund Expenses or Organizational Expenses. The General Partner shall give notice to the Limited Partner of the amount subject to recall pursuant to this Section 4.1(d) (*A*) in the case of Distributable Cash described in clause (i) above, at the time such Distributable Cash is distributed to the Limited Partner, and (*B*) in the case of Distributable Cash described in clause (ii) above, promptly after the General Partner determines that such amount shall be subject to recall.

4.2    Investment Restrictions. Without the consent of the Limited Partner, the Fund shall not:

(a)    make any Portfolio Investment in any Person that (when taken together with all other Portfolio Investments by the Fund in such Person and any of such Person's Affiliates run as a single enterprise of such Person) would result in an investment by the Fund at that time of an aggregate amount in such Person and such Person's Affiliates in excess of 20% of the aggregate Capital Commitments;

(b)    invest in excess of 20% of the aggregate Capital Commitments in Portfolio Companies that are organized and operated principally outside the United States and Canada, *provided* that, prior to making any such investment, the Fund shall receive advice of counsel qualified in the jurisdiction where the applicable Person was organized substantially to the effect that under the laws of such jurisdiction the limited liability of the Limited Partner will be recognized;

(c)    borrow money or otherwise incur indebtedness;

(d)    make any Portfolio Investment in any other pooled multiple-investment vehicle that provides for a payment by the Fund of a management fee or a carried interest or other incentive or performance-based fee; or

(e)    make any Portfolio Investment unless the General Partner determines that such investment is not "hostile" as such term is then commonly understood in the investment community.

4.3    ECI. The Fund shall not make a Portfolio Investment that will result in the realization of ECI by a Non-U.S. Partner, unless such a Non-U.S. Partner otherwise consents.

4.4    Temporary Investments. To the extent commercially reasonable, the General Partner shall cause the Fund to invest cash held by the Fund in Temporary Investments pending investment in Portfolio Investments, distribution or payment of Organizational Expenses or Fund Expenses.

*Confidential*

AP0768

4.5   Related Investment Funds.

(a)   General.  Notwithstanding any other provision of this Agreement, at any time the General Partner or any of its Affiliates may establish one or more Related Investment Funds as provided in this Section 4.5.

(b)   Co-Investment Funds.

(i)   *Co-Investment by Third Party Co-Investors*.  If a co-investment opportunity arises, the General Partner may offer such opportunity on substantially similar terms in with the consent of the Limited Partner to one or more limited partners of any Related Investment Fund or to one or more Third Party Co-Investors, in addition to or to the exclusion of, any other Person.  Any such co-investment may, if the General Partner so requires, be made through one or more investment partnerships or other vehicles (each a "Co-Investment Fund") formed to facilitate such co-investment, the terms of which may differ from those of the Fund.  Each Co-Investment Fund will be controlled by the General Partner or an Affiliate thereof and may be managed by the Manager or an Affiliate thereof.  In determining the appropriateness of offering any such opportunity, the General Partner may take into account the advisability of offering such opportunity to a Person other than the Limited Partner and other than the General Partner, the Manager and their respective Affiliates (a "Third Party Co-Investor").  With the consent of the Limited Partner, any such offer shall be made to Third Party Co-Investors in such proportions as the General Partner shall determine, and the General Partner may allocate such portion of an investment opportunity to a Co-Investment Fund as the General Partner determines in its sole discretion to be appropriate.  To the extent there is a Follow-On Investment with respect to any Portfolio Investment with respect to which a co-investment was made by a Co-Investment Fund, such Follow-On Investment shall be allocated *pro rata* to the Fund, any co-investing limited partners of any Related Investment Funds and Third Party Co-Investors in proportion to their respective initial investments.

(ii)   *Co-Investment Conditions*.  The terms on which a Co-Investment Fund or other co-investors contemplated by Section 4.5(b)(i) (collectively, "Co-Investors") acquire interests in a Portfolio Company shall, subject to legal, tax, regulatory or other considerations, be no more favorable to such Co-Investors than those received by the Fund, *provided* that, notwithstanding any other provision of this Agreement to the contrary, if the General Partner so determines in its sole discretion, any Portfolio Company to be acquired by the Fund and any Co-Investment Fund may be acquired initially by the Fund, with the applicable portion of such Portfolio Company to be subsequently transferred to such Co-Investment Fund at cost plus interest at a rate equal to the Prime Rate plus 2% from the date such Portfolio Company is made by the Fund to the date of such transfer.  With respect to each investment in which Co-Investors co-invest with the Fund, any investment expenses or indemnification or repayment obligations related to such investments shall be borne by the Fund and such Co-Investors

*Confidential*

31

AP0769

in proportion to the capital committed by each to such investment. For the avoidance of doubt, the General Partner may, with consent of the Limited Partner, structure any co-investment opportunity so that the proposed co-investors do not bear any broken deal expenses, *provided* that if so structured, such co-investors shall not be entitled to receive any break-up or similar fees that may be earned with respect to such transaction. The Fund and any Parallel Funds shall then bear all such broken deal expenses (and in such case shall be entitled to any such break-up or other similar fees). Unless the Advisory Committee otherwise consents, the General Partner shall not permit any Co-Investor to dispose of any such investment in a Portfolio Company before the Fund disposes of its investment in such Portfolio Company. If any such investment by a Co-Investor in a Portfolio Company and the Fund's investment in such Portfolio Company are disposed of at substantially the same time, such Co-Investor shall dispose of no more than its *pro rata* share of the Fund's and its investments in such Portfolio Company and on terms no more favorable to such Co-Investor than those received by the Fund. The General Partner shall cause the Co-Investors to dispose of any such investment in a Portfolio Company on a *pro rata* basis with the Fund and at substantially the same time that the Fund disposes of its investment in such Portfolio Company, unless the Co-Investors desire, for tax or other reasons, to hold some or all of such investment until a later date and the General Partner has determined that it would not be contrary to the best interests of the Fund for the Co-Investors to do so.

(iii)    *Mechanics of Formation of Co-Investment Funds*. Notwithstanding any other provision of this Agreement, in the event that the General Partner or an Affiliate thereof forms one or more Co-Investment Funds, the General Partner shall have full authority, without the consent of any Person, including any other Partner, to amend this Agreement as may be necessary or appropriate in the good faith judgment of the General Partner to facilitate the formation and operation of such Related Investment Funds and the investments contemplated by this Section 4.5(b), and to interpret in good faith any provision of this Agreement, whether or not so amended, to give effect to the intent of the provisions of this Section 4.5(b).

(c)    <u>Parallel Funds</u>.

(i)    *Formation of Parallel Funds to Accommodate Investor Considerations*. Prior to the Final Admission Date, the General Partner or an Affiliate thereof may, to accommodate legal, tax, regulatory or other considerations of certain investors (including employees of the Manager), form one or more pooled investment vehicles (each a "<u>Parallel Fund</u>") to co-invest with the Fund. Any Parallel Fund will be controlled by the General Partner or an Affiliate thereof, will be managed by the Manager or an Affiliate thereof and will be governed by organizational documents containing provisions substantially similar in all material respects to those of the Fund (other than such differences as may be appropriate to accommodate legal, tax, regulatory or other considerations or such other differences with the consent of the Limited

*Confidential*

32

AP0770

Partner). Subject to such legal, tax, regulatory or other considerations, the Parallel Funds will co-invest with the Fund in each Portfolio Company in proportion to the respective remaining capital commitments of the Parallel Funds and the Fund immediately prior to such investment. All references in this Section 4.5(c) to the limited partners of a Parallel Fund shall be deemed to include all investors in a Parallel Fund formed as a vehicle other than a limited partnership and all references in this Agreement to limited partners of a Parallel Fund shall, where the context so requires, include any feeder funds that are limited partners of such Parallel Funds.

(ii)     *Parallel Investment Conditions*.  Each investment by a Parallel Fund shall, subject to legal, tax, regulatory or other considerations, be on substantially the same terms as and on economic terms that are no more favorable to such Parallel Fund than those received by the Fund.  With respect to each investment in which Parallel Funds participate (or propose to participate) with the Fund, any investment expenses or any indemnification or repayment obligations related to such investment shall be borne by, the Fund and any Parallel Funds in proportion to the capital committed by each to such investment, *provided* that each Parallel Fund shall bear its share of the Fund's Organizational Expenses and Fund Expenses in proportion to the respective capital commitments of the Fund and the Parallel Funds, subject to such adjustment as the General Partner deems fair and equitable to the Fund and the Parallel Funds and to which the Limited Partner consents.  Unless the Limited Partner otherwise consents, the General Partner shall not permit any Parallel Fund to dispose of its investment in a Portfolio Company before the Fund disposes of its investment in such Portfolio Company. If any investment by a Parallel Fund in a Portfolio Company and the Fund's investment in such Portfolio Company are disposed of at substantially the same time, such Parallel Fund shall dispose of no more than its *pro rata* share of the Fund's and its investments in such Portfolio Company (unless required or appropriate to meet the legal, tax, regulatory or other similar considerations that warranted the formation of such Parallel Fund) and on terms no more favorable to such Parallel Fund than those received by the Fund.  The General Partner shall cause the Parallel Funds to dispose of their investments in a Portfolio Company on a *pro rata* basis with the Fund and at substantially the same time that the Fund disposes of its investment in such Portfolio Company, unless the Parallel Fund wishes to hold some or all of any such investment until a later date, the General Partner has determined that it would not be contrary to the best interests of the Fund for the Parallel Fund to do so and the Limited Partner consents.

(iii)     *Mechanics of Formation of Parallel Funds*.  Notwithstanding any other provision of this Agreement to the contrary, in the event that the General Partner or an Affiliate thereof forms one or more Parallel Funds, the General Partner shall have full authority, without the consent of any Person, including any other Partner, to amend this Agreement as may be necessary or appropriate in the good faith judgment of the General Partner to facilitate the formation and operation of such Parallel Funds and the investments contemplated by this Section 4.5(c), and to interpret in good faith any

*Confidential*

33

provision of this Agreement, whether or not so amended, to give effect to the intent of the provisions of this Section 4.5(c).

(iv)    *Certain Adjustments.*    If one or more Parallel Funds are formed, notwithstanding any other provision of this Agreement (*A*) Fund Expenses shall include only the Fund's *pro rata* share of any costs, expenses or liabilities that are incurred by or arise out of the activities of the Fund (determined based on the relative capital commitments to the Fund and any Parallel Fund, unless the General Partner determines in its sole discretion that a different share is appropriate in the case of a particular cost, expense or liability), (*B*) Organizational Expenses shall include only the Fund's share of any costs or expenses in connection with the formation and organization of, and sale of interests in, the Fund and any Parallel Fund (determined based on the relative capital commitments to the Fund and any Parallel Fund) and (*C*) the General Partner shall make such other adjustments as it shall deem to be appropriate to the operation of this Agreement, including adjustments to the limitations set forth in Sections 4.1 and 4.2 to take into account the capital commitments to a Parallel Fund and adjustments to the co-investment percentages in the event of default.

(d)    <u>Alternative Investment Funds.</u>

(i)    *Formation of Alternative Investment Funds for Particular Investments.* Notwithstanding any other provision of this Agreement to the contrary, if at any time the General Partner determines that for legal, tax, regulatory or other considerations certain or all of the Partners should participate in a potential or existing Portfolio Investment through one or more alternative investment structures, the General Partner may effect the making of all or any portion of such investment either outside of or through the Fund (*A*) in the case of a potential Portfolio Investment, by requiring certain or all Partners to be admitted as limited partners or other similar investors and to make capital contributions with respect to such potential portfolio investment directly to one or more limited partnerships or other similar vehicles (each, an "<u>Alternative Investment Fund</u>") or by utilizing different investment structures below the Fund and requiring different classes of investors to invest through different investment structures or (*B*) in the case of an existing Portfolio Investment, by Transferring the Portfolio Investment to one or more Alternative Investment Funds, distributing such Portfolio Investment to all or any portion of the Partners and having them contribute such Portfolio Investment to an Alternative Investment Fund or Funds, or any other similar restructuring that would result in such Portfolio Investment being held through one or more Alternative Investment Funds and (*C*) in either case, if an Alternative Investment Fund is used, by creating such Alternative Investment Fund(s) and distributing interests therein to certain or all the Partners as limited partners or other similar investors therein. In the case of an investment by the Fund in a Media Company or in a Portfolio Company that subsequently becomes a Media Company the General Partner shall require all of the Partners to make capital contributions with respect to such investment or shall Transfer

*Confidential*

AP0772

all Capital Contributions previously made with respect to such Portfolio Investment, as the case may be, to an Alternative Investment Fund formed for such purpose. In addition, the General Partner shall also have the right to direct that capital contributions of certain or all Partners with respect to a potential Portfolio Investment be made through an Alternative Investment Fund if, in the determination of the General Partner, the consummation of the potential Portfolio Investment would be prohibited or unduly burdensome for the Fund because of legal or regulatory constraints but would be permissible or less burdensome if an Alternative Investment Fund were utilized. Each Alternative Investment Fund will be controlled by the General Partner or an Affiliate thereof, will be managed by the Manager or an Affiliate thereof, and will be governed by organizational documents containing provisions substantially similar in all material respects to those of the Fund (other than such differences as may be appropriate to accommodate legal, tax, regulatory or other considerations, including, in the case of an investment in a Media Company, such differences as are necessary to provide that the limited partners investing therein will not be attributed with an ownership interest in such Media Company for purposes of the FCC Rules). If the Limited Partner participates in an Alternative Investment Fund, it shall not be generally liable for the obligations of such Alternative Investment Fund. All references in this Section 4.5(d) to the limited partners of an Alternative Investment Fund shall be deemed to include all investors in an Alternative Investment Fund formed as a vehicle other than a limited partnership.

(ii)  *Alternative Investment Conditions.*  Each Partner admitted to and investing in an Alternative Investment Fund shall be obligated to make capital contributions to such Alternative Investment Fund in a manner similar to that provided by Section 5.2, and each such Partner's Remaining Capital Commitment shall be reduced by the amount of such contributions to the same extent as if such contributions were made to the Fund as Capital Contributions. With respect to each investment in which an Alternative Investment Fund participates with the Fund, any investment expenses or indemnification or repayment obligations related to such investment shall be borne by the Fund, such Alternative Investment Fund and any other Related Investment Fund in proportion to the capital committed by each to such investment. Any management fee funded by a Partner with respect to an Alternative Investment Fund shall reduce such Partner's share of the Management Fee funded by such Partner, and payable to the Manager by the Fund, by a corresponding amount. The investment results of an Alternative Investment Fund will be aggregated with the investment results of the Fund for purposes of determining distributions by the Fund and such Alternative Investment Fund.

(iii)  *Mechanics of Formation of Alternative Investment Funds.*  In the event that the General Partner or an Affiliate thereof forms one or more Alternative Investment Funds, the General Partner shall have full authority, without the consent of any Person, including any Partner, to amend this Agreement as may be necessary or appropriate in

AP0773

the good faith judgment of the General Partner to facilitate the formation and operation of such Alternative Investment Fund and the investments contemplated by this Section 4.5(d), and to interpret in good faith any provision of this Agreement, whether or not so amended, to give effect to the intent of the provisions of this Section 4.5(d). The General Partner shall make all appropriate adjustments as may be necessary or otherwise appropriate to give effect to the intent of this Section 4.5(d). The limited partnership agreement or other organizational or Transfer documents of any Alternative Investment Fund and any other documents reflecting the admission of the Limited Partner to such Alternative Investment Fund may be executed on behalf of the Limited Partner investing therein by the General Partner pursuant to the power of attorney granted by the Limited Partner pursuant to Section 12.2.

## ARTICLE V

## CAPITAL COMMITMENTS; CAPITAL CONTRIBUTIONS

5.1    Capital Commitments.  The Capital Commitment of the General Partner shall equal $5 million. The Limited Partner shall make a Capital Commitment of $1.0 billion, as set forth in the Subscription Agreement of the Limited Partner.

5.2    Capital Contributions.  Except as otherwise provided elsewhere in this Agreement, the Capital Contributions of the Partners shall be paid in separate Drawdowns in amounts determined pursuant to the terms of Section 5.2(d), subject to the following terms and conditions:

(a)    Timing of Drawdown Notices; Use of Drawdowns.  The General Partner shall provide each Partner with a notice of each Drawdown (a "Drawdown Notice") at least 10 Business Days prior to the date on which such Drawdown is due and payable (the "Drawdown Date").  Each Drawdown may be used for any purpose authorized or contemplated by this Agreement.

(b)    Contents of Drawdown Notices.  In the case of a Drawdown to be used to make a Portfolio Investment, the relevant Drawdown Notice shall give such description of such Portfolio Investment as the General Partner shall determine is appropriate, including a general description of the business to be acquired, the Securities expected to be acquired and the purchase price therefor, to the extent practicable, such further information as shall have been reasonably requested by the Limited Partner in a written notice given to the General Partner prior to the Drawdown Date and information reasonably necessary for the Limited Partner to make the determinations contemplated by Section 4.2(f).  In addition, such Drawdown Notice shall specify, to the knowledge of the General Partner as of the date thereof, the amount of such Drawdown that will be used by the Fund to make Portfolio Investments or pay Organizational Expenses or Fund Expenses.

AP0774

(c)     <u>Revised Drawdown Notices</u>.  Notwithstanding Section 5.2(a), if the actual Capital Contribution to be paid by a Partner changes after delivery of a Drawdown Notice (due, for example, to a change in the amount or nature of the Securities to be acquired by the Fund), the General Partner shall issue a revised Drawdown Notice to the Partners, *provided* that the new Drawdown Date shall be no earlier than the prior Drawdown Date and at least three Business Days after the date that such revised Drawdown Notice is given.  Such Partners shall pay any additional Capital Contribution thereby required no later than the Drawdown Date specified in such revised Drawdown Notice.

(d)     <u>Calculation of Each Partner's Share of a Drawdown</u>.  Each Partner shall pay the Capital Contributions determined in accordance with the provisions of this Section 5.2(d) and specified in the relevant Drawdown Notice, as the same may be revised pursuant to Section 5.2(c), by wire transfer in immediately available funds to the account specified therein.  The required Capital Contribution of each Partner shall be made no later than the Drawdown Date specified in such Drawdown Notice and shall equal such Partner's *pro rata* share (based on Capital Commitments of all the Partners), in each case up to an amount not to exceed such Partner's Remaining Capital Commitment.

(e)     <u>Use of Distributable Cash or Temporary Investment Income to Fund Drawdowns</u>.  The General Partner may determine in its sole discretion to retain and use Distributable Cash or Temporary Investment Income that otherwise would be distributable to a Partner pursuant to Article VI to pay all or part of any Capital Contribution that is required to be made by such Partner, and the amount of such Distributable Cash or Temporary Investment Income so retained shall be deemed for all purposes of this Agreement to have been distributed to such Partner and then recontributed to the Fund by such Partner as a Capital Contribution.  In the event that the retained amount with respect to any Partner is not sufficient to cover such Partner's Capital Contribution requirement, the amount necessary to cover the balance of such Capital Contribution shall be paid by such Partner pursuant to a Drawdown Notice as provided in this Section 5.2.  Prior to or concurrent with the payment of any Capital Contributions to be used to make a Portfolio Investment out of retained Distributable Cash or Temporary Investment Income, the General Partner shall provide to the Limited Partner the distribution notice described in Section 6.3 and the information required to be provided in a Drawdown Notice issued pursuant to Section 5.2(b).  In addition to the foregoing, the Limited Partner agrees that the General Partner may hold back and use Distributable Cash or Temporary Investment Income that would otherwise be distributable to the Limited Partner to pay all or part of any amounts otherwise owing by the Limited Partner to the Fund, the General Partner or the Manager pursuant to the terms of this Agreement.

5.3     <u>Return of Unused Capital Contributions</u>.     If any proposed Portfolio Investment with respect to which there has been a Drawdown is not consummated within 60 days following the relevant Drawdown Date or if the amount of funds drawn down for any particular Portfolio Investment exceeds the amount necessary to consummate

*Confidential*

37

AP0775

such Portfolio Investment, as the case may be, the General Partner shall promptly return such Drawdown or such excess amount of funds, together, in each case, with any interest or gains thereon (net of any Fund Expenses in respect thereof), to the Partners in the same proportions that such funds were contributed by the Partners, *provided* that some or all of such Drawdown or such excess amount of funds (and any interest or gains thereon) may be retained by the Fund and not so returned to the extent that the Fund is likely, as determined by the General Partner in its sole discretion, to consummate a proposed Portfolio Investment or require payment of Fund Expenses within 60 days following the relevant Drawdown Date, and instead may be used to fund such proposed Portfolio Investment or to pay such Fund Expenses, and *provided, further*, that if the General Partner determines to rely on the first proviso of this Section 5.3, the General Partner shall provide to the Limited Partner the information required to be provided in a Drawdown Notice issued pursuant to Section 5.2(b). Any amounts drawn down and returned pursuant to this Section 5.3 shall not be treated as Capital Contributions.

   5.4   Defaulting Partners.

   (a)   General. If the Limited Partner fails to make, in a timely manner, all or any portion of any Capital Contribution or any other amount required to be funded by the Limited Partner hereunder, and such failure continues for five Business Days after receipt of written notice thereof from the General Partner, or the Limited Partner purports to Transfer all or any part of its interest in the Fund other than in accordance with this Agreement (a "Default"), then the Limited Partner may be designated by the General Partner in its sole discretion as in Default under this Agreement (a "Defaulting Partner") and shall thereafter be subject to the provisions of this Section 5.4. The General Partner may (without limiting any legal rights or remedies it or the Fund may have), in its sole discretion, choose not to designate the Limited Partner as a Defaulting Partner and may agree to waive or permit the cure of any Default by a Partner, subject to such conditions as the General Partner and the Defaulting Partner may agree upon. For the avoidance of doubt, the failure of the General Partner to make all or any portion of its Capital Contribution shall not be considered a Default to the extent that such failure is attributable solely to the failure of the contribution loan lender to fund the required portion of the General Partner's Capital Contribution.

   (b)   Funding of Defaulted Amount. With respect to any amount (other than the Management Fee) that is in Default (including any expenses contemplated by Section 5.4(e)) (the "Defaulted Amount"), the General Partner may in its sole discretion if the Defaulted Amount was to be used to fund a Portfolio Investment, (*i*) offer to such third parties as the General Partner may determine, subject to such timing and other conditions as the General Partner may impose, the opportunity to co-invest in such Portfolio Investment an aggregate amount equal to the Defaulted Amount or (*ii*) forfeit the opportunity for the Fund to make the Portfolio Investment.

*Confidential*

38

AP0776

(c)    Defaulted Capital Commitment.  With respect to the Remaining Capital Commitment of any Defaulting Partner (the "Defaulted Capital Commitment"), the General Partner may elect to admit to the Fund a Substitute Partner to assume all or a portion of the balance of such Defaulted Capital Commitment on such terms and upon the delivery of such documents as the General Partner shall determine in its sole discretion to be appropriate.  The General Partner shall make such revisions to the Cayman Register as may be necessary to reflect the change in Partners and Capital Commitments contemplated by this Section 5.4(c).

(d)    Forfeiture and Application of Forfeited Amounts.  Without prejudice to its rights under Section 5.4(e), the General Partner may in its sole discretion take any or all of the following actions with respect to a Defaulting Partner:  (*i*) reduce amounts otherwise distributable to such Defaulting Partner  attributable to Capital Contributions as of the date of such Default by 50%, and withhold 100% of any future distributions that otherwise would be payable to such Defaulting Partner pursuant to Article VI until the dissolution of the Fund and (*ii*) require such Defaulting Partner to remain fully liable for payment of up to its *pro rata* share of Organizational Expenses and Fund Expenses as if the Default had not occurred.  The General Partner may apply amounts withheld from such Defaulting Partner, and to the extent such amounts are not sufficient, amounts forfeited by such Defaulting Partner (such forfeited amounts applied to amounts payable pursuant to this sentence to be reimbursed by such Defaulting Partner, if appropriate), in satisfaction of all amounts payable by such Defaulting Partner, including pursuant to this Section 5.4(d) and Section 5.4(e).  In addition, such Defaulting Partner shall (*A*) have no further right to make Capital Contributions to participate in any Portfolio Investment and (*B*) to the fullest extent permitted by applicable law, (*1*) shall be treated for purposes of Sections 5.2, 8.1, 8.2 and 8.3 as no longer a Partner and (*2*) if such Defaulting Partner is no longer entitled to receive distributions shall, in the General Partner's sole discretion, cease to be a Partner.  The General Partner may charge such Defaulting Partner interest on the Defaulted Amount and any other amounts not timely paid at a rate per annum equal to the Prime Rate plus 4% from the date such amounts were due and payable through the date that full payment of such amounts is actually made or, if such amounts are not paid, through the end of the Term, and to the extent not paid such interest charge may be deducted from amounts otherwise distributable to such Defaulting Partner.  Amounts forfeited and not otherwise applied to the payment of the expenses specified in clause (ii) of the first sentence of this Section 5.4(d) or in Section 5.4(e) (to the extent not reimbursed by such Defaulting Partner), plus any interest thereon, shall be distributed to the General Partner.  If at any time the Limited Partner becomes a Defaulting Partner, (*x*) the Limited Partner shall, upon the written request and with the reasonable cooperation of the General Partner, use best efforts to dispose of its entire interest in the Fund (or such portion of its interest as the General Partner shall determine is sufficient to prevent or remedy such Default) to any Person in a transaction that complies with Section 10.1 (in which case the General Partner shall use commercially reasonable efforts to cooperate with the Limited Partner to facilitate the transaction) and (*y*) the General Partner may, in its sole discretion, dissolve the Fund in

accordance with Article XI. All costs and expenses incurred in connection with actions taken by or with respect to the Limited Partner under this Section 5.4 shall be paid by the Limited Partner. The General Partner shall make such adjustments as it determines to be appropriate to give effect to the provisions of this Section 5.4.

     (e)    <u>Other Remedies; Payment of Expenses</u>. The General Partner shall have the right to pursue all remedies at law or in equity available to it with respect to the Default of a Defaulting Partner. The parties hereto agree that no course of dealing between the General Partner and any Defaulting Partner and no delay in exercising any right, power, waiver or remedy conferred in this Section 5.4 or now or hereafter existing at law, in equity or by statute or otherwise shall operate as a waiver or otherwise prejudice any such right, power, waiver or remedy. In addition to the foregoing, to the fullest extent permitted by applicable law, the General Partner may in its sole discretion institute a lawsuit against any Defaulting Partner for specific performance of its obligation to make Capital Contributions and any other payments to be made by the Limited Partner pursuant to this Agreement and to collect any overdue amounts hereunder. Notwithstanding any other provision of this Agreement, the Limited Partner agrees, in the event of a Default by such Partner, to pay on demand all costs and expenses (including attorneys' fees and any borrowing costs) incurred by or on behalf of the Fund in connection with the enforcement of this Agreement against such Partner sustained as a result of such Default and that any such payment shall not constitute a Capital Contribution to the Fund. Each Partner acknowledges by its execution hereof that it has been admitted to the Fund in reliance upon its agreement under this Agreement that the General Partner and the Fund may have no adequate remedy at law for a breach hereof and that damages resulting from a breach hereof may be impossible to ascertain at the time hereof or of such breach.

     (f)    <u>Consents</u>. Whenever the vote, consent or decision of the Limited Partner is required or permitted pursuant to this Agreement or under the Partnership Law, if the Limited Partner is a Defaulting Partner, it shall not be entitled to participate in such vote or consent, or to make such decision, and such vote, consent or decision shall be tabulated or made as if such Defaulting Partner were not a Partner. The foregoing restriction shall not apply to any inalienable voting rights conferred on the Limited Partner under the Partnership Law.

     (g)    <u>Acknowledgement</u>. The Limited Partner hereby acknowledges that it has been admitted to the Fund in reliance upon its agreements under this Section 5.4 (as well as the other provisions of this Agreement), that the General Partner and the Fund may have no adequate remedy at law for a breach of this Agreement and that damages resulting from such breach may be impossible to ascertain as of the date of the Closing at which the Limited Partner is admitted to the Fund or as of the date of such breach.

     5.5    <u>Early Termination of Investment Period</u>. The Limited Partner may terminate the Investment Period at any time after one or more Co-Founders cease to be affiliated with the Manager, whether voluntarily, by death or permanent disability or

AP0778

otherwise. From and after the date that the Investment Period ends as contemplated by this Section 5.5, the General Partner shall continue to act on behalf of the Fund and perform the functions of the General Partner and shall have all of the rights and privileges of the General Partner hereunder.

## ARTICLE VI

## CAPITAL ACCOUNTS; DISTRIBUTIONS; ALLOCATIONS; WITHHOLDING

6.1   <u>Capital Accounts</u>.  There shall be established on the books and records of the Fund a capital account (a "<u>Capital Account</u>") for each Partner.

6.2   <u>Adjustments to Capital Accounts</u>.  As of the last day of each Period, the balance in each Partner's Capital Account shall be adjusted by (*a*) increasing such balance by (*i*) such Partner's allocable share of each item of the Fund's income and gain for such Period (allocated in accordance with Section 6.10) and (*ii*) the Capital Contributions, if any, made by such Partner during such Period and (*b*) decreasing such balance by (*i*) the amount of cash or the Value of Securities or other property distributed to such Partner by the Fund during such Period and (*ii*) such Partner's allocable share of each item of the Fund's loss and deduction for such Period (allocated in accordance with Section 6.10).  Each Partner's Capital Account shall be further adjusted with respect to any special allocations or adjustments pursuant to this Agreement.

6.3   <u>Distributions Attributable to Portfolio Investments</u>.  Except as otherwise provided herein, Distributable Cash (other than *de minimis* amounts) attributable to any Portfolio Investment shall be distributed within 90 days after receipt by the Fund (or, if distribution within such 90-day period is not practicable, as soon as practicable thereafter).  Distributable Cash attributable to any such Portfolio Investment shall initially be apportioned among the Partners in proportion to their Sharing Percentages with respect to such Portfolio Investment.  Except as otherwise provided herein, the amount apportioned to the General Partner shall be distributed to the General Partner, and the amount apportioned to the Limited Partner shall be distributed as follows (with each determination made as of the time of distribution):

(a)   *Return of Capital on Disposed of Deals, Unrealized Losses and Apportioned Expenses:*  First, 100% to the Limited Partner until the cumulative amount distributed to the Limited Partner pursuant to this Section 6.3(a) is equal to the sum of:

(i)   the Capital Contributions of the Limited Partner used to fund the cost of each Portfolio Investment disposed of or used to fund the portion of the cost of each Portfolio Investment held by the Fund that represents an Unrealized Loss, and

*Confidential*

41

AP0779

(ii)     the Capital Contributions of the Limited Partner used to fund Organizational Expenses and Fund Expenses that are apportioned pursuant to Section 6.6(b) to Portfolio Investments described in Section 6.3(a)(i);

(b)     *Preferred Return*:  Second, 100% to the Limited Partner until the cumulative amount distributed to the Limited Partner pursuant to this Section 6.3 is sufficient to provide the Limited Partner with an 8% annualized effective internal rate of return on the Capital Contributions of the Limited Partner described in Section 6.3(a) (computed from the due dates specified in the applicable Drawdown Notices until the dates distributions are made pursuant to this Section 6.3);

(c)     *Catch Up*:  Third, 100% to the General Partner (or 100% to the Limited Partner, as the case may be) until the cumulative amount distributed to the General Partner attributable to the Limited Partner pursuant to this Section 6.3 is equal to 20% of the excess of (*i*) the cumulative amount distributed to the Limited Partner and to the General Partner attributable to the Limited Partner pursuant to this Section 6.3 over (*ii*) the Capital Contributions of the Limited Partner described in Section 6.3(a); and

(d)     *80/20 Split*:  Fourth, 80% to the Limited Partner and 20% to the General Partner (the amounts distributed to the General Partner pursuant this Section 6.3(d) and Section 6.3(c) being referred to as the General Partner's "Carried Interest").

*Distributions Generally.*  The General Partner shall (*x*) in good faith determine the Portfolio Investment to which any Distributable Cash is considered attributable and (*y*) annually (and at such other times as the General Partner shall determine in its sole discretion) make such determinations of Value as may be required by the definition of "Unrealized Loss". Notwithstanding the foregoing, the General Partner may elect to waive or defer the receipt of any portion of the Carried Interest amounts distributable to it pursuant to Sections 6.3(c) and (d), and instead distribute such portion to the Limited Partner, *provided* that in such event the General Partner may subsequently elect to distribute to itself out of amounts otherwise distributable to the Limited Partner any amount previously deferred, so long as the cumulative amount distributed to the General Partner with respect to the Limited Partner does not exceed the cumulative amount that would have been distributed to the General Partner with respect to the Limited Partner in the absence of this sentence (except, if applicable, to the extent necessary to take into account the Limited Partner's achieving the preferred return earlier than it would have in the absence of this sentence).  The General Partner shall equitably determine pursuant to which paragraph of Section 6.3 each distribution made in accordance with the previous sentence shall be deemed to have been made.

*Reduction of Carried Interest Allocation.*  Notwithstanding the foregoing, the 20% allocation of Carried Interest to the General Partner pursuant to Sections 6.3(c) and (d) above may in the sole discretion of the Limited Partner be reduced at any time, but not below a 15% allocation of Carried Interest, if (*A*) the Limited Partner determines, in its sole

AP0780