discretion, that the hiring objectives set forth in **Schedule A** hereto have not been substantially achieved by the Manager by the target dates specified therein, *provided* that such reduction shall apply prospectively only to Portfolio Investments disposed after such reduction or (*B*) if one or more Portfolio Companies have been held by the Fund for more than eight years, *provided* that such reduction shall apply only to such Portfolio Companies. The General Partner agrees, that in connection with any such reduction of Carried Interest, such reduction shall be applied only to the interests in the General Partner held by the Co-Founders and their associated members, *pro rata* consistent with the dilution principles applicable to the Co-Founders and their associated members described in the limited liability agreement governing the General Partner.

*Notice of Distributions.* Prior to or concurrent with any distribution of Distributable Cash pursuant to this Section 6.3, the General Partner will provide a notice to the Limited Partner stating the amount to be distributed or deemed to be distributed to the Limited Partner and the source or sources of such Distributable Cash.

*Distributions of Marketable Securities; Adjustments Attributable to Changes in Value.* If any distribution pursuant to this Section 6.3 includes a distribution in kind of Marketable Securities, the General Partner shall, as soon as reasonably practicable after such distribution, determine the Post-Distribution Value of such Marketable Securities. If such Post-Distribution Value of such Marketable Securities differs from the Value of such Marketable Securities on the date of their distribution, subsequent distributions pursuant to this Section 6.3 shall be made so as to cause the aggregate distributions under this Section 6.3 received by each Partner to equal the aggregate distributions such Partner would have received under this Section 6.3 had the original distribution of such Marketable Securities been made assuming that such Marketable Securities were sold for an amount equal to the average of their Value as of the date of distribution and their Post-Distribution Value and the proceeds thereof distributed in the form of Distributable Cash.

6.4    <u>Distributions of Temporary Investment Income</u>.   Except as otherwise provided herein, Temporary Investment Income with respect to any Temporary Investment shall be distributed to the Partners in proportion to their Sharing Percentages in such Temporary Investment or, if the General Partner so determines, in proportion to their Capital Commitments, at such times and in such amounts as the General Partner determines to be appropriate, *provided* that if, as of the end of any Fiscal Year, Temporary Investment Income exceeds $100,000, the General Partner shall distribute such Distributable Cash to the Partners within 60 days after the last day of such Fiscal Year.

6.5    <u>Tax Distributions</u>. Notwithstanding Section 6.3 or 6.4, with respect to any Portfolio Investment, the Fund may, at any time, out of Distributable Cash from any source, make distributions ("<u>Tax Distributions</u>") to all Partners (other than any Defaulting Partners), regardless of their tax status, in amounts intended to enable such Partners (or any Person whose tax liability is determined by reference to the income of

any such Partner) to discharge their U.S. federal, state and local (and, as the General Partner shall determine in its sole discretion, non-U.S.) tax liabilities arising from allocations made (or to be made) pursuant to Section 6.11, and any distributions made, with respect to such Portfolio Investment. The amount of each Tax Distribution shall be determined by the General Partner in its sole discretion, taking into account the maximum combined U.S. federal, Texas State tax rate applicable to individuals on ordinary income and income subject to tax at capital gain rates (taking into account the applicable holding period), as the case may be, the amounts of ordinary income and income subject to tax at capital gain rates allocated to the Partners pursuant to this Agreement, and otherwise based on such assumptions as the General Partner determines in its sole discretion to be appropriate. The amount distributable to any Partner pursuant to any clause of Sections 6.3 or 6.4 (as applicable) shall be reduced by any Tax Distributions made to such Partner and not previously taken into account pursuant to this sentence, and such Tax Distributions shall also be deemed to have been distributed pursuant to such clause of Sections 6.3 or 6.4 (as applicable) for purposes of making the calculations required by this Agreement, so that to the extent possible each Partner receives in the aggregate pursuant to Sections 6.3 and 6.4 and this Section 6.5 the amount it would have received pursuant to Sections 6.3 and 6.4 as if this Section 6.5 were not included in this Agreement. For purposes of the preceding sentence, the General Partner shall allocate in its sole discretion any distributions received by it pursuant to this Section 6.5 among Distributable Cash apportioned to each Partner.

6.6    General Distribution Provisions.

(a)    Overriding Limitations on Distributions.    Notwithstanding any other provision of this Agreement, distributions shall be made only to the extent of Available Assets and in compliance with the Partnership Law and other applicable law.

(b)    Apportionment of Expenses.    For the purposes of Section 6.3, Capital Contributions of a Partner that were used to pay Fund Expenses determined by the General Partner to be attributable to a particular Portfolio Investment shall be apportioned to such Portfolio Investment.

(c)    Distributions to Persons Shown on the Register.    Any distribution by the Fund pursuant to Articles VI and XI to the Person shown on the Register as a Partner or to such Person's legal representatives, or to the Transferee of such Person's right to receive such distributions as provided herein, shall, to the fullest extent permitted by applicable law, acquit the Fund and the General Partner of all liability to any other Person that may be interested in such distribution by reason of any Transfer of such Person's interest in the Fund for any reason (including a Transfer of such interest by reason of the death, incompetence, bankruptcy or liquidation of such Person).

6.7   Distributions in Kind.

(a)   General.  Prior to the winding up and dissolution of the Fund, the General Partner may distribute only Marketable Securities as distributions in kind to any Partner unless such Partner consents otherwise.  Upon the winding up and dissolution of the Fund, the General Partner may also distribute any other Securities or other property as distributions in kind.  In the event that a distribution of Marketable Securities or other Securities or property is made, such Securities or property shall be deemed to have been sold at their Value and the proceeds of such sale shall be deemed to have been distributed in the form of Distributable Cash to the Partners pursuant to Section 6.3.  Distributions of Marketable Securities and, upon dissolution, winding up and liquidation of the Fund, distributions of any other Securities or other property shall be made in proportion to the aggregate amounts that would be distributed to each Partner pursuant to Section 6.3, as determined by the General Partner.  If a distribution consists of both cash and Securities or Securities of more than one class (with each lot of Securities with a separate basis or holding period being treated as a separate class of Securities), each Partner receiving such distribution shall, to the extent practicable, receive the same proportion of cash and Securities of each class being distributed.   To the extent that the foregoing is not practicable, a Partner may be compelled to accept a distribution of any asset in kind from the Fund to the extent that the percentage of the asset distributed to such Partner exceeds a percentage of that asset that is equal to the percentage in which such Partner shares in distributions from the Fund.  The General Partner may cause certificates evidencing any Securities (other than Marketable Securities) to be distributed to be imprinted with legends as to such restrictions on Transfer as it may determine are necessary or appropriate, including legends as to applicable U.S. federal or state or non-U.S. securities laws or other legal or contractual restrictions, and may require any Partner to which Securities are to be distributed, as a condition to such distribution, to agree in writing (*i*) that such Partner will not Transfer such Securities except in compliance with such restrictions and (*ii*) to such other matters as the General Partner may determine are necessary or appropriate.

(b)   Legal, Regulatory or Contractual Restrictions Relating to Distributions in Kind.  If any Partner would otherwise be distributed an amount of any Securities that would cause such Partner to own or control in excess of the amount of such Securities that it may lawfully own or control, would subject such Partner to any material regulatory filing or would raise material contractual or regulatory issues for such Partner, the General Partner may (*i*) cause the Fund, as agent for such Partner, to sell all or any portion of such Securities distributable to such Partner on behalf of such Partner or (*ii*) deposit such Securities in a trust established by the General Partner for the benefit and at the expense of such Partner (with voting control and other terms that are satisfactory to such Partner).

6.8   Negative Capital Accounts.  Except as otherwise expressly provided in Section 9.2, the Limited Partner shall not be required to make up a negative balance in its Capital Account.  Except as otherwise expressly provided in this Agreement or as

*Confidential*

AP0783

required by law, the General Partner shall not be required to make up a negative balance in its Capital Account.

6.9  No Withdrawal of Capital.  Except as otherwise expressly provided in this Agreement, no Partner shall have the right to withdraw capital from the Fund at its option or to receive any distribution of or return on such Partner's Capital Contributions.

6.10  Allocations to Capital Accounts.

(a)  Except as otherwise provided herein, each item of income, gain, loss or deduction of the Fund (determined in accordance with U.S. tax principles as applied to the maintenance of capital accounts) shall be allocated among the Capital Accounts of the Partners with respect to each Period, as of the end of such Period, in a manner that as closely as possible gives economic effect to the provisions of Articles VI and XI and the other relevant provisions of this Agreement, *provided* that, for the avoidance of doubt, the Management Fee shall be allocated to the Limited Partner in accordance with the amount calculated with respect to the Limited Partner as provided in Section 7.2.

(b) Notwithstanding any other provision of this Agreement, (*i*) the amount otherwise payable by the General Partner pursuant to Section 11.3 with respect to the Limited Partner shall be reduced to the extent necessary to give economic effect to the allocations contemplated by Section 6.10(a)(i) and (*ii*) to the extent any such reduction is made with respect to the Limited Partner, upon dissolution of the Fund (*A*) the Management Fee calculated with respect to the Limited Partner shall be reduced by a like amount, (*B*) the Manager shall return such amount to the Fund and (*C*) the Fund shall (subject to Section 6.12 and applicable law) distribute such amount to the Limited Partner.

6.11  Tax Allocations and Other Tax Matters.

(a)  Tax Allocations.  Each item of income, gain, loss or deduction recognized by the Fund shall be allocated among the Partners for U.S. federal, state and local income tax purposes in the same manner that each such item is allocated to the Partners' Capital Accounts or as otherwise provided herein, *provided* that the General Partner may adjust such allocations as long as such adjusted allocations have substantial economic effect or are in accordance with the interests of the Partners in the Fund, in each case within the meaning of the Code and the Treasury Regulations.  Tax credits and tax credit recapture shall be allocated in accordance with the Partners' interests in the Fund as provided in Treasury Regulations section 1.704-1(b)(4)(ii).  All matters concerning allocations for U.S. federal, state and local and non-U.S. income tax purposes, including accounting procedures, not expressly provided for by the terms of this Agreement shall be determined by the General Partner in its sole discretion.

(b)  Tax Matters Partner.  The General Partner is hereby designated as the tax matters partner of the Fund, in accordance with the Treasury Regulations promulgated

*Confidential*

AP0784

pursuant to section 6231 of the Code and any similar provisions under any other state or local or non-U.S. tax laws. Each Partner hereby consents to such designation and agrees that, upon the request of the General Partner, it will execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such consent. The Limited Partner shall have the right to participate in any administrative proceedings related to the determination of Fund items at the Fund level. If the Limited Partner elects to participate in such proceedings, the Limited Partner shall be responsible for any expenses incurred by the Limited Partner in connection with such participation. The cost of any resulting audits or adjustments of the Limited Partner's tax return shall be borne solely by the Limited Partner.

(c)     <u>Partnership for Tax Purposes</u>.  Either the General Partner shall have executed and filed a U.S. Internal Revenue Service Form 8832 prior to the date hereof electing to classify the Fund as a partnership for U.S. federal income tax purposes pursuant to section 301.7701-3 of the Treasury Regulations as of a date no later than the date hereof, or the General Partner shall timely execute and file such Form 8832 on or after the date hereof electing to classify the Fund as a partnership for United States federal income tax purposes as of a date no later than the date hereof, and the General Partner is hereby authorized to execute and file such Form 8832 for all of the Partners. The General Partner shall not subsequently elect to change such classification. The General Partner is hereby authorized to execute and file for all of the Partners any comparable form or document required by any applicable United States tax law for the Fund to be classified as a partnership under such tax law.  The Fund shall not participate in the establishment of an "established securities market" (within the meaning of section 1.7704-1(b) of the Treasury Regulations) or a "secondary market or the substantial equivalent thereof" (within the meaning of section 1.7704-1(c) of the Treasury Regulations) or, in either case, the inclusion thereon of "interests" in the Fund (within the meaning of section 1.7704-1(a)(2) of the Treasury Regulations).

(d)     <u>Certain Actions</u>.  Notwithstanding any other provision of this Agreement, (*i*) the Limited Partner shall, and shall cause each of its Affiliates and transferees to, take any action requested by the General Partner, and the General Partner may take any action, to ensure that the fair market value of any interest in the Fund that is transferred in connection with the performance of services is treated for U.S. federal income tax purposes as being equal to the "liquidation value" (within the meaning of Prop. Treas. Reg. section 1.83-3(l)) of that interest (and that each such interest in the Fund is afforded pass-through treatment for all applicable U.S. federal, state or local income tax purposes) and (*ii*) without limiting the generality of the foregoing, to the extent required in order to attain or ensure such treatment under any applicable law, Treasury Regulation, Revenue Procedure, Revenue Ruling, Notice or other guidance governing partnership interests transferred in connection with the performance of services, such action may include authorizing and directing the Fund or the General Partner to make any election, agreeing to any condition imposed on the Limited Partner, its Affiliates or its transferees, executing any amendment

*Confidential*

AP0785

to this Agreement or other agreements, executing any new agreement, making any tax election or tax filing, and agreeing not to take any contrary position.

(e)  <u>Limited Partner Notification Requirements</u>.  The Limited Partner shall notify the General Partner in a timely manner of its intention to (*i*) file a notice of inconsistent treatment under section 6222(b) of the Code, (*ii*) file a request for administrative adjustment of Fund items, (*iii*) file a petition with respect to any Fund item or other tax matters involving the Fund, or (*iv*) enter into a settlement agreement with the Secretary of the Treasury with respect to any Fund items.  Upon receipt of any such notification the General Partner, if it agrees with the Limited Partner's position, may in its sole discretion elect to make such filing or enter into such agreement, as applicable and practicable, on behalf of the Fund.  The cost of any audits or adjustments of the Limited Partner's tax return shall be borne solely by the Limited Partner.  The Limited Partner shall promptly upon request furnish to the General Partner any information that the General Partner may reasonably request in connection with any election or contemplated election or adjustment under section 734, 743 or 754 of the Code or with filing the tax returns of the Fund, any Affiliate thereof or any Portfolio Company.

6.12  <u>Withholding</u>.

(a)  <u>General</u>.  Each Partner shall, to the fullest extent permitted by applicable law, unless otherwise agreed by the General Partner in writing, indemnify and hold harmless the Fund and the General Partner, and each Partner hereby agrees that the Fund shall, to the fullest extent permitted by applicable law, similarly indemnify and hold harmless each other Covered Person pursuant to one or more separate indemnification agreements with such Covered Persons, in each case where such Person is or is deemed to be the responsible withholding agent for U.S. federal, state or local or non-U.S. income tax purposes against all claims, liabilities and expenses of whatever nature relating to such Covered Person's obligation to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Fund with respect to such Partner or as a result of such Partner's participation in the Fund.  If, pursuant to a separate indemnification agreement or otherwise, the Fund shall indemnify or be required to indemnify any Covered Person against any claims, liabilities or expenses of whatever nature relating to such Covered Person's obligation to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by such Covered Person as a result of any Partner's participation in the Fund, such Partner shall pay to the Fund the amount of the indemnity paid or required to be paid.

(b)  <u>Authority to Withhold; Treatment of Withheld Tax</u>.  Notwithstanding any other provision of this Agreement, each Partner hereby authorizes the Fund and the General Partner to withhold and to pay over, or otherwise pay, any withholding or other taxes payable or required to be deducted by the Fund or any of its Affiliates (pursuant to the Code or any provision of U.S. federal, state or local or non-U.S. tax law or otherwise) with respect to such Partner or as a result of such Partner's participation in the Fund (including

*Confidential*

48

as a result of a distribution in kind to such Partner). If and to the extent that the Fund shall be required to withhold or pay any such withholding or other taxes, such Partner shall be deemed for all purposes of this Agreement to have received a payment from the Fund as of the time that such withholding or other tax is withheld or required to be paid, whichever is earlier, which payment shall be deemed to be a distribution of Distributable Cash with respect to such Partner's interest in the Fund to the extent that such Partner (or any successor to such Partner's interest in the Fund) would have received a cash distribution but for such withholding. To the extent that such payment exceeds the cash distribution that such Partner would have received but for such withholding, the General Partner shall notify such Partner as to the amount of such excess and such Partner shall make a prompt payment to the Fund of such amount by wire transfer, which payment shall not constitute a Capital Contribution and, consequently, shall not reduce the Remaining Capital Commitment or increase the Capital Account of such Partner. The Fund may hold back from any such distribution in kind property having a Value equal to the amount of such taxes until the Fund has received payment of such amount.

      (c)    <u>Withholding Tax Rate</u>. Any withholdings referred to in this Section 6.12 shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel, or other evidence, satisfactory to the General Partner to the effect that a lower rate is applicable or that no withholding is applicable.

      (d)    <u>Withholding from Distributions to the Fund</u>. In the event that the Fund receives a distribution or payment from or in respect of which tax has been withheld, the Fund shall be deemed to have received cash in an amount equal to the amount of such withheld tax, and each Partner shall be deemed for all purposes of this Agreement to have received a payment from the Fund as of the time of such distribution or payment equal to the portion of such amount that is attributable to such Partner's interest in the Fund as determined by the General Partner in its sole discretion, which payment shall be deemed to be a distribution of Distributable Cash pursuant to the relevant clause of Section 6.3 or Section 6.4 to the extent that such Partner (or any successor to such Partner's interest in the Fund) would have received a cash distribution but for such withholding. To the extent that such payment exceeds the cash distribution that such Partner would have received but for such withholding, the General Partner shall notify such Partner as to the amount of such excess and such Partner shall make a prompt payment to the Fund of such amount by wire transfer, which payment shall not constitute a Capital Contribution and, consequently, shall not reduce the Remaining Capital Commitment or increase the Capital Account of such Partner. In the event that the Fund anticipates receiving a distribution or payment from which tax will be withheld in kind, the General Partner may elect to prevent such in-kind withholding by paying such tax in cash and may require each Partner in advance of such distribution to make a prompt payment to the Fund by wire transfer of the amount of such tax attributable to such Partner's interest in the Fund as equitably determined by the General Partner, which payment shall not constitute a Capital Contribution and,

*Confidential*

AP0787

consequently, shall not reduce the Remaining Capital Commitment or increase the Capital Account of such Partner.

(e)     AEOI. Each Partner shall provide the General Partner and the Fund with any information, representations, certificates or forms relating to such Partner (or its direct or indirect owners or account holders) that are requested from time to time by the General Partner and that the General Partner determines in its sole discretion are necessary or appropriate in order for any fund entity (including (*i*) the Fund and any Alternative Investment Fund, (*ii*) any entity in which the Fund or any Alternative Investment Fund holds (directly or indirectly) an interest (whether in the form of debt or equity), (*iii*) any member of any "expanded affiliated group" (as defined in section 1471(e)(2) of the Code) of which any Person described in clause (i) or (ii) is a member and (*iv*) the Manager or any of its Affiliates) to (*A*) enter into, maintain or comply with the agreement contemplated by section 1471(b) of the Code, (*B*) satisfy any requirement imposed under FATCA in order to avoid any withholding required under FATCA (including any withholding upon any payments to such Partner under this Agreement), (*C*) comply with any reporting or withholding requirements under AEOI or (*D*) comply with any fiscal or regulatory legislation, rules or practices adopted pursuant to AEOI. In addition, each Partner shall take such actions as the General Partner may reasonably request in connection with the foregoing. In the event that any Partner fails to provide any of the information, representations, certificates or forms (or undertake any of the actions) required under this Section 6.12(e), the General Partner shall have full authority to (*1*) (*x*) form an entity organized in such jurisdiction as the General Partner shall determine with the consent of the Limited Partner, transfer such Partner's interest in the Fund to such entity, admit such Partner as an owner of such entity and cause such Partner to cease to be a Partner of the Fund or (*y*) form a Parallel Fund organized as a limited partnership in such jurisdiction as the General Partner shall determine with the consent of the Limited Partner and require such Partner to be admitted as a partner or other similar investor in such Parallel Fund, and in connection therewith and in consideration for the cancellation of such Partner's interest in the Fund, such Partner will receive an equivalent interest in such Parallel Fund and cause such Partner to cease to be a Partner of the Fund, (*2*) close such Limited Partner's "account" with the Fund by causing a transfer of such Partner's interest in the Fund to a Person selected by the General Partner in a transaction that complies with Section 10.1 in exchange for any consideration that can be obtained for such interest or (*3*) take any other steps as the General Partner determines in its sole discretion are necessary or appropriate to mitigate the consequences of such Partner's failure to comply with this Section 6.12(e) on the fund entities and the other Partners. The General Partner shall make such revisions to the Cayman Register or the Register as may be necessary to reflect the change in Partners and Capital Commitments contemplated by this Section 6.12(e). If requested by the General Partner, such Partner shall execute any and all documents, opinions, instruments and certificates as the General Partner shall have reasonably requested or that are otherwise required to effectuate the foregoing. Any Partner that fails to comply with this Section 6.12(e) shall, together with all other Partners that fail to comply with this Section 6.12(e),

AP0788

unless otherwise agreed by the General Partner in writing, to the fullest extent permitted by law, indemnify and hold harmless the General Partner and the Fund for any costs or expenses arising out of such failure or failures, including any withholding tax imposed under FATCA or as a result of AEOI and any withholding or other taxes imposed as a result of a transfer effected pursuant to this Section 6.12(e). Each Partner acknowledges and agrees that any personal data in respect of such Partner (or any Persons that indirectly hold an interest in the Fund through such Partner) provided to the General Partner or the Fund in accordance with this Section 6.12(e) may, if required, be disclosed to any tax authority.

6.13 <u>Segregated Reserve Account</u>. The Fund shall establish an account for the Limited Partner (a "<u>Segregated Reserve Account</u>") into which a portion of the Carried Interest amounts otherwise distributable to the General Partner pursuant to Section 6.3(c) or (d) shall, subject to the terms of this Section 6.13, be deposited. If, at the time a Portfolio Investment is disposed of, the value of the remaining Portfolio Investments then held by the Fund is less than the unreturned Capital Contributions (determined based on the Fund's most recent report distributed to the Limited Partner pursuant to Section 8.2), prior to making any such distribution to the General Partner, the Fund shall hold back, and shall not distribute to the General Partner, an amount equal to 20% of the amount otherwise distributable to the General Partner pursuant to Section 6.3(c) or (d) and shall deposit such amounts in the Segregated Reserve Account, unless the Limited Partner agrees that a lesser amount, or no amount, shall be held back and deposited in the Segregated Reserve Account. Unless the context otherwise requires, with the consent of the Limited Partner, amounts deposited in the Segregated Reserve Account shall be deemed to have been distributed to the General Partner for purposes of making the calculations required by Sections 6.3 and 11.2(b). The funds attributable to the Segregated Reserve Account shall be invested by the General Partner in Temporary Investments or, with the consent of the Limited Partner from time to time, other Marketable Securities, *provided* that, if the General Partner invests such funds in other Marketable Securities with the consent of the Limited Partner, the General Partner shall contribute cash to the Segregated Reserve Account to make up for any losses on such other Marketable Securities on a quarterly basis or, if earlier, on the date on which such losses exceed 20% of the amount required to be held in the Segregated Reserve Account pursuant to this Section 6.13. Income earned on amounts held in the Segregated Reserve Account shall, subject to applicable law, be distributed from time to time to the General Partner, with the consent of the Limited Partner. The Securities in the Segregated Reserve Account shall be valued on a marked to market basis and such valuation shall be included in the quarterly reports provided to the Limited Partner pursuant to Section 8.2(b). Notwithstanding the foregoing provisions of this Section 6.13 and subject to applicable law, from time to time all or any portion of the funds attributable to the Segregated Reserve Account may be released with the consent of the Limited Partner, *provided* that after the Investment Period, the consent of the Limited Partner shall not be required to release the funds attributable to the Segregated Reserve Account to the extent

that the Fund has no unreturned Capital Contributions. Upon dissolution of the Fund, any remaining assets in the Segregated Reserve Account shall be applied as provided in Section 11.3.

## ARTICLE VII

## THE MANAGER

7.1    <u>Appointment of the Manager</u>.    The General Partner will appoint the Manager to provide portfolio management and administrative services to the Fund as set forth in a management agreement (the "**Management Agreement**"), the form of which is attached hereto as **Exhibit A**:

(a)    The Manager shall manage the operations of the Fund, shall have the right to execute and deliver documents on behalf of the Fund and otherwise bind the Fund in lieu of the General Partner and shall have discretionary authority with respect to investments of the Fund, including the authority to investigate, analyze, structure and negotiate potential investments and to evaluate, monitor, exercise voting rights, advise as to disposition opportunities and take other appropriate action with respect to investments on behalf of the Fund, *provided* that the management and the conduct of the activities of the Fund shall remain the ultimate responsibility of the General Partner and all decisions relating to the selection and disposition of the Fund's investments shall be made exclusively by the General Partner in accordance with this Agreement. The appointment of the Manager by the Fund shall not relieve the General Partner from its obligations to the Fund hereunder or under the Partnership Law.

(b)    The Manager shall act in conformity with this Agreement and with the instructions and directions of the General Partner, and in no event shall the Manager be considered a general partner of the Fund by agreement, estoppel, as a result of the performance of its duties or otherwise.

The General Partner agrees that the Limited Partner may, in its sole discretion, by written notice, direct the General Partner to terminate the appointment of the Manager set forth in the Management Agreement at any time by written notice to such effect, and if so directed, the General Partner shall terminate the Manager, which termination shall be effective as of the first to occur of end of the next quarter and the date that is at least 60 days after such written notice from the Limited Partner, and the General Partner shall not appoint a replacement manager without the prior written consent of the Limited Partner, which consent may be withheld in the Limited Partner's sole discretion; otherwise, the engagement of the Manager set forth in the Management Agreement shall terminate upon the earlier of the filing of a Notice of Dissolution of the Fund in accordance with Section 11.4 or the removal of the General Partner pursuant to Section 2.5. In the event of the termination of the Manager and the appointment of a replacement manager as provided in

*Confidential*

AP0790

this Section 7.1, the General Partner shall cause the replacement manager to (*i*) assume the obligations of the Manager's office lease, unless the Manager otherwise objects to such assumption and (*ii*) retain the senior employees of the Manager, other than the Co-Founders, and such other employees as appropriate under the circumstances, *provided* that such employees desire to be so retained by the replacement manager and are not at that time also employees of Reynolds, in each case with the then same responsibilities, compensation and interests (including interests in the Carried Interest) in the General Partner.

      7.2   <u>Management Fee</u>.  In consideration of the management and other services referred to in Section 7.1, the Fund shall pay the Manager an annual management fee (the "<u>Management Fee</u>") beginning as of the Initial Closing and continuing throughout the Term.  The Management Fee shall be payable in quarterly installments in advance commencing on the Initial Closing (or such later date as may be specified in writing by the General Partner) and on each January 1, April 1, July 1 and October 1 thereafter (each a "<u>Payment Date</u>"), and any payment for a period of less than three months shall be adjusted on a *pro rata* basis according to the actual number of days during the period: notwithstanding the foregoing, the first payment of the Management Fee shall be payable on May 1, 2018 and shall include the period including the actual number of days from the Initial Closing through May 1, 2018.  Through the last day of the Investment Period, the annual Management Fee shall be an aggregate amount, calculated with respect to each Limited Partner, equal to 1.5% per annum of the Capital Commitment of the Limited Partner and, thereafter, an aggregate amount, calculated with respect to the Limited Partner, equal to 1.5% per annum of the Capital Contributions of the Limited Partner that were used to fund the cost of Portfolio Investments that are held by the Fund as of the relevant Payment Date, *provided* that the Management Fee shall be reduced to 1.0% to the extent that the Fund has not invested at least (*a*) 20% of the Capital Commitments by December 31, 2019, (*b*) 40% of the Capital Commitments by December 31, 2020, or (*c*) 60% of the Capital Commitments by December 31, 2021, in each case unless and until the Limited Partner otherwise consents that no such reduction shall be applied. Notwithstanding the foregoing, the reductions described in clauses (a)-(c) above shall not apply if the General Partner can demonstrate to the satisfaction of the Limited Partner that the pipeline of potential investments likely to be consummated by June 30 of the year following the year specified in the applicable clause will satisfy the invested percentage requirements. Each quarterly installment of the Management Fee calculated with respect to the Limited Partner shall be *reduced*, but not below zero, by an amount equal to the Limited Partner's *pro rata* share (based on Capital Commitments of the Partners) of all Fee Income received since the preceding Payment Date.  To the extent that the Management Fee with respect to the Limited Partner is not reduced as of any given Payment Date by the amounts referred to in the preceding sentence (or any portion thereof determined with respect to a previous Payment Date and carried over to the current Payment Date pursuant to this sentence) because the Management Fee with respect to the Limited Partner has been reduced to zero, the excess shall be carried over

*Confidential*

AP0791

to the next succeeding Payment Date (and, if necessary, to one or more subsequent Payment Dates) and applied as a reduction of the Management Fee with respect to the Limited Partner, but not below zero, for such succeeding Payment Date (or a subsequent Payment Date). The General Partner may at any time defer or waive payment to the Manager of all or any part of any installment of the Management Fee.

## ARTICLE VIII

## BOOKS AND RECORDS; REPORTS TO PARTNERS; ETC.

8.1 <u>Maintenance of Books and Records</u>. Until the filing of a Notice of Dissolution of the Fund in accordance with Section 11.4, the General Partner shall maintain full and accurate accounts of the transactions of the Fund in proper books and records of account, which shall set forth all information required by the Partnership Law. Such books and records shall be maintained in accordance with U.S. generally accepted accounting principles, *provided* that if such accounting principles shall require the financial statements of the Fund to be consolidated with those of the General Partner or of any Portfolio Company, the Fund shall also provide supplemental unaudited "stand-alone" financial statements that are not consolidated with those of the General Partner or of any Portfolio Company, under which the carrying value of the Fund's investments in the Portfolio Companies shall be the cost thereof. The General Partner shall keep or cause to be kept at the address of the General Partner (or at such other place as the General Partner or the Manager shall determine and, until the filing of the Notice of Dissolution pursuant to Section 11.4, shall advise the Limited Partner in writing) copies of such books and records until the filing of the Notice of Dissolution pursuant to Section 11.4 and for a period of five years thereafter. The books and records of the Fund as so maintained shall be the basis for the preparation of the financial reports to be mailed to current and former Partners pursuant to this Article VIII. Such books and records shall be available, upon five Business Days' notice to the General Partner, for inspection and copying at reasonable times during business hours by the Limited Partner or its duly authorized agents or representatives.

8.2 <u>Audits and Reports</u>.

(a) <u>Financial Reports</u>. The books and records of account of the Fund shall be audited as of the end of each Fiscal Year beginning after January 1, 2018 by a nationally recognized independent public accounting firm selected by the General Partner. During the Term, the General Partner shall prepare and mail, deliver by fax, email or other electronic means or otherwise make available a financial report (audited in the case of a report sent as of the end of a Fiscal Year and unaudited in the case of a report sent as of the end of a quarter) to the Limited Partner within 90 days after the end of each Fiscal Year, or as soon as practicable thereafter (commencing after December 31 of the Fiscal Year in which the Initial Closing is held) and 45 days after the end of each of the first three quarters

*Confidential*

AP0792

of each Fiscal Year, or as soon as practicable thereafter (commencing with the first full quarter after the date of the first Drawdown), in each case subject to delays in the event of the late receipt by the Fund of any necessary financial statements from any Portfolio Company, setting forth for such Fiscal Year or quarter:

   (i)     the assets and liabilities of the Fund as of the end of such Fiscal Year or quarter;

   (ii)    the net profit or net loss of the Fund for such Fiscal Year or quarter; and

   (iii)   in the case of a Fiscal Year only, the Limited Partner's closing Capital Account balance as of the end of such Fiscal Year.

   (b)    <u>Quarterly Reports</u>.   During the Term, the General Partner shall use commercially reasonable efforts to cause to be prepared and mailed, delivered by fax, email or other electronic means or otherwise made available to the Limited Partner, with the financial reports described in Section 8.2(a), descriptive investment information for each Portfolio Company, including a description of material changes in the financial condition or results of operations of each Portfolio Company and such other information concerning the Fund's investments as the General Partner may determine to provide, and, with respect to any quarter, (*i*) a description of the relevant facts relating to any settlements during such quarter of Claims for which indemnification has been provided pursuant to Section 9.1 and (*ii*) notice if any Co-Founder ceases during such quarter to provide the Fund with the time and effort required pursuant to the first sentence of Section 2.3(e).

   (c)    <u>Annual Reports</u>.   During the Term, the General Partner shall deliver by fax, email or other electronic means or otherwise make available to the Limited Partner within 90 days after the end of each Fiscal Year a notice setting forth the Fee Income received by the General Partner, the Manager and their respective Affiliates during such Fiscal Year.

   (d)    <u>Other Information</u>.   In addition to the Limited Partner's rights under Section 8.1, during the Term, the General Partner shall use commercially reasonable efforts to deliver by fax, email or other electronic means or otherwise make available to the Limited Partner such other information as is reasonably requested by the Limited Partner from time to time for any purpose reasonably related to such Limited Partner's interest as a limited partner in the Fund to the extent that any such efforts shall not impose any undue cost or burden on the General Partner or the Fund.

   (e)    <u>Right to Account</u>.   The Limited Partner hereby waives, to the fullest extent permitted by law, any and all right to account that they may have under the Partnership Law

   (f)    <u>Change of Accounting Firm</u>.   The General Partner shall not change the accounting firm of the Fund without the prior written consent of the Limited Partner.

*Confidential*

AP0793

8.3   Annual Meeting; Other Requested Meetings.  The General Partner shall cause the Fund to have a meeting with the Limited Partner at least once each year during the Term, beginning in the year after the year of Initial Closing (the "Annual Meeting"), and at such other times as the Limited Partner shall reasonably request with at least 30 days' notice.  At the Annual Meeting and such other requested meetings, which at the election of the Limited Partners, shall be held either in person in the location specified by the Limited Partner, or telephonically, the General Partner will review the investment performance of the Fund.

8.4   Tax Information.  The General Partner shall use commercially reasonable efforts to prepare and mail, deliver by fax, email or other electronic means or otherwise make available to the Limited Partner (and each other Person that was a Limited Partner during such Fiscal Year or its legal representatives) within 90 days after the end of each Fiscal Year, or as soon as practicable thereafter such tax information as the Limited Partner shall reasonable request.

## ARTICLE IX

## INDEMNIFICATION

9.1   Indemnification of Covered Persons.

(a)   General.  The Fund shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless each Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings and actions, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Fund or activities undertaken in connection with the Fund, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and counsel fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to in this Section 9.1 are referred to collectively as "Damages"), except to the extent that such Damages arose from Disabling Conduct of such Covered Person, *provided* that in the event that a court of competent jurisdiction determines that such Damages arose partially from the Disabling Conduct of such Covered Person, such Covered Person's right to indemnification hereunder shall be reduced proportionately to reflect the relative liability of such Covered Person for such Damages.  Notwithstanding the foregoing, a Covered Person will only be eligible for indemnification pursuant to this Section 9.1 for Claims relating to or arising out of transactions that took place during the time such Covered Person was a shareholder, officer, director, employee, partner, member,

*Confidential*

AP0794

agent or manager of any of the General Partner, the Manager or any of their respective Affiliates or during the time such Covered Person was the Limited Partner or a member of the Advisory Committee. The termination of any Proceeding by settlement shall not, of itself, create a presumption that any Damages relating to such settlement or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Person. For the avoidance of doubt, (*i*) Claims among the Co-Founders or other employees of the Manager solely relating to or arising out of the internal affairs of the Manager or the General Partner shall not be considered investment or other activities of the Fund and shall not be covered by the indemnification provisions of this Section 9.1 and (*ii*) no Covered Person shall be liable to the Fund or any Partner with respect to the accuracy or completeness of any information furnished by such Covered Person or any other Covered Person regarding any Portfolio Company where such information is obtained from a third party and not prepared by such Covered Person to the extent that such Covered Person acts in good faith and in reasonable reliance upon such information and that such Covered Person discloses those facts when it furnishes such information.

(b)     Expenses, etc.  Reasonable expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder (other than in defense of a derivative action brought by the Limited Partner) may be advanced by the Fund to such Covered Person prior to the final disposition thereof upon receipt of an undertaking by or on behalf of such Covered Person to repay such amount if it shall be determined ultimately by a court of competent jurisdiction that the Covered Person was not entitled to be indemnified hereunder. Subject to Section 9.3 and to the fullest extent permitted by applicable law, judgments against the Fund and either or both of the General Partner or the Manager, in respect of which the General Partner or the Manager is entitled to indemnification, shall first be satisfied from Fund assets, including Capital Contributions and any payments under Section 9.2, before the General Partner or the Manager, as the case may be, is responsible therefor.

(c)     Notices of Claims, etc. Promptly after receipt by a Covered Person of notice of the commencement of any Proceeding, such Covered Person shall, if a claim for indemnification in respect thereof is to be made against the Fund, give written notice to the Fund of the commencement of such Proceeding, *provided* that the failure of any Covered Person to give such notice as provided herein shall not relieve the Fund of its obligations under this Section 9.1 except to the extent that the Fund is actually prejudiced by such failure to give such notice. If any such Proceeding is brought against a Covered Person (other than a derivative suit in right of the Fund), the Fund will be entitled to participate in and to assume the defense thereof to the extent that the Fund may wish, with counsel reasonably satisfactory to such Covered Person. After notice from the Fund to such Covered Person of the Fund's election to assume the defense of such Proceeding, the Fund will not be liable for expenses subsequently incurred by such Covered Person in connection with the defense thereof. The Fund will not consent to entry of any judgment or enter into any settlement of such Proceeding that does not include as an unconditional term thereof

*Confidential*

AP0795

the giving by the claimant or plaintiff to such Covered Person of a release from all liability in respect to such Proceeding and the related Claim.

(d)     Survival of Protection. The provisions of this Section 9.1 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 9.1 and regardless of any subsequent amendment to this Agreement, and no amendment to this Agreement shall reduce or restrict the extent to which these indemnification provisions apply to actions taken or omissions made prior to the date of such amendment.

(e)     Reserves. If the General Partner determines in its sole discretion that it is appropriate or necessary to do so, the General Partner may cause the Fund to establish reasonable reserves, escrow accounts or similar accounts to fund its obligations under this Section 9.1.

(f)     Rights Cumulative. The right of any Covered Person to the indemnification provided herein shall be cumulative with, and in addition to, any and all rights to which such Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall extend to such Covered Person's successors, assigns, heirs and legal representatives.

9.2     Return of Certain Distributions to Fund Indemnification. Notwithstanding any other provision of this Agreement, the General Partner may require the Partners to return distributions to the Fund in an amount sufficient to satisfy all or any portion of the indemnification or repayment obligations of the Fund pursuant to Section 9.1 or other liabilities of the Fund, whether such obligations or liabilities arise before or after the last day of the Term or, with respect to any Partner, before or after such Partner's withdrawal from the Fund, *provided* that each Partner shall return distributions in respect of its share of any such indemnification or repayment obligation or liability as follows:

(a)     if the obligation or liability arises out of a Portfolio Investment,

(i)     first, up to the amount of the Distributable Cash distributed in connection with such Portfolio Investment, in such amounts as shall result (to the maximum extent practicable) in each Partner's retaining cumulative distributions from the Fund (net of any returns of distributions under this Section 9.2 or under Section 11.3) equal to the cumulative amount that would have been distributed to and retained by such Partner had the amount of such Distributable Cash been, at the time of such distribution, reduced by the amount of such obligation or liability, as equitably determined by the General Partner; and,

(ii)     thereafter, by the Partners in proportion to their Sharing Percentages with respect to such Portfolio Investment, or

*Confidential*

AP0796

(b)     in any other circumstances, by the Partners in proportion to their Capital Commitments.

The Limited Partner's liability under the first sentence of this Section 9.2 is limited to an amount equal to 50% of all distributions received by such Partner from the Fund or any Alternative Investment Fund. In addition to the foregoing, no Partner shall be required to return distributions to the Fund pursuant to this Section 9.2 after the second anniversary of the last day of the Term, *provided* that if at the end of such period there are any Proceedings pending or Claims outstanding, the General Partner shall notify the Limited Partner in writing of the general nature of such Proceedings or Claims and an estimate of the amount of distributions that may be required to be returned pursuant to this Section 9.2 and the obligation of the Partners to return distributions pursuant to this Section 9.2 shall be extended with respect to each such Proceeding or Claim until the date such Proceedings or Claims are ultimately resolved and distributions are returned to the Fund in respect thereof pursuant to this Section 9.2. Any distributions returned pursuant to this Section 9.2 and equivalent provisions of the organizational documents of any Alternative Investment Fund, or any payments (other than Capital Contributions) made by the General Partner in respect of any Damages, shall not be treated as Capital Contributions, but shall be treated as returns of distributions and reductions in Distributable Cash, for all purposes of this Agreement other than for purposes of computing the Limited Partner's internal rate of return for purposes of this Agreement, which shall be computed based on actual Capital Contributions made, payments made pursuant to this Section 9.2 and distributions received. Nothing in this Section 9.2, express or implied, is intended or shall be construed to give any Person other than the Fund or the Partners any legal or equitable right, remedy or claim under or in respect of this Section 9.2 or any provision contained herein. To the extent any distributions are returned under this Section 9.2 after the dissolution of the Fund, subject to the limitations set forth in this Section 9.2, the General Partner shall in good faith adjust the amounts required to be returned by each Partner to reflect any returns of distributions that would have been required under Section 11.3 if the contributions required under this Section 9.2 had been made immediately prior to the dissolution of the Fund.

9.3     Other Sources of Recovery. The General Partner shall cause the Fund to use its commercially reasonable efforts to obtain the funds needed to satisfy its indemnification or repayment obligations under Section 9.1 from Persons other than the Partners (for example, out of Fund assets or pursuant to insurance policies or Portfolio Company indemnification arrangements) before causing the Fund to make payments pursuant to Section 9.1 and before requiring the Partners to return distributions to the Fund pursuant to Section 9.2. Notwithstanding the foregoing, nothing in this Section 9.3 shall prohibit the General Partner from causing the Fund to make such payments or requiring the Partners to return such distributions if the General Partner determines in its sole discretion that the Fund is not likely to obtain sufficient funds from such other sources in a timely fashion, or that attempting to obtain such funds would be futile or not in the best interests of the Fund (for example, nothing in this Section 9.3 shall require the

AP0797

General Partner to cause the Fund to sell any Portfolio Investment before such time as the General Partner shall determine is advisable).

Notwithstanding Section 9.1, to the extent that any Covered Person is entitled to receive advancement of expenses from, or be indemnified or reimbursed (*a*) by the Fund pursuant to Article IX of this Agreement and (*b*) by (*i*) any current or former Portfolio Company under any other agreement or instrument, (*ii*) any insurer under a policy maintained by such Portfolio Company or (*iii*) any insurer under a policy maintained by the Manager or any of its Affiliates, the Fund will treat the obligations of such Portfolio Company or such insurers (each, a "Portfolio Company Indemnitor") as primary and the obligations of the Fund hereunder as secondary. Notwithstanding Section 9.1, unless the General Partner determines otherwise in its sole discretion, the Fund shall not advance expenses or satisfy any claim for indemnification hereunder unless and until such Covered Person has demonstrated that it has first sought advancement, indemnification or reimbursement from such Portfolio Company and any insurer under a policy maintained by such Portfolio Company and second, if advancement, indemnification or reimbursement is not provided by any such Portfolio Company or any such insurer on a timely basis, from any insurer under a policy maintained by the Manager or any of its Affiliates, if any. If such Covered Person is other than the General Partner, such Covered Person shall obtain the written consent of the General Partner, not to be unreasonably withheld, prior to entering into any compromise or settlement that would result in an obligation of the Fund to indemnify such Covered Person. To the fullest extent permitted by law, if the Fund pays or causes to be paid, for any reason, any amounts to a Covered Person that should have been paid by a Portfolio Company Indemnitor, then the Fund shall be fully subrogated to all rights of such Covered Person with respect to such payment and such Covered Person shall assign to the Fund all of its rights to advancement, indemnification or reimbursement from or with respect to such Portfolio Company Indemnitor. To the fullest extent permitted by law, the Fund's obligation to indemnify or advance expenses to any Covered Person shall be reduced by any amount such Covered Person collects as indemnification, reimbursement or advancement from any Portfolio Company Indemnitor.

9.4    Indemnification Agreements for Covered Persons. The General Partner is hereby instructed to cause the Fund to indemnify and hold harmless each Covered Person, in each case pursuant to a separate indemnification agreement. It is the express intention of the parties hereto that the provisions of this Article IX for the indemnification of Covered Persons may be relied upon by such Covered Persons and may be enforced by such Covered Persons (or by the General Partner on behalf of any such Covered Person, provided that the General Partner shall not have any obligation to so act for or on behalf of any such Covered Person) against the Fund pursuant to this Agreement or to a separate indemnification agreement, as if such Covered Persons were parties hereto.

*Confidential*

AP0798

# ARTICLE X

# TRANSFERS

10.1 <u>Transfers by Partners.</u>

(a)    <u>Transfers by the Limited Partner.</u>  Except as set forth in this Article X or in Sections 4.5(c) and 5.4(c), the Limited Partner may not Transfer all or any part of its interest in the Fund, including any interest in the capital or profits of the Fund and the right to receive distributions from the Fund.  In the case of any attempted or purported Transfer of an interest in the Fund not in compliance with this Agreement, the transferring Limited Partner may be designated as a Defaulting Partner under Section 5.4.  The consent of the General Partner to (*i*) any such Transfer by the Limited Partner and (*ii*) admission of a Transferee as a Substitute Partner may be withheld by the General Partner in its sole discretion, *provided* that such consent will not be unreasonably withheld if such Transfer is (*A*) to an Affiliate of the Limited Partner or (*B*) to another Partner that is not a Defaulting Partner.  Notwithstanding the foregoing, unless agreed to by the General Partner in writing, the Limited Partner may not enter into, create, sell or Transfer any financial instrument or contract the value of which is determined in whole or in part by reference to the Fund (including the amount of Fund distributions, the value of Fund assets, or the results of Fund operations), within the meaning of section 1.7704-1(a)(2)(i)(B) of the Treasury Regulations.

(b)    <u>Conditions to Transfer.</u>  Any purported Transfer of an interest in the Fund by the Limited Partner pursuant to the terms of this Article X shall, in addition to requiring the prior written consent referred to in Section 10.1(a), be subject to the satisfaction of the following conditions:

(i)    the Limited Partner that proposes to effect such Transfer (a "<u>Transferor</u>") or the Person to whom such Transfer is to be made (a "<u>Transferee</u>") shall have paid all expenses incurred by the Fund, the General Partner and the Manager in connection therewith (whether or not such proposed Transfer is consummated);

(ii)    the General Partner shall have been given at least 30 days' prior written notice of the proposed Transfer;

(iii)    the Fund shall have received from the Transferee and, in the case of clause (C) below, from the Transferor to the extent specified by the General Partner, (*A*) such assignment agreement and other documents, instruments and certificates as may be reasonably requested by the General Partner, pursuant to which such Transferee shall have agreed to be bound by this Agreement, including if requested a counterpart of this Agreement executed by or on behalf of such Transferee, (*B*) a certificate or representation to the effect that the representations set forth in the Subscription Agreement of such Transferor are (except as otherwise disclosed to and consented to by

the General Partner) true and correct with respect to such Transferee as of the date of such Transfer and (*C*) such other documents, opinions, instruments and certificates as the General Partner shall have reasonably requested;

(iv)    upon written request of the General Partner, such Transferor or Transferee shall have delivered to the Fund the opinion of counsel, which counsel and opinion shall be reasonably satisfactory to the General Partner, described in Section 10.1(c);

(v)    each of the Transferor and the Transferee shall have provided a certificate or representation to the effect that (*A*) the proposed Transfer will not be effected on or through (*1*) a U.S. national, regional or local securities exchange, (*2*) a non-U.S. securities exchange or (*3*) an interdealer quotation system that regularly disseminates firm buy or sell quotations by identified brokers or dealers and (*B*) it is not, and its proposed Transfer or acquisition (as the case may be) will not be made by, through or on behalf of, (*1*) a Person, such as a broker or a dealer, making a market in interests in the Fund or (*2*) a Person that makes available to the public bid or offer quotes with respect to interests in the Fund;

(vi)    (*A*) such Transfer will not be made on a "secondary market or the substantial equivalent thereof" within the meaning of section 1.7704-1 of the Treasury Regulations, unless (*i*) such Transfer is disregarded in determining whether interests in the Fund are readily tradable on a secondary market or the substantial equivalent thereof under section 1.7704-1 of the Treasury Regulations (other than section 1.7704-1(e)(1)(x) thereof) or (*ii*) the Fund satisfies the requirements of section 1.7704-1(h) of the Treasury Regulations at all times during the taxable year of such Transfer and (*B*) such Transfer will not be made on an "established securities market" within the meaning of section 1.7704-1 of the Treasury Regulations;

(vii)    such Transfer would not result in the Fund at any time during its taxable year having more than 100 partners, within the meaning of section 1.7704-1(h)(1)(ii) of the Treasury Regulations (taking into account section 1.7704-1(h)(3) of the Treasury Regulations); and

(viii)    such Transfer would not result in the Fund being treated as a corporation for U.S. federal income tax purposes.

The General Partner may in its sole discretion waive any or all of the conditions set forth in this Section 10.1(b), other than clauses (vi), (viii) and (ix), of the preceding sentence.

(c)    <u>Opinion of Counsel</u>.    The opinion of counsel referred to in Section 10.1(b)(iv) with respect to a proposed Transfer shall, unless otherwise specified by the General Partner, be substantially to the effect that:

*Confidential*

AP0800

(i)      such Transfer will not require registration under the Securities Act or violate any provision of any applicable non-U.S. securities laws;

(ii)      the Transferee is a Person that is a "qualified purchaser" as such term is defined in section 2(a)(51) of the Investment Company Act;

(iii)      such Transfer will not require any of the Manager, the General Partner or any Affiliate of the Manager or the General Partner to register as an investment adviser under the Advisers Act if such Person is not already so registered;

(iv)      such Transfer will not cause the Fund to be treated as a corporation under the Code; and

(v)      such Transfer will not violate either this Agreement or the laws, rules or regulations of any state or any governmental authority applicable to the Transferor, the Transferee or such Transfer.

In giving such opinion, counsel may, with the consent of the General Partner, rely as to factual matters on certificates of the Transferor, the Transferee and the General Partner and may include in its opinion customary qualifications and limitations.

(d)      Substitute Partners.  A Transferee may be admitted to the Fund as a substitute Limited Partner of the Fund (a "Substitute Partner") only with the consent of the General Partner as described in Section 10.1(a). Unless the General Partner, the Transferor and the Transferee otherwise agree, in the event of the admission of a Transferee as a Substitute Partner, from and after the date of such admission all references herein to the Transferor shall be deemed to apply to such Substitute Partner, and such Substitute Partner shall succeed to all of the rights and obligations of the Transferor hereunder, in each case with respect to the interest in the Fund being Transferred, *provided* that the Transferor shall continue to remain subject to Sections 6.11, 6.12 and 13.10.  A Person shall be deemed admitted to the Fund as a Substitute Partner at the time that the foregoing conditions are satisfied and such Person is listed by the General Partner as a limited partner of the Fund on the Register.

(e)      Transfers, Assignments and Changes in Membership by the General Partner.  The General Partner shall not Transfer all or any part of its interest in the Fund, *provided* that, subject to applicable law, the General Partner may (*i*) be reconstituted as, or converted into, a corporation, partnership or other form of entity (any such reconstituted or converted entity being deemed to be the General Partner for all purposes hereof) by merger, consolidation, conversion or otherwise, or (*ii*) in the case of a Transfer all or a portion of its interest in the Fund to a Person directly or indirectly controlled by the General Partner or by one or more the Co-Founders in which the General Partner or the Co-Founders, as the case may be, retain an economic interest equal to at least 75% of their economic interest in the Fund or the General Partner, respectively, immediately prior to such transfer.  If the

*Confidential*

63

AP0801

General Partner assigns its entire interest in the Fund pursuant to this Section 10.1(e), the assignee shall automatically be admitted to the Fund as a replacement general partner immediately prior to such assignment without any further action, approval or vote of any Person, including any other Partner, upon execution of a counterpart of this Agreement and such assignee shall continue the investment or other activities of the Fund without dissolution of the Fund. In addition, the Co-Founders will not effect a transfer or transfers to third Persons of their interests in the General Partner such that after giving effect thereto the Co-Founders would cease to control the General Partner or would cease to own (together with trusts or similar vehicles for the primary benefit of the Co-Founders or their family members) a majority of the beneficial interests in the General Partner. The General Partner shall notify the Fund of any change in the general partner of the General Partner promptly after such change. For the avoidance of doubt the restrictions on transfers in this Section 10.1(e) shall not apply to any transfers of interests in the General Partner in connection with the admission or termination of members to the General Partner to the extent that such member, in the case of the admission of a member to the General Partner, is an employees of the Manager at the time of admission, and in the case of the termination of such member's interest, such termination is in connection with the termination of such member's employment with the Manager.

(f) <u>Transfers in Violation of Agreement Not Recognized</u>. Unless effected in accordance with and as permitted by this Agreement, no attempted Transfer or substitution shall be recognized by the Fund, any purported Transfer or substitution not effected in accordance with and as permitted by this Agreement shall, to the fullest extent permitted by law, be void and the Fund shall recognize no rights of the purported Transferee, including the right to receive distributions (directly or indirectly) from the Fund or to acquire an interest in the capital or profits of the Fund. In addition, as a result of such attempted Transfer, the General Partner may designate the purported Transferor a Defaulting Partner pursuant to Section 5.4(a).

(g) <u>Certain Changes in Record Ownership</u>. A change in record ownership of an interest in the Fund by reason of the succession of a successor trust or a change in the custodian of the Limited Partner shall be deemed not to be a Transfer within the meaning of this Section 10.1, *provided* that the Limited Partner shall notify the General Partner in writing of such change promptly and in no event later than 30 days after such event. The records of the Fund, the Cayman Register and the Register shall be changed by the General Partner to reflect the identity of the new trustee or other fiduciary upon receipt of such notice and the execution and delivery of such documents as the General Partner shall require in connection with such change. Pending the receipt of such notice and documentation, the Fund and the General Partner shall be entitled to rely on the Cayman Register for all purposes in connection with the affected interest.

(h) <u>Transfers of Interests of Natural Persons, Trusts, etc</u>. If the Limited Partner is or becomes, at any time prior to the termination of the Fund, (*i*) a natural person, (*ii*) a

AP0802

trust any portion of which is treated (under subpart E of part I of subchapter J of chapter 1 of subtitle A of the Code) as owned by a natural person or (*iii*) an entity disregarded for federal income tax purposes and owned (or treated as owned) by a natural person or a trust described in clause (ii) hereof, then, notwithstanding any other provision of this Agreement, the General Partner shall have full authority to form and operate an investment vehicle that is not treated as any of the Persons described in clause (i), (ii) or (iii) above and Transfer the Limited Partner's interest in the Fund to such investment vehicle. If requested by the General Partner, the Limited Partner shall execute any and all documents, opinions, instruments and certificates as the General Partner shall have reasonably requested or that are otherwise required to effectuate the foregoing. Notwithstanding the prior sentence, the General Partner shall have the power to execute such documents on behalf of the Limited Partner as set forth in Section 12.2(h).

## ARTICLE XI

## WINDING UP AND DISSOLUTION OF THE FUND

11.1 . The Fund's affairs shall be wound up upon the first to occur of any of the following events:

     (a)    the expiration of the Term as provided in Section 1.4;

     (b)    the last Business Day of the first Fiscal Year following the end of the Investment Period in which all assets acquired or agreed to be acquired by the Fund have been sold or otherwise disposed of;

     (c)    in accordance with Section 2.7;

     (d)    the determination in good faith by the General Partner to wind-up the Fund because it has determined that there is a substantial likelihood that due to a change in the text, application or interpretation of the provisions of the U.S. federal securities laws (including the Securities Act, the Investment Company Act and the Advisers Act), or any other applicable statute, regulation, case law, administrative ruling or other similar authority (including changes that result in the Fund being taxable as a corporation or association under U.S. federal income tax law), the Fund cannot operate effectively in the manner contemplated herein (including with respect to the General Partner's ability to receive the amounts distributable to it with respect to the Limited Partner pursuant to Sections 6.3 and 11.2), after the General Partner has used its commercially reasonable efforts to remedy the circumstances resulting in the General Partner's determination pursuant to this Section 11.1(d);

     (e)    an order or direction of a court of competent jurisdiction; or

(f)     in the General Partner's sole discretion if the Limited Partner at any time becomes a Defaulting Partner.

11.2  <u>Winding Up Procedure</u> .

(a)     <u>Liquidation of Assets</u>.  Upon the commencement of the winding-up of the Fund, the General Partner (or, if the commencement of the winding-up of the Fund should occur by reason of Section 11.1(c) or the General Partner is unable to act as liquidator, a liquidating trustee of the Fund or other representative designated by the Limited Partner, *provided* that if a liquidator, liquidating trustee or other representative is so appointed, no further Management Fees shall thereafter be payable to the Manager) shall use its commercially reasonable efforts to liquidate all of the assets of the Fund in an orderly manner, *provided* that if in the judgment of the General Partner (or such liquidating trustee or other representative) an asset of the Fund should not be liquidated, then such asset shall be distributed in accordance with Section 11.2(b) (other than any assets in the Segregated Reserve Account, which shall be distributed as provided in Section 11.3), and *provided, further*, that the General Partner (or such liquidating trustee or other representative) shall attempt to liquidate sufficient assets of the Fund to satisfy in cash (or make reasonable provision in cash for) the debts and liabilities referred to in clauses (i) and (ii) of Section 11.2(b).

(b)     <u>Application and Distribution of Proceeds of Liquidation and Remaining Assets</u>.  The General Partner (or the liquidating trustee or other representative referred to in Section 11.2(a)) shall apply the proceeds of the liquidation referred to in Section 11.2(a) and any remaining Fund assets (other than any assets, whether or not liquidated, in the Segregated Reserve Account, which shall be distributed as provided in Section 11.3), and shall distribute any such proceeds and assets, as follows and in the following order of priority:

(i)     <u>First</u>, to (*A*) creditors in satisfaction of the debts and liabilities of the Fund, to the extent permitted by law, whether by payment thereof or the making of reasonable provision for payment thereof (other than any loans or advances that may have been made by any of the Partners to the Fund), and (*B*) the expenses of liquidation, whether by payment thereof or the making of reasonable provision for payment thereof, and (*C*) the establishment of any reasonable reserves (which may be funded by a liquidating trust) to be established by the General Partner (or liquidating trustee or other representative) in amounts determined by it to be necessary for the payment of the Fund's expenses, liabilities and other obligations (whether fixed or contingent);

(ii)     <u>Second</u>, to the Partners, if any, that made loans or advances to the Fund in satisfaction of such loans and advances, whether by payment thereof or the making of reasonable provision for payment thereof; and

(iii)     <u>Third</u>, to the Partners in accordance with Article VI.

*Confidential*

66

AP0804

If the General Partner (or liquidating trustee or other representative) has received a prior written notice that a distribution of Securities to be made pursuant to clause (iii) of the preceding sentence of this Section 11.2(b) would cause a Material Adverse Effect on the Limited Partner, the General Partner (or liquidating trustee or other representative) shall distribute such Securities to a third Person designated in such notice by the Limited Partner.

(c)     <u>Time for Liquidation, etc</u>.  A reasonable time period shall be allowed for the orderly winding up and liquidation of the assets of the Fund and the discharge of liabilities to creditors so as to enable the General Partner (or liquidating trustee or other representative) to seek to minimize potential losses upon such liquidation.  The provisions of this Agreement shall remain in full force and effect during the period of winding up and, subject to Section 13.11, shall terminate upon the filing of a Notice of Dissolution of the Fund with the Registrar of Exempted Limited Partnerships as provided in Section 11.4.

11.3  <u>Clawback</u>.  Subject to Sections 2.5 and 9.2, if, after giving effect to all distributions made pursuant to Sections 6.3 and 11.2, but before giving effect to this Section 11.3, with respect to any Limited Partner other than a Defaulting Limited Partner, either

(a)     the General Partner has received distributions pursuant to Sections 6.3 and 11.2 attributable to such Limited Partner that exceed 20% (or in the event of any increases or reductions to such percentage, calculated with the the applicable increased or reduced percentages) of the excess of (*i*) the cumulative amount distributed to the Limited Partner and to the General Partner attributable to the Limited Partner pursuant to this Section 6.3 over (*ii*) the Capital Contributions of the Limited Partner described in Section 6.3(a), or

(b)     the distributions received by such Limited Partner pursuant to Sections 6.3 and 11.2 are not sufficient to provide such Limited Partner with an 8% annualized effective internal rate of return on the Capital Contributions of such Limited Partner used to fund (*i*) the cost of Portfolio Investments (computed from the due dates specified in the applicable Drawdown Notices until the dates distributions are made pursuant to Sections 6.3 and 11.2) and (*ii*) Organizational Expenses and Fund Expenses (computed from the due dates specified in the applicable Drawdown Notices until the dates distributions are made pursuant to Sections 6.3 and 11.2),

then, subject to the next sentence, the General Partner shall contribute to the Fund the lesser of

(A)     the greater of the amount of the excess of such distributions over such 20% (or other applicable increased or reduced percentages) described in clause (a) and the amount of the shortfall described in clause (b), and

(B)     the amount of distributions received by the General Partner pursuant to Sections 6.3 and 11.2 attributable to the Limited Partner, less the sum of (*1*) the

*Confidential*

AP0805

maximum amount of Tax Distributions that were made or that could have been made to the General Partner (assuming that the Fund had sufficient Distributable Cash therefor and had made no other distributions), (*2*) the additional tax liability that would have been incurred by the General Partner (or any Person whose tax liability is determined by reference to the income of the General Partner), based on the assumptions used in computing Tax Distributions, if each Security distributed in kind to the General Partner had been sold by the General Partner immediately after distribution for its value (as determined for purposes of Section 6.7), and (*3*) the amount of any payment made by, or distributions deemed to have been distributed to, the General Partner pursuant to Section 6.12, in the case of each of subclauses (1), (2) and (3), relating to the General Partner's right to receive distributions pursuant to Sections 6.3 and 11.2 attributable to the Limited Partner,

and the Fund shall, subject to Section 6.12 and applicable law, distribute such amount to the Limited Partner. The General Partner's obligation under this Section 11.3 with respect to the Limited Partner shall, subject to applicable law, first be satisfied by distributing to the Limited Partner the proceeds of liquidation of the assets in the Segregated Reserve Account up to the amount of such obligation; to the extent such proceeds exceed such obligation, such excess shall, subject to applicable law, be distributed to the General Partner, and to the extent such obligation is not satisfied by such proceeds, the General Partner shall contribute to the Fund an amount sufficient to satisfy the balance of such obligation. Contributions pursuant to this Section 11.3 shall be made by or on behalf of the General Partner either in cash or, at the election of the General Partner, by the return of Securities previously distributed to the General Partner by the Fund valued at their Value at the time returned to the Fund, *provided* that such Securities shall be Marketable Securities in the hands of the Limited Partner (assuming the Limited Partner has no other interest in the Portfolio Company to which such Marketable Securities relate). The members of the General Partner shall execute a separate several (but not joint) guarantee in favor of the Fund in respect of the obligations of the General Partner under this Section 11.3 (the "Clawback Guarantee"), the form of which is attached hereto as **Exhibit B**. The General Partner hereby covenants and agrees to maintain in the operative agreements among its members an obligation on the part of each of its members, severally, but not jointly, to contribute to the General Partner an amount equal to such member's *pro rata* share of the General Partner's obligations under this Section 11.3, and of the General Partner to contribute such amount to the Fund.

11.4 <u>Dissolution</u>. Following the completion of the foregoing provisions of this Article XI, the General Partner (or the liquidating trustee or other representative referred to in Section 11.2(a)) shall execute, acknowledge and cause to be filed a Notice of Dissolution of the Fund with the Registrar of Exempted Limited Partnerships of the Cayman Islands, *provided* that the winding up of the Fund will not be deemed complete and such Notice of Dissolution will not be filed by the General Partner (or such

liquidating trustee or other representative) prior to the third anniversary of the last day of the Term unless otherwise required by law.

# ARTICLE XII

# AMENDMENTS; POWER OF ATTORNEY

12.1 <u>Amendments</u>.

(a) <u>General</u>. Any modifications of or amendments to this Agreement duly adopted in accordance with the terms of this Agreement may be executed in accordance with Section 12.2. The terms and provisions of this Agreement (including any provision calling for the consent, approval, review or waiver of the members of the Advisory Committee) may be modified or amended at any time and from time to time with the written consent of the General Partner and the Limited Partner. For the avoidance of doubt, for purposes of applying Section 12.1, a modification or amendment of a capitalized term defined in this Agreement does not constitute a modification or amendment of the provisions in which such defined term is used and shall not otherwise be considered to alter the terms or application of such provision.

(b) <u>Certain Amendments Not Requiring Limited Partner Consent</u>. Notwithstanding anything to the contrary in this Agreement, the General Partner may, without the consent of the Limited Partner:

(i) enter into agreements with Persons that are Transferees pursuant to the terms of this Agreement, providing in substance that such Transferees will be bound by this Agreement and will become Substitute Partners;

(ii) amend this Agreement as may be required to implement a Transfer of the Limited Partner's interest or the admission of any Substitute Partner in accordance with the terms of this Agreement;

(iii) amend this Agreement ($A$) to satisfy any requirements, conditions, guidelines or opinions contained in any opinion, directive, order, ruling or regulation of the SEC, the Internal Revenue Service or any other U.S. federal or state or non-U.S. governmental agency, or in any U.S. federal or state or non-U.S. statute, compliance with which the General Partner deems to be in the best interest of the Fund, or ($B$) to change the name of the Fund;

(iv) amend this Agreement as may be necessary or advisable to comply with the Advisers Act, with the SEC and the FCC Rules, and any anti-money laundering or anti-terrorist laws, rules, regulations, directives or special measures;

AP0807

(v)    amend this Agreement to cure any ambiguity or correct or supplement any provision hereof that may be incomplete or inconsistent with any other provision hereof, so long as such amendment under this clause (v) does not adversely affect the interest of the Limited Partner; and

(vi)    amend this Agreement in accordance with Sections 2.5, 4.3 and 4.5.

(c)    Notices of Amendments.  Within a reasonable period of time after the adoption of any amendment in accordance with this Section 12.1, the General Partner shall send to the Limited Partner a copy of such amendment or a written notice describing such amendment.

(d)    Execution of Amendments.  Upon obtaining such approvals required by this Agreement and without further action or execution by any other Person, including the Limited Partner, (i) any amendment to this Agreement may be implemented and reflected in a writing executed solely by the General Partner and (ii) the Limited Partner shall be deemed a party to and bound by such amendment of this Agreement.

12.2  Power of Attorney.  To the fullest extent permitted by applicable law, the Limited Partner does hereby irrevocably constitute and appoint the General Partner and its officers, or the successor thereof as general partner of the Fund and its officers, with full power of substitution, the true and lawful attorney-in-fact and agent of such Partner, to execute, acknowledge, verify, swear to, deliver, record and file, in its or its assignee's name, place and stead, all instruments, documents and certificates that may from time to time be required by the laws of the Cayman Islands, the United States, the State of Delaware, the State of New York, any other jurisdiction in which the Fund conducts or plans to conduct business, or any political subdivision or agency thereof, to effectuate, implement and continue the valid existence and investment and other activities of the Fund, including the power and authority to execute, verify, swear to, acknowledge, deliver, record and file:

(a)    all certificates and other instruments, including any amendments to this Agreement or to the Certificate, that the General Partner determines to be appropriate to (i) form, qualify or continue the Fund as an exempted limited partnership (or a partnership in which the limited partners have limited liability) in the Cayman Islands and all other jurisdictions in which the Fund conducts or plans to conduct business and (ii) admit such Partner as the Limited Partner in the Fund;

(b)    all instruments that the General Partner determines to be appropriate to reflect any amendment to this Agreement or the Certificate (i) to satisfy any requirements, conditions, guidelines or opinions contained in any opinion, directive, order, ruling or regulation of the SEC, the Internal Revenue Service, or any other U.S. federal or state or non-U.S. governmental agency, or in any U.S. federal or state or non-U.S. statute, compliance with which the General Partner deems to be in the best interest of the Fund,

*Confidential*

AP0808

(*ii*) to change the name of the Fund or (*iii*) to cure any ambiguity or correct or supplement any provision hereof that may be incomplete or inconsistent with any other provision herein contained so long as such amendment under this clause (iii) does not adversely affect the interest of the Limited Partner;

    (c)    all instruments that the General Partner determines to be appropriate in connection with the formation or operation of any Alternative Investment Fund and the Transfer of the Limited Partner's interest in the Fund to any such Alternative Investment Fund, including the admission of the Limited Partner to any such Alternative Investment Fund;

    (d)    all conveyances and other instruments that the General Partner determines to be appropriate to reflect and effect the dissolution, winding up and termination of the Fund in accordance with the terms of this Agreement, including the filing of a Notice of Dissolution as provided for in Article XI;

    (e)    all instruments relating to (*i*) Transfers of interests in the Fund or the admission of Substitute Partners, (*ii*) the treatment of a Defaulting Partner or (*iii*) any change in the Capital Commitment of the Limited Partner, all in accordance with the terms of this Agreement;

    (f)    all amendments to this Agreement duly approved and adopted in accordance with this Agreement;

    (g)    certificates of assumed name and such other certificates and instruments as may be necessary under the fictitious or assumed name statutes from time to time in effect in the Cayman Islands and in all jurisdictions in which the Fund conducts or plans to conduct investment or other activities;

    (h)    all instruments that the General Partner determines to be appropriate in connection with forming and operating an investment vehicle and the Transfer of the Limited Partner's interest in the Fund to such investment vehicle, including the admission of the Limited Partner to such investment vehicle, all as contemplated by Section 10.1(h) hereof and by section 5.10 of the Subscription Agreement; and

    (i)    with the consent of the Limited Partner, any other instruments determined by the General Partner to be necessary or appropriate in connection with the proper conduct of the investment or other activities of the Fund and that do not adversely affect the interest of the Limited Partner.

Such attorney-in-fact and agent shall not, however, have the right, power or authority to amend or modify this Agreement, when acting in such capacities, except to the extent authorized herein. The Limited Partner hereby agrees not to revoke this power of attorney. To the fullest extent permitted by law, this power of attorney shall survive and not be

*Confidential*

71

AP0809

affected by the dissolution, bankruptcy, disability or incapacity of the Limited Partner and shall extend to the Limited Partner's successors and assigns. To the fullest extent permitted by applicable law, this power of attorney may be exercised by such attorney-in-fact and agent for the Limited Partner by a single signature of the General Partner acting as attorney-in-fact with or without listing the Limited Partner executing an instrument. Any Person dealing with the Fund may conclusively presume and rely upon the fact that any instrument referred to above, executed by such attorney-in-fact and agent, is authorized and binding, without further inquiry. If required, the Limited Partner shall execute and deliver to the General Partner, within five Business Days after receipt of a request therefor, such further designations, powers of attorney or other instruments as the General Partner shall determine to be necessary for the purposes hereof consistent with the provisions of this Agreement, including as required by any applicable state statute or other similar legal requirement. This power of attorney granted hereby is intended to secure a proprietary interest of the General Partner and the performance of the obligations of each relevant Limited Partner under this Agreement.

## ARTICLE XIII

### MISCELLANEOUS

13.1 <u>Notices</u>. Each notice relating to this Agreement shall be in writing and shall be delivered (*a*) in person, by registered or certified mail or by private courier, overnight or next-day express mail, or (*b*) by fax, email or other electronic means (including posting notices on an online investor reporting website, with notification by email), with such confirmation as the General Partner deems appropriate under the circumstances. All notices to the Limited Partner shall be delivered to it at the address, email address or fax number set forth on the Limited Partner's Subscription Agreement (including the Exhibits thereto), or to such other address, email address or fax number as the Limited Partner shall have furnished to the Fund in writing. All notices to the General Partner shall be delivered to the General Partner at Reynolds & Reynolds, 6700 Hollister, Houston, TX 77040, attn. Robert Burnett, with a copy to Robert Brockman, 333 West Friar Tuck Lane, Houston, TX 77024, Attention: Chief Compliance Officer, or such other address or addresses, email address or addresses, or fax number or numbers, as the Fund or the General Partner shall have furnished to the Limited Partner in writing. The Limited Partner may designate a new address for notices by giving written notice to that effect to the General Partner. Unless otherwise specifically provided in this Agreement, a notice given in accordance with the foregoing clause (a) shall be deemed to have been effectively given give Business Days after such notice is mailed by registered or certified mail, return receipt requested, and one Business Day after such notice is sent by FedEx or other one-day service provider, to the proper address, or at the time delivered when delivered in person or by private courier. A notice given in accordance with the foregoing clause (b) to the General Partner or to the Limited Partner by fax, email or other electronic

*Confidential*

AP0810

means shall be deemed to have been effectively given when sent without error notice on the first Business Day after being sent.

13.2 <u>Counterparts; Signatures</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which taken together shall constitute a single agreement.  Any signature on the signature page of this Agreement may be an original or a fax or electronically transmitted signature.

13.3 <u>Table of Contents and Headings; Terms Generally</u>.  The table of contents and the headings of the articles, sections and subsections of this Agreement are inserted for convenience of reference only and shall not be deemed to constitute a part hereof or affect the interpretation hereof.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  When the words "include," "includes" and "including" are followed by a list of one or more items, such list shall be deemed to be illustrative only and shall not be deemed to be an exclusive listing.  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (*a*) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (*b*) all references herein to Articles and Sections shall be construed to refer to Articles and Sections of this Agreement unless otherwise stated herein, (*c*) the words "discretion" and "sole discretion" shall be construed to have the same meaning and effect and (*d*) the word "or" shall be construed to be used in the inclusive sense of "and/or."

13.4 <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of the Partners, the Initial Limited Partner and the Covered Persons, and shall be binding upon the parties, and, subject to Section 10.1, their respective successors, permitted assigns and, in the case of individual Covered Persons, heirs and legal representatives.

13.5 <u>Severability</u>.  Every term and provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity shall not affect the validity of the remainder of this Agreement.

13.6 <u>Further Actions</u>.  The Limited Partner shall execute and deliver such other certificates, agreements and documents, and take such other actions, as may reasonably be requested by the General Partner in connection with the formation of the Fund and the achievement of its purposes or to give effect to the provisions of this Agreement, in each case as are not inconsistent with the terms and provisions of this Agreement, including any documents that the General Partner determines to be necessary or appropriate to form, qualify or continue the Fund as a limited partnership in all jurisdictions in which the Fund conducts or plans to conduct its investment and other activities and all such

*Confidential*

AP0811

agreements, certificates, tax statements and other documents as may be required to be filed by or on behalf of the Fund.

13.7 <u>Determinations of the Partners</u>. To the fullest extent permitted by law and notwithstanding any other provision of this Agreement or in any other agreement contemplated herein or applicable provisions of law or equity or otherwise, whenever in this Agreement a Partner is permitted or required to make a decision, consent, vote, make a judgment or take an action (*a*) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, such Partner shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Fund or any other Person, or (*b*) in its "good faith" or under another express standard, such Partner shall act under such express standard and shall not be subject to any other or different standard. If any questions should arise with respect to the operation of the Fund that are not specifically provided for in this Agreement or the Partnership Law, or with respect to the interpretation of this Agreement, the General Partner is hereby authorized to make a final determination with respect to any such question and to interpret this Agreement in good faith, and its determination and interpretation so made shall be final and binding on all parties, absent manifest error. Notwithstanding any other provision of this Agreement, including the preceding provisions of this Section 13.7, the Partners shall comply with the implied contractual covenant of good faith and fair dealing. To the fullest extent permitted by applicable law, the parties hereto acknowledge that the terms of this Agreement are the result of negotiations, and therefore agree that this Agreement shall be construed without regard to, or aid of, any canon or rule requiring construction against the party causing this Agreement to be drafted.

13.8 <u>Non-Waiver</u>. No provision of this Agreement shall be deemed to have been waived unless such waiver is given in writing, and no such waiver shall be deemed to be a waiver of any other or further obligation or liability of the party or parties in whose favor such waiver was given.

13.9 <u>Applicable Law</u>. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE CAYMAN ISLANDS. The Partners hereby submit to the nonexclusive jurisdiction of the courts of the Cayman Islands and to the courts of the jurisdiction in which the principal office of the General Partner is located (and, if the principal office is located in the United States, of the federal district court having jurisdiction over the location of the principal office) for the resolution of all matters pertaining to the enforcement and interpretation of this Agreement.

13.10     Confidentiality.

(a)     General.  The Limited Partner shall keep confidential and shall not disclose (and shall cause its representatives (including its representatives on the Advisory Committee), to keep confidential and not disclose), without the prior written consent of the General Partner any information with respect to the Fund, any Related Investment Fund, any Portfolio Company or any Affiliate of any of the foregoing, *provided* that the Limited Partner may disclose any such information:

(i)     as has become generally available to the public other than as a result of the breach of this Section 13.10 by the Limited Partner or any agent or Affiliate of the Limited Partner;

(ii)     as may be required to be included in any report, statement or testimony required to be submitted to any municipal, state or national regulatory body having jurisdiction over the Limited Partner, *provided* that the Limited Partner shall, to the extent permitted by applicable law, give prior notice thereof to the General Partner to enable the Fund, the General Partner or the Manager to seek a protective order or similar relief;

(iii)     as may be required in response to any summons or subpoena or in connection with any litigation, *provided* that the Limited Partner shall, to the extent permitted by applicable law, give prior notice thereof to the General Partner to enable the Fund, the General Partner or the Manager to seek a protective order or similar relief;

(iv)     to the extent necessary in order to comply with any law, order, regulation or ruling applicable to the Limited Partner, *provided* that the Limited Partner shall, to the extent permitted by applicable law, give prior notice thereof to the General Partner to enable the Fund, the General Partner or the Manager to seek a protective order or similar relief;

(v)     to its employees, directors and professional advisors (including the Limited Partner's auditors and counsel), *provided* that such Persons are advised of the confidentiality obligations contained herein;

(vi)     as may be required in connection with an audit by any taxing authority;

(vii)     that constitutes the "tax treatment" or "tax structure" of the Fund.  As used in this paragraph, the term "tax treatment" refers to the purported or claimed U.S. federal income tax treatment and the term "tax structure" refers to any fact that may be relevant to understanding the purported or claimed U.S. federal income tax treatment, *provided* that, for the avoidance of doubt, except to the extent otherwise established in published guidance by the U.S. Internal Revenue Service, "tax treatment" or "tax structure" shall not include the following (and thus disclosure of the following shall not be permitted

*Confidential*

AP0813

under this Section 13.10(a)(vii)): (*A*) the name of, or contact information for, or any other similar identifying information regarding the Fund, any Related Investment Fund or any of their investments (including the names of any employees or affiliates thereof), (*B*) any performance information relating to the Fund or any Related Investment Fund and (*C*) any other information not related to the tax structure or tax treatment of the Fund. Nothing in this Section 13.10(a)(vii) shall limit the ability of the Limited Partner to make any disclosure to the Limited Partner's tax advisors or to the U.S. Internal Revenue Service or any other taxing authority.

(b) <u>General Partner Disclosure or Non-Disclosure</u>. Notwithstanding any other provision of this Agreement, to the fullest extent permitted by applicable law, the General Partner shall have the right to keep confidential from the Limited Partner for such period of time as the General Partner determines is reasonable (*i*) any information that the General Partner reasonably believes to be in the nature of trade secrets and (*ii*) any other information (*A*) the disclosure of which the General Partner believes is not in the best interest of the Fund or could damage the Fund or any Related Investment Fund or any of their investments or (*B*) that the Fund, any Related Investment Fund, the General Partner, the Manager or any of their Affiliates, or the officers, employees or directors of any of the foregoing, is required by law or by agreement with a third Person to keep confidential. For the avoidance of doubt, the General Partner may disclose any information concerning the Fund or the Limited Partner necessary to comply with applicable laws and regulations, including any anti-money laundering or anti-terrorist laws or regulations, and the Limited Partner shall provide the General Partner, promptly upon request, all information that the General Partner reasonably deems necessary to comply with such laws and regulations.

13.11 <u>Survival of Certain Provisions</u>. Sections 6.11, 6.12 and 13.10 and Article IX shall survive the termination or expiration of this Agreement and the dissolution, winding up and termination of the Fund and the withdrawal of any Partner.

13.12 <u>Entire Agreement</u>. This Agreement and the Subscription Agreements constitute the entire agreement among the Partners and between the Partners and the Initial Limited Partner with respect to the subject matter hereof and supersede any prior agreement or understanding among them with respect to such subject matter. The representations and warranties of the Fund, the General Partner and the Limited Partner in and the other provisions of the Subscription Agreement shall survive the execution and delivery of this Agreement.

13.13 <u>No Third Party Beneficiaries</u>. Except with respect to the Covered Persons a person which is not a party to this Agreement shall not have any rights under the Contracts (rights of Third Parties) Law, 2014 (as amended) to enforce any term of this Agreement. Notwithstanding any other provision of this Agreement, including the foregoing, the consent of or notice to any person who is not a party to this Agreement shall not be required for any termination, rescission or agreement to any variation, waiver, assignment, novation, release or settlement under this Agreement at any time.

*Confidential*

AP0814

No Partner nor any Covered Person shall have any duty or obligation to any creditor of the Fund to make any contributions to the Fund pursuant to Section 5.2 or any other provision of this Agreement or to cause the General Partner to deliver to any Partner a Drawdown Notice.

13.14    <u>Compliance with Anti-Money Laundering Requirements</u>. Notwithstanding any other provision of this Agreement to the contrary, the General Partner, in its own name and on behalf of the Fund, shall be authorized without the consent of any Person, including any other Partner, to take such action as it determines in its sole discretion to be necessary or advisable to comply with any anti-money laundering or anti-terrorist laws, rules, regulations, directives or special measures, including the actions contemplated by the Subscription Agreement.

13.15    <u>No Political Contributions by Fund</u>.  No money or property of the Fund shall be paid, used or offered (*a*) to aid any political party, committee or organization, or any other entity organized for political purposes, or (*b*) to aid any candidate for political office, or in connection with any election (including any referendum or proposed constitutional amendment) or for any political purpose whatever, or (*c*) for lobbying in connection with legislation or regulations.

13.16    <u>Currency</u>.  The term "dollar" and the symbol "$," wherever used in this Agreement, shall mean the United States dollar.

*Confidential*

AP0815

**Exhibit B**

**Master Transaction Agreement**

Execution Version

## MASTER TRANSACTION AGREEMENT

This Master Transaction Agreement (this "Agreement"), dated as of July 1, 2019 (the "Effective Date"), is by and among Falcata Tech Investments Fund I, L.P., a Cayman Islands exempted limited partnership (the "Fund"), FTI GP I, LLC, a Delaware limited liability company (the "General Partner"), Point Investments Ltd., a Bermuda corporation (the "Limited Partner"), Falcata Capital LLC, a Delaware limited liability company (the "Manager"), Robert T. Brockman ("Brockman Sr."), Robert T. Brockman II ("Brockman Jr."; and together with Brockman Sr., the "Brockmans"), Robert D. Burnett ("Burnett"), Norman T. Barras ("Barras"), William A. Hiers III ("Hiers"), and Matthew T. Zachary ("Zachary") (collectively, the "Parties" and each, a "Party"). Capitalized terms used herein without definition have the meaning set forth in the Fund's Amended and Restated Exempted Limited Partnership Agreement dated as of April 20, 2018 (as amended, the "Fund LPA").

## RECITALS

A. The Limited Partner is the sole limited partner of the Fund; and the General Partner is the sole general partner of the Fund. As of the date hereof, (i) the Limited Partner has made aggregate Capital Contributions to the Fund of $83,612,562 (of which $74,626,866 constituted Capital Contributions of the Limited Partner used to fund the cost of Portfolio Investments) and (ii) the General Partner has made aggregate capital contributions to the Fund of $395,772.

B. Burnett and the Brockmans are the sole owners of the Manager.

C. Burnett, Brockman Sr. and Barras are the sole Class A Members of the General Partner; Hiers and Zachary are the sole Class B Members of the General Partner; and there are no other equity holders of the General Partner.

D. Brockman Sr. has not made any capital contribution to the General Partner.

E. Burnett, Brockman Sr. and Brockman Jr. have made capital contributions to the Manager equal to $10,000, $10,000 and $980,000, respectively.

F. The Parties wish to amend the Fund LPA, the organizational documents of the Manager and the General Partner, the Management Agreement, dated as of April 20, 2018, among the Fund, the General Partner and the Manager (the "Management Agreement"), and the Subscription Agreement between the Limited Partner and the Fund, dated April 20, 2018 (the "Subscription Agreement"); and together with the Fund LPA, the organizational documents of the Manager and the General Partner, and the Management Agreement, collectively, the "Underlying Documents").

G. The Fund and the Limited Partner desire for the Fund to sell all of its assets and for the Fund to liquidate as soon as is commercially practicable (as reasonably determined by the General Partner and the Manager taking into account relevant market, financial, business and other factors but in all cases subject to the terms of this Agreement), understanding that none of the Fund, the General Partner nor the Limited Partner wishes for the Fund to sell Portfolio Investments at stressed or discounted sale prices (the date when all of the Portfolio Investments of the Fund have been sold for cash and/or Marketable Securities, the "Complete Exit Date") (for the avoidance of doubt, the Fund may own only "Temporary Investments" after the Complete Exit Date).

-1-

H. The Parties wish to terminate the Fund's Investment Period and to take certain other actions described herein and, to the extent any one or more of the actions described herein are inconsistent with any Underlying Document(s) and/or other agreements among any one or more of the Parties, to amend such Underlying Documents and/or such other agreements to permit and take such actions.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, the Parties hereby agree that the Underlying Documents are (notwithstanding any other provision of the Underlying Documents and/or other agreements among any one or more of the Parties to the contrary) hereby amended as follows:

1. **Fund LPA and Management Agreement**.

1.1.    <u>Investment Period</u>. The Investment Period is hereby terminated. Notwithstanding anything in the Fund LPA or any other Underlying Document to the contrary, without the consent of the Limited Partner (which consent may be withheld in its sole and absolute discretion), the Fund shall not be permitted to make any further investments (whether funded through Capital Contributions or reinvestment of Distributable Cash) other than (a) Temporary Investments and (b) one or more Follow-On Investments with respect to XpressDocs Holdings, Inc. not to exceed US$11,000,000 (Eleven Million US Dollars) in the aggregate (the "<u>Follow-on Cap</u>").

1.2.    <u>Management Fees</u>.

1.2.1.    Notwithstanding anything else to the contrary in any Underlying Document, from and after the Effective Date, the Management Fee shall be equal to the amounts specified in <u>Schedule 1</u> attached hereto. The Management Fee shall be payable quarterly in advance (pro-rated and refundable for any partial quarters). Notwithstanding the foregoing, for the period beginning on July 1, 2019 and ending on June 30, 2020, the Management Fee shall be payable according to the following schedule: (a) for the quarter beginning on July 1, 2019 and ending on September 30, 2019, the Management Fee shall be equal to $2,575,000 (the "<u>Initial Management Fee</u>") and (b) the Management Fee payable for the three subsequent quarters shall be equal to $625,000 per quarter. The General Partner, the Fund, the Manager and the Limited Partner hereby acknowledge and agree that the Fund currently has cash on hand sufficient to pay one hundred percent (100%) of the Initial Management Fee and that the Fund shall not require an additional Capital Contribution from the Limited Partner after the date hereof to pay such amount.

1.2.2.    In the event that the Fund Transfers any Portfolio Investments, then the Management Fee shall be reduced (but not increased) to an amount equal to the then applicable Management Fee set forth in <u>Schedule 1</u> multiplied by the New Management Fee Percentage, subject to a minimum annual Management Fee of $500,000 for any period prior to June 30, 2026. The "<u>New Management Fee Percentage</u>" is a fraction (expressed as a percentage) measured immediately after the Transfer of any Portfolio Investment where (x) the numerator equals the cost of the remaining Portfolio Investments of the Fund measured immediately after the applicable Transfer and (y) the denominator equals the total aggregate cost of all Portfolio Investments of the Fund (whether or not any such Portfolio Investments were subsequently Transferred by the Fund).

-2-

AP0818

1.3.  Fund Expenses. From and after the Effective Date, the Manager and the General Partner shall be solely responsible for and shall bear all Fund Expenses; provided, however, that the Fund shall still be responsible for and shall bear (a) the Management Fee as set forth in Section 1.2 of this Agreement and (b) any Damages to the extent provided in Section 9.1(a) of the Fund LPA, and taxes and other governmental charges levied on the Fund (the amounts in clauses (a) and (b) are referred to herein as "Continuing Fund Expenses").

1.4.  Capital Calls. Unless the Limited Partner otherwise consents (which consent may be withheld in the Limited Partner's sole and absolute discretion), neither the General Partner nor the Fund shall be permitted to issue Drawdown Notices nor shall the Limited Partner be required to fund any Drawdown except for Capital Contributions made for Continuing Fund Expenses and Follow-On Investments (subject to the Follow-on Cap). For the avoidance of doubt, (a) the foregoing shall not alter the obligations of the Partners to return distributions pursuant to Section 9.2 of the Fund LPA and (b) Drawdown Notices and Drawdowns shall be made pro rata amongst the General Partner and the Limited Partner based on their respective initial Capital Commitments specified in Section 5.1 of the Fund LPA.

1.5.  Term. Unless the Limited Partner otherwise consents (which consent may be withheld in the Limited Partner's sole and absolute discretion), the Fund, the General Partner and the Manager shall use their reasonable best efforts to effect the sale of all or substantially all of the assets of the Fund as soon as commercially practicable but in any event no later than the date falling seven (7) years after the Effective Date (the "Wind-Up Deadline"), with the goal of obtaining the best and highest price therefor from a buyer(s) that the General Partner reasonably determines has the financial wherewithal to consummate such transaction(s). Following the sale of all or substantially all of the assets the Fund, the General Partner shall wind-up, liquidate and dissolve the Fund as contemplated by Section 11.2 of the Fund LPA.

1.6.  Removal. If the Complete Exit Date has not occurred on or prior to the Wind-Up Deadline, then the Limited Partner may, in its sole and absolute discretion, (a) remove the General Partner as the Fund's general partner and appoint a replacement general partner of the Fund and (b) remove the Manager and appoint a replacement manager of the Fund. In the event that the General Partner is removed as the Fund's general partner pursuant to this Section 1.6, then the provisions of Section 2.5 of the Fund LPA shall apply to such removal; provided, however, that the 50% reduction set forth in Section 2.5(c) of the LPA shall not apply and the General Partner shall be entitled to receive all distributions that otherwise would have been distributable to it pursuant to the Fund LPA (as modified by Section 1.7 of this Agreement) as if it had not been removed.

1.7.  Revised Carried Interest Calculation.

1.7.1.  If the Complete Exit Date occurs:

(a) on or before the fourth anniversary of the Effective Date, and substantially all cash and other assets held by the Fund are distributed to the Partners within ninety (90) calendar days of the Complete Exit Date (or, if certain of the proceeds from the sale of Portfolio Investments are subject to escrow, at least eighty-five (85%) of the gross sales price (inclusive of such escrowed funds) from such sale are distributed to the Partners in cash and/or Marketable Securities within ninety (90) days of the Complete Exit Date and the remaining proceeds are distributed to the Partners in

-3-

AP0819

cash and/or Marketable Securities promptly following release from escrow), then clauses (b), (c) and (d) of Section 6.3 of Fund LPA shall be disregarded and, after the Limited Partner receives cumulative distributions in an amount equal to all Capital Contributions made by the Limited Partner, then the Limited Partner shall receive 70% of all distributions in excess of such amount and the General Partner shall receive 30% of all distributions in excess of such amount (i.e., the General Partner shall receive its Carried Interest allocation (at a rate of 30%) without requiring the Limited Partner to receive the 8% preferred return as contemplated by Section 6.3(b) of the existing Fund LPA);

(b) after the fourth anniversary of the Effective Date but on or before the fifth anniversary of the Effective Date, and substantially all cash and other assets held by the Fund are distributed to the Partners within ninety (90) calendar days of the Complete Exit Date (or, if certain of the proceeds from the sale of Portfolio Investments are subject to escrow, at least eighty-five (85%) of the gross sales price (inclusive of such escrowed funds) from such sale are distributed to the Partners in cash and/or Marketable Securities within ninety (90) days of the Complete Exit Date and the remaining proceeds are distributed to the Partners in cash and/or Marketable Securities promptly following release from escrow), then (i) the reference to "8%" in Section 6.3(b) of the Fund LPA shall be replaced with "2%" and (ii) the references in clauses (c) and (d) of Section 6.3 to "20%" and "80%" shall be replaced with references "30%" and "70%", respectively;

(c) after the fifth anniversary of the Effective Date but on or before the sixth anniversary of the Effective Date, and substantially all cash and other assets held by the Fund are distributed to the Partners within ninety (90) calendar days of the Complete Exit Date (or, if certain of the proceeds from the sale of Portfolio Investments are subject to escrow, at least eighty-five (85%) of the gross sales price (inclusive of such escrowed funds) from such sale are distributed to the Partners in cash and/or Marketable Securities within ninety (90) days of the Complete Exit Date and the remaining proceeds are distributed to the Partners in cash and/or Marketable Securities promptly following release from escrow), then (i) the reference to "8%" in Section 6.3(b) of the Fund LPA shall be replaced with "5%" and (ii) the references in clauses (c) and (d) of Section 6.3 to "20%" and "80%" shall be replaced with references "30%" and "70%", respectively;

(d) after the sixth anniversary of the Effective Date but on or before the Wind-Up Deadline, and substantially all cash and other assets held by the Fund are distributed to the Partners within ninety (90) calendar days of the Complete Exit Date (or, if certain of the proceeds from the sale of Portfolio Investments are subject to escrow, at least eighty-five (85%) of the gross sales price (inclusive of such escrowed funds) from such sale are distributed to the Partners in cash and/or Marketable Securities within ninety (90) days of the Complete Exit Date and the remaining proceeds are distributed to the Partners in cash and/or Marketable Securities promptly following release from escrow), then the references in clauses (c) and (d) of Section 6.3 to "20%" and "80%" shall be replaced with references "30%" and "70%", respectively; or

-4-

AP0820

(e) after the Wind-Up Deadline, then the Carried Interest distributions shall not be subject to modification by this Agreement and Section 6.3 of the Fund LPA shall be in full force and effect as provided in the Fund LPA as it existed immediately prior to the adoption of the Standstill (defined below).

1.7.2.  If some but not all of the Portfolio Investments are sold prior to the sixth anniversary of the Effective Date, then that portion (if any) of such proceeds that may be subject to the revised Carried Interest allocations shall instead be held in escrow by the Fund (to the extent that the General Partner may be entitled to receive same) and such escrowed amounts shall be later released to the Limited Partner and/or General Partner once it is determined whether the General Partner and/or the Limited Partner (as applicable) is entitled to some or all of such amount(s).

1.7.3.  Notwithstanding the portion of Section 6.3 under the heading "Reduction of Carried Interest Allocation", the Limited Partner shall not be permitted to reduce the applicable percentage allocation of Carried Interest as set forth in such section.

1.8.  <u>Special Removal Conduct</u>.  If any Party (other than the Limited Partner) materially breaches any provision of this Agreement, which breach has not been cured (to the extent curable) within thirty (30) days after the earlier of (x) written notice from the Limited Partner of such breach and (y) either the General Partner or the Manager having actual knowledge of an intentional breach of this Agreement, then the Limited Partner may (x) remove the General Partner as the Fund's general partner and appoint a replacement general partner of the Fund and (y) remove the Manager and appoint a replacement manager of the Fund.  For the avoidance of doubt, a material breach of any provision of Sections 2.1 through 2.6 of this Agreement (inclusive) shall not be curable for purpose of this Section 1.8.

1.9.  <u>Veto on Certain Sales</u>.  The Fund shall not, without the prior written consent of the Limited Partner (which consent may be withheld in its sole and absolute discretion), either (x) Transfer less than all of the Portfolio Investments or (y) Transfer the Portfolio Investments for an aggregate purchase price that is less than the aggregate Capital Contributions of the Limited Partner to the Fund measured as of the time of the consummation of such sale.

1.10.  <u>Indemnification</u>.  For the avoidance of doubt, the Brockmans shall only be deemed Covered Persons eligible for indemnification pursuant to Section 9.1 of the Fund LPA for Claims relating to or arising out of transactions that took place prior to the Effective Date, subject to compliance with the requirements of Section 9.1 of the Fund LPA.

1.11.  <u>Change of Control</u>.  Notwithstanding Section 10.1(e) of the Fund LPA, to the extent that the actions described herein may constitute a Transfer of the General Partner's interest in the Fund, the Limited Partner consents to such Transfer. Further, to the extent that any of the actions described herein may be deemed an "assignment" (within the meaning of the Advisers Act) of the General Partner's interest in the Fund or of the Manager's obligations under the Management Agreement, the Limited Partner has reviewed and approved such assignment as contemplated by Section 205(a) of the Advisers Act.

AP0821

2. **Organization Documents of the Fund, General Partner and Manager**.

2.1. <u>Redemption of Brockman Sr.'s Interest in the Manager</u>. Effective as of the Effective Date, the Manager hereby redeems all of the membership interests in the Manager held by Brockman Sr. for $14,201.

2.2. <u>Redemption of Brockman Jr.'s Interest in the Manager</u>. Effective as of the Effective Date, the Manager hereby redeems all of the membership interests in the Manager held by Brockman Jr. for $1,322,740.

2.3. <u>Manager Ownership/Participation in Management Fees etc</u>. The Brockmans shall not be entitled to receive and shall not participate in, in each case directly or indirectly, any portion of the profits or losses of the Manager, including without limitation the Management Fees, allocable to and/or arising from any period on or after December 31, 2018 (the "Separation Date"). From and after the Effective Date, the Brockmans shall cease to own and shall not be permitted to own (directly or indirectly) any equity or economic interest in the Manager.

2.4. <u>Participation in the Management of the Fund, General Partner and Manager</u>. From and after the Effective Date, the Brockmans shall not participate, directly or indirectly, in the management or governance of the Fund, the General Partner or the Manager (whether as a manager, officer or otherwise).

2.5. <u>Redemption of Brockman Sr.'s Interest in the General Partner</u>. Effective as of the Effective Date, the General Partner hereby redeems all of the membership interests of Brockman Sr. in the General Partner for $1 (One US Dollar).

2.6. <u>General Partner Ownership/Participation in Carried Interests etc</u>. From and after the Separation Date, the Brockmans shall not be entitled to receive and shall not participate in, whether directly or indirectly, any portion of the profits or losses of the General Partner, including without limitation the Carried Interest. From and after the Effective Date, the Brockmans shall cease to own and shall not be permitted to own (directly or indirectly) any equity or economic interest in the General Partner.

2.7. <u>Transactions with the Brockmans</u>. The Brockmans shall not, directly or indirectly, enter into any transactions with the Fund or its Portfolio Investments. The Brockmans shall use their best efforts to reduce and eliminate any and all transactions, whether direct or indirect, with the Manager and/or the General Partner; provided that to the extent any such transactions cannot be eliminated then such transactions shall be (a) in writing and (b) on arm's-length and market terms, and the General Partner and the Manager shall provide copies of all such agreements (and any amendments thereto) to the Limited Partner.

2.8. <u>Activities of the General Partner and the Manager</u>. From and after the date hereof, (a) the General Partner shall have no business or other activities other than acting as the general partner of the Fund and activities incidental thereto and (b) the Manager shall have no business or other activities other than acting as the manager of the Fund and activities incidental thereto. For the avoidance of doubt, the foregoing shall in no way prohibit Affiliates of the General Partner or the Manager, including but not limited to Burnett and any other principal or employee of the General Partner, the Manager or their respective Affiliates, from conducting

AP0822

any other business or activity, including but not limited to providing investment advisory services to private investment funds.

3. **Standstill Agreement**. As of the Effective Date, that certain letter agreement dated February 7, 2019 (as amended) by and among the Fund, the Limited Partner, the General Partner, the Manager and the other parties thereto is hereby terminated (the "Standstill").

4. **Representations and Warranties of the Parties**. Each Party (as to itself only), severally and not jointly, represents and warrants to the other Parties as of the date hereof as follows:

4.1.   <u>Authorization of Agreement</u>. Such Party is (a) an individual or (b) an entity duly organized validly existing and in good standing under the laws of the jurisdiction of its organization. Such Party has the full right, power and authority to enter into, and to consummate the transactions contemplated by, this Agreement and otherwise to carry out its respective obligations hereunder, and the execution and delivery of, and performance by such Party of its obligations contemplated by, this Agreement have been duly authorized by all necessary corporate or similar action on the part of such Party, to the extent applicable. This Agreement constitutes a valid and legally binding obligation of such Party, enforceable against such Party in accordance with its terms.

4.2.   <u>No Conflicts</u>. Neither the execution and delivery of this Agreement, nor the consummation of the transaction contemplated hereby, does or will (a) if such Party is not an individual, violate any provision of such Party's organizational documents, (b) conflict with, violate or constitute a default under any agreement, credit facility, debt or other instrument or understanding to which such Party is bound, or (c) violate any statute, regulation, rule, injunction, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency, or court to which such Party is subject.

4.3.   <u>Consents</u>. No authorization, consent, approval or other order of, or declaration to or filing with, any governmental agency or body or other person is required for the valid authorization, execution, delivery or performance by such Party of this Agreement or the consummation of the transaction contemplated hereby.

5. **Releases**.

In partial consideration of the Fund, the Limited Partner, the Manager and the General Partner entering into this Agreement, each of the Brockmans, on behalf of himself and his heirs, executors, administrators, successors and/or assigns (collectively, the "Releasors"), hereby releases, effective as of the date of this Agreement, (a) the Fund, the Limited Partner, the Manager and the General Partner and (b) each and every director, manager, officer, employee, member, owner, agent and/or attorney of the Fund, the Limited Partner, the Manager and/or the General Partner and any of the heirs, executors, administrators, successors and assigns of any of those persons (each person described in the foregoing clauses (a) and (b), a "Releasee"), from any and all actions, causes of action, suits, debts, obligations, liabilities, contracts, controversies, agreements, promises, damages, judgments, claims or demands whatsoever, of whatever kind and based on whatever legal theory, that any Releasor ever had, now has or hereafter can, shall or may have against any Releasee, for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to and including the date of this Agreement; provided that, notwithstanding the foregoing, none of the Brockmans releases or waives any rights to which he is entitled under this Agreement.

-7-

AP0823

6. **Miscellaneous.**

This Agreement shall be governed by and interpreted in accordance with the laws of the State of Delaware, excluding its conflicts of laws principles. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which taken together shall constitute a single agreement. This Agreement may not be assigned or delegated by any party without the consent in writing of the other parties. This Agreement may not be amended, and no provision may be waived, without the consent in writing of the other parties. This Agreement constitutes the entire agreement among the parties regarding the subject matter hereof. If any provision of this Agreement is not fully valid and enforceable, then such provision will be valid and enforceable the fullest extent permitted and such invalidity or unenforceability shall not affect any other provision hereof. The parties hereto will take all further actions reasonably necessary to effect the intent and purposes hereof. The parties hereto agree that nothing in this Agreement shall affect the Limited Partner's status as a limited partner or cause the Limited Partner to be considered a general partner of the Fund.

**[SIGNATURE PAGES FOLLOW]**

AP0824

## Exhibit C

**August 4, 2020 Default Notice**

AP0825

**Falcata Capital LLC**
**10000 Memorial Dr.**
**Suite 200**
**Houston, TX 77024**

August 4, 2020

Point Investments Ltd.
Suite 539, 48 Par-La-Ville Road
Hamilton HM11 Bermuda
Attn: Evatt Tamine, Director
etamine@tangarra.com

Re: Falcata Tech Investment Fund – Notice of Default

Dear Mr. Tamine:

This letter is being delivered to you as the representative of Point Investments Ltd. ("Point") as set forth in the books and records of Falcata Tech Investment Fund I, L.P., a Cayman Islands Exempted Limited Partnership (the "Fund"), and in in accordance with Section 13.1 of the Fund's Amended and Restated Exempted Limited Partnership Agreement, dated April 20, 2018 (as amended by that certain Master Transaction Agreement dated July 1, 2019, the "LPA"). Terms used herein but not otherwise defined shall have the meaning set forth in the LPA.

By this letter, Falcata Capital LLC, as manager of the Fund (the "Manager") and as the authorized delegate of FTI GP I LLC, the Fund's general partner (the "General Partner") hereby gives notice to Point, as the limited partner of the Fund, pursuant to Section 5.4(a) of the LPA, that Point has failed to make Capital Contributions required to be made to the Fund pursuant to the terms of the LPA.

Pursuant to the enclosed Capital Call #9, Point was required to make a Capital Contribution to the Fund in an amount equal to $625,000 on or prior to July 1, 2020 (the "Default Amount"). In addition to failing to make such Capital Contribution, Point has also failed to respond to a second notice issued to Point via the enclosed email dated July 2, 2020, reminding Point of its obligations to respond to Capital Call #9. Point was required to fund Capital Call #9 on or before July 1, 2020.

Pursuant to Section 5.4(a) of the LPA, Point has five business days from the date of this notice to remedy this default by funding in full the Default Amount. Such Default Amount shall be payable in accordance with the wire instructions set forth in the enclosed Capital Call #9. If this failure to make a Capital Contribution has not been cured by the end of such five business day period, then Point will be designated as in Default by the Manager, as the authorized delegate

AP0826

of the General Partner. In the event that Point is designated as in Default, Point shall be a Defaulting Partner and shall be subject to any and all of the rights and remedies afforded to the General Partner and the Fund under the LPA. The General Partner hereby reserves all rights under the LPA and related agreements, and at law.

Sincerely,

Robert Burnett
Managing Member
Falcata Capital LLC

AP0827

# EXHIBIT 2

AP0828

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | **Chapter 15** |
| **POINT INVESTMENTS, LTD. (IN LIQUIDATION),** | **Case No. 22-10261 (TMH)** |
| **Debtor in a Foreign Proceeding.**[1] | |

**DECLARATION OF NICHOLAS JOHN MILES IN SUPPORT OF OBJECTION OF FTI GP I, LLC ON BEHALF OF FALCATA TECH INVESTMENT FUND I, L.P. TO THE MOTION OF THE FOREIGN REPRESENTATIVES FOR ENTRY OF AN ORDER ENFORCING THE AUTOMATIC STAY AND FOR DAMAGES**

Pursuant to 28 U.S.C. § 1746, I, NICHOLAS JOHN MILES, of Kennedys Chudleigh Ltd., 20 Brunswick Street, Hamilton HM 10 Bermuda, declare as follows:

1.      I am a Partner and Director of Kennedys Chudleigh Ltd, a Bermuda law firm of Barristers and Attorneys.  I have been instructed by Sheppard Mullin Richter & Hampton, LLP, counsel acting for FTI GP I, LLC (the "General Partner"), on behalf of Falcata Tech Investment Fund I, L.P. (the "Fund"), in the above-captioned proceedings, to express my opinion in relation to certain matters of Bermuda law (as set out below).  I understand that this Declaration will be submitted in connection with the objection (the "Objection") of the General Partner, on behalf of the Fund to the *Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and For Damages* [ECF No. 52] (the "Motion").

2.      Unless otherwise indicated in this Declaration, capitalized terms not otherwise defined herein shall have the meanings ascribed to the in the Objection.  My compensation for

---

[1]  Point Investments, Ltd. (the "Debtor") is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769.  The Debtor's registered office is at Vallis Building, 4th Floor, 58 Par-La Ville Road, , Hamilton HM 11, Bermuda.

-1-

providing this opinion is independent of the outcome of any proceedings in connection with the above-captioned chapter 15 case (the "Chapter 15 Case"), the adversary proceeding pending before this Court [Adv. Pro. No. 23-50122] (the "Adversary Proceeding"), or any other associated adversary proceedings.

**MY QUALIFICATIONS TO PROVIDE THIS DECLARATION**

3.       I am a Partner and Director of Kennedys Chudleigh Ltd, a Bermuda law firm of Barristers and Attorneys. My practice includes insolvency and restructuring and banking and finance matters. I am admitted and qualified to practice as a Barrister and Attorney of the Supreme Court of Bermuda. I was admitted and enrolled as a Solicitor of the Senior Courts of England and Wales in 2000 and as a Barrister and Attorney of the Supreme Court of Bermuda in 2015. In addition to my full-time practice as a Barrister and Attorney, I participate in various other professional activities that relate to Bermuda law and the Bermuda legal system. I am a committee member of the Restructuring and Insolvency Specialists Association of Bermuda (RISA). I have also been intimately involved in a number of law reform initiatives in Bermuda, including insolvency law. I consider that I have the requisite qualifications and expertise to express my opinions on the matters that I have been asked to consider under Bermuda law.

**MATTERS OF BERMUDA LAW CONSIDERED AND SUMMARY OF MY OPINIONS**

4.       In this Declaration, I have been instructed to express my opinion on the following questions, as a matter of Bermuda law:

(i)       Does the commencement of the Adversary Proceeding in this Court breach the provisions of section 167(4) of the Bermuda Companies Act 1981?

-2-

(ii)    Does the Supreme Court of Bermuda have jurisdiction to issue an anti-suit injunction against the Fund in respect of the Adversary Proceeding and, if so, is the jurisdiction exercisable under the circumstances?

I will not answer all the points made in the Motion, and my failure to do so should not be interpreted as acceptance of what the Motion says.

5.    I understand that the function of an expert on law is to state the law and explain how it applies to the facts stated in the Objection. Accordingly, I have referred to the facts stated in the Motion, the Objection, and other related documents that I understand the Court will read on the motions before it, in order to explain why, *inter alia*, under Bermuda law, the commencement of the Adversary Proceeding in this Court does not breach the provisions of section 167(4) of the Bermuda Companies Act 1981 and why the Bermuda Court does not have jurisdiction to issue an anti-suit injunction to restrain the General Partner or the Fund in connection with the Adversary Proceeding in this Court .

6.    In forming my opinions, I have read copies of (i) the Motion, (ii) the Objection, (iii) the *Declaration of Robert Burnett in Support of Objection of FTI GP I, LLC on behalf of Falcata Tech Investment Fund I, L.P. to the Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and For Damages* (the "Burnett Declaration"), and (iv) the Adversary Proceeding.

7.    I note that the Motion alleges, in relevant part, that the General Partner breached the automatic stay under section 362 of title 11 of the United States Code (the "Bankruptcy Code"), as well as the statutory stay under section 167(4) of the Bermuda Companies Act 1981 by commencing the Adversary Proceeding in this Court. Additionally, the Motion alleges that the

-3-

principles of international comity require that the Adversary Proceeding not continue in this Court, but rather be deferred to the Bermuda Proceeding.

       8.     It may assist if I briefly summarize my opinions on the main issues of Bermuda law that arise in the above-mentioned motions.

*The Section 167(4) Stay*

(a)     The commencement of the Adversary Proceeding in this Court does not breach the provisions of section 167(4) of the Bermuda Companies Act 1981 because the provisions of section 167(4) do not apply to proceedings commenced in courts outside Bermuda.

*Personal Jurisdiction / anti-suit injunctive relief / comity*

(b)     Neither the General Partner nor the Fund are amenable to the personal jurisdiction of the Bermuda court hearing the Bermuda Proceeding because (i) neither has received a dividend in the Bermuda winding up, (ii) neither have lodged a proof of claim in the Bermuda winding up, and (iii) neither has taken any procedural step in the Bermuda winding up consistent only with acceptance of the rules under which the court operates. Additionally, the Adversary Proceedings are not oppressive or vexatious. Finally, the practice and custom of the Bermuda is as a matter of comity to defer to this Court on questions of convenient forum.

       9.    **Exhibit A** to the Declaration contains copies of legislation and cases cited in this Declaration.

AP0832

## BACKGROUND TO BERMUDA LAW AND THE BERMUDA LEGAL SYSTEM

10.     It may be helpful if, as a starting point, I provide some background to Bermuda law and the Bermuda legal system.

11.     Bermuda is a British Overseas Territory.  As such, Bermuda is a self-governing but dependent territory of the United Kingdom, and it is a separate legal jurisdiction from the United Kingdom and its other constituent parts (since Bermuda has its own Parliament and its own Court system).  In common with other British Overseas Territories and former colonies, English law was introduced to Bermuda at the date of its settlement.  The system of law in Bermuda is therefore founded on the English legal system, although there is a distinct body of Bermudian statute law and Bermudian case law that has developed over the past 400 years.

12.     In particular, section 15 of the Supreme Court Act 1905 provides that the systems of law administered in Bermuda are (a) the common law,[2] (b) the doctrines of equity, and (c) the Acts of the Parliament of England of general application which were in force in England at the date of Bermuda's settlement on 11th July 1612, subject to the provisions of any Acts of the Bermuda Legislature which have been passed since 1612 in any way altering, amending, or modifying the same.  These three systems of law administered in Bermuda are also subject to Acts of the United Kingdom Parliament which have been passed since 1612 and made expressly applicable to Bermuda[3].  Section 18 of the Supreme Court Act 1905 further provides that law and equity are administered concurrently, and in any conflict the rules of equity should prevail.

---

[2] See also section 4 of Bermuda's Interpretation Act 1951, which defines the common law to mean "*so much of the common law of England (disregarding any supersession, modification or variation as respects its operation or effect in England by reason of any enactment of the Parliament of the United Kingdom) as has effect for the time being in Bermuda*".

[3] Colonial Laws Validity Act 1865, sections 1 to 3.

AP0833

13.     The Supreme Court of Bermuda is the first instance court in Bermuda with unlimited jurisdiction, and it determines all civil and commercial disputes with a value in excess of BD$25,000 (*i.e.*, US$25,000).

14.     There is a designated division of the Supreme Court known as the Commercial Court, which determines a wide variety of commercial and business disputes.  The Commercial Court of the Supreme Court of Bermuda also determines any disputes relating to the affairs of companies incorporated in Bermuda (including, for example, shareholder disputes and insolvency or bankruptcy proceedings).

15.     The Court of Appeal for Bermuda is the first-tier appellate court in Bermuda and it entertains appeals from the Supreme Court of Bermuda.  The judges of the Court of Appeal currently include judges that have sat as judges of the Court of Appeal for England and Wales; as judges of the Supreme Court of Bermuda; and as judges of the Grand Court of the Cayman Islands.

16.     Appeals against decisions of the Court of Appeal for Bermuda are entertained by the Judicial Committee of the Privy Council, which, although based in the United Kingdom, is Bermuda's highest appellate court.  The Privy Council is ordinarily made up of a five judge tribunal sitting in London.  Its composition consists of senior members of the judiciary of the Supreme Court of the United Kingdom (formerly the House of Lords, and the highest appellate court for England and Wales, Scotland, and Northern Ireland), as well as other senior judges from Commonwealth jurisdictions.

17.     Bermuda law, following English law in this regard, is based upon the common law principle of precedent.  Under the doctrine of precedent, certain judicial decisions are "binding"

AP0834

on other judges, in that their essential reasoning or "*ratio decidendi*"[4] must be followed and applied, unless they are properly capable of being distinguished. In particular, a judge of the Supreme Court of Bermuda is bound to follow and apply any relevant decision of the Court of Appeal for Bermuda, and any relevant decision of the Privy Council. The Court of Appeal, in turn, is bound to follow and apply any relevant decision of the Privy Council. Previous relevant decisions of the Privy Council are binding on the Privy Council itself, except in exceptional circumstances. The Privy Council can depart from a previous decision, when, for example, the previous decision is thought to be wrong and impeding the proper development of the law or to have led to results which were unjust or contrary to public policy.[5]

18.     Under the doctrine of precedent, certain judicial decisions or parts of judicial decisions (such as *obiter dicta*", which are comments or findings that do not form part of the essential reasoning), may be treated as persuasive, and, depending on the facts of the case, the seniority and experience of the tribunal, and the quality of their reasoning, should ordinarily be followed and applied, unless they are plainly wrong, were not fully or properly argued or reasoned (or failed to take into account relevant authorities), or are properly capable of being distinguished. Accordingly, first instance decisions of the Supreme Court of Bermuda are persuasive on, and should generally be followed in subsequent cases by, the Supreme Court of Bermuda, deciding subsequent cases.

19.     Furthermore, Bermudian courts often treat English case law as being persuasive, for two principal reasons (but subject to the circumstances of any particular case):

---

[4] The '*ratio decidendi*' of a case has been defined as any rule of law expressly or impliedly treated by the Court as a necessary step in reaching its conclusion, having regard to its reasoning.

[5] *Gibson v The United States of America* [2007] 1 WLR 2367, per Lord Brown at paragraph 22.

AP0835

(a)     Firstly, many Bermuda statutes are based upon current or former United
        Kingdom legislation.  For example, in the corporate law context, Bermuda's
        Companies Act 1981 is largely based on the UK's Companies Act 1948[6],
        although there have been a number of provisions omitted, added and
        amended to meet Bermuda's unique circumstances, some of which have
        been modelled on statutory provisions from other common law jurisdictions
        or which have been drafted specifically for Bermuda.  As a result, decisions
        of the Superior Courts of England and Wales with respect to provisions of
        United Kingdom statute law which are identical to or similar to Bermudian
        statutory provisions are considered in Bermuda to be highly persuasive
        authority, and such decisions are in practice often followed.[7]

(b)     Secondly, the decisions of the Supreme Court of the United
        Kingdom (formerly the House of Lords) on matters of common law and
        statutory interpretation are extremely persuasive in Bermuda since the
        Supreme Court of the United Kingdom (formerly the House of Lords),
        sitting as the highest appellate Court for the United Kingdom, and the Privy
        Council, sitting as the highest appellate Court for Bermuda, share common

---

[6] *See, e.g.*, *DE Shaw Oculus Portfolios Inc v Orient Express Hotels Ltd* [2010] Bda LR 32, per Ground CJ, and note also his comments at paragraph 48: "*I think that the common law of Bermuda is the same as that of England in this regard, and remains unaffected by subsequent statutory interventions in that country*".  By way of further illustration, in *The Minister of Finance v Hawkes (Trustee)* [1991] Bda LR 18, the Court of Appeal for Bermuda recognised that "*the source of section 236 of the Act of 1981 is section 319 of the Companies Act 1948 of the United Kingdom*", per Huggins JA at page 8 and Telford Georges JA at page 11.

[7] *Robins v National Trust Co Ltd* [1927] AC 515, PC, per Viscount Dunedin at 519; and *Mutual Reinsurance Co. Ltd. v Peat Marwick Mitchell & Co.* [1997] 1 BCLC 1.  Furthermore, the Bermuda courts are required, when interpreting or construing any Bermudian statutory provision, to apply as nearly as practicable the rules for the interpretation and construction of provisions of law for the time being binding upon the Supreme Court of Judicature in England: see section 10 of the Interpretation Act 1951.

-8-

AP0836

membership, in terms of the identities of the judges. The Court of Appeal for Bermuda has held that, generally speaking, Bermuda Courts will accept decisions of the Supreme Court of the United Kingdom (formerly the House of Lords) as effectively binding in common law matters, unless there are circumstances in which the social and economic conditions of Bermuda justify a departure from English precedent.[8]

20.    I turn now to the questions which I have specifically been asked to consider and address.

**DOES THE COMMENCEMENT OF THE ADVERSARY PROCEEDING IN THIS COURT BREACH THE PROVISIONS OF SECTION 167(4) OF THE BERMUDA COMPANIES ACT 1981?**

21.    Section 167(4) of the Bermuda Companies Act 1981 provides that when a winding-up order has been made or a provisional liquidator has been appointed, no action or proceeding shall be proceeded with or commenced against the company except by leave of the Court and subject to such terms as the Court may impose.

22.    While the provisions of subsection 167(4) do not expressly limit the territorial application of the subsection, it is settled law, as confirmed in a long and undisputed line of authorities on equivalent provisions of English insolvency legislation on which subsection 167(4) of the Bermuda Companies Act is based or which share a common derivation with the subsection, that the stay does not apply to proceedings in courts outside Bermuda: *see* Dicey, Morris & Collins on the Conflict of Laws 16th Ed., section 30-124 (discussing the functionally equivalent section 130 of the UK Insolvency Act 1986); *In re Oriental Inland Steam Co; Ex p Scinde Railway Co* (1874) LR 9 Ch App 557 at p 559: "*I quite agree that the 87th section of the Companies Act 1862*

---

[8] *Crockwell v Haley* [1993] Bda LR 7, Court of Appeal for Bermuda.

AP0837

*(25 & 26 Vict,, c 89), providing that no action shall be brought without the leave of the court, and*

*the 163rd section, enacting that no execution shall issue, apply on to the courts in this country. Of*

*course, Parliament never legislates respecting strictly foreign courts*": Re Vocalion (Foreign) Ltd

*[1932] 2 Ch. 196*; Bloom and others v Harms Offshore AHT "Taurus" GmbH Co KG and another

[2010] 2 WLR 349 (in which the Court of Appeal considered the relevantly similar section 43(6)

of schedule B1 of the UK Insolvency Act 1986): "*it has long been established that the statutory*

*prohibition against creditors bringing proceedings against a company being wound up by the*

*court is not extraterritorial, i.e., it does not extend to proceedings brought in foreign courts,*"

### DOES THE SUPREME COURT OF BERMUDA HAVE JURISDICTION TO ISSUE AN ANTI-SUIT INJUNCTION AGAINST THE FUND IN RESPECT OF THE ADVERSARY PROCEEDING AND, IF SO, IS THE JURISDICTION EXERCISABLE UNDER THE CIRCUMSTANCES?

23.     Notwithstanding the fact that section 167(4) of the Bermuda Companies Act 1981

is confined to Bermuda proceedings only, I would note that the Supreme Court of Bermuda (in

what follows, "Bermuda Court") has jurisdiction to issue injunctions restraining persons from

bringing foreign proceedings where the ends of justice require it including where the foreign

proceedings would give a creditor priority over other creditors in a Bermuda liquidation, contrary

to the principle of equal distribution under Bermuda insolvency law, or where the foreign

proceedings are oppressive or vexatious. However, this jurisdiction only arises where the person

to be restrained is amenable to the "in personam" (or personal) jurisdiction of the Bermuda Court

(*Re North Carolina Estate Co Ltd* (1889) 5 TLR 328; [2015] 1 BCLC at [27])): "*The fundamental*

*principle applicable to all anti-suit injunctions was stated at the outset of the history of this branch*

*of jurisprudence by Leach V-C in* Bushby v Munday (1821) 5 Madd 297, 307. *The court does not*

*purport to interfere with any foreign court, but may act personally on a defendant by restraining*

*him from commencing or continuing proceedings in a foreign court where the ends of justice*

AP0838

*require*" (*Stichtung Shell Pensioenfonds* v Krys (paragraph 17). A person or legal arrangement that is present in the jurisdiction by being incorporated or organized there or by having a physical presence there is amenable to the personal jurisdiction of the Court as is a person or legal arrangement that submits to it by, for example, receiving a dividend in a Bermuda winding up (*Ex p Robertson, Re Morton* (1875) LR 20 Eq 733); lodging a proof of claim in a Bermuda winding up (*Rubin v Eurofinance SA, New Cap Reinsurance Corp Ltd (in liq) v Grant* 2 BCLC 682); or by taking a procedural step in the Bermuda winding up which is consistent only with acceptance of the rules under which the court operates (*Stichtung Shell Pensioenfonds v Krys and another* [2015] AC 616 at paragraph [31]). However, based on my knowledge of the facts from the Burnett Declaration, dated April 14, 2023, that is being concurrently submitted, none of these applies and, accordingly, as a matter of applicable Bermuda law, neither the General Partner nor the Fund is amenable to the personal jurisdiction of the Bermuda court in the Bermuda Proceeding. It follows that the Bermuda Court does not have jurisdiction to issue an anti-suit injunction against the General Partner or the Fund.

24.     As a result of my foregoing opinion on the threshold issue of jurisdiction, it may not be strictly necessary to express an opinion on whether the Adversary Proceeding is oppressive or vexatious or disturbs the statutory scheme of distribution under Bermuda insolvency law. Nevertheless, for the avoidance of doubt and in case it assists the Court, I am of the opinion that it does not, because: (i) it does not seek to attach property of the Debtor (unlike *e.g.*, the facts in the following cases where foreign proceedings were restrained: *In re Oriental Inland Steam Co; Ex p Scinde Railway Co* (1874) LR 9 Ch App 557: creditor attached property in India; *In re North Carolina Estate Co.* (1889) 5 LTR 328: creditor restrained from proceedings with an action to attach property of the insolvent company in N. Carolina; *In re Belfast Shipowners Co.* [1894] 1

AP0839

LR 321: proceedings to attach sums that were the property of the insolvent company; *Bloom and others v Harms Offshore AHT "Taurus" GmbH Co KG and another* [2010] 2 WLR 349: a foreign attachment order); and (ii) the jurisdiction of this Court to grant the declaratory relief sought in the Adversary Proceeding is I consider of a purely "adjudicatory" one of a type which the Privy Council has held is not (provided it takes place in an appropriate jurisdiction and is not vexatious or oppressive) objectionable (*Stichting Shell Pensioenfonds v Krys and another* [2015] AC 616 at paragraph 40; *see also Hughes and others v Hannover Ruckversicherungs-Aktiengesellschaft* [1999] BPIR 224 a decision of the English Court of Appeal where it was held at p 246 that the principle justifying an injunction to protect the statutory scheme of distribution in a winding up was not appliable "*to a debtor seeking to establish [by declaration] that he is not liable to the insolvent at all*"); and (iii) it is not vexatious or oppressive (it does not involve, for example, parallel litigation about the same subject matter, as considered in paragraph 23 of *Stichting Shell Pensioenfonds v Krys and another* [2015] AC 616 and in the section from the decision of the Privy Council in *Société Nationale Industrielle Aerospatiale v Lee Kui Jak* [1987] AC 871 quoted there).

25.     I would also note as a final point that the Bermuda Court's anti-suit injunction jurisdiction "*must be exercised with caution.  As stated by Hoffmann J in* Barclays Bank v Homan *[1993] BCLC 680 at p 687:*

> *. . . both comity and common sense suggest that the foreign judge is usually the best person to decide whether in his own court he should accept or decline jurisdiction, stay proceedings or allow them to continue.*

(*Hughes and others v Hannover Ruckversicherungs-Aktiengesellschaft* [1999] BPIR 224). Considerations of comity point in this case to deference to this Court's decision about jurisdiction.

-12-

AP0840

## <u>CONCLUSION</u>

26.     For the reasons I have given, my opinions are as stated in this Declaration, I declare under penalty of perjury under the Laws of the United States of America that the foregoing is true and correct.

Dated this 14th day of April 2023

Signed: _____, Nicholas John Miles

-13-

AP0841

# Exhibit A

AP0842

# THE IRISH REPORTS,

PUBLISHED UNDER

THE CONTROL OF THE INCORPORATED COUNCIL OF LAW REPORTING FOR IRELAND:

CONTAINING

## REPORTS OF CASES ARGUED AND DETERMINED

IN

## THE COURT OF APPEAL,

## THE HIGH COURT OF JUSTICE,

## THE COURT OF BANKRUPTCY,

### IN IRELAND,

AND

## THE IRISH LAND COMMISSION.

EDITED BY

### WILLIAM GREEN,

BARRISTER-AT-LAW.



## 1894.

## VOL. I.

—

CHANCERY AND PROBATE DIVISIONS, AND COURT OF BANKRUPTCY.

DUBLIN:

PUBLISHED FOR THE INCORPORATED COUNCIL OF LAW REPORTING FOR IRELAND,

### BY EDWARD PONSONBY,

116, GRAFTON-STREET, DUBLIN.

1894.

AP0843

Case 1:23-cv-06622-CFC-DTML Document 269-2 Filed 08/23/23 Page 64 of 220 PageID #: 911

CHANCERY DIVISION.

Fitz Gibbon, L.J. :—

The ordinary rule seems to be that in a creditor's administration suit the mortgagee does not lose his priority by consenting to a sale of premises mortgaged to him by the deceased, nor does he thereby undertake to pay the costs of the sale in the event of there being a deficiency. There is no apparent reason why money or value, which would otherwise belong to him, should be spent upon the attempt of puisne owners to realize something for themselves, merely because he allowed them to make the attempt.

There are no circumstances in this case which take it out of the ordinary rule. Mr. Mac Gillycuddy's letter shows the real state of affairs. He states that in consequence of the Hon. Mr. de Moleyns not being a stranger, he had got no binding agreement from him, and, without agreement, the costs of the sale cannot be thrown upon the mortgagee.

Barry, L.J., concurred.

Solicitors for the plaintiff: *Mac Gillycuddy & Morphy.*
Solicitors for the Hon. E. A. de Moleyns: *Rooke & Co.*

G. Y. D.

*Appeal.*
*1894.*

Hilliard
*v.*
Moriarty.

Supplied by
Law Society Library
Lawdocs
020 7320 5946
library@lawsociety.org.uk
www.lawsociety.org.uk/library

In the MATTER of the BELFAST SHIPOWNERS COMPANY (Limited), and THE COMPANIES ACTS, 1862 to 1867.

(1893. No. 428.)

*Company—Winding-up—Injunction to restrain proceedings in foreign Court—Submission to jurisdiction—Companies Act, 1862 (25 & 26 Vict. c. 89) sections 87, 122, 163.*

The petitioners, in a winding-up under supervision, instituted proceedings in the Superior Court of Massachusetts to attach certain sums, representing cargo freight, then in the hands of a third party in Boston, and the property of the Company, for the purpose of acquiring, under the law of Massachusetts, a lien on the freight, which would give the petitioners priority over the other creditors of the Company. The petitioners were British subjects, carrying on

*V.-C.*
*1893.*

Dec. 4, 5.

*Appeal.*
*1894.*

Jan. 12.

Case 1:23-cv-00680-CFC-DDM Document 269-2 Filed 08/23/23 Page 65 of 220 PageID #: 312

*V.-C.*
1893.

*In re*
BELFAST
SHIP
OWNERS' CO.

business in London, and also, up to a short time before the matter came before the Court, in Ireland :—

*Held*, that they should be restrained from further prosecuting the proceedings in the American Court.

MOTION by the petitioners that an order made at Chambers on the 21st November, 1893, might be varied by omitting therefrom the portion which directed that the petitioners be restrained from prosecuting in the Courts of Massachusetts, U.S.A., the proceedings instituted by them to attach for their own benefit the amount of the freight earned by the ship Cavehill, and from putting in force any attachment, sequestration, distress, or execution against such freight.

The order of the 21st November, 1893, was made on the application of the liquidator, grounded on an affidavit which set out the following facts :—

An extraordinary resolution to wind up the Company was passed on the 5th May, 1893.

Messrs. Galbraith and Moorhead, who were the managers of the Company, carrying on all its business, and discharging the duties of secretary, presented a petition to the Court, and on the 13th June, 1893, an order was made to continue the voluntary winding-up, under the supervision of the Court, and appointing a liquidator.

At the date of the resolution for winding-up, the petitioners were the largest creditors of the Company, their claim being for money due to them as managers of the Company, and made up of items connected with a steamship called the China, which had been sold, and a sailing ship called the Cavehill, the property of the Company at the time of the winding-up.

The Cavehill had been mortgaged to Workman, Clarke & Co., who, prior to the resolution to wind-up, served notice on the Company and the consignees of the cargo, that they, as mortgagees, entered into possession of the ship and freight.

At the dates of the notice and resolution the Cavehill was on a voyage to Boston, where she arrived on the 22nd May after the filing of the petition.

On her arrival the Cavehill was seized under an attachment

AP0845

Case 1:23-cv-06582-CFC-DTM Document 269-2 Filed 08/23/23 Page 66 of 220 PageID #: 913

issued at the instance of the petitioners out of the Superior Court within and for the Commonwealth of Massachusetts, the object of the proceeding being to give the petitioners a lien on the ship for their claim, which would have priority over the claims of the other creditors. Workman, Clarke & Co. having, however, asserted their rights as mortgagees in possession, the seizure was withdrawn.

*V.-C.*
1893.
*In re*
BELFAST
SHIP
OWNERS' Co.

Workman, Clarke & Co. subsequently sold the ship by auction in this country for a sum more than sufficient to discharge their mortgage debt, but they had not yet accounted to the liquidator for the balance, as they had not received the freight accounts from Boston, owing to the circumstances following :—According to the law of Massachusetts a creditor can, before judgment, arrest any property of his debtor that he can lay his hand on, and hold it to discharge any claim he can establish against the debtor. Messrs. Lombard and Sons of Boston, as agents for Workman, Clarke & Co., collected the freight on the Cavehill cargo, which, not being required for payment of the mortgage debt, formed part of the property of the Company for the benefit of the creditors ; but the petitioners instituted proceedings against Messrs. Lombard to attach the freight in their hands. These proceedings were still pending, but the liquidator cautioned the petitioners not to continue them, stating that every opportunity would be afforded the petitioners in the winding-up of proving their claim, and establishing, if they could, any preferential right to any portion of the assets.

The liquidator was advised that he had not at present any *locus standi* in the American Court, and that even if he obtained permission in the winding-up to apply for leave to intervene, it was doubtful whether the American Court would allow him to do so.

The petitioners did not obtain any leave in the winding-up to institute or carry on the proceedings in America, the result of which might be to give them a preference over the other creditors.

The Company was registered in Ireland ; the Cavehill was registered in Belfast ; and the petitioners were British subjects having offices in Belfast and London.

The liquidator was advised that, according to American law, the petitioners had no maritime lien, and that the lien obtained

Case 1:23-cv-00680-CFC-CJB Document 69-2 Filed 08/23/23 Page 67 of 220 PageID #: 914

*V.-C.*
1893.

*In re*
BELFAST
SHIP
OWNERS' CO.

by the proceedings referred to was a lien such as any American subject can obtain in Massachusetts for any debt due him where his debtor has property in that State.

The petitioners did not appear on the liquidator's application, expecting, as they now alleged, that the case would have been adjourned.

The following order was made :—

"IT IS ORDERED that Messrs. Galbraith and Moorhead, the petitioners in this matter, be, and they are hereby restrained from further prosecuting in the Courts of Massachusetts, United States of America, the proceedings instituted by them for the purpose of attaching, for their own benefit, moneys belonging to the above-mentioned Company, and from applying for, or putting in force, any attachment, sequestration, distress, or execution against the estate or effects of the Company in such State of Massachusetts.  And it is ordered that the said liquidator be at liberty to take such steps as he may be advised by counsel for the recovery of the possession of such effects.  And for such purpose it is ordered that the said liquidator be at liberty, if so advised, to apply for liberty to intervene in the said proceedings in Massachusetts."

An affidavit now filed on behalf of the petitioners stated that the amount due to them, which exceeded £6000, represented the balance of advances and disbursements made by them for account of the Cavehill.  The petitioners alleged that they did not carry on business in Belfast, nor had they any business office there, after the 31st October, 1893.

*Piers F. White, Q.C.* (with him *Wright, Q.C.,* and *Herbert Wilson*), in support of the motion :—

Section 163 of the Companies Act, 1862, must be read with, and is controlled by sects. 85 and 87 : see Buckley's Companies Acts (6th Ed.), p. 396 ; sects. 87 and 163 apply only to the Courts in these countries, and do not relate to proceedings in foreign Courts: *ibid.* p. 255.  The mere fact that a person who takes proceedings in a foreign Court may be within the reach of this Court is not a sufficient ground for interfering : Kerr on Injunctions (3rd Ed.), p. 583.  Moreover, even where there is jurisdiction to interfere, this Court ought not to do so where it appears likely to be more conducive to justice, or where upon the balance of convenience and inconvenience it appears desirable

AP0847

Case 1:23-cv-00680-CFC Document 69-2 Filed 08/23/23 Page 68 of 220 PageID #: 915

that the foreign proceedings should be allowed to take their
course; if, for instance, this Court desires to ascertain what the
foreign law is: see Kerr, p. 582. That is the case here. See
also 1 Seton, Judgments and Orders (5th Ed.), p. 625. *Moor* v.
*Anglo-Italian Bank* (1); *M'Henry* v. *Lewis* (2).

V.-C.
1893.

*In re*
BELFAST
SHIP
OWNERS' CO.

*Gordon, Q.C.*, and *J. H. Moore*, for the liquidator :—

The argument for the petitioners omits to regard the fact
that this is the case of a Company. The order of the 13th June
relates back to the resolution. Moreover, the petitioners were
the managers of the Company, and had offices in Belfast up to
the end of October, and they still carry on business in London.
Sect. 122 of the Companies Act, 1862, enables the order of this
Court to be enforced in England. A proceeding against a Com-
pany in respect of property in a foreign country is within sect. 87 :
see Buckley, p. 255; *In re South Eastern of Portugal Railway
Co.* (3). An injunction may be granted to restrain the carrying
on of proceedings in foreign Courts : Daniell's Ch. Pr. (6th Ed.),
p. 1579. Moreover, this Court can make an order *in personam*,
though it affects property abroad: *Paget* v. *Ede* (4). See also
*In re Oriental Inland Steam Co.* (5), which is directly in point ;
*In re North Carolina Estate Co.* (6) ; *In re Thurso New Gas Co.* (7).
The petitioners' rights should be decided in the winding-up:
*In re Australian Direct Steam Navigation Co.* (8). Here the
applicants themselves presented the petition in this matter, and
they thereby subjected themselves to the jurisdiction of this
Court. See *Griendtoveen* v. *Hamlyn* (9). *Moor* v. *Anglo-Italian
Bank* (1) does not apply. That was a case in which there was
an already existing charge on land in Italy, and the Courts of
that country were the proper tribunals in which to proceed to
raise such charge.

| | |
|---|---|
| (1) 10 Ch. Div. 681, 686. | (6) W. N. 1889, p. 53. |
| (2) 22 Ch. Div. 397. | (7) 42 Ch. Div. 486. |
| (3) 17 W. R. 982. | (8) L. R. 20 Eq. 325. |
| (4) L. R. 18 Eq. 118. | (9) 8 *Times'* Rep. 231. |
| (5) L. R. 9 Ch. 557. | |

AP0848

Case 1:23-cv-00680-CFC Document 268-2 Filed 08/23/23 Page 69 of 220 PageID #: 910

*V.-C.*
1893.
___
*In re*
BELFAST
SHIP
OWNERS' CO.

*Wright, Q.C.,* in reply :—

The statement in Buckley, p. 255, that the Court has jurisdiction to restrain a British subject from taking proceedings in a foreign Court is grounded solely on one case, *In re North Carolina Estate Co.* (1), of which only a three-line note is given in the *Weekly Notes*, and which is not reported elsewhere. That case is of little value as an authority. *In re International Pulp and Paper Company* (2) rests on sections 87 and 122, the latter making an English order enforceable in Ireland. *In re Oriental Inland Steam Company* (3) was a peculiar case, and the Scinde Company had undertaken to abide by any order made : see also the judgment of Sir G. Mellish, L.J., at p. 559. In *Moor* v. *Anglo-Italian Bank* (4), Jessel, M. R., says (p. 690) :—" *Prima facie* this Court cannot interfere to restrain that proceeding. The Court of the country must be assumed to know more about the law of its own country than the Court of a foreign country, and the risk of miscarriage in this Court if it undertook to administer Italian law would be much greater than in the Courts of Italy, who are, of course, more familiar with their own law ; and as all parties can appear in that Court and have their rights finally settled, it appears to me it would be in the highest degree inconvenient for this Court to interfere at all, more especially when, to use an English phrase, the Italian Courts first had seisin of the matter, and have had seisin of it for some two or three years now past. On this ground also I should feel myself quite unable to accede to the present motion."

Dec. 5.

THE VICE-CHANCELLOR, having referred to the facts, continued :—

The sale in Belfast having produced more than sufficient to pay off Messrs. Workman, Clarke, and Company, the freight remained in the hands of their agents, Messrs. Lombard & Sons, *in usum jus habentis*. The supervision order was made on the 13th June, and George Johnston was thereby appointed liquidator. The freight remained the property of the Company attached by

(1) W. N. 1889, p. 53.          (3) L. R. 9 Ch. 557.
(2) 3 Ch. Div. 594.             (4) 10 Ch. Div. 681.

AP0849

Case 1:23-cv-00680-CFC Document 269-2 Filed 08/23/23 Page 73 of 220 PageID #: 917

this order, and the liquidator was bound to get it in. I hold that Messrs. Galbraith and Moorhead, by presenting the petition, submitted themselves to the jurisdiction of this Court for all purposes. The question of their lien is not for me to decide at present. The present question is whether this Court has power to restrain them from further prosecuting the proceedings taken by them in the American Court to attach the moneys received for freight.

*In re Australian Direct Steam Navigation Company* (1) decides that the proper mode of enforcing a maritime lien on a vessel of a Company ordered to be wound up is by a proceeding in the winding-up, and therefore this Court is the proper tribunal to decide whether the petitioners had a lien on the freight or not. The question is, are they to be allowed to catch by anticipation the money received by Messrs. Lombard as against the other creditors?

The Act of Parliament is plain. Questions have arisen, where a person takes two different proceedings, as to the power of the Court to interfere and stay one of them, and there have been doubts how far the power should be exercised. I understand the result to be that there is jurisdiction to interfere; but that in a case of double proceedings where one of the proceedings is in a foreign country, the Court is slow to exercise the power except under special circumstances. But that is quite different from the case here, which is not one of double or vexatious proceedings, but one in which I am called upon to exercise the power expressly given by the statute. Section 85 enables the Court, after the presentation of a petition, and before making an order for winding-up, to restrain further proceedings in any action, suit, or proceeding against the Company. This section provides for circumstances happening between the presentation of the petition and the order for winding-up. The 87th section provides for the period subsequent to this transition period. The proceedings taken by Messrs. Galbraith and Moorhead come exactly within the provisions of that section: they are proceedings after the order for winding-up under supervision, for the express purpose of getting hold of the property of the Company. Section 163 provides that where a Company is being wound up by the Court or subject to supervision, any attachment, sequestration, distress, or execution put in force against the

(1) L. R. 20 Eq. 325.

*V.-C.*
1893.
___
*In re*
BELFAST
SHIP
OWNERS' Co.

AP0850

Case 1:23-cv-00680-CFC-TMH Document 69-2 Filed 08/23/23 Page 71 of 220 PageID #: 913

*V.-C.*
1893.

*In re*
BELFAST
SHIP
OWNERS' Co

estate or effects of the Company after the commencement of the winding-up shall be void to all intents ; and if this were a proceeding in this country there could be no question about it, for it comes within the very words of that section.

It is said that I ought not to make the order as there is, it is alleged, no means of carrying it out.  This Court, of course, has not the power to restrain or interfere with any foreign Court, but it may act *in personam* against persons interfering with a proceeding for winding-up in which they are parties or claimants.  It was relied on that the petitioners are no longer resident in Ireland ; but there are two answers to this objection—first, section 122 provides for enforcing an order of this Court in England by the means directed by the next section ; secondly, I hold that by presenting the petition here Messrs. Galbraith and Moorhead submitted to any order I might make for all purposes of the winding-up.  Their position differs in no material respect from that of the Scinde Railway Company in the winding-up of the *Oriental Inland Steam Company* (1), which is an authority that a party coming in submits himself to the jurisdiction of the Court.

The Court does not interfere in such a case as *Moor* v. *Anglo Italian Bank* (2), where the subject-matter was land in Italy.  There was there no question as to the general jurisdiction, which was tacitly admitted ; but as the only means of realizing the incumbrance was by proceedings in the country where the property was situate, the Court did not consider it expedient to exercise its jurisdiction.  That case does not affect the general rule.

I am of opinion that *In re Oriental Inland Steam Co.* (1) is precisely applicable to the case before me.  It shows that the Court, in a winding-up proceeding, has the fullest jurisdiction to prevent parties from interfering with the assets of the Company in a foreign country, and that one creditor cannot be allowed to get priority over the other creditors by reason of having got possession of the assets.

Therefore, without going more fully into the authorities, I am of opinion that I should refuse the application.

D. M'C. M.

(1) L. R. 9 Ch. 557.                    (2) 10 Ch. Div. 681.

AP0851

Case 1:23-cv-00660-CFC-TMH Document 69-2 Filed 08/23/23 Page 72 of 220 PageID #: 919

Messrs. Galbraith and Moorhead appealed (1).

*Appeal.*
1894.

*In re*
BELFAST
SHIP
OWNERS' CO.

Jan. 12.

*Piers F. White, Q.C.,* and *Herbert Wilson,* for the appellants:—
Sects. 87 and 163 of the Companies Act of 1862 apply only to
Courts in this country : *Re Oriental Inland Steam Co.* (2). An
incumbrancer on immoveable property in a foreign country, who
has instituted legal proceedings in that country for the purpose of
enforcing his rights, will not be restrained by injunction, if the
other party may appear before the foreign tribunal and assert his
rights : *Moor v. Anglo-Italian Bank* (3) ; *Re The Missouri Steam-
ship Co.* (4). The judgment would place us in the position of a
secured creditor in the American Court. We submit that we are
entitled to proceed in the American Court, and then we can work
out our rights in the liquidation : *Re South Eastern of Portugal
Railway Co.* (5). The Court ought not to restrain us before judg-
ment : *Re Central Sugar Factories of Brazil* (6).

*Gordon, Q.C.,* and *J. H. Moore,* for the liquidator :—

These creditors have not only submitted to the jurisdiction,
but they have invoked the aid of a Court of Equity by filing a
petition. Under those circumstances they should be restrained,
as they can get their rights in the Irish liquidation : *Re Austra-
lian Direct Steam Navigation Co.* (7). *Moor v. Anglo-Italian
Bank* (3) was a case of real estate, which is governed by the *lex
loci,* though a Court of Equity has jurisdiction over lands out of
the jurisdiction : *Paget v. Ede* (8).

WALKER, C. :—

In this case we are all of opinion that the decision of the
Vice-Chancellor should be affirmed, and the appeal dismissed, with
costs. It appears that this is an Irish Company, registered in
Ireland ; it is an Irish winding-up, and the parties are Irish
creditors. The appellants are Messrs. Galbraith and Moorhead,

(1) In the Court of Appeal, before
WALKER, C., PALLES, C.B., and FITZ-
GIBBON, L.J.

(2) L. R. 9 Ch. 557.

(3) 10 Ch. Div. 681.

(4) 42 Ch. Div. 321.

(5) 17 W. R. 982.

(6) 10 *Times'* Rep. 150.

(7) L. R. 20 Eq. 325.

(8) L. R. 18 Eq. 118.

AP0852

Case 1:23-cv-00608-CFC-CJB Document 269-2 Filed 08/23/23 Page 73 of 209 PageID #: 920

*Appeal.*
1894.

*In re*
BELFAST
SHIP
OWNERS' CO.

Walker, C.

one of whom is a director and the other is the manager of the Company, and on the 5th May a resolution for a voluntary winding-up was made. Galbraith and Moorhead presented a petition to obtain a compulsory winding-up, with the result that an order was made for a winding-up under the supervision of the Court. By reason of that, the jurisdiction of the Court has been attracted, and the Court has jurisdiction to decide the question. The effect of the order of the 13th June was that the Court has complete jurisdiction and control over the assets of the Company, relating back to the 5th May, with a trust attaching upon the assets for all the creditors, the substance of which is equality. The only variation in that equality is to see—Is there some existing charge or judgment, which would disturb the equality at the time of the winding-up? And where such do exist at the date of the winding-up, the Court will not disturb the existing legal *status.* That being so, what happens in the result is that all the assets should be divided among the creditors, including this freight in question, which was due to the liquidator, and should be received by him. The freight arose out of the earnings of this vessel, the Cavehill, which, at the time the petition was presented, or, at all events, at the time the winding-up order was made, was on a voyage from Calcutta to Boston: it was earned, and was *prima facie* due to the liquidator. The ship arrived at Boston on the 27th May, and these petitioners, the creditors in respect of this debt, having got judgment for the benefit of all the creditors, proceeded on a date not fixed to take proceedings in an American Court to realize for themselves this freight, which belonged to the liquidator. There may be some rule of American law which may possibly enable the appellants to assert here a preference in the winding-up proceedings, because Mr. White's argument was, Allow us to get this judgment in the Court at Boston, to which we are entitled by American law, and we shall work it out in the winding-up.

It is perfectly plain that a suit in section 87 of the Companies Act of 1862 is not a suit previously instituted in a foreign tribunal; but it is quite another thing if a man comes in and gets a winding-up order for the benefit of the creditors, whether the Court will allow him afterwards to institute a suit in an American Court and to get a judgment, the effect of which may be to upset the whole

AP0853

Case 1:23-cv-00862-CFC-DTH Document 269-2 Filed 08/23/23 Page 74 of 220 PageID #: 921

proceedings here, and to disturb the equality, and the trust which have been created by the winding-up order. I think it is against those first principles upon which, acting *in personam*, the Court proceeds, whether in a winding-up, or an administration suit, or any other proceeding.

The cases referred to do not seem to me to affect the question. *Moor* v. *Anglo-Italian Bank* (1), is consistent with what we are now deciding, and is an affirmance of it. It lays down that if a man has real property in a foreign country, the *lex loci rei sitæ* will apply, and you must proceed according to that law. There the only mode in which the property could be realized was by the Italian suit, and the Court allowed it to proceed in the country where the property was situated, and allowed the property to be realized in that suit, because it appeared that the money would be available for distribution among the creditors. *In re The Australian Direct Steam Navigation Company* (2) also follows the same rule. There Baker, a master, had a claim for master's wages. That created a maritime lien—the suit for master's wages creates a maritime lien now more than ever since the Act of 1890—and an action *in rem* against the ship for wages was restrained, and the effect would have been the same, if the master, Baker, had proceeded in a foreign Court against the ship, because if the claim was not complete he could not be allowed to make it so, after a winding-up order had been obtained. But Sir George Jessel also said that if this gentleman had this lien, which he asserted that he had, and by virtue of which he instituted the action *in rem* against the ship, it might be asserted in the winding-up matter. And so, in this case, if Mr. White's client has such a claim as is asserted here, he will have a chance of ascertaining it in a proper *forum*, namely, that in which the assets are to be distributed.

In my opinion the only proper *forum* is the Irish Court for the distribution of this property, where these creditors came in and sought to have the jurisdiction of the Court exercised.

1894.
_____

*Appeal.*
1894.
_____

*In re*
Belfast
Ship
Owners' Co.
_____
Walker, C.

(1) 10 Ch. Div. 681.          (2) L. R. 20 Eq. 325.

AP0854

Case 1:23-cv-00680-CFC-CJB Document 269-2 Filed 08/23/23 Page 75 of 220 PageID #: 922

*Appeal.*
*1894.*

*In re*
BELFAST
SHIP
OWNERS' CO.

PALLES, C. B. :—

I am of the same opinion. Although section 87 does not include Courts in foreign countries, I am of opinion that the Court, under its general jurisdiction, was competent to make an order against the appellants *in personam*, such as that now under appeal. The appellants, although resident in England, are clearly liable to this jurisdiction, as the Company is an Irish one, which can be wound up in this country only, and the appellants are the petitioners upon whose application the winding-up was directed to be continued under supervision.

The only real question in the case is, not that of the jurisdiction, which is undoubted, but of its exercise. The extraordinary resolution, under which the Company is now being wound up under supervision, was passed on the 5th May last, and thereupon a trust was constituted for the benefit of all the creditors. At the time this trust attached upon the property of the Company, the "Cave Hill" was at sea on a voyage from Calcutta to Boston, at which latter port she did not arrive until the 22nd May, when she was seized under the appellants' attachment. It is undoubted that the assets of the Company are to be distributed according to the law of this country, and it is equally clear that the freight of the "Cave Hill," although it became payable in a foreign country, became subject to the statutable trust for creditors. *Sill* v. *Worswick* (1) ; *Hunter* v. *Potts* (2) ; and *Selkrig* v. *Davies* (3), although decided upon cases of assignments in bankruptcy, are equally applicable to cases under the Winding-up Acts. The trust having so attached, the appellants proceed to institute a suit in Boston, for the purpose of withdrawing the freight from that statutable trust, and having it applied, contrary to the law of this country, to payment in full of their own demand, in priority to those of the other creditors who by law are entitled to be paid *pari passu* with the petitioners. Now, if the suit proceeds in the American Court, and if the liquidators were permitted to intervene (which, at least, appears doubtful), and, even if the American Court adopted the same view of international law as does this country, and held that the question should be determined by Irish law, still

(1) 1 H. Bl. 665, 691.      (2) 4 T. R. 182.      (3) 2 Dow, 230.

AP0855

Case 1:23-cv-06690-CFC-1 Document 269-2 Filed 08/23/23 Page 76 of 220 PageID #: 923

*Appeal.*
1894.

*In re*
BELFAST
SHIP
OWNERS' Co.

Palles, C.B.

there would exist the objection to the petitioners being allowed to prosecute that suit which was held effectual in *Moor* v. *Anglo-Italian Bank* (1). "The Court of the country," says Sir George Jessel (p. 690), "must be assumed to know more about the law of its own country than the Court of a foreign country; and the risk of miscarriage in this Court, if it undertook to administer Italian law, would be much greater than in the Courts of Italy, who are of course more familiar with their own law." Were there nothing else in the case, it would, I think, follow that the appellants ought not to be permitted to proceed with the foreign suit.

There is, however, much more in the case, because it would seem that the law of Massachusetts differs from our law as to the title under the statutable trust prevailing against the subsequent American attachment. The matter is put thus in Story's Conflict of Laws, 5th Ed., sect. 409. In England "the following propositions are firmly established:—First, that an assignment under the bankrupt law of a foreign country passes all the personal property of the bankrupt locally situate, and debts owing in England; . . . . Third, that in England the same doctrine holds under assignments by her own bankrupt laws as to personal property and debts of the bankrupt in foreign countries; Fourth, that, upon principle, all attachments made by foreign creditors after such assignment in a foreign country ought to be held invalid; . . . . Sixth, that, at all events, a British creditor will not be permitted to hold the property acquired by a judgment under any attachment made in a foreign country after such assignment." Mr. Story then proceeds:—"There is no inconsiderable weight of American authority on the same side, but it must be admitted that the preponderating authority is certainly now the other way"; and in section 410 he mentions as the ground of the American doctrine: "It must be admitted that the general rule is that personal property, including debts, has no locality, but follows, as to its disposition and transfer, the law of the domicile of the owner: but every country may, by positive law, regulate as it pleases the disposition of personal property found within it, and may prefer its own attaching creditors to any foreign assignee; and no other country has any right to question the determination."

(1) 10 Ch. Div. 681.

AP0856

Case 1:23-cv-00609-CFC-DTM Document 269-2 Filed 08/23/23 Page 77 of 220 PageID #: 924

*Appeal.*
1894.

*In re*
BELFAST
SHIP
OWNERS' CO.

Palles, C.B.

In result, then, it appears, not only that the **proceeding has** been taken to prevent the freight being applied **according to our** law, and to dispose of it in a mode which that law **deems a** misapplication, but that such proceeding, if permitted to **continue,** will probably result in such misapplication. If the **suit in** America continues, and if, under a decree made in it, the **appellants** recover on foot of their debt more than their just **proportion,** the Courts of this country must give effect, as against **the** appellants, to their own law, and compel them to give up **the** surplus.

The distinction between the present case and *Moor* v. *Anglo-Italian Bank* (1), which I have already referred to for another purpose, is that there the subject-matter of the foreign suit **was** land, and the question was therefore to be determined by the *lex loci rei sitæ.* Here it is personal property which according to the law of this country is governed by the law of the domicile.

The appeal should be dismissed with costs.

FITZ GIBBON, L. J., concurred.

Solicitors for the appellants : *G. D. Fottrell & Son.*
Solicitors for the liquidator : *Carson & M'Dowell.*

R. D. M.

(1) 10 Ch. Div. 681.

349
[2010] 2 WLR                                    Bloom v Harms Offshore GmbH & Co KG (CA)

A                                      Court of Appeal

## Bloom and others *v* Harms Offshore AHT "Taurus" GmbH & Co KG and another

### [2009] EWCA Civ 632

B    2009  May 20;                            Ward, Stanley Burnton LJJ, Sir John Chadwick
          June 26

*Injunction — Jurisdiction to grant — Restraint of foreign proceedings — High Court making administration order in respect of English company — Creditors making without notice application to foreign court for attachments of company's assets — Whether foreign proceedings breaching statutory prohibition on legal process against company in administration — Whether "legal process" confined to process within United Kingdom — Whether High Court having jurisdiction to restrain foreign attachment proceedings interfering with administration — Circumstances in which jurisdiction to be exercised —  Insolvency Act 1986 (c 45), Sch B1, para 43(6) (as inserted by Enterprise Act 2002 (c 40), s 248, Sch 16)*

D        Two creditors of an English company which had entered administration pursuant to an order of the High Court commenced proceedings in New York seeking judgment for sums allegedly due from the company and an attachment and garnishment of its property sufficient to answer their claims.  That claim was made without notice to the administrators and without the New York court being informed either that the High Court had made an administration order or that the charterparties under which the claims were made had exclusive London arbitration clauses.  The New York court made ex parte orders attaching the property of the company within the Southern District of New York.  On the same date a summons was issued naming the company as defendant, and shortly thereafter writs of attachment and garnishment were issued against the property of the company, including property held for its benefit or moving through or within the possession of several named banks.  In ignorance of the attachments the administrators sought to make a substantial payment to a post-administration supplier of services to the company.  That sum went to the supplier's account with one of the banks in New York which had been served with the attachment orders and as a result a total of approximately US$2·2m was attached.  On being served with the New York proceedings and attachment orders the administrators applied to the High Court for an order requiring the creditors to take all necessary steps to procure the release of the two ex parte orders.  The judge granted the relief sought, holding that there was jurisdiction to restrain acts which interfered with an administration being conducted under an order of the English court, notwithstanding that the acts complained of were committed abroad.  In those circumstances the judge held that it was unnecessary for him to determine whether the New York proceedings breached the prohibition on instituting legal process against a company or property of a company in paragraph 43(6) of Schedule B1 to the Insolvency Act 1986[1].

          On the creditors' appeal—

          *Held*, dismissing the appeal, that the court's jurisdiction was not restricted by any territorial restriction on the statutory prohibition on instituting legal process against a company or property of a company imposed by paragraph 43(6) of Schedule B1 to the Insolvency Act 1986; that in the case of a company being wound up the court had jurisdiction to achieve the equitable distribution of the proceeds of the realisation of the assets by restraining creditors from moving against assets abroad; that although

    [1] Insolvency Act 1986, Sch B1, para 43(6), as inserted: see post, para 20.

AP0858

350
**Bloom v Harms Offshore GmbH & Co KG (CA)**                              [2010] 2 WLR

an administration was different, in that it did not give rise to trust property in favour        A
of the creditors, the underlying rationale of protecting the assets of the company was
the same; that, in the absence of any material distinction between winding up and
administration, the court also had a jurisdiction to protect the assets of a company
in administration from foreign attachments and executions; that the court would
exercise its powers so as to enable the administrators to discharge their statutory
functions and to fulfil their statutory duties in any particular case; that, although the
comity owed by the courts would normally make it inappropriate to grant injunctive        B
relief affecting procedures in a court of foreign jurisdiction, in an exceptional case
the conduct of the creditor against whom an injunction was sought, particularly if it
was oppressive, vexatious or otherwise unfair or improper, and the circumstances of
the attachment of the property of the company might justify the grant of such an
injunction; and that, in the circumstances of the present case, the court could and
should grant injunctive relief, but the judge's order should be varied so that the
interference with the proceedings in New York was limited to the release from        C
attachment of moneys paid by the administrators in respect of post-administration
liabilities before the date on which they were on notice of the orders made by the
New York court ( post, paras 22, 24–25, 27–29, 33, 34).

    *In re Oriental Inland Steam Co; Ex p Scinde Railway Co* (1874) LR 9 Ch App
557 and *Mitchell v Carter* [1997] 1 BCLC 673, CA applied.

    *Semble.* Like the statutory prohibition on creditors bringing proceedings
against a company being wound up by the court, the prohibition on "legal process" in
paragraph 43(6) of Schedule B1 to the Insolvency Act 1986 against companies        D
in administration does not have extraterritorial effect ( post, paras 16, 21, 34).

    Decision of Robert Englehart QC sitting as a deputy High Court judge [2009]
EWHC 1620 (Ch) varied.

The following cases are referred to in the judgment of Stanley Burnton LJ:

*Barclays Bank plc v Homan* [1993] BCLC 680, CA                                              E
*Mitchell v Carter* [1997] 1 BCLC 673, Blackburne J and CA
*Oriental Inland Steam Co, In re; Ex p Scinde Railway Co* (1874) LR 9 Ch App 557
*Polly Peck International plc, In re (No 2)* [1998] 3 All ER 812, CA
*Société Nationale Industrielle Aerospatiale v Lee Kui Jak* [1987] AC 871; [1987]
    3 WLR 59; [1987] 3 All ER 510, PC
*Vocalion (Foreign) Ltd, In re* [1932] 2 Ch 196

The following additional case was cited in argument:                                         F

*Hughes v Hannover Rückversicherungs-AG* [1997] 1 BCLC 497, CA

**APPEAL** from Mr Robert Englehart QC sitting as a deputy judge of the
Chancery Division

    On 7 January 2009, on the application of Oilexco North Sea Ltd, a
company incorporated in England, Patten J made an administration order in        G
respect of that company appointing Alan Robert Bloom, Colin Peter
Dempster, Thomas Merchant Burton and Roy Bailey as joint administrators.
On 16 January 2009, without notice to the administrators, Harms Offshore
AHT "Taurus" GmbH & Co KG and Harms Offshore AHT "Magnus"
GmbH & Co KG, companies incorporated in Germany which were
pre-administration creditors of the company ("the creditor companies"),
commenced proceedings in the United States District Court for the Southern        H
District of New York under its admiralty and maritime jurisdiction, seeking
judgment for the sums due from the company and an attachment and
garnishment of its tangible and intangible property sufficient to answer
their claims. The district court was not informed that the company was the

A   subject of an administration order, nor that arbitration agreements made in London were in place such that, if the debt claims were disputed, the creditor companies would be in breach by commencing substantive proceedings otherwise than by arbitration.  On 21 and 26 January 2009 the district court made ex parte orders attaching the property of the company within the Southern District of New York and on the same date a summons was issued naming the company as defendant.  Shortly thereafter writs of attachment

B   and garnishment were issued against the property of the company, including property held for its benefit or moving through or within the possession of 19 named banks.  The creditor companies did not inform the administrators that they had commenced proceedings in the district court or that they had obtained and were seeking to enforce attachments against the company's property.  In ignorance of the attachments, on 19 March 2009

C   the administrators sought to make a payment of US$3,380,963 to a post-administration supplier of services to the company.  That sum went to the supplier's account with one of the banks in New York that had been served with the attachment orders and, as a result, a total of approximately US$2·2m was attached. The New York proceedings and attachment orders were not served on the administrators until 24 March 2009.  The administrators proceeded to agree a sale of the shares of the company.  It was

D   conditional on a compromise of its liabilities to its creditors, which was to be effected by a company voluntary arrangement pursuant to Part I of the Insolvency Act 1986.  The company voluntary arrangement was approved by the creditors of the company.  It was a condition precedent of the sale of the shares of the company that the appointment of the administrators cease to have effect.   There was an alternative agreement for the sale of the

E   company's assets but it would result in a significantly smaller sum being available for unsecured creditors.  Both the creditor companies submitted forms of proxy and voting dated 9 April 2009 in favour of the company voluntary arrangement.

   By ordinary application issued on 24 April 2009 the administrators sought, inter alia, orders restraining the creditor companies from taking any further steps in the proceedings commenced in the district court and

F   requiring the creditor companies to take all necessary steps to procure the release of the two ex parte orders of maritime attachment and garnishment made by the district court in such proceedings against the tangible and intangible assets of the company and the release of any attachments effected pursuant to those orders.  On 15 May 2009 Mr Robert Englehart QC, sitting as a deputy judge of the Chancery Division in the Companies Court, granted

G   a mandatory injunction requiring the creditor companies to use their best endeavours to procure the release of the two ex parte orders of maritime attachment and garnishment and the release of attachments made pursuant to those orders; and he further ordered that the creditor companies be restrained from taking any steps in the substantive proceedings which they had commenced in the district court seeking judgments sums due to them from the company.  The judge granted permission to appeal but refused to

H   stay his order.
   By an appellant's notice dated 18 May 2009 the creditor companies appealed on the ground, inter alia, that since the Insolvency Act 1986 did not prohibit initiating proceedings abroad against a company in administration and since the administration did not give rise to a statutory trust over the

352
Bloom v Harms Offshore GmbH & Co KG (CA)                    [2010] 2 WLR
Stanley Burnton LJ

assets of the company for the benefit of the creditors, the judge had erred in    A
ordering that creditor companies give up the benefit of the attachments
obtained from the court in New York.

At the end of the hearing the Court of Appeal dismissed the appeal.  For
the benefit of the New York jurisdiction Sir John Chadwick [2009]
EWCA Civ 723 gave a brief summary of the court's basis for doing so
although the court reserved judgment as to its reasons.                            B

The facts are stated in the judgment of Stanley Burnton LJ.

*Elspeth Talbot Rice QC* and *Edward Cumming* (instructed by *Ince & Co*)
for the creditors.
*William Trower QC* and *Tom Smith* (instructed by *Herbert Smith LLP*)
for the joint administrators and the company.                                      C

The court took time for consideration.

26 June 2009.  The following judgments were handed down.

**STANLEY BURNTON LJ**

*Introduction*                                                                     D

1   On 7 January 2009, on the application of Oilexco North Sea Ltd ("the
company") Patten J made an administration order in respect of the company
appointing John Robert Bloom, Colin Peter Dempster, Thomas Merchant
Burton and Roy Bailey, as joint administrators.  On 15 May 2009, on the
application of the administrators, Mr Robert Englehart QC, sitting as a
deputy judge of the Chancery Division in the Companies Court, granted a
mandatory injunction requiring Harms Offshore AHT "Taurus" GmbH &          E
Co KG and Harms Offshore AHT "Magnus" GmbH & Co KG ("the creditor
companies"), to use their best endeavours to procure the release of two
ex parte orders of maritime attachment and garnishment made by the United
States District Court for the Southern District of New York ("the district
court") against the tangible and intangible assets of the company and the
release of attachments effected pursuant to those orders.  The order also    F
restrained the creditor companies from taking any steps in substantive
proceedings they had commenced in the district court seeking judgment for
sums due to them from the company.  The deputy judge granted permission
to appeal but refused to stay his order.

2   On 20 May 2009 as a matter of urgency this court heard an
application on the part of the creditor companies for a stay of the order     G
made on 15 May 2009 and their appeal against that order.  The application
and appeal were urgent because the United States Bankruptcy Court in the
Southern District of New York ("the bankruptcy court") was due to hear an
application by the administrators for the release of attachments secured by
the creditor companies later that day.  In addition, the administrators
contended that the release of the attachments was necessary for them to be in
a position to vacate office and thereby to enable completion of a sale of the    H
shares of the company.  We dismissed the appeal, and Sir John Chadwick
[2009] EWCA Civ 723 gave a brief summary of our reasons for doing so on
the basis that it would be of assistance to the bankruptcy court to know why
the courts in this country had maintained the injunction, and on the basis

A   that this court would give its reasons more fully in writing subsequently. The dismissal of the appeal rendered the application for a stay pending appeal otiose.

     3   This judgment sets out my reasons for dismissing the appeal.

*The facts*

B     4   The company is incorporated in England. It carried on the business of offshore oil and gas exploration in the North Sea. It encountered financial difficulties, and as a result, as mentioned above, the administration order was made on 7 January 2009. On the same date, on the application of the administrators, the Companies Court made an order authorising them to enter into and to procure the company to enter into a loan agreement with specified lenders and to draw down funds under that agreement for the purpose of "making such payments in respect of the post-administration liabilities of the company as the joint administrators consider likely to

C   achieve the purpose of the administration". The company was thus able to continue to trade, with a view to the sale of the company or, failing that, of its business and assets.

     5   The creditor companies are companies incorporated in Germany. They are one-ship companies, and are pre-administration creditors of the

D   company under time charterparties of their vessels, the *Taurus* and the *Magnus*, dated 7 November 2008. The charterparties are in the standard Supplytime 89 form for offshore service vessels; they are governed by English law and include an arbitration agreement requiring any dispute to be referred to arbitration in London. The charter hire and other payments to be made under the charterparty were denominated in sterling. The amounts

E   outstanding under the charterparties are, according to the creditor companies, £583,987·70 in respect of the *Taurus* and £595,203·65 in respect of the *Magnus*.

     6   By letters dated 7 January 2009 the administrators informed the known creditors of the company, including the appellant creditor companies, that it had entered administration and that they had been appointed administrators. The letter stated that the company was continuing its

F   business under their supervision whilst they investigated its financial affairs and endeavoured to realise a sale of the company or of its business or assets.

     7   On 16 January 2009, without notice to the administrators, the creditor companies commenced proceedings in the district court under its admiralty and maritime jurisdiction seeking judgment for the sums due from the company and an attachment and garnishment of its tangible and

G   intangible property sufficient to answer their claims. Para 7 of their verified complaints stated:

     "Under the laws of the United Kingdom, which govern the parties' charter, the prevailing party is entitled to recover its interest and attorneys' fees. Upon information and belief, it will take two years to bring this dispute to conclusion, resulting in a total of the following estimated interest and attorneys' fees in addition to plaintiff's principal

H   claim . . ."

In the *Taurus*, interest of US$85,641 and lawyers' fees of US$100,000 were thus added to the sum attached; in the *Magnus*, US$87,286 interest and US$100,000 were added to the sum attached.

354
Bloom v Harms Offshore GmbH & Co KG (CA)                    [2010] 2 WLR
Stanley Burnton LJ

    8   The creditor companies' verified complaints made no mention of the
fact, known to the creditor companies, that the company was the subject of
an administration order.  Although para 7 of the complaints stated that
the sums claimed were disputed, no mention was made of the London
arbitration agreements, of which, if their claims were disputed, the creditor
companies were in breach by commencing substantive proceedings
otherwise than by arbitration.  Of course, the United States of America is a
party to the New York Convention on the Recognition and Enforcement of
Foreign Arbitral Awards (1958), which would require the district court to
refer the claims to arbitration at the request of the company.  In fact, I have
seen nothing to show that the sums claimed by the creditor companies were
disputed; but even if they were, in my judgment the creditor companies'
complaints misled the district court by omitting mention of the
administration and the arbitration agreements.

    9   On 21 and 26 January 2009 ex parte orders were made by the district
court attaching the property of the company within the Southern District of
New York.  On the same date a summons was issued naming the company as
defendant.  Shortly thereafter writs of attachment and garnishment were
issued against the property of the company, including property held for its
benefit or moving through or within the possession of 19 named banks.

    10   The creditor companies did not inform the administrators that
they had commenced the proceedings in the district court or that they
had obtained and were seeking to enforce attachments against the
company's property.  In ignorance of the attachments, on 19 March 2009
the administrators sought to make a payment of US$3,380,963 to a
post-administration supplier of services to the company.  That sum went to
the supplier's account with one of the banks in New York that had been
served with the attachment orders.  As a result, a total of approximately
US$2·2m was attached.

    11   The New York proceedings and attachment orders were not served
on the administrators until 24 March 2009.

    12   The administrators agreed a sale of the shares of the company.
It was conditional on a compromise of its liabilities to its creditors, which
was to be effected by a company voluntary arrangement ("CVA") pursuant
to Part I of the Insolvency Act 1986.  The CVA was approved by the creditors
of the company.  It was a condition precedent of the sale of the shares of the
company that the appointment of the administrators cease to have effect.
There was an alternative agreement for the sale of the company's assets but
it would result in a significantly smaller sum being available for unsecured
creditors.  Both of the creditor companies submitted forms of proxy and
voting dated 9 April 2009 in favour of the CVA.

    13   In addition to seeking relief in the Companies Court, on 7 May 2009
the administrators brought proceedings in the bankruptcy court seeking an
order vacating the attachments obtained by the creditor companies.  The
basis of the administrators' proceedings is that the bankruptcy court in New
York should recognise the administration order under principles of comity
embodied in Chapter 15 of the United States Bankruptcy Code.  Chapter 15
is the United States' domestic adoption of the Model Law on Cross-Border
Insolvency promulgated by the United Nations Commission on International
Trade Law ("UNCITRAL") in 1997.  Its purpose is to "provide effective
mechanisms for dealing with . . . cross-border insolvency": preamble.

A

B

C

D

E

F

G

H

A    *The contentions of the parties*

   **14**   On behalf of the creditor companies, Mrs Talbot Rice QC submitted
   that the creditor companies had not acted in breach of any statutory
   restriction on legal proceedings being commenced against a company in
   administration.  Paragraph 43(6) of Schedule B1 to the Insolvency Act 1986
   (as substituted by section 248 of, and Schedule 16 to, the Enterprise Act
B    2002) does not have extraterritorial effect.   Furthermore, the assets of a
   company in administration, unlike those of a company that is being wound
   up, are not subject to the trust that justified anti-suit injunctions against
   creditors of companies in liquidation.  The district court in New York was
   properly seized of an attachment against property within its jurisdiction,
   and comity requires the courts of this country to abstain from interfering
   with proceedings before that court.   The need for judicial restraint and
C    recognition of the requirements of comity are particularly great where, as
   here, the foreign jurisdiction has adopted statutory provisions such as those
   of Chapter 15 of the Bankruptcy Code and the administrators have
   commenced proceedings in that jurisdiction.
   **15**   On behalf of the administrators, Mr Trower QC submitted that the
   deputy judge had been entitled to grant the injunction in the circumstances
D    of this case, where the action taken by the creditor companies interferes with
   the exercise by the administrators of their functions pursuant to orders of the
   Companies Court, and the subject matter of the foreign proceedings has no
   connection with the foreign jurisdiction.

   *Discussion*

E    **16**   It has long been established that the statutory prohibition against
   creditors bringing proceedings against a company being wound up by the
   court is not extraterritorial, i e, it does not extend to proceedings brought in
   foreign courts.   In *In re Oriental Inland Steam Co; Ex p Scinde Railway Co*
   (1874) LR 9 Ch App 557, the liquidator obtained an order requiring a
   creditor who had attached assets in India to return them to the company in
   liquidation.  James LJ said, at pp 558–559:
F
       "The winding up is necessarily confined to this country.   It is not
   immaterial to observe, that there could now be no possibility, having
   regard to the decision of the Supreme Court of *Calcutta*, in *Bank of
   Hindustan v Premchand* 5 Bomb HC Rep 83, which we must take to be
   quite right, of treating this case as if there were an auxiliary winding up in
   *India*. If this is so with regard to a company domiciled in *England*, but
G    having its business and assets in *India*, there would be no ground for the
   contention on the part of the appellants that they would obtain an
   equitable and rateable distribution of the assets between the creditors.  All
   the assets there would be liable to be torn to pieces by creditors there,
   notwithstanding the winding up, and there would be an utter incapacity
   of the courts there to proceed to effect an equitable distribution of them.
   The English Act of Parliament has enacted that in the case of a winding up
H    the assets of the company so wound up are to be collected and applied
   in discharge of its liabilities.   That makes the property of the company
   clearly trust property.   It is property affected by the Act of Parliament with
   an obligation to be dealt with by the proper officer in a particular way.
   Then it has ceased to be beneficially the property of the company; and,

356
Bloom v Harms Offshore GmbH & Co KG (CA)                    [2010] 2 WLR
Stanley Burnton LJ

being so, it has ceased to be liable to be seized by the execution creditors     A
of the company.  There may, no doubt, be some difficulty in the way
of dealing with assets and creditors abroad.  The court abroad may
sometimes not be disposed to assist this court, or take the same view of
the law as the courts of this country have taken as to the proper mode of
dealing with such companies, and also with such assets.  If so, we must
submit to these difficulties when they occur.  In this particular case there is     B
no such difficulty.  There were assets fixed by the Act of Parliament with a
trust for equal distribution amongst the creditors.  One creditor has, by
means of an execution abroad, been able to obtain possession of part of
those assets.  The Vice-Chancellor was of opinion that this was the same
as that of one cestui que trust getting possession of the trust property after
the property had been affected with notice of the trust.  If so, that cestui
que trust must bring it in for distribution among the other cestuis que     C
trust.  So I, too, am of opinion, that these creditors cannot get any priority
over their fellow-creditors by reason of their having got possession of the
assets in this way.  The assets must be distributed in *England* upon the
footing of equality.”

17   Mellish LJ said, at pp 559–561:

    “I quite agree that the 87th section of the Companies Act 1862     D
(25 & 26 Vict, c 89), providing that no action shall be brought without
the leave of the court, and the 163rd section, enacting that no execution
shall issue, apply only to the courts in this country.  Of course, Parliament
never legislates respecting strictly foreign courts.  Nor is it usually
considered to be legislating respecting colonial courts or Indian courts,
unless they are expressly mentioned.  Still, that appears to me not to     E
prevent the general application to this case of the principles which have
been established in cases of bankruptcy.  No doubt winding up differs
from bankruptcy in this respect, that in bankruptcy the whole estate, both
legal and beneficial, is taken out of the bankrupt, and is vested in his
trustees or assignees, whereas in a winding up the legal estate still remains
in the company.  But, in my opinion, the beneficial interest is clearly taken
out of the company.  What the statute says in the 95th section is, that from     F
the time of the winding up order all the powers of the directors of the
company to carry on the trade or to deal with the assets of the company
shall be wholly determined, and nobody shall have any power to deal
with them except the official liquidator, and he is to deal with them
for the purpose of collecting the assets and dividing them amongst the
creditors.  It appears to me that that does, in strictness, constitute a trust     G
for the benefit of all the creditors, and, as far as this court has jurisdiction,
no one creditor can be allowed to have a larger share of the assets than
any other creditor.  Then it is said that the assets are subject to the law of
the place where they are.  I quite agree that if the law of the place where
they are had given a charge of that nature on the assets prior to the time
when the petition for winding up was presented, or possibly prior to the
time when the winding up order was made, and a judgment, for instance,     H
had been put on the register, that might, by the law of *Bombay*, have
constituted a charge on the property of the company, and then the trust
for the benefit of the creditors would have been subject to that charge.
But here there is no allegation that the judgment in *Bombay*, any more

357
[2010] 2 WLR                                  Bloom v Harms Offshore GmbH & Co KG (CA)
                                                            Stanley Burnton LJ

A    than a judgment here, simply qua judgment, operates as any charge at all.
     It is quite clear that it does not, and that until the execution and
     attachment have issued and been executed, there is no actual charge on
     the property. That charge is subsequent to the creation of the trust, and is
     made by the particular appellants here with full notice of the trust. The
     consequence necessarily follows, that in this court these creditors cannot
     be allowed by such means to obtain priority; and that they must give up,
B    for the benefit of the creditors, what they have so obtained."

        18   As can be seen, although the statutory prohibition was interpreted as
     confined to the jurisdiction of these courts, the finding of a trust resulted in
     an effective extraterritorial jurisdiction.
        19   As mentioned above, before us the creditor companies sought to
     distinguish the position of a company being compulsorily wound up from
C    that of a company in administration. In the former case, the assets of the
     company are the subject of a trust, but not the latter. The administrators
     took issue with this submission. In addition, the administrators contended
     that the definition of "property" in section 436 of the Insolvency Act 1986 as
     including every description of property "wherever situated" means that the
     prohibition in paragraph 43 of Schedule B1 to the 1986 Act applies to
     property outside the jurisdiction.
D       20   Paragraph 43(6) of Schedule B1 is as follows:

           "No legal process (including legal proceedings, execution, distress
        and diligence) may be instituted or continued against the company
        or property of the company except— (a) with the consent of the
        administrator, or (b) with the permission of the court."
E
        21   I find it difficult, particularly in the light of the long line of
     authorities beginning with *In re Oriental Inland Steam Co* LR 9 Ch App
     557, to interpret this provision as applying to proceedings brought by a
     creditor who is not subject to the jurisdiction in a court outside the
     jurisdiction. The presumption against extraterritoriality would lead me to
     interpret the reference to legal process as confined to process within the
F    jurisdiction, or (having regard to paragraph 43(5)) within the United
     Kingdom. My difficulty is reinforced by the facts that in *Mitchell v Carter*
     [1997] 1 BCLC 673 Blackburne J decided that section 183, which precludes
     a creditor who levies execution or attaches a debt after commencement of
     a winding up from retaining the benefit of his execution or attachment,
     does not apply to executions or attachments in foreign jurisdictions, and
     that in the Court of Appeal it was not disputed that the section has no
G    extraterritorial effect. Moreover, Parliament has had but not used the
     opportunity to make express extraterritorial provision. I see no relevant
     distinction between the wording of paragraph 43 and that of the statutory
     prohibition in section 130 of the Insolvency Act 1986 in relation to
     companies in respect of which a winding up order has been made.
        22   It is however unnecessary for me to arrive at a final conclusion on
H    this issue. This is because cases such as *In re Oriental Inland Steam Co* and
     *Mitchell v Carter* show that the jurisdiction of the court is not restricted by
     the territoriality of the statutory prohibition. I do not think that this
     jurisdiction is confined to the protection of the assets of a company that is
     being wound up, and is not available to protect the assets of a company in

358
Bloom v Harms Offshore GmbH & Co KG (CA)                    [2010] 2 WLR
Stanley Burnton LJ

administration.  I do not accept that the protection of the assets of a    A
company in administration is to be regarded by the court as differing in
substance from the protection of the assets of a company in compulsory
liquidation.  In both cases, the assets of the company are dealt with by an
officer appointed by the court in accordance with statutory duties.  The
administrators of a company are required by paragraph 3(1) of Schedule B1
to the 1986 Act to perform their functions with the objective of:            B

    "(a) rescuing the company as a going concern, or (b) achieving a better
    result for the company's creditors as a whole than would be likely if
    the company were wound up (without first being in administration), or
    (c) realising property in order to make a distribution to one or more
    secured or preferential creditors."

Sub-paragraph (2) requires the administrators to perform their functions in    C
the interests of the company's creditors as a whole, subject to sub-paragraph
(4), viz:

    "(4) The administrator may perform his functions with the objective
    specified in sub-paragraph (1)(c) only if— (a) he thinks that it is not
    reasonably practicable to achieve either of the objectives specified in
    sub-paragraph (1)(a) and (b), and (b) he does not unnecessarily harm the    D
    interests of the creditors of the company as a whole."

23   One of the duties of the administrators, and therefore one of their
functions for the purpose of paragraph 3, is to "take custody or control of all
the property to which he thinks the company is entitled" (see paragraph 67
of Schedule B1 to the 1986 Act), and section 436 makes it clear that that
means the property of the company both within and outside the jurisdiction.    E

24   It seems to me that the trust the existence of which was established in
*In re Oriental Inland Steam Co* was a legal construct created to achieve the
equitable distribution of the proceeds of the realisation of the assets of the
company wherever situated.  As Millett LJ pointed out in *Mitchell v Carter*
[1997] 1 BCLC 673, 689, it is a trust which confers no beneficial interest on
the creditors, who are the beneficiaries.  Their only right is to have the assets    F
of the company dealt with in accordance with the statutory scheme
applicable to a company that is the subject of a winding up order.  Similarly,
the creditors of a company in administration are entitled to have the
company and its assets dealt with in accordance with the statutory scheme
applicable to such companies.  The lack of any material distinction between
compulsory winding up and administration is demonstrated by the
judgment of Mummery LJ in *In re Polly Peck International plc (No 2)* [1998]    G
3 All ER 812, 827.  If the court has a jurisdiction to protect the assets of a
company that is being wound up by the court from foreign attachments and
executions, in my judgment it has a similar jurisdiction in the case of a
company in administration.

25   But although the court has jurisdiction to prevent a creditor from
taking advantage of a foreign attachment, it does not follow that the    H
jurisdiction should be exercised in any particular case.  The exercise of the
jurisdiction will depend on the facts of the case, and must be tempered by
considerations of comity.  The judgment of Maugham J in *In re Vocalion
(Foreign) Ltd* [1932] 2 Ch 196 is helpfully summarised in the headnote:

A     "Section 177 of the Companies Act 1929 only applies to proceedings pending in a court of Great Britain and does not apply to proceedings pending in a foreign or colonial court.  The court can, however, in the exercise of its equitable jurisdiction in personam restrain a respondent properly served in this country from proceeding with an action brought in a foreign or colonial court to enforce a liability incurred abroad.  But as against a respondent domiciled abroad, substantial justice is more likely

B   to be attained by allowing the foreign proceedings to continue, and in such a case the court will not as a rule exercise that jurisdiction."

    26   The reluctance of the court to interfere with proceedings in a foreign court by the grant of anti-suit injunctions is demonstrated by the important judgment of the Privy Council in *Société Nationale Industrielle Aerospatiale v Lee Kui Jak* [1987] AC 871.  In that case, the question was

C   where a civil claim should be tried.  In such cases questions of forum non conveniens arise, although, as the judgment makes clear, the inconvenience of a forum is of itself not a sufficient justification for the grant of injunctive relief.  The present case is different.  The question is not where a dispute as to liability or damages should be determined, but whether the creditor companies should be able to continue their proceedings before the district court so as to secure the benefit of their attachments, and thus promote

D   themselves from unsecured to secured creditors.  In such cases, as the Privy Council pointed out in the *Aerospatiale* case [1987] 1 AC 871, 892H, the purpose of the anti-suit injunction may be said to be to protect the jurisdiction of the English court.  In *Mitchell v Carter* [1997] 1 BCLC 673, 687 Millett LJ said:

E     "The position today is that stated by Hoffmann J in *Barclays Bank plc v Homan* [1993] BCLC 680.  There must be a good reason why the decision to stop foreign proceedings should be made here rather than there.  The normal assumption is that the foreign judge is the person best qualified to decide if the proceedings in his court should be allowed to continue.  Comity demands a policy of non-intervention."

F     27   The court should exercise its powers so as to enable the administrators to exercise their statutory functions and to fulfil their statutory duties, so far as necessary in any particular case.  The comity owed by the courts of different jurisdictions to each other will normally make it inappropriate for the court to grant injunctive relief affecting procedures in a court of foreign jurisdiction.  In this particular case, this court recognises that the bankruptcy and district courts are experienced in commercial and

G   insolvency matters.  None the less, the conduct of the creditor against whom an injunction is sought, and the circumstances of the attachment of the property of the company, may justify the grant of an injunction despite the strong presumption that this court will not interfere with the proceedings of a foreign court.  In particular, if the conduct of the creditor can be castigated as oppressive or vexatious (as to which see the judgment of Glidewell LJ,

H   with whom the other members of the Court of Appeal agreed, in *Barclays Bank v Homan* [1993] BCLC 680) or otherwise unfair or improper, this court can and should grant relief in order to protect the performance by administrators of their functions and duties, and thus the creditors of the company, pursuant to orders of the court.

360
Bloom v Harms Offshore GmbH & Co KG (CA)                    [2010] 2 WLR
Stanley Burnton LJ

    28  In the present case, the following factors are relevant.  (a) The    A
company is incorporated in England and its place of business was in this
country.  It had no place of business or assets in the United States when the
attachment orders were made.  Similarly, neither of the creditor companies is
incorporated or carries on business in the United States.  (b) The company
entered into administration and the administrators were appointed and
carried out their duties and functions pursuant to orders of the Companies    B
Court in this jurisdiction.    Thus the administration is subject to the
jurisdiction of the Companies Court in this country.  (c) When applying for
the attachments, the creditor companies failed to inform the district court of
the fact that the company was in administration or of the arbitration
agreements by which they were bound.  If under the law of New York they
were under a duty to make full and frank disclosure, they were in breach of
that duty, but in any event their verified complaints gave a misleading picture    C
to the district court.  The district court thus made the attachment orders in
ignorance of highly material facts.  (d) The attachments did not fasten on
any pre-administration property of the company in New York.  I can assume
that there was none.  Successful attachments therefore depended on property
of the company coming within the jurisdiction of the district court during
the course of the administration.  (e) This was not a case of a debtor seeking    D
to evade payment of its liabilities to the creditor companies, but of officers
appointed by the court seeking to secure the best outcome for the creditors of
the company.  None the less, the creditor companies did not inform the
administrators of the attachment orders they had obtained until after they
had succeeded in attaching funds sufficient to secure their claims.  They had
been informed that the administrators proposed to carry on the business of
the company.  That would involve making payments, often in US dollars,    E
for post-administration supplies and services, as the creditor companies,
companies carrying on business in the oil and gas industries, must have been
aware.  Such payments would be made to suppliers' bank accounts, which
might be in New York; in any event, the district court's power to attach
funds has been applied to dollar payments cleared through New York.
International dollar payments are cleared through the USA, and generally
New York.    The creditor companies thus established a trap for the    F
administrators.    The creditor companies' conduct was unconscionable.
(f) The funds subject to the attachment were the proceeds of a loan entered
into pursuant to an order of the court and were transmitted to New York in
order to pay for post-administration services contracted for pursuant to an
order of the court.  The attachments thus interfered with the performance by
the administrators of their functions and duties as such pursuant to an order    G
of the Companies Court.
    29  In my judgment, the conduct of the creditor companies and the
circumstances of the attachments brought it into the exceptional category in
which the grant of injunctive relief is justified, notwithstanding comity and
notwithstanding the outstanding application of the administrators in New
York.  It is unnecessary to consider whether any of the factors listed above
alone would have justified the grant of injunctive relief.  It was similarly    H
unnecessary to determine any of the more wide-ranging submissions of the
parties.
    30  Last, it seemed to me that the bankruptcy court judge in New York
would be assisted to be made aware of the views of this court in this matter,

361
[2010] 2 WLR                        Bloom v Harms Offshore GmbH & Co KG (CA)
                                                            Stanley Burnton LJ

A    an English administration relating to an English company that did not carry
     on business in the United States and did not have any assets in that
     jurisdiction when the administration order was made; and indeed the
     transcript of the proceedings before Judge Drain indicated that he would be
     assisted by a ruling of this court.  The order dismissing the appeal and the
     short reasons given by Sir John Chadwick were an appropriate means of
     communicating the views of this court to the district court in New York.
B
         31   More generally, I point out that administrators should be aware that
     the jurisdiction of the district court to attach payments in dollars cleared
     through New York may mean that they will be unable safely to make dollar
     payments in respect of post-administration liabilities without first having
     obtained recognition of the administration as a "foreign proceeding" under
     Chapter 15 of the United States Bankruptcy Code.
C
     SIR JOHN CHADWICK
         32   As Stanley Burnton LJ has observed, we dismissed this appeal at the
     conclusion of oral argument.  But we varied the order made by the judge so
     as to make it clear that the interference with the proceedings in New York
     pursuant to that order was limited to the release from attachment of moneys
     paid by the administrators in respect of post-administration liabilities and
D    where such payments were made through New York before 25 March 2009:
     that is to say, before the date on which the administrators were on notice of
     the orders made by the district court.
         33   That is, to my mind, an important limitation.  It emphasises the
     special feature of this case: that the effect of the creditor companies' conduct,
     described by Stanley Burnton LJ, was to set a trap for the administrators
     which, when sprung, obstructed the proper discharge of the functions for
E    which the High Court had appointed them.  It is that feature which, to my
     mind, requires the United Kingdom court to intervene, notwithstanding the
     strong presumption against interference with proceedings in a foreign court
     to which Stanley Burnton LJ has referred.  It is that feature which justifies
     the categorisation of the creditor companies' conduct as improper and
     oppressive in the context of the ongoing administration of the company in
F    the United Kingdom.

     WARD LJ
         34   I agree with both judgments.

                                                    *Appeal dismissed.*
                                                    *Order varied.*
G                                                   *Permission to appeal refused.*

                                                                   M B

H                                  _____

# Colonial Laws Validity Act 1865

## 1865 CHAPTER 63

*An Act to remove Doubts as to the Validity of Colonial Laws*

[29th June 1865]

### 1 Interpretation

The term "colony" shall in this Act include all of Her Majesty's possessions abroad in which there shall exist a legislature, as herein-after defined, except the Channel Islands, the Isle of Man . . .

The terms "legislature" and "colonial legislature" shall severally signify the authority, other than the Imperial Parliament or Her Majesty in Council, competent to make laws for any colony:

The term "representative legislature" shall signify any colonial legislature which shall comprise a legislative body of which one half are elected by inhabitants of the colony:

The term "colonial law" shall include laws made for any colony either by such legislature as aforesaid or by Her Majesty in Council:

An Act of Parliament, or any provision thereof, shall, in construing this Act, be said to extend to any colony when it is made applicable to such colony by the express words or necessary intendment of any Act of Parliament:

The term "governor" shall mean the officer lawfully administering the government of any colony:

The term "letters patent" shall mean letters patent under the Great Seal of the United Kingdom of Great Britain and Ireland.

**NOTES**

**Initial Commencement**

    ***Royal Assent***

    Royal Assent: 29 June 1865: (no specific commencement provision).

**Amendment**

    Words omitted repealed by the Burma Independence Act 1947, s 5, Sch 2, and the Statute Law (Revision) Act 1976.

**See Further**

    See further, as to the disapplication of this Act for certain purposes: the Australia Act 1985, s 3.

### 2 Colonial laws, when void for repugnancy

Any colonial law which is or shall be in any respect repugnant to the provisions of any Act of Parliament extending to the colony to which such law may relate, or repugnant to any order or regulation made under authority of such Act of Parliament, or having in the colony the force and effect of such Act, shall be read subject to such Act, order, or regulation, and shall, to the extent of such repugnancy, but not otherwise, be and remain absolutely void and inoperative.

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis

**NOTES**

**Initial Commencement**
*Royal Assent*
Royal Assent: 29 June 1865: (no specific commencement provision).

**See Further**
See further, as to the disapplication of this Act for certain purposes: the Australia Act 1985, s 3.

**3 Colonial laws, when not void for repugnancy**

No colonial law shall be or be deemed to have been void or inoperative on the ground of repugnancy to the law of England, unless the same shall be repugnant to the provisions of some such Act of Parliament, order, or regulation as aforesaid.

**NOTES**

**Initial Commencement**
*Royal Assent*
Royal Assent: 29 June 1865: (no specific commencement provision).

**See Further**
See further, as to the disapplication of this Act for certain purposes: the Australia Act 1985, s 3.

**4 Colonial laws not void for inconsistency with instructions to governors**

No colonial law passed with the concurrence of or assented to by the governor of any colony, or to be hereafter so passed or assented to, shall be or be deemed to have been void or inoperative by reason only of any instructions with reference to such law or the subject thereof which may have been given to such governor by or on behalf of Her Majesty, by any instrument other than the letters patent or instrument authorizing such governor to concur in passing or to assent to laws for the peace, order, and good government of such colony, even though such instructions may be referred to in such letters patent or last-mentioned instrument.

**NOTES**

**Initial Commencement**
*Royal Assent*
Royal Assent: 29 June 1865: (no specific commencement provision).

**See Further**
See further, as to the disapplication of this Act for certain purposes: the Australia Act 1985, s 3.

**5 Colonial legislatures may establish, -&c, courts of law. Representative legislatures may alter their constitutions**

Every colonial legislature shall have, and be deemed at all times to have had, full power within its jurisdiction to establish courts of judicature, and to abolish and reconstitute the same, and to alter the constitution thereof, and to make provision for the administration of justice therein; and every representative legislature shall, in respect to the colony under its jurisdiction, have, and be deemed at all times to have had, full power to make laws respecting the constitution, powers, and procedure of such legislature; provided that such laws shall have been passed in such manner and form as may from time to time be required by any Act of Parliament, letters patent, Order in Council, or colonial law for the time being in force in the said colony.

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis

**NOTES**

**Initial Commencement**

    *Royal Assent*

    Royal Assent: 29 June 1865: (no specific commencement provision).

**See Further**

    See further, as to the disapplication of this Act for certain purposes: the Australia Act 1985, s 3.

## 6 Evidence of passing, disallowance, and assent

The certificate of the clerk or other proper officer of a legislative body in any colony to the effect that the document to which it is attached is a true copy of any colonial law assented to by the governor of such colony, or of any Bill reserved for the signification of Her Majesty's pleasure by the said governor, shall be prima facie evidence that the document so certified is a true copy of such law or Bill, and, as the case may be, that such law has been duly and properly passed and assented to, or that such Bill has been duly and properly passed and presented to the governor; and any proclamation purporting to be published by authority of the governor in any newspaper in the colony to which such law or Bill shall relate, and signifying Her Majesty's disallowance of any such colonial law, or Her Majesty's assent to any such reserved Bill as aforesaid, shall be prima facie evidence of such disallowance or assent.

**NOTES**

**Initial Commencement**

    *Royal Assent*

    Royal Assent: 29 June 1865: (no specific commencement provision).

**See Further**

    See further, as to the disapplication of this Act for certain purposes: the Australia Act 1985, s 3.

## 7 . . .

. . .

**NOTES**

**Amendment**

    Repealed by the Statute Law (Repeals) Act 1989.

Reproduced by permission of Reed Elsevier (UK) Limited trading as LexisNexis



**BERMUDA**

**COMPANIES ACT 1981**

**1981 : 59**

TABLE OF CONTENTS

PART I
INTERPRETATION AND APPLICATION

1        Short title and commencement
2        Interpretation
2A       Delivery of electronic records to and from the Registrar
2AA      Delivery of electronic records in other circumstances
3        Appointment of Registrar
4        Application
4A       Restricted business activities
4AA      Restricted business activity relating to corporate land holding
4B       Prohibited business activities

PART II
INCORPORATION OF COMPANIES

5        Mode of forming a company
5A       Information regarding economic substance
6        Registration of companies
7        Requirements of memorandum
8        Prohibition of registration of companies with undesirable names
9        Power to dispense with "limited" in name of charitable and other companies
10       Change of name of a company
10A      Secondary name
11       Objects and powers of a company
12       Procedure for alteration of memorandum
13       Bye-laws
14       Registration of companies
14A      Re-registration of limited liability company as unlimited liability company

---

**1**

COMPANIES ACT 1981

14B    Re-registration of unlimited liability company as company limited by shares or by guarantee
15    Certificate of incorporation to be conclusive evidence
16    Effect of memorandum and bye-laws
17    Alterations in memorandum or bye-laws increasing liability to contribute to share capital not to bind existing members without consent
18    Copies of memorandum and bye-laws to be given to members
19    Definition of member
20    *[repealed]*
21    Form of contracts
22    Bills of exchange and promissory notes
23    Execution of documents
24    Authentication of documents
24A    Agreement not to exercise powers
24B    Correction of filed documents

PART III
PROSPECTUSES AND PUBLIC OFFERS

25    Interpretation of Part III
26    Company offering shares to public shall publish a prospectus
27    Contents of a prospectus
28    Minimum amount required to be raised to be stated in prospectus
29    Companies continuously offering shares to the public
30    Offences relating to the issue of a prospectus
31    Civil liability for mis-statements in prospectus
32    When experts are not liable
33    Restriction on alteration of terms mentioned in prospectus
34    Rules

PART IIIA
INITIAL COIN OFFERING

34A    Interpretation of Part IIIA *[repealed]*
34B    Restriction on issuing Initial Coin Offering *[repealed]*
34C    Company offering digital assets to public shall publish an ICO offer document *[repealed]*
34D    Contents of an ICO offer document *[repealed]*
34E    Companies offering digital assets to the public *[repealed]*
34F    Providing a communication facility; cooling-off rights *[repealed]*
34G    General Initial Coin Offering risk warning *[repealed]*
34H    Identification of persons in relation to ICO offer document *[repealed]*
34I    Security of digital assets, confidentiality, disclosure of information *[repealed]*
34J    Offences relating to the issue of an Initial Coin Offering *[repealed]*
34K    Civil liability for mis-statements in ICO offer document *[repealed]*
34L    When experts are not liable *[repealed]*
34M    Regulations *[repealed]*
34N    Code of Conduct *[repealed]*
34O    Power to obtain information and reports *[repealed]*

**2**

**COMPANIES ACT 1981**

34P      Application of Public Access to Information Act 2010  *[repealed]*

PART IV
SHARE CAPITAL DEBENTURES AND DIVIDENDS

35      Prohibition of allotment unless minimum subscription received
36      Effect of irregular allotment
37      Penalty for the contravention of section 36
38      Payment of commissions
39      Financial assistance generally prohibited  *[repealed]*
39A     Exclusion from prohibition on financial assistance  *[repealed]*
39B     Circumstances where financial assistance is permitted  *[repealed]*
39C     Conditions applicable to giving of financial assistance under section 39B  *[repealed]*
40      Application of premiums received on issue of shares
41      Meaning of "reserve"
42      Power to issue redeemable preference shares
42A     Purchase by a company of its own shares
42B     Treasury shares
43      Power to convert preference shares into redeemable preference shares
44      Power of company to arrange for different amounts being paid on shares
45      Power of company limited by shares to alter its share capital
46      Reduction of share capital
47      Rights of holders of special classes of shares
48      Nature and transfer of shares
49      Transfer by estate representative
50      Notice of refusal to register transfer
51      Duties of company with respect to the issue of certificates
52      Certificate to be evidence of title and evidence of grant of probate
53      Bearer shares prohibited
54      Dividends and other distributions
54A     Right to claim damages

PART V
THE REGISTRATION OF CHARGES

55      Register of charges; registration; priorities
55A     Amendment of register
56      Correction of register
57      Registration of series of debentures
58      Registration of particulars of commission paid
59      Entry of satisfaction; release of property from charge
60      Registration of enforcement of security
61      Application of Part V to charges created and acquired by company incorporated outside Bermuda

PART VI
MANAGEMENT AND ADMINISTRATION

62      Registered office of company

**3**

**COMPANIES ACT 1981**

| | |
|---|---|
| 62A | Service of documents |
| 63 | Publication of name of company |
| 64 | Restriction on commencement of business |
| 65 | Register of members |
| 66 | Inspection of register |
| 66A | Offences relating to the register of members |
| 67 | Power of Court to rectify register |
| 68 | Register to be evidence |
| 69 | Provisional directors and their powers |
| 70 | First general meeting of members to elect directors |
| 71 | General meetings |
| 71A | Election to dispense with annual general meetings |
| 72 | Failure to hold annual general meeting or to elect directors |
| 73 | Position when election of directors does not take place |
| 74 | Convening of special general meeting on requisition |
| 75 | Length of notice for calling meetings |
| 75A | Telephonic, etc. meeting |
| 76 | Power of Court to order meeting |
| 77 | Voting at meetings |
| 77A | Resolution in writing |
| 78 | Representation of corporations at meetings |
| 79 | Circulation of members' resolution, etc. |
| 80 | Conditions to be met before company bound to give notice of resolution |
| 81 | Minutes of proceedings to be kept |
| 82 | Inspection of minute books |
| 83 | Keeping of books of account |
| 84 | Financial statements to be laid before general meeting |
| 85 | *[repealed]* |
| 86 | Definition of subsidiary and holding companies |
| 87 | Right to receive copies of balance sheet etc. |
| 87A | Provision of summarised financial statements to shareholders |
| 87B | Ascertainment of shareholders' election |
| 87C | Provision of full financial statements for inspection |
| 88 | Power to waive laying of accounts and appointment of auditor |
| 89 | Appointment and disqualification of auditor |
| 90 | Annual audit |
| 91 | Election of directors |
| 91A | Representation of director by another director |
| 91B | Directors entitled to receive notice of meetings, etc. |
| 92 | Appointment of secretary |
| 92A | Register of directors and officers |
| 92B | Register of Directors |
| 93 | Removal of directors |
| 94 | Undischarged bankrupt not to take part in management of a company |
| 95 | Court may order that a convicted person shall not take part in the management of the affairs of a company |
| 96 | Prohibition of loans to directors without consent of members |

AP0877

**COMPANIES ACT 1981**

| | |
|---|---|
| 97 | Duty of care of officers |
| 98 | Exemption, indemnification and liability of officers, etc. |
| 98A | Insurance of officers |
| 98(B) | Liability of auditor or officer |

PART VIA
BENEFICIAL OWNERSHIP

| | |
|---|---|
| 98C | Interpretation of this Part |
| 98D | Application of this Part |

*Company to identify beneficial owners*

| | |
|---|---|
| 98E | Meaning of beneficial owner |
| 98F | Companies to obtain information regarding beneficial owners |
| 98G | Company to issue notice to beneficial owners |

*Beneficial ownership register*

| | |
|---|---|
| 98H | Duty to keep beneficial ownership register |
| 98I | Company to keep beneficial ownership register up-to-date and current |
| 98J | Disputes regarding beneficial ownership |
| 98K | Power of Court to rectify beneficial ownership register |

*Beneficial ownership information to be filed with Bermuda Monetary Authority; compliance measures*

| | |
|---|---|
| 98L | Filing of beneficial ownership information with Bermuda Monetary Authority |

*Compliance measures*

| | |
|---|---|
| 98M | Notice by company imposing restrictions |
| 98N | Power to obtain information and reports |
| 98O | Offences |

*Miscellaneous*

| | |
|---|---|
| 98P | Confidentiality |
| 98Q | Privileged information |
| 98R | Application of Public Access to Information Act 2010 |
| 98S | Application of Personal Information Protection Act 2016 |
| 98T | Other provisions concerning beneficial ownership or registers etc. not affected |
| 98U | Notices |

PART VII
ARRANGEMENTS, RECONSTRUCTIONS, AMALGAMATIONS AND MERGERS

| | |
|---|---|
| 99 | Power to compromise with creditors and members |
| 100 | Information as to compromise with creditors and members |
| 101 | Reconstruction of companies |
| 102 | Power to acquire shares of shareholders dissenting from scheme or contract approved by majority |
| 103 | Holders of 95% of shares may acquire remainder |
| 104 | Amalgamation of companies |

AP0878

**COMPANIES ACT 1981**

104A    Amalgamation or merger of exempted company and foreign corporation and continuation as an exempted company
104B    Amalgamation or merger of exempted company and foreign corporation and continuation as a foreign corporation
104C    Documents to be filed on amalgamation or merger and continuation as a foreign corporation
104D    Provisions applicable to amalgamation or merger and continuation as a foreign corporation
104E    Effect of amalgamation of company under section 104B *[repealed]*
104F    Minister's refusal to grant consent *[repealed]*
104G    Regulations *[repealed]*
104H    Merger of companies
105    Amalgamation agreement or merger agreement
106    Shareholder approval
107    Short form amalgamation or merger
108    Registration of amalgamated or surviving companies
109    Effect of certificate of amalgamated or surviving companies

PART VIII
THE INVESTIGATION OF THE AFFAIRS OF A COMPANY AND THE PROTECTION OF MINORITIES

110    Investigation of the affairs of a company
111    Alternative remedy to winding up in cases of oppressive or prejudicial conduct
112    Preservation of the books and assets of a company

PART IX
LOCAL COMPANIES

113    Interpretation of Part IX and Third Schedule
114    Circumstances in which local company may carry on business
114A    Application for licence
114B    Granting and revocation of licence
114C    Fees payable by local licensed company
115    Hotel companies
116    Penalty for improper exercise of voting rights
117    Return of shareholdings
118    Allotment and transfer of shares
119    Minister may require information
120    Acquisition of land by local companies
121    Companies to make declarations and pay annual tax
122    Accountant General may call for auditor's certificate
123    Recovery of annual tax
124    *[repealed]*
125    Certain companies exempt from tax
126    Interpretation of sections 121 to 125

PART X
EXEMPTED COMPANIES

AP0879

**COMPANIES ACT 1981**

127      Meaning of exempted company
128      Exempted company to be an exempted undertaking
129      Restriction on acquisition of property
129A    Circumstances in which exempted company may carry on business in Bermuda
130      Requirements for officers or representatives in Bermuda
131      Annual fees
132      Investigation of affairs of exempted company
132A    Denomination of capital of exempted companies
132B    Section 124 applies to an exempted company

PART XA
CONTINUANCE AND DISCONTINUATION OF COMPANIES

132C    Continuance in Bermuda
132D    Provisions of Act applying to memorandum of continuance and certificate of
         continuance
132E    Consequences of continuance of foreign corporation
132F    Continued company to adopt bye-laws
132G    Exempted company may discontinue out of Bermuda
132H    Documents to be filed on discontinuance
132I     Effect of discontinuance
132J    Discontinuance of company under this Act  *[deleted]*
132K    Minister's refusal to grant consent etc.  *[deleted]*
132L    Public inspection of documents
132M   Regulations

PART XB
CONVERSION OF EXEMPTED COMPANY TO PARTNERSHIP

132N    Conversion of exempted company to partnership
132O    Conversion of partnership that is exempted and limited to an exempted company
132P    Conversion of company to limited liability company
132Q    Conversion of a limited liability company to a company
132R    Continuance of an incorporated segregated account as a company

PART XI
OVERSEAS COMPANIES

133      Overseas company not to carry on business without a permit
133A    Mutual fund exempted from requirement of a permit
134      Grant of permit to overseas company
135      Annual fees
136      Conditions subject to which permits may be granted
136A    Principal representatives
137      Form and proof of a permit
138      Alteration of conditions of a permit
139      Revocation of a permit
140      Revocation procedure
141      Appeals to Supreme Court
142      Register of permit companies

AP0880

**COMPANIES ACT 1981**

143 Restrictions on activities of a permit company
143A Permit company and re-insuring
144 Power of overseas and exempted companies to hold mortgages
145 Records to be kept by permit company
146 Investigation of affairs of permit company
147 Letter heads and service of process; permit company
148 Offences
149 *[repealed]*
150 Effect of repeals or amendments of other enactments and savings
150A Application of certain sections to non-resident insurance undertakings
151 Application of 1966:41 to permit companies

PART XII
MUTUAL COMPANIES

152 Interpretation
153 Mutual companies to create and maintain a reserve fund
154 Liability of members on a winding up
155 Apportionment of assets of mutual companies
155A Criteria for determining membership
156 Act to apply to mutual companies

PART XIIA
MUTUAL FUND COMPANIES

156A Interpretation
156B Redemption and purchase of shares by mutual fund
156C Redemption and purchase by mutual fund company of its own shares
156 *[repealed]*
156E Private Act companies incorporated with certain powers deemed to be mutual funds
156F Certain sections do not apply to mutual fund
156G Certain companies incorporated after 1 July 1983 deemed to be mutual funds
156H Certification by Minister of fund as United Kingdom class scheme
156I Conditions to be satisfied for certification
156J Right of member to bring action against custodian or manager for loss suffered as a result of breach of bye-laws
156K Power of Minister to require rectification where fund no longer complies with statutory conditions
156L Custodian and manager required to be independent of one another
156M Manager of fund deemed to be an officer of fund
156N Power of directors to amend bye-laws to ensure compliance with prescribed requirements
156O Power of Minister to direct custodian or manager of fund to furnish information
156P Regulations by Minister for Part XII

PART XIII
WINDING UP

157 Modes of winding up

**8**

AP0881

**COMPANIES ACT 1981**

| | |
|---|---|
| 158 | Liability as contributories of present and past members |
| 158A | Winding up of limited company that was formerly unlimited |
| 159 | Definition and nature of liability of a contributory |
| 160 | Contributories in case of death or bankruptcy of a member |
| 161 | Circumstances in which company may be wound up by the Court |
| 162 | Definition of inability to pay debts |
| 163 | Applications for winding up |
| 164 | Powers of Court on hearing petition |
| 165 | Powers to stay or restrain proceedings against a company |
| 166 | Avoidance of dispositions of property etc. after commencement of winding up |
| 167 | Commencement of winding up by the Court |
| 168 | Statement of company affairs to be submitted to Official Receiver |
| 169 | Report by Official Receiver |
| 170 | Power of Court to appoint liquidators |
| 171 | Appointment of liquidators |
| 172 | Liquidator who is not the Official Receiver |
| 173 | Liquidators; resignation, removal, salary |
| 174 | Custody and vesting of companies property |
| 175 | Powers of liquidator |
| 176 | Exercise and control of liquidator's powers |
| 177 | Books to be kept by liquidator |
| 178 | Release of liquidators |
| 179 | Receipts by liquidator |
| 180 | Audit of liquidators' accounts |
| 181 | Meetings of creditors and contributories to determine whether committee of inspection shall be appointed |
| 182 | Constitution and proceedings of committee of inspection |
| 183 | Powers of Registrar where no committee of inspection |
| 184 | Power to stay winding up |
| 185 | Settlement of list of contributories and application of assets |
| 186 | Delivery of property to liquidator |
| 187 | Payment of debts due by contributory to company and extent to which set-off allowed |
| 188 | Power of Court to make calls |
| 189 | Order on contributory conclusive evidence |
| 190 | Appointment of special manager |
| 191 | Power to exclude creditors not proving in time |
| 192 | Adjustment of rights of contributories |
| 193 | Inspection of books by creditors and contributories |
| 194 | Power to order costs of winding up to be made out of assets |
| 195 | Power to summon persons suspected of having property of company etc. |
| 196 | Power to order public examination of promoter and officer |
| 197 | Power to arrest absconding contributory |
| 198 | Powers of Court cumulative |
| 199 | Delegation to liquidator of certain powers of the Court |
| 199A | Early dissolution |
| 199B | Consequences of notice under section 199A |

**9**

AP0882

## COMPANIES ACT 1981

200   Dissolution of company
201   Circumstances in which a company may be wound up voluntarily
201A  Appointment of liquidator and dissolution of company of limited duration
202   Notice of resolution to wind up voluntarily
203   Commencement of voluntary winding up
204   Effect of voluntary winding up on business and status of company
205   Avoidance of transfers etc. after commencement of voluntary winding up
206   Statutory declaration of solvency in case of proposal to wind up voluntarily
207   Members' winding up
208   Power of company to appoint and fix remuneration of liquidators
209   Power to fill vacancy in office of liquidator
210   Power of liquidator to accept shares etc. as consideration for sale of property of
      company
211   Duty of liquidator to call creditors' meeting in case of insolvency
212   Duty of liquidator to call general meeting at end of each year
213   Final meeting and dissolution. Members voluntary winding up
214   Alternative provisions as to annual and final meetings in case of insolvency.
215   Creditors' winding up
216   Meeting of creditors
217   Appointment of liquidator
218   Appointment of committee of inspection
219   Fixing of liquidator's remuneration and cessor of officers' powers
220   Power to fill vacancy in office of liquidator
221   Application of s.210 to a creditors' voluntary winding up
222   Duty of liquidator to call meetings of company and creditors at end of each year
223   Final meeting and dissolution
224   Sections 225 to 233 apply to every winding up
225   Distribution of property of company
226   Powers and duties of liquidator in voluntary winding up
227   Power of Court to appoint and remove liquidator in voluntary winding up
228   Notice by liquidator of his appointment
229   Arrangement when binding on creditors
230   Liquidator's power to stay voluntary winding up
231   Power to apply to Court to have questions determined or powers exercised
232   Costs of voluntary winding up
233   Saving for rights of creditors and contributories
234   Debts of all description may be proved
235   Application of bankruptcy rules in winding up of insolvent companies
236   Preferential payments
237   Fraudulent preference
238   Liability and rights of certain fraudulently preferred persons
239   Effect of floating charge
240   Disclaimer of onerous property
241   Restriction of rights of creditor as to execution or attachment in case of company
      being wound up
242   Duties of Provost Marshal as to goods taken in execution
243   Offences by officers of companies in liquidation

AP0883

**COMPANIES ACT 1981**

244    Penalty for falsification of books
245    Frauds by officers of companies which have gone into liquidation
246    Persons concerned responsible for fraudulent trading
247    Power of Court to assess damages against delinquent officers
248    Prosecution of delinquent officers and members of company
249    Body corporate disqualified for appointment as liquidator
250    Corrupt inducement affecting appointment as liquidator
251    Enforcement of duty of liquidator to make returns etc.
252    Notification that a company is in liquidation
253    Exemption of certain documents from stamp duty
254    Books of company to be evidence
254A   Form of books and papers of company and liquidators
255    Disposal of books and papers of company
256    Information as to pending liquidations
257    Unclaimed assets to be paid into Consolidated Fund
258    Appointment of commissioner to take evidence
259    The swearing of affidavits etc.
260    Power of Court to declare dissolution of company void
261    Registrar may strike defunct company off register
261A   Striking off an application by a company
261B   Withdrawal of application
261C   Objections to strikeoff
262    Property of dissolved company to be bona vacantia
263    Power of Crown to disclaim title to property vesting under section 262
264    Investment of surplus funds

PART XIV
RECEIVERS AND MANAGERS

265    Disqualification of undischarged bankrupt from acting as receiver or manager
266    Receivers and managers appointed out of Court
267    Notification that receiver or manager appointed
268    Power of Court to fix remuneration on application of liquidator
269    Information where receiver or manager appointed
270    Delivery to Registrar of accounts of receivers and managers
271    Enforcement of duty of receiver to make returns
272    Construction of references to receivers and managers

PART XIVA
TRANSFER OF SECURITIES

272A   Transfer of securities   *[repealed]*

PART XIVB
POWER TO ASSIST FOREIGN REGULATORY AUTHORITIES

PART XIVC
FINTECH ADVISORY COMMITTEE

272F   FinTech Advisory Committee  *[repealed]*

---

**11**

AP0884

**COMPANIES ACT 1981**

PART XV
GENERAL

273     Form of registers
274     Accountant General and other officers may inspect books without charge
275     Penalty for improper use of word "Limited"
276     Production and inspection of books when offence suspected
276A   Appeals to Supreme Court against revocation of licence under section 114B or 129A
276B   Onus of proof
276C   Proof of certificate
276D   Publication of orders
277     Penalty for false statements or failure to make a statement
278     Section 80 of the Criminal Jurisdiction and Procedure Act 2015 not to apply
279     Application of fines
280     Default fines
281     Power of Court to grant relief in certain cases
282     Suits and actions against Registrar and Official Receiver
283     Registrar and Official Receiver to be indemnified in respect of foreign suits
284     Applications to Supreme Court by originating summons
285     Power to enforce orders
286     Amendment of private Acts
287     Repeal; amendments; transitional savings
287A   Regulations
288     Rules
289     Saving

FIRST SCHEDULE

SECOND SCHEDULE

THIRD SCHEDULE

FOURTH SCHEDULE

FIFTH SCHEDULE

SIXTH SCHEDULE

SEVENTH SCHEDULE

EIGHTH SCHEDULE
FEES FOR PROVISION OF COPIES AND ENTRIES IN REGISTERS

NINTH SCHEDULE
RESTRICTED BUSINESS ACTIVITIES

TENTH SCHEDULE
PROHIBITED BUSINESS ACTIVITIES

ELEVENTH SCHEDULE
REPEALED SECTION 120(1) SAVING PROVISIONS

**12**

# COMPANIES ACT 1981

*[preamble and words of enactment omitted]*

**PART I**

**INTERPRETATION AND APPLICATION**

**Short title and commencement**

1      This Act may be cited as the Companies Act 1981.

*[Commencement provisions omitted]*

**Interpretation**

2      (1) In this Act unless the context otherwise requires—

"affiliated company" has the meaning given in section 86(3);

"appointed digital asset exchange"*[Repealed by 2020 : 18 s. 84]*

"appointed jurisdiction" means a jurisdiction appointed under subsection (10);

"appointed newspaper" means the Gazette or newspaper appointed by the Registrar under subsection (6);

"appointed stock exchange" means any stock exchange appointed by the Minister under subsection (9);

"arrangement" includes a reorganization of the share capital of a company by the consolidation of shares of different classes or by the division of shares into shares of different classes or by both these methods;

"attorney" means barrister and attorney;

"bearer shares" means shares that may be transferred by delivery of the warrant or certificate relating thereto;

"Bermuda Monetary Authority" means the Bermuda Monetary Authority established under the Bermuda Monetary Authority Act 1969;

"book and paper" includes minutes, financial statements, accounts, records of account, beneficial ownership register, deeds and writings;

"bye-laws" means the bye-laws of a company as originally passed or as lawfully altered from time to time;

"civil penalty"*[Repealed by 2020 : 18 s. 84]*

"company" means a company to which this Act applies by virtue of section 4(1);

"company limited by shares" and "company limited by guarantee" have the meanings given in section 5(2)(a) and (b);

"competent regulatory authority" means any authority appointed by the Minister by notice in an appointed newspaper;

**13**

AP0886

# COMPANIES ACT 1981

"contributory" has the meaning given in section 159;

"Court" means the Supreme Court;

"creditors' voluntary winding up" has the meaning given in section 206(4);

"debenture" includes debenture stock, bonds and any other securities of a company whether constituting a charge on the assets of the company or not;

"default fine" has the meaning given in section 280;

"director" includes any person duly elected or appointed as a director of a company, an alternate director and any person occupying the position of director by whatever name called;

"document" includes books and papers, notices, written requests, reports, returns, applications, instruments, registers and legal processes, including orders and summonses;

"electronic record" has the meaning given in section 2 of the Electronic Transactions Act 1999, and includes any electronic code or device necessary to decrypt or interpret the electronic record;

"exempted company" has the meaning given in section 127;

"exempted undertaking" means an exempted company, or permit company or an exempted partnership as defined in the Exempted Partnership Act 1992 or an exempted LLC as defined in section 21 of the Limited Liability Company Act 2016;

"general rules" means general rules made under section 288(2) and includes forms;

"holding company" has the meaning given in section 86(2);

"Initial Coin Offering" or "ICO"[Repealed by 2020 : 18 s. 84];

"land" in relation to land held by a company under this Act, includes land covered by water and any building erected on land and any estate, interest or right in or over any land or building, except that it does not include easements or mortgages in or over any land or building;

"local company" means any company incorporated in Bermuda other than an exempted company;

"member" has the meaning given in section 19;

"members' voluntary winding up" has the meaning described by section 201;

"memorandum" means the memorandum of association of a company, as originally delivered to the Registrar or as lawfully altered from time to time;

"minimum subscription" has the meaning given in section 28;

"Minister" means the Minister of Finance or such other Minister as may be appointed to administer this Act;

**14**

**COMPANIES ACT 1981**

"mutual company" has the meaning given in section 152;

"non-resident insurance undertaking" has the meaning given in section 1 of the Non-Resident Insurance Undertakings Act 1967 ;

"Official Receiver" means the Official Receiver appointed under section 3 or such other person as may be performing his duties under this Act;

"officer" in relation to a body corporate, includes director and secretary;

"overseas company" means any body corporate incorporated outside Bermuda other than a non-resident insurance undertaking;

"permit" means a permit issued under section 134;

"permit company" means any company with a valid permit;

"prescribed" means prescribed by statutory instrument made under this Act;

"prospectus" means any prospectus, notice, circular, advertisement, or other invitation offering to the public for subscription or purchase any shares or debentures in a company;

"receiver" or "manager" have the meaning given in section 272;

"register" means the register of companies maintained under  section 14(1);

"Registrar" means the Registrar of Companies appointed under section 3 or such other person as may be performing his duties under this Act;

"relevant activity" has the meaning given in section 2 of the Economic Substance Act 2018.

"share" means share in the share capital of a company and includes stock;

"statutory meeting" means the meeting required to be held under section 70;

"subsidiary company" has the meaning given in section 86;

"unlimited liability company" has the meaning given in section 5(2)(c).

(2)  Wherever in this Act an obligation or duty is placed on a company or a company is authorised to do any act, then unless it is otherwise provided such obligation, duty or act may be carried out by the directors of the company, or by the director of the company, where the affairs of the company are managed by only one director.

(2A)  Wherever in this Act an obligation or duty is placed on directors or directors are authorised to do any act, then unless it is otherwise provided such obligation, duty or act may be carried out by the director of the company, where the affairs of the company are managed by only one director.

(3)  A person shall not be deemed within the meaning of any provision of this Act to be a person in accordance with whose directions or instructions the directors of a company are accustomed to act, by reason only that the directors of the company act on advice given by him in a professional capacity.

**15**

**COMPANIES ACT 1981**

(4)  The expressions "shall be liable to a fine" or "shall be liable to imprisonment" when used in this Act shall mean "shall be guilty of a summary offence and shall be liable on conviction to a fine" or "shall be guilty of a summary offence and shall be liable on conviction to imprisonment", as the case may be, and all fines and terms of imprisonment shall be deemed to be maximum fines or periods of imprisonment, as the case maybe.

(5)  Where it is stated that a person shall be guilty of contempt of court he shall be deemed to have committed an offence under section 5 of the Administration of Justice (Contempt of Court) Act 1979 *[title 8 item 1B]*.

(6)  The Registrar shall from time to time publish in the Gazette a list of newspapers appointed for the purposes of this Act.

(7)  Any requirement in this Act to use the word "Limited" may be met by the use of the abbreviation "Ltd.".

(8)  In this Act the expression "member" includes shareholder and the expression "shareholder" includes member.

(9)  The Minister may appoint a stock exchange and shall cause the appointment to be published in an appointed newspaper.

16

**COMPANIES ACT 1981**

**Commencement of winding up by the Court**

167      (1)  Where, before the presentation of a petition for the winding up of a company by the Court, a resolution has been passed by the company for voluntary winding up, the winding up of the company shall be deemed to have commenced at the time of the passing of the resolution, and unless the Court, on proof of fraud or mistake, thinks fit otherwise to direct, all proceedings taken in the voluntary winding up shall be deemed to have been validly taken.

(2)  In any other case, the winding up of a company by the Court shall be deemed to commence at the time of the presentation of the petition for the winding up.

(3)  On the making of a winding-up order, a copy of the order must forthwith be forwarded by the company to the Registrar, who shall make a minute thereof in his books relating to the company.

(4)  When a winding-up order has been made or a provisional liquidator has been appointed, no action or proceeding shall be proceeded with or commenced against the company except by leave of the Court and subject to such terms as the Court may impose.

(5)  An order for winding up a company shall operate in favour of all the creditors and of all the contributories of the company as if made on the joint petition of a creditor and of a contributory.

**Statement of company affairs to be submitted to Official Receiver**

168      (1)  Where the Court has made a winding-up order or appointed a provisional liquidator, there shall, unless the Court thinks fit to order otherwise and so orders, be made out and submitted to the Official Receiver a statement as to the affairs  of the company in the prescribed form, verified by affidavit, and showing the particulars of its assets, debts and liabilities, the names, residences and occupations of its creditors, the securities held by them respectively, the dates when the securities were respectively given, and such further or other information as may be prescribed or as the Official Receiver may require.

(2)  The statement shall be submitted and verified by one or more of the persons who are at the relevant date the directors and by the person who is at that date the secretary of the company, or by such of the persons hereinafter in this subsection mentioned as the Official Receiver, subject to the direction of the Court, may require to submit and verify the statement, that is to say, persons—

(a)  who are or have been officers of the company;

(b)  who have taken part in the formation of the company at any time within one year before the relevant date;

(c)  who are in the employment of the company, or have been in the employment of the company within the said year, and are in the opinion of the Official Receiver capable of giving the information required;

(d)  who are or have been within the said year officers of or in the employment of a company which is, or within the said year was, an officer of the company to which the statement relates.

**176**

AP0890

157

IN THE COURT OF APPEAL FOR BERMUDA

Civil Appeal No. 23 of 1992

LANCE MURRAY CROCKWELL                    Appellant

                and

THERESA E. HALEY & THOMAS F. HALEY        Respondents

Before:  da Costa JA., **P.Ag.**
         Henry JA.
         Georges JA.

Date of hearing: 11th & 12th March 1993
Date of judgment: 29th June, 1993

------------------------------

JUDGMENT

------------------------------

da Costa JA., **P.Ag.**

    In August 1955 the respondent Mrs. Haley while on vacation in
Bermuda was struck on a pedestrian crossing near the Inverurie
Hotel by a motor cycle driven by the appellant. She suffered
serious injuries which have effected the whole course of her
life. At the time of the accident she was a school teacher in
Philadelphia. She was then 49 years of age. She has been forced
by her injuries to abandon her career as a teacher.

    She claimed damages for pain, suffering and loss of
amenities, loss of earnings past and future and medical expenses
past and prospective. Ward J. assessed the past loss of earnings
in the sum of $225,078.78 and the future loss in the sum of
$263,900. These were gross figures. The appellant does not
contest these figures, but contends that tax should be deducted
from these gross figures with the result that the award should be
based on the net figures. In short the appellant submits that
the principle established by the decision of the House of Lords
in British Transport Commission v. Gourley (1956) AC 185 should
be applied in Bermuda.

The learned judge examined the question of whether he ought to take into account the tax position in assessing the part of the damages attributable to loss of earnings actual or prospective and concluded:

> "In Russell v Van **Galen** Civil Appeal No. 21 of 1984 the Court of Appeal for Bermuda considered the question of the possible tax liability in assessing damages for loss of earnings and concluded that the reduction of damages under that head so as to take account of a possible tax liability should not have been made because the matter involved a consideration of foreign law which must be pleaded and proved by expert evidence.  The Court also held that loss of earning capacity was a capital asset and not subject to income tax.  The Court adopted the reasoning advanced in the dissenting speech of Lord Keith in British Transport Commission v Gourley (1955) 3 All E.R. 796.
> Mr. Cooper sought to distinguish Russell's case from the one at bar and suggested that anything which might have been said by the learned Justices of Appeal which was not strictly necessary for the decision in Russell was obiter and should not be followed.  I disagree. Bermuda has long prided itself on having no income tax and Bermudian Courts should not concern themselves with the application of income tax rules and regulations in other jurisdictions particularly when such application would yield no direct benefit to the foreign state."

The first question that arises for consideration is whether the observations made in Gourley's case were part of the ratio decidendi or were obiter.

In Russell v Van **Galen** (1985) 36 WIR 144 at 176 I said:

> "The interesting question of the application of Gourley's rule in the present context almost emerged in this case, but in reality does not and for a very good reason.  The principle that in a court in Bermuda, as in England, foreign law is a matter of fact is well established and it has two important practical consequences.  In the first place, the foreign law must be pleaded: the general rule is that if a party wishes to rely on a foreign law he must plead it in the same way as any other fact (King of Spain v. **Machado** (1827) 4 **Russ** 225).  Secondly, the foreign law must be proved as the court will not take judicial notice of foreign law; and, further, it must be proved in each case."

After some further observations I added:

> "Accordingly, in my judgment, it is the defendant who relies on foreign law and he was therefore obliged to plead and prove it.  This he has failed to do.  The consequence is that it is not open to him to contend that United Kingdom tax should be deducted from the plaintiff's loss of earnings under the rule in Gourley's case.

- 2 -

AP0892

*136*

While I fully realise that any comment of mine on the
rule in Gourley's case must hereafter be held to be
strictly obiter I nevertheless would add a few
observations."

The learned President, Sir **Alastair** Blair-Kerr too after an
examination of the views expressed in Gourley's case concluded at
p.166: "But any views expressed by me concerning the decision in
Gourley's case should be treated as obiter." He then gave his
reasons why the views he expressed should be so regarded.

My brother Henry **JA** did not expressly state that his views
on the Gourley case were obiter, but a perusal of his judgment
shows that they obviously were (see pp. 180-181).

The vital question therefore which arises for consideration
on this appeal is whether the views expressed in Russell v. Van
**Galen** (1985) 36 WIR 144 by this Court on the Gourley case are
correct. Mr. **Ashworth** for the appellant submits that in the
circumstances of this case the Court is bound by, or
alternatively ought to follow Gourley; in the further
alternative, irrespective of Gourley, the general principles
governing the assessment of damages in cases of negligence
require that tax be deducted.

I turn therefore to consider the issue as to whether this
Court is bound by the decision of the House of Lords in Gourley's
case. I have had the privilege of reading in draft the judgment
of my brother Georges. I am in entire agreement with the views
expressed therein. I particularly endorse his views at pp. 4-7
of his judgment on the authority of the decisions of the House of
Lords, expressed as they are with consummate clarity. With some
diffidence I venture to add a few observations on this aspect of
the case.

The orthodox theory of the **position** of colonial courts is
stated by Sir Kenneth Roberts-Wray as follows:

- 3 -

AP0893

"In the first place, there appears in the past to have
been a tendency, possibly unintended, to view the
judicature overseas as if their authority was in some
way inferior. In some quarters, it may have been
fostered by their own judges, though the unquestioning
readiness with which they often relied upon English
decisions need be attributed to no more than the
respect with which the English Judiciary have always
been held and the dearth of other precedents. However
that may be, this tendency probably flowed from the
subordinate states of the Executive and the
Legislature. If so, the analogy, though understandable
was unsound; for Colonial Courts are not, and never
have been, subordinate to English Courts, or anymore
subordinate to the United Kingdom Parliament or
Government than the English Courts themselves" (Sir
Kenneth Roberts-Wray, Commonwealth & Colonial Law pp.
569-570).

Those words were written in 1966. Since then there have
been many judicial pronouncements on the subject. In de Lasala
v. de Lasala (1980) AC 546; 557-558 Lord **Diplock** said:

"It has become generally accepted at the present day
that the common law is not unchanging but develops to
meet the changing circumstances and patterns of society
in which it is applied. In Australian Consolidated
Press Ltd. v. Uren **[1969]** 1 AC 590 it was accepted by
this Board that the common law as to the right to
punitive damages for tort had of recent years developed
in different ways in England and in New South Wales and
that neither Australian courts themselves nor this
Board sitting on an appeal from an Australian court
were bound by the decision of the House of Lords in
Rookes v. Barnard **[1964]** A.C. 1129 which limited the
categories of cases in which punitive damages could be
awarded in England. So too in Hong Kong, where the
reception of the common law and the rules of equity is
expressed to be "so far as they are applicable to the
circumstances of Hong Kong or its inhabitants" and
"subject to such modifications as such circumstances
may require" a decision of the House of Lords on a
matter which in Hong Kong is governed by the common law
by virtue of the Application of English Law Ordinance
is not ipso facto binding upon a Hong Kong court
although its persuasive authority must be very great,
since the Judicial Committee of the Privy Council,
whose decisions on appeals from Hong Kong are binding
on all Hong Kong courts, shares with the Appellate
Committee of the House of Lords a common membership.
This Board is unlikely to diverge from a decision which
its members have reached in their alternative capacity,
unless the **decision** is in a field of law in which the
circumstances of the colony or its inhabitants make it
inappropriate that the common law in that field should
have developed on the same lines in Hong Kong as in
England."

This passage from the judgment of Lord **Diplock** was cited
with apparent approval by Lord Ackner in Franklin v The Queen
(1987) AC 576, 593-594. In Tai Hing Cotton Mill Ltd. v. Liu
Chong Hing Bank Ltd. (1986) AC 80, 108 Lord **Scarman** said:

- 4 -

*158*

> "It is, or course, open to the Judicial Committee to
> depart from a House of Lords' decision in a case where,
> by reason of custom, statute, or for other reasons
> peculiar to the jurisdiction where the matter in
> dispute arose, the Judicial Committee is required to
> determine whether English law should or should not
> **apply.** Only if it be decided or accepted (as in this
> case) that English law is the law to be applied will
> the Judicial Committee consider itself bound to follow
> a House of Lords' decision."

It would seem to follow therefore that the Judicial
Committee of the Privy Council would uphold a decision of a
colonial court differing from a decision of the House of Lords
when the conditions stated by Lord **Scarman** prevailed. (See for
example, Australian Press Ltd. v Uren (1969) 1 AC 590, 641).

Whatever may be the position in strict theory the reality of
the situation is summed up by Lord **Diplock** in these words:

> "Since the House of Lords as such is not a constituent
> part of the judicial system of Hong Kong it may be that
> in juristic theory it would be more correct to say that
> the authority of its decision on any question of law,
> even the interpretation of recent common legislation,
> can be persuasive only: but looked at realistically its
> decisions on such a question will have the same
> practical effect as if they were strictly binding, and
> courts in Hong Kong would be well advised to treat them
> as being so." (de Lasala v de Lasala (1980) AC 554,
> 558).

In short, whatever may be the orthodox theory of the
doctrine of precedents, any decision of the House of Lords will
be treated with the greatest respect having regard to the
reputation and distinction of that august body as the highest
legal tribunal of the United Kingdom, and will as a general rule
be followed by a court in Bermuda. Should the rare occasion
arise where it is thought that local conditions dictate a path
different from that charted by the House of Lords, then the local
court must be at liberty to adopt such a course leaving it to the
Judicial Committee to decide as ultimate arbiter whether such a
course was justified.

In matters of commerce uniformity-is of course highly
desirable and this court in J.E.L. Lightbourne & Co. Ltd. v Test

- 5 -

Freres (1980-80) LRC (Comm) 463 readily followed the decision of
the House of Lords in the Advocaat case (1980) RPC 31 as being
"the most authoritative pronouncement on the law of passing off
in England." The President of the Court took the view that there
was no reason why the Common Law on this subject as applied in
these island should be any different.

I think it is appropriate at this stage of my judgment to
face my locus poenitentiae. As stated above I was a party to the
decision in Russell v Van Galen (1985) 36 WIR 144 and expressed
certain views. Faced with an expression of an opinion that was
clearly obiter but which is no longer sustainable one must recant
with as much grace as possible. One can take some comfort that
at least the renunciation of an obiter dictum is not as
mortifying as the abandonment of a ratio decidendi previously
enunciated. In the very case that is at the heart of this matter
we find Lord Tucker saying:

> "My Lords, having heard this point argued three times -
> twice in your Lordships' House and once in the Court of
> Appeal - I am persuaded that the decision in Billingham
> v Hughes, to which I was a party in the Court of
> Appeal, was erroneous." (Gourley's case 1955 AC
> 185,215).

Perhaps, like the trial judge I was overly impressed by the
fact that Bermuda had no income tax, Mr. Ashworth has however
demonstrated that his fact is really irrelevant. It is not the
lex fori, that is the determinant for the deduction of tax in the
assessment of compensation for loss of earnings. English courts
always look at the factual basis, and if and only if, the
earnings would in fact (because of the law of his domicile or the
state where he was working) have been subject to taxation do
English courts deduct tax in the assessment of compensation for
their loss.

I come now to consider the rule in Gourley's case and to
give my reasons why after hearing the case fully argued I have
resiled from the view expressed in the Van Galen case.

- 6 -

AP0896

Few decisions of the House of Lords have been more
controversial and the debate on its merits have been vigorous and
sustained. In fact it rests upon a simple, but fundamental
proposition of law that damages for negligence are intended to be
purely compensatory. The case for the Appellant in the House of
Lords was put with striking simplicity by their counsel thus:

> "The object of awarding damages for personal injuries
> is to compensate the injured person for what he has
> lost in the past and is likely to lose in the future.
> All that the plaintiff has lost in the past and all
> that he will lose in the future is the amount of his
> earnings less tax. The true way to compensate him is
> to give him the sum equivalent to what he would have
> enjoyed from his earnings after paying the liabilities
> attached to those earnings. To do otherwise would be
> to enable him to make a profit out of his injuries."
> (per Sir Andrew Clarke Q.C. (1956) AC 185, 190).

The compensatory principle, if I may so call it, was
accepted by the Law Lords in Gourley's case ((1956) AC. 185: see
for example per Earl Jowett at **pp.197-198**; per Lord Goddard at
206; per Lord Reid at 212). Even Lord Keith the lone dissentient
did not express a contrary view, but addressed himself to the
"serious difficulties and complications" that would arise if tax
was to be deducted from the gross earnings.

In Hodgson v Trapp (1989) 807, 819 Lord Bridge reaffirmed
the principle in these terms:

> "My Lords, it cannot be emphasised too often when
> considering the assessment of damages for negligence
> that they are intended to be purely compensatory.
> Where the damages claimed are essentially financial in
> character, being the measure on the one hand of the
> injured plaintiff's consequential loss of earnings,
> profits or other gains which he would have made if not
> injured, or on the other hand, of consequential
> expenses to which he has been and will be put which, if
> not injured, he would not have needed to incur, the
> basic rule is that-it is the net consequential loss and
> expense which the court must measure. If, in
> consequence of the injuries sustained, the plaintiff
> has enjoyed receipts to which he would not otherwise
> have been entitled, prima facie, those receipts are to
> be set against the aggregate of the plaintiff's losses
> and expenses in arriving at the measure of his damages.
> All this is elementary and has been said over and over
> again."

- 7 -

AP0897

The principle is also accepted in Australia. In Skelton v. Collins (1965-66) 115 CLR 94, at 128, Windeyer J. gave eloquent expression to this **axiomatic** principle when he said:

> "The one principle which is absolutely firm, and which controls all else, is that damages for the consequences of mere negligence are compensatory. They are not punitive. They are given to compensate the injured person for what he has suffered and will suffer in mind body or estate. Only so far as they can do so is he entitled to have them."

Even **Barwick** C.J. an avowed opponent of the decision in Gourley's case accepts the proposition that damages are only compensatory as fundamental (see Atlas Tiles Ltd. v. Briers (1976-78) 144 CLR 202 at 208).

There are however two prerequisites for the application of the decision in Gourley's case: in the words of McGregor they are:

> "(1) the sums for the loss of which the damages awarded constitute compensation would have been subject to tax; and (2) the damages awarded -to the plaintiff would not themselves be subject to tax. For there cannot be any reason for **taking** tax into account in calculating damages given in compensation for a loss which would never itself have been taxed: this would let in a taxation where no taxation would have been, which would be unfair to the plaintiff. Equally there cannot be any reason for taking tax into account in calculating the damages if the damages themselves will then be taxed: this would result in a double taxation, equally unfair to the plaintiff." (McGregor on Damages, 15th edn. **pp.335-6**).

Gourley was a decision in Tort, but the principle upon which it rested also applies in other branches of the law where the function of damages is compensatory and not punitive. Commenting on its application in the realm of contract the authors of a leading text-book on the faw of Contract observe: "The logic of the principle **may** be impeccable, but the difficulties involved-in its application are formidable" (Cheshire, Fifoot & Furmiston's, Law of Contract, 12th edn. p. 610).

The alleged difficulties involved in the application of the principle in Gourley's case is one of the main grounds on which

- 8 -

the opponents of the principle rely. But can the objection
really be sustained? Admittedly there are elements of
uncertainty in the assessment of tax payable. But there is often
a considerable element of uncertainty in an award of damages, but
that does not prevent a court from doing the best it can in the
circumstances. In assessing pecuniary damages for the loss of
earnings there are many imponderables to be taken into account,
e.g. the likely duration of the plaintiff's incapacity, his
chances for promotion or increase in **earnings,** and the future
rates of inflation and return on invested capital. Again when a
court comes to deal with non-pecuniary damages the difficulties
are even more formidable. As Dickson **J.** observed in Andrews et
al v Grand **&** Toy Alberta Ltd. et al (83 D.L.R. (3d**)** 452 at **475-**
476):

> "There is no medium of exchange for happiness. There
> is no market for expectation of life. The monetary
> evaluation of non-pecuniary losses is a philosophical
> and policy exercise more than a legal or logical one.
> The award must be fair and reasonable, fairness being
> gaged by earlier decisions; but the award must also of
> necessity be arbitrary or conventional. No money can
> provide true restitution. . . . The sheer fact is that
> there is no objective yardstick for translating **non-**
> pecuniary losses, such as pain and suffering and loss
> of amenities, into monetary terms."

Despite the inherent difficulties courts do not shrink from
the task of assessing damages. One is tempted to observe that
the difficulties of application envisaged by the opponents of the
Gourley principle appear largely in the theoretical cases raised
by learned judges and authors rather than in the practical
application of the principle. In the Queen (In the Right of
Ontario) v Jennings (57 D.L.R. 92d) 644 at 657) Judson J. a
notable opponent of the Gourley principle enumerated some of the
practical difficulties that would arise from an application of
the principle. The final sentence in the potential catalogue of
woes asked: "What will be done with the foreign plaintiff and the
foreign system of taxation?" The case before us is just that
case and one could not justifiably say that the tax aspect has
presented any practical difficulties. In fact the parties have

- 9 -

AP0899

found it possible to agree the tax element, thus dispensing even with the necessity to call evidence on the matter.

As Kemp & Kemp have observed:

> "Many of the problems it was predicted would arise as a result of Gourley's case were premised on plaintiffs who were "people of affairs", and who had complex tax liabilities. In truth the overwhelming majority of plaintiffs are employed people subject to the **PAYE** scheme, most of whom are not even liable to the higher rates of tax, and it is usually straight forward in such cases to apply Gourley's rule simply by looking at the plaintiff's earnings." (Kemp & Kemp, The Quantum of Damages, (1992) edn. Vol. 1 **p.** 9-005-006).

The result is that "in practice, at least in personal injury litigation, the rule in Gourley's case has been applied for over a quarter of a century without creating too many difficulties or an abundance of case law" (Kemp & Kemp ibid **p.9-005**)

The opponents of Gourley further say: "The plaintiff has been deprived of his capacity to earn income. It is the value of that capital asset which is to be assessed." In Atlas Tiles Ltd. v Briers (1976-1978) 144 CLR 202 at 210 **Barwick** C.J. a leading protagonist of this school said:

> "Some have thought the distinction I have drawn between loss of earnings and loss of earning capacity is illusory or insubstantial. But, in my opinion, it is real and radical. . . . In my opinion, the distinction I make is not a matter of semantics but basically conceptual."

In my judgment the answer of Salmond & Heuston to their criticism is complete:

> "Another criticism is that a person whose earning capacity is wholly or partially destroyed thereby loses a capital asset, and-as it is a fundamental principle of English revenue law that a capital asset is not taxable, it should follow that the compensation which replaces that asset is also tax-free. But while it is true that a man's skill and experience are in the nature of capital assets, all that was done in Gourley was to value those assets by the income which they are likely to produce, and that income was affected by the predictable factor of taxation. In short, the Law Lords in Gourley faced the realities of life and refused to be misled by maxims such as res inter alios **acta.** There is no reason why someone who has lost a net sum should receive a gross sum." (Salmond & Heuston, Law of Torts, 18th edn. p.638).

- 10 -

AP0900

There is however, an interesting decision of Denning M.R. in which he seeks to distinguish the two concepts. In Farley v John Thompson Ltd. (1973) 2 Lloyd's Rep. 41, 42 he said:

> "It is important to realize that there is a difference between an award for loss of earnings as distinct from loss of earning capacity. Compensation for loss of future earnings is awarded for real assessable loss proved by evidence. Compensation for diminution in earning capacity is awarded as part of general damages."

**Scarman** L.J. (as he then was) was a member of the Court and he obviously agreed with the distinciton Lord Denning M.R. made. At p. 43 **Scarman** L.J. said:

> "Before the accident he could get his living as a steel or steelwork erector. After the accident he cannot. There is no evidence that actually it is causing or will cause him any loss of future earnings. Yet there is a disability. I think, with my Lord, that it has to be considered as an element in general damages."

I

It appears therefore from the above case that if a steel erector was earning E40 per week, but as a result of an accident he could only do a job in which he earned f30 per week he would be awarded compensation on the basis of **£10** per week for loss of future earnings. If on the other hand he suffered no loss of earnings then all he would have suffered was a loss of earning capacity for which he would be entitled to general damages.

This principle was applied by the Court of Appeal in Moeliker v Reyrolle **&** Co. (1977) WLR 132, a case where the plaintiff had suffered serious but not incapacitating injury. At p.140 Browne L.J. observed:

> "As I have said. this problem generally arises in cases where a plaintiff is in employment at the date of trial. If he is then earning as much as he was earning' before the accident and injury (as in the present case), or more, he has no claim for **los** of future earnings. If he is earning less than he was earning before the accident, as in Nicholls v. National Coal Board **[1976]** l.C.R. 266, he has a claim for loss of future earnings which is assessed on the ordinary multiplier/multiplicand basis. But in either case he may also have a claim, or an additional claim for loss of earning capacity if he should ever lose his present job."

- 11 -

*163*

**One** can of course appreciate the distinction made by Lord
Denning M.R. & Browne L.J.. On the other hand the view of the
Pearson Commission was that loss of earning capacity should be
regarded simply as a factor to be taken into consideration when
assessing damages for future loss of earnings (Salmond & Heuston
op. at **pp.635-6).**

In the final analysis however the fact of the matter is, as
**my** brother Georges has observed, in estimating a lump sum value
of the loss of earning capacity, the most sensible starting point
is an **estimate** of the annual earnings converted to a lump sum
over a number of years.

In calculating the damages for future **loss of** earnings the
learned judge used the **same** method that is employed in England.
It is agreed that this is the usual practice in Bermuda.

In **Cookson** v Knowles (1979) A.C. 556 the House of Lords
approved practical guidelines which have been confirmed and
applied in subsequent decisions, notably in **Pickett** v British
Rail Engineering Ltd. (1980) A.C. 136 and in Lim Poh Choo v
Camden and Islington Area Health Authority (1980) A.C. 174 in
which Lord **Scarman** delivered the leading speech.

In Hodgson v. Trapp (1989) A.C. 807, 826 Lord Oliver after
emphasising "the unpredictable consequences" inherent in making
an assessment of future income loss said:

> "Such an assessment cannot, therefore, by its nature be
> a precise science. The presence of so many
> imponderable factors-necessarily renders the process a
> complex and imprecise one and one which is incapable of
> producing anything better than an approximate result.
> Essentially what the court has to do is to calculate as
> best it can the sum of money which will on the one hand
> be adequate, by its capital and income, to provide
> annually for the injured person a sum equal to his
> estimated annual loss over the whole of the period
> during which that loss is likely to continue, but
> which, on the other hand, will not, at the end of that
> period, leave him in a better financial position than
> he would have been apart from the accident. Hence the
> conventional approach is to assess the amount

- 12 -

AP0902

*166*

notionally required to be laid out in the purchase of an annuity which will provide the annual amount needed for the whole period of loss."

His Lordship then went on to observe that the process cannot be better described than it was by Lord **Diplock** in **Cookson** v Knowles (1979) A.C. 556 and although that case was concerned with a claim under the Fatal Accidents Act 1846-1959 "his description of the approach to and the method of assessment of damages, is equally applicable to claims for future loss of earnings and future expenses by the injured party himself." His Lordship then went on to cite two well known passages from the speech of Lord **Diplock** in **Cookson** v Knowles at **pp.567-568** & 571-572.

At p.571 of his speech in **Cookson** & Knowles Lord **Diplock** said:

> "Quite apart from the prospects of future inflation, the assessment of damages in fatal accidents can at best be only rough and ready because of the conjectural nature of so many of the other assumptions upon which it has to be based. The conventional method of calculating it has been to apply to what is found upon the evidence to be a sum representing "the dependency," a multiplier representing what the judge considers in the circumstances particular to the deceased to be the appropriate number of years' purchase. In times of stable currency the multipliers that were used by judges were appropriate to interest rates of 4 per cent. to 5 per cent. whether the judges using them were conscious of this or not. For the reasons I have given I adhere to the opinion Lord Pearson and I had previously expressed which was applied by the Court of Appeal in Young v. Percival **[1975]** 1 W.L.R. 17, 27-29, that the likelihood of continuing inflation after the date of trial should not affect either the figure for the dependency or the multiplier used. Inflation is taken care of in a rough and ready way by the higher rates of interest obtainable as one of the consequences of it and no other practical basis of calculation has been suggested that is capable of dealing with so conjectural a factor with greater precision."

Indeed as Lord Oliver said in Hodgson v. Trapp (1988) 807, 828:

> "In an area in which, as Lord **Diplock** observed, the conjectural nature of the exercise necessarily renders the computation at best rough & ready, it is not to be expected that the process will or can be precise or entirely logical."

- 13 -

Be that as it may, the courts have evolved a particular
method for assessing the amount of damages for future loss of
earnings.  This amount as appears from the cases is calculated by
ascertaining the annual sum that represents the plaintiff's loss
of earnings at the date of trial, and multiplying this by a
figure which, while based upon the number of years during which
the loss of earning power will last, is discounted so as to allow
for the fact that a lump sum is being awarded now instead of
periodical payments over the years.  This latter figure is
referred to as the multiplier; the former figure has come to be
called the multiplicand.

As Lord Fraser of Tullybelton observed in **Cookson** v. Knowles
(1979) AC 556, 576:

> "The multipliers which are generally adopted in
> practice are based on the assumption (rarely mentioned
> and perhaps rarely appreciated) that the principal sum
> of damages will earn interest at about 4 or 5 per cent.
> which are rates that would be appropriate in **times** of
> stable currency, as **my** noble & learned friend Lord
> **Diplock** pointed out in Mallett v **McMonagle** (1970) AC
> **166,1761** D.

This method of assessment is not without its critics.  (See
for example Kemp & Kemp, The Quantum of Damages (1979) 6-005 & 7-
010); but this is perhaps not the place to pursue such criticism.
It is however the practice almost invariably adopted by the
court.

Again to quote Lord Oliver:

> "The **system** of multipliers & multiplicands
> conventionally employed in the assessment takes account
> of a variety of factors, none of which is or, indeed,
> is capable of being-worked out scientifically, but
> which are catered for by allowing a reasonably generous
> margin in the assumed rate of interest on which the
> **multiplier** is based" (Hodgson v Trapp (1989) AC 807,
> **834).**

Their Lordships in Hodgson v Trapp were also of the view
that "the incidence of taxation in the future should ordinarily
be assumed to be satisfactorily taken care of in the conventional

- 14 -

AP0904

assumption of an interest rate applicable to a stable currency and the selection of a multiple appropriate to that rate" (p.835). This reasoning would normally apply to inflation though:-

> "Both in **Cookson** v. Knowles (1979) AC 556 and in Lim's case (1980) AC 174 this House was prepared to envisage that there might be very exceptional cases, where it could be positively shown by evidence that justice required it, in which special allowance might have to be made for inflation and, inferentially for tax" (per Lord Oliver at p.835).

The **"Diplock** approach" has been consistently followed in assessing damages in Bermuda. As I have observed it has its critics. It is not a perfect system but then it operates in a realm in which perfection must remain beyond the wit of man. On the whole however it produces results that are substantially just. There does not appear to be any valid reason why Bermuda should seek to depart from **it** a system of assessment that has become well established here.

On the whole despite criticisms the decision in Gourley's case has gained favourable reception in many Common Law jurisdictions. In Atlas Tiles Ltd. v. Briers **(1976/78)** 144 CLR 202 the High Court of Australia by a majority rejected the doctrine; however, eighteen months later, in **Cullen** v Trappell **1979/80)** 146 CLR the full court by a majority overruled its previous decision thus establishing the principle in Australia.

The legendary acceptance of things British by Barbados found another illustration in the reception of the Gourley principle. In Johnson v. Browne 1972) 19 WLR 382 Douglas CJ followed the Gourley case without comment.

The situation in Canada presents a strange picture. In the Queen v. Jennings (1966) 57 DLR (3d) 64 the Supreme Court rejected the principle stated in Gourley, expressing agreement with the dissenting opinion of Lord Keith and the minority views

- 15 -

AP0905

of the 7th Report of the Law Reform Committee. The rejection was largely on the basis that the plaintiff has been deprived of his capacity to earn income and that was a capital asset. (See per Judson J. at page 656). It would appear however that the decision applies only to damages for future loss of earnings. In Keiser v. Hanna (1978) 82 DLR 3(d) 449 the Supreme Court held that in assessing damages in Fatal Accident cases income tax must be deducted. In Andrews v. Grand & Toy Alberta Ltd. (1978) 83 DLR 3(d) 452 the Supreme court affirmed both Jennings and Hanna v. Keiser distinguishing them on the ground that in the case of prospective income of a living plaintiff it is "earning capacity and not lost earnings which is the subject of compensation", whereas in a fatal accident case the "support payments could only come out of take home pay" (p. 774) It appears that in Canada tax is deducted from pre-trial loss of earnings but not from future loss of earnings.

In Smiths v. Wellington Wool Mfg. Co. Ltd. (1956) NZLR 491 the Court of Appeal of New Zealand followed Gourley. However, in North Island Groceries Ltd. v. Hewin (1982) 2 NZLR 176 the Court of Appeal by a majority declined to follow Gourley in a wrongful dismissal case. The majority expressly declined to reconsider the application of Gourley in a personal injury case because by then the question had become an academic one in New Zealand.

The position in South Africa is interesting as it appears that even before the decision in Gourley income tax was taken into consideration in the awarding of damages for the loss of earning: Thus in Pitt v. Economic Insurance Co. Ltd. [1957 (3)] SALR 284 Holmes J. said: "I would add as a matter of interest, that this is now the accepted view in England", as a result of the Gourley case.

In the United States the practice varies from state to state. However, in Norfolk and Western Railway Co. v. Liepelt

- 16 -

(1980) 100 S.C.R. 755 Stevens J. in delivering the judgement of the Supreme Court said at p.757:

> "The amount of money that a wage earner is able to contribute to the support of his family is unquestionably affected by the amount of the tax he must pay to the Federal Government. It is his **after**-tax income, rather than his gross income before taxes, that provides the only realistic measure of his ability to support his family. It follows inexorably that the wage earner's income tax is a relevant factor in calculating the monetary loss suffered by his dependents when he dies".

It is not possible to ascertain the precise method of their calculation of damages in as much as in the United States damages are awarded by juries. Again practice in various States appear confused. Apparently in matters governed by state law rather than federal law the state courts pursue their own policy without regard to pronouncements of the Supreme Court.

It would thus appear that so far as the common law jurisdictions are concerned although the decision in Gourley is not supreme over palm and pine it has nevertheless gained considerable acceptance.

As I said near the beginning of this judgment like the learned trial judge, I was overly impressed by the argument that Bermuda has no income tax. But clearly this factor is irrelevant. The Bermudian plaintiff will continue to be untouched by the Gourley principle for Bermuda has no income tax. Indeed, if a Bermudian goes to England and has the misfortune to be involved in an accident and sues there he will still enjoy his freedom from the demand of income tax. The Gourley principle will only apply here in the few exceptional cases, where foreign plaintiffs who sue for injuries suffered here come from countries in which income tax is payable. In such cases questions of foreign tax law will arise. They must be proved unless agreed, as indeed happened in this case.

- 17 -

AP0907

177

In the result, I would hold like my brother Georges, that while this Court is not bound to follow the Gourley case, there does not appear to be any valid reason in the context of the Bermuda situation why we should refuse to follow that decision, based as it is on a proposition that is universally accepted in common law jurisdictions. The learned judge should accordingly have taken the Gourley principle into consideration in assessing the actual and future loss of earnings.

Before the trial the parties had actually agreed that the plaintiffs past and future earnings (had she not been injured) would have been subject to federal and state income taxes at the rate of 25 per cent., and that her damages will not be taxable. The agreement was confirmed on appeal.

The parties have submitted the following agreed figures:

SUPREME COURT JUDGMENT

```
(a) Medical Expenses          $30,456.51   Total (a) & (b)
(b) Part loss of earnings     $225,078.78  $255,535.29
                                            Total (b) & (c)
(c) Future loss of earnings   $263,900.00  $488,978.78
(d) General damages            $65,000.00
(e) Interest on (a) & (b)                   $62,973.69
(f) Interest on (d)                          $4,581.16

       TOTAL JUDGMENT         $651,990.14
```

IF APPEAL SUCCEEDS:

FIRSTLY:        Reduce (b) and (c) by 25%

    25/100 x $488,978.79 = $122,244.70

SECONDLY:        Reduce (e) as follows

    $62,973.69 x $225,078.78 x  25
                 $255,535.29    100

        = $13,867.00

```
DEDUCTIONS  (1)      $122,244.70
            (2)    +  $13,867.00
       TOTAL         $136,111.70

TOTAL JUDGMENT       $651,990.14
LESS: DEDUCTIONS   -  $136,111.70
       TOTAL         $515,878.44
```

- 18 -

AP0908

Accordingly, I would allow the appeal and applying the Gourley principle I would substitute the amounts of **$515,878.44** agreed by the parties as correct for the award of damages made by the trial judge under the heads of loss of earnings and loss of future earnings. Accordingly there will be judgment for the plaintiff - respondent in the sum of **$515,878.44.**

H.L. da Costa

Piers **Ashworth** Q.C. and John Cooper for the Appellant

Kieron Unwin for the Respondent

- 19 -

AP0909

*173*

1

IN THE COURT OF APPEAL FOR BERMUDA

CIVIL APPEAL NO 23 of 1992

Lance Murray Crockwell                    Appellant

v

Theresa E. Haley & Thomas F. Haley        Respondent

Date of hearing: 11th March, 1993

Date of judgment: 29th June, 1993

Before        da Costa JA (Ag. P)
              Henry JA
              Georges JA

───────────────────

JUDGMENT

GEORGES JA

      The question arising for decision in this appeal is whether in
assessing damages for loss of earning capacity claimed in an action
for personal injuries, the judge should take into account and
deduct the tax the plaintiff would have had to pay on the lost
earnings.

      The respondent, Mrs. Haley, was struck on a pedestrian
crossing near a local hotel by a motor cycle driven by the

AP0910

*174*

2

appellant. She was at the time of the accident 49 years old and employed as a school teacher in Philadelphia. The injuries she sustained effectively disabled her from resuming her employment. The trial judge discussed the issue as to whether or not income tax should be deducted before arriving at the figure on which Mrs. Haley's loss of earnings would be **capitalised.** He concluded -

> "In Russell v Van Galen Civ. App. No.21 of 1984, the Court of Appeal for Bermuda considered the question of the possible tax liability assessing damages for loss of earnings and concluded that the reduction of damages under that head so as to take account of a possible tax liability should not have been made because the matter involved a consideration of foreign law which must be pleaded and proved by expert evidence. The Court also held that loss of earning capacity was a capital asset and not subject to income tax. The Court adopted the reasoning advanced in the dissenting **speech** of Lord Keith in British Transport Commission v Gourlev **[1955]** 3 All E.R. 796
>
> Mr. Cooper sought to distinguish Russell's case from the one at the bar and suggested that anything which might have been said by the learned Justices of Appeal which was not strictly necessary for the decision in Russell was obiter and should not be followed. I disagree. Bermuda has long prided itself on having no income tax and Bermudian courts should not concern themselves with the application of income tax rules and regulations in other jurisdictions particularly when such application would yield no direct benefit to the foreign state."

3

A perusal of <u>Russell</u> v <u>Van **Galen**</u> (1985) 36 W.I.R. 144 shows that the comments by the learned Justices of Appeal were clearly <u>obiter</u>. The President, Sir **Alastair** Blair-Kerr, critically reviewed <u>Gourlev's</u> case between pages 164 and 166 of the report and concluded -

> "But **any** views expressed by me concerning the decision in <u>Gourley's</u> should be treated as <u>obiter.</u> The defendant argues that the award of damages should be reduced by 30%. That involves a consideration of foreign law. He relies on that law. The onus was on him to prove it as a matter of fact. He has not pleaded it; and even if he had, such evidence as emerged in one way or another was wholly inadequate. The relevant foreign law was neither pleaded nor proved; and it is for those reasons that, in my view, grounds of appeal 7 must fail and grounds 3 and 4 of the cross-appeal must succeed."

Ground 7 of the notice of appeal and grounds 3 and 4 of the respondent's notice dealt with the manner in which the trial judge had ruled on the issue of income tax **deductibility** from loss earnings.

**DaCosta** JA reviewed <u>Gourlev's</u> case at pp 174-175 concluding -

> "While ˉ**I** fully realise that any comments of mine on the rule in <u>Gourlev's</u> case must hereafter be

*176*

4

> held to be strictly <u>obiter</u> I
> nevertheless would add a few
> observations . . . . . .."

He went on to state that he found the views of the minority as
stated in the 7th report of the Law Reform Committee on the effect
of tax liability on damages convincing.


    Henry JA did not specifically state as did his brethren that
the views he expressed on <u>Gourley</u> were <u>obiter</u> but in the context it
was patently obvious that they were.  He stated at p. 180 -

> "It is the submission of counsel for
> the defendant that the trial judge
> (who held that the rule in <u>Gourley's</u>
> case applied) ought to have reduced
> the amount he awarded by 30% and not
> 15% in order to make allowance for
> the plaintiff's tax liability where
> she now resides.  In my view, the
> short answer to this issue is that
> the incidence of taxation arises
> under the English Finance Act, a
> foreign law which has not been
> pleaded by the defendant and it was
> not therefore open to him to lead
> any evidence as to the law or to
> rely on it by way of **defence** for the
> purpose of reducing the amount of
> damages payable by him. However, it
> may be of assistance for the future
> to express some views as to the
> applicability of the rule in
> **Gourley's** case."

He went on at p.181 to state that he was

> "inclined to agree with the views
> expressed by Lord Keith and Judson
> J.  In my opinion, the rule in
> <u>Gourley's</u> case should not be applied
> in Bermuda."


These statements even though strictly <u>obiter</u>  could properly

AP0913

5

have been regarded by a trial judge as strongly indicative of the course that should be followed in decisions in that area in the future. The approach to be taken by this Court must clearly be different. The statements, being <u>obiter,</u> are not binding. The issue is open for re-examination though clearly much deference will need to be given to the considered opinions forcefully expressed.

Against that background the first issue which arises is whether this Court is free to depart from the views of the law expressed by 6 of the 7 members of the House of Lords who decided **Gourley's** case.

It should be emphasised that although Bermuda is technically not an independent country and retains colonial linkages the hierarchy of its courts is no more subordinate to courts in England than are the courts of independent countries which maintain the Judicial Committee of the Privy Council as the final appellate tribunal. As Sir Kenneth Roberts-Wray states in <u>Commonwealth and Colonial Law</u> at pp. 563-4 -

> "English decisions are treated as authoritative much more in the Courts of Colonies than in independent countries: but (though this is understandable) there appears to be no sound reason for saying they ought to be. It seems sometimes to be overlooked that the general jurisdiction of Superior Courts, even in the smallest territories, is the same as that of the Courts of Westminster: local statutes commonly so provide in express terms. If, therefore, there

AP0914

*178*

6

is an obligation upon such courts to
regard English decisions as binding,
it cannot rest upon any theory of
inferior status."

Statements of the principles which should be applied in
determining the binding effect of English authority on Commonwealth
Courts reflect the inherently irreconcilable goals which are being
pursued. There is the desire for almost seamless uniformity in the
development of the common law as a dynamic mechanism assisting in
the regulation of human affairs but this survival is only possible
where there is creative adaptation to local conditions.

It must be conceded that the common law of Bermuda now being
applied in the courts of Bermuda derives from the common law of
England. The ultimate authority for the declaration of that law is
the House of Lords. In that sense even though the courts of
Bermuda are not hierarchically subordinate to the House of Lords as
they are to the Judicial Committee of **the** Privy Council, there
exists compelling reason to accept declarations of the common law
by the House of Lords as binding. Further, in practical terms as
Lord **Diplock** has pointed out in de Lasala v de Lasala [1980]
A.C.546 at p.538 since the Judicial Committee of the Privy Council
shares a common membership with the Appellate Committee of the
House of Lords it is to be expected that the Judicial Committee
sitting as the final appellate tribunal for any particular
Commonwealth Country is hardly likely to disagree with views which
its members have expressed as the Appellate Committee **of the** House

*179*

7

of Lords.

Finally there is the fact that the practical experience and legal scholarship of the Appellate Committee of the House of Lords are such as to sustain a generally admirable reputation for soundness. The consequence is that views which they propound are usually reasoned and persuasive and easy to adopt quite apart from any dictate of the doctrine of precedents.

When all these factors are given full weight, there nonetheless remain areas in which there can be room for reasoned disagreement - often arising from conflicting views as to the purpose to be served by a rule - though necessarily formulated in the language of conceptual analysis and of an examination of the practical consequences flowing from the choice of a particular alternative. Not many disputes will fall within this range. Generally then it can be said that the Courts of Bermuda will accept as binding decisions of the House of Lords in common law matters. Where, however, a problem does fall within this range and the Courts are satisfied that the social conditions of Bermuda make inappropriate the particular path of development chosen by the House of Lords against the background of British conditions, then the Courts of Bermuda must be at liberty to map their own particular path making clear their reasons for so doing. Should the issue eventually reach their Lordships in their role as members of the Judicial Committee and as such the final **appellate tribunal**

for Bermuda, it will be possible for them to weigh and assess the reasons underlying the divergence and thereupon decide whether it should be nonetheless affirmed.

In my view, the method of determining the damages to which a plaintiff is entitled in an action for damages for negligence does permit of differences of approach springing from societal values. In this regard it clearly differs from the law relating to passing Off in relation to which Sir **Alastair** Blair-Kerr **P.** speaking for the Court in I.T. Lighthourne & Co. Ltd and another v Testut [1980-84] **LR(Comm)463** at 473 stated that there was no reason why the Common law on that subject in the Advocaat case **[1980]** R.P.C.31 should be any different in Bermuda.

It was stressed on behalf of the appellants that **once** the law being applied in the assessment of damages for personal injuries was English law, then there was an obligation to apply the entire bundle of rules. I find the proposition unacceptable. **Gourley's** case was not itself decided until 1956. Until then damages would have been assessed without regard to the plaintiff's tax liability.

One comes then to decide the issue whether the rule in **Gourley's** case should be adopted in Bermuda. Controversy over the adoption of the rule has been intense and proponents on one side and the other have seldom changed their views so deeply do convictions run.

9

On all sides, however, it is agreed that damages in a personal injury action are intended to compensate the plaintiff for losses incurred. **Barwick** CJ, an early opponent of the rule accepted this. He stated in Atlas Tiles Ltd v Briers **[1978]** 144 CLR 202 at **p.208**

> "**Gourley's** case and cases such as
> ..........' which have followed and
> applied **Gourley's** case are said to
> be founded upon the proposition that
> damages are only compensatory, a
> principle which may at once be
> accepted as fundamental.....-..It is
> for that of which the plaintiff has
> been deprived by the defendant's act
> that the award of damages must
> compensate."

**Barwick** CJ then went on to state that the important issue was "the identification of that for which compensation is to be assessed." Jurists who reject the Gourley approach emphasize that the process of assessment requires an assessment of the lump sum value of loss of earning capacity - a capital asset which is quite different from actual loss of earnings. Though earnings are usually liable to tax, the capital sum representing the assessed value of earning capacity, like most capital sums, should be reached without reference to income tax considerations.

In his dissent in Gourley Lord Keith of Avonholme did not stress the conceptual issue of the identification of that for which compensation was being assessed. Rather, he elaborated the inequities which could result if damages were to be assessed in circumstances in which two plaintiffs had near identical gross

incomes but one plaintiff had so arranged his affairs that his tax liability had been minimized while the other had not so arranged his affairs.  He made no explicit reference to the compensatory principle underlying the assessment of a plaintiff's damages.

I find difficulty in accepting as compelling the contention that what is being assessed is not loss of earnings but loss of earning capacity and that this distinction makes it juristically improper to take income tax into account.  The distinction appears to me semantic.  I can conceive of no sensible method of estimating a lump sum value of loss of earning capacity which could start from a point other than an estimate of annual earnings converted to a lump sum over a number of years.  Even if the individual with respect to whom the assessment is being made is unemployed and earning nothing, a potential earning capacity will have to be estimated from past earnings, or if there are none, from the earnings of persons comparably placed.  A building or a plot of land does have an objective value apart from the income which may be derived therefrom, though where this exists it will be a factor to be taken into account in assessing its value.  Earning capacity can have no meaning except in terms of income earned.

**Gourley's** case was decided in 1956. In the argument before us no instance was cited to illustrate an anomalous situation which arose from the application of the rule.  This must mean that the difficulties foreshadowed by Lord Keith of Avonholme have not yet

AP0919

*183*

11

materialised.

The essential nature of the process of assessment of damages in personal injuries claims should be borne in mind. It is inherently speculative. Judgments must be made in relation to the future about which there can be no evidence – only informed projections. The legal rules provide guidelines for the assessor in the exercise of judgment, but the use of somewhat differing approaches in the method of calculation **may** well lead to surprisingly similar final figures.

The approach of the majority in **Gourley** does not appear, in my view, to be flawed in logic and appeals to practical common sense. Generally the incidence of income tax is a fact of life. Anyone in evaluating the financial terms of an offer of employment must inevitably take into account the impact of income taxation on the earnings received. Efforts will be made so to arrange benefits as to minimise the incidence of tax. To the person earning income his net receipts after tax are his realistic emoluments and those should be the basis of assessing loss of earning capacity, if the purpose of the damages is to compensate for loss and no more.

The method of calculation used in Bermuda (and the method used by the trial judge in this case) has been described by Lord **Diplock** in **Cookson** v Knowles **[1979]** AC.556 at p.571 –

12

> "Quite apart from the prospects of
> future inflation, the assessment of
> damages in fatal accidents can at
> best be only rough and ready because
> of the conjectural nature of so many
> of the other assumptions upon which
> it has to be based. The
> conventional method of calculating
> it has been to apply what is found
> upon the evidence to be a sum
> representing "the dependency", a
> multiplier representing what the
> judge declared to be the appropriate
> number of years purchase. In times
> of stable currency the multipliers
> that were used by judges were
> appropriate to interest rates of 4
> percent to 5 per-cent whether the
> judges using them were conscious of
> this or not. For the reasons I have
> given I adhere to the opinion Lord
> Pearson and I had previously
> expressed which was applied by the
> Court of Appeal in **Young** v Percival
> **[1975] 1WLR.27-** 29, that the
> likelihood of continuing inflation
> after the date of trial should not
> affect either the figure for the
> dependency or the multiplier used.
> Inflation is taken care of in a
> rough and ready way by the higher
> rates of interest obtainable as one
> of the consequences of it and no
> other practical basis of calculation
> has been suggested that is capable
> of dealing with so conjectural a
> factor with greater precision."

This passage was cited by Lord Oliver in Hodgson v **Trapp [1989]**
A.C. 807 to emphasise the "conjectural nature of the exercise"
which necessarily rendered **"the** computation at best rough and
ready." It was not to be expected that the process would be or
could be "precise or entirely logical" - p.828.

This lack of precision and dearth of logic were used to base

*185*

13

the rejection of the argument that where a large award was made and interest on the invested amount could be expected to attract income tax at a significant rate then, applying the ~~Gourley~~ principle in reverse, the multiplier should be increased to offset the effect of tax.   Lord Oliver agreed at p.828 -

> "that it may fairly be said that the tax paying plaintiff  suffers tax twice,  first by having the notional tax deducted from his earnings for the purpose of computing the award and then again by suffering the actual tax which is deducted from the income earned by the award."

To pursue this course would in his Lordship's view be

> "a  further  illustration of  the complications and difficulties which arise if one seeks to take account, as if the computation were an exact science, of individual factors which are  themselves  imponderable."

Their Lordships held that there was no need to apply ~~Gourley~~ in reverse.  The use of the **"Diplock** approach" which required the multiplier to be based on low interest rates generally obtaining in periods of stable money and low inflation would compensate for the reduction of the income earned on the lump sum by reason of tax. It served to take into account both inflation and tax.

While the approach may be **criticised** for lack of logic, it is by no means devoid of practical sense.   In arriving at an estimate of reduction of income by reason of tax,  there will be evidence

AP0922

*186*

14

available once the parties wish to present it, on which to reach a sensible estimate of the existing net income.  Any attempt, however, to calculate the tax burden over a period of 11-12 years - a not infrequent multiplier - could only be conjectural.

Whatever its imperfections, the **"Diplock** approach" has been consistently applied in Bermuda in assessing damages.  It was the view of Lord Oliver that that approach had "been found over the years to produce a substantially just result."  By this I understand a result which over a broad range has been accepted as satisfactory compensation by litigants.  I would not, therefore, seek to tinker with it on the basis of lack of elegance or logic.

In rejecting <u>Gourlev</u> the trial judge placed much emphasis on the fact that Bermuda had no income tax and was proud that this was so.  The Courts of Bermuda should not, therefore, enmesh themselves in the income tax laws of foreign countries when Bermuda itself had no tax.

The argument is attractive but, in my view, not persuasive. As far as Bermudian plaintiffs are concerned the application of the <u>Gourlev</u> principle would have no effect.  There is no income tax here.  It will have effect on plaintiffs who sue for injuries suffered here and who come from jurisdictions in which income tax is payable.  Evidence of what the tax payable would be would have to be proved in each case.  Where no evidence is led, no tax will

AP0923

*181*

15

be deducted as in <u>Russell</u> v <u>Van **Galen**</u>.    In some cases no doubt there will be agreement - as was the case on the hearing of this appeal.   I would not think that the possible lengthening of the hearing process in some cases could be a proper basis for rejecting the rule in <u>Gourley</u> based as it is on the overriding principle that damages are purely compensatory.

   I am grateful for the thorough comparative analysis undertaken by Mr. Ashworth.   It was useful and instructive.   I do not think I should increase the length of the judgment by reviewing what has been done elsewhere.   The fundamental arguments remain unchanged and it is necessary  only to consider  them and to reach a conclusion.

   In the result I would hold that while this Court would not be bound to follow the decision in <u>British Transport Commission</u> v <u>Gourley</u> I see no compelling reason in the Bermuda situation why it should not do so.   The principle should have been applied by the trial judge in this case leading to a reduction in the actual loss of earnings by 25% and in the future  loss of earnings by a like percentage - the agreed tax deduction.

   The parties have submitted agreed figures setting out the consequence of these changes.

   I would allow the appeal and substitute for the award of

AP0924

188

16

damages made by the trial judge under the heads of loss of earnings'
and loss of future earnings the amounts submitted by the parties as
the correct amounts if the rule in _Gourley_ **is applied.**

AP0925

IN THE COURT OF APPEAL FOR BERMUDA

CIVIL APPEAL NO. 23 of 1992


LANCE MURRAY CROCKWELL                    Appellant

and

THERESA E. HALEY
THOMAS F. HALEY                           Respondents

JUDGMENT

Henry J.A.

On August 20, 1985 while on a visit to Bermuda the First Respondent was injured by a motor cycle ridden by the Appellant. Judgment was entered for her on December 3, 1990 with damages to be assessed, and on October 2, 1992 the learned trial judge entered judgment for the Second Respondent also and proceeded to assess damages for both. He assessed those damages in respect of the First Respondent at $651,990.14 and in respect of the Second Respondent at $500. This is an appeal against the assessment in respect of the First Respondent

Two grounds of appeal were argued. The substance of those grounds is that the learned trial judge in assessing damages for the loss of past and prospective earnings erred by failing to take into account the liability of the First Respondent to pay income tax on those earnings. This, it was submitted, ought to have been done in the light of the decision of the House of Lords in British Transport Commission V. Gourley (1956) A.C. 185.

One of the blessings of Bermuda is that the legislature has not so far found it necessary to introduce legislation providing for the imposition of income tax. The courts in Bermuda have not therefore been called upon to deal with the esoteric principles of that branch of the law. Those principles would not arise for consideration in the assessment of damages for a Bermudian plaintiff even if what is referred to as the rule in Gourley's case is applied in Bermuda. It seems to me therefore that this appeal turns on whether the courts in Bermuda are bound by the decision in that case. The decisions on the matter are by no means clear.

-2-

In <u>Robins v. National Trust Co. Ltd.</u> (1927) A.C. 515 at 519 Viscount Dunedin in giving the advice of the Privy Council stated:

> "...when an appellate Court in a colony which is regulated by English law differs from an appellate Court in England, it is not right to assume that the Colonial Court is wrong. It is otherwise if the authority in England is that of the House of Lords. That is the supreme tribunal to settle English law, and that being settled, the Colonial Court, which is bound by English law, is bound to follow it."

A somewhat less positive statement was made by Lord Diplock in <u>DeLasala v. DeLasala</u> (1980) A.C. 546 when at p.558A he said:

> "...a decision of the House of Lords on a matter which in Hong Kong is governed by the common law by virtue of the Application of English Law Ordinance is not upso facto binding upon a Hnog Kong court although its persuasive authority must be very great, since the Judicial Committee of the Privy Council, whose decisions on appeals from Hong Kong <u>are</u> binding on all Hong Kong courts, shares with the Appellate Committee of the House of Lords a common membership."

Lord Diplock then went on to say:

> "The Board is unlikely to diverge from a decision which its members have reached in their alternative capacity, unless the decision is in a field of law in which the circumstances of the colony or its inhabitants make it inappropriate that the common law in that field should have developed on the same lines in Hong Kong as in England."

This latter concept would appear to have influenced the decision of the Privy Council in <u>Hart v. O'Connor</u> (1985) A.C. 1000 when in overruling a decision of the New Zealand Court of Appeal Their Lordships observed that they would have taken a different view if that court's decision had been based on "considerations peculiar to New Zealand".

In the light of the several authorities I have concluded that decisions of the House of Lords while highly persuasive are not absolutely binding on this court, particularly where circumstances or considerations peculiar to Bermuda make it inappropriate for the courts in Bermuda to follow those decisions. Accordingly in the present case in circumstances where no income tax is payable in Bermuda it is my respectful view that the decision in Gourley's case which requires income

AP0927

tax to be taken into account in assessing damages for loss of earnings is not binding in Bermuda.

Counsel for the Appellant also submitted that the courts in Bermuda have adopted English law in following the multiplier and multiplicand method of assessment developed by Lord **Diplock** in **Cookson** v. Knowles (1979) A.C. 556; that method took into account the liability to income tax and the courts in Bermuda ought not to adopt a part only of English law in this regard. It seems to me that the answer to this submission is that the English courts use this method of assessment irrespective of whether the plaintiff is subject to English income tax laws or to some other income tax law or indeed, as would be the case of a Bermudian plaintiff injured in England, to no income tax law at all.

In Russell v. van **Galen** (1985) 36 W.I.R. 144 at 180 I observed:

> "[Gourley's] case has been followed in New Zealand but not in Canada where in R v. Jennings (1966) 57 D.L.R (2nd) 644, the Supreme Court of Canada agreed with the dissenting opinion of Lord Keith in Gourley's case. In his dissenting opinion Lord Keith pointed to the anomalies, difficulties and complications arising from the application of the principle approved by the majority. He also pointed out that in Britain income tax was an annual tax imposed by Parliament and that 'to assess damages de futuro on the basis of existing taxation savours of legislation by the judiciary'. In his judgment in the Jennings case Judson J. also pointed to the difficulties arising from the application of the principle. He also expressed the view that income tax is not an element of cost in earning income but a disposition of a portion of earned income required by law. In his view, if the State did not elect to demand payment of tax on damages awarded, the courts should not transfer this benefit to the defendant. I am inclined to agree with the views expressed by Lord Keith-and by Judson J. In my opinion the rule in Gourley's case ought not to be applied in Bermuda."

I remain of the same view. I would dismiss the appeal.

Dated the 29th June, 1993

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd                    [2010] Bda L.R. 32
                                                                                      page 1

**In The Supreme Court of Bermuda**

**Commercial Jurisdiction 2009 No. 4**

**In the Matter of the Companies Act 1981**

**And in the Matter of Orient-Express Hotels Limited**

**BETWEEN:**

DE SHAW OCULUS PORTFOLIOS **LLC**
DE SHAW VALENCE PORTFOLIOS **LLC**
CR INTRINSIC INVESTMENTS **LLC**                        Petitioners

                                      v

10                      ORIENT-EXPRESS HOTELS LIMITED
                      ORIENT-EXPRESS HOLDINGS 1 LIMITED
                          JOHN D CAMPBELL
                          JAMES B SHERWOOD
                          PRUDENCE M LEITH
                          JAMES B HURLOCK
                          J ROBERT LOVEJOY
                          GEORG R RAFAEL
                          PAUL M WHITE                        Respondents

Dated the 1st June 2010

20    Mr R Dicker, QC and Mr J Pachai for the Petitioners

Mr T Mowschenson, QC and Mr J Riihiluoma for the Respondents

**Oppressive conduct - Application to strike out - Preliminary issues - Purchase of company of its own shares - Directors' control of votes - Comparison of US and UK law - Conflict of interest**

The following cases were referred to in the judgment:

*Trevor v Whitworth* (1887) 12 App Cas 504
*Ex parte Holmes* 91826) 5 Cow 426
*McNeely v Woodruff* (1833) 13 NJ Law 352
*Brewster v Hartley* (1869) 37 Cal 15
30    *O'Connor v International Silver Co* (1904) 68 NJ Eq 67
*Italo Petroleum Corp v Producers Oil Corp* (1934) 174 Atl 276
*Speiser v Baker* (1987) 525 A 2d 1001
*Salomon v Salomon & Co* [1897] AC 22
*Kirby v Wilkins* [1929] 2 Ch 444
*In re Castiglione's Will Trusts* [1958] 1 Ch 549
*Stena Finance BV v Sea Containers Ltd* [1989] Bda LR 71
*Dyason v JC Hutton Pty Ltd* [1935] ALR 419
*Electra Private Equity Partners v KPMG Peat Marwick* [1999] EWCA Civ 1247
*Securum Finance Ltd v Ashton* [2001] Ch 291
40    *Re Saul Harrison & Sons plc* [1994] BCC 475
*Bermuda Cablevision Ltd v Colica Trust Co* [1998] 2 WLR 82
*Aberdeen Railway Co v Blaikie Bros* (1854) 1 Macq 461
*Bhullar v Bhullar* [2003] 2 AC 46

**JUDGMENT of GROUND, CJ**

**Introduction**

1.      This matter is a Petition under section 111 of the <u>Companies Act 1981</u> ('the Act'). That section allows any member of a company who complains that the affairs of the company are being or have been conducted in a manner oppressive or prejudicial to the interests of some part of the members, including himself, to apply to the Court for

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd    [2010] Bda L.R. 32
page 2

relief. The Petition was issued on 20th January 2009. It comes before me now in two ways:

i.   for the trial of certain preliminary issues directed to be heard by an order of Kawaley J; and

ii.  on the respondents' application to strike out the Petition or parts of it.

At the hearing, I heard the preliminary issues first, and reserved judgment. I then went on straight away to hear the application to strike-out. I now give judgment on both.

2.   By way of background the first respondent ('the Company') owns and operates various hotels and other tourism related ventures world-wide. Its common shares are divided into Class A and Class B shares. The A shares are publicly traded. The B shares are not. For most voting purposes each A share carries one tenth of a vote, and each B share carries a full vote, but they vote together as a single class. The second respondent ('the Subsidiary') is a wholly owned subsidiary of the Company, but it holds 18,044,478 of the Company's B shares, which carry approximately 70% of the combined voting rights of the two classes of shares, the result being that the Subsidiary can control the general meetings of the Company and carry most votes. It appears that the sole purpose of the Subsidiary is to hold and vote the B shares, and it carries on no other business[1].

3.   The petitioners are investment funds, and together they hold almost 7% of the A shares, which were acquired during the course of 2007 at a total cost of almost $315M[2]. The petitioners came to the existing voting structure, in the sense that they acquired their shares in the knowledge of it. However, they object to the control which they say the structure gives to the directors of the Company, and in particular to the way in which it enables the directors to resist any attempt to remove themselves. They also object to certain business decisions of the board of the Company. The petitioners raised their concerns in letters of 13th February and 2nd May 2008, and also at the AGM on 4th June 2008 ('the 2008 AGM'). When rebuffed they requisitioned a Special General Meeting ('the SGM') to consider resolutions to dismantle the voting structure by (1) treating the B shares as non-voting treasury shares under section 42B of the Act, and (2) by cancelling the B shares in accordance with section 42A of the Act. At the SGM, which was held on 10th October 2008, a substantial majority of the A shares present and voting were voted in favor of the resolutions. Nonetheless both resolutions were defeated by the use of the B shares.

**Background**

4.   For the purpose of the issues before me I do not think it necessary to go into any great detail in respect of the way that the current structure came about, but in broad overview in early 2000 The Company, which at that time was itself wholly owned by Sea Containers Ltd. ("SCL"), undertook a restructuring. It reorganized its share capital into the A and B shares, and initially all the share in both classes continued to be held by SCL. For a period there were alternative proposals as to how the shares might be held, one involving the acquisition of the B shares by four subsidiaries, and the other involving their acquisition by the Subsidiary alone. In the event the Subsidiary was given an option to acquire the B shares, which it then exercised on 22nd July 2002, paying $180,444.78 for the B shares, which were transferred to it from SCL.

5.   The money for the purchase was provided by a cheque drawn on the Company. The respondents' case is that the purchase money was provided by the Company out of an

---

[1] Thus, an SEC Schedule 13D filing of 22nd July 2002 stated "OE Holdings' principal business is to hold shares of its parent, OEH."

[2] The value of the A shares has since fallen substantially. Thus in the petitioners' letter of 24th July 2008 the share price was said to have fallen 47% since 18th October 2007. By March 2009 they had fallen 95% from September 2007, although by February 2010 they had crept back up to "approximately 85% below their high point": see paragraph 24 of Mr. O'Mary's second affidavit.

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd          [2010] Bda L.R. 32
                                                                              page 3

inter-company debt of $30M owed by it to the Subsidiary, thereby reducing that debt[3]. This is evidenced by a letter of 22nd July 2002, from the Subsidiary, which read:

"We refer to our intercompany credit balance with you in excess of $30 million. Out of this amount, we request that you issue your check in the amount of $180,444.78 payable to Sea Containers Ltd."

However, the petitioners plead that the Company provided the money for the purchase of its own shares, and has declined to admit the respondents' explanation. To the extent that it is necessary for me to decide this point for the determination of the preliminary issues, I accept the respondents' evidence on it, there being nothing to the contrary.

10

6.   At the time the structure was established, SCL was the sole shareholder in the Company. The respondents place great weight on that, for reasons to which I will return. Subsequently there was an Initial Public Offering ('the IPO'), under which 11,500,000[4] A shares were sold to the public, and there have been several subsequent public offerings. The shares are listed on the New York Stock Exchange under the symbol OEH, and the Company makes routine filings with the United States Securities and Exchange Commission ('the SEC').

7.   At the time of the IPO the Company issued a prospectus dated 9th August 2000. This was prior to the restructuring, but it gave notice of the proposals and of their effect. In particular it flagged the voting power of the B shares, and the fact that they would be held by subsidiaries, who would have overlapping directorships with the Company. It warned:

20

"Those directors, should they choose to act together, will be able to control substantially all matters affecting Orient-Express Hotels, including those listed in the preceding paragraph, and to block a number of matters relating to any potential change of control of Orient-Express Hotels."

The matters 'listed in the preceding paragraph' described the matters over which SCL retained control as long as it retained the B shares, and they included, at the top of the list:

30

"the composition of our board of directors, and, through it, any determination with respect to our business direction and policies, including the appointment and removal of officers."

8.   There was a second public offering in August 2001, this time of 5,000,000 A Shares, and it contained similar warnings. The present structure was then put in place on 22nd July 2002, when the subsidiary exercised its option to acquire the B Shares. The first prospectus after that was filed with the SEC on 18 November 2002, and it recorded the position as follows:

40

"On July 22, 2002 a subsidiary of Orient-Express Hotels exercised an option entered into in connection with its initial public offering to acquire from Sea Containers 18,044,478 class B common shares of Orient-Express Hotels for an aggregate purchase price of $180,445. Accordingly, the share-owning subsidiary of Orient-Express Hotels holds common shares of Orient-Express Hotels representing about 77.3% of the voting power for most matters submitted to a vote of its shareholders, and the share-owning subsidiary, together with the directors and officers of Orient-Express Hotels, holds common shares of Orient-Express Hotels representing about 77.5% of the combined voting power for most matters submitted to a vote of our shareholders. In general holders of Orient-Express Hotels' class A common shares and holders of its class B common shares vote together as a single class, with holders of class A common shares having one-tenth of one vote per

50

---

[3] See paragraph 21 of Mr. Hetherington's first affidavit.
[4] 6,500,000 of these came from SCL, and 5,000,000 from the Company.

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd       [2010] Bda L.R. 32
                                                                  page 4

share and holders of class B common shares having one vote per share. Therefore so long as the number of outstanding class B shares exceeds one-tenth the number of outstanding class A common shares, the holders of class B common shares could control the outcome of most matters submitted to a vote of the shareholders. Under Bermuda law, common shares of Orient-Express Hotels owned by its subsidiary will be deemed to be outstanding and may be voted by that subsidiary. The manner in which the subsidiary votes its commons shares will be determined by the six directors of the subsidiary, three of whom are also directors or officers of Orient-Express Hotels,

10 consistently with the exercise by those directors of their fiduciary duties to the subsidiary. Those directors, should they choose to act together, will be able to control substantially all matters affecting Orient-Express Hotels, and to block a number of matters relating to any potential change of control of Orient-Express Hotels. See "Description of Common Shares – Voting Rights".

9. After that SCL continued to dispose of its A shares, completing that process by November 2005. There continued to be prospectuses and SEC filings, all of which made full disclosure of the structure in similar terms to those quoted above. In the affidavit evidence the petitioners seem to advance the argument that these were not full and frank because they failed to disclose that the purpose of the structure was to enable the directors to entrench themselves[5], but that depends upon a determination

20 of whether that was indeed its purpose, rather than one possible effect. at one point Mr. Dicker described the disclosure as "opaque and insufficient" and says that the true purpose and rationale of the structure was never revealed, but I do not accept that. The reality is that the respondents make no secret of the structure and its effect, and I do not think it is seriously disputed that the petitioners were not fully aware of it and of all its ramifications.

10. The petitioners began to acquire their holding in the Company in the fourth quarter of 2007, and together are the beneficial owners of 6,053,378 A shares[6], which at the time of the Petition amounted to 11.88% of the A shares, although by the time of the

30 hearing subsequent share issues had reduced that to about 7%.

11. At about the same time as the petitioners acquired their stake, the Company also received expressions of interest from two suitors. One of the suitors was the Dubai Group LLC ('Dubai Holdings'), which in a letter of 10th September 2007 expressed an interest in acquiring all the A shares at a price of US \$60 per share, although that was subject to various conditions, including a 'no-shop' clause. This was summarily rebuffed by the board in a letter of 19th October 2007. The other suitor was Indian Hotels Company Limited ('IHCL'), which on 14th September 2007 expressed an interest in some form of association between the companies. Although they made no offer for the A shares, at the time of the letter they held 10% of them, which they

40 subsequently increased to 11.5%, with the intent of providing "a serious and credible foundation for discussions with your Board"[7]. That too was summarily rebuffed, in a way which seems to have caused some offence to IHCL, who by letter of 19th December 2007 wrote complaining about it, and stating –

"It is our firm belief that OEH has an entrenched board and management that does not meet the needs of its shareholder base, nor respect the most basic tenets of corporate governance. As an example Taj Hotels and Dubai Holdings, the two largest public shareholders of OEH, have been unable to enter into any meaningful dialogue with the OEH Board."

---

[5] Thus Mr. O'Mary in paragraph 32 of his first affidavit says "… these publicly available documents did not make it plain that the company's directors intended to exercise this power for their own benefit, rather than, as they repeatedly stated, to serve the best interests of the holders of A shares."
[6] According to the Petition each is also the registered holder of 100 A shares. The split in ownership is approximately 3,218,678 held by the first two petitioners, and 2,835,000 by the third.
[7] See IHCL's letter of 19th December 2007.

12. On 13th February 2008, the second petitioner wrote to the board expressing concern about its handling of IHCL, and asking, perhaps disingenuously, that they "Immediately and publicly clarify the rights of the Company's super voting Class B shares and how the Company intends to use those shares in the event a fair and equitable offer for the Company as a whole is received." When no reply was forthcoming, the second petitioner wrote again on 16th May, asking that a resolution be placed on the agenda for the upcoming 2008 AGM for a review by an investment bank of "the Company's strategic alternatives", but this was refused on the basis that the petitioners did not have a sufficient holding to propose such a resolution and that the board disagreed with its premise. Notwithstanding this, representatives of the petitioners then attended the AGM on 4th June and raised objections to the Company's structure and the voting of the B shares, all to no avail. On the 24th June they again wrote to the board, restating their position, demanding a meeting with the board, and saying –

"... we have been advised by our Bermuda counsel that the Company's governance structure would not withstand scrutiny by a Bermuda court. Our Bermuda counsel is of the view that the Company's Class B shares were not lawfully acquired and cannot legally be held and voted by a wholly-owned subsidiary of the Company."

13. The request for a meeting with the board was refused. The petitioners then warned that they would requisition an SGM, and on 25th August 2008 they did just that. The covering letter explained the proposed resolutions in the following terms:

"There are two proposed resolutions set forth in the accompanying requisition. The first resolution provides that the Company treat the class B shares as 'treasury shares' under Bermuda law and no longer purport to vote them. We propose the first resolution because a Bermuda company cannot hold its own shares except pursuant to the treasury share rules. The second resolution provides that the Company will take the next step and cancel the class B shares. We propose the second resolution because we see no legitimate reason for the class B shares to be outstanding, even as non-voting treasury shares. The proposed bye-law amendments do not otherwise change the corporate structure of the Company or the rights of its shareholders".

14. In response the board, while questioning whether the petitioners held sufficient shares to requisition one, did convene the SGM for 10th October 2008, and announced, in a letter to all the Class A shareholders, that the board of the Subsidiary had adopted a resolution to vote all Class B shares against the proposed resolutions. The petitioners complain that this was before they had even had a chance to issue their proxy statement setting forth the reasoning in support of the resolutions. At the meeting itself the B shares were indeed voted against the resolutions, with the result that they were defeated, notwithstanding that a very substantial majority of the A shares were voted in favour. The voting was as follows:

i.   73.8% of the issued A shares were voted[8], being approximately 31.3M shares;

ii.  96% of voting A shares (i.e. 30.1M) were voted in favour of the first resolution; and

iii. 94.6% of voting A shares (i.e. 29.64M) were voted in favour of the second resolution;

15. Against that background, paragraph 4 of Mr. O'Mary's second affidavit summarises the petitioners' case as follows:

"... the structure ... has been utilized by the Company's directors to, among other things, assure their own perpetual re-election to the Board, quash a

---

[8] Although it should be noted that the votes cast in favour represented 70.8% and 69.8% of the total A shares respectively: see paragraph 40 of Mr. Hetherington's second affidavit.

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd         [2010] Bda L.R. 32
                page 6

premium takeover offer, destroy an opportunity for a potential strategic transaction, stifle an opportunity for a potential bidding war for the Company at or near its all-time high share price, and veto shareholder proposals favoured by 96% of the voting A Shares."

16. Parsing that out, the "premium takeover offer" is the approach from Dubai holdings; the "potential strategic transaction" is the IHCL expression of interest; the "potential bidding war" would be between those two (notwithstanding that IHCL had never intimated an offer for the company). The veto of "shareholder proposals supported by 96% of the voting A shares" is a reference to the October 2008 SGM. As Mr. O'Mary puts it in paragraph 82 of his first affidavit

".... it was improper and unjustifiable for the Company's directors to use the Subsidiary and the voting rights attached to the B shares to prevent the holders of the A shares from achieving their desired results." (O'M 1, 82)

It is not so clear what the petitioners rely upon to support the allegation that the B shares have been used to "assure their own perpetual re-election to the Board", and I will return to that when I came to consider the application to strike-out the Petition.

**The Preliminary Issues**

**Introduction**

17. The parties issued cross-summonses seeking the trial of preliminary issues in July 2009. The petitioners' summons dated 10th July 2009 simply sought a determination "Whether it is unlawful for [the Subsidiary] to hold and/or exercise voting rights in respect of the Class B Shares in [the Company] held by it". The respondents' summons of 17th July 2009 sought the determination of various questions on the assumption that the Subsidiary holds its B shares in the Company beneficially. The trial of those issues was then ordered by Kawaley J on 16 September 2009, to be heard at the same time as the respondents' application to strike out the Petition.

18. The specific preliminary issues raised by the respondents' summons are:

(a) Whether the fact the Subsidiary holds the [B] Shares in the Company involves the Company breaching sections 42A or 42B of the Companies Act 1981 as alleged in paragraph 29(1) of the Petition;

(b) Whether the fact that the Subsidiary holds shares in the Company and exercised the votes attaching to those shares infringes any common law prohibition against a company acquiring its own shares or controlling its own affairs as alleged in paragraph 29(2) of the Petition;

(c) Whether by reason of the Subsidiary's continued ownership of the [B] Shares and claim to be entitled to exercise the votes attaching to the Shares, the Company has breached section 91 of the Act and Bye-Law 72 or section 93 of the Act and Bye-laws 74;

(d) Whether it is unlawful for the Subsidiary to hold the B Shares in the Company.

In order to understand those issues, it is necessary to set out the paragraphs of the Petition referred to, and then the various statutory and other provisions to which reference is also made.

19. Paragraphs 29(1) and (2) of the Petition, referred to in that formulation of the issues, allege as follows:

"(1) The Company has breached, and is continuing to breach, the common law prohibition and/or the express and/or implied prohibition under sections 42A and/or 42B of the Act, that a company may not, whether directly or indirectly, acquire or hold its own shares, save in accordance with the requirements of section 42A of the Act (inter alia that such shares be cancelled) or section 42B of the Act (inter alia, that such shares be held as non-voting treasury shares); further or alternatively

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd [2010] Bda L.R. 32
page 7

(2)    The Company has breached, and is continuing to breach, the common law prohibition and/or the express and/or implied prohibition under section 42B of the Act, that a company may not, whether directly or indirectly, vote its own shares or control its own affairs, to the exclusion of its outside shareholders;".

20.    Sections 42A and 42B of the Act, insofar as they are relevant, provide –

"Purchase by a company of its own shares

42A    (1)    Subject to this section, a company limited by shares, or other company having a share capital, may, if authorized to do so by its memorandum or bye-laws, purchase its own shares.

...

(4)    A purchase by a company of its own shares may be authorized by its board of directors or otherwise by or in accordance with its bye-laws.

(5)    No purchase by a company of its own shares may be effected if, on the date on which the purchase is to be effected, there are reasonable grounds for believing that the company is, or after the purchase would be, unable to pay its liabilities as they become due.

(6)    Shares purchased under this section shall be treated as cancelled and the amount of the company's issued capital shall be diminished by the nominal value of those shares accordingly; but the purchase of shares under this section shall not be taken as reducing the amount of the company's authorized share capital.

...

Treasury shares

42B    (1)    In this Act, references to a company holding shares as treasury shares are references to the company holding shares that —

(a)    were, or are treated as having been, acquired by the company in accordance with this section; and

(b)    have not been cancelled but have been held by the company continuously since they were acquired.

(2)    Subject to this section, a company limited by shares, or other company having a share capital, may, if authorized to do so by its memorandum or bye-laws, acquire its own shares, to be held as treasury shares, for cash or any other consideration.

....

(4)    A company may not acquire its own shares to be held as treasury shares if, as a result of the acquisition, all of the company's issued shares, other than the shares to be held as treasury shares, would be non-voting shares.

(5)    An acquisition by a company of its own shares to be held as treasury shares may be authorized by its board of directors or otherwise by or in accordance with its bye-laws.

(6)    No acquisition by a company of its own shares to be held as treasury shares may be effected if, on the date on which the acquisition is to be effected, there are reasonable grounds for believing that the company is, or after the acquisition would be, unable to pay its liabilities as they become due.

(7)    A company that acquires its own shares to be held as treasury shares may —

10

20

30

40

AP0935

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd　　　　　[2010] Bda L.R. 32
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　page 8

　　　　　　(a)　　hold all or any of the shares;

　　　　　　(b)　　dispose of or transfer all or any of the shares for cash or other consideration; or

　　　　　　(c)　　cancel all or any of the shares.

　　　...

　　　　　　(9)　　If a company holds shares as treasury shares, the company shall be entered in the register of members under section 65 as the member holding the shares.

10　　　　　　(10)　　A company that holds shares as treasury shares shall not exercise any rights in respect of those shares, including any right to attend and vote at meetings, including a meeting under section 99, and any purported exercise of such a right is void.

　　　....

　　　　　　(16)　　For the purposes of section 79(2)(b), a company that holds shares as treasury shares is not a member of the company."

21.　　Sections 91 and 93 of the Act, which are referred to in the respondents' issue (c), provide:

　　"Election of directors

20　　91　　(1)　　The affairs of the company shall be managed by not less than two directors who shall be individuals elected in the first place at the statutory meeting and thereafter at each annual general meeting of the company or elected or appointed by the members in such other manner and for such term as may be provided in the bye-laws.

　　　...

　　　　　　(5)　　The directors may, subject to the bye-laws of the company, exercise all the powers of the company except those powers that are required by this Act or the bye-laws to be exercised by the members of the company."

　　"Removal of directors

30　　93　　(1)　　Subject to its bye-laws the members of a company may at a special general meeting called for that purpose remove a director:

　　Provided that notice of any such meeting shall be served on the director concerned not less than fourteen days before the meeting and he shall be entitled to be heard at such meeting:

　　　...

　　　　　　(2)　　A vacancy created by the removal of a director at a special general meeting may be filled at that meeting by the election of another director in his place or in the absence of any such election by the other directors."

22.　　Bye-laws 72 and 74, which are referred to in the respondents' issue (c), provide:

40　　"72.　　Subject to the Companies Acts and these Bye-Laws, the Directors shall serve until re-elected or their successors are appointed at the next annual general meeting. ...

　　74.　　Directors may be removed for cause by vote of the Shareholders or by resolution of the Directors. Directors may be removed without cause by vote of the Shareholders. Notwithstanding the preceding sentences, a Director may not be removed at a special general meeting unless notice of any such meeting shall have been served upon the Director concerned not less than fourteen (14) days before the meeting and he shall be entitled to be heard at

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd        [2010] Bda L.R. 32
                                                                              page 9

the meeting and provided further that the Resolution removing any Director is
duly adopted by Shareholders holding not less than ninety percent (90%) of
the shares of the Company at the time in issue and outstanding and entitled to
vote generally in the election of Directors. Subject to the third sentence of
Bye-Law 71[9] any vacancy created by the removal of a Director at a special
general meeting may be filled at the meeting by the election of another
Director in his place or, in the absence of any such election, by the Board."

**The Broad Issues**

23.   Mr. Dicker puts the petitioners' case on the preliminary issues on two broad heads.
10    The first is what he calls 'the Voting Principle', being the principle that a company's
      directors *qua* directors may not lawfully control, directly or indirectly, votes attaching
      to shares in the company belonging, directly or indirectly, to it. The second he calls
      'the Return of Capital Principle', being the principle that any transaction which depletes
      the amount of capital available to a company's creditors in the event of its insolvency
      by returning it to shareholders *in a manner not expressly permitted by statute* is
      unlawful. Mr. Mowschenson denies the existence of the Voting Principle, and says that
      the Return of Capital Principle has no application to the facts of this case.

**(1) The Voting Principle**

24.   Mr. Dicker argues that the Voting Principle derives from the basic nature of a
20    company, and in particular from the right of the shareholders to elect and remove
      directors, which is now embodied in section 91(1) of the Act, and which may not be
      exercised by the directors. He says that it has been established at Common Law for
      almost 200 years, and endorsed in Bermuda by the legislature in section 91(5) of the
      Act, and reinforced by sections 42A and 42B of the Act. That being so, he argues that
      the court is under a duty to implement the will of the legislature and to prohibit
      evasion of it, and that the arrangement in the present case, being one which evades
      the legislative intent, should accordingly be struck down as unlawful. The result, he
      says, is that I should declare the structure unlawful, hold that the resolution that the B
      shares he held as non-voting treasury shares was passed and make an order requiring
30    an amendment of the Bye-laws so as to ensure that the B shares are held as non-
      voting treasury shares.

25.   Mr. Dicker argues that the provisions of section 91 of the Act embody a fundamental
      principle of Company Law, citing a wealth of material, including Gower and Davies',
      <u>Principles of Modern Company Law</u>, 7th ed. (2003) at p. 5 -

      "The company has built into it a distinction between the members of the
      company (usually shareholders) and the management of the company (vested
      in a board of directors) . . . the division is inherent in company law and so the
      company legal form deals comprehensively with the consequences of the
      division between membership and management …"

40    See also Keane, <u>Company Law</u>, 4th ed. (2007), at para. 1.29:

      "... in the case of a company there is a separation between the ownership of
      the company, which is vested in shareholders, and the day-to-day
      management of the company, which is carried on by the directors . . . But the
      shareholders . . . may remove the directors at any time, so that the ultimate
      control of the company is in their hands."

And Mayson, French and Ryan, <u>Company Law</u>, ch. 15 –

      "It is assumed in company law that the constitution of a company will assign
      all management power to the company's directors. The membership must be
      assured that handing over so much power to the directors will not deprive
50    them altogether of their interest in the company. Mandatory rules of company

---

[9] Quorum at SGM called for purpose of electing a director etc. to be 90% of Shareholders.

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd                [2010] Bda L.R. 32
                                                                          page 10

law reserve for the members many important decisions on a company's
affairs."

26.   In Bermuda, says Mr. Dicker, the paramount mandatory rule is that embodied in
      section 91(5) of the Act, which was added by amendment in 2006, and which says -

      "(5) The directors may, subject to the bye-laws of the company, exercise all
      the powers of the company *except those powers that are required by this Act
      or the bye-laws to be exercised by the members of the company.*" [Emphasis
      added]

27.   In order to support this argument, Mr. Dicker relies upon the common law as it
      developed in the United States. It developed there, he says, because it was
      permissible under US law for companies to acquire shares in themselves, something
      which was impossible in England due to the development of the rule in *Trevor v
      Whitworth* (1887) LR 12 App Cas 504. I am by no means sure that that is the reason
      for the development of the American law, not least because the cases concern shares
      held by third parties, such as trustees, a position that could also arise in England. But
      for whatever reason, early on American common law developed rules on the voting of
      shares held by third parties for a company. Thus in *Ex parte Holmes* (1826) 5 Cow 426
      shares were held by trustees for the company who were obliged to vote in accordance
      with instructions from the board. It was held that that was unlawful –

      "It is not to be tolerated, that a company should procure stock, in any shape,
      which its officers may wield to the purposes of an election; thus securing
      themselves against the possibility of removal."

28.   On the other hand, the route that the court used to get to that position was that the
      trustees held -

      "... not for the directors; but the company, the corporation itself. If there could
      be a vote at all upon such stock, one would suppose that it must be by each
      stockholder of the company, in proportion to his interest in it."

29.   Similar reasoning was adopted in *McNeely v Woodruff* (1833) 13 NJ Law (1 JS Green)
      352:

      "Belonging to the company they (i.e. the shares) belonged to each and every
      stockholder in proportion to his interest in the capital of the bank; an interest
      that could be represented only in fractions. As there are no fractions of a vote,
      the real owners could not possibly exercise the privilege; nor could it devolve
      on the directors; because they are not the owners of it; they are no more than
      trustees . . . The shares are so circumstanced that the real owners cannot
      vote, and the necessary consequence is that they can be voted upon by
      nobody."

30.   In *Brewster v Hartley* (1869) 37 Cal 15, the principle was upheld in the context of the
      election of directors, the Court holding that it was established by common law, as well
      as "virtually established by the third section of the Act of 1925", which provided in
      terms that if a company purchases or obtains its own stock it "shall not vote in virtue
      of their stock . . . either directly or indirectly, at any election for directors of the said
      company."

31.   The principle was applied directly to the question of subsidiaries in *O'Connor v
      International Silver Co.* (1904) 68 NJ Eq 67, aff'd (1904) NJ Eq 680, where the
      statutory provision in question provided that "shares of stock of a corporation
      belonging to said corporation shall not be voted on, directly or indirectly." This was
      held to bite on shares owned through a subsidiary:

      "That the shares of corporation A owned by it through the ownership of all the
      shares in corporation B are within the equity of this statute as well as within
      the mischief which it was intended to prevent, is too plain for argument ... The
      law as found in our statute ... is so well settled that I should not have thought

AP0938

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd          [2010] Bda L.R. 32
                                                                    page 11

it worthwhile to spend any time upon it but for the very earnest and apparently sincere insistence to the contrary by counsel for the defendant."

32.     In *Italo Petroleum Corp v Producers' Oil Corp.* (1934) 174 Atl 276, on a very similar statutory provision, it was held at 278:

> "The statute prevents the voting either directly or indirectly by a corporation of its own stock belonging to it. What can "indirectly" mean unless it be some such thing as having stock belonging to the corporation held in some third party's name and having that third party vote it? It requires some moments of reflection to discover any other possible device of indirection which the corporation could conjure up. The thought I have given to the matter, which I confess has not been lengthy, has failed to suggest any other. There may be other methods. But the one suggested is so obvious that it is reasonable to suppose that it certainly was dominant in the legislative mind when the section was enacted.

> "There can be no doubt that if a corporation acquired its own stock and caused it to be held in the name of an individual who would vote it as ordered by the corporation's directors, the vote of the individual would be the vote, indirectly given, of the corporation. Nor can there be any doubt that if a corporation planned to buy its own stock and its directors, desiring to vote that stock in violation of the statutory inhibition, organized a wholly owned subsidiary to hold the stock and vote it, the scheme would prove abortive. It would be so crude as to lack even the merit of cleverness. The fiction of the corporate entity would in that case be brushed aside and the device unhesitatingly pronounced but a mere scheme for the indirect voting by the corporation of its own stock in violation of the statute."

33.     The law was then reiterated and explained in modern days in *Speiser v Baker* (1987) 525 A 2d 1001, where the court demonstrated its willingness to "brush aside" intervening holdings to ascertain the true picture:

> "Almost from the earliest stirrings of a distinctive body of law dealing with corporations, courts have been alert to the dangers posed by structures that permit directors of a corporation, by reason of their office, to control votes appertenant to shares of the company's stock owned by the corporation itself or a nominee or agent of the corporation ...

> "The rule that finds its first expression in these cases can be said to be of common law origin in the sense that it arose as a judicial gloss on the statutory right to vote shares. The reason for the rule is not mysterious. Such structures deprive the true owners of the corporate enterprise of a portion of their voice in choosing who shall serve as directors in charge of the management of the corporate venture. Chief Justice Taft, while still an Ohio trial court judge, stated the rationale succinctly in 1888:

>> The power to vote is a power incident to ownership of stock, but to allow the directors acting for the corporation to vote the stock would not be distributing the power equally among the stockholders, as the dividends are distributed equally amongst them by payment into the treasury of the company, and it would be entrusting to persons in power the means of keeping themselves in power. *Allen v De Lagerberger,* 10 Ohio Dec.Rep. 341 (1888).

> "The earliest reported American decision on the point was even more succinct:

>> It is not to be tolerated that a Company should procure stock in any shape which its officers may wield to the purposes of an election; thus securing themselves against the possibility of removal. *Ex parte Holmes*, N.Y. Sup. Ct., 5 Cow. 426, 435 (1826).

AP0939

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd                [2010] Bda L.R. 32
                                                                          page 12

"As the country experienced a movement in the latter part of the 19th century towards comprehensive general laws of incorporation, the rule came to be expressed in those statutes...

"The nineteenth century cases on this subject dealt with a variety of schemes through which a corporation could control the voting of its own stock:

....

"The attempted use of a subsidiary for that purpose, however, was not treated during that period because, until very late in the century, corporations generally had no power to own stock in other corporations....

10      "The mischief address by Section 160(c) and its predecessors became feasible through the use of a separate corporation. The leading case dealing with this manifestation of the problem arose in Delaware in 1934. That case - *Italo Petroleum Corp. v Producers Oil Corp.*, Del. Ch., 174 A. 276 - construed a version of the statutory prohibition not materially different from the section of the 1899 Act quoted above. Chancellor Wolcott there rejected the argument that stock belonging to a 99% owned subsidiary was not stock "belonging to the [parent] corporation" because it was owned legally by the subsidiary. Thus, he construed the statutory prohibition against voting (directly or indirectly) stock belonging to the corporation as a prohibition against voting

20      stock belonging (directly or indirectly) to the corporation. In so holding, this court was motivated by the same concerns that underlay the pre-statute cases and the statutory codification itself:

                It seems to me to be carrying the doctrine of distinct corporate entity to an unreasonable extreme to say that, in a contest over control of a corporation those in charge of it should be allowed to have votes counted in their favor which are cast by a subsidiary stockholder wholly owned, controlled, dominated and therefore dictated to by themselves as the spokesmen of the parent.

...

30      "[7] Accordingly, attempting to read these words in a sensible way consistent with the underlying purpose of the enactment, I conclude that stock held by a corporate "subsidiary" may, in some circumstances, "belong to" the issuer and thus be prohibited from voting, even if the issuer does not hold a majority of shares entitled to vote at the election of directors of the subsidiary."

34.     Mr. Mowschenson argues that the reasoning of the early American cases ignores the basic tenets of company law, by treating the corporate structure as transparent and attributing a right in the assets of the company to the shareholders. He relies in this respect on *Salomon v Salomon & Co. Ltd.* [1897] AC 22 as establishing the separate and distinct corporate identity of a subsidiary. As Lord Halsbury said in that case at p.

40      30:

                "... it seems to me to be essential to the artificial creation that the law should recognize only that artificial existence – quite apart from the motives or conduct of individual corporators. .... it seems to me impossible to dispute that once the company is legally incorporated it must be treated like any other independent person with its rights and liabilities appropriate to itself, and that the motives of those who took part in the promotion of the company are absolutely irrelevant in discussing what those rights and liabilities are."

35.     Mr. Mowschenson also argues that, once English law came to look at the principle, it took a different view from that which had become established in the United States. As

50      noted above, in England a company was prohibited from holding its own shares by the rule in *Trevor v Whitworth*, but it was held that that did not prohibit trustees holding shares for it, nor did it prohibit those trustees voting the shares as directed by the company. Thus in *Kirby v Wilkins* [1929] 2 Ch 444 Romer J, as he then was, held that

AP0940

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd        [2010] Bda L.R. 32
page 13

the transfer of shares to a trustee (in fact the chairman of the board) on trust for the company was good. Indeed the Judge went further and held that the trustee could vote the shares as the company may from time to time direct:

"In my opinion, this transfer of shares does not offend against any principle which has been laid down by any of the decided cases, nor, so far as I have been able to ascertain, any principle to be deduced from a consideration of the Companies Acts. I do, however, raise this difficulty, and it is one which gives pause for consideration. The defendant, Mr. Wilkins, was proposing, pending a sale of these shares, to exercise his voting power in respect of them in a way that did not commend itself to the plaintiffs in this action, and it is said that, assuming that a transfer such as I have to deal with in the present case is otherwise unobjectionable, the effect of the transfer cannot be that the company obtains a power of voting through its nominee in respect of these shares. As I have already pointed out, one of the principles established in the cases is that a company cannot be a member of itself, but the company does not become a member of itself merely because a trustee of certain shares votes in respect of those shares as may be from time to time directed by the company. Nor can I see any reason why shares should not be held upon trust that the holder of the shares shall exercise his voting power as the company may from time to time direct. Supposing these four vendors, instead of transferring their shares, had agreed with the company that they would at all time exercise their voting power in respect of those shares as the company might from time to time direct. What is there in principle to render such an agreement invalid? I confess that I can see none, and if such an arrangement between the four vendors and the company would not have been invalid, it cannot be invalid for the four vendors to transfer their shares to a nominee on trusts which involve an obligation on the trustee to vote in respect of the shares as the company may from time to time direct. It does not appear to me, therefore, that the fact that the company can control the voting power in respect of these shares is an objection to the validity of the transfer."

36.   It is also worth noting that in that case one of the arguments advanced by the plaintiffs, and implicitly rejected was "that the trusts upon which the defendant held these 3000 shares were trusts for the individual shareholders in the company." That was essentially the argument accepted by the American court in *Ex parte Holmes* and *McNeely v Woodruff* (*supra*). Thus, while it is perhaps not surprising that, given the period, the court was not referred to any of the American cases, it may well be that Romer J would have been unpersuaded by them in any event.

37.   *Kirby v Wilkins* was followed by Danckwerts J, as he then was, in *In re Castiglione's Will Trusts* [1958] 1 Ch 549, where he held:

"I have to consider the question in the present case on this state of the authorities. It seems to me that it is quite plain that a company cannot hold its own shares because it cannot be a member, but it does not necessarily follow from that that it may not have a beneficial interest arising from the shares in some way or other. It appears to me quite plain from the decision of Romer J. in *Kirby v Wilkins* that there can be a trust under which certain persons on the share register of the company may hold the shares upon trust for the company beneficially. I think that must be taken to be established by that case.

In the present case the situation is that the shares are vested in the surviving trustees of the will. Therefore, at the moment, there is no rule of law which seems to be offended in the actual disposition of the shares. They are held upon trust for the company, and, as *Kirby v Wilkins* shows, that is entirely good in law.

On the other hand, what cannot be carried out is a transfer upon trust to the company itself of the shares in question. But is that an end of the matter? It does not seem to me that it is, I think that the person who is entitled to the

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd

[2010] Bda L.R. 32
page 14

benefit of the shares is entitled to direct that the shares should not be transferred to him directly but to any other person whom he shall name, and, if there is no other objection to the person to whom he directs the transfer, then the transfer may be good. Consequently, it seems to me that, in accordance with the principles laid down by Lord Hatherley and by Romer J., I must say that the company could direct a proper nominee to hold these shares for the company or as it should direct, and, therefore, the beneficial interest will be enjoyed by the company as in *Kirby v Wilkins*, so that the vote can be cast by the nominee at the meetings of the company as the company shall direct."

10

38. Mr. Dicker says with some force that Danckwerts J's observations about voting are obiter, and that the point was not argued. Nevertheless, it appears that two distinguished English judges, 30 years apart, had no difficulty coming to the conclusion that shares held beneficially for the company by third parties could be voted at the direction of the company. If that is right, it means that the common law of England had diverged in this, as in so many other respects, from that of the United States. That that is right is borne out by various circumstantial indications. Thus when a Committee under the Chairmanship of Mr. Justice Cohen reported in 1945[10] on, *inter alia*, the desirability of prohibiting a company from holding shares in its parent, it also recommended that in certain circumstances where that was unavoidable (such as where it held the shares at the time of the amendment, or where it became a subsidiary of another company in which it was already a shareholder) that the subsidiary should have no voting rights[11]. The implication being that, but for the proposed prohibition, the subsidiary could have voted its shares in the parent.

20

39. Those recommendations eventually became law as section 27 of the <u>Companies Act 1948</u>. Subsequently, when a Committee under the Chairmanship of Lord Jenkins reported in 1962[12] it reviewed the workings of section 27 of the 1948 Act, and considered extending it to prevent other types of "circular ownership" structures:

"Section 27

30

151. Section 27 (1) 1948 Act provides that, with minor exceptions, a subsidiary may not be a member of, and therefore may not acquire shares in, its holding company. Section 27 (3) provides an exception for a subsidiary which was at the commencement of the 1948 Act a member of its holding company, but in such a case the subsidiary is precluded from exercising its voting rights. These provisions appear to serve a two-fold purpose. <u>First,</u> the section prevents the directors of a holding company from maintaining themselves indefinitely in office, against the wishes of other shareholders, with the votes of shares held by a subsidiary. <u>Secondly,</u> section 27 operates to prevent the capital of a holding company from being indirectly depleted as the result of the purchase of its shares by its subsidiary.

40

152. We have received a number of criticisms that the Act does not go far enough in dealing with the first mischief, that is perpetuation of directors' control. Our attention has been drawn to the case where, for example, three companies (with a common board of directors or with boards who agree to act in concert) each have a holding of 26 per cent of the ordinary voting shares of each of the other companies. In these circumstances the boards of directors of each company, with the assistance of the boards of the other companies, command a majority and therefore cannot be removed by the remaining shareholders. A similar situation arises in practice where two or more companies have substantial cross-holdings in each other even though these provide something less than a majority. Then there is so-called "circular ownership": company A holds 40 per cent. of the ordinary voting shares of

50

---

[10] Report of the Committee on Company Law Amendment, June 1945, Cmd 6659.
[11] See Ibid., paragraph 170.
[12] Report of the Company Law Committee, June 1962, Cmnd. 1749.

AP0942

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd       [2010] Bda L.R. 32

company B, which holds 40 per cent. of the ordinary voting shares of company
C, which in turn holds 40 per cent of the ordinary voting shares of company A.
The directors of all three companies, if they act in concert, can in practice
prevent the removal of any of them by the other shareholders. We agree with
the view that arrangements of this kind run counter to the general intention of
section 184 of the Act, which provides that a director may be removed at any
time by ordinary resolution of the company, since directors holding no shares
at all in the companies which they direct can by these means maintain
themselves indefinitely in office.

10        153.   We have given careful consideration to the possibility of extending
section 27 to prevent such arrangements being made. We have considered, for
example, whether section 27 might be extended so as to provide that, if
company B controlled, say, 20 per cent or more of the ordinary voting rights of
company A, then company A should be prohibited from exercising its voting
rights in respect of any shares which it might hold in company B. There are, in
our opinion, a number of objections to provisions on these lines. First, we think
that many cross- holdings of this nature are advantageous for all the
shareholders concerned and that it would not be right to prohibit them all.
Secondly, there would be considerable difficulties of definition: if company A
20     and company B simultaneously obtain holdings of 20 per cent in each other,
which company should lose its voting rights? (The same problem would arise if
the provision were to apply to cross-holdings in existence when the now Act
entered into force.) If company B controls 20 per cent of the ordinary voting
rights of company A and company A thereafter obtains 90 per cent of the
ordinary voting shares of company B, is it reasonable to provide that company
B should continue to exercise its voting rights in company A but not vice
versa? With these considerations in mind we have somewhat reluctantly come
to the conclusion that the complexity and arbitrary nature of the necessary
provisions would not be justified by the mischief which they would be intended
30     to prevent. Moreover, if our recommendations at paragraph 147 for making
compulsory the disclosure of a ten per cent holding of the equity share capital
of quoted companies are adopted the existence of substantial cross (and
circular) holdings will become public knowledge and subject to press comment
so that investors and prospective investors may be warned. Finally, if cross
holdings are used by the directors of associated companies to pursue policies
which are oppressive, the outside shareholders have a remedy in section 210.

        154.   Our attention has also been drawn to the fact that shares in a
company may in certain circumstances lawfully be held in trust for it, and that
its directors would in such a case be able to use the votes concerned by such
40     shares towards maintaining themselves in control against the wishes of the
remaining shareholders. To avoid this undesirable result, any shares of a
company which are held in trust for it should, in our opinion, carry no right to
vote so long as they are so held."

     40.    I have set that out at length because many of the sentiments mirror those expressed
in the American cases, and it shows that the distinguished members of that Committee
were very much alive to them. On the other hand, and notwithstanding that, it seems
to me that it is implicit in all of it that at that point the English common law did not
recognize any common law 'voting principle', which, apart from the intervention of
statute, would operate to prevent directors using shares held by a third party "towards
50     maintaining themselves in office," and that similar concerns as those which led to the
evolution of the principle in the United States, were in England being dealt with by
statutory intervention.

     41.    That being the case, I consider that the common law of Bermuda is that of England
before the intervention of statute. I take it to be trite law that legislative acts of the
English Parliament which are not expressly extended to Bermuda have no force here,
and that the common law continues in effect until modified by local statute. That is

AP0943

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd

[2010] Bda L.R. 32
page 16

recognized in the definition of "common law" in section 4 of the <u>Interpretation Act 1951</u>, which provides:

"'common law' means so much of the common law of England (disregarding any supersession, modification or variation as respects its operation or effect in England by reason of any enactment of the Parliament of the United Kingdom) as has effect for the time being in Bermuda;"

That definition also provides an indication of the source from which Bermuda derives its common law. I appreciate that I am not construing that expression as it appears in an Act or Statutory Instrument, but I nevertheless find that the definition in the Interpretation Act provides a helpful steer.

42. The next step in Mr. Dicker's argument is that the common law principle is embodied in the provisions of the Act which enable a company to purchase its own shares and either cancel them (section 42A) or hold them as non-voting treasury shares (section 42B). Section 42A came first[13], and permitted a solvent company to purchase its own shares, thus abrogating the rules in *Trevor v Whitworth*. It provides that the shares be cancelled, which would have been the effect at common law, and thus does not address the voting issue. Section 42B came later[14], and changes the basic rule to the extent that shares acquired by the company do not have to be cancelled, but may be held as Treasury Shares. It seems to me, therefore, that only section 42B addresses the voting question, necessarily so if the shares are to remain extant. It does so in subsection (10), which provides:

"(10) A company that holds shares as treasury shares shall not exercise any rights in respect of those shares, including any right to attend and vote at meetings, including a meeting under section 99[15], and any purported exercise of such a right is void."

43. But it seems to me that Mr. Dicker's argument on this founders upon two things. First, I do not think that section 42B is, in its purpose and intent, primarily a prohibitory section. As Mr. Mowschenson argues, it is permissive. It permits companies to do something that they could not do before, which is to acquire and then hold their own shares. That is what section 42B(2) says:

"(2) Subject to this section, a company limited by shares, or other company having a share capital, may, if authorized to do so by its memorandum or bye-laws, acquire its own shares, to be held as treasury shares, for cash or any other consideration."

44. As a condition of that, the company cannot vote the shares. I do not think that that can be taken as legislating any wider prohibition, or that it applies to circumstances other than those specifically addressed in the section. Moreover, because I do not think that section 42B is prohibitory in nature, I do not think that I have to be astute to prevent the mischief that the legislature may have in mind, for I do not think that it had one. Nor is there any prohibition to be circumvented by indirect or roundabout means. I accept the authorities relied upon by Mr. Dicker in this regard, but I do not think that they are engaged.

45. Second, Mr. Dicker's argument requires the words "directly or indirectly" to be read into section 42B(10) between the words "holds" and "shares", but I do not think that that can be done in any meaningful way, for several reasons. First, the expression "treasury shares" has a statutory meaning:

"Treasury shares

42B (1) In this Act, references to a company holding shares as treasury shares are references to the company holding shares that —

---

[13] Section 42A was inserted by the Companies Amendment Act 1982
[14] Section 42B was inserted by the Companies Amendment Act 2006.
[15] Section 99 is the power to compromise with creditors and members.

AP0944

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd

[2010] Bda L.R. 32
page 17

> (a)   were, or are treated as having been, acquired by the company in accordance with this section; and
>
> (b)   have not been cancelled but have been held by the company continuously since they were acquired."

46.   But shares held by a subsidiary are not shares which were acquired by the company in accordance with the section. Nor can they be regarded as shares which "are treated" as having been acquired by the company in accordance with the section, because that seems to be an express reference to the allotment of bonus shares, which are "treated" as acquired by the company at the time of their allotment by virtue of section 42B(13)[16]. Second, where a company holds shares as Treasury Shares, then it has to be entered in the register of members as the member holding the shares: see section 42B(9)[17]. It is hard to fit the concept of an indirect holding through a subsidiary into that language, whereas if the legislature had intended to effect a ban on the voting of shares held by third parties, including trustees and subsidiaries, it would have been easy enough for it to say so. Indeed, in the case of subsidiaries it had the ready made language of section 27 of the UK Companies Act 1948 Act and its descendants:

> "27. – (1) Except in the cases hereafter in this section mentioned, a body corporate cannot be a member of a company which is its holding company, and any allotment or transfer of shares in a company to its subsidiary shall be void."

47.   Whether the omission to legislate in those terms represents a deliberate expression of parliamentary intent or whether it was an oversight, is really neither here nor there, because Parliament's intent is expressed through legislation, and the absence of legislation can only mean that it has not addressed the matter. That is really the end of it, but were it necessary to go further I would have no hesitation in finding that the failure to legislate was deliberate. That is because the Law Reform Committee which put together the draft of what became the Companies Act 1981 worked through a variety of sources, including the English Companies Act 1948, and the Jenkins report, and chose certain sections to incorporate here, including sections 22, 24 and 26[18]. The implication is that they chose to omit the sections which they did not include. I think it improbable, therefore, that the omission of section 27 of the 1948 Act was anything other than a conscious act of legislative will. Parliament having chosen not to legislate in that way, I would be slow to find that it had done so indirectly in sections 24A and 24B.

48.   In summary, therefore, I do not think that the common law of England developed a "voting principle" or adopted the principles to be found in the American cases upon which Mr. Dicker relies. I think that the common law of Bermuda is the same as that of England in this regard, and remains unaffected by subsequent statutory interventions in that country. It also seems to me plain that the common law has not been modified in Bermuda, the prohibition on subsidiaries holding shares in parents not having been enacted here.

**(2) Return Of Capital**

49.   This argument is based on *Trevor v Whitworth* (*supra*), in which the House of Lords held unanimously that a company has no power to purchase its own shares. The rationale of the decision was that a transaction which depletes the amount of capital available to a company's creditors in the event of its insolvency by returning it to its

---

[16] Section 42B(13) of the Act provides "Any shares allotted by the company as fully paid bonus shares in respect of shares held by the company as treasury shares shall be treated for the purpose of this Act as if they had been acquired by the company at the time they were allotted."

[17] Section 42B(9) of the Act provides "If a company holds shares as treasury shares, the company shall be entered in the register of members under section 65 as the member holding the shares."

[18] See the Committee's undated Report, "A Report on Company Law in Bermuda Together With A Draft Bill," which was put before me by Mr. Mowschenson without objection.

AP0945

shareholders in a manner not permitted by statute, is unlawful. This was on the basis that "the creditors of the company which is being wound up …. have a right to look to the paid-up capital as the fund out of which their debts are to be discharged":

"The capital may, no doubt, be diminished by expenditure upon and reasonably incidental to all the objects specified. A part of it may be lost in carrying on the business operations authorised. Of this all persons trusting the company are aware, and take the risk. But I think they have a right to rely, and were intended by the Legislature to have a right to rely, on the capital remaining undiminished by an expenditure outside these limits, or by the return of any part of it to the shareholders."

And

"And the stringent precautions to prevent the reduction of the capital of a limited company, without due notice and judicial sanction, would be idle if the company might purchase its own shares wholesale, and so effect the desired result. I do not think it was disputed that a company could not enter upon such a transaction for the purpose of reducing its capital, but it was suggested that it might do so if that were not the object …. To the creditor …. it makes no difference what the object of the purchase is. The result to him is the same. The shareholders received back the moneys subscribed, and there passes into their pockets what before existed in the form of cash in the coffers of the company, or of buildings, machinery, or stock available to meet the demands of the creditors[19]."

50.     Even at the time of that decision there were statutory provisions allowing a company to reduce its capital, with the sanction of the court and after due notice to creditors, and the descendant of those provisions can now be found in section 46 of the Act. In addition there are now the statutory provisions in sections 42A and 42B of the Act, which allow a company to acquire its own shares, thus reversing the actual outcome of *Trevor v Whitworth*, again on certain conditions.

51.     One obstacle in the way of the application of these principles to the acquisition by a subsidiary to shares in its parent is the decision of Astwood CJ, as he then was, in the local case of *Stena Finance BV & Anor. v Sea Containers Ltd. & Ors.* [1989] Bda LR 71 (27th November 1989). That case in fact concerned the original parent of the Company in this case, SCL, and the case is usually referred to by that company's name. It was argued by a galaxy of distinguished commercial counsel. The case came before Astwood CJ on the trial of three preliminary issues, the second of which was:

"(ii) Whether as a matter of Bermudian law it is lawful for a subsidiary to purchase for its own account shares in its parent;"

52.     He began his consideration of the point by setting out lengthy passages from *Trevor v Whitworth*. He considered the point a matter of statutory interpretation and one of first impression. He noted the existence of section 27 of the English Companies Act of 1948 (which by then had become section 23 of the 1985 English Act), and the absence of a similar provision in Bermuda:

"I do not know the reason why the English Legislation included section 23 in their Companies Act but I have to be careful not to usurp, by judicial interpretation, the functions of the Bermuda Parliament. I assume that, when Parliament enacted the Act, they were aware of the provisions at section 27 of the United Kingdom Act of 1948, which is similar in terms to the provisions at section 23 of their 1985 Act. No authority has been produced to show that the rule in Trevor and Whitworth was ever extended by the courts to meet the case where shares in a parent company were purchased by a subsidiary and I assume that there are none since I have found none. But one thing is clear and that is that the United Kingdom parliament enacted legislation to meet the

---

[19] Per Lord Herschell at 416

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd          [2010] Bda L.R. 32
                                                                                    page 19

case and to prohibit the practice, if there was one, of subsidiaries purchasing shares in their parent.

The United Kingdom Parliament, by the provisions at section 162 of their 1985 Act, seem to have reversed the actual decision in Trevor v Whitworth and our Parliament has placed limitations on the rule also in the provision at section 42A of the Act. But our Parliament has not introduced a provision such as section 23 of the United Kingdom Act."

And a little later –

"Submissions were made to me by Mr. Sykes that the case of *In re Thomas* (1916) 2 Ch. 331 supports the Plaintiffs' contention that a subsidiary cannot purchase its parent's shares. Having listened to the submission of Mr. Sykes, Mr. Potts and Miss Gloster concerning the case I do not think this case is sufficiently convincing authority for the bold proposition that a subsidiary cannot purchase its parent's shares and I do not believe that there is any authority to support such a proposition. In any case, the United Kingdom Parliament dealt with the matter by legislation and, in my view, if there is any problem in Bermuda concerning the purchase of shares in a parent company by a subsidiary, it would have to be dealt with by Parliament since, in my view, there is no law in Bermuda prohibiting a subsidiary from purchasing shares in its parent company. Neither *Trevor v Whitworth* nor s. 39, in my opinion, prohibits this. I therefore answer the Preliminary Issue No. 2 affirmatively. A Bermuda subsidiary may purchase for its own account shares in its parent."

53.  Apart from that it is not entirely clear how the learned Chief Justice dealt with the *Trevor v Whitworth* point. He seems in part to have treated it as a matter of construction of the provisions governing financial assistance, and to have held that they were inapplicable. However, he also notes at p. 11 that that "does not adequately cover the Plaintiffs' contention that the acquisition of the shares in the parent by the subsidiary reduces the parent's capital." However, previously on the same page he had noted –

"In my view, if the capital of the subsidiary may be considered the capital of the parent, there will be a reduction of the parent's capital when the subsidiary purchase the parent's shares."

Although he never says so in terms, I think it must be taken that Astwood CJ regarded that as a big "if", and came to the implicit conclusion that the capital of the subsidiary should not be considered the capital of the parent for these purposes. He was reinforced in that by the need for a statutory prohibition in England, which he seems to have attributed to the absence of any authority extending the rule in *Trevor v Whitworth* to embrace subsidiaries.

54.  Interpreted on that basis, I agree with the decision. I do not think that the subsidiary's capital should be regarded for these purposes as the parent's. Like Astwood CJ, I have not been shown any example of a case where the rule was applied in these circumstances, and again, the Cohen and Jenkins reports seem to have proceeded on the implicit basis that that was not how it was being applied when this was still potentially a live issue under the common law in England.

55.  On the other hand I have, thanks to the diligence of counsel, been shown one case from Australia which support the outcome in *Sea Containers*, and that is *Dyason v J.C. Hutton Pty Ltd.* [1935] ALR 419. The facts were:

"The shareholders of Company A, a holding company, consisted only of Company B and Company C. All the shares in Company B were held by or on behalf of Company A, the directors of all three companies being the same persons. There being power in the memorandum of association of Company B to invest its funds in the purchase of the shares of any other company, - *Held*, that the purchase by it of shares in Company A did not fall within the prohibition contained in the "Companies Act 1928," section 273(1)."

https://justis.vlex.com/#search/jurisdiction:BM/Shaw+Oculus+Portfolios/#vid/shaw-oculus-portfolios-llc-806232813

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd

[2010] Bda L.R. 32
page 20

56.     The actual judgment is very short –

        "The Company, in addition to being a trading Company, is also an investment Company, and there is no reason in law why it should not exercise its power of investing in the shares of another company. Whatever ultimate effects may follow in dealing with the shares acquired, it cannot be said that the action now proposed is a purchase by the Company of its own shares, either directly or indirectly."

57.     The case is recognized by Halsbury's Laws of Australia as representing the common law: see Ibid, 1993 ed., Vol. 7, paragraph 120-5350, at note 3, although, as with England, there is now a statutory prohibition in Australia on the issue or transfer of shares of a company to an entity it controls[20]. The authors also note that the statutory rule helps prevent the directors of the holding company maintaining themselves in office, and the indirect depletion of the capital of the holding company.

58.     Against that background I think, as did Astwood CJ, that in Bermuda it is now a matter for Parliament whether the potential abuses outweigh the benefits. That is all the more so because 21 years have passed since that decision, during which period it has stood unchallenged and people may have organized their affairs on the basis of it. It is accepted that there are no other publicly quoted companies that have done that, but there may be private ones, and in any event, given the link with SCL itself, the architects of the structure in this case no doubt relied upon the decision when devising it.

### Conclusions On The Preliminary Issues

59.     I therefore find for the respondents on the preliminary issues, and hold that it is lawful for Orient-Express Holdings 1 Limited to hold and exercise voting rights in respect of the Class B Shares in Orient-Express Hotels Limited held by it. In particular, in response to the respondents' issues, I hold

        (a) That the fact the Subsidiary holds the B Shares in the Company does not involve the Company breaching sections 42A or 42B of the Companies Act 1981 as alleged in paragraph 29(1) of the Petition;

        (b) That the fact the Subsidiary holds shares in the Company and exercised the votes attaching to those shares does not infringe any common law prohibition against a company acquiring its own shares or controlling its own affairs as alleged in paragraph 29(2) of the Petition;

        (c) That by reason of the Subsidiary's continued ownership of the B Shares and claim to be entitled to exercise the votes attaching to the Shares, the Company has not breached section 91 and Bye-Law 72 or section 93 of the Act and Bye-laws 74.

### The Application To Strike Out

60.     This is made by summons of 17th July 2009, which cites all the available grounds under RSC Ord. 18, r. 19(1), without giving any assistance as to the real basis on which it is made. That has, however, been supplemented by the first affidavit of Mr. Hetherington, sworn in support of the application to strike out, and by the respondents' skeleton argument on the point. In particular, the latter document makes it plain that the application is only made on the basis that the share structure is held to be lawful[21].

### The Principles to be Applied

61.     There is no real argument about the principles to be applied on such an application. A helpful and compendious modern statement of the principles is that of Auld LJ in

----

[20] See (CTH) Corporations Act 2001, s. 259C(1).
[21] See the skeleton of 12th April 2010, at paragraph 3.

AP0948

*Electra Private Equity Partners (Ltd Partnership) & Ors v KPMG Peat Marwick (A Firm) & Ors* [1999] EWCA Civ 1247 (23 April 1999):

"It is trite law that the power to strike out a claim under RSC Order 18, r. 19 or in the inherent jurisdiction of the Court should only be exercised in "plain and obvious" cases. That is particularly so where there are issues as to material primary facts and the inferences to be drawn from them, and when there has been no discovery or oral evidence. In such cases, as Mr Aldous submitted, to succeed in an application to strike out, a defendant must show that there is no realistic possibility of the plaintiff establishing a cause of action consistently with his pleading and the possible facts of the matter when they are known. Certainly, a judge, on a strike-out application where the central issue is one of determination of a legal outcome by reference to as yet undetermined facts, should not attempt to try the case on the affidavits. See *Goodson v Grierson* [1908] 1 KB 761, CA, per Fletcher Moulton LJ at 764-5 and Buckley LJ at 766; *Wenlock v Moloney*, per Sellers LJ at 1242G-1243D and Danckwerts LJ at 1244B; and *Torras v Al Sabah & Ors*. (unreported) 21st March 1997 CA, per Saville LJ. There may be more scope for early summary judicial dismissal of a claim where the evidence relied on by the plaintiff can properly be characterised as "shadowy" or where "the story told in the pleadings is a myth ... and has no substantial foundation"; see e.g. *Lawrance v Lord Norreys* (1890) 15 App. Cas. 210, per Lord Herschell at 219-220.

However, the court should proceed with great caution in exercising its power of strike-out on such a factual basis when all the facts are not known to it, when they and the legal principle(s) turning on them are complex and the law, as here, is in a state of development. It should only strike out a claim in a clear and obvious case. Thus, in *McDonald's Corporation v Steel* [1995] 3 All ER 615, CA, Neill LJ, with whom Steyn and Peter Gibson LJJ agreed, said, at 623e-f, that the power to strike out was a Draconian remedy which should be employed only in clear and obvious cases where it was possible to say at the interlocutory stage and before full discovery that a particular allegation was incapable of proof. In *X v Bedfordshire County Council* [1995] 2 AC 633, Sir Thomas Bingham MR, also underlined the rigour of the limits of the strike-out jurisdiction in the following passages, at 693E-694F, which were approved by Lord Browne-Wilkinson, at 740H-741D, and the other Members of the Appellate Committee when the matter reached the House of Lords:

" It is clear that a statement of claim should not be struck out under R.S.C. Ord. 18, r. 19 as disclosing no reasonable cause of action save in clear and obvious cases, where the legal basis of the claim is unarguable or almost incontestably bad. ...

... I share the unease many judges have expressed at deciding questions of legal principle without knowing the full facts. But applications of this kind are fought on ground of a plaintiff's choosing, since he may generally be assumed to plead his best case, and there should be no risk of injustice to plaintiffs if orders to strike out are indeed made only in plain and obvious cases. This must mean that where the legal viability of a cause of action is unclear (perhaps because the law is in a state of transition), or in any way sensitive to the facts, an order to strike out should not be made. But if after argument the court can be properly persuaded that no matter what (within the reasonable bounds of the pleading) the actual facts the claim is bound to fail for want of a cause of action, I can see no reason why the parties should be required to prolong the proceedings before that decision is reached. ..."

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd                    [2010] Bda L.R. 32
                                                                              page 22

62.    The only addition I would make to that is that the approach has now to be read in the light of the Overriding Objective[22], as was explained by Chadwick LJ in *Securum Finance Ltd. v Ashton* [2001] Ch 291:

"In exercising that power [to strike out] the court must seek to give effect to the overriding objective … The overriding objective of the procedural code embodied in the new rules is to enable the court "to deal with cases justly" … Dealing with a case justly includes "allotting to it an appropriate share of the court's resources, while taking into account the need to allot resources to other cases"…"

In that respect I accept the respondents' submission that it is inappropriate at this stage to draw adverse inferences from the limited disclosure given to date, particularly to the extent that broader disclosure was refused by Kawaley J on 16th September 2009.

63.    I also accept the respondents' submission that the court should scrutinize the allegations carefully at this point, bearing in mind the comments of Hoffmann LJ (as he then was) in *Re Saul Harrison & Sons plc* [1994] BCC 475 at 492:

"But the question in this case is whether on the evidence taken as a whole and assuming in favour of the petitioner any disputed questions of primary fact, there is a case to answer. Of course it is always possible that discovery and cross-examination may produce some written or oral confession that the board were indeed acting in bad faith. But I do not think that the petition can be allowed to proceed to trial simply in the hope that something may turn up."

**The Statutory Precondition**

64.    In order to achieve relief under section 111 of the Act the petitioners have to show that, were it not for the existence of the statutory remedy, it would otherwise be just and equitable to the wind up the Company. The requirement flows from the section itself, and it is an important distinction between the Bermudian provisions and the current English statutory regime, which no longer contains this requirement. Thus section 111 provides:

"Alternative remedy to winding up in cases of oppressive or prejudicial conduct

111    (1)    Any member of a company who complains that the affairs of the company are being conducted or have been conducted in a manner oppressive or prejudicial to the interests of some part of the members, including himself, … may make an application to the Court by petition for an order under this section.

(2)    If on any such petition the Court is of opinion—

(a)    that the company's affairs are being conducted or have been conducted as aforesaid; and

(b)    that to wind up the company would unfairly prejudice that part of the members, *but otherwise the facts would justify the making of a winding up order on the ground that it was just and equitable that the company should be wound up,*

the Court may, with a view to bringing to an end the matters complained of, make such order as it thinks fit, whether for regulating the conduct of the company's affairs in future, or for the purchase of the shares of any members of the company by other members of the company or by the company and, in the case of a purchase by the company, for the reduction accordingly of the company's capital, or otherwise." [Emphasis added]

---

[22] In Bermuda this is contained in Order 1A of the Rules of the Supreme Court 1985, which was inserted by the Rules of the Supreme Court Amendment Rules 2005.

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd                  [2010] Bda L.R. 32
                                                                            page 23

65.    In my judgment the Petition would necessarily fall at this first hurdle once it is
       accepted that the structure is not unlawful *per se*, because, apart from the structure
       itself and the refusal to dismantle it at the 2008 SGM, the only other specific acts of
       oppression alleged are the refusal of the Dubai Holdings offer and the IHCL approach.
       I accept Mr. Mowschenson's submission that no court, properly considering the matter,
       could wind-up a large public company, which is solvent and trading, on the just and
       equitable ground on the basis of those allegations on the petition of a shareholder who
       purchased its shares in full knowledge of the structure of which it complains. I fully
       accept that it might be otherwise if I were wrong, and the structure itself was
10     unlawful: see e.g. *Bermuda Cablevision Ltd. v Colica Trust Co* [1998] 2 WLR 82. It
       might also be different if the petitioners could not extricate themselves from the
       Company, but as it is publicly traded they can do so at any time. They will, in the
       current market, take a loss, but I do not think that there is any sufficient allegation
       that the fall in share price is attributable to the existence of the structure, which was
       of course in place when it was at the top of the market.

66.    It is also in my judgment important that the voting inequality - the fact that the A
       shares can always be outvoted by the B shares - is enshrined in the Bye-laws. The
       petitioners cannot, therefore, complain about that. As Hoffmann LJ said in *Re Saul
       Harrison & Sons plc* (supra):

20     "In deciding what is fair or unfair for the purposes of s. 459, it is important to
       have in mind that fairness is being used in the context of a commercial
       relationship. The articles of association are just what their name implies: the
       contractual terms which govern the relationships of the shareholders with the
       company and each other. They determine the powers of the board and the
       company in general meeting and everyone who becomes a member of a
       company is taken to have agreed to them. Since keeping promises and
       honouring agreements is probably the most important element of commercial
       fairness, the starting point in any case under s. 459 will be to ask whether the
       conduct of which the shareholder complains was in accordance with the
30     articles of association."

67.    Nonetheless, in case I were wrong on that, I have gone on to consider the specific
       points raised by the Petition. I have also done this because leave is sought to bring a
       derivative action against the board and the Subsidiary to have the B Shares cancelled
       or to prevent the Subsidiary voting them. This is pleaded in paragraphs 34, 35 and 40
       of the Petition, and relates to the alleged breaches of fiduciary duty.

68.    Once illegality has gone, Mr. Dicker says that the remaining claims are –

       (i)    Conflict of Interest;

       (ii)   Improper and Collateral Purpose;

       (iii)  Specific Breaches of Duty, being the way that the Dubai Holdings and
40             IHCL approaches were handled, and the refusal to dismantle the voting
              structure at the 2008 SGM.

**(i) Conflict of Interest**

69.    Mr. Dicker takes the formulation of the rule from 'Company Directors,' edited by Simon
       Mortimore QC, (OUP 2009) at para. 14.06:

       "A director of a company must avoid any situation in which he has or can have
       a direct or indirect interest that conflicts, or may possibly conflict, with the
       interests of the company."

70.    He cites Lord Cranworth in *Aberdeen Railway Co v Blaikie Bros* (1854) 1 Macq 461,
       471, HL:

50     "[It] is a rule of universal application, that no one, having [fiduciary] duties to
       discharge, shall be allowed to enter into engagements in which he has, or can
       have, a personal interest conflicting, or which may conflict, with the interests

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd

of those whom he is bound to protect. So strictly is this principle adhered to, that no question is allowed to be raised as to the fairness or unfairness of a contract so entered into."

71.    It is plain from the cases that the rule is strict; there is no requirement to show loss; and the fairness of the transaction is irrelevant, as is the honesty or otherwise of the director concerned. The possibility of conflict is enough, although that has to be viewed realistically: *Boardman v Phipps* [1967] 2 AC 46 HL. In *Bhullar v Bhullar* [2003] 2 BCLC 241 at para. 30, the test was restated as whether "reasonable men looking at the facts would think that there was a real sensible possibility of conflict."

72.    As I understand it the personal interest alleged here is that which the directors may have in using the structure to perpetuate themselves in office. Mr. Mowschenson argues that that is not pleaded, and that there is no currently pleaded case of conflict to sustain. I accept that, but suppose that the deficiency could be remedied by amendment. Certainly throughout his evidence Mr. O'Mary asserts that that is what the structure has been used for, although I accept the respondents' complaint that that is a conclusory opinion and does not itself have any evidential value.

73.    As I explain below, there is in my judgment no evidence in my view to support the allegation that the directors have in fact used the Subsidiary's votes to sustain themselves in office, but that does not deal with the *possibility* of a conflict. However, any such possibility was necessarily accepted and therefore waived by the sole shareholder, SCL, at the time the structure was created. It is perhaps for that reason that the Bye-laws of the Company and the subsidiary have matching provisions which, viewed in the light of the structure itself, could be seen as reciprocal. Thus the Company's Bye-law 80(3), provides:

"(3)    Subject to the provisions of the Companies Acts, a Director or other officer may notwithstanding his office be a party to, or otherwise interested in, any transaction or arrangement with the Company or in which the Company is otherwise interested; and may be a director or other officer of, or employed by, or a party to any transaction or arrangement with, or otherwise interested in, any body corporate promoted by the Company or in which the Company is interested. The Board may also cause the voting power conferred by the shares in any other company held or owned by the Company to be exercised in such manner in all respects as it thinks fit, including the exercise thereof in favour of any resolution appointing the Director or any of them to be director or officers of such other company, or voting or providing for the payment of remuneration to the directors or officers of such other company."

And there are similar provisions in the Bye-laws of the subsidiary.

74.    I think that when the Bye-laws are taken with the initial shareholder consent to the structure, it means that the inherent possibility of a conflict of interest has been sufficiently sanctioned and approved by the members, and cannot now be made a matter of complaint.

**(ii) Duty to Only Exercise Powers for the Purposes for Which They Are Conferred**

75.    Again, Mr. Dicker takes the formulation of the rule from Mortimore's 'Company Directors,' (*supra*) this time at para. 10.20, although this is now codified by statute in England. In essence a director is under a duty "to exercise each of the powers conferred on him only for their proper purpose. A proper purpose is one which, on a true construction of the constitution of the company, the power can be said to have been conferred." This calls for a quadripartite approach – the court must identify the power whose exercise is in question; identify the proper purpose; identify the substantial purpose for which it was in fact exercised (which is a question of fact); and then decide whether that purpose was proper.

76.    As I understand it, the powers in question are said to be those to carry on business through a subsidiary; to nominate directors to the board of that subsidiary; to inform that board of the wishes of the parent; to remove that board; and to dismantle or

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd                    [2010] Bda L.R. 32
                                                                             page 25

retain the share structure. It is said that those powers are all being misused to control the General Meetings of the Company and for the self-perpetuation of the existing board. It is said that there is no requirement to prove that the directors are acting unreasonably, or contrary to the best interests of the company; and that there is no need to demonstrate actual motive, dishonesty or bad faith. Once the misuse is established, Mr. Dicker asserts that the only defence is the informed consent of the shareholders.

77.  Mr. Mowschenson again points to the fact that the voting structure was established by the original sole shareholder, SCL, and that it is implicit in that that it enjoyed the informed consent of the shareholder at that point. I think that is determinative as far as the establishment of the original structure is concerned. Because the shareholder consented at that point I do not think it necessary at this stage to go into a detailed consideration of what the purpose of the structure was at that time, nor could I do so on the affidavit evidence alone. But I do think that the petitioners have to allege and prove an improper purpose, and they have indeed alleged one. The Petition alleges the improper purpose in respect of the continuance of the structure and the continuing exercise of the voting rights is to seize and maintain control of the Company's affairs by controlling the shareholder meetings irrespective of the wishes of the A shareholders, and to set up the board as a self-perpetuating oligarchy[23]. The question is, do the petitioners allege a sufficient case in respect of that?

78.  In this regard Mr. Dicker professes to abjure any allegation of bad faith on the part of the existing board, but it is very hard to see how he can do so in the face of a pleading which alleges that the board's sole or dominant purpose in operating the structure is to seize or maintain control of the Company's affairs and to set itself up as a "self-perpetuating oligarchy". In the end it may be a matter of semantics, but however the allegation is characterized it is one that requires full particularization. It is not enough, in my view, to say that because they could have done that, then they must be taken to have done it until they demonstrate the contrary.

79.  As noted above, the references to seizing control are particularly inapt given the fact that the structure was established effectively by, and certainly with the full consent, of the sole shareholder at the time, SCL. Do the petitioners allege sufficient facts to support the oft repeated allegation that since then the directors have been abusing the structure to hang on to personal control? In my judgment they do not, and the uncontested facts are against them.

80.  In his first affidavit Mr. Hetherington states that ". . . prior to the recent attempts by the petitioners to interfere with the Company's share structure, every resolution of the shareholders of the company (with one exception) has been passed with a majority of the votes cast by holders of A shares." The one exception relates to the election of one of the directors, Mr. John Campbell, at the 2007 AGM. To the extent that that pre-dates the petitioners' acquisition of their shares, it is not something that they can complain of. To the extent that it is relied on as evidence that the directors habitually abuse the structure to elect themselves, it would be a bit thin. In my view it loses all weight when placed in the context of the uncontested evidence that Mr. Campbell's election was approved by the majority of the A Shares at the AGM the following year, and that at the 2009 AGM, held on 5th June 2009, after the defeat of the petitioners' resolution at the October 2008 SGM, and after the commencement of these proceedings, all of the incumbent directors, including Mr. Campbell, were re-elected with a clear majority of the votes cast by the holders of the A Shares in favour of their re-election[24]. There is nothing to contradict the respondents' evidence on this. I think, therefore, that as things stand at the moment, there is no evidence that the directors have used their power to perpetuate themselves.

81.  To the extent that it might be said that the rejection of the approaches from Dubai Holdings and IHCL was motivated by a desire to perpetuate themselves, there is

---

[23] See paragraph 33 of the Petition.
[24] See paragraph 30 of Mr. Hetherington's first affidavit.

AP0953

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd          [2010] Bda L.R. 32
                                                                              page 26

nothing on the face of the transactions to support that. The Dubai offer was little more than an opening salvo, which was not persisted with. In the case of the IHCL approach, that was simply for a strategic alliance. IHCL were not proposing to acquire the company or replace the board, so the rejection of their offer could never be relied upon as act of self-perpetuation.

82.     The only other matter relied upon as demonstrating that the structure has been used for the self-perpetuation of the directors is the rejection of the petitioner's resolution at the 2008 SGM. I return to this below, but at the end of the day I do not think that support of a lawful *status quo* is sufficient evidence of an improper purpose, or indeed of the one alleged, to support the Petition. It would require something more.

**(iii) Various Specific Breaches of Duty**

83.     The specific breaches of duty alleged by the petitioners fall under two heads – (a) those relating to dealings with the two corporate suitors, Dubai Holdings and IHCL; and (b) the defeat of the shareholders attempt to dismantle the structure at the SGM.

**(a) The Offers**

84.     To recap the background, one of the suitors was Dubai Holdings, which in September 2007 expressed an interest in acquiring all the A shares at a price of US $60 per share. This was summarily rebuffed by the board in a letter of 19th October 2007. The other suitor was IHCL, which on 14th September 2007 expressed an interest in some form of association between the companies. Although they made no offer for the A shares, at the time of the letter they held 10% of them, which they subsequently increased to 11.5%, with the intent of providing "a serious and credible foundation for discussions with your board"[25]. That too was summarily rebuffed, and it was following that that the first two petitioners sought to have a resolution placed on the agenda for the 2008 AGM calling for a strategic review by an investment Bank. The respondents say that they had already had a strategic review conducted by Lazard Frères & Co LLC in 2007, and did not need another one. Indeed, they say that it was as a result of Lazard's recommendations for the future of the Company that the board had declined the expressions of interest from Dubai Holdings and IHCL.

85.     I do not think that the petitioners could ever rely upon the refusal to entertain their resolution at the 2008 AGM to support their case. It concerned the operations of the company, and such matters had been entrusted to the directors by the Bye-laws and were not a matter for the shareholders in General Meeting. In addition when considering that, and the whole question of the treatment of Dubai Holdings and IHCL, a very clear distinction has to be drawn between the voting rights attributed by the Bye-laws to the different classes of shares, and the completely separate issue of the way those shares are held. There is a tendency in talking of the voting structure, to elide these two quite separate issues, and I have been guilty of that in this judgment. But at this point the distinction has to be drawn. If the petitioners could not propose a resolution at the AGM because they did not hold enough shares, that is a consequence of the Bye-laws and of the voting rights attributed to those shares by the Bye-laws. They cannot complain of that, as the passage from <u>Re Saul Harrison & Sons plc</u>, quoted above, explains

86.     When considering the rejection of the approaches by Dubai Holdings and IHCL there is a similar, though different, distinction to be drawn. That was not done using the vote of the Subsidiary's B shares. It was done by the board in the course of the day to day management of the Company. There may be all sorts of reasons why it was a sensible course of action: I can understand the arguments the respondents make – that the board genuinely considered the expressions of interest not in the best interests of the Company; that the offer from Dubai was an opening gambit to which a positive response would have been tactically naive; that in any event it had a 'no-shop' condition; that IHCL were not making an offer; and that therefore there was no

---

[25] See IHCL's letter of 19th December 2007.

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd                    [2010] Bda L.R. 32
                                                                              page 27

question of a bidding war. There is also the more fundamental point, that the interests of the petitioners in jacking up the price of their newly acquired stake in the Company are not necessarily the same as the interests of the Company when viewed in the round. But I do not need to get into any of that on this application, nor indeed could I attempt to try the merits of the matter on the affidavit evidence.

87.    The point simply is, had those decisions been made by the board of a more conventionally structured company, could a minority shareholder have mounted a Petition under section 111 on the grounds that it was oppressive or prejudicial to their interests? I do not think so. In my view the use of the word "oppressive" introduces the concept of unfairness, and I think that on this point the English and Bermudian law in the same, notwithstanding the slight difference of wording between the statutory provisions: see *Bermuda Cablevision Ltd. v Colica Trust Co* [1998] 2 WLR 82 PC, at 92C. There has to be an element of unfairness to trigger the application of section 111, otherwise it could be used to question all sorts of the management decisions with which a shareholder did not agree, and thus subvert the delegation of such matters to the board. Yet there was no unfairness here, because, in rejecting the approaches of Dubai Holdings and IHCL, the board did not need to wield the Subsidiary's B Shares. It may be that they were emboldened by them, but that is not really a fit subject for forensic inquiry, and is probably not susceptible to resolution in the absence of "some written or oral confession[26]".

88.    I think that an English Court applying the English provisions would have come to the same conclusion, but were I wrong on that, in Bermuda the petitioners have to face the additional hurdle that the matters complained of would otherwise justify the winding up of the company on the 'just and equitable' ground, and I cannot see that the complaints about the rejection of the Dubai and IHCL approaches could ever support that.

**(b) The Resolutions of October 2008**

89.    As to the attempt to dismantle the structure, the history is set out above. In summary, the board convened the 2008 SGM at the petitioners' request, and the petitioners proposed their resolutions to dismantle the share structure. The B shares were voted against the resolutions, with the result that they were defeated, notwithstanding that a substantial majority of the A shares were voted in favour.

90.    As to the decision on how to vote the B shares, the respondents' evidence comes from Mr. Hetherington who is a Vice-President of, and Group Legal Counsel to, the Company. He is also the Company Secretary of the Company, and assistant Company Secretary of the Subsidiary. He has been Company Secretary of the Company since 30th December 1994, and he was also Company Secretary and Legal Counsel to SCL from 1980 to 2006. It is plain, therefore, that he has a long-standing and deep involvement in the affairs of the Company. He says[27]:

"I attended (by telephone) the board meeting of the Subsidiary which was held on 8 September 2008 when the Subsidiary's board determined how to cast the votes attaching to the B Shares in relation to the resolutions to be proposed by the Petitioners. The board were aware of the Company's views that it would not be in the interest of the Company or the Orient-Express Group for the resolutions to be passed and that there were issues as to the validity of the resolutions which were the subject of the requisition. The board considered the matter and resolved that it would not be in the interests of the Subsidiary, the Company or the Orient-Express Group for the resolutions to be passed because the effect of the resolutions if implemented would involve the expropriation of the Subsidiary's B Shares, effect a change of control of the Company which was not in the interest of the Company or the Orient-Express

---

[26] See the passage from Hoffmann LJ in *Re Saul Harrison & Sons plc* [1994] BCC 475 at 492 quoted above.
[27] See paragraph 33 of his first affidavit.

DE Shaw Oculus Portfolios LLC v Orient-Express Hotels Ltd          [2010] Bda L.R. 32
                                                                                page 28

> Group, and involve the destruction of the Company's capital and voting
> structure which the Subsidiary considered was in the interest of the
> Subsidiary, the Company and the Orient-Express Group to retain. That was a
> decision made in the light of the current economic circumstances of the Orient-
> Express Group."

91.    It seems to me that those are cogent points. In particular, the directors of the
       Subsidiary owe their duties to the Subsidiary, and would have to think very hard
       indeed before throwing away its asset. Nor is there any evidence, apart from
       assertion, to contradict that and show that the directors of the Subsidiary were acting
10     from some improper motive, such as to preserve the personal position of the
       Company's board, as opposed to the structure itself.

92.    But there is another, more fundamental point. The holding of the shares, with their
       appurtenant voting rights, is quite distinct from the use that may be made of those
       rights. At the point at which the directors of the Subsidiary had to decide whether to
       accept or defeat the petitioners' resolutions, they were not wielding the B Shares to do
       anything other than preserve the voting rights conferred upon those shares by the
       Bye-laws, or, in the case of the second resolution, the shares themselves. I do not see
       how that can be oppressive. In particular, I do not think that the petitioners can
       complain of the preservation of the voting structure *per se*. If it is used oppressively to
20     their disadvantage, and they can plead proper particulars of that, then they may be
       able to complain of that. But in my judgment that has not happened yet, for all the
       reasons set out above. But if the voting structure is lawful, as I find, then this case is
       not like the Bermuda Cablevision case, where there was a *prima facie* unlawful
       structure. In reality the petitioners knew what they were buying into, and they have
       what they bargained for. They were not entitled to expect that they could renegotiate
       the statutory contract to their advantage. There is no private or ancillary
       understanding that they would get more than the Bye-laws allowed, and had there
       been it would have been inappropriate in the context of a publicly traded company.
       There is, therefore, nothing to make the defeat of the petitioners' *putsch* oppressive.

30  **Conclusions On The Application To Strike-Out The Petition**

93.    In the circumstances, having held that the voting structure is not in itself unlawful, I
       consider that the remaining allegations in the Petition (i) are wholly insufficient to
       justify a winding up on the just and equitable ground, and that trial will do nothing to
       improve that; and (ii) are in any event insufficient to make out the breaches of
       fiduciary duty alleged. In the absence of sufficient evidence of breach of duty, the
       application for authorization to bring a derivative action is also bound to fail. I
       therefore strike out the Petition.

94.    I will hear the parties on costs, and any ancillary matters.

# B. - Effect of an English winding-up order

**Dicey, Morris & Collins on the Conflict of Laws 16th Ed.**

**Mainwork**

**Volume 2**

**Part 6 - Corporations and Insolvency**

**Chapter 30 - Corporations and Corporate Insolvency** [1]

**Section 4. - Winding up, Administration, Company Voluntary Arrangements and Receivership**

**B. - Effect of an English winding-up order** [361]

## Rule 192

**30R-119**

(1) The winding up of a company under the Insolvency Act 1986 [362] impresses the property of the company with a trust for its application in the course of the winding up for the benefit of the persons interested in the winding up. [363]

(2) The winding up of a company under the Insolvency Act 1986 is, in general, governed by English law. [364]

## Comment

### Introduction

**30-120**

Rule 192 is, in effect, a choice of law rule. The recast Insolvency Regulation supplied its own choice of law rules in cases which fell within that Regulation, [365] but that Regulation no longer applies to the United Kingdom. [366]

### Clause (1) of the Rule

**30-121**

The making of a winding-up order terminates a company's beneficial interest in its property. [367] Thereafter the property must be dealt with in the manner provided by the Insolvency Act 1986. [368] In particular the liquidator must take into their custody or under their control all the property and things in action to which the company is or appears to be entitled. [369] However the court may provide in the order that the liquidator is not to get in assets situate outside England without first seeking a direction from the court. [370] The court may also provide in the order that the liquidator should not settle a list of other than "English" creditors without first obtaining a direction. [371] These may be convenient provisions in the case of a company incorporated outside England which is being wound up at the place of its incorporation. [372]

**30-122**

Subject to compliance with any such special provisions in the winding-up order, and subject to the effect of the Cross-Border Insolvency Regulations 2006 where foreign main insolvency proceedings have been recognised under

© 2023 Thomson Reuters.

the UNCITRAL Model Law, [373] the liquidation is a liquidation of the company and not merely of its English affairs. Accordingly assets collected by the liquidator may be applied in satisfaction of "foreign" as well as of "English" liabilities; [374] whilst where there is a simultaneous liquidation abroad the court should seek to secure that all creditors of equal priority benefit equally whether they are claimants here or in the foreign proceedings. [375] As Sir Nicolas Browne-Wilkinson V.-C. put it, more generally, an "attempt to put a ring fence around either the assets or the creditors to be found in any one jurisdiction is, at least under English law as I understand it, not correct, and destined to failure. I believe the position will prove to be the same in most other countries and jurisdictions." [376]

**30-123**  In *Cleaver v Delta American Insurance Co* [377] the Privy Council affirmed the general principle that where a company is being wound up in an English liquidation and also in a liquidation in a foreign country, a creditor who had proved and received a dividend in the foreign liquidation could not receive a dividend in the English liquidation unless they brought into hotchpot their foreign dividend. The principle, however, applies only to assets which under English law formed part of the estate in liquidation, so that a secured creditor who had obtained their security before the liquidation commenced was entitled to realise their security, apply the proceeds towards the discharge of their debt and prove in the English liquidation for the balance owing. [378]

**30-124**  The Insolvency Act 1986 provides that, when a winding-up order has been made, no action or proceeding against the company or its property is to be continued or commenced without leave of the court. [379] This provision restrains proceedings in courts throughout the United Kingdom, [380] but it does not apply to proceedings in courts outside the United Kingdom. [381] However, a creditor who is subject to the jurisdiction may be restrained from continuing or commencing proceedings against the company outside the United Kingdom by an exercise of the court's inherent but discretionary power to restrain foreign proceedings. [382] The justification for exercising the power is that the creditor is thereby prevented from obtaining an inequitable share of the assets.

**30-125**  The Insolvency Act 1986 provides that, where a creditor has issued execution against any goods or land of a company or has attached any debt due to the company, and the company is subsequently wound up, the creditor is not entitled to retain the benefit of the execution or attachment against the liquidator unless it has completed the execution or attachment before commencement of the winding up. [383] This provision, however, does not extend to executions or attachments in foreign jurisdictions. [384] The 1986 Act also provides that any attachment, sequestration, distress or execution put in force against the estate or effects of the company after the commencement of the winding up shall be void. [385] Although the relevant provision is expressed to apply to "a company registered in England and Wales", [386] it has been judicially stated that it nonetheless applies to a foreign company as an unregistered company. [387] There are also elaborate provisions invalidating executions against estate or effects in Scotland. [388] The 1986 Act does not make provision for the invalidity of executions elsewhere. However, an unsecured [389] creditor who levies execution on effects situate outside Great Britain after the commencement of the winding up may, if subject to the jurisdiction of the court, be compelled to surrender the fruits of that execution for the general benefit of the creditors. [390] At least this is the position where the creditor is seeking to prove in the liquidation for other sums due from the company. [391]

**30-126**  In *Stichting Shell Pensioenfonds v Krys*, [392] it was held that a creditor who had submitted to the jurisdiction of the court responsible for administering the insolvency process could be restrained from pursuing proceedings in a foreign jurisdiction, including its own local jurisdiction, with a view to obtaining a priority over other creditors in the insolvency process. The Privy Council ruled that the distribution of the assets of an insolvent company among its creditors should normally be determined by the law of the place of the winding up, at least where the insolvent company was being wound up in the jurisdiction of its incorporation, unless there had been a valid transfer of a proprietary interest in the relevant assets under the law of the lex situs prior to a winding up order taking effect. The court pointed out that the rights and liabilities of claimants against the assets of an insolvent company were the same regardless of the nationality or place of residence of those claimants. It was inimical to the proper administration of the winding-up process that a creditor should

© 2023 Thomson Reuters.

seek to enforce a foreign order that would result in it enjoying priority access to the insolvent estate. Therefore there was no legal principle that protected a foreign litigant from being issued with an anti-suit injunction precluding it from having recourse to its own domestic courts. [393]  The court however had a discretion to refuse relief in the particular circumstances if this would not serve the ends of justice. [394]

**Clause (2) of the Rule**

30-127    In winding up a company, the courts apply English law to both matters of procedure and (subject to what is said below) matters of substance. This principle is incontestable, for matters of procedure are inevitably determined by the lex fori, and a liquidation under the Insolvency Act 1986 and the Insolvency Rules can hardly be conducted otherwise than in accordance with the provisions of that Act and those Rules. [395]  The Rule is not modified where there is a simultaneous liquidation under the law of the place of incorporation, even though in such circumstances the English winding up is expressed as being ancillary [396] to that proceeding abroad. Thus in *Re Bank of Credit and Commerce International SA (No.10)*, [397] Sir Richard Scott V.-C. held that although, where a foreign company was in liquidation in the country of its incorporation, a winding-up order made in England would normally be regarded as ancillary, [398] that did not relieve the English court of the obligation to apply English law to the resolution of any issue arising in the winding up which was brought before the English court. The court had no power to disapply the English rule on set-off [399] or any other substantive rule forming part of the statutory insolvency scheme contained in the Insolvency Act 1986 and the Insolvency Rules. [400]  Further, the court had no power to relieve English liquidators of the obligation to determine whether proofs of debt submitted to them should be admitted or of the obligation to ensure that creditors whose claims have been admitted receive the pari passu dividend to which they were entitled. [401]

30-128    However, clause (2) of the Rule does not entirely preclude a reference to the law of the place of incorporation, for it may be necessary by virtue of provisions in the Insolvency Act 1986, e.g. to ascertain whether or not a shareholder is liable as a contributory under s.226(1), or the persons who are entitled under s.154 to the surplus assets on completion of the liquidation. [402]  Again, reference will be made to other legal systems to discover (for example) whether debts alleged to be due either to or from the company are valid under their respective governing laws. [403]

**Territorial reach of certain provisions of Insolvency Act 1986**

30-129    Where a foreign company is being wound up in England, the liquidator is, generally, free to invoke the relevant provisions of the Insolvency Act 1986 in discharge of their functions. [404]  However, questions may arise as to the proper territorial reach of some provisions of the Act, whether the court is winding up a foreign company or an English company. [405]  On principle, the territorial reach of a provision of a statute depends on what reach Parliament intended the relevant provision to have. [406]  But Parliament's intention (if it ever gave any thought to the question) is not always easy to discern.

30-130    It has been held that the court has jurisdiction under s.133 of the Insolvency Act 1986 to order the public examination of an officer [407] of an English company which is in compulsory liquidation, regarding the promotion, formation or management of the company or as to the conduct of its business or affairs, or their conduct or dealings in relation to the company, irrespective of the nationality of the officer or whether they are resident or present in England. [408]  This provision can be invoked against an officer of a foreign company which is being wound up in the English court. [409]  The court has a discretion as to the manner and place of such service which can extend to ordering service out of the jurisdiction on the relevant person. [410]

30-131

© 2023 Thomson Reuters.

The court also has jurisdiction under s.236 of the Insolvency Act 1986 to summon to appear before it any officer of the company, any person known or suspected to have in their possession any property of the company or supposed to be indebted to the company, or any person whom the court thinks capable of giving information concerning the promotion, formation, business dealings, affairs or property of the company. [411] There is conflicting authority as to whether such an order can be made against a person who is not resident or present in England. [412] Section 236 also gives the court jurisdiction to require any such person to produce any books, papers or other records in their possession or under their control relating to the company or its promotion, formation, etc. [413] This section applies to documents located abroad. [414] To obtain such an order the liquidator must demonstrate that they reasonably require to see the documents [415] in order to carry out their statutory functions and that production of the documents does not impose an unnecessary or unreasonable burden on the person required to produce them. [416] Where an order under s.236 of the 1986 Act is made against a person while they are present in England, the court may restrain that person from leaving the jurisdiction or require that they give security as a condition of leaving the country. [417]

30-132    In *Re Paramount Airways*, the Court of Appeal held that s.238 of the Insolvency Act 1986, which enables a liquidator or administrator to apply for an order setting aside a transaction entered into by the company with "any person" at an undervalue, applies, in proceedings to wind up an English company, to any person whether or not that person is resident in England, i.e. without any territorial limitation. [418] The court, however, referred to two respects in which this apparently limitless jurisdiction may be confined.

30-133    First, s.238(3) provides that, on such an application, the court shall make such order as it thinks fit for restoring the position to what it would have been if the company had not entered into the transaction. This discretion is of sufficient width to permit the court to make no order at all against the other party to the transaction. If a foreign element is involved the court must be satisfied that the party against whom the order is to be made is sufficiently connected [419] with England for it to be just and proper to make the order irrespective of the foreign element in the case. Whether such a connection exists is to be assessed by reference to all the circumstances. Relevant for these purposes will be: [420] the residence and place of business of the party; that party's connection with the company; the purpose of the transaction which is being attacked; the nature and locality of the property involved; the circumstances in which the party became involved in the transaction, or received a benefit from it, or acquired the property in question; whether the party acted in good faith; and whether under any relevant foreign law the party acquired a title free of any claims even if the company had been wound up under that law. The weight to be attached to these factors will vary from case to case, and still further circumstances may be relevant. Overall the court will seek to ensure that it does not act oppressively or unreasonably in operating the very wide jurisdiction conferred upon it.

30-134    The court in *Re Paramount Airways* noted that a second safeguard arose at an earlier stage, in that proceedings under s.238 were not to be brought against a person abroad unless the court granted leave for the proceedings to be served on that person abroad pursuant to the Insolvency Rules. [421] To decide whether it was a suitable case for leave to be granted where a foreign element was involved, the court would have particular regard to the strength or weakness of the claimant's case that the defendant had a sufficient connection with England. [422]

30-135    The above principles apply equally in cases where it is alleged that a company [423] has given a preference to any person contrary to s.239 of the Insolvency Act 1986 [424] and where it is alleged that the company has entered into a transaction with another person which defrauds creditors contrary to s.423 of the Act. [425] In the latter class of case, it has been held that the court's powers to set aside a transaction defrauding creditors, at the suit of a victim of the transaction, extend to a foreign company and exist in respect of a transaction governed by foreign law, even a transaction relating to foreign land. [426] The circumstances in which the court can grant permission to serve proceedings out of the jurisdiction in cases under s.423 were considered in *Orexim Trading Ltd v Mahavir Port and Terminal Private Ltd*. [427] The Court of Appeal held that the court could permit [428] a claim to set aside a transaction under s.423 to be served on a defendant outside the

© 2023 Thomson Reuters.

jurisdiction but emphasised that this power is subject to important "safeguards". [429] In particular, relief under s.423 will not be granted unless it can be shown that there is a "sufficient connection" between the defendants and England to make such relief appropriate, and the court will not grant permission to serve a claim under s.423 out of the jurisdiction unless it can be shown that there is a realistic prospect of establishing that connection. [430]

30-136    Section 213 of the Insolvency Act 1986 (fraudulent trading) provides that if in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors or for any fraudulent purpose, then the court may declare that any persons who were knowingly parties to this shall make such contributions (if any) to the company's assets as the court thinks proper. In *Bilta (UK) Ltd v Nazir (No.2)* [431] the Supreme Court held that s.213 had extraterritorial effect, at least to the extent of applying to individuals and corporations resident outside the United Kingdom. The court noted that in the case of a company trading internationally, and in an increasingly globalised economy, the provisions of s.213 could not achieve their object if their effect was confined to the United Kingdom. The ease of modern travel meant that those who committed fraud in this country through the medium of a company (or otherwise) could readily abscond abroad. It would seriously handicap an efficient winding up process if the jurisdiction of the court did not extend to people and corporate bodies resident overseas who had been involved in the carrying on of the company's business. It was also be noted that the section contained no express limits on its territorial application. [432] The court endorsed the proposition [433] that modern patterns of cross-border business weaken the presumption against extraterritorial effect as applied to the exercise of the court's powers in conducting the liquidation of a UK company and the absence in the statute of any test for what would constitute presence in the United Kingdom made it unlikely that presence there was intended to be a condition of the exercise of the power. The absence however, of such a connection would be a factor in the exercise of the discretion to permit service out of proceedings as well in the discretion whether to grant the relief, which was sufficient to prevent injustice. [434]

30-137    Further, where proceedings are brought in England to disqualify a director of a company in liquidation [435] from being a director of a company, the court has jurisdiction to order service of the proceedings out of the jurisdiction and the power, if appropriate, to make such an order, irrespective of whether the director was a British subject or resident in England and irrespective of whether the conduct allegedly rendering them unfit to be a director had occurred in England or abroad. [436]

### Judicial assistance

30-138    The implementation of the consequences of an English winding-up order may be rendered more effective by s.426 of the Insolvency Act 1986. [437] In particular, courts in other parts of the United Kingdom are under an obligation to enforce orders made by the English court in the exercise of jurisdiction in relation to insolvency law. [438] Although such courts are not required to enforce the English order in relation to property situated within their respective jurisdictions, [439] they clearly have a discretion to do so. More generally, United Kingdom courts have a duty to assist each other in matters of winding up, [440] which assistance could extend to securing effective title to property which is alleged to be comprised in the English order. This duty extends to assisting courts in the Channel Islands, the Isle of Man and any other relevant country or territory designated by the Secretary of State. [441] The relevant provisions of s.426 may also be extended to any of the Channel Islands, thus enabling courts in any jurisdiction to which the section is extended to provide assistance to English courts conducting a winding up. [442]

30-139    There is no reason of principle why an English liquidator appointed in the winding up of an English company should not endeavour to obtain assistance from the courts of foreign countries directly by utilising any cooperative procedures which may be available under the laws of those countries. [443] Since there is no reciprocal obligation to provide assistance, the extent to which the authority of the liquidator will be recognised and, if so recognised, the nature of any assistance which will be provided in the foreign country will be entirely a matter for that country's law. [444]

© 2023 Thomson Reuters.

## Illustrations [445]

**30-140**

1.X, a company registered in England under the Companies Act, carries on its business largely in India. A, who is present in England, is a creditor of the company, and has accounts outstanding against it for £27,000 in England and £5,000 in India. A obtains judgment against the company in India for £5,000. A winding-up order is made in England and thereafter A levies execution upon the company's assets in India in order to satisfy his judgment. He also proves in the winding up. A must surrender to the liquidator the sum which he obtained under the execution. [446]

2.X is a company registered in South Africa but carrying on business in England. A final winding-up order is made in South Africa and a liquidator is appointed. A, an English creditor of the company, obtains a judgment in default of defence in this country, and proceeds to levy execution on the company's property situate in England. A winding-up order is made in England and a liquidator appointed. The execution is void under South African law, but this is not material in deciding whether A should be allowed [447] to keep the fruits of his execution as against the English liquidator. [448]

3.X is a company incorporated in Luxembourg where X is in liquidation. A winding-up order is made in relation to X in England where X has conducted banking business. The English liquidators of X wish to release funds at their disposal to the Luxembourg liquidators for distribution amongst X's creditors worldwide pari passu, with the funds, once transferred to Luxembourg, being distributed according to the principles of Luxembourg insolvency law. Luxembourg insolvency law does not permit set-off. [449] English law permits set-off. [450] Although the winding up in England is ancillary to that taking place in Luxembourg, English law governs the English winding-up and there is no power to disapply the English rule on set-off. [451]

4.X and Co, an English company, is in compulsory liquidation in England. Y is a former director of the company who is now resident and domiciled in Alderney, Channel Islands. The Official Receiver applies to the court for the public examination of Y as "any person" "who has been an officer of the company", pursuant to s.133 of the Insolvency Act 1986. The court has jurisdiction to make the order. [452]

**30-141**

5.An administration order [453] is made in England in respect of X and Co, an English company. A sum of money, beneficially owned by X and Co, is transferred to Jersey, to Y and Co, which pays it into its account at the Z bank, in Jersey, thereby reducing its overdraft. The administrator of X and Co alleges that the payment to Y and Co was a transaction at an undervalue, contrary to s.238 of the Insolvency Act 1986, and that the benefit (the reduction of Y and Co's overdraft) received by the Z bank is also obtained in contravention of s.238. Although the Z bank has no place of business in England and does not carry on business there, the court has jurisdiction to make an order setting aside the transaction against the bank. [454]

6.X is a company incorporated in the Lebanon where it is placed in liquidation. X operated as principal adviser and investment manager for several hundred investors who placed business with the London office of A, an American investment bank. A winding-up order against X is made in England. The English liquidators of X seek an order against A requiring A to produce documents [455] relating to X which are in A's possession in New York. The court has jurisdiction to make the order. [456]

7.A, B and C are directors of X, a company incorporated in Panama. A, B and C are residents of Monaco. X has sufficiently close connections with England to justify a winding up of X's affairs under the Insolvency Act 1986. The

© 2023 Thomson Reuters.

liquidator of X seeks relief against A, B and C under s.214 of the Insolvency Act 1986 in the form of a declaration that A, B and C are liable to contribute towards the assets of X. The court has jurisdiction to make such a declaration.[457]

8. A is a director of X, a company incorporated in England, which is being wound up in England. A is a British subject resident and domiciled in Alderney. The Official Receiver seeks leave to issue and serve on A, out of the jurisdiction, an originating summons seeking an order under s.6(1) of the Company Directors' Disqualification Act 1986 that A be disqualified from being a director of the company. The court has jurisdiction to grant the order.[458]

9. X, a company incorporated in England, is alleged to have been the vehicle for a VAT carousel fraud, having entered into a series of transactions relating to carbon credits with various counterparties including Y, a company incorporated in Switzerland. X goes into liquidation and its liquidators seek an order requiring Y to contribute pursuant to s.213 of the Insolvency Act 1986 (fraudulent trading). The court has jurisdiction to grant the order.[459]

10. X is a company incorporated in England. X invests in a scheme controlled by M, who is subsequently convicted of a major fraud. Y is a company incorporated in the Netherlands and an investor in X. Soon after M's arrest, Y obtains a pre-judgment attachment from the Dutch court over large sums in X's account in the Dublin branch of a Dutch bank. Six months later the court makes an order winding up X. Y submits a proof in X's liquidation. X's liquidators seek an anti-suit injunction to restrain Y from pursuing the Dutch proceedings. The court has jurisdiction to make the order.[460]

## Footnotes

1. Farnsworth, The Residence and Domicile of Corporations (1939); *Baxter (1962) 40 Can. Bar Rev. 165*; *Drucker (1968) 17 I.C.L.Q. 28*; Fletcher, Cross-Border Insolvency: Comparative Dimensions (1990); *Drury [1998] C.L.J. 165*; Rammeloo, Corporations in Private International Law (2001); Paschalidis, Freedom of Establishment and Private International Law for Companies (2012); American Law Institute, Transnational Insolvency: Global Principles for Cooperation in International Insolvency Cases (2012); Sheldon (ed.), Cross-Border Insolvency (4th ed. 2015); Fletcher, Law of Insolvency (7th ed. 2017), Chs 30, 31; Mevorach, The Future of Cross-Border Insolvency (2018); See also Briggs, Private International Law in English Courts (2014), Chs 10 and 11; *Franken (2014) 34 O.J.L.S. 97*; *Fletcher [2014] J.B.L. 523*.

361. Fletcher, Insolvency in Private International Law (2nd ed. 2005), pp.178-191; Sheldon (ed.), Cross-Border Insolvency (4th ed. 2015); Chs 10 and 11.

362. Insolvency Act 1986, ss.73-200, applied to unregistered companies by Insolvency Act 1986, s.221(1).

363. *Re Oriental Inland Steam Co (1874) L.R. 9 Ch. App. 557*; *Ayerst v C&K (Construction) Ltd [1976] A.C. 167*; *Mitchell v Carter [1997] 1 B.C.L.C. 681 (CA)*; *Re HIH Casualty and General Insurance Ltd [2008] UKHL 21, [2008] 1 W.L.R. 852*; *Bloom v Harms Offshore AHT [2009] EWCA Civ 632, [2010] Ch. 187*; *Singularis Holdings SA v PricewaterhouseCoopers [2014] UKPC 36, [2015] A.C. 1675*; *Stichting Shell Pensioenfonds v Krys [2014] UKPC 41, [2015] A.C. 616*; cf. *Federal Commissioner of Taxation v Linter Textiles Australia Ltd [2005] HCA 20, (2005) 220 C.L.R. 592*.

364. *Re English, Scottish and Australian Chartered Bank [1893] 3 Ch. 385, 394 (CA)*; *Re Suidair International Airways Ltd [1951] Ch. 165, 173*; *Re Bank of Credit and Commerce International SA (No.10) [1997] Ch. 213*; *Re HIH Casualty and General Insurance Ltd [2008] UKHL 21, [2008] 1 W.L.R. 852*; *Bloom v Harms Offshore AHT [2009] EWCA Civ 632, [2010] Ch. 187*; *Re Swissair Schweizerische Luftverkehr-Aktiengesellschaft [2009] EWHC 2099 (Ch.), [2009] B.P.I.R. 1505*. Also *North Australian Territory Co Ltd v Goldsbrough Mort & Co Ltd (1889) 61 L.T. 716, 717*; *Re Sefel Geophysical Ltd (1988) 54 D.L.R. (4th) 117 (Alta)*.

365. Regulation (EU) 2015/848, Arts 7–18.

366. See para.30-043, above. The retained recast Insolvency Regulation does not include the choice of law rules in Regulation (EU) 2015/848, Arts 7–18.

367. See the cases referred to at n.363 above. In theory the effect of an order extends to all the company's assets, whether situated in England or abroad: *Re International Tin Council [1987] Ch. 419, 446*, affd. without reference to the point, *[1989] Ch. 309 (CA)*; *Mitchell v Carter*, above, at 686; *Re HIH Casualty and General Insurance Ltd*, above; *Bloom v Harms Offshore AHT*, above; *Re Swissair Schweizerische Luftverkehr-Aktiengesellschaft*, above; *Jetivia v Bilta (UK)*

*Ltd* [2015] *UKSC* 23, [2016] *A.C.* 1, at [109] (Lord Sumption). See also *Bank of Credit and Commerce International SA v Bugshan* [2001] *EWCA Civ* 244.

368  See *Re Bank of Credit and Commerce International SA (No.10)*, above; *Re HIH Casualty and General Insurance Ltd*, above; *Bloom v Harms Offshore AHT*, above (applying the same principles to an administration under Sch.B1 to the Insolvency Act 1986); *Re Swissair Schweizerische Luftverkehr-Aktiengesellschaft*, above.

369  Insolvency Act 1986, s.144(1).

370  *Re Hibernian Merchants Ltd* [1958] *Ch.* 76. See also *Re International Tin Council* [1987] *Ch.* 419, 447, *affd. without reference to the point*, [1989] *Ch.* 309 *(CA)*; *Re Bank of Credit and Commerce International SA* [1994] 1 *W.L.R.* 708 *(CA); Re Bank of Credit and Commerce International SA (No.10)*, above, at 242; *Re HIH Casualty and General Insurance Ltd*, above.

371  *Re Hibernian Merchants Ltd*, above; *Re Bank of Credit and Commerce International SA (No.10)*, above; *Re HIH Casualty and General Insurance Ltd*, above; *Re Swissair Schweizerische Luftverkehr-Aktiengesellschaft*, above.

372  See Sheldon (ed.), Cross-Border Insolvency (4th ed. 2015), Ch.14. On the nature and effect of an ancillary liquidation, see *Re Bank of Credit and Commerce International SA (No.10)*, above; *Re HIH Casualty and General Insurance Ltd*, above; *Bloom v Harms Offshore AHT*, above; *Re Swissair Schweizerische Luftverkehr-Aktiengesellschaft*, above.

373  See Rule 199: under the Cross-Border Insolvency Regulations 2006 (SI 2006/1030), Sch.1, Art.28, where local insolvency proceedings are opened after foreign main insolvency proceedings have been recognised, the effects of the local proceedings are largely restricted to assets of the debtor within Great Britain. The Regulations thereby partly overturn the long-established common law principle that an English winding-up order has universal effect—see the comments of Sir Richard Scott V.-C. in *Banco Nacional de Cuba v Cosmos Trading Corp* [2001] 1 *B.C.L.C.* 813, 820 *(CA)* that it is "a weakness in our winding up law" that it is not possible to have a winding up of a foreign company that is exclusively territorial in its application.

374  *Re Azoff-Don Commercial Bank* [1954] *Ch.* 315; see also *Re Vocalion (Foreign) Ltd* [1932] 2 *Ch.* 196, 207; *Re Delhi Electric Supply and Traction Co Ltd* [1954] *Ch.* 131, 144 *(CA); Re Bank of Credit and Commerce International SA* [1992] *B.C.L.C.* 570; *Re Bank of Credit and Commerce International SA (No.10)*, above; *Re HIH Casualty and General Insurance Ltd*, above; *Bloom v Harms Offshore AHT*, above; *Re Swissair Schweizerische Luftverkehr Aktiengesellschaft*, above. Compare *Russian and English Bank v Baring Bros* [1936] *A.C.* 405, 428; *Re Banque des Marchands de Moscou* [1954] 1 *W.L.R.* 1108, 1112-1113. But see also the rule against enforcement of foreign revenue laws e.g. *Government of India v Taylor* [1955] *A.C.* 491; *Webb v Webb* [2020] *UKPC* 22, [2021] 1 *F.L.R.* 448, *Skatteforvaltningen (the Danish Customs and Tax Administration) v Solo Capital Partners LLP (in special administration)* [2021] *EWHC* 974 *(Comm.)*, above, Rule 20.

375  *Re Standard Insurance Company Ltd* [1968] *Qd.R.* 118, 128, citing *Re Matheson Bros* (1884) 27 *Ch.D.* 225, 231; *Sedgwick Collins & Co v Rossia Insurance Co* [1926] 1 *K.B.* 1, 13 *(CA); Re Bank of Credit and Commerce International SA*, above; *Re Bank of Credit and Commerce International SA (No.10)*, above; *Re Air Express Foods Pty Ltd* [1977] *Qd.S.R.* 107. It is not clear whether the court has jurisdiction at common law to direct or authorise English liquidators in ancillary proceedings to remit assets to the liquidators in the principal liquidation where those assets may not be distributed in accordance with the pari passu principle of distribution which applies in an English liquidation: *Re HIH Casualty and General Insurance Ltd* [2008] *UKHL* 21, [2008] 1 *W.L.R.* 852, and see para.30-182 below.

376  *Re Bank of Credit and Commerce International SA* [1992] *B.C.L.C.* 570, 577; *Mitchell v Buckingham International Plc (No.2)* [1998] 2 *B.C.L.C.* 369 (Harman J. and CA); *Re Bank of Credit and Commerce International SA (No.10)*, above; *Re HIH Casualty and General Insurance Ltd*, above; *Bloom v Harms Offshore AHT*, above; *Re Swissair Schweizerische Luftverkehr-Aktiengesellschaft*, above.

377  [2001] *UKPC* 6, [2001] 2 *A.C.* 328; and see *ML Ubase Holdings Co Ltd v Trigem Computer Inc* [2007] *NSWC* 859. For critical comment, see *Ho* [2003] *L.M.C.L.Q.* 95.

378  ibid. See also *Re HIH Casualty and General Insurance Ltd*, above; *Bloom v Harms Offshore AHT*, above.

379  Insolvency Act 1986, s.130(2). See *New Cap Reinsurance Corp Ltd v HIH Casualty and General Insurance Ltd* [2002] *EWCA Civ* 300, [2002] 2 *B.C.L.C.* 228. Leave may be granted on terms. For the position between presentation of the petition and the making of the order, see s.126(1), and *Re Dynamics Corp of America* [1973] 1 *W.L.R.* 63. On the general question of restraining foreign actions in the context of insolvency, see Sheldon (ed.), Cross-Border Insolvency (4th ed. 2015), pp.523–539; *Ho* (2003) 52 *I.C.L.Q.* 697.

380  *Re International Pulp and Paper Co* (1876) 3 *Ch.D.* 594; *Re Middlesborough Firebrick Co Ltd* (1885) 52 *L.T.* 98; *Re Hermann Loog Ltd* (1887) 36 *Ch.D.* 502; *Re Thurso New Gas Co* (1889) 42 *Ch.D.* 486; *Martin v Port of Manchester Insurance Co, 1934 S.C.* 143; *Boyd v Lee Guinness Ltd* [1963] *N.Ir.* 49. A secured creditor will normally be allowed to enforce its security: *Re West Cumberland Iron and Steel Co* [1893] 1 *Ch.* 713; *Cleaver v Delta American Reinsurance Co* [2001] *UKPC* 6, [2001] 2 *A.C.* 328.

© 2023 Thomson Reuters.

381    *Re Vocalion (Foreign) Ltd [1932] 2 Ch. 196*; *Mazur Media Ltd v Mazur Media GmbH [2004] EWHC 1566 (Ch.), [2004] 1 W.L.R. 2966*; *Bloom v Harms Offshore AHT*, above; see also *AWB Geneva SA v North American Steamships Ltd [2007] EWCA Civ 739, [2007] 2 Lloyd's Rep.315*; *Stichting Shell Pensioenfonds v Krys [2014] UKPC 41, [2015] A.C. 616*.

382    *Re North Carolina Estate Co (1889) 5 T.L.R. 328*; *Re Central Sugar Factories of Brazil [1894] 1 Ch. 369*; *Re Jenkins & Co Ltd (1907) 51 S.J. 715*; *Re Vocalion (Foreign) Ltd [1932] 2 Ch. 196*; *Mitchell v Carter [1997] 1 B.C.L.C. 673* (Blackburne J. and CA); *Bloom v Harms Offshore AHT*, above; *Ho (2003) 52 I.C.L.Q. 697*. See also *Hughes v Hannover Ruckversicherungs-Aktiengesellschaft [1997] 1 B.C.L.C. 497 (CA)*; *Stichting Shell Pensioenfonds v Krys [2014] UKPC 41, [2015] A.C. 616*; *Kemsley v Barclays Bank Plc [2013] EWHC 1274 (Ch.), [2013] B.P.I.R. 839*. A secured creditor will not be prevented from enforcing its security, see *Moor v Anglo-Italian Bank (1879) 10 Ch.D. 681*; *Minna Craig SS Co v Chartered, etc. Bank [1897] 1 Q.B. 55, 60; 460, 470 (CA)*; *Cleaver v Delta American Reinsurance Co Ltd*, above.

383    Insolvency Act 1986, s.183.

384    *Mitchell v Carter [1997] 1 B.C.L.C. 681 (CA)*; *Bloom v Harms Offshore AHT*, above.

385    s.128(1).

386    ibid. The provision is explicitly extended to companies registered in Scotland by s.128(2).

387    *Re Lineas Navieras Bolivianas SAM [1995] B.C.C. 666*. See *Smart [1996] L.M.C.L.Q. 168*.

388    s.185.

389    As to a creditor who has obtained a judgment in rem, see *Minna Craig SS Co v Chartered, etc. Bank [1897] 1 Q.B. 460 (CA)*.

390    *Re Oriental Inland Steam Co (1874) L.R. 9 Ch. App. 557*; *Mitchell v Carter [1997] 1 B.C.L.C. 673* (Blackburne J. and CA); *Kemsley v Barclays Bank Plc [2013] EWHC 1274 (Ch.), [2013] B.P.I.R. 839*, *Stichting Shell Pensioenfonds v Krys*, above.

391    ibid. See also *Re Vocalion (Foreign) Ltd [1932] 2 Ch. 196, 210*; *Mitchell v Carter*, above; *Cleaver v Delta American Reinsurance Co*, above; *Bloom v Harms Offshore AHT*, above; *Kemsley v Barclays Bank Plc*, above, and see *Re HIH Casualty and General Insurance Ltd [2008]UKHL 21, [2008] 1 W.L.R. 852*.

392    *[2014] UKPC 41, [2015] A.C. 616*. The case originated in the British Virgin Islands (BVI). The court proceeded on the basis that the relevant laws of England and the BVI were the same.

393    ibid., at [34]: "A distinction between foreign and English claimants would respond to no principle known to the law." The court said that the true principle, applicable to all injunctions (and not just anti-suit injunctions) in the course of insolvency proceedings, was that the courts would not as a matter of discretion grant injunctions affecting matters outside their territorial jurisdiction if they were likely to be disregarded.

394    ibid., at [41]. The court also said at [42]: "Comity will normally require that the foreign judge should decide whether an action in his own court should proceed: *Barclays Bank Plc v Homan [1993] B.C.L.C. 680, Mitchell v Carter [1997] 1 B.C.L.C. 673* (Millett LJ). "See also *UBS AG New York v Fairfield Sentry Ltd [2019] UKPC 20, [2019] 2 B.C.L.C. 1, [2019] B.P.I.R.1054*.

395    *Re Bank of Credit and Commerce International SA (No.10) [1997] Ch. 213*; *Bloom v Harms Offshore AHT*, above. Contrast the position where the court is called upon to grant assistance in support of a foreign insolvency proceeding under s.426 of the Insolvency Act 1986: see para.30-164, below.

396    On the meaning of this term see *Re Commercial Bank of South Australia (1886) 33 Ch.D. 174, 178–179*; *Re Queensland Mercantile Agency Co Ltd (1888) 58 L.T. 878, 879*; *North Australian Territory Co Ltd v Goldsborough Mort & Co Ltd (1889) 61 L.T. 716, 717*; *Re Federal Bank of Australia Ltd (1893) 62 L.J. Ch. 561*; *Re English, Scottish and Australian Chartered Bank [1893] 3 Ch. 385, 394 (CA)*; *Sedgwick Collins and Co v Rossia Insurance Co of Petrograd [1926] 1 K.B. 1, 13 (CA)*; *Re Vocalion (Foreign) Ltd [1932] 2 Ch. 196, 207*; *Re Hiberian Merchants Ltd [1958] Ch. 76, 78*; *Re Suidair International Airways Ltd [1951] Ch. 165, 173–174*; *Felixstowe Dock and Railway Co v US Lines Inc [1989] Q.B. 360, 379*; *Re Bank of Credit and Commerce International SA [1992] B.C.L.C. 570, 574*; *Re Bank of Credit and Commerce International SA (No.2) [1992] B.C.L.C. 579, 581*; *Re Bank of Credit and Commerce International SA (No.3) [1993] B.C.L.C. 1490 (CA)*; *Re Bank of Credit and Commerce International SA (No.10) [1997] Ch. 213, 238–246*; *Bloom v Harms Offshore AHT*, above; *Re HIH Casualty and General Insurance Ltd*, above; *Connock v Fantozzi [2011] EWHC 15 (Ch.)*, at [48]–[58]; *Re Alfred Shaw & Co Ltd (1897) 8 Q.L.J. 93*; Smart, Ch.14. See also *Banco Nacional de Cuba v Cosmos Trading Corp [2000] 1 B.C.L.C. 813, 819 (CA)*.

397    *[1997] Ch. 213*; see *Re HIH Casualty and General Insurance Ltd*, above, at [15]–[28], [56], [59]–[60], [72]; *Re Swissair Schweizersche Luftverkehr-Aktiengesellschaft [2009] EWHC 2099 (Ch.), [2009] B.P.I.R. 1505*, at [4]–[12]. cf. *Liquidator of Bank of Credit and Commerce International SA, Noter [2007] CSOH 165, 2007 S.L.T. 1149*. See *Ho (2007) 23 Insolvency L. & Pr. 174*; *Tham [2009] L.M.C.L.Q. 113*.

398    cf. *Re Mid East Trading Ltd [1998] 1 All E.R. 577 (CA)*.

© 2023 Thomson Reuters.

399   Insolvency (England and Wales) Rules 2016 (SI 2016/1024), r.14.25. This rule on set-off may express an overriding principle of public policy (*Fletcher*, *[1997] J.B.L. 471, 473*) or it may be regarded as a mandatory rule of the law of the forum (Sheldon (ed.). Cross-Border Insolvency (4th ed. 2015), pp.551–556.). In the domestic insolvency context the rule has been described as "mandatory and self-executing": *Stein v Blake [1996] A.C. 243, 251*. What is now Rule 14.25 is a rule of substantive law not procedural law: *Stein v Blake*, above, at 255; *Re Bank of Credit and Commerce International SA (No.10)*, above, at 246. cf. *Meridien Biao Bank GmbH v Bank of New York [1997] 1 Lloyd's Rep. 437 (CA)*.

400   The Vice-Chancellor went on to say that if this view was wrong and there was a discretion to disapply the set-off rule he would not so exercise it: see *[1997] Ch. 213, 248–249*. See further, *Re HIH Casualty and General Insurance Ltd*, above.

401   He would also have refused to exercise his discretion to disapply the English rules on this matter, if, contrary to the view he took, such a discretion existed: see *[1997] Ch. 213, 249–250*.

402   *Re Banque des Marchands de Moscou [1958] Ch. 182*. cf. *Chee Ho Tam [2007] L.M.C.L.Q. 23, 36–41*.

403   *Re Bank of Credit and Commerce International SA (No.10)*, above, at 246; *Wight v Eckhardt Marine GmbH [2003] UKPC 37, [2004] 1 A.C. 147*. See also Financial Markets and Insolvency (Settlement Finality) Regulations 1999 (SI 1999/2979), regs 23 and 24.

404   Insolvency Act 1986, s.229(1), provides that the court or liquidator may exercise any powers or do any act in the case of unregistered companies that it might exercise or do in winding up a company registered in England or Scotland. Further, the Secretary of State may by order provide for a provision of the Insolvency Act 1986 to apply (with or without modification) to a company incorporated outside Great Britain: Enterprise Act 2002 (s.254). To date no orders have been made under the power conferred by this provision.

405   See generally *Bilta (UK) Ltd v. Nazir (No.2) [2015] UKSC 23, [2016] A.C. 1*, at [108], and *AWH Fund Ltd v ZCM Asset Holding Co (Bermuda) Ltd [2019] UKPC 37* in which the Privy Council at [40] said that it was "now settled law that insolvency provisions can have extraterritorial effect … ".

406   *Clark (Inspector of Taxes) v Oceanic Contractors Inc [1983] 2 A.C. 130*. See also *Re Sahaviriya Steel Industries UK Ltd [2015] EWHC 2877 (Ch.), [2016] B.C.C. 456*, in which the court held that there was a "strong prima facie case" that Insolvency Act 1986, s.233, applied extraterritorially (in relation to necessary IT services), and therefore permission was given to serve the application out of the jurisdiction. See also *R. (on the application of KBR Inc) v Director of the Serious Fraud Office [2021] UKSC 2, [2021] 2 W.L.R. 335*, at [60] and [63].

407   The jurisdiction applies to any person who is or has been an officer of the company, or has acted as liquidator or administrator of the company or as receiver or manager or, in Scotland, receiver of its property, or, not being any of the foregoing, is or has been concerned or has taken part in the promotion, formation or management of the company: Insolvency Act 1986, s.133(1).

408   *Re Seagull Manufacturing Co Ltd [1992] Ch. 128, affd. [1993] Ch. 345 (CA)*. cf. *Re Tucker [1990] Ch. 148 (CA)*; *Re Skase (1992) 114 A.L.R. 303*. cf. *Masri v Consolidated Contractors International Co SAL (No.4) [2009] UKHL 43, [2010] 1 A.C. 90* where it was held that the court has no jurisdiction under CPR, r.71.2 to order examination of a foreign director of a foreign company in connection with proceedings to enforce a judgment debt.

409   Insolvency Act 1986, ss.221(1), 229(1). If a relevant person is *in* the jurisdiction the court may make an order restraining that person from leaving the jurisdiction or only permitting departure upon the giving of security; see *Re Bank of Credit and Commerce International SA (No.7) [1994] 1 B.C.L.C. 455* (relating to an order under s.236, below); *Morris v Murjani [1996] 1 W.L.R. 848 (CA)* (relating to an order against a bankrupt under Insolvency Act 1986, s.333(1)).

410   Insolvency (England and Wales) Rules 2016 (SI 2016/1024), Sch.4, paras.1(5) and 1(8); *Re Seagull Manufacturing Co Ltd*, above; *Re Busytoday Ltd [1992] 1 W.L.R. 683*.

411   Insolvency Act 1986, s.236(2). This is sometimes referred to as an order for private examination, in contrast to an order for public examination under s.133. See, e.g. *Shierson v Rastogi [2002] EWCA Civ 1624, [2003] 1 W.L.R. 586*.

412   In *Re MF Global UK Ltd [2015] EWHC 2319 (Ch.), [2016] Ch. 325* it was held that no such order could be made. In *Omni Trustees Ltd [2015] EWHC 2697 (Ch.), [2015] B.C.C. 906* and *Wallace (as liquidator of Carna Meats (UK) Ltd) v Wallace [2019] EWHC 2503 (Ch.), [2021] B.P.I.R. 299* it was held that such an order could be made. In *Re Akkurate Ltd [2020] EWHC 1433 (Ch.), [2021] Ch. 73*, Sir Geoffrey Vos C. held that the court was bound by *Re Tucker [1990] Ch. 148* (a bankruptcy case) to find that s.236 did not permit such an order to be made, and that the decision in *Re MF Global* was to be preferred to both *Omni* and *Wallace* as to the extraterritorial effect of s.236.

413   Insolvency Act 1986, s.236(3). See also *Re Bernard L Madoff Investment Securities LLC [2009] EWHC 442 (Ch.), [2009] 2 B.C.L.C. 78* (which held that there was nothing in s.235 of the 1986 Act, which requires former officers of the company and others to co-operate with an insolvency office-holder, that meant it could not apply to a trustee in bankruptcy based in New York).

414   *Re Mid East Trading Ltd [1998] 1 All E.R. 577 (CA)*.

415   The documents must be documents which relate to the company in whose liquidation the application is made: *Re Mid East Trading Ltd*, above, at 585–590.

© 2023 Thomson Reuters.

416   See *British and Commonwealth Holdings Plc v Spicer & Oppenheimer [1993] A.C. 426*. The court may take account of the risk that the relevant person might be exposed to liability under the law of the country where the documents are situated if production is ordered: *Re Mid East Trading Ltd*, above, at 590–593; see *Mackinnon v Donaldson, Lufkin & Jenrette Securities Corp [1986] Ch. 482*.

417   *Re Bank of Credit and Commerce International SA (No.7) [1994] 1 B.C.L.C. 455*; *Daltel Europe Ltd v Makki (No.1) [2004] EWHC 726 (Ch.), [2005] 1 B.C.L.C. 594*. See also *In Re Oriental Credit Ltd [1988] Ch. 204*; *Re a Company No.003318 of 1987 (1987) 3 B.C.C. 564* (each relating to orders for private examination under Companies Act 1985, s.561); *Morris v Murjani [1996] 1 W.L.R. 848 (CA)* (relating to an order against a bankrupt under Insolvency Act 1986, s.333(1)).

418   *Re Paramount Airways Ltd [1993] Ch. 223, 239 (CA)*. See also *Banco Nacional de Cuba v Cosmos Trading Corp [2000] 1 B.C.L.C. 813, 819–820 (CA)*. On the potential for choice of law in insolvency transaction avoidance see *Ho (2008) 20 Sing. Acad. L.J. 343; (2009) 24 B.J.I.B. & F.L. 86, 132.*

419   *Re Paramount Airways Ltd*, above, at 239–240.

420   ibid., at 240.

421   ibid., at 240–241. The relevant service provision is now the Insolvency (England and Wales) Rules 2016 (SI 2016/1024), Sch.4, para.1(8), which applies Pt 6 of the CPR to the service of documents outside the jurisdiction with such modifications as the court may approve or direct.

422   *Re Paramount Airways Ltd*, above, at 240–241. See also *Barclays Bank Plc v Homan [1993] B.C.L.C. 680* (Hoffmann J. and CA).

423   Whether it is an English company or a foreign company being wound up under Insolvency Act 1986, s.221: see s.229(1) of the Act.

424   *Re Paramount Airways*, above, at 229–231, 233–234.

425   ibid., at 234–235; *HMRC v Begum [2010] EWHC 1799 (Ch.), [2011] BPIR 59*; *Concept Oil Services Ltd v EN-GIN Group Ltd [2013] EWHC 1897 (Comm.)*; *Erste Bank AG v "VMZ Red October" [2015] EWCA Civ 379, [2015] 1 C.L.C. 706*; *Orexim Trading Ltd v Mahavir Port and Terminal Private Ltd [2018] EWCA Civ 1660, [2018] 1 W.L.R. 4847*; *Suppipat v Narongdej [2020] EWHC 3191 (Comm.).*

426   *Jyske Bank (Gibraltar) Ltd v Spjeldnaes [1999] 2 B.C.L.C. 101*. Neither the company providing the benefit of the transaction nor the company receiving it were being wound up in England, but the court found that both were properly subject to the jurisdiction of the English court. In that case the court made an order under s.423 despite the absence of the sort of connections with England referred to above, finding that *Re Paramount Airways* had not laid down that a court should never grant an order under s.423 in the exercise of its discretion in the absence of such factors. See also *Suppipat v Narongdej [2020] EWHC 3191 (Comm.).*

427   *[2018] EWCA Civ 1660, [2018] 1 W.L.R. 4847*. Insolvency (England and Wales) Rules 2016 (SI 2016/1024), Sch.4, para.1(4) does not apply to claims under Insolvency Act 1986, s.423, since the latter provision can also apply outside the context of insolvency proceedings. Nor can such a claim be served out of the jurisdiction without the court's permission under CPR, r.6.33(3): see *Orexim Trading Ltd v Mahavir Port and Terminal Private Ltd*, above; *Re Banco Nacional de Cuba [2001] 1 W.L.R. 2039* (disapproving a dictum in *Jyske Bank (Gibraltar) Ltd v Spjeldnaes*, above, at p.123); *Re Harrods (Buenos Aires) Ltd (No.2) [1992] Ch. 72, 116 (CA).*

428   Under CPR, PD6B, para.3.1(20).

429   *Orexim Trading Ltd v Mahavir Port and Terminal Private Ltd [2018] EWCA Civ 1660, [2018] 1 W.L.R. 4847*, at [49].

430   See also *New Media Distribution Company Sezc Ltd v Kagalovsky [2018] EWHC 2876 (Ch.)* at [77], where it was held that an English court which had jurisdiction as of right should be slow to decline to make an order unless it would cut across the position under some relevant foreign law, and where that was the case the court "must pay careful regard to the exorbitance or potential extraterritorial adverse effect of making an order under the section 423 jurisdiction." See also *Akhmedova v Akhmedov [2021] EWHC 545 (Fam.).*

431   *[2015] UKSC 23, [2016] A.C. 1.*

432   ibid., at [10], [53], [108]–[110], [213]–[214].

433   Reference was made to *Re Paramount Airways Ltd (No.2) [1993] Ch. 223*.

434   See also s.214 of the Insolvency Act 1986 (as amended by SI 2015/1689) which enables the court, in circumstances of "wrongful trading", to declare, on the application of the liquidator, that any person who is or has been a director of a company in liquidation in England is to be liable to make such contribution, if any, to the company's assets that the court thinks proper. This section has been held to apply to the directors of a foreign company in liquidation in England despite the fact that the directors were resident abroad and that there was no such liability under the law of the country in which the company was incorporated: see *Re Howard Holdings Inc [1998] B.C.C. 549*.

435   Company Directors' Disqualification Act 1986, s.6(1), as amended.

© 2023 Thomson Reuters.

436    *Re Seagull Manufacturing Co Ltd (No.2) [1994] Ch. 91.*

437    See more detailed discussion in the commentary to Rule 193(3). See also the position under the UNCITRAL Model Law
       on Cross-Border Insolvency, implemented in Great Britain in the Cross-Border Insolvency Regulations 2006: Rules
       195–200.

438    Insolvency Act 1986, s.426(1).

439    ibid., s.426(2).

440    ibid., s.426(4) and (5). See *Liquidator of Bank of Credit and Commerce International SA, Noter [2007] CSOH 165,
       2007 S.L.T. 1149; Hynd's Trustee, Petitioner [2009] CSOH 165, 2007 S.C. 1149.*

441    ibid., s.426(4), (5), and (11). See Rule 193(3).

442    Insolvency Act 1986, s.442. See SI 1989/2409 extending s.426(4), (5), (10) and (11) of the 1986 Act, with modifications,
       to Guernsey. See *Re Seagull Manufacturing Co Ltd [1993] Ch. 345 (CA)* (Official Receiver enlisting aid of court in
       Alderney, to which the above Order also applies, to obtain books and papers of English company from a director resident
       in Alderney, together with an order for the examination of the director and the appointment of an examiner).

443    See UK Cross-Border Insolvency Regulations 2006, Sch.1, Art.5, and see Rule 200. In practice, "global" insolvencies
       may involve co-operation amongst liquidators and analogous officers appointed under the laws of different countries:
       see *Re Bank of Credit and Commerce International SA [1992] B.C.L.C. 570; Re Bank of Credit and Commerce
       International SA (No.3) [1993] B.C.L.C. 106; Re Bank of Credit and Commerce International SA (No.10) [1997] Ch.
       213; Re Maxwell Communications Corp Plc [1993] 1 W.L.R. 1402; Barclays Bank Plc v Homan [1993] B.C.L.C. 680*
       (Hoffmann J. and CA); *Re Maxwell Communications Corp Plc, 93 F.3d 1036 (2d Cir. 1996); Fletcher [1997] J.B.L. 471;
       Centre Reinsurance International Co v Freakley [2005] EWCA Civ 115, [2005] 2 All E.R. (Comm.) 65; Re Cenargo
       International Plc, 294 B.R. 571 (2003).* cf. *Felixstowe Dock and Railway Co v US Lines Inc [1989] Q.B. 360.*

444    For the position in the United States, see 11 U.S.C., Ch.15 (implementing UNCITRAL Model Law on Cross-Border
       Insolvency), inserted by the Bankruptcy Abuse Prevention and Consumer Protection Act 2005; *Jaffe v Samsung Elec.
       Co, Ltd, 737 F.3d 14 (4th Cir. 2013); Re Oi Brasil Holdings Coöperatief UA, 578 B.R. 169 (Bankr. S.D.N.Y. 2017);
       Gilhuly et al (2015) 24 Am. Bankr. Inst. L. Rev. 47.* For the position in Australia see Corporations Act 2001, s.581; and
       for the application of that law, see e.g. *Independent Insurance Co Ltd [2005] NSWSC 587; Re Chow Cho Poon (Private)
       Ltd [2011] NSWSC 300; Legend International Holdings Inc (in liq.) v Indian Farmers Fertiliser Cooperative Ltd [2016]
       VSCA 151, (2016) 114 A.C.S.R. 257.*

445    These Illustrations assume that no foreign insolvency proceedings have been recognised under the Cross-Border
       Insolvency Regulations 2006 implementing the UNCITRAL Model Law.

446    *Re Oriental Inland Steam Co (1874) L.R. 9 Ch. App. 557.*

447    See Insolvency Act 1986, s.183(1) and (2)(c).

448    Re Suidair International Airways Ltd [1951] Ch. 165.

449    Re Bank of Credit and Commerce SA (No.10) [1997] Ch. 213, 236.

450    Insolvency (England and Wales) Rules 2016 (SI 2016/1024), r.14.25.

451    Re Bank of Credit and Commerce SA (No.10), above.

452    Re Seagull Manufacturing Co Ltd [1993] Ch. 345 (CA).

453    The same result would ensue if the company had been in liquidation: see Insolvency Act 1986, s.238(1).

454    *Re Paramount Airways Ltd [1993] Ch. 223 (CA).*

455    Insolvency Act 1986, s.236.

456    Re Mid East Trading Ltd [1998] 1 All E.R. 577 (CA).

457    Re Howard Holdings Inc [1998] B.C.C. 549.

458    Re Seagull Manufacturing Co Ltd (No.2) [1994] Ch. 91.

459    Bilta (UK) Ltd v Nazir (No 2) [2015] UKSC 23, [2016] A.C. 1.

460    Stichting Shell Pensioenfonds v Krys [2014] UKPC 41, [2015] A.C. 616.

---

**End of Document**                              © 2022 Sweet & Maxwell

WOL. XX.]                 EQUITY CASES.                         733

*Ex parte* ROBERTSON.   *In re* MORTON.

C. J. B.
1875
May 24 ;
June 7.

*Bankruptcy—Jurisdiction—Foreign Creditor resident Abroad—Effect of Proving
Debt—Notice of Motion—Service out of Jurisdiction— Waiver of Irregularity
—Bankruptcy Act, 1869 (32 & 33 Vict. c. 71), ss. 2, 72–76—Bankruptcy
Rules, 1870, r. 50.*

A foreign creditor, residing out of the jurisdiction of the Court of Bank-
ruptcy, by proving a debt in a bankruptcy or liquidation, brings himself
within the general jurisdiction of the Court as to the administration of the
estate, just as if he were residing within it. An order can therefore be made
on him to restore property of the bankrupt or debtor improperly in his
possession.

A notice of motion was served out of the jurisdiction on the Respondent.
No order authorizing the service had been obtained from the Court. The
Respondent appeared on the hearing of the motion, and objected to the juris-
diction of the Court. On his objection being overruled, he asked for and
obtained an adjournment to enable him to answer the case on its merits :—

*Held,* that there had been a mere irregularity in the service, and that it had
been waived.

THIS was an appeal from a decision of the Judge of the *New-
castle-on-Tyne* County Court.

*William Morton* and *Edmund Morton,* potato merchants at
*Newcastle,* filed a liquidation petition on the 18th of February,
1874, and the same day a receiver and manager of their property
and business was appointed. At the first meeting of the creditors,
on the 13th of March, 1874, the creditors resolved on a liquidation
by arrangement, and appointed *J. B. Benson* and *J. Greener*
trustees of the debtors' property.

The debtors had been in the habit of purchasing potatoes from
*Donald Robertson,* a potato merchant, who resided at *Mayfield,* in
the parish of *Cupar,* in *Scotland,* and was a domiciled Scotchman.
He had no residence or place of abode in *England.* On the 17th
of February, 1874, the debtors owed him £367 2s. 11d. for pota-
toes, and they sent him by post a cheque for £120, drawn upon
Messrs. *Lambton & Co.,* bankers at *Newcastle.* He received this
cheque on the 18th of February, and paid it to his bankers, by
whom it was sent the same day back to *Newcastle,* and it was on
the 19th of February honoured by *Lambton & Co.,* who were then
ignorant of the filing of the liquidation petition.

AP0969

734                              EQUITY CASES.                        [L. R.

C. J. B.          *Robertson* proved in the liquidation for £247 2s. 11d., the
1875          balance remaining due to him after giving credit for the £120 ;
*Ex parte*        the proof was admitted by the trustees, and on the 27th of October,
ROBERTSON.    1874, they paid him a dividend of 4s. 6d. in the pound.
*In re*
MORTON.          The above-mentioned facts afterwards came to the knowledge of
              the trustees, and on the 6th of March, 1875, *Robertson* was served
              at *Mayfield* with a notice of motion on their behalf, stating that an
              application would be made to the County Court on the 12th of
              March for an order that he should repay the £120 to the trustees.
              No order for service on him had been made.  On the 12th of
              March, Mr. *Philipson*, a solicitor at *Newcastle*, appeared on behalf
              of *Robertson*, and objected that the Court had no jurisdiction over
              him.  The Judge overruled the objection, and Mr. *Philipson* then
              asked for an adjournment, on the ground that he was not then
              prepared to go into the merits of the case.  The Judge granted
              an adjournment for a month, on the terms of *Robertson* paying
              £100 into Court within a fortnight, and also paying the costs
              of the adjournment.  On the subsequent hearing of the motion
              on the 23rd of April, counsel appeared for *Robertson*, and took the
              objection as to the jurisdiction.  The Judge overruled it, and
              *Robertson's* counsel withdrew before the evidence on the merits
              of the case was heard.  *Robertson* had filed an affidavit in which
              he took the objection of want of jurisdiction, on the ground that
              he was a domiciled Scotchman, having no residence in *England*,
              and also deposed to facts bearing on the merits of the case.  The
              Judge made an order in the terms of the notice of motion.

                 *Robertson* appealed.

                 Mr. *De Gex*, Q.C., and Mr. *Finlay Knight*, for the Appellant :—

                 An English Court of Bankruptcy has no jurisdiction over a
              domiciled Scotchman resident in *Scotland*.  If this had not been
              a case of bankruptcy, no action could have been brought in an
              English Court against the Appellant to recover this money ; he
              must have been sued in *Scotland*.  Sects. 66 and 72 (1) of the

---

(1) Sect. 65 provides that "the        Majesty's Superior Courts of Common
Chief Judge in Bankruptcy shall have   Law at *Westminster*, or by any Judge
all the powers, jurisdiction, and privi-   of Her Majesty's High Court of Chan-
leges possessed by any Judge of Her    cery, and the orders of such Judge

AP0970

VOL. XX.]                    EQUITY CASES.                    735

*Bankruptcy Act,* 1869, do not give the Court of Bankruptcy a
jurisdiction larger than that of the Court of Chancery or one of the
superior Courts of Common Law.

C. J. B.
1875
*Ex parte*
ROBERTSON.
*In re*
MORTON.

Moreover, the notice of motion was not effectually served on the
Appellant.   In *Ex parte O'Loghlen* (1) it was held that a debtor's
summons could not be served out of the jurisdiction, there being no
power given by the Act or the Rules to effect a service there, and
that such a service, though made under an express order of the
Court, was a nullity.   This applies equally to service of a notice of
motion under Rule 50 of the *Bankruptcy Rules,* 1870 (2), for no
power is given to serve the notice out of the jurisdiction, and the
shortness of the interval allowed for service shews that the rule
could not have contemplated service out of the jurisdiction.

[They were stopped by the Court.]

Mr. *Little,* Q.C., and Mr. *Colt,* for the trustees:—

The Appellant having proved and received a dividend, the Court
has complete jurisdiction under sect. 72 to compel him to refund
any part of the debtors' estate which is improperly in his hands.
Sect. 74 of the Act enables the Scotch Courts, which have juris-
diction in bankruptcy, to enforce in *Scotland* orders made by the
English Bankruptcy Courts, and sect. 75 makes the English and
Scotch Bankruptcy Courts auxiliary to each other.   The order in
this case was rightly made by the English Court, but it must be

---

shall be of the same force as if they were judgments in the Superior Courts of Common Law, or decrees in the High Court of Chancery."

Sect. 66 : " Every Judge of a local Court of Bankruptcy shall, for the purposes of this Act, in addition to his ordinary powers as a County Court Judge, have all the powers and jurisdiction of a Judge of Her Majesty's High Court of Chancery, and the orders of such Judge may be enforced accordingly in manner prescribed."

Sect. 72 provides that, " Subject to the provisions of this Act, every Court having jurisdiction in bankruptcy under this Act shall have full power to decide all questions of priorities, and all other questions whatsoever, whether of law or fact, arising in any case of bankruptcy coming within the cognizance of such Court, or which the Court may deem it expedient or necessary to decide for the purpose of doing complete justice, or making a complete distribution of property in any such case."

(1) Law Rep. 6 Ch. 406.

(2) Rule 50 provides that a notice of motion must be "served upon the party or parties to be affected thereby four clear days at least before the day named in such notice as the day when the motion is to be made."

AP0971

736                  EQUI Y CASES.                    [L. R.·

Ç. J. B.
1875
*Ex parte*
ROBERTSON.
*In re*
MORTON.

enforced by the Scotch Court. In *Ex parte Tait* (1) it was held that the Court had jurisdiction to restrain a creditor from suing in *Ireland* in respect of a debt included in a deed which the debtor had executed under the *Bankruptcy Act*, 1861. Under the old bankruptcy law it was held that a creditor who had proved was subject to the jurisdiction of the Court in respect of his proof: *Ex parte Hilton* (2). As to the service of the notice of motion, there has been nothing more than an irregularity, which has been waived by the Appellant's asking for time to answer the case on its merits, and filing an affidavit upon the merits. *Ex parte O'Loghlen* (3) does not apply. .

Mr. *De Gex* in reply :—

The service out of the jurisdiction was, as is shewn by the *ratio decidendi* of *Ex parte O'Loghlen*, a complete nullity—not a mere irregularity which could be waived. As to the jurisdiction, my argument is that this proceeding is equivalent to the bringing of any action for money had and received in an English Court against a domiciled Scotchman resident in *Scotland*. That cannot be done. *Davis* v. *Park* (4) and *Cookney* v. *Anderson* (5) shew very clearly what are the principles which govern the territorial jurisdiction of Courts. Sect. 72 of the Act gives the Court of Bankruptcy no higher jurisdiction than that of the Court of Chancery or the Courts of Common Law. *Ex parte Tait* does not apply. Proof of debt does not amount to a complete submission to the jurisdiction of the Court. *Ex parte Hilton* only shews that the dividend on the debt proved for may be retained, or that a dividend paid may be recalled. It is no authority for saying that the Court has jurisdiction to order a creditor who has proved to repay some other fund which he has received from the debtor. *Ex parte Dobson* (6) shews that the Court formerly had no such power, and I say that sect. 72 does not confer it.

SIR JAMES BACON, C.J. :—

Two objections have been taken to this order. The first and

| | |
|---|---|
| (1) Law Rep. 13 Eq. 311. | (4) 42 L. J. (Ch.) 204, 208. |
| (2) 1 Jac. & W. 467. | (5) 1 D. J. & S. 3£5. |
| (3) Law Rep. 6 Ch. 406. | (6) 1 Mont. & A. 666. |

AP0972

VOL. XX.]                        EQUITY CASES.                        737

larger one is that the Court has no jurisdiction to make such an
order against the Appellant because he is a domiciled Scotchman.
The second is that the Court has proceeded erroneously in making
the order, even if it had a right in other respects to make it,
because there have been no proper service of the notice of motion.
The two questions are totally distinct from each other, the first,
the larger and more important one, being whether, under the ex-
isting Act of Parliament and the existing practice of the Bank-
ruptcy Court, the Court at *Newcastle* had power to make an order
directing the Appellant to pay back the £120, part of the debtors'
estate, which he had received.     Now, that is a question, no
doubt, of very great importance.   Every question, indeed, of juris-
diction is of vital importance.   The question can be decided only
by an inspection of the existing Act of Parliament.   That there
was a valid bankruptcy, or an arrangement which is equivalent to
bankruptcy, prosecuted in the proper Court, is not questioned in
the slightest degree.   Then the 72nd section of the Act provides :—
[His Lordship read the section.]

   Now let us inquire, first, whether the subject-matter of this
application comes within those words.   It is not disputed that on
the 18th of February an act of bankruptcy was committed, and
after that the Appellant possesses himself, not unnaturally or
wrongfully in any other than a legal sense, of £120, part of the
debtors' estate.   The law is that, from the appointment of the
trustee in a liquidation, he shall have all the powers and rights of
a trustee in bankruptcy, and therefore, on the 18th of February,
and before the receipt by the Appellant of the £120, the whole of
the debtors' estate, including that sum, which was part of the
debtors' estate before it was received by the Appellant, was vested
in the trustee.   The Appellant came in under the liquidation pro-
ceedings.   He made an affidavit, which stated that a certain debt
was due to him at the institution of the proceedings, and that it
was still justly due and owing.   In stating that amount he gave
credit to the debtors' estate for the £120, not in terms, but it
appears by the result that he excluded it from his proof of debt.
He came in under the liquidation, and what is the consequence of
creditors coming in under a liquidation or bankruptcy ?   They
come in under what is as much a compact as if each of them had

C. J. B.

1875

*Ex parte*
ROBERTSON.
*In re*
MORTON.

AP0973

738                          EQUITY CASES.                       [L. R.

C. J. B.      signed and sealed and sworn to the terms of it—that the bank-
1875          rupt's estate shall be duly administered among the creditors.
Ex parte      That being so, the administration of the estate is cast upon the
ROBERTSON.    Court, and the Court has jurisdiction to decide all questions of
In re         whatever kind, whether of law, fact, or whatever else the Court
MORTON.       may think necessary in order to effect complete distribution of
              the bankrupt's estate.  Can there be any doubt that the Court
              had jurisdiction to get back that £120?  I am not touching upon
              the merits of the case, nor am I expressing any opinion upon
              them; but can there be any doubt that the Appellant in this case
              has agreed that, as far as he is concerned, and as far as the whole
              of the creditors proving are concerned, the law of bankruptcy
              shall take effect as to him, and under this jurisdiction, to which
              he is not only subjected, but under which he has become an active
              party, and of which he has taken the benefit, and is entitled as
              much as any other creditor, though not more than any other
              creditor, to insist on the due distribution of the whole of the debtors'
              estate?

                  It is said that this Court, being an English Court, has no juris-
              diction over this gentleman who has entered into this, which I
              call a compact, who has come in under it, and has been a party to
              the administration of the estate in the manner I have mentioned,
              because he lives on the other side of the border.   I am of opinion
              that there is no ground whatever for that, and I think that he is
              as much bound to perform the conditions of the compact, and to
              submit to the jurisdiction of the Court, as if he had never been out
              of the limits of *England*.

                  The other objection is, that there has not been due service of
              the notice of the motion by which the Appellant was called upon
              to account for that £120.  It is quite true, as I understand the
              case, that the service was very defective in point of regularity;
              but that the notice was actually brought to his attention is not
              only stated in the affidavit, but, in point of fact, on the very day
              when the notice of motion was to be heard, the day on which it
              was returnable, as it is called, he, by his attorney, came into Court
              and raised his objection that the Court had no jurisdiction.  The
              objection as to irregularity was waived.

                  What would have happened if it had been taken?  *Philipson*

AP0974

VOL. XX.]          EQUITY CASES.                    739

comes into Court and says, You cannot do anything, for two reasons. One of them is, that you have no jurisdiction; and the other is, that the notice with which my client has been served is not a good one. In that case the learned Judge below would have said, I will make no order upon this notice of motion, but I will allow it to stand over in order that the four days' notice may be properly given. But, in fact, the Appellant comes in and says, You have no jurisdiction; and, besides that, I want time to answer; and asks for further time, when he finds that the Judge is not with him on the subject of jurisdiction. The learned Judge accedes to this request for further time, and does allow the matter to stand over till another day on certain terms. He gave the Appellant time to answer the summons which had been confessedly served upon him, although served irregularly. The adjournment took place as a matter of course, and when the day which had been fixed for the adjourned hearing arrived there was an affidavit by him going into the merits of the case. It was stated in this affidavit that he was a domiciled Scotchman, and he submitted that the Court had no jurisdiction over him. Upon every rule of practice that was a perfect and complete waiver of the technical objection that there had been an inadequate service.

When *Ex parte O'Loghlen* (1) was referred to I told Mr. *De Gex* that I did not agree that the *ratio decidendi* there given was in his favour. The interlocutory proceeding in that case, that is, the service of the debtor's summons, the disobedience to which constitutes an act of bankruptcy, was of the very greatest consequence, and the question raised before the Court was, not whether there had been a due service of the summons, because there was no question that the debtor had been served, and there was no irregularity in the service, but a want of legal efficacy was suggested. I cannot come to the conclusion that on the facts Sir *Coleman O'Loghlen* was amenable to the English process in bankruptcy—the Act having expressly said that it should not apply to *Scotland* or *Ireland*—merely because he was out of *Ireland* by accident, and had been served in *England*, being a Member of Parliament resident in *London*, for the purpose of discharging his Parliamentary duties,

(1) Law Rep. 6 Ch. 406.

C. J. B.

1875

*Ex parte*
ROBERTSON.

*In re*
MORTON.

AP0975

740           EQUITY CASES.        [L. R.

C. J. B.
1875
*Ex parte*
ROBERTSON.
*In re*
MORTON.

where they took an opportunity of serving him. But that was no ground for deciding that the Court had jurisdiction to order service of the summons.

I do not agree with Mr. *De Gex* that the *ratio decidendi* there was that the service had been wrong. Lord Justice *Mellish*, in the course of his observations, directs himself to the particular proceeding before him, which was the service of a debtor's summons. It is impossible to read his judgment in any other light, and the Court accordingly decided that Sir *Coleman O'Loghlen* was a person not under any circumstances subject to the jurisdiction of the Court, and therefore that the Court could have no jurisdiction over him. Well, then, what am I to do with respect to this, this being really the point of the case? I find that there was an irregular service of the notice of motion on a man out of the jurisdiction. I find that that man came in with the notice of motion in his hand (as I must assume), and said, This notice has been served on me. I am subject to the laws of *Scotland*. You, as an English Judge, have nothing to do with me; and then the Judge disagrees with him, and tells him that he has. Thereupon his solicitor asks for time, that he may address himself to the merits of the case. That was a waiver of the mere irregularity in form, and there was not an irregularity in substance, as in the case of Sir *Coleman O'Loghlen*. There it was substance, here it was an irregularity of form merely; and it is the practice in this Court, beyond all question, and the practice of every other Court, in all cases to cure irregularity by accepting the waiver of the person affected by it. What is the real gist and reason of this rule which requires a four days' notice of motion? It is that the person who is to be affected by it shall have time to set himself right, and to file his affidavits. He is not to be compelled to come into Court on a shorter notice than four days, nor even then if he can make out any ground for extending the time. The case of *Ex parte Hilton* (1) was plain enough according to the law as it then stood. There was no 72nd section then, and no law by which the Court could compel the delivery up of property of a bankrupt held by a creditor. The case is different now, because the 72nd section supplies the defect, and makes it

           (1) 1 Jac. & W. 467.

AP0976

VOL. XX.]                    EQUITY CASES.                    **741**

unnecessary to bring an action, as in *Ex parte Dobson* (1). No necessity exists for it now, for a wiser provision has been made.    In my opinion it is wiser and more consistent with justice that the law should enable the Court of Bankruptcy to exercise, I was going to say unlimited, jurisdiction over every man who claims the benefit of the process of the Court and who has obtained it, and who has, therefore, in the most formal and explicit manner, subjected himself to the jurisdiction of the Court.    I think, therefore, that the judgment of the Court below cannot be assailed on either of the two grounds I have mentioned.

I am much obliged to Mr. *De Gex* for reading the judgment in *Cookney* v. *Anderson* (2), for it is very pleasant to hear so lucid an explanation of the law, conveyed in such choice terms as those in which Lord *Westbury* expressed himself.    But if you look at that case closely you will find that it is less favourable to the argument than the general scope of the reasoning seemed to be. You will find that Lord *Westbury* limits what he says to the case of a party who does not appear, or who is absent from the jurisdiction.    But I have to deal with a case in which he plainly did appear.

It was directed that the case should be remitted to the County Court to be decided upon the merits, with a declaration that that Court had jurisdiction in the matter.

Solicitors for the Appellant: Messrs. *Williamson, Hill, & Co.,* agents for Mr. *J. A. Philipson, Newcastle-on-Tyne.*

Solicitor for the Trustee: Mr. *G. B. Wheeler,* agent for Mr. *H. S. Sewell, Newcastle-on-Tyne.*

(1) 1 Mont. & A. 666.                    (2) 1 D. J. & S. 365.

C. J. B.

1875

*Ex parte* ROBERTSON.

*In re* MORTON.

2367

[2007] 1 WLR          Gibson v Government of the United States of America (PC)

A                                              Privy Council

*Gibson v Government of the United States of America

[2007] UKPC 52

2007   June 20;              Lord Hoffmann, Lord Woolf, Lord Scott of Foscote,
B        July 23                  Lord Carswell, Lord Brown of Eaton-under-Heywood,
                                      Lord Mance and Sir Christopher Rose

*Bahamas, The* — *Extradition* — *Committal proceedings* — *Applicant and two others charged with criminal offences in United States of America* — *Magistrate making committal orders in respect of all three on evidence of accomplice* — *Habeas corpus proceedings to challenge magistrate's order* — *Judge raising issue whether certiorari more appropriate remedy and granting leave to add judicial review* —
C     *Judge hearing habeas corpus and certiorari together concluding accomplice evidence inadmissible rendering committal proceedings void* — *Judge granting writs of habeas corpus without determining certiorari issue* — *Whether Court of Appeal having jurisdiction to entertain appeal* — *Court of Appeal Act (Statute Law of The Bahamas, 1987 rev, c 40), s 17(3) (as amended by Court of Appeal (Amendment) Act 1996 (No 26 of 1996), s 9)*
D     *Judicial precedent* — *Privy Council* — *Decision* — *How far binding* — *Judicial Committee unanimously deciding that its own previous majority decision incorrect* — *Whether previous decision should nevertheless be followed*

The applicant and two others, K and C, were indicted by a federal grand jury in the United States of America for drug offences and the US Government requested their extradition from The Bahamas. The Attorney General of The Bahamas issued his authority pursuant to the Extradition Act 1994 and provisional warrants for
E     their arrest were issued and enforced. The magistrate committed the applicant, K and C under section 10(5) of the 1994 Act to await extradition to the United States. All three applied to the Supreme Court for writs of habeas corpus ad subjiciendum. During the habeas corpus application the question arose, in respect of a challenge to the sufficiency of the evidence before the magistrate, whether the appropriate remedy was certiorari and the judge gave leave to add an application for judicial review. The judge then proceeded to hear both the habeas corpus and
F     judicial review applications together. He concluded that the committal orders were void on the ground that the magistrate had erred in treating an accomplice's evidence as admissible. The judge granted the habeas corpus applications and ordered the release of the applicant, K and C, stating that there was no need to make any determination on the certiorari applications. All three were released unconditionally. The prison superintendent and the US Government appealed. On a preliminary objection to the jurisdiction of the Court of Appeal to hear the appeal
G     on the ground that there was no provision in the 1994 Act or the Court of Appeal Act for any appeal against a successful habeas corpus application, the Court of Appeal held that the judge had been exercising a judicial review function so that it had jurisdiction under section 17(3) of the Court of Appeal Act[1] to hear the appeal. The Court of Appeal allowed the appeal and restored the committal orders. K and C were re-arrested and appealed to the Judicial Committee of the Privy Council. In February 2004 the Judicial Committee, by a majority of three to two, dismissed the
H     appeal and held that the judge had based his decision on judicial review so that there was a right of appeal against it under section 17(3). The applicant, who had been at liberty since his release, was re-arrested in February 2005.
On the applicant's appeal to the Judicial Committee—

[1] Court of Appeal Act, s 17(3), as amended: see post, para 6.

AP0978

2368
Gibson v Government of the United States of America (PC)                [2007] 1 WLR

    *Held*, (1) that the applicant's case was indistinguishable from those of K an C and    A
therefore the issue was whether the decision of the Judicial Committee in the case
of K and C was correct; that on an application for habeas corpus in extradition
proceedings the court was not confined to a review of the formal validity of the
detention order so that an application for certiorari was not necessary for an inquiry
into the substantial merits of the order; that whether or not the judge had made an
order for certiorari or a declaration, he had undoubtedly made an order for habeas
corpus, and there was no appeal against an order for habeas corpus; that therefore the    B
Court of Appeal had no jurisdiction to hear the appeal, and the minority opinion of the
Judicial Committee in the cases of K and C was correct ( *post*, paras 11–15, 18–21).
    *R v Governor of Brixton Prison, Ex p Armah* [1968] AC 192, HL(E) considered.
    (2) Allowing the appeal (Lord Hoffmann, Lord Carswell and Lord Mance
dissenting), that stare decisis was an important principle for the purposes of certainty
and finality, but it was not an absolute principle, and the Privy Council, unlike the
House of Lords, had always been free to depart from its own previous decisions; that    C
although the previous decision of the majority in the case of K and C could not be
said to be impeding the proper development of the law nor prompting unsatisfactory
attempts to distinguish it, it was not a decision which had come to be relied on, and
their Lordships had unanimously regarded that earlier decision as clearly wrong in
a matter which concerned the liberty of a single individual who had been wrongly
re-arrested and imprisoned due to a misunderstanding or misapplication of the law
by the Court of Appeal; that notwithstanding that the applicant's challenge by way of    D
habeas corpus to his original committal ought to have failed, the law was that the
Court of Appeal had no jurisdiction to entertain an appeal however meritorious that
appeal might be; and that their Lordship's task was to ensure justice according to the
law, and it was appropriate in all the circumstances that they should depart from
their previous decision in the case of C and K and allow the applicant's appeal ( *post*,
paras 22–28).
    *R v National Insurance Comr, Ex p Hudson* [1972] AC 944, HL(E), *Fitzleet*    E
*Estates Ltd v Cherry* [1977] 1 WLR 1345, HL(E) and *Horton v Sadler* [2007] 1 AC
307, HL(E) considered.
    *Cartwright v Superintendent of Her Majesty's Prison* [2004] 1 WLR 902, PC
departed from.
    Decision of the Court of Appeal of the Commonwealth of the Bahamas reversed.

The following cases are referred to in the judgments:

*Cartwright v Superintendent of Her Majesty's Prison* [2004] UKPC 10; [2004]    F
    1 WLR 902, PC
*Fitzleet Estates Ltd v Cherry* [1977] 1 WLR 1345; [1977] 3 All ER 996, HL(E)
*Horton v Sadler* [2006] UKHL 27; [2006] 1 AC 307; [2006] 2 WLR 1346; [2006]
    3 All ER 1177, HL(E)
*Knowles v Government of the United States of America* [2006] UKPC 38; [2007]
    1 WLR 47, PC
*Planned Parenthood of Southeastern Pennsylvania v Casey* (1992) 505 US 833    G
*Practice Statement (Judicial Precedent)* [1966] 1 WLR 1234; [1966] 3 All ER 77,
    HL(E)
*R v Governor of Brixton Prison, Ex p Armah* [1968] AC 192; [1966] 3 WLR 828;
    [1966] 3 All ER 177, HL(E)
*R v National Insurance Comr, Ex p Hudson* [1972] AC 944; [1972] 2 WLR 210;
    [1972] 1 All ER 145, HL(E)
*R v Simpson* [2003] EWCA Crim 1499; [2004] QB 118; [2003] 3 WLR 337; [2003]    H
    3 All ER 531, CA
*R v Superintendent at Her Majesty's Prison Fox Hill, Ex p Bain* [1989–1990] 1 LRB
    156
*R v Superintendent at Her Majesty's Prison Fox Hill, Ex p Darville (No 1)* [1989–
    1990] 1 LRB 128

[2007] 1 WLR        Gibson v Government of the United States of America (PC)

A    *Walkley v Precision Forgings Ltd* [1979] 1 WLR 606; [1979] 2 All ER 548, HL(E)

The following additional cases were cited in argument:

*Lewis v Attorney General of Jamaica* [2001] 2 AC 50; [2000] 3 WLR 1785, PC
*R v Northumberland Compensation Appeal Tribunal, Ex p Shaw* [1952] 1 KB 338; [1952] 1 All ER 122, CA
*R v Oldham Justices Ex p Cawley* [1997] QB 1; [1996] 2 WLR 681; [1996] 1 All ER 464, DC
B    *R v Secretary of State for the Home Department, Ex p Khawaja* [1984] AC 74; [1983] 2 WLR 321; [1983] 1 All ER 765, HL(E)
*R v Secretary of State for the Home Department, Ex p Muboyayi* [1992] QB 244; [1991] 3 WLR 442; [1991] 4 All ER 72, CA

**APPEAL** from the Court of Appeal of the Commonwealth of The Bahamas
C    The applicant, Lemuel Gibson, appealed with leave from the decision of Court of Appeal (Sawyer P, Churaman and Ibrahim JJA) given on 22 January 2003 whereby, on a determination of a preliminary objection by the applicant, the court had held that it had jurisdiction to entertain an appeal by the respondents, the Superintendent of Her Majesty's Prison and the Government of the United States of America, from the judgment of Isaacs J given on 5 February 2002 in the Supreme Court whereby the judge
D    had granted the applicant a writ of habeas corpus.

The facts are stated in the judgments of their Lordships.

*Julian Knowles* for the applicant.
*Peter Knox QC* for the Government of the United States of America.

E    23 July.  The following judgment of the majority of their Lordships was delivered by **LORD BROWN OF EATON-UNDER-HEYWOOD**.

1   The Government of the United States of America ("USA") seeks the extradition of Lemuel Gibson ("the appellant") from The Bahamas to stand trial on drugs charges in Florida.  The circumstances in which he now appeals against his committal to await such extradition are as follows.

F    2   On 8 December 2000 the appellant, Samuel Knowles and Frank Cartwright were indicted by a federal grand jury on charges of conspiracy to import and distribute large quantities of cocaine and marijuana into the USA.  On 22 January 2001 the USA requested the three men's extradition and, following their arrest, authority to proceed against them was promptly given by the Attorney General of The Bahamas.  On 5 October 2001, after a two-day hearing in June, the magistrate (Mrs Carolita Bethel), pursuant to section 10(5) of the Extradition Act 1994, committed the three men to
G    custody to await extradition.  The evidence upon which the USA (the requesting state) principally relied was an affidavit from an accomplice, Herbert Hanna, who gave a detailed and damning account of the three men's close involvement in the conspiracy.  Thousands of pounds of cocaine were found, millions of US dollars in cash.

3   On committing the men to custody the magistrate told them of their
H    right to apply to the Supreme Court for habeas corpus.  This was pursuant to section 11(1) of the 1994 Act:

"Where a person is committed to custody under section 10(5), the court of committal shall inform him in ordinary language of his right to make an application to the Supreme Court for habeas corpus."

2370
Gibson v Government of the United States of America (PC)          [2007] 1 WLR

On 17 October 2001 the three men each applied for habeas corpus and
these applications (together with judicial review proceedings issued on
14 December 2001 upon the judge's own suggestion) were heard by
Isaacs J in the Supreme Court on 5 February 2002. At the conclusion of the
hearing the judge ordered writs of habeas corpus to issue with a return date
of 26 February 2002, the men meanwhile to be released on bail subject to
sureties. The final order of habeas corpus was duly made on 26 February
2002 when the three men were released unconditionally. On 5 February the
judge had ruled:

　　"I find that the orders of committal are void. In the premises the writs
　　must issue and the applicants [be] released. And I so order. I do not here
　　make any determination in respect of the certiorari applications upon the
　　view I have taken on the habeas corpus applications."

4   The judge's order was based upon his finding

　　"that the magistrate erred in law when she held that the evidence of
　　Hanna was direct evidence and, hence, admissible as evidence of the
　　applicants' participation in a conspiracy with him."

This finding itself was based upon the form of words used by Mr Hanna in his
affidavit as a prelude to giving his detailed account of the conspiracy: "I am
a source of information for the US Drug Enforcement Administration . . .
On 9 August 2000, I provided the following information . . ."

5   As the Board was later to observe (when dealing, as will shortly be
explained, with an appeal by the appellant's two co-defendants), this was
"an astonishing conclusion"; indeed, no court has since suggested that it
could possibly be supported. Their Lordships readily acknowledge that it
produced a serious miscarriage of justice. The critical question arising,
however, is whether or not this injustice could be corrected. Did the
USA have a right of appeal?

6   Section 11(5) of the 1994 Act provided that: "An appeal shall lie to
the Court of Appeal against the refusal of an application made under
subsection (1) for an order of habeas corpus . . ." In short, it provided for an
appeal against a judge's *refusal* to grant habeas corpus but not for an appeal
against its *grant*. This provision notwithstanding, the USA on 12 February
2002 gave notice of appeal to the Court of Appeal against the order of
5 February 2002 for the issue of writs of habeas corpus, invoking for the
purpose section 17(3) of the Court of Appeal Act as amended:

　　"Any person aggrieved . . . (a) by any declaratory order, order of
　　mandamus, order of prohibition or order of certiorari made by the
　　Supreme Court in any proceedings . . . may appeal to the court against
　　any such order . . . on any ground of appeal which involves a point of law
　　or of mixed fact and law . . ."

7   The USA argued that, properly analysed, the judge here had in fact
been exercising a judicial review function and that accordingly the Court of
Appeal had jurisdiction to entertain the appeal. The Court of Appeal
(Sawyer P, Churaman and Ibrahim JJA) accepted this argument and on
22 January 2003 allowed the USA's appeal and restored the magistrate's
orders for committal (initially against Knowles and Cartwright and then
later, following his arrest on 9 February 2005, against the appellant too).

2371
[2007] 1 WLR          *Gibson v Government of the United States of America* (PC)

A   8   Knowles and Cartwright appealed to the Judicial Committee, the critical issue again being whether or not the Court of Appeal had had jurisdiction to entertain the USA's appeal.  By a majority of three to two the board (Lord Steyn, Sir John Roch and Sir Swinton Thomas, Lord Hoffmann and Lord Rodger of Earlsferry dissenting)—*Cartwright v Superintendent of Her Majesty's Prison* [2004] 1 WLR 902—dismissed the appeal, concluding on the facts that section 17(3) of the Court of Appeal Act was applicable.  In
B   giving the opinion of the Board Lord Steyn said, at para 5, that "the correct approach is to ask, against the relevant context, what the legal effect of the pronounced decision is", before concluding, at para 19:

    "[The Court of Appeal's] view [that in substance the judge had been making an order for certiorari] is reinforced by the judge's conclusion that 'I find that the orders of committal are void'.  The judge was in effect
C   making a declaration that the orders of committal were void.  From that decision it followed that the state was no longer entitled to detain the applicants.   The judge had based his decision on judicial review.  Accordingly there was a right of appeal against the critical order."

    9   The dissenting minority said, at para 38:

D   "Even if the judge (contrary to his express statement) is to be treated as having made an order of certiorari, we do not see how that helps the applicants.  That only means that he made two orders: a deemed order of certiorari and an actual order that habeas corpus should issue.  The applicants may have been entitled to appeal against the first.  But that does not enable them to set aside the order for release unless they can also appeal against the second."
E   The minority then applied the same reasoning to the Board's suggestion that the judge should be treated as having made a declaratory order.

    10   As already indicated, the appellant was still at liberty at the time of the Court of Appeal's judgment on 22 January 2003 and it was not applied to his case until after his arrest on 9 February 2005.  By then, of course, it had been upheld by the Board as against Knowles and Cartwright.  On
F   3 November 2005 the appellant himself obtained leave to appeal to the Judicial Committee.

    11   Three issues now arise before their Lordships.   First, is the appellant's case distinguishable from that brought by Knowles and Cartwright?  Second, if not, is the decision of the (majority of the) Board on 10 February 2004 (the decision in the *Cartwright* case) correct?  Third,
G   even if incorrect, should it nevertheless be followed?

    12   The first issue can be speedily disposed of.  Mr Knowles seeks to distinguish the appellant's case from that of his two co-defendants by reference to an order for habeas corpus signed by Isaacs J bearing the date 26 February 2002 but in fact prepared by the appellant's attorney, placed by him ex parte before the court and signed by the judge in February 2005 following the appellant's re-arrest.

H   13   The argument is a hopeless one.  Not only is there nothing to suggest that the draft order was even shown to (let alone agreed by) the USA's attorney, or that the judge's attention had been drawn to the judgment of the Board in the *Cartwright* case [2004] 1 WLR 902, but, conclusively, the USA's appeal against the order had already been allowed so that whatever

2372

**Gibson v Government of the United States of America (PC)**          [2007] 1 WLR

A

order had previously been made by the judge was long past any process of
perfection or correction.

14   The second issue requires somewhat fuller discussion although, since
each of the seven members of the Board as presently constituted is of the clear
view that the minority opinion of the Board in the *Cartwright* case was
correct and that the Court of Appeal had had no jurisdiction to hear the USA's
appeal in these cases, their Lordships need not labour the points unduly.

B

15   Mr Knox for the respondent government seeks to uphold the Court
of Appeal's assumption of jurisdiction on two grounds. First he submits that
the opinion of the (majority of the) Board in the *Cartwright* case was correct
for the reasons given. Mr Knox chose not to elaborate this submission but
rather to allow Lord Steyn's opinion to speak for itself. With the utmost
respect to that opinion their Lordships cannot see how it meets the decisive
objection noted by the minority: the fact that, whether or not the judge also
made an order for certiorari or a declaration, he undoubtedly made an order
for habeas corpus and against that particular order there was no appeal.
Para 41 of the minority's opinion encapsulates the essential difficulty in the
majority's view:

C

"The interpretation given by the majority to the judgment of Isaacs J
means that not only did he (presumably on the authority of Molière)
make a declaratory order and order of certiorari without realising that
he was doing so, but that he did nothing else. The notional orders
are conjured up in order to be set aside on appeal and, this being
accomplished, the actual order against which there was no appeal
vanishes in a puff of smoke."

D

16   Mr Knox's second submission is that the majority's conclusion
should be upheld on a different ground. The starting point for this
alternative argument is the proposition that, as a matter of law, it was a
necessary precondition to the habeas corpus order releasing these men
that the judge first made an order of certiorari quashing the magistrate's
committal. Given that the formal return to the habeas corpus writ here
would have been simply that the men were held pursuant to the magistrate's
committal order, Mr Knox argues that the judge had no power on the return
of the writ to consider whether or not the magistrate had properly exercised
her jurisdiction in making the order (whether, in other words, the evidence
was sufficient to support the committal order). That question would have
had to be decided on a certiorari challenge and only then, having set aside
the committal order, would the judge have become entitled to make habeas
corpus orders for the men's release.

E

F

G

17   It follows, submits Mr Knox, that the intention and effect of the
judge's order was to quash the committal order by certiorari and that the
Court of Appeal accordingly had jurisdiction to entertain the USA's appeal
against that part of the judge's order. True, acknowledges Mr Knox, this
would leave the appellant free following his release under the unappealable
habeas corpus order. But, runs the argument, once the Court of Appeal had
allowed the USA's appeal against the quashing of the committal order, it
would have been open to the authorities to re-arrest the appellant and return
him to custody to await extradition.

H

18   Their Lordships would unhesitatingly reject this argument. It is
impossible nowadays to argue that on an application for habeas corpus in

AP0983

A    extradition proceedings the court is confined to a review of the formal validity of the detention order and cannot, except by certiorari, inquire into its substantial merits. Just such an argument, indeed, was recently rejected by the Board in *Knowles v Government of the United States of America* [2007] 1 WLR 47: see para 14 of the Board's opinion given by Lord Bingham of Cornhill. As Lord Bingham pointed out, it is contrary both to sound Bahamian authority—*R v Superintendent at Her Majesty's Prison Fox Hill, Ex p Darville (No 1)* [1989–1990] 1 LRB 128 and *R v Superintendent at Her Majesty's Prison Fox Hill, Ex p Bain* [1989–1990] 1 LRB 156—and also to English authority of high standing: *R v Governor of Brixton Prison, Ex p Armah* [1968] AC 192.

    19   As Lord Pearce observed in *Ex p Armah*, at p 254:

C    "It appears . . . that for at least 100 years the courts have accepted the depositions and decision in place of a formal return of the writ, in cases where a writ of certiorari would lie, without insisting on an additional writ to bring the depositions before the court. In 1864 in *In re Tivnan* 5 B & S 645, 646, a case of extradition, the depositions were considered as being before the court on an application of habeas corpus: 'As to the remaining question, viz, whether . . . there is a case on which the magistrate ought to commit these prisoners, I cannot say that there is not evidence under which he was entitled to do so—a prima facie case was made out.' See, too *In re Windsor* (1865) 6 B & S 522,523, where there was an arrangement between the parties that the depositions and affidavits were taken as in court. It appears that this was the practice at the time when the Extradition Act was passed in 1870 and the Fugitive Offenders Act in 1881. And no doubt it was in the light of that practice that the magistrates' court was enjoined by section 11 in the former Act and section 5 in the latter to point out to the accused his remedy by way of habeas corpus. When the depositions were thus before it the court was entitled and bound to see whether there was evidence which raised, in the case of the Fugitive Offenders Act, a strong or probable presumption, and which thus gave the magistrate jurisdiction to commit. If there were not, the accused was entitled to be discharged."

See also Lord Reid's speech, at pp 233–235.

    20   This view as to the wide scope of a habeas corpus application in extradition proceedings has been consistently held ever since *Ex p Armah*. It is clearly expressed in *Sharpe, The Law of Habeas Corpus*, 2nd ed (1989), pp 82–83. It is to be found too in *Wade & Forsyth, Administrative Law*, 9th ed (2004)—see, for example, footnote 52, at p 597:

    "At one time the prisoner would have had to obtain certiorari to quash the detention order at the same time as habeas corpus to secure his release, in order to succeed on this ground [any ground other than the ground of detention stated in the return to the writ]. But to insist upon a separate certiorari was pointless formalism, since the habeas corpus brought the whole question of the validity of the detention before the court. It therefore became the practice to receive the depositions of evidence as if there had been a certiorari and to treat them as part of the record, in the same way as used to be done in reviewing magistrates' decisions before 1848. If error of law then appeared, habeas corpus would be granted, thus in effect quashing the detention order. For this see

2374

Gibson v Government of the United States of America (PC)           [2007] 1 WLR

A

Bacon's Abridgement (1768), iii, 6, cited in *Ex p Armah* [by Lord Reid and Lord Pearce]."

21   It is, indeed, surprising today to find Mr Knox's submission being advanced at all.  It becomes unnecessary, therefore, to dwell upon the artificiality of the second stage of his argument, or the oddity of a statutory provision requiring that a person committed to custody to await extradition be told only of his right to apply for habeas corpus if in fact he needs also to apply for certiorari.

B

22   The third issue frankly is the difficult one on this appeal and on this issue, clearly, there is room for two views.  There are, indeed, powerful arguments available to both sides.  Stare decisis is an important principle.  The virtues of certainty and finality hardly need emphasis or elaboration.  As Lord Wilberforce said in *Fitzleet Estates Ltd v Cherry* [1977] 1 WLR 1345, 1349:

C

"Nothing could be more undesirable . . . than to permit litigants, after a decision has been given by this House with all appearance of finality, to return to this House in the hope that a differently constituted committee might be persuaded to take the view which its predecessors rejected.  True that the earlier decision was by a majority: I say nothing as to its correctness or as to the validity of the reasoning by which it was supported.  That there were two eminently possible views is shown by the support for each by at any rate two members of the House.  But doubtful issues have to be resolved and the law knows no better way of resolving them than by the considered majority opinion of the ultimate tribunal."

D

But the principle is not an absolute one.  In the Privy Council it never was.  And since the *Practice Statement (Judicial Precedent)* [1966] 1 WLR 1234 the House of Lords too has been free to depart from its own previous decisions.  As Lord Bingham of Cornhill recently said in *Horton v Sadler* [2007] 1 AC 307, 323, para 29:

E

"As made clear in the [*Practice Statement*] former decisions of the House are normally binding.  But too rigid adherence to precedent may lead to injustice in a particular case and unduly restrict the development of the law.  The House will depart from a previous decision where it appears right to do so."

F

23   Generally speaking, as Lord Reid observed in *R v National Insurance Comr, Ex p Hudson* [1972] AC 944, 966, the practice will be used "sparingly": when the previous wrong decision is "thought to be impeding the proper development of the law or to have led to results which were unjust or contrary to public policy", when "courts tend to distinguish it on inadequate grounds" which itself "is bound to lead to uncertainty".  *Horton v Sadler* was just such a case where the House departed from its previous longstanding decision in *Walkley v Precision Forgings Ltd* [1979] 1 WLR 606, a decision which had prompted a good deal of unsatisfactory jurisprudence in efforts to distinguish it.

G

H

24   That, it must be acknowledged, is not the position here.  It cannot be said that the Board's decision in the *Cartwright* case [2004] 1 WLR 902 is one which has been impeding the proper development of the law or, indeed, prompting unsatisfactory attempts to distinguish it.  But nor is it a decision on which people have come to rely.  On the contrary, following the

2375

[2007] 1 WLR        Gibson v Government of the United States of America (PC)

A   *Cartwright* case [2004] 1 WLR 902, the Bahamian Government in 2004 amended section 11(5) of the 1994 Act so as to confer a specific right of appeal against the grant of habeas corpus as well as against its refusal.

25   Viscount Dilhorne said in *Ex p Hudson*, at p 993:

"if the view be that the decision is clearly wrong, it is, I think, easier to decide that a recent case should not be followed than if it is one that has stood for a long time, for if it is in the latter category many may have B   acted in reliance on it."

Here, as in *Horton v Sadler* [2007] 1 AC 307, but unlike the position in *Ex p Hudson* [1972] AC 944 itself (where three of the seven members of the appellate committee thought the earlier decision of the House rightly decided so that four of the seven in the event declined to depart from it), C   each member of the Board thinks the earlier decision in the *Cartwright* case [2004] 1 WLR 902 clearly wrong.  The issue here is not, as in *Ex p Hudson* [1972] AC 944, "simply the proper construction of complicated provisions in a statute" where "it cannot be said positively that one construction is right and the other wrong": see Lord Reid, at p 966.  Nor is this the kind of case which has prompted the United States Supreme Court to issue guidelines designed to ensure that its previous decisions are not overruled D   merely because a new majority favour a different approach to certain highly contentious constitutional issues.

26   Rather their Lordships are concerned here with the liberty of a single individual who was set free (however wrongly) in February 2002 and ought not thereafter to have been re-arrested.  *Halsbury's Laws of England*, 4th ed reissue, vol 37 (2001), para 1242 states that:

E   "In its criminal jurisdiction the Court of Appeal applies the same principles [to the rules of precedent] as on the civil side, but recognises that there are exceptions (a) where the applicant is in prison and in the full court's opinion wrongly so; (b) where the court thinks the law was misunderstood or misapplied . . ."

F   Lord Woolf CJ in *R v Simpson* [2004] QB 118, 128, para 27, described that statement as "unexceptional" and "soundly based upon the authorities to which [it referred]".

27   There can be no getting away from the fact that this appellant is wrongly imprisoned through the misunderstanding or misapplication of the law by the Court of Appeal (and by the Board in the *Cartwright* case [2004] 1 WLR 902) with regard to rights of appeal under the Bahamian legislation G   then in force.

28   Of course the view could be taken that the appellant had faced overwhelmingly strong evidence justifying (indeed requiring) his extradition to the USA on the gravest possible charges of drug dealing, that his habeas corpus challenge to committal ought certainly to have failed, and that the erroneous decision in the *Cartwright* case has fortuitously enabled the Bahamian Court of Appeal to correct a serious miscarriage of justice.  Their H   Lordships, however, reject that view.  The Board's task is to ensure justice according to law.  According to law the Court of Appeal had no jurisdiction to entertain the USA's appeal, however meritorious that appeal was.  So much is plain.  The Board should not now shrink from saying so.  The appeal must accordingly be allowed.

AP0986

2376
Gibson v Government of the United States of America (PC)          [2007] 1 WLR

**LORD HOFFMANN, LORD CARSWELL AND LORD MANCE** delivered   A
the following dissenting opinion.

29  On 8 December 2000 Samuel Knowles, Frank Cartwright and
Lemuel Gibson were indicted in the Federal District Court of Southern
Florida on charges of conspiracy to import large quantities of cocaine and
marijuana into the United States of America. Warrants for their arrest were
issued and on 22 January 2001 the USA, pursuant to a treaty of extradition
with the Commonwealth of The Bahamas, made a request to the   B
Government of The Bahamas for their extradition. They were arrested on
provisional warrants, the minister issued his authority to proceed and on
5 October 2001 they were brought before the magistrate, Mrs Carolita
Bethel, pursuant to section 10 of the Extradition Act 1994.

30  The duty of the magistrate was to decide whether the evidence
tendered by the Government of the USA would be "sufficient to warrant his   C
trial for that offence if the offence had been committed in The Bahamas".
The evidence consisted largely of an affidavit sworn by one Herbert Hanna,
an accomplice, and affidavits by Canadian police officers who had
intercepted telephone conversations to which Knowles was a party. As a
result of information obtained from these conversations, US police officers
followed Knowles in his car from a hotel where he had met the other   D
conspirators, stopped and arrested him and found US$2·5m in the car and
subsequently in his house. Hanna said that his role hade been to travel to
The Bahamas and load the drugs into high speed boats and then accompany
them as "security" to the Florida coastline. There had been more than
20 such trips, on each of which Gibson had captained the boat. On the last
occasion, when Hanna had been arrested bringing the drugs ashore, the boat   E
had carried 2,585lbs of cocaine and 716lbs of marijuana.

31  This was plainly prima facie evidence of drug smuggling on a very
large scale and the magistrate committed all three defendants to custody to
await extradition. Pursuant to section 11(1) of the Act, she informed the
accused of their right to apply to the Supreme Court for habeas corpus. An
application by all three was heard by Isaacs J, who gave judgment on   F
5 February 2002 granting habeas corpus and ordering the defendants to be
released. The ground for the order was that the evidence of Hanna was
inadmissible because the form of words which he used in his affidavit
was "I am a source of information for the US Drug Enforcement
Administration . . . On 9 August 2000, I provided the following
information", followed by an account of the events which have been
described. The judge said that this was evidence of what he had informed
the authorities but not evidence of the facts contained in the information.   G

32  No one now suggests that this extraordinary pedantry could be
justified or that it did not produce a serious miscarriage of justice. But the
question then arose as to whether any legal procedure existed by which the
error could be corrected. Section 11(5) of the 1994 Act gave a right of
appeal to the Court of Appeal against the refusal of an application for habeas
corpus but not against the grant of such an order.

33  The US Government nevertheless appealed to the Court of Appeal,   H
founding jurisdiction upon the more general provisions of section 17(3) of
The Bahamas Court of Appeal Act, as amended. By this time, Gibson
and Cartwright had disappeared and the appeal proceeded only against
Knowles. The Court of Appeal accepted the submission that it had

AP0987

2377

[2007] 1 WLR          Gibson v Government of the United States of America (PC)

A   jurisdiction and allowed the appeal.  Cartwright was later apprehended and
the appeal in his case was also allowed.

34   A further appeal by Knowles and Cartwright to the Judicial
Committee was dismissed on 10 February 2004 by a majority of three to
two: see *Cartwright v Superintendent of Her Majesty's Prison* [2004] 1 WLR
902.  Afterwards, Gibson was arrested and the Court of Appeal, following
the decision of the Board, allowed the appeal of the US Government.  Gibson
B   now appeals to the Privy Council and invites the Board to rule that the
*Cartwright* case was wrongly decided.

35   In the *Cartwright* case, the Board was unanimous in considering that
the decision of Isaacs J had been egregiously in error, with the result that not
only had three men against whom there was evidence of serious offending
been set at liberty, but The Bahamas had been put in breach of its treaty
C   obligations to the United States.  The majority felt able to interpret the
decision reached by Isaacs J as giving rise to a right of appeal under
section 17(3) which enabled this error to be corrected.  They said, at para 19,
that this was "not an issue of high legal principle but simply a question of
assessing in the absence of a formal order what in context the judge in fact
did".  The minority regretfully did not consider this to be a permissible
D   interpretation.

36   Mr Knowles, who appeared for Gibson, submitted that the earlier
*Cartwright* decision could be distinguished on the basis that when that case
came before the Board, no formal order by Isaacs J had been drawn up.
Since the decision of the Court of Appeal in this case, the judge has, on an
ex parte application by the appellant, approved a formal order in terms
E   which Mr Knowles says do not permit the interpretation put upon it by the
Privy Council.  But we do not think there is anything in this point.  By the
time the judge had approved the order, the appeal against it had been
allowed and he had long been functus officio.

37   The question therefore is whether the Board should depart from its
previous decision.  We respectfully consider that, had question been res
integra, we would have agreed with the minority opinion, to which one of us
F   was a party.  But the matter is not res integra.  According to well established
constitutional principles, the decision of the Board lays down the law of The
Bahamas, by which the courts in The Bahamas are bound and from which
the Board itself will depart only in exceptional circumstances.  For this
purpose, it does not matter whether the earlier decision was unanimous or
by a majority.  It is the decision of the Board.  As Lord Wilberforce said in
*Fitzleet Estates Ltd v Cherry* [1977] 1 WLR 1345, 1349:
G
"Nothing could be more undesirable . . . than to permit litigants,
after a decision has been given by this House with all appearance of
finality, to return to this House in the hope that a differently constituted
committee might be persuaded to take the view which its predecessors
rejected.  True that the earlier decision was by a majority: I say nothing
as to its correctness or as to the validity of the reasoning by which it was
H   supported.  That there were two eminently possible views is shown by
the support for each by at any rate two members of the House.  But
doubtful issues have to be resolved and the law knows no better way of
resolving them than by the considered majority opinion of the ultimate
tribunal."

AP0988

2378
Gibson v Government of the United States of America (PC)            [2007] 1 WLR

A

38   Unlike the House of Lords, the Privy Council has never considered itself absolutely bound by its own previous decisions.  The House of Lords did not regain the same freedom until the *Practice Statement (Judicial Precedent)* [1966] 1 WLR 1234.  But whether the freedom to depart from previous decisions is of long standing or relatively recently acquired, it must be exercised on the same rational principles.  It must recognise the importance of adhering to precedent and the exceptional nature of a decision to depart from previous authority.  It follows that the observations of Lord Reid in *R v National Insurance Comr, Ex p Hudson* [1972] AC 944, 966 are an important guide to the use of judicial precedent by any final tribunal:

B

C

"My understanding of the position when this resolution was adopted was and is that there were a comparatively small number of reported decisions of this House which were generally thought to be impeding the proper development of the law or to have led to results which were unjust or contrary to public policy and that such decisions should be reconsidered as opportunities arose.  But this practice was not to be used to weaken existing certainty in the law."

D

39   The general applicability of these remarks is shown by the fact that very similar guidelines were laid down by the Supreme Court of the United States in the well known case of *Planned Parenthood of Southeastern Pennsylvania v Casey* (1992) 505 US 833, in which it was said, at p 864, that "a decision to overrule should rest on some special reason over and above the belief that a prior case was wrongly decided".

E

40   What special reason exists in this case?  The decision in the *Cartwright* case is not impeding the proper development of the law.  On the contrary, it has been, so to speak, adopted by the legislature of The Bahamas which has amended the 1994 Act to put the matter beyond doubt by giving a right of appeal against a decision to grant habeas corpus as well as to refuse it.  It is speculation as to whether other jurisdictions have the same statutory provisions.  If there are, and nothing has been done to alter the law since the *Cartwright* case, one could infer that the local legislature is satisfied with the decision.  Nor has the case led to results which are unjust or contrary to public policy.  On the contrary, the decision allowed the correction of a plain miscarriage of justice and supported public policy in allowing The Bahamas to comply with its international obligations.  But the majority proposes to perpetuate injustice and a breach of the extradition treaty simply on the grounds that they think that the *Cartwright* decision was wrong, or, despite the views of three members of the Board, very wrong.  In our opinion this would encourage attempts to revisit cases decided by a narrow majority, which are likely to be the most difficult.  We therefore do not think that this is a proper case in which to exercise the power to depart from precedent and would dismiss the appeal.

F

G

H

*Appeal allowed.*

Solicitors: *Simons Muirhead & Burton; Charles Russell LLP.*

S H

224                                                        [1999] BPIR

# HUGHES AND OTHERS v HANNOVER RUCKVERSICHERUNGS-AKTIENGESELLSCHAFT

Court of Appeal

Roch, Morritt and Thorpe LJJ

28 January 1997

*Insolvency courts – Co-operation procedures – Judicial comity – Relief available – Degree of discretion enjoyed by English courts where extra-territorial relief sought*

EMLICO was a mutual insurance company which transferred its place of incorporation from Massachusetts, USA, to Bermuda in July 1995. On 20 October 1995, after a winding-up petition has been presented in the courts of Bermuda, H and two others were appointed provisional liquidators. The Supreme Court of Bermuda issued a letter of request on 9 February 1996 asking, inter alia, for an order from the English courts under s 426 of the Insolvency Act 1986 restraining HR (a German reinsurance company) from pursuing arbitration proceedings against EMLICO in England or in any other jurisdiction. HR had a place of business in London and had instituted arbitration proceedings in Massachusetts in respect of a reinsurance agreement it had with EMLICO. The question that had to be resolved was whether the court had jurisdiction in the matter and, if so, whether it was obliged by virtue of s 426(4) to grant the relief sought. Knox J refused the injunctive relief and the liquidators appealed.

**Held** – dismissing the appeal –

(1)   The jurisdiction specified under s 426(10) was exhaustive and the phrase 'insolvency law' included the relevant general jurisdiction of the court, those general rules of English insolvency law as found in the legislation such as the Insolvency Act 1986, the Company Directors Disqualification Act 1986 and subordinate legislation, as well as those principles of the insolvency law of the foreign jurisdiction that corresponded to English insolvency legislation.

(2)   Here the letter of request related to assistance falling within the inherent jurisdiction of the English courts. There was jurisdiction to grant relief sought (ie to restrain proceedings abroad) but the court was not obliged to offer that assistance; the court enjoyed discretion in dealing with such applications. It could refuse assistance or offer alternative help to that sought.

(3)   In exercising that discretion the court was not limited to a consideration of issues of public policy. It could consider other factors, such as proper jurisdiction for the arbitration, the availability of relief from the American courts under s 304 of the US Bankruptcy Code and the fact that later developments had occurred in the litigation which had not been considered by the Bermudian courts when submitting their letter of request. As there had been a change of circumstances the letter of request had been submitted, the appropriate course of action would be to dismiss the application.

**Statutory provisions considered**
Bankruptcy Act 1869, s 74
Bankruptcy Act 1883, s 118
Bankruptcy Act 1914, s 122
Supreme Court Act 1981, s 37(1)
Civil Jurisdiction and Judgments Act 1982, s 18(3)
Company Directors Disqualification Act 1986, ss 6–10, 12, 15, 19(c), 20, Sch 1
Insolvency Act 1986, ss 8, 130(2), 212, 213, 214, 238, 239, 426
Insolvency Rules 1986 (SI 1986/1925), r 7.51

Co-operation of Insolvency Courts (Designation of Relevant Countries and Territories) Orders 1986 (SI 1986/2123) and 1996 (SI 1996/253)
Bankruptcy Code (US), s 304
Bermuda Companies Act 1981, s 167(4)

**Cases referred to in judgment**

*Barclays Bank v Homan* [1993] BCLC 680, ChD and CA
*Bank of Credit and Commerce International (SA) (No 9), Re* [1994] 2 BCLC 636, [1994] 3 All ER 764, ChD and CA
*Bank of Credit and Commerce International (SA) (No 11), Re* [1997] 1 BCLC 80, sub nom *Re Bank of Credit and Commerce International (SA) (No 10)* [1996] 4 All ER 796
*Belfast Shipowners Co, Re* [1894] 1 IR 321
*Carron Iron Co Proprietors v Maclaren* (1855) 5 HL Cas 416, HL
*Central Sugar Factories of Brazil, Re; Flack's Case* [1894] 1 Ch 369
*Dallhold Estates (UK) Pty Ltd, Re* [1992] BCLC 621
*Debtor, Re A, ex parte Viscount of the Royal Court of Jersey* [1981] Ch 384, [1980] 3 WLR 758, [1980] 3 All ER 665
*Focus Insurance Co Ltd, Re* [1997] 1 BCLC 219, [1996] BCC 659
*Galbraith v Grimshaw* [1910] AC 508, [1908–10] All ER Rep 561, HL
*Gibbons, Re; ex parte Walker* [1960] I Jur Rep 60
*International Pulp and Paper Co, Re* (1876) 3 Ch D 594
*Jackson (A Bankrupt in the Republic of Ireland), Re* [1973] NI 67
*Levy's Trusts, Re* (1885) 30 Ch D 119
*MacKinnon v Donaldson, Lufkin and Jenrette Securities Corporation* [1986] Ch 482, [1986] 2 WLR 453, [1986] 1 All ER 653
*North Carolina Estate Co Ltd, Re* (1889) 5 TLR 328
*Oriental Inland Steam Co, Re, ex parte Scinde Rly Co* (1874) LR 9 Ch App 557
*Ormiston, ex parte, Distin, Re* (1871) 24 LT 197
*Osborn, Re, ex parte Trustee* [1931–32] B & CR 189
*Paramount Airways Ltd, Re* [1992] BCLC 710, [1992] 3 WLR 690, [1992] 3 All ER 1, CA
*Pepper (Inspector of Taxes) v Hart* [1993] AC 593, [1992] 3 WLR 1032, [1993] 1 All ER 42, HL
*Sill v Worswick* (1791) 1 Hy Bl 665
*SNI Aérospatiale v Lee Kui Jak* [1987] AC 871, [1987] 3 WLR 59, [1987] 3 All ER 510, PC
*South Eastern Portugal Rly Co, Re* (1869) 17 WR 982
*Vocalion (Foreign) Ltd, Re* [1932] 2 Ch 196, [1932] All ER Rep 519

**Cases cited but not referred to in judgment**

*Brink's MAT Ltd v Elcombe* [1988] 3 All ER 188, [1988] 1 WLR 1350, CA
*British Airways Board v Laker Airways Ltd* [1984] 3 All ER 39, [1985] AC 58

*Gabriel Moss* QC and *Susan Prevezer* for the appellants
*Martin Pascoe* for the respondent

## MORRITT LJ:

The Insolvency Act 1986, s 426 provides, so far as relevant, that:

> '(4)   The courts having jurisdiction in relation to insolvency law in any part of the United Kingdom shall assist the courts having the corresponding jurisdiction in any other part of the United Kingdom or any relevant country or territory.

(5)   For the purposes of subsection (4) a request made to a court in any part of the United Kingdom by a court in any other part of the United Kingdom or in a relevant country or territory is authority for the court to which the request is made to apply, in relation to any matters specified in the request, the insolvency law which is applicable by either court in relation to comparable matters falling within its jurisdiction.

In exercising its discretion under this subsection, a court shall have regard in particular to the rules of private international law.

…

(10)   In this section "insolvency law" means—

(a)    in relation to England and Wales, provision made by or under this Act or sections 6 to 10, 12, 15, 19(c) and 20 (with Schedule 1) of the Company Directors Disqualification Act 1986 and extending to England and Wales;

…

(d)    in relation to any relevant country or territory, so much of the law of that country or territory as corresponds to provisions falling within any of the foregoing paragraphs …'

Bermuda is a relevant territory (the Co-operation of Insolvency Courts (Designation of Relevant Countries and Territories) Order 1986, SI 1986/2123) and the Supreme Court of Bermuda has jurisdiction in relation to insolvency law in Bermuda corresponding to that of the High Court in England and Wales. By a letter of request dated 9 February 1996 the Supreme Court of Bermuda, in the exercise of its inherent jurisdiction, requested the High Court of Justice in England pursuant to the provisions of s 426 of the Insolvency Act 1986 to assist it by:

'(1)   recognising the right and title of David E. W. Lines, Peter C. B. Mitchell and Christopher J. Hughes, when acting within the jurisdiction of the High Court of Justice in England, to represent and to act for and on behalf of [Electric Mutual Liability Insurance Company Ltd] as its Joint Provisional Liquidators for the purposes of restraining any actions or proceedings issued by [Hannover Ruckversicherungs-Aktien-gesellschaft] in England and in any and all jurisdictions

(2)   ordering that:

(a)    the continuation or commencement of any actions and proceedings brought by Hannover Re or any of its associated or subsidiary companies against the Company within the jurisdiction of the High Court of Justice in England and in any and all jurisdictions, and

(b)    the putting in force of any attachment, sequestration, distress or execution within the jurisdiction of the High Court of Justice in England and in any and all jurisdictions by Hannover Re or any of its associated or subsidiary companies against the estate or effects of the company be restrained subject, in each case, to the leave of this court …'

Earlier in the letter it had been recited that a petition to wind up the company referred to had been presented to and the joint provisional

liquidators appointed by that court on 20 October 1995 and that:

> '… it has been shown to the satisfaction of this Court that it is necessary for the purposes of justice and to assist the Joint Provisional Liquidators in the performance of their duties …'

that, in effect, such orders should be made.

On 9 and 15 February 1996 Harman J made orders in terms of the request pending the full hearing of the application for such relief made by the joint provisional liquidators of Electric Mutual Liability Insurance Co Ltd ('the company'). By his order made on 3 April 1996 following such hearing Knox J declined to continue the injunctive relief in respect of 'any and all jurisdictions' outside England and Wales as sought in the letter of request. As the joint provisional liquidators were not concerned to obtain such relief confined to England and Wales Knox J dismissed their application. This appeal of the joint provisional liquidators from that order is brought with the leave of the judge.

The company was incorporated in the State of Massachusetts in 1927 on the initiative of interests connected with General Electric Co, a company incorporated in New York. It was formed to carry on business as a mutual property/casualty insurance company and as such issued, amongst others, comprehensive general liability policies covering risks arising in the United States and Puerto Rico to, principally, General Electric and its associated companies. The company does not now and never did have any place of business in the UK.

One of the reinsurers of the company was the defendant, Hannover Ruckversicherungs-Aktiengesellschaft ('Hannover Re'), which at all material times had and still has a place of business in Fountain House, 130 Fenchurch Street, London EC3 and in Chicago, Illinois, USA but none in Bermuda. This reinsurance, though effected through brokers in London, was accepted by Hannover Re through its office in Germany. Each of the eight contracts of reinsurance between the company and Hannover Re in force at the material time contained an arbitration clause in common form which, so far as relevant, provided that:

> 'Should any difference of opinion arise between the reinsurers and the company which cannot be resolved in the normal course of business with respect to the interpretation of this agreement or the performance of the respective obligations of the parties under this agreement, the difference shall be submitted to arbitration.
>
> …
>
>    The arbitrators and umpire shall be officials of insurance or reinsurance companies authorised to transact business in one or more states of the USA and writing the kind of business about which the difference has arisen. The arbitrators and umpire are relieved from all judicial formalities and may abstain from following the strict rules of law and they shall make their award with a view to effecting the general purpose of this agreement rather than in accordance with the literal interpretation of the language and the decision of the majority shall be final and binding upon the parties under this agreement.
>
> …

> The arbitration shall be held at the times and place agreed upon by the arbitrators and umpire. The laws of the State of Massachusetts shall govern the arbitration.'

From 1991 onwards the company faced very substantial claims from General Electric which the latter contends are covered by the comprehensive general liability policies issued to it by the company. Those claims are in respect of the cost of cleaning up toxic waste dumps in the USA used for many years by General Electric and in respect of persons alleged to have contracted asbestos-related diseases from asbestos products manufactured by General Electric. The evidence suggests that there are now some 600 of such sites and 75,000 such asbestosis claims.

In 1995 the company reorganised its business. The reorganisation involved two principal steps. The first was to hive down to a wholly owned subsidiary, Electric Insurance Co, the more profitable insurance business of the company and assets worth about US$75m. The effect of this step was to leave General Electric as the only creditor of substance of the company in respect of the claims relating to toxic waste and asbestosis. The shares in Electric Insurance Co were transferred to Wilmington Trust Co as the trustee of a Delaware Guarantor Trust of which the company was and is the beneficiary. The second principal step was to 'redomesticate' itself to Bermuda. This step involved transferring its domicile as permitted by the Massachusetts Insurance Code, s 49A and being 'continued' into Bermuda as an 'exempted Company' in accordance with the Bermudian Companies Act 1981, Part XA.

The reorganisation and therefore both these steps required the approval of the Commissioner of the Massachusetts Division of Insurance pursuant to Massachusetts General Laws, ch 175, para 206B. Application for approval was made on 7 June 1995 and, following a public hearing held on 20 June 1995, was granted on 28 June 1995. On 1 July 1995 the company was re-registered in Bermuda and thereby continued as an exempted company.

On 20 October 1995 the company presented a petition to the Supreme Court in Bermuda for its winding up by that court on the grounds that it was insolvent. On the same day the joint provisional liquidators were appointed. The company contended that its reserves, stated in the accounts for the periods ended 31 December 1994 and 30 June 1995 to be some US$250m, were non-existent and that its liabilities exceeded its assets by US$500m.

By a letter addressed to the company dated 9 January 1996 Hannover Re demanded arbitration under the various reinsurance contracts then subsisting between them. The relief sought was 'rescission of the Treaties from inception'. In the alternative Hannover Re sought, but has since abandoned, an order 'to withdraw its Bermudian winding-up petition as fraudulently filed and redomesticate back in Massachusetts under the regulatory oversight of the Massachusetts Division of Insurance'. The grounds set out in the letter alleged fraud in the reorganisation which was described as 'a carefully devised scheme to extract more money from Hannover Re … than it was rightfully owed' and alleged that the company had 'engaged in serious breaches of contract and other actionable conduct in connection with … its redomestication and its filing of the winding-up petition'.

The letter of request with which this appeal is concerned was issued a month later on 9 February 1996. Orders giving effect to the request in accordance with its terms were made ex parte and on a temporary basis by

Harman J on that day and on 15 February 1996. On the latter date he gave directions as to the evidence to be filed. The application was heard by Knox J in mid-March 1996. Before referring to the reasons for the order of Knox J contained in the judgment he gave on 3 April 1996 it is convenient to indicate certain relevant matters which have occurred subsequently.

On 9 April 1996 Kemper Re, another of the reinsurers of the company, sought leave to intervene on the hearing of the winding-up petition, gave notice of its intention to apply to the Supreme Court in Bermuda for leave to commence proceedings for judicial review of the decisions of the Minister of Finance and the Registrar of Companies in Bermuda which enabled the redomestication of the company and served an arbitration demand on the company. On 8 May 1996 the Supreme Court in Bermuda restrained Kemper Re from proceeding with the arbitration pending the hearing of both the winding-up petition and the judicial review proceedings which had been issued on 18 April 1996 in accordance with leave granted on 16 April 1996. On 18 May 1996 certain London reinsurers of the company made demands for arbitration. On 26 July 1996 Ground J ordered that the company should be wound up by the court, in consequence of which the joint provisional liquidators were appointed joint liquidators of the company on 12 September 1996. Between 8 and 22 October 1996 Wade J heard the application of the company dated 9 May 1996 to set aside the leave to issue the proceedings for judicial review granted to Kemper Re on 16 April 1996. Wade J delivered her reserved judgment on 18 December 1996. She concluded that leave to move for an order of judicial review and an extension of time for that purpose should not be granted. Accordingly she set aside the leave and extension of time granted by Ground J to Kemper Re on 16 April 1996 primarily on the ground that 'arbitration proceedings will provide the most appropriate vehicle to secure, fully and directly, the relief they [sc Kemper Re] seek'.

In his judgment Knox J recorded the relevant facts. He noted that there was no evidence that any step in the arbitration demanded by Hannover Re was threatened or intended to be taken in this jurisdiction with which the only connection was that Hannover Re has a presence and had been duly served here. He considered that it would be inappropriate for him to go into the merits of the issues in the arbitration but observed that 'there is a real issue which if determined in favour of Hannover Re would lead to reinsurance treaties being rescinded'. He described the nature of the application before him in these terms:

> 'It is not suggested the reinsurance treaties have any connection with this jurisdiction. Nor is relief within this jurisdiction sought otherwise than as a peg on which to hang a worldwide injunction against Hannover Re. It was made clear during argument that an order limited to this jurisdiction would be of no utility to the joint provisional liquidators and was not desired. In this respect, there is so far as I am aware no precedent in reported cases of an extra-territorial order being made by the court pursuant to a request under s 426(4) of the Insolvency Act 1986, when no relief within the jurisdiction is being sought.'

He referred to the availability in the USA under s 304 of the Bankruptcy Code of a procedure whereby an injunction may be obtained in proceedings

ancillary to a Bermudian liquidation to restrain the continuation of proceedings against the company in liquidation. That procedure was not thought by the joint provisional liquidators to be as appropriate or as cheap as obtaining an injunction from the High Court in England.

Knox J rejected the submission for Hannover Re that the application before him was not one in which the court was being asked to apply 'insolvency law' as referred to in the Insolvency Act 1986, s 426(4). In that context he said:

> 'I do not accept that submission which seems to me to involve much too strict adherence to the letter rather than the evident intention of the legislation. Even on a purely literal approach, the authority conferred by subsection (5) is authority to apply in relation to England and Wales provision made by or under the Insolvency Act 1986 and extending to England and Wales or in relation to Bermuda so much of the law of Bermuda as corresponds to provisions made by or under the Insolvency Act 1986. As Mr Hildyard, for the joint provisional liquidators, pointed out there is no article, whether definite or indefinite, preceding the word 'provision' and the expression is capable of referring to the scheme of insolvency law provided by the Insolvency Act 1986 and to embrace ancillary jurisdictions of the court, such as the grant of injunctions to prevent abuse of or interference with the processes of liquidation. Such ancillary provisions even on a technical linguistic level can properly be regarded as provisions made under the Insolvency Act 1986 because the Insolvency Rules, r 7.51 provides for the Rules of the Supreme Court in the practice in the High Court to apply insolvency proceedings except so far as is inconsistent with the Insolvency Rules and RSC 1981 Ord 29, r 1 provides for the grant of injunctions. Quite apart from such verbal justifications for the existence of a jurisdiction under s 426 to grant an injunction in aid of a liquidation process I am of the opinion that the section should be construed so as to include the court's ancillary jurisdiction where it exists in connection with the protection of the processes of liquidation even though the remedy derives from the court's general power to grant injunctions under s 37(1) of the Supreme Court Act 1981. A common example in the Companies Court is the grant of an injunction to restrain presentation or advertisement of a winding-up petition where there is a genuine dispute as to the status of the petitioner as a creditor. The granting of the injunction is technically an exercise of the court's power to restrain abuses of its processes and as such not specifically authorised by any particular section of the Insolvency Act 1986 or of the rules although the petition itself, if and when heard, would be dismissed because the petitioner was not a creditor within and did not therefore have a debt within s 123 of the Insolvency Act 1986.'

He then considered the submission for Hannover Re that there was no 'subject matter' jurisdiction in relation to the matters in dispute and the rival submission for the joint provisional liquidators that the word 'shall' in s 426(4) required the court, subject only to principles of public policy and a discretion as to the way in which the assistance might be provided, to do all that it could to assist. After referring to a number of authorities including *Re Paramount Airways Ltd* [1992] BCLC 710, *Mackinnon v Donaldson*, *Lufkin*

*and Jenrette Securities Corporation* [1986] Ch 482 and *Barclays Bank v Homan* [1993] BCLC 680, he continued:

> 'In my judgment there is jurisdiction in this court to make an extra-territorial order in personam upon a person properly served here. The decisions in *Re Paramount Airways Ltd*, *MacKinnon*, and *Barclays Bank v Homan* seem to me to support that. But they equally support the view that as a matter of discretion extra-territorial orders against foreign bodies need to be justified by a relevant link with this jurisdiction. There is no such link in this case before me. It is not suggested that the London branch of Hannover Re had any connection with the reinsurance. I have no doubt therefore that but for the letter of request and s 426(4) this court would not make the worldwide order asked for on this application if it was asked to do so. The issue therefore narrows itself as to whether the letter of request either effectively compels or should tip the scales of discretion in favour of the making of the order sought. I have come to the conclusion that it does not. My reasons are as follows:
>
> First, as I have already indicated, I am content to accept for the purposes of this judgment that in the circumstances I should be prepared to grant the injunction asked for within this jurisdiction. That seems to me to satisfy the obligation made upon the court to assist. I am not refusing to assist because if asked for it I would grant assistance within the jurisdiction and it is only because it is not asked for that I do not grant that [relief] to that extent.
>
> Secondly, s 426(10) in its definition of insolvency law appears to me to give some guidance about the ambit of the relevant law in its final words "and extending to England and Wales".
>
> Thirdly, where this court is being asked to act extra-territorially it seems to me incumbent upon the applicant for such an order to show affirmatively why this, rather than the court which has the most connection with the subject matter of the proceedings, should give assistance. I can conceive of circumstances where in that court which has the closest connection with the subject matter of the proceedings there might be a lack of available remedies and that that could justify a request for extra-territorial action by this court. But that is not this case where the only reasoned criticism of the US jurisdiction under s 304 of the Federal Code is that it is more expensive. That seems to me to be an inadequate reason.
>
> Fourthly, I consider that the inclusion in the letter of request for an order within this jurisdiction should be disregarded in testing this question because it is not what is wanted. The request to this court should be understood as a request to act entirely and exclusively extra-territorially in a matter with no connecting factors with this jurisdiction other than the existence of a London office of a German organisation with a very wide, if not strictly worldwide trade. To make such an order, would, in my view, be contrary to established principles of private international law.
>
> Fifthly, I consider that there is no doubt whatever but that the country which has the closest connection with the arbitration treaties and the proposed arbitration thereunder is the USA. I have not, of course, forgotten that one of the provisions in the article which I have quoted is one to the effect that the arbitration can take place where the arbitrators decide.'

After referring to and rejecting a number of further points made by counsel for the joint provisional liquidators he concluded that the temporary order made by Harman J should be discharged.

The joint liquidators submit that Knox J was wrong. They ask this court to make orders against Hannover Re in the form set out in the letter of request. They contend that the court in England is mandated by s 426(4) to assist the Supreme Court in Bermuda and, given that a world wide injunction is the only possible or effective means of assisting, it is not entitled to exercise its own discretion and consider whether or not to grant an injunction of the type sought in the request. In the alternative, they submit, if this court is entitled to exercise its own discretion it should do so in favour of assisting the Supreme Court in Bermuda by making the orders it has requested.

For Hannover Re it is submitted that the orders sought by the letter of request do not come within s 426(4) at all, for to grant them would involve an exercise of the court's general equitable jurisdiction and not the application of insolvency law as defined in s 426(10). In the alternative it submits that the proper construction of s 426 requires the court in England to entertain the application by the foreign applicant notwithstanding its lack of jurisdiction apart from the section, to consider the relevant insolvency law and the subject matter of the request and if and to the extent that it thinks fit to grant the relief sought. It recognises that this approach may be thought to be contrary to the first instance decisions in *Re Dallhold Estates (UK) Pty Ltd* [1992] BCLC 621; *Re Bank of Credit and Commerce International SA (No 9)* [1994] 2 BCLC 636 and *Re Focus Insurance Co Ltd* [1996] BCC 659 and asks that to that extent they be overruled.

Hannover Re submits that the relief sought should be refused. It justifies this outcome on one or other of two bases. The first is that if the court in England has the general discretion for which it contends then it should be exercised so as to refuse the relief sought. The second is that if the court in England has the more limited discretion indicated in *Re Dallhold Estates (UK) Pty Ltd*, *Re Bank of Credit and Commerce International SA (No 9)*, and *Re Focus Insurance*, namely that it should do what is requested unless there is a good or compelling reason to the contrary, the absence of any connection with England and the existence of appropriate remedies in the USA with which the dispute is connected are sufficient reasons to refuse the orders sought. In the last resort it submits that the letter of request should not be complied with further than to grant an injunction restraining proceedings etc in England only, leaving the joint liquidators to apply in the USA for comparable relief there. Hannover Re also seeks, though faintly, to justify the withholding of relief on the grounds that the joint liquidators failed to disclose to Harman J the existence in the USA of the jurisdiction under the Bankruptcy Code, s 304 or of other proceedings pending against the company as elaborated in the affidavit of the principal deponent for Hannover Re.

In these circumstances it appears to me that the submissions should be dealt with under two broad headings, namely the construction of s 426(4), (5) and (10) and the application of those provisions so construed to the facts of this case. Each of those broad headings comprehends a number of separate issues which have to be resolved. I will deal first with the question of construction.

The issues which arise under this heading are:

(1)    What is comprised in the words 'insolvency law' as defined in subs (10)?
(2)    In the light of the answer to that question what is the inter-relationship between subss (4) and (5) with regard to the ability of the courts in England to assist the courts of the other parts of the UK or of the relevant countries or territories?
(3)    In the light of the answers to both those questions what is the nature and extent of the obligation imposed by subs (4)?

Before seeking to resolve those issues it is convenient to trace the legislative history of what is now s 426(4), (5) and (10) and consider such authorities on the construction of those provisions and their predecessors as exist.

Provisions for co-operation between the courts of England and Wales and the courts of other places in connection with the bankruptcy of individuals have existed since at least 1869. The provisions of the Bankruptcy Act 1869, s 74, the Bankruptcy Act 1883, s 118 and the Bankruptcy Act 1914, s 122 are for present purposes in identical terms so that it is only necessary to set out the terms of the last such provision before the enactment of Insolvency Act 1985 which with other legislation was consolidated into Insolvency Act 1986. The Bankruptcy Act 1914, s 122 provided as follows:

'The High Court, the county courts, the courts having jurisdiction in bankruptcy in Scotland and Ireland, and every British court elsewhere having jurisdiction in bankruptcy or insolvency, and the officers of those courts respectively, shall severally act in aid of and be auxiliary to each other in all matters of bankruptcy, and an order of the court seeking aid, with a request to another of the said courts, shall be deemed sufficient to enable the latter court to exercise, in regard to the matters directed by the order, such jurisdiction as either the court which made the request, or the court to which the request is made, could exercise in regard to similar matters within their respective jurisdictions.'

There appear to have been only four reported decisions of courts in England and one in Northern Ireland concerning the construction or application of any of the statutory predecessors of s 426(4) and (5) which bear on any of the issues we have to decide.

The first is *Re Levy's Trusts* (1885) 30 ChD 119. That case concerned the question whether the bankruptcy of the life tenant in New South Wales caused a forfeiture of his interest. Kay J decided that it did for the trustee in bankruptcy in New South Wales might have sought an order in aid under the Bankruptcy Act 1869, s 74 requiring the trustees of the settlement to pay the income to the trustee in bankruptcy. He considered that had he done so such an order would have been made 'as a matter of course'. There is no indication whether this was because of the lack of arguable defence or because of the requirement of the section that the courts in England 'shall severally act in aid of' every British court elsewhere.

The second is *Galbraith v Grimshaw* [1910] AC 508. In that case a bankruptcy order was made in Scotland after the making of a garnishee order nisi in England. The issue was which of the trustee in bankruptcy or the judgment creditor was entitled to the debt. The House of Lords, in agreement

with the Court of Appeal, decided in favour of the judgment creditor because the court in Scotland had had no power to interfere with the claim of the judgment creditor. At p 512 Lord Macnaghten said, in reference to the Bankruptcy Act 1883, s 118:

> 'The Act does not say that a Scotch sequestration shall have effect in England as if it were an English bankruptcy of the same date. It only says that the courts of the different parts of the UK shall severally act in aid of and be auxiliary to each other in all matters of bankruptcy. The English court, no doubt, is bound to carry out the orders of the Scottish court, but in the absence of special enactment the Scottish court can only claim the free assets of the bankrupt.'

Again, because of the circumstances of that case, it is not clear whether the English court was so bound because of the provision of the Act or because of the absence of any reasonable alternative.

The third case is *Re Osborn ex parte Trustee* [1931–32] B&CR 189. In that case a bankruptcy order had been made in the Isle of Man pursuant to which the trustee sought to recover real and personal property of the bankrupt in England. For that purpose the trustee sought and obtained from the court in the Isle of Man an order that a request be made to the High Court in England for declarations that the whole of the real and personal estate of the bankrupt situate in England 'became vested in the trustee' on the date of the bankruptcy order or that such property should vest in the trustee from the date of the declaration or for such other declarations as the court thought fit. The trustee applied to the court in England for declarations that certain specified real and personal property of the bankrupt had so vested, for the appointment of a receiver, for a vesting order and for such other orders as the court thought fit for the purpose of enabling the trustee to obtain possession and control of the specified property. During the course of argument Farwell J indicated that the court had a discretion. Counsel for the applicant disputed this and relied on the terms of the Bankruptcy Act 1914, s 122. In his judgment, at p 194, after describing the facts of the case, Farwell J said:

> 'I think it is clear that I am bound in a proper case under s 122 to assist the court in the Isle of Man in the bankruptcy which is the bankruptcy under that jurisdiction. I think under the section it is plain that this court must give such assistance as it can, but subject of course, to the considerations which would arise if there was also a bankruptcy in this country, as to the rights of the creditors and other persons in this country. There not being any such conflict, I think this court is bound to give all the assistance that it can. On the other hand, it is in my judgment, a matter of discretion in this court as to what assistance it ought to give in each case, and I think I am therefore certainly entitled to impose conditions in any order which I think it right to make in aid of the bankruptcy in the Isle of Man.'

The judge concluded that he could not make the declaration or vesting order sought but that he could and should appoint a receiver for otherwise it would not be possible to assist the bankruptcy in the Isle of Man 'which I think that I am bound to do if I can'. He decided to impose conditions on the appointment including one that the trustee should submit to the jurisdiction