and abide by the decisions of the court in England on any question arising in respect of property in England.

A leading textbook on bankruptcy, namely Williams on Bankruptcy, (18 edn, 1968), noted under s 122 that the High Court was bound to give assistance but had a discretion as to what assistance it ought to give. This note was plainly in accordance with the then reported authorities, in particular Re Osborn.

The fourth case is the decision of Lord Lowry, then Lord Chief Justice of Northern Ireland, in *Re Jackson (A Bankrupt in the Republic of Ireland)* [1973] NI 67. In that case the bankrupt had carried on business in the Republic where he was made bankrupt. The day before the order to that effect he gave a cheque to solicitors in Northern Ireland with instructions to use the money in the purchase of a house for his wife. The court in the Republic made an order for a request to be made of the court in Northern Ireland for an order declaring that the real and personal estate of the bankrupt situate in Northern Ireland had vested in the trustee in bankruptcy. Lord Lowry considered that the Bankruptcy Act 1914, s 122 applied. He adverted to the question which had arisen concerning the exercise of the discretion by the court requested to act in aid. He considered that the terms of the statutory provision was mandatory in form and that in general the intention was that once the necessary conditions were satisfied it was the duty of the court to give such assistance as it can. He referred to the judgment of Farwell J in *Re Osborn* and continued, at p 72:

'There appears, with respect, to be a conflict between the duty of a court to give "all the assistance that it can" and its discretion to decide what assistance it ought to give in each case, since the exercise of discretion may result in the courts giving less assistance than it can.

While there may be examples which have not occurred to me, I consider that, except in cases of conflicting bankruptcies and those where the applicant seeks to enforce another country's revenue laws, this court is bound to give under the relevant provisions every assistance in its power. To impose, as Farwell J did and as I intend to do, conditions designed to uphold the bankruptcy jurisdiction of this court while acting in aid is not the same thing as exercising discretion to refuse aid.'

In the event he made an order declaring that the real and personal estate of the bankrupt had vested in the trustee in bankruptcy appointed by the court in the Republic but on substantially the same conditions as Farwell J had imposed in Re Osborn.

In *Williams on Bankruptcy* (19 edn, 1979), the note to s 122 was changed. At p 475 it was stated that orders under the section were known as 'orders in aid' and that they were discretionary. No authority was cited for the latter proposition and none was suggested to us during the course of the hearing. I can only assume that the note reflected the editors' reassessment of the effect of the decisions to which I have referred. As the note has probably been the source for other similar statements (see for example Dicey & Morris *The Conflict of Laws* (11 edn), p 1106) it is of some importance to identify its origin.

The fifth case is *Re a Debtor ex parte Viscount of the Royal Court of Jersey* [1981] Ch 384. In that case sequestration proceedings similar to

bankruptcy proceedings had been commenced in Jersey in respect of the movable property of an English solicitor. The court in Jersey made a request to the High Court in England for an order enabling the viscount to discharge the duties conferred on him by the court in Jersey and to appoint him receiver of the movable property in England of the solicitor with authority to take all such steps as might be necessary. In relation to this request Goulding J, at p 402, said:

> 'I do not think that this court, when requested for aid under s 122 of the Act of 1914, has any general duty to scrutinise the requesting court's transactions once it is satisfied that the case falls within the scope of the section. Farwell J said, in *Re Osborn* [1931–32] B&CR 189, 194: "There not being any such conflict, [ie conflict with a current English bankruptcy] I think this court is bound to give all the assistance it can". Lord Lowry LCJ took the same view of the section in Re Jackson [1973] NI 67, preferring it to that expressed by Walsh J in the Irish case of *Re Gibbons* [1960] I Jur Rep 60, where Walsh J thought such provisions to be merely enabling and discretionary. I respectfully agree with Farwell J and Lord Lowry CJ, while recognising that the court might have to refuse aid if it were proved that the anterior proceedings were hopelessly bad under their own proper law, or that they offended against some overriding principle of English public policy.'

Like Farwell J and Lord Lowry CJ before him Goulding J imposed similar conditions on his order appointing the viscount receiver of all the movable property of the solicitor in England.

In the course of the submissions for the joint liquidators it was suggested that s 426 was obscure, ambiguous and, on one construction, might lead to absurdity. On that view and in accordance with the decision of the House of Lords in *Pepper (Inspector of Taxes) v Hart* [1993] AC 593 we were invited to and did look at the report in Hansard of the introduction into the Insolvency Bill 1985 of the new clause which subsequently became the Insolvency Act 1985, s 213 and was re-enacted as the Insolvency Act 1986, s 426 as part of the consolidation carried out by the latter Act. The report in Hansard for 18 July 1985 columns 550 and 551 shows in the speech of the responsible minister that the purpose of the new clause was to give effect to the recommendations of the Cork Committee contained in ch 49 of their report. It was reported as the view of the minister that the clause created a complete intra-UK system of reciprocal enforcement in respect of bankruptcy, winding up, receivership and the new administration order procedure.

Chapter 49 of the Report of the Review Committee on Insolvency Law and Practice (Cmnd 8558) (chaired by Sir Kenneth Cork) was concerned with extra-territorial aspects of insolvency law. In para 1909 it referred to the Bankruptcy Act 1914, s 122 which, in para 1910, it described as conferring powers 'which are discretionary only'. I infer that the source for that statement was the note in *Williams on Bankruptcy* (19 edn), p 475. The recommendations were that the mutual aid provisions suitably remodelled should be applicable in winding-up proceedings (para 1911) and that provision should be made for the reciprocal enlargement of such remodelled provisions particularly within the Commonwealth (para 1912).

Case 1:23-cv-00630-CFC   Document 12-5   Filed 08/23/23   Page 3 of 300 PageID #: 1070

It is evident that these recommendations were carried out. Section 426(4) and (5) extended the mutual aid provisions to insolvency generally and replaced the somewhat outdated references to 'every British Court' with references to, amongst others, the courts of relevant countries and territories, being those specified by the Secretary of State pursuant to subs (11)(b). This enabled recognition of other countries or territories on a reciprocal basis which has been carried out by the Co-operation of Insolvency Courts (Designation of Relevant Countries and Territories) Orders 1986 and 1996. But the introduction into s 426 as a whole of criteria by reference to 'insolvency law' and the definition of those words in subs (10) was new. No problem arises therefrom in connection with the reciprocal enforcement of judgments throughout the UK under s 426(1) for by the same Act s 18(3) Civil Jurisdiction and Judgments Act 1982 was amended. The effect of the amendment was to except from the reciprocal enforcement of judgments under that section only those for which reciprocal enforcement was provided by s 426. This was achieved by using the same definition of insolvency law. Thus, contrary to the argument of counsel for the joint liquidators, there can be no gap in the provisions for reciprocal enforcement if one rather than another construction of those words is adopted.

The provisions of s 426 have been considered in three reported cases two of which were decided before and considered in the judgment of Knox J now under appeal. The first is the decision of Chadwick J in *Re Dallhold Estates (UK) Pty Ltd* [1992] BCLC 621. In that case a company incorporated and in liquidation in Australia ('Investments') petitioned in Australia for the winding up of its wholly owned subsidiary also incorporated in Australia ('Estates') and obtained the appointment of a provisional liquidator. Estates was the tenant of land in England under a lease terminable on bankruptcy or winding up. In the light of advice received from solicitors in England Investments, instead of pressing for a winding-up order in respect of Estates, sought from the Court in Australia an order that a request should be made to the court in England for the making of an administration order under s 8 of the Insolvency Act 1986. Gummow J acceded to that application and made a declaration that it was desirable to request the assistance of the English courts; that assistance might be provided by the making of an administration order if the English court having charge of the matter thought fit so to order; or by the making of such further or other order as it might consider appropriate. The application for an administration order in respect of Estates was made to the High Court in England by Estates, acting by its provisional liquidator appointed by the court in Australia, and by Investments. It was opposed by two creditors one of which was the landlord under the lease to Estates. The problem, as explained by Chadwick J at p 623 was that s 8 of the Insolvency Act 1986 only applied to a company registered in England. Accordingly, he could only provide the assistance sought by the court in Australia if, pursuant to s 426(5), he could apply the insolvency law of England to a company incorporated in Australia. He analysed the two subsections in a passage which should be cited in full. At p 626 he said:

'For the purposes of those two subsections, insolvency law in England and Wales means or includes any provision made by or under the Insolvency Act 1986 (see s 426(10)). It is common ground that Australia is a relevant country or territory for the purposes of those subsections by virtue of an

order made by statutory instrument, and the definition in subs (11).

The two subss (4) and (5), read together, envisage that assistance will be requested by a foreign court from the English court. If the English court were intended only to exercise the jurisdiction which it would have under domestic insolvency law in relation to the assistance requested, there would be no need for the provisions of subs (5).

It appears to me clear that the purpose of s 426(5) of the Insolvency Act 1986 is to give to the requested court a jurisdiction that it might not otherwise have under domestic insolvency law in order that it can give the assistance to the requesting court which, by subs (4), it is directed to give.

The scheme of subs (5) appears to me to be this. The first step is to identify the matters specified in the request. Secondly, the domestic court should ask itself what would be the relevant insolvency law applicable by the domestic court to comparable matters falling within its jurisdiction. Thirdly, it should then apply that insolvency law to the matters specified in the request, notwithstanding that on this hypothesis, those are matters which would not, or might not, otherwise fall within its jurisdiction by reason of some foreign element.

Also, of course, the domestic court is authorised to apply those provisions of the foreign insolvency law which the foreign court could apply to comparable matters falling within the jurisdiction of the foreign court; but that is not an issue in this case.

The result is that the English court can act on a request by the Federal Court by applying to the matters specified in the request provisions of English insolvency law, including the provisions of s 8 of the 1986 Act, which the English court could apply to comparable matters falling within the jurisdiction of the English court. Comparable matters for this purpose must, in my view, include matters in which all the facts were the same as those specified in the request, save that the company concerned was a company incorporated in England rather than a company incorporated in Western Australia.

I should perhaps add that it is my view that the proviso to subs (5) is directed towards the only discretion that can be exercised under subs (5), namely, the discretion of the requesting court in deciding whether or not to make a request. There is nothing in subs (5) which confers a discretion on the requested court.'

Then he passed to a consideration of the provisions of s 8 of the Insolvency Act and, at p 627, continued:

'In a purely domestic case, if conditions (a) and (b) of s 8(1) are satisfied, the court has a discretion whether or not to make an administration order: that must be the effect of the use of the word 'may' in the final line of that subsection. However in circumstances where jurisdiction is conferred by s 426, it appears to me that the position may well be different. Section 426(4) provides, as I have already indicated, that the requested court shall assist the courts having corresponding jurisdiction in the foreign country.

Those are mandatory words. It appears to me that their effect is such that, if the conditions set out in paras (a) and (b) of s 8(1) of the 1986 Act are satisfied, then this court ought to make an administration order – and

so give the assistance required – unless there is some compelling reason why that should [not] be done.'

After quoting from the judgments of Farwell J in *Re Osborn* and Goulding J in *Re a Debtor* he returned to the point at p 628 where he said:

> 'In those circumstances it seems to me that the English court, faced with a request, is required to satisfy itself that conditions (a) and (b) in s 8(1) have been fulfilled; but once satisfied of that it should ordinarily make the administration order sought by the foreign court as a matter of course, so giving effect to the mandatory requirements of s 426(4) of the 1986 Act.
>
> In the present case, condition 1(a) of s 8 is clearly satisfied. There is no dispute that Dallhold Estates is or is likely to become unable to pay its debts.
>
> In relation to condition 1(b) I must consider whether the making of an administration order would be likely to achieve a more advantageous realisation of the company's assets than would be effected on a winding up. And I must consider that having regard only to the matters specified in the request which confers jurisdiction upon the English court. It is not open to this court, when giving assistance in response to a request under s 426 of the 1986 Act, to engage in a far-ranging inquiry which goes beyond the matters specified in the request.'

The second case is the decision of Rattee J in *Re Bank of Credit and Commerce International SA (No 9)* [1994] 2 BCLC 636. Though the case went to appeal, the Court of Appeal was not concerned with the construction or application of s 426. The material facts for the purposes of this appeal are those relating to BCCI Overseas. That company was incorporated in the Cayman Islands and was being wound up there. The liquidator obtained from the court in the Cayman Islands an order that a request be made to the High Court in England under s 426 to assist that court by making orders against a former director and employee under ss 212, 213, 214, and 238 of the Insolvency Act 1986 substantially in the form sought 'if and insofar as the High Court … considers it just and appropriate that such orders be made'. Armed with this request the liquidator obtained leave in England to serve out of the jurisdiction on those former directors or employees applications under ss 212, 213, 214 and 238 of the Insolvency Act 1986 seeking relief under those statutory jurisdictions for misfeasance, fraudulent or wrongful trading and in respect of transactions at an undervalue. In support of and to protect those claims they applied for and were granted world wide Mareva injunctions to restrain the respondents from dissipating or secreting their assets. When served the respondents applied for the applications and injunctions to be set aside. They contended that s 426(5) limited the English law applicable to the procedural as opposed to the substantive law, and that the letter of request was not a request within that subsection. Rattee J referred to s 426 and its statutory predecessors and the earlier cases to which I have referred. He agreed with the analysis of the section given by Chadwick J in *Re Dallhold* save that he considered that subs (5) did confer on the court in England a discretion as to which of the two possible insolvency laws to apply. He rejected the submission that such laws were limited to procedural laws. He then posed the question whether the court

should exercise the jurisdiction conferred by s 426(5) and continued (at pp 657–658):

> 'Section 426(4) of the 1986 Act imposes an obligation on this court to assist the Grand Court. As I have said, this court nonetheless does have a discretion as to how it should give assistance (cf the similar approach of Farwell J to the application of s 122 of the Bankruptcy Act 1914 in the passage from his judgment in *Re Osborn ex parte the trustee* [1931–32] B&CR 189 which I have quoted earlier in this judgment). In my judgment, this court should exercise its discretion in favour of giving the particular assistance requested by the Grand Court unless there is some good reason for not doing so. As the concluding words of s 426(5) make it clear, one such reason could in some cases be found in the rules of private international law, such as where the request is such to comply with it would infringe the rule enforcing another country's tax claims.'

The third case on s 426 is the decision of Sir Richard Scott V-C in *Re Focus Insurance Co Ltd* [1996] BCC 659. The company Focus had been incorporated in Bermuda and was in the course of being wound up there. Focus had obtained judgment in Bermuda for a substantial sum against a former director and an order for his examination there as to his assets. In addition Focus had obtained a bankruptcy order against him in England. A letter of request from the Supreme Court of Bermuda asked the High Court to make orders against the former director designed to secure his examination in England as to his assets. The application before the court was that of the liquidator of Focus seeking orders in terms of those referred to in the letter of request. It was opposed by the former director. After referring to the terms of s 426 and the decisions of Chadwick J and Rattee J, Sir Richard Scott V-C continued at p 665:

> 'So there I have two very similar approaches – Chadwick J: do what you are asked unless there is a compelling reason not to do so; Rattee J: do what you are asked unless there is some good reason for not doing so.
> I am content to accept that guidance as to the manner in which an application under s 426(4) should be approached by the court.'

After considering the various objections of the former director he concluded at p 668:

> 'So, I am faced with the question as to the propriety of making an order to assist foreign liquidators to obtain assets of an English bankruptcy and in circumstances in which the foreign liquidators were the petitioning creditors in the bankruptcy, and, moreover, in circumstances in which what would be required of Mr Hardy under the proposed order could, as I see it, be required of him by his trustee in bankruptcy in this country at any time.
> There is, so far as I know, no authority on this point. The circumstances are, perhaps, too peculiar to make that a matter of any surprise. There is, however, plainly some element of discretion vested in me as to whether I should or should not accede to the originating application pursuant to the letter of request notwithstanding that subs (4) of s 426 uses the words 'shall assist'. It seems to me the inconsistency between what is now

> sought by the joint liquidators and the status of Focus as a creditor in an English bankruptcy does constitute good reason why I should not make the order that is sought. There is, moreover, I think, an element of oppression – I do not put this as a very strong point but I think it is there as a point – in that whatever order may be made pursuant to the originating application, obliging Mr Hardy to provide information, documents and so forth to the joint liquidators for the purposes of the Bermudian liquidation, Mr Hardy could be asked by the trustee in bankruptcy to repeat the process for the purposes of the English bankruptcy. It would seem to me oppressive that that should happen twice. The proper forum for the information and documents to be sought and supplied seems to me to be the English bankruptcy.'

The Vice-Chancellor concluded, at p 669, that it would not be proper to provide the Bermudian court with the assistance it sought for the purpose for which it sought it. In the later case of *Bank of Credit and Commerce International (SA) (No 10)* [1996] 4 All ER 796 at p 828 the Vice-Chancellor commented that the letters of request in that case required him to assist the Manx and Scottish courts, but that he had a discretion as to the nature of the assistance to be provided.

    In my view this historical survey of the authorities and statutory predecessors of s 426 reveals a number of material propositions. First, in all the earlier cases the assistance afforded to the requesting court was the result of the exercise of this court's general equitable jurisdiction. Thus receivers were appointed in *Re Osborn*, *Re Jackson* and *Re a Debtor* so as to give control over the assets here of the person made bankrupt in the other jurisdiction. There was no suggestion in either the earlier statutory provisions nor in the cases that the courts here were somehow limited in their jurisdiction to afford assistance to what they were entitled to do under the express provisions of the Bankruptcy Act then in force. Secondly the orders made in each of those cases recognised in the conditions imposed that issues between the trustee in bankruptcy and third parties would have to be determined by due process of law. Thus the trustee was required to submit to the jurisdiction and to abide by the decision of the court here in all matters concerning the assets of the bankrupt in England. Thirdly, it was not the intention of Parliament when enacting s 426 of the Insolvency Act 1986 and its predecessor in the Insolvency Act 1985 to restrict the jurisdiction or ability of the courts in England to afford assistance to the courts of the other parts of the UK or of the other relevant countries or territories. Fourthly, whereas the cases decided under the earlier legislation are all ones in which the court exercised its general jurisdiction, all those decided under s 426 in which the assistance sought has been given are examples of the court exercising a jurisdiction conferred specifically by the Insolvency Act 1986 (*Re Dallhold*) or of its general powers as ancillary to such jurisdiction (*BCCI No 9*). Fifthly, in all the cases in which assistance was actually being sought, that is in all those to which I have referred except *Re Levy* and *Galbraith v Grimshaw*, the judge concerned has recognised that the requesting court was not entitled to assistance as of right but that there was some discretion in the courts here to determine whether and if so in what terms assistance should be given. This reservation has been variously expressed as shown by the passages in the judgments I have quoted.

As I indicated earlier the first issue arises in connection with s 426(10). For Hannover Re it was submitted that the definition in para (a) and thence in (d) was clear and limited what was embraced by those words to the specific statutory provisions referred to and the subordinate legislation authorised by and made under them. It was argued that Knox J was wrong to have reached the different conclusion I have already quoted. For the joint liquidators it was submitted with force that there is no reason to attribute to Parliament any intention to restrict the field over which or the way in which the courts in England and Wales might give assistance. In particular it would be absurd to limit insolvency law to the substantive provisions contained in the legislation, primary or subordinate, to the exclusion of the power of the courts to make those provisions effective by the grant of injunctions and the enforcement of such orders by contempt proceedings. Counsel for Hannover Re accepted that such ancillary powers must be included in the words 'insolvency law' but maintained that those words still could not embrace final injunctions granted in exercise of the jurisdiction of the court which is either inherent or conferred by or under some other statute.

It seems to me that the wording of subs (10) is such as to supply a complete definition. Thus it states what the words 'insolvency law' mean, not what they include. Further, the words 'provision made by or under this Act' do not in their normal meaning include provision made by some quite different Act such as the general power to grant injunctions under s 37 of the Supreme Court Act 1981. I am unimpressed by the absence of any article, definite or indefinite, before the word 'provision'. But, like Knox J, I would seek to give to the definition as wide an ambit as I could if that was the only way of preserving to the court the general jurisdiction it can be seen to have been exercising in *Re Osborn*, *Re Jackson* and *Re a Debtor*. But I do not think that it is necessary to do so.

The earlier statutory provisions referred to the request of the other court as being 'sufficient to enable [the English] Court to exercise … such jurisdiction as [it] could exercise in regard to similar matters within [its] jurisdiction'. The earlier references to 'jurisdiction in bankruptcy' and 'jurisdiction in bankruptcy and insolvency' were used to identify the courts to which reference was being made. But the jurisdiction which might be exercised was not so limited. Thus on a request to the High Court in England for assistance in a form it could not give did not inhibit it from exercising its general equitable jurisdiction to appoint a receiver. The fact that the jurisdiction to do so did not arise under the Bankruptcy Act for the time being in force was immaterial.

In my view the position is the same under s 426. The reference to 'insolvency law' in subs (4) serves to identify the courts in any part of the UK on which the obligation to assist is cast. Those courts have their usual jurisdiction and powers as such courts; in England they are the High Court and certain county courts. There is nothing in s 426 to exclude the general jurisdiction and powers vested in those courts as such under the laws of England and Wales. The purpose of subs (5) is not to reduce that jurisdiction or those powers but for the purposes of subs (4) only to extend them. Thus the court in England, faced with a request from a relevant country may in respect of the matters specified in the request apply either the insolvency law of the relevant country concerned or its own insolvency law. By itself this would not be of much help for the courts of the relevant country would not

normally see much point in making a request to the courts of England in preference to applying its own insolvency law; and if it could not do so it would be unlikely that the court in England could. Moreover, the court in England would not require the further authority of subs (5) to apply all the provisions of the Insolvency Act 1986 in accordance with their terms. Consequently, the concluding words of subs (5) introduce the hypothesis that the matters specified in the request fall within the jurisdiction of the court applying the insolvency law under consideration insofar as 'comparable matters' would do so. I agree with the analysis of Chadwick J in *Re Dallhold* [1992] BCLC 621 at p 626 which I have already quoted. Thus there is available to the court in England when asked for assistance by the court of a relevant country under s 426 (a) its own general jurisdiction and powers and either (b) the insolvency law of England and Wales as provided for in the Insolvency Act 1986, the specified sections of the Company Directors Disqualification Act 1986 and the subordinate legislation made under any of those provisions or (c) so much of the law of the relevant country as corresponds to that comprised in (b). In the case of (b) and (c) but not (a) the court in England is entitled to apply such law on the hypothesis as to jurisdiction concerning the matters specified in the request to which I have referred. Thus in *Re Dallhold* Chadwick J applied (b) and in *Re BCCI (No 9)* Rattee J applied (a) and (b). In each of the three earlier cases the judge in question applied (a). It seems to me that on this construction the evident intention of Parliament is given effect to without distorting the language of subs (10). Accordingly, I disagree with Knox J as to the proper construction of subs (10) but that may not lead to any different result as to the outcome of the request in this case.

That conclusion largely disposes of the second issue also. The purpose of subs (5) is to extend the jurisdiction of the court. This is achieved in two ways. First, by enabling certain assumptions as to jurisdiction to be made in the application of the insolvency law of England and secondly, by enabling the court in England to apply the insolvency law of the country the court of which made the request again on an assumption as to jurisdiction to enable that to be done. The request has a dual effect. First, it informs the court here what assistance is sought for the purposes of subs (4). Secondly, it is the trigger to the enlarged jurisdiction for which subsection (5) provides. But there is nothing in either subs which requires the court in England merely to grant the assistance sought, for subs (4) does not refer to the request and subs (5) does not require assistance to be given by reference to the request.

It is in those circumstances that the third issue arises. The obligation to assist is imposed on a court, not some executive agency. It would in my view require very clear words to justify a conclusion that the court in England was not intended by Parliament to perform its normal function of seeking to do justice in accordance with the law. There is no such indication. Accordingly, the function of the court under s 426 must be to consider whether in accordance with the three sources of law I earlier identified as (a), (b) and (c) the assistance may properly be granted. If it may then it should be, thereby discharging the statutory duty imposed by s 426. But if it may not be properly granted then it should be withheld for it must be implicit in the fact that the duty is cast on a court that the duty is qualified by reference to what the court may properly do as a court. Of course if the court in England cannot do exactly what is sought then it should consider whether it can

properly assist in some other way in accordance with any of the available systems of law. Thus the reasons for withholding assistance either as sought or in any other way are not limited to reasons of public policy. Of course public policy is a reason why assistance may be impossible under (a) or (b). But it is by no means the only reason. Further public policy might prevent assistance being given under (c) if the provision of the insolvency law of the country the court of which requested the assistance were contrary to the public policy recognised by the court in England. In my view the court must consider in all cases whether the assistance sought or any other comparable assistance may be properly granted in accordance with the laws the court is authorised to apply on the hypotheses likewise permitted.

In some cases the assistance sought is, in accordance with the system law (sc (a), (b) and (c)) under which it is available, discretionary. Obviously the fact of the request for assistance is a weighty factor to be taken into account. Further the court in England may be expected, as Knox J did in this case, to accept without further investigation the views of the requesting court as to what was required for the proper conduct of the bankruptcy or winding up. But I do not think that the request can ever be conclusive as to the manner in which the discretion of the court should be exercised. It would be incompatible with the principle of the law which was being applied that the decision was one for the discretion of the court if the fact of the request was anything more than a factor, however weighty. In my view this is the justification for the reservations expressed, in various ways, by all the judges who have been faced by requests for assistance under s 426 or its statutory predecessors.

In summary therefore I would reject the submission of counsel for the joint liquidators that the only ground on which a request for assistance may be refused is public policy or that the only discretion of the court is to decide which system of law made available under subs (5) to apply and how, as opposed to whether, the assistance is to be rendered. But I would also reject the submission of counsel for Hannover Re that the only obligation of the court in England is to entertain the application for assistance. The assistance should be given if, in accordance with the law to be applied, the relief sought may properly be granted. In cases requiring the exercise of a discretion the fact of the request is a weighty matter to be taken into account but it cannot outweigh all others. In my view, having regard to the circumstances of the individual cases, in none of *Re Dallhold*, *Re BCCI (No 9)* and *Re Focus Insurance Co Ltd* did the judge adopt an approach not warranted by the section; contrary to the submission of counsel for Hannover Re, I would approve rather than overrule them.

I pass then to consider the application of s 426(4), (5) and (10) so construed to the facts of this case. The first question is whether any of the three systems of law to which I have referred as (a), (b) and (c) enable the court in England to grant injunctions in the form sought by the Supreme Court in Bermuda, in the case of (b) and (c) on the hypothesis required by subs (5).

It is common ground in this court that the insolvency law of Bermuda and the insolvency law of England entitle the courts of those respective countries to grant in respect of the company being wound up or its assets within their jurisdiction injunctions to restrain actions or proceedings being commenced or proceeded with or executions being put into force within that jurisdiction.

In England the jurisdiction is conferred by s 130(2) of the Insolvency Act 1986. Section 167(4) of the Bermuda Companies Act 1981 is in the same terms. It was suggested by counsel for the joint liquidators that the territorial limitation under both provisions might be ignored because of the hypothesis required by s 426(5). That hypothesis would enable the court in England to apply s 130(2) of the Insolvency Act 1986 notwithstanding that the company was not incorporated in England and is not being wound up here but would not entitle it to disregard the territorial limits to the relief it might give, for that could not be a comparable matter falling within its jurisdiction. Similarly in the case of s 167(4) of the Bermuda Companies Act 1981 the court here could grant an injunction to restrain proceedings etc in England for that would be the comparable matter to that which is within the jurisdiction of the court in Bermuda. But it would not be entitled to ignore the limit on the jurisdiction of that court. In short it is not open to the court in England under s 426(5) to ignore the territorial limitation common to the relevant provision in the insolvency law of each of them.

Accordingly, the only system of law under which the assistance sought may properly be given is that which I have earlier identified as (a), namely the general jurisdiction of the court in England. It is common ground that the court in England may grant an injunction against a person properly served in accordance with the law of England restraining him from commencing or prosecuting an action or other proceeding, including any process of execution, anywhere in the world. The issue is whether such an injunction should be granted in this case.

It is convenient at this stage to note submissions for each party as to the proper exercise of that jurisdiction albeit made in connection with the different point of whether on the true construction of s 426 Knox J was entitled to refuse to grant the relief which the letter of request sought. The joint liquidators criticised the reliance of Knox J on *Mackinnon v Donaldson, Lufkin and Jenrette Securities Corporation* [1986] Ch 482, *Re Paramount Airways Ltd* [1992] BCLC 710 and *Barclays Bank v Homan* [1993] BCLC 680 as justification for his refusal. This was in connection with their submission on the proper construction of s 426 that in cases where it applied the request was mandatory. I have already rejected that submission. But I did not understand the joint liquidators to contend that if that submission was rejected the test propounded by Knox J in the passage at p 35 of his judgment which I have already quoted was inapposite. That test was that 'as a matter of discretion extra-territorial orders against foreign bodies need to be justified by a relevant link with this jurisdiction'. It was contended that the letter of request and hence the application of s 426, even if it did not exclude all discretion as to whether or not to grant the relief sought, made all the difference to the exercise of such discretion as does exist.

For Hannover Re we were referred to a line of authority which demonstrated the willingness of courts in England to restrain foreign proceedings by a creditor who has or is entitled to prove in an insolvency in England from seeking to obtain for himself alone the assets of the insolvent situate abroad. The line consisted of *Carron Iron Co Proprietors v Maclaren* (1855) 5 HL Cas 416; *Re South Eastern Portugal Rly Co* (1869) 17 WR 982; *Re Oriental Inland Steam Co ex parte Scinde Rly Co* (1874) LR 9 Ch App 557; *Re International Pulp and Paper Co* (1876) 3 ChD 594; *Re North Carolina Estate Co Ltd* (1889) 5 TLR 328; *Re Central Sugar Factories of*

*Brazil*; *Flack's Case* [1894] 1 Ch 369; *Re Belfast Shipowners Co* [1894] 1 IR 321 and *Re Vocalian (Foreign) Ltd* [1932] 2 Ch 196. These cases were relied on to show that the jurisdiction to restrain foreign proceedings in connection with an English insolvency arose under the general jurisdiction of the court and not a provision which could have been treated as insolvency law as defined in s 426(10). This point does not arise because of the view I have formed as to the proper construction of s 426. But they were also relied on to show that the general jurisdiction to grant such injunctions in connection with insolvencies was limited to cases concerning creditors of the company seeking to obtain an advantage at the expense of the general body of creditors. Thus, it was contended, they could have no relevance to a case such as the present where it is sought to restrain, not a creditor, but a debtor. That submission is right if the basis for those decisions is only that referred to in Flack's case; namely that the creditor has notice of the statutory trust affecting all assets of the company being wound up in England with the consequence that he is accountable to the liquidators for any asset so subject which he obtains abroad. That principle cannot apply to a debtor seeking to establish that he is not liable to the insolvent at all.

However, as indicated by the advice of the Privy Council in *SNI Aérospatiale v Lee Kui Jak* [1987] AC 871 at pp 892–893 this line of cases is merely one category which illustrates the much wider basis on which the courts in England will restrain a person served in England from commencing or pursuing proceedings abroad. It is that basis which applies in this case, which, as indicated in that advice (pp 892–893), is dependent on four basic principles. First, the jurisdiction is to be exercised when the ends of justice so require. Secondly, the injunction is directed to the person enjoined, not the foreign court. Thirdly, the person to be enjoined must be amenable to the jurisdiction of the English court so that the remedy may be effective. Fourthly, the jurisdiction must be exercised with caution. As stated by Hoffmann J in *Barclays Bank v Homan* [1993] BCLC 680 at p 687:

> '… both comity and common sense suggest that the foreign judge is usually the best person to decide whether in his own court he should accept or decline jurisdiction, stay proceedings or allow them to continue.'

Hannover Re relies on the fact that there is available in the USA a procedure under s 304 of the Federal Bankruptcy Code whereby the joint liquidators might obtain injunctions restraining the continuation of the arbitration proceedings in any of the state courts. It is contended that the first principle laid down in *SNI Aérospatiale v Lee Kui Jak* is not, therefore, satisfied.

The evidence includes affidavits from lawyers qualified to practice in the USA concerning the jurisdiction and powers of the Federal Court under that section. It does not appear to be disputed that it is open to the joint liquidators to apply under that provision for an injunction to restrain proceedings, including arbitration proceedings, in the courts of any of the states. Such an application is ancillary to the foreign insolvency. The injunction may be granted so as to restrain any action against a debtor, for example the company, with respect to property involved in the foreign insolvency or the enforcement of an order concerning such property. The section sets out the considerations the court is to have in mind when

considering whether to exercise that jurisdiction; they include 'comity'.

The evidence sworn since the judgment of Knox J discloses that the joint provisional liquidators applied to the court in Bermuda for directions whether to make an application under s 304. On 10 June 1996 the court in Bermuda directed them to make such an application. Subsequently they were authorised to defer the application until the appointment of joint liquidators consequent on the winding-up order made on 26 July 1996. The joint provisional liquidators were appointed joint liquidators on 12 September 1996 and the order to that end specifically conferred power on them to make the application directed by the order of 10 June 1996. As at 29 November 1996 no definite decision had been taken by the joint liquidators about whether or when to apply for relief pursuant to s 304 of the Federal Bankruptcy Code. It is not disputed that Hannover Re may be sued in Chicago, Illinois, USA as it has a place of business there. Accordingly, there does not appear to be any impediment to an application by the joint liquidators for a nationwide injunction restraining Hannover Re from commencing or proceeding with any action or other proceeding against the company.

The joint liquidators contend that a successful application under s 304 would not be as efficacious as a worldwide injunction granted by the court in England pursuant to the letter of request. They point out that an injunction granted under s 304 might not be effective outside any of the United States and that it would be up to the arbitrators, not the parties, to decide where to conduct the arbitration. This is countered by Hannover Re offering an undertaking to this court that if the Federal Court grants an injunction under s 304 it would not commence or proceed with any action or arbitration outside the USA. It is suggested that it is inconceivable that the arbitrators would proceed with an arbitration outside the USA contrary to the wish of one of the parties and in the face of an injunction restraining the other.

In considering whether, and if so how, this court should exercise the jurisdiction to restrain proceedings abroad it is also necessary to consider matters occurring since the letter of request was signed by the Chief Justice of Bermuda. The letter stated that it was necessary for the purposes of justice and to assist the joint provisional liquidators for the relief sought to be granted. But that was signed on 9 February 1996 and much has happened since. Normally it would not be appropriate for the court in England to inquire into the basis for the views expressed by the court of the country making the request. But there is no reason of comity or justice to prevent it from considering subsequent events.

In the affidavit of Mr Hughes, one of the joint liquidators, sworn on 12 February 1996, he stated that the demand for arbitration made by Hannover Re on 10 January 1996 challenged the entire process of the liquidation and the existence of the company as a Bermudian corporation, the basis for any scheme of arrangement which the joint liquidator might formulate and appeared to be an attempt by Hannover Re 'to derail the … liquidation in Bermuda and to frustrate the orderly achievement of the objects of the … liquidation'. He indicated that the assistance of the court in England was sought because Hannover Re might be sued here but could not be sued in Bermuda. This view is readily understandable in the light of the fact that at that time the demand for arbitration sought as one alternative an order that the company withdraw its winding-up petition and redomesticate back in

Massachusetts. But that claim has now been abandoned. Accordingly the only relief now sought in the arbitration is that the reinsurance treaties be rescinded from their inception.

In an affidavit sworn by Mr Mitchell, another of the joint liquidators, on 7 May 1996 for the purpose, amongst others, of the application for injunctions to restrain Kemper Re, another of the company's reinsurers, from instituting arbitration proceedings, he deposed in paras 11 to 17 why it was premature and oppressive for Kemper Re to seek arbitration at that stage. But he accepted that the allegations made by Kemper Re would have to be the subject matter of arbitration at some time, the only issue was when. It was suggested that it should not proceed before the winding-up petition had been determined when it would be known where the company was to be wound up and who were its joint liquidators. These objections were, of course, overtaken by events when Ground J ordered the winding up of the company on 26 July 1996. It was also suggested that the arbitration would be premature even if a winding-up order had been made, for to deal with the issues raised in the arbitration then would interfere with 'the discrete steps in the orderly administration of the affairs of an insurance company in liquidation'. In summary those steps are the admission or otherwise of the proofs of creditors, the allocation of their debts to the appropriate reinsurance treaties and demanding payment by the reinsurers of the sums so allocated and the enforcement of such claims against the reinsurers.

Hannover Re submits that the issue raised by its demand for arbitration does not interfere with those steps or any of them. It submits that the issue to be resolved is the 'threshold issue' whether Hannover Re is entitled to rescind the reinsurance treaties from their inception. As the principal deponent for Hannover Re, Herr Kunze, stated in his affidavit sworn on 6 December 1996:

'If rescission is ordered, the question of the extent of GE's claims against EMLICO will not be relevant to Hannover Re and the question of the allocation of those liabilities to Hannover Re under those treaties will not arise.'

Prima facie this would indicate not that the arbitration should be deferred but rather that it should be accelerated.

There is no indication in the evidence for the joint liquidators whether the court in Bermuda has reconsidered the letter of request in the light of the substantially changed circumstances I have mentioned. All that Mr Hughes said in his last affidavit, sworn on 29 November 1996, was that the joint liquidators had kept the Bermudian court informed of developments relating to the liquidation of the company including, most recently, the then current status of this appeal. On 21 November 1996 the court in Bermuda confirmed that the joint liquidators were at liberty to pursue the appeal.

In my judgment the combination of the change of circumstances, which, prima facie, removed the reasons for the letter of request when first made, coupled with the absence of any clear evidence that the letter of request has been reconsidered by the court in the light of those changed circumstances entitles this court to reduce the weight it would otherwise attach to the letter of request.

Thus in seeking to persuade this court to disagree with the conclusion of

Knox J and grant the worldwide relief they want, the joint liquidators face three formidable obstacles. The first is that if the liquidation of the company was taking place in England there would not appear to be any reason to make an order in England restraining the prosecution of the arbitration in Massachusetts. The proper law of each of the reinsurance treaties and of any arbitration is the law of that State. The arbitrators and the umpire are to be officials of authorised insurers in one or more of the United States and writing comparable business. Likewise there is no reason to restrain an arbitration outside the USA. If Hannover Re were enjoined by the Federal Court under s 304 of the Federal Bankruptcy Code from proceeding with the arbitration anywhere in the USA and gave the undertaking I have mentioned not to sue or arbitrate outside the USA it is most unlikely that the arbitrators would of their own motion and contrary to the wishes of the joint liquidators determine to proceed with the arbitration outside the USA.

Secondly, given the procedure under s 304 of the Federal Bankruptcy Code, there is no reason why the Federal Court should not consider whether the arbitration should proceed in Massachusetts. The dispute and the agreed method of its determination have the closest connection with the USA and none with England. The fact that the company is being wound up in Bermuda does not mean that the issue to be arbitrated is connected with Bermuda, for Hannover Re is not a creditor of the company but a debtor. Thus, in principle, the case is to be viewed as one in which a third party, Hannover Re, is denying the claim of the joint liquidators to recover property of the company situate in Massachusetts.

Thirdly, for the reasons I have already given, the weight which may properly be put on the request of the Supreme Court in Bermuda is seriously reduced by the matters occurring since it was sent. This obstacle is not one on which Hannover Re could have relied before Knox J but is one which in this court the joint liquidators must surmount if they are to satisfy this court not only that Knox J was wrong but that an injunction should be granted now.

The joint liquidators rely on a number of factors. They submit that there is a sufficient connection with England because that with which there must be the connection is the winding up and the court in England is only asked to act as an ancillary jurisdiction in relation to that winding up. I do not agree. Hannover Re is not a creditor of the company. In substance the property in question and the dispute is in Massachusetts with which the court in England has no connection.

Then it is said that the remedy under s 304 of the Federal Bankruptcy Code may not be so all embracing as a worldwide injunction granted by the court in England. In theory that may be true. But for reasons I have already given I do not accept that the theory represents the practical situation in this case. In any event that would not of itself be a justification for the court in England granting the relief sought.

The joint liquidators are concerned that Hannover Re should be put in the same position as Kemper Re. The injunction granted by the court in Bermuda restrained Kemper Re from proceeding with its demand for arbitration made on 8 April 1996 until the final hearing of the winding-up petition and the final determination of the judicial review proceedings it had instituted to challenge the validity of the continuation of the company into Bermuda. The same points were raised in both those proceedings as well as in the

arbitration proceedings. Thus there was good reason to enjoin Kemper Re on the conventional ground of multiplicity of proceedings. No such ground exists in the case of Hannover Re. In any event, the judicial review proceedings in Bermuda have been terminated, subject to any appeal or further application which may be available there, by the order of Wade J made on 18 December 1996. It has been agreed by the solicitors for Kemper Re and the joint liquidators that the injunction should remain in force until the time for applying for leave to appeal from the judgment of Wade J has expired or if such an application is made in time until it or, if leave is granted, the substantive appeal has been finally disposed of. Subject to that agreement the injunction will cease to operate.

The joint liquidators also submitted that Hannover Re should be required to raise its objections to the grant of the relief sought in Bermuda, not by opposing in England the assistance requested from the court in England. I do not agree. Whilst in certain circumstances that might be the appropriate course to take in respect of one who is concerned in the liquidation as a creditor or contributory, I do not see how it could be right in the case of a debtor to the insolvent. Such a person is not concerned with the insolvency.

In the course of a very wide-ranging argument other factors were relied on. I have mentioned those which appear to me to be the most significant and have reread the skeleton arguments for the joint liquidators and my notes of the oral submissions made by their counsel. My conclusion is that Knox J was right to refuse to grant the relief sought in the letter of request. For the reasons I have sought to explain, it was not then and is not now a proper case in which to grant the relief sought. Further, I agree with him that it is not a proper case in which to grant the more limited relief of an injunction in the terms sought but confined in its operation to England and Wales. That is not what the Supreme Court in Bermuda requested and I can see no threat or other conduct of Hannover Re such as would justify it.

For all these reasons I would dismiss this appeal.


**THORPE LJ:**
I agree.


**ROCH LJ:**
I also agree.


*Appeal dismissed, with costs of the respondent's notice.*


Solicitors:     *Freshfields* for the appellants
                *Lovell White Durrant* for the respondent

VOL. IX.]          CHANCERY APPEALS.                    557

forced construction upon the Act for the purpose of enabling that L. JJ.
injustice to be done.                                             1874
 This appeal is dismissed with costs.                        Bush's Case.

SIR G. MELLISH, L.J. :—

 I am of the same opinion.

 Solicitors for the Appellant: Messrs. *Harper, Broad, & Battcock*.
 Solicitors for Mr. *Bush*: Messrs. *Linklaters & Co*.

---

 *In re* ORIENTAL INLAND STEAM COMPANY.    L. JJ.
   *Ex parte* SCINDE RAILWAY COMPANY.       1874
                                            July 1.
*Winding-up—Attachment—Property Abroad—Foreign Judgment—Companies
       Act, 1862 (25 & 26 Vict. c. 89), s. 163.*

   When a company has in this country been ordered to be wound up,
   judgment creditors who are in this country, and have proved under the
   winding-up, will not be allowed to attach property in *India* belonging to the
   company
   Order of *Malins*, V.C., affirmed.

THE *Oriental Inland Steam Company* and the *Scinde Railway
Company* were both English companies having their chief offices
in *England*, but carrying on business in *India*. On the 23rd of
May, 1867, the *Scinde Company* obtained in *India* judgment against
the *Oriental Company* for Rs.40,122.
   On the 8th of November, 1867, an order to wind up the
*Oriental Company* was made in *England*, and on the 12th of
March, 1868, the *Scinde Company* came in under the winding-up
and proved their debt.
   On the 28th of January, 1869, the *Scinde Company*, proceeding
under their judgment, attached certain property in *India* belong-
ing to the *Oriental Company*. By an order made on the 4th of
March, 1869, in the winding-up, the *Scinde Company* was ordered
to withdraw the attachment, without prejudice to any question;
and upon the *Scinde Company* undertaking to abide by any order
of the Court, the official liquidator was ordered, out of the proceeds
of the sale of property in *India* belonging to the *Oriental Company*,

558                           CHANCERY APPEALS.                        [L. R.

L. JJ.
1874

*In re*
ORIENTAL
INLAND STEAM
COMPANY.

*Ex parte*
SCINDE
RAILWAY CO.

to pay the *Scinde Company* the amount of principal, interest, and costs then due to them.

The attachments were accordingly withdrawn, and Rs.19,813 were paid by the official liquidator to the *Scinde Company* in satisfaction of their claim; the remainder of their claim having been satisfied by sales under attachments before the winding-up.

The official liquidator applied by summons that the *Scinde Company* should repay this sum of Rs.19,813, and the Vice-Chancellor *Malins*, on the 18th of April, 1874, made an order accordingly.

The *Scinde Company*, appealed.

Mr. *J. Pearson*, Q.C., and Mr. *Marten*, Q.C., for the Appellants:—

We are ready to abandon our claim under the winding-up here, and then we ought not to be prevented from retaining what we have received in *India*. The only result of our giving up our attachment, or not issuing it, would have been to allow other execution creditors in *India* to take the property. If those creditors are not in this country this Court will have no jurisdiction over them: *Bank of Hindustan* v. *Premchand* (1), and it is very hard upon us that they should thus obtain an advantage over us. If this is the law the result in all these cases will be to hand over the assets to those creditors who happen to be out of the jurisdiction. *In re Kelson* (2) was a case of inspectorship only.

Mr. *Glasse*, Q.C., and Mr. *Whitehorne*, for the *Oriental Company*, were not called upon.

SIR W. M. JAMES, L.J.:—

I am of opinion that the order of the Vice-Chancellor in this case is perfectly right.

The winding-up is necessarily confined to this country. It is not immaterial to observe, that there could now be no possibility, having regard to the decision of the Supreme Court of *Calcutta*, in *Bank of Hindustan* v. *Premchand*, which we must take to be quite right, of treating this case as if there were an auxiliary winding-up in *India*. If this is so with regard to a company domiciled in *England*, but having its business and assets in *India*, there would be no ground for the contention on the part of the

(1) 5 Bomb. H. C. Rep. 83.          (2) Law Rep. 4 Ch. 125.

VOL. IX.]                CHANCERY APPEALS.                      559

Appellants that they would obtain an equitable and rateable   L. JJ.
distribution of the assets between the creditors. All the assets  1874
there would be liable to be torn to pieces by creditors there, not-  In re
withstanding the winding-up, and there would be an utter inca-  ORIENTAL
pacity of the Courts there to proceed to effect an equitable  INLAND STEAM
                                                              COMPANY.
distribution of them. The English Act of Parliament has enacted  Ex parte
that in the case of a winding-up the assets of the company so  SCINDE
wound up are to be collected and applied in discharge of its liabi-  RAILWAY CO.
lities. That makes the property of the company clearly trust
property. It is property affected by the Act of Parliament with
an obligation to be dealt with by the proper officer in a particular
way. Then it has ceased to be beneficially the property of the
company; and, being so, it has ceased to be liable to be seized by
the execution creditors of the company.

There may, no doubt, be some difficulty in the way of dealing
with assets and creditors abroad. The Court abroad may some-
times not be disposed to assist this Court, or take the same view
of the law as the Courts of this country have taken as to the
proper mode of dealing with such companies, and also with such
assets. If so, we must submit to these difficulties when they occur.

In this particular case there is no such difficulty. There were
assets fixed by the Act of Parliament with a trust for equal dis-
tribution amongst the creditors. One creditor has, by means of
an execution abroad, been able to obtain possession of part of
those assets. The Vice-Chancellor was of opinion that this was
the same as that of one *cestui que trust* getting possession of the
trust property after the property had been affected with notice of
the trust. If so, that *cestui que trust* must bring it in for distribu-
tion among the other *cestuis que trust*. So I, too, am of opinion,
that these creditors cannot get any priority over their fellow-cre-
ditors by reason of their having got possession of the assets in this
way. The assets must be distributed in *England* upon the footing
of equality.

The Vice-Chancellor's judgment must therefore be affirmed, and
the appeal dismissed.

SIR G. MELLISH, L.J.:—

I am of the same opinion.

I quite agree that the 87th section of the Act of 1862, pro-

AP1019

560                           CHANCERY APPEALS.                    [L. R.

L. JJ.

1874

*In re*
ORIENTAL
INLAND STEAM
COMPANY.

*Ex parte*
SCINDE
RAILWAY Co.

viding that no action shall be brought without the leave of the
Court, and the 163rd section, enacting that no execution shall
issue, apply only to the Courts in this country. Of course,
Parliament never legislates respecting strictly foreign Courts.
Nor is it usually considered to be legislating respecting Colonial
Courts or Indian Courts, unless they are expressly mentioned.
Still, that appears to me not to prevent the general application to
this case of the principles which have been established in cases of
bankruptcy.

No doubt winding-up differs from bankruptcy in this respect,
that in bankruptcy the whole estate, both legal and beneficial, is
taken out of the bankrupt, and is vested in his trustees or
assignees, whereas in a winding-up the legal estate still remains
in the company. But, in my opinion, the beneficial interest is
clearly taken out of the company. What the statute says in the
95th section is, that from the time of the winding-up order all the
powers of the directors of the company to carry on the trade or
to deal with the assets of the company shall be wholly determined,
and nobody shall have any power to deal with them except the
official liquidator, and he is to deal with them for the purpose of
collecting the assets and dividing them amongst the creditors. It
appears to me that that does, in strictness, constitute a trust for
the benefit of all the creditors, and, as far as this Court has juris-
diction, no one creditor can be allowed to have a larger share of
the assets than any other creditor.

Then it is said that the assets are subject to the law of the
place where they are. I quite agree that if the law of the place
where they are had given a charge of that nature on the assets
prior to the time when the petition for winding-up was presented,
or possibly prior to the time when the winding-up order was made,
and a judgment, for instance, had been put on the register, that
might, by the law of *Bombay*, have constituted a charge on the
property of the company, and then the trust for the benefit of the
creditors would have been subject to that charge. But here there
is no allegation that the judgment in *Bombay*, any more than
a judgment here, simply *quâ* judgment, operates as any charge at
all. It is quite clear that it does not, and that until the execution
and attachment have issued and been executed, there is no actual
charge on the property. That charge is subsequent to the creation

VOL. IX.]                    CHANCERY APPEALS.                              561

of the trust, and is made by the particular Appellants here with full notice of the trust.

The consequence necessarily follows, that in this Court these creditors cannot be allowed by such means to obtain priority ; and that they must give up, for the benefit of the creditors, what they have so obtained.

The appeal will be dismissed with costs.

L. JJ.

1874

*In re*
ORIENTAL
INLAND STEAM
COMPANY.

*Ex parte*
SCINDE
RAILWAY CO.

Solicitors for the Appellants : Messrs. *Hollams, Son, & Coward.*

Solicitors for the Official Liquidator : Messrs. *Tilleard, Godden, & Holme.*

---

## VAUGHAN *v.* HALLIDAY.

[1872 V. 1.]

*Securities for Bills of Exchange—Doctrine of Ex parte Waring—Unaccepted Bills—Right of Double Proof—Practice—Appeal by one of two Defendants.*

L. JJ.

1874

July 4, 6.

*R & Co.,* of *Brazil,* in the course of exchange operations with *A.,* of *Manchester,* drew bills on him for £2000, which they sold to the Plaintiff, and about the same date transmitted to *A.* acceptances of another house for £1900 to cover the bills drawn. Before the covering remittances reached *England, R. & Co.* stopped payment and presented a petition for liquidation. *A.,* being also in difficulties, refused to accept the bills drawn on him, and also became a liquidating debtor. The Plaintiff, as holder of the dishonoured bills, filed a bill against the trustees of the estates of *R. & Co.* and *A.,* praying that the remittances might be applied in payment of the bills :—

*Held* (reversing the decision of *Bacon,* V.C.), that the Plaintiff had no equity to support the bill.

The doctrine of *Ex parte Waring* (1) does not apply to a case where the bills drawn by one of the insolvent firms on the other have not been accepted, nor in any other case in which the holder of the bills has no right of double proof against the two firms.

*Ex parte Smart* (2) distinguished.

On bill by *P.* against *R.* and *A.,* who all separately claimed the same property, decree made in favour of *P.* On appeal by *A.* alone, the Court being of opinion that *R.* was entitled, dismissed the bill against both Defendants.

THIS was an appeal from a decision of Vice-Chancellor *Bacon.*

*C. W. Ryder* carried on business as a merchant at *Bahia* and *Pernambuco,* in *Brazil,* under the firm of *Ryder & Co.,* and at *Manchester* under the firm of *J. O. Ryder & Co.*

(1) 19 Ves. 345.                    (2) Law. Rep. 8 Ch. 220.

AP1021



**BERMUDA**

**INTERPRETATION ACT 1951**

**1951 : 68**

TABLE OF CONTENTS

| | |
|---|---|
| 1 | Application of provisions of Act |
| 2 | Definitions of legislative expressions |
| 3 | Definitions of official designations |
| 4 | Definitions of judicial expressions and designations. |
| 5 | Topographical definitions |
| 6 | Definition of Commonwealth; etc. |
| 7 | Definitions of miscellaneous expressions |
| 7A | The Gazette |
| 7B | Domestic partnerships and domestic partners |
| 8 | Construction of certain expressions |
| 9 | Construction of certain provisions |
| 10 | Application of English law in interpreting and construing statutory provisions |
| 11 | Effect of sections of an Act as substantive enactments |
| 12 | Citation of Acts and subsidiary legislation |
| 12A | Date of commencement of Act |
| 13 | Time of commencement of Act |
| 14 | Effect of repeal of repealing Act, etc. |
| 15 | Repeal and re-enactment |
| 16 | Effect of repeal on rights, liabilities, etc., under repealed Act |
| 17 | Effect of repealing Act on statutory instruments made, etc., under repealed Act |
| 18 | Construction of amending Act. etc., with Act, etc., amended thereby |
| 19 | Modification of Acts of the Parliament of the United Kingdom, etc., to meet local circumstances |
| 19A | Citation of United Kingdom statutes |
| 19B | Construction of reference to United Kingdom legislation |
| 20 | Interpretation of expressions in statutory instruments |
| 21 | Appointment of officers by name or office |
| 22 | Provisions relating to construction of powers of appointment |

**1**

## INTERPRETATION ACT 1951

23      Official designation to include person performing functions
24      Changes in the title of public officers and public authorities, etc
24A     Change in style of a Minister
25      Construction of provisions as to exercise of powers and duties
26      Governor in exercising functions to act on advice of Cabinet
27      Powers to delegate functions
28      Signification of statutory instruments, etc
29      Exercise of functions after obtaining advice
30      Exercise of functions after consultation
31      Exercise of functions in accordance with recommendation
32      Procedure on appeals to Governor, etc.
33      Effect of transferring functions from one functionary to another
34      Exercise of statutory power between passing and commencement of Act
35      Powers in respect of making, etc., statutory instruments
36      Acts done under statutory instrument to be deemed to be done under Act by which statutory instrument authorized
37      Provision where no time prescribed
38      Deviations from forms
39      Disposal of forfeits
40      Punishments
41      Effect of setting out punishment in section of Act or in provision of statutory instrument
42      Effect, etc., of suspension of operation until Her Majesty's pleasure is made known
43      Rights of the Crown
44      Declaration that Government is a corporation sole

[*preamble and words of enactment omitted*]

**Application of provisions of Act**

1       (1)   Subject to this section, this Act shall have effect in relation to the interpretation and construction of every Act of the Legislature of Bermuda, whether enacted before or after 19 July 1951, and of every statutory instrument made, given or issued in Bermuda, whether made, given or issued before or after 19 July 1951—

> (a)   so as to assign to any expression used in any such Act or in any such statutory instrument the meaning assigned to that expression by this Act; and

> (b)   so as to apply in respect of any such Act or statutory instrument the rules of construction declared in this Act.

(2)   Notwithstanding anything in subsection (1), any provision of this Act—

> (a)   which assigns a particular meaning to any expression; or

> (b)   which applies a particular rule of construction,

---

**2**

**INTERPRETATION ACT 1951**

shall not have effect so as to assign that meaning or, as the case may be, so as to apply that rule of construction, in relation to any other Act or to any statutory instrument—

    (i) where there is in that other Act or statutory instrument any express provision to the contrary; or

    (ii) where in that other Act or statutory instrument the context otherwise requires.

(3) In this section "statutory instrument" has the meaning given in section 2.

**Definitions of legislative expressions**

2      In every Act and in every statutory instrument—

"Act" means an Act of the Legislature of Bermuda;

"affirmative resolution procedure" means the procedure described in section 7 of the Statutory Instruments Act 1977 [*title 1 item 3*];

"amending Act", in relation to any other Act, means an Act which amends that other Act;

"commencement", in relation to an Act or to any enactment in an Act or to any statutory instrument or to any provision of a statutory instrument, means the time at which the Act, enactment, statutory instrument or provision comes into operation;

"negative resolution procedure" means the procedure described in section 8 of the Statutory Instruments Act 1977 [*title 1 item 3*];

"private Act" means an Act which, not being a Government measure, affects or benefits some particular person, association or corporate body;

"provision of law" means any provision of law which has effect for the time being in Bermuda, including any statutory provision, any provision of the common law, any provision of the Constitution, and any right or power which may be exercised by virtue of the Royal Prerogative;

"public Act" means any Act which is not a private Act;

"statutory instrument" means any proclamation, rule, regulation, order, rule of court, bye-law, notice or other instrument made under or by virtue of any provision of law and having legislative effect;

"statutory provision" means a provision—

    (i) of any Act; or

    (ii) of any statutory instrument.

**Definitions of official designations**

3      In every Act and in every statutory instrument—

**3**

## INTERPRETATION ACT 1951

"the Cabinet" means the Cabinet for Bermuda constituted in accordance with section 57 of the Constitution;

"the Constitution" means the Constitution of Bermuda set out in Schedule 2 to the Bermuda Constitution Order 1968 [*title 2 item 1*], as the same may from time to time be amended and any Constitution for Bermuda set out in any enactment replacing that Order;

"consular officer" includes consul-general, consul, vice-consul, consular agent, and any person for the time being authorized to discharge the duties of consul-general, consul, vice-consul or consular agent;

"the Crown Agents" means the persons for the time being acting as the Crown Agents for Oversea Governments and Administrations, or any of such persons;

"the Deputy Governor" means the person appointed by the Governor under section 18 of the Constitution to be the Deputy Governor;

"the Government" means the Government of Bermuda;

"Government Board" means any board or body of persons having the supervision or control of a Government Department or administering under any Act on behalf of the Government any undertaking or activity of the Government; but does not include a board of enquiry or board of survey;

"Government Department" means a Ministry, department or branch of the Government of Bermuda;

"the Governor" means the Governor and Commander-in-Chief of Bermuda or other Officer for the time being administering the Government;

"Her Majesty" or "the Queen" includes Her Majesty the Queen, Her Heirs and Successors;

"Her Majesty's Forces" means any of the naval, military or air forces of Her Majesty;

"House of the Legislature" means the Senate or the House of Assembly;

"Justice of the Peace" or "Justice" means any Justice of the Peace appointed by the Governor under the Magistrates Act 1948 [*title 8 item 15*];

"Law Officer" means the Attorney-General, the Director of Public Prosecutions or the Solicitor-General;

"Minister" means the Minister in the Cabinet charged under the Constitution with responsibility for the conduct of the Government business to which the subject matter of the Act or statutory instrument relates or, if no Minister has been so charged, the Minister whose responsibility under the Constitution is most closely related to the context in which the expression is used;

"Municipality" means the Corporation of the City of Hamilton or the Corporation of the Town of St. George; and "municipal" shall be construed accordingly;

AP1025

**INTERPRETATION ACT 1951**

"Opposition Leader" means the member of the House of Assembly appointed by the Governor to be Opposition Leader in accordance with section 72 of the Constitution;

"Parish Council" means a Parish Council within the meaning of the Parish Councils Act 1971 [*title 4 item 40*];

"police officer" means any member of the Bermuda Police Service, of the Royal Bermuda Regiment coast guard unit; and includes any member of the Reserve Police when called out for police duty;

"Premier" means the member of the House of Assembly—

    (a) appointed by the Governor to be the Premier under section 58 of the Constitution; or

    (b) authorized by the Governor under section 60 of the Constitution to perform the functions conferred on the Premier by the Constitution;

"public authority" means any designated person or body of persons (whether corporate or unincorporate) required or authorized to discharge any public function—

    (i) under any Act; or

    (ii) under any Act of the Parliament of the United Kingdom which is expressed to have effect, or whose provisions are otherwise applied, in respect of Bermuda; or

    (iii) under any statutory instrument;

"public officer" means the holder of any office of emolument in the public service and includes any person appointed to act in any such office;

"public service" means the service of the Crown in a civil capacity in respect of the government of Bermuda;

"the Royal Instructions" means the Instructions passed from time to time under the Royal Sign Manual and Signet to the Governor;

"Secretary of State" means one of Her Majesty's Principal Secretaries of State;

"the United States Forces" means any of the military, naval or air forces of the United States of America.

*[Section 3 amended by 1997:37 effective 6 May 1999; "law officer" amended by 1999:8 s.3 & Sch 2 effective 1 April 1999; Section 3 definition "police officer" amended by 2018 : 57 s. 3 effective 1 February 2021]*

**Definitions of judicial expressions and designations.**

4    (1)  In every Act and in every statutory instrument—

"Assistant Justice" means a person who is appointed under section 73 of the Constitution, to be an Assistant Justice of the Supreme Court;

**5**

## INTERPRETATION ACT 1951

"barrister", "barrister and attorney", or "counsel", means a person duly admitted under the Supreme Court Act 1905 [*title 8 item 1*], to practise as a barrister and attorney in the Supreme Court;

"commissioner for oaths" means a person appointed under the Commissioners for Oaths and Notaries Public 1972 [*title 8 item 22*], to be a commissioner for taking affidavits, declarations and affirmations;

"court" does not include a Coroner's court, a court martial or a court of enquiry;

"Court of Appeal" means the Court of Appeal for Bermuda constituted by the Constitution;

"court of summary jurisdiction" means a court composed of a magistrate sitting alone, or, as the case may be, a Special Court composed and sitting in accordance with the Magistrates Act 1948 [*title 8 item 15*];

"Judge" means the Chief Justice, Puisne Judge, or any Assistant Justice;

"magistrate" means a person appointed to be a magistrate under the Magistrates Act 1948 [*title 8 item 15*];

"Registrar" means the Registrar of the Supreme Court;

"Registry" means the Registry of the Supreme Court;

"Senior Magistrate" means the magistrate appointed to be the Senior Magistrate under the Magistrates Act 1948 [*title 8 item 15*];

"Supreme Court" means the Supreme Court of Bermuda constituted by the Constitution.

(2)  In every Act and in every statutory instrument—

"common law" means so much of the common law of England (disregarding any supersession, modification or variation as respects its operation or effect in England by reason of any enactment of the Parliament of the United Kingdom) as has effect for the time being in Bermuda;

"conviction", in relation to any person, includes a conviction upon a plea of guilty by such person as well as upon a finding of guilt by a court or jury;

"corrective training", in relation to any person, means corrective training imposed on, or ordered in respect of, that person under the Young Offenders Act 1950 [*title 10 item 33*];

"imprisonment", in relation to any person, means imprisonment imposed on, or ordered in respect of, that person under any Act;

"offence" means any act or omission which is punishable by or under any statutory provision;

"rules of court", in relation to any court, means rules made by the public authority having for the time being power to make rules or orders regulating the practice and procedure of that court.

**INTERPRETATION ACT 1951**

    (3)  In every Act and in every statutory instrument—

        (a)  "indictable offence" means an offence which is triable on indictment, whether it is exclusively so triable or triable either way;

        (b)  "summary offence" means an offence which is triable only summarily;

        (c)  "offence triable either way" means an offence which is triable either on indictment or summarily,

and the terms "indictable", "summary" and "triable either way", in their application to offences, are to be construed accordingly;

        (d)  "on conviction on indictment", in relation to any offence or to the punishment for any offence, shall be taken to imply that a person charged with that offence is triable in respect of that offence before the Supreme Court, and that the offence so charged is an indictable offence; and cognate expressions shall be construed accordingly;

        (e)  "on summary conviction" or "on conviction by a court of summary jurisdiction", in relation to any offence or to the punishment for any offence, shall be taken to imply that a person charged with that offence is triable in respect of that offence by a court of summary jurisdiction; and cognate expressions shall be construed accordingly;

    (4)  In the definitions in subsections (3)(a), (b) and (c), references to the way or ways in which an offence is triable are to be construed without regard to the effect, if any, of the provisions of the Criminal Jurisdiction and Procedure Act 2015, on the mode of trial in a particular case.

*[Section 4 subsection (2) "preventive detention" deleted by 2001:29 s.11(1) & Sch effective 29 October 2001; subsection (1) "indictable offence", "on conviction on indictment" and "on summary conviction" deleted, and subsections (3) and (4) inserted, by 2005:43 s.3 effective 30 December 2005; subsection (4) amended by 2015 : 38 s. 91 effective 6 November 2015]*

## Topographical definitions

5       In every Act and in every statutory instrument—

"the City of Hamilton"or "Hamilton" means the City of Hamilton within the meaning of the Municipalities Act 1923 [*title 4 item 1*];

"parish" means any one of the nine parishes of Bermuda;

"the Town of St. George"or "St. George's" means the Town of St. George within the meaning of the Municipalities Act 1923 [*title 4 item 1*];

"United Kingdom" means——

        (a)  the United Kingdom of Great Britain and Northern Ireland; or

        (b)  when used with reference to citizenship or nationality, Great Britain, Northern Ireland, the Channel Islands and the Isle of Man;

AP1028

**INTERPRETATION ACT 1951**

    (i) a period of days from the happening of an event or the doing of any act or thing shall be exclusive of the day on which the event happened or the act or thing was done;

    (ii) if the last day of a period of days from the happening of an event or the doing of any act or thing is a Sunday or other public holiday (which days are hereinafter in this paragraph referred to as "excluded days") then such period shall include the next following day which is not an excluded day;

    (iii) where any act or proceeding is required or authorized to be done or taken on a certain day, then, if that day is an excluded day, the act or proceeding shall be deemed to have been done or taken in due time if it is done or taken on the next following day which is not an excluded day;

    (iv) where an act or proceeding is required or authorized to be done or taken within any period not exceeding six days, then an excluded day falling within such period shall not be reckoned in computing the passage of time;

    (f) a reference to a part, section, regulation, rule or Schedule shall, unless the contrary intention appears, be read as a reference to a part, section, regulation, rule or Schedule of or to that Act or statutory instrument, as the case may be, and a reference to a subsection, paragraph or sub-paragraph shall, unless the contrary intention appears, be read as a reference to a subsection, paragraph or sub-paragraph of the section, subsection or paragraph, as the case may be, in which the said reference occurs.

**Application of English law in interpreting and construing statutory provisions**

10    Except as otherwise expressly provided in this or in any other Act, a court or other public authority constituted in Bermuda shall, in interpreting or construing any statutory provision, apply as nearly as practicable the rules for the interpretation and construction of provisions of law for the time being binding upon the Supreme Court of Judicature in England.

**Effect of sections of an Act as substantive enactments**

11    Every section of an Act shall have effect as a substantive enactment without any introductory words.

**Citation of Acts and subsidiary legislation**

12    (1) Where reference is to be made to an Act, it shall be sufficient to cite the Act—

    (a) by its title; or

    (b) by its short title (if any); or

    (c) by the year in which it was passed together with its number among the Acts of that year.

**13**

AP1029

*a*

# Mutual Reinsurance Co Ltd v Peat Marwick Mitchell & Co (a firm) and another

*b*

COURT OF APPEAL, CIVIL DIVISION
LEGGATT, HOBHOUSE AND THORPE LJJ
3, 11 OCTOBER 1996

*c*

*Auditors – Whether auditors are officers – Meaning of officer in articles of association – Companies Act 1985, ss 310, 384 and 727 (Bermudan Companies Act 1981, ss 2, 89, 98).*

Auditors are officers of the company when appointed under the Companies Act 1985, s 384. However, if auditors are merely retained to conduct and carry out an audit function, without being appointed as auditors they will not *d* be officers. The separate references in s 310 to an officer of the company or any person employed as an auditor are not mutually exclusive but are intended to make provision for auditors who have not been appointed officers of the company. Accordingly, a provision in a company's articles of association providing for the indemnification of officers applied to auditors.

*e*

[**Note** This case deals with the Bermudan Companies Act 1981, but the sections in that Act are the equivalent to the corresponding provisions in the Companies Act 1985 and the provisions of the latter Act have been inserted in the headnote.]

*f* **Cases referred to in judgment**

*Great Western Forest of Dean Coal Consumers Co, Re Carter's Case* (1886) 31 Ch D 496.
*Imperial Land Co of Marseilles, Re, Re National Bank* (1870) LR 10 Eq 298, V-C.
*Kingston Cotton Mill Co, Re* [1896] 1 Ch 6, CA.
*g* *Liberator Permanent Benefit Building Society, Re* (1894) 71 LT 406, DC.
*London and General Bank, Re* [1895] 2 Ch 166, [1895–9] All ER Rep 948, CA.
*R v Shacter* [1960] 1 All ER 61, [1960] 2 QB 252, [1960] 2 WLR 258, CCA.
*Western Counties Steam Bakeries and Milling Co, Re* [1897] 1 Ch 617, CA.

*h* **Case also cited or referred to in skeleton arguments**

*Lipschitz v Wolpert and Abrahams* 1977 (2) SA 732, AD.

**Appeal**

By notice dated 28 June 1996 the defendants, Peat Marwick Mitchell & Co and KPMG Peat Marwick, appealed against the decision of Tuckey J on *i* 21 June 1996, whereby he found in favour of the plaintiffs, Mutual Reinsurance Co Ltd, a company incorporated in Bermuda, on the trial of a preliminary issue as to whether the terms of the company's byelaws

[1997] 1 BCLC 1

Case 22-10201-TMH   Doc 55-2   Filed 5/1/23   Page 20 of 320

precluded the plaintiffs making a claim against the defendants, their statutory auditors, alleging that they were negligent in failing to detect that moneys which should have been received by the plaintiffs were, as a result of fraud, retained by certain Liechtenstein and German companies. The facts are set out in the judgment of Hobhouse LJ.

*Peter Scott QC* and *Richard Hacker* (instructed by *Stephenson Harwood*) for the defendants.
*Richard Adkins QC* and *Lloyd Tamlyn* (instructed by *Freshfields*) for the plaintiff.

**HOBHOUSE LJ** (giving the first judgment at the invitation of Leggatt LJ). In this action the plaintiff, a reinsurance company incorporated in Bermuda under the Bermudan Companies Act 1981 (the Bermudan Act), sues the firms which were its auditors for the company's accounting years 1986–1989 inclusive. The plaintiff alleges that the defendants were negligent in failing to detect that moneys which it is alleged should have been received by the plaintiff were, as a result of a fraud, retained by certain Liechtenstein and German companies. The defendants deny that they were negligent. But a preliminary question has arisen in the action whether the terms of the plaintiff's byelaws (the Bermudan equivalent of the company's articles) in any event preclude the plaintiff from making this claim against the defendants. The short question of construction that arises is whether the word 'officers' as used in byelaw 123 includes the company's auditors appointed under byelaw 118. Although the questions in the action fall to be decided by Bermudan law, the parties agreed to submit their dispute to the Commercial Court in London. The Commercial judge ordered the trial of a preliminary issue to determine the question of construction. On the trial of the preliminary issue in June of this year Tuckey J ruled in favour of the plaintiff and held that for the purposes of byelaw 123 the defendants were not officers of the company. The defendants have appealed to this court.

   The question is a question of the construction of a provision in a commercial document – the byelaws of the company. Any commercial document has to be construed having regard to the surrounding circumstances and the legal and factual context. In the present case the relevant context is the law of Bermuda which in many respects follows the law of England. The Bermudan Act is largely derived from the corresponding United Kingdom legislation and the evidence is that any decision of a Bermudan court would be inclined to follow and apply the established English law. It is therefore convenient to start with a brief consideration of the position of auditors as officers of a company under English law.

   The definition of 'officers' in s 744 of the Companies Act 1985 (the 1985 Act) is an inclusive one: it 'includes a director, manager or secretary'. Prior to 1948 there was no statutory definition of 'officer'. Over the years the courts have held that the expression can include, depending on the circumstances, an auditor, a solicitor, an investment manager and a liquidator. As regards auditors, there is a line of authority from 1895 that they can be officers of a company and will be if they have been appointed as such. In *Re London and General Bank* [1895] 2 Ch 166, [1895–9] All ER Rep 948 the Court of Appeal held that the bank's auditors were officers of the company. Lindley LJ said ([1895] 2 Ch 166 at 170, [1895–9] All ER Rep

Case 11 10201 4 M T    Doc 00 2    Filed 0 4 1 20    Page 200 of 020

CA    Mutual Reinsurance v Peat Marwick Mitchell (Hobhouse LJ)    3

948 at 949): '. . . it seems to me impossible to deny that for some purposes and to some extent an auditor is an officer of the company.'

*a*    The Court of Appeal rejected the argument that an officer must be a person who is concerned with the management of the company or has at least some measure of control over the assets of the company. This decision was followed in *Re Kingston Cotton Mill Co* [1896] 1 Ch 6. The Court of Appeal held that the *London and General Bank* decision was of general application.

*b*    The distinction drawn by Kay LJ in the earlier case between auditors appointed by the company to report upon the balance sheet and accounts presented to them by the officers of the company and persons asked, ad hoc, to carry out a particular audit exercise, was referred to. This distinction was specifically picked up in *Re Western Counties Steam Bakeries and Milling Co* [1897] 1 Ch 617. The earlier cases were distinguished. Lindley LJ said (at

*c*    627):

*d*

*e*
> 'An auditor may or may not be an officer of a company. So may anybody else—e.g., a banker or solicitor. Prima facie such persons are not officers. See as to bankers, *Re Imperial Land Co of Marseilles* ((1870) LR 10 Eq 298); as to solicitors *Re Carter's Case* ((1886) 31 Ch D 496). But if appointed to an office under the company, and if they act in that office as officers of the company, they will be officers within s. 10. That was decided in the case of *Re Liberator Permanent Benefit Building Society* ((1894) 71 LT 406), and no irregularity in their appointment would, I conceive, avail them. But to be an officer there must be an office, and an office imports a recognised position with rights and duties annexed to it, and it would be an abuse of words to call a person an officer who fills no such position either de jure or de facto, but who happens to do some of the work which he would have to do if he were an officer in the proper sense of the word.'

*f*    Accordingly in that case, because the relevant persons had never been appointed as auditors of the company, they were held not to be officers of the company. Finally, in *R v Shacter* [1960] 1 All ER 61, [1960] 2 QB 252, a criminal case, the Court of Appeal again followed the earlier cases. The relevant offences were statutory offences which could only be committed by an officer of a company. The Court of Appeal considered that the question

*g*    was answered by ascertaining in what capacity the person had been appointed. If the person had been appointed to hold—

*h*
> 'the office of auditor . . . it can well be asked what office an auditor is being appointed to unless it is an office in the company and what officer he becomes unless it be an officer of the company'. (See [1960] 1 All ER 61 at 63, [1960] 2 QB 252 at 256 per Lord Parker CJ.)

*i*    The English legislation reflects the same approach. The Companies Acts provide for the appointment of auditors, normally by the company in general meeting and refer to such an auditor as holding 'office'. The implication is that auditors are appointed and are, whilst they hold office, officers of the company. (See generally Pt XI, Ch V of the 1985 Act.) Sections 310 and 727 of the 1985 Act also recognise the distinction made in the *Western Counties*

AP1032

Case 22-10001-TMH    Doc 00-2    Filed 0 /14/20    Page 200 of 020

4                    Butterworths Company Law Cases        [1997] 1 BCLC

case. A person carrying out an auditing function may or may not be an officer
of the company. These provisions do not draw a contrast between officers on
the one hand and auditors on the other but recognise that persons other than
officers may be employed to carry out an audit.

One of the arguments considered in the *London and General Bank* case
was whether the commonly found provision disqualifying an officer of the
company from being appointed auditor meant that an auditor should not be
treated as an officer of the company. (See now s 89 of the 1985 Act and Pt II
of the Companies Act 1989.) In *Re London and General Bank* [1895] 2 Ch
166 at 174–175, [1895–9] All ER Rep 948 at 952 Kay LJ said:

> '. . . art. 108 provides that no director or officer of the company shall
> during his continuance in office be eligible as auditor. It was said that
> that shews plainly that an auditor is not to be an officer of the company,
> but somebody who is not an officer. I do not read it in that sense. It is a
> copy of the language of the Act of 1879, which provides in s. 7, sub-s. 2,
> that, "A director or officer of the company shall not be capable of being
> elected an auditor of such company." I take art. 108 not to contradict
> that which has been said in the earlier part of these articles, that an
> auditor of this company is an officer of the company, but merely to
> provide, as the statute provides, that while he is an auditor he shall not
> hold any other office of the company. The object of that section is that
> he might not hold some other office the duties of which might bias him
> in his conduct as an auditor, and therefore, to prevent the danger of that,
> it is provided by that statute, and repeated by the articles, that he cannot
> hold at the same time any other office of the company.'

With this introduction I now turn to the Bermudan Act. The definition of
'officer' is the same inclusive definition as is found in the United Kingdom
legislation (s 2). The appointment of auditors is governed by s 89 which
includes the provisions—

> '(1)  The members of a company at the statutory meeting shall subject
> to section 88, appoint one or more auditors to hold office until the close
> of the next annual general meeting . . .
> (2)  The members of a company at each annual general meeting shall
> appoint one or more auditors to hold office until the close of the next
> annual general meeting, and, if an appointment is not made the auditor
> in office shall continue in office until a successor is appointed . . .'

Subsections (3) and (4) expressly refer to 'the office of auditor' and other
subsections also refer to it as an 'office'. Subsection (8) includes a provision
corresponding to that considered by Kay LJ and, for the reasons which he
gave, does not give rise to an inference that an auditor appointed under s 89
will not be an officer of the company.

The Bermudan Act also includes provisions which correspond to ss 310
and 727 of the 1985 Act. Section 98 of the Bermudan Act, under the heading
'PROVISIONS AS TO LIABILITY OF OFFICERS AND AUDITORS', provides:

> 'Subject to the provisions of this section and section 98A, any
> provision, whether contained in the bye-laws of a company or in any

AP1033

Case 22-10901-TMH    Doc 35-2    Filed 04/14/23    Page 207 of 326

CA    Mutual Reinsurance v Peat Marwick Mitchell (Hobhouse LJ)    5

*a*  contract or arrangement between the company and any officer, or any person employed by the company as auditor, exempting such officer or person from, or indemnifying him against any liability which by virtue of any rule of law would otherwise attach to him in respect of any wilful negligence, wilful default, fraud or dishonesty of which he may be guilty in relation to the company shall be void . . .'

*b*  Section 98A under the heading 'INSURANCE OF OFFICERS ETC', provides:

'Notwithstanding the provisions of section 98, a company may purchase and maintain insurance for the benefit of any officer of the company against any liability incurred by him under section 97(i)(b) in his capacity as an officer of the company or indemnifying such an officer *c*  in respect of [certain classes of loss] and nothing in this Act shall make void or voidable any such policy.'

The power of the court to grant relief is contained in s 281 of the Bermudan Act and refers, like the 1985 Act, to 'an officer of a company or a person employed by a company as auditor, whether he is or is not an officer of the *d*  company'.
    It is clear that the Bermudan Act adopts the same approach to auditors in the material respects as does the 1985 Act. Auditors may or may not be officers of the company. If they are appointed under s 89 they will be officers but if employed to carry out an audit without being so appointed they will not be officers. Both ss 98 and 281 are drafted taking into account this *e*  distinction. Although s 98 and its heading read in isolation might justify a different inference, when the other provisions of the Act and the general legal context are taken into account, the inference can be seen to be unsound.
    Coming now to the byelaws themselves, byelaw 123, under the heading 'INDEMNITY', provides:

*f*  'Subject to the proviso below, every Director, officer of the Company and member of a committee constituted under Bye-Law 90 shall be indemnified out of the funds of the Company against all civil liabilities loss damage or expense (including but not limited to liabilities under contract, tort and statute or any applicable foreign law or regulation and all reasonable legal and other costs and expenses properly payable) *g*  incurred or suffered by him as such Director, officer or committee member and the indemnity contained in this Bye-Law shall extend to any person acting as a Director, officer or committee member in the reasonable belief that he has been so appointed or elected notwithstanding any defect in such appointment or election PROVIDED *h*  ALWAYS that the indemnity contained in this Bye-Law shall not extend to any matter which would render it void pursuant to the Companies Acts.'

The phrase 'every Director, officer of the company and member of a committee constituted under Bye-Law 90' is repeated in the following *i*  byelaws. The reference to directors takes into account the provisions regarding directors in byelaws 73 and following. The reference to a committee constituted under byelaw 90 is a reference to the power of the

Case 22-10301-TMH   Doc 39-2   Filed 04/14/23   Page 293 of 325

board to delegate to such a committee. The submission of the company is
that a reference to officers is a cross-reference to byelaw 99 which provides,
under the heading 'OFFICERS', that:

> 'The officers of the Company shall include a President and Vice-
> President who shall be Directors and shall be elected by the Board as
> soon as possible after the statutory meeting and each annual general
> meeting. In addition, the Board may appoint any person whether or not
> he is a Director to hold such other office (including any additional Vice-
> Presidencies) as the Board may from time to time determine. Any person
> elected or appointed pursuant to this Bye-Law shall hold office for such
> period and upon such terms as the Board may determine and the Board
> may revoke or terminate any such election or appointment . . . Save as
> provided in the Companies Acts or these Bye-Laws, the powers and
> duties of the officers of the Company shall be such (if any) as are
> determined from time to time by the Board.'

The company is able to found a forceful argument from these provisions.
The byelaws should be read consistently. Byelaw 123 is drafted so as to refer
back to earlier provisions in the byelaws. There is an express provision
(byelaw 99) which makes provision for the officers of the company and
which does not refer to auditors nor, on an ordinary reading, extend to them.
This is a short and cogent argument which does not require elaboration.
Were there no countervailing arguments it would suffice to enable the
company to succeed on this appeal.

However, the byelaws also make provision for the appointment of
auditors. This is done in byelaw 118 which provides:

> 'Save unto the extent that an audit is waived in the manner permitted
> by the Companies Acts, auditors shall be appointed and their duties
> regulated in accordance with the Companies Acts, any other applicable
> law and such requirements not inconsistent with the Companies Acts as
> the Board may from time to time determine.'

This byelaw must be read with the statutory provisions to which it refers.
Consequently if the auditors are appointed in accordance with s 89 of the
Bermudan Act, they are appointed as officers of the company and byelaw
118 implicitly confirms that. Accordingly, notwithstanding byelaw 99, the
byelaws do contemplate and provide for auditors to be appointed in
accordance with s 89 as officers of the company. It is not in dispute that the
defendants were appointed in accordance with s 89 and it follows that for the
purposes of the byelaws they are to be regarded as officers of the company.

Therefore, it is not right to construe byelaw 123 solely by reference to
byelaw 99. Byelaw 118 must also be taken into account. Byelaw 118 by
implication extends the category of those who may be referred to as officers
of the company to include auditors. Unless there is some countervailing
consideration byelaw 123 should be similarly construed.

The company submitted that there was such a countervailing
consideration which arose from the drafting of byelaw 123 itself. This
argument persuaded the judge. Byelaw 123 includes a proviso so as to avoid

Case 11-10001 TMR   Doc 35-2   Filed 3/14/23   Page 200 of 320

CA    Mutual Reinsurance v Peat Marwick Mitchell (Hobhouse LJ)      7

*a* conflict with s 98 of the Bermudan Act. The company submits that s 98 both in its title and its text contrasts those who are 'officers' on the one hand with those who are 'auditors' on the other. As a matter of language, taking s 98 in isolation, this argument, too, can be attractively put but it remains superficial. Section 98 properly understood in its legal context, having regard to the provisions of the Act as a whole and to the relationship to English law, refers to officers and to auditors not in a mutually exclusive fashion but so *b* as to make provision also for auditors who have not been appointed officers of the company. For the reasons which I explained earlier in this judgment, s 98, properly understood, does not lead to the conclusion for which the company contends.

Therefore, in my judgment, the question of construction raised by this appeal must be decided in favour of the defendants. They were appointed as *c* auditors of the company under s 89 of the Bermudan Act and byelaw 118 of the company's byelaws. They therefore became officers of the company for the periods for which they were appointed. They are entitled to the protection of byelaw 123. The preliminary issue must be answered in favour of the defendants and their appeal allowed.

*d* **THORPE LJ.** I agree.

**LEGGATT LJ.** I agree.

*Appeal allowed with costs; application for leave to appeal to the House of Lords refused.*

Paul Magrath Esq   Barrister.

AP1036

196                          CHANCERY DIVISION.                    [1932]

MAUGHAM
J.
——
1932
——
May 9, 11;
June 6.
——

*In re* VOCALION (FOREIGN), LIMITED.

(00868 OF 1931.]

*Company—Company registered abroad—Company ordered to be Wound Up—
Action against the Company commenced abroad—Sect. 177 of the Companies
Act, 1929, does not apply to Proceedings begun in a Foreign or Colonial
Court—Equitable Jurisdiction in Personam of the Court of Chancery
to restrain a Respondent properly served in Great Britain from proceeding
with an Action brought in a Foreign or Colonial Court—Undesirability
of Court exercising that Jurisdiction—Companies Act, 1929 (19 & 20
Geo. 5, c. 23), ss. 172 (b), 174, 177, 223, 344.*

Sect. 177 of the Companies Act, 1929, only applies to proceedings
pending in a Court of Great Britain and does not apply to proceedings
pending in a foreign or colonial Court. The Court can, however, in the
exercise of its equitable jurisdiction in personam restrain a respondent
properly served in this country from proceeding with an action brought
in a foreign or colonial Court to enforce a liability incurred abroad.
But as against a respondent domiciled abroad, substantial justice is
more likely to be attained by allowing the foreign proceedings to con-
tinue, and in such a case the Court will not as a rule exercise that
jurisdiction.

THE Company was ordered to be wound up by the Court
on January 11, 1932. Three summonses were taken out,
one on February 12 and two on February 25 following. The
first two were applications by the Official Receiver and the
provisional liquidator of the Company; and by them orders
were sought to restrain the respondent Bank of New South
Wales from further proceeding without the leave of the
Court with (1.) an action brought against the Company
in the Supreme Court of Melbourne in the State of Victoria
claiming payment of the sum of 2584*l.* 12*s.* 11*d.* and interest,
and (2.) an action in the same Court, brought by the Bank
against the Company and two gentlemen called Wharton and
Gendle, claiming as against the Company and Gendle specific
performance of an undertaking alleged to have been given
by Gendle to give security for the debt claimed in the first
action over the assets of the Company in Australia, and also
claiming an injunction restraining all three defendants from
disposing of the assets of the Company, and incidental relief.
The third summons is an application by the Bank of New

AP1037

**2 Ch.**                    CHANCERY  DIVISION.                    **197**

South Wales for an order that, notwithstanding the order to wind up the Company, the Bank may be at liberty to proceed with the two actions in the Supreme Court at Melbourne. The first action will hereinafter be called the debt action, and the second the security action.  The Bank was a corporation incorporated in Australia, where its principal business was situate, and having a place of business or branch in England at 29 Threadneedle Street in the City of London ; and it was registered in England pursuant to s. 344 of the Companies Act, 1929.  The Company, which was registered in England and was an English company, carried on business in Australia, both in Victoria and in New South Wales, and it was registered in Victoria as a foreign company on May 31, 1928, its registered agent being Gendle, then described as of 49 to 59 Coppin Street, Richmond, the ground floors of which were owned by the Company.  Two powers of attorney, dated respectively May 4, 1928, and November 15, 1929, were given by the Company to Mr. Gendle.  The debt sued for in the debt action was alleged to have been due for commission for work done by the Bank in Australia as banker for the Company and for money lent to the Company or paid at its request, and for interest.  The writ in that action was duly served on the Company in London on November 5, 1931. The security action was an endeavour to obtain and to enforce a security over the freeholds (if any) and all other the assets of the Company.  The alleged security was given by Gendle for and on behalf of the Company on March 10, 1930, and was in the form of an undertaking by the Company to give to the Bank such security for all moneys owing by the Company to the Bank over the freeholds (if any) and all other assets of the Company as the Bank might require whenever called upon so to do, and in the meantime not to pledge or in any way incumber or raise money on any of the said assets, except with the consent in writing of the Bank.  The writ in the security action was never served on the Company.  An ex parte injunction was, however, granted on December 17, 1931 (the date of the issue of the writ) purporting to restrain the Company and Gendle and Wharton and each of them

MAUGHAM
J.

1932

VOCALION
(FOREIGN),
LD.,
In re.

AP1038

198                    CHANCERY  DIVISION.                    [1932]

MAUGHAM
J.

1932

VOCALION
(FOREIGN),
LD.,
*In re.*

from selling or dealing with the assets of the Company or any of them pending the giving of certain securities, or in any way dealing with any of the assets of the Company contrary to the rights of the plaintiff, and also from removing or causing to be removed out of the State of Victoria any of the assets of the Company or causing any of them to be removed to England, and from in any way pledging, incumbering, or raising money on any of the said assets, except with the consent in writing of the plaintiff.

The position with regard to the security action was somewhat involved.  On March 1, 1930, the Company agreed to sell its leasehold land, buildings, plant, etc., and the whole of its undertaking in Australia to one Maurice Rosenthal for the sum of 65,000*l.* payable as to 5000*l.* in cash, as to 40,000*l.* by the issue to the Company of a first mortgage debenture of the nominal value of 40,000*l.* containing the usual charge, and as to 20,000*l.* by the allotment to the Company of 80,000 fully paid ordinary shares of 5*s.* each in the capital of a company to be formed by Rosenthal.  The company was in fact duly formed in Australia under the name of Vocalion (Australasia), Ld.  The debenture was granted to the Company, and on August 6, 1931, the Company appointed Wharton receiver under the debenture.  On December 16, 1931, Wharton purported to sell all the undertaking and assets of Vocalion (Australasia), Ld., to a company called Merchandise Trading Company, Ld., for the sum of 4500*l.*, of which sum 1000*l.* was paid to Wharton, and the balance of 3500*l.* was due and payable at the date when the security action was commenced.  Wharton was joined as a defendant in the security action on an allegation that he was endeavouring to defeat the rights of the Bank under the undertaking.  The company called Merchandise Trading Company, Ld., had not been joined as a defendant in the security action, which claimed specific performance of the undertaking above mentioned, and an order that the defendant Company or the defendant Gendle, or some other fit and proper person, should execute a transfer or assignment by way of security to the plaintiff Bank of all rights in the lease and premises, a bill of

2 Ch.                    CHANCERY DIVISION.                    199

sale over the erections, works, machinery and plant on the premises, a transfer of all the Company's right, title and interest to the debenture over the assets and undertakings of Vocalion (Australasia), Ld., and other relief not limited to property in the State of Victoria. The undertaking to give security was not registered either in this country or in Australia. The debenture to secure the sum of 40,000*l.* granted by Vocalion (Australasia), Ld., was duly registered in the State of Victoria on August 9, 1930. The only fact with reference to the law of Victoria which was established before the Court was that by s. 101 of the Companies Act, 1928, of the State of Victoria, any mortgage or charge created by a company which was not registered in the office of the Registrar-General in manner provided by that section was void as against the liquidator and any creditor of the company, so far as any security on the company's property was concerned ; and that by s. 7 of that Act the word " company " included a foreign company carrying on business in Victoria.

MAUGHAM
J.

1932
VOCALION
(FOREIGN),
LD.,
*In re.*

*J. B. Lindon* for the Official Receiver. The Court does not, as a matter of course, grant leave to proceed on applications such as that which the Bank is making here. The Court has equitable jurisdiction in personam to restrain the Bank from proceeding with this action : *In re Oriental Inland Steam Co.* (1) ; *In re North Carolina Estate Co.* (2) ; *In re Belfast Shipowners Co.* (3) This is a proper case for the Court to exercise its jurisdiction : *In re Oriental Inland Steam Co.* (1) There is a statutory trust for creditors under s. 189 of the Companies Act, 1929, and if an English Court has jurisdiction it ought not to allow one creditor to have a larger share of the assets than any other creditor. It is for the Bank to satisfy the Court that the case is one in which leave to appeal should be granted.

[He also referred to *In re International Pulp and Paper Co.* (4) ; *Moor* v. *Anglo-Italian Bank* (5) ; *In re Wanzer, Ld.* (6) ;

| | |
|---|---|
| (1) (1874) L. R. 9 Ch. 557. | (4) (1876) 3 Ch. D. 594. |
| (2) (1889) 5 Times L. R. 328. | (5) (1879) 10 Ch. D. 681. |
| (3) [1894] 1 I. R. 321. | (6) [1891] 1 Ch. 305. |

AP1040

200                       CHANCERY DIVISION.                    [1932]

MAUGHAM *Flack's Case* (1) ; and *Employers' Liability Assurance Corpor-*
J.          *ation* v. *Sedgwick, Collins & Co.* (2)]

1932          *Vanneck* for the Bank.  The real question for the Court
VOCALION   to determine is whether when an English company, carrying
(FOREIGN), on business abroad, enters into transactions abroad with a
LD.,
*In re.*    foreign company and then goes into liquidation in England, the
           Court will prevent the foreign company from taking proceedings
           in its own country.  The Court cannot restrain proceedings
           taken in a foreign Court by a foreigner against an English
           company which has assets in the foreign country : *Carron
           Iron Co.* v. *Maclaren*. (3)  The debts due in the foreign
           country prevail over the English debtors or debenture holders :
           *In re Maudslay, Sons & Field*. (4)  The mere fact that the
           Bank has registered in this country is not sufficient to entitle
           the Court to prevent it from taking proceedings in the
           foreign country.

           *J. B. Lindon* in reply.  There is authority that the words of
           s. 177 apply to actions commenced abroad : see Chitty J. in
           *In re North Carolina Estate Co.* (5)  The *Carron Iron* case (3)
           was before the Companies Act, 1862, and the company was
           not carrying on business in this country.  The Bank in the
           present case has business and is registered in this country, and
           has some one who can be sued here.  The Court therefore has
           jurisdiction, and ought to give effect to that jurisdiction by
           restraining a breach of trust.

           [He also referred to *In re Boyse*. (6)]

                                                    *Cur. adv. vult.*

           June 6.  MAUGHAM J.  In the circumstances of this case
           three questions, I think, arise for consideration.  The first
           is whether s. 177 of the Companies Act, 1929, has any
           application to an action or proceeding in any Court other
           than a Court in Great Britain.  The second question is
           whether, assuming that question to be answered in the nega-
           tive, this Court can in the exercise of its equitable jurisdiction
           in personam restrain a respondent properly served in this

(1) [1894] 1 Ch. 369.            (4) [1900] 1 Ch. 602.
(2) [1927] A. C. 95.             (5) 5 Times L. R. 328.
(3) (1855) 5 H. L. C. 416.       (6) (1880) 15 Ch. D. 591.

2 Ch.                  CHANCERY DIVISION.                        201

country from proceeding with an action so brought. The third question is whether such a jurisdiction, if it exists, ought to be exercised in the circumstances of the present case.

Dealing with the first question, I should observe that s. 177 must be considered in connection with s. 172 (*b*) (which gives the Court power to stay or restrain proceedings other than proceedings in the High Court or the Court of Appeal in England or Northern Ireland against a company after the presentation of a winding-up petition), s. 174 (which renders void any attachment, sequestration, distress, or execution put in force against the estate or effects of the Company after the commencement of the winding-up), and s. 223, which provides for enforcement throughout the United Kingdom of orders made in winding-up. Now by the decision of the Privy Council in *New Zealand Loan and Mercantile Agency Co.* v. *Morrison* (1) it has been made evident that the various Companies Acts do not either by express words or by necessary implication extend to the Colonies, and that the said Acts were not intended to bind the Colonial Courts. The judgment of the Board points out the distinction in this respect between the Bankruptcy Acts and the Companies Acts. It is apparent then that in regard to the matters I have to consider the Supreme Court of Melbourne is in precisely the same position as a completely foreign Court, for instance, a Court in Russia or Turkey. It will be noted that s. 177 contains the words : "No action or proceeding shall be proceeded with or commenced against the company except by leave of the court," a phrase which seems to involve that the Legislature imagined that the winding-up order would probably become known to an intending plaintiff before commencing his action. If s. 174 is considered, it would seem to be impossible to hold that the Legislature intended to say that an attachment or distress or execution put in force under the jurisdiction of some foreign Court against the assets of a company in a foreign land should be void to all intents ; and it may be observed that a provision of that kind would in almost every case be nugatory. But

MAUGHAM J.

1932

VOCALION (FOREIGN), LD., *In re.*

(1) [1898] A. C. 349.

202                    CHANCERY DIVISION.                    [1932]

MAUGHAM
J.

1932

VOCALION
(FOREIGN),
LD.,
In re.

apart from these considerations of the language of the relevant sections I think the observation of Mellish L.J. in *In re Oriental Inland Steam Co.* (1) is undeniable : " Of course," he says, " Parliament never legislates respecting strictly foreign Courts. Nor is it usually considered to be legislating respecting Colonial Courts or Indian Courts, unless they are expressly mentioned." Apart from authority, in my judgment it is reasonably clear that s. 177 has no application to actions or proceedings in foreign Courts. It seems to me impossible so to construe this, and the other sections, as to hold that they are limited either to British subjects who may be concerned with such proceedings or to persons who can be served with a summons in this country.

The authorities on this point are not perhaps wholly satisfactory ; but in my opinion the Court of Appeal in the case mentioned (*In re Oriental Inland Steam Co.* (1)), did decide that the section in the Companies Act of 1862 was not applicable, though they thought fit in the circumstances of that case, and in the exercise of an equitable jurisdiction in personam, to prevent a creditor from obtaining the fruits of an attachment over certain property in India belonging to the Company. It will be noted that James L.J. did not refer to the section at all, and that Mellish L.J. clearly treated that section as not being applicable to proceedings in India. The dicta of Jessel M.R. in *In re International Pulp and Paper Co.* (2) seem to me to support the same view, for he gives reasons for supposing that the Companies Act, 1862, related to the whole of the United Kingdom and did not, as I understand the language he used, extend beyond it. In *In re North Carolina Estate Co.* (3) Chitty J. restrained a creditor from proceeding with an action in the Superior Court of Burke County, North Carolina, seeking to attach the property of the Company in that State. The learned judge made this observation (3), after referring to the decision in *In re Oriental Inland Steam Co.* (4) : " It was quite true, as was said by Lord Justice Mellish, that Parliament did not

(1) L. R. 9 Ch. 557, 560.        (3) 5 Times L. R. 328.
(2) 3 Ch. D. 594, 599.           (4) L. R. 9 Ch. 557.

2 Ch.                    CHANCERY DIVISION.                    203

legislate for a foreign country. The point, however, was would the Court grant an injunction which was ineffectual, not as being against the foreign Court, but as being against a person who could not be reached ? Supposing, for instance, the case was one of a French creditor suing in a French Court, or of an American creditor in an American Court, the Court, of course, could not grant an injunction, the reason being that the order would be ineffectual. But here the creditor was within the jurisdiction of the Court, had come in under the winding-up order and claimed, and moreover was a British subject permanently residing here. He thought that the case quite fell within the decision in *In re International Pulp and Paper Co.* (1) The doctrine of the Court with respect to injunctions was that they were directed against the person. They were a personal remedy, and in the present case an order for an injunction would be an effectual order against the person sought to be restrained." There is, I think, a certain ambiguity in the report as to the reasons for the decision, but in my view the learned judge was simply enforcing the equity referred to in *In re Oriental Inland Steam Co.* (2), and was not purporting to decide that the section he had to deal with (s. 87 of the Companies Act, 1862) could be held to apply to foreign proceedings. The next case is *Flack's Case.* (3) North J. there purported to follow the authority of *In re Oriental Inland Steam Co.* (2), and I do not think there is anything in his judgment which conflicts with the view I have taken of the true construction of the sections. The last case I shall refer to on this point is the decision of the Court of Appeal in Ireland in *In re Belfast Shipowners Co.* (4) The Court included Walker L.C., Palles C.B., and FitzGibbon L.J., and the judgment of Palles C.B. begins with this observation in reference to s. 87 of the Act of 1862 as applicable to proceedings in the Superior Court of Massachusetts to attach certain sums the property of the company after a winding-up order (5): " Although

MAUGHAM
J.

1932

VOCALION
(FOREIGN),
LD.,
*In re.*

(1) 3 Ch. D. 594.                    (3) [1894] 1 Ch. 369.
(2) L. R. 9 Ch. 557.                 (4) [1894] 1 I. R. 321.
(5) [1894] 1 I. R. 321, 332.

204                       CHANCERY DIVISION.                    [1932]

MAUGHAM
J.

1932

VOCALION
(FOREIGN),
LD.,
In re.

s. 87 does not include Courts in foreign countries, I am of opinion that the Court, under its general jurisdiction, was competent to make an order against the appellants *in personam*, such as that now under appeal. The appellants, though resident in England, are clearly liable to this jurisdiction, as the Company is an Irish one, which can be wound up in this country only, and the appellants are the petitioners upon whose application the winding-up was directed to be continued under supervision. The only real question in the case is, not that of the jurisdiction, which is undoubted, but of its exercise." The conclusion therefore at which I arrive is that, upon principle and authority, s. 177 does not extend to the actions or proceedings which have been commenced in the Supreme Court of Melbourne.

The next question is, so far as I am concerned, determined by the authority of the Court of Appeal in the case cited: *In re Oriental Inland Steam Co.* (1)   It was there held that as the effect of the Act of Parliament the assets of the company became subject to a statutable trust for creditors, and that (as a general rule) so far as the British Court has jurisdiction no one creditor ought to be allowed to have a larger share of the assets than any other creditor. The respondent having been registered here under s. 344 of the Companies Act, 1929, is properly brought within the jurisdiction of the Court, and I have no doubt that, following the decision of the Court of Appeal, this Court has jurisdiction to grant an injunction restraining the prosecution of the proceedings in Melbourne by an injunction operating in personam on the grounds given in the various cases above referred to. The real question in the case, to borrow the language of Palles C.B., is not that of the jurisdiction, which is undoubted, but of its exercise. This question is, I think, one of considerable difficulty and importance.

It will be convenient in the first instance to consider the question apart from the effect of s. 344 of the Companies Act, 1929, that is on the assumption that the Court is dealing with an application for an injunction to restrain a

(1) L. R. 9 Ch. 557.

**2 Ch.**                    CHANCERY DIVISION.                         205

foreign corporation properly served within the jurisdiction
from endeavouring by proceedings in its own Courts brought
to enforce payment of a debt notwithstanding the liquidation
in this country.  It would be difficult to distinguish such a
case from the position that would arise if the respondent
were not a corporate body, but a person domiciled abroad
temporarily resident in this country.  Would it be right
to restrain such a corporation or such a person from exer-
cising such rights of action as may exist in the foreign
country ?  It must be observed in the first place that an
injunction in such circumstances might well be ineffectual :
for the respondent if a corporate body might cease to carry on
business in the jurisdiction and remove its assets, and the same
might take place in regard to a respondent individual.  The
Court in general is very reluctant to exercise a jurisdiction
in personam against a foreigner in relation to a matter in
which there cannot be an effective order.  It may be added
that the Court ought to be satisfied before making the order
that it will not hesitate if the order is disobeyed to commit
or sequestrate the property of the person or company in
default.

In the second place it must be remembered that foreign
creditors of a company in liquidation, not being within the
jurisdiction of the Court, cannot be restrained from taking
such proceedings as they may be advised in their own country ;
and the only result of an injunction to restrain a particular
creditor who can be sued in this country from exercising the
rights which the laws of his country would give him, may be
to benefit other foreign creditors without in any way increasing
the amount of the assets ultimately distributable in the
liquidation in this country.

Next it is to be noted that the rights of creditors in foreign
countries, for instance, in France and Germany, are often
more extensive as against their debtor and his assets than
they are in this country.  For example, they often include
a right to hold up, so to speak, both the movable and
immovable estate of the alleged debtor before judgment so
as to make it available for the payment of the debts when

MAUGHAM
J.

1932
—
VOCALION
(FOREIGN),
LD.,
In re.
—

AP1046

206                            CHANCERY DIVISION.                        [1932]

MAUGHAM
J.

1932

VOCALION
(FOREIGN),
LD.,
In re.

established, a process resembling to some extent the letters of inhibition and arrestment which, as I understand it, may be issued in Scotland in a proper case. It may well be that credit has been given to a debtor by creditors within a foreign jurisdiction in reliance upon the former's known possession of available assets, movable or immovable, capable of being seized or attached. It does not seem to me to be in consonance with the principles of equity to restrain one or more of such creditors who happen, perhaps by accident, to be subject to the jurisdiction of this Court from exercising the rights given to them in the country where they reside and carry on business, as against a company which also carried on business there, and was thus subject to the foreign law. Further, it is to be remembered that an incumbrancer of immovable property situate in a foreign country will not be restrained by injunction from prosecuting proceedings to enforce his security in that country even though the mortgagor is a company in the course of liquidation (see *Moor* v. *Anglo-Italian Bank* (1) ), and that even though the incumbrancer is a British subject or a corporation resident in this country. Some at least of the reasons given by Sir George Jessel in deciding that case appear to me to be applicable to movable as well as to immovable property ; for it seems that a creditor who has obtained in a foreign country security on personal property ought not in equity to be deprived of his rights because of a supervening statutable trust for creditors of a debtor.

Next it should be observed that questions of evidence, of priority, of statutes of limitation, and of set-off must depend on the lex fori, which may well differ from the law of this country, and it would not appear to be fair or just to deprive foreign creditors of any rights which they may have in the foreign country against a company which has carried on business there merely because a summons can properly be served upon them here.

Finally it must be remembered that there may be winding-up orders made in the foreign country where the company has

(1) 10 Ch. D. 681.

AP1047

**2 Ch.**            CHANCERY DIVISION.                           **207**

carried on business and possesses assets. The view of this MAUGHAM
Court is that the principal winding-up should be in the J.
principal domicil of the Corporation, and that any other 1932
winding-up order should be ancillary to the principal winding- VOCALION
up : see Orders and Cases referred to in Palmer, Part II., (FOREIGN),
Winding-up, 13th ed., at pp. 150–1, and see *In re Commercial* Ld.,
*Bank of South Australia.* (1) The effect of one winding-up *In re.*
being ancillary to the principal winding-up has not, I think, been
much considered in our Courts. This Court no doubt holds
that in the winding-up here all creditors, whether British or
foreign, who can prove their debts have equal rights ; but it
would seem that foreign Courts do not always take the same
view (see *Employers' Liability Assurance Corporation* v.
*Sedgwick, Collins & Co.* (2), where the liquidation of the
company in Russia was treated as valid in the House of Lords,
though no provision had been made for English claims).

If there are two winding-up orders, one here and one
abroad, it would seem to be impossible to contend that a
foreign creditor is not to be allowed to prove his debt abroad
and, if the lex fori permits it, to bring an action abroad. In
*Antony Gibbs & Sons* v. *La Société Industrielle et Commerciale
des Métaux* (3), the facts were that the defendants, a French
company, had been the subject of a judgment of judicial
liquidation pronounced by a French tribunal ; yet the Court
of Appeal held that a party to a contract made and to be
performed in England could properly sue the French com-
pany (who had an office here) in England. This is in a sense
the converse of the present case, and the judgments tend,
I think, strongly to support the view that this Court ought
not to restrain a foreigner from securing in a foreign country
such rights in respect of a contract made and to be performed
there as the lex fori will give him. The case was cited with
approval by Lord Davey in delivering the judgment of the
Privy Council in *New Zealand Loan & Mercantile Agency
Co.* v. *Morrison.* (4)

Turning now to the authorities on the question whether
the jurisdiction should be exercised, there is an important

(1) (1886) 33 Ch. D. 174.          (3) (1890) 25 Q. B. D. 399.
(2) [1927] A. C. 95.               (4) [1898] A. C. 349.

208                         CHANCERY DIVISION.                    [1932]

MAUGHAM
J.

1932

VOCALION
(FOREIGN),
LD.,
*In re.*

statement of Cranworth L.C. in *Carron Iron Co.* v. *Maclaren.* (1) It was a case where there had been a decree for administration of the estate of one Henry Stainton who died possessed of considerable real and personal property in both England and Scotland. He had been the London manager of the Carron Iron Company, and apparently owed them at the date of his death a very large sum which they sought to obtain by proceedings in Scotland. The Carron Iron Company had agencies and valuable assets in this country, and an application was made in England for an injunction to restrain the company from further proceeding in Scotland in their suit. The injunction was granted, but the company appealed to the House of Lords. Lord Cranworth delivered the leading judgment and, after showing that there was clear jurisdiction in the Court of Chancery to restrain persons within its jurisdiction from instituting or prosecuting suits in foreign Courts, he proceeded to consider whether such an injunction ought to be granted in the circumstances of that case. After mentioning the reported cases he remarked as follows (2) : " The result of the authorities is, that if the circumstances are such as would make it the duty of the Court to restrain a party from instituting proceedings in this country, they will also warrant it in restraining proceedings in a foreign Court. But though they will justify such a course, yet they will not, as I apprehend, make it the duty of the Court so to act, if from any cause it appears likely to be more conducive to substantial justice that the foreign proceedings should be left to take their course." He then considered the facts of that case, pointed out the difference in many respects between the foreign laws relating to creditors and those of this country, and came to the conclusion that the injunction ought to be dissolved and the foreign corporation allowed to prosecute its own remedy in its own jurisdiction as it might think fit. Lord Brougham came to the same conclusion. Lord St. Leonards in his dissenting judgment placed great reliance on the fact that the company was not only within the jurisdiction of the English Court but was a

(1) 5 H. L. C. 416.              (2) 5 H. L. C. 416, 439.

2 Ch.                    CHANCERY DIVISION.                    209

Scotch corporation ; and I do not read his judgment as MAUGHAM
indicating that he would have differed from Lord Cranworth    J.
if the corporation had been truly a foreign corporation.      1932

    In the case of the *International Pulp and Paper Co.* (1) the   VOCALION
injunction, as I have said, was to restrain proceedings in    (FOREIGN),
Ireland.  In *In re North Carolina Estate Co.* (2) the injunction   LD.,
was against a British subject permanently residing in this    *In re.*
country.  In *In re Wanzer, Ld.* (3), the only question was as
to the validity of a sequestration in Scotland.  In *Flack's
Case* (4) the motion was against an English creditor residing
in this country, and the order preserved for him such security
as he had by the effect of the foreign judgment.  In the
Irish case, *In re Belfast Shipowners Co.* (5), the persons
restrained from proceeding in Massachusetts were not only
British subjects resident in England, but they were actually
petitioners upon whose application the winding-up was
directed to be continued under supervision.  I have been
unable to find any case in which the Court in the exercise
of its jurisdiction in personam has restrained a foreigner or
a foreign corporation from exercising his or its rights in a
foreign Court in relation to a contract to be performed abroad
on the ground that there has been a winding-up order in this
country.                                                        .

    I will add that the propositions contained in ss. 142 and 143
in Westlake's Private International Law, 7th ed., p. 183,
seem to me to be substantially correct, and to tend to the
same conclusion, though the somewhat ancient cases cited
are not, I think, wholly satisfactory as authorities for the
propositions to their full extent ; and it must be remembered,
as pointed out in Dicey (Conflict of Laws, 5th ed., p. 376),
that the principles applicable to the winding-up of a company
differ materially from those affecting bankruptcy.  I can
find, however, no reason to doubt that a person domiciled
abroad can sue in his own Courts a company which, in carrying
on business there, has incurred a debt or liability to him,

        (1) 3 Ch. D. 594.                (3) [1891] 1 Ch. 305.
        (2) 5 Times L. R. 328.           (4) [1894] 1 Ch. 369.
                    (5) [1894] 1 I. R. 321.

VOL. II. 1932.              *R*                        1

210        CHANCERY DIVISION.      [1932]

MAUGHAM J.

1932

VOCALION (FOREIGN), LD., In re.

whether or not that company is being wound up in this country, to which he owes no allegiance and with the laws of which he is not acquainted ; though, as pointed out in Dicey, p. 377, if he desires to benefit under the English winding-up he must, generally speaking (see for an exception *Moor* v. *Anglo-Italian Bank* (1)), give up for the benefit of other creditors any advantage which he may have obtained for himself by the proceedings abroad. If these views be well founded it is difficult to see why an English Court should attempt to restrain such a creditor from enforcing his rights in his own country merely because it is possible to serve him with process here. To prevent a misconception I should point out that I am not here dealing with the case of a British subject or a corporation incorporated under our law, nor am I dealing with the case where the person sought to be restrained from proceedings abroad has made himself a party to the proceedings in the liquidation, for instance by putting in a proof or in some other way.

For these reasons I think that in such a case, and on the hypothesis I am dealing with, the Court ought prima facie not to exercise the equitable jurisdiction which, as I have held, exists, for the reason that in general it will be more conducive in such a case to substantial justice that the foreign proceedings should be allowed to proceed. Then does it make any difference that the respondent Bank in the present case is registered in England pursuant to s. 344 of the Companies Act, 1929, which takes the place of s. 274 of the Act of 1908 ? It has been settled that such a registration amounts to a submission to the jurisdiction of the Courts in this country (*Employers' Liability Assurance Corporation* v. *Sedgwick, Collins & Co.* (2)), and no doubt the Bank has a place of business in London, and may properly be sued in this country. It does not seem to me to follow that a foreign corporation in this petition ought to be treated differently from any other foreigner who can be properly served in this country, so far as concerns the exercise of the jurisdiction in personam which I am now asked to exercise. In considering

(1) 10 Ch. D. 681.        (2) [1927] A. C. 95.

2 Ch.                CHANCERY DIVISION.                    211

this question I must assume that the Supreme Court at MAUGHAM
Melbourne will properly deal with the matter, and will not     J.
disregard so far as it may be material the legal effects of the   1932
liquidation of the Company and the trust for creditors which   VOCALION
has been thereby established; and it should be noted that   (FOREIGN),
the injunction was granted by that Court before the liquidation   In re.
in this country. Moreover, although it is asserted on behalf of
the applicants that the leaseholds of the Company have been
agreed to be sold, there is no evidence that the sale has been
completed; and further it is possible that the proceeds of
sale so far as they can be reached ought to be regarded in
the circumstances as subject to the lex situs just as if the
sale had not taken place, and to that extent, at any rate,
the decision in *Moor* v. *Anglo-Italian Bank* (1) would be an
authority for allowing the respondents to have their rights
finally settled by the Melbourne Court. So far as I can judge
on the materials before me the Bank will have considerable
difficulty in establishing its alleged rights, having regard to
the non-registration of the undertaking to give security and
to other circumstances adumbrated in the affidavits; but
I do not conceive that I have any sufficient ground for holding
that the proceedings must necessarily fail or are brought
otherwise than in good faith. On the whole I have come to
the conclusion that the Court ought not to interfere in the
circumstances of this case with either the debt action or the
security action. The summonses by the Official Receiver
must be dismissed, and leave must be given to the Bank on
the third summons to proceed with the actions in the Supreme
Court at Melbourne.

The Bank should have its costs of all three summonses,
and the liquidator, who has properly raised the question
here, will have his costs out of assets available in the
liquidation.

Solicitors for the liquidator: *Lawrence Jones & Co.*
Solicitors for the Bank: *Markby, Stewart & Wadesons.*

(1) 10 Ch. D. 681.

                                      P. J. B.

        *R* 2                                 1

A. C.                    AND  PRIVY  COUNCIL.                          515

[PRIVY COUNCIL.]

ROBINS . . . . . . . . . . APPELLANT ;          J. C.*

                         AND                    1927

NATIONAL TRUST COMPANY, LIMITED,              } RESPONDENTS.  Feb. 7.
  AND OTHERS   . . . . . . . . }

        ON APPEAL FROM THE SUPREME COURT OF ONTARIO,
                   APPELLATE DIVISION.

_Privy  Council  Practice—Concurrent  Findings—Authority  of  Decision  of
         Appellate Court of Colony._

      The rule of practice of the Judicial Committee that concurrent findings
   of fact will not be interfered with, in the absence of very definite and
   explicit grounds, applies from whatever Court in the Empire the appeal
   is made.
      A decision of the appellate Court in a Colony which is regulated by
   English law is not assumed by the Judicial Committee to be wrong
   because it conflicts with a decision of the Court of Appeal in England ;
   it is otherwise if the conflict is with a decision of the House of Lords
   or of the Privy Council.
      Judgment of the Appellate Division affirmed.

   APPEAL (No. 122 of 1925) from a judgment of the Supreme
Court of Ontario, Appellate Division (April 3, 1925), affirming
a judgment of Mowat J.
   The appellant brought an action in the Supreme Court
of Ontario against the respondents to set aside the will of
E. C. Walker, deceased, dated February 27, 1914, alleging
want of testamentary capacity in the testator, also that the
will was obtained by fraud and undue influence. The
respondents were the executors, trustees and principal
beneficiaries under the will.
   The trial judge (Mowat J.) found against both the above
allegations, and dismissed the action. The Appellate Division
unanimously affirmed the decision by a judgment delivered
by Orde J.A., the other members of the Court (Latchford C.J.,
Middleton J.A. and Masten J.A.) concurring.

   * _Present :_ VISCOUNT FINLAY, VISCOUNT DUNEDIN, LORD PARMOOR,
LORD DARLING, and LORD WARRINGTON OF CLYFFE.

AP1053

516                          HOUSE OF LORDS                    [**1927**]

J. C.        1926.  Nov. 25, 28, 29.  *Stuart Bevan K.C.*, *Fleming K.C.*
1927     and *Sir Robert Aske* for the appellant.
ROBINS         *Osler K.C.* and *Rodd K.C.* for the respondents the National
*v.*      Trust Co.
NATIONAL
TRUST CO.      *Hellmuth K.C.* for the other respondents.

     1927.  Feb. 7.  The judgment of their Lordships was
delivered by

     VISCOUNT DUNEDIN.  The late Edward Chandler Walker
was at first senior partner of the firm of Walker & Sons, and
thereafter when that firm was changed into a limited company
was president of Walker & Sons, Ld., whiskey distillers, in
Walkerville, Ontario.  He was a very wealthy man, married,
but with no children, and he died on March 11, 1915, leaving
a widow.  He left a will of date February 27, 1914, and the
respondents are the trustees and the principal beneficiaries
under the said will.  The said will revoked all prior wills.
The testator had made a prior will on December 21, 1901,
under which the appellant is a beneficiary.  The present
action is at the instance of the appellant to set aside the will
of 1914, and restore the will of 1901.  The grounds on which
he seeks to set aside the will of 1914 are : (1.) Want of testa-
mentary capacity in the testator on the date of the execution
of the said will ; (2.) Fraud or undue influence by which the
testator's brothers obtained the execution of the said will.

     The appellant was manager of the company, both as a firm
and afterwards as a limited company, for a long period, and
was on terms of great intimacy with the testator.  The
appellant left Walkerville in 1914, and went to England.
He alleges that he only came to know of the will of 1901
under which he was a beneficiary, and of the state of affairs
as at the date of the will of 1914, in April, 1922.  On June 23,
1923, he raised the present action against the executors,
and the beneficiaries were afterwards added as defendants.

     The action was tried before Mowat J. without a jury.
Evidence was read on both sides.  The evidence was volu-
minous and contradictory, and the trial lasted six or seven
days.  The learned judge found that no testamentary incapacity

AP1054

**A. C.**                     AND PRIVY COUNCIL.                     517

of the testator had been made out, and that it had not been
shown that the execution of the will was induced by fraud
or undue influence, and he dismissed the action. Appeal
was taken to the Appellate Division of the Supreme Court
of Ontario, and that Court unanimously affirmed the judg-
ment of the trial judge. Appeal has now been taken to the
King in Council, and the appellant has sought to induce
their Lordships who sat on this Board to examine and revise
the evidence and to come to the conclusion that the result
arrived at by the trial judge and the Appellate Division
was wrong.

J. C.
1927
ROBINS
v.
NATIONAL
TRUST CO.

This raises in a quite distinct way the question of whether
their Lordships will examine the evidence in order to interfere
with the concurrent findings of two Courts on a pure question
of fact. Whether a man at the time of making his will had
testamentary capacity, whether a will was the result of his
own wish and act or was procured from him by means of
fraud or circumvention or undue influence, are pure questions
of fact. The rule as to concurrent findings is not a rule
based on any statutory provision. It is rather a rule of
conduct which the Board has laid down for itself. As such
it has gradually developed. The judicature which has given
greatest occasion for its development has undoubtedly been
the judicature of India, but the principle is not in any way
limited in its application to Indian legislation or Indian law,
be it Hindu or Moslem, as such. Indeed it is obvious that
if such a rule is a good rule to be applied to the findings of
the Courts in India, there could be no reason for suggesting
that the findings of the Courts of our great self-governing
Dominions should be entitled to less consideration. Their
Lordships wish it to be clearly understood that the rule of
conduct is a rule of conduct for the Empire, and will be
applied to all the various judicatures whose final tribunal is
this Board.

Being, as has been said, a rule of conduct, and not a
statutory provision, the rule is not cast iron ; but it would
avail little to try to give a definition which should at once
be exhaustive and accurate, of the exceptions which may

518                         HOUSE OF LORDS                    [1927]

J. C.
1927
ROBINS
v.
NATIONAL
TRUST CO.

arise. It will be sufficient to quote what has been said on this subject in the past :—

In *Moung Tha Hnyeen* v. *Moung Pan Nyo* (1) Lord Hobhouse, delivering the judgment of a Board which included Lord Macnaghten and Lord Lindley, said : " There has been nothing to show that there has been a miscarriage of justice, or that any principles of law or of procedure have been violated in the Courts below: This case is one which very decidedly falls within the valuable principle recognised here and commonly observed in second Courts of Appeal, that such a Court will not interfere with concurrent judgments of the Courts below on matters of fact, unless very definite and explicit grounds for that interference are assigned."

In *Rani Srimati* v. *Khajendra Narayan Singh* (2) Lord Lindley repeated the view: " The appellants have failed to show any miscarriage of justice, or the violation of any principle of law or procedure. Their Lordships, therefore, see no reason for departing from the usual practice of this Board of declining to interfere with two concurrent findings on pure questions of fact."

There was a faint attempt made in the present case to argue that what the appellant considered a quite inadequate appreciation and an unjustifiable belittling of a certain witness whom he regarded as all important would amount to a miscarriage of justice. The expression means no such thing. It means such departure from the rules which permeate all judicial procedure as to make that which happened not in the proper use of the word judicial procedure at all. There is, however, also another way of preventing the application of the rule. If it can be shown that the finding of one of the Courts is so based on an erroneous proposition of law that if that proposition be corrected the finding disappears, then in that case it is no finding at all. Such an attempt was made with great skill and pertinacity by Mr. Bevan for the appellant in the present case. He laid stress on the law as it had been authoritatively settled in England, and in Ontario in such matters the law of England

(1) (1900) L. R. 27 I. A. 166, 167.      (2) (1904) L. R. 31 I. A. 127, 131.

AP1056

**A. C.**          AND PRIVY COUNCIL.          519

rules. Now the English Courts have gone what some might think pretty far on the question of what duty lies on those who propound a will. Those who propound a will must show that the will of which probate is sought is the will of the testator, and that the testator was a person of testamentary capacity. In ordinary cases if there is no suggestion to the contrary any man who is shown to have executed a will in ordinary form will be presumed to have testamentary capacity, but the moment the capacity is called in question then at once the onus lies on those propounding the will to affirm positively the testamentary capacity. Moreover, if a will is only proved in common and not in solemn form, the same rule applies, even though the action is to attack a probate which has been granted long ago.

These propositions will be found to be settled by the following cases : *Barry* v. *Butlin* (1) ; *Cross* v. *Cross* (2) ; *Tyrrell* v. *Painton.* (3)

Now their Lordships will assume that these cases are right. The reason for this form of expression is that the appellant represented that the Appellate Division of the Supreme Court of Ontario in the case of *Larocque* v. *Landry* (4) had taken another view, in that it held that once probate was granted, though only in common form, the onus was on him who sought to set it aside, and the Court in this case held itself bound by that case. It is questionable whether that is the result of the decision. But assuming that it is, when an appellate Court in a colony which is regulated by English law differs from an appellate Court in England, it is not right to assume that the Colonial Court is wrong. It is otherwise if the authority in England is that of the House of Lords. That is the supreme tribunal to settle English law, and that being settled, the Colonial Court, which is bound by English law, is bound to follow it. Equally, of course, the point of difference may be settled so far as the Colonial Court is concerned by a judgment of this Board. But in the present case their Lordships do not consider it necessary to

J. C.

1927

ROBINS
*v.*
NATIONAL
TRUST CO.

(1) (1838) 2 Moo. P. C. 480.    (3) [1894] P. 151.
(2) (1864) 3 Sw. & Tr. 292.    (4) (1922) 52 Ont. L. R. 479.

520                         HOUSE OF LORDS                    [1927]

J. C.

1927

ROBINS
v.
NATIONAL
TRUST CO.

settle which of the two possible views as to the onus is right ;
they will assume, for the purposes of this discussion, that
the English rule is right.  But given the law the appellant
in their Lordships' opinion fails in its application to the
facts.

Their Lordships cannot help thinking that the appellant
takes rather a wrong view of what is truly the function of the
question of onus in such cases.  Onus is always on a person
who asserts a proposition or fact which is not self-evident.
To assert that a man who is alive was born requires no proof.
The onus is not on the person making the assertion, because
it is self-evident that he had been born.  But to assert that
he was born on a certain date, if the date is material, requires
proof ; the onus is on the person making the assertion.  Now,
in conducting any inquiry, the determining tribunal, be it
judge or jury, will often find that the onus is sometimes on
the side of one contending party, sometimes on the side of the
other, or as it is often expressed, that in certain circumstances
the onus shifts.  But onus as a determining factor of the
whole case can only arise if the tribunal finds the evidence
pro and con so evenly balanced that it can come to no such
conclusion.  Then the onus will determine the matter.  But
if the tribunal, after hearing and weighing the evidence,
comes to a determinate conclusion, the onus has nothing to
do with it, and need not be further considered.

That seems to their Lordships the case here.  After
reviewing the evidence as to capacity the learned trial
judge says : " The result of this evidence pieced together,
dovetailed together, combined and considered as a whole
does not make me think that there was anything which would
affect the mind or which would show the incapacity of the
late E. C. Walker to make his will when he did."  The
Appellate Division first stated the grounds put forward by
the appellant for the reversal of the judgment of the trial
judge thus : " That the evidence established that the testator
was not mentally capable of making a will at the time when
the alleged will was executed " ; and after examining the
evidence the judgment concludes thus : " The plaintiff

AP1058

A. C.                    AND PRIVY COUNCIL.                    521

clearly fails upon the first of his grounds for the reversal of
the judgment."                                -

There is a passage at the beginning of the trial judge's
judgment which shows that on the question of onus he agreed
with what had been laid down by the Court of Ontario, and
the appellant argued that the learned judges of the Appellate
Division must be presumed to have had the same views, and
that, consequently, the whole judgment was vitiated by this
wrong view as to onus.  But, as has been already explained,
there was no question of onus in the determination as it came
to be made.  It was a considered result of the evidence, and
onus as a determining factor never arose, for the learned judges
could, and did, come to a positive conclusion on the evidence
laid.  Learned counsel laid stress on the fact that the trial
judge expressed the result of his view in a negative fashion :
" The evidence does not make me think that there was any-
thing which would show the incapacity of the testator."
And he argued that that was no positive finding of capacity
as the authorities require.  The learned judge was not dealing
with onus.  He was stating a result in ordinary English, and
to say that the above sentence was not a positive finding
of capacity seems to their Lordships as out of the question
as to say that if one said of a man that he was not dead on
a certain date there was no finding that he was alive.

Their Lordships therefore think that the attempt to avoid
the effect of the concurrent finding rule fails.  Much was
sought to be made of the unfair way in which the appellant
argued the trial judge had treated the evidence of a certain
Dr. Shurly.  Some of the criticisms he made do not particu-
larly recommend themselves to their Lordships, but in the
end he came to his result on a consideration of the whole
evidence.  That the Court of Appeal looked at the evidence
in rather a different way matters not, for the rule is a rule
as to concurrent findings, and not a rule as to concurrent
reasons.  Thus in *Ram Anugra Narain Singh* v. *Chowdhry
Hanuman Sahai* (1) the judgment of their Board states: "The
rule (as to concurrent findings) is none the less applicable

J. C.
1927

ROBINS
*v.*
NATIONAL
TRUST CO.

(1) (1902) L. R. 30 I. A. 41, 43.

A. C. 1927.                           3          2 O

522                          HOUSE OF LORDS                          [1927]

J. C.
1927
ROBINS
*v.*
NATIONAL
TRUST CO.

because the Courts may not have taken precisely the same view of the weight to be attached to each particular item of evidence.'' No question of this sort arises as to the procuring of the will by fraud or undue influence, because it is admitted that in that case the onus is always on the person who attacks the will : see *Craig* v. *Lamoureux.* (1)

In their Lordships' opinion the rule as to concurrent findings clearly applies in this case, and the appeal falls to be dismissed. A petition was lodged for the admission of new evidence. This application had been made to the Court of Appeal and refused. Their Lordships will be slow indeed to interfere with the decision of the local Court on what is really a question of discretion and procedure. This petition therefore falls to be dismissed with costs.

Their Lordships will humbly advise His Majesty in accordance with the above opinion. The appellant will pay the costs of the appeal.

Solicitors for appellant : *Collyer-Bristow & Co.*
Solicitors for respondents : *Blake & Redden ; Freshfields, Leese & Munns.*

(1) [1920] A. C. 349.

AP1060

Case 1:23-cv-00680-CFC-TMH Document 129-2 Filed 08/23/23 Page 62 of 300 PageID #: 1128

*a*

# Rubin and another v Eurofinance SA and others

*b*

# New Cap Reinsurance Corp Ltd v Grant and others

### [2012] UKSC 46

*c*

SUPREME COURT

LORD WALKER OF GESTINGTHORPE, LORD MANCE, LORD CLARKE OF STONE-CUM-EBONY, LORD SUMPTION AND LORD COLLINS OF MAPESBURY SCJJ

21–24 MAY, 24 OCTOBER 2012

*d*

*Conflict of laws – Foreign judgment – Recognition and enforcement – Judgment in default against third party in foreign insolvency proceedings – Foreign judgment setting aside voidable transaction entered into prior to insolvency – Whether enforcement of judgment in England subject to common law rules relating to foreign in personam judgments – Whether necessary to show defendant was either present in foreign country at time of foreign proceedings or submitted to jurisdiction of foreign court – Whether judgment enforceable as part of collection of assets in cross-border insolvency.*

*e*

*Conflict of laws – Foreign judgment – Recognition and enforcement – Judgment in default against third party in foreign insolvency proceedings – Defendant's submission to jurisdiction of foreign court – Whether submitting proof of debt and receiving dividends in liquidation amounting to submission to jurisdiction of foreign court supervising liquidation.*

*f*

In two separate appeals the issue arose whether a judgment in default against a third party in foreign insolvency proceedings setting aside a voidable transaction entered into prior to the insolvency, such as a preference or transaction at an undervalue, was to be treated in the same way and subject to the same common law rules as any other foreign in personam judgment for the purposes of recognition and enforcement in England and Wales, and in particular whether the rule requiring the defendant to have been either present in the foreign country at the time of the foreign proceedings or to have submitted to the jurisdiction of the foreign court applied; or whether the judgment was to be treated as part of the process of collection of assets in a cross-border insolvency for equal distribution to creditors whose rights were admitted or established, in which case English courts, applying the principle of modified universalism where it was consistent with justice and public policy to do so, were required to co-operate with the courts of the country of the principal liquidation in order to ensure that all the company's assets were distributed to its creditors under a single system of distribution.

Subsidiary issues arose whether if the common law rules did not apply, foreign bankruptcy proceedings could be recognised as a foreign main

*g*

*h*

*i*

AP1061

a  proceeding under the UNCITRAL Model Law, as implemented by the Cross-Border Insolvency Regulations 2006, and whether the judgment of an Australian court could be enforced under the Foreign Judgments (Reciprocal Enforcement) Act 1933. Article 21 of the Model Law provided that on recognition of a foreign proceeding, where it was necessary to protect the assets of the debtor or the interests of the creditors the court

b  could, at the request of the foreign representative, 'grant any appropriate relief', and arts 25 and 27 gave a British court discretion to co-operate with foreign courts or foreign representatives 'to the maximum extent possible' and 'by any appropriate means'.

   In the first appeal, a dubious sales promotion scheme was operated in the USA and Canada through an English trust set up by the first appellant, a

c  company owned by the second, third and fourth appellants. The scheme collapsed when it ran foul of consumer protection legislation in the US and potential awards against the trust were likely to exceed the funds held by it. The respondents were appointed joint receivers and managers of the trust by the High Court in England. They obtained Chapter 11 bankruptcy

d  protection for the trust in New York and having been appointed by the US Bankruptcy Court to be the legal representatives of the trust they brought 'adversary proceedings' under US bankruptcy law against the appellants in New York, alleging inter alia fraudulent conveyances and avoided transfers (which were generally equivalent to avoidance proceedings under English law) in respect of amounts paid out or transferred to the appellants in the

e  year before the commencement of the bankruptcy of the trust. The appellants, who were not resident in the United States, chose not to enter an appearance or submit to the jurisdiction of the New York court and summary judgment in default was entered against them for about $US10m. The receivers applied to the High Court for an order that the New York judgment be enforced as a judgment of the English court under CPR Pts 70

f  and 73. The deputy judge refused to enforce the New York judgment, on the grounds (i) that at common law a default judgment in foreign insolvency proceedings could not be directly enforced in the High Court if the defendant was not subject to the foreign court's jurisdiction, and (ii) that arts 21 and 25 of the Model Law did not justify the enforcement of judgments in insolvency proceedings, since the Model Law was not

g  intended to replace the conflict of laws rules of enacting states. The receivers appealed to the Court of Appeal, which upheld the appeal on the grounds that although the judgment of the New York court had all the indicia of a judgment in personam the ordinary rules for enforcing foreign judgments in personam did not apply to bankruptcy proceedings, and under

h  the doctrine of modified universalism the judgment was enforceable as part of the collective proceeding to enforce the rights of creditors. The appellants appealed to the Supreme Court.

   In the second appeal the appellants were members of a Lloyd's syndicate which placed reinsurance with an Australian reinsurance company which made two payments to the syndicate to commute its liabilities and soon

i  afterwards went into liquidation in New South Wales. The syndicate submitted a proof of debt and was credited with dividends in the winding up of the company. The liquidator brought proceedings in New South Wales to set aside and recover the payments on the grounds that they were a preference because the company was insolvent when they were made. The

Case 1:23-cv-00630-MN Document 129-2 Filed 08/23/23 Page 63 of 90 PageID #: 1130

syndicate objected to, and refused to submit to, the jurisdiction of the
Australian court. The Supreme Court of New South Wales upheld the
liquidator's claim, declared that the two payments were voidable
transactions, entered judgment in default against the syndicate members,
and ordered them to repay the two sums to the liquidator. On the
liquidator's application the Australian court issued a letter of request to the
High Court in England requesting that it exercise its jurisdiction under
s 426 of the Insolvency Act 1986 to act in aid of and assist the Australian
court by ordering the syndicate to pay the amount of the Australian
judgment, alternatively by allowing the liquidator to commence fresh
proceedings in England. The judge held that the Australian judgment was
enforceable under s 426 of the Insolvency Act 1986 and also at common
law. The syndicate appealed to the Court of Appeal which followed its
decision in the first appeal and dismissed the appeal on the grounds that the
Australian judgment could be registered in England under the 1933 Act and
s 426 of the 1986 Act , since the fact that the syndicate did not submit to
the jurisdiction of the Australian court was not a bar to enforceability of the
judgment. The syndicate appealed to the Supreme Court.

**Held** – (1) (Lord Clarke dissenting) A default judgment in foreign
insolvency proceedings setting aside a transaction relating to assets
transferred prior to the insolvency, on the grounds that the transaction was
a voidable preference or was at an undervalue, was to be treated in the
same way and subject to the same common law rules as any other foreign in
personam judgment for the purposes of recognition and enforcement in
England and Wales. That meant that the judgment was not enforceable
against the defendant unless he was present in the foreign country at the
time of the proceedings or submitted to the jurisdiction of the foreign court.
Judgments in cross-border insolvency proceedings did not form a separate
category of insolvency judgments for the purpose of recognition and
enforcement in England and Wales, since there was no difference in
principle between a foreign judgment against a debtor on a debt due to a
company in liquidation and a foreign judgment against a creditor for
repayment of a preferential payment. Accordingly, the rules regarding the
collective enforcement of, and collection of assets in, cross-border
insolvency proceedings under the doctrine of modified universalism did not
apply to the enforcement of foreign insolvency judgments. (See [92],
[105]–[106], [115]–[117], [126]–[132], [178], below.) *Cambridge Gas
Transport Corp v Navigator Holdings plc Creditors Committee* [2006]
UKPC 26, [2007] 2 BCLC 141 doubted and not followed. *Re HIH Casualty
and General Insurance Ltd* [2012] 2 BCLC 655 considered.

(2) Applying the general rule that a party was taken to have waived his
objection to the jurisdiction of a court if he took some step which was only
necessary or useful if his objection to jurisdiction was actually waived or
never entertained at all, the syndicate in the second appeal was to be taken
to have submitted to the jurisdiction of the Australian court, because by
choosing to submit to the Australian insolvency proceedings it had
submitted to the jurisdiction of the Australian court responsible for the
supervision of those proceedings. Moreover, the 1933 Act applied to the
enforcement of Australian judgments in civil and commercial matters and
since that included insolvency proceedings the judgment of the New South

AP1063

a   Wales court was enforceable by registration under the 1933 Act rather than
    by the common law. However (Lord Clarke dissenting), in the first appeal,
    the appellants had not appeared in the adversary proceedings or submitted
    to the jurisdiction of the US Bankruptcy Court in any other way and
    therefore the judgment of the New York court was not enforceable in
    England against the appellants. The first appeal would therefore be allowed
b   and the second appeal dismissed. (See [159]–[160], [167], [169],
    [175]–[178], below.) Dicta of Lord Fraser in *Williams & Glyn's Bank plc v
    Astro Dinamico Cia Naviera SA* [1984] 1 All ER 760 at 764 applied.
        (3) The UNCITRAL Model Law, as implemented by the 2006 regulations,
    was not designed to provide for the reciprocal enforcement of judgments, as
    neither the Model Law nor the regulations made express provision for the
c   enforcement of foreign judgments against third parties, and they were not
    intended to deal with judgments in insolvency matters by implication. It
    followed that the judgment of the New York court in the first appeal could
    not be enforced under the Model Law and 2006 regulations. (See
    [142]–[144], [178], [205], below.)
d   Decisions of the Court of Appeal [2011] 2 BCLC 473 and [2012]
    1 All ER 755 reversed.

    **Cases referred to in judgment**
    *Adams v Cape Industries plc* [1990] BCLC 479, [1991] 1 All ER 929,
      [1990] Ch 433, [1990] 2 WLR 657, CA; *affg* [1991] 1 All ER 929, [1990]
      Ch 433.
e   *African Farms Ltd, Re* [1906] TS 373, Trsvl SC.
    *Akai Pty Ltd v People's Insurance Co Ltd* [1998] 1 Lloyd's Rep 90.
    *Akande v Balfour Beatty Construction Ltd* [1998] ILPr 110.
    *Al Sabah v Grupo Torras SA* [2005] UKPC 1, [2005] 1 All ER 871, [2005]
      2 AC 333, [2005] 2 WLR 904.
f   *Ali v Pattni* [2006] UKPC 51, [2007] 2 All ER (Comm) 427, sub nom
      *Pattni v Ali* [2007] 2 AC 85, [2007] 2 WLR 102.
    *Amin Rasheed Shipping Corp v Kuwait Insurance Co, The Al Wahab*
      [1983] 2 All ER 884, [1984] AC 50, [1983] 3 WLR 241, HL.
    *Bank of Credit and Commerce International SA, Re* (No 11) [1997]
      1 BCLC 80, sub nom *Re Bank of Credit and Commerce International*
g     (No 1) [1996] 4 All ER 796, [1997] Ch 213, [1997] 2 WLR 172.
    *Banque Indosuez SA v Ferromet Resources Inc* [1993] BCLC 112.
    *Barcelona Traction, Light and Power Co Ltd, Re* (*second phase*)
      (*Belgium v Spain*) [1970] ICJ Rep 3, Int Ct of Just.
    *Beals v Saldanha* [2003] 3 SCR 416, Can SC.
h   *Bergerem v Marsh* (1921) B & CR 195, 91 LJKB 80, KB.
    *Berliner Industriebank Akt v Jost* [1971] 2 All ER 1513, [1971] 2 QB 463,
      [1971] 3 WLR 61, CA.
    *Byers v Yacht Bull Corp* [2010] EWHC 133 (Ch), [2010] 2 BCLC 169.
    *Cambridge Gas Transport Corp v Navigator Holdings plc Creditors
      Committee* [2006] UKPC 26, [2007] 2 BCLC 141, [2006] 3 All ER 829,
i     [2007] 1 AC 508, [2006] 3 WLR 689.
    *Cavell Insurance Co, Re* (2006) 80 OR (3d) 500, 269 DLR (4th) 679, Ont
      CA.
    *CCIC Finance Ltd v Guangdong International Trust & Investment Corp*
      [2005] 2 HKC 589, HK Ct of 1st Inst.

AP1064

*Condor Insurance Ltd, Re* (2010) 601 F 3d 319, US CA (5th Circ).

*Credit Suisse Fides Trust v Cuoghi* [1997] 3 All ER 724, [1998] QB 818, [1997] 3 WLR 871, CA.

*Desert Sun Loan Corp v Hill* [1996] 2 All ER 847, CA.

*F-Tex SIA v Lietuvos-Anglijos UAB-Jadecloud-Vilma* Case C-213/10 (19 April 2012, unreported), ECJ.

*Flightlease (Ireland) Ltd (in liq), Re* [2012] IESC 12, Ir SC.

*Galbraith v Grimshaw* [1910] AC 508, [1908–10] All ER Rep 561, HL.

*Gavin Gibson & Co Ltd v Gibson* [1913] 3 KB 379.

*German Graphics Graphische Maschinen GmbH v Schee* Case C-292/08, [2009] ECR I-8421, ECJ.

*Godard v Gray* (1870) LR 6 QB 139, 40 LJQB 62, DC.

*Gourdain v Nadler* Case C-133/78, [1979] ECR 733, [1979] 3 CMLR 180, ECJ.

*Gourmet Resources International Inc v Paramount Capital Corp* (1991) 3 OR (3d) 286, [1993] ILPr 583, Ont Ct of Just (Gen Div); *affd* (1993) 14 OR (3d) 319, Ont CA.

*Hayward (decd), Re* [1997] 1 All ER 32, [1997] Ch 45, [1996] 3 WLR 674.

*Henderson, Re, Nouvion v Freeman* (1890) 15 App Cas 1, HL.

*HIH Casualty and General Insurance Ltd, Re, McMahon v McGrath* [2008] UKHL 21, [2012] 2 BCLC 655, [2008] 1 WLR 852.

*Hughes v Hannover Rückversicherungs-AG* [1997] 1 BCLC 497, CA.

*Impex Services Worldwide Ltd, Re* [2004] BPIR 564, IoM HC.

*Industrial Maritime Carriers (Bahamas) Inc v Sinoca International Inc, The Eastern Trader* [1996] 2 Lloyd's Rep 585.

*Indyka v Indkya* [1967] 2 All ER 689, [1969] 1 AC 33, [1967] 3 WLR 510, HL.

*Lines Bros Ltd, Re* [1982] 2 All ER 183, [1983] Ch 1, [1982] 2 WLR 1010, CA.

*Maxwell Communications Corp v Barclays Bank plc* (1994) 170 Bankr R 800, US Bktcy Ct, NY SD; *affd* (1996) 93 F 3d 1036, US CA (2nd Circ).

*Metcalfe & Mansfield Alternative Investments, Re* (2010) 421 BR 685, US Bktcy Ct, NY SD.

*Modern Terminals (Berth 5) Ltd v States Steamship Co* [1979] HKLR 512, HK HC.

*Morguard Investments Ltd v De Savoye* [1990] 3 SCR 1077, Can SC.

*New Cap Reinsurance Corp v Grant* [2009] NSWSC 662, 257 ALR 740, NSW SC.

*New Cap Reinsurance Corp v Renaissance Reinsurance Ltd* [2002] NSWSC 856, NSW SC.

*Oakley v Ultra Vehicle Design Ltd* [2005] EWHC 872 (Ch), [2006] BCC 57, [2005] ILPr 55, [2006] BPIR 115.

*Owens Bank Ltd v Bracco* [1992] 2 All ER 193, [1992] 2 AC 443, [1992] 2 WLR 621, HL.

*Paramount Airways Ltd, Re* [1992] BCLC 710, [1992] 3 All ER 1, [1993] Ch 223, [1992] 3 WLR 690, CA.

*Rein v Stein* (1892) 66 LT 469, DC; *affd* [1892] 1 QB 753, CA.

*Robertson, Ex p, Re Morton* (1875) LR 20 Eq 733, Ct of Eq (Bktcy).

AP1065

a  *Seagon v Deko Marty Belgium NV* Case C-339/07, [2009] Bus LR 1151,
   [2009] 1 WLR 2168, ECJ.

   *Siskina (cargo owners) v Distos Cia Naviera SA, The Siskina* [1977]
   3 All ER 803, [1979] AC 210, [1977] 3 WLR 818, CA and HL.

   *Société Eram Shipping Co Ltd v Compagnie Internationale de Navigation*
   [2003] UKHL 30, [2003] 3 All ER 465, [2004] AC 260, [2003] 3 WLR
b  21, HL.

   *Solomons v Ross* (1764) 1 H Bl 131n, 126 ER 79, LC.

   *Southern Equities Corp Ltd (in liq), Re, England v Smith* [2000] 2 BCLC
   21, [2001] Ch 419, [2000] 2 WLR 1141, CA.

   *Spiliada Maritime Corp v Cansulex Ltd, The Spiliada* [1986] 3 All ER 843,
   [1987] AC 460, [1986] 3 WLR 972, HL.

c  *Starlight International Inc v Bruce* [2002] EWHC 374 (Ch), [2002] ILPr
   617, [2002] All ER (D) 192 (Mar).

   *Stone & Rolls Ltd (in liq) v Moore Stephens (a firm)* [2009] UKHL 39,
   [2009] 2 BCLC 563, [2009] 4 All ER 431, [2009] AC 1391, [2009]
   3 WLR 455.

d  *Swissair Schweizerische Luftverkehr-AG, Re* [2009] EWHC 2099 (Ch),
   [2009] BPIR 1505, [2010] BCC 667.

   *Television Trade Rentals, Re* [2002] EWHC 211 (Ch) [2002] BCC 807,
   [2002] BPIR 859.

   *Travers v Holley* [1953] 2 All ER 794, [1953] P 246, CA.

   *Trepca Mines Ltd, Re* [1960] 3 All ER 304, [1960] 1 WLR 1273, CA.

e  *Turners & Growers Exporters Ltd v Ship 'Cornelis Verolme'* [1997] 2
   NZLR 110, [2000] BPIR 896, NZ HC.

   *UBS AG (as successor to Swiss Bank Corp) v Omni Holding AG (in liq)*
   [2000] 2 BCLC 310, [2000] 1 WLR 916.

   *Williams & Glyn's Bank plc v Astro Dinamico Cia Naviera SA* [1984]
   1 All ER 760, [1984] 1 WLR 438, HL.

f  *Williams v Jones* (1845) 13 M & W 628, 153 ER 262, Exch.

**Appeals**

*Rubin and another v Eurofinance SA and others*

The appellants, Eurofinance SA, Adrian Roman, Justin Roman and
g  Nicholas Roman, appealed from the decision of the Court of Appeal (Ward,
Wilson LJJ and Henderson J) ([2010] EWCA Civ 895, [2011] 2 BCLC 473,
[2011] 1 All ER (Comm) 287, [2011] Ch 133) delivered on 30 July 2010
allowing the appeal of the respondents, David Rubin and Henry Lan, the
joint receivers and managers of The Consumers Trust (TCT), from the
decision of Nicholas Strauss QC ([2010] 1 All ER (Comm) 81) sitting as a
h  deputy judge of the High Court in the Chancery Division on 31 July 2009
refusing to grant an order enforcing, as a judgment of the English courts,
the decision of the United States Bankruptcy Court for the Southern
District of New York in which that court held that the appellants were liable for the
debts of TCT totalling $US160m and for sums transferred to them whilst
i  TCT was insolvent. The facts are set out in the judgment of Lord Collins.

*New Cap Reinsurance Corp Ltd v Grant and others*

The defendants, A E Grant and others as members of Lloyd's syndicate 991
for the 1997 and 1998 years of account (the syndicate), appealed from the
decision of the Court of Appeal (Mummery, Lloyd and Macfarlane LJJ)

([2011] EWCA Civ 971, [2012] 1 All ER 755, [2012] 1 All ER (Comm) *a*
1207, [2012] 2 WLR 1095) delivered on 9 August 2011 dismissing their
appeal from the order made by Lewison J (2011 EWHC 677 (Ch)) on
15 March 2011 under s 426 of the Insolvency Act 1986 registering an order
dated 11 September 2009 made by Barrett J in the Supreme Court of New
South Wales against the syndicate in favour of the respondent, New Cap
Reinsurance Corporation Ltd. The respondent cross-appealed. The facts are *b*
set out in the judgment of Lord Collins.

Irving Picard, the trustee for the liquidation in the United States of
Bernard L Madoff Investment Securities LLC, and Vizcaya Partners Ltd and
Asphalia Fund Ltd against both of whom the trustee was seeking to enforce
judgments in Gibraltar, were given permission to intervene by written
submissions. *c*

*Marcus Staff* (instructed by *Brown Rudnick LLP*) for the appellant
Eurofinance.

*Robin Knowles QC* and *Blair Leahy* (instructed by *Edwards Wildman
Palmer UK LLP*) for the appellant Lloyd's syndicate.

*Robin Dicker QC* and *Tom Smith* (instructed by *Chadbourne & Parke* *d*
*LLP*) for the respondent receivers of TCT.

*Gabriel Moss QC* and *Barry Isaacs QC* (instructed by *Mayer Brown
International LLP*) for the respondent New Cap Reinsurance.

*Pushpinder Saini QC*, *Adrian Briggs*, *Shaheed Fatima*, *Ian Fletcher* and
*Stephen Robins* (instructed by *Taylor Wessing*) for the intervener *e*
Mr Picard.

*Michael Driscoll QC* and *Rosanna Foskett* (instructed by *Wilsons Solicitors
LLP & Wedlake Bell LLP*) for the interveners Vizcaya Partners Ltd and
Asphalia Fund Ltd.

*Cur adv vult*
*f*

24 October 2012. The following judgments were delivered.

**LORD COLLINS SCJ** (Lord Walker and Lord Sumption concurring).

I INTRODUCTION

*The appeals*

[1] There are two appeals before the court: *Rubin v Eurofinance SA* *g*
(*Rubin*) and *New Cap Reinsurance Corp Ltd v Grant* (*New Cap*). These
appeals raise an important and novel issue in international insolvency law.
The issue is whether, and if so, in what circumstances, an order or judgment
of a foreign court (on these appeals the United States Bankruptcy Court for
the Southern District of New York and the New South Wales Supreme
Court) in proceedings to adjust or set aside prior transactions, *h*
eg preferences or transactions at an undervalue (avoidance proceedings),
will be recognised and enforced in England. The appeals also raise the
question whether enforcement may be effected through the international
assistance provisions of the UNCITRAL Model Law (implemented by the
Cross-Border Insolvency Regulations 2006 (SI 2006/1030) (the 2006
regulations)), which applies generally, or the assistance provisions of s 426 *i*
of the Insolvency Act 1986, which applies to a limited number of countries,
including Australia.

[2] In *Rubin* a judgment of the US Federal Bankruptcy Court for the
Southern District of New York (the US Bankruptcy Court) in default of

*a*   appearance for about $US10m under state and federal law in respect of fraudulent conveyances and transfers was enforced in England at common law. In *New Cap* (in which the Court of Appeal was bound by the prior decision in *Rubin*) a default judgment of the New South Wales Supreme Court, Equity Division, for about $US8m in respect of unfair preferences under Australian law was enforced under the Foreign Judgments (Reciprocal Enforcement) Act 1933 (the 1933 Act), and, alternatively,

*b*   pursuant to powers under s 426 of the Insolvency Act 1986.

[3] In each of the appeals it was accepted or found that the party against whom they were given was neither present (nor, for the purposes of the 1933 Act, resident) in the foreign country nor submitted to its jurisdiction (which are the relevant conditions for enforceability at common law and

*c*   under the 1933 Act), but that those conditions did not apply to judgments or orders in foreign insolvency proceedings.

[4] In addition to the arguments on these two appeals, the court has had the great benefit of written submissions on behalf of parties to proceedings pending in Gibraltar. Those proceedings are to enforce default judgments

*d*   entered by the US Bankruptcy Court for some $247m in respect of alleged preferential payments to companies in the British Virgin Islands and Cayman Islands arising out of the notorious Ponzi scheme operated by Mr Bernard Madoff.

[5] It has been necessary to emphasise that the judgments in all three matters were in default of appearance, because if the judgment debtors had

*e*   appeared and defended the proceedings in the foreign courts, the issues on these appeals would not have arisen. The reason is that the judgments would have been enforceable on the basis of the defendants' submission to the jurisdiction of the foreign court. Enforcement would have been at common law, or, in the *New Cap* case either under the common law, or under the 1933 Act which substantially reproduces the common law

*f*   principles—there is a subsidiary issue on this appeal as to whether the 1933 Act applies to judgments in insolvency proceedings, dealt with in Section IX below.

[6] Under the common law a court of a foreign country has jurisdiction to give a judgment in personam where (among other cases) the judgment debtor was present in the foreign country when the proceedings were

*g*   instituted, or submitted to the jurisdiction of the foreign court by voluntarily appearing in the proceedings. In the case of the 1933 Act the foreign court is deemed to have jurisdiction where the judgment debtor submitted to the jurisdiction by voluntarily appearing in the proceedings otherwise than for the purpose (inter alia) of contesting the jurisdiction; or

*h*   where the judgment debtor was resident at the time when the proceedings were instituted, or being a body corporate had an office or place of business there: s 4(2)(a)(i), (iv).

*The Dicey Rule*

[7] The general principle has been referred to on these appeals, by reference to the common law rule set out in *Dicey, Morris & Collins,*

*i*   *Conflict of Laws* (14th edn, 2006), as 'Dicey's Rule 36'. This was only by way of shorthand, because the rules in the 1933 Act are not quite identical, and in any event has been purely for convenience, because the rule has no standing beyond the case law at common law which it seeks to re-state. What was rule 36 now appears (incorporating some changes which are not

AP1068

material on this appeal) as Rule 43 in the new 15th edition, and I shall refer *a*
to it as 'the *Dicey* Rule' (see *Dicey* (15th edn, 2012) para 14R-054). So far
as relevant, Rule 43 states:

> 'a court of a foreign country outside the United Kingdom has
> jurisdiction to give a judgment in personam capable of enforcement or
> recognition as against the person against whom it was given in the *b*
> following cases:
>
> *First Case*—If the person against whom the judgment was given was,
> at the time the proceedings were instituted, present in the foreign
> country.
>
> *Second Case*—If the person against whom the judgment was given
> was claimant, or counterclaimed, in the proceedings in the foreign *c*
> court.
>
> *Third Case*—If the person against whom the judgment was given
> submitted to the jurisdiction of that court by voluntarily appearing in
> the proceedings.
>
> *Fourth Case*—If the person against whom the judgment was given
> had before the commencement of the proceedings agreed, in respect of *d*
> the subject matter of the proceedings, to submit to the jurisdiction of
> that court or of the courts of that country.'

[8] The 1st edition of *Dicey* in 1896 stated (Rule 80) that the foreign
court would have jurisdiction if 'the defendant was resident [or present?]' in
the foreign country 'so as to have the benefit, and be under the protection, *e*
of the laws thereof.' By the 6th edition in 1949 the formula was repeated by
Professor Wortley (Rule 68) but without the doubt about presence as a basis
of jurisdiction. In the 8th edition in 1958 Dr (later Professor) Clive Parry
removed the phrase (then Rule 189) about the benefit and protection of the
foreign country's laws. The rule, subsequently edited by Dr Morris and then
by Professor Kahn-Freund, remained in that form until the decision in *f*
*Adams v Cape Industries plc* [1990] BCLC 479, [1990] Ch 433, which
established that presence in the foreign jurisdiction, as opposed to residence,
was a sufficient basis for the recognition of foreign judgments. Then, edited
by myself and later by Professor Briggs, the Rule took substantially its
present form in the 12th edition in 1993.

[9] The theoretical basis for the enforcement of foreign judgments at *g*
common law is that they are enforced on the basis of a principle that where
a court of competent jurisdiction has adjudicated a certain sum to be due
from one person to another, a legal obligation arises to pay that sum, on
which an action of debt to enforce the judgment may be maintained:
*Williams v Jones* (1845) 13 M & W 628 at 633 per Parke B; *Godard v*
*Gray* (1870) LR 6 QB 139 at 147 per Blackburn J; *Adams v Cape* *h*
*Industries plc* [1990] BCLC 479 at 490, [1990] Ch 433 at 513; *Owens*
*Bank Ltd v Bracco* [1992] 2 All ER 193 at 198–199, [1992] 2 AC 443 at
484 per Lord Bridge of Harwich. As Blackburn J said in *Godard v Gray* LR
6 QB 139 at 150, this was based on the mode of pleading an action on a
foreign judgment in debt, and not merely as evidence of the obligation to *i*
pay the underlying liability. But this is a purely theoretical and historical
basis for the enforcement of foreign judgments at common law. It does not
apply to enforcement under statute, and makes no practical difference to

AP1069

*a*    the analysis, nor, in my judgment, to the issues on these appeals.

[10] Consequently, if the judgments in issue on the appeals are regarded as judgments in personam within the *Dicey* Rule, then they will only be enforced in England at common law if the judgment debtors were present (or, if the 1933 Act applies, resident) in the foreign country when the proceedings were commenced, or if they submitted to its jurisdiction. It is
*b*    common ground that the judgment debtors were not present or resident, respectively, in the United States or in Australia, although there is an issue as to whether the New Cap defendants submitted to the jurisdiction of the Australian court, which is dealt with in s VIII below.

*Insolvency proceedings and the international dimension*

*c*    [11] There are some general remarks to be made. First, from as early as the mid-18th century the English courts have recognised the effect of foreign personal bankruptcies declared under the law of the domicile: *Solomons v Ross* (1764) 1 H Bl 131n, where Dutch merchants were declared bankrupt in Amsterdam, and the Dutch curator was held entitled
*d*    to recover an English debt in priority to an English creditor of the merchants who had attached the debt after the bankruptcy: see Nadelmann, *Conflict of Laws: International and Interstate* (1972) p 273; Blom-Cooper, *Bankruptcy in Private International Law* (1954) pp 107–108.

[12] In *Galbraith v Grimshaw* [1910] AC 508 at 513 Lord Dunedin said that there should be only one universal process of the distribution of a
*e*    bankrupt's property and that, where such a process was pending elsewhere, the English courts should not allow steps to be taken in its jurisdiction which would interfere with that process:

'Now so far as the general principle is concerned it is quite consistent with the comity of nations that it should be a rule of international law that if the Court finds that there is already pending a process of universal distribution of a bankrupt's effects it should not allow steps to
*f*    be taken in its territory which would interfere with that process of universal distribution …'

[13] Second, in the case of corporations the English courts have exercised a winding-up jurisdiction which is wider than that which at common law
*g*    they have accorded to foreign courts. The court exercises jurisdiction to wind up a foreign company if there is a sufficient connection between the company and England, there are persons who would benefit from the making of a winding-up order, and there are persons interested in the distribution of assets of the company who are persons over whom the court can exercise jurisdiction: see *Dicey* (15th edn) para 30R-036. But as regards
*h*    foreign liquidations, the general rule is that the English court recognises at common law only the authority of a liquidator appointed under the law of the place of incorporation (*Dicey* (15th edn) para 30R-100). That is in contrast to the modern approach in the primary international and regional instruments, the EC Regulation on Insolvency Proceedings (Council Regulation (EC) No 1346/2000) (the EC Insolvency Regulation) and the
*i*    Model Law, which is that the jurisdiction with international competence is that of the country of the centre of main interests of the debtor (an expression not without its own difficulties). It is ultimately derived from the civil law concept of a trader's domicile, and was adopted in substance in the draft EEC Convention of 1980 as a definition of the debtor's centre of

administration: see Report by M Lemontey on the draft EEC Bankruptcy    *a*
Convention, Bulletin of the European Communities, Supp 2/82, p 58;
American Law Institute, *Transnational Insolvency: Global Principles for
Co-operation in International Insolvency Cases* (2012), Principle 13, pp 83
et seq.

[14] Third, it is not only in recent times that there have been large
insolvency proceedings with significant cross-border implications. Even    *b*
before then there were the Russian Bank cases in the 1930s (arising out of
the nationalisation and dissolution of the banks by the Soviet Government)
and the *Barcelona Traction* case in the 1940s and 1950s (see *Re Barcelona
Traction, Light and Power Co Ltd (second phase) (Belgium v Spain)* [1970]
ICJ Rep 3), but there is no doubt that today international co-operation in    *c*
cross-border insolvencies has become a pressing need. It is only necessary to
recall the bankruptcies or liquidations of Bank of Credit and Commerce
International, Maxwell Communications, or Lehman Brothers, each with
international businesses, assets in many countries, and potentially
competing creditors in different countries with different laws. There is not
only a need to balance all these interests but also to provide swift and    *d*
effective remedies to combat the use of cross-border transfers of assets to
evade and to defraud creditors.

[15] Fourth, there is no international unanimity or significant
harmonisation on the details of insolvency law, because to a large extent
insolvency law reflects national public policy, for example as regards
priorities or as regards the conditions for the application of avoidance    *e*
provisions: 'the process of collection of assets will include, for example, the
use of powers to set aside voidable dispositions, which may differ very
considerably from those in the English statutory scheme': *Re HIH Casualty
and General Insurance Ltd, McMahon v McGrath* [2008] UKHL 21,
[2012] 2 BCLC 655 at [19], [2008] 1 WLR 852 (*Re HIH*) per
Lord Hoffmann.    *f*

[16] Fifth, there has been a trend, but only a trend, to what is called
universalism, that is, the 'administration of multinational insolvencies by a
leading court applying a single bankruptcy law': Westbrook, *A Global
Solution to Multinational Default* (2000) 98 Mich Law Rev 2276 at 2277.
What has emerged is what is called by specialists 'modified universalism'.    *g*

[17] The meaning of the expression 'universalism' has undergone a
change since the time it was first used in the 19th century, and it later came
to be contrasted with the 'doctrine of unity'. In 1834 Story in
*Commentaries on the Conflict of Laws* (1st edn, 1834) pp 340–341,
para 406, referred to the theory that assignments under bankrupt or
insolvent laws were, and ought to be, of universal operation to transfer    *h*
movable property, in whatever country it might be situate, and concluded
that there was great wisdom in adopting the rule that an assignment in
bankruptcy should operate as a complete and valid transfer of all his
movable property abroad, as well as at home, and for a country to prefer an
attaching domestic creditor to a foreign assignee or to foreign creditors
could 'hardly be deemed consistent with the general comity of nations …    *i*
[T]he true rule is, to follow out the lead of the general principle that makes
the law of the owner's domicil conclusive upon the disposition of his

AP1071

*a*   personal property,' citing *Solomons v Ross* (1764) 1 H Bl 131n as supporting that doctrine.

[18] Professor Cheshire, in his first edition of *Private International Law* (1935) pp 375–376, said that although English law 'neglects the doctrine of unity it recognizes the doctrine of universality'. What he meant was that English law was committed to separate independent bankruptcies in *b*   countries where the assets were situate, rather than one bankruptcy in the country of the domicile (the doctrine of unity), but also accepted the title of the foreign trustee to English movables provided that no bankruptcy proceedings had begun within England (universality). He cited *Solomons v Ross* for this proposition:

*c*       'The English Courts … have consistently applied the doctrine of universality, according to which they hold that all *movable* property, no matter where it may be situated at the time of the assignment by the foreign law, passes to the trustee.'

[19] In *Re HIH* [2012] 2 BCLC 655 at [30] Lord Hoffmann said:

*d*       'The primary rule of private international law which seems to me applicable to this case is the principle of (modified) universalism, which has been the golden thread running through English cross-border insolvency law since the 18th century. That principle requires that English courts should, so far as is consistent with justice and United Kingdom public policy, co-operate with the courts in the country of the principal liquidation to ensure that all the company's assets are *e*     distributed to its creditors under a single system of distribution',

and in *Cambridge Gas Transport Corp v Navigator Holdings plc Creditors Committee* [2007] 2 BCLC 141 at [16], [2007] 1 AC 508 (*Cambridge Gas*) he said, speaking for the Privy Council:

*f*       'The English common law has traditionally taken the view that fairness between creditors requires that, ideally, bankruptcy proceedings should have universal application. There should be a single bankruptcy in which all creditors are entitled and required to prove. No one should have an advantage because he happens to live in a jurisdiction where more of the assets or fewer of the creditors are situated.'

*g*   [20] The US Bankruptcy Court accepted in *Re Maxwell Communication Corp* (1994) 170 Bankr R 800 at 816 that the United States courts have adopted modified universalism as the approach to international insolvency:

      '… the United States in ancillary bankruptcy cases has embraced an approach to international insolvency which is a modified form of universalism accepting the central premise of universalism, that is, that *h*     assets should be collected and distributed on a worldwide basis, but reserving to local courts discretion to evaluate the fairness of home country procedures and to protect the interests of local creditors.'

II INTERNATIONAL CO-OPERATION AND ASSISTANCE

*i*   [21] Jurisdiction in international bankruptcy has been the subject of multilateral international instruments at least since the Montevideo Treaty on International Commercial Law of 1889, Title X, although bilateral treaties go back much further, and the subject of international recognition and co-operation in insolvency was the subject of early discussion by the International Law Association (1879), the Institut de droit international

AP1072

(1888–1912) and the Hague Conference on Private International Law    *a*
(1904):see *Nadelmann* pp 299 et seq.

[22] In more modern times, the European Convention on Certain
International Aspects of Bankruptcy (the Istanbul Convention) was
concluded under the auspices of the Council of Europe in 1990, but never
came into force. The European Community/Union initiative took 40 years
to come to fruition. In 1960 the European Community embarked on a    *b*
project for a Bankruptcy Convention, which resulted in a draft convention
in 1980, to which there was significant opposition. But the project was
renewed in 1989, and this led to the tabling of a draft convention in 1995,
which provided that it would only come into force when signed by all 15 of
the then member states. The United Kingdom, however, alone of the states,
did not sign the convention (for political reasons), and it never came into    *c*
force. In 1999 the project was relaunched as a Council Regulation, which
resulted in the EC Insolvency Regulation in 2000.

[23] The United Nations Commission on International Trade Law
(UNCITRAL) adopted a Model Law on cross-border insolvency in 1997.
The Model Law was adopted following initiatives in the 1980s by the    *d*
International Bar Association and later by INSOL International (ie the
International Association of Restructuring, Insolvency and Bankruptcy
Professionals). In 1993 UNCITRAL adopted a resolution to investigate the
feasibility of harmonised rules of cross-border insolvencies. In 1994 an
expert committee was assembled consisting of members of INSOL and
representatives of the UNCITRAL Secretariat and, following a series of    *e*
reports and drafts, UNCITRAL adopted the Model Law in May 1997. The
Model Law provides for a wide range of assistance to foreign courts and
office-holders. It has been implemented by 19 countries and territories,
including the United States and Great Britain (although by some states only
on the basis of reciprocity). It was not enacted into law in Great Britain
until 2006, by the 2006 regulations.    *f*

[24] Apart from the EC Insolvency Regulation, none of these instruments
deals expressly with the enforcement of judgments in insolvency
proceedings. The question whether the Model Law does so by implication
will be considered below in Section IV.

[25] Consequently, there are four main methods under English law for    *g*
assisting insolvency proceedings in other jurisdictions, two of which are
part of regionally or internationally agreed schemes. First, s 426 of the
Insolvency Act 1986 provides a statutory power to assist corporate as well
as personal insolvency proceedings in countries specified in the Act or
designated for that purpose by the Secretary of State. All the countries to
which it currently applies are common law countries or countries sharing a    *h*
common legal tradition with England. They include Australia; by the
Co-operation of Insolvency Courts (Designation of Relevant Countries and
Territories) Order 1986 (SI 1986/2123).

[26] Second, the EC Insolvency Regulation applies to insolvency
proceedings in respect of debtors with their centres of main interests
(COMI) within the European Union (excluding Denmark). The EC    *i*
Insolvency Regulation has no role in the present appeal because none of the
debtors has its centre of main interests in the European Union.

[27] Third, the 2006 regulations came into force on 4 April 2006,
implementing the Model Law. The regulations supplement the common law,

*a*  but do not supersede it. Article 7 of the Model Law provides:

'Nothing in this Law limits the power of a court or British insolvency officeholder to provide additional assistance to a foreign representative under other laws of Great Britain'.

*b*  **[28]** Article 23 of the Model Law allows avoidance claims to be made by foreign representatives under the Insolvency Act 1986, and the regulations apply to preferences after they came into force on 4 April 2006. The UNCITRAL guide to enactment (the *UNCITRAL Legislative Guide on Insolvency Law* (2005)) (to which resort may be had for the purposes of interpretation of the regulations) also emphasises at Annex III, Ch IV, p 311, para 20(b) that the Model Law enables enacting states to make

*c*  available to foreign insolvency proceedings the type of relief which would be available in the case of a domestic insolvency:

'The Model Law presents to enacting states the possibility of aligning the relief resulting from recognition of a foreign proceeding with the relief available in a comparable proceeding in the national law.'

*d*  **[29]** Fourth, at common law the court has power to recognise and grant assistance to foreign insolvency proceedings. The common law principle is that assistance may be given to foreign officeholders in insolvencies with an international element. The underlying principle has been stated in different ways: 'recognition ... carries with it the active assistance of the court' (*Re African Farms Ltd* [1906] TS 373 at 377); 'This court ... will do its utmost

*e*  to co-operate with the United States Bankruptcy Court and avoid any action which might disturb the orderly administration of [the company] in Texas under ch 11' (*Banque Indosuez SA v Ferromet Resources Inc* [1993] BCLC 112 at 117).

**[30]** In *Credit Suisse Fides Trust v Cuoghi* [1997] 3 All ER 724 at 730,

*f*  [1998] QB 818 at 827 Millett LJ said:

'In other areas of law, such as cross-border insolvency, commercial necessity has encouraged national courts to provide assistance to each other without waiting for such co-operation to be sanctioned by international convention ... It is becoming widely accepted that comity between the courts of different countries requires mutual respect for the territorial integrity of each other's jurisdiction, but that this should not

*g*  inhibit a court in one jurisdiction from rendering whatever assistance it properly can to a court in another in respect of assets located or persons resident within the territory of the former.'

**[31]** The common law assistance cases have been concerned with such

*h*  matters as the vesting of English assets in a foreign officeholder, or the staying of local proceedings, or orders for examination in support of the foreign proceedings, or orders for the remittal of assets to a foreign liquidation, and have involved cases in which the foreign court was a court of competent jurisdiction in the sense that the bankrupt was domiciled in the foreign country or, if a company, was incorporated there.

*i*  **[32]** An early case of recognition was *Solomons v Ross* (1764) 1 H Bl 131n, where, as I have said, the bankruptcy was in Holland, and the bankrupts were Dutch merchants declared bankrupt in Amsterdam, and the Dutch curator was held entitled to recover an English debt: see also *Bergerem v Marsh* (1921) B & CR 195 (English member of Belgian firm

AP1074

submitted to Belgian bankruptcy proceedings: movable property in England   *a*
vested in Belgian trustee).

[33] One group of cases involved local proceedings which were stayed or
orders which were discharged because of foreign insolvency proceedings.
Thus in *Banque Indosuez SA v Ferromet Resources Inc* [1993] BCLC 112
an English injunction against a Texas corporation in Chapter 11
proceedings was discharged; cf *Re African Farms Ltd* [1906] TS 373   *b*
(execution in Transvaal by creditor in proceedings against English company
in liquidation in England stayed by Transvaal court), applied in *Turners &
Growers Exporters Ltd v Ship 'Cornelis Verolme'* [1997] 2 NZLR 110
(Belgian shipowner in Belgian bankruptcy: ship released from arrest);
*Modern Terminals (Berth 5) Ltd v States Steamship Co* [1979] HKLR 512   *c*
(stay in Hong Kong of execution against Nevada corporation in Chapter 11
proceedings in United States Federal Court in California), followed in *CCIC
Finance Ltd v Guangdong International Trust & Investment Corp* [2005] 2
HKC 589 (stay of Hong Kong proceedings against Chinese state-owned
enterprise in mainland insolvency). Cases of judicial assistance in the
traditional sense include *Re Impex Services Worldwide Ltd* [2004] BPIR   *d*
564, where a Manx order for examination and production of documents
was made in aid of the provisional liquidation in England of an English
company.

[34] Cases involving remittal of assets from England to a foreign
office-holder include *Re Bank of Credit and Commerce International SA
(No 11)* [1997] 1 BCLC 80, sub nom *Re Bank of Credit and Commerce*   *e*
*International SA (No 10)* [1997] Ch 213 (Luxembourg liquidation of
Luxembourg company); and *Re HIH* [2012] 2 BCLC 655, [2008] 1 WLR
852 (the view of Lord Hoffmann and Lord Walker) (Australian liquidation
of Australian insurance company); and *Re Swissair Schweizerische
Luftverkehr-AG* [2009] EWHC 2099 (Ch), [2009] BPIR 1505 (Swiss
liquidation of Swiss company).   *f*

III THE CAMBRIDGE GAS AND HIH DECISIONS

[35] The opinion of Lord Hoffmann speaking for the Privy Council in
*Cambridge Gas* and his speech in the House of Lords in *Re HIH* have
played such a major role in the decisions of the Court of Appeal and in the
arguments of the parties on these appeals that it is appropriate to put them   *g*
in context at this point.

*Cambridge Gas*
[36] The broad facts of *Cambridge Gas* were these. In 1997 a shipping
business was initiated by a Swiss businessman, Mr Giovanni Mahler. The
investors borrowed $300m on the New York bond market and the business   *h*
bought five gas transport vessels. The venture was a failure, and ended with
a Chapter 11 proceeding in the US Bankruptcy Court in New York. The
question for the Privy Council on appeal from the Isle of Man was whether
an order of the New York court was entitled to implementation in the Isle
of Man.

[37] The corporate structure of the business was that the investors owned,   *i*
directly or indirectly, a Bahamian company called Vela Energy Holdings Ltd
(Vela). Vela owned (through an intermediate Bahamian holding company)
Cambridge Gas, a Cayman Islands company.

[38] Cambridge Gas owned directly or indirectly about 70% of the shares

a  of Navigator Holdings plc (Navigator), an Isle of Man company. Navigator owned all the shares of an Isle of Man company which in turn owned companies which each owned one ship.

[39] In 2003 Navigator petitioned the US Bankruptcy Court for relief under Chapter 11 of the US Bankruptcy Code, which allows insolvent companies, under supervision of the court and under cover of a
b  moratorium, to negotiate a plan of reorganisation with their creditors. The petition was initiated by the investor interests, who proposed a plan to sell the ships nominally by auction but in fact to the previous investors, but the bondholders did not accept this and proposed their own plan under which the assets of Navigator would be vested in the creditors and the equity interests of the previous investors would be extinguished. The judge rejected
c  the investors' plan and approved the creditors' plan.

[40] The mechanism which the plan used to vest the assets in the creditors was to vest the shares in Navigator in their representatives, ie the creditors' committee. That would enable them to control the shipping companies and implement the plan. The plan provided that upon entry of the confirmation
d  order title to all the common stock of Navigator would vest in the creditors' committee to enable it to implement the plan. The order of the New York court confirming the plan recorded the intention of the court to send a letter of request to the Manx court asking for assistance in giving effect to 'the plan and confirmation order' and such a letter was sent. The committee of creditors then petitioned the Manx court for an order vesting the shares in
e  their representatives.

[41] At this point it is necessary to emphasise two features of the case. The first feature is that Navigator was an Isle of Man company and 70% of its common stock was owned directly or indirectly by Cambridge Gas. Under the normal principles of the conflict of laws the shares would have been situate in the Isle of Man: *Dicey* (15th edn) para 22–045. That is why
f  Lord Hoffmann said (at para [6]), that the New York court was aware that the order vesting title to the common stock of Navigator in the creditors' committee could not automatically have effect under the law of the Isle of Man; and also why he accepted (at paras [12]–[13]) that if the judgment were a judgment in rem it could not affect title to shares in the Isle of Man.

[42] The second feature which it is necessary to emphasise is that
g  Cambridge Gas was a Cayman Islands company which (as held by the Manx courts) had not submitted to the jurisdiction of the US Bankruptcy Court. Lord Hoffmann said (at para [8]) that the position that Cambridge Gas had not submitted to the jurisdiction of the US Bankruptcy Court bore little relation to economic reality since the New York proceedings had been
h  conducted on the basis that the contest was between rival plans put forward by the shareholders and the creditors; Vela, the parent company of Cambridge Gas, participated in the Chapter 11 proceedings; and they had been instituted by Navigator. Consequently the claim by Cambridge Gas that it had not submitted was highly technical, but there was no appeal from the decisions of the Manx courts that it had not submitted. But
i  Lord Hoffmann also accepted that if the order of the US Bankruptcy Court were to be regarded as a judgment in personam it would not be entitled to recognition or enforcement in the Isle of Man because 'the New York court had no personal jurisdiction over Cambridge [Gas]' (para [10]).

[43] Nevertheless the Privy Council held that the plan could be carried

into effect in the Isle of Man. The reasoning was as follows: first, if the
judgment had to be classified as in personam or in rem the appeal would
have to be allowed, but bankruptcy proceedings did not fall into either
category:

> '[13] … Judgments in rem and in personam are judicial
> determinations of the existence of rights: in the one case, rights over
> property and in the other, rights against a person. When a judgment in
> rem or in personam is recognised by a foreign court, it is accepted as
> establishing the right which it purports to have determined, without
> further inquiry into the grounds upon which it did so. The judgment
> itself is treated as the source of the right.
>
> [14] The purpose of bankruptcy proceedings, on the other hand, is
> not to determine or establish the existence of rights, but to provide a
> mechanism of collective execution against the property of the debtor by
> creditors whose rights are admitted or established …
>
> [15] … [B]ankruptcy, whether personal or corporate, is a collective
> proceeding to enforce rights and not to establish them. Of course, as
> Brightman LJ pointed out in *Re Lines Bros Ltd* [1982] 2 All ER 183 at
> 194–195, [1983] Ch 1 at 20, it may incidentally be necessary in the
> course of bankruptcy proceedings to establish rights which are
> challenged: proofs of debt may be rejected; or there may be a dispute
> over whether or not a particular item of property belonged to the
> debtor and is available for distribution. There are procedures by which
> these questions may be tried summarily within the bankruptcy
> proceedings or directed to be determined by ordinary action. But these
> again are incidental procedural matters and not central to the purpose
> of the proceedings.'

[44] Second, the principle of universality underlay the common law
principles of judicial assistance in international insolvency, and those
principles were sufficient to confer jurisdiction on the Manx court to assist,
by doing whatever it could have done in the case of a domestic insolvency
(paras [21]–[22]). Third, exactly the same result could have been achieved
by a scheme under the Isle of Man Companies Act 1931. Fourth, it was no
objection to implementation of the plan in the Isle of Man that the shares in
Navigator belonged to a person (Cambridge Gas) which was not a party to
the bankruptcy proceedings for these reasons (at para [26]):

> '… [A] share is the measure of the shareholder's interest in the
> company: a bundle of rights against the company and the other
> shareholders. As against the outside world, that bundle of rights is an
> item of property, a chose in action. But as between the shareholder and
> the company itself, the shareholder's rights may be varied or
> extinguished by the mechanisms provided by the articles of association
> or the Companies Act. One of those mechanisms is the scheme of
> arrangement under s 152 [of the Isle of Man Companies Act 1931]. As
> a shareholder Cambridge is bound by the transactions into which the
> company has entered, including a plan under Chapter 11 or a scheme
> under s 152.'

[45] At this point it is necessary to point out that the opinion in
*Cambridge Gas* does not articulate any reason for holding that, in the eyes

Case 1:23-cv-00682-CFC-TMH Document 129-2 Filed 08/23/23 Page 78 of 300 PageID #: 1145

*a*  of the Manx court, the US Bankruptcy Court had international jurisdiction in either of two relevant senses.

[46] The first sense is the jurisdiction of the US Bankruptcy Court in relation to the Chapter 11 proceedings themselves. The entity which was in Chapter 11 was Navigator. The English courts exercise a wider jurisdiction in bankruptcy and (especially) in winding up than they recognise in foreign

*b*  courts. At common law, the foreign court which is recognised as having jurisdiction in personal bankruptcy is the court of the bankrupt's domicile or the court to which the bankrupt submitted (*Dicey* (15th edn) para 31R-059) and the foreign court with corresponding jurisdiction over corporations is the court of the place of incorporation (*Dicey* (15th edn) para 30R-100). Under United States law the US Bankruptcy Court has

*c*  jurisdiction over a 'debtor', and such a debtor must reside or have a domicile or place of business, or property in the United States. From the standpoint of English law, the US Bankruptcy Court had international jurisdiction because although Navigator was not incorporated in the United States, it had submitted to the jurisdiction by initiating the proceedings.

*d*  [47] The second sense in which international jurisdiction is relevant is the jurisdiction over the third party, Cambridge Gas, and its shares in Navigator. Cambridge Gas was not incorporated in the United States, and it was held by the Isle of Man courts that it had not submitted to the jurisdiction of the US Bankruptcy Court (and this was, as I have said, accepted with evident reluctance by the Privy Council). The property which

*e*  was the subject of the order of the US Bankruptcy Court was shares in an Isle of Man company. Consequently the property dealt with by the US Bankruptcy Court was situate, by Manx rules of the conflict of laws, in the Isle of Man, and the shareholder relationship was governed by Manx law.

[48] *Cambridge Gas* was the subject of brief comment a few months later by the Privy Council in *Ali* v *Pattni* [2007] 2 All ER (Comm) 427, [2007]

*f*  2 AC 85. The decision in that case was simply that a Kenyan judgment deciding that A was bound to sell shares in a Manx company to B was entitled to recognition in the Isle of Man. It resulted in an order in personam against a person subject to the jurisdiction of the Kenyan court, and was not a judgment in rem against property in the Isle of Man and outside the jurisdiction of the Kenyan court, because the fact that a judicial

*g*  determination determines or relates to the existence of property rights between parties does not in itself mean that it is in rem. Lord Mance, speaking for the Board, said (at [23]):

'In *Cambridge Gas* … the Board touched on the concepts of in personam and in rem proceedings, but held that the bankruptcy order

*h*  with which it was concerned fell into neither category. Its purpose was simply to establish a mechanism of collective execution against the property of the debtor by creditors whose rights were admitted or established.'

*Re HIH*

*i*  [49] The decision in *Re HIH* does not deal with foreign judgments. *Re HIH* concerned four Australian insurance companies which were being wound up in Australia and in respect of which provisional liquidators had been appointed in England. The question was whether the English court had power to direct remission of assets collected in England to Australia,

AP1078

notwithstanding that there were differences between the English and
Australian statutory regimes for distribution which meant that some
creditors would benefit from remission whilst some creditors would be
worse off. The House of Lords unanimously directed that remission should
take place, but the reasons differed.

[50] The reasoning of the majority (Lord Scott of Foscote and
Lord Neuberger of Abbotsbury, with Lord Phillips of Worth Matravers
agreeing)) was based exclusively on the statutory power to assist foreign
insolvency proceedings under s 426 of the Insolvency Act 1986, but
Lord Hoffmann (with whom Lord Walker agreed) also considered that such
a power existed at common law.

[51] Lord Hoffmann characterised the principle of universality as a
principle of English private international law that, where possible, there
should be a unitary insolvency proceeding in the courts of the insolvent's
domicile which receives worldwide recognition and which should apply
universally to all the bankrupt's assets (at [6]):

'Despite the absence of statutory provision, some degree of
international co-operation in corporate insolvency had been achieved by
judicial practice. This was based upon what English judges have for
many years regarded as a general principle of private international law,
namely that bankruptcy (whether personal or corporate) should be
unitary and universal. There should be a unitary bankruptcy proceeding
in the court of the bankrupt's domicile which receives world-wide
recognition and it should apply universally to all the bankrupt's assets.'

[52] Other parts of Lord Hoffmann's speech have already been quoted
above, and it is only necessary for present purposes to recall that he said
that (a) 'the process of collection of assets will include, for example, the use
of powers to set aside voidable dispositions, which may differ very
considerably from those in the English statutory scheme' (at para [19]) and
(b) that the purpose of the principle of universality was to ensure that the
debtor's assets were distributed under one scheme of distribution, and that
the principle required that English courts should co-operate with the courts
in the country of the principal liquidation to ensure that all the company's
assets are distributed to its creditors under a single system of distribution
(para [30]).

*Subsequent treatment of Cambridge Gas*

[53] The decision in *Cambridge Gas* was not applied by the Supreme
Court of Ireland in *Re Flightlease (Ireland) Ltd* [2012] IESC 12 (to which I
shall revert) and has been subject to academic criticism. Professor Briggs has
expressed the view (in (2006) 77 BYIL 575 at 581) that—

'the decision in [*Cambridge Gas*] is wrong, for it requires a Manx
court to give effect to a confiscation order made by a foreign court of
property belonging to a person who was not subject to the personal
jurisdiction of the foreign court. That a Manx court could have done so
itself is nothing to the point.'

I shall return to the question whether it was correctly decided.

[2012] 2 BCLC 682

IV THE CASES BEFORE THE COURT AND THE ISSUES

*Rubin*

[54] Eurofinance SA is a company incorporated in the British Virgin Islands. It was established by Adrian Roman, the second appellant on the *Rubin* appeal. Eurofinance SA settled 'The Consumers Trust' (TCT) under a deed of trust made in 2002 under English law, with trustees resident in England, of whom two were accountants and two were solicitors.

[55] TCT was established to carry on a sales promotion scheme in the USA and Canada. The class of beneficiaries was made up of persons who had successfully participated in the scheme by claiming validly in certain sales promotions owned and operated by Eurofinance SA. The trustees were to hold the capital and income of TCT for the beneficiaries and subject thereto for Eurofinance SA as beneficiary in default. The promotion, known as the cashable voucher programme, was entered into with participating merchants in the United States and Canada who, when they sold products or services to their customers, offered those customers a cashable voucher comprising a rebate of up to 100% of the purchase price for the product or service. Under the terms of the voucher the rebate was to be paid to customers in three years' time provided that certain conditions were followed by the customer involving the completion by the customer of both memory and comprehension tests.

[56] The participating merchants paid TCT 15% of the face value of each cashable voucher issued by the merchant during a week. TCT retained 40% of the payments received (ie 6% of the face value of each cashable voucher). About one half of the 60% balance received from merchants was paid to Eurofinance SA (and so effectively to Adrian Roman) and the remainder was paid to others involved in the operation of the programme, such as solicitors, accountants and US lawyers. From about 2002 Adrian Roman's sons, Nicholas Roman and Justin Roman, each began to receive about 2%. The trustees maintained bank accounts in the USA and Canada where the payments they had received from merchants were kept.

[57] Since the trustees only retained 6% of the face value of the issued vouchers, the success of the scheme necessarily involved the consumers either forgetting to redeem the vouchers or being unsuccessful in navigating the process required to be followed in order to obtain payment. When the scheme folded in 2005 the trustees held nearly US$10m in bank accounts in the United States and Canada.

[58] By about 2005 TCT's business ceased after the Attorney General of Missouri brought proceedings under Missouri's consumer protection legislation which resulted in a settlement involving a payment by the trustees of $US1,650,000 and $US200,000 in costs.

[59] When it became clear that further proceedings were likely to be brought by Attorneys General in other states, that the number of consumer claims would increase, and that TCT would not have sufficient funds to meet all the valid claims of its beneficiaries, in November 2005 Adrian Roman caused Eurofinance to apply for the appointment by the High Court of the respondents on the *Rubin* appeal, David Rubin and Henry Lan, as receivers of TCT for the purposes of causing TCT then to obtain protection under Chapter 11 of Title 11 of the United States Code. The English court was told that Chapter 11 reorganisation proceedings would result in an automatic stay of proceedings against TCT, would enable the receivers to

AP1080

reject unprofitable or burdensome executory contracts, and might result in   *a*
the recovery as preferential payments of sums paid to consumers and to the
Missouri Attorney General.

[60] In November 2005 the respondents were appointed as receivers by
order of Lewison J, and in the following month, the respondents and the
trustees then caused TCT to present a voluntary petition to the US   *b*
Bankruptcy Court for relief under Chapter 11. TCT was placed into
Chapter 11 proceedings in New York as virtually all of its 60,000 creditors
were located in the United States or Canada as were its assets. As a matter
of United States bankruptcy law, TCT could be the subject matter of a
petition for relief under Chapter 11 as a debtor. This is because a trust such
as TCT is treated under Chapter 11 as a separate legal entity under the   *c*
classification of a 'business trust'.

[61] A joint plan of liquidation for TCT was prepared, and in September
2007 Lewison J ordered that the respondents (as receivers) be at liberty to
seek approval of the plan from the US Bankruptcy Court. Under the terms
of the plan the respondents were appointed legal representatives of TCT
and given the power to commence, prosecute and resolve all causes of   *d*
action against potential defendants including the appellants. The US
Bankruptcy Court approved the plan in October 2007, and appointed the
respondents as 'foreign representatives' of the debtor to make application to
the Chancery Division in London for recognition of the Chapter 11
proceedings as a foreign main proceeding under the 2006 regulations; and
to seek aid, assistance and co-operation from the High Court in connection   *e*
with the Chapter 11 proceedings, and, in particular to seek the High Court's
assistance and co-operation in the prosecution of litigation which might be
commenced in the US Bankruptcy Court including 'the enforcement of
judgments of this court that may be obtained against persons and entities
residing or owning property in Great Britain ...'

[62] In December 2007 proceedings were commenced in the US   *f*
Bankruptcy Court by the issue of a complaint against a number of
defendants including the appellants. These claims fall within the category of
'adversary proceedings' under the US bankruptcy legislation, and I will use
this term to refer to them. The adversary proceedings comprised a number
of claims including causes of action arising under the US Bankruptcy Code,
which related to funds received by TCT from merchants which were paid   *g*
out to the defendants (including the appellants), or to amounts transferred
to the defendants within one year prior to the commencement of the TCT
bankruptcy case including the appellants.

[63] The defendants were the appellants and other parties involved with
the programme. The appellants were served personally with the complaint
commencing the adversary proceedings but did not defend, or participate,   *h*
in the adversary proceedings, although it appears from a judgment of the
US Bankruptcy Court that Eurofinance SA had filed a notice of appearance
in the main Chapter 11 proceedings (see order of 22 July 2008,
paras 42–43).

[64] On 22 July 2008 default and summary judgment was entered against   *i*
the appellants in the adversary proceedings by the US Bankruptcy Court.
The US Bankruptcy Court entered a judgment against the appellants on the
ten counts of the complaint.

[65] In November 2008 the respondents applied as foreign representatives

a   to the Chancery Division for, inter alia, (a) an order that the Chapter 11 proceedings be recognised as a 'foreign main proceeding'; (b) an order that the respondents be recognised as 'foreign representatives' within the meaning of art 2(j) of the Model Law in relation to those proceedings; and (c) an order that the US Bankruptcy Court's judgment be enforced as a judgment of the English court in accordance with CPR Pts 70 and 73.

b   [66] Nicholas Strauss QC, sitting as a deputy judge of the Chancery Division, recognised the Chapter 11 proceedings (including the adversary proceedings) as foreign main proceedings, and the respondents as foreign representatives, but refused to enforce the judgments in the adversary proceedings because (a) at common law the English court will not enforce a judgment in personam contrary to the normal jurisdictional rules for foreign judgments, and (b) there was nothing in the 2006 regulations, c   arts 21(e) (realisation of assets) and 25 (judicial co-operation), which justified the enforcement of judgments in insolvency proceedings.

[67] At first instance the respondents sought to enforce the entirety of the US Bankruptcy Court's judgment, but before the Court of Appeal they d   sought an order for the enforcement of those parts of the judgment which were based on state or federal avoidance laws, including fraudulent conveyance under state fraudulent conveyance laws, and under federal law, namely fraudulent transfers under s 548(a) of 11 USC; liability of transferees of avoided transfers under s 550; fraudulent transfers under s 548(b) and liability of transferees of avoided transfers under s 550.

e   [68] The Court of Appeal (Ward and Wilson LJJ and Henderson J) ([2010] EWCA Civ 895, [2011] 2 BCLC 473, [2011] Ch 133) allowed an appeal, and held that the judgment was enforceable.

*New Cap*

[69] In the *New Cap* appeal the appellants are members of Lloyd's Syndicate No 991 (the Syndicate) for the 1997 and 1998 years of account. f   The respondents are a reinsurance company (New Cap) and its liquidator, a partner in Ernst & Young in Sydney.

[70] New Cap is an Australian company, which was licensed as an insurance company in Australia under the Australian Corporations Act 2001 (Cth) (the Australian Act). New Cap did not conduct insurance g   business in any country other than Australia, and the majority of New Cap's business was generated through reinsurance brokers conducting business in Australia and the balance was generated from overseas insurance brokers.

[71] New Cap reinsured the Syndicate in relation to losses occurring on risks attaching during the 1997 and 1998 years of account under h   reinsurance contracts which were subject to English law, and contained London arbitration clauses and also (oddly) English jurisdiction clauses. The reinsurance contracts were placed with New Cap by the Syndicate's Australian broker, which was the sub-broker for the Syndicate's London broker.

i   [72] Each reinsurance contract contained a commutation clause. The Syndicate and New Cap entered into a commutation agreement to commute the reinsurances with effect from 11 December 1998. Under the commutation agreement, New Cap agreed to make a lump sum payment to the Syndicate by 31 December 1998 in consideration for its release from liability under the reinsurance contracts. The payments were calculated on

the basis of a 7.5% discount and a deduction from premium. New Cap made payment pursuant to the commutation agreements in two instalments of $US2,000,000 and $US3,980,600 in January 1999. The commutation payments were made from a bank account held by New Cap at the Sydney branch of the Commonwealth Bank of Australia to a bank account in London.

[73] The second respondent was appointed the administrator of New Cap by a resolution of its directors in April 1999. In September 1999 the creditors of New Cap resolved that New Cap be wound up and the second respondent (the liquidator) was appointed its liquidator. Under the Australian legislation, the winding up is deemed to have commenced on the day on which the administration began.

[74] In April 2002 the liquidator caused proceedings to be commenced against the Syndicate in the Supreme Court of New South Wales alleging that because New Cap was insolvent when the commutation payments were made in January 1999, and because those payments were made within the period of six months ending on the date when the administrator was appointed, they constituted unfair preferences and were thus 'voidable transactions' under Part 5.7B of the Australian Act.

[75] The Syndicate (which does not accept that the payments were preferences) refused to accept service of the Australian proceedings. The liquidator obtained leave from the Australian court to serve the Australian proceedings on the Syndicate's English solicitors in London. The Syndicate did not enter an appearance to the proceedings, but corresponded with the liquidator's solicitors, including commenting on an independent expert's report to be used by the respondents as evidence of New Cap's insolvency in all of the avoidance proceedings including the proceedings against the Syndicate.

[76] The Australian court (White J in a judgment in September 2008, and Barrett J in a judgment in July 2009) recognised that there had been no submission by the Syndicate to the jurisdiction of the Australian court in that it did not enter an appearance, but White J held that the Australian court had jurisdiction over the Syndicate because a cause of action available under the Australian Act for the recovery of a preferential payment to an overseas party made when the company is insolvent was a cause of action which arose in New South Wales for the purposes of the New South Wales provisions for service out of the jurisdiction.

[77] Barrett J gave a reasoned judgment in July 2009 holding the Syndicate liable. After the respondents had been given leave to re-open their case so that the orders made by the Australian court would more accurately reflect the differences between those appellants who were members of the Syndicate for the 1997 year of account and those appellants who were members for the 1998 year of account, the Australian court entered final judgment against the Syndicate in its absence on 11 September 2009. The Australian judgment declared that the commutation payments were voidable transactions within the meaning of Part 5.7B of the Australian Act and ordered the Syndicate to repay the amount of the commutation payments to the liquidator together with interest.

[78] On the liquidator's application the Australian court issued, in October 2009, a letter of request to the High Court in England and Wales requesting that the court 'act in aid of and assist' the Australian court and

AP1083

*a* exercise jurisdiction under s 426 of the Insolvency Act 1986 by (1) ordering the Syndicate to pay the sums specified in the Australian judgment; alternatively (2) allowing the liquidator to commence fresh proceedings under the Australian Act in the English court; (3) granting such further and other relief as the High Court may consider just; and (4) making such further or other orders as may, in the opinion of the High Court, be
*b* necessary or appropriate to give effect to the foregoing orders.

[79] On 30 July 2010 the Court of Appeal handed down judgment in *Rubin*. As a result, the respondents' alternative application for permission to commence fresh proceedings against the Syndicate under the Australian Act in England pursuant to s 426 of the Insolvency Act 1986 was adjourned generally, and the respondents were granted permission to seek relief at
*c* common law as an alternative to relief under s 426.

[80] In *New Cap* Lewison J and the Court of Appeal were bound by the decision of the Court of Appeal in *Rubin*. Lewison J ([2011] EWHC 677 (Ch)) held (a) the judgment was not enforceable under the Foreign Judgments (Reciprocal Enforcement) Act 1933 because, although it applied
*d* to Australian judgments, it did not apply to orders made in insolvency proceedings; but (b) the judgment was enforceable under the assistance provision of s 426 of the Insolvency Act 1986 and also at common law.

[81] The Court of Appeal (Mummery, Lloyd and Macfarlane LJJ) ([2011] EWCA Civ 971, [2012] 1 All ER 755, [2012] 2 WLR 1095) affirmed Lewison J's judgment on these grounds: (a) the 1933 Act applied, and
*e* registration would not be set aside for lack of jurisdiction in the foreign court, because of the *Rubin* decision; (b) s 426 could also be used and was not excluded by s 6 of the 1933 Act; (c) but s 6 would preclude an action at common law; (d) it was not necessary to decide whether the court's power of assistance at common law was exercisable where the statutory power was available.

*f*
*Picard v Vizcaya Partners Ltd*

[82] This court gave permission for intervention by a written submission on behalf of Mr Irving Picard (the trustee), the trustee for the liquidation in the United States under the Securities Investor Protection Act of 1970 of Bernard L Madoff Investment Securities LLC (Madoff), which was Bernard
*g* Madoff's broking company. The trustee is seeking to enforce at common law in Gibraltar judgments of the US Bankruptcy Court against Vizcaya Partners Ltd (Vizcaya), a BVI company, for $US180m, and against Asphalia Fund Ltd (Asphalia), a Cayman Islands company, for $US67m, representing alleged preferential payments. He is also seeking to enforce a US Bankruptcy Court default judgment in excess of $US1bn in the Cayman
*h* Islands in *Picard v Harley International (Cayman) Ltd*. The Gibraltar and Cayman Islands proceedings have been adjourned to await the outcome of the present appeals.

[83] In *Picard v Vizcaya Partners Ltd* proceedings have been brought in Gibraltar to enforce the default judgments against Vizcaya and Asphalia because $US73m is held there on behalf of Vizcaya which the trustee
*i* maintains is available to satisfy the judgments. Vizcaya and Asphalia have also, with the permission of the court, intervened by written submissions.

[84] There is no agreed statement of facts relating to this aspect of the case, and nothing which is said here about the facts should be taken as representing or reflecting any finding. According to Vizcaya and Asphalia

[2012] 2 BCLC 682

the position is as follows. Between 2002 and 2007 a bank in Europe, acting as a custodian trustee for Vizcaya, sent $US327m to Madoff for investment in securities. Unknown to the bank, or to Vizcaya, or its shareholder Asphalia, Madoff had been engaged in a Ponzi scheme for some 30 years, and their money was never invested in securities. In 2008, at the time of the credit crunch and the banking crisis, the custodian trustee withdrew $US180m (leaving $US147m with Madoff) and $US67m of the $US180m was paid to Asphalia.

[85] In late 2008 the Madoff fraud came to light, and the trustee was appointed. The trustee targeted investors who had withdrawn investments from Madoff in the two years before its collapse in December 2008 as a source for recovery of 'customer property' for the benefit of other investors who had not withdrawn their investments. The trustee commenced adversary proceedings in the US Bankruptcy Court alleging preference and fraudulent conveyance against Vizcaya and Asphalia under the Securities Investor Protection Act of 1970 and under the Bankruptcy Code, the effect of which, they say, is that (a) as the trustee argues, a person who, on the basis that he has received 'customer money' has been required to repay a preference, does not necessarily become a 'customer' and thereby entitled to share with other customers in the bankruptcy; and (b) the trustee may avoid a payment made by the bankrupt to a creditor 90 days before the commencement of the bankruptcy, irrespective of the intention with which the payment is made or received.

[86] The trustee obtained judgments in default, and Vizcaya and Asphalia say that they took no part in the New York proceedings because they had no connection with New York, and in particular (a) Asphalia was not a customer of Madoff but a shareholder of Vizcaya; (b) arguably Vizcaya was not a customer since it had appointed the bank to act as custodian trustee and it was the bank which entered into contracts with Madoff.

*The issues*

[87] The principal issue on these appeals is whether the rules at common law or under the 1933 Act regulating those foreign courts which are to be regarded as being competent for the purposes of enforcement of judgments apply to judgments in avoidance proceedings in insolvency, and, if not, what rules do apply (Section V below). The other issues are whether, in the *Rubin* appeal, enforcement may be effected through the assistance provisions of the Cross-Border Insolvency Regulations 2006 (Section VI) or, in the *New Cap* appeal, s 426 of the Insolvency Act 1986 (Section VII); whether the judgments are enforceable as a result of the submission by the judgment debtors to the jurisdiction of the foreign courts (Section VIII); and, in the *New Cap* appeal, if the judgment is enforceable, whether enforcement is at common law or under the 1933 Act (Section IX).

V THE FIRST ISSUE: RECOGNITION AND ENFORCEMENT OF FOREIGN JUDGMENTS IN INSOLVENCY PROCEEDINGS

*Reasoning of the Court of Appeal in Rubin and the issue on the appeal*

[88] The Court of Appeal in the *Rubin* appeal decided that a foreign insolvency judgment could be enforced in England and Wales at common law against a defendant not subject to the jurisdiction of the foreign court under the traditional rule as formulated in the *Dicey* Rule.

[89] As I have already said, on the *Rubin* appeal in the Court of Appeal

*a*   the receivers sought only to enforce those parts of the judgment which in effect related to the avoidance causes of action. The Court of Appeal held that the judgment (as narrowed) was enforceable at common law. The reasoning was as follows: (a) the judgment was final and conclusive, and for definite sums of money, and on the face of the orders was a judgment in personam; (b) it was common ground that the judgment debtors were not

*b*   resident (this was a slip for 'present' since the action was at common law and not under the 1933 Act) when the proceedings were instituted, and did not submit to the jurisdiction, and so at first blush had an impregnable defence; (c) *Cambridge Gas* decided that the bankruptcy order with which it was concerned was neither in personam nor in rem, and its purpose was simply to establish a mechanism of collective execution against the property

*c*   of the debtor by creditors whose rights were admitted or established: *Ali* v *Pattni* [2007] 2 All ER (Comm) 427 at [23], [2007] 2 AC 85; (d) bankruptcy was a collective proceeding to enforce rights and not to establish them: *Cambridge Gas* [2007] 2 BCLC 141 at [15], [2007] 1 AC 508; (e) the issue was whether avoidance proceedings which could only be

*d*   brought by the representative of the bankrupt were to be characterised as part of the bankruptcy proceedings, ie part of the collective proceeding to enforce rights and not to establish them; (f) the adversary proceedings were part and parcel of the Chapter 11 proceedings; (g) the ordinary rules for enforcing foreign judgments in personam did not apply to bankruptcy proceedings; (h) avoidance mechanisms were integral to and central to the

*e*   collective nature of bankruptcy and were not merely incidental procedural matters; (i) the process of collection of assets will include the use of powers to set aside voidable dispositions, which may differ very considerably from those in the English statutory scheme: *Re HIH* [2012] 2 BCLC 655 at [19], [2008] 1 WLR 852; (j) the judgment of the US Bankruptcy Court was a judgment in, and for the purposes of, the collective enforcement regime of

*f*   the insolvency proceedings, and was governed by the sui generis private international law rules relating to insolvency; (k) that was a desirable development of the common law founded on the principles of modified universalism, and did not require the court to enforce anything that it could not do, mutatis mutandis, in a domestic context; (l) there was a principle of private international law that bankruptcy should be unitary and universal,

*g*   and there should be a unitary insolvency proceeding in the court of the bankrupt's domicile which receives worldwide recognition and should apply universally to all the bankrupt's assets; (m) there was a further principle that recognition carried with it the active assistance of the court which included assistance by doing whatever the English court could do in the case of a

*h*   domestic insolvency; (n) there was no unfairness to the appellants in upholding the judgment because they were fully aware of the proceedings, and after taking advice chose not to participate: see [2011] 2 BCLC 473 at [38], [41], [43], [45], [48], [50], [61]–[62], [64], [2011] Ch 133. It was unnecessary to decide whether the judgment was enforceable under the 2006 regulations: para 63.

*i*   [90] In short, Ward LJ accepted that the judgment was an in personam judgment, but he decided that the *Dicey* Rule did not apply to foreign judgments in avoidance proceedings because they were central to the

collective enforcement regime in insolvency and were governed by special rules.                                                                                                *a*

[91] The essential questions on this aspect of the appeals are these. Is the judgment in each case to be regarded as a judgment in personam within the scope of the traditional rules embodied in the *Dicey* Rule, or is it to be characterised as an insolvency order which is part of the bankruptcy proceedings, ie part of the collective proceeding to enforce rights and not to establish them? Is that a distinction which has a role to play? Is there a distinction between claims which are central to the purpose of the proceedings and claims which are incidental procedural matters? As a matter of policy, should the court, in the interests of universality of insolvency proceedings, devise a rule for the recognition and enforcement of judgments in foreign insolvency proceedings which is more expansive, and more favourable to liquidators, trustees in bankruptcy, receivers and other officeholders, than the traditional common law rule embodied in the *Dicey* Rule, or should it be left to legislation preceded by any necessary consultation?                                                                              *b*

                                                                                              *c*

[92] Ward LJ's conclusion derives from a careful synthesis of dicta in Lord Hoffmann's brilliantly expressed opinion in *Cambridge Gas* and his equally brilliant speech in *Re HIH*, each of which has on these appeals been subjected to an exceptionally detailed analysis. For reasons which will be developed, I do not agree with the conclusions which Ward LJ draws.                     *d*

[93] But I begin with two matters on which I accept the respondents' analysis. The first is that avoidance proceedings have characteristics which distinguish them from ordinary claims such as claims in contract or tort. The second is that, if it were necessary to draw a distinction between insolvency orders and other orders, it would not be difficult to formulate criteria for the distinction, along similar lines to that drawn by the European Court in relation to the Brussels Convention (Convention on Jurisdiction and Enforcement of Judgments in Civil and Commercial Matters), the Brussels I Regulation (Council Regulation (EC) 44/2001 of 22 December 2000 on Jurisdiction and the Recognition and Enforcement of Judgments in Civil and Commercial Matters), and the EC Insolvency Regulation (Council Regulation (EC) 1346/2000 of 29 May 2000 on Insolvency Proceedings).                                                              *e*

                                                                                              *f*

*Nature of avoidance proceedings*                                                             *g*

[94] In order to achieve a proper and fair distribution of assets between creditors, it will often be necessary to adjust prior transactions and to recover previous dispositions of property so as to constitute the estate which is available for distribution. The principle of equality among creditors which underlies the pari passu principle may require the adjustment of concluded transactions which but for the winding up of the company would have remained binding on the company, and the return to the company of payments made or property transferred under the transactions or the reversal of their effect. Systems of insolvency law use avoidance proceedings as mechanisms for adjusting prior transactions by the debtor and for recovering property disposed of by the debtor prior to the insolvency. Thus under the Insolvency Act 1986 an administrator, or liquidator, or trustee in bankruptcy may, where there has been a transaction at an undervalue, or amounting to an unlawful preference, apply for an order restoring the position to what it would have been had the transaction   *h*

                                                                                              *i*

*a* not taken place: ss 238 et seq and 339 et seq. Other systems of law have similar mechanisms, but they will differ in matters such as the period during which such transactions are at risk of reversal and the role of good faith of the parties to the transaction.

[95] The underlying policy is to protect the general body of creditors against a diminution of the assets by a transaction which confers an unfair
*b* or improper advantage on the other party, and it is therefore an essential aspect of the process of liquidation that antecedent transactions whose consequences have been detrimental to the collective interest of the creditors should be amenable to adjustment or avoidance: Fletcher, *Law of Insolvency* (4th edn, 2009) para 26–002; Goode, *Principles of Corporate Insolvency Law* (4th edn, 2011) para 13–03.

*c* [96] Thus the UNCITRAL Legislative Guide on Insolvency Law (2005) says:

'150. Many insolvency laws include provisions that apply retroactively from a particular date (such as the date of application for, or commencement of, insolvency proceedings) for a specified period of
*d* time (often referred to as the "suspect" period) and are designed to overturn those past transactions to which the insolvent debtor was a party or which involved the debtor's assets where they have certain effects …

151. It is a generally accepted principle of insolvency law that collective action is more efficient in maximizing the assets available to
*e* creditors than a system that leaves creditors free to pursue their individual remedies and that it requires all like creditors to receive the same treatment. Provisions dealing with avoidance powers are designed to support these collective goals, ensuring that creditors receive a fair allocation of an insolvent debtor's assets consistent with established priorities and preserving the integrity of the insolvency estate.'
*f*
[97] In *Re Condor Insurance Ltd* (2010) 601 F 3d 319 at 326 the Court of Appeals for the Fifth Circuit said:

' "Avoidance laws have the purpose and effect of re-ordering the distribution of a debtor's assets … in favor of the collective priorities established by the distribution statute" [and] must be treated as an
*g* integral part of the entire bankruptcy system.'

[98] In different phases of the Australian proceedings in *New Cap* Barrett J made similar points. He said that in an action for unfair preference under the Australian legislation the liquidator might obtain an order for the payment of money, but the action did not contemplate recovery in the sense
*h* applicable to damages and debts; and the proceedings sought to remedy or counter the effects of that depletion caused by the payment by New Cap: see *New Cap Reinsurance Corp v Renaissance Reinsurance Ltd* [2002] NSWSC 856 at [23], [27]. The order does not vindicate property rights which the company itself would have had prior to liquidation, but statutory rights which the liquidator has under the statutory scheme in consequence
*i* of winding up. The purpose of the order for the payment of money to a company in liquidation is not to compensate the company, but to adjust the rights of creditors among themselves in such a way as to eliminate the effects of favourable treatment afforded to one or more creditors, to the exclusion of others, in the period immediately before an insolvent

AP1088

administration commences: see *New Cap Reinsurance Corp v Grant* [2009]          *a*
NSWSC 662, 257 ALR 740, paras [20]–[21].

*Difference between insolvency claims and others*

[99] I also accept that, if there were to be a separate rule for the
recognition and enforcement of insolvency orders, it would not normally be
difficult to distinguish between judgments in insolvency proceedings which          *b*
are peculiarly the subject of insolvency law such as avoidance proceedings,
and other judgments of the kind which are covered by the *Dicey* Rule.

[100] In the context of the Brussels Convention, the Brussels I Regulation
and the EC Insolvency Regulation, the European Court has developed a
distinction between claims which derive directly from the bankruptcy or
winding up, and which are closely connected with them, on the one hand,          *c*
and those which do not, on the other hand, and the distinction has been
applied by the English court. In my judgment, the distinction is a workable
one which could be adapted to other contexts should it be useful or
necessary to do so.

[101] Claims which were regarded as bankruptcy claims have been held to          *d*
include a claim under French law by a liquidator against a director to
make good a deficiency in the assets of a company (*Gourdain v Nadler*
Case C-133/78, [1979] ECR 733, [1979] 3 CMLR 180); or a claim under
German law to set aside a transaction detrimental to creditors (*Seagon v
Deko Marty Belgium NV* Case C-339/07, [2009] 1 WLR 2168). Claims          *e*
outside the category of bankruptcy claims have been held to include an
action brought by a seller based on a reservation of title against a purchaser
who was insolvent (*German Graphics Graphische Maschinen GmbH v
Schee* Case C-292/08, [2009] ECR I-8421) or a claim by a liquidator as to
beneficial ownership of an asset (*Byers v Yacht Bull Corp* [2010] EWHC
133 (Ch), [2010] 2 BCLC 169)). In *Oakley v Ultra Vehicle Design Ltd*          *f*
[2005] EWHC 872 (Ch), [2006] BCC 57 at [42], Lloyd LJ (sitting as an
additional judge of the Chancery Division) said:

> 'it has been held that a claim by a liquidator to recover
> pre-liquidation debts, although made in the course of the winding up
> and so, in a sense, relating to it, does not derive directly from it and is
> therefore not excluded from the Brussels Convention (and therefore          *g*
> now not from the [Brussels I] Regulation) by article 1.2(b): see *Re
> Hayward* (*decd*) [1997] 1 All ER 32, [1997] Ch 45, and *UBS AG v
> Omni Holding AG* [2000] 2 BCLC 310, [2000] 1 WLR 916. By
> contrast, proceedings by a liquidator against a director or a third party
> to set aside a transaction as having been effected at an undervalue or on
> the basis of wrongful or fraudulent trading would be claims deriving          *h*
> directly from the winding up and therefore excluded from the Brussels
> Convention and now from the [Brussels I] Regulation.'

*In personam or sui generis?*

[102] I have already quoted the passage in *Cambridge Gas* in which          *i*
Lord Hoffmann distinguished between judgments in rem and in personam,
on the one hand, and judgments in bankruptcy proceedings, on the other,
but it is necessary to repeat it at this point. He said:

> '[13] … Judgments in rem and in personam are judicial
> determinations of the existence of rights: in the one case, rights over

*a*

property and in the other, rights against a person. When a judgment in rem or in personam is recognised by a foreign court, it is accepted as establishing the right which it purports to have determined, without further inquiry into the grounds upon which it did so. The judgment itself is treated as the source of the right.

*b*

[14] The purpose of bankruptcy proceedings, on the other hand, is not to determine or establish the existence of rights, but to provide a mechanism of collective execution against the property of the debtor by creditors whose rights are admitted or established …'

[103] There is no doubt that the order of the US Bankruptcy Court in *Cambridge Gas* did not fall into the category of an in personam order. Even though the question whether a foreign judgment is in personam or in rem is

*c*

sometimes a difficult one (*Dicey* (15th edn) para 14–109), that was not a personal order against its shareholders, including Cambridge Gas. The order vested the shares in Navigator in the creditors' committee. It did not declare existing property rights. Indeed the whole purpose of what was the functional equivalent of a scheme of arrangement was to alter property

*d*

rights. But it is not easy to see why it was not an in rem order in relation to property in the Isle of Man in the sense of deciding the status of a thing and purporting to bind the world: see *Jowitt's Dictionary of English Law* (3rd edn, 2010) p 1249.

[104] The judgments in the *Rubin* and *New Cap* appeals were based on avoidance legislation which, with some differences of substance, performs

*e*

the same function as the equivalent provisions in the Insolvency Act 1986 and its predecessors. But Ward LJ in *Rubin* accepted that the judgment was in personam and the *Rubin* respondents have not sought to argue that it was not an in personam judgment. What they say is that, even if it is in personam, it is within a sui generis category of insolvency orders or judgments subject to special rules.

*f*

[105] There can be no doubt that the avoidance orders in the present appeals are in personam. In *Re Paramount Airways Ltd* [1992] BCLC 710 at 720, [1993] Ch 223 at 238 Nicholls LJ said that the remedies under s 238 of the Insolvency Act 1986 (transactions at an undervalue) were 'primarily of an in personam character', and that accords with the nature of

*g*

the orders in these appeals. The form of judgment of the US Bankruptcy Court in the *Rubin* case was that 'plaintiffs have judgment … against the defendants …' in the sums awarded, and the orders of the New South Wales Supreme Court in the *New Cap* case included orders that 'the defendants … pay to the first plaintiff' the sums due under s 588FF(1) of the Australian Corporations Act.

*h*

*The question of principle and policy*

[106] Since the judgments are in personam the principles in the *Dicey* Rule are applicable unless the court holds that there is, or should be, a separate rule for judgments in personam in insolvency proceedings, at any

*i*

rate where those judgments are not designed to establish the existence of rights, but are central to the purpose of the insolvency proceedings or part of the mechanism of collective execution.

[107] Prior to *Cambridge Gas* and the present cases, there had been no suggestion that there might be a different rule for judgments in personam in insolvency proceedings and other proceedings. There are no cases in

AP1090

England which are helpful. The normal rules for enforcement of foreign
judgments were applied to a claim by a liquidator for moneys due to the
company (*Gavin Gibson & Co Ltd v Gibson* [1913] 3 KB 379) and to a
claim on a debt ascertained in bankruptcy under German law (*Berliner
Industriebank Akt v Jost* [1971] 2 All ER 1513, [1971] 2 QB 463). A
judgment of the US Bankruptcy Court in Chapter 11 proceedings for
repayment of a preferential transfer was enforced in Ontario on the basis of
the judgment debtor's submission to the New York court, without any
suggestion that the normal rules did not apply: *Gourmet Resources
International Inc v Paramount Capital Corp* (1991) 3 OR (3d) 286, [1993]
ILPr 583; appeal dismissed (1993) 14 OR (3d) 319.

[108] The principles in the *Dicey* Rule have never received the express
approval of the House of Lords or the UK Supreme Court and the leading
decisions remain *Adams v Cape Industries plc* [1990] BCLC 479, [1990]
Ch 433 and the older Court of Appeal authorities which it re-states or
re-interprets. But there can be no doubt that the references by the House of
Lords in the context of foreign judgments to the foreign court of 'competent
jurisdiction' are implicit references to the common law rule: eg *Re
Henderson, Nouvion v Freeman* (1890) 15 App Cas 1 at 8; *Owens
Bank Ltd v Bracco* [1992] 2 All ER 193 at 198, [1992] 2 AC 443 at 484.

[109] The *Rubin* respondents question whether the rules remain sound in
the modern world. It is true that the common law rule was rejected in
Canada, at first in the context of the inter-provincial recognition of
judgments. The Supreme Court of Canada held that the English rules
developed in the 19th century for the recognition and enforcement of
judgments of foreign countries could not be transposed to the enforcement
of judgments from sister provinces in a single country with a common
market and a single citizenship. Instead a judgment given against a person
outside the jurisdiction should be recognised and enforced if the subject
matter of the action had a real and substantial connection with the province
in which the judgment was given: *Morguard Investments Ltd v De Savoye*
[1990] 3 SCR 1077 at [45]. This approach was applied, by a majority, to
foreign country judgments in *Beals v Saldanha* [2003] 3 SCR 416 (applied
to the recognition of an English order convening meetings in a scheme of
arrangement in *Re Cavell Insurance Co* (2006) 80 OR (3d) 500, 269 DLR
(4th) 679).

[110] There is no support in England for such an approach except in the
field of family law. In *Indyka v Indyka* [1967] 2 All ER 689, [1969] 1 AC
33 it was held that a foreign decree of divorce would be recognised at
common law if there was a 'real and substantial connection' between the
petitioner (or the respondent) and the country where the divorce was
obtained. This rule (now superseded by the Family Law Act 1986) was in
part devised to avoid 'limping marriages', ie cases where the parties were
regarded as divorced in one country but regarded as married in another
country. It has never been adopted outside the family law sphere in the
context of foreign judgments.

[111] The Supreme Court of Ireland in *Re Flightlease (Irelan*d) *Ltd* [2012]
IESC 12 declined to follow *Cambridge Gas* (and also the decision of the
Court of Appeal in *Rubin*) and also held that the *Dicey* Rule should not be
rejected in favour of a real and substantial connection test. In *Flightlease* the
airline Swissair was in a form of debt restructuring proceeding in

AP1091

*a*    Switzerland, where it was incorporated. Flightlease is an Irish company in the same group as Swissair. An application was before the Swiss courts under the Swiss federal statute on debt enforcement and bankruptcy seeking the return of money paid by Swissair to Flightlease. The proceedings had reached the stage of judgment, but the liquidators of Flightlease were concerned to know whether a Swiss judgment would be enforceable in

*b*    Ireland so that they could decide whether to appear in the Swiss proceedings.

[112] The Irish Supreme Court held that the judgment would not be enforceable if Flightlease did not appear in the Swiss proceedings for these reasons: (1) the effect of the Swiss order would be to establish a liability on Flightlease to repay moneys and would therefore result in a judgment in personam; (2) it would be preferable for any change in the rules relating to

*c*    the enforcement of foreign judgments to take place in the context of international consensus by way of treaty or convention given effect by legislation. In particular, the Irish Supreme Court said that it would not adopt the approach in *Cambridge Gas* because it had resulted from legislative changes in the United Kingdom (this appears to have been based

*d*    on a misapprehension), and should not be adopted in Ireland in the absence of consensus among common law jurisdictions.

[113] But there is no suggestion on this appeal that the principles embodied in the *Dicey* Rule should be abandoned. Instead the *Rubin* respondents suggest that the principles should not apply to foreign insolvency orders.

*e*

[114] The respondents accept that the *Dicey* Rule applies to claims which may be of considerable significance by an officeholder in a foreign insolvency, such as a claim for breach of contract, or a tort claim, or a claim to recover debts. It is clear that such claims may affect the size of the insolvent estate just as much, and often more, than avoidance claims. Like

*f*    claims to recover money due to the insolvent estate such as restitutionary claims not involving avoidance, avoidance claims may establish a liability to pay or repay money to the bankrupt estate (as in the present cases). There is no difference of principle.

[115] The question, therefore, is one of policy. Should there be a more liberal rule for avoidance judgments in the interests of the universality of

*g*    bankruptcy and similar procedures? In my judgment the answer is in the negative for the following reasons.

[116] First, although I accept that it is possible to distinguish between avoidance claims and normal claims, for example in contract or tort, it is difficult to see in the present context a difference of principle between a

*h*    foreign judgment against a debtor on a substantial debt due to a company in liquidation and a foreign judgment against a creditor for repayment of a preferential payment. The respondents suggest that a person who sells goods to a foreign company accepts the risk of the insolvency legislation of the place of incorporation. Quite apart from the fact that the suggestion is wholly unrealistic, why should the seller/creditor be in a worse position

*i*    than a buyer/debtor?

[117] The second reason is that if there is to be a different rule for foreign judgments in such proceedings as avoidance proceedings, the court will have to ascertain (or, more accurately, develop) two jurisdictional rules. There are two aspects of jurisdiction which would have to be satisfied if a

AP1092

Case 1:23-cv-00632-CFC Document 129-2 Filed 08/23/23 Page 93 of 300 PageID #: 1160

foreign insolvency judgment or order is to be outside the scope of the *Dicey* a
Rule: the first is the requisite nexus between the insolvency and the foreign
court, and the second is the requisite nexus between the judgment debtor
and the foreign court.

[118] In *Cambridge Gas* Navigator was an Isle of Man company, and the
jurisdiction of the United States Bankruptcy Court depends on whether the b
'debtor' resides or has a domicile or place of business, or property, in the
United States. The shares in Navigator owned by Cambridge Gas (a
Cayman Islands company) were, on ordinary principles of the conflict of
laws, situated in the Isle of Man, and the shareholder relationship between
Navigator and Cambridge Gas was governed by Manx law. The Privy
Council, as noted above, did not articulate any rule for the jurisdiction of c
the US Bankruptcy Court over Navigator (although it had plainly submitted
to its jurisdiction) or over Cambridge Gas (which, the Manx courts had
held and the Privy Council accepted, had not submitted) or over Cambridge
Gas's Manx assets.

[119] Nor did the Court of Appeal in *Rubin* articulate the reasons why
the English court recognised the jurisdiction of the US Bankruptcy Court d
over TCT, or over the appellants. The receivers appear to have proceeded
originally on the basis that the United States Bankruptcy Court had
jurisdiction under United States bankruptcy law because of TCT's residence
and principal place of business in New York (petition, 5 December 2005),
but the US Bankruptcy Court, in deciding to appoint the receivers as foreign
representatives also noted that TCT's business operations were conducted e
primarily in the United States, the majority of its creditors, substantially all
of its assets, and its centre of main interests, were all in the United States.
The basis of jurisdiction of the US Bankruptcy Court under United States
law over the individual defendants in *Rubin* was that they were subject both
to the general jurisdiction of the court (ie connection of the defendant with
the jurisdiction) and also to the specific jurisdiction of the court f
(ie connection of the cause of action with the jurisdiction) because they
specifically sought out the United States as a place to do business and
specifically sought out United States merchants and consumers with whom
to do business. Accordingly, the exercise of jurisdiction satisfied the due
process requirements of the Fifth Amendment.

[120] The basis of jurisdiction in *New Cap* over New Cap itself was of g
course that it was incorporated in Australia. The basis of jurisdiction over
the Syndicate under New South Wales law was that the cause of action
against the Syndicate arose in New South Wales.

[121] The respondents do not put forward any principled suggestion for
rules which will deal with the two aspects of jurisdiction. They accept, as h
regards the jurisdictional link between the foreign country and the insolvent
estate, that English law has traditionally recognised insolvency proceedings
taking place in an individual bankrupt's place of domicile, or, in the case of
corporations, the place of incorporation, but (because the connection which
the trustees of TCT, or TCT itself, had with the United States was that the
trust's main business was there) they rely on what Lord Hoffmann said in i
*Re HIH* [2012] 2 BCLC 655 at [31], [2008] 1 WLR 852:

    'I have spoken in a rather old-fashioned way of the company's
    domicile because that is the term used in the old cases, but I do not
    claim it is necessarily the best one. Usually it means the place where the

AP1093

a  company is incorporated but that may be some offshore island with which the company's business has no real connection. Council Regulation on Insolvency Proceedings ((EC) No 1346/2000 of 29 May 2000) uses the concept of the 'centre of a debtor's main interests' as a test, with a presumption that it is the place where the registered office is situated: see art 3.1. That may be more appropriate.'

b  [122] They propose that each of these issues be resolved, not by a black letter rule like the common law rule for enforcement of judgments, but instead by an appeal to what was said in oral argument to be the discretion of the English court to assist the foreign court.

[123] On the second aspect, the jurisdictional link between the foreign c  country and the judgment debtor, they accept that it is necessary for there to be an appropriate connection between the foreign insolvency proceeding and the insolvency order in respect of which recognition and enforcement is sought. They propose that, in the exercise of the discretion, the court should adopt an approach similar to that taken by the English court in deciding whether to apply provisions of the Insolvency Act 1986, such as s 238 d  (transactions at an undervalue), to persons abroad, relying on *Re Paramount Airways Ltd* [1992] BCLC 710, [1993] Ch 223.

[124] That case decided that there is no implied territorial limitation to the exercise of jurisdiction over 'any person'. The Court of Appeal rejected the argument that the section applied only to British subjects and to persons present in England at the time of the impugned transaction. In particular e  the physical absence or presence of the party at the time of the transaction bore no necessary relationship to the appropriateness of the remedy. Nor was the test of 'sufficient connection' with England satisfactory because it would hardly be distinguishable from the ambit of the sections being unlimited territorially: [1992] BCLC 710 at 719, [1993] Ch 223 at 237. Instead, the approach was to be found in the discretion of the court, first to f  grant permission to serve the proceedings out of the jurisdiction, and secondly, to make an order under the section. On both aspects the court would take into account whether the defendant was sufficiently connected with England for it to be just and proper to make the order against him despite the foreign element.

g  [125] The *Rubin* respondents say that *Re Paramount Airways Ltd* is instructive because, if the facts of the present case were reversed such that TCT had carried on the scheme in England and had been placed into insolvency proceedings here and the appellants were resident in New York, then it can be expected that the English court would have considered that England was the correct forum in which to bring s 238 proceedings to h  recover payments made to the appellants and would have given permission to serve out of the jurisdiction accordingly. They go on to say that it is implicit in this that the English court would have expected the New York court then to recognise and enforce any judgment of the English court even if the appellants had remained in New York and had not contested the proceedings; and that by the same token that the court seeks and expects i  the recognition and enforcement abroad of its own insolvency orders, the court should recognise and enforce in England insolvency orders made in insolvency proceedings in other jurisdictions.

[126] There is no basis for this line of reasoning. There is no necessary connection between the exercise of jurisdiction by the English court and its

[2012] 2 BCLC 682

recognition of the jurisdiction of foreign courts, or its expectation of the
recognition of its judgments abroad. It has frequently been said that the
jurisdiction exercised under what used to be RSC Ord 11, r 1 (and is now
CPR Practice Direction 6B, para 3.1) is an exorbitant one, in that it was a
wider jurisdiction than was recognised in English law as being possessed by
courts of foreign countries in the absence of a treaty providing for
recognition: see *Siskina (cargo owners) v Distos Cia Naviera SA, The
Siskina* [1977] 3 All ER 803 at 823, [1979] AC 210 at 254 per
Lord Diplock; *Amin Rasheed Shipping Corp v Kuwait Insurance Co, the Al
Wahab* [1983] 2 All ER 884 at 891, [1984] AC 50 at 65 per Lord Diplock;
*Spiliada Maritime Corp v Cansulex Ltd, The Spiliada* [1986] 3 All ER 843
at 858, [1987] AC 460 at 481 per Lord Goff of Chieveley.

[127] Outside the sphere of matrimonial proceedings (see *Travers v
Holley* [1953] 2 All ER 794, [1953] P 246, disapproved on this aspect in
*Indyka v Indyka* [1967] 2 All ER 689, [1969] 1 AC 33) reciprocity has not
played a part in the recognition and enforcement of foreign judgments at
common law. The English court does not concede jurisdiction in personam
to a foreign court merely because the English court would, in corresponding
circumstances, have power to order service out of the jurisdiction: *Re
Trepca Mines Ltd* [1960] 3 All ER 304, [1960] 1 WLR 1273.

[128] In my judgment, the dicta in *Cambridge Gas* and *Re HIH* do not
justify the result which the Court of Appeal reached. This would not be an
incremental development of existing principles, but a radical departure from
substantially settled law. There is a reason for the limited scope of the *Dicey*
Rule and that is that there is no expectation of reciprocity on the part of
foreign countries. Typically today the introduction of new rules for
enforcement of judgments depends on a degree of reciprocity. The EC
Insolvency Regulation and the Model Law were the product of lengthy
negotiation and consultation.

[129] A change in the settled law of the recognition and enforcement of
judgments, and in particular the formulation of a rule for the identification
of those courts which are to be regarded as courts of competent jurisdiction
(such as the country where the insolvent entity has its centre of interests and
the country with which the judgment debtor has a sufficient or substantial
connection), has all the hallmarks of legislation, and is a matter for the
legislature and not for judicial innovation. The law relating to the
enforcement of foreign judgments and the law relating to international
insolvency are not areas of law which have in recent times been left to be
developed by judge-made law. As Lord Bridge of Harwich put it in relation
to a proposed change in the common law rule relating to fraud as a defence
to the enforcement of a foreign judgment, 'if the law is now in need of
reform, it is for the legislature, not the judiciary, to effect it': *Owens
Bank Ltd v Bracco* [1992] 2 All ER 193 at 203, [1992] 2 AC 443 at 489.

[130] Furthermore, the introduction of judge-made law extending the
recognition and enforcement of foreign judgments would be only to the
detriment of United Kingdom businesses without any corresponding benefit.
I accept the appellants' point that if recognition and enforcement were
simply left to the discretion of the court, based on a factor like 'sufficient
connection', a person in England who might have connections with a
foreign territory which were only arguably 'sufficient' would have to
actively defend foreign proceedings which could result in an in personam

*a*

judgment against him, only because the proceedings are incidental to bankruptcy proceedings in the courts of that territory. Although I say nothing about the facts of the Madoff case, it might suggest that foreigners who have bona fide dealings with the United States might have to face the dilemma of the expense of defending enormous claims in the United States or not defending them and being at risk of having a default judgment enforced abroad.

*b*

[**131**] Nor is there likely to be any serious injustice if this court declines to sanction a departure from the traditional rule. It would not be appropriate to express a view on whether the officeholders in the present cases would have, or would have had, a direct remedy in England, because there might be, or might have been, issues as to the governing law, or issues as to time limits or as to good faith. Subject to those reservations, several of the ways in which the claims were put (especially those parts of the judgment which were not the subject of these proceedings) in the United States proceedings in *Rubin* could have founded proceedings by trustees in England for the benefit of the creditors (as beneficiaries of the express trust). In addition there are several other avenues available to officeholders. Avoidance claims by a liquidator of an Australian company may be the subject of a request to the Australian court pursuant to s 426(4) of the Insolvency Act 1986, applying Australian law under s 426(5). In appropriate cases, art 23 of the Model Law will allow avoidance claims to be made by foreign representatives under the Insolvency Act 1986. In the cases where the insolvent estate has its centre of main interests in the European Union, judgments will be enforceable under art 25 of the EC Insolvency Regulation.

*c*

*d*

*e*

[**132**] It follows that, in my judgment, *Cambridge Gas* was wrongly decided. The Privy Council accepted (in view of the conclusion that there had been no submission to the jurisdiction of the court in New York) that Cambridge Gas was not subject to the personal jurisdiction of the US Bankruptcy Court. The property in question, namely the shares in Navigator, was situate in the Isle of Man, and therefore also not subject to the in rem jurisdiction of the US Bankruptcy Court. There was therefore no basis for the recognition of the order of the US Bankruptcy Court in the Isle of Man.

*f*

*g*

VI ISSUE 2: RUBIN: ENFORCEMENT UNDER THE CROSS-BORDER INSOLVENCY REGULATIONS

[**133**] In the *Rubin* appeal it was argued by the respondents that the judgment should also be enforced through the 2006 regulations, implementing the UNCITRAL Model Law.

*h*

[**134**] The order made by the deputy judge recognised the Chapter 11 proceeding 'including the adversary proceedings,' because 'bringing adversary proceedings against debtors of the bankrupt is clearly part of collecting the bankrupt's assets with a view to distributing them to creditors' and 'the adversary proceedings are part and parcel of the Chapter 11 insolvency proceedings': [2010] 1 All ER (Comm) 81 at [46], [47]. The Court of Appeal was of the same view: [2011] 2 BCLC 473 at [61](2)–(3), [2011] Ch 133. The appellants no longer maintain that the adversary proceedings should not be recognised under the Model Law.

*i*

[**135**] The issue which still arises in relation to the Model Law as implemented by the 2006 regulations is whether the court has power to

grant relief recognising and enforcing the relevant parts of the judgment.    *a*

[136] Article 21 provides that—

'1. Upon recognition of a foreign proceeding, whether main or non-main, where necessary to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including—

     *b*

(a) staying the commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities, to the extent they have not been stayed under paragraph l(a) of article 20;

(b) staying execution against the debtor's assets to the extent it has not been stayed under paragraph l(b) of article 20;

     *c*

(c) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under paragraph 1(c) of article 20;

(d) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

     *d*

(e) entrusting the administration or realisation of all or part of the debtor's assets located in Great Britain to the foreign representative or another person designated by the court;

(f) extending relief granted under paragraph 1 of article 19; and

(g) granting any additional relief that may be available to a British insolvency officeholder under the law of Great Britain, including any relief provided under paragraph 43 of Schedule B1 to the Insolvency Act 1986.'

     *e*

[137] The reference to relief under para 43 of Sch B1 to the Insolvency Act 1986 is a reference to a moratorium on claims in an administration.

[138] The *Guide to Enactment* states, at paras 154, 156:      *f*

'[154] The types of relief listed in article 21, paragraph 1, are typical or most frequent in insolvency proceedings; however, the list is not exhaustive and the court is not restricted unnecessarily in its ability to grant any type of relief that is available under the law of the enacting state and needed in the circumstances of the case …

     *g*

[156] It is in the nature of discretionary relief that the court may tailor it to the case at hand. This idea is reinforced by article 22, paragraph 2, according to which the court may subject the relief granted to conditions that it considers appropriate.'

[139] Article 25 provides (under the heading 'Co-operation and direct communication between a court of Great Britain and foreign courts or foreign representatives') that—

     *h*

'1 … the court may co-operate to the maximum extent possible with foreign courts or foreign representatives, either directly or through a British insolvency officeholder.

2. The court is entitled to communicate directly with, or to request information or assistance directly from, foreign courts or foreign representatives.'

     *i*

[140] Article 27 provides that the co-operation referred to in art 25 may be implemented 'by any appropriate means', including—

*a*      '(a) appointment of a person to act at the direction of the court;
(b) communication of information by any means considered appropriate by the court;
(c) coordination of the administration and supervision of the debtor's assets and affairs;
(d) approval or implementation by courts of agreements concerning
*b*      the coordination of proceedings;
(e) coordination of concurrent proceedings regarding the same debtor.'

[141] The respondents say that (a) the power under art 21 is to grant any type of relief that is available under the law of the relevant state, and that
*c*  the fact that recognition and enforcement of foreign judgments is not specifically mentioned in art 21 as one of the forms of relief available, does not mean that such relief cannot be granted; (b) the recognition and enforcement of the judgments of a foreign court is the paradigm means of co-operation with that court; and (c) the examples of co-operation in art 27 are merely examples and are not exhaustive.

*d*      [142] But the 2006 regulations (and the Model Law) say nothing about the enforcement of foreign judgments against third parties. As Lord Mance pointed out in argument, recognition and enforcement are fundamental in international cases. Recognition and enforcement of judgments in civil and commercial matters (but not in insolvency matters) have been the subject of intense international negotiations at the Hague Conference on Private
*e*  International Law, which ultimately failed because of inability to agree on recognised international bases of jurisdiction.

[143] It would be surprising if the Model Law was intended to deal with judgments in insolvency matters by implication. Articles 21, 25 and 27 are concerned with procedural matters. No doubt they should be given a purposive interpretation and should be widely construed in the light of the
*f*  objects of the Model Law, but there is nothing to suggest that they apply to the recognition and enforcement of foreign judgments against third parties.

[144] The respondents rely on United States decisions but the only case involving enforcement of a foreign judgment in fact supports the appellants' argument. The Model Law has been implemented into United States law
*g*  through Chapter 15 of Title 11 of the United States Code, which has in sections 1521, 1525 and 1527 provisions which are, with modifications not relevant for present purposes, equivalent to arts 21, 25 and 27 of the 2006 regulations. In *Re Metcalfe & Mansfield Alternative Investments* (2010) 421 BR 685 the US Bankruptcy Court ordered that orders made by a Canadian court in relation to a plan of compromise and arrangement under
*h*  the (Canadian) Companies' Creditors Arrangement Act 1985 be enforced. That decision does not assist the respondents because the US Bankruptcy Court applied the normal rules in non-bankruptcy cases for enforcement of foreign judgments in the United States: see 421 BR 685 at 698–700. In my judgment the Model Law is not designed to provide for the reciprocal enforcement of judgments.
*i*

VII ISSUE 3: NEW CAP: ENFORCEMENT THROUGH ASSISTANCE UNDER SECTION 426 OF THE INSOLVENCY ACT 1986

[145] In view of my conclusion in the next section (Section VIII) that the Syndicate submitted to the jurisdiction of the Australian court, the issues on

s 426(4) and (5) of the Insolvency Act 1986, and their relationship with s 6    *a*
of the Foreign Judgments (Reciprocal Enforcement) Act 1933 do not arise,
but since the matter was fully argued I will express a view on the
applicability of s 426(4) to a case such as this.

[146] Sections 426(4) and (5) of the Insolvency Act 1986 provides:

> '(4) The courts having jurisdiction in relation to insolvency law in any    *b*
> part of the United Kingdom shall assist the courts having the
> corresponding jurisdiction in any other part of the United Kingdom or
> any relevant country or territory.
>
> (5) For the purposes of subsection (4) a request made to a court in
> any part of the United Kingdom by a court in any other part of the
> United Kingdom, or in a relevant country or territory is authority for    *c*
> the court to which the request is made to apply, in relation to any
> matter specified in the request, the insolvency law which is applicable
> by either court in relation to comparable matters falling within its
> jurisdiction. In exercising its discretion under this subsection, a court
> shall have regard in particular to the rules of private international law.'
                                                                              *d*
[147] The reference to the application of rules of private international law
in s 426(5) is difficult and obscure: see *Dicey* (15th edn) para 30–119; my
discussion in *Re Television Trade Rentals* [2002] EWHC 211 (Ch), [2002]
BCC 807 at [17], and the cases there cited; and *Al Sabah v Grupo Torras
SA* [2005] UKPC 1, [2005] 1 All ER 871 at [47], [2005] 2 AC 333. But
nothing turns on it on these appeals.                                          *e*

[148] The question is whether s 426(4) of the 1986 Act provides a
procedure by which a judgment of a court having jurisdiction in relation to
insolvency law in a 'relevant country or territory' may be enforced in the
United Kingdom. As I have said, Australia is a relevant country.

[149] A further question arises if s 426(4) applies to the enforcement of    *f*
foreign judgments and that is whether s 426 is ousted by s 6 of the Foreign
Judgments (Reciprocal Enforcement) Act 1933, which provides:

> 'No proceedings for the recovery of a sum payable under a foreign
> judgment, being a judgment to which this Part of the Act applies, other
> than proceedings by way of registration of the judgment, shall be
> entertained by any court in the United Kingdom.'                           *g*

[150] Both Lewison J and the Court of Appeal ([2012] 1 All ER 755,
[2012] 2 WLR 1095) held that s 426(4) was available as a tool for the
enforcement of the judgment.

[151] Section 426(4) has been given a broad interpretation: see *Hughes v
Hannover Rückversicherungs-AG* [1997] 1 BCLC 497; *Re Southern           *h*
Equities Corp Ltd* (*in liq*), *England v Smith* [2000] 2 BCLC 21, [2001]
Ch 419; *Re HIH* [2008] UKHL 21, [2012] 2 BCLC 655, [2008] 1 WLR
852. It has been held that the fact that a letter of request has been made is
a weighty factor, and public policy and comity favour the giving of
assistance: *Hughes v Hannover* [1997] 1 BCLC 497 at 517–518; *Re
Southern Equities Corp Ltd* (*in liq*), *England v Smith* [2000] 2 BCLC 21 at    *i*
64, [2001] Ch 419 at 433. Thus in *England v Smith* the Australian court
overseeing the liquidation of the Bond Corporation made an order for the
examination of a London partner in Arthur Andersen. It issued a letter of
request asking the English court to assist it by making its own order for the

AP1099

*a*    examination. The Court of Appeal decided that the order should be made.

[152] But, despite the respondents' argument to the contrary, *Re Southern Equities Corp Ltd (in liq), England v Smith* was not a case of the enforcement of the Australian order, but rather the making of the court's own order in aid of the Australian liquidation. In my judgment, sub-ss 426(4) and (5) of the 1986 Act are not concerned with enforcement

*b*    of judgments. Sections 426(1) and (2), by contrast, deal with enforcement of orders in one part of the United Kingdom in another part, and refer expressly to the enforcement of such orders ('shall be enforced' in s 426(1)). Section 426(4) deals with assistance not only for foreign designated countries such as Australia but also to intra-United Kingdom assistance. If s 426(4) applied to intra-United Kingdom enforcement of orders, then

*c*    s 426(1) would be largely redundant, going beyond what the Court of Appeal ([2012] 1 All ER 755 at [57], [2012] 2 WLR 1095) described as 'a degree of overlap'.

[153] Sections 426(1) and (4) have their origin in ss 121 and 123 of the Bankruptcy Act 1914. Section 121 of the 1914 Act provided that orders of bankruptcy courts in one part of the United Kingdom were to be enforced

*d*    in other parts. Section 122 provided that the courts exercising bankruptcy and insolvency jurisdiction in the United Kingdom and 'every British court elsewhere' were to act in aid of, and be auxiliary to, each other; and, upon a request by the non-English court, could exercise the jurisdiction of either court.

*e*    [154] The Insolvency Law and Practice Report of the Review Committee (1982) (Cmnd 8558) (the Cork Report) said (paras 1909–1913) that s 122 was the 'vital section in this context', and recommended that the section should be extended to winding up. But, despite the respondents' arguments, I do not discern any recommendation which would suggest that s 426(4) applies to the enforcement of foreign judgments.

*f*    [155] Consequently the applicability of s 6 of the 1933 Act does not arise for decision, except in a context which makes little practical difference, and to which I will revert.

VIII SUBMISSION

[156] If the *Dicey* Rule applies the judgments in issue will be enforceable

*g*    in England if the judgment debtors submitted to the jurisdiction of the foreign court.

*New Cap*

[157] The Australian court granted leave to serve these proceedings out of the jurisdiction on the Syndicate: Section IV, above. The Syndicate did not

*h*    enter an appearance, but its solicitors commented in writing on evidence presented to the Australian court about New Cap's insolvency and their comments were placed before the Australian judge.

[158] More relevant is the fact that from August 1999 the Syndicate submitted proofs of debt (in relation to unsettled claims and outstanding premiums for the 1997, 1998, and 1999 years of account, and not to the

*i*    reinsurance contracts which are the subject of these proceedings) and attended and participated in creditors' meetings. In particular, at an adjourned meeting of creditors on 16 September 2009 the Syndicate had given a proxy for that meeting to the chairman, and submitted a proof of debt and proxy form for that meeting. The Syndicate voted at a meeting of

creditors in favour of a scheme of arrangement. The liquidator has admitted claims by the Syndicate for the sterling equivalent of more than £650,000, although the liquidator is retaining the dividend in partial settlement of the costs incurred in these proceedings.

[159] The general rule in the ordinary case in England is that the party alleged to have submitted to the jurisdiction of the English court must have 'taken some step which is only necessary or only useful if' an objection to jurisdiction 'has been actually waived, or if the objection has never been entertained at all': *Williams & Glyn's Bank plc v Astro Dinamico Cia Naviera SA* [1984] 1 All ER 760 at 764, [1984] 1 WLR 438 at 444, approving *Rein v Stein* (1892) 66 LT 469 at 471 (Cave J).

[160] The same general rule has been adopted to determine whether there has been a submission to the jurisdiction of a foreign court for the purposes of the rule that a foreign judgment will be enforced on the basis that the judgment debtor has submitted to the jurisdiction of the foreign court: *Adams v Cape Industries* [1991] 1 All ER 929 at 950, [1990] Ch 433 at 459; *Akai Pty Ltd v People's Insurance Co Ltd* [1998] 1 Lloyd's Rep 90 at 96–97; see also *Desert Sun Loan Corp v Hill* [1996] 2 All ER 847 at 856; *Akande v Balfour Beatty Construction Ltd* [1998] ILPr 110; *Starlight International Inc v Bruce* [2002] EWHC 374 (Ch), [2002] ILPr 617 at [14] (cases of foreign judgments); *Industrial Maritime Carriers (Bahamas) Inc v Sinoca International Inc, The Eastern Trader* [1996] 2 Lloyd's Rep 585 at 601 (a case involving the question whether the party seeking an anti-suit injunction in support of an English arbitration clause had waived the agreement by submitting to the jurisdiction of the foreign court).

[161] The characterisation of whether there has been a submission for the purposes of the enforcement of foreign judgments in England depends on English law. The court will not simply consider whether the steps taken abroad would have amounted to a submission in English proceedings. The international context requires a broader approach. Nor does it follow from the fact that the foreign court would have regarded steps taken in the foreign proceedings as a submission that the English court will so regard them. Conversely, it does not necessarily follow that because the foreign court would not regard the steps as a submission that they will not be so regarded by the English court as a submission for the purposes of the enforcement of a judgment of the foreign court. The question whether there has been a submission is to be inferred from all the facts.

[162] It is in that context that Scott J said at first instance in *Adams v Cape Industries plc* [1991] 1 All ER 929 at 952, [1990] Ch 433 at 461 (a case in which the submission issue was not before the Court of Appeal):

'If the steps would not have been regarded by the domestic law of the foreign court as a submission to the jurisdiction, they ought not … to be so regarded here, notwithstanding that if they had been steps taken in an English court they might have constituted a submission. The implication of procedural steps taken in foreign proceedings must … be assessed in the context of the foreign proceedings.'

[163] I agree with the way it was put by Thomas J in *Akai Pty Ltd v People's Insurance Co Ltd* [1998] 1 Lloyd's Rep 90 at 97:

'The court must consider the matter objectively; it must have regard to the general framework of its own procedural rules, but also to the

*a*

domestic law of the court where the steps were taken. This is because the significance of those steps can only be understood by reference to that law. If a step taken by a person in a foreign jurisdiction, such as making a counterclaim, might well be regarded by English law as amounting to a submission to the jurisdiction, but would not be regarded by that foreign court as a submission to its jurisdiction, an English court will take into account the position under foreign law.'

*b*

[**164**] The Syndicate did not take any steps in the avoidance proceedings as such which would be regarded either by the Australian court or by the English court as a submission. Were the steps taken by the Syndicate in the liquidation a submission for the purposes of the rules relating to foreign judgments?

*c*

[**165**] In English law there is no doubt that orders may be made against a foreign creditor who proves in an English liquidation or bankruptcy on the footing that by proving the foreign creditor submits to the jurisdiction of the English court. In *Ex p Robertson, Re Morton* (1875) LR 20 Eq 733 trustees were appointed over the property of bankrupt potato merchants in a liquidation by arrangement. A Scots merchant received payment of £120 after the liquidation petition was presented, and proved for a balance of £247 and received a dividend of what is now 20p in the pound. The trustees served a notice of motion, seeking repayment of the £120 paid out of the insolvent estate, out of the jurisdiction. The respondent objected to the jurisdiction of the English court on the ground that he was a domiciled Scotsman. On appeal from the county court, Sir James Bacon CJ held that the court had jurisdiction. He said (at 737–738):

*d*

*e*

'… what is the consequence of creditors coming in under a liquidation or bankruptcy? They come in under what is as much a compact as if each of them had signed and sealed and sworn to the terms of it—that the bankrupt's estate shall be duly administered among the creditors. That being so, the administration of the estate is cast upon the Court, and the Court has jurisdiction to decide all questions of whatever kind, whether of law, fact, or whatever else the Court may think necessary in order to effect complete distribution of the bankrupt's estate … [C]an there be any doubt that the Appellant in this case has agreed that, as far as he is concerned … the law of bankruptcy shall take effect as to him, and under this jurisdiction, to which he is not only subjected, but under which he has become an active party, and of which he has taken the benefit … [The Appellant] is as much bound to perform the conditions of the compact, and to submit to the jurisdiction of the Court, as if he had never been out of the limits of England.'

*f*

*g*

*h*

[**166**] The Syndicate objected to the jurisdiction of the Australian court. Barrett J in his judgment of 14 July 2009 accepted that it had made it clear that it was not submitting to its jurisdiction, and he also accepted that as a result the judgment of the Australian court would not be enforceable in England. His judgment is concerned exclusively with the preference claims, and he did not deal with the question of submission by reference to the Syndicate's participation in the liquidation by way of proof and receipt of dividends. He decided that the court had jurisdiction because the New South Wales rules justified service out of the jurisdiction on the basis that

*i*

the cause of action arose in New South Wales.

[167] I would therefore accept the liquidators' submission that, having chosen to submit to New Cap's Australian insolvency proceeding, the Syndicate should be taken to have submitted to the jurisdiction of the Australian court responsible for the supervision of that proceeding. It should not be allowed to benefit from the insolvency proceeding without the burden of complying with the orders made in that proceeding.

*Rubin*

[168] The position is different in the *Rubin* appeal. It would certainly have been arguable that Eurofinance SA had submitted to the jurisdiction of the United States District Court, for these reasons: first, it was Eurofinance SA which applied for the appointment by the High Court of Mr Rubin and Mr Lan as receivers of TCT specifically for the purpose of causing TCT then to obtain protection under Chapter 11; second, it was Eurofinance SA which represented to the English court that officeholders appointed by the United States court would be able to pursue claims against third parties; third, the judgment of the US Bankruptcy Court states that the court had personal jurisdiction over Eurofinance SA not only because it did business in the United States but also (as I have mentioned above) because it had filed a notice of appearance in the Chapter 11 proceedings (Order 22 of July 2008, paras 42--43).

[169] But the *Rubin* appellants did not appear in the adversary proceedings, and it was not argued in these proceedings that Eurofinance SA (or Mr Adrian Roman, who caused Eurofinance SA to make the application) had submitted to the jurisdiction of the US Bankruptcy Court in any other way and it is not necessary therefore to explore the matter further.

IX NEW CAP: ENFORCEMENT AT COMMON LAW OR UNDER THE 1933 ACT

[170] In view of my conclusion that the Australian judgment in *New Cap* is enforceable by reason of the Syndicate's submission, a purely technical point arises on the method of enforcement. The point is whether the enforcement is to be under the 1933 Act or at common law. If insolvency proceedings are excluded from the 1933 Act, then enforcement would be at common law. If they are not excluded, then (as I have said) s 6 has the effect of excluding an action at common law on the judgment and making registration under the 1933 Act the only method of enforcement of judgments within Part I of the Act.

[171] Section 11(2) of the 1933 Act provides that the expression 'action in personam' shall not be deemed to include (inter alia) proceedings in connection with bankruptcy and winding up of companies. But the effect of s 4(2)(c) is that in the case of a judgment given in an action other than an action in personam or an action in rem, the foreign court shall be deemed to have jurisdiction if its jurisdiction is recognised by the English court, ie at common law. Accordingly, the question whether insolvency proceedings are wholly excluded from the operation of the 1933 Act still arises. There is no other provision in the 1933 Act which throws any light on the point.

[172] The main object of the 1933 Act was to facilitate the enforcement of commercial judgments abroad by making reciprocity easier. The only reference to insolvency proceedings in the Report of the Foreign Judgments (Reciprocal Enforcement) Committee (1932) (Cmnd 4213), (the Greer

*a*  Report), which recommended the legislation, is the statement (in para 4): 'It is not necessary for our present purposes to consider the effect in England of foreign judgments in bankruptcy proceedings …' The report annexed draft conventions which had been drawn up in consultation with experts from Belgium, France and Germany. The draft conventions with Belgium (arts 4(3) and (4)) and Germany (art 4(4)) provided that the jurisdictional

*b*  rules in the convention did not apply to judgments in bankruptcy proceedings or proceedings relating to the winding up of companies or other bodies corporate, but that the jurisdiction of the original court would be recognised where such recognition was in accordance with the rules of private international law observed by the court applied to. That provision

*c*  paralleled what became ss 4(2)(c) and 11(2) of the 1933 Act. The draft convention with France did not apply to judgments in bankruptcy proceedings etc (art 2(3)), but provided that nothing was deemed to preclude the recognition and enforcement of judgments to which the convention did not apply: art 2(4).

[173] The conventions concluded with countries to which the 1933 Act

*d*  applied adopted similar techniques. It is unnecessary to set them out in detail. But there is no reason to suppose that bankruptcy proceedings were not regarded as being 'civil and commercial matters'. Thus the 1961 Convention with the Federal Republic of Germany of 1961 (the Reciprocal Enforcement of Foreign Judgments (Germany) Order, SI 1961/1199) provided in art I(6) that the expression 'judgments in civil and commercial

*e*  matters' did not include judgments for fines or penalties, and had a separate provision in art II(2) that the convention did not apply to judgments in bankruptcy proceedings or proceedings relating to the winding up of companies or other bodies corporate (although, in accordance with the usual technique, it did not rule out recognition and enforcement: art II(3)). Other conventions simply excluded bankruptcy proceedings from the

*f*  specific jurisdictional provisions of the convention, like the draft conventions annexed to the Greer Report: art 4(5) of the Reciprocal Enforcement of Foreign Judgments (Austria) Order 1962, SI 1962/1339; art 4(3) of the Reciprocal Enforcement of Foreign Judgments (Norway) Order 1962, SI 1962/636; and art IV(3) of the Reciprocal Enforcement of Foreign Judgments (Italy) Order 1973, SI 1973/1894.

*g*  [174] The Reciprocal Enforcement of Judgments (Australia) Order 1994, SI 1994/1901 extended the 1933 Act to Australia, implementing the UK-Australia agreement for the reciprocal enforcement of judgments in civil and commercial matters. The agreement is expressed in art I(c)(i) to apply to judgments in civil and commercial matters. The order applies Part I of

*h*  the Act to judgments in respect of a 'civil or commercial matter' (art 4(a)).

[175] There is no reason to conclude that the phrase 'civil and commercial matters' does not include insolvency proceedings, and the history of the 1933 Act and the conventions shows that it does. The fact that insolvency was expressly excluded from the operation of the Brussels Convention, the original and revised Lugano Conventions and the Brussels I Regulation in

*i*  fact suggests that otherwise they would have been within their scope. The respondents relied on a passage in the ruling of the European Court of Justice in *Gourdain v Nadler* Case 133/78, [1979] ECR 733 at paras [3]–[4], [1979] 3 CMLR 180, as suggesting that the exclusion of bankruptcy in art 1 of the Brussels Convention was an example of a matter

AP1104

excluded from the concept of civil and commercial matters. But it is clear from the context (and from the opinion of Advocate General Reischl) that the court was simply saying that because the expression 'civil and commercial matters' in art 1 had to be given an autonomous meaning, so also was the case with the expression 'bankruptcy'. That the exclusion of bankruptcy proceedings does not affect their character as civil or commercial matters is confirmed by the recent ruling in *F-Tex SIA v Lietuvos-Anglijos UAB-Jadecloud-Vilma* Case C-213/10 on 19 April 2012, where the court said that the Brussels I Regulation was 'intended to apply to all civil and commercial matters apart from certain well-defined matters' and as a result actions directly deriving from insolvency proceedings and closely connected with them were excluded: see para [29].

[176] It follows that the 1933 Act applies to the Australian judgment and that enforcement should be by way of registration under the 1933 Act.

X DISPOSITION

[177] I would therefore allow the appeal in *Rubin*, but dismiss the appeal in *New Cap* on the ground that the Syndicate submitted to the jurisdiction of the Australian court.

**LORD MANCE SCJ.**

[178] I agree with Lord Collins' reasoning and conclusions in his judgment on these appeals, essentially for the reasons he gives, though without subscribing to his incidental observation (para [132]) that the Privy Council decision in *Cambridge Gas Transport Corp v Navigator Holdings plc Creditors Committee* [2007] 2 BCLC 141, [2007] 1 AC 508 was necessarily wrongly decided. This was not argued before the Supreme Court, and I would wish to reserve my opinion upon it. *Cambridge Gas* is, on any view, distinguishable.

[179] The common law question central to these appeals is whether the Supreme Court should endorse or introduce a special rule of recognition and enforcement, one falling outside the scope of the *Dicey* Rule which Lord Collins has identified (Rule 36 in *Dicey, Morris & Collins, Conflict of Laws* (14th edn, 2006) and Rule 43 in *Dicey* (15th edn, 2012)) and applicable to judgments in foreign insolvency proceedings setting aside voidable pre-insolvency transactions. For the principal reasons which Lord Collins gives in paras [95]–[131], I agree that we should not do so.

[180] Since much weight was placed by the respondents and the Court of Appeal upon the Board's reasoning and decision in *Cambridge Gas*, I add some observations to indicate why, as the present appellants submitted, it concerned circumstances and proceeded upon factual assumptions and a legal analysis which have no parallel in the present case.

[181] *Cambridge Gas* has attracted both Irish judicial dissent and English academic criticism, to which Lord Collins refers in paras [53] and [111]–[112]. Giving the judgment of the Board in *Ali v Pattni* [2006] UKPC 51, [2007] 2 All ER (Comm) 427, [2007] 2 AC 85, I said that the purpose of the bankruptcy order with which the Board was concerned in *Cambridge Gas* 'was simply to establish a mechanism of collective execution against the property of the debtor [Navigator] by creditors whose rights were admitted or established' (para [23]).

[182] This analysis, admittedly, involved treating the vesting in creditors of shares *in* Navigator as no different in substance from the vesting in

AP1105

*a*  creditors of Navigator's shares in its ship-owning subsidiaries. But it is clear from paras [8] and [9] and again from [24]–[26] of the Board's advice in *Cambridge Gas* that the Board saw no difference. It did not regard Cambridge Gas as having any interest of value to advance or protect in the shares still held nominally in its name. Their vesting in Navigator's creditors was no more than a mechanism for disposing of Navigator's assets, which
*b*  did not affect or concern Cambridge Gas. The Board was therefore, in its view (and rightly or wrongly), concerned with distribution of the insolvent company's assets in a narrow and traditional sense.

[183] Amplifying this, the Board approached the situation in *Cambridge Gas* as follows. The New York court had jurisdiction over Navigator's assets, since Navigator had submitted to the New York proceedings.
*c*  Cambridge Gas's shares in Navigator (located in the Isle of Man, Navigator's place of incorporation) were 'completely and utterly worthless': [2007] 2 BCLC 141 at [9], [2007] 1 AC 508. The transfer to Navigator's creditors of Cambridge Gas's shares in Navigator had the like effect to a transfer of Navigator's assets, since Navigator was 'an insolvent company,
*d*  in which the shareholders ha[d] no interest of any value' (para [26]). Cambridge Gas's shares in Navigator were vulnerable in the Isle of Man, under s 152 of the Companies Act 1931, to a similar scheme of arrangement to that which the New York court intended by its Chapter 11 order. More generally, as I noted in *Stone & Rolls Ltd (in liq) v Moore Stephens (a firm)* [2009] UKHL 39, [2009] 2 BCLC 563 at [236]–[238],
*e*  [2009] AC 1391, in insolvency shareholders' interests yield to those of creditors.

[184] It was in this limited context that the Board concluded that the New York and Manx courts' orders could be regarded as doing no more than facilitating or enabling collective execution against Navigator's property.

[185] The Court of Appeal believed on the contrary that the answer to the
*f*  present cases lay in the Board's general statements in *Cambridge Gas* at [19]–[21] regarding the nature of insolvency proceedings. It is true that proceedings to avoid pre-insolvency transactions can be related to the process of collection of assets. That is, their general purpose and effect is to ensure a fair allocation of assets between all who are and were within some specified pre-insolvency period creditors. A dictum of Lord Hoffmann in *Re*
*g*  *HIH Casualty and General Insurance Ltd* [2008] UKHL 21, [2012] 2 BCLC 655 at [19], [2008] 1 WLR 852, quoted by Lord Collins in paras [15] and [52] above, is to that effect, though again uttered in a different context to the present.

[186] However, the Board did not see these considerations as answering
*h*  or eliminating all questions regarding the existence of jurisdiction or at least its exercise in *Cambridge Gas*. On the contrary, it went on to examine in close detail in paras [22]–[26] the limits of the assistance that a court could properly give. In rejecting the argument that the interference with the shareholding held in Cambridge Gas's name was beyond the Manx court's jurisdiction (para [26]), the only reason it gave related to the nature of
*i*  shares in an insolvent company. This meant, according to its advice, that Cambridge Gas had no interest of any value to protect and that registration of the shares in Navigator's creditors' name was no more than a mechanism for giving creditors access to Navigator's assets.

[187] On this basis, the decision in *Cambridge Gas* is, as Professor Adrian

AP1106

Briggs noted in a penetrating case-note (in (2006) 77 BYIL 575–581), less    *a*
remarkable (although, as Professor Briggs also notes, it perhaps still poses
problems of reconciliation with the House's decision in *Société Eram
Shipping Co Ltd v Compagnie Internationale de Navigation* [2003] UKHL
30, [2003] 3 All ER 465, [2004] AC 260). But, because the actual decision
in *Cambridge Gas* was so narrowly focused on the nature of a shareholder's
rights in an insolvent company and was not directly challenged, I prefer to    *b*
leave open its correctness.

[188] Whatever view may be taken as to the validity of the Board's
reasoning in *Cambridge Gas*, it is clear that it does not cover or control the
present appeal. The present cases are not concerned with shares, with
situations in which shares are, or are treated by the court as, no more than    *c*
a key to the insolvent company's assets or even with situations in which it is
clear that those objecting to recognition and enforcement of the foreign
courts' orders have no interests to protect. There are, on the contrary,
substantial issues as to whether there were fraudulent preferences giving rise
to in personam liability in large amounts. The persons allegedly benefitting    *d*
by fraudulent preferences did not appear in the relevant foreign insolvency
proceedings in which judgment was given against them. They were (leaving
aside any question of submission) outside the international jurisdiction of
the relevant foreign courts.

[189] Lord Clarke takes a different view from Lord Collins, but does not
define either the circumstances in which a foreign court should, under    *e*
English private international law rules, be recognised as having 'jurisdiction
to entertain' bankruptcy proceedings or, if one were (wrongly in my view)
to treat the whole area as one of discretion, the factors which might make it
either unjust or contrary to public policy to recognise an avoidance order
made in such foreign proceedings (see paras [193], [200] and [201] of
Lord Clarke's judgment). The scope of the jurisdiction to entertain    *f*
bankruptcy proceedings which English private international law will
recognise a foreign court as having is described in *Dicey* (in para 31–064 in
the 14th and 15th editions) as a 'vexed and controversial' question. But it
would include situations in which the bankrupt or insolvent company had
simply submitted to the foreign bankruptcy jurisdiction. On Lord Clarke's
analysis, in such a case (of which *Rubin v Eurofinance* is an example), it    *g*
would be irrelevant that the debtor under the avoidance order had not
submitted, and was not on any other basis subject, to the foreign
jurisdiction. It would be enough that the judgment debtor had had the
chance of appearing and defending before the foreign court. For the reasons
given by Lord Collins, I do not accept that this is the common law.

[190] In the light of the above, the Court of Appeal was, in my view, in    *h*
error in seeing the solution to the present appeals as lying in the advice
given by the Board in *Cambridge Gas*. Even on an assumption that the
actual decision in *Cambridge Gas* can be supported, it cannot and should
not be treated as supporting the respondents' case that fraudulent
preference claims and avoidance orders in insolvency proceedings generally
escape the common law rules requiring personal or in rem jurisdiction.    *i*

**LORD CLARKE SCJ.**

[191] I would like to pay tribute to the learning in Lord Collins'
comprehensive judgment. However, left to myself, I would dismiss the
appeal in the *Rubin* case. Since I am in a minority of one, little is to be

*a*   gained by my writing a long dissent. I will therefore try to explain my reasons shortly. In doing so, I adopt the terminology and abbreviations used by Lord Collins.

[**192**] I agree with Lord Collins and Lord Mance that the decision of the Privy Council in *Cambridge Gas Transport Corp v Navigator Holdings plc Creditors Committee* [2006] UKPC 26, [2007] 2 BCLC 141, [2007] 1 AC

*b*   508 is distinguishable. The facts there were quite different from those here. However, in so far as it is suggested that *Cambridge Gas* was wrongly decided, I do not agree. Moreover, I do not think that it would be appropriate so to hold because it was not submitted to be wrong in the course of the argument. To my mind the approach which should be adopted is presaged in the speech of Lord Hoffmann in *Re HIH Casualty and*

*c*   *General Insurance Ltd* [2012] 2 BCLC 655, [2008] 1 WLR 852 and in his judgment in *Cambridge Gas*.

[**193**] As I see it, the issue is simply whether an avoidance order made by a foreign bankruptcy court made in the course of the bankruptcy proceedings, whether personal or corporate, which the court has

*d*   jurisdiction to entertain, is unenforceable if it can fairly be said to be an order made either in personam or in rem. I would answer that question in the negative. Put another way, the question is whether the English court has jurisdiction under English rules of private international law to enforce an avoidance order made in foreign bankruptcy proceedings in circumstances where, under those rules, the foreign court has jurisdiction to entertain the

*e*   bankruptcy proceedings themselves. I would answer that question in the affirmative. It is not, as I understand it, suggested here that the US court did not have jurisdiction to entertain the bankruptcy proceedings themselves.

[**194**] The relevant paragraphs of Lord Hoffmann's judgment in *Cambridge Gas* are in these terms (as quoted by Lord Collins at para [43] above):

*f*

'[13] … Judgments in rem and in personam are judicial determinations of the existence of rights: in the one case, rights over property and in the other, rights against a person. When a judgment in rem or in personam is recognised by a foreign court, it is accepted as establishing the right which it purports to have determined, without further inquiry into the grounds upon which it did so. The judgment

*g*   itself is treated as the source of the right.

[14] The purpose of bankruptcy proceedings, on the other hand, is not to determine or establish the existence of rights, but to provide a mechanism of collective execution against the property of the debtor by creditors whose rights are admitted or established …

*h*   [15] … [B]ankruptcy, whether personal or corporate, is a collective proceeding to enforce rights and not to establish them. Of course, as Brightman LJ pointed out in *Re Lines Bros Ltd* [1982] 2 All ER 183 at 194–195, [1983] Ch 1 at 20, it may incidentally be necessary in the course of bankruptcy proceedings to establish rights which are challenged: proofs of debt may be rejected; or there may be a dispute

*i*   over whether or not a particular item of property belonged to the debtor and is available for distribution. There are procedures by which these questions may be tried summarily within the bankruptcy

AP1108

    proceedings or directed to be determined by ordinary action. But these   *a*
again are incidental procedural matters and not central to the purpose
of the proceedings.'

    **[195]** The critical paragraph is para [15], which seems to me to make it
clear that it is possible to have an order which is both in personam or in
rem and an order of the kind referred to by Lord Hoffmann in para [14].   *b*
Thus it may be incidentally necessary to establish substantive rights in the
course of the bankruptcy proceedings as part of a collective proceeding to
enforce rights. In such a case the order will be doing two things. It will be
both establishing the right and enforcing it. This can be seen from the
examples given in para [15]. Proofs of debt may be rejected, which is a
process which may involve determining, for example, the substantive rights   *c*
of the creditor against the debtor. Or it may be necessary to determine
whether or not a particular item of property belongs to the debtor and is
available for distribution. As para [15] contemplates, such procedures may
be tried either summarily within the bankruptcy proceedings or by ordinary
action. In either such case Lord Hoffmann describes them as incidental
procedures which are not central to the purpose of the bankruptcy   *d*
proceedings. As I see it, in such a case, an avoidance order may be both an
order in personam or in rem and an order in the bankruptcy proceedings.

    **[196]** I agree with Lord Collins (at para [103] above) that it is not easy to
see why the order of the US Bankruptcy Court in *Cambridge Gas* was not
an order in rem. However, that does not to my mind show that *Cambridge
Gas* was wrongly decided but demonstrates that it is possible to have an in   *e*
rem order which is made as incidental to bankruptcy proceedings but which
is enforceable at common law, provided that the bankruptcy court has
jurisdiction in the bankruptcy.

    **[197]** The approach is explained by Lord Hoffmann in *Re HIH* at
para [30] and in *Cambridge Gas* at para [16], both of which are quoted by
Lord Collins (at para [19] above). In *Re HIH* Lord Hoffmann said:   *f*

      'The primary rule of private international law which seems to me
applicable to this case is the principle of (modified) universalism, which
has been the golden thread running through English cross-border
insolvency law since the 18th century. That principle requires that
English courts should, so far as is consistent with justice and United   *g*
Kingdom public policy, co-operate with the courts in the country of the
principal liquidation to ensure that all the company's assets are
distributed to its creditors under a single system of distribution.'

In *Cambridge Gas* he said:   *h*

      'The English common law has traditionally taken the view that
fairness between creditors requires that, ideally, bankruptcy proceedings
should have universal application. There should be a single bankruptcy
in which all creditors are entitled and required to prove. No one should
have an advantage because he happens to live in a jurisdiction where
more of the assets or fewer of the creditors are situated. …'

    **[198]** Lord Collins discusses (at paras [94]–[98] above) the nature of   *i*
avoidance proceedings. I entirely agree with his analysis. Avoidance
provisions requiring the adjustment of prior transactions and the recovery
of previous dispositions of property so as to constitute the estate available
for distribution are necessary in order to maintain the principle of equality

*a*    among creditors. Lord Collins notes (at para [15]) that Lord Hoffmann said in *Re HIH* (at para [19]) that—

> 'the process of collection of assets will include, for example, the use of powers to set aside voidable dispositions, which may differ very considerably from those in the English statutory scheme.'

*b*    In short, avoidance proceedings, and therefore avoidance orders, are central to the bankruptcy proceedings. As Lord Collins puts it (at para [98] above), avoidance proceedings are peculiarly the subject of insolvency law.

   [**199**] I accept that to permit the enforcement of an avoidance order in circumstances of this kind would be a development of the common law. However, it seems to me that it would be a principled development. It *c*   would in essence be an application of the principle identified by Lord Hoffmann in *Re HIH* (at para [30]) in the passage quoted above that the principle of modified universalism requires that English courts should, so far as is consistent with justice and United Kingdom public policy, co-operate with the courts in the country of the principal liquidation to ensure that all the company's assets are distributed to its creditors under a *d*   single system of distribution.

   [**200**] The position of the judgment debtor in such a case would be protected by the principle that the English court would only enforce a judgment in a case like this where to do so was consistent with justice and United Kingdom public policy. All would depend upon the facts of the particular case. In the case of *Rubin*, there would be no injustice in *e*   enforcing the judgment against the appellants.

   [**201**] Lord Mance notes (at para [189]) that I do not define either the circumstances in which a foreign court should be recognised as having jurisdiction to entertain bankruptcy proceedings or the factors which would make it unjust or contrary to public policy to recognise an avoidance order made in such foreign proceedings. As I see it, these are matters which would *f*   be worked out on a case by case basis in (as Lord Hoffmann put it in *Re HIH* at para [30]) co-operating with the courts in the country of the principal liquidation to ensure that all the company's assets are distributed to its creditors under a single system of distribution. It would not be irrelevant that the debtor under the avoidance order had not submitted. All *g*   would depend upon the particular circumstances of the case, including the reasons why the debtor had not submitted.

   [**202**] In essence, on the critical question, I prefer the reasoning of the Court of Appeal, which is contained in the judgment of Ward LJ, with whom Wilson LJ and Henderson J agreed. Lord Collins (in paras [88]–[90] above) has concisely summarised their reasoning, substantially as follows: *h*   (a) the judgment was final and conclusive, and for definite sums of money, and on the face of the orders was a judgment in personam; (b) it was common ground that the judgment debtors were not present when the proceedings were instituted, and did not submit to the jurisdiction, and so at first blush had an impregnable defence; (c) *Cambridge Gas* decided that *i*   the bankruptcy order with which it was concerned was neither in personam nor in rem, and its purpose was simply to establish a mechanism of collective execution against the property of the debtor by creditors whose rights were admitted or established: *Ali v Pattni* [2006] UKPC 51, [2007] 2 All ER (Comm) 427 at [23], [2007] 2 AC 85; (d) bankruptcy was a collective proceeding to enforce rights and not to establish them: *Cambridge*

*Gas* [2007] 2 BCLC 141 at [15], [2007] 1 AC 508; (e) the issue was whether avoidance proceedings which could only be brought by the representative of the bankrupt were to be characterised as part of the bankruptcy proceedings, ie part of the collective proceeding to enforce rights and not to establish them; (f) the adversary proceedings were part and parcel of the Chapter 11 proceedings; (g) the ordinary rules for enforcing foreign judgments in personam did not apply to bankruptcy proceedings; (h) avoidance mechanisms were integral to and central to the collective nature of bankruptcy and were not merely incidental procedural matters; (i) the process of collection of assets will include the use of powers to set aside voidable dispositions, which may differ very considerably from those in the English statutory scheme: *Re HIH* at [19]; (j) the judgment of the US Bankruptcy Court was a judgment in, and for the purposes of, the collective enforcement regime of the insolvency proceedings, and was governed by the sui generis private international law rules relating to insolvency; (k) that was a desirable development of the common law founded on the principles of modified universalism, and did not require the court to enforce anything that it could not do, mutatis mutandis, in a domestic context; (l) there was a principle of private international law that bankruptcy should be unitary and universal, and there should be a unitary insolvency proceeding in the court of the bankrupt's domicile which receives worldwide recognition and should apply universally to all the bankrupt's assets; (m) there was a further principle that recognition carried with it the active assistance of the court which included assistance by doing whatever the English court could do in the case of a domestic insolvency; (n) there was no unfairness to the appellants in upholding the judgment because they were fully aware of the proceedings, and after taking advice chose not to participate: see [2011] 2 BCLC 473 at [38], [41], [43], [45], [48], [50], [61]–[62] and [64].

[203] That seems to me to be a correct summary of the views of the Court of Appeal. I agree with those views subject to this comment on point (c). I am not sure that in *Cambridge Gas* the Privy Council decided that the bankruptcy order with which it was concerned was neither in personam nor in rem. It held that the purpose of the order was simply to establish a mechanism of collective execution against the property of the debtor by creditors whose rights were admitted or established. As discussed above, it may well have appreciated that it was also an order in rem. However that may be, I agree with Lord Collins (at para [90] above) that, in short, the Court of Appeal accepted that the judgment sought to be enforced in the instant cases was an in personam judgment, but decided that the *Dicey* Rule did not apply to foreign judgments in avoidance proceedings because they were central to the collective enforcement regime in insolvency and were governed by special rules. I agree with the reasoning of the Court of Appeal. Put another way, the *Dicey* Rule should in my opinion be modified to include a fifth case in which a foreign court has jurisdiction to give a judgment in personam capable of enforcement or recognition as against the person against whom it is given. That fifth case would be if the judgment was given in avoidance proceedings as part of foreign bankruptcy proceedings which the foreign court had jurisdiction to entertain.

[204] I recognise that there are other ways of achieving such a result, as for example by an equivalent provision to the EC Insolvency Regulation:

*a*

per Lord Collins (at paras [99]–[101] above). I also recognise that it would be possible to adopt a more radical approach not limited to avoidance proceedings. However, so limited, I respectfully disagree with the view expressed by Lord Collins (at para [128] above) that this development would not be an incremental development of existing principles but a radical departure from substantially settled law. For the reasons given in para [198], it would in essence be an application of the principle of modified universalism. It seems to me that in these days of global commerce, the step taken by the Court of Appeal was but a small step forward. Judgment debtors are protected by the principle that no order would be made if it were contrary to justice or United Kingdom public policy. Moreover, on the facts here, I can see no basis upon which the order made by the Court of Appeal would be either unjust or contrary to public policy. Finally, I do not think that that conclusion is undermined by any absence of reciprocity.

*b*

*c*

    [**205**] For these reasons, I would dismiss the appeal in the *Rubin* case on the common law point. On all other issues I agree with the judgment of Lord Collins.

*d*

    *Appeal in Rubin v Eurofinance SA allowed; appeal in New Cap Reinsurance Corp Ltd v Grant dismissed.*

                                  Peter Hutchesson   Barrister (NZ).

Case 1:23-cv-00630-2H02-DocUment 02-69 Filed 08/24/23 Page 136 of 300 PageID #: 1180

# ANNUAL DIGEST

OF

# THE TIMES LAW REPORTS.



## VOL. V.

### (1888-89.)



LONDON :

PRINTED AND PUBLISHED BY GEORGE EDWARD WRIGHT,

AT THE TIMES OFFICE, PRINTING HOUSE SQUARE.

[Entered at Stationers' Hall.]

AP1113

not make food and sell it as Thorley's food. So he may, but if, unfortunately for him, some preceding Thorley has carried on the business of making cattle food in such a way that by the name "Thorley's cattle food" is understood th[...] of that man, then the second Thor[...] ssumes his name, must take [...] busi- ness as not to be m[...] horley, and if he carrie[...] istaken he must be re[...] at being the state of [...] re? The plaintiff [...] ed medical compou[...] designations, of whi[...] e term "safe" forme[...] e that these com- pour[...] wn to the public as "[...] ared that previously to Jan[...] named Ashton had carried on a [...] and had advertised his prepara- tions a[...] s great cures." That business was purchased by the defendant, who at first advertised and sold the preparations as manufactured by J. Warner, successor to Ashton. There could be no objection to that. But he subsequently thought fit to sell the preparations under his own name. He must be taken to have known that the plaintiff's prepara- tions were in the market, but he advertised the goods manufactured by him as Warner's cures at 2s. 9d. per bottle. It appeared that the plaintiff's preparations were sold in 4s. 6d. bottles. The result of the defen- dant's advertisements would be that persons would suppose that the plaintiff's cures were now to be ob- tained at a lower price. It was further proved that on January 11, 1889, the following letter was ad- dressed to the defendant, purporting to be written by a Mr. Fisher :—" Sir,—Please send me by return one bottle of Warner's safe cure for rheumatism as per advertisement, for which enclosed 2s. 9d. I have paid 4s. 6d., I think, before ; have you reduced your price, or is it a smaller bottle ? Yours faithfully, C. W. FISHER." The defendant answered that by simply sending one of his own bottles without in any way replying to the inquiry. That was sufficient to show that he was so acting as to mislead the public. The inference was that the defendant was not really honestly advertising his medicines under his own name, but was doing it in such a way as to acquire a portion of the reputation previously acquired by the plaintiff. Under the circumstances, there ought to be an injunc- tion to restrain him until the trial or further order from selling or offering or advertising for sale any medical preparations not of the plaintiff's manufac- ture, so as to lead to the belief that such preparations were the goods of the plaintiff. The costs would be costs in the action.

[Solicitor—Ernest Solomon.]

Chan. Div. }
(Chitty, J.) }                                    March 2.

IN RE THE NORTH CAROLINA ESTATE COMPANY
(LIMITED).*

Company—Winding up—Application to restrain proceedings being taken against Company in liquidation in Courts of United States of America.

This was **an application made by the official liqui- dator** of the above company to restrain Mr. William Battye from taking any proceedings in the Courts of the

*Reported by R. B. SCHOMBERG, Esq., Barrister-at-Law.

United States of America against the company for the purpose of recovering any purchase-money alleged to be due from him to the company. It appeared that Mr. Battye was one of the vendors of the company, and had claimed in the liquidation for £8,900, and instituted proceedings in the superior Court of Burke County, North Carolina, seeking to attach the property of the company in that State. Actions by American creditors were also being proceeded with in North Carolina.

Mr. ROMER, Q.C., and Mr. BUTCHER, for the official liquidator, relied upon section 87 of the Companies Act of 1862, providing that after an order for winding up a company no suit, action, or other proceeding shall be proceeded with or commenced against the company except with leave of the Court. In " In re International Pulp and Paper Company " (L.R. 3, Ch. D., 594) the Court restrained proceedings in an Irish Court against a company which was being wound up here.

Mr. BYRNE, Q.C., and Mr. QUIN, for the respond- ent, submitted that the Court had no jurisdiction to interfere with proceedings brought in a foreign country, and that the words of the statute were to be confined to legal proceedings within the area of jurisdiction for which the Imperial Legislature was competent to legislate. That section 87 was thus to be confined in its meaning was shown by section 122, which gave the Courts of England, Scotland, and Ireland co-ordinate jurisdiction for the enforcement of all winding-up proceedings. Parliament never legislated for foreign Courts (" In re Oriental Inland Steam Company," L.R. 9, Ch., 557, per Lord Justice Mellish, p. 560).

Mr. JUSTICE CHITTY said that the respondent in the present case was a British subject permanently residing in this country. The argument was that the Court had, notwithstanding the Companies Act, no jurisdiction to interfere with him when bringing an action in a foreign Court. The language of section 87 was general, and there were no words which re- stricted the proceedings spoken of in the section to proceedings within any local limits. Under the Com- panies Act of 1862 it was clear that after a winding- up order the assets of the company were to be collected and applied in discharge of its liabilities, and that the assets were fixed by the Act of Parlia- ment with a trust for equal distribution among creditors (" In re Oriental Steam Company," L.R. 9, Ch., p. 559 ; " In re Vron Colliery Company," L.R. 20, Ch. D., 442). No creditor, therefore, could be allowed, by taking proceedings at his own will and pleasure, to destroy, waste, or impair assets which were subjected to a trust for the general benefit of all creditors alike. It was quite true, as was said by Lord Justice Mellish, that Parliament did not legis- late for a foreign country. The point, however, was would the Court grant an injunction which was in- effectual, not as being against the foreign Court, but as being against a person who could not be reached ? Supposing, for instance, the case was one of a French creditor suing in a French Court, or of an American creditor in an American Court, the Court, of course, could not grant an injunction, the reason being that the order would be ineffectual. But here the creditor was within the jurisdiction of the Court, had come in under the winding-up order and claimed, and moreover was a British subject permanently residing here. He thought that the case quite fell within the decision in " In re International Pulp and Paper Company." The doctrine of the Court with respect to injunctions was that they were directed against the person. They

Supplied by
Law Society Library
Lawdocs
020 7320 5946
library@lawsociety.org.uk
www.lawsociety.org.uk/library

were a personal remedy, and in the present case an order for an injunction would be an effectual order against the person sought to be restrained. There might be reasons why, on evidence still to be ascertained, leave should be granted to the respondent to take proceedings in America. He should therefore grant an injunction until further order, without prejudice.

[Solicitors—Richard Smith and Sons, for Spencer and Clarkson, Keighley; Ashurst, Morris, Crisp, and Co.]

Chan. Div. }
(Chitty, J.) }　　　　　　　　　　　　March 2.

METROPOLITAN MUSIC-HALL COMPANY V. LAKE AND OTHERS.*

Contempt of Court—Publication of Article in Newspaper—Interference with Course of Justice.

This was a motion to commit to prison the editor and printer of the *Financial Times* for contempt of Court on the ground that an article or circular published in that newspaper was calculated to interfere with the free course of justice. The applicant, Mr. Lake, was a defendant with others in an action for cancellation of a conveyance to the plaintiff company and of other deeds and the return of certain moneys alleged to have been received by the defendant as a promoter of the company. The action was commenced on January 18 last, and the writ was served on the defendant some three days afterwards. On February 2 the respondents published in their newspaper the document in question, prefacing it with a statement that it was a report of the voluntary liquidator of the company issued for the shareholders only, and marked " Confidential," and adding thereto a certain comment. The applicant complained of this publication as being a gross contempt of Court, inasmuch as it published statements to the effect that he was a promoter of the company, whereas he was, as he alleged, a mere vendor, and also, as he alleged, an inference that he was liable to prosecution. He submitted that such a publication was calculated to do him an injury when defending the action, inasmuch as it would deter persons from coming forward as witnesses on his behalf. The respondents in answer to this now said that when they published the document they were wholly ignorant of any pending action, and that on February 5, having become aware of the actual existence of an action, they published a statement to the effect that they refrained from saying anything more, because they were informed that legal proceedings had been instituted against the defendant and other promoters of the company and that the matter was *sub judice*, and the respondents further alleged in defence to the motion that it was not until more than a week after this second publication that the defendant served them with notice of the present motion.

Mr. BYRNE, Q.C., and Mr. MICKLEM, for the applicant, submitted that ignorance could not be pleaded in excuse of contempt of Court, although it might be a matter which appealed to the Court in extenuation of the offence.

Mr. ROMER, Q.C., and Mr. H. TERRELL, for the respondents, submitted that contempt of Court was an offence of a quasi-criminal nature, and therefore that the alleged offender must be shown to have acted with knowledge.

MR. JUSTICE CHITTY said that the chief point

which was raised was whether the respondents were or were not aware of the existence of the action when they published the matter in question. The respondents said that they were not, and had put an affidavit in to that effect, upon which the applicant had not cross-examined them. He, however, said that the matter published contained internal evidence which showed that they must have been aware that proceedings had been actually commenced, or at the least that they were placed in such a position that they should have made inquiries. It did appear from the matter published that they knew that the liquidator had obtained leave to bring an action. The respondents said that they were not aware of any actual action pending. This gave rise to a controversy of a legal nature, whether in cases of this kind the publisher, when he had no actual knowledge, was yet bound by cognizance of what was going on in Her Majesty's Courts. The old doctrine was that all persons were so bound. The statutes as to *lis pendens* were passed with a view of relieving purchasers and mortgagees from the consequences of such a doctrine, and to afford them protection, in the event of non-registration. It also appeared that in proceedings in the nature of contempt for disobedience to injunctions the Court declined to act unless the injunction was brought to the notice of the person intended to be restrained. Therefore as to this kind of contempt the Court had not proceeded on the lines of the strict and severe rule such as formerly obtains as to *lis pendens*. Then there was another kind of contempt, that of interfering with wards of Court. Of what was the doctrine as to *scienter* in that class of case, a good illustration was afforded by " Herbert's Case " (A.D. 1731, 3 P. Wms., 115). In that case a ward of Court, aged 18, was entrapped into a marriage with a servant maid older than himself and of no fortune, and the question arose as to the imprisonment for contempt of the contrivers of the marriage. Sir Joseph Jekyll held that the excuses of the persons instrumental in the marriage as to not having noticed availed nothing, because the creation of the wardship was an act of the Court in a pending cause of which everybody at his peril was concerned to take notice, in the same manner as a *lis pendens* or judgment debt, and that learned Judge proceeded to point out the evil consequences of a contrary doctrine. That was a distinct authority as to what was the doctrine as to contempt in the case of wards of Court. No doubt that was based upon the peculiar considerations affecting such questions, such as the necessity of protecting infants, and that persons must be deemed as having cognizance of infancy, and indeed as being put upon their guard by means of their ability to discern as to age of persons. The contempt alleged in the present case was based upon the obstruction of justice, and the respondents pleaded in defence that they had published nothing which was not allowable in the publishers of a newspaper unless it could be said that they were saddled with notice of an action, of which they, in fact, knew nothing, and that if the Court were to hold them liable for what they had done on the ground that every person must be deemed to have had notice of every writ which had been issued, it would be a harsh thing, and render persons liable for that which they had had no real opportunity of avoiding. From the foregoing statements it was apparent that the doctrine of the Court as to contempt in the cases of *lis pendens*, injunctions, and wardship could not be said to be uniform. It would be a strong thing to say that a man exposes himself to the severity of the doctrine of contempt where he does a thing in ignorance and the Court accepts his statement that he was ignorant. With cases of suspicion the Court could

*Reported by R. B. SCHOMBERG, Esq., Barrister-at-Law.

Distinguished
REG. v. ODHAMS
PRESS LTD.
[1956] 3 W.L.R. 796

Distinguished
REG. v. ODHAMS
PRESS LTD.
[1957] 1 Q.B. 73

616
Stichting Shell Pensioenfonds v Krys (PC)                                    [2015] AC

Privy Council                                           A

## Stichting Shell Pensioenfonds *v* Krys and another

[On appeal from the Eastern Caribbean Court of Appeal]

[2014] UKPC 41
                                                                            B

2014   Oct 8, 9;                         Baroness Hale of Richmond DPSC,
       Nov 26                    Lord Clarke of Stone-cum-Ebony, Lord Wilson,
                                         Lord Sumption, Lord Toulson JJSC

*Conflict of laws — Jurisdiction — Anti-suit injunction — Dutch creditor obtaining*
*pre-judgment garnishing attachment in Dutch court in respect of assets in Dutch*
*bank account of company incorporated in British Virgin Islands — Company*          C
*subsequently wound up in British Virgin Islands and liquidators appointed by*
*court — Liquidators obtaining injunction to restrain creditor from prosecuting*
*Dutch proceedings — Whether court precluded from granting anti-suit*
*injunction restraining foreign creditors from bringing proceedings in courts of*
*their own country — Whether necessary to show that creditor had acted*
*vexatiously or oppressively by invoking jurisdiction of foreign court — Whether*
*injunction rightly made*                                                           D

The defendant, a regulated Dutch pension fund incorporated in The Netherlands,
invested large sums in F Ltd, a company incorporated in the British Virgin
Islands. F Ltd invested in a scheme controlled by M, who was subsequently convicted
of a major fraud.   Immediately after M's arrest the defendant obtained a
pre-judgment garnishing attachment from a Dutch court over approximately
US$71m in F Ltd's account in the Dublin branch of a Dutch bank.  About six months     E
later a court in the British Virgin Islands made an order for the winding up of F Ltd
and appointed the claimants as liquidators.  The claimants applied in the British
Virgin Islands for an injunction to restrain the defendant from pursuing
the proceedings against F Ltd in The Netherlands.  Bannister J refused the application but
the Eastern Caribbean Court of Appeal allowed the claimants' appeal and granted
the anti-suit injunction.
     On the defendant's appeal—
     *Held*, advising that the appeal be dismissed, that where an English company was        F
being wound up in England, or a British Virgin Islands company in the British Virgin
Islands, all of its assets, including those located within the jurisdiction of foreign
courts, were subject to the statutory trusts; that the rights and liabilities of claimants
against the assets were the same regardless of their nationality or place of residence;
that, where a creditor or member of a company in insolvent liquidation who was
amenable to the personal jurisdiction of the court began or continued foreign
proceedings which would interfere with the statutory trusts over the company's          G
assets, an injunction would in principle be available to restrain their prosecution,
irrespective of the nationality or residence of the creditor or member in question, and
there was no principle that such an injunction would not issue so as to prohibit a
foreign litigant from resorting to the courts of his own country or some foreign court;
that, although as a general rule there was no objection in principle to a creditor
invoking the purely adjudicatory jurisdiction of a foreign court provided that it was
an appropriate jurisdiction and that litigation there was not vexatious or oppressive     H
to other interested parties, it was in principle inimical to the proper winding up
process for a creditor to seek or to enforce an order from a foreign court which would
result in his enjoying prior access to any part of the insolvent estate; that, on an
application for an injunction to restrain foreign proceedings which were calculated to
give a creditor such prior access, it was not necessary to show that the creditor had

© 2015 The Incorporated Council of Law Reporting for England and Wales

617

[2015] AC                                     Stichting Shell Pensioenfonds v Krys (PC)

A   acted vexatiously or oppressively by invoking the jurisdiction of the foreign court;
    that, as with any injunction, the court had a discretion to refuse relief if in the
    particular circumstances it would not serve the ends of justice; and that, accordingly,
    although it had not acted vexatiously or oppressively by invoking the jurisdiction of
    the Dutch court, since (i) the defendant had invested in a company incorporated in
    the British Virgin Islands and had, as a reasonable investor, to have expected that if
    that company became insolvent it would be wound up under the law of that
B   jurisdiction, (ii) it had submitted to the jurisdiction of the courts of the British Virgin
    Islands and thereby to a statutory regime which precluded it from acting so as to
    prevent the assets subject to the statutory trust from being distributed in accordance
    with it, and (iii) there was nothing to suggest that allowing the defendant an
    advantage over other comparable claimants would be consistent with the ends of
    justice, the Court of Appeal had been entitled to exercise its discretion in the
    liquidators' favour and its order should stand (post, paras 24–28, 32–35, 38–40, 43,
C   45).
        *In re North Carolina Estate Co Ltd* (1889) 5 TLR 328, *Société Nationale
    Industrielle Aerospatiale v Lee Kui Jak* [1987] AC 871, PC and *Mitchell v Carter*
    [1997] 1 BCLC 673, CA applied.
        Dictum of Lord Cranworth LC in *Carron Iron Co Proprietors v Maclaren* (1855)
    5 HL Cas 416, 441, HL(E) explained.
        *In re Vocalion (Foreign) Ltd* [1932] 2 Ch 196 not applied.
D       *Per curiam.* (i) The true principle, which applies to all injunctions and not just
    anti-suit injunctions in the course of insolvency proceedings, is that the English and
    British Virgin Islands courts will not as a matter of discretion grant injunctions
    affecting matters outside their territorial jurisdiction if they are likely to be
    disregarded or would be "brutum fulmen". Various judicial statements suggesting a
    wider rule are in reality concerned either with personal jurisdiction over the person
    sought to be restrained or else with the practical efficacy of the remedy (post,
    para 34).
E       (ii) Where the foreign litigant undertakes to bring any assets realised in the
    foreign proceedings into the bankruptcy so that no advantage would be obtained
    over other creditors, the basis on which an anti-suit injunction might otherwise be
    justified will not apply (post, para 40).

    The following cases are referred to in the judgment of the Board:

F   *Akers as a joint foreign representative of Saad Investments Co Ltd v Deputy Comr of
        Taxation* [2014] FCAFC 57; 311 ALR 167
    *Ayerst v C & K (Construction) Ltd* [1976] AC 167; [1975] 3 WLR 16; [1975] 2 All
        ER 537, HL(E)
    *Bank of Credit and Commerce International SA, In re* [1992] BCLC 570
    *Barclays Bank plc v Homan* [1993] BCLC 680, Hoffmann J and CA
    *Bloom v Harms Offshore AHT "Taurus" GmbH & Co KG* [2009] EWCA Civ 632;
        [2010] Ch 187; [2010] 2 WLR 349; [2009] Bus LR 1663, CA
G   *Bushby v Munday* (1821) 5 Madd 297
    *Carron Iron Co Proprietors v Maclaren* (1855) 5 HL Cas 416, HL(E)
    *Castanho v Brown & Root (UK) Ltd* [1981] AC 557; [1980] 3 WLR 991; [1981]
        1 All ER 143; [1981] 1 Lloyd's Rep 113, HL(E)
    *Chapman, In re* (1872) LR 15 Eq 75
    *Cole v Cunningham* (1890) 133 US 107
    *HIH Casualty and General Insurance Ltd, In re* [2008] UKHL 21; [2008] 1 WLR
H       852; [2008] Bus LR 905; [2008] 3 All ER 869, HL(E)
    *International Pulp and Paper Co, In re* (1876) 3 Ch D 594
    *Kemsley v Barclays Bank plc* [2013] EWHC 1274 (Ch); [2013] BPIR 839
    *Liddell's Settlement Trusts, In re* [1936] Ch 365; [1936] 1 All ER 239, CA
    *Mitchell v Carter; In re Buckingham International plc* [1997] 1 BCLC 673, CA
    *North Carolina Estate Co Ltd, In re* (1889) 5 TLR 328

© 2015 The Incorporated Council of Law Reporting for England and Wales

618
Stichting Shell Pensioenfonds v Krys (PC)                                    [2015] AC
Argument

*Oriental Inland Steam Co, In re; Ex p Scinde Railway Co* (1874) LR 9 Ch App 557            A
*Robertson, Ex p; In re Morton* (1875) LR 20 Eq 733
*Rubin v Eurofinance SA (Picard intervening)* [2012] UKSC 46; [2013] 1 AC 236;
    [2012] 3 WLR 1019; [2013] Bus LR 1; [2013] 1 All ER 521; [2013] 1 All
    ER (Comm) 513; [2012] 2 Lloyd's Rep 615, SC(E)
*Singularis Holdings Ltd v PriceWaterhouseCoopers* [2014] UKPC 36; [2015] 2 WLR
    971, PC
*Société Nationale Industrielle Aerospatiale v Lee Kui Jak* [1987] AC 871; [1987]            B
    3 WLR 59; [1987] 3 All ER 510, PC
*Vocalion (Foreign) Ltd, In re* [1932] 2 Ch 196

The following additional cases were cited in argument:

*Airbus Industrie GIE v Patel* [1999] 1 AC 119; [1998] 2 WLR 686; [1998] 2 All ER
    257; [1998] 1 Lloyd's Rep 631, HL(E)
*Deutsche Bank AG v Highland Crusader Offshore Partners LP* [2009] EWCA Civ            C
    725; [2010] 1 WLR 1023; [2010] Bus LR 515; [2009] 2 All ER (Comm) 987;
    [2009] 2 Lloyd's Rep 617, CA

**APPEAL** from the Eastern Caribbean Court of Appeal
    The claimants, Kenneth Krys and Joanna Lau, in their capacity as joint
liquidators of the company, Fairfield Sentry Ltd, applied for an anti-suit
injunction to restrain the defendant, Stichting Shell Pensioenfonds, from            D
prosecuting ongoing proceedings in The Netherlands against the company.
On 9 August 2011 Bannister J sitting in the Commercial Division of the High
Court of the British Virgin Islands refused the application.
    The claimants appealed.  On 17 September 2012 the Eastern Caribbean
Court of Appeal (Pereira, Mitchell and Belle JJA) allowed the appeal and
made an order restraining the defendant from prosecuting its proceedings            E
against the company in The Netherlands.
    The defendant appealed.  The issue for the Judicial Committee of the
Privy Council was whether, when a company was being wound up in the
jurisdiction where it was incorporated, an anti-suit injunction should issue
to prohibit a creditor or member of the company from pursuing proceedings
in another jurisdiction which are calculated to give him an unjustifiable            F
priority over other creditors or members.
    The facts are stated in the judgment.

    *Catherine Newman QC* and *Arabella di Iorio* (instructed by *Herbert
Smith Freehills LLP*) for the defendant.
    Dutch law allows the courts of The Netherlands to grant pre-judgment
attachment orders over assets in the jurisdiction or over assets of Dutch            G
debtors.  Since the company's choice of banker, Citco, is a Dutch company,
the Amsterdam court had jurisdiction to grant attachments over debts owed
by Citco to the company.  The jurisdiction to garnish or attach does not
depend on whether the Dutch court would have prior jurisdiction over the
dispute between the person with the prior claim to the asset in the hands of
the Dutch third party and the attacher.
    The right of a creditor to invoke his right of payment from assets in The            H
Netherlands is not disturbed by a non-recognised foreign bankruptcy.  The
right of the liquidator to speak for the company does not disturb any such
domestic principle.  A foreign country such as the British Virgin Islands
("BVI") which has no treaty arrangement with The Netherlands cannot

© 2015 The Incorporated Council of Law Reporting for England and Wales

A   expect The Netherlands to abandon its own domestic law in favour of BVI
    law.

        Statutory provisions preventing the continuation of litigation after the
    opening of an insolvency do not have extra-territorial effect.  Before the
    court of the insolvency injuncts a foreigner from continuing proceedings in a
    foreign country (a fortiori his own) there must be a submission to the
    jurisdiction of the insolvency for all purposes or vexatious or oppressive
B   conduct.  A submission to the BVI court for the purpose of defending the
    anti-suit injunction application is not a submission for the purpose of
    bringing a claim in tort governed by the general law and not arising out of
    the insolvency.  Nor was there any vexatious or oppressive conduct on the
    part of the defendant: *Bloom v Harms Offshore AHT "Taurus" GmbH &
    Co KG* [2010] Ch 187.  There must be a good reason why the foreign court's
C   decision to accept jurisdiction should not be respected: *In re Vocalion
    (Foreign) Ltd* [1932] 2 Ch 196.  The natural forum for the litigation must be
    the domestic court.  The company did not contend that the BVI court was
    the natural forum for the substantive litigation

        It cannot be said that the company had no connection with The
    Netherlands.  It had Dutch administrators and a Dutch bank account.  The
    BVI must consider not only its own jurisdiction but also what the natural
D   forum is for the resolution of the issues.  [Reference was made to *Rubin v
    Eurofinance SA (Picard intervening)* [2013] 1 AC 236.]

        The defendant has not submitted to the jurisdiction of the BVI courts for
    all purposes although it respects the statutory scheme of the BVI liquidation.
    However, as in England, the statutory scheme of the BVI does not involve
    any provision which automatically provides for or requires the stay of
    foreign proceedings.  The defendant is not amenable to the BVI jurisdiction
E   for the purpose of making claims which are governed by the general law and
    not specifically governed by insolvency law.  The defendant accepts that if
    the liquidator were to reject its proof, any appeal which it might wish to
    bring would have to be brought in the court of the insolvency proceedings.
    But the defendant does not accept that claims under the general law should
    be brought in the BVI courts.
F
        The justification for the grant of an anti-suit injunction in the present case
    cannot be found in contract, in statute or in an aspirational term
    like "modified universalism".  Nor do the ordinary principles of private
    international law applicable to submission to the jurisdiction provide a
    route.  The law relating to submission to the jurisdiction depends upon the
    foreigner submitting becoming involved in proceedings in the domestic
G   courts to decide the self same issues in a way which is inconsistent with
    resisting submission to the jurisdiction.  That rule does not result in the
    defendant becoming amenable to BVI jurisdiction for all purposes as a result
    of attempting to prove.  In *Ex p Robertson; In re Morton* (1875) LR 20 Eq
    733, by contrast, the creditor had accepted a dividend and attended a
    meeting.

        The BVI courts should not then use the anti-suit injunction simply to
H   create a long-arm jurisdiction over foreigners or general law claims to
    establish rights where none exist.

        There is no injustice to any creditor or redeeming member in permitting
    the defendant to litigate its claim in the Dutch court.  In accepting
    jurisdiction to determine the defendant's damages claim the Dutch court was

620
Stichting Shell Pensioenfonds v Krys (PC)                    [2015] AC
Argument

not exercising a jurisdiction which is exorbitant, oppressive, vexatious or   A
unjust to those interested in the company's estate, nor was it interfering with
the due process of the BVI court or the liquidation of the company.

The company has not suggested that it would not get a fair trial in The
Netherlands.  It was legitimate for the defendant, which is a regulated
pension fund established to provide retirement income for Dutch former
employees of the Royal Dutch Shell group, to seek, by its substantive   B
proceedings, to advance its position from that of a member to that of a
creditor.

*Paul Girolami QC, Andrew Westwood* and *William Hare* (instructed by
*Wragge Lawrence Graham & Co LLP*) for the claimants.

The true issue is whether the Court of Appeal was correct to grant anti-
suit relief against the defendant when the object and effect of the Dutch   C
proceedings, if successful, would be to enable the defendant, by recourse to
an asset which it had attached, to make recovery on its claims in priority to
and at the expense of other creditors in the compulsory liquidation of the
company.

The position in the BVI in respect of the liquidation of a company is the
same as that under English law.  In England, on the making of an order
winding up a company incorporated in England, all the company's assets,   D
wherever situated, are made subject to a statutory scheme for administration
and distribution among the creditors and members in accordance with the
Insolvency Act 1986.  No creditor should be advantaged or disadvantaged
by where the assets happen to be.  The core of the scheme is pari passu
distribution to all creditors, wherever situated and wherever their claims
arise.                                                                         E

For that purpose "creditor" is widely construed and extends to all manner
of claims, including contractual and tortious claims for damages.  A foreign
creditor is treated no differently from a domestic creditor.  Nor is a creditor
treated differently because he is in a jurisdiction where more or fewer of the
assets or of the creditors are located.  The reason for the principal liquidation
being considered as having a worldwide reach is that it tends to achieve, so
far as possible, the fairest and most effective distribution of all the   F
company's assets to those entitled to share in them.

The scheme of the BVI legislation and of BVI policy are the same.
[Reference was made to the British Virgin Islands Insolvency Act 2003,
sections 2, 9, 12, 163, 175 and paragraph 5 of Schedule 3.]

The grounds for granting an anti-suit injunction are not confined to
evidence of oppression or vexatiousness.  One of the categories of case which   G
the authorities recognise as potentially justifying the grant of anti-suit relief
is where there is a need to protect an insolvent or other estate which the
court is in the course of administering; and one of the particular instances
recognised as justifying relief in order to afford such protection is where a
creditor is taking proceedings to get hold of an asset and thereby gain
priority.

The object and effect of the Dutch proceedings was to obtain priority over   H
other creditors.  The asset subject to conservatory attachment is money
standing to the credit of a bank account in Dublin.  That is an asset located in
Ireland.  There is no evidence of the company having any assets in The
Netherlands.  The Dutch proceedings are distinctly not proceedings for the

© 2015 The Incorporated Council of Law Reporting for England and Wales

A administration of the company's assets located in The Netherlands for
the benefit of the company's creditors as a whole, nor even for the body of its
Dutch creditors; they are not proceedings relating to any asset located in The
Netherlands at all. The sole basis upon which the Dutch court attached the
asset was that Citco as garnishee is present in The Netherlands. Jurisdiction
then to determine the substantive claim made by the defendant against the
company was founded upon the attachments having been made. Under
B Dutch law any judgment obtained by the defendant will be enforced against
the attached debt in priority to other creditors. The Court of Appeal rightly
took the view that the defendant instituted the Dutch proceedings for the
purpose of gaining priority. The question is not where there should be
determined any underlying dispute as to the company's liability to the
defendant, but rather whether the defendant should be able to take the
C benefit of that priority. [Reference was made to *Carron Iron Co Proprietors
v Maclaren* (1855) 5 HL Cas 416; *In re Chapman* (1872) LR 15 Eq 75; *In re
International Pulp and Paper Co* (1876) 3 ChD 594; *In re Vocalion
(Foreign) Ltd* [1932] 2 Ch 196 and *Bloom v Harms Offshore AHT "Taurus"
GmbH & Co KG* [2010] Ch 187.]

The BVI court has jurisdiction to restrain a creditor from pursuing such
D proceedings. [Reference was made to *In re Oriental Inland Steam Co;
Ex p Scinde Railway Co* (1874) LR 9 Ch App 557; *In re International Pulp
and Paper Co* (1876) 3 ChD 594; *In re North Carolina Estate Co* (1889)
5 TLR 328; *Société Nationale Industrielle Aerospatiale v Lee Kui Jak* [1987]
AC 871 and *Kemsley v Barclays Bank plc* [2013] BPIR 839.]

By submitting a proof in the liquidation of the company the defendant
E claimed for itself the benefit of, and invoked its rights under, the BVI
statutory scheme. Those were rights which would be protected under the
BVI scheme. By doing so the defendant was making itself amenable to the
jurisdiction of the BVI courts in matters relating to the liquidation of
the company. It is the act of proof which is significant for the purposes of
submission to the jurisdiction. A benefit need not have been received.
[Reference was made to *Ex p Robertson; In re Morton* (1875) LR 20 Eq 733
F and *Rubin v Eurofinance SA (Picard intervening)* [2013] 1 AC 236.] There is
no reason why the same principle should not apply to BVI law.

By supporting the decision of Bannister J which proceeded on the basis
that the defendant was amenable to the jurisdiction of the BVI courts for
present purposes, the defendant voluntarily recognised that the BVI courts
had jurisdiction to hear and determine the application for an anti-suit
injunction on the merits. In the circumstances the defendant is precluded
G from thereafter objecting to the court exercising its jurisdiction.

No considerations of comity apply to inhibit the grant of an anti-suit
injunction and in all the circumstances the Court of Appeal was correct to
restrain the defendant from pursuing the Dutch proceedings.

*Newman QC* replied.

H 26 November 2014. **LORD SUMPTION** and **LORD TOULSON JJSC**
handed down the following judgment of the Board.

1   The question at issue on this appeal is whether, when a company is
being wound up in the jurisdiction where it is incorporated, an anti-suit
injunction should issue to prevent a creditor or member from pursuing

622
Stichting Shell Pensioenfonds v Krys (PC)                    [2015] AC

A

proceedings in another jurisdiction which are calculated to give him an unjustifiable priority. This question falls to be decided under the law of the British Virgin Islands, which is not identical to the law of the United Kingdom, because of differences in their respective insolvency legislation. But for the purpose of the present issue, the laws of the two jurisdictions can be treated as the same.

B

*Bernard L Madoff Investment Securities LLC and Fairfield Sentry Ltd*

2   Bernard L Madoff Investment Securities LLC ("BLMIS"), was a New York-based fund manager controlled by the eponymous Bernard Madoff. Although not all of the facts are yet known, it appears that over a period of at least 17 years he operated what was probably the largest Ponzi scheme in history, accepting sums variously estimated between $17 billion and $50 billion for investment. From at least the early 1990s there appear to have been no trades and no investments. Reports and returns to investors were fictitious and the corresponding documentation fabricated. On 11 December 2008, Mr Madoff was arrested, and in March 2009 pleaded guilty to a number of counts of fraud.

C

3   Funds for investment were commonly entrusted to BLMIS by "feeder funds", of which the largest was Fairfield Sentry Ltd, the company whose winding up has given rise to this appeal. Fairfield Sentry is incorporated as a mutual fund in the British Virgin Islands. Its liquidators have stated that as at 31 October 2008 about 95% of its assets, amounting to some US$7·2 billion, were placed with BLMIS. Investors participated indirectly in these placements by acquiring shares in Fairfield Sentry at a price dependent on the net asset value per share published from time to time by the directors. Investors were entitled to withdraw funds by redeeming their shares under the provisions of the fund's articles of association, also at a price based on the published NAV per share. The information provided to investors was contained in a private placement memorandum, which made it clear that funds subscribed for shares would be placed for investment with BLMIS, and described in general terms the way that the scheme was supposed to work.

D

E

4   Fairfield Sentry's business involved the use of a number of intermediaries. For present purposes three of them may be mentioned. Fairfield Greenwich Ltd was a Cayman-incorporated associate which acted as its investment manager. Dealings with investors were handled by Citco Fund Services (Europe) BV, a company incorporated in the Netherlands which served as Fairfield Sentry's administrative agent. Citco Bank Nederland BV, an associated company of Citco Fund Services, is a Dutch bank which acted as Fairfield Sentry's asset custodian under its agreements with subscribers. Citco Bank Nederland had a branch in Dublin. It maintained an account in the name of Fairfield Sentry in which substantial cash balances were held.

F

G

5   The appellant, Stichting Shell Pensioenfonds, which we shall call "Shell", is a Dutch pension fund incorporated and with its seat in the Netherlands. Between 2003 and 2006, it subscribed US$45m for 46,708·1304 Fairfield Sentry shares, under five successive subscription agreements. These agreements were governed by New York law and contained submissions to the exclusive jurisdiction of the New York courts. Before the first of its placements, Shell obtained a side-letter dated 26 March

H

© 2015 The Incorporated Council of Law Reporting for England and Wales

A 2003 from Fairfield Sentry and its parent company Fairfield Greenwich Ltd containing various warranties, including a warranty that the contents of the private placement memorandum were correct and complete.

*The Dutch proceedings*

6   On 12 December 2008, the day after Mr Madoff's arrest, Shell
B applied to redeem its shares.   However, no redemption payment was received and, six days later on 18 December, the directors of Fairfield Sentry suspended determinations of its Net Asset Value per share, thereby in practice bringing redemptions to an end.

7   On 22 December 2008 Shell applied in the Amsterdam District Court for permission to obtain a pre-judgment garnishment or conservatory attachment over all assets of Fairfield Sentry held by Citco Bank up to a value
C of US$80m, including any credit balance on its account with Citco Bank's Dublin branch.   An order in those terms was made on the following day, 23 December 2008.   In accordance with that order, attachments were made on 23 December 2008, 21 January 2009 and 16 March 2010 of sums in the Dublin account totalling about US$71m.   It is common ground that no other assets of Fairfield Sentry are subject to the Dutch attachments.   The initial
D application for authority to attach was made ex parte.   However, Fairfield Sentry was entitled to apply inter partes to lift the attachment and did so.   The application was rejected by the District Court of Amsterdam on 16 February 2011.

8   The effect of the attachments as a matter of Dutch law was the subject of argument in related proceedings in the Netherlands and of evidence in other related proceedings in Ireland.   The parties are substantially agreed
E about it.   Three points should be noted:

(1) Where the asset attached is a debt, the fact that the debtor (in this case Citco Bank Nederland) is amenable to the jurisdiction of the Dutch courts is a sufficient basis on which to establish the jurisdiction of the Dutch courts to hear the substantive claim.   Fairfield Sentry being resident outside the European Union, it is the only basis of jurisdiction available in the present
F case.   It was a term of the court's permission to attach assets of Fairfield Sentry that Shell should begin proceedings in support of its substantive claim within four months.

(2) The attachments do not, as a matter of Dutch law, create any kind of proprietary interest in the balances on the Dublin account.  But they purport to conserve the funds in the account so that they will be available to satisfy any judgment which may be obtained against Fairfield Sentry in due course.
G Subject to any relevant period of limitation, it would be open to any other person with claims against Fairfield Sentry to take the same course as Shell has done, and apply in the Dutch courts to attach its assets in the hands of Citco Bank.   Where there is more than one judgment creditor with attachments over the same assets, the funds attached will then be shared between them.

(3) In principle a claimant is entitled as of right to attach assets in support
H of an arguable claim, subject only to the reservation that an attachment will not be authorised if the substantive claim is unarguable or the attachment would put the garnishee at risk of having to pay twice.   However, except in cases governed by the insolvency legislation of the European Union, the fact that the debtor is in liquidation elsewhere and that the attachment will

© 2015 The Incorporated Council of Law Reporting for England and Wales

624
Stichting Shell Pensioenfonds v Krys (PC)                          [2015] AC

prevent its assets from being distributed pari passu, is regarded as irrelevant       A
to the exercise of the power to authorise an attachment.  In rejecting Fairfield
Sentry's challenge to the attachment order, the District Court of Amsterdam
explained that Dutch law does not treat a foreign insolvency, even where it is
proceeding in the jurisdiction of incorporation, as applying to assets located
in the Netherlands.

   9    The four-month deadline for the commencement of proceedings on       B
Shell's substantive claim was extended several times, and the proceedings
were ultimately commenced within the extended time on 19 March 2010.
The principal claim made was for US$45m damages for the alleged breaches
of the representation and warranties contained in the side-letter of 26 March
2003.  The present status of the Dutch proceedings is that they have been left
to lie on the file pending the final resolution of the injunction proceedings in
the BVI.                                                                      C

*The winding up proceedings*

   10    On 21 July 2009, Fairfield Sentry was ordered by the High Court of
the British Virgin Islands to be wound up and Mr Kenneth Krys and
Ms Joanna Lau were appointed as its joint liquidators.  There are broadly
speaking three categories of claimant or potential claimant in the BVI       D
liquidation.  First, there are what one can loosely call trade creditors, unpaid
suppliers of goods or services.  The Board was told that the value of their
claims was small.  Second, there are redemption claims, from shareholders in
Fairfield Sentry who submitted redemption notices before the determination
of its NAV per share was suspended on 18 December 2008.  The Board
understands that there are persons claiming to fall within this category.
However, on 14 August 2014 Bannister J in the High Court directed that       E
subject to any contrary order of the court the assets should be distributed on
the footing that no outstanding redemption moneys were due to any member
or former member of Fairfield Sentry.  Third, there are shareholders entitled
to share in any surplus.  Somewhat unusually, therefore, it is likely that by
far the greater part of the recoveries made by the liquidators will be
distributed to shareholders in Fairfield Sentry.  No one, however, suggests     F
that these distributions will represent more than a small part of the losses
that they will have suffered by investing in the company.

   11    On 5 November 2009, Shell submitted a proof of debt in the
liquidation for US$63,045,616·18.  This amount was said to represent the
redemption price of Shell's shares, calculated by reference to the NAV per
share published by the directors of Sentry at 31 October 2008.  It was
claimed as a debt due under Shell's redemption notice of 12 December 2008.     G
The joint liquidators rejected Shell's proof on 21 August 2014, as a result of
Bannister J's direction of 14 August, subject to Shell's right if it objected to
the assets being distributed in accordance with that direction to put forward
its objection in writing by 17 October 2014.  The Board was told that some
other members claiming to be entitled to redeem have objected, and their
objections will be heard by the BVI court later this year.  But Shell has not
objected, and the position at the time of the hearing of this appeal was that it     H
was not intending to do so.

   12    Manifestly, the effect of the attachments is that if Shell succeeds in its
claim in the Dutch courts, it is likely to be able to satisfy its judgment-debt in
full out of Fairfield Sentry's balance in the Dublin account, whereas others

© 2015 The Incorporated Council of Law Reporting for England and Wales

[2015] AC                       Stichting Shell Pensioenfonds v Krys (PC)

A  who have claims in the liquidation ranking with or ahead of theirs may recover only a dividend.  Shell says that it would have been open to other claimants to obtain attachments through the Dutch courts against the Dublin account in support of their own claims against Fairfield Sentry.  If that had happened, there would have to be a kind of mini-liquidation in the Netherlands in which Shell might or might not fare better than comparable claimants in the liquidation.  Shell also says that if it had proved for its

B  damages claim (as it was and remains entitled to do), it would arguably be entitled to rank as a creditor ahead of other members and might have recovered in full anyway.  These conjectural possibilities depend on questions that are not before the Board, and for present purposes can be ignored.  Miss Newman QC, who appeared for Shell, candidly acknowledged, as she did below, that the real purpose of the Dutch attachments is to obtain priority

C  which Shell would not, or not necessarily get in the liquidation.  The issue on this appeal is whether Shell was in principle entitled to do that, and if not whether an injunction can issue to stop it.

    13  On 8 March 2011, shortly after the District Court of Amsterdam rejected Fairfield Sentry's challenge to the attachments, the joint liquidators applied in the High Court of the British Virgin Islands for an anti-suit injunction restraining Shell from prosecuting its proceedings in the

D  Netherlands and requiring it to take all necessary steps to procure the release of the attachments.  The application was heard inter partes by Bannister J in July 2011, who rejected it in a judgment delivered on 9 August.  His main reason, in summary, was that as a matter of principle the BVI court would not prevent a foreign creditor from resorting to his own courts, even if he was amenable to the BVI court's jurisdiction.  The Court of Appeal allowed

E  the appeal and made an order in substantially the terms which the joint liquidators had asked for in their notice of appeal.  The order restrained Shell from taking any further steps in the existing Dutch proceedings against Fairfield Sentry or commencing new ones, but did not refer in terms to the attachments.  The Court of Appeal's reasons, in summary, were (i) that Shell was subject to the personal jurisdiction of the BVI court by virtue of having lodged a proof in the liquidation, (ii) the assertion by the Dutch courts of a

F  jurisdiction to attach assets on the sole ground that it consisted in a debt owed to the insolvent company by a Dutch entity was exorbitant; and (iii) Shell should not be allowed to avail itself of that jurisdiction so as to gain a priority to which it was not entitled under the statutory rules of distribution applying in the British Virgin Islands.

G  *Anti-suit injunctions in insolvency cases*

    14  In the British Virgin Islands, as in England, the making of an order to wind up a company divests it of the beneficial ownership of its assets, and subjects them to a statutory trust for their distribution in accordance with the rules of distribution provided for by statute: *Ayerst v C & K (Construction) Ltd* [1976] AC 167.  In the case of a winding up of a BVI company in the BVI, this applies not just to assets located within the

H  jurisdiction of the winding up court, but all assets world-wide.  In England, this follows from the unqualified terms of section 144(1) of the Insolvency Act 1986.  In the British Virgin Islands, it is provided for in terms by section 175(1) of the Insolvency Act 2003, combined with the inclusive definition of "asset" in section 2(1) ("every description of property, wherever

© 2015 The Incorporated Council of Law Reporting for England and Wales

626
Stichting Shell Pensioenfonds v Krys (PC)                    [2015] AC

situated"). It reflects the ordinary principle of private international law that only the jurisdiction of a person's domicile can effect a universal succession to its assets. They will fall to be distributed in the BVI liquidation pari passu among unsecured creditors and, to the extent of any surplus, among its members.

15   This necessarily excludes a purely territorial approach in which each country is regarded as determining according to its own law the distribution of the assets of an insolvent company located within its territorial jurisdiction. The lex situs is of course relevant to the question what assets are truly part of the insolvent estate. It will generally determine whether the company had at the relevant time a proprietary interest in an asset, and if so what kind of interest. Thus, if execution is levied on an asset of the company within the territorial jurisdiction of a foreign court before the company is wound up, it will no longer be regarded by the winding up court as part of the insolvent estate. But short of a transfer of a proprietary interest in the asset prior to the winding up order, it is generally for the law of that jurisdiction to determine the distribution of the company's assets among its creditors and members, at any rate where the company is being wound up in the jurisdiction of its incorporation. In England and the BVI the court may, and commonly does, assert dominion over the local assets of an insolvent foreign company by conducting an ancillary winding up. But it does so in support of the principal winding up, and so far as it can in such a way as to ensure that creditors and members are treated equally regardless of the location of the assets. It does not seek to ring-fence local assets or local creditors. As Sir Nicolas Browne-Wilkinson V-C put it in *In re Bank of Credit and Commerce International SA* [1992] BCLC 570, 577:

"The attempt to put a ring fence around either the assets or the creditors to be found in any one jurisdiction is, at least under English law as I understand it, not correct, and destined to failure. I believe the position will prove to be the same in most other countries and jurisdictions."

16   In the present case the attachments were obtained some six months before the company was ordered to be wound up in the British Virgin Islands. Therefore at the time that they were obtained there could have been no inconsistency with the law of the British Virgin Islands. If the effect of the attachments as a matter of Dutch law had been to charge the assets attached or otherwise transfer a proprietary interest in them to Shell, and if that were held to be effective in relation to an asset situated in Ireland, the interest thus created would have ranked prior to the statutory trust created on the winding up order and there would be no basis for an anti-suit injunction. It is, however, common ground that no alteration in the proprietary interests in the Dublin balance was effected at the time of the attachments and that no right to execute against the balance had yet arisen. Any proprietary interest which might come into existence in future on execution being levied against it would in the eyes of BVI law be postponed to the administration of the statutory trust. It must follow that since the date of the winding up order, 21 July 2009, the attachments, which exist only for the purpose of enabling property in the Dublin balance to be transferred to Shell if and when it recovers judgment in the Dutch proceedings, have been directly inconsistent

A
B
C
D
E
F
G
H

© 2015 The Incorporated Council of Law Reporting for England and Wales

[2015] AC                                    Stichting Shell Pensioenfonds v Krys (PC)

A    with the mandatory statutory scheme resulting from the winding up order in
     the British Virgin Islands.

         17    The fundamental principle applicable to all anti-suit injunctions was
     stated at the outset of the history of this branch of jurisprudence by
     Leach V-C in *Bushby v Munday* (1821) 5 Madd 297, 307.  The court does
     not purport to interfere with any foreign court, but may act personally on a
     defendant by restraining him from commencing or continuing proceedings
B    in a foreign court where the ends of justice require.

         18    The "ends of justice" is a deliberately imprecise expression.  It
     encompasses a number of distinct legal policies whose application will vary
     with the subject matter and the circumstances.  In *Carron Iron Co
     Proprietors v Maclaren* (1855) 5 HL Cas 416, Lord Cranworth LC (at
     pp 437–439) identified three categories of case which, without necessarily
C    being comprehensive or mutually exclusive, have served generations of
     judges as tools of analysis.  The first comprised cases of simultaneous
     proceedings in England and abroad on the same subject matter.  If a party
     to litigation in England, where complete justice could be done, began
     proceedings abroad on the same subject matter, the court might restrain
     him on the ground that his conduct was a "vexatious harassing of the
D    opposite party".  The second category comprised cases in which foreign
     proceedings were being brought in an inappropriate forum to resolve
     questions which could more naturally and conveniently be resolved in
     England.  Proceedings of this kind were vexatious in a larger sense.  The
     court restrained them "on principles of convenience, to prevent litigation,
     which it has considered to be either unnecessary, and therefore vexatious, or
     else ill-adapted to secure complete justice".  Third, there are cases which do
E    not turn on the vexatious character of the foreign litigant's conduct, nor on
     the relative convenience of litigation in two alternative jurisdictions, in
     which foreign proceedings are restrained because they are "contrary to
     equity and good conscience".  It is with this third category that the House of
     Lords was concerned.  The appeal arose out of the administration by the
     English court of the insolvent estate of a deceased who appears to have been
F    domiciled in England.  The estate comprised property in both England and
     Scotland.  The Carron Iron Co, which had claims against the estate, brought
     proceedings against the executors in Scotland, in which they obtained
     letters of arrestment.  These attached the deceased's Scottish property and
     would have resulted in the application of that property to the satisfaction of
     their own claim in priority to claims in the liquidation.  The House of Lords
     by a majority (Lord Cranworth LC and Lord Brougham, Lord St Leonards
G    dissenting) refused an injunction to restrain the Scottish proceedings on the
     ground that the company was not amenable to the personal jurisdiction of
     the English court.  The Board will return to that question below.  But all
     three members of the House agreed on the principle on which such an
     injunction would issue if personal jurisdiction had existed.    Lord
     Cranworth LC said, at p 440:

H        "In general, after a decree under which the creditors of a testator may
         come in and obtain payment of their demands, the court does not permit a
         creditor to institute proceedings for himself.  The decree is said to be a
         judgment, or in the nature of a judgment, for all the creditors.  The court
         takes possession of the assets, and distributes them rateably, on principles

628
Stichting Shell Pensioenfonds v Krys (PC)                    [2015] AC

of equality, giving, however, due effect to any legal rights of preference    A
which any one creditor may possess.  To allow a creditor, after such a
decree, to institute proceedings for himself, would give rise to great
inconvenience and injustice: it would disturb the general principle of
equal distribution which the court is always anxious to enforce, and
would leave the executors exposed to actions after the assets have been
taken out of their hands.  Of the general justice, therefore, of the rule on
which the court acts, no doubt can, I think, be entertained."                  B

The basis of this conclusion, as the reasoning of all three members of the
House shows, is that the court has an equitable jurisdiction to restrain the
acts of persons amenable to the court's jurisdiction which was calculated to
violate the statutory scheme of distribution.

    19   The principle thus stated has been applied on a number of occasions.   C
In *In re Oriental Inland Steam Co; Ex p Scinde Railway Co* (1874) LR 9 Ch
App 557, a creditor proved in the liquidation of the Oriental Inland Steam
Co in England but attempted to obtain priority to other creditors by
attaching property of the company in India.  He was restrained by injunction
from proceeding in India, but obtained the value of his debt from the
liquidator in return for lifting the attachment, without prejudice to the
question whether he should be allowed to retain it.  The Court of Appeal       D
affirmed an order of Malins V-C requiring him to repay it.  James LJ said,
at p 559:

    "All the assets there would be liable to be torn to pieces by creditors
    there, notwithstanding the winding up, and there would be an utter
    incapacity of the courts there to proceed to effect an equitable
    distribution of them.  The English Act of Parliament has enacted that in    E
    the case of a winding up the assets of the company so wound up are to be
    collected and applied in discharge of its liabilities.  That makes the
    property of the company clearly trust property.  It is property affected by
    the Act of Parliament with an obligation to be dealt with by the proper
    officer in a particular way . . .   One creditor has, by means of an
    execution abroad, been able to obtain possession of part of those assets.   F
    The Vice-Chancellor was of opinion that this was the same as that of one
    cestui que trust getting possession of the trust property after the property
    had been affected with notice of the trust.  If so, that cestui que trust
    must bring it in for distribution among the other cestuis que trust .  So I,
    too, am of opinion, that these creditors cannot get any priority over their
    fellow-creditors by reason of their having got possession of the assets in
    this way.  The assets must be distributed in *England* upon the footing of   G
    equality."

    20   In *In re North Carolina Estate Co Ltd* (1889) 5 TLR 328, Chitty J
applied the same principle, observing that:

    "Under the Companies Act of 1862 it was clear that after a winding up
    order the assets of the company were to be collected and applied in
    discharge of its liabilities, and that the assets were fixed by the Act of
    Parliament with a trust for equal distribution among creditors (*In re       H
    Oriental Inland Steam Co* LR 9 Ch App 557, 559; *In re Vron Colliery Co*
    (1882) LR 20 Ch D 442).  No creditor, therefore, could be allowed, by
    taking proceedings at his own will and pleasure, to destroy, waste, or

© 2015 The Incorporated Council of Law Reporting for England and Wales

A    impair assets which were subjected to a trust for the general benefit of all
     creditors alike."

     21    In *Mitchell v Carter* [1997] 1 BCLC 673, Millett LJ referred to the
     jurisdiction as well established.  He said, at p 687:

          "a creditor who successfully completes a foreign execution is able to
B         gain priority over the unsecured creditors.  To prevent this, the English
          court has jurisdiction to restrain creditors from bringing or continuing the
          foreign execution process . . ."

     22    In the United States, the Supreme Court has independently arrived at
     the same position and recognised the right of the state of an insolvent's
     domicile to restrain proceedings in another state designed to obtain a more
     favourable distribution of the assets, notwithstanding the constitutional
C    duty of each state to give full faith and credit to judicial proceedings in every
     other state: *Cole v Cunningham* (1890) 133 US 107.  As Fuller CJ observed,
     delivering the opinion of the court, at p 122:

          "At the time of these proceedings, as for many years before, the
          Commonwealth of Massachusetts had an elaborate system of insolvent
          laws, designed to secure the equal distribution of the property of its
D         debtors among their creditors.  Under these insolvent laws, all preferences
          were avoided and all attachments in favour of particular creditors
          dissolved.  The transfer of the debtor's property to his assignees in
          insolvency extended to all his property and assets, wherever situated.
          This was expressly provided as to such as might be outside the state . . .
          Nothing can be plainer than that the act of Butler, Hayden & Co in
E         causing the property of the insolvent debtors to be attached in a foreign
          jurisdiction tended directly to defeat the operation of the insolvent law in
          its most essential features, and it is not easy to understand why such acts
          could not be restrained within the practice to which we have referred."

     The court regarded this, as the English courts do, as the enforcement of an
     equitable right: see p 116.
F    23    The leading modern case on the jurisdiction to restrain foreign
     proceedings is *Société Nationale Industrielle Aerospatiale v Lee Kui Jak*
     [1987] AC 871.  This was an alternative forum case, in which the Judicial
     Committee, sitting on appeal from Brunei, granted an injunction restraining
     proceedings in Texas on the ground that Texas was not the appropriate
     forum and the proceedings there were oppressive.  Lord Goff of Chieveley,
     delivering the advice of the Board, pointed out that the insolvency cases
G    proceeded on a different principle, which was based not on protecting
     litigants against vexation or oppression, but on the protection of the court's
     jurisdiction to do equity between claimants to an insolvent estate.  At
     pp 892–893, he observed:

          "The decided cases, stretching back over a hundred years and more,
          provide however a useful source of experience from which guidance may
H         be drawn.  They show, moreover, judges seeking to apply the
          fundamental principles in certain categories of case, while at the same
          time never asserting that the jurisdiction is to be confined to those
          categories.  Their Lordships were helpfully taken through many of the
          authorities by counsel in the present case.  One such category of case

630
Stichting Shell Pensioenfonds v Krys (PC)                                    [2015] AC

arises where an estate is being administered in this country, or a petition     A
in bankruptcy has been presented in this country, or winding up
proceedings have been commenced here, and an injunction is granted to
restrain a person from seeking, by foreign proceedings, to obtain the sole
benefit of certain foreign assets.  In such cases, it may be said that the
purpose of the injunction is to protect the jurisdiction of the English
court . . .  Another important category of case in which injunctions may       B
be granted is where the plaintiff has commenced proceedings against the
defendant in respect of the same subject matter both in this country and
overseas, and the defendant has asked the English court to compel the
plaintiff to elect in which country he shall alone proceed.  In such cases,
there is authority that the court will only restrain the plaintiff from
pursuing the foreign proceedings if the pursuit of such proceedings is
regarded as vexatious or oppressive: see *McHenry v Lewis* (1882)            C
22 Ch D 397 and *Peruvian Guano Co v Bockwoldt* (1883) 23 Ch D 225."

It is clear from Lord Goff's formulation that he was making the same
distinction as Lord Cranworth made in the *Carron Iron* case between cases
such as the insolvency cases, in which there is an equitable jurisdiction to
enforce the statutory scheme of distribution according to its terms, and cases
in which the court intervenes on the ground of vexation or oppression.         D

   24   The conduct of a creditor or member in invoking the jurisdiction of a
foreign court so as to obtain prior access to the insolvent estate may well be
vexatious or oppressive, in which case an injunction may be justified on that
ground.  An example is provided by the decision of the English Court of
Appeal in *Bloom v Harms Offshore AHT "Taurus" GmbH & Co KG* [2010]
Ch 187, where a creditor used a foreign attachment order in a manner which     E
the court regarded as amounting to sharp practice.  However, vexation and
oppression are not a necessary part of the test for the exercise of the court's
jurisdiction to grant an anti-suit injunction in a case where foreign
proceedings are calculated to give the litigant prior access to assets subject to
the statutory trust.  In the Board's opinion there are powerful reasons of
principle why this should be so.  The whole concept of vexation or
oppression as a ground for intervention, is directed to the protection of a    F
litigant who is being vexed or oppressed by his opponent.  Where a company
is being wound up in the jurisdiction of its incorporation, other interests are
engaged.  The court acts not in interest of any particular creditor or member,
but in that of the general body of creditors and members.  Moreover, as the
Board   has   recently   observed   in   *Singularis   Holdings   Ltd   v
PriceWaterhouseCoopers* [2015] 2 WLR 971, para 23, there is a broader          G
public interest in the ability of a court exercising insolvency jurisdiction in
the place of the company's incorporation to conduct an orderly winding up
of its affairs on a worldwide basis, notwithstanding the territorial limits of
its jurisdiction.  In protecting its insolvency jurisdiction, to adopt Lord
Goff's phrase, the court is not standing on its dignity.  It intervenes because
the proper distribution of the company's assets depends on its ability to get
in those assets so that comparable claims to them may be dealt with fairly in   H
accordance with a common set of rules applying equally to all of them.
There is no jurisdiction other than that of the insolvent's domicile in which
that result can be achieved.  The alternative is a free-for-all in which the
distribution of assets depends on the adventitious location of assets and the

© 2015 The Incorporated Council of Law Reporting for England and Wales

631

[2015] AC                                    Stichting Shell Pensioenfonds v Krys (PC)

A  race to grab them is to the swiftest, and the best informed, best resourced or
   best lawyered.

      25   The Board is not prepared to say that Shell acted vexatiously or
   oppressively by invoking the jurisdiction of the Dutch courts, but for the
   reasons that it has given, this does not prevent the issue of an anti-suit
   injunction.

B     26   It does not, however, follow that an injunction must issue. There are
   at least two matters to be considered before that step can be justified. The
   first is whether Shell, as a foreign entity, is amenable to the court's
   jurisdiction. The second is whether, even on the footing that an anti-suit
   injunction is available in principle, it is right to make one as a matter of
   discretion. To those questions the Board will now turn.

C  *Jurisdiction*

      27   As Chitty J pointed out in *In re North Carolina Estate Co Ltd* (1889)
   5 TLR 328, it necessarily follows from the fact that the court acts in
   personam against the foreign litigant, that the latter must be must be
   amenable to its personal jurisdiction. He must be present within the
   jurisdiction or amenable to being served with the proceedings out of the
D  jurisdiction, or else he must have submitted voluntarily.

      28   Subject to a reservation to which the Board will return, Miss Newman
   accepted that her clients had submitted to the jurisdiction of the BVI courts
   for the purpose of being amenable to an anti-suit injunction, by participating
   unconditionally in the injunction proceedings. Mr Girolami QC said that
   they had submitted not just by doing that but also by proving for the debt
   alleged to arise under their redemption notice of 12 December 2008. In
E  common with the Court of Appeal, the Board considers that Shell submitted
   in both ways. The Board will deal first with the consequences of the lodging
   of a proof of debt, about which the parties are fundamentally at odds, before
   turning to Miss Newman's reservation about the effect of participating in the
   injunction proceedings.

      29   In *Ex p Robertson; In re Morton* (1875) LR 20 Eq 733, a Scottish
F  merchant proved in the bankruptcy of his debtor for a debt of £367 and
   recovered a dividend without bringing into account £120 which he had
   obtained from the insolvent estate separately. He was held to be subject to
   the jurisdiction of the court in proceedings to recover the £120 for the benefit
   of the estate. Bacon CJ observed, at pp 737–738:

         "what is the consequence of creditors coming in under a liquidation or
G     bankruptcy? They come in under what is as much a compact as if each of
      them had signed and sealed and sworn to the terms of it—that the
      bankrupt's estate shall be duly administered among the creditors. That
      being so, the administration of the estate is cast on the court, and the
      court has jurisdiction to decide all questions of whatever kind, whether of
      law, fact, or whatever else the court may think necessary in order to effect
      complete distribution of the bankrupt's estate . . . can there be any doubt
H     that the appellant in this case has agreed, as far as he is concerned . . . the
      law of bankruptcy shall take effect as to him, and under this jurisdiction,
      to which he is not only subjected, but under which he has become an
      active party, and of which he has taken the benefit . . . [The appellant] is
      as much bound to perform the conditions of the compact, and to submit

© 2015 The Incorporated Council of Law Reporting for England and Wales

632
Stichting Shell Pensioenfonds v Krys (PC)                              [2015] AC

to the jurisdiction of the court, as if he had never been out of the limits of       A
*England*."

30   This was a case where the creditor had actually received a dividend.
However, in *Akers as a joint foreign representative of Saad Investments Co
Ltd v Deputy Comr of Taxation* (2014) 311 ALR 167, where no dividend
had been received, the Full Court of the Federal Court of Australia held that
in *Ex p Robertson* the submission consisted in the lodging of the proof and       B
not the receipt of the dividend. Accordingly, at para 165:

> "formal submission of a proof of debt to the insolvency administration
> will generally be adequate to support a conclusion that the court
> supervising the administration thereafter has jurisdiction to make orders
> in matters connected with the administration against the creditor who has
> proved."                                                                         C

The same view was taken by the Supreme Court in *Rubin v Eurofinance SA
(Picard intervening)* [2013] 1 AC 236. Lord Collins of Mapesbury (with
whom on this point the rest of the court agreed) held at paras 165, 167,
citing *Ex p Robertson*, that there was:

> "no doubt that orders may be made against a foreign creditor who proves      D
> in an English liquidation or bankruptcy on the footing that by proving the
> foreign creditor submits to the jurisdiction of the English court . . . having
> chosen to submit to New Cap's Australian insolvency proceeding, the
> syndicate should be taken to have submitted to the jurisdiction of the
> Australian court responsible for the supervision of that proceeding. It
> should not be allowed to benefit from the insolvency proceeding without      E
> the burden of complying with the orders made in that proceeding."

31   It has been suggested by Professor Briggs in a recent lecture in
Singapore (*New Developments in Private International Law: A Busy
12 Months for the Supreme Court*, 21 November 2013) that this conclusion
was "astonishing" because no proof had been admitted and no dividend had
been paid. Miss Newman, adopting this criticism, submitted that Lord        F
Collins was wrong on this point. The Board is satisfied that his statement
was correct. The present case is not properly speaking a case of election, like
those in which a party must elect between two mutually inconsistent
remedies. In such cases he is usually not taken to elect until he has actually
obtained one of the remedies. The question here is not what remedy is Shell
entitled to have, but whether it has submitted to the jurisdiction of the court.
A submission may consist in any procedural step consistent only with          G
acceptance of the rules under which the court operates. These rules may
expose the party submitting to consequences which extend well beyond the
matters with which the relevant procedural step was concerned, as when the
commencement of proceedings is followed by a counterclaim. In the present
case the defendant lodged a proof. It cannot make any difference to the
character of that act whether the proof is subsequently admitted or a
dividend paid, any more than it makes a difference to the submission implicit      H
in beginning an ordinary action whether it ultimately succeeds. This result is
neither unjust nor contrary to principle, for by submitting a proof the
creditor obtains an immediate benefit consisting in the right to have his claim
considered by the liquidator and ultimately by the court according to its

© 2015 The Incorporated Council of Law Reporting for England and Wales

A  merits and satisfied according to the rules of distribution if it is admitted.
The Board would accept that the submission of a proof for claim A does not
in itself preclude the creditor from taking proceedings outside the
liquidation on claim B.  But what he may not do is take any step outside the
liquidation which will get him direct access to the insolvent's assets in
priority to other creditors.  This is because by proving for claim A, he has
submitted to a statutory scheme for the distribution of those assets pari
B  passu in satisfaction of his claim and those of other claimants.

32  Turning to Miss Newman's reservation, the argument was that Shell
had not submitted to the jurisdiction of the BVI courts for all purposes.  In
particular, it was said to have submitted only for the purpose of claims under
the Insolvency Act and Rules, and not for the purpose of claims governed by
the general law, such as its claim in the Netherlands for misrepresentation
C  and breach of warranty.  This, it was said, was because the BVI courts have
no subject matter jurisdiction over the damages claim that is being asserted
in the Netherlands.  The Board has no hesitation in rejecting this contention.
It has no bearing on the question whether Shell submitted by participating in
the injunction proceedings, because that submission necessarily involved an
acceptance on its part of the court's jurisdiction to grant the injunction
sought in those proceedings.  The point appears to the Board to be equally
D  irrelevant to the question whether Shell submitted by lodging a proof of debt
for the redemption price.  Liquidation is a mode of collective enforcement of
claims arising under the general law.  There is, in the present context, no
relevant difference between the claim for which Shell proved (a debt arising
from its redemption notice) and the claim for which it did not prove but
which it has put forward in the Dutch proceedings (damages for
E  misrepresentation and breach of warranty).  They both arise under the
general law.  They are both capable of being proved in the liquidation.  If
they are proved, the BVI courts will have subject matter jurisdiction to
adjudicate on them.  And so far as they submitted by proving for anything in
the liquidation, Shell submitted to a statutory regime which precluded it
from acting so as to prevent the assets subject to the statutory trust from
being distributed in accordance with it.
F
*Application to foreign litigants*

33  Against that background, the Board turns to Miss Newman's main
point, which was that even on the footing that Shell submitted to the
jurisdiction of the BVI court, that was not enough to make it amenable to an
anti-suit injunction.  This, she contended, was because there was a distinct
G  principle that an anti-suit injunction will not issue so as to prevent a foreign
litigant from resorting to the courts of his own country (or at any rate some
foreign court).

34  In the Board's opinion, there is no such principle.  Where an English
company is being wound up in England or a BVI company in the BVI, all of
its assets are subject to the statutory trusts including those which are located
within the jurisdiction of foreign courts.  The rights and liabilities of
H  claimants against the assets are the same regardless of their nationality or
place of residence.  A distinction between foreign and English claimants
would respond to no principle known to the law.  The true principle, which
applies to all injunctions and not just anti-suit injunctions in the course of
insolvency proceedings, is that the English and BVI courts will not as a

© 2015 The Incorporated Council of Law Reporting for England and Wales

634
Stichting Shell Pensioenfonds v Krys (PC)                                    [2015] AC

matter of discretion grant injunctions affecting matters outside their
territorial jurisdiction if they are likely to be disregarded or would be, as the
colourful phrase went, "brutum fulmen".  With one exception, to which the
Board will return, the various judicial statements suggesting a wider rule are
in reality concerned either with personal jurisdiction over the person sought
to be restrained or else with the practical efficacy of the remedy.

35    In the *Carron Iron* case 5 HL Cas 416 Lord Cranworth LC, having
set out the principles on which the court acts, continued, at p 441:

> "the first question is, whether there is any rule or principle of the Court
> of Chancery which, after a decree for administering a testator's assets,
> would induce it to interfere with a foreign creditor resident abroad, suing
> for his debt in the courts of his own country?  Certainly not.  Over such a
> creditor the courts here can exercise no jurisdiction whatever.  He is
> altogether beyond their reach, and must be left to deal as he may with his
> own forum, and to obtain such relief as the courts of his own country may
> afford."

The observation that over such a person the English court can exercise "no
jurisdiction whatever" shows that Lord Cranworth LC was in fact
addressing the question of personal jurisdiction.  The issue which divided the
House was whether the Carron Iron Co was domiciled in England as well as
Scotland (as Lord St Leonards thought) or only in Scotland (as the majority
thought).  The injunction was refused for want of personal jurisdiction, not
because the Carron Iron Co was a Scottish company proceeding in the courts
of Scotland.  That this was the issue is apparent from Lord Cranworth LC's
observation at pp 442–443 that the position would have been different if the
Carron Iron Co had "come under the decree, so as to obtain payment
partially from the English assets" or had "sought or obtained any relief in
this country".

36    Cases in which the courts have been concerned with the practical
efficacy of their injunctions include *In re Chapman* (1872) LR 15 Eq 75, 77.
In that case, Bacon CJ refused an injunction to restrain proceedings brought
by American creditors in New York on the ground that

> "neither this court not the Court of Chancery ever grants injunctions
> that will be wholly ineffectual."

In *In re International Pulp and Paper Co* (1876) 3 Ch D 594, Jessel MR
granted an injunction restraining proceedings brought by an Irish creditor in
Ireland.  He distinguished between creditors resident in another jurisdiction
of the United Kingdom and those resident in a "purely foreign country" such
as Turkey or Russia.  They were both equally outside the territorial
jurisdiction of an English court.  The difference was that there were statutory
procedures for enforcing English judgments in Ireland as if they were
judgments of the Irish courts.  Without such procedures, the English court's
orders were likely to be disregarded by locally resident litigants.  At p 599,
Jessel MR said:

> "although it would be desirable in the interests of the person concerned
> in the litigation to make that creditor come in with the rest, yet the court
> cannot restrain the action for want of power—not from want of will or
> want of provisions in the Act of Parliament, but simply that the Act of

© 2015 The Incorporated Council of Law Reporting for England and Wales

635

[2015] AC                                     Stichting Shell Pensioenfonds v Krys (PC)

A    Parliament cannot give this court jurisdiction over *Turkey* or over *Russia*.
That is the only reason . . .   Therefore, as to a purely foreign country, it is
of no use asking for an order, because the order cannot be enforced."

In *In re North Carolina Estate Co Ltd* 5 TLR 328, Chitty J observed that it
was:

B        "quite true . . . that Parliament did not legislate for a foreign country.
The point, however, was would the court grant an injunction which was
ineffectual, not as being against the foreign court but as being against a
person who could not be reached?"

C    37   In some of the older cases, the foreign residence of a claimant
combined with the foreign location of the relevant assets, was treated as a
reason for expecting an order of the English courts to be disregarded.  In an
age when assets and persons were less mobile, the English courts were
realistic enough to appreciate that the mere existence as a matter of English
law of personal jurisdiction over a foreign resident offered no assurance that
the injunction would in practice be observed.  In modern conditions, with an
increasingly unified global economy, the English courts have generally
assumed that their injunctions will be obeyed by those who are subject to
D    their personal jurisdiction, irrespective of their place of residence.  The
modern law takes the more robust position stated by the Court of Appeal in
*In re Liddell's Settlement Trusts* [1936] Ch 365, 374 (Romer LJ), that it is
"not the habit of this court in considering whether or not it will make an
order to contemplate the possibility that it will not be obeyed".  In *Castanho
v Brown & Root (UK) Ltd* [1981] AC 557, 574 Lord Scarman, with the
agreement of the rest of the House of Lords, regarded this retort as a
E    sufficient answer to the submission that an anti-suit injunction should be
refused because it was liable to be disregarded by a Portuguese party suing in
Texas.

38   The case which on the face of it does most to advance
Miss Newman's submission is the decision of Maugham J in *In re Vocalion
(Foreign) Ltd* [1932] 2 Ch 196.  Maugham J declined to issue an injunction
F    restraining proceedings by a resident of Victoria in Melbourne.  His reason,
expressed at pp 209–210 was:

         "I can find, however, no reason to doubt that a person domiciled
abroad can sue in his own courts a company which, in carrying on
business there, has incurred a debt or liability to him, whether or not that
company is being wound up in this country, to which he owes no
allegiance and with the laws of which he is not acquainted; though, as
G    pointed out in Dicey, p 377, if he desires to benefit under the English
winding up he must, generally speaking (see for an exception *Moor v
Anglo-Italian Bank* (1879) 10 Ch D 681), give up for the benefit of other
creditors any advantage which he may have obtained for himself by the
proceedings abroad.  If these views be well founded it is difficult to see
why an English court should attempt to restrain such a creditor from
H    enforcing his rights in his own country merely because it is possible to
serve him with process here.  To prevent a misconception I should point
out that I am not here dealing with the case of a British subject or a
corporation incorporated under our law, nor am I dealing with the case
where the person sought to be restrained from proceedings abroad has

© 2015 The Incorporated Council of Law Reporting for England and Wales

636
Stichting Shell Pensioenfonds v Krys (PC)                                    [2015] AC

A   made himself a party to the proceedings in the liquidation, for instance by
    putting in a proof or in some other way."

    Maugham J concluded, at p 210, that where a foreigner is proceeding in his
    own courts:

        "in general it will be more conducive in such a case to substantial
        justice that the foreign proceedings should be allowed to proceed."

B   These observations were not a statement of law.  As Millett LJ observed in
    *Mitchell v Carter* [1997] 1 BCLC 673, they went to the court's discretion.
    What is thought to be "conducive to the ends of justice" is liable to change
    over time.   The Court of Appeal in the present case considered that
    Maugham J's remarks could no longer be regarded as consistent with the
    policy of the law relating to international insolvencies.  The Board is of the
C   same view.  Maugham J's approach would be fair enough if the common law
    regarded insolvency proceedings as purely territorial.  But it has not taken
    that view for many years, either in relation to its own winding up
    proceedings which have always been universal, or in relation to the
    corresponding proceedings of foreign courts dealing with the insolvency of
    their own companies.  The object of the winding up court in dealing with an
D   international insolvency is to ensure, so far as it properly can, that the
    worldwide assets of the company and the worldwide claimants to those
    assets are treated on a common basis: see *In re HIH Casualty and General
    Insurance Ltd* [2008] 1 WLR 852, para 30 (Lord Hoffmann); *Singularis
    Holdings Ltd v PriceWaterhouseCoopers* [2015] 2 WLR 971, para 19.

E   39   The Board concludes that where a creditor or member who is
    amenable to the personal jurisdiction of the court begins or continues
    foreign proceedings which will interfere with the statutory trusts over the
    assets of a company in insolvent liquidation, in principle an injunction will
    be available to restrain their prosecution irrespective of the nationality or
    residence of the creditor in question.

    40   The Board would accept that as a general rule, there can be no
    objection in principle to a creditor invoking the purely adjudicatory
F   jurisdiction of a foreign court, provided that it is an appropriate jurisdiction
    and that litigation there is not vexatious or oppressive to the liquidators or
    other interested parties.  But it is in principle inimical to the proper winding
    up process for a creditor to seek or enforce an order from a foreign court
    which will result in his enjoying prior access to any part of the insolvent
    estate.  In *Kemsley v Barclays Bank plc* [2013] BPIR 839, para 41 Roth J
G   observed that where the foreign litigant undertakes to bring any assets
    realised in the foreign proceedings into the bankruptcy so that no advantage
    would be obtained over other creditors, the basis on which an anti-suit
    injunction might otherwise be justified will not apply.  The Board wishes to
    record its endorsement of that approach.

    *Discretion*

H   41   As with any injunction, this is subject to the court's discretion to
    refuse relief if in the particular circumstances it would not serve the ends of
    justice.  It is neither possible nor desirable to identify what circumstances
    might have that effect.  But it has often, and rightly, been said that the
    jurisdiction to grant anti-suit injunctions is to be exercised with caution.

© 2015 The Incorporated Council of Law Reporting for England and Wales

A   There may in particular be factors at work other than the desire to obtain an advantage over comparably placed creditors or members which make it just to allow the foreign proceedings to continue, either without restriction or on terms which will sufficiently protect other interests.  In the present case, the judge having concluded that the issue of an injunction would be contrary to principle, the Court of Appeal were entitled to overrule him and to exercise their own discretion.  They exercised it in the liquidators' favour, and the

B   Board will not interfere unless it is shown that they were guilty of some error of principle or misconception of fact, or that they were plainly wrong.

    42    The only substantial criticism made of the way that they exercised their discretion was that as a matter of comity they ought to have left to the Dutch courts the decision whether the Dutch proceedings should be allowed to proceed.  The District Court of Amsterdam having rejected Fairfield

C   Sentry's application to lift the attachments, it was said that the courts of the British Virgin Islands should have respected that decision.  In the Board's opinion this submission misunderstands the role that comity plays in a decision of this kind.  Where the issue is whether the BVI or the foreign court is the more appropriate or convenient forum, it can in principle be decided by either court.  Comity will normally require that the foreign judge should decide whether an action in his own court should proceed: *Barclays Bank plc*

D   *v Homan* [1993] BCLC 680, *Mitchell v Carter* [1997] 1 BCLC 673 (Millett LJ).  In the present case, however, there is no room for deference to the Dutch court's decision.  In the first place, the question does not turn on the relative convenience or appropriateness of litigation in the courts of the Netherlands and the BVI.  Both courts can adjudicate on the substantive dispute, the Dutch courts in Shell's current proceedings, and the BVI court in

E   ruling on a proof if Shell lodges one.  But the BVI is the only forum in which priorities between claimants generally can be determined.  The question before the Court of Appeal was whether Shell should be allowed to invoke the jurisdiction of the Dutch courts to obtain an unjustified priority in violation of a mandatory statutory scheme in the British Virgin Islands.  Second, the relevant principles of Dutch law would prevent the Dutch courts from deciding in which court the issues would be better determined.  It is

F   apparent from the evidence of Dutch law and the judgment of the Amsterdam District Court rejecting Fairfield Sentry's application, that the decision does not involve identifying the most appropriate forum.  Save in the case of unarguable claims or those in which an attachment would expose the garnishee to a real risk of having to pay twice, the issue of an attachment is a matter of right in the Netherlands.  The Dutch courts have no regard to

G   foreign insolvencies so far as they conflict with Dutch domestic law or limit the recovery of local creditors.  Third, although when a company is being wound up under the law of the jurisdiction of its incorporation the distribution of its assets among creditors and members is in general a matter for that law, there may well be circumstances in which as a matter of discretion an English or BVI court might refuse an injunction on the ground that the foreign court had a special interest in asserting dominion over an

H   asset forming part of the insolvent estate within its own territory.  However, that question could not arise in the present case, because the relevant asset was not located in the Netherlands but in Ireland.  The jurisdiction of the Dutch court under its own law to authorise the attachment of an Irish debt owed to a BVI company in liquidation in the BVI may fairly be described, as

638
Stichting Shell Pensioenfonds v Krys (PC)                              [2015] AC

the Court of Appeal did, as exorbitant.  There are cases, as Hoffmann J                    A
observed in *Barclays Bank plc v Homan* [1993] BCLC 680, 688, in which

> "the judicial or legislative policies of England and the foreign court are
> so at variance that comity is overridden by the need to protect British
> national interests or prevent what it regards as a violation of the
> principles of customary international law".

In the Board's opinion, this is such a case.                                                B

    43   There appears to the Board to be nothing to suggest that allowing
Shell an advantage over other comparable claimants would be consistent
with the ends of justice.  Nor, in the circumstances, should Shell find this
surprising.  It invested in a company incorporated in the British Virgin
Islands and must, as a reasonable investor, have expected that if that
company became insolvent it would be wound up under the law of that                          C
jurisdiction.

*The scope of the order*

    44   It is necessary, finally, to refer to an issue about the scope of the relief
sought which arose in the course of the hearing of the appeal.  The reasoning
of the Court of Appeal was based on the inconsistency between the Dutch                       D
attachments and the statutory trust of Fairfield Sentry's assets.  But its order,
following the form proposed in the notice of appeal, restrained Shell from
pursuing the Dutch proceedings generally without any specific reference to
the attachments.  As the Board has pointed out, merely by invoking the
adjudicatory jurisdiction of a foreign court, a creditor does not necessarily
act inconsistently with the statutory trusts.  The vice of the Dutch                         E
proceedings lay in the attachments.  In the generality of such cases, absent
vexation or oppression, an order restraining the entire proceedings would be
too wide.  Miss Newman, however, objected to the order being modified so
as to limit it to the attachments because no application to limit it in that way
had been made in the Court of Appeal and an attempt to modify it after
judgment failed.  The result is that both parties were contending for an all or
nothing solution.                                                                             F

    45   In the particular circumstances of this case, the Board is persuaded
that it should leave the order of the Court of Appeal as it stands.  The effect
of that order is that there can be no judgment on the merits in the
Netherlands to which the attachment could relate.  The order as framed
therefore achieves the desired result of preventing the attachments from
leading to execution against the Dublin account.  In theory, it achieves more
than that by also preventing the exercise of the Dutch court's adjudicatory                  G
jurisdiction.  But this is rather unreal.  The sole substantial purpose of the
Dutch proceedings was to obtain the attachments and the resulting priority.
The attachments are also the sole basis in Dutch law for the Dutch court's
exercise of any adjudicatory jurisdiction.  Therefore an injunction requiring
Shell to procure the lifting of the attachments would in reality have brought
an end to the Dutch proceedings as a whole by removing their jurisdictional
basis, just as the order of the Court of Appeal does.  This will not deprive                  H
Shell of any advantage to which it is legitimately entitled.  It may prove in the
liquidation for its damages for misrepresentation and breach of warranty.
While the position as regards limitation has not been explored in detail on
this appeal, Miss Newman was not able to assert that a proof of debt for the

© 2015 The Incorporated Council of Law Reporting for England and Wales

639
[2015] AC                           Stichting Shell Pensioenfonds v Krys (PC)

A    claims brought in the Netherlands would be time-barred in the British Virgin
     Islands, and nothing in the material before the Board suggests that it would
     be.  Since the operative date for limitation purposes in the liquidation will be
     the date of the winding up order and the Dutch substantive proceedings were
     begun after that date, if the claim which Shell have brought in the Dutch
     courts is not time-barred there, there is no reason to think that a proof of
     debt would be time-barred either.

B        46   The practical inconvenience of the present state of affairs is that the
     Dutch proceedings and the attachments may remain for some time in
     existence without going anywhere, and that in the meantime the liquidators
     will be unable to access the balance on the Dublin account.  As between
     responsible parties such as these, the Board would expect this problem to be
     resolved by agreement.  If that does not happen, and the result is that the
C    money in Dublin remains in balk when the liquidators need it to fund
     distributions, it may well be appropriate for the liquidators to make a
     further application in the High Court for an order requiring the attachments
     to be released.

     *Conclusion*

D        47   The Board will humbly advise Her Majesty that the appeal should be
     dismissed.

                                   SHIRANIKHA HERBERT, *Barrister*

E                                   _____

F

G

H

© 2015 The Incorporated Council of Law Reporting for England and Wales



**BERMUDA**

**SUPREME COURT ACT 1905**

**1905 : 4**

TABLE OF CONTENTS

PRELIMINARY

1     Interpretation

CONSTITUTION OF THE SUPREME COURT

2     Union of existing Courts into Supreme Court
3     Prescription of number of Puisne Judges
4     Assistant Justices
5     Appointment of Judges of Supreme Court
6     Precedence of Judges
7     Powers of Judges to exercise jurisdiction
8     Powers of Acting Chief Justices
9     Powers etc. of Puisne Judge
10    Seal of Court
11    Place of sitting

JURISDICTION AND LAW

12    Jurisdiction of Supreme Court
13    *[repealed]*
14    Jurisdiction in respect of persons suffering from mental disorder
15    Extent of application of English law
16    *[repealed]*
17    *[repealed]*
18    Concurrent administration of law and equity
19    Rules of law upon certain points
20    Proceedings in chambers
21    Provision as to criminal procedure
22    Savings for rules of evidence and law relating to jurors, etc.

1

## SUPREME COURT ACT 1905

23      Restriction on institution of vexatious actions

ADMIRALTY JURISDICTION

24      Admiralty jurisdiction of the Court
25      Mode of exercise of Admiralty jurisdiction
26      Jurisdiction in personam in collision and other similar cases
27      Wages
28      Supreme Court not to have jurisdiction in cases falling within Rhine Convention
29      Savings

DISPOSAL OF MONEY PAID INTO COURT

30      Disposal of money paid into court
31      Payment into Consolidated Fund
32      Money paid into court prior to 1 July 1980 and still in court on that date
33      Notice of payment into court
34      Forfeiture of money
35      Rules relating to the payment of interest on money paid into court

SITTINGS AND DISTRIBUTION OF BUSINESS OF THE COURT

36      Sittings of the Court
37      Session day
46      []

OFFICERS OF THE COURT

47      Duties of Provost Marshal General
48      Registrar and Assistant Registrar of the Court
49      Duties of Registrar
50      Taxing Master

BARRISTERS AND ATTORNEYS

51      Admission of barristers and attorneys
52      Deposit of certificate of call etc. with Court
53      Entitlement of Law Officers, ex officio, to admission as barristers and attorneys.
54      Enrolment of barristers and attorneys
55      [repealed]
56      Practitioners deemed Officers of Court
57      Striking off the role and suspension from practice
61      []

RULES OF COURT

62      Rules of Court
63      Enactment of Rules of Court

JUDICIAL REVIEW

64      Application for judicial review
65      Order of mandamus, prohibition or certiorari
66      Declaration or injunction

**2**

# SUPREME COURT ACT 1905

67        Award of damages
68        Delay in making of application

FIRST SCHEDULE

SECOND SCHEDULE

*[preamble and words of enactment omitted]*

## PRELIMINARY

### Interpretation

1        (1)  In this Act, and in any Rules of Court made under this Act, unless the context otherwise requires—

> "absence", in relation to any Judge, means the actual absence of the Judge from Bermuda, or his absence from Court by reason of being ill or of the extreme illness of any member of his family, or for any cause which in the opinion of the court renders it undesirable for him to sit as a member of the Court; and shall also be held to take place when a Judge is on leave or when the office is actually vacant;

> "action" means a civil proceeding commenced by writ, or in such other manner as may be prescribed by Rules of Court; but does not include a criminal proceeding by the Crown;

> "cause" includes any action, suit or other original proceeding between a plaintiff and a defendant, and any criminal proceeding by the Crown;

> "the Court" means the Supreme Court constituted under section 73 of the Constitution [*title 2 item 1*];

> "defendant" includes every person served with any writ of summons or process, or served with notice of, or entitled to attend, any proceedings;

> "fit and proper person certificate" means a certificate issued by the Bar Council pursuant to section 10E of the Bermuda Bar Act 1974;

> "goods" include baggage;

> "Judge" means the Chief Justice, a Puisne Judge or an Assistant Justice;

> "judgment" includes decree;

> "master" includes every person (except a pilot) having command or charge of a ship;

> "matrimonial cause" means any action for divorce, nullity of marriage or judicial separation;

> "matter" includes every proceeding in the Court or before any Judge thereof, not in a cause;

---

**3**

## SUPREME COURT ACT 1905

"order" includes rule;

"party" includes every person served with notice of, or attending, any proceeding, although not named on the record;

"petitioner" includes every person making any application to the Court, either by petition, motion or summons, otherwise than as against any defendant;

"plaintiff" includes every person asking any relief (otherwise than by counterclaim as a defendant) against any other person by any form of proceeding, whether those proceedings are by way of action, suit, petition, motion, summons or otherwise;

"pleading" includes—

(i) any petition or summons; and

(ii) the statements in writing of the claim or demand of any plaintiff, and of the defence of any defendant thereto, and of the reply of the plaintiff to any counterclaim of a defendant;

"qualified Assistant Justice" means an Assistant Justice of the Supreme Court of Bermuda who possesses the qualifications specified in section 5;

"the Rhine Navigation Convention" means the Convention of the seventh of October, eighteen hundred and sixty-eight, as revised by any subsequent Convention;

"Rules of Court" include forms;

"ship" includes any description of vessel used in navigation and any reference to a ship shall be deemed to include a reference to an aircraft designed to operate on water;

"shipping master" means, with respect to the Port of Hamilton and the Port of St. George's, the Collector of Customs;

"stenographer" means any person or persons employed under the authority of the Court or of any Judge under this Act to take down evidence, or other matter, in typewriting, or to take down evidence or other matter in shorthand and afterwards to transcribe the evidence or matter in typewriting;

"suit" includes action;

"towage" and "pilotage", in relation to an aircraft, mean towage and pilotage while the aircraft is waterborne.

(2) Unless the context otherwise requires, but subject to subsection (3), any reference in this Act or other provision of law to a Judge or Assistant Justice shall include a reference to a Puisne Judge.

(3) Subsection (2) shall have no application to section 4.

*[Section 1 subsection (1) definition "fit and proper person certificate" inserted by 2018 : 53 s. 21 effective 31 January 2019]*

AP1143

## SUPREME COURT ACT 1905

of administration of the personal estate of persons deceased and by all or any of the following courts, that is to say—

      (a)  the Court of General Assize;

      (b)  the Court of Chancery;

      (c)  the Court of Exchequer;

      (d)  the Court of Probate;

      (e)  the Court of Ordinary;

      (f)  the Court of Bankruptcy.

      (2)  The jurisdiction transferred to the Supreme Court by virtue of this Act shall include the jurisdiction which, at the commencement of this Act [*6 June 1905*], was vested in, or capable of being exercised by, all or any one or more of the Judges of the aforementioned courts, respectively, sitting in court or chambers, when acting as Judges or a Judge in pursuance of any Act, law or custom, and all powers given to any such court, or to any such Judges or Judge, by any Act or Act of the Parliament of the United Kingdom, and also all ministerial powers, duties and authorities, incident to any and every part of the jurisdictions so transferred.

13      *[Repealed by 1974:4]*

### Jurisdiction in respect of persons suffering from mental disorder

14      The Chief Justice, and in his absence a Puisne Judge, shall, in respect of persons suffering from mental disorder, have all the jurisdiction, powers and authorities as are conferred upon him under the provisions of Part IV of the Mental Health Act 1968 [*title 11 item 36*].

### Extent of application of English law

15      Subject to the provisions of any Acts which have been passed in any way altering, amending or modifying the same, and of this Act, the common law, the doctrines of equity, and the Acts of the Parliament of England of general application which were in force in England at the date when these Islands were settled, that is to say, on the eleventh day of July one thousand six hundred and twelve, shall be, and are hereby declared to be, in force within Bermuda.

16      *[Repealed by 1974:4]*

17      *[Repealed by 1979:17]*

### Concurrent administration of law and equity

18      In every civil cause or matter which is pending in the Supreme Court law and equity shall be administered concurrently; and the Court, in the exercise of the jurisdiction vested in it by virtue of this Act, shall have power to grant, and shall grant, either absolutely or on such reasonable terms and conditions as seems just, all such remedies or relief whatsoever,

AP1144

Case 1:23-cv-00832-UNA Document 269-2 Filed 06/24/24 Page 145 of 300 PageID #: 1212

## SUPREME COURT ACT 1905

whether interlocutory or final, as any of the parties thereto may appear to be entitled to in respect of any and every legal or equitable claim or defence properly brought forward by them respectively, or which appears in such cause or matter, so that as far as possible all matters in controversy between the said parties respectively may be completely and finally determined, and all multiplicity of legal proceedings concerning any of such matters avoided; and in all matters in which there is any conflict or variance between the rules of equity and the rules of common law with reference to the same matter the rules of equity shall prevail.

*[Section 18 amended by 2009:28 s.3 effective 7 July 2009]*

### Rules of law upon certain points

19    It is hereby declared that the law and practice relating to the matters mentioned in this section shall be as follows, that is to say—

    (a)   all judgments shall be dated as of the day and month of the year on which they are signed, and shall, as regards *bona fide* purchasers for valuable consideration, affect lands, tenements and hereditaments only as from the date on which they are signed;

    (b)   when any person neglects or refuses to comply with a judgment or order directing him to execute any conveyance, contract or other document, or to endorse any negotiable instrument, the Court may, on such terms and conditions (if any) as may be just, order that such conveyance, contract or other document, shall be executed, or that such negotiable instrument shall be endorsed, by such person as the Court may nominate for that purpose; and in any such case the conveyance, contract, document or instrument so executed or endorsed, shall operate, and be for all purposes available as if it had been executed or endorsed by the person originally directed to execute or endorse it;

    (c)   an injunction may be granted, or a receiver appointed, by an interlocutory order of the court in all cases in which it appears to the Court to be just or convenient that such order should be made; and any such order may be made either unconditionally or upon such terms and conditions as the court thinks just; and if any injunction is asked for either before, at, or after the hearing of any cause or matter, to prevent any threatened or apprehended waste or trespass, such injunction may be granted, if the Court thinks fit, whether the person against whom such injunction is sought is or is not in possession under any claim of title or otherwise, or (if out of possession) does or does not claim the right to do the act sought to be restrained under any colour of title, and whether the estates claimed by both or either of the parties are legal or equitable;

    (d)   any absolute assignment, by writing under the hand of the assignor (not purporting to be by way of charge only), of any debt or other legal chose in action, of which express notice in writing has been given to the debtor, trustee or other person from whom the assignor would have been entitled to receive or claim such debt or chose in action, shall be, and be deemed

AP1145

263

IN THE **COURT OF** APPEAL FOR BERMUDA

CIVIL APPEAL NO. 8 of 1991

THE MINISTER OF FINANCE          Appellant

and

PETER L. HAWKES (Trustee)          Respondent

---------

Before:    Roberts, P.
           **Huggins,** J.A.
           Georges, J.A.

Date of Hearing: 10th July, 1991

----------

J U D G M E N T

Roberts, P.

The appellant issued a summons on 24th October, 1990, seeking a determination of the Court as to whether "Subsection (2) of section 236 of the Companies Act (as amended ) applies to paragraph (a) of subsection (1) of the said section and Act or as may be".

The summons was heard by the Chief Justice on 12th March 1991 and judgment was delivered by him on the 15th March 1991.

Having set out the wording of section 236 of the Companies Act, which was amended in 1982, he turned his attention to subsection **(2)**, which reads -

> "Notwithstanding anything in paragraph (b) of the foregoing subsection, the sum to which priorty is to be given under those paragraphs respectively shall not, in the case of any one claimant, exceed two thousand five hundred dollars.
>
> Provided that where a claimant under the said paragraph (b) has entered into a contract for the payment of a portion of his wages in a lump sum or for the payment of a gratuity at the end of his hiring, he shall have priority in respect of the whole of such sum, or a part thereof, as the Court may decide to be due under the contract, proportionate to the time of service up to the relevant date."

Section **236(2)** was amended, with no retrospective effect, by the Companies (Amendment) Act 1990. which substituted for the words "those paragraphs respectively" the words "that paragraph".

It might perhaps be suggested that, if the Crown is right, there was no need to amend the law, in such a way that henceforward

AP1146

the section will contain the words for which the appellant now
contends.

The point at issue is a narrow one, though in matters of
interpretation there is frequently a divergence of view, as has
happened here.

The Chief Justice found that the old wording of section
**236(2)** was not ambiguous or equivocal and that there was therefore
no need for him to resort to other aids to construction. He went
on "The words of the section have to be given their plain and
ordinary meaning in the context in which they are used and
Parliament's intention is to be inferred from them".

The Chief Justice finds that the words "those paragraphs
respectively" in Section **236(2)** must refer to the various
paragraphs of Section **236(1)**.

The object of statutory interpretation is to discover the
meaning of what the Act says, and not the meaning which Parliament
would like the section to mean.

It is possible that the limitation of amount was not
intended by Parliament to apply to taxes. But this is not
necessarily so, and good sense can be made of Section **236(2)** with
such a limit, if that is **what .the** words say.

It is only if the words are not clear and unambiguous that
the legislative history can be examined to discover what the
legislature intended. But this should not be examined unless the
words used are such that a meaning cannot reasonably be derived
from them.

The words "those paragraphs respectively" must refer to
paragraphs in Section **236(2)** other than paragraph (b), which is
separately dealt with in subsection (2). The word "respectively"
connotes the plural. It must refer to the other paragraphs in
Section **236(1),** so that the limitation on the amount of money which
may be claimed in priority on a winding up is limited in relation
to taxes, as it is to all other matters contained in the various
paragraphs of Section **236(1)**.

I agree with the Chief Justice and would find accordingly.

265

1 would dismiss the appeal.


A. Warner (Attorney General's Chambers) for appellant.
D. Kessaram for respondent.

Denys Roberts

DENYS ROBERTS, P.

DATED the *16*[th] day of *July*, 1991.

266

IN THE COURT OF APPEAL FOR BERMUDA

CIVIL APPEAL NO. 8 of 1991

THE MINISTER OF FINANCE          Appellant

and

PETER L. HAWKES (Trustee)          Respondent

----------

Before:  Roberts, P.
         **Huggins,** J.A.
         Georges. J.A.

Date of Hearing:  10th July, 1991

----------

J U D G M E N T

**Huggins,** J.A.

This is an appeal against the decision of the Chief
Justice upon a construction summons by which he held that the
provisions of section **236(1)** ('a) of the Companies Act 1981 was
subject to the limitation set out in subsection (2) of that
section.  It is a short point but one which is not without
difficulty.

It is necessary to set out in full the terms of the two
subsections as they stood at the material time.  (They have since
been further amended).

"(1) In a winding up there shall be paid in
priority to all other debts -

(a)  all taxes owing to the Government and
rates owing to a municipality at the
relevant date;

(b)  all wages or salary, whether or not
earned wholly or in part by way of commission
or whether payable for time or piece work of
any enployee of the company in respect of
services rendered to the company during four
months next before the relevant date;

(c)  all accrued holiday remuneration becoming
payable to any employee, or in the case of his
death to any other person in his right, on the
termination of his employment before or by the
effect of the winding-up order or resolution;

(d)  unless the company is being wound up
voluntarily merely for the purposes of
reconstruction or of amalgamation with another
company, all amounts due in respect of
contributions payable during the twelve months
next before the relevant date by the company
as the employer of any person under the
Contributory Pensions Act 1970 or any contract

AP1149

of insurance.

(e) unless the company is being wound up voluntarily merely for the purposes of reconstruction or of amalgamation with another company, or unless the company has, at the commencement of the winding up, under a contract with insurers capable of being transferred to and vested in the workman, all amounts due in respect of any compensation or liability for compensation under the Workmen's Compensation Act 1965, being amounts which have accrued before the relevant date.

(2) Notwithstanding anything in paragraph (b) of the fore-going subsection, the sum to which priority is to be given under those paragraphs respectively shall not, in the case of any one claimant, exceed two thousand five hundred dollars:

Provided that where a claimant under the said paragraph (b) has entered into a contract for the payment of a portion'of his wages in a lump sum or for the payment of a gratuity at the end of his hiring, he shall have priority in respect of the whole of each sum, or a part thereof, as the Court may decide to be due under the contract, proportionate to the time of service up to the relevant date."

The reference to "those paragraphs respectively" in subsection (2) immediately raises the question, To which paragraphs did that reference relate? The Chief Justice took the view that the words clearly "refer back to the words 'of the foregoing subsection'" and that there was nothing ambiguous or equivocal in subsection (2). He must have asked himself what plurality of "paragraphs" had previously been mentioned and inevitably came to the conclusion that he was driven back to the paragraphs of subsection (1).

It is fundamental to the argument on behalf of the appellant that there was an ambiguity in subsection (2), which would justify introducing other aids to construction. If any such ambiguity does arise, I think it must arise from the inclusion of the words "Notwithstanding anything in paragraph (b) of the foregoing subsection" at the beginning of subsection (2). If the Legislature intended that subsection (2) should apply to all the paragraphs of subsection (1), those words would be surplusage, and one is led to ask why they were included: the whole phrase could have been omitted and the subsection would clearly have had the meaning contended for by the respondent. Alternatively the draftsman could have omitted the words "in paragraph (b) of", and

the meaning would have been the same, for **there** is nothing in
paragraph (b) itself which could possibly suggest that the rates
and taxes referred to in paragraph (a) were to be paid in full.

The fact that the draftsman saw fit to include a
specific reference to paragraph (b) suggests that that paragraph
has some special significance in relation to the substantive
provision of subsection (2). Indeed, it must suggest that
subsection (2) was intended to apply only to paragraph (b).

If that be correct, one is left with a necessary choice
between (i) saying that the opening phrase of subsection (2) is
surplusage and (ii) concluding that the words "those paragraphs
respectively" should read "that paragraph", that being a reference
to paragraph (b). That would constitute an ambiguity or difficulty
which would justify the Court in using other aids in the
construction of subsection (2).

In the event I incline to the view that there is such an
ambiguity, and when one looks at the history of this legislation it
becomes immediately apparent that the appellant's argument is
correct.

The source of section 236 of the Act of 1981 is section
319 of the Companies Act **1948** .of the United Kingdom, where the
words in question were aptly included, because the limiting
subsection was intended to relate to two paragraphs of the
preceding subsection. However. the priority provision was in 1979
(before the present consolidation Act) included in our Companies
(Winding-up) Act of that year, where the reference was not to
"those paragraphs respectively" but to "that paragraph", thus
making it clear that the limitation did not apply to rates and
taxes. I am not persuaded that in the consolidation Act the
Legislature intended to alter that situation: if it had so
intended, the draftsman would have omitted the opening phrase **of**
subsection (2). It is not without significance that the priority
provisions in the bankruptcy legislation, which are in **pari** materia
with these provisions in the Companies Act 1981. impose no
limitation on the priority to be given to rates and taxes. I

suspect that in a moment's aberration the draftsman of the consolidation Act referred back to the United Kingdom Act, and, per incuriam, treated section 319 of that act as one of the provisions which was being consolidated.  Be that as it may, I am satisfied that there was no intention to limit the priority given to any debt for rates and taxes and that this appeal should succeed. the question asked in the originating summons being answered "No: subsection (2) of section 236 of the Companies Act 1981 (as amended) does not apply to paragraph (a) of subsection (1) of the said subsection and Act".

ALAN **HUGGINS**, J.A.

DATED the 19th day of July, 1991.

A. Warner (Attorney General's Chambers) for the Appellant.
D. Kessaram (Cox & Wilkinson) for the Respondent.

AP1152

*210*

IN THE COURT OF APPEAL FOR BERMUDA

CIVIL APPEAL NO. 8 of 1991

THE MINISTER OF FINANCE        Appellant

and

PETER L. HAWKES (Trustee)        Respondent

---------

Before:   Roberts, P.
          **Huggins,** J.A.
          Georges, J.A.

Date of Hearing:   10th July, 1991

---------

J U D G M E N T

Georges, J.A.

Section 236 of the Companies Act 1981 (the Act) reads -

"(1)  In a winding up there shall be paid in priority
to all other debts -
(a) all taxes owing to the Government and rates
owing to a municipality at the relevant date;

**(b)** all wages or salary whether or not earned
wholly or in part by way of commission or whether
payable for time or piece work of any employee of
the company in respect of services rendered to
the company during four months next before the
relevant date;

**(c)**  all accrued holiday remuneration becoming
payable to any employee or, in the case of his
death to any other person in his right, on the
termination of his employment before or by the
effect of the winding-up order or resolution;

(d) unless the company is being wound up
voluntarily merely for the purposes of
reconstruction or of amalgamation with another
company, all amounts due in respect of
contributions payable during the twelve months
next before the relevant date by the company as
the employer of any persons under the
Contributory Pensions Act 1970 or any contract of
insurance;

**(e)**  unless the company is being wound up
voluntarily merely for the purposes of
reconstruction or of amalgamation with another
company, or unless the company has at the
commencement of the winding up, under a contract
with insurers capable of being transferred to and
vested in the workman, all amounts due in respect
of any compensation under the Workmen's
Compensation Act 1965, being amounts which have
accrued before the relevant date.

(2) Notwithstanding anything in paragraph **(b)** of the
foregoing subsection, the sum to which priority is to
be given under those paragraphs respectively shall
not, in the case of any one claimant, exceed two
thousand five hundred dollars.

Provided that where a claimant under the said
paragraph (b) has entered into a contract for the
payment of a portion of his wages in a lump sum or
for the payment of a gratuity at the end of his
hiring, he shall have priority in respect of the
whole of each sum, or part thereof, as the Court may
decide to be due under the contract proportionate to
the time of service up to the relevant date."

The issue for decision is whether section **236(2)** which

imposes the limit of **$2,500.00** per claimant should be applied to

paragraphs (a) to (e) of section **236(1)** or whether they should

apply only to paragraph (b) which is specifically mentioned in that

subsection.

The learned Chief Justice held that the meaning of section

**236(2)** was clear.   He stated -

"The plain and ordinary meaning is that the words
'those paragraphs respectively' as used in
subsection 2 of section 236 of the Act refer back
to the words 'of the foregoing subsection' and,
that being the case, subsection (2) applies to
paragraph (a) of subsection (1) of section 236 of
the Act."

**In** adopting this approach the Chief Justice completely

ignored the opening words of section **236(2)** -

"Notwithstanding anything in paragraph (b) of the
foregoing subsection . .."

Coming as they do at the beginning of the subsection they give a

clear indication of an Intention to qualify that paragraph and that

paragraph alone by the limitation thereafter defined.

There is further support for this intention in the opening

sentence of the proviso which follows -

"Provided that where a claimant under the said
paragraph (b) , .." [Emphasis supplied].

Doubtless the words "those paragraphs respectively" which

appear in the opening sentence of section **236(2)** do embrace all the

paragraphs in the preceding subsection and for that very reason

create an ambiguity having regard to the clear contrary intention

expressed in the opening words.

The only circumstance in which a specific reference to

paragraph (b) would have been necessary even if the intention had

not been to confine the limitation to it, was the circumstance in

which paragraph **(b)** differed in same way from paragraphs (a), (c),

272

(d) and (e) and that difference had to be overcome so as to make the limitation effective. That is not so. Under all the paragraphs (a) to (e) there could be more than one claimant and potentially any one claimant could be entitled to more than **$2,500.00**.

It is a prime rule of statutory interpretation that some attempt should be made to give meaning to all the words of an enactment. The conclusion that the meaning of the subsection is plain and obvious can only be reached by ignoring the opening words, emphasised by reason of their position and clearly intended to be a guide to its application. In effect the subsection would be read as though it stated – "Notwithstanding anything in the foregoing subsection..." omitting the words "paragraph (b) of . .." This would be a breach of a fundamental rule of construction. When effect is given to all the words one can conclude that there is an ambiguity and resort to the legislative history to resolve it.

The source of section **236(2)** of the Act is clear. It is section 319 of the Companies Act 1948 of the United Kingdom (the U.K. Act). It first became part of the law of Bermuda in the Companies (Winding-up) Act 1977. The scheme of that Act was the general adoption of the U.K. Act with such changes as were needed to fit the situation in Bermuda. Section 319 of the U.K. Act was not to apply, but was replaced by provisions essentially following those of the section 319 of the U.K. Act. Priority was accorded to the categories of indebtedness set out in paragraphs (a) to (e) of section **236(1)**.

Section **319(2)** of the Companies (Winding-up) Act 1977 reads –

> "Notwithstanding anything in paragraph (b) of the foregoing subsection, the sum to which priority is to be given under that paragraph shall not, in the case of any one claimant, exceed two thousand five hundred dollars."

Although, as has been stated, section 319 of the U.K. Act was not to apply, the language is an exact reproduction of section **319(2)** of that Act. The qualification in subsection (2) was limited to paragraph (b).

It was this section which became section **236(2)** of the Act but with the words "under that paragraph" changed to "under those paragraphs respectively".. It seems highly unlikely in the light of the replication of the entire scheme that there was an intention to introduce such a radical change.

The issue now being considered falls under paragraph (a) where the creditor is the Government ▬ an entity whose losses hardly affect the moral sensibility. Under paragraph **(e)** however, protection is afforded to sums due as workmen's compensation. It seems hardly likely that a cap would have been placed on this limiting the right of a severely injured workman to recover in full a sum to which he had become entitled prior to be winding up.

On the legislative history it seems clear that effect should be given to the opening words which specify the particular section to which the limitation is to apply.

Accordingly I would allow the appeal with costs and give the following answer to the question posed in the summons -

Subsection (2) of section 236 of the Companies Act as amended applies only to paragraph (a) of subsection (1).

P. TELFORD GEORGES, J.A.

DATED the _19th_ day of July, 1991.

A. Warner (Attorney General's Chambers) for the Appellant.
D. Kessaram (Cox & Wilkinson) for the Respondent.

AP1156

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | **Chapter 15** |
| **POINT INVESTMENTS, LTD. (IN LIQUIDATION),** | **Case No. 22-10261 (TMH)** |
| Debtor in a Foreign Proceeding.[1] | |

## DECLARATION OF CHRISTOPHER LEVERS

Pursuant to 28 U.S.C. § 1746, I, CHRISTOPHER LEVERS, of Ogier (Cayman) LLP, 89 Nexus Way, Camana Bay, Grand Cayman, Cayman Islands KY1-9009, declare as follows:

1.      I am a Partner of Ogier (Cayman) LLP, a Cayman Islands law firm.  I have been instructed by Sheppard Mullin Richter & Hampton, LLP, counsel acting for FTI GP I, LLC (the "General Partner") in its capacity as the general partner  Falcata Tech Investment Fund I, L.P. (the "Fund"), in the above-captioned proceeding, to express my opinion in relation to certain matters of Cayman Islands law (as set out below).  I understand that this Declaration will be submitted in connection with the reply (the "Reply") of the General Partner, on behalf of the Fund, in support of the *Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination That There is No Automatic Stay, or in the Alternative Seeking Relief From the Automatic Stay to Proceed With Adversary Proceeding* [ECF No. 47] (the "Motion"), and in response to the *Foreign Representatives' Objection to Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination That There is No Automatic Stay, or in*

---

[1] Point Investments, Ltd. (the "Debtor") is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769.  The Debtor's registered office is at Vallis Building, 4th Floor, 58 Par-La Ville Road, , Hamilton HM 11, Bermuda.

AP1157

*the Alternative, Seeking Relief From the Automatic Stay to Proceed With Adversary Proceeding* [ECF No. 66] (the "Objection").

2.      Unless otherwise indicated in this Declaration, capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Reply.  My compensation for providing this opinion is independent of the outcome of any proceedings in connection with the above-captioned chapter 15 case (the "Chapter 15 Case"), the adversary proceeding pending before this Court [Adv. Pro. No. 23-50122]  (the "Adversary Proceeding"), or any other associated proceedings.

## MY QUALIFICATIONS TO PROVIDE THIS DECLARATION

3.      I am an attorney licensed to practice in the Cayman Islands, having been admitted to practice in the Cayman Islands in 2011.  I am a partner at the law firm Ogier (Cayman) LLP and based in the firm's Cayman Islands office. My practice includes restructuring and corporate recovery matters and funds disputes.

4.      I earned a first class Honours Bachelor of Laws degree from the University of Liverpool in 2006 and completed the Bar Vocational Course at the Inns of Court School of Law in London in 2007.  I was subsequently called to the Bar of England and Wales as a barrister later that year.

5.      In addition to my full-time practice as an attorney, I participate in various other professional activities that relate to Cayman Islands law and the Cayman Islands legal system.  I am a member of the Recovery and Insolvency Specialists Association in the Cayman Islands and INSOL International.  I consider that I have the requisite qualifications and expertise to express my opinions on the matters that I have been asked to consider under Cayman Islands law.

AP1158

## MATTERS OF CAYMAN ISLANDS LAW CONSIDERED AND SUMMARY OF MY OPINIONS

4.      In this Declaration, I have been instructed to express my opinion on the following questions, as a matter of Cayman Islands law:

(i)      What are the overarching fiduciary duties which the General Partner has to the Fund, an exempted limited partnership, and by extension, to the Debtor, as the sole limited partner of the Fund?

(ii)     How is the General Partner required to exercise its discretion when applying the rights and remedies available to it under the terms of the Fund Agreements in circumstances where the Debtor has breached the terms of those Agreements?

I will not provide my opinion with respect to all the points made in the Objection and its supporting material, and my failure to do so should not be interpreted as acceptance by me of the matters which have not been addressed.

5.      I understand that the function of an expert on law is to state the law and explain how it applies to the facts stated in the Reply.  Accordingly, in forming my opinions, I have read copies of (i) the Motion, (ii) the Objection, (iii) the Reply, (iv) the *Declaration of Robert Burnett in Support of Objection of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. to the Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and For Damages* (the "Burnett Declaration"), (v) the *Declaration of Jayson Wood in Support of Foreign Representatives' Objection to Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination That There is No Automatic Stay, or in the Alternative, Seeking Relief From the Automatic Stay to Proceed With Adversary Proceeding*, and (vi) the

-3-

complaint in the Adversary Proceeding [ECF No. 45] and I have referred to the facts stated in those documents.

6.  As this material will be before the Court, I do not provide a detailed analysis of the matters alleged in therein, and in particular the Objection. However, I do note that the Objection alleges, in relevant part, that the General Partner breached its fiduciary duties to the Debtor, as the sole limited partner of the Fund, by designating the Debtor as a "Defaulting Partner" under the Limited Partnership Agreement upon the Debtor's default.

7.  It may assist the Court if I briefly summarize my opinions on the main issues of Cayman Islands law that arise in the above-mentioned motions:

*The General Partner's Fiduciary Duties*

The General Partner's fiduciary duties to the Fund and, by extension, to the Debtor co-exist with the contractual relationship established between the parties as set forth in the Fund Agreements. As such, the Fund Agreements will regulate the basic rights and liabilities of the parties, with the fiduciary relationship operating only in such a manner which is consistent with the terms of the Fund Agreements.

*The General Partner's Discretion to Reduce the Debtor's Rights and Entitlements Under the Fund Agreements*

In the exercise of its discretion (including in exercising any rights and remedies which the General Partner may have authority upon a default by the Debtor under the Limited Partnership Agreement), the General Partner must act honestly and in good faith, and not capriciously, arbitrarily or so outrageously in defiance of reason as to be perverse.

9.  For the Court's convenience, I have included as **Exhibit A** to this Declaration copies of legislation, commentary and cases cited herein.

-4-

## BACKGROUND TO CAYMAN ISLANDS LAW AND THE CAYMAN
## ISLANDS LEGAL SYSTEM

1.     It may be helpful if, as a starting point, I provide some background to Cayman Islands law and the Cayman Islands legal system.

2.     The legal framework of the Cayman Islands is a common-law system based upon the doctrine of precedent and deriving substantially from English law.  Disputes are dealt, in the first instance, by the Grand Court of the Cayman Islands (the "Grand Court").  Subject to certain exceptions, an appeal from a final order made by Grand Court will lie as of right to the Cayman Islands Court of Appeal, whereas an appeal from an interlocutory order can only be made with leave of the Grand Court.  A further appeal may lie to the Judicial Committee of the Privy Council (the "Privy Council") in respect of a judgment, decree, order or declaration of the Cayman Islands Court of Appeal.  The *rationes decidendi* of decisions of the Cayman Islands Court of Appeal and Privy Council in respect of appeals from the Cayman Islands courts are binding on the lower Cayman Islands courts in subsequent cases.  The Grand Court should ordinarily follow previous Grand Court decisions unless convinced they are wrong.

3.     There is a comparatively small, but growing, body of case law in the Cayman Islands, including reported decisions contained in the Cayman Islands Law Reports (the "CILR"). The Cayman Islands courts will also regard as highly persuasive relevant decisions of the superior courts of record of England and Wales and of the Privy Council on appeals from other countries, although such decisions are not, strictly speaking, binding on the Cayman Islands courts.

4.     Similarly, relevant decisions of the senior courts of record of the other jurisdictions within the British Commonwealth have persuasive value in the Cayman Islands courts where the legal principle under consideration is the same or substantially the same.

AP1161

5. Specifically, case law on exempted limited partnerships in the Cayman Islands is scant and those Cayman cases on exempted limited partnerships that are reported in the CILR relate primarily to their winding up and dissolution. There are, necessarily, no English cases relating specifically to exempted limited partnerships (since English law has no equivalent to the ELP Act (defined in paragraph 11 below), but where the issues involved deal with matter of general principle, English case law may, nonetheless, assist with the interpretation of the ELP Act.

6. I turn now to the questions which I have specifically been asked to consider and address.

## WHAT ARE THE OVERARCHING FIDUCIARY DUTIES WHICH THE GENERAL PARTNER HAS TO THE FUND, AN EXEMPTED LIMITED PARTNERSHIP, AND BY EXTENSION, TO THE DEBTOR, AS THE SOLE LIMITED PARTNER OF THE FUND?

Fiduciary Duties Under Cayman Islands Law

7. Subject to what is explained below, fiduciaries in the Cayman Islands are usually subject to a number of duties which arise by virtue of the relationship of loyalty that exists between a fiduciary and their principal, including (but not limited to) duties to: (a) act loyally, honestly and in good faith in what they consider (but not necessarily what a court might consider) is in the best interests of the principal; (b) exercise the powers vested in them for the purposes for which they are conferred and not for some personal, collateral or other improper purpose; (c) exercise independent judgment; and (d) not put themselves in a position of conflict with their principal.

8. By way of example, in the case of *Arnage Holdings Limited & Ors v Walkers (a firm)* [2019 (2) CILR 382] at [314], the Grand Court summarized the nature of a fiduciary's duties, citing the decision of Millett LJ (as he then was) in *Bristol & West Building Society v Mothew* [1998] Ch. 1 (cited also in the 34th Edition of Snell's Equity at [7-008]) as follows:

-6-

AP1162

*A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary. The core liability has several facets. A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. This is not intended to be an exhaustive list but it is sufficient to indicate the nature of fiduciary obligations. They are the defining characteristics of the fiduciary. As Dr Finn pointed out in his classic work Fiduciary Obligations (1977), p 2, he is not subject to fiduciary obligations because he is a fiduciary; it is because he is subject to them that he is a fiduciary.*

9.      Generally, these duties do not arise as a matter of statue but instead arise under the common law and is an incidence of the fact that a fiduciary is someone who has undertaken to act for or on behalf of another in circumstances which give rise to a relationship of trust or confidence. However, as I explain below, given the specific character of an exempted limited partnership, the duties owed by a general partner, as a fiduciary, must be seen through the specific statutory and contractual regime which governs these structures.

Exempted Limited Partnerships

10.      Exempted limited partnerships ("ELPs") are a corporate vehicle unique to the Cayman Islands which is derived from a combination of both English and Delaware partnership law principles, in particular. As such, it has no direct comparator.

11.      Between 1983 and 1991, when the Exempted Limited Partnership Act (the "ELP Act") was originally enacted, all partnerships were subject to the provisions of the Cayman Islands Partnership Act of 1983 (now the 2013 Revision) (the "CPA"). Partnerships were also subject to the rules of equity and the common law applicable to partnerships, which were expressly preserved by the CPA, except to the extent that they were inconsistent with the express provisions thereof.

AP1163

12.     Part VI of the CPA, which is in substantially the same terms as the English Limited Partnership Act 1907 (the "English 1907 Act"), applied only to limited partnerships.  The remaining parts of the CPA, which are in substantially the same terms as the English Partnership Act 1890, applied to all other partnerships.

13.     As the Cayman Islands increased in popularity as a jurisdiction for the formation of offshore mutual funds and private equity vehicles, it became clear that the CPA had inherited from the English 1907 Act certain provisions which made limited partnerships registered under Part VI of the CPA unsuitable for Cayman investment vehicles.  During the first and second readings of the Exempted Limited Partnership Bill (recorded in the Hansard Report of the Cayman Islands - an impartial, accurate and permanent record of parliamentary proceedings), parliament highlighted the need for a legislation "*to enable the provisions concerning the establishment and operation of a limited partnership whose business is exterior to the clients. The new vehicle – we use the word 'vehicle' in terms of it being attractive to investors in the Cayman Islands . . . . "* [Hansard Report, First and Second Reading of the Exempted Limited Partnership Bill, 1991, 26 June 1991 at 516].  In providing justification for the Bill, parliament noted that "*we here in the Cayman Islands have grown and have become known as one of the leading financial centers in the world and I think we have to guard this position very aggressively . . . I think it's important for us to continue to be creative and flexible with regards to the business environment in which we operate"*. Hansard Report, First and Second Reading of the Exempted Limited Partnership Bill, 1991, 26 June 1991 at 519.

14.     The ELP Act, enacted in 1991, created a new form of limited partnership, the exempted limited partnership, which differs significantly from limited partnerships registered under the CPA.

-8-

15.     This difference, in part, derives from the fact that, unlike most Cayman statutes, the ELP Act has no English equivalent – it was primarily based on a North American model, in particular the Uniform Limited Partnership Act as then in force in Delaware.

16.     Notwithstanding the above difference, the ELP Act provides, in section 3, that "*The rules of equity and of common law applicable to partnerships, as modified by the* [CPA] *but excluding* [the sections relating only to limited partnerships registered under the CPA]), *shall apply to an exempted limited partnership except insofar as they are inconsistent with the express provisions of* [the ELP Act]."

The Role of a General Partner in an ELP

17.     In assessing its duties, it is important to understand a general partner's role in an exempted limited partnership.

18.     An ELP has no separate legal personality and exists only as its constituent partners. In *Kuwait Port Authority v Port Link GP Ltd & Ors* (Unreported, Parker J, 25 November 2021) at paragraphs 54, Mr Justice Parker confirmed that:

> *Critically, in contrast to a company, but in common with a partnership, an [exempted limited partnership] has no separate legal personality and exists only as its constituent partners.*[2]

19.     The notion that an ELP is a collection of its partners is also reflected in section 4(2) of the ELP Act which provides that: "*An exempted limited partnership shall consist of one or more persons called general partners who shall, in the event that the assets of the exempted limited partnership are inadequate, be liable for all debts and obligations of the*

---

[2] This was accepted and affirmed by the Cayman Islands Court of Appeal in *Kuwait Port Authority v Port Link GP Ltd & Ors*, CICA (Civil) Appeal Nos 2 and 3 of 2022 (Unreported, 20 January 2023) at paragraph 56.

AP1165

*exempted limited partnership, and one or more persons called limited partners who shall not be liable for the debts or obligations of the exempted limited partnerships*".

20.    In return for this limited liability for the debts or obligations of the exempted limited partnership, the limited partners do not play any role in management of the partnership. For example, section 14(1) of the ELP Act expressly restricts a limited partner from involvement in the business of an ELP: "*A limited partner shall not take part in the conduct of the business of an exempted limited partnership in its capacity as a limited partner*".

21.    It is therefore the general partner who is responsible for the management of the exempted limited partnership and its assets and it is through the general partner that the exempted limited partnership acts.  The following are examples of the various roles which the general partner will play given its role (as provided for by the ELP Act):

    a.    Section 14(2) of the ELP Act provides that all letters, contracts, deeds, instruments or documents etc. are entered into by, or on behalf of, the general partner (or any agent or delegate of the general partner) on behalf of the ELP.

    b.    Section 16(1) of the ELP Act provides that the general partner of an ELP holds, or is deemed to hold, any partnership assets as trustee for the benefit of the partnership.

    c.    Section 33 of the ELP Act provides that legal proceedings by or against an ELP may be instituted by or against the general partner.

AP1166

General Partner's fiduciary duties

22.     Given the general partner's role, it is commonly accepted that it is a fiduciary and therefore owes duties to the ELP.  The general partner's duties arise from a mixture of common law and statute.

23.     The principal fiduciary duties are:

a.     Pursuant to section 19(1) of the ELP Act, a general partner "*must act at all times in good faith and, subject to any express provisions of the* [limited partnership agreement] *to the contrary, in the interests of the ELP*";

b.     to exercise its powers for the purposes for which they are conferred and not for some personal, collateral or other improper purpose;

c.     to exercise independent judgment; and

d.     not to put itself in a position of conflict with the exempted limited partnership.

24.     Although the ELP Act provides that a general partner of an exempted limited partnership will owe its duties to the exempted limited partnership, the Cayman Islands Courts have construed this to mean that a general partner will owe its duties to the individual limited partners.  In *Kuwait Port Authority v Port Link GP Ltd & Ors* (Unreported, Parker J, 25 November 2021), the Grand Court held at paragraphs 55 and 56 that "*[t]he fact that the partnership has no separate legal personality means that the GP of an ELP holds its rights and property of every description, including choses in action, on trust for each of the partners which make up the limited partnership as a whole . . . Moreover the GP of an ELP owes its duties to all of the individual limited partners*".

25.     It is often said that these are all different facets of the overarching duty, on the part of a fiduciary to act, at all times, in the best interests of his principal.  However, in the context of

-11-

an ELP, a general partner may contract out of the obligation to act at all times in the interests of the ELP. As I note above, section 19(1) of the ELP Act, which was introduced when the ELP Act was amended in 2014, expressly provides that the duty to act in the interests of the limited partners will be "*subject to any express provisions of the Partnership Agreement to the contrary*".

26.     In *Dorsey Ventures Limited v XiO GP Limited* [2019 (1) CILR 249] at [38], Madam Justice Mangatal considered the phrase "subject to any express or implied term of the partnership agreement" (albeit in the context of information rights under section 22 of the ELP Act) and held that, in order for the proviso to operate, it must be clear that the relevant duty (or in that case right) was expressly excluded by the terms of the limited partnership agreement in question.

27.     It follows that a general partner's duty to act in the interests of the exempted limited partnership may be excluded by the terms of the relevant limited partnership agreement, provided that the exclusion is in express terms. In my experience, such provisions are not uncommon in Cayman Islands partnership agreements. For example, a general partner may be permitted under the terms of a partnership agreement to:

    a.  Invest in the exempted limited partnership alongside the other limited partners (acting therefore as both general partner and limited partner); and/or

    b.  Have a carried interest with respect to distributions in the exempted limited partnership; and/or

    c.  Permit a conflict of interest as between the interests of the general partner and the exempted limited partnership/the limited partners; and/or

    d.  Act as a general partner for other exempted limited partnerships which invest/operate in the same market.

-12-

28.     Accordingly, while all general partners are subject to a duty of good faith, the express provisions of the limited partnership agreement will be critical in determining the extent of the fiduciary duties that may be owed to the ELP.

29.     In addition, the terms of the limited partnership agreement will also be important as the scope and operation of the various fiduciary duties owed by a general partner will not be viewed independently of the terms of the limited partnership Agreement more broadly.

30.     As a matter of general principle, the scope and operation of those fiduciary duties must accommodate themselves to the express terms of any underlying contractual arrangements by which the fiduciary duty arose.  Indeed, such duties cannot be superimposed upon a contract in such way as to alter the operation which the contract was intended to have according to its true construction.

31.     This proposition is taken from the English authority of *Hospital Products Ltd v United States Surgical Corporation* (1984) 156 CLR 41 at paragraph 70:

> *That contractual and fiduciary relationships may co-exist between the same parties has never been doubted.  Indeed, the existence of a basic contractual relationship has in many situations provided a foundation for the erection of a fiduciary relationship. In these situations it is the contractual foundation which is all important because it is the contract which regulates the basic rights and liabilities of the parties.  The fiduciary relationship, if it is to exist at all, must accommodate itself to the terms of the contract so that it is consistent with, and conforms to them. The fiduciary relationship cannot be superimposed upon the contract in such a way as to alter the operation which the contract was intended to have according to its true construction.*

32.     The Grand Court accepted this approach in *Arnage Holdings Limited et al v Walkers (a firm)* at paragraphs 329 to 330, where the former Chief Justice, approved of the following excerpt from *Ratiu v Conway* [2005] EWCA Civ 1302:

> 73.     *Where there is a contractual retainer and where it provides expressly or by implication obligations of a fiduciary nature, such obligations must clearly prevail,*

-13-

*or "mould" or "inform" the fiduciary nature of the contractual relationship . . . So much seems to be clear from the historic development and continued separate existence of the notion of a fiduciary relationship and one created purely by contract. It is clearly acknowledged in the following passage from the judgment of Mason J in Hospital Products Ltd v United States Surgical Corporation . . . .*

*74.      Mason J's approach is instructive in that, whilst it subordinates the effect of a fiduciary relationship to the terms of any concurrent contract . . . . "*

33.      Whilst this is not a point which has arisen before the Cayman Islands Court's previously in the context of exempted limited partnerships, I am confident that that they would adopt a similar approach; particularly where the existence of the fiduciary aspects of the relationship between a general partners and its limited partners arise solely as a result of the parties' contractual relationship as embodied in the Limited Partnership Agreement.

34.      For completeness, I note that while there are no authorities in the Cayman Islands which have considered the duties of a general partner in the context of an exempted limited partnership with a sole limited partner, and as a matter of general legal principle there is no reason why the approach set out above should be not be adopted in that circumstance.

### HOW IS THE GENERAL PARTNER REQUIRED TO EXERCISE ITS DISCRETION WHEN APPLYING THE RIGHTS AND REMEDIES AVAILABLE TO IT UNDER THE TERMS OF THE FUND AGREEMENTS IN CIRCUMSTANCES WHERE THE DEBTOR HAS BREACHED THE TERMS OF THOSE AGREEMENTS?

35.      There are very limited commonwealth authorities which have considered the exercise of a discretion by a general partner and there are no reported judgments by the Cayman Islands Courts on the issue. However, in the partnership context, the courts in England have generally drawn on the principles developed to regulate contractual discretions and applied them to partnership agreements *mutandis mutatis*.

-14-

36.     The leading text on the law of partnership, Banks, Lindley & Banks on Partnership (21st ed (1st supp), Sweet & Maxwell 2022), comments at paragraph [10-201] on the exercise of a discretion by partners in a partnership as follows:

> *Where a discretion is conferred on one or more partners, it hardly needs to be said that the discretion must be exercised honestly, in good faith and for a proper purpose. The ultimate benchmark against which such an exercise must be measured is what is in the best interests of the partnership as a whole and the fact that one or more partners may be disadvantaged thereby is not, in itself objectionable. It would seem to follow from this that, as a normal rule, such a power cannot be exercised capriciously or arbitrarily or, indeed, irrationally, i.e. taking into account irrelevant matters, ignoring relevant matters or exercising the power for an irrelevant or unintended purpose or otherwise in bad faith.*

37.     This principle was applied in the decision of *Greck v Henderson Asia Pacific Equity Partners (FP) LP* [2008] CSOH 2. The dispute in question concerned the exercise of a general partner's discretion to designate a departing limited partner as a "Bad Leaver". The consequence of that designation was to reduce the departing limited partner's entitlements to carried interest in partnership assets to its obvious detriment.

38.     The limited partner sought a declaration that he was a "Good Leaver" on several grounds, one of which was that the general partner ought to have exercised a discretion to disregard his status as a "Bad Leaver" for the purposes of calculating his entitlements.

39.     In deciding the issue, Lord Glennie, applying the ratio of the decision in *Ludgate Insurance Co Ltd v Citibank NA* [1998] 1 Lloyd's Rep 397 at [35], held that when exercising a discretion, a general partner was under a duty to do so honestly and in good faith for the purposes for which it was conferred, and not capriciously, arbitrarily or so outrageously in defiance of reason as to be perverse. The Court confirmed that, in assessing the general partner's conduct, the scope (in terms of subject matter and assets) of the limited partnership agreement would be relevant.

-15-

AP1171

40.     As a matter of basic logic and principle, and as demonstrated by *Greck v Henderson Asia Pacific Equity Partners (FP) LP*, when seeking to exercise a discretion which would invariably harm the interests of a limited partner, a general partner is not required to act in the best interests of that limited partner.  Otherwise, a general partner would never be able to exercise the discretion granted to it under a limited partnership agreement to, for example, sanction a limited partner for breach of its duties under the limited partnership agreement.

41.      In my view, this position would not be changed by the fact that the Debtor is the sole limited partner of the Fund.

42.     In this connection, I consider that the following matters to be highly relevant (which I understand to be common ground):

a.   The Master Transaction Agreement was entered into in by the Debtor and the General Partner on 1 July 2019;

b.   At that time, the Fund was either in, or was to soon be, in the process of winding down its operations;

c.   At the time of the entry into the Master Transaction Agreement, the Debtor was the sole limited partner of the Fund and it was understood that the parties did not intend for any other limited partner to be admitted to the partnership given the Fund's wind-down being in effect; and

d.   The Master Transaction Agreement, which was negotiated and agreed by, *inter alia*, the Debtor and the General Partner, amended various provisions of the Limited Partnership Agreement.  However, the parties did not elect to agree any amendment of Limited Partnership Agreement with respect to the various

-16-

provisions dealing with the consequences of a default by the Debtor, despite it being the sole limited partner.

43. Accordingly, the terms of the Limited Partnership Agreement and the Master Transaction Agreement did not, expressly or by implication, remove the General Partner's discretion to designate the Debtor as a Defaulting Partner.

44. In my view, consistent with the authorities discussed above, the General Partner is not required to take into account the Debtor's best interests when exercising its discretion and its duty when determining whether or not to exercise that discretion is to do so honestly and in good faith for the purposes for which it was conferred, and not capriciously, arbitrarily or so outrageously in defiance of reason as to be perverse.

## CONCLUSION

For the reasons I have given, my opinions are as stated in this Declaration, I declare under penalty of perjury under the Laws of the United States of America that the foregoing is true and correct.

Dated this 9 th day of May 2023

Signed: _____, Christopher Levers

-17-

AP1173

**Exhibit A**


**Part 1**

# 1. - Loyalty

**Snell's Equity 34th Ed.**

**Mainwork**

**Part 3 - Equitable Protection**

**Chapter 7 - Fiduciaries**

**Section 2. - General Nature of Fiduciary Duties**

**1. - Loyalty** [75]

**7-008**   "The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary." [76] This obligation of loyalty has several facets, which are addressed separately below. Millett LJ provided a non-exhaustive list of those facets in his judgment in *Bristol & West Building Society v Mothew*, which is "widely regarded as a masterly survey of the modern law of fiduciary duties" [77] :

> "A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal." [78]

The fundamental fiduciary obligation of loyalty comprises two related themes. [79] The first prohibits a fiduciary from acting in a situation where there is a conflict between the fiduciary's duty and his or her interest: "the objective is to preclude the fiduciary from being swayed by considerations of personal interest". [80] The second prohibits a fiduciary from making a profit out of his or her fiduciary position: "the objective is to preclude the fiduciary from actually misusing his position for his personal advantage". [81] It has been suggested that the second of these two themes is merely an instance of the first. [82] In most cases where the profit theme applies, the fundamental conflict theme will also capture the situation and give rise to liability on the part of the fiduciary. [83] The profit theme developed out of the conflict theme, [84] but has reached the point where it applies without the need for any conflict analysis. [85] In other words, the two principles largely overlap but there may be cases where the two do not necessarily both apply. [86]

The two themes are often addressed separately in respect of the same factual situation. [87] The two themes are, therefore, considered separately below, but the overlap in their application and their entwined development must be borne in mind to comprehend fully the nature of fiduciary loyalty. Both themes "are canons of the court of equity which have their foundation, not in the actual commission of fraud, but in that hallowed orison, 'lead us not into temptation'". [88]

A further, more recent, development has been the recognition of principles which prohibit a fiduciary from acting in a situation where there is a conflict between the duties which he owes to more than one principal. These have developed out of the rule regarding conflicts between duty and interest, but have developed into a separate doctrine and so they are addressed separately below.

## Footnotes

[75]   For a detailed examination of the fiduciary concept of loyalty, see M. Conaglen, Fiduciary Loyalty: Protecting the Due Performance of Non-Fiduciary Duties (2010). See also *M. Conaglen, "The Nature and Function of Fiduciary Loyalty" (2005) 121 L.Q.R. 452.*

© 2023 Thomson Reuters.

76    *Bristol & West Building Society v Mothew [1998] Ch. 1* at 18; *Boulting v Association of Cinematograph, Television & Allied Technicians [1963] 2 Q.B. 606* at 636; *KLB v British Columbia [2003] 2 S.C.R. 403; (2003) 230 D.L.R. (4th) 513* at [48]; *Chirnside v Fay [2004] 3 N.Z.L.R. 637* at [51]; *Sinclair Investment Holdings SA v Versailles Trade Finance Ltd [2005] EWCA Civ 722* at [20]; *Ultraframe (UK) Ltd v Fielding [2005] EWHC 1638 (Ch)* at [1285]–[1288]; *Gibson Motorsport Merchandise Pty Ltd v Forbes [2006] FCAFC 44 at [11]; (2006) 149 F.C.R. 569; Stevens v Premium Real Estate Ltd [2009] NZSC 15 at [67]; [2009] 2 N.Z.L.R. 384; Sinclair Investments (UK) Ltd v Versailles Trade Finance Ltd [2010] EWHC 1614 (Ch)* at [26]; *Rossetti Marketing Ltd v Diamond Sofa Co Ltd [2012] EWCA Civ 1021* at [20]; *Adventure Golf Systems Australia Pty Ltd v Belgravia Health & Leisure Group Pty Ltd [2017] VSCA 326* at [124].

77    *Johnson v EBS Pensioner Trustees Ltd [2002] EWCA Civ 164* at [37].

78    *Bristol & West Building Society v Mothew [1998] Ch. 1* at 18.

79    *Australian Securities and Investments Commission v Citigroup Global Markets Australia Pty Ltd (No.4) [2007] FCA 963* at [291]; *South Australia v Peat Marwick Mitchell & Co (1997) 24 A.C.S.R. 231, 264; Sinclair Investments (UK) Ltd v Versailles Trade Finance Ltd [2010] EWHC 1614 (Ch)* at [29]; *Grimaldi v Chameleon Mining NL (No.2) [2012] FCAFC 6 at [178]; (2012) 200 F.C.R. 296; Ancient Order of Foresters in Victoria Friendly Society Ltd v Lifeplan Australia Friendly Society Ltd [2018] HCA 43 at [67]–[69]; (2018) 360 A.L.R. 1.*

80    *Chan v Zacharia (1984) 154 C.L.R. 178* at 198 (quoted with approval in *Don King Productions Inc v Warren [2000] Ch. 291* at [40]).

81    *Chan v Zacharia (1984) 154 C.L.R. 178* at 199 (quoted with approval in *Don King Productions Inc v Warren [2000] Ch. 291* at [40]).

82    See, e.g. *Broughton v Broughton (1855) 5 De G.M. & G. 160* at 164 (43 E.R. 831 at 833); *Bray v Ford [1896] A.C. 44* at 51; *Boardman v Phipps [1967] 2 A.C. 46* at 123; *New Zealand Netherlands Society "Oranje" Inc v Kuys [1973] 1 W.L.R. 1126* at 1129; *Ratiu v Conway [2005] EWCA Civ 1302* at [59]; *Huntington Copper & Sulphur Co (Ltd) v Henderson (1877) 4 S.C. (4th Series) 294* at 299; *FHR European Ventures LLP v Cedar Capital Partners LLC [2014] UKSC 45 at [5]; [2015] A.C. 250.*

83    See, e.g. *Boston Deep Sea Fishing & Ice Co v Ansell (1888) 39 Ch. D. 339* at 355, 357.

84    See generally *A. McClean, "The Theoretical Basis of the Trustee's Duty of Loyalty" (1969) 7 Alberta L. Rev. 218.*

85    See, e.g. *Re Lewis (1910) 103 L.T. 495; Regal (Hastings) Ltd v Gulliver [1967] 2 A.C. 134n.* at 144–145, 153, 159; *Brown v Inland Revenue Commissioners [1965] A.C. 244* at 256, 265; *Boardman v Phipps [1967] 2 A.C. 46* at 100–101, 103, 105, 118; *Queensland Mines Ltd v Hudson (1978) 18 A.L.R. 1* at 4.

86    *Oceanic Life Ltd v HIH Casualty & General Insurance Ltd [1999] NSWSC 292* at [42].

87    See, e.g. *Don King Productions Inc v Warren (No.1) [2000] Ch. 291* at [40], [42]–[43]; *Quarter Master UK Ltd v Pyke [2004] EWHC 1815 (Ch)* at [53]–[55], [70]–[72]; *Ultraframe (UK) Ltd v Fielding [2005] EWHC 1638 (Ch)* at [1305]–[1306]; *John Taylors v Masons [2001] EWCA Civ 2106 at [20]–[28], [2005] W.T.L.R. 1519; O'Donnell v Shanahan [2009] EWCA Civ 751* at [52]–[76].

88    *Wormley v Wormley 21 U.S. (8 Wheat.) 421 at 463; 5 L. Ed. 651* at 662 (1823). See also *Ross River Ltd v Cambridge City Football Club Ltd [2007] EWHC 2115 (Ch)* at [250], mentioning the "propensity" for misconduct that a bribe creates.

---

**End of Document**                    © 2022 Sweet & Maxwell

© 2023 Thomson Reuters.

**[2019 (2) CILR 382]**

# ARNAGE HOLDINGS LIMITED and FOUR OTHERS v. WALKERS (a firm)

GRAND CT. (Smellie, C.J.) July 24th, 2019

*Attorneys-at-Law — obligations towards client — lawyer–client relationship — on application for summary judgment against attorney on liability for breach of contractual and fiduciary duties of confidence, trust and loyalty, client must establish existence of lawyer–client relationship, existence of attendant duties, actionable breaches of duties and proof of causation of some loss*

The plaintiffs brought proceedings against the defendant for breach of contractual and fiduciary duties of confidence, trust and loyalty, and tortious duties of care.

The plaintiffs were companies and individuals who represented the interests of the Rabellos, a prominent Brazilian family. The Rabellos held extensive business interests in Brazil and elsewhere, including in banking, land holding, finance, hospitality and other areas of industry, in the form of a conglomerate named the "Rural Group." Banco Rural was the flagship of the group operating more than 100 branches throughout Brazil and with subsidiaries abroad. The family also owned Trade Link Bank ("TLB"), a licensed Cayman bank incorporated by the defendant to conduct investments for the Rabello family.

The first and second plaintiffs were Cayman Islands companies which were owned and controlled by the fourth plaintiff, Katia Rabello, who represented her family's interests as well as her own. The third plaintiff was a Cayman Islands company of which the registered shareholder was the fifth plaintiff, Fernando Toledo, a close and trusted friend and business associate of the Rabellos. The defendant was a major Cayman Islands law firm which provided legal services in the Cayman Islands and other jurisdictions. The plaintiffs claimed that there was a longstanding lawyer–client relationship with the defendant, which the defendant had betrayed by acting for a Dr. Braga, a Brazilian court-appointed trustee-in-bankruptcy. The defendant largely denied the existence of a lawyer–client relationship and entirely denied any liability for the alleged losses.

The evidence revealed that there had been a longstanding lawyer–client relationship between the defendant and the Rabellos, including Katia Rabello and Fernando Toledo. Many retainers and engagements had been undertaken by the defendant over the course of a number of years. The

382

relationship began in 1984 when the defendant was engaged by Katia Rabello's father to incorporate TLB. In 1998, the third plaintiff ("EFHL") was incorporated by the defendant, instructed by Katia Rabello's father, to hold the family's majority shares in TLB. Following the father's death, the defendant transferred the share in EFHL to Fernando Toledo. The defendant also acted for the Rabello family for the transmission of the father's estate in the Cayman Islands. In 2000, the defendant acted for the first and second plaintiffs and TLB in connection with a note facility (the note purchase transaction) by which Securinvest Holdings S.A. provided a $40m. note to the first and second plaintiffs for onward sale to TLB, in return for financing from TLB for the carrying out of Securinvest's business in Brazil. That involved the defendant being satisfied that, as was in fact the case, the common interest purpose and beneficial ownership of all parties for whom it acted were held in common with the Rabello family (including Katia Rabello as 50% beneficial owner of the first and second plaintiffs and 10% ultimate beneficial owner of Securinvest).

Dr. Braga alleged collusion between Katia Rabello's father and the principal of a different group of companies, the Petroforte Group. Dr. Braga alleged that Katia Rabello's father had used Securinvest and another Rural entity in collusion with the principal of the Petroforte Group (which was later placed into bankruptcy) to defraud creditors of Petroforte. A transaction ("the Sobar transaction") had been entered into in 2000 when Petroforte, the parent of Sobar, was alleged to have become bankrupt. It was alleged that Katia Rabello's father and the principal of Petroforte colluded to strip away Sobar assets from the Petroforte Group, putting them out of reach of creditors by use of a Rural Group entity and, later, Securinvest.

In 2006, the Brazilian Central Bank contacted the Cayman Islands Monetary Authority in respect of its investigation into links between the Rabello family, Banco Rural and TLB. The CIMA provided information as to the shareholdings in TLB, namely that the majority shareholder was Katia Rabello's father until November 1998, after which it was EFHL, represented by Katia Rabello's father. In 2007, CIMA, on behalf of the BCB, issued a formal direction to TLB to provide documents, including a copy of the register of officers and directors of TLB. In May 2007, the defendant was engaged by a Mr. Macaulay (Miami counsel) on behalf of TLB to provide legal advice on resisting the CIMA direction. This was expressly stated to be to maintain the confidentiality of any further connections between TLB and the Rabello family. The BCB, in breach of its undertaking to CIMA, publicly disclosed the information provided, which linked the Rabello family to TLB. The information was used in criminal proceedings against Katia Rabello and other family members. In August 2009, the defendant was again engaged, this time to seek his advice on obtaining the possible intervention of the Cayman Islands Attorney General and/or CIMA, with the BCB or the Brazilian courts to prevent the CIMA disclosure from being further "abused" in the criminal proceedings, to the detriment of the Brazilian defendants.

383

The defendant was retained by Dr. Braga in April 2010 in the context of a long-running battle between Dr. Braga as trustee in-bankruptcy of the Petroforte Group and the Rabello family and their Rural Group, concerning the alleged stripping away of the Sobar assets. Although the Rural Group claimed the Sobar transaction was not a sham and had in fact been approved by the Brazilian courts, Dr. Braga had commenced a revocation action in 2006 and obtained a secured lien over the Sobar assets. Dr. Braga commenced bankruptcy proceedings against Securinvest, seeking to bring all Securinvest assets into the Petroforte bankruptcy, relying on the Brazilian legal theory of "common economic group." The legal theory would be established unless it could be shown that Securinvest (as the destination of the Sobar assets) was itself owned by third parties having no connection to either the Rural Group or the Petroforte Group. Dr. Braga persuaded a Brazilian judge to make an order *ex parte* in August 2007 extending the Petroforte bankruptcy over Securinvest. Securinvest appealed against the August 2007 bankruptcy order but the Tribunal de Justicia de São Paulo affirmed the order. Securinvest also appealed unsuccessfully to the Superior Tribunal de Justicia ("STJ"). Evidence was presented to the STJ on behalf of Securinvest which sought to show that there was no interest on behalf of the Rabellos or the Rural Group in Securinvest which, it was argued, was ultimately owned by Costa Rican individuals through Costa Rican companies, as the registered owners of the first and second plaintiffs. In reality, that structure was an artifice put in place on the instructions of Katia Rabello. When this came to light, Dr. Braga persuaded the STJ that he should be allowed to come to the Cayman Islands to investigate further into the ultimate beneficial owner of Securinvest, through the first and second plaintiffs.

Katia Rabello explained that her reason for lying to the STJ by obscuring her status as the owner of the first and second plaintiffs, and thus the ultimate beneficial owner of Securinvest, was not to defraud creditors of Petroforte but to prevent the wholesale confiscation of Securinvest's assets and even greater harm to the Rabellos' interests.

Dr. Braga retained the defendant. The first application made on Dr. Braga's behalf relying on the *Norwich Pharmacal* principle sought orders addressed to Equity Trust for disclosure of information held on behalf of the first and second plaintiffs (as the registered owners of Securinvest). The application was made *ex parte.* It resulted in orders in May 2010 for the disclosure to Dr. Braga of confidential information showing *inter alia* that Katia Rabello was the ultimate beneficial owner of Securinvest through the first and second plaintiffs. A "gagging" order was obtained, preventing Equity Trust from notifying the plaintiffs of the existence of the proceedings and the orders. A second such application was made to CIBC as a previous service provider, resulting in an order directed to CIBC for disclosure. The information sought and obtained in the orders exceeded that which showed the ultimate beneficial owner of Securinvest and included other information held by the respondents about the plaintiffs' financial affairs. The court required Dr. Braga to give certain

384

undertakings to limit the use and disclosure of the confidential information obtained.

Dr. Braga deployed the Cayman disclosure in support of a new *ex parte* petition in Brazil for the extension of the Petroforte bankruptcy to Katia Rabello personally and other identifiable entities of the Rural Group, which petition was granted. The Cayman disclosure was also placed before the STJ. The Cayman disclosure was provided to the Brazilian Central Bank which it was pleaded resulted in regulatory action against Banco Rural, with punitive damages sought against Banco Rural and Katia Rabello personally. The plaintiffs claimed that the consequences of the defendant's breach of duties to them had been catastrophic.

The plaintiffs claimed that the longstanding lawyer–client relationship with the defendant had been betrayed by the defendant's breach of contractual and fiduciary duties, causing massive loss. It was alleged that the breaches of duty related to obtaining confidential information for Dr. Braga relating to the first and second plaintiffs and the note purchase transaction, along with information revealing that Katia Rabello was the ultimate beneficial owner of Securinvest through the first and second plaintiffs.

There were two cross-applications presently before the court. The first was that of the plaintiffs for summary judgment on liability on the basis that the defendant had no arguable defence to their claims. The second was an application by the defendant to strike out the plaintiffs' claims on the basis that the claims had no prospect of success and were an abuse of process of the court.

The plaintiffs submitted that (a) in relation to the May 2007 retainer, the defendant could not have been in any doubt as to its obligation to maintain and protect the confidentiality of the information when approached by Dr. Braga; (b) in relation to the August 2009 retainer, it should also have been clear that the defendant's clients were those, including Katia Rabello, facing possible conviction in Brazil as a result of the abuse of the CIMA disclosure by the BCB; (c) while she had never dealt personally with the defendant, Katia Rabello had relied on the defendant to act on her behalf regarding all Cayman legal matters that affected her; (d) the defendant had betrayed the trust and confidence between it and the Rabello family by disloyally acting on behalf of Dr. Braga; (e) that amounted to a serious and flagrant breach of the defendant's fiduciary, contractual and tortious duties and was a gross breach of confidence; (f) the extensive disclosure of the confidential information obtained by Dr. Braga in the Cayman Islands with the assistance of Dr. Braga directly influenced the rejection of the appeal against the extension of the Petroforte bankruptcy to Securinvest as it was pivotal in the finding that there was a common economic group; (g) the consequences of the defendant's breaches had been catastrophic for the plaintiffs, leading to multiple legal proceedings in various countries, an investigation by the BCB and extremely harmful publicity in Brazil, and ultimately leading to Banco Rural being taken over by the BCB; (h) significant losses had unarguably been incurred both in terms of legal

385

costs and damages, so that summary judgment should be granted though quantum could be assessed later; (i) the court should also exercise its supervisory jurisdiction and order compensation for breach of the professional conduct rules; and (j) there was no collateral attack on the Brazilian judgments or invitation to conclude that the Brazilian judgments were wrong.

The defendant submitted that (a) although it was admitted that there was a fiduciary duty to existing clients not to prefer the defendant's own interests over those of the existing clients, that duty had not been breached; (b) the fiduciary duty did not apply in relation to Katia Rabello and Fernando Toledo as the defendant's lawyer–client relationship was with the corporate plaintiffs rather than their beneficial owners; (c) the defendant had not breached its duty of confidentiality in relation to the May 2007 retainer by later acting for Dr. Braga; (d) every retainer with the plaintiffs had expired apart from the 2000 note purchase transaction retainer; (e) it was an impermissible collateral attack upon the judgments of the Brazilian courts to submit that the common economic group theory was misapplied; (f) there was no causation of loss to Katia Rabello as she would ultimately have been released from the Petroforte bankruptcy if Securinvest itself had been ultimately released; (g) the loss was also the result of Katia Rabello's own misconduct in trying to obfuscate the fraudulent relationship between Securinvest and Petroforte; (h) the position was to be considered according to a hypothetical "reasonably competent" attorney, and any other competent attorney would have inevitably obtained the disclosure that Katia Rabello was the ultimate beneficial owner of Securinvest; and (i) the plaintiffs were required to elect between remedies before obtaining summary judgment on liability.

**Held, granting summary judgment for the plaintiffs on liability:**

(1) The evidence showed that there was a longstanding lawyer–client relationship between the defendant and the Rabellos including Katia Rabello and, through Fernando Toledo's dealings with the defendant on his own behalf and on behalf of the Rabellos, with him as well. This conclusion emerged from an examination of many retainers and engagements undertaken by the defendant over the course of a quarter of a century (paras. 39–40; paras. 1, 9–140).

(2) The plaintiffs' arguments—that, had they been given notice of the defendant's applications to the Grand Court on behalf of Dr. Braga, they could at least have applied for protective measures to contain the unwarranted misuse of the information in Brazil, or to have persuaded the court to refuse or revoke the orders for disclosure—were well grounded in probability. In essence, the claim of the plaintiffs was for loss of opportunity to seek remedial relief as a result of the defendant's actions in obtaining the *ex parte* orders on behalf of Dr. Braga. It was established for the purposes of summary judgment on liability that, at a minimum, there was as pleaded a loss of the earliest opportunity for the plaintiffs to defend themselves in the context of the proceedings before the Grand Court. The

386

loss of opportunity arose from the defendant's actions on behalf of Dr. Braga. The denial of opportunity buttressed the plaintiffs' claims for breach of duty and consequential damages. Ultimately the plaintiffs would also need to establish to the civil standard of proof the various alleged losses as the result of the averred loss of opportunity (paras. 173–175; paras. 195–200).

(3) For the grant of summary judgment, the plaintiffs had to establish the existence of the lawyer–client relationship, the existence of the attendant duties, actionable breaches of those duties and proof of causation of some loss.

(4) Whether there was a lawyer–client relationship in respect of each plaintiff was an exercise to be undertaken by an examination of all the circumstances of the case. The lawyer–client relationship was based on general concepts of contract and the specific contract of a retainer. Whether a relationship existed was a question of fact. There was no need for a person to formally retain a lawyer by way of a letter or other document, nor for an account to be rendered or a bill paid. The court must look to a number of factors to ascertain whether such a relationship existed. The relevant indicia were: (i) a contract or retainer; (ii) a file opened by the lawyer; (iii) meetings between the lawyer and the party; (iv) correspondence between the lawyer and the party; (v) a bill rendered by the lawyer to the party; (vi) a bill paid by the party; (vii) instructions given by the party to the lawyer; (viii) the lawyer acting on the instructions given; (ix) statements made by the lawyer that the lawyer was acting for the party; (x) a reasonable expectation by the party about the lawyer's role; (xi) legal advice given; and (xii) any legal documents created for the party. Not all indicia needed to be present, rather the question was whether a reasonable person in the position of a party with the knowledge of all the facts would reasonably have formed the belief that the lawyer was acting for a particular party. Further, the indicia were not exhaustive. Other indicia could include a situation where a lawyer acted for a company knowing that its interests were identical or closely aligned with the interests of its beneficial owners who themselves came to depend on the lawyer–client relationship. In the present case it was obvious that, when applied to the facts, the indicia served to identify each of the plaintiffs as clients of the defendant. The circumstances of the present case required the lifting of the corporate veil to prevent the defendant from denying the existence of the relationship of trust and confidence which had clearly developed, not merely between the incorporated plaintiffs and the defendant, but also between the individual plaintiffs (Katia Rabello and Fernando Toledo) and the defendant. The fiduciary nature of the lawyer–client relationship imposed duties on the fiduciary beyond the duty not to disclose confidential information. It included a duty of loyalty and good faith not to act against the interests of the client (paras. 300–305; paras. 312–316).

387

(5) As the court found the defendant's assertion that Katia Rabello and Fernando Toledo were never its clients to be wrong, the defence had no prospect of success as against those plaintiffs' claims for breaches of duty. That conclusion was unavoidable in light of the continuing nature of the duty of confidence. That a duty of confidence had arisen as owed by the defendant to the plaintiffs when their confidential information was imparted to the defendant was indisputable. A duty of confidence arose when confidential information came to the knowledge of a person in circumstances where he had notice, or was held to have agreed, that the information was confidential, with the effect that it would be just in all the circumstances that he should be precluded from disclosing the information to others. In light of the existence of the lawyer–client relationship with the plaintiffs and the patent conflict of interest in acting for Dr. Braga, the defendant's denial of the breach of duty was completely untenable. Irrespective of the existence of a formal or express contractual retainer, a lawyer would owe and continue to owe the fiduciary duties and obligations of trust, confidence and loyalty if the circumstances of his relationship with his client gave rise to those duties. In the present case, there were two express contractual retainers: the May 2007 retainer (to contain the impact of the CIMA disclosure to the BCB) and the August 2009 retainer (to protect the Brazilian defendants). The other retainers also incontrovertibly existed, as evidenced by their circumstances, including correspondence between the defendant and Fernando Toledo or Mr. Macaulay. Each retainer gave rise to the lawyer–client relationship and to the attendant duties and obligations of trust, confidence and loyalty, which survived the expiry of any retainer which had in fact expired. In light of the court's conclusions that the August 2009 retainer obviously covered all those persons known to the defendant to have been in jeopardy in Brazil, especially Katia Rabello and Fernando Toledo, and that it continued until well after the Braga retainer, it must be concluded that the defendant placed itself into an irreconcilable conflict of duty and interest when it accepted the Braga retainer. In so doing, the defendant acted in breach of its duties owed to Katia Rabello and Fernando Toledo. The defendant throughout remained under a continuing duty of trust and confidence in respect of all retainers not to disclose, nor take steps contrary to its clients' interests to disclose, their confidential information. It followed that the defendant should not have accepted the Braga retainer. In acting for Dr. Braga against the plaintiffs and their interests, the defendant had breached the duties and obligations of trust, confidence and loyalty owed to the plaintiffs. While the court did not find that the defendant had acted knowingly and deliberately in breach, the breaches were nonetheless serious and clear. No explanation had been offered by the defendant (paras. 321–341).

(6) As the conduct of the defendant in acting for Dr. Braga was the subject of the plaintiffs' claim, the position of a hypothetical "reasonably competent" attorney was not relevant to the outcome. The defendant's proposition that it should be excused from liability for its own breaches of

388

duty because some other attorney not owing those duties would have achieved the same results for Dr. Braga was untenable. The court was satisfied that the defendant did owe to each plaintiff the contractual and fiduciary duties of care, confidence and loyalty and that these duties were breached by the defendant. The breach was, for present purposes, proven not just by the obtaining and disclosure of the Cayman disclosure, but also by enabling or facilitating its adverse use against the plaintiffs (paras. 342–359).

(7) The defendant argued that whatever breaches it might have committed, there was a break in the chain of causation of loss when Katia Rabello's lie was revealed resulting in the STJ's final dismissal of Securinvest's appeal. The defendant's argument went only to the question of Katia Rabello's duty of disclosure to the STJ and her failure to meet that duty. The argument did not address the case in relation to the loss of opportunity to appear before this court and to prevent the wider abuse of the Cayman disclosure in Brazil against Katia Rabello and Fernando Toledo and the consequences arising from that wider abuse. This argument of the defendant on causation could be relevant, if at all, only to the loss of Securinvest's assets as that was the issue affected by the duty of disclosure to the STJ. That was so notwithstanding the defendant's further argument that had Securinvest been released from the Petroforte bankruptcy, so would Katia Rabello have been released. The converse situation had to be considered as well: had she not been taken into the Petroforte bankruptcy in the first place as a result of the abuse of the Cayman disclosure, she would not have remained in it, whatever the outcome for Securinvest. Moreover, if Securinvest was ultimately released and consequentially Katia Rabello as well there would still have been significant losses sustained in the meantime such as could be attributed to the defendant's breaches of duty. The assessment of quantum would proceed on the basis of the court's conclusion that the Cayman disclosure was the cause of the losses to be quantified (paras. 365–371).

(8) The fourth element to be established by the plaintiffs beyond argument was that some loss was caused by the defendant's breaches of duty. Given the size of the claim, this must be significant in amount. If the plaintiffs could at this stage establish only some *de minimis* amount, it would be an abuse of process to allow the action to proceed (para. 390).

(9) Each of the plaintiffs claimed, in the alternative, (i) damages; (ii) equitable compensation; or (iii) an account of profits. As regarded (ii) and (iii), there was an election to be made by the plaintiffs. The basic principle was that the plaintiff must choose when, but not before, judgment was given in his favour and the judge was asked to make orders against the defendant. The plaintiffs were not required to elect between remedies before obtaining summary judgment on liability (paras. 396–400).

(10) In respect of the available remedies, as the defendant had been found liable for breaches of fiduciary as well as contractual duties, the

389

plaintiffs were entitled to claim compensation on two different bases: equitable compensation or damages at common law. Equitable compensation was now firmly recognized in English law as a remedy for breaches of fiduciary obligations. There was a clear distinction to be observed between the traditional remedies for breach of fiduciary duty involving non-disclosure by the fiduciary of his interest in a transaction affecting a client or for a fraudulent breach of trust and a claim for damages for breach of fiduciary duty. In the former set of circumstances, the non-disclosure rendered the transaction voidable at the election of the client and considerations as to the causative effect of the non-disclosure did not arise. In the latter set of circumstances, the case law explained the requirement for showing a causal link such that it would be inappropriate to regard there as being a general principle of general application. Accordingly, in their claims for compensation for loss caused by the defendant's breaches of fiduciary duty, the plaintiffs must establish causation. However, in assessing compensation, the objective was to compensate for the consequences of the breach of fiduciary duty and in so doing a common-sense view had to be taken of what loss occurred from the breach and so fell to be compensated. The remedy was truly compensatory, not punitive and so there was no power to make an exemplary award. Any claims for compensation for breach of the contractual duties (or in negligence for breach of tortious duties of care if pursued) must be proven on the usual common law bases (paras. 404–419).

(11) The plaintiffs also claimed that the defendant's conduct was such that the court should exercise its supervisory jurisdiction and order compensation for breach of the professional conduct rules. While there were compelling arguments on which to respond to the allegations in the defence, the court was not persuaded that they provided the distinct and separate basis required for the invocation of the court's supervisory jurisdiction leading to the making of an award of compensation or an award of wasted costs. Given the supervisory and summary nature of the jurisdiction to impose wasted costs orders, as well as the debatable question whether it might be used to make an extensive award for unliquidated damages of the sort claimed by the plaintiffs in the present case, this was not a suitable case for its application, egregious though the breaches of duty appeared to be. The plaintiffs had other clear remedies of equitable compensation for breaches of fiduciary duties or damages for breaches of contractual duties open to them (para. 421; paras. 426–427).

(12) The court was satisfied that the plaintiffs had shown that they had suffered some loss. The court was satisfied for the purposes of summary judgment on liability (and subject to specific proof at assessment of quantum), that the plaintiffs had suffered the following pecuniary losses, connected to legal fees and disbursements caused by the litigation engendered by the Cayman disclosure: (i) legal fees and disbursements incurred by Brazilian counsel in respect of (a) the court proceedings in Brazil; (b) the BCB investigation; and (c) proceedings outside Brazil in excess of

390

US$15m.; (ii) legal fees and disbursements incurred by Cayman Islands counsel in the Cayman Islands proceedings and assisting in proceedings outside the Cayman Islands in excess of US$850,000; (iii) legal fees and disbursements incurred by US counsel in connection with the US proceedings and assisting in proceedings outside the US in excess of US$1m.; (iv) legal fees and disbursements incurred by BVI counsel in connection with BVI proceedings and assisting in proceedings outside the BVI in excess of US$100,000; and (v) legal fees and disbursements incurred in Belize in connection with Belize proceedings and assisting in proceedings outside Belize in excess of US$25,000. Other much larger claims, such as for the loss of the assets of Securinvest and Banco Rural, must satisfy the causation tests (paras. 428–430).

***The defendant's strike-out application***

(13) It was an inescapable conclusion that the presentation of the Costa Rican structure to the STJ was—as Katia Rabello admitted when pressed in the present proceedings—an artifice capable of misleading the STJ. The issue in the present proceedings was whether her lie to the STJ could be invoked by the defendant in support of its *ex turpi causa* defence, to the extent of striking out the plaintiffs' claims because they failed to disclose a reasonable cause of action or were an abuse of the process of the court. Katia Rabello's explanation for her lie to the STJ was highly relevant. She claimed that her lie had no fraudulent intent primarily because, had the STJ been misled, the result would not have been the successful extraction of the contentious Sobar assets from Petroforte. Instead, had the STJ acted on her misrepresentations, allowed Securinvest's appeal and reversed the extension of the Petroforte bankruptcy over it, the validity of the Sobar transaction would have remained to be resolved in the context of the revocation action. Further, that Dr. Braga would then have been obliged not merely to allege fraud but to prove it in the revocation action. Securinvest's non-Sobar assets, to which he could have had no entitlement to claim, would therefore very likely have remained where they belonged (with Securinvest) because he would not have been able to prove the alleged fraudulent intermeddling in the Petroforte estate. The *bona fides* of Katia Rabello's explanation was a matter of fact which could not be resolved without a trial, including cross-examination as to her intentions. The plaintiffs' case was therefore not amenable to being struck out simply because (on the defendant's view) it depended on Katia Rabello's intention to deceive the STJ. In light of her explanation, the defendant could not have succeeded with its strike-out application on the summary basis relying solely on its interpretation of her intentions in lying to the STJ. The defendant needed to show that her explanation was not an arguable or plausible response to its allegations of illegality. The onus was on the defendant to do so and, given her untested and therefore as yet unrefuted explanations, the onus was not discharged. As a recent judgment of the UK Supreme Court (*Patel* v. *Mirza*) had explained, a claim could no longer be dismissed simply by reliance on the doctrine of *ex turpi causa.* Applying those principles, it readily became apparent why the defendant's

391

strike-out application based on the *ex turpi causa* doctrine was bound to fail. Moreover, there were no allegations of illegality on the part of EFHL or Fernando Toledo. Accordingly, to the extent that those plaintiffs could show loss or damage caused by the Cayman disclosure, the defendant could not argue that their claims were unsustainable or an abuse of process. In so far as Katia Rabello was concerned, she had made no admission of illegal conduct nor had she been convicted of any in relation to the pivotal issue of the extension of the Petroforte bankruptcy. Her transgression appeared to have been the fact of her beneficial ownership of Securinvest and her lie to the STJ about that fact. There was no reliance in her pleaded case on any illegality as between herself and anyone (including the defendant). Her case was that the defendant had breached its duties and obligations owed to her and that those breaches resulted in loss and damage, in turn the result of court and regulatory actions in Brazil. She did not rely on her own impugned conduct. The defendant had failed to explain why the plaintiffs' claims should be barred on the basis of the modern restatement of the illegality principle. Any fraudulent intent behind Katia Rabello's lie to the STJ was a matter for cross-examination at the assessment of loss stage and could only go to the question of causation of loss, not to the defendant's liability for breaches of duty (paras. 434–465).

(14) The court had a well-settled jurisdiction (both as a matter of its inherent powers and expressly from GCR O.18, r.19) to strike out claims which amounted to an abuse of its process. The categories of conduct which might render a claim liable to being struck out for being frivolous, vexatious or otherwise an abuse of process were not closed but depended on all the relevant circumstances, and considerations of public policy and the interests of justice might be very material. The defendant argued that the plaintiffs' claims were a collateral attack on the Brazilian judgments and that in effect the plaintiffs sought to re-litigate the consequences of those judgments by challenging the correctness of the judgments under Brazilian law as well as the integrity of the judges who decided them. The plaintiffs claimed that it was not a challenge to the validity of the Brazilian judgments to seek to recover from the defendant the losses which were incurred as the result of the defendant's actions resulting in those judgments. It was difficult to see why the plaintiffs' claims should be struck out as an abuse of process. Despite the critical tenor of much of the plaintiffs' pleadings and arguments, as the plaintiffs' case did not depend on the court having to conclude in any way contrary to the Brazilian judgments, there could be no finding of a collateral attack on those judgments. The defendant's strike-out application for abuse of process would be dismissed (paras. 466–468; paras. 479–483).

**Cases cited:**

(1) *AB Jnr.* v. *MB*, 2013 (1) CILR 1, considered.
(2) *AIB Group (UK) plc* v. *Mark Redler & Co. Solicitors*, [2014] UKSC 58; [2015] A.C. 1503; [2014] 3 W.L.R. 1367; [2015] 1 All E.R. 747;

392

[2015] 2 All E.R. (Comm) 189; [2015] WTLR 187; (2015), 18 ITELR 216, referred to.
(3) *Al-Ibraheem v. Bank of Butterfield Intl. (Cayman) Ltd.*, 2000 CILR 38; further proceedings, 2000 CILR 277; further proceedings, 2000 CILR 507, referred to.
(4) *Al-Sabah* v. *Maple & Calder*, 1994–95 CILR 471, considered.
(5) *Associated Bulk Carriers Ltd.* v. *Koch Shipping Inc.*, *The Fuohsan Maru*, [1978] 2 All E.R. 254; [1978] 1 Lloyd's Rep. 1; (1978), 7 B.L.R. 24, referred to.
(6) *Att. Gen.* v. *Blake (Jonathan Cape Ltd., third party)*, [2001] 1 A.C. 268; [2000] 3 W.L.R. 625; [2000] 4 All E.R. 385; [2001] IRLR 36, *dicta* of Lord Nicholls of Birkenhead followed.
(7) *Att.-Gen.* v. *Guardian Newspapers Ltd. (No. 2)*, [1990] 1 A.C. 109; [1988] 3 All E.R. 545, referred to.
(8) *Attorney-at-Law, In re an*, 1988–89 CILR N–1, referred to.
(9) *Bankers Trust Co.* v. *Shapira*, [1980] 1 W.L.R. 1274; [1980] 3 All E.R. 353, referred to.
(10) *Bolkiah (Prince Jefri)* v. *KPMG*, [1999] 2 A.C. 222; [1999] 2 W.L.R. 215; [1999] 1 All E.R. 517; [1999] 1 BCLC 1; [1999] C.L.C. 175; [1999] P.N.L.R. 220, *dicta* of Lord Millett considered.
(11) *Bristol & West Bldg. Socy.* v. *Mothew*, [1998] Ch. 1; [1997] 2 W.L.R. 436; [1996] 4 All E.R. 698, referred to.
(12) *Campbell* v. *MGN Ltd.*, [2004] UKHL 22; [2004] 2 A.C. 457; [2004] 2 All E.R. 995, referred to.
(13) *Canson Enterprises Ltd.* v. *Boughton & Co.*, [1991] 3 SCR 534; 1991 CanLII 52 (SC); 85 DLR (4th) 129; [1992] 1 WWR 245; 1 BCLR (2d) 1, referred to.
(14) *Carl Zeiss Stiftung* v. *Rayner & Keeler Ltd. (No. 2)*, [1967] 1 A.C. 853; [1966] 3 W.L.R. 125; [1966] 2 All E.R. 536, referred to.
(15) *Castrique* v. *Imrie*, [1861–73] All E.R. Rep. 508; (1870), L.R. 4 H.L. 414; 39 L.J.C.P. 350; 3 Mar. L.C. 454; 19 W.R. 1, referred to.
(16) *Castro* v. *Murray* (1875), L.R. 10 Ex. 213, referred to.
(17) *Chiefs of Ontario* v. *Ontario*, 2003 CanLII 32351; [2003] O.J. No. 580, referred to.
(18) *Clark Boyce* v. *Mouat*, [1994] 1 A.C. 428; [1993] 4 All E.R. 268, considered.
(19) *Dane* v. *Mortgage Ins. Corp.*, [1894] 1 Q.B. 54, referred to.
(20) *Davey* v. *Bentinck*, [1893] 1 Q.B. 185, referred to.
(21) *Dawkins* v. *Prince Edward of Saxe Weimar, Willis* v. *Earl Beauchamp* (1886), 11 P. 59, referred to.
(22) *Deutsch-Südamerikanische Bank A.G.* v. *Codelco*, 1996 CILR 1, referred to.
(23) *Douglas* v. *Hello! Ltd. (No. 3)*, [2005] EWCA Civ 595; [2006] Q.B. 125; [2005] 3 W.L.R. 881; [2005] 4 All E.R. 128; [2005] 2 FCR 487; [2005] HRLR 27, referred to.
(24) *Drabinsky* v. *KPMG* (1998), 41 OR (3D) 565, *dicta* of Ground, J. followed.

393

(25) *Drummond-Jackson* v. *B.M.A.*, [1970] 1 W.L.R. 688; [1970] 1 All E.R. 1094, referred to.
(26) *Edwards* v. *Davis* (1888), 4 T.L.R. 385, referred to.
(27) *European Asian Bank AG* v. *Punjab & Sind Bank (No. 2)*, [1983] 1 W.L.R. 642, [1983] 2 All E.R. 508; [1983] 1 Lloyd's Rep. 611; [1983] Com LR 128, referred to.
(28) *Fennoscandia Ltd.* v. *Clarke*, [1999] 1 All E.R. (Comm) 365, considered.
(29) *Gartside* v. *Outram* (1857), 26 L.J. Ch. (N.S.) 113, *dictum* of Wood, V.-C. referred to.
(30) *Goddard* v. *Gray* (1870), L.R. 6 Q.B. 139, referred to.
(31) *Gray* v. *Lewis, Parker* v. *Lewis* (1873), 8 Ch. App. 1035, referred to.
(32) *Grovewood Holdings plc* v. *James Capel & Co. Ltd.*, [1995] Ch. 80; [1995] 2 W.L.R. 70; [1994] 4 All E.R. 417; [1994] 2 BCLC 782; [1995] BCC 760, referred to.
(33) *Harris* v. *Digital Pulse Pty. Ltd.*, [2003] NSWCA 10, referred to.
(34) *Henderson* v. *Henderson*, [1843–60] All E.R. Rep. 378; (1843), 3 Hare 100; 67 E.R. 313, considered.
(35) *Hilton* v. *Barker Booth & Eastwood (a firm)*, [2005] UKHL 8; [2005] 1 W.L.R. 567; [2005] 1 All E.R. 651; [2005] P.N.L.R. 23, referred to.
(36) *House of Spring Gardens Ltd.* v. *Waite*, [1991] 1 Q.B. 241; [1990] 2 All E.R. 990, referred to.
(37) *Hunt* v. *R.M. Douglas (Roofing) Ltd.*, [1990] 1 A.C. 398; [1988] 3 W.L.R. 975; [1988] 3 All E.R. 823, referred to.
(38) *Hunter* v. *Chief Const. (West Midlands)*, [1982] A.C. 529; [1981] 3 W.L.R. 906; [1981] 3 All E.R. 727, considered.
(39) *Johnson* v. *Gore Wood & Co.*, [1999] BCC 474; on appeal, [2002] 2 A.C. 1; [2001] 2 W.L.R. 72; [2001] 1 All E.R. 481; [2001] 1 BCLC 313, followed.
(40) *ICP Strategic Credit Income Fund Ltd., In re*, 2014 (1) CILR 314, referred to.
(41) *Les Laboratoires Servier* v. *Apotex Inc.*, [2014] UKSC 55; [2015] A.C. 430; [2014] 3 W.L.R. 1257; [2015] 1 All E.R. 671; [2014] Bus. L.R. 1217; [2015] R.P.C. 10, considered.
(42) *London Loan & Savings Co.* v. *Brickenden*, [1934] 3 D.L.R. 465, followed.
(43) *Lunnun* v. *Singh, The Times*, July 18th, 1999, English C.A., 1999 WL 477360, applied.
(44) *Maes Finance Ltd.* v. *A. Phillips & Co.*, English High Ct., March 12th, 1997, unreported, referred to.
(45) *Martin Boston Co.* v. *Roberts*, [1996] P.N.L.R. 45, referred to.
(46) *Midland Bank* v. *Hett, Stubbs Kemp*, [1979] Ch. 384; [1979] 3 All E.R. 571, referred to.
(47) *Moore* v. *Lawson* (1915), 31 T.L.R. 418, referred to.
(48) *Myers* v. *Elman*, [1940] A.C. 282; [1939] 4 All E.R. 484; (1939), 162 L.T. 113; 56 T.L.R. 177; 109 L.J.K.B. 105, considered.

394

(49) *Nassau Steam Press* v. *Tyler* (1894), 70 L.T. 376, referred to.
(50) *National Comm. Bank Jamaica Ltd.* v. *Olint Corp. Ltd.*, [2009] UKPC 16; [2009] 1 W.L.R. 1405; [2009] Bus. L.R. 1110; [2009] 1 CLC 637; [2009] 5 LRC 370, applied.
(51) *Nocton* v. *Ashburton (Lord)*, [1914] A.C. 932; [1914–15] All E.R. Rep. 45, referred to.
(52) *Norwich Pharmacal Co.* v. *Customs & Excise Commrs.*, [1974] A.C. 133; [1973] 3 W.L.R. 164; [1973] 2 All E.R. 943; [1974] R.P.C. 101; [1973] F.S.R. 365, considered.
(53) *Omni Secs. Ltd. (No. 3), In re, 1998 CILR 275*, referred to.
(54) *Patel* v. *Mirza*, [2014] EWCA Civ 1047; [2015] 1 Ch. 271; [2015] 2 W.L.R. 405; [2015] 1 All E.R. 326; [2014] WTLR 1567; [2015] 1 BCLC 256; on appeal, [2016] UKSC 42; [2017] A.C. 467; [2016] 3 W.L.R. 399; [2017] 1 All E.R. 191, followed.
(55) *Quayum* v. *Hexagon Trust Co. (C.I.) Ltd.*, 2002 CILR 161, referred to.
(56) *R.* v. *Speid*, 1983 Carswell Ont 1333; [1983] O.J. No. 2441, referred to.
(57) *R & T Thew Ltd.* v. *Reeves (No. 2)*, [1982] Q.B. 1283; [1982] 3 W.L.R. 869; [1982] 3 All E.R. 1086, considered.
(58) *R.P. Howard Ltd.* v. *Woodman Matthews & Co.*, [1983] BCLC 117; [1983] Com. L.R. 100, considered.
(59) *Rankin* v. *Scott, 2008 CILR N* [9], referred to.
(60) *Ratiu* v. *Conway*, [2005] EWCA Civ 1302; [2006] 1 All E.R. 571, followed.
(61) *Roberts* v. *Plant*, [1895] 1 Q.B. 597, referred to.
(62) *Robinson & Co.* v. *Lynes*, [1894] 2 Q.B. 577, referred to.
(63) *Safeway* v. *Twigger*, [2010] EWCA Civ 1472; [2010] 3 All E.R. 577, referred to.
(64) *Stephens* v. *Hill* (1842), 10 M & W 28, referred to.
(65) *Swain* v. *Hillman*, [2001] 1 All E.R. 91; [2001] C.P. Rep. 16; [1999] C.P.L.R. 779; [2000] P.I.Q.R. P51; [1999] T.L.R. 745, referred to.
(66) *Swindle* v. *Harrison*, [1997] 4 All E.R. 705; [1997] 2 P.N.L.R. 641, considered.
(67) *Tang Man Sit* v. *Capacious Invs.*, [1996] A.C. 514, considered.
(68) *Target Holdings Ltd.* v. *Redferns*, [1996] A.C. 421; [1995] 3 W.L.R. 352; [1995] 3 All E.R. 785; [1995] CLC 1052, considered.
(69) *Thomas, In re*, [1894] 1 Q.B. 747, referred to.
(70) *Thomas* v. *Bunn*, [1991] 1 A.C. 262; [1991] 2 W.L.R. 27; [1991] 1 All E.R. 193, referred to.
(71) *Tinsley* v. *Milligan*, [1994] 1 A.C. 340; [1993] 3 W.L.R. 126; (1994), 68 P. & C.R. 412, considered.
(72) *Trillium Motor World Ltd.* v. *General Motors of Canada Ltd.*, 2015 ONSC 3824, followed.
(73) *Turner* v. *Toleman*, English C.A., January 15th, 1999, unreported, referred to.

395

(74) *Udall (t/a Udall Sheet Metal & Co.)* v. *Capri Lighting Ltd.*, [1988] 1 Q.B. 907; [1987] 3 W.L.R. 465; [1987] 3 All E.R. 262, considered.
(75) *Wenlock* v. *Moloney*, [1965] 1 W.L.R. 1238; [1965] 2 All E.R. 871, referred to.
(76) *Yat Tung Inv. Co. Ltd.* v. *Dao Heng Bank Ltd.*, [1975] A.C. 581, referred to.

**Legislation construed:**
Grand Court Rules, O.14, r.1:
    "1. (1) Where in an action to which this rule applies a statement of claim has been served on a defendant and that defendant has given notice of intention to defend the action, the plaintiff may, on the ground that the defendant has no defence to a claim included in the writ, or to a particular part of such a claim, or has no defence to such a claim or part except as to the amount of any damages claimed, apply to the Court for judgment against the defendant.
        (2) This rule applies to every action begun by writ in the Court other than—
        (a)    an action which includes a claim by the plaintiff for libel, slander, malicious prosecution or false imprisonment;
        (b)    an admiralty action in rem; or
        (c)    an action to which Order 86 applies."
O.14A, r.1: "(1) The Court may, upon the application of a party or of its own motion, determine any question of law or construction of any document arising in any cause or matter at any stage of the proceedings where it appears to the Court that—
        (a)    such question is suitable for determination without a full trial of the action; and
        (b)    such determination will finally determine (subject only to any possible appeal) the entire cause or matter or any claim or issue therein.
        (2) Upon such determination the Court may dismiss the cause or matter or make such order or judgment as it thinks just.
        (3) The Court shall not determine any question under this Order unless the parties have either—
        (a)    had an opportunity of being heard on the question; or
        (b)    consented to an order or judgment on such determination.
        (4) Nothing in this Order shall limit the powers of this Court under Order 18, rule 19 or any other provision of these Rules."
O.18, r.19(1): The relevant terms of this sub-rule are set out at footnote 4.

*A. Day*, Q.C., *A. Akiwumi* and *R. Annette* for the plaintiffs;
*M. Simpson*, Q.C., *S. Said* and *A. Snead* for the defendant.

1    **SMELLIE, C.J.:** The plaintiffs are companies and individuals who represent the interests of the Rabellos, a prominent Brazilian family.

396

2   The first and second plaintiffs are Cayman Islands companies which are owned and controlled by the fourth plaintiff, Katia Rabello. She represents her family's interests, as well as her own, in this action. The third plaintiff is another Cayman Islands company of which the registered shareholder is the fifth plaintiff, Fernando Toledo. Fernando Toledo is a close and trusted friend and business associate of the Rabellos, regarded by them as a *de facto* member of the family. He has personal claims and supports the claims of the Rabellos in this action.

3   Lying at the heart of the dispute before the court is the plaintiffs'—and through them the Rabellos'—claim to a longstanding lawyer–client relationship with the defendant. It is a relationship which the plaintiffs claim existed for many years and which the defendant betrayed. This alleged betrayal is pleaded to have resulted in massive losses which the plaintiffs seek to recover in this action.

4   The defendant is a major Cayman Islands law firm which provides legal services in the Cayman Islands and in other jurisdictions. It largely denies the existence of the lawyer–client relationship with the plaintiffs, and denies entirely any liability for the alleged losses.

5   Before the court for resolution now are two cross-applications. The first is that of the plaintiffs for summary judgment on liability, on the basis that the defendant has no arguable defence to their claims. The second, that of the defendant for the striking out of the plaintiffs' claims, is presented on the basis that the claims have no prospect of success and are an abuse of the process of the court.

6   These antithetical and opposing applications are emblematic of this hostile litigation which has been marred throughout by allegations and counter-allegations of abuse.[1]

7   Despite that history, the arguments in support of the claims and those for the defence must now be addressed on these cross-applications.

8   The plaintiffs sue, more particularly, for breach of contractual and fiduciary duties of confidence, trust and loyalty and tortious duties of care;[2] claims which are said to have arisen from the defendant's betrayal of their lawyer–client relationship.

———————————

1   Including two earlier contested hearings before this court, one by the plaintiffs successfully challenging orders for disclosure (about which more below) and the other, a strike-out application brought by the defendant against the plaintiffs, alleging that the plaintiffs had abused the process of this court by failing to disclose and deliberately suppressing highly relevant evidential material about proceedings in Brazil. That acrimonious application consumed 14 days of court time in April–May 2016 and confrontational cross-examination of witnesses. It was eventually rejected for reasons given in a judgment delivered on August 10th, 2016.

2   Although no claims in tort for breaches are particularized, claims for contractual and fiduciary breaches of duty are at pp. 52–54. In the statement of claim in the prayers at pp. 68–69, there are however, what appear to be claims in tort for "aggravated and exemplary damages" and "damages for breach of duty of care." In so far as these may depend upon the defendant's breaches of the duty of confidence, the English Court of Appeal have said that an action for breach of confidence did not fall to be considered as a "tort" for the purposes of English law: see *Douglas* v. *Hello! Ltd. (No. 3)* (23). Note however, as the authors of *Jackson & Powell on Professional Liability*, 7th ed. (2012), comment (at 101) that Lord Nicholls in *Campbell* v. *MGN Ltd.* (12) ([2004] UKHL 22, at, *inter alia* para. 14), referred to the cause of action for breach of confidence as a tort, at least in the context of a claim which concerned the misuse of private information. In the context of this case, it will be necessary for the plaintiffs to prove their losses under any one of the proven heads of liability. There are also pleaded claims for damage to the reputation of Katia Rabello said to have arisen from the publication of the Cayman disclosure in Brazil (paras. 194–196 of the statement of claim) about which I expressed strong doubts during exchanges with counsel at the hearing as these appear to be tantamount to claims in defamation and to which the usual defences would apply.

9   The focus of the plaintiffs' grievances is the conduct of the defendant in acting for a third party, a Dr. Afonso Braga, a Brazilian court-appointed trustee in bankruptcy. Dr. Braga is regarded by the plaintiffs as their arch nemesis, he having pursued and rendered the Rabello family interests, including Katia Rabello herself and her interests, bankrupt in Brazil.

10   It is uncontroverted that in aid of Dr. Braga's campaign against the plaintiffs, the defendant obtained the disclosure of the plaintiffs' confidential information in this jurisdiction by way of *ex parte* (without notice) applications to this court and provided that information to be deployed by Dr. Braga against them in Brazil.

11   This conduct of the defendant is the basis upon which the plaintiffs seek summary judgment on liability, asserting, as already mentioned, that the defendant has no arguable defence[3] to their claims.

12   Upon being granted summary judgment on liability, the plaintiffs would next move for the trial and assessment of the quantum of the consequential losses.

13   The defendant for its part either denies the existence of the lawyer–client relationship or where, in the case of any of the plaintiffs, it is either admitted or is to be found to have existed, denies any breach of duty and pleads that the plaintiffs, by their own unlawful conduct in Brazil, are the authors of their own misfortune.

---

3   Citing Grand Court Rules, O.14, r.1.

14   This, the defendant pleads, is largely the result of Katia Rabello having been found by the Brazilian courts to be complicit in fraudulent misconduct, including having been found to have deceived the Brazilian courts. This is misconduct which the defendant also pleads was the justification for Dr. Braga's campaign in bankruptcy against the Rabello interests.

15   On that basis, says the defendant, the plaintiffs' claims against it are for losses which are the consequences of fraudulent conduct and cannot be maintained without either raising an impermissible collateral attack upon judgments of the Brazilian courts or without reliance upon their own, and in particular Katia Rabello's, illegal conduct. That, for those reasons also, the defendant is entitled to the striking out of the plaintiffs' claims now.[4]

16   Framed in those conflicting terms, it was immediately apparent that the plaintiffs' application for summary judgment and the defendant's strike-out cross-application were not readily given to resolution on the summary basis upon which such applications are typically to be heard and decided. For even while important matters of fact were incontrovertible (and so not requiring of trial to proof),[5] some factual issues were complicated. Complex issues of law also arose for determination but none which could not also be determined without the need for a full trial and as contemplated by the rules where the determination of points of law could result in the disposal of the entire case or of an important aspect of the case.[6]

17   Accepting that allowing the entire dispute to go instead to a full trial on all the issues would certainly have involved a more costly and acrimonious exercise, I acceded to the taking of the cross-application at this stage.

---

4   Citing Grand Court Rules, O.18, r.19(1) which states, as relied upon by the defendant here:
"19. (1) The Court may at any stage of the proceedings order to be struck out or amended any pleading or the indorsement of any writ in the action, or anything in any pleading or in the indorsement, on the ground that—
   (a)   it discloses no reasonable cause of action or defence, as the case may be; or
   . . .
   (d)   it is otherwise an abuse of the process of the court . . ."
5   Very importantly in this regard for the purposes of establishing liability on the summary basis, is the fact that there was a very limited number of documents to be examined, comprised in less than 100 pages and compiled at my request by the plaintiffs' attorneys and presented in a single bundle entitled "Plaintiffs' selection of documents relating to various retainers." The contents of these documents very much speak for themselves.
6   See Grand Court Rules O.14A, r.1.

399

18   I was satisfied, on the basis of the settled principles for the taking of such applications, and as a matter of better case management, that the issues of liability (on the plaintiffs' case) and the strike-out arguments (on the defendant's case) were sufficiently amenable to resolution on the incontrovertible facts to allow for their summary determination at this stage.

19   I was also satisfied that proper case management in the case called for a split trial of liability and quantification of loss, the latter being likely to itself involve a substantial hearing once liability was established.

20   The plaintiffs' application for summary judgment on liability is predicated upon the absence of a reasonable defence.[7] This is the test to be applied to the assessment of the pleadings and the evidence as to liability, without the need for a trial of facts which may properly be disputed.[8] The policy of GCR O.14 is to prevent delay in cases where there is no real defence. See *European Asian Bank AG* v. *Punjab & Sind Bank (No. 2)* (27),[9] *per* Goff, L.J. (as he then was). And where, in an action for unliquidated damages such as the present, the *liability* of the defendant can be clearly and readily established, the case law is also clear that the court should give judgment for the plaintiff with costs for damages and interest thereon to be assessed. In those circumstances, the statutory interest[10] on the damages awarded will run, not from the date of judgment on liability, but from the date of the judgment which assessed or recorded the damages payable to the plaintiff, see *Thomas* v. *Bunn* (70).[11]

---

7     See Grand Court Rules O.14, r.1(1) which states:
    "Where in an action to which this rule applies a statement of claim has been served on a defendant and that defendant has given notice of intention to defend the action, the plaintiff may, on the ground that the defendant has no defence to a claim included in the writ, or to a particular part of such a claim, or has no defence to such a claim or part except as to the amount of any damages claimed, apply to the Court for judgment against the defendant."

8     See variously, *Roberts* v. *Plant* (61); *Robinson & Co.* v. *Lynes* (62); *Dane* v. *Mortgage Ins. Corp.* (19); *Nassau Steam Press* v. *Tyler* (49); *Edwards* v. *Davis* (26).

9     [1983] 1 W.L.R. at 654. See also as an example of the application of the principles in the local case law: *In re Omni Secs. Ltd. (No. 3)* (53) and *Rankin* v. *Scott* (59), citing *Swain* v. *Hillman* (65).

10    To be awarded in this jurisdiction pursuant to s.34 of the Judicature Law (2017 Revision).

11    The Notes to RSC O.14(4)(2) explain that, in relation to costs, such interest will run from the date of the judgment or order for costs, even though this is before the costs have been taxed (*Hunt* v. *R.M. Douglas (Roofing) Ltd.* (37)). And, where unliquidated damages are claimed but there is a triable issue as to the quantum of damages, the court has no power to give judgment for part of the damages or to give conditional leave to defend in respect of part of the damages, unless the court is satisfied that such part of the damages can be clearly identified and quantified and that such ascertained part of the damages is undisputedly due (*Associated Bulk Carriers Ltd.* v. *Koch Shipping Inc.* (5)). On the other hand, in such a case, the court has power to make an order for an interim payment of such amount as it thinks just, not exceeding a reasonable proportion of the damages which the plaintiff is likely to recover.

21   In the case of the defendant's strike-out cross-application on grounds of abuse of process, proper case management also called for its resolution now. A primary consideration here was that the issues would be largely subsumed within those to be heard on the plaintiffs' case for summary judgment.

22   The hearings on the cross-applications commenced on May 22nd–24th, 2018 when they were adjourned, part-heard, to December 5th, 2018.[12] They eventually concluded on December 20th, 2018, after a total of 14 days of argument (involving also the cross-examination of one important witness, Mr. Robert Macaulay, about whom more below). These circumstances developed because, in order to ascertain whether the defendant had an arguable or reasonable defence to the claims on liability, and without usurping the functions of a trial judge, it was necessary to make some assessment of the evidence supporting the plaintiffs' claims in this regard. Indeed, it was also necessary to determine the defendant's strike-out application based as it was on the proposition of the plaintiffs' having no prospect of success and their case being an abuse of the process.[13]

23   Having acquired a sufficient understanding of the facts and law to be able to arrive at a determination of both applications on the summary basis, this is the judgment on both, with reasons for my conclusions.

**The plaintiffs' burden**

24   As discussed above, and as will be more fully explained below in the factual context, the plaintiffs, without the court having to be called upon to try disputed issues of fact, each needed to establish that the defendant has no arguable or reasonable defence to the essential elements of their respective claims on *liability* for the breaches of duty claimed.

25   These elements, to be fully examined below, are (i) the existence of the lawyer–client relationship and the concomitant duties of confidence, loyalty and care; (ii) breaches of those duties; (iii) the causation of loss arising from the breaches; and (iv) as further regards causation at this stage, proof that *some* identifiable loss was caused for which the respective plaintiff would be entitled to compensation.

---

12   Due primarily to my unavailability taking another complex trial.
13   See for this approach in principle, as discussed in *In re Omni* (53) (1998 CILR at 279–280 and 291).

AP1196

26   In respect of each plaintiff, I am satisfied that these elements of claim have been proven, such that each plaintiff is entitled to the pronouncement of summary judgment on liability against the defendant, with the assessment of quantum of loss to be set for trial.

27   It follows that the defendant failed in its strike-out cross-application which required establishing that the plaintiffs' claims disclosed no reasonable cause of action and were an abuse of the process of the court.[14]

28   However, for reasons which will also be explained, the defendant will remain entitled, at the trial of quantum, to challenge the plaintiffs' claims as they allege any particular causative link between the conduct of the defendant and any particular head of loss. This, as the plaintiffs accept, will all be subject to the principles of the case law on equitable compensation or damages, on the basis that the duties proven to have been breached by the defendant were fiduciary or contractual in nature.

29   While at this summary judgment stage the plaintiffs were able, as required, to establish that some significant losses were sustained as the result of the defendant's breaches of duty, in respect of the largest heads of claim for loss, the causative links between the defendant's breaches and those losses remain to be established to the civil standard of proof. Those remain as a primary subject of the trial to come on quantum, as will also be further explained below.

**The factual background to the plaintiffs' claim to the lawyer–client relationship**

30   While all the plaintiffs, including the incorporated entities, are linked to the Rabello family, the nature and extent of the relationship between the defendant and the Rabellos themselves is of central importance to the dispute.

31   The Rabellos held extensive business interests in Brazil and elsewhere, in banking (Banco Rural), land holding, finance, hospitality, and other areas of industry, in the form of a conglomerate named the Rural Group.[15]

32   Banco Rural was the flagship of the group. It operated more than 100 branches throughout Brazil and had a number of subsidiaries abroad, such

---

14   See GCR O.18, r.19, to be discussed below.

15   Apart from Banco Rural, other notable Rural entities include Rural Leasing S.A. Arrendamento Mercantil ("Rural Leasing"), Rural International Inc., a Florida corporation ("Rural International"), Rural Securities Inc., another Florida corporation ("Rural Securities") and Investcred Companhia Securitizadora de Creditos Financeiros ("Investcred") which was renamed in May 2003 as Securinvest Holdings S.A. ("Securinvest"). Securinvest figured prominently in events in Brazil.

402

as Banco Rural Europa S.A. (Portugal); Rural International Bank ("RIB") in Nassau, Bahamas, and IFE Banco Rural in Uruguay.

33   The majority shareholder in Banco Rural was Trapezio S.A., a Brazilian company which was itself majority owned and controlled by the Rabello family.

34   The family also owned Trade Link Bank ("TLB"), a licensed Category B Bank in this jurisdiction. While neither a subsidiary nor a legal affiliate of Banco Rural (which, as a Brazilian entity was separately regulated in Brazil), the family's interests in TLB carried significant repercussions in Brazil and these must also be examined.

35   As Mr. Toledo avers in his first affidavit—following almost three years of materially adverse regulatory, financial and reputational consequences, Banco Rural was placed into compulsory liquidation by the Brazilian Central Bank ("the BCB") in August 2013.

36   Banco Rural's demise is sought to be attributed by the plaintiffs, at least in significant part, to the defendant's breaches of duty. However, the plaintiffs' losses in this regard, as in regard to other heads of losses, are not yet fully particularized. The plaintiffs, through Mr. Akiwumi, acknowledged during the hearing that full particulars will have to be pleaded once the case is set for trial on quantum.[16]

37   It was nonetheless accepted by Mr. Akiwumi that it was essential at this stage for the grant of summary judgment on liability, that—given the size of the claim—some significant loss must be proven. This was, therefore, the basis upon which this summary judgment application was taken.

**The defendant's admissions**

38   While the defendant makes no admission as to breach of duty or any consequential loss, it makes limited admissions as to the existence of the lawyer–client relationship. It admits that such a relationship existed in relation to the first, second and third plaintiffs but denies its existence in relation to the fourth and fifth plaintiffs—Katia Rabello and Fernando Toledo.

---

16   It is also appropriate to note here that upon the assessment of quantum of losses, the court will be called upon to address the question of what is the proper basis. Will it be equitable compensation for breach of the fiduciary duties of confidence and loyalty (as the plaintiffs claim) or will it be the common law "but for" test which will require the respective plaintiff to establish the causative link between the breaches of duty and any particular head of loss (as the defendant asserts)? This too will be discussed below.

403

39   The undisputed evidence reveals, however, that there was, indeed, a long-standing relationship between the defendant and the Rabellos, including Katia Rabello and through Fernando Toledo's dealings with the defendant on his own behalf and on behalf of the Rabellos, with him as well.

40   This conclusion emerges from an examination of many retainers and engagements undertaken by the defendant over the course of a quarter of a century.

**The TLB retainer in 1984**

41   The relationship began in late 1984 when the defendant was engaged by Sabino Rabello (Katia Rabello's father and the patriarch of the family), to establish TLB in this jurisdiction.

42   TLB was incorporated by the defendant on January 2nd, 1985. It was established to operate as an offshore investment bank, at first headquartered in Miami[17] where it conducted investments on behalf of the Rabello family and a book of other clients largely based in Brazil.

43   Mr. Toledo began working for the Rural Group in Miami in 1991. Beginning in 1996, the majority of Mr. Toledo's work was related to TLB, which established its headquarters office in Grand Cayman in 1993. As Mr. Toledo took on increasing responsibility within the Rural Group, he travelled frequently to the Cayman Islands. In particular, he managed the Rabello family's offshore investments (and those of other clients) through TLB. In May 2003, Mr. Toledo became a director of TLB. In January 2005, upon the death of Sabino Rabello, Mr. Toledo became President and Managing Director of TLB.

44   In 1998, East Farthing Ltd. (the third plaintiff, "EFHL") was incorporated in this jurisdiction by the defendant on the instructions of Sabino Rabello to hold the family's majority shares in TLB.

45   The shareholding in EFHL itself (issued as a single share) was first held by a partner of the defendant as nominee[18] but was later transferred to Sabino Rabello. Upon his passing in 2005, the share in EFHL was transferred by the defendant to Mr. Toledo acting on the instructions of Sabino's widow, Mrs. Jandyra Rabello, herself acting as personal representative of the estate of Sabino Rabello.

---

17   As explained by Mr. Fernando Toledo in his first affidavit.
18   Acting by David Whittome, a partner of the defendant—see Register of Members kept by the defendant.

404

46   By resolution of its board at a meeting convened by the defendant, Mr. Toledo was also appointed sole director of EFHL on May 4th, 2005.[19] As can be seen from the Register of Directors and Officers of EFHL, its initial directors were Sabino Rabello, Junia Rabello, Jandyra Rabello, Nora Rabello and Katia Rabello. Walkers SPV, an affiliate of the defendant, provided registered offices services and acted as corporate secretary.

47   The defendant also acted for the Rabello family for the transmission of Sabino Rabello's estate in this jurisdiction,[20] in particular in respect of the devolution of the share in EFHL (as mentioned above) and thus in respect of the devolution of TLB itself.

48   Despite this background (and more to be examined below in respect of TLB, EFHL, and the other two incorporated plaintiffs, Arnage Holdings Ltd. and Brooklands Holdings Ltd. ("Arnage" and "Brooklands")), the defendant, as already mentioned, does not admit that either Katia Rabello or Fernando Toledo was a client.

49   As regards Katia Rabello, this is also despite it being no longer disputed that the defendant acted on behalf of Arnage and Brooklands, of which she was at all material times the 50% beneficial owner (until her father's death in January 2005) or 100% beneficial owner (after her father's death). This action by the defendant was in respect of a significant note purchase transaction in which context, to be explained below, it could not have been overlooked or misunderstood that she was the 50% beneficial owner.

**Incorporation of Arnage and Brooklands and Securinvest**

50   In May 2000, Arnage and Brooklands were incorporated in this jurisdiction and together became the registered shareholders of a Brazilian company named Investcred,[21] which was soon afterwards incorporated in Brazil on May 17th, 2000 (later renamed Securinvest Holdings S.A. ("Securinvest")). The Canadian Imperial Bank of Commerce (Cayman

---

19   Register of Directors kept by the defendant.
20   As is asserted by Katia Rabello and admitted by Mr. Diarmad Murray, a partner of the defendant, in his letter of September 22nd, 2011, to Mr. Toledo's affidavit. In that letter there appears the following general admission of the lawyer–client relationship at least in respect of TLB:
  "Walkers acted as Cayman counsel for Trade Link Bank ('TLB') from its incorporation until its liquidation. The firm received instructions to assist in setting up of TLB from Sabino Rabello and had an ongoing relationship with Mr. Rabello and TLB as a result … The last matter this firm dealt with on behalf of the Rabello Family was the estate of Sabino Rabello, in respect of which Walkers obtained a grant of probate."
21   Full name: Investcred Companhia Securtizadora de Creditos Financeiros.

405

Islands) ("CIBC") served as corporate administrator for Arnage and Brooklands until this role was later transferred, on the instructions of Katia Rabello, to Equity Trust (Cayman) Ltd. ("Equity Trust").

51   This change of administrator would prove to be a crucial change of circumstances in relation to Dr. Braga's campaign against the family in Brazil because Katia Rabello, through her ownership of Arnage and Brooklands, had become the ultimate beneficial owner of Securinvest ("UBO"). These very consequential circumstances are also to be more fully examined below.

**Arnage and Brooklands—the June 2030 retainer—the note purchase transaction and its connection to Banco Rural and the Rural Group**

52   In June 2000, the defendant acted for each and all of Arnage, Brooklands and TLB in connection with a note facility ("the note purchase transaction") by way of a letter agreement dated June 27th, 2000. By this arrangement, Securinvest provided a $40m. note to Arnage and Brooklands for onward sale to TLB, in return for financing from TLB for the carrying out of Securinvest's business in Brazil.

53   That business included the acquisition of bad loans and other non-performing assets from Banco Rural and the realization of those assets on behalf of Banco Rural and the wider Rural Group.

54   In agreeing to act for all the Cayman corporate parties to the note purchase transaction,[22] the defendant would have had to satisfy itself that in doing so it would act under no conflict of interest. This meant that the defendant must have been satisfied, as indeed was the case, that the common interest purpose and beneficial ownership of all parties for whom it acted were held in common within the Rabello family (including Katia Rabello as 50% beneficial owner of Arnage and Brooklands and as 50% UBO of Securinvest).

55   Following its review of the transactional documentation, the defendant issued its opinion to CIBC and Canadian Imperial Bank of Commerce, Toronto Office, dated June 27th, 2000, approving of the transaction on behalf of Arnage and Brooklands.

56   Thus, it is apparent that as Mr. Toledo asserts in his first affidavit:

"The Note Purchase Transaction was essentially an inter-group transaction whereby TLB loaned funds to Securinvest to purchase distressed assets from the Rural Group.

———————————

22   It is admitted by the defendant that it acted on behalf each and all of Arnage, Brooklands and TLB in this transaction.

My understanding is that the above-mentioned corporate structure of incorporating a Brazilian company (Securinvest) owned by two Cayman Islands companies (Arnage and Brooklands) was proposed by Banco Rural executives working with the Brazilian representatives of CIBC, which provided nominee directors, shareholders and a registered office of Arnage and Brooklands. I instructed the TLB General Manager (Ricardo Bermudez) to obtain advice from the Defendant as to whether the proposed structure was advisable under Cayman Islands law and whether it would fit with the overall offshore structure that the Defendant had already established in the form of TLB. At all times, the Defendant was fully aware of the reasons why Arnage and Brooklands were incorporated and accordingly, their ultimate beneficial ownership by the Rabello family . . .

All of the Plaintiffs are inter-related as was their relationship with the Defendant: Arnage and Brooklands were incorporated to act as shareholders in Securinvest and for the purpose of the inter-group Note Purchase Transaction entered into with TLB; EFHL held Sabino Rabello and my shares in TLB. I was ultimately the Managing Director of TLB and I am now the sole director of Arnage, Brooklands and EFHL. Katia Rabello is the ultimate beneficial owner of Securinvest, through Arnage and Brooklands. I and the Rabello family, at all material times, owned and/or controlled TLB. The Defendant was fully aware of all of these inter-relationships, having acted on behalf of all of the Plaintiffs as well as the Rabello family generally."

57   The breaches of duty claimed by the plaintiffs relate in important part to the obtaining by the defendant on behalf of Dr. Braga of the disclosure of confidential information relating to Arnage and Brooklands and to the very same note purchase transaction involving TLB and Securinvest (including the defendant's legal opinion itself), along with information revealing Katia Rabello's status as UBO of Securinvest through Arnage and Brooklands. This, along with other confidential information, came to be disclosed to Dr. Braga pursuant to orders obtained by the defendant from this court in May and July 2010. The disclosed information was quickly deployed by Dr. Braga against Katia Rabello, Securinvest and other Rural Group entities in Brazilian bankruptcy proceedings. These proceedings will be considered in some detail below.

**Other relevant events in Brazil**

58   Against the foregoing background of the lawyer–client relationships, and before turning to look in more detail at the Brazilian bankruptcy proceedings and the related court proceedings in this jurisdiction, it is necessary at this stage to look at an earlier concatenation of events in Brazil, as they came to involve the Rabello family.

407

59   Katia Rabello is a ballerina. Her primary calling was as patron of a ballet school in her home city of Belo Horizonte, in the State of Minas Gerais. This was her occupation until 1999 when she became a director of Banco Rural upon the tragic death of her elder sister Junia (who had been groomed by their father Sabino to succeed him at the helm of the Rural Group).

60   Later, in October 2001, Katia became President of Banco Rural and still later, upon the passing of her father in January 2005, she became President of Banco Rural's Administrative Council.

61   By then there had been underway in Brazil, a Joint Parliamentary Commission of Enquiry into the infamous "Mensalao affair." This enquiry revealed payments for vote-buying in Brazil's Congress in return for the corrupt promotion and passage of preferential legislation. The scandal raised widespread allegations of corruption against the Government of Luiz Inacio Lula da Silva.

62   It came to light that certain of the Mensalao payments had been made or arranged through Banco Rural. As a result, Katia Rabello, as its novice President, found herself summoned before the Joint Parliamentary Commission in September 2005.

63   Unsurprisingly, there was intense publicity about Mensalao in Brazil and overseas, including adverse publicity relating to Banco Rural and Katia Rabello as its President.

64   As a result, states Mr. Toledo, the legal and political environment within which the Rabellos, Banco Rural and the Rural Group were operating became very hostile.

65   Despite her protestations of personal innocence while admitting to knowledge that her bank had been involved in the passing of certain payments, Katia Rabello was indicted, along with some 40 others implicated, on March 30th, 2006 by the Supreme Federal Prosecution Office. She was much later convicted in September 2013 for offences of conspiracy, mismanagement of a financial institution, money laundering and fraudulent transmission of moneys abroad. Eventually, after final appeal to the Supreme Federal Tribunal,[23] she was sentenced in November 2013 in relation to the Mensalao affair. She was imprisoned from November 2013 to December 2016.

66   It is of some significance now, however, that she asserts that the charges in relation to the Mensalao affair had no connection to the allegations which were later promoted by Dr. Braga to engulf the Rabellos

---

23   About which more below.

408

and their interests in the bankruptcy proceedings of a different group of companies, the Petroforte Group. In this regard, Dr. Braga came to allege collusion between her father and Mr. Ari Natalino, the then principal of the Petroforte Group. Dr. Braga alleged that Sabino Rabello used Securinvest and another Rural entity, Rural Leasing, in collusion with Ari Natalino—using his Petroforte Group (which was later placed into bankruptcy)—to defraud the creditors of Petroforte. This allegation, when accepted by the Brazilian courts, as will be seen below, later became the basis upon which Dr. Braga was able to extend the Petroforte bankruptcy over the Rabello interests and which later became the basis for his allegations of collusion against Katia Rabello herself.

**The Cayman connection to events in Brazil and the defendant's further involvement: the May 200˜ retainer**

67    The Mensalao affair itself had revealed no immediate connection to the Rabello family's affairs in the Cayman Islands but other related events did.

68    In its capacity as regulator of Banco Rural and other Brazilian banks implicated, the BCB had commenced its own investigation into the Mensalao affair.

69    In August 2005, the use of a TLB account by a well-known publicist of the Workers' Party (the party of President Lula da Silva) was disclosed by a leading Brazilian newspaper and this linked TLB to Mensalao, attracting the attention of the BCB.

70    While TLB was an entirely unrelated Cayman entity having no legal relationship with Banco Rural, this revelation resulted, as Mr. Toledo explains, in heightened press and regulatory scrutiny of Banco Rural's overseas holdings and affiliates. The BCB then commenced an investigation into TLB itself.

71    On May 2nd, 2006, Mr. Robert Macaulay, acting on behalf of the Rabellos as their Miami based overseas counsel, emailed Mr. Mark Lewis, a partner of the defendant, requesting a call to discuss corporate and banking issues relating to EFHL (and by obvious implication TLB).

72    On May 15th, 2006, following a teleconference with the defendant (described by Mr. Macaulay as having taken place in response to his email and which the defendant neither denies nor admits), another email was sent by Mr. Macaulay to another associate attorney of the defendant's, Mr. Winston Conolly. This email requested that—

"we urgently need from Walkers (Secretaries) Limited certificates substantially in the forms attached confirming that none of Mr. Rabello's heirs is or has been a member/shareholder of the Company [EFHL] or TLB."

409

73   The plaintiffs assert through Mr. Macaulay that a meeting in May 2006 (also neither admitted nor denied by the defendant) was held in Grand Cayman between Mr. Macaulay and Mr. Toledo on behalf of the Rabello family and Mark Lewis and Winston Connolly of the defendant. Mr. Toledo avers that at that meeting both he and Mr. Macaulay explained the implications for TLB and the Rabellos of the Mensalao affair, in light then of the BCB's involvement as regulator of Banco Rural.

74   According to Mr. Toledo, discussions were focused on—

"developing a strategy with the Defendant to protect the Rabello family and TLB given the problems that were developing; the Rabello family's objective being to try to ensure that its links to TLB were kept confidential given the political climate in Brazil."

75   Instructions were given to the defendant to take steps to transfer the shareholding in EFHL to Mr. Toledo and discussions were had around the ultimate closure of TLB, the essential objective being to "distance the Rabello family from TLB (especially given the Mensalao investigations)."

76   Confirmatory of these discussions and instructions, it appears that the defendant (*per* Mark Lewis) then issued notarial certificates dated May 31st, 2006 to certify that certain named members of the Rabello family (excluding Sabino Rabello who was by then deceased but including Katia Rabello) "do not and have not appeared on the Register of Members of the Company [respectively EFHL and TLB] as members of the Company at any time since incorporation of the Company."

77   This was of course, a technically correct certification as it did not speak to ultimate beneficial ownership of either EFHL or TLB.

78   Mr. Toledo avers that the defendant was specifically informed that these notarial certificates were intended to be presented to the Brazilian authorities, an averment which, again, the defendant neither admits nor denies.

79   In the event, the notarial certificates provided by the defendant were presented to the BCB and their purpose would have been clearly understood by the defendant.

**The defendant acted in other contexts relating to Sabino Rabello's estate**

80   It is also uncontroverted that the defendant acted in other contexts on behalf of one or other of the plaintiffs or on behalf of the Rabello family as a whole.

81   As already mentioned, the defendant advised the family and Mrs. Jandyra Rabello, as personal representative of Sabino Rabello's intestate estate, in particular, in the context of administration proceedings in this

410

jurisdiction. This was against the background according to Mr. Toledo, of advice from the defendant that in order to transfer the share in EFHL to him, it was first necessary to apply to this court for a grant permitting Mrs. Jandyra Rabello to deal with the estate in this jurisdiction.

82   The defendant therefore acted for the family in applying to this court for resealing of the Brazilian letters of administration, to permit Mrs. Rabello to act on behalf of her husband's estate in this jurisdiction.

83   This then involved the heirs (including Katia Rabello) entering into a deed of variation to vary the normal entitlements upon intestacy and so to relinquish any claims they might have had to an interest in EFHL. A copy of the deed of variation which was drafted by the defendant is propounded in evidence, as entered into by each of the relevant family members, including Katia Rabello. Further written consents from each of the relevant family members (again including Katia Rabello) to the transfer of the share in EFHL were provided and copies are also propounded in evidence. The transfer was approved by the EFHL board and executed by Mrs. Jandyra Rabello, effectively transferring Sabino Rabello's interest in EFHL, and so in TLB, to Mr. Toledo, all on the advice of the defendant.

**The BCB investigation in Brazil and the May 2007 retainer**

84   Apprehensions expressed by Mr. Toledo and Mr. Macaulay on behalf of the family to the defendant at the May 2006 meeting turned out to be all too well founded. In February 2006 (and unknown at the time to the Rabellos[24]) the BCB had contacted the Cayman Islands Monetary Authority ("CIMA")—its Cayman Islands counterpart—in respect of its investigation into links between the Rabello family, Banco Rural and TLB. The BCB requested from CIMA any information relating to the shareholding in TLB.

85   Having extracted undertakings from the BCB by way of letter dated June 28th, 2006 that any information provided would be used only for regulatory purposes, CIMA provided to the BCB information from its own records which showed the shareholdings in TLB from its date of incorporation, and specifying that the majority shareholder was Sabino Rabello up to November 1998 and, thereafter, that the shareholder was EFHL "represented by Sabino Rabello."

86   But even that revealing disclosure proved inadequate for the BCB's purposes and so, on November 30th, 2006, the BCB requested further information from CIMA relating to TLB, expressly including any documents showing "current outstanding operations between TLB and any

---

24   According to Mr. Toledo at para. 129 of his first affidavit.

411

company of the Rural Conglomerate" which was defined as including Banco Rural. The BCB informed CIMA that the purpose of the investigation was "to identify common ownership between Banco Rural and TLB." This was implicitly, it must have been understood, to further establish an ownership link between the Rabello family and TLB.

87    The letter dated November 30th, 2006 again confirmed that the information was sought only for the BCB's regulatory purposes, including civil and administrative (*i.e.* not criminal) proceedings.

88    In response, CIMA informed the BCB[25] that not all the information sought was in their possession and accordingly that CIMA would have to issue a "direction" under s.34(9) of the Monetary Authority Law (MAL). However, that before so doing (in addition to the assurances earlier given) CIMA required from the BCB—

> "an undertaking that the information provided will not be used in criminal proceedings against any person(s) providing the information, other than proceedings for an offence under section 34 (17) of the (MAL) or an offence of perjury."

89    By way of letter dated February 23rd, 2007, the BCB gave that undertaking.

90    Accordingly, on April 30th, 2007, CIMA, on behalf of the BCB, issued a formal direction to TLB to provide documents pursuant to s.34(9) of the MAL, including a copy of the Register of Officers and Directors of TLB.

**The May 2007 retainer**

91    Immediately, in response to CIMA's April 30th direction, in early May 2007 the defendant was engaged by Mr. Macaulay on behalf of TLB (and therefore as Mr. Toledo avers, on behalf also of TLB's directors, officers and shareholders) to provide legal advice on resisting the CIMA April 30th direction. This was stated expressly in order to maintain the confidentiality of any further connections between TLB and the Rabello family.

92    The defendant's engagement letter contains an expressed obligation on its part to "take such steps as we in good faith think fit to preserve confidential information from misuse both during and after termination of the Engagement."

93    This is acknowledged by the defendant as having given rise to an ongoing duty of confidentiality beyond the termination of the May 2007

---------------------

25    By letter dated January 16th, 2006 (but meant as January 2007).

412

retainer itself. Nonetheless, it is a duty which, as I understand its case, the defendant insists it did not breach in later acting for Dr. Braga.

94   But more to the point here of what the defendant must have understood and appreciated about the predicament in which the Rabellos found themselves in the context of events unfolding in Brazil, including the BCB inquiry, the following appears in the letter written by the defendant on May 3rd, 2007 to CIMA, on behalf of those whom it considered to be its clients. This was in response to CIMA's April 30th direction and confirmatory of the wide ambit of the May 2007 retainer as Mr. Toledo avers (NB: the interchangeable use of the plural and singular "clients" and "client"):

> "Our clients are aware that other of their documents provided by foreign government sources to the Brazilian authorities under conditions of confidentiality have, within a short period of time, appeared in the Brazilian press as a result of what appear to have been deliberate leaks. We would therefore, be grateful if you would please confirm that to the best of your knowledge the request is not in respect of criminal proceedings contemplated being brought against TLB or any of its current or former directors, officers or agents and that the request is not being made for the benefit of another branch of the Brazilian government. In light of the above please also confirm the measures that CIMA has taken to satisfy itself that the information enclosed herewith will be kept confidential and not further disseminated by the BCB to anyone outside of that institution, whether in the press, another branch of the Brazilian government or otherwise.
>
> We have enclosed on behalf of our clients the information requested—'The Register of Officers and Directors for Trade Link Bank'—in a complete and redacted version. The redacted version simply sets forth the current officers and directors—Messrs. Toledo and Jacobson, citizens of the USA and UK respectively, neither of whom resides in Brazil—and confirms that they have been the sole officers and directors of TLB since inception in 2005. The complete version reflects all officers and directors of TLB since inception in 1985. The additional information contained in the complete version cannot in our client's view be relevant to any legitimate regulatory enquiry. The only possible use for that information, in our client's view, would be non-regulatory legal and other actions to be taken against individual Brazilian residents who are former TLB officers and directors. In our client's view no such legitimate claims arise.
>
> Based on the foregoing, we respectfully request that you produce to BCB only the redacted register of TLB officers and directors. We

413

would be pleased to meet with you at your earliest convenience to discuss this matter further if you think it appropriate . . ."

95   As it happened, CIMA did not accede to that request to disclose only the redacted register of TLB to the BCB but, instead, presented the BCB with the full unredacted version.

96   Worst fears were realized when the BCB, in breach of its undertaking to CIMA, publicly disclosed the information provided which linked the Rabello family to TLB and gave it over for deployment to the detriment of Katia Rabello and other family members, for use in criminal proceedings against them. These were proceedings in which Mr. Toledo was also named although not indicted. More about these criminal proceedings will be examined below in the context of a further retainer of the defendant in August 2009.

97   At this juncture, it is important to note that while no complaint has been raised against the defendant in relation to their conduct of this, the May 2007 TLB/CIMA retainer, the plaintiffs assert that the defendant could not—when later approached by Dr. Braga in April 2010 to act for him— have been in any doubt about the nature of the predicament facing the family in Brazil in relation both to the Mensalao affair and then contemporaneously, the BCB enquiry. The defendant could therefore have been in no doubt, say the plaintiffs, about its obligation to maintain and protect their confidentiality when Dr. Braga came along.

98   This is an unanswered averment and one which I regard as unanswerable.

**The August 2007 retainer: dissolution of TLB**

99   The plaintiffs' grievance is further contextualized by other retainers by which the defendant had acted for one or other of the plaintiffs before Dr. Braga came along. Next there was the August 2007 retainer for the dissolution of TLB which had stopped trading, although it was then still a solvent entity. The following uncontroverted account of this retainer comes from Mr. Toledo:[26]

"Between August 2007 and November 2007, there were a number of further discussions between Mr. Macaulay, myself and both Mark Lewis and/or Nick Rogers (another Partner) of the Defendant. By this stage TLB had effectively ceased trading and, given both the BCB investigation into links between the Rabello family and TLB and increased regulatory scrutiny due to the Mensalao Affair, in which the indictment of Katia Rabello had been accepted by the STF

_____

    26   First affidavit at para. 152.

414

[Supreme Federal Tribunal[27]] in August 2007, the Defendant was instructed to advise upon dissolving TLB . . .

. . . in its capacity as general Cayman Islands legal counsel to TLB and also pursuant to the May 2007 Retainer and the August 2007 Retainer, I believe that the Defendant was fully aware that any links between the Rabello family (and/or Banco Rural) and TLB were strictly confidential, subject to regulatory investigation by the BCB and that the Defendant should take all reasonable steps to prevent disclosure of such material.

TLB was dissolved on 17 September 2009."

100   This was the culmination, as regards TLB, of the concerns raised at the May 2006 meeting and which led to the subsequent retainers of the defendant in relation to the BCB.

**The August 2009 retainer**

101   Next followed the August 2009 retainer. As mentioned above, this arose when, as anticipated and feared by the Rabellos and Mr. Toledo, the information relating to TLB's officers and directors which had been provided to the BCB by CIMA, was disclosed by the BCB and used by the Brazilian authorities as the basis for criminal proceedings (despite the undertakings given to CIMA by the BCB).

102   In that regard, on December 15th, 2008, a criminal complaint[28] was issued by the office of Federal Public Prosecutions in the State of Minas Gerais against Katia Rabello and seven other defendants (including three other members of the Rabello family). This complaint alleged the making of false representations to the BCB and expressly relied upon the information provided by CIMA to the BCB.

103   The persons indicted included controlling shareholders in Banco Rural and its senior management. Among the "Facts" particularized in the complaint, at item 1 reads as follows (translated):

"The accused offered falsified information to the Central Bank of Brazil when denying the existence of stockholding (either direct or indirect) and/or joint management in Banco Rural S.A. and the Trade Link Bank (TLB) financial institution, headquartered in the Cayman Islands, incurring in the crime of false representation reported by private document 9 articles 299 and 298 of the Penal Code . . ."

104   And at item 5:

---

27   Brazil's highest court for the determination of constitutional and criminal cases.
28   Referred to herein interchangeably as "complaint" or "indictment."

415

"By conclusively proving the shareholding by the Directors of Banco Rural S.A in Trade Link Bank, the Cayman Islands (CIMA) Monetary Authority, meeting the request made by the Central Bank, sent a graph showing the evolution of the TLB shareholders on the period from 08.31.1984 (the TLB incorporation) to 02.09.2004 (pages 318/323). From that list it is found that Banco Rural's controllers, administrators and former administrators are or were TLB shareholders, including periods with joint shareholding in both . . ."

105   On August 5th, 2009, Mr. Macaulay (according to Mr. Toledo, at his request) sent an email to partner Mark Lewis of the defendant setting out the background relating to this criminal complaint stating:

". . . new criminal proceedings have been opened in Brazil utilizing confidential documents relating to TLB provided by CIMA to the Brazilian Central Bank (BCB) purportedly for the purpose of civil regulatory functions. This use of the confidential information for criminal proceedings is in violation of the applicable provisions of the Cayman Monetary Authority Law,[29] the MOU between Brazil and Cayman[30] and the correspondence between the BCB and CIMA. *We need assistance from you and/or the appropriate persons at your firm to immediately address this issue and limit the harm to the Brazilian defendants* who have been prejudiced by the unlawful disclosure." [Emphasis added.]

106   On the same day, Mr. Macaulay received separate emails from partner Mark Lewis and associate James Austin-Smith of the defendant. They confirmed that the retainer had been accepted and that the firm (including the partner Mr. Diarmad Murray who was then Managing Partner) had the necessary experience and competence to deal with the matter.

107   By way of letter of the next day (August 6th, 2009), Mr. Macaulay provided the defendant with correspondence between CIMA and the BCB which had been disclosed in the context of the ongoing proceedings in Brazil. This included the correspondence between CIMA and the BCB exchanged in 2006 in relation to the disclosure of the legal and beneficial ownership of TLB discussed above and which was relied upon to advance

---

29   Section 50 of the Monetary Authority Law (2004 Revision) is cited in Mr. Toledo's affidavit at para. 165 in support.
30   The MOU s.8.1 is also cited as containing provisions restricting the use of disclosure provided by CIMA to the BCB to the exercise of BCB's "regulatory functions" and s.5.4 as restricting that use to the specific defined purposes disclosed to CIMA when requesting the information.

GRAND CT.                                        ARNAGE HOLDINGS v. WALKERS

the BCB's objective of establishing any affiliation, business operations or connections between TLB and Banco Rural.

108   Mr. Macaulay's letter of August 6th, 2009 also included a copy of the criminal complaint which named the "Brazilian defendants," including Katia Rabello.

109   The objective of Mr. Macaulay's letter, gleaned from its terms, was, in effect, to seek the defendant's advice on obtaining the possible intervention of the Cayman Attorney General and/or CIMA, with the BCB or the Brazilian courts, to prevent the CIMA disclosure from being further "abused" in the criminal proceedings, to the detriment of the Brazilian defendants.

110   On August 7th there followed an email from Mr. Austin-Smith to Mr. Macaulay in these terms:

"I am putting together an engagement letter now. Is the *ultimate client* TLB or the various individuals facing prosecution? If the latter can you indicate which." [Emphasis added.]

111   In response, Mr. Macaulay sent an email later that day to the defendant in these terms:

"Your *ultimate clients* for purposes of this matter should be *East Farthing Holdings Ltd*, a Cayman corporation which was the sole shareholder of TLB upon liquidation, *and Fernando Toledo*, the sole shareholder of East Farthing." [Emphasis added.]

112   Then followed the August 2009 retainer letter itself, which begins in these terms:

"You have asked us to assist East Farthing Holdings Ltd in preventing the use of material provided by the Cayman Islands Monetary Authority to Banco Central Do Brasil in a criminal prosecution in Brazil ('the Engagement')."

113   This engagement letter goes on at paras. 35 and 36 to confirm that the defendant would vouchsafe the confidentiality of the "clients'" information, in terms identical to those in the May 2007 retainer set out above at para. 92.

114   It is the defendant's position that notwithstanding the context and background of the criminal proceedings in Brazil, the only client for which it was by this August 2009 retainer engaged was EFHL. The defendant thus invites the narrowest construction of the phrase "ultimate client" from Mr. Macaulay's email of August 7th (above).

115   Unsurprisingly, the plaintiffs do not accept this.

417

116   For one matter, while the engagement letter in terms refers only to EFHL, Mr. Toledo was its sole shareholder. And while Mr. Toledo was not indicted, he was named in the Brazilian indictment.

117   Moreover, say the plaintiffs, it was obvious from Mr. Macaulay's letter of August 6th, 2009 that the purpose of this retainer was to "protect the Brazilian defendants"—the natural persons who were the subject of the indictment, and which made no mention of EFHL. The obvious concern was to ameliorate the impact of the CIMA disclosure (which revealed the connection between the Rabello family, Banco Rural and TLB) upon those persons identified as subjects of the indictment.

118   The defendant, say the plaintiffs, could therefore have been under no misunderstanding that its true clients in this context were those, especially Katia Rabello, facing possible conviction in Brazil, as the result of the abuse of the CIMA disclosure by the BCB.

119   It is also to be noted that Mr. Toledo became listed by the defendant as a client,[31] in its internal records relating to the August 2009 retainer. This is a fact which the defendant at first sought, it seems mistakenly, to deny by averring in its defence[32] that EFHL was named as the sole client in its marketing and billing database.

120   Still further, it does appear from the letter written by the defendant (*per* Mr. Austin Smith) to CIMA on September 9th, 2009, that the defendant regarded itself as acting on behalf of those persons in jeopardy in Brazil.

121   At para. 5 this letter states:

"We have subsequently been informed that criminal proceedings have been brought by the Federal Public Prosecutors office in Brazil based on the information provided by CIMA. We attach (in original and English translation) a document prepared in those court proceedings by the Federal Public Prosecutors office in Minas Gerais. In particular we would draw your attention to the comments made at paragraphs 5 and 6, in which the document makes it quite clear that material provided by CIMA is not only to be used as evidence in

_____

31   See reply 10.1 to the reply to the request for further and better particulars of the amended defence dated December 5th, 2014. See also the second affidavit of Ms. Feena Christian (*née* Cray) which suggests that the listing of Mr. Toledo as a client could not have been by "mistake," as the defendant sought to aver. Also, in the affidavit of Antonia Hardy filed on behalf of the defendant, she attests that no conflict check was ever carried out, by the defendant in its clients' database, against the names of Katia Rabello or Fernando Toledo.

32   Paragraph 47.4 of the amended defence (now withdrawn by the defendant).

418

these criminal proceedings but, in fact, forms the backbone of the case against the Defendants."

122   Thus, this letter clearly raises the concern that documentation provided by CIMA to the BCB for regulatory purposes was being used in the Brazilian criminal proceedings and, as it goes on to conclude, that the manner in which information had been obtained by the BCB had—

"deprived those now facing serious criminal charges of the protections imposed by the Cayman Islands legislature through the Monetary Authority Law (and other statutes).

In the circumstances we would appreciate if you could confirm that our understanding of the position is accurate so that this breach of the law and the MOU can be brought to the attention of both the trial court and the authorities in Brazil."

123   As a further sign of the ongoing lawyer–client relationship, throughout this period in late 2009 and subsequently, as Mr. Toledo avers, the defendant regularly sent fee invoices to Mr. Macaulay to be settled on behalf of its clients.[33] Those invoices were settled, save for the final one dated June 7th, 2011 which was, quite remarkably, issued more than a year after the defendant had accepted Dr. Braga's retainer and started acting for him in April 2010.[34]

124   The full factual context to the August 2009 retainer, including the historical significance of earlier retainers, must be analysed for the application of the common law criteria for the identification of the lawyer–client relationship and its duties and obligations, including the ongoing duty of confidence which it engendered. This analysis will be undertaken below.

125   The narrative on the August 2009 retainer can be concluded here by noting that despite CIMA's attempts at intervention, the BCB denied having acted contrary to its undertakings and the indictment was nonetheless prosecuted against the Brazilian defendants, including Katia Rabello, to their conviction.

126   Katia Rabello was, however, later acquitted on her appeal in relation to this indictment, the Brazilian appellate courts having found that the allegation of "misrepresentation on documents" as raised by the BCB was unjustified.

---

33   Albeit that these invoices state the matter as "Trade Link Bank—CIMA Request." The fees were incurred by and/or on behalf of Mr. Macaulay's client (the defendant's past submissions that Carlton Fields (Mr. Macaulay's firm) were the clients, was abandoned).
34   Fee invoice dated June 7th, 2011, first affidavit of Fernando Toledo.

419

**Katia Rabello as client**

127   As regards her status as client, Katia Rabello avers in her witness statement[35] that while she never dealt personally with the defendant, given the defendant's longstanding relationship with her family, the Rural Group and TLB, she relied on the defendant to act on her behalf regarding all Cayman Islands legal matters that affected her and understood that they would act to protect her interests in this regard.

128   This relationship began where she was concerned, in 1998. This was when her father set up EFHL as the holding company for his interests in TLB. The defendant handled the legal work, including naming herself, her sisters Junia and Nora and their mother Jandyra, as directors of EFHL. She also avers to her belief that the defendant must have regarded her as a client when it acted on her behalf as a beneficial owner of Arnage and Brooklands and as a UBO of Securinvest (as it indisputably did at least on behalf of the Cayman incorporated parties) in relation to the note purchase transaction.

**Winding up of EFHL—retainer in February 2010**

129   As a further post-script and for completeness—in addition to acting for EFHL in connection with the August 2009 retainer, in early 2010 the defendant began advising on the potential dissolution of EFHL.

130   This is apparent from a chain of emails between Mr. Macaulay and attorney Charles Kirkconnell of the defendant beginning on February 1st, 2010, in which Mr. Macaulay stated that "the client has decided to dissolve the company as it is no longer needed due to the completion of the liquidation of Trade Link Bank."

131   Mr. Macaulay asserts, and to my mind it is plain, that that reference to "the client" must have been understood to be a reference at least to Mr. Toledo, but also as well to the Rabellos as the persons implicated with TLB in the BCB inquiry and the resultant criminal proceedings in Brazil.

132   There then followed a number of email exchanges between the defendant and its associate Walkers Corporate Services Ltd. on the one hand and Mr. Macaulay on behalf of "the client" on the other, in relation to the dissolution of EFHL.

133   Having read them, it is safe to say that nothing in those email exchanges suggests a contrary understanding on the part of the defendant.

—————————————

35   Dated January 22nd, 2015, at para 10.

AP1215

**The significance of historical retainers**

134   The May 2006 retainer, the May 2007 retainer, the August 2007 retainer, the August 2009 retainer and the February 2010 EFHL retainer, like those before them relating to the setting up of TLB and EFHL and advice to Arnage and Brooklands (in relation to the note purchase transaction), are of significance now for specific purposes.

135   First, they provide the factual background for the legal examination of the existence of the lawyer–client relationship between the defendant and the plaintiffs which the plaintiffs claim. The retainers also reveal, as the plaintiffs complain, that the defendant must have been aware of the vulnerable position of the Rabello interests in Brazil—vulnerability both in the public and regulatory arenas—which was widely known. It follows that the defendant must therefore have been aware of the dire implications for the Rabello interests when the defendant decided to act for Dr. Braga against them. Thus, the retainers set the context for the finding of the lawyer–client relationship, as well as for the examination of the allegations of breaches of duty arising from the relationship.

**Summary of evidence showing the lawyer-client relationship—Katia Rabello and Fernando Toledo**

136   The defendant, through Mr. Simpson, has admitted the existence of the relationship with the first three plaintiffs—Arnage, Brooklands and EFHL.

137   The evidence in support was undeniable in any event, as discussed above.

138   I think I need therefore summarize here only the evidence which in my view shows the relationships with Katia Rabello and Fernando Toledo.

139   As regards Katia Rabello, the only conclusion to be reached from the events discussed above is that Katia Rabello was a client of the defendant as at the date when the defendant agreed to act for Dr. Braga ("the Braga retainer"). This is undeniable given not only the many years of the defendant having acted as the Cayman attorneys for the Rabello family, including Katia Rabello, but also more particularly on account of the following:

(a) The explicit instruction given on August 5th, 2009 by Mr. Macaulay for the defendant to act so as to limit the harm to the Brazilian defendants in the Brazilian criminal proceedings which, to the defendant's knowledge, included Katia Rabello.

(b) The fact that a clear purpose of the August 2009 retainer was to assist Katia Rabello in her defence to the Brazilian criminal proceedings.

421

(c) The August 2009 retainer (entered into only some eight months before the Braga retainer) was ongoing at the time of the acceptance of the Braga retainer. As set out at paras. 77 and 78 of the statement of claim and paras. 193–201 of Mr. Toledo's first affidavit, whilst the Braga retainer was being pursued by the defendant, the defendant was simultaneously:

    (i)  advising Katia Rabello's US Attorneys on her behalf as to the progress being made under the August 2009 retainer;

    (ii)  taking further instructions in relation thereto;

    (iii)  liaising with CIMA in furtherance of Katia Rabello's interests in this regard; and

    (iv)  providing further advice for her benefit as to Cayman Islands law as regards the CIMA disclosure to the BCB.

(d) The defendant's own work-product and correspondence with CIMA clearly demonstrates its own understanding that it was acting on behalf of the defendants in the Brazilian criminal proceedings. See for example, the defendant's letter to CIMA of September 9th, 2009, discussed in detail above.

(e) Finally, the two references and connections[36] to Katia Rabello in the defendant's own client database as explained by Feena Christian in her second affidavit and in respect of which she acknowledged, very belatedly on behalf of the defendant, that upon the acceptance of the Braga retainer, a conflicts check had not been conducted in relation to Ms. Rabello. This is an oversight which occurred although Katia Rabello was expressly named as a respondent to the second application brought on behalf of Dr. Braga and for which the defendant has also belatedly, apologized.

140   As regards Fernando Toledo:

(a) The defendant's own records indicate that he was a client in respect of the August 2009 retainer. A simple search of the defendant's systems would again have revealed multiple references to him, including the express reference to him as "client."

(b) Mr. Macaulay's email of August 7th, 2009 to the defendant expressly named Mr. Toledo as a client.

(c) Mr. Toledo's known position as managing director of TLB.

(d) Mr. Toledo's position as sole shareholder of TLB through EFHL, making him to the defendant's knowledge, the beneficial owner of both TLB and EFHL.

---

36   There were a number of connections in the defendant's client database to the Rural Group and TLB which were majority owned by the Rabello family.

422

(e) His undisputed evidence that he met with the defendant on several occasions and regularly communicated with the defendant for many years in the context of TLB and Rabello family business, including both (i) the voluntary dissolution of TLB, and (ii) the probate process whereby he inherited the TLB shares through the transfer of EFHL shares previously owned by Sabino Rabello.

(f) The defendant's belated admission and apology for not having carried out a conflicts search regarding Mr. Toledo, despite the fact that he was expressly named by the defendant as a subject of the applications made by it on behalf of Dr. Braga. By this belated admission, the defendant has confirmed that a conflicts search would have disclosed him as a client under the August 2009 retainer and would have shown his connections with TLB, the Rabello family and the Rural Group (Banco Rural and Rural Leasing both being named specifically as related entities in the applications brought on behalf of Dr. Braga). Mr. Toledo was also recorded in the defendant's systems as a director of Rural International Inc., equally with his connections to TLB and EFHL.

(g) The earlier suggestion by the defendant that Carlton Fields (Mr. Macaulay's firm) was the client is no longer being asserted. Contrary to that earlier position advanced in court, it is now admitted that Carlton Fields "has never been recorded as a client in Walkers' systems."

(h) As in the case of the other plaintiffs, many confidential documents relating to Mr. Toledo were obtained by the defendant and disclosed to Dr. Braga.

**The Braga retainer and the Brazilian bankruptcy proceedings**

141   Even before their difficulties with the BCB began in about 2006, problems for the Rabellos had arisen from the allegedly dishonest involvement of Sabino Rabello with Ari Natalino of the Petroforte Group, in what became known as the Sobar S.A. Álcool e Derivados ("Sobar") sale/leaseback transaction ("the Sobar transaction").

142   The Sobar transaction was entered into in 2000 at a time when Petroforte,[37] the parent of Sobar, is alleged to have become bankrupt. It gave rise to allegations that between them, Sabino Rabello and Ari Natalino had colluded to strip away Sobar assets from the Petroforte Group, putting them out of reach of its creditors, through the use of the Rural Group entity Rural Leasing and, later, by using Securinvest.

_____

37   Petroforte Brasileiro De Petroleo Ltda., once one of the largest distributors of petroleum and ethanol products in Brazil.

423

143   The defendant came to be retained by Dr. Braga in April 2010,[38] in the context of a long-running battle between Dr. Braga, as trustee-in-bankruptcy of the Petroforte estate on one side, and the Rabello family and their Rural Group on the other. This battle had been engaged in the Brazilian courts over the alleged stripping away of the Sobar assets (a sugar plantation and ethanol plant valued at some US$100m.).

144   In proceedings filed by him before the Brazilian courts to revoke the Sobar transaction ("the revocation action"), Dr. Braga averred that the Sobar transaction was a sham, and that its effect which was to fraudulently deprive the Petroforte estate of the Sobar assets.

145   In 2000, prior to Petroforte having been placed into bankruptcy, Rural Leasing and Sobar had, in fact, entered into a contract for the sale/leaseback of the Sobar assets. Pursuant to the terms of the contract, Sobar transferred to Rural Leasing the Sobar assets which were subsequently leased back to Sobar by Rural Leasing for a contracted price to be paid by instalments.

146   Due, at least ostensibly, to the non-payment of instalments under the contract, Rural Leasing commenced litigation against Sobar and those proceedings were settled.

147   In 2003, Rural Leasing commenced a further action to repossess the Sobar assets given that again at least ostensibly, Sobar had not made any further payments.

148   This repossession of the assets by Rural Leasing was eventually, and the plaintiffs say finally—and the revocation action notwithstanding—approved by the Brazilian courts.

149   Subsequent to the Brazilian courts' approval, the Sobar assets were sold to Securinvest and then by Securinvest to a Brazilian company named Turvo Participacoes Ltda. ("Turvo").

150   Notwithstanding Rural Group's protestations that the Sobar transaction was not a sham and had in fact been approved by the Brazilian courts, Dr. Braga, having become appointed as trustee over the Petroforte Group, commenced the revocation action in 2006 and immediately obtained from the court a secured lien over the Sobar assets. This lien was described by him to the Brazilian court as needed to prevent risk of the dissipation of those assets.

---

38   The defendant has confirmed that it was first contacted, in respect of acting for Dr. Braga, by email from the BVI law firm Martin Kenney & Co. on April 28th, 2010 to Diarmad Murray who was then Managing Partner of the defendant and the same Mr. Murray who is shown to have been referenced in correspondence with Mr. Macaulay on behalf of the plaintiffs.

424

151   For reasons which still remain unexplained in these proceedings, despite having commenced the revocation action, Dr. Braga commenced a new action by way of bankruptcy proceedings against Securinvest itself. By this action he has sought to bring all Securinvest assets (not only those which were Sobar related), into the Petroforte bankruptcy. For these purposes, as I understand it, Dr. Braga relied (and continues in the course of ongoing appeals in Brazil to rely) upon the Brazilian legal theory of the "common economic group." This is that such a common group came into existence to comprise Securinvest and Petroforte because of the alleged collusion between Sabino Rabello and Ari Natalino for the stripping away of the Sobar assets from the Petroforte Group to the Rural Group using Rural Leasing, Securinvest and Turvo.

152   A pivotal point for the extension of the Petroforte bankruptcy to the Rural Group ultimately through Securinvest was the fact that Sabino Rabello and Ari Natalino were both found to be the shareholders in Turvo.[39] This was said to be the pivotal connection for the application of the legal theory of "common economic group," as I understand it.

153   The legal theory would thus be established unless it could be shown that Securinvest (as the destination of the Sobar assets), was itself owned by third parties having no connection to either of the Rural or Petroforte Groups.

154   On the basis of his petition against Securinvest (supported by his alleged but then as yet unproven connection between Securinvest and Petroforte), Dr. Braga persuaded Judge Beethoven of the São Paulo Bankruptcy Court to make an order *ex parte* (*i.e.* without notice) in August 2007, extending the Petroforte bankruptcy over Securinvest ("the August 2007 bankruptcy order"). This order, even while the revocation action remained unresolved, then allowed Dr. Braga (through a court-appointed receiver) to take control of all of Securinvest's assets going well beyond Sobar. These assets include the Hotel Nacional in Brasilia; a BR$100m. note payable to Securinvest from a television network (Rede TV),[40] along with various other land holdings and a private plane.

---

39   As discussed in the earlier judgment of this court of May 20th, 2011 in which the Cayman disclosure orders were reviewed (reported at 2011 (1) CILR 402, *sub nom. Braga* v. *Equity Trust Co.* ("the May 2011 judgment")).

40   Pleaded as a note for R100,000 at para. 202 of the statement of claim and summary of losses, but this is explained by the plaintiffs' attorney Mr. Annette as being a typographical error.

155   These non-Sobar Securinvest assets[41] are alleged by the plaintiffs to be worth in the order of US$300m. and as will be further explained, form the core of the losses sought to be recovered from the defendant. And when including the claim relating to the loss of Banco Rural (also to be further explained below), the claim rises to over US$400m.

156   The defendant's liability is claimed to have arisen from subsequent events in this jurisdiction after it started acting under the Braga retainer. These are events to which I now turn.

**Chronology leading to the disclosure of the plaintiffs' confidential information to Dr. Braga in the Cayman Islands ("the Cayman disclosure")**

157   While the August 2007 bankruptcy order against Securinvest was obtained from Judge Beethoven prior to the Braga retainer (which arose later in April 2010), the Cayman disclosure and the claim against the defendant relating to it, relates to the ultimate rejection of Securinvest's appeal in August 2011.[42] The rejection of Securinvest's appeal is averred by the plaintiffs to have been directly influenced by the Cayman disclosure—the disclosure of confidential information obtained by Dr. Braga in this jurisdiction, acting through the defendant.

158   The procedural chronology, in brief, was as follows.

159   Securinvest had appealed against Judge Beethoven's August 2007 bankruptcy order to the Tribunal de Justiça de São Paulo ("the TJSP") but on September 30th, 2008, the TJSP affirmed the judge's order.[43] In his judgment on behalf of the TJSP, it was Judge Akel who, for the first time, made reference to a common economic group having come to comprise Petroforte and the Rural Group.

160   In his earlier judgment issued on August 24th, 2007, Judge Beethoven had, however, made very damning conclusions against Securinvest and the wider Rural Group. It is important for present purposes to record aspects of this judgment here because an important element of the defendant's causation defence is that the crucial conclusions reached by the Brazilian courts, adverse to the plaintiffs, had been reached prior to the Braga retainer and the defendant's actions taken on behalf of Dr. Braga. Accordingly, that there was therefore no causal link

---

41   The plaintiffs' claim for US$100m. in respect of loss of the Sobar assets was abandoned during the arguments having regard to the disputed entitlement to them which is the subject of the revocation proceedings.

42   By the Superior Tribunal de Justiça ("the STJ"), the highest appellate court for non-constitutional questions of federal law and about which more below.

43   The TJSP's order *per* Judge Elliot Akel, being filed on October 16th, 2008.

426

between the defendant's actions and the plaintiffs' loss, at any rate in relation to Securinvest.

161   Having noted in his judgment that Dr. Braga had applied for the extension of the effects of the Petroforte bankruptcy over Securinvest and had requested that the BCB be notified (because the Sobar transaction was also seen as linked to Banco Rural), Judge Beethoven continued:

> "In reality, based on the petition . . . there is serious evidence that the very leaseback operation, as alleged, was *a flagrant sham* involving Rural Leasing . . . and the company Sobar (once the debt had been passed on to Securinvest, Banco Rural obtained title to the factory for a small amount representing a fraction of its true worth . . . These leaseback operations were highly prejudicial to Petroforte's creditors . . .
>
> Thus the intention to defraud Petroforte's creditors is proven . . . All that has exposed (the fraudulent) practices here has been the effort of the brilliant administrator in bankruptcy supported by the good work of the Public Prosecutor's Office of Sao Paulo. They took note of the operation thus involving Sobar. The commercial leaseback agreement was concluded for sky high values. Hence Sobar ended up owing Rural Leasing more than BRL 20 million . . . It followed the covert sale to Securinvest, in which the spurious link between Petroforte Group and Rural Group is obvious. Finally, it lends credence to the further operations effected and legal actions brought, listed by the Administrator at [illegible] 6 et seq of these case papers. All this was designed to frustrate the rights of the creditors in addition to the agreements between the companies, and in addition to the offshore companies belonging to Banco Rural. There is no doubt of the suspect behavior involved in the transactions with Petroforte Group . . . Clearly the Rural Group is liable given the well-known bankrupt status of Petroforte Group . . .
>
> In view of the foregoing, I hereby determine that a copy of this order and of the Administrator's statements shall be served on the Central Bank, and also on the Public Prosecutor's office, so that each may take measures within its competence against Rural Group, in view of what is found herein, and that all useful documents be placed at the disposal of the Central Bank at its simple request.
>
> Based on these facts, as a guarantee to the estate's creditors, I ORDER SEIZURE of all assets listed on pages 22 and 23 of these case papers [Sobar as well as the other Securinvest assets mentioned above] *in view of the mixing of the relations and assets now inferred. The case papers demonstrate the fraud, the perversion of the corporate object and the bad faith of those involved. Hence it is appropriate, as a preliminary, to disregard the legal personality of all these associated*

427

*companies, and to extend to them the bankruptcy of the Petroforte Group, in view of the embezzlement of assets and the erosion of capital which the financial group promoted, in collusion with Mr. ARI NATALINO. The management of Rural Group were included in this aspect. In light of the Consumer Defence and Civil Codes, the personal assets of the defrauders are liable for the company's debts, given the willful misconduct identified above.*

I therefore rule that the effects of the bankruptcy shall be extended to all the companies listed on page 02, and that the usual procedure shall be followed.

I order that an on-line stop be placed on all accounts of the companies and persons involved, the amount of which shall be as stated on page 40.

I order the appointment of Mr. ALEXANDRE CURY DE REZENDE, a person trusted by this court, as ...ANAGER of the company SOBAR S.A. . . . The commission requested shall be issued for that purposes. The Military Police shall take action for the requested purposes. The brief shall be carried out by the Administrator in Bankruptcy, and the manager shall lend support and write a report of the proceedings and of the measures taken . . . ANAC[44] is to take action to ground the aircraft."

162   A number of arguments were raised on behalf of the plaintiffs in relation to this judgment of Judge Beethoven. First, it is said that its real rationale was the finding that the Sobar transaction was a "flagrant sham" and that it was on that basis the judge decided to "disregard the legal personality of these associated companies and extend to them the bankruptcy of the Petroforte Group." Further, that nowhere did the judge purport to rely upon the common economic group theory. Rather, as mentioned above, it was Judge Akel of the TJSP who first invoked the theory in relation to Securinvest and Petroforte.

163   It was therefore also contended in argument and by Mr. Macaulay in his evidence on behalf of the plaintiffs, that Judge Beethoven got the facts and the law wrong when he made this judgment. As to the law, based on Brazilian legal advice, Mr. Macaulay contends that under Brazilian law, a third party (in this instance the Rural Group, including Securinvest) and its assets may be brought into another company's bankruptcy proceedings *only* if:

(a) The bankrupt entity and the third party acted with an intent to defraud creditors; *and*

---

44   The National Civil Aviation Agency of Brazil.

(b) The two companies were part of a "common economic group," *i.e.* acting under common ownership and control.

164   While insisting that the Sobar transaction is not a sham (which he emphasized is the very issue joined before another Brazilian court in the revocation action yet to be determined), Mr. Macaulay contends that the evidence, including the Cayman disclosure which was obtained by Dr. Braga in this jurisdiction with the aid of the defendant, confirmed that there was in reality no factual basis for a finding of "common economic group" as between Securinvest and Petroforte and/or between Banco Rural and Petroforte, as that concept is to be understood at Brazilian law. As Mr. Macaulay contends, the concept requires there to be common ownership between Securinvest and Petroforte, a state of affairs that never, in fact, existed as the Cayman disclosure merely proved that Katia Rabello is (and always has been, with her father or individually) the UBO of Securinvest.

165   This is a criticism which was maintained in the plaintiffs' pleadings in respect of the Brazilian judgments, including the TJSP's judgment of September 30th, 2008, all the way up to the final decision of the STJ in August 2011. The plaintiffs also emphasize that the final STJ decision (to be considered below) itself followed after Dr. Braga's obtaining of the Cayman disclosure and so must have been influenced by it.

166   The plaintiffs aver that in this way, the Cayman disclosure was pivotal in the erroneous finding of common economic group being ultimately upheld. They say that although Judge Beethoven had already made his judgment before the Cayman disclosure was obtained, the ultimate outcome before the STJ was undoubtedly influenced by the Cayman disclosure.

167   There is no dispute that the STJ certainly had access to the Cayman disclosure.

168   This criticism that the common economic group theory was misapplied by the Brazilian courts is strongly rejected by the defendant through Mr. Simpson. He characterizes it as an impermissible collateral attack upon the judgments of the Brazilian courts, judgments to which he argued, this court is, by principles of comity, obliged to defer and respect.

169   An important consideration of this duty of comity, insists Mr. Simpson, is the fact that the STJ, as the final appellate court, was bound by the findings of fact by the courts below and that both Judge Beethoven and the TJSP had concluded that the factual basis for the extension of the Petroforte bankruptcy over Securinvest was proven.

170   Faced with these arguments, and when pressed by this court during the latter days of the hearing, Mr. Akiwumi sought to explain that no criticism of the Brazilian judgments themselves is intended by the

429

plaintiffs. Rather, that what the plaintiffs contend is that the obtaining *ex parte* of the Cayman disclosure by the defendant and the unilateral and unwarranted[45] deployment of it by Dr. Braga before the Brazilian courts, as well as its release to the BCB and ultimately to the media, deprived the plaintiffs of the opportunity to contain its harmful impact and the ultimate prejudice which it caused to them, in the different arenas in Brazil.

171    The plaintiffs claim that had they been allowed notice of the defendant's applications to this court on behalf of Dr. Braga (instead of being denied notice due to the gagging orders obtained by the defendant),[46] the plaintiffs could and would have applied to this court for, at least, protective measures to contain the unwarranted misuse of the information in Brazil. Had they had this opportunity, that at the very least they would have limited the consequences of the defendant's actions in acting for Dr. Braga, in breach of its duties to them.[47]

172    They might well, say the plaintiffs, even have managed to persuade this court to refuse or revoke entirely the orders for disclosure, had they had the opportunity to explain that the revocation action instituted by Dr. Braga himself was still pending and therefore that the allegations of fraud raised against them and relied upon by Dr. Braga in his applications to this court were yet to be determined by the Brazilian courts. In this regard therefore, this court might have thought it proper to require Dr. Braga to first obtain the adjudication of the revocation action before entertaining his applications. The most telling factor against the plaintiffs in Dr. Braga's applications to this court, were the allegations of fraud upon the Petroforte creditors. Yet, neither Dr. Braga nor the defendant disclosed

———————————————

45    In the sense of not being authorized by this court.
46    Which prevented Equity Trust and CIBC as the respective respondents to the *Norwich Pharmacal* applications from notifying the plaintiffs, their clients.
47    See statement of claim para. 85(xi), para. 94(ix) and (x) (in relation to the absence of urgency which negated the need for *ex parte* applications which excluded the plaintiffs); para. 110 (citing the consequence of the *ex parte* action taken by the defendant which was that the plaintiffs were unaware of the defendant's actions until November 2010 after the Cayman disclosure had been deployed against them in the proceedings in Brazil, the United States, Belize and the British Virgin Islands ("BVI"); paras. 117, 125 and 127(iii), 133 and 135 (alleging again, the failure to notify the plaintiffs). Finally, and most expressly on this point, para. 136 pleads that—

"By reason of the Defendant's wrongful conduct in failing to inform the Plaintiffs of the (Norwich Pharmacal applications and orders) [the plaintiffs] had no knowledge of the First Norwich Pharmacal Order when it was made. In those circumstances and by reason of the Defendant's wrongful and unlawful conduct, the Plaintiffs were unable to apply to Court to seek relief prior to either (i) the Defendant's egregious breaches of contract, fiduciary duty and/or its duty of care; or (ii) prior to the wrongful consequential disclosure of confidential documents being made to the Defendant on behalf of Dr. Braga."

when seeking the *Norwich Pharmacal* orders that these were as yet merely unproven allegations.

173   I am persuaded that these arguments and pleadings are well grounded in probability. In its May 2011 judgment (reported as *Braga* v. *Equity Trust Co. (Cayman) Ltd.*  2011 (1) CILR 402)), this court, when reviewing the orders for disclosure and disapproving of most (even while approving of some) of the Cayman disclosure:

(i) expressly referenced the fact that the allegations of fraud against the Grupo Rural interests remained unproven; and,

(ii) moreover, found that there had been no risk of dissipation of assets belonging to the Petroforte estate such as could justify the wider disclosure that had been obtained;

(iii) and held that in any event, the urgency contended for by Dr. Braga in getting the disclosure and gagging orders[48] was unfounded in light of Judge Beethoven's injunctive order and appointment of a manager/receiver over all Securinvest assets, including over Sobar, the only alleged Petroforte asset identified; and

(iv) was concerned that Dr. Braga could be regarded as operating under a conflict of interest in light of the incentivized scheme for his and his court-appointed investigator OAR's[49] remuneration—remuneration which was based upon the amount of the recoveries achieved on behalf of the Petroforte estate. This especially was a very sensitive fact says the plaintiffs, which this court was entitled to be informed about from

_____

48   As set out in his first affidavit at paras. 14–15:
"This application is urgent. The reasons for the urgency are that the Brazilian Superior Court has given me a limited time in which to provide it with evidence as to the true beneficial owners of Securinvest. It has imposed a limited time window for that evidence to be provided, which is due to expire on Tuesday, 6 July 2010 . . . In addition . . . If those who are improperly seeking to avoid the turnover of a potential US$500 million of value to the Petroforte Estate are aware of my enquiries in Costa Rica, I suspect they are likely to take steps to frustrate my enquiries elsewhere, including in the Cayman Islands . . ."And further, at para. 43: "As I have explained above, one of the reasons this Application is so urgent is because of the value of the assets vested in Securinvest . . ."

49   OAR Consultantes Consultoria Ltda., the private investigatory firm engaged by Dr. Braga to assist in his investigation in Brazil and overseas with the aim of finding and "repatriating" to the Petroforte Estate, any assets belonging to any of a long list of Rural Group and Petroforte companies. OAR, by cl. 5 of its agreement with Dr. Braga, was expressly to be remunerated only on the contingency of recoveries, at 20% of value and at 30% of value, depending on whether it simply produced evidence which enabled the confiscation of known assets or whether it actually discovered and assisted in the recovery of unknown assets.

AP1226

the outset, when assessing Dr. Braga's credibility as the sole witness who gave evidence in support of his application for the far-reaching disclosure orders which were obtained, important aspects of which were later, upon review, reversed by this court for being "premature, unjustified and impermissibly wide."[50] It is also remarkable that this court also then made an order for the retrieval of most of the Cayman disclosure.

174   Thus, in essence, the claim of the plaintiffs is for loss of opportunity to seek remedial relief as a result of the defendant's actions in obtaining the *ex parte* orders on behalf of Dr. Braga. I will return to consider the claims as framed in these terms, when dealing with the pleadings on breach and causation and the law relating to them.

175   An important marker to lay down here is that this aspect of the claim *does not involve* this court having to consider any alleged "collateral attack" upon the judgments of the Brazilian courts. It is trite, and I accept, that any remedial relief in respect of its own orders would have been a matter for this court to grant either to pre-empt the use of the Cayman disclosure in Brazil (and in Florida, USA, the BVI and Belize where it was also used to the detriment of the plaintiffs) or to delimit its use in those jurisdictions. It is to be noted in this context as to the probable outcomes, that when this court made its retrieval order on July 25th, 2011 in respect of most of the Cayman disclosure, the Brazilian courts did, at least, purport to comply.[51]

176   I return here to the chronology of events in Brazil.

177   Having failed in its appeal to the TJSP, Securinvest appealed finally against Judge Beethoven's August 2007 judgment to the STJ where it did indeed contend, among other things, that Judge Akel's finding of "common economic group" was wrong.

178   Evidence was presented to the STJ on behalf of Securinvest which sought to show that far from there being any Rabello, Rural Group (or for that matter Natalino) interest in Securinvest, that company, while owned by Arnage and Brooklands, was ultimately owned by Costa Rican individuals through Costa Rican companies, as the registered owners of Arnage and Brooklands.

---

50   See the May 2011 judgment (above), in which this court also held that in light of the revocation action already instituted and the appointment of a receiver by Judge Beethoven over all Securinvest assets, there was no risk of dissipation and no urgency to justify Dr. Braga's seeking the breath of disclosure that he obtained.

51   See the certificate to the Grand Court, sent by the Brazilian court, certifying that the retrieval order had been implemented. "Purport to comply," because the BCB was nonetheless allowed to use the Cayman disclosure to the detriment of the plaintiffs.

432

179   This was a state of affairs which had come, at that time, to be reflected on the share registers of Arnage and Brooklands maintained in this jurisdiction ("the Costa Rican structure").

180   But the Costa Rican structure was, in reality, an artifice put in place before, on the instructions of Katia Rabello.[52] By those means, the Costa Rican individuals came to hold the shares in Arnage and Brooklands merely as her nominees but the Costa Rican structure was presented to the STJ as the real beneficial ownership of Securinvest.

181   Informed by OAR from their investigation in Costa Rica that the Costa Rican individuals were "people of straw," Dr. Braga persuaded the STJ (in circumstances to be more closely examined below) that he should be allowed to come to the Cayman Islands to investigate further into the UBO of Securinvest, through Arnage and Brooklands.

182   The STJ gave directions to allow him to do so and this was how he came to engage the defendant to act for him in this jurisdiction.

**Katia Rabello's reasons for lying to the STJ**

183   This court insisted upon an explanation from Katia Rabello of her reasons for devising the Costa Rica structure. In response, she filed her third witness statement in these proceedings. The creation of the Costa Rican structure to obscure her status as the owner of Arnage and Brooklands, and so as the UBO of Securinvest as well, she contends before this court, was not intended to defraud Petroforte's creditors by misleading the STJ over the existence of the "common economic group" issue. Instead, she contends that it was meant only to prevent the wholesale confiscation of all Securinvest assets (wider than just Sobar) and even greater harm to the Rabellos' interests—harm which she correctly anticipated would result from the public disclosure of her status as UBO of Securinvest in Brazil.

184   This is a contention which is sought to be explained on the basis also of her Brazilian legal advice, which is that her status as UBO of Securinvest, far from showing any commonality of ownership between the two Groups—Rural and Petroforte—rather proved instead that there was no such commonality of ownership as it confirms that only she, a Rabello, and no Petroforte interest, owns Securinvest.

---

52   According to para. 11 of the amended defence, the false information about the beneficial ownership of Securinvest through Arnage and Brooklands was submitted to the STJ on October 15th, 2009 and re-submitted on May 11th, 2009, the only change being that the names of the Costa Rican holding companies were switched from Arnage to Brooklands and *vice versa*.

433

185   If the Securinvest issue was the only concern, there would therefore have been, she asserts, no need to obscure her status as its UBO in the context of the STJ appeal. Her status as UBO should have resulted in Securinvest being released from the Petroforte bankruptcy. This, she argues, should therefore be taken by this court as confirming that her real objective was not to mislead the STJ or defraud Petroforte creditors but to prevent the even more harmful consequences of the disclosure of her status as UBO of Securinvest to the BCB and in the public domain in Brazil.

186   Especially in this regard, she invites this court to consider that by the time of the STJ hearing, the BCB had also embarked upon its own investigation into Banco Rural's involvement in the allegedly fraudulent Sobar transaction, as prompted by Judge Beethoven's judgment of August 24th, 2007.

187   And so, not only were her family and herself at risk of losing Securinvest's Sobar assets, they were (and remain) also at risk of losing all of Securinvest's other assets as well. Further, that they have in fact lost Banco Rural itself which has been compulsorily liquidated by the BCB following a run on the bank caused by the BCB's investigation having become public knowledge. All these events she avers, were triggered or exacerbated by the Cayman disclosure being deployed or publicized against her family in Brazil.

188   The Costa Rican structure is therefore ultimately sought by her to be explained as intended not to deceive the STJ in its determination of Securinvest's appeal but to protect Securinvest from the "confiscation" of its other and more valuable non-Sobar assets, by Dr. Braga.

189   Her family, she asserts, was willing to have the question of the Sobar transaction resolved in the revocation action and this was what would have happened had Securinvest succeeded in its appeal to the STJ. Thus there was no intention to defraud the Petroforte estate of Sobar assets. It is the extension of the Petroforte bankruptcy to all of Securinvest's assets which the plaintiffs regard as confiscatory and which she sought to avoid. And further, for reasons also articulated by Mr. Macaulay in his evidence, the campaign against Securinvest was all part of the incentivized scheme by which Dr. Braga and his advisers, OAR,[53] seek unjustly to enrich themselves at the expense of the Rural Group and the Rabello family.

---

53   As mentioned above, it is now acknowledged that Dr. Braga is assisted and advised by OAR (which was appointed by Judge Beethoven to assist in his inquiries). Mr. Macaulay's unchallenged evidence is that both are remunerated by way of commission as a percentage of recoveries made on behalf of the Petroforte estate.

434

190   These are concerns and explanations upon which Katia Rabello elaborates in her third witness statement[54] and for which she gets support from Mr. Toledo and Mr. Macaulay in their evidence.

191   For reasons which I trust will become apparent from my discussion of the legal principles on liability below, I did not need to reach a conclusion now on the veracity or correctness of these concerns and explanations.

192   Whether or not Katia Rabello's concerns and intentions were as she explains, will be of relevance to the *ex turpi causa* defence raised by the defendant and will be examined further in that context below.

**Conclusions on the plaintiffs' loss of opportunity to contest the *Norwich Pharmacal* applications**

193   What I was required to conclude upon and which I regard as established for the purposes of summary judgment on liability, is that, at minimum, there was indeed as pleaded a loss of the earliest opportunity for the plaintiffs to defend themselves in the context of the proceedings before this court. Further, that this loss of opportunity arose from the defendant's actions on behalf of Dr. Braga.

194   The defendant relies upon the fact that this court after an *inter partes* hearing approved those parts of the disclosure which revealed the evidence of Katia Rabello's status as UBO of Securinvest.[55] But that cannot in my view be relied upon by the defendant as an answer to liability for the loss of opportunity for the plaintiffs to have challenged the applications for disclosure.

195   I explain my reasons for this conclusion at this juncture, as follows.

196   First, it is notable, as discussed above, that other important aspects of the Cayman disclosure were found by this court to have been unjustified and went well beyond disclosure of the UBO of Securinvest. Given all the other arguments that the plaintiffs would likely have been able to put before this court, they may well therefore have succeeded, either in preventing Dr. Braga's deployment of their confidential information in Brazil altogether or at least in confining the use of it to the singular issue of the identity of UBO, which was pivotal to Securinvest's appeal then before the STJ.

197   The former of those two propositions now finds support in the likelihood that Dr. Braga would have been compelled to explain to this court why, in the absence of risk of dissipation of Sobar assets, he should

---

54   See immediately below.
55   Judgment delivered on June 10th, 2011, formal order May 20th, 2011.

435

not first have been required to prove his allegations of fraud in the revocation action and in so doing also compelled to answer to the concerns over his and/or his advisers' apparent conflicts of interest. These were concerns which could have led this court at first instance, had they been revealed, to question the *bona fides* of his applications especially for the *Bankers Trust* disclosure.

198   The latter proposition now also finds support in the fact that this court would have been inclined, as indeed it showed it was,[56] to impose restrictions to confine the use of the Cayman disclosure to only so much of it as was necessary for answering the specific question raised by the STJ (the subject of its mandate to Dr. Braga for coming to the Cayman Islands), *viz.* the identity of the UBO of Securinvest.

199   It is the denial of the opportunity to establish either of those two propositions that I regard as buttressing the plaintiffs' claims for breach of duty and consequential damages.

200   Ultimately, however, the plaintiffs (Katia Rabello in particular) will also need to establish to the necessary civil standard of proof, the various alleged losses as the result of this averred loss of opportunity. This issue of causation will also necessarily be examined in some detail below for the purposes of summary judgment on liability. The issue arises whether the plaintiffs are entitled to claim equitable compensation for breach of fiduciary duty (as they claim primarily) without proof of causation or must satisfy the "but for" causation test in seeking to recover damages for breaches of the equitable as well as contractual duties.

**Katia Rabello's bankruptcy**

201   A very obvious consequence of the use of the Cayman disclosure was the reliance on it by Dr. Braga, for petitioning *ex parte* to put Katia Rabello herself into the Petroforte bankruptcy and for persuading Judge Beethoven to hand the Cayman disclosure over to the BCB.[57]

202   It is an irresistible conclusion that these consequences would likely have been avoided had she had the opportunity to oppose the granting of the Cayman disclosure.

203   My reasons specifically for this conclusion will become clearer below after an examination of the Cayman *Norwich Pharmacal* proceedings, including the *inter partes* proceedings in which the plaintiffs were belatedly able to participate before this court, as well as the events which followed in Brazil.

---

56   See orders made upon the CR(P)L application.
57   This petition to Judge Beethoven's court will be examined below.

436

204   I return now to the chronology of events leading to Dr. Braga's applications to this court.

**The STJ directions and the *Norwich Pharmacal* applications to this court leading to the Cayman disclosure and Katia Rabello's bankruptcy**

205   As mentioned above, Dr. Braga acting through OAR, had made his inquiries in Costa Rica. He concluded that the individuals behind the Costa Rican structure were "straw men for unknown third parties,"[58] a situation which was not consistent with their purported beneficial ownership of a company as valuable as Securinvest. One of them had, moreover, denied having any interest in or knowledge of Arnage and Brooklands.

206   Dr. Braga was therefore able to persuade the STJ that he should be allowed to make further enquiries in the Cayman Islands into the ultimate beneficial (not merely legal) ownership of Securinvest.

207   The STJ, *per* Justice Nancy Andrighi, agreed that he should further his investigation but as a precautionary measure to avoid undue prejudice to Securinvest, she ordered the temporary suspension of the extension of the Petroforte bankruptcy over Securinvest.

208   As expressed by Justice Andrighi in her order of September 22nd, 2009 (translated):

"Doubt as to the economic group to which SECURINVEST belongs initially suggests that its rights should be protected. Until it is possible to determine which economic group SECURINVEST belongs to, I consider it appropriate to suspend, for the time being, the winding up order before the harm caused to its business becomes irreversible.

However, this measure cannot continue indefinitely. The uncertainty that hangs over this subject must be cleared up.

According to the information contained in this injunction application, SECURINVEST is a company made up of two shareholders: ARNAGE HOLDINGS LTD and BROOKLANDS HOLDINGS LTD (both of which are legal entities based in a foreign country). Documents have been submitted within the proceedings which recount that neither of the two foreign companies have among their shareholders any of the businesses or individuals involved in Grupo Rural or Grupo Petroforte, according to the information checked by the Sao Paulo Public Prosecution Service.

---

58   Dr. Braga's first affidavit, dated May 26th, 2010 filed in support of the *Norwich Pharmacal* applications, at para. 12.

437

That information however, is not enough to clear up the doubts which these proceedings throw up. SECURINVEST must not just limit itself to saying who does not have a share in its capital. It is possible, for example, that the businesses ARNAGE and BROO¹ LANDS have among their shareholders other legal entities, and so indirectly it might be possible to identify the two economic groups. Therefore, instead of saying who its shareholders are not, SECURINVEST must indicate who actually has a shareholding in its capital in order to eliminate the impasse over this issue.

For these reasons, I hereby grant this interim injunction and suspend the winding up order against SECURINVEST for a period of 15 (fifteen) days. Within that time limit, the applicant must submit to the High Court of Justice documents which specifically demonstrate who its shareholders are, who the shareholders of the shareholders are, and so on. This must be done in such a way that the corporate chain is unraveled and all the individuals with a direct or indirect share in the company's capital are revealed.

After that information has been submitted, the matter must return for a decision on whether to confirm or revoke the interim injunction hereby granted.

Let the respondent be served so that it may submit a response within the legal time limit."

209   From the foregoing it is clear that the issue before the STJ was two-fold: (i) the identity of the UBO of Securinvest, and (ii) whether Securinvest should remain within the Petroforte bankruptcy by operation of the legal theory of common economic group.

210   There was at that time no question of Katia Rabello herself or her assets being placed into the Petroforte bankruptcy and there is nothing to suggest that the STJ had such a possible outcome in mind.

211   But as was to be soon apparent, Dr. Braga had a different agenda which was not disclosed to this court.

212   Having come to Cayman, Dr. Braga retained the defendant.

213   The first application made by the defendant on his behalf by reliance on the *Norwich Pharmacal* principle[59] sought orders addressed to Equity Trust for disclosure of information held on behalf of Arnage and Brooklands (as the registered owners of Securinvest).

---

59   *Norwich Pharmacal Co.* v. *Customs & Excise Commrs.* (52). His affidavit also cited the *Bankers Trust* principle: *Bankers Trust* v. *Shapira* (9).

438

214   This was on the basis that Equity Trust, in terms of the *Norwich Pharmacal* principle, had become "innocently mixed up" in the fraudulent wrongdoing of Securinvest (and by association Arnage and Brooklands) in its attempts to defraud Petroforte of its assets.

215   This application, made *ex parte* and so without notice to the plaintiffs, resulted in orders made on May 27th, 2010 for the disclosure to Dr. Braga of confidential information which showed not only that Katia Rabello was the UBO of Securinvest through Arnage and Brooklands, but also that on her instructions the registered offices had been changed from CIBC to Equity Trust. It also showed, ultimately to her greatest embarrassment, that also on her instructions to Equity Trust given only some days after Justice Andrighi's order, the Costa Rican structure had been put in place.

216   Recognizing that Equity Trust would have had a fiduciary obligation to inform its clients of the May 27th, 2010 orders ("the Equity Trust orders") and was obliged to bring an application to this court before it could divulge its client's confidential information,[60] the defendant on Dr. Braga's behalf also sought and obtained a "gagging" order, preventing Equity Trust from notifying the plaintiffs of the existence of the proceedings and of the Equity Trust orders.

217   The justification for such orders was said by Dr. Braga to have been to prevent the respondents (first Equity Trust and later CIBC) from "tipping off" their clients "which would likely frustrate and prejudice my investigation. I also seek an injunction which would have the effect of keeping my investigation confidential in Cayman with respect to Brooklands and Arnage."

218   Dr. Braga having thus obtained information from Equity Trust which also showed the earlier involvement of CIBC as service provider to Arnage and Brooklands (and so indirectly to Katia Rabello); a second application[61] was made on his behalf by the defendant resulting in an order of July 1st, 2010 directed to CIBC for disclosure ("the CIBC orders"). Gagging orders were again obtained to prevent CIBC from notifying its former clients.

219   Together, the Equity Trust orders and the CIBC orders are hereinafter referred to as "the *Norwich Pharmacal* orders."

220   As already mentioned, the information sought and ordered to be disclosed extended far beyond that which showed the UBO of Securinvest

---

60   Under the law as it then stood, pursuant to the Confidential Relationships (Preservation) Law ("CR(P)L"), s.4.
61   Again relying on the *Norwich Pharmacal* and *Bankers Trust* principles.

439

and included other information held by the respondents about the financial affairs of the plaintiffs.

221    Of its own motion, this court had, however, required of Dr. Braga certain undertakings to limit the use and disclosure in Brazil and elsewhere of the confidential information obtained by way of the *Norwich Pharmacal* orders. Essentially, the undertakings were that the information not be used or disclosed by him outside of the Petroforte bankruptcy proceedings.

222    Unfortunately, and perhaps inevitably given the entirely *ex parte* nature of the proceedings, those undertakings proved not to have been sufficiently worded to have prevented Dr. Braga from initiating or prompting the dissemination of the Cayman disclosure beyond the STJ, in Brazil.

**The *inter partes* review by this court leading to the May 2011 judgment**

223    The insufficiency of the undertakings became a subject of concern for the plaintiffs when, on the *inter partes* basis long after Dr. Braga's deployment of the Cayman disclosure in Brazil,[62] they sought a review of the *Norwich Pharmacal* orders and the Cayman disclosure by this court.

224    The unduly extensive nature of the Cayman disclosure and its onward dissemination to the BCB or acquiescence in it by Dr. Braga, were the subjects of deserved criticism by the plaintiffs and this court in its May 2011 judgment.

225    However, no finding of a contemptuous breach of his undertakings was made against Dr. Braga, given the lack of clarity and specificity of the wording. The court expressed its concerns all the same, that the spirit of the undertaking had been violated by him.[63]

**Katia Rabello's bankruptcy**

226    Dr. Braga's first port of call after obtaining the Cayman disclosure was not the STJ but Judge Beethoven's first instance bankruptcy court.

227    There, he deployed the Cayman disclosure in support of a new (and again) *ex parte* petition for the extension of the Petroforte bankruptcy to Katia Rabello personally, to her lawyer and close associate Flavio Barbosa Do Amaral Jr. and to all other identifiable entities of the Rural Group. This petition appears to have relied upon a different legal theory or premise, *viz.* the "disregarding of legal personality" although apparently to some as

---

62    When for the first time, the plaintiffs became aware of the *Norwich Pharmacal* orders and Cayman disclosure having been obtained.
63    See judgment of May 20th, 2011 (extracted below), at para. 265.

had been invoked by Judge Beethoven himself against Securinvest at first instance.

228   Judge Beethoven readily granted the petition, as appears from the strident language of his judgment of October 28th, 2010. It is clear that his judgment was heavily influenced by the Cayman disclosure as it revealed Katia Rabello's lie to the STJ. Relevant passages are excerpted as follows:

> "This matter concerns seeking CIVIL LIABILITY AND THE DISREGARDING OF LEGAL PERSONALITY, along with an application for a freezing order submitted by the LIQUIDATED ESTATE OF PETROFORTE BRASILEIRO DE PETROLEO, and which cites the banker KATIA RABELLO and the lawyer FLAVIO BARBOSA DO AMARAL JUNIONR. The Trustee [illegible] a huge amount of documents.
>
> These documents for the most part were obtained abroad by the Trustee who applied in camera from the courts of those countries at hearings held in camera. This was all done with the authorization of this court and the Office of Counsel for the State consented to this step being taken, as appears in the secret action taken before this court.
>
> . . .
>
> Through this brief report I DECIDE AS FOLLOWS.
>
> INITIAL DECLARATION
>
> Even after 32 years of service to the Judiciary of Sao Paulo, this lowly judge is suddenly faced with a truly shocking situation . . . The respondent relied upon LIES and FRAUDULENTLY AVOIDING the Honourable SUPERIOR COURT OF JUSTICE, as represented by the brilliant and esteemed JUSTICE NANCY ANDRIGHI, the greatest judge the JUDICIARY of this country can boast of; it disrespected the moral grandeur of Justice Andrighi, who granted the PETROFORTE GROUP an interlocutory injunction suspending the extension of the effects of the Winding Up Order by way of an interim measure issued by that Honourable Court—as is evidenced by the documents attached to the application by the diligent Receiver, ALVES BRAGA.
>
> UBI GENTIUM SUMUS? As Cicero would say.
>
> The key issue relating to the interlocutory order granted by the aforementioned esteemed Justice lay in unraveling the link which the shareholders in SECURINVEST had with the PETROFORTE ECONOMIC INTEREST GROUP. To put another way, it is alleged that the Court

441

AP1236

acted erroneously because, allegedly, no one from SECURINVEST had any relationship with any company in the LIQUIDATED GROUP.[64]

Thus, despite that initial astonishment, the documents attached, and obtained from abroad by the Trustee, demonstrate that the order of the brilliant Justice NANCY ANDRIGHI, Interlocutory Order [which require SECURINVEST to reveal

'. . . exactly who the shareholders are, who the shareholders of the shareholders of the shareholders are and so forth . . .'

was responded to by SECURINVEST [by] FALSEHOOD—because, according to documents from the [illegible] country [presumably Cayman Islands], COSTA RICA, the shareholders in SECURINVEST are ARNAGE HOLDINGS in the Cayman Islands—which has one shareholder, DESAROLLO DE PROYECTOS S.A., with only one shareholder, by the name of Jose Ignacio Jenkins Moreno—and BROOKLAND HOLDINGS, also from the Cayman Islands—which has its shareholder the individual Adriana Cordero Ehreberg.

It should be noted that the very clear order of the esteemed Justice revealed that the information provided by SECURINVEST was to the effect that, from among their shareholders, whether individuals or companies, neither ARNAGE HOLDINGS nor BROOKLANDS HOLDINGS had shareholdings in Rural Group or the PETROFORTE GROUP . . . and therein lies the core falsehood used to deceive . . .

The attitude of SECURINVEST is incredible—a thousand times incredible. It is a product and demonstration of the prurient times in which we live that the Superior Court and the meticulous Judge Rapparteur could be FRAUDULENTLY DECEIVED. The rectitude and probity of the Reputable Order were defiled by the action of SECURINVEST which touches on LITIGATION IN BAD FAITH . . . in that way SECURINVEST gambled its defence against an incontrovertible fact, distorting the

––––––––––––––––––––

64  It must be noted here that with the Brazilian legal theory framed in those terms, the Cayman disclosure, in revealing the link between Securinvest and Rural Group (through Katia Rabello), did not reveal that anyone from Securinvest had any relationship with any company in the "liquidated group" (*i.e.* Petroforte). This, Katia Rabello argues, was the mistaken "common economic group" basis for the extension of the Petroforte bankruptcy to Securinvest. A different basis was however apparently adopted here against Katia Rabello herself on Dr. Braga's petition by reliance on art. 50 of the Brazilian Civil Code, and so by disregarding her separate legal identity (and that of the other subjects) to treat them as liable for the debts of Petroforte. This emerges more clearly from later passages in Judge Beethoven's judgment below. Despite this change of tack by Dr. Braga deployed *ex parte* against her, Katia Rabello's appeal to the TJSP was refused. She appealed further to the STJ, where her appeal is yet to be concluded.

442

documented truth after the Court Order was made by creating [illegible] SHAREHOLDER COMPOSITION in order to make believe that there was no connection between RURAL GROUP and the PETROFORTE GROUP, something which was manifestly unfounded, invented and deceitful and which showed disrespect for the Courts and the esteemed Judge Rapporteur. SECURINVEST was oblivious of the fact that these claims did not—nor could they—produce any returns from lies . . .

Even more incredible is the disrespect which SECURINVEST showed to the Courts when it fraudulently altered the shareholder composition of the companies located in tax havens because the documents which the Trustee obtained in Costa Rica, the Cayman Islands and the British Virgin Islands reveal without shadow of doubt that the abovementioned shareholder composition was created after the date when the brilliant Judge Rapporteur made the order requiring clarification as to [ultimate beneficial ownership].

. . . Thus it has been fully established that the ultimate beneficiary of SECURINVEST always was and continues to be KATIA RABELLO . . .

To put it another way; at the time of this Court's decision making SECURINVEST liable for the debts of PETROFORTE in light of clear connections which it has with the liquidated company, Katia was the SECURINVEST shareholder—and FALSE INFORMATION has been supplied to the SUPERIOR COURT OF JUSTICE, because as at 05.11.2009 an email was sent (see page 155) stating that ARNAGE and BROOKLANDS had been incorporated in 2000—it also stated that these companies form part of the structure set up in order to enable Banco Rural to show a better financial balance—so SECURINVEST was set up to in order 'to clean up Banco Rural's balance sheet'[65] . . .

Similarly, it is not possible to say that the owners of SECURINVEST had no relationship with the liquidated company. The dismissal of the director in the Cayman Islands by Katia Rabello and his replacement by the Equity Trust [illegible] intention of misleading JUSTICE NANCY ANDRIGHI. This was untruthful, it created a new circumstance that would frustrate the true situation with regard to the control of SECURINVEST, and it was a manifestly malicious act.

Note must also be taken of the letter from FLAVIO BARBOSA AMARAL giving an account of the creation of Arnage and Brooklands so as to

---

65   It is unclear why, in light of this earlier admission by email on November 5th, 2009, it was nonetheless alleged by Dr. Braga (and accepted by Judge Beethoven) that the connection between Securinvest and Rural Group (through Katia Rabello) was sought to be hidden from the Brazilian courts.

443

'enable Banco Rural to produce better financial statements' and 'to clean up the balance [sheet].'[66] . . .

Similarly, the documents reveal [illegible] that the deceased bankrupt ARI NATALINO was involved with KATIA RABELLO, with River South as intermediary for him and SECURINVEST for her—which by the way was admitted by ARI when he was heard in court. Thus by linking the word of ARI to what FLAVIO AMARAL stated in the letter revealed above, [it can be seen] that SECURINVEST was created to obtain these loans . . .

CONCLUSION

There can be no doubt that hundreds of documents have been omitted, relating to the promiscuity between the companies in the BANCO RURAL [GROUP] and the PETROFORTE GROUP—all in the [illegible] of decisions predating this Judgment and since confirmed by the Court of Justice of SAO PAULO.[67] The true malicious litigation perpetrated, albeit unsuccessfully, by PETROFORTE was revealed, and note should be taken of the judgments of the honourable LABOUR COURT and the Report from the BANCO CENTRAL (CENTRAL BANK OF BRAZIL), all of which have been appended by the Trustee. For that reason, imposition of personal liability on the parties cited in this action must be rigorously enforced, in view of Art 50 of the Civil Code.[68]

OPERATIVE PART

In light of the foregoing, I ALLOW IN FULL the application made by the Trustee. I order that the legal personality of all the companies identified on page 102 be disregarded due to the clearly established

---

66   It is worth noting that while this aspect of the evidence as revealed by the Cayman disclosure (as many other aspects) appeared to put the subjects of the petition in a negative light without having given them an opportunity to explain, the obvious explanation was that the use of Securinvest in this way was not in and of itself unlawful but an advisable strategy on which the defendant itself advised, for the recovery of Banco Rural's bad debts and as illustrated by the note purchase transaction.

67   This is a reference to Securinvest's appeal to the TJSP from Judge Beethoven's earlier judgment having been refused—the further appeal then taken to the STJ.

68   Article 50, that which was relied upon here for "the disregarding of legal personality" (as taken from the translation of Dr. Braga's petition) provides:

"If legal personality is abused, through perversion of purpose or by the intermingling of assets, the courts may decide, on application by the party concerned or by the public prosecution service if it joins the proceedings, that the effects of certain given binding relationships extend to the personal assets of directors or members of legal persons."

444

link with the PETROFORTE GROUP, despite the fact that it has been noted that a number of directors, controllers and managers are declared to be liable for the irregularities found. I impose a freezing order to be placed on the assets of KATIA RABELLO and of FLAVIO BARBOSA DO AMARAL JUNIOR pursuant to Art. 40 Decree Law no. 7.661/45 and an extension of the effects of the Winding up Proceedings to both so that their assets shall be liable to meet the debts of the Liquidated Estate, in light of their attitude to the matters under review. I therefore make the following orders:

1)   I order that the bank account of both be blocked and seized ELECTRONICALLY.

2)   The application from these individuals for DISMISSAL be dismissed in order to implement this action . . .

7)   The BANCO CENTRAL shall be served with a copy of this decision, for the purposes set out in page 104 [of the petition].

8)   A copy of this decision shall be sent by official letter to the Honourable JUSTICE NANCY ANDRIGHI, with a direction that the Trustee deliver the appropriate documents.

The Registry Office shall be notified that, due to the fact that the proceedings have been ordered to be heard IN CAMERA in the Cayman Islands, only interested parties shall have sight of and free access to the court papers, along with their legal representatives . . ."

**Relevance of Judge Beethoven's judgment of August 2010 to the plaintiffs' case**

229   I must make a number of relevant findings and observations here about this judgment by way of expansion on conclusions already recorded above.

230   First (and without intending any criticism of the judgment), its obvious far-reaching effects against Katia Rabello, going far beyond anything that this court could have contemplated when granting the *Norwich Pharmacal* orders on the *ex parte* basis on which it did.

231   While Katia Rabello was named as a subject of the second *Norwich Pharmacal* application, no indication was given to this court of Dr. Braga's intention to press, beyond the remit given him by the STJ in respect of Securinvest, for the extension of the Petroforte bankruptcy to her personally, by reliance upon the Cayman disclosure.

232   Had that intention been disclosed to this court, a different view may well have been taken of the making of the gagging orders which were sought and granted and which resulted in the Cayman disclosure being

445

released from this jurisdiction to Brazil entirely without notice to her (or to any other plaintiff).

233  Indeed, the specific basis upon which Dr. Braga was granted *Norwich Pharmacal* relief was emphasized by this court in the May 2011 judgment where (at paras. 100–101) is noted the following:

> "In response to those criticisms [as to his lack of standing to bring the applications], Dr. Braga also presented an alternative argument—developed in his third and fourth affidavits—to the effect that he would, in any event, have been entitled as officeholder over the Petroforte Bankruptcy, to investigate the alleged 'economic group' connection with Securinvest and so entitled to Norwich Pharmacal relief in any event in that capacity, whether or not he remained as Administrator over Securinvest.

> I am obliged to explain that that is not a premise that I would have accepted given the clearly different basis on which he obtained the Norwich Pharmacal relief in his capacity as office holder over Securinvest."

234  Thus, it was clearly not within the contemplation of this court that Dr. Braga would have been deploying the information against Katia Rabello personally, or against her other interests within the Rural Group apart from against Securinvest itself.

235  Indeed, had such an intention been understood, a different view may well have been taken of the *Norwich Pharmacal* applications being allowed to proceed *ex parte*, in the first instance.

236  The very need for the gagging orders themselves would have been seen in a different light, orders which, in any event, could hardly have been necessary to ensure the compliance of CIBC and Equity Trust. Yet, it ought to have been apparent to the defendant that Katia Rabello was at risk of the actions to be taken in Brazil by Dr. Braga, once armed with the Cayman disclosure. She was in fact specifically named as a subject of the second *Norwich Pharmacal* application addressed to CIBC and which sought the wider disclosure about her financial affairs (including the note transaction involving Arnage and Brooklands on which the defendant itself had advised). This wider disclosure—described by this court as being of the unwarranted *Bankers Trust* type,[69] had not been authorized by

---

69  Citing *Bankers Trust* v. *Shapira* (9), the leading case on the principles governing *ex parte* disclosure of financial information which may lead to the location or preservation of assets or where there is a risk of dissipation of assets. The principles are discussed in the May 2011 judgment (2011 (1) CILR 402, at paras. 63–78).

446

the STJ and was found by this court,[70] upon the eventual review of the *Norwich Pharmacal* orders, to have been improperly obtained.

237   What the defendant ought to have realized then may now be but a secondary consideration—foreseeability not being a requirement for liability for breach of fiduciary duty.[71] Its understanding then of the situation is, however, now relevant (assuming as I have found,[72] that Katia Rabello was a client), to the issue of its actual breach of duty, in acting as it did against her and her interests on behalf of Dr. Braga.

**The plaintiffs' loss of opportunity to respond to the *Norwich Pharmacal* applications and the May 2011 judgment**

238   The defendant's actions also go to Katia Rabello's loss of opportunity to respond to the *Norwich Pharmacal* and CR(P)L applications, and to do so before the Cayman disclosure was allowed to leave this jurisdiction.

239   Anticipating an adverse conclusion on this aspect of the case—in particular as to the alleged breaches of duty owed to Katia Rabello—the defendant's response, *per* Mr. Simpson, is essentially that there is in any event no proven causation of loss because Katia Rabello would have been (and might yet be),[73] released from the Petroforte bankruptcy if Securinvest itself had been (or is ultimately) released.

240   In other words, that no loss was caused which would not have been caused once her status as UBO became known to the Brazilian courts.

241   But this is hardly an effective response given that, even if the defendant is correct in this supposition, the fiscal harm which will have been caused in the meantime to her interests will be undeniably significant. This fiscal harm would have occurred over many years of litigation, arising from legal costs, as well as the restraint and alienation of her assets. Regard must also be paid to the adverse intervention by the BCB upon Banco Rural, alleged by Katia Rabello to have been also caused by the Cayman disclosure.

242   Regrettably, also now to be factored in, and as is also now apparent from hindsight, Dr. Braga's representations to this court that there was a risk of dissipation of assets as a basis also for the gagging orders and rapid *ex parte* disclosure, were not true.

---

70   In its May 2011 judgment (on which in this context, see further below).
71   As will be discussed further below.
72   And as will be more fully explained below.
73   Referring her to Katia Rabello's appeal which is still to be finally resolved by the STJ.

447

243   This is confirmed, as shown above from Judge Beethoven's judgment of October 28th, 2010, by the earlier appointment of the manager/receiver over all Securinvest assets.

244   And so, by hindsight, it is also now apparent that Dr. Braga's real reason for wanting to shut the plaintiffs out of the Cayman proceedings was to steal a march on those, beyond Securinvest itself, against whom he intended to extend the Petroforte bankruptcy and in so doing seize their assets.

245   Had this court not been misled in relation to the need for secrecy and urgency, again it is highly probable that it would not have proceeded on the entirely *ex parte* basis, nor granted the *Norwich Pharmacal* orders in the terms that it did.

246   Katia Rabello (and, where applicable, other plaintiffs) seek, and are in my view entitled, to rely on this high probability now to ground their claims for breaches of duty and consequential loss.

247   These conclusions, while far-reaching as regards the breach of duties and so potentially detrimental to the defendant's defence on causation, I am satisfied can safely be reached now despite the fact that this court, upon its review of the *Norwich Pharmacal* orders, decided that some of the Cayman disclosure had been properly granted, even while deciding that much of it had not.

248   As explained in the May 2011 judgment, this court was then hearing the matter on the basis of specific criticisms then raised by the plaintiffs in respect of Dr. Braga's conduct in the Cayman proceedings. It then did not have the benefit of hindsight it now has in relation to important aspects of the plaintiffs' case. In summary the concerns which were then addressed were as follows.

*1. The first and pivotal question (already touched upon in passing above) was whether Dr. Braga had proper standing for making his applications to this court for any of the Cayman disclosure. As explained at para. 42 (i) of the May 2011 judgment:*

"Dr. Braga's alleged misrepresentation to this Court as to the nature, meaning and effect of the Suspension—that is the Stay Order of the 22 September 2009 of the STJ, as ratified and confirmed by the STJ on 7 May 2010.

As a corollary to this, the alleged misrepresentation by Dr. Braga as to his status as officeholder over Securinvest in light of the suspensive meaning and effect of the Suspension.

And, as a further corollary, Dr. Braga's alleged misrepresentation to this Court as to his authority to act in the Cayman Islands as the

448

equivalent of trustee in bankruptcy of Securinvest—the basis upon which he obtained the Norwich Pharmacal Orders."

249   On this issue, this court found, in summary, that Dr. Braga did not misrepresent to the court his status as judicial administrator over Securinvest at the time of his applications for *Norwich Pharmacal* relief. It was accepted that he was authorized by the STJ and so had standing to bring the applications.

250   The second issue:

"Dr. Braga's alleged non-disclosure of the Revocation Suit which he had instituted in respect of the SOBAR transaction and which he had failed to pursue; instead seeking to extend the Petroforte Bankruptcy to Securinvest and other Rural Group entities.

Brazilian law. As a further corollary, the alleged failure of Dr. Braga to disclose to this Court, Securinvest's defence to the SOBAR fraud allegations."

251   In essence, Dr. Braga's response to these criticisms was that he was under no obligation to disclose the revocation action and discuss its implications with this court because that was all irrelevant to Securinvest's appeal which was then before the STJ and which was the basis upon which he had been directed to investigate the UBO of Securinvest in this jurisdiction.[74] Further, that Securinvest had been placed into the Petroforte bankruptcy, not on any basis of judicial finding of fraud (the subject-matter of dispute enjoined in the revocation action) but on the basis of findings of fact by the lower courts of a common economic group between Securinvest and Petroforte. And moreover, that these were findings of fact which were not to be reversed on appeal to the STJ, which was concerned only with the *legal basis* for the extension of the bankruptcy.

252   This meant, therefore, that the factual conclusions reached by Judge Beethoven at first instance and affirmed by the TJSP were unassailable. And this was though the implication was that the underlying factual allegations of fraudulent collusion between Sabino Rabello and Ari Natalino must have been accepted and acted upon by those courts, without either the Rabello interests or the Natalino interests having had the opportunity to respond to those allegations.

253   That having been the basis upon which the issue of the revocation action was addressed by Dr. Braga upon the review by this court at paras.

---

74   It must be noted that when it suited him, Dr. Braga argued differently to the effect that he was entitled to use the Cayman disclosure to advance the revocation action and for the recovery of assets generally. See the May 2011 judgment.

449

106–110 of the May 2011 judgment, the following conclusions were reached:

"If this [the narrow legal basis for appeal to the STJ] is correctly taken as precluding Securinvest's assertion before the STJ that it has a factual defence to the allegations of fraud upon which the extension of bankruptcy has been made to it, then Dr. Braga could have had no obligation to bring such a factual defence to the attention of this Court when making the Norwich Pharmacal application . . .

I do not consider that Dr. Braga had a duty to disclose any more than the fact of the existence of the Suspension and the appeal before the STJ . . .

Whether, as a matter of Brazilian law and procedure, it was permissible and fair for Dr. Braga to have instituted the Revocation Suit in respect of the SOBAR transaction, then elected not to pursue those proceedings, opting instead by ex parte proceedings before the same Court to seek and obtain the extension of the Petroforte Bankruptcy to Securinvest; is not a matter upon which this Court can properly seek to pass judgment. That issue is for the Brazilian Courts to determine. It would therefore have been irrelevant to the question whether the Norwich Pharmacal relief in aid of the Bankruptcy proceedings should have been given by this Court."

254   Those conclusions were reached specifically and only in the context of this court's review of the Cayman disclosure in response to the STJ's mandate to Dr. Braga in relation to Securinvest. Those conclusions in no way anticipated or condoned the use of the Cayman disclosure against Katia Rabello herself or against any other Rabello interest. That was not the subject which was before this court for review.

255   All I think I need repeat for emphasis now with the benefit of hindsight—not only from the point of view of the extension of the Petroforte bankruptcy to Securinvest as considered in the May 2011 judgment but also especially, and differently, as regards its extension to Katia Rabello and her interests—is that it is highly probable that her concerns that the allegations of fraud should first have been resolved in the context of the revocation action before the Cayman disclosure was released for deployment against her in Brazil, would have been regarded by this court as relevant and persuasive. Had she been afforded the opportunity to make that case, it is also highly probable that Dr. Braga would not have been able to force her into the Petroforte bankruptcy without having first resolved the revocation action (which remains unresolved).

450

256   As already mentioned, this is an important aspect of the loss of opportunity of which she (and by association the other plaintiffs) now complain.

257   In the absence of written reasons from this court for the grant, *ex parte*, of the *Norwich Pharmacal* orders, it must be assumed that the allegations of fraud, albeit then as yet unproven, would have been of central importance to the deliberations of this court when granting those orders.

258   Indeed, at para. 120 of the May 2011 judgment, following the *inter partes* review, the following finding—reflective of the basis for the exercise of the *Norwich Pharmacal* jurisdiction itself—appears:

> "In light of what has been brought to the attention of this Court about the allegations of wrong-doing in Brazil by the use of Securinvest for the fraudulent stripping away of Petroforte Bankruptcy assets, the Defendants [*i.e.* Equity Trust and CIBC] may be regarded as having become innocently 'mixed-up' in those allegations by their arrangements with the Applicants which enabled the impugned transactions to remain concealed."[75]

259   Katia Rabello's inability, for want of notice, to have addressed this issue of fraud in the first instance before this court (and consequently it seems, to address it proactively as it remained to be resolved in the revocation action or in any other forum) in her own defence, is another important aspect of the loss of opportunity of which Katia Rabello now complains and which goes properly, in my judgment, to the issue both of the defendant's breaches of duty as well as to their consequences. These are issues to be more closely examined below.

260   Here I can conclude that had Katia Rabello been given the opportunity to address this court on these matters, it is highly probable that, at the very least, clear and strict orders would have been made to preclude Dr. Braga's deployment of the Cayman disclosure against her personally in the Petroforte bankruptcy, or its disclosure to the BCB to be deployed against Banco Rural—matters which went well beyond the mandate given to Dr. Braga by the STJ.

261   It is safe to arrive at that conclusion now precisely because neither of those uses of the Cayman disclosure was either contemplated or expressly allowed by the *Norwich Pharmacal* orders.

262   For completeness, I will also examine the third, fourth and fifth

---

75   See also 2011 (1) CILR 402, at para. 52 (where the analysis proceeded expressly on the basis that the allegations of fraud were as yet unproven but nonetheless sufficed for the grant of *Norwich Pharmacal* relief.

451

aspects of the plaintiffs' complaints to this court at the time of the *inter partes* review:

*2. Dr. Braga's alleged breach of the* express *undertakings given to this court upon the grant of the CR(P)L orders for disclosure of the confidential information belonging to Arnage and Brooklands and so relating to or belonging to their ultimate legal and/or beneficial owners. Related to this, Dr. Braga's alleged breaches of the implied undertakings given to this court upon seeking and obtaining the Norwich Pharmacal orders.*

263    In this regard Dr. Braga had indeed given undertakings (both expressed and implied) not to use and file copies of any of the Cayman disclosure for any purpose other than (i) for complying with the order of the STJ; (ii) for the institution and prosecution of any proceedings relating to the Petroforte estate either in Brazil or overseas; or (iii) his investigation regarding the UBO of Securinvest.

264    The evidence reveals that while Dr. Braga did not himself disclose the Cayman disclosure to the BCB, he did persuade Judge Beethoven to direct that that be done for the purpose of expanding the reach of the Petroforte bankruptcy over Banco Rural.[76]

265    It was found by this court from the evidence then available, that his breaches of the undertakings did not rise to the level of proof required for a finding of contempt.[77] However, this court remarked upon his failure to honour the *spirit* of the undertaking in these terms:

"While the Court must express its disappointment at Dr. Braga's failure to honour the spirit of the Undertakings by taking reasonable measures available to him to protect the confidential information, I am obliged to conclude that he is not shown to have breached the terms—expressed or implied—of the Undertakings.

---

76    Dr. Braga's petition to the Bankruptcy Court, dated October 25th, 2010, submitted:
"Petition official letters be addressed to the Central Bank of Brazil for the purposes of acknowledging the transactions of Securinvest Holdings along with the Rural/Petroforte Group, as well as knowing that its actual owner is Katia Rabello. Also, that its shares from Banco Rural and other companies shall be attached and collected by the bankrupt estate. (Law 6.024, on 03/13/74). In the same way, it needs to acknowledge that it is the Rural Group, and personally Ms. Katia Rabello that are behind the companies listed in that evidence."
77    As discussed at paras. 88–136 of the May 2011 judgment (2011 (1) CILR 402).

452

ARNAGE HOLDINGS v. WALKERS

In reality, the circumstances of this case emphasize the need for great circumspection (already recognized in the *Codelco* case (above),[78] in the granting, on the ex parte basis, of discovery orders in aid of foreign proceedings; in particular where discovery is to be the consequence of Norwich Pharmacal type applications in aid of foreign proceedings."

266  All the more reason, say the plaintiffs, why it was wrong in all the circumstances then prevailing for the defendant to have acted against them on behalf of Dr. Braga and to have obtained the gagging orders preventing them from making a timely and effective response to his applications.

267  The plaintiffs' case in this regard is firmly grounded in high judicial authority. In *National Comm. Bank of Jamaica Ltd.* v. *Olint* (50) Lord Hoffmann said on behalf of the Privy Council ([2009] 1 W.L.R. 1405, at para. 13):

"... [A] judge should not entertain an application of which no notice has been given unless *either* giving notice would enable the defendant to take steps to defeat the purpose of the injunction (as in the case of a *Mareva* or *Anton Piller* order) or there has been literally no time to give notice before the injunction is required to prevent the threatened wrongful act." [Emphasis in original.]

268  His Lordship went on to say (*ibid.*):

"Their Lordships would expect cases in the latter category to be rare, because even in cases in which there was no time to give the period of notice required by the rules, there will usually be no reason why the applicant should not have given shorter notice or even made a telephone call. Any notice is better than none."

These standards of care were disregarded by the defendant when it acted for Dr. Braga by proceeding on the *ex parte* basis on which it did, its failings exacerbated in the circumstances then prevailing, by the absence of urgency or any risk of destruction of evidence or dissipation of assets.

*3. The question whether or not Dr. Braga was obliged to seek recognition and authorization to act in the Cayman Islands pursuant to Part XVII of the Companies Law (assuming he was properly to be regarded as a foreign representative of a bankrupt estate) instead of bringing an application for Norwich Pharmacal relief as he did.*

---

78  Reported as *Deutsch-Südamerikanische Bank A.G.* v. *Codelco* (22).

453

269   Here the argument[79] was that Dr. Braga, acting as a foreign court-appointed trustee as he claimed to be, was obliged to seek recognition and authorization to act in the Cayman Islands pursuant to Part XVII of the Companies Law, instead of bringing an application for *Norwich Pharmacal* relief as he had done.

270   Given the specific and limited mandate of the directions issued to him by the STJ to investigate the UBO of Securinvest, this argument was not accepted by this court in the May 2011 judgment. Rather, it was held that there was no requirement to obtain recognition and enforcement of his appointment generally within the jurisdiction as he was not, for example, required to search for and recover assets.[80] This was notwithstanding that the defendant sought and obtained on his behalf the wider disclosure which could only have been justified on the *Bankers Trust* principles (below) by a mandate of that kind as discussed next below.

*4. Other issues of principle relating to the seeking and obtaining of Norwich Pharmacal relief or related Bankers Trust relief[81]—which (further relief by way of disclosure) was also given as part of the Norwich Pharmacal orders.*

271   It was here that this court most directly criticized the application for the wider disclosure which had been made by the defendant on behalf of Dr. Braga and which went far beyond the disclosure of Katia Rabello's status as UBO of Securinvest. At paras. 72–74 of the May 2011 judgment, the following conclusions were expressed in this regard:

". . . In my view, there simply was no basis for thinking that the information sought by those means could assist with locating and preserving assets which had been fraudulently diverted away from the Petroforte estate.

73   Any such allegation up to the time of the applications before this court (May 27th, 2010 and July 2nd, 2010) centered around the SOBAR transaction. Yet the assets involved—the ethanol plant and sugar cane plantations—had long since been under the control of Dr. Braga through the extension of the bankruptcy to Securinvest, Turvo, Agroindustrial and Kiaparack in August 2007 (see the first affidavit of Dr. Vasconcellos, para. 77(iv)). No other 'assets' to which a risk of dissipation attends have been identified.

74   The substantive disputes between the parties have been ongoing in open court in Brazil for several years. Accordingly, it cannot

_____

79   As set out at para. 37(d) of the May 2011 judgment.
80   See paras. 86–87 of the May 2011 judgment.
81   *Bankers Trust* v. *Shapira* (9).

454

properly be maintained that there was any urgent need for the *Bankers Trust* type relief here to prevent the dissipation of assets. The fact that there has been no subsequent need for *Mareva* injunctive orders (to freeze assets identified) and no allegedly hidden assets disclosed, is strongly indicative of the fact that the *Bankers Trust* relief was never likely to have achieved its permissible objectives."

272   As already mentioned, the plaintiffs (Katia Rabello in particular) became aware of the Cayman disclosure having been obtained only after it was deployed in Judge Beethoven's court in Brazil against them. This was also after the orders were made placing Katia Rabello's assets into the Petroforte bankruptcy and referring the matter to the BCB for investigation.[82]

273   The Cayman disclosure was also later placed before the STJ by Dr. Braga (he was directed to do so by Judge Beethoven)[83] and the STJ itself—even while making no express reference to the Cayman disclosure but having adjourned for the specific purpose of obtaining it—must have relied upon it to lift the stay ("suspension") of the operation of the Petroforte bankruptcy over Securinvest and to dismiss Securinvest's appeal.

274   This reliance by the STJ will go ultimately to the question of causation of loss and is clear enough from the following analysis.

275   While alluding to and noting the significance of the Cayman disclosure,[84] Justice Andrighi (in her judgment on behalf of the STJ) emphasized that matters of fact were for the courts below, thus:

"The characterization of a union of companies, in turn, is more than anything else, a factual matter. For that reason, whatever the [Lower] Court decided in that respect cannot be revised in this office [court] by virtue of the obstacle of the Abridgement of Law 7/ Court of Appeals."[85]

---

82   See para. 171(vi) of the statement of claim.
83   See "OPERATIVE PART," item 8 at p. 11 of his judgment of October 28th, 2010.
84   Stating at different points for instance that:   "It is also asserted [by Dr. Braga] in short, that SECURINVEST itself, whose     members/partners/stockholders . . . are two companies with headquarters in a tax haven, would immediately be a member of the Rural Group. It is through that perspective that this appeal shall be judged" and that ". . . the corporate chain described in this process, is not only with regard to the agro-industrial complex SOBAR, but in relation to diverse other assets, shows the existence of a modus operandi which offers evidence of one group of companies (GRUPO SECURINVEST, whether or not it is a member of the more extensive GRUPO RURAL), on the other (PETROFORTE)."
85   *Ibid.*

455

276   This, as Mr. Simpson, correctly in my view, emphasized on behalf of the defendant, meant that the STJ did not retry the factual issue whether or not there was in existence a common economic group. Instead the STJ deferred to the findings of the lower courts in that regard.

277   But it is clear that it was only after seeing the Cayman disclosure that the STJ was content to defer to the findings of the lower courts (originally by Judge Beethoven but expanded upon by the TJSP by its invocation of the common economic group legal theory).

278   This meant (as Mr. Simpson emphasized throughout the hearing) that the extension of the Petroforte bankruptcy which had been ordered before the Cayman disclosure was obtained, was therefore not a result of the Cayman disclosure obtained by the defendant on behalf of Dr. Braga.

279   If this is correct, then the defendant's actions could not have caused the plaintiffs' losses.

280   A different conclusion is reached, however, on the more likely analysis that the STJ would have released Securinvest from the Petroforte bankruptcy but for the Cayman disclosure, especially the disclosure of Katia Rabello's status as UBO.

281   It is therefore important that I here lay down yet another marker.

282   It is that the question whether the STJ relied upon the Cayman disclosure, and if so to what extent, for the dismissal of Securinvest's appeal remains a disputed question of fact which was not given to determination by me on the basis of this application for summary judgment on liability.

283   Rather, it is a factual dispute which in my view did not have to be resolved now in order to establish liability for breach of duty. However, it still properly remains to be examined and resolved as a question of causation of loss at the next stage.

284   It is a question which will need to be answered in that context but only if Katia Rabello can show that Securinvest would have been released from the Petroforte bankruptcy had it not been for the Cayman disclosure.

285   This will be a difficult hurdle for her to overcome when it is recognized that she was herself under a legal (one might even say moral) obligation to disclose the truth about her status as UBO to the STJ and that status was (on correct *prima facie* analysis in my view) the ultimate reason for the STJ's refusal of Securinvest's appeal.

286   As already mentioned above, it is also in this respect that Mr. Simpson invokes the *ex turpi causa* defence. It goes to the effect that Katia Rabello's case depends upon her having been entitled to mislead the STJ by her lie.

456

287   Otherwise, she would be required to accept that the extension of the Petroforte bankruptcy to Securinvest (and he also contends ultimately to herself) was the result of her status as UBO being revealed to the Brazilian courts. This, he submits, she was obliged to disclose and so may not claim for damages from the defendant because it brought about the disclosure. Any other competent attorney would have been obliged to take the same actions, said Mr. Simpson. Thus, the same outcome was inevitable.

288   And moreover, the argument goes, Katia Rabello cannot claim to have suffered any loss as the result of the Cayman disclosure, even if it was relied upon by the STJ for dismissing Securinvest's appeal—the loss was the result of her own misconduct in trying to obfuscate the "fraudulent" relationship between Securinvest and Petroforte.

289   While I have rejected the *ex turpi causa* defence as a basis for striking the plaintiffs' claims (especially those of Katia Rabello), I must note that in any event, it could not serve as a defence to *all* of the plaintiffs' claims, some of which—such as the claims for loss of opportunity discussed above—in no sense depend upon Katia Rabello's lie to the STJ or upon any other form of illegality.

290   Given the various and complex bases upon which liability for loss is claimed by the plaintiffs, it sufficed, in my view, for the grant of summary judgment that liability for loss was established in at least some areas.[86] These include, as I will come to discuss further below, the placing of Katia Rabello herself into the Petroforte bankruptcy. I will also consider the provision of the Cayman disclosure to the BCB which is pleaded as resulting in regulatory action against Banco Rural (of which Katia Rabello was a major shareholder) and ultimately its demise.[87]

---

86   *Lunnun* v. *Singh* (43) (to be further discussed below).
87   See the statement of claim, para. 15. And, for instance as regards action taken against Banco Rural despite the recall by this court of the Cayman disclosure from the BCB, an English translation of an Attorney General's ruling of March 2012, on the use of the Cayman disclosure by the BCB (submitted with the second affidavit of Nicholas Dunne on behalf of the Defendant) and which confirms that the Cayman disclosure was used as "reputable evidence to support an administrative proceeding for punitive damages against Banco Rural and Ms. Katia Rabello due to violation of the provisions set forth in Article 34, V of Law No. 4595 of 1964."

457

291   In this regard, the record shows for instance[88] that Katia Rabello was herself the subject of administrative proceedings by subpoena taken by the BCB in relation to Banco Rural's provision of funding to Securinvest. If not exactly the same as by way of the note purchase transaction, these provisions were certainly of that kind. In those proceedings, the BCB sought orders for the recovery of "punitive damages" against Banco Rural and against Katia Rabello, personally.

292   This BCB subpoena went on at length to cite and quote from Judge Beethoven's decision of October 29th, 2010 against Katia Rabello, making it plain that the BCB was relying not only upon his findings but also upon the Cayman disclosure referenced by the judge and sent by him to the BCB at Dr. Braga's behest (and contrary to the spirit of Dr. Braga's undertakings given to this court, as discussed above).

293   It has not yet been established before me what fiscal penalties were imposed upon Katia Rabello arising from this subpoena (or from any other measure taken against her by the BCB) but it is *prima facie* clear that a link between the defendant's breach and the BCB's actions is established and that some loss was caused.

294   This finding too will suffice for summary judgment on liability, as will become clearer from the discussion of the case law below.

295   But I emphasize here again, that the full extent of any loss must be a matter for assessment at the trial of quantum.

**Sanction of settlement proposal granted by Judge Beethoven but resisted by Dr. Braga**

296   The evidence also reveals that after the case was referred back to Judge Beethoven's court by the STJ,[89] a settlement proposal in relation to Katia Rabello's and Securinvest's bankruptcy (as part of the Petroforte bankruptcy) was propounded before the judge. The judge (after what

---

88   That by reliance on the Cayman disclosure, Katia Rabello was subpoenaed, in prosecution of the administrative proceedings for punitive damages by the BCB in respect of "irregularities" committed by her as President of Banco Rural namely,
      "Granting prohibited loans to corporations banned from operating with the institution, since the respective corporate control belongs to companies established in tax havens, and of which you are the owner and ultimate beneficiary, while acting as the Director and Board Member of the said financial institution,"the subpoena continued under "Description of events":
      "Banco rural S.A granted credit operations to Securinvest Holdings s.a., a company registered with the Brazilian Registry of Legal Entities—a company controlled by two companies incorporated and organized under the laws of the Cayman Islands: Arnage Holdings and Brooklands Holdings . . ."
89   After the rejection of Securinvest's appeal.

458

seems to be characteristic peroration) approved of the proposal which would have resulted in the release of the non-Sobar assets, referring to the wider effects of the bankruptcy as "offensive" to his court, and as "unjust enrichment" for the Petroforte estate.[90]

297   This judgment of Judge Beethoven's was, however, appealed against by Dr. Braga to the TSPJ and was overturned. Katia Rabello and the other Rural Group interests have appealed further to the STJ, where a final judgment on the settlement proposal is awaited.

**Summary of claim**

298   In summary, the plaintiffs' claims are as follows:[91]

    8.   Despite the quarter of a century relationship of trust and confidence between the defendant and the Rabello family summarized above (including the specific instruction of the defendant in relation to confidential information relating to Cayman Islands companies being sought by authorities in Brazil), from about May 2010 the defendant betrayed that trust by disloyally acting on behalf of Dr. Braga . . . as judicial administrator over the bankruptcy estate of Petroforte . . . in obtaining extensive disclosure of confidential information relating to the plaintiffs through the *ex parte Norwich Pharmacal* proceedings.

    9.   The *Norwich Pharmacal* proceedings expressly sought very broad disclosure of documents. At all material times, the defendant knew that Banco Rural and Rural Leasing were directly and/or indirectly owned and controlled by the Rabello family (including Ms. Katia Rabello) and that the material sought was both confidential and sensitive and that the Rabello family would not want such information to be

_____

    90   That
"... what is certain is that the plea is ready to be accepted. It is offensive to this court that the Bankrupt parties be requested one penny more than what is correctly owed. Continuing in the unlimited accountability of the bankrupt parties, since the main object of the babbling [*sic*] is already in the possession of the Court, is a thesis that does not sail in calm seas. There is a principle that should apply to all human relations: the prohibition of unjust enrichment . . . based on these principles, there is no doubt in the decision for the acceptance of the request . . . the humble magistrate does not have reasons to continue ad infinitum with the persecution of the assets of the bankrupt parties when there is already the main company which was the object of the initiatives from the Public Audit Office . . . [*i.e.* Sobar]."
    91   As taken from paras. 8–17 of the statement of claim.

459

disclosed to the Brazilian authorities which could cause great damage to the plaintiffs.

10.  The disclosure obtained by the defendant on behalf of Dr. Braga included numerous confidential documents relating to the defendant's former clients, Arnage, Brooklands and Mr. Sabino Rabello, including both confidential documents created by the defendant and work product produced by the defendant on behalf of those clients.

11.  The disclosure also contained numerous confidential documents relating to the defendant's then existing clients, Ms. Katia Rabello and Mr. Fernando Toledo.

12.  Furthermore, the disclosure contained numerous confidential documents relating to the ownership and commercial operations of TLB and demonstrating commercial connections between TLB and the Rabello family in circumstances where the defendant was, at the same time, expressly engaged by, *inter alia*, Ms. Katia Rabello in connection with Brazilian criminal proceedings concerning the alleged joint ownership of TLB and Banco Rural by the Rabello family.

13.  In summary, the defendant not only acted against its own former and existing clients' interests, it also acted against its existing clients' interests in circumstances where it was simultaneously expressly engaged to seek to protect such confidential information from disclosure to the Brazilian authorities by reason of the great damage which could be caused to the plaintiffs and the Rabello family by . . . such disclosure.

14.  Such actions were in serious and flagrant breach of the defendant's fiduciary, contractual and tortious duties to the plaintiffs and were also a gross breach of confidence.

15.  The consequences of the defendant's breaches have been catastrophic for the plaintiffs. The disclosure of confidential documents relating to the plaintiffs has in turn led to multiple legal proceedings in various countries, a BCB investigation and extremely harmful publicity in Brazil. In turn, this has:

   (i)  severely impaired confidence in the value of Banco Rural, having a devastating impact upon its operations, and has ultimately led to Banco Rural being taken over by the BCB and being placed into compulsory liquidation; and

460

   (ii)   resulted in Ms. Katia Rabello's assets being frozen in the Petroforte bankruptcy in Brazil.

16.   Further, following the disclosure of the confidential information and documents, the defendant continued to aid and abet Dr. Braga in his improper efforts to pursue alleged offshore assets held by the Rabello family and related entities as well as Brazilian assets which were never part of the Petroforte estate but which are in jeopardy as a result of the defendant's breaches.

17.   The defendant's breaches are likely to result in losses of over US$500m. being sustained by the plaintiffs.

**Discussion on the four elements to be established for grant of summary judgment**

299   Against the background of the foregoing factual explanation of the plaintiffs' case, I will now consider in turn, each of the four elements they must establish, and the applicable legal principles, for the grant of summary judgment.

**The existence of the lawyer–client relationship**

300   The first, of course, is the existence of the lawyer–client relationship in respect of each plaintiff and the concomitant duties which arose.

301   Both sides agree that the identification of the lawyer–client relationship is an exercise to be undertaken by an examination of all the circumstances of the case.

302   As was stated persuasively by the Ontario Superior Court of Justice in the recent case of *Trillium Motor World Ltd.* v. *General Motors of Canada Ltd.* (72) (2015 ONSC 3824, *per* McEwen J., at para. 417):[92]

---

92   In the case, the question was whether the well-known Canadian law firm of Cassels Brock & Blackwell LLP had been retained by the Trillium parties (a group of General Motors car dealerships) and had acted in breach of its fiduciary and contractual duties owed to them by, at the same time, having acted for a Canadian Government entity which regulated the relationship between Trillium and the then distressed General Motors and whose interests were adverse to those of the Trillium parties. The lawyer–client relationship was found to have existed and that Cassells had acted in breach of its duties without having first notified the Trillium parties of its conflict of interests and obtained their consent to act for the Canadian Government (which consent would not have been given). Compensation for the breach of duties in the amount of CA$45m. was awarded to the Trillium parties.

461

"The existence of a solicitor–client relationship is a fact-driven and multifaceted analysis. Sometimes, it will be readily apparent that a retainer exists. Other times, a careful examination of the facts must be undertaken. The court must take a holistic approach to the question at hand, considering the evidence in its totality . . ."

303   Earlier in the judgment (at paras. 411–413), the following very helpful *dicta* appear in relation more specifically to the analysis of the issue "Was there a retainer?" This *dicta* was cited and accepted by both sides in the arguments before me as appropriate for adoption and application here. I agree and so set it out fully, as it deserves:

"[411] The solicitor-client relationship is based on general concepts of contract and the specific contract of a retainer: *Filipovic v. Upshall* (2000), 2000 CanLII 26971 (ON CA), 133 O.A.C. 151 at para. 5 (C.A.). Whether a solicitor-client relationship exists is a question of fact. There is no need for a person to formally retain a lawyer by way of letter or other document. Nor is it necessary that an account be rendered or a bill paid. Rather, a court must look to a number of factors to ascertain whether such a relationship exists.

[412] Justice Hawco helpfully identified twelve relevant indicia in *Jeffers v. Calico Compression Systems*, 2002 ABQB 72, 314 A.R. 294 [*Jeffers*]. Both parties agree that these indicia are accurate and apply to this case. They are as follows:

   (i)  a contract or retainer;

   (ii)  a file opened by the lawyer;

   (iii)  meetings between the lawyer and the party;

   (iv)  correspondence between the lawyer and the party;

   (v)  a bill rendered by the lawyer to the party;

   (vi)  a bill paid by the party;

   (vii)  instructions given by the party to the lawyer;

   (viii)  the lawyer acting on the instructions given;

   (ix)  statements made by the lawyer that the lawyer is acting for the party;

   (x)  a reasonable expectation by the party about the lawyer's role;

   (xi)  legal advice given; and

   (xii)  any legal documents created for the party.

[413] Not all indicia need to be present. Rather, as Hawco J. explains at para 8,

462

. . . the question appears to be whether a reasonable person in the position of a party with knowledge of all the facts would reasonably form the belief that the lawyer was acting for a particular party.

Further, the twelve indicia are not exhaustive. Depending on the facts of the case, other indicia may be relevant."

304   I think I need only state here what must be obvious from all the circumstances of this case. This is that, when applied to the facts of this case, the *Trillium* indicia serve to identify each of the plaintiffs, including Katia Rabello and Fernando Toledo, as clients of the defendant. I simply make reference here again, by way of illustration, to the discussion of the circumstances pointing to the lawyer–client relationship undertaken above, especially at paras. 134–140.

305   And specifically in relation to "other *indicia*"—these could include, as the case law reveals, a situation where a lawyer acts for a company knowing that its interests are identical to or closely aligned with the interests of its beneficial owners who themselves come to depend upon the lawyer–client relationship. This is, as explained above, the nature of the relationship contended for by the plaintiffs here.

306   This principle is illustrated by the conclusion reached by the Court of Appeal for England and Wales in *Johnson* v. *Gore Wood* (39) ([1999] BCC at 485).[93] There the issue was whether it was an abuse of process to claim that solicitors engaged by a company and who were alleged to have breached their duty of care by giving negligent advice to the company, also had breached a similar duty of care owed to its controlling shareholders (the plaintiffs). Ward, L.J., giving the judgment of the court, approved the reasoning of Staughton, J. (as he then was), where he had decided on a similar issue in favour of the client and against the solicitors in *R.P. Howard Ltd.* v. *Woodman Matthews & Co. (a firm)* (58) ([1999] BCC at 485):

"... [A]rguments of a very similar nature prevailed in the judgment of Staughton J in ... [*Howard Matthews*] ... where the solicitor knew that the company was a family company effectively run by Mr Witchell from whom they received instructions. He held at p 121A:

'In my judgment, in the circumstances of this case, Mr Witchell as well as the company was the client of Mr Mason. That seems to me to reflect the reality of the situation. Mr Mason knew that

_____

93   [1999] BCC at 485. The case went further on appeal to the House of Lords where the arguments proceeded on the assumption that the duty of care (found by the Court of Appeal on the strike-out application to have been arguable), could be established ([2002] 2 A.C. 1, at 32C–G (*per* Lord Bingham) and 41E–G (*per* Lord Goff)).

463

> Mr Witchell ... was the company. He probably knew that Mr Witchell derived his livelihood and some profit from the company, and was vitally concerned in its well-being. Mr Witchell had first been his personal friend, and had then come to him in connection with other matters for legal advice, both as the representative of the company and in a personal capacity. When Mr Witchell sought his advice on ... [a matter concerning the company] Mr Mason owed a contractual duty of care both to the company and Mr Witchell.'

And in *Ratiu* v. *Conway* (60) ([2005] EWCA Civ 1302, at para. 80):

> "Nor, in my view, should it matter in principle, where a fiduciary duty is engendered by a contractual relationship, whether the client has entered into a direct contractual relationship with the fiduciary or through an agent or, in the case of a corporate client, through the use of a nominee company ..."

307   Another fundamental issue in *Johnson* v. *Gore Wood* (39) was whether Mr. Johnson should have been allowed to bring claims for losses in his personal capacity as shareholder which were not merely reflective of the losses claimed by his company (which latter claims had been the subject of an earlier settlement between the company and the solicitors).

308   In holding that certain of his claims were not merely reflective of the company's losses and so not prone to being struck out on that basis for being an abuse of process, the Court of Appeal also acknowledged that a separate lawyer–client relationship had developed as between Mr. Johnson and the solicitors.[94] It followed that, subject to Mr. Johnson showing that the damage complained of was caused by the solicitors' breach of duty and was not too remote, he was entitled in principle to recover any damage which he himself suffered as a personal loss separate and distinct from any loss suffered by the company.[95] Like in this case, the proof of his

---

94   Lord Bingham records ([2002] 2 A.C. at 35C), that it was accepted for the purposes of the application to strike out the damages claim that the solicitors Gore Wood & Co., owed a duty to Mr. Johnson personally and was in breach of that duty.

95   The case is a leading authority on the subject of reflective loss. After a compendious review of the earlier case law, Lord Bingham summarized the principle as it applies to circumstances like those claimed in the case by Mr. Johnson and here, by Katia Rabello and Fernando Toledo in respect of Arnage, Brooklands and EFHL ([2002] 2 A.C. at 35H–36A):

> "Where a company suffers loss caused by a breach of duty to it, and a shareholder suffers a loss separate and distinct from that suffered by the company caused by breach of a duty independently owed to the shareholder, each may sue to recover the loss caused to it by breach of the duty owed to it but neither may recover loss caused to the other by breach of the duty owed to the other."

464

personal loss depended on the facts to be established at trial and could not have been determined simply on the pleadings.

309   *Johnson* v. *Gore Wood* was later reaffirmed and applied by the English Court of Appeal in *Ratiu* v. *Conway* (60). In *Ratiu* v. *Conway*, the court was called upon to decide whether a contractual retainer, engaged between a company and its solicitors, could give rise also to fiduciary obligations of confidence and loyalty owed to the owners of the company who, despite not being privy to the contractual retainer, had nonetheless also reposed trust and confidence in the solicitors not to act in detriment of their interests.

310   In arriving at their affirmative decision, their Lordships necessarily also had to consider whether the separation of legal identity, as between the company and its owners, precluded the extension of the lawyer–client relationship and its attendant fiduciary obligations. In concluding that the relationship could be extended and affirming the approach taken in *Johnson* v. *Gore Wood*, Auld, L.J. on behalf of the court, expressed the reasoning in the following terms ([2005] EWCA Civ 1302, at para. 78):

> "There is, it seems to me, a powerful argument of principle, in this intensely personal context of considerations of trust, confidence and loyalty, for lifting the corporate veil where the facts require it to include those in or behind the company who are in reality the persons whose trust in and reliance upon the fiduciary may be confounded."

311   The solicitors in *Ratiu* v. *Conway* (60) were thus found to be liable, not only to the company for breach of the contractual obligations arising from the retainer, but also to the owners of the company (another company and its individual shareholders) for breach of the implicit fiduciary obligation of loyalty arising from the trust and confidence that they themselves had reposed in the solicitors, not to act against their interests in order to advance their own.[96]

312   These conclusions of principle are very relevant and applicable to the present case where the defendant seeks to rely upon the separation of legal identities as between the incorporated plaintiffs (Arnage, Brooklands and EFHL) and the individual plaintiffs who are their legal and beneficial owners, as a basis for denying the existence of the lawyer–client relationships with the latter and so the fiduciary obligations as well. Like in *Ratiu* v. *Conway*, the circumstances of this case require the lifting of the corporate veil to prevent the defendant from denying the existence of the relationship of trust and confidence which had clearly developed, not merely between the incorporated plaintiffs and the defendant but also

---

96   This they had done by bidding for a valuable property in St. John's Wood, London, in competition with those persons who were found to be their clients.

465

between the individual plaintiffs (Katia Rabello and Fernando Toledo) and the defendant as well.

313   There is further *dicta* from *Ratiu* v. *Conway* which is of instructive application to the present case in this regard.

314   Reflecting on the fiduciary nature of the lawyer–client relationship, Auld, L.J. stated as follows ([2005] EWCA Civ 1302, at paras. 57–58):

"As to fiduciary obligation, where better to start than the following treatment by Millett LJ (as he then was) in *Bristol & West v Mothew* [1998] Ch 1, at 18A–C:

'. . . A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary. The core liability has several facets. A fiduciary must act in good faith; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent[97] of his principal. This is not intended to be an exhaustive list but it is sufficient to indicate the nature of fiduciary obligations. They are the defining characteristics of the fiduciary. As Dr Finn pointed out in his classic work *Fiduciary Obligations* (1977), p 2, he is not subject to fiduciary obligations because he is a fiduciary; it is because he is subject to them that he is a fiduciary.'

58. In short, as he was later to put it in *Bolkiah v KMPG* [1999] 2 AC 222 at pp 234H–235A, a fiduciary must not put himself in position of actual or potential conflict with his client without the latter's fully informed consent."

315   The foregoing principles have all come to be enshrined in the Code of Conduct for Cayman Islands Attorneys-at-Law:[98]

_____

97   Defined in *Clark Boyce* v. *Mouat* (18) ([1994] 1 A.C. at 435) as—
"consent given in the knowledge that there is a conflict between the parties and that as a result the solicitor may be disabled from disclosing to each party the full knowledge which he possesses as to the transaction or may be disabled from giving advice to one party which conflicts with the interest of the other."
98   These rules were adopted after the defendant's acceptance of the Braga retainer but the defendant was nonetheless obliged, at the times relevant to the plaintiffs' claims, to comply with the equivalent duties as set out in the English Rules and recognized at common law in place at the time. The English Rules have been deemed by implication to apply in the absence of local rules: see *In re an Attorney-at-Law* (8), written judgment of this court delivered on July 22nd, 1988, *per* Collett, C.J., where disciplinary sanction was imposed on the basis of conduct measured against the long-standing English principle of "conduct unbecoming" an attorney.

466

(a)   "The relationship between practitioner and client is one of confidence and trust which must never be abused" (r.1.02).

(b)   "An attorney's primary duty is to his client, to whom he must act in good faith. He must at all times and by all proper and lawful means advance and protect his clients' best interests without fear or regard for self-interest" (r.1.04).

As the commentary states:

(c)   ". . . an attorney has a duty to hold in strict confidence all information concerning the business and affairs of the client acquired in the course of the professional relationship, and may not divulge such information except . . ." in certain specified and closely circumscribed circumstances (see r.1.06).

As the commentary records:

> ". . . confidentiality and privilege of client information are among the prime principles of professional practice. Such information belongs to the client and not to the attorney. Generally any request by a third party for client information held by an attorney should be referred to the client or refused . . . An attorney's duty continues even after the client has ceased to be the attorney's client . . ."

(d)   "An attorney must not without the informed consent of such person act or continue to act for any person where there is a conflict of interest between the attorney on the one hand and an existing or prospective client on the other hand; nor similarly may the attorney agree to act for such person when, at the time he takes instructions, it is reasonably foreseeable that such conflict may arise during the course of his doing so" (r.1.11).

As the commentary states:

> "This rule is based on the principle that a person who occupies a position of trust must not permit his personal interests to conflict with the interests of those whom it is that person's duty to protect . . . A potential conflict of interest is a situation which, without care, could well lead an attorney into a breach of fiduciary duty."

467

316   In summary, it is clear from all the foregoing that, as was neatly stated by Ground, J. of the Ontario court in *Drabinsky* v. *KPMG* (24) (41 OR (3D) 565, at 2):

> "I am of the view that the fiduciary relationship between the client and the professional advisor, either a lawyer or accountant, imposes duties on the fiduciary beyond the duty not to disclose confidential information. It includes a duty of loyalty and good faith not to act against the interests of the client."

**Actionable breaches of duty**

317   The foregoing analysis and findings on the existence of the lawyer–client relationship (and its attendant duties) lead to the second and third elements of the plaintiffs' case—the existence of the duties in this case and the actionable breaches of those duties. These must now also be established beyond reasonable argument, for the grant of summary judgment on liability. They may also be conveniently examined together.

318   Subject to the lawyer–client relationships being established, it is not surprising that the defendant itself would admit to the existence of the duties. At paras. 32 and 34 of the amended defence, the defendant admits to:

- "● Owing a fiduciary duty to existing clients not to prefer the Defendant's own interests over those of existing clients;

- ● Owing a fiduciary duty to existing clients not to prefer the interests of one client over another;

- ● Owing a fiduciary duty to existing clients not to put itself in a position where its duty to one client might conflict with its duties to another; and

- ● That an attorney should not act if it is in possession of '. . . information that might be relevant to a new client.'"

319   Notwithstanding the obvious ways in which the foregoing admissions would also describe the breaches committed by the defendant in this case, it seeks to avoid that conclusion in relation to Katia Rabello and Fernando Toledo by asserting that they were never its clients.

320   As I have found that assertion to be wrong then the defence has no prospect of success as against Katia Rabello's and Fernando Toledo's claims for breaches of duty.

321   This conclusion is unavoidable in light of the continuing nature of the duty of confidence, when the facts of this case are considered in light of the case law.

468

322    The reason is neatly expressed in the following statement of principle by the Ontario Court of Appeal:[99]

"... that brings me to what appears to be the rationale for the disqualification of a solicitor who owes conflicting duty to two different clients. The most obvious justification for removal of a solicitor is to uphold the public's confidence in the proper administration of justice. A solicitor cannot properly serve clients opposed in interest, and once having chosen to serve a particular client, will not be allowed to advance the cause of that client in a particular matter at the expense of what he has learned in confidence from the other client interested in the same cause ... Two other justifications are also given. First, the other client feels aggrieved when his or her former solicitor appears for a party opposed to his or her interest. That client feels a sense of exploitation at having confidentiality communicated to that solicitor or his associate certain confidences and later having to answer ... in cross-examination in the same or related matter. Of course, this situation also diminishes the general public's confidence in the legal profession ..."

323    That very practical explanation of the importance of the duty of confidence owed by a lawyer to his client underscores the grievances of the plaintiffs in this case. They rightly say that a duty of confidence had arisen when they imparted their confidential information to the defendant such that the defendant was precluded from acting for Dr. Braga against them and from taking steps to disclose their information to him. The obligation to keep matters confidential is one of the defining features of a lawyer–client relationship.

324    That a duty of confidence had arisen as owed by the defendant to the plaintiffs when their confidential information was imparted to the defendant is indisputable. A duty of confidence arises when confidential information comes to the knowledge of a person in circumstances where

---

99    From *R.* v. *Speid* (56) ([1983] O.J. No. 2441, at paras. 18–19). The case law is replete with similar denunciations of lawyers acting in conflict of interests for different clients. See for instance, *Al-Sabah* v. *Maples & Calder* (4), where this court injuncted a firm from accepting a brief which would have required it to act against a former client despite the firm's proposal to erect "Chinese walls" to ensure that information belonging to the former client did not inform those acting for the proposed client; and *Bolkiah* v. *KPMG* (10), where Lord Millett explained ([1999] 2 A.C. at 234) that—

"... a fiduciary cannot act at the same time both for and against the same client, and his firm is in no better position ... his disqualification has nothing to do with the confidentiality of the client information. It is based on that inescapable conflict of interest which is inherent in the situation."

469

he has notice, or is held to have agreed, that the information is confidential, with the effect that it would be just in all the circumstances that he should be precluded from disclosing the information to others: see *Att.-Gen.* v. *Guardian Newspapers Ltd. (No. 2)* (7) ([1990] 1 A.C. at 281, *per* Lord Goff).

325   Reflecting further on the nature of the fiduciary duties and obligations of a lawyer, their Lordships in *Ratiu* v. *Conway* (60) also emphasized the fact that they will often survive the expiry of the contractual retainer by which they were engendered ([2005] EWCA Civ 1302, at para. 60):

> "As to a solicitor's duty of confidentiality, it can come into its own as a separate obligation from that of a fiduciary when the fiduciary relationship has come to an end with the end of the solicitor/client relationship. Lord Millett, in *Bolkiah v KPMG*, which was a breach of confidence, not a breach of fiduciary duty, case, sought to emphasise this distinction at 235C:
>
> > 'Where the court's intervention is sought by a former client, however, the position is entirely different. The court's jurisdiction cannot be based on any conflict of interest, real or perceived, for there is none. The fiduciary relationship which subsists between solicitor and client comes to an end with the termination of the retainer. Thereafter the solicitor has no obligation to defend and advance the interests of his former client. The only duty to the former client which survives the termination of the client relationship is a continuing duty to preserve the confidentiality of information imparted during its subsistence.'"

326   In the case at bar, the plaintiffs contend for the survival of the ongoing duties of trust and confidence owed to them as arising from each and every one of the distinct retainers discussed above. These surviving duties were, as set out above, belatedly acknowledged by the defendant[100]

---

[100]  This is although at the earlier stages until this hearing began, the defendant had relied upon the defence of "No confidence in iniquity," averring at para. 27 of its amended defence by reliance on the *dictum* of Wood, V.-C. from *Gartside* v. *Outram* (29) (26 L.J. Ch. at 114) that—
"You cannot make me the confidant of a crime or a fraud and be entitled to close up my lips upon nay secret which you have the audacity to disclose to me relating to any fraudulent intention on your part: such a confidence cannot exist."This was explained by the defendant in these terms (at para. 28):
"The documents disclosed by CIBC and Equity Trust in the Cayman Islands (the disclosure of which, on the Plaintiffs' case led to other proceedings in the BVI, Belize and Florida) showed that Katia Rabello had sought to deceive the STJ as to the beneficial ownership of Securinvest in order to cover up a fraud on the creditors of the Petroforte Estate. They were therefore not confidential."The defendant's belated concession in this regard merely reflects the inevitable outcome, as will be more fully explained when dealing with the *ex turpi causa* defence, below.

470

but it contends, without explanation (at least at this stage), that the duties were never breached. This is contended notwithstanding the defendant's actions on behalf of Dr. Braga, including, as a stark example, the compulsion of disclosure from Equity Trust and CIBC of the records of the note purchase transaction. This was a transaction in respect of which the defendant advised Arnage and Brooklands (and implicitly Katia Rabello on behalf of her own and her family's interests as beneficial owners). Given the defendant's implicit knowledge that the beneficial interests in Arnage, Brooklands, TLB, Securinvest and Banco Rural (the direct or indirect counterparties to the note purchase transaction) all belonged to the Rabellos, it followed that the defendant owed each of those entities and their beneficial owner, the continuing duty of confidence[101] and obligations of trust and loyalty such that the defendant was precluded from acting for Dr. Braga.

327    In light of the existence of the lawyer–client relationship with Arnage and Brooklands (and in my view by extension with the Rabellos) and its patent conflict of interest in acting for Dr. Braga, the defendant's denial of the breach of duty is completely untenable.

328    The plaintiffs also contend that at the time the defendant accepted the Braga retainer, the defendant was still under the contractual (and attendant fiduciary) obligations of trust confidence and loyalty first engendered by the general retainer which began in 1985 and which continued to subsist on behalf of the Rabello family. Its latest iteration was the August 2009 retainer to protect the "Brazilian defendants" and in respect of which, as we have seen, the defendant continued to advise and rendered bills to Mr. Macaulay,[102] even after the acceptance of the Braga retainer.

329    In this regard, further principles from *Ratiu* v. *Conway* are relied upon by the plaintiffs ([2005] EWCA Civ 1302, *per* Auld, L.J., at paras. 71–73):

---

101   Here there is no dispute that the continuing duty of confidence was owed at the time of the Braga retainer to those plaintiffs who were admitted to have been or are found by the court to have been clients. The local case law clearly recognizes the continuing nature of this duty of confidence: *Al-Sabah v. Maples & Calder* (4).

102   These bills were issued, as we have seen, in the name of EFHL but only as a matter of convenience as Mr. Macaulay explained.

". . . it is important to keep in mind that the reason for a solicitor's fiduciary duty to his client, though engendered by the retainer, is distinct from the contractual obligations arising under it. It arises from the relationship of trust and confidence that is an important consequence and feature of the retainer . . .

73. Where there is a contractual retainer and where it provides expressly or by implication obligations of a fiduciary nature, such obligations must clearly prevail, or 'mould' or 'inform' the fiduciary nature of the contractual relationship. But where there is a relationship involving, say, a transaction or transactions between a solicitor and a person who, having regard to that relationship and the solicitor's profession, reposes trust and confidence in him, a fiduciary duty may arise without a retainer. So much seems to be clear from the historic development and continued separate existence of the notion of a fiduciary relationship and one created purely by contract. It is clearly acknowledged in the following passage from the judgment of Mason J in *Hospital Products Ltd v United States Surgical Corpn* (1984) 156 CLR, 41, at 97, cited with approval by Lord Browne-Wilkinson, giving the judgment of the Privy Council in *Kelly v Cooper* [1993] AC 205, at 215:

'That contractual and fiduciary relationships may co-exist between the same parties has never been doubted. Indeed, the existence of a basic contractual relationship has in many situations provided a foundation for the erection of a fiduciary relationship. In these situations it is the contractual foundation which is all important because it is the contract that regulates the basic rights and liabilities of the parties. The fiduciary relationship, if it is to exist at all, must accommodate itself to the terms of the contract so that it is consistent with, and conforms to them. The fiduciary relationship cannot be superimposed upon the contract in such a way as to alter the operation which the contract was intended to have according to its construction.'"

330    There then followed some further very pertinent comments from Auld, L.J. (*ibid.*, at paras. 74–75):

"74. Mason J's approach is instructive in that, whilst it subordinates the effect of a fiduciary relationship to the terms of any concurrent contract, it also acknowledges—depending upon the circumstances—the potential coming into being and continuation of a fiduciary obligation without or regardless of any contract.

75. Illustrative of such an approach is *Longstaff v Birtles* [2002] 1 WLR 470, in which this Court held on the facts, that the defendant's solicitors' fiduciary duty extended beyond the termination of the

472

retainer. In that case solicitors who had acted for a couple in an abortive negotiation to purchase a public house and whose retainer had been terminated, persuaded the couple to join with them, without advising them to seek independent legal advice, in what turned out to be a disastrous commercial venture. In allowing the couple's appeal against the first instance judge's dismissal because the solicitors' retainer had been terminated before the matters of which the couple complained, Mummery LJ, with whom Laws LJ and Sir Anthony Evans agreed, said at paragraphs 1 and 35 of his judgment:

> '1. . . . The source of the [fiduciary] duty is not the retainer itself, but all the circumstances (including the retainer) creating a relationship of trust and confidence, from which flow obligations of loyalty and transparency. As long as that confidential relationship exists the solicitor must not place himself in a position where his duty to act in the interests of the confiding party and his personal interest may conflict . . .

> 35. This case can and, in my judgment, should be decided on the simple ground that there was a relationship of trust and confidence between the Longstaffs and the solicitors; that the relationship did not cease on the termination of the retainer in respect of the intended purchase . . .; that during the course of that relationship a personal business opportunity presented itself to the solicitors; that the solicitors took advantage of that opportunity to propose that the Longstaffs buy into the . . . [solicitors' business venture]; that in the context of the relationship the proposal gave rise to a situation in which the duty of solicitors might conflict with their interest; and that they acted in breach of a fiduciary duty in continuing to deal with Longstaffs, in a situation of a conflict of duty and interest, without insisting they obtain independent advice.'"

331   The importance of the foregoing *dicta* for present purposes is its premise that, irrespective of the existence of a formal or express contractual retainer, a lawyer will owe and continue to owe the fiduciary duties and obligations of trust, confidence and loyalty, if the circumstances of his relationship with his client gave rise to those duties.

332   In this case the evidence has disclosed two express contractual retainers—the May 2007 retainer (to contain the impact of the CIMA disclosure to the BCB) and the August 2009 retainer to protect the Brazilian defendants (in the form of the letter sent by Walkers, *per* Mr. Austin-Smith, to Mr. Macaulay on August 7th, 2009).

333   Nonetheless, the other retainers incontrovertibly existed, as evidenced by their circumstances, including correspondence as between the defendant and Mr. Toledo or Mr. Macaulay.

473

334   Each retainer gave rise to the lawyer–client relationship and to the attendant duties and obligations of trust, confidence and loyalty. On the basis of the case law discussed above (and indeed the local code of conduct itself),[103] these duties survived the expiry of any retainer which had in fact expired.

335   As I understand his case, the defendant argues for the expiry of all but one of the many retainers, *viz.* the 2000 note purchase retainer. And so, in relation to the TLB retainer in late 1984 (by which TLB was established in 1985), the Arnage and Brooklands retainer (other than for the note purchase transaction in 2000), the May 2006 retainer (re the shareholder certification in respect of EFHL and TLB to the BCB), the May 2007 retainer (re the further BCB investigation aided by CIMA)—that, if they existed, that they had all expired and that the defendant owed no ongoing duties or obligations in relation to them.

336   Moreover, the defendant also denies that there was a "general retainer" on an ongoing basis, to act for the Rabello family.

337   However, as regards the one exception—the August 2009 retainer—the arguments centered around not strictly its expiry but whether it covered only EFHL and/or Mr. Toledo, rather than more widely, the "Brazilian defendants."

338   In light of my conclusions above that the August 2009 retainer obviously covered all those persons known to the defendant to have been in jeopardy in Brazil, especially Katia Rabello and Fernando Toledo (who was also named), and that it continued until well after the Braga retainer, it must also be concluded that the defendant placed itself into an irreconcilable conflict of duty and interest when it accepted the Braga retainer. In so doing, as the case law explains, the defendant acted in breach of its duties owed to Katia Rabello and Fernando Toledo.

339   In light of the case law, it is also clear that the defendant remained throughout under a continuing duty of trust and confidence (in respect of all retainers) not to disclose—nor take steps contrary to its client's interests to disclose—their confidential information. This was a duty owed not only to Arnage and Brooklands in respect of the note purchase transaction in 2000 as the defendant contends, but to all the plaintiffs in respect of all their affairs.

340   It follows that the defendant should not have accepted the Braga retainer, as the defendant has itself come belatedly to acknowledge.[104] In acting for Dr. Braga against the plaintiffs and their interests, the defendant

---

103  See the Commentary to r.1.06 (above).
104  *Per* Antonia Hardy, from her affidavits, as explained above.

474

breached its duties and obligations of trust, confidence and loyalty which it owed to the plaintiffs.

341   While I do not need to find and do not find that the defendant acted knowingly and deliberately in breach, the breaches are nonetheless serious and clear. No explanation has been offered by the defendant. There was, for instance, no explanation whatsoever why Mr. Murray (the managing partner who had direct responsibility for the then still ongoing August 2009 retainer), decided that the defendant could act for Dr. Braga when he was approached by Martin Kenney & Co. to do so on April 28th, 2010. Nor was it explained how it came about that the defendant proceeded to act both for the plaintiffs on the August 2009 retainer and for Dr. Braga, simultaneously acting through the same litigation department which, at that time, comprised a relatively compact team of approximately only ten persons.[105]

**The hypothetical "reasonably competent" attorney**

342   Given that it is the conduct of the defendant in acting for Dr. Braga that is the subject of the plaintiffs' claim, I do not accept, as the defendant pleaded and argued, that the position of a hypothetical "reasonably competent" attorney is relevant to the outcome. The defendant's proposition—that it must be excused from liability for its own breaches of duty because some other attorney not owing those duties would have achieved the same results for Dr. Braga—is in my view, untenable.

343   Nonetheless, I consider that I should record the reasons for my conclusions on this issue as well.

344   First, the defendant in running this argument also proposes that the effects of the Cayman disclosure should be considered under two separate heads: the *Norwich Pharmacal* disclosure and the *Bankers Trust* disclosure. Thus, as the *Norwich Pharmacal* order—to the extent it allowed the disclosure of Katia Rabello's status as UBO of Securinvest, was upheld by this court—the actions of the defendant could be separated from its actions in obtaining the unwarranted *Bankers Trust* disclosure, for the purposes of assessing what a "reasonably competent hypothetical attorney" would have done. And, that as it was arguably the disclosure of the UBO status that resulted in the losses complained of by Katia Rabello, the defendant should be excused because any other competent attorney would have inevitably obtained that disclosure.

---

105   While Antonia Hardy in her first affidavit explains the nature of the conflict searches which were undertaken and their results, she offers no explanation and likely could herself offer no explanation) as to the matters identified by the court in this paragraph.

475

345   The difficulty for the defendant in running this argument is that the plaintiffs are not suing any other attorneys. They sue the defendant, the firm that had the conflict of interest and which should never have acted against the plaintiffs, its existing and former clients in the circumstances which it did. The basis of the claim is the breach by the defendant of the duties which it, not some other hypothetical set of attorneys, owed.

346   The strictness with which breaches of fiduciary duty by attorneys acting in conflict of interest is regarded by the courts, is illustrated by the House of Lords decision in *Hilton* v. *Barker Booth & Eastwood* (35).

347   In that case, the solicitors had acted for two clients in a commercial transaction in a situation of conflict. They had failed to reveal to client A the fact, of which they were aware because they had acted for him, that client B had convictions for dishonesty, was an undischarged bankrupt and so was unlikely to fulfill his end of the commercial transaction, as he in fact failed to do. His failure resulted in significant financial harm to client A, who sued the solicitors for breach of duty. The trial judge found for the claimant client A but awarded only nominal damages on the basis of what another (hypothetical) solicitor would have done, concluding that if other reasonably competent solicitors had acted the claimant would not have been told about client B's criminal convictions and dubious past (and hence would have proceeded with the transaction in any event).

348   However, the House of Lords looked at what the defendant solicitors should have done (*i.e.* not act in the position of conflict of interest) and found that once they proceeded, they should have disclosed client B's convictions and dubious history (even if that meant they would have been liable to suit by him) and declared that substantial damages for client A should be assessed on that basis.

349   Secondly, the defendant's proposition is unsupported when one considers how a reasonably competent attorney would have been required to meet his or her obligations to the court and to those persons (the plaintiffs) who were properly entitled to notice of the applications for disclosure of their confidential information. The test to be applied being "what the reasonably competent practitioner would do having regard to the standards normally adopted in his profession."[106]

350   I have already considered this issue above in the context of examining the plaintiffs' loss of opportunity. Here, I think it will suffice therefore if I simply set out what I consider to be the factors, correctly identified by counsel for the plaintiffs, which might well have led to a

---

106   *Midland Bank* v. *Hett, Stubbs Kemp* (46), approved by the Court of Appeal in *Martin Boston Co.* v. *Roberts* (45) ([1996] P.N.L.R. at 50), and as discussed in *Jackson & Powell*, *op. cit.*, para. 11–086.

476

different outcome had another "reasonably competent" attorney been engaged by Dr. Braga to act against the interests of the plaintiffs.

351   Having regard to the nature of the duties of full and frank disclosure when making an *ex parte* application of the *Norwich Pharmacal* kind (to be measured also against the duty to give notice as explained by the Privy Council in *Olint* (50)), it is highly probable that another competent attorney would have ascertained and would have disclosed that:

   (a) Dr. Braga did not have authority to bring the breadth of claims which he brought for disclosure of the plaintiffs' affairs in Cayman. This is also shown as discussed above by reference to the May 2011 judgment and the order then made for the retrieval of the *Bankers Trust* type of disclosure. The unwarranted disclosure as shown by Schedule 4 of the *Norwich Pharmacal* orders, went so far as to identify *34* allegedly "related entities and individuals" and covered "all" documents relating to Arnage and Brooklands and those 34 other entities and individuals. That breadth of disclosure went far beyond what was necessary to identify Katia Rabello as the UBO of Securinvest through her connection to Arnage and Brooklands.

   (b) The statutory fee structure under which Dr. Braga himself stood to be remunerated by way of a percentage of the recoveries on behalf of the Petroforte estate, was, at least, one capable of incentivizing his conduct in a way that could affect his objectivity and credibility as a party and as a witness.[107]

   (c) The contingency agreement into which Dr. Braga had entered on behalf of the Petroforte estate with OAR was, at least arguably, champertous. As mentioned above, OAR was a company owned and/or controlled at all material times by Dr. Braga's legal team and was, through the OAR contingency agreement, entitled to a success fee of between 20% and 30% of the value of recoveries by the Petroforte estate (30% being the applicable rate in respect of assets recovered from outside Brazil).

   (d) A champertous agreement had also arguably been entered into with BVI solicitors, Martin Kenney & Co.[108] who instructed the defendant on behalf of Dr. Braga and advised him and OAR in respect of actions taken outside Brazil against the plaintiffs.

   (e) Thus, OAR and Martin Kenney & Co. both had a significant personal interest in the actions taken against the plaintiffs in Cayman and

---

107  He stood to receive at least 6% of recoveries: see decision of the TJSP.
108  As confirmed by them in response to requests for further and better particulars and exhibited at Appendix 1 of the reply to the defence dated April 21st, 2015.

477

in the other jurisdictions where steps were taken to identify and seize their assets for the Petroforte estate by use of the Cayman disclosure.

(f) Before acting for parties so incentivized under the cloak of champerty, any competent attorney was obliged at least to have ascertained the interests of those instructing him and to inform this court of the arrangement.[109] Champerty was then and still remains an offence in the Cayman Islands. It is therefore probable that this court would not have entertained applications presented on the basis of instructions from parties to such arrangements, at least not without first being satisfied that the arrangements were fair and that it could rely on representations made by or on behalf of parties who were so incentivized; see *Quayum* v. *Hexagon Trust Co. (C.I.) Ltd.* (55) and *In re ICP Strategic Credit Income Fund Ltd.* (40).

352 It would have been a legitimate concern of this court whether Dr. Braga and those advising him were acting in the interest of Petroforte creditors or in their own interests.

353 At the very least, disclosure of the arrangements would likely have led this court to enquiries which would have revealed Dr. Braga's intentions to use the Cayman disclosure more widely than was strictly necessary or permitted to assist the STJ to resolve the Securinvest appeal.

354 At all events, had the defendant not failed in its duty to have notified the plaintiffs of the applications, the plaintiffs would themselves likely have raised these concerns with the court.

355 Further and in any event, it was an abuse of process for the *Norwich Pharmacal* applications to have been made on the misleading bases on which they were, citing the need for urgency and gagging orders which were, in retrospect, clearly unjustified. See again the analysis above from the May 2011 judgment, reflecting on the consequential loss of opportunity.

356 No hypothetical reasonably competent attorney can be assumed to have been willing to act in an abuse of the process of the court, and certainly not without full and frank disclosure being made. It is probable

---

109 The flagrant nature of the incentive later became apparent from a *Financial Times* article "Fund sees Brazilian fraud as next big thing in emerging markets," contributed by Joe Leahy from São Paulo, December 8th, 2013. In this article it is revealed that Martin Kenney had entered into a litigation funding deal with an investment fund (Platinum Partners) and in which Jack Simony of Platinum Partners discussed the potentiality of funding for offshore litigation and citing the arrangements with Martin Kenney, opined that while expensive to fund "The rewards of a successful case, however, can be huge. Mr. Kenney said his firm was close to recovering R$900m in a Brazilian fraud case involving the former owner of a local bank, Banco Rural."

that had such disclosure been made, the *Norwich Pharmacal* applications would have been stayed for being champertous (see *Grovewood Holdings plc* v. *James Capel & Co. Ltd.* (32)) or until, at the very least, the plaintiffs had been given the opportunity to respond, that loss of opportunity about which they now complain and are found to have suffered.

357   Finally, on this issue, I considered that if this court were to accept the defendant's proposition, the fiduciary duties which the defendant plainly owed to the plaintiffs would be deprived of any content. It would mean that no duty of loyalty at all would effectively be owed to clients (especially to clients who might most need protection). The fact that documents which should never have been disclosed contain information potentially damaging to the client may not be regarded as meaning that a client should lose its right to argue that the information was confidential and should never have been disclosed in the first place.

358   I am satisfied from the foregoing examination of the plaintiffs' case, that the defendant did owe to each plaintiff respectively, the contractual and fiduciary duties of care, confidence and loyalty and that these duties were breached by the defendant.

359   The breach is for present purposes proven, not just by the obtaining and disclosure of the Cayman disclosure, but also by enabling or facilitating its adverse use against the plaintiffs, in the circumstances to be further examined below.

**The defence: no causation of loss**

360   The defendant's response to the allegations of causation of loss has been various and complex. They have argued variously that the Cayman disclosure had no character of confidentiality. This argument as I understood it, was a restatement of their "no confidence in inequity" point, which they latterly abandoned.

361   They also argued that it was only the *Norwich Pharmacal* disclosure—that which was obtained by dint of the first order from Equity Trust—that caused the plaintiffs' (in particular Katia Rabello's) losses. And, that in the event, as she was obliged in any event, to disclose the crucial fact that she was the UBO of Securinvest, that crucial element of the *Norwich Pharmacal* disclosure could, for that reason also, have had no quality of confidentiality. This argument, linked to the argument that any other attorney would have obtained this disclosure, means that the defendant should be excused from having obtained the disclosure.

362   Further, that the damage was done by the *Norwich Pharmacal* disclosure and this was inevitable. Moreover, as Katia Rabello was under

479

a legal obligation to disclose her UBO status to the STJ and maintains[110] that had she done so, Securinvest (and by association herself) ought to have and would have been released from the Petroforte bankruptcy, the losses were caused not by the defendant's actions on behalf of Dr. Braga but by Katia Rabello's lie.

363   This argument is encapsulated in the defendant's written submissions[111] as follows:

"The Plaintiff's case, as set out in Mr. Macaulay's eighth affidavit and Ms. Rabello's third witness statement, is that if Ms. Rabello had told the truth to the STJ then Securinvest would have been released from the bankruptcy. On that basis the answer to the case is very simple— the Plaintiffs' losses were caused by Ms. Rabello's lie. If Ms. Rabello had told the truth then Securinvest would have been released from the bankruptcy and Ms. Rabello's assets would never have been incorporated in it. Further Dr. Braga, who came to Cayman specifically to ascertain the UBO of Arnage and Brooklands, would not have done so. Thus there would have been no Cayman Disclosure. It is important to note that this causation point does not turn either on the fact that it is a lie, or on the motivation for that lie. It turns on the fact that it is *Ms. Rabello's own actions* which have caused the loss."

364   This in other words, is a defence that whatever breaches the defendant may have committed, there was a break in the chain of causation of loss when Katia Rabello's lie was revealed resulting in the STJ's final dismissal of Securinvest's appeal.[112] Plausible though this argument might at first appear, there are two clear and telling responses from the plaintiffs.

365   First, this argument of the defendant goes only to the question of what was Katia Rabello's duty of disclosure to the STJ and her failure to fulfill that duty. The argument does not address the case against the defendant in relation to the loss of opportunity to appear before this court at first instance and to have prevented the wider abuse, beyond the STJ, of the Cayman disclosure in Brazil against Katia Rabello and Fernando Toledo and the consequences arising from that wider abuse.

366   In other words, this argument of the defendant on causation can be relevant, if at all, only to the loss of Securinvest's assets as that was the

――――――――――――――――

110  In her explanatory third witness statement, to be considered fully below.
111  For this hearing listed for December 3rd–14th, 2018.
112  The argument was similarly presented on March 3rd, 2016: "It doesn't matter whether the actions of the relevant party were dishonest or fraudulent. What matters is whether it broke the chain of causation. So, it wraps up into the causation point."

480

issue affected by the duty of disclosure to the STJ. And this must be so also, notwithstanding the defendant's further argument that had Securinvest been released from the Petroforte bankruptcy, so would Katia Rabello have been released. The converse situation must be considered also: had she not been taken into the Petroforte bankruptcy in the first place as a result of the abuse of the Cayman disclosure, she would not have remained in it, whatever the outcome for Securinvest.

367   Moreover, if Securinvest is ultimately released and consequentially Katia Rabello as well, there still will have been significant losses sustained in the meantime such as could be attributed to the defendant's breaches of duty.

368   Secondly, the defendant's response would overlook a very pertinent aspect of Ms. Rabello's explanation, in her third witness statement, for her lie to the STJ:[113]

> "Given the logical consequences in the Petroforte bankruptcy proceeding of my admission to being the UBO of Securinvest [*viz.* that Securinvest would have been shown not to be owned by any Petroforte interest and so entitled to be released from the bankruptcy] this Honourable Court is rightly concerned as to why I chose not to take this course. In essence, as I explain below, the problem was that, had I made the admission, very serious collateral issues would have arisen affecting Banco Rural and me from the perspective of the relevant regulator of the bank; namely the Brazilian Central Bank."

369   It would follow, if this explanation came to be accepted by the court upon an examination of Ms. Rabello's evidence on assessment of quantum of loss, that she was justifiably concerned that disclosing that she was UBO of Securinvest would not only result in the dismissal of Securinvest's appeal[114] and the extension of the Petroforte bankruptcy to herself, but also that it would result in the destruction and loss of Banco Rural.

370   It is already established that the assessment of quantum will proceed on the basis of my conclusion that the Cayman disclosure was, indeed, the cause of losses to be quantified.[115]

---

113   As described above and as set out in her own words below in response to the defendant's *ex turpi causa* defence.

114   Although, as set out above at para. 368, she asserts that it ought not to have had that consequence.

115   It was also accepted in the August 2016 judgment, that *all* of the Cayman disclosure was available to the Brazilian courts and would have influenced the outcomes before them.

481

371   For the present purposes of summary judgment on liability, I will set out briefly below how it is that I find the Cayman disclosure to have had that consequence.

**Adverse use of the Cayman disclosure**

372   The Cayman disclosure (the confidential nature of which is undeniable and is described in paras. 73–88 of the reply to the defence)[116] related not only to Sabino Rabello and Katia Rabello's ultimate beneficial ownership of Arnage and Brooklands but also contained numerous other documents including:

(a) Documents expressly naming Sabino Rabello, Katia Rabello and Fernando Toledo.

(b) Documents relating to the note purchase transaction (including the defendant's own work product).

(c) Documents concerning both TLB and the Rabello family (the Trade Link Bank documents) which were directly relevant to both the May 2007 and the August 2009 retainers.

(d) Documents relating to Fernando Toledo's personal and business affairs connected to EFHL and TLB.

373   The Cayman disclosure has been heavily relied upon by Dr. Braga in proceedings in Brazil, the United States, the BVI and Belize, contrary to the plaintiffs' interests.

374   The Cayman disclosure has also been relied upon by the Brazilian regulatory authorities in regulatory proceedings unconnected with the Petroforte bankruptcy.

**Adverse use of the Cayman disclosure before the Brazilian courts**

375   As mentioned above, the Cayman disclosure has been specifically relied upon by Dr. Braga in applications before the Brazilian Bankruptcy Court, the TJSP and the STJ. In particular, it clearly was relied upon for placing Katia Rabello into the Petroforte bankruptcy and, inferentially, by the STJ in refusing Securinvest's appeal.

376   While this was the subject of dispute between the parties before,[117] there really is no longer any doubt about this and it is confirmed by the

_____

116  Under the heading "The disclosure of documents and information."
117  See, for instance, judgment of August 10th, 2016 (above), where, at paras. 22–24, despite the defendant's argument to the contrary, it is noted that the plaintiffs' case is and always has been that the totality of the Cayman disclosure caused damage.

expert evidence both of Roberto Figueiredo on behalf of the plaintiffs and Roberto Liesegang on behalf of the defendant.

377    Moreover, in his affidavit of February 17th, 2011, Dr. Braga admitted that he had provided the totality of the Equity Trust documents (including *Bankers Trust* documents) to the STJ (Justice Andrighi). Dr. Braga also filed the OAR Report dated June 29th, 2010 on the STJ precautionary measure file (which both summarized and quoted from the Equity Trust disclosure). It is agreed that Dr. Braga filed the totality of the Cayman disclosure on file 1819 (the file of the OAR investigation directed by Judge Beethoven in connection with the Petroforte bankruptcy).[118]

378    The Cayman disclosure was persuasive in the key applications before the Brazilian courts. It was fundamental to the October 28th, 2010 bankruptcy order made by Judge Beethoven against Katia Rabello, the August 9th, 2011 STJ judgment refusing Securinvest's appeal and which, in turn, formed part of the basis for the TJSP's judgment of September 27th, 2011, refusing Katia Rabello's appeal.[119]

379    By the defendant's own admission,[120] the disclosure of the *Norwich Pharmacal* disclosure by Dr. Braga to the Bankruptcy Court resulted in catastrophic consequences for Katia Rabello.

380    The foregoing findings in relation to the deployment of the Cayman disclosure before the Brazilian courts are not, however, to be taken as a conclusion on causation of loss or still less, on quantification of loss. For instance as already explained[121] and will be explained further below,[122] it is part of the defendant's case that, to the extent the revelation of Katia Rabello's status as UBO of Securinvest affected the outcome in Brazil, this was information that she was herself obliged to disclose in any event in the context where Securinvest had already been taken into the Petroforte bankruptcy, before the obtaining of the Cayman disclosure.

**Adverse use of the Cayman disclosure by the BCB**

381    As also already mentioned, following the October 28th, 2010 bankruptcy order, the Bankruptcy Court also referred the matter to the BCB for investigation with that investigation leading to adverse publicity against Katia Rabello and Banco Rural, and a complaint dated March

---

118  As confirmed by defendant's expert Roberto Liesegang in his sixth affidavit.
119  See reply to further request for further and better particulars of the reply to the defence.
120  See for example, para. 17 of its submissions for the March 2016 hearing.
121  At paras. 280–285 above.
122  At paras. 427–428 below.

483

21st, 2012 ("the BCB 2012 complaint"), specifically based on the Cayman disclosure.[123]

382   Further, as averred in the pleadings,[124] the provision of the Cayman disclosure also led to the BCB intervening in Banco Rural's affairs and the placing of Banco Rural into compulsory liquidation on August 2nd, 2013.

**BCB administrative proceedings**

383   The adverse use of the Cayman disclosure by the BCB also resulted in formal administrative proceedings against Katia Rabello and Banco Rural in March 2012.[125] By way of the BCB complaint, the BCB alleged (as already mentioned above) that as Katia Rabello is the actual owner of Securinvest, certain credit transactions entered into by Banco Rural in favour of Securinvest were in violation of Brazilian law prohibiting the provision of credit to Securinvest as an "associated" company.

384   The use of the Cayman disclosure by the BCB was in contravention of para. 1(e) of the retrieval order of this court dated July 25th, 2011.

385   The BCB proceeded on the basis of the judgments of the Brazilian courts which had themselves made reference to the wrongfully obtained *Bankers Trust* aspects of the Cayman disclosure; the BCB referring to aspects of it and the information it disclosed as principally set out in Judge Beethoven's decision of October 28th, 2010. Of importance in this regard was an original letter from Judge Beethoven (2892/2010—Docinho) dated November 3rd, 2010, confirming that Katia Rabello was the beneficial owner of Arnage and Brooklands and consequently "controller" of Securinvest.

386   The documents and/or information obtained from the Cayman disclosure and expressly set out in the BCB complaint included:

   (i) Arnage and Brooklands subscription documents;

   (ii) the 2009 Costa Rican corporate restructuring; and

   (iii) correspondence between Katia Rabello and Securinvest.

387   A copy of the regulatory decision imposing a fine of 250,000 Reais upon both Ms. Rabello and Banco Rural is exhibited in evidence. This too expressly referred to and relied upon the Cayman disclosure, referring *inter alia*, to the same subscription documents and to the 2009 Costa Rican restructuring.

---

123  All as described at paras. 168–218 of the statement of claim.
124  Statement of claim, para. 192.
125  See plaintiffs' reply to request 2 in replies dated August 21st, 2015 to defendant's further request for further and better particulars.

484

388   This decision is under appeal and the outcome is still awaited but unless set aside, the fine must be paid.[126] At present the fine is therefore cited by Katia Rabello as being an item of loss and so as an item of the damages she is entitled to recover from the defendant.

**Adverse use of the Cayman disclosure in other jurisdictions**

389   The Cayman disclosure has repeatedly been used against the plaintiffs in other jurisdictions causing what they allege to be extensive losses and catastrophic damage. For present purposes, it will I think suffice to note that I accept that, at least in relation to the resistance of such proceedings in Florida, the BVI and Belize, the plaintiffs must have incurred significant costs.

**The fourth element for summary judgment: proof of causation of "some" loss**

390   As already mentioned, even at this summary judgment stage, the plaintiffs must establish beyond argument, that *some* loss was caused by the defendant's breaches of duty. And given the size of the claim, this must be significant in amount. If the plaintiffs can at this stage establish only some *de minimis* amount, it would, in my view, be an abuse of the process of the court to allow this action to proceed any further. This must be correct, although the plaintiffs may not yet be in possession of all material that would be relevant to their pleading out of the issues on causation and loss.

391   I do not understand the plaintiffs to disagree.

392   Instead what they assert through Mr. Akiwumi (also as already mentioned), is that they can indeed show at this stage that significant losses were unarguably incurred both in terms of legal costs and damages and that they are therefore entitled to summary judgment on liability now, with the larger proof of quantum to be established later at the assessment of quantum.

393   The authority cited for this proposition is *Lunnun* v. *Singh* (43), a decision of the Court of Appeal of England and Wales. In that case it was held that the fact that default judgment had been entered in favour of the plaintiff for damage to his property caused by water leakages from the defendant's adjacent property did not absolve the plaintiff from having to prove causation of loss and quantum in respect of each individual head of loss.

---

126  *Per* Mr. Akiwumi on Day 7 of the hearing.

AP1280

394   The principles, as they would also, in my view, apply to a case like the present upon the grant of summary judgment on liability with damages to be assessed, were summarized by Clarke, L.J. (at 7–9):

"In my judgment the relevant principles can be deduced from *Turner v Toleman* [(73)[127]] and *Maes Finance Limited and Another v A Phillips & Co* [(44)[128]] to both of which my Lord, Mr Justice Jonathan Parker, has referred. They may be summarised as follows:

. . .

    4.    On the assessment of damages the defendant [in a case like this, following a grant of summary judgment] may not take any point which is inconsistent with the liability alleged in the statement of claim.

    5.    Subject to 4 the plaintiff may take any point which is relevant to the assessment of damages.

    6.    Such points will include [(where applicable)] the following:

      (1)   Contributory negligence: see the passage quoted by Mr. Justice Parker from *Maes Finance* [to the effect that contributory negligence could be relevant on an assessment of damages following judgment on liability, but only if the judgment had not settled an issue on which an allegation of contributory negligence would depend];

      (2)   Failure to take reasonable steps to mitigate (see the same passage in *Maes*).

      (3)   Subject to (5) below, causation.

      (4)   Quantum [this is of particular relevance here] [emphasis added].

      (5)   Causation. As the Vice-Chancellor put it in *Maes*:

'The defendant cannot thereafter contend that his acts or omissions were not causative of *any* loss to the plaintiff [emphasis in original]. But he may still be able to argue, on the assessment, that they were not causative of any particular items of alleged loss.'

Moreover, he may do so even if the statement of the claim alleges a particular loss was caused by the tort.

———————————

   127  Unreported decision of the Court of Appeal, delivered January 15th, 1999, *per* Simon Brown, L.J. and Wilson, J.
   128  Unreported decision of the High Court, *per* Sir Richard Scott, V.-C.

486

In *Turner v Toleman* Lord Justice Simon Brown, with whom Mr. Justice Wilson agreed, as my Lord has indicated, quoted the following statement by Lord Justice Waller in refusing leave to appeal on paper in that case:

> 'What loss and damage was caused by this defendant's negligence must be part of the exercise of assessing damages.'

Lord Justice Simon Brown expressed the view that that was plainly correct and that it accorded with his own experience over many years."

395   Those principles are equally applicable to the present case for the purposes of drawing the appropriate line between the judgment on liability against the defendant for its breaches of duty and the assessment to come of the quantum of loss and/or damages.

**Election**

396   In this action, each of the plaintiffs claim, in the alternative, (i) damages, (ii) equitable compensation, or (iii) an account of profits received as a consequence of the defendant's breach of fiduciary duty.

397   As regards (ii) and (iii), there is an election to be made by the plaintiffs. The principles, as well as the procedure, were explained by the House of Lords in *Att. Gen.* v. *Blake* (6) as follows *per* Lord Nicholls of Birkenhead ([2001] 1 A.C. at 280):

> "I should refer briefly to breach of trust and breach of fiduciary duty. Equity reinforces the duty of fidelity owed by a trustee or fiduciary by requiring him to account for any profits he derives from his office or position. This ensures that trustees and fiduciaries are financially disinterested in carrying out their duties. They may not put themselves in a position where their duty and interest conflict. To this end they must not make any unauthorised profit. If they do, they are accountable. Whether the beneficiaries or persons to whom the fiduciary duty is owed suffered any loss by the impugned transaction is altogether irrelevant."

398   And by the Privy Council in *Tang Man Sit* v. *Capacious Invs.* (67), *per* Lord Russell, as follows ([1996] A.C. at 521):

> "Faced with alternative and inconsistent remedies a plaintiff must choose, or elect, between them. He cannot have both. The basic principle governing when a plaintiff must make his choice is simple and clear. *He is required to choose when, but not before, judgment is given in his favour and the judge is asked to make orders against the defendant.* A plaintiff is not required to make his choice when he launches his proceedings. He may claim one remedy initially, and

487

then by amendment claim in favour of the other. *He may claim both remedies, as alternatives. But he must make up his mind when judgment is being entered against the defendant.*" [Emphasis added.]

399   It is accepted that the plaintiffs must elect between remedies but the defendant, through Mr. Simpson, argued that they were bound to do so before obtaining summary judgment on liability.

400   Having regard to the *dictum* above from the Privy Council, this argument is plainly wrong.

401   The defendant proffered an account of the "profits" by way of fees earned from the Braga retainer, for which it says it could only possibly be found accountable. This was done through the affidavit of Neil Sherlock, its Chief Financial Officer. He averred that US$362,117.50 was the amount earned.

402   Notwithstanding that the plaintiffs maintained that they were not obliged to elect until "when judgment is being entered against the Defendant" in keeping with the Privy Council's *dictum*, I was told by Mr. Akiwumi that one of the plaintiffs, EFHL, upon judgment being entered, would elect for an account of profits from the defendant. The other plaintiffs, each of whom would be entitled to do so, would elect instead for the assessment of damages or equitable compensation.

**The available remedies**

403   It should be helpful for me to express my views at this stage on the nature of the remedies which will be available on the assessment of quantum (apart from an equitable account for profits already mentioned).

404   Given that the defendant has been found liable for breaches of fiduciary as well as contractual duties, the plaintiffs are entitled to claim compensation on two different bases: equitable compensation or damages at common law.

405   The plaintiffs also seek compensation under the supervisory jurisdiction of the court for breaches of professional conduct, citing *Udall (t/a Udall Sheet Metal & Co.)* v. *Capri Lighting Ltd.* (74). I will return to this issue below.

406   As regards the bases for assessment of equitable compensation for breach of fiduciary duty, the case law has been evolving, as very helpfully explained in *Jackson & Powell.*[129]

---

129   *Op. cit.*, at paras. 3–013 – 3–017.

488

407   Equitable compensation is now firmly recognized in English law as a remedy for breaches of fiduciary obligation.

408   There is, however, a clear distinction to be observed between the traditional remedies for breach of fiduciary duty involving non-disclosure by the fiduciary of his interest in a transaction affecting a client[130] or for a fraudulent breach of trust[131] and a claim for damages for breach of fiduciary duty.

409   As was settled by the Privy Council in *London Loan & Savings Co.* v. *Brickenden* (42),[132] in the former set of circumstances, the non-disclosure renders the transaction voidable at the election of the client (as the beneficiary of the fiduciary duty owed) and considerations as to the causative effect of the non-disclosure do not arise.

410   In the latter set of circumstances, the case law now explains the requirement for the showing of a causal link such that it would be inappropriate to regard *Brickenden* as laying down a contrary principle of general application.

411   In *Swindle* v. *Harrison* (66), the Court of Appeal had to consider to what extent proof of a causal link between a breach of fiduciary duty and loss should be established if compensation or damages were to be awarded. The case involved a claim by Mrs. Harrison against her haplessly named solicitor Mr. Swindle, for failure to disclose a small profit he stood to make from an arrangement he made with his bank to provide her with a secured loan for the promotion of her restaurant business. When her restaurant failed, Mrs. Harrison was unable to meet the loan payments and

---

130  As classically examined and explained in *Nocton* v. *Lord Ashburton* (51).
131  Where the remedy would be reparative, such as by an account or other form of restitution of a trust fund: see for insightful discussions on the different remedies: M. Hoyle, "'Where there is discord, may we bring harmony': *AIB Group (UK)* v. *Mark Redler* and the Perils Facing Equity," 4 OCULJ 22 (2016) and S. Degeling, "Loss of Chance and Breach of Fiduciary Duty, The Requirement of Certainty of Loss," 28 SAcLJ 825 (2016).
132  [1934] 3 DLR at 469, *per* Lord Thankerton:
     "When a party, holding a fiduciary relationship, commits a breach of his duty by non-disclosure of material facts, which his constituent is entitled to know in connection with the transaction, he cannot be heard to maintain that disclosure would not have altered the decision to proceed with the transaction, because the constituent's actions would be solely determined by some other factor, such as the valuation by another party of the property proposed to be mortgaged. Once the Court has determined that the non-disclosed facts were material, speculation as to what course the constituent, on disclosure, would have taken is not relevant."

489

the charge, secured against her home, was enforced. She lost her home and any equity acquired in the business venture.

412    She counterclaimed against Mr. Swindle for her entire loss, alleging that he was in breach of duty in failing to reveal the profit he stood to make from the loan arrangement, notwithstanding that its terms had been quite reasonable and would in any event have been readily accepted by her, given her then dire need for financing.

413    She relied on the *dictum* of Lord Thankerton in *Brickenden*, arguing that she did not need to prove that the breach of fiduciary duty caused her losses. The argument failed, the Court of Appeal declaring that, as distinct from claims for breach of fiduciary duty involving non-disclosure, considerations of causation applied to claims for compensation for non-fraudulent breaches of fiduciary duty (*per* Evans, L.J. following *Bristol & West Bldg. Socy.* v. *Mothew* (11)) and that it is necessary to satisfy the "but for" test of the common law if damages were to be recovered (*per* Hobhouse, L.J.). Mummery, L.J., the third member of the court, expressly recognized the availability of equitable compensation as a remedy for breach of fiduciary duty. Having observed that common law considerations of remoteness and foreseeability were generally irrelevant to *restitutionary* remedies for breach of trust or fiduciary duty, he held that ([1997] 4 All E.R. at 733):

"Although equitable compensation, whether awarded in lieu of rescission or specific restitution or whether simply awarded as monetary compensation, is not damages, it is still necessary for Mrs Harrison to show that the loss suffered has been caused by the relevant breach of fiduciary duty. Liability is not unlimited. There is no equitable by-pass of the need to establish causation."

414    In *Target Holdings Ltd.* v. *Redferns* (68), the need to show the connection between the breach of trust and the loss in a claim for equitable compensation was also recognized by the House of Lords, *per* Lord Browne-Wilkinson ([1996] 1 A.C. at 439):[133]

"Equitable compensation for breach of trust is designed to achieve exactly what the word compensation suggests: to make good a loss in fact suffered by the beneficiaries and which, *using hindsight and common sense*, can be seen to have been caused by the breach." [Emphasis added.]

---

133  *Target Holdings* v. *Redferns* has been explained and upheld by the Supreme Court, its widespread academic criticism notwithstanding, in *AIB Group (UK)* v. *Mark Redler & Co.* (2).

490

415   The words in emphasis, being an adaptation and approval of *dictum* from *Canson Enterprises Ltd.* v. *Boughton & Co.* (13) (85 D.L.R (4th) at 163, *per* McLachlin, J.), will also inform the approach to the exercise of assessment of loss.

416   *Swindle* v. *Harrison* (66), *Target Holdings Ltd.* v. *Redferns* (68) and *Brickenden* (42) have been followed and applied in this jurisdiction in *AB Jnr.* v. *MB* (1).[134] In that case it was found that equitable compensation was an available remedy for the trustees' non-fraudulent breach of trust in failing to disclose information to their beneficiary, information which was relevant to the valuation of the beneficiary's interests in the trust. The appropriate basis for the calculation of equitable compensation was to enquire into whether or not a loss resulted from the failure of the trustees to disclose and to quantify that loss. Thus, by implication, a causation analysis in the context of a non-fraudulent breach of trust.

417   Accordingly, in their claims for compensation for loss caused by the defendant's breaches of fiduciary duty, the plaintiffs must establish causation. However, in assessing compensation, the objective is to compensate for the consequences of the breach of fiduciary duty and in so doing a common-sense view must be taken of what loss occurred from the breach and so falls to be compensated.

418   The remedy is truly compensatory, not punitive,[135] and so there is no power to make an exemplary award (as the plaintiffs also pray).

419   Any claims for compensation for breach of the contractual duties (or in negligence for breach of tortious duties of care if pursued) must, of course, be proven on the usual common law bases.

**The supervisory jurisdiction to order compensation**

420   As mentioned above, the plaintiffs also claim that the defendant's conduct is such (both in terms of its actions against them on behalf of Dr. Braga and its continuing allegations of misconduct and attacks upon their reputation in the manner of its defence[136]) that the court should exercise

---

134  2013 (1) CILR 1, among other cases discussed at 102–114.

135  *Harris* v. *Digital Pulse Pty. Ltd.* (33), cited in *Jackson & Powell*, *op. cit.*, at para. 3–016.

136  These include references to the Mensalao scandal, criticisms of the plaintiffs' honesty and integrity inconsistent with the defendant's duty of loyalty (as explained by Campbell, J. in *Chiefs of Ontario* v. *Ontario* (17)), and their submissions on *ex turpi causa*, to be discussed below. The plaintiffs, through counsel, also submit that the defendant should be estopped from raising such allegations having expressly and/or impliedly represented by its conduct that it would seek to protect the Rabello family and the plaintiffs' interests in relation to the matters alleged.

491

its supervisory jurisdiction and order compensation for breach of the professional conduct rules, following *Udall* v. *Capri* (74).

421    While these are compelling arguments on which to respond to the allegations in the defence, I am not persuaded that they provide the distinct and separate basis required for the invocation of the court's supervisory jurisdiction leading to the making of an award of compensation or an award of wasted costs, the latter, as I will now explain, being the basis as already applied in this jurisdiction, for the application of the supervisory jurisdiction.[137]

422    The plaintiffs rely upon *dicta* from *Udall* v. *Capri* which suggests that the court has a very wide discretionary jurisdiction ([1988] Q.B. at 916) "to supervise the conduct [of an attorney as its officer] and to visit with penalties any conduct which is of such a nature as to tend to defeat justice in the very cause in which the [attorney] is engaged . . ."[138]

423    That principle was applied in *Udall* v. *Capri* where the professional misconduct involved the failure to honour an undertaking given to the court. The principle was adopted as contained in a passage from the earlier authoritative judgment of Lord Wright delivered on behalf of the House of Lords in *Myers* v. *Elman* (48) by which the jurisdiction of the courts to impose wasted costs orders upon attorneys for gross neglect or inaccuracy in the conduct of a matter, was settled. There the jurisdiction is described ([1940] A.C. at 319) as:

"... not merely punitive but compensatory. The order is for payment of costs thrown away or lost because of the conduct complained of. It is frequently . . . exercised in order to compensate the opposite party in the action."

424    *Myers* v. *Elman* was itself followed and applied by this court in the *Al-Ibraheem* judgments (3) cited above.

425    The jurisdiction is both discretionary and summary in nature. It is *R&T Thew Ltd.* v. *Reeves (No. 2)* (57) ([1982] Q.B. at 1286): "only available where the conduct of the [attorney] is inexcusable and such as to merit reproof" by the court. And, being summary in nature, only where the enquiry to be undertaken will not involve the resolution of extensive factual issues or counter-allegations. Otherwise, the appropriate redress is by way of an action at law for negligence—see *Udall* v. *Capri* (74) (at 917C, quoting from *Myers* v. *Elman* (48)).

---------------------

137  As discussed and applied in *Al-Ibraheem* v. *Bank of Butterfield Intl. (Cayman) Ltd. (3)*.
138  Citing *Stephens* v. *Hill* (64) (*per* Abinger, C.B.).

492

426   Given the supervisory and summary[139] nature of the jurisdiction, as well as the debatable question whether it might be used to make an extensive award for unliquidated damages of the sort claimed by the plaintiffs here, I would not consider this a case suitable for its application, egregious though the breaches of duty appear to be.

427   Here, the plaintiffs have open to them the other clear remedies of equitable compensation for breaches of fiduciary duties or damages for breaches of the contractual duties.[140]

**Particulars of some loss**

428   To the extent that the plaintiffs must now show that they have suffered some loss, I am satisfied that they have met this test. In setting out below the particular heads of pecuniary loss as identified, I do not prejudge the assessment exercise; I simply identify those heads under which I am satisfied the plaintiffs will certainly be able to recover some substantial loss.

429   The other much larger claims, such as for the loss of Securinvest's or Banco Rural's assets,[141] must of course satisfy the causation tests discussed above.

430   In particular, I am satisfied for the purposes of summary judgment on liability (and subject to specific proof at assessment of quantum), that the plaintiffs have suffered the following pecuniary losses, connected to legal fees and disbursements caused by the litigation engendered by the Cayman disclosure (as set out at para. 220 of the statement of claim):

   (i) Legal fees and disbursements incurred by Brazilian counsel in respect of (a) the court proceedings in Brazil; (b) the BCB investigation; and (c) proceedings outside Brazil in excess of US$15m.;

   (ii) Legal fees and disbursements incurred by Cayman Islands counsel in the Cayman Islands proceedings and assisting in proceedings outside the Cayman Islands in excess of US$850,000;

---

139  Albeit the procedural strictures were regarded as not being determinative of whether or not a wasted costs enquiry should be engaged in this jurisdiction: see *Al-Ibraheem (3)* (2000 CILR at 290–300).
140  The latter as based, for instance upon cl. 1 of the August 7th, 2009 terms of engagement letter which states: "We will provide our legal services with reasonable care and skill and in accordance with the professional standards expected of us and in a timely manner."
141  As pleaded at paras. 186 and 187 of the statement of claim.

493

(iii) Legal fees and disbursements incurred by US counsel in connection with the US proceedings and assisting in proceedings outside the US in excess of US$1m.;

(iv) Legal fees and disbursements incurred by BVI counsel in connection with BVI proceedings and assisting in proceedings outside the BVI in excess of US$100,000;

(v) Legal fees and disbursements incurred in Belize in connection with the Belize proceedings and assisting in proceedings outside Belize in excess of US$25,000.

431   During the hearing, the defendant pressed, through Mr. Simpson, for proof of payment of these fees and disbursements. In response, the plaintiffs were unable to show actual payment of anything like the US$17m. posited above from the statement of claim, instead, at this stage proposing to show that through a company Gladbeck Capital Ltd. owned by Katia Rabello and other companies affiliated with her had in fact paid US$1,875,000 as part of these legal fees.[142] This was money which Mr. Macaulay testified was actually paid to his firm and then paid out, including to Cayman Islands lawyers and counsel. In support of the plaintiffs' case he confirmed that in connection with—

"taking steps to mitigate their loss and to set aside the orders obtained by the Defendant on behalf of Dr. Braga in the Cayman Islands, the Plaintiffs incurred substantial Cayman Islands legal costs and disbursements in excess of US$850,000 together with substantial further Brazilian and US legal costs and disbursements."[143]

432   I conclude that questions over whether or not Gladbeck Capital Ltd. itself actually made these payments on behalf of the plaintiffs, or from whatever other source they might have been paid, are matters for proof at the assessment hearing, along with other matters for quantification of loss or damage.

433   This is, of course, without prejudice to any proper application the plaintiffs might make for an interim payment on the basis that some quantifiable loss can now be shown beyond argument.

───────────────────

142   As explained in Mr. Macaulay's tenth affidavit, sworn on December 10th, 2018 (para. 7).
143   As pleaded at para. 173 of the statement of claim.

494

**The defendant's strike-out application**

**(i)** ***The ex turpi causa defence: Katia Rabello's lie to the STJ***

434   It is an inescapable conclusion that the presentation of the Costa Rican structure to the STJ was—as Katia Rabello herself came to admit when pressed by this court in these proceedings for an explanation[144]—an artifice capable of misleading the STJ.

435   She maintains, however, that there was no intention to deceive the STJ so as to defraud the Petroforte estate. Her explanations must also therefore be again considered in the context of her response to the *ex turpi causa* defence of the defendant and this will be done below.

436   The issue to be decided now, therefore, is whether Katia Rabello's lie to the STJ can be invoked in this action by the defendant, in support of its *ex turpi causa* defence, to the extent of striking out the plaintiffs' claims because, in the manner contemplated by GCR O.18, r.19, it fails to disclose a reasonable cause of action or for being an abuse of the process of the court.

437   In this context (as well as in the earlier context discussed above of her (and the other plaintiffs) pleading of the loss of opportunity to limit the harmful deployment of the Cayman disclosure in Brazil), Katia Rabello's explanation for her lie to the STJ is highly relevant.

438   It is therefore convenient to set out here in her own words, her explanations, as taken from her third witness statement filed in this court in these proceedings:

"In particular, I am responding to the Court's request for clarification as to the motivation relating to Securinvest's deliberate failure to provide the STJ with the UBO information requested in its 22 September 2009 Order.

The STJ Order presented the Rural Group and me with a serious dilemma.

Collectively, we knew that there never was any direct or indirect involvement by Petroforte or any of its affiliates in the ownership or control of Securinvest or the Rural Group and that therefore there was no common economic group between the Rural Group/Securinvest on the one hand and the Petroforte Group on the other. On this basis, as we understood the relevant bankruptcy law to be at that time, we believed that there was no legal basis by which Dr.

———————————————

144   In her third witness statement, of November 9th, 2018.

495

Braga could keep Securinvest within the Petroforte bankruptcy or to pursue any Securinvest asset other than Sobar . . .

A transparent declaration by me, acknowledging my status as UBO of Securinvest, I believe and understand would have fully satisfied the STJ that Petroforte had no ownership or management interest in Securinvest, thereby providing the STJ with the substantive basis for rejecting Dr. Braga's contention of a common economic group. As a result, I believed that had I made the correct UBO declaration, Securinvest would have been excluded from the Petroforte bankruptcy.

I also understood that, if Securinvest and I were successful in the STJ appeal, so as to free Securinvest from the Petroforte bankruptcy, this would not give Securinvest the right to ownership of Sobar, which, logically would remain subject to a resolution on the merits of the revocation action.

Given the logical consequences in the Petroforte bankruptcy proceeding of my admission to being the UBO of Securinvest, this Honourable Court is rightly concerned as to why I chose not to take this course. In essence, as I explain below, the problem was that, had I made this admission, very serious collateral issues would have arisen affecting Banco Rural and me from the perspective of the relevant regulator of the bank, namely the Brazilian Central Bank (BCB).

Under the applicable regulatory regime, common ownership by my family of Securinvest (100% through the First and Second Plaintiffs) and Banco Rural (54%) meant that transactions between Securinvest and Banco Rural should have been classified and disclosed as related party transactions and subject to the BCB's rigorous restrictions on related party transactions. Had the true nature of the relationship between Securinvest and Banco Rural been disclosed to the BCB, given the extensive transactions between Banco Rural and Securinvest, Banco Rural (the main asset of the RURAL Group) and I would have been exposed to severe legal and administrative sanctions.

Regrettably, it is against this background that I made the choice not to make a full and frank disclosure to the STJ that I was the UBO of Securinvest. Paradoxically, it was clearly in my interest to declare my UBO status for the purposes of the Petroforte litigation; however, for reasons I have stated in this Statement, namely protection from the significant risk of legal and/or regulatory proceedings against Banco Rural and me for the breach of the relevant banking laws and regulations, I elected not to declare this status.

496

At the time of my decision not to disclose Securinvest's UBO to the STJ, I knew that proceedings had already commenced against me and other Banco Rural affiliates in 2008 as a result of disclosure of UBO information as to TLB, which had been provided by CIMA to the BCB in 2006.[145]

In summary therefore, at the time of Securinvest's response to the STJ's Order regarding UBO disclosure, I knew that the Rural Group was the victim of an attempt by Dr. Braga to misappropriate hundreds of millions of dollars worth of non-Sobar assets based on the Rural Group's vulnerability to the BCB arising from the irregular nature of the Securinvest/Banco Rural relationship.

The cost of declaring my status as UBO of Securinvest would have been very high given the risks relating to the BCB and Brazilian banking law. Consequently, given the dilemma we faced, I decided not to disclose myself as Securinvest's UBO and instead disclose only the Costa Rican nominees while truthfully emphasizing to the STJ the key legal point that there was no connection between Securinvest's owners and Petroforte and that therefore no basis existed for any Securinvest assets to be subjected to the Petroforte bankruptcy, save for Sobar, which remained subject to the outcome of the revocation action:

> 'We would stress that what is important for the purposes of the law upheld by these interim remedy proceedings and according to the esteemed court ruling which granted an interim injunction, is that the Petitioner's shareholders, and the natural persons who are partners of those shareholders, do not have any relationship with the bankrupt party's group of companies.'[ 146]

My lack of candor with the STJ regarding the UBO of Securinvest had nothing to do with either the merits of Securinvest's appeal to the STJ or the Sobar property, which would have remained subject to Dr. Braga's revocation action following Securinvest's exclusion from the Petroforte bankruptcy. I and the Rural Group simply sought to vindicate our legitimate rights to the non-Sobar assets which Dr. Braga was trying to misappropriate, while at the same time avoiding

---

145  I note in parenthesis here that this is implicitly a reference to herself as an interested party behind the note purchase transaction and a subject of the August 2009 retainer.

146  From the closing paragraph of Securinvest's submissions to the STJ (submissions to Justice Andrighi) of November 5th, 2009, exhibited to Katia Rabello's third witness statement.

497

the very serious collateral regulatory and legal problems for Banco Rural (the main asset of the Rural Group) and me, which could arise from the BCB receiving proof that Securinvest was not independent, in terms of its ultimate beneficial ownership, from Banco Rural.

In the absence of this huge legal and regulatory risk having nothing to do with Petroforte, I would have gladly disclosed my beneficial ownership of Securinvest to the STJ. Of course, in the absence of that risk, which I believe Dr. Braga knew I faced, I strongly doubt that he would have tried to misappropriate Securinvest's non-Sobar assets. Indeed, the existence of this overarching concern was subsequently validated by Dr. Braga's actions after obtaining the Cayman Disclosure in ex parte proceedings before this Court in May and July 2010, with the Defendant acting as his counsel in breach of the Defendant's duties to me. My fears were realized when I learned that Dr. Braga had requested Judge Beethoven to deliver to the BCB the confidential documents concerning my ownership of Securinvest, an action which was entirely irrelevant to the limited basis upon which he claimed to have been authorized by the STJ to seek cross border assistance from this Honourable Court."

439    The first point to note for present purposes is Ms. Rabello's response to the allegation of her intent fraudulently to mislead the STJ.

440    In summary, her response as I understand it (and as already briefly discussed above in the context of the plaintiffs' summary judgment application), is that her lie had no fraudulent intent primarily because, had the STJ been misled, the result would not have been the successful extraction of the contentious Sobar assets from Petroforte. Instead, had the STJ acted on her misrepresentations, allowed Securinvest's appeal and reversed the extension of the Petroforte bankruptcy over it, the validity of the Sobar transaction would have remained to be resolved in the context of the revocation action.

441    Further, that Dr. Braga would then have been obliged not merely to allege fraud, as he was able to in support of the bankruptcy proceedings, but instead to prove it in the revocation action. Securinvest's non-Sobar assets, to which he could have had no entitlement to claim, would very likely therefore have remained where they belonged, with Securinvest, because he would not have been able to prove the alleged fraudulent intermeddling in the Petroforte estate.

442    This explanation of Katia Rabello's intent was of course, not something given to resolution on the summary basis so as to afford her (or the other plaintiffs through her) a final answer to the defendant's strike-out

498

application. But conversely, neither was the defendant's strike-out application which must also be taken summarily,[147] a proper basis for rejecting it.

443   In short, the *bona fides* of her explanation is a matter of fact which could not be resolved without a trial, including cross-examination as to her intentions. The plaintiffs' case was therefore not amenable to being struck simply because (on the defendant's view of it) it depends on Katia Rabello's intention to deceive the STJ.

444   Her explanation also gives rise to the question whether, if accepted by the court, it might afford her a *locus poenitentiae*[148] from which she might urge this court to uphold her claims, her lie to the STJ notwithstanding. If so, it would provide a definitive answer to the defendant's strike-out application which, again, must show that the plaintiffs' case reveals no reasonable cause of action. The case law on this issue will be examined immediately below.

445   In light of her explanation, the defendant could not have succeeded with its strike-out application on the summary basis relying solely on its interpretation of her intentions in lying to the STJ. In this context, the defendant needed to show that her explanation was not an arguable or plausible response to its allegations of illegality. The onus was on the defendant to do so and, given her untested and therefore as yet unrefuted explanations, the onus was not discharged.

446   The principle of illegality (as a defence to a claim) was recently and authoritatively considered and restated by the UK Supreme Court in the case of *Patel* v. *Mirza* (54).

447   The facts were that Mr. Patel, the plaintiff, had transferred £620,000 to the defendant Mr. Mirza for him to bet on the price of shares in the Royal Bank of Scotland (RBS). Their agreement was based on the expectation that Mr. Mirza had access to inside information from his RBS

---

147  See GCR O.18, r.19 (at fn 4 above). As the Notes to RSC explain at 18/19/6: "It is only in plain and obvious cases that recourse should be had to the summary process under this rule." And at 18/19/10: "[A] 'reasonable cause of action' [such as should survive a strike-out application] means a cause of action with some chance of success when . . . only the allegations in the pleadings are considered" (*per* Lord Pearson in *Drummond-Jackson* v. *B.M.A.* (25) ([1970] 1 W.L.R. at 696)). So long as the statement of claim or the particulars (*Davey* v. *Bentinck* (20)) disclose some cause of action, or raise some question fit to be decided by a judge or a jury, the mere fact that the case is weak and not likely to succeed is no ground for striking it out (*Moore* v. *Lawson* (47); *Wenlock* v. *Maloney* (75)).

148  Within the meaning of the case law as recently discussed by the Court of Appeal in *Patel* v. *Mirza* (54), although now to be regarded as but a factor for consideration and subsumed within the proportionality principle recognized by the Supreme Court in the majority decision delivered by Lord Toulson to be considered below.

AP1294

contacts which would enable him to predict or anticipate movements in the market price of the shares. This agreement was illegal—it was a conspiracy to commit an offence of insider trading contrary to s.52 of the Criminal Justice Act 1993. But the inside information, which would have moved the market, never arrived. The bid for shares was not placed and although Mr. Mirza said he would return the money, he decided to keep it. When he was sued by Mr. Patel for its return he pleaded illegality as the defence, invoking the time honoured legal maxims: *ex turpi causa non oritur actio* (from a dishonourable cause an action may not arise) and in *pari delicto potior est conditio defendentis* (where fault is equal, the condition of the possessor is better)—in other words, where the parties are equally to blame, the position of the defendant is to be preferred, *i.e.* "let the loss lie where it falls."

448   The nine justices were unanimous that Mr. Patel should be entitled to recover his money and, which came to the same thing, that Mr. Mirza should not be permitted to keep the money because he would thereby have been unjustly enriched. The reasoning also was that Mr. Mirza was able to make full restitution of the money and Mr. Patel would neither be profiting from his admitted complicity in the illegal agreement, nor did he need to invoke the process of the court by way of reliance on it to prove his claim. In essence his claim was for his money handed over to Mr. Mirza, money by which Mr. Mirza would be unjustly enriched if it was not returned.

449   In his judgment on behalf of the majority, Lord Toulson identified tripartite policy considerations and adopted a "range of factors" approach that a court should take when deciding on a defence to a claim on the basis that the claim should fail on account of some illegality by the plaintiff. He explained that ([2016] UKSC 42, at para. 120):

"*The essential rationale of the illegality doctrine is that it would be contrary to the public interest to enforce a claim if to do so would be harmful to the integrity of the legal system . . .* In assessing whether the public interest would be harmed in that way, it is necessary a) to consider the underlying purpose of the prohibition which has been transgressed and whether that purpose will be enhanced by denial of the claim, b) to consider any other relevant public policy on which the denial of the claim may have an impact and c) to consider whether denial of the claim would be a proportionate response to the illegality, bearing in mind that punishment is a matter for the criminal courts." [Emphasis added.]

450   In assessing whether it would be disproportionate to refuse relief to which the plaintiff was otherwise entitled (consideration (c) above), Lord Toulson explained (at para. 107) that "various factors may be relevant." In a claim where a party was attempting to enforce a contract, he explained

500

that these factors could include how central to the contract or its performance the relevant conduct was, how serious a sanction the denial of the enforcement would be for the party seeking enforcement, whether denying enforcement of the claim would further the purpose of the rule which the conduct had infringed, and whether denying enforcement would act as a deterrent to conduct that was illegal or contrary to public policy.

*Impact of Patel v. Mirza in this case*

451    In seeking to strike out the plaintiffs' claims on the ground of their illegality, the defendant made no effective attempt to engage with the impact of *Patel* v. *Mirza* (54).

452    Instead, the defendant has throughout repeated the refrain that if the claims succeed, then the plaintiffs, and Katia Rabello in particular, would have profited from her own dishonest wrongdoing. As Mr. Simpson put it during the final days of the hearing, asserting her reliance on illegality: "giving back to Katia Rabello by way of damages against her attorney that which was correctly taken by the Brazilian courts" and that she is guilty of "a massive fraud on Petroforte."

453    Yet, even a cursory reading of *Patel* v. *Mirza* explains that a claim can no longer be dismissed[149] simply by reliance on the doctrine of *ex turpi causa.* The mere assertion that Ms. Rabello would be profiting from her wrongdoing as an automatic bar to the plaintiffs' claims, fails to engage with the principles from *Patel* v. *Mirza.* As Lord Toulson explained ([2016] UKSC 42, at paras. 100–101):

> "100.    Lord Goff observed in the Spycatcher case, *Attorney General v Guardian Newspapers Ltd (No 2)* [1990 1 AC 109], 286, that the '*statement that a man shall not be allowed to profit from his own wrong is in very general terms, and does not of itself provide any sure guidance to the solution of a problem in any particular case*'. In *Hall v Hebert* [1993] 2 SCR 159 McLachlin J favoured giving a narrow meaning to profit but, more fundamentally, she expressed the view (at 175–176) that, as a rationale, *the statement that a plaintiff will not be allowed to profit from his or her own wrongdoing does not fully explain why particular claims have been rejected, and that it may have the undesirable effect of tempting judges to focus on whether the plaintiff is 'getting something' out of the wrongdoing, rather than on the question whether allowing recovery for something which was illegal would produce inconsistency and disharmony in the law, and so cause damage to the integrity of the legal system.*

---

149    As it was sometimes liable to be under the old rule in *Tinsley* v. *Milligan* (71) which was overruled by *Patel* v. *Mirza* (54).

501

101.   *That is a valuable insight, with which I agree.*" [Emphasis added.]

454   With those principles in mind, it readily became apparent why the defendant's strike-out application based on *ex turpi causa* was bound to fail.

455   In the first place, even if the approach to the issue of illegality approved in *Patel* v. *Mirza* could be applied here (about which I make no finding because the allegation in this case of illegal conduct is entirely moot) then clearly, the burden of making out this defence rests upon the defendant. Yet the defendant has not even attempted to say why the defence of illegality should apply to bar each and every one of the plaintiffs' claims.

456   Moreover, there are no allegations of illegality on the part of EFHL and Mr. Toledo. Accordingly, to the extent that those plaintiffs can show loss or damage caused by the Cayman disclosure, the defendant may not argue that their claims are unsustainable or an abuse of process.

457   Secondly, so far as Katia Rabello herself is concerned, she makes no admission of illegal conduct nor has she been convicted of any in relation to the pivotal issue of the extension of the Petroforte bankruptcy. Her transgression, at least from the point of view of Judge Beethoven's extension of the bankruptcy to her, appears to have been the fact of her beneficial ownership of Securinvest and her lie to the STJ about that fact.

458   There is no reliance in her pleaded case, in order to claim loss against the defendant, upon any illegality as between herself and anyone (including the defendant as the counterparty for that matter). Her case is that the defendant breached its duties and obligations owed to her and that these breaches resulted in loss and damage, in turn the result of court and regulatory actions in Brazil.

459   In no sense does she rely upon her own impugned conduct. As already mentioned, this is in two respects. First her lie to the STJ. While she offers an explanation, she does not suggest that her lie should be accepted as the truth by this court in relation to establish her claims. Acknowledging that she lied to the STJ, she explains that she had no fraudulent intent and no such intent could have prevailed in any event because the Sobar assets claimed by Petroforte would not have been released to her even if she had succeeded in Securinvest's appeal. And so, in light of the proportionality exercise advised by *Patel* v. *Mirza*, it would be disproportionate to reject her claims against the defendant on account of her lie, which would result only in an unjustified windfall for the defendant.

460   Moreover, again when considering proportionality, it must be remembered that the alleged fraudulent misappropriation of Petroforte

502

assets, allegations relating to events which preceded her time as head of the Rural Group—are, as yet, strictly to be regarded as unproven.

461    And so, even assuming the applicability of the *Patel* v. *Mirza* principles, in order to invoke them to block the plaintiffs' claims, the defendant must explain but has failed to even attempt to do so:[150]

(i) which acts it relies upon as constituting the relevant transgressions which would engage the illegality principle. Even if (in the continuing irresolution of the revocation action and despite also the absence of any criminal charges), the plaintiffs were to be regarded as guilty of the alleged "fraud" against Petroforte, the plaintiffs have not sought to rely upon that fraud for recovery in this action. Their claim, primarily, is for recovery of the value of Securinvest's and Katia Rabello's non-Sobar assets which were lost as a result of the defendant's actions which enabled the extension of the Petroforte bankruptcy to them by dint of civil,[151] not criminal, legal measures;

(ii) what effect the enforcement of the claims would have upon the public interest (in Cayman or in Brazil, assuming without acknowledging, the relevance of the latter) and conversely, their denial would have upon the plaintiffs. In the absence of proven illegality on the part of Katia Rabello in particular (and hence Arnage and Brooklands against whom the defendant makes such assertions) it is difficult to see how the public interests in the Cayman Islands (or in Brazil for that matter) would be harmed by allowing the enforcement of her and Arnage's and Brooklands' claims. Conversely, denying these claims would allow the defendant to escape from the consequences of its numerous and serious breaches of

---

150  Instead, in its written submissions seeking to invoke public policy as a bar to the plaintiffs' claims on the basis that they sought to pervert the course of justice in Brazil by Katia Rabello's lie to the STJ. See defendant's skeleton arguments for hearing December 3rd–14th, 2018, paras. 172–175. And by a bold reliance on allegations of illegal conduct at written submissions for May 2018 hearing, paras. 110–111.

151  Recognizing that in *Laboratoires Servier* v. *Apotex* (41), in the context of a claim for infringement of pharmological patents, the Supreme Court held, *inter alia* (while finding on the facts of the case that the public interest was not sufficiently engaged to invoke the *ex turpi causa* rule) that:

"acts which constituted 'turpitude' for the purposes of the ex turpi causa rule were not confined to criminal acts but extended to acts which were quasi-criminal in that they were contrary to the public law of the state and engaged the public interest, which was the foundation of the illegality defence; that non-criminal acts which engaged the public interest included dishonesty or corruption even in the context of purely civil disputes, and the infringement of rules which were enacted for the protection of the public interest and which attracted civil sanctions of a penal character . . ."And see *Safeway* v. *Twigger* (63) (breaches of competition law) cited by the defendant.

503

duty owed to the plaintiffs because, entirely separately, unproven allegations by the defendant itself of illegal conduct in Brazil have been made against one (but not others) of the plaintiffs;

(iii) whether the denial of the claims would be a proportionate response to the (alleged) illegality. The defendant has not sought to explain why denial of these claims would be a proportionate response despite the apparent harm suffered by the plaintiffs. Let alone why denial of the claims would be proportionate to the undermining of the public interests which also demand (and would be in this case denied) the preservation and observance of the lawyer–client duties of confidentiality, loyalty and trust. Moreover, given Katia Rabello's explanation for her lie to the STJ, why it would be a proportionate response to block her claims entirely by way of strike-out, instead of affording her a *locus poenitentiae* (as discussed above), on the basis of her stated intention not to defraud the Petroforte estate of any of its assets.

462   Put shortly, the defendant has failed to explain why the plaintiffs' claims, or any of them, should be barred on the basis of the modern restatement of the illegality principle.

463   When properly understood and applied, the modern restatement of the principles present no clear basis for the denial of the plaintiffs' claims. In particular, the plaintiffs do not plead any reliance upon any illegal activity as between themselves and anyone else including, in particular, Securinvest. Their claims seek no recovery in respect of the Sobar assets and so, in that respect, any allegations of fraud (illegality), as yet unproven and yet to be resolved in the revocation action, are irrelevant to this action. Here I emphasize the difference, as I understand it, between the extension of the Petroforte bankruptcy on the civil (*i.e.* non-criminal) bases cited in the Brazilian judgments,[152] and any *proven* criminal allegation of fraud.[153]

464   Nor do the modern principles provide a proper basis upon which the defendant might seek to strike out the plaintiffs' claims on the summary basis upon which the defendant proposes.

465   Any fraudulent intent behind Katia Rabello's "lie" to the STJ is a matter to be cross-examined upon at the assessment of loss stage and can

_____

152  *Viz.* "common economic group" or "lifting of the corporate veil" to extend the bankruptcy respectively to Securinvest and Katia Rabello.

153  To the extent any such allegation ought now to be regarded as proven at this stage, the defendant, in any event, would be precluded from relying upon such allegation against its former clients in order to bar an otherwise proper claim. See *In re Thomas* (69), where the English Court of Appeal roundly rejected such a pleading by solicitors against their former client.

504

go only to the question of causation of loss,[154] not, in my view, to the question of the defendant's liability for breaches of duty. These are important observations to be expanded upon below, in the context of addressing the defendant's abuse of process "collateral attack" arguments.

**(ii) *Abuse of process: collateral attack upon the Brazilian judgments***

466   The court has a well-settled jurisdiction—both as a matter of its inherent powers and expressly from GCR O.18, r.19—to strike out claims which amount to an abuse of its process.

467   The categories of conduct which might render a claim liable to strike out for being frivolous, vexatious or otherwise an abuse of process are not closed but depend on all the relevant circumstances and, for this purpose, considerations of public policy and the interests of justice may be very material.[155]

468   The term "abuse of process of the court" connotes that the process of the court must be used *bona fide* and properly and must not be abused. The court will prevent the improper use of its machinery, and will, in a proper case, summarily prevent its machinery from being used as a means of vexation and oppression in the process of litigation by striking out the offending pleading. See Notes to the RSC, citing *Castro* v. *Murray* (16) and *Dawkins* v. *Prince Edward of Saxe Weimar, Willis* v. *Earl Beauchamp* (21) (11 P. at 63, *per* Bowen, L.J.).

469   The further manner in which the defendant says that the plaintiffs' claims are an abuse of process is that they are a collateral attack upon the Brazilian judgments and that in effect, the plaintiffs seek to re-litigate the consequences of those judgments by challenging both the correctness of the judgments under Brazilian law, as well as the integrity of the judges who decided them. Further, that in so doing submits the defendant, the plaintiffs question the very integrity of the Brazilian judicial system itself.

470   The defendant relies upon the statement of the law on collateral attack from Lord Diplock in *Hunter* v. *Chief Const. (West Midlands)* (38) ([1982] A.C. at 541). In that case there was an attempt by Hunter, one of the hapless Birmingham Six,[156] to challenge his criminal convictions for 21 murders by way of a civil claim in damages against the West Midlands

---

154   That is, whether she should be regarded as having been obliged to tell the truth and so whether, had she told the truth as she was obliged to do, the outcome for Securinvest would have been the same as that which resulted from the defendant's breaches of duty.

155   See Notes to the RSC (*op. cit.*)—18/19/18, at 352.

156   As shown by their exoneration many years later when it was revealed that their confessions had indeed been fabricated by the police.

505