Police. In doing so he had to impugn in his civil action, the admissibility and authenticity of his confession upon which he had been convicted by the jury in the criminal case. This he sought to do by alleging that his confession to having planted the devastating bomb had been fabricated, following beatings at the hands of the police. Lord Diplock declared on behalf of the House of Lords that ([1982] A.C. at 541):

> "The abuse of process which the instant case exemplifies is the initiation of proceedings in a court of justice for the purpose of mounting a collateral attack upon a final decision against the intending plaintiff which has been made by another court of competent jurisdiction in previous proceedings in which the intending plaintiff had a full opportunity of contesting the decision in the court by which it was made."

471    While the House of Lords was there concerned with precluding the potential abuse of process which would have been inherent in allowing a challenge to the integrity of a *criminal conviction* by way of re-litigation in subsequent *civil proceedings*, it is clear from the discussion of the older cases that the collateral attack principle is meant to be of wider application. And so, that it could apply as regards a challenge in later civil proceedings to the outcome in earlier civil proceedings.

472    Lord Diplock stated (*ibid.*, at 541–542):

> "My Lords, collateral attack upon a final decision of a court of competent jurisdiction may take a variety of forms. It is not surprising that no reported case is to be found in which the facts present a precise parallel with those of the instant case. But the principle applicable is, in my view, simply and clearly stated in those passages from the judgment of A.L. Smith L.J. in *Stephenson v. Garnett* [1898] 1 Q.B. 677, 680–681 and the speech of Lord Halsbury L.C. in *Reichel v. Magrath* (1899) 14 App. Cas. 665, 668 which are cited by Goff L.J in his judgment in the instant case. I need only repeat an extract from the passage which he cites from the judgment of A. L.Smith L.J:
>
> > '. . . the court ought to be slow to strike out a statement of claim or defence, and to dismiss an action as frivolous and vexatious, yet it ought to do so when, as here, it has been shewn that the identical question sought to be raised has been already decided by a competent court.'
>
> The passage from Lord Halsbury's speech deserves repetition here in full:
>
> > '. . . I think it would be a scandal to the administration of justice if, the same question having been disposed of by one case, the

506

litigant were to be permitted by changing the form of the proceedings to set up the same case again.'"

473   Despite the many criticisms in their pleadings and written submissions of the Brazilian judgments,[157] the plaintiffs, *in arguendo* through Mr. Akiwumi, have disavowed any reliance on an invitation to this court to conclude that those judgments were wrong.

474   Instead, as I understand their argument, while the plaintiffs protest what they regard as injustice at the hands of the Brazilian judges, it is the consequence of their judgments which forms the basis of their claims against the defendant. Accordingly, the plaintiffs' position is that they do not need to invite this court to re-litigate the outcome or second-guess the correctness of the Brazilian judgments, a proposition which, as I already noted earlier in this judgment, it would have been inappropriate for this court to entertain in any event.[158]

475   So for instance, while they regard the *ex parte* and summary manner of Judge Beethoven's extension of the Petroforte bankruptcy to Katia Rabello as unjust, their claim against the defendant in that regard is for having, in breach of duty, obtained for Dr. Braga Katia Rabello's confidential information upon which Judge Beethoven relied in coming to his decision.

476   And that while Judge Beethoven's judgment may have been the most proximate cause of her loss, she does not need to challenge its correctness in order to hold the defendant liable for its breaches of duty which also caused her loss.

477   In other words, the plaintiffs say that it is not a challenge to the validity of the Brazilian judgments to seek to recover from the defendant the losses which were incurred as the result of the defendant's actions resulting in those judgments. Indeed, the opposite would be the case advanced, the losses being but the manifestation of the effectiveness of the judgments.

478   And moreover, that where the defendant may not show that recovery should be barred on grounds of the illegality principle,[159] there can be

───────────────────

157  See as summarized in paras. 164–171 of the defendant's written submissions for hearing on December 3rd–14th, 2018.
158  In light of the settled principle that the decision of a foreign court taken in accordance with its own law is binding, notwithstanding that an English (Cayman) court would have decided the matter differently according to English law: *Goddard* v. *Gray* (30) (L.R. 6 Q.B. at 149 and *Castrique* v. *Imrie* (15).
159  Discussed above.

507

no abuse of process in seeking to recover the losses resulting from the defendant's breaches of duty.

479   Understood as set out in those terms, it is difficult to see why the plaintiffs' claims should be struck for being an abuse of process either by exercise of the O.18, r.19 power or the inherent jurisdiction of the court. And this is so notwithstanding that, in the latter context, the cases suggest that a wider discretionary power to strike out exists.[160]

480   Simply put—despite the critical tenor of much of their pleadings and arguments—as the plaintiffs' case does not depend upon this court having to conclude in any way contrary to the Brazilian judgments, there can be no finding of a collateral attack upon those judgments. For that reason, say the plaintiffs, the defendant's strike-out application for abuse of process must be dismissed.

481   There is, however, a further point of principle which has arisen and which I think should be recognized, if only in passing.

482   The point arises because what is by no means clear from the case law is the extent to which the collateral attack principle may be invoked for the preclusion of an action which seeks to challenge an earlier *foreign* judgment.

483   In light of my understanding of the plaintiffs' case as set out above, I do not need to resolve this question raised by the defendant as relating to the plaintiffs' pleadings *vis-à-vis* the Brazilian judgments. In the absence of any collateral attack upon them, those judgments will be relevant but only to the issue of causation in the context of the assessment of loss or damages to come, and that exercise will in no manner involve a scrutiny or criticism of the correctness of those judgments.

484   Following, therefore, is but a brief examination of the case law relating to the question of collateral attack upon foreign judgments. This is for the sake of explaining why, in any event, I would not have considered it appropriate to strike out the plaintiffs' claims on that basis.

485   There is a longstanding rule first settled in *Henderson* v. *Henderson* (34), that it is an abuse of the process of the court to raise in subsequent proceedings matters which could and should have been litigated in earlier proceedings.

---

160  See Notes to RSC (*op. cit.*) 18/19/26–18/19/38, where it is explained among other things, that resort to the inherent jurisdiction allows the court to conduct a full factual enquiry based upon evidence (unlike the guidance given in relation to the O.18, r.19 route).

508

486    The abuse of process arises from the fact that in such circumstances, *res judicata* in the wider sense is deemed to have been established as between the disputing parties even though, in the strict, narrower sense, the matters raised had not actually been joined or adjudicated in an earlier action between them. The principle was explained by the Privy Council in *Yat Tung Inv. Co. Ltd.* v. *Duo Heng Bank* (76) ([1975] A.C. at 590):

> "But there is a wider sense in which the doctrine may be appealed to, so that it becomes an abuse of process to raise in subsequent proceedings matters which could and therefore should have been litigated in earlier proceedings. The locus classicus of that aspect of res judicata is the judgment of Wigram V-C in *Henderson v. Henderson* (1843) 3 Hare 100, 115, where the judge says:
>
> > '. . . where a given matter becomes the subject of litigation in, and of adjudication by, a court of competent jurisdiction, the court requires the parties to that litigation to bring forward their whole case, and will not (except under special circumstances) permit the same parties to open the same subject of litigation in respect of matter which might have been brought forward as part of the subject in contest, but which was not brought forward, only because they have from negligence, inadvertence, or even accident, omitted part of their case. The plea of res judicata applies, except in special cases, not only to points upon which the court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which the parties, exercising reasonable diligence, might have brought forward at the time.'"

487    This principle ("the *Henderson* principle") has been applied to preclude actions[161] being taken in England for the determination of matters which could and should have been determined not only in

––––––––––––––––––––––

161  In cases which have been the subject of strong criticism because of the assumption on which they proceeded that the *Henderson* rule should operate to preclude action in England in deference to action taken in foreign courts. See for instance Briggs, "Foreign judgments and res judicata," 68 BYBIL 355, at 357 (1997), extensively discussed with approval by 2001, and Beckwith, "Res Judicata and Foreign Judgments: The Indian Grace," 43(1) *Int. & Comp. L.Q.* 185–193 (1994). These critiques, which also identify (Briggs, "Foreign judgments and res judicata: Desert Sun Loan Corp v. Hill," 67 BYBIL 596, at 599 (1996)) the danger of giving ready preclusive effect to foreign judgments which have not otherwise satisfied the standards for recognition and enforcement, draw support from the cautionary words of the House of Lords in *Carl Zeiss Stiftung* v. *Rayner & Keeler Ltd. (No. 2)* (14), albeit relating to the preclusive effect of issue estoppel rather than to the abuse of process *Henderson* rule: "Issue estoppel can be based on a foreign judgment, although in such a case the doctrine should be applied with caution because of the uncertainties arising from the differences of procedure in foreign countries" (as taken from the headnote ([1967] 1 A.C. 853)).

509

domestic but also in earlier foreign proceedings between the same parties.[162]

488    However, as is trite law, the preclusive effect of a foreign judgment *in personam*[163] in subsequent proceedings in England is limited according to the doctrines of privity and mutuality; *i.e.* the parties or privies to the earlier foreign proceedings must be the same as those to the subsequent English proceedings and must have been mutually bound by the outcome in the foreign proceedings. In other words, each party in the subsequent proceedings must have been party or privy to the earlier proceedings, and must claim or defend in the subsequent proceedings in the same right as they, or those to whom they are privy, claimed or defended in the earlier. Thus:

> ". . . [I]t unquestionably is not the general rule of law that a judgment obtained by *A.* against *B.* is conclusive in an action by *B.* against *C.* On the contrary, the rule of law is otherwise. . . . [A] judgment *inter partes* is conclusive only between the parties and those claiming under them."[164]

489    There is no privity of parties or mutuality of outcome as between the defendant and the plaintiffs in relation to the Brazilian judgments and the case at bar and the defendant clearly may not and does not contend otherwise.

490    The defendant's strike-out application, based as it also is upon the *Henderson* principle (or for that matter upon *Hunter* v. *Chief Constable of West Midlands* (38)) is therefore misconceived.

---

162  See, for instance, *House of Spring Gardens Ltd.* v. *Waite* (36), where it was found to be an abuse of the process of the court in England and contrary to justice and public policy for a party to re-litigate the issue of fraud after the selfsame issue had been tried and decided by the Irish court. In *Femoscandia Ltd.* v. *Clarke* (28), where the claimant, C, was precluded from bringing proceedings in England against F Ltd. to claim breach of a legal duty allegedly owed by F Ltd. to C, C having already brought and lost proceedings against F Ltd. in Delaware. F Ltd. defended the English action by arguing (successfully) that C's claim did not identify a legal duty known to English law but, also, by arguing that (in any case) this was a claim which could and should have been raised in Delaware. These decisions are themselves the subject of convincing criticism because of their confusing interpolation of issue estoppel and the preclusive *Henderson* principle on abuse of process. See again *Briggs* (*op. cit.*).

163  Such as, for instance here, the judgment of Judge Beethoven which rendered Katia Rabello bankrupt.

164  *Gray* v. *Lewis, Parker* v. *Lewis* (31) (8 Ch. App. at 1059–1060), *per* Mellish, L.J. See, as these cases are discussed also by Barnett, *Res Judicata, Estoppel & Foreign Judgments*, *op. cit.*, at 62–74.

510

ARNAGE HOLDINGS v. WALKERS

491   For the reasons explained above, so is its application as it is based upon the illegality principle.

492   The defendant's strike-out application for abuse of process is, for those reasons, dismissed.

493   The plaintiffs are granted summary judgment on liability with loss/damages to be assessed.

494   The plaintiffs are of course entitled as they seek at para. 4 of their summons, to their costs.

495   I will accept submissions in writing as to the terms of the order to be made for the costs of these proceedings. Written submissions are to be exchanged between the parties within four days and submitted to the court within seven days.

*Orders accordingly.*

*Stuarts* for the plaintiffs; *Appleby* for the defendant.

———————————————————

as such even if there was no proper consent. It is only if the expenditure was not proper partnership expenditure or could or should have been avoided or reduced that it should be disallowed in whole or in part as appropriate."

In the current editor's view that cannot be right or there is no purpose served by inserting such a requirement in the agreement. Certainly the expenditure may be validly incurred on behalf of the partnership as regards the supplier,[578] although a partner who chooses to exceed his authority under the agreement should take the consequences.[579]

In giving or withholding their consent to a particular act, the general body of partners must act bona fide in the interests of the partnership but, in the view of the current editor, they will not normally be subject to an implied duty to act reasonably.[580]

**10-199**

### Managing and senior partners, etc.

If one partner is to be given special or exclusive authority to carry out certain functions in the firm, the limits of that authority should be clearly stated.[581] Contrary to popular belief amongst partners and others, a "senior" partner has no special rights or authority merely because he is the first named in the agreement.[582] Again, it will not follow from the fact that a partner is designated as the "managing partner" and given power to conduct litigation on behalf of the firm that he automatically has power to initiate proceedings on behalf of *retired* partners, unless the agreement specifically authorises him to do so.[583]

**10-200**

### Exercise of powers and discretions conferred on partners

Where a discretion is conferred on one or more partners, it hardly needs to be said that the discretion must be exercised honestly, in good faith and for a proper purpose.[584] The ultimate benchmark against which such an exercise must be measured is what is in the best interests of the partnership as a whole and the fact that one or more partners may be disadvantaged thereby is not, in itself,

**10-201**

---

[578] See the Partnership Act 1890, s.5 considered infra, para.12-02, et seq.

[579] Note, that the circumstances in *Prasad* were exceptional: there was clearly a degree of acquiescence on the defendant's part and it was also clear that the consent requirement had been applied retrospectively: see [125]–[127].

[580] See *Price v Bouch* (1987) 53 P.& C.R. 257 (a decision concerning restrictive covenants); *Imperial Group Pension Trust Ltd v Imperial Tobacco Ltd* [1991] 1 W.L.R. 589 at 596F, et seq., per Browne-Wilkinson VC (a pension fund case). This will, however, be a matter of construction of the particular agreement: see *Mahon v Sims* (2005) 39 E.G. 138, a restrictive covenant case; *Lymington Marina Ltd v Macnamara* [2007] 2 All E.R. (Comm) 825 CA, which concerned a licence agreement.

[581] See also supra, para.10-74 and infra, paras 10-214, 10-215.

[582] Indeed, the senior partner has for many years not per se been responsible for ensuring that the firm delivers its partnership return under the Taxes Management Act 1970 s.12AA(2) (as added by the Finance Act 1994 s.184 and amended by the Finance Act 1995 s.115(4) and the Finance Act 1996 s.123(1)). Cf. the Taxes Management Act 1970 s.9(1) in its original form. See also infra, para.34-33.

[583] *HLB Kidsons v Lloyd's Underwriters* [2009] 1 All E.R. (Comm) 760.

[584] See further infra, paras 10-257, et seq., 10-279, et seq., 16-30, et seq. *Quaere* whether the duty of good faith could be expressly negated in such a case. In *Brown v GIO Insurance Ltd* [1998] C.L.C. 650 at 659, Chadwick LJ seemed to think not in the case of an insurance contract: "It seems to me that the court will be ready (in the absence of express words to the contrary) to construe the agreement, if necessary by implying an appropriate term, so as to impose on the decision-making party to [sic] obligation to act reasonably and in good faith. An agreement which did not permit of such a

AP1307

objectionable.[585] It would seem to follow from this that, as a normal rule, such a power cannot be exercised capriciously or arbitrarily[586] or, indeed, irrationally, i.e. taking into account irrelevant matters, ignoring relevant matters[587] or exercising the power for an irrelevant or unintended purpose or otherwise in bad faith.[588] However, the standard applied is not an objective one.[589] The fact that some of the reasons can be shown to be incorrect does not necessarily mean that a decision is irrational,[590] although the partners exercising the power may, in practice, be obliged to lead evidence as to what was taken into account in reaching the decision if they are to fend off an attack on that ground.[591] Equally, there may be instances where it is necessary for the partners to justify the fact that cases that appear to be similar have not been treated in the same way.[592] Despite these strictures, it is not the function of the court to take over the discretion with a view to exercising it on the relevant partners' behalf.[593] There may also genuinely (but rarely) be cases where the

---

[585] construction would, I think, be void; but that is not an issue in the present case." The position is, if anything, a fortiori in the case of a partnership. But see also infra, para.16-39.

[585] See infra, paras 15-11, 16-35. And see, in particular, for a recent affirmation of this principle (albeit in the case of a limited liability partnership) *Tribe v Elborne Mitchell LLP* [2021] EWHC 1863 (Ch).

[586] See, for example, *Ludgate Insurance Co Ltd v Citibank NA* [1998] 1 Lloyd's Rep. 397 CA at [35] per Brooke LJ (this was not a partnership case); *Greek v Henderson Asia Pacific Equity Partners (FP) LP* [2008] CSOH 2 at [76] per Lord Glennie. Semble, the partner exercising the power must not take into account an extraneous consideration which has no bearing on the partnership's interests: see *Greck* at [82]. Note that the position may be different where, on a true analysis, there is actually no discretion as such: see *Compass Group UK and Ireland Ltd v Mid Essex Hospital Services NHS Trust* [2013] B.L.R. 265 CA, especially at [83] per Jackson LJ.

[587] See *Braganza v BP Shipping Ltd* [2015] 1 W.L.R. 1661 SC, an employment case. See also *Reinhard v Ondra LLP* [2016] 2 B.C.L.C. 571, 691 at [412], 697 at [445]; *Odey Asset Management LLP v Revenue & Customs Commissioners* [2021] UKFTT 31 (TC); *HFFK LLP v Revenue & Customs Commissioners* [2021] UKFTT 36 (TC) (all decisions concerning limited liability partnerships); *Patural v DB Services (UK) Ltd* [2016] I.R.L.R. 286 (an employee case); *Watson v Watchfinder.co.uk Ltd* [2017] Bus. L.R. 1309 (concerning a share option agreement). Note, however, there are limits to the *Braganza* principle: see *UBS AG v Rose Capital Ventures Ltd* [2019] 2 B.C.L.C. 47 at [49], per Chief Master Marsh; *Taqa Bratani Ltd v Rockrose UKCS8 LLC* [2020] 2 Lloyd's Rep. 64 at [44], et seq. And see further infra, para.16-30, et seq.

[588] See *Brown v Neon Management Services Ltd* [2019] I.R.L.R. 30 at [83] per Choudhury J. This was, again, an employment case.

[589] As a result, use of the term "unreasonable" is generally eschewed, because it tends to suggest an objective standard, which is not in point; see also *Hayes v Willoughby* [2013] 1 W.L.R. 935 SC at [14] per Lord Sumption. But note *AB v University of XYZ* [2020] EWHC 2978 (QB) at [75] where a duty to act reasonably was stated to apply.

[590] See *Faieta v ICAP Management Services Ltd* [2018] I.R.L.R. 227 at [63] per Moulder J; also *No.1 West India Quay (Residential) Ltd v East Tower Apartments Ltd* [2018] 1 W.L.R. 5682 CA.

[591] See *Hills v Niksun Inc* [2016] I.R.L.R. 715 CA at [25], an employment case; also supra, para.10-158, fn.456.

[592] It can certainly be argued that rationality requires that similar cases are treated in the same way: see, for example, *R. (Gallaher Group Ltd) v Competition and Markets Authority* [2018] 2 W.L.R. 1583 where Lord Sumption observed (at [50]) "Consistency of treatment is, as Lord Hoffmann observed in *Matadeen v Pointu* [1999] 1 AC 98, para 9 'a general axiom of rational behaviour'."; also [25], [26] per Lord Carnwath. Although these observations were made in the context of administrative law, they may have application where, for example, two partners are being considered for expulsion on precisely the same grounds, although there will usually be differences in their respective positions which will rationally justify a differing approach in each case.

[593] See *Keen v Commerzbank AG* [2007] I.C.R. 623 CA at [39]. The decision concerned the discretionary award of bonuses to a bank employee, but the circumstances were unusual in that it was unclear not only on what basis the decision has been made but also by whom. In the event, Mr Keen did not plead his case on the basis of breach of an implied term of trust and confidence as between employer and employee and the court held that he had failed to show that the exercise of the bank's

[318]

Ch.

A

## CASES

determined by the

## CHANCERY DIVISION

B

and the

## COURT OF PROTECTION

and on appeal therefrom in the

C

## COURT OF APPEAL

————

D

[COURT OF APPEAL]

## BRISTOL AND WEST BUILDING SOCIETY v. MOTHEW

1996  May 21, 22;                                    Staughton, Millett and Otton L.JJ.
        July 24

E

*Solicitor—Negligence—Incorrect advice or information—Mortgage transaction—Solicitor acting for borrowers and lender—Solicitor negligently giving lender incorrect information—Lender suffering loss—Whether lender merely having to prove reliance on information—Whether necessary to show loss attributable to negligence—Whether breach of trust or fiduciary duty*

F

In 1988 the defendant solicitor acted for a husband and wife in the purchase of a house for £73,000 and also for the plaintiff to whom the purchasers had applied for a loan of £59,000 to finance the purchase. The plaintiff offered to advance the money on the express condition that the balance of the purchase price was provided by the purchasers without resort to further borrowing, and it instructed the solicitor to report, prior to completion, any proposal that the purchasers might create a second mortgage or otherwise borrow in order to finance part of the purchase price. The solicitor knew that the purchasers were arranging for an existing bank debt of £3,350 to be secured by a second charge on the new property but, due to an oversight, he stated in his report to the plaintiff that the balance of the purchase price was being provided by the purchasers without resort to further borrowing. The plaintiff advanced the loan and the purchase was completed. When the purchasers defaulted on their mortgage repayments the plaintiff enforced its security and the house was sold at a loss. The plaintiff sought to recover the whole of its loss on the transaction from the solicitor, alleging breach of contract, negligence and breach of trust. The district judge gave the plaintiff summary judgment for damages to be

G

H

2

Bristol and West Building Society v. Mothew (C.A.) [1998]

A

assessed for breach of contract and negligence and for damages of £59,000 less the amount received on the sale of the property for breach of trust. The judge affirmed those decisions.

On appeal by the solicitor:—

*Held*, allowing the appeal, (1) that, where a client sued his solicitor for negligently giving him incorrect advice or information, the client did not have to show that he would not have acted as he did if he had been given the proper advice or correct information but merely that he had relied on the incorrect advice or information; that the evidence showed that the plaintiff had relied on the solicitor's report in advancing the loan and, therefore, the necessary causal link between the solicitor's negligence and the loan was proved; but that the plaintiff had still to establish what, if any, loss was attributable to the solicitor's negligence and, as there was an issue as to what loss was occasioned by the existence of the second charge and the purchasers' indebtedness to the bank, damages remained to be assessed (post, pp. 11D–E, F–H, 13B–C, 24E–F, 25E–F, 28A).

B

C

*Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191, H.L.(E.) and *Downs v. Chappell* [1997] 1 W.L.R. 426, C.A. applied.

(2) That the solicitor's conduct in providing the plaintiff with the wrong information, although a breach of duty, was neither dishonest nor intentional but due to an oversight and was unconnected to the fact that he was also acting for the purchasers; that, accordingly, his conduct and subsequent application of the money advanced by the plaintiff to complete the purchase was not a breach of trust or fiduciary duty; and that the order for damages for breach of trust would therefore be set aside (post, pp. 15H–16A, 19E, 20G, 22A–C, 24E–F, 25E–F, 26C–E, 28A).

D

Decision of Chadwick J. reversed.

E

The following cases are referred to in the judgments:

*Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191; [1996] 3 W.L.R. 87; [1996] 3 All E.R. 365, H.L.(E.)
*Bristol and West Building Society v. May May & Merrimans* [1996] 2 All E.R. 801
*Clark Boyce v. Mouat* [1994] 1 A.C. 428; [1993] 3 W.L.R. 1021; [1993] 4 All E.R. 268, P.C.

F

*Commonwealth Bank of Australia v. Smith* (1991) 102 A.L.R. 453
*Coomber, In re; Coomber v. Coomber* [1911] 1 Ch. 723, C.A.
*Downs v. Chappell* [1997] 1 W.L.R. 426; [1996] 3 All E.R. 344, C.A.
*El Ajou v. Dollar Land Holdings Plc.* [1993] 3 All E.R. 717
*Girardet v. Crease & Co.* (1987) 11 B.C.L.R. (2d) 361
*Henderson v. Merrett Syndicates Ltd.* [1995] 2 A.C. 145; [1994] 3 W.L.R. 761; [1994] 3 All E.R. 506, H.L.(E.)

G

*Kelly v. Cooper* [1993] A.C. 205; [1992] 3 W.L.R. 936, P.C.
*LAC Minerals Ltd. v. International Corona Resources Ltd.* (1989) 61 D.L.R. (4th) 14
*Lewis v. Hillman* (1852) 3 H.L.Cas. 607, H.L.(E.)
*Lipkin Gorman v. Karpnale Ltd.* [1991] 2 A.C. 548; [1991] 3 W.L.R. 10; [1992] 4 All E.R. 512, H.L.(E.)

H

*Moody v. Cox and Hatt* [1917] 2 Ch. 71, C.A.
*Mortgage Express Ltd. v. Bowerman & Partners* [1996] 2 All E.R. 836, C.A.
*Nocton v. Lord Ashburton* [1914] A.C. 932, H.L.(E.)
*Permanent Building Society v. Wheeler* (1994) 14 A.C.S.R. 109

3

Ch.                    **Bristol and West Building Society v. Mothew (C.A.)**

A    *Sykes v. Midland Bank Executor and Trustee Co. Ltd.* [1971] 1 Q.B. 113;
         [1970] 3 W.L.R. 273; [1970] 2 All E.R. 471, C.A.
     *Target Holdings Ltd. v. Redferns* [1996] A.C. 421; [1995] 3 W.L.R. 352; [1995]
         3 All E.R. 785, H.L.(E.)
     *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council*
         [1996] A.C. 669; [1996] 2 W.L.R. 802; [1996] 2 All E.R. 961, H.L.(E.)

B    The following additional cases were cited in argument:

     *Alliance & Leicester Building Society v. Edgestop Ltd.* (unreported), 18 January
         1991, Hoffmann J.
     *Brickenden v. London Loan & Savings Co.* [1934] 3 D.L.R. 465, P.C.
     *Canson Enterprises Ltd. v. Boughton & Co.* (1991) 85 D.L.R. (4th) 129
     *Gemstone Corporation of Australia Ltd. v. Grasso* (1994) 12 A.C.L.C. 653
     *Gray v. New Augarita Porcupine Mines Ltd.* [1952] 3 D.L.R. 1
C    *Sinclair v. Brougham* [1914] A.C. 398, H.L.(E.)
     *Wan v. McDonald* (1992) 105 A.L.R. 473
     *Witten-Hannah v. Davis* [1995] 2 N.Z.L.R. 141

     The following cases, although not cited, were referred to in the skeleton
     arguments:

D    *Attorney-General for Hong Kong v. Reid* [1994] 1 A.C. 324; [1993] 3 W.L.R.
         1143; [1994] 1 All E.R. 1, P.C.
     *Bishopsgate Investment Management Ltd. v. Maxwell (No. 2)* [1994] 1 All
         E.R. 261, C.A.
     *Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd.* [1981]
         Ch. 105; [1980] 2 W.L.R. 202; [1979] 3 All E.R. 1025
     *Dawson, decd., In re; Union Fidelity Trustee Co. Ltd. v. Perpetual Trustee Co.
         Ltd.* [1966] 2 N.S.W.R. 211
E    *Farrington v. Rowe McBride & Partners* [1985] 1 N.Z.L.R. 83
     *McPherson v. Watt* (1877) 3 App.Cas. 254, H.L.(Sc.)
     *Miller's Deed Trusts, In re* (1978) 75 L.S.G. 454
     *Nelson v. Rye* [1996] 1 W.L.R. 1378; [1996] 2 All E.R. 186
     *Nestlé v. National Westminster Bank Plc.* [1993] 1 W.L.R. 1260; [1994] 1 All
         E.R. 118, C.A.

F    INTERLOCUTORY APPEAL from Chadwick J.
         On 21 June 1995 Deputy District Judge Raskin granted the plaintiff,
     Bristol and West Building Society, summary judgment pursuant to R.S.C.,
     Ord. 14 of its claims against the defendant solicitor, Anthony Paul
     Mothew (trading as Stapley & Co.), for damages to be assessed for breach
     of contract and negligence and damages for breach of trust. On 27 July
G    1995 Chadwick J. dismissed the defendant's appeal against that order.
         Pursuant to leave granted by Nourse L.J. on 29 December 1995 and
     by a notice of appeal dated 5 January 1996 the defendant sought to set
     aside the orders and be granted unconditional leave to defend on the
     grounds that the judge had erred in holding (1) that money paid to the
     defendant by the plaintiff was impressed with a constructive trust in
     favour of the plaintiff; (2) that the money was paid to the defendant under
H    a mistake of fact or had been induced by the defendant's misrepresentation,
     when no such allegations were made in the statement of claim; (3) that it
     was not necessary for the plaintiff to establish that it had sustained loss
     and damage as a result of the defendant's alleged breach of trust; (4) that

4

**Bristol and West Building Society v. Mothew (C.A.)**    [1998]

the defendant had no arguable defence to the claim for breach of trust    A
based upon acquiescence or affirmation by the plaintiff; and (5) that the
defendant had no arguable defence to the allegation that the plaintiff had
sustained loss and damage as a result of the breach of contract and
negligence.

By a respondent's notice dated 25 January 1996 the plaintiff contended
that it was entitled to judgment for the sum claimed in respect of its    B
claims for breach of contract and negligence.

The facts are stated in the judgment of Millett L.J.


*Jonathan Sumption Q.C.* and *Glenn Campbell* for the defendant.
A breach of a solicitor's conveyancing duty which makes no difference to
the lender's decision and has no impact on the value of the security cannot
result in the solicitor becoming the underwriter of the transaction when    C
the security is later sold at a loss: see *Target Holdings Ltd. v. Redferns*
[1996] A.C. 421. Although a solicitor has a number of fiduciary obligations
to his client, not every duty which is owed in the context of a fiduciary
relationship is a fiduciary duty: see *Girardet v. Crease & Co.* (1987)
11 B.C.L.R. (2d) 361, 362; *LAC Minerals Ltd. v. International Corona
Resources Ltd.* (1989) 61 D.L.R. (4th) 14, 28 and *In re Coomber; Coomber*    D
*v. Coomber* [1911] 1 Ch. 723, 728. A solicitor's duty to report to his client
the outcome of conveyancing and allied inquiries is the ordinary
contractual duty of a professional to comply with his instructions and to
do so with reasonable skill.

*Brickenden v. London Loan & Savings Co.* [1934] 3 D.L.R. 465 does
not assist the plaintiff as it was concerned only with a breach by a
fiduciary of his obligation to disclose to his principal his own personal    E
interest in the transaction. [Reference was also made to *Nocton v. Lord
Ashburton* [1914] A.C. 932.] The principle that relief is granted for such a
breach, without regard to what the plaintiff would have done if disclosure
had been made reflects the rule of equity that where a fiduciary has dealt
personally with the plaintiff without full disclosure to him the latter's
relief is not compensatory at all. He has, irrespective of his loss, an    F
absolute right to set aside the transaction or to claim an account of
profits. The compensation awarded to him is simply the financial
equivalent of setting aside: see *Gray v. New Augarita Porcupine Mines Ltd.*
[1952] 3 D.L.R. 1, 12–15. Compensation cannot be awarded for breach of
a duty as to the manner in which work should be carried out: see
*Permanent Building Society v. Wheeler* (1994) 14 A.C.S.R. 109, 164–165.
[Reference was also made to *Canson Enterprises Ltd. v. Boughton & Co.*    G
(1991) 85 D.L.R. (4th) 129; *Wan v. McDonald* (1992) 105 A.L.R. 473;
*Witten-Hannah v. Davis* [1995] 2 N.Z.L.R. 141 and *Target Holdings Ltd.
v. Redferns* [1996] A.C. 421.]

There is no distinction between a solicitor who breaches his duty by
failing to report in accordance with his instructions before the mortgage
advance cheque is received and a solicitor who fails to deal with the
advance in accordance with his instructions after it is received. In neither    H
case does the breach of duty have the effect of terminating the solicitor's
retainer and his authority to complete the transaction. Equally, the
argument that the solicitor held the advance as soon as it was received on

Ch.                    Bristol and West Building Society v. Mothew (C.A.)

A  a constructive trust to return it forthwith to the plaintiff cannot be supported. There cannot be a constructive trust inconsistent with the existing express trust to apply the loan moneys in completing the transaction, unless the solicitor's authority and obligation to complete the transaction are first brought to an end. [Reference was made to *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council* [1996] A.C. 669; *Sinclair v. Brougham* [1914] A.C. 398 and *Lipkin Gorman*

B  *v. Karpnale Ltd.* [1991] 2 A.C. 548.]

    If the plaintiff is to be awarded the amount of the advance money (less actual recoveries) it must be on the basis that that money has been misapplied. If the defendant had no authority to pay out the money to the vendor the payment was a breach of trust: see *Target Holdings Ltd. v. Redferns* [1996] A.C. 421 and *Alliance & Leicester Building Society v.*

C  *Edgestop Ltd.* (unreported), 18 January 1991.

    The plaintiff's loss on the loan transaction is due to the default of the purchasers and the fact that the security was not sufficient to cover the loan when it came to be realised, neither of which is the responsibility of the solicitor. The loss is not due to the existence or non-disclosure of a second mortgage.

    *Nicholas Patten Q.C.* and *Timothy Higginson* for the plaintiff. The

D  relationship between a solicitor and his client gives rise to fiduciary obligations on the part of the solicitor in the handling of his client's affairs. A failure to perform those obligations gives rise to a remedy in equity regardless of whether the acts complained of also constitute a breach of contract with a right to damages: see *Nocton v. Lord Ashburton* [1914] A.C. 932, 956–957. The underlying contractual relationship between

E  the parties cannot dictate or limit the scope of the concurrent fiduciary duties, as the defendant was expressly required to report any proposal for further borrowing before releasing the plaintiff's mortgage advance: see *Henderson v. Merrett Syndicates Ltd.* [1995] 2 A.C. 145, 205–206.

    A solicitor who acts for both lender and borrower in the same transaction has an unrestricted obligation to each client to act in his own best interests, including an obligation to disclose to the lender information

F  about the borrower which is material to the transaction: see *Clark Boyce v. Mouat* [1994] 1 A.C. 428, 437. [Reference was also made to *Lewis v. Hillman* (1852) 3 H.L.Cas. 607; *Kelly v. Cooper* [1993] A.C. 205; *Moody v. Cox and Hatt* [1917] 2 Ch. 71 and *Bristol and West Building Society v. May May & Merrimans* [1996] 2 All E.R. 801, 817–818.]

    The non-disclosure of the proposed further borrowing was a breach of

G  trust. In addition, the release of the advance by the defendant when he had failed to disclose the proposed further borrowing in breach of his express instructions was made without authority and was itself a breach of trust. The right of the plaintiff to recover its advance is unaffected by *Target Holdings Ltd. v. Redferns* [1996] A.C. 421 because the payment of the advance to the defendant (and therefore the creation of his agency to hold the money for the purpose of the intended transaction) was the direct

H  result of the reliance by the plaintiff upon the contents of the defendant's report on title. Therefore the defendant's ability to utilise the payment for the benefit of the borrowers in breach of trust was caused by the report on title.

6

**Bristol and West Building Society v. Mothew (C.A.)** [1998]

Breaches of trust or fiduciary duty must cause the loss complained of   A
but the test of causation is not the common law test. The inquiry is not to
determine what position the plaintiff would have been in had the contract
been performed but rather whether the loss would have been sustained
but for the breach of trust. The non-disclosure in the report on title caused
the loss because it induced the plaintiff to advance the funds in reliance
on the report. To inquire as to what the plaintiff would have done had
disclosure been made is to apply the common law test and is wrong in   B
principle: see *Brickenden v. London Loan & Savings Co.* [1934] 3 D.L.R.
465, 469; *Gray v. New Augarita Porcupine Mines Ltd.* [1952] 3 D.L.R. 1,
15; *Commonwealth Bank of Australia v. Smith* (1991) 102 A.L.R. 453 and
*Gemstone Corporation of Australia Ltd. v. Grasso* (1994) 12 A.C.L.C. 653.
  *Sumption Q.C.* replied.

C
*Cur. adv. vult.*

July 24.   The following judgments were handed down.

MILLETT L.J.   This is an appeal brought by the defendant with the
leave of the single Lord Justice from an order for summary judgment
given initially by the district judge and affirmed (for different reasons) by   D
Chadwick J. It raises important questions of principle in relation to a
claim by a mortgagee to recover from the solicitor who was acting for
both mortgagor and mortgagee the loss arising from the mortgagor's
subsequent default.

The collapse in the property market which accompanied the recession
at the beginning of the present decade caused mortgage lenders to suffer   E
serious losses. Unable to recover their advances from the borrowers or by
the enforcement of their security they have sought to recover them from
the valuers or solicitors on whose valuations or advice they have relied. In
some cases they have been the victims of a fraud to which the valuers and
solicitors have been parties. In other cases, such as the present, they have
been unable to accuse their solicitor of anything more serious than
negligence. Believing that the common law rules of causation and   F
remoteness of damage might not enable them to recover the whole amount
of their loss they have turned to equity and alleged breach of trust or
fiduciary duty. We have thus been concerned to decide just what is
involved in these concepts.

*The facts*   G

The facts are not in dispute. The defendant is a solicitor. In August
1988 he acted for a Mr. and Mrs. Towers in the purchase of 17, Thameshill
Avenue, Romford for £73,000. In accordance with the usual practice he
also acted for the Bristol and West Building Society ("the society") to
which the purchasers had applied for an advance of £59,000 in order to
finance the purchase. (This was the Cheshunt Building Society, but its
rights have since vested in the society.) In their application form the   H
purchasers had stated that the balance of the purchase price of £14,000
was being provided by them personally and that they were not applying
elsewhere for financial assistance towards the purchase price.

7

Ch.          Bristol and West Building Society v. Mothew (C.A.)          Millett L.J.

A    The society offered to advance to the purchasers £59,000 on the
security of a first mortgage of the property on the express condition that
unless otherwise agreed in writing the balance of the purchase price was
to be provided by the purchasers personally without resort to further
borrowing and that no second mortgage or other loan was being arranged
or contemplated in connection with the purchase. The defendant was
provided with the offer of advance (but not with the purchasers'
B    application).
       The society's standing instructions to solicitors acting for the society
required them to report to the society prior to completion, inter alia:

     "(viii) Any proposal that the applicant may create a second mortgage
     or enter into a promissory note or otherwise borrow in order to
     finance part of the purchase price. (ix) Any incorrect information
C    given in the solicitor's instructions. (x) Any other matters which
     ought to be brought to the notice of the society . . ."

The solicitor was required to submit a report on title and request for
advance cheque to the society at least five clear working days before the
cheque was required. This was done on a form by which the solicitor was
asked to confirm, inter alia, that the title was good and marketable and
D    might safely be accepted by the society, that to the best of his knowledge
and belief the balance of the purchase money was being provided by the
applicant personally without resort to further borrowing, and that the
special conditions attached to the offer of advance had been, or would be,
complied with.
       Mr. and Mrs. Towers intended to provide the balance of the purchase
E    price from the net proceeds of sale of their existing property after
discharging a subsisting mortgage. As it happens, they owed money to
Barclays Bank which was secured by a second charge on that property.
They arranged with the bank to allow a small part of the debt (£3,350) to
remain outstanding after the sale of the existing property and to be
secured by a second charge on the new property. The defendant was
informed of these arrangements and gave an undertaking to the bank to
F    hold the title deeds to its order pending registration. Unfortunately, he
either failed to appreciate that, although they related to old borrowing,
they were a matter which he was required to report to the society, or he
had forgotten or overlooked them when he made his report.
       By his report dated 2 August 1988 the defendant confirmed that to the
best of his knowledge and belief the balance of the purchase money was
G    being provided by the applicants personally without resort to further
borrowing and that the special conditions attached to the offer of advance
had been or would be complied with. He failed to disclose the fact that
Mr. and Mrs. Towers were making arrangements for a second mortgage
in connection with the purchase.
       It is conceded by the defendant that his statements were untrue and
that his failure to report the purchasers' arrangements for a second
H    mortgage was a breach of his instructions. The society alleges that the
defendant acted negligently and in breach of contract, and this is admitted.
There is no allegation of dishonesty or bad faith, and if any such allegation
were made it would be strongly resisted. The society does not allege that

AP1315

8

Millett L.J.        Bristol and West Building Society v. Mothew (C.A.)        [1998]

the defendant made the statements in question knowing them to be untrue.     A
It alleges only that he "knew or ought to have known" that they were
untrue, and this is consistent with oversight.

Following the receipt of the report the society forwarded a cheque for
the amount of the advance to the defendant in readiness for completion
on 30 August. Completion took place on that date when the mortgage
advance was released to the vendor's solicitors as part of the purchase     B
price for the property. Mr. and Mrs. Towers executed a first charge in
favour of the society and a second charge in favour of the bank. On
25 November the defendant applied to the society for its consent to the
registration of the second charge in favour of the bank. The society
granted its consent on 10 March 1989. It does not appear that the society
was aware of the date of the bank's charge (and so was aware that it
constituted a breach of the conditions of the advance) when it gave its     C
consent, but it is alleged that the society must have learnt of it shortly
afterwards and nevertheless took no action.

The purchasers defaulted after making only small repayments and the
society enforced its security. The property was sold on 6 February 1991
and realised net proceeds of a little under £53,000. The society claimed to
recover the whole of its net loss on the transaction from the defendant,
alleging breach of contract, negligence and breach of trust. As I have      D
already indicated, breach of contract and negligence are admitted; breach
of trust is denied.

It has always been the defendant's case that the society would not have
been concerned by the purchasers' proposal to grant a second charge to
the bank if this had been disclosed to it in August 1988, that it would still
have proceeded with the transaction and that it would have suffered         E
precisely the same loss in that event. It is alleged that, in the heady days
of 1988, when the property market was at its height and mortgage lenders
were falling over themselves to advance money to house purchasers, the
society would not have been concerned by a proposal to grant a second
charge to secure a relatively trivial indebtedness which did not even
represent fresh borrowing; and it is contended that this is demonstrated
by the lack of concern shown by the society when it was asked to give its    F
consent to the registration of a second charge in March 1989. Despite the
submissions of the society to the contrary, I am satisfied that, if legally
relevant, these allegations raise a triable issue.

*The course of the proceedings below*                                        G

It was common ground below that no damages would be recoverable
at common law for breach of contract or tort unless the society could
show that it would not have proceeded with the transaction if it had been
informed of the facts. The society, however, submitted that the position
was different in equity. It alleged that the defendant had committed a
breach of trust or fiduciary duty, and submitted that common law
principles of causation and remoteness of damage have no application in     H
such a case so that it was not necessary for the society to show that it
would not have proceeded with the transaction if it had been informed of
the facts.

AP1316

9

Ch.                    Bristol and West Building Society v. Mothew (C.A.)              Millett L.J.

A   The district judge accepted these arguments. In respect of the common law claims for breach of contract and negligence she gave summary judgment for damages to be assessed. This was apparently on the basis that the judgment would leave it open to the defendant to contend that no loss was caused by the breach.

The district judge also gave summary judgment for the society for breach of trust for the sum of £59,000 less the sums received by the society on the sale of the property, and this was affirmed by the judge, who was satisfied that there was no question or issue to be tried in the action and dismissed the appeal.

B

*The course of the appeal*

C   In the course of the appeal the defendant submitted that, by consenting to the registration of the second charge, the society waived the breaches of which complaint is made; and that this raises a triable issue on liability which entitles him to unconditional leave to defend in relation to all the pleaded causes of action. In the absence of any evidence or reason to suppose that the society was aware of the date of the second charge when it gave its consent to its registration, I am not persuaded that there is a triable issue on waiver, and I would not disturb the order below on this ground.

D   When the appeal was first argued before us it was still conceded by the society that it could not recover damages at common law for breach of contract or negligence unless it could show that it would not have proceeded with the mortgage advance if it had been informed of the facts. The society, however, maintained that it could escape this principle because the defendant was also guilty of a breach of trust and that common law rules of causation and remoteness of damage have no application in such a case. The critical questions, therefore, appeared to be whether the defendant was guilty of a breach of trust or fiduciary duty and if so whether the society needed to prove that it would not still have proceeded with the transaction if it had been told of the facts.

E

F   After we had reserved judgment on the appeal, however, the society informed us that it wished to resile from its concession. Relying on the recent decision of this court in *Downs v. Chappell* [1997] 1 W.L.R. 426, the society submitted that it was entitled to recover the whole of its net loss on the transaction by way of damages for negligence at common law without having to establish that it would not have proceeded with the transaction if it had been informed of the facts. If correct, it submitted, this would be determinative of the case, and it would not be necessary for the society to rely on any breach of trust or fiduciary duty. Before the defendant's advisers could respond to this, speeches were delivered in the House of Lords in *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191. These were relevant to the common law position. For the reasons given by Staughton L.J., however, we decided that it was not necessary to restore the appeal for further argument. This was because the assessment of damages at common law is still pending. They will have to be assessed in conformity with the decision of the House of Lords in *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* and not

G

H

AP1317

10

Millett L.J.         Bristol and West Building Society v. Mothew (C.A.)         [1998]

with any gloss which, in the absence of argument, we may inadvertently    A
have put upon that decision.

*The claims at common law*

The society has served a respondent's notice, in which it contends that
it is entitled to judgment for the sum claimed, and not merely for damages
to be assessed, in respect of its common law claims. If this is correct, then    B
the society does not need to establish that the defendant was guilty of a
breach of trust or fiduciary duty.

This question depends upon an alleged difference between the tests of
causation and remoteness of damage at common law and in equity. In a
case of the present kind, however, two different questions of causation are
involved and it is necessary to distinguish between them. Where a plaintiff
claims that he has suffered loss by entering into a transaction as a result    C
of negligent advice or information provided by the defendant, the first
question is whether the plaintiff can establish that the defendant's
negligence caused him to enter into the transaction. If he cannot his claim
must fail. But even if he can, it is not sufficient for him to establish that
the transaction caused him loss. He must still show what (if any) part of
his loss is attributable to the defendant's negligence. This is usually treated    D
as a question of the measure of damages rather than causation, and for
convenience I shall so treat it in this judgment, but it must be
acknowledged that it involves questions of causation.

In *Downs v. Chappell* [1997] 1 W.L.R. 426 the plaintiffs bought a small
business in reliance on trading figures contained in a letter from
the vendor's accountants which was forwarded to them by the vendor.
The vendor knew that the figures contained in the letter were false. The    E
plaintiffs sued the vendor for deceit and the accountants for negligence.
The judge accepted the plaintiffs' evidence that they would not have
contracted to purchase the business without verification of the figures by
the accountants. But he was not satisfied that they would not still have
bought the business even if the correct figures had been supplied, and
dismissed the action against both defendants.
                                                                            F
This court allowed the plaintiffs' appeal against both defendants.
Hobhouse L.J. gave the only reasoned judgment. In relation to the vendor,
he pointed out that for a plaintiff to succeed in the tort of deceit it was
necessary for him to prove (1) a fraudulent representation, (2) materiality
and (3) inducement. All three elements had been proved. The judge had
found that the representations did induce the plaintiffs to enter into the
transaction: they would not have done so without them. This was sufficient    G
proof of causation. Whether the plaintiffs would have entered into the
transaction if they had been told the truth was irrelevant.

We are not concerned with this part of the decision, since the present
case is not one of fraud. But Hobhouse L.J. held that the position was the
same in relation to the accountants, who were charged with negligence
only. Here the question was not inducement but reliance. The relevant    H
question was simply whether the plaintiffs had entered into the contract
in reliance upon the figures contained in the accountants' letter. The judge
had answered that question in the affirmative: the plaintiffs would not
have entered into the contract if they had not been provided with the

11

Ch.                Bristol and West Building Society v. Mothew (C.A.)        Millett L.J.

A  letter. The causal relationship between the accountants' negligence and the plaintiffs' purchase was established. It was not necessary to consider whether the plaintiffs would have purchased the business if they had been supplied with the correct figures.

In the present case the society's claim is not for misrepresentation. Accordingly, questions of inducement and materiality are not relevant. Its claim lies in negligence, and the relevant concept is reliance. In considering
B  the issue of causation in an action for negligence brought by a client against his solicitor it appears from *Downs v. Chappell* that it is necessary to distinguish between two different kinds of case.

Where a client sues his solicitor for having negligently failed to give him proper advice, he must show what advice should have been given and (on a balance of probabilities) that if such advice had been given he would
C  not have entered into the relevant transaction or would not have entered into it on the terms he did. The same applies where the client's complaint is that the solicitor failed in his duty to give him material information. In *Sykes v. Midland Bank Executor and Trustee Co. Ltd.* [1971] 1 Q.B. 113, which was concerned with a failure to give proper advice, the plaintiff was unable to establish this and his claim to damages for negligence failed. In *Mortgage Express Ltd. v. Bowerman & Partners* [1996] 2 All E.R. 836,
D  which was concerned with a failure to convey information, the plaintiff was able to establish that if it had been given the information it would have withdrawn from the transaction and its claim succeeded.

Where, however, a client sues his solicitor for having negligently given him incorrect advice or for having negligently given him incorrect information, the position appears to be different. In such a case it is
E  sufficient for the plaintiff to prove that he relied on the advice or information, that is to say, that he would not have acted as he did if he had not been given such advice or information. It is not necessary for him to prove that he would not have acted as he did if he had been given the proper advice or the correct information. This was the position in *Downs v. Chappell* [1997] 1 W.L.R. 426.

In the present case the society makes complaints of both kinds. It
F  alleges that the defendant negligently and in breach of his instructions failed to report the purchasers' proposed arrangements with the bank prior to completion. This is a claim of the first kind, and if it were all the society would have to establish that if it had been informed of those arrangements it would not have proceeded with the mortgage advance. But the defendant went further than this. He did not merely fail to report
G  the arrangements to the society; he expressly represented to the society that no such arrangements existed. That brings the case within the second category. It follows from the decision of this court in *Downs v. Chappell* that it is sufficient for the society to prove that it relied on the representations in the report. Although the judge spoke in terms of inducement, he plainly found reliance. The society's procedures were designed to ensure that no cheque would be issued in the absence of a
H  satisfactory report from its solicitor.

In my judgment we are bound by the decision in *Downs v. Chappell* to hold that the necessary causal link between the defendant's negligence and the mortgage advance was proved.

AP1319

12

Millett L.J.          Bristol and West Building Society v. Mothew (C.A.)          [1998]

*Measure of damages*                                                                 A

It does not, however, follow from the fact that the defendant's negligent statements caused the society to make the mortgage advance that the whole of the society's loss is attributable to his negligence. Having regard to the date of the advance, some part at least of the society's loss may well be attributable to the fall in property values which had occurred by the time that it was able to sell the property.                                            B

In *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191 the House of Lords ruled definitively on the correct measure of damages for the negligent provision of information on which the plaintiff relied in entering into a transaction from which loss resulted. The only speech was delivered by Lord Hoffmann. He distinguished between the measure of damages for (1) breach of a contractual warranty and (2) breach of a duty (whether contractual or tortious) to take care   C (i) to give proper advice and (ii) to provide accurate information.

In the case of breach of warranty, the comparison is between the plaintiff's position as a result of entering into the transaction and what it would have been if the facts had been as warranted. The measure of damages is the extent to which the plaintiff would have been better off if the information had been right. In the case of a breach of duty to take   D care the measure of damages is the extent to which the plaintiff is worse off because the information was wrong. Since he entered into the transaction in reliance on the advice or information given to him by the defendant, the starting point is to compare his position as a result of entering into the transaction with what it would have been if he had not entered into the transaction at all.

But that is only the starting point. Lord Hoffmann distinguished   E between a duty to advise someone as to what course of action he should take and a duty to provide information for the purpose of enabling someone else to decide upon his course of action. In the former case, the defendant is liable for all the foreseeable consequences of the action being taken. In the latter case, however, he is responsible only for the consequences of the information being wrong. The measure of damages is   F not necessarily the full amount of the loss which the plaintiff has suffered by having entered into the transaction but only that part if any of such loss as is properly attributable to the inaccuracy of the information. If the plaintiff would have suffered the same loss even if the facts had actually been as represented the defendant is not liable.

Accordingly, in this class of case the plaintiff must prove two things: first, that he has suffered loss; and, secondly, that the loss fell within the   G scope of the duty he was owed. In the present case the society must prove what (if any) loss was occasioned by the arrangements which the purchasers had made with the bank.

The society was told that Mr. and Mrs. Towers had no other indebtedness and that no second charge was contemplated. The existence of the second charge did not affect the society's security. The absence of any indebtedness to the bank would not have put money in the purchasers'   H pocket; it would merely have reduced their liabilities. Whether their liability to the bank affected their ability to make mortgage repayments to the society has yet to be established, but given the smallness of the liability

13

Ch.              **Bristol and West Building Society v. Mothew (C.A.)**              Millett L.J.

A    its effect on the purchasers' ability to meet their obligations to the society
     may have been negligible. It may even be, for example, that the purchasers
     made no payments at all to the bank at the relevant time, and if so it is
     difficult to see how any part of the loss suffered by the society can be
     attributable to the inaccuracy of the information supplied to it by the
     defendant. It would have occurred even if the information had been
     correct.
B

     *Conclusion*

        The society has proved the causal link between the defendant's
     negligence and the making of the mortgage advance but it has not yet
     established the amount of its loss (if any) which is properly attributable
C    to the defendant's negligence. Damages remain to be assessed. We are
     bound by the decision of this court in *Downs v. Chappell* [1997] 1 W.L.R.
     426 to hold that the society will not have to prove that it would not have
     made the mortgage advance if it had known the true facts; but it will be
     required to establish what it has lost as a result of the existence of the
     second charge and the purchasers' indebtedness to the bank. It can
     maintain the money judgment which it has obtained below only if it can
D    invoke equitable principles.

     *The claims in equity*

       *The judge's reasoning*

        The judge found that, in the events which happened, the defendant
E    committed a breach of trust by applying the mortgage advance in the
     purchase of the property, that he was accordingly liable to restore the
     trust property, viz. the £59,000 with interest less receipts, that no question
     of damages at common law or of compensation for loss arose, and that it
     was irrelevant whether, had it been told of the position, the society might
     still have chosen to make the advance notwithstanding the arrangements
F    which had been made with the bank. Accordingly the judge concluded
     that there was no question or issue to be tried in the action and gave
     summary judgment for the whole of the society's claim.
        The judge's conclusion that the defendant had committed a breach of
     trust in applying the mortgage advance in the purchase of the property
     was based on the fact that he had obtained payment of the mortgage
     advance by misrepresentation. The judge said:
G
        "it seems to me beyond argument that [the defendant] received the
        cheque . . . for £59,000 as a direct result of the misleading report
        which he had supplied to the society on 2 August 1988. The money
        was paid to the defendant . . . as a result of a misrepresentation
        made to the society by the defendant. . . . *The effect, in my judgment,
        was that from the moment when [the] cheque for £59,000 was received
H       by [the defendant] he held it upon a constructive trust to return it
        forthwith to the society, unless authorised by the society to retain, or
        dispose of, it after a full knowledge of the facts had been disclosed."*
        (My emphasis.)

                                                                    AP1321

14

Millett L.J.        Bristol and West Building Society v. Mothew (C.A.)        [1998]

In the judge's opinion it necessarily followed that the defendant's    A
subsequent application of the mortgage money in the purchase of the
property constituted a breach of trust. He said:

> "In making that payment there is, in my view, no doubt that the
> defendant acted in breach of the trust which had been imposed upon
> him by the circumstances in which he had received the society's
> cheque. That trust required him to return the £59,000 to the society.    B
> Any payment of that £59,000 to a third party, albeit to the vendors
> of the property, was a breach of that trust."

The judge dismissed the submission that the society had to establish that
it would not have made the advance if it had known the facts. He said:

> "But that point affords no defence to the [society]'s claim. It is
> nihil ad rem that if the true position had been disclosed to the society,    C
> the society might or might not have issued an amended offer of
> advance. Liability to repay arises in this case because [the defendant]
> received money from the society as a result of his own
> misrepresentation. He cannot be heard to say that he could retain
> that money against the society, or dispose of it to the vendors,
> because, in other circumstances, the society might have chosen to
> make the advance notwithstanding the borrowing from [the bank]."    D

The judge did not explain why the consequence of the defendant's
misrepresentation was that he held the mortgage advance on a constructive
trust for the society, or why the defendant's authority to apply the money
in accordance with the society's instructions was determined, but he took
the opportunity to do so when he revisited these questions a few months
later in *Bristol and West Building Society v. May May & Merrimans* [1996]    E
2 All E.R. 801 after two county court judges had declined to follow his
decision in the present case. The later case involved a number of
transactions in which the same society had made mortgage advances and
suffered loss when the borrowers defaulted which it sought to recover
from the solicitors who had acted for both parties to the lending
transactions. In some cases the solicitor knew nothing, prior to the receipt
of the cheque for the mortgage advance, which ought to have led him to    F
qualify his report, though he discovered the facts afterwards and before
he disbursed the money on completion. In other cases the solicitor's
breach of his instructions preceded his receipt of the mortgage advance,
as it did in the present case.

The judge distinguished between the two groups of cases. In relation
to the first group he reluctantly felt compelled by the decision in *Target*    G
*Holdings Ltd. v. Redferns* [1996] A.C. 421 to conclude that, at least for the
purpose of an application for summary judgment, it was necessary for the
society to show that it would not have proceeded with the transaction if it
had known the facts. In relation to the second group, however, where the
society paid the cheque for the mortgage advance to the solicitor in
response to a request based upon a warranty or representation which (as
the judge put it) the solicitor "knew or must be taken to have known" to    H
be misleading, he confirmed his previous decision in the present case. He
held that the society was entitled to succeed in such cases whether or not
it would have still made the advance if it had known the facts.

AP1322

15

Ch.                    Bristol and West Building Society v. Mothew (C.A.)          Millett L.J.

A    In the course of his judgment the judge explained how the constructive trust in question arose. It was, he said, because the solicitor had given misleading information to his client. This constituted a breach of fiduciary duty which enabled the court to impose a constructive trust on the property acquired as a result of the breach of duty. He said [1996] 2 All E.R. 801, 818:

B    "where moneys have been received by the solicitor from the society following a request based upon a warranty or representation which he knew, or must be taken to have known, to be misleading in some material respect, equity will give a remedy in respect of any loss which the society may suffer as a result of its payment in reliance upon that request. That will be a remedy based upon breach of fiduciary duty and may, where necessary, take the form of the

C    imposition of a constructive trust on those moneys to enforce the solicitor's obligation to return them to the society forthwith. The constructive trust imposed by equity to enforce the obligation to make immediate restitution overrides any express or implied trust which might otherwise arise out of any instructions given by [the society] when the money is paid to the solicitor. No reliance can be placed on . . . those instructions, because they are vitiated by the

D    breach of duty by which they were obtained. . . . In the absence of some fresh instructions, given by the society after full disclosure of the matters in respect of which it has been misled, the only course properly open to the solicitor is to repay the moneys to the society with interest."

E    The judge evidently considered himself to be imposing a remedial constructive trust as the appropriate remedy for a prior breach of fiduciary duty.

    The judge's references to the solicitor having made a representation which "he knew, or must be taken as having known" to be misleading is not an accurate description of the facts of the present case. It is not alleged that the defendant "knew or must be taken to have known" the

F    facts, but only that he "knew or ought to have known" them, which is a very different matter. In explaining his decision in the present case the judge said that the defendant's misrepresentation could not be described as innocent because he "clearly had the knowledge which made the representation false:" see [1996] 2 All E.R. 801, 832. That confuses knowledge with the means of knowledge. On the society's pleaded case

G    the defendant must be taken to have known the facts at one time but to have forgotten or overlooked them so that they were not present to his mind when he came to complete his report to the society.

    It is not alleged that the defendant deliberately concealed the arrangements which the purchasers had made with their bank from the society or that he consciously intended to mislead it. Nothing in this judgment is intended to apply to such a case. My observations are

H    confined to the case like the present where the provision of incorrect information by a solicitor to his client must be taken to have been due to an oversight. In such a case his breach of duty is unconscious; he will ex hypothesi be unaware of the fact that he has committed a breach of his

16

Millett L.J.          Bristol and West Building Society v. Mothew (C.A.)                [1998]

instructions; and if this means that his subsequent application of the     A
mortgage money constitutes a breach of trust then it will be a breach of a
trust of which he is unaware. I would not willingly treat such conduct as
involving a breach of trust or misapplication of trust money unless
compelled by authority to do so, and in my judgment neither principle
nor authority compels such a conclusion.

Before us the defendant submits that, while he was guilty of negligence
and breach of contract, he was not guilty of a breach of trust or fiduciary     B
duty. It is convenient to take first the question of fiduciary duty, and then
to consider the question of breach of trust.

*Breach of fiduciary duty*

Despite the warning given by Fletcher Moulton L.J. in *In re Coomber;
Coomber v. Coomber* [1911] 1 Ch. 723, 728, this branch of the law has     C
been bedevilled by unthinking resort to verbal formulae. It is therefore
necessary to begin by defining one's terms. The expression "fiduciary
duty" is properly confined to those duties which are peculiar to fiduciaries
and the breach of which attracts legal consequences differing from those
consequent upon the breach of other duties. Unless the expression is so
limited it is lacking in practical utility. In this sense it is obvious that not     D
every breach of duty by a fiduciary is a breach of fiduciary duty. I would
endorse the observations of Southin J. in *Girardet v. Crease & Co.* (1987)
11 B.C.L.R. (2d) 361, 362:

"The word 'fiduciary' is flung around now as if it applied to all
breaches of duty by solicitors, directors of companies and so
forth. . . . That a lawyer can commit a breach of the special duty [of
a fiduciary] . . . by entering into a contract with the client without     E
full disclosure . . . and so forth is clear. But to say that simple
carelessness in giving advice is such a breach is a perversion of
words."

These remarks were approved by La Forest J. in *LAC Minerals Ltd. v.
International Corona Resources Ltd.* (1989) 61 D.L.R. (4th) 14, 28 where
he said: "not every legal claim arising out of a relationship with fiduciary     F
incidents will give rise to a claim for breach of fiduciary duty."

It is similarly inappropriate to apply the expression to the obligation
of a trustee or other fiduciary to use proper skill and care in the discharge
of his duties. If it is confined to cases where the fiduciary nature of the
duty has special legal consequences, then the fact that the source of the
duty is to be found in equity rather than the common law does not make     G
it a fiduciary duty. The common law and equity each developed the duty
of care, but they did so independently of each other and the standard of
care required is not always the same. But they influenced each other, and
today the substance of the resulting obligations is more significant than
their particular historic origin. In *Henderson v. Merrett Syndicates Ltd.*
[1995] 2 A.C. 145, 205 Lord Browne-Wilkinson said:

"The liability of a fiduciary for the negligent transaction of his duties     H
is not a separate head of liability but the paradigm of the general
duty to act with care imposed by law on those who take it upon
themselves to act for or advise others. Although the historical

17

Ch.                    **Bristol and West Building Society v. Mothew (C.A.)**                    Millett L.J.

A    development of the rules of law and equity have, in the past, caused different labels to be stuck on different manifestations of the duty, in truth the duty of care imposed on bailees, carriers, trustees, directors, agents and others is the same duty: it arises from the circumstances in which the defendants were acting, not from their status or description. It is the fact that they have all assumed responsibility for the property or affairs of others which renders them liable for the

B    careless performance of what they have undertaken to do, not the description of the trade or position which they hold."

I respectfully agree, and endorse the comment of Ipp J. in *Permanent Building Society v. Wheeler* (1994) 14 A.C.S.R. 109, 157:

C    "It is essential to bear in mind that the existence of a fiduciary relationship does not mean that every duty owed by a fiduciary to the beneficiary is a fiduciary duty. In particular, a trustee's duty to exercise reasonable care, though equitable, is not specifically a fiduciary duty . . ."

Ipp J. explained, at p. 158:

D    "The director's duty to exercise care and skill has nothing to do with any position of disadvantage or vulnerability on the part of the company. It is not a duty that stems from the requirements of trust and confidence imposed on a fiduciary. In my opinion, that duty is not a fiduciary duty, although it is a duty actionable in the equitable jurisdiction of this court. . . . I consider that Hamilton owed P.B.S. a duty, both in law and in equity, to exercise reasonable care and skill, and P.B.S. was able to mount a claim against him for breach of the

E    legal duty, and, in the alternative, breach of the equitable duty. For the reasons I have expressed, in my view the equitable duty is not to be equated with or termed a 'fiduciary' duty."

I agree. Historical support for this analysis may be found in Viscount Haldane L.C.'s speech in *Nocton v. Lord Ashburton* [1914] A.C. 932, 956.

F    Discussing the old bill in Chancery for equitable compensation for breach of fiduciary duty, he said that he thought it probable that a demurrer for want of equity would always have lain to a bill which did no more than seek to enforce a claim for damages for negligence against a solicitor.

In my judgment this is not just a question of semantics. It goes to the very heart of the concept of breach of fiduciary duty and the availability of equitable remedies.

G    Although the remedy which equity makes available for breach of the equitable duty of skill and care is equitable compensation rather than damages, this is merely the product of history and in this context is in my opinion a distinction without a difference. Equitable compensation for breach of the duty of skill and care resembles common law damages in that it is awarded by way of compensation to the plaintiff for his loss. There is no reason in principle why the common law rules of causation,

H    remoteness of damage and measure of damages should not be applied by analogy in such a case. It should not be confused with equitable compensation for breach of fiduciary duty, which may be awarded in lieu of rescission or specific restitution.

18

Millett L.J.          Bristol and West Building Society v. Mothew (C.A.)          [1998]

This leaves those duties which are special to fiduciaries and which   A
attract those remedies which are peculiar to the equitable jurisdiction and
are primarily restitutionary or restorative rather than compensatory.
A fiduciary is someone who has undertaken to act for or on behalf of
another in a particular matter in circumstances which give rise to a
relationship of trust and confidence. The distinguishing obligation of a
fiduciary is the obligation of loyalty. The principal is entitled to the single-
minded loyalty of his fiduciary. This core liability has several facets.   B
A fiduciary must act in good faith; he must not make a profit out of his
trust; he must not place himself in a position where his duty and his
interest may conflict; he may not act for his own benefit or the benefit of
a third person without the informed consent of his principal. This is not
intended to be an exhaustive list, but it is sufficient to indicate the nature
of fiduciary obligations. They are the defining characteristics of the   C
fiduciary. As Dr. Finn pointed out in his classic work *Fiduciary Obligations*
(1977), p. 2, he is not subject to fiduciary obligations because he is a
fiduciary; it is because he is subject to them that he is a fiduciary.

(In this survey I have left out of account the situation where the
fiduciary deals with his principal. In such a case he must prove
affirmatively that the transaction is fair and that in the course of the
negotiations he made full disclosure of all facts material to the transaction.   D
Even inadvertent failure to disclose will entitle the principal to rescind the
transaction. The rule is the same whether the fiduciary is acting on his
own behalf or on behalf of another. The principle need not be further
considered because it does not arise in the present case. The mortgage
advance was negotiated directly between the society and the purchasers.
The defendant had nothing to do with the negotiations. He was instructed   E
by the society to carry out on its behalf a transaction which had already
been agreed.)

The nature of the obligation determines the nature of the breach. The
various obligations of a fiduciary merely reflect different aspects of his
core duties of loyalty and fidelity. Breach of fiduciary obligation, therefore,
connotes disloyalty or infidelity. Mere incompetence is not enough.   F
A servant who loyally does his incompetent best for his master is not
unfaithful and is not guilty of a breach of fiduciary duty.

In the present case it is clear that, if the defendant had been acting for
the society alone, his admitted negligence would not have exposed him to
a charge of breach of fiduciary duty. Before us counsel for the society
accepted as much, but insisted that the fact that he also acted for the
purchasers made all the difference. So it is necessary to ask: "Why did the   G
fact that the defendant was acting for the purchasers as well as for the
society convert the defendant's admitted breach of his duty of skill
and care into a breach of fiduciary duty?" To answer this question it is
necessary to identify the fiduciary obligation of which he is alleged to have
been in breach.

It is at this point, in my judgment, that the society's argument runs   H
into difficulty. A fiduciary who acts for two principals with potentially
conflicting interests without the informed consent of both is in breach of
the obligation of undivided loyalty; he puts himself in a position where
his duty to one principal *may* conflict with his duty to the other: see *Clark*

19

Ch.        Bristol and West Building Society v. Mothew (C.A.)        Millett L.J.

A    *Boyce v. Mouat* [1994] 1 A.C. 428 and the cases there cited. This is
sometimes described as "the double employment rule." Breach of the rule
automatically constitutes a breach of fiduciary duty. But this is not
something of which the society can complain. It knew that the defendant
was acting for the purchasers when it instructed him. Indeed, that was the
very reason why it chose the defendant to act for it. The potential conflict
was of the society's own making: see *Finn, Fiduciary Obligations*, p. 254
B    and *Kelly v. Cooper* [1993] A.C. 205.
    It was submitted on behalf of the society that this is irrelevant because
the defendant misled the society. It did not know of the arrangements
which the purchasers had made with their bank, and so could not be said
to be "fully informed" for the purpose of absolving the defendant from
the operation of the double employment rule. The submission is
C    misconceived. The society knew all the facts relevant to its choice of
solicitor. Its decision to forward the cheque for the mortgage advance to
the defendant and to instruct him to proceed was based on false
information, but its earlier decision to employ the defendant despite the
potentially conflicting interest of his other clients was a fully informed
decision.
D    That, of course, is not the end of the matter. Even if a fiduciary is
properly acting for two principals with potentially conflicting interests he
must act in good faith in the interests of each and must not act with the
intention of furthering the interests of one principal to the prejudice of
those of the other: see *Finn*, p. 48. I shall call this "the duty of good
faith." But it goes further than this. He must not allow the performance
of his obligations to one principal to be influenced by his relationship with
E    the other. He must serve each as faithfully and loyally as if he were his
only principal.
    Conduct which is in breach of this duty need not be dishonest but it
must be intentional. An unconscious omission which happens to benefit
one principal at the expense of the other does not constitute a breach of
fiduciary duty, though it may constitute a breach of the duty of skill and
F    care. This is because the principle which is in play is that the fiduciary
must not be inhibited by the existence of his other employment from
serving the interests of his principal as faithfully and effectively as if he
were the only employer. I shall call this "the no inhibition principle."
Unless the fiduciary is inhibited or believes (whether rightly or wrongly)
that he is inhibited in the performance of his duties to one principal by
reason of his employment by the other his failure to act is not attributable
G    to the double employment.
    Finally, the fiduciary must take care not to find himself in a position
where there is an *actual* conflict of duty so that he cannot fulfil his
obligations to one principal without failing in his obligations to the other:
see *Moody v. Cox and Hatt* [1917] 2 Ch. 71; *Commonwealth Bank of
Australia v. Smith* (1991) 102 A.L.R. 453. If he does, he may have no
H    alternative but to cease to act for at least one and preferably both. The
fact that he cannot fulfil his obligations to one principal without being in
breach of his obligations to the other will not absolve him from liability.
I shall call this "the actual conflict rule."

20

Millett L.J.        Bristol and West Building Society v. Mothew (C.A.)                [1998]

In the present case the judge evidently thought that the defendant was    A
in breach of both the duty of good faith and the actual conflict rule. In
*Bristol and West Building Society v. May May & Merrimans* [1996] 2 All
E.R. 801, 817–818 he said:

"there can be no doubt that the requirement of unconscionable
conduct is present where a solicitor who is acting for both borrower
and lender misrepresents to the lender some fact *which he knows, or*    B
*must be taken to know,* will or may affect the lender's decision to
proceed with the loan. In those circumstances the solicitor *is abusing
his fiduciary relationship with one client, the lender, to obtain an
advantage for his other client, the borrower.* It is as much 'against the
dictates of conscience' for a solicitor *knowingly to prefer the interests
of one client over those of another client* as it is for him to prefer his    C
own interests over those of his client." (My emphasis.)

I respectfully agree; but no such allegation is made in the present case.
As to the actual conflict rule, the judge said, at p. 832:

"First, in *Mothew,* the 'agent' was a fiduciary who had put himself in
a position in which his duty to the lender *was* in conflict with the
interests of his other client, the borrower." (My emphasis.)    D

I do not accept this. By instructing him to act for them, the purchasers
must be taken to have authorised the defendant to complete the report
without which the mortgage advance would not have been forthcoming;
and to complete it truthfully. The defendant was required by the society
to report on the purchasers' title as well as to confirm the absence of any
further borrowing. The two stood in exactly the same case. The defendant    E
would not have been in breach of his duty to the purchasers if he had
disclosed the facts to the society any more than if he had reported a defect
in their title.

This proposition can be tested by considering what the defendant's
position would have been if he had acted for the purchasers and another
solicitor had been instructed to act for the society. He would have been    F
required to deduce the purchasers' title to the satisfaction of the society's
solicitor, and to confirm to him that no further borrowing or second
charge was in contemplation. His duty to the purchasers would have
required him to ascertain the facts from them and to report them to
the society. Unless they told him the facts and instructed him to lie to
the society, instructions which he would be bound to refuse, his duty to the
purchasers would not inhibit him in providing full and truthful information    G
to the solicitor acting for the society.

In my judgment, the defendant was never in breach of the actual
conflict rule. It is not alleged that he acted in bad faith or that he
deliberately withheld information because he wrongly believed that his
duty to the purchasers required him to do so. He was not guilty of a
breach of fiduciary duty.

The judge relied on *Nocton v. Lord Ashburton* [1914] A.C. 932 and    H
*Commonwealth Bank of Australia v. Smith,* 102 A.L.R. 453 to hold that a
party who pays money to his solicitor in reliance on a representation
*known* by the solicitor to be false has a remedy for breach of fiduciary

AP1328

21

Ch.            Bristol and West Building Society v. Mothew (C.A.)            Millett L.J.

A    duty. Neither case is authority for the proposition (though its correctness
     is not in issue); certainly neither is authority for the proposition that a
     party who pays money to a solicitor in reliance on a representation which
     the solicitor *ought to have known* to be false has such a remedy.

          In *Nocton v. Lord Ashburton* [1914] A.C. 932 a solicitor had an
     undisclosed personal interest in a transaction on which he gave his client
     advice which was to his own advantage and the disadvantage of his client.
B    The plaintiff pleaded breach of the duty of good faith. In fact this
     was unnecessary; the existence of the defendant's undisclosed interest was
     enough: see *Lewis v. Hillman* (1852) 3 H.L.Cas. 607. The plaintiff was
     entitled to receive, and thought that he was receiving, the disinterested
     advice of a solicitor with no other interest in the transaction.
     *Commonwealth Bank of Australia v. Smith*, 102 A.L.R. 453 involved a
C    breach of the actual conflict rule. The defendant, who was acting for both
     parties to a proposed transaction, placed himself in an impossible position
     by undertaking to advise one of them on the merits of the transaction.

          In *Moody v. Cox and Hatt* [1917] 2 Ch. 71 a solicitor, who was acting
     for both vendor and purchaser, was in possession of valuations which
     showed that the property was not worth the price which the purchaser
D    had agreed to pay. He did not disclose them to the purchaser, and claimed
     that his duty to the vendor precluded him from doing so. The purchaser
     was allowed to rescind. The case bears a superficial resemblance to the
     present but there are two crucial differences: (i) the vendor was under no
     obligation to disclose the valuations to the purchaser and did not wish his
     solicitor do so; and (ii) the vendor and the solicitor tacitly agreed to
E    conceal the valuations from the purchaser. The solicitor was in breach of
     both the duty of good faith and the actual conflict rule; his defence fell
     foul of the no inhibition principle.

          That was a case of deliberate concealment. Non-disclosure and
     concealment are two very different things. This has been a truism of the
     law from the time of Cicero (De Officiis, lib. 3, c. 12, 13 citing Diogenes
F    of Babylon). It is even enshrined, like other such truisms, in a Latin tag:
     aliud est celare, aliud tacere.

          The society placed much reliance on a dictum by Lord Jauncey of
     Tullichettle in *Clark Boyce v. Mouat* [1994] 1 A.C. 428, 437 where he said:

               "Another case of breach [of fiduciary duty] is where a solicitor
          acts for both parties to a transaction without disclosing this to one of
G         them *or where having disclosed it he fails, unbeknown to one party, to
          disclose to that party material facts relative to the other party of which
          he is aware.*" (My emphasis.)

     But I do not think that Lord Jauncey meant to include an inadvertent
     failure which owes nothing to the double employment. Where such failure
H    is to the advantage of the other party, the court will jealously scrutinise
     the facts to ensure that there has been nothing more than inadvertence,
     but there can be no justification for treating an unconscious failure as
     demonstrating a want of fidelity.

22

Millett L.J.          Bristol and West Building Society v. Mothew (C.A.)          [1998]

In my judgment the distinction drawn by Ipp J. in *Permanent Building Society v. Wheeler*, 14 A.C.S.R. 109 is sound in principle and is decisive of the present case. On the society's pleaded case the fact that the defendant was acting for the purchasers played no part in his failure to report the true state of affairs to the society. It did not inhibit him from fulfilling his obligations to the society. It is consistent with its pleaded case that the defendant would have done so but for a negligent oversight. It would have been exactly the same if he had failed to notice and report the existence of a defect in the purchasers' title. To characterise either such failure as a breach of fiduciary duty because he was acting for both parties in a situation where that fact did not contribute to his failure is, in my opinion, to substitute a verbal formula for principle.

In my judgment the judge's conclusion that the defendant was in breach of fiduciary duty cannot be supported. It follows that it cannot be sustained as a ground for holding the defendant in breach of a constructive trust of the mortgage money.

### Breach of trust

It is not disputed that from the time of its receipt by the defendant the mortgage money was trust money. It was client's money which belonged to the society and was properly paid into a client account. The defendant never claimed any beneficial interest in the money which remained throughout the property of the society in equity. The defendant held it in trust for the society but with the society's authority (and instructions) to apply it in the completion of the transaction of purchase and mortgage of the property. Those instructions were revocable but, unless previously revoked, the defendant was entitled and bound to act in accordance with them.

The society's instructions were not revoked before the defendant acted on them, and in my judgment there was no ground upon which the judge could properly conclude that his authority to apply the money in completing the transaction had determined.

If his judgment in the present case is considered without the benefit of his later explanation in *Bristol and West Building Society v. May May & Merrimans* [1996] 2 All E.R. 801, it would appear that the judge was of opinion that the defendant's authority to deal with the money was automatically vitiated by the fact that it (and the cheque itself) was obtained by misrepresentation. But that is contrary to principle. Misrepresentation makes a transaction voidable not void. It gives the representee the right to elect whether to rescind or affirm the transaction. The representor cannot anticipate his decision. Unless and until the representee elects to rescind the representor remains fully bound. The defendant's misrepresentations merely gave the society the right to elect to withdraw from the transaction on discovering the truth. Since its instructions to the defendant were revocable in any case, this did not materially alter the position so far as he was concerned, though it may have strengthened the society's position in relation to the purchasers.

The right to rescind for misrepresentation is an equity. Until it is exercised the beneficial interest in any property transferred in reliance on the representation remains vested in the transferee. In *El Ajou v. Dollar*

AP1330

23

Ch.            **Bristol and West Building Society v. Mothew (C.A.)**        Millett L.J.

A    *Land Holdings Plc.* [1993] 3 All E.R. 717, 734 I suggested that on rescission the equitable title might revest in the representee retrospectively at least to the extent necessary to support an equitable tracing claim. I was concerned to circumvent the supposed rule that there must be a fiduciary relationship or retained beneficial interest before resort may be had to the equitable tracing rules. The rule would have been productive of the most extraordinary anomalies in that case, and its existence continually threatens

B    to frustrate attempts to develop a coherent law of restitution. Until the equitable tracing rules are made available in support of the ordinary common law claim for money had and received some problems will remain incapable of sensible resolution.

     But all that is by the way. Whether or not there is a retrospective vesting for tracing purposes it is clear that on rescission the equitable title

C    does not revest retrospectively *so as to cause an application of trust money which was properly authorised when made to be afterwards treated as a breach of trust.* In *Lipkin Gorman v. Karpnale Ltd.* [1991] 2 A.C. 548 Lord Goff of Chieveley said, at p. 573:

> "Of course, 'tracing' or 'following' property into its product involves a decision by the owner of the original property to assert his title to
D    > the product in place of his original property. This is sometimes referred to as ratification. I myself would not so describe it, but it has, in my opinion, at least one feature in common with ratification, that it cannot be relied upon so as to render an innocent recipient a wrongdoer (cf. *Bolton Partners v. Lambert* (1889) 41 Ch.D. 295, 307, *per* Cotton L.J.: 'an act lawful at the time of its performance [cannot]
E    > be rendered unlawful, by the application of the doctrine of ratification.')"

     In *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council* [1996] A.C. 669 Lord Browne-Wilkinson expressly rejected the possibility that a recipient of trust money could be personally liable, regardless of fault, for any subsequent payment away of the moneys to third parties even though, at the date of such payment, he was ignorant

F    of the existence of any trust. He said, at p. 705:

> "Since the equitable jurisdiction to enforce trusts depends upon the conscience of the holder of the legal interest being affected, he cannot be a trustee of the property if and so long as he is ignorant of the facts alleged to affect his conscience, i.e. until he is aware that he is intended to hold the property for the benefit of others in the case
G    > of an express or implied trust, or, in the case of a constructive trust, of the factors which are alleged to affect his conscience."

     Mutatis mutandis that passage is directly applicable in the present case. The defendant knew that he was a trustee of the money for the society; but he did not realise that he had misled the society and could not know that his authority to complete had determined (if indeed it had). He could

H    not be bound to repay the money to the society so long as he was ignorant of the facts which had brought his authority to an end, for those are the facts which are alleged to affect his conscience and subject him to an obligation to return the money to the society.

24

Millett L.J.          Bristol and West Building Society v. Mothew (C.A.)          [1998]

Before us the society put forward a more sophisticated argument. The A
defendant's instructions, it pointed out, expressly required him to report
the arrangements in question "to the society prior to completion." This, it
was submitted, made it a condition of the defendant's authority to
complete that he had complied with his obligation. Whether he knew it or
not, he had no authority to complete. It was not necessary for the society
to revoke his authority or withdraw from the transaction. I do not accept B
this. The society's standing instructions did not clearly make the
defendant's authority to complete conditional on having complied with
his instructions. Whether they did so or not is, of course, a question of
construction, and it is possible that the society could adopt instructions
which would have this effect. But it would in my judgment require very
clear wording to produce so inconvenient and impractical a result. No
solicitor could safely accept such instructions, for he could never be C
certain that he was entitled to complete.

In my judgment the defendant's authority to apply the mortgage
money in the completion of the purchase was not conditional on his
having first complied with his contractual obligations to the society, was
not vitiated by the misrepresentations for which he was responsible but of
which he was unaware, had not been revoked, and was effective to prevent
his payment being a breach of trust. Given his state of knowledge (and, D
more importantly, that his authority had not been revoked), he had no
choice but to complete.

*Conclusion*

In my judgment the defendant was not guilty of breach of trust or
fiduciary duty. This makes it unnecessary to consider what the E
consequences of such a breach would have been. I would allow the appeal
and set aside the money judgment. I would leave undisturbed the
judgments for damages to be assessed for breach of contract and
negligence, but make it clear that it does not follow that the society will
establish any recoverable loss.

OTTON L.J.   I have read with advantage the judgments of Staughton F
and Millett L.JJ. I agree with the analysis and reasoning regarding breach
of trust and of fiduciary duty. I wish only to add a few words on the
extant common law claims.

I am satisfied that there was sufficient evidence before the judge to
establish negligence on the part of the defendant. There was the requisite
proximity between the parties, and there was foreseeability of damage. G
Thus a duty of care arose. This duty included answering correctly such
questions as were posed by the proposed lender and which it was
reasonable for him to be required to answer. The answer sought was one
of fact and not opinion. The fact sought could have been supplied
accurately by information which was within his knowledge. If it was not
at his fingertips the information was either on file or could easily have
been obtained by direct inquiry of the intending purchaser. His breach of H
duty occurred when he conveyed the inaccurate information to the
plaintiff. The duty was not simply a duty not to act carelessly; it was a
duty not to inflict damage carelessly. Damage is the gist of the action.

AP1332

25

Ch.                 **Bristol and West Building Society v. Mothew (C.A.)**                 Otton L.J.

A      The more complex issues are whether the inaccurate information given was causative of damage, and if so what measure. To my mind it is not necessary to adopt a particular procedural path to find the answer. I appreciate that Lord Hoffmann suggests that it is first necessary to decide the kind of loss to which the plaintiff is entitled. This may be appropriate in most cases where negligence/causation is involved. From a practical point of view in some cases it may be more expedient to establish

B  the causal link between the negligent act or omission and the reliance by the plaintiff or the course of action which he was induced to take. The judge may find as a fact that there was no reliance or that the plaintiff would have behaved in the same or substantially the same manner if he had been given accurate information; in either event the negligence had no causative potency. That is the end of the matter. The chain is broken, there is no loss at all and there is no need to consider or determine the

C  kind of loss.

      In other cases it may be appropriate to identify the type or particular head of damage claimed. This may identify damage which is too remote and for which no remedy lies (e.g. economic loss), and the claim in respect of it fails in limine. As I concur that the damages award must now be set aside the issue of the measure of damage, if any, is now at large. I regard

D  the evidence (in particular the hearsay evidence of Ms Samantha Bennett at paragraph 29 of Mr. Prees's affidavit) as falling short of resolving the issues of causation or damage. It does not (for example) address the possibility of a revised offer if the accurate and full position had been explained to the plaintiff.

      I do not think it necessary to conclude whether there was a breach of

E  contract. This cause of action probably adds nothing to the case in negligence. It is unlikely that there is any practical difference between a breach of the duty of care and a breach of contract, or in the issues arising on causation, or the measure of damages. If there is any issue it can be determined by the trial judge. I also consider that there was no waiver.

      For these reasons I consider that there are triable issues and they should be determined by a judge at first instance.

F      I would therefore allow the appeal and remit the assessment of damages as proposed by Staughton L.J. and dismiss the respondent's notice.

G      STAUGHTON L.J. Mr. Mothew made his report to the Cheshunt Building Society on 2 August 1988. In it he answered one of the questions asked as follows:

         "Q. Please confirm that (to the best of your knowledge and belief) the balance of the purchase money is being provided by the applicant(s) personally without resort to further borrowing. If not please give details. A. Confirmed."

H  That was untrue. There were other aspects of the same error, but I need not go into them in detail. Although Mr. Mothew had the means of knowledge in his possession, which could have brought the error to his attention, it is not said that he acted fraudulently or in bad faith.

AP1333

26

Staughton L.J.      Bristol and West Building Society v. Mothew (C.A.)            [1998]

The ordinary remedy of a client who has received wrong information    A
or advice from his solicitor is to claim damages for negligence, whether as
a breach of contract or as a tort. For such a claim to give rise to
substantial damages the building society would have to show that the
breach of contract or negligence caused them loss. By their respondent's
notice they seek to say that, if they had known the true facts, they would
not have lent any money to Mr. and Mrs. Towers.

The judge regarded that point as immaterial, since the building society    B
succeeded on other grounds. If it is material, in my opinion it raises a
triable issue. According to Samantha Bennett of the society's advances
department, the offer of advance would have immediately been withdrawn
if the society had known that even £3,350 was being borrowed elsewhere.
In the nature of things Mr. Mothew is unlikely to have evidence which
directly controverts that statement. But there are grounds for supposing    C
that it may be open to question. I would not give judgment under R.S.C.,
Ord. 14 on the basis that it is true. If it is critical, the case must go to
trial, perhaps with the aid of interrogatories and discovery of documents.

However in this particular case the building society were not the sole
clients of Mr. Mothew; he was also the solicitor acting for Mr. and
Mrs. Towers. That is said to make all the difference, because Mr. Mothew    D
then became under a fiduciary duty to the building society. And the
argument is that for breach of fiduciary duty the remedy does not depend
on causation or remoteness; all that is necessary is that the loss would not
have occurred *but for* the breach of duty.

It seems to me wrong that a breach of contract or tort should become
a breach of fiduciary duty in that way. I am glad to find that the
authorities relied on by Millett L.J. show that it is wrong. In my judgment    E
Mr. Mothew was in breach of a duty of care and nothing more. True he
was in a situation where he owed duties to two clients, and those duties
might conflict with each other. But he did not prefer the interest of one
client to that of another; at most he was guilty of negligence which had
that unintended effect.

Alternatively it is said that Mr. Mothew was in breach of trust because    F
he paid away the trust fund contrary to his instructions. He did indeed
hold the £59,000 in trust; it was not his own money. There was in my
opinion an express or implied trust, and not (as the judge held) a
constructive trust. But he did not pay it away contrary to the society's
instructions. The cheque reached Mr. Mothew with a letter dated
23 August 1988, which in effect instructed him to use it for completion of    G
the proposed purchase. That was what he did.

There being in my opinion no breach of fiduciary duty or breach of
trust, it is unnecessary to consider what remedy such a breach might have
afforded.

Thus far the appeal succeeds, but there remains judgment on the cause
of action at common law for damages to be assessed. Mr. Sumption says
that even that must go, since there is a triable issue as to waiver by the    H
building society. The problem that he faces is that, although the building
society readily agreed when they were asked to consent to the registration
of the second charge, they are not shown to have known that the second

27

Ch.                    Bristol and West Building Society v. Mothew (C.A.)          Staughton L.J.

A   charge was contemplated and intended at the time of Mr. Mothew's
report. There has been ample opportunity to produce evidence that they
knew, if indeed they did. In my judgment there was no waiver.

When the argument before us was concluded on 21 May that was all
that we had to decide. But we have since been asked to consider the
judgment of Hobhouse L.J. in *Downs v. Chappell* [1997] 1 W.L.R. 426 and
B   the speech of Lord Hoffmann in *Banque Bruxelles Lambert S.A. v. Eagle
Star Insurance Co. Ltd.* [1997] A.C. 191. Such has been the volume of
litigation on the topic of loss to lenders following negligent professional
advice and the collapse of the property market that judges risk being
overtaken by new authority.

The Court of Appeal in the *Banque Bruxelles* case began with a
reference to the well known principle that damages should be as nearly as
C   possible the sum which would put the plaintiff in the position in which he
would have been if he had not been injured. That would lead to two
possible answers in the present case. (1) If there had been no report from
Mr. Mothew to the building society, the money would not have been lent;
the society would still have their £59,000. There would have been no
transaction, a phrase which I use not as a label for anything but as a
D   description of the fact. (2) If Mr. Mothew had provided an accurate
report to the building society, then they might have been content to
proceed on the terms previously proposed, or they might have made a
revised offer, or they might have proceeded as in (1) above. There is a
triable issue as to that. Left to myself, I would have ruled that (2) was the
appropriate situation for the judge to consider in assessing the damages.
E   But I have to acknowledge that Hobhouse L.J. in *Downs v. Chappell*
[1997] 1 W.L.R. 426, with the agreement of Butler-Sloss and Roch L.JJ.,
preferred method (1), both for fraudulent misrepresentation and for
negligence.

Lord Hoffmann, in the *Banque Bruxelles* case [1997] A.C. 191, 211, as
it seems to me, considered that either method was the wrong place to
F   begin:

   "Before one can consider the principle on which one should calculate
   the damages to which a plaintiff is entitled as compensation for loss,
   it is necessary to decide for what kind of loss he is entitled to
   compensation."

G   There follows an exposition of the problem and the answer to it, as set
out in the judgment of Millett L.J.

For my part I feel that we should not at this stage purport to instruct
the judge who has to assess the damages by a paraphrase or interpretation
of that decision, for a number of reasons. First, we have not heard
argument on it, and our judgment is already long delayed by intervening
H   material. I am told it would be impractical for us to have a further hearing
before October. Secondly, the judge has yet to find the facts relating to
the assessment of damages. Thirdly, the judge must be guided by what
Lord Hoffmann has said and not by any gloss of ours.

28

Staughton L.J.     Bristol and West Building Society v. Mothew (C.A.)     [1998]

I would allow the appeal and remit the assessment of damages, either   A
to Chadwick J. or to another judge of the Chancery Division as the
exigencies of business may require. The cross-appeal should be dismissed.

*Appeal allowed.*
*Cross-appeal dismissed.*

B

Solicitors: *Wansbroughs Willey Hargrave; Osborne Clarke, Bristol.*

[Reported by JILL SUTHERLAND, Barrister]

C

———

[COURT OF APPEAL]

TURNER v. STEVENAGE BOROUGH COUNCIL     D

1997 March 6                          Staughton, Pill and Mummery L.JJ.

*Arbitration—Arbitrator—Misconduct—Application to remove arbitra-*
*tor—Lengthy correspondence and preliminary proceedings—Arbitra-*
*tor proposing interim payment of fees and expenses—Payment*
*by one party only—Subsequent return of payment—Whether*     E
*misconduct—Whether arbitrator to be removed—Arbitration Act*
*1950 (14 & 15 Geo. 6, c. 27), s. 23*

In February 1993 an arbitrator was appointed to conduct
arbitration proceedings relating to a rent review between the
council, as landlords of a shop, and the tenant. The arbitrator's
terms of appointment contained no express provision for payment
of interim fees or expenses. The parties contemplated that the     F
arbitration would be concluded within about three months and
the arbitrator stated that the award would be made by 30 June
1993. In May 1994, after lengthy correspondence and five
preliminary hearings, the arbitration had still not concluded and
the arbitrator wrote to both parties suggesting a timetable for the
hearing and requesting payment by each party of half his interim
fees and expenses. The tenant objected and asked whether, if     G
payment were not made, the arbitrator would not hear the
arbitration. The arbitrator replied that the first priority was to fix
the hearing and to resolve the dispute, but that he hoped the
parties would agree that it was reasonable that he should receive
interim payment for time expended on the matter. The council
paid the sum to the arbitrator, but three months later, after
taking legal advice, he returned it. The tenant applied for the     H
arbitrator to be removed for misconduct under section 23 of the
Arbitration Act 1950[1] on the ground that he had no power to

[1] Arbitration Act 1950, s. 23: "(1) Where an arbitrator or umpire has misconducted
himself or the proceedings, the High Court may remove him."

**[2019 (1) CILR 249]**

# DORSEY VENTURES LIMITED v. XIO GP LIMITED

GRAND CT. (Mangatal, J.) February 21st, 2019

*Partnership — exempted limited partnership — information regarding condition of partnership — pursuant to Exempted Limited Partnership Law 2014, s.22 limited partner sought order that general partner provide true and full information regarding business and financial condition of fund — limited partner's right to receive such information not expressly or impliedly excluded by partnership agreement providing for furnishing of accounts*

The plaintiff sought certain information and documentation pursuant to the Exempted Limited Partnership Law 2014, s.22.

XiO Fund I LP ("the fund") was a Cayman Islands exempted limited partnership. The plaintiff was the fund's limited partner and the defendant its general partner.

There was a dispute between a Ms. Li and a Mr. Xie as to the beneficial ownership of the plaintiff. Ms. Li incorporated the plaintiff in the Cayman Islands as a special purpose vehicle to facilitate investments by Chinese investors into global private equity deals. Mr. Xie claimed that the plaintiff was incorporated on his instructions and that pursuant to a share entrustment agreement Ms. Li held the shares on trust for him. The question of Mr. Xie's interest in the plaintiff was the subject of an arbitration. Ms. Li claimed that she had never agreed to the terms of the share entrustment agreement and was the sole legal and beneficial owner of the plaintiff; the plaintiff was dormant, its only asset was its limited partnership interest in the fund and it was obliged to repay the US$70m. in initial capital contribution to its lenders; and she held the benefit of her shares in the plaintiff on trust for those who, by virtue of their capital contributions to the purchase of the underlying assets of the fund, could be said to have the real economic interest in the fund.

Given the dispute, Ms. Li resigned as sole director of the plaintiff. She subsequently appointed two directors ("the GT directors"). The terms on which they were appointed were set out in a protocol agreement and a director services agreement. The scope of the GT directors' reporting obligations was the subject of a separate application.

There were substantive proceedings before the Grand Court filed by Mr. Xie and others against the defendant, Ms. Li, the plaintiff and another. The claims in that suit were complex.

249

The plaintiff brought the present application seeking an order pursuant to s.22 of the Exempted Limited Partnership Law 2014 that the defendant deliver up to the plaintiff true and full information regarding the state of the business and financial condition of the fund by reference to certain categories of documents; further and other relief as the court considered fit; and an order that the plaintiff pay the defendant's costs of the summons to be taxed, if not agreed, on the indemnity basis. The plaintiff sought documents and information relating to the initial capital contribution of US$70m. injected by it into the fund.

Section 22 of the Exempted Limited Partnership Law provided:

"Subject to any express or implied term of the partnership a_reement, each limited partner may demand and shall receive from a general partner true and full information regarding the state of the business and financial condition of the exempted limited partnership."

Clause 9.2 of the amended Limited Partnership Agreement ("LPA") provided:

"**Partnership Expenses and Other Fees**

(a)  The General Partner, acting for the account of the Partnership, will pay all Partnership Expenses out of the Assets.

(b)  The General Partner will prepare a budget for the anticipated Partnership Expenses for each Fiscal Year and the budget will be approved by the Limited Partner.

(c)  The General Partner, on behalf of the Partnership, may pay its agents, delegates and professional advisors any fees that form part of the Partnership Expenses."

Clause 14.3 provided:

"**Supply of Information**

The Limited Partner must use all reasonable endeavors to promptly supply the General Partner any information, in substantially the form the General Partner reasonably requests, in order for the Partnership, General Partner, Manager and/or their Affiliates to comply with applicable legal or regulatory requirements or guidelines, including, but not limited to, in connection with Assets or proposed investments, or in relation to the taxation of the Partnership, the General Partner, their Affiliates, or any Limited Partner, or otherwise."

Clauses 15.2 and 15.3 provided:

"**15.2 Records and Books of Accounts**

The General Partner will keep proper and complete records, books of account and Accounts of the Partnership in accordance with Applicable Law and this Agreement, in which will be entered fully and accurately all transactions and other matters related to the business of the Partnership as are usually entered into records, books of account and Accounts maintained by persons engaged in similar businesses, including a Capital Account for the Limited Partner. The Partnership books, records and Accounts will be prepared in accordance with recognized auditing standards.

250

AP1338

GRAND CT.                                      DORSEY VENTURES v. XIO GP

**15.3 Annual Accounts and Other Information**
(a) No later than 120 days after the end of the first full Fiscal Year and each Fiscal Year thereafter, the General Partner will provide the Limited Partner with audited accounts of the Partnership in respect of the immediately preceding Fiscal Year. The audited accounts will comprise an annual investment report and annual financial statements of the Partnership. The first audited Accounts will be prepared for the Fiscal Year ending 31 December 2015.
(b) Within 30 Business Days following the end of the first Fiscal Quarter and each Fiscal Quarter thereafter, the General Partner will send to the Limited Partner a report containing the unaudited accounts of the Partnership, an unaudited valuation report of the Investments, an update on the Partnership's existing investments, Investment pipeline and divestments (if any) for the immediately preceding Fiscal Quarter.
(c) For the avoidance of doubt, a failure by the General Partner to provide any information or documentation within the relevant period stipulated in this clause 15.3 does not amount to a breach of this Agreement by the General Partner. In the event that the General Partner is not able to comply with the deadlines set out above, the General Partner will use its best endeavors to deliver the relevant accounts as soon as practicable thereafter."

The plaintiff submitted *inter alia* that although s.22 was in wide terms, the application and request for disclosure were focused and proportionate.

The defendant submitted that the application was misconceived as s.22 of the Law provided that the right to request true and full information was "subject to any express or implied term of the partnership agreement", the amended LPA made detailed express provision for the severely restricted information rights of the plaintiff as the limited partner of the fund. The contractual provisions governing the plaintiff's information rights in the amended LPA were inconsistent with the general right under s.22 and did not extend to the very detailed information sought. As a matter of construction of the amended LPA, read with the opening words of s.22, the general right to information under s.22 was excluded. Alternatively, in order to give efficacy to the amended LPA and/or to give effect to the obvious but unexpressed intentions of the parties, a term excluding what would be the right under s.22 was implied.

### Held, ruling as follows:

There was nothing in the wording of the amended LPA that was inconsistent with an overriding general right to information under s.22 of the Exempted Limited Partnership Law 2014. In so far as cl. 15.2 of the amended LPA provided that "the general partner will keep proper and complete books of account and Accounts of the Partnership in accordance

251

with the Applicable Law and this Agreement, in which will be entered fully and accurately all transactions and other matters related to the business of the Partnership as are usually entered into records, books of account and Accounts maintained by persons engaged in similar businesses, including a Capital Account for the Limited Partner," the general partner had agreed to keep complete books and accounts in accordance with the 2014 Law. The fact that the amended LPA at cl. 15.2 provided for the furnishing of accounts was not the same as the topic dealt with under s.22 of the Law, which was the limited partner's right to demand and receive from a general partner true and full information regarding the state of the business and the financial condition of the exempted limited partnership. The right to demand and receive true and full information was wide and encompassed more than accounts, audited and unaudited. Section 21 of the Law provided for the keeping of detailed accounts, information and documentation. In relation to the amended LPA, the defendant was bound expressly to keep books of account in accordance with the Law. Unless the amended LPA said expressly that the limited partner was not entitled to true and full information, the limited partner had the right under the Law to such information. The reasonable man with the background knowledge of the parties could not reasonably have understood the parties to have meant by their agreement that the limited partner's right to demand information would be excluded. The amended LPA could not properly be said to lack a commercial or practical coherence unless a term excluding the information was implied. On the contrary, because s.22 of the Law stated a default position, that effectively, in accordance with commercial common sense and the dimensions of the relationship between a general and a limited partner, applied unless the terms of the LPA expressly or impliedly excluded it. On a proper construction of the amended LPA and having regard to commercial common sense, it was plain that the limited partner's right to demand and receive full information had neither been expressly nor impliedly excluded. The information and matters sought in the originating summons should be provided to the plaintiff by the defendant, indeed this information should have been provided long ago. It seemed that the defendant had acted unreasonably in this regard. The plaintiff would be awarded its costs to be taxed, if not agreed, on an indemnity basis (paras. 36–44).

**Case cited:**

(1) *Marks & Spencer plc* v. *BNP Paribas Secs. Servs. Trust Co. (Jersey) Ltd.*, [2015] UKSC 72; [2016] A.C. 742; [2015] 3 W.L.R. 1843; [2016] 4 All E.R. 441; (2015), 163 Con. L.R. 1; [2016] 1 P. & C.R. 13; [2016] L. & T.R. 8, applied.

**Legislation construed:**

Exempted Limited Partnership Law 2014, s.21: The relevant terms of this section are set out at para. 35.

s.22: The relevant terms of this section are set out at para. 35.

*M. Collings*, *Q.C.*, *C. Levers* and *J. Vickers* for the plaintiff;
*Lord Grabiner*, *Q.C.*, *M. Kish* and *G. Lardner* for the defendant;
*Lord Goldsmith*, *Q.C.*, *C. McKie*, *Q.C.* and *P. Smith* (present with leave of the court).

1   **MANGATAL, J.:**

**Introduction**

This application has been referred to during the hearing and related proceedings as the "disclosure proceedings." It concerns XiO Fund I LP ("the fund"), which is a Cayman Islands exempted limited partnership which has been registered under the Exempted Limited Partnership Law 2014 ("the ELP"). The plaintiff is Dorsey Ventures Ltd. ("Dorsey"). Dorsey is the fund's limited partner and the defendant, XiO GP Ltd. ("XiO GP") is its general partner. Dorsey seeks from XiO GP certain information and documentation and relies upon s.22 of the ELP.

**Background**

2   There is a dispute between Ms. Athene Xiang Li ("Ms. Li") and Mr. Xie Zhikun ("Mr. Xie") as to the beneficial ownership of Dorsey. Ms. Li incorporated Dorsey in the Cayman Islands on July 10th, 2014 as a special purpose vehicle for facilitating investments by PRC investors into global private equity deals.

3   Mr. Xie claims that Dorsey was incorporated on his instructions and that pursuant to a Share Entrustment Agreement ("SEA") Ms. Li holds the shares in Dorsey on trust for Mr. Xie. The question of Mr. Xie's interest in Dorsey is the subject of an arbitration commenced by him in the Hong Kong International Arbitration Centre on February 16th, 2017, with arbitration number AI17035 ("the SEA arbitration").

4   Ms. Li's position in the SEA arbitration is that:

(a) Ms. Li never agreed to the terms of the SEA and is the sole legal and beneficial owner of Dorsey.

(b) Dorsey is a dormant entity. Its only asset is its limited partnership interest in the fund and it is obliged to repay the US$70m. in initial capital contribution to its lenders.

(c) Ms. Li does not claim an economic interest in Dorsey. Instead she asserts that she holds the benefit of her shares in Dorsey on trust for those who, by virtue of their capital contributions to the purchase of the underlying assets of the fund, can be said to have the real economic interest in the fund.

5   Given this dispute over the beneficial ownership of Dorsey, Ms. Li resigned as sole director of Dorsey on February 3rd, 2017 and sought the

253

appointment of independent directors. Following her resignation, Ms. Li appointed two directors from FTI but they later resigned. Ms. Li subsequently appointed, with Mr. Xie's agreement, Mr. David Bennett and Ms. Tsz Nga Georgia Chow of Grant Thornton Directorship Services Ltd. as independent directors ("the GT directors"), by written resolution dated August 11th, 2017.

6   The terms on which the GT directors were appointed are set out in a protocol agreement dated August 14th, 2017 ("the Dorsey protocol") and a director services agreement of the same date. The scope of the GT directors' reporting obligations under the Dorsey protocol is the subject of a separate application in Cause No. FSD 17 of 2018 (IMJ) ("the Dorsey protocol proceedings").

7   There are substantive proceedings before the Grand Court, filed by Mr. Xie, Fortune Favors Holdings Ltd., and Shengshi View International Holdings Ltd. ("the applicants") against XiO GP, Joseph Pacini, Ms. Li and Dorsey. The claims in that suit, Cause No. FSD 25 of 2017 (IMJ), are complex. After hearing extensive arguments in March, May and June 2017 in that cause, I continued certain interlocutory injunctions, initially granted *ex parte*, but as varied, in favour of the applicants. The injunction application is the subject of my written unreported judgment delivered in private, date of delivery being June 6th, 2017. That judgment has been appealed to the Court of Appeal, which heard the matter in November 2017 and reserved judgment.

**Ruling on application on May 30th, 2018 by the applicants to be joined or alternatively inspect the file or alternatively attend hearings and make submissions**

8   On May 30th, 2018, the applicants sought either to be joined as parties to the proceedings, alternatively, to be granted leave to inspect and take copies of documents on the court file in this cause, Cause No. FSD 38 of 2018 (IMJ), or further or alternatively, to be granted leave to attend and observe all hearings in the proceedings.

9   It is to be noted that, by consent of the parties to the proceedings and at their request, I made a sealing order on certain terms on or about April 12th, 2018. One of the terms of the order sealing the court file from inspection without leave of the court on notice to the parties, was as follows:

"Nothing in this order prevents the independent directors of the Plaintiff from reporting on the status of the Proceedings in accordance with the terms of a protocol agreement entered into between each of them and Mr. Xie Zhikun and Ms. Athene (Xiang) Li dated 14 August 2017."

254

10   On May 31st, 2018, I ruled on the application by the applicants as follows:

"2.   The Court, having heard from attorneys for the Applicants, Plaintiff and Defendants [*sic*], is not satisfied that the Applicants are necessary parties to the proceedings or that they have a separate dispute that needs to be determined along with the issue in FSD 38 of 2018. The narrow issue in FSD 38 of 2018 is between Dorsey . . . and XiO GP . . . who are the only parties to the Amended LPA. Further, to the extent that the Applicants have questions relating to the meaning and scope of the Dorsey Protocol, they are able to and are in fact fully participating in FSD 17 of 2018—the Dorsey Protocol Proceedings.

3.   However, the Applicants are parties that may be affected by the outcome of the FSD 38 of 2018 proceedings, and I therefore think that they should be allowed to attend and observe all hearings in the proceedings in FSD 38 of 2018 and make brief legal submissions, if necessary.

4.   I do not view it as appropriate for the Applicants to have leave to inspect and take copies of the documents on the court file. There are confidentiality issues, and Mr. Xie's entitlement to receive confidential information as a matter of construction of the Dorsey Protocol, is already the subject of the Dorsey proceedings.

5.   The hearing tomorrow (1st June 2018) will therefore have to be tailored in such a way that confidential documents and information are not expressly referred to in the hearing."

11   Lord Goldsmith, Q.C. did, on behalf of the applicants, make brief submissions at this hearing.

**The application by Dorsey**

12   The application is brought by way of an originating summons which states:

". . . [T]he Plaintiff is seeking the following relief:

1.   Pursuant to section 22 of the Exempted Limited Partnership Law, 2014, an order that the Defendant deliver up to the Plaintiff true and full information regarding the state of the business and financial condition of XiO Fund I LP by reference to the categories of documents more particularly described in paragraph 40 of the First Affidavit of Mr. David James Bennett filed in support of this originating summons.

2.   Further or other relief as the Court considers fit.

255

3.   An order that the Defendant do pay the Plaintiff's costs of and incidental to this originating summons to be taxed, if not agreed, on an indemnity basis."

13   Paragraph 40 of Mr. Bennett's first affidavit states as follows:

"By the same letter, we requested within 14 days of the date of the letter:

(a)   a copy of the Detailed Breakdown:

i.    in Microsoft Excel format; and

ii.   disclosing the payer/recipient for each transaction;

iii.  ensuring that multiple transactions are not grouped into a single line entry; and

iv.   categorising each transaction item into one of the following:

1.  Management Fees, or

2.  Establishment Expenses, or

3.  Investment Related and Non-Consummated Deals; or

4.  Fund Expenses; or

5.  Partnership Expense;

(b)   supporting documentation for the transactions disclosed in Annex A of that letter, which amounted to 224 line items representing 93% of the Detailed Breakdown aggregate value. We noted that such supporting documentation should include, but not be limited to:

i.    copies of quotes, leases, purchase orders, invoices (including supporting narratives, if applicable) and receipts;

1.  For example legal/accounting invoices should be supported by narrative and billing details; and

2.  If any narrative is subject to legal privilege, the relevant individual narrative lines may be redacted;

ii.   if the cost was a cost shared between various entities, documentation in support of the cost share arrangement, for example:

1.  signed share cost agreement;

256

    2.  evidence of payment by the entities sharing the cost;

    3.  correspondence in support of the arrangement and the relevant commercial terms/rationale for splitting costs;

iii.  in respect of travel-related costs:

    1.  a schedule for all travel-related costs including:

      a.  the employee(s)/individual(s) who incurred such expenses;

      b.  the purpose of the expenses/trip

      c.  the dates of travel and the locations visited;

      d.  if the expense is tied to a particular investment, the investment/project name (on the basis that non-disclosure of a particular project would be assumed to be a general costs of the GP).

iv.  in respect of Establishment Expenses:

    1.  a schedule of the employee(s)/individual(s) to whom each relocation costs/visa cost related:

    2.  employment contracts for all employees whose recruitment costs/professional charges have been charged as an Establishment Expense;

    3.  a schedule of the location tied to each transaction for leasehold improvement costs, office equipment, computer equipment and rental costs;

    4.  a copy of the fixed asset register and depreciation schedule in relation to the office equipment, computer equipment and other assets of a capital nature;

    5.  if the costs was a cost shared between various entities, documentation in support of the cost share arrangement;

v.  in respect of Partnership Expenses:

    1.  a schedule detailing the different types of operating expenses within the Partnership;

      a.  a schedule detailing the target investment company name(s) associated with each project name;

257

   b. bank statements for the bank account(s) which were used for the ICC expenditure (for the period during which expenditure took place); and

   c. details of whether any of the costs paid have been reimbursed to the Fund by other entities."

**Dorsey's position**

14 Reliance is placed upon s.22 of the ELP (which is in the same terms as the Exempted Limited Partnership Law (2018 Revision)) which provides as follows:

  "Subject to any express or implied term of the partnership agreement, each limited partner may demand and shall receive from a general partner true and full information regarding the state of the business and financial condition of the exempted limited partnership."

15 Dorsey seeks documents and information relating to the initial capital contribution of US$70m. injected by Dorsey into the fund. Mr. Collings, Q.C., who appears on behalf of Dorsey, asserts that the GT directors have been seeking for some time to understand how these moneys have been spent, given they comprise Dorsey's investment in the fund, and they (the GT directors) have been unable accurately to reconcile its expenditure with the documents and information which have been provided to Dorsey by XiO GP to date. The amended LPA contains, at cl. 15.2, an obligation on the general partner to keep proper, full and accurate records and accounts; and at cl. 15.3 an obligation on the general partner to provide the limited partner with annual audited accounts and other information.

16 The duties owed to Dorsey by the GT directors, as directors of Dorsey, have been addressed in their skeleton argument in respect of the Dorsey protocol proceedings. In those arguments, the GT directors declare that they do not accept that those duties are (or could be) constrained in any way. In particular, the GT directors must, it was submitted, acquire and maintain, on an ongoing basis, a sufficient knowledge and understanding in order to properly discharge their duties of supervision and control of Dorsey's affairs.

17 The evidence on this application consists of the first affidavit of Mr. Bennett, one of the GT directors, the first affidavit of Mr. Pacini of April 24th, 2018, on behalf of XiO GP, and the second affidavit of Mr. Bennett. XiO GP has also filed the first affidavit of David Andrew Freeman, who is a litigation paralegal at Ogier, which exhibits correspondence and documents. One of the documents exhibited to Mr. Freeman's affidavit is a copy of the limited partnership agreement ("the LPA") in respect of the fund dated August 6th, 2014. The terms of the amended LPA under

258

discussion here do not appear to be materially different from that which was contained in the original LPA.

18   XiO GP also relies upon Ms. Li's second affirmation in the Dorsey protocol proceedings to provide its position on the background to the appointment of the GT directors, Dorsey's independent directors and its view of the purpose behind that appointment.

19   Mr. Bennett's first affidavit describes the assistance which has been afforded, and the materials which have been provided, by XiO GP. Mr. Bennett also describes the difficulties which have arisen, and explains the justification for Dorsey's further requests, and the need for this application to ensure that they are met.

20   Mr. Collings argues that although s.22 is in wide terms, the request (and this application) for disclosure is focused and proportionate: it is set out in Mr. Bennett's first affidavit, having previously been set out in a letter dated February 21st, 2018.

21   Mr. Collings submitted that the robust stance taken by Mr. Pacini in his affidavit on behalf of XiO GP may be ameliorated in the light of a meeting which took place the day after his affidavit was sworn. The meeting is described at para. 15 of Mr. Bennett's second affidavit, and Mr. Bennett also refers to the prior provision of information by XiO GP. Mr. Bennett asserts that during that meeting Mr. Pacini openly agreed that Dorsey was entitled to the information sought in this application.

22   It was hoped, Dorsey says, that these proceedings could have been avoided, particularly in circumstances including Mr. Pacini's concession that Dorsey is entitled to the information sought by these proceedings and that it should be provided to Dorsey.

23   The GT directors also refute strongly the criticism by Mr. Pacini and XiO GP that the GT directors' fees have been excessive or unnecessarily incurred. At para. 11 of his second affidavit, Mr. Bennett states as follows:

   "Our investigations have not been undertaken at the behest of Mr. Xie as suggested by Mr. Pacini. As we have been at pains to point out, we owe our duties to Dorsey, not to any of Mr. Xie, Ms. Li or the GP (see Mourant's letter to Campbells the GP's former Cayman Counsel) and Maples dated 25 January 2018."

**XiO GP's position**

24   Lord Grabiner, Q.C., on behalf of XiO GP, submits that this application is misconceived. Section 22 of the Law provides that the right to request true and full information is "subject to any express or implied term of the partnership agreement." He argues that the amended LPA makes detailed express provision for the severely restricted information rights of

259

Dorsey, as the limited partner of the fund. Further that the contractual provisions governing the limited partner's information rights in the amended LPA are therefore flatly inconsistent with the general right under s.22 and do not extend to the very detailed information sought in this application. On its true construction, the amended LPA excludes the general right under s.22. Alternatively, an implication of a term to this effect is both obvious and necessary to give business efficacy to the amended LPA.

### *The Law and the amended LPA*

25   Lord Grabiner submits that the amended LPA expressly addresses the respective rights to information of the limited partner and the general partner. Clause 9.2(b) provides for Dorsey, as limited partner, to receive a budget of annual partnership expenses for approval. Clause 14.3 imposes a duty on Dorsey to supply such information as the general partner may reasonably request. Clause 15.3 provides for Dorsey to receive the partnership's annual audited accounts and unaudited quarterly accounts. Further, whilst cl. 15.2 of the amended LPA requires XiO GP to maintain records and books of account, it does not require XiO GP to provide Dorsey with copies of such records or books of accounts, nor does it give Dorsey the right to inspect them.

26   In circumstances where XiO GP has not been able to comply with the deadlines referred to in cll. 15.3(a) and 15.3(b), it is obliged to use its best endeavours to deliver the relevant accounts to Dorsey "as soon as practicable."

27   Lord Grabiner argues that these express provisions of the amended LPA do not entitle Dorsey to the information requested in this application under the provisions of the amended LPA. Further, the argument continues, these provisions are inconsistent with an overriding general right to information under s.22. As a matter of construction of the amended LPA, read with the opening words of s.22, the general right to information under s.22 is excluded. Alternatively, in order to give efficacy to the amended LPA and/or to give effect to the obvious but unexpressed intentions of the parties, a term excluding what would be the right under s.22 is implied: reference was made to *Marks & Spencer plc* v. *BNP Paribas Secs. Servs. Trust. Co. (Jersey) Ltd.* (1).

28   It follows that Dorsey is not entitled to the information sought and the application should be dismissed.

29   As regards the audited accounts which are the subject of cl. 15.3 of the amended LPA, XiO GP says that the GT directors have already been advised that the fund's auditors, PricewaterhouseCoopers are preparing the fund's audited accounts, and XiO GP will provide the audited accounts to Dorsey as soon as practicable in accordance with cl. 15.3(c) of the LPA.

30   As to the GT directors' forensic point that Mr. Pacini did not object to provision of the information requested in this application until the service of his first affidavit, learned counsel submits that as Mr. Pacini explains in that affidavit, XiO GP initially sought to co-operate with the GT directors to the maximum extent possible, notwithstanding the limits on their entitlement to information, in the hope that it could get the GT directors up to speed and address any concerns without delay. However, in the light of the GT directors' many demands for historical information in relation to the fund and the massively disproportionate costs incurred by the GT directors as a result, XiO GP had no choice but to insist on limiting the information provided to the GT directors to that which they are entitled to receive: namely, the audited accounts.

**Discussion and analysis**

31   Clause 9.2 of the amended LPA states:

"**9.2 Partnership Expenses and Other Fees**

(a)   The General Partner, acting for the account of the Partnership, will pay all Partnership Expenses out of the Assets.

(b)   *The General Partner will prepare a budget for the anticipated Partnership Expenses for each Fiscal Year and the budget will be approved by the Limited Partner.*

(c)   The General Partner, on behalf of the Partnership, may pay its agents, delegates and professional advisors any fees that form part of the Partnership Expenses." [Emphasis supplied.]

32   Clause 14.3 of the amended LPA provides as follows:

"**14.3 Supply of Information**

The Limited Partner must use all reasonable endeavors to promptly supply the General Partner any information, in substantially the form the General Partner reasonably requests, in order for the Partnership, General Partner, Manager and/or their Affiliates to comply with applicable legal or regulatory requirements or guidelines, including, but not limited to, in connection with Assets or proposed investments, or in relation to the taxation of the Partnership, the General Partner, their Affiliates, or any Limited Partner, or otherwise."

33   Clauses 15.2 and 15.3 of the amended LPA provide:

"**15.2 Records and Books of Accounts**

*The General Partner will keep proper and complete records, books of account and Accounts of the Partnership in accordance with Applicable Law and this Agreement, in which will be entered fully and accurately all transactions and other matters related to the business*

261

*of the Partnership as are usually entered into records, books of account and Accounts maintained by persons engaged in similar businesses, including a Capital Account for the Limited Partner.* The Partnership books, records and Accounts will be prepared in accordance with recognized auditing standards.

**15.3 Annual Accounts and Other Information**

(a) No later than 120 days after the end of the first full Fiscal Year and each Fiscal Year thereafter, the General Partner will provide the Limited Partner with audited accounts of the Partnership in respect of the immediately preceding Fiscal Year. The audited accounts will comprise an annual investment report and annual financial statements of the Partnership. The first audited Accounts will be prepared for the Fiscal Year ending 31 December 2015.

(b) Within 30 Business Days following the end of the first Fiscal Quarter and each Fiscal Quarter thereafter, the General Partner will send to the Limited Partner a report containing the unaudited accounts of the Partnership, an unaudited valuation report of the Investments, an update on the Partnership's existing investments, Investment pipeline and divestments (if any) for the immediately preceding Fiscal Quarter.

(c) For the avoidance of doubt, a failure by the General Partner to provide any information or documentation within the relevant period stipulated in this clause 15.3 does not amount to a breach of this Agreement by the General Partner. In the event that the General Partner is not able to comply with the deadlines set out above, the General Partner will use its best endeavors to deliver the relevant accounts as soon as practicable thereafter."

34   In my judgment, it is important to bear in mind the proviso in the opening words of s.22 of the ELP which state "Subject to any express or implied term of the partnership agreement."

35   However, it is also important to look at the terms of s.21 of the ELP, which immediately precede s.22. It is useful to set out that section, which deals with the issue of "Accounts," followed directly after by s.22 which covers "Information regarding condition of partnership." Sections 21 and 22 provide as follows:

"Accounts

21. (1) A general partner shall keep or cause to be kept proper books of account including, where applicable, *material underlying documentation including contracts and invoices, with respect to—*

262

(a)   *all sums of money received and expended by the exempted limited partnership and matters in respect of which the receipt of expenditure takes place;*

(b)   *all sales and purchases of goods by the exempted limited partnership;* and

(c)   *the assets and liabilities of the exempted limited partnership.*

(2) *For the purposes of subsection (1), proper books of account shall not be deemed to be kept if there are not such books as are necessary to give a true and fair view of the business and financial condition of the exempted limited partnership and to explain its transactions.*

(3) Where the general partner keeps the books of account described in subsection (1) at any place other than at the registered office of the exempted limited partnership or at any other place within the Islands, the general partner shall, upon service of an order or notice by the Tax Information Authority pursuant to the Tax Information Authority Law (2013 Revision), make available, in electronic form or any other medium, at its registered office copies of its books of account, or any part or parts thereof, as are specified in the order or notice.

(4) A general partner shall cause all books of account required to be kept under subsection (1) to be retained for a minimum period of five years from the date on which they are prepared.

(5) A person who, being a general partner, knowingly and wilfully contravenes subsection (1) or (4) shall be subject to a penalty of five thousand dollars.

(6) A person who, being a general partner, defaults in complying with an order or notice under subsection (3) without reasonable excuse, shall incur a penalty of five thousand dollars and a further penalty of one hundred dollars for every day during which the non-compliance continues.

Information regarding condition of partnership

22. Subject to any express or implied term of the partnership agreement, *each limited partner may demand and shall receive from a general partner true and full information regarding the state of the business and financial condition of the exempted limited partnership.*" [Emphasis supplied.]

36   In my judgment, there is nothing in the wording of the amended LPA that is inconsistent with an overriding general right to information under

263

s.22 of the ELP. It seems to me, that in so far as cl. 15.2 of the amended LPA provides that—

> "The general partner will keep proper and complete books of account and Accounts of the Partnership *in accordance with Applicable Law and this Agreement, in which will be entered fully and accurately all transactions and other matters related to the business of the Partnership as are usually entered into records, books of account and Accounts maintained by persons engaged in similar businesses, including a Capital Account for the Limited Partner*,"

the general partner has agreed to keep complete books and accounts in accordance with the ELP.

37   The fact that the amended LPA, at cl. 15.3 provides for and addresses the subject of the furnishing of accounts is not the same thing as the topic dealt with under s.22 of the ELP, which is the limited partner's right to demand and receive from a general partner *true and full* information regarding the state of the business and the financial condition of the exempted limited partnership. The right to demand and receive true and full information, in my view, is wide and encompasses more than accounts, audited and unaudited.

38   Section 21 of the ELP provides for the keeping of detailed accounts, and information and documentation. It seems obvious to me, that, in relation to this amended LPA, XiO GP is bound expressly to keep books of account in accordance with the ELP. Unless the amended LPA said expressly that the limited partner is *not* entitled to true and full information, then the limited partner has the right under the governing Law, the ELP, to such information.

39   In my judgment, the reasonable man with the background knowledge of the parties could not reasonably have understood the parties to have meant by their agreement that the limited partner's right to demand information would be excluded. I have found paras. 14 and 15 of the judgment of Lord Neuberger in the *Marks & Spencer* case (1), which was referred to by both parties, instructive. It is there stated ([2016] A.C. 742, at paras. 14–15):

> "*Implied terms in contracts*
>
> 14   It is rightly accepted on behalf of the claimant that there is no provision in the lease which expressly obliges the landlords to pay the apportioned sum to the tenant. Accordingly, it follows that in order to succeed the claimant has to establish that such an obligation must be implied into the lease.
>
> 15   As Baroness Hale of Richmond JSC pointed out in *Geys v Société Générale, London Branch* [2013] 1 AC 523, para 55, there

264

are two types of contractual implied term. The first, with which this case is concerned, is a term which is implied into a particular contract, in the light of the express terms, commercial common sense, and the facts known to both parties at the time when the contract was made. *The second type of implied terms arises because, unless such a term is expressly excluded, the law (sometimes by statute, sometimes through the common law) effectively imposes certain terms into certain classes of relationship.*" [Emphasis supplied.]

40   Mr. Collings also referred to para. 21 of the *Marks & Spencer* judgment, where Lord Neuberger suggests that a term can only be implied if, without the term, the contract would lack commercial or practical coherence. In my judgment, the amended LPA could not properly be said to lack commercial or practical coherence unless a term excluding the information is implied.

41   Quite the contrary, because what s.22 of the ELP speaks to is a default situation, that effectively, in accordance with commercial common sense, and the dimensions of the relationship between a general and limited partner, applies unless the terms of the LPA expressly or impliedly exclude it. What this means is that the statute law, the ELP, implies the rights and relationship covered under s.22 unless the amended LPA expressly or impliedly excludes such rights.

42   The fact that cl. 14.3 speaks to supply of information by the limited partner does not assist with the question of construction. This is because that clause is not addressing the matter of true and full information regarding the state of the business and financial condition of the exempted limited partnership, as does s.22 of the ELP. Clause 14.3 is aimed at the limited partner providing information to the general partner for the purpose of compliance with applicable legal or regulatory requirements or guidelines. It is therefore addressing a completely different purpose and subject matter and does not suggest express or implied exclusion of the matters dealt with at s.22 of the ELP.

43   In my judgment, upon a proper construction of the amended LPA, and having regard to commercial common sense, it is plain that the limited partner's right to demand and receive full information has neither been expressly nor impliedly excluded.

44   I am of the view that the information and matters sought in the originating summons ought to be provided to Dorsey by XiO GP and I order that this be provided by October 31st, 2018. It does seem to me that this information ought to have been provided long ago. Indeed, at the very latest period, around the time of the meeting when Mr. Pacini indicated his accord that Dorsey was entitled to the information sought. It does seem that XiO GP has acted unreasonably in that regard.

265

45    Costs are awarded to Dorsey as sought in the originating summons, to be paid by XiO GP to be taxed, if not agreed, on an indemnity basis.

*Ruling accordingly.*

Attorneys: *Mourant Ozannes* for the plaintiff; *Ogier* for the defendant; *Maples & Calder.*

———————————————————

**Exhibit A**

**Part 2**

AP1355

**CAYMAN ISLANDS**



# EXEMPTED LIMITED PARTNERSHIP ACT

### (2021 Revision)

Supplement No. 3 published with Legislation Gazette No. 9 of 29th January, 2021

.

AP1356

## PUBLISHING DETAILS

Law 5 of 2014 consolidated with Laws 10 of 2017, 31 of 2020 and as amended by Law 56 of 2020.

Revised under the authority of the *Law Revision Act (2020 Revision)*.

Originally enacted —

     Law 5 of 2014-11th April, 2014
     Law 10 of 2017-27th March, 2017
     Law 31 of 2020-1st July, 2020
     Law 56 of 2020-7th December, 2020.

Consolidated and revised this 31st day of December, 2020.



Exempted Limited Partnership Act (2021 Revision)                    Arrangement of Sections

**CAYMAN ISLANDS**



# EXEMPTED LIMITED PARTNERSHIP ACT

**(2021 Revision)**

## Arrangement of Sections

| Section | | Page |
|---|---|---|
| 1. | Short title | 5 |
| 2. | Interpretation | 5 |
| 3. | Saving of rules of equity and common law | 7 |
| 4. | Constitution | 8 |
| 5. | When licence not required | 9 |
| 6. | Name and registered office | 9 |
| 7. | Establishment | 10 |
| 8. | Registrar | 10 |
| 9. | Registration | 10 |
| 10. | Changes in registered particulars | 11 |
| 11. | Failure to file statement | 12 |
| 12. | Copies of certificates | 12 |
| 13. | Express fees | 12 |
| 14. | Modification of general law | 13 |
| 15. | Agreement may specify delegation of authority | 13 |
| 16. | Property | 13 |
| 17. | Rights, property and proceeds to vest in incoming partner | 14 |
| 18. | Transactions with the exempted limited partnership | 14 |
| 19. | General partner to act in good faith | 14 |
| 20. | Liability of limited partner | 15 |
| 21. | Accounts | 16 |
| 22. | Information regarding condition of partnership | 17 |
| 23. | Differences decided by general partner | 17 |
| 24. | Establishment, regulation of boards, committees | 18 |
| 25. | Failure to perform | 18 |



Revised as at 31st December, 2020                    AP1358  Page 3

Arrangement of Sections                                    Exempted Limited Partnership Act (2021 Revision)

26.    Agreement as to benefits .................................................................... 19
27.    Execution considered valid ................................................................. 19
28.    Power of attorney ............................................................................... 20
29.    Register of limited partnership interests............................................ 20
30.    Maintenance of records ..................................................................... 21
31.    Registration of security interests....................................................... 21
32.    Transfer of partnership interests ....................................................... 22
33.    Proceedings ....................................................................................... 24
34.    Return of contributions ...................................................................... 25
35.    Manner in which partnership may not be dissolved ........................... 25
36.    Dissolution ......................................................................................... 26
37.    Registrar may strike off register ........................................................ 29
38.    Tax undertaking ................................................................................. 30
39.    Annual return ..................................................................................... 31
40.    Re-registration ................................................................................... 31
41.    De-registration pursuant to partnership agreement .......................... 32
42.    Registration of foreign limited partnerships....................................... 32
43.    De-registration for continuation in another jurisdiction...................... 35
44.    Certificate of de-registration ............................................................. 37
45.    Notice of de-registration .................................................................... 38
46.    Certificate of good standing .............................................................. 39
47.    Electronic business ............................................................................ 39
48.    Regulations ........................................................................................ 39
49.    Recovery of penalties ........................................................................ 39
50.    *Repeal* of the Exempted Limited Partnership Law (2013 Revision) and savings ..................... 40

**ENDNOTES**                                                                                      **41**

Table of Legislation history:............................................................................. 41

Exempted Limited Partnership Act (2021 Revision)                                    Section 1

**CAYMAN ISLANDS**



# EXEMPTED LIMITED PARTNERSHIP ACT

**(2021 Revision)**

---

**Short title**

**1**.     This Act may be cited as the *Exempted Limited Partnership Act (2021 Revision)*.

**Interpretation**

**2**.     In this Act —

"**certified translator**" means a person whose interpretation or translation competence has been tested and approved by a professional association or governmental body or any other person determined by the Registrar;

"**commitment**" means cash, property, services rendered or other assets which a partner agrees to contribute to the capital of an exempted limited partnership in its capacity as partner but does not include any moneys agreed to be lent to an exempted limited partnership;

"**Companies Law**" means the *Companies Act (2021 Revision)*;

"**contribution**" means cash, property, services or other assets which a partner contributes to the capital of an exempted limited partnership in its capacity as partner but does not include any moneys lent by a partner to an exempted limited partnership;

"**court**" means the Grand Court;

"**dual foreign name**" means an additional name in any language not utilising the Roman alphabet, utilising any letters, characters, script, accents and other diacritical marks, and which does not have to be a translation or transliteration of the name in the Roman alphabet;

---



"**exempted limited partnership**" means —

(a)  a partnership formed and registered under section 9(1); or

(b)  a partnership that before the commencement of the *Exempted Limited Partnership Law, 2014 (Law 5 of 2014)* was formed and registered under the **repealed** *Exempted Limited Partnership Law (2013 Revision)*;

"**general partner**" means a person who is named as such in the statement filed pursuant to section 9 or 10(2) and if more than one shall mean each general partner, unless this Act otherwise provides;

"**general partnership interest**" means the partnership interest of a general partner in that person's capacity as such;

"**insolvency of the exempted limited partnership**" means that the general partner is unable to pay the debts and obligations of the exempted limited partnership, otherwise than in respect of liabilities to partners on account of their partnership interests, in the ordinary course of business as they fall due out of the assets of the exempted limited partnership, without recourse to the separate assets of the general partner not contributed or committed to the exempted limited partnership and "**insolvent**" shall be construed accordingly;

"**limited partner**" means a person who has become a limited partner in accordance with section 4(2) or otherwise pursuant to section 32;

"**limited partnership interest**" means the partnership interest of a limited partner in that person's capacity as such;

"**majority of limited partners**" means a majority or number of limited partners, or class or category of limited partners, or other persons, whether parties to the partnership agreement or otherwise including the general partner, required by or specified, either generally or in respect of a particular matter, in the partnership agreement and calculated in the manner specified in the partnership agreement, but if no such majority or manner is specified in the partnership agreement any required majority of the limited partners shall be a simple majority of the limited partners calculated by reference to the value of the contributions of the limited partners at the time of determination;

"**overseas company**" means a company, body corporate or corporate entity existing under the law of a jurisdiction outside of the Islands;

"**part**" means, in relation to a partnership interest, a proportionate part of that partnership interest, comprising both the rights, and the obligations under the partnership agreement and this Act but without prejudice to the liability of a general partner under section 4(2);

"**partner**" means a limited partner or a general partner;

"**partnership agreement**" means any agreement of the partners which provides for the establishment of, and regulates the affairs of, an exempted limited

partnership, the conduct of its business and the rights and obligations of the partners amongst themselves;

"**partnership interest**" means the interest of a partner in an exempted limited partnership in respect of profit, capital and voting or other rights, benefits or obligations to which that partner is entitled or subject pursuant to the partnership agreement or this Act;

"**Partnership Law**" means the *Partnership Act (2013 Revision);*

"**public in the Islands**" excludes any exempted or ordinary non-resident company registered under the *Companies Act (2021 Revision),* a foreign company registered pursuant to Part IX of the *Companies Act (2021 Revision),* a foreign limited partnership registered under section 42, any company acting as general partner of a partnership registered under section 9(1) or any director or officer of the same acting in that capacity or the trustee of any trust registered or capable of registration under section 74 of the *Trusts Act (2021 Revision)* acting in that capacity;

"**qualifying general partner**" means a general partner of an exempted limited partnership that satisfies paragraph (a), (b), (c) or (d) of section 4(4);

"**registered office provider**" means in relation to an exempted limited partnership the person who provides the registered office for that exempted limited partnership;

"**Registrar**" means the Registrar of Exempted Limited Partnerships appointed in accordance with section 8;

"**security interest**" means a legal mortgage, an equitable mortgage, charge or other form of security interest granted with respect to a partnership interest or part thereof whether or not governed by the laws of the Islands;

"**signature**" includes a facsimile of a signature however reproduced and a digital signature;

"**special economic zone business**" means any type of business authorised to be carried on in a special economic zone pursuant to any Law in force in the Islands; and

"**translated name**" means a translation or transliteration of an exempted limited partnership's dual foreign name into the English language provided by either a person licensed to provide the exempted limited partnership's registered office in the Islands or a certified translator, together with a statement as to the foreign language in which the dual foreign name is written.

**Saving of rules of equity and common law**

**3.**   The rules of equity and of common law applicable to partnerships as modified by the *Partnership Act (2013 Revision)* but excluding sections 31, 45 to 54 and 56 to 57 shall apply to an exempted limited partnership, except where they are inconsistent with the express provisions of this Act.



Section 4                                    Exempted Limited Partnership Act (2021 Revision)

**Constitution**

**4**.  (1)  An exempted limited partnership may be formed for any lawful purpose to be carried out and undertaken either in or from within the Islands or elsewhere upon the terms, with the rights and powers, and subject to the conditions, limitations, restrictions and liabilities mentioned in this Act but an exempted limited partnership shall not undertake business with the public in the Islands other than so far as may be necessary for the carrying on of the business of that exempted limited partnership exterior to the Islands.

(2)  An exempted limited partnership shall consist of one or more persons called general partners who shall, in the event that the assets of the exempted limited partnership are inadequate, be liable for all debts and obligations of the exempted limited partnership, and one or more persons called limited partners who shall not be liable for the debts or obligations of the exempted limited partnership save as provided in the partnership agreement and to the extent specified in sections 20(1) and 34(1), but a general partner, without derogation from that general partner's position as such, may, in addition, take an interest as a limited partner in the exempted limited partnership.

(3)  A body corporate, with or without limited liability, and a partnership whether in the name of the partnership and whether or not an exempted limited partnership, may be a general or limited partner of an exempted limited partnership.

(4)  Any one or more of the limited partners and general partners of an exempted limited partnership may be resident, domiciled, established, incorporated or registered under the laws of the Islands or outside of the Islands but at least one general partner shall —

(a)  if an individual, be resident in the Islands;

(b)  if a company, be registered under the *Companies Act (2021 Revision)* or registered pursuant to Part IX of the *Companies Act (2021 Revision)*;

(c)  if a partnership, be registered pursuant to section 9(1) or 42, as applicable; or

(d)  if any other person, be registered under any other Law or regulation as may be prescribed.

(5)  A limited partner, or person with analogous status, of a partnership which is the general partner of an exempted limited partnership shall not, by virtue of that fact alone, be taken to be a general partner of the exempted limited partnership.

(6)  A limited partner of an exempted limited partnership shall not cease to have the benefit of limited liability by reason only of the partnership ceasing to have a qualifying general partner.



Exempted Limited Partnership Act (2021 Revision)                    Section 5

### When licence not required

**5**.    A person who acts as a general partner of an exempted limited partnership is not, by virtue solely of so acting, required to be licensed under the *Local Companies (Control) Act (2019 Revision)* and shall not require a trust company licence under the *Banks and Trust Companies Act (2021 Revision)*, a mutual fund administrator's licence under the *Mutual Funds Act (2021 Revision)*, a licence under the *Companies Management Act (2021 Revision)* or a licence under the *Trade and Business Licensing Act (2021 Revision)*.

### Name and registered office

**6**.    (1)    Every exempted limited partnership shall have a name which —

   (a)    shall include the words "Limited Partnership" or the letters "L.P." or "LP";

   (b)    may include the name of any general partner or limited partner or any derivation thereof; and

   (c)    in the case of an exempted limited partnership carrying on special economic zone business, shall include the words "special economic zone" or the letters "SEZ",

   in each case which may be preceded by or followed with a dual or foreign name, but no exempted limited partnership shall have a name or translated name which, because it is identical or similar to the name of any other entity or it falsely suggests the patronage of or a connection with some person or authority or it suggests that the exempted limited partnership is licensed whether in the Islands or elsewhere to carry on any type or class of business when it is not in fact so licensed or because of any other reason, is calculated or likely to mislead.

   (2)    Every exempted limited partnership shall have a registered office situated in the Islands for the service of process and to which all notices and communications may be addressed.

   (3)    The registered office of an exempted limited partnership shall be the same as the address of a person licensed by the Authority under the *Banks and Trust Companies Act (2021 Revision)*, the *Companies Management Act (2021 Revision)* or the *Mutual Funds Act (2021 Revision)* except where the registered office was at a different address immediately prior to the date of commencement of this Act and remains at that address on or after the date of commencement of this Act.

   (4)    For the purpose of subsection (3) the Authority means the Cayman Islands Monetary Authority established under section 5(1) of the *Monetary Authority Act (2020 Revision)*, and includes a person acting under the Authority's authorisation.



**Establishment**

**7**.     A partnership, limited or otherwise, shall not be an exempted limited partnership unless registered as such under section 9(1).

**Registrar**

**8**.     The Registrar of Companies appointed under the *Companies Act (2021 Revision)* shall be the Registrar of Exempted Limited Partnerships.

**Registration**

**9**.     (1)     The registration of an exempted limited partnership shall be effected by payment to the Registrar of a registration fee of an amount that the Cabinet shall, from time to time, by regulation prescribe and by filing with the Registrar a statement signed, subject to section 11, by or on behalf of a general partner containing —

    (a)     the name or dual foreign name and translated name of the exempted limited partnership;

    (b)     the general nature of the business of the exempted limited partnership;

    (c)     the address in the Islands of the registered office of the exempted limited partnership;

    (d)     the term, if any, for which the exempted limited partnership is entered into or, if for unlimited duration, a statement to that effect and the date of its commencement;

    (e)     the full name and address of the general partner and, if more than one of each of them, specifying each of them as a general partner and

        (i)     in the case of a corporate general partner, there shall be filed with the statement a certificate of incorporation and a certificate of good standing (or similar documents under the laws of the jurisdiction of incorporation) or a certificate of registration and a certificate of good standing under Part IX of the *Companies Act (2021 Revision)*;

        (ii)     in the case of a general partner which is a partnership registered under this Act, there shall be filed with the statement a certificate of registration and a certificate of good standing or certified copies thereof; and

        (iii)     in the case of a general partner who is an individual there shall be filed with the statement photographic evidence of that person's identity and evidence of that person's residential address in the Islands; and

    (f)     a declaration that the exempted limited partnership shall not undertake business with the public in the Islands other than so far as may be necessary for the carrying on of the business of that exempted limited partnership exterior to the Islands.

Case 1:23-cv-00630-CFC   Document 12-6   Filed 08/23/23   Page 66 of 863 PageID #: 1433

(2) The Registrar shall maintain a record of each exempted limited partnership registered under this Act and all the statements filed in relation to the exempted limited partnership, which records and statements shall be kept open to public inspection during all usual business hours.

(3) An exempted limited partnership's dual foreign name shall only be entered on the record if its translated name conforms with the provisions of section 6(1).

(4) If the exempted limited partnership does not conform with section 6(1) then the dual foreign name and the translated name shall not be entered on the record.

(5) The Registrar shall issue a certificate of registration under the Registrar's hand and seal of office as soon as the registration of the statement pursuant to subsection (1) has been effected.

(6) A limited partner of an exempted limited partnership formed after the 15th July, 1991 shall not have the benefit of limited liability until the date indicated on the certificate referred to in subsection (5) issued by the Registrar, and a partnership registered in accordance with section 40(1) shall obtain the benefit of limited liability under this Act with effect from that date but subject to section 40(2).

(7) A certificate issued under subsection (5) shall be conclusive evidence that compliance has been made with all the requirements of this Act in respect of the formation and registration of an exempted limited partnership but subject to section 40(2).

(8) Notwithstanding subsections (1) and (5), the Registrar may refuse to accept the registration of an exempted limited partnership and refuse to issue a certificate of registration in any case where, in the Registrar's opinion, the name or translated name of the proposed exempted limited partnership is in contravention of section 6(1).

## Changes in registered particulars

**10**. (1) Without prejudice to subsection (2), if, during the continuance of an exempted limited partnership, any change is made or occurs in any matter specified in paragraphs (a) to (e) of section 9(1), a statement signed, subject to section 11, by a general partner specifying the nature of the change shall, within sixty days of the change, be filed with the Registrar.

(2) A statement signed in accordance with subsection (1) in respect of any arrangement or transaction consequent upon which any person will be removed, replaced or admitted as a general partner in any exempted limited partnership, shall, within fifteen days of the arrangement or transaction, be filed with the Registrar and, until the statement is so filed, the arrangement or transaction shall, for the purposes of this Act and the partnership agreement, not be effective to remove, replace or admit that person as a general partner of the exempt limited partnership and with respect to a replacement or admitted general partner



Section 11                                    Exempted Limited Partnership Act (2021 Revision)

the documentation required by subsection 9(1)(e)(i), (ii) or (iii) of this Act shall be provided as the case may require.

(3)  Save with the written consent of any person thereby affected, no arrangement or transaction shall take effect to the extent that it seeks to relieve or discharge a general partner from the obligations of a general partner with regard to any debt or obligation of the exempted limited partnership to a person incurred before the arrangement or transaction takes effect.

(4)  If default is made in compliance with this section, each general partner in default shall incur a penalty of two hundred dollars for each day that the default continues which penalty shall be a debt due to the Registrar and the general partner shall indemnify any person who thereby suffers any loss.

(5)  The name or translated name of an exempted limited partnership shall not be changed so as to contravene section 6(1) and the Registrar may refuse to accept a statement under subsection (1) which, in the Registrar's opinion, seeks to effect such a change.

## Failure to file statement

**11.**  If a person required by section 9(1), section 10(1) or (2) or section 36, or by the partnership agreement to execute and file a statement or notice fails to do so, any other partner, and any assignee of a partnership interest who is or may be affected by the failure or refusal may petition the court to direct a person the court sees fit to sign the statement and file the same on behalf of the person in default.

## Copies of certificates

**12**.  (1)  Any person may require a certified copy of the certificate of registration, a certificate of good standing or a copy of or extract from any registered statement filed in relation to the exempted limited partnership to be certified as a true copy by the Registrar on payment of a fee the Cabinet may by regulation prescribe.

(2)  A certificate of registration, a certificate of good standing or a copy of or extract from a registered statement filed with the Registrar issued under this Act, if certified by the Registrar to be a true copy, shall be received in evidence in all legal proceedings.

## Express fees

**13**.  (1)  The Registrar, on receipt of —

(a)  an application for registration under section 9 or section 42; or

(b)  an application for any certificate, other than a certificate under section 9(5), which the Registrar is authorised to provide under this Act,

which is accompanied by an express fee of an amount specified in subsection (2), shall complete the transaction for which the application has been made by —

Exempted Limited Partnership Act (2021 Revision)                                   Section 14

(i)   the end of the working day, where the application and all fees are received by 12 noon; or

(ii)   12 noon on the following working day, where the application and all fees are received after 12 noon.

(2)   The express fee referred to in subsection (1) is —

(a)   four hundred dollars for an application referred to in paragraph (a) of subsection (1); and

(b)   one hundred dollars for an application referred to in paragraph (b) of subsection (1).

## Modification of general law

**14**.  (1)  A limited partner shall not take part in the conduct of the business of an exempted limited partnership in its capacity as a limited partner.

(2)   All letters, contracts, deeds, instruments or documents whatsoever shall be entered into by or on behalf of the general partner (or any agent or delegate of the general partner) on behalf of the exempted limited partnership.

## Agreement may specify delegation of authority

**15**.  Where an exempted limited partnership has more than one general partner and this Act gives an authority, consent or power but not an obligation or liability, to the general partner, the partnership agreement may specify which general partner is entitled to exercise that authority, consent or power to the exclusion of any other general partner.

## Property

**16**.  (1)  Any rights or property of every description of the exempted limited partnership, including all choses in action and any right to make capital calls and receive the proceeds thereof that is conveyed to or vested in or held on behalf of any one or more of the general partners or which is conveyed into or vested in the name of the exempted limited partnership shall be held or deemed to be held by the general partner and if more than one then by the general partners jointly, upon trust as an asset of the exempted limited partnership in accordance with the terms of the partnership agreement.

(2)   Any debt or obligation incurred by a general partner in the conduct of the business of an exempted limited partnership shall be a debt or obligation of the exempted limited partnership.

(3)   The assets of an exempted limited partnership, or any class of assets, may be the subject of a floating charge, whether or not the partners of the exempted limited partnership, or any of them, are companies, overseas companies or bodies corporate.



Section 17                                          Exempted Limited Partnership Act (2021 Revision)

**Rights, property and proceeds to vest in incoming partner**

**17**.  (1)   On the admission or substitution of any general partner or general partners, in this subsection referred to as an "incoming general partner", in accordance with the terms of the partnership agreement and this Act, all rights or property of every description of the exempted limited partnership, including all choses in action and any right to make capital calls and receive the proceeds thereof, held or deemed to be held by the general partner or general partners in accordance with the foregoing subsection, in this subsection referred to as the "existing general partners", shall vest without the requirement for further formalities in the incoming general partner and any continuing existing general partners and shall be held by it or them in accordance with this Act.

   (2)   On the withdrawal of a general partner in accordance with the terms of the partnership agreement and this Act —

      (a)   all rights or property of every description of the exempted limited partnership, including all choses in action and any right to make capital calls and receive the proceeds thereof, shall vest without the requirement for further actions or formalities in the remaining general partner or general partners and shall be held by it or them in accordance with this Act; and

      (b)   subject to section 10(3), the remaining general partner or general partners shall be liable for and the property of the exempted limited partnership held by them in accordance with this Act shall be subject to all mortgages, charges or security interests and all contracts, obligations, claims, debts and liabilities of the exempted limited partnership.

**Transactions with the exempted limited partnership**

**18**.   Subject to any express or implied term of the partnership agreement to the contrary and to the duty imposed upon a general partner by section 19(1), a partner may lend money to, borrow from and transact other business with the exempted limited partnership so that an asset, debt or obligation of the exempted limited partnership shall thereby be created and with or without interest or security as the general partner shall determine, and shall have the same rights and obligations with respect thereto as a person who is not a partner, but the obligations of the exempted limited partnership to repay a debt to a general partner shall, at all times, be subordinated to the claims of secured and unsecured creditors of the exempted limited partnership.

**General partner to act in good faith**

**19**.  (1)   A general partner shall act at all times in good faith and, subject to any express provisions of the partnership agreement to the contrary, in the interests of the exempted limited partnership.

   (2)   Subject to any express provisions of the partnership agreement to the contrary, a limited partner of an exempted limited partnership in that capacity does not



Exempted Limited Partnership Act (2021 Revision)                                    Section 20

owe any fiduciary duty in exercising any of its rights or authorities or otherwise in performing any of its obligations under the partnership agreement to the exempted limited partnership or any other partner.

### Liability of limited partner

**20**.  (1)  If a limited partner takes part in the conduct of the business of an exempted limited partnership in its dealings with persons who are not partners, that limited partner shall be liable, in the event of the insolvency of the exempted limited partnership, for all debts and obligations of that exempted limited partnership incurred during the period that that limited partner participates in the conduct of the business as though that limited partner were, for that period, a general partner, but that limited partner shall be liable only to a person who transacts business with the exempted limited partnership during the period with actual knowledge of that limited partner's participation and who then reasonably believed the limited partner to be a general partner.

(2)  A limited partner does not take part in the conduct of the business of an exempted limited partnership within the meaning of this section by —

(a)  holding an office or interest in, or having a contractual relationship with, a general partner or being a contractor for or an agent or employee of the exempted limited partnership or of a general partner or acting as a director, officer or shareholder of a corporate general partner;

(b)  consulting with and advising a general partner or consenting or withholding consent to any action proposed, in the manner contemplated by the partnership agreement, with respect to the business of the exempted limited partnership;

(c)  investigating, reviewing, approving or being advised as to the accounts or business affairs of the exempted limited partnership or exercising any right conferred by this Act;

(d)  acting as surety or guarantor for the exempted limited partnership either generally or in respect of specific obligations;

(e)  approving or disapproving an amendment to the partnership agreement;

(f)  calling, requesting, attending or participating in any meeting of the partners;

(g)  taking any action that results in the winding up or the dissolution of the exempted limited partnership;

(h)  taking any action required or permitted by the partnership agreement or by law to bring, pursue, settle or terminate any action or proceedings brought pursuant to section 33(2);

(i)  appointing a person to serve on any board or committee of the exempted limited partnership, a general partner or a limited partner or removing a person therefrom;



(j)   serving on any board or committee of the exempted limited partnership, a general partner, the limited partners or the partners, or by appointing, electing or otherwise participating in the choice of a representative or any other person to serve on any board or committee, or by acting as a member of any board or committee either directly or by or through any representative or other person, including giving advice or consenting, or refusing to consent, to any action proposed by the general partner on behalf of the exempted limited partnership and exercising any powers or authorities or performing any obligations as a member of that board or committee in the manner contemplated by the partnership agreement;

(k)   serving on the board of directors or a committee of, consulting with or advising or being an officer, director, shareholder, partner, member, manager, trustee, agent or employee of, or by being a fiduciary or contractor for, any person in which the exempted limited partnership has an interest or any person providing management, consultation, custody or other services or other products for, to or on behalf of, or otherwise having a business or other relationship with, the exempted limited partnership or a general partner of the exempted limited partnership; or

(l)   voting as a limited partner on —

(i)    the winding up and dissolution of the exempted limited partnership;

(ii)   the purchase, sale, exchange, lease, mortgage, pledge or other acquisition or transfer of any asset by or of the exempted limited partnership;

(iii)  the incurrence or renewal of indebtedness by the exempted limited partnership;

(iv)  a change in the nature of the business of the exempted limited partnership;

(v)   the admission, removal or withdrawal of a general or limited partner and the continuation of business of the exempted limited partnership thereafter; or

(vi)  transactions in which one or more of the general partners have an actual or potential conflict of interest with one or more of the limited partners.

(3)   Subsection (2) shall not import any implication that the possession or exercise of any other power by a limited partner will necessarily constitute the taking part by that limited partner in the business of the exempted limited partnership.

## Accounts

**21**.  (1)   A general partner shall keep or cause to be kept proper books of account including, where applicable, material underlying documentation including contracts and invoices, with respect to —

Exempted Limited Partnership Act (2021 Revision)                         Section 22

    (a)   all sums of money received and expended by the exempted limited partnership and matters in respect of which the receipt of expenditure takes place;

    (b)   all sales and purchases of goods by the exempted limited partnership; and

    (c)   the assets and liabilities of the exempted limited partnership.

(2)   For the purposes of subsection (1), proper books of account shall not be deemed to be kept if there are not kept such books as are necessary to give a true and fair view of the business and financial condition of the exempted limited partnership and to explain its transactions.

(3)   Where the general partner keeps the books of account described in subsection (1) at any place other than at the registered office of the exempted limited partnership or at any other place within the Islands, the general partner shall, upon service of an order or notice by the Tax Information Authority pursuant to the *Tax Information Authority Act (2021 Revision)*, make available, in electronic form or any other medium, at its registered office copies of its books of account, or any part or parts thereof, as are specified in the order or notice.

(4)   A general partner shall cause all books of account required to be kept under subsection (1) to be retained for a minimum period of five years from the date on which they are prepared.

(5)   A person who, being a general partner, knowingly and wilfully contravenes subsection (1) or (4) shall be subject to a penalty of five thousand dollars.

(6)   A person who, being a general partner, defaults in complying with an order or notice under subsection (3) without reasonable excuse, shall incur a penalty of five thousand dollars and a further penalty of one hundred dollars for every day during which the non-compliance continues.

### Information regarding condition of partnership

**22**.   Subject to any express or implied term of the partnership agreement, each limited partner may demand and shall receive from a general partner true and full information regarding the state of the business and financial condition of the exempted limited partnership.

### Differences decided by general partner

**23**.   Any difference arising as to matters connected with the business of the exempted limited partnership shall be decided by the general partner, and, if more than one, by a majority of the general partners as is provided in the partnership agreement.



Section 24                                    Exempted Limited Partnership Act (2021 Revision)

**Establishment, regulation of boards, committees**

**24**. (1)   Where a partnership agreement contains provisions for the establishment and regulation of any boards or committees of an exempted limited partnership, its partners or any class or category of those partners, or representatives of any of the partners, including —

   (a)   the establishment and constitution of boards or committees;

   (b)   the manner and terms of appointment and removal of the members of boards or committees;

   (c)   the powers, rights, authorities, obligations and duties of the members of boards or committees;

   (d)   the regulation of the proceedings of boards or committees; and

   (e)   the rights of the members and former members of boards or committees to exculpation or to be indemnified out of the assets of the exempted limited partnership,

   then, subject to the express provisions of the partnership agreement, any person duly appointed to be a member of any board or committee in accordance with those provisions shall be deemed to have notice of and shall have the benefit of those provisions which shall not be unenforceable by any person in that person's own right by reason only that the person is not a party to the partnership agreement.

   (2)   Subject to any express provisions of the partnership agreement to the contrary, a member of any board or committee referred to in subsection (1) does not owe any fiduciary duty in exercising any of its rights or authorities, or otherwise in performing any of its obligations, as a member of the board or committee to the exempted limited partnership or any partner.

**Failure to perform**

**25**. (1)   If a partnership agreement provides that where a partner fails to perform any of its obligations under, or otherwise breaches the provisions of, the partnership agreement that partner may be subject to or suffer remedies for, or consequences of, the failure or breach specified in the partnership agreement or otherwise applicable under any law then those remedies or consequences shall not be unenforceable solely on the basis that they are penal in nature.

   (2)   The remedies or consequences under subsection (1) may include but are not limited to any one or more of the following —

   (a)   reducing, eliminating or forfeiting the defaulting partner's partnership interest in the exempted limited partnership or any rights of the defaulting partner under the partnership agreement;

   (b)   subordinating the defaulting partner's partnership interest to the interests of non-defaulting partners;

    (c)    effecting a forced sale or forfeiture of the defaulting partner's partnership interest;

    (d)    arranging for the lending by other partners or other persons to the defaulting partner of the amount necessary to meet the defaulting partner's commitment;

    (e)    providing for the fixing of the value of the defaulting partner's partnership interest by appraisal or by formula and the redemption or sale of the defaulting partner's partnership interest at that value; or

    (f)    exercising any other remedy or consequence specified in the partnership agreement or available under any applicable laws.

(3) Subject to the general partner's duty under section 19(1), a general partner shall not be liable for its decision to impose or for imposing any remedies or consequences upon any partner, or for its decision not to do so and references in this subsection to a partnership interest shall for the avoidance of doubt also be construed as including any part thereof.

### Agreement as to benefits

**26**. A person who has executed the partnership agreement of an exempted limited partnership or who is named or otherwise identified, including as a class, in the partnership agreement shall not be deemed to be or otherwise construed as a partner of the exempted limited partnership if —

    (a)    that person has executed the partnership agreement solely in order to take the benefit of a provision of, or assume an obligation under, the partnership agreement otherwise than as a partner; or

    (b)    where, on a proper construction of the partnership agreement, the parties did not intend the person to be a partner of the exempted limited partnership.

### Execution considered valid

**27**. (1) Any partnership agreement, any agreement pursuant to which any person agrees to make any commitment or contribution to an exempted limited partnership as a partner and any agreement, contract, deed, instrument including any instrument under seal or document entered into by or on behalf of the general partner for itself in the case of the partnership agreement or otherwise on behalf of the exempted limited partnership is executed validly by the parties thereto where it is executed in any manner contemplated by the parties thereto, including, without limitation —

    (a)    where the complete agreement, contract, deed, instrument or document is executed; or

    (b)    where any signature or execution page to the agreement, contract, deed, instrument or document is executed, whether or not the agreement,



contract, deed, instrument or document is at the time in its final form, and which is attached by, or on behalf of, the relevant party to, or otherwise with the relevant party's express or implied authority to, the agreement, contract, deed, instrument or document,

if the agreement, contract, deed, instrument or document is executed in conformity with this Act or any other Law of the Islands applicable to execution of the agreement, contract, deed, instrument or document.

(2)  Subsection (1) shall apply to agreements, contracts, deeds, instruments including instruments under seal or other documents regardless of whether they were made before, on or after the commencement of this subsection and no agreement, contract, deed, instrument, including instruments under seal, or other document made before the commencement of this subsection shall be invalid if it satisfies the requirements of subsection (1).

## Power of attorney

**28**.  (1)  For the purposes of the *Powers of Attorney Act (1996 Revision)* and section 8 of the *Property (Miscellaneous Provisions) Act (2017 Revision)* where a partnership agreement purports to create or grant a power of attorney, including an irrevocable power of attorney, that power shall be deemed validly to have been executed as a deed and if required duly witnessed on execution of the partnership agreement by or on behalf of the donor of the power or on adherence thereto by the donor of the power pursuant to section 32 without demonstration or satisfaction of any further formalities regarding its execution.

(2)  Subsection (1) applies equally to every partnership agreement entered into prior to as well as after the commencement of this Act.

## Register of limited partnership interests

**29**.  (1)  Subject to subsection (2) the general partner shall maintain or cause to be maintained in the country or territory that the general partner may determine a register of limited partners which shall contain the name and address of each person who is a limited partner of the exempted limited partnership, the date on which a person became a limited partner and the date on which a person ceased to be a limited partner, and the register shall be updated within twenty-one days of the date of any change in the particulars therein.

(2)  The general partner shall maintain or cause to be maintained at the registered office of the exempted limited partnership a record of the address at which the register of limited partners is maintained, which record shall be updated within twenty-one days of the date of any change in the particulars therein.

(3)  The register of limited partners and the record of the address at which the register of limited partners is maintained shall be open to inspection during all usual business hours in the place where the register or record is maintained by —

Exempted Limited Partnership Act (2021 Revision)                                    Section 30

(a)    subject to any express or implied term of the partnership agreement, all partners; and

(b)    any other person with the consent of the general partner.

(4)    The register of limited partners shall be *prima facie* evidence of the matters which are directed by this Act to be inserted therein.

(5)    Where the register of limited partners is kept at a place other than the registered office of the exempted limited partnership, the general partner shall make available at the registered office, in electronic form or any other medium, the register of limited partners upon service of an order or notice by the Tax Information Authority pursuant to the *Tax Information Authority Act* (*2021 Revision*).

(6)    A person who, being a general partner, defaults in complying with subsection (1) or (2), commits an offence and is liable on summary conviction to a fine of ten thousand dollars for each day that the default continues and shall indemnify any person who thereby suffers any loss.

(7)    A person who, being a general partner, defaults in complying with an order or notice under subsection (5) without reasonable excuse, shall incur a penalty of five hundred dollars and a further penalty of one hundred dollars for every day during which that non-compliance continues.

### Maintenance of records

**30**.  (1)    The general partner shall maintain or cause to be maintained in any country or territory that the general partner may determine, a record of the amount and date of the contribution or contributions of each limited partner and the amount and date of any payment representing a return of the whole or any part of the contribution of any limited partner, which record shall be updated within twenty-one days of the date of any change in the particulars therein.

(2)    Subsections (4), (5), (6) and (7) of section 29 shall apply to the records required to be maintained pursuant to this section.

(3)    The records maintained pursuant to this section shall be open to inspection during all usual business hours in the place where the records are maintained by any person with the consent of the general partner.

### Registration of security interests

**31**.  (1)    The general partner shall maintain or cause to be maintained at the registered office, a register of security interests in which shall be registered each security interest in relation to which a valid notice has been served in accordance with section 32(9).

(2)    The register of security interests under subsection (1) shall contain the identity of the grantor and grantee, the partnership interest or part thereof subject to the



security interest and the date on which notice of the security interest was validly served in accordance with section 32(9).

(3) The register described in subsection (1) may be inspected by any person during all usual business hours.

(4) Any security interest over the whole or any part of a limited partnership interest shall have priority according to the time that the written notice is validly served at the registered office of the exempted limited partnership in accordance with section 32(9).

(5) If default is made by a general partner in the maintenance of the register described in subsection (1), each general partner in default shall incur a penalty of twenty-five dollars for each day that the default continues.

**Transfer of partnership interests**

**32.** (1) A partnership interest is transferable in whole or in part in accordance with the provisions of the partnership agreement and this section.

(2) Subject to the partnership agreement, a person may become a partner of an exempted limited partnership either by executing and delivering the partnership agreement or any supplement thereto or counterpart thereof together with the general partner, by acceding to the partnership agreement in accordance with its terms or upon the transfer of all or part of a partnership interest in accordance with this section, each of which is for this section referred to as an "admission", and in each case without the consent of the limited partners.

(3) Where the requirements for or conditions to an admission contained in the partnership agreement have been complied with in accordance with their terms or, to the extent permitted by the partnership agreement, waived, any person, however admitted, shall without the requirement for any further actions or formalities, be deemed to have adhered to and agreed to be bound by the terms and conditions of the partnership agreement and shall have the rights and be subject to the obligations contained in the partnership agreement and this Act as if the person and all existing partners had together duly executed and delivered the partnership agreement.

(4) The provisions of subsection (3) shall apply to every transfer or purported transfer of a partnership interest in whole or in part and each admission of a person as a partner of an exempted limited partnership prior to, as well as after, the commencement of this Act.

(5) Section 6 of the *Property (Miscellaneous Provisions) Act (2017 Revision)* shall not apply to partnership interests.

(6) Subject to the partnership agreement, no limited partner may —

(a) transfer; or

(b) grant any security interest in,

 

Exempted Limited Partnership Act (2021 Revision)                    Section 32

the whole or any part of that person's limited partnership interest except with the written consent of the general partner given prior to, or simultaneously with, the transfer or grant.

(7)   Subject to the partnership agreement and this Act, a general partner may transfer or grant a security interest in the whole or any part of that person's general partnership interest with the written consent of any other general partner given prior to, or simultaneously with, the transfer or grant.

(8)   Subject to the partnership agreement —

(a)   the transferee of a general partnership interest or part thereof shall be admitted as a general partner in place of and subject to section 10(2) to the exclusion of, or in addition to, as the case may be, the transferor in respect of the general partnership interest or part thereof transferred but —

(i)    the transferee shall not be liable for any obligation of the exempted limited partnership incurred before the transferee is so admitted unless otherwise agreed in writing by the transferor and the transferee; and

(ii)   the transferor shall remain liable for any obligation of the exempted limited partnership incurred before the transferor ceased to be a general partner unless otherwise agreed in writing by the transferor, the transferee and the person to whom the obligation is owed; and

(b)   the transferee of a limited partnership interest or part thereof shall be admitted as a limited partner, wholly or partly, as the case may be, in place of and to the exclusion of the transferor in respect of the limited partnership interest or part thereof transferred but, unless otherwise agreed in writing by the transferor, the transferee and the general partner, the transferee shall not assume any liability of the transferor pursuant to section 20(1) or section 34(1) and no transfer shall relieve the transferor of any liability under those subsections.

(9)   Written notice of the grant of a security interest over the whole or any part of a limited partnership interest shall be given by the grantor or the grantee to the exempted limited partnership at its registered office.

(10)  A notice under subsection (9) is not validly given unless it specifies the agreement pursuant to which the security interest is granted including the date thereof and the parties thereto, the identity of the grantor and grantee of the security interest, and the partnership interest or part thereof that is subject to that security interest.

(11)  Nothing in this section shall prevent a partner from assigning or otherwise disposing of, whether absolutely or by way of security in any manner permitted by law, any right, debt or other chose in action arising under a partnership agreement but no assignment or other disposition may, subject to the partnership agreement, be made without the consent of the general partner or, in the case of



an assignment or disposition by a general partner, the consent of any other general partner given prior to, or simultaneously with, the assignment or disposition.

(12) A partnership agreement may provide that, as against any other partner, any assignment or other disposition by a partner of any right, debt or chose in action arising under a partnership agreement shall confer economic rights only and for the purposes of this section "**economic rights**" are —

    (a) any rights to make and enforce capital calls, to receive the proceeds thereof and to enforce payment of, and receive any sums payable to the partner including the rights on the winding up and dissolution of the exempted limited partnership;

    (b) the right to receive a share of profits of the exempted limited partnership or a share of the property on its winding up and dissolution;

    (c) the right to an account for the purpose of ascertaining the amount or share of any of the foregoing; and

    (d) any other rights that are expressly stated in the partnership agreement to be assignable.

(13) Any consent of a general partner required by this section may, subject to any express provision of the partnership agreement to the contrary, be withheld in the general partner's sole discretion.

(14) Any notice of any assignment or other disposition referred to in subsection (11) that may be required or permitted to be given to any one or more of the other general partners of an exempted limited partnership shall, notwithstanding any other rule of law or equity, be deemed to have been so given if given to the exempted limited partnership.

**Proceedings**

**33**. (1) Subject to subsection (3), legal proceedings by or against an exempted limited partnership may be instituted by or against any one or more of the general partners only, and a limited partner shall not be a party to or named in the proceedings.

(2) If the court considers it just and equitable any person or a general partner shall have the right to join in or otherwise institute proceedings against any one or more of the limited partners who may be liable under section 20(1) or to enforce the return of the contribution, if any, required by section 34(1).

(3) A limited partner may bring an action on behalf of an exempted limited partnership if any one or more of the general partners with authority to do so have, without cause, failed or refused to institute proceedings.

(4) If any action taken pursuant to subsection (3) is successful, in whole or in part, as a result of a judgment, compromise or settlement of any action, the court may

Exempted Limited Partnership Act (2021 Revision)                              Section 34

award any limited partner bringing any action reasonable expenses, including attorney's fees, from any recovery in any action or from an exempted limited partnership.

## Return of contributions

**34**. (1) If a limited partner receives a payment representing a return of any part of that person's contribution or is released from any outstanding obligation in respect of that person's commitment and at the time that the payment was made or the release effected —

(a) the exempted limited partnership is insolvent including where the payment or release causes the insolvency; and

(b) the limited partner has actual knowledge of the insolvency of the exempted limited partnership,

then for a period of six months commencing on the date of that payment or release but not thereafter, the limited partner shall be liable to the exempted limited partnership for the amount of the payment or the due performance of the released obligation in respect of that person's commitment in each case to the extent that the repayment or performance of the released obligation is necessary to discharge a debt or obligation of the exempted limited partnership incurred during the period that the contribution or commitment represented an asset of the exempted limited partnership.

(2) Any amount required to be repaid pursuant to this section shall, unless the partnership agreement specifies otherwise, bear simple interest at the rate of ten per cent per annum, calculated on a daily basis.

(3) The partnership agreement may specify —

(a) that no interest shall apply;

(b) that a different rate of interest, including a compound rate shall apply; or

(c) a different basis for calculating interest payable.

## Manner in which partnership may not be dissolved

**35**. Subject to any express or implied term of the partnership agreement to the contrary —

(a) an exempted limited partnership shall not be dissolved nor the partnership agreement terminated by —

(i) changes in, additions to or substitutions of any one or more of the partners;

(ii) the transfer of the whole or part of the partnership interest of a limited partner;

(iii) the death, bankruptcy, dissolution, removal, withdrawal or winding up of a limited partner or a limited partner's withdrawal or



redemption of, or repurchase by the partnership of, any limited partnership interest;

(iv)  the incapacity of a limited partner;

(v)  any one or more of the limited partners granting a mortgage, charge or other form of security interest over the whole or part of that peson's partnership interest;

(vi)  the sale, exchange, lease, mortgage, pledge or other transfer of any of the assets of the exempted limited partnership; or

(vii)  a de-registration of the exempted limited partnership pursuant to section 41 or 43; and

(b)  a limited partner shall not be entitled to wind up and dissolve the partnership by notice.

**Dissolution**

**36**.  (1)  An exempted limited partnership shall be voluntarily wound up in accordance with the provisions of the partnership agreement —

(a)  at the time or upon the occurrence of any event specified in the partnership agreement; or

(b)  unless otherwise specified in the partnership agreement, upon the passing of a resolution of all the general partners and a two-thirds majority of limited partners.

(2)  Upon the completion of the winding up of an exempted limited partnership, the general partner or other person appointed as liquidator in accordance with the provisions of subsection (12) shall file a notice of dissolution with the Registrar and subject to section 37, an exempted limited partnership shall not be dissolved by an act of the partners or otherwise until a notice of dissolution signed by a general partner or liquidator has been filed with the Registrar.

(3)  Except to the extent that the provisions are not consistent with this Act, and in the event of any inconsistencies, this Act shall prevail, and subject to any express provisions of this Act to the contrary, the provisions of Part V of the *Companies Act (2021 Revision)* and the *Companies Winding Up Rules, 2018* shall apply to the winding up of an exempted limited partnership and for this purpose —

(a)  references in Part V to a company shall include references to an exempted limited partnership;

(b)  the limited partners shall be treated as if they were shareholders of a company and references to contributories in Part V shall be construed accordingly, except that the application of the provisions shall not cause a limited partner to be subject to any greater liability than that limited partner

Exempted Limited Partnership Act (2021 Revision)                                    Section 36

would otherwise bear under this Act, but for the application of this paragraph;

(c)   references in Part V to a director or officer of a company shall include references to the general partner of an exempted limited partnership;

(d)   except for sections 123, excluding subsection (1)(b) and (c), 129, 140, 145, and 147 of the *Companies Act (2021 Revision),* Part V shall not apply to a voluntary dissolution and winding up under subsection (1);

(e)   in the case of a voluntary winding-up of an exempted limited partnership under subsection (1) where the partnership was registered under section 9 prior to 11th May 2009, the necessary time period for compliance with the requirements of section 123 (1) of the *Companies Act (2021 Revision)* shall be at least twenty-eight days prior to the final distribution of the assets of the exempted limited partnership to partners rather than within twenty-eight days of the commencement of its voluntary winding-up;

(f)   the Insolvency Rules Committee established pursuant to the *Companies Act (2021 Revision)* shall have the power to make rules and prescribe forms for the purpose of giving effect to this section or its interpretation; and

(g)   on application by a partner, creditor or liquidator, the court may make orders and give directions for the winding up and dissolution of an exempted limited partnership as may be just and equitable.

(4)   Notwithstanding that any order or direction has been made pursuant to subsection (3)(g) or that the winding up of an exempted limited partnership has commenced, a creditor who has security over the whole or part of the assets of the exempted limited partnership is entitled to enforce that person's security without the leave of the court and without reference to the general partner or any liquidator appointed to wind up the exempted limited partnership.

(5)   Where a liquidator sells assets on behalf of a secured creditor of an exempted limited partnership, the liquidator is entitled to deduct from the proceeds of sale a reasonable sum by way of remuneration.

(6)   Where an exempted limited partnership is being wound up and a liquidator is appointed, the Registrar shall within 28 days of the appointment be notified of the name and business address of the liquidator.

(7)   The general partner or its legal representative shall promptly serve notice on all limited partners informing the limited partners of —

(a)   the death;

(b)   the commencement of liquidation, bankruptcy or dissolution proceedings; or

(c)   the withdrawal, removal or making of a winding up or dissolution order,

in relation to the sole or last remaining qualifying general partner and in this section each event is referred to an "event of withdrawal".



(8)   If default is made in compliance with this section, each general partner or its legal representative, in default shall incur a penalty of twenty-five dollars for each day that the default continues, which penalty shall be a debt due to the Registrar.

(9)   Unless the partnership agreement provides otherwise, if a new qualifying general partner is not elected within ninety days after the service of notice of an event of withdrawal in accordance with subsection (7), in this section referred to as "the automatic wind up date", the exempted limited partnership shall be wound up in accordance with the partnership agreement or the orders or directions the court may make or give in accordance with subsection (3)(g).

(10) The winding up of an exempted limited partnership shall be deemed to commence upon the earlier to occur of any of the following —

(a)   the passing of a resolution for winding up;

(b)   subject to subsection (9), the automatic wind up date;

(c)   the expiry of the period fixed for the duration of the exempted limited partnership by the partnership agreement;

(d)   the occurrence of an event provided by the partnership agreement upon which the exempted limited partnership is to be wound up; or

(e)   where a winding up order has been made, the presentation of the petition for winding up.

(11) In the event that an exempted limited partnership is required to be wound up in accordance with the provisions of subsection (9) then the date of commencement of winding up shall be the date falling ninety days after the service of notice of an event of withdrawal.

(12) If a majority of limited partners specified in the partnership agreement as being entitled to vote to elect a new general partner in accordance with the terms of the partnership agreement elects one or more new qualifying general partners by the automatic winding up date —

(a)   the exempted limited partnership shall not be required to be wound up and dissolved; and

(b)   the business of the exempted limited partnership may be resumed and continued as provided for in the partnership agreement or any subsequent agreement.

(13) Following the commencement of the winding up of an exempted limited partnership its affairs shall be wound up by the general partner or other person appointed pursuant to the partnership agreement unless the court otherwise orders on the application of any partner, creditor or liquidator of the exempted limited partnership pursuant to subsection (3)(g).



### Registrar may strike off register

**37**. (1)   Where the Registrar has reasonable cause to believe that an exempted limited partnership is not carrying on business or is not in operation, the Registrar may strike the exempted limited partnership off the register and the exempted limited partnership shall thereupon be dissolved.

(2)   A request on behalf of the general partner to strike the exempted limited partnership off the register shall be accompanied by a fee in the amount prescribed by the Cabinet by regulation.

(3)   Where an exempted limited partnership is being wound up, and the Registrar has reasonable cause to believe either that no liquidator is acting, or that the affairs of the exempted limited partnership are fully wound up, the Registrar may strike the exempted limited partnership off the register and the exempted limited partnership shall thereupon be dissolved without the need for a notice of dissolution to be filed pursuant to section 36(2).

(4)   The Registrar shall immediately publish a notice in the Gazette to the effect that the exempted limited partnership in question has been struck off the register, the date on which it has been struck off and the reason therefor.

(5)   A general partner, limited partner or creditor who objects to an exempted limited partnership being struck off the register pursuant to this section, on the grounds that the exempted limited partnership was at the time it was struck off the register carrying on business, in operation or otherwise, may make an application to the court for the name of the exempted limited partnership to be restored to the register.

(6)   An application under subsection (5) shall be made —

    (a)   within two years of the date upon which the name of the exempted limited partnership was struck off the register; or

    (b)   within a period that the Cabinet may by order allow but which shall not exceed ten years of the date upon which the name of the exempted limited partnership was struck off the register.

(7)   The court, if satisfied that the exempted limited partnership was, at the time that it was struck off the register, carrying on business, in operation or otherwise, may order that the name of the exempted limited partnership be restored to the register upon —

    (a)   payment by the applicant of a reinstatement fee;

    (b)   payment by the applicant of any other accrued outstanding fees; and

    (c)   any other terms and conditions which the court considers just.

(8)   The reinstatement fee referred to in subsection (7) shall be the same as the fee paid by the exempted limited partnership upon initial registration.



(9) Where an order is made under subsection (7) the exempted limited partnership is deemed to have continued in existence as if it had not been struck off.

(10) The court may, in addition or subsequent to, an order made under subsection (7), by order give directions and make provision for, as far as possible, placing the exempted limited partnership and all other persons affected from the name of the exempted limited partnership being struck off the register, in the same position as if the name of the exempted limited partnership had not been struck off the register.

(11) The striking off the register of any exempted limited partnership under this Act shall not affect the liability, if any, of any general partner or limited partner of the exempted limited partnership, and the liability shall continue and may be enforced as if the exempted limited partnership had at all times continued to be in existence.

(12) An act performed or thing done by the Registrar under this section shall not attract any liability.

**Tax undertaking**

**38**. (1) The Financial Secretary may, on application by a general partner, give an undertaking in respect of any exempted limited partnership that a law which is hereafter enacted in the Islands imposing any tax to be levied on profits or income or gains or appreciations shall not apply to the exempted limited partnership or to any partner thereof in respect of the operations or assets of the exempted limited partnership or the partnership interest of a partner therein.

(2) Any undertaking given under subsection (1) may provide, in addition, that the aforesaid taxes and any tax in the nature of estate duty or inheritance tax shall not be payable in respect of the obligations of the exempted limited partnership or the interests of the partners therein.

(3) Any undertaking as aforesaid may be for a period not exceeding fifty years from the date of the approval of the application and may be in the form determined by the Financial Secretary.

(4) The Financial Secretary shall prepare and present to the Cabinet, a report of all applications made and granted pursuant to this section on a monthly basis.

(5) The first report due to be prepared pursuant to subsection (4) shall be presented to the Cabinet on the date specified by the Cabinet by Order.



Exempted Limited Partnership Act (2021 Revision)                                    Section 39

### Annual return

**39**. (1)  An exempted limited partnership shall, in January in every year, file with the Registrar a return signed by or on behalf of a general partner certifying that the exempted limited partnership has, during the prior calendar year, complied with section 10(1) and that there has been no breach of the declaration given in accordance with paragraph (f) of section 9(1) and pay to the Registrar an annual fee of the amount that the Cabinet shall, from time to time, by regulation prescribe.

(2)  The annual fee payable and the return due to be filed under subsection (1) shall be tendered at the same time.

(3)  An exempted limited partnership which fails to comply with subsection (1) shall —

    (a)  where the annual fee is paid or the return is filed between 1st April and 30th June, incur a penalty of 33.33% of the annual fee;

    (b)  where the annual fee and penalties are paid or the return is filed between 1st July and 30th September, incur a penalty 66.67% of the annual fee; and

    (c)  where the annual fee and penalties are paid or the return is filed between 1st October and 31st December, incur a penalty 100% of the annual fee.

(4)  A penalty specified in subsection (3) shall be a debt due to the Registrar.

### Re-registration

**40**. (1)  Any partnership registered under the *Limited Partnership Law (Revised)* prior to its **repeal** or sections 45 to 54 and 56 to 57 of the *Partnership Act (2013 Revision)* or any Law amending or replacing the same shall not be affected by this Act but shall continue to be governed by that law.

(2)  A partnership described in subsection (1) and any partnership established under the laws of a jurisdiction other than the Islands, in this section referred to as a "registered partnership", may, at any time, upon —

    (a)  effecting the amendments to the partnership agreement as shall be necessary to comply with this Act, if any;

    (b)  paying a fee of the amount that the Cabinet may by regulation prescribe; and

    (c)  filing the statement required by section 9(1),

be registered under this Act and, with effect from the date indicated on the certificate of registration issued by the Registrar pursuant to section 9(5), shall be governed exclusively thereafter as an exempted limited partnership in accordance with this Act.

(3)  With effect from the date indicated on the certificate of registration described in subsection (2), the exempted limited partnership and the partnership interests of



the parties therein and their rights and liabilities, as against any person who is not a partner, shall cease to be governed by the **repealed** *Limited Partnership Law (Revised)*, or sections 45 to 54 and 56 to 57 of the *Partnership Act (2013 Revision)* or the laws of any other jurisdiction, as the case may be, save in respect of any act or omission occurring before that date which shall continue to be governed by the law of the other jurisdiction.

(4) Without prejudice to the foregoing generality such registration shall not operate to —

(a) create a new legal entity;

(b) affect the property previously acquired by or on behalf of the exempted limited partnership;

(c) affect any act or thing done prior to registration or the rights, powers, authorities, functions or obligations of the exempted limited partnership, any partner or any other person prior thereto; or

(d) render defective any legal proceedings by or against the exempted limited partnership or any partner or any other person,

and any legal proceedings that could have been continued or commenced by or against the exempted limited partnership or any partner or any other person before its registration hereunder may, notwithstanding registration, be continued or commenced after registration and in respect of which the law of the other jurisdiction shall be of application.

(5) With effect from the date indicated on the certificate of registration described in subsection (2), all property of every description, including all choses in action and any right to make capital calls of the registrant partnership shall be the property of the exempted limited partnership to be held in accordance with section 16(1).

**De-registration pursuant to partnership agreement**

**41**. A general partner of an exempted limited partnership may at any time terminate the registration of an applicant partnership as an exempted limited partnership, if termination of registration is permitted under the terms of the partnership agreement, by filing a written notice of termination of registration with the Registrar together with written confirmation that the action is authorised by the partnership agreement.

**Registration of foreign limited partnerships**

**42**. (1) In this section —

"**foreign limited partnership**" means a limited partnership or limited liability partnership established in a recognised jurisdiction outside the Islands.

"**recognised jurisdiction**" is one that is prescribed as such by the Cabinet in regulations made under this Act; and

Exempted Limited Partnership Act (2021 Revision)                                    Section 42

"**relevant authority**" means the national, state or local government authority, registry or other body in the recognised jurisdiction that is responsible for forming or establishing the foreign limited partnership.

(2)   Subject to subsection (3), a foreign limited partnership may apply to be registered pursuant to this section in order to act as the general partner of an exempted limited partnership.

(3)   A foreign limited partnership may be registered by the Registrar upon payment to the Registrar of a registration fee of the amount the Cabinet by regulation, prescribes and by filing with the Registrar certified copies of —

(a)   its certificate of formation in its jurisdiction of establishment or the equivalent document issued by the relevant authority as evidence of its formation; and

(b)   a certificate of good standing issued by the relevant authority.

(4)   If the certificate of good standing required under subsection (3)(b) is unavailable from the relevant authority, then the foreign limited partnership is required to file with the Registrar, a declaration signed by a person authorised to act on behalf of the foreign limited partnership stating that the foreign limited partnership is in good standing with the relevant authority.

(5)   Neither certificate of good standing under subsection (3)(b) nor the declaration under subsection (4) shall be dated earlier than one month prior to the date of its delivery to the Registrar, and shall be accompanied by a statement signed by or on behalf of the foreign limited partnership specifying —

(a)   the name, dual foreign name and the translated name, if applicable, of the foreign limited partnership;

(b)   the jurisdiction in which it is established;

(c)   whether the foreign limited partnership is deemed to be a separate legal person under the laws of the jurisdiction in which it is established and, if so, the full name and address of any managing member or other person, if not identified in paragraph (f), who immediately controls or directs the affairs of the foreign limited partnership;

(d)   the address of its registered office in its jurisdiction of formation or establishment;

(e)   the names and addresses of some one or more than one person resident in the Islands authorised to accept on its behalf service of process and any notices required to be served on it; and

(f)   the full name and address of any general partners of the foreign limited partnership, if applicable.

(6)   A foreign limited partnership shall, in January of each year, pay to the revenues of the Islands an annual fee in the amount and in the manner the Cabinet by regulation, prescribes.



(7) A foreign limited partnership that defaults in paying the annual fee specified in subsection (6) shall incur a penalty of —

    (a) 33.33% of the annual fee specified in subsection (6) if the fee and penalty are paid between the 1st April and the 30th June;

    (b) 66.67% of the annual fee specified in subsection (6) if the fee and penalty are paid between the 1st July and the 30th September; and

    (c) 100% of the annual fee specified in subsection (6) if the fee and penalty are paid between the 1st October and the 31st December.

(8) A penalty specified in subsection (7) is a debt due to the Registrar.

(9) Upon compliance with subsections (3), (4) and (5) the Registrar shall issue a certificate of registration under the Registrar's hand and seal of office to the foreign limited partnership.

(10) A certificate of registration of a foreign limited partnership issued under subsection (9) is conclusive evidence that compliance has been made with all requirements of this Act in respect of registration.

(11) If any change is made in any details contained in the statement filed under subsection (5), a statement signed by or on behalf of the foreign limited partnership specifying the nature of the change shall, within sixty days of the change, be filed with the Registrar.

(12) If default is made in compliance with subsection (11), each foreign limited partnership shall incur a penalty of two hundred dollars for each day that the default continues which shall be a debt due to the Registrar and the foreign partnership shall indemnify any person who thereby suffers any loss.

(13) Any process or notice required to be served on a foreign limited partnership is sufficiently served if addressed to any person whose name has been delivered to the Registrar under subsection (5) and left at or sent by post to the address which has been so delivered.

(14) A document may be served on the foreign limited partnership by leaving it at or sending it by post to any place of business established by the foreign limited partnership in the Islands.

(15) An instrument executed by or on behalf of a foreign limited partnership outside the Islands is, and is to be treated as, a deed or instrument under seal —

    (a) if it is —

        (i) sealed; or

        (ii) expressed to be, or is expressed to be executed as, or otherwise makes clear on its face it is intended to be, a deed; and

    (b) if it is executed in conformity with any requirement imposed by —



          (i)   the laws of the jurisdiction in which the foreign limited partnership was established; and

         (ii)  its partnership agreement or equivalent governing document.

(16)  An instrument executed in accordance with subsection (15) meets any requirement of any law that the instrument is, and is to be treated as, a deed or instrument executed under seal.

(17)  The execution of an instrument in accordance with subsection (15)(a) and the fact that it was executed in accordance with subsection (15)(b) may be proved by the affidavit or solemn declaration of a witness to the execution of the instrument sworn or made before a notary public or any other person qualified to administer oaths in any jurisdiction.

(18)  If any foreign limited partnership ceases to be a general partner of an exempted limited partnership it shall forthwith notify the Registrar and from the date on which notice is given, the obligation of the foreign limited partnership to deliver any document to the Registrar ceases.

(19)  Notwithstanding subsection (18) if the Registrar is satisfied by any other means that a foreign limited partnership has ceased to be a general partner of an exempted limited partnership the Registrar may close the file of the foreign limited partnership and thereupon the obligation of the foreign limited partnership to deliver any document to the Registrar ceases.

(20)  A general partner of a foreign limited partnership shall not be deemed to have established a place of business in the Islands or commenced carrying on business in the Islands pursuant to Part IX of the *Companies Act (2021 Revision)* by virtue solely of so acting.

### De-registration for continuation in another jurisdiction

**43**.  (1)  A general partner on behalf of an exempted limited partnership which proposes to be registered by way of continuation as a partnership, body corporate or any other form of entity under the laws of any jurisdiction outside the Islands, in this section referred to as an "applicant", may apply to the Registrar for the exempted limited partnership, in this section referred to as the "applicant partnership", to be de-registered in the Islands.

(2)  The Registrar shall de-register an applicant partnership if —

    (a)  the applicant proposes to register the applicant partnership by way of continuation in a jurisdiction which permits or does not prohibit the transfer of the applicant partnership in the manner provided in this section referred to as a "relevant jurisdiction";

    (b)  the applicant has paid to the Registrar a fee equal to three times the annual fee that would have been payable pursuant to section 39(1) in the January immediately preceding the application for de-registration;



(c)   the applicant has filed with the Registrar notice of any —

    (i)   change in the name or dual foreign name;

    (ii)   change in the applicant partnership; and

    (iii)   change in its proposed registered office or agent for service of process in the relevant jurisdiction;

(d)   no petition or other similar proceeding has been filed and remains outstanding or order made or resolution adopted to wind up, dissolve or liquidate the applicant partnership in any jurisdiction and no time or event has occurred upon which the applicant partnership is to be wound up;

(e)   no receiver, trustee or administrator or other similar person has been appointed in any jurisdiction and is acting in respect of the applicant partnership, its affairs or its property or any part thereof;

(f)   no scheme, order, compromise or other similar arrangement has been entered into or made whereby the rights of creditors of the applicant partnership are and continue to be suspended or restricted;

(g)   the applicant partnership is not insolvent;

(h)   an application for de-registration is *bona fide* and not intended to defraud creditors or the limited partners of the applicant partnership;

(i)   the applicant has delivered to the Registrar an undertaking signed by an authorised signatory of the applicant that notice of the transfer has been or will be given within twenty-one days to the secured creditors of the applicant partnership;

(j)   any consent or approval to the transfer required by any contract or undertaking entered into or given by the applicant partnership has been obtained, released or waived, as the case may be;

(k)   the transfer is permitted by and has been approved in accordance with the partnership agreement of the applicant partnership;

(l)   the laws of the relevant jurisdiction with respect to transfer have been or will be complied with;

(m)   the applicant partnership, if licensed or registered under the *Banks and Trust Companies Act (2021 Revision),* the *Companies Management Act (2021Revision)*, the *Insurance Act, 2010 [Law 32 of 2010]*, the *Mutual Funds Act (2021 Revision), the Private Funds Act (2021 Revision)* or the *Securities Investment Business Act (2020 Revision)*, has obtained consent of the Cayman Islands Monetary Authority to the transfer;

(n)   the applicant partnership will upon registration under the laws of the relevant jurisdiction continue as a partnership, body corporate or other form of entity;



Exempted Limited Partnership Act (2021 Revision)                                    Section 44

    (o)  the applicant partnership is in good standing with the registrar and all outstanding fees due to be paid in relation to the applicant partnership to the Registrar are paid; and

    (p)  the Registrar is not aware of any other reason why it would be against the public interest to de-register the applicant partnership.

(3)  Paragraphs (d), (e), (f), (g), (h), (j), (k), (l) and (n) of subsection (2) may be satisfied by filing with the Registrar a voluntary declaration or affidavit of an authorised signatory of the applicant to the effect that, having made due enquiry, the Registrar is of the opinion that the requirements of those paragraphs have been met.

(4)  A declaration or affidavit under subsection (3) shall include a statement of the assets and liabilities of the applicant partnership.

(5)  The statement under subsection (4) shall be based on an assessment of the assets and liabilities of the applicant partnership as at the date of the declaration or affidavit or the date as close as is practicable to the foregoing date.

(6)  An authorised signatory of the applicant, who makes a declaration or affidavit under subsection (3) without reasonable grounds commits an offence and is liable on summary conviction to a fine of fifteen thousand dollars and to imprisonment for five years.

(7)  The Registrar may, upon request from an applicant, where the Registrar is satisfied that the applicant has complied with subsection (2), de-register the applicant partnership.

(8)  Section 41 does not apply to an applicant partnership under this section.

### Certificate of de-registration

**44**. (1)  Upon the termination of registration of a partnership under section 41, the Registrar shall issue a certificate under the Registrar's hand and seal of office that the registration of the partnership as an exempted limited partnership has been terminated and specifying the date of termination; and shall enter in the register of exempted limited partnerships the date of termination of the registration of the partnership under section 41.

(2)  Upon de-registration of an applicant partnership under section 43, the Registrar shall issue a certificate under the Registrar's hand and seal of office that the applicant partnership has satisfied the de-registration requirements under section 43 and been de-registered as an exempted limited partnership and specifying the date of de-registration and shall enter in the register of exempted limited partnerships the date of de-registration of the applicant partnership under section 43.

(3)  From the commencement of the date of termination of registration under section 41 or de-registration under section 43 the applicant partnership shall



cease to be an exempted limited partnership for all purposes under this Act and in the case of de-registration under section 43 shall continue as a partnership, body corporate or other entity under the laws of the relevant jurisdiction.

(4)   From the commencement of the date of termination of registration of a partnership under section 41 the applicant partnership becomes a general partnership under the *Partnership Act (2013 Revision)* and in the case of an applicant partnership de-registered under section 43, the applicant partnership de-registered shall not by virtue of that de-registration alone cease to be a partnership, body corporate or other entity under the laws of the relevant jurisdiction.

(5)   This section shall not operate, in relation to an applicant partnership de-registered under section 43 and continued as a partnership under the laws of the relevant jurisdiction —

(a)   to create a new legal entity unless otherwise provided by the laws of the relevant jurisdiction;

(b)   to prejudice or affect the identity or continuity of the applicant partnership as previously constituted unless otherwise provided by the laws of the relevant jurisdiction;

(c)   to affect the property of any applicant partnership;

(d)   to affect any appointment made, resolution passed or any other act or thing done in relation to the applicant partnership pursuant to a power conferred by the partnership agreement of the applicant partnership or by the laws of the Islands;

(e)   except to the extent provided by or pursuant to section 43 and this section, to affect the rights, powers, authorities, functions and liabilities or obligations of the applicant partnership or any other person unless otherwise provided by the laws of the relevant jurisdiction; or

(f)   to render defective any legal proceedings by or against the applicant partnership, and any legal proceedings that could have been continued or commenced by or against the applicant partnership before its de-registration under this Act may, notwithstanding the de-registration, be continued or commenced by or against the applicant partnership after de-registration.

**Notice of de-registration**

**45**.   The Registrar shall give notice in the Gazette of the termination of registration of a partnership under section 41 or the de-registration of an applicant partnership under section 43 and, in the case of de-registration under section 43, the jurisdiction under the laws of which the applicant partnership has been registered by way of continuation and the name of the applicant partnership, if changed.

Exempted Limited Partnership Act (2021 Revision)                              Section 46

### Certificate of good standing

**46**.  (1) The Registrar may on application made by —

 (a) an exempted limited partnership; or

 (b) a foreign limited partnership registered under section 42,

issue a certificate of good standing to the exempted limited partnership or the foreign limited partnership that is in good standing in accordance with subsection (2).

 (2) A certificate of good standing is evidence of the fact that the exempted limited partnership is in good standing on the date that the certificate of good standing is issued.

 (3) An exempted limited partnership is deemed to be in good standing if all fees and penalties under this Act have been paid and the Registrar has no knowledge that the exempted limited partnership is in default under this Act.

### Electronic business

**47**.  Nothing in this Act shall prohibit an exempted limited partnership from offering, by electronic means, and subsequently supplying, real or personal property, services or information from a place of business in the Islands or through an internet service provider or other electronic service provider located in the Islands.

### Regulations

**48**.  The Cabinet may make Regulations in respect of exempted limited partnerships prescribing —

 (a) the duties to be performed by the Registrar for the purposes of this Act;

 (b) the forms to be used for the purposes of this Act;

 (c) the fees payable to the Registrar in respect of filings or certifications or otherwise pursuant to this Act; and

 (d) generally, the conduct and regulation of registration under this Act and any matters incidental thereto.

### Recovery of penalties

**49**.  (1) Notwithstanding any provision of this Act which prescribes a specific *per diem* penalty in respect of a default of any obligation to make a filing, to serve a notice or to maintain a record set out in this Act the Registrar may, in any case where the aggregate *per diem* penalty has exceeded the amount of one thousand dollars and the Registrar is satisfied that the failure is not due to wilful default, accept payment of a penalty of one thousand dollars in lieu thereof.

 (2) Without prejudice to the powers exercisable by the Registrar under this Act, all sums that the Registrar is entitled to recover by way of fees or penalties are



Section 50                      Exempted Limited Partnership Act (2021 Revision)

recoverable either summarily as a civil debt, or as a simple contract debt, in any court of competent jurisdiction.

### *Repeal* of the Exempted Limited Partnership Law (2013 Revision) and savings

**50**. (1) The *Exempted Limited Partnership Law (2013 Revision)* is **repealed**.

(2) The **repeal** of the *Exempted Partnership Law (2013 Revision)* shall not affect any exempted limited partnership registered under the **repealed** *Exempted Limited Partnership Law (2013 Revision)* and a provision in any document referring to the **repealed** *Exempted Limited Partnership Law (2013 Revision)* or its revision shall, so far as may be necessary for preserving its effect, be construed as referring to the corresponding provision in this Act.

**Publication in consolidated and revised form authorised by the Cabinet this 5th day of January, 2021.**

**Kim Bullings**
*Clerk of the Cabinet*



Exempted Limited Partnership Act (2021 Revision)                                    ENDNOTES

## ENDNOTES

### Table of Legislation history:

| SL # | Law # | Legislation | Commencement | Gazette |
|------|-------|-------------|--------------|---------|
|      | 56/2020 | Citation of Acts of Parliament Act, 2020 | 3-Dec-2020 | LG89/2020/s1 |
|      | 31/2020 | Exempted Limited Partnership (Amendment)Law, 2020 | 7-Jul-2020 | LG49/2020/s7 |
|      |       | **Exempted Limited Partnership Law (2018 Revision)** | 16-Mar-2018 | GE22/2018/s15 |
|      | 10/2017 | Exempted Limited Partnership (Amendment) Law, 2017 | 5-Jun-2017 | G12/2017/s7 |
|      | 5/2014 | Exempted Limited Partnership Law, 2014 | 2-Jul-2014 | GE48/2014/s1 |



ENDNOTES                                     Exempted Limited Partnership Act (2021 Revision)

Exempted Limited Partnership Act (2021 Revision)                    ENDNOTES



ENDNOTES                          Exempted Limited Partnership Act (2021 Revision)

(Price: $8.80)

on 18th June and the departure and arrival times are improved over what they were previously. The company is presently operating seven round-trip flights per week between the 737-200 and the 737-400 aircraft.

**MADAM SPEAKER:**          The Second Elected Member for Cayman Brac and Little Cayman.

**MR. GILBERT A. McLEAN:**          Is it not a fact that the frequency of flights have been reduced to the island of Cayman Brac since the third aeroplane has been in service?

**HON. W. NORMAN BODDEN:**          Madam Speaker, there might have been a reduction of one flight, but I do not think that it was any more than that.

**MADAM SPEAKER:**          The Third Elected Member for George Town.

**MR. TRUMAN M. BODDEN:**          Could the Honourable Member say whether this ten-year old jet is about the age of the two 727-200s that were sold? Secondly, is it a lease/purchase where we are building equity as in the 727-200s, or is it a pure lease where the money is just paid out in lease payments?

**HON. W. NORMAN BODDEN:**          Madam Speaker, I would say around the same age as the 727s and it is a straight lease. It is for three years and it is a straight lease. I might add that the lease is arranged in such a way that it can be re-assigned or sub-let.

**MADAM SPEAKER:**          The Second Elected Member for Cayman Brac and Little Cayman.

**MR. GILBERT A. McLEAN:**          Would the Member say under whose instructions, or under what advice was a third aeroplane taken on by Cayman Airways, seeing the serious financial losses that it has been suffering? And is there any indication from the study now in progress that that was a wise thing to do?

**HON. W. NORMAN BODDEN:**          Madam Speaker, the proposal for the introduction of a third jet was a decision, or a recommendation made by the Board of Cayman Airways with the Portfolio supporting that decision. Because of the attractive lease cost of this third aircraft, the company is able to offer a schedule of more attractive times which should enable the company to attract a greater share of the market.

**MADAM SPEAKER:**          Eleven o'clock has now been reached. That concludes Question Time for this morning. We will suspend for 15 minutes.

<center>AT 11:04 A.M. THE HOUSE WAS SUSPENDED</center>

<center>HOUSE RESUMED AT 11:28 A.M.</center>

**MADAM SPEAKER:**          Please be seated. Proceedings are resumed. Government Business - Bills, First and Second Readings.

<center>

## GOVERNMENT BUSINESS

### BILLS

### FIRST AND SECOND READINGS

#### THE EXEMPTED LIMITED PARTNERSHIP BILL, 1991

</center>

**CLERK:** THE EXEMPTED LIMITED PARTNERSHIP BILL, 1991

**MADAM SPEAKER:**          The Exempted Limited Partnership Bill, 1991, is deemed to have been read a first time and is set down for Second Reading.

**CLERK:** THE EXEMPTED LIMITED PARTNERSHIP BILL, 1991

**HON. THOMAS C. JEFFERSON:**          Madam Speaker, I beg to move the Second Reading of a Bill entitled A Bill For A Law To Establish The Exempted Limited Partnership. Before I get to the Memorandum of Objects and Reasons, may I begin by saying that there are presently two pieces of legislation dealing with partnerships. One being the Limited Partnership Law, (Revised), which was consolidated in 1968 and revised back in 1968 and The Partnerships Law, 1933 which is Law 26 of 1983.

         The Limited Partnership Law referred to earlier is for local limited partnerships. Today we are not dealing with local partnerships at all. The Exempted Limited Partnership Bill seeks to enable provisions concerning the establishment and operation of a limited partnerships whose business is exterior to the Islands. The new vehicle - we use the word "vehicle" in terms of it being attractive to investors in the Cayman Islands - is to be known as the Exempted Limited Partnership and is broadly analogous to an Exempted

<center>1</center>

26th June, 1991                                    Hansard                                    517

Company under the Companies Law (Revised).

              This Bill has been in the drafting stages for a number of years. It has been put to various Societies, including the Law Society and many other Associations or Societies within the financial community. It has also been vetted by major United States law firms in terms of its tax provisions, such as Sidley and Austin, Brown and Wooc, Cahill Gordon and Reindel, Coudert Brothers of United States, Debevoise and Plimpton and Simmons and Simmons from London, so that we have gotten a wide cross-section of input in putting together the present Bill which is before this Honourable House.

           In addition to that Madam Speaker, the draft Bill which is before us was also put before the Private Sector Consultative Committee which has assisted me so ably over the years, and their view is that this piece of legislation has their support.

           As mentioned earlier, this legislation has been moving around the financial industry for approximately three years. It has now become urgent that we place this piece of legislation before this Honourable House.

           It was approximately one month ago that the Ministry of International Trade and Industry in Japan issued a statement that future funds established in foreign jurisdictions for investment by Japanese institutions must have within its provisions redemption of interest during the life of the fund. Because of this we have pushed for this Bill to be before the House because this country stands to lose a significant amount of business if we do not get an urgent decision and hopefully, a positive decision.

           The Partnership Law, 1983 which I mentioned being the other Law, does not have these provisions which allow for the redemption of interest among attractive features which are in the present Bill before this Honourable House.

           The Bill, in clause 1 shall come into force on such day as the Governor, by notice published in the Gazette, appoint.

           In clause 2, which deals with definitions, refers to the Companies Law, meaning the Companies Law (Revised), as amended from time to time. And the word "contributions" means such cash, property or other assets which a partner contributes to the capital of an exempted limited partnership (but shall not include any moneys lent by a partner to an exempted limited partnership). The word "court" means the Grand Court of this country. "Exempted limited partnership" means a limited partnership registered under section 9(1) of this Law - we will get to that in a little while; a "general partner" means a person who is named as such in the statement filed pursuant to section 9 of this Law and if more than one, shall mean each general partner; "Governor" means the governor in Council; "insolvency of the exempted limited partnership" means that the general partner is unable to pay the debts and obligations of the exempted limited partnership (otherwise than in respect of liabilities to partners on account of their partnership interest) in the ordinary course of business as they fall due out of the assets of the exempted limited partnership; "limited partner" means a person who has become a limited partner in accordance with section 4(2) of this Law - and we will get to that in a minute - and if more than one shall mean each limited partner; "partner" means a limited partner or a general partner. It goes on to define partnership agreements, partnership interests, the public in the Cayman Islands and the "Registrar" means the Registrar of Exempted Limited Partnerships appointed pursuant to section 8, which we will come to.

           The Constitution of a partnership, in an exempted limited partnership may be formed for any lawful purpose or purposes to be carried out and undertaken either in or from within the Islands or elsewhere upon the terms, with the rights and powers, and subject to the conditions, limitation, restrictions, and liabilities herein mentioned. Clause 4 goes on to say that provided that such exempted limited partnership shall not undertake business with the public in the Cayman Islands other than so far as may be necessary for the carrying on of the business of that exempted limited partnership exterior to the Islands. In other words they could set up their own office and staff it provided that their business is catering to persons outside the Islands.

           An exempted limited partnership shall consist of one or more persons called general partners and a general partner shall act at all times in good faith in the interest of the exempted limited partnership.

           Any one or more of the limited partners and general partners of an exempted limited partnership may be resident, domiciled, established, incorporated or registered pursuant to the laws of these Islands or outside of the Islands provided that at least one general partnership, (a) if an individual be resident, (b) if a company be registered under the Companies Law or registered pursuant to Part VIII of the Companies Law.

           Clause 5 deals with the establishment. It says that no partnership limited or otherwise shall be an exempted limited partnership unless registered as such in accordance with section 9(1) of this Law. Section 9(1) stipulates the process of registration. Each limited partnership shall have a name which shall include the words "Limited Partnership" or the letters "L.P." Clause 5 also provides that no partnership can be an exempted partnership unless registered as such.

           Clause 6 deals with the name under which it carries on business.

           Clause 7 which deals with modification of general Law. It more or less states that the limited partnership shall not take part in the conduct of the business of an exempted limited partnership and letters, contracts, deeds, instruments of documents whatsoever shall be entered into by the general partner on behalf of the limited partnership. So it is the general partner who is conducting the business of a limited partnership.

           Clause 8 states that the Registrar of Companies appointed under the Companies Law, (Revised), shall be the Registrar of Exempted Limited Partnerships.

**Error! Unknown document property name.**

AP1401

Clause 9 which deals with registration sets out the particulars required when the application is made by the exempted limited partnership for registration purposes. It should specify the name of the exempted limited partnership; the general purpose of the business of that partnership; the address in the Cayman Islands of the registered office; the term, if any, for which the exempted limited partnership is entered into or if for unlimited duration a statement to that effect and the date of its commencement; the full name and address of the general partner and a declaration that the exempted limited partnership shall not undertake business with the public in the Cayman Islands. Clause 9 subsection (2) The Registrar shall maintain a record of each exempted limited partnership registered under this Law and all the statements filed in relation to it.

Clause 10 deals with changes in the registered particulars, that is if there is any change in the particulars which were put forward under the clause just read, that is 9 (1) and (2), that change must be notified within 60 days and be filed with the Registrar of Exempted Limited Partnerships, who we know is the Registrar of Companies.

Clause 11 provides for a register of the partnership interest to be maintained at the registered office. This is a register which shall be maintained by the general partner in writing on one or more sheets giving the name and address, amount and date of the contribution or contributions of each partner and the amount and date of any payment representing a return of any part of the contribution of any partner which register shall be updated within twenty-one business days of any change in the particulars therein.

Section 12 deals with the right to account. It is dealing with the limited partners right for information. The exempted limited partnership is run by the general partner with the limited partner having the right to have a look at all the information being kept by the general partner.

Under clause 14 of the Bill, this is the clause which allows redemption of interest in the partnership. It says a limited partner shall not, on dissolution or otherwise, receive out of the capital of the exempted limited partnership a payment representing a return of any part of his contribution to the partnership unless at the time of and immediately following such payment the exempted limited partnership is solvent. So there is a provision which secures and protects the creditor, that even though clause 14 allows the redemption of interest, having made that payment to the partner, six months from the date of that receipt it may be recalled from the partner if the partnership is in any difficulty. That is it is deemed not to be able to pay all of its bills.

Section 15 deals with dissolution of the partnership. It says that an exempted limited partnership shall not be dissolved by an act of the partners until a notice of dissolution signed by a general partner has been filed with the Registrar of Exempted Limited Partnership.

Clause 15(2) speaks to the application by a partner or a creditor to the court, and the court having the power to make a decree of dissolution.

In Clause 15(3), notwithstanding the point that we have just made, the death, the insanity, the retirement, bankruptcy, commencement of liquidation proceedings, resignation, insolvency or dissolution of the sole or last remaining general partner shall cause the immediate dissolution of the exempted limited partnership which shall forthwith be wound up in accordance with the provisions of the partnership agreement or such orders as the court may decree pursuant to subsection (2) of this subsection - which I read earlier - provided that if within ninety days of such date of dissolution the limited partners unanimously elect one or more new general partners the business of the exempted limited partnership it then would not be required to be wound up but may assume and continue as provided for in the partnership agreement. So that the death of the general partner does not ultimately cause dissolution, the death of the limited partner does not cause dissolution of the partnership. The caveat is that if the general partner dies then in order to keep the partnership ongoing, the limited partners shall elect a general partner and provided that is done the partnership may continue.

Just pointing to clause 7, subsection (6)(a)(iii), where it says that:-

"an exempted limited partnership shall not be terminated or dissolved by the death or bankruptcy or dissolution or winding up of a limited partner.".

Moving on to clause 16 dealing with Inspections.

(16)(1) "Any person may require a certified copy of the certificate of registration, a certificate of good standing or a copy of or extract from any registered statement filed in relation to the exempted limited partnership to be certified as a true copy by the Registrar on payment of such fees as the Governor may from time to time by regulation prescribe.".

Under section 17 the exempted limited partnership may apply to the Governor for a tax exemption or tax undertaking in respect of the business of the exempted limited partnership. That particular clause reads:-

17(1) "The Governor may, on application by a general partner, give an undertaking in respect of any exempted limited partnership that no Law which is hereafter enacted in the Islands imposing any tax to be levied on profits or income or gains or appreciations shall apply to such exempted limited partnership or to any partner thereof in respect of the operations or assets of such exempted limited partnership or the partnership interest of a partner therein.

17(2) Any undertaking given under subsection (1) of this section may provide, in addition, that the aforesaid taxes and any tax in the nature of estate duty or inheritance tax shall not be payable in

3                            **Error! Unknown document property name.**

respect of the obligations of the exempted limited partnership or the interests of the partners therein.".

And the undertaking shall not exceed fifty years.

Clause 18 deals with the making of Regulations prescribing the duties to be performed by the Registrar. The forms to be used for the purposes of this Law; the fees payable to the Registrar in respect of filings or certifications or otherwise; and generally , the conduct and regulation of registration under this Law and any matters incidental thereto.

Clause 19 speaks to the annual returns which shall be made on the 31st day of January of each year and filed with the Registrar. A return signed by or on behalf of a general partner certifying that the exempted limited partnership has during the prior calendar year complied with the section 10(1) of this Law. Section 10(1), as we heard earlier, deals with changes in registered particulars. And that there has been no breach of the declaration given in accordance with section 9(1)(f), which is the declaration that the exempted limited partnership shall not undertake business with the public in the Cayman Islands, and to pay to the Registrar an annual fee of such amount as the Governor shall from time to time by regulations prescribe.

Clause 20 deals with transaction between the partners and the partnership.

Clause 21 contains provisions allowing existing limited partnerships to re-register under these new provisions.

Clause 22 provides that a company acting as a general partner does not by reason of that alone require certain licence.

Madam Speaker, I believe that it is also proper for me to point out that this Bill does not have a clause that repeals the Partnership Law, 1983. While legislatively we could grandfather all of the partnerships presently registered under the present Law, it is likely that if we took that approach we may create some amount, or maybe huge difficulty, and a better approach - I believe - is to leave both Laws on the books, thus allowing the partnerships presently registered to apply and be registered under this new Bill, if you so wish.

So we are leaving flexibility for each partnership to decide whether it remains under the present Law or under the Bill when it becomes Law.

As I said earlier, I believe that is the better approach. The present Partnership Law, 1983 does not have the flexibility as regards its dissolution provisions, because under section 34 dissolution by bankruptcy, death or charge, subject to any agreement between the partners, every partnership is dissolved as regards all partners by the death or bankruptcy of any partner. And a partnership may at the option of the other partners be dissolved if any partner suffers his share of the partnership property to be charged under this Law for his separate debt. In other words, if under the present Law any one of the partners dies, the partnership according to my interpretation, must be dissolved.

I believe the features which are in the present Bill will become in addition to the redemption of interest, attractive to the outside world who are seeking to establish such partnerships. I know that there is much interest by law firms in the United States, as well as in Japan as to what stage this present Bill is at because their clients, if they are Japanese investors, have to respond quickly to the requirements of the Ministry of International Trade and Industry.

I have received a number of faxed messages from many of those firms and I am pleased to recommend this Bill, as I believe that it is in the best interest of the Cayman Islands.

**MADAM SPEAKER:**                    The Third Elected Member for West Bay.

**MR. JOHN B. McLEAN:**               Thank you, Madam Speaker.

I rise to offer my support to the Bill presently before the House, entitled A Law To Establish The Exempted Limited Partnership.

Madam Speaker, I think that it is important for us to be cognisant at all times as to what our competitors are doing to attract business to their respective jurisdictions. We here in the Cayman Islands have grown and have become known as one of the leading financial centres in the world and I think that we have to guard this position very aggressively because there are other jurisdictions who are out there now vying for some of the business.

From the presentation it can be seen that this proposed legislation has been widely circulated in the financial community and has the support of these respective entities and businesses. In addition to that, input has been gained from attorneys in the United States and London and from all indications it appears that the Bill before this House this morning is what they support, and is as a result of that consultation. They are satisfied with the objectives and provisions of this Bill.

I think it is important for us to continue to be creative and flexible with regards to the business environment in which we operate, because it is amazing the number of different services that clients, especially from the outside who do operate or reside in tax jurisdictions, find themselves in need of. If we are flexible in identifying those services and creative enough to find some way legally - and I want to make it abundantly clear that we are not in any position, nor do we have any desire to attract any business which is not legitimate - then we will continue to grow and enjoy the position that we have as a leading financial centre.

The position that we enjoy today did not just happen, there are reasons for it. Some of those reasons are, the high level of services which are available in the Cayman Islands; the high degree of expertise and professionalism; and the fact that we have a clean business environment here which is

guarded very aggressively by all parties involved. Everyone appreciates the fact that if we can keep out the undesirables, then we will continue to attract the right calibre of business in this country. One other great advantage that we have here is that we have always enjoyed the reputation of political stability. I do not think that we in this country can ever become complacent and not be aware of what is needed here by way of services, because I can assure you that if we are not in a position to provide those services here, they will go elsewhere, at our expense.

Madam Speaker, I commend the mover and would like to advise that he has my support on this very important piece of legislation.

Thank you.

**MADAM SPEAKER:**                          The First Elected Member for West Bay.

**MR. W. McKEEVA BUSH:**                    Madam Speaker, I rise briefly in support of this Bill before the House. I remember that as late as 1986, we were not charging fees on partnerships, and in 1986 I moved a resolution asking Government to make Regulations providing for registration and annual fees to be paid. I understand that in 1990, there were 38 registered, bringing in over $63,000. For 1990 there are already 16 with $49,000 in the kitty. I am glad to see that this is another route which will hopefully help the coffers of the Cayman Islands and I offer my support to it.

I thought I would just remind the House about the motion in 1986, since it is often said that I do not do anything right.

**MADAM SPEAKER:**                          The Third Elected Member for George Town.

**MR. TRUMAN M. BODDEN:**                   Madam Speaker, I rise to support this Bill. It is good to see Bills coming before this House to continue to develop the offshore business, which I think we can assure ourselves is one of the best and most advanced of the offshore industries that exists in the world. We are obviously in the forefront in banking and insurance, but I am not exactly certain of where we are with the shipping at present, that is new. But here we have a new innovation and one in which we are able to see an expansion of a good thing.

The concept of the Limited Partnership Bill follows closely on the very successful concept of the Limited Companies Law which we were one of the early users, and perhaps inventors of sections of it. We also had the Exempted Trust Law which survived for a fairly long period, but is used somewhat less these days.

Normally with the exempted legal entities, in the case of companies at least, we have the concept of a guarantee against tax, an undertaking given by the Government that it will not in future (normally a period of 20 years) put taxes on the income and other forms of revenue, as set out specifically in the tax undertakings. The second concept is that normally there is flexibility with the exempted partnership, company or trust, which does not exist in the normal partnership. So with the tax undertaking comes specific flexibility on the basis that neither of the exempted legal entities (in this case the exempted partnership) will actually be doing business within the Cayman Islands.

On the basis of the Statutory Declaration given by the promoters and the people who continue with these exempted entities, we have going with it an assurance that despite the flexibility the public here normally would not be involved with it, except to a very limited extent. This Exempted Partnership Law carries with it the usual clause that the "exempted limited partnership shall not undertake business with the public in the Cayman Islands other than so far as may be necessary to the carrying on of the business of that exempted limited partnership exterior to the Islands". That is similar to the type of undertaking that is given in the other entities. The attractiveness, I understand, of this is the fact that the partnership will be able to make a return of contributions as set out, read and quite clearly put in detail by the Honourable First Official Member.

Normally the attractiveness of getting into a market means that the Government has to move quickly because sometimes the advantages may be short-term or may not be around year after year, and I think that the Government has taken the right approach by moving at an early stage and getting our foot in the door before too many of the other countries see the advantage and do so.

The flexibility that has been given to the exempted partnership, I think is good and it is bound to assist considerably in the operation of these partnerships from time to time. The advantage to Cayman naturally, will be that there will be a payment of fees and normaly if it follows the trust and the exempted company, the fees will be slightly more than the fees that the normal exempted trust or company would pay. With it naturally, goes the assurance of the tax undertaking which is given by the Governor in Council.

So it is attractive and hopefully in the areas of Japan and elsewhere where this can be used and its a full legal means of use, that we will see more business coming here, there will not only what Government receives in fees, but other benefits as well. There will some employment - be it limited, but the trust companies or other companies that manage and deal with this sort of thing, as well as accountants, lawyers, and others in the offshore business, will receive some benefits.

I would congratulate the Honourable First Official Member in moving this forward, and in seeing an opportunity to build upon what he has now built into an extremely good thing within the offshore business - as I mentioned earlier, putting us really in the forefront now with banks, trust companies, insurance companies, and now with this innovative Law, in the limited partnership.

Thank you.

**MADAM SPEAKER:**                          If no other Member wishes to speak, I shall put the question. Sorry, would you like to reply, Honourable Member?

Error! Unknown document property name.

26th June, 1991                   Hansard                     521

**HON. THOMAS C. JEFFERSON:** Madam Speaker, only briefly to say thanks to Members for their support and contribution.

**MADAM SPEAKER:** Thank you. I shall put the question. Those in favour please say Aye...Those against No.

AYES.

**MADAM SPEAKER:** The Ayes have it.

AGREED. THE EXEMPTED LIMITED PARTNERSHIP BILL, 1991, GIVEN A SECOND READING.

**MADAM SPEAKER:** The House will now go into Committee to consider the Exempted Limited Partnership Bill, 1991, together with the Pensions (Amendment) Bill, 1991.

HOUSE IN COMMITTEE - 12:20 P.M.

## COMMITTEE ON BILLS

**MADAM CHAIRMAN:** Please be seated.
The House is now in Committee. The Exempted Limited Partnership Bill, 1991, and as is customary it is assumed the House will agree that if there are any typographical or other errors, the Honourable Second Official Member will correct these.

### THE EXEMPTED LIMITED PARTNERSHIP BILL, 1991

CLERK: THE EXEMPTED LIMITED PARTNERSHIP BILL, 1991

| | |
|---|---|
| CLAUSE 1: | SHORT TITLE. |
| CLAUSE 2: | DEFINITIONS. |
| CLAUSE 3: | SAVINGS OF RULES OF EQUITY AND COMMON LAW. |
| CLAUSE 4: | CONSTITUTION. |
| CLAUSE 5: | ESTABLISHMENT. |
| CLAUSE 6: | NAME AND REGISTERED OFFICE. |
| CLAUSE 7: | MODIFICATION OF GENERAL LAW. |
| CLAUSE 8: | REGISTRAR. |
| CLAUSE 9: | REGISTRATION. |
| CLAUSE 10: | CHANGES IN REGISTERED PARTICULARS. |
| CLAUSE 11: | REGISTER OF LIMITED PARTNERSHIP INTERESTS. |
| CLAUSE 12: | RIGHT TO ACCOUNT. |
| CLAUSE 13: | PROCEEDINGS. |
| CLAUSE 14: | RETURN OF CONTRIBUTIONS. |
| CLAUSE 15: | DISSOLUTION. |
| CLAUSE 16: | INSPECTION. |
| CLAUSE 17: | TAX UNDERTAKING. |
| CLAUSE 18: | REGULATIONS. |
| CLAUSE 19: | ANNUAL RETURN. |
| CLAUSE 20: | TRANSACTIONS WITH THE EXEMPTED LIMITED PARTNERSHIP. |
| CLAUSE 21: | RE-REGISTRATION. |
| CLAUSE 22: | WHEN LICENCE NOT REQUIRED. |

**MADAM CHAIRMAN:** The question is that clauses 1 through 22 do stand part of the Bill. I shall put the question. Those in favour please say Aye...Those against No.

AYES.

**MADAM CHAIRMAN:** The Ayes have it.

CLAUSES 1 THROUGH 22 PASSED.

CLERK: A Bill for a Law to Establish the Exempted Limited Partnership.

**MADAM CHAIRMAN:** The question is that the title do stand part of the Bill. I shall put the question. Those in favour please say Aye...Those against No.

AYES.

**MADAM CHAIRMAN:** The Ayes have it.

Error! Unknown document property name.

**BarNet Jade**                                                                 jade.io

### Hospital Products v United States Surgical Corporation - [1984] HCA 64

**BarNet publication information** - Date: Tuesday, 02.05.2023 - Publication number: 11428073 - User: anonymous

AP1406

View this document in a browser

| Attribution | |
|---|---|
| Original court site URL: | file://032--HOSPITAL_PRODUCTS_LTD._v. _UNITED_STATES_SURGICAL_CORPORATION,_SURGEONS_CHOICE--(1984) _156_CLR_41.html |
| Content retrieved: | August 05, 2012 |
| Download /print date: | May 02, 2023 |

---

**More than 1000 citations - citations filtered to show only HCA and appellate citations - showing 839 HCA and appellate citations out of 3573 from all sources.**

**To view all citations, please use the Jade Citator.**

---

# HIGH COURT OF AUSTRALIA

Gibbs C.J., Mason, Wilson, Deane and Dawson JJ.

*HOSPITAL PRODUCTS LTD. v. UNITED STATES SURGICAL CORPORATION, SURGEONS CHOICE*
*(1984) 156 CLR 41*
*25 October 1984*

*Contract—Trusts*

BarNet publication information  -  Date: Tuesday, 02.05.2023  -  Publication number: 11428073  -  User: anonymous

AP1407

*Contract—Exclusive distribution agreement—Statements preceding contract—Whether promissory—Statement that distributor would devote best efforts to distribute products—Whether warranty or mere representation—Implied terms—Term implied by statute that distributor would "use best efforts" to promote products—Whether further term implied that distributor not to do anything inimical to market for products—Distributor developing own capacity to manufacture principal's products—Orders for principal's products deferred to be met with distributor's products—Whether breach of best efforts term—Uniform Commercial Code (U.S.), s. 2-306(2). Trusts—Constructive trust—Fiduciary duty—Breach—Distributorship agreement—Whether fiduciary relationship between parties—Importation of fiduciary duties into commercial transactions—Relevance of terms of contract to existence of fiduciary relationship.*

**Decisions**

GIBBS C.J. This is an appeal from a decision of the Court of Appeal of New South Wales, which allowed an appeal from a judgment of McLelland J. given in proceedings brought by United States Surgical Corporation ("U.S.S.C."), one of the present respondents, against the present appellant, Hospital Products Limited ("H.P.L.") and the other respondents, Surgeons Choice Inc. ("S.C.I."), Hospital Products International Pty. Limited (whose name has been changed to Ballabil Holdings Pty. Limited), Alan Richard Blackman and I.R.D. Engineering Services Pty. Limited ("I.R.D."). All of the respondents have cross-appealed.

2. After hearing voluminous evidence, McLelland J. made findings of fact which have not been challenged, although the Court of Appeal has supplemented them with some further findings. For present purposes it is unnecessary to state the facts in the full detail in which they are recounted in the judgments below. The material facts were as follows. U.S.S.C., a corporation incorporated in the United States, carried on the business of manufacturing in the United States, and marketing in the United States and elsewhere, implements for use in surgery, in particular surgical stapling instruments, disposable loading units for use with such instruments and disposable skin staplers. These implements were all made to U.S.S.C.'s own design, which was apparently novel. They were marketed under the name "Auto Suture".

3. The marketing of U.S.S.C.'s products in countries other than the United States was carried out through distributors - independent contractors who purchased the products from U.S.S.C. and resold them to customers. Early in November 1978 Mr Blackman arranged a meeting with the President of U.S.S.C., Mr Leon Hirsch, and the Vice-President in charge of marketing, Ms Turi Josefsen, at which he proposed to them that he should be appointed sole distributor of the company's products in Australia in place of Downs Surgical (Australia) Pty. Limited ("Downs") which had been the Australian distributor since December 1976. Mr Blackman was at the time on good terms with Mr Hirsch and Ms Josefsen, and was known to them as an efficient salesman. He had in 1973 been appointed a dealer for U.S.S.C. in the New York area, and in 1976 a corporation (The Hospital Products Corporation) which he owned and controlled had been appointed to replace him as dealer. It was part of his proposal that this dealership should be phased out. Mr Hirsch and Ms Josefsen indicated that they were favourably disposed to the proposal. After some later discussions and correspondence, U.S.S.C. on 27 December 1978 wrote to Downs, terminating its appointment as from 31 March 1979, and to Mr Blackman, advising him that he would be U.S.S.C.'s exclusive Australian distributor from 1 April 1979. It will be necessary to refer again to these discussions and correspondence for the purpose of determining more precisely the terms of the agreement between U.S.S.C. and Mr Blackman, but that task may for the moment be postponed.

4. In January 1979 Mr Blackman arrived in Australia, and in February of that year he acquired a shelf company whose name he changed to Hospital Products of Australia Pty. Limited. In the same month, by a novation, that company was substituted for Mr Blackman as the distributor under the agreement with U.S.S.C. In November 1979 the name of Hospital Products of Australia Pty. Limited was changed to Hospital Products International Pty. Limited and it will be convenient to refer to that company as "H.P.I.", in respect of the period before November 1979 as well as afterwards. H.P.I. purchased the stock of U.S.S.C.'s products held by Downs and on 1 April 1979 commenced to market U.S.S.C.'s products in Australia. It was successful in bringing about a substantial increase in the use of those products. From about May 1979 H.P.I. began purchasing further stocks direct from U.S.S.C. and until about October 1979 it satisfied the orders which it received from customers from those stocks.

5. During all this time Mr Blackman was putting into effect a dishonest plan which he had formulated before he had put his proposal to U.S.S.C. in November 1978, and for which he had made careful preparations before he had been appointed U.S.S.C.'s Australian distributor. The object of the plan was that ultimately H.P.I. would itself manufacture products which very closely resembled those made by U.S.S.C. and would pass them off as products made under licence from, or by arrangement with, U.S.S.C., and in that way would appropriate for Mr Blackman's own benefit the market in Australia that would otherwise have been available to U.S.S.C. The plan was to be put into effect in a number of stages. In the first stage, Mr Blackman intended to market products which contained some components of his own manufacture together with demonstration cartridges obtained from U.S.S.C. It was the practice for U.S.S.C., in order to assist in the marketing of its products, to supply its distributors and dealers, at comparatively low cost, with disposable loading units and disposable skin staplers for demonstration purposes. The demonstration units were identical with those for clinical use, except that they were not sterilized or packed in sterile containers and that they contained only a single anvil and (in certain cases) a single retaining pin or pusher-knife assembly for use with a number of separate cartridges. In clinical use each component, once used, had to be discarded, and a new anvil and (where applicable, retaining pin or pusher-knife assembly) was needed for each cartridge. In the first stage Mr Blackman's intention was to manufacture anvils, retaining pins and pusher-knife assemblies, to add them to the demonstration cartridges and to sterilize and repack the resulting units and sell them in satisfaction of the orders which H.P.I. obtained for U.S.S.C. products. In the second stage, it was intended to manufacture all of the components of the disposable units, and to assemble, sterilize, pack, label and sell them in competition with or substitution for U.S.S.C.'s products.

6. From about 1977 Mr Blackman had been accumulating large stocks of demonstration products which he was able to obtain in the course of the New York dealership. As early as August 1978 he commenced to make inquiries from his solicitors in Australia about the possibility that he might compete with U.S.S.C., and might register the trade mark "Autosuture", and from experts with regard to the possible manufacture of the components and the sterilization of disposable loading units. In November 1978 Mr Blackman's solicitors lodged an application for registration of the trade mark "Autosuture" in respect of, inter alia, "instruments and apparatus for use in surgery". During the period from December 1978 to February 1979 he arranged for the demonstration products which he had accumulated to be shipped by The Hospital Products Corporation to H.P.I. via Hong Kong. The products were invoiced by The Hospital Products Corporation at a price of US$19,190, and were ultimately received by H.P.I. at invoiced prices of about $500,000. At the beginning of March 1979 Mr Blackman engaged an engineering consultant who set about arranging for the manufacture of the various components and the assembling, packaging and sterilizing of the disposable loading

units. Much of the engineering work in both stages of the plan was performed under contract for H.P.I. by I.R.D., a company which on 30 June 1980 came under the control of Mr Blackman. A painstaking process of reverse engineering was carried out; i.e. U.S.S.C.'s components were disassembled, measured and analysed, and tools, moulds and dies were prepared to enable components to be made which were as far as possible identical with those made by U.S.S.C. In July 1979 Mr Blackman, who had known at least from August 1978 that U.S.S.C. had no patent rights in Australia, applied for an Australian patent for a "surgical skin and fascia stapler and disposable staple cartridge for use therewith" and lodged a provisional specification which was largely copied from the specifications of certain United States patents of U.S.S.C.; his purpose was to enable him to use the words "patent pending" on H.P.I.'s labels and thus discourage other potential manufacturers in Australia. By about August 1979, anvils, retaining pins and pusher-knife assemblies were being manufactured for, and supplied to, H.P.I. In about October 1979 H.P.I. began to defer fulfilment of orders being received for Auto Suture products, its intention being to fill those orders with the products assembled by H.P.I.; it then ceased placing its own orders with U.S.S.C. On 25 December 1979 H.P.I. wrote to U.S.S.C., saying that from that day on H.P.I. would no longer be the authorized agent of U.S.S.C.; the reasons given for bringing the distributorship to an end were spurious. On 10 January 1980 U.S.S.C. accepted H.P.I.'s decision to terminate the distributorship. From 25 December 1979 H.P.I. began supplying products, which it had itself assembled and repacked, in fulfilment of orders then outstanding and subsequently received for Auto Suture products. The products which it supplied had labels which included the words "For use with Auto Suture instrument", "Packaged and distributed by H.P.I." and "Patent pending", but which bore no reference to U.S.S.C. On 28 December 1979, and again on 18 February 1980, H.P.I. issued to its customers a circular stating that it was phasing out all goods manufactured in the United States and substituting a product manufactured in Australia. The learned trial judge made the following finding:

> "I am satisfied that as from 25 December 1979 H.P.I. began to supply customers in Australia with H.P.I.-labelled products, the H.P.I.-made proportion of the contents of which was increasing with the passage of time, in order that the existing Australian market for U.S.S.C.-made products might change into an equivalent market for H.P.I.-made products, and that this was done in a manner which was intended to, and did in fact, mislead existing customers for U.S.S.C.-made products into believing that the H.P.I.-labelled products were being manufactured in Australia by arrangement with, or under licence from, the manufacturer of United States-made Auto Suture products, namely U.S.S.C."

By June 1980 H.P.I. commenced to supply some disposable instruments completely manufactured by itself, but it experienced some manufacturing difficulties, and found it necessary to obtain supplies of quite large quantities of U.S.S.C. products in order to enable it to satisfy its orders. These products were acquired by subterfuge, so that U.S.S.C. was not aware of the true identity of the purchaser, and were either repackaged under a label which showed that they were packed and distributed by H.P.I., or were used to supply components for the product which H.P.I. assembled.

7. H.P.I. continued to market its products in Australia, until November 1980, when it commenced to market them in the United States and to withdraw from the Australian market. The marketing in the United States was done through S.C.I., which was incorporated in the United States in October 1980 as a wholly owned subsidiary of H.P.I.

8. It is apparent that it was essential to the success of Mr Blackman's scheme that H.P.I. should be

appointed exclusive distributor of U.S.S.C. products in Australia and that U.S.S.C. should not know that H.P.I. was using the distributorship for the purpose of obtaining a market for itself. The Court of Appeal concluded (although McLelland J. made no finding on the matter) that H.P.I. would not have been able to raise the finance necessary to enable it to develop its manufacturing capacity had it not been for financial assistance provided by U.S.S.C. itself, and for the fact that the Bank of New Zealand extended credit to it only because it was U.S.S.C.'s distributor. It is unnecessary to consider whether that conclusion is justified by the evidence, because quite apart from the difficulty of obtaining finance, it is most unlikely that H.P.I. could have developed its manufacturing capacity and entered the market as it did if it had not been able to persuade its customers to believe that it was in some way acting for, or with the concurrence of, U.S.S.C. Because it was the exclusive distributor of U.S.S.C.'s products, H.P.I. was able to sell its own goods as soon as they were ready for sale, without having to secure for itself orders in competition with U.S.S.C. It is reasonable to conclude on the balance of probabilities that H.P.I. would not have been able to develop its manufacturing and marketing business if it had not been U.S.S.C.'s exclusive distributor.

9. In February 1980 U.S.S.C. received information which caused it to suspect that Mr Blackman was "up to no good". It commenced investigations, and by April or May 1980 it was aware that H.P.I. was manufacturing or attempting to manufacture copies of its products. In August 1980 U.S.S.C. re-entered the Australian market.

10. In July 1980 U.S.S.C. commenced proceedings against H.P.I. and Mr Blackman in New York alleging, inter alia, conspiracy. Further proceedings, including proceedings for infringement of patent, have since been commenced by U.S.S.C. in Connecticut and Texas. In August 1980 U.S.S.C. commenced proceedings in the Federal Court of Australia against H.P.I. and Mr Blackman and others who are not parties to the present proceedings seeking relief for contraventions of the Trade Practices Act 1974 (Cth) , as amended, and for passing off, infringement of copyright, breach of confidence, unfair competition and other alleged wrongs. The defendants brought a challenge in this Court to the jurisdiction of the Federal Court, and it was held that the Federal Court lacked jurisdiction to entertain the whole of those proceedings (see 55 A.L.J.R. 120 ).

11. By an agreement made on 1 April 1981, H.P.I. and I.R.D. agreed to sell all their assets (including the shares in S.C.I.) to a listed public company, Aquila Investment Corporation Limited ("Aquila"), for a consideration which included an issue of shares representing 60 per cent of the capital in that company. Aquila agreed to change its name to Hospital Products Limited ("H.P.L.") and to indemnify H.P.I. and I.R.D. in respect of existing litigation, and H.P.I. and I.R.D. agreed to hold any amount awarded to them for the benefit of Aquila. Completion was conditional upon the approval of Aquila's shareholders, which was given at a meeting held on 11 May 1981. Completion took place on or about 30 June 1981; thereby H.P.L. acquired all the assets of H.P.I. and I.R.D., and Mr Blackman, through H.P.I., acquired a controlling interest in H.P.L.

12. The present proceedings were commenced on 6 May 1981. By its amended statement of claim, U.S.S.C. claimed a variety of relief, including declarations that the defendants held certain assets on constructive trusts in favour of U.S.S.C., an account of profits made by the defendants as a result of breaches of contract or fiduciary duty, or in the alternative damages for such breaches, damages for conspiracy and extensive ancillary relief. A claim was originally made for damages for fraudulent misrepresentation, but that was abandoned. No claim was made for passing off or infringement of patent. McLelland J. declared that H.P.I. had committed breaches of contract, that Mr Blackman had knowingly participated in the breaches by H.P.I. of its equitable obligations and that U.S.S.C. was entitled, at its election, either (1) as against H.P.I. and Mr Blackman,to an account of profits, secured

In the case of H.P.I. by an equitable lien over certain of its assets; or (2) as against H.P.I. and Mr Blackman, to equitable compensation for breach of H.P.I.'s equitable obligations; or (3) as against H. P.I., to damages for breach of contract. U.S.S.C. elected for the first of these remedies and it was ordered accordingly. The proceedings were dismissed as against the other defendants, H.P.L., I.R.D. and S.C.I. An appeal by U.S.S.C. to the Court of Appeal was allowed, and in lieu of the orders made by McLelland J. it was declared that all assets owned by H.P.L. on 1 July 1981 and at any time thereafter, except such as were its assets prior to its acquisition of the assets, goodwill and undertaking of H.P.I. and I.R.D. on or about 29 and 30 June 1981 pursuant to the agreement made on 1 April 1981, are held in trust for U.S.S.C. Orders were made for extensive ancillary relief. Orders were also made against H.P.I., Mr Blackman and H.P.L. for costs.

The Terms of the Contract

13. To determine the rights of U.S.S.C., it is necessary first to consider what were the terms of the contract between that corporation and Mr Blackman, which became the terms of the contract between U.S.S.C. and H.P.I. when the novation took effect. It is therefore necessary to consider in further detail the circumstances in which the contract between U.S.S.C. and Mr Blackman was made. It was found by the learned trial judge that when, at the meeting early in November 1978, Mr Blackman put to Mr Hirsch and Ms Josefsen his proposal that U.S.S.C. appoint him its exclusive Australian distributor, he made statements to the following effect in support of that proposal:

> "(a) that there was a great potential market for USSC surgical stapling products in Australia which was not being tapped by the existing distributor,
>
> (b) that with his long experience of, and accumulated knowhow in, marketing such products, and his long association with USSC, he could do an outstanding job for USSC and perform better than anyone else in building up sales of USSC products,
>
> (c) that this would be a great opportunity both for himself and for USSC,
>
> (d) that he would set up a marketing organisation with sales representatives trained in the use and demonstration of USSC products in a manner similar to that used in USSC's training program in the United States,
>
> (e) that after he had got the Auto Suture business built up, 'really rolling', he might take on other non-competing product lines and build up a broad-based surgical distributorship but not so as to interfere with his giving proper attention to USSC's products,
>
> (f) that because establishment of the new business would take some time and would be expensive he would need some financial help in the form of credit and would like to rent instruments from USSC with the option of purchasing them in the future."

14. The learned trial judge further found that at this discussion Mr Blackman laid considerable emphasis on the benefit to be derived by U.S.S.C. from his appointment as its Australian distributor. Mr Hirsch and Ms Josefsen indicated that they were favourably disposed to the proposal. Mr Hirsch said, "Alan we will work it out" and Mr Blackman replied, "You won't regret it". It was arranged

that Mr Blackman should later discuss further details of the matter with Ms Josefsen.

15. A further discussion took place, probably in late November 1978, but the details are not important for present purposes. However Ms Josefsen then said that she thought that a written distributorship agreement was necessary; Mr Blackman disagreed but said that he would read anything that she sent him.

16. By arrangement with Ms Josefsen, Mr Blackman discussed with Mr Grimes, another officer of U.S.S.C., the details of the termination of the New York dealership. On 27 November 1978 he wrote to Ms Josefsen a letter in which he set out a "chronology of events", which suggested 1 December 1978 as the date on which Downs' distributorship should be terminated on ninety days notice, and 30 September 1979 as the date on which the dealership would be officially ended. Again, much of the detail in the letter does not matter, but it should be mentioned that Mr Blackman stated that he would purchase from Downs their "inventory", i.e. their stocks, and that the letter went on to state:

> "(e) I will be using my inventory of $100-$125,000 wholesale value, to provide an inventory level in Australia.
>
> (f) All additional products ordered from U.S.S.C. will be paid in 30 days.
>
> (g) U.S.S.C. will make instruments available to me on a rental basis.
>
> A transition in this manner will benefit U.S.S.C. by having improved coverage in the Australian market, as well as an orderly change here."

Ms Josefsen replied by letter of 18 December 1978, agreeing in principle to these proposals. She said in the letter that she had asked Mr Fisher (U.S.S.C.'s in-house counsel) to write a distributorship agreement which would be ready when she returned from vacation on 2 January, and said, "At that time I will contact you so that we can review it, 'sign and seal'."

U.S.S.C. again wrote to Mr Blackman on 27 December 1978.

The letter, omitting formal parts, was as follows:

> "We take pleasure in confirming the continuance of our relationship. You will become our Australian distributor while phasing out your dealership in accordance with the following procedures.
>
> 1. We have this day given notice of termination to our present Australian distributor, Downs Surgical (Australia) Pty. Ltd. effective March 31, 1979. A copy of the notice has been furnished to you. Upon that termination becoming effective and commencing April 1, 1979 you will be our exclusive Australian distributor. Although you have indicated that no formal agreement is necessary, we believe it is desirable and will forward to you a suggested agreement covering the distributorship.
>
> 2. During the period through March 31, 1979 you will undertake to purchase the Downs' inventory at prices mutually agreeable to you and them and in any event use your dealership inventory which you estimate will be approximately $100,000 - $125,000, wholesale value, to provide an inventory level in Australia. Additional

products purchased by you from us will be paid on a 30 day net basis. In the meantime arrangements should be made to examine your inventory books and records as per your dealership agreement at the earliest convenient date.

3. You expect to rent from us between 20-30 sets of instruments which within 120 days you will convert to purchase from us.

4. You will hire and train your nurse unless she is agreeable to training by us at your expense.

5. Your dealership will continue without change through June 30, 1979. Effective July 1, 1979 your dealership shall be deemed terminated in all respects and your PAR (Primary Area of Responsibility) will be taken over by us for servicing.

6. By July 1, 1979 all accounts owed to us will be paid in full by you. This includes outstanding A/R (Accounts Receivable), inventory, demonstrations, interest, financing charges and other obligations.

If the above is your understanding of our discussions please sign and return the enclosed copy of this letter. We look forward with great pleasure to our new relationship and wish you every success in your new undertaking."

On 28 December, Mr Fisher telephoned Mr Blackman and asked him to come to his office in New York to discuss the letter. Mr Blackman went to Mr Fisher's office on the following day, read over the letter and confirmed that he was satisfied with its contents and then signed it as follows:

"Accepted and Agreed The Hospital Products Corporation

Alan R. Blackman President"

Mr Fisher said that he might forward to Mr Blackman a formal contract. Mr Blackman replied that he did not think that one was necessary but said that he would read whatever Mr Fisher sent. Ms Josefsen and Mr Hirsch decided that they would take no further steps in relation to a formal agreement, having regard to Mr Blackman's disinclination to enter into one, and U.S.S.C. took no further action to send any contract document to Mr Blackman.

17. It was held both at first instance and in the Court of Appeal that the proper law of the contract between U.S.S.C. and H.P.I. was that of either New York or Connecticut, that there was no material difference between the laws of those two States, and that, so far as concerns the principles governing the implication of terms in a contract, there was no material difference between the laws of those States and the law of New South Wales. These conclusions are not challenged. There is however a statutory provision, s.2-306(2) of the Uniform Commercial Code, which is in force in both New York and Connecticut, and which provides:

"A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale."

Neither McLelland J. nor the Court of Appeal thought this provision to be of importance, because they considered that the matter was covered by the express terms of the contract.

18. McLelland J. held, and the Court of Appeal agreed, that the letter of 27 December 1979 did not embody all of the terms of the contract, and that the statements made during the course of the meeting between Mr Blackman and Mr Hirsch and Ms Josefsen early in November 1978 were of a promissory nature and should be regarded as express terms of Mr Blackman's offer, and therefore of the contract which resulted from the acceptance of that offer, and that, as the result of the novation, H.P.I. became bound by the same terms, which were to the following effect:

> "(1) That the distributor would establish a marketing organisation for U.S.S.C. surgical stapling products in Australia having one or more sales representatives specifically trained in the use and demonstration of those products,
>
> (2) That the distributor would devote its best efforts to distributing U.S.S.C. surgical stapling products, and building up the market for those products, in Australia, to the common benefit of U.S.S.C. and itself,
>
> (3) That the distributor would not deal (scil. in Australia) in any products competitive with U.S.S.C. surgical stapling products,
>
> (4) That the distributor would not deal (scil. in Australia) in any other products in such a manner as would diminish its efforts in distributing U.S.S.C. surgical stapling products and building up the market for those products, in Australia."

It was held that by necessary implication these obligations were to endure for the duration of the distributorship. It was further held that a term should be implied in the contract that "the distributor would not during the distributorship do anything inimical to the market in Australia for U.S.S.C. surgical stapling products".

---

**Following paragraph cited by:**

Crown Melbourne Ltd v Cosmopolitan Hotel (Vic) Pty Ltd (20 July 2016) (French CJ, Kiefel, Bell, Gageler, Keane, Nettle and Gordon JJ)

Crown Melbourne Ltd v Cosmopolitan Hotel (Vic) Pty Ltd (20 July 2016) (French CJ, Kiefel, Bell, Gageler, Keane, Nettle and Gordon JJ)

Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd (22 December 2014) (Warren CJ, Whelan and Santamaria JJA)

Kronenberg v Bridge (20 October 2014) (Blow CJ, Porter and Pearce JJ)

Mainieri v Cirillo (17 September 2014) (Nettle AP and Hansen and Santamaria JJA)

Crouch and Lyndon (a Firm) v IPG Finance Australia Pty Ltd (09 August 2013) (Holmes and Fraser JJA and Dalton J)

Westpac Banking Corporation v Bell Group Ltd (in liq) (No 3) (17 August 2012) (Lee AJA Drummond AJA Carr AJA)

Gough & Gilmour Holdings Pty Ltd v Peter Campbell Earthmoving Pty Ltd (11 March 2009) (McColl JA ; Macfarlan JA; Sackville AJA)

---

55 In order to determine whether the FOCUS Contracts included a Minimum Available Hours Warranty, his Honour considered it appropriate to apply the test used to determine whether a representation made in pre-contractual negotiations form part of the main contract or constituted a collateral warranty. On this basis, the relevant test was whether the representation was reasonably considered by the person to whom it was made as intended to constitute a contractual promise: *Hospital Products Ltd v United States Surgical Corporation* [1984] HCA 64; (1984) 156 CLR 41 at 61 , per Gibbs CJ . The intention of the parties was to be deduced from the conduct of the parties, their words and behaviour, as assessed by an intelligent bystander: *Oscar Chess Ltd v Williams* [1957] 1 WLR 370 at 375, per Lord Denning MR.

*Dem Compagnie P/L v Telxon Australia P/L* (12 March 2004) (Meagher, Handley and Giles JJA)

*Dem Compagnie P/L v Telxon Australia P/L* (12 March 2004) (Meagher, Handley and Giles JJA)

19. There can be no doubt that the parties reached a concluded agreement when the letter of 27 December 1978 was signed by Mr Blackman, or that they intended themselves to be bound to performance of that agreement, notwithstanding that they left open the possibility that the terms might be restated in an ampler form (cf. Masters v. Cameron (1954) 91 CLR 353, at p 360 ). The question however is whether the statements made by Mr Blackman to Mr Hirsch and Ms Josefsen, in the course of the negotiations in November 1978, became terms of the contract which is, in part at least, embodied in that letter. The letter purports to state the effect of the previous discussion between the parties, and the fact that Mr Blackman was asked to, and did, endorse it "Accepted and Agreed" provides an indication that the letter itself was intended to state all the terms of the agreement then made between the parties, although it was envisaged that further terms might be added if the agreement were put into more formal shape. In these circumstances, the rule that oral evidence is not allowed to be given to add to a written contract might have made it difficult to treat the statements made in the course of negotiations as part of the agreement, were it not for the fact that it was admitted on the pleadings that the distributorship agreement reached by the parties in November and December 1978 was partly in writing, partly oral and partly implied: see par.13 of the amended statement of claim and par.8 of the various amended defences. There was, however, no admission that all the representations made by Mr Blackman in November 1978 became part of the distributorship agreement.

**Following paragraph cited by:**

*Refaat v Barry* (20 August 2015) (Warren CJ, Ashley and Tate JJA)

*Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd* (22 December 2014) (Warren CJ, Whelan and Santamaria JJA)

*Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd* (22 December 2014) (Warren CJ, Whelan and Santamaria JJA)

*Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd* (22 December 2014) (Warren CJ, Whelan and Santamaria JJA)

*Wyllie v Tarrison Pty Ltd* (30 July 2007) (Giles JA; Basten JA; Campbell JA)

20. A representation made in the course of negotiations which result in a binding agreement may be a warranty - i.e. it may have binding contractual force - in one of two ways: it may become a term of the agreement itself, or it may be a separate collateral contract, the consideration for which is the promise to enter into the main agreement. In either case the question whether the representation creates a binding contractual obligation depends on the intention of the parties. In J.J. Savage &Sons Pty. Ltd. v. Blakney (1970) 119 CLR 435, at p 442 and Ross v. Allis-Chalmers Australia Pty. Ltd. (1 980) 55 ALJR 8, at pp 10 and 11, it was said that a statement will constitute a collateral warranty only if it was "promissory and not merely representational", and it is equally true that a statement which is "merely representational" - i.e. which is not intended to be a binding promise - will not form part of the main contract. If the parties did not intend that there should be contractual liability in respect of the accuracy of the representation, it will not create contractual obligations. In the present case Mr Blackman, who made his statements fraudulently, had of course no intention that they should amount to contractual undertakings, but he could not rely on his secret thoughts to escape liability, if his representations were reasonably considered by the persons to whom they were made as intended to be contractual promises, and if those persons intended to accept them as such. The intention of the parties is to be ascertained objectively; it "can only be deduced from the totality of the evidence": Heilbut, Symons & Co. v. Buckleton (1913) AC 30, at p 51. In other words, as Lord Denning said in Oscar Chess Ltd. v. Williams (1957) 1 WLR 370, at p 375 :

> "The question whether a warranty was intended depends on the conduct of the parties, on their words and behaviour, rather than on their thoughts. If an intelligent bystander would reasonably infer that a warranty was intended, that will suffice."

The intelligent bystander must however be in the situation of the parties, for "what must be ascertained is what is to be taken as the intention which reasonable persons would have had if placed in the situation of the parties": Reardon Smith Line v. Hansen-Tangen (1976) 1 WLR 989, at p 996.

---

**Following paragraph cited by:**

> Romero v Farstad Shipping (Indian Pacific) Pty Ltd (22 December 2014) (Allsop CJ, Rares J and McKerracher J)
>
> Mainieri v Cirillo (17 September 2014) (Nettle AP and Hansen and Santamaria JJA)

---

21. In the present case I am unable to agree with the conclusion reached by the learned judges in the Supreme Court that the statements made by Mr Blackman in November 1978 were intended by the parties to be warranties. The fact that Mr Blackman intended Mr Hirsch and Ms Josefsen to act on the representations by entering into an agreement, and that they did so, does not mean that the parties intended the representations to be terms of the agreement. The representations were not made at the time when the parties concluded an agreement, but about a month before that time. They were followed up by further discussions and correspondence in which no reference was made to them. The explanation suggested for the fact that the representations were not incorporated into the letter of 27 December 1978 was that the letter dealt largely with the procedures for determining the dealership and commencing the distributorship, but the absence from the letter of any mention of the suggested terms is nevertheless an indication, although not a conclusive one, that the parties did not intend them to be warranties. With one exception, the representations were not promissory in form, but were statements of fact or of belief or of self-commendation. The possible exception was the

statement (immaterial for present purposes) that Mr Blackman would set up a marketing organization with sales representatives trained in the use and demonstration of U.S.S.C.'s products in a manner similar to that used in U.S.S.C.'s training program in the United States. The critical terms found by McLelland J. to be warranties were, as was stated in the judgment of the Court of Appeal, "a distillation of the words which Blackman actually employed". Although it might well have been thought that Mr Blackman was making a proposal that would be for the benefit of both parties, he made no promise to act for the common benefit. The suggested term that he would not deal in competitive products is sought to be implied from the statement that after he had got the Auto Suture business "really rolling" he might take on non-competitive product lines - a statement which falls far short of a promise not to deal in competitive products. The form of the representations is not decisive, but is nevertheless relevant in determining the intention, actual or imputed, of the parties. Although the suggested terms now appear to have great significance, it is by no means clear that they were so regarded at the time. When agreements had been made by U.S.S.C. with other distributors, such as Downs, it was not a term of those agreements that the distributor should act for the common benefit of the parties and should not deal in products competitive with those of U.S.S. C. The Australian market seems to have been regarded as of so little significance to U.S.S.C. that that company did not at the time of the agreement bother to protect itself by applying for patents or seeking to register a trade mark, and in the same way it did not require Mr Blackman to enter into a formal agreement containing express warranties of the kind now sought to be based on the representations made in the conversation of November 1978. The proper conclusion to be drawn from the evidence in my opinion is that neither Mr Blackman nor Mr Hirsch and Ms Josefsen intended the statements made in November to be anything more than mere representations.

Implied Terms

22. It then becomes necessary to consider whether any terms should be implied in the agreement. It is clear that, as a matter of law, there is implied a term imposing on the parties the obligations described in s.2-306(2) of the Uniform Commercial Code. The obligation thus imposed on H.P.I. was to "use best efforts" to promote the sale of the goods concerned, i.e. the relevant products of U.S. S.C.

---

**Following paragraph cited by:**

Electricity Generation Corporation t/as Verve Energy v Woodside Energy Ltd (20 February 2013) (McLure P, Newnes JA, Murphy JA)

Memery v Trilogy Funds Management Limited (15 June 2012) (Margaret McMurdo P, Fraser and White JJA,)

Rafferty v Madgwicks (20 March 2012) (Kenny, Stone and Logan JJ)

Williamson and McGillivray v JIA Holdings (02 December 2011) (Fraser and Chesterman JJA, and Margaret Wilson AJA,)

Mr Whippy Pty Ltd v Oceanwalk Pty Ltd (19 February 2008) (Giles JA at 1; Handley AJA at 90; Howie J at 91)

Wolseley Investments Pty Ltd v Gillespie (12 December 2007) (Santow JA at 1; Ipp JA at 86; Tobias JA at 87)

Waters Lane v Sweeney (16 August 2007) (Giles JA; Santow JA; Tobias JA)

Best and Less Pty Limited v Divergent Technologies Pty Limited (05 February 2002) (Hill, Whitlam & Conti JJ)

*Etna v Arif* (01 July 1999) (Charles, Callaway and Batt, Jj.A)

23. In the Supreme Court, little attention seems to have been paid to the question whether the implication of this term, as a matter of law, might render it unnecessary to make any further implication as a matter of fact. McLelland J. thought that in order to effectuate the purpose of the agreement as mutually contemplated by the parties, and to enable U.S.S.C. to have the benefit thereof which was mutually contemplated, it was necessary to imply a term that H.P.I. would not during the distributorship do anything inimical to the market in Australia for U.S.S.C.'s surgical stapling products. The members of the Court of Appeal, who agreed with this conclusion, considered that the express warranties which they held had been given, that Mr Blackman would use his best efforts to build up the Australian market for U.S.S.C.'s products for the common benefit of the parties and would not deal in any products competitive with those of U.S.S.C., removed the agreement from the common run of contracts between supplier or manufacturer and distributor, and that in the circumstances it was necessary to imply a provision that Mr Blackman would do nothing to damage or destroy U.S.S.C.'s market in Australia.

24. The implied obligation to use best efforts to promote the sale of the goods necessarily imported the obligation not to take any deliberate steps to damage the market for those goods in Australia. The meaning of terms of this kind has been considered in a number of cases, but it is trite to say that the meaning of particular words in a contract must be determined in the light of the context provided by the contract as a whole and the circumstances in which it was made, and that decisions on the effect of the same words in a different context must be viewed with caution. On the one hand, an express promise by an agent to use his best endeavours to obtain orders for another and to influence business on his behalf "necessarily includes an obligation not to hinder or prevent the fulfilment of its purpose": Shepherd v. Felt and Textiles of Australia Ltd. (1931) 45 CLR 359, at p 378. On the other hand, an obligation to use "best endeavours" does not require the person who undertakes the obligation to go beyond the bounds of reason; he is required to do all he reasonably can in the circumstances to achieve the contractual object, but no more: Sheffield District Railway Co. v. Great Central Railway Co. (1911) 27 TLR 451, at p 452 ; Terrell v. Mabie Todd &Co. Ltd. (1952) 69 RPC 234, at p 237. In Transfield Pty. Ltd. v. Arlo International Ltd. (1980) 144 CLR 83 the licensee of a patented process for the manufacture and erection of a steel pole for the purpose of electricity transmission lines (the Arlo pole) covenanted "to use its best endeavours in and towards the ... selling" of the pole. The actual decision in the case was that this provision of the contract did not prohibit the licensee from using any pole other than the Arlo pole. Stephen J. said, at p. 94 :

> "An obligation to use best endeavours to sell Arlo poles implies a prohibition upon the offering for sale and selling of competitive poles, at least to the extent that to do so will prejudice the sale of Arlo poles."

Mason J. took a somewhat narrower view of the effect of the words of the relevant clause of the contract. He said, at pp.101, that the licensee's obligation was "to use all its efforts and skills towards (inter alia) the selling of the ARLO pole to the extent that it was reasonable so to do in the circumstances and to energetically promote and develop a market for it" and that he could see "no adequate basis for importing into this positive obligation a negative implication that the appellant will not use or for that matter sell a pole which competes with the ARLO pole, whether that pole be manufactured by the appellant or by another". He added, at p.102, that the licensee might do all that

was within its power to comply with the clause yet find that it had no practical alternative but to use or sell a competing pole and that the clause did not prohibit or prevent such use or sale. Wilson J. said, at p.107, that the licensee was obliged to do "all that could reasonably be expected of it having regard to the circumstances of its business operations". An undertaking to use best endeavours or best efforts to promote the sale of one product does not necessarily impose an obligation not to sell a competing product (see Van Valkenburgh, Nooger &Neville, Inc. v. Hayden Publishing Co. (1972) 330 NYS 2d 329, at p 333, and cases there cited) although it may do so in some circumstances, as was held to be the case in Randall v. Peerless Motor Car Co. (1912) 99 NE 221. However, a person who had given such an undertaking could not successfully assert that he had fulfilled it if he prepared a product of his own and promoted the sale of that product with the deliberate intention of appropriating for himself the market which he had in effect promised to do all he reasonably could to secure for the person to whom he had given the undertaking. Clearly it was a breach of the implied obligation for H.P.I. to prepare and sell, as it did, its own products instead of those of U.S.S.C.

---

**Following paragraph cited by:**

Servcorp WA Pty Ltd v Perron Investments Pty Ltd (18 May 2016) (Martin CJ, Buss JA, Murphy JA)

Regreen Asset Holdings Pty Ltd v Castricum Brothers Australia Pty Ltd (27 October 2015) (Warren CJ and Kyrou and McLeish JJA)

Grocon Constructors (Victoria) Pty Ltd v APN DF2 Project 2 Pty Ltd (23 July 2015) (Santamaria, Kyrou and McLeish JJA)

Secure Parking (WA) Pty Ltd v Wilson (19 December 2008) (Martin CJ)

Jackson Nominees Pty Ltd v Hanson Building Products Pty Ltd (21 April 2006) (Williams and Jerrard JJA and McMurdo J,)

---

25. There is in my opinion no room in the present case for the implication in the agreement of any further term such as that implied by McLelland J. and the Court of Appeal. The principles governing the implication of terms in contracts have recently been stated by the Judicial Committee in B.P. Refinery Pty. Ltd. v. Hastings Shire Council (1977) 52 ALJR 20, at pp 26-27, and by this Court in Secured Income Real Estate (Australia) Ltd. v. St. Martins Investments Pty. Ltd. (1979) 144 CLR 596, at pp 605-606, and Codelfa Constructions Pty. Ltd. v. State Rail Authority of N.S.W. (1982) 149 CLR 337, at pp 345-347 and 403-404 . It was said by the majority of the Judicial Committee in the first of those cases, and accepted in this Court in the others, that for a term to be implied the following conditions (which may overlap) must be satisfied:

"(1) it must be reasonable and equitable; (2) it must be necessary to give business efficacy to the contract, so that no term will be implied if the contract is effective without it; (3) it must be so obvious that 'it goes without saying'; (4) it must be capable of clear expression; (5) it must not contradict any express term of the contract."

**Following paragraph cited by:**

Schmidt v AHRKalimpa Pty Ltd (31 July 2020) (Kyrou, Hargrave and Emerton JJA)

David Nolan v Executive Director, Land Management Policy,Department of Environment and Primary Industries (13 November 2015) (Warren CJ, Tate and Kaye JJA)

Kalls Enterprises Pty Ltd (in liq) v Baloglow (09 August 2007) (Giles JA at 1; Ipp JA at 210; Basten JA at 230)

McCann v Switzerland Insurance Australia Ltd (14 December 2000) (Gleeson CJ,Gaudron, Kirby, Hayne and Callinan JJ)

26. In the present case the agreement was efficacious without the implication of any further term. In other words, it does not here become necessary to imply any further term, "with the object of giving to the transaction such efficacy as both parties must have intended that at all events it should have" (to use the familiar words of The Moorcock (1889) 14 P.D. 64, at p. 68 ) or to make the agreement work or to avoid an unworkable situation, to adopt the words of the dissenting judgment in B.P. Refinery Pty. Ltd. v. Hastings Shire Council, at p 30. The commercial objective that U.S.S.C. sought to achieve by means of the agreement was that as many of its products should be sold in Australia as was reasonably possible and that as a result the market for those products should be expanded in Australia. This objective would be secured if H.P.I. did all that it reasonably could to sell as many of U.S.S.C.'s products as possible in Australia. In other words, the obligation imported by the Uniform Commercial Code was enough to give to the agreement the business efficacy that U.S.S.C. intended it to have. The circumstances that Mr Blackman had been fraudulent and (if it was the case) that U.S.S.C. had placed special trust in him did not justify the implication of any further term of this kind. Moreover a term that H.P.I. would not do anything inimical to U.S.S.C.'s market in the goods in question, or in other words that H.P.I. would do nothing to damage or destroy U.S.S.C.'s market in Australia, if it went beyond the term implied by the Uniform Commercial Code, was not a term which the parties must presumably have intended to be a part of the agreement - a term so obvious that there was no need to express it. On the contrary, if the parties had been asked on 27 December 1978 whether such a term was part of the agreement, instead of replying "of course; that is so clear that we did not bother to say it", they might well have answered that such a term would go too far, since it might require the distributor to refrain from action that was perfectly reasonable although it might in some way damage U.S.S.C.'s market in Australia. For example, a decision by H.P.I. to increase the price of the products, or to reduce the extent to which they were advertised, might have an adverse effect on the market, although it might be reasonable or even necessary from H.P.I.'s point of view. I conclude that the agreement contained no implied term imposing any duty on H.P.I. except that resulting from the operation of s.2-306(2) of the Uniform Commercial Code. The conclusions which I have reached on this aspect of the matter differ in their practical consequences from those reached in the Supreme Court in two main respects. First, although H.P.I. was bound to use its best efforts to promote the sale of U.S.S.C.'s products, and thus to build up the market for them, and it was necessarily contemplated that this would enure to the advantage of both parties, H.P.I. had no contractual obligation to act for the common benefit of U.S.S.C. and itself; it was entitled to put its own interests first, or to disregard its own interests entirely, provided that it did not fail to do all that it reasonably could to promote the sale of U.S.S.C.'s products. Secondly, the term which the Supreme Court held to be implied, against doing anything inimical to the market in Australia for U.S.S.C.'s products, would make it a breach for H.P.I. to do anything whose effect was to damage or destroy U.S.S.C.'s market, whereas in my opinion action by H.P.I. having a damaging effect would amount to a breach only if it amounted to a failure to do all that could reasonably be done to sell U.S.S.C.'s products.

Following paragraph cited by:

Schmidt v AHRKalimpa Pty Ltd (31 July 2020) (Kyrou, Hargrave and Emerton JJA)
Adventure Golf Systems Australia Pty Ltd (ACN 077 643 175) v Belgravia Health & Leisure Group Pty Ltd (ACN 005 087 463) (08 November 2017) (Santamaria, Kaye and Ashley JJA)
Adventure Golf Systems Australia Pty Ltd (ACN 077 643 175) v Belgravia Health & Leisure Group Pty Ltd (ACN 005 087 463) (08 November 2017) (Santamaria, Kaye and Ashley JJA)
Despot v Registrar General of NSW (20 September 2013) (Meagher and Ward JJA, Bergin CJ in Eq)
Grefeld & Grefeld (01 June 2012) (Finn, Strickland & Austin JJ)

67. On that basis, applying the law of Australia, the relationship created by the power of attorney was one of agency, and that is ordinarily a fiduciary one

(see *Hospital Products Ltd v United States Surgical Corp & Ors* (1984) 156 CLR 41 at 68 , 96 , 141 ) in which the agent is not permitted to put his interest in conflict with the principal's, nor to act for different principals for conflicting interests, nor to profit from the agency, at least without full disclosure to the principal (see *Keith Henry & Co Pty Ltd v Stuart Walker & Co Pty Ltd* (1958) 100 CLR 342 at 350 ; *Consul Development Pty Ltd v DPC Estates Pty Ltd* (1975) 132 CLR 373 at 377, 392-394 ; *Chan v Zacharia* (1984) 154 CLR 178 at 198-199 ; *Hospital Products v United States Surgical* at 67).

Townsend v Roussety & Co (WA) Pty Ltd (20 February 2007) (Wheeler JA)
Brooker v Friend & Brooker Pty Ltd (20 December 2006) (Mason P; McColl JA; Basten JA)

144. Indeed, on appeal, the argument that the relationship between the parties was a partnership was but faintly pressed. Rather Mr Forster's submissions focused more on whether, having regard to the proposition that the relationship was one of quasi-partnership, as the respondent conceded through his counsel, there was a fiduciary relationship between the parties, exposing them to an obligation to account in relation to personal borrowings. He contended that that quasi-partnership relationship was established by the para 8 conversations and persisted despite the incorporation of the company, or came into existence as a result, in particular, of the course of personal borrowings undertaken when the company was in parlous financial circumstances. He relied upon the propositions that a fiduciary relationship with attendant fiduciary obligations may, and ordinarily will, exist between prospective partners who have embarked upon the conduct of the partnership business or venture before the precise terms of any partnership agreement have been settled (*United Dominions Corporation*

*Ltd v Brian Pty Ltd* [1985] HCA 49; (1985) 157 CLR Pat 12 ) and that partners normally stand in a fiduciary relationship to one another: *Birtchnell v. Equity Trustees, Executors and Agency Co Ltd* (at 407) per Dixon J; *Hospital Products Ltd v United States Surgical Corporation* (at 68 ) per Gibbs CJ. He also argued that there was a joint venture between the parties with attendant fiduciary obligations. Having regard to the conclusion I have reached concerning the quasi-partnership argument, it is unnecessary to deal with the joint venture argument.

*Dresna Pty Ltd v Linknarf Management Services Pty Ltd (in liq)* (19 December 2006) (Heerey, Gyles & Bennett JJ)

51. While the categories of relationships which give rise to fiduciary obligations are not closed ( *Hospital Products Ltd v United States Surgical Corporation* (1984) 156 CLR 41 at 68 per Gibbs CJ ), it is hardly surprising that senior counsel for Dresna was unable to point to any case where the relationship between co-litigants, or anything remotely analogous thereto, had given rise to such a relationship. The hazards and inherent uncertainty of litigation are such that parties who join together as plaintiffs, or are joined together as defendants, are likely to be faced with contingencies which compel them to act in their own interests, ignoring the interests of their temporary allies. *Sauve qui peut* often becomes the guiding precept.

*Dresna Pty Ltd v Linknarf Management Services Pty Ltd (in liq)* (19 December 2006) (Heerey, Gyles & Bennett JJ)

157. As was stated in *Hospital Products Ltd v United States Surgical Corporation* (1984) 156 CLR 41 at 68 by Gibbs CJ, there is a difficulty in suggesting a test by which it may be determined that a fiduciary relationship exists outside the accepted categories. The basis of the relationship between Dresna and Franklins was the Mentone BSA. The fact that the arrangement between the parties was of a purely commercial kind is indicative of no fiduciary duty ( *Hospital Products* at 70 ). In *Hospital Products,* Gibbs CJ referred at 71 to the fact that an agreement between parties which was, as here, terminable on reasonable notice argued against such a relationship. Factors such as a relation of confidence, inequality of bargaining power (considered to be of importance by Dawson J in *Hospital Products* at 142 ), the existence of a duty to be performed and an undertaking to act for another, are not of themselves sufficient to found such a relationship. It is a question of fact in each case (at 72). In discussing the proposition that where two people have dealt with each other as principals neither will be the other's fiduciary, Gibbs CJ commented that the duty did not exist where one party did not undertake, whether by representation or contractual provision, to act solely in the interest of the other and not in its own interest (at 72). Although in dissent on the existence of a fiduciary relationship on the facts in *Hospital Products* , Mason J observed at 97 that a contractual and fiduciary relationship may co-exist but the fiduciary relationship, if it is to exist, must accommodate itself to and be regulated by the terms of contract.

*Public Trustee of the Australian Capital Territory v Colin Geoffrey Hall* (23 December 2003)

20. Mr Ward supported the reasoning of Crispin J. He accepted that a joint tenancy may be severed by a unilateral act of severance but he contended that severance 'does not affect any underlying equitable estates'. Mr Ward said that a 'fiduciary relationship of trust and confidence exist[s] between joint tenants'. He cited a passage in the judgment of Gibbs CJ in *Hospital Products Limited v United States Surgical Corporation* (1984) 156 CLR 41 at 68 ( '*Hospital Products*'), in which his Honour set out a list of classes of persons 'who normally stand in a fiduciary relationship to one another'. The list comprised partners, principal and agent, director and company, master and servant, solicitor and client, tenant-for-life and remainderman. Mr Ward submitted, on the basis of this list, that a married couple was an *a fortiori* example of a fiduciary relationship. He also said the 'relationship between joint tenants is analogous to that of partnership'.

*Rexstraw v Johnson* (09 October 2003)

*Asset Risk Management v Hyndes* (13 July 1999) (Meagher, Sheller and Stein JJA)

9 Moreover, if authority were needed that a man in the respondent's position owed a fiduciary duty to his master, one need search no further than *Hospital Products Limited v United States Surgical Corporation* (1984) 156 CLR 41 at 68 , 96 and 141.

10 In my view the following orders should be made:

27. It is clear that H.P.I. committed serious breaches of its obligation to use its best efforts to promote the sale of U.S.S.C.'s products, and that U.S.S.C. is entitled to recover from H.P.I. damages for these breaches. However U.S.S.C. contends that it was also owed by H.P.I. a fiduciary obligation, the breach of which entitled U.S.S.C. not merely to compensation but to "restitution of property unconscientiously withheld" (Vyse v. Foster (1872) LR 8 Ch App 309, at p 333 ), and to the equitable remedies of equitable lien and constructive trust. A person who occupies a fiduciary position may not use that position to gain a profit or advantage for himself, nor may he obtain a benefit by entering into a transaction in conflict with his fiduciary duty, without the informed consent of the person to whom he owes the duty. This principle - some would prefer to say "these principles" - has been described as "inflexible" (Birtchnell v. Equity Trustees, Executors and Agency Co. Ltd. (1929) 42 CLR 384, at p 408 ) and "fundamental" (Phipps v. Boardman (1967) 2 AC 46, at p 123 ) and its nature and application have been discussed in a number of comparatively recent cases: by this Court in Consul Development Pty. Ltd. v. D.P.C. Estates Pty. Ltd. (1975) 132 CLR 373 and Chan v. Zacharia (1984) 58 ALJR 353 ; by the Judicial Committee in N.Z. Netherlands Society "Oranje" Incorporated v. Kuys (1973) 1 WLR 1126 and Queensland Mines Ltd. v. Hudson (1978) 52 ALJR 399 ; by the Court of Appeal of New Zealand in Coleman v. Myers (1977) 2 NZLR 225 ; and by the Supreme Court of Canada in Canadian Aero Service Ltd. v. O'Malley (1973) 40 DLR (3d) 371 . Clearly if H.P.I. was under a fiduciary obligation to U.S.S.C. it failed to fulfil it. The question however is whether any fiduciary relationship did exist between the parties.

28. The authorities contain much guidance as to the duties of one who is in a fiduciary relationship with another, but provide no comprehensive statement of the criteria by reference to which the existence of a fiduciary relationship may be established. The archetype of a fiduciary is of course the trustee, but it is recognized by the decisions of the courts that there are other classes of persons who normally stand in a fiduciary relationship to one another - e.g., partners, principal and agent, director and company, master and servant, solicitor and client, tenant-for-life and remainderman. There is no reason to suppose that these categories are closed. However, the difficulty is to suggest a test by

which it may be determined whether a relationship, not within one of the accepted categories, is a fiduciary one.

---

**Following paragraph cited by:**

Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd (01 September 2017) (Dowsett, Greenwood and White JJ)

Omnilab Media Pty Ltd v Digital Cinema Network Pty Ltd (19 December 2011) (Jacobson, Rares and Besanko JJ)

Bli Bli # 1 P/L v Kimlin Investments P/L (04 June 2010) (Holmes and Fraser and White JJA,)

Bacnet Pty Ltd v Lift Capital Partners Pty Ltd (in liq) (04 May 2010) (Keane CJ, Finkelstein and Jacobson JJ)

Pilmer v Duke Group Ltd (In Liq) (31 May 2001) (McHugh, Gummow, Kirby, Hayne and Callinan JJ)

Harrison v Schipp (20 February 2001) (Handley, Giles and Fitzgerald JJA)

Harrison v Schipp (20 February 2001) (Handley, Giles and Fitzgerald JJA)

Harrison v Schipp (20 February 2001) (Handley, Giles and Fitzgerald JJA)

G & M Aldridge Pty Ltd v Walsh; Elecraft Pty Ltd v Walsh; K & v Plumbers Pty Ltd v Walsh; Barden-Steeldeck Industries Pty Ltd v Walsh (12 November 1999) (Winneke, P., Phillips and Buchanan, Jj.A)

---

11. First, it was by no means clear that the amount in question represented retention money, previously withheld from the trade contractors by Construction. The appellants could point only to one letter from Construction to support their contention in this regard and the terms of that letter were equivocal. Secondly, even if some sums had been retained by Construction as claimed by the appellants, I am far from persuaded that there was any separation out of the money so retained, any fund established in the hands of Construction to which a trust might attach, or indeed any obligation cast upon Construction which might have grounded such a trust. The appellants relied upon *In re Australian Home Finance Ltd.* [1956] V.L.R. 1, *Hospital Products Ltd. v. U.S. Surgical Corporation* (1984) 156 C.L.R. 41 at 69 , 72 , 96-7 , 125 , *Stephens Travel Service International Pty. Ltd. v. Qantas Airways Ltd.* (1988) 13 N.S.W.L.R. 331, *A.S.C. v. Melbourne Asset Management Nominees Pty. Ltd.* (1994) 49 F.C.R. 334 at 358-9 and *Re Old Inns of N.S.W. Pty. Ltd.; Millar v. Leach* (1994) 13 A.C.S.R. 141; but either the cases were distinguishable or the passages relied upon had no application. In my opinion, there was nothing to indicate that the amount of $399,329 was other than a sum within the general funds of Construction - even if, as calculated by Construction, the amount identified was held by it, for and on behalf of Thompson, to be paid out to the contractors under their contracts as and when appropriate. In my opinion the evidence fell a long way short of what would be needed to prove that the amount being held by Construction was subject to a trust for trade contractors before Thompson gave the direction for its payment.

G & M Aldridge Pty Ltd v Walsh; Elecraft Pty Ltd v Walsh; K & V Plumbers Pty Ltd v Walsh; Barden-Steeldeck Industries Pty Ltd v Walsh (12 November 1999) (Winneke, P., Phillips and Buchanan, Jj.A)

11 First, it was by no means clear that the amount in question represented retention money, previously withheld from the trade contractors by Construction. The appellants could point only to one letter from Construction to support their contention in this regard and the terms of that letter were equivocal. Secondly, even if some sums had been retained by Construction as claimed by the appellants, I am far from persuaded that there was any separation out of the money so retained, any fund established in the hands of Construction to which a trust might attach, or indeed any obligation cast upon Construction which might have grounded such a trust. The appellants relied upon Re Australian Home Finance Pty. Ltd. [1956] V.L.R. 1 ; Hospital Products Ltd. v United States Surgical Corporation (1984) 156 C.L.R. 41 at 69 , 72 , 96-7 , 125 ; Stephens Travel Service International Pty. Ltd. v Qantas Airways Ltd. (1988) 13 N.S.W.L.R. 331 ; Australian Securities Commission v Melbourne Asset Management Nominees Pty. Ltd. (1994) 49 F.C.R. 334 at 358-9 and Re Old Inns of N.S.W. Pty. Ltd.;

Brunninghausen v Glavanics (23 June 1999) (Priestley, Handley and Stein JJA)

Brunninghausen v Glavanics (23 June 1999) (Priestley, Handley and Stein JJA)

Brunninghausen v Glavanics (23 June 1999) (Priestley, Handley and Stein JJA)

29. In the present case McLelland J. said that there were two matters of importance in deciding when the court will recognize the existence of the relevant fiduciary duty. First, if one person is obliged, or undertakes, to act in relation to a particular matter in the interests of another and is entrusted with the power to affect those interests in a legal or practical sense, the situation is, in his opinion, analogous to a trust. Secondly, he said that the reason for the principle lies in the special vulnerability of those whose interests are entrusted to the power of another to the abuse of that power. The learned members of the Court of Appeal considered that the first of these statements needed a qualification which McLelland J. had intended to suggest, namely that the undertaking to act in the interests of another meant that the fiduciary undertook not to act in his own interests; they said that the principle is that "a fiduciary relationship exists where the facts of the case in hand establish that in a particular matter a person has undertaken to act in the interests of another and not in his own". They added that it is not inconsistent with this principle that a fiduciary may retain that character although he is entitled to have regard to his own interest in particular matters. Their conclusion was that in matters concerning the development of U.S.S.C.'s market in Australia for its surgical stapling products, and its protection from competition, H.P.I. undertook to act in U.S.S.C.'s interest and not in its own.

30. I doubt if it is fruitful to attempt to make a general statement of the circumstances in which a fiduciary relationship will be found to exist. Fiduciary relations are of different types, carrying different obligations (see In re Coomber. Coomber v. Coomber (1911) 1 Ch 723, at pp 728-729, Jenyns v. Public Curator (Q.) (1953) 90 CLR 113, at pp 132-133 and Phipps v. Boardman, at pp 126-127) and a test which might seem appropriate to determine whether a fiduciary relationship existed for one purpose might be quite inappropriate for another purpose. For example, the relation of physician and patient, and priest and penitent, may be described as fiduciary when the question is whether there is a presumption of undue influence, but may be less likely to be relevant when an alleged conflict between duty and interest is in question. Moreover, different fiduciary relationships may entail different consequences, as is shown by the discussion of the respective positions of a

trustee and a partner in relation to the renewal of a lease: see In re Biss. Biss v. Biss (1903) 2 Ch 40, at pp 56-57 and 61-62, Griffith v. Owen (1907) 1 Ch 195, at pp 203-204, and Chan v. Zacharia.

31. In the decided cases, various circumstances have been relied on as indicating the presence of a fiduciary relationship. One such circumstance is the existence of a relation of confidence, which may be abused: Tate v. Williamson (1866) LR 2 Ch App 55, at p 61, Coleman v. Myers, at p 325. However, an actual relation of confidence - the fact that one person subjectively trusted another - is neither necessary for nor conclusive of the existence of a fiduciary relationship; on the one hand a trustee will stand in a fiduciary relationship to a beneficiary notwithstanding that the latter at no time reposed confidence in him, and on the other hand an ordinary transaction for sale and purchase does not give rise to a fiduciary relationship simply because the purchaser trusted the vendor and the latter defrauded him.

---

**Following paragraph cited by:**

Kafataris v Davis (05 October 2016) (Greenwood, Middleton and McKerracher JJ)
Potts v Robins (24 September 2013) (Margaret McMurdo P and Muir and Gotterson JJA)
Dresna Pty Ltd v Linknarf Management Services Pty Ltd (in liq) (19 December 2006) (Heerey, Gyles & Bennett JJ)

157. As was stated in *Hospital Products Ltd v United States Surgical Corporation* (1984) 156 CLR 41 at 68 by Gibbs CJ, there is a difficulty in suggesting a test by which it may be determined that a fiduciary relationship exists outside the accepted categories. The basis of the relationship between Dresna and Franklins was the Mentone BSA. The fact that the arrangement between the parties was of a purely commercial kind is indicative of no fiduciary duty ( *Hospital Products* at 70 ). In *Hospital Products,* Gibbs CJ referred at 71 to the fact that an agreement between parties which was, as here, terminable on reasonable notice argued against such a relationship.  Factors such as a relation of confidence, inequality of bargaining power (considered to be of importance by Dawson J in *Hospital Products* at 142 ), the existence of a duty to be performed and an undertaking to act for another, are not of themselves sufficient to found such a relationship. It is a question of fact in each case (at 72). In discussing the proposition that where two people have dealt with each other as principals neither will be the other's fiduciary, Gibbs CJ commented that the duty did not exist where one party did not undertake, whether by representation or contractual provision, to act solely in the interest of the other and not in its own interest (at 72). Although in dissent on the existence of a fiduciary relationship on the facts in *Hospital Products* , Mason J observed at 97 that a contractual and fiduciary relationship may co-exist but the fiduciary relationship, if it is to exist, must accommodate itself to and be regulated by the terms of contract.

---

32. Another circumstance which is sometimes suggested indicates the existence of a fiduciary relationship is inequality of bargaining power, but it is clear that such inequality alone is not enough to create a fiduciary relationship in every case and for all purposes. In any case, Mr Blackman was not in a position of dominance or advantage over U.S.S.C. at the time the contract was made. Indeed, if there was any inequality in the situation of the parties, it might well be thought that U.S.S.

C. was in the stronger position.

33. On the other hand, the fact that the arrangement between the parties was of a purely commercial kind and that they had dealt at arm's length and on an equal footing has consistently been regarded by this Court as important, if not decisive, in indicating that no fiduciary duty arose: see Jones v. Bouffier (1911) 12 CLR 579, at pp 599-600, 605 ; Dowsett v. Reid (1912) 15 CLR 695, at p 705 ; Para Wirra Gold &Bismuth Mining Syndicate No Liability v. Mather (1934) 51 CLR 582, at p 592 ; Keith Henry &Co. Pty. Ltd. v. Stuart Walker &Co. Pty. Ltd. (1958) 100 CLR 342, at p 351. A similar view was taken in Canada in Jirna Ltd. v. Mister Donut of Canada Ltd. (1971) 22 DLR (3d) 639 ; affirmed (1973) 40 DLR (3d) 303 .

34. In Reading v. The King (1949) 2 KB 232, a case in which a soldier had obtained bribes by abuse of his position, Asquith L.J. said, at p 236 :

> "A consideration of the authorities suggests that for the present purpose a 'fiduciary relation' exists (a) whenever the plaintiff entrusts to the defendant property, including intangible property as, for instance, confidential information, and relies on the defendant to deal with such property for the benefit of the plaintiff or for purposes authorized by him, and not otherwise ... and (b) whenever the plaintiff entrusts to the defendant a job to be performed, for instance, the negotiation of a contract on his behalf or for his benefit, and relies on the defendant to procure for the plaintiff the best terms available ..."

That decision was approved in the House of Lords ( (1951) A.C. 507 ) although Lord Porter said (at p.516) that the words "fiduciary relationship" in that setting were used in "a wide and loose sense". The first branch of Lord Asquith's statement has no application to the present case. It was submitted on behalf of U.S.S.C. that that company had entrusted to H.P.I. its actual and prospective business connexion and goodwill in Australia and had relied on H.P.I. to protect and increase that goodwill for the benefit of U.S.S.C. I do not need to discuss the question whether product goodwill can be regarded as property capable of assignment by itself, for I find it impossible to accept that H.P.I. became a fiduciary in respect of U.S.S.C.'s goodwill. The contract did not oblige H.P.I. to protect U. S.S.C.'s goodwill nor were representations made that it would be protected. H.P.I.'s relevant obligation was to use its best efforts to promote the sale of U.S.S.C.'s goods. However, apart from the agreement, in cl.2 of the letter of 27 December 1978, to purchase Downs' inventory and use the dealership inventory of approximately $100,000 to $125,000 wholesale value, H.P.I. was not obliged to purchase from U.S.S.C. any particular quantity or value of products for distribution. Failure to make further purchases would only be a breach if it amounted to a failure to do all that could reasonably be expected to promote the sale of the products, and H.P.I.'s business circumstances and financial situation could be considered in deciding what was reasonable. There was no express provision as to the duration of the agreement; it was therefore terminable either at will or on reasonable notice. Although what H.P.I. did would be likely to affect the market for U.S.S. C.'s goods in Australia, it is apparent that H.P.I. had not given an undertaking to develop or protect the market since its obligation to buy the products for distribution was qualified by what was reasonable having regard to its own circumstances, and it was free to terminate the agreement at any time. Nor was U.S.S.C. powerless in this situation; it also was free to terminate the agreement and make other arrangements for the distribution of its goods. The argument that a fiduciary relation was created with regard to the goodwill of the products in my opinion quite deserts the reality of the situation.

35. The second branch of Lord Asquith's statement, if regarded as enunciating a general rule divorced from its context, seems to me, with all respect, to be far too wide; the fact that there is a duty to be performed - a job to do - cannot in every case create a fiduciary obligation. I agree with the statement of Megarry V.-C. in Tito v. Waddell (No. 2) (1977) Ch 106, at pp 229-230, that the imposition of a statutory duty to perform certain functions cannot be said as a general rule to impose fiduciary obligations, and the same is true of contractual duties arising under ordinary commercial contracts.

---

Following paragraph cited by:

Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd (01 September 2017) (Dowsett, Greenwood and White JJ)
Feiglin v Ainsworth (07 December 2015) (Tate, Osborn and McLeish JJA)
Bli Bli # 1 P/L v Kimlin Investments P/L (04 June 2010) (Holmes and Fraser and White JJA,)
Brunninghausen v Glavanics (23 June 1999) (Priestley, Handley and Stein JJA)
Brunninghausen v Glavanics (23 June 1999) (Priestley, Handley and Stein JJA)
Brunninghausen v Glavanics (23 June 1999) (Priestley, Handley and Stein JJA)
Brunninghausen v Glavanics (23 June 1999) (Priestley, Handley and Stein JJA)
Brunninghausen v Glavanics (23 June 1999) (Priestley, Handley and Stein JJA)

---

36. Finally, I would refer to the opinion expressed by Dr Finn in his comprehensive work on Fiduciary Obligations (1977), at p.201, that, for the purposes of the conflict rule, a fiduciary is "simply, someone who undertakes to act for or on behalf of another in some particular matter or matters." Even if it were meant that every agent is a fiduciary, the statement would be open to doubt: see McKenzie v. McDonald (1927) VLR 134, at p 144, Phipps v. Boardman, at p 127, and cases cited in 17 MLR, at pp 31-32. And if the statement is to be understood more widely it cannot be accepted without some qualification. Indeed Dr Finn appeared himself to qualify it when he went on to say, at p.201:

"The finding of such an undertaking is simply a question of fact in each case. So if, for example, all that can be shown is that two people have dealt with each other only as principals neither will be the other's fiduciary."

37. The test suggested by the Court of Appeal in the present case seems to me not inappropriate in the circumstances, although it must be remembered that any test can only be stated in the most general terms and that all the facts and circumstances must be carefully examined to see whether a fiduciary relationship exists (cf. Phipps v. Boardman, at pp 123, 127). However, if the Court of Appeal's test is applied, it is not satisfied, for in my opinion H.P.I. did not undertake, whether by representation or contractual provision, to act solely in the interests of U.S.S.C. and not in its own interests.

Following paragraph cited by:

Correa v Whittingham (15 August 2013) (Barrett and Gleeson JJA, Tobias AJA)

38. An examination of all the circumstances confirms in my opinion that the relationship between the parties was not a fiduciary one. It is true that U.S.S.C. relied on H.P.I. to promote the sale of its products and left it to H.P.I. to determine how it should go about doing so, and that H.P.I. had it in its power to affect U.S.S.C.'s interests beneficially or adversely. However, there are two features of the case, in particular, which together constitute an insuperable obstacle to the acceptance of U.S.S.C.'s contention that a fiduciary relationship existed between itself and H.P.I. In the first place, as I have said, the arrangement was a commercial one entered into by parties at arm's length and on an equal footing. It was open to U.S.S.C. to include in its contract whatever terms it thought necessary to protect its position, for U.S.S.C. acted in response to Mr Blackman's request and was under no pressure either to make him a distributor in place of Downs or to accept an agreement on his terms; indeed U.S.S.C. itself prepared the letter of agreement which its in-house counsel asked Mr Blackman to sign. An ordinary commercial contract made in those circumstances, even as a result of fraud, is unlikely to give rise to fiduciary obligations. Secondly, it was of course clear that the whole purpose of the transaction from Mr Blackman's point of view, as U.S.S.C. knew, was that he, and later H.P.I., should make a profit. Further, as I have already explained, in the performance of the contract a conflict between the interests of H.P.I. and U.S.S.C. was likely to arise, and any such conflict was not necessarily to be resolved in favour of U.S.S.C. How, in those circumstances, is it possible to say that H.P.I. was under an obligation not to profit from its position, and not to place itself in a situation in which its duty and its interest might conflict? It is true, as Lord Wilberforce said in New Zealand Netherlands Society "Oranje" Incorporated v. Kuys, at p 1130, that a person "may be in a fiduciary position quoad a part of his activities and not quoad other parts: each transaction, or group of transactions must be looked at." His Lordship referred to Birtchnell v. Equity Trustees, Executors and Agency Co. Ltd. where Dixon J. said, at p 408:

> "The subject matter over which the fiduciary obligations extend is determined by the character of the venture or undertaking for which the partnership exists, and this is to be ascertained, not merely from the express agreement of the parties ... but also from the course of dealing actually pursued by the firm."

Lord Wilberforce said that although these remarks were made in the context of a partnership the principle must be of general application, and it is clear that in the case of every fiduciary relationship it is critical to determine what is the subject of the fiduciary obligation. However, in the present case, there was, in my opinion, no part of the transaction to which a fiduciary obligation might sensibly be limited. H.P.I. was entitled to make a profit from the entire conduct of the distributorship, and possible and actual conflicts between its interest and its duty might arise at any stage in the conduct of that business. It would commit a breach of its contractual obligations only if it acted unreasonably and thereby failed to use its best endeavours to promote the sale of the products. An obligation to act reasonably falls far short of that imposed by the rules of equity on a fiduciary, who can defeat a claim to account for profits acquired by reason of his fiduciary position and by reason of the opportunity resulting from it only on the ground that the profits were made with the knowledge and assent of the person to whom the fiduciary obligation was owed (see Phipps v. Boardman, at p 105); the equitable rules are exceedingly strict, as the decisions in Regal (Hastings) Ltd. v. Gulliver (1942) 1 All ER 378 , noted (1967) 2 AC 134 , and Phipps v. Boardman plainly

illustrate. What is attempted in this case is to visit a fraudulent course of conduct and a gross breach of contract with equitable sanctions. It is not necessary to do so in order to vindicate commercial morality, for the ordinary remedies for damages for fraud and breach of contract were available to U. S.S.C. although it did not choose to pursue the former, but in any case the equitable doctrines sought to be invoked have no application to the present circumstances.

39. For these reasons I conclude that H.P.I. did not stand in a fiduciary relation to U.S.S.C. and that the only relief to which U.S.S.C. was entitled in the circumstances of the case was an award of damages for breach of contract.

40. I have not failed to consider the decisions of the United States courts upon which counsel for U. S.S.C. relied in support of the view that a manufacturer's distributing agent stands in a fiduciary relationship to the manufacturer. Of those cases that which is most in point is Flexitized, Inc. v. National Flexitized Corporation (1964) 335 F 2d 774. In that case the plaintiffs, which manufactured flexible collar stays under the name "Flexitized", appointed the defendants to be their exclusive distributors under an agreement by which the defendants promised to use their best efforts to sell the plaintiffs' product and also promised not to sell a competing product during the life of the contract. The defendants, in breach of their agreement, sold competing collar stays and the plaintiffs recovered damages for that breach. That aspect of the case does not concern us. After the plaintiffs had terminated the agreement, the defendants continued to use the name "Flexitized" while marketing collar stays not made or sold by the plaintiffs. It was held that although the plaintiffs had no valid trade mark, they were entitled to an account of the defendants' profits by reason of their unfair competition. The court said, at p. 782 :

> "Also, the defendants' conduct in continuing to use, without plaintiffs' permission, the
> name 'Flexitized' after its contract breach was expressly found to have been the result of
> a deliberate attempt to exploit purchaser familiarity with the name, and, as is clear from
> our prior discussion of the breach of contract claim in this case, such conduct by
> defendants was also directly connected with a breach on their part of a fiduciary
> relationship which had arisen upon their becoming exclusive sales agents for plaintiffs.
> Under these circumstances we think that defendants were properly chargeable with
> having misappropriated a valuable property right or commercial benefit under
> circumstances meriting a finding of unfair competition according to the law of New
> York ..."

In another case of passing off by a former distributor, Distillerie Fili Ramazzotti, S.P.A. v. Banfi Products Corporation (1966) 276 NYS 2d 413, it was said, at p 422, that "the goods being sold by defendant are the same goods which it sold during the time when it stood in what amounts to a fiduciary relationship to plaintiff, both as distributor and licensee." In Sapery v. Atlantic Plastics, Inc. (1958) 258 F 2d 793, where it was held that a manufacturer was entitled to terminate an agreement with its sales representative when he had set up a competing business, the view also seems to have been taken that the parties stood in a fiduciary relationship: see at p. 796. It was not necessary to decide in any of these cases whether the relation between the parties was a fiduciary one in the sense that the distributor or representative owed a duty not to make a profit from his relationship and not to allow his interest to conflict with his duty. In none of the cases was there any discussion of the question why or how the alleged fiduciary relationship arose. In another case to which we were referred, Arnott v. American Oil Co. (1979) 609 F 2d 873, it was held that a fiduciary relationship existed between an oil company and a dealer who had leased a service station

from that company and that in consequence the oil company was in breach of its "fiduciary" duty of good faith and fair dealing by terminating the dealer's lease without good cause. Again the court was considering whether there existed what it called a "fiduciary relationship" but which was quite different in kind from that suggested to exist in the present case. In truth those decisions provide no assistance in deciding the questions that now arise. The fact that they are relied on illustrates "the danger of trusting to verbal formulae" of which Fletcher Moulton L.J. spoke in In re Coomber. Coomber v. Coomber, at p 728. If the distributors were properly described as "fiduciaries" for the purposes of the American cases to which I have referred, it does not follow that they were fiduciaries who owed duties of the kind sought to be enforced against H.P.I. The judgments in those cases throw no light on the questions that now fall for decision.

41. The conclusion which I have reached, that there was no breach of fiduciary duty, makes it unnecessary to consider other questions so fully debated at the bar. It means that U.S.S.C.'s claim to have it declared that the assets of H.P.I., I.R.D. and S.C.I., and certain of the assets of H.P.L., are held subject to a constructive trust for U.S.S.C. fails at the outset. A case might have been made out against Mr Blackman for inducing a breach of contract, but the proceedings in the Supreme Court do not appear to have been conducted on that basis. McLelland J. held that Mr Blackman had knowingly participated in the breaches by H.P.I. of its equitable obligations, but made no finding that he had induced a breach of H.P.I.'s contractual obligations. The matter was not pursued on appeal to this Court.

42. I accordingly hold that the only relief to which U.S.S.C. is entitled is to recover from H.P.I. damages for breach of contract.

Damages

43. Clearly, it was a breach by H.P.I. of its contractual obligations to defer fulfilment of orders for U.S.S.C.'s products in anticipation of filling those orders with products which it prepared or manufactured and to fill orders for the products of U.S.S.C. with its own competing products. The question remains whether it was a breach of the contract for H.P.I. secretly to develop a capacity to manufacture copies of U.S.S.C.'s products or components thereof with a view to appropriating for itself at the expense of U.S.S.C. the whole or a part of the Australian market for U.S.S.C.'s products. In my opinion that did amount to a breach of H.P.I.'s duty to use its best endeavours to promote the sale of U.S.S.C.'s products. It was quite incompatible with that obligation to make preparations to sell its own products as those of U.S.S.C. to persons who would otherwise have bought the products of U.S.S.C.: cf. Blyth Chemicals Ltd. v. Bushnell (1933) 49 CLR 66, especially at p 82. It will of course be a question of fact whether any damage flowed from that breach additional to that which flowed from the other breaches mentioned.

Conclusion

44. In my opinion the appeal of the appellant and the cross appeals of the second, third, fourth and fifth respondents should be allowed and the cross appeal of the first respondent should be dismissed. Judgment should be entered for the first respondent against the third respondent for damages and the matter should be remitted to the Supreme Court to assess the damages. Judgment should be entered for the appellant and the second, fourth and fifth respondents.

MASON J.

2. This appeal, which has attracted cross appeals, is from a decision of the New South Wales Court of Appeal allowing an appeal by the first respondent ("USSC"), the plaintiff in an action in the Supreme Court of New South Wales, which, though it succeeded in the action, failed to obtain relief by way of constructive trust at first instance. The case raises interesting questions as between an overseas manufacturer and its exclusive distributor in Australia. These questions concern the existence of a fiduciary relationship, the scope of the distributor's fiduciary duty and the extent of relief for breach of that duty, in particular the availability of relief by way of a constructive trust over the assets of a business commenced by the distributor in competition with that of the overseas manufacturer at a time when the distributorship was still on foot.

3. USSC is a manufacturer in the United States of surgical stapling devices and disposable loading units. In November-December 1978 USSC agreed with the fourth respondent, Alan Richard Blackman, to appoint him as USSC's exclusive Australian distributor as from 1 April 1979. In or about February 1979, by agreement between USSC, Blackman and Hospital Products International Pty. Ltd. ("HPI") (then known as Hospital Products of Australia Pty. Ltd.), HPI was substituted for Blackman as the proposed distributor. HPI acted as the exclusive distributor in Australia of USSC's products from 1 April 1979 until 25 December 1979 when HPI terminated the distributorship. That termination was accepted by USSC by telex on 10 January 1980.

4. On 25 December 1979 HPI began to supply to its existing customers for USSC's products and to market generally products which were for all relevant purposes identical to those of USSC but which were contained in packages identifying them with HPI, not with USSC. Initially the products were of USSC manufacture and were sterilized and repackaged by HPI, in some cases with components manufactured by HPI. Gradually the components manufactured by HPI increased so that ultimately it marketed products entirely of its own manufacture.

5. The development by HPI of its own manufacturing capacity had been proceeding, unknown to USSC, from a time before the commencement of the distributorship, by a process known as "reverse engineering", involving the measurement and analysis of USSC components and the construction of tools, moulds and dies for the production of copies. In connexion with the "reverse engineering", HPI engaged the fifth respondent, I.R.D. Engineering Services Pty. Ltd. ("IRD"), a company which eventually came under the control of Blackman. Later, towards the end of 1980, HPI began to market its products in the United States through the second respondent, Surgeons Choice Inc. ("SCI"), a wholly-owned subsidiary of HPI.

6. In June 1981 the business and assets of HPI and of IRD, including the issued capital of SCI, were acquired by the appellant. Blackman and HPI acquired control of the appellant.

7. I have taken this narration of the basic facts from the judgment of the primary judge, McLelland J. They reflect what was common ground between the parties in the Supreme Court. Before I examine the facts more closely I should refer to the principal conclusions reached and the relief granted by the primary judge and later by the Court of Appeal.

8. McLelland J. made the following declarations:

(1) that HPI by secretly developing a capacity to manufacture copies of products manufactured by USSC or components thereof, by deferring fulfilment of orders for products manufactured by USSC in anticipation of filling those orders with products packaged or manufactured by HPI and by filling those orders with its competing products, with a

view to appropriating for itself at the expense of USSC the whole or a substantial part of the Australian market for products manufactured by USSC, committed breaches of equitable and contractual obligations owed by HPI to USSC;

(2) that Blackman knowingly participated in the breaches by HPI of its equitable obligations; and

(3) that by reason of the breaches and the knowing participation by Blackman, USSC was entitled at its election -

(a) as against HPI and Blackman to payment of an amount equal to the profits made by HPI by selling surgical stapling products, other than products manufactured by USSC and sold in USSC's packages, on the Australian market between 1 December 1979 and 30 November 1980 and such payment to be secured by an equitable lien over the assets held by HPI representing the proceeds of the sale by HPI of its manufacturing business to the appellant or so much of those assets as the court may think sufficient to secure the payment;

(b) as against HPI and Blackman, to payment of equitable compensation in respect of the breaches of equitable obligations; or

(c) as against HPI to damages for breaches of its contractual obligations.

Orders were made in accordance with these declarations, USSC having elected to pursue the first of the alternative remedies.

9. By way of security for the payment of the amount of profits, McLelland J. further declared that USSC was entitled to an equitable lien over all the shares in the capital of the appellant held by HPI and all moneys owing by the appellant to HPI, representing or derived from any part of the consideration on the sale of its manufacturing business to the appellant. His Honour restrained the appellant until payment from (a) disposing of, charging or otherwise dealing with any such shares held by HPI in the capital of the appellant; and (b) demanding, directing or receiving payment of, or assigning, charging or otherwise dealing with any such moneys owing to HPI by the appellant.

10. The Court of Appeal, unlike the primary judge, concluded that USSC was entitled to relief by way of constructive trust over the assets of HPI and that the appellant acquired HPI's assets with notice of USSC's claim to those assets. The Court set aside the declarations and orders of McLelland J. and declared that all assets including the business and goodwill owned by the appellant on 1 July 1981 and at any time thereafter were and had been at all material times since 1 July 1981 held on trust for USSC with the exception of those assets which were assets of the appellant prior to its acquisition of the business and assets of HPI and IRD. The Court ordered the appellant to transfer those assets to USSC. Other orders consequential upon the making of those orders were also made.

11. The arguments presented to this Court by the appellant, HPI, Blackman and IRD challenge the findings that there was a fiduciary duty owed by HPI to USSC, that there was a breach of that duty and that relief by constructive trust was appropriate relief for breach of fiduciary duty. These arguments call for a detailed examination of the facts and of the findings made by the primary judge and by the Court of Appeal.

THE FACTS

(a) Background

12. Since 1967 USSC has manufactured in the United States and marketed there and in other countries, under the name "Auto Suture", surgical stapling devices of its own design, and disposable loading units, also of its own design, for use with those devices. They enable surgeons to carry out surgical procedures, in particular suturing, using stainless steel staples applied mechanically instead of surgical needles and thread. By the end of 1978 USSC had developed and was manufacturing and marketing a range of these devices and disposable loading units for use in various types of surgical procedure. USSC had also developed and was manufacturing and marketing integrated devices and staple cartridges known as disposable skin staplers suitable for use on a single occasion, being made predominantly in plastic.

13. In the years 1972 and 1973 USSC began to appoint "authorized dealers" to market its products and provide instruction to users. Each dealer was allocated a defined geographical area. The relationship between USSC and each dealer was governed by a standard form "Dealership Agreement", supplemented where necessary by a "Dealer Security Agreement" regulating the financial arrangements between USSC and the dealer.

14. The authorized dealer was neither an employee nor an agent of USSC. The dealer was in business on his own account and purchased USSC's products for resale to customers. By 1975 USSC had approximately eighty dealers serving areas within the United States. In that year USSC began to establish its own sales staff to market its products within the United States. Thereafter the sales representatives employed by USSC replaced authorized dealers. By late 1978 there were no more than thirty three dealers and by 1980 or 1981 they had been entirely eliminated.

15. In foreign countries USSC appointed distributors. By the end of 1978 they numbered twenty seven. Generally speaking a foreign distributor was an established business house already engaged in the distribution of other products. The arrangements between USSC and its distributors were more informal than those regulating USSC's relationships with its dealers. There was no standard form distribution agreement, the contractual arrangements consisting of an appointment of the distributor by letter following preliminary discussions or correspondence. Foreign distributors were not agents of USSC; like dealers, they purchased USSC's products for resale to customers.

16. USSC supplied to its dealers and distributors disposable loading units and disposable skin staplers for demonstration purposes at a fraction of the cost charged for the clinical products. They were in general identical to those supplied for clinical use except in two respects, viz., (1) unlike the clinical product, the demonstration product was not sterilized; and (2) unlike the clinical product the demonstration product was supplied in unsterile packs.

(b) Blackman's Association with USSC

17. Blackman first became associated with USSC early in 1973 when he was employed as product manager in relation to the marketing of an intravenous infusion set then manufactured by USSC. In August 1973 he commenced business on his own account as an authorized USSC dealer for a substantial part of the city of New York. In 1976 the dealership was taken over by The Hospital Products Corporation ("HPC"), a corporation formed in New York and owned and controlled by Blackman.

18. Blackman was a competent salesman with a high degree of expertise in USSC's products. He was highly regarded by Mr Leon Hirsch, the President of USSC, and Miss Turi Josefsen, Mr Hirsch's wife and Vice-President of USSC in charge of marketing, with each of whom he maintained a close relationship.

19. Despite this close relationship there had been some friction, arising principally from the substantial reduction in September 1975 of Blackman's New York distributorship area and a complaint made in December 1975 by Blackman about USSC's quality control which Hirsch believed to have been fabricated. The primary judge found that its existence did not cause "any permanent impairment of the cordial relationship" between Blackman and Hirsch and Josefsen.

(c) The Australian Distributorship

20. At or about the beginning of November 1978 at a meeting in a restaurant in Stamford, Connecticut, or in New York, Blackman, after informing Hirsch and Josefsen that he wished to emigrate to Australia, proposed that he be appointed USSC's exclusive Australian distributor in place of Downs Surgical (Australia) Pty. Ltd., ("Downs Surgical"), the then Australian distributor of USSC products, and that his existing New York dealership be phased out. Hirsch and Josefsen indicated that they were favourably disposed to Blackman's proposal. It was arranged that Blackman should later discuss further details of the matter with Josefsen. There was a conflict of evidence between Blackman on the one hand and Hirsch and Josefsen on the other, as to the discussions which they had. The primary judge resolved this conflict in favour of Hirsch and Josefsen, concluding that Blackman was not a credible witness.

21. A later discussion did take place, apparently in the latter half of November 1978 in USSC's office in Stamford. There was discussion about the training of a nurse whom Blackman proposed to employ in Australia and about the size of Downs Surgical's stock inventory and the possibility of its purchase by Blackman. It was arranged that he would consult with Mr Grimes, USSC's regional manager, in order to work out details of the termination of the New York distributorship. Although Josefsen stated that she thought a written distributorship agreement should be prepared, Blackman said that he did not think it was necessary.

22. Subsequently, Blackman discussed with Grimes the phasing out of the New York dealership. There followed an exchange of letters between Blackman and Josefsen beginning with a letter dated 27 November 1978 from Blackman and a reply dated 18 December 1978 from Josefsen in which she agreed in principle to proposals outlined by Blackman in his letter of 27 November for (a) the termination of his dealership; (b) the termination of the Downs Surgical distributorship on 1 December 1978 with 90 days' notice on the footing that Blackman would purchase its inventory and USSC would refrain from shipping to Downs Surgical further supplies; and (c) the terms of supply by USSC to Blackman in Australia. Josefsen stated that she had requested Mr Fisher (USSC's in-house counsel) to prepare a distributorship agreement for execution by USSC and Blackman.

23. On 27 December 1978 USSC wrote to Downs Surgical terminating its distributorship as from 31 March 1979. On the same day USSC sent to Blackman in duplicate a letter under the hand of Mr Whittingham, Senior Vice-President, Administration, which read as follows:

> "We take pleasure in confirming the continuance of our relationship. You will become our Australian distributor while phasing out your dealership in accordance with the following procedures.
>
> 1. We have this day given notice of termination to our present Australian distributor, Downs Surgical (Australia) Pty. Ltd. effective March 31, 1979. A copy of the notice has been furnished to you. Upon that termination becoming effective and commencing April 1, 1979 you will be our exclusive Australian distributor. Although you have indicated that no formal agreement is necessary, we believe it is desirable and will forward to you a suggested agreement covering the distributorship.
>
> 2. During the period through March 31, 1979 you will undertake to purchase the Downs' inventory at prices mutually agreeable to you and them and in any event use your dealership inventory which you estimate will be approximately $100,000 - $125,000, wholesale value, to provide an inventory level in Australia. Additional products purchased by you from us will be paid on a 30 day net basis. In the meantime arrangements should be made to examine your inventory books and records as per your dealership agreement at the earliest convenient date.
>
> 3. You expect to rent from us between 20-30 sets of instruments which within 120 days you will convert to purchase from us.
>
> 4. You will hire and train your nurse unless she is agreeable to training by us at your expense.
>
> 5. Your dealership will continue without change through June 30, 1979. Effective July 1, 1979 your dealership shall be deemed terminated in all respects and your PAR (primary area of responsibility) will be taken over by us for servicing.
>
> 6. By July 1, 1979 all accounts owed to us will be paid in full by you. This includes outstanding A/R (accounts receivable), inventory, demonstrations, interest, financing charges and other obligations.
>
> If the above is your understanding of our discussions please sign and return the enclosed copy of this letter. We look forward with great pleasure to our new relationship and wish you every success in your new undertaking."

24. On 29 December 1978 in a discussion in Fisher's office in New York Blackman confirmed that he was satisfied with the contents of the letter. Blackman signed the letter under the words:

> "Accepted and agreed
>
> The Hospital Products Corporation". USSC took no further steps in relation to a formal

distributorship agreement on the decision of Josefsen, concurred in by Hirsch, as a result of Blackman's expressed disinclination to have one.

25. On 6 January 1979 Blackman arrived in Australia. At or about the beginning of February he acquired HPI, then a shelf company bearing a different corporate name. It was admitted on the pleadings that at about the same time, by novation, HPI was substituted for Blackman in the distributorship agreement entered into in November and December 1978.

26. Having made arrangements to purchase the excess stock of Downs Surgical, HPI replaced that company as USSC's sole distributor in Australia as from 1 April 1979 and began to market Auto Suture products to Australian hospitals and surgeons. Blackman devoted himself energetically to the promotion of Auto Suture products with the result that between April and December 1979 there was a substantial increase in the use of those products in Australian hospitals.

27. The cost price to Downs Surgical of the stock purchased from it by HPI was $50,000 approximately, some five times more than Blackman had anticipated as a result of his discussions with Josefsen. The price at which HPI was to purchase the stock was 10 per cent over cost. HPI paid Downs Surgical $5,000 approximately and it was arranged that USSC would give that company credit for the balance of $50,000 approximately and debit that amount to HPI.

28. In or about May 1979 HPI began to purchase further stock direct from USSC. As at 30 June 1979 HPI was indebted to USSC in the sum of US$65,000 approximately for stock purchased from USSC as well as US$54,000 approximately for stock purchased from Downs Surgical. In addition HPC was indebted to USSC in respect of the New York dealership in an amount of US$70,000 as at 30 July 1979. These debts gave rise to a further agreement between the parties which resulted later in the execution of mutual releases.

(d) Blackman's Plans To Compete With USSC

29. Blackman had first come to Australia in August 1978 for twelve days. He ascertained then, if not earlier, that USSC's surgical stapling devices and disposable loading units, which were the subject of patents in the United States, were not the subject of patents registered in Australia and he consulted solicitors in Sydney in relation to his competing with USSC by marketing USSC-made demonstration products repackaged and sterilized in Australia and the possibility of his obtaining registration in Australia of the trademark "AUTOSUTURE". On 11 August 1978 he set in train investigations by Professor Wallwork, a metallurgist in the University of New South Wales, into

    (a) the composition and physical properties of the wire staples in USSC disposable loading units; and

    (b) the suitability of radiation sterilization of disposable loading units after packaging.

Later in 1978 he asked Professor Wallwork to investigate and report on the composition and physical properties of other metal components in the disposable loading units and to investigate the possibility of the production of dies for the manufacture of those components.

30. Blackman had for some years known that USSC's demonstration product did not differ in quality from its clinical product. He had been accumulating since 1977 abnormally large stocks of

demonstration product in the course of HPC's New York dealership. No doubt this was the stock to which he referred when on 2 February 1979 he told HPI's prospective banker that he had purchased stock in America at very advantageous prices in readiness for him to start on his own.

31. The primary judge found that by the time of the restaurant meeting at the beginning of November 1978 Blackman had, subject to his being appointed USSC's Australian distributor, formed the intention of setting up an organization in Australia:

> (a) to manufacture components similar to USSC-made components of the types required to be used with USSC-made demonstration cartridges;

> (b) to repackage and sterilize USSC-made demonstration cartridges accompanied where necessary by components made by himself; and

> (c) to market the resulting products in competition with USSC-made clinical products.

His Honour also found that Blackman was at that stage exploring the feasibility of recovering, refurbishing, repackaging and marketing used cartridges as well as manufacturing and marketing complete copies of USSC-made disposable loading units.

32. On a subsequent visit to Australia in the first half of November 1978 Blackman retained Graham Engel and Associates Pty. Ltd., consultants in pharmaceutical sciences and in the regulation of pharmaceutical goods, to act for him in his dealings with the Federal and State Governments in Australia and to advise in relation to the sterilization and quality control of surgical stapling cartridges and the packing of such cartridges. After Blackman's return to the United States Mr Engel, the principal of the company, entered into discussions with Blackman's Sydney solicitors with a view to taking steps "to get the stapling business underway". In December 1978 approaches were made to Smith &Nephew Associated Companies of Australia Pty. Ltd. with a view to carrying out the packaging and sterilization of certain USSC-made demonstration disposable loading units. This company was later retained to undertake this work, but the engagement did not proceed. On 15 November 1978 Blackman's solicitors lodged an application for the registration of the trademark "AUTOSUTURE" in the name of HPI in respect of, inter alia, "instruments and apparatus for use in surgery".

33. Between December 1978 and February 1979 arrangements were made by Blackman for the shipping of large quantities of USSC-made demonstration product by HPC to HPI via Hong Kong. For taxation reasons each transaction was structured as a sale by HPC to Pilotte Nominees Ltd., a New Hebrides company, as a trustee for a trust called the Bellevue Trust at a price equivalent to the cost of the product to HPC, a second sale by Pilotte Nominees Ltd. to Morust Ltd., a Hong Kong company, the shares in which were to be held by the Bellevue Trust, whilst Morust Ltd. was intended to hold all the shares in HPI, at a price many times that under the first sale, and a third sale by Morust Ltd. to HPI at a price slightly in excess of the price under the second sale. Shipments of these demonstration products were made by HPC by air on 16 February 1979 and on 29 March 1979 at invoiced prices to Pilotte Nominees Ltd. of US$4,490 and US$14,700 respectively. They were received by HPI at invoiced prices of the order of $500,000.

34. At the beginning of March 1979 HPI, through Blackman, engaged Mr L. Crispe, a product engineering consultant, as project manager for HPI's proposed manufacturing activities. Under

Blackman's direction Crispe immediately set about establishing a production capability for HPI involving, inter alia, as a first stage:

(a) the manufacture of components for disposable loading units identical to USSC-made components; and

(b) the cleaning, assembly, packaging, labelling and sterilization of certain disposable loading units manufactured by USSC, comprising USSC-made demonstration product, combined where necessary with locally-made components;

and as a second stage:

(c) the manufacture of all components identical with USSC-made components of certain types of disposable loading units manufactured by USSC; and

(d) the assembly, packaging, labelling and sterilization of those types using locally-made components.

All this was with a view to marketing the disposable loading units so produced, under the name of HPI in competition with, or in substitution for, USSC-made clinical product.

35. Substantially all the engineering work involved in the first stage of these activities was performed for HPI under contract by a firm called IRD Engineering Services and in the second stage by that firm and its successor in business, the respondent IRD. By August 1979 a number of components for disposable loading units were being manufactured for, and supplied to HPI. And by October 1979 HPI had begun to defer fulfilment of orders received for Auto Suture products in anticipation of filling those orders with HPI packaged products. At or about the same time HPI ceased to place further orders with USSC. In or about November 1979 HPI commenced to assemble disposable loading units comprising USSC-made demonstration product with HPI-made components added where necessary, repackaging them under HPI's label and sterilizing them.

36. On 25 December 1979 Blackman wrote to Josefsen as follows:

"Dear Turi,

I am sorry to inform you that Hospital Products of Australia Pty. Ltd. shall this day on, no longer be the authorized distributor for United States Surgical Corporation's product line. This decision has been made for numerous reasons, not the least of which involves:

1/ U.S.S.C.'s growing problem with quality control. 2/ U.S.S.C.'s constant back-order position. 3/ U.S.S.C.'s inability to process orders efficiently. 4/ Resulting damage to Hospital Products of
Australia Pty. Ltd.'s reputation in the marketplace.

I will be in New York City from January 25 - February 15 finalizing all my affairs. I suggest we get together during this period to settle all accounts due."

37. The letter was received by Josefsen on 7 January 1980. On 10 January 1980 Josefsen telexed Blackman on behalf of USSC accepting HPI's decision to terminate the distributorship and suggesting that a time and place be appointed in New York for settling accounts and the outstanding debt owing to USSC.

38. From 25 December 1979 HPI began to supply HPI repackaged product to fill orders then outstanding and subsequently received for Auto Suture products. Blackman anticipated that HPI would be able to supply products wholly manufactured by itself within a few months and in the meantime considered that HPI would be able to supply its labelled and repackaged USSC-made demonstration products with the addition of HPI-made components where necessary.

39. On 28 December 1979 HPI communicated with all hospital purchasing agents, stating that it was phasing out all the United States' manufactured goods and substituting an Australian manufactured product. Thereafter products supplied by HPI made no reference to USSC or to Auto Suture except in the words "For use with Auto Suture instrument". Each label included the words:

> "Packaged and distributed by Hospital Products International Pty. Ltd. 10-12 Clarke Street, Crows Nest. Sydney, NSW 2065. Patent pending".

40. The primary judge found that as from 25 December 1979 HPI began to supply customers in Australia with HPI-labelled products, the HPI-made proportion of the content of which was increasing with the passage of time, in order that the existing Australian market for USSC-made products might be converted into an equivalent market for HPI-made products. He found also that this was done in a manner which was intended to, and did in fact, mislead existing customers for USSC-made products into believing that the HPI labelled products were being manufactured in Australia by arrangement with, or under license from, USSC.

41. During 1980 HPI began to supply various types of disposable loading units of its own manufacture. However, in order to maintain its ability to satisfy orders in that year, HPI obtained supplies of USSC-made clinical products which HPI repackaged under its label. HPI obtained large quantities of these products by procuring their purchase from USSC, or its distributors, by agents either using a false name or otherwise adopting methods to conceal from USSC the identity of HPI as purchaser. HPI also acquired USSC-made devices by similar means for use in the promotion of HPI-packaged products.

42. After the termination of HPI's distributorship, USSC did not re-enter the Australian market until August 1980 when it formed a subsidiary which resumed the marketing of USSC-made disposable loading units in Australia. HPI continued marketing its products in Australia until November 1980. Thereafter, while continuing to manufacture its product in Australia, it marketed them in the United States and elsewhere through SCI which it formed in the United States for that purpose in or about October 1980.

43. McLelland J. found that the obtaining by Blackman of the distributorship was a condition of the implementation by him of his scheme to take over the whole or a substantial part of the market in

Australia for USSC's products. The Court of Appeal concluded that his appointment as distributor conferred on him a number of opportunities without which his scheme may not have succeeded. The opportunities which the Court of Appeal identified were as follows:

(1) the distributorship would enable him to know or become

   known to purchasers of USSC's products in Australia, without labouring under the handicap of being a competitor;

(2) the distributorship would enable him to establish

   surreptitiously a manufacturing capacity;

(3) he would be able to obtain finance from USSC and other

   sources;

(4) he would be able to reduce the promotion and sale of

   USSC's products before terminating the distributorship and satisfy outstanding orders with products containing Australian made components; and

(5) he could supply his own products to existing customers

   who might readily believe that he was acting with the authority of USSC.

As the Court pointed out, Blackman and HPI took advantage of each of these opportunities.

44. The Court of Appeal then drew the inference:

> "... that in all Blackman did, and through him all that HPI did, he and with him HPI, were actuated by one design, namely to put himself, and hence HPI, in a position in which he, and it, could appropriate for himself and it at the expense of USSC, the whole or a substantial part of the Australian market for USSC products. ... Without limiting what we have said, this applied throughout the period of the actual operation of the distributorship. Even his activity, during the distributorship, of building up the market in Australia for USSC products by the use of USSC marketing techniques was done by him in order that the enhanced market could be taken over by HPI as it was by vacating it for USSC products during the distributorship and thereupon occupying it with HPI products."

CHOICE OF LAW

45. USSC based its claim for relief in the proceedings in the Supreme Court on the law of New South Wales. The primary judge and the Court of Appeal proceeded on the footing that choice of law was not a material issue in the case because there was a substantial identity between the law of New South Wales and the laws of New York and Connecticut, the two competing jurisdictions. Consequently choice of law is not a matter which this Court need consider and I shall therefore proceed on the assumption that the relevant law is that of New South Wales.

TERMS OF THE DISTRIBUTORSHIP AGREEMENT

46. McLelland J.'s finding that the countersigned letter of 27 December 1978 from USSC to Blackman was not intended to record the whole of the transaction between them, was confirmed by the Court of Appeal. The appellant challenges the finding on the ground that Blackman was asked to sign beneath the words "Accepted and agreed" and that the letter purported to be a statement of USSC's understanding of the discussions between the parties. It seems that the letter did more than confirm the earlier discussions. The letter specified a different termination date for the New York dealership and a different commencement date for the Australian distributorship from those proposed in the earlier letter of 27 November and the new dates do not appear to have been mentioned in the oral discussions. The letter of 27 December actually records an appointment of Blackman as Australian distributor from 1 April 1979 and a termination of his New York dealership on 1 July 1979. Apart from these matters the letter deals with procedural matters, as McLelland J. found. It indicates that USSC then contemplated the execution of a formal agreement regulating Blackman's appointment as Australian distributor.

47. The ultimate decision of the parties to dispense with the execution of a formal agreement does not necessarily compel the conclusion that the letter of 27 December was a complete statement of the contract between the parties. Although Hirsch and Josefsen participated in the earlier discussions with Blackman believing that a formal contract governing the Australian distributorship should be executed, it does not follow that the discussions had no contractual significance. It sometimes happens that parties arrive at an oral agreement without knowing whether the oral agreement will constitute a contract in its own right or whether it will lead to the execution of a formal written contract. If the parties then proceed on the footing that they have entered into a contract without executing a formal contract, the terms of their contract are to be found in their oral discussions. Here the problem has an extra dimension in that the oral discussions were followed by the countersigned letter which evidenced an agreement on a number of topics and contemplated the possibility of the execution of a formal contract governing the appointment of Blackman as Australian distributor.

> **Following paragraph cited by:**
>
> Apple and Pear Australia Ltd v Pink Lady America LLC (23 November 2016) (Tate, Ferguson and McLeish JJA)

48. That USSC did not insist on a formal distributorship contract was due to Blackman's insistence that it was unnecessary and possibly to the confidence which Hirsch and Josefsen, particularly Josefsen, had in Blackman, though this is not supported by any finding on the part of the primary judge. Although USSC's decision not to insist on a formal contract might suggest that it was content to rely on the contract as set out in the countersigned letter, it is equally consistent with USSC's reliance on a contract consisting of that letter and the earlier discussions between Blackman, Hirsch and Josefsen. The importance of the discussions is acknowledged in the penultimate sentence of that letter which indicates that the discussions constituted the contract. The letter itself does not purport to be a contract between the parties; it begins by confirming "the continuance of our relationship" and ends by making it clear that the object of the letter is to record USSC's "understanding" of the antecedent discussions. In those discussions USSC had agreed to appoint Blackman as its exclusive distributor in Australia and to provide financial assistance, factors which support the view that the

discussions were contractual in some aspects at least.

49. In addition to these matters there is the conclusion reached by the primary judge, a conclusion with which I agree, that some of the matters conveyed by Blackman to Hirsch and Josefsen at the restaurant meeting were "of a promissory nature and not merely representational", amounting in substance to an offer by Blackman to USSC which was accepted by USSC by its agreement to appoint him as Australian distributor. This acceptance had the effect of incorporating these promises, subject to later modifications of them in discussion and correspondence, as express terms of the contract.

50. The express terms of the contract as found by McLelland J. and accepted by the Court of Appeal, were:

> (1) that the distributor would establish a marketing oganisation for USSC surgical stapling products in Australia having one or more sales representatives specifically trained in the use and demonstration of those products;

> (2) that the distributor would devote its best efforts to distributing USSC surgical stapling products,

> and building up the market for those products, in Australia, to the common benefit of USSC and itself;

> (3) that the distributor would not deal (scil. in Australia) in any products competitive with USSC surgical stapling products; and

> (4) that the distributor would not deal (scil. in Australia) in any other products in such a manner as would diminish its efforts in distributing USSC surgical stapling products and building up the market for those products in Australia.

Each was to endure for the term of the distributorship.

51. The implied terms of the contract as found by McLelland J. were:

> (1) that the distributorship was not terminable unilaterally except upon reasonable notice to the other party; and

> (2) that the distributor would not during the distributorship do anything inimical to the market in Australia for USSC surgical stapling products.

The Court of Appeal was in agreement with the primary judge, observing that he was using the word "inimical" in its most stringent sense. It is apparent that his Honour was using the word in a sense of "adverse or injurious in tendency or influence; harmful, hurtful", the meaning usually assigned to the word in its application to acts.

52. The appellant submits that the third and fourth express terms and the second implied term were not part of the contract. The appellant also submits that the obligation of the distributor to use his best efforts do not go beyond the obligation to use such efforts to promote the sale of the goods with

a corresponding obligation on the part of USSC to use its best efforts to supply the goods.

53. To take the last point first, by including in the second express term the concluding words "to the common benefit of USSC and itself" his Honour was reflecting the emphasis which Blackman in the restaurant meeting had given to the advantages which would flow to USSC and to himself from his energetic development of the Australian market for USSC surgical stapling products, an emphasis which any person seeking appointment as a distributor would give to his proposed activities. This emphasis merely underlined the respective advantages which ordinarily flow to manufacturer and distributor from active promotion by the latter of the market for the former's products.

54. Although McLelland J. confined his use of the phrase "common benefit" to the obligation to use best efforts and to the development (and servicing) of the market for USSC's surgical stapling products in Australia - a limitation which is repeated in his treatment of the fiduciary duty owed by HPI - the Court of Appeal seems to have gone somewhat further. The Court of Appeal concluded that McLelland J. was not referring to a shared benefit. The Court regarded the phrase "common benefit" as indicating a promise to carry on the distributorship for the benefit of both parties. The Court did not suggest that Blackman made an explicit promise in terms that he would work, or carry on the distributorship, for the benefit of both parties; instead the Court acknowledged that the express terms found by the primary judge were no more than a distillation of what was actually said in the oral discussions. The problem, as it seems to me in this respect, is that the Court of Appeal has treated as contractual statements made by Blackman which stressed the advantages his appointment as distributor would bring to both parties - statements not usually promissory in nature though made with the object of inducing USSC to make the appointment - and has given them a wider significance than that attributed to them by McLelland J.

> **Following paragraph cited by:**
>
> Mana v Fleming (30 July 2007)

55. A best efforts clause is not an uncommon feature of a distributorship agreement. However, it is unusual to include in the clause a provision that the promissor will use his best efforts for the common benefit of both parties. It is a clause ordinarily inserted in a contract between parties at arm's length, designed to give protection to one party by imposing an obligation on the other to promote the sales of the first party's products. The extent of the obligation thereby imposed is governed by what is reasonable in the circum stances (Transfield Pty. Ltd. v. Arlo International Ltd. ( 1980) 144 CLR 83, at pp 100-101, 107 ). In Transfield a tender by a licensee based on its use of its own product instead of the product of its licensor was held not to be a breach of a best efforts clause. However, in other cases sale of competing products has been regarded as a breach (see, for example, Randall v. Peerless Motor Car Co. (1912) 99 NE 221; Paige v. Faure (1920) 127 NE 898). To say that the promise was to be performed to or for the common benefit of both parties is to overlook the qualification of reasonableness usually associated with a best efforts promise. The qualification itself is aimed at situations in which there would be a conflict between the obligation to use best efforts and the independent business interests of the distributor and has the object of resolving those conflicts by the standard of reasonableness. Its effect here is to modify the obligation to distribute (and service) USSC's surgical stapling products and to build up the market for them by reference to what is reasonable in the circumstances, in particular the situation of the distributor. It therefore involves a recognition that the interests of USSC could not be paramount in every case and that in

some cases the interests of the distributor would prevail. This qualification of the promise, unlike the common benefit qualification, does not attribute to the distributorship the characteristics of a joint venture.

56. Yet, the Court of Appeal seems to have treated the promise as investing the entire distributorship with joint venture characteristics, if not the character of a joint venture agreement. The Court regarded the promise as "restricting Blackman to business decisions calculated to advance the interests of both parties." It is necessary then to examine the elements of a distributorship arrangement, for that is the basic relationship which Blackman proposed, and to ascertain whether such an arrangement lends itself to a restriction of the kind suggested by the Court of Appeal.

---

Following paragraph cited by:

Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd (01 September 2017) (Dowsett, Greenwood and White JJ)

---

57. A distributorship agreement generally, as here, contemplates that the manufacturer will sell and the distributor will purchase the manufacturer's products for resale to customers. Subject to the impact of the provisions of the contract, the distributor is entitled to set the prices payable on resale because its profit depends largely on the difference between these prices and those payable to the manufacturer. And unless the contract provides that the distributor is to make the resale as agent for the manufacturer then in making the resale the distributor resells as principal without bringing the customer into contractual relations with the manufacturer. It is scarcely necessary to add that the distributor in carrying on its business is entitled to make decisions in its own interests, subject to such restrictions on its power so to do as may be imposed by the contract.

58. Indeed, it is because the distributor is free to act independently in its own interests that from time to time the parties include in the contract stipulations, like the best efforts clause, the performance of which will serve to protect and benefit the manufacturer. All this is to say that a distributorship agreement is not in general a joint venture in which the parties pool their resources in an undertaking carried on for their mutual or common benefit, though it is possible that some aspects of a distributorship agreement may have joint venture characteristics. Of course, the agreement may be so structured as to impose on the distributor the responsibility of acting, in some matters at least, as agent for the manufacturer. In this event the distributor is bound in those matters to act in the interests of the manufacturer, rather than in his own interest, or for that matter in their joint interests.

59. The characteristics of a distributorship arrangement are all present in this case. The relationship between the parties was that of buyer and seller; HPI was entitled to set the prices to be paid by Australian customers, subject to the best efforts promise and to its promise not to injure USSC's market; and there is no suggestion that HPI was to resell as agent for USSC so as to bring it into contractual relations with the Australian customers. See Michelin Tyre Co. Ltd. v. Macfarlane (Glasgow) Ltd. (in Liq.) (1916) 2 SLT 221 .

60. HPI was an exclusive distributor which, in the early stages at any rate, was to devote its entire efforts to the building up of the market for USSC's products. But this factor does not affect or detract from the elements of the relationship between USSC and HPI which I have mentioned. Nor does it provide a basis for finding that HPI promised to carry on its business for and on behalf of the parties

jointly or for their common benefit.

61. The problems presented by the "common benefit" qualification are pointed up when we consider the Court of Appeal's view that the promise restricted HPI to "business decisions calculated to advance the interests of both parties" and how this restriction would operate in practice. Take, for example, the consequences to HPI of an increase in the price of USSC-made products brought about by an increase by USSC in its prices to HPI, by an increase in duties or by a change in the exchange rate. A decision by HPI to increase its prices to Australian customers might well have a tendency to affect adversely the market in Australia for USSC's products and in that sense be calculated not to advance the interests of USSC. Likewise, a decision by HPI to reduce its purchases of USSC's products by reason of USSC's increased prices or HPI's financial circumstances or a decision to restrict credit to purchasers of USSC's products due to HPI's financial circumstances might well prejudice the market for these products notwithstanding that the decisions might be essential to HPI's financial viability and to its continuing existence as a commercial entity.

62. True it is that a decision which has a tendency to prejudice the interests of one of two parties may in particular circumstances be calculated to advance the common interests of both parties. However, in all the situations which I have mentioned there arises a situation of conflict or potential conflict between the interests of USSC and those of HPI. It is unrealistic to suggest that Blackman was promising that HPI would in these situations confine itself to decisions calculated to advance the interests of both parties. No party would be likely to sacrifice or surrender its capacity to make vital business decisions of this kind by reference to what it considers to be its own interests on matters essential to its financial viability and continuing existence as a commercial entity. The more sensible approach is to recognize that a distributor in the position of HPI would make ordinary business decisions by reference to its own interests but that in making those decisions it would need to take account of (a) the obligation imposed by the best efforts promise with the qualification of reasonableness which it imports; and (b) any implied obligation prohibiting injury to the market for USSC's products in Australia.

63. The appellant's challenge to the third and fourth express terms as found by the primary judge is based very largely on the effect which the appellant seeks to attach to a best efforts clause. According to the argument, such a clause ordinarily permits the promissor to compete; it is therefore inconsistent with the third and fourth express terms. No doubt the appellant goes too far in suggesting that a best efforts clause ordinarily permits the promissor to compete, as so much in each case depends on the context in which the clause is to be found and on the terms of the particular contract that it is impossible to formulate a rule of universal or general application. Here the nature and details of the conversation are such that the judge was quite entitled to conclude that Blackman was promising not to deal in competing products or in other products which would diminish his efforts in distributing USSC products and in building up the market for those products in Australia. Blackman's appointment as exclusive distributor in Australia and USSC's provision of substantial financial assistance to him are other factors which tend to support the primary judge's conclusion.

64. The second implied term found by McLelland J. presents in a more acute form difficulties of the kind considered in connexion with the qualification attached to the best efforts promise by the Court of Appeal. An undertaking to do nothing inimical to the market in Australia for USSC's surgical stapling products would be broken by any act or business decision whose tendency was to damage or injure that market, even if the act was done or the decision taken in the honest belief based on reasonable grounds that it would not damage or injure that market or that it would enhance or protect that market. The examples already given in relation to the best efforts promise have

additional force here. A decision by HPI to increase prices, to reduce purchases or restrict credit in the situations already discussed would involve a breach of the second implied term if the action taken had a tendency to injure the market for USSC's surgical stapling products in Australia, notwithstanding the existence of an honest and reasonable belief that it would not have such a tendency.

> **Following paragraph cited by:**
>
> Garner v Central Innovation Pty Limited (21 April 2022) (Charlesworth, Stewart and Halley JJ)
>
> Adventure Golf Systems Australia Pty Ltd (ACN 077 643 175) v Belgravia Health & Leisure Group Pty Ltd (ACN 005 087 463) (08 November 2017) (Santamaria, Kaye and Ashley JJA)
>
> Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd (01 September 2017) (Dowsett, Greenwood and White JJ)
>
> Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd (01 September 2017) (Dowsett, Greenwood and White JJ)
>
> Commonwealth Bank of Australia v Barker (06 August 2013) (Jacobson, Lander and Jessup JJ)
>
> Harrison v Schipp (20 February 2001) (Handley, Giles and Fitzgerald JJA)
>
> Commonwealth Bank of Australia v Finding (23 July 1999)
>
> Erlistoun Gold Pty Ltd (Formerly Erlistoun Gold Nl) v Worth Investments Pty Ltd (10 May 1999) (White J, Parker J)

65. The severity of the operation of the second implied term suggests that it goes beyond what was necessary to give the contract business efficacy and what was within the reasonable contemplation of the parties - see Secured Income Real Estate (Australia) Ltd. v. St. Martins Investments Pty. Ltd. (1979) 144 CLR 596 ; Codelfa Construction Pty. Ltd. v. State Rail Authority of New South Wales (1982) 56 ALJR 459, at pp 463-465 ; B.P. Refinery (Westernport) Pty. Ltd. v. Hastings Shire Council (1977) 52 ALJR 20 ; Prenn v. Simmons (1971) 1 WLR 1381, at pp 1383-1385 . It is unnecessary and inappropriate to impose upon the distributor an obligation more onerous than the negative aspect of the positive best efforts promise, namely that the distributor would not during the distributorship do anything for the purpose of injuring or destroying the market in this country for USSC's surgical stapling products. Such an obligation to restrain deliberate acts undertaken by the distributor for that purpose sufficiently protected USSC and at the same time preserved HPI's freedom of decision in relation to its business operations. The Court of Appeal's view to the contrary is based on the proposition, which I cannot accept, that HPI was not entitled to take action by reference to its own interests in any matter pertaining to the distributorship and that in all matters it was bound to act in the interests of USSC as well as in its own interests.

66. Neither the express terms nor the implied terms of the contract prohibited fair competition by HPI with USSC after termination of the distributorship. Nor in my view did they prohibit preparations on the part of HPI during the course of the distributorship for fair competition after termination of the distributorship, so long as the preparatory acts (a) were not undertaken for the purpose of developing a market for the competing products before termination took place, or (b) did not otherwise amount to a breach of contract (see Robb v. Green (1895) 2 QB 1, at pp 14-18 ; Wessex Dairies Ld. v. Smith (1935) 2 KB 80, at pp 84-85, 87-88 ; Feiger v. Iral Jewelry Ltd. (1975)

382 NYS(2d) 216; (1976) 382 NYS(2d) 221; (1977) 363 NE(2d) 350). However, HPI, by secretly developing a capacity to manufacture copies of USSC's products or components, by deferring fulfilment of orders for USSC's products in anticipation of satisfying those orders with HPI's product and by satisfying those orders with HPI's products with a view to appropriating for itself at the expense of USSC the market or a substantial part of the market for USSC's products, committed breaches of contract, as McLelland J. declared in the first declaration which he made.

## WAS HPI A FIDUCIARY?

67. Because distributor-manufacturer is not an established fiduciary relationship it is important in the first instance to ascertain the characteristics which, according to tradition, identify a fiduciary relationship. As the courts have declined to define the concept, preferring instead to develop the law in a case by case approach, we have to distill the essence or the characteristics of the relationship from the illustrations which the judicial decisions provide. In so doing we must recognize that the categories of fiduciary relationships are not closed (Tufton v. Sperni (1952) 2 TLR 516, at p 522 ; English v. Dedham Vale Properties Ltd. (1978) 1 WLR 93, at p 110 ).

---

**Following paragraph cited by:**

Ross v Gordon (10 May 2022) (Mossop J, Rangiah J and McWilliam AJ)

Garner v Central Innovation Pty Limited (21 April 2022) (Charlesworth, Stewart and Halley JJ)

Parker v Auswild; Bergmuller v Auswild (03 February 2022) (Ferguson CJ, Kennedy JA and Garde AJA)

Pittmore Pty Ltd v Chan; Chan v Tan (18 December 2020) (Bell P, Leeming and Brereton JJA)

Pittmore Pty Ltd v Chan; Chan v Tan (18 December 2020) (Bell P, Leeming and Brereton JJA)

Commissioner of State Revenue (WA) v Rojoda Pty Ltd (18 March 2020) (Bell, Gageler, Keane, Nettle and Edelman JJ)

Mann v Paterson Constructions Pty Ltd (09 October 2019) (KIEFEL CJ, BELL, GAGELER, KEANE, NETTLE, GORDON AND EDELMAN JJ)

Gunasegaram v Blue Visions Management Pty Ltd (14 August 2018) (Basten, Meagher and Gleeson JJA)

Australian Competition and Consumer Commission v Flight Centre Travel Group Ltd (14 December 2016) (French CJ, Kiefel, Gageler, Nettle and Gordon JJ)

Howard v Commissioner of Taxation (11 June 2014) (French CJ, Hayne, Crennan, Gageler and Keane JJ)

Correa v Whittingham (15 August 2013) (Barrett and Gleeson JJA, Tobias AJA)

Alliance Craton Explorer Pty Ltd v Quasar Resources Pty Ltd (12 March 2013) (North, Cowdroy & Katzmann JJ)

Streetscape Projects (Australia) Pty Ltd v City of Sydney (01 February 2013) (Meagher, Barrett and Ward JJA)

97. A fiduciary duty may exist in a contractual setting. Reference need only be made to the following statement by Mason J in *Hospital Products Ltd v United States Surgical Corporation* (above) at 97 :

---

That contractual and fiduciary relationships may co-exist between the same parties has never been doubted. Indeed, the existence of a basic contractual relationship has in many situations provided a foundation for the erection of a fiduciary relationship."

Streetscape Projects (Australia) Pty Ltd v City of Sydney (01 February 2013) (Meagher, Barrett and Ward JJA)

The Baby Hammock Co Limited v AJ Park Law HC Auckland CIV-2008-404-3581 (13 July 2011)

Bacnet Pty Ltd v Lift Capital Partners Pty Ltd (in liq) (04 May 2010) (Keane CJ, Finkelstein and Jacobson JJ)

White City Tennis Club Ltd v John Alexander's Clubs Pty Ltd (03 June 2009) (Giles JA at 1; Basten JA at 2; Macfarlan JA at 3)

Counties Manukau Pacific Trust v Manukau City Council HC Auckland CIV 2008-404-003214 (02 March 2009)

Glover v Blumer (20 February 2008) (Gray P, Madgwick and Cowdroy JJ)

Brooker v Friend & Brooker Pty Ltd (20 December 2006) (Mason P; McColl JA; Basten JA)

147. A fiduciary relationship may exist notwithstanding the fact that the parties are in a contractual relationship ( *Hospital Products Ltd v United States Surgical Corporation* at 97 , per Mason J ; *Moorgate Tobacco Co Ltd v Philip Morris Ltd (No2)* (1984) 156 CLR 414 at 436, per Deane J), as, too, may a joint venture attracting fiduciary obligations carried out through a medium other than a partnership, such as a company, a trust, an agency or joint ownership: *United Dominions Corporation Ltd v Brian Pty Ltd* (at 10 – 11), per Mason, Brennan and Deane JJ.

Brooker v Friend & Brooker Pty Ltd (20 December 2006) (Mason P; McColl JA; Basten JA)

Dresna Pty Ltd v Linknarf Management Services Pty Ltd (in liq) (19 December 2006) (Heerey, Gyles & Bennett JJ)

157. As was stated in *Hospital Products Ltd v United States Surgical Corporation* (1984) 156 CLR 41 at 68 by Gibbs CJ, there is a difficulty in suggesting a test by which it may be determined that a fiduciary relationship exists outside the accepted categories. The basis of the relationship between Dresna and Franklins was the Mentone BSA. The fact that the arrangement between the parties was of a purely commercial kind is indicative of no fiduciary duty ( *Hospital Products* at 70 ). In *Hospital Products,* Gibbs CJ referred at 71 to the fact that an agreement between parties which was, as here, terminable on reasonable notice argued against such a relationship. Factors such as a relation of confidence, inequality of bargaining power (considered to be of importance by Dawson J in *Hospital Products* at 142 ), the existence of a duty to be performed and an undertaking to act for another, are not of themselves sufficient to found such a relationship. It is a question of fact in each case (at 72). In discussing the proposition that where two people have dealt with each other as principals neither will be the other's fiduciary, Gibbs CJ commented that the duty did not exist where one party did not undertake, whether by representation or contractual provision, to act solely in the interest of the other and not in its own interest (at 72). Although in dissent on the existence of a fiduciary relationship on the facts in *Hospital Products* ,

Mason J observed at 97 that a contractual and fiduciary relationship may co-exist but the fiduciary relationship, if it is to exist, must accommodate itself to and be regulated by the terms of contract.

Say-Dee Pty Ltd v Farah Constructions Pty Ltd (15 September 2005) (Mason P, Giles and Tobias JJA)

Expectation Pty Ltd v PRD Realty Pty Ltd (28 July 2004) (Carr, Emmett & Gyles JJ)

Dalecoast Pty Ltd v Guardian International Pty Ltd (27 June 2003) (Wallwork J, Murray J, Anderson J)

Pilmer v Duke Group Ltd (In Liq) (31 May 2001) (McHugh, Gummow, Kirby, Hayne and Callinan JJ)

Lexcray Pty Ltd v Northern Territory of Australia (18 January 2001) (Gallop, Angel and Bailey JJ)

100. Having considered the authorities cited and those parts of the evidence relevant to the existence or otherwise of a fiduciary relationship, we are not persuaded that his Honour was in error in finding that no fiduciary relationship existed. Of fiduciary relationships, Mason J (as he then was) in *Hospital Products Ltd v United States Surgical Corps* (1984) 156 CLR 41 at 97 , said:

"The critical feature of these relationships is that the fiduciary undertakes or agrees to act for or on behalf of or in the interests of another person in the exercise of a power or discretion which will affect the interests of that other in a legal or practical sense."

How can it be said that the respondent had agreed or undertaken to serve the interests of the appellant in relation to BTEC? BTEC was a co-operative exercise undertaken in the public interest by the Australian cattle industry, the Commonwealth and the respondent with the objective of producing benefits for individual pastoralists (including the appellant) and the cattle industry as a whole. The proposition that the respondent had bound itself to act in the appellant's interests rather than the interests of the cattle industry and the public generally has only to be stated to demonstrate it cannot be sustained.

We agree with the learned trial judge that there was no fiduciary relationship between the parties.

**ESTOPPEL**

68. The accepted fiduciary relationships are sometimes referred to as relationships of trust and confidence or confidential relations (cf. Phipps v. Boardman (1967) 2 AC 46, at p 127 ), viz., trustee and beneficiary, agent and principal, solicitor and client, employee and employer, director and company, and partners. The critical feature of these relationships is that the fiduciary undertakes or agrees to act for or on behalf of or in the interests of another person in the exercise of a power or discretion which will affect the interests of that other person in a legal or practical sense. The relationship between the parties is therefore one which gives the fiduciary a special opportunity to exercise the power or discretion to the detriment of that other person who is accordingly vulnerable to abuse by the fiduciary of his position. The expressions "for", "on behalf of" and "in the interests of" signify that the fiduciary acts in a "representative" character in the exercise of his responsibility,

to adopt an expression used by the Court of Appeal.

69. It is partly because the fiduciary's exercise of the power or discretion can adversely affect the interests of the person to whom the duty is owed and because the latter is at the mercy of the former that the fiduciary comes under a duty to exercise his power or discretion in the interests of the person to whom it is owed. See generally: Weinrib, "The Fiduciary Obligation" (1975) 25 University of Toronto Law Journal 1, at pp.4-8. Thus a mere sub-contractor is not a fiduciary. Although his work may be described loosely as work which is to be carried out in the interests of the head contractor, the sub-contractor cannot in any meaningful sense be said to exercise a power or discretion which places the head contractor in a position of vulnerability.

70. That contractual and fiduciary relationships may co-exist between the same parties has never been doubted. Indeed, the existence of a basic contractual relationship has in many situations provided a foundation for the erection of a fiduciary relationship. In these situations it is the contractual foundation which is all important because it is the contract that regulates the basic rights and liabilities of the parties. The fiduciary relationship, if it is to exist at all, must accommodate itself to the terms of the contract so that it is consistent with, and conforms to, them. The fiduciary relationship cannot be superimposed upon the contract in such a way as to alter the operation which the contract was intended to have according to its true construction.

71. Because I take a different view about the terms of the contract I do not share the Court of Appeal's conclusion that HPI was under a fiduciary duty to carry on the entire distributorship business in the joint interests of USSC and HPI. That view, it seems to me, rested very heavily on the suggested promise to carry on the business for the common benefit of the parties and on the implied term that HPI would do nothing inimical to USSC's interests.

---

**Following paragraph cited by:**

Adventure Golf Systems Australia Pty Ltd (ACN 077 643 175) v Belgravia Health & Leisure Group Pty Ltd (ACN 005 087 463) (08 November 2017) (Santamaria, Kaye and Ashley JJA)

Jireh International Pty Ltd t/as Gloria Jean's Coffee v Western Exports Services Inc (01 June 2011) (Macfarlan and Young JJA, Tobias AJA)

Chen v Marcolongo (13 October 2009) (Allsop P, Giles and Young JJA)

145 Mr Pritchard and Mr Hewitt put that the first inquiry must always be into the scope of any alleged fiduciary duty. They quote from the judgment of Mason J in *Hospital Products Ltd v United States Surgical Corporation* [1984] HCA 64; 156 CLR 41 at 98 where his Honour said, when contrasting a general fiduciary relationship with a more limited fiduciary relationship that:

"It is well settled that a person may be a fiduciary in some activities but not in others."

This is a helpful statement with respect to the difference between a general fiduciary and a limited fiduciary but does not really address the question as to whether Mr Chen should in the present case be considered to be a limited fiduciary or a general fiduciary.

White City Tennis Club Ltd v John Alexander's Clubs Pty Ltd (03 June 2009) (Giles JA at 1;
Basten JA at 2; Macfarlan JA at 3)

84 It is not necessary to enquire whether the relationship generally between JACS and
the Club was fiduciary in character. It is sufficient to consider whether in exercising the
option which the MOU contemplated may later be acquired, JACS was to be subject to
a fiduciary duty owed to the Club to exercise it in a particular manner. As Mason J
pointed out in *Hospital Products* , the fact that a general fiduciary relationship does not
exist "does not exclude the existence of a more limited fiduciary relationship for it is
well settled that a person may be a fiduciary in some activities but not in others …" (at 98
, citations omitted).

Counties Manukau Pacific Trust v Manukau City Council HC Auckland CIV 2008-404-
003214 (02 March 2009)

72. My conclusion that HPI was at liberty to make some business decisions by reference to its own
interests, subject to the obligations arising under the best efforts promise and the other terms of the c
ontract express and implied, presents an overwhelming obstacle to the existence of the
comprehensive fiduciary relationship found by the Court of Appeal. This is because HPI's capacity
to make decisions and take action in some matters by reference to its own interests is inconsistent
with the existence of a general fiduciary relationship. However, it does not exclude the existence of
a more limited fiduciary relationship for it is well settled that a person may be a fiduciary in some
activities but not in others (Kuys, at p 1130; Birtchnell v. Equity Trustees, Executors and Agency
Co. Ltd. (1929) 42 CLR 384, at p 408 ; Phipps, at p 127).

73. The appellant submits, mistakenly in my view, that the very existence of the best efforts promise
is inconsistent with the co-existence of a fiduciary duty. True it is that a promise or a contractual
term may be so precise in its regulation of what a party can do that there is no relevant area of
discretion remaining and therefore no scope for the creation of a fiduciary duty (R.H. Deacon &Co.
Ltd. v. Varga (1972) 30 DLR(3d) 653; affirmed (1973) 41 DLR (3d) 767 ). Here, however, HPI
enjoyed a substantial area of discretion in the exercise of its responsibility to promote the market in
Australia for USSC surgical stapling products. The giving of a best efforts promise to promote that
market did not relevantly limit the ambit of HPI's discretion in discharging that responsibility.

74. In considering whether a fiduciary duty, and if so, what fiduciary duty, was generated by that
responsibility we have to take account of the following factors:

(1) there was a valuable market for USSC's products in

        Australia;

(2) USSC, by appointing HPI, entrusted HPI with the

        exclusive responsibility of promoting that market during the term of the distributorship
        which was determinable by either party on reasonable notice;

(3) the manner in which the market was to be promoted was

left to HPI's general discretion, subject to the express and implied terms of the contract;

(4) the exercise of that discretion provided HPI with a

special opportunity of acting to the detriment of the market for USSC's products, rendering USSC vulnerable to abuse by HPI of its position, USSC having no representation at all in Australia;

(5) in selling USSC's products to Australian customers HPI

was not acting as agent for USSC;

(6) although HPI's actions would not alter or affect USSC's

---

**Following paragraph cited by:**

Blackmagic Design Pty Ltd v Overliese (25 February 2011) (Finkelstein, Jacobson and Besanko JJ)

---

legal rights vis-a-vis others, its actions could and did affect adversely in a practical sense the market in Australia for USSC's products and consequently its product goodwill in this country;

(7) in the circumstances mentioned in (1)-(6) above USSC

relied on HPI to protect and promote USSC's product goodwill in Australia; and

(8) HPI's responsibility to protect and promote USSC's

product goodwill was necessarily subject to the qualification of reasonableness attached to the best efforts promise.

75. Paragraph (8) above presents an unusual problem. The classical illustrations of the fiduciary relationship are those in which the fiduciary is under a duty to act not in his own interests or solely in his own interests but in the interests of another or jointly in the interests of another and himself, e. g., a trustee and a partner. In the present case the nature of the distributorship relationship and the best efforts promise with its attendant standard of reasonableness necessarily entailed that HPI could make some business decisions by reference to its financial interests, without subordinating them to the promotion of the market for USSC's products, so long at any rate as HPI did not deliberately do something, or omit to do something, for the purpose of destroying or injuring that market. And, as we know, HPI when it entered into a contract to sell USSC's products to an Australian customer was not acting as trustee or agent for USSC. The contractual rights which arose against the customer were held by HPI in its own right and were not the subject of any trust in favour of USSC. HPI was entitled to recover and retain the purchase price for its own benefit, being under no duty to account to USSC.

76. But entitlement to act in one's own interests is not an answer to the existence of a fiduciary

relationship, if there be an obligation to act in the interests of another. It is that obligation which is the foundation of the fiduciary relationship, even if it be subject to qualifications including the qualification that in some respects the fiduciary is entitled to act by reference to his own interests. The fiduciary duty must then accommodate itself to the relationship between the parties created by their contractual arrangements. And entitlement under the contract to act in a relevant matter solely by reference to one's own interests will constitute an answer to an alleged breach of the fiduciary duty. The difficulty of deciding under the contract when the fiduciary is entitled to act in his own interests is not in itself a reason for rejecting the existence of a fiduciary relationship, though it may be an element in arriving at the conclusion that the person asserting the relationship has not established that there is any obligation to act in the interests of another.

77. There has been an understandable reluctance to subject commercial transactions to the equitable doctrine of constructive trust and constructive notice. But it is altogether too simplistic, if not superficial, to suggest that commercial transactions stand outside the fiduciary regime as though in some way commercial transactions do not lend themselves to the creation of a relationship in which one person comes under an obligation to act in the interests of another. The fact that in the great majority of commercial transactions the parties stand at arms' length does not enable us to make a generalization that is universally true in relation to every commercial transaction. In truth, every such transaction must be examined on its merits with a view to ascertaining whether it manifests the characteristics of a fiduciary relationship.

78. The disadvantages of introducing equitable doctrine into the field of commerce, which may be less formidable than they were, now that the techniques of commerce are far more sophisticated, must be balanced against the need in appropriate cases to do justice by making available relief in specie through the constructive trust, the fiduciary relationship being a means to that end. If, in order to make relief in specie available in appropriate cases it is necessary to allow equitable doctrine to penetrate commercial transactions, then so be it. See, for example, Barclays Bank Ltd. v. Quistclose Investments Ltd. (1970) AC 567 and Swiss Bank Corporation v. Lloyds Bank Ltd. (1982) AC 584 . A preferable approach to an artificial narrowing of the fiduciary relationship - the gateway to relief in specie - is to define and delimit more precisely the circumstances in which the remedy by way of constructive trust will be granted.

---

**Following paragraph cited by:**

Streetscape Projects (Australia) Pty Ltd v City of Sydney (01 February 2013) (Meagher, Barrett and Ward JJA)

109. The Court of Appeal upheld that claim. Reference was made by Cooke P to *Hospital Products Ltd v United States Surgical Corporation* (above) and, in particular, to the following passage in the judgment of Mason J (at 101 ):

"HPI's position as custodian of USSC.'s product goodwill in Australia may be likened in a general way to that of a bailee whose duty is to protect and preserve a chattel bailed to him. It has been well recognized, at least since the judgment of Jessel M.R. in *In re Hallett's Estate* [ (1880) 13 Ch D 696 at 708-9 ], that a bailee stands in a fiduciary relationship with the bailor when the bailor entrusts to the bailee goods to be held or dealt with by him for the benefit of the bailor or for certain limited purposes stipulated by the bailor."

---

*Streetscape Projects (Australia) Pty Ltd v City of Sydney* (01 February 2013) (Meagher, Barrett and Ward JJA)

*Residential Housing Corporation v Esber* (21 February 2011) (Campbell JA Macfarlan JA Sackville AJA)

*Residential Housing Corporation v Esber* (21 February 2011) (Campbell JA Macfarlan JA Sackville AJA)

79. There is a strong case for saying that because USSC entrusted HPI with the responsibility of protecting and promoting the market for USSC's products in Australia HPI was a fiduciary in protecting and promoting USSC's Australian product goodwill. In procuring orders for, making sales of and supplying USSC's products to Australian consumers HPI was acting in USSC's interests as well as its own. And by engaging in these activities HPI enhanced both USSC's local product goodwill and the goodwill of its own distributing business. By the sale of its products to its distributor here and by its sale of those products to Australian consumers under the name of "Auto Suture" in circumstances in which the products were associated by consumers with USSC as manufacturer, USSC created a local product goodwill (Estex Clothing Manufacturers Pty. Ltd. v. Ellis and Goldstein Ltd. (1967) 116 CLR 254, at pp 267-268, 270-271 ; Imperial Tobacco Company of India Ltd. v. Bonnan (1924) 41 RPC 441 ). The remarks of Latham C.J. and Rich J. in Commissioner of Taxes (Q.) v. Ford Motor Co. of Australia Pty. Ltd. (1942) 66 CLR 261, at p 272, indicate that goodwill cannot be assigned independently of the business with which it is associated, but they do not deny the existence of local product goodwill in a case such as the present. The difficulty of determining how much of the goodwill in Australia was local product goodwill of USSC and how much was goodwill of HPI's distributing business does not deny the separate existence in USSC of local product goodwill.

80. USSC, by entrusting HPI with a responsibility for protecting and promoting the market for USSC's products in Australia, effectively constituted HPI the custodian of its product goodwill in this country. Its responsibility in procuring orders, making sales and effecting deliveries of USSC's products in Australia armed HPI with a power and discretion to affect USSC's product goodwill. And in exercising this responsibility HPI had a special opportunity of acting to the detriment of USSC which was, accordingly, vulnerable to the abuse by HPI of its position.

81. HPI's position as custodian of USSC's product goodwill in Australia may be likened in a general way to that of a bailee whose duty it is to protect and preserve a chattel bailed to him. It has been well recognized, at least since the judgment of Jessel, M.R., in In re Hallett's Estate (1880) 13 ChD 696, at pp 708-709, that a bailee stands in a fiduciary relationship with his bailor when the bailor entrusts to the bailee goods to be held or dealt with by him for the benefit of the bailor or for certain limited purposes stipulated by the bailor.

82. In engaging in the activities which I have mentioned, activities related to the production and promotion of USSC's product goodwill, HPI was acting in its own interests as well as in the separate interests of USSC. Although, as we have seen, it was entitled to prefer its own interests to the interests of USSC in some situations where those interests might come into conflict, this entitlement was necessarily subject to the requirement that HPI act bona fide and reasonably with due regard to the interests of USSC. In no circumstance could it act solely in its own interests without reference to the interests of USSC. This, as it seems to me, fixed HPI with the character of a fiduciary in relation to those activities mentioned, notwithstanding that in pursuing them HPI was also acting in its own

interests and that it was carrying on the distributorship business generally for its own benefit and in no sense as a trustee for USSC.

---

**Following paragraph cited by:**

    Schmidt v AHRKalimpa Pty Ltd (31 July 2020) (Kyrou, Hargrave and Emerton JJA)

    Schmidt v AHRKalimpa Pty Ltd (31 July 2020) (Kyrou, Hargrave and Emerton JJA)

    Gunasegaram v Blue Visions Management Pty Ltd (14 August 2018) (Basten, Meagher and Gleeson JJA)

    Gunasegaram v Blue Visions Management Pty Ltd (14 August 2018) (Basten, Meagher and Gleeson JJA)

    Howard v Commissioner of Taxation (11 June 2014) (French CJ, Hayne, Crennan, Gageler and Keane JJ)

    ABN AMRO Bank NV v Bathurst Regional Council (06 June 2014) (JACOBSON, GILMOUR AND GORDON JJ)

    Potts v Robins (24 September 2013) (Margaret McMurdo P and Muir and Gotterson JJA)

    Glover v Blumer (20 February 2008) (Gray P, Madgwick and Cowdroy JJ)

    Price v Powers (30 November 2006) (Martin CJ)

    Pilmer v Duke Group Ltd (In Liq) (31 May 2001) (McHugh, Gummow, Kirby, Hayne and Callinan JJ)

    Pilmer v Duke Group Ltd (In Liq) (31 May 2001) (McHugh, Gummow, Kirby, Hayne and Callinan JJ)

    Clay v Clay (15 February 2001) (Gleeson CJ, McHugh, Gummow, Hayne and Callinan JJ)

---

83. This conclusion is largely founded on the general nature of the responsibility which, according to the contract, HPI undertook to discharge in pursuing the relevant activities, though the obligation not to compete and the obligation not to deliberately injure USSC's market were significant elements in that responsibility. And it is the general nature of that responsibility which distinguishes HPI from the mortgagee who is bound to exercise his power of sale in good faith. In exercising that power the mortgagee is acting in his own interests, subject to the requirement of good faith (see Kennedy v. De Trafford (1897) AC 180, at p 185 ) and possibly that of reasonable care (see Australia and New Zealand Banking Group Ltd. v. Bangadilly Pastoral Co. Pty. Ltd. (1978) 139 CLR 195, at pp 222-225 ). Even so, the mortgagee's duty in exercising the power is sometimes described as analogous to a fiduciary duty (Sir Frederick Jordan, Chapters on Equity (6th ed. 1947) p.113).

THE SCOPE OF THE FIDUCIARY DUTY

---

**Following paragraph cited by:**

    Hylepin Pty Ltd v Doshay Pty Ltd (19 November 2021) (Markovic, Banks-smith and Anderson JJ)

    Hylepin Pty Ltd v Doshay Pty Ltd (19 November 2021) (Markovic, Banks-smith and Anderson JJ)

    Metal Manufactures Limited v Johnston (13 March 2020) (Fraser and McMurdo JJA and Buss AJA)

---

Gunasegaram v Blue Visions Management Pty Ltd (14 August 2018) (Basten, Meagher and Gleeson JJA)

Gunasegaram v Blue Visions Management Pty Ltd (14 August 2018) (Basten, Meagher and Gleeson JJA)

Australian Careers Institute Pty Ltd v Australian Institute of Fitness Pty Ltd (09 December 2016) (Bathurst CJ, Meagher JA and Sackville AJA)

Coope v LCM Litigation Fund Pty Ltd (08 June 2016) (Gleeson, Leeming and Payne JJA)

106. Not all personal interests come within the conflict rule. The interest must give rise to a conflict or a real or substantial possibility of conflict: *Hospital Products v United States Surgical Corporation* (1984) 156 CLR 41 at 103 per Mason J . An expectation or hope of future advantage may be sufficient to constitute a relevant interest: *Hospital Products* at 104 per Mason J.

Australasian Annuities Pty Ltd (in liq) v Rowley Super Fund Pty Ltd (12 February 2015) (Warren CJ, Neave JA and Garde AJA)

Australasian Annuities Pty Ltd (in liq) v Rowley Super Fund Pty Ltd (12 February 2015) (Warren CJ, Neave JA and Garde AJA)

Howard v Commissioner of Taxation (11 June 2014) (French CJ, Hayne, Crennan, Gageler and Keane JJ)

Howard v Commissioner of Taxation (11 June 2014) (French CJ, Hayne, Crennan, Gageler and Keane JJ)

Westpac Banking Corporation v Bell Group Ltd (in liq) (No 3) (17 August 2012) (Lee AJA Drummond AJA Carr AJA)

Durham v Durham (04 November 2011) (Bathurst CJ, Campbell JA and Sackville AJA)

Durham v Durham (04 November 2011) (Bathurst CJ, Campbell JA and Sackville AJA)

Blackmagic Design Pty Ltd v Overliese (25 February 2011) (Finkelstein, Jacobson and Besanko JJ)

Blackmagic Design Pty Ltd v Overliese (25 February 2011) (Finkelstein, Jacobson and Besanko JJ)

Streeter v Western Areas Exploration Pty Ltd (No 2) (20 January 2011) (McLure P, Buss JA, Murphy JA)

Southern Wine Corporation Pty Ltd (in Liq) v Perera (19 December 2006) (Steytler P)

Ebner v Official Trustee in Bankruptcy (07 December 2000) (Gleeson CJ,Gaudron, McHugh, Gummow, Kirby, Hayne and Callinan JJ)

Beach Petroleum NL v Kennedy (05 November 1999) (Spigelman CJ, Sheller and Stein JJA)

Beach Petroleum NL v Kennedy (05 November 1999) (Spigelman CJ, Sheller and Stein JJA)

84. The categories of fiduciary relationships are infinitely varied and the duties of the fiduciary vary with the circumstances which generate the relationship. Fiduciary relationships range from the trustee to the errand boy, the celebrated example given by Fletcher Moulton L.J. in his judgment in In re Coomber (1911) 1 Ch 723, in which, after referring to the danger of trusting to verbal formulae, he pointed out (at pp 728-729 ) that the nature of the curial intervention which is justifiable will vary from case to case. In accordance with these comments it is now acknowledged generally that the scope of the fiduciary duty must be moulded according to the nature of the relationship and the facts of the case (Phipps v. Boardman, at pp 123-125; Kuys, at p 1129-1130; Canadian Aero Service Ltd. v. O'Malley (1973) 40 DLR(3d) 371, at pp 383, 390). The often

repeated statement that the rule in Keech v. Sandford (1726) Sel Cas T King of ( 25 ER 223) applies to fiduciaries generally tends to obscure the variable nature of the duties which they owe. The rigorous standards appropriate to a trustee will not apply to a fiduciary who is permitted by contract to pursue his own interests in some respects. Thus, in the present case the so-called rule that the fidicuary cannot allow a conflict to arise between duty and interest (Kuys, at p. 1130 ) cannot be usefully applied in the absolute terms in which it has been stated.

85. McLelland J. found - a finding with which I agree - that, as a fiduciary having responsibility for protecting and promoting the market for USSC's products in Australia, HPI was under a duty not to make a profit or to take a benefit by virtue of its position as a fiduciary without the informed consent of USSC and that within the ambit of its fiduciary responsibility it should not act in a way in which there was a possibility of conflict between its own interests and those of USSC (Queensland Mines Ltd. v. Hudson (1978) 52 ALJR 399, at p 401 ). It was accepted in that case (at p 401) that "possibility of conflict" needs to be understood in the sense of "real sensible possibility of conflict" as was pointed out by Lord Upjohn in Phipps v. Boardman, at p 124. The rule that a fiduciary is not entitled to make a profit without the informed consent of the person to whom the fiduciary duty is owed is not limited to profits which arise from the use of the fiduciary position or of the opportunity or knowledge gained from it for it is said that the basis of this rule is that the fiduciary may not place himself in a situation where his duty and his interest conflict (Consul Development Pty. Ltd. v. D.P. C. Estates Pty. Ltd. (1975) 132 CLR 373, at p 393 ).

---

**Following paragraph cited by:**

Hylepin Pty Ltd v Doshay Pty Ltd (19 November 2021) (Markovic, Banks-smith and Anderson JJ)

Atanaskovic Hartnell v Birketu Pty Ltd (03 September 2021) (Basten, Gleeson and McCallum JJA)

Atanaskovic Hartnell v Birketu Pty Ltd (03 September 2021) (Basten, Gleeson and McCallum JJA)

Ancient Order of Foresters in Victoria Friendly Society Ltd v Lifeplan Australia Friendly Society Ltd (10 October 2018) (Kiefel CJ, Gageler, Keane, Nettle and Edelman JJ)

Hart Security Australia Pty Ltd v Boucousis (09 November 2016) (Bathurst CJ, Beazley P and Meagher JA)

Coope v LCM Litigation Fund Pty Ltd (08 June 2016) (Gleeson, Leeming and Payne JJA)

106. Not all personal interests come within the conflict rule. The interest must give rise to a conflict or a real or substantial possibility of conflict: *Hospital Products v United States Surgical Corporation* (1984) 156 CLR 41 at 103 per Mason J. An expectation or hope of future advantage may be sufficient to constitute a relevant interest: *Hospital Products* at 104 per Mason J .

Howard v Commissioner of Taxation (11 June 2014) (French CJ, Hayne, Crennan, Gageler and Keane JJ)

---

86. The traditional view that the profit rule is merely a corollary of the conflict rule may be traced back to the speech of Lord Herschell in Bray v. Ford (1896) AC 44, at p 51. The view has been severely criticised, with some justification - see Shepherd, The Law of Fiduciaries (1981) pp.147-151. And a recognition of its shortcomings induced Sir Frederick Jordan in his Chapters on Equity, op. cit., at p.115 to describe the conflict rule as a "counsel of prudence" rather than a rule of equity. Accordingly, the fiduciary's duty may be more accurately expressed by saying that he is under an obligation not to promote his personal interest by making or pursuing a gain in circumstances in which there is a conflict or a real or substantial possibility of a conflict between his personal interests and those of the persons whom he is bound to protect (Aberdeen Railway Co. v. Blaikie Brothers (1854) 1 Macq 461, at p 471 ). By linking the obligation not to make a profit or take a benefit to a situation of conflict or possible conflict of interest the proposition, in accordance with the authorities, (a) excludes the relevance of an inquiry into the actual motives of the fiduciary; and (b) excludes restitutionary relief when the interest of the fiduciary is remote or insubstantial - see Boulting v. Associ ation of Cinematograph, Television and Allied Technicians (1963) 2 QB 606, at pp 637-638 ; Phelan v. Middle States Oil Corporation (1955) 220 F 2d 593, at pp 602-603 .

87. In Phelan Learned Hand J., in discussing the nature of the conflict that gives rise to the fiduciary's liability to account, said (at pp.602-603):

"Was that such a conflict as invokes the doctrine? It enables the beneficiary to hold the fiduciary liable for any profits he may make, or losses he may cause, in order to deprive him of any inducement that will affect his absolute and disinterested loyalty; and there is no doubt that an expectation or hope of future advantage may do so, even though it is not secured to him as an existing legally protected interest. Therefore, if the doctrine be inexorably applied and without regard to the particular circumstances of the situation, every transaction will be condemned once it be shown that the fiduciary had such a hope or expectation, however unlikely to be realized it may be, and however trifling an inducement it will be, if it is realized. We do not understand that it is to be applied so rigidly, or to so literal an extreme. ... we have to determine the scope of the implementary rule that dispenses with the need of proving that his personal interest had any part in determining the fiduciary's conduct; indeed, with a rule that altogether forbids any inquiry whether it had any such part. We have found no decisions that have applied this rule inflexibly to every occasion in which the fiduciary has been shown to have had a personal interest that might in fact have conflicted with his loyalty. On the contrary in a number of situations courts have held that the rule does not apply, not only when the putative interest, though in itself strong enough to be an inducement, was too remote, but also when, though not too remote, it was too feeble an inducement to be a determining motive."

## BREACH OF FIDUCIARY DUTY

88. In Blyth Chemicals Ltd. v. Bushnell (1933) 49 CLR 66, at p 82, Dixon and McTiernan JJ. observed that it would be misconduct amounting to a ground justifying dismissal for a manager to take steps during his employment to prepare a position to which he could retreat with a large part of his employer's business in the event that it should become necessary or desirable to vacate the managership. And in Maryland Metals Inc. v. Metzner (1978) 382 A(2d) 564, the Court of Appeals of Maryland, referring to competition by an employee after termination of his employment,

observed (at p.569):

---

**Following paragraph cited by:**

Blackmagic Design Pty Ltd v Overliese (25 February 2011) (Finkelstein, Jacobson and Besanko JJ)

---

"The right to make arrangements to compete is by no means absolute and the exercise of the privilege may, in appropriate circumstances, rise to the level of a breach of an employee's fiduciary duty of loyalty. Thus, the privilege has not been applied to immunize employees from liability where the employee has committed some fraudulent, unfair or wrongful act in the course of preparing to compete in the future...".

89. Of course the fiduciary duty of a distributor is not necessarily to be equated with that of an employee. The employee's duty of loyalty may involve him in a breach of duty if he secretly makes arrangements during his employment to compete with his employer after termination of the employment. And the secret development by the employee of a manufacturing capacity by surreptitiously copying the manufacturer's product will certainly constitute a breach of duty. Whether either of these activities constitutes a breach of fiduciary duty on the part of a distributor is another question the answer to which depends on the terms of the contract and the ambit of the fiduciary relationship which it creates. It is possible that it would not have been a breach of duty for HPI to make secret arrangements during the distributorship for the establishment of a manufacturing capacity in order to compete with USSC after termination of the distributorship, so long as HPI did not compete and did not deliberately damage USSC's product goodwill before that time.

90. HPI's copying of USSC's products raises a more complex question. As we have seen, a bailee may stand in a fiduciary relationship with his bailor. A buyer who has possession of goods the subject of a contract of sale on terms that property does not pass until payment of the purchase price is a bailee of the goods until the property passes (see City Motors (1933) Pty. Ltd. v. Southern Aerial Super Service Pty. Ltd. (1961) 106 CLR 477, at p 490 ; see also Aluminium Industrie Vaassen B.V. v. Romalpa Aluminium Ltd. (1976) 1 WLR 676 ; In re Bond Worth (1980) Ch 228, at pp 246-247 ; Borden (U.K.) Ltd. v. Scottish Timber Products Ltd. (1981) Ch 25 ). Where the buyer is an exclusive distributor and his purchase is for the purpose of supplying the local market with the manufacturer's product, it being the duty of the distributor to promote and protect the market, it may well be a breach of the fiduciary duty of the distributor as bailee to copy the manufacturer's product - the distributor thereby putting the product to a use lying outside the scope of the bailment. But there is here nothing to indicate that HPI copied USSC's products whilst it was still a bailee, i.e., before property in the products passed to HPI when the bailment came to an end. Once the bailment came to an end HPI's fiduciary duty as bailee terminated and it was thereupon at liberty to deal with or use the product as it thought fit, subject to such other rights as USSC may have had, e.g., passing off and breach of contract.

91. However, HPI did more than copy USSC's products. McLelland J. found that during the distributorship HPI failed to fulfil its fiduciary duty and its contractual obligations in the two ways

set out in his first declaration:

> "(i) by secretly developing a capacity to manufacture copies of USSC's products or components thereof with a view to appropriating for itself at the expense of USSC the whole or a substantial part of the Australian market for USSC products and (ii) by deferring fulfilment of orders for USSC clinical products in anticipation of filling those orders with HPI repackaged or manufactured competing products and by filling orders for USSC clinical products with such competing products, again with a view to appropriating for itself at the expense of USSC the whole or a substantial part of the Australian market for USSC products."

The two breaches described by his Honour need to be understood as involving actions taken by HPI during the term of the distributorship with a view to appropriating USSC's market for itself during that term and thereafter. Once the breaches are understood in this light, it is incontestable, as it seems to me, that his Honour was correct in finding that the relevant acts constituted breaches of fiduciary duty. HPI, though custodian of USSC's product goodwill, sought to appropriate that goodwill for itself by the means described in the declaration.

92. In expressing the breaches in the same terms for contractual and fiduciary purposes his Honour was not asserting that, once a fiduciary relationship is found to exist, that relationship endows breaches of contract with a fiduciary character as well. He was saying no more than that the acts described constituted breaches of each obligation. Neither breach constituted the making of a gain but rather the pursuit of a gain, the intended gain being the appropriation of USSC's local product goodwill. Each breach as described in the declaration is a description of the means by which HPI pursued the gain. Each breach, had it been discovered in time, might have been restrained by injunction (In re Thomson (1930) 1 Ch 203 ).

---

Following paragraph cited by:

Mavaddat v Lee (04 July 2007) (Steytler P)

---

93. The Court of Appeal, giving the ambit of the fiduciary relationship much wider scope than I am disposed to do, went further than the primary judge in holding that all the steps taken by HPI in relation to the development of the manufacturing capacity, the reverse engineering, the production of moulds (and dies), the entry into the relevant contracts, the raising of the necessary finance and the employment of workers, were breaches of HPI's fiduciary duty. The Court also held that HPI's manufacturing activities (including the incorporation of HPI-manufactured components with those manufactured by USSC) and the promotion and sale of HPI packaged and labelled goods, constituted breaches of HPI's fiduciary duty. The Court commented:

> "By actually manufacturing before 25th December, and by manufacturing, promoting and selling between that date and 10th January, HPI put to practical use the capacity it had developed."

94. I agree that HPI's manufacturing activities and the promotion and sale of HPI packaged and labelled goods constituted breaches of its fiduciary duty. I agree also with the comment in the final sentence of the preceding paragraph. But I do not find it necessary to isolate and identify every step taken by HPI in developing a manufacturing capacity so as to assign to each such step the character of a breach of HPI's fiduciary duty. This is because it is possible to ascertain the profit which HPI made in breach of its fiduciary duty by accepting the breaches of duty as McLelland J. generally described them without seeking to describe them in greater detail.

RELIEF FOR BREACH OF FIDUCIARY DUTY

(a) General Principle Governing Liability to Account

95. The principle, accepted by the courts below, is that the fiduciary cannot be permitted to retain a profit or benefit which he has obtained by reason of his breach of fiduciary duty (Consul Development, at p.393; Queensland Mines, at p.401). A fiduciary is liable to account for a profit or benefit if it was obtained (1) in circumstances where there was a conflict, or possible conflict of interest and duty or (2) by reason of the fiduciary position or by reason of the fiduciary taking advantage of opportunity or knowledge which he derived in consequence of his occupation of the fiduciary position.

(b) Constructive Trust

---

**Following paragraph cited by:**

Davis & Peterson (17 February 2023) (Tree, Christie & Schonell JJ)
Grimaldi v Chameleon Mining NL (No 2) (21 February 2012) (Finn, Stone and Perram JJ)
Grimaldi v Chameleon Mining NL (No 2) (21 February 2012) (Finn, Stone and Perram JJ)
Gangemi v Osborne (15 December 2009) (Nettle, Mandie and Harper JJA)
White City Tennis Club Ltd v John Alexander's Clubs Pty Ltd (03 June 2009) (Giles JA at 1; Basten JA at 2; Macfarlan JA at 3)

71 Even if the MOU was validly terminated and the Club did not have enforceable contractual rights in respect of the options after the termination, the remedy of a constructive trust was in my view still available to the Club. Although relevant contractual rights are undoubtedly of assistance to a plaintiff, the ultimate question to be addressed in relation to the imposition of a constructive trust is whether the holder of the legal title to the property in question "may not in good conscience retain the beneficial interest" (*Jacobs' Law of Trusts* at [1301] quoting Cardozo CJ in *Beatty v Guggenheim Exploration Co* (1919) 122 NE 378 at 380 see also *Hospital Products Ltd v United States Surgical Corporation* [1984] HCA 64; (1984) 156 CLR 41 at 108 ).

---

96. Any profit or benefit obtained by a fiduciary in either of the two situations already described is held by him as a constructive trustee (Keith Henry &Co. Pty. Ltd. v. Stuart Walker &Co. Pty. Ltd. (1 958) 100 CLR 342, at p 350 ). Neither principle nor authority provide any support for the proposition that relief by way of constructive trust is available only in the case where a profit or

benefit obtained by the fiduciary was one which it was an incident of his duty to obtain for the person to whom he owed the fiduciary duty. Once it is established that the fiduciary is liable to account for a profit or benefit which he has obtained there can be no objection to his being held to account as a constructive trustee of that profit or benefit. It can make no difference that it was not his duty to obtain the profit or benefit for the person to whom the duty was owed. What is important is that the advantage has accrued to him in breach of his fiduciary duty or by his misuse of his fiduciary position. The consequence is that he must account for it and in equity the appropriate remedy is by means of a constructive trust.

97. In Beatty v. Guggenheim Exploration Co. (1919) 225 NY 380, Cardozo J. observed (at p 386 ) that an agent or a partner who promised or covenanted not to engage in some other business does not, as a matter of course, become chargeable as a trustee for the profits of the forbidden venture. For this proposition he cited well-known authorities which included Dean v. MacDowell (1878) 8 ChD 345 , and Aas v. Benham (1891) 2 Ch 244. He went on to say (at p 386 ):

> "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee."

Later he said (at p.389):

> "A court of equity in decreeing a constructive trust is bound by no unyielding formula. The equity of the transaction must shape the measure of relief."

---

**Following paragraph cited by:**

Turner v O'Bryan-Turner (24 February 2022) (Meagher, White and McCallum JJA)
Turner v O'Bryan-Turner (24 February 2022) (Meagher, White and McCallum JJA)
Ancient Order of Foresters in Victoria Friendly Society Ltd v Lifeplan Australia Friendly Society Ltd (10 October 2018) (Kiefel CJ, Gageler, Keane, Nettle and Edelman JJ)
Grimaldi v Chameleon Mining NL (No 2) (21 February 2012) (Finn, Stone and Perram JJ)
Grimaldi v Chameleon Mining NL (No 2) (21 February 2012) (Finn, Stone and Perram JJ)
Mavaddat v Lee (04 July 2007) (Steytler P)
Harris v Digital Pulse Pty Ltd (07 February 2003) (Spigelman CJ Mason P Heydon JA)
Harris v Digital Pulse Pty Ltd (07 February 2003) (Spigelman CJ Mason P Heydon JA)
Harris v Digital Pulse Pty Ltd (07 February 2003) (Spigelman CJ Mason P Heydon JA)

---

98. The decided cases provide many illustrations of the fiduciary who has been held to be accountable as a constructive trustee of a profit or benefit which he has obtained for himself, notwithstanding that it was not his duty to acquire that profit or benefit as an incident of his fiduciary duty. See, for example, Regal (Hastings) Ltd. v. Gulliver (1967) 2 AC 134 ; Phipps v. Boardman; Prebble v. Reeves (1910) VLR 88 ; Industrial Development Consultants Ltd. v. Cooley (

1972) 1 WLR 443, at p 455 ; and Pre-Cam Exploration &Development Ltd. v. McTavish (1966) 57 DLR(2d) 557. The principle and the policy which underlie the cases was comprehensively expressed by Rich, Dixon and Evatt JJ. in Furs Ltd. v. Tomkies (1936) 54 CLR 583. Their Honours, after pointing out the rule that an undisclosed profit derived by a director from the execution of his fiduciary duties belongs in equity to the company, observed (at p. 592 ):

> "It is no answer to the application of the rule that the profit is of a kind which the company could not itself have obtained, or that no loss is caused to the company by the gain of the director. It is a principle resting upon the impossibility of allowing the conflict of duty and interest which is involved in the pursuit of private advantage in the course of dealing in a fiduciary capacity with the affairs of the company. If, when it is his duty to safeguard and further the interests of the company, he uses the occasion as a means of profit to himself, he raises an opposition between the duty he has undertaken and his own self interest, beyond which it is neither wise nor practicable for the law to look for a criterion of liability. The consequences of such a conflict are not discoverable. Both justice and policy are against their investigation."

99. However, there is authority for the proposition that equity does not assume jurisdiction to punish a fiduciary for misconduct by making him account for more than he actually received as a result of his breach of fiduciary duty. In Vyse v. Foster (1872) LR 8 Ch App 309, James L.J. said (at p 333 ):

> "This Court is not a Court of penal jurisdiction. It compels restitution of property unconscientiously withheld; it gives full compensation for any loss or damage through failure of some equitable duty; but it has no power of punishing any one. In fact, it is not by way of punishment that the Court ever charges a trustee with more than he actually received, or ought to have received, and the appropriate interest thereon. It is simply on the ground that the Court finds that he actually made more, constituting moneys in his hands 'had and received to the use' of the cestui que trust."

The decision of the Court of Appeal was affirmed by the House of Lords ( (1874) L.R. 7 H.L. 318 ) without their Lordships reflecting on the passage which I have quoted.

---

**Following paragraph cited by:**

Wilden Pty Ltd v Green [No 6] (09 November 2018) (Murphy JA, Mitchell JA, Beech JA)

Ancient Order of Foresters in Victoria Friendly Society Ltd v Lifeplan Australia Friendly Society Ltd (10 October 2018) (Kiefel CJ, Gageler, Keane, Nettle and Edelman JJ)

Gunasegaram v Blue Visions Management Pty Ltd (14 August 2018) (Basten, Meagher and Gleeson JJA)

Grimaldi v Chameleon Mining NL (No 2) (21 February 2012) (Finn, Stone and Perram JJ)

Grimaldi v Chameleon Mining NL (No 2) (21 February 2012) (Finn, Stone and Perram JJ)

Grimaldi v Chameleon Mining NL (No 2) (21 February 2012) (Finn, Stone and Perram JJ)

Grimaldi v Chameleon Mining NL (No 2) (21 February 2012) (Finn, Stone and Perram JJ)

Harris v Digital Pulse Pty Ltd (07 February 2003) (Spigelman CJ Mason P Heydon JA)

100. The proposition which I have stated based on the observations of James L.J. needs to be modified in order to take account of the situation where the fiduciary has so mixed an indeterminate profit with his own property as to render the identification of the gain impossible. There "... the whole will be treated as trust property, except so far as he may be able to distinguish what is his own." (Brady v. Stapleton (1952) 88 CLR 322, at p 336, quoting Page Wood V-C. in Frith v. Cartland (1865) 2 H &M 417, at p 418 ( 71 ER 525, at p 526 )). The proposition may also need to be modified to take account of a profit acquired by a fraudulent fiduciary through a combination of trust property and his own property or efforts. It may well be that equity in such circumstances will not seek to apportion the gain.

101. The propriety of granting relief by way of constructive trust is therefore closely associated with the answers to two questions: (1) What is the breach of fiduciary duty? and (2) What is the profit or benefit which the fiduciary has made in consequence of that breach? Before proceeding to answer the second question, which is the outstanding question, I should mention that a particular problem has arisen with respect to the declaration of a constructive trust of a competing business established and carried on by a fiduciary in breach of his duty. One approach, more favourable to the fiduciary, is that he should be held liable to account as constructive trustee not of the entire business but of the particular benefits which flowed to him in breach of his duty. Another approach, less favourable to the fiduciary, is that he should be held accountable for the entire business and its profits, due allowance being made for the time, energy, skill and financial contribution that he has expended or made. In In re Jarvis (1958) 1 WLR 815, Upjohn J. observed (at p 820 ), correctly in my opinion, that it is not possible to say that one approach is universally to be preferred to the other, for each case depends on its own facts and the form of inquiry which ought to be directed must vary according to the circumstances. In each case the form of inquiry to be directed is that which will reflect as accurately as possible the true measure of the profit or benefit obtained by the fiduciary in breach of his duty.

(c) What was the Profit or Benefit obtained by HPI in

    Breach of its Fiduciary Duty?

102. McLelland J. confined the profit or benefit obtained by HPI to the profits which it made during the "headstart" period which ceased in November 1980 when HPI stopped selling on the Australian market. McLelland J. found:

> "The development of its manufacturing capacity in breach of its (HPI's) equitable obligation to USSC prior to the termination of the distributorship gave HPI a very considerable lead-time advantage in getting its own products on the market ... . The advantage represented by this headstart, which it would not have received had it not breached its fiduciary duty, provided HPI with a springboard which, together with its fraudulent conduct prior to the termination of the distributorship in filling orders for USSC clinical products with its repackaged product and creating a situation where HPI repackaged or manufactured products would be supplied in lieu of USSC clinical products in circumstances calculated to mislead consumers, enabled it to have the

benefit of a market in Australia which otherwise would have been a market for USSC products."

103. The Court of Appeal found that the true measure of the profit or benefit was represented by all the assets of HPI as at 10 January 1980. In rejecting the view that the "headstart" was the correct yardstick, the Court considered that as at 10 January 1980, the date of termination of the distributorship, HPI would not have been able to develop a manufacturing capacity had it attempted to do so on that date, and not before. This was because the raising of very substantial finance was an essential preliminary to the establishment of manufacturing capacity and HPI's status as exclusive Australian distributor of USSC's products was a sine qua non to its ability to raise that finance. The Court of Appeal's assessment of HPI's gain was expressed as follows:

> "What it had on 10th January, 1980, on the termination of the distributorship, was a manufacturing capacity, the benefit of the knowledge of and by the market it had obtained or generated as a distributor of USSC goods, the benefit of deferred orders for USSC goods, and the benefit of the financial resources which it had obtained on the assumption that it was acting with USSC's approval in developing its manufacturing capacity. It was no longer USSC's distributor and it was not in the business of executing with USSC goods the orders which it had deferred or which it obtained unless its own manufacturing limitations made that necessary. The selling activities which it then had were substantially the selling, under its own name, of products containing components manufactured by itself, leading in due course to the selling of products wholly manufactured by itself."

104. By way of reinforcing this conclusion the Court of Appeal stated that the assets held by HPI on 10 January 1980 had been acquired, created or developed by the misuse of USSC's distributorship, for the purpose of or in the course of the commission of breaches of its fiduciary duties. The assets were not assets acquired, created or developed for use only in the event that USSC's distributorship should be terminated but were the means by which HPI intended to appropriate to itself the market for USSC's products in Australia.

---

**Following paragraph cited by:**

Astra Pharmaceuticals (New Zealand) Ltd v Pharmaceutical Management Agency Ltd (23 November 2000) (Thomas J, Keith J, Blanchard J, Tipping J, McGrath J)

---

105. This approach opened up the way to relief by way of constructive trust over the assets of HPI, an approach which McLelland J. rejected. Unlike the Court of Appeal he thought that the "headstart" was an accurate measure of the profit or benefit gained by HPI. The ultimate profit or gain which HPI sought to obtain - USSC's local product goodwill - formed no part of the relief which he or the Court of Appeal awarded. The reason for this is that HPI did not succeed in appropriating for itself that goodwill on a permanent basis. It ceased to compete with USSC in the Australian market. Any

loss of local product goodwill by USSC to HPI was on a temporary footing only. Whether it was recovered by USSC or lost to other competitors we do not know.

106. The Court of Appeal's reason for rejecting the "headstart" approach centred on its view that, but for its status and standing as exclusive distributor of USSC's products in Australia, HPI would not have succeeded in securing the substantial finance essential for the establishment of a manufacturing capacity on or after 10 January 1980. There is some evidence that the Bank of New Zealand, HPI's principal financier, would not have advanced finance to HPI to undertake manufacturing activities if HPI had not been USSC's distributor and if the Bank had been aware that USSC had not approved the copying of its products. This direct evidence and other evidence capable of supporting an inference that HPI would have found it necessary to borrow substantially from other sources may well have justified the Court of Appeal's finding that HPI would not have been able to develop a manufacturing capacity had it attempted to do so on 10 January 1980 and not before.

107. However, this finding does not demonstrate that the headstart was not a correct measure of HPI's profit. First, the establishment by HPI of a manufacturing capacity or the taking of preparatory steps to that end after the termination of the distributorship would not have amounted to a breach of fiduciary duty or of contract. Secondly, it was not established that finance would not have been available to HPI from other sources to enable it to develop a manufacturing capacity. The headstart period fixed by the primary judge - 1 December 1979 to 30 November 1980 - covers the entire period in which HPI was selling its products to the Australian market. It therefore covers all the profits made by HPI in Australia in the course of its appropriation of USSC's product goodwill in Australia.

108. Whether HPI is accountable for (1) profits made from sales of its surgical stapling devices in the United States market and (2) its assets generally raises two separate questions. The first point to be made about sales in the United States - one which McLelland J. considered decisive - is that the ambit of the fiduciary relationship and the contractual obligations with which it was associated, i.e., the promise not to compete and the promise not to damage USSC's market, was restricted to the market in Australia. However, it does not follow as a matter of principle or logic that the profits for which HPI is liable are necessarily restricted to profits made within the ambit, geographical or otherwise, of the fiduciary relationship. As a fiduciary HPI is liable for any profits made in breach of its fiduciary duty, even if they happen to be made outside the area of the fiduciary relationship. If, for example, the responsibilities of the Victorian manager of a company with a nation-wide business are limited to Victoria, this geographical limitation on his responsibility gives him no immunity from liability to account for profits which he makes in Western Australia in competition with his employer by making use in breach of his fiduciary duty of knowledge or an opportunity gained in his fiduciary position. See Green and Clara Pty. Ltd. v. Bestobell Industries Pty. Ltd. (1982) WALR 1 ; McLeod and More v. Sweezey (1944) 2 DLR 145 and Pre-Cam. Although these are cases in which the defendant turned to his own advantage confidential information or knowledge acquired in his capacity as a fiduciary, they clearly illustrate that limitations on the ambit of the fiduciary relationship cannot be invoked as limitations on the fiduciary's liability to account for profits resulting from his breach of duty.

109. However, the second and decisive point to be made in connexion with possible profits arising from United States sales is that what gave the secret development of manufacturing capacity during the term of the distributorship the character of a breach of fiduciary duty was HPI's intention that the capacity should be exploited for the purpose of appropriating to HPI USSC's Australian product goodwill. The development of manufacturing capacity with a view to competing with USSC in the

United States market only during the distributorship would not have amounted to a breach of duty, though it would unquestionably have triggered a termination by USSC of the distributorship, had USSC been aware of the development. And it is clear from the findings of fact made in the courts below that at all material times HPI intended to use its manufacturing capacity to compete in the United States market as well as in the Australian market.

110. In some circumstances it may be proper to hold a fiduciary liable to account for a profit or benefit arising from the pursuit of an activity which did not amount to a breach of fiduciary duty but for the circumstance that the activity was also undertaken for the purpose of obtaining another profit or benefit which was a breach of fiduciary duty. If the breach of fiduciary duty is a sine qua non in the sense that the pursuit of the activity for the purpose of obtaining the legitimate profit or benefit could not have been undertaken as a practical business operation on its own without seeking also to obtain the forbidden profit or benefit, then there is much to be said for the view that the fiduciary's liability to account should extend to all profits and benefits. The problem seems not to have been explored in the courts below. There was no occasion to do so in the Court of Appeal because USSC obtained more extensive relief. And, although at first instance USSC sought in its statement of claim an account of profits generally, it seems not to have sought an account of profits arising from the United States sales on the footing now under discussion, preferring instead to claim, as it does in this Court, a comprehensive remedy by way of constructive trust over HPI's assets. In these circumstances it is not appropriate to make any order requiring HPI to account for profits arising from sales made in the United States.

111. The claim for a constructive trust of all the assets of HPI as at 1 July 1981 ranges far beyond the profits and benefits obtained by HPI in breach of its fiduciary duty. In granting that relief the Court of Appeal based its finding not only on a wider view of the fiduciary relationship, but more importantly on the view that the business of the Australian distributor had been fraudulently established with the very object of operating as a vehicle for the appropriation of USSC's Australian product goodwill. Whether fraud provides an adequate additional foundation for the constructive trust is a question still to be considered. At the moment it is sufficient to mention two matters. The first is that the constructive trust sought by USSC not only extends far beyond the profits and benefits obtained by HPI in breach of its duty but fails to make any allowance for the contribution in time, effort and finance made by HPI to the acquisition and creation of the assets which it held on 1 July 1981. The second is that the consequence of upholding the claim for the constructive trust would be to debar HPI from competing with USSC in the United States market, notwithstanding that the contract between the parties contained no such embargo during the currency of the contract or after its termination.

112. Nevertheless there is one aspect of HPI's manufacturing capacity which merits specific mention. This capacity was developed on the basis of reverse engineering - the copying of USSC's products. The evidence does not establish that the copying of these products constituted a breach of HPI's fiduciary duty, considered apart from the intention with which it was undertaken. As we have seen, the evidence seems to indicate that HPI acquired title to the products which it bought from USSC, including the demonstration product and that the copying or reverse engineering was carried out in relation to products of which HPI was the owner. There is no separate claim for relief by USSC based on confidential information alleging that the copying of the products amounted to an exploitation by HPI of confidential information to its own advantage to the detriment of USSC. Consequently, there is no foundation for imposing a constructive trust over the dies and moulds produced by the reverse engineering which are used in the course of HPI's manufacturing operations.

THE CLAIM TO A CONSTRUCTIVE TRUST BASED ON FRAUD

113. USSC submits that the constructive trust declared by the Court of Appeal can be sustained on the footing of the findings of fraud made by that Court. These findings are incontestably correct. USSC seizes on the finding that Blackman's fraudulent conduct - conduct which HPI adopted - in procuring the distributorship and in committing breaches of contractural and fiduciary obligations was undertaken in the execution of a dishonest scheme the object of which was to appropriate the whole or a substantial part of USSC's market.

114. The reasons which I have already given for rejecting the claim to a constructive trust for breach of fiduciary duty apply with equal force to the ground now under consideration. This is because common to both claims is the notion that the assets of HPI represent the material profit made or benefit taken, in one case in breach of fiduciary duty, in the other case by means of fraud. The answer in each case is that the assets of HPI do not represent, and substantially exceed, any profit or benefit obtained by HPI in breach of its duty or by means of fraud. It is not, and could not be suggested, that in equity restitutionary relief for fraud involving actual dishonesty differs in material respects from restitutionary relief in other species of equitable fraud not involving actual dishonesty. In every case the wrongdoer's underlying liability is to account for the gain that he has made.

115. There are cases, Timber Engineering Co. Pty. Ltd. v. Anderson (1980) 2 NSWLR 488 , being a striking example, where an employee has fraudulently and in breach of his fiduciary duty diverted business from his employer to a company owned and operated by the employee and others who participated in the fraudulent breach of fiduciary duty and the court has declared that the business of the company was held on a constructive trust to the employer. The decision in Timber Engineering, rests on the proposition that the business of the company represented the measure of the profit or benefit which was obtained in breach of fiduciary duty, for relief by way of constructive trust is merely a means of giving effect to the fiduciary's basic liability to account. This is how Kearney J. dealt with the matter. He was at pains (at p.496) to demonstrate that (a) every opportunity which the company received was directly attributable to resources and benefits provided by the employer, even to the extent of time and effort expended by the employees for which the employer paid and (b) every advance made by the company was due to resources and facilities provided by the employer, leading to the conclusion that the business of the company was "carved out of the business" of the employer.

116. The final matter to be mentioned on this aspect of the case is that in an interlocutory judgment delivered on 11 June 1982 McLelland J. ruled that in the light of the pleadings and the manner in which USSC's case had been conducted the claim in fraud could only be pursued in association with the case for relief for breach of fiduciary duty and not as an independent case for relief.

ORDERS

117. In the result I would allow the appeal and the cross appeals of the second, third, fourth and fifth respondents, dismiss the cross appeal of the first respondent, set aside the orders made by the Court of Appeal and restore the orders made by McLelland J.

WILSON J. My consideration of the issues in this case has led me to a view substantially in accord with that expressed both by the Chief Justice and by Dawson J. in their respective reasons for judgment. In the circumstances, I refrain from embarking on a lengthy judgment of my own. I content myself with a few observations.

2. I accept the finding of the learned trial judge, with which the Court of Appeal agreed, that the statements made by Blackman at the restaurant meeting in November 1978 were "promissory and not merely representational" (J.J. Savage &Sons Pty. Ltd. v. Blakney (1970) 119 CLR 435, at p 442 ) and that consequently it was an express term of the contract that

> "the distributor would devote its best efforts to distributing U.S.S.C. surgical stapling products, and building up the market for those products, in Australia, to the common benefit of U.S.S.C. and itself".

Although the use of the words "common benefit" may leave room for differences of opinion as to the precise operation of such a term, I would not give it an effect which is different in any significant respect from that which is achieved by the implication of the statutory term prescribed by s.2-306(2) of the Uniform Commercial Code which is in force in both New York and Connecticut. That clause provides:

> "A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale".

I would have thought that every sole distributor contract would induce in both parties a reasonable expectation of mutual benefit accruing from the "best efforts" of the distributor.

3. However, I agree that the trial judge erred when, having identified the express terms of the contract he went on to imply a term that the distributor would not, during the distributorship, do anything inimical to the market in Australia for USSC surgical stapling products (the "nothing inimical" clause). McLelland J. was of the view that the fact that the distributor was bound by a promise to devote its best efforts to distributing USSC surgical stapling products in Australia to the common benefit of USSC and itself necessarily imported, in all the circumstances, an obligation not to do anything inconsistent with building up the market for USSC products in Australia to the common benefit of USSC and the distributor. On a number of recent occasions this Court has considered and reviewed the principles which govern the implication of contractual terms. In Secured Income Real Estate (Australia) Ltd. v. St. Martins Investments Pty. Ltd. (1979) 144 CLR 596 Mason J., in a judgment concurred in by other members of the Court, declined to imply a term in the contract of sale confining the leases to long-term leases, saying "(t)he fact that such a provision would provide a greater protection for the respondent is not a sufficient reason for implying it." (at p. 605 ). He then referred to and expressly adopted the majority judgment of the Judicial Committee in B.P. Refinery (Westernport) Pty. Ltd. v. Hastings Shire Council (1977) 52 ALJR 20, at p 26 wherein their Lordships said:

---

Following paragraph cited by:

Electricity Generation Corporation v Woodside Energy Ltd (05 March 2014)
(French CJ, Hayne, Crennan, Kiefel and Gageler JJ)

---

... for a term to be implied, the following conditions (which may overlap) must be satisfied: (1) it must be reasonable and equitable; (2) it must be necessary to give business efficacy to the contract, so that no term will be implied if the contract is effective without it; (3) it must be so obvious that 'it goes without saying'; (4) it must be capable of clear expression; (5) it must not contradict any express term of the contract."

4. The implication of a term was again considered at length by this Court in Codelfa Construction Pty. Ltd. v. State Rail Authority of N.S.W. (1982) 149 CLR 337 (per Mason J. at pp. 345-356, per Aickin J. at pp. 371-375 and per Brennan J. at pp 400-407) and, to a lesser extent, in Meehan v. Jones (1982) 149 CLR 571 and Booker Industries Pty. Ltd. v. Wilson Parking (Qld) Pty. Ltd. (1982) 149 CLR 600 . In those cases the Court reiterated that "it is not enough that it is reasonable to imply a term; it must be necessary to do so to give business efficacy to the contract." (Codelfa per Mason J. at p. 346). In my view there is no necessity to imply the nothing inimical clause in order to accord business efficacy to the distributorship agreement.

5. The relationship which existed between the parties in this case, namely that of manufacturer and sole distributor, is not one which would ordinarily be productive of a fiduciary duty. Notwithstanding the fact that Blackman had embarked on a fraudulent scheme, the circumstances of this case do not persuade me that any such duty came into existence. What was required of the distributor was that it devote its best efforts to distributing USSC surgical stapling products and building up the market for those products in Australia to the common benefit of USSC and itself. The extent of that obligation falls to be determined by what is reasonable in the circumstances: see Transfield Pty. Ltd. v. Arlo International Limited (1980) 144 CLR 83 . In Van Valkenburgh v. Haydon Publishing Co. (1972) 30 N.Y. 2d 34 the New York Court of Appeals was clearly of the view that the obligation to use one's "best efforts" to promote the object of the agreement between the parties does not foreclose the obligee's right to pursue his own economic interests in matters to which the agreement relates: see Bergan J. (with whom Burke, Scileppi, Breitel and Gibson JJ. concurred) at p. 45.

6. In a commercial transaction of the kind here under consideration, where the parties are dealing at arm's length and there is no credible suggestion of undue influence, I am reluctant to import a fiduciary obligation. The Courts have often expressed a cautionary note against the extension of equitable principles into the domain of commercial relationships, so as "not to strain (them) beyond (their) due and proper limits", to use the words of Lord Selborne L.C. in Barnes v. Addy (1874) 9 ChApp 244, at p 251. In New Zealand and Australian Land Co. v. Watson (1881) 7 QBD 374 the Court of Appeal held that the defendants, who had effected sales of wheat consigned by the plaintiffs for sale, did not stand in any fiduciary character towards the plaintiffs so as to entitle the latter to follow the proceeds of their property in the defendant's hands. Bramwell L.J. said, at p. 382 :

"Now I do not desire to find fault with the various intricacies and doctrines connected with trusts, but I should be very sorry to see them introduced into commercial transactions and an agent in a commercial sense turned into a trustee with all the troubles that attend that relation. I think there is no good ground for holding that these defendants have any fiduciary character towards the plaintiffs."

These observations remain as pertinent today as they were one hundred years ago: Scandinavian Trading Tanker Co. A.B. v. Flota Petrolera Ecuatoriana (1983) 2 AC 694, per Lord Diplock at pp 70 3-704 ; cf. Law Quarterly Rev., vol. 100 (1984), at pp 369-375. As the cases referred to by the Chief Justice in his judgment show, this Court has refused, on several occasions, to find a fiduciary relationship in circumstances where the parties contract with each other freely and more or less on an equal footing in a commercial dealing: see Jones v. Bouffier (1911) 12 CLR 579 ; Dowsett v. Reid (1912) 15 CLR 695 ; Para Wirra Gold &Bismuth Mining Syndicate N.L. v. Mather (1934) 51 CLR 582 . In my view the passage of the judgment of this Court in Keith Henry &Co. Pty. Ltd. v. Stuart Walker &Co. Pty. Ltd. (1958) 100 CLR 342 wherein they said:

> "It cannot be suggested that the plaintiff and the defendant at any stage stood in any fiduciary relationship one to the other. The position is simply that business men - or business firms - were engaged in ordinary commercial transactions with each other, dealing with each other, as the saying goes, at arm's length." (per Dixon C.J., McTiernan and Fullagar JJ. at p. 351)

aptly describes the relationship which existed between the parties in the present case.

7. I would make orders in similar terms to those proposed by the Chief Justice.

DEANE J. Due largely to the accuracy and precision of the findings of the learned trial judge, the basic facts of this complicated case are no longer in dispute. They are set out in other judgments in th is Court and I refrain from repeating them. As I see the matter, the issues on this appeal involve three broad questions: (i) which, if any, of Mr. Blackman's oral statements to the representatives of United States Surgical Corporation ("USSC") constituted express terms of the contract between Blackman and USSC and, by substitution or novation, between Hospital Products International Pty. Limited ("HPI") and USSC; (ii) whether any, and if so what, terms should be implied in that contract, and (iii) whether USSC is entitled to any, and if so what, relief by way of constructive trust. The discussion of those questions in the judgments of other members of the Court makes it possible for me to indicate, in comparatively summary fashion, the conclusions to which I have come and my reasons for them. I shall refer indifferently to the contract between Blackman and USSC and the substituted contract between HPI and USSC as "the contract".

(i) Express terms of the Contract

2. In the course of the critical restaurant conversation in November 1978 between himself and the two representatives of USSC, Blackman made a number of statements or representations which arguably constituted express terms of the contract which is agreed to have been partly oral. The test for determining whether any, and if so which, of those statements in fact constituted an express term of the contract is whether the proper inference is that the relevant statement or representation was, when viewed objectively and in context, offered and accepted as, or as part of, a contractual promise. At first instance, McLelland J. identified four such statements or representations which he concluded had been incorporated as express terms of the contract. That conclusion was upheld by the Court of Appeal. For the reasons given by Mason J. and Dawson J. in their judgments in this Court, I am of the view that his Honour's finding of those four express terms of the contract should be accepted as correct.

3. That being so, the express terms of the contract included a promise by the distributor (i.e.

Blackman and, subsequently, HPI) to the effect that, during the term of the distributorship under the contract, the distributor "would devote its best efforts to distributing USSC's surgical stapling products, and building up the market for those products, in Australia, to the common benefit of USSC and itself" and that, during that term, the distributor would not deal in Australia "in any products competitive with USSC's surgical stapling products". I agree with Mason J's comments about the limited effect of the words "to the common benefit of USSC and itself" in that "best efforts" clause.

---

**Following paragraph cited by:**

Realestate.com.au Pty Ltd v Hardingham (14 December 2022) (Kiefel CJ, Gageler, Gordon, Edelman and Steward JJ)

Hardingham v RP Data Pty Limited (18 August 2021) (Greenwood, Rares and Jackson JJ)

Hardingham v RP Data Pty Limited (18 August 2021) (Greenwood, Rares and Jackson JJ)

Hardingham v RP Data Pty Limited (18 August 2021) (Greenwood, Rares and Jackson JJ)

Hardingham v RP Data Pty Limited (18 August 2021) (Greenwood, Rares and Jackson JJ)

Pilbara Iron Ore Pty Ltd v Ammon (11 June 2020) (Buss P, Murphy JA, Vaughan JA)

Westpac Banking Corporation v Bell Group Ltd (in liq) (No 3) (17 August 2012) (Lee AJA Drummond AJA Carr AJA)

Central City Pty Ltd v Montevento Holdings Pty Ltd (18 January 2011) (Buss JA, Murphy JA)

Pegela Pty Ltd v Oates (09 August 2010) (Allsop P, McColl and Young JJA)

> 12 The appellants criticised his Honour's conclusion on the basis that the implication did not meet the well-known tests in *BP Refinery (Westernport) Pty Ltd v President, Councillors and Ratepayers of the Shire of Hastings* [1977] UKPCHCA 1; 180 CLR 266 at 283. These five tests are relevant in full when there is an agreement in writing complete upon its face: Deane J in *Hospital Products Ltd v United States Surgical Corporation* [1984] HCA 64; 156 CLR 41 at 121 , approved in *Byrne v Australian Airlines Ltd* [1995] HCA 24; 185 CLR 410 at 422 (Brennan CJ, Dawson and Toohey JJ) and at 442 (McHugh and Gummow JJ).

Secure Parking (WA) Pty Ltd v Wilson (19 December 2008) (Martin CJ)

Secure Parking (WA) Pty Ltd v Wilson (19 December 2008) (Martin CJ)

Parramatta Design & Developments Pty Ltd v Concrete Pty Ltd (29 July 2005) (Branson, Kiefel & Finkelstein JJ)

> 14. For a time it was thought that it was necessary in all cases to meet all five conditions. (We put to one side the possibility, based on cases such as *Bank of Nova Scotia v Hellenic Mutual War Risks Association (Bermuda) Ltd* [1990] 1 QB 818 at 895 and 897, that conditions (2) and (3) are alternative). But there has been a sensible retreat from this rigidity. It is now accepted that it is only where the parties have set out their contract in some detail, apparently having covered all aspects, that each condition must be satisfied. Where there is no formal contract complete on its face a more flexible approach is allowed: *Hospital Products Limited v United States Surgical Corporation* (1984) 156 CLR 41 at 121 ; *Hawkins v Clayton* (1988) 164 CLR 539 at 573 ; *Byrne & Frew v Australian Airlines Limited* (1995) 185 CLR 410 at 422-423 . In that kind of case all that is

necessary is to show that the term to be implied is necessary for the reasonable or effective operation of the contract in all the circumstances.

*Yau's Entertainment Pty Ltd v Asia Television Ltd* (28 March 2002) (Sundberg, Finkelstein & Hely JJ)

28.  In *Hospital Products Ltd v United States Surgical Corporation* (1984) 156 CLR 41 at 121 , Deane J cautioned against an over-rigid application of those criteria to a case where the parties have never attempted to reduce their contract to complete written form. In particular a rigid approach to the requirement "that it must be necessary to give business efficacy to the contract" should not be adopted in the case of an informal and obviously not detailed oral contract where the term which it is sought to imply is one which satisfies the requirement of being "so obvious that it goes without saying". At 156 CLR 121 Deane J said:

> "As a general rule, however, the 'so obvious that it goes without saying' requirement must be satisfied even in the case of an informal oral contract before the courts will imply a term which cannot be implied from some actual statement, from previous dealings between the parties or from established mercantile practice."

*Yau's Entertainment Pty Ltd v Asia Television Ltd* (28 March 2002) (Sundberg, Finkelstein & Hely JJ)

34.  A test formulated in this way does not, at least in terms, incorporate the familiar requirement of obviousness. But in *Byrne* at 185 CLR 446 McHugh and Gummow JJ said:

> "In contracts of this nature, apparently lacking written formality and detailed specificity, it still is necessary to show that the term in question would have been accepted by the contracting parties as a matter so obvious that it would go without saying."

And in *Hospital Products* (supra) Deane J said at 121 that the "so obvious it goes without saying" requirement must be satisfied before the Court will imply a term even in the case of an informal contract.

(ii) Implied terms of the Contract

4. In a number of recent cases, this Court has accepted the summary of the majority of the Privy Council in B.P. Refinery Pty. Ltd v. Hastings Shire Council (1977) 52 ALJR 20, at p 26 of the criteria which must be satisfied before a term will be implied in a contract. Those cases in this Court, like the B.P. Refinery Case itself, were concerned with the question whether a term should be implied in a formal contract which was complete upon its face and care should be taken to avoid an over-rigid application of the cumulative criteria which they specify to a case such as the present where the contract is oral or partly oral and where the parties have never attempted to reduce it to complete written form. In particular, I do not think that a rigid approach to the requirement "that it must be necessary to give business efficacy to the contract" should be adopted in the case of an informal and obviously not detailed oral contract where the term which it is sought to imply is one

which satisfies the requirement of being "so obvious that it goes without saying " in that if it had been raised both parties would "testily" have replied "of course" (cf. the B.P. Refinery Case, at p. 27). As a general rule however, the "so obvious that it goes without saying" requirement must be satisfied even in the case of an informal oral contract before the courts will imply a term which cannot be implied from some actual statement, from previous dealings between the parties or from established mercantile practice.

5. Both at first instance and in the Court of Appeal, it was held that it was an implied term of the contract that the distributor would not, during the distributorship, "do anything inimical to the market in Australia for USSC surgical stapling products". I respectfully disagree with that finding. Such a term, particularly if the word "inimical" is given the "most rigorous sense" attributed to it by the Court of Appeal, would be commercially unusual and unexpected in a distributorship arrangement. Indeed, the express "best efforts" clause of the contract appears to me to remove any basis which might otherwise be thought to exist for implying a broad unqualified term under which the distributor was contractually bound during the distributorship not to do "anything" inimical to the Australian market for the relevant product or for implying some other term having a similar but more limited operation. I would add that, subject to the foregoing and one additional qualification, I am in general agreement with what is said on this aspect of the case by the Chief Justice and by Dawson J. The additional qualification is that my acceptance of the "best efforts" clause as an express term of the contract makes it unnecessary to place reliance upon the similar provision prescribed by s.2-306(2) of the Uniform Commercial Code which is set out in the judgment of the Chief Justice.

(iii) Constructive Trust

6. The conclusions of the Court of Appeal on the questions of fiduciary relationship, fiduciary duty and constructive trust were, to no small extent, based on the view that it was an implied term of the contract that the distributor would not do anything inimical to the market in Australia for USSC surgical stapling products. The rejection of that implied term removes an important part of the basis of the Court of Appeal's conclusion that USSC was entitled to the benefit of the comprehensive constructive trust which it declared. While a careful reading of McLelland J's judgment leaves me in little doubt that his finding that the distributor owed a limited fiduciary duty to the manufacturer would have been the same if he had relied merely on the express "best efforts" and "no competing products" terms of the contract, he would seem partly to have based that finding of a limited fiduciary duty on the existence of the relevant implied term ("HPI's position of power and its contractual obligations": (1982) 2 N.S.W.L.R. 766, at p. 811 ). In all the circumstances, the preferable course is to approach the question of constructive trust afresh on the basis of McLelland J's findings of fact.

7. The relationship between a manufacturer and a distributor is not, in itself, ordinarily a fiduciary one even in a case where the distributor enjoys sole rights of distribution in a particular area. Such a relationship is ordinarily that of seller and buyer. It is true that the manufacturer and distributor have a common interest in ensuring that the distributor should sell as much of the relevant product as possible. That however is a truism of the market place and not a legal principle. In seeking such sales, the distributor is ordinarily acting in pursuit of his own interests. It is in the pursuit of his own interests that he acts to the advantage of the manufacturer by generating more sales of the product (cf. Federal Commissioner of Taxation v. Cooke (1980) 42 FLR 403, at p 419 ).

8. The express term of the contract in the present case requiring the distributor to use its "best

efforts "to build up the market for, and distribute, the products in Australia" to the common benefit of both manufacturer and distributor did not, of itself, impose a general fiduciary duty on the distributor to seek no profit or benefit for itself or to disregard its own interests where they conflicted with the manufacturer's. In the context of the term precluding the distributor from dealing in any competing product, the reference to "the common benefit" was no more than a reflection of the commercial fact that, while the distributorship subsisted, it was in the interests of both manufacturer and distributor that, consistently with ordinary economic restraints on pricing, the market for the manufacturer's product in the relevant area be maximized. Neither that nor any other provision of the contract transformed the relationship into a partnership or joint venture. Nor was there anything in the contract which either authorized the distributor to act on behalf of the manufacturer in the sense of acting as agent for a principal or which required the distributor generally to subordinate its own interests to those of the manufacturer. The arrangement under the contract was the ordinary arrangement that a distributor would buy product from a manufacturer and sell it on its own behalf. Subject to one possible qualification, the manufacturer - distributor arrangement between USSC and HPI was not a fiduciary relationship and did not involve general fiduciary duties.

9. The conclusion that the overall relationship between USSC and the distributor was not fiduciary does not preclude the possibility that, within or arising from that relationship, a more restricted fiduciary relationship might exist. Indeed, the continuing relationship of manufacturer and distributor might well provide a context in which it would be easier to imply an undertaking by one party to act as a fiduciary in relation to a particular matter than would be the case if that relationship did not exist. The possible qualification to the denial of a general fiduciary relationship is that which was accepted by McLelland J., namely, that HPI was a fiduciary in respect of "such of USSC's interests as were represented by the market for its products in Australia" or, to adopt the phraseology used in argument in this Court, in respect of USSC's local products goodwill.

10. Under the contract, the distributor was given the exclusive opportunity of exploiting and developing the local goodwill of USSC's products. There was an established local goodwill in respect of USSC's products before HPI was appointed as the exclusive Australian distributor. Upon its appointment, HPI circularized "numerous" hospitals advising that "we currently distribute the product for the manufacturer in the United States" and "will be the exclusive Distributors nationwide in Australia". The contractual right to distribute and exploit that local goodwill was not, however, uncontrolled. It was subject to the terms of the contract including the express terms that the distributor would devote its best efforts to distributing USSC's products and to building up the market for those products in Australia to the common benefit of USSC and itself and that the distributor would not deal in Australia in any other products competing with those products. Plainly, the distributor was acting in breach of those express terms of the contract when, during the currency of the distributorship, it deferred fulfilment of orders for USSC's clinical products in anticipation of filling those orders with HPI's re-packaged or manufactured competing products and filled orders for USSC's clinical products with such competing products. It is clear from the evidence that, as McLelland J. found, the distributor committed those breaches of the contract "with a view to appropriating for itself at the expense of USSC the whole or a substantial part of the Australian market for USSC products".

11. In these circumstances, I agree with the conclusion reached by McLelland J. at first instance and Mason J. in this Court that USSC was entitled to an order that HPI account, as constructive trustee, for any profits it derived from the business of distributing within Australia its own re-packaged or manufactured products up until November 1980 when it ceased to distribute in this country. The

reasoning which leads me to that conclusion diverges however from that accepted by McLelland J. at first instance and by Mason J. in this Court in that I am not persuaded that a "fiduciary relationship" existed between USSC and HPI in respect of the local products goodwill. Provided that it did not act in breach of the terms of the contract, HPI was, as I see the matter, entitled to exploit that local goodwill for its own benefit not only as regards its profit from sales of USSC's products but also, for example, by taking advantage of the "flow on" advantage which it might derive in marketing any non-competing products to the existing customers for USSC's products. If it had not acted in breach of its contractual obligations, it would have subsequently been free to exploit the advantage of its previous association with USSC's products to build up the goodwill of its own. In my view, the constructive trust pursuant to which HPI is liable to account for the profits arising from the sale in Australia of its own re-packaged or manufactured competing products should properly be seen as imposed as equitable relief appropriate to the particular circumstances of the case rather than as arising from a breach of some fiduciary duty flowing from an identified fiduciary relationship. HPI's business of distributing those competing products in Australia was founded upon and incorporated the appropriation to itself, by a course of conduct which involved calculated breach of its contractual obligations to USSC, of the local goodwill for USSC's products. In all the circumstances, USSC was entitled to a declaration that HPI was liable to account as a constructive trustee for the profits of that Australian business in accordance with the principles under which a constructive trust may be imposed as the appropriate form of equitable relief in circumstances where a person could not in good conscience retain for himself a benefit, or the proceeds of a benefit, which he has appropriated to himself in breach of his contractual or other legal or equitable obligations to another. Since this particular aspect of the matter was not explored in argument and a majority of the Court is of the view that there is no basis for any finding of constructive trust however, it is preferable that I defer until some subsequent occasion a more precise identification of the principles governing the imposition of a constructive trust in such circumstances.

12. Subject to what has been said above and to my rejection of any relevant implied term in the contract, I am in general agreement with Mason J's reasoning (and the reasoning of McLelland J. at first instance) leading to the conclusion that the only relief by way of constructive trust to which USSC was entitled was in respect of HPI's liability to account for the profits which it made from distributing its competing products in Australia for the limited period up until November 1980. The consequence of that conclusion is that I agree with the orders proposed by Mason J. which would effectively restore the orders made at first instance.

13. The relief to which USSC is entitled may well appear inadequate in the light of the calculated and fraudulent conduct of which it was the victim. That is, however, at least in part, the result of the manner in which USSC has, no doubt for good commercial or other reasons, framed its claims for relief in the present proceedings rather than any inability of the law to provide adequate remedies. In that regard, it is possibly relevant to note that the evidence indicates that the present proceedings should properly be seen as but one battle in wider hostilities being waged on a multi-national scale.

DAWSON J. In 1973 the fourth respondent, Alan Richard Blackman ("Blackman"), was employed by the first respondent, United States Surgical Corporation ("USSC") as a product manager. USSC is a company, incorporated in the United States of America, which has since 1967 marketed in that country and elsewhere surgical stapling implements of its own design together with disposable loading units containing staples, also of its own design, for use with such instruments. Surgical stapling is a form of suturing during surgical operations by means of stainless steel staples rather than needle and thread. Some of the instruments also enable a cutting operation to be performed simultaneously with the application of the staples. The instruments save time, avoid trauma and

minimize blood loss during operations. In some instances they enable surgical procedures to be carried out which were not possible using traditional suturing methods.

2. After some months Blackman ceased to be an employee of USSC and was appointed an authorized dealer of that company for a territory covering a substantial part of the City of New York. The terms of the dealership were contained in an agreement in standard form.

3. In 1976 Blackman formed a company in New York called The Hospital Products Corporation ("HPC") which, under a new dealership agreement, replaced him as the dealer in the dealership which he held with USSC. Blackman, however, continued to carry on the actual work of the dealership.

4. Authorized dealers were appointed by USSC only in respect of areas within the United States. Elsewhere distributors were appointed by it to market its products. In general, these distributors carried on an established business marketing, as well as USSC products, the products of other manufacturers. There was no standard form of distributorship agreement and the arrangement between USSC and its distributors tended to be informal and loose, unlike the arrangement between USSC and its dealers. It is clear, however, that distributors, like dealers, did not sell USSC products as agents of the company; they purchased the products from USSC and resold them to customers. In 1976 a company called Downs Surgical (Australia) Pty. Ltd. ("Downs Surgical") became USSC's distributor in Australia.

5. Blackman was an effective salesman who became expert in the use and sale of USSC products. Authorized dealers took part in a programme designed to make USSC products familiar to surgeons and hospital staffs in the United States. They were required to develop skills which involved a considerable degree of medical and technical knowledge. USSC established a training school where its dealers were given instruction in basic anatomy and physiology, medical and surgical terminology, operating theatre protocol, the nature of the surgical procedures in which USSC products could be used and the appropriate product for the purpose and the techniques of using USSC products. Dealers were required to provide guidance to surgeons in hospital operating theatres during actual operations. For this purpose there was a training course established by USSC which extended over some five or six weeks of study and, in addition, USSC supplied its dealers with a training manual setting out in detail the matters which they were required to know.

6. The founders and principal executives of USSC were a Mr Hirsch and a Miss Turi Josefsen. They were in fact husband and wife. As an employee of USSC and as a dealer Blackman developed a direct, personal relationship with Hirsch and Josefsen and they held him in high regard, recognizing his skills in demonstrating and promoting USSC products. On occasions Hirsch and Josefsen asked Blackman to monitor the performance of other dealers and to give them advice. There were occasional disagreements between Hirsch and Josefsen on the one hand and Blackman on the other but these do not appear to have resulted in any permanent impairment of the cordial relationship between them.

7. In August 1978, Blackman visited Australia for twelve days. At about this time he ascertained that USSC surgical stapling instruments and disposable loading units were not the subject of registered patents in Australia as they were in the United States. On 11 August 1978, he consulted an Australian expert in metallurgy, Professor Wallwork, and provided him with samples of USSC disposable loading units for the purpose of investigating the composition and physical properties of the staples in those samples and the suitability for radiation sterilization after packaging of loading

units of the same kind as the samples. Later in 1978 Blackman also asked Professor Wallwork to investigate and report on the composition and physical properties of other metal components in the various sample disposable loading units and to investigate the sources of possible tool and die makers in Sydney capable of producing dies for the manufacture of such components. At Blackman's request, Professor Wallwork also referred him to a colleague for information concerning plastic components in the disposable loading units. Reports on some of these matters were made to Blackman during 1978 and the remainder in January 1979.

8. Also during his visit to Australia during August 1978, Blackman consulted solicitors in Sydney about his competing with USSC by marketing USSC demonstration products repackaged and sterilized in Australia and about the registration in Australia by him of USSC's trade mark "Auto Suture".

9. Demonstration products consisting of disposable loading units were supplied by USSC to dealers and distributors for demonstration purposes at a fraction of the cost of clinical products. They were identical with those supplied for sale for clinical use but were neither sterilized nor supplied, individually packed, in sterile packs like the clinical products. Moreover, in a number of instances each pack of the clinical products held separate components comprising a cartridge containing the staples and a pusher mechanism, an anvil to form the staples to the required shape and, in most cases, a retaining pin to secure and align the cartridge and anvil on the instrument. Each pack of the demonstration products, containing six or twelve separate cartridges, held only one anvil and, where applicable, only one retaining pin. The single anvil and pin could be used a number of times with the demonstration products but would have to have been discarded after a single use with the clinical products because of the possibility of contamination. Blackman had been aware for some years that USSC demonstration products did not differ in quality from its clinical products. Since about 1977 he had been accumulating abnormally large stocks of demonstration products in the course of HPC's New York dealership.

10. In November 1978, Blackman again visited Australia for twelve days. This time he consulted Mr Engel of Graham Engel and Associates Pty. Ltd., consultants in pharmaceutical sciences and the regulation of pharmaceutical goods. He engaged Engel's company to advise him about the repackaging and sterilizing of USSC disposable loading units and provided it with samples. He also asked for advice about Australian requirements relating to the information required for, and the labelling of, such products.

11. During November 1978, Blackman telephoned Josefsen and arranged a meeting to discuss an unspecified proposal. On some date between 17 and 27 November 1978 the meeting took place between Blackman, Hirsch and Josefsen over a meal at a restaurant, either in Stamford, Connecticut, or in New York City. Blackman told Hirsch and Josefsen that he would like to emigrate to Australia and proposed that USSC appoint him as its exclusive Australian distributor in place of Downs Surgical. He said that there was a great potential market for USSC surgical stapling products in Australia which was not being tapped by the existing distributor. He pointed out that with his long experience of, and accumulated know-how in, marketing these products and with his long association with USSC he could do an outstanding job for USSC and perform better than anyone else in building up sales of USSC products. He expressed the view that this would be a great opportunity both for himself and for USSC. He said that he would set up a marketing organization with sales representatives trained in the use and demonstration of USSC products in a manner similar to that used in USSC's training programme in the United States. Blackman indicated that after he had built up the Auto Suture business - had "got it really rolling" - he might take on other

non-competing lines and build up a broad-based surgical distributorship but not so as to interfere with his giving proper attention to USSC products. He pointed out that the establishment of the new business would take some time and would be expensive so that he would need some financial help in the form of credit and would like to rent instruments from USSC with the option of purchasing them in the future.

12. Hirsch and Josefsen indicated at the meeting that they were favourably disposed to Blackman's proposal. Hirsch said "Alan we will work it out" and Blackman said "You won't regret it." It was arranged that Blackman should discuss further details of the arrangement later with Josefsen.

13. In the meantime, after Blackman's return from Australia to the United States, Engel was in touch with Blackman's Sydney solicitor and they "discussed the various steps needed to get the stapling business under way". On 15 November 1978, on Blackman's instructions, his solicitors lodged an application in Australia for the registration of the trademark "Auto Suture" under the Trade Marks Act 1955 (Cth) , in the name of HPC in respect of, amongst other things, "instruments and apparatus for use in surgery". In December 1958, Engel made approaches to Smith and Nephew Associated Companies of Australia Pty. Ltd. ("Smith and Nephew") in Melbourne for them to carry out for Blackman the repackaging and sterilization of certain USSC demonstration disposable loading units.

14. Probably in the latter half of November 1978 a further meeting took place between Blackman and Josefsen. There was a discussion about a number of matters relating to Blackman's proposal, including the training of a nurse to be employed by Blackman in Australia, the size of Downs Surgical's stock inventory and the possibility of Blackman's purchasing it and the transfer to Australia of some of the inventory of HPC's New York dealership. At that meeting the question was raised whether USSC should have a written distributorship agreement with Blackman. It had not been the usual practice of USSC to require its overseas distributors to enter into formal, written agreements. Josefsen indicated that she would prefer a written agreement with Blackman but he rejected the suggestion on the ground that it was not necessary. He said, however, that he was willing to read a draft agreement.

15. On 27 November 1978 Blackman wrote to Josefsen outlining a timetable of events intended to facilitate his American company's withdrawal from the market in the United States and his entry into the Australian market. He ended the letter by saying:

> "A transition in this manner will benefit USSC by having improved coverage in the Australian market, as well as an orderly change here. We will provide all necessary introductions to assure the success of the salespeople who will be representing USSC, and inventories of hospitals will not be overloaded.
>
> Turi, it has been a pleasure being associated with you for the past 7 years, I look forward to many more."

16. On 18 December 1978, Josefsen replied to Blackman's letter. She indicated her agreement in principle with Blackman's proposals. However, she affirmed USSC's desire to have Blackman enter into a written agreement by advising him that one would be drawn up by Mr Fisher, who acted as in-house counsel for USSC and was also a director of that company. Josefsen concluded her letter by

saying:

> "We look forward to working with you and although personal contacts will be few and far between, we shall do our best to keep you informed and abreast of trends and new events as they happen. Alan, this is an exciting step you are taking and I wish you every success in your endeavours and happiness in your new country. May it all work out exactly the way you hope."

17. On 27 December 1978, USSC wrote to Downs Surgical terminating its distributorship from 31 March 1979. Also on 27 December 1978, USSC wrote to Blackman. The letter was signed by Mr Whittingham, a senior Vice-President of USSC, because Josefsen was then on vacation and it was ultimately countersigned by Blackman. It was as follows:

> "We take pleasure in confirming the continuance of our relationship. You will become our Australian distributor while phasing out your dealership in accordance with the following procedures.
>
> 1. We have this day given notice of termination to our present Australian distributor, Downs Surgical (Australia) Pty. Ltd. effective March 31, 1979. A copy of the notice has been furnished to you. Upon that termination becoming effective and commencing April 1, 1979 you will be our exclusive Australian distributor. Although you have indicated that no formal agreement is necessary, we believe it is desirable and will forward to you a suggested agreement covering the distributorship.
>
> 2. During the period through March 31, 1979 you will undertake to purchase the Downs' inventory at prices mutually agreeable to you and them and in any event use your dealership inventory which you estimate will be approximately $100,000 - $125,000, wholesale value, to provide an inventory level in Australia. Additional products purchased by you from us will be paid on a 30 day net basis. In the meantime arrangements should be made to examine your inventory books and records as per your dealership agreement at the earliest convenient date.
>
> 3. You expect to rent from us between 20-30 sets of instruments which within 120 days you will convert to purchase from us.
>
> 4. You will hire and train your nurse unless she is agreeable to training by us at your expense.
>
> 5. Your dealership will continue without change through June 30, 1979. Effective July 1, 1979 your dealership shall be deemed terminated in all respects and your PAR will be taken over by us for servicing.
>
> 6. By July 1, 1979 all accounts owed to us will be paid in full by you. This includes outstanding A/R, inventory, demonstrations, interest, financing charges and other obligations.

"If the above is your understanding of our discussions please sign and return the enclosed copy of this letter. We look forward with great pleasure to our new relationship and wish you every success in your new undertaking."

18. Blackman placed his signature on this letter on 28 December 1978. He did so having read it in Fisher's office and in Fisher's presence. Fisher said that he might forward to Blackman a formal contract for the Australian distributorship to which Blackman replied that he did not think that one was necessary. Fisher said that nevertheless he might forward a formal agreement and Blackman said that he would read whatever Fisher sent.

19. In the event there was no formal written agreement. Josefsen. and apparently Hirsch, eventually accepted Blackman's view that, as Josefsen put it, " ... we just do not need to have a written agreement we are old friends, we have done business together for years, what do we need to put it in writing for?" Josefsen gave evidence that Blackman appeared to be offended by the suggestion that there ought to be a formal distributorship agreement.

20. Blackman arrived in Australia on 6 January 1979 and immediately set about developing his distributorship. He acquired a shelf company and changed its name to Hospital Products of Australia Pty. Ltd. ("HPA"). By novation, HPA became the distributor under the distributorship agreement in place of Blackman.

21. Between December 1978 and March 1979, HPC sent to Australia, at Blackman's direction, a large quantity of demonstration products. These were sent in two consignments through the New Hebrides and Hong Kong in a purported series of sales which involved companies and a trust controlled by Blackman. It is unnecessary to go into these transactions in detail. For taxation reasons and in order to provide increased security for subsequent bank advances it was advantageous that the value of the demonstration products be inflated and this result was achieved. The invoiced price of the demonstration products when first sold totalled US$19,190. The same products were eventually invoiced to HPA at prices of about $500,000.

22. On 14 February 1979, Blackman wrote to Smith and Nephew on behalf of HPA about quality control and packaging of "my staple cartridges". This was a reference to demonstration cartridges made by USSC. The letter also made reference to the sterilizing of the cartridges and sample checking to verify sterility. It went on to say "my current schedule indicates a shipment of 5000 cartridges to be sent to your firm April 16, 1979. I will be in need of the finished product by May 4, 1979." As it turned out, the work was not done by Smith and Nephew.

23. Using the services of a product engineering consultant, HPA caused retaining pins, anvils and pusher-knife assemblies identical with the USSC products to be manufactured in Australia and to be combined with USSC demonstration products which were cleaned, assembled, packaged and sterilized here in order that the combined products could be sold under an Australian label in competition with or in substitution for USSC-made clinical products. Subsequently, disposable loading units identical with the USSC products were entirely manufactured locally for the same purpose. The work was performed under contract by a firm called IRD Engineering Services and later by its successor, IRD Engineering Services Pty. Ltd. ("IRD"), which was incorporated on 1 December 1979, using in turn the services of subcontractors and of another engineering company which was expert in the field of plastics, together with the assistance and guidance of the product

engineering consultant. Eventually IRD came under the control of Blackman. From about June 1979 an effort was also made to develop a plastic skin stapler similar to USSC skin staplers, which could be used and resterilized repeatedly and be fitted with detachable cartridges.

24. In February 1979, HPA sent a circular to numerous hospitals in Australia announcing the end of Downs Surgical's distributorship and the beginning of the new one after 31 March 1979. HPA purchased Downs Surgical's stock for more than $50,000 which was more than Blackman had anticipated. HPA paid Downs Surgical approximately $5000 and arranged for USSC to give Downs Surgical credit for the balance of about $50,000, debiting that amount to HPA. There were other sums for stock arising out of the New York dealership which Blackman or his companies owed to USSC and in the end this led to mutual releases being executed. Nothing, however, turns on that in this appeal.

25. After HPA replaced Downs Surgical as USSC's sole distributor in Australia, Blackman set about promoting Auto Suture products energetically. Between April and December 1979 there was a substantial increase in the usage of those products in hospitals in Australia.

26. By about October 1979, HPA began to defer the filling of orders which it had received for Auto Suture products in anticipation of meeting those orders with products packaged by HPA and it ceased placing any further orders with USSC. In about November 1979, HPA began to assemble the disposable loading units comprising the USSC-made demonstration products with HPA-made components added where necessary, repackaging them under HPA's label and sterilizing them. By this time Blackman had decided that the cleaning and recycling of used components of disposable loading units was not feasible.

27. On 13 November 1979, HPA changed its name to Hospital Products International Pty. Ltd. ("HPI"). On 25 December 1979, HPI wrote to USSC terminating its distributorship giving as its reasons USSC's growing problem with quality control, its constant back-order position and its inability to process orders efficiently. USSC replied by telex dated 10 January 1980 accepting the decision to terminate the distributorship but rejecting the reasons given for it.

28. After 25 December 1979, HPI began to fill the outstanding orders and those which were subsequently received, with products repackaged by it. Blackman anticipated that HPI would within a few months be able to supply products wholly manufactured by itself and until then could carry on with USSC products, repackaged and relabelled by HPI, with HPI-made components where necessary.

29. On 28 December 1979, HPI advised hospitals by circular that it was "currently phasing out all U. S. manufactured goods and substituting Australian manufactured product." The trial judge, from whose findings the foregoing statement of facts is largely taken, found that from 25 December 1979, HPI began to supply customers in Australia with HPI-labelled products, the HPI proportion of the contents of which was increasing with the passage of time, in order that the existing Australian market for USSC-made products might change into an equivalent market for HPI-made products and that this was done in a manner which was intended to, and did in fact, mislead existing customers for USSC-made products into believing that HPI-labelled products were being manufactured by arrangement with, or under licence from, the manufacturer of United States-made Auto Suture products, namely, USSC.

30. During 1980, HPI experienced some difficulty with its manufac turing capacity and was forced

to obtain supplies of USSC clinical products which it combined with its own components or repackaged under its own label. It obtained the USSC products by means of agents using false names or otherwise in a manner designed to conceal from USSC the identity of HPI as the purchaser. It also obtained USSC instruments by similar means for use in the promotion of products packaged by HPI.

31. HPI continued marketing in Australia until November 1980. Thereafter, while continuing to manufacture its products in Australia, it marketed them in the United States through Surgeons Choice Incorporated ("SCI"), a company which it formed there for that purpose in about October 1980. It would appear that it also marketed its products elsewhere in the world.

32. After the termination of HPI's distributorship, USSC did not re-enter the Australian market until August 1980 when it formed a subsidiary in Australia to resume marketing its disposable loading units here.

33. In about June 1981, Blackman and HPI acquired control of a listed public company which was called Aquila Investment Corporation Ltd. but which changed its name to Hospital Products Limited ("HPL"). HPL acquired the business and assets of HPI. These transactions were described as a reverse takeover.

34. USSC commenced this action in the Supreme Court of New South Wales seeking the enforcement of a constructive trust which was alleged to extend to assets held by all defendants which were the companies controlled by Blackman and to Blackman himself. The constructive trust was alleged to arise from breaches of fiduciary duty by HPI as USSC's distributor, in which the other defendants participated and from which they received benefits. Alternatively, USSC sought against all defendants an account of profits or equitable compensation arising out of the alleged breaches of fiduciary duty. There were, in addition, claims against HPI and HPL for damages for breach of contract and for injunctions to restrain any continuing breach. Claims against all defendants for damages for conspiracy and for injunctions to restrain the continuation of the conspiracy were included but were rejected by the trial judge and it is unnecessary to have further regard to them in this appeal. Also, at one stage USSC claimed damages against Blackman and HPI for fraudulent misrepresentations which were alleged to have induced the appointment of HPI as USSC's distributor in Australia but these claims were abandoned. Blackman's alleged fraud was, however, relied upon by USSC to the extent that it was relevant to the claim for relief based upon the breach of fiduciary duty.

35. There is, or has been, other litigation both in Australia and the United States between USSC and one or more of the defendants in this action and there is a claim in the United States by USSC against HPI, Blackman and SCI for relief under patents and trademarks legislation and for relief against unfair competition, including passing off. There was no claim in these proceedings based upon passing off as such although what may have amounted to passing off was relied upon as going to the breaches of fiduciary duty.

36. Putting on one side the claims based upon conspiracy, these proceedings have a limited scope. It has been the choice of USSC to limit its claims to relief for breach of fiduciary duty and for breach of contract.

37. The trial judge found that HPI was under a fiduciary duty towards USSC because the former had been entrusted by USSC with the development and servicing of the market for USSC surgical

stapling products in Australia. However, HPI's fiduciary position ended, he held, upon the termination of the distributorship on 10 January 1980. The fiduciary duty found by the trial judge was that HPI should not make a profit or take a benefit through its position as a distributor without the informed consent of USSC and that it should not act in a way in which there was a possible conflict between its own interests and those of USSC.

38. The breaches of that duty were, in the opinion of the trial judge, twofold. First, HPI secretly developed a capacity to manufacture copies of USSC products or components with a view to appropriating for itself at the expense of USSC the whole or a substantial part of the Australian market for USSC products. Secondly, it deferred the fulfilment of orders for USSC clinical products in anticipation of filling those orders with HPI repackaged or manufactured competing products and by filling orders for USSC clinical products with such competing products, again with a view to appropriating for itself at the expense of USSC the whole or a substantial part of the Australian market for those products.

39. Taking the view, which he did, that HPI was not a fiduciary in respect of any of the assets of its distributing business or in respect of any of the profits from that business, the trial judge declined to grant relief upon the basis of a constructive trust over the assets of the manufacturing business developed by HPI and later carried on by HPL. He did, however, order an account of profits upon the basis that the breaches of fiduciary duty which he found to have been committed by HPI gave HPI a head start, or acted as a springboard for HPI, in getting its own product on the market. He concluded that all profits up to the time HPI abandoned the Australian market in November 1980 should be treated as flowing from HPI's breaches of fiduciary duty and as properly the subject of account. He held that HPI's fiduciary obligation was limited to the Australian market and that it was not accountable for profits made outside Australia. In the alternative, the trial judge found that USSC was entitled to equitable monetary compensation to be assessed if it elected to accept that remedy.

40. The trial judge also found a number of breaches of contract and put USSC to its election as to the acceptance of damages, to be ascertained, against HPI, in place of the equitable relief.

41. So far as Blackman was concerned, the trial judge found that he was liable in equity to account to USSC for any benefit which he received as a result of his participation in HPI's breaches of fiduciary duty and was jointly liable with HPI in respect of any equitable monetary compensation due to USSC as a result of those breaches.

42. On appeal by HPL to the Court of Appeal, that Court also found that HPI was in breach of a fiduciary duty which it owed to USSC. It, however, concluded that the breaches of duty were such that it was appropriate to declare a constructive trust in favour of USSC over all the assets including the goodwill and business of HPI as at 10 January 1980 and until 30 June 1981 and to declare a constructive trust in favour of USSC over all the assets of HPL acquired by it in the reverse take-over. The consequence of these declarations was that on 1 July 1981 and thereafter HPL held in trust for USSC all its assets including its goodwill and business with the exception of those assets which were the assets of HPL before 1 July 1981. It is from the judgment of the Court of Appeal that HPL now appeals to this Court. There are cross appeals by the respondents other than USSC, namely, Ballabil Holdings Pty. Ltd. (which is now the name of HPI), SCI, Blackman and IRD.

43. The real basis of the appellant's case is that neither Blackman nor HPI was under a fiduciary duty to USSC and, of course, if that is so, then USSC would not be entitled to relief by the

declaration of a constructive trust or an account of profits or equitable compensation. It was not contested, indeed it was conceded, that HPI was in breach of its distributorship agreement with USSC in deferring the filling of orders for USSC products and, to the extent that it was done during the currency of the distributorship agreement, in the sale of products under the HPI label. That would entitle USSC to damages but that is a remedy which it clearly finds less attractive than equitable relief. Indeed, it appears that USSC has chosen to place heavy reliance upon the remedy of the constructive trust rather than other remedies which may have been open to it. It is appropriate, therefore, to turn to the question of the existence of a fiduciary relationship between USSC and Blackman in the first place and then HPI which is the basis of any entitlement to that relief.

44. In examining that question it is, I think, necessary to have regard first to the definition of the relationship between Blackman and USSC which is provided by the terms of the distributorship agreement. It is convenient to continue to speak of the relationship between Blackman and USSC because that is the origin of any fiduciary obligations, although, of course, after the novation which substituted HPI for Blackman as a party to the distributorship agreement those obligations were imposed upon HPI. The fact of that agreement is no necessary bar to the existence of a fiduciary relationship between the parties to it whether or not the agreement imposed obligations of a fiduciary nature but its terms are obviously of significance in determining what their relationship was. The trial judge found that proper law of the distributorship agreement was either that of New York or Connecticut both before and after the novation. He found it unnecessary to distinguish between the law of New York and Connecticut which was, for the purposes of this case, the same and was, indeed, not significantly different from the law of New South Wales. These findings were not questioned upon this appeal. In order to put the choice of law to one side it is convenient to say at this point that the trial judge found it unnecessary to determine which law should govern the question of the existence of fiduciary obligations and entitlement to equitable relief because he found, upon the evidence, that there is no material difference upon the subject between the law of New York, the law of Connecticut and the law of New South Wales. He found that in this area of jurisprudence decisions of the courts of the United States, as well as those of other jurisdictions, are of assistance in ascertaining the law of New South Wales. This finding was also not questioned upon this appeal.

---

**Following paragraph cited by:**

Barooga Projects (Management) Pty Ltd v Flag International Ltd (04 September 1998) (Pincus JA. McPherson JA. Mackenzie J.)

16   The principle has been applied frequently since. (e.g. Secured Income Real Estate

(Aust) Pty Ltd v St. Martin's Investments Pty Ltd (1979) 144 CLR 597, 607 ; Hospital Products Ltd v United States Surgical Corporation (1984) 156 CLR 41 , 138 ; Fitzgerald v F.J. Leonhardt Pty Ltd (1997) 143 ALR 569, 570 ). It is not necessary to consider in detail the limits of

application of the principle to this case, since counsel for the appellant observed in his submissions,
correctly in our view, that it was debateable whether this argument and his argument as to the
construction point were different, since the point was essentially that consideration of

---

the recitals and

the contractual provisions relied on led to the conclusion that the intention of the parties, or

necessary implication, required the agreement to be construed in the manner contended for by the

appellant. In our opinion, the reasons for finding that the construction point fails are equally

compelling against implication of the term contended for and that argument also fails.

45. Perhaps, however, express mention should be made of the trial judge's finding that under the law of New York and of Connecticut "every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement": Restatement of the Law: Contracts (2d) s.205. This, he found, meant no more than that neither party to an agreement may do anything to impede performance of the agreement or to injure the right of the other party to receive the proposed benefit and was, in substance, an expression of the same principle enunciated by this Court in Secured Income Real Estate (Australia) Ltd. v. St. Martins Investments Pty.Ltd. (1979) 53 ALJR 745, at p 749, quoting the words of Griffith C.J. in Butt v. M'Donald (1896) 7 QLJ 68, at pp 70-71 :

"It is a general rule applicable to every

contract that each party agrees, by implication, to do all such things as are necessary on his part to enable the other party to have the benefit of the contract."

46. The trial judge rejected the contention that the letter dated 27 December 1978 was intended by the parties to constitute the whole agreement between them and found that the conversation in the restaurant early in November 1978 gave rise to express terms of that agreement which were to the following effect:

1. That the distributor would establish a marketing organization for USSC surgical stapling products in Australia having one or more sales representatives specifically trained in the use and demonstration of those products.

2. That the distributor would devote its best efforts to distributing USSC surgical stapling products and building up the market for those products in Australia to the common benefit of USSC and itself.

3. That the distributor would not deal (scil. in Australia) in any products competitive with USSC surgical stapling products.

4. That the distributor would not deal (scil. in Australia) in any other products in such a manner as would diminish its efforts in distributing USSC surgical stapling products and building up the market for those products in Australia.

Following paragraph cited by:

    Hobhouse v Macarthur-Onslow (23 August 2022) (Ward P, Macfarlan and White JJA)

47. I can see no reason to disagree with the finding that these terms formed part of the distributorship and am content to proceed upon the basis that they did. I should, perhaps, just add that even if there were no express term, as the trial judge found, that the distributor would devote its best efforts to distributing USSC products, s.2-306(2) of the Uniform Commercial Code, which forms part of the law of both New York and Connecticut, would have imposed a term with similar effect. The trial judge went further, however, and, in addition to the express terms which he found, implied a term that the distributor would not during the distributorship do anything inimical to the market in Australia for USSC surgical stapling products. He further held that an act done during the distributorship could for this purpose be considered inimical to that market notwithstanding that it was calculated to lead to actual damage to the market only after termination of the distributorship. The development of a capacity to manufacture copies of USSC products or components of such products, and the manufacture of them, with a view to appropriating the whole or a part of the market for USSC products would, in either case, constitute an act inimical to the market.

48. I must confess that I am unable to see how the application of any of the recognized principles gives rise to the implication of any term such as that implied by the trial judge. Those principles were recently examined by this Court in Codelfa Construction Pty. Ltd. v. State Rail Authority of New South Wales (1982) 56 ALJR 459 and for present purposes it is sufficient to say that it is not enough that it is reasonable to imply a term; it must be necessary to do so to give business efficacy to the contract. In my view it is plain that a distributorship agreement containing the express terms found by the judge was capable of an effective operation in a business sense without the implication of a further term, save for a term (which the trial judge found) that the agreement could be brought to an end by reasonable notice on either side. The observance of the best efforts clause may or may not have impeded Blackman during the distributorship from developing a capacity to manufacture and from manufacturing copies of USSC products, but I am unable to see that there was any necessary implication that he should not do so, having regard to his right to market copies at the conclusion of the distributorship. It is certainly not something which went without saying in the agreement. Indeed, USSC's position during the distributorship was protected by the express term found by the trial judge which precluded Blackman from dealing in products competitive with USSC products, a term which obviously included copies of USSC products sold under another name. It also needs to be remarked that USSC had not previously shown itself to be concerned to protect its Australian market and had taken no steps to take out any patents or to register its trade mark. It does not appear that its distributorship agreement with Downs Surgical contained any protection against the use of copies of its products and it is far from a necessary conclusion that USSC regarded the situation differently when it concluded its distributorship agreement with Blackman.

49. Indeed, the implied term as it is expressed by the trial judge has a curious effect. It is limited in its operation to the duration of the distributorship agreement. That, as the trial judge found, could be terminated upon reasonable notice. Such an implied term would do nothing to prevent Blackman from terminating the distributorship and competing upon the Australian market by manufacturing and selling copies of USSC products. Such an implied term would afford no real protection of USSC's Australian market. As the trial judge himself saw it, its effect would be limited to

prohibiting activities on the part of Blackman during the currency of the distributorship which were calculated to enable him to capture the market or part of it after the determination of the distributorship. However, the agreement, as it was found, was explicit about what it required from Blackman during the distributorship agreement: it required him to devote his best efforts to distributing USSC surgical stapling products and building up the market for those products in Australia to the common benefit of USSC and himself. The agreement was silent about what was to happen at its conclusion and in those circumstances it seems to me impossible to decide that the distributorship could only have business efficacy if, in addition to the requirement that Blackman use his best efforts on behalf of USSC during the currency of the agreement, there was a requirement that he not do anything which would enable him to damage USSC's market after the distributorship had ended. However much the latter requirement may eventually have appeared to USSC to be desirable for its protection, the distributorship was clearly able to operate effectively without it.

50. No assistance is to be derived from the authorities dealing with contracts which establish what is clearly a confidential (in the sense of fiduciary) relationship - contracts such as contracts of employment or partnership agreements. There the confidential nature of the relationship may require the implication of a term or terms in the absence of express provisions in order to protect the confidence. A distributorship agreement of the kind here does not ordinarily, and certainly does not necessarily, give rise to a confidential relationship and it would be wrong to assume such a relationship in order to read into the agreement a term protecting it. Moreover, the development by Blackman during the currency of the distributorship agreement of a capacity to manufacture copies of USSC products did not involve the use of confidential information and, except to the extent that it resulted in his failure to devote his best efforts to distributing USSC products or building up its market in Australia, involved no breach of any express term of the agreement. Nor did the possibility of such an occurrence call for the implication of a term in addition to the best efforts clause. Cf. Robb v. Green (1895) 2 QB 1 ; Wessex Dairies Ltd. v. Smith (1935) 2 KB 80 ; Furs Ltd. v. Tomkies (1936) 54 CLR 583 ; Hivac Ltd. v. Park Royal Scientific Instruments Ltd. (1946) 1 Ch 169 ; Feiger v. Iral Jewellery Ltd. (1975) 382 NYS (2d) 216, 221; (1977) 363 NE (2d) 350.

51. Clearly, if it had wished to do so, there were various ways in which USSC could have protected the market which it had in Australia or which it anticipated it would have as a result of Blackman's distributorship. As I have said, it could have patented its products and registered its trade mark or at least have taken some steps to do so. It could have required Blackman to enter into a covenant in restraint of trade to the extent permitted by the law so as to restrict his activities during and after the termination of the distributorship. But to imply a term such as that implied by the learned trial judge would, in my view, be to impute to USSC a concern which had in no way been manifested by it and which, if it had existed, could have been met by appropriate contractual terms. In those circumstances, not only was the term implied by the trial judge unnecessary to give the distributorship agreement business efficacy but its implication would effectively recast that agreement in a form which the parties had chosen not to adopt.

52. It is clear that the term implied by the trial judge and accepted by the Court of Appeal was of fundamental importance in their arrival at the conclusion that Blackman occupied a fiduciary position. There is nothing else in the contract itself which would assist in that regard. It is possible that a fiduciary relationship might arise from the circumstances surrounding the agreement but before embarking upon an examination of those circumstances it is desirable to make some attempt to identify the characteristics of such a relationship, even if that attempt is unlikely to meet with complete success. It has been said more than once that it is not possible to define completely and

with precision those matters which give rise to fiduciary obligations notwithstanding that it is possible to discern a fiduciary relationship when it exists. See Lloyds Bank v. Bundy (1975) 1 QB 326, at p 341.

53. To be sure there are relationships which are ordinarily recognized as fiduciary, at least in some of their aspects, and little trouble is experienced with them. They are all relationships which are analogous to that which exists between a trustee and his beneficiary - the clearest of all fiduciary relationships. Without any attempt at classification, obvious examples spring to mind such as the relationship between partners, between employee and employer, between agents and their principals, between solicitors and their clients, between directors and their companies and between wards and their guardians.

---

**Following paragraph cited by:**

Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd (01 September 2017) (Dowsett, Greenwood and White JJ)

Dresna Pty Ltd v Linknarf Management Services Pty Ltd (in liq) (19 December 2006) (Heerey, Gyles & Bennett JJ)

157. As was stated in *Hospital Products Ltd v United States Surgical Corporation* (1984) 156 CLR 41 at 68 by Gibbs CJ, there is a difficulty in suggesting a test by which it may be determined that a fiduciary relationship exists outside the accepted categories. The basis of the relationship between Dresna and Franklins was the Mentone BSA. The fact that the arrangement between the parties was of a purely commercial kind is indicative of no fiduciary duty ( *Hospital Products* at 70 ). In *Hospital Products,* Gibbs CJ referred at 71 to the fact that an agreement between parties which was, as here, terminable on reasonable notice argued against such a relationship.  Factors such as a relation of confidence, inequality of bargaining power (considered to be of importance by Dawson J in *Hospital Products* at 142 ), the existence of a duty to be performed and an undertaking to act for another, are not of themselves sufficient to found such a relationship. It is a question of fact in each case (at 72). In discussing the proposition that where two people have dealt with each other as principals neither will be the other's fiduciary, Gibbs CJ commented that the duty did not exist where one party did not undertake, whether by representation or contractual provision, to act solely in the interest of the other and not in its own interest (at 72). Although in dissent on the existence of a fiduciary relationship on the facts in *Hospital Products* , Mason J observed at 97 that a contractual and fiduciary relationship may co-exist but the fiduciary relationship, if it is to exist, must accommodate itself to and be regulated by the terms of contract.

---

54. Notwithstanding the existence of clear examples, no satisfactory, single test has emerged which will serve to identify a relationship which is fiduciary. It is usual - perhaps necessary - that in such a relationship one party should repose substantial confidence in another in acting on his behalf or in his interest in some respect. But it is not in every case where that happens that there is a fiduciary relationship. If it were, whenever there is "a job to be performed" (Tito v. Waddell (No.2) (1977) 1 Ch 106, at p 229 ) and entrusting the job to someone involves reposing substantial trust and

confidence in him, equity would impose fiduciary obligations. Clearly that is not the case. Nor does a fiduciary duty arise because the person to whom a job is entrusted acts in his own interest and thereby fails to perform the job properly, however useful it may appear with hindsight that such protection should have been available. As Megarry V.-C. put it in Tito v. Waddell, at p 230:

> "If there is a fiduciary duty, the equitable rules about self-dealing apply: but self-dealing does not impose the duty. Equity bases its rules about self-dealing upon some pre-existing fiduciary duty: it is a disregard of this pre-existing duty that subjects the self-dealer to the consequences of the self-dealing rules. I do not think that one can take a person who is subject to no pre-existing fiduciary duty and then say that because he self-deals he is thereupon subjected to a fiduciary duty."

55. The difficulty in identifying and classifying those qualities in individual relationships which give rise to fiduciary obligations is well recognized. See, e.g., Phipps v. Boardman (1967) 2 AC 46, at p 125 per Lord Upjohn. There is, however, the notion underlying all the cases of fiduciary obligation that inherent in the nature of the relationship itself is a position of disadvantage or vulnerability on the part of one of the parties which causes him to place reliance upon the other and requires the protection of equity acting upon the conscience of that other. See Tate v. Williamson (1866) 2 ChApp 55, at pp 60-61. From that springs the requirement that a person under a fiduciary obligation shall not put himself in a position where his interest and duty conflict or, if conflict is unavoidable, shall resolve it in favour of duty and shall not, except by special arrangement, make a profit out of his position. In terms of general principle I do not think that it is necessary to go further than that in the present case. It is sufficient, in my view, to lead to the conclusion that no fiduciary relationship arose between USSC on the one hand and Blackman or, subsequently, HPI, on the other, having regard to all the circumstances.

56. No doubt it was necessary to look to the contract as part of an inquiry whether the relationship between the parties was of such a kind that equity would impose fiduciary obligations in addition to those imposed by the contract. However, as I have said, I can discern no basis for the implication of a term such as was found to exist and it follows that in my view there is absent from the relationship between the parties any fiduciary character which may have been derived from such a term. Of course, the relationship between the parties to a contract may be defined not only by the contract itself but may also arise from the circumstances in which the contract is made. But, just as the common law does not allow the implication of a term merely to remedy the inadequacy of the parties' contractual arrangements, so too does equity decline to re-adjust the balance of a relationship which does not of its very nature place the parties in an unequal position.

57. I have already explained why in my view there was no implied term such as that found by the trial judge. That goes some distance in explaining why I am unable to accept the further conclusion that the relationship between the parties was sufficiently analogous to that of a trust to classify it as fiduciary. The circumstances which make it inappropriate to imply the term in question form part of those circumstances which, in my view, preclude the formation of any fiduciary relationship. But there is more to it than that.

58. By its very nature a distributorship agreement does not ordinarily give rise to a relationship in which any conflict between duty and interest must be eliminated. It is, if anything, an exception to

the adage that a man cannot serve two masters. Whilst the parties have the common aim of exploiting a market and, no doubt, rely upon that coincidence of aim as much as any contractual provision to ensure the success of their arrangement, nevertheless their interests do not always and entirely coincide. Where there is no agreement to the contrary (and there was none here) and the distributor re-sells his supplier's products, he must determine the price at which he will market them. Whilst it may be in the supplier's interest that the products should be sold at a price which is as close as possible to the wholesale price, the distributor's interest may dictate a higher price. Whilst it is in the supplier's interest that the distributor should purchase and sell as many of the supplier's products as the market will absorb, there may be considerations which the distributor must take into account in his own interest which involve a lesser achievement. I have in mind such matters as the distributor's capacity to finance his operations, to give credit and to promote the product. All of these matters and others may require the distributor to make decisions in a situation which of its very nature makes it impossible to eliminate conflict between his interests and those of the supplier.

---

Following paragraph cited by:

Electricity Generation Corporation v Woodside Energy Ltd (05 March 2014) (French CJ, Hayne, Crennan, Kiefel and Gageler JJ)
Expectation Pty Ltd v Pinnacle VRB Ltd (16 November 2004) (Steytler J, McKechnie J, Jenkins J)

---

59. Nor does the existence of a best efforts or best endeavours clause, such as was found to be a term of the contract between USSC and Blackman, impose a duty upon the distributor to disregard his own interests. In speaking of a "best endeavours" clause in a licence agreement, in Transfield Pty. Ltd. v. Arlo International Ltd. (1980) 54 ALJR 323, at p 329, Mason J. said that it went no further than to prescribe "a standard of endeavour which is measured by what is reasonable in the circumstances, having regard to the nature, capacity, qualifications and responsibilities of the licensee viewed in the light of the particular contract." See also Terrell v. Mabie Todd &Coy Ltd. (1952) RPC 234, at p 237 ; B. Davis, Ltd. v. Tooth &Co., Ltd. (1937) 4 All ER 118, at p 127 ; Van Valkenburgh, N.&N., Inc. v. Hayden P Co. (1972) 30 N.Y.2d 34, at p 45. Clearly that leaves room for a balancing of interests and does not require the elimination of any conflict.

60. What is important is that in a distributorship agreement such as that in the present case it is assumed that the distributor will pursue his own economic interests and reliance is placed upon the fact that in doing so he will sufficiently serve the supplier's interests as well as his own, notwithstanding that he may on occasions follow his interests to the exclusion of those of his supplier. Apart from the considerations to which I have already referred, this of itself makes it inappropriate to imply a contractual term purporting to impose absolute obligations upon the distributor. It makes it even less appropriate to impose an equitable obligation upon the distributor in the performance of the contract to have regard to the interests of the supplier in disregard of his own.

61. Moreover, in considering whether any of Blackman's obligations towards USSC were of a fiduciary nature, I find no assistance in the notion that he may have occupied a fiduciary position of a limited kind in relation to the goodwill attaching to USSC products. Product goodwill as a legal concept is virtually unexplored. How and when it may exist, if at all, as something distinct from the goodwill of the business which is the origin of the product is something which has received little attention. See Pinto v. Badman (1891) 8 RPC 181, at pp 194-195 ; Heublein Inc. v. Continental

Liqueurs Pty. Ltd. (1960) 105 CLR 433 ; Estex Clothing Manufacturers Pty. Ltd. v. Ellis and
Goldstein Ltd. (1967) 116 CLR 254 ; Commissioner of Taxes (Q.) v. Ford Motor Co. of Australia
Pty. Ltd. (1942) 66 CLR 261 . Perhaps some explanation of this fact is to be found in the position at
common law where a trade mark is assignable only in conjunction with the goodwill of the business
in which the mark is used. That was also the position for some time with registered trade marks. It
is, however, unnecessary to examine in detail in this case any meaning which the term product
goodwill may have, because whatever it may be in another context, it can in the context of this case
mean no more than the reputation in the market place which USSC products had in this country.

62. It is not possible, to my mind, to say that Blackman had a fiduciary relationship with USSC
limited to its product goodwill or the reputation in the market place of USSC products. It is, I think,
artificial in the extreme to regard USSC as having entrusted Blackman with the reputation of its
products in Australia in the same way as one person might entrust another with property of a
tangible kind to deal with it on his behalf. There were no special features of Blackman's
distributorship relating to product goodwill. The only sense in which it could be said that USSC
entrusted Blackman with the reputation of its products in Australia is in the sense that the reputation
of those products might grow or diminish as a consequence of the manner in which he performed his
function as a distributor of those products. But the same might be said of any distributor of any
supplier's products. Moreover, the nature of the agreement between Blackman and USSC precluded
any special obligations relating to product goodwill.

63. The extent of the exertions required of Blackman under the agreement is to be found in the
obligation imposed upon him to devote his best efforts to distributing USSC products and building
up the market for them. Any effect upon the reputation of USSC products in Australia was
necessarily a consequence of Blackman's performance of or failure to perform these functions.
However, in observing the requirements of the best efforts clause, Blackman was, as I have noted,
not required to have regard to USSC's interests to the exclusion of his own. He was not required to
resolve any conflict entirely in favour of USSC and he was, therefore, not placed by the best efforts
clause in a fiduciary position. No more was or could be required of Blackman under the agreement
in relation to the reputation of USSC products than was required of him by the best efforts clause.

64. If that clause imposed no fiduciary obligation upon Blackman, and I have already indicated that
it did not, it follows ineluctably, in my view, that there was no fiduciary obligation in relation to the
reputation of USSC products even if some such obligation could in other circumstances arise. It is to
my mind quite impossible to say that the efforts which Blackman was required to make under the
agreement were not in discharge of any fiduciary duty but that the reputation of USSC products,
which could only be affected under the agreement by the way in which he discharged the duties
which the agreement imposed, was somehow entrusted to Blackman in a fiduciary way.

65. Nor is the problem to be solved by saying that there was a limited fiduciary relationship with
respect to the reputation of USSC products which was of a different kind from that normally
encountered in that it recognized the possibility of conflict between the interests of Blackman and
those of USSC which was not to be resolved in favour of USSC. That is the antithesis of a fiduciary
relationship which demands that in any situation of conflict between duty and interest, duty must
come first. See Furs Ltd. v. Tomkies, at pp 590, 592, 600. As Lord Hodson said in Phipps v.
Boardman, at p 111:

"Nevertheless, even if the possibility of conflict is present between personal interest and the fiduciary position the rule of equity must be applied."

See also Gillett v. Peppercorne (1840) 3 Beav 78, at pp 83-84 ( 49 ER 31, at p 33 ); Bray v. Ford (1896) AC 44, at pp 51-52 ; Regal (Hastings) Ltd. v. Gulliver (1967) 2 AC 134, at pp 137, 144-145 . The whole purpose served by the recognition of a fiduciary relationship would otherwise be thwarted for the court would be required to examine individual transactions in order to determine whether the interests of the person to whom the fiduciary duty was owed had been sacrificed in some impermissible manner as, for example, where the person owing the duty had not acted reasonably in the circumstances. That may well be a task which "no court is equal to" and certainly is a task which has never been undertaken. See Ex parte James (1803) 8 Ves Jun 337, at p 345 ( 32 ER 385, at p 388 ).

66. The circumstances in which the contract between USSC and Blackman was made do not suggest any disadvantage or vulnerability on the part of USSC requiring the intervention of equity to protect its interests. Those negotiations were of a commercial nature and were at arm's length. They were conducted by persons on both sides who were experienced in the market place. The recognition by those who represented USSC that a formal, written agreement was desirable was a recognition of the possibility, at least, of a contract providing greater protection of USSC's interest than was in fact provided. Not only does the conscious choice to proceed in the absence of a formal agreement fail to provide any basis for the implication of a term affording the type of protection which the agreement might have provided, but it is also inconsistent with any need for the intervention of equity.

67. It may be conceded that USSC eventually accepted that there was no need for a formal agreement because of the misplaced trust which Hirsch and Josefsen had in Blackman's integrity and ability. But that is not the sort of trust or confidence which equity will protect by the imposition of fiduciary obligations. A fiduciary relationship does not arise where, because one of the parties to a relationship has wrongly assessed the trustworthiness of another, he has reposed confidence in him which he would not have done had he known the true intentions of that other. In ordinary business affairs persons who have dealings with one another frequently have confidence in each other and sometimes that confidence is misplaced. That does not make the relationship a fiduciary one. See Lloyds Bank v. Bundy at p 341. A fiduciary relationship exists where one party is in a position of reliance upon the other because of the nature of the relationship and not because of a wrong assessment of character or reliability. That is to say, the relationship must be of a kind which of its nature requires one party to place reliance upon the other; it is not sufficient that he in fact does so in the particular circumstances. Of course, where a relationship is fiduciary in character it will be so whether or not the party in whose favour the fiduciary obligations are imposed actually trusts the party upon whom the obligations are imposed.

68. Moreover, a fiduciary relationship does not arise where one of the parties to a contract has failed to protect himself adequately by accepting terms which are insufficient to safeguard his interests. Where a relationship is such that by appropriate contractual provisions or other legal means the parties could adequately have protected themselves but have failed to do so, there is no basis without more for the imposition of fiduciary obligations in order to overcome the shortcomings in the arrangement between them.

69. In my view, there was no special feature of the distributorship agreement between USSC and Blackman which distinguished it from an ordinary commercial arrangement of its type. Apart from

the actual terms of the contract, I do not think that the nature of the relationship which it created or the circumstances in which it was made, required USSC to put its trust and confidence in Blackman in a way which called for the imposition of fiduciary obligations to protect it from a position of vulnerability or disadvantage. That it did put its trust and confidence in Blackman is clear, but it did so of its own choice. If that placed it in an unequal position in relation to Blackman it was not due to anything inherent in the relationship but to the way in which the parties chose to establish and define it.

70. Too much should not, however, be made of any inequality in the position of USSC. The distributorship was, even in the absence of breach, determinable upon reasonable notice and although Blackman's activities took place unnoticed for some time in what USSC appears to have regarded as a remote corner of the globe, that company had at least the means of remedying the situation by ending its relationship with Blackman as soon as those activities could be seen to be harmful to it.

71. It should also be borne in mind that at the time Blackman concluded a distributorship agreement with USSC, the dealership agreement which he had previously made with USSC was in existence and continued in operation for some time thereafter. It is clear, indeed it was conceded, that the position of dealer under the latter agreement carried with it no fiduciary obligations. That agreement, which was contained in a formal document, expressly provided that it should not constitute the dealer the agent of USSC and that the relationship between USSC and Blackman should at all times be that of independent contractors. See Jirna Ltd. v. Mister Donut of Canada Ltd. ( 1973) 40 DLR (3d) 303 . It would have been anomalous that any fundamental change in the relationship between USSC and Blackman should have taken place during the subsistence of the dealership agreement without either party adverting to it merely because Blackman had become a distributor of USSC products in Australia in addition to his, or his company's, being a dealer for USSC in the United States. From a commercial point of view, the distributorship was, and was intended to be, a much looser arrangement than a dealership.

72. In the Court of Appeal considerable emphasis was placed upon Blackman's fraudulent conduct and the importance to him of obtaining the distributorship in order to effectuate his plan of capturing USSC's market for himself with copies of USSC products. For my part, I am unable to see how either of these circumstances, which are clearly established, assists in answering the question whether a fiduciary relationship existed. The law, of course, offers remedies for fraudulent misrepresentation and the fact that USSC has chosen not to pursue them is not to the point in the case which it has eventually made out. The fact that USSC was the victim of Blackman's fraud is no indication that the agreement which it induced gave rise to a relationship which called for the special protection of equity. And if such a relationship had existed, the fact that the conduct of which USSC complains was fraudulent would in the circumstances have been of limited relevance to the availability of the equitable remedies which it seeks; it would have been sufficient that Blackman allowed his duty to conflict with his interest so as to profit from his position of trust.

73. Even less relevant, in my view, is the importance of the distributorship to Blackman. It explains, of course, his motivation in obtaining a distributorship; his whole plan to capture the Australian market was dependent upon it. It emphasizes, perhaps, the lack of judgment and the misplaced confidence on the part of those who were acting for USSC in failing to see and guard against what Blackman was doing or was about to do. But the fact that it was important to Blackman to achieve the relationship which he did with USSC did not determine the nature of that relationship any more than the failure of USSC to recognize that fact.

74. The undesirability of extending fiduciary duties to commercial relationships and the anomaly of imposing those duties where the parties are at arm's length from one another was referred to in Weinberger v. Kendrick (1892) 34 Fed. Rules Serv. 2d 450. And in Barnes v. Addy (1874) 9 Ch App 244, at p 251, Lord Selborne L.C. said:

> "It is equally important to maintain the
>
> doctrine of trusts which is established in this court, and not to strain it by unreasonable construction beyond its due and proper limits. There would be no better mode of undermining the sound doctrines of equity than to make unreasonable and inequitable applications of them."

75. There can be no question that the behaviour of Blackman was calculated and fraudulent. But the law provides remedies for such behaviour which are capable of a precise application. To invoke the equitable remedies sought in this case would, in my view, be to distort the doctrine and weaken the principle upon which those remedies are based. It would be to introduce confusion and uncertainty into the commercial dealings of those who occupy an equal bargaining position in place of the clear obligations which the law now imposes upon them. The remarks of Bramwell L.J. in New Zealand and Australian Land Co. v. Watson (1881) 7 QBD 374, at p 382, have, I think, special application:

> "Now I do not desire to find fault with the various intricacies and doctrines connected with trusts, but I should be very sorry to see them introduced into commercial transactions, and an agent in a commercial case turned into a trustee with all the troubles that attend that relation."

76. For these reasons, I would allow the appeal and dismiss the cross appeal of the first respondent. I would also allow the cross appeals of the second, third, fourth and fifth respondents. I would order that the proceedings be remitted to the Supreme Court of New South Wales for an inquiry as to the damages suffered by the first respondent as the result of the breach by the third respondent of its contractual obligations and for entry of judgment in favour of the first respondent against the third respondent in the amount of the damages ascertained by that inquiry.

## Orders

Appeal of the appellant allowed, and cross appeal of the first respondent dismissed, with costs against the first respondent.

Cross appeals of the second and fifth respondents allowed, with costs against the first respondent.

Cross appeals of the third and fourth respondents allowed. No order as to costs.

Order of the Court of Appeal of the Supreme Court of New South Wales set aside, and in lieu thereof order as follows:

(1) Appeal by the appellant to that Court dismissed with costs.

(2) Cross appeal by the first respondent in that Court allowed in part. No order as to costs.

(3) Cross appeal by the second respondent in that Court allowed. No order as to costs.

(4) Cross appeals by the third, fourth and fifth respondents in that Court dismissed with costs.

(5) Order of McLelland J. set aside, and in lieu thereof order:

(a) Judgment for the second defendant in the action. No order as to costs.

(b) Judgment for the third, fourth and fifth defendants in the action with costs.

(c) Judgment for the plaintiff in the action against the first defendant for damages for breach of contract and for costs.

Remit the matter to the Supreme Court of New South Wales to assess damages and to enter judgment in favour of the plaintiff against the first defendant in the amount assessed.

Liberty to apply.

---

## Cited by:

Australian Competition and Consumer Commission v NSW Ports Operations Hold Co Pty Ltd [2023] FCAFC 16 -
Davis & Peterson [2023] FedCFamC1A 13 -
Realestate.com.au Pty Ltd v Hardingham [2022] HCA 39 -
Realestate.com.au Pty Ltd v Hardingham [2022] HCA 39 -
Realestate.com.au Pty Ltd v Hardingham [2022] HCA 39 -
Realestate.com.au Pty Ltd v Hardingham [2022] HCA 39 -
Realestate.com.au Pty Ltd v Hardingham [2022] HCA 39 -
Realestate.com.au Pty Ltd v Hardingham [2022] HCA 39 -
Realestate.com.au Pty Ltd v Hardingham [2022] HCA 39 -
Realestate.com.au Pty Ltd v Hardingham [2022] HCA 39 -
Realestate.com.au Pty Ltd v Hardingham [2022] HCA 39 -
Charisteas & Charisteas [2022] FedCFamC1A 160 -
APD Technology Pty Ltd v Maximo Developments Pty Ltd [2022] FCAFC 141 -
Hobhouse v Macarthur-Onslow [2022] NSWCA 158 -
Minogue v Falkingham [2022] VSCA 111 -
Ross v Gordon [2022] ACTCA 21 -
Ross v Gordon [2022] ACTCA 21 -
Twigg v Twigg [2022] NSWCA 68 -
Twigg v Twigg [2022] NSWCA 68 -
Twigg v Twigg [2022] NSWCA 68 -

Twigg v Twigg [2022] NSWCA 68 -

Garner v Central Innovation Pty Limited [2022] FCAFC 64 -
Garner v Central Innovation Pty Limited [2022] FCAFC 64 -
Garner v Central Innovation Pty Limited [2022] FCAFC 64 -
Garner v Central Innovation Pty Limited [2022] FCAFC 64 -
Hobart International Airport Pty Ltd v Clarence City Council [2022] HCA 5 -
Hobart International Airport Pty Ltd v Clarence City Council [2022] HCA 5 -
Turner v O'Bryan-Turner [2022] NSWCA 23 -
Turner v O'Bryan-Turner [2022] NSWCA 23 -
Turner v O'Bryan-Turner [2022] NSWCA 23 -
Turner v O'Bryan-Turner [2022] NSWCA 23 -
Turner v O'Bryan-Turner [2022] NSWCA 23 -
Turner v O'Bryan-Turner [2022] NSWCA 23 -
Turner v O'Bryan-Turner [2022] NSWCA 23 -
Turner v O'Bryan-Turner [2022] NSWCA 23 -
Turner v O'Bryan-Turner [2022] NSWCA 23 -
Turner v O'Bryan-Turner [2022] NSWCA 23 -
Turner v O'Bryan-Turner [2022] NSWCA 23 -
Parker v Auswild; Bergmuller v Auswild [2022] VSCA 8 -
Parker v Auswild; Bergmuller v Auswild [2022] VSCA 8 -
Parker v Auswild; Bergmuller v Auswild [2022] VSCA 8 -
Parker v Auswild; Bergmuller v Auswild [2022] VSCA 8 -
Hylepin Pty Ltd v Doshay Pty Ltd [2021] FCAFC 201 -
Hylepin Pty Ltd v Doshay Pty Ltd [2021] FCAFC 201 -
Hylepin Pty Ltd v Doshay Pty Ltd [2021] FCAFC 201 -
Hylepin Pty Ltd v Doshay Pty Ltd [2021] FCAFC 201 -
Hylepin Pty Ltd v Doshay Pty Ltd [2021] FCAFC 201 -
Hylepin Pty Ltd v Doshay Pty Ltd [2021] FCAFC 201 -
Hylepin Pty Ltd v Doshay Pty Ltd [2021] FCAFC 201 -
Atanaskovic Hartnell v Birketu Pty Ltd [2021] NSWCA 201 -
Atanaskovic Hartnell v Birketu Pty Ltd [2021] NSWCA 201 -
Atanaskovic Hartnell v Birketu Pty Ltd [2021] NSWCA 201 -
Atanaskovic Hartnell v Birketu Pty Ltd [2021] NSWCA 201 -
Atanaskovic Hartnell v Birketu Pty Ltd [2021] NSWCA 201 -
Atanaskovic Hartnell v Birketu Pty Ltd [2021] NSWCA 201 -
Atanaskovic Hartnell v Birketu Pty Ltd [2021] NSWCA 201 -
Atanaskovic Hartnell v Birketu Pty Ltd [2021] NSWCA 201 -
Atanaskovic Hartnell v Birketu Pty Ltd [2021] NSWCA 201 -
Hardingham v RP Data Pty Limited [2021] FCAFC 148 -
Hardingham v RP Data Pty Limited [2021] FCAFC 148 -
Hardingham v RP Data Pty Limited [2021] FCAFC 148 -
Hardingham v RP Data Pty Limited [2021] FCAFC 148 -
Hardingham v RP Data Pty Limited [2021] FCAFC 148 -
Hardingham v RP Data Pty Limited [2021] FCAFC 148 -
Hardingham v RP Data Pty Limited [2021] FCAFC 148 -
Hardingham v RP Data Pty Limited [2021] FCAFC 148 -
Zibara v Ultra Management (Sports) Pty Ltd [2021] FCAFC 4 -
Pittmore Pty Ltd v Chan; Chan v Tan [2020] NSWCA 344 -
Pittmore Pty Ltd v Chan; Chan v Tan [2020] NSWCA 344 -
Pittmore Pty Ltd v Chan; Chan v Tan [2020] NSWCA 344 -
Chief Commissioner of State Revenue v Benidorm Pty Ltd [2020] NSWCA 285 (13 November 2020)
(Meagher, Leeming and Payne JJA)

104. None of the foregoing is to deny the persuasive (as opposed to precedential) value of Gageler J's reasoning. There are many very famous dissenting judgments whose reasoning on points of principle is unimpeachable and which have attained canonical status. Windeyer J's

dissenting judgment in *Norman v Federal Commissioner of Taxation* (1963) 109 CLR 9; [1963] HCA 21 on the law of voluntary assignments and Mason J's dissenting judgment in *Hospital Products Ltd v United States Surgical Corporation* (1984) 156 CLR 41; [1984] HCA 64 on fiduciary obligations are obvious examples. Those judgments have immense authority because of the quality of their reasoning, not because of any operation of the extended principles of the law of precedent.

<u>Chief Commissioner of State Revenue v Benidorm Pty Ltd</u> [2020] NSWCA 285 -
<u>Chief Commissioner of State Revenue v Benidorm Pty Ltd</u> [2020] NSWCA 285 -
<u>Zollo v Polley</u> [2020] SASCFC 100 -
<u>Zollo v Polley</u> [2020] SASCFC 100 -
<u>Zollo v Polley</u> [2020] SASCFC 100 -
<u>Zollo v Polley</u> [2020] SASCFC 100 -
<u>Zollo v Polley</u> [2020] SASCFC 100 -
<u>Schmidt v AHRKalimpa Pty Ltd</u> [2020] VSCA 193 -
<u>Schmidt v AHRKalimpa Pty Ltd</u> [2020] VSCA 193 -
<u>Schmidt v AHRKalimpa Pty Ltd</u> [2020] VSCA 193 -
<u>Schmidt v AHRKalimpa Pty Ltd</u> [2020] VSCA 193 -
<u>Schmidt v AHRKalimpa Pty Ltd</u> [2020] VSCA 193 -

Warner Capital Pty Ltd v Shazbot Pty Ltd [2020] NSWCA 121 (25 June 2020) (Macfarlan, Meagher and Gleeson JJA)

97.  Adopting the language of Mason J in *Hospital Products Ltd v United States Surgical Corporation* (1984) 156 CLR 41 ( *Hospital Products* ) at 96-97 ; [1984] HCA 64 , Handley JA said at [99] , that this gave the defendant the capacity to affect the interests of the plaintiff "in a practical sense" and in the context of negotiations with him "a special opportunity" to exercise that capacity to the detriment of the plaintiff who was "at the mercy" of the defendant and "vulnerable to abuse" by the defendant of "his position".

Warner Capital Pty Ltd v Shazbot Pty Ltd [2020] NSWCA 121 (25 June 2020) (Macfarlan, Meagher and Gleeson JJA)

97.  Adopting the language of Mason J in *Hospital Products Ltd v United States Surgical Corporation* (1984) 156 CLR 41 ( *Hospital Products* ) at 96-97 ; [1984] HCA 64, Handley JA said at [99] , that this gave the defendant the capacity to affect the interests of the plaintiff "in a practical sense" and in the context of negotiations with him "a special opportunity" to exercise that capacity to the detriment of the plaintiff who was "at the mercy" of the defendant and "vulnerable to abuse" by the defendant of "his position".

Warner Capital Pty Ltd v Shazbot Pty Ltd [2020] NSWCA 121 (25 June 2020) (Macfarlan, Meagher and Gleeson JJA)

115.  There was no withholding by Mr Warner of information relevant to the value of Shazbot's share in Debtfree. Nor was Mr Kugel "vulnerable to abuse" by Mr Warner "of his position" in the sense referred to by Mason J at 96-97 in *Hospital Products* . His accountant had been told by Mr Warner that no dividend would be paid for the 2014 financial year. Whilst it is likely that Mr Watson passed this information to Mr Kugel, on any view, Mr Kugel had imputed notice of this matter in May 2014 and had actual notice when the 2014 financial statements of Debtfree were tabled at the meeting on 22 September 2014. Mr Kugel was aware from the previous financial year that Debtfree had over $200,000 in retained earnings as at June 2013; he must have been aware that Shazbot had not received a dividend from Debtfree in respect

of the 2014 financial year; and he must have been aware that Shazbot's share in Debtree was worth substantially more than $1.00.

Warner Capital Pty Ltd v Shazbot Pty Ltd [2020] NSWCA 121  -

Pilbara Iron Ore Pty Ltd v Ammon [2020] WASCA 92  -

Kraft Foods Group Brands LLC v Bega Cheese Ltd [2020] FCAFC 65  -

Commissioner of State Revenue (WA) v Rojoda Pty Ltd [2020] HCA 7  -

Metal Manufactures Limited v Johnston [2020] QCA 42  -

Metal Manufactures Limited v Johnston [2020] QCA 42  -

Metal Manufactures Limited v Johnston [2020] QCA 42  -

Metal Manufactures Limited v Johnston [2020] QCA 42  -

Metal Manufactures Limited v Johnston [2020] QCA 42  -

Metal Manufactures Limited v Johnston [2020] QCA 42  -

Blong Ume Nominees Pty Ltd v Semweb Nominees Pty Ltd [2019] SASCFC 151  -

Blong Ume Nominees Pty Ltd v Semweb Nominees Pty Ltd [2019] SASCFC 151  -

Blong Ume Nominees Pty Ltd v Semweb Nominees Pty Ltd [2019] SASCFC 151  -

Blong Ume Nominees Pty Ltd v Semweb Nominees Pty Ltd [2019] SASCFC 151  -

Blong Ume Nominees Pty Ltd v Semweb Nominees Pty Ltd [2019] SASCFC 151  -

Blong Ume Nominees Pty Ltd v Semweb Nominees Pty Ltd [2019] SASCFC 151  -

Blong Ume Nominees Pty Ltd v Semweb Nominees Pty Ltd [2019] SASCFC 151  -

Eaton v Rare Nominees Pty Limited [2019] QCA 242  -

Eaton v Rare Nominees Pty Limited [2019] QCA 242  -

Eaton v Rare Nominees Pty Limited [2019] QCA 242  -

New Standard Energy PEL 570 Pty Ltd v Outback Energy Hunter Pty Ltd [2019] SASCFC 132  -

New Standard Energy PEL 570 Pty Ltd v Outback Energy Hunter Pty Ltd [2019] SASCFC 132  -

New Standard Energy PEL 570 Pty Ltd v Outback Energy Hunter Pty Ltd [2019] SASCFC 132  -

Mann v Paterson Constructions Pty Ltd [2019] HCA 32  -

Mann v Paterson Constructions Pty Ltd [2019] HCA 32  -

Hoh v Ying Mui Pty Ltd [2019] VSCA 203  -

Hoh v Ying Mui Pty Ltd [2019] VSCA 203  -

Hoh v Ying Mui Pty Ltd [2019] VSCA 203  -

Hoh v Ying Mui Pty Ltd [2019] VSCA 203  -

Hoh v Ying Mui Pty Ltd [2019] VSCA 203  -

Hoh v Ying Mui Pty Ltd [2019] VSCA 203  -

Young v Crime and Corruption Commission [2019] QCA 189  -

Young v Crime and Corruption Commission [2019] QCA 189  -

Eaton v Rare Nominees Pty Limited [2019] QCA 190  -

Eaton v Rare Nominees Pty Limited [2019] QCA 190  -

Eaton v Rare Nominees Pty Limited [2019] QCA 190  -

Eaton v Rare Nominees Pty Limited [2019] QCA 190  -

Eaton v Rare Nominees Pty Limited [2019] QCA 190  -

Eaton v Rare Nominees Pty Limited [2019] QCA 190  -

Eaton v Rare Nominees Pty Limited [2019] QCA 190  -

Eaton v Rare Nominees Pty Limited [2019] QCA 190  -

Eaton v Rare Nominees Pty Limited [2019] QCA 190  -

Eaton v Rare Nominees Pty Limited [2019] QCA 190  -

Rahme v Benjamin & Khoury Pty Ltd [2019] NSWCA 211 (30 August 2019) (Bathurst CJ, Macfarlan and McCallum JJA)

As stated in Pilmer v Duke Group Ltd (in liq) (2001) 207 CLR 165; [2001] HCA 31 at [71] , quoting Norberg v Wynrib [1992] 2 SCR 226 at 272, "[t]he essence of a fiduciary relationship ... is that one party exercises power on behalf of another and pledges himself or herself to act in the best interests of the other": see also Hospital Products Ltd v United States Surgical Corpor- ation (1984) 156 CLR 41 at 96–97 ; [1984] HCA 64 . One aspect of the fiduciary relationship is that a fiduciary "is not allowed to put himself in a position where his interest and duty conflict": Chan v Zacharia (1984) 154 CLR 178 at 198; [1984] HCA 36, quoting Bray v Ford [1896] AC 44 at 51.

87. As stated in *Pilmer v Duke Group Ltd (in liq)* (2001) 207 CLR 165; [2001] HCA 31 at [71] , quoting *N orberg v Wynrib* [1992] 2 SCR 226 at 272, "[t]he essence of a fiduciary relationship ... is that one party exercises power on behalf of another and pledges himself or herself to act in the best interests of the other" (see also *Hospital Products Ltd v United States Surgical Corporation* (1984) 156 CLR 41 at 96-7 ; [1984] HCA 64 ). One aspect of the fiduciary relationship is that a fiduciary "is not allowed to put himself in a position where his interest and duty conflict" ( *Chan v Zacharia* (1984) 154 CLR 178 at 198; [1984] HCA 36 quoting *Bray v Ford* [1896] AC 44 at 51 ).

Rahme v Benjamin & Khoury Pty Ltd [2019] NSWCA 211 (30 August 2019) (Bathurst CJ, Macfarlan and McCallum JJA)

ACQ Pty Ltd v Cook (2008) 72 NSWLR 318 ; [2008] NSWCA 161 Barnes v Addy (1874) LR 9 Ch App 244 Bester v Perpetual Trustee Co Ltd [1970] 3 NSWR 30 Bray v Ford [1896] AC 44 Cassegrain v Cassegrain [2016] NSWCA 71 Chan v Zacharia (1984) 154 CLR 178 ; [1984] HCA 36 Citicorp Australia Ltd v O'Brien (1996) 40 NSWLR 398 Commonwealth Bank of Australia v Smith (1991) 42 FCR 390 D Tannous No 2 Pty Ltd v Bevillesta Pty Ltd [2009] NSWSC 782 Farah Constructions Pty Ltd v Say-Dee Pty Ltd (2007) 230 CLR 89 ; [2007] HCA 22 Hospital Products Ltd v United States Surgical Corporation (1984) 156 CLR 41 ; [1984] HCA 64 Law Society of New South Wales v Foreman (1994) 34 NSWLR 408 Life Association of Scotland v Siddal (1861) 3 De GF&J 58 ; 45 ER 800 Maguire v Makaronis (1997) 188 CLR 449 ; [1997] HCA 23 Monaghan Surveyors Pty Ltd v Stratford Glen-Avon Pty Ltd [2012] NSWCA 94 Norberg v Wynrib [1992] 2 SCR 226 Perpetual Trustee Company Ltd v CTC Group Pty Ltd (No 2) [2013] NSWCA 58 Perpetual Trustee Company Ltd v Milanex Pty Ltd (in liq) [2011] NSWCA 367 Pilmer v Duke Group Ltd (in liq) (2001) 207 CLR 165 ; [2001] HCA 31 Polkingh orne v Holland (1934) 51 CLR 143 ; [1934] HCA 28 Provident Capital Ltd v Papa (2013) 84 NSWLR 231 ; [2013] NSWCA 36 Rahme v Satouris [2018] NSWSC 1753 Symonds v Raphael (1998) 148 FLR 171 Unite d Dominions Corporation Ltd v Brian Pty Ltd (1985) 157 CLR 1 ; [1985] HCA 49

Sellers and Burns and Anor [2019] FamCAFC 113  -
Sellers and Burns and Anor [2019] FamCAFC 113  -
Wilden Pty Ltd v Green [No 6] [2018] WASCA 198  -
Wilden Pty Ltd v Green [No 6] [2018] WASCA 198  -
Ancient Order of Foresters in Victoria Friendly Society Ltd v Lifeplan Australia Friendly Society Ltd [2018] HCA 43  -
Ancient Order of Foresters in Victoria Friendly Society Ltd v Lifeplan Australia Friendly Society Ltd [2018] HCA 43  -
Ancient Order of Foresters in Victoria Friendly Society Ltd v Lifeplan Australia Friendly Society Ltd [2018] HCA 43  -
Ancient Order of Foresters in Victoria Friendly Society Ltd v Lifeplan Australia Friendly Society Ltd [2018] HCA 43  -
Ancient Order of Foresters in Victoria Friendly Society Ltd v Lifeplan Australia Friendly Society Ltd [2018] HCA 43  -
Ancient Order of Foresters in Victoria Friendly Society Ltd v Lifeplan Australia Friendly Society Ltd [2018] HCA 43  -
Brooks & Anor v Young & Ors [2018] SASCFC 81  -
Brooks & Anor v Young & Ors [2018] SASCFC 81  -
Brooks & Anor v Young & Ors [2018] SASCFC 81  -
Gunasegaram v Blue Visions Management Pty Ltd [2018] NSWCA 179  -
Gunasegaram v Blue Visions Management Pty Ltd [2018] NSWCA 179  -
Gunasegaram v Blue Visions Management Pty Ltd [2018] NSWCA 179  -
Gunasegaram v Blue Visions Management Pty Ltd [2018] NSWCA 179  -
Gunasegaram v Blue Visions Management Pty Ltd [2018] NSWCA 179  -
Gunasegaram v Blue Visions Management Pty Ltd [2018] NSWCA 179  -
Gunasegaram v Blue Visions Management Pty Ltd [2018] NSWCA 179  -

Gunasegaram v Blue Visions Management Pty Ltd [2018] NSWCA 179  -
Gunasegaram v Blue Visions Management Pty Ltd [2018] NSWCA 179  -
Gunasegaram v Blue Visions Management Pty Ltd [2018] NSWCA 179  -
Gunasegaram v Blue Visions Management Pty Ltd [2018] NSWCA 179  -
Adventure Golf Systems Australia Pty Ltd (ACN 077 643 175) v Belgravia Health & Leisure Group Pty Ltd
(ACN 005 087 463) [2017] VSCA 326  -
Adventure Golf Systems Australia Pty Ltd (ACN 077 643 175) v Belgravia Health & Leisure Group Pty Ltd
(ACN 005 087 463) [2017] VSCA 326  -
Adventure Golf Systems Australia Pty Ltd (ACN 077 643 175) v Belgravia Health & Leisure Group Pty Ltd
(ACN 005 087 463) [2017] VSCA 326  -
Adventure Golf Systems Australia Pty Ltd (ACN 077 643 175) v Belgravia Health & Leisure Group Pty Ltd
(ACN 005 087 463) [2017] VSCA 326  -
Adventure Golf Systems Australia Pty Ltd (ACN 077 643 175) v Belgravia Health & Leisure Group Pty Ltd
(ACN 005 087 463) [2017] VSCA 326  -
Adventure Golf Systems Australia Pty Ltd (ACN 077 643 175) v Belgravia Health & Leisure Group Pty Ltd
(ACN 005 087 463) [2017] VSCA 326  -
Adventure Golf Systems Australia Pty Ltd (ACN 077 643 175) v Belgravia Health & Leisure Group Pty Ltd
(ACN 005 087 463) [2017] VSCA 326  -
Adventure Golf Systems Australia Pty Ltd (ACN 077 643 175) v Belgravia Health & Leisure Group Pty Ltd
(ACN 005 087 463) [2017] VSCA 326  -
Adventure Golf Systems Australia Pty Ltd (ACN 077 643 175) v Belgravia Health & Leisure Group Pty Ltd
(ACN 005 087 463) [2017] VSCA 326  -
Adventure Golf Systems Australia Pty Ltd (ACN 077 643 175) v Belgravia Health & Leisure Group Pty Ltd
(ACN 005 087 463) [2017] VSCA 326  -
Adventure Golf Systems Australia Pty Ltd (ACN 077 643 175) v Belgravia Health & Leisure Group Pty Ltd
(ACN 005 087 463) [2017] VSCA 326  -
Adventure Golf Systems Australia Pty Ltd (ACN 077 643 175) v Belgravia Health & Leisure Group Pty Ltd
(ACN 005 087 463) [2017] VSCA 326  -
Adventure Golf Systems Australia Pty Ltd (ACN 077 643 175) v Belgravia Health & Leisure Group Pty Ltd
(ACN 005 087 463) [2017] VSCA 326  -
Adventure Golf Systems Australia Pty Ltd (ACN 077 643 175) v Belgravia Health & Leisure Group Pty Ltd
(ACN 005 087 463) [2017] VSCA 326  -
Adventure Golf Systems Australia Pty Ltd (ACN 077 643 175) v Belgravia Health & Leisure Group Pty Ltd
(ACN 005 087 463) [2017] VSCA 326  -
Adventure Golf Systems Australia Pty Ltd (ACN 077 643 175) v Belgravia Health & Leisure Group Pty Ltd
(ACN 005 087 463) [2017] VSCA 326  -
Adventure Golf Systems Australia Pty Ltd (ACN 077 643 175) v Belgravia Health & Leisure Group Pty Ltd
(ACN 005 087 463) [2017] VSCA 326  -
Adventure Golf Systems Australia Pty Ltd (ACN 077 643 175) v Belgravia Health & Leisure Group Pty Ltd
(ACN 005 087 463) [2017] VSCA 326  -
Young v Thomson [2017] FCAFC 140  -
Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd [2017] FCAFC 141  -
Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd [2017] FCAFC 141  -
Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd [2017] FCAFC 141  -
Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd [2017] FCAFC 141  -
Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd [2017] FCAFC 141  -
Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd [2017] FCAFC 141  -
Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd [2017] FCAFC 141  -
Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd [2017] FCAFC 141  -
Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd [2017] FCAFC 141  -
Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd [2017] FCAFC 141  -
Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd [2017] FCAFC 141  -
Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd [2017] FCAFC 141  -
Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd [2017] FCAFC 141  -

Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd [2017] FCAFC 141 -
Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd [2017] FCAFC 141 -
Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd [2017] FCAFC 141 -
Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd [2017] FCAFC 141 -
Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd [2017] FCAFC 141 -
Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd [2017] FCAFC 141 -
Oliver Hume South East Queensland Pty Ltd v Investa Residential Group Pty Ltd [2017] FCAFC 141 -

Lifeplan Australia Friendly Society Ltd v Ancient Order of Foresters in Victoria Friendly Society Ltd [2017] FCAFC 74 (12 May 2017) (Allsop CJ, Middleton and Davies JJ)

58. The principles by reference to which this question was to be answered were discussed at [422]-[425] and [431]-[440] of the reasons. The relevant cases referred to and discussed were: *Warm an International Ltd v Dwyer* [1995] HCA 18; 182 CLR 544; *Grimaldi v Chameleon Mining NL (No 2)* [2012] FCAFC 6; 200 FCR 296; *Colbeam Palmer Ltd v Stock Affiliates Pty Ltd* [1968] HCA 50; 122 CLR 25; *Dart Industries Inc v Decor Corporation Pty Ltd* [1993] HCA 54; 179 CLR 101; and in the Full Court in *Decor Corporation Pty Ltd and Another v Dart Industries Inc* [1991] FCA 844; 33 FCR 397; *Hospital Products Limited v United States Surgical Corporation* [1984] HCA 64; 156 CLR 41 ; *Timber Engineering Co Pty Ltd v Anderson* [1980] 2 NSWLR 488; and *Howard v Commissioner of Taxation* [2014] HCA 21; 253 CLR 83. No expression of principle by the primary judge was said to be erroneous.

Lifeplan Australia Friendly Society Ltd v Ancient Order of Foresters in Victoria Friendly Society Ltd [2017] FCAFC 74 (12 May 2017) (Allsop CJ, Middleton and Davies JJ)

59. As can be seen from the analysis of the jurisprudence by the primary judge, the causal relationship between the breach and the profit has been variously expressed: profits made attributable to the breach ( *Colbeam Palmer* 122 CLR at 42-43 ; approved in *Dart v Decor* 179 CLR at 120-1 ); "profits obtained by the infringement" ( *Dart v Decor* 33 FCR at 407 , approved in the High Court 179 CLR at 120 ); "the particular benefits which flowed ... in breach of ... duty" ( *Hospital Products* 156 CLR at 110 (per Mason J)); "by reason of (the breach) ( *Warman* 182 CLR at 557 ); and "by reason or by use of (the breach)" ( *Howard* 253 CLR at 107 [62]).

Lifeplan Australia Friendly Society Ltd v Ancient Order of Foresters in Victoria Friendly Society Ltd [2017] FCAFC 74 (12 May 2017) (Allsop CJ, Middleton and Davies JJ)

65. In *Dart v Decor* 179 CLR at 111 , Mason CJ, Deane, Dawson, and Toohey JJ adopted the expression of Windeyer J in *Colbeam Palmer* 122 CLR at 34 that the account of profits retains its equitable characteristics in that a defendant is made to account for, and then is stripped of, profits that it has dishonestly made by the infringement, and which it would be unconscionable for it to retain. The proposition that Windeyer J in *Colbeam Palmer* and the plurality in *Dart v Decor* then expressed was that an "account of profits is confined to profits actually made" is not any narrow restriction, but an expression of the purpose of the remedy – not punishment but the prevention of unjust enrichment. Likewise, there is no call to over-emphasise the word "particular" used by Mason J in *Hospital Products* 156 CLR at 110 (see [59] above).

Blenkinsop v Herbert [2017] WASCA 87 -
Blenkinsop v Herbert [2017] WASCA 87 -
Dog At the Bridge Pty Ltd (ACN 154 906 377) v Bridge Bar Investments Pty Ltd (ACN 154 906 377) and Byrn McMurray [2017] VSCA 45 -
Dog At the Bridge Pty Ltd (ACN 154 906 377) v Bridge Bar Investments Pty Ltd (ACN 154 906 377) and Byrn McMurray [2017] VSCA 45 -
Australian Competition and Consumer Commission v Flight Centre Travel Group Ltd [2016] HCA 49 -
Australian Careers Institute Pty Ltd v Australian Institute of Fitness Pty Ltd [2016] NSWCA 347 -
Australian Careers Institute Pty Ltd v Australian Institute of Fitness Pty Ltd [2016] NSWCA 347 -
Apple and Pear Australia Ltd v Pink Lady America LLC [2016] VSCA 280 -

Hart Security Australia Pty Ltd v Boucousis [2016] NSWCA 307  -
Hart Security Australia Pty Ltd v Boucousis [2016] NSWCA 307  -
Hart Security Australia Pty Ltd v Boucousis [2016] NSWCA 307  -
Kafataris v Davis [2016] FCAFC 134  -
Kafataris v Davis [2016] FCAFC 134  -
Crown Melbourne Ltd v Cosmopolitan Hotel (Vic) Pty Ltd [2016] HCA 26  -
Crown Melbourne Ltd v Cosmopolitan Hotel (Vic) Pty Ltd [2016] HCA 26  -
Crown Melbourne Ltd v Cosmopolitan Hotel (Vic) Pty Ltd [2016] HCA 26  -
Crown Melbourne Ltd v Cosmopolitan Hotel (Vic) Pty Ltd [2016] HCA 26  -
Crown Melbourne Ltd v Cosmopolitan Hotel (Vic) Pty Ltd [2016] HCA 26  -
Crown Melbourne Ltd v Cosmopolitan Hotel (Vic) Pty Ltd [2016] HCA 26  -
Crown Melbourne Ltd v Cosmopolitan Hotel (Vic) Pty Ltd [2016] HCA 26  -
Duncan v Independent Commission Against Corruption [2016] NSWCA 143  -

Coope v LCM Litigation Fund Pty Ltd [2016] NSWCA 37 (08 June 2016) (Gleeson, Leeming and Payne JJA)

*Pilmer v Duke Group (In Liquidation)* [2001] HCA 31; 207 CLR 165; *Hospital Products v United States Surgical Corporation* (1984) 156 CLR 41 ; *Maguire v Makaronis* (1997) 188 CLR 449.

Coope v LCM Litigation Fund Pty Ltd [2016] NSWCA 37 (08 June 2016) (Gleeson, Leeming and Payne JJA)

106.  Not all personal interests come within the conflict rule. The interest must give rise to a conflict or a real or substantial possibility of conflict: *Hospital Products v United States Surgical Corporation* (1984) 156 CLR 41 at 103 per Mason J . An expectation or hope of future advantage may be sufficient to constitute a relevant interest: *Hospital Products* at 104 per Mason J.

Coope v LCM Litigation Fund Pty Ltd [2016] NSWCA 37 (08 June 2016) (Gleeson, Leeming and Payne JJA)

106.  Not all personal interests come within the conflict rule. The interest must give rise to a conflict or a real or substantial possibility of conflict: *Hospital Products v United States Surgical Corporation* (1984) 156 CLR 41 at 103 per Mason J. An expectation or hope of future advantage may be sufficient to constitute a relevant interest: *Hospital Products* at 104 per Mason J .

Coope v LCM Litigation Fund Pty Ltd [2016] NSWCA 37 (08 June 2016) (Gleeson, Leeming and Payne JJA)

119.  This becomes clear when the Separation Proposal is viewed against the Employment Proposal – there were a number of key features of his negotiations with Vannin that Mr Coope did not disclose to LCM:

1.  First, the termination and commencement dates. In the Separation Proposal, Mr Coope proposed his termination be "[e]ffective 31 March 2015". He did not disclose that if the Employment Proposal went ahead he would commence employment with Vannin Malta on 1 April 2015;

2.  Second, Mr Coope had negotiated a significant equity stake for himself in Vannin Malta. If released, he would have, in addition to his salary, an equity stake in a close competitor of LCM's;

3. Third, that Mr Coope was, to borrow the language of Mason J in *Hospital Products*, "pursuing" a windfall gain. The Separation Proposal would require LCM to pay Mr Coope a termination payment of 12 months existing salary (as opposed to the approximately four years that would otherwise be payable). However, Mr Coope did not disclose to the Board that through his Employment Proposal he had negotiated a salary, presumably to be payable from 1 April 2015 as follows:

    1. Mr Coope proposed a "Salary of $450K per annum plus superannuation contributions of $30K per annum"

    2. Mr Craddock responded that "Because VM would have no AUS footprint it would only be able to pay you the $450K Gross, you would then sort out your own tax affairs."

4. Fourth, the effect of the release of Mr Coope's non-compete obligations and extent of his proposed role at Vannin Malta. The Separation Proposal made to the Board was that, "The parties release each other from all obligations under Coope's employment contract." This would have allowed Mr Coope to take up the role of "Managing Director of Australia and Asia" for Vannin Malta proposed in his Employment Proposal. Mr Coope also proposed to Mr Craddock that, as part of the deal:

    VM undertakings [sic] all Australian and Asian projects of Vannin Capital ("VC") and VC agrees not to compete in those jurisdictions with VM.

*Coope v LCM Litigation Fund Pty Ltd* [2016] NSWCA 37 (08 June 2016) (Gleeson, Leeming and Payne JJA)

203. The fact that the Transaction Options document was a "work in progress" is not determinative of the existence of a conflict of interest and duty. It is not correct to say that a director does not have a conflict of interest and duty until an offer made to that director (which contains an element of personal interest) becomes binding or legally enforceable. Mason J in *Hospital Products* makes clear that an expectation or hope of future advantage may be sufficient to constitute a relevant interest. In my view the present is such a case.

*Servcorp WA Pty Ltd v Perron Investments Pty Ltd* [2016] WASCA 79  -
*Servcorp WA Pty Ltd v Perron Investments Pty Ltd* [2016] WASCA 79  -
*Servcorp WA Pty Ltd v Perron Investments Pty Ltd* [2016] WASCA 79  -
*Feiglin v Ainsworth* [2015] VSCA 326  -
*Feiglin v Ainsworth* [2015] VSCA 326  -
*Feiglin v Ainsworth* [2015] VSCA 326  -
*David Nolan v Executive Director, Land Management Policy,Department of Environment and Primary Industries* [2015] VSCA 301  -
*Regreen Asset Holdings Pty Ltd v Castricum Brothers Australia Pty Ltd* [2015] VSCA 286  -
*Regreen Asset Holdings Pty Ltd v Castricum Brothers Australia Pty Ltd* [2015] VSCA 286  -
*Regreen Asset Holdings Pty Ltd v Castricum Brothers Australia Pty Ltd* [2015] VSCA 286  -
*Wandel v Halloran* [2015] SASCFC 155  -
*Wandel v Halloran* [2015] SASCFC 155  -
*Refaat v Barry* [2015] VSCA 218  -
*Grocon Constructors (Victoria) Pty Ltd v APN DF2 Project 2 Pty Ltd* [2015] VSCA 190  -
*Grocon Constructors (Victoria) Pty Ltd v APN DF2 Project 2 Pty Ltd* [2015] VSCA 190  -
*Grocon Constructors (Victoria) Pty Ltd v APN DF2 Project 2 Pty Ltd* [2015] VSCA 190  -
*Paciocco v Australia and New Zealand Banking Group Ltd* [2015] FCAFC 50  -

Palermo v Palermo [2015] WASCA 49 -
Palermo v Palermo [2015] WASCA 49 -
Palermo v Palermo [2015] WASCA 49 -
Korda v Australian Executor Trustees (SA) Ltd [2015] HCA 6 -
Korda v Australian Executor Trustees (SA) Ltd [2015] HCA 6 -
Korda v Australian Executor Trustees (SA) Ltd [2015] HCA 6 -
Korda v Australian Executor Trustees (SA) Ltd [2015] HCA 6 -
Korda v Australian Executor Trustees (SA) Ltd [2015] HCA 6 -
Mercier Rouse Street Pty Ltd v Burness & Ors [2015] VSCA 8 -
Mercier Rouse Street Pty Ltd v Burness & Ors [2015] VSCA 8 -
Australasian Annuities Pty Ltd (in liq) v Rowley Super Fund Pty Ltd [2015] VSCA 9 -
Australasian Annuities Pty Ltd (in liq) v Rowley Super Fund Pty Ltd [2015] VSCA 9 -
Australasian Annuities Pty Ltd (in liq) v Rowley Super Fund Pty Ltd [2015] VSCA 9 -
Australasian Annuities Pty Ltd (in liq) v Rowley Super Fund Pty Ltd [2015] VSCA 9 -
Australasian Annuities Pty Ltd (in liq) v Rowley Super Fund Pty Ltd [2015] VSCA 9 -
Australasian Annuities Pty Ltd (in liq) v Rowley Super Fund Pty Ltd [2015] VSCA 9 -
Australasian Annuities Pty Ltd (in liq) v Rowley Super Fund Pty Ltd [2015] VSCA 9 -
Australasian Annuities Pty Ltd (in liq) v Rowley Super Fund Pty Ltd [2015] VSCA 9 -
Flinders Ports Pty Ltd v Woolford [2015] SASCFC 6 -
Flinders Ports Pty Ltd v Woolford [2015] SASCFC 6 -
Flinders Ports Pty Ltd v Woolford [2015] SASCFC 6 -
Sze Tu v Lowe [2014] NSWCA 462 (23 December 2014) (Meagher, Barrett and Gleeson JJA)

451. Gzell J held (at [241]-[251]) that once it has been shown that an errant fiduciary had mixed trust funds with his own funds, the onus of proof shifts to the fiduciary to establish that it is inequitable to order that the fiduciary account for the whole of the property acquired with the mixed fund: *Re Hallett's Estate* (1879) 13 Ch D 696; *Brady v Stapleton* [1952] HCA 62; 88 CLR 322; *Frith v Cartland* (1865) 2 H & M 417; 71 ER 525 at 526 ; *Vyse v Foster* (1872) LR 8 Ch App 309 at 333 ; *Hospital Products Ltd v United States Surgical Corporation* ( **Hospital Products** ) [1985] HCA 64; 156 CLR 41 at 109-110 (Mason J); *Warman International Ltd v Dwyer* at 561-562 .

Sze Tu v Lowe [2014] NSWCA 462 -
Sze Tu v Lowe [2014] NSWCA 462 -
Sze Tu v Lowe [2014] NSWCA 462 -
Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd [2014] VSCA 353 -
Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd [2014] VSCA 353 -
Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd [2014] VSCA 353 -
Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd [2014] VSCA 353 -
Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd [2014] VSCA 353 -
Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd [2014] VSCA 353 -
Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd [2014] VSCA 353 -
Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd [2014] VSCA 353 -
Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd [2014] VSCA 353 -
Romero v Farstad Shipping (Indian Pacific) Pty Ltd [2014] FCAFC 177 -
Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd [2014] VSCA 353 -
Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd [2014] VSCA 353 -
Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd [2014] VSCA 353 -
Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd [2014] VSCA 353 -
Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd [2014] VSCA 353 -
Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd [2014] VSCA 353 -
Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd [2014] VSCA 353 -
Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd [2014] VSCA 353 -
Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd [2014] VSCA 353 -
Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd [2014] VSCA 353 -
Cosmopolitan Hotel (Vic) Pty Ltd v Crown Melbourne Ltd [2014] VSCA 353 -
Canehire Pty Ltd v Themis Holdings Pty Ltd [2014] QCA 296 -

Canehire Pty Ltd v Themis Holdings Pty Ltd [2014] QCA 296 -
Canehire Pty Ltd v Themis Holdings Pty Ltd [2014] QCA 296 -
Kronenberg v Bridge [2014] TASFC 10 -
Kronenberg v Bridge [2014] TASFC 10 -
Mainieri v Cirillo [2014] VSCA 227 -
Mainieri v Cirillo [2014] VSCA 227 -
Mainieri v Cirillo [2014] VSCA 227 -
Mainieri v Cirillo [2014] VSCA 227 -
Commonwealth Bank of Australia v Barker [2014] HCA 32 -
Commonwealth Bank of Australia v Barker [2014] HCA 32 -
Taheri v Vitek [2014] NSWCA 209 -
Taheri v Vitek [2014] NSWCA 209 -
Taheri v Vitek [2014] NSWCA 209 -
Howard v Commissioner of Taxation [2014] HCA 21 -
Howard v Commissioner of Taxation [2014] HCA 21 -
Howard v Commissioner of Taxation [2014] HCA 21 -
Howard v Commissioner of Taxation [2014] HCA 21 -
Howard v Commissioner of Taxation [2014] HCA 21 -
Howard v Commissioner of Taxation [2014] HCA 21 -
Howard v Commissioner of Taxation [2014] HCA 21 -
ABN AMRO Bank NV v Bathurst Regional Council [2014] FCAFC 65 -
ABN AMRO Bank NV v Bathurst Regional Council [2014] FCAFC 65 -
Electricity Generation Corporation v Woodside Energy Ltd [2014] HCA 7 -
Electricity Generation Corporation v Woodside Energy Ltd [2014] HCA 7 -
Electricity Generation Corporation v Woodside Energy Ltd [2014] HCA 7 -
Electricity Generation Corporation v Woodside Energy Ltd [2014] HCA 7 -
Electricity Generation Corporation v Woodside Energy Ltd [2014] HCA 7 -
Electricity Generation Corporation v Woodside Energy Ltd [2014] HCA 7 -
Electricity Generation Corporation v Woodside Energy Ltd [2014] HCA 7 -
Cassegrain v Gerard Cassegrain & Co Pty Ltd [2013] NSWCA 454 -
Potts v Robins [2013] QCA 273 -
Potts v Robins [2013] QCA 273 -
Potts v Robins [2013] QCA 273 -
Potts v Robins [2013] QCA 273 -
Potts v Robins [2013] QCA 273 -
Potts v Robins [2013] QCA 273 -
Potts v Robins [2013] QCA 273 -
Potts v Robins [2013] QCA 273 -
Potts v Robins [2013] QCA 273 -
Potts v Robins [2013] QCA 273 -
Potts v Robins [2013] QCA 273 -
Potts v Robins [2013] QCA 273 -
Potts v Robins [2013] QCA 273 -
Despot v Registrar General of NSW [2013] NSWCA 313 -
Correa v Whittingham [2013] NSWCA 263 -
Correa v Whittingham [2013] NSWCA 263 -
Correa v Whittingham [2013] NSWCA 263 -
Crouch and Lyndon (a Firm) v IPG Finance Australia Pty Ltd [2013] QCA 220 -
Crouch and Lyndon (a Firm) v IPG Finance Australia Pty Ltd [2013] QCA 220 -
Commonwealth Bank of Australia v Barker [2013] FCAFC 83 -
Commonwealth Bank of Australia v Barker [2013] FCAFC 83 -
Commonwealth Bank of Australia v Barker [2013] FCAFC 83 -
Commonwealth Bank of Australia v Barker [2013] FCAFC 83 -
Commonwealth Bank of Australia v Barker [2013] FCAFC 83 -

Commonwealth Bank of Australia v Barker [2013] FCAFC 83 -
Macedonian Orthodox Community Church St Petka Incorporated v Metropolitan Petar [2013] NSWCA 223 (18 July 2013) (Beazley P, Macfarlan and Emmett JJA)

In my view a finding of dishonesty against the Council Members could not be made without a finding that they knew, or reasonable persons in their position would have known, that the Association was not entitled to deal with the St Petka Church and property as it thought appropriate in accordance with its Constitution (see *Farah v Say-Dee* at [177] ). As this Court in *US Surgical Corporation v Hospital Products* [1983] 2 NSWLR 157 at 253 - 4 (reversed on other grounds: (198 4) 156 CLR 41 ) understood the judgment of Stephen J in *Consul Development Pty Ltd v DPC Estates Pty Ltd* [1975] HCA 8; 132 CLR 373, there must be knowledge of the circumstances which imposed the fiduciary duty (or, in this case, trust) "and, in addition, the recognition that those facts did bear that character".

Alliance Craton Explorer Pty Ltd v Quasar Resources Pty Ltd [2013] FCAFC 29 -
Alliance Craton Explorer Pty Ltd v Quasar Resources Pty Ltd [2013] FCAFC 29 -
Alliance Craton Explorer Pty Ltd v Quasar Resources Pty Ltd [2013] FCAFC 29 -
Electricity Generation Corporation t/as Verve Energy v Woodside Energy Ltd [2013] WASCA 36 -
Electricity Generation Corporation t/as Verve Energy v Woodside Energy Ltd [2013] WASCA 36 -
Electricity Generation Corporation t/as Verve Energy v Woodside Energy Ltd [2013] WASCA 36 -
Streetscape Projects (Australia) Pty Ltd v City of Sydney [2013] NSWCA 2 (01 February 2013) (Meagher, Barrett and Ward JJA)

57.  In relation to legal principles, the judge quoted several passages in the judgments in *Hospital Products Ltd v United States Surgical Corporation* [1984] HCA 64; (1984) 156 CLR 41 . He referred also to *Moorgate Tobacco Co Ltd v Philip Morris Ltd (No 2)* [1984] HCA 73; [1984] 156 CLR 414 and *Elecon Australia Pty Ltd v Brevini Pty Ltd* [2009] FCA 1327; (2009) 263 ALR 1. Then followed this conclusion (at [449] ):

     "The Court accepts that the factual circumstances referred to above give rise to Streetscape owing a fiduciary duty to the City to act for and on behalf of the interests of the City in respect of the Information. In this respect, Streetscape was obliged to act for the City in all respects in relation to its use and disclosure of the Information and was not, without the authority and consent of the City, permitted to obtain a benefit for itself, or to assist third parties to obtain a benefit for themselves, from such use and /or disclosure or to be in a position of conflict in relation to the use and/or disclosure of the same."

Streetscape Projects (Australia) Pty Ltd v City of Sydney [2013] NSWCA 2 (01 February 2013) (Meagher, Barrett and Ward JJA)

97.  A fiduciary duty may exist in a contractual setting. Reference need only be made to the following statement by Mason J in *Hospital Products Ltd v United States Surgical Corporation* (ab ove) at 97 :

     "That contractual and fiduciary relationships may co-exist between the same parties has never been doubted. Indeed, the existence of a basic contractual relationship has in many situations provided a foundation for the erection of a fiduciary relationship."

Streetscape Projects (Australia) Pty Ltd v City of Sydney [2013] NSWCA 2 (01 February 2013) (Meagher, Barrett and Ward JJA)

109.  The Court of Appeal upheld that claim. Reference was made by Cooke P to *Hospital Products Ltd v United States Surgical Corporation* (above) and, in particular, to the following passage in the judgment of Mason J (at 101 ):

"HPI's position as custodian of USSC.'s product goodwill in Australia may be likened in a general way to that of a bailee whose duty is to protect and preserve a chattel bailed to him. It has been well recognized, at least since the judgment of Jessel M.R. in *I n re Hallett's Estate* [ (1880) 13 Ch D 696 at 708-9 ], that a bailee stands in a fiduciary relationship with the bailor when the bailor entrusts to the bailee goods to be held or dealt with by him for the benefit of the bailor or for certain limited purposes stipulated by the bailor."

*Streetscape Projects (Australia) Pty Ltd v City of Sydney* [2013] NSWCA 2 (01 February 2013) (Meagher, Barrett and Ward JJA)

113. Some of these factors were at work also in *Hospital Products Ltd v United States Surgical Corporation* . As French CJ, Gummow, Hayne, Heydon and Kiefel JJ pointed out in *John Alexander's Clubs Pty Ltd v White City Tennis Club Ltd* [2010] HCA 19; (2010) 241 CLR 1 (at [93] ), the dissenting view of Mason J as to the existence of a fiduciary duty in *Hospital Products* came from the circumstance that the overseas party was "a remote principal lacking the capacity to observe what was happening half the world away" and in a situation where the Australian distributor was the only person in touch with the Australian market and thus positioned so as to enrich itself at the overseas principal's expense. This, their Honours said, created the principal's "vulnerability to the distributor's abuse of its position".

*Streetscape Projects (Australia) Pty Ltd v City of Sydney* [2013] NSWCA 2 (01 February 2013) (Meagher, Barrett and Ward JJA)

113. Some of these factors were at work also in *Hospital Products Ltd v United States Surgical Corporation* . As French CJ, Gummow, Hayne, Heydon and Kiefel JJ pointed out in *John Alexander's Clubs Pty Ltd v White City Tennis Club Ltd* [2010] HCA 19; (2010) 241 CLR 1 (at [93] ), the dissenting view of Mason J as to the existence of a fiduciary duty in *Hospital Products* came from the circumstance that the overseas party was "a remote principal lacking the capacity to observe what was happening half the world away" and in a situation where the Australian distributor was the only person in touch with the Australian market and thus positioned so as to enrich itself at the overseas principal's expense. This, their Honours said, created the principal's "vulnerability to the distributor's abuse of its position".

*Streetscape Projects (Australia) Pty Ltd v City of Sydney* [2013] NSWCA 2 (01 February 2013) (Meagher, Barrett and Ward JJA)

114. Mason J was the only member of the High Court in *Hospital Products Ltd v United States Surgical Corporation* who considered that the Australian distributor owed a fiduciary duty to the overseas party. The finding in *Watson v Dolmark Industries Ltd* in favour of the existence of a fact-based fiduciary duty is thus to be contrasted with the reasoning employed by the other members of the High Court.

*Streetscape Projects (Australia) Pty Ltd v City of Sydney* [2013] NSWCA 2 (01 February 2013) (Meagher, Barrett and Ward JJA)

125. The primary judge noted (at [445]) the observation of Mason J in *Hospital Products Ltd v United States Surgical Corporation* that contractual and fiduciary duties may co-exist between the same parties. At [447], he referred to statements by both Gibbs CJ and Mason J that a person may be a fiduciary in some activities but not others. He then (at [449] ) stated the conclusion set out at [57] of these reasons.

*Streetscape Projects (Australia) Pty Ltd v City of Sydney* [2013] NSWCA 2 - 
*Streetscape Projects (Australia) Pty Ltd v City of Sydney* [2013] NSWCA 2 - 
*Streetscape Projects (Australia) Pty Ltd v City of Sydney* [2013] NSWCA 2 -

Streetscape Projects (Australia) Pty Ltd v City of Sydney [2013] NSWCA 2  -
Streetscape Projects (Australia) Pty Ltd v City of Sydney [2013] NSWCA 2  -
Streetscape Projects (Australia) Pty Ltd v City of Sydney [2013] NSWCA 2  -
Streetscape Projects (Australia) Pty Ltd v City of Sydney [2013] NSWCA 2  -
Streetscape Projects (Australia) Pty Ltd v City of Sydney [2013] NSWCA 2  -
Streetscape Projects (Australia) Pty Ltd v City of Sydney [2013] NSWCA 2  -
Streetscape Projects (Australia) Pty Ltd v City of Sydney [2013] NSWCA 2  -
Streetscape Projects (Australia) Pty Ltd v City of Sydney [2013] NSWCA 2  -
JT International SA v Commonwealth [2012] HCA 43  -
Commissioner of Taxation v Qantas Airways Limited [2012] HCA 41  -
Westpac Banking Corporation v Bell Group Ltd (in liq) (No 3) [2012] WASCA 157  -
Westpac Banking Corporation v Bell Group Ltd (in liq) (No 3) [2012] WASCA 157  -
Westpac Banking Corporation v Bell Group Ltd (in liq) (No 3) [2012] WASCA 157  -
Westpac Banking Corporation v Bell Group Ltd (in liq) (No 3) [2012] WASCA 157  -
Westpac Banking Corporation v Bell Group Ltd (in liq) (No 3) [2012] WASCA 157  -
Westpac Banking Corporation v Bell Group Ltd (in liq) (No 3) [2012] WASCA 157  -
Westpac Banking Corporation v Bell Group Ltd (in liq) (No 3) [2012] WASCA 157  -
Westpac Banking Corporation v Bell Group Ltd (in liq) (No 3) [2012] WASCA 157  -
Westpac Banking Corporation v Bell Group Ltd (in liq) (No 3) [2012] WASCA 157  -
Westpac Banking Corporation v Bell Group Ltd (in liq) (No 3) [2012] WASCA 157  -
Westpac Banking Corporation v Bell Group Ltd (in liq) (No 3) [2012] WASCA 157  -
Steggles Limited v Yarrabee Chicken Company Pty Ltd [2012] FCAFC 91  -
Steggles Limited v Yarrabee Chicken Company Pty Ltd [2012] FCAFC 91  -
Memery v Trilogy Funds Management Limited [2012] QCA 160  -
Memery v Trilogy Funds Management Limited [2012] QCA 160  -
Memery v Trilogy Funds Management Limited [2012] QCA 160  -
Memery v Trilogy Funds Management Limited [2012] QCA 160  -
Joseph Street Pty Ltd v Tan [2012] VSCA 113  -
Grefeld & Grefeld [2012] FamCAFC 71 (01 June 2012) (Finn, Strickland & Austin JJ)
    *Hospital Products Ltd v United States Surgical Corp & Ors* (1984) 156 CLR 41
    *Keith Henry & Co Pty Ltd v Stuart Walker & Co Pty Ltd*

Grefeld & Grefeld [2012] FamCAFC 71 (01 June 2012) (Finn, Strickland & Austin JJ)

67.  On that basis, applying the law of Australia, the relationship created by the power of attorney was one of agency, and that is ordinarily a fiduciary one

(see *Hospital Products Ltd v United States Surgical Corp & Ors* (1984) 156 CLR 41 at 68 , 96 , 141 ) in which the agent is not permitted to put his interest in conflict with the principal's, nor to act for different principals with conflicting interests, nor to profit from the agency, at least without full disclosure to the principal (see *Keith Henry & Co Pty Ltd v Stuart Walker & Co Pty Ltd* (1958) 100 CLR 342 at 350 ; *Consul Development Pty Ltd v DPC Estates Pty Ltd* (1975) 132 CLR 373 at 377 , 392-394 ; *Chan v Zacharia* (1984) 154 CLR 178 at 198-199 ; *Hospital Products v United States Surgical* at 67).

Foster v Hall [2012] NSWCA 122 (04 May 2012) (Macfarlan JA at [1]; Meagher JA at [50]; Tobias AJA at [51])

33.  The addition of the word "best" to the expression "reasonable endeavours" raises the required standard to a level somewhat higher than that imposed by a simple "reasonable endeavours" obligation. However I do not consider that there is any significant difference, at least for present purposes, between the content of an obligation to use "best reasonable endeavours"

and one to use "best endeavours". In *Hospital Products Ltd v United States Surgical Corporation* [1984] HCA 64; 156 CLR 41 Gibbs J explained the meaning of the latter expression as follows:

> "[A]n obligation to use 'best endeavours' does not require the person who undertakes the obligation to go beyond the bounds of reason; he is required to do all he reasonably can in the circumstances to achieve the contractual object, but no more" (at 64).

In the same case Mason J referred to the extent of the obligation of best efforts (or endeavours) as "governed by what is reasonable in the circumstances" (at 91 - 2). Dawson J noted that the obligation does not impose a duty upon a party to disregard his or her own interests (at 143 - 4).

Rafferty v Madgwicks [2012] FCAFC 37 -
Grimaldi v Chameleon Mining NL (No 2) [2012] FCAFC 6 -
Grimaldi v Chameleon Mining NL (No 2) [2012] FCAFC 6 -
Grimaldi v Chameleon Mining NL (No 2) [2012] FCAFC 6 -
Grimaldi v Chameleon Mining NL (No 2) [2012] FCAFC 6 -
Grimaldi v Chameleon Mining NL (No 2) [2012] FCAFC 6 -
Grimaldi v Chameleon Mining NL (No 2) [2012] FCAFC 6 -
Grimaldi v Chameleon Mining NL (No 2) [2012] FCAFC 6 -
Grimaldi v Chameleon Mining NL (No 2) [2012] FCAFC 6 -
Grimaldi v Chameleon Mining NL (No 2) [2012] FCAFC 6 -
Grimaldi v Chameleon Mining NL (No 2) [2012] FCAFC 6 -
Grimaldi v Chameleon Mining NL (No 2) [2012] FCAFC 6 -
Grimaldi v Chameleon Mining NL (No 2) [2012] FCAFC 6 -
Grimaldi v Chameleon Mining NL (No 2) [2012] FCAFC 6 -
Grimaldi v Chameleon Mining NL (No 2) [2012] FCAFC 6 -
Grimaldi v Chameleon Mining NL (No 2) [2012] FCAFC 6 -
Grimaldi v Chameleon Mining NL (No 2) [2012] FCAFC 6 -
Grimaldi v Chameleon Mining NL (No 2) [2012] FCAFC 6 -
Grimaldi v Chameleon Mining NL (No 2) [2012] FCAFC 6 -
Grimaldi v Chameleon Mining NL (No 2) [2012] FCAFC 6 -
Grimaldi v Chameleon Mining NL (No 2) [2012] FCAFC 6 -
Tonto Home Loans Australia Pty Ltd v Tavares [2011] NSWCA 389 (21 December 2011) (Bathurst CJ, Allsop P and Campbell JA)
Hospital Products Ltd v United States Surgical Corporation [1984] HCA 64; 156 CLR 41
Hygienic Lily Ltd v Deputy Federal Commissioner of Taxation

Tonto Home Loans Australia Pty Ltd v Tavares [2011] NSWCA 389 (21 December 2011) (Bathurst CJ, Allsop P and Campbell JA)

177. These expressions of the central characteristics of the relationship reveal the closeness of identity that is required for the relationship to exist. Not every independent contractor performing a task for, or for the benefit of, a party will be an agent, and so identified as it, or as representing it, and its interests. Agency is a consensual relationship, generally (if not always) bearing a fiduciary character, in which by its terms A acts on behalf of (and in the interests of) P and with a necessary degree of control requisite for the purpose of the role. Central is the conception of identity or representation of the principal: *Colonial Mutual* at 48-49 ; Seavey *op cit* at 859. Examples and contexts may be infinite, and any arrangement must be understood and characterised by reference to its legal terms in context. In *McKenzie v McDonald* [1927] VLR 134 at 144 Dixon AJ, in saying that not every agent stands as a fiduciary, was recognising that the word "agent" is used in many senses and is apt to mislead, citing *Kennedy v De Trafford* at 188. That is, however, no more than to say that the word "agent" has a potentially wide and varying meaning in life and business and that, on some occasions, the business description will be given to someone who is not a fiduciary. See also *Hospital Products Ltd v United States Surgical Corporation* [1984] HCA 64; 156 CLR 41 at 71-72 (per Gibbs

C), et at 96-97 (per Mason)); *Boardman v Phipps* [1967] 2 AC 46 at 127; P E Dowrick "The Relationship of Principal and Agent" (1954) 17 *Modern Law Review* 24 and R P Meagher, J D Heydon and M J Leeming (eds) *Meagher, Gummow and Lehane's Equity: Doctrines and Remedies* (4th Ed, LexisNexis, 2002) at 191-192 [5-195]. It is sufficient to recognise that the essential characteristic is that one party (A) acts on the other's (P's) behalf, and that this will generally be in circumstances of a requirement or duty not to act otherwise than in the interests of P in the performance of the consensual arrangement. *Bowstead and Reynolds on Agency*, the *Restatement* and Seavey *op cit* at 863 include in the conception of agency the characteristic of fiduciary duty. The duty will, of course, conform with the extent and scope of the agency and thus be of potentially varied content, recognising that context (in particular, perhaps, a market or commercial context) may attenuate the rigour or content of the fiduciary duty: *Birtchnell v The Equity Trustees, Executors and Agency Co Ltd* [1929] HCA 24; 42 CLR 384 at 408 ; *In re Goldcorp Exchange Ltd* [1995] 1 AC 74 at 98 ; *Meagher, Gummow and Lehane* (4th Ed) at 161-162 [5-010]); Finn J in *South Sydney v News* at [136], and in his text *Fiduciary Obligations* (LawBook Co, 1977) at 201. The necessary good faith implicit in a fiduciary character in the relationship reflects the character of identity or representation that the relationship essentially carries.

SAS Trustee Corporation v Cox [2011] NSWCA 408  -
Omnilab Media Pty Ltd v Digital Cinema Network Pty Ltd [2011] FCAFC 166  -
Williamson and McGillivray v JIA Holdings [2011] QCA 346  -
Taylor v Attorney-General HC Auckland CIV 2010-404-6985 [2011] NZHC 1688  -
Durham v Durham [2011] NSWCA 335  -
Durham v Durham [2011] NSWCA 335  -
Durham v Durham [2011] NSWCA 335  -
The Baby Hammock Co Limited v AJ Park Law HC Auckland CIV-2008-404-3581 [2011] NZHC 686  -
Cypjayne Pty Limited v Babcock and Brown International Pty Ltd [2011] NSWCA 173 (29 June 2011) (Chief Justice, Macfarlan and Young JJA)
Hospital Products Ltd v United States Surgical Corporation [1984] HCA 64 ; (1984) 156 CLR 41 .

Cypjayne Pty Limited v Babcock and Brown International Pty Ltd [2011] NSWCA 173  -
Cypjayne Pty Limited v Babcock and Brown International Pty Ltd [2011] NSWCA 173  -
Li v Xing HC Auckland CIV-2010-404-008005 [2011] NZHC 1553  -
Li v Xing HC Auckland CIV-2010-404-008005 [2011] NZHC 1553  -
Jireh International Pty Ltd t/as Gloria Jean's Coffee v Western Exports Services Inc [2011] NSWCA 137  -
Jireh International Pty Ltd t/as Gloria Jean's Coffee v Western Exports Services Inc [2011] NSWCA 137  -
Blackmagic Design Pty Ltd v Overliese [2011] FCAFC 24  -
Blackmagic Design Pty Ltd v Overliese [2011] FCAFC 24  -
Blackmagic Design Pty Ltd v Overliese [2011] FCAFC 24  -
Blackmagic Design Pty Ltd v Overliese [2011] FCAFC 24  -
Blackmagic Design Pty Ltd v Overliese [2011] FCAFC 24  -
Residential Housing Corporation v Esber [2011] NSWCA 25  -
Residential Housing Corporation v Esber [2011] NSWCA 25  -
Residential Housing Corporation v Esber [2011] NSWCA 25  -
Streeter v Western Areas Exploration Pty Ltd (No 2) [2011] WASCA 17  -
Streeter v Western Areas Exploration Pty Ltd (No 2) [2011] WASCA 17  -
Streeter v Western Areas Exploration Pty Ltd (No 2) [2011] WASCA 17  -
Streeter v Western Areas Exploration Pty Ltd (No 2) [2011] WASCA 17  -
Central City Pty Ltd v Montevento Holdings Pty Ltd [2011] WASCA 5  -
Central City Pty Ltd v Montevento Holdings Pty Ltd [2011] WASCA 5  -
Watson v Ebsworth & Ebsworth [2010] VSCA 335  -
Watson v Ebsworth & Ebsworth [2010] VSCA 335  -
Watson v Ebsworth & Ebsworth [2010] VSCA 335  -
Watson v Ebsworth & Ebsworth [2010] VSCA 335  -
Watson v Ebsworth & Ebsworth [2010] VSCA 335  -
Watson v Ebsworth & Ebsworth [2010] VSCA 335  -
Watson v Ebsworth & Ebsworth [2010] VSCA 335  -
Watson v Ebsworth & Ebsworth [2010] VSCA 335  -

Watson v Ebsworth & Ebsworth [2010] VSCA 335

Commissioner of State Taxation v Cyril Henschke Pty Ltd [2010] HCA 43 (01 December 2010) (French CJ, Gummow, Hayne, Heydon and Kiefel JJ)

21. The submissions to the contrary made by the respondents to a significant degree relied upon a particular view of the role of equitable doctrines and remedies in the conduct of partnerships. Much of what was submitted, and accepted by the Full Court, is uncontroversial. While the business conducted under the name CA Henschke & Co in the period before 23 December 2004 was the activity provided for by the 1986 Partnership Agreement, the relationships between the partners were not regulated purely by their contract. There was a fiduciary relationship between them, a critical feature of which was that each had agreed to act for or on behalf of or in the interests of all of them in the exercise of any power or discretion affecting their interests in a legal or practical sense [11] .

*via*

[11]   *Hospital Products Ltd v United States Surgical Corporation* (1984) 156 CLR 41; [1984] HCA 64 .

Canberra Residential Developments Pty Ltd v Brendas [2010] FCAFC 125 (24 September 2010) (Finkelstein, Siopis and Katzmann JJ)
   *Hospital Products Limited v United States Surgical Corporation* (1984) 156 CLR 41
   *House v King*

Canberra Residential Developments Pty Ltd v Brendas [2010] FCAFC 125 (24 September 2010) (Finkelstein, Siopis and Katzmann JJ)

35. These are the circumstances in which it is necessary to assess CRD's claims. In this connection it is not in dispute that Mr Brendas, as a director of CRD, was in a fiduciary relationship. This is one of the accepted categories of a fiduciary relationship. It is a fiduciary relationship because of the trust and confidence that is reposed by the company in its directors: *Hospital Products Limited v United States Surgical Corporation* (1984) 156 CLR 41, 96-97 .

Simpson v Donnybrook Properties Pty Ltd [2010] NSWCA 229 (09 September 2010) (Hodgson, Macfarlan and Young JJA)
   Hospital Products Ltd v United States Surgical Corporation [1984] HCA 64 ; 156 CLR 41
   Huat v Rintag Pty Ltd [2000] ANZ Conv Rep 2

Simpson v Donnybrook Properties Pty Ltd [2010] NSWCA 229 (09 September 2010) (Hodgson, Macfarlan and Young JJA)
   Hospital Products Ltd v United States Surgical Corporation [1984] HCA 64 ; 156 CLR 41

Simpson v Donnybrook Properties Pty Ltd [2010] NSWCA 229 (09 September 2010) (Hodgson, Macfarlan and Young JJA)

62. Basically, a fiduciary is a person who undertakes or had thrust upon him or her by the law an obligation to act for the benefit of another. This flows from *Hospital Products Ltd v United States Surgical Corporation* [1984] HCA 64; 156 CLR 41, 67. Although, as B H McPherson demonstrates in "Fiduciaries: Who are They" (1998) 72 ALJ 288, 289, that statement is not open to too critical an examination, it is a useful starting point.

Pegela Pty Ltd v Oates [2010] NSWCA 186 (09 August 2010) (Allsop P, McColl and Young JJA)
   Hospital Products Ltd v United States Surgical Corporation [1984] HCA 64; 156 CLR 41
   In re Stock; Ex parte Amos

Pegela Pty Ltd v Oates [2010] NSWCA 186 (09 August 2010) (Allsop P, McColl and Young JJA)

*Breen v Williams* [1996] HCA 57; 186 CLR 71; *Hawkins v Clayton* [1988] HCA 15; 64 CLR 539; *Byrne v Australian Airlines Ltd* [1995] HCA 24; 185 CLR 410, applied; *Associated Alloys Pty Ltd v ACN 001 452 106 Pty Ltd (in liq)* [2000] HCA 25; 205 CLR 588; *BP Refinery (Westernport) Pty Ltd v President, Councillors and Ratepayers of the Shire of Hastings* [1977] UKPCHCA 1; 180 CLR 266; *Hospital Products Ltd v United States Surgical Corporation* [1984] HCA 64; 156 CLR 41; *Moneywood Pty Ltd v Salamon Nominees Pty Ltd* [2001] HCA 2; 202 CLR 351 referred to.

Pegela Pty Ltd v Oates [2010] NSWCA 186 (09 August 2010) (Allsop P, McColl and Young JJA)

12 The appellants criticised his Honour's conclusion on the basis that the implication did not meet the well-known tests in *BP Refinery (Westernport) Pty Ltd v President, Councillors and Ratepayers of the Shire of Hastings* [1977] UKPCHCA 1; 180 CLR 266 at 283. These five tests are relevant in full when there is an agreement in writing complete upon its face: Deane J in *Hospital Products Ltd v United States Surgical Corporation* [1984] HCA 64; 156 CLR 41 at 121, approved in *Byrne v Australian Airlines Ltd* [1995] HCA 24; 185 CLR 410 at 422 (Brennan CJ, Dawson and Toohey JJ) and at 442 (McHugh and Gummow JJ).

Bli Bli # 1 P/L v Kimlin Investments P/L [2010] QCA 136 -
Bli Bli # 1 P/L v Kimlin Investments P/L [2010] QCA 136 -
Bli Bli # 1 P/L v Kimlin Investments P/L [2010] QCA 136 -
John Alexander's Clubs Pty Ltd v White City Tennis Club Ltd [2010] HCA 19 -
John Alexander's Clubs Pty Ltd v White City Tennis Club Ltd [2010] HCA 19 -
John Alexander's Clubs Pty Ltd v White City Tennis Club Ltd [2010] HCA 19 -
John Alexander's Clubs Pty Ltd v White City Tennis Club Ltd [2010] HCA 19 -
John Alexander's Clubs Pty Ltd v White City Tennis Club Ltd [2010] HCA 19 -
John Alexander's Clubs Pty Ltd v White City Tennis Club Ltd [2010] HCA 19 -
John Alexander's Clubs Pty Ltd v White City Tennis Club Ltd [2010] HCA 19 -
John Alexander's Clubs Pty Ltd v White City Tennis Club Ltd [2010] HCA 19 -
John Alexander's Clubs Pty Ltd v White City Tennis Club Ltd [2010] HCA 19 -
John Alexander's Clubs Pty Ltd v White City Tennis Club Ltd [2010] HCA 19 -
John Alexander's Clubs Pty Ltd v White City Tennis Club Ltd [2010] HCA 19 -
John Alexander's Clubs Pty Ltd v White City Tennis Club Ltd [2010] HCA 19 -
Bacnet Pty Ltd v Lift Capital Partners Pty Ltd (in liq) [2010] FCAFC 36 -
Bacnet Pty Ltd v Lift Capital Partners Pty Ltd (in liq) [2010] FCAFC 36 -
Bacnet Pty Ltd v Lift Capital Partners Pty Ltd (in liq) [2010] FCAFC 36 -
Bacnet Pty Ltd v Lift Capital Partners Pty Ltd (in liq) [2010] FCAFC 36 -
St Alder v Waverley Local Council [2010] NSWCA 22 -
St Alder v Waverley Local Council [2010] NSWCA 22 -
1144 Nepean Highway Pty Ltd v Abnote Australasia Pty Ltd [2009] VSCA 308 -
1144 Nepean Highway Pty Ltd v Abnote Australasia Pty Ltd [2009] VSCA 308 -
Crawley v Short [2009] NSWCA 410 (16 December 2009) (Allsop P; Macfarlan JA; Young JA)

Hospital Products Ltd v United States Surgical Corporation [1984] HCA 64; 156 CLR 41 In re Gold Company

Crawley v Short [2009] NSWCA 410 (16 December 2009) (Allsop P; Macfarlan JA; Young JA)

103 His Honour quoted and discussed key passages from the leading cases in this area of the law including *Hospital Products Ltd v United States Surgical Corporation* [1984] HCA 64; 156 CLR 41, per Mason J at 96-97; *Coleman v Myers* [1977] 2 NZLR 225 and *Charlton v Baber* (2003) 47 ACSR 31 at [17] per Barrett J.

Gangemi v Osborne [2009] VSCA 297 -
Centennial Coal Company Ltd v Xstrata Coal Pty Ltd [2009] NSWCA 341 (16 October 2009) (Hodgson, Tobias and Campbell JJA)

26 He gave the following reasons for rejecting these submissions:

[25] As Mr Meagher SC for the plaintiffs emphasises, cl 8.6(b) is not, in terms or in effect, an obligation to "ensure that the novation and transfer occurs as soon as reasonably practicable"; it is an obligation to "use all reasonable endeavours" to that end.

[26] While the content of a "best endeavours" clause depends upon the particular obligation and the circumstances in which it was undertaken, it posits an objective standard to be addressed by reference to what was done or not done in the circumstances that existed; it requires the doing of what can reasonably be done in the circumstances to achieve the contractual object [ *Hospital Products Ltd v United State Surgical Corporation* ( 1984) 156 CLR 41 at 64–65 , 91–92 and 118 ]. It necessarily includes an obligation not to hinder or prevent achievement of the contractual object [ *Hospital Products* , 64–65 (Gibbs CJ), 95 (Mason J)]. The obligation continues until the obligor "should reasonably judge in the circumstances that further efforts would have such remote prospects of success that they are simply likely to be wasted" [ *Hawkins v Pender Bros Pty Ltd* [1990] I Qd R 135 at 150–151 and 152 ]; however, one must allow for events, including extraordinary events, as they unfold, as Lewison J said in *Yewbelle Ltd v London Green Developments Ltd* [2006] EWHC 3166 (Ch) (at [123] ); affirmed [2007] EWCACiv 475 [29], [33], [122], [124]] (emphasis added):

> I come back to the question: for how long must the seller continue to use reasonable endeavours to achieve the desired result? In his opening address, Mr Morgan said that the obligation to use reasonable endeavours requires you to go on using endeavours until the point is reached when all reasonable endeavours have been exhausted. You would simply be repeating yourself to go through the same matters again. I am prepared to accept this formulation, *subject to the qualification that account must be taken of events as they unfold, including extraordinary events* .

[27] Centennial Coal and Hunter submit that such an obligation may be discharged by performance, in circumstances where there is nothing reasonably available to be done which has a realistic chance of achieving that outcome. However, this proposition must be subject at least to the following qualifications: first, that such endeavours as could be made to achieve the outcome have been made; and secondly, that even though there may be no realistic chance of achieving the contractual object presently, regard must be had to the possibility of that situation changing — to what extent and for how long that will be so will depend on the contractual context in each individual case.

[28] In the present case, the relevant contractual object was the transfer of Centennial's shareholding and capacity entitlement to Mangoola. Other than invoking the Sch 7 procedure, one way in which that object could have been — and still could be — achieved is if the other parties to the NCIG Shareholders Agreement waived their pre-emptive rights. Seeking the agreement of the other shareholders to that course would ordinarily be a reasonable step towards achieving the contractual object, and one that an obligation to use "all reasonable endeavours" would require be taken. It

has not been taken, Centennial Hunter having formed the view that the other shareholders would not agree. Xstrata does not assert the contrary. In those circumstances, it cannot be said that Centennial Hunter has failed to use all reasonable endeavours by not seeking the agreement of the other NCIG shareholders to the transfer and novation. Xstrata has suggested two other means (apart from the Sch 7 procedure) by which the contractual object might be achieved. It is unnecessary for me to examine them in detail; I am unconvinced that either could lawfully achieve the contractual object, and it follows that I am unsatisfied that they would be "reasonable endeavours". In those circumstances, Centennial contends that the only way in which the contractual object could be achieved is by invoking the Sch 7 procedure, that its invocation is a "reasonable endeavour" to secure the contractual object, that it has done everything it can to invoke it, and that Mangoola is obliged to co-operate in it but has failed to do so.

[29] However, the purpose of the Sch 7 procedure is to permit existing shareholders in NCIG to acquire shares from any shareholder who wishes to sell, in priority to an external party. If a low transfer price were nominated, there would be a very substantial probability that the shares would be snapped up by the existing NCIG shareholders, and not transferred to Mangoola at all. If so high a price were nominated as to deter other existing shareholders, Mangoola would become obliged to pay — and Centennial entitled to receive — a very substantial premium over and above the consideration provided for by the Anvil Hill Asset Sale Deed. It is impossible to see how the invocation of a procedure which in all probability will result in the shares and ship-or-pay agreements being transferred to other existing shareholders and not to Mangoola, or at best Mangoola having to pay a substantial consideration over and above that in the Asset Sale Deed, could be a reasonable endeavour to achieve the contractual object. To the contrary, its likely consequence would be to defeat the contractual object by resulting in the shares and ship-or-pay agreements being transferred to persons other than Mangoola. To invoke such a procedure would be contrary to Centennial Hunter's obligations under cl 8.6(c)(i) and (ii). Far from being a "reasonable endeavour" to achieve the contractual object that Hunter is obliged to take, it would be calculated to defeat the contractual object and prohibited.

[30] It also follows that the Sch 7 procedure is not one in which Mangoola is obliged to cooperate. Accordingly, its refusal to cooperate is not a breach of its obligations under cl 8.6(b), and does not discharge Hunter from its obligation.

[31] It follows that, other than by seeking consent — which both parties appear to accept would at present be futile — there is no reasonable step which Centennial could take to procure the transfer and novation. The plaintiffs contend that the result is that they are discharged by performance.

[32] However, that there is no step that can presently be taken to that end is not to say that reasonable endeavours to achieve the result "as soon as reasonably practicable after completion" have been exhausted, so as to discharge the obligation. It may be accepted that Centennial Hunter is not in breach of its obligation to use "best endeavours" under cl 8.6(a) and (b). But breach and discharge by performance are not the only possibilities; a party may be not in breach of a contractual obligation, and still not yet have been discharged from that obligation by performance. Just because novation and transfer are not presently reasonably practicable does not mean that the position is forever frozen. The evidence shows that there are currently on foot negotiations in relation to the implementation of a long-term solution for access to and the expansion of export capacity at the port. The climate for obtaining consent from the other NCIG shareholders may change, and some other commercial realignment of interests may emerge, presenting an opportunity not presently perceived for a transfer: these possibilities are, at least in the context of this case, within the concept of "events, including extraordinary events, as they unfold" referred to by Lewison J in *Yewbelle Ltd v London Green Developments Ltd* , in the passage cited above.

[33] In this respect, context is of importance. It is not as if the parties did not give consideration to and make provision for the circumstance that it might be impracticable and remain impracticable for the novation and transfer to take place. Indeed, it was because they recognised the difficulties in securing that end that they adopted the "reasonable endeavours" approach, and the interim arrangements in cl 8.6 (c). Together, cll 8.6(a), (b) and (c) recognise that it may not be reasonably practicable to effect the novation and transfer upon completion. Clause 8.6(b) appears in the context of the remainder of cl 8.6, which involves ongoing mutual obligations of each party, unless and until they are "excluded" by Mangoola pursuant to cl 8.6(e). Clause 8.6(c) is intended to achieve the contractual object to the best of the parties' ability, unless and until the novation and transfer takes place, or the NCIG arrangements are excluded under 8.6(e). The obligation imposed by cl 8.6(b) is to use all reasonable endeavours to ensure that the novation and transfer occurs "as soon as reasonably practicable after completion". The obligation to use reasonable endeavours is connected with the state of affairs that the novation and transfer be "reasonably practicable". The evidence establishes that it was not at completion, and is not now (and in the interim has not been) "reasonably practicable" to effect the novation and transfer. If and when it becomes "reasonably practicable", cl 8.6(b) will oblige Centennial then to use reasonable endeavours to effect it. Unless and until that happens, cl 8.6(c) operates to govern the position.

[34] In my view, therefore, the obligation imposed by cl 8.6(b) is an on-going one which subsists until a novation and

transfer is achieved, or the NCIG arrangements are excluded under cl 8.6(e). Clause 8.6(c) regulates the relevant arrangements in the meantime.

[35] I also reject the submission about cl 8.6(c) — that the obligations in cl 8.6(c) are subsidiary to the "paramount" obligations in cll 8.6(a) and (b) and are intended to preserve the utility and value of the shares and contractual rights and obligations the subject of those clauses only so long as the obligations in cl 8.6(a) and (b) continue — for the following reasons.

[36] *First* and foremost, even if the submission were otherwise correct, for the reasons already advanced Hunter has not been discharged from its obligations under cl 8.6(b), which subsist.

[37] *Secondly* , cl 8.6(c) expressly applies "where the novation and transfer of shares required under cl 8.6(a) has not occurred on and with effect from completion". It contains no hint that it is to cease to apply if the parties cannot effect a novation or transfer after completion.

[38] *Thirdly* , the parties provided by cl 8.6(e) for Mangoola — but not Hunter — to have the ability to exclude the NCIG Arrangements, whereupon cl 8.6(c) would cease to apply. That provision would be superfluous if cl 8.6(c) expired automatically upon discharge of the obligations to use "all reasonable endeavours" under cl 8.6(a) and (b).

[39] *Fourthly* , a reasonable person with knowledge of the facts known to both parties would conclude that they intended the obligation imposed by cl 8.6(c) to subsist, even if "reasonable endeavours" did not result in a novation and transfer under cll 8.6(a) or (b), or that such novation and transfer never became "reasonably practicable". Part of the factual matrix known to both parties when the Anvil Hill Asset Sale Deed was agreed was that there were significant capacity constraints at the port; under the Asset Sale Deed Xstrata acquired a new coal mine for which port capacity would be required; initially, the parties contemplated including Centennial's interest in NCIG in the sale, but because of the contractual difficulties imposed by the NCIG Heads of Agreement sought an alternative solution; that alternative solution involved Centennial agreeing to make capacity available through NCIG for the output of the Anvil Hill Mine; and when the sale deed was negotiated, the NCIG terminal was not expected to be operational until late 2009, when Anvil Hill itself was expected to commence production, some two years after completion — so that cl 8.6(c)(iv) was always intended to operate, if at all, some years after completion.

[40] Centennial urged that such a construction would leave it in a position of uncertainty in the longer term, with on-going and indeterminate obligations under the ship-or-pay agreement, but potentially no ability to use its capacity entitlement at NCIG because of the on-going obligation to

make it available for Mangoola for out-put from the Anvil Hill Mine, with the consequence that it could not rely on its capacity entitlement at NCIG for output from its own Newstan and Mandalong mines. I do not find this persuasive, for multiple reasons: (1) if the contractual object were achieved and the transfer and novation effected, Centennial would have exactly the same problem with access to port capacity for coal extracted from Newstan and Mandalong; (2) the PWCS facility is a common user facility, and it is not self-evident that capacity would not be available to Centennial through PWCS — the mere possibility that its accessibility to NCIG shareholders might in the future be reduced is not a compelling consideration; and (3) in any event, this was a billion dollar deal, and the assumption of some commercial risk by Centennial in return is far from incomprehensible. Far more telling, in my judgment, is that for the acquisition of Anvil Hill to be a commercial proposition, shipping capacity was necessary; conceptually, the Anvil Hill project had included as an aspect the securing of shipping capacity through NCIG, and Anvil Hill was to come on line at about the same time as NCIG; the parties initially contemplated including Centennial's interest in NCIG in the asset sale, and when that proved impracticable — having regard to the terms of the NCIG Heads of Agreement — substituted an alternative mechanism for the purpose of securing, so far as they were able to do so without contravening existing obligations, access to capacity through the NCIG terminal so long as the transfer of shares and novation of the ship-or-pay agreement had not taken place.

[41] It follows that cl 8.6(c) is not temporarily limited the way in which the plaintiffs contend. It was intended to be of indeterminate operation, to secure to Mangoola as best as the parties were able, in the context of existing legal constraints, access to capacity at the NCIG terminal, unless and until there was a transfer and novation, or the NCIG arrangements were excluded by Mangoola.

[42] It follows that the plaintiffs' claims for declarations to the effect that they have no further obligations under cl 8.6(a), (b) and (c) fail. My conclusion that invocation of the Sch 7 procedure is not a "reasonable endeavour" within cl 8.6(b) sufficiently disposes of the alternative claim, insofar as it was pressed, for specific performance, by which the plaintiffs contended that the defendants ought to be required to provide the requisite information to facilitate the preparation and issue of an assignment notice to trigger the Sch 7 procedure.

### Issues on appeal

Centennial Coal Company Ltd v Xstrata Coal Pty Ltd [2009] NSWCA 341 (16 October 2009) (Hodgson, Tobias and Campbell JJA)

26 He gave the following reasons for rejecting these submissions:

[25] As Mr Meagher SC for the plaintiffs emphasises, cl 8.6(b) is not, in terms or in effect, an obligation to "ensure that the novation and transfer occurs as soon as reasonably

practicable ; it is an obligation to "use all reasonable endeavours" to that end.

[26] While the content of a "best endeavours" clause depends upon the particular obligation and the circumstances in which it was undertaken, it posits an objective standard to be addressed by reference to what was done or not done in the circumstances that existed; it requires the doing of what can reasonably be done in the circumstances to achieve the contractual object [ *Hospital Products Ltd v United State Surgical Corporation* ( 1984) 156 CLR 41 at 64–65, 91–92 and 118 ]. It necessarily includes an obligation not to hinder or prevent achievement of the contractual object [ *Hospital Products* , 64–65 (Gibbs CJ), 95 (Mason J)]. The obligation continues until the obligor "should reasonably judge in the circumstances that further efforts would have such remote prospects of success that they are simply likely to be wasted" [ *Hawkins v Pender Bros Pty Ltd* [1990] 1 Qd R 135 at 150–151 and 152 ]; however, one must allow for events, including extraordinary events, as they unfold, as Lewison J said in *Yewbelle Ltd v London Green Developments Ltd* [2006] EWHC 3166 (Ch) (at [123] ); affirmed [2007] EWCACiv 475 [29], [33], [122], [124]] (emphasis added):

> I come back to the question: for how long must the seller continue to use reasonable endeavours to achieve the desired result? In his opening address, Mr Morgan said that the obligation to use reasonable endeavours requires you to go on using endeavours until the point is reached when all reasonable endeavours have been exhausted. You would simply be repeating yourself to go through the same matters again. I am prepared to accept this formulation, *subject to the qualification that account must be taken of events as they unfold, including extraordinary events* .

[27] Centennial Coal and Hunter submit that such an obligation may be discharged by performance, in circumstances where there is nothing reasonably available to be done which has a realistic chance of achieving that outcome. However, this proposition must be subject at least to the following qualifications: first, that such endeavours as could be made to achieve the outcome have been made; and secondly, that even though there may be no realistic chance of achieving the contractual object presently, regard must be had to the possibility of that situation changing — to what extent and for how long that will be so will depend on the contractual context in each individual case.

[28] In the present case, the relevant contractual object was the transfer of Centennial's shareholding and capacity entitlement to Mangoola. Other than invoking the Sch 7 procedure, one way in which that object could have been — and still could be — achieved is if the other parties to the NCIG Shareholders Agreement waived their pre-emptive rights. Seeking the agreement of the other shareholders to that course would ordinarily be a reasonable step towards achieving the contractual object, and one that an obligation to use "all reasonable endeavours" would require be taken. It has not been taken, Centennial Hunter having formed the view that the other shareholders would not agree. Xstrata does not assert the contrary. In those circumstances, it cannot

be said that Centennial Hunter has failed to use all reasonable endeavours by not seeking the agreement of the other NCIG shareholders to the transfer and novation. Xstrata has suggested two other means (apart from the Sch 7 procedure) by which the contractual object might be achieved. It is unnecessary for me to examine them in detail; I am unconvinced that either could lawfully achieve the contractual object, and it follows that I am unsatisfied that they would be "reasonable endeavours". In those circumstances, Centennial contends that the only way in which the contractual object could be achieved is by invoking the Sch 7 procedure, that its invocation is a "reasonable endeavour" to secure the contractual object, that it has done everything it can to invoke it, and that Mangoola is obliged to co-operate in it but has failed to do so.

[29] However, the purpose of the Sch 7 procedure is to permit existing shareholders in NCIG to acquire shares from any shareholder who wishes to sell, in priority to an external party. If a low transfer price were nominated, there would be a very substantial probability that the shares would be snapped up by the existing NCIG shareholders, and not transferred to Mangoola at all. If so high a price were nominated as to deter other existing shareholders, Mangoola would become obliged to pay — and Centennial entitled to receive — a very substantial premium over and above the consideration provided for by the Anvil Hill Asset Sale Deed. It is impossible to see how the invocation of a procedure which in all probability will result in the shares and ship-or-pay agreements being transferred to other existing shareholders and not to Mangoola, or at best Mangoola having to pay a substantial consideration over and above that in the Asset Sale Deed, could be a reasonable endeavour to achieve the contractual object. To the contrary, its likely consequence would be to defeat the contractual object by resulting in the shares and ship-or-pay agreements being transferred to persons other than Mangoola. To invoke such a procedure would be contrary to Centennial Hunter's obligations under cl 8.6(c)(i) and (ii). Far from being a "reasonable endeavour" to achieve the contractual object that Hunter is obliged to take, it would be calculated to defeat the contractual object and prohibited.

[30] It also follows that the Sch 7 procedure is not one in which Mangoola is obliged to cooperate. Accordingly, its refusal to cooperate is not a breach of its obligations under cl 8.6(b), and does not discharge Hunter from its obligation.

[31] It follows that, other than by seeking consent — which both parties appear to accept would at present be futile — there is no reasonable step which Centennial could take to procure the transfer and novation. The plaintiffs contend that the result is that they are discharged by performance.

[32] However, that there is no step than can presently be taken to that end is not to say that reasonable endeavours to achieve the result "as soon as reasonably practicable after

completion" have been exhausted, so as to discharge the obligation. It may be accepted that Centennial Hunter is not in breach of its obligation to use "best endeavours" under cl 8.6(a) and (b). But breach and discharge by performance are not the only possibilities; a party may be not in breach of a contractual obligation, and still not yet have been discharged from that obligation by performance. Just because novation and transfer are not presently reasonably practicable does not mean that the position is forever frozen. The evidence shows that there are currently on foot negotiations in relation to the implementation of a long-term solution for access to and the expansion of export capacity at the port. The climate for obtaining consent from the other NCIG shareholders may change, and some other commercial realignment of interests may emerge, presenting an opportunity not presently perceived for a transfer: these possibilities are, at least in the context of this case, within the concept of "events, including extraordinary events, as they unfold" referred to by Lewison J in *Yewbelle Ltd v London Green Developments Ltd* , in the passage cited above.

[33] In this respect, context is of importance. It is not as if the parties did not give consideration to and make provision for the circumstance that it might be impracticable and remain impracticable for the novation and transfer to take place. Indeed, it was because they recognised the difficulties in securing that end that they adopted the "reasonable endeavours" approach, and the interim arrangements in cl 8.6 (c). Together, cll 8.6(a), (b) and (c) recognise that it may not be reasonably practicable to effect the novation and transfer upon completion. Clause 8.6(b) appears in the context of the remainder of cl 8.6, which involves ongoing mutual obligations of each party, unless and until they are "excluded" by Mangoola pursuant to cl 8.6(e). Clause 8.6(c) is intended to achieve the contractual object to the best of the parties' ability, unless and until the novation and transfer takes place, or the NCIG arrangements are excluded under 8.6(e). The obligation imposed by cl 8.6(b) is to use all reasonable endeavours to ensure that the novation and transfer occurs "as soon as reasonably practicable after completion". The obligation to use reasonable endeavours is connected with the state of affairs that the novation and transfer be "reasonably practicable". The evidence establishes that it was not at completion, and is not now (and in the interim has not been) "reasonably practicable" to effect the novation and transfer. If and when it becomes "reasonably practicable", cl 8.6(b) will oblige Centennial then to use reasonable endeavours to effect it. Unless and until that happens, cl 8.6(c) operates to govern the position.

[34] In my view, therefore, the obligation imposed by cl 8.6(b) is an on-going one which subsists until a novation and transfer is achieved, or the NCIG arrangements are excluded under cl 8.6(e). Clause 8.6(c) regulates the relevant arrangements in the meantime.

[35] I also reject the submission about cl 8.6(c) — that the obligations in cl 8.6(c) are subsidiary to the "paramount" obligations in cll 8.6(a) and (b) and are intended to preserve the utility and value of the shares and contractual rights and obligations the subject of those clauses only so long as the obligations in cl 8.6(a) and (b) continue — for the following reasons.

[36] *First* and foremost, even if the submission were otherwise correct, for the reasons already advanced Hunter has not been discharged from its obligations under cl 8.6(b), which subsist.

[37] *Secondly* , cl 8.6(c) expressly applies "where the novation and transfer of shares required under cl 8.6(a) has not occurred on and with effect from completion". It contains no hint that it is to cease to apply if the parties cannot effect a novation or transfer after completion.

[38] *Thirdly* , the parties provided by cl 8.6(e) for Mangoola — but not Hunter — to have the ability to exclude the NCIG Arrangements, whereupon cl 8.6(c) would cease to apply. That provision would be superfluous if cl 8.6(c) expired automatically upon discharge of the obligations to use "all reasonable endeavours" under cl 8.6(a) and (b).

[39] *Fourthly* , a reasonable person with knowledge of the facts known to both parties would conclude that they intended the obligation imposed by cl 8.6(c) to subsist, even if "reasonable endeavours" did not result in a novation and transfer under cll 8.6(a) or (b), or that such novation and transfer never became "reasonably practicable". Part of the factual matrix known to both parties when the Anvil Hill Asset Sale Deed was agreed was that there were significant capacity constraints at the port; under the Asset Sale Deed Xstrata acquired a new coal mine for which port capacity would be required; initially, the parties contemplated including Centennial's interest in NCIG in the sale, but because of the contractual difficulties imposed by the NCIG Heads of Agreement sought an alternative solution; that alternative solution involved Centennial agreeing to make capacity available through NCIG for the output of the Anvil Hill Mine; and when the sale deed was negotiated, the NCIG terminal was not expected to be operational until late 2009, when Anvil Hill itself was expected to commence production, some two years after completion — so that cl 8.6(c)(iv) was always intended to operate, if at all, some years after completion.

[40] Centennial urged that such a construction would leave it in a position of uncertainty in the longer term, with on-going and indeterminate obligations under the ship-or-pay agreement, but potentially no ability to use its capacity entitlement at NCIG because of the on-going obligation to make it available for Mangoola for out-put from the Anvil Hill Mine, with the consequence that it could not rely on its

capacity entitlement at NCIG for output from its own Newstan and Mandalong mines. I do not find this persuasive, for multiple reasons: (1) if the contractual object were achieved and the transfer and novation effected, Centennial would have exactly the same problem with access to port capacity for coal extracted from Newstan and Mandalong; (2) the PWCS facility is a common user facility, and it is not self-evident that capacity would not be available to Centennial through PWCS — the mere possibility that its accessibility to NCIG shareholders might in the future be reduced is not a compelling consideration; and (3) in any event, this was a billion dollar deal, and the assumption of some commercial risk by Centennial in return is far from incomprehensible. Far more telling, in my judgment, is that for the acquisition of Anvil Hill to be a commercial proposition, shipping capacity was necessary; conceptually, the Anvil Hill project had included as an aspect the securing of shipping capacity through NCIG, and Anvil Hill was to come on line at about the same time as NCIG; the parties initially contemplated including Centennial's interest in NCIG in the asset sale, and when that proved impracticable — having regard to the terms of the NCIG Heads of Agreement — substituted an alternative mechanism for the purpose of securing, so far as they were able to do so without contravening existing obligations, access to capacity through the NCIG terminal so long as the transfer of shares and novation of the ship-or-pay agreement had not taken place.

[41] It follows that cl 8.6(c) is not temporarily limited the way in which the plaintiffs contend. It was intended to be of indeterminate operation, to secure to Mangoola as best as the parties were able, in the context of existing legal constraints, access to capacity at the NCIG terminal, unless and until there was a transfer and novation, or the NCIG arrangements were excluded by Mangoola.

[42] It follows that the plaintiffs' claims for declarations to the effect that they have no further obligations under cl 8.6(a), (b) and (c) fail. My conclusion that invocation of the Sch 7 procedure is not a "reasonable endeavour" within cl 8.6(b) sufficiently disposes of the alternative claim, insofar as it was pressed, for specific performance, by which the plaintiffs contended that the defendants ought to be required to provide the requisite information to facilitate the preparation and issue of an assignment notice to trigger the Sch 7 procedure.

### Issues on appeal

Centennial Coal Company Ltd v Xstrata Coal Pty Ltd [2009] NSWCA 341 -
Centennial Coal Company Ltd v Xstrata Coal Pty Ltd [2009] NSWCA 341 -
Centennial Coal Company Ltd v Xstrata Coal Pty Ltd [2009] NSWCA 341 -
Centennial Coal Company Ltd v Xstrata Coal Pty Ltd [2009] NSWCA 341 -
Centennial Coal Company Ltd v Xstrata Coal Pty Ltd [2009] NSWCA 341 -
Centennial Coal Company Ltd v Xstrata Coal Pty Ltd [2009] NSWCA 341 -
Chen v Marcolongo [2009] NSWCA 326 (13 October 2009) (Allsop P, Giles and Young JJA)
    Hospital Products Ltd v United States Surgical Corporation [1984] HCA 64 ; 156 CLR 41
    In re Carl Hirth; Ex parte The Trustee

Chen v Marcolongo [2009] NSWCA 326 (13 October 2009) (Allsop P; Giles and Young JJA)

145 Mr Pritchard and Mr Hewitt put that the first inquiry must always be into the scope of any alleged fiduciary duty. They quote from the judgment of Mason J in *Hospital Products Ltd v United States Surgical Corporation* [1984] HCA 64; 156 CLR 41 at 98 where his Honour said, when contrasting a general fiduciary relationship with a more limited fiduciary relationship that:

> "It is well settled that a person may be a fiduciary in some activities but not in others."

This is a helpful statement with respect to the difference between a general fiduciary and a limited fiduciary but does not really address the question as to whether Mr Chen should in the present case be considered to be a limited fiduciary or a general fiduciary.

Settlement Agents Supervisory Board v Property Settlement Services Pty Ltd [2009] WASCA 143  -
Settlement Agents Supervisory Board v Property Settlement Services Pty Ltd [2009] WASCA 143  -
Settlement Agents Supervisory Board v Property Settlement Services Pty Ltd [2009] WASCA 143  -
Settlement Agents Supervisory Board v Property Settlement Services Pty Ltd [2009] WASCA 143  -
Settlement Agents Supervisory Board v Property Settlement Services Pty Ltd [2009] WASCA 143  -
Settlement Agents Supervisory Board v Property Settlement Services Pty Ltd [2009] WASCA 143  -
United Group Rail Services Ltd v Rail Corporation New South Wales [2009] NSWCA 177  -
United Group Rail Services Ltd v Rail Corporation New South Wales [2009] NSWCA 177  -
White City Tennis Club Ltd v John Alexander's Clubs Pty Ltd [2009] NSWCA 114 (03 June 2009) (Giles JA at 1; Basten JA at 2; Macfarlan JA at 3)

Hospital Products Ltd v United States Surgical Corporation [1984] HCA 64 ; (1984) 156 CLR 41
Lennard's Carrying Co Ltd v Asiatic Petroleum Co Ltd

White City Tennis Club Ltd v John Alexander's Clubs Pty Ltd [2009] NSWCA 114 (03 June 2009) (Giles JA at 1; Basten JA at 2; Macfarlan JA at 3)

71 Even if the MOU was validly terminated and the Club did not have enforceable contractual rights in respect of the options after the termination, the remedy of a constructive trust was in my view still available to the Club. Although relevant contractual rights are undoubtedly of assistance to a plaintiff, the ultimate question to be addressed in relation to the imposition of a constructive trust is whether the holder of the legal title to the property in question "may not in good conscience retain the beneficial interest" (*Jacobs' Law of Trusts* at [1301] quoting Cardozo CJ in *Beatty v Guggenheim Exploration Co* (1919) 122 NE 378 at 380 see also *Hospital Products Ltd v United States Surgical Corporation* [1984] HCA 64; (1984) 156 CLR 41 at 108 ).

White City Tennis Club Ltd v John Alexander's Clubs Pty Ltd [2009] NSWCA 114 (03 June 2009) (Giles JA at 1; Basten JA at 2; Macfarlan JA at 3)

84 It is not necessary to enquire whether the relationship generally between JACS and the Club was fiduciary in character. It is sufficient to consider whether in exercising the option which the MOU contemplated may later be acquired, JACS was to be subject to a fiduciary duty owed to the Club to exercise it in a particular manner. As Mason J pointed out in *Hospital Products* , the fact that a general fiduciary relationship does not exist "does not exclude the existence of a more limited fiduciary relationship for it is well settled that a person may be a fiduciary in some activities but not in others ..." (at 98 , citations omitted).

White City Tennis Club Ltd v John Alexander's Clubs Pty Ltd [2009] NSWCA 114  -
White City Tennis Club Ltd v John Alexander's Clubs Pty Ltd [2009] NSWCA 114  -
Mantonella Pty Ltd v Thompson [2009] QCA 80  -
Gough & Gilmour Holdings Pty Ltd v Peter Campbell Earthmoving Pty Ltd [2009] NSWCA 37 (11 March 2009) (McColl JA ; Macfarlan JA; Sackville AJA)

Hospital Products Ltd v United States Surgical Corporation [1984] HCA 64 ; (1984) 156 CLR 41
Oscar Chess Ltd v Wiliams

**Gough & Gilmour Holdings Pty Ltd v Peter Campbell Earthmoving Pty Ltd** [2009] NSWCA 37 (11 March 2009) (McColl JA ; Macfarlan JA; Sackville AJA)

> 55 In order to determine whether the FOCUS Contracts included a Minimum Available Hours Warranty, his Honour considered it appropriate to apply the test used to determine whether a representation made in pre-contractual negotiations form part of the main contract or constituted a collateral warranty. On this basis, the relevant test was whether the representation was reasonably considered by the person to whom it was made as intended to constitute a contractual promise: *Hospital Products Ltd v United States Surgical Corporation* [1984] HCA 64; (1984) 156 CLR 41 at 61, per Gibbs CJ . The intention of the parties was to be deduced from the conduct of the parties, their words and behaviour, as assessed by an intelligent bystander: *Oscar Chess Ltd v Williams* [1957] 1 WLR 370 at 375, per Lord Denning MR.

**Trinkler v Beale** [2009] NSWCA 30 (02 March 2009) (Giles JA ; Macfarlan JA ; Gyles AJA)
Hospital Products Ltd v United States Surgical Corporation [1984] HCA 64 ; (1984) 156 CLR 41
Law v Law

**Trinkler v Beale** [2009] NSWCA 30 (02 March 2009) (Giles JA ; Macfarlan JA ; Gyles AJA)

> 45. In *Hospital Products Limited v United States Surgical Corporation* [1984] HCA 64; (1984) 156 CLR 41, Mason J said that the critical feature of traditional fiduciary relations:
>
> > "[I]s that the fiduciary undertakes or agrees to act for or on behalf of or in interests of another person in the exercise of a power or discretion which will affect the interests of that other person in a legal or practical sense. The relationship between the parties is therefore one which gives the fiduciary a special opportunity to exercise the power or discretion to the detriment of that other person who is accordingly vulnerable to abuse by the fiduciary of his position" (at 96-7).

Trinkler v Beale [2009] NSWCA 30 -
Trinkler v Beale [2009] NSWCA 30 -
Trinkler v Beale [2009] NSWCA 30 -
Trinkler v Beale [2009] NSWCA 30 -
Trinkler v Beale [2009] NSWCA 30 -
Trinkler v Beale [2009] NSWCA 30 -
Counties Manukau Pacific Trust v Manukau City Council HC Auckland CIV 2008-404-003214 [2009] NZHC 231 -
Counties Manukau Pacific Trust v Manukau City Council HC Auckland CIV 2008-404-003214 [2009] NZHC 231 -
Secure Parking (WA) Pty Ltd v Wilson [2008] WASCA 268 -
Secure Parking (WA) Pty Ltd v Wilson [2008] WASCA 268 -
Secure Parking (WA) Pty Ltd v Wilson [2008] WASCA 268 -
Secure Parking (WA) Pty Ltd v Wilson [2008] WASCA 268 -
Secure Parking (WA) Pty Ltd v Wilson [2008] WASCA 268 -
Quince v Varga [2008] QCA 376 -
Quince v Varga [2008] QCA 376 -
Joyce v Palassis [2008] WASCA 151 (21 July 2008) (Pullin JA ; Buss JA)
Hospital Products Ltd v United States Surgical Corporation (1984) 156 CLR 41
Pilmer v Duke Group Ltd (in liq)

Joyce v Palassis [2008] WASCA 151 (21 July 2008) (Pullin JA ; Buss JA)
Hospital Products Ltd v United States Surgical Corporation (1984) 156 CLR 41
Pilmer v Duke Group Ltd (in liq)

Joyce v Palassis [2008] WASCA 191

Rigg v Sheridan [2008] NSWCA 79 (05 May 2008) (Beazley JA ; Giles JA ; Handley AJA)
    Hospital Products Ltd v United States Surgical Corporation [1984] HCA 64
    Bristol and West Building Society v Mothew

Rigg v Sheridan [2008] NSWCA 79 (05 May 2008) (Beazley JA ; Giles JA ; Handley AJA)

    41 This Court noted in *Beach Petroleum* that Lord Upjohn's statement in the later case had been
    cited with approval by the Privy Council in *Queensland Mines Ltd v Hudson* (1978) 52 ALJR 399, 400,
    and in *Hospital Products Ltd v United States Surgical Corporation* [1984] HCA 64, 156 CLR 41 at para [85]
    per Mason J , with whom Deane J agreed. Theirs were dissenting judgments on the fiduciary issue
    but they are persuasive on the present point. Gibbs CJ and Dawson J who formed part of the
    majority also quoted extensively from the speech of Lord Upjohn in *Phipps v Boardman* (above).

Fubilan Catering Services Limited (Incorporated in PNG) v Compass Group (Australia) Pty Ltd [2008]
FCAFC 53  -
Glover v Blumer [2008] ACTCA 1  -
Glover v Blumer [2008] ACTCA 1  -
Glover v Blumer [2008] ACTCA 1  -
Mr Whippy Pty Ltd v Oceanwalk Pty Ltd [2008] NSWCA 8 (19 February 2008) (Giles JA at 1; Handley
AJA at 90; Howie J at 91)
    Hospital Products Ltd v United Surgical Corporation (1984) 156 CLR 41 ;

Mr Whippy Pty Ltd v Oceanwalk Pty Ltd [2008] NSWCA 8  -
Wolseley Investments Pty Ltd v Gillespie [2007] NSWCA 358 (12 December 2007) (Santow JA at 1; Ipp JA
at 86; Tobias JA at 87)
    Hospital Products Ltd v United States Surgical Corp (1984) 156 CLR 41
    Marks v Lilley

Wolseley Investments Pty Ltd v Gillespie [2007] NSWCA 358  -
Waters Lane v Sweeney [2007] NSWCA 200 (16 August 2007) (Giles JA; Santow JA; Tobias JA)
    Hospital Products Ltd v United States Surgical Corp (1984) 156 CLR 41
    Hungry Jack's Pty Ltd v Burger King Corp

Waters Lane v Sweeney [2007] NSWCA 200  -
Waters Lane v Sweeney [2007] NSWCA 200  -
Waters Lane v Sweeney [2007] NSWCA 200  -
Kalls Enterprises Pty Ltd (in liq) v Baloglow [2007] NSWCA 191  -
Kalls Enterprises Pty Ltd (in liq) v Baloglow [2007] NSWCA 191  -
Wyllie v Tarrison Pty Ltd [2007] NSWCA 184  -
Wyllie v Tarrison Pty Ltd [2007] NSWCA 184  -
Wyllie v Tarrison Pty Ltd [2007] NSWCA 184  -
Mana v Fleming [2007] NZCA 324  -
Mana v Fleming [2007] NZCA 324  -
Ismail-Zai v The State of Western Australia [2007] WASCA 150  -
Ismail-Zai v The State of Western Australia [2007] WASCA 150  -
Mavaddat v Lee [2007] WASCA 141  -
Mavaddat v Lee [2007] WASCA 141  -
Mavaddat v Lee [2007] WASCA 141  -
Mavaddat v Lee [2007] WASCA 141  -
Mavaddat v Lee [2007] WASCA 141  -
Townsend v Roussety & Co (WA) Pty Ltd [2007] WASCA 40  -
Townsend v Roussety & Co (WA) Pty Ltd [2007] WASCA 40  -
Townsend v Roussety & Co (WA) Pty Ltd [2007] WASCA 40  -
Townsend v Roussety & Co (WA) Pty Ltd [2007] WASCA 40  -
Townsend v Roussety & Co (WA) Pty Ltd [2007] WASCA 40  -
Brooker v Friend & Brooker Pty Ltd [2006] NSWCA 385 (20 December 2006) (Mason P; McColl JA;
Basten JA)

144. Indeed, on appeal, the argument that the relationship between the parties was a partnership was but faintly pressed. Rather Mr Forster's submissions focused more on whether, having regard to the proposition that the relationship was one of quasi-partnership, as the respondent conceded through his counsel, there was a fiduciary relationship between the parties, exposing them to an obligation to account in relation to personal borrowings. He contended that that quasi-partnership relationship was established by the para 8 conversations and persisted despite the incorporation of the company, or came into existence as a result, in particular, of the course of personal borrowings undertaken when the company was in parlous financial circumstances. He relied upon the propositions that a fiduciary relationship with attendant fiduciary obligations may, and ordinarily will, exist between prospective partners who have embarked upon the conduct of the partnership business or venture before the precise terms of any partnership agreement have been settled (*United Dominions Corporation Ltd v Brian Pty Ltd* [1985] HCA 49; (1985) 157 CLR 1 at 12 ) and that partners normally stand in a fiduciary relationship to one another: *Birtchnell v. Equity Trustees, Executors and Agency Co Ltd* (at 407) per Dixon J; *Hospital Products Ltd v United States Surgical Corporation* (at 68 ) per Gibbs CJ. He also argued that there was a joint venture between the parties with attendant fiduciary obligations. Having regard to the conclusion I have reached concerning the quasi-partnership argument, it is unnecessary to deal with the joint venture argument.

*Brooker v Friend & Brooker Pty Ltd* [2006] NSWCA 385 (20 December 2006) (Mason P; McColl JA; Basten JA)

147. A fiduciary relationship may exist notwithstanding the fact that the parties are in a contractual relationship ( *Hospital Products Ltd v United States Surgical Corporation* at 97 , per Mason J ; *Moorgate Tobacco Co Ltd v Philip Morris Ltd (No2)* (1984) 156 CLR 414 at 436, per Deane J), as, too, may a joint venture attracting fiduciary obligations carried out through a medium other than a partnership, such as a company, a trust, an agency or joint ownership: *United Dominions Corporation Ltd v Brian Pty Ltd* (at 10 – 11), per Mason, Brennan and Deane JJ.

*Brooker v Friend & Brooker Pty Ltd* [2006] NSWCA 385 (20 December 2006) (Mason P; McColl JA; Basten JA)

154. No doubt it was their primary intention that such borrowings would be repaid using company funds, but that does not preclude a finding that they were subject to a fiduciary obligation to be equally and personally liable to each other for losses flowing from personal borrowings. Such a finding is consistent with the understanding upon which they embarked upon the business in 1977 or, if not, could be inferred from their conduct once the company got into financial difficulties. They ensured by their joint, but unequal, borrowings from their family and friends that the business could be kept afloat. In this respect they undertook to act in the interests of each other in a manner which affected their interests in a practical sense and, to that extent, in my view stood in a fiduciary relationship: see *Hospital Products Ltd v United States Surgical Corporation* (at 96 – 97 ), per Mason J.

Brooker v Friend & Brooker Pty Ltd [2006] NSWCA 385  -
*Dresna Pty Ltd v Linknarf Management Services Pty Ltd (in liq)* [2006] FCAFC 193 (19 December 2006) (Heerey, Gyles & Bennett JJ)

51. While the categories of relationships which give rise to fiduciary obligations are not closed ( *Hospital Products Ltd v United States Surgical Corporation* (1984) 156 CLR 41 at 68 per Gibbs CJ ), it is hardly surprising that senior counsel for Dresna was unable to point to any case where the relationship between co-litigants, or anything remotely analogous thereto, had given rise to such a relationship. The hazards and inherent uncertainty of litigation are such that parties who join together as plaintiffs, or are joined together as defendants, are likely to be faced with contingencies which compel them to act in their own interests, ignoring the interests of their temporary allies. *Sauve qui peut* often becomes the guiding precept.

Dresna Pty Ltd v Linknarf Management Services Pty Ltd (in liq) [2006] FCAFC 193 (19 December 2006)
(Heerey, Gyles & Bennett JJ)

157.  As was stated in *Hospital Products Ltd v United States Surgical Corporation* (1984) 156 CLR 41 at 68 by Gibbs CJ, there is a difficulty in suggesting a test by which it may be determined that a fiduciary relationship exists outside the accepted categories. The basis of the relationship between Dresna and Franklins was the Mentone BSA. The fact that the arrangement between the parties was of a purely commercial kind is indicative of no fiduciary duty ( *Hospital Products* at 70 ). In *Hospital Products,* Gibbs CJ referred at 71 to the fact that an agreement between parties which was, as here, terminable on reasonable notice argued against such a relationship.  Factors such as a relation of confidence, inequality of bargaining power (considered to be of importance by Dawson J in *Hospital Products* at 142 ), the existence of a duty to be performed and an undertaking to act for another, are not of themselves sufficient to found such a relationship. It is a question of fact in each case (at 72). In discussing the proposition that where two people have dealt with each other as principals neither will be the other's fiduciary, Gibbs CJ commented that the duty did not exist where one party did not undertake, whether by representation or contractual provision, to act solely in the interest of the other and not in its own interest (at 72). Although in dissent on the existence of a fiduciary relationship on the facts in *Hospital Products* , Mason J observed at 97 that a contractual and fiduciary relationship may co-exist but the fiduciary relationship, if it is to exist, must accommodate itself to and be regulated by the terms of contract.

Dresna Pty Ltd v Linknarf Management Services Pty Ltd (in liq) [2006] FCAFC 193 (19 December 2006)
(Heerey, Gyles & Bennett JJ)

157.  As was stated in *Hospital Products Ltd v United States Surgical Corporation* (1984) 156 CLR 41 at 68 by Gibbs CJ, there is a difficulty in suggesting a test by which it may be determined that a fiduciary relationship exists outside the accepted categories. The basis of the relationship between Dresna and Franklins was the Mentone BSA. The fact that the arrangement between the parties was of a purely commercial kind is indicative of no fiduciary duty ( *Hospital Products* at 70 ). In *Hospital Products,* Gibbs CJ referred at 71 to the fact that an agreement between parties which was, as here, terminable on reasonable notice argued against such a relationship.  Factors such as a relation of confidence, inequality of bargaining power (considered to be of importance by Dawson J in *Hospital Products* at 142 ), the existence of a duty to be performed and an undertaking to act for another, are not of themselves sufficient to found such a relationship. It is a question of fact in each case (at 72). In discussing the proposition that where two people have dealt with each other as principals neither will be the other's fiduciary, Gibbs CJ commented that the duty did not exist where one party did not undertake, whether by representation or contractual provision, to act solely in the interest of the other and not in its own interest (at 72). Although in dissent on the existence of a fiduciary relationship on the facts in *Hospital Products* , Mason J observed at 97 that a contractual and fiduciary relationship may co-exist but the fiduciary relationship, if it is to exist, must accommodate itself to and be regulated by the terms of contract.

Dresna Pty Ltd v Linknarf Management Services Pty Ltd (in liq) [2006] FCAFC 193 (19 December 2006)
(Heerey, Gyles & Bennett JJ)

157.  As was stated in *Hospital Products Ltd v United States Surgical Corporation* (1984) 156 CLR 41 at 68 by Gibbs CJ, there is a difficulty in suggesting a test by which it may be determined that a fiduciary relationship exists outside the accepted categories. The basis of the relationship between Dresna and Franklins was the Mentone BSA. The fact that the arrangement between the parties was of a purely commercial kind is indicative of no fiduciary duty ( *Hospital Products* at 70 ). In *Hospital Products,* Gibbs CJ referred at 71 to the fact that an agreement between parties which was, as here, terminable on reasonable notice argued against such a relationship.  Factors such as a relation of confidence, inequality of bargaining power (considered to be of importance by Dawson J in *Hospital Products* at 142 ), the existence of a duty to be performed and an undertaking to act for another, are not of themselves sufficient

to found such a relationship. It is a question of fact in each case (at 72). In discussing the proposition that where two people have dealt with each other as principals neither will be the other's fiduciary, Gibbs CJ commented that the duty did not exist where one party did not undertake, whether by representation or contractual provision, to act solely in the interest of the other and not in its own interest (at 72). Although in dissent on the existence of a fiduciary relationship on the facts in *Hospital Products* , Mason J observed at 97 that a contractual and fiduciary relationship may co-exist but the fiduciary relationship, if it is to exist, must accommodate itself to and be regulated by the terms of contract.

*Dresna Pty Ltd v Linknarf Management Services Pty Ltd (in liq)* [2006] FCAFC 193 (19 December 2006) (Heerey, Gyles & Bennett JJ)

157. As was stated in *Hospital Products Ltd v United States Surgical Corporation* (1984) 156 CLR 41 at 68 by Gibbs CJ, there is a difficulty in suggesting a test by which it may be determined that a fiduciary relationship exists outside the accepted categories. The basis of the relationship between Dresna and Franklins was the Mentone BSA. The fact that the arrangement between the parties was of a purely commercial kind is indicative of no fiduciary duty ( *Hospital Products* at 70 ). In *Hospital Products,* Gibbs CJ referred at 71 to the fact that an agreement between parties which was, as here, terminable on reasonable notice argued against such a relationship. Factors such as a relation of confidence, inequality of bargaining power (considered to be of importance by Dawson J in *Hospital Products* at 142 ), the existence of a duty to be performed and an undertaking to act for another, are not of themselves sufficient to found such a relationship. It is a question of fact in each case (at 72). In discussing the proposition that where two people have dealt with each other as principals neither will be the other's fiduciary, Gibbs CJ commented that the duty did not exist where one party did not undertake, whether by representation or contractual provision, to act solely in the interest of the other and not in its own interest (at 72). Although in dissent on the existence of a fiduciary relationship on the facts in *Hospital Products* , Mason J observed at 97 that a contractual and fiduciary relationship may co-exist but the fiduciary relationship, if it is to exist, must accommodate itself to and be regulated by the terms of contract.

*Southern Wine Corporation Pty Ltd (in Liq) v Perera* [2006] WASCA 275 -
*Southern Wine Corporation Pty Ltd (in Liq) v Perera* [2006] WASCA 275 -
*Southern Wine Corporation Pty Ltd (in Liq) v Perera* [2006] WASCA 275 -
*Price v Powers* [2006] WASCA 262 (30 November 2006) (Martin CJ)
    Hospital Products Ltd v United States Surgical Corporation (1984) 156 CLR 41
    Port of Melbourne Authority v Anshun Pty Ltd

*Price v Powers* [2006] WASCA 262 (30 November 2006) (Martin CJ)
    Hospital Products Ltd v United States Surgical Corporation (1984) 156 CLR 41
    Port of Melbourne Authority v Anshun Pty Ltd

*Price v Powers* [2006] WASCA 262 -
*Price v Powers* [2006] WASCA 262 -
*Zhong v Wang* [2006] NZCA 242 -
*Emu Brewery Mezzanine Ltd (in liq) v Australian Securities and Investments Commission* [2006] WASCA 105 -
*Emu Brewery Mezzanine Ltd (in liq) v Australian Securities and Investments Commission* [2006] WASCA 105 -
*Emu Brewery Mezzanine Ltd (in liq) v Australian Securities and Investments Commission* [2006] WASCA 105 -
*Jackson Nominees Pty Ltd v Hanson Building Products Pty Ltd* [2006] QCA 126 -
*Gibson Motorsport Merchandise Pty Ltd v Forbes* [2006] FCAFC 44 -
*Gibson Motorsport Merchandise Pty Ltd v Forbes* [2006] FCAFC 44 -
*Paper Reclaim Ltd v Aotearoa International Ltd Ca70/04* [2006] NZCA 27 -
*Say-Dee Pty Ltd v Farah Constructions Pty Ltd* [2005] NSWCA 309 -
*Say-Dee Pty Ltd v Farah Constructions Pty Ltd* [2005] NSWCA 309 -

Say-Dee Pty Ltd v Farah Constructions Pty Ltd [2005] NSWCA 309  -
Say-Dee Pty Ltd v Farah Constructions Pty Ltd [2005] NSWCA 309  -
Say-Dee Pty Ltd v Farah Constructions Pty Ltd [2005] NSWCA 309  -
Say-Dee Pty Ltd v Farah Constructions Pty Ltd [2005] NSWCA 309  -
Say-Dee Pty Ltd v Farah Constructions Pty Ltd [2005] NSWCA 309  -
Seven Network (Operations) Ltd v TCN Channel Nine Pty Ltd [2005] FCAFC 144 (08 August 2005)
(Lindgren, Finkelstein and Edmonds JJ)

> *Hospital Products Limited v United States Surgical* Corporation (1984) 156 CLR 41

Seven Network (Operations) Ltd v TCN Channel Nine Pty Ltd [2005] FCAFC 144 (08 August 2005)
(Lindgren, Finkelstein and Edmonds JJ)

94.  The next point is this. Nine's ability to broadcast the film to the public is dependent upon it having permission to do so from the copyright owner or owners: Copyright Act, ss 86, 101 . It has Mr Murray's permission, but he is not the sole owner of the copyright. So Nine also requires the permission of Seven. It does not have that permission directly from Seven. It could only obtain that permission if the licence given to Mr Murray contained an implied term that it could be assigned. Here we look to the presumed intention of the parties and ask whether the putative implied term is necessary for the reasonable or effective operation of the licence: *Hospital Products Limited v United States Surgical* Corporation (1984) 156 CLR 41 . The judge made a finding that is inconsistent with the implication of the supposed term. The finding is that 'if the possibility of any part of the [film] being broadcast on Nine had been raised, it is likely that McPherson would not have agreed to that possibility'.

Eastland Technology Australia Pty Ltd v Whisson [2005] WASCA 144  -
Parramatta Design & Developments Pty Ltd v Concrete Pty Ltd [2005] FCAFC 138 (29 July 2005)
(Branson, Kiefel & Finkelstein JJ)

14.  For a time it was thought that it was necessary in all cases to meet all five conditions. (We put to one side the possibility, based on cases such as *Bank of Nova Scotia v Hellenic Mutual War Risks Association (Bermuda) Ltd* [1990] 1 QB 818 at 895 and 897, that conditions (2) and (3) are alternative). But there has been a sensible retreat from this rigidity. It is now accepted that it is only where the parties have set out their contract in some detail, apparently having covered all aspects, that each condition must be satisfied. Where there is no formal contract complete on its face a more flexible approach is allowed: *Hospital Products Limited v United States Surgical Corporation* (1984) 156 CLR 41 at 121 ; *Hawkins v Clayton* (1988) 164 CLR 539 at 573 ; *Byrne & Frew v Australian Airlines Limited* (1995) 185 CLR 410 at 422-423 . In that kind of case all that is necessary is to show that the term to be implied is necessary for the reasonable or effective operation of the contract in all the circumstances.

Graham-Helwig v The State of Western Australia [2005] WASCA 127 (06 July 2005) (Malcolm CJ, Wheeler JA, Pullin JA)

> Hospital Products Ltd v United States Surgical Corporation (1984) 156 CLR 41
> Parker v McKenna

Graham-Helwig v The State of Western Australia [2005] WASCA 127 (06 July 2005) (Malcolm CJ, Wheeler JA, Pullin JA)

> Hospital Products Ltd v United States Surgical Corporation (1984) 156 CLR 41
> Parker v McKenna

Graham-Helwig v The State of Western Australia [2005] WASCA 127  -
GM & AM Pearce & Co Pty Ltd v Australian Tallow Producers [2005] VSCA 113  -
GM & AM Pearce & Co Pty Ltd v Australian Tallow Producers [2005] VSCA 113  -
GM & AM Pearce & Co Pty Ltd v Australian Tallow Producers [2005] VSCA 113  -
GM & AM Pearce & Co Pty Ltd v Australian Tallow Producers [2005] VSCA 113  -
Lashansky v Bruvecchis Pty Ltd [2005] FCAFC 64 (26 April 2005) (Madgwick, Lander and Crennan JJ)

19. Although the categories of fiduciary relationship are not closed, as noted in *Hospital Products Ltd v United States Surgical Corp* (1984) 156 CLR 41 , the fiduciary relationship which is said to exist between the first and second respondents and the appellant does not fall within any accepted category. Nor does the relationship have the indicia necessary for, or indicative of, a fiduciary relationship. In our opinion, the fiduciary duty which is said to be owed by the first and second respondents to the appellant does not arise and that plea would need to be struck out.

Expectation Pty Ltd v Pinnacle VRB Ltd [2004] WASCA 261  -
Expectation Pty Ltd v PRD Realty Pty Ltd [2004] FCAFC 189  -
Expectation Pty Ltd v PRD Realty Pty Ltd [2004] FCAFC 189  -
Dem Compagnie P/L v Telxon Australia P/L [2004] NSWCA 66  -
Optus Vision Pty Ltd v Australian Rugby Football League Ltd [2004] NSWCA 61  -
Dem Compagnie P/L v Telxon Australia P/L [2004] NSWCA 66  -
Dem Compagnie P/L v Telxon Australia P/L [2004] NSWCA 66  -
Gray v Morris [2004] QCA 5  -
Public Trustee of the Australian Capital Territory v Colin Geoffrey Hall [2003] ACTCA 27 (23 December 2003)

20. Mr Ward supported the reasoning of Crispin J. He accepted that a joint tenancy may be severed by a unilateral act of severance but he contended that severance 'does not affect any underlying equitable estates'. Mr Ward said that a 'fiduciary relationship of trust and confidence exist[s] between joint tenants'. He cited a passage in the judgment of Gibbs CJ in *Hospital Products Limited v United States Surgical Corporation* (1984) 156 CLR 41 at 68 ( *'Hospital Products'*), in which his Honour set out a list of classes of persons 'who normally stand in a fiduciary relationship to one another'. The list comprised partners, principal and agent, director and company, master and servant, solicitor and client, tenant-for-life and remainderman. Mr Ward submitted, on the basis of this list, that a married couple was an *a fortiori* example of a fiduciary relationship. He also said the 'relationship between joint tenants is analogous to that of partnership'.

Public Trustee of the Australian Capital Territory v Colin Geoffrey Hall [2003] ACTCA 27  -
Public Trustee of the Australian Capital Territory v Colin Geoffrey Hall [2003] ACTCA 27  -
Public Trustee of the Australian Capital Territory v Colin Geoffrey Hall [2003] ACTCA 27  -
Public Trustee of the Australian Capital Territory v Colin Geoffrey Hall [2003] ACTCA 27  -
Rexstraw v Johnson [2003] NSWCA 287  -
Adler v Australian Securities and Investments Commission [2003] NSWCA 131  -
Dalecoast Pty Ltd v Guardian International Pty Ltd [2003] WASCA 142  -
Dalecoast Pty Ltd v Guardian International Pty Ltd [2003] WASCA 142  -
Dalecoast Pty Ltd v Guardian International Pty Ltd [2003] WASCA 142  -
Pryors Tours Pty Ltd v Minister for Transport [2003] WASCA 129  -
Pryors Tours Pty Ltd v Minister for Transport [2003] WASCA 129  -
Smith v FAI Leasing Finance P/L (in liq) [2003] QCA 205  -
Smith v FAI Leasing Finance P/L (in liq) [2003] QCA 205  -
Jessop v McInteer [2003] QCA 170  -
Jessop v McInteer [2003] QCA 170  -
Tottle Christensen v Westgold Resources NL [2003] WASCA 224  -
Wright v Hamilton Island Enterprises Ltd; ACN 055 389 725 P/L v Hamilton Island Enterprises Ltd [2003] QCA 36  -
Wright v Hamilton Island Enterprises Ltd; ACN 055 389 725 P/L v Hamilton Island Enterprises Ltd [2003] QCA 36  -
Wright v Hamilton Island Enterprises Ltd; ACN 055 389 725 P/L v Hamilton Island Enterprises Ltd [2003] QCA 36  -
Wright v Hamilton Island Enterprises Ltd; ACN 055 389 725 P/L v Hamilton Island Enterprises Ltd [2003] QCA 36  -
Harris v Digital Pulse Pty Ltd [2003] NSWCA 10 (07 February 2003) (Spigelman CJ Mason P Heydon JA)

156 CLR 41 at 96-97 Mason J said:

Harris v Digital Pulse Pty Ltd [2003] NSWCA 10 (07 February 2003) (Spigelman CJ Mason P Heydon JA)

"In Bailey v Namol [ Pty Ltd (1994) 53 FCR 102] at 112, the NSWLR 157 (reversed on appeal ( 156 CLR 41 ) without affecting the present point), the Court of Appeal would have deprived the dishonest fiduciary defendant of any allowance at all for its skill and effort in building the business over which the plaintiff claimed a constructive trust. The Court, at 242, adopted as applicable to the determination of what allowance should be made to a defaulting fiduciary the following passage from Story on Equity (3rd Ed) para.697:

Harris v Digital Pulse Pty Ltd [2003] NSWCA 10 (07 February 2003) (Spigelman CJ Mason P Heydon JA)

In *Hospital Products Limited v United States Surgical Corporation* (1984) 156 CLR 41 at 96-97 Mason J said:

Harris v Digital Pulse Pty Ltd [2003] NSWCA 10 (07 February 2003) (Spigelman CJ Mason P Heydon JA)

260.  He then said:

"In *Bailey v Namol* [*Pty Ltd (1994) 53 FCR 102*] at 112, the Full Federal Court (Burchett, Gummow and O'Loughlin JJ) observed that there were authorities in Canada and New Zealand which suggested that as a general proposition exemplary damages could be awarded for breach of fiduciary duty. The court found it unnecessary to decide the point but remarked that '*there is much to be said for the contrary view ... that 'equity and penalty are strangers*': at 112-113.

Extra-curial comment on the question is not wanting. The learned authors of Meagher, Gummow & Lehane *'Equity: Doctrines and Remedies'* 3rd Ed, para.259, castigate the majority of the New Zealand Court of Appeal in *Aquaculture Corporation v New Zealand Green Mussel Co Ltd* ( [1990] 3 NZLR 299 ) for deciding that exemplary damages may be awarded for breach of confidence, citing the case as an illustration of the errors produced by the fallacy that equity and the common law have been fused by the Judicature Acts. The authors quote with approval the statement of Somers J in that case that '*equity and penalty are strangers*'.

On the other hand, Dr I.C.F. Spry in *'Principles of Equitable Remedies'* (3rd Ed [p 600]) says that there is no reason in principle why a court of equity should not award exemplary damages.

The delphic remark of Somers J. in *Aquaculture* that '*equity and penalty are strangers*' was not explained by his Honour nor was authority cited in support. The remark seems to be an evocation of a view, long held by some, that the concept of punishment was always foreign to the nature of the equity jurisdiction and that equity never gave a plaintiff more than that to which he or she was strictly entitled: D.B. Dobbs *'Handbook on the Law of Remedies: Damages, Equity, Restitution'* West (1973) 212 note 99.

However, the concept of punishment was by no means always foreign to the Chancery courts. Numerous decisions in the 16th and 17th centuries may be found which show that Chancery judges exercised a jurisdiction encompassing wrongs such as forgery and perjury, and that defendants were sometimes punished with imprisonment, fines, the pillory and irons: see, for example, in 21 ER the following cases reported by Tothill and by Cary: *Barker v Ireland & Morris* at 136 (1610-11); *Baskervile v Guilliams* at 153 (1545-46); *Phillips v Benson* at 108 (1578-79); *Sacheverell v Sacheverell* 116 (1621); *Barker v Shepheard* at 136 (1663); *Woodcock v Woodcock* 34 (1576-77); *Clegge v Waberton* at 38 (1577-78); *Griffith v Jenkin* at 40 (1579).

But even in modern times it cannot be right to say that equity never gives a plaintiff more than his or her strict entitlement and never exacts a punishment from a defendant. When a fiduciary has derived profit by reason of his or her breach of duty, an account of profits is

awarded in favour of the plaintiff. Allowances for the work and skill of the fiduciary in producing the profits are given in the accounting. If there has been no actual dishonesty on the part of the fiduciary in deriving the profit, the allowances are said to be on a liberal scale, but if there has been dishonesty then the Court, in its discretion, may stipulate that the scale of allowances will not be liberal and will reflect the degree of the fiduciary's dishonesty: see e. g. *Phipps v Boardman* [ [1967] 2 AC 46] at 104, 112 ; *Green & Clara Pty Ltd v Bestobell Industries Pty Ltd (No.2)* [1984] WAR 32; *Bailey v Namol* at 112. A grossly dishonest fiduciary may even be deprived of his or her allowances altogether: see, e.g., Mason & Carter *Restitution Law in Australia*, para.1735.

In *USSC v Hospital Products International Pty Ltd* [1983] 2 NSWLR 157 (reversed on appeal ( 156 CLR 41 ) without affecting the present point), the Court of Appeal would have deprived the dishonest fiduciary defendant of any allowance at all for its skill and effort in building the business over which the plaintiff claimed a constructive trust. The Court, at 242, adopted as applicable to the determination of what allowance should be made to a defaulting fiduciary the following passage from *Story on Equity* (3rd Ed) para.697:

> 'On the other hand, where the party seeking relief is the sole guilty party, or where he has participated equally and deliberately in the fraud; or where the agreement which he seeks to set aside, is founded in illegality, immorality, or base and unconscionable conduct on his own part; in such cases courts of equity will leave him to the consequences of his own iniquity; and will decline to assist him to escape from the toils which he has studiously prepared to entangle others, or whereby he has sought to violate with impunity the best interests and morals of social life. And if acts of this sort have been deliberately done under circumstances in which innocence has been betrayed, or confidence seduced, or falsehood or concealment systematically practised, a fortiori, courts of equity could not, without straining the administration of justice, interfere to save the party from the just results of his own gross misconduct, when the failure of success in the scheme would manifestly be the sole cause of his praying relief.'

Again, it is difficult to suggest that there is no element of deterrence underlying the often-cited statement of James LJ in *Parker v McKenna* ((1874) LR 10 Ch.App. 96, at 124 ) that the rule that a fiduciary cannot make any profit without the knowledge of his principal is *'an inflexible rule, and must be applied inexorably by this Court, which is not entitled, in my judgment, to receive evidence, or suggestion, or argument as to whether the principal did or did not suffer any injury in fact by reason of the dealing of the agent; for the safety of mankind requires that no agent shall be able to put his principal to the danger of such an inquiry as that.'* That statement recognises that an honest fiduciary who has, by unwitting breach of duty, made a profit that the principal would never have obtained by his or her own efforts must, nevertheless, account to the principal in order that the standards of integrity required of fiduciaries may be kept up and fiduciaries may not succumb to the temptation to stray.

In proposing that exemplary damages be available for breach of fiduciary duty, breach of confidence and procuring or assisting in a breach of fiduciary duty, the United Kingdom Law Commission, in its Report No.247 *'Aggravated, Exemplary and Restitutionary Damages'* said at para.5.55:

> 'But despite the absence of English authorities for awarding exemplary damages for an equitable wrong, we can ultimately see no reason of principle or practicality for excluding equitable wrongs from any rational statutory expansion of the law of exemplary damages. We consider it unsatisfactory to perpetuate the historical divide between common law and equity, unless there is a very good reason to do so. Professor Waddams argues, ... the availability of exemplary damages should not be determined by classification of the wrong as a common law tort or as a breach of an equitable obligation ... Indeed, we can see good reason for allowing punitive damages to be recovered against, for example, the dishonest trustee who acts in breach of his fiduciary duty or the person who dishonestly abuses another's confidence. Thus if, as we propose,

*punitive damages are available in respect of the (commonlaw) tort of deceit, it would be anomalous if analogously wrongful conduct could not also give rise to an award, just because the cause of action originated in equity. Moreover, 'deterrence' is an aim that is not alien to courts of equity. For example it is a clear aim of the commonplace equitable remedy of an account of profits awarded for breach of fiduciary duty or breach of confidence.'*

In my opinion, the present position in Australia can be summarised thus. There is no authority which decides that exemplary damages cannot, as a matter of principle, be given by a court of equity for breach of fiduciary duty. Accordingly, to hold that wrongful conduct which would attract an award of exemplary damages in an action in tort cannot attract exemplary damages if the cause of action is equitable creates an anomaly which, in this country, is not justifiable either by precedent or by principle.

Consistency in the law requires that the availability of exemplary damages should be coextensive with its rationale. Where wrongful and reprehensible conduct calls for the manifest disapprobation of the community, where a punishment is called for to deter the wrongdoer and others of like mind from similar conduct and where something more than compensation is felt necessary to ameliorate the plaintiff's sense of outrage, then it should make no difference in the availability of exemplary damages that the court to which the plaintiff comes is a court of equity rather than a court of common law.

There is no need to appeal to any perceived fusion between the principles of equity and those of the common law in order to invest the equity court with jurisdiction to award exemplary damages. Such jurisdiction is already inherent in the court. It is, and always has been, a court of conscience; at least until the early seventeenth century, it frequently inflicted punishments in aid of its ordinary and traditional jurisdiction. Since then the exercise of the jurisdiction to punish has been muted, manifesting itself in the manner in which dishonest fiduciaries, as distinct from honest fiduciaries, will be called to account for profits and in the higher rate of interest imposed upon dishonest defaulting trustees, as distinct from honest defaulting trustees. The jurisdiction of the equity court to punish and deter may have been muted for many years but it is by no means dead.

Finally, as has been pointed out by the High Court, it is no longer appropriate to think in terms of a 'sharp cleavage' between the criminal law and the civil law. The equity court, which at least in NSW administers the *Corporations Act* , is empowered to inflict punishment under the civil penalty provisions on those who breach duties under the *Corporations Act* whic h in former times were cognisable only in equity: Pt. 9.4B *Corporations Act* . Likewise, criminal courts are increasingly invested with jurisdiction to award compensation to victims of crime, a jurisdiction formerly exercised only by civil courts: see *Gray* at 7-8 . Whatever the views of Chancery lawyers in former times might have been as to the place of punishment and deterrence in the jurisdiction of equity, the rationale for depriving the equity court of such a jurisdiction has now disappeared. As the New Zealand Court of Appeal said in *Aquaculture* at 301 :

> '*The practicality of the matter is that in the circumstances of the dealings between the parties the law imposes a duty of confidence. For its breach a full range of remedies should be available as appropriate, no matter whether they originated in common law, equity or statute*'."

Harris v Digital Pulse Pty Ltd [2003] NSWCA 10 (07 February 2003) (Spigelman CJ Mason P Heydon JA)

"Undoubtedly, there is a strong deterrent element in the formulation of the duties imposed upon fiduciaries.  As I have stated earlier, this is reflected in the decisions rendering fiduciaries accountable for profits in circumstances where the gaining of the profit has not occasioned a loss.  It also appears in the wide form of accounting ordered and the limited allowances permitted in cases of cheating by roguish fiduciaries [See, for example, *Re Tebbs* [1976] 1 WLR 924 (Ch D); *Bartl*

*arr v Barclay's Bank Trust Co Ltd* [1980] Ch 515 at *546-7*; *US Surgical Corp v Hospital Products Ltd* [1983] 2 NSWLR 157 at *237-43* (CA), reversed on other grounds *(1984) 156 CLR 41* ]. In principle, there would seem to be no reason why this concept of deterrence should not also play a part in compensation cases.

Harris v Digital Pulse Pty Ltd [2003] NSWCA 10 -
Harris v Digital Pulse Pty Ltd [2003] NSWCA 10 -
Harris v Digital Pulse Pty Ltd [2003] NSWCA 10 -
Harris v Digital Pulse Pty Ltd [2003] NSWCA 10 -
Harris v Digital Pulse Pty Ltd [2003] NSWCA 10 -
Harris v Digital Pulse Pty Ltd [2003] NSWCA 10 -
Harris v Digital Pulse Pty Ltd [2003] NSWCA 10 -
Harris v Digital Pulse Pty Ltd [2003] NSWCA 10 -
Harris v Digital Pulse Pty Ltd [2003] NSWCA 10 -
Harris v Digital Pulse Pty Ltd [2003] NSWCA 10 -
Harris v Digital Pulse Pty Ltd [2003] NSWCA 10 -
Harris v Digital Pulse Pty Ltd [2003] NSWCA 10 -
Wright v Wright [2002] WASCA 319 (06 November 2002) (Templeman J, Wheeler J, McKechnie J)
   Hospital Products Ltd v United States Surgical Corporation (1984) 156 CLR 41
   Keith Henry & Co Pty Ltd v Stuart Walker & Co Pty Ltd

Wright v Wright [2002] WASCA 319 (06 November 2002) (Templeman J, Wheeler J, McKechnie J)
   Hospital Products Ltd v United States Surgical Corporation (1984) 156 CLR 41
   Keith Henry & Co Pty Ltd v Stuart Walker & Co Pty Ltd

Kay v ASIC [2002] WASCA 299 -
Kay v ASIC [2002] WASCA 299 -
Finesky Holdings Pty Ltd v Minister for Transport (WA) [2002] WASCA 206 (02 August 2002) (Wallwork J, Steytler J, Parker J)

   Hospital Products Ltd v United States Surgical Corporation (1984) 156 CLR 41

Peninsula Balmain Pty Ltd v Abigroup Contractors Pty Ltd [2002] NSWCA 211 -
Peninsula Balmain Pty Ltd v Abigroup Contractors Pty Ltd [2002] NSWCA 211 -
Tara Shire Council v Garner [2002] QCA 232 -
Dellys v Elderslie Finance Corporation Ltd [2002] WASCA 161 -
Dellys v Elderslie Finance Corporation Ltd [2002] WASCA 161 -
Dellys v Elderslie Finance Corporation Ltd [2002] WASCA 161 -
Central Exchange Ltd v Anaconda Nickel Ltd [2002] WASCA 94 (23 April 2002) (Malcolm CJ, Wallwork J, Steytler J)
   Hospital Products Ltd v United States Surgical Corporation (1984) 55 ALR 417
   Hughes Aircraft Systems International v Airservices Australia

Central Exchange Ltd v Anaconda Nickel Ltd [2002] WASCA 94 (23 April 2002) (Malcolm CJ, Wallwork J, Steytler J)
   Hospital Products Ltd v United States Surgical Corporation (1984) 55 ALR 417
   Hughes Aircraft Systems International v Airservices Australia

Central Exchange Ltd v Anaconda Nickel Ltd [2002] WASCA 94 (23 April 2002) (Malcolm CJ, Wallwork J, Steytler J)

18 It is also a general rule that "each party to a contract agrees by implication, to do all things as are necessary on his part to enable the other party to have the benefit of the contract": *Butt v M'Donald* ( 1896) 7 QLJ 68 at *70 - 71* per Griffiths CJ; and *Hospital Products Ltd v United States Surgical Corporation* (1984) 55 ALR 417 at *485* per Dawson J . In *Pierce Bell Sales Pty Ltd v Fraser* (1973) 130 CLR 575 at *592* Gibbs J (as he then was) said that, "The contract imposed an implied obligation of each party to do all that was necessary to secure performance".

Yau's Entertainment Pty Ltd v Asia Television Ltd [2002] FCAFC 78 (28 March 2002) (Sundberg, Finkelstein & Hely JJ)

*Hospital Products Ltd v United States Surgical Corporation* (1984) 156 CLR 41 applied

Yau's Entertainment Pty Ltd v Asia Television Ltd [2002] FCAFC 78 (28 March 2002) (Sundberg, Finkelstein & Hely JJ)

28. In *Hospital Products Ltd v United States Surgical Corporation* (1984) 156 CLR 41 at 121 , Deane J cautioned against an over-rigid application of those criteria to a case where the parties have never attempted to reduce their contract to complete written form. In particular a rigid approach to the requirement "that it must be necessary to give business efficacy to the contract" should not be adopted in the case of an informal and obviously not detailed oral contract where the term which it is sought to imply is one which satisfies the requirement of being "so obvious that it goes without saying". At 156 CLR 121 Deane J said:

> *"As a general rule, however, the 'so obvious that it goes without saying' requirement must be satisfied even in the case of an informal oral contract before the courts will imply a term which cannot be implied from some actual statement, from previous dealings between the parties or from established mercantile practice."*

Yau's Entertainment Pty Ltd v Asia Television Ltd [2002] FCAFC 78 (28 March 2002) (Sundberg, Finkelstein & Hely JJ)

34. A test formulated in this way does not, at least in terms, incorporate the familiar requirement of obviousness. But in *Byrne* at 185 CLR 446 McHugh and Gummow JJ said:

> *"In contracts of this nature, apparently lacking written formality and detailed specificity, it still is necessary to show that the term in question would have been accepted by the contracting parties as a matter so obvious that it would go without saying."*

And in *Hospital Products* (supra) Deane J said at 121 that the "so obvious it goes without saying" requirement must be satisfied before the Court will imply a term even in the case of an informal contract.

Yau's Entertainment Pty Ltd v Asia Television Ltd [2002] FCAFC 78 (28 March 2002) (Sundberg, Finkelstein & Hely JJ)

48. The second term sought to be implied is that referred to in par 39 of FAPC (see par 22 above). The primary judge dealt with the implication of the second term as follows:

> *"The second pleaded term depends upon more general considerations stemming from the exclusive nature of the licence and the significant term of it, namely, three years with the option of a further year. The licensee effectively has the use of the name, logo and reputation of the licensor for that period. This is no academic issue in the present case. The reputation of ATV and its programmes was obviously significant amongst the Australian Chinese population. The applicants point to the unchallenged evidence of Mr Wing Cheung that pirate videos badged with the ATV name and logo commanded double the price that they otherwise could be expected to command. This is consistent with Mr Yau having offered ATVE significantly more for externally-made programmes than he had been prepared to offer the producers of the programmes when they first offered them to him directly.*
>
> *Whilst the term as pleaded comes close to the 'no inimical actions' term rejected by the High Court in Hospital Products Ltd (supra), I think it captures the essence of what should be implied here. In particular, it seems to me that the term is apt to cover conduct such as that involved in the breaches alleged. In using the ATV logo, name and*

*reputation when not authorised to do so, Yau's Entertainment was appropriating to itself the benefit of the rights it was granted for the purposes of the agreement which can be described as goodwill, and was also doing so in a way which was calculated to cause harm to the licensor. It associated the logo, name and reputation of the licensor with goods with which it had no connection, and which members of the public might have regarded as quite inferior. It would also imply (wrongly) that it had the consent of the producers of the programmes to distribute them. In the case of material taped from free-to-air television in Hong Kong and reproduced, it would suggest that the licensor was prepared to flout restrictions upon its licences for commercial gain."*

Royal Botanic Gardens and Domain Trust v South Sydney City Council [2002] HCA 5 -

BHP Iron Ore Pty Ltd v Westraint Resources Pty Ltd [2002] WASCA 18 -

BHP Iron Ore Pty Ltd v Westraint Resources Pty Ltd [2002] WASCA 18 -

Best and Less Pty Limited v Divergent Technologies Pty Limited [2002] FCAFC 2 -

Best and Less Pty Limited v Divergent Technologies Pty Limited [2002] FCAFC 2 -

Maggbury Pty Ltd v Hafele Australia Pty Ltd [2001] HCA 70 -

Australian Broadcasting Corporation v Lenah Game Meats Pty Ltd [2001] HCA 63 -

Australian Broadcasting Corporation v Lenah Game Meats Pty Ltd [2001] HCA 63 -

Australian Broadcasting Corporation v Lenah Game Meats Pty Ltd [2001] HCA 63 -

Pilmer v Duke Group Ltd (In Liq) [2001] HCA 31 -

Pilmer v Duke Group Ltd (In Liq) [2001] HCA 31 -

Pilmer v Duke Group Ltd (In Liq) [2001] HCA 31 -

Pilmer v Duke Group Ltd (In Liq) [2001] HCA 31 -

Pilmer v Duke Group Ltd (In Liq) [2001] HCA 31 -

Pilmer v Duke Group Ltd (In Liq) [2001] HCA 31 -

Pilmer v Duke Group Ltd (In Liq) [2001] HCA 31 -

Pilmer v Duke Group Ltd (In Liq) [2001] HCA 31 -

Pilmer v Duke Group Ltd (In Liq) [2001] HCA 31 -

Pilmer v Duke Group Ltd (In Liq) [2001] HCA 31 -

Pilmer v Duke Group Ltd (In Liq) [2001] HCA 31 -

Pilmer v Duke Group Ltd (In Liq) [2001] HCA 31 -

Pilmer v Duke Group Ltd (In Liq) [2001] HCA 31 -

Pilmer v Duke Group Ltd (In Liq) [2001] HCA 31 -

Pilmer v Duke Group Ltd (In Liq) [2001] HCA 31 -

Pilmer v Duke Group Ltd (In Liq) [2001] HCA 31 -

Pilmer v Duke Group Ltd (In Liq) [2001] HCA 31 -

Pilmer v Duke Group Ltd (In Liq) [2001] HCA 31 -

Pilmer v Duke Group Ltd (In Liq) [2001] HCA 31 -

Brambles Holdings Ltd v Bathurst City Council [2001] NSWCA 61 -

Harrison v Schipp [2001] NSWCA 13 -

Harrison v Schipp [2001] NSWCA 13 -

Harrison v Schipp [2001] NSWCA 13 -

Harrison v Schipp [2001] NSWCA 13 -

Harrison v Schipp [2001] NSWCA 13 -

Harrison v Schipp [2001] NSWCA 13 -

Harrison v Schipp [2001] NSWCA 13 -

Clay v Clay [2001] HCA 9 -

Clay v Clay [2001] HCA 9 -

Lexcray Pty Ltd v Northern Territory of Australia [2001] NTCA 1 (18 January 2001) (Gallop, Angel and Bailey JJ)

100. Having considered the authorities cited and those parts of the evidence relevant to the existence or otherwise of a fiduciary relationship, we are not persuaded that his Honour was in error in finding that no fiduciary relationship existed. Of fiduciary relationships, Mason J (as he then was) in *Hospital Products Ltd v United States Surgical Corps* (1984) 156 CLR 41 at 97 , said:

> "The critical feature of these relationships is that the fiduciary undertakes or agrees to act for or on behalf of or in the interests of another person in the exercise of a power or discretion which will affect the interests of that other in a legal or practical sense."

How can it be said that the respondent had agreed or undertaken to serve the interests of the appellant in relation to BTEC?  BTEC was a co-operative exercise undertaken in the public interest by the Australian cattle industry, the Commonwealth and the respondent with the objective of producing benefits for individual pastoralists (including the appellant) and the cattle industry as a whole.  The proposition that the respondent had bound itself to act in the appellant's interests rather than the interests of the cattle industry and the public generally has only to be stated to demonstrate it cannot be sustained.

We agree with the learned trial judge that there was no fiduciary relationship between the parties.

**ESTOPPEL**

Concut Pty Ltd v Worrell [2000] HCA 64  -
Concut Pty Ltd v Worrell [2000] HCA 64  -
Concut Pty Ltd v Worrell [2000] HCA 64  -
McCann v Switzerland Insurance Australia Ltd [2000] HCA 65  -
Ebner v Official Trustee in Bankruptcy [2000] HCA 63  -
Astra Pharmaceuticals (New Zealand) Ltd v Pharmaceutical Management Agency Ltd [2000] NZCA 345  -
Scott v Davis [2000] HCA 52  -
Associated Alloys Pty Ltd v ACN 001 452 106 Pty Ltd (in liq) [2000] HCA 25  -
Phillips Fox (a firm) v Westgold Resources NL [2000] WASCA 85  -
Campomar Sociedad, Limitada v Nike International Ltd [2000] HCA 12  -
Prospero Publishing Pty Ltd v Rumcoast Holdings Pty Ltd [2000] WASCA 61  -
Prospero Publishing Pty Ltd v Rumcoast Holdings Pty Ltd [2000] WASCA 61  -
Anaconda Nickel Ltd v Tarmoola Australia Pty Ltd [2000] WASCA 27 (17 February 2000) (Pidgeon J, Ipp J, Anderson J)

Hospital Products Ltd v United States Surgical Corporation (1984) 156 CLR 41

Boland v Yates Property Corporation Pty Ltd [1999] HCA 64  -
G & M Aldridge Pty Ltd v Walsh; Elecraft Pty Ltd v Walsh; K & v Plumbers Pty Ltd v Walsh; Barden-Steeldeck Industries Pty Ltd v Walsh [1999] VSCA 179 (12 November 1999) (Winneke, P., Phillips and Buchanan, Jj.A)

11.  First, it was by no means clear that the amount in question represented retention money, previously withheld from the trade contractors by Construction. The appellants could point only to one letter from Construction to support their contention in this regard and the terms of that letter were equivocal. Secondly, even if some sums had been retained by Construction as claimed by the appellants, I am far from persuaded that there was any separation out of the money so retained, any fund established in the hands of Construction to which a trust might attach, or indeed any obligation cast upon Construction which might have grounded such a trust. The appellants relied upon *In re Australian Home Finance Ltd.* [1956] V.L.R. 1, *Hospital Products Ltd. v. U.S. Surgical Corporation* (1984) 156 C.L.R. 41 at 69 , 72 , 96-7 , 125 , *Stephens Travel Service International Pty. Ltd. v. Qantas Airways Ltd.* (1988) 13 N.S.W.L.R. 331, *A.S.C. v. Melbourne Asset Management Nominees Pty. Ltd.* (1994) 49 F.C.R. 334 at 358-9 and *Re Old Inns of N.S.W. Pty. Ltd.; Millar v. Leach* (1994) 13 A.C.S.R. 141; but either the cases were distinguishable or the passages relied upon had no application. In my opinion, there was nothing to indicate that the amount of $399,329 was other than a sum within the general funds of Construction - even if, as calculated by Construction, the amount identified was

held by it, for and on behalf of Thompson, to be paid out to the contractors under their contracts as and when appropriate. In my opinion the evidence fell a long way short of what would be needed to prove that the amount being held by Construction was subject to a trust for trade contractors before Thompson gave the direction for its payment.

G & M Aldridge Pty Ltd v Walsh; Elecraft Pty Ltd v Walsh; K & v Plumbers Pty Ltd v Walsh; Barden-Steeldeck Industries Pty Ltd v Walsh [1999] VSCA 179 (12 November 1999) (Winneke, P., Phillips and Buchanan, Jj.A)

11 First, it was by no means clear that the amount in question represented retention money, previously withheld from the trade contractors by Construction. The appellants could point only to one letter from Construction to support their contention in this regard and the terms of that letter were equivocal. Secondly, even if some sums had been retained by Construction as claimed by the appellants, I am far from persuaded that there was any separation out of the money so retained, any fund established in the hands of Construction to which a trust might attach, or indeed any obligation cast upon Construction which might have grounded such a trust. The appellants relied upon Re Australian Home Finance Pty. Ltd. [1956] V.L.R. 1 ; Hospital Products Ltd. v United States Surgical Corporation (1984) 156 C.L.R. 41 at 69 , 72 , 96-7 , 125 ; Stephens Travel Service International Pty. Ltd. v Qantas Airways Ltd. (1988) 13 N.S.W.L.R. 331 ; Australian Securities Commission v Melbourne Asset Management Nominees Pty. Ltd. (1994) 49 F.C.R. 334 at 358-9 and Re Old Inns of N.S.W. Pty. Ltd.;

Beach Petroleum NL v Kennedy [1999] NSWCA 408  -
Beach Petroleum NL v Kennedy [1999] NSWCA 408  -
Beach Petroleum NL v Kennedy [1999] NSWCA 408  -
Beach Petroleum NL v Kennedy [1999] NSWCA 408  -
Beach Petroleum NL v Kennedy [1999] NSWCA 408  -
Beach Petroleum NL v Kennedy [1999] NSWCA 408  -
Beach Petroleum NL v Kennedy [1999] NSWCA 408  -
Beach Petroleum NL v Kennedy [1999] NSWCA 408  -
Beach Petroleum NL v Kennedy [1999] NSWCA 408  -
Beach Petroleum NL v Kennedy [1999] NSWCA 408  -
Commonwealth Bank of Australia v Finding [1999] QCA 273  -
Asset Risk Management v Hyndes [1999] NSWCA 201 (13 July 1999) (Meagher, Sheller and Stein JJA)
Hospital Products Limited v United States Surgical Corporation (1984) 156 CLR 41 .

Asset Risk Management v Hyndes [1999] NSWCA 201 (13 July 1999) (Meagher, Sheller and Stein JJA)

9 Moreover, if authority were needed that a man in the respondent's position owed a fiduciary duty to his master, one need search no further than *Hospital Products Limited v United States Surgical Corporation* (1984) 156 CLR 41 at 68 , 96 and 141.

10 In my view the following orders should be made:

Asset Risk Management v Hyndes [1999] NSWCA 201  -
Etna v Arif [1999] VSCA 99  -
Etna v Arif [1999] VSCA 99  -
Brunninghausen v Glavanics [1999] NSWCA 199  -
Brunninghausen v Glavanics [1999] NSWCA 199  -
Brunninghausen v Glavanics [1999] NSWCA 199  -
Brunninghausen v Glavanics [1999] NSWCA 199  -
Brunninghausen v Glavanics [1999] NSWCA 199  -
Brunninghausen v Glavanics [1999] NSWCA 199  -
Brunninghausen v Glavanics [1999] NSWCA 199  -
Brunninghausen v Glavanics [1999] NSWCA 199  -
Brunninghausen v Glavanics [1999] NSWCA 199  -
Brunninghausen v Glavanics [1999] NSWCA 199  -
Brunninghausen v Glavanics [1999] NSWCA 199  -
Brunninghausen v Glavanics [1999] NSWCA 199  -

Ferrari Investment (Townsville) Pty Ltd (in liq) v Ferrari [1999] QCA 230 -
Ferrari Investment (Townsville) Pty Ltd (in liq) v Ferrari [1999] QCA 230 -
Tableau Holdings Pty Ltd v Joyce [1999] WASCA 49 (14 June 1999) (Owen J, Steytler J, Parker J)

31 That dictum has since been considered in many cases and it has become customary to speak of the first and second limbs of Lord Selborne's propositions, the first being that which refers to agents who receive and become chargeable with trust property and the second referring to agents who assist with knowledge in a dishonest and fraudulent design on the part of trustees (see *Jacobs' Law of Trusts in Australia* , *supra* , par 1334). It has also become clear, since such cases as *Consul Development Pty Ltd v DPC Estates Pty Ltd* (1975) 132 CLR 373 at 397 and *United States Surgical Corporation v Hospital Products International* [1983] 2 NSWLR 157 (reversed on other grounds in (1984 ) 156 CLR 41 ), that the reference to trustees in the second limb extends to involvement of a third party in misconduct by a fiduciary or fiduciaries who was or were not trustees. Moreover, as is pointed out in *Jacobs* , *supra* , *ibid* , later cases have also extended the role of the stranger beyond that of agents in a strict sense (see *Selangor United Rubber Estates Ltd v Cradock* (No 3) [1968] 2 All ER 1073; *Karak Rubber Co Ltd v Burden (No 2)* [1972] 1 All ER 1210 and *Rowlandson v National Westminster Bank Ltd* [1978] 1 WLR 798).

*Paola v OCE Copying Equipment* [1999] NSWCA 169 (25 May 1999) (Mason P, Meagher and Powell JJA)

1   MASON P- This appeal has been well argued. Mr Ryan, in his written and oral submissions, has advanced everything that can be put on behalf of the appellant but I am of the view that the appeal should be dismissed. 2   The appellant was found liable under a guarantee executed on 26 September 1992 in favour of the respondent in relation to goods sold and delivered to Condor OA Pty Limited. I am grateful to adopt the summary of facts in Judge Knight's reasons for judgment. 3   With one exception, the grounds of appeal essentially re-agitate defences that were raised below. In my view it is appropriate to adopt the reason for rejecting them in the careful and detailed judgment of the learned trial judge. 4   On the critical issue it is common ground that the relevant legal principles are as stated by Gibbs CJ in *Hospital Products Limited v United States Surgical Corporation* [1984] 156 CLR 41 at 61-2 and by Herron J in *C J Grais and Sons Pty Limited v F Jones and Co Pty Limited* [1962] NSWLR 22 at 26-7 . 5 The appellant points to evidence that he asserted the importance of ninety days consignment terms when negotiating the Adelaide and Victorian dealership arrangements. This may be so, but it does not compel a finding that the respondent committed itself to this position irrevocably as a term of the guarantee. The manner in which Mr Mackay expressed himself in this matter (see appeal book pp 61-2), the timing in relation to the critical guarantee, the express terms of the consignment stock agreements and the absence of the critical warranty in the written guarantee all reinforce the trial judge's conclusion that Mr Mackay's statements did not become part of the contractual guarantee. 6 As Mr Ryan frankly and properly conceded, the warranty propounded by the appellant had to go so far in its effect as to stipulate that if and when the respondent withdrew the ninety day consignment arrangement, then the guarantorould be forthwith discharged, regardless of the dealings between the creditor and principal debtor that gave rise to the guarantor's liability at that point of time. The patent unlikelihood of such a term being acceptable is a further reason why I am not satisfied that the requisite intention to contract existed as an objective fact. 7 In any event,there was no subsequent breach of the putative term on the respondent's part for the reasons at AB357A-358. Condor OA Pty Limited did not stay within its credit terms and this, in my view, would have precluded reliance upon the putative warranty in answer to an action on the guarantee. 8 The appellant seeks to raise a new ground said to be one of construction on the written guarantee. The parties to that agreement were Oce Copying Equipment Pty Limited and Oce Australia Limited on the one part, and the appellant on the other. The two Oce companies have a common registered office. The agreement uses the shorthand expression "Oce" to refer to them. In this context this expression should be read distributively with the consequence that the supply by one, other or both of the companies would enliven the guarantee. In any event I would uphold the respondent's submission that the late raising of this point is precluded by the well known principles which prevent the raising of fresh issues on appeal, if there was a possibility that had the point been taken below, evidence might possibly have been called to rebut it. 9 In my view the appeal should be dismissed with costs. 10 MEAGHER JA: I agree.

Erlistoun Gold Pty Ltd (Formerly Erlistoun Gold NL) v Worth Investments Pty Ltd [1999] WASCA 3 -

Clay v Clay [1999] WASCA 8 -

Clay v Clay [1999] WASCA 8 -

Clay v Clay [1999] WASCA 8 -

Clay v Clay [1999] WASCA 8 -

Dovade Pty Ltd v Westpac Banking Group [1999] NSWCA 113 -

Barooga Projects (Management) Pty Ltd v Flag International Ltd [1998] QCA 253 (04 September 1998) (Pincus JA. McPherson JA. Mackenzie J.)

Hospital Products Ltd v. United States Surgical Corporation (1984) 156 CLR 41

Barooga Projects (Management) Pty Ltd v Flag International Ltd [1998] QCA 253 (04 September 1998) (Pincus JA. McPherson JA. Mackenzie J.)

16   The principle has been applied frequently since. (e.g. Secured Income Real Estate

(Aust) Pty Ltd v St. Martin's Investments Pty Ltd (1979) 144 CLR 597, 607 ; Hospital Products Ltd v United States Surgical Corporation (1984) 156 CLR 41 , 138 ; Fitzgerald v F.J. Leonhardt Pty Ltd (1997) 143 ALR 569, 570 ). It is not necessary to consider in detail the limits of

application of the principle to this case, since counsel for the appellant observed in his submissions,
correctly in our view, that it was debateable whether this argument and his argument as to the construction point were different, since the point was essentially that consideration of the recitals and
the contractual provisions relied on led to the conclusion that the intention of the parties, or necessary implication, required the agreement to be construed in the manner contended for by the appellant. In our opinion, the reasons for finding that the construction point fails are equally compelling against implication of the term contended for and that argument also fails.

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

CAUSE NO. FSD 236 OF 2020 (RPJ)

BETWEEN:

### (1) KUWAIT PORTS AUTHORITY
### (2) THE PUBLIC INSTITUTION FOR SOCIAL SECURITY

**Plaintiffs**

AND:

### (1) PORT LINK GP LTD.
### (2) MARK ERIC WILLIAMS
### (3) WELLSPRING CAPITAL GROUP, INC
### (4) KGL INVESTMENT COMPANY ASIA

**Defendants**

**IN CHAMBERS**

| | |
|---|---|
| **Appearances:** | Mr David Allison QC, Ms Rachael Reynolds QC, Ms Jennifer Fox, Mr Oliver Green, and Mr Harry Clark of Ogier for the Plaintiffs |
| | Ms Clare Stanley QC, Mr Peter Tyers-Smith and Mr Thomas Wright of Kobre & Kim on behalf of the First Defendant |
| | Mr Graham Chapman QC, Mr Andrew Pullinger, Mr Harry Shaw, and Ms Katie Logan of Campbells on behalf of the Second - Fourth Defendants |
| **Before:** | The Hon. Justice Parker |
| **Heard:** | 13 – 19 October 2021 |
| **Draft Judgment Circulated:** | 17 November 2021 |
| **Judgment Delivered:** | 25 November 2021 |

### HEADNOTE

*Exempted Limited Partnership Act (2021 Revision)-**strike out**- GCR O.18 r.19*
*-Section 33 ELPA-direct and derivative claims by limited partner against general partner and others-*
*procedure-nature of Exempted Limited Partnership-section 33(3) ELPA derivative claims-failure or*
*refusal without cause-approach to the evidence on 'without cause'-joinder of the limited partnership-*
*GCR O.81 r.12-discretion-**security for costs**- GCR O.23 r. 1-foreign plaintiffs-discretion-foreign*
*government or state agency-assets within jurisdiction- undertakings by plaintiffs*

251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark
Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment

**JUDGMENT**

**Introduction**

1.      The Plaintiffs (KPA and PIFSS) are Kuwaiti state-owned enterprises and are financed by Kuwaiti public funds. They are Limited Partners in The Port Fund L.P. ("TPF").

2.      TPF is an exempted limited partnership formed under the Exempted Limited Partnership Act (as amended) ("ELPA"), pursuant to the terms of a limited partnership agreement dated 21 March 2007 and amended and restated on 24 July 2008 (the "LPA").

3.      The First Defendant ("D1") Port Link GP Ltd (the "GP"), is a Cayman Islands company incorporated on 8 March 2007 as an exempted limited company. It is the General Partner of TPF and was responsible for managing its affairs at all material times.

4.      According to the Plaintiffs TPF made four known investments over the course of its term, two of which were written off as total losses[1]. Its main asset, the Clark Global City asset in the Philippines, was sold in November 2017 and USD 496,429,767 representing the net proceeds of sale, were paid into the GP's account with Noor Bank in Dubai[2]. The Noor Bank account, according to the Plaintiffs, was frozen upon the resolution of the Dubai Public Prosecutor following a suspicious transaction report made by Noor Bank to the relevant Dubai authorities[3]. The Kuwait Attorney General entered into correspondence with the Dubai authorities seeking to recover the funds for the benefit of the Plaintiffs and (the Plaintiffs say) the other Limited Partners[4]. It should be noted that this episode is hotly contested by the Defendants who argue that the Plaintiffs sought to have most of this amount paid over to them[5] and instead of obtaining orders from the relevant courts sought to extract the monies through high level political channels. Happily those matters do not arise for determination on this application.

5.      What is relevant for this application is that when the account was unfrozen in February 2019 the Plaintiffs say there was a fraudulent scheme to expropriate money from TPF by the Defendants. It is alleged that the GP made numerous payments to third parties engaged by the GP, many of whom were apparently engaged for the purpose of assisting with unfreezing the

---

[1] *Florent 2 §40*
[2] *Florent 2 §46*
[3] *Florent 2 §§54 and 56*
[4] *Florent 2 §57*
[5] *Lewis 3 § 38*

251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment

Page **2** of **41**
AP1545

funds in the Noor Bank account and some of whom were closely associated with the KGLI group and those who controlled and owned the GP[6]. The Plaintiffs' claims derive from the way in which the GP dealt with the proceeds of sale.

## The former directors of the GP

6.      Marsha Lazareva ("Ms Lazareva") was a director of the GP between 8 March 2007 and 24 May 2018. Saeed Dashti ("Mr Dashti") was a director of the GP between 16 April 2007 and 24 May 2018. Both Ms Lazareva and Mr Dashti have been convicted in proceedings concerning various criminal offences connected to TPF and/or the Limited Partners in Kuwait (the "Kuwaiti Criminal Proceedings").

7.      Abdulghfoor A M Alwadhi ("Mr Alwadhi") was a director of the GP between 18 November 2010 and 28 March 2021. He was its sole *de jure* director from 24 May 2018 until 29 January 2020.

## D2-D4

8.      The Second Defendant ("D2"), Mark Eric Williams ("Mr Williams"), is resident in the USA. He is the sole shareholder of Port Link Holdings USA Inc, a Delaware company which he incorporated on 29 May 2018. This entity is the sole shareholder of the GP.

9.      He was Vice President of KGL Investment Company KSCC ("KGLI KSCC") from September 2007 until 2008 and Investment Director of KGLI KSCC from 2009 to 2011. KGLI KSCC is incorporated under the laws of Kuwait and acted as TPF's sponsor and placement agent. He was also a member of the Investment Committee of TPF from 2009 through 2013.

10.     Mr Williams is also the CEO, CFO, President, Vice-President, Treasurer and Secretary of the Third Defendant ("D3"), Wellspring Capital Group, Inc ("Wellspring"). Wellspring is a company incorporated in the state of Georgia in the USA. Wellspring is owned by the Mark E Williams Living Trust, the Trustees of which are Mr Williams, his wife (Laura Williams), and his brother (Dylan Williams).

---

[6] *Florent 2 §§245-246 and 274*

*251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and  KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

11.     Mark Williams was also closely involved in the management of the Fourth Defendant ("D4"), KGL Investment Company Asia ("KGLI Asia"), a Cayman Islands incorporated company, now in voluntary liquidation. It provided administrative support to TPF between December 2017 and August 2020, pursuant to an Administrative Support Agreement dated 1 December 2017 (the "ASA").

## The Plaintiffs' case in summary

12.     The Plaintiffs' case is that the Defendants' wrongdoing has caused TPF and its Limited Partners losses well in excess of USD 100 million. The Plaintiffs' primary case is that they are entitled to bring their claims against the GP alleging systematic unlawful conduct in relation to the assets and affairs of TPF on their own behalf, but in the alternative they also advance those claims as derivative claims on behalf of TPF.

13.     Similarly the Plaintiffs' primary case is that they are entitled to bring claims against Mr Williams and Wellspring on their own behalf, although they also seek to advance like claims as derivative claims on behalf of TPF. The Plaintiffs' claims against D4 are advanced solely on a derivative basis.

14.     The Plaintiffs specifically claim: [7]

   a)     against D1 to D3, equitable compensation payable to them direct, alternatively to TPF and damages payable to them direct, alternatively to TPF.

   b)     against D1, accounts in equity on the footing of wilful default, alternatively common accounts.

   c)     against D1 and D3, relief under the Fraudulent Dispositions Act.

   d)     against D3, a declaration that it holds the Wellspring payment or the traceable proceeds thereof on constructive trust for TPF or the partners therein.

   e)     against D4, equitable compensation payable to TPF.

---

[7] §211 ASOC
   251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment

Page 4 of 41
AP1547

**GP's current directors**

15.     The GP's current directors are two individuals at FFP (Directors) Limited who were appointed on 29 January 2020 (the "FFP Directors"). Andrew Childe and Christopher Rowland of FFP were the original appointees. Mr Rowland was subsequently replaced by Richard Lewis on 28 October 2020.

**The derivative case**

16.     The Plaintiffs argue that each of the derivative claims in the Amended Statement of Claim ("ASOC") are brought pursuant to section 33(3) of the ELPA on the basis that the GP has without cause failed, further or alternatively refused, to initiate these proceedings and there is no real prospect of it doing so. The Plaintiffs maintain that the FFP Directors are not independent and have not investigated the relevant matters properly or formed sound judgments in relation the claims the Plaintiffs wish to bring.

17.     The FFP Directors for their part say that they have conducted an extensive investigation into the actions of the GP and the former management team of TPF for the benefit of the Limited Partners. They have concluded that there is currently cause not to bring claims advanced as derivative claims by the Plaintiffs. Even if they had concluded that there were claims of merit available to TPF it would be necessary for them to consider, on a cost benefit analysis, whether those claims were worth pursuing and if so whether TPF was in a position to pursue them and, if not, whether it could raise funding to do so, and whether doing so would be in the best interests of TPF. Detailed reasons for this are given in the third affidavit of Richard Lewis[8].

18.     The Plaintiffs do not suggest that the FFP Directors are implicated in the Defendants' alleged wrongdoing which is said to have taken place well before they were appointed, but contend that the FFP Directors have been so influenced by those who allegedly conspired with the GP and its advisors at the relevant times that they have lost their objectivity. They do not accept that a proper investigation has been conducted by them.

---

[8]*Lewis 3, 4 June 2021*
    *251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and  KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

**The relevant entities and their interests**

19. The relevant factual involvement of the various entities can be taken from the second and third affidavits of Mr Florent sworn on behalf of the Plaintiffs[9]. Mr Florent is a partner at Baker McKenzie, the firm advising the Plaintiffs in connection with their attempts to seek redress for their losses.

20. TPF is comprised of twelve partners. They are the GP, the two Plaintiffs as Limited Partners, and nine other Limited Partners.

21. Between them, the Plaintiffs invested USD 125 million in TPF, amounting to almost two thirds (65.16%) of the total supposed investment in TPF[10].

22. Among the other Limited Partners in TPF, Gulf Investment Corporation ("GIC") and the General Retirement and Social Insurance Authority of Qatar ("GRSIA"), who between them invested 15.14% of the total supposed investment in TPF, have brought claims against D2-D3 in the State of Georgia, USA alleging (*inter alia*) that the Georgia defendants are guilty of dishonesty, deliberate breaches of fiduciary duty and unlawful means conspiracy.

23. Therefore, according to the Plaintiffs, the majority by value of the Limited Partners and investors in TPF (some 80.3%) are litigating against it on the basis that the GP or related entities have committed serious wrongdoing. GIC and GRSIA support the current proceedings and have consented to a stay of their claim in the State of Georgia pending the determination of these proceedings.

24. According to the Plaintiffs, of the remaining 19.7% (by value) of the Limited Partners and investors in TPF, 14% of the total supposed investment in TPF are associated with the GP.

25. Limited Partners who are currently presumed 'neutral' therefore account for only 6% of the total supposed investment in TPF.

26. In addition, TPF is no longer trading. It has no creditors apart from disputed claims by the Defendants   and certain advisers' fees.

---

[9] 26 August 2021 and 27 August 2021
[10] Although the Plaintiffs do not accept KGLI KSCC invested USD 20 million in TPF as the GP and KGLI KSCC claim.
    251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and  KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment

27.     The Court heard applications to strike out parts of the Plaintiffs' case[11], for case management directions and for security for costs[12], made on behalf of the Defendants over five days.

**The strike out applications**

28.     Mr David Allison QC, who appeared for the Plaintiffs, properly conceded in his oral submissions that criminal convictions pleaded against the two former directors of the GP convicted in the Kuwaiti criminal proceedings should be struck out.[13]

29.     However, he resisted all the other applications to strike out his clients' claims. I summarise the arguments deployed in those applications below.

**Summary of submissions**

30.     Ms Clare Stanley QC, who appeared for the GP (D1), submitted in summary that:

i)      to the extent that the Plaintiffs seek to bring derivative claims, these are claims for TPF to bring, by its duly authorised agent, namely the GP. In order for the Plaintiffs to bring a derivative claim, they need to plead a claim which meets the statutory threshold in section 33 of the ELPA, and join TPF which they have not done.

ii)     to the extent that the Plaintiffs bring direct claims and seek to obtain damages from the GP and D2-D4 paid to themselves directly, this is impermissible. They are but two members of a class of eleven Limited Partners (the other nine Limited Partners not being parties to these proceedings), and they have no standing, still less authority, to receive such compensation themselves. The Plaintiffs are contractually and statutorily prohibited from involving themselves in the management of TPF, and payment of compensation to themselves would be to usurp the management function of the GP.

iii)    the Plaintiffs have not obtained any authority from the other Limited Partners permitting them to have control of TPF funds (any compensation), whether as trustees or otherwise. Given the historic willingness by the State of Kuwait (of which the Plaintiffs are entities) to seize TPF's funds for the sole benefit of the Plaintiffs, and the

---

[11] *Pursuant to GCR O.18 r.19*
[12] *Pursuant to GCR O.23 r. 1*
[13] *§§16,17,19,20 and 21 ASOC*
    *251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

failure of KPA to repay over USD 13 million which is due to TPF, the Court cannot be confident that it would be in TPF's best interests for the Plaintiffs to have control of the choses in action belonging to TPF[14].

iv)     the Plaintiffs complain about a number of payments made by the GP during the lifetime of TPF. It would be arguable (if pleaded) that the Plaintiffs can seek partnership accounts from the GP (notwithstanding that there has been no dissolution) in respect of those payments, but presently the Plaintiffs have not pleaded such a claim and no application to amend has been made. The joinder of the other Limited Partners would be necessary for such accounting proceedings.

v)      even if the Plaintiffs had sought partnership accounts (originally or by amendment), the 'scattergun' and 'kitchen sink' approach that the Plaintiffs have adopted in their ASOC is not conducive to the expeditious and efficient resolution of such an account. Some order needs to be brought to the case. The starting point might be, for example, a Scott Schedule by the Plaintiffs.

31.     Mr Graham Chapman QC, who appeared for D2-D4, submitted in summary that :

i)      the derivative claims should be struck out on the ground that the Plaintiffs have not established, and cannot establish, any right to bring those claims and, even if they could, they should not, as a matter of the Court's discretion, be permitted to continue with those claims.

ii)     this issue turns on the proper construction and application of section 33 of the ELPA which provides that a claim belonging to a limited partnership must be brought by the GP acting for and on behalf of the partnership.

iii)    exceptionally, section 33(3) also permits a derivative claim to be brought by a limited partner for and on behalf of a limited partnership where the GP has refused or failed to bring that claim "without cause". The decision by the GP not to bring or adopt the claims has been taken by the FFP Directors. The FFP Directors have not simply failed to pursue the claims but have, after a detailed investigation and undertaking their own

---

[14] *Florent 2 § 61 says that he has been informed by the Director General of KPA that the full amount is held in a segregated account until its external auditors have confirmed that there is no dispute or question over the amount of its entitlement.*

    *251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

assessment of the position, positively decided in respect of each claim not to bring the clams as they do not consider doing so would be in the best interests of TPF.

iv)     accordingly, it is these decisions of the FFP Directors not to bring the claims which the Plaintiffs have the burden of demonstrating were taken "without cause". This requires the Plaintiffs to plead and demonstrate that the decision itself or the decision making-process was inhibited in the sense of being bound up in the wrong-doing upon which the claims are based, or which results from a conflict of interest, which prevents an independent decision in relation to the claims being reached.

v)      alternatively, the Plaintiffs must show that the decision is so unreasonable as effectively to be irrational, such that it could not have been taken in good faith in the interests of TPF. Given the independence of the FFP Directors, that they were not involved in the events that are said to give rise to the claims and, given further, their detailed and dispassionate review of the claims, the Plaintiffs are simply unable to discharge this burden. This is all the more so where it is not even alleged that the FFP Directors have acted dishonestly or in bad faith.

vi)     notwithstanding the extensive affidavit evidence submitted, the Court should not determine the merits of the Plaintiffs' claims on a summary basis in these applications.

vii)    the decisions taken by the GP, acting through the FFP Directors, not to bring or adopt the derivative claims brought by the Plaintiffs were reasoned and reasonable. The GP's evidence addresses this issue and, in order to assist the Court, provides a (partnership) account. This evidence demonstrates that, far from being without cause, the decisions not to bring the claims have been taken with cause (although this need not be demonstrated in order for the strike out application to succeed, the burden being on the Plaintiffs to demonstrate that the decisions were taken without cause). Importantly, they were commercial decisions taken by the FFP Directors and the Court should not ordinarily interfere, absent special or exceptional circumstances.

viii)   the Plaintiffs have, on their own case, an available alternative remedy in the form of the personal and direct claims that they are currently pursuing against the Defendants (other than KGLI Asia) in the proceedings and the derivative claims should be struck out as an exercise of the Court's discretion. D2-D4 do not seek to strike out the direct claims brought against them by the Plaintiffs.

*251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and  KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

Page 9 of 41
AP1552

32.    In response to these points Mr Allison QC submitted in summary that:

i)    the Plaintiffs' claims are principally (if not exclusively) advanced as direct claims, vested not in TPF but in the Limited Partners. A proper analysis of the unique nature of Exempted Limited Partnerships ("ELPs") demonstrates this to be so.

ii)    an ELP is more closely analogous to a partnership, not a company. Whereas the directors of a company owe fiduciary duties to the company alone (and not to the company's shareholders), so that a breach of their fiduciary duties is only actionable by or on behalf of the company, the general partner of an ELP owes fiduciary duties to all of the ELP's limited partners. Such duties can only be enforceable by the Limited Partners themselves. Indeed, claims in respect of breaches by a general partner of an ELP of the statutory, equitable, common law and contractual duties that they owe to the ELP's Limited Partners are not assets of the ELP at all: they are vested in the Limited Partners alone. They are thus not claims that can be brought 'on behalf of the ELP' and cannot be brought 'derivatively'. When a wrong is done to a company, it is the company that suffers loss. If the company has a cause of action in respect of that loss, the law does not recognise loss suffered by its shareholders by reason of a decrease in the value of their shareholding and/or the dividends or other distributions that they received by reason of their shareholding. In contrast, when a wrong is done to an ELP, its constituent partners suffer loss directly: the ELP does not suffer any loss that is separate or distinct from the partners' loss, because an ELP (unlike a company) has no separate legal personality.

iii)    on a proper understanding of section 33(3) of the ELPA, all the derivative claims pleaded in the ASOC are permissible. The Court need not embark on a detailed inquiry as to the substantive merits of the underlying claims. The derivative claims are (at least) well maintainable as pleaded. The GP has had a reasonable opportunity to bring the claims in question but has not done so. Therefore the GP has "failed" to bring them within the meaning of section 33(3). Moreover, if and to the extent that it is relevant, it is clear that the FFP Directors have no intention of causing the GP to bring them.

iv)    the GP, which is distinct from the FFP Directors, is hopelessly conflicted by the actions of wrongdoers who caused it to breach its duties and is bound up in the wrongdoing. It is prevented by reason of this conflict from reaching an independent view of the

251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment

Page 10 of 41
AP1553

Plaintiffs' claims which are clearly against its interests. The GP cannot simply cure this irreconcilable conflict by having appointed the FFP Directors in 2020.

v) in any case the Court cannot safely hold at an interlocutory stage that the GP had "cause" not to bring the derivative claims, not least because (a) both the GP and its former attorneys, Walkers, are (and were) conflicted, it being the Plaintiffs' case that they both are guilty of serious wrongdoing in their dealings with TPF, and (b) the assessment of whether the GP had "cause" not to institute the derivative claims is informed by the merits of the claims, which the Court cannot safely or fairly assess until trial. The question of whether the GP had 'cause' is a question to be determined as at the date that claims which engage section 33(3) were issued.

**Relevant legal principles**

33. There are a number of relevant legal principles that I bear in mind in determining the strike out applications:

i) An application to strike out should not be granted unless the Court is certain, not just satisfied on the balance of probabilities, that the claim is bound to fail. This is a high standard of proof[15].

ii) A statement of claim is not suitable for striking out if it raises a serious live issue of fact which can only be finally determined by hearing oral evidence.[16] The live issue of fact with regard to the derivative claims is the 'without cause' issue under section 33(3) ELPA.

iii) It is not appropriate to strike out a claim that raises complex issues of law, a fortiori in an area of developing jurisprudence. In such areas, decisions as to new points of law should be based on actual findings of fact[17].

---

[15] *Hughes v Colin Richards & Co [2004] EWCA Civ 266 cited with approval in Re Sphinx Group [2010 1 CILR 234] at §37*
[16] *Bridgeman v McAlpine-Brown, 19 January 2000, unreported.*
[17] *Tianrui (International) Holding Company Ltd v China Shanshui Cement Group Ltd [2020] CIGC J0406-3 unreported 6 April 2020 per Segal J at §§111 and 112 citing with approval Farah v British Airways, The Times, 26 January 2000, CA*
 *251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

iv)     In addition all Leading Counsel agreed a 'mini-trial' is inappropriate in deciding whether the section 33(3) criteria are satisfied in this case.

v)      Likewise the allegations in the ASOC are not, as Leading Counsel all agreed, to be assessed on the merits at the hearing of the strike out applications. Notwithstanding detailed criticisms of the ASOC made by both Mr Chapman QC and Ms Stanley QC, this is not a 'merits based' strike out application. I proceed on the basis that the pleaded claims meet the test of a real (as opposed to fanciful) prospect of success at a trial, and they are good arguable claims.

vi)     As it is for the Defendants to prove that the claims should be struck out, it is only if the Court is certain[18] that the GP has *not* refused or failed to bring the claims "without cause", that the derivative claims must be struck out. I do not accept Mr Chapman QC's submission that the Plaintiffs have the legal burden at this stage to prove that they may bring the derivative claims. There is, for the reasons given below, no 'leave stage' for the Plaintiffs to overcome when section 33(3) is examined, or any special circumstances to be pleaded. It is different from the position of a shareholder asking the Court to be allowed to bring a derivative action on behalf of a company, where it is for the shareholder to establish to the satisfaction of the Court that he should be allowed to sue[19].

vii)    I accept that in deciding the issue now rather than at trial the Court needs to assess on the available evidence whether there is an arguable case that the GP and, if necessary, the FFP Directors have failed without cause to bring the claims.

**Analysis**

**Background to Plaintiffs' complaints**

34.     It is clear from the material before the Court [20] that the Plaintiffs have been raising serious concerns with the GP concerning the management of TPF for many years dating back to October 2016. The requests of the Plaintiffs seeking large amounts of information regarding

---

[18] *Re Sphinx ibid*
[19] *Barrett v Duckett* [1995] 1 BCLC p 250 §§ 5 and 6 per Peter Gibson LJ
[20] *Florent 2 at §92*
    251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment

the state of the business and financial condition of TPF has led to litigation between the GP and KPA in this Court before these proceedings were issued in October 2020[21].

35. The Plaintiffs, relying in part on information obtained as a result of those proceedings, now make particularised allegations about the conduct of the GP, Mr Williams, Wellspring and KGLI Asia and allege losses well in excess of USD 100 million caused to the TPF.

36. Dishonesty, breach of fiduciary duty and knowing receipt, as well as unlawful means conspiracy are alleged. The ASOC alleges that the GP breached numerous statutory, contractual, common law, and fiduciary duties owed to TPF and to the Limited Partners by making substantial payments in respect of five main categories with TPF monies[22]. Each of these categories will involve a detailed factual enquiry at trial.

37. The Plaintiffs also make numerous complaints in this application about the appointment of the FFP Directors and their approach and conduct.

38. First, they were appointed by Mr Alwadhi who was the sole director of the GP and Mr Williams, the ultimate beneficial owner of the GP, on 29 January 2020[23]. Mr Alwadhi was a director of the GP from 2010 to March 2021 and the sole appointed director from May 2018 to January 2020 at the time when much of the alleged wrongdoing took place.

39. Second, they assert that it is remarkable, given the allegations made against him in these proceedings and in the proceedings in the State of Georgia, that Mr Williams appears to be one of the main sources of information for the FFP Directors[24]. Moreover, they point out that the FFP Directors continued to be advised by Walkers until 14 September 2021 and continue to be advised by another law firm, Crowell & Moring. They assert that neither law firm can be regarded as suitable counsel for assisting with or advising on independent investigations, given that they were both involved with advising the GP at times when the alleged wrongdoing was carried out[25].

---

[21] See judgment (unreported dated 16 June 2020) Parker J which dealt with the Plaintiffs entitlement to true and full information regarding the business and affairs of TPF under s.22 ELPA.
[22] Apache fees, Placino payment, lobbying fees for Dashti, Lazareva and third parties, payments to Kuwaiti service providers and conduct in the DIFC proceedings.
[23] Exhibit RL 5 § 257 and Florent 2 §128
[24] Florent 2 at § 130
[25] Florent 2 §136
  251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment

40.     Finally the Plaintiffs also assert that the FFP Directors are being financed by KGLI KSCC, a company which was centrally involved in the alleged wrongdoing. Mr Dashti and Ms Lazareva were shareholders and Chairman and Vice Chairman respectively. Mr Williams is or was its Vice President and investment director. KGLI KSCC is said to be responsible for placing KGLI Asia into voluntary liquidation on 20 December 2020 and seeking to have it dissolved[26].

41.     The Plaintiffs say that since their appointment the FFP Directors have consistently rejected their concerns out of hand including opposing proceedings in this Court and in the US for disclosure of information.

42.     The Plaintiffs allege that the FFP Directors have been so influenced by those implicated in the alleged wrongdoing, including their advisers, that they have lost independence and objectivity and have shown themselves to be incapable of making a fair judgment after a thorough and independent investigation. The alleged wrongdoers at the GP may no longer be directors, but Mr Williams through his ownership interest in the GP, the Plaintiffs allege, still has a significant interest and influence.

43.     The FFP Directors deny any improper influence and say they have reached fair judgments after a thorough and independent investigation. They say that the sole shareholder of the GP has undertaken (albeit this is dated 23 March 2021 some five months after the issuance of these proceedings against D1), not to obstruct or interfere with the independent directors in the discharge of their duties.[27] The Plaintiffs say Mr Williams could easily revoke this and remove the FFP Directors.

44.     It is also said by the Plaintiffs that the GP and the FFP Directors, whose primary duty is to the GP of which they are directors, have an irreconcilable conflict of interest in assessing whether TPF has and should bring claims against the GP. This is also denied by the Defendants and the FFP Directors.

45.     In order to determine the legal questions at the heart of the arguments as to the position of the GP, the Plaintiffs' claims on behalf of themselves directly and on behalf of TPF, it is necessary to examine the characteristics of an ELP.

---

[26] *Florent 2 at §152 and exhibit RL 3 at §5*
[27] *Lewis 3 §33*
    *251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

**An ELP is distinct from an ordinary partnership**

46.　　An ELP is a creature of statute. There is a specific Cayman Islands statutory regime which regulates the rights and obligations of the Limited Partners and the General Partner(s) *inter se;* the ELPA.

47.　　The rules of common law and equity applicable to partners and partnerships are preserved, unless they are inconsistent with the express provisions of the ELPA[28]. It follows that the express provisions of the ELPA are to prevail in the event of any inconsistency with the rules of common law and equity applicable in ordinary partnership matters.

48.　　An important characteristic of an ELP and point of distinction from an ordinary partnership is that, unlike the GP(s), the Limited Partners in an ELP have limited liability[29].

49.　　Another important characteristic is that the Limited Partners have no active involvement in the business, which is carried out by the GP. In particular, all contracts are entered into by the GP for and on behalf of the ELP[30]. The fact that a Limited Partner is prohibited from taking part in the conduct of the business of the limited partnership can be said to be the *quid pro quo* for having the benefit of limited liability.[31]

50.　　By section 19(1) of the ELPA the GP of an ELP is subject to an express (statutory) duty of good faith requiring the GP to act in the interests of the ELP. That is unsurprising given the GP's key role in the limited partnership's business dealings.

51.　　Importantly, unless the partnership agreement provides to the contrary, a Limited Partner owes no fiduciary duty either to the ELP or to other partners.[32] This is of course different from an ordinary partnership where mutual and reciprocal rights and obligations are owed to each other by partners.

52.　　As can be seen from this analysis, the existence of the GP in an ELP introduces an important difference to ordinary partnerships with regard to the management of the partnership business and the specific duties owed.

---

[28] *ELPA section 3*
[29] *ELPA sections 4(2) and 20*
[30] *ELPA section 14(2)*
[31] *ELPA section 14 (1)*
[32] *ELPA section 19(2)*
　　*251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

AP1558

53.     The consequence of this unique structure is that an ELP, which consists of the GP(s) and non-participating Limited Partners with limited liability, also creates different rights and obligations to an ordinary partnership arising between the partners.

**An ELP is distinct from a company**

54.     Critically, in contrast to a company, but in common with a partnership, an ELP has no separate legal personality and exists only as its constituent partners. That is a fundamental legal distinction.[33] It cannot own property in its own right.

55.     The fact that the partnership has no separate legal personality means that the GP of an ELP holds its rights and property of every description, including choses in action, on trust for each of the partners which make up the limited partnership as a whole. There is no ability however to enforce the GP's obligations as trustee by the partnership as a whole, because it has no legal personality.

56.     Moreover the GP of an ELP owes its duties to all of the individual limited partners. That is different to a board of directors of a company who only owe duties to the company as the legal entity, not to its shareholders.

57.     A company is a separate legal entity in itself and its articles of association form the contract between the company and its members. The so called *Foss v Harbottle*[34] rule imposes upon the directors of the company fiduciary duties to the company alone, and not to the company shareholders. Any breach by the directors is only actionable by or on behalf of the company. The rule is not just a rule of the law of companies in England, it has been extended to a rule of the law of associations applicable to all associations which can bind themselves by decision of a simple majority of their members[35].

58.     It follows that where the company has suffered loss it is the company that has a cause of action in respect of that loss and the law does not recognise losses suffered by shareholders[36].

---

[33]*See section 3 Partnership Act (2013 Revision) and Padma (unreported 8 October 2021) § 21 Parker J.*
[34] *(1843) 2 Hare 461*
[35] *Palmer Limited Liability Partnership Law (second edition)  A5-28 p198 ,citing Edwards V Halliwell  [1950] 2 All ER  1064 CA which concerned a trades union.*
[36] *Sevilleja v Marex [2020] UKSC 31(the so called rule against reflective loss)*
    *251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and  KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

59. There are, however, important exceptions to this rule where the wrongdoer directors are in control of the company. The courts have made an exception in those cases so that shareholders can sue on behalf of the company, derivatively, to prevent injustice[37].

60. Another distinction an ELP has from a company is that the GP in an ELP is the only entity who can institute proceedings on behalf of the partnership[38]. If the limited partners have claims against the GP it is in practice unworkable for it to bring proceedings against itself for breach of duty. If the GP is the arbiter of whether to bring claims against itself that clearly gives rise to a conflict of interest.

**Direct claims by a Limited partner**

61. I accept Mr Allison QC's submission that the logical consequence of the aforesaid analysis of the nature and characteristics of an ELP is that the GP's obligations must be capable of enforcement by each of the partners to whom it owes duties individually. That is to be contrasted to the situation where directors of a company hold the company's assets and are treated as trustees because they owe fiduciary duties to the company. In that situation they hold the assets for the company, rather than the shareholders.[39]

62. I accept Mr Allison QC's submission that the GP of an ELP owes fiduciary duties to each of the Limited Partners and any breaches are therefore enforceable by the Limited Partners themselves.

63. It follows that where an ELP is alleged to have suffered loss, as in this case, that is the loss of each of the Limited Partners. There is no distinct or separate loss in respect of 'the partnership' (TPF), which as an entity does not exist at law. The Limited Partners in enforcing their individual claims do not owe duties to each other.[40]

64. I therefore find that the direct claims in respect of the individual partners' losses are vested in the Limited Partners alone, and are not claims that can be brought on behalf of TPF derivatively, except in the circumstances permitted by section 33(3) of the ELPA where the Limited Partners

---

[37] *Wallersteiner v Moir (no 2) [1975] QB 373 at p 390 and Iesini v Westrip [2009] 2526 at §§ 73 and 74 per Lewison J and UPM v Gilkicker [2013] Ch 551 Briggs J.*
[38] *Section 33(1) ELPA*
[39] *Auden Mckenzie v Patel [2019] EWCA civ 2291 § 57*
[40] *Section 19 (2) ELPA*
*251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

who wish to obtain redress for TPF are in effect put in the place of the GP, and bring claims on behalf of TPF.

65. The statutory and contractual prohibitions upon Limited Partners participating in the conduct of the business[41] do not affect this conclusion in my view, providing the circumstances of section 33(3) are met. Otherwise for the reasons stated above there would be no mechanism for a derivative claim on behalf of a limited partnership to be brought against a GP.

**Henderson**

66. The decision of the English High Court in *Henderson*[42] is instructive in this regard. Mr Justice Cooke was dealing with an English limited partnership, which also has no legal existence independent of its constituent partners. Whilst subject to a different (and much older) statutory regime, English limited partnerships are also creatures of statute and are similarly used by the financial community as a useful structure for investment.

67. It is also to be noted that Cooke J was deciding a number of points following a hearing on preliminary issues. It was not a strike out application, as in this case. The preliminary issues included whether the limited partners were entitled to pursue the claims as derivative claims on behalf of the partnership, and if so whether the pursuit of those claims constituted taking part in the management of the business of the partnership for the purposes of the Limited Partnerships Act 1907,[43] such that claimants would forfeit their limited liability. It is important to note that there is no section 33(3) equivalent provision in the English statute.

68. The claimants comprised the majority of the limited partners. D1 was the partnership, D2 the investment manager and D3 the general partner. It was alleged that D2 and D3 had used the partnership's capital to make unauthorised investments. The relationship between the parties was governed by the limited partnership agreement, the Limited Partnerships Act 1907 and a management deed.

69. Cooke J held that each limited partner could in its own individual capacity sue D3, the general partner for its own losses in respect of liabilities under the limited partnership agreement,

---

[41] For example section 14 ELPA
[42] [2012] EWHC 3259
[43] section 6 (1)

251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment

without reference to the losses of other limited partners, who chose not to make such a claim. The individual claims were not treated as partnership assets.

70. It seems to be the case that, for whatever reason, the arguments Ms Stanley QC advances that the Plaintiffs can only seek partnership accounts from the GP (notwithstanding that there has been no dissolution) were not advanced.[44]

71. Derivative claims were also sought to be brought by the limited partners both against D3, the general partner, and D2, the investment manager, on behalf of the partnership. The derivative claim was not permitted against the general partner on the basis that the limited partners had direct claims of their own against it and so a derivative claim was unnecessary.

72. Cooke J held that any claim brought by each limited partner as an individual contractual or fiduciary claim would not involve management of the partnership business. He also held that the partnership which consisted of the limited partners and the general partner together, had no form of joint right or claim against the general partner.

73. He says at § 28:

> *"The Partnership, unlike a limited company, does not possess a corporate legal personality. Like an ordinary partnership under the Partnership Act "the Partnership" is simply a convenient way of referring to the body of partners as a whole. In my judgement therefore no difficulty arises for a Limited Partner's claim against the General Partner, regardless of whether or not removal and substitution of the General Partner is possible. The claim to be made against the General Partner is that of the individual Limited Partners and is not a Partnership Asset...."*

74. Any claim against D2, the investment manager, was however a partnership asset and could only be pursued by the general partner in the name of the partnership or by means of a derivative claim. The derivative claim would have been permitted against the investment manager on the basis that there was a conflict between the general partner and the investment manager (because they were sister companies) and injustice would have been caused if no such claim had been allowed. In that event (with regard to the investment manager claim), he held that the limited partners would forfeit their right to limited liability.

---

[44] §28
  251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and  KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment

75.     One of the arguments advanced by the Defendants on this application is that the effect of section 16(1) of the ELPA and the LPA (clauses 3.1 and 3.3) prevent such direct claims because the Limited Partners cannot usurp the function of the GP. They argued that the GP is the trustee holding all of the partnership property on trust for TPF, not the Limited Partners, who are prohibited from being involved. On that basis all claims for wrongs done to the partners, some eleven of whom have not given authority for the Plaintiffs' claims, belong to TPF and the GP is the *only* authorised agent of TPF able to sue.

76.     The practical difficulty with that submission is that in practice the GP could obviously not sue itself and suffers from the conflict of interest I have outlined above. In addition, in agreement with Cooke J, I find that the Plaintiffs bringing such claims would not involve management of the partnership business. Moreover I find that the authority point does not arise because these are claims the Plaintiffs are entitled to bring on their own account.

77.     I therefore reject the Defendants' argument that the individual partners have no entitlement to any specific asset or share of any specific asset and cannot obtain individual compensation as the Plaintiffs seek to do.

78.     I have accepted that the consequence of the ELP structure is that the GP's obligations must be capable of enforcement by each of the partners to whom it owes duties individually. Again, in agreement with the analysis of Cooke J in this regard, I find that the Plaintiffs may bring direct claims. I find that a direct claim made against the GP is that of the individual partners and is not a partnership asset. They are claims which they are entitled to bring individually. That leads to the question of what is the correct procedure for them to be brought, which was Ms Stanley QC's principal argument.

**Partnership accounts**

79.     Ms Stanley QC submits that the report of the decision of Cooke J does not deal with how the limited partners claims were advanced, whether by direct action for damages/compensation, or for partnership accounts. It is only the latter procedure which she says is legally permissible.

*251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

Page 20 of 41
AP1563

80.    She concentrated her forceful submissions on the premise that the direct claims against the GP can *only* be vindicated by the taking of a partnership account[45]. Notwithstanding her arguments to the contrary, I do not accept that in a Cayman Islands ELP applying the provisions of the ELPA and bearing in mind the distinctive characteristics they import, that the causes of action belong to TPF and fall to be distributed by the taking of partnership accounts and in no other way.

81.    Ms Stanley QC submits that the rights and obligations between the partners are only to be procedurally adjudicated by the taking of partnership accounts, before or after dissolution, because the English law authorities dealing with ordinary partnerships are 'pellucidly clear'[46]. However, on analysis in my view those authorities have no direct application to Cayman Islands ELPs.

82.    Ordinary partnerships involve reciprocal fiduciary obligations between the partners and the necessary joinder of all partners to any proceedings so that the necessary accounting for any monetary claims can take place[47]. This is not the case with a Cayman Islands ELP.

83.    As I have set out above, a Cayman Islands ELP is distinct from an ordinary partnership under English law. A general partner is inserted into the structure owing fiduciary and contractual duties directly to the limited partners and those duties are enforceable directly by the limited partners.

84.    There are no reciprocal duties owed by the limited partners, unlike the position in ordinary partnerships. In fact no fiduciary duties are owed at all by the limited partners to the other partners, unless the limited partnership agreement provides otherwise.[48]

85.    Each partner is not, as is the case in an ordinary partnership, jointly and several liable for the partnership's liabilities. The rules of equity and common law applicable to ordinary partnerships are in this respect inconsistent with express provisions of the ELP, which deals

---

[45] *Meyer v Faber (no 2) [1923] 2 Ch .421, Hurst V Bryk [2002] 1 AC 185 and Public Trustee v Elder Ch D [1926] 776*

[46] *Atkins Court Forms Partnership, Limited Partnerships and LLPs: Vol 29 § 15 and § 31 accounts and enquiries § 123 and § 138 Vol 29(2) § 461;, Popat  v Soncchatra 1 WLR p 1367 at p1372 ,Hurst v Bryk [2002] 1 AC 185 at p 194 ,Meyer v Faber 2 Ch p 421 .*

[47] *See Public Trustee v Elder ibid at § 789*

[48] *Section 19(2) ELPA*

*251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and  KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

with unique rights and obligations of partners in an ELP and the statutory provisions of the ELP are to prevail.[49]

86.     In these circumstances, not only do the English authorities and cases dealing with ordinary partnerships not apply, there seems to me to be no good reason why the taking of partnership accounts should be the only procedural route available to the Plaintiffs to obtain redress under the ELPA.

87.     I have concluded that if there was a breach by the general partner of the statutory, equitable, common law or contractual duties owed to the limited partners, these claims are vested in the limited partners themselves and may be brought directly in the ways pleaded in the ASOC.

**Section 33(3) ELPA**

88.     The general rule provided for in section 33(1) ELPA is that proceedings by or against an ELP may only be instituted by or against the GP, and a limited partner will not be a party to the proceedings. What Mr Chapman QC described as an exception to this general rule is provided for in section 33(3) ELPA.

89.     I was informed by Mr Chapman QC that there is currently no Cayman Islands authority on the interpretation and meaning of section 33 ELPA. Further, while similar statutory provisions exist in the Bahamas, British Virgin Islands, Delaware, Hong Kong, and New Zealand, they too appear not to have been considered in any decided cases. We are therefore treading new ground.

90.     Section 33(3) ELPA provides:

> *"A limited partner may bring an action on behalf of an exempted limited partnership if any one or more of the general partners with authority to do so have, without cause, failed or refused to institute proceedings."*

91.     That is the straightforward test the court has to apply when determining whether a limited partner may bring a derivative claim. The ELPA, unlike other statutory regimes for derivative claims[50], imposes no requirement to obtain the leave of the Court to bring or continue

---

[49] *Section 3 ELPA, see also sections 4(2),16(1) and 19 (2).*
[50] *For example, GCR O.15 r.12A regarding derivative claims by shareholders in a company and section 261 English Companies Act 2006 ,which requires a member to apply to court for permission to continue a derivative claim. See Iesini ibid at § 78per Lewison J*

251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment

Page 22 of 41
AP1565

proceedings on behalf of an ELP, nor is there any language to suggest special circumstances would need to be pleaded by a limited partner.

92.     The Defendants argued that the Court should apply principles derived from cases dealing with derivative claims in other contexts, including English cases.

**The English cases**

**Trusts**

93.     Beneficiaries are not required to seek leave to bring a derivative claim on behalf of a trust, although they must plead and establish special circumstances, and join the trustee to the proceedings if they wish to sue.[51] As the authors of *Lewin on Trusts 20th Ed.* explain:

> *"for example, circumstances which tend to disable the trustees from suing (as where their acts and conduct with reference to the trust fund are impeached) or circumstances rendering it difficult or inconvenient for the trustee to sue, as where there is a conflict between their interest and duty. Special circumstances are not confined to circumstances of these kinds. The guiding principle is that there must be exceptional circumstances, which embrace a failure, excusable or inexcusable, by the trustees in the performance of a duty to the beneficiaries to protect the trust estate, or to protect the interest of the beneficiaries in the trust estate. The special circumstances relied on must have something to do with the willingness or ability of the trustee or alleged trustees to bring the action.[52]*

94.     As can be seen the authors refer to the concept of 'special circumstances' in the trusts context when the trustee has been unwilling or unable to bring the action.

**English limited partnerships**

95.     The issue of derivative claims in the context of an English limited partnership was considered in *Henderson[53]*, as I have set out above. Mr Justice Cooke said:

> "It is common ground that derivative claims are not limited to the corporate context. They can arise in other circumstances where the justice of the case demands it, such as where a beneficiary sues to enforce the cause of action vested in a trust or where a legatee under a will seeks to enforce a cause of

---

[51] *Roberts v Gill Roberts [2011] 1 AC 240 §§50-53 and 103 and Lewin at § 47-012*
[52] *Lewin at § 47-008*
[53] *[2012] EWHC 3259*
      *251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

> *action vested in the estate. There is however a need for "special circumstances" to justify a derivative action. What matters is the person seeking to pursue the derivative action has a legitimate interest in the relief claimed, sufficient to justify him in bringing the proceedings to obtain it. It is agreed that there is no example in English law of a claimant limited partner seeking to pursue a derivative claim on behalf of a limited partnership, but the claimant submits there is no reason in principle why such a claim should not be made provided that there are special circumstances which would warrant a departure from the usual rule that the party in whom the cause of action vests must bring the claim."*

96.     As set out earlier in this judgment, the relevant "special circumstance" in *Henderson* was that the general partner had a conflict of interest because it could not or would not sue itself or the manager of the fund, which was its sister company. For that reason, a derivative claim against the manager was permitted to proceed.

97.     As I have noted above there is no equivalent to section 33 ELPA in the English Limited Partnership Act 1907.

98.     The terms of section 33(3) ELPA which allows a limited partner in an ELP to bring proceedings on behalf of the ELP if the general partner has *without cause failed or refused* to do so has no language requiring permission or special circumstances. In my view the principles taken from the common law or equity for bringing derivative claims whether as regards companies, trusts, limited partnerships or associations are not applicable.

99.     In my judgment section 33(3) is *sui generis* and is not subject to the rules relating to permission or for special circumstances for derivative actions in other contexts. I accept Mr Allison QC's submission that to this extent it can be said to '*occupy the field*' in the Cayman Islands with respect to ELPs and there is no room for a case by case judge led formulation of a common law or equitable test.

100.    I have in coming to this view had regard to the principles Ms Stanley QC and Mr Chapman QC referred me to relating to cases which dealt with failures or refusals to bring claims in other contexts, for example where the board of the company or the trustee had the relevant inhibition which prevented a decision to bring claims. Whilst these principles provide helpful guidance, the company and trusts law cases to which I was referred do not directly apply to the position in this case which involves the application of a specific statutory test for Cayman Islands ELPs.

*251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

Page 24 of 41

AP1567

101.    I note however that the common thread running through those cases is that where the authorised decision maker is inhibited, the Court may permit, in the interests of justice, derivative claims.

**Has the statutory test been satisfied?**

**The GP**

102.    In my judgment the evidence shows a good arguable case that the GP has failed and refused to bring the claims set out in the ASOC over a period of years.[54] I have also come to the view that there is a good arguable case that the GP had and still has a relevant inhibition because it is conflicted in relation to the Plaintiffs' claims.[55]

103.    I accept Mr Alison QC's submission that in exercising its fiduciary obligations to TPF the GP should take a neutral position with regard to claims sought to be advanced by the Limited Partners derivatively. It should act in what it considers to be the best interests of TPF, and not with regard to its own interests. It clearly cannot do so given the claims advanced against it. I accept Mr Allison QC's submission that its decision not to bring the claims is infected and made unsafe by the facts which give rise to this conflict of interest.

104.    The GP is a Defendant to litigation where it is accused of serious wrongdoing: wilful default, liability under the Fraudulent Dispositions Act, and conspiracy with the other Defendants are alleged.

105.    A large number of the claims against D2-D4 are premised on a breach of duty by the GP. For example the allegation of knowing receipt is based upon a breach of duty by the GP. In the circumstances the GP cannot be expected to be the arbiter of whether to bring a claim against another Defendant that is premised on its own breach of duty. It is in my view incapable of exercising an impartial decision-making function.

106.    I accept Mr Allison QC's submission that section 33(3) ELPA requires a finding as to whether '*the GP*', that is to say the relevant corporate entity, has failed or refused to institute proceedings, not whether the directors at the relevant time can be said to have done so. I find that the GP has without cause failed to bring the derivative claims.

---

[54] See Florent 2
[55] Florent 2 §§89-98
      *251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

107.    I therefore accept the Plaintiffs' case that the FFP Directors and the GP are not one and the same. The statute applies to the legal entity which is the GP, not its directors at any one time. I set out below my findings on the position of the FFP Directors in case I am wrong about that.

**FFP Directors**

108.    The FFP Directors owe their duties primarily to the GP, not the limited partners. I accept Mr Chapman QC's submission in response to this that the duties of the GP and the FFP Directors should be aligned. That is, to bring the claims if that is overall in the best interests of the limited partnership. He submits that there is no problem if they thought that was the right thing to do, but they have after careful independent investigation and analysis decided against that and given perfectly defensible reasons based on commercial judgments.

109.    That to my mind does not change the analysis that they are separate from the GP and it is the GP that matters for the statutory test. Neither does it change my conclusion below that there is a real conflict that the FFP Directors have not themselves identified.

110.    I find that there is a *prima facie* case that they are unable to assess the claims properly in an independent and objective way, notwithstanding Mr Lewis' extensive evidence.[56] I accept of course that there is no challenge to their integrity and honesty and in accordance with ordinary principles the Court should be slow to interfere with the commercial judgments of decision makers.[57] I also accept that they are experienced professionals in these matters and they have confirmed that they fully understand and have complied with the nature and scope of their duties as fiduciaries. It is, however, the case that they owe their duties primarily to the GP and it is obviously not in the GP's interests to be sued. That seems to me to place them in a position where they are seriously inhibited from making impartial decisions.

111.    I also find that there is a *prima facie* case that they have been guided (until recently) in their investigations by information provided by those who were under investigation themselves, and by their legal advisers, who were also conflicted.

112.    The Plaintiffs also claim that there is an arguable case that they continue to be funded by entities closely associated with the alleged wrongdoers[58]. I should make clear that I accept the evidence

---

[56] See Lewis 3 at §33 and Florent 2 §§126-153
[57] See Iesini v Westrip at § 85 per Lewison J and Kleanthous v Paphitis per Newey J
[58] Florent 2 §152
    251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment

that the FFP Directors themselves are financially disinterested from the assets and affairs of TPF and the outcome of these proceedings [59]and were not, it is agreed[60], involved in the events which form the basis of the derivative claims. I also accept the evidence that their views and conclusions have no link to their own compensation.

113. That in my view does not change the finding that there is a *prima facie* case that they are not capable of being truly independent and objective.

114. Having reviewed the FFP Memoranda and the nature of the investigations carried out and the detailed explanation in Lewis 3 as to how decisions were reached, I am left with the fact that, perhaps of necessity, these investigations involved interviewing individuals or representatives of parties who are either Defendants in these proceedings, or were closely associated with them, or who have allegedly made, received or benefited from payments from TPF assets.

115. I have carefully noted Mr Lewis's evidence'[61]

> ".. *I wish to make clear that the conclusions reached by the Independent Directors (and I hasten to add that several investigations are ongoing) are based on commercial judgement, with the benefit of legal and expert advice where appropriate. Where investigations are ongoing, needless to say we are not satisfied that it is prudent or appropriate to commence proceedings in the name of the Fund. To do so would be premature and irresponsible.*"

116. The FFP Directors' evidence is that the decisions taken were good faith determinations for which there was a rational basis, that the risks of pursuing the claims outweighed the benefits, or that there were other good grounds not to pursue the claims and it was not in TPF's interest to do so. Ms Stanley QC and Mr Chapman QC submit that the Court should not interfere with these commercial judgments of experienced professionals whose integrity is not impugned.[62] The Court, it is said, is not in a position to and should not 'second guess' those commercial judgments.

117. However, if this point is relevant and my decision in relation to the GP itself is wrong, in my judgment the question of 'cause' cannot be one for the FFP Directors to decide alone without more given the circumstances of this case.

---

[59] *Lewis 5 § 29*
[60] *Florent 2 § 127*
[61] *Lewis 5 § 76*
[62] *Lewis 5 at § 76*

*251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

118.     I note that Mr Lewis says:[63]

> *"I appreciate that the Plaintiffs have strong views about Mr Williams, but in exercising our discretions and powers in discharging our fiduciary and other obligations to the GP, the Independent Directors are not acting in a judicial capacity. We are required to consider and evaluate relevant matters, disregard irrelevant matters, and have regard to the interests of the various constituents of the GP and the Fund, including the shareholders, financial stakeholders, employees, and creditors when reaching our conclusions. That is what we have done."*

119.     The Court has a role to ensure that the process described by Mr Lewis[64] was fair and the decisions taken were impartial and sound when assessing whether they were taken '*without cause*' under section 33(3) ELPA. I am, on the evidence, unable to accept the FFP Directors' views at this stage that the GP had cause not to institute claims on behalf of TPF (which of course include serious claims against the GP itself). There is a *prima facie* case that the decisions were not taken in fair or safe circumstances and I find that there is therefore an arguable case that they failed to bring the claims without cause.

120.     To be clear I do not find that the FFP Directors have been "*engaged as 'friendly' professionals to provide a 'veneer of independence' in order to vindicate the personal positions of those that participated in the former management of the Fund*" or that they "*…have behaved in a way that facilitates an exercise in whitewashing*".[65]

121.     Based on the available evidence, I have formed the view that there is a relevant inhibition which prevents the FFP Directors' decision making process being fair, because the decisions not to pursue the claims are insufficiently distinct from the wrongdoing upon which the claims are founded. As a consequence TPF is prevented from pursuing claims which it legitimately has. A derivative claim by the Plaintiffs to obtain redress for TPF would therefore lie in my view to avoid injustice.

122.     I have taken into account that the issue of statutory interpretation raised by section 33(3) is a new and important point of law which has not been the subject of any judicial consideration and which arises against a complex and hotly contested set of facts. In the circumstances I have

---

[63] Lewis 5 § 45
[64] See for example Lewis 5 §§ 44-46
[65] Lewis 5 at §§42 and 43

    251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment

AP1571

concluded that I should decide the '*failed without cause*' issue now,[66] in favour of the Plaintiffs who should be permitted to continue with the derivative claims.

123.    The applications have proceeded on the basis that the Plaintiffs' claims have a real prospect of success (having had regard to the criticisms of the language of the pleading advanced by the Defendants) and in my view the Plaintiffs should be permitted to bring the derivative claims under section 33(3) ELPA. There is an arguable case that the criteria in section 33(3) are satisfied.

**Joining TPF**

124.    Since the Grand Court Rules provide that a claim can be brought by and against an ELP[67] it seems to me to make sense to join TPF in its name, so that it is bound by and is a party to the proceedings, even although it is not a legal entity. In that way the interests of the nine non-participating Limited Partners' interests on whose behalf the derivative claims are also brought, can be formally recognised. That is not because the claims as formulated are not properly constituted without the joinder, but because it is in my view desirable in the circumstances of this case for TPF to be joined.

**Are the derivative claims properly pleaded?**

125.    The Defendants argued that the derivative claims were not properly pleaded.

126.    The plea at § 25B of the ASOC is as follows:

> "*The balance of the claims against Mr Williams and Wellspring and the claim against KGLI Asia are brought by the Plaintiffs as derivative claims on behalf of TPF in circumstances where Port Link has without cause failed to initiate proceedings on behalf of TPF against those parties and there is no real prospect of it doing so. Not only did Port Link fail to commence such claims; as described in paragraph 4 it deliberately withheld from the Limited Partners the information upon which the claims are based. In the premises, the requirements of section 33(3) of the ELP Act are satisfied such that the Plaintiffs should be permitted to prosecute these claims on behalf of and in the name of TPF.*"

---

[66] *Prudential v Newman [1982] Ch 204 CA*
[67] *GCR O.81 r.12*

    *251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

127.   This is in my view sufficient to enable the Defendants to understand the gist of the case, which has been factually set out in the detailed evidence filed on these applications. Given the background to the bringing of the Plaintiffs' claims set out earlier in this judgment, there was no necessity for the Plaintiffs to have made any formal demand on the GP before commencing proceedings seeking derivative relief. The statutory gateway of section 33(3) requires only a failure or refusal to bring a claim, which is to be judged on the relevant facts as they were at the time proceedings were commenced.

128.   In interpreting the plain words of section 33(3), which are expressed in the past tense, I accept Mr Allison QC's submission that the GP has failed since at least the time the Plaintiffs brought the derivative claims, which for the GP was October 2020 and for D2-D4 was early this year. That is the correct time at which the point is to be assessed.

129.   Mr Chapman QC on behalf of D2 to D4 submitted that the ASOC is also inadequate in the way it pleaded the detail of the derivative claims. Having gone through the relevant paragraphs which were criticised in some detail I am not so persuaded. The submissions in relation to the statutory gateway apart, there is no strike out application on the merits. The facts as pleaded, the Court must assume for this application, would be established at trial.

130.   He also submitted on the Plaintiffs' own pleaded case they had an alternative remedy available to them in their direct claims against all of the Defendants other than D4, which is a powerful reason why they should not be permitted to bring the derivative claims. An alternative remedy is an important consideration in the exercise of the Court's discretion, but is not conclusive[68] and in this case no defences have yet been served. In my view the Plaintiffs should be allowed to proceed with direct and derivative claims (which are not legally identical) as it would not be fair or safe to conclude at this stage that there is an effective alternative remedy available. The trial Court will ensure that there is no risk of double recovery.

**Discretion**

131.   Finally the Defendants argue that in the Court's discretion the derivative claims should not be allowed to proceed. They argue that the Court can be satisfied there is serious doubt as to whether the Plaintiffs are appropriate parties to bring a derivative claim for and on behalf of TPF given the complex and often toxic relationship between the parties and the Plaintiffs'

---

[68] *Henderson §§31,32 and 39*
*251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

previous conduct. They allege that the State of Kuwait (of which the Plaintiffs are entities) attempted to seize TPF's funds for the sole benefit of the Plaintiffs, and that KPA failed to repay over USD 13 million which is due to TPF. They argue that the Court cannot be confident that it would be in TPF's best interests for the Plaintiffs to have control of the choses in action belonging to TPF.

132.   These matters are no doubt going to be vigorously contested at trial. There is evidence that [69] the Director General of KPA has confirmed that that the full amount is held in a segregated account until its external auditors have confirmed that there is no dispute or question over the amount of its entitlement.

133.   The Defendants say that this is the latest proxy war as part of a larger commercial dispute and point to the multiple derivative claims on foot brought in different proceedings by different Limited Partners against different parties relating to the same underlying subject matter, which is a highly unsatisfactory situation.

134.   I should first say that an important factor in the exercise of my discretion is that the direct claims against D1-D3 are going to trial. I have decided that they should not be struck out by the GP (D1). There was no attempt to strike them out by D2 and D3, who also face direct claims in unlawful means conspiracy.

135.   I am not persuaded that there is a serious doubt as to whether the Plaintiffs are appropriate parties so as to refuse in my discretion to allow these claims to be pursued on the grounds advanced by the Defendants. Nor am I persuaded that as a matter of discretion they should be struck out because there are a number of proceedings by different Limited Partners against different parties relating to the same underlying subject matter. This Court will case manage the cases it has jurisdiction over appropriately in due course.

136.   Having found that the GP has failed without cause to bring the derivative claims, in the exercise of my discretion the Plaintiffs should be allowed to continue with those claims which are brought (save in the case of D4) as an alternative to the Plaintiffs' direct claims.

---

[69] *Florent 2 § 61*
   *251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

137.    An additional factor in the exercise of my discretion to allow the claims to proceed in this case is that the Plaintiffs, who represent the vast majority[70] of the Limited Partner economic interests in TPF, are also bearing the litigation costs and adverse costs risk of litigating these claims on behalf of TPF. Moreover TPF is no longer trading and has few creditors. The risk of real damage to ongoing commercial relationships does not seem to be material.

138.    Also, I take into account that it is common ground that the derivative claims raise a new point of law of some importance to the Funds community in the Cayman Islands on the application of section33(3) ELPA. There will be a factual enquiry into these claims at trial. In those circumstances the right course in my view is to allow the Court at trial to assess the merits, boundaries and overlap of the direct and derivative claims against these Defendants.[71]

**The security for costs (SFC) applications**

**The Defendants' case**

**I summarise below the submissions of Mr Chapman QC and Ms Stanley QC**

139.    The GP (D1) seeks security in the amount of USD 5,536,025.50. D2-D4 seek security in the sum of USD 2,720,00.

**The gateway is met**

140.    The Plaintiffs are Kuwaiti state entities. They are both, undisputedly, ordinarily resident outside of the Cayman Islands, and so the gateway for SFC is established.

**Discretion**

141.    As for the exercise of discretion in favour of ordering SFC, there is a real risk that there will be substantial obstacles to the enforcement of an adverse costs order made by the Grand Court:

(i)     there is no bilateral treaty between the Cayman Islands and Kuwait for the enforcement of judgments;

---

[70] *When one removes the Limited Partners associated with the Defendants ,94% by value bring proceedings against the Defendants*
[71] *Tianrui ibid*
    *251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

AP1575

(ii)     there is no clear alternative route to enforcing and executing a money judgment against a state-owned entity, such as the Plaintiffs;

(iii)    there is ample evidence to demonstrate that the Plaintiffs would or at the very least might not pay.

**The attempts to compromise**

142.    On 25 March 2021, the Plaintiffs were invited to voluntarily provide SFC in the amount of USD 4,105,438.00[72] by D1. On 7 April 2021, by letter from their attorneys the Plaintiffs refused to voluntarily give security on the premise of a bare assurance that they "*will comply with any final and binding costs orders of the Cayman Court*."

143.    By letter dated 19 August 2021, Campbells (for D2-D4) informed Ogier (for the Plaintiffs) that if the Plaintiffs remained unwilling to pay a sum by way of security into Court on a voluntary basis, the Defendants would in principle be amenable to adjourning the Security Application if they could be satisfied that any costs order against both KPA and PIFSS could readily be enforced. That would be taken against the Jermyn St Fund interest said to be held by PIFSS in the Cayman Islands by putting in place appropriate security arrangements. This reasonable and pragmatic attempt to address the concerns as to enforcement was rejected by the Plaintiffs.

144.    A further attempt to reach a pragmatic solution on the part of D2-D4 was also rejected. By letter dated 8 September 2021, D2-D4 proposed that the Plaintiffs hold funds in a Cayman Islands money market account, over which the Plaintiffs would retain control over all investment decisions and would be entitled to withdraw any interest or profits made above the value of the security for costs (thus mitigating all downsides which would otherwise result from the Plaintiffs not being able to invest the secured funds while the proceedings are determined). Again, this reasonable proposal was rejected out of hand and without providing any reasons.

**The difficulties with enforcement**

145.    The Plaintiffs are not natural persons or corporate entities against which a lawful demand for payment could be made under threat of bankruptcy or winding up proceedings. Beyond that, it is clear on the Plaintiffs' own evidence that, as a matter of Kuwait law, even a judgment of the

---

[72] *Lewis 2 at § 21*
     *251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

Kuwaiti courts is incapable of being enforced against them. There is not only a real risk that a costs order against the Plaintiffs would not be enforced but, according to Mr Chapman QC, a certainty: even if the order of the Cayman Islands Court were adjudged by the Kuwaiti courts as being capable of being enforced as an order of the Kuwaiti courts (which is highly unlikely), that order (of the Kuwaiti courts) would itself be incapable of being enforced against the Plaintiffs.

**The relevant legal principles applicable to this case**

**The discretion in GCR O.23, r1 (1)**

146.    GCR O.23, r.1(1) provides :

> "*Where, on the application of a defendant to an action or other proceedings it appears to the Court – (a) that the plaintiff is ordinarily resident out of the jurisdiction... then if, having regard to all the circumstances of the case, the Court thinks it just to do so, it may order the plaintiff to give such security for the defendant's costs of the action or other proceedings as it thinks just.*"

147.    Both Plaintiffs are ordinarily resident outside the jurisdiction (in Kuwait) and, accordingly, the Court has discretion to require them to provide security for the Defendants costs pursuant to GCR O.23, r.1(1)(a).

148.    This rule gives the Court a wide discretion when considering whether to make such an order. The fact that a plaintiff is ordinarily resident outside the jurisdiction is simply a necessary precondition to the making of an order under GCR O.23, r.1 (1) .[73]

149.    There is no presumption that the Court will ordinarily require a foreign plaintiff to give security for costs; rather, the "*discretion is to be exercised on a case-by-case basis, as the rule states, having regard to all the circumstances of the case*".[74]

150.    The interpretation of this rule has been explained by Smellie C.J. as follows:[75]

---

[73] *Re Cybervest Fund [2006 CILR 80] at §23 per Smellie C.J.*
[74] *Cybervest at § 24 citing Aeronave SpA v Westland Charters Ltd. 1 W.L.R. [1971] 1 W.L.R. 1445 per Lord Denning at 1449.*
[75] *Tasaruff § 14*
    *251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and  KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

> "*There is no hard and fast rule that every foreign plaintiff must be required to put up security. The matter is one, as already stated, of discretion to be exercised in every case. All the circumstances will be considered including the means and ability of the plaintiff to pay and even, in an appropriate case, the relative strength or weakness of the case for each side provided those factors are clearly discernible from the evidence. See, for these propositions, the leading case of Sir Lindsay Parkinson & Co. Ltd. v. Triplan Ltd. (8)."*

151.    The Court's discretion must be exercised impartially and must not be exercised discriminatorily[76]. The discrimination of which the Courts are conscious is not the more serious discrimination arising out of nationality, but a lesser discrimination based on residence. There needs to be objectively justifiable grounds for the exercise of the discretion.

152.    The merits of the case will only be relevant if (i) either party can clearly demonstrate a strong probability of success or (ii) the Court is considering a summary judgment application at the same time.[77]

## Analysis and application of principles to this case

153.    Dealing with the latter point first, the merits of the case cannot be properly determined at this stage, save to say that the Plaintiffs' claims are clearly arguable and in my judgment may proceed to trial.

154.    The issue I have to decide is whether the Defendants have shown there are objectively justified grounds for concluding that there are obstacles or burdens to the enforcement of a costs order against the Plaintiffs, such that there is a real risk of non-enforcement and whether, if there are such real risks, it is just in the circumstances to order security and if so on what terms.

## Foreign government or state agency

155.    Where the plaintiff is a foreign government or state agency, there is a presumption that security for costs should not be awarded, although each case will turn on its own facts. The presumption arises from comity and common sense and may be displaced by the evidence.

---

[76] *Walkers v Arnage unreported 2 August 2021 at §§ 43-50 and Jafar v Abraaj unreported 10 August 2021 and AHAB v SICL (2) CILR 602 at § 21*
[77] *Cesar Hotelco v Ryan [2012 (2) CILR 164] per Cresswell J, applying Fernhill Mining v Kier Construction [2000] CP Rep 69*

*251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

Page 35 of 41
AP1578

156.   As Smellie C.J. has held, drawing the common practical principles together from decided cases:[78]

> *"..where the plaintiff is the government (or a state agency) of a foreign state enjoying good standing in the international community (in particular from this court's point of view, enjoying diplomatic relations with H.M. Government) it should be assumed as a matter of comity and common sense, in the absence of anything to the contrary, that it will honour its obligations for costs made against it. Nonetheless, as the question remains one to be decided on a case by case basis in the discretion of the court, an order for security for costs could undoubtedly be made against a foreign state in appropriate circumstances."*

157.   As Smellie C.J. also observed the only modern reported case in which security has been ordered against a foreign government was *Sierra Leone Govt. v. Davenport [2003] EWHC 1913 (Ch).* The circumstances in that case were exceptional, as Sierra Leone had recently emerged from a civil war. There was accordingly [79]

> *"..no certainty that, faced with many competing demands on limited financial resources, the claimant Government is likely to provide spontaneous payment in a rapid timescale. And, so far as enforcement is concerned, there is nothing to indicate that there is likely to be any ready means by which the judgment for costs could be enforced against the Government in Sierra Leone. Nor is it suggested that there are any assets readily susceptible to execution, either in this country or in a Brussels or Lugano State".*

158.   The petitioner (and respondent to the security for costs application in *Cybervest)* was the Second Plaintiff in this case, PIFSS (and the decision in *Cybervest* was considered in *Tasarruf* decided later that same year). Smellie C.J. noted that PIFSS had "*immensely valuable assets to be regarded as being within the jurisdiction*"[80] and so if PIFSS failed to pay an order for costs it would be open to the applicant to seek recourse.

159.   Another circumstance "*of some weight*" was the fact that [81]

> "*..the petitioner is a state agency of a foreign government of undoubted resources and enjoying a high reputation in the global financial and commercial community. This is relevant insofar as it would tend to negate any concern that the plaintiff would be unlikely to obey an order for costs made in favour of the respondent. To my mind, it also addresses the concern raised by Mr. Farrow, that efforts to enforce an order in Kuwait, if it ever came to that, could be met with a plea of state immunity."*

---

[78] *Tassaruff §22*
[79] *§ 14*
[80] *Cybervest at § 25*
[81] *Cybervest at §27*

251121 *In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

**Assets within the jurisdiction**

160. Security will not be required of a foreign plaintiff who has substantial assets within the jurisdiction.[82] Where any liability for costs on the plaintiffs' part will inevitably be joint and several, security will not be required if at least one plaintiff has substantial assets within the jurisdiction.

161. A foreign plaintiff does not have the burden of establishing that it has fixed and permanent property within the jurisdiction.

> "*The common sense principle applies that the existence of assets within the jurisdiction, their fixity and performance, are among a number of potentially relevant factors, their importance depending on the particular facts of the case. The Court will not infer the existence of a real risk that assets within this country will be dissipated or shipped abroad to avoid their being available to satisfy a judgment for costs unless there is reason to question the probity of the claimant: there is no such reason in this case. If there is reason to question the claimant's probity, the character of his property within the jurisdiction is relevant in assessing the risk: the risk may be greater if the property is cash or immediately realisable or transportable, and less if fixed and permanent*"[83]

**Undertakings given by a plaintiff**

162. The value of an undertaking given by the plaintiff in the context of a security for costs application was considered by Sanderson Ag. J.[84] He concluded that:

> "*Should a plaintiff in this jurisdiction sign an agreement that he will not raise any of the potential defences in his home jurisdiction should an award of costs be made against him, it would, I think, be very persuasive evidence to any court in the United States*" (the United States being the plaintiff's home country in that case).[85]

**Decision**

163. Applying these principles to the facts of this case in my judgment, the SFC applications should be dismissed. I am of the view that there is no real risk that the Defendants will be unable to obtain costs awarded against the Plaintiffs because the Plaintiffs are agents of the State of

---

[82] *Cybervest* at § 25 and *In re Apollinaris Co.'s Trade Mark [1891] 1 Ch 1*
[83] *Oded Moshe Leyvand v Amnon Barasch and others [2000] WL 191256 at §6 per Lightman J*
[84] *Elliott v Cayman Islands Health Service Authority [2007 CILR 163]*
[85] *At § 18*

251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment

Kuwait and there is no reason to doubt that they would satisfy any award. In addition, PIFSS has substantial assets within the jurisdiction.

**Agents of the State of Kuwait**

164. It is not in dispute that the Plaintiffs are both agents of the State of Kuwait. The Head of the Kuwaiti Department for Legal Advice and Legislation ("DLAL") has provided a letter to the Court dated 20 May 2021 confirming that PIFSS and KPA are wholly owned by the State of Kuwait and are both advised by DLAL. [86]

165. There is therefore on the decided cases a rebuttable presumption that security for costs should not be ordered[87].

166. That presumption has not been rebutted on the evidence adduced on this application. The Plaintiffs would appear to have ready access to funds and would be able to satisfy any costs order against them in a timely manner.

**KPA**

167. KPA is an internationally recognised commercial organisation and relies on its international reputation to do business.[88] Its profit for the financial year 2020-2021 was KWD 56,450,000 (about USD 187,522,553 based on the exchange rate on 9 August 2021).[89]

168. The Director General of KPA has confirmed that it has sufficient resources to meet any costs order made against it in these proceedings, and will comply with any such costs orders in a timely fashion, a position that has been reconfirmed by DLAL.

169. In addition, KPA provided a written undertaking to this effect to the Court on 27 May 2021, a copy of which was sent to the Defendants' attorneys on 3 August 2021.

---

[86] *Florent 3 at §14*
[87] *Tasarruf at §23*
[88] *Florent 3 at §17*
[89] *Florent 3 at §18*
*251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

**PIFSS**

170. PIFSS is a public institution which administers Kuwait's pension fund for all Kuwaiti citizens in the workforce, both in public and private sectors. It operates independently from the State of Kuwait and has its own budget and board of directors. PIFSS has a global investment asset portfolio worth approximately USD 133.7 billion (as at 31 March 2021).[90]

171. Its profit for the period March 2020 to December 2020 was USD 18.9 billion. An officer in the Compliance and Governance Department of PIFSS has confirmed that PIFSS has sufficient resources to meet any costs order made in these proceedings, and will comply with any such costs orders in a timely fashion. PIFSS provided a written undertaking to this effect to the Court on 24 May 2021, a copy of which was sent to the Defendants' attorneys on 3 August 2021.

172. In addition, PIFSS has been a party to several sets of proceedings before the Cayman Islands Courts and has never failed to comply with any costs order.[91]

173. It would in my view be clearly detrimental to PIFSS' ongoing commercial reputation and business to be in breach of an order of the Cayman Islands Courts.

174. Accordingly, having carefully considered the evidence on this application, I find that the presumption against ordering security against agents of a foreign state has not been rebutted. It would therefore not be just to grant the SFC applications against the Plaintiffs.

**PIFSS has substantial assets within the jurisdiction**

175. Moreover, PIFSS has substantial assets in the Cayman Islands.[92] It is a limited partner of Jermyn Street Commercial Real Estate Fund V LP ("Jermyn St Fund"), a Cayman Islands ELP. Its interest in the Jermyn St Fund was EUR 35,074,942 as at 31 March 2021.[93] This significantly exceeds the security for costs collectively sought by the Defendants (c.USD 6.8 million).

176. It is well established that security will not be ordered against a foreign plaintiff who has assets within the jurisdiction.[94]

---

[90] *Florent 3 at §20*
[91] *Florent 3 at §21*
[92] *Florent 3 at §§22 - 27*
[93] *Florent 3 at §24*
[94] *Cybervest at 25 and In re Apollinaris Co.'s*
251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment

177. There is no reason to doubt the probity of PIFSS, which is an agent of the State of Kuwait and familiar with conducting international litigation (including in the Cayman Islands). There is no reason to conclude that PIFSS' interest in the Jermyn St Fund is encumbered, or not amenable to enforcement if necessary, and no reason to conclude that PIFSS would dispose of or otherwise encumber its interest to attempt to defeat an order as to costs.

178. Accordingly, since PIFSS has sufficient assets within the jurisdiction to cover any costs order that is made against the Plaintiffs (in respect of which they would be jointly and severally liable), and in circumstances where both Plaintiffs have given written undertakings to the Court, it would not be just to require the Plaintiffs to pay security for costs (even if they were not agents of the State of Kuwait).

179. I have reviewed the correspondence between Campbells (for D2-D4) and Ogier (for the Plaintiffs) in this regard and conclude there is no basis to form the view that PIFSS would seek to frustrate the enforcement of a costs order against it by disposing of its interest in the Jermyn St Fund even if it were able to do so.

180. The enforceability of Cayman Islands judgments in Kuwait does not therefore arise for determination.

**Conclusion**

1. The Defendants' applications to strike out are dismissed save that:

   a) the paragraphs in the ASOC which rely on criminal convictions are to be struck out.[95]

   b) the Plaintiffs are to join TPF to the proceedings.[96]

2. The applications for SFC are dismissed.

The Defendants should pay the Plaintiffs' costs, to be taxed if not agreed.

---

*Trade Mark [1891] 1 Ch. 1*
[95]  *§§16,17,19,20 and 21 ASOC*
[96]  *Under GCR O.81, r.12*

*251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

Page 40 of 41
AP1583

If costs cannot be agreed I will deal with the matter on the basis of short written submissions.

_____
**THE HON. JUSTICE PARKER**
**JUDGE OF THE GRAND COURT**

*251121 In the Matter of Kuwait Ports Authority and The Public Institution for Social Security v. Port Link GP Ltd, Mark Eric Williams, Wellspring Capital Group, Inc and KGL Investment Company Asia – FSD 236 OF 2020 (RPJ) – Judgment*

Page 41 of 41
AP1584

IN THE COURT OF APPEAL OF THE CAYMAN ISLANDS

ON APPEAL FROM THE GRAND COURT, FINANCIAL SERVICES DIVISION

<div align="right">

CICA (Civil) Appeal Nos. 002 & 003 of 2022
(Grand Court Cause No. FSD 236 of 2020 (RPJ))

</div>

BETWEEN:

<div align="center">

**(1) KUWAIT PORTS AUTHORITY**
**(2) THE PUBLIC INSTITUTION FOR SOCIAL SECURITY**
**(3) THE PORT FUND L.P**.

</div>

<div align="right">

Plaintiffs/Respondents

</div>

<div align="center">

-and-

**(1) PORT LINK GP LTD.**
**(2) MARK ERIC WILLIAMS**
**(3) WELLSPRING CAPITAL GROUP, INC**
**(4) KGL INVESTMENT COMPANY ASIA**

</div>

<div align="right">

Defendants/Appellants

</div>

BEFORE:

<div align="center">

**The Hon. Sir Richard Field JA**
**The Hon Sir Michael Birt JA**
**The Rt Hon Sir Jack Beatson JA**

</div>

Appearances:     **Ms Clare Stanley KC and Mr Peter Tyers-Smith and Mr Thomas Wright of Kobre & Kim on behalf of the First Appellant**

**Mr Graham Chapman KC, Mr Andrew Pullinger and Mr Harry Shaw of Campbells LLP on behalf the Second-Fourth Appellants**

**Mr David Allison KC, Ms Jennifer Fox,  Mr Oliver Green and Mr Harry Clark of Ogier for the Respondents**

Date of hearing:                     **25 and 26 May 2022**

Date draft judgment circulated:     **13 December 2022**

Judgment Delivered:                 **20 January 2023**

<div align="center">

**JUDGMENT**

</div>

**Sir Richard Field JA**

**Introduction**

1.      This is the judgment of the Court to which each member has contributed.

2.      There are two appeals before the Court. The first is brought by all the appellants from the order made by Justice Parker ("the judge") dismissing their summonses to strike out certain claims in the Amended Statement of Claim[1] (the "ASOC") (the "Strike Out Appeal"). The second appeal is brought by the first appellant against the dismissal of its summons for security for costs ("the SFC Appeal"). Hereinafter, we refer to the appellants as "the defendants" or "D1", "D2", "D3" and "D4" and to the respondents as "the plaintiffs".

The Strike Out Appeal

3.      This appeal raises important issues concerned with: (a) the nature of a Cayman Islands Exempted Limited Partnership ("ELP") established under the Exempted Limited Partnership Act (2021 Revision) ("the ELPA"); (b) whether a limited partner of an ELP can sue, independently of any of the other limited partners ,alleged wrongdoers, including the ELP's general partner, who are alleged to have been parties to the wrongful misappropriation of the ELP's assets held on trust by the general partner and, if so, what is the appropriate remedy to be granted by the court;  and (c) the circumstances in which a limited partner can bring a derivative action under section 33(3) of the ELPA in the name of the ELP against the general partner for  breaches of contractual, statutory and fiduciary duty.

4.      The ELP in question is The Port Fund L. P. ("TPF") which was registered on 21 March 2007. It was established as a vehicle for investments in port-related assets around the world.  It has one general partner and eleven limited partners including the two plaintiffs, the Kuwait Ports Authority ("KPA"), which it is alleged has invested USD 85 million giving it at least a 41% interest in TPF and The Public Institution for Social Security ("PIFSS"), which it is alleged invested USD 40 million (giving it a 23.77% interest in TPF). The total invested in TPF by the limited partners was USD 188,152,000.

5.      The first defendant, Port Link GP Limited ("the GP" or "D1"), is a Cayman Islands Exempted Limited Company incorporated on 8 March 2007. It was appointed the general partner of TPF pursuant to a limited partnership agreement ("the LPA") made on 21 March 2007 between it and the original limited partners of TPF. The whole of the GP's share capital is held by Port Link Holdings USA Inc ("PLH"), a Delaware company; and the whole of PLH's share capital is held by the Second Defendant ("Mr Williams"). Mr Williams is also CEO, CFO, President, Vice President, Treasurer and Secretary of the Third Defendant, Wellspring Capital Group Inc ("Wellspring"), a company incorporated in the US State of Georgia. Wellspring is owned by

---

[1] The Defendants' application to strike out those paragraphs of the ASOC that pleaded the criminal convictions in Kuwait of a Ms Lazareva and a Mr Dashti was not opposed and the judge so ordered.

the Mark E Williams Living Trust, the trustees of which are Mr Williams, his wife Laura Williams, and his brother, Dylan Williams.

6.    TPF's sponsor and placement agent was KGL Investment Company KSCC, a Kuwaiti company ("KGLI Kuwait"). From September 2007 until 2008, Mr Williams was KGLI Kuwait's Vice President and he was its Investment Director from 2009 to 2011. He was also a member of TPF's Investment Committee in the years 2009 – 2013.

7.    Pursuant to an agreement with the GP dated 28 June 2007 ("the IMA"), KGL Investment Cayman Limited was appointed TPF's investment manager. In July 2018, KGL Investment Cayman Limited changed its name to Emerging Markets PE Management Limited ("EMPEML"). The ultimate beneficial owner of EMPEML as at the date of the IMA and until around January 2018 was KGLI Kuwait, which is the 100% shareholder of the Fourth Defendant ("KGLI Asia"). KGLI Asia is said by the defendants to have provided administrative support to TPF between December 2017 and August 2020 pursuant to an agreement for the provision of such services dated 1 December 2017 ("the ASA").

8.    Briefly put, the plaintiffs plead in the ASOC that assets of TPF worth hundreds of millions of US Dollars held on trust by the GP have been misappropriated as part of an unlawful means conspiracy and/or dishonest breaches of trust and fiduciary duty and that each of the defendants has wrongfully participated in some or all of these defalcations, in some cases having knowingly received some or all of the proceeds thereof. Amongst the allegations made against the defendants is a claim that the GP made substantial improper payments using TPF monies that were not for the benefit of TPF.

9.    Two of the other limited partners in TPF, Gulf Investment Corporation ("GIC") and General Retirement and Social Insurance Authority of Qatar ("GRSIA"), who between them it is alleged invested 15.14 % of the total alleged investment in TPF, have brought claims against the Second and Third Defendants in the US State of Georgia alleging that those parties are guilty of dishonesty, deliberate breaches of fiduciary and unlawful means conspiracy. GIC and GRSIA have consented to a stay of their claims in the courts of Georgia pending determination of the instant proceedings which they support.

10.    The two current directors of the GP ("the FFP Directors") are individuals recruited from FFP (Directors) Limited. Mr Andrew Childe ("Mr Childe") was appointed on 29 January 2020 and Mr Richard Lewis ("Mr Lewis") on 28 October 2020, replacing Mr Christopher Rowland ("Mr Rowland") who had been appointed at the same time as was Mr Childe.

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

AP1587

11.     The FFP Directors have no connection to any of the wrongdoing alleged in the ASOC and describe themselves as "independent directors". In his third affidavit, Mr Lewis states that, fully cognisant of their fiduciary duties, they have conducted an intensive, forensic investigation into the actions of the GP and the former management team of TPF for the benefit of all the limited partners and not just the plaintiffs. The stated results of the FFP Directors' forensic investigation are set out in a series of memoranda issued to the limited partners in an update to the limited partners dated 29 May 2021, save for their investigations into the DIFC Proceedings Claim and the Lazareva Lobbying Campaign which are respectively dealt with in [300] –[345] and [346] – [399] of Mr Lewis's third affidavit. In their view, there is currently no cause to bring the derivative claims and even if TPF had meritorious claims, it would be necessary to consider whether the claims were worth pursuing on a cost/benefit analysis and, if so, whether TPF was in a position to pursue them or could raise funding to do so, and whether it would be in the best interests of TPF to do so.

12.     The plaintiffs plead individual direct claims against the defendants for losses each has suffered as a limited partner in TPF by reason of the defendants' actionable involvement in the wrongful misappropriation of assets held on trust by the GP. Relying on section 33(3) ELPA, they also plead derivative claims against the GP and the other defendants on behalf of TPF in respect of the aforesaid alleged misappropriation of assets.

**The direct claims and the applications to strike them out**

13.     We first consider the direct claims brought against the GP, (D1), Mr Williams (D2), and Wellspring (D3). It is not necessary to consider the plaintiffs' claims against KGLI Asia (D4) for their losses from payments made to that entity under the ASA because the plaintiffs' counsel, Mr Allison KC, accepted that there is no direct claim against D4; see respondents' skeleton [48].

14.     The plaintiffs plead that in breach of the statutory, contractual, common-law and fiduciary duties owed by the GP to TPF and the limited partners and pursuant to a conspiracy to injure TPF and the limited partners by unlawful means, the GP made very substantial payments using TPF monies that were not for the benefit of TPF and the limited partners. These payments were allegedly made to the following five recipients and/or for the following purposes: (i) Apache Asia Limited and its related Macau entity, Apache Asia Limitada ("Apache") which received USD 58,528,399 from the GP, of which USD 45,850,000 was purportedly for services under an advisory agreement and USD 14,550,000 was directed to be paid to KGLI Kuwait; (ii) Wilfredo Placino who received USD 2,920,000 purportedly by way of "advisor fees"; (iii)

lawyers and lobbyists acting for Ms Marsha Lazareva (a director of the GP from 8 March 2007 to 24 May 2018) and Mr Saeed Dashti (a director of the GP from 16 April 2007 to 24 May 2018); (iv) a group of Kuwaiti Service Providers, allegedly for services rendered, of which USD 14,070,000 was paid to Golden Shahin General & Trading Contracting Company ("Golden Shahin"), which is part of a group of companies associated with KGLI Kuwait and Mr Dashti; and (v) Wellspring, which received USD 59,990,461.30 ("the Wellspring Payment") by way of a payment alleged to be due under a judgment given in proceedings brought by EMPEML against the GP and TPF in the Dubai International Finance Centre Court ('the DIFCC").

15. The alleged background to (v) is that on 15 November 2017, USD 496,429,767 (representing part of the net proceeds resulting from the sale by the GP of a TPF asset in the Philippines called "Clark City") were transferred to the GP's account with Noor Bank PJSC ("Noor Bank"). The same day, Noor Bank made a suspicious transaction report to the Financial Intelligence Function of the UAE which issued a report to the Dubai Public Prosecutor who successfully moved to freeze the transferred money, an order that remained in place until February 2019. On 9 July 2018, EMPEML commenced proceedings ("the DIFC Proceedings") against the GP and TPF in the DIFCC of First Instance claiming unpaid Carry in the sum of USD 45,462,000, compound interest on the unpaid Carry sum, and unpaid Management Fees of USD 8,106,386 with compound interest thereon at 8% pa. The GP acknowledged service of the claim, submitted to the jurisdiction of the DIFCC and admitted the claim in the sum of USD 56,808,005. The DIFCC then entered judgment ordering the GP and TPF to pay USD 56,999,978 and, at the request of EMPEML, the GP transferred USD 59,990,461.30 to Wellspring in satisfaction of the judgment. The plaintiffs claim, inter alia, that this payment was made by the GP in wilful and negligent breach of trust in that EMPEML had no entitlement to the claimed Management Fees having assigned its rights therein to KGLI Kuwait; there was no contractual right to interest; it was wrong to submit to the jurisdiction of the DIFCC when the law of the Cayman Islands governed the relationship between the GP and EMPEML; and the IMA contained an exclusive jurisdiction clause in favour of the courts of the Cayman Islands. The plaintiffs also allege that the payment made in satisfaction of the DIFCC judgment was made on the advice of the same legal counsel who, to the GP's knowledge, was also advising EMPEML with respect to its entitlement.

16. The plaintiffs' direct claims against D1 and D3 are for relief under the Fraudulent Dispositions Act, 1996 Revision: (see ASOC [179] and [189]). They claim that these defendants culpably participated in the aforementioned imp roper payments made by the GP that are related in [14] and [15] above and/or dishonestly received such payments or the

traceable proceeds thereof. They maintain that Wellspring was party to an unlawful means conspiracy, dishonestly assisted in a breach of trust/duty by the GP, knowingly procured a breach of the contractual obligations the GP owes the limited partners, and is liable in knowing receipt for "the Wellspring Payment" holding "the Wellspring Payment" or its traceable proceeds on constructive trust for TPF. The plaintiffs also claim that Mr Williams conspired and dishonestly assisted in the GP's breaches of duty and was in breach of his fiduciary duties to TPF and the GP by orchestrating the DIFC Proceedings and the Wellspring Payment.

17.    The GP applied to strike out the direct and the derivative claims against it but not on the ground that they lacked merit.  Instead, it accepted that the pleaded allegations were arguable, but contended in relation to the direct claims that it is impermissible for two members of a class of eleven limited partners to claim damages from the GP to be paid directly to themselves except by seeking partnership accounts that would require the joinder of the other limited partners.

18.    D2-D4 applied to strike out the derivative claims against them but D2 and D3 did not apply to strike out the direct claims against them. They have not appealed the judge's decision, but do not admit that the plaintiffs have standing to bring the direct claims that they face. Like D1, they maintain that these claims "*ought to be pursued by way of a partnership account as against the GP*".

**The general rule as to who may bring proceedings by or against an ELP**

19.    Section 16 ELPA provides that all rights or property of an ELP shall be held on trust by the GP as an asset of the ELP and section 33 contains the general rule as to who can bring proceedings by or against an ELP. Section 16(1) reads:

> "*Any rights or property of every description of the exempted limited partnership, including all choses in action ... shall be held or deemed to be held by the general partner and if more than one by the general partners jointly, **upon trust as an asset of the exempted limited partnership** in accordance with the terms of the partnership agreement*" (emphasis added).

20.    The material provisions of section 33 are:

> "*(1)  Subject to subsection (3), legal proceedings by or against an exempted limited partnership may be instituted by or against any one or more of the general partners only, and a limited partner shall not be a party to or named in the proceedings.*
>
> *(2)  If the court considers it just and equitable any person or a general partner shall have the right to join in or otherwise institute proceedings against*

> *any one or more of the limited partners who may be liable under section 20(1) or to enforce the return of the contribution, if any, required by section 34(1).*
>
> (3)     *A limited partner may bring an action on behalf of an exempted limited partnership if any one or more of the general partners with authority to do so have, without cause, failed or refused to institute proceedings."*

21.     It is important to note that, as recognized in [2] and [6] of D2 – D4's skeleton argument for the appeal, the effect of ELPA section 33 is that *"ordinarily, actions **for and on behalf of an ELP** must by statute be brought by the general partner of that ELP"* and *"**a claim belonging to a limited partnership must be brought by the GP acting for and on behalf of the ELP**"* (emphasis added). Sections 33 (1) and (3) thus apply only to claims brought by or on behalf of an ELP, that is to derivative claims. They therefore do not apply to direct claims brought by a limited partner in respect of its own right of action against the GP and others.

**The judge's decision on the direct claims**

22.     The judge dealt with direct claims by a limited partner at [60]-[65]. Before doing so, at [46]-[59] he helpfully considered and analysed the characteristics of an ELP, how it differs from an ordinary partnership and a company, and the statutory regime established by the ELPA.

23.     He stated at [46]-[47] that the rights and obligations of the limited partners and the general partner (or partners) *inter se* are regulated by the ELPA, the express provisions of which are to prevail where they are inconsistent with the rules of equity and of common law applicable to partnerships as modified by the Partnership Act (2013 Revision). He also referred at [46] to the provision in section 3 of the ELPA that absent such inconsistency those rules *"shall apply to an exempted limited partnership"*.

*(a) Characteristics of an ELP that differ from those of an ordinary partnership:*

24.     At [46]-[53] the judge identified the following characteristics of ELPs which he considered to be important points of distinction from an ordinary partnership, and which create different rights and obligations between the partners to those in an ordinary partnership:

(1)     By section 4(2) and 20 of the ELPA, the limited partners in an ELP have limited liability whereas the general partner is liable for all debts and obligations of the ELP: [48].

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

AP1591

(2)     By section 14 of the ELPA limited partners have no active involvement in the business in their capacity as limited partners. The business is carried out by the general partner who enters into all contracts by or on behalf of the ELP: [49] and [52].

(3)     Section 19(1) of the ELPA imposes an express duty of good faith on the general partner of an ELP requiring the general partner to act in the interests of the ELP: [50].[2]

(4)     Whereas in an ordinary partnership, mutual and reciprocal rights and obligations are owed to each other by partners, section 19(2) of the ELPA provides that, unless the partnership agreement provides to the contrary, a limited partner owes no fiduciary duty either to the ELP or to other partners: [51].

*(b)     Characteristics of an ELP that differ from those of a company:*

25.     At [54]-[55] the judge stated that the fundamental legal distinction is that an ELP has no separate legal personality and exists only as its constituent partners and cannot own property in its own right. He stated that the consequence of the ELP not having a separate legal personality is that its general partner holds its rights and property, including choses in action, on trust for each of the partners. Because a limited partnership has no legal personality, the partnership as a whole is not able to enforce the general partner's obligations as trustee.

26.     The judge then identified other characteristics of ELPs which he considered to be important points of distinction from those of companies:

(1)     the general partner of an ELP owes its duties to all of the individual limited partners whereas the board of directors of a company only owe duties to the company (as the legal entity) and not to its shareholders: [56]-[57].

(2)     because in the case of a company directors' duties are owed to the company, any breach by them is generally only actionable by or on behalf of the company and not by shareholders, although there are important exceptions where the wrongdoer directors are in control of the company: [57]-[59].

(3)     by section 33(1) of the ELPA, the general partner in an ELP is the only entity who can institute proceedings on behalf of the partnership, whereas in the case of a company there are exceptions to the rule in *Foss v Harbottle* (1843) 2 Hare 461 where the wrongful directors are in control of the company. The judge stated that "*if the limited*

---

[2] The judge did not mention, but must have been aware, that this statutory duty is subject to any express provisions to the contrary in the partnership agreement.

*partners have claims against the GP it is in practice unworkable for it to bring proceedings against itself for breach of duty. If the GP is the arbiter of whether to bring claims against itself that clearly gives rise to a conflict of interest*": [60].[3]

(c)    *Direct claims by a limited partner:*

27.    The judge accepted the submissions of counsel for the plaintiffs, Mr Allison KC, based on the characteristics of an ELP which differ from those of an ordinary partnership and a company, in particular that an ELP has no separate legal personality and that a limited partner does not owe fiduciary duties to the ELP or to the other limited partners. He stated that:

> "*[T]he logical consequence of the aforesaid analysis of the nature and characteristics of an ELP is that the GP's obligations must be capable of enforcement by each of the partners to whom it owes duties individually. That is to be contrasted to the situation where directors of a company hold the company's assets and are treated as trustees because they owe fiduciary duties to the company. In that situation they hold the assets for the company, rather than the shareholders*": [61].

> "*The GP of an ELP owes fiduciary duties to each of the Limited Partners and any breaches are therefore enforceable by the Limited Partners themselves*": [62].

28.    The judge then stated:

> "*It follows that where an ELP is alleged to have suffered loss, as in this case, that is the loss of each of the Limited Partners. There is no distinct or separate loss in respect of 'the partnership' (TPF), which as an entity does not exist at law. The Limited Partners in enforcing their individual claims do not owe duties to each other*": [63].[4]

29.    He concluded at [64] that:

> "*[T]he direct claims in respect of the individual partners' losses are vested in the Limited Partners alone, and are not claims that can be brought on behalf of TPF derivatively, except in the circumstances permitted by section 33(3) of the ELPA where the Limited Partners … who wish to obtain redress for TPF are in effect put in the place of the GP, and bring claims on behalf of TPF*".

30.    The judge rejected the submission on behalf of the GP and the other defendants that sections 16(1) of the ELPA and clauses 3.1 and 3.3 of the LPA prevented such direct claims because the limited partners cannot usurp the function of the GP, who is the only authorized agent of the

---

[3]  In [60] the judge does not mention section 33(3) of the ELPA which, as we have seen, permits a limited partner to bring a derivative action: "an action on behalf of an [ELP] if any one or more of the GPs with authority to do so have, without cause, failed or refused to do so".

[4]  The last sentence, stating that, in enforcing their individual claims, limited partners do not owe duties to each other, contains a footnote referring to section 19(2) of the ELPA on which see para [24] (4) above.

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

AP1593

partnership, here TPF, able to sue. He stated that: "*the practical difficulty with that submission is that in practice the GP could obviously not sue itself and suffers from the conflict of interest*" that arises if the GP is the arbiter of whether to bring claims against itself which clearly gives rise to a conflict of interest: see [76] and (on the conflict of interest) [60].

*(d)     The Henderson case*

31.     At [66]-[78] the judge considered the decision of Cooke J in the English Commercial Court in *Certain Limited Partners in Henderson PFI Secondary Fund II LLP (A Firm) v Henderson PFI Secondary Fund II LLP (A Firm) & others* [2012] EWHC 3259 (Comm) (hereafter "*Henderson*"). That case concerned the similar but by no means identical UK statutory regime in the Limited Partnerships Act 1907 under which such partnerships also have no legal existence independent of their constituent partners. The focus of *Henderson* was whether limited partners were entitled to pursue derivative claims on behalf of the partnership, and, if so, the consequence of doing so.[5]   We therefore primarily consider it when giving our conclusion and reasons about the derivative claim against D1 at [147] – [148] below. But in considering entitlement to pursue a derivative claim, Cooke J also considered whether a limited partner could sue the general partner for "*its own loss under its own claim*" under the limited partnership agreement. He stated that it could because "*it has its own contractual or fiduciary claim for its own loss*": [2012] EWHC 3259 (Comm) at [28] and [31].

32.     In the present case, the judge stated that Cooke J held that:

      (i) "*each limited partner could in its own individual capacity sue … the general partner for its own losses in respect of liabilities under the limited partnership agreement*": [69];

      (ii) "*any claim brought by each limited partner as an individual contractual or fiduciary claim would not involve management of the partnership business*", [72]; and

      (iii) "*the partnership which consisted of the limited partners and the general partner together, had no form of joint right or claim against the general partner*": [72].

*(e)     Must direct claims by a Limited Partner be by seeking an order for partnership accounts?*

---

[5] i.e. whether the pursuit of derivative claims constituted taking part in the management of the business of the partnership so that, under section 6(1) of the 1907 Act, claimants doing so would forfeit their limited liability.

33.     The judge considered the GP's submission that direct claims by a limited partner can *only* be vindicated by the taking of partnership accounts at [79] ff. At [86]-[87], he rejected it and accepted the plaintiffs' submission that the claims advanced were principally direct claims vested in the individual limited partners rather than in TPF (the ELP itself) and that the taking of partnership accounts was not the only procedural route available to the plaintiffs.[6]

34.     The judge took into account the distinct characteristics of an ELP and the provisions of the ELPA: [80]-[81]. He considered that the English authorities on ordinary partnerships which Ms Stanley submitted were "*pellucidly clear*" in requiring rights and obligations between partners only to be procedurally adjudicated by the taking of partnership accounts had no direct application to Cayman Islands' ELPs. His reasons were that, unlike ordinary partnerships, under a Cayman Islands' ELP:

(ii)     there are no reciprocal fiduciary obligations or reciprocal duties between the limited partners unless the LPA provides otherwise: [84];

(iii)    the absence of reciprocal fiduciary obligations between the limited partners means that the joinder of all partners to any proceedings so that the necessary accounting for any monetary claims required by *Public Trustee v Elder* [1926] 1 Ch. 776 at 789 does not apply to a Cayman Islands' ELP: [82];

(iv)    the general partner owes fiduciary and contractual duties directly to the limited partners and those duties are enforceable directly by the limited partners: [ 83];

(v)     each limited partner is not, as is the case in an ordinary partnership, jointly and several liable for the partnership's liabilities; referring to sections 3[7], 4(3), 16(1) and 19(2) of the ELPA, the judge stated that "*the rules of equity and common law applicable to ordinary partnerships are in this respect inconsistent with express provisions of the ELP*": [85];

(vi)    claims against the general partner for a breach of the statutory, equitable, common law or contractual duties owed to the limited partners are vested in the limited partners themselves and may be brought directly: [87].

---

[6] His summary of the GP's submissions is at [2(i)&(ii)].

[7] "The rules of equity and of common law applicable to partnerships as modified by the Partnership Act (2013 Revision) but excluding sections 31, 45 to 54 and 56 to 57 shall apply to an exempted limited partnership, except where they are inconsistent with the express provisions of this Act".

**The questions before us and the submissions**

35.  We have stated that D2 and D3 did not apply to strike out the direct claims against them but do not accept that the plaintiffs have standing to bring such claims against them and, although D2 and D3 were not partners, maintain that their direct claims "*ought to be pursued by way of a partnership account as against the GP*". The result was that the focus of the submissions before us was on the judge's rejection of the application to strike out the direct claims against the GP. Little was said specifically about the direct claims against D2 and D3. Ms Stanley for D1, accepted in substance, that there are direct claims against the GP. But, supported by Mr Chapman, she submitted that the judge erred in two respects. The first was his finding that the rule/principle that claims by partners *inter se* can only be brought by the taking of partnership accounts does not apply to a limited partnership. She maintained that the judge erred in holding at [85] that the application of the rule/principle is inconsistent with the express provisions of the ELPA and that it has therefore been disapplied by section 3 of the ELPA. She submitted that his second error was in holding at [55] that the GP holds the property of the ELP "*on trust for each of the partners*". That, she submitted, was a clear misreading of ELPA section 16(1). However, she accepted that before the dissolution of a partnership, although there is jurisdiction to obtain a partnership account, "*it is an exceptional jurisdiction to allow an account pre-dissolution*": Transcript day 2 4/2-14.

36.  On behalf of the plaintiffs, Mr Allison submitted that the partnership accounts rule/principle does not apply to ELPs in this jurisdiction, in the same way that it does not apply to limited partnerships in England and Wales.[8] This, he maintained, is because the element of reciprocity of fiduciary duties in an ordinary partnership is absent in an ELP. Moreover, in an ordinary partnership, but not an ELP, all the partners have unlimited liability for the partnership's liabilities, and (subject to contrary agreement) are entitled to take part in the management of the partnership business. Mr Allison further argued that to apply the rule/principle would be inconsistent with ELPA section 32 (12) (c)[9] which makes it clear that partners in an ELP have a right to an account. Here the pleaded claims against the GP and D2 and D3 include claims for accounts and equitable compensation for the plaintiffs' individual losses. Mr Allison submitted that they are entitled to bring these against the GP because of the GP's position as a fiduciary and statutory trustee and its overarching duty to account. Although less clearly stated, it appears that the basis for the plaintiffs' entitlement to bring direct claims against D2 and D3 is their

---

[8] In fact the Limited Partnership Act 2007 applies throughout the U.K

[9] "A partnership agreement may provide that, as against any other partner, any assignment or other disposition by a partner of any right, debt or other chose in action arising under a partnership agreement shall confer economic rights only and for the purposes of this section "economic rights" are… The right to an account for the purpose of ascertaining the amount of share of any of the foregoing …"

knowing receipt of TPF's property or monies which the GP transferred to them in breach of its statutory, equitable and other obligations, and their participation in a conspiracy to cause loss to the plaintiffs by unlawful means. During Ms Stanley's oral submissions there was some debate as to whether, in a claim by a limited partner against the GP or against a third party, the court could order that the remedy against an unsuccessful defendant should be the restoration of the trust fund by analogy with the position where a claim is brought by the beneficiary of a trust: *Target Holdings Limited v Redferns* [1996] AC 421 (hereafter "*Target v Redferns*"). Ms Stanley accepted that this was possible in a claim against the GP (Transcript day 1 155/2-12) but did not accept that it was possible in a claim against a third party such as D2 and D3. She stated that the obvious way for a limited partner to make a claim against a third party would not be by a direct claim but, using the trust analogy, by a claim on behalf of the trust: see Transcript day 1 155/18-156/11. That appears to be a submission that the claim must be a derivative claim and thus subject to the requirements of ELPA section 33(3). Mr Chapman's written submissions on behalf of D2 and D3, to which we have referred, are to the same effect.

37.    In principle, two main questions arise in respect of the direct claims although, in the light of the way the appeal has proceeded, the second does not in fact arise. The first question is whether a direct claim by a limited partner against the general partner must be made by claiming partnership accounts in proceedings to which all the partners are parties as it must in an ordinary partnership. Can a limited partner claim an account against a general partner for breach of fiduciary or other duty without at the outset joining the other partners and, if the breach is established, may a limited partner obtain an order that the general partner restore the fund?

38.    The second question is whether the ELP itself, although not a legal entity, also has a claim against the GP or a third party such as D2 and D3 for breach of their fiduciary and other obligations. The judge stated at [63] (set out at [29] above) that there is no distinct or separate loss in respect of "the partnership" which does not exist in law as an entity. When dealing with the derivative claims later in this judgment, we state that, for the reasons we give at [145] below, we are not to be taken as agreeing that the judge was correct in concluding that the partnership has no claim against the GP. However, absent a Respondents' Notice in respect of the judge's finding or any submission by the plaintiffs that the judge was wrong, the question is not properly before us. But since it is accepted that a limited partner may have a direct claim against the GP for breach of its fiduciary and other duties, albeit only in the context of partnership accounts, uncertainty as to whether TPF itself also has a claim *qua* ELP does not affect our resolution of the dispute about the plaintiffs' direct claims.

39.     There were three limbs to Ms Stanley's submissions. The first was that the application of the partnership accounts rule/principle to limited partnerships is not inconsistent with the provisions of the ELPA and therefore is not disapplied by section 3. She accepted (skeleton [28]-[36] that there are obvious examples of inconsistency between the rules of equity and common law that apply to ordinary partnerships and the provisions of the ELPA governing limited partnerships. She gave three examples. The first is the disapplication by ELPA sections 4(2) and 16(2) of the rule that in ordinary partnerships each partner is liable jointly and severally with the other partners for all partnership liabilities. The second is section 32(11)'s provision that in limited partnerships the rule that a partner cannot assign its partnership interest to a third party without the consent of the other partners does not apply. The third is that, in the case of limited partnerships, the rule in ordinary partnerships that certain events cause a dissolution of the partnership does not apply to the events specified in ELPA section 35(a)(i)-(vi). But she submitted (skeleton [35]) that none of these "*shed light on the fundamental question at issue on Grounds 2 and 3, namely whether limited partners are entitled to bring direct claims against the GP*". It would appear this may require some reformulation in the light of her acceptance during her oral submissions in response to questions by Birt JA (Transcript day 2 3/21-4/2-14) that in a claim by a limited partner against the GP the court could order that the defendant restore the fund and that it is exceptional to obtain partnership accounts whilst the partnership is continuing.

40.     As to the meaning of "inconsistent", Ms Stanley relied on *Re Knight and Tabernacle BS* [1891] 2 QB 63 at 69. That case concerned a statutory provision that its provisions were to apply except where those provisions were inconsistent with those of another statute. She submitted that this approach applied where, as in the case of section 3 of the ELPA, the question is whether non-statutory rules and principles are inconsistent with the express provisions of a statute and that the partnership accounts rule/principle is not inconsistent with these provisions in the sense used in *Re Knight and Tabernacle BS*. That case stated that to be "inconsistent", the rule/principle must be so at variance with the machinery and procedure indicated by the statute that, if it is applied, the statute would not work. Ms Stanley argued (skeleton [43]) that this shows that "inconsistent" means "irreconcilable" rather than "different to", and that there is no such irreconcilability between the partnership accounts rule/principle and the provisions of the ELPA.

41.     Ms Stanley also referred to the judge's statement (at [86]) that there is "*no good reason why the taking of partnership accounts should be the only procedural route available to the Plaintiffs to obtain redress under the ELPA*". She submitted that the judge thus "*accepted that*

*partnership accounts **were** a means of redress available*" which showed that there is no irreconcilability or inconsistency between the partnership accounts rule/principle and the provisions of the ELPA.

42. Mr Allison's response to these submissions was that the reasons given by the judge at [82]-[85] (summarised at [34] above) for concluding that the partnership rule/ principle was disapplied by ELPA section 3 and is inconsistent with the scheme of the ELPA were correct. As to the scheme of the ELPA, he also submitted that the inconsistency is shown *inter alia* by section 16(1) which makes the GP trustee of an ELP's assets and by section 32(11) which permits the assignment of a limited partner's interest without the consent of the other partners, and section 32(12)(c) which gives a limited partner the right to claim an account.

43. The second limb of Ms Stanley's submissions were the authorities which hold that claims by partners *inter se* can **only** be brought in the context of the taking of partnership accounts. She referred to the statements in *Meyer v Faber (No 2)* [1923] 2 Ch 421 at 439 and *Hurst v Bryk* [2002] 1 AC 185 at 194 respectively that in an action against a co-partner "*the only relief which the plaintiff could obtain would be an account*" and that "*the amount owing to a partner by his fellow partners is recoverable only by the taking of an account in equity after the partnership has been dissolved*". Mr Allison's response was that the cases relied on by Ms Stanley emphasise the reciprocity of personal obligation and trust and the mutuality of personal liability in an ordinary partnership, and Cooke J at [28] of *Henderson's* case emphasised the absence of this in a limited partnership.

44. The third limb of Ms Stanley's submissions were considerations of "*practicality and policy*". She maintained (skeleton [49]) that there were sound practical reasons for the application of the partnership account rule/principle to Cayman Islands ELPs. The rule/principle ensures that the creditors of the partnership are paid first before the partners (as they should be) and that all the limited partners will be bound by the outcome. It, she argued, prevents a multiplicity of proceedings with resulting chaos by providing a mechanism for the orderly winding up of the affairs of the ELP.

45. Ms Stanley submitted that if the partnership accounts rule/principle does not apply "*the limited partners would have to bear the additional burden of the costs of the GP dealing with a multiplicity of proceedings, rather than one*": skeleton [49(4)]. There was, she argued, no prejudice to the partners of an ELP by the application of the rule/principle because "*claims can all be dealt with in the managed process of the taking of partnership accounts*": skeleton [49(4)]. She relied on the statements in *Public Trustee v Elder* [1926] Ch 776 at 784 that all

partners needed to be joined "*to avoid multiplicity of actions*", in *Stevenson v Akt. Fur Carton-Nagen-Industrie* [1918] AC 329 at 247 that partners "*cannot sue each other excepting for the balance of the account taken in accordance with the principles which the courts of equity apply in working out the results of dissolution",* and on 29(1) *Atkins Court Forms on 'Partnerships, Limited Partnerships and LLPs* at [15].

46.     In his oral submissions, Mr Allison relied on *Golstein v Bishop* [2013] EWHC 881 (Ch.), [2014] Ch. 131 to show that in a partnership dispute it is not always necessary to have a claim for a partnership account at the outset. Mr Christopher Nugee QC, sitting as a Deputy High Court judge, stated at [2] and [24] that factual matters and the merits of the claim in that case, which included a claim for damages for breach of the partnership agreement,[10] would be determined but that dissolution accounts would be taken at a later stage. In the Court of Appeal, Briggs LJ, with whom Kay and Sullivan LJJ agreed, recognized that there are remedies other than the taking of a partnership account that might be available for breaches of duty in an ordinary partnership: see [2014] EWCA Civ 10 at [11]. Ms Stanley submitted that *Golstein v Bishop* was distinguishable for two reasons. The first was that the point before us did not arise in that case because the parties had agreed to this being dealt with by way of preliminary issue. Secondly, the substance of the partnership rule/principle was satisfied in that case because there were only two partners, and they were both before the court. Notwithstanding the force of those points, the case shows that, even in the case of an ordinary partnership, there is room for flexibility.

47.     As to misreading ELPA section 16(1), its material provisions are set out at [19] above. It expressly provides that the rights and property of an ELP, including all choses in action are held "***by the general partner upon trust as an asset of the exempted limited partnership in accordance with the terms of the partnership agreement***" (emphasis added)*.* Ms Stanley compared its wording with the judge's holding at [55] that the property of an ELP is held "*on* trust for each of the limited partners".

48.     She submitted that the judge's holding was clearly a misreading of section 16(1). The legislature has directed that the assets are those of "the partnership". Thus, giving full recognition to the fact that whilst an ELP has no independent legal personality, it provided for there to be a first call on the assets by the creditors of limited partnerships and that the limited partners stand behind those creditors. She argued that section 16(1) is consistent with the preservation of the operation of the partnership accounts rule/principle which enables the court to identify the

---

[10]  The Chancery Report omits [178] – [214] of the judgment which deal with the claim for damages for breach of the partnership agreement but those paragraphs are included in the neutral citation version available on the BAILLI website.

assets of the ELP which are "*actually available*" for distribution to limited partners after the creditors had been paid.

49.     Drawing on the analogy of the position under a non-partnership trust, she also relied on the statements in the decisions of the High Court of Australia in *Chief Commissioners of Stamp Duties v Buckle* [1998] HCA 4, 192 CLR 226 and *Commissioner of State Revenue v Rojoda* [2020] HCA 7, 268 CLR 281. In *Buckle's* case the High Court stated at [48] that "*the entitlement of the beneficiaries is confined to so much of those assets as is available after the liabilities in question had been discharged or provision has been made for them*". In *Rojoda's* case, the High Court stated at [33] that "*unlike the beneficiary of a fixed trust, it was well established that a partner's interest was not an interest in, or in relation to, any specific asset other than an entitlement to the partner's share of the net proceeds from the sale of each asset at the completion of winding up. In other words, the only right that the partners have, both before and after dissolution, in relation to each asset is a right to the account and distribution after sale of the proceeds of that asset – 'not to an individual proportion of a specific article, but to an account: the property to be made the most of, and divided'.*"

50.     In *Buckle's* case, the High Court also stated at [47] that in aid of the right of a trustee to reimbursement or exoneration for liabilities properly incurred by the trustee in the administration of the trust, "*the trustee cannot be compelled to surrender the trust property to the beneficiaries until the claim has been satisfied*". At the beginning of [48] it stated that, until such reimbursement or exoneration, "*it is impossible to say what the trust fund is*".

51.     Mr Allison submitted that because an ELP has no separate legal personality the only sensible construction of the words in ELPA section 16(1) is that the general partner of an ELP holds its assets on trust for all the limited partners. The judge was correct so to hold. Because the general partner owes fiduciary duties to all the limited partners, any breaches of those duties must be enforceable by the limited partners themselves. Where there is a claim against the general partner itself it cannot be only the general partner who can institute proceedings. The absence of separate legal personality means that, legally, it is the ELP's constituent limited partners who suffer loss directly and the general partner's fiduciary obligations "*must be capable of enforcement by the other partners (just as the obligations of any other trustee are enforceable at the suit of the beneficiaries)*": skeleton [83(3) – (5)].

**Conclusions on the direct claims**

52.     We first consider the direct claims brought by the plaintiffs against the GP and then consider the direct claims brought against D2 and D3.

(a)     *Direct claims by a limited partner against the GP*

53.     There is considerable force in the considerations of "*practicality and policy*" relied on by Ms Stanley and the need to protect the positions of the creditors of an ELP and of the other limited partners. But we have concluded that the differences between ordinary partnerships and ELPs mean that it is not appropriate to require that a direct claim by a limited partner against the GP must always be initially brought by way of a claim for partnership accounts and that it is not necessary to protect the positions of the creditors and of the other limited partners by requiring this. We have so concluded for the following reasons.

54.     First, we have borne in mind two related factors based on the wording of the ELPA. One is the inconsistency of the proposition that such a claim must be by way of partnership accounts with the right given to a limited partner under ELPA section 32(12)(c) to claim "an account". The legislature addressed the question and used the word "account" but not the term "partnership account". We agree with Mr Allison's submission (skeleton [92]) that it is difficult to see a principled justification for refusing a limited partner a claim to "an account" but permitting such a partner to claim "a partnership account" although there are no mutual and reciprocal rights and obligations between limited partners or fiduciary duties. The other is that ELPA section 16(1) provides that the general partner holds or is deemed to hold "[a]*ny rights or property of every description of the exempted limited partnership, including all choses in action … **upon trust as an asset of the exempted limited partnership** in accordance with the terms of the partnership agreement*" (emphasis added). That in substance (see [56] below), provides that the assets of an ELP are held by the general partner on a statutory trust for the limited partners.

55.     Secondly, an ELP does not have the mutuality and reciprocity of obligations that is the hallmark of an ordinary partnership. This is because ELPA section 19(2) provides that, absent express provision in the partnership agreement, the limited partners owe no fiduciary duties. The statements in the cases relied on by Ms Stanley requiring the claim to be brought by way of a partnership account emphasise the reciprocity and mutuality that exists between conventional partners.

56.     We turn to Ms Stanley's submissions based on section 3 of the ELPA that, absent inconsistency with the rules of equity and of common law applicable to partnerships, those rules "*shall apply to an exempted limited partnership*" and *Re Knight and Tabernacle BS*. We bear in mind the modern purposive approach to statutory interpretation. We consider that, as well as provisions such as sections 16 (1) 19 (2) and 32 (12 (c), the scheme of the ELPA with the absence of

reciprocity and mutuality of rights and obligations is inconsistent with requiring claims by a limited partner to be brought by taking partnership accounts in proceedings to which all the limited partners are party. We accept Mr Allison's submission that because an ELP has no separate legal personality the only sensible construction of the words in ELPA section 16(1) is that the GP of an ELP holds its assets on trust for all the limited partners. On its own, the judge's use of the phrase "*on trust for each of the partners*" at [55] may leave some uncertainty as to whether he meant to treat the entitlement of each of the partners as totally individuated, but at [61] what he said was "*capable of enforcement by each of the partners to whom [the GP] owes duties individually*".

57.     Because a trust also has no separate legal personality, thus making the position similar to the statutory trust created by ELPA section 16(1), we also regard the position of a claim by a beneficiary of a trust against the trustee as important. The beneficiary of a subsisting trust including a discretionary trust is entitled to bring a claim against the trustee to recover loss suffered by the trustee's breach of trust, but the remedy is for an order to restore to the trust what ought to have been there: see *Target v Redferns*; *Lewin on Trusts*, 20th ed., [21-046] and *Snell's Equity*, 34th ed., [2-003] – [2-004] and 21-46.

58.     In *Target v Redferns* at 436D-E, Lord Browne-Wilkinson stated that the rule developed by equity reflected the fact that while each beneficiary had the right to claim, "*no one beneficiary was entitled to the trust property*" and there was a "*need to compensate all beneficiaries for the breach*". He had earlier stated at 434C-D that an order to restore was "*the only way in which **all** beneficiaries' rights [could] be protected*" (emphasis added). The remedy thus ensured that all the beneficiaries' rights were protected and that the beneficiary who issued the proceedings did not steal a march on the others and scoop the pool. There is no inconsistency between such an order and what was stated in *Chief Commissioners of Stamp Duties v Buckle* [1998] HCA 4, 192 CLR 226 and *Rojoda's* case because all that is ordered at that stage is restoration of the fund. Should there be a claim against the ELP, it can then be determined. There is also no inconsistency between such an order and what was said by the High Court of Australia in *Rojoda's* case about the nature of the partnership trust in an ordinary partnership and the difference between that and that of the beneficiary of a fixed trust because ordering restoration of the fund does not give an individual limited partner an interest in any specific asset.

59.     We consider that this approach and remedy is equally applicable in the case of the statutory trust created by section 16 (1) ELPA. We have had regard to the two factors based on the wording of the ELPA referred to at [54] and [55] above; the inconsistency of the proposition that such a claim must be by way of a partnership account with the right expressly given to a

limited partner under ELPA section 32(12)(c) to claim "an account" and the absence in an ELP of the mutuality and reciprocity of obligations that is the hallmark of an ordinary partnership. Whilst, as Ms Stanley submitted at [20] - [25] of her reply skeleton by reference to *Rojoda's* case, assets held by a partner of an ordinary partnership are also held on trust for the partnership, these factors lead to the conclusion that the partnership accounts rule/principle is inconsistent with the ELPA and the judge was correct in his conclusion. Mr Allison accepted that it was likely that the plaintiffs could not have as a remedy equitable compensation payable directly to them because that took no account of the other limited partners and of the ELP's creditors: Transcript day 2 75/12-23. We have concluded that in proceedings against the GP, a limited partner can recover for loss suffered by the breach of the statutory trust but that the remedy would be the restoration of the ELP's fund thus compensating the direct losses suffered by all the constituent limited partners. We discuss further aspects of ordering the restoration of the fund and its doctrinal underpinning when considering the plaintiffs' direct claims against D2 and D3. The important point is that while the individual partners, like the beneficiaries of a discretionary trust, have a direct claim, if established, the remedy for that claim reflects the fact that no one partner is entitled to all of the fund.

60.     This remedy prevents a limited partner claimant from benefitting alone from any recovery either at the expense of the other limited partners or of the ELP's creditors. It thus directly meets the "stealing a march" and "scooping the pool" elements of the practical and policy reasons relied on by Ms Stanley, the substantive elements of her case for requiring a claim by a limited partner against the GP to be by way of partnership accounts from the outset. As we have stated, *Golstein v Bishop* shows that even in the case of an ordinary partnership there is room for flexibility and that a trial of the merits of the claim may be held before taking a partnership account. It suggests that where there is no prejudice either to the creditors of the partnership or to other third parties it is possible to have a trial of the merits of a claim brought by a partner before a partnership account is taken.

61.     We consider that the problem of multiplicity of actions and what Mr Chapman referred to as an "ungated litigation superhighway" can be dealt with by robust case management. Later claims brought in a single jurisdiction can be stayed or consolidated and ordered to be heard together. Where claims are brought in more than one jurisdiction, stays or anti-suit injunctions can also be used to avoid the problems identified by Ms Stanley and Mr Chapman.

62.     Mr Allison's description (see skeleton [89]) of the insistence on the joinder of all the limited partners from the outset as "*unedifyingly formalistic*" may put it too highly. We, however, consider that insistence that a claim for partnership accounts always be made at the outset

reflects an entirely technical procedural approach. In her responses to questions by the Court, Ms Stanley at one stage suggested that the plaintiffs in effect should start again and now seek the taking of partnership accounts and that this either be by the Court now directing further pleadings or an inquiry to identify what is being alleged by the limited partners: Transcript day 1 136/9 -137/20. She argued that the taking of partnership accounts occurs "*in a much more court managed process than a fraud trial where anything goes ...*": Transcript day 1 137/21 – 138/10.

63.     Our rejection of the submission that the direct claims are defective in not at the outset joining all partners and seeking partnership accounts does not mean that the court cannot direct that there be such a procedure at a later stage as part of its case management powers if that proves necessary. If, after the merits of the plaintiffs' claims against the GP have been determined, it appears that an order to restore the fund should be made but that, given the GP's wrongdoing, steps such as placing the assets in escrow, appointing a Receiver, or taking partnership accounts are necessary, the court can make appropriate directions. Alternatively, if the plaintiffs so apply, we would allow them now to add a prayer for the taking of partnership accounts to their pleading, but that such accounting should take place only after the resolution of the issues in their current claims and only if, at that time, it appears necessary.

64.     In summary, for the reasons we have given, we dismiss the GP's appeal against the judge's refusal to strike out the plaintiffs' direct claims against the GP. The consequence is that the plaintiffs may bring their direct claim against the GP. We wish to make it clear that, in the event of success, the likely remedy would be an order to restore the trust fund rather than equitable compensation payable directly to the relevant limited partner.

*(b)     Direct claims by a limited partner against third parties such as D2 and D3*

65.     We have stated that there was no application by D2 and D3 to strike out the direct claims against them on the merits but they submit that the plaintiffs do not have standing to bring the direct claims against them and ought to have brought the claims against the GP seeking the taking of partnership accounts.

66.     The question is whether, if D2 and D3 are held liable to the plaintiffs for breach of their statutory, equitable and other obligations, it is open to the court to order that those defendants restore the fund rather than pay the plaintiffs. If the court is not able to order this, there will be a risk of prejudice to the creditors of the ELP and/or to the other limited partners in the ways we have discussed in the context of claims against the GP but concluded it did not exist in that context. Indeed, since different limited partners may bring claims against different third parties,

there may be a multiplicity of both plaintiffs and defendants and the risk of chaos referred to by Ms Stanley and Mr Chapman might well be greater. That risk would be avoided by a derivative action where the requirements of section 33(3), discussed at [94] – [98] below, are satisfied.

67. Ms Stanley submitted that it is not possible to order D2 and D3 to restore the fund and that the only way that TPF would be entitled to anything is if the plaintiffs' claims are made on its behalf and are thus derivative claims: Transcript day 1 155/25 – 156/10. During an exchange primarily about the claims against the GP, it was put to Mr Allison that against the other defendants he might not be able to get an order restoring the trust. His response (see Transcript day 2 91/3-6) was "*arguably not*" but it is not altogether clear whether the exchanges related to the direct or the derivative claims against D2 and D3.

68. Since D2 and D3 did not apply to strike out the direct claims against them, strictly the question of whether it is possible for the court to order D2 and D3 to restore the fund is one which falls for determination after the merits of the claims against them have been determined. Although we did not hear full argument on this question, in the light of the points that were made, we consider it appropriate to give our preliminary view on the question. We consider that the plaintiffs have a good arguable case that, where third parties are liable for breaches such as those claimed against D2 and D3, the court may order those defendants to restore the fund rather than pay the plaintiffs and thus avoid the risk of prejudice to other limited partners or creditors.

69. As in the case of a claim against the general partner, the starting point is the position of a claim by a beneficiary of a trust. It is clear that the interest of the beneficiary of a discretionary trust is enforceable against a third party who received trust property which the trustee did not have authority to transfer and the third party knew enough to make it unconscionable to retain the asset for his own benefit: see *Lewin on Trusts*, 20th ed., [21-046] and *Snell's Equity*, 34th ed., [2-003] –[2-004] and 21-46.

70. *Snell* also states that "*the beneficiary's only right would be to have the asset or its proceeds reinstated to the trustee ...*": see [21-045] and to the same effect [22-005] and [30-015]. The reason given is that the beneficiary "*could not compel the third party to transfer the asset directly to himself since this would give him a greater equitable right against the third party than he had against the trustee ... ".* At [2-004] of *Snell* it is stated that "*the third party's duty is to restore the trust asset to the properly appointed trustee*" and that this would happen "*if the original trust involved continuing duties to manage a fund and if the beneficiary did not have*

*the entire beneficial interest in the trust asset*". Nolan, "Equitable Property" (2006) 122 LQR 232 at 242-243 states that the cases on the rights of a beneficiary against the recipients of misapplied trust assets all acknowledge that a recipient is bound to restore the assets and their proceeds to the relevant trustees, or else transfer them at the direction of a beneficiary or beneficiaries who, being absolutely entitled to the assets in equity, may terminate the trust and direct such a transfer. At p. 255 he states that the cases provide a doctrinal basis for actions to restore the integrity of a pool of assets held in trust, should it be depleted without authority.

71.     That doctrinal basis explains why, given the analogy between a non-partnership trust, an ELP with no separate legal personality, and the statutory trust imposed by section 16(1) of the ELPA, it is possible to order third parties such as D2 and D3 to restore the fund where the claim against them succeeds. The analogy rests on the fact that, in cases of knowingly assisting a trustee in a fraudulent and dishonest disposition of the trust property, although the third party is not in fact a trustee, he is made liable in equity "**as if he were**" a trustee: *Selangor United Rubber Estates Ltd. v Craddock and others (No. 3)* [1968] 1 WLR 1555 at 1580 and 1582 citing Lord Esher MR in *Soar* v. *Ashwell* [1893] 2 Q.B. 390, 394-395 and Lord Selborne LC in *Barnes* v. *Addy* (1874) 9 Ch. App. 244 at 251. This reflects the fact that it is the fund which has suffered the loss and, in the words of Lord Browne-Wilkinson in *Target v Redferns,* an order to restore is "*the only way in which **all** beneficiaries' rights"* could be protected.

72.     For these reasons, had D2 and D3 applied to strike out the plaintiffs' direct claims against them, our preliminary view is that the objections raised to the plaintiffs' standing to bring the claims are unfounded. The consequence is that the plaintiffs may bring these claims against D2 and D3. It will be for the court hearing the claims to decide whether they are in fact made out on the merits and, if they are, whether, in the circumstances of this case, an order to restore the fund should be made and, given that the GP would be implicated in the wrongdoing, steps such as placing the assets in escrow, the appointment of a Receiver, or the taking of partnership accounts are necessary.

**The derivative claims**

73.     We turn to consider the derivative claims brought against D1 and D2-4. This is the first occasion on which one or more limited partners of a Cayman Islands ELP have sought to bring a derivative claim pursuant to section 33(3) ELPA and accordingly we shall proceed to review the approach adopted by the judge and consider if we can provide any guidance for the future.

74. We begin with a brief discussion of derivative claims generally before turning to consider the interpretation of section 33(3). We shall then consider a number of specific matters of principle raised by the parties before turning to apply our conclusions on the law to the facts of this case.

*(a)    Derivative claims in general*

75. The general rule is that the only person who can bring an action against another who has caused injury or damage is the person who has suffered that injury or damage. As the Court of Appeal put it in the leading case of *Prudential Assurance Co Limited v Newman Industries Limited* [1982] 1 Ch 204 at 210:

> "A derivative action is an exception to the elementary principle that A cannot, as a general rule, bring an action against B to recover damages or secure other relief on behalf of C for an injury done by B to C. C is the proper plaintiff because C is the party injured, and, therefore, the person in whom the cause of action is vested. This is sometimes referred to as the rule in Foss v Harbottle (1843) 2 Hare 461 when applied to corporations, but it has a wider scope and is fundamental to any rational system of jurisprudence."

76. The court went on to outline an exception to the rule in *Foss v Harbottle* in the following terms at p. 211:

> "There is an exception to the rule where what has been done amounts to fraud and the wrongdoers are themselves in control of the company. In this case the rule is relaxed in favour of the aggrieved minority, who are allowed to bring a minority shareholders' action on behalf of themselves and all others. The reason for this is that, if they were denied that right, their grievance could never reach the court because the wrongdoers themselves, being in control, would not allow the company to sue."

77. A further helpful general description of a derivative claim in the context of companies is to be found in the judgment of Lewison J in *Iesini v Westrip Holdings Limited* [2009] EWHC 2526 (Ch) at [73]:

> "I should begin by saying a little about derivative claims generally. In the first place the new code has replaced the common law derivative action. A derivative claim may 'only' be brought under the [Companies Act 2006]. As section 260(1) makes clear a derivative claim is one in which the cause of action is vested in the company, but where the claim is brought by a member of the company. This reflects the old law in which a derivative action was an exception to the general principle (known as the rule in Foss v Harbottle ….) that where an injury is done to a company only the company may bring proceedings to redress the wrong. Allied to this principle was the principle that whether a company should bring proceedings to redress a wrong was a matter that was to be decided by the company internally; that is to say by its board of directors, or by a majority of its shareholders if dissatisfied by the board's decision. The Court would not second guess a decision made by the company in accordance with its own

> *constitution. The exception to these principles was necessitated where the company's own constitution could not be properly operated. If the wrongdoers were in control of the company (because they were a majority of the shareholders) they would not in practice vote in favour of taking proceedings against themselves, even though the taking of proceedings would be in the company's best interest...."*

78.     Derivative claims are not restricted to companies. They can also be brought, for example, in connection with trusts and limited partnerships.

79.     In relation to trusts, it is well-established that, although in general terms the only person who may bring an action against a third party on behalf of a trust is the trustee, a beneficiary can, in special circumstances, bring a derivative action so as to stand in the place of the trustee. In *Roberts v Gill and Co* [2011] 1 AC 240, Lord Collins of Mapesbury summarised the position as follows at [46]:

> *"The cases go back to the 18th century, and many of them were reviewed in Hayim v Citibank NA [1987] AC 730. The special circumstances which were identified in the earliest authorities as justifying a beneficiary's action were fraud on the part of the trustee, or collusion between the trustee and the third party, or the insolvency of the trustee, but it has always been clear that these are merely examples of special circumstances, and that the underlying question is whether the circumstances are sufficiently special to make it just for the beneficiary to have the remedy...."*

80.     To like effect is the observation of Lord Walker of Gestingthorpe at [110] (omitting references):

> *"There is ample authority, comprehensively reviewed in the judgment of Lord Collins JSC, as to the need for special circumstances before the court will countenance a derivative action. Such actions are now relatively common in cases concerned with mismanaged companies, and in many jurisdictions actions by or on behalf of minority shareholders are now regulated by a statutory code... Derivative actions by beneficiaries under inter vivos trusts or wills are less common.... But in all these cases the unifying factor – what has to be special about the circumstances – is that the derivative action is needed to avoid injustice...."*

81.     A helpful summary of the position in relation to trusts under the law of England and Wales is to be found in *Lewin on Trusts (20th Edition)* at [47-006] and [47-008]:

> *"47-006. However, as an alternative to proceedings brought in the name of trustees, a beneficiary may, sometimes, bring an action in his name on behalf of the trust against a third party. The fact that the action is brought in the name of the beneficiary rather than the name of the trustee does not alter its character. The action is a derivative action in which the beneficiary stands in the place of the trustees and sues in right of the trust, and does not enforce duties owed to him rather than the trustees; a beneficiary can be in no better position than trustees carrying out their duties in a proper manner....*

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

> 47-008. *A beneficiary can bring a derivative action only in special circumstances, <u>for example circumstances which tend to disable the trustees from suing (as where their acts and conduct with reference to the trust fund are impeached), or in circumstances rendering it difficult or inconvenient for the trustees to sue, as where there is a conflict between their interest and duty</u>. Special circumstances are not confined to circumstances of these kinds. The guiding principle is that there must be exceptional circumstances, which embrace a failure, excusable or inexcusable, by the trustees in the performance of a duty to the beneficiaries to protect the trust estate, or to protect the interests of the beneficiaries in the trust estate. The special circumstances relied on must have something to do with the willingness or ability of the trustee or alleged trustees to bring the action."* [Emphasis added]

As can be seen from the emphasised passage, circumstances where the trustees are inhibited from suing because their own conduct in relation to the trust is impeached or they are under a conflict of interest are leading examples of *'special circumstances'*.

82. Turning to English limited partnerships, the question of whether and, if so, in what circumstances, a limited partner can bring a derivative claim on behalf of the limited partnership arose in *Henderson* referred to above in [31]. As we have already stated, although by no means identical, there are similarities between an English limited partnership and an ELP. In particular, neither is a separate legal entity and, as in an ELP, the limited partners in an English limited partnership may not take part in the management of the partnership business, which is to be left in the exclusive hands of the general partner. Thus, in the ordinary way, a limited partner cannot sue a third party in the name of the limited partnership; such action can only be taken by the general partner.

83. In *Henderson*, a majority of limited partners instituted derivative proceedings on behalf of the partnership against the general partner and the manager of the partnership (who had been appointed as manager by the general partner on behalf of the partnership). The manager was a sister company of the general partner. The claims sought compensation in respect of various alleged breaches of duty by both the general partner and the manager. It was directed that a preliminary issue should be tried as to whether the claimants could bring derivative claims on behalf of the partnership against the general partner and the manager, and it was this issue which came before Cooke J.

84. For reasons discussed below, Cooke J held that the limited partners could not bring a derivative claim against the general partner. However, having referred to *Roberts v Gill* and to the equivalent passage in the 18th edition of *Lewin* to that referred to at [81] above, he held that special circumstances existed which enabled the derivative claim to be brought against the manager. The special circumstances were that the general partner had an irremediable conflict

of interest because it was a sister company of the manager and was therefore not in a position to be seen fairly to determine whether to sue the manager. Cooke J therefore allowed the derivative claim against the manager to proceed, but went on to hold that, under the relevant provision of the English statute, the limited partners would lose their limited liability as a consequence.

85.     In summary, Cooke J applied the '*special circumstances*' test concerning trusts (as summarised in *Lewin*) to limited partnerships.

86.     Although the ability to bring a derivative action in respect of a company is now governed by statute in England and by the Grand Court Rules in this jurisdiction, the principles governing such claims were developed as a matter of common law. Similarly, the requirement of special circumstances in connection with trusts and limited partnerships has been developed entirely by the courts.

87.     The position is different in relation to ELPs because of the terms of section 33(3) of the Act and accordingly we turn next to consider the correct interpretation of that provision.

**Interpretation of Section 33(3) of the ELPA**

88.     Unlike in the case of trusts or English limited partnerships, the legislature has prescribed in section 33 ELPA when a derivative action may be brought in respect of an ELP. For convenience we repeat the relevant provisions of section 33 at this stage:

> (1)     *Subject to sub-section (3), legal proceedings by or against an exempted limited partnership may be instituted by or against any one or more of the general partners only, and a limited partner shall not be a party to or named in the proceedings….*
>
> (2)     ….
>
> (3)     *A limited partner may bring an action on behalf of an exempted limited partnership if any one or more of the general partners with authority to do so have, without cause, failed or refused to institute proceedings…."*

As can be seen, the key requirement is that the general partner must have *"without cause, failed or refused to institute proceedings"*.

89.     Before the Grand Court, the defendants argued that, when considering section 33(3), the court had to apply principles derived from cases dealing with derivative claims in other contexts. The judge rejected this submission. His conclusion is expressed at [98]-[101] of his judgment:

> "98. The terms of section 33(3) ELPA which allows a limited partner in an ELP
> to bring proceedings on behalf of the ELP if the general partner has <u>without</u>
> <u>cause failed or refused</u> to do so has no language requiring permission or
> special circumstances. In my view the principles taken from the common
> law or equity for bringing derivative claims whether as regards companies,
> trusts, limited partnerships or associations are not applicable. [original
> emphasis]
>
> 99. In my judgment section 33(3) is sui generis and is not subject to the rules
> relating to permission or for special circumstances for derivative actions in
> other contexts. I accept Mr Allison QC's submission that to this extent it can
> be said to 'occupy the field' in the Cayman Islands with respect to ELPs and
> there is no room for a case by case judge led formulation of a common law
> or equitable test.
>
> 100. I have in coming to this view had regard to the principles Ms Stanley QC
> and Mr Chapman QC referred me to relating to cases which dealt with
> failures or refusals to bring claims in other contexts, for example where the
> board of the company or the trustee had the relevant inhibition which
> prevented a decision to bring claims. Whilst these principles provide helpful
> guidance, the company and trusts law cases to which I was referred do not
> directly apply to the position in this case which involves the application of a
> specific statutory test for Cayman Islands ELPs.
>
> 101. I note however that the common thread running through those cases is that
> where the authorised decision maker is inhibited, the Court may permit, in
> the interests of justice, derivative claims."

90. On appeal, the defendants have argued that the judge fell into error in stating at [98] and [99]
that the principles applicable in other contexts, such as trusts and companies, are not applicable
in relation to the statutory test. At [68] of her skeleton argument, Ms Stanley submitted that
*'without cause'* should be interpreted by reference to the well-established tests applied in all
other derivative actions. Similarly, at [8] of his skeleton argument, Mr Chapman submitted that
the statutory gateway prescribed by section 33 did not oust the ordinary rules of common law
and equity. On the contrary, it provided a <u>further</u> statutory hurdle or threshold that had to be
met, together with those imposed by the common law and equity, before a derivative claim
would be permitted. He submitted that this was a fundamental error in the judge's approach.

91. Conversely, in his skeleton argument, Mr Allison submitted at [124] and [125] that the judge
was correct to hold that section 33(3) *'occupies the field'* and that there was no scope or reason
to import any *'special circumstances'* test or other common law or equitable principles that
apply to derivative claims in respect of other entities or structures. There was no reason to
imply any requirements for derivative claims beyond those explicitly mentioned in section
33(3).

92.     It seems to us that, during the course of the hearing, both sides rather modified their submissions and were eventually not very far apart in relation to the proper construction of section 33(3). Thus Mr Chapman (who by agreement with Ms Stanley presented the main argument on the derivative claims on behalf of all the defendants) conceded that, to the extent that his written submissions had suggested that one imported wholesale the common law and equitable principles on derivative claims, this might go too far. He accepted that one had to apply the statutory test set out in section 33(3), but submitted that this test was consistent with the established principles and that one derived assistance from those principles when construing and applying the statutory test.[11]

93.     Similarly, Mr Allison accepted that, when applying the statutory test and determining whether the failure by the general partner to institute proceedings was *'without cause'*, one could have regard to the principles established in other contexts, such as whether special circumstances existed.[12]

94.     In our judgment, in circumstances where the legislature has established a statutory criterion for bringing a derivative action in respect of an ELP, the courts are duty bound to apply that statutory test. The test cannot be replaced by common law and equitable principles developed in other contexts even if, in the absence of a statutory test, the courts would no doubt have applied those principles to an ELP. Nor can those principles form an additional threshold beyond the statutory test, as submitted by Mr Chapman in his skeleton argument referred to at [90] above.

95.     The statutory test is in general and imprecise terms and leaves open how the test should be applied in practice. However, we think that the expression "without cause" must carry the implication of "good" cause. The legislature cannot have intended that a decision for <u>any</u> cause, no matter how inhibited or conflicted the decision-maker, would be sufficient to prevent a derivative action. This is so notwithstanding the fact that, as originally enacted, the legislation referred to 'good cause' whereas, in its current form, the word 'good' is omitted. No guidance as to the reason for this change is to be found in the legislative materials produced in relation to the revision of the statute and we cannot attribute any significance to the change.

96.     In these circumstances, we are of the view that the court is entitled to have regard to and may derive assistance from the developed principles in other contexts. In particular, given the existence of the statutory trust imposed by section 16(1) of the ELPA (namely that the general

---

[11] Transcript, day 1 pp 48-50
[12] Transcript, day 2 pp 45-46 and 49

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

partner holds the property of the ELP *'upon trust as an asset of the exempted limited partnership in accordance with the terms of the partnership agreement'*), the court is likely to derive assistance from considering whether special circumstances (as established in the contexts of trusts and English limited partnerships) exist.

97.     If special circumstances exist, this is likely to assist the Court in deciding whether a general partner's decision not to institute proceedings is *'without cause'*. Indeed, in opening his oral submissions on appeal, Mr Allison (rightly in our view) accepted that, if a general partner were under a relevant inhibition or conflict of interest – concepts which emerge strongly from consideration of special circumstances as stated in the emphasised passage from [47-008] of *Lewin* quoted at [81] above – his decision would necessarily and unavoidably be *'without cause'*.[13]

98.     We emphasise, however, that the court's duty is to apply the statutory test of *'without cause'*; it is not sufficient simply to consider whether there are special circumstances and, if so, then to allow a claim under section 33(3). Consideration of whether there are special circumstances, if it assists at all, is simply a step on the road to determining the statutory test. If the court decides that the facts would satisfy the special circumstances test, it must nevertheless go on and consider whether they therefore satisfy the '*without cause*' test in section 33(3). Conversely, we do not rule out the possibility of a case in which the facts enable the court to find that the general partner's decision is '*without cause*' without consideration of whether there are special circumstances. The two tests are not to be equated, although we envisage that consideration of whether there are special circumstances is likely in most cases to be of considerable assistance in determining whether the decision is *'without cause'*. Indeed, it was common ground before us that a decision by a decision-maker which is made under a relevant inhibition will be a decision *'without cause'*.

99.     Although there is some ambiguity and possible inconsistency between [98] and [99] of the judge's judgment on the one hand and [100] on the other, we do not see the judge's decision on this aspect as being essentially any different from our own. [98] and [99], when read in context, simply state that the court's duty is to apply the statutory test, not the common law and equitable principles, but [100] goes on to explain that, although they are not directly applicable, these principles provide helpful guidance. The fact that such helpful guidance may be obtained is emphasised by the fact that, when he goes on to consider the application of the statutory test to the facts of this case, the judge concentrates exclusively on the fact that, in his view, the GP

---

[13] Transcript day 2, p8

was subject to an inhibition because of its conflict of interest. Inhibition is not a word which appears in section 33 but, as the judge correctly states at [101] of his judgment, it is a concept which is a common thread in the cases which allows the court to permit derivative claims in other contexts in the interests of justice.

100.   Having expressed our view as to the correct interpretation of section 33(3), we turn next to consider a number of supplementary points which were argued before us in relation to the statutory test.

**Procedure for determining the statutory test**

101.   Unlike in the case of companies, there is no requirement under section 33 for a limited partner to seek leave from the court to bring derivative proceedings under section 33(3). It follows that a limited partner is free to commence derivative proceedings without leave.

102.   In this respect, the position is the same as derivative claims in respect of companies prior to the introduction by statute and/or rules of court of a requirement for leave and is the same as it remains in respect of trusts and English limited partnerships. But, despite the historical lack of a requirement for leave in respect of companies, it was established as long ago as 1982 in *Prudential* that the question of whether a plaintiff should be permitted to bring a derivative action on behalf of a company should be determined at an early stage rather than left until trial. In *Prudential*, the defendant applied by summons to have heard as a preliminary issue whether the plaintiff was entitled to maintain the derivative action. The judge dismissed the summons on the ground that it was more convenient to decide the issue after the action had been heard. The Court of Appeal was very critical of this decision saying at 221:

> *"First, as we have already said, we have no doubt whatever that Vinelott J erred in dismissing the summons of May 10, 1979. He ought to have determined as a preliminary issue whether the plaintiffs were entitled to sue on behalf of Newman by bringing a derivative action. It cannot have been right to have subjected the company to a 30-day action (as it was then estimated to be) in order to enable him to decide whether the plaintiffs were entitled in law to subject the company to a 30-day action. Such an approach defeats the whole purpose of the rule in Foss v Harbottle and sanctions the very mischief that the rule is designed to prevent."*

103.   Following *Prudential*, it has been the practice that a plaintiff's standing to bring a derivative action is determined at an early stage in the proceedings rather than the issue being left to trial, with all the disadvantages which that course would bring as described in *Prudential*. Where there is a leave requirement (e.g. for companies) the issue is dealt with on the application for leave. Where there is no requirement to obtain leave, the matter is traditionally dealt with on

an application by the defendant to strike out the proceedings on the ground of a lack of standing on the part of the plaintiff or by the court ordering, at the request of the defendant, the trial of a preliminary issue as to whether the plaintiff has the necessary standing to bring a derivative action.

104.    The practice was conveniently summarised by Chadwick P in this court in the case of *Autumn Holdings Asset Inc v Renova Resources Private Equity Limited and Others* [2017] (2) CILR 136 at [26], where he quoted with approval from the judgment of Ribeiro PJ in the Hong Kong Final Court of Appeal in the case of *Waddington Limited v Chan Chun Hoo Thomas* [2008] HKCFA 63; [2009] 2 BCLC 82, where that learned judge said:

> "[13]    ... *Procedurally, there is no requirement at common law for a person seeking to sue derivatively first to obtain the leave of the court....*
>
> [14]    *The time honoured practice at common law is for the plaintiff to issue proceedings 'on behalf of himself and the other shareholders other than the defendants', naming the company on whose behalf the proceedings are brought as one of the defendants. A challenge to the plaintiff's locus generally takes the form of an application by the relevant defendants to strike out the claim or to have the court determine as a preliminary issue that the plaintiff has no locus to sue on the company's behalf."*

105.    In our judgment, this is also the appropriate procedure to be followed in relation to proceedings brought under section 33(3). The subsection is clear that a limited partner may only <u>bring</u> a derivative claim if the general partner has refused or failed to do so without cause. It is therefore necessary for the court to decide at an early stage of the proceedings whether the limited partner can indeed bring himself within section 33(3) and therefore '*bring*' the claim. For the reasons set out so graphically in *Prudential*, this is not a matter which should normally be left until trial. We agree therefore that a defendant wishing to challenge the right of a limited partner to have instituted proceedings on behalf of an ELP pursuant to section 33(3), should do so either by applying to strike out the proceedings on the ground of a lack of standing (as was done in this case) or by applying for the court to direct the trial of a preliminary issue as to the limited partner's ability to bring himself within subsection (3).

106.    The question then arises as to the approach which the court should adopt on such an application. In the first place, it is clear that the outcome cannot depend on which of the two courses a defendant chooses to follow. The court's approach must therefore be the same whether there is a strike out application or the trial of a preliminary issue.

107.    The judge held that, as this was a strike out application, the normal approach on such an application should be adopted, with the result that the defendants had to show that it was certain

that, at trial, the plaintiffs would fail to bring themselves within the terms of section 33(3); see *Hughes v Colin Richards & Co* [2004] EWCA Civ 266, cited with approval in *Re Sphinx Group* [2010] 1 CILR 234, at para 37. The burden lay upon the defendants to show this and there was no burden on the plaintiffs to show that they came within section 33(3). If there was an arguable case that at trial the plaintiffs would be able to satisfy the requirements of that subsection, that was sufficient to enable the case to proceed.[14] It would only be at trial that it would be finally resolved whether the plaintiffs had brought themselves within section 33(3)[15]. Although at times the judge used slightly inconsistent language about his approach[16], we are satisfied that he essentially applied the test we have just described and which he spelt out at [33] of his judgment. Mr Allison submitted that the judge had followed the right approach.

108. Mr Chapman, on the other hand, submitted that this was the wrong approach. In his submission, the onus lay upon the plaintiffs to satisfy the court that they came within section 33(3) i.e. that the GP had refused or failed to institute proceedings without cause.

109. In other contexts, the onus lies upon a plaintiff to satisfy the court that he should be permitted to bring a derivative action. Thus in *Prudential*, after the passage cited above, the Court of Appeal went on to say at 221-222:

> *"...we do not think that the right to bring a derivative action should be decided as a preliminary issue upon the hypothesis that all the allegations in the statement of claim of 'fraud' and 'control' are facts, as they would be on the trial of a preliminary point of law. In our view, whatever may be the properly defined boundaries of the exception to the rule, the plaintiff ought at least to be required before proceeding with his action to establish a prima facie case (i) that the company is entitled to the relief claimed and, (ii) that the action falls within the proper boundaries of the exception to the rule in Foss v Harbottle."*

This approach has been followed in this jurisdiction in relation to companies; see *Top Jet Enterprises Limited v Sino Jet Holding Limited* [2018] (1) CILR 18 at [29] per Segal J.

110. It is not entirely clear what standard the Court of Appeal in *Prudential* was intending to set by referring to a plaintiff *'at least'* being required to establish a *'prima facie'* case that he falls within the exception to the rule in *Foss v Harbottle*. Some assistance can be derived from the subsequent judgment of Knox J in *Smith v Croft (No 2)* [1988] Ch 114 at 138-139 (approved in *Top Jet* at [30]) as follows:

---

[14] Judgment [33], [119], [123]
[15] Judgment [33(ii)], [138]
[16] Thus at [102] the judge refers to *'good arguable case'* and [106] and [136] might be said to suggest that he was in fact making a clear finding that D1 had failed without cause to bring proceedings rather than that it was simply arguable.

> *"My conclusion is that it is the question stated by the Court of Appeal that has to be decided as a preliminary matter, that it is a special form of procedure concerned with giving sensible operation to the rule in Foss v Harbottle, and which is concerned with avoiding the Scylla and Charybdis, on the one hand, of having a preliminary issue which effectively requires one to try the whole action where the rule serves no useful purpose and, on the other side of the strait, of assuming that everything the plaintiffs allege is necessarily correct as a matter of fact, which is of course the technique the court adopts when it has what was called a strict demurrer. The Court of Appeal, it seems to me, has laid down a halfway house for this very special type of case, one in which the legal issues in this particular case are sufficiently well defined for the parties to be able to argue them."*

In other words, the approach should be a halfway house between a strike out application and a full trial.

111. When pressed during the hearing as to what he thought the Court of Appeal meant by a prima facie case, Mr Allison suggested that it meant a good arguable case and that was in fact an expression the judge used at [102] of his judgment, despite his references (see [107] above) to mere arguability being the test. This court recently had occasion to consider what was meant by the expression *'good arguable case'* in *Scully Royalty Limited v Raiffeisen Bank International AG* (30 December 2021) at [47]-[52]. In particular, the court approved the observation of Mustill J in *The Niedersachsen [1983]* 2 Lloyds Rep 600 at 605 where he said:

> *"I consider that the right course is to adopt the test of a good arguable case, in the sense of a case which is more than barely capable of serious argument, and yet not necessarily one which the judge believes to have a better than fifty percent chance of success."*

112. During the hearing, the court invited counsel to ascertain whether recent English decisions in relation to derivative actions offered any assistance as to the standard to be applied when considering whether the grounds for permitting a derivative action had been made out. However, counsel's researches were unable to come up with anything of significant assistance.

113. Mr Chapman referred us to the decision of the English Court of Appeal in *Barrett v Duckett* [1995] (1) BCLC 243, which was decided before the requirement for leave in relation to companies was introduced by statute. This was a case where B & D each held a 50% shareholding in a company. B instituted a derivative action against D and others on behalf of the company alleging wrongdoing by D and others, D being the sole director of the company. The defendants applied to strike out the claim on the basis that it was not a proper case for a derivative action. In the course of his judgment Peter Gibson LJ sought at p.249 to summarise the principles in relation to derivative actions concerning companies in the following terms (omitting passages not relevant for our purposes):

> *"The general principles governing actions in respect of wrongs done to a company or irregularities in the conduct of its affairs are not in dispute:*
>
> > *1. The proper plaintiff is prima facie the company.*
> >
> > *2. ...*
> >
> > *3. There are however recognised exceptions, one of which is where the wrongdoer has control which is or would be exercised to prevent a proper action being brought against the wrongdoer: in such a case the shareholder may bring a derivative action (his rights being derived from the company) on behalf of the company.*
> >
> > *4. When a challenge is made to the right claimed by a shareholder to bring a derivative action on behalf of the company, it is the duty of the court to decide as a preliminary issue the question whether or not the plaintiff should be allowed to sue in that capacity.*
> >
> > *5. In taking that decision it is not enough for the court to say that there is no plain and obvious case for striking out; it is for the shareholder to establish to the satisfaction of the court that he should be allowed to sue on behalf of the company.*
> >
> > *6. ..."*

114.   Mr Chapman relied in particular on the second part of 5 above, namely that it is for the shareholder to establish to the satisfaction of the court that he should be allowed to sue on behalf of the company.  He submitted not simply that this places the onus on the shareholder, which we accept, but that it means that the shareholder must establish his ability to sue on the balance of probabilities.  He says that *Barrett* changed the test set out in *Prudential*, with its reference to a prima facie case.

115.   We are unable to place such weight on the decision in *Barrett*.  Peter Gibson LJ was simply recording general principles, which were not in dispute.  We do not think that it assists on how a shareholder satisfies the court that he should be allowed to sue on behalf the company.  What is made clear, however, in the first part of 5 above is that the court should not apply the normal strike out test.  It is therefore inconsistent with the approach which the judge adopted in the present case.

116.   It is perhaps of note that the relevant provisions of the English Companies Act set out a number of factors which the court should consider when deciding whether it should allow a derivative action, but the matter is ultimately left to the court as a matter of evaluation.  In our judgment, that approach is consistent with the observation of Lord Collins (*'the underlying question is whether the circumstances are sufficiently special to make it just for the beneficiary to have the remedy....'*) and Lord Walker (*'the unifying factor – what has to be special about the*

*circumstances – is that the derivative action is needed to avoid injustice....'*) in *Roberts v Gill* quoted above in relation to special circumstances.

117.    It is clear that, whether the matter is being considered on a strike out application or on the trial of a preliminary issue, the court should not hold a mini trial in order to decide whether the criterion in section 33(3) is met. However, it should, as in the present case, permit the parties to adduce affidavit evidence on the topic. Ultimately, the court must then reach a view on the material provided to it.

118.    Whilst reference to a *'good arguable case'* may in some cases be a helpful criterion, in our judgment the task is ultimately an evaluative one. The court must decide, on the basis of the material before it, whether the likelihood of the general partner having failed or refused to institute proceedings without cause is sufficient to lead the court to conclude that a derivative action should be permitted in the interests of justice. In reaching this evaluative conclusion, the court will no doubt have regard, inter alia, to the strength of the evidence that the general partner has failed or refused to institute proceedings without cause, the strength of the underlying claim which is sought to be brought and the likelihood and nature of any injustice if the derivative claim is not permitted.

119.    For these reasons, we respectfully disagree with the judge that, because this was a strike out application, the burden was on the defendants and he only had to consider whether it was merely arguable that the plaintiffs met the statutory criterion in section 33(3). That was to set the bar too low. It follows that, as Mr. Chapman submitted, he erred in this respect.

120.    However, we have before us the same affidavit evidence that was before the judge and accordingly we propose to reach our own decision, applying the approach we have just described.

**Timing**

121.    As occurred in this case, and as will invariably be the position, given that there is no requirement for leave before commencing an action in reliance on section 33(3), the hearing of a strike-out application or a preliminary issue as to whether the claim falls within section 33(3) will take place at some point after the action is begun. The question then arises as to whether the court should assess compliance with section 33(3) by reference to the facts at the time of commencement of the action or as at the date of the hearing of the strike out or preliminary issue.

122.    The judge held at [127] and [128] that the question of whether the general partner had failed or refused to bring a claim without cause was to be judged on the relevant facts as they were at the time the proceedings were commenced.

123.    The plaintiffs support the judge's decision. They point out that the words '*failed or refused*' in section 33(3) are in the past tense, which suggests that the relevant failure or refusal must have taken place before the date of institution of the derivative claim.

124.    We do not agree with the judge's decision on this point, essentially for the reasons advanced by Mr Chapman. The plaintiffs' approach would require the court to ignore anything that has happened between the institution of the proceedings and the hearing of the relevant strike out application/preliminary issue. This could lead to highly unsatisfactory results. Thus, suppose that, after the institution of the proceedings, a new general partner was appointed with completely separate ownership, so there was no longer any question of an inhibition or conflict of interest. Suppose further that the new general partner has reviewed the alleged claim and decided in good faith on commercial grounds to maintain the decision of the former general partner not to institute proceedings against the alleged wrongdoer.

125.    In our judgment, the legislature cannot have intended that the court should allow a derivative claim to proceed in circumstances where, as at the date of the hearing of the strike out or preliminary issue, the requirements of section 33(3) are not met because, for example, any inhibition of the general partner has disappeared. In our judgment, the natural meaning of section 33(3) is that the court should consider the issue of whether the requirements of the subsection are met by reference to the facts as they are at the time of the hearing of the strike out or preliminary issue. Mr Allison submitted that the court could surmount any difficulty which his construction of section 33(3) might cause by taking any change of circumstances into account when considering whether to exercise its discretion to allow the derivative claim to proceed. However, we do not see that as a satisfactory solution, nor is it in our view consistent with the natural meaning of section 33(3).

126.    Whilst by no means determinative – because the legislation is not the same – we note that in England and Wales, in the context of derivative actions for companies, the court does take into account events which have occurred between the institution of the proceedings and the hearing before the court as to whether the derivative action should be allowed to proceed; see for example the decision of Newey J in *Kleanthous v Phaphitis [2011] EWHC 2287 (Ch)* where the judge placed great weight on the fact that, since the institution of the proceedings, the company had appointed a special committee of independent directors, who had decided that the

company should not bring or continue the claim which the plaintiff was seeking to bring derivatively.

127.     In our judgment therefore, a judge hearing a strike out application or preliminary issue in relation to an ELP should consider whether the test in section 33(3) is met by reference to the facts as they appear at the time of the relevant hearing.

**Pleading**

128.     In relation to the derivative claim against D1, [25] of the ASOC pleads:

> *"In the alternative, if and to the extent that the claims set out in this Statement of Claim (or any of them) are properly regarded as and/or must be brought as derivative claims on behalf of TPF, the Plaintiffs will contend that Port Link has without cause failed to initiate proceedings on behalf of TPF against itself (and there is no real prospect of it doing so) such that the requirements of section 33(3) of the Exempted Limited Partnership Act (2020 Revision) (the "ELP Act") are satisfied, such that the Plaintiffs should be permitted to prosecute the relevant claims on behalf of and in the name of TPF."*

129.     In relation to the derivative claims against D2, D3 and D4, para 25B of the ASOC pleads:

> *"The balance of the claims against Mr Williams and Wellspring and the claim against KGLI Asia are brought by the Plaintiffs as derivative claims on behalf of TPF in circumstances where Port Link has without cause failed to initiate proceedings on behalf of TPF against those parties and there is no real prospect of it doing so. Not only did Port Link fail to commence such claims; as described in paragraph 4 above, it deliberately withheld from the Limited Partners the information upon which the claims are based. In the premises, the requirements of section 33(3) of the ELP Act are satisfied such that the Plaintiffs should be permitted to prosecute these claims on behalf of and in the name of TPF."*

130.     The judge held at [127] that [25B] of the ASOC was sufficient to enable the defendants to understand the gist of the case, which had also been factually set out in the detailed evidence filed in the strike out applications.

131.     That conclusion was criticised by Mr Chapman. He submitted that it was necessary for a limited partner to plead the facts and matters relied upon as allowing the limited partner to bring a derivative claim pursuant to section 33(3) and that the particulars in this case were wholly inadequate to serve that purpose. Thus, there was no pleading of the facts and matters relied upon to show that D1 as general partner was under an inhibition or suffered from a conflict of interest.

132.    Mr Allison, on the other hand, submitted that the facts and matters relied upon emerged with sufficient clarity from the detailed allegations of wrongdoing against D1 and the other defendants set out in the ASOC.

133.    In our judgment, the ASOC was inadequately pleaded in this respect.  In *Roberts v Gill* Lord Walker at [103] in relation to a derivative claim on the grounds of special circumstances concerning an estate or trust, said this:

>    *"So while he need not obtain prior leave from the court, he must plead the special circumstances entitling him to the court's indulgence.  Those special circumstances are part of his cause of action."*

134.    In our judgment, the position is analogous in cases brought pursuant to section 33(3).  There is no requirement for leave but a limited partner may only bring a claim where the general partner has failed or refused to bring proceedings without cause.  The failure or refusal without cause is part of the cause of action brought by the limited partner and must therefore be pleaded.  In our judgment, it is not sufficient simply to plead the wording of section 33(3) as was done by the plaintiffs in this case.  A limited partner must plead the facts and matters relied upon as showing that he comes within the provisions of section 33(3).

135.    What is relied upon by the plaintiffs in this case is that D1 as general partner is under a clear inhibition arising from its conflict of interest.  The facts and matters relied upon as showing that this was so should therefore have been pleaded.  Accordingly, we differ from the judge's assessment that the pleading was adequate.  However, we are satisfied that no prejudice has been caused to the defendants by this failure.  As the judge correctly stated, the points of issue emerge very clearly from the evidence filed during the strike out applications and it is clear that the defendants knew the case which they had to meet.  We therefore decline to decide this case on a technical pleading point, although we emphasise, for the future, that simply pleading that a claim is brought pursuant to section 33(3) is not sufficient and that a plaintiff must plead the facts and matters relied upon as showing that he falls within the subsection.

**Need for a request to sue**

136.    It is common ground that the plaintiffs in this case did not request or demand that D1 as general partner bring proceedings against D2-D4.  Mr Chapman submits that there must be such a request before a general partner can be said to have failed or refused to bring such proceedings.  We agree that the word '*refused*' implies the existence of a request.  However, this is not so in relation to the word '*failed*'.  A general partner can be said to have '*failed*' to bring proceedings if he simply has not brought such proceedings.

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

AP1623

137.  Whilst it will often be the case that, before instituting derivative proceedings under section 33(3), a limited partner will have requested the general partner to institute the relevant proceedings, it is not a necessary pre-condition that he has done so.  In this case, it is perfectly apparent from the evidence that D1 has not brought the relevant proceedings and has no intention of doing so. As outlined earlier, it has reached a decision not to institute proceedings even following the change in the board of directors by the appointment of the FFP Directors. The requirement of section 33(3) that the general partner has failed to bring proceedings on behalf TPF has obviously been satisfied.

**Discretion**

138.  It is well established in other contexts that the court has a discretion whether or not to allow a derivative claim even where the relevant ground for the bringing of such an action (e.g. an exception to the rule in *Foss v Harbottle* in the case of companies and *'special circumstances'* in the case of trusts or limited partnerships) is met.  Although there is no reference to the existence of a discretion in section 33(3) itself, the judge considered that he had such a discretion and it was common ground before us that there is such a discretion[17].

139.  Thus, even if it be satisfied that a plaintiff can bring himself within section 33(3), the court may in its discretion decide that he should not be permitted to continue the derivative claim. One relevant factor in the exercise of this discretion is likely to be whether the plaintiff has an alternative remedy, so that a derivative action is not required in order to avoid injustice.

**Summary**

140.  Pulling the threads of the above discussion together, we would attempt to summarise our conclusions in relation to section 33(3) as follows:

(i)      There is no requirement for leave to bring derivative proceedings under section 33(3). A limited partner may simply institute such proceedings.

(ii)     A limited partner must however plead the facts and matters relied upon as showing that he can bring himself within the requirements of the subsection because this forms an essential part of his cause of action.

---

[17] D2 – D4, skeleton argument,  [80(i)]; the plaintiffs, transcript, day 2 pp12,61.

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

AP1624

(iii)     If a defendant wishes to raise an issue as to the standing of a limited partner to bring such derivative proceedings, he should do so by means of a strike out application or seek the trial of a preliminary issue.

(iv)     Whichever of these routes is chosen does not affect the test which has to be applied in deciding whether section 33(3) is complied with and whether a limited partner should be permitted to continue with the derivative claim.

(v)     The decision of the court on such an application or preliminary issue is determinative (subject to appeal).  If the court holds that the derivative claim may be continued, the limited partner thereafter has the necessary standing to pursue the claim.  It is not an issue which is deferred until or revisited at trial (save possibly in the context of costs at the end of the trial).

(vi)     The court should not conduct a mini trial as to whether the requirements of section 33(3) are satisfied.  The court has to reach its decision on the basis of the material before it, which will be more limited than it will be following discovery and trial.

(vii)     At the hearing, the onus is on the limited partner to satisfy the court that the requirements of section 33(3) are met.  Reference to '*onus*' is not to be mistaken as a reference to a '*burden*' in the sense of having to show something on the balance of probabilities.

(viii)     The essential task for the court at such a hearing is to determine whether the limited partner has brought himself within the terms of section 33(3),  namely that the general partner has failed or refused to bring the relevant proceedings without cause.

(ix)     In determining this issue, the court is likely to be assisted by consideration of whether special circumstances (as developed in cases concerning trusts, limited partnerships and other entities) exist, but the court's task remains one of applying the statutory test set out in section 33(3).

(x)     Whilst reference to a '*good arguable case*' may be a helpful indicator of the level of comfort which the court should have when deciding whether the requirements of section 33(3) are met, the court's task is essentially an evaluative one having regard to the facts as they appear to the court at that stage of the proceedings from the material before the court and the need to avoid injustice balanced with the need to respect the fact that a derivative action is an exception to the general principle in the ELPA that

management (including decisions as to litigation) of an ELP is for the general partner, not the limited partners. As stated at [118] above, the court should consider, inter alia, the strength of the evidence that the general partner has failed or refused to institute proceedings without cause, the strength of the underlying claim which is sought to be brought and the likelihood and nature of any injustice if the derivative claim is not permitted.

(xi)     The court should reach its decision as to standing by reference to the facts as they appear at the date of the hearing of the strike out or preliminary issue.

(xii)    Even where the requirements of section 33(3) are met, the court has a discretion as to whether to permit a derivative claim to continue. One of the factors which is likely to be relevant in exercising that discretion is whether the plaintiff has an alternative remedy.

**Application to the facts**

(a)     The claim against D1

141.    It is to be recalled that, as described at [75] above, a derivative action allows a party to bring a claim in the name of and on behalf of a second party against a third party for loss and damage caused to the second party. It follows that the second party must have a claim against the third party before the first party can be permitted to bring such a claim derivatively.

142.    Ms Stanley submits that, regardless of whether the test in section 33(3) is otherwise met, (i.e. that D1 is subject to an inhibition which makes its decision in relation to potential proceedings one which is without cause), there is a more fundamental reason why the derivative claim against D1 should be struck out, namely that, on the judge's finding, the ELP has suffered no loss or damage and therefore has no claim of its own to bring.

143.    At [63] the judge said:

> "It follows that where an ELP is alleged to have suffered loss, as in this case, that is the loss of each of the Limited Partners. There is no distinct or separate loss in respect of 'the partnership' (TPF), which as an entity does not exist in law."

144.    To similar effect is the decision of Cooke J in *Henderson* in relation to limited partnerships at [28] – [32]. Thus at [28] he said:

> "The Partnership, unlike a limited company, does not possess a corporate legal personality. Like an ordinary partnership under the Partnership Act, 'the

> *Partnership', is simply a convenient way of referring to the body of partners as a whole. In my judgment therefore, no difficulty arises for a Limited Partner's claim against the General Partner, regardless of whether or not removal and substitution of the General Partner is possible. The claim to be made against the General Partner is that of the individual Limited Partners and is not a Partnership Asset. Each Limited Partner has its own contractual or fiduciary claim for its own loss, where the inter-relationship with the General Partner is governed by the [Partnership Agreement]. The Partnership, which consists of the Limited Partners and the General Partner together has no form of joint right or claim against the General Partner, as the claimants suggest."* [Emphasis added]

145. We are not to be taken as agreeing that this is correct. As already stated, section 16(1) of the Act provides that the general partner will hold the assets of the ELP upon trust. In the case of a trust, whilst a beneficiary undoubtedly has a direct claim against the trustee for breach of trust, the appropriate remedy (as discussed above by reference to *Target v Redferns*) is for an order that the trustee restore the trust fund to what it would have been had the breach not been committed. Such a claim may be brought by one or more beneficiaries, but a successor trustee will often bring such a claim against a former trustee for breach of trust on behalf of the trust as a whole and will hold any sums recovered from the former trustee upon the terms of the trust. Thus, even though like an ELP, a trust is not a separate legal entity, it can properly be said that the trust as well as a beneficiary has a claim against a trustee for breach of trust and that such a claim can be considered as an asset of the trust. It seems to us strongly arguable that the position is the same in relation to an ELP, particularly given that the general partner is also a trustee.

146. However, there has been no Respondents' Notice in respect of the above finding of the judge and indeed the plaintiffs have not sought to argue that the judge was wrong in this respect. What they say is that the judge was correct in what he said at [64] where, immediately following the passage quoted above in [143] above from [63] he said:

> "64. *I therefore find that the direct claims in respect of the individual partners' losses are vested in the Limited Partners alone, and are not claims that can be brought on behalf of TPF derivatively, except in the circumstances permitted by section 33(3) of the ELPA where the Limited Partners who wish to obtain redress for TPF are in effect put in the place of the GP and bring claims on behalf of TPF".*

147. With respect to the learned judge we cannot accept that section 33(3) permits a claim in such circumstances. The subsection pre-supposes that there is a claim to be brought by the general partner on behalf of the partnership. If, as the judge held, the partnership has no claim against the general partner, there can be no failure by the general partner to bring such a claim without cause.

148.    Even if we are wrong on this point, there is a second reason for not permitting the derivative claim against D1 as a matter of discretion; that is because the plaintiffs as limited partners have an adequate alternative remedy.

149.    As we have held earlier in this judgment, a limited partner has the right to claim against a general partner for breach of duty on the part of the general partner.  In the event of such a claim succeeding, the appropriate remedy will almost certainly not be an award of equitable compensation to the particular limited partners who have sued (thereby potentially causing difficulties in relation to those who have not also joined in the action and in respect of creditors of the ELP), but instead an order that the general partner restore the trust fund as outlined in *Target v Redferns*.

150.    In these circumstances, exactly the same will be achieved by a direct claim as would be the case in a derivative action. In the event of the plaintiffs succeeding in their direct claim, the estate of the ELP will be made whole by payment from the general partner pursuant to an order for restoration of the trust fund.  Success in a derivative action would have the same result. Accordingly, there is simply no need for a derivative action; it would add nothing to the direct claims brought by the limited partners coupled with an order for restoration of the trust fund in the event of such claims succeeding.  Indeed, during oral argument, Mr Allison accepted that, if the plaintiffs have a valid direct claim against D1 for which restoration of the trust fund can be awarded, there would be no need for the derivative action[18]. In those circumstances, we conclude that, as a matter of discretion, the derivative claim against D1 should not be permitted.

151.    Accordingly, for both of the above reasons, we strike out the derivative claim of the plaintiffs against D1.

(b)     The claims against D2 – D4

152.    We have described the claims brought against the various defendants at [13] to [16] above.  The relevant features for present purposes can be summarised as follows:

(i)     The plaintiffs invested some 65% of the total amount invested in TPF.

(ii)    Other limited partners, who invested 15.14%, have instituted broadly similar claims against D2 and D3 in the State of Georgia, USA.  Thus a total of 80.3% by value of

---

[18] Transcript day 2 pp 90(22) - 92(11)

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

AP1628

limited partners are litigating on the basis of alleged serious wrongdoing on the part of the GP.

(iii) Of the remaining 19.7% (by value), 14% are associated with the GP.

(iv) The plaintiffs allege that D1 as the general partner has been guilty of wrongdoing which has caused TPF loss said to be well in excess of US $100m.

(v) The claims against D1 essentially allege that, in breach of its fiduciary, contractual and other duties, it acted contrary to the interests of TPF and the limited partners by making substantial payments, using TPF's monies, that were not for the benefit of TPF and/or the limited partners. Amongst these is the alleged sham settlement of the DIFC Proceedings brought against it in the DIFCC as a result of which the Wellspring Payment of US $59,990,461.30 was paid to D3. The ASOC alleges that D1 conspired with, amongst others, D2 (Mr Williams) and D3 (Wellspring) to cause loss to TPF and/or the limited partners by unlawful means in relation to the DIFC Proceedings and the Wellspring Payment.

(vi) The claims against D2 are that he orchestrated the DIFC Proceedings and the Wellspring Payment and was accordingly party to the above conspiracy. It is further alleged that he dishonestly assisted in D1's breach of trust/fiduciary duty, knowingly procured D1 to breach its contractual duties and was in breach of fiduciary duties he owed to TPF and/or D1.

(vii) The claims against D3 are for knowing receipt of the Wellspring Payment, conspiracy in relation to the Wellspring Payment and the DIFC Proceedings and for repayment of the Wellspring Payment pursuant to Section 4 of the Fraudulent Dispositions Act (1996 Revision).

(viii) The claim against D4 is for knowing receipt in respect of a number of payments said to have been made to it in breach of trust and/or fiduciary duty by D1 as general partner.

153. The judge held at [106] that section 33(3) required a finding as to whether the GP (i.e. the relevant corporate entity) has failed or refused to institute the proceedings without cause, not the directors at the relevant time. He concluded at [102] that there was a good arguable case that D1 had and still has a relevant inhibition because it is conflicted in relation to the plaintiffs' claims. Its decision not to bring the claims against D2 – D4 was infected and made unsafe by the facts giving rise to its conflict of interest.

154.   The underlying facts in relation to the inhibition were not disputed before us and would appear
       to be as follows:

   (i)      Mr Williams, D2, is the sole shareholder of PLH, a Delaware company, which in turn
            is the sole shareholder of D1.  Thus Mr Williams is the sole ultimate beneficial owner
            of the general partner of TPF.  He was the investment director of TPF's sponsor and
            placement agent from 2009 – 2011 and a member of the Investment Committee of TPF
            from 2009 – 2013.

   (ii)     On 23 January 2020, he was appointed as the authorised representative of D1 in relation
            to proceedings against D1 by certain limited partners (including the first plaintiff)
            pursuant to section 22 of the ELPA seeking disclosure of full information regarding the
            state of the business and financial condition of TPF. The resolution conferred full
            authority on Mr. Williams to take all necessary actions in relation to the section 22
            proceedings.  The application of the limited partners under section 22 was opposed by
            D1 at a time when the FFP Directors were in post and eventually Parker J ruled against
            D1 and ordered it to make disclosure.  Thereafter, D1 sought to appeal that decision
            but the appeal was eventually compromised and D1 agreed to provide the necessary
            information.

   (iii)    Mr Williams is the CEO, CFO, President, Vice-President, Treasurer and Secretary of
            D3, Wellspring.  The company is owned by the Mark E Williams Living Trust, of
            which Mr Williams, his wife and brother are the trustees.  The ASOC pleads that it is
            to be inferred that the beneficiaries are also Mr Williams' family.

   (iv)     D4, KGLI Asia is a company incorporated in the Cayman Islands and Mr Williams was
            its CEO from 1 January 2012.

155.   As can be seen therefore, Mr Williams is the ultimate beneficial owner of the GP and has very
       close connections with Wellspring and KGLI Asia.

156.   In considering whether D1 as the general partner would be under an inhibition in relation to the
       taking of proceedings against D2 – D4, it is useful to refer to the case of *Henderson*.  The facts
       of that case are summarised at [83] to [84] above.  Certain limited partners of an English limited
       partnership sought to bring a derivative action against, inter alia, the manager, who had been
       appointed by the general partner and was a sister company of the general partner.

157.  Cooke J held at [59] that as a result the general partner had an irreconcilable conflict of interest in relation to whether to institute proceedings against the manager and this constituted *'special circumstances'* which therefore justified the limited partners being able to bring a derivative claim.  In coming to that conclusion, he held that (i) the ability (which was not straightforward) under the limited partnership agreement for the limited partners to remove and replace the general partner and (ii) the ability of the limited partners to sue the general partner for wrongly failing to institute proceedings against the manager, were not satisfactory alternative remedies so as to refuse the limited partners the ability to bring a derivative claim.

158.  We respectfully agree with the decision of Cooke J in *Henderson*.  In our judgment there is a similar conflict of interest in the present case.  On the plaintiffs' case, D1 as the general partner was deeply involved in all the alleged wrongdoing as was Mr Williams.  D1 has to decide whether to institute proceedings against D2 – D4 in circumstances where:

(i)  The essential wrongdoing giving rise to the claims against D2 – D4 was that of D1 itself in making the various payments and where it is said to be part of the unlawful means conspiracy to injure TPF involving Mr Williams and Wellspring.

(ii)  The contemplated proceedings would have to be brought against the beneficial owner of the GP and against two companies in which Mr Williams is deeply and closely involved, namely Wellspring and KGLI Asia.

(iii)  D1 would also have to consider whether (as general partner) it should sue itself (in its own right) as a co-conspirator in the alleged unlawful means conspiracy.

159.  On the face of it, by reason of the obvious and serious conflict of interest, D1 is under an inhibition which would amount to special circumstances in the context of a trust or limited partnership and this inhibition also means that the failure by D1 to bring proceedings against D2 – D4 is without cause for the purposes of section 33(3).

160.  However, the defendants say that this is not the position for two associated reasons.  First, they point out that the present directors of D1, namely the FFP Directors, are wholly independent and were not in office at the time of the alleged wrongdoing on the part of D1.  They do not therefore suffer from any conflict of interest.  They are in a position to bring an independent and impartial view to bear on whether claims should be brought against D2 – D4 and in this respect are in the same position as a liquidator of a company, who has to decide whether to bring a claim against former directors or other parties for injury caused to a company.  The defendants point out that, as summarised in the third affidavit of Mr Lewis, the FFP Directors

have reviewed the position thoroughly with the benefit of legal advice and have concluded that the interests of TPF are best served by not instituting any claims against D2 – D4 for the reasons there set out.

161.    It is clear, submit the defendants, that the court must give great weight to the commercial judgment of those who have responsibility for the management of the relevant entity under the constitutive documents; see for example the observation of the Lewison J in *Iesini* quoted at [77] above.

162.    Secondly, they submit that the independence of the FFP Directors is fortified by the fact that Mr Williams has given an undertaking that the shareholder of the GP will not exercise any powers so as to remove the FFP Directors or interfere in any way in the exercise of their functions.  Thus, submit the defendants, the FFP Directors are, and are seen to be, free to act independently.

163.    In our judgment, these submissions do not overcome the inhibition referred to earlier.  In relation to the first point, the judge was in our view correct to focus on the entity which is the general partner rather than the directors for the time being of that entity.  Section 33(3) refers to the 'general partner' having failed or refused to bring proceedings without cause.  The general partner is the legal entity D1.  D1 is subject to the conflicts of interest we have summarised above and thus cannot be seen to be in a position to take a fair and independent decision about the potential litigation.  New directors are not in the same position as a liquidator, who is appointed by and subject to the supervision of the court and therefore clearly is and is seen to be independent of the company, its directors and shareholders.  The FFP Directors owe a fiduciary duty to act in the best interests of D1.  The defendants submitted that because D1 owes fiduciary duties to act in the best interests of the partnership, the FFP Directors therefore have a duty to act in the best interests of TPF.  However, there is certainly the potential for conflict between acting in the best interests of TPF (which might include taking action against D1 as a co-conspirator) and acting in the best interests of D1 (which might be said to include the avoidance of being sued).

164.    In connection with the undertaking, we were referred to the case of *St. John's Trust Company (PVT) Limited v Medlands (PTC) Limited and Others* [2021] CA (Bda) 20 Civ, ("the B Trust"), a decision of the Court of Appeal of Bermuda.  That was a case which involved a number of issues but, for present purposes, it is sufficient to say that one of the issues before that court was whether it would be appropriate to reappoint St. John's Trust Company (PVT) Limited ("SJTC") as trustee of the B Trust.  SJTC was wholly owned by a company, Cabarita, which

was in turn wholly owned by a Mr T.  Mr T was said to have misappropriated funds from the B Trust and there were ongoing proceedings against him in this respect.

165.  Mr T had appointed two independent directors of SJTC and, before the Bermuda Court of Appeal, he proffered an undertaking not to interfere with the appointment of these two individuals.  Despite this, the Bermuda Court of Appeal held at [62] that it was clearly not appropriate for SJTC to be trustee.  It would be contrary to the interests of the beneficiaries for Mr T to have any control or influence over the B Trust.  This would be possible, despite his undertaking, by reason of his ownership of Cabarita which owned SJTC. The undertaking did not meet the fundamental issue of Mr T's potential influence.

166.  Mr Chapman sought to distinguish re *B Trust* on three grounds.  First, he pointed out that Mr Williams is only an <u>indirect</u> beneficial owner of the D1; but that was also the case in the *B Trust* as Mr T owned Cabarita which owned SJTC.  Secondly, he referred to the undertaking by Mr Williams not to interfere.  However, an undertaking was also given by Mr T in the *B Trust* and this did not persuade the Bermuda Court of Appeal that his potential influence was thereby negated.  Thirdly, he submitted that the *B Trust* was concerned with whether there might be interference in the future by Mr T whereas the present case was concerned with a decision (namely not to issue proceedings) which had already been taken.  However, we do not see that this is a significant point of difference.  The fact is that the decision as to whether to institute proceedings on behalf of TPF involved consideration by the GP of whether to sue itself as an alleged co-conspirator and whether to sue its beneficial owner and two closely linked companies in circumstances where the claims were said to arise on the basis of the wrongdoing of the GP and its beneficial owner.

167.  We find the reasoning of the Court of Appeal of Bermuda to be persuasive.  In our judgment, the undertaking given by Mr Williams is insufficient to overcome the inhibition from which D1 as general partner suffers.  If one stands back and considers how it would appear to the plaintiffs (who allege that there has been serious wrongdoing by D1 – D4 which has cost TPF over US $100m) for the decision as to whether to seek recompense from any one or more of D1 – D4 to be left in the hands of D1, they would have no confidence that a fair and independent decision had been taken, even following the appointment of the FFP Directors.  In our judgment, they would be justified in this lack of confidence.  There is no doubt in our view that D1 was and is suffering from an inhibition which leads to the conclusion that, subject to the exercise of any discretion, it is appropriate for the plaintiffs to bring derivative claims on behalf of TPF pursuant to section 33(3) against D2 – D4.

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

168.  Given our decision to uphold the judge's conclusion that it is the position of D1 as the general partner which must be considered in relation to any inhibition rather than the position of the directors from time to time, it is not necessary for us to address his finding about the position of the FFP Directors.  Suffice it to say that, if we had found it necessary to do so, we would have considered that the judge was entitled to reach the conclusions which he did in this respect.

169.  As to discretion, the defendants submit that, because the plaintiffs are bringing direct claims against D2 and D3, they have an alternative remedy in respect of those two defendants and there is no need for them to bring a derivative action.  They point out that they have not sought to strike out the direct claims against D2 and D3.  That is so, but it is of note that footnote 10 to [15] of the skeleton argument of D2 – D4 states:

> "For the avoidance of doubt, [D2 – D4] do not admit that the Respondents, in particular KPA, have standing to bring the direct claims, and expressly reserve the right to challenge the Respondents' standing to bring such claims, including on the basis of a lack of authority in the case of KPA."

170.  As stated at [67] above, Ms Stanley asserted in oral argument that the only way to get the proceeds of any successful claim against D2 and D3 into TPF is by way of a derivative claim. Furthermore, despite the defendants' explanation, submitted in response to the draft of this judgment, that footnote 10 was only intended to cover the KPA lack of authority point and the partnership accounting point, the fact remains that the footnote expressly reserves the right to challenge the plaintiffs' standing to bring the direct claims in general terms and the KPA point is merely mentioned by way of inclusion as a ground of challenge. We bear in mind the overriding objective and, in our view, it would be inconsistent with that objective and highly undesirable to run the risk of the court eventually finding against D2 and D3 on the underlying merits of the claims but finding that the plaintiffs did not have standing for the direct claims or that it could not make an order for restoration of the trust fund in the absence of a derivative claim on behalf of TPF. The existence of an alternative remedy is a matter to be taken into account when determining whether to allow a derivative claim to proceed although its existence is not conclusive of the matter; see *Henderson* at [39]. In our judgment, whilst we have expressed certain preliminary views at [65]-[72] above, in the light of the above matters there is sufficient uncertainty about whether the plaintiffs have direct claims against D2 and D3 or whether the court could order restoration of the trust fund on the success of such claims that, as a matter of discretion, it is just and fair to allow the derivative claims to proceed alongside the direct claims so that they are all heard at the same time. If, following a trial, the direct claims are upheld and the court also holds that it can order restoration of the trust fund as a remedy for such claims, then there will be no need to make any award on the derivative claims; if on the

other hand the direct claims are found not to be maintainable or restoration of the trust fund cannot be ordered, the derivative claims will be necessary to provide a remedy, assuming that the underlying allegations against the defendants are upheld.

171.    We add by way of postscript, that both sides sought to raise arguments based on the position of the Cayman Islands as a leading centre for the establishment of investment funds. Thus the defendants argued that, by setting the bar for derivative actions too low, the judge had rendered it less likely that promotors of investment funds in the form of ELPs would choose the Cayman Islands as the location of their funds because of the comparatively easy exposure to derivative claims.

172.    Conversely, the plaintiffs argued that it was important for the reputation of the Cayman Islands as a centre for investment funds that persons who have invested in ELPs should have a remedy when the general partner is alleged to have been guilty of wrongdoing and that a derivative action is the only remedy in such circumstances. It should not therefore be too difficult to bring such an action.

173.    Whilst noting these arguments, we have not decided this case by reference to the arguments' respective merits, which are more matters for the legislature. We have confined ourselves to construing section 33(3) in the light of the words used against the background of the law on derivative claims generally.

**Summary of conclusions reached on the derivative claims**

174.    In respect of D1, for the reasons which we have given above, we allow the appeal to the extent of striking out the plaintiffs' derivative claims against it.

175.    In relation to the derivative claims against D2 – D4, we dismiss the appeals brought by these defendants, with the consequence that the plaintiffs may bring those claims under section 33(3).

**The SFC Appeal**

176.    At the hearing below, the GP (D1) applied for security of costs ("SFC") in the sum of USD 5,536,025.50 and the sum sought by D2 – D4 was USD 2,720,000. It is and was common ground that the plaintiffs are both Kuwait state-owned enterprises ordinarily resident out of the jurisdiction and accordingly the judge had jurisdiction to exercise the discretion conferred on the court by GCR O.23 r.1(1), which reads in relevant part:

>        "*Where on the application of a defendant to an action or other proceedings it appears to the Court – (a) that the plaintiff is ordinarily resident out of the*

> *jurisdiction; ... then, if having regard to all the circumstances of the case, the Court thinks that it just to do so, it may order the plaintiff to give such security for the defendant's costs of the action or other proceedings as it thinks just."*

177.  Briefly summarised the defendants' case was that there were substantial obstacles to the enforcement in Kuwait of an adverse costs order since there was no treaty between Kuwait and the Cayman Islands for the mutual enforcement of judgments and as a matter of Kuwaiti law even a judgment of the Kuwaiti courts was incapable of enforcement against the plaintiffs because they were state entities.

178.  In dismissing the SFC applications, the judge began by setting out the legal principles he found to be applicable. He then analysed the principles and applied them to the case before him and then proceeded to give the reasons for his decision. The key elements of this part of his judgment can be summarised as follows:

The applicable principles

179.  (i)   There is no presumption that the court will ordinarily require a foreign plaintiff to give SFC; rather the discretion "is to be exercised on a case-by-case basis, as the rule states, having regard to all the circumstances of the case"; (see *Re Cybervest Fund* [2006 CILR 80], per Smellie CJ at [23]). [149]

(ii)  The court should follow the guidance on the interpretation of O. 23 r.1(1) provided by the following passage in the judgment of Smellie CJ in *Tasarruf Mevduati Sigorta Fonu v Wisteria Bay Limited [2006 CILR 351 at [14]]:* [150].

> *"There is no hard and fast rule that every foreign plaintiff must be required to put up security. The matter is one, as already stated, of discretion to be exercised in every case. All the circumstances will be considered including the means and ability of the plaintiff to pay and even, in an appropriate case the relative strength or weakness of the case for each side provided those factors are clearly discernible from the evidence. See, for these propositions, the leading case of Sir Lindsay Parkinson & Co Ltd v Triplan.."*

(iii)  The court's discretion must be exercised impartially and must not be exercised discriminately; see eg *Ahab v Saad* [2017 (2) CILR 602 at [21]. [151]

(iv)  The merits of the case will only be relevant if: (i) either party can clearly demonstrate a strong probability of success or (ii) the Court is considering a summary judgment application at the same time. [152].

Analysis and application of the principles to this case

(v)   In this case, the merits could not be properly determined at this stage. [153]

(vi)  The issue to be decided was whether the defendants had shown there are objectively justified grounds for concluding that there are obstacles or burdens to the enforcement of a costs order against the plaintiffs, such that there is a real risk of non-enforcement and whether, if there are such real risks, it is just in the circumstances to order security and if so, on what terms. [154]. (This proposition, like principle (iii) above, is based on *Ahab v Saad* [2017(2) CILR 602] where Smellie CJ stated at [15]-[16]

> "*the focal concern of the modern case law [on security for costs] is not to ensure that a plaintiff is seldom required to provide security or that orders for security are only exceptionally made but to ensure that such orders are not imposed in an arbitrary or discriminatory manner. Accordingly, the making of such orders against a non-resident plaintiff would be appropriate, and may now be justified, not simply on the discriminatory basis of the plaintiff's foreign status but because real risks of unenforceability are shown "on objectively justified grounds" to exist: per Gloster, L.J. in her dictum cited above from Bestfort (1), applying the dictum of Mance, L.J. from Nasser (7). This approach dictated by the modern cases is aimed at addressing not only basic tenets of fairness but more particularly, the requirements of the Constitutional Bill of Rights where, in s.16, it is mandated that "government shall not treat any person in a discriminatory manner in respect of the rights under this Part of the Constitution"—the most directly operative here being that right to a fair and public trial guaranteed by s.7 which states that "Everyone has the right to a fair and public hearing in the determination of his or her legal rights and obligations by an independent and impartial court within a reasonable time.")*

(vii) Where the plaintiff is a foreign government or state agency, there is a presumption that SFC should not be awarded, although each case will turn on its own facts. The presumption arises from comity and common sense and may be displaced by the evidence; see *Tasarruf* at [22].[156].

(viii) As Smellie CJ observed in *Tasarruf,* the only modern reported case in  which SFC had been ordered against a foreign government was *Sierra Leone Govt. v Davenport* [2003] EWHC 1913 (Ch) where the circumstances were exceptional in that Sierra Leone had recently emerged from a civil war. [157].

(ix)  PIFSS (the second plaintiff) was the subject of the SFC application determined in *Cybervest* where PIFSS was petitioning as a shareholder for the winding up of a Cayman incorporated investment fund. In giving judgment in this case, Smellie CJ noted that PIFSS

had "immensely valuable assets to be regarded as being within the jurisdiction" and so if PIFSS failed to pay an order for costs it would be open to the applicant to seek recourse. The SFC application was dismissed on the grounds that: (a) PIFSS's very valuable shareholding in the fund was to be treated as assets within the jurisdiction; and (b) PIFSS was *"a state agency of a foreign government of undoubted resources and enjoying a high reputation in the global financial and commercial community'' [that was] relevant insofar as it would tend to negate any concern the plaintiff would be likely to obey an order for costs made in favour of the respondent."*

(x)  Security will not be required of a foreign plaintiff who has substantial assets within the jurisdiction; see *Cybervest* at [25]. [160].

(xi)  Where any liability for costs on the plaintiffs' part will inevitably be joint and several, security will not be required if at least one plaintiff has substantial assets within the jurisdiction. [160].

(xii)  A foreign plaintiff does not have the burden of establishing that it has fixed and permanent property within the jurisdiction. [161]. See the following extract from the judgment of Lightman J in *Oded Moshe Leyvand v Amnon Barasch & Ors* [2000] WL 191256 at [6]:

> *"The commonsense principle applies that the existence of assets within the jurisdiction, their fixity and performance, are among a number of potentially relevant factors, their importance depending on the particular facts of the case. The Court will not infer the existence of a real risk that assets within this country will be dissipated or shipped abroad to avoid their being available to satisfy a judgement for costs unless there is a reason to question the probity of the claimant: there is no such reason in this case. If there is a reason to question the claimant's probity, the character of his property within the jurisdiction is relevant in assessing the risk: the risk may be greater if the property is cash or immediately realisable or transportable, and less if fixed and permanent".*

(xiii)  Undertakings given by a plaintiff that it will not raise any of the potential defences in their home jurisdiction should an award of costs be made against it would be very persuasive evidence in any court in the plaintiff's home jurisdiction [162]. See Sanderson Ag. J in *Elliott v Cayman Islands Health Service* Authority [2007 CILR 163] at [18].

<u>The judge's reasons why, on the application of the foregoing principles, the SFC application would be refused.</u>

(xiv)  The plaintiffs are both wholly owned by, and are the agents of, the State of Kuwait. There is therefore on the decided cases a rebuttable presumption that security for costs should

not be ordered (see *Tasarruf* at [23]). This presumption has not been rebutted on the evidence adduced. The plaintiffs appeared to have ready access to funds and would be able to satisfy any adverse costs order in a timely manner. [164] – [166].

(xv) KPA is an internationally recognised commercial organisation and relies on its international reputation to do business. Its profit for the financial year 2020 – 2021 was KWD 56,450,000 (about USD 187,522,553 based on the exchange rate on 9 August 2021).The Director General of KPA has confirmed that it has sufficient resources to meet any costs order made against it in these proceedings, and will comply with any such costs orders in a timely fashion, a position that has been reconfirmed by the Kuwaiti Department for Legal Advice and Legislation ("DLAL"). In addition, KPA has provided a written undertaking to this effect to the Court on 27 May 2021. [167] – [169].

(xvi) PIFSS is a public institution which administers Kuwait's pension fund for all Kuwaiti citizens in the workforce, both in public and private sectors. It operates independently from the State of Kuwait and has its own budget and board of directors. It has a global investment asset portfolio worth approximately USD 133.7 billion (as at 31 March 2021). Its profit for the period March 2020 to December was USD 18.9 billion. An officer in PIFSS's Compliance and Government Department had confirmed that PIFSS had sufficient resources to meet any costs order made in these proceedings and will comply with any such orders in a timely fashion. PIFSS has provided a written undertaking to this effect to the Court. In addition, PIFSS has been party to several sets of proceedings before the Cayman Islands Courts and has never failed to comply with any costs order. [170] - [172].

(xvii) It would be clearly detrimental to PIFSS's ongoing commercial reputation and business to be in breach of an order of the Cayman Islands Courts.[173].

(xviii) Accordingly, after a careful consideration of the evidence, the presumption against ordering security against agents of a foreign state has not been rebutted. Accordingly, it would not be just to grant the SFC applications against the plaintiffs. [174].

(xix) It is well established that security will not be ordered against a foreign plaintiff who has substantial assets within the jurisdiction (see *Cybervest*) and PIFSS is such a plaintiff by reason of its interest valued at EUR 35,074,942 as a 31 March 2021 in the Jermyn Street Commercial Real Estate Fund ("the Jermyn Street Fund"), of which PIFSS is a limited partner. [175] – [176].

(xx)     There is no reason to doubt the probity of PIFSS, which is an agent of the State of Kuwait and familiar with conducting international litigation (including in the Cayman Islands). [177].

(xxi)    There is no reason to conclude that PIFSS's interest in the Jermyn Street Fund is encumbered, or not amenable to enforcement if necessary, and no reason to conclude that PIFSS would dispose of or otherwise encumber its interest to attempt to defeat an order as to costs. [177].

(xxii)   Accordingly, since PIFSS has sufficient assets within the jurisdiction to cover any costs order that is made against the plaintiffs (in respect of which they would be jointly and severally liable), and in circumstances where both plaintiffs have given written undertakings to the court, it would not be just to require the plaintiffs to pay security for costs (even if they were not agents of the State of Kuwait). [178].

(xxiii)  In light of the correspondence between Campbells (for D2-D4) and Ogier (for the plaintiffs) there was no basis to form the view that PIFSS would seek to frustrate the enforcement of a cost order against it by disposing of its interest in the Jermyn Street Fund, even if it were able to do so. [179].

(xxiv)   The enforceability of Cayman Islands judgments in Kuwait does not therefore arise for determination. [189].

The case advanced by the GP (D1)

180.     (i)      By reason of the errors made by the judge in reaching his decision to refuse to order SFC, his decision should be set aside and the SFC summons remitted to another judge of the Grand Court or alternatively the judge himself.

(ii)     Although the discretion under GCR O.23, r.1(a) is at large, it can only be properly exercised when **all** of the circumstances are taken into account, and this the judge failed to do because he did not consider the obstacles of enforcement in Kuwait. Instead, he appears to have been satisfied that the plaintiffs could and would pay adverse costs order without question and the defendants had not proved otherwise.

(iii)    The judge erred in principle in proceeding on the basis that there was a presumption that a foreign government or state agency will not be ordered to provide security for costs unless the applicant "rebuts" the presumption. The authorities the judge relied for the presumption -- *Cyberfest* and *Tasarruf* -- laid down no such principle. Instead, Smellie

CJ in the former case decided it on the basis that the Court had a wide discretion which fell to be exercised on a case-by-case basis and in the latter case, Smellie CJ highlighted that it was all a matter of discretion taking into account all the circumstances. The true ratio was that the Court does not apply the rules for SFC differently depending on whether the plaintiff is a state or an individual but on the basis that all plaintiffs who seek to engage the Court's jurisdiction must play by the same rules. This, after all, is the position in England (see *Sierra Leone (Govt) v Davenport* [2003] EWHC 1913 (Ch) ) and in Australia (see eg *Papua New Guinea v Sandline* [1998] QDC 298 (per Andrews J) and *Ministry of Foreign Affairs of the Republic of Italy v Simeone* [2016] QDC 160.

(iv)  Where there is joint and several liability between plaintiffs for costs and one of them is in the jurisdiction, it is the practice not to make a SFC order against the plaintiff who is resident outside the jurisdiction if it is inevitably to be inferred by the Court that there will be joint liability for costs between the plaintiffs. Assuming that this practice can apply to a situation where both plaintiffs are outside the jurisdiction but one has substantial assets within the jurisdiction, D1 submits that there were no sufficient grounds for the judge to have concluded that the plaintiffs would be jointly and severally liable for the costs. Indeed, D1 pleads a defence against KPA that it commenced and carried on its claims against them without due authority, and ratification of these acts is not possible under Kuwaiti law.

(v)  The judge erred in taking into account the confirmation from the Director General of KPA, Mr Al-Sabah, which was related to Mr Florent, who in turn related it in paragraph 18 of his Third Affidavit, that KPA had sufficient resources to meet a costs order made against it in these proceedings, and would comply with any such costs order in a timely fashion. Mr Florent's Third Affidavit was sworn on 27 August 2021 but Mr Al Sabah had been suspended from the position of Director General of KPA by the Minister of Commerce and Industry on 24 October 2021 pending investigations of "violations" attributed to him. The expert evidence before the judge was that during his suspension, Mr Al-Sabah was not authorised to represent KPA in any capacity or exercise any powers on behalf of KPA.

(vi)  The judge erred in treating the letters he called "undertakings" to pay an adverse costs order as if they were indeed "undertakings" when they were merely "comfort letters" since they contained the words, ***"Without prejudice to the exercise of KPA's legal rights"*** and stated *"**we confirm** that KPA will comply with any final and binding costs orders …"* Even if the letters had contained express undertakings on behalf of the plaintiffs to pay an adverse costs order the judge should have considered whether there remained a significant

risk that such a costs order would not be paid and gone on to find that there was such a risk because the undertaking could only be enforced by committal or sequestration proceedings in the jurisdiction and such an order would not be enforceable in any other court. Nor was it clear that the comfort letters would be enforced by the Courts of Kuwait.

(vii) The judge erred in placing reliance on the evidence given in Mr Florent's third affidavit to the effect that PIFSS had never failed to comply with any costs order made in proceedings before the courts of the Cayman Islands when there was no evidence that any adverse costs order had ever been made against PIFSS in any Cayman Island proceedings. What the judge should have done was to require production of examples of Cayman Islands costs orders that had been honoured by PIFSS.

(viii) The judge made the following errors in giving the weight he did to PIFSS's assets within the jurisdiction:

(a) He stated that the plaintiff does not have the burden of establishing that it has fixed and permanent property within the jurisdiction when that burden in fact lay upon the plaintiffs and he should have taken note of the fact that PIFSS's interest in the Jermyn Street Fund was not of a fixed or permanent nature but was in the nature of a receivable in the event that a distribution were to be made and/or the Fund were wound up.

(b) He was wrong to consider whether there was any reason to doubt the probity of PIFSS when the question to be considered was whether there was a real risk that the assets in the jurisdiction may not be available if and when a case of enforcement arises; see Butcher J in PJSC *Tatneft v Bogolybov* [Costs LR 977 at [49]] and Henshaw J in *Pisante v Logothetis* [2020] EWHC 3332 (Comm) at [65]-[66].

*Discussion and decision*

181. We deal first with D1's submission that the judge erred in proceeding on the basis there was a presumption that a foreign government or state agency will not be ordered to provide security for costs unless the applicant "rebuts" the presumption.

182. The principal authority relied on by the judge for the aforesaid presumption was *Tasarruf.* Here, as related in [2] and [3] of Smellie CJ's judgment in that case, the plaintiff was a Turkish state entity authorised by statute to recover deficiencies in the accounts of insolvent banks by, among

other things, the seizure and sale of the assets of their managers, shareholders or auditors. This authorisation was given as part of a regulatory scheme to protect depositors against bank failure. In March 2004, the plaintiff seized in Turkish waters two motor yachts registered in the Cayman Islands Shipping Registry in the names of the corporate defendants. These yachts were said to belong to the controlling shareholders of a leading Turkish bank now in the administration of the plaintiff. In December 2004, the plaintiff brought an action in the Grand Court to prevent the completion of registration of mortgages for amounts in excess of their total value, granted against each vessel in favour of the third defendant in person.

183. On the question whether the plaintiff should be ordered to provide SFC, in *Tasarruf* the Chief Justice said that the fundamental question was whether an agency of a friendly foreign state, enjoying good standing in the international community and which has invoked the jurisdiction of this court, should be required to put up security for a defendant's costs of the action [14]. In earlier times there had been a practice that a foreign plaintiff should be ordered to provide SFC[19] but given the changes to the Rules since then and the discretionary nature of the exercise requiring the court to consider all the circumstances, a modern and different approach where the plaintiff is a foreign state, was discernible from the judgments in *Banco Economico S.A. v Allied Leasing & Fin. Corp* [1998 CILR 102] and *Ministère de la Culture &c. de France* v. *Lielb* [1981] 1 WLUK 253 at [16] – [18]. This modern principle was *"that where the plaintiff is the government (or a state agency) of a foreign state enjoying good standing in the international community (in particular from this court's point of view, enjoying diplomatic relations with H.M. Government) it should be assumed as a matter of comity and common sense, in the absence of anything to the contrary, that it will honour its obligations for costs made against it. Nonetheless, as the question remains one to be decided on a case by case basis in the discretion of the court, an order for security for costs could undoubtedly be made against a foreign state in appropriate circumstances".* [22]

184. In *Banco Economico S.A.* v *Allied Leasing & Fin. Corp.* the plaintiff, a Brazilian bank, itself in liquidation and under the control of a liquidator appointed by the Brazilian Government, petitioned for the winding up of the respondent. Mr Justice Smellie (as he then was) was of the prima facie view that there was merit in the petition [p. 112] and he concluded:

> *"that the proper balance is struck when account is taken of the consideration that the petitioner is now under the control of a liquidator who is appointed by the Brazilian Government. Even in the ordinary case, the fact of insolvency will not by itself dictate an order for security. When the entity is a large bank, as the petitioner is, any such presumption becomes even less appropriate as grounds*

---

[19] See e.g. *Costa Rica (Republic) v Erlanger* (1876) 3 Ch D 62

*for ordering security for costs: see Dartmouth Harbour Commrs. v. Mayor of Dartmouth Hardness (3) and the notes in 1 The Supreme Court Practice 1997, para. 23/1–3/13, at 412. Although Ms. Collins (who argued the aspect of the matter for the petitioner) had no instructions to give an undertaking as to costs, I have nothing at all before me to support any suggestion that the Brazilian Government would not ensure that its obligations for costs (to be incurred if its appointed officer proves unsuccessful before this court) would not be honoured. In the interest of comity, I would consider that any presumptions would arise in favour of such obligations being met and not the other way around. The rule in the Dartmouth Harbour Commrs. case applies, a fortiori, to the present circumstances".*

185. As related in [179 (ix)] above, *Cybervest* concerned a petition to wind up a fund incorporated in the Cayman Islands presented by PIFSS which faced a SFC application. In [22]-[23] of his judgment Smellie CJ said:

*"The wording of [O.23, r.1 (1)] plainly reveals the wide discretion to be exercised in the making of an order. The wording does not admit any judicial policy that would mandate the making of an order simply because the plaintiff is a foreign plaintiff; the requirement that the plaintiff is ordinarily resident outside the jurisdiction is simply a pre-condition to the making of an order under the particular O.23, r. 1(1) (a). It is a precondition just like those stipulated in (b) – (d), the other sub-rules, which are aimed at plaintiffs who may not ordinarily reside out of the jurisdiction. ... I would simply add that discretion is to be exercised on a case-by-case basis, as the rule states, having regard to all the circumstances of the case."*

186. After noting the significant fact that PIFSS had immensely valuable assets (its shares in the fund PIFSS was seeking to have wound up) that were to be regarded as being within the jurisdiction, Smellie CJ went on to say,

*"Another circumstance, of some weight, is the fact that the petitioner is a state agency of a foreign government of undoubted resources and enjoying a high reputation in the global financial and commercial community. This is relevant insofar as it would tend to negate any concern that the plaintiff would be unlikely to obey an order for costs made in favour of the respondent. To my mind, it also addresses the concern raised by Mr. Farrow, that efforts to enforce an order in Kuwait, if it ever came to that, could be met with a plea of state immunity".*

187. The judge supported his statement in [165] of his judgment that there was a rebuttable presumption that SFC should not be ordered by reason of the plaintiffs being the agent of, and wholly owned by, the State of Kuwait by footnote 87 which reads "*Tasarruf at §23*". However, it is clear that the paragraph of the judgment in *Tasarruf* to which the judge intended to refer was [22] which reads:

*"Taken together, there is a common practical principle to be discerned from these last cited three cases which is that where the plaintiff is the government (or a state agency) of a foreign state enjoying good standing in the international*

> *community (in particular from this court's point of view, enjoying diplomatic relations with H.M. Government)* **it should be assumed** *as a matter of comity and common sense,* **in the absence of anything to the contrary***, that it will honour its obligations for costs made against it. Nonetheless, as the question remains one to be decided on a case by case basis in the discretion of the court, an order for security for costs could undoubtedly be made against a foreign state in appropriate circumstances."* [ Emphasis supplied]

188.    It was no doubt in light of the emphasised words in this passage that the judge expressed himself as he did in [165] of his judgment. In our view, with respect to the judge, the Chief Justice is not to be taken here as laying down a principle based on a presumption that was to prevail unless it was rebutted. We say this having regard to the words used in the following sentence in the quoted passage that stress that the court is exercising a broad discretion on a case-by-case basis. It follows, in our opinion, that the judge erred in law in proceeding as he did on the basis that there was a presumption arising from comity and common sense that security for costs should not be awarded against the plaintiffs, although each case will be decided on its own facts.

189.    In our opinion, the approach of the court when dealing with an SFC application against a foreign state or foreign state agency that enjoys good standing in the international community should be that it can treat this as a factor in favour of such of a plaintiff to go into the scales but on the basis that it is just one amongst all the other factors that must be weighed by the court when exercising the discretion conferred upon it.

190.    We also accept Ms Stanley's submission that the judge erred in stating that a foreign plaintiff does not have the burden of establishing that it has fixed and permanent property within the jurisdiction. The judge supported this statement by citing Lightman J's dictum in *Oded Moshe Leyvand v Amnon Barasch et al* [2000] WL 191256 that the court will not infer a real risk that assets within the jurisdiction will be dissipated or moved abroad in the absence of a question over the plaintiff's probity. Whilst the judge clearly intended this statement to apply to a situation where the evidence showed that a foreign plaintiff had property within the jurisdiction but there was nothing or very little about the property's permanency or freedom from encumbrances, we find it to have been too broadly expressed. Evidence that a foreign plaintiff has valuable property within the jurisdiction will obviously be of relevance but the significance of this evidence will depend on all the facts of the case, including any evidence as to the permanency of the property and its freedom from encumbrances (or the lack of such evidence) and other evidence tending to show that the plaintiff can be trusted to honour an adverse costs order. We also respectfully disagree with Lightman J's dictum in *Oded Moshe Leyland v Amnon Barasch*. In our view, the approach adopted by Butcher J in *PJSC Tatneft v Bogolyubov* [2019]

Costs LR 977 at [49] and Henshaw J in *Pisante v Logothetis* [2020] 3332 (Comm) at [65]- [66]: "the question is not whether a lack of probity has been shown, but whether there is a real risk that the assets in a Contracting State may no longer be available if and when an asset enforcement arises," is to be preferred.

191.  We turn to Ms Stanley's submission challenging the finding by the judge in [178] that, if the plaintiffs' claims against the defendants all fail, there will be a costs order in respect of which KPA and PIFSS will be jointly and severally liable, the latter having substantial assets within the jurisdiction. Ms Stanley's submission is based on the contention now pleaded in [12] of D1's Defence that KPA'S claim is a nullity because it was not authorised by the Chairman of KPA, who, as a matter of Kuwaiti law (having regard to KPA's constitution) is the only officer of KPA who can authorise the bringing of claims by the company and who has no authority to delegate this power or to ratify an earlier unauthorised issue of proceedings.

192.  D1's Defence and Counterclaim to KPA's Claim was served and filed on 31 January 2022, over three months after the hearing below. In her skeleton argument for this appeal, Ms Stanley submits that, "As recorded in the evidence [the fourth affidavit of Mr Lewis] and then set out in the GP's Defence at [12], there is a major factual dispute in this case as between KPA and the Appellants as to whether these proceedings have been commenced and continued on behalf of KPA with its authority (there being no power under Kuwaiti law to ratify proceedings if brought without authority.)"

193.  Attention was first drawn to the significance of the plaintiffs being joint and several debtors under an adverse costs order in paragraph 20 of Mr Florent's third affidavit dated 27 August 2021, where he deposed that he had alerted PIFSS to the possibility that, owing to the joint and several nature of costs orders in the Cayman Islands, it was possible that PIFSS would be required to satisfy any costs order that may be made in these proceedings in full from its own resources.

194.  In [42] – [47] of his fourth affidavit dated 17 September 2021, Mr Lewis deposed that the FFP Directors had been sent an opinion of Mr Omar Al Qahtani of the Turkey office of Al Tamimi & Co ("the Al Tamimi Opinion") stating that only the Chairman of KPA had authority to approve the issuance of proceedings by KPA and this authority was not capable of being delegated; nor could an unauthorised issuance of proceedings be ratified by the KPA's Chairman. Reference was also made to the suspension of Mr Al Sabah on 24 August 2021 from his position as Director General KPA.

195.     Curious as to how this lack of authority contention was deployed below, the Court has perused
         the skeleton arguments relied on before the judge and the transcript of the oral submissions
         advanced below by Ms Stanley for D1, Mr Chapman for D2 – D3 and Mr Allison for the
         plaintiffs.

196.     In [245] of his skeleton argument for the hearing below, Mr Allison contended that PIFSS had
         sufficient assets within the jurisdiction to cover any costs order that might be made against the
         plaintiffs in respect of which they would be jointly and severally liable.

197.     Mr Chapman did not contend in either his skeleton argument or his oral opening submissions
         that one of the consequences of the Tamimi Opinion was that it was not inevitable that if the
         plaintiffs' claims were dismissed they would both be jointly and severally liable for the costs
         of the proceedings.

198.     Ms Stanley also did not contend in her skeleton argument or in her opening or closing
         submissions that, in light of the Tamimi Opinion, KPA's claim was a nullity so that it could not
         be said that it was inevitable that if KPA's and PIFSS's respective claims were dismissed, the
         plaintiffs would be jointly and severally liable for the costs of the proceedings. Instead, she
         contended that the effect of the Tamimi Opinion was that it undermined the plaintiffs'
         contention that an adverse costs order would be enforceable in Kuwait and undermined KPA's
         reliance on assurances given by KPA's Director General, Mr Al Sabah, both before and after
         he was suspended from that office, that KPA would honour any costs order made against it.

199.     In  his oral submissions in reply, Mr Allison observed that the defendants had not taken the
         point that it was only one of the plaintiffs, PIFSS, that had assets within the  jurisdiction and
         contended that, even if it had been taken, as Mr Florent explained in paragraph 30 of his third
         affidavit, PIFSS was well aware of the joint and several nature of costs orders so that it may
         have to pay the whole sum from its own resources. Mr Allison also submitted that the "lack of
         authority issue" was not a live issue in the proceedings before the Court because there had been
         no application to strike out KPA's claim on that basis or to seek the determination of a
         preliminary issue.

200.     In the course of his reply submissions made ahead of Ms Stanley's reply submissions, Mr
         Chapman accepted that, if the plaintiffs' claims were dismissed, the likely costs order would be
         a joint and several one, subject to the possibility that PIFSS might well argue that joint and
         several liability should not apply if KPA's claim was found to have been brought without
         authority.

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

AP1647

201. Whilst Ms Stanley had expressly adopted Mr Chapman's opening oral submissions when she made her own opening oral submissions, she did not adopt the same course when she delivered her oral closing submissions, in the course of which she said she was going to deal just with the Al Tamimi/authority/suspension point and the point she wished to make was not the lack of authority to commence KPA's proceedings but the suspension of Mr Al Sabah as Director General of KPA and the resulting loss of his authority to provide information to Mr Florent upon which Mr Florent had purported to rely in advancing KPA's case.[20]

202. In our judgment, since the point now taken by D1[21] as to the impact of the lack of authority contention on what the judge said in [178] of his judgment was not taken on behalf of D1 below, when it plainly could have been, it is not open to D1 to take the point in this appeal in support of D1's case that the judge's decision refusing the Defendants' SFC applications should be set aside.

203. In our judgment, the errors of the judge identified in [188] and [190] above played such a significant role in the exercise of his discretion (see eg [155], [165], [166] and [176]) that his decision must be set aside.

204. In these circumstances, it is open to us to exercise the discretion conferred by GCR O. 23, r. 1 (1) and since we have before us all the evidence and the parties' skeleton arguments that were before the judge and the transcript of the oral submissions the judge heard on the SFC issue, we propose to decide whether SFC should or should not be ordered against each of the plaintiffs.

205. We proceed on the assumption that the defendants are correct in their submission that there would be very real difficulties indeed in enforcing in Kuwait costs orders made against the plaintiffs if their claims against the defendants are dismissed.

206. Although it is a necessary condition for the ordering of SFC that there is a real risk that an adverse costs order would not be enforced against the postulated foreign plaintiff in his/its home jurisdiction, this is not a sufficient condition for ordering SFC whatever the other circumstances of the case. Instead, it is open to the court, if there is sufficient evidence to support such a conclusion, to find that there is no real risk that the plaintiff will not honour an adverse costs order and for this reason to decline to order SFC. In our judgment, this is such a case having regard to the following matters.

---

[20] Day 5, p.139
[21] See paragraph 180 (iv) above

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

207. As is common ground, the plaintiffs are agencies of a foreign state, Kuwait, which is of good standing in the international community and enjoys diplomatic relations with HM Government. Further, as related above, an instrumentality of the State of Kuwait, the DLAL, acting by the Head of its International Arbitration and Litigation Sector, sent a formal letter to the judge on behalf not only of KPA and PIFSS but also the State of Kuwait that reads in relevant part:

> "Dear Sirs.
>
> Cause No. FSD 236 of 2020 ( RPJ ) - ( 1 ) Kuwait Ports Authority and (2 ) The Public institution for Social Security v ( 1 ) Port Link GP Ltd ., (2) Mark Eric Williams, ( 3) Wellspring Capital Group, Inc and (4) KGL Investment Company Asia (the "Proceedings")
>
> I am the Head of the International Arbitration and Litigation Sector for the Department of Legal Advice and Legislation (the "Department") of the State of Kuwait.
>
> One of the responsibilities of the Department is to act as legal adviser to the State of Kuwait as well as to certain State entities and/or incarnations of the State. In particular, the Department currently advises and represents each of the Kuwait Ports Authority ("KPA") and The Public Institution for Social Security ("PIFSS") in connection with the Proceedings.
>
> I hereby confirm, on behalf of the Department, that KPA and PIFSS are wholly owned by the State of Kuwait and bring to your attention the attached letters, duly signed by authorised representatives of KPA and PIFSS confirming that they will comply with any final and binding costs orders made against them in the Proceedings ("Costs Orders").
>
> We respectfully request, on behalf of KPA and PIFSS [and the State of Kuwait][22] that the Grand Court take these letters into consideration in determining whether or not KPA and/or PIFSS should be required to provide security for costs in the Proceedings".
>
> [Emphasis supplied]

208. The letters (also addressed to the judge) that were sent with the DLAL letter on behalf of PIFSS and KPA were in common form. In relevant part, they read:

> "Dear Sirs
>
> We refer to the abovementioned Proceedings before the Grand Court of the Cayman Islands, in which Kuwait Ports Authority ("KPA") [PIFSS] is a Plaintiff.
>
> Without prejudice to the exercise of KPA's [PIFSS's] legal rights, including without limitation its right to appeal, or to seek leave to appeal, any decision of the Grand Court, we confirm that KPA will comply with any final and binding

---

[22] The brackets do not signify that the words they contain were not part of the original letter, they were.

> *costs order(s) made against KPA in the course of the Proceedings ("Costs Orders").*
>
> *Yours faithfully"*

209.    The KPA letter is signed by Mr Al Sabah in his capacity as KPA's Director General. The letter is dated 27 May 2021, which was at least two months before Mr Al Sabah was suspended from this office on 24 August 2021.

210.    Ms Stanley criticises the judge for placing the reliance he did on these letters. Focusing on the words, "Without prejudice to the exercise of KPA's [PIFSS's] legal rights, including without limitation to its right to appeal, or to seek leave to appeal, any decision of the Grand Court", she submits that the letters were merely "comfort letters" and further contends that the judge should have found there remained a significant risk that an adverse costs order would not be paid because the confirmation expressed in the letters could only be enforced by committal or sequestration proceedings in the jurisdiction and such an order would not be enforceable in any other court; nor was it clear that the comfort letters would be enforced by the Courts of Kuwait.

211.    We do not accept these criticisms. In our judgment the three letters amount to a representation intended to be relied on by the Grand Court that the plaintiffs would honour any final and binding costs order made against them and we regard the letters as providing strong support for the conclusion that there is no real risk that such costs orders would not be paid. We say this because we have no doubt that the State of Kuwait and its agencies, KPA and PIFSS, would suffer very significant reputational damage if the plaintiffs were to depart from the confirmations given in the letters. Also, further support for this "no real risk" conclusion comes from the evidence as to the financial resources of the plaintiffs that shows that each could be expected to have the ready funds to honour an adverse costs award.

212.    As related by the judge, the unchallenged evidence is that PIFSS, which administers independently Kuwait's pension fund for all Kuwaiti citizens in the workforce, had a global investment asset portfolio worth approximately USD 133.7 billion as at 31 March 2021 and earned a profit for the period March 2020 to December 2020 of USD 18.9 billion. Included in these assets is its investment in the Jermyn Street Fund, a Cayman Islands ELP, which was valued at EUR 35,074,942 as at 31 March 2021. It is true that PIFSS is likely to be entitled to redeem this investment under the partnership agreement and to do so without publicity but there are no reasons to think that PIFSS would set about redeeming its investment and transferring the proceeds out of the jurisdiction to avoid having to satisfy a costs order: accordingly its existence provides reassurance that PIFSS is going to have amply sufficient resources over at

least the next five to six years to meet an adverse costs order should its claims against the Defendants be dismissed.

213.    When setting out KPA's financial details that are recorded in [179 (xv)] above when relating the his reasons why the SFC applications should be dismissed, the judge was relying on the evidence given in Mr Florent's Third Affidavit which was based in part on information that had come from Mr Al Sabah. Ms Stanley submits that this evidence was and is inadmissible because it is hearsay and Mr Florent's Third Affidavit was sworn on 27 August 2021 after Mr Al Sabah was suspended on 24 August 2021. We are not impressed by this submission. Even assuming that the information from Mr Al Sabah was provided to Mr Florent after Mr Al Sabah had been suspended (which we think unlikely), Mr Al Sabah would have been in a position to provide reliable figures showing that KPA's profit for the financial year 2020 – 2021 was KWD 56,450,000, the equivalent to c.USD 187,522,553 (based on a foreign exchange currency conversion of KWD 1: USD 3.32 as at 9 August 2021). Further, Mr Florent exhibits at pp. 171 -172 of MEF-4 a public announcement made by KPA on 4 April 2021 that KPA's profit for the financial year 2020 – 2021 was KWD 56,450,000.

214.    Apart from its interest in the assets held on trust for it and TPF by the GP, KPA has no assets within the jurisdiction but it is clear to us from the level of profit earned by KPA for the year 2020 – 2021 that it is extremely likely to have ample resources to honour an adverse costs order over the next five to six years.

215.    It was argued below by the defendants that the plaintiffs could not be trusted to honour an adverse costs order on two particular grounds: the attempts by the Attorney General of Kuwait to obtain the monies that had been paid into the account held at the Noor Bank that were part of the proceeds from the sale of Clark City, TPF's asset in the Philippines; and the manner in which the defendants had conducted the proceedings, including the bringing of proceedings against Walkers, the defendants' previous attorneys, the bringing of derivative claims for proceeds that would be paid to the plaintiffs and the plaintiffs' alleged refusal to compromise the SFC issue. These contentions are not advanced by Ms Stanley. Had they been, they would have found no favour with the Court.

216.    For the reasons given in [205] – [215] above, we find that there is no real risk that the plaintiffs will not honour their confirmations that they will pay any final and binding costs order made against them and accordingly we order that the plaintiffs should not be ordered to provide security for costs.

217.     It follows that D1's appeal against the judge's refusal to order SFC must be and is dismissed.

**Summary of conclusions**

218.     We would summarise our conclusions as follows:

(i)      D1's appeal against the refusal of the judge to strike out the plaintiffs' direct claims against D1 is dismissed.

(ii)     D1's appeal against the refusal of the judge to strike out the plaintiffs' derivative claims against D1 is allowed and the claims are struck out.

(iii)    The appeals of D2, D3 and D4 against the refusal of the judge to strike out the plaintiffs' derivative claims against them are dismissed.

(iv)     The appeal of D1 against the refusal of the judge to order the plaintiffs to provide security for costs is dismissed.

219.     Our preliminary view as to costs is:

(i)      There should be no order as to costs in respect of D1's strike out appeal. Although D1 succeeded in having the derivative claim against it struck out, it did not succeed on its argument that the plaintiffs' claims were misconceived because they were not in the form of an application for partnership accounts.

(ii)     D2, D3 and D4 should pay the costs of their strike out appeals.

(iii)    D1 should pay the costs of its SFC appeal.

(iv)     The parties are at liberty to contend for different costs orders than those set out in (i) – (iii) but they must serve (concise) written submissions in support thereof within 10 days of the issuance of this judgment.

**Sir Michael Birt JA**

220.     I agree.

**Sir Jack Beatson JA**

221.     I also agree.



# Ludgate Insurance Company Limited v Citibank NA

 **Positive/Neutral Judicial Consideration**

**Court**
Court of Appeal (Civil Division)

**Judgment Date**
26 January 1998

<div align="center">

Case No. QBCMR 96/0755/B

Supreme Court of Judicature Court of Appeal (Civil Division)

**[1998] EWHC 1144 (Comm), 1998 WL 1042401**

Before Lord Justice Brooke Lord Justice Mummery Sir Patrick Russell

Date: Monday, 26th January 1998

</div>

On Appeal from the Queen's Bench Division (Commercial) Final List

(Mr Justice Waller)

**Representation**

Mr John Rowland QC (instructed by Messrs Titmuss Sainer Dechert , London EC4Y 1LT) appeared on behalf of the Appellants/Plaintiffs.
Mr Christopher Butcher (instructed by Messrs Clifford Chance , London EC1A 4JJ) appeared on behalf of the Respondents/ Defendants.

Judgment

Lord Justice Brooke:

1. This is an appeal by the Plaintiffs, Ludgate Insurance Company Ltd ("Ludgate"), against a judgment by Mr Justice Waller on 25th April 1996 in which he dismissed all their claims against the Defendants, Citibank (SA) ("Citibank").

2. The Plaintiffs' claims arise out of a dispute between the parties which followed the collapse of certain companies trading in the London insurance market in the early 1990s. Ludgate, in short, contends that Citibank is wrongly retaining too much by way of collateral deposits in support of Letters of Credit it has issued and that it has also wrongly debited interest charges to its account.

3. The background history to this dispute relates to the underwriting activities of H S Weavers (Underwriting) Agencies Ltd ("Weavers", sometimes called "HSW"), which traded as underwriting agents between 1963 and March 1990 when it ceased writing any further insurance business. It went into liquidation in August 1992. At all material times Weavers provided an underwriting service for UK and overseas insurance companies which wished to participate in the London insurance market. The companies for whom it acted as an underwriting agent entered into agency agreements with it. These companies were often called "stamp companies", although not all such companies appeared on the Weavers stamp. These agreements gave

© 2023 Thomson Reuters.

Weavers authority to accept business on their behalf, settle claims and arrange reinsurance programmes either collectively or individually. These companies became known in the context of this case as Weavers' Principals.

4. Weavers' business steadily expanded, particularly after its take-over by London United Investments plc ("LUI") in 1971. Following this take-over, Weavers became the underwriting agent for the insurance companies in the LUI group, the most notable of these being companies called Walbrook, Kings Croft, El Paso, Lane Street and Mutual Reinsurance (later called the KELM or KWELM companies, depending on whether Walbrook was included). It also continued to perform underwriting services for non-LUI group companies, but from the time it joined the LUI group, its prominence in the field of North American Casualty and Professional Indemnity insurance increased rapidly, to such an extent that by the mid-1970s it had become one of the acknowledged leaders in these fields.

5. At all material times, therefore, until March 1990, Weavers was engaged in underwriting casualty, liability and property insurance and reinsurance emanating mainly but not exclusively from the United States. The underwriting was evidenced by an underwriting stamp which showed the different insurers' respective 'gross' participation in the risks being underwritten. Behind the companies which appeared on the stamp were a number of other insurance companies who were participating by way of quota share reinsurance of the companies on the stamp. Some of the latter companies had appointed Weavers as their underwriting agent. Others had not. In general Weavers treated these quota share reinsurers as part of the stamp.

6. The composition of the stamp and the extent of the participation of each stamp company (including those participating by way of quota share reinsurance) varied from time to time. Changes would occur when a stamp company departed or a new company arrived, or when an existing stamp company wished to increase or reduce its participation. There were separate 'stamps' for casualty and liability business and for property business. This form of trading continued until 26th March 1990 when the Secretary of State directed that LUI and its subsidiary insurance companies should take on no new insurance business. Two months later an administration order was made in respect of LUI, and several of the LUI group insurance companies, including the last four of the five mentioned above, went into provisional liquidation in due course. They were followed in August 1992 by Walbrook, which had been Weavers' principal stamp company.

7. This appeal is concerned with the operation of the London Market Letter of Credit scheme. This scheme was operated by Citibank from 1964 onwards, and it enabled reinsurers in the London market (and, later, other European reinsurers) to conduct reinsurance business in the United States. In that country insurance companies are regulated at state level, and state regulators make certain requirements of a US direct writing company or reinsurer who has reinsured any part of its risk portfolio with a non-domestic reinsurer, both in relation to outstanding claims and to unearned premium. If a claim is made, the non-domestic reinsurer must be promptly told of its share of the claim and required to put up security for that amount. As to unearned premium, although US insurance companies offer to pay reinsurance premiums annually in advance, they require Letters of Credit to be opened in their favour to cover the portion of the premium still to be earned by the reinsurer in order that their balance sheets will not be negatively affected. The London Market scheme enabled participants to substitute Letters of Credit for cash advances for both these purposes.

8. Weavers were from time to time required to establish irrevocable Letters of Credit for these two purposes on business emanating from the United States which it accepted on behalf of its Principals. Until 1989 the standard form of request to Citibank was in the following terms, so far as is material:

"2. To meet payments under the Credit, the undersigned applicants have transferred and delivered to you at your London, England branch a Reinsurance Deposit of an amount in United States [or Canadian] currency at least equal to the face value of the Credit requested, such amount to be applied by you on the terms of the agreement hereinafter set forth.

3. You are to utilise the Reinsurance Deposit for the payment of any and all sums which may be drawn upon you under the Credit by the beneficiary, plus your commissions and any and all charges and expenses which you may pay or incur

© 2023 Thomson Reuters.

relative to the Credit, and no part of such amounts shall be repaid, and no interest thereon shall be paid to us unless and until all such sums have been paid to you in full.

4. Also in the premises, the undersigned applicants agree to pay to you on demand at your London branch office any sum or sums as required by the foregoing paragraphs remaining unsettled in your favour after the said Reinsurance Deposit may have been exhausted."

9. That the Principals' liability in relation to the Letters of Credit was a joint liability was later put beyond doubt by Clauses 1, 3(b) and 9 of a Master Agreement dated May 1989 , by which Ludgate was bound, which was expressed to apply also to all Credits already established by Citibank at Weavers' request.

10. The Letters of Credit which Citibank issued at Weavers' request showed no breakdown of the liability as between the various stamp companies and other companies which underwrote through the Weavers underwriting pool. Sometimes the stamp companies were the only reinsurers participating on a Letter of Credit, and on other occasions non-Weavers reinsurers also took part.

11. In order to ensure it was properly secured when it issued a Letter of Credit, Citibank required Weavers to maintain deposit accounts with the bank in London. If a Letter of Credit was drawn down in the United States, the London office of Citibank, on receiving notice from the New York office, would draw down on the Weavers accounts to meet Weavers' share of the drawing under the Letter of Credit. Weavers would ensure that the accounts had sufficient money in them to meet any liability which arose on such a draw down. The system worked well until the events which followed the Secretary of State's direction in March 1990.

12. The Plaintiff company, Ludgate Insurance Company Limited, was incorporated in 1981 as a wholly owned subsidiary of MMI Companies Inc. It entered into an agency agreement with Weavers in November 1981, and from its inception it underwrote all its insurance business through the Weavers underwriting pool. Its share of the Weavers stamp between 1982 and 1987 varied between 4% and 6%. It terminated its membership of the pool on 31st December 1987, and participated in 1988 only by way of two quota share reinsurance agreements, one being made with Walbrook and the other with another company. After 31st December 1988 it took no further part in the pool. On 3rd August 1992 Ludgate was bought by new owners, and five weeks later it removed any remaining authority from Weavers.

13. Until 1986 Ludgate's liabilities in respect of any Letters of Credit issued by Citibank on Weavers' instructions (and on the instructions of all the other Principals in the Weavers pool) were secured by cash deposits deposited by Weavers in accounts in its name. These accounts were sometimes described as the Weavers pool account. Weavers had direct control over its Principals' collateral and it ensured that the pool account stayed in credit to the extent that it could meet any drawings under the Letters of Credit.

14. In 1986, however, there was a change in these arrangements, so far as Ludgate and certain of the other Weavers Principals were concerned. They followed some of the other leading Principals in taking steps then to establish segregated collateral accounts in their own names, even though Weavers retained its authority to give instructions to Citibank in relation to the money in those accounts. The dispute in this case turns on the interpretation of the letter of agreement between Ludgate and Citibank dated 9th December 1986 whereby Ludgate's segregated accounts were opened for the first time that month, and the way in which Citibank has purported to exercise its discretionary powers under that agreement in the events that have occurred.

© 2023 Thomson Reuters.

15.  Clause 1(i), (ii) and (iii) and Clause 2(i) and (ii) of the agreement are in the following terms:

"1.  We [Ludgate] refer to:—

(i)  the sundry letters of agreement ("the Agreement(s)") now or hereafter entered into by you [Citibank] with H.S.Weavers (Underwriting) Agencies Limited ("HSW") in respect inter alia of any letters of credits ("Credit(s)") now or hereafter issued by any branch of Citibank NA ("the Bank") on behalf of and for the account of HSW;

(ii)  the accounts with the Bank in our name now or hereafter established by us with the Bank for the purposes hereof ("the Account(s)"); and

(iii)  the proposal that the Bank agrees to waive in part its requirement that HSW maintains certain deposits with the Bank in connection with the Agreement(s) on condition inter alia that we maintain certain deposits with the Bank which, taken together with the deposits which HSW continues to maintain with the Bank, at least equal the amount required to be deposited by the terms of the Agreement(s).

2.  We hereby offer to agree with you as follows:—

(i)  we shall maintain in the Account(s) a deposit or deposits equal in aggregate amount to that portion of the Bank's actual or contingent liability under the Credits as is notified to the Bank by HSW from time to time as attributable to our interest in the Credit(s) and (a) we shall be deemed to have requested the Bank to assume such liability under the Credit(s) for our sole account on the same terms and conditions *mutatis mutandis* as the Agreement(s) and (b) we shall not be entitled to withdraw any monies from the Account(s) that would result in a breach of the foregoing requirement, Provided Always that if HSW fails to so notify the Bank or the Bank is in receipt of conflicting or ambiguous instructions from HSW or otherwise it would appear to the Bank that the monies in the Account(s) and in the account(s) of HSW held or established pursuant to the terms of the Agreement(s) would not together equal 100% of the Bank's actual and contingent liabilities (as aforesaid) then the Bank shall be entitled to retain in the account(s) such additional margin as it considers appropriate in all circumstances until a solution satisfactory to it is effected in respect thereof;

(ii)  we irrevocably authorise the Bank (without prior notice to us) to debit the Account(s) from time to time for the payment of any and all sums which may be drawn under any of the Credit(s) by any beneficiary thereof in such manner as may be notified to the Bank by HSW Provided Always that if HSW fails to so notify the Bank or the Bank is in receipt of conflicting or ambiguous instruction(s) from HSW the Bank shall (a) advise us in writing of such circumstances and (b) in the absence of a solution satisfactory to it being effected within such period as the Bank considers reasonable in all the circumstances, the Bank may allocate the drawing(s) under the Credit(s) between us and HSW in such manner as the Bank considers appropriate in its sole discretion."

16.  The agreement therefore limited Ludgate's obligation to maintain sums on deposit to sums equal to that part of Citibank's actual or contingent liability under the Letters of Credit as was notified to Citibank by Weavers from time to time as attributable to Ludgate's interest in the credits unless one or other of what the judge described as the "trigger events" occurred. If such an event occurred, then Citibank would be entitled to retain such additional margin as it considered appropriate in all [the] circumstances until a solution satisfactory to Citibank was effected. The judge held that the first of the trigger events had indeed occurred, since Weavers had failed to notify the bank in the manner provided for by the agreement. Ludgate now accepts that he was correct in so holding. There was a continuing dispute before us as to whether the judge was correct in holding that the third trigger event had not occurred.

17.  Before considering the issues on this appeal, it is necessary to say a little more about the history after December 1986. During 1989 Citibank and many of Weavers' Principals became concerned about the solvency of both Weavers and the insurance companies in the LUI group which formed the backbone of the Weavers 'stamp'. As a result, Citibank completely restructured its relationship with Weavers in relation to the issuing of Letters of Credit. Weavers and a number of its Principals who had significant liabilities under Letters of Credit were now obliged to enter into new agreements. These related to the

© 2023 Thomson Reuters.

establishment of new types of reinsurance deposits to secure the Letters of Credit, and the charging of those deposits to secure Weavers' liabilities and the liabilities of all its Principals whose funds were so charged. Ludgate's agreement in the event remained unchanged, a matter on which Ludgate relies in these proceedings, although it was, as I have said, bound by the terms of the new Master Agreement for Insurance Letters of Credit which Weavers executed for itself and its Principals at the same time.

18.  The concerns I have mentioned were justified in the end. When the principal LUI companies and Weavers all stopped underwriting in March 1990, the orderly administration of the run-off of the Weavers underwriting pool became a matter of major concern to Citibank. Weavers no longer provided information on the agreed monthly basis about the liabilities of its Principals for Letters of Credit issued by Citibank. Instead, this information flowed through to Citibank irregularly in the manner I will now describe..

19.  In September 1990 Weavers transferred a large part (but not all) of its business to a new company called Southwark Run-off Services Ltd ("SROS"), which was a wholly owned subsidiary of Walbrook. Weavers did not formally assign its agency agreements to SROS. Instead, it secured the future servicing of business it had underwritten in the past by making an agreement with SROS. It was apparently intended by both Weavers and SROS that SROS should provide the information Citibank required under the agreement, but Citibank acquired no contractual rights to obtain information from SROS, and there was evidence before the judge to the effect that Citibank had doubts about the quality of the information which would be coming from SROS because several key members of Weavers' staff did not move to SROS but went to work for another company. Between September 1990 and June 1992 SROS supplied relevant notifications to Weavers, and Weavers sporadically transmitted information so notified to Citibank. Shortly after SROS's appearance on the scene the idea of definitively segregating the liability of Weavers' Principals for their respective shares in the Letters of Credit was first mooted.

20.  The emergence of these difficulties in 1990 does not appear to have caused any significant problems, either from the point of view of drawing down on the Letters of Credit or of Citibank's ability to reimburse itself following such drawdown. At all material times until the present day the total collateral held by Citibank has exceeded by a substantial margin all the liabilities assumed by Citibank under all the Letters of Credit issued at Weavers' request. The difficulty confronting both Citibank and Weavers in 1990 was how to allocate the liabilities between the different categories of Principals who were participating in the Weavers' underwriting pool. Citibank understandably wanted to receive regular information identifying each Principal's share of liability under the outstanding Letters of Credit. From the information provided during 1990 Citibank was able to determine that although the total collateral it held comfortably exceeded all its liabilities under the Letters of Credit there were a small number of Principals with a shortfall in collateral, if assessed individually. Citibank was therefore concerned that although the segregation exercise being contemplated would show that many Principals had surplus collateral, others would not have enough to cover their individual liabilities. For this reason the bank was only willing to proceed with a segregation exercise if the latter made good their collateral shortfall or if the former funded the deficiencies. Citibank has always favoured segregation provided that an agreed solution on one or other of these lines could be found.

21.  The judge described some of the technical difficulties they encountered in these terms:

"A great deal of time and effort was expended on the segregation exercise. If it had been achieved, this dispute would not have come this far. One complicating factor has been the fact that not all of HSW's Principals actually appeared on the "stamp" when HSW's underwriters subscribed to a risk. Even for those who did appear on the stamp the ultimate net share of that risk may have been different from the gross share indicated on the "stamp". The web of inter-Principal reinsurances, outside quota share reinsurances and facultative excess of loss reinsurances produced a sharing of ultimate liabilities between many more insurers. The description "gross stamp" was applied to the HSW stamp companies proper and reflected each companies' agreed percentage participation. The description "net stamp" was applied to HSW stamp companies proper together with their whole account quota share reinsurers. HSW treated these reinsurers as if they were stamp companies. This led to HSW keeping their accounts on a net stamp basis rather than a gross stamp basis. However, Citibank wished to have the segregation exercise carried out on a gross stamp basis. The collateral position of Principals differs depending upon whether net or gross accounting is adopted."

22. Eventually Citibank formally wrote to all the Weavers Principals on 22nd May 1992. In this letter the bank announced that no new Letters of Credit would be issued at Weavers' request and that the amount of existing Letters of Credit would not be increased. It also indicated that it would be prepared to consider requests for the release of collateral on certain conditions. In this letter the bank provided information about the proposed segregation exercise and enclosed a Questionnaire inviting Principals to indicate whether they supported this exercise. Ludgate, like some of the other Principals, did not respond to this letter at all.

23. The conditions for the release of collateral became known as the "acid test". This test made the following requirements:

"1) written confirmation from HSW (supported by financial data) that the principal requesting the release of surplus collateral does have a specified amount of surplus collateral over its share of letter of credit obligations (calculated on both gross and net bases of accounting);

2) a written statement from HSW (based on its data) of all principals which have collateral (or shares of collateral) smaller than their respective shares of letter of credit obligations (on both bases of accounting), and a written computation to determine whether the sum of such shortfalls is greater on a gross or a net basis of accounting;

3) the amount to be released to the relevant principal will be the amount remaining after the deduction of (a) the larger figure computed under (2) above from (b) the smaller figure computed under (1) above."

24. There is another aspect of the history which should be mentioned. When the court appointed administrators to the KELM companies, orders were obtained which were believed to have the effect of preventing Weavers from transferring sums from their deposits to meet this liability for sums drawn down under the Letters of Credit. For a while Walbrook's deposit account funded the KELM companies' share of the drawings, but Citibank perceived that the continuation of this practice might drive Walbrook closer to insolvency. Citibank therefore sought advice as to how it could resume enforcing its security so far as the KELM companies were concerned, and it was advised that provided that debts were due to Citibank on an overdraft once Letters of Credit were drawn down, it would be able to enforce its collateral from those companies. As a result steps were taken to ensure that the Pool Account at Citibank went into overdraft. In 1992 this overdraft became larger than it might otherwise have done due to the absence of instructions from Weavers. On 16th June 1992 Weavers purported to give instructions to Citibank, after having omitted to do so for many months, but Citibank felt unable to accept these instructions for technical reasons, so that the overdraft continued to rise, thereby occasioning substantial interest charges on the overdrawn Pool Account.

25. In early August 1992, the month when Walbrook was placed in provisional liquidation and Weavers went into liquidation (thereby terminating all the Agency Agreements with its Principals), the new owners of Ludgate, which was put into run off but has always remained solvent, immediately adopted a more aggressive approach towards the company's efforts to have funds released by Citibank. At the same time, with Weavers now in liquidation and a mounting deficit on the Weavers Pool Account, the bank became concerned to see whether it was possible to achieve some apportioning as between the different Principals, so that the overdraft could be paid off by drawing on their accounts. To this end it wrote to Weavers on 18th September 1992, referring to the deficit on the Pool Account and requesting it to notify it of Pool members' liabilities in order to open the way for apportionment of this debit balance between the different segregated accounts. No such information was forthcoming, and indeed Weavers supplied no information of any kind to Citibank after it went into liquidation. In October 1992 Citibank approached SROS direct and received information from it direct for the first time. The judge found that this information was furnished on terms and understandings different from those which had prevailed while Weavers were supplying the information. In particular, SROS would not verify the figures for companies other than the KWELM

companies and one other company whom it represented, and no agreement has ever been forthcoming from all the former Weavers Principals that the figures furnished by SROS and its successor are 100% accurate.

26.  On 12th October 1992 Ludgate told Citibank that it saw no reason why it should provide collateral beyond the amount of its liability. It also made certain other requests, but following correspondence and meetings on these topics, Citibank wrote to Ludgate on 6th November 1992 to the effect that it did not accept that Ludgate's maximum exposure related purely to its own liabilities. Instead, it maintained that it had the right to retain Ludgate's segregated collateral pursuant to the terms of the letter dated 9th December 1986; that in the absence of a solution it found satisfactory, it had the right to allocate drawings in such manner as it considered appropriate in its sole discretion; that unless and until a segregation exercise was agreed between all Principals, the release of collateral could only be obtained on the basis of the acid test; and that it hoped that a solution which lay in the hands of the Principals, as opposed to Citibank, could be achieved.

27.  A week later Citibank told all the Principals that in the absence of advice from Weavers, it would use its power to apportion drawings between Principals unless some other arrangement it found satisfactory was devised. It added that it considered it appropriate to use figures for this purpose which SROS was then furnishing to it directly. It referred to the possibility of releases of collateral pursuant to the "acid test" (which was modified slightly) and added that it believed that this was a conservative basis for collateral release and that it intended to adhere to it for the immediate future. It would be pleased to consider a less conservative basis in due course, provided that none of the Principals objected to it. It believed that its action was equitable to Principals and that it was the best solution open to all parties until such time as Principals were able to conclude full segregation on a mutually agreed basis.

28.  None of the Principals suggested in reply that Citibank did not have the power to apportion drawings, and in particular there was no suggestion at that time from Ludgate that Citibank was actually receiving notifications which counted as notifications from Weavers. On the contrary, Ludgate wrote to Citibank on 26th November 1992 accepting that it had the power to apportion and telling it that they broadly supported the approach it was taking in that regard.

29.  On 18th December 1992 SROS sold its assets and transferred its business to a company called KWELM Management Services Ltd ("KMS"). A month later Citibank told the Principals that it intended to use the information supplied by KMS in place of that previously supplied by SROS.

30.  Citibank went on trying to achieve an equitable result as between Principals but it was unable to achieve agreement across the board. Ludgate continued to insist that its surplus collateral should be released, and eventually the writ in this action was issued on 14th January 1994.

31.  There were originally three main issues arising for our decision on this appeal. In the event Mr Rowland accepted that the first of the trigger events mentioned in the 1986 agreement had indeed occurred when Weavers stopped notifying the bank of the information required from it under the agreement and the bank never agreed to accept an alternative supplier of information. He argued, however, that the manner in which the bank was entitled to exercise its discretion under the agreement depended critically on the nature and identity of the trigger event that had occurred. In the circumstances he said that since SROS and KMS were simply following in Weavers' tradition and the information these companies provided was in every respect comparable to that provided by Weavers, this was an important factor to take into account when assessing Citibank's conduct when exercising its discretionary powers. The other two issues on the appeal go to the manner in which Citibank in fact exercised its powers under the proviso to clause 2(i) and the question whether it was entitled to debit Ludgate's account for interest debited to it by SROS and KMS when it allocated the drawings under the credits pursuant to the authority given to it under the proviso in clause 2(ii).

32.  In my judgment the first issue which arises for decision on this appeal is quite simple. Mr Rowland resolutely maintained that the only purpose of the December 1986 agreement was to ensure that Ludgate maintained collateral sufficient to secure its own liabilities under the Letters of Credit. I have no doubt that if everything had continued to go well, Citibank would never have dreamed of looking to Ludgate to secure the liability of other Weavers Principals. But that it reserved the right to do so under the proviso to Clause 2(i) of the agreement I have not got the slightest doubt. The three trigger events all presuppose a situation in which things are not going well. Either Weavers will not be notifying Citibank at all or the bank will be in receipt of conflicting instructions from Weavers, or for some other reason it will appear to the bank that the monies in the new Ludgate account or accounts and in the accounts of Weavers do not together equal 100% of the bank's actual or contingent liabilities. In such a situation, where almost by definition Citibank would be legitimately worried that it might not have sufficient collateral to secure its liabilities under all the Weavers Letters of Credit, the agreement gave the bank the additional discretionary powers whose exercise is at the heart of the dispute.

33.  Mr Rowland was quite unable to explain the reference in the proviso to clause 2(i) to all the bank's actual and contingent liabilities (as opposed to that portion of them attributable to Ludgate's interest in the Credits) if the agreement was to be interpreted as restrictively as he maintained, and I do not accept that on the proper construction of the Agreement the bank's discretionary powers were to be exercised for different purposes depending on the particular trigger which operated to bring them into effect.. Whether it was completely clear in 1986 that Ludgate was potentially liable for the full amounts drawn down under the Letters of Credit, subject of course to recourse to all the other solvent Principals in respect of sums in excess of those for which it had expressly accepted the risk, this question was put beyond doubt by the terms of the 1989 Master Agreement by which it was bound.

34.  For the sake of completeness I would add that I accept Mr Butcher's submission that the judge was wrong to hold that the third trigger event mentioned in the proviso to Clause 2(i) had not also occurred. The expression "The account(s) of HSW held or established pursuant to the terms of the Agreement(s)" can only, on any ordinary interpretation of the agreement, mean the accounts held in Weavers' own name. The expression "The Agreement(s)" is specifically defined in Clause 1(i), and cannot extend to agreements made by the bank with other Weavers Principals, and "the account(s) of HSW" or "account(s) in the name of HSW" are mentioned in Clause 2(iv) and (v) in contexts in which they could not possibly be taken to include the segregated accounts of other Weavers Principals. Mr Rowland objected that on this interpretation this trigger event occurred as soon as the December 1986 agreement was executed since so much money had by then been diverted from the Weavers pool account to the segregated accounts of other Weavers Principals, but I do not see how this consideration can deflect the court from giving the words the meaning they naturally bear. Indeed, any other approach to construction would involve substantially rewriting the agreement.

35.  It is very well established that the circumstances in which a court will interfere with the exercise by a party to a contract of a contractual discretion given to it by another party are extremely limited. We were *referred to Weinberger v Inglis [1919] AC 606* ; *Dundee General Hospitals Board of Management v Walker [1952] 1 All ER 896* ; Docker v Hyams [1969] 1 Ll R 487 ; and Abu Dhabi National Tanker Company v Product Star Shipping Company Limited [1993] 1 Ll R 397 (" The Product Star "). These cases show that provided that the discretion is exercised honestly and in good faith for the purposes for which it was conferred, and provided also that it was a true exercise of discretion in the sense that it was not capricious or arbitrary or so outrageous in its defiance of reason that it can properly be categorised as perverse, the courts will not intervene.

36.  Mr Rowland sought to derive comfort from some of the language used by Leggatt LJ, with whom the other members of this court agreed, in The Product Star at p 404 in support of a contention that the courts are more ready today to apply a standard of objective reasonableness when assessing whether a discretionary decision can stand. That Leggatt LJ had not the slightest intention of watering down the well-established test is manifest from the passages of his judgment (at pp 405 RHC; 406 RHC; and 407 RHC) in which he applied the law to the facts, where it is clear that he is using the epithet "unreasonable" to characterise a view which no reasonable decision- maker could reasonably have formed on the material before him.

© 2023 Thomson Reuters.

37. Given, therefore, that the bank was entitled to retain in the segregated Ludgate account such additional margin as it considered appropriate in all the circumstances, in the absence of a satisfactory solution being found, there appears to be no ground on which Citibank can properly be faulted in a court of law for exercising its discretionary power in the way it has. The judge described Citibank's dilemma in these terms:

"The difficulty for Citibank is that they are dealing with Principals in relation to whom, by reference to their own liabilities, Citibank are amply secured, and in relation to others, where they are not. What is more, the Principals cannot agree as between themselves who and in what proportions the shortfall, in relation to those Principals where there is a shortage, should be borne. If one Principal like Ludgate were to obtain the whole of its surplus, the effect as I see it would be that there would then have to be a recalculation of surplus or shortfall so far as all other Principals were concerned. If other Principals came along who had a surplus and demanded payment, that would again lead to a further recalculation. That would ultimately lead to a situation in which those with surplus who were last in making a demand for their collateral would have to bear all the shortfall of those who were in debit. What accordingly Citibank have done is to apply as they concede a very conservative attitude i.e. "the acid test" in the hope that the Principals will get together to provide a solution equitable as between themselves and a solution which will by virtue of the agreement not be attackable by any other Principal.

Ludgate has not itself found it possible to agree to release of surplus to other Principals without a solution being found in relation to its own surplus. That may well have been a perfectly reasonable attitude from Ludgate but it demonstrates the difficulties which Citibank are in.

It does not seem unreasonable to me for Citibank to maintain a conservative attitude in relation to security. The monies that they hold are earning interest and what Citibank are entitled to do is to insist on Principals working out a method whereby Citibank remain adequately secured and are relieved of any fear that they may be attacked by other Principals for having released collateral in circumstances which would impose higher liabilities on other Principals."

38. I agree and I would dismiss the appeal in this regard.

39. I turn next to the dispute which relates to the charging of interest. Until things started going wrong in the early 1990s, no issue about interest had ever arisen. Drawdowns were made on the Letters of Credit in New York, Citibank (New York) notified Citibank (London), and Citibank (London) drew the appropriate sum from the Weavers Pool Account. Even if there was a short time-lag before this was done, it was treated for all material purposes as if it was done on the same day. In so far as the holders of any of the segregated accounts had incurred any of the relevant liability, Weavers would transfer the necessary funds into the Pool Account. They would not necessarily draw on the relevant Principal's account immediately if this might involve incurring charges for breaking a time deposit: instead they might draw on the account of another Principal where money was immediately ready for transfer. Weavers kept a ledger for accounting purposes, which it called its Pool Account, in which it noted the true position as between itself and the different Principals and made appropriate adjustments to the funds in the different Citibank deposit accounts when it was convenient to do so. The broad brush view seems to have been taken that since each Principal was likely to be treated in the same way over a period of time, the position should not be further complicated by Weavers making notional interest charges as between the different Principals and itself in its pool account ledger. At one stage during argument the epithet "chaotic" was applied by counsel to the manner in which Weavers latterly maintained its books, but since all the Principals were trading profitably no very searching questions seem to have been asked about Weavers' accounting methods.

40. From 1990 onwards this position changed in two ways. First, when Citibank decided that it was expedient to create an overdraft on the Weavers Pool Account in order to enable it to drawn the KELM deposits, it rewrote a large number of the past entries so as to make an interest charge for the period between the time Citibank (New York) permitted a drawdown on a Letter of Credit and the time Citibank (London) reimbursed itself from the Weavers Pool Account. We were told that this change did not itself give rise to any real dispute so far as Ludgate was concerned. The position was quite different, however,

when SROS decided unilaterally to charge and credit interest as between the different Principals in respect of any period when one Principal's deposit account was being drawn upon for the benefit of another.

41.  For much of the time between 1990 and 1992 Ludgate was in debit on the Weavers pool account ledger, which was of course being maintained by SROS from September 1990 onwards, although the Citibank deposit account in its name remained in credit. This reflected the fact that money belonging to other Principals was being drawn down to meet what were in due course shown to be Ludgate's share of the liabilities under the Letters of Credit, and SROS then made what it considered to be appropriate charges for interest against Ludgate's name in its ledger. This process worked to Ludgate's disadvantage, since it was being charged interest at the overdraft rate in SROS's pool ledger account while it was only being credited with interest at the lower deposit account rate on its own credit balance in the Citibank deposit account.

42.  Against this background, Ludgate complains about the way in which Citibank exercised its power to allocate the drawings under the Credits between it and Weavers under Clause 2(ii) of the December 1986 agreement once Weavers had stopped notifying the bank of the way in which it ought to be debiting Ludgate's account.

43.  Mr Rowland has founded his argument on a submission that Clause 2(ii) gave Citibank no authority to draw on Ludgate's deposit account for interest at all: he maintains that the provisions of that sub-clause restricted it to making debits for the payments of sums drawn down under any of the credits. It was never envisaged that any of these accounts would be in overdraft, and there was therefore not surprisingly no authority provided in the agreement for authorising the debiting of interest charges.

44.  In my judgment the judge was correct to reject this argument. If Weavers had maintained the arrangements SROS initiated for allocating interest liabilities as between Principals when it was using one Principal's money to satisfy the liability of another for sums drawn down under one of the Credits, there could have been no question but that Weavers would have been entitled to give a notification to Citibank to debit Ludgate's account at an appropriate moment in an amount which incorporated these interest charges. Once Weavers disappeared from the scene and Citibank obtained its discretionary powers under Clause 2(ii) of the 1986 agreement it was entitled to allocate the drawings under the credits as between the Ludgate and Weavers accounts in such manner as it considered appropriate in its sole discretion. In my judgment there was nothing capricious or arbitrary about the bank's decision to adopt the SROS approach, and indeed it appeared to be no part of Mr Rowland's argument that SROS was not adopting a reasonable approach. He confined his challenge to his submission that Citibank was simply not entitled, on the proper construction of Clause 2(ii) to adopt this method of allocation, and in my judgment this challenge fails for the reasons I have given.

Lord Justice Mummery:

I agree.

Sir Patrick Russell:

I also agree.

© 2023 Thomson Reuters.

LORD JUSTICE BROOKE: The appeal will therefore be dismissed with costs. By agreement with counsel, whose attendance today we have excused, this order is not to be drawn up for seven days.

*Order: Appeal dismissed with costs; order not to be drawn up for seven days.*

Crown copyright

© 2023 Thomson Reuters.



IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

FSD CAUSE NOs**:** **322 of 2020 (RPJ)**
**141 of 2021 (RPJ)**
**52 of 2022 (RPJ)**

BETWEEN:

**NEOMA MANAGER (MAURITIUS) LIMITED,**

**in its capacity as the manager of**

**NEOMA PRIVATE EQUITY FUND IV L.P.**

**Plaintiff**

AND:

**(1) ABRAAJ ABOF IV SPV LIMITED**

**(2) MARK LONGBOTTOM AND**

**GEOFFREY VARGA, AS TRUSTEES**

**OF THE CREDITORS OF MEMBERS**

**OF ABOF IV FUND INVESTOR**

**LIMITED, DISSOLVED**

**(4) COLUMBUS VENTURES LIMITED (acting by its joint receivers, Mark Shaw and Russell**
**Smith)**

**(6) MENA VEHICLE LIMITED (acting by its joint receivers, Mark Shaw and Russell Smith)**

**Defendants**

AND:                **ABRAAJ GENERAL PARTNER VIII LIMITED,**

**in its capacity as the general partner of**

**NEOMA PRIVATE EQUITY FUND IV L.P.**

**Additional Defendant**

*230310- In the Matter of Neoma Manager (Mauritius) Limited et al- FSD 322 of 2020; FSD 141 of 2021; FSD*     1
*52 of 2022 (RPJ) Judgment*

AP1664



| Appearances: | Ms Clare Stanley KC instructed by Mr. Barnaby Gowrie and Mr. Blake Egelton of Walkers (Cayman) LLP on behalf of the First Defendant |
| --- | --- |
| | Mr Sebastian Said and Mr Daniel Coelho of Appleby (Cayman) Ltd on behalf of the Fourth and Sixth Defendants |
| | Ms. Sue Prevezer KC instructed by Mr. James Kennedy, Mr. Mark Russell, and Ms. Alexandra Murphy of KSG on behalf of the Plaintiff and Additional Defendant |
| Before: | The Hon. Justice Raj Parker |
| Heard: | 6 & 7 February 2023 |
| Date of Decision: | 10 March 2023 |
| Draft Judgment Circulated: | 27 February 2023 |
| Judgment Delivered: | 10 March 2023 |

## HEADNOTE

*Calculation of limited partners' capital account balances - s.22 Exempted Limited Partnership Act (as amended) - Observations as to compliance with s.22 ELPA - Application for summary judgment - Application for case management directions - The order in which applications are to be considered.*

*Introduction*

1.      Abraaj ABOF IV SPV Limited ("D1") is a limited partner in the Neoma Private Equity Fund IV L.P. (the "Fund" or "Partnership"). Columbus Ventures Limited ("D4") and Mena Vehicle Limited ("D6") are also each limited partners in the Partnership.

2.      The Additional Defendant to D1, D4 and D6's Counterclaims in litigation before this Court is Abraaj General Partner VIII Limited (the "GP"), the general partner of the Partnership.

*230310- In the Matter of Neoma Manager (Mauritius) Limited et al- FSD 322 of 2020; FSD 141 of 2021; FSD 52 of 2022 (RPJ) Judgment*     2

AP1665



3.     Between 24 September 2008 and 13 July 2019, the manager of the Partnership was Abraaj
Investment Management Limited ("AIML"). AIML also acted as the investment manager of the
Abraaj Group and was responsible for the management of all of the funds of that group.

4.     In 2018, certain financial irregularities were identified in the Abraaj Group and regulatory
proceedings in Dubai and the US have followed. Certain former directors of the GP have faced and
are facing allegations of serious wrongdoing.

5.     Abraaj Holdings Limited ("AH"), the parent company of the Abraaj Group, was placed into
provisional liquidation on 18 June 2018. AIML was placed into provisional liquidation on 18 July
2018.  AH and AIML were placed into official liquidation on 11 September 2019.

6.     On 14 July 2019, the Plaintiff, Neoma Manager (Mauritius) Limited (the "Manager"), was
appointed as the new manager of the Partnership. An Amended and Restated Limited Partnership
Deed ("LPA") was concluded on 14 July 2019.

7.     The AH Joint Official Liquidators ("AH JOLs") have concluded that the Abraaj Group was
effectively operated as a single entity with little regard for the separate corporate personality of the
various companies within the Abraaj Group, including the Partnership. The Manager was appointed
against the backdrop of the Abraaj Group's collapse and serious allegations of fraud and
mismanagement.

8.     Pursuant to the new LPA, the Manager was charged with determining each limited partner's
'Capital Account Balance'. Under clauses 11.1 (h) and 11.1 (h) (iii), the Manager undertakes "*as
soon reasonably practicable following the date of this Deed*" to provide or procure the provision
to each limited partner of "*all relevant supporting documentation*". There is now litigation between
the Manager as Plaintiff and D1, D4 and D6 (and D2) as Defendants in FSD 322 of 2020 (the "CAB
proceedings"). The Manager is an entirely new entity and has no financial incentive or interest in
the outcome of the CAB proceedings.

9.     Clare Stanley KC appeared for D1. Sebastian Said appeared for D4 and D6. Sue Prevezer KC
appeared for the Plaintiff and Additional Defendant.

*230310- In the Matter of Neoma Manager (Mauritius) Limited et al- FSD 322 of 2020; FSD 141 of 2021; FSD
52 of 2022 (RPJ) Judgment*     3

AP1666



*D1's Capital Account Balance*

10.     On 27 May 2020, the Manager reissued the limited partners' Capital Account Balances, following which D1, along with 25 other limited partners representing approximately 30% of all limited partners, disputed the accuracy of the Manager's calculations.[1]

11.     In the case of D1, the Manager concluded (D1 says wrongly) that D1 had not made any of its capital contributions. The consequence was that D1's Capital Account Balance was negative (-US11.9 million), meaning that D1 has no economic interest in the Partnership.

12.     D1 alleges (in its Defence), among other matters, that the Manager's calculation was fundamentally flawed not least because the Manager ignored the reality of the way that the Abraaj Group as a whole was operated. In addition, D1 also alleges that although the Manager had possession of some 300,000 documents, it failed to review at least 231,000 (77%) of them.

13.     D1 contends that it was always the position that further time and information was required to properly calculate D1's Capital Account Balance and that the Manager's calculation and issuance of the Capital Account Balances following its appointment was premature.[2]

14.     In accordance with the machinery under the LPA, D1 issued an 'Adjustment Notice' on 21 October 2020, which triggered a review period whereby the Manager and D1 could seek to reach agreement on D1's Capital Account Balance.

15.     No agreement was reached, and the Manager issued the CAB proceedings on 23 December 2020 to seek declarations as to the accuracy of its calculations.

16.     On 6 August 2021, D1 issued its counterclaim against the Manager and the GP (as an Additional Defendant),[3] seeking relief under s.22 of the Exempted Limited Partnership Act (as amended) (the "ELPA").

17.     As against the GP, the counterclaim seeks an order pursuant to s.22 of the ELPA that the GP "*do forthwith provide to the First Defendant true and full information regarding the state of the*

---

[1] *All but 4 limited partners have agreed to their opening account balances: Russell 1 in FSD 322 of 2020 at § 34.*
[2] *Hutchison 1 in FSD 322 of 2020 at §§ 27 to 53; Shaw 1 at § 12.*
[3] *Since the GCR do not expressly allow a counterclaiming defendant to apply for summary judgment against anyone other than the Plaintiff, D1 issued fresh proceedings against the GP seeking information under s. 22 ELPA.*

AP1667



*business and financial condition of the Partnership*", including a list of specific classes of documents in particular which related to the calculation of D1's Capital Account Balance.

*D4's and D6's Capital balances*

18.     D4 and D6 are also each limited partners in the Partnership. D4 and D6 act via their Joint Receivers who were appointed by Société Générale SA ("SocGen"). SocGen advanced a loan of US$100 million to AH on 24 September 2014, drawn down in full, on the security of D4's and D6's interests in the Partnership and allegedly on the strength of representations by the GP that D4 and D6 had fully paid up all of the drawdowns requested as at 22 September 2014.

19.     D4 and D6 say that the GP provided signed extracts of the Partnership's register, to prove compliance with the standard secured finance obligation that the security interests in the form of D4's and D6's Partnership stakes were fully paid-up. D4 and D6 say that it is particularly unsatisfactory that the same GP, having induced SocGen to lend to AH on the basis that their stakes were fully paid-up, should now contend (as it does in the CAB proceedings through its new Manager) that there is no evidence that the stakes were ever funded at all. They make similar counterclaims in respect of s.22 ELPA.

*The summary judgment applications*

20.     D1 by summons filed 4 April 2022 , D4 and D6by summons filed 3 March 2022, now apply for summary judgment on their counterclaims under s.22 of the ELPA against the GP and for summary judgment against the Manager under clauses 5.1(h) and 11.1(h)(iii) of the LPA against the Manager.

21.     The order sought by D1 is (*inter alia*) for declaratory relief as to D1's entitlement under s.22, and for the provision of "*true and full information regarding the state of the business and financial condition of [the Partnership]*" (the "s.22 Information").

22.     D1 contends that notwithstanding numerous demands having been made by D1 under s.22 for many months, both the GP and the Manager have refused to comply with those demands, and none of the s.22 Information has been forthcoming.

23.     The s.22 Information D1 requires, it says, will include a large number of documents, but it will go further than just documents; it will require the GP (and therefore its agent, the Manager) to provide "*information*", which will include explanations and answers to certain questions which have been put by D1 in its s.22 requests.

230310- In the Matter of Neoma Manager (Mauritius) Limited et al- FSD 322 of 2020; FSD 141 of 2021; FSD     5
52 of 2022 (RPJ) Judgment

AP1668



24.     D1 also says that the s.22 Information which has been sought is wider than just information as regards the calculation of the Capital Account Balances. The s.22 Information as sought is "*true and full information regarding the state of the business and financial condition*" of the Partnership.

25.     D1 says it follows that documents and information regarding the Manager's calculation of the Capital Account Balances are likely to be included in the s.22 Information when it is provided by the GP.

26.     D1 says whilst it is possible that some documents which are relevant only to the calculation of the Capital Account Balances will not be included in the s.22 Information as provided because the GP might say that those documents do not concern the "*state of the business and financial condition of the Partnership*", those additional CAB documents will fall to be disclosed by the Manager in its discovery in the CAB proceedings, albeit that they will not have been disclosed under s.22.

27.     D1 says there is likely to be a large number of documents in the s.22 Information which have little or no relevance to the calculation of the CAB. These non-CAB documents will not fall to be disclosed by the Manager in its discovery in this action but must be disclosed by the GP under s22.

28.     D4 and D6 support D1's arguments for summary determination of the entitlement to s.22 Information and say the issues raised concern questions of law, the contractual and statutory entitlements are clear, and are already the subject of prior (and clear) authority in this Court, and the documents and information sought are of critical importance to their ability to plead a full defence. They echo D1's case that the GP and the Manager have both given no satisfactory answer as to why the documents and information sought has not been provided and that the GP and the Manager have no real defence to D4 and D6s' counterclaims.

*Should discovery in the CAB proceedings await the outcome of the summary judgment applications?*

29.     The first issue which arose was in relation to the hearing and determination of a directions summons filed by the Manager on 27 May 2022 some months after the s. 22 summonses were issued and listed for hearing at the same time. The GP and the Manager argued that the summary judgment applications should be adjourned to allow discovery to take place in the CAB proceedings and if it then transpired that D1, D4 and D6 were of the view that there were documents which fell within s. 22 that ought to have been provided but were not, they could then bring their applications under s.22.

*230310- In the Matter of Neoma Manager (Mauritius) Limited et al- FSD 322 of 2020; FSD 141 of 2021; FSD 52 of 2022 (RPJ) Judgment*     6

AP1669



30.     D1, D4 and D6 say that the issuance of the directions summons is consistent with the tactical approach that the Manager and the GP have adopted to addressing their obligations under s.22 ELPA and the LPA. They say that they have sought to wrap those issues into the Manager's general discovery obligations in the CAB proceedings so as to limit the their access to information at the outset of the proceedings and make the costs of providing documents costs of the proceedings (rather than costs of the Fund).[4]

31.     The GP and the Manager say[5] that the Manager has obtained data from three sources: AIML under the control of the AIML Joint Official Liquidators; the Fund's limited partners; and the GP including documents provided to the GP by the AIML Joint Official Liquidators. They say that they have made several good faith efforts to resolve the summary judgment applications and that D1's and D4/D6's rejection of those efforts demonstrates that the current application is tactical and a renewed effort to delay the litigation.

32.     They also say that vast quantities of documents have already been provided by the Manager and the GP, either voluntarily or in response to particular requests. Those documents (listed in Schedule 1 to the Statement of Claim) include all Fund bank statements within the control, possession or power of the Manager and the GP, all iterations of the Partnership Register within the control, possession or power of the Manager and the GP, all drawdown notices for D1, D4 and D6 within the control, possession or power of the Manager and GP, and copies of the Partnership's general ledger from inception to 31 March 2019 (being the relevant date for the purposes of the Opening Capital Account Balances). The GP and the Manager say that the summary judgment applications ought never to have been brought and that they have complied with their obligations under s.22.

33.     They also say that they have already provided full information as to the Partnership business, that certain documents or information are not within their control, and that some categories of documents fall outside the ambit of s.22. They say the summary judgment applications are misconceived and should be dismissed. Moreover, they argue that they have made practical proposals which effectively provide or offer to provide the material that D1, D4 and D6 say they are entitled to.

---

[4] *See §11.1(o) LPA.*
[5] *See Russell 1 §§27-28.*

230310- *In the Matter of Neoma Manager (Mauritius) Limited et al- FSD 322 of 2020; FSD 141 of 2021; FSD 52 of 2022 (RPJ) Judgment*     7

AP1670



*Determination*

34.    The Court is of the clear view that the resolution of the directions to trial in the CAB proceedings will not dispose of the important issues raised in the summary judgment applications. It is relevant in this regard to note that s. 22 ELPA entitles D1, D4 and D6 to true and full information (and not just documents) regarding the state of the business and financial condition of the Partnership, which is an obligation that goes wider than the discovery obligations in the CAB proceedings. As "*information*" is wider than documents, the obligation must also in the Court's view logically extend to making requests of third parties.

35.    In the Court's assessment, the summary judgment applications need to be determined now. As the Court indicated to the parties at the outset of the hearing of this matter, directions on disclosure or a timetable to trial in the CAB proceedings cannot fairly be given until the summary judgment applications are determined. It may be that the core factual issues in the CAB proceedings as presently constituted are relatively narrow. However, one cannot judge what the ambit of the issues will be assuming the summary judgment applications are granted.

36.    It is therefore more efficient and just in the Court's judgment to deal with them first as the outcome may inform the issues in dispute in the CAB proceedings, and so affect the scope of discovery to be given in the litigation.

37.    It would be unsatisfactory for the parties to carry out a discovery exercise in the CAB proceedings, and then revisit the case on any new issues raised by information provided under s .22 (assuming it was so ordered). It would also be particularly unfair to D1, D4 and D6 to progress to discovery in the CAB proceedings without full information (to which they are entitled under statute as limited partners in the Partnership) being provided.

38.    If the Court rejected the applications for summary judgment under s.22 that matter can proceed to trial.

39.    If the Court acceded to the applications, the s.22 Information would have to be provided and reviewed by D1, D4 and D6. Directions can then be made in the CAB proceedings on a basis where D1, D4 and D6are much better informed.

40.    As is well known, a limited partner does not have to commence proceedings in order to be provided "*full information*" as to the Partnership business run on its behalf. It simply has to make a demand of the GP. If that demand is not satisfied it may then make an application to the Court.

AP1671



41.     Discovery in the CAB proceedings is not likely to be an answer to a limited partner's request to enforce its statutory and contractual information rights. Discovery in litigation requires the disclosure of documents (and not information) which are or have been in the party's possession custody or power and is restricted to matters in issue in the action. The obligation to give "*true and full*" information "*is not a process of disclosure (like that under the CPR)*".[6]

42.     Further, a s22 ELPA right is a substantive legal right, not a procedural right. It exists independently of and in addition to the procedural rights afforded to the parties under the GCR in the context of discovery. The granting (or not) of summary judgment involves a determination of the parties' substantive legal rights. It is not a case management decision, and should not ordinarily be influenced by case management considerations.[7]

*The test for summary judgment*

43.     The test for summary judgment is straightforward and is contained in GCR Ord 14, rr. 1 and 5. Rule 1 provides:

> "*Where in an action to which this rule applies a statement of claim has been served on a defendant and that defendant has given notice of intention to defend the action, the plaintiff may, on the ground that the defendant has no defence to a claim included in the writ, or to a particular part of such a claim, or has no defence to such a claim or part except as to the amount of any damages claimed, apply to the Court for judgment against the defendant.*"

44.     The words "*has no defence*" have been interpreted as requiring the claimant to demonstrate that the defendant has no defence with a real prospect of success, as confirmed by the Cayman Islands Court of Appeal in *Walkers v Arnage Holdings Ltd.*[8]

45.     As to the proper approach to such applications, the Court should not allow such applications to take the form of mini trials on extensive facts.

46.     However, where an application gives rise to "*a short point of law or construction and, if the court is satisfied that it has before it all the evidence necessary for the proper determination of the*

---

[6] See *Inversiones Frieira SL v Colyzeo Investors II LP [2012] EWHC 1450 (Ch) (Inversiones 2) at § 7.*
[7] See *Arnage v Walkers (CICA, 1 February 2021, unreported)* at §17.
[8] Ibid at *§12.*

AP1672



*question and that the parties have had an adequate opportunity to address it in argument, it should grasp the nettle and decide it*": see *Easyair Ltd (t/a Openair) v Opal Telecom Ltd.*[9]

*The ELPA*

47.    Section 22 of the ELPA provides:

   "*Subject to any express or implied term of the partnership agreement, each limited partner may demand and shall receive from a general partner true and full information regarding the state of the business and financial condition of the exempted limited partnership.*"

48.    The terms of the LPA do not in this case displace or substantially restrict the s.22 ELPA right. The parties did not agree to change the depth and width of the statutory obligation in any material respect.

49.    As noted above, a limited partner may make a relevant "*demand*" of the GP. Once that demand is made, the GP is then under an obligation to provide the requested material provided it falls within the wide ambit of the section.

50.    The entitlement is to "*true and full information*" regarding "*the state of the business and financial condition of the exempted limited partnership*".

51.    The entitlement is in reality to be put on 'a level playing field' with regard to information. It arises from the GP's position as agent and fiduciary of the Partnership and, since the exempted limited partnership has no separate legal personality, as agent of each of the limited partners. The GP also holds the assets of the Partnership on a statutory trust and is, as trustee, under an obligation to account to the limited partners. By s.14 of the ELPA, the limited partner is prevented from taking part in the conduct of the business. By s.16 of the ELPA, all rights or property of the Partnership which is held on behalf of the GP or in the name of the Partnership is deemed to be held by the GP upon trust as an asset of the Partnership.

*Section 21*

52.    Section 21 of the  ELPA also obliges the GP to keep or cause to be kept "*proper books of account, including, where applicable, material underlying documentation*", extending to records of all sums

---

[9] *[2009] EWHC 339 (Ch)* at *§15* per *Lewison J.*

230310- In the Matter of Neoma Manager (Mauritius) Limited et al- FSD 322 of 2020; FSD 141 of 2021; FSD    10
52 of 2022 (RPJ) Judgment

AP1673



of money received or expended by the Partnership, of all matters relating to expenditure, and of all its assets and liabilities.

53.   Moreover, proper books of account shall not be deemed to be kept if there are not kept "*such books as are necessary to give a true and fair view of the business and financial condition of the exempted limited partnership and to explain its transactions.*"

*Relevant authorities*

54.   These sections of the ELPA have been considered recently by this Court in the *Dorsey Ventures* [2019 (1) CILR 249] ("*Dorsey*") and *Port Fund*[10] cases.

55.   In *Dorsey*, Mangatal J considered an argument that a limited partner's rights to information under s. 22 ELPA were limited or superseded by the contractual information rights contained in the limited partnership agreement. Those contractual rights were limited to a right to request accounts and updates within a reasonable period.[11]

56.   Mangatal J did not accept the argument that the contractual rights ousted the statutory ELPA right. She held that the s.22 ELPA right was general and unqualified, and was qualitatively different from the specific rights granted under the limited partnership agreement.

57.   She held that although the limited partnership agreement in that case provided for and addressed the provision of accounts, that was not the same thing as the topic dealt with under s.22 of the ELPA, which is the limited partner's right to demand and receive from a general partner "*true and full information*". This was "*…wide and encompasses more than accounts, audited and unaudited*".[12]

58.   *Dorsey* was considered and followed in *Port Fund* (Parker J) where it was held at §§ 83-84 that it was necessary to adopt a "*plain and natural reading of [s.22 ELPA]*". The plain language of the section provided for wide information rights, and that this made "*logical commercial sense*" because the general partner was the limited partner's agent and, indeed, the limited partners had paid for all of its activities.[13]

---

[10] *Gulf Investment Corporation and others v the Port Fund and Port Link GP (Grand Ct, 16 June 2020)* per *Parker J.*
[11] Ibid *§33.*
[12] Ibid *§37.*
[13] Ibid *§ 85.*

AP1674



59.     At §§ 86 and 87 the Court said:

> "[S.22 ELPA] is a very wide unqualified provision and will include all of the books and records maintained by the General Partner pursuant to the statutory obligation imposed on it under [s.21 ELPA]. However, it is wider than [s.21 ELPA] as it requires information to be provided, not just documents, and the information needs to be 'true and full', not 'true and fair' as is the case under [s.21 ELPA], which only deals with books and records of account".

> "It is only if there is a proper basis for contending that any of the categories of information demanded fall outside the operation of [s.22 ELPA] that the Plaintiffs claim would fail. That would only be in cases where it is clear that the information sought did not relate to the business and financial affairs of the partnership, which is a very wide target to aim at".

60.     There had been a previous decision of the English court which is also relevant to consider: *Inversiones Friera SL v Colyzeo Investors II LP [2012] 1 BCLC 469 (Norris J).* This was a case in which two limited partners in a collective investment scheme sought access to documents from the scheme's investment manager, who acted as delegee of the general partner's powers. Specifically, and further to a fall in the value of the scheme's investments, they sought disclosure of certain classes of document concerning the investments made on the partnership's behalf.

61.     The claimants relied on s.6 of the Limited Partnerships Act 1907 (the "1907 Act"), which on its terms is narrower than s.22 of the ELPA. The claimants also relied on the terms of the partnership deed and management agreement that permitted inspection of the partnership "books" which are in similar terms to the LPA on which D1, D4 and D6 rely in this case. The claim was issued under the Part 8 procedure in England. The issue was whether the limited partners' admitted rights to inspect the partnership books extended only to its "*books of account*" (as the manager alleged) or encompassed "*all books and records of [the partnership] that concern the investments made*" (as the partners alleged).

62.     Summarising the conclusions of Norris J at § 23, I derive the following guidance from this case:

    i)      A limited partnership is a partnership, and every partner has a right to disclosure by his co-partner of true accounts and full information as to all matters relating to the partnership dealings and transactions.

*230310- In the Matter of Neoma Manager (Mauritius) Limited et al- FSD 322 of 2020; FSD 141 of 2021; FSD 52 of 2022 (RPJ) Judgment*      12

AP1675



ii) The manager was under a duty to maintain books of the Partnership, and that record was meant to be a record of "*the partnership's business and affairs sufficient to enable a partner, whether general or limited, with access to it to examine into the state and prospects of the partnership business*".

iii) If the manager (as delegee of the general partner) had failed to maintain records of all information necessary for recording the partnership business, then "*the limited partners must see the primary documents from which such books of the partnership would have been prepared*". They are also entitled to see underlying documents establishing the existence of assets or liabilities.

iv) The limited partners were also entitled to see the documents which support the valuations of the partnership investments and, if those valuations were based on the manager's own data, to see that underlying data: "*It is not possible to understand the state of the partnership business... without understanding the robustness of the attributed values and to what matters they may be sensitive*".

v) All materials and advice produced by the manager and paid for by the partnership, or for which the manager was paid as part of its remuneration *qua* manager, should in principle be available to the limited partners so far as they relate to the partnership business. That extends to reports and minutes of meetings between the general partner and manager.

63. Following disagreement between the parties as to the scope and effect of the judgment, Norris J handed down a further judgment addressing matters arising out of the first judgment *("Inversiones 2")*.[14] In this further judgment, he "*took the view that, in general, if it would be necessary or advantageous for the general partner or its delegate to rely on a document to establish rights as against a third party or to determine rights as between the members of the partnership themselves, then the document should be available for inspection by the limited partners*".[15] He also noted that the limited partner could not make requests without reference to some practical advantage in understanding the partnership business.

*Determination*

64. Although this case arises against the backdrop of the Abraaj Group collapse and fraud allegations, the Court notes that the present Manager was not involved in any wrongdoing in the Abraaj Group which occurred before it was appointed, and has no vested interest in the outcome of the CAB

---

[14] *Inversiones Frieira SL v Colyzeo Investors II LP [2012] EWHC 1450 (Ch).*
[15] Ibid *§4.*



proceedings. It also notes that the GP, is now run by 'neutral' management and that it inherited a situation where complete documents were not available.  The - Partnership is apparently in run off and not actively recruiting new investment.

65.     The LPA was not substantively amended notwithstanding this inherited situation of incomplete records. Clauses 11.1(h)(ii) and (iii) of the LPA only modify to a small degree but do not restrict the scope of the s. 22 ELPA right.

66.     Doubtless the exercise has been a difficult and resource intensive one for the GP and the Manager who have had to patch together information from various sources.[16] The Court also notes that other limited partners have agreed their CAB positions.[17] Whilst not minimising the effort required to satisfy the obligation, none of these matters can be properly said to affect the entitlement of D1, D4 and D6 to true and full information.

67.     Ms Prevezer KC submitted that there is no real dispute between the parties as to the scope of the entitlement that D1, D4 and D6 have to true and full information. That may be right at a high level of principle, but it has not resulted in anything close to an agreement on a number of issues.

68.     Indeed the Court does not accept having reviewed the pleadings and evidence[18] in this case and carefully listened to the submissions of Ms Prevezer KC on behalf of the GP and the Manager, that full information has been provided, or has been offered to be provided to these Defendants.[19]

69.     The GP and Manager have taken the position at various times that the limited partners were not entitled to the information they have requested, that their requests were unreasonable and/or disproportionate, that they did not have and could not obtain the information, that some categories of documents fell outside the ambit of s.22, and as outlined above that D1, D4 and D6 would receive sufficient information in discovery in the CAB proceedings in any case.

70.     The Court does not accept the suggestion that these applications have been brought to delay the CAB litigation or because D1, D4 and D6 simply do not like the answers contained in the information given to date.

---

[16] See *Russell 1 in FSD 322 of 2020 at § 28.*
[17] See *Russell 1 in FSD 322 of 2020 at §§30-34.*
[18] *Hutchison 1 and 2 in FSD 322 of 2020; Russell 1 and 2 in FSD 322 of 2020; Fariba 1 in FSD 322 of 2020; Shaw 1 and 2 in FSD 322 of 2020.* The Court was also referred to transcripts of meetings and four video presentations given by the Manager in 2020 and the Explanatory Note provided by the Manager.
[19] The Court has carefully reviewed the Plaintiff's written argument dated 30 January 2023 at §§5.4 and 5.5 and schedules A and B referenced therein.

AP1677



71.     The Court has formed the clear view that they have been properly brought by D1, D4 and D6 after many months of wrangling over the scope of the entitlement and the practicalities of complying with it.

72.     On analysis there is no reasonably arguable defence to the declarations and judgment sought. The GP and Manager have not persuaded the Court that there are plausible arguments that there are legal and/or factual issues which arise on this application that will require a trial to determine them. In keeping with other Courts faced with similar issues, (*Dorsey* and *Port Fund* proceeded by way of Originating Summons and *Inversiones*, by way of a Part 8 claim) a summary determination can and should be made.[20]

73.     In this case the determination of rights under statute (the ELPA) and the construction of an LPA are points of law which do not require a trial.  The applications do not require a trial to determine what documents and information have been provided, what documents and information are within the Manager and the GP's possession, custody and control, and whether the explanations that have been provided to date fulfil the statutory obligation.

*The way forward*

74.     The Court is persuaded that there is a pragmatic purpose to the relief sought. Once the legal framework has been made clear, the Court expects the parties to work more collaboratively and constructively to agree a sensible way forward as to the provision of information than has been the case to date, and in accordance with the Overriding Objective.

*Observations*

75.     The Court makes the following observations to assist the parties in reaching an agreement for the provision of information.

      a)   The economic owners of the Partnership (the limited partners) who have paid for all of the business activity undertaken on their behalf by the GP and its delegates are each entitled to true and full information. The GP is in a fiduciary position and acts as trustee for the interests of the limited partners. The GP owes fiduciary duties to the limited partners. The business and affairs of the Partnership are managed exclusively by the

---

[20] *Inversiones Friera SL v Colyzeo Investors II LP [2012] Bus LR 1136 § 19.*

AP1678



GP and its delegates for and on behalf of the limited partners. As is evident, the limited partners are not entitled to participate in the management of the business under the terms of the LPA and the ELPA and so have limited visibility into its affairs.

b) Section 22 of the ELPA seeks to address the imbalance of information which arises. In this case, the parties have not substantively excluded or modified the application of s.22 (as they could have done under the LPA) and are to be held to its plain meaning and effect.

c) The limited partners will not have information concerning the day-to-day operations and business activities of the Partnership, unless they are provided with it. However, the Court, following Norris J's reasoning in *Inversiones 2*, is not prepared in the abstract to say that there are no practical and purposive boundaries built into the statutory right. It may be that such boundaries could be drawn if it was in the interests of justice to do so. But it is a free standing statutory right.

d) A limited partner's ability to exercise its s. 22 ELPA right is not impacted by its motives or the intended use of the documents. However, the Court expects the parties to conduct litigation reasonably and efficiently in accordance with the Overriding Objective. In the context of the counterclaim in the CAB proceedings, the Court expects the information will go principally (but not exclusively) to the issues concerning the business managed on behalf of D1, D4 and D6 which will assist them to properly defend the CAB proceedings. However, the obligation is wider than the presently pleaded issues in the CAB proceedings. The limited partners are entitled to the same information that is available to the GP concerning the business and financial affairs of the Partnership in this regard so that they may be properly informed as to what has been done on their behalf.

e) Where, as in this case, the GP has undertaken an assessment relying upon supporting documentation and internal data or information, the limited partners are entitled to that information to allow them to understand that assessment properly. The Partnership's records were incomplete at the time that the Manager took over from AIML, and there was missing information in respect of the drawdown requests. It is therefore important that the underlying materials are provided so that the limited partners can be properly informed. If judgment calls have been made by the GP and/or the Manager in circumstances where there are discrepancies or incomplete information, that should be identified and explained. If the information is mixed up or mingled or hard to identify,

AP1679



this is not a reason to refuse to provide it to D1, D4 and D6. The GP and/or the Manager, if they cannot find a solution to that type of problem, should err on the side of 'over provision' rather than 'under provision' so that D1, D4 and D6 may receive the full picture and if necessary sift the information for themselves.[21]

f)   Similarly it may be necessary to create a document, for example a schedule, in order to satisfy the obligation to provide  true and full information. It is to be noted that the obligation is an ongoing one.

g)   To satisfy the obligation the GP may also, where necessary, have to seek to obtain material from the Manager and relevant third parties. Where it can be obtained reasonably upon request without steps being taken at disproportionate expense it should be obtained.[22]

h)   There is no requirement in s.22 for the information to be in the possession of the GP. The GP may have a legal right to require material which is not in its possession. If it does not, it should make all reasonable efforts to try to obtain material from third parties in order to fulfil the obligation.

i)   There should be no difficulty in the GP obtaining the Manager's documents and records which relate to the Partnership which it will be entitled to as principal. Further, pursuant to the LPA, the Manager has the obligation (under clauses 5.1 (a) and 5.2 (a) (xii)) as the delegate and lawful attorney of the GP to maintain the Partnership's records and books of account. Working papers would also be included.[23]

j)   The GP (working in conjunction with the Manager) will therefore have to search for and produce documents and information to the extent such information exists and has not already been provided.  It is no answer to say that the Partnership would thereby expend significant time and resources answering the requests of only a few limited partners in this case who have not agreed their capital account balances. As the court has made clear, D1, D4 and D6 are entitled to full information which goes wider than the issues in the CAB proceedings. What is required to fulfil the obligation to provide

---

[21] See *Equitas v Horace Holman [2007] EWHC 903 Comm. At § 27 citing Colman j in Yasuda v Orion [1995] QB at 174 p .191F.*
[22] *Inversiones 2 at §32.*
[23] *Port Fund ibid at §104.*

230310- In the Matter of Neoma Manager (Mauritius) Limited et al- FSD 322 of 2020; FSD 141 of 2021; FSD     17
52 of 2022 (RPJ) Judgment

AP1680

'full information' will vary from case to case depending on the circumstances and the test as Mr Justice Norris indicated in *Inversiones* is essentially a functional one.

k) It is of course self evident that if material does not exist the GP and/or the Manager cannot conjure it up out of thin air. Material already provided can be excluded from any Order drawn up by the parties. It seems to the Court that the GP and/or the Manager should, in such circumstances, explain what searches have been conducted and why it is not possible to retrieve or find the relevant information.

*Conclusion*

76.   Neither the GP nor the Manager have a triable defence to the claims made against them respectively in the counterclaims advanced by D1, D4 and D6. The Manager and GP should perform their obligations under the LPA and the GP should perform its obligations under the ELPA. The relief sought in the summonses will be granted. There are practical benefits in the information being made available to D1, D4 and D6 as soon as is reasonably practicable. The Plaintiff's and Additional Defendant's summons for directions in the CAB proceedings is adjourned with liberty to apply.

77.   There should be a stay of the CAB proceedings for a period of three months following receipt of the information provided pursuant to the Orders made, in order to give D1, D4 and D6 an appropriate opportunity to review the material. The parties may then apply to Court for directions as necessary.

78.   The parties should draw up and agree the relevant Orders which reflect this judgment.

79.   D1, D4 and D6's respective costs of and incidental to the summary judgment applications shall be payable by the Manager and the GP to be assessed if not agreed. There is to be no order on the costs of the adjourned summons for directions in the CAB proceedings.

*[signature]*

_____
**THE HON. MR JUSTICE RAJ PARKER**
**JUDGE OF THE GRAND COURT**

AP1681

# Nicolae Christopher Ratiu, Simon Harry Karmel, Regent House Properties Ltd v David Peter Conway

 **Positive/Neutral Judicial Consideration**

**Court**
Court of Appeal (Civil Division)

**Judgment Date**
8 November 2005

<div align="center">

A2/2004/0948

Court of Appeal (Civil Division)

**[2005] EWCA Civ 1302, 2005 WL 2974063**

Before: The Right Honourable Lord Justice Auld , The Right Honourable
Lord Justice Laws and The Right Honourable Lord Justice Sedley

Tuesday 8th November, 2005

On Appeal from the High Court of Justice the Honourable Mr Justice Tugendhat

</div>

**Representation**

Sir Sydney Kentridge QC , Mr Kenneth MacLean QC & Mr James Goldsmith (instructed by Clifford Chance ) for the Appellants.
Mr Romie Tager QC & Mr William Bojczuk (instructed by David Conway & Co ) for the Respondent.

**Judgment**

Lord Justice Auld :

**Introduction**

1. This is an appeal of Mr Nicolae Ratiu, Mr Simon Karmel and Regent House Properties Ltd (all of whom I shall collectively call "Regent" unless otherwise indicated) against a jury's finding of liability and award of damages of £96,000 on 31st March 2004 in favour of Mr David Conway, a practising solicitor with the London firm, David Conway & Co., in his claims against Regent for damages for libel and malicious falsehood in a trial presided over by Tugendhat J.

2. The claims arose out of a letter of complaint by Regent to the agent for the Trustees of the Eyre Estate ("Eyre"), owners and vendors of a development site in St John's Wood. Regent complained that Mr Conway, whom they had instructed through a nominee company called Pristbrook Limited ("Pristbrook") to act for them as their solicitor in the purchase and, then, sale of a development site at No. 32 Elm Tree Road ("No.32") in St John's Wood, had, in his personal capacity, competed with them in bidding for another nearby and closely related site, Nos. 24-26 Elm Tree Road ("No. 24"). In particular, Regent complained that he sought to re-open the bidding after Mr Karmel had informed him that Eyre had accepted Regent's offer. Before making his rival bid, Mr Conway had contemplated that he might accept instructions from Regent to act for them on the acquisition of the site or that he might enter into a business deal with them for the purpose of such acquisition.

© 2023 Thomson Reuters.

3.  The letter, which was written by Mr Ratiu on behalf of Regent to Mr Julian Briant of the firm of Cluttons, chartered surveyors, acting as agents for Eyre, read as follows:

> "Further to your fax of earlier today, we are extremely concerned that we are being asked to bid against Mr Conway.
>
> We have reached agreement with you on two separate occasions. We informed Mr Conway that you had accepted an unconditional offer for the property from us and asked him to act for us in the purchase.
>
> He then used this confidential information to put in a higher offer.
>
> We are aware of your duty as trustees to obtain the highest price for the property. The trustees will however want to complete the purchase. If you proceed with the sale to a person who used confidential information obtained through a solicitor/client relationship, we will do all in our power to prevent the formalisation of a contract in breach of the duties owed by the solicitor.
>
> We will do everything in our power to prevent Mr Conway using this information to our detriment.
>
> We have already contacted the Law Society on this matter and are awaiting their response. We are ready and willing to exchange and complete on the basis of the offer that you have already accepted and have confirmed our meeting tomorrow morning at the offices of Pemberton Greenish together with our solicitors Clifford Chance."

4.  It should be noted that the core allegation in the letter is that Mr Conway, in his capacity as solicitor for Regent, had misused confidential information imparted to him by Regent that Eyre had accepted its unconditional offer for No 24. There is no express reference in the letter to the *amount* of the offer. I should also record at this stage that, on the same day, Mr Ratiu also wrote letters to Mr Conway and the Law Society complaining in similar terms, though, contrary to the assertion in his letter to Mr Briant, he had not contacted the Law Society.

5.  The nub of Regent's complaint, as expressed in that letter to Eyre's agent, Cluttons, was that that Mr Conway should not have bid for No 24 or sought to re-open the bidding once Regent had informed him that Eyre had accepted its offer. Regent maintain that he thereby put himself in a position of conflict between his duty as a solicitor to them as his clients and his personal interest in which he would inevitably (consciously or subconsciously) misuse his clients' confidential information.

**The main issues at trial**

6.  Regent accepted at trial that the letter was defamatory in that it contained an allegation of unprofessional conduct of Mr Conway as a solicitor. The Judge, Tugendhat J, ruled that the letter was protected by qualified privilege, a ruling that Mr Conway does not challenge. The main issues for the Jury were (i) the meaning of the defamatory words and whether such meaning was justified (ii) if not, whether Regent had lost the protection of qualified privilege because they had been actuated by malice and (iii) damages. If Regent established justification or Mr Conway failed to establish malice, the claim would fail. However, the jury found that the defamatory letter on its true meaning was not justified and that, in writing it, Regent had been actuated by malice.

© 2023 Thomson Reuters.

7.  The issues of justification and malice both turned on the duties, if any, of trust, loyalty and confidence, owed by Mr Conway as a solicitor to Regent, whether viewed as a past, existing and/or prospective client. Regent maintain that the Judge's directions to the Jury on the law and on its application to the facts of the case were wrong and/or contradictory and that, as a result, the Jury's verdict is unsafe and ought to be set aside. They argue that if the Judge had properly directed the jury on these aspects of duty, they could not reasonably have found, as they did, in Mr Conway's favour.

8.  Regent's case, in summary is that when Mr Conway made his bid for No 24 he owed them a fiduciary duty of loyalty and, in any event, a duty of confidence, and was in breach of both duties. They contend that the Judge erred as a matter of law and fact in a number of important directions to the jury on the issues of justification and malice, withdrew from them an essential part of Regent's case on both issues, namely that Mr Conway had a fiduciary duty to Regent, and, in any event, wrongly left the issue of malice to them when there was insufficient evidence of it. In the result, Regent ask the Court to enter judgment for them, alternatively to order a re-trial.

9.  Mr. Conway's case is that he was never, whether as a solicitor or otherwise, at any stage under a fiduciary duty to Regent, and certainly not in relation to Nos 32 or 24, because such retainer as he had had was from Pristbrook, not Regent, and then only in relation to the purchase and sale of No. 32. He contends that the Judge's rulings and directions were sound in law and in fact.

**The Facts**

*Mr Conway and Regent*

10.  Mr Conway was admitted as a solicitor in 1970 and has since been in private practice, initially in partnership with others and more recently as a sole practitioner in the West End of London. His main fields of practice are commercial and residential property transactions and company and commercial work. He has particular expertise in leasehold enfranchisement. Much of his practice involves transactions in residential properties in and around St John's Wood, where he has lived for over 30 years, and acting in enfranchisement claims by tenants of major residential property owners in that area, including Eyre.

11.  Mr Ratiu and Mr Karmel are friends and business partners. Regent House Properties Ltd is a property investment company, ultimately controlled by Mr Ratiu's family and of which Mr Ratiu, but not Mr Karmel, was a director. It owned and controlled a company called Warleggan Group Limited ("Warleggan"), of which Mr Ratiu and Mr Karmel were directors. Warleggan, in turn, owned Pristbrook, of which they were also directors. The Judge directed the jury not to distinguish between Mr Ratiu and Mr Karmel on the one hand and Regent on the other for the purposes of the case, a direction not challenged in the appeal. But, as will appear, he directed them as a matter of law to distinguish between Pristbrook and Regent, a direction that is challenged in the appeal and goes to the heart of the issue between the parties on justification and, to a lesser extent, on malice.

12.  Regent had had a long history with Elm Tree Road. Mr Karmel had lived at No 20 Elm Tree Road ('No 20') since 1987. From July 1994 to September 1999, Mr Ratiu, on behalf of Regent, corresponded with Eyre with a view to purchasing Nos. 32 and/or 24, together with Mr Karmel. No 32 was a semi-detached house on a development site in a prime residential area subject to a compulsory purchase order ('CPO') by Westminster Council ('the Council'). By 1999 it had become derelict. No 24, situated virtually opposite Mr Karmel's house at No 20, was a cleared development site approximately three times the size of No 32, which was suitable for building up to three houses, but which was also under threat from a CPO. Building on both sites required the consent of the Council and Eyre.

13.  In November 1999, Mr Ratiu, on behalf of Regent, participated in a tender process to purchase No 32 from Eyre. He offered £1.2m, in the name of "Regent … or its nominee", an offer that Eyre accepted. Mr Ratiu's evidence was that the purchase of No 32, although it had to stand on its own as a commercial proposition, was intended to convince Eyre of Regent's credentials as a serious purchaser for the larger plot at No 24.

*Mr Conway's involvement as a solicitor in the acquisition and sale of No. 32*

© 2023 Thomson Reuters.

14. On 19th November 1999, following the success of Regent's bid for No 32, Mr Karmel orally retained Mr Conway on behalf of Regent, to act as their solicitor in respect of their intended purchase of that property and, so Mr Karmel maintained, also its re-sale. At the time, Mr Conway was already acting for Mr Karmel in the enfranchisement of the lease on No 20, having been instructed for the purpose three years earlier in August 1996. In the course of that retainer Mr Conway had inevitably learned something of Mr Karmel's business affairs and his finances. By letter of 24th November 1999 Mr Conway confirmed to Regent his acceptance of their retainer to act for them on the purchase of No 32 and also, in his quotation of his charges for both purchase and re-sale, his expectation that he would be instructed and would accept instructions on the re-sale when the time came. Mr Conway's first attendance note in relation to the property records that the purchase was to be made in the name of "Regent or its nominee" and that a special purpose vehicle ('SPV') might be set up to acquire the site. On 2nd December, on Regent's instruction, Mr Conway acquired Pristbrook, an off-the-shelf company that became a subsidiary of Warleggan, to act as the nominee of Regent in the purchase and holding of No. 32.

15. On 14th December 1999 contracts for the purchase of No. 32 were exchanged in the name of Pristbrook. The purchase was financed partly by a mortgage taken out in Pristbrook's name, partly guaranteed by Mr Karmel and Regent. Mr Conway sent confirmation of exchange to Regent not Pristbrook. Completion took place on 12 January 2000.

16. Whether or not Regent at this early stage had formally instructed Mr Conway and whether Mr Conway had accepted instructions to act on the re-sale of No 32, it is plain that both parties proceeded in the confident expectation that he would act on the re-sale, and Regent took care to keep him informed of their plans and progress in connection with the property and to involve him in them from time to time. In February 2000, Regent instructed him to seek information from Eyre in connection with Regent's application for planning permission. He also kept Mr Conway informed on progress in relation to matters bearing on the re-sale, of No 32, including securing the Council's agreement not to implement the CPO and obtaining planning permission, and in its move to secure an undertaking from Eyre that it would not attempt to enforce its standard restrictive covenants.

17. Prospective purchasers immediately began to show an interest in purchasing No 32. Mr Conway, in his evidence at the trial, said that he had understood that the disposal of the property might take the form of transfer of the shares in Pristbrook rather than sale of the land itself, so as to avoid stamp duty. In April 2000 he advised Mr Karmel on that as a possible course.

18. In June 2000 the price paid by Pristbrook for No 32 was referred to in expert evidence before a Leasehold Valuation Tribunal on the hearing of an application for enfranchisement of another property in St John's Wood, a matter which, as will appear, has some relevance to an issue canvassed at trial as to whether Mr Conway's knowledge of the purchase price, derived from his involvement in the purchase as Regent's/Pristbrook's solicitor, imposed on him a duty of confidence in respect of it. In August 2000 planning permission for the redevelopment of No 32 was granted to Pristbrook. And, on 11th and 14th September 2000, Mr Karmel and Mr Conway discussed a possible legal problem concerning the validity of that permission.

*Regent's proposed purchase of No. 24*

19. Returning to Regent's proposed acquisition of No. 24, on 11th September 2000 they made successive offers of £3.6m and £3.75m to Eyre to purchase it in the name of "Regent … or its nominee (most probably Pristbrook)", the latter offer being conditional on Eyre withdrawing the property from the market. Eyre, which appears to have been looking at that stage for an unconditional offer at a figure closer to £4m, refused both offers.

20. On 20th September, Mr Karmel telephoned Mr Conway to bring him up to date on the planning position in relation to No 32. Mr Conway's evidence was that, at that time, he considered he was still under retainer in respect of No 32. In the course of the call, Mr Karmel informed him that Regent were also negotiating to acquire No 24. Mr Conway's evidence was that he had an interest in acquiring part of if Mr Karmel was successful in his negotiations. His evidence was that he had also "hoped", or expected that Regent would instruct him as the solicitor on its purchase if the negotiations for it were successful.

21. On 21st September 2000, Mr Karmel wrote to Mr Conway on Pristbrook headed writing paper about No 32, enclosing correspondence with the Council about the threat of compulsory purchase of the site, a copy of the planning permission relating to it and correspondence with Eyre on the matter. Mr Karmel concluded the letter by stating: "We are now planning to actively market the site and doubtless will be in touch in due course"; and he added "We are still progressing matters with … [Eyre] in respect of the larger plot [No 24] and I will let you know the outcome".

© 2023 Thomson Reuters.

22.  Mr Conway immediately began preparing his own plans for No 24. On the same day he contacted Ms Emma Poyser and Mr Briant of Cluttons, and he wrote to his architect. In his evidence he claimed that he had learned from Ms Poyser that the best offer received for No 24 thus far had been £3.75m.

23.  On 22nd September Mr Conway telephoned Mr Karmel, who indicated to him that the £3.75m bid had probably been "his" bid. He maintained in evidence that he had told Mr Karmel he intended to bid for the whole of the site, and produced two attendance notes of that telephone call, one in the name of Pristbrook but under the Regent file reference in his filing system, and one without any file reference. Neither attendance note records that Mr Conway told Mr Karmel of his intention to bid against Regent for the whole of the site, as distinct from a suggestion that he should be a party with Regent to some sort of joint venture in relation to it. In cross-examination, Mr Conway said that, if he had not made clear in the telephone call that he intended to bid for the whole site, or if Mr Karmel had not understood that, he had made it clear in a telephone call the following week. But there is no attendance note or other record of such a conversation.

24.  On the weekend of 23rd and 24th September 2000, Mr Karmel and Mr Conway met twice. They discussed, on Mr Karmel's recollection, a proposal from Mr Conway that he should purchase part of No 24 from Regent should they succeed in the bidding, or, on Mr Conway's account, that he should enter into some other form of joint venture with Regent for the site. Mr Ratiu also acknowledged in evidence, as he did in the unsent letter to the Law Society of 6th December 2000 (see paragraph 4 above), that Mr Conway had at one stage approached Regent with a proposition for joint purchase with them of No 24. But he and Mr Karmel emphatically denied in their evidence that Mr Conway had ever told them he intended to compete against them by seeking to purchase the whole of the site. Mr Karmel's evidence was that at about that time, 29th September 2000, Mr Conway told him that he could not afford to buy the whole site.

25.  It is common ground that in the course of the meetings over the weekend of 23rd–24th September, Mr Karmel spoke to Mr Conway of his development ideas for No 24 and left him, overnight, copies of architects' plans and drawings relating to existing planning permission for the site. Mr Conway photocopied part of one of the plans, which had features he liked.

26.  It is also common ground that Mr Conway did not suggest at this stage or later that Regent should seek legal advice about dealing with him personally in connection with No 24. However, on 25th September he drafted a letter to Pristbrook under the Regent file reference as a proposed response to Mr Karmel's letter of 21st September (see paragraph 21 above), in which he stated, "we, of course, have met twice over the weekend and clearly in the prevailing circumstances my firm could not act whilst there remained a conflict of interest". But he never sent the letter to Regent or Pristbrook. In evidence, he explained that he had drafted it to make clear that he could not act for and against Pristbrook in relation to No 24 at the same time.

27.  Mr Conway's evidence at trial was that, shortly after the weekend of 23rd–24th September, in a conversation with Mr Karmel of which there is no record, Mr Karmel suggested to him that he should pay Regent £500,000 to drop out of the bidding for No 24. Mr Conway asserted that, in the same conversation, he made clear to Mr Karmel that he would bid for the site, and warned that, as he was acting for Regent on the sale of No 32, Mr Karmel should not discuss with him any information relating to Regent's bidding intentions for No. 24. Mr Karmel, in his evidence, denied any such conversation, or that he had ever suggested to Mr Conway that he should pay Regent £500,000 not to bid. Although there is no record of the alleged conversation, Mr Conway's wife and his secretary, Ms Coulson, gave evidence that he had informed them of the alleged £500,000 offer at around that time.

28.  According to Mr Conway, from about that time, the end of September 2000, neither Mr Ratiu nor Mr Karmel said any more to him until November 2000 about their interest in purchasing No 24.

29.  Returning for a moment to the progress towards sale of No 32, on 4th October 2000, Regent/Pristbrook agreed its sale by private treaty to a Mr and Mrs Richard Green at a price of £1.65m. On the same day Mr Karmel instructed Mr Conway over the telephone to undertake the conveyance to them, which instruction Mr Conway accepted by a letter addressed to Pristbrook of 5th October.

30.  The apparent sale by Regent/Pristbrook of No 32 at such price appears to have given Mr Conway some encouragement and impetus to pursue his own plans for No 24. A day or so later, on 6th October 2000, he wrote to his bank requesting a loan to enable him to acquire No 24, indicating a purchase price of at least £4m. In his letter to the bank, he cited No 32 as one of three comparables giving a good indication as to value. Mr Conway attached a plan of Elm Tree Road on which he had shaded No 32. The Bank appears to have agreed in principle to consider a loan facility of some £4m for the purchase.

© 2023 Thomson Reuters.

31.  However, Mr Conway's reliance on the sale of No 32 was premature, for it fell through on about 10th October 2000 because of the compulsory purchase order to which the property was subject. This led, on 1st November 2000, to Mr Karmel seeking advice from Mr Conway on the course recommended by a firm of local estate agents, of sale of the property by tender. On the 8th November, Mr Conway took part in a three-way telephone call with Mr Karmel and a representative of those agents to finalise arrangements for the tender on No 32.

32.  On the same day, 8th November, Mr Conway and Regent were separately invited to take part in a tender to purchase No 24 set for late November.

33.  On the 10th November, according to Mr Conway in his evidence at trial, he telephoned the Law Society's Professional Guidance Section, seeking guidance on (i) money laundering concerns relating to Regent (a wholly unfounded and unsupported suggestion not previously raised) and (ii) being involved in tenders for and against the same clients on different and proximate properties at the same time, with specific reference to the impending transactions relating to Nos. 32 and 24. On his account, this is what he said to the official to whom he spoke at the Law Society:

> "… I explained that I was acting for clients … I told the person I spoke to that I was proposing — I was acting for people that were preparing to sell this site by tender; that I was acting for them; I had prepared the tender documents; and that I was also competing with them to buy another property."

It is plain that, in seeking advice as to his professional position in that way, he was not at that time distinguishing between Regent and Pristbrook or between those corporate clients and Mr Ratiu and Mr Karmel. He said that the official advised that he should not be the collection point for tenders for the purchase of No 32 and that he should not become privy to the details of its sale until after the bidding had closed on No 24. As will appear, Mr Conway did not follow that guidance.

34.  On 13th November 2000, Mr Conway sent Regent's/Pristbrook's estate agents, Aston Chase, the tender documentation for the sale of No 32, seeking bids in excess of £1.5m. In his covering letter he stated that the letter of invitation to tender was to come from his firm, David Conway & Co, acting on behalf of Pristbrook and that the agents should notify his firm of the names of the interested parties. Although Mr Conway suggested in evidence that he had instructed a change in the tender documentation so as to substitute the agents for his firm as the recipient of the tenders, no amended documents to that effect have ever been disclosed.

35.  On the 16th November, a private buyer was found for No 32 at a price of £1.6m, on the basis of quick exchange. On Mr Karmel's instructions, Mr Conway offered to transfer the property to the purchasers by selling them Pristbrook, but the purchasers declined, and contracts were prepared for exchange with Pristbrook shown as the vendor.

36.  The next day, Mr Conway wrote to his bank in connection with his request of 6th October for a loan facility of £4m to enable him to bid for No. 24, citing the invitation to tender for No. 32 of offers in excess of £1.5m. as further market evidence to support higher gross sale prices.

37.  On 20th November, four days before the deadline for submission of tenders for No. 24, Mr Conway's firm exchanged contracts with the solicitors for the purchasers of No 32, the contracts still showing Pristbrook as the vendor. As a result, Mr Conway knew the re-sale price for No 32 and thus the gross profit margin of £400,000 that Regent, through Pristbrook, had achieved on their short-term investment in No. 32. Completion and redemption of the mortgage on that property were scheduled to take place on 21st December 2000.

38.  However, as to No. 24, neither Regent nor Mr Conway took part in the November tender, which, seemingly, did not produce any bids acceptable to Eyre. On 28th November 2000, Eyre issued a further invitation to interested parties, including both of them, to take part in a second tender exercise for the property, with a closing date for tenders of 4th December.

39.  Mr Conway telephoned Mr Karmel on 30th November 2000 to find out, according to Mr Karmel, whether Regent had taken part in the first tender exercise and whether they intended to take part in this one. Mr Conway did not produce any attendance note of that discussion, but said in evidence that they had discussed why neither of them had bid in the 24th November tender. And he said he had told Mr Karmel that he intended to bid in the forthcoming tender. He also said that he

© 2023 Thomson Reuters.

had told Mr Karmel not to discuss his bidding intention with him. Mr Karmel's evidence was that Mr Conway said nothing about his intention to bid and did not advise him not to discuss Regent's bidding intentions with him — on the contrary, he said, the purpose of Mr Conway's call was to discover what Regent intended to do about No 24.

40. At about that time Mr Briant of Cluttons told Mr Conway that Eyre would prefer an *unconditional* bid of £3.5m to the highest *conditional* offer in the November tender, which had been just over £3.750m. Mr Conway thereupon arranged with his bank to revise the facility agreed of £4m to £3.5 or £3.75m, based on a maximum purchase price of £3.75m.

41. In the mid-afternoon of 4th December 2000 Mr Conway telephoned Mr Karmel again. He produced in evidence an attendance note for this conversation, but he acknowledged that he may not have made it until after a further telephone conversation with Mr Karmel on the morning of the 5th. By reference to the note, he said that he had again indicated to Mr Karmel that he intended to bid for No 24. The note read:

> "I told him that having talked matters over, I did not feel I could agree a deal at this stage with him but that we could talk if either he or us were successful in the re-tender.
>
> I asked him if he was intending to re-tender. He said he thought they probably would."

Mr Karmel, in his evidence, denied that Mr Conway gave him any more indication in that conversation than in earlier conversations as to his bidding intentions for No 24.

42. The second tender exercise attracted 11 bids by the closing time of 5 p.m. on the 4th. Regent made an unconditional offer of £3.75m in the name of "Regent … or its nominee (most probably Pristbrook)", namely the same amount that it had bid in September 2000 conditionally on the property being removed from the market. And Mr Conway made an unconditional offer of £3.5m. On the evening of the 4th, Mr Briant informed Mr Ratiu that he intended to recommend Eyre to accept Regent's bid.

43. On the morning of the 5th December, Mr Briant confirmed to Mr Ratiu that Eyre had accepted his recommendation, had agreed with him to exchange contracts two weeks after receipt of documents and had asked for the name of Regent's solicitor. Within a short time of that call, Mr Karmel telephoned Mr Conway and informed him Eyre's acceptance of Regent's offer. Mr Conway did not respond that he had been a competing bidder or that Mr Karmel should not disclose to him any further confidential information. Rather, he asked when the deal had been done, to which Mr Karmel replied that Regent's bid had been accepted on the previous evening and that they had been informed of the Eyre Trustees' approval that morning. He then asked Mr Conway to act for Regent in the purchase of the site. Mr Conway did not say he could not act. He said that he needed to make a telephone call first. Mr Karmel said that he hoped that the call was not to Eyre. Mr Conway repeated that he needed to make a telephone call and hung up abruptly. It is common ground that, until that conversation, there had been no invitation to Mr Conway to accept a retainer to act for Regent or Pristbrook or any other associated company in the purchase of No 24 and that the conversation itself did not amount to acceptance by Mr Conway of such a retainer.

44. On his own evidence, Mr Conway immediately telephoned Mr Johnson, the Chief Executive of Eyre (rather than Mr Briant) and sought to re-open the bidding for No 24 by putting in a higher unconditional offer of £3.8m and offering to exchange contracts within 48 hours. Mr Johnson then telephoned Mr Ratiu and told him that someone had made a higher bid than that of Regent, to which Mr Ratiu responded that, if the bid was from Mr Conway, Eyre should know that he was Regent's solicitor.

45. Eyre then informed Mr Conway that his bid of £3.8m was rejected, whereupon he faxed a further offer of £4m and contacted his bank to raise his loan facility back up to £4m

46. On the following day, 6th December, Eyre re-opened the bidding by inviting final offers in excess of £4m from Mr Conway and Regent. Mr Conway responded immediately by faxing a further increased bid of £4.12m. Regent's response was to seek urgent legal advice from Clifford Chance, solicitors, and then to write the fateful letter, the subject of these proceedings, to Mr Briant, in his capacity as Eyre's agent, complaining about Mr Conway's behaviour. The letter, the terms of which I have set out in paragraph 3 above, was drafted by Clifford Chance on the instructions of Mr Ratiu and Mr Karmel, and was written on Regent's headed writing paper.

© 2023 Thomson Reuters.

47.  As I have said, Mr Ratiu wrote two further letters on 6th December, both on Pristbrook headed writing paper. One was to Mr Conway, which he sent. The other was to the Law Society, which he did not send. Mr Ratiu's explanation in evidence for not sending the latter was that they had intended to send the letters in a different order but were overtaken by events, and he added, as was the case , that Regent informed Eyre the next day that they had not sent it.

48.  The letter to Mr Conway throws some light on Regent's attitude at the time to his behaviour. It read as follows:

> "Further to telephone conversations of yesterday in which you were informed that Pristbrook Limited had made an offer for the above property which had been accepted, I am extremely concerned to learn that you have also made an offer for the property.
>
> We informed you of our offer, and invited you to act for us on the purchase. After a certain delay you declined to accept our instructions. We believe that is wholly inappropriate for you to then use this information that we disclosed to you, by way of a confidential conversation between ourselves as your respective [sic] client, and our legal adviser.
>
> We do not believe that this is appropriate conduct for a professional person.
>
> We would take this opportunity to inform you that if you continue to pursue your interest in the property, we will inform the Law Society of the recent events.
>
> In actuality your making an offer for the property may cause us to raise the price that we are paying for the property.
>
> Please confirm by return that you will desist from your interest in the premises, you will withdraw any existing offers and will not make any further offers. …"

49.  The letter which Mr Ratiu, with the assistance of Clifford Chance, wrote to the Law Society, but which he did not send, also throws some light on Regent's attitude at the time towards Mr Conway's conduct:

> "We are writing to inform you of our concerns regarding the conduct of a solicitor.
>
> We made an offer to purchase a house. This was an unconditional offer which was accepted by the vendor. We then spoke with our solicitor and asked him to act for us on the purchase. The solicitor approached us some time previously with regard to purchasing the property jointly with him but these discussions did not come to fruition. This had emanated from an existing client/solicitor relationship between us on an almost adjacent property with the same vendor. When we contacted him to ask him to act for us on this purchase, we explained that we had reached agreement with the vendor. He responded by saying only that he needed to make a telephone call. He did not expressly state that he would not act. He certainly did not indicate that he would be making an offer for the property.
>
> The solicitor was then able to make a higher offer for the premises solely on the basis of the information disclosed in our telephone conversation. This was disclosed solely on the basis that it was a conversation between ourselves as a prospective client and him as a lawyer.
>
> We assume that this is a practice which the Law Society would find unacceptable. The solicitor has clearly acted against the best interests of ourselves as a prospective client. This must bring into disrepute the solicitor's profession, and we would ask for your urgent assistance on what action the Law Society might be able to take in this situation.

© 2023 Thomson Reuters.

> We believe that it cannot be in the public interest for a solicitor to use information obtained in this manner to outbid his client when acting on a personal level."

50.  In the event, Mr Johnson, who was called as a witness by Mr Conway, gave evidence that Eyre resolved to adhere to its acceptance of Regent's offer of £3.75m regardless of Regent's letter to it of 6th December. Exchange of contracts took place the following day, 7th December 2000, and the transaction was concluded with a transfer to a further nominee of Regent, Hoolway Limited.

51.  Before leaving the evidence and turning to the issues, I should mention two matters.

52.  The first is that in none of the three letters written by Mr Ratiu on 6th December 2000, did he complain that Mr Conway had not been entitled to bid because he had been or was acting for Regent or Pristbrook in relation to No 32. His complaint was of a specific breach of confidence in relation to the telephone conversation of Mr Karmel and Mr Conway of 5th December 2000 in relation to No 24.

53.  The second is that Mr Conway's case before the jury included an allegation of a "dirty trick" by Regent. He maintained that Regent wrote and sent the letter of 6th December 2000 to Eyre's agent with the intention of securing No 24 at £3.75m without having to raise their bid in response to Mr Conway's renewed bid and, for the purpose, to blacken his name.

## The issues on appeal

54.  The two principal issues at trial were, as I have said, justification and malice. As to both, a great deal of time was spent on the meaning of the defamatory letter, going to two important sub-issues raised by Regent's defence, namely: 1) whether Mr Conway, by competing with Regent in the bidding for No 24, had put himself in a position in which their respective interests conflicted so as to put him in breach of fiduciary duty to Regent; and/or 2) whether, in his conduct leading up to and including his competition with Regent in the bidding for No 24 he had breached a duty of confidence to Regent.

55.  The main issues on the appeal were whether the Judge:

i)  wrongly directed the jury that Mr Conway was not in breach of fiduciary duty in bidding for No 24, as his only duty of loyalty was to Pristbrook, Regent's wholly-owned and controlled SPV, thereby, so Regent contend, wrongly withdrawing the issue of breach of fiduciary duty to Regent from the jury;
ii)  wrongly directed the jury that there could be no conflict of interest unless Mr Conway was acting for and against his clients on the "same matter" in the sense that it could adversely affect Pristbrook's interests in relation to No 32, whereas Regent contend that the Judge should have directed the jury that Mr Conway had put himself in an inevitable position of conflict between his interest and his duty in acting for them on the sale of No 32 and bidding against them on No 24;
iii)  wrongly directed the jury that it was open to them to find that Regent had given their informed consent to Mr Conway acting for them on No 32 and against them on No 24, an option for which Regent maintain there was no evidential support;
iv)  on the issue of breach of duty of confidence, wrongly directed the jury: (a) that Mr Conway was in possession of only minimal, if any, relevant confidential information and that it was for Regent to prove that he had misused it; whereas Regent maintain that there was evidence for the jury's consideration of possession of more than minimal relevant confidential information, and that proof of his misuse of it was not a necessary ingredient of the breach of duty;
v)  wrongly directed the jury on the law and approach to the meaning of justification;
vi)  should have withdrawn the question of malice from the jury on the grounds that there was insufficient evidence on which a reasonably minded jury, properly directed, could find it, and wrongly directed them on the law and approach to malice; and
vii)  wrongly directed the jury on the law and approach to damages (or whether the jury's award of £96,000 was perverse).

## Breach of fiduciary duty and breach of duty of confidence

© 2023 Thomson Reuters.

56. Before considering each of the matters of which Regent complain, it may be helpful to set out some basic and uncontroversial general propositions of law as to a solicitor's fiduciary obligations and his overlapping, but sometimes distinct, duty of confidence to his client.

57. As to fiduciary obligation, where better to start than the following treatment by Millett LJ (as he then was) in *Bristol & West v Mothew [1998] Ch 1* , at 18A–C:

> "… A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary. The core liability has several facets. A fiduciary must act in good faith; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. This is not intended to be an exhaustive list but it is sufficient to indicate the nature of fiduciary obligations. They are the defining characteristics of the fiduciary. As Dr Finn pointed out in his classic work *Fiduciary Obligations* (1977), p 2, he is not subject to fiduciary obligations because he is a fiduciary; it is because he is subject to them that he is a fiduciary."

58. In short, as he was later to put it in *Bolkiah v KMPG [1999] 2 AC 222* at pp 234H–235A, a fiduciary must not put himself in position of actual or potential conflict with his client without the latter's fully informed consent.

59. As to "possible" or potential conflict, as Lawrence Collins J observed at paragraph 9 of his judgment in *Marks & Spencer PLC v Freshfields Bruckhaus Deringer [2004] EWHC 1337* (Ch), a judgment upheld by the *Court of Appeal [2004] EWCA Civ 741* , "The cases establish that the potential conflict must be a reasonable apprehension of a potential conflict, not a mere theoretical possibility". A common instance of such conflict, whether actual or potential, is where a solicitor acts so as to make or attempt to make an unauthorised profit; see *Boardman v Phipps [1967] 2 AC 46, HL* .

60. As to a solicitor's duty of confidentiality, it can come into its own as a separate obligation from that of a fiduciary when the fiduciary relationship has come to an end with the end of the solicitor/client relationship. Lord Millett, in *Bolkiah v KPMG* , which was a breach of confidence, not a breach of fiduciary duty, case, sought to emphasise this distinction at 235C:

> "Where the court's intervention is sought by a former client, however, the position is entirely different. The court's jurisdiction cannot be based on any conflict of interest, real or perceived, for there is none. The fiduciary relationship which subsists between solicitor and client comes to an end with the termination of the retainer. Thereafter the solicitor has no obligation to defend and advance the interests of his former client. The only duty to the former client which survives the termination of the client relationship is a continuing duty to preserve the confidentiality of information imparted during its subsistence."

© 2023 Thomson Reuters.

**Issues arising as to the existence of and breach of fiduciary duty**

*i) Whether Mr Conway owed a fiduciary duty to Regent*

61. The first matter for consideration by the jury, on a proper direction of law, was the nature of the relationship of Regent and Mr Conway at the material time, namely from late November 1999 to 6th December 2000. Was there, throughout, a solicitor/client relationship between Regent and Mr Conway in respect of the purchase and sale of No. 32, as Regent maintains, or was it broken with Regent's introduction on 2nd December 1999 of its sub-subsidiary, Pristbrook, as its nominee for the purchase, as Mr Conway maintains? And, in either event, what, if any, duty did it impose upon Mr Conway towards Regent in his competition with Regent for the purchase of No.24?

62. The first issue for the Court arises out of the Judge's direction that that Mr Conway was not in breach of fiduciary duty to Regent in bidding for No. 24 because his only duty of loyalty was to Pristbrook. This affects, not only Regent's defence of justification, but also their plea of qualified privilege in the face of Mr Conway's allegation of malice.

63. Regent maintain that they, not Pristbrook, were the true clients of Mr Conway in respect of the purchase and sale of No 32, that he was their prospective solicitor on the purchase of No 24 and that, as a result of one or both of those relationships, he owed them a fiduciary duty in relation to the latter purchase of which he was in breach.

64. Mr Conway's case is that he owed no fiduciary duty to Regent in the purchase of No 24 and did not, therefore, put himself in a position of actual or potential conflict with Regent, or for that matter with Pristbrook. His stance was that Pristbrook, not Regent, instructed him on the sale of No 32, that the telephone conversation between him and Mr Karmel on 5th December 2000 about the purchase of No 24, and/or the circumstances leading up to it, did not make him the prospective solicitor for Regent for that purchase and, that, even if it had done, it would have imposed no fiduciary duty, only a possible duty of confidence, and that, in any event it would have created no actual or potential conflict of interests as the two transactions were unrelated.

65. There were thus two main questions for the jury under this head, namely: 1) whether Mr Conway owed a fiduciary duty to Regent, as distinct from Pristbrook, and, if so, 2) whether his conduct in relation to No. 24 put him in breach of it, namely, whether it arose in the context of the same matter giving rise to a potential conflict of interest.

66. The Judge directed the jury as a matter of law that Mr Conway was not in breach of fiduciary duty to Regent in bidding for No. 24 because his only duty of loyalty was to Pristbrook. This is how he put it:

> "In relation to number 32, Mr Conway's client was Pristbrook Limited, they were the owner of number 32 and they were selling it. Normally, when a solicitor acts for a company, his duty is to that company and not to the shareholders or owners of that company. It is a matter of fact for you but you may think that Mr Conway would not have expected Pristbrook Limited to be the bidder for number 24. As you remember, Pristbrook Limited is what is called a special purpose vehicle: its special purpose was to own that one property, number 32. Pristbrook never actually did bid for number 24. It is true that its name was mentioned by Mr Ratiu as a possible owner … [in the letter of Regent to Eyre of 4th December 2000; see paragraph 42 above] …
>
> *As a matter of law* , the existing client of Mr Conway at the relevant time in December was Pristbrook Limited and it was to Pristbrook Limited that he owed his duties of loyalty under the retainer in respect of number 32.
>
> So, Mr Conway did not owe a duty of loyalty to Regent … in November and December 2000. He was not in breach of his solicitor's duty of loyalty by bidding for number 24. …" (my emphases)

67. The effect of the direction was to remove from the jury the responsibility of deciding to whom, if anyone and in what respect, he owed a fiduciary duty. Also, as will appear, it largely undermined Regent's defence of justification, regardless of the meaning to be attributed to the 6th December letter. If, as a matter of law, Pristbrook, not Regent, was the client at all

material times, then Mr Conway owed no fiduciary duty to Regent, including Mr Ratiu or Mr Karmel, of which he could be in breach or in respect of which they could rely upon the defence of justification for the undoubtedly defamatory letter. Nevertheless, as will appear, the Judge went on to direct the jury in great detail on the defence of justification with reference to a number of different possible meanings to be attributed to the allegation in the letter.

68.  Sir Sydney Kentridge QC, on behalf of Regent, submitted that the direction effectively withdrew from the jury essential parts of Regent's case and was sufficiently serious to render the decision of the jury unsafe — in the words of Lord Halsbury LC in *Bray v Ford [1986] AC 44, HL* , at 47, HL, amounting to "a substantial wrong" in which "the defendant was not permitted to present his case to the jury with the argument that his original complaint was true". He maintained that, as a matter of law and/or fact, Regent was Mr Conway's client in material respects and that, in any event, a solicitor instructed on behalf of a company may also owe a duty to others for, example, its controlling shareholder or shareholders; it all depends on the facts.

69.  Mr Romie Tager QC, on the other hand, submitted that Mr Conway owed no fiduciary duty to Regent, since, apart from a brief period at the start of the move to purchase No 32, Pristbrook, not Regent, was the client for both the purchase and the sale. As to the purchase, Pristbrook's retainer had been substituted for that of Regent on 2nd December 1999 and, he maintained, terminated with the completion of the purchase in early January 2000. As to the sale, although the parties had apparently contemplated throughout that he would be instructed on that transaction when the time came, he submitted that he was not formally retained until 4th October 2000 and then, by Pristbrook, not Regent. Accordingly, he maintained that, because such a duty can only arise out of a fiduciary relationship, Mr Conway owed no fiduciary duty to Regent. Drawing on Lord Millett's distinction in *Bolkiah* , he submitted that, as distinct from a duty of confidence, it does not extend to a potential retainer, for example to a solicitor who is consulted by a potential client, but who declines to accept instructions or, as happened here in relation to No 24, does not accept them. Similarly, once the transaction in respect of which the solicitor was retained is completed, he submitted, the retainer comes to an end, and with it the fiduciary relationship, citing *Donsland v Van Hoogstraten [2002] EWCA Civ 253* , per Tuckey LJ at para 18, applying *Underwood, Son & Piper v Lewis [1894] 2 QB 306* .

70.  Mr Tager added that there is no authority for the proposition that a solicitor acting for one company in a group cannot act contrary to the interest of another company in that group or to the personal interests of directors or shareholders of his client company unless it or they were a party to the retainer. Accordingly, he submitted, the Judge correctly directed the jury that there was no conflict of interest, or duty or breach of duty on the part of Mr Conway to Regent in bidding for No 24 because Pristbrook, not Regent, had been his client on the sale of No 32.

71.  Before looking at this issue in a little more detail, it is important to keep in mind that the reason for a solicitor's fiduciary duty to his client, though engendered by the retainer, is distinct from the contractual obligations arising under it. It arises from the relationship of trust and confidence that is an important consequence and feature of the retainer. But the solicitor/client retainer is not the only form of association between two or more persons that carries with it such a duty. It has a separate and more broadly based jurisprudential justification. In his analysis in *Bolkiah* , Lord Millett focused on the solicitor/client relationship for the purpose of contrasting a duty of confidence with a fiduciary duty. As I have noted, he concluded as part of that analysis, that the latter, when arising out of such a relationship, is coterminous with it, but that matters of confidence imparted to a solicitor in anticipation of or flowing from it, may create a duty of confidence that is not coterminous with it.

72.  With respect, Lord Millett, in drawing that distinction in a breach of confidence case, may have tied more tightly than he intended the principle of fiduciary duty to contractual duty, something that he had been at pains not to do in giving his broader and non-exhaustive description of a fiduciary in the passage from his judgment in *Bristol & West Building Society* that I have set out in paragraph 57 above. Lord Walker of Gestingthorpe made much the same point in *Hilton v Barker Booth & Eastwood [2005] 1 WLR 567, HL* , at paras 28–30, that a solicitor's fiduciary duty to his client is not necessarily to be found in or confined to the terms of the contractual retainer:

> "28.  A solicitor's duty to his client is *primarily* contractual and its scope depends on the express and implied terms of his retainer. …
>
> 29.  The relationship between a solicitor and his client is one in which the client reposes trust and confidence in the solicitor. It is a fiduciary relationship. …

© 2023 Thomson Reuters.

30. A solicitor's duty of single-minded loyalty to his client's interest, and his duty to respect his client's confidences, do have their roots in the fiduciary nature of the solicitor-client relationship. But they may have to be moulded and informed by the terms of the contractual relationship."

73. Where there is a contractual retainer and where it provides expressly or by implication obligations of a fiduciary nature, such obligations must clearly prevail, or "mould" or "inform" the fiduciary nature of the contractual relationship. But where there is a relationship involving, say, a transaction or transactions between a solicitor and a person who, having regard to that relationship and the solicitor's profession, reposes trust and confidence in him, a fiduciary duty may arise without a retainer. So much seems to be clear from the historic development and continued separate existence of the notion of a fiduciary relationship and one created purely by contract. It is clearly acknowledged in the following passage from the judgment of Mason J in *Hospital Products Ltd v United States Surgical Corpn (1984) 156 CLR, 41* , at 97, cited with approval by Lord Browne-Wilkinson, giving the judgment of the *Privy Council in Kelly v Cooper [1993] AC 205* , at 215:

"That contractual and fiduciary relationships may co-exist between the same parties has never been doubted. Indeed, the existence of a basic contractual relationship has in many situations provided a foundation for the erection of a fiduciary relationship. In these situations it is the contractual foundation which is all important because it is the contract that regulates the basic rights and liabilities of the parties. The fiduciary relationship, if it is to exist at all, must accommodate itself to the terms of the contract so that it is consistent with, and conforms to them. The fiduciary relationship cannot be superimposed upon the contract in such a way as to alter the operation which the contract was intended to have according to its construction."

74. Mason J's approach is instructive in that, whilst it subordinates the effect of a fiduciary relationship to the terms of any concurrent contract, it also acknowledges — depending upon the circumstances — the potential coming into being and continuation of a fiduciary obligation without or regardless of any contract.

75. Illustrative of such an approach is *Longstaff v Birtles [2002] 1 WLR 470* , in which this Court held on the facts, that the defendant's solicitors' fiduciary duty extended beyond the termination of the retainer. In that case solicitors who had acted for a couple in an abortive negotiation to purchase a public house and whose retainer had been terminated, persuaded the couple to join with them, without advising them to seek independent legal advice, in what turned out to be a disastrous commercial venture. In allowing the couple's appeal against the first instance judge's dismissal because the solicitors' retainer had been terminated before the matters of which the couple complained, Mummery LJ, with whom Laws LJ and Sir Anthony Evans agreed, said at paragraphs 1 and 35 of his judgment:

"1. … The source of the [fiduciary] duty is not the retainer itself, but all the circumstances (including the retainer) creating a relationship of trust and confidence, from which flow obligations of loyalty and transparency. As long as that confidential relationship exists the solicitor must not place himself in a position where his duty to act in the interests of the confiding party and his personal interest may conflict. …

35. This case can and, in my judgment, should be decided on the simple ground that there was a relationship of trust and confidence between the Longstaffs and the solicitors; that the relationship did not cease on the termination of the retainer in respect of the intended purchase …; that during the course of that relationship a personal business opportunity presented itself to the solicitors; that the solicitors took advantage of that opportunity to propose that the Longstaffs buy into the … [solicitors' business venture]; that in the context of the relationship the proposal gave rise to a situation in which the duty of solicitors might conflict with their interest; and that they acted in breach of a fiduciary duty in continuing to deal with Longstaffs, in a situation of a conflict of duty and interest, without insisting they obtain independent advice."

© 2023 Thomson Reuters.

Mr Tager suggested that the decision in that case was incorrect and arrived at per incuriam, as *Bolkiah* was not cited to the Court, it had not been argued at first instance or, initially, on appeal by reference to fiduciary duty but on the common law duty of care, and it was a special case on the facts. However, it is an authoritative illustration of the readiness of the courts, regardless of the precise issue involved, to draw back the corporate veil to do justice when common-sense and reality demand it.

76.  Moreover, it is of interest to note that the Judge, contrary to his direction to the jury that Mr Conway owed no fiduciary duty to Regent because Pristbrook, not Regent, retained him for the purchase and sale of No 32, in a later passage of his directions to them, slipped into the same sort of reasoning as Mummery LJ in that case. When dealing, in the context of breach of confidence, with Mr Conway's own anxieties in September 2000 about possible conflict of interest between his and Regent's interest in the purchase of No 24 (see paragraph 26 above), he observed:

> "There was undoubtedly, you may think, a potential confusion at that point. As well as a potential business role Mr Conway was also the potential or prospective solicitor for the sale of number 32 by Pristbrook Limited and indeed he became the solicitor for Pristbrook Limited some days, a week or two, or ten days later.
>
> As a matter of law at that point even if there were no formal relationship of solicitor and client between Mr Conway and the defendants there had been a relationship of solicitor and client between Mr Conway and Regent … in the past, and there had been a relationship between Mr Conway as solicitor and Mr Karmel as client in the past; and even if there was not formally such a relationship in the second half of September you may think that there, nevertheless, was a relationship of trust and confidence arising out the past solicitor relationship with Regent … and Mr Karmel and the past retainer from Regent … and from Pristbrook … in relation to 32, and the potential retainer or prospective retainer on 32. … But that does not resolve the question whether there was any confidential information because … information does not become confidential simply because you tell it to your solicitor. It has to be confidential in the first place."

77.  In short, I see strong jurisprudential support for the proposition that the answer to the question whether a fiduciary duty, which has its start in a solicitor/client relationship, may outlive it is highly fact-sensitive. Lord Millett's distinction between fiduciary duty and a duty of confidence in *Bolkiah* arose, as I have said in a much narrower focus and one that was primarily concerned with the extent of the latter duty.

78.  There is, it seems to me, a powerful argument of principle, in this intensely personal context of considerations of trust, confidence and loyalty, for lifting the corporate veil where the facts require it to include those in or behind the company who are in reality the persons whose trust in and reliance upon the fiduciary may be confounded.

79.  Such was the approach of this Court in *Johnson v Gore Wood [1999] BCC 474* , at 485, where the issue was whether it was arguable so as to defeat an abuse of process application that solicitors to a company alleged to have been negligent in its advice to the company, also owed a duty of care to its controlling shareholder, Ward LJ, giving the judgment of the Court, held, at page 485C–E, that it was arguable, citing with approval the reasoning of Staughton J (as he then was) on a similar issue in *R P Howard Ltd v Woodman Matthews & Co (a firm) [1983] QB 117* :

> "… arguments of a very similar nature prevailed in the judgment of Staughton J in … *Howard v Woodman Matthews* … where the solicitor knew that the company was a family company effectively run by Mr Witchell from whom they received their instructions. He held at p. 121A:

© 2023 Thomson Reuters.

> 'In my judgment, in the circumstances of this case, Mr Witchell as well
> as the company was the client of Mr Mason. That seems to me to reflect
> the reality of the situation. Mr Mason knew that Mr Witchell … was
> the company. He probably knew that Mr Witchell derived his livelihood
> and some profit from the company, and was vitally concerned in its
> well-being. Mr Witchell had first been his personal friend, and had then
> come to him in connection with other matters for legal advice, both as
> the representative of the company and in a personal capacity. When Mr
> Witchell sought his advice on … [a matter concerning the company] Mr
> Mason owed a contractual duty of care both to the company and to Mr
> Witchell."

80.  Nor, in my view, should it matter in principle, where a fiduciary duty is engendered by a contractual relationship, whether the client has entered into a direct contractual relationship with the fiduciary or through an agent or, in the case of a corporate client, through the use of a nominee company, as Regent used Pristbrook in this case.

81.  It is also important to remember that the issue of fiduciary relationship is usually tried by a chancery judge in direct claims of breach of trust or other fiduciary duty as a mixed question of law and fact. In the context of defamation it is in this instance transposed into a supposed issue of objective fact for a jury as to whether a defendant can justify not only his understanding of his relationship with the other party, but also the validity of the complaint of a violation of that relationship. In such a context there may well be a greater imperative, already signposted in some of the authorities to which I have referred, for allowing reality to prevail over technical aspects of corporate law.

82.  With all those considerations in mind, I return briefly to the facts of this case. The evidence before the jury showed, as I have summarised it in paragraphs 10 to 53 above, that, between November 1999 and December 2000, Regent, acting on its own and then through its nominee, Pristbrook, retained Mr Conway as its solicitor for the purpose of its purchase and then re-sale of No. 32. Both before and after completion of the purchase of No 32 in January 2000, he provided legal advice and assistance to Regent, in particular in connection with planning permission in February and September 2000 and the anticipated sale of Pristbrook (instead of No 32 itself) in April and November 2000. Provision for disposal of Pristbrook as a proxy for the property, as an encouragement to its ready and profitable disposal for Regent, is hardly consistent with the suggestion made by Mr Conway at trial that Pristbrook, not Regent, was his sole client in respect of No. 32.

83.  It is also apparent from Mr Conway's call to the Law Society on 10th November 2000, seeking guidance as to his potential conflict of interest with Regent over No. 24 arising out of his involvement with No. 32 (see paragraph 33 above), that he did not at the material time distinguish between Pristbrook and Regent for this purpose. Mr Karmel's letter to Mr Conway of 21st September 2000 (see paragraph 21 above) on Pristbrook headed writing paper about Nos 32 and 24, attaching as it did correspondence of Regent with the Council as to the former and stating "we are still progressing matters with … [Eyre] in respect of the larger plot [No 24] and I will let you know the outcome", made plain that the moving spirit in relation to the proposed sale of the former and purchase of the latter was Regent. So much is clear from Mr Conway's unsent letter to Mr Karmel of 25th September 2000 (see paragraph 26 above), in which, under his Regent file reference, he observed as to No 24, "we, of course, have met twice over the weekend and clearly in the prevailing circumstances my firm could not act whilst there remained a conflict of interest". He, therefore, knew by 20th November 2000 that Pristbrook had not been sold together with No 32, so that it was still available to be used as a nominee for the purchase by Regent of No 24. As Sir Sydney observed, in such circumstances, Mr Conway could not realistically maintain that the continuation of such conflict of interest depended upon his uncertainty as to which company would be used for the purchase of No 24. In the event, as must have been within his contemplation, Regent's offer for No 24 was made in the name of "Regent … or its nominee, most probably Pristbrook".

84.  The reality of the case here, as Mr Conway well knew, was that his client in relation to No 32 was Regent, not Pristbrook, and that Pristbrook was effectively a vehicle controlled by Regent.

85.  In such circumstances, the Judge's direction to the jury that, as a matter of law, Mr Conway's only "client" was Pristbrook and that, therefore, he owed no duty of loyalty to Regent in respect of No 32 of which his bid for No 24 could put him in breach was a serious error — serious in that, on that aspect alone, it effectively withdrew the issue of breach of fiduciary duty from the jury.

86.  Given: 1) the partial dependence of Regent's defence of justification on the existence of a fiduciary relationship between Mr Conway and Regent; 2) the legal and factual complexity of that notion involving, as it did here, relationships between companies as well as individuals; and 3) the various possible meanings of the acknowledged libel as candidates for justification; it would have been better for the Judge, with the agreement of the parties, to have dealt with this issue himself as one of mixed law and fact.

87.  However, once embarked on the process of directing, and leaving to, the jury the whole issue of justification the Judge should at least have directed them that there was evidence on which they should consider whether Regent had retained Mr Conway in respect of the No 32 transactions and that, as a result of those retainers and their discussions with him of their interest in purchasing No 24, he had a fiduciary duty to Regent at the time of his bidding for No 24. In giving such a direction, he should, of course, have given them some guidance on the law and their application of it to the primary and secondary facts that they found proved. That guidance, in my view, should have included a reminder that Pristbrook was simply a nominee and as to the legal and possible factual implications of that. And, after rehearsing the evidence going to the relevant facts, he should have left them to determine as a matter of fact whether and to whom at the time of the bidding for No 24 Mr Conway owed a fiduciary duty. As it was, removing half their task in the way that he did denied the defendants a verdict on a crucial issue. It follows that I am of the view that he erred in directing the jury that, as a matter of law, at the material time Pristbrook, not Regent, was Mr Conway's client, and that Mr Conway did not, therefore, owe a duty of loyalty to Regent of which he could be in breach by bidding for No 24. For reasons that will become more apparent in the remainder of this judgment, I am of the view that this error of the Judge alone amounted to a substantial wrong to Regent, effectively depriving them of presenting their defence of justification to the jury.

*ii) Conflict of interest*

88.  Regent maintain that the Judge made a further error in his direction to the jury on the issue of Mr Conway's fiduciary duty to Regent and of his breach of it, in directing them that there could only be a conflict of interest in relation to one matter — the same matter — and that the sale of No 32 and the purchase of No 24 were different matters. This is how he put it to the jury:

> "… When a solicitor agrees to act for a client in a particular matter, that gives rise to a relationship which lawyers refer to as a relationship of trust and confidence. The client is then entitled to the single minded loyalty of the solicitor. … he must not put himself in a position where his duty to the client and his own interests conflict. He may not act for his own benefit or for the benefit of the third party in relation to that matter without the informed consent of his client. …
>
> …
>
> A clear example of a conflict of interest is where a solicitor buys or sells something from or to his own client. You will recall that both Mr Conway and Mr Karmel agree that a possibility of that happening was discussed in September 2000, namely the possibility of … [Regent] selling half the site of number 24 to Mr Conway if they succeeded in buying it. …
>
> … if Mr Conway were to have entered into a joint venture like that with … [Regent] or if he were to have bought the site from … [Regent], then there would have been a glaring conflict of interest. …
>
> It is equally clear that if and so long as Mr Conway was contemplating bidding for number 24 in competition with … [Regent], then Mr Conway could not advise … [Regent] in relation to number 24. …

Neither side suggests that Mr Conway was ever actually instructed by … [Regent] in relation to number 24. Mr Ratiu specifically explained he did not want to instruct a solicitor in relation to number 24 before … Eyre … had agreed to sell it to him. …

That is, I hope, a comprehensible outline of the relevant law. …"

89.  The Judge gave associated directions to the jury that there was no complaint or evidence that Mr Conway, in bidding for No 24, had an adverse interest so as to cause him to act in conflict with his retainers on the purchase or sale of No 32. He correctly identified Regent's case, albeit interspersing his directions with their case on breach of confidence, "that … [Mr Conway] acted in breach of his duty of loyalty" in that he put himself in a position where "his own interest conflicted with those of … Regent who, they allege, were existing clients who had instructed him in relation to 32." However, he made plain in his directions that Regent's proposed purchase of No 24, on which it had not instructed Mr Conway, was to be regarded as a quite separate matter.

90.  Regent maintain that the Judge, in those directions, took too narrow an approach in instructing the jury that there could be no conflict of interest unless Mr Conway was acting for and against his clients on the 'same matter' in the sense that it could adversely affect Pristbrook's interests strictly in relation to No 32. They maintain that he should have directed the jury that Mr Conway had put himself in an inevitable position of conflict between his interest and his duty in acting for Regent on the sale of No 32 and bidding against it on No 24.

91.  Sir Sydney submitted that "no conflict rule" is not limited to dealings or advice in relation to the same matter, but also applies to reasonably related matters. He submitted that in the present case there was clearly a reasonable relationship between the purchase and sale of No. 32 in which Mr Conway acted for Regent, acting through its nominee, Pristbrook, and the purchase of No. 24 in which he acted against Regent's interest.

92.  Mr Conway's case is that the fiduciary duty, and for that matter the duty of confidence, of a solicitor to avoid a conflict of duty and/or interest with his client arises directly from his duty to protect and advance that client's interests in the matter, or any linked matter, in which he is retained by that client. He maintains that it does not extend to other matters unrelated to the retainer in respect of which he may have a personal interest or in respect of which he may be instructed by another client.

93.  Mr Tager, in support of that case referred to formulations of the Court, when articulating the conflict of interest rule, of such terms as "in a particular matter" (see *Bristol & West Building Society v Mothew, CA* , per Millett LJ, as he then was, at 18A), "in the transaction in hand" (see *Hilton v Barker Booth* , per Lord Walker of Gestingthorpe at para 31) and to the period of the retainer (see *Bolkiah* , per Lord Millett at 235C). In summary, he submitted that when considering whether a solicitor is acting in breach of his fiduciary duty, there is no such thing as "a general retainer" so as to impose on the solicitor a duty to advance or protect the interests of the client in all matters affecting or potentially affecting the client; see per Oliver J (as he then was) in *Midland Bank Trust Co Ltd v Hett Stubbs & Kemp (a firm) [1979] Ch 384* , at 402H–G.

94.  Applying those propositions to the evidence in the case, and putting aside for this purpose the issue of a duty of confidence and its breach, Mr Tager submitted that Mr Conway owed no fiduciary duty to Regent or was not in breach of any such duty because: 1) the sale by Pristbrook of No 32 and the proposed purchase by Regent of No 24 were different matters involving respectively different clients and prospective clients; 2) even if they were so inter-linked as to be capable of creating a conflict or risk of a conflict of interest if the clients and prospective clients had been the same, no such conflict of interest arose because when, in early October 2000, Pristbrook retained Mr Conway for the sale of No 32, he had not been instructed by either in respect of the proposed bid for No 24; 3) Regent knew by that time that he had a personal interest in No 24 and nevertheless, through Pristbrook, instructed him on the sale of No 32; and 4) when, on 5th December Regent approached him as a prospective client for the purchase of No 24, it did so with full knowledge of what he had learned through his retainer and otherwise of Regent's financial position and the purchase and sale price of No 32 and of his interest to date in No 24 as a personal investment.

95.  The point was recently considered in *Marks & Spencer PLC v Freshfields Bruckhaus Deringer* , in which Marks & Spencer successfully secured an injunction against Freshfields restraining them from acting on behalf of a consortium seeking to take it over, on the ground that they had an actual or potential conflict of interest arising from past and continuing retainers for Marks & Spencer in respect of certain matters, in particular its contractual arrangements in relation to one of its most successful lines. Lawrence Collins J, whose judgment was specifically upheld on this issue by a two — judge Court of Appeal,

© 2023 Thomson Reuters.

consisting of Pill and Kay LJJ, in refusing an application for permission to appeal, (in which both parties were represented by leading counsel), observed, with *Bolkiah* firmly in mind, at paragraph 16 of his judgment:

> "Most of the cases refer to the problem in the context of conflicting interests in the same transaction, but it seems to me clear that it goes somewhat beyond that. Although *Bolkiah* is not directly in point because it is a former client conflict and not, therefore … an application of the double employment rule, the way in which Lord Millett expresses himself is wholly inconsistent with the double employment rule being limited to same matter conflicts."

In the Court of Appeal, Pill LJ, in agreeing with that approach and specifically rejecting the notion that it was outlawed by Lord Millett's language in *Bolkiah* , said at paragraphs 10 and 11 of his judgment:

> "10  Mr Brindle [QC, for the applicants] submits that the [ *Bolkiah* ] principle cannot extend beyond the same transaction situation. He gave examples which indicate situations with no possible conflict of interest arising from the fact that a solicitor's firm, which may of course have a number of branches spread around the country and abroad, is in one transaction acting contrary to a client for whom it acts on another. I would accept that there must be a degree of relationship between the two transactions, but I am quite unable to accept that the language used by Lord Millett in *Bolkiah* and the comparative strictness, with respect, with which he has stated the principles in this area of the law is confined to same transaction cases.
>
> 11.  Moreover, while there must be limits upon the application of the principle, it is, in my judgment, a sound one and I accept the submission of Mr MacLean [QC, for the proposed respondents] on that point. The court must consider what the relationship is between the two transactions concerned."

Kay LJ, in his concurring judgment, put the reality of the potential conflict of interest for Freshfields very clearly in terms which have even greater application to the circumstances in this case, involving as it does two rival bidders. At paragraph 33, he said:

> "Mr Brindle argues that all attempts to define the circumstances in which conflict might arise have failed and as such any potential risk is no more than a theoretical one. That argument, in my judgment, fails to recognise the reality of the situation. If the defendant is to act for those making the bid its partners may be called upon at various stages to give advice as to the tactical approach to be adopted by the bidders in the circumstances of the bid becoming hostile. The claimant company is entitled to know that any such advice cannot possibly be influenced in any way by the knowledge that the defendant has of its affairs as a result of its relationship with the defendant as its client, even if the defendant does not directly reveal the information to the bidders. Where there is a matter which may feature prominently in any attempt to win over the shareholders of the claimant company, it seems to me wholly impossible to have the necessary degree of confidence that the claimant company will not be adversely affected by the bidders having the benefit of the defendant as their solicitors with the solicitors having previously acted for the claimant company on the very subject matter which may come to prominence in the bid. This, in my judgment, precludes the defendant from acting for the bidders."

© 2023 Thomson Reuters.

96.  In my view, in the present case, the near-contemporaneous sales of Nos. 32 and 24, the former by Regent and the latter by Eyre to Regent, and Mr Conway's involvement in both, albeit in different roles, were reasonably capable of being found by the jury to be related matters in two respects. First, on Regent's case and evidence, they had told Mr Conway that the No 32 transaction was a precursor to the No 24 transaction. And, second, as Sir Sydney pointed out, the two sites were comparable properties in the same road that were being marketed and offered for sale at the same time, at one point both by private tender. The particular features of No 32, namely the threat of compulsory purchase, the planning environment and the impact on Eyre's restrictive covenants, which Mr Conway himself described as distinguishing it from other transactions, were shared with No 24. Being on the market at the same time, it was possible that the fact that, or the price at which, one site was offered or sold would have an impact on the other. It will be remembered that Mr Conway, in his letters to his bank of 6th October and 17th November 2000 (see paragraphs 30 and 36), cited No 32 as a "comparable" in relation to No 24.

97.  It was also possible that, whilst acting for Regent on No 32 and against it on No 24, Mr Conway would come into possession of relevant confidential information that would put him in a position of actual or potential conflict between his interest and his duty. That the potential for conflict was not merely theoretical is clear from Mr Conway's own conduct in November 2000 when he telephoned the Law Society to seek advice on the possibility of conflict inherent in being involved in tenders for and against the same clients on proximate properties at the same time, followed by his decision not to follow the advice received. Mr Conway did not deny that Mr Karmel told him of the appellants' bidding intentions in relation to No 24 and that they had made an offer of £3.75m for the site in September 2000. It was clearly a matter for the jury whether Mr Conway was entitled to disregard the inevitable conflict of interests and put himself in a position whereby he might gain an unfair advantage over Regent in relation to No 24. This is particularly so given that, on Mr Conway's own evidence, it was always contemplated that he might be instructed to act as a solicitor in relation to the acquisition by Regent of No 24.

98.  As Sir Sydney observed, the facts going to a reasonable apprehension of conflict in the *Marks & Spencer* case, rehearsed by Lawrence Collins J in paragraphs 8 and 19–14 of his judgment, are an instructive comparison and support Regent's argument on this issue, namely that Mr Conway should have disclosed to Regent the full extent of his personal interest and/or intentions in respect of No 24 *and* should have advised it to take independent legal advice if he was to continue acting for it on the sale of No 32. Properly directed, it would, in my view, have been open to the jury to take the view that Mr Conway was not entitled to ignore that information and Regent's interests in that transaction, thereby enabling him, as a trusted confidant and adviser in relation to the sale of No 32 to put himself in a position where he stood to gain an unfair advantage over Regent in relation to No 24.

*iii) Informed consent*

99.  Regent contend that the Judge wrongly left to the jury the issue of informed consent and that he should have directed them that he had put himself in a position of inevitable conflict between his interest and duty in bidding against Regent for No 24 whilst acting for them on No 32. This is a complaint that goes both to issues of breach of fiduciary duty and of a duty of confidence. Sir Sydney submitted that it was plain on the evidence that Regent had not given fully informed consent to Mr Conway acting for them in relation to No 32 and against them in relation to No 24.

100.  Mr Conway's case is that Regent had known from at least September that he had a personal interest in acquiring some interest in No 24 and that if and to the extent that that he had a fiduciary duty or one of confidence to Regent in respect of No 32 and/or in respect of No 24, Regent by their conduct consented to his bidding regardless of such duty. He relied principally upon his account, which Mr Karmel denied, of having told him in a telephone conversation shortly after the weekend of 23rd/24th September 2000 that he intended to bid for No 24 and that, as he was acting for Regent on the sale of No 32, Mr Karmel should not talk to him of Regent's intentions for No 24 (see paragraph 27 above).

101.  Sir Sydney referred to the absence of any attendance note of Mr Conway in respect of that conversation or of any other direct evidence to support Mr Conway's account of it. And he argued that, even if that account was true, it fell far short of information on which a jury could find that Regent, by their inaction in the matter, gave fully informed consent to Mr Conway bidding against them. He referred the Court to the words of Upjohn LJ in *Boulting v ACTAT [1963] 2 QB 606, CA* , at 636, that, to give fully informed consent, the person entitled to the benefit of the rule must:

> "fully understand … not only what he is doing but also what his legal rights are, and that he is in part surrendering them."

© 2023 Thomson Reuters.

He mentioned, by way of example, that it was no part of Mr Conway's case that he had explained to them: 1) the impact his competing bidding on No 24 might have on the existing retainer for No 32; 2) the risk that he would come into possession of confidential information in the course of his retainer on No 32 which was or might be relevant to his own bid for No 24; 3) the risk that he might otherwise put himself in a position of actual or potential conflict between his duty and his interest; and 4) what Regent's legal rights were and whether they should seek independent legal advice. In short, Sir Sydney maintained that Mr Conway should have disclosed his personal interest in No 24 with complete frankness and should have advised Regent to take independent legal advice if he was to continue acting for them on No 32.

102. All of those comments were no doubt valid points to make to the jury, and I have no doubt that they were made. However, in the light, particularly of Mr Conway's account of his conversation with Mr Karmel in September 2000 and, if true, its undoubted significance to men of Mr Karmel's and Mr Ratiu's experience in property dealing in the area, I cannot say that the Judge was not entitled to leave this issue to the jury. Nor can I say, having considered the Judge's various directions on the issue, that they were deficient or so deficient as to amount to material misdirections. On the contrary, in my view, the Judge's directions on the law and respective cases of the parties on this issue were correct and appropriate.

**Duty of confidence**

*iv)a) The extent of relevant confidential information imparted to Mr Conway*

103. The fourth main issue is two-fold, namely whether the Judge wrongly directed the jury: (a) that Mr Conway had only minimal, if any, relevant confidential information and (b) that it was for Regent to prove that he had misused it.

104. The main thrust of Regent's case is that they imparted information to Mr Conway in the course of their solicitor-client relationship that included confidential information, and that he actually misused it. Their concern was about his response, in seeking to re-open his bidding for No 24, to Mr Karmel's information to him on 5th December of Eyre's acceptance of Regent's unconditional offer. However, they also complained that he had other confidential information that was or might have been relevant to his bidding tactics for No 24, namely: as to Mr Karmel's personal finances and those of Regent, in particular as to when and the amount in respect of which its borrowing would be redeemed and funds released on Pristbrook's sale of No 32; as to the particular characteristics and development potential of No 32 that were similar to those of No 24; as to the extent of the market interest in No 32 and of the price and profit margin on its re-sale; and as to information given by Mr Karmel in September 2000 of Regent's £3.75m offer for No 24 (see paragraph 23 above) and as to Regent's plans for it.

105. Mr Conway's case is that there was no substance in Regent's complaint about the Judge's directions, whether in relation to Regent's or Pristbrook's interests in relation to No 32 or to Regent's interests in relation to No 24. Mr Tager, on his behalf, acknowledged that there could conceivably have been a risk of his having come into possession of confidential information in the course of his retainer on No 32 that might have given him an unfair advantage in his bidding tactics for No 24, but none was apparent on the evidence. And he maintained that the Judge directed the jury correctly on the law and on its application to each piece of information alleged by Regent to have been confidential and imparted to Mr Conway in circumstances imposing a duty of confidentiality and on the issue of his alleged misuse of it.

106. The scope of the solicitor's duty not to use his client's or prospective ( *Minter v Priest [1930] AC 558, HL* , per Lord Atkin at 581 and 584) or former client's, confidential information for his own benefit is included in the following proposition of Lord Millett in *Bolkiah* at 235G–236A:

> "Whether founded on contract or equity, the duty to preserve confidentiality is unqualified. It is a duty to keep the information confidential, not merely to take all reasonable steps to do so. Moreover, it is not merely a duty not to communicate the information to a third party. It is a duty not to misuse it, that is to say, without the consent of the former client to make any use of it or to cause any use to be made of it by others otherwise than for his benefit. The former client cannot be protected completely from accidental or inadvertent disclosure. But he is entitled to prevent his former solicitor from exposing him to any avoidable risk; …".

© 2023 Thomson Reuters.

107.  The Judge correctly directed the jury that a duty of confidence arises when the information is confidential, as distinct from being a matter of public knowledge or record or generally accessible, and imparted in circumstances in which the recipient knows or agrees that it is confidential. He also told the jury that such a duty is only breached where the recipient of the information makes some unauthorised use or disclosure of it for the benefit of another client or for himself that either does or might harm the client. He said:

> "Information which is confidential and which a client or prospective client gives to a solicitor will almost always be given in circumstances where a duty of confidence arises. If the solicitor agrees to act for the client, that duty of confidence will be part of the agreement, even if nothing is actually said about it. …
>
> But suppose the solicitor does not agree to act for the client, what then? … Normally, it makes no difference at all if the solicitor does not agree to act for the client; the circumstances will normally still give rise to a duty of confidence on the part of the solicitor. …. I say 'normally' because I am referring to the situation when a person speaks to a solicitor in order to obtain the solicitor's assistance on a professional matter. The defendants say that that is this case. But Mr Conway says that that is not this case.
>
> Mr Conway says that when Mr Karmel rang him up, on 5th December, Mr Karmel already knew that Mr Conway could not possibly act as the defendant's solicitor because of his conflict of interest as a rival bidder …
>
> What Mr Karmel knew and what he intended are matters of fact which are strictly for you, the jury, to decide. So far as the law is concerned, I can best express it in this way: the test is what a reasonable person in the position of Mr Conway would have understood. If the circumstances on 5th December were that any reasonable person standing in the shoes of Mr Conway would have realised that Mr Karmel was giving him information in confidence, then that would suffice to impose on Mr Conway an obligation of confidence."

108.  As to unauthorised mis-use of confidential information, the Judge directed the jury as follows:

> "… Mr Conway's expertise was built up by acting for many different clients over a number of years. The law permitted Mr Conway to use information from various clients to add to his general stock of knowledge and experience. …
>
> … Some confidential information remains confidential for a lifetime or more but other confidential information is only confidential for a very short period. So, what Mr Karmel told Mr Conway in September may perhaps have been confidential when Mr Karmel told it Mr Conway in September; it does not necessarily follow that that it was still confidential in December. …
>
> … Of course, the mere fact that other people might know of the information by December does not automatically mean that Mr Conway would be released from any obligation of confidence. A solicitor cannot use confidential information to get a head start over other members of the public but, if there was something that Mr Karmel told Mr Conway in confidence in September, but which was all over the papers in December, then, in December, it will have lost its character of confidential information.

© 2023 Thomson Reuters.

On the other hand, if some members of the public would know the information in December, the fact that Mr Conway learnt it from Mr Karmel in September could still mean that Mr Conway is or was prevented from using it the information, even though other members of the public, who were not solicitors, were free to use it.

In this case, it is not just what was in the Estates Gazette, or in some other newspaper or what was used in a Valuation Tribunal, that might prevent certain information being confidential in December. As you have heard, there are official registers relating to land matters, it is also possible to get certain information from planning authorities if you ask. …

… if there is any information, whether it be about compulsory purchase orders or planning or sale prices of property which is being sold, which appears in any of these official records or registers or other sources of information which solicitors normally consult when they act for a prospective buyer, then none of that information can continue to count as confidential information, for the purposes of the present case, once it becomes accessible on the public register or from the Planning Authority as the case may be."

109.  As to the early passage in that direction that confidential information acquired by Mr Conway could be added to his general stock of knowledge and experience, which he was free to use, Mr Karmel and Mr Ratiu both accepted in evidence that one of the reasons for their instruction of Mr Conway on the purchase and sale of No 32 was his experience and knowledge gained of property transactions in the area.

110.  Sir Sydney submitted that principles developed in cases involving employees, where there is a real interest in ensuring that there is no restraint on trade, cannot be applied in the same way in the context of information acquired during a solicitor-client relationship. He maintained that, whilst Mr Conway was entitled to add confidential information to his general stock of knowledge and experience, he was not entitled to use specific information acquired in the course of his professional relationship with the appellants against their interests.

111.  Similarly, in relation to the Judge's direction that information, which is or becomes a matter of public record would not be considered 'confidential', he submitted that the courts will not allow a person to use information given to him in confidence as a "spring-board" for activity detrimental to the person who imparted it, and then excuse his breach of confidence by simply finding other ways to discover what he has already learnt from the client in confidence, citing Lord Denning in *Seager v Copydex [1967] 1 WLR 923, CA* , at 931, and Shaw LJ in *Schering Chemicals v Falkman [1983] QB 1, CA* , at 28. However, as is apparent from the third paragraph of the Judge's direction, he made that important qualification.

112.  Later in the Judge's summing-up, when dealing with the evidence going to a continuing relationship of trust and confidence after September 2000 arising from the past solicitor relationship with Regent, he repeated what he had already indicated:

"But that does not resolve the question whether there was any confidential information because as I say information does not become confidential simply because you tell it to your solicitor. It has to be confidential in the first place.

Sir Sydney cited that remark in support of his general complaint that the Judge did not have sufficient regard to the special features of the solicitor-client relationship here. He maintained that the Judge should have directed the jury that Mr Conway was under a duty to keep confidential *all* information that he acquired in the course of his relationship of trust and confidence with Regent, which was more than merely trivial, untrue or obviously public knowledge.

113.  Mr Tager submitted that Sir Sydney had cast the notion of confidentiality too widely in his submissions and that on the facts of this case there was no evidence that Mr Conway had received any relevant confidential information when acting initially for Regent and then for Pristbrook on the purchase of No 32. He noted, in particular, that the purchase price of £1.2 m

for No 32 had been in the public domain from June 2000 (see paragraph 18 above). And he argued by reference to the history of the matter that there was no evidence of any information imparted by Regent to Mr Conway of a confidential nature in relation to No 32 or otherwise that could have had any bearing on his bidding tactics for No 24, certainly before Mr Karmel's telephone call to Mr Conway on 5th December 2000.

114.  The critical question, which is essentially one of fact in each case, is, as Lord Denning MR put it in *Seager v Copydex*, at 931E–F, whether the information is used for the purpose of taking unfair advantage.

115.  I need not detail Mr Tager's submissions as to the presence or absence of confidentiality of information imparted to Mr Conway and as to the adequacy of the Judge's directions to the jury on it. In my view, in the passages from the his directions that I have set out, he correctly and adequately identified their task. And in his treatment of the evidence going to Regent's evidential candidates for relevant confidential information that they alleged Mr Conway had misused or had been at risk of misusing, I consider his directions to have been realistic and, where critical of Regent's case, not to have been unfair.

*iv)b) Burden of proof as to misuse of confidential information*

116.  The Judge directed the jury that, even if Regent established that Mr Conway had been in possession of relevant confidential information, they could only succeed if they also established that he had in fact used it for his own benefit. He said:

> "There is nothing wrong in Mr Conway having confidential information if he did not, in fact, use it for his own benefit. It is the use for his own benefit without … [Regent's] consent which is the first unlawful act which he is accused of having committed."

117.  Sir Sydney submitted that this direction was wrong in law for two overlapping reasons.

118.  The first was that, absent informed consent, possession of relevant confidential information was an absolute bar to Mr Conway competing personally against Regent on the purchase of No 24. He maintained that proof by Regent of Mr Conway's unauthorised use of such information was not required; risk of it was sufficient to establish Regent's defence of justification. He said that Mr Conway could not assert that that there was no real risk of unauthorised use, since the information was in his personal possession, and he could not put it out of his mind. He prayed in aid the reasoning of Lord Millett in *Bolkiah*, at 235G 236A, 236F–H and 237A, that the duty encompassed the avoidance of risk or perception of risk that a former professional confidence may be abused:

> "Whether founded on contract or equity, the duty to preserve confidentiality is unqualified. It is a duty to keep the information confidential, not merely to take all reasonable steps to do so. Moreover, it is not merely a duty not communicate the information to a third party. It is a duty not to misuse it, that is to say, without the consent of the former client to make any use of it or to cause any use to be made of it by others otherwise than for his benefit. The former client cannot be protected completely from accidental or inadvertent disclosure. But he is entitled to prevent his former solicitor from exposing him to any avoidable risk; and this includes the increased risk of the use of the information to his prejudice arising from the acceptance of instructions to act for another client with an adverse interest in a matter to which the information is or may be relevant." …

> "It is … difficult to discern any justification in principle for a rule which exposes a former client without his consent to any avoidable risk, however slight, that information which he has imparted in confidence in the course of a fiduciary relationship may come into the possession of a third party and be used to his disadvantage. …

> … the risk must be a real one, and not merely fanciful or theoretical. But it need not be substantial. …"

© 2023 Thomson Reuters.

119. As Sir Sydney submitted, adverting to an earlier passage in Lord Millett's reasoning in *Bolkiah* , at 234 F–G, the essential issue was whether there was a real risk of the two transactions having an impact on one another and/or whether there was a real risk that Mr Conway would acquire relevant confidential information:

> "… In the course of argument, however, … [counsel for Prince Jeffri] modified his position, accepting that there was no ground on which the court could properly intervene unless two conditions were satisfied: (i) that the solicitor was in possession information which was confidential to the former client and (ii) that such information was or might be relevant to the matter on which he was instructed by the second client. This makes the possession of relevant confidential information the test of what is comprehended within the expression 'the same or a connected matter'. On this footing the court's intervention is founded not on the avoidance of any perception of possible impropriety but on the protection of confidential information.
>
> My Lords, I would affirm this as the basis of the court's jurisdiction to intervene on behalf of a former client. …"

120. Sir Sydney added that, in circumstances where the evidence showed that Mr Conway had recurring doubts as to his professional position, a conflict of interest could not be dismissed as a mere "fanciful or theoretical possibility". The duty, as Lord Millett went on to emphasise in *Bolkiah* , at 235D–236A, is strict and the burden of proof on the party complaining of breach is not heavy.

121. Sir Sydney's second criticism of the Judge's direction on this issue, which is really a corollary of the first, is the rule derived from a broader, but clearly applicable, proposition of Lord Penzance in *Erlanger v New Sombrero Phosphate (1878) LR 3 App Cas 1218* , at 1229–1230, and recently applied by Morritt LJ (as he then was) to alleged misuse of confidential information in *United Pan-Europe Communications NV v Deutsche Bank AG [2000] 2 BCLC 461* , at para 34, that, where a fiduciary relationship between parties may be the occasion of unfair advantage to one of them, the burden of proof lies on that party to show that he has not used that advantage for his own benefit. Sir Sydney espoused that approach, as affording the client protection against the unfair advantage inherent in, or derived from a former, fiduciary relationship, and because, in practice, there is no way of the client telling what may or may not have carried weight in the solicitor's mind.

122. The matter is one of perception as well as substance; per Megarry J in *Specot v Ageda [1973] Ch 30* , at 47, and per Lord Millett in *Bolkiah* , at 236. This is particularly so where the solicitor is confronted by the potential conflict between his personal interest and his duty to his client; per Lord Walker of Gestingthorpe in *Hilton v Barker Booth* , at para 41:

> "… if a solicitor puts himself in a position of having two irreconcilable duties … it is his own fault. If he has a personal financial interest which conflicts with his duty, he is even more obviously at fault. …"

123. Sir Sydney, on the strength of those authorities, submitted that not only had the Judge wrongly reversed the burden of proof in directing the jury that, unless Regent proved actual misuse, Mr Conway had done nothing wrong, but he had also wrongly imposed on Regent an obligation to prove actual misuse in order to succeed in their defence of substantial justification. As to the burden of proof — or lack of it — he drew from Lord Millett's observations in *Bolkiah* at 235C–236A and 237A and F–G and those of Lord Hope at 226H–227A, the proposition that where confidentiality of information obtained in a fiduciary relationship, say by a solicitor, is at risk of misuse after the termination of that relationship by the

former fiduciary, it is a breach of his duty of confidentiality to put his former client at risk of the confidential information being used against him by himself or another.

124.   However, it should be borne in mind that those observations of high judicial authority, however generally expressed on the duty of confidentiality, arose in the context of injunctive relief. The issue before the jury was not whether Regent needed protection against Mr Conway's misuse or possible misuse of their confidential information or a remedy, say in the form of damages or an account against his having done so; it was whether Regent's libellous defamatory allegation of misuse, could be justified.

125.   Mr Tager acknowledged that, if Mr Conway had been in possession of relevant confidential information, Regent might be able to justify what would otherwise be a libel on its facts in *Bolkiah* terms as a case of breach of confidentiality by the solicitors. But, he submitted, such an avenue was not open to Regent in this case, because their letter of 6th December 2000 did not accuse Mr Conway of having had confidential information where there was a risk of misuse, but that he had misused confidential information. On that aspect, to which I return in paragraph 131 of this judgment, he maintained, it seems to me with appropriate focus on the issue arising on the appeal, that the Judge's direction was correct.

126.   Secondly, and in any event, Mr Tager argued that, as Mr Conway had not been retained by Regent at the time of his bid for No 24, he owed no fiduciary duty to Regent in relation to that property, and, therefore, there could be no presumption of misuse in the absence of proof to the contrary. The rule in *Erlanger* , he submitted, was predicated on the existence of a fiduciary relationship. It was, of course, for the jury to determine whether there had been a fiduciary relationship between Mr Conway and Regent at the material time and whether he had received any confidential information in the course of that relationship.

127.   In most instances litigation involving the giving and possible misuse of confidential information is likely to arise out of a fiduciary, or alleged fiduciary, relationship, whether or not continuing — and that is the context of the issue arising in this case. In the course of his directions the Judge dealt with both fiduciary and non-fiduciary confidences, not always differentiating between the two circumstances. In his directions giving rise to this complaint, he was focusing on the duty of confidence. But he had earlier given them the direction that I have set out at paragraph 76 of this judgment of what might be described as a continuing "free-standing fiduciary relationship" as a back-drop for considering the existence of a duty of a breach of confidence and its breach, so as to attract the *Erlanger* principle. Given that direction, it may be that he should have gone on to direct the jury in the manner suggested by Sir Sydney.

128.   However, as I have said the main thrust of the allegation in the letter of 6th December 2000 was that Mr Conway had "used confidential information obtained through a solicitor/client relationship", not that he put himself in a position where he might have used it or was at risk of using it, conduct which, in my view, the Judge was entitled to put to the jury as possibly more serious than putting himself at risk of misusing it.

129.   Nevertheless, Sir Sydney submitted that the Judge should have directed the Jury that, on the undisputed evidence, Mr Conway was precluded from bidding on No 24 by possession of confidential information obtained in the course of his solicitor/client relationship with Regent, which was or might have been relevant to his bidding for No 24 and which: (i) he could not put out of his mind or (ii) which it was impossible for him to rebut the presumption that he had made some use of it. The information to which he referred was of: Regent's finances; characteristics of No 32 similar to those No 24; the re-sale value of No 32, in particular the price and profit margin on its re-sale and the extent of market interest in it; Regent's September 2000 offer for No 24 of £3.75m; Regent's plans for No 24 conveyed by Mr Karmel to Mr Conway in September 2000; and Mr Karmel's information to Mr Conway on 5th December 2000 of Regent's successful bid for No 24.

130.   Mr Tager submitted that none of those matters was truly confidential information in the context of this case and that there was, in any event, no evidence that Mr Conway had in his bidding for No 24 misused it or, if it is the test, was at risk of misusing it. As to evidence of actual misuse, he added that, even if Mr Conway had such or other relevant confidential information, whether the jury could infer his misuse of it in the absence of evidence to the contrary was a matter of fact for them whether each item relied upon was confidential and, if so, whether Mr Conway misused it. He relied upon the Judge's reminder to the jury of each item of information relied on by Regent as confidential.

131.   In my view, on the issue of misuse that Regent seeks to justify, it was not critical to the outcome that the Judge did not direct the jury in broader terms as to the risk of misuse arising from possible confidences imparted in relation to No 32 and other earlier matters. The true sting of the libel was of finer focus, namely that on 5th December 2000 Mr Conway, by seeking

© 2023 Thomson Reuters.

to outbid Regent for No 24, actually misused confidential information imparted to him by Mr Karmel on the telephone that day of Eyre's acceptance of Regent's bid.

**Meaning and Justification**

*vi) the possible meanings of the letter of 6th December for justification*

132.  Regent accepted at trial that the letter of 6th December 2000 was defamatory in its allegation of breach of duty by Mr Conway to Regent, but sought to justify it. One of the important issues was the meaning or the meanings of the allegation which it sought to justify. But, regardless of the possible meanings, since they all related to breach of duty to Regent, the Judge, as I have said, effectively destroyed Regent's defence of justification to the extent that it depended on a fiduciary relationship with Regent, by directing the jury that, as a matter of law, the only fiduciary duty he had had was to Pristbrook, not Regent. Similarly, his associated direction that Mr Conway was entitled to use Regent's relevant confidential information provided it was not likely to cause any harm to his client's, namely Pristbrook's, interests and that there had been no suggestion of any harm to Pristbrook's interests in relation to No 32, all but destroyed Regent's defence of justification insofar as it depended on breach of confidence. It follows that the considerable debate before the jury as to precisely what meaning or meanings were to be attributed to the letter for the purpose of considering Regent's defence of justification was, given those directions, largely academic.

133.  However, as so much time was given to the question in the appeal, I shall, in deference to the arguments, examine it in this judgment, albeit shortly.

134.  The Judge left to the Jury three possible meanings of the allegation in the letter of 6th December 2000, the first two of which Regent accepted, the third of which they did not seek to justify. They were:

i)  breach of Mr Conway's legal and professional duties to Regent ("the broad meaning");
ii)  misuse for his own benefit of confidential information arising out of a solicitor-client relationship with Regent in respect of No 24 ("the narrow meaning"); and
iii)  misuse of confidential information arising out of a solicitor-client relationship with Regent on No 24 established on 5th December, relating to *the amount* of Regent's successful offer for No 24 ("the very narrow meaning"), pleaded by Mr Conway in his amended particulars of claim in the following terms:

> "the … words in their natural and ordinary meaning meant and were understood to mean that the Claimant had been informed by or on behalf of Regent that the Trustees had accepted an unconditional offer for the Site from Regent and of the amount of the offer, and had agreed to act for Regent in relation to Regent's purchase of the Site from the Trustees; that he had then used that information to put in a higher offer than that made by Regent and accepted by the Trustees; and that by so doing he had acted in breach of confidence and/or in breach of his professional duty as a solicitor and/or in breach of fiduciary duty in bidding for the Site …"

135.  The Judge, in his guidance to the jury on the issue of meaning took his line from the analysis of Eady J, approved by this Court in *Gillick v Brook Advisory Centres [2001] EWCA Civ 1263* , at para 7. He said:

> "… The meaning you have to decide upon is the meaning that a reasonable person in the position of the person receiving the letter would have understood.
>
> The meaning of the words depends … partly on their context. You have to take the context into account whenever you try and understand what somebody is saying. It is not just the literal meaning of what a person says; the meaning includes what an ordinary reasonable reader would conclude as he reads the letter.

Of course, the ordinary reasonable reader of this letter would be, and no doubt was, a busy person with a job to do. A man like Mr Briant, or Mr Johnson for that matter, would not spend days discussing the letter as we have. The ordinary reasonable reader might not even go through the letter sentence by sentence as you have heard both counsel doing in this case more than once. But you may think that the reasonable reader would probably read this particular letter once or twice or more. You may think that he might pay more attention to it than he might pay to other business letters because the letter makes serious accusations against a solicitor who the reader knew personally; and also because the letter might affect the sale of some very valuable property which the reader was attempting sell to the highest bidder.

You are a jury, have special expertise here that we lawyers do not have. … reasonable readers … are ordinary members of society. They will use their common sense. They will not be unduly suspicious, but they will not be naïve either. They will be fair-minded, but they will not be treating the letter as an exam question. They may just absorb the gist or message of the letter in general terms. They may get the broad impression which may not be the same as the result of a line by line analysis assisted by lawyers.

They will not be avid for scandal, but neither will they be looking for the most charitable interpretation they can find."

136. Regent maintain, that the Judge wrongly left to the jury the question whether the letter had the very narrow meaning, namely breach of confidence arising out of a solicitor-client relationship as to the *amount* of Regent's December 2000 offer — the meaning that Regent did not seek to justify. This is how the Judge put the matter to the jury:

"One of the main differences between the two sides in this case is: did the words complained of accuse Mr Conway of misusing information about the price which Regent … had bid on 5th December? … [Regent] say the letter does not mean that. Whether or not the letter does mean that of course is crucial to what you have to decide.

It is important because … Regent accept they cannot prove, indeed have never alleged, that Mr Conway ever knew or misused information as to the amount which … [they] had bid on 5th December, communicated to him on 5th December by Mr Karmel. Mr Karmel accepts and says that on 5th December he did not tell Mr Conway the figure at which they had put in their bid. …

… You have to ask yourselves: does the letter mean that Mr Conway had been told a figure by … [Regent] at all? What happens if you think the letter means that Mr Conway did know and misuse confidential information about the figure that … Regent had bid on 5th December? Would it help … [Regent] if they could prove that he had misused a figure given in September?

What a defendant has to prove is that the gist of the libel is true. The law allows some leeway for exaggeration and inaccuracy of detail but the leeway for exaggeration and inaccuracy of detail is limited. If you think that … [Regent's] letter means something more than what … Regent can prove, it is for you to decide whether or not that difference is an unimportant detail or whether what … [Regent] cannot prove is a further allegation of much more gravity than what they can prove."

137. Regent maintain that the letter, which is in plain terms, did not state that they had told Mr Conway the amount of their successful bid, and that the imputation that the letter was to be read as having that meaning was not a reasonable interpretation of it and should not have been left to the jury. They also maintained at trial that the letter was not to be read as meaning that

Mr Conway had agreed to act for Regent in relation to their purchase of No 24, but seemingly do not complain in the appeal about the Judge having left that part of the meaning to the jury.

138. Mr Conway's case on the third and very narrow meaning is that it was a reasonable meaning to leave to the jury since the making of an offer by Mr Conway could have had no effect unless it exceeded Regent's offer.

139. In support of Regent's construction, Sir Sydney referred to the well-established canons of construction in defamation that where there are a number of possible interpretations, the hypothetical reasonable reader should not be taken as seizing upon the worst one: (see *Capital & Countries Bank Ltd v George Henry (1882) 7 App Cas 741* and *Nevill v Fine Art & General Insurance [1897] AC 68, HL* ) and that such a person is a fair minded one, who resists jumping to conclusions (see *Lewis v Daily Telegraph [1964] AC 234, HL* ).

140. Alternatively, Sir Sydney argued that the very narrow meaning could not have materially injured Mr Conway's reputation if he was, in fact, guilty of unprofessional conduct by bidding against his clients when he was also in possession of other relevant confidential information acquired in the course of a fiduciary relationship, information, given that relationship, which the law presumes him to have misused in the absence of proof to the contrary. On that approach, he maintained that it did not matter whether the letter was reasonably capable of meaning that Mr Conway had misused information as to the amount of Regent's offer for No 24 in December 2000, since, given their acceptance that the letter was defamatory, the primary reason why the jury was being asked to determine its meaning was to decide whether it was substantially justified. Sir Sydney observed that it would have been perverse of the jury to find that the letter was not substantially justified if Regent established that Mr Conway had misused relevant confidential information obtained through a solicitor-client relationship, though not such particular piece of confidential information. He thus argued that the core allegation remained the same, namely misuse of confidential information arising out of a solicitor-client relationship in respect of No 32 or in the discussions about No 24 in September 2000, for the solicitor's own benefit, i.e. meanings i) and ii), a very serious breach in itself of a solicitor's legal and professional duties.

141. By contrast, Sir Sydney complained, the Judge invited the jury to treat the letter as a sort of puzzle, and adopt a lawyer's analytical approach to the letter, dissecting each phrase one by one with a view to construing it as if it were a contract. Such an approach, he maintained, was highly prejudicial to Regent, given that they had not attempted to justify the very narrow meaning of the letter.

142. Sir Sydney made a number of other mostly marginal criticisms of the Judge's directions on justification, which, he maintained, misled them as to how they should approach the issue of substantial justification. These included a direction that the jury could consider an allegation of actual misuse of confidential information as more serious than one of a risk of such misuse or of creating a conflict of interest, and a direction to consider as a possibility that the letter would not be substantially justified because of the untrue allegation in it that Regent had contacted the Law Society about Mr Conway's conduct. In my view, there is no substance in either of those criticisms.

143. An allegation of actual misuse of confidential information may, depending on the circumstances, be more serious than creating a risk of such misuse or acting in breach of fiduciary duty not involving confidential information. The Judge, in the way he put the matter to the jury, left them to consider whether that was so in this case.

144. As to the possible effect of the untrue reference in the letter about Regent having contacted the Law Society about Mr Conway, I do not read the Judge's short reference to it in his directions to the jury as an invitation to them to treat it as of such importance that it could preclude substantial justification, quite the reverse. He commented:

> "… If you think that the bit about contacting The Law Society is an unimportant detail, then you will go on to consider whether the defendants have proved that Mr Conway did misuse any other confidential information or otherwise act in breach of his duties as a solicitor."

145. In any event, it is difficult to see how the jury, in rejecting Regent's defence of justification could have concluded that the allegation that Regent had reported to the Law Society the very conduct alleged in the letter materially added anything to

© 2023 Thomson Reuters.

the seriousness of the allegation, though it could have been relevant on the issue of malice and/or of quantum of damages. If Regent succeeded in justifying its allegation, a complaint to the Law Society would have been justified.

146. However, I have some sympathy with Regent's main complaint of what might be called "salami-slicing" by the Judge in the way in which he invited the jury to approach the variously pleaded allegations of meaning of the libel on behalf of Mr Conway. Notwithstanding the conventions of pleading that survive in this area of the law, I agree with Sir Sydney that it would have been more realistic and helpful for the Judge to have concentrated on the core of the complaint contained in pleaded meanings i) and ii) and that recourse to the "frills" in alleged meaning iii) was likely to add little but complication on the central question whether Regent had *substantially* justified their allegation. Nevertheless, I would not on this ground alone, set aside the jury's verdict. As I have said, it contains a far more serious flaw flowing from the Judge's direction that, as a matter of law, such fiduciary duty as Mr Conway had to Pristbrook, not Regent, which is ground enough for setting aside the verdict on justification.

**Malice**

147. The Judge ruled that the letter of 6th December was protected by qualified privilege, a ruling that Mr Conway has not challenged. However, the Judge went on to give directions on malice, which Regent complain wrongly removed that protection. He put two questions to the jury under this head. The first was whether Mr Ratiu and Mr Karmel, in respectively sending and authorising the letter, were "acting out of malice in the legal sense", to which the jury's answer was "yes". The second was whether Mr Ratiu sent the letter "with the motive of getting an economic or material gain in the belief that … [Regent] would be better off financially if they violated Mr Conway's rights than if they did not violate … [his] rights", to which their answer was "no". So, wherever the jury found malice it could not have been on their answer to the second question.

148. There are two parts to this head of appeal. The first is whether the Judge should have withdrawn the issue from the jury on the ground that there was insufficient evidence on which a reasonably minded jury, properly directed, could find it, an issue not raised by Regent at the trial. The second is whether he wrongly directed them on the law on their approach to the evidence going to the existence of malice.

149. Regent maintain that the Judge, having wrongly left the issue of malice with the jury, seriously misdirected them by failing to make clear that malice did not turn on the objective meaning of the letter, as found by them on the question of justification, but on the subjective meaning intended by Regent, in particular in relation to the very narrow meaning, which was in issue and which Regent had not attempted to justify.

150. As to the adequacy of evidence of malice, Mr Conway's case is that it lies ill in the mouth of Regent to complain of the Judge leaving the issue of malice to the jury when it did not seek to persuade him at trial not to do so, and that, in any event, there was substantial evidence of malice for their consideration. He also seeks to support the Judge's direction on the issue as accurate and fair, in particular as an issue only to be addressed if the jury were against Regent on justification.

151. It was for Mr Conway to prove malice. The question is whether there was sufficient evidence on which a reasonably minded jury, properly directed, could find it proved — adopting and adapting May LJ's succinct formula in *Alexander v Arts Council of Wales [2001] 1 WLR 1840, CA* , at para 42, "whether there [is] any evidence, taken at its highest, on which a jury properly directed could properly infer that … [Regent] subjectively did not honestly believe that what … [it] intended to say in the … [letter] was true". Such a proposition, as May LJ noted in para 32 of his judgment in that case, is of a piece with the assertion in the 8th edition of Gatley on Libel and Slander , (1981), para 795, cited with approval by this Court in *Telnikoff v Matusevitch [1991] 1 QB 102, CA* , at 120, that a "[p]laintiff must adduce probability of malice at least".

152. Where defences of justification and qualified privilege are both in play, the meaning of the alleged defamatory words on the issue of justification is objective and the defendant's intended meaning on the issue of malice as a counter to the defence of qualified privilege is subjective. A judge, in his directions to the jury, should make that distinction, and he should keep to

it in his treatment of the evidence and inferences capable of being drawn from it. Hirst LJ emphasised the importance of this in *Loveless v Earl [1999] EMLR 530* , at 538–9, in the following terms:

> "… it is very important to contrast the test for meaning on the one hand and the test for malice on the other. Meaning is an objective test, entirely independent of the defendant's state of mind or intention. Thus, in a case where words are ultimately held objectively to bear meaning A, if the defendant subjectively not meaning A, and honestly believed meaning B to be true, then the plaintiff's case on malice would be likely to fail."

*vii)a) Whether the Judge should have withdrawn the issue of malice from the jury*

153.  Mr Tager, in his conduct of Mr Conway's case at trial, put at the centre of his case on malice a "dirty trick" allegation, namely that Regent wrote and sent the letter of 6th December 2000 to Eyre with the intention of securing No 24 at £3.75m without having to raise their bid in response to Mr Conway's renewed bidding and, for the purpose, to blacken his name. This allegation, which Mr Tager repeated many times in his addresses to the jury, became the subject of the two questions of the Judge to the jury to which I have referred. This is how the Judge introduced the issue to the jury:

> "The real issue … was Mr Karmel genuinely ringing Mr Conway as a prospective client ringing a prospective solicitor? If he was, then the information that Mr Karmel was giving, namely that he had done a deal with … Eyre … would, you may think, be fairly classic confidential information.
>
> On the other hand if Mr Karmel was not genuinely ringing as a prospective client, but was ringing because he knew that Mr Conway was a rival bidder and he wanted to knock him out using this dirty trick, if that was what the position was then you may conclude that the information was not genuinely being given in a solicitor/client relationship at all, but was being given by one competitor trying to knock out another by unfair means.
>
> …
>
> … If there was trickery and deception … Eyre … would have been tricked out of the chance of getting more than £3.75 million for their property at number 24. So, you will bear the context of all this in mind. The question is whether or not Mr Karmel was calling Mr Conway because he genuinely wanted Mr Conway to act as a solicitor, or because he wanted to knock him out as a competing bidder, and that is a question of fact which is for you to decide."

154.  Such a formulation, suggesting dishonesty on the part of Mr Karmel in making the telephone call, in fact formed little or no part of Mr Conway's case or Mr Tager's presentation of it at trial, save as a broad suggestion from the latter that there had been "a dirty trick from beginning to end". But, the Judge, in directing the jury on the "dirty tricks" allegation, as it had been put at trial by Mr Tager on behalf of Mr Conway, characterised it as a suggestion that Mr Karmel, telephoned Mr Conway on 5th December 2000 to force confidential information on him so as to disqualify him from bidding for No 24. The Judge's version appears to have had its origin in speculation by Mr Conway, in his evidence, as to a possible alternative reason for Mr Karmel's telephone call to him, but it was an alternative that Mr Tager never put to Mr Karmel in his extensive cross-examination of him.

155.  Sir Sydney submitted that there was no evidential support for either version of the "dirty trick" allegation. He suggested that the Judge's version of it was also highly improbable for a number of reasons, but in particular that Regent had already

reached an oral agreement with Eyre, and were hardly likely to have contacted anyone whom they regarded as a potential competitor at that stage who might seek to gazump them.

156. The Judge, in his directions to the jury in the context of justification, had described Regent's argument that Mr Conway must be taken to have misused confidential information as being "without an explanation from Conway … a strong argument", namely that he must be taken to have misused confidential information, given that he had put in a bid of only £50,000 higher than that of Regent shortly after Mr Karmel had told him of Eyre's acceptance of Regent's offer. The only explanation since proffered by Mr Conway, Sir Sydney observed, was that he had had an incremental bidding strategy that involved continuing to raise his bids after the bidding had closed. However, he pointed out that there was no evidence that Regent knew or could have known of that strategy when they wrote the letter, so it could not possibly displace the strong argument of their honest belief in it. The Judge's comment in his directions to the jury at this point that they might find Regent's case on malice as "rather difficult to follow" was, as Sir Sydney stressed, only because he was testing Regent's case on malice by reference to a meaning that they may not have intended (see paragraphs 166–167 below).

157. Sir Sydney also referred to the fact that it was common ground on the evidence that Mr Conway contemplated up to and including the telephone call from Mr Karmel on 5th December that he might be instructed to act for Regent on the purchase of No 24 if Regent secured the site. In answer to a question in cross-examination whether he should have competed against Regent on No 24 whilst contemplating that he might ultimately accept instructions from them to act as a solicitor in respect of it, he said: "excuse me, even if I had been prepared to ride two horses, so what". If Mr Conway had contemplated (as he had done) that he might be instructed once he had lost the biding, why, Sir Sydney asked, should Regent not seek to instruct him when they had won it?

158. As to a suggestion by the Judge to the jury that they could, if they considered it important, find malice against Regent in relation to the inaccurate statement in the letter of 6th December 2000 that Regent had reported the matter to the Law Society, Sir Sydney submitted that if Regent genuinely believed that Mr Conway had acted unprofessionally so as to jeopardise their deal with Eyre, they were entitled to complain to the Law Society. The fact that a draft letter of complaint was prepared, but not sent due to pressure of time, and that Regent informed Eyre the next day that it had not sent the complaint (see paragraph 47 above) was, he said, to be put against the Judge's suggestion to the jury that they might not think very much of it as an explanation.

159. In summary, Sir Sydney submitted that, on the undisputed evidence, far from being actuated by malice, Regent were entitled to feel aggrieved at Mr Conway's conduct and to have considered that he had acted unprofessionally in attempting to outbid them.

160. Mr Tager, notwithstanding the prominence that he had given to the "dirty trick" issue in his conduct of the case before the jury, maintained that it formed only a small part of Mr Conway's case on malice. However, apart from falling back on the incorrect statement in the letter to Eyre of 6th December 2000 of having reported the matter to the Law Society, he had little more to say on the subject save that, as a result of his, Mr Tager's canvassing of the matter at trial and Mr Conway's suggestions in his evidence, the Judge correctly left it to the jury and directed them adequately and fairly on the rival contentions. He maintained that, however unlikely the suggestion, as Regent now maintains, juries often do have to determine the truth of unlikely suggestions. He also, in a short hypothetical analysis, sought to suggest a number of rational bases for the allegation or to dismiss one or more of Sir Sydney's points on this issue as irrelevant to it.

161. In my view, there is force in Sir Sydney's submissions. Consider the telephone conversation between Mr Karmel and Mr Conway on the morning of 5th December 2000. Mr Karmel told Mr Conway that Regent's bid had been accepted and asked him to act as Regent's solicitor on the purchase, information that the Judge, in his summing-up to the jury described as "pretty classic confidential information". Mr Conway did not say that he could not act, nor that Mr Karmel should not give him confidential information or speak to him, as he was a competing bidder. He simply said that he needed first to make a telephone call and then hung up abruptly. Regent subsequently learned from Eyre, not Mr Conway, that he had contacted Mr Johnson, its Chief Executive, immediately after putting the phone down on Mr Karmel, and had offered to outbid Regent by the small margin of £50,000 over their, so far, successful bid. That bid, it will be remembered was at the same level as their unsuccessful September 2000 bid, of which they knew Mr Conway was aware (see paragraphs 19, 22 and 23 above).

162. In my view, there was no sufficient evidence on which a jury properly directed on the law, could find malice either in respect of the "dirty trick" allegation (in either of its forms) or in relation to the inaccurate assertion that the matter had been reported to the Law Society. As I have already said by reference to the passage from the 8th edition of Gatley approved by this Court in *Telnikoff v Matusevitch* , pat 120 and in *Alexander v Arts Council of Wales* , at paras 32, 37–38 and 42, the law requires evidence of at least probability of malice; mere possibility is not enough. It follows that, in my view, there was no

© 2023 Thomson Reuters.

evidence upon which the jury could, even if properly directed, have found malice so as to defeat Regent's defence of qualified privilege. I would, therefore, set aside the jury's finding of malice on this ground alone, with the result, if I am right, that Regent succeed in their appeal on this issue as well as that of justification.

*Vii)b) The Judge's directions on the application of the subjective test of malice*

163.  If I am right in my view that there was insufficient evidence of malice to go to the jury, it does not matter whether the Judge correctly directed the jury on the issue. However, in case I am wrong in that view and in relation to justification, I should go on to consider the Judge's directions.

164.  Regent maintain that the Judge erred in failing to distinguish clearly in his directions on malice that, whilst justification was to be determined solely by reference to the objective meaning of the letter, malice was to be determined solely by reference to the state of mind and intention of Regent.

165.  Mr Conway's case is that the Judge, throughout his directions on malice stressed that the jury could only find it if they were satisfied that Regent knew the letter to be false or did not believe it to be true, making plain, without using the word "subjectivity" that that is what he meant.

166.  Sir Sydney illustrated the scope for confusion by tracking the Judge's line of reasoning in the following sequence of his directions to the jury on the issue. First, the Judge introduced the issue of malice by telling them that "[m]ost of what you need know for this topic, as far as the facts are concerned, … overlaps with what you need to know for the purpose of deciding whether [the letter] is true or not. …" And, having previously on more than one occasion referred to the meaning of the letter as probably the most important matter they had to decide, he then made a number of references to whether Regent believed what the letter meant or stated. Finally, he directed them to decide, if they found that the letter bore the very narrow meaning and related to confidential information, "whether Mr Karmel and Mr Ratiu knew that the letter was false".

167.  Such an approach, Sir Sydney submitted, amounted to a serious misdirection because it gave rise to a risk that the jury would fix upon "the very narrow meaning" and would then find malice on the sole basis that Regent had never attempted to justify that meaning. It would have been otherwise, he implied, if the Judge had framed the question as "whether Mr Karmel and Mr Ratiu *intended* that meaning and knew it to be false". And he held to that criticism notwithstanding the following potentially curative passage in the Judge's direction, maintaining that that it was so diffuse as to be incapable of curing the earlier misdirection:

> "It is for you to decide … what the letter means. And so it is for you to decide whether it bears a meaning which the defendants did not intend. You may not think it very likely that the letter bears a meaning which the defendants did not intend, but if you do think that the letter bears a meaning that the defendants did not intend, then for the purposes of malice I must direct you, and I do, to judge the defendants' belief by what you find they actually intended to say. If they intended to say what they did believe to be true but have managed to something else which they knew to be untrue, then you judge them by what they intended to say."

168.  Sir Sydney made a number of other criticisms of the Judge's treatment of this issue that do not take Regent's case much further and with which, with respect to him, I do not consider it necessary to deal.

169.  Sir Sydney also criticised the Judge's direction to the jury that it would be open to them to find malice on the sole basis that the letter contained an inaccurate reference to having reported Mr Conway to the Law Society. This is how the Judge put that matter:

> "… it is admitted that Mr Ratiu knew they had not reported Mr Conway to The Law Society, so what Mr Ratiu wrote about the Law Society was obviously false and untrue to Mr Ratiu's knowledge. You heard Mr Ratiu's explanation for those words: he said the letters were intended to be sent in a different order. Entirely a matter for you, but you may not think much of that as an explanation.

© 2023 Thomson Reuters.

The sentence about the Law Society you may think could very easily have been deleted before the letter was sent.

As I said earlier, you will need to consider whether that sentence is important; whether it makes the seriousness of the alleged wrongdoing appear greater than it otherwise would have appeared, or whether those words are simply detail as Mr Price suggests. If you find the sentence is important, you may find that the defendants could not prove that the letter was substantially true for that reason, that is going back to the earlier stage [i.e. the issue of justification]. If you have found that the sentence about the Law Society is important, you may also feel able to find malice against Mr Ratiu, it is entirely a matter for you to decide how important you decide that sentence is."

170.  Sir Sydney submitted that that is another example of the Judge's elision of the objective test for justification and the subjective test for malice. He added that it would have been perverse for the jury to have found malice in the light of Mr Ratiu's explanation that they had intended to send the letters in a different order but were overtaken by events and the undisputed fact that Regent informed Eyre on the following morning that the letter to the Law Society had not been sent. In any event, as Sir Sydney observed, it made no difference whether Regent had already reported Mr Conway to the Law Society or whether it was contemplating doing so. What mattered was whether Regent, in writing the letter to Eyre, honestly believed that Mr Conway had acted in breach of his legal and professional duties as a solicitor.

171.  Mr Tager maintained that the Judge was justified in giving the direction he did because it is malicious to write what the writer knows to be untrue, and Regent had admitted the third possible meaning of the letter of 6th December 2000 to have been untrue. Such untruth was also relevant to whether the jury could infer that Regent had no honest belief in other parts of the letter.

172.  Given the complexity of the task for the jury in distinguishing between the objective meaning of the words for the purpose of reaching a finding on justification and their subjective meaning when considering the issue of malice, regardless of justification, it was vital that the Judge should make that distinction clearly. And it was vital to the outcome of the case if they had reached a stage in their deliberations of having opted for the very narrow meaning, which Regent had not attempted to justify, that they should have the distinction clearly in mind. In my view, there is a grave danger, in the light of the Judge's directions, that the jury did not have it in mind. Moreover, it does not seem to have been canvassed in that sort of focus at the trial. In particular, it does not appear to have been put to Mr Ratiu or Mr Karmel in cross-examination that they maliciously intended to convey in the letter the very narrow meaning, which they had never at any stage suggested to be true.

173.  Accordingly, I would also set aside the finding of malice by the jury on the ground of misdirection.

174.  I should add that Regent also maintained that the Judge presented a prejudicial and one-sided account of the parties' respective submissions in his summing-up, including an alleged emphasis on Regent's admission that the letter was defamatory and in a few instances where he had referred to Regent's case on particular issues as "technical" or "difficult" or unspecific. In my view, there is little in this complaint; the Judge went to great trouble to sum up this case comprehensively, comprehensibly and fairly. This case was nothing if not detailed, technical and difficult, combining as it did the mysteries of defamation, breach of fiduciary duty and of confidence. There were inevitably difficulties and technicalities in the arguments on both sides, and the comments of which Regent complains were, in my view, justified or at the very least permissible.

**Damages**

*viii) Whether the Judge misdirected the jury on damages or whether their award was perverse*

175.  If I am right in my views on the issues of justification and malice, this issue is now academic. But in case I am wrong and also out of deference to counsel's submissions on damages, I hope that it may be helpful for me to say something on the subject.

176.  The Judge, in directing the jury on this issue, directed them comprehensively and carefully, summarising the salient points for and against Mr Conway, including the manner in which the parties had conducted their respective cases. He gave general guidance by way of comparison about sums that might be awarded for very serious personal injuries and on

aggravation. The Jury awarded £96,000 in general damages, which is very close to the conventional award for the total loss of both hands.

177. Regent maintain that this was substantially in excess of what a reasonable jury could have thought necessary to compensate Mr Conway and to re-establish his reputation, and that, in any event, any such loss resulted from a single letter, allegedly published only to three people; two of them, the addressee, Mr Briant, and Mr Eyre (the Chairman of Eyre) were not called to give evidence; and the third, Mr Johnson, who gave evidence for Mr Conway, said that it had had no effect on his opinion of him.

178. Regent also maintain that the Judge erred in directing the Jury that:

i) Mr Johnson, who was Mr Conway's own witness, was not giving a truthful account of his reaction to the letter;
ii) if they found that the words complained of were circulated to other people in Mr Conway's business circle (which was unpleaded and unsupported by evidence), they might consider raising the damages from a possible £65,000 to up to £100,000;
iii) they should bear in mind, in assessing compensatory damages, that the parties and the persons who read the letter were people who think in rather large sums of money;
iv) they should assess the appropriate compensation for libel and aggravation separately rather than together.

179. As to those matters:

i) I consider that the Judge's remark about Mr Johnson's stated lack of reaction to the letter was in the following and, in my view, acceptable terms:

> "You have heard two different statements from Mr Johnson: one as reported by Mr Ratiu at the initial telephone call [namely that the reported conduct was outrageous] and his evidence from the witness box. It is for you to decide what you make of Mr Johnson's evidence if you think fit. I simply say that it is very rare for witnesses to come to court and say that they thought the worse of a claimant as a result of a libel and you may understand why that might be."

ii) As to the Judge's reference to a possibly wider circulation justifying a possible rise in the level of damages from a possible £65,000 to £100,000, it is true there was some evidence suggesting a little wider circulation, certainly among the Eyre Trustees and those working for them and professional firms, such as Cluttons and solicitors instructed on behalf of Eyre. However, I am uneasy about the Judge's invitation to the jury consider so substantial a rise on the basis of such unpleaded and nebulous a suggestion.
iii) As to the Judge's remark about the people involved being persons who think in large sums of money, such a factor considered on its own would normally be irrelevant to the fixing on a sum sufficient in the circumstances of any particular case to vindicate reputation. But this is how he put the point, after properly directing jury on the need for a sum of damages to be sufficient for that purpose:

> "In this connection, you will bear in mind that both parties in this case, and those by whom the letter complained of was read, were and are people who think rather large sums of money. A sum that might be large for most of the population of the country might appear to be not quite so much for them. On the other hand, you will not be dazzled by the millions you have heard spoken of and you will confine yourselves to what is reasonable and proportionate in the circumstances."

Such a direction, it seems to me, just about passes muster as putting in context the direction he had just given on the function of damages as vindication — in this case a context of impugning the reputation of a successful and highly paid solicitor in the property field. In any event, as Mr Tager commented, if the Judge in this reference introduced an irrelevant consideration, he did so in a qualified way and it should be seen in the context of his directions as a whole.
iv) As to the calculation of the award taking into account aggravation if the jury considered it appropriate, the Judge directed the jury in the following terms:

© 2023 Thomson Reuters.

> "If you decide to award any compensatory damages and if you do decide that they should be aggravated damages then you should award one total sum. If you get to that stage, you decide amongst yourselves: first the appropriate compensation for the libel you find and, second, the appropriate sum for any aggravation. You then add them together and produce a single sum. You will not be asked to state what sum, if any, you have awarded as aggravated damages."

That direction does not accord with the guidance given by this Court in *Thompson v Commissioner of Police of the Metropolis [1998] QB 498, CA* , at 516E, albeit in claims for wrongful arrest and false imprisonment. However, if a defamation jury take a two stage approach to calculating a global figure as the Judge directed here, it seems to me to be just as desirable as in the sort of claims considered in *Thompson* for them to indicate the make-up of that figure as between the "basic" award and that for aggravated damages. But, I do not suggest that the award is necessarily vitiated by the Judge's direction to them not to do that in this case. As the learned editor of the 17th edition of McGregor on Damages notes at paragraph 39–036 of that work, it has been unclear whether the *Thompson* guidance applies to defamation.

180.  Mr Kenneth MacLean QC, for Regent, submitted that the Judge should have directed the jury that the letter was at least partially justified such that damages could only be minimal. In so submitting, he had in mind Neill LJ's observation in *Pamplin v Express Newspapers [1988] 1 WLR 116* , at 120, that damages may be reduced, possibly almost to a vanishing point if a jury consider that defamatory words were partially justified. It is plain that the jury, whatever their individual conclusions on the many issues of fact and judgment presented to them, in particular as to the make-up of that figure as between the "basic" award and that for aggravated damages, ended up well above the level of considering damages as minimal or close to vanishing point. However, given my criticisms of the Judge's direction of law as to fiduciary relationship and its effect on Regent's defence of justification and its knock-on complications for his directions on malice, and my view that there was no evidence of malice fit for the jury, it is pointless for me to attempt a reasoned conclusion on this aspect of Mr MacLean's submissions on damages.

181.  Mr Tager, in detailed oral submissions, sought to defend the Judge against Mr MacLean's various criticisms of his directions. And he rightly emphasised that, provided a jury is directed properly, there is a heavy burden on a party attacking an award as excessive. As this Court held in *Rantzen v Mirror Group Newspapers [1994] QB 670* , at 692H, it can only intervene if it can give a negative answer to the question "Could a reasonable jury have thought that this award was necessary to compensate the plaintiff and to re-establish his reputation?"

182.  Mr Tager also drew attention in support of the jury's award to a number of elements contributing to the inclusion of a sum for aggravated damages, including: the seriousness of the allegation to a professional man with such local involvement and contacts; the absence of an apology; allegations of impropriety in the course of the trial going beyond the allegation in the letter; Regent's initial attempts to deny Mr Conway access to the 6th December letter; and claimed untruthfulness in the witness box.

183.  Save for the Judge's direction as to the possible consequence of suggested wider circulation, I could not say, taking his directions overall, that he misdirected them so as to vitiate their award. However, I am, concerned about that suggestion and as to its possible effect, namely an increase of about a third in the damages that the jury might otherwise have awarded. Independently of that concern, I also feel unease that the total sum awarded by the jury, £96,000 is, as Mr MacLean pointed out, close to the conventional award for the total loss of both hands. That is probably quite enough comment from me in an area which is peculiarly within the province of the jury and whose award in this case, if I am right in my conclusions as to liability, is now academic.

184.  For the reasons I have given, I would set aside the jury's findings on the issues of justification and malice and would therefore allow Regent's appeal.

185.  Before leaving the case, I should express my sympathy to the Judge and to the jury on the enormous burdens imposed on both of them in this case, given the unhappy divide of responsibility between them on supposedly self-contained issues of law and fact. In fact, the critical issues, particularly as to fiduciary relationship and matters of confidence and the ingredients of malice as distinct from justification were in truth more matters of mixed law and fact. It is, in my view, no advertisement

for our system of jury trial in civil cases — where it applies — for such complex issues to be tried in this way. A Martian, on learning of it, would be amazed, as would the ordinary person in the street.

Lord Justice Laws:

186.  I agree that this appeal should be allowed for the reasons given by Auld LJ. I would only wish to emphasise my emphatic agreement with two aspects of my Lord's judgment. First, there is his observation at paragraph 78 that there is a "powerful argument of principle for lifting the corporate veil where the facts require it to include those in or behind the company who are in reality the persons whose trust in and reliance upon the fiduciary may be confounded". Secondly I wish in particularly to support my Lord's presentation as to the means of trial, in defamation cases, of complex issues such as arose here.

Lord Justice Sedley:

187.  I agree that this appeal succeeds for the reasons given by Lord Justice Auld. While the want of a suitable direction on justification would by itself have indicated a retrial, the want of sufficient evidence of malice makes a retrial otiose.

188.  This was in the end a case in which a solicitor, who had set about competing with a client, could not legitimately complain if in the circumstances the client accused him of behaving unethically. I recognise that there is an asymmetry between the law's longstanding insistence on the discrete legal personality of limited liability companies and its willingness to lift the veil, as the expression is, in a case like the present. But it is the latter, not the former, which accords with common sense and justice when the issue is who a solicitor owes his professional duties to.

189.  I too would have been concerned, had the appeal on liability failed, at the magnitude of an award of general damages of almost £100,000. It is worth recalling that the special damage, which the judge had adjourned to a separate inquiry, was said to be the profit Mr Conway had lost by being prevented from buying No.24. This could be readily gauged by the seven-figure profit that the defendants themselves had made on the transaction. There could be little pain that the recovery of such a sum — with costs — would not assuage. As to Mr Conway's standing in the eyes of others, what mattered was not what Mr Johnson said about it (if indeed it was admissible) but how few people had seen or learnt of the letter, and what would be left of its sting once it was known to those few individuals that a jury had cleared Mr Conway of wrongdoing. For my part, even had the verdicts for the claimant stood, I doubt whether the jury's munificent award of general damages could have survived.

Crown copyright

**SCOTT GRECK v. HENDERSON ASIA PACIFIC EQUITY PARTNERS (FP} LP+HENDERSON EQUITY PARTNERS (GP) LIMITED+HENDERSON EQUITY PARTNERS LIMITED+ROGER GREVILLE**

---

**OUTER HOUSE, COURT OF SESSION**

**[2008] CSOH 2**

OPINION OF LORD GLENNIE

in the cause

SCOTT GRECK

Pursuer;

against

HENDERSON ASIA PACIFIC EQUITY PARTNERS (FP) LP

First Defender;

CA9/07

HENDERSON EQUITY PARTNERS (GP) LIMITED

Second Defender;

HENDERSON EQUITY PARTNERS LIMITED

Third Defender;

ROGER GREVILLE

Fourth Defender:

---

**Pursuer: MacKenzie, Solicitor Advocate, Pinsent Masons**

**Defenders: Johnston QC, Burness LLP**

1      8 January 2008

2      Introduction

[1] The pursuer seeks declarator that he is a "Good Leaver" in terms of a Limited Partnership Agreement ("The Limited Partnership Agreement") dated 21 November 2001 between himself, the second defender and others. The second defender ("the General Partner"), as the General Partner in the Limited Partnership established by The Limited Partnership Agreement ("the Limited Partnership"), has declared the pursuer to be a "Bad Leaver". The pursuer's status as a "Good" or "Bad" Leaver has consequences in terms of his entitlement to "carried interest" in the assets of the Limited Partnership.

[2] The pursuer has been involved in the private equity business for a number of years. In about August 2000 he entered into employment with AMP, an Australian private equity business, which had acquired Henderson Global Investors in 1998 and, in consequence, when the pursuer joined in 2000, operated in

LITI-9533391-1

AP1718

the private equity business worldwide. At the beginning of his employment with AMP, the pursuer was based in Sydney, Australia. AMP was about to launch the Henderson Asia Pacific Equity Partners I fund (HAPEP I), a pan-Asian private equity fund. The pursuer was one of the investment managers in the HAPEP I fund. In 2001 he became a partner in the Limited Partnership which, as I explain below, was designed to give investment managers in the HAPEP I fund a stake in the success of the fund. In 2002 the pursuer moved his base to Singapore on the instruction of Sanjiv Kapur, the managing partner in HAPEP I, who had decided that opportunities were being missed through the fund not having people "on the ground" where the investment opportunities were. Thereafter, until sometime in 2005, the HAPEP I fund had an Asian "team" under Sanjiv Kapur, consisting of Lucian Wu in Hong Kong, the pursuer in Singapore, and Vishal Marwaha and Wei Hsien Chan in India.

[3] At the end of December 2003, for reasons which I need not go into, AMP and Henderson "de-merged". The position after the de-merger was that AMP retained the business in Australia and New Zealand, whilst the UK, North American and Asian operations were retained by Henderson - that is no doubt an oversimplification, but it is sufficient for the purposes of this action. Since the pursuer was involved in the pan-Asian HAPEP I fund, he went with the Henderson side of the business; and his contract of employment was transferred to Henderson Global Investors (Singapore) Limited. He remained based in Singapore. Save where it is necessary to identify presently which "Henderson" company is involved at any particular stage, I shall refer to them indiscriminately as "Henderson" or collectively as "Henderson group".

[4] Early in 2005 Henderson began marketing to institutional investors a new fund called Henderson Asia Pacific Equity Partners II ("HAPEP II"). The intention was to market HAPEP II on the strength of the success of HAPEP I, using the same investment management team. However, difficulties were soon encountered due to the departure from Henderson of a number of people who had been part of that team. Sanjiv Kapur and Lucian Wu left in September and October 2005. Others left shortly afterwards. At the end of 2005 the pursuer was made a partner in the HAPEP II fund (no doubt, though it was not produced in evidence, under an agreement similar to the Limited Partnership Agreement). The other two partners involved in the HAPEP II fund at that time were Vishal Marwaha and the fourth defender, Roger Greville.

[5] On 27 March 2006 the pursuer sent a letter of resignation from Henderson Global Investors (Singapore) Limited. He was asked to extend his notice period until fundraising for HAPEP II had been completed but he declined. He explained in evidence that he wanted to return to Australia both for family reasons and because there were uncertainties over the HAPEP II fund. He finally left on 10 June 2006, having assisted in recruiting a replacement, Sigit Prasetya. About three weeks later, on about 3 July 2006, he joined Archer Capital Pty Limited ("Archer"), a private equity manager based in Sydney, Australia. At a board meeting of the General Partner on 29 January 2007, it was noted that the pursuer had previously been treated as an Intermediate Leaver. The minutes of the meeting go on to say this:

"However the Company [the General Partner] had become aware that [the pursuer] had joined a competitor within 6 months of becoming a Leaver and as such, pursuant to the terms of part 1 of Schedule 2 to the LPA [The Limited Partnership Agreement], became a Bad Leaver on 10 June 2006."

It is this decision as to his status which has provoked the present litigation. The pursuer's principal contention is that Archer is not a competitor of Henderson or any associated company.

The Limited Partnership Agreement

[6] All the witnesses were agreed that investors in private equity funds wanted the investment fund managers to be "aligned with them" by sharing in the successes of the fund. They wanted the investment team to be "incentivised". Accordingly, in addition to remuneration by way of salary and bonuses, fund managers receive a share of the gains made by the fund. Such an arrangement is not uncommon in the private equity business, although the precise terms of, and amounts involved in, any such scheme may differ from one company to another. The pursuer told me that typically some 20% of any profit over 8% per annum might be shared between the individual fund managers and the company (through the General Partner); and the portion going to the individual fund managers would be shared between them in differing percentages reflecting the seniority and experience of the particular individual and the length of time he

LITI-9533391-1

AP1719

had been with the company and/or the particular fund. The intent is not only to reward fund managers for the success of the fund to which they have contributed but also to encourage them to stay with the fund, the stability and continuity in the investment team being of importance to the success of the fund. To this end the scheme will often provide for the entitlement of an individual investment manager to be reduced if he leaves early in the life of the fund; and for his entitlement to be removed altogether if, within a certain period after leaving, he takes up employment with a competitor. Within Henderson, the share of the profits of the fund which goes to the fund managers as an incentive is known as "carried interest" (or "carry"). For tax reasons, as to which I heard very little, the incentive scheme is channelled through a limited partnership. Each limited partnership relates to only one fund. It appears that a separate limited partnership is established in respect of each private equity fund in order to give effect to a similar incentive scheme in relation to that fund.

[7] This action is concerned with the limited partnership established to give effect to such an incentive scheme for the HAPEP I fund. The partners in the Limited Partnership are the General Partner (effectively representing the employer) and the Limited Partners or Carried Interest Partners (i.e. the investment managers in the fund). In the Introduction to the Limited Partnership Agreement, it is explained that the purpose of the Limited Partnership is to act as a founder partner in an English limited partnership to be known as Henderson Asia Pacific Equity Partners I, LP ("the Fund Partnership") with a view to providing profits for distribution in accordance with the terms of the Limited Partnership Agreement. Put simply, the Limited Partnership, as founder partner, receives a part of the gains made by the HAPEP I fund. The sums thus accruing to the Limited Partnership are allocated between the General Partner and the various Carried Interest Partners in the manner set out in the Limited Partnership Agreement. I was not shown the partnership agreement for the Fund Partnership; and do not know the precise arrangements in terms of which the Limited Partnership receives income from the gains accruing to the HAPEP I fund.

[8] The Limited Partnership is the first defender in this action. In terms of the Limited Partnership Agreement, the General Partner has responsibility for the management and operation of the Limited Partnership. The General Partner named in the Limited Partnership Agreement is the second defender. The General Partner is entitled to appoint a Manager to manage or operate the Limited Partnership. The third defender ("the Manager") is the Manager of the Limited Partnership, named as such in the Limited Partnership Agreement. The fourth defender, ("Mr Greville"), in addition to being an investment manager in the HAPEP II fund, is the managing director of the Manager. One of the Manager's functions is to make distributions to the partners in accordance with the Limited Partnership Agreement. The other Carried Interest Partners have not been convened as defenders. Nor has the pursuer's former employer, Henderson Global Investors (Singapore) Limited. No point is taken in the pleadings to the effect that they should have been. The point is of some relevance, however, when considering an argument which the pursuer raised in final submissions without it having been foreshadowed in the Summons.

[9] The Limited Partnership Agreement provides for the allocation of sums to the partners in accordance with their "Relevant Proportion", i.e. the percentage set against their names in Schedule 1 as adjusted or amended from time to time. Schedule 1 contains the names of the Carried Interested Partners and the General Partner. The Relevant Proportion attributable to the General Partner is 46.9232%. The balance is apportioned between the individual Carried Interest Partners. The Relevant Proportion attributed to the pursuer is 4.6154% (of the whole). Schedule 2 provides for the making of adjustments to these percentages to deal with the cases of people joining after the beginning of the Limited Partnership or leaving before the end. The adjustment to be made where people leave early is governed by paragraphs 2, 3 and 4 of Schedule 2 Part 1. The position varies depending upon the Leaver status of the person leaving.

[10] Before turning to those paragraphs, it is necessary to note certain definitions in that Part of Schedule 2. A "Leaver" is defined as:

"A Carried Interest Partner who has, or whose Related Party has, ceased for whatever reason to be employed full time, by Henderson Administration Limited, the Manager or any Associate of the Manager (referred to in this definition as the 'Employers') ..."

LITI-9533391-1

AP1720

That last expression covers, in effect, all companies within the Henderson group. Leavers are classified into Good Leavers, Bad Leavers and Intermediate Leavers. A Good Leaver is someone who has become a Leaver by reason of death, retirement (on or after the age of sixty), disability or other incapacity, or termination for any reason other than "for cause". Of central importance to the present action is the definition of Bad Leaver. A Bad Leaver is:

"any Leaver who has, or whose Related Party has:

(i) Prior to a Change in Control or Default Event voluntarily become a Leaver and who, or whose Related Party, within six months of them or their Related Party becoming a Leaver joins a competitor of the Manager or any Associate; or

(ii) Who has become a Leaver by reason of termination for cause;

and for the purposes of this definition a Leaver shall be deemed to have joined a competitor of the Manager or any Associate if they (or their Related Party) take employment with, or provides services to, a competitor of the Manager or any Associate and a business shall be deemed to compete with the Manager or any Associate if its business includes making, dealing in, managing or advising as to unquoted equity investments whether for its own account as principal or as agent, trustee, manager or adviser on behalf of others or if it includes seeking to raise or raising commitments (or similar) from other persons to facilitate the making, dealing in, managing or advising as to unquoted equity investments and further, for the avoidance of doubt, any Leaver who has become a Leaver by reason of them (or their Related Party) being constructively dismissed shall not be deemed to have voluntarily become a Leaver."

The definition of an Intermediate Leaver is: "A Leaver who is not (at any time) either a Good Leaver or a Bad Leaver".

[11] Paragraphs 2, 3 and 4 of Schedule 2 Part 1 set out the consequences, in terms of the adjustments to be made to the Relevant Proportion when a Carried Interest Partner leaves early, of him being classified as a Good, Bad or Intermediate Leaver. In summary the position is as follows:

(1) If he is a Good Leaver, then his Relevant Proportion may be reduced depending upon when he leaves. The amount of the reduction is set out in Schedule 2 Part 2. If he leaves before 1 January 2006, i.e. within the first five years of the life of the fund (a period which, according to the evidence, can be described as the "investment period"), he suffers a reduction to his Relevant Proportion calculated according to a formula therein set out. The position improves after the Investment Period. If he leaves within a year after the end of the Investment Period, his Relevant Proportion is reduced by 20%. If he leaves during the following year, it is reduced by only 10%. And if he leaves more than two years after the end of the Investment Period, his Relevant Proportion is not reduced at all.

(2) The treatment given to an Intermediate Leaver is somewhat less favourable. He loses all of his Relevant Proportion if he leaves within the first three years of the life of the fund. If he leaves in the next two years his Relevant Proportion is reduced by reference to a formula set out in Schedule 2 Part 3 - the reduction is by rather more than the reduction applicable to a Good Leaver who leaves at the same time. However, if he does not leave until on or after 1 January 2006, i.e. until after the end of the Investment Period, then he is treated as if he were a Good Leaver (see para.4 of Part 3).

(3) By contrast, a Bad Leaver, whenever he leaves, ceases to be a partner in the Limited Partnership and has his Relevant Proportion reduced to zero: Schedule 2, Part 1 para.3.1. (This is subject to him remaining entitled to his share of such sums, if any, as are held in an escrow account and which, but for certain events, would otherwise have been distributed to him before he became a Bad Leaver - but for present purposes this can be disregarded.)

In each case where there is a reduction in a Leaver's Relevant Proportion, the Relevant Proportions of the remaining Carried Interest Partners and of the General Manager are increased by an amount which is roughly in proportion to their pre-existing interests.

LITI-9533391-1

AP1721

[12] The practical effect of these provisions was summarised in a letter from Henderson to the pursuer dated 20 July 2001 setting out the terms on which he was invited to become a partner in the Limited Partnership. This letter, which parties referred to as the "vesting schedule", set out in percentage terms the respective entitlements of Good, Bad and Intermediate Leavers. It provided that a Good Leaver could expect to retain the following amount of carried interest:

Leaver during Year 1                    70% of the Invested Proportion of the Fund (%)

Leaver during Year 2                    70% of the Invested Proportion of the Fund (%)

Leaver during Year 3                    70% of the Invested Proportion of the Fund (%)

Leaver during Year 4                    70% of the Invested Proportion of the Fund (%)

Leaver during Year 5                    70% of the Invested Proportion of the Fund (%)

Leaver during Year 6                    80%

Leaver during Year 7                    90%

Leaver after Year 7                     100%

An Intermediate Leaver could expect to receive the following amount:

Leaver during Year 1                    0%

Leaver during Year 2                    0%

Leaver during Year 3                    0%

Leaver during Year 4                    70% of the Good Leaver Schedule

Leaver during Year 5                    85% of the Good Leaver Schedule

Leaver during Year 6                    100% of the Good Leaver Schedule

Leaver during Year 7                    100% of the Good Leaver Schedule

Leaver after Year 7                     100% of the Good Leaver Schedule

A Bad Leaver, however, immediately forfeits the whole of his future entitlement to carried interest.

[13] Two other provisions of Schedule 2 Part 1 to The Limited Partnership Agreement are relevant to the issues in this action. The first is para.3.4 of that Part. This permits the General Partner, in his discretion, to allow a Bad Leaver to be treated in many respects as if he were a Good Leaver. That paragraph provides as follows:

"3.4 Notwithstanding the above, the General Partner may in its sole discretion determine in respect of a Bad Leaver that paragraphs 3.1, 3.2 and 3.3 shall not apply and instead that the provisions of paragraph 2 shall apply as if such Bad Leaver were a Good Leaver save that the reduction of Relevant Proportion pursuant to paragraph 2(a) shall be determined not in accordance with Part 2 of Schedule 2 but in the General Partner's sole discretion (to be determined within 60 days of the Carried Interest Partner

becoming a Bad Leaver). Adjustments to Capital Contributions as a result of a reduction to the Relevant Proportion shall be made in accordance with paragraph 6."

The second is para.3.5 of Schedule 2 Part 1. This applies the Bad Leaver provisions to any Intermediate Leaver who, after becoming an Intermediate Leaver, subsequently becomes a Bad Leaver.

### The Evidence

[14] I heard evidence in this case from four witnesses. They were, in order of giving evidence: (i) the pursuer; (ii) David Bull, a former finance director within Henderson and their Head of Private Equity in Europe, and now Chief Financial Officer with Archer; (iii) Roger Yates, the Chief Executive Officer of Henderson Group plc; and (iv) Roger Greville, the fourth defender. The first three were called by the pursuer and the fourth by the defenders. There was little dispute between them on the way in which the private equity business operated. The main point of contention was as to whether, as a matter of fact (and regardless of the definition of competitor in the Limited Partnership Agreement), Archer could be said in fact to compete with Henderson. Otherwise the differences between them consisted mainly of differences of emphasis and interpretation. Neither party challenged the general credibility or reliability of any of the witnesses. It was clear that they were all knowledgeable about the private equity business. Although the pursuer gave his evidence when he was clearly fatigued the day after a long flight from Australia, and Mr Bull gave his evidence by video link from Australia, I was satisfied that they were not disadvantaged by this - they were both able to give the evidence they wanted to give and to do so with the same clarity and cogency as the other witnesses. All of their evidence was helpful in giving the court an understanding of the salient features of the private equity business. I summarise it below.

### (i) The pursuer

[15] The pursuer gave evidence as to the private equity business generally and the particular activities of both Archer and Henderson. He said that private equity investment was at the riskier end of the investment range. Pension funds would put about 6-8 percent of their investment into private equity funds. His role as an investment manager involved identifying businesses in which to invest, executing the investment and then managing those businesses with a view to selling them for such sum as would maximise the return for the investors in the fund. The majority of his time was spent in "sourcing deals", i.e. identifying and trying to secure investment opportunities. He might expect to look at about 150 companies and only make one investment. Usually the deals would be sourced through accountancy firms or banks; but where there were a number of funds targeting the same types of business in the same way, they would sometimes approach certain businesses direct rather than through intermediaries. There was no scientific answer to the question of how to win a particular deal. One consideration was price. Another, particularly if the existing management was staying in the business, was the personal relationship between that management and the fund manager, and the investor's plans for the business. Where intermediaries were involved, the relationship with the intermediary was important. The skills needed of a successful fund manager were many and varied. He needed to be numerate and analytical but also to be able to connect with people. He needed a commercial and strategic mind. Once the fund was interested in a particular company as an investment opportunity, they would sign a confidentiality agreement and on that basis see confidential information from the company. In this way a fund manager would acquire a bank of knowledge enabling him to compare one opportunity with another. But he would hold no confidential information about the private equity fund itself apart from his awareness of the then current targets for potential investment. He emphasised that it was important as a fund manager to have a geographic focus and, to be taken seriously, to have an ear to the ground. It was an advantage to be on the spot where the potential investments were.

[16] The normal life of a fund was ten years, but the fund manager could extend that by about two years. That ten year period was normally divided into an "investment period", usually the first five years, within which the fund would both attract investors and source deals and make investments into identified businesses. After that investment period they would start selling to realise the best profit on their investment. The period in between making the investment and selling (generally about four to five years) would, in the case of each company, be taken up working with the management of the company (or

LITI-9533391-1

AP1723

sometimes in taking over the management of the company altogether) in attempting to grow the business and maximise the value of the investment.

[17] The pursuer joined AMP in August 2000. He was based in Sydney and became part of the HAPEP I fund which was about to be launched. He joined as an investment manager and reported to Sanjiv Kapur. AMP was a big player in the private equity business. It had been in the private equity business in Australia since the 1960s and had sought to expand into other markets when it acquired Henderson. When the pursuer joined, it had private equity investments in Chile, Alaska, Australia, New Zealand and Europe. The pursuer moved to Singapore in 2002 because Sanjiv Kapur had decided that, without being on the ground, they were not seeing the opportunities as they arose. At the same time as he moved himself and the pursuer to Singapore, Sanjiv Kapur decided to set up an Asian team with Lucian Wu in Hong Kong and Vishal Marwaha and Wei Hsien Chan in India. The fund thereafter had offices in India, Hong Kong and Singapore. This was all part of the process of being taken seriously. Shortly after the pursuer arrived in Singapore, there was further discussion as a result of which it was agreed that he would work with the Delhi partners for deals in India; and from that time onwards he focused almost entirely on India. After the de-merger he joined Henderson. Despite being UK based, Henderson in effect continued the UK, North American and Asian private equity business, including the business on which he was engaged.

[18] The pursuer referred to the Private Placement Memorandum ("PPM") for the HAPEP II fund issued on 25 January 2006. The PPM is designed to tell investors about the fund and to encourage them to invest in it. The fund was promoted on the basis that the investment team which had been responsible for the success of HAPEP I would carry out the investment activities for HAPEP II. There had been some changes to the investment team by the time the PPM was issued, amongst the most important of which was the replacement of Sanjiv Kapur by the fourth defender as managing partner, but the remaining members had been responsible for sourcing some 85% of the investment for HAPEP I. The PPM outlined the investment strategy to be applied and emphasised the advantage which this fund had by having an investment team with a thorough knowledge of targeted industries. It emphasised that in the Asian market business opportunities were gained through relationships and through having a team on the ground. Other documents to which he referred in his evidence also reflected the importance of the team. A revised PPM dated 2 March 2007 for the HAPEP II fund did not show the pursuer as one of the team, but it still sought to emphasise the continuity from the earlier fund.

[19] He was presently working for Archer. He was involved in a particular private equity fund investing in Australian and New Zealand businesses, the value of any one investment being between Aus $20-100 million. This fund was typically looking at family businesses facing, for example, succession issues and therefore wanting to sell out altogether, or at least to sell a majority stake. He only looked to source deals in Australia and New Zealand. That was true of Archer as a whole. They only invested in businesses headquartered in Australia and New Zealand.

[20] Asked what value he brought to Archer when he joined it from Henderson, he answered: "not a lot". He had been out of the Australian market for five or six years and had lost contact with key people; his knowledge of Asian markets was no good to Archer. When he went back to Australia, on joining Archer, it took him a good twelve months to be in a position to see opportunities. He had not yet completed a deal with Archer; and the fund for which he was working had only completed one deal so far. Nonetheless, he accepted in a broad sense that private equity companies were global businesses and competed for talent - the recruitment of Mr Bull and himself by Archer were illustrative of this.

[21] In order to emphasise the lack of competition between Henderson and Archer, the pursuer referred to an internal Henderson document concerning "Competition in the Asian Private Equity Space". He said it was a document provided to potential investors to inform them of the Asian market. It explained the difference between "country" and "regional" funds, the former investing in only one country while the latter covered a number of countries in a region. The pursuer said that Archer was a country fund, Australia and New Zealand being regarded as one country for this purpose. Under the heading "Who are the competitors for HAPEP?" the document listed and described "some of the key players in the Asian PE market". At Henderson, he said, we knew who our competitors were. The list did not include Archer. Another document, "Profiles of Asian Private Equity Market Participants", painted the same picture. He

7

referred to pages from the Henderson Group Plc website which contained no reference to Henderson doing business in Australia. It was true that they had a registered office there, but this was only to deal with shareholder enquiries arising from the de-merger. A cutting from the Australian Financial Review of 5 March 2007 quoted the Henderson Chief Executive, Roger Yates, as saying that Henderson had no plans to enter the Australian market. By contrast, the Archer website showed it to be focused on investments in businesses headquartered in Australia or New Zealand. In cross-examination on this part of his evidence, the pursuer accepted that Archer and Henderson sought to attract the same investors. There was therefore some competition between them, but only in a broad sense. Investors sought to diversify, he said. They tended to make their investment decisions based on the geographic focus of the fund. Within that area, they would back the best manager. He accepted that companies in one country might have subsidiaries in another, but did not accept that this resulted in any significant overlap or competition between private equity funds concentrating on different countries.

[22] He explained that his reasons for resigning from Henderson in March 2006 had been twofold. He and his wife had just had a young son and he wanted to be home in Australia. In addition he had some uncertainties over the future of the HAPEP II fund given the individuals who had left. After some discussions, in particular with Roger Greville, it was agreed that his last day of employment would be 10 June 2006. A letter from Henderson dated 25 May 2006 confirmed these arrangements. There was no mention of carried interest in the letter. The pursuer said that he thought that he would get the amount set out in the vesting schedule for a Good Leaver, because he was joining a company far removed from the market in which Henderson worked. Henderson knew that he was going to Australia. He explained to Archer when he joined them that, as an Intermediate Leaver - who, since it was after the end of the Investment Period, was to be treated as a Good Leaver - he expected to lose 20% of his carried interest entitlement. He asked Archer to compensate him for that loss and they agreed to do that. He knew that a Bad Leaver would lose 100% of his entitlement, but he thought that he was not a Bad Leaver because Archer was not a competitor.

[23] After he tendered his resignation on 27 March 2006, Mr Greville had asked him if he would stay on until the fundraising for HAPEP II was completed. He was not willing to do this. Quite apart from wanting to get back to Australia for family reasons, he did not want to be a party to any misrepresentation to the effect that he was going to be part of the team on HAPEP II. Although he had known that the HAPEP II fund was being marketed on the basis that he was part of the team, he had never made a commitment to stay with the fund for any particular period. Having decided to resign, he wished to leave quickly so as to avoid the risk of would-be investors being misled. He referred to a series of e-mail exchanges between himself and the fourth defender. He had emphasised on 30 March 2006 that he was not willing to extend his notice period. Henderson were clearly concerned about the timing of the announcement of his resignation. He accepted in cross-examination that his resignation came at an inconvenient moment for the HAPEP II fund. As he put it, his name added to a growing list of departures. Gaps remained to be filled. However, he rejected the idea that this led to adverse public reaction or negative publicity for the fund. He attributed the fund's difficulties to other factors.

[24] Before leaving, the pursuer had helped to recruit his replacement, Sigit Prasetya. In August 2006, soon after leaving, he had at the request of Mr Greville provided a reference for Henderson to a potential investor in the HAPEP II fund. It was at this time, he said, that he was first told that he was to be regarded as a Bad Leaver. He was disappointed, and had asked: how can I in good faith give a decent reference if I am treated as a Bad Leaver? He nonetheless gave the reference.

[25] He received a number of documents after he left Henderson which he would not have expected to receive had he been regarded as a Bad Leaver. These included quarterly reports on the HAPEP I fund as at 30 September 2006, 31 December 2006 and 30 June 2007. People at Henderson knew that he had joined Archer. He had given Mr Greville his contact details there in July 2006. He had received e-mails of congratulation about his employment with Archer. If he was a Bad Leaver, with no remaining entitlement to "carried interest" under the Limited Partnership Agreement, why was he being sent such documents?

[26] He was formally told that he was a Bad Leaver by letter dated 17 January 2007. He had been told by phone on the previous day. He was extremely disappointed, particularly since he had left on good terms.

LITI-9533391-1

AP1725

He said that he was never given any reason for the failure to exercise the discretion in his favour; nor was he given any opportunity to influence the exercise of that discretion.

[27] In the course of his evidence, the pursuer gave evidence as to other employees of Henderson who had left. I deal with these below. His argument was that these others had been treated more favourably than he had been treated. He commented particularly on the departure of Sanjiv Kapur. There had been friction within the team. Something had had to give. He had brought certain matters to the attention of Mr Greville which, he thought, should have led to Mr Kapur having his employment terminated for cause. He told Mr Greville this but his advice was not accepted. In the event, Mr Kapur left as a Good Leaver. In answer to a suggestion put to him in cross-examination, he said that he did not recall Mr Greville emphasising to him how important it was that he stayed.

*(ii) David Bull*

[28] Mr Bull described his position both in Henderson and in Archer. He had left Henderson because of family considerations. Within Henderson he had been responsible for the "non deal-doing" activities. He spoke to the organisation of the Henderson group. He had been responsible for establishing the group structure; and for putting in place the carried interest scheme under which team members participated in the growth of the fund. He was involved in drafting the documentation. Members of the team, including the pursuer, had obtained legal advice, paid for by Henderson, before joining the partnership. He agreed with the pursuer that it was only for historical reasons, to do with the de-merger, that Henderson had a representative office in Australia. As far as he knew, they had no investment manager in Australia. However, he accepted, when asked about Henderson's PPM, that nothing in it precluded Henderson from seeking investment opportunities within Australia and New Zealand.

[29] Mr Bull gave evidence as to the private equity business generally and the question of competition between Henderson and Archer. He confirmed what the pursuer had said about the "investment period" in the life of a fund. He supported the pursuer's evidence that although investors might come from anywhere and that, to that extent, the market was global, nonetheless the business was not competitive between funds operating in different regions. Investors identified the country or region that they wanted to be in and then backed the best manager in that area. He accepted that it was possible for private equity business in different countries or regions to compete through subsidiaries of target companies, but said that, typically, Australian companies had not worked through foreign subsidiaries. It would have been unusual for a would-be investor in Asia to approach Archer. It was seen as a different market from that in Australia. Any decision about investing in Australia would have been quite separate from a decision about investing in Asia. Fund managers tried to "sell" their funds by reference to the countries or regions in which they operated. Potential investors wanted to know that the team had the knowledge to operate in the market that they wanted to invest in.

[30] Mr Bull said that when he tendered his resignation he did not have another job lined up. He wanted to go to Australia for family reasons. It was difficult to secure employment from a distance. His plan was to take a break, go out there and see what happened. Henderson wanted him to extend his notice period. He told them that he was prepared to extend it, but was concerned with what it would mean in terms of having to take another six months off afterwards in order to be a Good or Intermediate Leaver and thereby protect his carried interest. He discussed the matter with Roger Greville and Roger Yates and they agreed that he would be considered a Good Leaver even if he were to join a competitor within 6 months of his (delayed) leaving date.

*(iii) Roger Yates*

[31] Roger Yates gave evidence about the Henderson group and the private equity market generally. He explained that AMP and Henderson had split on a geographical basis. The shareholders received one share in each company. Henderson therefore had a historical listing on the Australian stock exchange. Some of the original shareholders had now been replaced by institutional investors in Australia. Henderson kept a representative office there, with a staff of two, dealing with shareholder enquiries. They had no investment manager based in Australia.

[32] He explained that the Henderson group was purely an investment management business. It managed about £61 billion of investments. By far the greater part of that (about £50 billion) was in listed assets, i.e. publicly quoted securities. The client base for that was international. It managed something over £1.1 billion investments in private equity. The largest part was made up of two infrastructure funds (Private Finance Initiatives), then the Asian funds (HAPEP I and II) and some smaller funds. The client base differed from fund to fund. The infrastructure funds were mainly UK based. In HAPEP I the biggest investor was a UK institution, though he thought there was one Australian investor as well. The investors in HAPEP II, which was still marketing, were more international in scope. The Henderson Group plc website described the group as "a financial services group **focused** on **asset management** operations in **Europe, Asia** and the **United States** ...". Mr Yates said that he was happy with that headline but it was in no way designed to be exclusive. He confirmed that they had not been involved in Australian domiciled businesses thus far. He was referred to an interview in The Australian Financial Review dated 5 March 2007 in which it was attributed to him that Henderson had no plans to make a splash in Australia because of the structure of the local market which favoured large wealth managers such as the big four banks and AMP. He accepted that he had said this and he stood by it. They had no particular plans to create an office in Australia so as to compete head on; but they did invest in Australian companies, albeit from London, and did have Australian clients. He confirmed again that they had not done any private equity business in Australia to date, though, as the article quoted him as saying, they would continue to monitor Australia. In cross-examination, he emphasised that he had meant that if they developed products of interest to Australian investors, they would then decide whether to make more efforts to win Australian clients. The percentage of Australian investors was continuing to rise. Under reference to a document about Henderson Global Investors, he explained the terms "country fund" and "regional fund". With the former, all or most of the fund's investments are in businesses domiciled in the particular country or which do most of their business there. With the latter, investments are more broadly spread across a region. The document identified Henderson's major competitors. They did not include Archer. He knew very little about Archer; but he did know that they operated a number of private equity funds and invested largely, but not exclusively, in Australian based companies. In cross-examination he was asked whom he regarded as competitors. He replied that there were legions of competitors on many levels. There was competition for staff, which was global in nature, and competition for assets and for clients.

[33] Mr Yates explained the arrangements made with David Bull on his departure. It was very straightforward. Henderson were in discussions with one of their clients. Mr Bull knew all the details. It was essential from Henderson's point of view that Mr Bull continued working for Henderson until these discussions had been concluded. In exchange for him extending his notice period, it was agreed that he would be a Good Leaver. Otherwise, by staying on, Mr Bull would be prejudiced in any future employment plans, in that the commencement of the six month period (before the expiry of which he could not work for a competitor without losing his carried interest entitlement) would be delayed. He regarded the pursuer's assistance in finding a replacement as helpful, but it was quite a different situation from that surrounding Mr Bull's departure. In cross-examination he accepted that he did not personally have the power to agree that Mr Bull should be a Good Leaver. This was for the board of the General Partner to decide. But he made a recommendation to them that they make Mr Bull a Good Leaver, and they agreed.

[34] In answer to a question about how much Henderson employees would have known about the carried interest arrangements, Mr Yates said that he thought that they would know about the whole process, including the Good Leaver/ Bad Leaver classification and its consequences, in "almost forensic detail".

*(iv) Roger Greville*

[35] As well as being managing director of the Manager, Mr Greville was co-head of Henderson's Asia-Pacific Funds and a carried interest partner in both HAPEP I and HAPEP II. He had stayed with Henderson after the de-merger, running its world-wide operations. The role of the Manager was that of gathering money from investors who wanted to invest in unlisted assets and of managing and growing the businesses into which they invested. He said that clients (investors) were interested in the track record of the company and concerned about the stability of the investment management team (whether they would stay together; and how to lock them in). In this connection he referred to the scheme in place for rewarding members of the team by carried interest in addition to their salary and bonus. The carried

LITI-9533391-1

AP1727

interest scheme implied a long term link with investors. The life of a fund was ten years. A successful private equity business had overlapping funds and would aim to keep a stable investment management team in place over a considerable period of time. If people left the team, this had to be handled delicately with investors. The carried interest scheme was the component to which investors looked to ensure that the team was together for an extended period of time. In the private equity business it was typical of such schemes that a person would expect to lose his carried interest entitlement if, having left, he went to join another organisation to carry on similar activities. He thought that this was pretty standard in the market place.

[36] Mr Greville gave evidence about how Sanjiv Kapur came to leave. The team had become fractured. There had been criticism from the pursuer and others of certain deals which Mr Kapur had carried through; and Mr Kapur, in turn, had made negative comments about some members of the team. Mr Greville looked into the complaints against Mr Kapur. He decided that there was no foundation for some of the allegations. There had been more substance in some of the others, but after careful consideration he had formed the opinion that it would be almost impossible to dismiss Mr Kapur "for cause". He had tried unsuccessfully to get the team working together again. He was faced with a difficult position. Mr Kapur had headed up a successful team but it was no longer viable. Mr Greville had to decide whom to back. He wanted to get the fundraising for HAPEP II under way. One option was to let Mr Kapur go and rebuild the team with himself (Mr Greville) playing a bigger role. There were many one-to-one discussions in which he tried to get commitments from the pursuer and others that, if he let Mr Kapur go, they would stay. He felt that he had commitments from the pursuer and some others, though he recognised that some might leave - I should note that, in the face of an objection to this line based on lack of record, Mr Johnston confirmed that he did not seek to rely on any evidence to the effect that the pursuer had given a commitment to stay for the whole life of the fund. Mr Greville said that he took the decision to let Mr Kapur go. It was really a commercial decision to let him go. He decided that he could not terminate his employment for cause. Accordingly, Mr Kapur left as a Good Leaver and therefore retained a significant percentage of his carried interest. He was put on gardening leave in September 2005 and left his employment in April 2006. During the intervening period, Lucian Wu, Roger Wu and Wei Hsien Chan all left and, with the pursuer's help, replacements were hired. This was all just before the pursuer left.

[37] Mr Greville said that the pursuer telephoned him to say that his letter of resignation was coming by fax. The pursuer had said that he was leaving principally for family reasons but also because fundraising (for HAPEP II) was not going so well. They had spent some time together when Mr Greville was in Singapore the previous week, but the pursuer had not mentioned that he was leaving. He could understand the timing, and his not mentioning it before then, since the pursuer would not have wanted to do anything before he received his bonus. When he heard the news he was flabbergasted, stunned. The implications both for him and the fundraising were "monumental". In cross-examination he maintained this position: it was a "devastating" blow. Mr Greville described the impact on the HAPEP II fund. He had wondered whether they should stop raising money for HAPEP II. By this time they had put together the presentation pack for HAPEP II. The pursuer was identified as a partner in the team being built around the remnants of the old team. Quite a lot of marketing had been done. The pursuer had been involved in the marketing within Europe. They had had to re-configure things and delay going back to the market while they worked out how to present the situation. Mr Greville went through the exchange of e-mails between himself and the pursuer. He tried to persuade him to change his mind. Failing that, he wanted him to stay longer than the three month notice period. When marketing the fund, they would have to tell clients that he was leaving, and they therefore wanted more time to manage the transition smoothly. The pursuer was not willing to extend his notice period. He was pushing to go earlier than the three months. He had mentioned at one point that he was losing his patience, which Mr Greville thought was "pretty amazing" in the circumstances. The pursuer helped in the recruitment of his replacement, Sigit Prasetya, but this was not entirely successful since Mr Prasetya moved on to greener pastures soon afterwards. The pursuer had also helped Henderson by giving a reference. This was in late August 2006. Mr Greville explained that they were trying to get an investor to come into the fund. One of the people from the investor had wanted to interview the pursuer, to find out why he left and why Mr Kapur had left, and to ask his views about the team that remained. Mr Greville had rung the pursuer to find out if he would take the call. The pursuer had turned it into a negotiation over the "carry". He had said that he was taking a risk in giving a reference; and that he felt badly treated because Mr Kapur had been treated as a Good Leaver, whereas

LITI-9533391-1

AP1728

he was an Intermediate Leaver and his position was up in the air. Mr Greville told him he was not participating in a negotiation and cut him off. Mr Greville knew that at this time the pursuer was working for Archer. Soon afterwards he received an e-mail from the pursuer saying that he, Mr Greville, had got the wrong end of the stick. He was willing to speak to the potential investor and did so. The feedback that Mr Greville got from this was "lukewarm".

[38] Mr Greville was taken to the minutes of the board meeting at which it was noted that the pursuer was a Bad Leaver, and to the letter of 17 January 2007 informing the pursuer of this. He accepted that there had been no specific discussion at the board meeting about the e-mail correspondence with the pursuer. Mr Greville explained that all board members sat close to each other at work in an open plan office and they were all aware of what was going on They did not at the board meeting formally consider the question of whether to exercise the discretion in favour of the pursuer. They had discussed the issues amongst themselves before - the discretion issue would have featured in the discussions, since it had been raised in correspondence from the pursuer's Australian solicitors - but no motion about the exercise of the discretion was put to the board to vote on.

[39] Mr Greville discussed what had happened in terms of their Leaver status to others who had left. David Bull had agreed to stay longer in return for being made a Good Leaver. Lucian Wu resigned and became an Intermediate Leaver. He did not join a competitor within six months and remains an Intermediate Leaver. Roger Wu and Wei Hsien Chan both joined competitors within six months of leaving and therefore became Bad Leavers.

[40] In cross-examination Mr Greville was pressed, by reference to various documents lodged in process, on the question of whether Henderson in fact competed with Archer. It was put to him that the PPM for HAPEP II dated 25 January 2006, showed that the fund was targeted to leading Asian businesses, predominantly in India, South East Asia, South Korea and Greater China, without any mention of Australia. He agreed, but said that they were not precluded from going outside that market. In some cases he would have to go back to ask the investors; but in others not. He gave as an example the fact that they were presently discussing funding a company in South Korea which wants to invest in a company in Australia. They would not need to go back to the investors to do that. But if they were going to invest directly into an Australian or European company with no Asian exposure or business, then they would certainly discuss it with the investors before doing so. He said that they had recently considered the case of a company in India with strong exposure to defence and military contracts. They had gone back to the investors on that, because it was "on the edge" of what their investors would have expected them to do. They had also consulted the investors on an investment into an Australian company which wanted to partner an Asian business. He gave a similar answer when it was put to him, by reference to the Limited Partnership Agreement for HAPEP II, that as a matter of contract they were limited in their investment range; if there was any question, they would go back to their investors and ask them. He agreed that the PPM also stressed the advantages of having a team "on the ground" in the markets in which it was intended to invest, but it was not the "be all and end all" and it did not restrict you to those markets. It helped for origination of deals, and it was important to keep talking to managements to see where their businesses were heading, but you could do it effectively without a permanent presence. For example, they had had one person permanently in India, with others, including the pursuer, flying in from Singapore. They were currently going through due diligence on a company in Hyderabad, many hours flying from Delhi, but it was fanciful to think that they should have an office in Hyderabad. Instead their people flew in, stayed in hotels and hired local consultants. There did not need to be a focus on a particular area - some of the companies they were looking at were involved in global businesses. They were helping grow global business and for that purpose they might, if required, make their target company to buy a company in Australia or Europe. He thought that the extent of the differences in management style between companies in the different markets was exaggerated. Of course one had to adapt to every market and understand the conventions, but you did so by using advisors and intermediaries and doing research. He agreed that HAPEP II was being sold in part on the back of HAPEP I. It was also borne of their drive to build up their origination capacity. HAPEP I covered Asia and the Pacific, from Australia to Korea and beyond. For HAPEP I, some twenty deals in Australia had been looked at, though none were concluded; however he accepted that it was possible, though he could not be certain, that these opportunities in Australia had arisen prior to the de-merger from AMP. One investment in India led indirectly to an

LITI-9533391-1

AP1729

investment in a company in Germany. They had never precluded themselves from looking outside the Asian region or funding Asian companies to invest in Australian companies. He agreed that the Quarterly Report as at 30 September 2006 for HAPEP I contained no reference to Australia. It showed that the regulatory status of the relevant Henderson businesses was limited to the UK, Hong Kong and Singapore and did not include Australia.

[41] On being asked in cross-examination whether the pursuer was a good fund manager, Mr Greville said that he had no complaints about the work he and his colleagues were producing. They were a good team and worked effectively together. His skills were internationally tradeable. He rejected the suggestion that the pursuer's knowledge of Asian and Indian markets was of little use to him in Sydney. He had learned due diligence, how to run companies, etc. These were marketable attributes. Mr Greville gave a careful and considered answer to the suggestion put to him that, in Sydney, the pursuer was not a threat to Henderson. To the extent that Henderson looked at Australian transactions, he could be a threat. He posed this question:

"If I was talking to him, or having a beer with him, would I mention an Australian company that we were looking at?"

The answer he gave was: "No". "That's the test", he said, and added (on more than one occasion):

"We haven't competed with Archer to my knowledge. I wouldn't expect them to be against us, but I wouldn't be surprised if they were."

He agreed with the suggestion that Archer's exclusive focus was on companies headquartered in Australia and New Zealand; but the significance of this turned on the word "headquartered". He named two or three companies headquartered in Australia but having business in Asia. Their business interests might compete in other markets. He knew that Archer had invested in companies which had interests in Asia. Henderson might invest in a coffee company in Asia which would compete with an Australian company involved in coffee in Asia. While you knew who your main competitors were, you did not know them all - competition could come from anywhere. Further, Archer had definitely been a threat in the labour market. He gave as an illustration of this the fact that both David Bull and the pursuer were now with Archer.

### Submissions

*(i) Submissions for the pursuer*

[42] Both Mr MacKenzie, who appeared for the pursuer, and Mr Johnston QC, who appeared for the defenders, helpfully put in written outlines of their submissions and, subsequently, supplementary notes of submissions. I am grateful to them for that.

[43] Mr MacKenzie invited me to sustain the pursuer's first plea in law and to grant decree as concluded for. He began his submissions by referring to the evidence. He submitted that one critical question of fact had to be resolved: was Archer a competitor of Henderson? In answering this question it was necessary to have in mind three areas of potential competition: competition for funds; competition for deals; and competition for staff. Mr MacKenzie submitted that Archer competed with Henderson for funds and for staff only in the broadest sense. Investors, particularly pension fund investors, would invest with both Henderson and Archer. Their selection of a particular fund would depend on the investor's preference in terms of the geographical and risk profile of the fund. An investor seeking to invest in Asia would not go to Archer; nor would an investor seeking to invest in Australia go to Henderson. On the evidence, Archer did not compete with Henderson for deals at all. There was not a single instance of them having come up against each other in connection with a proposed deal. It was relevant to consider whether there was a legitimate business interest for Henderson to protect in seeking to restrain the pursuer from leaving at all. There was no such interest unless he went to join a competitor. Mr MacKenzie submitted that if, on the evidence, the court considered that Archer was not in fact a competitor, it followed that the pursuer was not a Bad Leaver and was entitled to succeed in his action.

LITI-9533391-1

AP1730

[44] The remainder of Mr MacKenzie's submissions were made in anticipation of an argument by the defenders that, because of the "deeming provision" in the definition of Bad Leaver, the pursuer must fail regardless of any finding that Archer did not in fact compete. They fell under five heads. First, he considered the contract framework. He pointed out that although the pursuer was initially employed by AMP, and had become a Carried Interest Partner whilst the business was still merged, after the de-merger his employment was assigned to Henderson. Accordingly, the assessment of his Leaver status must now be made by reference to employment with Henderson without AMP. Schedule 2 to The Limited Partnership Agreement sets out the Leaver arrangements. He then went through various provisions in The Limited Partnership Agreement. He referred to the definitions of Bad Leaver and Intermediate Leaver. In connection with the definition of Bad Leaver, he pointed to the width of the definition of Associate which included parent companies, subsidiaries and associate companies, and their parents and subsidiaries; in other words all companies in the Group, up, down and across. He noted that Good Leavers received their carried interest subject to the relevant reduction depending on when they leave, whereas Bad Leavers received nothing. Finally, he pointed to the "saving provision", as he called it, in Schedule 2, Part 1 para.3.4, which gave the General Partner a discretion to allow a Bad Leaver to be treated, for the purpose of his entitlement to carried interest, as a Good Leaver. That discretion had to be exercised within 60 days of him having become a Bad Leaver.

[45] Secondly, Mr MacKenzie developed an argument that, on a proper construction of The Limited Partnership Agreement, the pursuer was automatically a Good Leaver by reason of the terms of Schedule 2, Part 3 para.4. He pointed out that, when he left Henderson on 10 June 2006, the pursuer was an Intermediate Leaver and had been, in advance of his leaving, classified as such by the General Partner at a board meeting of 25 May 2006. There was no attempt to re-classify him as a Bad Leaver until the board meeting of 29 January 2007. On the evidence, therefore, the pursuer became, and was categorised as, an Intermediate Leaver after 1 January 2006. Para.4 of Schedule 2, Part 3 provided that "if a Carried Interest Partner becomes an Intermediate Leaver on or after 1 January 2006 they shall be treated as a Good Leaver ... and Part 2 above [i.e. the Good Leaver provisions] shall apply." Having left as an Intermediate Leaver after 1 January 2006, the pursuer had the right to be treated as a Good Leaver so far as concerned his entitlement to carried interest, and any attempt to change that status at a later date was inept.

[46] Third, Mr MacKenzie made submissions about the definition of Bad Leaver in Schedule 2. He drew attention to the order in which phrases appeared in the definition. A Bad Leaver was a Leaver who, within six months of leaving, "joins a competitor". In ordinary language, this meant a Leaver who joined a business which in fact competed with Henderson. The important wording was: "joins a competitor". The purpose of the second ("deeming") part of the definition - "shall be deemed to compete with the Manager or any Associate if ...", followed by a series of business activities - was not to expand the class of competitors relevant to Leaver status to include those who, although they did private equity work, did not compete; it was to restrict the relevant class of competitors to competitors who did private equity work;. To read the "deeming" provision in such a way that "competitor" meant all those engaged in private equity work whether they were competitors or non-competitors would be absurd. In support of this argument, Mr MacKenzie put forward a number of well-known principles on construction of contracts under reference to well-known authorities. *Emcor Drake & Scull Limited* v *Edinburgh Royal Joint Venture* 2005 SLT 1233 at para.[13] and *Melville Dundas Limited (In Receivership)* v *Hotel Corporation of Edinburgh Limited* 2007 SC 12 at para.[17] identified the correct approach to construction. Under reference to McBryde, The Law of Contract, 3rd ed. paras.8-10 to 8-13, he submitted that words in a contract should be given their ordinary meaning; the construction of a contract should accord with business reality; and absurd meanings should be rejected. Parties could create their own "dictionary": Lewison, The Interpretation of Contracts, para.5.10. Any ambiguity could be assisted by reference to the presumption of legality: *McBryde* para.8.37; *Neilson* v *Stewart*, 1991 SC (HL) 22, per Lord Jauncey at 38; *Scottish Farmers' Dairy Co. (Glasgow) Limited* v *M'Ghee* 1933 SC 148; or by resort to the *contra proferentem* rule, in either or both of the ways in which that rule is commonly understood: McBryde para.8-38.

[47] Fourth, Mr MacKenzie sought to argue that the Bad Leaver provisions were unenforceable. Before summarising his argument, I should observe that the only contention to this effect of which notice had been given in the pleadings was the averment in Article 6 of Condescendence: "*esto* the pursuer has been

<div align="center">14</div>

correctly classified as a Bad Leaver (which is denied) Clause 3 of Schedule 2 to the [Limited] Partnership Agreement is a penalty clause". The reference should, I think, be to clause 3 of Part 1 of Schedule 2, but nothing turns on this. Mr MacKenzie did not in fact seek to support the "penalty clause" argument, and I say nothing more about that argument. Instead, however, he sought to argue that the Bad Leaver provisions were unenforceable as being in restraint of trade. Under reference to the Stair Memorial Encyclopaedia, volume 15, at paras.770-777, he identified an agreement in restraint of trade as being one whose terms profess to prevent one of the parties to it from conducting itself in a manner which is economically damaging to the other party. As a general proposition, he submitted, a contractual term restricting an employee's activities after termination is unenforceable as being in restraint of trade and contrary to public policy unless the employer can show that (a) it has a legitimate proprietary interest that it is appropriate to protect and (b) the protection sought is no more than is reasonable having regard to the interests of the parties and the public interest: *Nordenfelt* v *Maxim Nordenfelt Guns and Ammunition Co. Ltd.* [1894] AC 535, especially per Lord Herschell at 547 and 549. An employer cannot impose a covenant merely to stop someone competing; but it can seek to stop that person using or damaging something which legitimately belongs to it. This type of restriction is to be distinguished from a restriction to enforce a duty of confidentiality that an employee owes to an employer. Each case must be considered by reference to the business needs of the employer imposing the restriction. In the case of a restraint against joining a competitor, the meaning of competitor will be construed at the time employment ceases: *Commercial Plastics Limited* v *Vincent* [1965] 1 QB 623, 639; McBryde paras.19-102 and 19-103. To determine what rights may require protection, it was necessary to look at the nature of the business and the employer's position in that business: *Mason* v *Provident Clothing and Supply Co. Ltd* [1913] AC 724, 731, 742; *Herbert Morris Ltd* v *Saxelby* [1916] 1 AC 688. The rights that a court will allow to be protected fall broadly into two categories: trade connections (with suppliers or customers) or goodwill; and trade secrets and other confidential information. As regards trade connections, an employer must distinguish its own customer connections from the personal qualities of the employee: *Cantor Fitzgerald (UK) Ltd* v *Wallace* [1992] IRLR 215. If there is a legitimate interest to protect, the restriction must be no wider than is reasonably necessary to protect that interest: *Allied Dunbar (Frank Weisinger) Ltd* v *Weisinger* [1988] IRLR 60. In some cases exception was taken to the period for which the restriction was sought to be enforced, but in this case the restriction was for six months only, and no objection was taken to that period if the restriction were otherwise valid. The geographical extent of the limitation must also be considered. Worldwide covenants have been held to be enforceable (*Nordenfelt*). Relevant factors will include: whether there is an actual relationship between the interest to be protected and any specific geographical area (*Office Angels Ltd* v *Rainer-Thomas and O'Connor [1991] IRLR 214 CA*); the area of activities of the employee; and the size and nature of the population of the area. By way of example, he referred to *Dyson Technology Ltd* v *Strutt* [2005] EWHC 2814; *TFS Derivatives Ltd* v *Morgan* [2005] IRLR 246; *Wincanton Ltd* v *Cranny* [2000] IRLR 716; *Lansing Linde* v *Kerr* [1991] 1 All ER 418. In reliance on *FSS Travel and Leisure Systems Limited* v *Johnson [1998] IRLR 382*, he submitted that employers seeking to enforce a non-compete clause must identify the trade secrets and confidential information which may be legitimately protected. Mr MacKenzie emphasised that the law concerning agreements in restraint of trade did not apply only to prohibitions on working for others. In *Marshall* v *N M Financial Management Limited* [1996] IRLR 20 it was held, relying on *Wyatt* v *Kreglinger & Fernau* [1933] 1 KB 793, that rules of a commission scheme under which a person was entitled to accrued commission after he left only on condition that he did not work for a competitor, amounted to a covenant in restraint of trade. In the present case, Mr MacKenzie submitted, the pursuer had had a geographical focus, any proprietary information in his possession related to the availability of deals in a particular location (not Australia) and the pursuer did not take anything of value with him to Archer, apart from his skills and experience. The definition of Bad Leaver in The Limited Partnership Agreement, however, had no geographical limit; and, further, though this was not essential to his argument, on the defenders' reading of the clause it included a definition of competitor which went too wide in many respects.

[48] Finally, Mr MacKenzie made submissions on the exercise of the discretion under para.3.4 of Schedule 2 Part 1 to The Limited Partnership Agreement. He accepted that the court would be reluctant to interfere with a contractual discretion so long as it was exercised honestly and in good faith: *Ludgate Insurance Co Ltd* v *Citibank NA* [1998] Lloyd's Rep. I.R. 221, 230, 239; *Abu Dhabi National Tanker Co* v *Product Star Shipping (The Product Star)* [1993] 1 Lloyd's Rep. 397, 404. In the context of a widely drawn non-compete covenant, the discretion given in this contract is an obvious "check" on the wide scope of the

LITI-9533391-1

AP1732

restriction and is therefore of great importance. He submitted that where a discretion of this sort is given, it ought to be exercised reasonably, and reasons given: see *Burgerking Limited* v *Rachel Charitable Trust* 2006 SLT 224. On its proper construction, para.3.4 obliged the General Partner to address the question of discretion in every Bad Leaver case. In this case it was not clear that the discretion was exercised at all. The evidence suggested that it was not. Certainly no reasons were given. Any decisions were taken in an informal and casual manner. In such circumstances the court was entitled, as it had in *Burgerking*, to rule that the discretion should have been exercised in favour of treating the pursuer as a Good Leaver, having regard to a number of factors, viz.: that Archer was not actually a competitor of Henderson; that the pursuer was recognised to be a good fund manager; that he left primarily for family reasons; that he assisted the defenders by providing references when asked to do so; and that he assisted in finding his replacement. Alternatively the court could remit the matter to the General Partner for it to reconsider.

*(ii) Submissions for the defender*

[49] Mr Johnston QC moved the court to sustain the defenders' second to fifth pleas-in-law and grant decree of absolvitor. He did not challenge Mr MacKenzie's submissions concerning the principles to be applied in construing a contract, though he emphasized that, whilst it would look for the construction which appeared to make the best commercial sense, the court would not "re-write" a contract to achieve a particular result.

[50] His primary submission was a very simple one. For the purpose of determining whether a leaver has joined a competitor, the relevant provision of the agreement was the definition of "Bad Leaver" in Part 1 of Schedule 2, which provided that a business was "deemed to compete" in certain circumstances. It was established in evidence, and was anyway a matter of admission in the pleadings that, having tendered his resignation on 27 March 2006 and having left that employment on 10 June 2006, the pursuer entered employment with Archer on about 3 July 2006. Archer was a private equity manager in Australia. It was also established in evidence that the business of Archer included making, dealing in, managing, or advising as to unquoted equity investments, and raising or seeking to raise commitments (or similar) from other persons to facilitate the same. Accordingly, Archer fell within the relevant definition of "competitor"; and since the pursuer joined that competitor within six months of becoming a leaver, he fell squarely within the definition of Bad Leaver.

[51] During the course of the proof Mr Johnston had objected when the pursuer sought to lead evidence about the nature of Archer's business. The evidence was allowed subject to the usual reservations. In his closing submissions Mr Johnston insisted upon his objection. Whilst such evidence might have been relevant for other purposes, it was objected to in so far as it was led for the purpose of supplanting or contradicting the definition of competitor in The Limited Partnership Agreement. It was well established that evidence which seeks to qualify or contradict the clear terms of an agreement is inadmissible: see Dickson, Evidence paras.1015-22, Walker, Evidence para.267 and Macphail, Evidence paras.15.02, 15.08, 15.35-6. However, he went on to submit that even if this evidence was admissible, it did not assist the pursuer. The evidence showed that Archer was a competitor. Mr Johnston made detailed submissions on the evidence to the effect that private equity was a global business in which all participants competed for staff, for clients (investors) and for deals.

[52] Mr Johnston next dealt with the pursuer's submission that the General Partner should have exercised its discretion to treat the pursuer as a Good Leaver. He pointed out that this question arose only in the event that the pursuer was a Bad Leaver in terms of The Limited Partnership Agreement. He referred to para.3.4 of Schedule 2 Part 1. He submitted that there was no duty on the General Partner to exercise the discretion at all, let alone in every Bad Leaver case. The clause was permissive. In considering whether to exercise the discretion in favour of a Bad Leaver, the General Partner owed a duty - and in the context of a partnership, a fiduciary duty - not only to the Bad Leaver but also to all the other partners who would stand to lose financially if the discretion were exercised in his favour. He submitted that the pursuer had made no averments and had led no evidence sufficient to allow the court to review the exercise or non-exercise of the discretion. The discretion was reviewable, if at all, only if *ultra vires* or exercised in bad faith. This was the approach taken in the cases cited by Mr MacKenzie and it was consistent also with the case law concerning discretionary trustees: see *Board of Management for Dundee General Hospitals* v

16

*Bell's Trs* 1952 SC (HL) 78 and *MacTavish* v *Reid's Trs* (1904) 12 SLT 404. The pursuer had not proved, or even averred, anything of this sort. In any event, it was not for the court to exercise the discretion in place of the General Partner. At most the court could remit the matter to the General Partner for reconsideration.

[53] Turning to the facts relevant to the exercise of the discretion, Mr Johnston suggested that little weight should be attached to the fact that the pursuer had assisted in recruiting his replacement. It was the least he could have done in the circumstances. Had a replacement not been recruited speedily, the pursuer would not have been able to leave early but would have had to serve out his notice. According to the evidence of Mr Yates, what really makes a difference is if a person stays on; help in finding a successor, though welcome, is not as good. Mr Johnston submitted that there were no grounds on which the General Partner could fairly or appropriately have exercised the discretion in favour of the pursuer; and there were certainly no grounds for saying that a failure to exercise it in favour of the pursuer was unreasonable, let alone *mala fide*. He had joined a competitor; he had resigned suddenly and had refused the request to stay longer to assist with transitional arrangements; he had had a key role in the HAPEP II fund and, despite having given a commitment to the fund, had left at a damaging time for it, given recent departures from the investment team. Mr Johnston also submitted that the pursuer had not been treated inconsistently with the way in which other leavers were treated.

[54] Mr Johnston moved on to consider the argument that the pursuer was automatically a Good Leaver. Mr Johnston submitted that that argument was flatly contradicted by Schedule 2 Part 1 para.3.5, which dealt with the case of someone moving from being an Intermediate Leaver to being a Bad Leaver. Para.4 of Schedule 2 Part 3, on which the pursuer relied, was concerned not with altering the status of an Intermediate Leaver but with quantification of the sums to which he was entitled. He was to be treated for these purposes as a Good Leaver. That clearly would not apply if an Intermediate Leaver joined a competitor within six months of leaving and thereby became a Bad Leaver; because then he would no longer be an Intermediate Leaver and would no longer be entitled in terms of that paragraph to be treated for quantification purposes as a Good Leaver.

[55] Mr Johnston submitted that the pursuer was not entitled to argue the restraint of trade point. There was no record for any such argument. Under reference to *Morrison's Associated Companies Ltd* v *James Rome & Sons Ltd* 1964 SC 160, 182, 190 and *Burns* v *Dixon's Iron Works* 1961 SC 102, 107-8, he submitted that the pursuer was not entitled to advance a case of which he had given no notice and in respect of which the defenders had had no fair chance to lead evidence. The case on restraint of trade was not a mere variation, modification or development of the pursuer's case on record. The penalty clause argument was entirely different. Had restraint of trade been in issue, the defenders would have conducted the proof differently. For example, they would have led evidence about the legitimate interest which the Bad Leaver provisions sought to protect: were they seeking to protect Henderson from the use or misuse of confidential information and trade connections? were they seeking to protect goodwill? or was the restriction aimed at preventing the pursuer using his personal skills in competition to them? He referred in this connection to *Cantor Fitzgerald (UK) Ltd* v *Wallace*. As appeared from the authorities cited by the pursuer, consideration of these issues required detailed evidence about the nature of a person's employment (and the court had not even seen the pursuer's contract of employment); the character of any information held; restrictions on its dissemination; the extent to which it was in the public domain; and the damage that might arise if it is used or disclosed: cf. *Lansing Linde* v *Kerr* and *FSS Travel and Leisure Systems Ltd* v *Johnson*. Detailed evidence of this kind was not available to the court at this stage.

[56] Mr Johnston said that if, contrary to that argument, the court regarded this point as open to the pursuer, on such limited evidence as there was the provisions should not be regarded as unenforceable. He relied upon a number of factors pointing to this conclusion. The provisions only affected (for a period of six months) working for a company dealing in unquoted securities and therefore did not touch working for companies that deal in quoted securities or any other kind of investment management. The industry is global in nature and a world-wide restraint is therefore reasonable: c.f. *Commercial Plastics Ltd* v *Vincent*. The terms were industry standard; they were entered into by the various partners, including the pursuer, with the benefit of independent legal advice obtained on their behalf in a consultation process that took many months; and the Bad Leaver provision was not (as for instance in *Marshall* v *NM Financial*

17

*Management Ltd*) part of the contract of employment but a provision within a separate partnership agreement whose whole purpose on the evidence was to make it financially attractive for the partners to stay with the defenders for a reasonable period.

[57] Further, the pursuer on his own evidence knew that a Bad Leaver would lose 100% of his carried interest and knew the definition of a Bad Leaver. He had anticipated losing 20% on the basis that he was not joining a competitor and had negotiated a payment from Archer to compensate him for that loss. There was no evidence of what Archer would have been willing to pay had he approached them as a Bad Leaver who would lose 100%. The court cannot assume that, had he tried so to do, the pursuer could not have negotiated a payment from Archer (or another intended employer) of the full amount of his carried interest. Accordingly the court had no evidence that the loss of carried interest in the event of a Leaver joining a competitor amounted to a restriction on employment at all.

[58] Mr Johnston emphasised that the court was here concerned with a multiparty agreement. The pursuer's submissions appeared to be directed at disapplying the provisions so far as they applied to him but adhering to them so far as the other partners were concerned. That was not possible as a matter of law. The terms on which the partners made their agreement were such that the determination of the Leaver status of any one partner affected every other partner. It is not possible for the clause to be legal with respect to some partners and illegal with respect to others, since its legality is tested at the date the contract was made: McBryde, para.19-102.

[59] Finally, Mr Johnston reminded me that The Limited Partnership Agreement was entirely separate from the pursuer's contract of employment. The Limited Partnership Agreement had no content other than the calculation of and attribution to the various partners of shares in carried interest: it was not possible to sever the clause of which the pursuer complains from the remainder of the agreement. Accordingly, to delete Schedule 2 Part 1 clause 3 on grounds of illegality would be illegitimate since what would remain would be an altogether different bargain from that which the partners entered into: cf. e.g. *Marshall* v *NM Financial Management Ltd* at para.17.

*(iii) Reply for the pursuer*

[60] In a brief reply, MacKenzie submitted that the restraint of trade point was open to him. The argument was a legal one. It challenged the enforceability of the clause founded upon. The Summons contained an averment that "... Clause 3 of Schedule 2 is penal and unenforceable." While the legal arguments were different, the factual basis for such an argument had been set out on record. He pointed out that restraint of trade is mentioned as early as the initial correspondence from the pursuer's Australian solicitors. He submitted that the defenders had already in their pleadings put in issue matters relating to what, if any, legitimate interest the defenders had to protect, what confidential information the pursuer possessed and his knowledge of customer connections. They also made averments about the duration and reasonableness of the restriction. They had had the opportunity of dealing with these matters in evidence, and had put forward a case on the evidence as to why the pursuer's argument should not succeed on the merits. They had suffered no prejudice and it would be wrong not to allow the restraint of trade point to be argued.

[61] On the question of the multipartite nature of the agreement and the linked arguments about severability, he submitted that the terms of the Limited Partnership were unenforceable <u>as between the pursuer and the defenders</u>. Enforceability depended on whether it was reasonable for the protection of the legitimate business interests of the defenders. What those interests were would depend on the nature of the business and the pursuer's position in the business. He referred to *Robin M. Bridge* v *Deacons (A firm)* [1984] 1 AC 705, 714G; and Gloag on Contract, 2nd ed., at page 585 ("The objection that a contract is immoral or illegal <u>as between plaintiff and defendant</u>..."). He submitted that the provision in this contract was capable of being severed, and should be regarded as unenforceable as between the pursuer and the defenders. When this provision was severed from the rest of The Limited Partnership Agreement, the relationship between the various partners continued to exist.

LITI-9533391-1

AP1735

[62] Mr MacKenzie also drew my attention to the case of *Alec Lobb (Garages) Ltd* v *Total Oil GB Ltd* [1985] 1 WLR 173 as an illustration of two agreements being taken together for the purpose of considering a restraint of trade argument.

### Discussion

*(i) Is the pursuer a Bad Leaver as defined in The Limited Partnership Agreement?*

[63] Mr MacKenzie submitted that the critical issue of fact was whether Archer was a competitor of Henderson. The correctness or otherwise of that submission depends upon the proper construction of The Limited Partnership Agreement.

[64] There was little difference between the parties as to the general principles to be applied in construing a contract. This is not, therefore, the occasion on which to attempt yet another re-statement of those principles. For present purposes I am content to approach the matter in accordance with the guidance given by Lord Drummond Young in *Encor Drake & Scull* v *Edinburgh Royal Joint Venture* at paras.[13]-[14] and in *Melville Dundas Ltd* v *Hotel Corporation of Edinburgh Ltd* at paras.[9]-[10] and [17]. The court attempts to identify the bargain which the parties have made primarily by reference to the words which they have used in the contract, giving those words their ordinary meaning except where it is shown, objectively, that a different meaning must have been intended. The contract must be construed as a whole; and, since no contract is made in a vacuum, must also be construed in the light of the factual background against which it was made. That background will sometimes assist in identifying whether a suggested construction appears to make commercial sense; and, of two or more possible constructions, the court will generally prefer that which is the most sensible commercially, not because of any preconceived notion by the court that parties ought to be sensible but simply because that is what is more likely to have been intended by reasonable businessmen. But the court will not impose its own view of what makes business sense; and it will not rewrite the contract so as to make it fit with its own ideas of what the parties ought reasonably to have agreed.

[65] The relevant background here is that the private equity business is a global business. There are a large number of private equity funds competing both for investors and for deals. The success of a fund will depend on being able to source and win deals, on being able to help the target businesses grow, and on having a successful exit strategy. Much depends, particularly at the initiating stage, on the abilities of the particular fund managers. The track record of the fund management team will affect its ability to attract inward investment. A company will want to hold onto members of a successful fund management team, particularly during the investment period, the early period of a fund when it is trying to attract inward investment and source deals. Investors in the fund, for their part, want the fund managers to be incentivised by having a stake in the success of the business. It is common within the private equity business to link such incentives to the willingness of each individual fund manager to stay with the fund for a substantial part of its life, and in particular for the duration of the investment period. There is generally a desire that, during that period at least, fund managers should not leave; and in particular should not leave to join other companies in the private equity business. An early departure will weaken the team and may risk breaking it up further, to the detriment of the fund. Movement of some team members to another private equity company may have an adverse effect on inward investment. Although I accept, to some extent, the pursuer's evidence that a fund manager's expertise and experience in one market is not readily transferable to a different market, and that those wishing to invest in private equity funds will tend generally to decide on a geographic basis before choosing the best fund with that focus, it seemed to me that this was somewhat overstated. I do not accept that there is a firm dividing line. The pursuer accepted in cross-examination that funds do compete to some extent for investors. This was confirmed to varying degrees by the other witnesses. I accept also that they compete for the best fund managers, though which fund managers go to which companies will also depend upon personal reasons. It is not always easy to say whether private equity companies compete for deals. The pursuer placed great reliance on the documents which did not include Archer amongst Henderson's main competitors; but all that such documents show is that Archer is not perceived as one of Henderson's <u>main</u> competitors. As Mr Greville explained, you know your main competitors, but competition can come from anywhere. Nor do I consider that the geographic focus of the fund in the PPM and the Private Partnership Agreement excludes the

LITI-9533391-1

AP1736

possibility of competition with Archer. I found convincing the whole evidence of Mr Greville, and in particular that which I have summarised at paras.[40]-[41] above. In so far as his evidence was in conflict with the evidence of other witnesses, I prefer it. He pointed to the global nature of the business and to the fact that investment into a business headquartered in one region may enable that business to compete in another region. In his only real criticism of the witnesses, Mr MacKenzie said that Mr Greville tended to be argumentative, to avoid simple questions and to make "nice distinctions". I reject that criticism. He was argumentative only in refusing to accept what he regarded, rightly in my view, as an over-simple analysis of the private equity business. And if he made "nice distinctions", it was because there were nice distinctions to be made. I think Mr Greville put it well when he said, referring to the possibility of competition with Archer, that though he would not expect to be against them he would not be surprised if they were. To that extent it is, in my opinion, correct to say that on some level all private equity companies are at least potential competitors of one another in all three of the areas identified by Mr MacKenzie. It would not be surprising, therefore, if parties to the Limited Partnership Agreement decided to include in the definition of Bad Leaver a definition of "competitor" which included all companies operating in the private equity business.

[66] The Limited Partnership Agreement gives the members of the investment management team a stake in the business in the form of their entitlement, as Carried Interest Partners, to a proportion of the income accruing to the Limited Partnership. The Limited Partnership is specific to the HAPEP I fund. Other funds will have their own limited partnership arrangements to give effect to a similar incentive scheme. It is necessary in the Limited Partnership to make provision for some people leaving the team and others joining. The Leaver and Joiner Arrangements in Schedule 2 do this. In addition to allowing Joiners to be given a stake in the profits of the partnership, they deal with the different circumstances in which a fund manager may leave. No doubt there are a number of different ways in which Leavers might be categorised depending, for example, on whether they leave voluntarily or are dismissed, the stage at which they leave and whether or not they go on to join a competitor. Equally there are a number of different ways in which leavers falling within any particular category might be treated in terms of whether they retain or lose, in whole or in part, their entitlement to carried interest. Each categorisation, and each way of treating persons falling within such category, will have advantages and disadvantages both for the person leaving and for those remaining - and it must not be forgotten that those who remain also have an interest when a person leaves, not only because of their interest in the success of the fund which might be affected by that departure, but also because they stand to gain by an increase in their Relevant Proportion if the Leaver loses any part of his entitlement. It is not for the court in this context to assess whether any particular provision is fair or unfair to any particular person or group of persons. The court has to interpret the agreement the parties have made. That involves looking to the detailed provisions in Schedule 2.

[67] The overall scheme of Schedule 2 is that, for the purpose of identifying what is to happen to their carried interest entitlements, Leavers are categorised into Good, Bad and Intermediate Leavers. Good and Intermediate Leavers lose some of their carried interest entitlement depending on when, in the life of the fund, they leave. However, a Bad Leaver immediately ceases to be a partner in the Limited Partnership and has his entitlement to carried interest "reduced to zero", subject to a discretion given to the General Partner in any particular case to determine that a Bad Leaver's carried interest entitlement should be treated in a different way. The terms Good Leaver, Bad Leaver and Intermediate Leaver have no independent existence or meaning outwith the terms of the Limited Partnership Agreement. There was, for example, no suggestion in the evidence that those terms had an established meaning throughout the private equity business. They take their meanings from the definitions in Schedule 2; and, in order to identify the category into which a Leaver falls, one has to look to the terms of Schedule 2.

[68] In this case only the definition of Bad Leaver is in issue. A Bad Leaver is defined *inter alia* as a Leaver who "within six months of ... becoming a Leaver joins a competitor of the Manager or any Associate". I accept Mr MacKenzie's submission that, in light of the de-merger, it is right to look at the term "Associate" as referring to companies in the Henderson group, rather than within both AMP and Henderson. So a Bad Leaver is a Leaver who "within six months of ... becoming a Leaver joins a competitor of" a company in the Henderson group. A Leaver shall be deemed to have joined a competitor if he takes employment with or provides services to a competitor. That presents no difficulties. But there is then the further deeming provision which has given rise to the present dispute. A business shall be deemed to compete

LITI-9533391-1

AP1737

"if its business includes making, dealing in, managing or advising as to unquoted equity investments whether for its own account as principal or as agent, trustee, manager or adviser on behalf of others or if it includes seeking to raise or raising commitments (or similar) from other persons to facilitate the making, dealing in, managing or advising as to unquoted equity investments ...."

That definition identifies the critical issue of fact in this case. The critical issue is not, as Mr MacKenzie submitted, whether Archer in fact competes with Henderson. The issue is whether Archer falls within the definition of competitor in Schedule 2 to the Limited Partnership Agreement. I did not understand it to be disputed that Archer does fall within that definition. It is admitted in Articles 2 and 7 of the Summons (as adjusted), and was admitted by the pursuer in evidence, that the pursuer joined Archer within six months of becoming a Leaver and that Archer is a private equity manager in Australia. It was established in evidence, and was not disputed, that Archer, like all other private equity managers, deals in unquoted equity and investments and also seeks to raise commitments from others to facilitate that dealing. Accordingly it falls within both parts of the deeming provision and is deemed to be a competitor. Since the pursuer joined a competitor so defined (Archer) within six months of becoming a Leaver, he falls within the definition of Bad Leaver.

[69] Mr McKenzie's argument was that the definition of Bad Leaver focused on whether or not the Leaver joined a competitor. That meant what it said. Only those who joined actual competitors within six months of leaving were Bad Leavers. The purpose of the deeming part of the definition was not to widen the meaning of competitor to include any company whose business included dealing in unquoted equity investments, whether that company was an actual competitor or not; but rather to narrow the wide range of actual competitors, so that the only competitors to be taken into account for the purpose of determining whether or not someone was a Bad Leaver were those competitors who were involved in dealing with unquoted equity investments. Without this narrowing, a Leaver might be a Bad Leaver if he joined any company which was in fact a competitor of any company in the Henderson Group. Since companies in the Henderson Group carried on a wide range of activities, only a small part of which were to do with unquoted equities, that could include almost anything. The deeming provision therefore protected the Leaver by limiting the range of competitors, the joining of which made him a Bad Leaver, to those engaged in the private equity business. But for this to cut in at all, he had to have joined a business which was in fact a competitor. To determine whether or not a particular company was a competitor, one needed to look at the facts.

[70] In my opinion this argument must fail on a proper construction of the agreement. Two factors point strongly against it. The first is the way in which the clause is drafted. A Leaver is a Bad Leaver if he joins a competitor. He is deemed to have joined a competitor if he takes employment with a competitor. A business is deemed to compete if its business includes dealing in unquoted equities; or if its business includes raising commitments from third parties to facilitate dealing in private equities. The clause drives one through a number of stages to determine whether the business that the Leaver joins is a competitor. It answers this by deeming such a business to be a competitor if it deals etc. in unquoted equities. There is no ambiguity. It does not seek to narrow a potentially wide class of competitors. It would have been easy to achieve the result preferred by Mr MacKenzie had such a result been intended. The deeming clause would have said something like: a business shall be deemed to compete <u>only</u> if its business includes dealing etc. in unquoted equity investments. But it does not.

[71] The second is this. The definition of Bad Leaver has to be seen in the context of the Limited Partnership Agreement of which it forms part. That Partnership Agreement is concerned, and solely concerned, with giving the various partners a stake in the gains arising from the operations of the HAPEP I fund. It is entirely to do with dealing in unquoted equities. In those circumstances it seems to me to be clear that the deeming provision in the definition of Bad Leaver is deliberately framed so as to identify as a competitor any company whose business includes dealing in unquoted equities. There are sound reasons for this. As the evidence demonstrated, the private equity business is global in nature. Every company is capable of competing with any other. They may not have come up against each other in competition for deals in the past, but that is not to say that they will not in the near future. They compete for funds, even at the most general level. They compete for employees, if only in the sense that investment managers move from one company to another. And such movement may make one company more competitive both in

21

LITI-9533391-1

AP1738

attracting funds and in its ability to source deals. The situation is inevitably fluid. Regular or major competitors can readily be identified. But outside the list of major competitors, it is not easy to say whether one company is a competitor of another. The lack of competition in the past may not be conclusive as to the future. It cannot, so it seems to me, have been the intention of the parties that the status of a Leaver should depend upon a minute examination of whether the business which he joins, assuming it to be a business involving dealing in unquoted equities, has in fact been and/or is likely in the future to be a competitor of a company in the Henderson Group. Would one look for evidence of past competition on particular deals? Or would one take into account that although their paths had not yet crossed, they might do so in the future? This possible uncertainties are, in my opinion, almost unlimited. They would remove any certainty from the arrangements. A Leaver wanting to join a business dealing in unquoted equities would simply not know, in some cases, whether the business that he was joining was or was not a competitor - and therefore would not know whether by joining them he stood to lose all or only a small part of his "carried interest". I do not think that reasonable businessmen would be likely to have intended to enter into an agreement fraught with such uncertainty. More likely, in my view, that they put in the deeming provision to make it clear beyond doubt that all businesses dealing in unquoted equities were to be regarded as competitors for the purpose of the definition of a Bad Leaver.

[72] A question was raised in argument as to whether the deeming provision provided an exhaustive definition of a competitor for the purpose of the Bad Leaver definition. That does not arise for decision. There might be good arguments why it should include businesses that compete with parts of the Henderson Group other than those involved in dealing in unquoted equities; and there might be good reasons to exclude such businesses. I do not think that the answer to this issue affects the answer to the question of construction with which I am concerned. Should the point become important in some other case, it can be answered then.

[73] In case I am wrong, however, I should state my conclusion on the question whether Archer was a competitor of Henderson. I have already foreshadowed this in paras.[65] and [71] above. I accept that they had not knowingly competed. I also accept that they operated primarily in different geographic markets. But for the reasons I have given I find that Archer were competitors of Henderson not only for investors and for employees but also, potentially, for deals. Mr MacKenzie accepts that, albeit only in the broadest sense, they competed for funds (investors) and staff (employees). This would be enough in my view to make them actual competitors. I note that the definition of competitor in the Bad Leaver provision is not limited to companies competing for deals; it specifically includes a company raising commitments (funds) for private equity investment. When one adds to that the fact that they potentially compete for deals, there can be no doubt in my mind that they are actual competitors in a real sense. Accordingly, even if I were to accept Mr MacKenzie's submission that the critical issues of fact was whether Archer is a competitor of Henderson, I would still find the pursuer to be a Bad Leaver.

*(ii) "Automatically" a Good Leaver?*

[74] I turn next to consider Mr MacKenzie's argument that the pursuer was "automatically" a Good Leaver. The argument was that, when he left on 10 June 2006, the pursuer was an Intermediate Leaver. He had not joined Archer. Further, he was initially categorised by the second defenders (the General Partner), at a board meeting of 25 May 2006, as an Intermediate Leaver. In terms of Schedule 2 Part 3 para.4 of the Limited Partnership Agreement, a person who became an Intermediate Leaver on or after 1 January 2006 was to be treated as a Good Leaver for the purpose of how his carried interest entitlement was to be dealt with. In my opinion, that argument is wrong for two main reasons. First, it fails to take into account the fact that a person who leaves as an Intermediate Leaver will become a Bad Leaver if he joins a competitor within six months of leaving. Unless such a person moves straight into employment with a competitor on the day of leaving Henderson, he will start as an Intermediate Leaver. It may not be known then whether or not he will become a Bad Leaver. Para.3.5 of Schedule 2 Part 1 provides for the application to an Intermediate Leaver who becomes a Bad Leaver of the whole of the Bad Leaver provisions. If Mr MacKenzie's argument were correct, a carried interest partner leaving after 31 December 2005 could never become a Bad Leaver, unless he was foolish enough to join a competitor at the very same moment as he left Henderson. Yet it is clear that the Bad Leaver provisions are intended to deprive a carried interest partner of his entitlement <u>whenever</u> he becomes a Bad Leaver, whether during the first or the

eighth year of the life of the fund. Secondly, the argument fails to recognise that the paragraph relied upon (Schedule 2 Part 3 para.4) forms part of a series of provisions in Parts 2 and 3 of Schedule 2 dealing not with status but with entitlement and loss of entitlement. Part 2 sets out the reductions to his Relevant Proportion that a Good Leaver will suffer, depending upon when he leaves. This sets out in words what is reflected in figures in the "vesting schedule" in the letter of 20 July 2001. Part 3 does the same in respect of an Intermediate Leaver. The terms of para.4, on which reliance is placed, do not say that a person who becomes an Intermediate Leaver on or after 1 January 2006 becomes a Good Leaver. They simply state that a person who becomes an Intermediate Leaver on or after that date is to be treated as a Good Leaver, i.e. he will suffer the same deduction (if any) as a Good Leaver leaving at the same time. This too is reflected in the "vesting schedule". Nothing in this paragraph suggests that an Intermediate Leaver after this date becomes a Good Leaver; still less does it suggest that he will not become a Bad Leaver, with all the consequences that that entails, if he joins a competitor within six months of leaving.

*(iii) Should the discretion have been exercised in the pursuer's favour?*

[75] I consider next the argument for the pursuer that the General Partner failed properly or at all to exercise the discretion given by Schedule 2 Part 1 para.3.4. In terms of that paragraph the General Partner "may in its sole discretion determine" that (and I summarise) a Bad Leaver should not lose his whole carried interest entitlement but should instead receive such proportion thereof as shall be determined by the General Partner. Any such determination has to be made within 60 days of the Carried Interest Partner becoming a Bad Leaver. It should be noted that, contrary to Mr MacKenzie's argument, this provision does not entitle a Bad Leaver in whose favour the discretion is exercised to be treated in all respects as a Good Leaver. The reduction of his Relevant Proportion is to be determined not in accordance with Schedule 2 Part 2 (the provisions applicable to Good Leavers) but in the General Partner's sole discretion. For that reason, if for no other, a successful argument that the discretion should have been exercised in favour of the pursuer would not lead automatically to decree in favour of the pursuer in terms of the first Conclusion to the Summons. If this were the only difficulty, however, it could be dealt with by putting the matter out By Order for an appropriate amendment. But it is not the only difficulty, and accordingly it is necessary to consider the argument on its merits.

[76] There was no dispute about the principles to be applied in considering the exercise of a contractual discretion. The trust cases to which I was referred reflected the test suggested in the contract cases; not surprisingly, since one of the trust cases, *Board of Management for Dundee General Hospitals* v *Bell's Trs*, was relied on (under the reference *Dundee General Hospitals Board* v *Walker* [1952] 1 All ER 896) by the Court of Appeal in *Ludgate Insurance.* I take the law to be as set out at para.35 of the judgment of Brooke LJ in *Ludgate Insurance*:

"... provided that the discretion is exercised honestly and in good faith for the purposes for which it was conferred, and provided also that it was a true exercise of discretion in the sense that it was not capricious or arbitrary or so outrageous in its defiance of reason that it can properly be categorised as perverse, the courts will not intervene."

I would only add that where the discretion is exercised, reasons ought usually to be given, not necessarily in any formal way but in some manner sufficient to indicate to interested parties what decision has been taken and why.

[77] Mr MacKenzie said that the discretion did not appear to have been exercised at all. He is correct on this point. Indeed, Mr Greville accepted as much. There was no formal decision taken at a board meeting of the General Partner. At best, it appears that the members of the board discussed the question of the pursuer's Leaver status informally in the office. The decision was then taken at the board meeting of 29 January 2007, no doubt without much discussion but nonetheless correctly (as I have found), that the pursuer had become a Bad Leaver because he had joined a competitor within six months. No separate consideration was given at that meeting or at any other time to the exercise of the discretion in his favour. Mr MacKenzie submitted that the failure to consider the case brought the case within the principles described above. Mr Johnston, on the other hand, argued that it was not necessary that there should have been any consideration of the question. There was no duty on the General Partner to exercise the

23

discretion in every Bad Leaver case. I think that Mr Johnston is correct in this submission. There are various ways in which a discretion comes into play in a contract. In *Ludgate Insurance* the discretion under review arose in the context of how the Bank should allocate drawings under letters of credit in the absence of agreed instructions within a reasonable time. The contract provided for them to be allocated "in such manner as the Bank considers appropriate in its sole discretion". In *Abu Dhabi National Tanker Co* v *Product Star Shipping Ltd*, the owners of the vessel were allowed to request charterers to nominate another port if the nominated port of loading or discharge was "considered by the Master or Owners in his or their discretion dangerous". In such types of case, the requirement to exercise a discretion under the contract is dictated by circumstance and any challenge is to the decision which has been taken. I am not convinced that in such cases one is really talking about a person exercising a discretion at all, as that expression is normally used; what he is doing is really just taking a decision or making a judgement when faced with particular circumstances, in which context words such as "in its discretion" are intended to do no more than indicate that the decision reached is to be subject to challenge only in extreme circumstances. In other cases there may be something more akin to the traditional requirement, often imposed upon a trustee, to exercise a discretion. In such a case, a complaint might properly be made if the discretion is not exercised at all. What is the position here? It depends, in my view, upon the proper construction of the contract. Mr MacKenzie argues that there is a duty on the General Partner in every case where a Carried Interest Partner becomes a Bad Leaver to consider whether or not to exercise its discretion in favour of the Bad Leaver under para.3.4. I do not agree. In my opinion, para.3.4 does no more than permit the General Partner to exercise its discretion in favour of a Bad Leaver if it is so minded. The use of the word "may" is instructive. It is permissive. The words "in its sole discretion" apply to "may ... determine [that the Bad Leaver provisions should not apply]". If the General Partner does take the first step and determine that the Bad Leaver provisions shall not apply in a particular case, it has a further discretion as to what reduction of the Bad Leaver's Relevant Proportion should apply in its place. But I consider that there is no general obligation on the General Partner, in every case when a Carried Interest Partner becomes a Bad Leaver, to take the first step and apply its mind to the question whether the Bad Leaver should be treated not as a Bad Leaver but in some other way. That is not to say that the General Partner could not be criticised if, without explanation or reason, he simply ignored a request for the discretion to be exercised in favour of a Bad Leaver. But that is not the case here, since no such request has ever been made. On the contrary, the pursuer has always contended that he is a Good Leaver; and could not consistently with that have requested the General Partner to exercise that discretion in his favour.

[78] Had I taken the view that the question of discretion under para.3.4 ought to have been considered by the General Partner, I would have had to consider how to deal with its failure to do so in the present case. The only relevant Conclusion in this action is that for declarator. There is no Conclusion directed towards the question of the exercise of the discretion, nor is there any plea-in-law raising this issue. Nonetheless, the question of discretion is specifically pled on an *esto* basis in Article 10 of Condescendence and both parties have approached the matter in argument on the basis of the averments contained in that Article and such further matters as have emerged during the evidence.

[79] In support of his argument that the discretion ought to have been exercised in his favour, Mr MacKenzie relied strongly upon the treatment of other Leavers. The thrust of the pursuer's pleaded case was that the General Partner had exercised its discretion in their favour; and that the treatment he received was not consistent with that. Thus, it was averred that David Bull, who left Henderson at about the same time as the pursuer and also joined Archer within six months of leaving, was treated as a Good Leaver in terms of para.3.4. The pursuer averred that Lucian Wu resigned and was treated as an Intermediate Leaver. It is alleged that Sanjiv Kapur was dismissed - the pursuer had made allegations about Sanjiv Kapur's conduct both before and after his departure - but was treated as a Good Leaver. The evidence clarified all of these issues. Lucian Wu was indeed treated as an Intermediate Leaver, but he did not join a competitor and was entitled to be so treated. Two others, namely Roger Wu and Wei Hsien Chan, who were not mentioned in the Summons but whose positions were investigated during the evidence, joined competitors within six months of leaving and were correctly treated as Bad Leavers. In the case of Mr Kapur, the defenders took the decision not to dismiss him "for cause". He did not join a competitor within the six month period and was therefore, correctly, treated as a Good Leaver. The position of David Bull, who did join Archer within six months of leaving but was nonetheless treated as a

LITI-9533391-1

AP1741

Good Leaver, was explained by a number of witnesses. He was not a member of the investment team - he was responsible for the "non-deal doing" things. More importantly, he was specifically asked to stay on longer than he wanted to and he did stay longer. He made it a condition of staying that he would be treated as a Good Leaver when he left. That seems to me to be an entirely reasonable agreement. But even if it were not, his situation is clearly not comparable to that of the pursuer.

[80] Mr Mackenzie also relied upon a number of other factors. He said that the pursuer had joined a company which was not (in real terms, whatever the deeming clause might say) a competitor. I have found, however, that Archer was a competitor, though not a major or regular competitor for deals, so there is nothing in this point. He said that the pursuer was a "good fund manager". So he was, but of itself that carries little weight. He had left for family reasons. So he had, in part, though he was motivated also by concerns about the new fund. Again, I cannot see that this takes the argument very far. Mr MacKenzie said that the pursuer had been helpful in two particular respects. He had helped in the recruitment of his replacement, Sigit Prasetya; and he had helped by giving a reference. These are no doubt relevant factors which the General Partner could have taken into account. But they do not point irresistibly to the conclusion that the discretion ought to have been exercised in his favour. In any event, so far as concerns helping to recruit his replacement, my understanding of the evidence was that he did this in order to be able to leave before serving out his notice period; and he did, in fact, leave earlier than he would otherwise have been entitled to leave. That distinguishes his case from that of Mr Bull. Further, I accept the evidence of Mr Yates that helping to recruit a successor is not as beneficial to the company as staying on beyond the notice period.

[81] Having regard to all these factors, I consider that the pursuer has failed to establish that the General Partner ought to have exercised the discretion in his favour. It is noticeable that the pursuer does not plead a case that the General Partner acted *mala fide* or capriciously or arbitrarily, or that the failure to exercise a discretion in his favour was or would be perverse. Nor did any such case manifest itself from the evidence led at the proof. In those circumstances, standing the tests to which I have referred, there is no basis upon which the court could interfere in this matter. Equally, since I am looking at the matter from the point of view of what would have happened had a discretion been exercised, I can see no basis upon which it could be said that the General Partner ought to have exercised its discretion in the pursuer's favour, let alone that it would have been perverse of the General Partner not to exercise its discretion in favour of the pursuer. Accordingly, I see no basis on which this part of the pursuer's argument can succeed. The pursuer's primary case was that I should, in effect, exercise the discretion for myself and decide that the pursuer should be treated Good Leaver. In the alternative, Mr Mackenzie invited me to remit the matter back to the General Partner for it to exercise the discretion. I would not have adopted the former course. Nor, for the reasons I have given, do I propose to do the latter.

[82] Before leaving this part of the case, I should mention two separate matters which were raised in argument. The first is an argument by Mr Johnston that it was relevant to the exercise of the discretion that the pursuer had left at a damaging time for the HAPEP II fund, given the recent departures from the investment team. His departure was a set-back for HAPEP II since that fund was being marketed upon the success of the investment team handling the HAPEP I fund. Further, he submitted that the pursuer had made a commitment to HAPEP II, albeit informal and non-binding, which he did not honour. Henderson, and Mr Greville in particular, had been devastated when the pursuer gave his notice. I accept on the evidence that his departure at that time was unhelpful, to say the least, and that Mr Greville was taken aback by it. There may have been other problems with the fund running alongside this, but that does not take away from the fact that the pursuer's departure then was potentially damaging. However I do not consider that such matters can properly be taken into account by the defenders. The Limited Partnership Agreement is concerned only with the HAPEP I fund. If it were the case, contrary to the view which I have expressed, that the General Partner ought to have applied its mind to the exercise of the discretion in favour of the pursuer, it seems to me that it would be entitled to take into account the pursuer's conduct relating to the HAPEP I fund; but it would not have been relevant to take into account anything to do with the effect that his departure may have had on a different fund.

[83] The second point is that Mr MacKenzie relied upon the fact that, prior to January 2007, the pursuer was treated by the General Partner as a Good Leaver, notwithstanding that from July 2006 onwards he

LITI-9533391-1

AP1742

had advised various employees of Henderson, including Mr Greville, of his new employment with Archer. He was sent one or more Quarterly Reports relating to the HAPEP funds after it was known that he had joined Archer. The contention was that as a Bad Leaver would have no entitlement to receive any such financial information, the sending of these documents indicated that for that period at least the defenders were treating him as a Good Leaver. My initial reaction to this argument was: so what? Having thought further about the it, that remains my reaction. Absent any plea of personal bar - and I have heard no suggestion that any such plea would be available to the pursuer in this case - the conduct of the defenders is not relevant to the issue before me. There was no explanation as to why this material continued to be sent out to the pursuer. It is likely, as Mr MacKenzie accepted in his submissions, that it was simply an oversight.

*(iv) Restraint of trade arguments*

[84] I turn finally to consider Mr MacKenzie's argument that the Bad Leaver provisions were unenforceable as being in restraint of trade. As I have said, this line of argument did not find its way into the Summons. It was not raised at any preliminary or procedural hearing. It was mentioned in one letter from the pursuer's Australian solicitors, but then disappeared from view. Although it seeks to reach the same conclusion as the "penalty clause" line of argument, it is a different legal proposition and involves consideration of different facts. Since the argument was not pleaded, those facts were not investigated. The defenders had no notice of the case to be met. The restraint of trade case is not a mere variation, modification, amplification or development of the pursuer's pleaded case. In those circumstances it seems to me that Mr Johnston was fully entitled to object that it was too late to seek to argue the restraint of trade point at the stage of final submissions. I have set out his submissions on this point in para.[55] above. I agree with them and hold that this argument cannot be advanced.

[85] In those circumstances, it would be invidious for me to attempt to make any findings relevant to the restraint of trade argument which would, necessarily, be based on an incomplete view of the possible evidence. I should, however, make these brief observations. It is true, as Mr Johnston pointed out, that the Limited Partnership Agreement is entirely separate from the pursuer's contract of employment. It does not follow, however, that the two agreements cannot be looked at together as essential parts of the one transaction: *Alex Lobb (Garages) Limited* v *Total Oil GB Limited.* To come to any decision as to whether that would be the proper approach in any particular case, one would need to see both agreements. In this case one would need to see the contract of employment as well as the Limited Partnership Agreement. The contract of employment was not in evidence; and I heard no evidence as to what it said. There is a further difficulty in that, whereas the contract of employment is between the pursuer and Henderson Global Investors (Singapore) Limited, the Limited Partnership Agreement is amongst the General Partner and the Carried Interest Partners, i.e. the various individual investment managers including the pursuer. There must, at the very least, be a question as to how two different agreements between different parties can be read as though they were all part of one agreement. Further, if they are to be considered as one agreement, there is a difficulty is seeing how the court could entertain an argument that part of the overall agreement was unlawful when one of the parties to it, namely the employer under the employment contract, has not been convened as a party to the action.

[86] If, on the other hand, the Limited Partnership Agreement is properly to be considered in isolation, there is force in Mr Johnston's submission that it is not possible to sever the Bad Leaver provisions from the remainder of the agreement. The Limited Partnership Agreement has little content other than the calculation of an attribution to the various partners of shares in carried interest, that calculation and attribution depending on each partner's leaver status. One could not simply delete all references to Bad Leaver and to the consequence of being a Bad Leaver. The determination that a person becomes a Bad Leaver has an impact upon the shares of the remaining Carried Interest Partners. It has, indirectly, an effect also upon the Relevant Proportion that is to be given to a new Joiner. More generally, the Limited Partnership Agreement is in place as a method of incentivising the investment management team. It is a mixture of carrot and stick. If the stick is removed by the excision of the Bad Leaver provisions, the package is considerably altered. It has to be considered not only from the point of view of the pursuer and the General Partner but also from that of the other Carried Interest Partners, in particular those who have no intention of leaving during the lifetime of the fund. And the question would have to be asked whether

26

LITI-9533391-1

AP1743

such an agreement would achieve the aim apparently desired by would-be investors. I heard no evidence on these matters, but they seem to me to raise important questions. There is every possibility, seen from a number of different standpoints, that severance of the Bad Leaver provisions would make the bargain something other than the bargain which the parties objectively thought that they were making: c.f. *Marshall* v *N M Financial Management Limited* at para.17.

[87] Next, while I accept that "there is no relevant difference between a contract that a person will not carry on a particular trade and a contract that if he does not do so he will receive some benefit to which he would not otherwise be entitled" (*Marshall* v *N M Financial Management Limited* at para.14), it is not clear that this necessarily applies in the present case. The pursuer's evidence was that he anticipated losing 20% of his entitlement and asked Archer to compensate him for that. A possible inference, which was not explored in evidence, is that had he known he was to be categorised as a Bad Leaver, he would have sought to negotiate a payment by Archer to compensate him for losing his whole entitlement. There is no evidence as to what Archer's reaction would have been. However, Mr Johnston was entitled to ask where was the restriction on employment if an employer in the private equity business is generally willing to pay up to compensate a new employee for the amount which he was likely to lose by reason of such a provision? This would be a matter for evidence.

[88] Finally, on this issue, it seems to me that there are considerable difficulties in applying a two-dimensional view of restraint of trade principles to a multi-party agreement. In this action the court is asked to hold that the Bad Leaver provisions are unenforceable (unenforceability rather than illegality appears to be the better view of the consequence of a finding that the agreement is in restraint of trade, though the cases are not entirely consistent on this point). However, in considering whether a clause is unreasonable on restraint of trade grounds, it is necessary to take into account the precise circumstances of the parties to the contract. It is at least possible that a consideration of those factors might produce a different answer depending upon the circumstances of the particular Carried Interest Partner. It is thus possible that the same clause might be held unenforceable as against one Carried Interest Partner, but enforceable against another. This does not appear to make much commercial sense.

[89] In view of my decision that the restraint of trade argument is not open on the pleadings in the present case, I do not need to decide any of these points. They might merit fuller consideration in a case where they arise for decision. I mention them simply to show the difficulties that might lie in the way of the pursuer in any event.

### *Disposal*

[90] I shall sustain the second to fifth pleas-in-law for the defenders and assoilzie each of them from the Conclusions of the Summons.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | **Chapter 15** |
| **POINT INVESTMENTS, LTD. (IN LIQUIDATION),** | **Case No. 22-10261 (TMH)** |
| **Debtor in a Foreign Proceeding.**[1] | |

## DECLARATION OF NICHOLAS JOHN MILES

Pursuant to 28 U.S.C. § 1746, I, NICHOLAS JOHN MILES, of Kennedys Chudleigh Ltd., 20 Brunswick Street, Hamilton HM 10 Bermuda, declare as follows:

1.    I am a Partner and Director of Kennedys Chudleigh Ltd, a Bermuda law firm of Barristers and Attorneys. I have been instructed by Sheppard Mullin Richter & Hampton, LLP, counsel acting for FTI GP I, LLC (the "General Partner"), on behalf of Falcata Tech Investment Fund I, L.P. (the "Fund"), in the above-captioned proceedings, to express my opinion in relation to certain matters of Bermuda law (as set out below). I understand that this Declaration will be submitted in connection with the reply (the "Reply") of the General Partner, on behalf of the Fund in support of the *Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination That There is No Automatic Stay, or in the Alternative Seeking Relief From the Automatic Stay to Proceed With Adversary Proceeding* [ECF No. 47] (the "Motion"), and in response to the *Foreign Representatives' Objection to Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination That There is No Automatic Stay, or*

---

[1] Point Investments, Ltd. (the "Debtor") is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is at Vallis Building, 4th Floor, 58 Par-La Ville Road, , Hamilton HM 11, Bermuda.

AP1745

*in the Alternative, Seeking Relief From the Automatic Stay to Proceed With Adversary Proceeding* [ECF No. 66] (the "Objection").

2.     Unless otherwise indicated in this Declaration, capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Reply.  My compensation for providing this opinion is independent of the outcome of any proceedings in connection with the above-captioned chapter 15 case (the "Chapter 15 Case"), the adversary proceeding pending before this Court [Adv. Pro. No. 23-50122]  (the "Adversary Proceeding"), or any other associated proceedings.

## MY QUALIFICATIONS TO PROVIDE THIS DECLARATION

3.     I am a Partner and Director of Kennedys Chudleigh Ltd., a Bermuda law firm of Barristers and Attorneys.  My practice includes insolvency and restructuring and banking and finance matters.  I am admitted and qualified to practice as a Barrister and Attorney of the Supreme Court of Bermuda.  I was admitted and enrolled as a Solicitor of the Senior Courts of England and Wales in 2000 and as a Barrister and Attorney of the Supreme Court of Bermuda in 2015.  In addition to my full-time practice as a Barrister and Attorney, I participate in various other professional activities that relate to Bermuda law and the Bermuda legal system.  I am a committee member of the Restructuring and Insolvency Specialists Association of Bermuda (RISA).  I have also been intimately involved in a number of law reform initiatives in Bermuda, including insolvency law.  I consider that I have the requisite qualifications and expertise to express my opinions on the matters that I have been asked to consider under Bermuda law.

-2-

AP1746

## MATTERS OF BERMUDA LAW CONSIDERED AND
## SUMMARY OF MY OPINIONS

4.      In this Declaration, I have been instructed to express my opinion on the following

questions, as a matter of Bermuda law:

(i)      Do parties have the option to assert a right of set-off in a liquidation proceeding in
         Bermuda?

(ii)     Does a claim for declaratory relief trigger a right of set-off?

I will not answer all the points made in the Objection, and my failure to do so should not be

interpreted as acceptance of what the Objection says.

5.      I understand that the function of an expert on law is to state the law and explain

how it applies to the facts stated in the Reply.  Accordingly, I have referred to the facts stated in

the Motion, the Objection, the Reply, and other related documents that I understand the Court will

read on the motions before it, in order to explain why, *inter alia*, under Bermuda law, parties do

not have the option to assert a right of set-off in a liquidation proceeding in Bermuda, and why a

claim for declaratory judgment does not trigger a right of set-off.

6.      In forming my opinions, I have read copies of (i) the Motion, (ii) the Objection, (iii)

the Reply, (iv) the *Declaration of Robert Burnett in Support of Objection of FTI GP I, LLC on

Behalf of Falcata Tech Investment Fund I, L.P. to the Motion of the Foreign Representatives for

Entry of an Order Enforcing the Automatic Stay and for Damages* (the "Burnett Declaration"), (v)

the *Declaration of Jayson Wood in Support of Foreign Representatives' Objection to Motion of

FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination That There

is No Automatic Stay, or in the Alternative, Seeking Relief From the Automatic Stay to Proceed

With Adversary Proceeding*, and (vi) the complaint in the Adversary Proceeding [ECF No. 45].

AP1747

7.     I note that the Objection alleges, in relevant part, that the General Partner's claims, including its claim for declaratory relief, are likely subject to set-off against certain amounts that the Debtor alleges to have paid on behalf of the General Partner and/or the Fund.

8.     It may assist if I briefly summarize my opinions on the main issues of Bermuda law that arise in the above-mentioned motions.

*Assertion of Rights of Set-off*

In an insolvent liquidation proceeding in Bermuda, all mutual, credits, debts and other dealings between the company and any other person proving or claiming to prove a debt in the liquidation are automatically set of at the commencement of such liquidation proceeding.   Insolvency set-off is not dependent on the option of either party.

*Declaratory Relief and Set-off Rights*

The Fund's claims for declaratory relief do not appear to trigger any potential rights of set-off because such relief is not a monetary claim.

9.     **Exhibit A** to the Declaration contains copies of legislation and cases cited in this Declaration.

## BACKGROUND TO BERMUDA LAW AND THE BERMUDA LEGAL SYSTEM

10.     It may be helpful if, as a starting point, I provide some background to Bermuda law and the Bermuda legal system.

11.     Bermuda is a British Overseas Territory.  As such, Bermuda is a self-governing but dependent territory of the United Kingdom, and it is a separate legal jurisdiction from the United Kingdom and its other constituent parts (since Bermuda has its own Parliament and its

AP1748

own Court system). In common with other British Overseas Territories and former colonies, English law was introduced to Bermuda at the date of its settlement. The system of law in Bermuda is therefore founded on the English legal system, although there is a distinct body of Bermudian statute law and Bermudian case law that has developed over the past 400 years.

12.      In particular, section 15 of the Supreme Court Act 1905 provides that the systems of law administered in Bermuda are: (a) the common law;[2] (b) the doctrines of equity; and (c) the Acts of the Parliament of England of general application which were in force in England at the date of Bermuda's settlement on 11th July 1612, subject to the provisions of any Acts of the Bermuda Legislature which have been passed since 1612 in any way altering, amending, or modifying the same. These three systems of law administered in Bermuda are also subject to Acts of the United Kingdom Parliament which have been passed since 1612 and made expressly applicable to Bermuda[3]. Section 18 of the Supreme Court Act 1905 further provides that law and equity are administered concurrently, and in any conflict the rules of equity should prevail.

13.      The Supreme Court of Bermuda is the first instance court in Bermuda with unlimited jurisdiction, and it determines all civil and commercial disputes with a value in excess of BD$25,000 (*i.e.*, US$25,000).

14.      There is a designated division of the Supreme Court known as the Commercial Court, which determines a wide variety of commercial and business disputes. The Commercial Court of the Supreme Court of Bermuda also determines any disputes relating to the affairs of

---

[2] *See also* section 4 of Bermuda's Interpretation Act 1951, which defines the common law to mean "*so much of the common law of England (disregarding any supersession, modification or variation as respects its operation or effect in England by reason of any enactment of the Parliament of the United Kingdom) as has effect for the time being in Bermuda*".

[3] Colonial Laws Validity Act 1865, sections 1 to 3.

AP1749

companies incorporated in Bermuda (including, for example, shareholder disputes and insolvency or bankruptcy proceedings).

15.     The Court of Appeal for Bermuda is the first-tier appellate court in Bermuda and it entertains appeals from the Supreme Court of Bermuda.  The judges of the Court of Appeal currently include judges that have sat as judges of the Court of Appeal for England and Wales; as judges of the Supreme Court of Bermuda; and as judges of the Grand Court of the Cayman Islands.

16.     Appeals against decisions of the Court of Appeal for Bermuda are entertained by the Judicial Committee of the Privy Council, which, although based in the United Kingdom, is Bermuda's highest appellate court.  The Privy Council is ordinarily made up of a five judge tribunal sitting in London.  Its composition consists of senior members of the judiciary of the Supreme Court of the United Kingdom (formerly the House of Lords, and the highest appellate court for England and Wales, Scotland, and Northern Ireland), as well as other senior judges from Commonwealth jurisdictions.

17.     Bermuda law, following English law in this regard, is based upon the common law principle of precedent.  Under the doctrine of precedent, certain judicial decisions are "binding" on other judges, in that their essential reasoning or "*ratio decidendi*"[4] must be followed and applied, unless they are properly capable of being distinguished.  In particular, a judge of the Supreme Court of Bermuda is bound to follow and apply any relevant decision of the Court of Appeal for Bermuda, and any relevant decision of the Privy Council.  The Court of

---

[4] The '*ratio decidendi*' of a case has been defined as any rule of law expressly or impliedly treated by the court as a necessary step in reaching its conclusion, having regard to its reasoning.

AP1750

Appeal, in turn, is bound to follow and apply any relevant decision of the Privy Council. Previous relevant decisions of the Privy Council are binding on the Privy Council itself, except in exceptional circumstances. The Privy Council can depart from a previous decision, when, for example, the previous decision is thought to be wrong and impeding the proper development of the law or to have led to results which were unjust or contrary to public policy.[5]

18.    Under the doctrine of precedent, certain judicial decisions or parts of judicial decisions (such as *obiter dicta*", which are comments or findings that do not form part of the essential reasoning), may be treated as persuasive, and, depending on the facts of the case, the seniority and experience of the tribunal, and the quality of their reasoning, should ordinarily be followed and applied, unless they are plainly wrong, were not fully or properly argued or reasoned (or failed to take into account relevant authorities), or are properly capable of being distinguished. Accordingly, first instance decisions of the Supreme Court of Bermuda are persuasive on, and should generally be followed in subsequent cases by, the Supreme Court of Bermuda, deciding subsequent cases.

19.    Furthermore, Bermudian courts often treat English case law as being persuasive, for two principal reasons (but subject to the circumstances of any particular case):

> Firstly, many Bermuda statutes are based upon current or former United Kingdom legislation. For example, in the corporate law context, Bermuda's Companies Act 1981 is largely based on the UK's Companies Act 1948[6],

---

[5] *Gibson v The United States of America* [2007] 1 WLR 2367, per Lord Brown at paragraph 22.

[6] *See, e.g., DE Shaw Oculus Portfolios Inc v Orient Express Hotels Ltd* [2010] Bda LR 32, per Ground CJ, and note also his comments at paragraph 48: "*I think that the common law of Bermuda is the same as that of England in this regard, and remains unaffected by subsequent statutory interventions in that country*". By way of further illustration, in *The Minister of Finance v Hawkes (Trustee)* [1991] Bda LR 18, the Court of Appeal for Bermuda recognised that "*the source of section 236 of the Act of 1981 is section 319 of the Companies Act 1948 of the United Kingdom*", per Huggins JA at page 8 and Telford Georges JA at page 11.

AP1751

although there have been a number of provisions omitted, added and amended to meet Bermuda's unique circumstances, some of which have been modelled on statutory provisions from other common law jurisdictions or which have been drafted specifically for Bermuda. As a result, decisions of the Superior Courts of England and Wales with respect to provisions of United Kingdom statute law which are identical to or similar to Bermudian statutory provisions are considered in Bermuda to be highly persuasive authority, and such decisions are in practice often followed.[7]

Secondly, the decisions of the Supreme Court of the United Kingdom (formerly the House of Lords) on matters of common law and statutory interpretation are extremely persuasive in Bermuda since the Supreme Court of the United Kingdom (formerly the House of Lords), sitting as the highest appellate Court for the United Kingdom, and the Privy Council, sitting as the highest appellate Court for Bermuda, share common membership, in terms of the identities of the judges. The Court of Appeal for Bermuda has held that, generally speaking, Bermuda Courts will accept decisions of the Supreme Court of the United Kingdom (formerly the House of Lords) as effectively binding in common law matters, unless there are circumstances in which the social and economic conditions of Bermuda justify a departure from English precedent.[8]

---

[7] *Robins v National Trust Co Ltd* [1927] AC 515, PC, per Viscount Dunedin at 519; and *Mutual Reinsurance Co. Ltd. v Peat Marwick Mitchell & Co.* [1997] 1 BCLC 1. Furthermore, the Bermuda courts are required, when interpreting or construing any Bermudian statutory provision, to apply as nearly as practicable the rules for the interpretation and construction of provisions of law for the time being binding upon the Supreme Court of Judicature in England: see section 10 of the Interpretation Act 1951.

[8] *Crockwell v Haley* [1993] Bda LR 7, Court of Appeal for Bermuda.

AP1752

I turn now to the questions which I have specifically been asked to consider and address.

## DO PARTIES HAVE THE OPTION TO ASSERT A RIGHT OF SET-OFF IN A LIQUIDATION PROCEEDING IN BERMUDA?

20.    There are numerous species of set-off under Bermuda law. They all share similarities but there are in turn also differences. I do not consider it necessary to list them or identify all their characteristics. I consider only three species – insolvency set-off, statutory set-off and equitable set-off.

21.    The answer to this question depends on whether the liquidation of the Debtor (Point) is a solvent or an insolvent liquidation.

**Insolvency Set-Off**

22.    By section 235 of the Companies Act and section 37 of the Bankruptcy Act 1989, in the winding up of an insolvent company, a mandatory statutory account is taken of all mutual, credits, debts or other dealings between the company and any other person proving or claiming to prove a debt in the liquidation. Only the balance can be claimed or paid. Insolvency set-off is mandatory and self-executing (Stein v Blake [1996] AC 243). It is not optional.

23.    No reported Bermuda authority that I have identified has determined the question whether insolvency set-off applies in a solvent liquidation. Decisions of the High Court of England and Wales, considering the equivalent provision of the UK companies Act 1948 (on which section 235 is based), have held that mandatory insolvency set-off does not apply in a Bermuda liquidation if the liquidation is a solvent liquidation or if it becomes clear that there will be a surplus (*Re Rolls-Royce Co. Ltd.* [1974] 1 WLR 1584; *Re Fine Industrial Commodities Ltd.* [1956] Ch. 256; [1955] 3 WL.R. 940; [1955] 3 All E.R. 707). Since these authorities

-9-

concern the meaning of a provision of English legislation that section 235 is based on, they will be treated as highly persuasive in Bermuda.

**Statutory or Equitable Set-Off**

24.    If statutory or equitable set-off applies, it is at the option of the party with the benefit of the right of set-off (in the sense that the party may choose not to plead set-off).

## DOES A CLAIM FOR DECLARATORY RELIEF TRIGGER A RIGHT OF SET-OFF?

25.    Insolvency set-off and statutory and equitable set-off require that the claims and cross-claims are money claims (Smith (Administrator of Cosslett (Contractors) Ltd.) v Bridgend County Borough Council - [2002] 1 All ER 292).  The claims for declaratory relief do not appear to be money claims.  If they are not money claims, they are not subject to set-off.

## CONCLUSION

26.    For the reasons I have given, my opinions are as stated in this Declaration, I declare under penalty of perjury under the Laws of the United States of America that the foregoing is true and correct.

Dated this 9th day of May 2023

Signed: _____, Nicholas John Miles

AP1754

# Exhibit A

AP1755

256             CHANCERY DIVISION.        **[1956]**

1956

COLLBRAN,
DECD.,
*In re.*

Upjohn J.

although the point is not an easy one, that the decision of the Administrator was right. I will declare that he was right in holding that the claimant's claim in respect of the sum of £307 14s 6d against the lessee is not a "German enemy debt" as defined in section 8 (1) of the Act of 1949.

*Declaration accordingly.*

Solicitors: *Withers & Co.; The Solicitor, The Board of Trade.*

I. G. R. M.

---

1955
*Nov.* 23.

Vaisey J.

*In re* FINE INDUSTRIAL COMMODITIES LTD.

[00945 of 1950.]

*Company—Winding up—Interest on debts—Jurisdiction—Compulsory winding up on ground of insolvency — Company subsequently becoming solvent — Payment in full of debts admitted to proof — Whether interest payable on debts other than judgment debts—Law Reform (Miscellaneous Provisions) Act, 1934 (24 & 25 Geo. 5, c. 41), s. 3—Companies Act, 1948 (11 & 12 Geo. 6, c. 38), s. 317. Interest—Jurisdiction to award.*

The court has no power, either by statute or under its general jurisdiction, in a winding up of a company on the ground of its insolvency, to award, on the amounts admitted to proof, interest to simple contract creditors of the company, which after payment of such debts in full is left with surplus assets.

A petition was presented and an order made for the compulsory winding up of a company on the ground of insolvency. In the course of the winding up the liquidator successfully prosecuted an action to set aside a debenture. In the result the liquidator had in hand a substantial surplus after paying the company's creditors 20s. in the pound.

On the question whether interest was payable out of the surplus assets of the company on the amounts admitted to proof in respect of (a) a judgment creditor; (b) simple contract creditors:—

*Held,* that for the purpose of dealing with its surplus assets the company must be deemed to be and always to have been solvent, so that the rules of bankruptcy did not apply, and, accordingly, (1) the judgment creditor was entitled to interest as from the date of the commencement of the winding up; (2) simple contract creditors were not entitled to claim interest on their debts since (i) the claim of a company's creditor in a winding up could not be brought under section 3 of the Law Reform (Miscellaneous Provisions) Act, 1934,

AP1756

**1 Ch.**                      CHANCERY DIVISION.                      257

1955

FINE
INDUSTRIAL
COMMODITIES
LTD.,
*In re.*

as it was not a proceeding for "the recovery of any debt or "damages" within the meaning of the section; (ii) section 317 of the Companies Act, 1948,[1] only applied section 33 (8) of the Bankruptcy Act, 1914, to an insolvent company.

Observations of Giffard L.J. in *In re Humber Ironworks and Shipbuilding Co.* (1869) L.R. 4 Ch. 643, 647 applied.

*Semble,* that the judgment creditor was entitled (if he had so claimed) to interest as from the date of the judgment.

ADJOURNED SUMMONS.

Fine Industrial Commodities Ltd. (" the company ") was, by an order of the court made on December 11, 1950, ordered to be wound up compulsorily, and by an order dated January 25, 1951, a liquidator was appointed for the purposes of the winding up.

In the course of the winding up it appeared to the liquidator that a debenture, which the company had issued to one of its directors for securing the sum of £22,000, was capable of being impeached. Accordingly, the liquidator, on the advice of counsel, instituted and prosecuted in the Chancery Division an action for having the said debenture set aside. This action was successful and as a result of it the liquidator had in hand the sum of £23,644 4s. 0d., having paid the company's creditors 20s. in the

[1] Companies Act, 1948, s. 316: "In every winding up (subject, in "the case of insolvent companies, to "the application in accordance with "the provisions of this Act of the law "of bankruptcy) all debts payable "on a contingency, and all claims "against the company, present or "future, certain or contingent, ascer- "tained or sounding only in damages, "shall be admissible to proof against "the company. . . ."

S. 317: "In the winding up of an "insolvent company registered in "England the same rules shall pre- "vail and be observed with regard to "the respective rights of secured and "unsecured creditors and to debts "provable and to the valuation of "annuities and future and contingent "liabilities as are in force for the "time being under the law of bank- "ruptcy in England with respect to "the estates of persons adjudged "bankrupt, and all persons who in "any such case would be entitled to "prove for and receive dividends out "of the assets of the company may "come in under the winding up and

"make such claims against the com- "pany as they respectively are en- "titled to by virtue of this section."

Law Reform (Miscellaneous Pro- visions) Act, 1934, s. 3: "(1) In any "proceedings tried in any court of "record for the recovery of any debt "or damages, the court may, if it "thinks fit, order that there shall "be included in the sum for which "judgment is given interest at such "rate as it thinks fit on the whole "or any part of the debt or damages "for the whole or any part of the "period between the date when the "cause of action arose and the date "of judgment:

"Providing that nothing in this "section—(*a*) shall authorize the "giving of interest upon interest; or "(*b*) shall apply in relation to any "debt upon which interest is payable "as of right whether by virtue of "any agreement or otherwise. . . .

"(2) Sections twenty-eight and "twenty-nine of the Civil Procedure "Act, 1833, shall cease to have "effect."

258                      CHANCERY DIVISION.                      **[1956]**

1955

FINE
INDUSTRIAL
COMMODITIES
LTD.,
*In re.*

pound by three dividends, the first of 10s. in the pound on April 28, 1952, the second of 2s. 6d. in the pound on April 22, 1953, and the third of 7s. 6d. in the pound on July 24, 1954.

Certain of the shareholders requested the liquidator to seek the directions of the court before paying interest to the creditors on the amounts of their respective proofs from the date of the commencement of the winding up to the date of payment.

There were 83 unsecured creditors of the company whose debts totalled £16,064 6s. 8d. The only creditor who was, to the knowledge of the liquidator, entitled to prove for interest was the respondent, Benett & Sons and Shears Ltd., who recovered judgment against the company on November 10, 1950, for the sum of £1,518 4s. and £13 costs.

The liquidator deposed in his affidavit that if the action to set aside the debenture had not been successful there would have been a deficiency as regards the unsecured creditors of the company. The amount recovered in that action was approximately £22,000, so that if it had not been successful the assets in the hands of the liquidator would have been £22,000 less, and further reduced by the costs of both parties to the action.

The liquidator having been advised that the question whether or not interest should be paid on the said debts was not beyond doubt, this summons was issued for determination, inter alia, of the question whether interest was payable out of the surplus assets of the company remaining after payment of 20s. in the pound and the amounts which had been admitted to proof (a) on the amounts admitted to proof in respect of creditors who were entitled to prove for interest on their debts; (b) on the amounts admitted to proof in respect of creditors who were not entitled to prove for interest on their debts.

*C. A. Settle* for the liquidator.

*Philip Sykes* for the judgment creditor. A judgment creditor is entitled to interest on his judgment debt at the rate of four per cent. per annum: section 17 of the Judgments Act, 1838. If the company is, or ultimately turns out to be, solvent, interest is payable, upon any debts which carry interest, out of surplus assets remaining after payment of principal and interest up to the date of the winding-up order: *In re Humber Ironworks and Shipbuilding Co., Warrant Finance Co.'s Case.*[2] Accordingly, the judgment creditor is entitled to interest on the judgment

[2] (1869) L.R. 4 Ch. 643.

**1 Ch.**          CHANCERY DIVISION.                    259

debt at the rate of four per cent. from the date of the presenta-
tion of the petition until the date of payment. [Reference was
also made to *In re The Agricultural Wholesale Society Ltd.*³]

   *Allan Heyman* for the simple contract creditors. These
creditors are entitled to interest on their debts from the date of
the winding-up order until the date of payment. The claim is
put forward on two grounds. First, the court has a discretion
to award interest " in any proceedings . . . for the recovery of
" any debt or damages " pursuant to the provisions of section 3
of the Law Reform (Miscellaneous Provisions) Act, 1934. The
powers of the court in this respect are wider than those contained
in sections 28 and 29 of the Civil Procedure Act, 1833 (repealed
by section 3 of the Act of 1934): see the note in Halsbury's
Statutes of England, 2nd ed., vol. 18, p. 526. If the proofs of
the simple contract creditors had been rejected by the liquidator
and they had applied to the court for an order that their proofs
be allowed, there is no doubt that the court would have power
to admit them and to award interest thereon under section 3
of the Act of 1934. The creditors should not be placed in a worse
position by virtue of the circumstance that the liquidator has
admitted their proofs.

   Alternatively, the company must be deemed to be an
insolvent company (albeit that the liquidator is now possessed
of substantial surplus assets) since this summons was taken out
in the course of the winding up, which was granted on the footing
that the company was insolvent. Accordingly, by virtue of
section 317 of the Companies Act, 1948, section 33 (8) of the
Bankruptcy Act, 1914, applies, which provides: " If there is
" any surplus after payment of the foregoing debts, it shall be
" applied in payment of interest from the date of the receiving
" order at the rate of four pounds per centum per annum on all
" debts proved in the bankruptcy." Therefore, unless and until
it is shown that this company is not insolvent all the relevant
bankruptcy rules apply, with the consequence that interest
accrues and is payable on simple contract debts under section
33 (8) of the Act of 1914. [Reference was also made to Stiebel's
Company Law and Precedents, 3rd ed., vol. 2, p. 1092; Buckley
on the Companies Act, 12th ed., p. 631; *In re Hatfield Cask Co.
Ltd.*⁴; *In re Albert Life Assurance Arbitration*⁵; *Fryer* v.
*Ewart*⁶; and *In re Milan Tramways Co.*⁷]

1955

FINE
INDUSTRIAL
COMMODITIES
LTD.,
*In re.*

---

³ [1929] 2 Ch. 261, 264.          ⁶ [1902] A.C. 187, 192.
⁴ (1863) 11 W.R. 971.             ⁷ (1884) 25 Ch.D. 587.
⁵ (1872) 16 S.J. 517, 518.

260                         CHANCERY DIVISION.                    [**1956**]

<div style="float:left">
1955

FINE
INDUSTRIAL
COMMODITIES
LTD.,
*In re.*
</div>

*Richard Hunt* for the contributories.  The 26th rule of the General Order, November, 1862, provided for payment of interest on debts of this nature; but that rule was held to be ultra vires. It is suggested that interest is now payable on such debts of a company by virtue of section 3 of the Law Reform (Miscellaneous Provisions) Act, 1934; but none of the leading textbooks on company law suggest that the section applies.  Proceedings in the winding up of a company may be for the purpose of establishing a claim, but they are not " proceedings in " a " court of record for the recovery of any debt or damages " within the meaning of section 3.  The section is inconsistent with the scheme of the Companies Act and the Winding Up Rules, and proceedings such as the present are not within its contemplation.

For the purposes of dealing with any surplus assets this must be treated as a company which is, and always was, a solvent company.  Accordingly, section 317 of the Companies Act has no application and there is, consequently, no room for the application of the rules in bankruptcy.  In any event, section 33 (8) of the Bankruptcy Act, 1914, does not apply to a limited company.  [Reference was also made to Stiebel's Company Law and Precedents, 3rd ed., vol. 2, p. 1092; Palmer's Company Precedents (Part 2), Winding Up, 16th ed., p. 401; *In re Whitaker*.[8]]

VAISEY J.  This is a curious point which cannot often have arisen and is not likely to arise with any frequency hereafter. The strange feature of the case is that a company in the process of being wound up on the footing that it was an insolvent company now finds itself in the position, in the person of its liquidator, of being in possession of a substantial surplus.

The question which arises may be summarized thus: Are the creditors of the company entitled to interest on their debts or not?  Only one creditor was a judgment creditor, and there can be no doubt in my mind that that particular creditor is entitled to interest under his judgment.  I shall make a declaration in his case that he was and is entitled to interest as from the date of the commencement of the winding up.  In strictness, he might have been entitled to interest from the date of his judgment, which was some ten days earlier, but that has not been claimed and no further mention need be made of it.

<hr style="width:20%">

[8] [1904] 1 Ch. 299.

**1 Ch.**          CHANCERY DIVISION.                    261

1955

FINE
INDUSTRIAL
COMMODITIES
LTD.,
*In re.*

Vaisey J.

The difficulty is as regards the ordinary creditors, whose debts do not carry interest under the rights which accrued to them by virtue of their debts. The point may be thus formulated. Is there anything in the relevant statutes or in the general jurisdiction of the court which either entitles those creditors to interest or enables the court to give them interest as a matter of bounty or equity, in the due process of carrying out the liquidation of this company's affairs?

The Law Reform (Miscellaneous Provisions) Act, 1934, cannot apply to this case, because, in my judgment, this is not a proceeding " for the recovery of any debt or damages," those being the words in section 3 of the Act. The Act of 1934 declared that sections 28 and 29 of the Civil Procedure Act, 1833, should cease to have effect. In the note which appears in Halsbury's Statutes, 2nd ed., vol. 18, at p. 526, it is suggested that those repealed sections were more limited in scope than the new section which replaced them, namely, section 3 of the Act of 1934. The note states: " The court had, however,"—that is to say, had under the Act of 1833—" no general power, such as is " conferred by the present section "—that is, section 3 of the Act of 1934—" to award interest on debts and damages." Speaking for myself, I think that that note is misleading. I think that the scope of section 3 of the Act of 1934 is not wider but narrower than the replaced sections of the Act of 1833. On the ground that this is not a proceeding for the recovery of any debt or damages, whether one regards the winding-up proceeding as a whole or whether one takes it as a step in the winding-up proceeding, I do not think it can be brought within the words " proceedings for the recovery of any debt."

The next point which is taken is this: under section 317 of the Companies Act, 1948, it is provided: " In the winding " up of an insolvent company . . . the same rules shall prevail " and be observed with regard to the respective rights of secured " and unsecured creditors and to debts provable . . . as are in " force for the time being under the law of bankruptcy in England " with respect to the estates of persons adjudged bankrupt. . . ."

It has been argued, and argued with some force, that the company with which I am now concerned must be treated as having been an insolvent company by reason of the proceedings which began with the presentation of the petition and continued with the order to wind it up. Those proceedings have gone on, and must be deemed to be founded upon the assumption that it was an insolvent company. It is suggested that because it must be

AP1761

262                    CHANCERY DIVISION.            **[1956]**

<div style="float:left">

1955

FINE
INDUSTRIAL
COMMODITIES
LTD.,
*In re.*

Vaisey J.

</div>

treated as having been an insolvent company, section 317 of the Companies Act, 1948, applies, and consequently that section 33 (8) of the Bankruptcy Act, 1914, which is in these terms, applies: " If there is any surplus after payment of the foregoing debts, it " shall be applied in payment of interest from the date of the " receiving order at the rate of four pounds per centum per " annum on all debts proved in the bankruptcy."

This is a highly technical matter, and I am bound to say that I have approached it with considerable hesitation, and I decide it with considerable doubt. But it seems to me that section 33 (8) of the Bankruptcy Act, 1914, can only come into operation in the event of there being a surplus upon which that direction can act. Although for some purposes during the winding-up proceedings this company must have been deemed to have been insolvent, it seems to me that when the time comes for dealing with the surplus it must no longer be deemed to be an insolvent company, but has to be treated as a company which is, and was, and always has been, solvent. I agree that that is a curious conclusion to reach, because one would have thought that the payment of interest on debts was something which would only operate where there was a surplus to which the subsection applied. But one only gets the incorporation of that section as a result of the opening words of section 317 of the Companies Act, 1948, which begins, as I have already indicated, with the words: " In the winding up of an insolvent company." But I should have thought that as soon as it is found that there is a surplus, that the court must be deemed to be no longer winding up an insolvent company, but to be winding up a company which is solvent. The effect of that seems to be that the creditors other than the first respondent, who was a secured judgment creditor, are really seeking to put themselves in the position, or are asking the court to put them in the position, of secured creditors or judgment creditors entitled to interest. It would be a very strange result if I gave effect to the arguments which have been put forward on behalf of those creditors, and were to hold that they had brought themselves into exactly the same position as if they were judgment creditors entitled to interest. I feel very reluctant to bring about such a result as a consequence of the arguments which have been addressed to me. In my view the creditor whose right rests upon his judgment is and must be entitled to interest, but the ordinary creditors, that is to say, the creditors other than the judgment creditor, ought to come in and prove their debts without any claim to interest.

**1 Ch.**          CHANCERY DIVISION.                                    263

1955

FINE
INDUSTRIAL
COMMODITIES
LTD.,
*In re.*

Vaisey J.

In this connexion I will read a passage from the judgment of Giffard L.J. in *In re Humber Ironworks and Shipbuilding Company*,[1] where he said: "For these reasons I am of "opinion that dividends ought to be paid on the debts as they "stand at the date of the winding-up; for when the estate is "insolvent this rule distributes the assets in the fairest way; "and where the estate is solvent, it works with equal fairness, "because, as soon as it is ascertained that there is a surplus, "the creditor whose debt carries interest is remitted to his rights "under his contract; and, on the other hand, a creditor who has "not stipulated for interest does not get it. I may add another "reason, that I do not see with what justice interest can be "computed in favour of creditors whose debts carry interest, "while creditors whose debts do not carry interest are stayed "from recovering judgment, and so obtaining a right to interest."

I rather hoped that I should find in the present case that I had a discretion, and that, applying equitable principles to the winding up of this company, I should be in a position to award some interest, not necessarily at any particular rate, to the creditors whose rights are now in question, who have stood by and allowed an action to be brought for the benefit of the shareholders, the contributories, and thereby were kept out of their money for some time. I should have been very much disposed, if I had a discretion in the matter, to allow those creditors interest, at least from the date of the winding-up order, down to the time when the company was finally proved and established as a solvent company. But I cannot discover any case or any section of the Act which enables me to hold, as a matter of equity, justice or fairness, that these creditors should be put, either in regard to the whole period from the winding up to the date of payment, or in regard to some part of that period, in the same position as if they were judgment creditors. After all, persons who give credit to companies must expect, as a general rule, if the debtor company turns out to be solvent, that they will be paid the amount of their debts.

Accordingly, I must declare, subject to the form of order, that the first respondent, the judgment creditor, is entitled to receive and be paid the principal amount of its debt with interest at 4 per cent. from the date of the winding up; and I must hold that the other creditors who did not recover judgment must be treated as creditors of a solvent company not restricted to interest.

[1] (1869) L.R. 4 Ch. 643, 647.

264                         CHANCERY DIVISION.                    **[1956]**

1955

FINE
INDUSTRIAL
COMMODITIES
LTD.,
*In re.*
——
Vaisey J.
——

Mr. Hunt, who appeared for the contributories, is made a respondent on this summons in a representative capacity, and I think that he was fully justified in arguing the case quite apart from any considerations of fairness or equity, or anything of that kind. If I have no discretion, as, to my regret I feel bound to hold, he has certainly no right or obligation to give away anything which rightfully belongs to the class of persons whom he represents.

If this had been a matter which arose with any frequency, I would have reserved my judgment and dealt with it in a more detailed manner, but in the circumstances I think that the parties will wish to know my conclusion and be less interested in the processes by which I have arrived at it than they are in the conclusion itself.

*Declaration accordingly.*

Solicitors: *Herbert Oppenheimer, Nathan & Vandyk; E. F Turner & Sons; W. R. J. Hickman & Randall.*

J. A. G.

——————

1955
Dec. 2.
——
Danckwerts J.

*In re* HANBEY'S WILL TRUSTS.
CUTLERS' COMPANY *v.* PRESIDENT AND GOVERNORS
OF CHRIST'S HOSPITAL, LONDON.

[1955 H. 1480.]

*Charity — Scheme — Forfeiture clause — Gift over from one charity to another—Impossibility of complying strictly with terms of original trust—Application for a scheme—Delay in bringing application—Power of court to direct a scheme—Whether discretionary—Effect of scheme upon the gift over.*

The testator, who died on December 25, 1786, by his will dated January 12, 1782, bequeathed the sum of £8,000 to the Cutlers' Company [of Sheffield] upon trust to apply the annual income thereof in perpetuity for divers charitable purposes set out with great particularity, with a gift over in favour of Christ's Hospital in the event of the company at any time failing to distribute the income of the trust fund in the manner and according to the directions prescribed by the will.

Since the year 1917 the company had found itself no longer able to comply strictly with the terms of the bequest in respect of the mode of the annual distribution of the fund.

AP1764

1584

The Weekly Law Reports, December 6, 1974

Megaw L.J.                  Stone v. Taffe (C.A.)                    [1974]

It follows, in my judgment, that any suggestion that the deceased $\quad$ A
was a trespasser must fail.  He had been lawfully invited and he had
not been made aware that his invitation had ceased.  It follows equally,
in my judgment, that the brewers' manager was not acting outside the
scope of his employment, vis-à-vis the deceased, when he switched
off, or failed to switch on, the light which was required for the de-
ceased's safety when he, having lawfully come upon the premises as
a visitor, was lawfully seeking to leave the premises.  It remained $\quad$ B
within the scope of the manager's employment to take proper steps
to see to the departing visitor's safety.  His failure to do so was a
failure within, and not outside, the sphere of his employment.  If the
deceased had connived at the manager's breach of the licensing law
or breach of his obligations to his employers, the position would have
been different.  What other arguments might then have been relevant, $\quad$ C
it is not necessary to consider.

*Appeal allowed with costs of
appeal and in court below.
Judgment for plaintiff for £8,000.
Leave to appeal refused.*

$\quad$ D

Solicitors: *Pattinson & Brewer, for Stanley A. Coleman & Hill, Bir-
mingham; Barlow, Lyde & Gilbert, for Duggans, Birmingham.*

N. P.

$\quad$ E

[CHANCERY DIVISION]

\* *In re* ROLLS-ROYCE CO. LTD.

$\quad$ F

1974   July 9, 10, 11; 17                      Pennycuick V.-C.

*Company—Winding up—Interest on debts—Company in liquidation
having surplus assets—Whether creditor entitled to interest on
debt from commencement of winding up—Whether creditor's
invoice " written instrument"—Whether debt carrying interest
from date of payment in invoice to commencement of winding $\quad$ G
up—Companies Act 1948 (11 & 12 Geo. 6, c. 38), s. 317—
Bankruptcy Act 1914 (4 & 5 Geo. 5, c. 59), s. 33 (8)—Com-
panies (Winding-up) Rules 1949 (S.I. 1949 No. 330 (L.4)),
r. 100*

The applicants supplied R, a manufacturing and engineering
company, with metal and engineering components which in-
cluded a metal named zirconium.  R went into a creditors' $\quad$ H
liquidation, at which time it owed the applicants some £300,000
in respect of zirconium supplies but it had a claim against the
applicants in respect of defective material which had become
the subject of arbitration proceedings.  R's liquidators paid divi-
dends to creditors in the liquidation, withholding dividends to
the applicants to the extent of the set-off claim against them,
but it retained assets sufficient to pay whatever further sum the
applicants might be entitled to on determination of the set-off
claim.  A new company acquired R on terms which left the

AP1765

1 W.L.R.                    In re Rolls-Royce Ltd. (Ch.D.)

A    liquidators with surplus assets and creditors were utimately paid
     in full.   By summons, the applicants claimed interest from the
     date of the winding up on R's total indebtedness to them, to be
     paid out of the surplus assets; further or alternatively, interest
     on the sums from time to time becoming due to the applicants
     on their invoices as from the due dates for payment down to
     the commencement of the winding up.

          On the questions whether, by virtue of section 317 of the
B    Companies Act 1948,[1] section 33 (8) of the Bankruptcy Act
     1914[2] applied and interest was payable on the debts from the
     date of the winding up and whether the applicants' invoices
     were " instruments " within the meaning of rule 100 of the
     Companies (Winding-up) Rules 1949[3] so that interest was
     payable from the date for payment in the invoices to the com-
     mencement of the winding up:—

          Held, (1) that section 317 of the Companies Act 1948 could
C    not be considered in isolation but had to be looked at together
     with those sections corresponding to it in preceding statutes;
     that, on that basis, the bankruptcy rules applied to insolvent
     companies only where, in the event, there were no surplus
     assets; that, accordingly, section 317 of the Act of 1948, on
     its proper construction, had no application and the applicants
     could not claim interest out of the surplus assets from the
     date of the winding up (post, pp. 1589A–C, 1591D–G).

D         In re Fine Industrial Commodities Ltd. [1956] Ch. 256
     considered.

          (2) That the invoices were simply statements of account and
     the sums due were payable, not by virtue of the invoices but by
     virtue of the contract between R and the applicants created by
     R's order for goods and the applicants' acceptance of the order;
     that therefore the debts due to the applicants were not payable
     by virtue of a written instrument so as to admit of proof for
E    interest from the date for payment in an invoice to the com-
     mencement of the winding up under rule 100 of the Companies
     (Winding-up) Rules 1949 (post, pp. 1592H—1593B, E).

     The following cases are referred to in the judgment:

     Beswick v. Beswick [1968] A.C. 58; [1967] 3 W.L.R. 932; [1967] 2 All E.R.
          1197, H.L.(E.).
F    East of England Banking Co., In re (1868) 4 Ch.App. 14.
     Fine Industrial Commodities Ltd., In re [1956] Ch. 256; [1955] 3 W.L.R.
          940; [1955] 3 All E.R. 707.
     Garvin (Theo) Ltd., In re [1969] 1 Ch. 624; [1968] 2 W.L.R. 683; [1967]
          3 All E.R. 497.
     Grey v. Inland Revenue Commissioners [1960] A.C. 1; [1959] 3 W.L.R.
          759; [1959] 3 All E.R. 603, H.L.(E.).
G    Humber Ironworks and Shipbuilding Co., In re (1869) 4 Ch.App. 643.
     Milan Tramways Co., In re (1884) 25 Ch.D. 587, C.A.

     The following additional cases were cited in argument:

     Cockburn, Ex parte, In re Smith & Laxton (1863) 3 De G.J. & Sm. 175.
     Cookney v. Anderson (1862) 1 De G.J. & Sm. 365.
H    Davies Investments Ltd., In re (unreported) December 6, 1965.
     Duncan (W. W.) & Co., In re [1905] 1 Ch. 307.
     East of England Banking Co., In re (1868) L.R. 6 Eq. 368.
     London, Chatham and Dover Railway Co. v. South Eastern Railway Co.
          [1892] 1 Ch. 120, C.A.; [1893] A.C. 429, H.L.(E.).

     ─────────────
     [1] Companies Act 1948, s. 317: see post, p. 1588D–F.
     [2] Bankruptcy Act 1914, s. 38 (8): see post, p. 1588F–G.
     [3] Companies (Winding-up) Rules 1949, r. 100: see post, p. 1591H.

AP1766

1586

| In re Rolls-Royce Ltd. (Ch.D.) | [1974] |
|---|---|

*Merchant Shipping Co. Ltd.* v. *Armitage* (1873) L.R. 9 Q.B. 99.
                A
*Riches* v. *Westminster Bank Ltd.* [1947] A.C. 390; [1947] 1 All E.R.
   469, H.L.(E.).
*State Fire Insurance Co., In re, Times Assurance Company's Case* (1864)
   2 Hem. & M. 722.
*Taylor* v. *Holt* (1864) 3 H. & C. 452.
*Whitaker, In re* [1901] 1 Ch. 9, C.A.
                                             B

SUMMONS

On November 8, 1973, the applicants, Imperial Metal Industries
(Kynoch) Ltd. of Witton, Birmingham, creditors in the winding up of
Rolls-Royce Ltd., issued a summons against the respondents, the liquida-
tors of Rolls-Royce Ltd., which, as amended on February 15, 1974,
asked for an order, inter alia, that: 1. The liquidators do reserve and retain  C
in their hands (a) pending the hearing of the summons or further order a
sum sufficient to pay the interest claimed under paragraph 2 (a) (b) (c) and
(d) hereof; (b) pending the determination of the claim made against the
applicants in respect of defective zirconium a sum sufficient to pay the
whole of the sum of £158,436 together with interest thereon down to the
date of payment. 2. That the liquidators do pay to the applicants interest as
follows (a) interest at 4 per cent. per annum from the date of the com-  D
mencement of the winding up on the total indebtedness of the company to
the applicants being interest payable out of the surplus assets in the hands
of the liquidators; (b) further or alternatively, interest at such rate as the
court should prescribe on the dividends which have been paid to the
applicants. Interest was claimed on such dividends from the dates when
and the extent to which they should have been paid, if payment had been  E
made pro rata with the other unsecured creditors down to the dates of
payment; (c) further or alternatively, interest on the sums from time to
time becoming due to the applicants on invoices as from the dates for
payment thereof down to the commencement of the winding up, at such
rate as the court shall prescribe; (d) interest on any dividend in respect of
the amount by which the sum of £158,436 exceeded the damages and
costs (if any) actually awarded to the liquidators by the arbitration in  F
respect of the zirconium claim.

*Muir Hunter Q.C., P. J. Crawford* and *P. M. Miller* for the applicants.
 *G. B. H. Dillon Q.C.* and *W. F. Stubbs* for the respondent liquidators.

                                  *Cur. adv. vult.*
                                             G

July 17. PENNYCUICK V.-C. I have before me a summons in the
matter of Rolls-Royce Ltd., to which I shall refer as " the company." The
application is made by Imperial Metal Industries (Kynoch) Ltd. Sum-
marily, for the purpose of the present judgment, two questions are raised,
those questions relating to interest on certain debts owing by the company
to the applicants at the commencement of the liquidation. I put it that  H
way because an additional question has now been raised by amendment.
I am not at present dealing with that question. The respondents to the
summons are, of course, the liquidators.

The relevant facts for the purpose of these questions may be quite
shortly stated. The company went into a creditors' voluntary winding up
on October 4, 1971. No declaration of solvency was filed and the liquida-
tion was in the first place conducted on the basis that the company was

1 W.L.R.          In re Rolls-Royce Ltd. (Ch.D.)          Pennycuick V.-C.

A  insolvent, as indeed it undoubtedly was at the commencement of the
winding up. During the years preceding the liquidation the applicants had
from time to time sold to the company consignments of a metal known
as zirconium. I shall refer later in more detail to the terms upon which
these sales took place. At the commencement of the winding up the
company was indebted to the applicants in respect of these sales in a sum
exceeding £300,000. The company had, however, a claim against the
B  applicants in respect of defective material, this claim originally exceeding
the amount admitted by the liquidators as owing to the applicants in
respect of the trading debt. However, as the months passed, the amount
of the admitted trading debt owing by the company to the applicants
increased and was on August 14, 1973, agreed at £358,293; while on the
other hand the amount of the company's set-off claim against the applicants
C  decreased, so as to become much less than the trading debt. The set-off
claim by the liquidators against the applicants forms the subject of an
arbitration which is still pending. It will be sufficient for the present
purpose to say that the maximum amount claimed by the liquidators is
now £185,000; the maximum amount admitted by the applicants to be even
in dispute is £118,321. I put it that way because the liquidators are
seeking an amendment of their claim in the arbitration, and a new issue
D  has been raised by amendment to this summons as to the amount which
the liquidators are now entitled to retain against the applicants.

The liquidators paid a series of dividends to creditors of the company
but excluded the applicants from these dividends to the extent to which
the applicants' debt was claimed to be the subject of a set-off. As the
set-off claim was reduced the liquidators paid dividends on the amount to
E  which the applicants were entitled on the footing of such reduction. These
dividends were in the natural course paid after the corresponding dividends
to the other creditors. Particulars of the dividends will be found in an
exhibit to an affidavit sworn by Mr. Corbett on behalf of the liquidators,
on this summons. As appears from that schedule, the liquidators were
ultimately able to pay a final dividend to creditors on September 20, 1973,
making a dividend of 100 per cent. in all, the dividend to the applicants
F  on their debt, so far as not claimed to be the subject of set-off, being
made up to 100 per cent. on February 5, 1974. The liquidators are
retaining assets sufficient to pay 100 per cent. on whatever further sum
the applicants were entitled to receive after the set-off claim has been
determined. The amount retained is sufficient to meet a claim of £158,436.

The reason why the liquidators were able to pay the creditors in full
G  is that the undertaking of the company was acquired by a new company,
Rolls-Royce (1971) Ltd., on terms which left the liquidators with a surplus
in their hands.

I have summarised the facts in broad outline, the details being irrele-
vant to the issues on interest on which I now have to determine. These
are issues entirely of law.

H  The present summons was issued on November 8, 1973. The claim
originally made by the summons was for payment of a certain immediate
dividend and reservation of assets sufficient to meet a further dividend,
but that claim was overtaken by the events. As I have said, the liquidators
did pay dividends to the applicants on the amounts admittedly due to the
applicants.

The summons was amended on February 15, 1974, and as far as now
material reads as follows: " 1. That the liquidators do reserve and retain

AP1768

1588

Pennycuick V.-C.          In re Rolls-Royce Ltd. (Ch.D.)          [1974]

in their hands, . . ." and I need not read the further particulars under
question 1 because it is not in dispute that the liquidators are bound to
reserve assets sufficient to meet the applicants' claim when the set-off has
been determined. Question 2:

> " That the liquidators do pay to the applicants interest as follows (a)
> interest at 4 per cent. per annum from the date of the [commencement]
> of the winding up on the total indebtedness of the company to the
> applicants being interest payable out of the surplus assets in the
> hands of the liquidators . . . (c) Further or alternatively, interest on
> the sums from time to time becoming due to the applicants on their
> invoices as from the dates for payment thereof down to the com-
> mencement of the winding up, at such rate as the court shall
> prescribe."

I have not read (b) and (d) because Mr. Muir Hunter, appearing for the
applicants, very properly abandoned those contentions in the course of
the hearing.

It will be observed that paragraph (a) of question 2 relates to the period
of the winding up and paragraph (c) to a period preceding the winding up.
Paragraph (a) has been argued first and I shall deal with the two issues in
the same order.

Question 2 (a).  On this issue the governing provision is contained in
section 317 of the Companies Act 1948, which reads as follows:

> " In the winding up of an insolvent company registered in England
> the same rules shall prevail and be observed with regard to the
> respective rights of secured and unsecured creditors and to debts
> provable and to the valuation of annuities and future and contingent
> liabilities as are in force for the time being under the law of bank-
> ruptcy in England with respect to the estates of persons adjudged
> bankrupt, and all persons who in any such case would be entitled to
> prove for and receive dividends out of the assets of the company may
> come in under the winding up and make such claims against the
> company as they respectively are entitled to by virtue of this section."

That section sends one to the Bankruptcy Act 1914 and there one finds
these two provisions: section 33 (8) reads:

> " If there is any surplus after payment of the foregoing debts,"—those
> are various preferential debts—" it shall be applied in payment of
> interest from the date of the receiving order at the rate of four pounds
> per centum per annum on all debts proved in the bankruptcy."

Then section 69 reads:

> " The bankrupt shall be entitled to any surplus remaining after
> payment in full of his creditors, with interest, as by this Act provided,
> and of the costs, charges, and expenses of the proceedings under the
> bankruptcy petition."

The provision contained in section 33 (8) reproduces in substance a pro-
vision which has been in force since the Bankruptcy Act 1849 at least.

Mr. Muir Hunter contended that the opening words of section 317,
that is to say, " In the winding up of an insolvent company " mean in
the winding up of a company which has been placed in liquidation on
the basis that it is insolvent. So he contends that the rule contained in

AP1769

1589

J W.L.R.          In re Rolls-Royce Ltd. (Ch.D.)          Pennycuick V.-C.

A  section 33 (8) of the Bankruptcy Act is made applicable in the winding up
of every company placed in liquidation on that basis however the liquida-
tion may turn out.  If one could look at section 317 in isolation from its
statutory history, I should see the greatest force in this contention.  The
general policy of the company legislation, as implemented in this respect
by section 317, is to equate the rules applicable in liquidation with the
rules applicable in bankruptcy.  There appears to be no reason in principle
B  why in this particular respect, namely, the payment of interest for the
period of administration where there is a surplus, different rules should
apply in the one case from those in the other.  Again, the bankruptcy
rule appears to be eminently fair.  The creditor is compensated for being
kept out of his money during the period of administration.

Unfortunately, however, as it seems to me, an examination of the
C  statutory history of section 317 makes it impossible to accept this con-
tention.  Prior to the Supreme Court of Judicature Act 1875 there was no
general provision for the application of the bankruptcy rules in the winding
up of an insolvent. company.  Specifically, the court had no power to
direct payment of interest on debts not in themselves carrying interest,
even though there turned out to be a surplus: see *In re East of England
Banking Co.* (1868) 4 Ch.App. 14, 18, in which the Court of Appeal held
D  ultra vires an attempt to achieve this result by rule.  Contrast the position
of debts in themselves carrying interest: see *In re Humber Ironworks and
Shipbuilding Co.* (1869) 4 Ch.App. 643 and in particular *per* Giffard L.J.
at p. 647 where the distinction is neatly put.

Then came section 10 of the Supreme Court of Judicature Act 1875,
which is in the following terms:

E       " Whereas, by section 25 of the principal Act,"—that is, the Supreme
Court of Judicature Act 1873—" after reciting that it is expedient to
amend and declare the law to be thereafter administered in England
as to the matters next thereinafter mentioned, certain enactments are
made with respect to the law, and it is expedient to amend the
said section: Be it therefore enacted as follows:—Subsection (1) of
F       clause 25 of the principal Act is hereby repealed, and instead thereof
the following enactment shall take effect; (that is to say,) in the
administration by the court of the assets of any person who may die
after the commencement of this Act, and whose estate may prove to
be insufficient for the payment in full of his debts and liabilities, and
in the winding up of any company under the Companies Acts 1862
G       and 1867, whose assets may prove to be insufficient for the payment
of its debts and liabilities and the costs of winding up, the same rules
shall prevail and be observed as to the respective rights of secured
and unsecured creditors, and as to debts and liabilities provable,
and as to the valuation of annuities and future and contingent liabili-
ties respectively, as may be in force for the time being under the law
of bankruptcy with respect to the estates of persons adjudged bank-
H       rupt; and all persons who in any such case would be entitled to
prove for and receive dividends out of the estate of any such deceased
person, or out of the assets of any such company, may come in
under the decree or order for the administration of such estate, or
under the winding up of such company, and make such claims against
the same as they may respectively be entitled to by virtue of this
Act."

AP1770

1590

Pennycuick V.-C.          In re Rolls-Royce Ltd. (Ch.D.)          [1974]

I mention in passing that the Act of 1873 had covered in this respect the    A
position of insolvent estates, but not the position of companies in liquida-
tion.  That, no doubt, is the reason for this amending Act.

Section 10 of the Act of 1875 imports the bankruptcy rules only in the
case of the winding up of any company " whose assets may prove to be
insufficient for the payment of its debts and liabilities and the costs of
winding up."  The words " prove to be " and the reference to " the costs
of winding up " leave no doubt that one must look at the situation as it    B
turns out in the course of the administration and that the bankruptcy
rules are only made applicable where in the event, after paying the debts
and liabilities and costs, there is no surplus.  It is, I think, quite impossible
to construe this section as importing the provision now contained in
section 33 (8) of the Bankruptcy Act, 1914 since that rule only applies
where there is a surplus.  In the event of a surplus, the pre-1875 position    C
remains unaltered, that position having been determined by the pre-1875
judicial decisions.  This point is neatly put by Lord Selborne L.C. sitting in
the Court of Appeal in *In re Milan Tramways Co.* (1884) 25 Ch.D. 587,
591 where he says :

  " The 10th clause of the Judicature Act 1875 refers only to a com-
  pany unable to pay its debts, but I am of opinion that it must be    D
  treated as applicable to any company in liquidation until it is shown
  that the assets are sufficient for payment of the debts in full."

The Companies (Consolidation) Act 1908 repealed section 10 of the
Act of 1875 and by section 207 substituted the following provision :

  " In the winding up of an insolvent company registered in England
  or Ireland the same rules shall prevail and be observed with regard    E
  to the respective rights of secured and unsecured creditors and to
  debts provable and to the valuation of annuities and future and con-
  tingent liabilities as are in force for· the time being under the law of
  bankruptcy in England or Ireland, as the case may be, with respect to
  the estates of persons adjudged bankrupt; and all persons who in any
  such case would be entitled to prove for and receive dividends out of    F
  the assets of the company may come in under the winding up, and
  make such claims against the company as they respectively are
  entitled to by virtue of this section."

This section, instead of the elaborate formula contained in section 10 of
the Act of 1875, introduces the shorter formula " In the winding up of an
insolvent company," otherwise it reproduces section 10 in almost identical    G
terms.

Mr. Muir Hunter contended that this change of language rendered
section 207 of the Act of 1908 applicable to any company which had been
placed in liquidation on the basis that it was insolvent, thereby fully
equating the provisions of the section to the provisions applicable under the
bankruptcy legislation.  That is an attractive argument, but I feel unable    H
to accept it.  The Act of 1908 is a consolidating Act.  It consolidated the
principal Companies Act then in force and also one or two other Acts
passed shortly before it for the purpose of such consolidation.  Compare
the position in the case of the· property legislation of 1925, which has
been the subject of judicial decision : see in particular the general principle
stated by the House of Lords in *Grey* v. *Inland Revenue Commissioners*
[1960] A.C. 1, where Viscount Simonds said, at p. 13:

1 W.L.R.                In re Rolls-Royce Ltd. (Ch.D.)                Pennycuick V.-C.

A    ·" the principles applicable to the construction of a consolidating Act
are not in doubt.  The presumption is that such an Act is not in-
tended to alter the law, but this prima facie view must yield to plain
words to the contrary: . . ."

See also an informative statement by Lord Reid in *Beswick* v. *Beswick*
[1968] A.C. 58, 73, where he sets out the parliamentary practice in con-
B    nection with consolidating Acts.

If the intention of Parliament in the Act of 1908 had really been to
alter the law as it stood under the Act of 1875, I find it inconceivable
that it would have done so simply by the use of the expression " In the
winding up of an insolvent company," which in itself is decidedly
imprecise, in place of the longer formula in the Act of 1875.  This is
certainly to my mind not a case in which there are plain words to the
C    contrary to which the presumption that the Act is not intended to alter
the law must yield.

Section 207 was re-enacted by section 262 of the Companies Act 1929
and is now represented by section 317 of the Companies Act 1948, which
I have already read; the terms of the Acts of 1929 and 1948 are identical
with those of section 207 of the Act of 1908 apart from the references to
D    Ireland.

I conclude that on the proper construction of the statutory provision,
and quite apart from authority, section 317 of the Companies Act 1948 has
no application once the liquidation throws up a surplus, whatever may have
been the position at the commencement of the winding up.

Perhaps I should add that it is not altogether clear that the words " with
regard to the respective rights of secured and unsecured creditors and to
E    debts provable " cover the allowance of interest on a surplus.  I would
certainly strive to hold that they did if one reached that point.  In fact this
question is not free from authority because Vaisey J. in *In re Fine Industrial
Commodities Ltd.* [1956] Ch. 256 decided it in the same sense as I have
decided it.  I have gone over the ground again, partly in deference to
Mr. Muir Hunter's arguments and partly because the attention of Vaisey J.
F    was apparently not directed to the statutory predecessors of section 317 of
the Act of 1948.  As I have indicated, a consideration of the earlier pro-
visions to my mind conclusively fortifies the conclusion at which Vaisey J.
arrived on other grounds.

I reach this conclusion with some regret, as did Vaisey J. because, as I
have already said, it seems fair that a creditor should be compensated for
being kept out of his money during the period of administration if there
G    turns out to be a surplus, and again because the difference in this respect
between the winding up provisions and the bankruptcy provisions appears
to be without logical foundation.

Question 2 (c).  The relevant statutory provision here is rule 100 of the
Companies (Winding-up) Rules 1949, which is in the following terms :

" On any debt or sum certain, payable at a certain time or otherwise,
H    whereon interest is not reserved or agreed for, and which is overdue at
the date of the commencement of the winding up, the creditor may
prove for interest at a rate not exceeding four per centum per annum to
that date from the time when the debt or sum was payable, if the debt
or sum is payable by virtue of a written instrument at a certain time,
and if payable otherwise, then from the time when a demand in writing
has been made, giving notice that interest will be claimed from the date
of the demand until the time of payment."

1592

| Pennycuick V.-C. | In re Rolls-Royce Ltd. (Ch.D.) | [1974] |

This provision has a long statutory history going back to section 28 of the **A**
Civil Procedure Act 1833. The first critical question here is whether the
applicants' debt is " payable by virtue of a written instrument."

I shall now state such facts relating to this debt as appear on the evi-
dence. Mr. Roger Buckley Almond, assistant secretary to the applicants,
gives the following account of the matter:

> " At all material times prior to the liquidation of the company, the **B**
> company carried on business as (inter alia) manufacturing engineers.
> The applicants have at all material times carried on business as manu-
> facturers and suppliers of (inter alia) metal and engineering com-
> ponents, and as such supplied metal and components to the company.
> Pursuant to such trading relationship there was at the date of the
> liquidation a substantial sum owing by the company to the applicants,
> mainly in respect of the price of goods sold and delivered (hereinafter **C**
> referred to as ' the trading debt '). The goods so sold and delivered
> had been invoiced to the company upon invoices in a standard form,
> an example of which is hereinafter exhibited. By the terms of such
> invoices payment thereon was due in cash in the month following the
> month of the invoice."

Then he exhibits a form of invoice which is headed " Imperial Metal **D**
Industries (Kynoch) Ltd." Then comes the word *" Invoice ";* then:

> *" Damage, short delivery or loss* must be notified and claimed, in
> writing, to the carrier and to consignor. *Damage or short delivery.*
> Notify within three days of receipt. Claim within five days of receipt.
> *Loss.* Notify and claim within 21 days of despatch. *Terms.* Net cash
> due in the month following month of invoice." **E**

There follows a number of squares in which the relevant particulars can be
entered, including particulars of price.

Mr. Muir Hunter contended that these invoices are " instruments " by
virtue of which the price of the various consignments is payable. I feel the
greatest doubt as to whether these invoices are indeed instruments at all for
the purpose of winding up rule 100. The word " instrument " normally **F**
denotes a document which creates or affects rights or liabilities, though it
may in context have a wider meaning: see *Halsbury's Laws of England,*
3rd ed., vol. 11 (1955), p. 371:

> " An instrument under hand only is a document in writing which either
> creates or affects legal or equitable rights or liabilities, and which is
> authenticated by the signature of the author, but is not sealed by him. **G**
> Such documents are used in a great variety of transactions, including
> contracts, assignments, acknowledgements of title, and notices. The
> expression is not limited to documents of a formal character, and it
> extends to any duly signed document which is intended by the author
> to be the means of producing a result recognised in law . . . The word
> ' instrument ' as applied to a writing may have a still wider scope, and **H**
> may include documents which affect the pecuniary position of parties
> although they do not create rights or liabilities recognised in law; but
> usually it applies to a document under which some right or liability,
> whether legal or equitable, exists."

I should not myself have thought, in the absence of any authority to the
contrary that a tradesman's invoice could properly be described as an

1593

1 W.L.R.                    In re Rolls-Royce Ltd. (Ch.D.)                Pennycuick V.-C.

A   " instrument."  However that may be, the debts comprised in these invoices are to my mind clearly not payable by virtue of the invoices.  The debts are payable by virtue of the contract between the company and the applicants created by an order, given orally, or in writing, by the company and accepted by the applicants either orally or in writing or by conduct in delivering the goods.  The invoices are simply the seller's statement of account.  It is true that the invoices contain certain terms as to damage and

B   loss and time of payment.  I will assume that these terms should be treated as having been accepted by the company by its conduct in accepting the goods.  This point might, I think, depend on the precise sequence of events. However that may be, I find it impossible to say that the debt can be said to be payable by virtue of the seller's statement of account, even though that statement introduces one or two new terms.  Contrast the simple case

C   which is the case normally covered by rule 100 where the whole terms of a contract are contained in a written document.  In such case the contract is clearly an instrument and the debt payable under the contract is payable by virtue of that instrument.  No authority was cited on this point.  I suspect that Mr. Muir Hunter's contention is a novel one and would cut across the ordinary practice as regards proof in respect of tradesmen's bills.

D   Mr. Dillon, for the liquidators, contended that quite apart from the point which I have discussed, the debts cannot be said to be payable at a certain time, and I was referred to a number of authorities in this connection.  On the clear view which I have taken as to the meaning of the words " by virtue of a written instrument," this point does not arise, and I do not think it would be necessary or useful to express an opinion on it.

E   I conclude, therefore, that these are not debts payable by virtue of a written instrument at a certain time so as to admit of proof for interest under rule 100.

I was taken at some length through a decision of my own in *In re Theo Garvin Ltd.* [1969] 1 Ch. 624.  This decision may, perhaps, be of some use by way of general explanation, but it does not, I think, throw any direct light on the questions which I have to decide on the present summons.

F   I propose accordingly to make no order under question 2 of the summons.  It will remain to deal with a new question which has been raised by amendment.

*No order as to payment of interest*
*by liquidators.*

G   Solicitors: *J. S. Copp; Linklaters & Paines.*

K. N. B.

H

of Admiralty in England ; and it was well held, that the Plaintiffs were estopped
from setting up a claim in another court of justice to recover it from the Defendant
as French property.   But here, the Plaintiff's criminality cannot be inferred : she
cannot even write, which is strong to shew that she could not be, as contended, the
prime mover in this fraud.   The case of *Williams v. Hedley* recognizes the principle
contended for by the Plaintiff, who is entitled to recover.

Cur. adv. vult.

And now, the judgment of the Court was delivered by

GIBBS C. J.   This was an action in which the Plaintiff sought to recover the sum
of 60l., paid as a premium with her son to the Defendant, under an indenture of
apprenticeship, on the ground that the premium was not inserted in the indenture,
and that, therefore, the indenture was void and the money paid without consideration.
Supposing the Plaintiff to be an innocent party, she would certainly be entitled to
recover the money so paid, as being paid without consideration ; but any Plaintiff
who seeks to recover on such grounds, must come into court with clean hands.   It
has been contended for the Plaintiff in this case, that no imputation rests on her ; for
that it was the master's duty to insert the premium, on whom alone the legis-[498]
lature imposes the penalty for the default.   This latter proposition is true, and, if the
case rested here, I should be of opinion that the Plaintiff was entitled to recover : but
there are other circumstances in this case ; circumstances which deeply implicate the
Plaintiff in a collusion for the purpose of fraud.   With the notice before her eyes,
she executed the indenture without the insertion of the premium, and, by her act,
endeavoured to give validity to an instrument which had not that in it, which the
legislature has prescribed for giving effect to the provisions of the revenue.   The
legislature marks out the master alone for punishment ; but all are involved in the
offence who lend assistance to the master in giving effect, as this Plaintiff has done, to
unlawful purposes.   In this case, both the Defendant and the Plaintiff were parties to
the offence.   The former, by concealing from the public and the revenue officer the
amount of the premium, and so defrauding the revenue ; the latter, by enabling the
Defendant to conceal that amount from the revenue, whereby she was likely to find
the Defendant content with a less premium than he might otherwise have been disposed
to take.   Under these circumstances the Plaintiff cannot be considered as an innocent
party ; and we are of opinion, that she is not entitled to recover.

Judgment of nonsuit.

**[499]**  ROSE AND OTHERS, Assignees of Smart, *v.* HART.   June 9, 1818.

[S. C. 2 Moore, 538.   Discussed, *Gibson* v. *Bell*, 1 Bing. N. C. 754.   Followed, *Young*
v. *Bank of Bengal*, 1836, 1 Moo. P. C. 168 ; *Naoroji* v. *Chartered Bank of India,
Australia and China*, 1868, L. R. 3 C. P. 449.   Considered, *Astley* v. *Gurney*, 1869,
L. R. 4 C. P. 722.   Commented on, *Booth* v. *Hutchinson*, 1872, L. R. 15 Eq. 33.
Referred to, *In re Winter*, 1878, 8 Ch. D. 229 ; *Elliott* v. *Turquand*, 1881, 7 App.
Cas. 87 ; *Palmer* v. *Day*, [1895] 2 Q. B. 621.   Considered, *In re Daintrey*, [1900]
1 Q. B. 557.]

Trover for cloths deposited by the bankrupt previously to his bankruptcy with the
Defendant, a fuller, for the purpose of being dressed : Held, that the Defendant was
not entitled to detain them for his general balance for such work done by him for
the bankrupt previously to his bankruptcy ; for that there was no mutual credit
within stat. 5 G. 2, c. 30, s. 28.

Trover for cloths deposited by the bankrupt, previously to his bankruptcy, with
the Defendant, who was a fuller, for the purpose of being dressed.   At the trial, before
Holroyd J., at the Salisbury Spring assizes, 1817, it appeared, that when the cloths
were so deposited, there was a debt due from the bankrupt to the Defendant, for other
cloths dressed by the latter.   After the bankruptcy, the Plaintiffs tendered the sum
due for dressing the cloths in question to the Defendant, who refused to deliver them
up, without payment of the whole debt due to them from the bankrupt.   They then
brought their action.   For the Defendant it was contended, that the case came within

Case 1:23-cv-00630-CFC   Document 12-6   Filed 08/23/23   Page 476 of 863 PageID #: 1843
Case 22-10261-TMH   Doc 76-1   Filed 05/09/23   Page 22 of 66

the principle laid down in *Olive* v. *Smith* (5 Taunt. 56), and that he was entitled to retain the cloths for his general balance. The jury found a verdict for the Plaintiffs; and, Holroyd J. having reserved the point,

Pell Serjt. in Easter term, 1817, moved for a rule nisi to set aside the verdict and enter a nonsuit, on the ground urged at the trial, and he cited *Ex parte Deeze* (1 Atk. 228), as in point, and observed, that the principle of the cases which contradicted the doctrine there laid down was vicious, inasmuch as it went to destroy the law of lien.

GIBBS C. J.   You are aware of the case of *Green* v. *Farmer* (4 Burr. 2214), which by the bye I may say has been frequently disregarded. In a case in which I have the [500] brief, and in which case Lord Ashburton was, a special custom for dyers to have their general lien was proved; and, notwithstanding *Green* v. *Farmer*, that custom was acted upon in that case, and has been many times since recognised. The case *Ex parte Deeze* is certainly contradictory to the case *Ex parte Ockenden* (1 Atk. 235), subsequently decided. The question is of the utmost importance, and we are quite open to hear it discussed. Take your rule.

Rule nisi granted.

In the following Trinity term cause was shewn by

Lens Serjt., who contended, that Lord Hardwicke, in *Ex parte Ockenden*, recognised by Mansfield C. J. in *Green* v. *Farmer*, had much narrowed the extensive construction which he had put in *Ex parte Deeze*, on the words "mutual credits," in the stat. 5 G. 2, c. 30, s. 28, and had excluded cases like the present from its operation; and referred to the case of *Chase* v. *Westmore* (5 M. & S. 180), where a point similar to the present was made, but the Court, thinking that that case did not involve the question of mutual credits, gave judgment on the point of lien. He also cited *Birdwood* v. *Raphael* (5 Price, 593), and contended, that the decision in *Olive* v. *Smith* did not apply to the present case.

Pell was then heard in support of the rule. If the Defendant had sold these cloths, and the assignees had brought their actions for money had and received, they must clearly have allowed to the Defendant the amount of their general balance against the bankrupt before they could have recovered the difference, if any, from the Defendant. Mutual credit is used as synonymous with mutual trust. "Where there is a trust between [501] two men, on each side, that makes a mutual credit"(a). The case *Ex parte Deeze* and the whole reasoning of Lord Hardwicke on the subject of mutual credit in that case (which is recognised and confirmed in *French* v. *Fenn*, and *Smith* v. *Hodson* (4 T. R. 211), and both by Gibbs J., in his statement of his opinion at the trial in *Olive* v. *Smith* (5 Taunt. 58), and subsequently, by the whole Court, in their final decision) is most strong for the Defendants; but, if the case *Ex parte Ockenden*, in which no judgment was given, is to be upheld against the case *Ex parte Deeze*, confirmed over and over again by subsequent decisions, then it is admitted, that the Defendants cannot succeed.

It is true, that this is an action of trover, and no case of this precise nature has been decided; but the Plaintiffs, by their choice of action, can never prevent the Defendant from having the benefit of this statutable lien. In *Jennings* v. *Rundall* (8 T. R. 335), the Plaintiff shaped his case in tort, in order to deprive the Defendant of the benefit of his infancy; but the Defendant pleaded his infancy, and it was holden a good plea. In *Ex parte Deeze* Lord Hardwicke says, "It is very hard to say that mutual credit should be confined to pecuniary demands, and that if a man has goods in his hands belonging to a debtor of his, which cannot be got from him without an action at law or bill in equity, it should not be considered a mutual credit." "There have been many cases which the clause of the act has been extended to, where an action of account would not lie, nor could this Court, upon a bill, decree an account." These strong expressions acquire double strength when the judgment of Mansfield C. J. in *Olive* v. *Smith* is referred to. "I should have thought that the words of the statute meant only money transactions; but if the extension of mutual credit be, as it [502] has been contended, a mistaken doctrine, the mistake is so deeply rooted, that it would be rash to overturn it; and there is a great deal of justice in the determination at which not only the Court of King's Bench but the Court of Chancery have arrived on this point." This is hardly saying less, than that the statute extends to cases of

_____

(a) Per Buller J., *French* v. *Fenn*, Co. B. L. 536, 7th ed.

AP1776

8 TAUNT. 503.                         ROSE *v.* HART                              479

trover, and the whole judgment lays down the rule of extension on the broadest
ground ; a rule resting as much on sound law as it does on justice. [Burrough J.
Is it the true meaning of the act, to extend the doctrine of mutual credit to cases
where the goods are not ultimately to be turned into money? Dallas J. Where the
goods are specifically to remain as goods?] Lord Hardwicke, in *Ex parte Deeze,*
expressly goes on that ground. [Burrough J. In *Lanesborough v. Jones* (1 Peere
Wms. 325), which was a decision on stat. 4 Ann. c. 17, s. 11, the judgment of Lord
Chancellor Cowper went on the ground that there was a plain mutual credit.] In
*French* v. *Fenn,* if trover had been brought, it must have been brought on the same
ground on which it may be brought here. [Burrough J. No. In *French* v. *Fenn,*
the pearls were sent out on an express contract to be sold, and, though the sale was
after the bankruptcy, the contract was before the bankruptcy.] In *Smith* v. *Hodson,*
the assignees might have brought trover ; and the whole judgment in that case goes
to shew that if the action had been so shaped, the assignees might have recovered.
[Gibbs C. J. The judgment of the Court in *Smith* v. *Hodson,* as to the probable
success of the assignees, if they had brought trover, goes on the ground of fraud and
undue preference, with which that case was tinctured.] The language of the Courts
in *Ex parte Deeze, French* v. *Fenn,* and *Olive* v. *Smith,* is clear to shew that the form of
action can make no difference ; and the Plaintiffs are not to be shut out from the
benefit of the rule so broadly laid down and **[503]** so strongly confirmed, because this
is the first action for trover for goods in specie, on which the point has arisen.

Cur. adv. vult.

And now, the case having stood over till this day,

GIBBS C. J. delivered the judgment of the Court.

This was an action of trover for cloths left by Smart before his bankruptcy, with
the Defendant, who was a fuller, to be dressed.

There was then a balance due from the bankrupt to the Defendant, for work done
on other cloths.

The assignees tendered to the Defendant the sum due for work done on the cloths
in his possession, and demanded them from him ; but the Defendant refused to deliver
them up, unless he was paid his general balance.

The question was, whether he were entitled to retain them for that balance? And
Mr. Justice Holroyd, before whom the cause was tried, at the Spring assizes for
Salisbury, 1817, reserved the point for the opinion of the Court ; and we are of opinion
that the Defendant, who received these cloths for the purpose of dressing only, had
no right to detain them for his general balance.

He founds his claim on the ground of mutual credits, mentioned in stat. 5 G. 2,
c. 30, s. 28, and the construction which has been put upon that statute.

The case *Ex parte Deeze* (1 Atk. 228) is not distinguishable from the present.
There, a packer claimed to retain goods, not only for the price of packing them, but
for a sum of 500l., lent to the bankrupt on his note ; and Lord Hardwicke determined
that he had such right, on the ground of mutual credits, to which he gives a very
extensive effect, and says, that the clause relative to them has always received a very
liberal construction.

**[504]** This doctrine, if it were supportable, would apply directly to the present
case, and would establish the Defendant's right to retain for his general balance.

But, in the case *Ex parte Ockenden,* which came before Lord Hardwicke about six
years after the former, he very much narrows the extensive construction that he
had before put on the words "mutual credits," in the statute 5 G. 2, c. 80, s. 28, and
determines, in express terms, that a case like the present does not fall within them.

That the cases *Ex parte Deeze* and *Ex parte Ockenden* are accurately reported by
Atkyns, we have the authority of Lord Mansfield, in *Green* v. *Farmer* (4 Burr. 2222),
who confirms them by his own notes.

It appears, therefore, that the final opinion of Lord Hardwicke, after a very full
consideration of the subject, would exclude the present case from the protection of
the statute as a mutual credit, though he admits that the words mutual credits have
a larger effect than mutual debts, and that under them many cross claims may be
allowed in cases of bankruptcy, which in common cases would be rejected.

I am not aware of any later decision upon this subject, until the case of *French and
Another, Assignees of Cox* v. *Fenn,* which occurred in the year 1783, and is very fully
and correctly reported in Cooke's Bankrupt Laws (536, 7th ed.).

AP1777

Cox, the bankrupt, was indebted to Fenn, and had entrusted him with his share or interest in a string of pearls, to be sold by Fenn, and the profit on such share to be paid to Cox. Fenn sold the pearls after Cox's bankruptcy, and Cox's assignees brought an action against Fenn for his share of the profit. On the part of the Defendant it was insisted, that there was a mutual **[505]** credit, though not a mutual debt, at the time of the bankruptcy, and that one could not be demanded without satisfying the other.

The doctrine of Lord Hardwicke, in *Ex parte Deeze*, was relied on by the counsel, and seemed to be fully adopted by the Court, without adverting to the qualification which it received from the case *Ex parte Ockenden;* and, applying that doctrine to the case before them, they determined, that Fenn was protected from the claim of Cox's assignees, by the clause of mutual credits.

*French* v. *Fenn* has been followed by a string of causes running through a period of more than thirty years, all professing to depend upon it, some of them containing the fullest approbation of *Ex parte Deeze*, from the Bench.

Whatever I might think of the original decision, I could not persuade myself to break in upon a class of cases so long established; and if they could not be supported without carrying the doctrine found in *Ex parte Deeze* to its fullest extent, speaking for myself, I should be ready to follow it, rather than overturn all that has been settled upon this subject for such a length of time.

But, it is first to be considered, whether these cases may not be supported by a construction of the statute, which will not go to that extent, and will leave the opinion of Lord Hardwicke in the case of *Ex parte Ockenden* untouched.

By the 28th section of 5 G. 2, c. 30, it is enacted, "that where it shall appear to the said commissioners or the major part of them, that there hath been mutual credit given by the bankrupt, and any other person, or mutual debts between the bankrupt and any other person, at any time before such person became bankrupt, the said commissioners or the major part of them, or the assignees of such bankrupt's estate, shall state the **[506]** account between them, and one debt may be set against another; and what shall appear to be due on either side, on the balance of such account, and on setting such debts against one another, and no more, shall be claimed on either side respectively."

Something more is certainly meant here by mutual credits than the words mutual debts import; and yet, upon the final settlement, it is enacted merely that one debt shall be set against another. We think this shews that the legislature meant such credits only as must in their nature terminate in debts, as where a debt is due from one party, and credit given by him on the other for a sum of money payable at a future day, and which will then become a debt, or where there is a debt on one side, and a delivery of property with directions to turn it into money on the other; in such case the credit given by the delivery of the property must in its nature terminate in a debt, the balance will be taken on the two debts, and the words of the statute will in all respects be complied with: but where there is a mere deposit of property, without any authority to turn it into money, no debt can ever arise out of it, and, therefore, it is not a credit within the meaning of the statute.

This principle will support all the cases from *French and Fenn* to *Olive* v. *Smith*, which is the last that has occurred.

In *French and Fenn* there was a debt due from Cox to Fenn, and Cox entrusted Fenn with his share in the pearls for sale, which when sold would constitute a cross debt for the produce from Fenn to Cox.

In *Smith* v. *Hodson* (4 T. R. 211) the Defendant had entrusted the bankrupts with his acceptance, which he was liable to pay, and which when paid would create a debt from the bankrupts to him for the amount.

**[507]** In *Parker* v. *Carter*, Co. Bankrupt Laws, 548, and *Olive* v. *Smith*, the bankrupts were indebted to the Defendants, and the bankrupts delivered policies of insurance to the Defendants to collect losses under them, which, when collected, would make the Defendants their debtors for the amount.

So, in all the other cases which have occurred upon this subject, it will be found, that that which has been allowed as a mutual credit has always been of such a nature as must terminate in a cross debt.

To this extent we think the statute may be carried, but no farther; and we follow the final opinion of Lord Hardwicke, in determining, that the delivery of these cloths

AP1778

Case 1:23-cv-00630-CFC   Document 12-6   Filed 08/23/23   Page 479 of 863 PageID #: 1846
Case 22-10261-TMH   Doc 76-1   Filed 05/09/23   Page 25 of 66

to the Defendant, for the purpose of being dressed, does not form an article of mutual credit in his favour within the fair construction of the clause relied on.

The postea must, therefore, be delivered to the Plaintiffs (a).


[508] HOLMES *v.* BLOGG.   June 10, 1818

If an infant pays money with his own hands without a valuable consideration, he cannot get it back again. Therefore, where an infant paid money to A. as a premium for a lease, and enjoyed the same for a short period during his infancy, but avoided it after he became of age, and quitted the premises : Held, that he could not recover the sum so paid, in an action against A. for money had and received.

Assumpsit by the Plaintiff to recover 157l. 10s., paid by him during his infancy to the Defendant. Plea, general issue. At the trial before Burrough J. at the London sittings after last Michaelmas term, in addition to the facts stated when this case was before the Court in Hilary term last (ante, p. 35), it appeared that when the arrangement with Taylor was entered into by the Defendant, the Plaintiff was not in business, having quitted it when he became of age, and that, in a subsequent conversation between the Plaintiff and Taylor respecting the lease, the former declined having any thing to do with it ; that the Plaintiff had never slept in the house after he became of age, and that his name was soon afterwards taken off the door. For the Defendant, it was contended that under these circumstances the Plaintiff could not recover. Burrough J. was of opinion that the action was well brought, but reserved the point. The jury found for the Plaintiff ; and, in Hilary term last,

Copley Serjt. obtained a rule nisi to set aside this verdict, on the ground that there had been no disaffirmance of the contract ; and that the sum sought to be recovered, having been paid on the joint account of the Plaintiff and Taylor, this action by the Plaintiff could not be maintained.

Best Serjt., in the last term, shewed cause, and made two points ; first, that, if disaffirmance were necessary, [509] the Plaintiff, upon coming of age, had disaffirmed the contract. Second, that disaffirmance was not necessary, and that infants were not bound by any contract unless there were affirmance by them after coming to full age. In addition to the cases cited in favour of the Plaintiff on the former discussion, the following authorities were relied on in support of these points. Com. Dig. (tit. Enfant, c. 2), *Smith* v. *Low* (1 Atk. 489), *Nightingale* v. *Earl Ferrers* (3 Peere Wms. 206), Litt. (s. 258).

Copley, in support of the rule, argued on the point of the Plaintiff's liability for rent to the same effect in substance, as he did in shewing cause on the former occasion, referring in addition to Com. Dig. (tit. Enfant, c. 3) ; and urged that, as the payment made was a partnership payment, the Plaintiff's remedy was against Taylor for contribution, but that he could not recover the money so paid in the present action.

Cur. adv. vult.

And now,

GIBBS C. J. delivered the judgment of the Court. This was an action by Holmes against Blogg for money had and received ; and the ground on which the Plaintiff sought to recover is founded on the following facts. Holmes, an infant, together with Taylor, had agreed with the Defendant to take the lease of his house, and to pay to him a certain sum of money for that lease. Part of the money was paid down, and security was given for the residue. In point of fact, the money paid was the money of Holmes, at that time an infant. The infant avoided the lease when he came of age, as he had a [510] right to do ; and, having avoided the lease, he brought this action for the money paid to the Defendant, on the ground that the consideration having failed, he was entitled to recover it. There has been a good deal of argument on the subject of this avoidance, and, indeed, it has been treated as the main question : but

_____

(a) Dallas J. was absent from illness, but concurred in this judgment, ex relatione Gibbs C. J.

See *Sampson* v. *Burton*, 2 Brod. & Bing. 89., particularly the judgment of Burrough J.

AP1779

All England Law Reports/2002/Volume 1 /Smith (Administrator of Cosslett (Contractors) Ltd) v Bridgend County Borough Council - [2002] 1 All ER 292

<span style="color:red">[2002] 1 All ER 292</span>

# Smith (Administrator of Cosslett (Contractors) Ltd) v Bridgend County Borough Council

[2001] UKHL 58

### HOUSE OF LORDS

**LORD BINGHAM OF CORNHILL, LORD BROWNE-WILKINSON, LORD HOFFMANN, LORD SCOTT OF FOSCOTE AND LORD RODGER OF EARLSFERRY**

### 8–10 OCTOBER, 8 NOVEMBER 2001

*Company – Charge – Floating charge – Company in administration – Effect of non- registration of charge – Engineering contract giving employer right to sell contractor's on-site plant in event of default in satisfaction of sums due from contractor – Whether right constituting floating charge – Whether unregistered floating charge void against company in administration or only against administrator – Companies Act 1985, s 395(1) – Institution of Civil Engineers Conditions of Contract (5th edn), cl 63.*

The predecessor of the respondent local authority entered into an engineering contract with C Ltd. Under the contract, which was made on the Institution of Civil Engineers Conditions of Contract (the ICE conditions), C Ltd agreed to carry out land reclamation works for the authority involving the processing of coal-bearing shale. For the purposes of the works, C Ltd purchased, with the benefit of an advance of £1·438m from the authority, two coal-washing plants which were installed on the site. Under cl 53 of the ICE conditions, all plant owned by the contractor were deemed to be the property of the employer when on site, but in accordance with an amendment made by the parties the washing plant was at all times owned by C Ltd. Clause 63 gave the employer the right, in various circumstances of default by the contractor (including the abandonment of the contract), to enter the site, expel the contractor, complete the works themselves or employ another contractor to do so, use the plant for that purpose, sell it and apply the proceeds of sale towards the satisfaction of any sums due to the employer from the contractor under the contract. After two years, C Ltd fell into financial difficulties and abandoned the contract. The authority then entered the site and reached a provisional agreement with another contractor under which the latter started work using C Ltd's washing plant. Shortly afterwards, C Ltd went into administration. In subsequent summary proceedings brought by the administrator against the authority under s 234 of the Insolvency Act 1986 for delivery up of the washing plant, the administrator contended that cl 63 was an unregistered floating charge over the company's property. He therefore sought to rely on s 395(1)ᵃ of the Companies Act 1985 which provided that such a charge was 'void against the liquidator or adminstrator'. While the s 234 proceedings were pending, the authority entered into another agreement with the new contractor. By one of its terms, the new contractor would, on completion of the

---

ᵃ    Section 395, so far as material, provides: '(1) … a charge created by a company registered in England and Wales and being a charge to which this section applies is, so far as any security on the company's property or undertaking is conferred by the charge, void against the liquidator or administrator … unless the prescribed particulars of the charge together with the instrument (if any) by which the charge is created or evidenced, are delivered to or received by the registrar of companies for registration in the manner required … within 21 days after the charge's creation …'

works, become owners of the washing plant and could remove and dispose of it. Three years later, the s 234 proceedings reached the Court of Appeal. By that time, the works had been completed and the new contractor had either removed the washing plant from the site or was just about to remove them, eventually selling them directly to a third party. However, in the absence of any clear information to the contrary, the Court of Appeal dealt with the case on the basis that the authority was still exercising its right to use the plant under cl 63. The court held that that right could not be a charge and therefore dismissed the appeal. It nevertheless expressed the view that the power of sale in cl 63 was a floating charge and that it was therefore void against the administrator under s 395(1) of the 1985 Act for want of registration. Accordingly, on discovering that the plant had been sold, the administrator brought proceedings for conversion against the authority and applied for summary judgment. The judge granted the application, but his decision was reversed, and the proceedings struck out, by the Court of Appeal which held that s 395(1) made the floating charge void against the administrator rather than against the company in administration, that the right to sue for conversion (unlike s 234 proceedings) was vested in the company rather than its adminstrator, that accordingly the power of sale in cl 63 remained valid against C Ltd and that it therefore provided an answer to the claim for conversion. The administrator appealed to the House of Lords, challenging the Court of Appeal's view of the effect of s 395(1). On the appeal, the authority contended that the power of sale was not a charge at all, or, if it was, that it was a fixed rather than a floating charge and therefore fell outside the scope of s 395(1). If that was wrong and, contrary to the Court of Appeal's view, the charge was void against C Ltd itself, the authority submitted that it was entitled to an equitable set-off. Finally, the authority contended that, in any event, it had not done any act which could be regarded as conversion of the plant since it had been entitled to possession of the plant when it had entered into the agreement giving the new contractor the right to remove the plant on completion of the works.

**Held** – (1) Clause 63 of the ICE conditions constituted a floating charge, registrable under s 395 of the 1985 Act, in so far as it allowed the employer, in various situations of default by the contractor, to sell the contractor's plant and equipment and apply the proceeds in discharge of its obligations. A right to sell an asset belonging to a debtor and appropriate the proceeds to payment of the debt could not be anything other than a charge. It was a floating charge because the property subject to cl 63 was a fluctuating body of assets which could be consumed or removed from the site in the ordinary course of the contractor's business (see [1], [2], [41], [58], [64], [81], below).

(2) On the true construction of s 395(1) of the 1985 Act, an unregistered floating charge on a company's property was void against the company in administration, ie it was void against the company when acting by its administrator. Such a charge was void against a company in liquidation, and s 395 operated in relation to a company in administration in exactly the same way as it did in relation to a company in liquidation. Its purpose was to protect the interests of the company in administration and, if it should subsequently go into liquidation, the interests of creditors. If, on the other hand, the company emerged solvent from the administration, the secured creditor would by definition obtain payment of its debt without recourse to the avoided security. In the instant case, the administrator had ample power to cause C Ltd to bring an action against the authority for converting its property. If the defence to such a claim was a charge that was avoided by s 395(1), C Ltd would be entitled to rely upon that provision. Nor did

*[2002] 1 All ER 292 at  294*

the authority have any right of equitable set-off. Such a set-off depended upon showing some equitable reason for protection against the claimant's demand. A defendant could not, in the absence of a lien or other security, claim to retain an asset belonging to a claimant by way of set-off against a monetary cross-claim. If that were not so, everyone would in effect have a lien over any property of his debtor which happened to be in his possession. It followed that he could not improve his security in equity by wrongfully converting the debtor's property. To allow an equitable set-off would be to allow the authority to exercise the very right which it could have exercised if the charge had been registered but which s 395 was intended to avoid. Moreover, the authority had consented to the removal of the plant by the new contractor in violation of C

Ltd's right to possession. The fact that it had given such consent in advance, at a time when C Ltd was not entitled to possession, could make no difference. The consent remained effective until the moment when the new contractor took the plant. That was sufficient to amount to a conversion. Accordingly, the appeal would be allowed (see [1], [2], [21], [29], [31], [33], [36], [39], [41], [45],[67], [68], [70], [73]–[76], [78], [80], [81], below).

### Notes

For floating charges and the effect of non-registration, see 7(2) *Halsbury's Laws* (4th edn reissue) paras 1260, 1299.

For the Companies Act 1985, s 395, see 8 *Halsbury's Statutes* (4th edn) (1999 reissue) 454.

### Cases referred to in opinions

*Agnew v Comr of Inland Revenue* [2001] UKPC 28, [2001] 2 BCLC 189, [2001] 2 AC 710, [2001] 3 WLR 454.

*Ayala Holdings Ltd, Re (No 2)* [1996] 1 BCLC 467.

*Cuckmere Brick Co Ltd v Mutual Finance Ltd* [1971] 2 All ER 633, [1971] Ch 949, [1971] 2 WLR 1207, CA.

*Dimond v Lovell* [2000] 2 All ER 897, [2000] 2 WLR 1121, HL.

*Evans v Rival Granite Quarries Ltd* [1910] 2 KB 979, CA.

*Governments Stock and Other Securities Investment Co Ltd v Manila Rly Co Ltd* [1897] AC 81, HL.

*Hanak v Green* [1958] 2 All ER 141, [1958] 2 QB 9, [1958] 2 WLR 755, CA.

*Independent Automatic Sales Ltd v Knowles & Foster* [1962] 3 All ER 27, [1962] 1 WLR 974.

*Manson v Smith (liquidator of Thomas Christy Ltd)* [1997] 2 BCLC 161, CA.

*Monolithic Building Co, Re, Tacon v Monolithic Building Co* [1915] 1 Ch 643, [1914–15] All ER Rep 249, Ch D and CA.

*Newitt, Ex p, re Garrud* (1881) 16 Ch D 522, [1881–5] All ER Rep 1039, CA.

*Orakpo v Manson Investments Ltd* [1977] 3 All ER 1, [1978] AC 95, [1977] 3 WLR 229, HL.

*Tse Kwong Lam v Wong Chit Sen* [1983] 3 All ER 54, [1983] 1 WLR 1349, PC.

*Winter Garden Theatre (London) Ltd v Millenium Productions Ltd* [1947] 2 All ER 331, [1948] AC 173, HL.

**Appeal**

The claimant, Gerald Clifford Smith, the administrator of Cosslett (Contractors) Ltd (the company), appealed with permission of the Appeal Committee of the House of Lords given on 24 July 2000 from the order of the Court of Appeal (Lord Woolf MR, Ward and Laws LJJ) on 19 January 2000 ([2000] 1 BCLC 775), as amended on 15 February 2000, whereby it (i) allowed an appeal by the defendant,

*[2002] 1 All ER 292 at   295*

Bridgend County Borough Council, from the order of Judge Toulmin QC perfected on 8 September 1998 giving effect to his decision on 9 July 1998 granting an application by the then administrator of the company, Ian Clark, for summary judgment against the council in proceedings for conversion of certain plant owned by the company, and (ii) struck out those proceedings. The facts are set out in the opinion of Lord Hoffmann.

*Richard Wilmot-Smith QC* and *Alan Maclean* (instructed by *Hammond Suddards Edge*, Manchester) for the administrator.

*Gabriel Moss QC* and *Peter Arden* (instructed by *Edwards Geldard,* Cardiff) for the council.

*Their Lordships took time for consideration.*

**8 November 2001. The following opinions were delivered.**

**LORD BINGHAM OF CORNHILL.**

**[1]**

My Lords, I have had the advantage of reading in draft the opinion of my noble and learned friend Lord Hoffmann. I am in full agreement with it and for the reasons which he gives I would allow the appeal and make the order which he proposes.

**LORD BROWNE-WILKINSON.**

**[2]**

My Lords, I have had the advantage of considering the speech of my noble and learned friend, Lord Hoffmann, in draft. I agree with it and for the reasons he gives I too would allow the appeal.

**LORD HOFFMANN.**

**[3]**

My Lords, this appeal raises two questions of general importance. The first is whether a standard condition in the Institution of Civil Engineers (ICE) form of contract which allows the employer, in various situations of

default by the contractor, to sell his plant and equipment and apply the proceeds in discharge of his obligations, is a floating charge which should be registered under s 395 of the Companies Act 1985 (the 1985 Act). The second is the effect of a failure to register when the contractor has gone into administration but the employer has nevertheless purported to exercise the power of sale.

**[4]**

The contract, dated 28 January 1991, was for engineering works to rehabilitate an area of 141 hectares of the upper Garw valley which had been disfigured by derelict coal dumps. The employer was the Mid-Glamorgan County Council, which disappeared on a reorganisation of Welsh local government and was succeeded for this purpose by the Bridgend County Borough Council. I shall refer to both as 'the council'. The contractor was Cosslett (Contractors) Ltd, which I shall call 'the company'.

**[5]**

The largest items of equipment brought on site by the contractor were two coal-washing plants which were used to separate usable coal from residue. The council had advanced about £1·438m to the company to enable it to buy the washing plants and the contract provided for repayment by way of deduction from the sums which would periodically become payable to the company over the term of the contract, which was expected to last about four years.

**[6]**

Clause 53(1) of the standard ICE conditions has a definition of 'plant' and cl 53(2) provides that all plant, goods and materials owned by the contractor 'shall

*[2002] 1 All ER 292 at   296*

when on the site be deemed to be the property of the employer'. In this case, however, the parties had amended the definition of plant to include a specific reference to the coal-washing plant:

> 'For the purpose of this clause … the expression "Plant" shall mean any constructional plant coal washing plant temporary works and material for temporary works but shall exclude any vehicles engaged in transporting any labour, plant or material to or from the Site.'

'Constructional plant' has its own definition in cl 1(1)(o): '"Constructional Plant" means all appliances or things of whatsoever nature required in or about the construction completion and maintenance of the Works …' That seems easily wide enough to accommodate the washing plant and so it is not clear why they needed a special mention in cl 53(1). Perhaps the draftsman of the amendments did not notice that constructional plant was a defined expression. In any event, I do not think that it made any difference.

**[7]**

Clause 53(2), which, as I have said, provided that the contractor's plant goods and materials should, when on site, 'be deemed to be the property of the employer', was amended to add 'The washing plant must be owned by the Contractor or by a company in which the Contractor has a controlling interest'. This condition was observed. The washing plant was at all times owned by the company.

**[8]**

Also relevant are cl 53(6) and (7):

> '(6) No Plant (except hired Plant) goods or materials or any part thereof shall be removed from the Site without the written consent of the Engineer which consent shall not be unreasonably withheld where the same are no longer immediately required for the purposes of the completion of the Works … (7) Upon the removal of any such Plant goods or materials as have been deemed to have become the property of the Employer under sub-clause (2) of this Clause with the consent as aforesaid the property therein shall be deemed to revest in the Contractor …'

[9]

Thus the status of being deemed to be property of the employer attached to plant etc when it was brought onto the site and ceased to attach when, subject to the consent of the engineer, it was removed from the site.

[10]

The condition which gives rise to the present dispute is cl 63(1):

> 'If the Contractor shall become bankrupt … or (being a corporation) shall go into liquidation … or if the Engineer shall certify in writing to the Employer that in his opinion the Contractor … has abandoned the Contract … then the Employer may after giving 7 days' notice in writing to the Contractor enter upon the Site and the Works and expel the Contractor therefrom … and may himself complete the Works or may employ any other contractor to complete the Works and the Employer or such other contractor may use for such completion so much of the Constructional Plant Temporary Works goods and materials which have been deemed to become the property of the Employer under [clause 53] … as he or they may think proper and the Employer may at any time sell any of the said Constructional Plant Temporary Works and unused goods and materials and apply the proceeds of sale in or towards the satisfaction of any sums due or which may become due to him from the Contractor under the Contract.'

[11]

After about two years of operating the contract the company found that selling the recovered coal was not as profitable as it had expected. In the summer

*[2002] 1 All ER 292 at   297*

of 1993 it told the council that it appeared to be heading for insolvency and would not be able to carry on with the contract. On 4 August 1993 it abandoned the site and on 6 August the engineer gave a certificate to that effect in accordance with cl 63. On 12 August the council gave seven days' notice of its intention to enter upon the site. It found another contractor, Burrows Bros (Sales) Ltd (Burrows) and entered into a provisional agreement under which they started work at the end of August, using the company's washing plant.

[12]

On 8 September 1993 the company went into administration. Mr Ian Clark was appointed administrator. He demanded the immediate return of the plant or payment of a substantial hire fee for its use. When the council replied that it was entitled under cl 63 to use the plant, Mr Clark said that the condition was an unregistered

floating charge and void against him under s 395(1) of the 1985 Act. On 22 November 1993 he commenced summary proceedings under s 234 of the Insolvency Act 1986 for delivery up of the washing plant.

[13]

On a date in January 1994, while the proceedings under s 234 were pending, the council replaced the provisional arrangements under which Burrows had been employed with a 'continuation contract' for the completion of the works. One of the terms of that agreement was that when the works had been completed, Burrows would become owners of the washing plant and could remove and dispose of it.

[14]

The administrator's application came before the court in December 1995, when Burrows was using the plant under the continuation contract. The council's first line of defence was that the provision in cl 53 by which the plant, when on site, was 'deemed to be the property of the employer' meant that it actually became their property. The company lost all title. The judge rejected this argument (see [1996] 4 All ER 46, [1997] Ch 23). He said that cl 63 created a charge over the company's property. But he held that the charge was fixed, not floating. In his opinion cl 53(6) gave the employer an absolute right to refuse to allow any plant to be removed from site and therefore from the scope of the charge if it was immediately required to complete the works and a right to refuse in any other circumstances if it was not unreasonable to do so. This meant that the contractor did not have that freedom to deal with the assets until crystallisation which was the badge of a floating charge. As a fixed charge, it did not need to be registered. On that ground, he dismissed the application.

[15]

The administrator appealed. By the time the case got to the Court of Appeal in July 1997, the works had been completed and Burrows had either removed or were just about to remove the washing plants from the site. In fact they sold them to a third party for their own account. The administrator does not appear to have had much information about what was happening and the Court of Appeal was invited to deal with the appeal on the basis that the council was still exercising its right to use the plant but, for the avoidance of further litigation, to express a view about what the position would be if the council exercised the power of sale.

[16]

The Court of Appeal (Evans and Millett LJJ and Sir Ralph Gibson) ([1997] 4 All ER 115, [1998] Ch 495) said that one had to distinguish between the two rights which cl 63 conferred upon the employer. The right to use the plant to finish the works could not be a charge. It was simply a contractual right which continued to be exercisable whether the company was in administration or not. On that ground, the court dismissed the appeal. On the other hand, they agreed with the judge that the right to sell the plant and apply the proceeds to discharge any debt from the company to the council was a charge. But they did not agree that it was a fixed charge. Millett LJ, with whom the other two judges agreed,

*[2002] 1 All ER 292 at   298*

pointed out that power to refuse consent to the removal of the plant, which the judge had treated as vested in the employer, was actually conferred upon the engineer. This suggested that the discretion was to be exercised independently on operational grounds and not as a method of enforcing the employer's security for the payment of money. It therefore did not give the employer such control over the plant as to create a fixed charge in advance of crystallisation.

**[17]**

The result was that the power of sale was void against the administrator under s 395(1) of the 1985 Act. In the course of discussion after judgments had been handed down, counsel told the court that according to their information, the plant had been sold. Millett LJ remarked that 'on our judgment, as it stands at the moment, you would be entitled to an RSC Ord 14 judgment'.

**[18]**

The administrator took the judge at his word and issued a fresh writ claiming damages for conversion of its plant, followed by an application for judgment under RSC Ord 14. Judge Toulmin QC gave judgment for damages to be assessed and an interim payment of £389,000. The council appealed and the Court of Appeal (Lord Woolf MR, Ward and Laws LJJ) ([2000] 1 BCLC 2000) set aside the judgment on entirely new grounds. Laws LJ (with whom the other judges agreed) said that s 395(1) made the floating charge void against the administrator but not against the company. This meant that in cases in which the administrator had a personal cause of action (such as to recover the company's property in specie by summary proceedings under s 234 of the 1986 Act) he could disregard the charge. But the right to sue for conversion of its property vested in the company, not the administrator. The power of sale remained valid against the company and was an answer to the claim for conversion. The Court of Appeal therefore allowed the appeal and struck out the action. Against that order the administrator appeals to your Lordships' House.

**[19]**

My Lords, I shall first address the grounds upon which the Court of Appeal decided the case. They are in my view startling and unorthodox. Section 395 of the 1985 Act, which can be traced back to the Companies Act 1900 was intended for the protection of the creditors of an insolvent company. It was intended to give persons dealing with a company the opportunity to discover, by consulting the register, whether its assets were burdened by floating and certain fixed charges which would reduce the amount available for unsecured creditors in a liquidation. Whether this was a realistic form of protection and whether the choice of registrable charges was entirely logical is not presently relevant. The plain intention of the legislature was that property subject to a registrable but unregistered charge should be available to the general body of creditors (or a secured creditor ranking after the unregistered charge) as if no such charge existed.

**[20]**

When a winding-up order is made and a liquidator appointed, there is no divesting of the company's assets. The liquidator acquires no interest, whether beneficially or as trustee. The assets continue to belong to the company but the liquidator is able to exercise the company's right to collect them for the purposes of the liquidation.

**[21]**

It must in my opinion follow that when s 395 says that the charge shall be 'void against the liquidator', it means void against a company acting by its liquidator, that is to say, a company in liquidation. In *Re Monolithic Building Co, Tacon v Monolithic Building Co* [1915] 1 Ch 643 at 667–668, [1914–15] All ER Rep 249 at 254 Phillimore LJ said of a predecessor of s 395:

> 'It makes void a security; not the debt, not the cause of action, but the security, and not as against everybody, not as against the company grantor,

*[2002] 1 All ER 292 at 299*

but against the liquidator, and against any creditor, and it leaves the security to stand as against the company while it is a going concern. It does not make the security binding on the liquidator as successor of the company.'

The last sentence shows some degree of confusion because of course the liquidator is not a successor of the company. But Phillimore LJ was quite right in saying that s 395 does not invalidate a charge against a company while it is a going concern, that is to say, when it is not in liquidation. On the other hand, once the company is in liquidation and can act only by its liquidator, there seems to me little value in a distinction between whether the charge is void against the liquidator or void against the company. It is void against the company in liquidation.

[22]

In *Independent Automatic Sales Ltd v Knowles & Foster* [1962] 3 All ER 27, [1962] 1 WLR 974 a company in liquidation which had sold machines on hire purchase brought an action against a finance company to recover hire-purchase agreements and other securities which it had charged to secure the repayment of advances. When the finance company relied upon the charge, the plaintiff replied that it was void because it should have been registered as a charge over book debts under a predecessor of s 395. The plaintiff named in the writ was the company. Mr Arthur Bagnall QC for the defendant took the preliminary point that as the liquidator was claiming that the charges were void as against him, he should have been the plaintiff. Buckley J agreed but allowed an amendment to join the liquidator as an additional plaintiff and the action proceeded.

[23]

As everyone knew that the company was in liquidation and suing by its liquidator, it is hard to see what the point of this manoeuvre was, unless the defendants had omitted or been unable to obtain an order for security for costs and hoped to be able to make the liquidator personally liable. (In the event they lost, so it did not matter.) But I respectfully think that Buckley J was wrong. The cause of action was vested in the company. It owned the hire-purchase agreements. It should therefore have been the plaintiff. The liquidator was causing it to sue for the purpose of realising assets to be distributed in the liquidation. The fact that he relied upon the statute to invalidate what would otherwise be a defence open to the holder of the assets does not alter the nature of the proceedings or provide a reason why he should have to expose himself to personal liability for costs.

[24]

I express no view on the related question, which came before Knox J in *Re Ayala Holdings Ltd (No 2)* [1996] 1 BCLC 467 as to whether a liquidator (or administrator) can assign the company's right to recover property free from a charge avoided by s 395. Even if I am right in thinking that the proceedings in the *Independent Automatic Sales* case were properly brought in the name of the company, the decision of Knox J against such an assignment can be upheld on the ground that the right of avoidance under s 395 is not in itself an assignable item of property and can be claimed only by the company acting by its liquidator or administrator.

[25]

This brings me to s 234 of the 1986 Act, which Laws LJ treated as the only situation in which the administrator would be able to sue in his own name and therefore be able to rely upon the fact that the charge was void against him. This section can be traced back to s 100 of the Companies Act 1862. Originally it was confined to applications against contributories and any 'Trustee, Receiver, Banker, or Agent, or Officer of the Company'. It provided a summary procedure by which they could be required to 'pay, deliver, convey, surrender, or

transfer' to the liquidator 'any Sum or Balance, Books, Papers, Estate, or Effects which happen to be in his Hands for the Time being, and to which the Company is *primâ facie* entitled'.

*[2002] 1 All ER 292 at   300*

**[26]**

In its original form, such an application was not an originating process. It was an application in the liquidation, invoking the summary jurisdiction of the Companies Court against certain persons connected with the company and in possession of its money or property. Its purpose was to enable the liquidator to carry out his statutory functions. It did not necessarily involve a determination of title. If, for example, the liquidator appeared on affidavit evidence to be prima facie entitled to property, books or records which he needed to proceed with the liquidation, the court could in its discretion order the person in possession to hand over the property and argue about ownership later.

**[27]**

Plainly, therefore, when the 1900 Act said that an unregistered charge should be void against the liquidator, it was not intending to confine the scope of that provision to cases in which the liquidator was making a summary application under s 100 of the 1862 Act. The registration provisions would have had little value if they applied only to charges in favour of the persons subject to the summary jurisdiction. It is to be observed that the *Independent Automatic Sales* case was an ordinary action commenced by writ.

**[28]**

The scope of the summary procedure was enlarged by provisions of the Insolvency Act 1985 which are now contained in s 234 of the 1986 Act. It is now available against any person who has in his control 'any property, books, papers or records to which the company appears to be entitled'. It remains, however, a summary discretionary remedy, obtainable by a liquidator or other office-holder for the purpose of enabling him to carry out his functions and which does not necessarily involve any determination of title.

**[29]**

When administration was introduced by the Insolvency Act, s 395 of the 1985 Act was amended simply by adding the words 'or administrator' after the word 'liquidator'. This seems to me to indicate that the section was to operate in relation to a company in administration exactly as it had in relation to a company in liquidation. An administration order did not vest any of the company's property in the administrator any more than a winding-up order vested it in the liquidator. Instead, s 14 of the 1986 Act gave the administrator powers in many respects similar to those of a liquidator over the company's property:

> '(1) The administrator of a company—(a) may do all such things as may be necessary for the management of the affairs, business and property of the company, and (b) without prejudice to the generality of paragraph (a), has the powers specified in Schedule 1 to this Act …'

**[30]**

Paragraph 1 of Sch 1 to the 1986 Act gives the administrator power to 'take possession of, collect and get in the property of the company and, for that purpose, to take such proceedings as may seem to him expedient' and para 5 confers power to bring any action in the name and on behalf of the company.

**[31]**

Ordinarily, therefore, an action brought by an administrator to assert a claim on behalf of the company should be in the name of the company. The title to the claim will be vested in the company. In the present case, for example, s 14(1) and the Schedule gave the administrator ample power to cause the company to bring an action against the council for converting its property. If the defence to such a claim is a charge which is avoided by s 395 of the 1985 Act, the company will be entitled to rely upon the section. As in the case of liquidation, I consider that 'void against the administrator' means void against the company in administration or (another way of saying the same thing) against the company when acting by its administrator.

*[2002] 1 All ER 292 at 301*

**[32]**

In fact, the title given to the writ in the proceedings under appeal was headed 'Between: Ian Clark, the Administrator of Cosslett (Contractors) Ltd and Bridgend County Borough Council'. In my view, the proper heading should have been 'Between: Cosslett (Contractors) Ltd (in administration) and Bridgend County Borough Council'. But no one was misled about the nature of the proceedings because the statement of claim endorsed on the writ made it clear that the claim was for loss and damage suffered by the company on account of the conversion of its property. So I do not think that any amendment was necessary. On the other hand, the earlier proceedings under s 234 were at first headed 'In the matter of Cosslett (Contractors) Ltd and in the matter of the Insolvency Act 1986, between Cosslett (Contractors) Ltd, applicant, and Mid-Glamorgan County Council, respondent'. Later the title was amended to substitute the name of the administrator for that of the company as applicant. In this case I think that second thoughts were correct.

**[33]**

Laws LJ described ([2000] 1 BCLC 775 at 791) the effect of s 395 of the 1985 Act as being to confer upon the administrator 'a purely adventitious potential claim in specie to recover or retain the plant' and the right to 'take advantage' of the ineffectiveness of the floating charge as 'nothing but statutory serendipity'. I see no reason to impute such whimsical intentions to the legislature. The purpose of s 395 as originally enacted was to protect the interests of the general body of creditors. The purpose of s 395 as extended to administrators is to protect the interests of the company in administration and, if it should subsequently go into liquidation, the interests of creditors. If, on the other hand, the company emerges solvent from the administration, the secured creditor will by definition obtain payment of his debt without recourse to the avoided security.

**[34]**

In giving s 395 a narrow and arbitrary construction, Laws LJ appears to have been influenced by what he regarded as the merits of the case. He thought it was unfair that the council should lose its security over the plant when it had a cross-claim greatly exceeding the value of that security, part of which arose from the advances which had enabled the company to buy the plant in the first place. He said that if there had been no charge created by cl 63, any claim by the company for damages for conversion would 'plainly' have been met by a set-off, either in equity or under r 4.90 of the Insolvency Rules 1986, SI 1986/1925, raising the council's cross-claim. There would in his judgment have been 'no answer' to such a set-off. Why should the council be in a worse position because it had taken an unregistered charge?

**[35]**

If there was indeed such a right of set-off, the argument would be a strong one. And, encouraged by the judge's remarks, Mr Moss QC, who appeared for the council, submitted that even if the charge was void not merely against the administrator personally but against the company in administration, he could still rely up-

on an equitable set-off. But in my opinion neither equitable set-off nor (if the company were to go into liquidation) set-off under r 4.90 would be available. The position under r 4.90, which provides for a set-off arising out of 'mutual credits, mutual debts or other mutual dealings between the company and any creditor', was expressly considered by Millett LJ in *Manson v Smith (liquidator of Thomas Christy Ltd)* [1997] 2 BCLC 161. There a director who had been held liable for misappropriating funds belonging to an insolvent company attempted to invoke r 4.90 to set off his liability against what the company owed him on loan account. Millett LJ said 'a misappropriation of assets is not a dealing'. Nor is a conversion of the company's property.

[36]

Similarly, equitable set-off depends upon showing some equitable reason for protection against the plaintiff's demand (see *Hanak v Green* [1958] 2 All ER

*[2002] 1 All ER 292 at    302*

141, [1958] 2 QB 9). In my opinion a defendant could not, in the absence of a lien or other security, claim to retain an asset belonging to a plaintiff by way of set-off against a monetary cross-claim. If this were not the case, everyone would in effect have a lien over any property of his debtor which happened to be in his possession. It follows, in my opinion, that he cannot improve his security in equity by wrongfully converting the debtor's property. As Lord Uthwatt said in *Winter Garden Theatre (London) Ltd v Millenium Productions Ltd* [1947] 2 All ER 331 at 343, [1948] AC 173 at 203: 'In a court of equity, wrongful acts are no passport to favour.' To allow an equitable set-off would be to allow the council to exercise the very right which it could have exercised if the charge had been registered but which s 395 was intended to avoid.

[37]

Mr Moss next submitted that the council had not done any act which could be regarded as a conversion of the plant. Conversion is a tort against a person entitled to possession and when the council entered into the continuation contract which gave Burrows the right to take away the plant on completion of the works, the company had no right to possession. The council was entitled, as the first Court of Appeal held, to retain possession for the purpose of completing the works. When the works were completed and the company became entitled to possession, the council did not do anything to interfere with that right. Burrows simply removed the plant. If anyone converted the plant, Burrows did.

[38]

These arguments were presented to the Court of Appeal and tentatively rejected by Laws LJ. He said that if he thought on other grounds that the company should have a remedy, he—

> 'would have been prepared to hold that as between A, B and C, A converts B's goods when he
> (A) gives possession and purported title in the goods to C, notwithstanding that A's obligation to
> C to do so had been undertaken at a time when B had no right to immediate possession.' (See
> [2000] 1 BCLC 775 at 787.)

[39]

I agree. The council consented to the removal of the plant by Burrows in violation of the company's right to possession. The fact that they gave such consent in advance, at a time when the company was not entitled to possession, can make no difference. The consent remained effective until the moment when Burrows took the plant. This was sufficient to amount to a conversion.

**[40]**

My Lords, in my opinion Millett LJ was therefore right in saying that on the basis of the first Court of Appeal judgment, there could be no answer to the company's claim for damages for conversion. But, in addition to attempting to support the second Court of Appeal's grounds for differing from this view, Mr Moss also challenged the original decision that cl 63 created a floating charge. He said that it was not a charge and that if it was, it was fixed and not floating.

**[41]**

On these points I can be brief because I agree with Millett LJ for the reasons which he gave. I do not see how a right to sell an asset belonging to a debtor and appropriate the proceeds to payment of the debt can be anything other than a charge. And because the property subject to cl 63 (constructional plant, temporary works, goods and materials on the site) was a fluctuating body of assets which could be consumed or (subject to the approval of the engineer) removed from the site in the ordinary course of the contractor's business, it was a floating charge (see *Agnew v Comr of Inland Revenue* [2001] UKPC 28, [2001] 2 BCLC 189 at 199, [2001] 2 AC 710 at 724).

**[42]**

Mr Moss submitted that in the many years during which cl 63 had been in use, no one had imagined that it created a floating charge. A requirement of

*[2002] 1 All ER 292 at   303*

registration might ruin the credit of contractors when a search revealed the existence of such charges or cause them to be in breach of covenants with lenders which prohibited the granting of charges to third parties. The parties cannot therefore be supposed to have intended to create such a charge. But the intentions of the parties, as expressed in the ICE form of contract, are relevant only to establish their mutual rights and obligations. Whether such rights and obligations are characterised as a floating charge is a question of law (see *Agnew*'s case [2001] 2 BCLC 189 at 191, [2001] 2 AC 710 at 716). The answer to this question may come as a surprise to the parties but that is no reason for adopting a different characterisation.

**[43]**

I would also observe that the first Court of Appeal decision was reported more than four years ago and we were shown nothing to suggest that it has been the cause of any difficulties in the building or engineering industries.

**[44]**

Mr Moss also submitted that while cl 63 might create a floating charge over materials and small items of plant which were more obviously likely to come and go during the course of a four-year contract, it should be construed as a fixed charge over the washing plant, which was unlikely to be removed and received a separate mention in cl 53(1) as amended. As I said at the beginning of this speech, it is not easy to guess why the washing plant was treated separately in cl 53(1). But it receives no separate treatment in cl 63, where it falls within the charge simply as an item of constructional plant. It is in my opinion impossible to construe the latter condition as creating a charge over the washing plant different in nature from that which it created over the other plant and materials brought on site. Although the washing plant was very large, it was not inconceivable that during the contract, just as it was found necessary to acquire a second plant, it might be found

advantageous to replace one or both by a more efficient machine. In that case the contractor would have been entitled to withdraw the old machine from the site and the charge.

**[45]**

Finally, Mr Moss submitted that even if he was not entitled to raise an equitable set-off, any claim for conversion should be stayed pending the determination of its cross-claim. For my part, I can see no reason why there should be such a stay. It is agreed that the company is insolvent. But for the existence of these proceedings, it would no doubt have been wound up long ago. The council will be entitled to prove in the liquidation. But the claim for conversion is an asset which the administrator is entitled now to recover in due course of administration. In my opinion the judgment and interim order of Judge Toulmin should be restored.

**LORD SCOTT OF FOSCOTE.**

**[46]**

My Lords, there are, in my opinion, four main issues to be decided on this appeal. (1) Did the terms of the Institution of Civil Engineers Conditions of Contract (the ICE conditions) entered into between Cosslett (Contractors) Ltd (Cosslett) and the council on 28 January 1991 entitle the council, in the events which happened, to a security interest in the two coal-washing plants? (2) If so, did that security constitute a charge that was registrable pursuant to s 395 of the Companies Act 1985 (the 1985 Act)? (3) If so, and having regard to the fact that the charge was never registered but that nevertheless the two plants were sold by the council to Burrows Bros (Sale) Ltd (Burrows) under the continuation contract entered into between them in January 1994, did the terms of the continuation contract constitute the tort of conversion? If so, can Cosslett's administrator sue on that tort in his own name? And on what basis should the damages for conversion be calculated? (4) On the footing that the council's security interest in the coal-washing

*[2002] 1 All ER 292 at 304*

plants was void against Cosslett's administrator as a result of the failure to register it pursuant to s 395, can the council set-off against the conversion damages for which the council is liable to Cosslett the contractual damages for breach of the 28 January 1991 contract for which Cosslett is liable to the council?

**[47]**

The essential background facts relating to these issues have been set out by my noble and learned friend Lord Hoffmann and I gratefully adopt them.

**[48]**

It is, in my view, essential to keep in mind that at all material times Cosslett was the legal owner of the coal-washing plants. It was so decided by Jonathan Parker J ([1996] 4 All ER 46, [1997] Ch 23) and the Court of Appeal ([1997] 4 All ER 115, [1998] Ch 495) in the first set of proceedings regarding the coal-washing plants.

**[49]**

It is also essential to bear in mind the nature of the ICE conditions. The contract between the council and Cosslett was a commercial contract in a form used widely within the construction industry. Mr Moss QC, who

appeared for the council before your Lordships, stressed the importance of keeping in mind the commercial character and purpose of the ICE conditions when construing their terms and considering their effect. I agree with him about that importance.

**(1) Did the council have a security interest in the coal-washing plants?**

**[50]**

In my opinion it plainly did. The coal-washing plants were items falling within the definition in the ICE conditions of 'constructional plant'. No one has argued the contrary. Clause 63(1) of the ICE conditions gave rights and remedies to 'the employer' ie in this case, the council, in a number of specified events, one of which was that the 'Contractor … (a) has abandoned the Contract'. That is what happened in the present case. Cosslett abandoned the contract on 4 August 1993. The contractual rights and remedies given to the employer are triggered by the service on the contractor of a seven-day notice. The council, presumably for belt-and-braces reasons, gave two such notices. No one has suggested a valid notice was not given. The rights and remedies that follow the service of a valid seven- day notice fall into three groups. (i) The employer may enter the site, expel the contractor from it, and take possession of the 'constructional plant' and materials on the site. (ii) The employer may itself complete the works, or may engage some substitute contractor to do so, and the employer, or the substitute contractor, may use any items of 'constructional plant' and any of the materials for that purpose. (iii) The employer may—

> 'at any time sell any of the said Constructional Plant … and unused goods and materials and apply the proceeds of sale in or towards satisfaction of any sums due or which may become due to him from the Contractor under the Contract.'

**[51]**

As to (i), the right to enter and expel is a necessary preliminary both to the exercise of the right to use the constructional plant, and to the exercise of the right to sell it. As to (ii), the right to use the plant is not a security right. It was so decided by the Court of Appeal. Millett LJ said:

> '… this right of the council in the present case … does not constitute any kind of security interest, since it is not given to the council by way of security. It does not secure the performance of the contract by the company, but merely enables the council to perform the contract in its place.' (See [1997] 4 All ER 115 at 125, [1998] Ch 495 at 508; see also [1997] 4 All ER 115 at 123, [1998] Ch 495 at 505 per Evans LJ.)

**[52]**

But, as to (iii), the Court of Appeal held that:

*[2002] 1 All ER 292 at   305*

> 'By contrast the council's power to sell the plant and apply the proceeds in or towards discharge of whatever sums might be or become due from the company by reason of its failure to complete the works clearly is a security interest.' (See [1997] 4 All ER 115 at 125, [1998] Ch 495 at 508 per Millett LJ.)

**[53]**

In the second hearing before the Court of Appeal ([2000] 1 BCLC 775), which culminated in the judgment now under appeal before your Lordships, the security character of the employer's cl 63(1) right to sell the plant and apply the proceeds in discharge of sums due to it from the contractor seems to have been accepted (see at 783–784 (paras 15, 16) of Laws LJ's judgment). But before your Lordships Mr Moss challenged the proposition. He submitted that the purpose of the power of sale was to enable the council to clear the site by disposing of plant and materials when they were no longer needed for completion of the engineering works and that the council's right to apply the proceeds of sale in or towards satisfaction of any sum owing by Cosslett was simply a contractual right of set-off and not intended to constitute equitable security. I do not agree. The power to sell was not only for the purpose of enabling the council to clear the site of plant and materials no longer needed but was, plainly, also for the purpose of enabling the council to bring into existence a fund that it could appropriate towards any debt owing to it by Cosslett. In my opinion, a contractual right enabling a creditor to sell his debtor's goods and apply the proceeds in or towards satisfaction of the debt is a right of a security character. The conclusion does not depend on the parties' intention to create a security. Their intention, objectively ascertained, is relevant to the construction of their contract. But once contractual rights have, by the process of construction, been ascertained, the question whether they constitute security rights is a question of law that is not dependent on their intentions (see *Agnew v Comr of Inland Revenue* [2001] UKPC 28, [2001] 2 BCLC 189 at 200, [2001] 2 AC 710 at 725–726 per Lord Millett).

**[54]**

The classification of the council's rights under cl 63(1) as a security right is, in my opinion, supported by the decision of the Court of Appeal in *Ex p Newitt, re Garrud* (1881) 16 Ch D 522, [1881–5] All ER Rep 1039. That case arose out of a building agreement between a landowner and a builder. The agreement entitled the landowner, in the event of default by the builder, to re-enter the building site and expel the builder. It provided that:

> '… on such re-entry all such buildings, erections, constructions, materials, and things then in and about the said premises shall be forfeited to and become the property of the said lessor, as and for liquidated and settled damages …'

**[55]**

The issue for decision was whether the agreement should have been registered as a bill of sale. The landowner argued that although the agreement did grant 'a licence to take possession of personal chattels', the licence was not granted 'as security for a debt' (see s 7 of the Bills of Exchange Act 1854). The court agreed. James LJ said (at 530): 'It was no doubt "an authority or licence to take possession of personal chattels," but not as security for a debt' and Brett LJ explained (at 532): '… the chattels were taken, not as security for, but in discharge of the debt'.

**[56]**

Clause 63(1), however, has the features that the *Ex p Newitt* argument lacked. First, despite the index and the side heading, which refer to 'forfeiture', the subclause is not a forfeiture provision. The employer does not take the proceeds of sale in satisfaction for sums due by the contractor, but on account of sums due. If there were a deficiency, the contractor would still owe the amount of the

*[2002] 1 All ER 292 at   306*

deficiency. If there were a surplus, the employer would have to account for it to the contractor.

**[57]**

Moreover, an employer exercising a cl 63(1) power of sale would, in my opinion, have to take reasonable care to obtain a proper price (cf *Cuckmere Brick Co Ltd v Mutual Finance Ltd* [1971] 2 All ER 633, [1971] Ch 949) and would not be entitled to sell to himself (cf *Tse Kwong Lam v Wong Chit Sen* [1983] 3 All ER 54, [1983] 1 WLR 1349). These obligations are not expressed in cl 63(1) but, in my opinion, have to be implied in order to provide proper protection for the contractor's interest in the items being sold and are all indicia of a security interest.

**[58]**

Accordingly, in my opinion, the council's rights under cl 63(1) included security rights over the plant and materials that were on the site when the council entered into possession after the expiry of the seven day notice and over the proceeds of sale of any items of plant or materials that were sold.

**(2) Did the council's security rights under cl 63(1) constitute a charge registrable under s 395?**

**[59]**

Section 396(1) of the 1985 Act specifies the types of charge that are registrable under s 395. Subparagraph (f) specifies 'a floating charge on the Company's undertaking or property'. Subparagraph (c) specifies 'a charge created or evidenced by an instrument which, if executed by an individual, would require registration as a bill of sale'. The argument before your Lordships concentrated on the question whether the council's security constituted a floating, as opposed to a fixed, charge. After argument had concluded the parties were given leave to make supplemental written submissions on the bills of sale point.

**[60]**

In the first Court of Appeal hearing the court held that the security constituted a floating charge. The reasons were given by Millett LJ (see [1997] 4 All ER 115 at 127, [1998] Ch 495 at 510). He described the essential difference between a floating charge and a fixed charge in the following passage:

> 'The essence of a floating charge is that it is a charge, not on any particular asset, but on a fluctuating body of assets which remain under the management and control of the chargor, and which the chargor has the right to withdraw from the security despite the existence of the charge. The essence of a fixed charge is that the charge is on a particular asset or class of assets which the chargor cannot deal with free from the charge without the consent of the chargee. The question is not whether the chargor has complete freedom to carry on his business as he chooses, but whether the chargee is in control of the charged assets.'

He then held that the provisions of cl 53 of the ICE conditions enabled Cosslett to remove items of plant or materials from the site provided the removal would not prejudice or delay the completion of the works. This ability, he concluded, justified categorising the council's security as a floating charge. This conclusion does not seem to have been challenged in the second Court of Appeal hearing. Laws LJ described the categorisation of the council's security as a floating charge as 'uncontentious' (see [2000] 1 BCLC 775 at 784 (para 16)). The conclusion has, however, been firmly challenged before your Lordships by Mr Moss. He submitted that if he was wrong in contending that the ICE conditions did not create a charge at all, as I in common with all of your Lordships think that he was, the charge did not come into existence until a valid seven-day notice had been given under cl 63(1) and then came into existence as a fixed charge over all the plant and materials then on the site.

*[2002] 1 All ER 292 at   307*

**[61]**

AP1796

Up to a point I agree with Mr Moss' analysis, but I am not sure that it makes any difference. A charge expressed to be granted over all the assets of a company but with liberty for the company until the occurrence of some specified future event to deal with the assets in the ordinary course of its business would be a classic floating charge (see Lord McNaghten in *Governments Stock and Other Securities Investment Co Ltd v Manila Rly Co Ltd* [1897] AC 81 at 86). The grant would vest in the grantee an equitable security interest in the assets of the company for the time being; but the interest, although existing, would remain dormant until the requisite event happened. Contrast a charge expressed to come into existence on a specified future event and then to attach to assets then owned by the company. Such a grant would not, in my opinion, vest in the grantee any immediate equitable interest in the company's assets for the time being. Mr Moss would categorise such a grant as a grant creating a future fixed charge over the assets in question, rather than as a floating charge over the company's assets for the time being. I agree with Mr Moss that a grant of the sort described would not create a traditional floating charge. And if parties want to create future charges over assets that cannot be identified until the future event happens, I do not see why, unless there be some public policy objection, they should not be free to do so.

[62]

However, there has never been any statutory definition of 'floating charge'. The definitions are all judicial ones and, in most cases, expressed in order to distinguish floating charges from fixed charges. Buckley LJ in *Evans v Rival Granite Quarries Ltd* [1910] 2 KB 979 at 999 said: 'A floating security is not a future security; it is a present security, which presently affects all the assets of the company expressed to be included in it.' This language, I think, assists Mr Moss. It suggests that a future security lacks something of the character of a floating charge. In the present case, over the period between the date of the contract, 28 January 1991, and the date of one or other of the seven-day notices given in August 1993 was there a 'present' security that 'presently' affected the coal- washing plants? To put the point another way, did the council have any equitable interest in the coal-washing plants until the service of a seven day notice? In my opinion, it did not. Its rights over constructional plant and materials during the pre-seven-day notice period were contractual operational right, not property rights. Its security rights were dependent on the occurrence of one or other of the future events specified in cl 63(1).

[63]

I do not think, however, that this analysis bars the cl 63(1) future security rights from constituting a floating charge for s 395 registration purposes. In my opinion, a charge expressed to come into existence on the occurrence of an uncertain future event and then to apply to a class of assets that cannot be identified until the event has happened would, if otherwise valid, qualify for registration as a floating charge. The future charge would have the essential characteristic of floating, remaining dormant, until the occurrence of the specified event. It would, I think, come within the mischief sought to be dealt with by the s 395 requirement of registration of floating charges. For the same reasons, it would also, in my view, constitute a floating charge for Insolvency Act 1986 purposes (see eg ss 15(3) and 245).

[64]

The conclusion that the council's security was registrable as a floating charge makes it unnecessary to decide whether it might also have been registrable as a bill of sale; as to which see ss 4 and 8 of the Bills of Sale Act 1878 and ss 3, 4 and 8 of the Bills of Sale Act (1878) Amendment Act 1882.

**(3) In disposing of the coal-washing plants to Burrows under the continuation contract of January 1994 did the council commit the tort of conversion?**

**[65]**

The failure to register the charge under s 395(1) of the 1985 Act made the charge 'void against the liquidator or administrator and any creditor of the company'.

<div align="right">*[2002] 1 All ER 292 at  308*</div>

It has been suggested that this language leaves an unregistered charge valid against the grantor company, that the cl 63(1) charge was accordingly valid as against Cosslett notwithstanding that it was void against the administrator, and that consequently the disposition by the council of the coal-washing plants did not constitute the tort of conversion. In *Re Monolithic Building Co, Tacon v Monolithic Building Co* [1915] 1 Ch 643 at 667, [1914–15] All ER Rep 249 at 253 Lord Cozens-Hardy MR said this of an unregistered charge: 'It is a perfectly good deed against the company so long as it is a going concern.' And Phillimore LJ said:

> 'We have to construe s. 93 of the statute. It makes void a security; not the debt, not the cause of action, but the security, and not as against everybody, not as against the company grantor, but against the liquidator, and against any creditor, and it leaves the security to stand as against the company while it is a going concern.' (See [1915] 1 Ch 643 at 667, [1914–15] All ER Rep 249 at 254.)

**[66]**

The words 'or administrator' were inserted into s 395(1) by the Insolvency Act 1985 (see s 109(1) and Sch 6, para 10). The previous language 'void as against the liquidator and any creditor' may have been derived from the Bills of Sale Acts. Under s 8 of the 1878 Act the consequence of failure to register was that the bill of sale became void 'as against all trustees or assignees of [the grantor of the bill of sale] and against [any creditor levying execution]'—I have endeavoured to summarise the rather turgid language of the section. Section 8 did not make the unregistered bill of sale void against the grantor. But, on a bankruptcy or assignment for the benefit of creditors, the grantor's title to his assets would have left the grantor and passed to his trustee or assignee. The references in *Re Monolithic Building Co* to the unregistered security remaining enforceable while the grantor company was a going concern produce the same effect for companies pre-liquidation as s 8 of the 1878 Act produced for individuals pre-bankruptcy. Until bankruptcy intervened the unregistered bill of sale was enforceable against the grantor. Thereafter it was not. Until a liquidation or administration intervenes, the unregistered charge is enforceable against the grantor company. Thereafter, or until the liquidation or administration comes to an end, it is not.

**[67]**

I am, therefore, in full agreement with my noble and learned friend Lord Hoffmann that for as long as an unregistered charge is void under s 395(1) against a liquidator or administrator the charge is, for the reasons he gives, void against the grantor company in liquidation or in administration.

**[68]**

It follows, in my opinion, that the council's security rights under cl 63(1), being unregistered, have been void against Cosslett since 8 September 1993 when the administration order was made.

**[69]**

In *Clerk & Lindsell on Torts* (18th edn, 2000), conversion is described as 'a wide tort, covering the deliberate taking, receipt, purchase, sale, disposal or consumption of another's property' (p 726 (para 14–03)). Paragraph 14–08 (p 729) says that 'The essence of the wrong [is] the unauthorised dealing with the claimant's chattel so as to question or deny his title to it'.

**[70]**

Under the continuation contract between the council and Burrows the council purported to dispose of the coal-washing plants to Burrows. But since Cosslett was the owner of the plants and the council's power of sale under cl 63(1) was void as against Cosslett in administration, the disposal was, in my opinion, a clear act of conversion.

**[71]**

I would add that even if the cl 63(1) power of sale had been valid as against Cosslett, I do not think the disposal to Burrows would have been franked by the power. A sale is a disposition of property for a price. The obligation of a chargee with

*[2002] 1 All ER 292 at   309*

a power of sale is to obtain the best price reasonably obtainable. Under the continuation contract, only parts of which were available to your Lordships, it seems that the council disposed of the plants to Burrows on the footing that Burrows would be allowed a credit of £100,000 for each against its tender price for completion of the engineering works. But by a letter to the council dated 13 October 1993 Burrows estimated the residual value of the plants to be £500,000 and stated that 'The £200,000 credit quoted in our tender is after making allowance for the cost of expected barren earthworks'. On this evidence it seems to me impossible for the council to contend that it made a proper exercise of its cl 63(1) power of sale. If the cl 63(1) power had been valid as against Cosslett in administration, I think the position would be that the council had become a mortgagee in possession on entry on the site and, accordingly, accountable to Cosslett on the footing of wilful default for the proper value of the coal-washing plants.

**[72]**

Mr Moss contended that conversion was a wrongful interference with the right of possession, that the council was entitled to retain possession of the coal- washing plants in order to complete the engineering works and that the purported disposal to Burrows at a time when the works had not been completed and Cosslett did not have a right to possession could not have constituted a conversion. He argued that the eventual removal of the plants by Burrows after the works had been completed, although done pursuant to the continuation contract, did not constitute a conversion by the council for it was not done by the council.

**[73]**

I am unable to accept these submissions. The continuation contract, being a purported disposal of the plants by the council, was a wrongful interference with Cosslett's title to the plants. It was repudiatory in character and, had it been relied on in the first set of proceedings between the parties, might well have enabled Cosslett to succeed in its claim to immediate possession of the plants. The details of the continuation contract were not, however, then known and the right of the council to retain the plant pending completion of the works became res judicata as between the council and Cosslett.

**[74]**

Both the coal-washing plants were removed from the site in or about June 1997. By that time they were no longer needed for completion of the works and were removed by Burrows, acting in reliance on the continuation contract.

**[75]**

In these circumstances, in my opinion, the fact that at the date of the continuation contract Cosslett did not have an immediate right to possession did not deprive the continuation contract of its effect as constituting a conversion by the council of the coal-washing plants. What it did do was to postpone the date at which, for measure of damages purposes, the value of the converted plants had to be assessed. Cosslett was, and in my opinion is, entitled to damages for conversion representing the value of the plants at the date of the conversion, that is to say, January 1994. But the plants were, at that date, subject to the cl 63(1) rights of user that were binding on Cosslett. So the value should be adjusted accordingly. In practice, I imagine that the value of the plants subject to the rights of user will be equivalent to the value of the plants in their used state at the completion of the works.

**(4) Set-off**

**[76]**

Can the council, even if its cl 63(1) rights do constitute a security that was unregistered and therefore void, claim the benefit of equitable set-off so as to set off its contractual damages claim against Cosslett's conversion damages claim? In my opinion, clearly not. This is a case in which the parties, in cl 63(1) of their contract, have provided the council with a contractual right of set-off that, for failure to comply with applicable statutory provisions, is void against Cosslett in administration. Why should equity intervene and protect the council from its failure to comply with the

*[2002] 1 All ER 292 at   310*

statutory provisions? Similar questions arose in *Orakpo v Manson Investments Ltd* [1977] 3 All ER 1, [1978] AC 95 and in *Dimond v Lovell* [2000] 2 All ER 897, [2000] 2 WLR 1121. *Orakpo*'s case was a moneylending case. The defendants were licensed moneylenders but, in respect of loans to the plaintiff with which the plaintiff had purchased properties, had failed to comply with the requirements of the Moneylenders Act 1927. The consequence was that the loan agreements were unenforceable and so were the mortgages granted by the plaintiff to secure the repayment of the loans. The defendants claimed to be entitled by subrogation to the benefit of the vendors' liens. This House rejected the claim and Lord Salmon commented ([1977] 3 All ER 1 at 13, [1978] AC 95 at 111) that he could not think 'that it would be proper to apply an equitable doctrine for the purpose of enabling a moneylender to escape from the consequences of his breach of the statute'. Lord Edmund-Davies, in answer to the question whether a court of equity should grant relief to a moneylender who was in breach of the Act, said that he felt compelled to answer in the negative: '… for to answer affirmatively would be to enable the court to express a policy of its own in regard to moneylending transactions which would be in direct conflict with the policy of the 1927 Act itself.' (See [1977] 3 All ER 1 at 16, [1978] AC 95 at 115.)

**[77]**

In *Dimond v Lovell* a regulated consumer credit agreement relating to the hire of a car was unenforceable for failure to comply with the requirements of the Consumer Credit Act 1974. It was argued for the car hire company that it should have an unjust enrichment remedy. The argument was rejected by this House. Lord Hoffmann, citing *Orakpo*'s case, said:

> 'Parliament intended that if a consumer credit agreement was improperly executed, then … the debtor should not have to pay. This meant that Parliament contemplated that he might be en-

riched and I do not see how it is open to the court to say that this consequence is unjust and should be reversed by a remedy at common law …' (See [2000] 2 All ER 897 at 906, [2000] 2 WLR 1121 at 1131.)

**[78]**

Similar reasoning applies here. If the council's cl 63(1) security is barred by s 395(1) from being enforceable against Cosslett in administration, it is no part of equity to provide, via equitable set-off, an alternative security.

**(5) Title to sue in conversion**

**[79]**

I respectfully agree that the plaintiff/claimant in Cosslett's conversion action ought to have been 'Cosslett (Contractors) Ltd (in administration)' and have nothing to add on this point to what Lord Hoffmann has already said.

**[80]**

For all these reasons I agree that the appeal should be allowed and the judgment and interim order of Judge Toulmin QC restored.

**LORD RODGER OF EARLSFERRY.**

**[81]**

My Lords, I have had the advantage of considering the speech of my noble and learned friend, Lord Hoffmann, in draft. I agree with it and for the reasons he gives I too would allow the appeal.

*Appeal allowed.*

Celia Fox Barrister.

243

1 A.C.

A                              [HOUSE OF LORDS]

STEIN      .     .     .     .     .     .     .     .     .     RESPONDENT

BLAKE      .     .     .     .     .     .     .     .     .     APPELLANT

B     1995   April 3, 4;                     Lord Keith of Kinkel, Lord Ackner,
            May 18                          Lord Lloyd of Berwick, Lord Nicholls
                                             of Birkenhead and Lord Hoffmann

*Bankruptcy—Debt—Set-off—Plaintiff bringing action for breach of
    contract—Plaintiff becoming bankrupt before trial of claim and
    counterclaim—Plaintiff's trustee in bankruptcy assigning right of
    action against defendant to plaintiff without taking balance of*
C   *account for set-off—Whether valid as assignment of net balance—
    Insolvency Act 1986 (c. 45), s. 323*

         The plaintiff instituted proceedings against the defendant for
    breach of contract and the defendant counterclaimed for damages
    for misrepresentation. Prior to the commencement of the trial the
    plaintiff was adjudicated bankrupt. The trustee in bankruptcy
D   thereafter purported to assign to the plaintiff the right of action
    against the defendant in the action. On the defendant's summons,
    the action was stayed by the deputy master, and his decision was
    upheld by the judge on the ground that the plaintiff's claim and
    the defendant's counterclaim fell to be dealt with by way of set-
    off in the bankruptcy and that until the trustee had taken an
    account under section 323 of the Insolvency Act 1986[1] there was
    nothing to assign. On appeal by the plaintiff the Court of Appeal
    allowed the appeal.
E        On appeal by the defendant:—
         *Held,* dismissing the appeal, that on the bankruptcy the choses
    in action represented by the cross-claims were no longer capable
    of being assigned and all that was assignable was the amount due
    after the mandatory account was taken pursuant to section 323
    of the Insolvency Act 1986, namely, a claim to a net balance; that
    the trustee in bankruptcy was entitled to assign the net balance
F   like any other chose in action; and that, accordingly, the action
    would be restored (post, pp. 249G–250B, 255A–B, 258F–G).
         *Farley v. Housing and Commercial Developments Ltd.* [1984]
    B.C.L.C. 442 approved.
         Dictum of Brett J. in *New Quebrada Co. Ltd. v. Carr* (1869)
    L.R. 4 C.P. 651, 653 disapproved.
         Decision of the Court of Appeal [1994] Ch. 16; [1993]
G   3 W.L.R. 718; [1993] 4 All E.R. 225 affirmed on different grounds.

    The following cases are referred to in the opinion of Lord Hoffmann:

*Daintrey, In re; Ex parte Mant* [1900] 1 Q.B. 546, C.A.
*Day & Dent Constructions Pty. Ltd. (In Liquidation) v. North Australian
    Properties Pty. Ltd.* (1982) 150 C.L.R. 85
*Dynamics Corporation of America, In re* [1976] 1 W.L.R. 757; [1976] 2 All
H   E.R. 669
*Farley v. Housing and Commercial Developments Ltd.* [1984] B.C.L.C. 442
*Forster v. Wilson* (1843) 12 M. & W. 191

[1] Insolvency Act 1986, s. 323: post, pp. 250G–251A.

AP1802

244

Stein v. Blake (H.L.(E.))       [1996]

A

*Gye v. McIntyre* (1991) 171 C.L.R. 609
*Halesowen Presswork & Assemblies Ltd. v. National Westminster Bank Ltd.* [1972] A.C. 785; [1972] 2 W.L.R. 455; [1972] 1 All E.R. 641, H.L.(E.)
*Mersey Steel and Iron Co. v. Naylor Benzon & Co.* (1882) 9 Q.B.D. 648, C.A.
*New Quebrada Co. Ltd. v. Carr* (1869) L.R. 4 C.P. 651
*Ramsey v. Hartley* [1977] 1 W.L.R. 686; [1977] 2 All E.R. 673, C.A.
*Sovereign Life Assurance Co. v. Dodd* [1892] 2 Q.B. 573, C.A.

B

The following additional cases were cited in argument:

*Barnett, Ex parte; In re Deveze* (1874) L.R. 9 Ch.App. 293
*Bize v. Dickason* (1786) 1 Durn. & E. 285
*Cushla Ltd., In re* [1979] 3 All E.R. 415
*M.S. Fashions Ltd. v. Bank of Credit and Commerce International S.A.* [1993] B.C.L.C. 280, Millett J. and C.A.

C

*M.S. Fashions Ltd. v. Bank of Credit and Commerce International S.A.* [1993] Ch. 425; [1993] 3 W.L.R. 220; [1993] 3 All E.R. 769, Hoffmann L.J. and C.A.
*Maxwell Communications Corporation Plc., In re* [1993] 1 W.L.R. 1402; [1994] 1 All E.R. 737
*Milan Tramways Co., In re; Ex parte Theys* (1884) 25 Ch.D. 587, C.A.
*Peat v. Jones* (1881) 8 Q.B.D. 147, C.A.

D

*Turner v. Thomas* (1871) L.R. 6 C.P. 610
*Unit 2 Windows Ltd., In re* [1985] 1 W.L.R. 1383; [1985] 3 All E.R. 647
*Victoria Products Ltd. v. Tosh & Co. Ltd.* [1940] 165 L.T. 78
*Willment Brothers Ltd. v. North West Thames Regional Health Authority* (1984) 26 B.L.R. 51, C.A.

E

The following cases, although not cited in argument, were referred to in the printed cases:

*Billon v. Hyde and Michell* (1749) 1 Atk. 126
*Bolland v. Nash* (1828) 8 B. & C. 105
*Central Brakes Service (Newcastle) Pty. Ltd. v. Central Brakes Service (Sydney) Pty. Ltd. (In Liquidation)* (1989) 7 A.C.L.C. 1
*Charge Card Services Ltd., In re* [1987] Ch. 150; [1986] 3 W.L.R. 697; [1986] 3 All E.R. 289

F

*China Steamship Co., In re; Ex parte Mackenzie* (1869) L.R. 7 Eq. 246
*Debtor (No. 66 of 1955), In re A; Ex parte the Debtor v. Waite's Trustee* [1956] 1 W.L.R. 1226; [1956] 3 All E.R. 225, C.A.
*Emerson v. Wreckair Pty. Ltd.* (1991) 103 A.L.R. 404
*Government Security Fire Insurance Co., In re. White's Case* (1879) 12 Ch.D. 511

G

*Hans Place Ltd., In re* [1992] B.C.C. 737
*Harmony and Montague Tin and Copper Mining Company, In re. Spargo's Case* (1873) L.R. 8 Ch.App. 407
*Hiley v. Peoples Prudential Assurance Co. Ltd. (In Liquidation)* (1938) 60 C.L.R. 468
*Hunt v. R.M. Douglas (Roofing) Ltd.* [1990] 1 A.C. 398; [1988] 3 W.L.R. 975; [1988] 3 All E.R. 823, H.L.(E.)

H

*Kitchen's Trustee v. Madders* [1950] Ch. 134; [1949] 2 All E.R. 1079, C.A.
*Law, Ex parte; In re Kennedy* (1848) de Gex 378
*Leon v. York-O-Matic Ltd.* [1966] 1 W.L.R. 1450; [1966] 3 All E.R. 820

245

1 A.C.                        Stein v. Blake (H.L.(E.))

A    *Norman Holding Co. Ltd. (In Liquidation), In re* [1991] 1 W.L.R. 10; [1990]
          3 All E.R. 757
     *Sudbrook Trading Estate Ltd. v. Eggleton* [1983] 1 A.C. 444; [1982] 3 W.L.R.
          315; [1982] 3 All E.R. 1, H.L.(E.)
     *Thomas v. Bunn* [1941] 1 A.C. 362; [1991] 2 W.L.R. 27; [1991] 1 All E.R. 193,
          H.L.(E.)

B    APPEAL from the Court of Appeal.
        This was an appeal by leave dated 23 May 1994 of the House of Lords
     (Lord Goff of Chieveley, Lord Mustill and Lord Slynn of Hadley) by the
     defendant, David Blake, from the judgment dated 5 May 1993 of the
     Court of Appeal (Balcombe, Staughton and Waite L.JJ.) allowing an
     appeal by the plaintiff, Allan Stein, from the judgment dated 11 June 1992
     of Mr. Thomas Morison Q.C. sitting as a deputy High Court judge
C    whereby it was held that a claim subject to a set-off under section 323 of
     the Insolvency Act 1986 could not validly be assigned.
        The facts are stated in the opinion of Lord Hoffmann.

     *Michael Mark* for the defendant. Section 323 of the Insolvency Act
     1986 is part of the rules for the administration of a bankrupt's estate by
D    the trustee. It is the non-delegable duty of the trustee to ensure that the
     account referred to in section 323(2) is taken. A bankruptcy set-off is
     different in practice and effect from other types of set-off. Section 323(4)
     provides that in a case such as the present only the balance (if any) of the
     account taken under section 323(2) is provable as a bankruptcy debt or is
     to be paid to the trustee as part of the bankrupt's estate. That is an
     absolute mandatory statutory rule: *Ex parte Barnett; In re Deveze* (1874)
E    L.R. 9 Ch.App. 293, 295; *Halesowen Presswork & Assemblies Ltd. v.
     National Westminster Bank Ltd.* [1972] A.C. 785. It follows that any sum
     due is only payable once it is shown to be due on the taking of the
     account. The account must be taken between the trustee in bankruptcy
     and the creditor. No account having been taken the plaintiff has no
     present cause of action, and the action should be stayed or dismissed. The
F    plaintiff's position defeats the object of the Acts and his approach cannot
     be reconciled with long established principles of bankruptcy law.
        A bankruptcy set-off is not simply an extension of other types of set-
     off for it is mandatory and not optional: *Halesowen Presswork &
     Assemblies Ltd. v. National Westminster Bank Ltd.* [1972] A.C. 785.
     Moreover, it operates automatically and substantively by way of notional
     payment as at the commencement of the bankruptcy, whether or not the
G    creditor formally seeks to prove his debt, unless the creditor elects not to
     prove it: see *Ex parte Barnett; In re Deveze* (1874) L.R. 9 Ch.App. 293; *In
     re Milan Tramways Co.; Ex parte Theys* (1884) 25 Ch.D. 587; *M.S.
     Fashions Ltd. v. Bank of Credit and Commerce International S.A.* [1993]
     B.C.L.C. 280, 287I–288B; *M.S. Fashions Ltd. v. Bank of Credit and
     Commerce International S.A.* [1993] Ch. 425, 432G, 433C–D, 448C–D and
     *Gye v. McIntyre* (1991) 171 C.L.R. 609.
H    A creditor cannot assign his debt after the commencement of the
     bankruptcy in such a way as to avoid the set-off provisions of section 323.
     He can assign no more than the right to the balance, if any, shown to be
     due on the taking of an account under section 323. The set-off only

246

Stein v. Blake (H.L.(E.)) [1996]

A applies where there have been mutual credits, mutual debts or other mutual dealings between the bankrupt and any creditor proving or claiming to prove for a bankruptcy debt. Where there is more than one debt against which any sum might be set off, neither party is free to allocate the set-off to any particular debt. Thus the trustee cannot allocate the set-off solely to a preferential debt or secured debt, and the creditor cannot allocate the set-off solely to an unsecured non-preferential debt: *In* B *re Unit 2 Windows Ltd.* [1985] 1 W.L.R. 1383. The trustee's only right to payment is in respect of the balance of the account taken in accordance with section 323(2). It follows that this is the only right to payment which he can assign: see *Farley v. Housing and Commercial Developments Ltd.* [1984] B.C.L.C. 442, 451B–G. Parliament could have amended the law following this decision in the Insolvency Acts 1985 and 1986. It did not C do so, and must therefore be presumed to have intended the law to remain as then understood. The object of the set-off is to do substantial justice between the parties: *Forster v. Wilson* (1843) 12 M. & W. 191, 203. It is also to ensure that bankrupts' estates are administered in a proper and orderly way, a matter in which the commercial community generally has an interest: see *Halesowen Presswork & Assemblies Ltd. v. National Westminster Bank Ltd.* [1972] A.C. 785, 809A and *In re Maxwell* D *Communications Corporation Plc.* [1993] 1 W.L.R. 1402, 1410D–1411G. Mutual claims should be dealt with by the process laid down by section 323 in the course of the bankruptcy, and any attempt to remove from that process a particular item should be regarded as against the policy of the bankruptcy laws and therefore defeated: *Victoria Products Ltd. v. Tosh & Co. Ltd.* (1940) 165 L.T. 78, 80.

E The history of the set-off provision is consistent with the defendant's case. Statutes up to and including section 171 of the Bankruptcy Law Consolidation Act 1849 provided for the account to be taken by the commissioners or the bankruptcy court. That did not prevent the trustee from suing in another court but if he did, and the creditor wished to raise a set-off which was outside the competence of the court in which the action was brought, he could obtain an injunction preventing the trustee F from pursuing the claim at law. Generally, however, the creditor was allowed to plead the set-off against the trustee in the common law courts, so that it was usually unnecessary for him to seek an injunction from the bankruptcy court: see *Peat v. Jones* (1881) 8 Q.B.D. 147, 149. The action between the trustee and the creditor has always been treated as part of the account-taking process between the trustee and the creditor: see *Peat v. Jones*, 8 Q.B.D. 147 and *Turner v. Thomas* (1871) L.R. 6 C.P. 610, 615. If G the creditor's claim might exceed that of the trustee, it was for the bankruptcy court to decide whether the most convenient way of dealing with it was by giving leave to the creditor to counterclaim in the trustee's action. For the early history of the set-off provision, see *Wood on English and International Set-Off* (1989), pp. 283, 284–285, paras. 7-27, 7-28, 7-31. For the differences between solvent and insolvency set-off, see *Wood*, H pp. 287, 288, paras. 7-37, 7-38, 7-39.

The following are the practical problems if a trustee could assign a debt which is subject to set-off. (i) The action could decide nothing so long as the account between the trustee and the creditor remained to be

247

1 A.C.                                   Stein v. Blake (H.L.(E.))

A    taken. That would make the assignment pointless. (ii) Any agreement by
the trustee as to any matter on the taking of the account would potentially
prejudice the position of the assignee. (iii) If the trustee was inhibited in
the taking of the account with the creditor as a result of the assignment,
then he would have fettered the exercise of his discretion. If he could not
agree the position with the creditor he will have put it out of his power to
quantify the creditor's claim or admit it to proof. (iv) If both the action
B    and the account proceed, then there is the real possibility that different
results will be arrived at unless the two proceedings are combined. (v) If
both proceedings are combined, it will still not be possible for the trustee
to reach agreement with the creditor without at the same time determining
the rights of the assignee without his consent. Alternatively, if he cannot
reach agreement with the creditor without involving the assignee, then he
C    will have fettered his discretion in relation to his statutory duties. He will
also be unable to control the pace of the proceedings in the same way as
if the assignee were not involved. (vi) If the trustee were to choose to sit
back and await the result of the action (assuming that the creditor
permitted this) then (a) the action could conclude without any account
being taken, and possibly without any determination of any relevant issue;
D    (b) no determination in the action would in any event bind either the
trustee or the creditor as against each other; (c) if there was a debt of
the creditor which the trustee was required by section 322(3) to value, the
court hearing the action could only estimate what value the trustee might
put on it; (d) if there were other unassigned claims which the trustee
retained, the court could not assess how the creditor's
claims should be apportioned as between those claims and the assigned
E    claim; (e) the administration of the bankruptcy would be delayed.
(vii) The creditor would face two separate sets of proceedings and two
sets of costs, and unless he pursued his claim in bankruptcy at the same
time as the assignee was proceeding against him, he would not get
discovery from the trustee, who will have the relevant documents.

These problems are not matters which could be dealt with by a
bankrutpcy court controlling the trustee under sections 303 and 363 of the
F    Insolvency Act 1986. What is involved is not the case of the incorrect
exercise of a discretion but even if it were, these sections would not entitle
a creditor to challenge an assignment of a claim against him unless the
trustee is not acting bona fide or is doing something so utterly
unreasonable and absurd that no reasonable man would so act.

Balcombe L.J. [1994] Ch. 16, 24 sought to query the reliance by
G    Neill J. in the *Farley* case [1984] B.C.L.C. 442 on *In re Cushla Ltd.* [1979]
3 All E.R. 415 in support of his own decision, because that case was
concerned with section 323(4) and not section 323(2). But *In re Cushla
Ltd.* is the application of a general principle and is not so to be
distinguished: see *Bize v. Dickason* (1786) 1 Durn. & E. 285. [Reference
was also made to *Mersey Steel and Iron Co. v. Naylor Benzon & Co.*
(1882) 9 Q.B.D. 648 and *Ramsey v. Hartley* [1977] 1 W.L.R. 686.]

H        *Edward Bannister Q.C.* and *Philip Hoser* for the plaintiff. The defendant
relied on *Farley v. Housing and Commercial Developments Ltd.* [1984]
B.C.L.C. 442 and statements in *M.S. Fashions Ltd. v. Bank of Credit and
Commerce International S.A.* [1993] B.C.L.C. 280 and *M.S. Fashions Ltd.*

AP1806

248

Stein v. Blake (H.L.(E.))                    [1996]

*v. Bank of Credit and Commerce International S.A.* [1993] Ch. 425, but     A
such statements must always be read in the context in which they were
made.

The mere existence of a set-off (which is what must have been achieved
as a result of the process directed to be carried out by section 323(2))
does not discharge or extinguish cross-claims, wholly or in part. A set-off,
without more, leaves the cross-claims which go to make it up unaffected.
There will be a *balance*, but there will still be two claims. The existence of     B
a set-off, in other words, is not the same thing as payment, but requires
an agreement that the set-off should be treated as payment before it will
diminish or extinguish the claim. Debts can be extinguished only if they
are released under seal or for considerations, or as the result of an accord
and satisfaction, or by payment. The *existence* of a set-off, without more,
will not produce that result. If that were so, all banks whose customers     C
had more than one account would be obliged to deal with them on a net
basis. They plainly are under no such obligation. The general principle is
that debts are freely assignable. The fact that it might be difficult to
quantify the amount does not prevent the sum eventually payable from
being assignable. The approach taken by Staughton L.J. is correct.

The material on which the defendant relies to support the decision of     D
the trial judge could be put forward in relation to an ordinary assignment.
There is no reason why there should not be an assignment by a trustee in
bankruptcy. Section 323 does not contemplate any formality in respect of
the taking of an account. The account being taken is simply a matter of
adjustment. Furthermore, the practical problems postulated by the
defendant, in the main, do not arise.

While section 323(2) merely directs the establishment of the set-off, it     E
is section 323(4) which prescribes the resulting consequences for the
parties. Section 323(4) prescribes that, as between the immediate parties,
only the balance is provable or payable. In other words, a proof for the
claim will be reduced by the amount of the estate's cross-claim. A demand
by the estate for the claimant's own liability may not be enforced except
as to any remaining balance after the set-off has been made. There is
nothing in the language of section 323(4) to suggest that any further result     F
is intended. In particular, there is nothing to suggest that the underlying
claims are affected in any way. It is the remedies of the parties which are
restricted by the subsection. The subsection does not deal with rights.
Those are left to be determined, so far as may be necessary, on ordinary
principles. As between the immediate parties, the result is *equivalent to*
payment because neither of the immediate parties (in the absence, in the     G
case of bankruptcy, of an annulment) can ever enforce against the other a
claim for more than the ultimate balance: *Ex parte Barnett; In re Deveze*,
L.R. 9 Ch.App. 293, 297 and *M.S. Fashions Ltd. v. Bank of Credit and
Commerce International S.A.* [1993] Ch. 425. This is not because the debt
has been wholly or pro tanto extinguished. It is because the Act forbids
further enforcement of the claims. Commercially, it is *as if* payment had
taken place. The judgments of Hoffmann L.J. and Dillon L.J. in *M.S.*     H
*Fashions* do not suggest that there was a legal extinguishment of the claims
(or part thereof). The existence or non-existence of the claims does not
turn upon whether the "account" referred to in section 323(2) is taken

AP1807

1 A.C.                          Stein v. Blake (H.L.(E.))

A   sooner or later. The taking of the "account" is no more than rather
    antique language for the ascertainment of the quantum of each side's
    claim. But the remedy (of one or other side) and the corresponding
    disentitlement of the other would take effect as of the relevant date,
    whenever the "account" is taken. There is no reason why the underlying
    claims should not be assigned, whatever limitations may be placed by the
    statutory provisions upon the remedies available to the immediate parties.
B   The continuing assignability of the claims creates no problems. It is not
    necessary, in order to achieve the purpose of the section, to hold that
    cross-claims ceased to exist or are rendered non-assignable; the purpose of
    the section is to do substantial justice between the immediate parties:
    *Forster v. Wilson*, 12 M. & W. 191. Neill J. in *Farley v. Housing and
    Commercial Developments Ltd.* [1984] B.C.L.C. 442 was wrong on this
C   point.
        On the question whether, when all that the trustee in bankruptcy has
    in his hands is the net balance, this is assignable, the answer is in the
    affirmative but any such assignment will be subject to equities: see *Gye v.
    McIntyre*, 171 C.L.R. 609, 622.
        The acceptance of the defendant's argument would have surprising
    consequences, for it would follow that a trustee in bankruptcy could not
D   discount or sell a promissory note or bearer bond for £100,000 given to
    the bankrupt before the bankruptcy intervened, simply because the giver
    of the note or the issuer of the bond was owed £5 by the bankrupt. Even
    odder would be the position of the liquidator of a company that had gone
    into members' voluntary liquidation for the purposes of reconstruction or
    amalgamation and whose assets consisted largely, say, of leasing contracts,
E   and found that it could not dispose of the business because of the existence
    of cross-claims from various of the lessees. Yet the application of rule 4.90
    to solvent liquidations (see rule 4.1 of the Insolvency Rules 1986
    (S.I. 1986 No. 1925)) coupled with an application of the *Farley* principle
    would require this remarkable result.
        As to the argument that it follows from the plaintiff's position that
    negotiable instruments would not be assignable, see *Willment Brothers
F   Ltd. v. North West Thames Regional Health Authority* (1984) 26 B.L.R.
    51. [Reference was also made to *In re Milan Tramways Co. Ltd.; Ex parte
    Theys*, 25 Ch.D. 587; *In re Unit 2 Windows Ltd.* [1985] 1 W.L.R. 1383.]
        *Hoser* followed.
        *Mark* replied.

G       Their Lordships took time for consideration.


        18 May.  LORD KEITH OF KINKEL.  My Lords, for the reasons given
    in the speech to be delivered by my noble and learned friend, Lord
    Hoffmann, which I have read in draft and with which I agree, I would
    dismiss this appeal.
H
        LORD ACKNER.  My Lords, I have had the advantage of reading in
    draft the speech prepared by my noble and learned friend, Lord Hoffmann.
    For the reasons he gives, I, too, would dismiss this appeal.

                                                            AP1808

250

Stein v. Blake (H.L.(E.)) [1996]

LORD LLOYD OF BERWICK.   My Lords, I have had the advantage of   A
reading in draft the speech prepared by my noble and learned friend, Lord
Hoffmann. For the reasons he gives, I, too, would dismiss this appeal.

LORD NICHOLLS OF BIRKENHEAD.   My Lords, I have had the advantage
of reading in draft the speech prepared by my noble and learned friend,
Lord Hoffmann. For the reasons he gives, with which I agree, I, too,
would dismiss this appeal.   B

LORD HOFFMANN.   My Lords,

1. *The issues*

If A and B have mutual claims against each other and A becomes
bankrupt, does A's claim against B continue to exist so that A's trustee   C
can assign it to a third party? Or is the effect of section 323 of the
Insolvency Act 1986 to extinguish the claims of A and B and to substitute
a claim for the net balance owing after setting off the one against the
other? And if the latter is the case, can the trustee assign the net balance
(if any) before it has been ascertained by the taking of an account between
himself and B? If yes, is that what the trustee in this case has done? These   D
are the issues in this appeal.

2. *The facts*

The plaintiff, Mr. Stein, was adjudicated bankrupt on 16 July 1990.
He was at the time a legally aided plaintiff engaged in suing the defendant,
Mr. Blake. It is unnecessary to go into the details save to say that   E
Mr. Stein was claiming damages for breach of contract and a declaration
that he was entitled to be indemnified against certain tax liabilities.
Mr. Blake was counterclaiming for damages for misrepresentation and
had in addition an indisputable cross-claim under various orders for costs
in any event. Mr. Blake perhaps hoped that Mr. Stein's trustee, in whom
the right of action (if any) had vested, would decide that it was not in the
interests of creditors on pursuing the litigation. If so, he   F
was right, but the trustee did not abandon the claim. Instead he executed
a deed dated 4 April 1991 by which he assigned the benefit of the action
back to Mr. Stein in return for 49 per cent. of the net proceeds. Mr. Stein
again obtained legal aid. Mr. Blake applied to have the proceedings
dismissed on the ground that a claim subject to a set-off under section 323
of the Insolvency Act 1986 could not validly be assigned. The application
succeeded before the judge but his decision was reversed by the Court of   G
Appeal. Mr. Blake now appeals.

3. *Bankruptcy set-off*

Section 323 reads, so far as relevant, as follows:

"(1) This section applies where before the commencement of the   H
bankruptcy there have been mutual credits, mutual debts or other
mutual dealings between the bankrupt and any creditor of the
bankrupt proving or claiming to prove for a bankruptcy debt. (2) An
account shall be taken of what is due from each party to the other in

251

1 A.C.                    Stein v. Blake (H.L.(E.))              Lord Hoffmann

A    respect of the mutual dealings and the sums due from one party shall be set off against the sums due from the other. . . . (4) Only the balance (if any) of the account taken under subsection (2) is provable as a bankruptcy debt, or, as the case may be, to be paid to the trustee as part of the bankrupt's estate."

B    4. *Bankruptcy set-off compared with statutory legal set-off*

    Section 323 is the latest in a line of bankruptcy set-off provisions which go back to the time of Queen Anne. As it happens, legal set-off between solvent parties is also based upon statutes of Queen Anne. But the two forms of set-off are very different in their purpose and effect. Legal set-off does not affect the substantive rights of the parties against
C    each other, at any rate until both causes of action have been merged in a judgment of the court. It addresses questions of procedure and cash-flow. As a matter of procedure, it enables a defendant to require his cross-claim (even if based upon a wholly different subject matter) be tried together with the plaintiff's claim instead of having to be the subject of a separate action. In this way it ensures that judgment will be given simultaneously on claim and cross-claim and thereby relieves the defendant from having
D    to find the cash to satisfy a judgment in favour of the plaintiff (or, in the 18th century, go to a debtor's prison) before his cross-claim has been determined.

    Bankruptcy set-off, on the other hand, affects the substantive rights of the parties by enabling the bankrupt's creditor to use his indebtedness to the bankrupt as a form of security. Instead of having to prove with other
E    creditors for the whole of his debt in the bankruptcy, he can set off pound for pound what he owes the bankrupt and prove for or pay only the balance. So in *Forster v. Wilson* (1843) 12 M. & W. 191, 204, Parke B. said that the purpose of insolvency set-off was "to do substantial justice between the parties." Although it is often said that the justice of the rule is obvious, it is worth noticing that it is by no means universal. (*Wood on English and International Set-Off* (1989), pp. 1165–1169, paras. 24-49 to
F    24-56.) It has however been part of the English law of bankruptcy since at least the time of the first Queen Elizabeth: see p. 282, para. 7–26.

    Legal set-off is confined to debts which at the time when the defence of set-off is filed were due and payable and either liquidated or in sums capable of ascertainment without valuation or estimation. Bankruptcy set-off has a much wider scope. It applies to any claim arising out of mutual
G    credits or other mutual dealings before the bankruptcy for which a creditor would be entitled to prove as a "bankruptcy debt." This is defined by section 382 of the Insolvency Act 1986 to mean:

    "(1) . . . any of the following—(*a*) any debt or liability to which he is subject at the commencement of the bankruptcy, (*b*) any debt or liability to which he may become subject after the commencement of the bankruptcy (including after his discharge from bankruptcy) by
H    reason of any obligation incurred before the commencement of the bankruptcy. . . (3) For the purposes of references in this Group of Parts to a debt or liability, it is immaterial whether the debt or liability is present or future, whether it is certain or contingent or

AP1810

252

Lord Hoffmann                    Stein v. Blake (H.L.(E.))                         [1996]

whether its amount is fixed or liquidated, or is capable of being      A
ascertained by fixed rules or as a matter of opinion; and references in
this Group of Parts to owing a debt are to be read accordingly."

5. *Taking the account under section 323*

Bankruptcy set-off therefore requires an account to be taken of
liabilities which, at the time of bankruptcy, may be due but not yet      B
payable or may be unascertained in amount or subject to contingency.
Nevertheless, the law says that the account shall be deemed to have been
taken and the sums due from one party set off against the other as at the
date of the bankruptcy. This is in accordance with the general principle of
bankruptcy law, which governs payment of interest, conversion of foreign
currencies etc., that the debts of the bankrupt are treated as having been
ascertained and his assets simultaneously distributed among his creditors      C
on the bankruptcy date: see *In re Dynamics Corporation of America* [1976]
1 W.L.R. 757, 762. It is clear, therefore, that when section 323(2) speaks
of taking an account of what is "due" from each party, it does not mean
that the sums in question must have been due and payable, whether at the
bankruptcy date or even the date when the calculation falls to be made.
The claims may have been contingent at the bankruptcy date and the      D
creditor's claim against the bankrupt may remain contingent at the time
of the calculation, but they are nevertheless included in the account.
I consider next how this is done.

6. *Quantifying the cross-claims*

How does the law deal with the conundrum of having to set off, as of      E
the bankruptcy date, "sums due" which may not yet be due or which may
become owing upon contingencies which have not yet occurred? It employs
two techniques. The first is to take into account everything which has
actually happened between the bankruptcy date and the moment when it
becomes necessary to ascertain what, on that date, was the state of
account between the creditor and the bankrupt. If by that time the
contingency has occurred and the claim has been quantified, then that is      F
the amount which is treated as having been due at the bankruptcy date.
An example is *Sovereign Life Assurance Co. v. Dodd* [1892] 2 Q.B. 573, in
which the insurance company had lent Mr. Dodd £1,170 on the security
of his policies. The company was wound up before the policies had
matured but Mr. Dodd went on paying the premiums until they became
payable. The Court of Appeal held that the account required by      G
bankruptcy set-off should set off the full matured value of the policies
against the loan.

But the winding up of the estate of a bankrupt or an insolvent company
cannot always wait until all possible contingencies have happened and all
the actual or potential liabilities which existed at the bankruptcy date have
been quantified. Therefore the law adopts a second technique, which is to
make an estimation of the value of the claim. Section 322(3) says:      H

"The trustee shall estimate the value of any bankruptcy debt
which, by reason of its being subject to any contingency or
contingencies or for any other reason, does not bear a certain value."

AP1811

1 A.C.                        Stein v. Blake (H.L.(E.))                    **Lord Hoffmann**

A   This enables the trustee to quantify a creditor's contingent or unascertained claim, for the purposes of set-off or proof, in a way which will enable the trustee safely to distribute the estate, even if subsequent events show that the claim was worth more. There is no similar machinery for quantifying contingent or unascertained claims *against* the creditor, because it would be unfair upon him to have his liability to pay advanced merely because the trustee wants to wind up the bankrupt's estate.

B

### 7. *The occasion for taking the account*

   In what circumstances must the account be taken? The language of section 323(2) suggests an image of the trustee and creditor sitting down together, perhaps before a judge, and debating how the balance between them should be calculated. But the taking of the account really means no

C   more than the calculation of the balance due in accordance with the principles of insolvency law. An obvious occasion for making this calculation will be the lodging of a proof by a creditor against whom the bankrupt had a cross-claim. Indeed, it might have been thought from the words "any creditor of the bankrupt proving or claiming to prove for a bankruptcy debt" in section 323(1) that the operation of the section

D   actually depended upon the lodging of a proof. But it has long been held that this is unnecessary and that the words should be construed to mean "any creditor of the bankrupt who (apart from section 323) would have been entitled to prove for a bankruptcy debt." Thus the account to which section 323(2) refers may also be taken in an action by the trustee against a creditor who, because his cross-claim does not exceed that of the trustee,

E   has not lodged a proof: see *Mersey Steel and Iron Co. v. Naylor Benzon & Co.* (1882) 9 Q.B.D. 648 and *In re Daintrey; Ex parte Mant* [1900] 1 Q.B. 546, 568.

   Once one has eliminated any need for a proof in order to activate the operation of the section, it ceases to be linked to any step in the procedure of bankruptcy or litigation. This is a sharp contrast with legal set-off, which can be invoked only by the filing of a defence in an action.

F   Section 323, on the other hand, operates at the time of bankruptcy without any step having to be taken by either of the parties. The "account" in accordance with section 323(2) must be taken whenever it is necessary for *any* purpose to ascertain the effect which the section had. This is shown most clearly by the Australian case of *Gye v. McIntyre* (1991) 171 C.L.R.

G   609. In 1980 Gye, Perkes and three others bought a hotel in New South Wales from a company for $1·25m. For this purpose they borrowed $200,000 from Mrs. McIntyre, who was the company's tenant. The business was a failure and in June 1982 Mrs. McIntyre obtained judgment by default for $224,000 in respect of her loan, interest and costs. Execution was stayed while Gye and Perkes pursued an action for damages against Mrs. McIntyre for having fraudulently induced them to buy the hotel

H   from the company by overstating its profits. In 1985 both Gye and Perkes entered into binding compositions with their creditors under which they assigned certain assets and promised certain payments to a trustee for the benefit of their creditors. The assigned assets did not include the benefit

254

Lord Hoffmann                    Stein v. Blake (H.L.(E.))                    [1996]

of the action against Mrs. McIntyre and she did not prove as a creditor    A
in either composition. In 1988 the action against Mrs. McIntyre was
successful and Gye and Perkes obtained judgment in the sum of $214,600.
They claimed a declaration that she was not entitled to set off the 1982
judgment, for which she could have proved in the compositions. The
Australian Bankruptcy Act 1966 provides, if I may paraphrase in English
terminology, that bankruptcy set-off shall apply in a composition as if a
bankruptcy order had been made on the day on which the resolution    B
accepting the composition was passed and the trustee of the composition
was the trustee in bankruptcy.

    It will be observed that in this case the creditor was neither seeking to
prove nor being sued by the trustee in bankruptcy. The issue was the
effect which the deemed bankruptcy had had upon a claim which had
never passed to the deemed trustee and which was later litigated between    C
the bankrupt and the creditor. The High Court of Australia held that
bankruptcy set-off applied. The judgment of the court said, at p. 622:

        "Section [323] is a statutory directive ('shall be set off') which
    operates as at the time the bankruptcy takes effect. It produces a
    balance upon the basis of which the bankruptcy administration can
    proceed. Only that balance can be claimed in the bankruptcy or    D
    recovered by the trustee. If its operation is to produce a nil balance,
    its effect will be that there is nothing at all which can be claimed in
    the bankruptcy or recovered in proceedings by the trustee. The section
    is self-executing in the sense that its operation is automatic and not
    dependent upon 'the option of either party:' see, per Lord
    Selborne L.C. in *In re Deveze; Ex parte Barnett* (1874) L.R. 9    E
    Ch.App. 293, 295."

    The court noted the majority decision of this House in *Halesowen
Presswork & Assemblies Ltd. v. National Westminster Bank Ltd.* [1972]
A.C. 785 that the application of section 323 is mandatory in the sense that
it cannot be excluded by prior agreement of the parties. But it said that
whether or not it could be excluded by agreement, its operation did not    F
depend upon any procedural step. If, for example, the cross-claims
produced a nil balance, one would hardly expect either the creditor to
prove or the trustee to sue. But there could be no doubt that if the
question subsequently needed to be decided, the two claims would be
treated as having extinguished each other. The court said:

        "Even if one were to accept the dissenting view of Lord Cross of    G
    Chelsea in the *National Westminster Case* [1972] A.C. 785, 813–818
    to the effect that the otherwise automatic operation of a provision
    such as [section 323] may be excluded by an antecedent agreement, it
    would be wrong to attribute to the legislature the illogical intent that
    a directive which was intended to be otherwise automatic in its
    operation and to apply in circumstances where set-off produced a nil
    balance should not operate at all unless and until either the bankrupt's    H
    creditor saw fit to exercise the option of lodging a formal proof of
    debt or the trustee in bankruptcy instituted proceedings for recovery
    of a debt due to the bankrupt."

AP1813

1 A.C.                    Stein v. Blake (H.L.(E.))                    **Lord Hoffmann**

A   ### 8. *Do the causes of action survive?*

The principles so far discussed should provide an answer to the first of the issues in this appeal, namely, whether if A, against whom B has a cross-claim, becomes bankrupt, A's claim against B continues to exist as a chose in action so that A's trustee can assign it to a third party. In my judgment the conclusion must be that the original chose in action ceases to exist and is replaced by a claim to a net balance. If the set-off is

B   mandatory and self-executing and results, as of the bankruptcy date, in only a net balance being owing, I find it impossible to understand how the cross-claims can, as choses in action, each continue to exist.

This was the conclusion of Neill J. in *Farley v. Housing and Commercial Developments Ltd.* [1984] B.C.L.C. 442. Mr. Farley was the principal shareholder in W. Farley & Co. (Builders) Ltd., which in 1972 had entered

C   into two agreements with the defendant company to build blocks of flats. Both led to disputes, with claims by the building company for money due under the contracts and cross-claims by the defendant for damages. In 1975 the building company went into insolvent liquidation. In 1979 the liquidator purported to assign to Mr. Farley the benefit of the agreements and all moneys payable thereunder. Mr. Farley then commenced arbitration proceedings under the agreements. The arbitrator stated a

D   special consultative case asking, at p. 447:

"(1) Whether by reason of the provisions of [the then equivalent of section 323 as applied to companies] upon the contractor becoming insolvent and being wound up . . . the debts due under the [two agreements] ceased to have a separate existence as choses in action (and thus thereafter could not be assigned) being replaced by a

E   balance of account under [section 323]."

Neill J. answered in the affirmative. I think that he was right. The cross-claims must obviously be considered separately for the purpose of ascertaining the balance. For that purpose they are treated as if they continued to exist. So, for example, the liquidator or trustee will commence an action in which he pleads a claim for money due under a contract and

F   the defendant will counterclaim for damages under the same or a different contract. This may suggest that the respective claims actually do continue to exist until the court has decided the amounts to which each party is entitled and ascertained the balance due one way or the other in accordance with section 323. But the litigation is merely part of the process of retrospective calculation, from which it will appear that from

G   the date of bankruptcy, the only chose in action which continued to exist as an assignable item of property was the claim to a net balance.

### 9. *The reasoning of the Court of Appeal*

The Court of Appeal took the view that *Farley* was wrong and that the separate causes of action survived the bankruptcy and could be assigned, subject to the "equity" of the bankruptcy set-off. My Lords, the

H   notion of an assignment subject to equities looks plausible when one is dealing with an assignment of the only claim which the bankrupt has against a creditor. In such a case it produces the same result as an assignment of the net balance. But the fallacy is exposed if the bankrupt

AP1814

256

Lord Hoffmann                    Stein v. Blake (H.L.(E.))                    [1996]

has more than one claim. Take, for example, the two contracts in *Farley's*    A
case and assume that the liquidator at first assigns only one to Mr. Farley.
If each contract continues to exist as a chose in action, each can be the
subject of a legal assignment. Mr. Farley sues on his contract and by way
of defence the defendants plead counterclaims for damages under both
contracts. The court decides that the damages exceed the sums due under
the contract and dismisses the action. The liquidator then assigns the
other contract to Mrs. Farley. She is not bound by the decision in her    B
husband's case and the defendant would have to plead and prove its
counterclaims all over again. The account envisaged by section 323 would
have to be taken twice (with possibly differing results) when the section
plainly contemplates a single calculation.

The argument for the plaintiff, which was recorded and accepted by
Balcombe L.J. in the Court of Appeal [1994] Ch. 16, 22, began with the    C
proposition that "Nothing in the wording of section 323 changes the
*nature* of set-off as it operates between solvent parties; it merely widens
the categories of claim capable of being, and which must be, set off."
I hope I have demonstrated that this submission is fundamentally wrong.
It is true that bankruptcy set-off does cover a much wider range of claims
than legal set-off. But for present purposes the important difference is that
the latter must be pleaded and is given effect only in the judgment of the    D
court, whereas the latter is self-executing and takes effect on the
bankruptcy date.

Secondly it was submitted for the plaintiff, at pp. 22–23, that

"The language of the section draws a distinction between what is
*due*—which is the word used in subsections (2) and (3)—and what is
payable or recoverable—as under subsection (4). The separate causes    E
of action (claim and cross-claim) remain due, and do not cease to
exist, until the set-off has been completed by payment one way or the
other."

This argument is derived, via *Derham on Set-Off* (1987), p. 74, from a
dictum of Mason J. in *Day & Dent Constructions Pty. Ltd. v. North
Australian Properties Pty. Ltd.* (1982) 150 C.L.R. 85. The judge said that    F
"due" in the Australian equivalent of section 323(2) meant due at the date
when the account had to be taken and he relied upon this construction to
explain why a creditor should be entitled to set off a debt which was
contingent at the bankruptcy date. I would respectfully disagree because
I think that "due" merely means treated as having been owing at the
bankruptcy date with the benefit of the hindsight and, if necessary,    G
estimation prescribed by the bankruptcy law. The valuation provision in
section 322(3) shows that the contingency need not have occurred even at
the time when the account has to be taken. But the point was not
necessary for the decision and was in any case addressing the question of
what obligations should be taken into account in arriving at the net
balance rather than whether those obligations survived as choses in action.

Thirdly, Balcombe L.J. placed much weight upon a dictum of Brett J.    H
in *New Quebrada Co. Ltd. v. Carr* (1869) L.R. 4 C.P. 651, 653–654. This
was an action by a company in liquidation for calls against three partners,
joint owners of shares in a company. The plea was a set-off of a debt

257

1 A.C.                          Stein v. Blake (H.L.(E.))                    Lord Hoffmann

A   alleged to be owing by the company to the shareholders. It is important
to bear in mind that this was pleaded as a legal set-off under the Statutes
of Set-off, not a bankruptcy set-off arising on the liquidation of the
company. Bankruptcy set-off did not apply to company liquidations until
the Judicature Act 1875 (38 & 39 Vict. c. 77). It was therefore essential
that the debt relied upon as set-off should have been legally actionable by
the defendants. The replication was that after the action had been brought
B   and before the plea, one of the partners had become bankrupt and his
interest in the company's alleged debt had vested in his assignee. It had
therefore ceased to be actionable by him. There was a demurrer to this
replication. In support of the demurrer it was argued that the bankrupt's
share in the debt had not vested in his trustee because under section 171
of the Bankruptcy Law Consolidation Act 1849 (12 & 13 Vict. c. 106) (the
C   then equivalent of section 323 of the Insolvency Act 1986) it was on his
bankruptcy automatically set off against the calls due to the company.
Bovill C.J., applying an earlier decision, disposed of the case on the
ground that section 171 applied only to a sole trader and not to one
partner in a firm. Byles J. and Montague Smith J. agreed. Brett J. also
agreed, but went on to consider obiter what the effect of section 171
would have been if the bankrupt had been a sole trader. In his view, the
D   debt owing to the bankrupt would have vested in his trustee and therefore
ceased to be actionable by the bankrupt. Having so vested, it would then
have been liable to be set off *in the bankruptcy* against the company's
claim to prove for calls. He added:

E       "[Section 171] does not, I think, extinguish the mutual debts, but if it
did, I should have thought it would have answered the plea of set-off.
In either view I think it does not leave a right of action in the
bankrupt against the plaintiffs, and that he cannot, therefore, avail
himself of his claim against the plaintiffs under an ordinary plea of
set-off, and that, on the present pleadings and argument, it seems to
me, is all we have to decide."

F       It should be noticed that section 171 of the Bankruptcy Law
Consolidation Act 1849 said that "one debt or demand *may* be set against
another," as opposed to the words "the sum due from the one party *shall*
be set off against any sum due from the other party" which were used in
the equivalent section [section 39] of the Bankruptcy Act 1869 (32 &
33 Vict. c. 71) and all its successors. It is therefore perhaps not surprising
that the mandatory and self-executing nature of the set-off was not as
G   fully apparent under the Act of 1849 as it is today. At any rate, I do not
think that despite the eminence of its author, this somewhat throw-away
dictum on the Bankruptcy Act 1849 can be regarded as authoritative on
the construction of section 323 of the Insolvency Act 1986.

10. *Can the net balance be assigned?*

H       The next question is whether the trustee can assign the net balance.
(I should mention that the question was not put to Neill J. in *Farley
v. Housing and Commercial Developments Ltd.* [1984] B.C.L.C. 442.) The
duty of the trustee under section 305(2) is to realise the bankrupt's estate
and the right to the net balance is part of the property of the bankrupt

AP1816

258

Lord Hoffmann                 Stein v. Blake (H.L.(E.))                    [1996]

vested in the trustee. One method of realisation is to transfer or assign the    A
individual assets for value. In *Ramsey v. Hartley* [1977] 1 W.L.R. 686 the
Court of Appeal, following authority which went back more than a
century, held that even a bare right of action was property which the
trustee was entitled to assign. His statutory duty to realise the estate
excluded the doctrines of maintenance and champerty which would
otherwise have struck down such an assignment. Likewise, there is no rule
to prevent him from assigning such a right of action to the bankrupt    B
himself. So why should a trustee not assign the right to the net balance?

Mr. Mark, for the appellant, says that the right cannot be assigned
until the balance has been quantified by the account taken under
section 323. The reason, he says, is that the trustee must be party to the
taking of that account. Bankruptcy set-off is, as Lord Simon of Glaisdale
said in *Halesowen Presswork & Assemblies Ltd. v. National Westminster*    C
*Bank Ltd.* [1972] A.C. 785, 809, part of a "code of procedure whereby
bankrupts' estates . . . are to be administered in a proper and orderly
way." So, for example, section 322(3) (which I have already quoted)
requires that the value of a contingent or otherwise unascertained debt to
be estimated by the trustee.

I think that this submission of Mr. Mark is wrong for the same reasons    D
that persuaded me that his submission on the first issue was right. If
bankruptcy set-off is self-executing, it does not require the trustee or
anyone else to execute it. The argument gives too literal a meaning to the
notion of taking an account. *Gye v. McIntyre*, 171 C.L.R. 609 shows the
account being taken in proceedings to which the trustee was not a party.
It is true that the situation arose because in a composition, the parties are
able to decide which property should vest in the trustee and could exclude    E
the claim against Mrs. McIntyre. In the case of a bankruptcy, vesting is
determined by the law. But for present purposes I can see no logical
distinction between a case in which the trustee assigns the right to the net
balance and one in which the bankrupt's claim, though subject to
bankruptcy set-off, did not vest in him in the first place.

It is true that the trustee will ordinarily not be party to the action
between assignee and creditor. So if the creditor is asserting that there is    F
actually a net balance in his favour for which he is entitled to prove, a
successful outcome of the action will not, as a matter of res judicata,
oblige the trustee to allow his proof. But there is no reason why a
defendant should not, with leave, join the trustee as a defendant to his
counterclaim. Even if the action had been brought by the trustee, the
creditor would have needed the leave of the court to make a counterclaim.
In these circumstances, there seems to me little additional inconvenience    G
in having to add the trustee as a party. I would therefore hold that a
trustee may assign the right to the net balance like any other chose in
action.

11. *Questions of construction*

Did the actual deed executed by the trustee have the effect of carrying    H
the net balance? That is a question of construction. If a trustee purports
to assign the bankrupt's rights in a cheque for £10,000, it would be absurd
to hold that the deed has no effect because it turns out that the drawer of

AP1817

259

1 A.C.                    Stein v. Blake (H.L.(E.))                Lord Hoffmann

A   the cheque has some small counterclaim against the bankrupt. The intention of the parties is clear enough. If the assignment would have carried the original cause of action, it will also, as a matter of conveyance, carry the right to the balance after deduction of the cross-claim. Whether the assignee would have any claim against the trustee for having purported to assign a greater interest than he actually had need not here be considered.

B       There is greater difficulty if the trustee has assigned *less* than the net balance, i.e. to have kept back some credit item in the calculation. This would be an assignment of a part of a debt. On ordinary principles it would not be enforceable in proceedings to which the trustee was not a party. Only if the trustee were joined as a plaintiff could the single account envisaged by section 323 be taken.

C       In this case the deed of assignment of 4 April 1991 recited that the trustee had agreed with the bankrupt for the assignment to him of:

        "such claims and legal rights of action as are hereinafter mentioned which the trustee as trustee in bankruptcy of the assignee may have against [the defendant]."

D   The operative part said in clause 1 that the trustee assigned to the bankrupt:

        "such claim or claims against Mr. Blake as the trustee may have as trustee in the bankruptcy of the assignee as presently formulated, or as amended by counsel with the trustee's approval, based only on the facts pleaded in consolidated action No. Ch. 1989 S-8148 and 1988
E       S-4555 ('the claim') to the intent that the assignee shall be entitled (subject as hereinafter mentioned) to such monies as Mr. Blake may pay to the assignee in settlement of the claim."

    By clause 6 (ii) the parties agreed, for the avoidance of doubt, that:

        "nothing in this agreement shall affect the trustee's right to take action against Mr. Blake if so advised in relation to matters not
F       arising out of the facts other than those pleaded in the aforesaid consolidated action."

        My Lords, the fact that the assignment makes no express reference to the defendant's cross-claim is, for the reasons I have given, no obstacle to holding the assignment effective to carry whatever balance is due after its deduction. But if the effect of this last clause was that the trustee retained
G   a part of his claim to the net balance against Mr. Blake, then in my judgment the action would not have been properly constituted until the trustee had been added as a party. Mr. Blake could not be put in a position in which he had to raise the same cross-claim in two sets of proceedings. His remedy would have been to apply to have the action stayed until the trustee had been added. Before your Lordships' House,
H   however, Mr. Bannister for Mr. Stein said that the trustee asserted no other causes of action against Mr. Blake. He is willing to make it clear that he is assigning the whole of the net balance due to the bankrupt's estate. In these circumstances it is unnecessary to discuss further the question of what might have happened if there had been an application

AP1818

260
Lord Hoffmann                    Stein v. Blake (H.L.(E.))                    [1996]

for a stay on the grounds that the proceedings were not properly   A
constituted. The application to which the judge actually acceded was to
dismiss the action on the ground that Mr. Stein had no title to sue. For
the reasons which I have given, which I think were the alternative reasons
of Staughton L.J., the Court of Appeal was in my judgment right to hold
that the judge's order could not be supported. I would therefore dismiss
this appeal.                                                               B

### 12. *The wider issues*

I should add in conclusion that although the appeal may have turned
on a somewhat technical question, it is a symptom of a wider problem.
Although Mr. Mark argued that it was inconvenient and unjust for the
account under section 323 to be taken between him and Mr. Stein, rather   C
than between him and the trustee, he frankly admitted that his main
grievance was that despite the bankruptcy, he was still being pursued by
Mr. Stein with the benefit of legal aid. But he acknowledged that this
complaint would have been the same if there had been no counterclaim
and the case had not fallen within section 323 at all.

It is a matter of common occurrence for an individual to become
insolvent while attempting to pursue a claim against someone else. In   D
some cases, the bankruptcy will itself have been caused by the failure of
the other party to meet his obligations. In many more cases, this will be
the view of the bankrupt. It is not unusual in such circumstances for there
to be a difference of opinion between the trustee and the bankrupt over
whether a claim should be pursued. The trustee may have nothing in his
hands with which to fund litigation. Even if he has, he must act in the   E
interests of creditors generally and the creditors will often prefer to receive
an immediate distribution rather than see the bankrupt's assets ventured
on the costs of litigation which may or may not yield a larger distribution
at some future date. The bankrupt, with nothing more to lose, tends to
take a more sanguine view of the prospects of success. In such a case the
trustee may decide, as in this case, that the practical course in the interests
of all concerned (apart from the defendant) is to assign the claim to the   F
bankrupt and let him pursue it for himself, on terms that he accounts to
the trustee for some proportion of the proceeds.

It is understandable that a defendant who does not share the bankrupt's
view of the merits of the claim may be disappointed to find that
notwithstanding the bankruptcy, which he thought would result in a
practical commercial decision by an independent trustee to discontinue the   G
proceedings, the action is still being pursued by the bankrupt. His
disappointment is increased if he finds that the bankrupt as plaintiff in his
own name has the benefit of legal aid which would not have been available
to the trustee. Similar considerations apply to an assignment of a right of
action by the liquidator of an insolvent company to a shareholder or
former director. In such a case there is the further point that the company
as plaintiff can be required to give security for costs. The shareholder   H
assignee as an individual cannot be required to give security even if (either
because he does not qualify or the Legal Aid Board considers that the
claim has no merits) he is not in receipt of legal aid.

261

1 A.C.                    Stein v. Blake (H.L.(E.))            **Lord Hoffmann**

A   I mention these questions because they were alluded to by Mr. Mark as a policy reason for why the courts should be restrictive of the right of bankruptcy trustees or liquidators to assign claims. But the problems can be said to arise not so much from the law of insolvency as from the insoluble difficulties of operating a system of legal aid and costs which is fair to both plaintiffs and defendants. Mr. Blake is in no worse position now than he was before the bankruptcy when Mr. Stein was suing him

B   with legal aid (although this would not have been the case if the plaintiff had been a company). Mr. Blake's complaint is that the bankruptcy has brought him no relief. But whether it should seems to me a matter for Parliament to decide.

*Appeal dismissed with costs.*

C
    *Solicitors: Maislish & Co.; Bray Walker.*

J. A. G.

D   ――――――

[HOUSE OF LORDS]

E   REGINA v. INVESTORS COMPENSATION SCHEME LTD.,
    *Ex parte* BOWDEN AND ANOTHER

[On appeal from REGINA v. INVESTORS COMPENSATION BOARD, *Ex parte* BOWDEN]

F   1995   May 22, 23, 24;        Lord Keith of Kinkel, Lord Browne-Wilkinson,
          July 13                    Lord Lloyd of Berwick, Lord Nicholls of
                                     Birkenhead and Lord Steyn

*Financial Services—Compensation—Statutory scheme—Investors suffering losses as result of advice given by broker in contravention of Act—Moneys received and expended in reliance on soundness of investment—Whether recoverable—Whether limit on professional*
G   *fees incurred in mitigating loss lawful—Whether elements not essential for fair compensation to be excluded from investors' claims—Financial Services (Compensation of Investors) Rules 1990, r. 2.04*

A number of investors entered into "home income plans" advertised by brokers under which they were advised to raise money on mortgages of their homes so as to provide capital
H   investment in income-producing bonds. In the event, they were confronted with mortgage obligations that they could not meet. The brokers went into liquidation, and the investors applied for compensation to the board of I.C.S. Ltd., which administered a scheme governed by the Financial Services (Compensation of

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| POINT INVESTMENTS, LTD. (IN LIQUIDATION),[1] | Case No. 22-10261 (TMH) |
| | **Hearing Date: May 25, 2023 at 10 a.m. (ET)** |
| Debtor in a Foreign Proceeding. | **Re: D.I. 52, 69** |

### FOREIGN REPRESENTATIVES'
### REPLY IN FURTHER SUPPORT OF MOTION FOR ENTRY
### OF AN ORDER ENFORCING THE AUTOMATIC STAY AND FOR DAMAGES

Andrew Childe and Richard Lewis of FFP Limited, and Mathew Clingerman of Kroll Bermuda Ltd. (the "Foreign Representatives"), in their capacity as the foreign representatives of Point Investments, Ltd. (the "Debtor"), in respect of the winding up proceeding pending before the Supreme Court of Bermuda (the "Bermuda Court"), Commercial Court, Case 2020: No. 300 (the "Bermuda Proceeding"), by and through the undersigned counsel, hereby file this reply (the "Reply") to the *Objection of FTI GP I, LLC, on Behalf of Falcata Tech Investment Fund I, L.P., to the Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and for Damages* [D.I. 69] (the "Objection"), and in further support of *the Motion of the Foreign Representatives for Entry of an order Enforcing the Automatic Stay and for Damages* [D.I. 52] (the "Stay Enforcement Motion").[2] In support of this Reply, the Foreign Representatives submit the *Declaration of Jayson Wood in Support of Foreign Representatives' Reply in Further Support of Motion for Entry of an Order Enforcing the Automatic Stay and for Damages*

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

[2] Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Stay Enforcement Motion.

(the "Wood Reply Declaration"), filed contemporaneously herewith. In support of this Reply, the Foreign Representatives respectfully state as follows:

## PRELIMINARY STATEMENT

1.  As set forth in detail in the Stay Enforcement Motion, allowing the Adversary Proceeding to continue would violate the express provisions of the Bankruptcy Code, defy principles of international comity that guide bankruptcy courts in Chapter 15 cases, and contravene Chapter 15's legislative history. Furthermore, because this Court has recognized the Debtor's Bermuda liquidation as a "foreign main proceeding" under section 1517 of the Bankruptcy Code, the General Partner's assertion of claims against the Debtor here in the United States, as opposed to in the Debtor's foreign main proceeding, would contradict numerous purposes of Chapter 15, including: encouraging cooperation between courts of the United States and foreign courts; promoting the fair and efficient administration of cross-border insolvencies that protects the interests of *all* stakeholders of the Debtor; and maximizing the value of the Debtor's assets. *See* 11 U.S.C. § 1501(a)(1), (3), (4).

2.  In a strained attempt to justify why the Adversary Proceeding should proceed, the General Partner alleges that the Foreign Representatives are "manipulat[ing]" the protections of Chapter 15 to "run out the clock" on their claims. The General Partner's theory is unsupported by the facts and the law. The Foreign Representatives are court-appointed and court-supervised professionals that owe fiduciary duties to *all* of the Debtor's stakeholders. There is no scheme to deprive the General Partner from asserting claims or receiving a distribution should it be entitled to one. Rather, the Foreign Representatives seek to enforce the protections of the automatic stay to channel claims to the Debtor's foreign main proceeding in Bermuda—consistent with the purposes of, and general practices in, Chapter 15 cases. The Foreign Representatives' actions are likewise consistent with their duties to maximize recoveries for all of the Debtor's stakeholders.

2

AP1822

3.      The Foreign Representatives will soon commence the proof of debt process, which is akin to a proof of claim process in the United States, and they will provide notice of that process to the General Partner. For the avoidance of any doubt, the General Partner will have the opportunity to lodge a proof of debt. Accordingly, there is no basis for the General Partner to allege that the Foreign Representatives have not properly noticed it of the Bermuda Proceeding, as it does in the Objection.[3]

4.      The General Partner's contention that it is unable to timely assert its rights in Bermuda is simply not true. Bermuda law does not mandate any deadline by which the Foreign Representatives are required to commence or complete the proof of debt process. To protect the interests of creditors, any applicable statute of limitations is suspended under Bermuda law with respect to claims lodged through the proof of debt process. Moreover, under Section 108(c) of the Bankruptcy Code, which applies in a Chapter 15 case, the General Partner is provided with tolling protection against any claims that would be extinguished under United States law by the passage of time. Thus, the General Partner's contention that it must be permitted to proceed with the Adversary Proceeding to avoid the running of the statutes of limitations is simply wrong—both as a matter of Bermuda law and under the Bankruptcy Code.

5.      But to avoid any uncertainty, the Foreign Representatives have agreed in principle with the General Partner to enter into a tolling agreement. The Foreign Representatives have proposed that this agreement toll not only any statute of limitations for bringing claims in the Adversary Proceeding (if and only if this Court permit such proceeding to go forward), but also

---

[3] Contrary to the General Partner's complaints about not receiving notice of the Bermuda Proceeding, the Foreign Representatives provided the General Partner's Bermuda counsel with: (i) notice of their appointment on November 3, 2021, attached hereto as **Exhibit A**; (ii) notice of the winding up order (entered on February 18, 2022) as early as March 16, 2022, attached hereto as **Exhibit B**; and (iii) notice of the first meeting of creditors on June 15, 2022, attached hereto as **Exhibit C**.

for purposes of lodging claims against the Debtor in the Bermuda Proceeding. Thus, the General

Partner will be able to timely assert any claims against the Debtor.

6.       For all these reasons, and those set forth more fully below and in the Stay

Enforcement Motion, the General Partner's Objection should be overruled, and the Court should

enforce the protections of the automatic stay.

## ARGUMENT

**I.       The Automatic Stay Arising Under Sections 1520 and 362 of the Bankruptcy Code Prevents The General Partner From Commencing The Adversary Proceeding**

### A.   The Plain Language of the Bankruptcy Code and Its Legislative History Make Clear That The Adversary Proceeding Is Not Exempt from the Automatic Stay

7.       Both the Foreign Representatives and the General Partner agree that sections

1520(a)(1) and 362 of the Bankruptcy Code apply to the Debtor. *See* Obj. ¶ 29. In interpreting

whether these provisions stay the Adversary Proceeding, the Court should "begin[] where all such

inquiries must begin: with the language of the statute itself. " *United States v. Ron Pair Enterprises,*

*Inc.*, 489 U.S. 235, 241 (1989).

8.       Section 1520(a)(1) provides, in relevant part, that "[u]pon recognition of a foreign

proceeding that is a foreign main proceeding … [section] 362 appl[ies] with respect to the debtor

and the property of the debtor that is within the territorial jurisdiction of the United States." 11

U.S.C. § 1501(a)(1). In turn, section 362(a)(1) of the Bankruptcy Code stays "the commencement

or continuation … of a judicial, administrative, or other action or proceeding against the debtor

that was or could have been commenced [prior to the petition date] or to recover a claim against

the debtor that arose [prior to the petition date]." 11 U.S.C. § 362(a)(1).

9.       Section 362(b) of the Bankruptcy Code enumerates a litany of exceptions to the

automatic stay. *See* 11 U.S.C. § 362(b). Notably, it does not provide any exception for

commencing an adversary proceeding against a debtor in bankruptcy court. As discussed in more

4

detail below, some courts have found that an implicit exception exists for adversary proceedings against the debtor in its home bankruptcy court because "such suits are the equivalent to the filing of claims against the estate and allowable under 11 U.S.C. § 501, despite the automatic stay." *In re J.T. Moran Fin. Corp.*, 124 B.R. 931, 940 (S.D.N.Y. 1991). However, section 501 of the Bankruptcy Code is not applicable in a Chapter 15 case. *See* 11 U.S.C. § 103(a) (providing that only "this chapter, section 307, 362(o), 555 through 557, and 559 through 562 apply in a case under chapter 15."). Thus, there is no statutory basis to support the General Partner's argument that the home court exception applies here.

10.     In Chapter 15 cases, sections 1520(b) and (c) provide additional exceptions to the automatic stay. Most relevant, section 1520(b) states that the automatic stay "does not affect the right to commence an individual action or proceeding *in a foreign country* to the extent necessary to preserve a claim against the debtor." 11 U.S.C. § 1520(b) (emphasis added).[4] Notably, the corollary provision of the UNCITRAL Model Law on Cross-Border Insolvency (the "Model Law"), which Chapter 15 is based on, does not contain a similar limitation that such action or proceeding be commended in "a foreign country." *See In re Fairfield Sentry Ltd.*, 452 B.R. 52, 61 (Bankr. S.D.N.Y. 2011) (noting section 1520(b) deviates from the Model Law by including the phrase "in a foreign country").

11.     The legislative history of Chapter 15 explains the reason why Congress included the limitation "in a foreign country" in section 1520(b):

> Two special exceptions to the automatic stay are embodied in subsections (b) and (c). To preserve a claim in certain foreign countries, it may be necessary to commence an action. Subsection

---

[4] Section 1520(c) also provides that the stay arising under Section 1520(a) "does not affect the right of a foreign representative or an entity to file a petition commencing a case under this title or the right of any party to file claims or take other proper actions in such case." 11 U.S.C. 1520(c). As made clear by the legislative history of Chapter 15, this exception permits the foreign representative or debtor to commence a full bankruptcy case in the United States under Chapter 11 or Chapter 7.

AP1825

(b) permits the commencement of such an action, but would not allow for its further prosecution. Subsection (c) provides that there is no stay of the commencement of a full United States bankruptcy case. This essentially provides an escape hatch through which any entity, including the foreign representative, can flee into a full case ... Section 108 of the Bankruptcy Code provides the tolling protection intended by Model Law article 20(3), *so no exception is necessary for claims that might be extinguished under United States law*.

H.R.Rep. No. 109–31(I), at 115 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 88 (emphasis added).

Thus, the reason that section 1520(b) only excepts actions or proceedings to preserve a claim "in a foreign country" is because claims that may by extinguished under the laws of the United States, such as the General Partner's contract claims under the MTA,[5] are automatically tolled in a Chapter 15 case pursuant to section 108(c). *See* 11 U.S.C. § 103(a) (providing that Chapter 1 of the Bankruptcy Code applies in a Chapter 15 case, among other provisions); *In re Fairfield Sentry Ltd.*, 452 B.R. at 61 (noting that "[t]his legislative history confirms that Congress was aware of the application of at least certain provisions of Section 108 to a chapter 15 proceeding.").[6]

12. Accordingly, Congress was aware of the General Partner's concerns regarding expiration of the statute of limitations. However, Congress addressed this issue by making the tolling provisions of Section 108(c) of the Bankruptcy Code applicable in Chapter 15 cases. If Congress intended for creditors to be able to preserve their claims by commencing an adversary proceeding against a foreign debtor in a Chapter 15 case, as the General Partner attempts to do,

---

[5] While the General Partner's claim under the MTA is governed by Delaware law, the General Partner's claim based on the LPA is governed by the law of the Cayman Islands. *See* Obj. ¶ 44. There is a six-year statute of limitations on such claim under Cayman law. Wood Reply Decl. ¶ 6. As mentioned, the statute of limitations under the LPA would be suspended if the General Partner lodges a claim in the Bermuda Proceeding. Even if it does not, pursuant to section 1520(b), the General Partner's remedy to preserve its claim under the LPA would be to commence an action in a foreign country, such as the Cayman Islands.

[6] The General Partner itself concedes in the Objection that Section 108(c) applies and tolls its claims. *See* Obj. ¶ 46, n.11.

6

Congress would not have made an exception only for proceedings "in a foreign country" in section 1520(b).

13.      Indeed, any interpretation of section 1520 that excepts the Adversary Proceeding from the automatic stay would effectively render the phrase "in a foreign country" in section 1520(b) meaningless and should thus be rejected. *See Reiter v. Sonotone Corp.,* 442 U.S. 330, 339 (1979) (stating the Court is "obliged to give effect, if possible, to every word Congress used"); *United States v. Cooper*, 396 F.3d 308, 312 (3d Cir. 2005), as amended (Feb. 15, 2005) ("It is a well known canon of statutory construction that courts should construe statutory language to avoid interpretations that would render any phrase superfluous.") (citing *TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.").

### B. The Home Court Rule Does Not Apply In An Ancillary Chapter 15 Case Because The Foreign Court Is The "Home Court"

14.      Notwithstanding that there is no statutory provision that permits the filing of the Adversary Proceeding, the General Partner argues that the Court should permit the Adversary Proceeding to go forward because of the "home court" rule. The home court rule is a non-statutory exception to the automatic stay that some (but not all) courts in this District have followed. Courts applying the home court rule have allowed a creditor in a Chapter 11 or Chapter 7 case to file an adversary proceeding against a debtor in its "home" bankruptcy court without violating the automatic stay because it is equivalent to filing a proof of claim. *C.f. In re Uni-Marts, LLC*, 399 B.R. 400, 418 (Bankr. D. Del. 2009) ("The Court agrees with the reasoning of the majority of courts to address the issue that the filing of an adversary proceeding against a debtor in its bankruptcy case can be equivalent to the filing of a proof of claim and, therefore, does not violate

the automatic stay."); *with Matter of Coastal Grp., Inc.*, 100 B.R. 177, 178 (Bankr. D. Del. 1989) (dismissing adversary proceeding based on state-law contract because "[i]t is the typical case which cannot be filed subsequent to a bankruptcy filing absent relief from stay for cause.").

15.     However, in an ancillary Chapter 15 case, the United States bankruptcy court does not oversee the debtor's estate or claims process, which is under the supervision of the foreign court. Thus, the rationale underlying the home court rule does not exist in a Chapter 15 case. *See Armco Inc. et al. v. N. Atlantic Ins. Co. Ltd. (In re Bird)*, 229 B.R. 90, 96 (Bankr. S.D.N.Y. 1999) ("The underlying rationale for allowing actions against the debtor in the home court, that is, that the purposes of the automatic stay are not undermined by allowing such suits in the court where all litigation is centralized, simply does not exist when I preside over an ancillary proceeding."). For this reason, *all* of the decisions cited by the General Partner in support of its "home court" argument are from Chapter 11 or Chapter 7 cases. *See e.g.*, *Allied Dev. of Ala. LLC v. Forever 21, Inc., et al. (In re Forever 21, Inc.)*, 623 B.R. 53 (Bankr. D. Del. 2020) (Chapter 11 case); *Charan Trading Corp. et al. v. Uni-Marts, LLC et al.* (*In re Uni-Marts, LLC*), 399 B.R. 400 (Bankr. D. Del. 2009) (Chapter 11 case); *Sharf v. BC Liquidating*, LLC, No. 14–cv–7320, 2015 WL 5093097, (E.D.N.Y. Aug. 28, 2015) (Chapter 7 case).[7]

16.     Despite relying exclusively on Chapter 7 and Chapter 11 cases for the "home court" rule, the General Partner urges the Court to disregard the only case it cites that has considered whether the home court rule applies in an ancillary bankruptcy proceeding. *See* Obj. ¶ 30 n. 6

---

[7] *See also Maxwell Real Estate Inv., LLC, et al. v. Liberty Asset Mgmt. Corp. (In re Liberty Asset Mgmt. Corp.),* No. CC–16–1273, 2017 WL 1100586 (B.A.P. 9th Cir. Mar. 21, 2017) (Chapter 11 case); *Cowin v. Countrywide Home Loans, Inc. et. al. (In re Cowin)*, 538 B.R. 721, 733 (S.D. Tex. 2015) (Chapter 11 case); *Cellceutix Corp. v. Nickless, et al., (In re Formatech, Inc.)*, 496 B.R. 26 (Bankr. D. Mass. 2013) (Chapter 7 case); *Nat'l City Bank of Minneapolis v. Lapides, et al., (In re Transcolor Corp.)*, 296 B.R. 343 (Bankr. D. Md. 2003) (Chapter 11 case); *Civic Ctr. Square, Inc. v. Ford et al. (In re Roxford Foods, Inc.)*, 12 F.3d 875, 878 (9th Cir. 1993) (Chapter 7 case); *Prewitt v. North Coat Vill., Ltd. (In re North Coast Vill, Ltd.)*, 135 B.R. 641 (B.A.P. 9th Cir. 1992) (Chapter 11 case); *Lighthouse Bluffs Corp. v. Arteus Enter., Ltd. (In re Atreus Enter., Ltd.)*, 120 B.R. 341 (Bankr. S.D.N.Y.1990) (Chapter 7 case).

AP1828

(discussing *Armco Inc. et al. v. N. Atlantic Ins. Co. Ltd. (In re Bird)*, 229 B.R. 90 (Bankr. S.D.N.Y.

1999) ("*Bird*")). In *Bird*, the Court held that counterclaims and an adversary proceeding brought

against a foreign debtor in an ancillary bankruptcy case violated the injunction arising under

section 304, the predecessor to Chapter 15, that served the same purpose as the automatic stay. *Id*.

at 93-97. The General Partner contends that *Bird* "is not relevant here because it applied the since

repealed section 304", and "courts who applied former section 304 may not have had to analyze

section 362 [and its applications] … including the 'home court rule.'" Obj. ¶ 30 n. 6.

17.    However, the fact that *Bird* applied section 304 does not mean that the case is

irrelevant. Quite the opposite, "Congress intended that case law under section 304 apply unless

contradicted by Chapter 15." *In re Condor Ins. Ltd.*, 601 F.3d 319, 328 (5th Cir. 2010) (citing H.R.

Rep. 109–31, 109th Cong., 1st Sess., 2005 U.S.C.C.A.N. 88 (2005)). Moreover, the Court in *Bird*

examined the injunction under section 304 by analogizing it to the automatic stay under section

362, and explicitly considered the application of the home court rule. *See Bird*, 229 B.R. at 94-95

(noting that "[m]any judges, myself included, have likened the injunctive relief provided in

connection with 11 U.S.C. § 304 to the protection afforded by the automatic stay under § 362(a)"

and acknowledging that in domestic bankruptcy cases "the automatic stay does not apply to actions

brought in the bankruptcy court where the debtor's case is pending.").

18.    The *Bird* Court ultimately concluded that the home court rule would not permit the

adversary proceeding and counterclaims to go forward because:

> [The Bankruptcy Court's] function in a domestic bankruptcy case is
> quite different from my function in an ancillary one. Were this a
> traditional chapter 7 or 11 proceeding, I would be empowered to
> administer [the debtor's] estate …. However, in the context of an
> ancillary proceeding, I do not determine the extent or validity of
> claims against the estate; proofs of claim are not even filed in this
> court. The administration of the debtor's estate, as a whole, is not
> within my province, for I am not the home court; the main

9

> proceeding is in the United Kingdom. It would offend principles of
> comity for me to decide, in lieu of the English court, whether the
> claims …would unduly interfere with the provisional liquidation
> and the court proceedings which likely would follow it.

*Id*. at 95-96.

19.    Other bankruptcy courts have refused to permit adversary proceedings in ancillary

bankruptcy cases under both old section 304 and Chapter 15 of the Bankruptcy Code for the same

reasons. *See In re Sibaham Ltd.,* No. 19-31537, 2020 WL 2731870, at *1 (Bankr. W.D.N.C. May

4, 2020) (holding automatic stay barred adversary proceeding in Chapter 15 case based on

principles of international comity); *In re Marconi PLC*, 363 B.R. 361, 365 (S.D.N.Y. 2007)

("Section 304 does not permit the filing by domestic creditors of adversary proceedings to establish

claims against a foreign bankrupt … its very purpose is to centralize such proceedings … in the

foreign court.").[8]

20.    The General Partner also argues that "the Debtor appears to be incorrectly

expanding the limited automatic stay that applies in a chapter 15 case" and because "the 'home

court' rule applies to the more expansive automatic stay in a chapter 11 or chapter 7 case … it

must also apply to the much smaller and more limited automatic stay in the Chapter 15 Case." Obj.

¶ 33. However, the only aspect of the automatic stay arising in a Chapter 15 case that courts have

---

[8] All of the cases cited by the General Partner where adversary proceedings have been commenced against a debtor in
a Chapter 15 case (*see* Obj. ¶ 41 n. 8) are inapposite because they do not involve adjudication of a pre-petition claim,
as the case here, but rather are generally either (i) proceedings seeking a declaratory judgment that the automatic stay
does not apply as a threshold matter, or (ii) proceedings that involve claims that are not subject to the automatic stay.
*See Col. Bankers Life Ins. Co. v. PB Life and Annuity Co.*, Ltd, Adv. Pro. No. 22-01149 (Bankr. S.D.N.Y. 2022)
(adversary proceeding seeking declaratory judgment that automatic stay did not apply); *CT Inv. Mgmt. Co., LLC v.
Cozumel Caribe, S.A. de C.V.* Adv. Proc. No. 11-02936 (Bankr. S.D.N.Y. 2011) (same)); *Volo Logistics, LLC et al. v.
Varig Logistica, S.A.*, Adv. Proc. No. 20-01243 (Bankr. S.D. Fla. 2020) (same); *Wolverine Energy and Infrastructure
Inc. v. ENT Capital Corp.*, Adv. Proc. No. 20-3455 (Bankr. S.D. Tex. 2020) (action arising from post-petition conduct
not barred by the automatic stay); *Girobank, N.V et al., v. Trade Fin. Tr. et al.*, Adv. Proc. No. 20-01321 (Bankr.
S.D.N.Y. 2020) (same); *Aircraft Engine Lease Fin., Inc. v. Alitalia Societa Aerea Italiana S.P.A.* in extraordinary
admin., Adv. Proc. No. 18-01578, (Bankr. S.D.N.Y. 2018) (same); *Dohrn v. Sanjel (USA), Inc.*, Adv. Proc. No. 16-
05043 (Bankr. W.D. Tex. 2016) (same); *Pelton et al., v. Sanjel (USA), Inc.*, Adv. Proc. No. 16-05029 (Bankr. W.D.
Tex. 2016) (same); *Hoak et al., v. Rock Well Petroleum, Inc.*, Adv. Pro. No. 09-02014 (Bankr. D. Wy. 2009) (same)).

AP1830

found to be more "limited" compared to the automatic stay in a Chapter 11 or Chapter 7 case is the stay's *extraterritorial* application. *See In re JSC BTA Bank*, 434 B.R. 334 (Bankr. S.D.N.Y. 2010) (holding the "automatic stay that arises in Chapter 15 case on recognition of [a] foreign main proceeding applies to [a] debtor within the United States for all purposes … but does not apply globally to all proceedings against debtor."); *In re Pro-Fit Holdings Ltd.*, 391 B.R. 850, 863 (Bankr. C.D. Cal. 2008) ("[I]n a chapter 15 case, the automatic stay of § 1520 applies only to the debtor and the debtor's property that is within the territorial jurisdiction of the United States.").

21.     Here, the General Partner commenced the Adversary Proceeding in the United States. Thus, the same extraterritorial concerns that were at issue in the cases cited in the Objection are not implicated. Further, the General Partner's logic that because the home court rule applies in Chapter 11 and Chapter 7 cases it *must* apply in a Chapter 15 case fails to address the rationale underlying the exception and the fundamental differences that exist in Chapter 15 cases. It also ignores the fact that section 501 of the Bankruptcy Code, which permits creditors to file proofs of claim, does not apply in a Chapter 15 case. For these reasons, the Court should reject the General Partner's argument that the home court rule applies.

## II.     Principles of International Comity Confirm That The Automatic Stay Should Apply, Particularly Because The General Partner Will Not Be Prejudiced By The Stay

22.     As set forth in the Stay Enforcement Motion, principles of international comity and cross-border insolvency law reinforce the applicability of the automatic stay to the Adversary Proceeding. Mot. ¶¶ 33-36.

23.     In the Objection, the General Partner misconstrues this argument. The Foreign Representatives do not argue that international comity provides an independent basis to grant a stay of the Adversary Proceeding.  Rather, the Foreign Representatives contend that, under well-established precedent, there is nothing inherently unfair in upholding the automatic stay and

AP1831

requiring the General Partner to pursue its claims in the Debtor's foreign main proceeding. Indeed,

that is the design of Chapter 15, and it is consistent with the comity principles upon which cross-

border insolvency law is based.[9] In any event, the General Partner's arguments are unavailing.

24.     The General Partner contends that staying the Adversary Proceeding is inconsistent

with international comity because the Bermuda Court allegedly does not have jurisdiction over it.

*See* Obj. ¶¶ 44-45. However, the only jurisdictional requirement relevant to recognition of a foreign

proceeding is whether the foreign court has jurisdiction over the *Debtor*. *See* 11 U.S.C. § 101(23)

(defining a "foreign proceeding" to mean, in relevant part, a proceeding in which "the assets and

affairs of the debtor are subject to control or supervision by a foreign court"). The Bermuda Court

has jurisdiction over the Debtor, and this Court has already recognized the Bermuda Proceeding

as a "foreign proceeding" under section 1517 of the Bankruptcy Code. *See* Recognition Order,

¶ G.

25.     There is simply no requirement that the foreign court must have jurisdiction over

every potential creditor for a U.S. bankruptcy court to grant comity to the foreign proceeding, nor

would such requirement be consistent with bankruptcy cases in the United States. *See In re Energy*

*Coal S.P.A.*, 582 B.R. 629 (Bankr. D. Del. 2018) ("U.S. bankruptcy courts have not hesitated to

require foreign creditors to file their claims and to litigate in our courts if they wish a distribution

from a U.S. Debtor's estate. It is equally appropriate to expect U.S. creditors to file and litigate

their claims in a foreign main bankruptcy case.") (quotations and citations omitted).[10]

---

[9] The Foreign Representatives agree that the doctrine of international comity may provide a basis to dismiss the adversary case under Federal Rule 12(b) if, and only if, the Court permits the Adversary Proceeding to proceed. But, as set forth above, the Court should hold that the automatic stay applies and that the Adversary Proceeding is therefore void *ab initio*.

[10] In *Energy Coal*, the foreign representatives expressly agreed to liquidate creditor claims in the United States after the Italian court overseeing the foreign main proceeding entered a homologation order that restructured the foreign debtor's assets. *In re Energy Coal S.P.A.*, 582 B.R., at 623. Here, the Foreign Representatives decline to do so because the prejudice to the debtor and other creditors would far outweigh any hardship to the General Partner, and for the other reasons set forth in the Foreign Representatives' objection to the General Partner's stay relief motion [D.I. 66].

26.     Furthermore, the General Partner will not be severely prejudiced because the statute of limitations on its claims will be tolled under Bermuda law (*see* Wood Reply Decl. ¶ 4) or under section 108(c) of the Bankruptcy Code (*see supra* ¶ 4). In any event, the Foreign Representatives have agreed to enter into a tolling agreement with the General Partner. The Foreign Representatives have also provided notice to the General Partner of their appointment (Exhibit A), the winding up order (Exhibit B), and the first meeting of creditors (Exhibit C), and will also provide the General Partner notice of the deadline and procedures for filing claims once the proof of debt process begins.[11]

27.     The procedures for filing a proof of debt will also not create additional burdens to the General Partner as a foreign creditor. *See* Wood Reply Decl. ¶ 5. *In re Oi S.A.*, 587 B.R. 253, 268 (Bankr. S.D.N.Y. 2018) (finding comity should be granted where "creditors are given adequate notice of the timing and procedures for filing claims, and such procedures do not create additional burdens for a foreign creditor seeking to file a claim"). And, under Bermuda law, foreign creditors "have the same status, the same rights and protections, and are subject to the same procedures, as local creditors with respect to the filing of claims." *Id.*; Wood Reply Decl. ¶ 5.

28.     Lastly, there will be little, if any, prejudice to the General Partner or the Fund in staying the Adversary Proceeding. The alleged missed capital contribution at the heart of the dispute was requested on account of the General Partner's management fees, rather than for

---

[11] In addition, the General Partner complains that it was not provided notice of this Chapter 15 Case or the Recognition Order. *See* Obj. ¶ 21. However, pursuant to Bankruptcy Rule 2002(q)(1), notice of a Chapter 15 case is only required to be given to "the debtor, all persons or bodies authorized to administer foreign proceedings of the debtor, all entities against whom provisional relief [was] being sought under §1519 of the Code, all parties to litigation pending in the United States in which the debtor [was] a party at the time of the filing of the petition, and such other entities as the court may direct . . . ." Fed. R. Bankr. Pr. 2002(q)(1). The Foreign Representatives provided notice to all such parties, as well as to certain additional parties reflected on the Debtor's books and records in accordance with the notice procedures approved by the Court [D.I. 25]. *See* Affidavit of Service [D.I. 30]. At the time, the General Partner was not party to litigation with the Debtor, nor was it reflected as a creditor on the Debtor's books, so notice was not required.

AP1833

investment purposes. *See* Childe Decl. [D.I. 67] at ¶ 6. The Foreign Representatives have offered to discuss funding the alleged missed capital contribution and subsequent capital contributions, but have been rebuffed or ignored by the General Partner. *See* Childe Decl. [D.I. 59] at ¶ 8. It is evident that the General Partner is bringing the Adversary Proceeding to attempt to obtain a windfall for itself through claiming the right to returns from Falcata's investments rather than to protect or preserve such investments.

29.     At bottom, any delay in the resolution of the General Partner's claims caused by the Bermuda Proceeding does not amount to the kind of manifest injustice that would prevent a court from staying the Adversary Proceeding based on principles of comity. *See e.g.*, *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005) (extending comity to Mexican court despite creditors argument that doing so would be procedurally unfair because of a six-year delay in resolving claim). For these reasons, application of the automatic stay to the Adversary Proceeding would be consistent with principles of international comity.

## III.     The Foreign Representatives Are Entitled To Damages For Willful Violation Of the Automatic Stay

30.     Lastly, the General Partner should be liable for damages for willfully violating the automatic stay. The Third Circuit has found that a party that has violated the automatic stay may raise a "willfulness" defense where its actions were "taken in reliance on statutory direction and case law support" such that there is sufficient uncertainty as to whether such actions violate the stay. *See In re Univ. Med. Ctr.*, 973 F.2d 1065, 1089 (3d Cir. 1992); *In re Aleckna*, 13 F.4th 337 (3d Cir. 2021) ("[A] defendant does not 'willfully' violate the stay if the law governing the alleged violation was 'sufficiently uncertain' and the defendant, in good faith, relied on persuasive legal authority to support its position."). The party asserting a willfulness defense must rely on statutory direction or "compelling persuasive authority that supports its position." *Aleckna*, 13 F.4th 337 at

AP1834

344. It cannot simply rely on a lack of case law to establish that the law is sufficiently uncertain. *Id*. ("But a lack of case law to the contrary does not render the law sufficiently unsettled ….").

31.     Here, the General Partner has no statutory basis for asserting that the Adversary Proceeding is exempt from the automatic stay. *See supra* ¶¶ 7-13. Rather, the express terms of section 1520 and its legislative history make clear that the automatic stay bars the Adversary Proceeding. *Id*. at ¶¶ 10-11. Moreover, every decision the General Partner cites for support that the home court rule applies is distinguishable because it is either from a Chapter 11 or Chapter 7 case (*see id.* at ¶ 15) and should not be considered as compelling persuasive authority. *See In re Aleckna*, 13 F.4th 337, 346 (3d Cir. 2021) (finding that university willfully violated the stay where the cases it relied on were distinguishable).[12] In fact, the General Partner's position plainly contradicts persuasive compelling authority from Chapter 15 and section 304 cases. *See supra* ¶¶ 17-19.

32.     Nonetheless, the General Partner decided to commence its Adversary Proceeding *first*, resulting in costs to the Foreign Representatives and the Debtor, and then *later* sought a determination that its actions were not violative of the stay based on inapposite decisions from Chapter 7 and Chapter 11 cases or, alternatively, relief from stay. The General Partner's election to beg for forgiveness afterward rather than seek permission first should not be tolerated, and the Court should allow the Foreign Representatives to recover their fees and costs.

## CONCLUSION

For these reasons, the Foreign Representatives respectfully request that the Court grant the Stay Enforcement Motion.

---

[12] What's worse, the Foreign Representatives provided the General Partner with an opportunity to withdraw its Adversary Proceeding, by sending a stay violation letter that cited the statutory provisions and persuasive authority that the Foreign Representatives relies upon in prosecuting its Stay Enforcement Motion. *See* Stay Violation Letter [D.I. 52-3]

AP1835

Dated: May 9, 2023
Wilmington, Delaware

Respectfully submitted,

/s/ Stephen J. Astringer
**KOBRE & KIM LLP**
Jacob R. Kirkham (No. 5768)
Stephen J. Astringer (No. 6375)
600 North King Street, Suite 501
Wilmington, Delaware 19801
Telephone: (302) 518-6451
Facsimile: (302) 518-6461
jacob.kirkham@kobrekim.com
stephen.astringer@kobrekim.com

-and-

Adriana Riviere-Badell (admitted *pro hac vice*)
Evelyn Baltodano Sheehan (admitted *pro hac vice*)
201 South Biscayne Boulevard, Suite 1900
Miami, Florida 33131
Telephone: (305) 967-6100
Facsimile: (305) 967-6120
adriana.riviere-badell@kobrekim.com
evelyn.sheehan@kobrekim.com

-and-

Adam M. Lavine (admitted *pro hac vice*)
John G. Conte (*pro hac vice* pending)
800 Third Avenue
New York, New York 10022
Telephone: (212) 380-2580
Facsimile: (212) 488-1220
Adam.lavine@kobrekim.com
John.conte@kobrekim.com
*Counsel to the Foreign Representatives*

AP1836

# EXHIBIT A

Letter from Foreign Representatives to the General Partner's Bermuda Counsel Providing Notice of the Foreign Representatives' Appointment (November 3, 2021)

**POINT INVESTMENTS, LTD.**
**(PROVISIONAL LIQUIDATORS APPOINTED)**
**(Company No. 43769)**
c/o KRyS Global · Chancery Hall · 1st Floor
52 Reid Street · Hamilton · Bermuda

3 November 2021

Falcata Tech Investment Fund I LP
C/O Walkers Corporate Services Limited
190 Elgin Avenue
George Town
Cayman Islands

By email: ASutton@FalcataCapital.com; cc: rburnett@falcatacapital.com

Dear Sirs,

RE: POINT INVESTMENTS, LTD. (Provisional Liquidators Appointed) (the "Company")

Please be advised that on 29 October 2021 an Order was made in the Supreme Court of Bermuda appointing Mathew Clingerman of Krys Global, Chancery Hall, 1st Floor, 52 Reid Street, Hamilton, HM 12, PO Box 671, HM CX, Bermuda and Richard Lewis and I of FFP Limited, 2nd Floor Harbour Centre, 159 Mary Street, Grand Cayman and as Joint Provisional Liquidators ("JPLs") of the Company pursuant to the provisions of the Companies Act 1981 and the Companies (Winding Up) Rules 1982.

Please find enclosed a copy of the Order for your records.

Affairs and Control of the Company.

We are writing to you in respect of the Company's investment in Falcata Tech Investment Fund I LP ("Falcata"). Under the terms of the Order the JPLs are empowered to take control of the Company's affairs. Further, upon the JPLs' appointment, the powers of the Board of Directors to conduct the affairs of the Company are suspended, including the ability to enter into contracts or deal with the Company's investments or operate its bank or financial accounts.

Accordingly, please update your records to reflect the authorized representatives of the Company are now the JPLs. For the avoidance of doubt, please be advised that no action should be taken on behalf of the Company in any capacity, unless such action has been authorised by one or more of the JPLs in writing.

Powers of Investigation/ Books and Records

Please note that under the terms of the Order, the JPLs are empowered to investigate the affairs of the Company and obtain such information as is necessary to locate, take possession of, collect, and get in assets of the Company and to see, review, secure, take possession of the Company's books and records.

The JPLs are currently in the process of gathering in the books and records of the Company. Please can you assist with the following:

AP1838

- Provide a copy of the latest Limited Partnership Agreement for Falcata;
- Provide a copy of the latest available financial statements for Falcata;
- Provide a copy of the last available limited partner statement / investor report;
- Provide the details of the Company's current capital account with Falcata;
- Provide a list of all Capital Calls made to the Company;
- Provide details of any missed Capital Calls and any amounts due (including any penalties and/or interest);
- Confirm if there are any upcoming Capital Calls and ensure all future Capital Calls are directed to the JPLs at the email address below;
- Provide details of any distributions or other funds held by Falcata which are being held on behalf Company.
- Provide copies of all correspondence sent by Falcata to the Company;
- Confirm if there are any side letters in place between Falcata and the Company.

As the sole Limited Partner, the JPLs on behalf of the Company propose a call be held with the General Partner, FTI GP1, LLC GP in order it can understand the Company's investment in further detail. Please confirm the correct contact and their contact details to coordinate this discussion.

Finally, we should be grateful if you could please amend your records to indicate that the Registered Office of the Company has now changed to that of the JPLs, c/o Krys & Associates (Bermuda) Ltd., Chancery Hall, 1st Floor, 52 Reid Street, Hamilton, HM 12, Bermuda.

Please also refrain from any actions which may result in the destruction, alteration, or deletion of records relating the Company.

All future correspondence in relation to the Company should be sent to the address noted above with e-mail directed to pointinvestments@ffp.ky.

Should you have queries or concerns regarding the JPLs appointment of if there are any matters to bring to our attention, please do not hesitate to contact the JPLs.

Yours sincerely,

Andrew Childe
Joint Provisional Liquidator
For and on behalf of
Point Investments Ltd (provisional liquidators appointed)

Cc: Falcata Capital LLC, 10000 Memorial Drive, Suite 200, Houston, Texas, 77024-5331, USA

AP1839

IN THE SUPREME COURT OF BERMUDA

COMMERCIAL COURT

COMPANIES ACT (WINDING UP)

2020: NO. 300

BETWEEN

SPANISH STEPS HOLDINGS LTD.

PETITIONER

AND

POINT INVESTMENTS LTD.

RESPONDENT

_____

ORDER

_____

**UPON** the Petitioner's Summons dated 29 October 2021;

**AND UPON** reading the evidence;

**AND UPON** hearing Counsel for the Petitioner and for the Respondent;

**IT IS ORDERED THAT:**

1.  Andrew Childe and Richard Lewis of FFP Limited, 10 Market Street, #769 Camana Bay, Grand Cayman, Cayman Islands and Mathew Clingerman of Krys Global, Chancery Hall, 1st Floor, 52 Reid Street, Hamilton, HM 12, PO Box 671, HM CX, Bermuda be appointed as Joint Provisional Liquidators ("JPLs") of Point Investments Ltd. (the "Company");

2.  The powers of the JPLs shall not be limited, pursuant to section 170(3) of the Companies Act 1981 ("the Act"), by the Order appointing them;

3.  Without restricting the generality of paragraph 3 above, the JPLs shall be empowered to carry out the following functions:

    (a)  to ascertain the assets of the Company and their location and take all steps necessary including Court actions where appropriate to obtain possession of such assets and to bring the same under their control and further, where appropriate, bring the same into

the jurisdiction of this Honourable Court and, for this purpose, to seek the assistance of the Courts of the various jurisdictions in which assets of the Company are located;

(b)    to incur and pay for all reasonable expenses and disbursements in connection with the running, administration and management of the Company's records and affairs and offices;

(c)    if appropriate, in the discretion of the JPLs, to retain or employ such further professionals or other individuals, partnerships, associations or companies, to assist in running the affairs and business of the Company and for the purposes of ascertaining and quantifying the assets, records and liabilities of the Company, such employment being either in this jurisdiction or in any other jurisdiction of the world where the Company has conducted business or entered into contracts with third parties;

(d)    to render invoices for their own remuneration at their usual and customary rates (and this shall include all costs charges and expenses of his attorneys, and all other agents, managers, accountants, auctioneers, brokers or other person that the JPLs may employ);

(e)    to see, review, secure, take possession of and copy any books, papers, writings, documents and records relating to the accounts and audit of the Company's accounts that are located in the offices of its auditors or any other person both in this jurisdiction and in any other jurisdiction;

(f)    to see, review, secure, take possession of and copy the claims and financial records of the Company that are located in the offices of the Company or any company affiliated with the Company or any other person;

(g)    to open and operate bank accounts in the name of the JPLs or the Company as may be necessary;

(h)    to conduct such investigations and obtain such information as is necessary to locate, protect, secure, take possession of, collect and get in the assets of the Company and determine liabilities;

(i)    to do all such things as may be necessary or expedient for the protection of the Company's property or assets;

(j)    to employ and dismiss any employees of the Company;

(k)    to discharge rent, salaries of any employees of the Company and other current expenses of the Company;

(l)    to grant or accept a surrender of a lease or tenancy of any of the property of the Company and to take a lease or tenancy of any property required or convenient for the business of the Company;

(m)    to terminate, complete or perfect as advised any contracts or transactions relating to the business of the Company;

(n)    to effect insurance in connection with the management and maintenance of the business, property and assets of the Company;

(o)    to do all acts and to execute in the name and on behalf of the Company all deeds receipts or other documents and for that purpose using when necessary the Company's seal;

(p)    to rank and claim in the bankruptcy, liquidation or insolvency of any person (including but not limited to any body corporate) indebted to the Company and to receive dividends, and to accede to trust deeds for the creditors of any such person;

(q)    to change the situation of the Company's registered office;

(r)    to carry on all or any portion of the business of the Company so far as may be necessary for the beneficial winding-up of the Company;

(s)    to retain and employ barristers, attorneys, solicitors or other lawyers in Bermuda, the United States, the United Kingdom and other jurisdictions as the JPLs see fit for the purpose of advising and assisting the JPLs in the execution of their powers or in any legal or arbitration proceedings and such professionals or other individuals, partnerships, associations or companies as they may consider necessary with regard to the execution of their powers and they shall in their discretion determine the quantum of remuneration to be paid to such attorneys, professionals or other individuals, partnerships, associations or companies as aforesaid.

(t)    to consider any legal or arbitration proceedings wherever situate in which the Company either is a party or of which the Company presently has conduct or which the Company would, but for these liquidation proceedings, take conduct and (for any purpose, including without restriction the purpose of preserving the *status quo* in relation to proceedings while the JPLs complete their own due diligence in relation to such proceedings) to pay all fees and expenses and to give all instructions in connection therewith and take such action as may be thought necessary to continue to prosecute or to defend such proceedings or to apply for a stay of such proceedings;

(u)    to consider and if thought advisable to commence such actions as may be necessary to protect, recover or obtain assets and or monies belonging or due to the Company and to commence all other proceedings outside Bermuda as may be necessary to have their appointment recognised and to protect the assets of the Company;

(v)    to bring or defend any action or other legal proceedings in the name and on behalf of the Company;

(w)    to do all things incidental to the exercise of the foregoing powers.

4.    The said JPLs may bring or defend in their names any action or other legal proceedings which relate to the said property belonging to the said Company or which it is necessary to bring or defend for the purposes of effectually winding-up the Company and recovering its property as aforesaid as provided by section 174 of the Act. Notwithstanding paragraph 5 below, the costs charges and expenses of all persons retained or employed by the JPLs together with the costs charges and expenses of the JPLs and all other costs and expenses properly incurred in the course

of the provisional liquidation of the Company shall be paid as bills are rendered out of the assets of the Company.

5. The JPLs shall be at liberty to submit to the Registrar of the Supreme Court of Bermuda bills of costs for taxation for all costs charges and expenses of those persons or firms employed by them and that such taxation shall be on an attorney-and-own-client basis with respect to the costs charges and expenses of attorneys and on an equivalent basis for all managers, accountants, auctioneers or other persons.

6. Costs in the Petition.

7. Liberty to apply.

DATED this 29th day of October 2021

CHIEF JUSTICE

By Order
Of
The Court

Registrar

IN THE SUPREME COURT OF BERMUDA

COMMERCIAL COURT

COMPANIES ACT (WINDING UP)

2020: NO. 300

BETWEEN

SPANISH STEPS HOLDINGS LTD.

PETITIONER

AND

POINT INVESTMENTS LTD.

RESPONDENT

---

ORDER

---

SUPREME COURT BERMUDA

2021 OCT 29  PM 3: 50



**CAREY OLSEN BERMUDA LIMITED**
5th Floor Rosebank Centre
11 Bermudiana Road
Pembroke HM 08
Bermuda

**Attorneys for the Petitioner**
Ref: KLHR/CVO/OJW/lw/1075311.0002

**EXHIBIT B**

Email from Foreign Representatives' Counsel to the General Partner's Bermuda Counsel
Providing Notice of the Winding Up Order (March 16, 2022)

| From: | Ilona Groark |
|---|---|
| To: | Nour Khaleq |
| Cc: | Marc Kish; Christopher Levers; Peter Tyers-Smith |
| Subject: | RE: [EXTERNAL] RE: Point Investments, Ltd. (Joint Provisional Liquidators Appointed) / Falcata Tech Investment Fund I, L.P. [OGIER-GCMLAW.FID813711] |
| Date: | Wednesday, March 16, 2022 2:34:40 PM |
| Attachments: | 2022 02 18 Order (Sealed).PDF |

Dear Nour,

Your client has had ample time to provide instructions.

We attach a copy of the order of the Supreme Court of Bermuda dated 18 February 2022 providing for the winding-up of PIL and would draw your attention, in particular to paragraph 6(a). You will therefore appreciate that the matters set out in our letter of 1 March 2022 must be resolved quickly. If they cannot be resolved, then our clients will have to enforce PIL's rights through formal processes.

By return, please provide the assurance sought at the bottom of page 5 of our letter of 1 March 2022 and also confirm when you will be in a position to respond substantively to the proposals made in that letter.

We look forward to hearing from you.

Kind regards,

Ilona


Ilona Groark
+1 345 749 4004



**www.kobrekim.com**

**Americas** (New York, Buenos Aires, Chicago, Delaware, Miami, San Francisco, São Paulo, Washington DC)
**Asia-Pacific** (Hong Kong, Seoul, Shanghai), **EMEA** (Dubai, London, Tel Aviv), **Offshore** (BVI, Cayman Islands)

**From:** Nour Khaleq <Nour.Khaleq@ogier.com>
**Sent:** Friday, 11 March 2022 4:24 pm
**To:** Ilona Groark <Ilona.Groark@kobrekim.com>
**Cc:** Marc Kish <Marc.Kish@ogier.com>; Christopher Levers <Christopher.Levers@ogier.com>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>

**Subject:** [EXTERNAL] RE: Point Investments, Ltd. (Joint Provisional Liquidators Appointed) / Falcata Tech Investment Fund I, L.P. [OGIER-GCMLAW.FID813711]

Dear Ilona,

Thank you for your letter dated 1 March 2022.

We are still seeking instructions and expect to be in a position to provide a substantive response next week.

Kind regards

**Nour Khaleq**
Associate
**Ogier**

D: +1 345 815 1857 | T: +1 345 949 9876 | M: +1 345 525 1857

---

**From:** Ilona Groark <Ilona.Groark@kobrekim.com>
**Sent:** 01 March 2022 10:44 AM
**To:** Nour Khaleq <Nour.Khaleq@ogier.com>
**Cc:** Marc Kish <Marc.Kish@ogier.com>; Christopher Levers <Christopher.Levers@ogier.com>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>
**Subject:** Point Investments, Ltd. (Joint Provisional Liquidators Appointed) / Falcata Tech Investment Fund I, L.P.

**This email originated from outside Ogier**

---

Dear Nour,

Please see the attached correspondence.

Kind regards,

Ilona

Ilona Groark
+1 345 749 4004



**www.kobrekim.com**

**Americas** (New York, Buenos Aires, Chicago, Delaware, Miami, San Francisco, São Paulo, Washington DC)
**Asia-Pacific** (Hong Kong, Seoul, Shanghai), **EMEA** (Dubai, London, Tel Aviv), **Offshore** (BVI, Cayman

AP1847

Islands)

This e-mail message is from Kobre & Kim (Cayman), a general partnership established under the laws of the Cayman Islands, referred to above as Kobre & Kim, and may contain legally privileged and/or confidential information. If the reader of this message is not the intended recipient(s), or the employee or agent responsible for delivering the message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please notify the sender immediately and delete this e-mail message and any attachments from your computer without retaining a copy.

--------------------------------------------------------------------------------------------------------
This e-mail is confidential and may also be privileged.
If you are not the intended recipient, please notify the sender immediately.
You should not copy it or disclose its contents to any other person.

Internet communications cannot be guaranteed to be secure or error free as information could be intercepted, corrupted, lost, arrive late or contain viruses.
The sender does not accept liability for any errors or omissions in the context of this message which arise as a result of internet transmission.
If we receive a request from you via e-mail we will treat that as authority to reply by e-mail.
Please note from time to time, our firewall will eliminate legitimate e-mails that it believes represents 'spam' emails.
If your e-mail contains important instructions, please either confirm by separate means we have received them or ask us to acknowledge receipt.

Information on the Ogier Group, its law practices and companies including their registered offices and details of their local regulatory status can be accessed via the Ogier Group website:-

www.ogier.com/legal-notice

IN THE SUPREME COURT OF BERMUDA
COMMERCIAL COURT
COMPANIES ACT (WINDING UP)
2020: No. 300

IN THE MATTER OF POINT INVESTMENTS, LTD. (PROVISIONAL LIQUIDATORS APPOINTED)

AND IN THE MATTER OF THE COMPANIES ACT 1981

---

**ORDER**

---

**UPON** the petition being presented by Spanish Steps Holding Ltd **(Petitioner)** to this Court on 16 September 2020 and amended with leave of the Court on 18 November 2021 **(Amended Petition)**

**AND UPON** the Order of this Court dated 29 October 2021 **(Appointment Order)** appointing Andrew Childe and Richard Lewis of FFP Limited, 10 Market Street, #769 Camana Bay, Grand Cayman, Cayman Islands and Mathew Clingerman of Krys Global, Chancery Hall, 1st Floor, 52 Reid Street, Hamilton, HM 12, PO Box 671, HM CX, Bermuda as Joint Provisional Liquidators **(JPLs)** of Point Investments, Ltd. **(Company)**

**AND UPON** reading the First Affidavit of Mathew Clingerman dated 2 December 2021, and the Second Affidavit of Mathew Clingerman dated 17 February 2022

**AND UPON** the Order of this Court dated 3 December 2021 adjourning the Amended Petition and expanding the JPLs' powers

**AND UPON** the Orders of this Court dated 17 December 2021, 14 January 2022 and 4 February 2022 adjourning the Amended Petition

**AND UPON** hearing counsel for the Petitioner and counsel for the Company and the JPLs

**IT IS HEREBY ORDERED** that:

1. The Company be wound up under the provisions of the Companies Act 1981 **(Act)**.

2. That Andrew Childe and Richard Lewis of FFP Limited, 10 Market Street, #769 Camana Bay, Grand Cayman, Cayman Islands and Mathew Clingerman of Krys Global, Chancery Hall, 1st Floor, 52 Reid Street, Hamilton, HM 12, PO Box 671, HM CX, Bermuda be appointed to continue as JPLs.

3. The JPLs not be required to give security for their appointment.

4. The JPLs shall have the power to act jointly and severally in their capacity as joint provisional liquidators of the Company.

5. The powers granted to the JPLs shall include all of those under section 175 of the Act and shall not be limited, pursuant to section 170 (3) of the Act.

6. Without restricting the generality of paragraph 5 above, the JPLs shall be empowered to carry out the

following:

(a) to ascertain the assets of the Company and their location and take all steps necessary including Court actions where appropriate to obtain possession of such assets and to bring the same under their control and further, where appropriate, bring the same into the jurisdiction of this Honourable Court and, for this purpose, to seek the assistance of the Courts of the various jurisdictions in which assets of the Company are located;

(b) to incur and pay from the assets of the Company all reasonable expenses and disbursements in connection with the running, administration and management of the Company's records and affairs and offices (and this shall include all costs charges and expenses of attorneys, managers, accountants, auctioneers, brokers, and all other agents or other persons that the JPLs may engage or employ);

(c) if appropriate, in the discretion of the JPLs, to retain or employ such further professionals or other individuals, partnerships, associations or companies, to assist in running the affairs and business of the Company and for the purposes of ascertaining and quantifying the assets, records and liabilities of the Company, such employment being either in this jurisdiction or in any other jurisdiction of the world where the Company has conducted business or entered into contracts with third parties;

(d) to render invoices for their own remuneration at their usual and customary rates (and this shall include all costs charges and expenses of his attorneys, , managers, accountants, auctioneers, brokers, and all other agents or other persons that the JPLs may engage or employ);

(e) to see, review, secure, take possession of and copy any books, papers, writings, documents and records relating to the accounts and audit of the Company's accounts that are located in the offices of its auditors or any other person both in this jurisdiction and in any other jurisdiction;

(f) to see, review, secure, take possession of and copy the claims and financial records of the Company that are located in the offices of the Company or any company affiliated with the Company or any other person;

(g) to operate any existing bank, investment, or other financial accounts established in the name of the Company;

(h) to open and operate bank, investment, or other financial accounts in the name of the JPLs or the Company as may be necessary;

(i) to conduct such investigations and obtain such information as is necessary to identify, locate, protect, secure, take possession of, collect and get in the assets of the Company and determine the Company's liabilities, and/or to enable these proceedings to otherwise proceed in a speedy and efficient manner;

(j) to do all such things as may be necessary or expedient for the protection of the Company's property or assets;

(k) to employ and dismiss any employees of the Company;

(l) to discharge rent, salaries of any employees of the Company and other current expenses of the Company;

(m) to grant or accept a surrender of a lease or tenancy of any of the property of the Company and to

take a lease or tenancy of any property required or convenient for the business of the Company;

(n)    to terminate, complete or perfect as advised any contracts or transactions relating to the business of the Company;

(o)    to effect insurance in connection with the management and maintenance of the business, property and assets of the Company;

(p)    to do all acts and to execute in the name and on behalf of the Company all deeds receipts or other documents and for that purpose using when necessary the Company's seal;

(q)    to rank and claim in the bankruptcy, liquidation or insolvency of any person (including but not limited to any body corporate) indebted to the Company and to receive dividends, and to accede to trust deeds for the creditors of any such person;

(r)    to change the situation of the Company's registered office;

(s)    to carry on all or any portion of the business of the Company so far as the JPLs as may consider it beneficial to the winding-up of the Company;

(t)    to take control of and exercise all rights which the Company may have in relation to any subsidiaries, joint ventures, investments, associated companies, businesses, or other entities (collectively "Entities") in which the Company holds an interest (directly or indirectly) or such shares as are owned by the Company (directly or indirectly), as may be necessary to obtain control or management of any such Entities including, without prejudice to the generality of the foregoing, the rights relating to the appointment or removal of all or any directors and other officers (including legal representatives) and agents of any such Entities and to take all such steps as the thought fit to protect the interests of the Company;

(u)    to retain and employ barristers, attorneys, solicitors or other lawyers in Bermuda, the United States, Switzerland, the Cayman Islands, the United Kingdom and other jurisdictions as the JPLs see fit for the purpose of advising and assisting the JPLs in the execution of their powers or in any legal or arbitration proceedings and such professionals or other individuals, partnerships, associations or companies as they may consider necessary with regard to the execution of their powers and they shall in their discretion determine the quantum of remuneration to be paid to such attorneys, professionals or other individuals, partnerships, associations or companies as aforesaid;

(v)    to consider any legal or arbitration proceedings wherever situate in which the Company either is a party or of which the Company presently has conduct or which the Company would, but for these liquidation proceedings, take conduct and (for any purpose, including without restriction the purpose of preserving the *status quo* in relation to proceedings while the JPLs complete their own due diligence in relation to such proceedings) to pay all fees and expenses and to give all instructions in connection therewith and take such action as may be thought necessary to continue to prosecute or to defend such proceedings or to apply for a stay of such proceedings;

(w)    to consider and if thought advisable to commence such actions as may be necessary to protect, recover or obtain assets and or monies belonging or due to the Company and to commence all other proceedings, whether in Bermuda or in any other jurisdiction outside Bermuda as may be necessary to protect, recover or obtain assets and or monies belonging or due to the Company and/or have their appointment recognised;

(x)        to consider and if thought advisable to bring, participate in, or defend any action or other legal proceedings, whether in Bermuda or in any other jurisdictions outside of Bermuda, in the name and on behalf of the Company;

(y)        consider and if thought advisable commence such actions as may be necessary to have their appointment recognised in jurisdictions outside of Bermuda including for the avoidance of doubt the United States, the Cayman Islands, Switzerland, the United Kingdom and other jurisdictions as may be relevant;

(z)        to draw, accept, make and indorse any bill of exchange or promissory note in the name and on behalf of the Company, with the same effect with respect to the liability of the Company, with the same effect with respect to liability of the Company as if the bill or note had been drawn, accepted, made or indorsed by or on behalf of the Company in the course of its business;

(aa)     to raise on the security of its assets of the Company any money required;

(bb)     to do all things incidental to the exercise of the foregoing powers.

7.    The JPLs be at liberty to apply generally to this Honourable Court to make such orders for regulating the future conduct of the affairs of the Company as this Honourable Court shall see fit.

8.    The JPLs may bring or defend in their names any action or other legal proceedings which relate to the said property belonging to the said Company or which it is necessary to bring or defend for the purposes of effectually winding-up the Company and recovering its property as aforesaid as provided by section 174 of the Act. Notwithstanding paragraph 9 below, the costs charges and expenses of all persons retained or employed by the JPLs together with the costs charges and expenses of the JPLs and all other costs and expenses properly incurred in the course of the provisional liquidation of the Company shall be paid as bills are rendered out of the assets of the Company in accordance with Rule 140 of the Companies (Winding Up) Rules 1982.

9.    The time for the holding of the first meetings of creditors and contributories under section 171 of the Act be extended by three months, to six months from the date of this Order.

10.   The Second Affidavit of Mathew Clingerman dated 17 February 2022 be sealed on the Court file and not be open to inspection by any person unless upon further Order of this Court.

11.   The JPLs shall be at liberty to submit to the Registrar of the Supreme Court of Bermuda bills of costs for taxation for all costs charges and expenses of those persons or firms employed by them and that such taxation shall be on an attorney-and-own-client basis with respect to the costs charges and expenses of attorneys and on an equivalent basis for all managers, accountants, auctioneers or other persons.

12.   The Petitioner shall have its costs of this application as costs of preserving, realising, or getting in the assets of the Company pursuant to Rule 140 of the Companies (Winding Up) Rules 1982.

Dated the 18th day of February 2022.



Hon. Chief Justice / Puisne Judge

IN THE SUPREME COURT OF BERMUDA

COMMERCIAL COURT

COMPANIES (WINDING UP)

2020: No. 300

IN THE MATTER OF POINT INVESTMENTS, LTD
(PROVISIONAL LIQUIDATORS APPOINTED)

AND IN THE MATTER OF THE COMPANIES ACT 1981

---

**ORDER**

---

SUPREME COURT BERMUDA

-2022 FEB 18 PH 3: 30

**CAREY OLSEN BERMUDA LIMITED**
Rosebank Centre, 5th Floor
11 Bermudiana Road
Pembroke HM 08
Bermuda

**Attorneys for the Petitioner**

**EXHIBIT C**

Email from Foreign Representatives to the General Partner's Bermuda Counsel Providing Notice
of the First Meeting of Creditors (June 15, 2022)

| | |
|---|---|
| **From:** | Emily Lo |
| **To:** | christopher.levers@ogier.com |
| **Cc:** | Andrew Childe; Richard Lewis; PointInvestments; PIL.KG |
| **Subject:** | EXTERNAL Re: Point Investments, Ltd. (In Liquidation) - Notice of First Meeting of Creditors |
| **Date:** | Wednesday, June 15, 2022 11:18:54 AM |
| **Attachments:** | 22.06.15 PIL - First Creditors Meeting Pack.pdf |

---

**External Email. Exercise Caution.**

---

**To Potential Creditor – Falcata Tech Investment Fund I, L.P.**

Good day,

I refer to the subject matter and attach herewith a notice of first meeting of creditors together with enclosures, the contents of which are self-explanatory, for your attention.

Kind regards,

## EMILY LO

Senior Manager

T +1 441 292 0818 · D +1 441 294 2946 · M + 1 441 777 0121
E Emily.Lo@KRyS-Global.com · W KRyS-Global.com

## KRyS Global

Chancery Hall · 1st Floor · 52 Reid Street
Hamilton · HM 12 · Bermuda

Cayman Islands · BVI · Bermuda · Guernsey · Hong Kong · London · Singapore · USA

**POINT INVESTMENTS, LTD.**
**(IN LIQUIDATION)**
**(Company No. 43769)**
c/o KRyS Global · Chancery Hall · 1st Floor
52 Reid Street · Hamilton HM 12· Bermuda

**Strictly Private & Confidential**
To All Known Creditors of
Point Investments, Ltd. (In Liquidation)

15 June 2022

Dear Sirs,

**RE: Point Investments, Ltd. (In Liquidation) (the "Company")**

Please be advised that on 29 October 2021 an order was made in the Supreme Court of Bermuda (the "**Court**") appointing Andrew Childe and Richard Lewis of FFP Limited, Harbour Centre, 2nd Floor, 159 Mary Street, Grand Cayman, Cayman Islands and Mathew Clingerman of KRyS Global, Chancery Hall, 1st Floor, 52 Reid Street, Hamilton HM 12, P.O. Box 671, HM CX, Bermuda as Joint Provisional Liquidators ("**JPLs**") of the Company pursuant to the provisions of the Companies Act 1981.

On 18 February 2022, the Court made a winding-up order against the Company and further ordered that Andrew Childe, Richard Lewis and Mathew Clingerman continue as the JPLs of the Company (the "**Winding-up Order**").

A copy of the Winding-up Order is enclosed for your records.

The JPLs understand that you may be a creditor of the Company. Accordingly, the JPLs hereby inform you that the first meeting of creditors (the "**Meeting**") is to be held at the office of Harneys (Bermuda) Limited, Rose Cottage, 18 Parliament Street, Hamilton HM 12, Bermuda and by way of Zoom conference on 29 June 2022 (Wednesday) at 2 p.m. (Bermuda Time). Please email the JPLs at pointinvestments@ffp.ky for attendance details. In this regard, please find enclosed:

- Notice of the Meeting;
- Proof of Debt Form ("**POD**") for voting purposes only;
- General Proxy and Special Proxy Forms ("**Proxy Forms**"); and
- A Summary of the Statement of Affairs.

To entitle you to vote at the Meeting, you are requested to lodge a correctly completed and valid POD along with Proxy Form. **In order to vote at the Meeting, you or your proxy needs to be in attendance at the Meeting**. Depending on whether your proxy must vote in accordance with special instructions received (Special Proxy) or will have discretionary votes (General Proxy), you need to duly and properly complete the appropriate Proxy Form.

The POD and Proxy Form should be submitted to the JPLs by email to pointinvestments@ffp.ky or by post to the following address no later than 24 June 2022 (Friday) at 2 p.m. (Bermuda Time). Failure to do so will result in your proxy being unable to vote.

Joint Provisional Liquidators of
Point Investments, Ltd. (In Liquidation)
c/o KRyS Global, Chancery Hall, 1st Floor, 52 Reid Street, Hamilton HM 12, Bermuda

Should you wish to appoint the Chairman of the Meeting (who will be one of the JPLs or their representative) as your proxy, please complete the Special Proxy only and direct the Chairman on how to vote on the resolutions proposed.

Please note that if you appoint the Chairman of the Meeting as your proxy on a General Proxy, your vote will not be counted, as the Chairman is unable to exercise discretion in voting (he must be directed via a Special Proxy).

Attendees (creditors attending in person or their proxies) may be required to supply proof of identity (i.e. certified copy of passport or drivers' license) and their authorization (i.e. powers of attorney, corporate register of directors and officers) to the satisfaction of the JPLs.

Please note that you do not need to complete a proxy form if you attend the meeting in person unless you are representing a corporate entity or another individual on their behalf.

At the Meeting, the following resolutions will be considered:

1. Whether or not an application is to be made to the Court to have the JPLs continue in office as liquidators; and

2. Whether or not an application is to be made to the Court for the appointment of a Committee of Inspection to act with the liquidators.

   Please note that a Committee of Inspection is not mandatory in a liquidation.

For any questions, please contact Emily Lo by phone at 1 441 294 2946 or the JPLs by email at pointinvestments@ffp.ky.

Yours faithfully,

Mathew Clingerman
Joint Provisional Liquidator
For and on behalf of
Point Investments, Ltd. (In Liquidation)
As agent of the Company without personal liability

Enclosures

2

AP1857

IN THE SUPREME COURT OF BERMUDA
COMMERCIAL COURT
COMPANIES ACT (WINDING UP)
2020: No. 360

IN THE MATTER OF POINT INVESTMENTS, LTD. (PROVISIONAL LIQUIDATORS APPOINTED)

AND IN THE MATTER OF THE COMPANIES ACT 1981

---

## ORDER

---

UPON the petition being presented by Spanish Steps Holding Ltd (Petitioner) to this Court on 16 September 2020 and amended with leave of the Court on 18 November 2021 (Amended Petition)

AND UPON the Order of this Court dated 29 October 2021 (Appointment Order) appointing Andrew Childe and Richard Lewis of FFP Limited, 10 Market Street, #769 Camana Bay, Grand Cayman, Cayman Islands and Mathew Clingerman of Krys Global, Chancery Hall, 1st Floor, 52 Reid Street, Hamilton, HM 12, PO Box 671, HM CX, Bermuda as Joint Provisional Liquidators (JPLs) of Point Investments, Ltd. (Company)

AND UPON reading the First Affidavit of Mathew Clingerman dated 2 December 2021, and the Second Affidavit of Mathew Clingerman dated 17 February 2022

AND UPON the Order of this Court dated 3 December 2021 adjourning the Amended Petition and expanding the JPLs' powers

AND UPON the Orders of this Court dated 17 December 2021, 14 January 2022 and 4 February 2022 adjourning the Amended Petition

AND UPON hearing counsel for the Petitioner and counsel for the Company and the JPLs

IT IS HEREBY ORDERED that:

1. The Company be wound up under the provisions of the Companies Act 1981 (Act).

2. That Andrew Childe and Richard Lewis of FFP Limited, 10 Market Street, #769 Camana Bay, Grand Cayman, Cayman Islands and Mathew Clingerman of Krys Global, Chancery Hall, 1st Floor, 52 Reid Street, Hamilton, HM 12, PO Box 671, HM CX, Bermuda be appointed to continue as JPLs.

3. The JPLs not be required to give security for their appointment.

4. The JPLs shall have the power to act jointly and severally in their capacity as joint provisional liquidators of the Company.

5. The powers granted to the JPLs shall include all of those under section 175 of the Act and shall not be limited, pursuant to section 170 (3) of the Act.

6. Without restricting the generality of paragraph 5 above, the JPLs shall be empowered to carry out the

following:

(a) to ascertain the assets of the Company and their location and take all steps necessary including Court actions where appropriate to obtain possession of such assets and to bring the same under their control and further, where appropriate, bring the same into the jurisdiction of this Honourable Court and, for this purpose, to seek the assistance of the Courts of the various jurisdictions in which assets of the Company are located;

(b) to incur and pay from the assets of the Company all reasonable expenses and disbursements in connection with the running, administration and management of the Company's records and affairs and offices (and this shall include all costs charges and expenses of attorneys, managers, accountants, auctioneers, brokers, and all other agents or other persons that the JPLs may engage or employ);

(c) if appropriate, in the discretion of the JPLs, to retain or employ such further professionals or other individuals, partnerships, associations or companies, to assist in running the affairs and business of the Company and for the purposes of ascertaining and quantifying the assets, records and liabilities of the Company, such employment being either in this jurisdiction or in any other jurisdiction of the world where the Company has conducted business or entered into contracts with third parties;

(d) to render invoices for their own remuneration at their usual and customary rates (and this shall include all costs charges and expenses of his attorneys, , managers, accountants, auctioneers, brokers, and all other agents or other persons that the JPLs may engage or employ);

(e) to see, review, secure, take possession of and copy any books, papers, writings, documents and records relating to the accounts and audit of the Company's accounts that are located in the offices of its auditors or any other person both in this jurisdiction and in any other jurisdiction;

(f) to see, review, secure, take possession of and copy the claims and financial records of the Company that are located in the offices of the Company or any company affiliated with the Company or any other person;

(g) to operate any existing bank, investment, or other financial accounts established in the name of the Company;

(h) to open and operate bank, investment, or other financial accounts in the name of the JPLs or the Company as may be necessary;

(i) to conduct such investigations and obtain such information as is necessary to identify, locate, protect, secure, take possession of, collect and get in the assets of the Company and determine the Company's liabilities, and/or to enable these proceedings to otherwise proceed in a speedy and efficient manner;

(j) to do all such things as may be necessary or expedient for the protection of the Company's property or assets;

(k) to employ and dismiss any employees of the Company;

(l) to discharge rent, salaries of any employees of the Company and other current expenses of the Company;

(m) to grant or accept a surrender of a lease or tenancy of any of the property of the Company and to

take a lease or tenancy of any property required or convenient for the business of the Company;

(n) to terminate, complete or perfect as advised any contracts or transactions relating to the business of the Company;

(o) to effect insurance in connection with the management and maintenance of the business, property and assets of the Company;

(p) to do all acts and to execute in the name and on behalf of the Company all deeds receipts or other documents and for that purpose using when necessary the Company's seal;

(q) to rank and claim in the bankruptcy, liquidation or insolvency of any person (including but not limited to any body corporate) indebted to the Company and to receive dividends, and to accede to trust deeds for the creditors of any such person;

(r) to change the situation of the Company's registered office;

(s) to carry on all or any portion of the business of the Company so far the JPLs as may consider it beneficial to the winding-up of the Company;

(t) to take control of and exercise all rights which the Company may have in relation to any subsidiaries, joint ventures, investments, associated companies, businesses, or other entities (collectively "Entities") in which the Company holds an interest (directly or indirectly) or such shares as are owned by the Company (directly or indirectly), as may be necessary to obtain control or management of any such Entities including, without prejudice to the generality of the foregoing, the rights relating to the appointment or removal of all or any directors and other officers (including legal representatives) and agents of any such Entities and to take all such steps as the thought fit to protect the interests of the Company;

(u) to retain and employ barristers, attorneys, solicitors or other lawyers in Bermuda, the United States, Switzerland, the Cayman Islands, the United Kingdom and other jurisdictions as the JPLs see fit for the purpose of advising and assisting the JPLs in the execution of their powers or in any legal or arbitration proceedings and such professionals or other individuals, partnerships, associations or companies as they may consider necessary with regard to the execution of their powers and they shall in their discretion determine the quantum of remuneration to be paid to such attorneys, professionals or other individuals, partnerships, associations or companies as aforesaid;

(v) to consider any legal or arbitration proceedings wherever situate in which the Company either is a party or of which the Company presently has conduct or which the Company would, but for these liquidation proceedings, take conduct and (for any purpose, including without restriction the purpose of preserving the *status quo* in relation to proceedings while the JPLs complete their own due diligence in relation to such proceedings) to pay all fees and expenses and to give all instructions in connection therewith and take such action as may be thought necessary to continue to prosecute or to defend such proceedings or to apply for a stay of such proceedings;

(w) to consider and if thought advisable to commence such actions as may be necessary to protect, recover or obtain assets and or monies belonging or due to the Company and to commence all other proceedings, whether in Bermuda or in any other jurisdiction outside Bermuda as may be necessary to protect, recover or obtain assets and or monies belonging or due to the Company and/or have their appointment recognised;

(x)    to consider and if thought advisable to bring, participate in, or defend any action or other legal proceedings, whether in Bermuda or in any other jurisdictions outside of Bermuda, in the name and on behalf of the Company;

(y)    consider and if thought advisable commence such actions as may be necessary to have their appointment recognised in jurisdictions outside of Bermuda including for the avoidance of doubt the United States, the Cayman Islands, Switzerland, the United Kingdom and other jurisdictions as may be relevant;

(z)    to draw, accept, make and indorse any bill of exchange or promissory note in the name and on behalf of the Company, with the same effect with respect to the liability of the Company, with the same effect with respect to liability of the Company as if the bill or note had been drawn, accepted, made or indorsed by or on behalf of the Company in the course of its business;

(aa)    to raise on the security of its assets of the Company any money required;

(bb)    to do all things incidental to the exercise of the foregoing powers.

7.    The JPLs be at liberty to apply generally to this Honourable Court to make such orders for regulating the future conduct of the affairs of the Company as this Honourable Court shall see fit.

8.    The JPLs may bring or defend in their names any action or other legal proceedings which relate to the said property belonging to the said Company or which it is necessary to bring or defend for the purposes of effectually winding-up the Company and recovering its property as aforesaid as provided by section 174 of the Act.  Notwithstanding paragraph 9 below, the costs charges and expenses of all persons retained or employed by the JPLs together with the costs charges and expenses of the JPLs and all other costs and expenses properly incurred in the course of the provisional liquidation of the Company shall be paid as bills are rendered out of the assets of the Company in accordance with Rule 140 of the Companies (Winding Up) Rules 1982.

9.    The time for the holding of the first meetings of creditors and contributories under section 171 of the Act be extended by three months, to six months from the date of this Order.

10.    The Second Affidavit of Mathew Clingerman dated 17 February 2022 be sealed on the Court file and not be open to inspection by any person unless upon further Order of this Court.

11.    The JPLs shall be at liberty to submit to the Registrar of the Supreme Court of Bermuda bills of costs for taxation for all costs charges and expenses of those persons or firms employed by them and that such taxation shall be on an attorney-and-own-client basis with respect to the costs charges and expenses of attorneys and on an equivalent basis for all managers, accountants, auctioneers or other persons.

12.    The Petitioner shall have its costs of this application as costs of preserving, realising, or getting in the assets of the Company pursuant to Rule 140 of the Companies (Winding Up) Rules 1982.

Dated the 18th day of February 2022.



Hon. Chief Justice (Puisne) Judge

IN THE SUPREME COURT OF BERMUDA

COMMERCIAL COURT

COMPANIES (WINDING UP)

2020: No. 300

IN THE MATTER OF POINT INVESTMENTS, LTD
(PROVISIONAL LIQUIDATORS APPOINTED)

AND IN THE MATTER OF THE COMPANIES ACT 1981

---

ORDER

---

**CAREY OLSEN BERMUDA LIMITED**
Rosebank Centre, 5th Floor
11 Bermudiana Road
Pembroke HM 08
Bermuda

**Attorneys for the Petitioner**

SUPREME COURT BERMUDA
-2022 FEB 18 PM 3: 30

IN THE SUPREME COURT OF BERMUDA

COMMERCIAL COURT

COMPANIES (WINDING-UP)

2020: No. 300

IN THE MATTER OF COMPANIES ACT 1981

AND IN THE MATTER OF POINT INVESTMENTS, LTD. (IN LIQUIDATION)

---

FORM 64 (rule 85)

NOTICE TO CREDITORS OF FIRST MEETING

---

NOTICE IS HEREBY GIVEN that the first meeting of creditors in the above matter will be held at the office of Harneys (Bermuda) Limited, Rose Cottage, 18 Parliament Street, Hamilton HM 12, Bermuda on 29 June 2022 (Wednesday) at 2 p.m. (Bermuda Time). Creditors may also attend the meeting remotely by way of Zoom conference. Please email the Joint Provisional Liquidators ("JPLs") at pointinvestments@ffp.ky for attendance details.

To entitle you to vote at the meeting of creditors, you must lodge your Proof of Debt together with supporting documents with the JPLs at c/o KRyS Global, Chancery Hall, 1st Floor, 52 Reid Street, Hamilton HM 12, Bermuda or by email to pointinvestments@ffp.ky no later than 24 June 2022 (Friday) at 2 p.m. (Bermuda Time).

Forms of general and special proxies are enclosed. For your nominated proxy to be entitled to act on your behalf at the meeting of creditors, your proxy form must also be lodged with the JPLs at c/o KRyS Global, Chancery Hall, 1st Floor, 52 Reid Street, Hamilton HM 12, Bermuda or by email to pointinvestments@ffp.ky no later than 24 June 2022 (Friday) at 2 p.m. (Bermuda Time).

A statement of the Company's affairs has been lodged by one of the directors of the Company, a summary of which is enclosed.

Dated this 15th day of June 2022

Andrew Childe
Joint Provisional Liquidator acting as
Agent of the Company without personal liability

Richard Lewis
Joint Provisional Liquidator acting as
Agent of the Company without personal liability

Mathew Clingerman
Joint Provisional Liquidator acting as
Agent of the Company without personal liability

**Note:**

At the first meeting of the creditors, they may amongst other things:

1.  By resolution determine whether or not an application is to be made to the court to have the Joint Provisional Liquidators continue in office as liquidators.

2.  By resolution determine whether or not an application shall be made to the court for the appointment of a committee of inspection to act with the liquidator(s), and who are to be the members of the committee if appointed.

---

NOTE: If a liquidator is not appointed by the court the Official Receiver will be the liquidator.

IN THE SUPREME COURT OF BERMUDA

COMMERCIAL COURT

COMPANIES (WINDING-UP)

2020: No. 300

IN THE MATTER OF THE COMPANIES ACT 1981

AND IN THE MATTER OF POINT INVESTMENTS, LTD. (IN LIQUIDATION)

---

FORM 54 (rule 64)
PROOF OF DEBT

---

Please carefully review the directions in the notes and in italics.

I ...................................................................................................................................................................
*(enter name of the deponent, including all former names)*

of ................................................................................................................................................................
*(enter the address of the deponent)*

MAKE OATH AND SAY* as follows:

1.  This is the proof of debt of ................................................................................................................
    *(enter name of creditor)*

    of .........................................................................................................................................................
    *(enter the address of the creditor)*

1A. I am in the employ of the above-named creditor, and I am duly authorized by that creditor to make this affidavit, and it is within my own knowledge that the debt deposed to in this affidavit (the "**Debt**") was incurred and for the consideration stated, and to the best of my knowledge and belief the Debt still remains unpaid and unsatisfied. *See Note 1*

1B. I am duly authorized under the seal of the above-named creditor, to make the proof of debt on its behalf. *See Note 1*

AP1865

2.  Point Investments, Ltd. was, at the date of the winding-up order made against it, the 18 February 2022, and still is, justly and truly indebted to the above-named creditor in  the amount of the Debt, being the sum of $          for *(give particulars of the debt including consideration)*

    ...........................................................................................................................................................

    ...........................................................................................................................................................

3.  I have not nor has the above-named creditor nor any person by my/his/its /their *(delete as applicable)* order to my knowledge or belief for my/his/its/their *(delete as applicable)* usehad or received any manner of satisfaction or security whatsoever for the Debt or any part of the Debt, save and except the following: *(Here state the particulars of all securities held, and where the securities are on the property of the company assess the value of the same, and if any bills or other negotiable securities be held specify them in  the schedule)*–

    ...........................................................................................................................................................

    ...........................................................................................................................................................

Date            ......................................................

Drawer          ......................................................

Acceptor        ......................................................

Amount          ......................................................

Due Date        ......................................................

SWORN by                            )
At                                  )
                                    )
this      day of          2022      )

BEFORE ME:

_____

A Commissioner for Oaths

*\*For purposes of voting at the First Meeting of Creditors, the Joint Provisional Liquidators will not reject a proof of debt solely on the basis of it being unsworn before a Commissioner of Oaths (or equivalent).  For avoidance of doubt, the Joint Provisional Liquidators reserve their rights to require any creditor wishing to prove, to provide additional information or evidence substantiating their claim.*

**TO BE COMPLETED BY JOINT PROVISIONAL LIQUIDATOR ONLY**

Admitted to vote for $        the        day of        2022

_____
Joint Provisional Liquidator

**NOTES:**

1) Delete 1A and 1B if proof made by creditor himself. If proof made by employee of creditor delete 1B. If proof made by agent or officer of creditor delete 1A.

2) The proof cannot be admitted for voting at the first meeting unless it is properly completed and lodged with the Joint Provisional Liquidators at c/o KRyS Global, Chancery Hall, 1st Floor, 52 Reid Street, Hamilton HM 12, Bermuda or by email to pointinvestments@ffp.ky by the deadline specified at the Notice to Creditors of First Meeting.

3) Bills of exchange or other negotiable instruments must be produced before the proof can be admitted.

AP1867

**IN THE SUPREME COURT OF BERMUDA**

**COMMERCIAL COURT**

**COMPANIES (WINDING-UP)**

**2020: No. 300**

**IN THE MATTER OF COMPANIES ACT 1981**

**AND IN THE MATTER OF POINT INVESTMENTS, LTD. (IN LIQUIDATION)**

---

**FORM 62 (rule 103)**

**General Proxy**

---

I/We, ……………………………………………………………………………………………………………………………………………………………………………
*(Name of the creditor, including all former names)*

of …………………………………………………………………………………………………………………………………………………………………………..
*(Enter the address of the creditor)*
being a creditor of Point Investments, Ltd. (In Liquidation) **HEREBY APPOINT**

the Chairman of the meeting or …………………………………………………………………………………………………………………………..
*(See notes below)* as my/our proxy to vote for me/us at the first meeting of creditors (*delete as applicable),*
to be held at the office of Harneys (Bermuda) Limited, Rose Cottage, 18 Parliament Street, Hamilton HM
12, Bermuda and by way of Zoom conference on 29 June 2022 (Wednesday) at 2 p.m. (Bermuda Time) or
any adjournment thereof.

Contact details of Proxy (including email address) …………………………………………………………………………………………..

Signature *(See notes below)* ………………………………………………………………………………………………………………………………..

Name *(In Block)* ………………………………………………………………………………………………………………………………………………….

Date …………………………………………………………………………………………………………………………………………………………………..

**The below certificate should only be signed where a person other than a creditor filling up the above
proxy**

I, …………………………………………………………………………………………………………………………………………………………. *(name)*

of …………………………………………………………………………………………………………………………………………………………*(address)*

**Point Investments, Ltd. (In Liquidation)**

General proxy of ……………………………………………………………………………………………………… (name of creditor)

being a *(See Note 3)* …………………………………………………………………………………………………………………………..

hereby certify that all insertions in the above proxy are in my own handwriting and have been made by me at the request of the above-named creditor and in his presence before he attached his signature (or mark) thereto.

Signature ……………………………………………………………………………………

Name …………………………………………………………………………………………

Date …………………………………………………………………………………………..

Contact details (including email address) …………………………………………….

………………………………………………………………………………………………..

………………………………………………………………………………………………..

GENERAL PROXY NOTES:

1. The Chairman of the meeting will either be one of the provisional liquidators or a representative of the provisional liquidators. If you wish to appoint a person other than the Chairman of the meeting as your proxy, delete the words, "the Chairman of the meeting" and enter the name of the person to be appointed. That person may be such other person as the creditor may approve. The proxy form when signed must be lodged by the time and at the address (or email address) named for that purpose in the notice convening the meeting at which it is to be used.

2. If a firm, sign the firm's trading title, add "A,B., a partner in the said firm". If the appointer is a corporation, then the form of proxy must be under its common seal or under the hand of some officer duly authorized in that behalf, and the fact that he is so authorized must be stated thus:-

   For and on behalf of (Your Company Name)
   J.S. (duly authorized under the seal of the company)

3. Here state whether clerk or manager in the regular employment of the creditor or the attorney employed by him in connection with the matter or a commissioner to administer oaths in the Supreme Court.

IN THE SUPREME COURT OF BERMUDA

COMMERCIAL COURT

COMPANIES (WINDING-UP)

2020: No. 300

IN THE MATTER OF COMPANIES ACT 1981

AND IN THE MATTER OF POINT INVESTMENTS, LTD. (IN LIQUIDATION)

---

FORM 63 (rule 103)

Special Proxy

---

I/We, .................................................................................................................................................
*(Name of the creditor, including all former names)*

of .................................................................................................................................................
*(Enter the address of the creditor)*
being a creditor of Point Investments, Ltd. (In Liquidation) **HEREBY APPOINT**

the Chairman of the meeting or .................................................................................................
*(See notes below)* as my/our proxy to vote for me/us at the first meeting of creditors (*delete as applicable*),
to be held at the office of Harneys (Bermuda) Limited, Rose Cottage, 18 Parliament Street, Hamilton HM
12, Bermuda and by way of Zoom conference on 29 June 2022 (Wednesday) at 2 p.m. (Bermuda Time) or
any adjournment thereof.

Contact details of Proxy (including email address) .................................................................................

Signature *(See notes below)* .................................................................................................................

Name *(In Block)* .................................................................................................................................

Date .................................................................................................................................................

If you wish to vote for a resolution or nomination, sign in the box "FOR". If you wish to vote against a
resolution or nomination, sign in the box marked "AGAINST".

| Resolution 1 | FOR | AGAINST |
|---|---|---|
| That an application be made to the Court for the Joint Provisional Liquidators to continue in office as liquidators of the Company | | |
| | Signature | Signature |

**Point Investments, Ltd. (In Liquidation)**

Special proxy of ................................................................................................................ (name of creditor)

Note:  If no liquidator(s) is/are appointed by the Court, the Official Receiver of Bermuda will be the liquidator.

| Resolution 2 | FOR | AGAINST |
|---|---|---|
| That an application is to be made to the Court for the appointment of a Committee of Inspection to act with the liquidator(s) | | |
| | Signature | Signature |

**Constitution of the Committee of Inspection**

A Committee of Inspection is generally made up of representatives of creditors and/or contributories who represent all of the creditors/contributories' interests.  A Committee of Inspection is not mandatory in a liquidation; however, if a majority of the creditors decide that a committee should be appointed then you may wish to nominate yourself or some other creditor to sit on the committee.

You may indicate in the boxes set out below the names of any eligible creditors whom you wish to nominate to serve on the Committee of Inspection and for whom you wish your proxy to vote.  Please ensure that you sign in the box provided next to that nominee's name since failure to do so will invalidate the special proxy as regards that nomination.

Pursuant to section 218 of the Companies Act 1981, the Committee of Inspection, if any, shall consist of not more than five persons.

| | | FOR | AGAINST |
|---|---|---|---|
| 1. | | Signature | Signature |
| 2. | | Signature | Signature |
| 3. | | Signature | Signature |
| 4. | | Signature | Signature |
| 5. | | Signature | Signature |

**Point Investments, Ltd. (In Liquidation)**

Special proxy of ……………………………………………………………………………………………… (name of creditor)

**The below certificate should only be signed where a person other than a creditor filling up the above proxy**

I, ………………………………………………………………………………………………………………………….. *(name)*

of …………………………………………………………………………………………………………………….*(address)*

being a *(See Note 3)* …………………………………………………………………………………………………….

hereby certify that all insertions in the above proxy are in my own handwriting and have been made by me at the request of the above-named creditor and in his presence before he attached his signature (or mark) thereto.


Signature …………………………………………………………………………………

Name ………………………………………………………………………………

Date …………………………………………………………………………………..

Contact details (including email address) …………………………………………..

…………………………………………………………………………………………..

---

SPECIAL PROXY NOTES:

1.  The Chairman of the meeting will either be one of the provisional liquidators or a representative of the provisional liquidators. If you wish to appoint a person other than the Chairman of the meeting as your proxy, delete the words, "the Chairman of the meeting" and enter the name of the person to be appointed. That person may be such other person as the creditor may approve. The proxy form when signed must be lodged by the time and at the address (or email address) named for that purpose in the notice convening the meeting at which it is to be used. A creditor may give a special proxy to any person to vote at any specified meeting or adjournment thereof on all or any of the following matters:

    a.  for or against the appointment of any nominated liquidator or the continuance of the Joint Provisional Liquidators as liquidators of the Company;

    b.  for or against the appointment of the Committee of Inspection and any specified person as member of the Committee of Inspection, if applicable;

    c.  on all questions relating to any matter, other than those above referred to, arising at specified meeting or adjournment thereof.

2.  If a firm, sign the firm's trading title, add "A,B., a partner in the said firm". If the appointer is a corporation, then the form of proxy must be under its common seal or under the hand of some officer duly authorized in that behalf, and the fact that he is so authorized must be stated thus:-

    > For and on behalf of (Your Company Name)
    > J.S. (duly authorized under the seal of the company)

3.  Here state whether clerk or manager in the regular employment of the creditor or the attorney employed by him in connection with the matter or a commissioner to administer oaths in the Supreme Court.

## POINT INVESTMENTS, LTD. (IN LIQUIDATION)

### A summary of the Statement of Affairs as of 30 June 2021

| Assets (Estimated Realizable Value) | (USD) |
|---|---|
| Private Equity Investments | 1,252,572,999 |
| Redemption Received in Advance | 1,338,813,212 |
| Direct Investments | 513,056,659 |
| Investments, Cash and Derivatives | 127,305,506 |
| Withheld Cash Distributions | 23,652,211 |
| Loans and Accrued Interest | 8,484,255 |
| Cash | 1,225,484 |
| Dividends and Interest Receivable | 397,325 |
| Total Assets | 3,265,507,651 |
| | |
| Liabilities | |
| | |
| Unmet Capital Calls | 6,005,556 |
| Attorneys' fees | 338,403 |
| Directors' fees | 263,125 |
| Reimbursements | 139,270 |
| Other service providers | 101,067 |
| Total Liabilities | 6,847,421 |
| | |
| Net Estimated Realizable Assets | 3,258,660,230 |

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 15 |
| POINT INVESTMENTS, LTD. (IN LIQUIDATION),[1] | Case No. 22-10261 (TMH) |
| Debtor in Foreign Proceedings. |  |

## DECLARATION OF JAYSON WOOD IN SUPPORT OF FOREIGN REPRESENTATIVES' REPLY IN FURTHER SUPPORT OF MOTION FOR ENTRY OF AN ORDER ENFORCING THE AUTOMATIC STAY AND FOR DAMAGES

I, Jayson Wood, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States that the following is true and correct:

1.      I am an attorney duly admitted to practice in Bermuda and I am a Partner at Harneys (Bermuda) Limited, a Bermuda legal practice located at Rose Cottage, 18 Parliament Street, Hamilton HM 12, Bermuda. I am serving as Bermuda counsel to Andrew Childe and Richard Lewis of FFP Limited, and Mathew Clingerman of Kroll Bermuda Ltd. (collectively, the "Liquidators" or "Foreign Representatives"), in their capacity as the foreign representatives of Point Investments, Ltd. (the "Debtor") in respect of the winding-up proceedings commenced pursuant to section 161(g) of the Bermuda Companies Act 1981 (As amended) and the Companies (Winding Up) Rules 1982, and pending before the Supreme Court of Bermuda (the "Bermuda Court"), Commercial Court, Case 2020: No. 300 (the "Bermuda Proceeding").

2.      This declaration (the "Declaration") includes statements of my view of Bermuda and Cayman Islands law or statements of fact. Where the matters stated in this Declaration are

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is located at Chancery Hall, 1st Floor, 52 Reid Street, Hamilton HM 12, Bermuda.

1

statements regarding Bermuda or Cayman Islands law, such statements represent my view of Bermuda and Cayman Islands law based on my experience practicing in these jurisdictions. Where the matters stated in this Declaration are statements of fact that are within my personal knowledge, they are true. Where the matters stated in this Declaration that are statements of fact are not within my personal knowledge, they are derived, as appropriate, from documents maintained by the Registrars of Companies of Bermuda and the Cayman Islands, from the records maintained by me as a result of advising the Debtor in connection with the Bermuda Proceeding, and/or from information supplied to me by or on behalf of the Debtor and are true to the best of my knowledge, information, and belief. I am over 18 years of age, and if I were called upon to testify, I could and would testify competently to the facts set forth herein.

3.      I submit this Declaration in support of the *Foreign Representative's Reply in Further Support of Motion for Entry of an Order Enforcing the Automatic Stay and for Damages* (the "Reply")[2] filed contemporaneously herewith. For a background of my credentials and experience please refer to the *Declaration of Jayson Wood in Support of Foreign Representatives' Objection to Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination That There is No Automatic Stay, or in the Alternative, Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding* [D.I. 68].

4.      Bermuda law does not mandate any deadline by which the Liquidators are required to commence or complete the proof of debt process. Under Bermuda law, any applicable statute of limitations period on a creditors claim is suspended with respect to claims lodged through the proof of debt process. In my experience, the proof of debt process is typically commenced towards

---

[2] Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Reply.

AP1875

the end of a debtor's liquidation, and the process may begin months or years after a winding up order is entered.

5.      In my view, the procedures in a Bermuda winding up proceeding for filing proofs of debt do not create additional burdens for foreign creditors. Foreign creditors have the same status, the same rights, same protections, and are subject to the same procedures as domestic creditors with respect to lodging proofs of debt.

6.      Under Cayman law, there is a six-year statute of limitations for the General Partner to assert claims under the LPA.

AP1876

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this 5th day of May 2023 in
Hamilton, Bermuda

Jayson Wood

4

AP1877

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| POINT INVESTMENTS, LTD.<br>(IN LIQUIDATION),[1] | Case No. 22-10261 (TMH) |
| | **Re: D.I. 53 & 65** |
| Debtor in a Foreign Proceeding. | |

## FOREIGN REPRESENTATIVES' REPLY IN FURTHER SUPPORT OF MOTION FOR ENTRY OF AN ORDER TO CONDUCT DISCOVERY PURSUANT TO 11 U.S.C. § 1521(a)(4), FED. R. BANKR. P. 2004, AND LOCAL RULE 2004-1

Andrew Childe and Richard Lewis of FFP Limited, and Mathew Clingerman of Kroll Bermuda Ltd. (the "Foreign Representatives"), in their capacity as the joint liquidators and foreign representatives of Point Investments, Ltd. (the "Debtor") in respect of the winding up proceeding pending before the Supreme Court of Bermuda, Commercial Court, Case 2020: No. 300 (the "Bermuda Proceeding"), by and through undersigned counsel, respectfully submit this reply to the *Objection of FTI GP I, LLC on Behalf of Falcata Tech Investments Fund to Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1* [D.I. 65] (the "Objection") and in further support of the *[SEALED] Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1* [D.I. 53] (the "Motion"),[2] and respectfully state as follows:

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Motion.

AP1878

## <u>REPLY</u>

I.     **If The Automatic Stay Applies, Then The Foreign Representatives' Discovery Motion Must Be Granted**

1.     The General Partner does not dispute that the Recognition Order, section 1521(a)(4) of the Bankruptcy Code, and Rule 2004 entitle the Foreign Representatives to broad discovery regarding the Debtor's assets. Nor does the General Partner dispute that the Foreign Representatives' discovery requests fall within the scope of Rule 2004. Rather, the Objection rests solely on the argument that Rule 2004 discovery is procedurally improper because of the pending proceeding rule. *See* Obj. ¶¶ 18-24.

2.     By not raising any objection other than the pending proceeding rule, the General Partner has conceded that the Foreign Representatives are entitled to Rule 2004 discovery if the Adversary Proceeding is not permitted to continue. In other words, if the Court rules that the automatic stay applies and should not be modified, there can be no dispute that Rule 2004 discovery is appropriate because the Adversary Proceeding would be void *ab initio*. Mot. ¶ 32. And if the Adversary Proceeding is void, there is no pending proceeding.

3.     The Rule 2004 requests are also appropriate because they indisputably seek information about Falcata and the General Partner that would assist the Foreign Representatives in potentially bringing claims and recovering assets for the benefit of the Debtor's stakeholders— which are some of the key purposes for which the Foreign Representatives were appointed as Joint Liquidators.  *See Krys v. Paul, Weiss, Rifkind, Wharton & Garrison, LLP* (*In re China Med. Techs., Inc.*), 539 B.R. 643, 649 (S.D.N.Y. 2015) ("[O]ne of the main purposes of Chapter 15 is to assist a foreign representative in the administration of the foreign estate, and Rule 2004 proceedings are one of the mechanisms by which bankruptcy courts provide such assistance.") (internal quotation marks and citations omitted). For example, regardless of whether there was a breach under the

AP1879

LPA or MTA (which the General Partner claims is in the magnitude of $625,000 for payment of fees), the Foreign Representatives are still entitled to a distribution from the Fund upon the sale of the Fund's underlying Investment, and the sale price of that Investment will exceed $625,000 by several orders of magnitude. Due to the Falcata Parties' resistance to discovery, the Foreign Representatives have not been able to evaluate what the likely sale price of the Investment would be or what distribution they should expect. Additionally, the Foreign Representatives have been hindered in investigating whether the purported notice of default was properly issued and whether there are potential claims against any of the Falcata Parties (*e.g.*, for breach of fiduciary duty). Each of these lines of inquiry are properly within the scope of Rule 2004, and they were therefore included within the Discovery Requests.

4. Here, Rule 2004 discovery would be particularly appropriate because the General Partner has alleged that the Bermuda Court does not have jurisdiction over it, likely making it difficult for the Foreign Representatives to obtain discovery against it in Bermuda. *See generally In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 471 B.R. 342, 347 (Bankr. S.D.N.Y. 2012) ("[O]ne of the main purposes of chapter 15 is to assist a foreign representative in the administration of the foreign estate . . . which would militate in favor of granting a foreign representative broad discovery rights using the full scope of Rule 2004."); *see also In re Platinum Partners Value Arbitrage Fund L.P.,* No. 18CV5176 (DLC), 2018 WL 3207119, at *6 (S.D.N.Y. June 29, 2018) (denying motion to stay chapter 15 discovery and analogizing to 28 U.S.C. § 1782, which permits discovery against third-parties located in the United States in aid of foreign litigation). Thus, Rule 2004 discovery provides the Foreign Representatives with the exact assistance that section 1521(a)(4) was designed to facilitate by allowing the Foreign Representatives to take discovery in the United States to aid their liquidation efforts in Bermuda.

AP1880

## II.  Even If The Adversary Proceeding Is Permitted To Proceed (Which It Should Not), The Court Has Discretion To Grant The Foreign Representatives' Discovery Motion

5.      Even if the Adversary Proceeding is permitted to go forward, the Foreign Representatives maintain that the pending proceeding rule should not apply. Whether to apply the pending proceeding rule is within the discretion of the Bankruptcy Court. *See* FED. R. BANKR. P. 2004(a) ("On motion of any party in interest, the court *may* order the examination . . .") (emphasis added); s*ee also In re Camferdam*, 597 B.R. 170, 174 (Bankr. N.D. Fla. 2018) (holding that "[a]pplying the pending proceeding rule is discretionary and not mandatory," and allowing Rule 2004 discovery commenced prior to the filing of an adversary case to proceed); *In re Millenium Lab Holdings II, LLC*, 562 B.R. 614, 628 ("[A]n aggressive application of the pending proceeding rule may prevent legitimate Rule 2004 examinations . . . .") (internal quotation marks omitted).

6.      Here, the Bankruptcy Court should decline to apply the pending proceeding rule in light of the Falcata Parties' conduct, including their continual delays. Indeed, the Motion was filed after more than a year of the Foreign Representatives' attempts to obtain information from the Falcata Parties informally. The Discovery Requests were served only after such informal discovery proved fruitless, and the purpose of the Discovery Requests was to learn about the Debtor's assets, not to assist with the Adversary Proceeding (which was not yet pending). To comply with Local Rule 2004-1(a), undersigned counsel sent counsel to the Falcata Parties the Discovery Requests on December 9, 2022, instead of filing a formal Rule 2004 motion.

7.      As set forth in more detail in the Motion, over the course of the next twelve weeks, the Falcata Parties feigned that they would work cooperatively with the Foreign Representatives to respond to the Discovery Requests. Indeed, after a series of meet and confers, including one on February 27, 2023, the Falcata Parties agreed to propose search terms, consider custodians, enter into an ESI protocol, and respond to the Discovery Requests on a request-by-request basis by

4

March 3, 2023. These representations made by the Falcata Parties were the primary reason why the Foreign Representatives did not file a motion to compel an examination. Then, on March 3, 2023 (*i.e.*, the very same day the Foreign Representatives were expecting a fulsome discovery response), the General Partner, on behalf of Falcata, filed the Adversary Complaint initiating the Adversary Proceeding.  Since that time, the Falcata Parties have not produced a single document, nor have they abided by their prior commitment to propose search terms, enter into an ESI protocol, and respond to the Discovery Requests on a request-by-request basis.

8.      Given that the Falcata Parties have now been in receipt of informal discovery requests for more than a year, formalized discovery requests for nearly five months, and a motion for discovery for almost two months, the time for production is <u>now</u>, particularly if the Court anticipates taking under advisement the parties' motions concerning the automatic stay.  Stated simply, the Foreign Representatives should not have to start from scratch in an adversary proceeding given the Falcata Parties' already lengthy delays.

9.      Lastly, the Falcata Parties appear to take the position that *all* the discovery requests are relevant to the subject of the Adversary Proceeding. *See* Obj. at 29 ("Contrary to the Debtor's assertion, every Rule 2004 Discovery Request relates to the Fund Agreements: the default thereunder; the disputed results of such default – legally and monetarily; communication around such default; and the relationship and rights of the Parties."); Obj. ¶ 30 ("The information sought in the Motion overlaps entirely with the Adversary Proceeding …."). As such, even if the Court denies the Motion and permits the Adversary Proceeding to go forward, it should be without prejudice to the Foreign Representatives seeking the information contained in the 2004 requests through discovery in the Adversary Proceeding under the Federal Rules of Civil Procedure. By the

AP1882

General Partner's own admissions, such information sought is central to the dispute between the parties.[3]

## **CONCLUSION**

For these reasons, the Foreign Representatives respectfully request that the Court grant the Motion.

*[Remainder of Page Intentionally Left Blank]*

---

[3] Likewise, any denial of the Motion should be without prejudice to the Foreign Representatives' ability to reissue discovery under Rule 2004 and section 1521(a)(4) to the extent the Falcata Parties later claim—contrary to the suggestion in their Objection—that the discovery sought by the Foreign Representatives is beyond the scope of permissible discovery in the Adversary Proceeding.

AP1883

Dated: May 9, 2023
     Wilmington, Delaware

Respectfully submitted,

/s/ Stephen J. Astringer
**KOBRE & KIM LLP**
Jacob R. Kirkham (No. 5768)
Stephen J. Astringer (No. 6375)
600 North King Street, Suite 501
Wilmington, Delaware 19801
Telephone: (302) 518-6451
Facsimile: (302) 518-6461
jacob.kirkham@kobrekim.com
stephen.astringer@kobrekim.com

-and-

Adriana Riviere-Badell (admitted *pro hac vice*)
Evelyn Baltodano Sheehan (admitted *pro hac vice*)
201 South Biscayne Boulevard, Suite 1900
Miami, Florida 33131
Telephone: (305) 967-6100
Facsimile: (305) 967-6120
adriana.riviere-badell@kobrekim.com
evelyn.sheehan@kobrekim.com

-and-

Adam M. Lavine (admitted *pro hac vice*)
John G. Conte (*pro hac vice* pending)
800 Third Avenue
New York, New York 10022
Telephone: (212) 380-2580
Facsimile: (212) 488-1220
Adam.lavine@kobrekim.com
John.conte@kobrekim.com
*Counsel to the Foreign Representatives*

AP1884

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| **POINT INVESTMENTS, LTD.** **(IN LIQUIDATION),** | **Case No. 22-10261 (TMH)** |
| Debtor in a Foreign Proceeding.[1] | Re: D.I. 47 & 66 |

### REPLY OF FTI GP I, LLC ON BEHALF OF FALCATA TECH INVESTMENT FUND I, L.P. IN SUPPORT OF MOTION FOR DETERMINATION THAT THERE IS NO AUTOMATIC STAY, OR IN THE ALTERNATIVE SEEKING RELIEF FROM THE AUTOMATIC STAY TO PROCEED WITH ADVERSARY PROCEEDING

FTI GP I, LLC, a Delaware limited liability company (the "General Partner"), on behalf of Falcata Tech Investment Fund I, L.P. (the "Fund"), a Cayman Islands exempted limited partnership, by and through its undersigned counsel, respectfully submits this reply (the "Reply") in support of the *Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination That There Is No Automatic Stay, or in the Alternative Seeking Relief from the Automatic Stay to Proceed With Adversary Proceeding* [ECF No. 47] (the "Motion"), and in response to the *Foreign Representatives' Objection to Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination That There Is No Automatic Stay, or in the Alternative Seeking Relief From the Automatic Stay to Proceed with Adversary Proceeding* [ECF No. 66] (the "Objection").[2]  In support of the Reply, the General Partner submits the (i) *Declaration of Christopher Levers* (the "Levers Declaration"), and (ii) *Declaration of Nicholas*

---

[1] Point Investments, Ltd. (the "Debtor") is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769.  The Debtor's registered office is located at c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

*Miles* (the "Miles Declaration"). In further support of the Reply, the General Partner states as follows:

## PRELIMINARY STATEMENT

1.     The Motion should be determined as a matter of blackletter law. In its Objection, the Debtor twists itself into knots trying to re-write the clear statutory language of section 1520(a)(1), as well as years of bankruptcy common law, to create a new and amorphous automatic stay that is broader than the automatic stay under section 362 of the Bankruptcy Code. This Court should not follow such attempts to contort the statutory language of section 1520(a)(1). Rather, if section 1520 applies to the Debtor in this case, then this Court must follow its plain and unambiguous statutory text, and not the self-serving, conclusory statements argued in the Debtor's Objection. The law on a court's role in interpreting and applying section 1520(a)(1) is clear: in interpreting the meaning of section 1520(a)(1), courts are bound by the plain language and meaning of the statute. Therefore, it is bound by the express language of section 1520(a)(1) that states: "[u]pon recognition of a foreign proceeding . . . section[ ] 362 appl[ies] with respect to the debtor." Notably, section 1520(a)(1) does not state that only certain parts of section 362 apply with respect to the debtor, or that only the parts of section 362 that are "cherry picked" by the debtor are to apply. In sum, under section 1520(a)(1), section 362 applies *in its entirety*, including all of its applications and interpretations, such as the long established "home court" rule that allows adversary proceedings to be commenced and proceed without violating the automatic stay.

2.     Accordingly, because the General Partner commenced the Adversary Proceeding in *this* Court, as part of *this* case, the section 362 automatic stay, as applied to the Debtor *via* section 1520, does not stay the Adversary Proceeding. In fact, the General Partner commenced the Adversary Proceeding in *this* Court, rather than in the Southern District of Texas, which, but for the filing of the Chapter 15 Petition, would have been a permitted jurisdiction to commence an

AP1886

action against the Debtor under the Limited Partnership Agreement, because there is no stay of adversary proceedings and contested matters in *this* case. The Debtor's arguments to the contrary are decisively incongruous with the practice and case law in this district as well as other jurisdictions. In fact, the Debtor's arguments would render this case, and all chapter 15 cases, unilateral proceedings by staying all creditors and interested parties from commencing any contested matters or even objecting to applications or proceedings filed by the Debtor.

3. Moreover, if the General Partner had commenced an action in connection with the Default in Texas in accordance with the terms of the Fund Agreements, then relief from any automatic stay may have been necessary, and that would likely have triggered a severe prejudice to the General Partner due to a resulting Delaware statute of limitations bar on the relief sought in the Adversary Proceeding. However, that is not what happened here. Here, the General Partner commenced the Adversary Proceeding in the Debtor's "home court," *i.e.*, <u>*this*</u> Court. Such an action is clearly not a violation of section 362, as applied to the Debtor *via* section 1520, pursuant to the overwhelming authority in this Court and elsewhere.

4. Finally, even assuming *arguendo*, the Court finds that the Adversary Proceeding is stayed under sections 362 and 1520, which the General Partner disputes, any automatic stay should be modified to allow the Adversary Proceeding to proceed through adjudication of the General Partner's claims. Otherwise, the General Partner and the Fund would be severely prejudiced for several reasons. First, if any automatic stay, to the extent it exists, is not modified to allow the Adversary Proceeding to continue, there will be no forum for the General Partner's claims to be adjudicated because the General Partner and the Fund are not subject to jurisdiction in Bermuda,

AP1887

and for nearly three years the Debtor has not even begun a claims adjudication process in the Bermuda Proceeding.

5.      Second, if any automatic stay, to the extent it exists, is not modified to permit the continuation of the Adversary Proceeding, the General Partner and the Fund would likely be time barred from asserting its claims due to the upcoming expiration of the Delaware statute of limitations period in connection with the Defaults.

6.      Third, there is currently a statutory stay of the commencement of any action or proceeding against the Debtor in Bermuda, which, together with the lack of a claims adjudication process in the Bermuda Proceeding, prohibits the General Partner's claims from being asserted and adjudicated for dividend purposes in Bermuda.

7.      The Debtor, in comparison, will face no prejudice or hardship, or nominal at the most, if the Adversary Proceeding is allowed to proceed through adjudication of the General Partner's claims.  There are minimal costs and expenses to the Debtor, if any at all, by allowing the General Partner, to merely assert a claim for adjudication, which does not rise to the "great prejudice" to the Debtor that is necessary to find that the Debtor is prejudiced by a modification of any automatic stay such that the stay should not be modified under applicable law.  This lack of prejudice is made even more obvious when the Debtor argues in its Objection that it "has viable counterclaims against the General Partner." *See* Objection ¶ 37.  Obviously, if the Debtor has "counterclaims", the Adversary Proceeding must proceed unless the Debtor's incongruous view that only it can make applications and commence contested proceedings in this Court and no one

-4-

can object is somehow the new "law", *i.e.*, basic due process is completely suspended in chapter 15 cases.

## ARGUMENT

**A.**     **The Text of Section 1520 Permits the Filing of the Adversary Proceeding Against the Debtor in This Court Without Stay Relief**

8.     The Debtor's Objection asserts that, upon recognition of the Bermuda Proceeding, "the protections of the automatic stay went into effect at that time pursuant to section 1520 of the Bankruptcy Code." *See* Objection, ¶ 7.  While the Debtor is factually correct that, pursuant to section 1520, upon recognition of the Bermuda Proceeding, certain stay protections went into effect, the Debtor fails to accurately cite the statutory language of section 1520, which sets forth the parameters, attributes and applications of such stay protections.  Thus, because the automatic stay *pursuant to section 1520 of the Bankruptcy Code* went into effect upon recognition of the Bermuda Proceeding, this Court must read and analyze the express terms of section 1520, rather than the Debtor's incomplete, misleading and conclusory statements in its Objection.

9.     Section 1520(a)(1) of the Bankruptcy Code explicitly provides, in relevant part, that "[u]pon recognition of a foreign proceeding that is a foreign main proceeding . . . **section[ ]** . . . **362 appl[ies]** with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States." *See* 11 U.S.C.§ 1520(a)(1) (emphasis added).[3]  Accordingly, section 1520(a)(1) expressly provides that section 362 applies with respect to a debtor, such as the Debtor, in a foreign proceeding that has been recognized by a court in the United States, such as

---

[3] The Recognition Order provides that "[a]ll relief protections afforded to foreign main proceedings under section 1520 of the Bankruptcy Code is hereby granted to the Bermuda Proceeding, the Debtor, the Debtor's property located within the United States and the foreign representatives, as applicable." *See* Recognition Order ¶ 5.  Accordingly, pursuant to the terms of the Recognition Order, section 362 of the Bankruptcy Code applies to the Debtor and the Debtor's property located in the United States.

AP1889

the Bermuda Proceeding.[4]  Instead, the Debtor's Objection attempts to circumvent the text of section 1520 by omitting the portion of the statute that explicitly applies section 362 with respect to the Debtor.  Rather than recognize the statutory language of section 1520, the Debtor merely states that the "automatic stay went into effect."

10.     This Court cannot, as the Debtor attempts to do, overlook the text of section 1520(a)(1) because in interpreting the meaning of section 1520(a)(1), courts are bound by the plain language and meaning of the statute.  *See, e.g., In re JSC BTA Bank*, 434 B.R. 334, 340 (Bankr. S.D.N.Y. 2010) ("In interpreting the meaning of section 1520(a)(1), the Court is bound by the plain meaning of the statute"); *see also In re Fairfield Sentry Ltd.*, 452 B.R. 52, 57 (Bankr. S.D.N.Y. 2011) (finding that, in connection with the provisions of chapter 15 of the Bankruptcy Code, where the language of the relevant statute is plain and unambiguous, the sole function of the courts is to enforce it according to its terms); *U.S. v. Ron Pair Enter., Inc.*, 489 U.S. 235, 241 (1989) ("[W]here . . . the statute's language is plain, the sole function of the courts is to enforce it according to its terms").  Accordingly, this Court must follow and apply the plain text of section 1520(a)(1) that explicitly and unambiguously applies *all* of section 362 with respect to the Debtor.

11.     As the provisions of section 1520 expressly provide that section 362 applies with respect to the Debtor, this Court must follow its own clear precedent concerning section 362 in connection with the commencement of adversary proceedings.  This Court, and courts elsewhere, have routinely found that the Bankruptcy Code permits the filing of an adversary proceeding in the bankruptcy court against a debtor without violating the automatic stay.  *See, e.g., Allied Dev.*

---

[4] While the Debtor argues in the Objection that the protections of the automatic stay under section 1520 apply not only to the Debtor's property located within the territorial jurisdiction of the United States but to the Debtor itself, *see* Objection, ¶ 8, there is authority that provides that the stay under section 1520 applies *only* to the property of a debtor that is located within the United States.  For example, in *In re Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96 (Bankr. S.D.N.Y. 2012), the court held that the section 1520(a)(1) stay applies to "property of the debtor that is within the United States."  *See Cozumel Caribe*, 482 B.R. at 111 n.12.

AP1890

*of Ala. LLC v. Forever 21, Inc., et al. (In re Forever 21, Inc.*), 623 B.R. 53, 62-63 (Bankr. D. Del. 2020) (concluding that creditor's claims in subject adversary proceeding against debtor that arose out of a contract involving debtor were not barred by the automatic stay); *Charan Trading Corp. et al. v. Uni-Marts, LLC et al.* (*In re Uni-Marts, LLC*), 399 B.R. 400, 418 (Bankr. D. Del. 2009) (agreeing with reasoning of the majority of courts to address the issue that filing an adversary proceeding against a debtor in its bankruptcy case does not violate the automatic stay); *Sharf v. BC Liquidating*, LLC, No. 14–cv–7320, 2015 WL 5093097, at *4 (E.D.N.Y. Aug. 28, 2015) ("Under this 'home court' rule, courts have refused to find a violation of § 362 [if an action to assert a prepetition claim is commenced in the bankruptcy court where the debtor's bankruptcy case is pending] because application of the automatic stay to litigation in the bankruptcy court where the debtor's case is pending does not serve any of the purposes underlying the automatic stay."); *Maxwell Real Estate Inv., LLC, et al. v. Liberty Asset Mgmt. Corp. (In re Liberty Asset Mgmt. Corp.),* No. CC–16–1273, 2017 WL 1100586, at *5 (B.A.P. 9th Cir. Mar. 21, 2017) (agreeing with the bankruptcy court that the automatic stay does not preclude creditors from asserting their claims in either the main bankruptcy case or an adversary proceeding); *Civic Ctr. Square, Inc. v. Ford et al. (In re Roxford Foods, Inc.)*, 12 F.3d 875, 878 (9th Cir. 1993) ("[T]he automatic stay [is] inapplicable to a suit commenced in the same court where the bankruptcy was pending"); *Prewitt v. North Coat Vill., Ltd. (In re North Coast Vill, Ltd.)*, 135 B.R. 641, 643 (B.A.P. 9th Cir. 1992) ("[T]he stay does not apply to proceedings commenced against the debtor in the bankruptcy court where the debtor's bankruptcy is pending . . . the application of the stay to proceedings against the debtor in the home bankruptcy court would be illogical and would not serve the purposes underlying the automatic stay"); *Lighthouse Bluffs Corp. v. Arteus Enter., Ltd. (In re Atreus Enter., Ltd.)*, 120 B.R. 341 (Bankr. S.D.N.Y.1990) (finding that the subject adversary

-7-

AP1891

proceeding against the debtor was not enjoined under 11 U.S.C. § 362 from proceeding in the bankruptcy court).[5]

12.     In the Objection, the Debtor states that "the . . . 'home court' rule . . . simply does not apply in Chapter 15 cases." *See* Objection, ¶ 13.  The Debtor provides no support for this assertion, and nor can it because the "home court" rule does not distinguish between chapter 15 cases and cases under other chapters of the Bankruptcy Code.  Rather, the "home court" rule applies to the automatic stay under section 362, which, as the plain text of section 1520 and the Recognition Order provide, applies with respect to the Debtor in this Chapter 15 Case.  Further, the Debtor's Objection fails to contend with the long line of cases addressing section 362 that have continuously found that an adversary proceeding against a debtor commenced in the same court where such debtor's bankruptcy is pending is <u>not</u> a violation of the automatic stay.  If the Debtor wishes for section 362 to apply, then it must adhere to the "home court" rule that the vast majority of courts follow, including this Court.  Courts have explicitly stated that "[u]nder section 1520, section 362 of the Code applies *in its entirety.*"  *See In re Creative Fin. Ltd*., 543 B.R. 498, 523 (Bankr. S.D.N.Y. 2016) (emphasis added).  Accordingly, the Debtor cannot "cherry pick" portions of section 362, seek to have it both ways,[6] and use the stay as both a sword and a shield.  *See*

---

[5] While the Debtor states in the Objection that the General Partner cites no cases where a bankruptcy court has applied the home court rule to permit an adversary proceeding in a chapter 15 case, the General Partner notes that numerous other courts have permitted adversary proceedings to be filed against a debtor in chapter 15 cases*.  See, e.g.*, *Col. Bankers Life Ins. Co. v. PB Life and Annuity Co., Ltd*, Adv. Pro. No. 22-01149 (Bankr S.D.N.Y. 2022); *Wolverine Energy and Infrastructure Inc. v. ENT Capital Corp.*, Adv. Proc. No. 20-3455 (Bankr. S.D. Tex. 2020); *Girobank, N.V et al., v. Trade Fin. Tr. et al.*, Adv. Proc. No. 20-01321 (Bankr. S.D.N.Y. 2020); *Volo Logistics, LLC et al. v. Varig Logistica, S.A.*, Adv. Proc. No. 20-01243 (Bankr. S.D. Fla. 2020); *Aircraft Engine Lease Fin., Inc.  v. Alitalia Societa Aerea Italiana S.P.A. in extraordinary admin.*, Adv. Proc. No. 18-01578, (Bankr. S.D.N.Y. 2018); *Dohrn v. Sanjel (USA), Inc.*, Adv. Proc. No. 16-05043 (Bankr. W.D. Tex. 2016); *Pelton et al., v. Sanjel (USA), Inc.*, Adv. Proc. No. 16-05029 (Bankr. W.D. Tex. 2016); *CT Inv. Mgmt. Co., LLC v. Cozumel Caribe, S.A. de C.V.* Adv. Proc. No. 11-02936 (Bankr. S.D.N.Y. 2011); *Hoak et al., v. Rock Well Petroleum, Inc.*, Adv. Pro. No. 09-02014 (Bankr. D. Wy. 2009).

[6] The strikingly illogical nature of the Debtor's Objection is highlighted by its unsubstantiated argument that "the Debtor has viable *counterclaims* against the General Partner".  S*ee* Objection at ¶ 37 (emphasis added).  In short, the Debtor seems to believe that it is permitted to bring counterclaims in this Court in the Adversary Proceeding, but the

*Winters By and Through McMahon v. George Mason Bank,* 94 F.3d 130, 136 (4th Cir. 1996) ("Section 362 is a shield, not a sword"); *see also In re Cracked Egg, LLC*, 624 B.R. 84, 88-89 (Bankr. W.D. Pa. 2021) (observing that the automatic stay in bankruptcy is a shield and not a sword).

13.     Additionally, in the Objection, the Debtor states that "the 'home court' rule does not provide a basis for the General Partner's commencement of the Adversary Proceeding in violation of the automatic stay."  *See* Objection, ¶ 15.  By erroneously claiming that the well-established "home court" rule does not permit the commencement of the Adversary Proceeding against the Debtor in *this* Court, the Debtor appears to unilaterally seek to expand the limited automatic stay that applies to chapter 15 cases.  Courts have held that in a chapter 15 case, the section 1520 automatic stay is more limited than the stay in other chapters of the Bankruptcy Code. *See, e.g., JSC*, 434 B.R. at 345 (finding that, in the chapter 15 context, the bankruptcy court only possesses the power to stay a limited subset of actions against a debtor); *see also In re Pro-Fit Holdings Ltd.*, 391 B.R. 850 (Bankr. C. D. Cal. 2008) (holding that, unlike cases filed under other chapters of the Bankruptcy Code, the automatic stay of section 1520 applies in a limited manner). Because the automatic stay in a chapter 15 is more limited, it is completely illogical to argue, as the Debtor does, that the stay in this chapter 15 case is so broad and expansive that it does not have to follow the "home court" rule.  The "home court" rule applies to the more expansive automatic stay in a chapter 11 or a chapter 7 case, and therefore it must also apply to the much smaller and more limited automatic stay in the Chapter 15 Case.[7]

---

underlying claims of the General Partner are somehow stayed by section 362.  Such a result reveals the truly incongruous substance of the Debtor's arguments and would defy any logical principals of jurisprudence.

[7] As an aside, section 1509(b)(1) provides that upon the recognition of a foreign proceeding "the foreign representative has the capacity to . . . be sued in a court in the United States."  *See* 11 U.S.C. § 1509(b)(1).  Accordingly, because the foreign representative acts on behalf of a debtor in a chapter 15 case, it follows that a debtor, such as the Debtor, also has the capacity to be sued in a court in the United States, such as this Court.  *See, e.g., In re Ace Track Co., Ltd.*,

AP1893

14.     Moreover, the Debtor heavily relies, to its detriment, on the *JSC BTA Bank* case to argue that the Adversary Proceeding is barred by the automatic stay.  However, the applicable proceeding being stayed in *JSC* was an arbitration proceeding in Switzerland (far away from the relevant home court in New York), rather than an adversary proceeding commenced in the bankruptcy court where the subject chapter 15 case was pending, such as the Adversary Proceeding here.  Such a factual situation is fundamentally different than the Adversary Proceeding that is in this Court.  Accordingly, any rationale or discussion in *JSC* cannot, and should not, be applied here.  Rather, as clearly set forth in this Reply, well established case law in this District permits the filing of an adversary proceeding in the debtor's home court.  *See, e.g., Forever 21, Inc*., 623 B.R. at 62; *Uni-Marts, LLC*, 399 B.R. at 418.

15.     The Debtor also cites to *Armco Inc. et al. v. N. Atlantic Ins. Co. Ltd. (In re Bird)*, 229 B.R. 90, 95-96 (Bankr. S.D.N.Y. 1999), but solely to describe the rationale for permitting the "home court" rule in a chapter 7 or chapter 11 case.  *See* Objection, ¶ 15.  However, neither section 362 nor the cases addressing the "home court" rule make any distinction between a chapter 7 or a chapter 11 case and a chapter 15 case, and therefore the rationale stated in the *Bird* case for permitting the "home court" rule in a chapter 7 or a chapter 11 must also apply to a chapter 15 case.[8]

---

556 B.R. 887, 916 n.25 (Bankr. N.D. Ill. 2016) (finding that chapter 15 as a whole is drafted so as to have the foreign representative as the party with the right to seek relief on behalf of the debtor, which makes a foreign representative—at the very least—a sort of guardian ad litem of the debtor for purposes of the chapter 15 case).

[8] To the extent the Debtor seeks to rely on the *Bird* case in the future to argue that the underlying rationale for allowing actions to proceed against a debtor in its home court does not exist when a United States court is presiding over an ancillary proceeding, with the "home court" being the foreign main proceeding, *Bird* is not relevant because it applied the since-repealed section 304, rather than the provisions of chapter 15, such as section 1520(a)(1).  As provided herein, section 1520(a)(1), unlike former section 304, explicitly applies section 362 upon recognition of a foreign main proceeding, together with its applications and analyses conducted by numerous courts, with respect to a debtor, such as the Debtor.

AP1894

16.     Accordingly, any automatic stay that went into effect upon recognition of the Bermuda Proceeding pursuant to the plain text of section 1520 does not bar the Adversary Proceeding that was filed in this Court pursuant to the overwhelming authority of courts in this District, and in other districts as well.[9]

**B.     Even If the Stay Existed as to the Adversary Proceeding in This Court, the General Partner Has Made a *Prima Facie* Case That the Stay Should Be Lifted**

17.     The Debtor also argues that the General Partner has failed to submit evidence demonstrating why "cause" exists to lift the automatic stay, and therefore the Motion should be denied based on the lack of support and the General Partner's alleged failure to make out a *prima facie* case.  *See* Objection, ¶ 18.  However, there is no specific requirement, as the Debtor alleges in the Objection, that the movant must specifically attach documentation or a supporting declaration directly in connection with a motion for relief from stay that seeks similar relief as in the Motion to meet any burden on a motion to lift the stay.  Rather, to lift the stay, the movant must meet its burden of demonstrating "cause" under section 362(d)(1).  *See, e.g.*, *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 304 (Bankr. D. Del. 2011) ("The movant has the burden of proving . . . a prima facie case for cause . . . .").

18.     The Third Circuit has found that section 362(d)(1) does not define "cause," and therefore courts must consider what constitutes cause based on the totality of the circumstances in each particular case.  *See, e.g., In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997).  Here, the totality of the circumstances clearly favors lifting any automatic stay to permit the Adversary Proceeding to continue, to the extent such stay even exists.  The General Partner has demonstrated that, if the stay is not lifted to permit the Adversary Proceeding to continue, the General Partner will have no

---

[9] *See* fn 5, *supra*.

AP1895

forum to litigate its cause in connection with the Defaults due to (i) the absence of a claims adjudication process in the Bermuda Proceeding for nearly three years, (ii) the statutory stay against filing a suit in Bermuda, (iii) the upcoming expiration of the Delaware statute of limitations period in connection with the Defaults, and (iv) the fact that neither the General Partner, the Manager, nor the Fund are subject to, or can be forced to submit to, the jurisdiction of the Bermuda Court. Indeed, courts in the Third Circuit have found that the "totality of the circumstances" favors a lifting of the automatic stay when the non-debtor party will have no forum to litigate its cause of action if such party is denied relief from the automatic stay. *See, e.g., Wilson*, 116 F.3d at 90; *see also Matter of Highway Truck Drivers and Helpers Local Union*, 107, 98 B.R. 698, 705 (E.D. Pa. 1989) (affirming bankruptcy court's decision to lift the automatic stay because if the subject movant was denied relief from the automatic stay, then it would have no opportunity to continue to litigate and challenge a judgement).

19. Moreover, the General Partner has clearly provided more than sufficient evidence and has thus established the requisite "cause" through the detailed Complaint [ECF No. 45] (the "Complaint") that was filed in the Adversary Proceeding and the *Declaration of Robert Burnett in Support of Objection of FTI GP I, LLC on behalf of Falcata Tech Investment Fund I, L.P. to the Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and For Damages* [ECF No. 69, Exh. 1] (the "Burnett Declaration"). As thoroughly described in the Complaint and the Burnett Declaration, the Debtor defaulted on its obligations under the Fund Agreements by failing to pay the July Capital Contribution. *See* Complaint, ¶¶ 36-41; Burnett Declaration, ¶¶ 21-23. In fact, in the *Motion of the Foreign Representatives For Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(A)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1* [ECF No. 58] (the "2004 Motion"), the Debtor concedes that the Debtor defaulted on its

AP1896

obligations under the Fund Agreements by stating that "former management of the Debtor elected not to make a capital contribution to Falcata." *See* 2004 Motion, ¶ 2; *see also Declaration of Adam M. Lavine Pursuant to U.S.C. § 1746* [ECF No. 5, Exh. 1] (the "Lavine Declaration"), ¶ 27(5) ("[Point] has failed to meet the capital call in respect of at least one of the funds in which it is invested . . . ."). Courts in the Third Circuit have routinely found that the debtor's failure to make required payments under a pre-petition contract constitutes sufficient "cause" to lift the automatic stay. *See, e.g., In re Rambo*, No. 02–35226, 2004 WL 231011, at *3 (Bankr. E.D. Pa. Jan. 29, 2004) (finding that the creditor established "cause" for relief from the automatic stay by demonstrating evidence of the debtor's failure to make any payments on a pre-petition contract for almost three years); *In re Panas*, 63 B.R. 637, 638 (Bankr. E.D. Pa. 1986) (concluding that a default of payments under a contract that was entered into pre-petition constituted "cause" for relief from the stay under section 362(d)(1)).

20. Further, although the Debtor's Objection argues that the policies underlying the automatic stay weigh against granting relief from the stay for unsecured creditors, *see* Objection, ¶ 20, courts in the Third Circuit have found that the policies underlying section 362(d)(1) actually contemplate that an unsecured creditor may be granted relief from the automatic stay. *See In re Chatkin*, 465 B.R. 54, 59 (Bankr. W.D. Pa. 2012) (finding that relief from the automatic stay was potentially available to unsecured creditor, and the primary question was whether the particular facts of the case justified relief from stay); *see also In re U.S. Physicians, Inc.*, 236 B.R. 593, 605 (Bankr. E.D. Pa. 1999) (finding that relief from automatic stay is available to unsecured creditors under § 362(d)(1) if the "balance of hardships" tips in the unsecured creditors' favor). Thus, even though the General Partner's claim is not secured, the General Partner may be granted relief from any automatic stay, and the facts set forth in the Complaint and the Burnett Declaration, as well as

-13-

the balance of the hardships described below that clearly weigh in the General Partner's favor, show that sufficient "cause" exists to lift any automatic stay. *Id*.

21.      Accordingly, the General Partner has demonstrated more than sufficient evidence to make its *prima facie* case and demonstrate that sufficient "cause" exists to lift any automatic stay to permit the Adversary Proceeding to continue, to the extent such stay even exists as to the Adversary Proceeding, based on the totality of the circumstances.

**C.      The *Rexene* Factors Favor Lifting the Automatic Stay**

22.      As noted in the Motion, the General Partner has met each of the three-prongs under *Matter of Rexene Prod. Co.*, 141 B.R. 574 (Bankr. D. Del. 1992) ("*Rexene*"), to determine whether "cause" exists for granting relief from the stay to continue litigation.

**1.      The Debtor Will Not Suffer Any Great Prejudice if the Adversary Proceeding Continues in This Court**

23.      The Debtor alleges, without any evidence, that if the General Partner were allowed to proceed with the Adversary Proceeding against the Debtor ahead of other creditors, other parties would be more likely to file similar actions to adjudicate claims against the Debtor outside of Bermuda. *See* Objection, ¶ 22. However, the Debtor omits that, even though the Bermuda Proceeding has been pending for nearly three years, the Debtor, whether through its Foreign Representatives or otherwise, has not established a claims adjudication process for the Fund, the General Partner or the Manager to have its claim adjudicated for dividend purposes in the Bermuda Proceeding. Moreover, since the General Partner and all creditors have been denied the opportunity to have any claims adjudicated for dividend purposes in the Bermuda Proceeding, <u>and</u> the Debtor is seeking to prevent this Court from hearing any claims against the Debtor, the Debtor, which has been found by the Bermuda Court to have "in the region of US $1.8 billion" of "extremely valuable assets," *see* Lavine Decl., Exh. 1 at ¶ 5, has "over $3 billion in assets,"

-14-

according to the financial statements prepared by the Debtor, and never says it is insolvent, *see* Lavine Decl., Exh. 1 at ¶ 31, and lists $3,265,507,651 in total assets in the June 15th Letter (as defined herein), *see* June 15th Letter, p. 19, appears to be seeking to use this case and the Bermuda Proceeding in bad faith. Its purpose appears to be to frustrate all interested parties and creditors, including the Internal Revenue Service (the "IRS") who has filed Notices of Levies against the Debtor for $1,461,337,340.89, *see* Lavine Decl., Exh. 4, from asserting claims against the Debtor, so it can implement "the only legal mechanism by which the Petitioner [Spanish Steps Holdings Ltd. ("Spanish Steps")[10]], . . . can recover over US$3 billion of assets". *Id.* at ¶31.[11] Therefore, rather than the Debtor being prejudiced as it argues in its Objection, the Debtor is seeking to utilize this case and the Bermuda Proceeding to enable Spanish Steps to obtain the Debtor's assets of over $3 billion while the Debtor's creditors and interested parties are precluded from prosecuting and adjudicating their claims and thereby are the real prejudiced parties.

---

[10] The Liquidators/Foreign Representatives were selected by Spanish Steps, *see* Chapter 15 Petition, ¶ 17, which was the petitioner in the Bermuda Proceeding and is the owner of the Debtor.

[11] The IRS initially objected to the Debtor's *Motion to Shorten Time with Respect to Motion for Provisional Relief under Section 1519 of The Bankruptcy Code* [ECF No. 14] (the "IRS Objection"), on the grounds that, *inter alia*, the Tax Anti-Injunction Act applies to bankruptcy courts and provides that no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, and as such, the Tax Anti-Injunction Act should take precedence over section 1519(a). *See* IRS Objection, p. 2-3. After the IRS filed the IRS Objection, the IRS, through the United States Department of Justice, Tax Division (the "DOJ"), negotiated certain revisions to the proposed *Order Granting Provisional Relief Under Section 1519 of the Bankruptcy Code. See Notice of Filing of Agreed Revised Proposed Order Granting Provisional Relief Under Section 1519 of the Bankruptcy Code* [ECF No. 26], p. 2. Such revisions included, *inter alia*, (i) adding a provision stating that, prior to a decision on the Chapter 15 Petition, the Joint Provisional Liquidators would not direct the transfer of the Debtor's assets located within the territorial jurisdiction of the United States to a location outside the territorial jurisdiction of the United States, except after notice to the DOJ and approval from the Court, and (ii) adding language whereby the Joint Provisional liquidators represented that they did not seek enforcement of a provisional stay as to certain criminal or civil court proceedings pending before the United States Tax Court and the District Court for the Southern District of Texas, or of the civil asset forfeiture proceeding pending in the District Court for the District of Colorado. *See id.*, Exh. A. The *Order Granting Provisional Relief Under Section 1519 of the Bankruptcy Code* [ECF No. 27] (the "Provisional Relief Order") included the revisions negotiated with the DOJ/IRS. After the entry of the Provisional Relief Order, the IRS withdrew the IRS Objection upon the understanding with the Debtor's counsel that the substantive terms of the Provisional Relief Order would remain in effect, and that the IRS's withdrawal was without prejudice to the IRS's right to seek relief from the Provisional Relief Order if recognition of the Bermuda Proceeding was denied. *See United States' Withdrawal of Opposition* [ECF No. 31].

AP1899

24.     Specifically, the Debtor states that maintaining the automatic stay merely keeps the General Partner on an equal footing with the other creditors in the Bermuda Proceeding and promotes an efficient claims process by channeling claims to Bermuda.  *See* Objection, ¶ 24. However, the "equal footing" that the Debtor alludes to in the Objection in actuality is just the Debtor denying the General Partner and other creditors the opportunity to assert a claim against the Debtor for adjudication.  This argument is indicative of the Debtor's gamesmanship by camouflaging who is actually prejudiced if the Adversary Proceeding does not proceed, and alluding to a non-existent hardship in allowing creditors (like the General Partner who is not subject to jurisdiction in Bermuda) to seek adjudication of their claim and their rights in this Court. Instead, the real prejudice arises from the Debtor's arguments seeking to preserve the more than $3 billion in assets of the Debtor - presumably for its equity holder, Spanish Steps, rather than creditors.  Moreover, there are minimal costs and expenses to the Debtor, if any at all, by allowing a creditor, such as the General Partner, to merely assert a claim for adjudication, which does not rise to the "great prejudice" to the Debtor that courts in Delaware have found is necessary to tip the balancing of hardships described in *Rexene* in favor of a debtor.  *See, e.g., In re ABC Learning Centres Ltd.*, 445 B.R. 318, 337 (Bankr. D. Del. 2010) (finding that relief from stay did not result in "great prejudice" to the debtors because the costs in the subject litigation did not rise to "great prejudice").[12]

25.     Instead of prejudicing the Debtor, which claims that the Bermuda Proceeding was commenced because the Debtor's corporate purpose of serving as an investment vehicle for Spanish Steps had been frustrated,  *see* Chapter 15 Petition, ¶ 16, rather than due to insolvency,

---

[12] Additionally, the General Partner is only seeking to adjudicate its claims against the Debtor in the Adversary Proceeding, and courts in Delaware have found that such an action does not prejudice a debtor in considering whether to grant a relief from any automatic stay. *See Rexene*, 141 B.R. at 577.

-16-

the Debtor's arguments to impose a stay will only prejudice the General Partner and other creditors, and not the Debtor.

26.     In addition, the Debtor provides no support for its "floodgate concern" that it alludes to, because such a concern does not exist considering the Debtor only has three other assets in the United States, as disclosed by the Debtor in its Chapter 15 Petition.  According to the Debtor, its assets in the United States only consist of (i) a direct minority ownership interest in Solera Global Holding Corp., a Delaware corporation, (ii) a direct minority investment in Universal Computer Systems Holding, Inc., and (iii) an interest in a promissory note issued by Difficult LLC, a Delaware limited liability company, to the Debtor.  *See* Chapter 15 Petition, ¶ 31.  Moreover, the Debtor admits in the Chapter 15 Petition that the Debtor's overall assets are valued at over $1.6 billion.  *See id.*  Accordingly, this alleged "floodgate" of litigation outside of Bermuda by other creditors of the Debtor cannot and will not exist, and therefore the Debtor has not asserted any evidence that it will suffer any significant or great prejudice by allowing the Adversary Proceeding to continue in this Court  –  the same court where the Chapter 15 Case is pending.[13]

**2.     The Severe Hardship and Prejudice to the General Partner and the Fund by Maintaining the Stay Considerably Outweighs Any Minimal Hardship to the Debtor**

27.     The Debtor's Objection argues that the General Partner will suffer minimal, if any, hardship if the stay is maintained because the General Partner remains free to pursue its claims against the Debtor through the Debtor's winding up proceeding in Bermuda, and to that end, the Foreign Representatives "***will be*** noticing the deadline for creditors to file and prove proofs of

---

[13] The Debtor also states that courts in Bermuda have emphasized the importance of the automatic stay triggered under Section 167(4) of the Companies Act in channeling claims against a debtor into its winding up proceeding.  *See* Objection, ¶ 24.  However, Bermuda law has no relevance to the automatic stay under section 362 of the Bankruptcy Code.  Accordingly, this statement is merely another attempt by the Debtor to distract this Court from its blatant tactics to avoid and delay a claims adjudication process in Bermuda.

AP1901

debt." *See* Objection, ¶ 27. However, a stay of the Adversary Proceeding would severely prejudice the General Partner by depriving it, as well as the Fund, of a remedy for the Defaults under the Fund Agreements.

28.     At present, pursuant to section 167(4) of the Bermuda Companies Act 1981, there is currently a statutory stay of the commencement of any action or proceeding against the Debtor in Bermuda.

29.     Further, despite having been pending for nearly three years, creditors have lacked the opportunity to adjudicate a claim in the Bermuda Proceeding.[14]

30.     Thus, if the Adversary Proceeding was barred by the automatic stay, the General Partner would have no way to assert and adjudicate its claim arising out of the Debtor's defaults under the Fund Agreements due in large part to the Debtor's delays in commencing a claims adjudication process in the Bermuda Proceeding, as well as the policy in the United States against forcing a United States citizen, like the General Partner, to submit to jurisdiction in a foreign country. *See, e.g., In re PT Bakrie Telecom Tbk,* 628 B.R. 859, 879 (Bankr. S.D.N.Y. 2021*); see also In re Oi S.A.,* 587 B.R. 253, 268 (Bankr. S.D.N.Y. 2018).

31.     Additionally, as stated in the *Objection of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. to the Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and for Damages* [ECF No. 69] (the "Stay Enforcement Objection"), the applicable Delaware statute of limitations period in connection with the Debtor's defaults under

---

[14] In fact, the Debtor admits in the Objection that creditors have not even been noticed of the deadline for creditors to file and prove, for adjudication purposes, proofs of debt in the Bermuda Proceeding. *See* Objection, ¶ 27 ("[T]he Foreign Representatives *will be* noticing the deadline for creditors to file and prove proofs of debt") (emphasis added). Additionally, in the *Motion of the Foreign Representatives For Entry of an Order Enforcing the Automatic Stay and for Damages* [ECF No. 52] (the "Stay Enforcement Motion"), the Debtor states that, despite the Bermuda Proceeding having been pending for nearly three years, the Foreign Representatives merely *intend* to give notice to potential creditors, including the General Partner and the Fund, requesting they file proofs of debt in Bermuda, and that Foreign Representatives also merely *intend* to notice the deadlines for the claims adjudication process in this Chapter 15 Case. *See* Stay Enforcement Motion ¶ 24.

-18-

AP1902

the Fund Agreements is set to expire in July/August 2023,[15] and thus the General Partner is quickly running out of time to assert a claim for the Debtor's Defaults of the Fund Agreements, thus losing the remedy of asserting its rights in connection with the Defaults. Courts in Delaware have found that, when balancing the hardships to determine whether the stay should be lifted, great hardship will result to a non-debtor party if such party is not permitted to proceed with certain litigation, thus resulting in them losing a valuable remedy. *See, e.g., In re Levitz Furniture Inc.*, 267 B.R. 516, 523 (Bankr. D. Del. 2000).

32.     Accordingly, the severe hardship and prejudice to the General Partner if the automatic stay is not lifted (assuming *arguendo* there is any stay) to permit the Adversary Proceeding to continue significantly outweighs the minimal potential hardship the Debtor may face if the General Partner is merely permitted to assert its rights against the Debtor before the Delaware statute of limitations period expires.

**3.     The General Partner Has a High Probability of Prevailing on the Merits of the Adversary Proceeding**

33.     As an initial matter, the Debtor, in the Objection, vastly overstates the appropriate standard in Delaware for determining whether a creditor has a probability of prevailing on the merits and thus satisfying this prong of the *Rexene* factors. Courts in Delaware have routinely found that even a slight probability of success on the merits may be sufficient to support lifting the automatic stay in an appropriate case. *See, e.g., SCO Grp.*, 395 B.R. at 859; *ABC Learning Centres Ltd.*, 445 B.R. at 338; *Tribune Co.*, 418 B.R. at 129; *Levitz Furniture Inc.*, 267 B.R. at 523 ("[T]he Defendants have met the third prong, since that merely requires a showing that their claim is not

---

[15] Since the General Partner is not subject to jurisdiction in Bermuda and cannot be forced to submit to jurisdiction in Bermuda, any possible tolling of any statute of limitations in Bermuda, such as may exist under Bermuda common law when a winding up order is made, as well as the Bermuda Proceeding due to its delay of any claims adjudication process, cannot be relied upon by the General Partner for such a critical rule as a limitations period.

AP1903

frivolous"); *Rexene*, 141 B.R. at 578 (finding that the required showing for the third prong is very slight).

34.    Here, there is far more than a slight probability that the General Partner succeeds on the merits of its claims in the Adversary Proceeding because the Debtor has already admitted that it did not pay the July Capital Contribution, thus defaulting under the Fund Agreements, which is the basis for the General Partner's claims in the Adversary Proceeding.  Accordingly, following the correct standard for bankruptcy courts in Delaware, this factor clearly weighs in favor of lifting any automatic stay because, by the Debtor's own admission, there are no material facts in dispute in the Adversary Proceeding, and thus the General Partner will clearly prevail on the merits thereof.

>   **a.    *The Adversary Proceeding Is in Its Initial Stages But the Underlying Merits Are Not in Dispute and Demonstrate the General Partner's Strong Likelihood of Success***

35.    Even though the General Partner has already addressed the applicable legal standard and has demonstrated that under such standard, the General Partner has a high probability of prevailing on the merits, the General Partner will address the Debtor's misplaced arguments in the Objection.  First, the Debtor argues that it is simply too early in the Adversary Proceeding for this Court to determine that the General Partner has a strong likelihood of success on the merits. *See* Objection, ¶ 29.  The Debtor notes that there has been no motion practice to test the sufficiency of the Adversary Complaint, discovery has not been conducted, and the Adversary Proceeding is nowhere near trial.  *See id.*  While the Adversary Proceeding is still early in its procedural stages due, in part, to the Debtor's Stay Enforcement Motion,  the merits of the Adversary Proceeding are ripe for determination because the Debtor has already admitted to the underlying Defaults that are the subject of the Adversary Proceeding.[16]

---

[16] In actuality, the most substantive thing that exists with respect to adjudicating the Adversary Proceeding is for this Court to consider the facts, the most critical of which the Debtor has admitted, *i.e.*, the Default, and based upon such

AP1904

### b. There Are No Jurisdictional Issues That Impact the General Partner's High Probability of Prevailing on the Merits of the Adversary Proceeding

36.     The Debtor then alleges that the Court may be required to abstain from exercising jurisdiction or may exercise its discretion to do so. *See* Objection, ¶ 31. However, as already addressed in the Stay Enforcement Objection, the doctrine of abstention under 28 U.S.C. § 1334(c) does *not* apply to the Adversary Proceeding. First, with regard to mandatory abstention, even if there is a "timely" motion filed, because there is no parallel pending non-bankruptcy action in connection with the defaults under the Fund Agreements, mandatory abstention is not available. This Court has repeatedly found that mandatory abstention does not apply to an action for the simple reason that there is no pending state action, an explicit statutory requirement under section 1334(c)(2). *See, e.g., In re PSA, Inc.*, No. 02–5565, 2003 WL 22938894, at *3 (Bankr. D. Del. Dec. 8, 2003); *see also In re Maxus Energy Corp.*, 597 B.R. 235, 245 (Bankr. D. Del. 2019 (finding that an appropriate action in state court had not been commenced, and thus this factor did not support mandatory abstention).[17] Second, with regards to permissive abstention, 28 U.S.C. § 1334(c)(1) provides that "**[e]xcept with respect to a case under chapter 15 of title 11**, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising

---

facts interpret the Fund Agreements in accordance with the applicable law, which courts in this district do routinely with foreign law. *See, e.g., In re FKF Madison Park Grp. Owner, LLC*, No. 10–11867, 2012 WL 174342, at *3 (Bankr. D. Del. Jan. 20, 2012) (finding that a Delaware bankruptcy court would be the more convenient forum for various parties because, among other reasons, bankruptcy courts commonly interpret and apply foreign law); *Reavis v. Gulf Oil Corp.*, 85 F.R.D. 666, 672 (D. Del. 1980) ("Federal courts are often called upon to apply law foreign to the forum and with which they are unfamiliar.").

[17] The Debtor further alleges that diversity jurisdiction is not alleged in the Adversary Proceeding, and it likely cannot be established given that the Fund maintains the same citizenship of its partners (*i.e.*, the Debtor). *See* Objection, ¶ 31 n.4. However, the General Partner, not the Fund, is the plaintiff in the Adversary Proceeding. *See* Complaint, ¶ 1. There is no overlap in the citizenship of the members of the General Partner with that of the Debtor, which is a Bermuda exempted corporation in liquidation with its registered office in Hamilton, Bermuda. *See id.* at ¶ 8. Accordingly, there is complete diversity jurisdiction in the Adversary Proceeding, and the Debtor's allegations to the contrary are inaccurate.

under title 11 or arising in or related to a case under title 11." *See* 28 U.S.C. § 1334(c)(1) (emphasis added). In interpreting section 1334(c)(1), multiple courts in the Third Circuit have explicitly stated that a court cannot permissively abstain from hearing a proceeding in chapter 15 cases. *See, e.g., In re Zhejiang Topoint Photovoltaic Co., Ltd.*, No. 16–01873, 2017 WL 6539481, at *4 (Bankr. D.N.J. Dec. 19, 2017); *see also Abrams v. General Nutrition Companies, Inc.*, No. 06–1820, 2006 WL 2739642, at *7 (D.N.J. Sep. 25, 2006) ("The only exception to this Court's ability to exercise discretionary abstention is that it cannot abstain from hearing a case under chapter 15 of the Bankruptcy Code") (internal citations omitted). Accordingly, any argument that this Court should permissively abstain from hearing the Adversary Proceeding lacks merit.

37. The Debtor further alleges that the Court may permissively abstain based on principles of international comity. *See* Objection, ¶ 31. However, as addressed in the Stay Enforcement Objection, federal courts will only extend comity provided that the foreign court has proper jurisdiction and recognition of its judgment or proceeding does not prejudice the rights of United States citizens or violate domestic public policy. *See, e.g., In re Oi Brasil Holdings Coöperatief U.A.,* 578 B.R. 169, 213 (Bankr. S.D.N.Y. 2017). Here, the court in the Bermuda Proceeding does not have jurisdiction over either the General Partner, the Manager, or the Fund under applicable law. Specifically, (i) the Limited Partnership Agreement is governed by and construed and enforced in accordance with the laws of the Cayman Islands and the Master Transaction Agreement is governed by and construed and enforced in accordance with the laws of the State of Delaware, and thus neither of the Fund Agreements are governed by Bermuda law, (ii) neither the General Partner nor the Fund have any operations in Bermuda, (iii) the Debtor, whether through its Foreign Representatives or otherwise, has not provided the Fund, the General Partner or the Manager with the opportunity to prosecute and adjudicate for dividend purposes a claim in

the Bermuda Proceeding,[18] (iv) neither the Fund, the General Partner nor the Manager have participated in the Bermuda Proceeding such that they cannot be said to have submitted themselves to the jurisdiction of the Bermuda Court, and (v) neither the Fund, the General Partner nor the Manager have consented to the jurisdiction of the Bermuda Proceeding. *See In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 374 (Bankr. S.D.N.Y. 2014) (finding that the creditor was not subject to the jurisdiction of the foreign court because it refused to consent to such jurisdiction). Accordingly, the Bermuda Proceeding does not have "proper jurisdiction" to adjudicate the Adversary Proceeding as is required for such an extension of comity.[19]

38.     Moreover, the Debtor states that interests of judicial efficiency weigh against having this Court adjudicate the Adversary Proceeding because it cannot enter a final order absent both parties' consent. *See* Objection, ¶ 32. However, if the stay is not lifted (assuming *arguendo* a stay exists) with respect to the Adversary Proceeding, then there would be no forum for any party, including Point, to adjudicate the parties' rights under the Fund Agreements because (i) there is no claims adjudication process in existence in the Bermuda Proceeding, and (ii) the General Partner, the Manager and the Fund cannot be compelled to submit, and have not submitted to, jurisdiction in Bermuda. Such a situation would leave the issues surrounding the Defaults in a

---

[18] The Debtor informed the General Partner by letter dated June 15, 2022 (the "June 15th Letter") that it could submit a proof of debt "for voting purposes only." *See* June 15th Letter, p. 1. A true and correct copy of the June 15th Letter is annexed hereto as Exhibit A and will be filed under seal. The June 15th Letter did not provide for a claims adjudication process and according to the Debtor, no such process has been initiated by the Liquidators. *See* Objection, ¶ 27. Neither the Fund, the General Partner nor the Manager submitted any such proof of debt and did not participate in any creditors meeting or vote.

[19] Further, international comity does not support a determination that forces a United States citizen to submit to jurisdiction in a foreign country to pursue a claim in a non-existent claims adjudication process or otherwise. *See PT Bakrie Telecom Tbk,* 628 B.R. at 877 (finding that the requirement of protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in a foreign proceeding, consistent with the principles of comity, is satisfied when creditors are given adequate notice of the timing and procedures for filing claims, and such procedures do not create additional burdens for a foreign creditor seeking to file a claim).

AP1907

state of perpetual limbo, which clearly does not serve the interests of judicial economy nor the expeditious and economical resolution of litigation.

> ### c. The Adversary Proceeding Does Not Raise Any Complex Foreign Law Issues and the General Partner Has a Likelihood of Success Under Any Potential Foreign Law Issues

39.     For the first time in the Chapter 15 Case, the Debtor raises allegedly novel issues of foreign law that it claims the Court must consider to determine the parties' rights under the Fund Agreements in the Adversary Proceeding. First, the Debtor argues that the Court must consider not only the express terms of the Fund Agreements, but also whether the General Partner acted in accordance with its duties to the Debtor—the sole limited partner of the Fund—under various sources of Cayman Islands law. *See* Objection, ¶ 35. Specifically, the Debtor alleges that, as the general partner of a Cayman Islands exempted limited partnership, the General Partner acts as a statutory trustee for the benefit of the limited partners, such as the Debtor, and the General Partner also owes fiduciary duties to the Debtor, including a duty to act in good faith and in the Debtor's interests, and it owes other duties arising in equity and common law in accordance with Cayman Islands partnership law. *See id.* at ¶ 36. The Debtor further alleges that the purported designation of the Debtor as a "Defaulting Partner," was invalid and a breach by the General Partner of its fiduciary obligations to the Debtor under various sources of Cayman Islands law because the General Partner failed to exercise its powers appropriately and—what's more—the Debtor has viable counterclaims against the General Partner for breaching its duties. *See id.* at ¶ 37.

40.     However, contrary to the Debtor's claims otherwise, any potential Cayman Islands law issues in connection with the Limited Partnership Agreement, and the Debtor's Defaults thereunder, such as any potential fiduciary relationship between the General Partner and the Debtor, are not determined in isolation, but are dependent upon the terms of the Limited

AP1908

Partnership Agreement. *See* Levers Decl. ¶¶ 28-30. Courts in the Third Circuit routinely apply both domestic and foreign contract law in other matters and can easily do so in this case. *See, e.g., Hay Grp. Mgmt., Inc. v. Schneider*, 965 F.3d 244, 249 (3d Cir. 2020) (applying applicable German law in adjudicating a contract assignment claim).

41.     Further, the Master Transaction Agreement, and the Debtor's Default thereunder, is governed by Delaware law, not Cayman Islands law. Thus, the issues in the Adversary Proceeding in connection with the Debtor's Default under the Master Transaction do not raise any foreign law issues, let alone ones which are incapable of being resolved by this Court.

42.     Moreover, in connection with the General Partner's designation of the Debtor as a "Defaulting Partner" under the Limited Partnership Agreement, the applicable standard under Cayman Islands law is likely to be deferential to the General Partner's discretion in taking such action. *See id.* at ¶ 44. Thus, pursuant to applicable Cayman Islands law, as long as the General Partner exercised its discretion honestly, in good faith and for a proper purpose (which it did so in the present circumstances), the General Partner's discretion to designate the Debtor as a "Defaulting Partner" must be adhered to. Further, there is no legal basis for the Debtor's argument, *see* Objection, ¶ 37, to essentially adjudicate the Debtor's status as a Defaulting Partner in isolation from the Limited Partnership Agreement since the terms of the Limited Partnership Agreement provide the foundation for determining the parties' respective rights under Cayman Islands law. *See* Levers Decl. ¶¶ 28-29.

43.     Accordingly, there are no issues of Cayman Islands law present in the Adversary Proceeding which would impact upon this Court's ability to deal with this case. Any issues of Cayman Islands law which arise in connection with the Adversary Proceeding can be easily dealt with by this Court because they merely involve a simple review of the relevant terms of the Limited

Partnership Agreement and a review of whether the General Partner exercised its discretion honestly, in good faith and for a proper purpose. Thus, under Cayman Islands law, the General Partner has demonstrated significantly more than the mere slight probability of success on the merits that is required to support lifting any automatic stay under the third prong of the *Rexene* factors.

44.     Further, the Debtor alleges that the General Partner's claims are likely subject to set-off against certain amounts, including partnership expenses the Debtor paid on behalf of the General Partner and/or Falcata in June 2017 and June 2018 that allegedly total more than the July 2020 Capital Contribution, among other expenses. *See* Objection, ¶ 40.[20]  The Debtor then argues that, in order to completely liquidate the General Partner's claims in the Adversary Proceeding, a court would need to consider, as a matter of Bermuda law, amounts that may be set-off against the General Partner's claims, and thus the proper forum for any liability and any set-off to be considered is the Debtor's (non-existent) claim adjudication process in Bermuda. *See id.*  As explained above, *see supra* ¶ 30, a United States citizen cannot be forced to submit to jurisdiction in a foreign country to pursue a claim in a non-existent claims adjudication process.  Accordingly, the Debtor cannot compel the General Partner or the Fund to submit to the jurisdiction of the Bermuda Proceeding for the purposes of adjudicating any potential or alleged set-off rights of the Debtor when the Bermuda Proceeding does not have an established claims process or otherwise.

45.     Moreover, under applicable Bermuda law, any set-off rights, to the extent such rights ever existed, were automatically adjudicated at the date of the winding up order in the Bermuda Proceeding.  *Stein v Blake [1996] A.C. 243* ("[T]he operation is automatic and not

---

[20] For the avoidance of doubt, the General Partner objects to the Debtor's alleged set-off claims as described in the Objection and reserves all of its rights with respect to such alleged claims.

AP1910

dependent upon the option of either party"). *See* Miles Decl. ¶ 22. Thus, there is no reason for this Court to consider, as a matter of Bermuda law, alleged amounts that may be set-off against the General Partner's claims because such amounts, if they ever existed, were automatically set-off at the date of the winding up order in the Bermuda Proceeding. Further, the claim for declaratory judgment in the Complaint is not even subject to any alleged claim for set-off because for set off to apply under applicable Bermuda law, the relief must be reducible to a monetary claim, and the claim for declaratory relief in the Complaint is not. *See id.* at ¶ 25.

46. Accordingly, there are no complex issues of Bermuda law at issue in the Adversary Proceeding, and the General Partner's high probability of success on the merits of the Adversary Proceeding far exceeds the low threshold to meet the third prong of the *Rexene* factors and supports a lifting of any automatic stay to continue the Adversary Proceeding in this Court.

### 4. Other Factors Considered by Courts

47. The Debtor also briefly, and without any support, discusses certain other factors that courts consider in determining whether relief from any automatic stay is appropriate.[21] However, none of the Debtor's baseless, unsubstantiated and conclusory assertions in connection with these factors holds any weight and can be easily discarded.

48. The Debtor argues that permitting the Adversary Proceeding to continue would impede the Debtor's ongoing liquidation process in Bermuda where claims are being channeled and may incentivize other parties to bring actions against the Debtor outside of Bermuda. *See* Objection, ¶ 44. As stated above, there is no claims adjudication process in existence in the

---

[21] These factors arise from *In re Sonnax Indus., Inc. v. Tri Component Prods. Corp.*, 907 F.2d 1280 (2d Cir. 1990), which sets forth numerous factors that courts consider when determining whether relief from any automatic stay should be granted. The *Sonnax* factors largely overlap with the *Rexene* factors that were already thoroughly addressed above. Therefore, in this section of the Reply, the General Partner only addresses those factors that were not already addressed in the section of the Reply that discussed the *Rexene* factors.

AP1911

Bermuda Proceeding, and therefore there is nothing for the Adversary Proceeding to interfere with or impede. Moreover, the Debtor argues that permitting the Adversary Proceeding to proceed may incentivize other parties to bring actions against the Debtor outside of Bermuda, but the Debtor, once again, fails to mention that it has yet to commence a claims adjudication process in the Bermuda Proceeding to permit any party to prosecute adjudication of a claim. The Debtor also overlooks the simple fact that by filing the Chapter 15 Case, it submitted itself to the jurisdiction of this Court.

49. The Debtor also argues that the Bermuda Court overseeing the Debtor's winding up proceeding has the necessary expertise to liquidate Falcata's claim. *See id.* at ¶ 45. However, as provided herein, neither the Limited Partnership Agreement nor the Master Transaction Agreement are governed by Bermuda law; neither the General Partner, the Manager, nor the Fund, have any operations or presence in Bermuda; neither the Fund, the General Partner nor the Manager have participated in the Bermuda Proceeding or submitted themselves to the jurisdiction of the Bermuda Court; and neither the Fund, the General Partner nor the Manager have consented to the jurisdiction of the Bermuda Proceeding. Therefore, because neither the General Partner, the Fund nor the Manager have any connection to Bermuda, there is no support for the Debtor's argument that the Bermuda Court overseeing the Debtor's winding up proceeding has the necessary expertise or ability to liquidate the General Partner's claims.

50. Finally, the Debtor baselessly alleges that the Adversary Proceeding could have an impact on distributions to other creditors and the General Partner's claim should thus be determined by the Bermuda Court. *See id.* at ¶ 46. As there is no claims adjudication process in the Bermuda Proceeding or the Chapter 15 Case to give distributions to other creditors, this

AP1912

allegation is wholly irrelevant and the mere fact of a party having a claim is not a basis to preclude them from asserting it.

## **<u>CONCLUSION</u>**

WHEREFORE, for all the foregoing reasons, the General Partner respectfully requests that the Court (a) grant the Motion in its entirety, and (b) grant such further relief as the Court deems just and proper.

*[Signature page follows]*

AP1913

Dated: May 10, 2023

By: _/s/ Daniel B. Butz_____
Eric D. Schwartz (No. 3134)
Daniel B. Butz (No. 4227)
Evanthea Hammer (No. 7061)
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899
Telephone: (302) 658-9200
Email: eschwartz@morrisnichols.com
   dbutz@morrisnichols.com
   ehammer@morrisnichols.com

-and-

Paul Werner (admitted *pro hac vice*)
A. Joseph Jay III (admitted *pro hac vice*)
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
2099 Pennsylvania Avenue NW, Suite 100
Washington, D.C. 20006-6801
Telephone: (202) 747-1900
Email: pwerner@sheppardmullin.com
   jjay@sheppardmullin.com

-and-

Edward H. Tillinghast, III (admitted *pro hac vice*)
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
30 Rockefeller Plaza
New York, New York 10112-0015
Telephone:  (212) 653-8700
Email:  etillinghast@sheppardmullin.com

*Attorneys for FTI GP I, LLC on behalf of Falcata Tech Investment Fund I, L.P.*

AP1914

# Exhibit A

AP1915

**POINT INVESTMENTS, LTD.**
**(IN LIQUIDATION)**
**(Company No. 43769)**
c/o KRyS Global · Chancery Hall · 1st Floor
52 Reid Street · Hamilton HM 12· Bermuda

**Strictly Private & Confidential**
To All Known Creditors of
Point Investments, Ltd. (In Liquidation)

15 June 2022

Dear Sirs,

**RE: Point Investments, Ltd. (In Liquidation) (the "Company")**

Please be advised that on 29 October 2021 an order was made in the Supreme Court of Bermuda (the "**Court**") appointing Andrew Childe and Richard Lewis of FFP Limited, Harbour Centre, 2nd Floor, 159 Mary Street, Grand Cayman, Cayman Islands and Mathew Clingerman of KRyS Global, Chancery Hall, 1st Floor, 52 Reid Street, Hamilton HM 12, P.O. Box 671, HM CX, Bermuda as Joint Provisional Liquidators ("**JPLs**") of the Company pursuant to the provisions of the Companies Act 1981.

On 18 February 2022, the Court made a winding-up order against the Company and further ordered that Andrew Childe, Richard Lewis and Mathew Clingerman continue as the JPLs of the Company (the "**Winding-up Order**").

A copy of the Winding-up Order is enclosed for your records.

The JPLs understand that you may be a creditor of the Company. Accordingly, the JPLs hereby inform you that the first meeting of creditors (the "**Meeting**") is to be held at the office of Harneys (Bermuda) Limited, Rose Cottage, 18 Parliament Street, Hamilton HM 12, Bermuda and by way of Zoom conference on 29 June 2022 (Wednesday) at 2 p.m. (Bermuda Time). Please email the JPLs at pointinvestments@ffp.ky for attendance details. In this regard, please find enclosed:

- Notice of the Meeting;
- Proof of Debt Form ("**POD**") for voting purposes only;
- General Proxy and Special Proxy Forms ("**Proxy Forms**"); and
- A Summary of the Statement of Affairs.

To entitle you to vote at the Meeting, you are requested to lodge a correctly completed and valid POD along with Proxy Form. **In order to vote at the Meeting, you or your proxy needs to be in attendance at the Meeting**. Depending on whether your proxy must vote in accordance with special instructions received (Special Proxy) or will have discretionary votes (General Proxy), you need to duly and properly complete the appropriate Proxy Form.

AP1916

The POD and Proxy Form should be submitted to the JPLs by email to pointinvestments@ffp.ky or by post to the following address no later than 24 June 2022 (Friday) at 2 p.m. (Bermuda Time). Failure to do so will result in your proxy being unable to vote.

Joint Provisional Liquidators of
Point Investments, Ltd. (In Liquidation)
c/o KRyS Global, Chancery Hall, 1ˢᵗ Floor, 52 Reid Street, Hamilton HM 12, Bermuda

Should you wish to appoint the Chairman of the Meeting (who will be one of the JPLs or their representative) as your proxy, please complete the Special Proxy only and direct the Chairman on how to vote on the resolutions proposed.

Please note that if you appoint the Chairman of the Meeting as your proxy on a General Proxy, your vote will not be counted, as the Chairman is unable to exercise discretion in voting (he must be directed via a Special Proxy).

Attendees (creditors attending in person or their proxies) may be required to supply proof of identity (i.e. certified copy of passport or drivers' license) and their authorization (i.e. powers of attorney, corporate register of directors and officers) to the satisfaction of the JPLs.

Please note that you do not need to complete a proxy form if you attend the meeting in person unless you are representing a corporate entity or another individual on their behalf.

At the Meeting, the following resolutions will be considered:

1. Whether or not an application is to be made to the Court to have the JPLs continue in office as liquidators; and

2. Whether or not an application is to be made to the Court for the appointment of a Committee of Inspection to act with the liquidators.

   Please note that a Committee of Inspection is not mandatory in a liquidation.

For any questions, please contact Emily Lo by phone at 1 441 294 2946 or the JPLs by email at pointinvestments@ffp.ky.

Yours faithfully,

Mathew Clingerman
Joint Provisional Liquidator
For and on behalf of
Point Investments, Ltd. (In Liquidation)
As agent of the Company without personal liability

Enclosures

2

AP1917

IN THE SUPREME COURT OF BERMUDA
COMMERCIAL COURT
COMPANIES ACT (WINDING UP)
2020: No. 300

IN THE MATTER OF POINT INVESTMENTS, LTD. (PROVISIONAL LIQUIDATORS APPOINTED)

AND IN THE MATTER OF THE COMPANIES ACT 1981

---

## ORDER

---

UPON the petition being presented by Spanish Steps Holding Ltd (Petitioner) to this Court on 16 September 2020 and amended with leave of the Court on 18 November 2021 (Amended Petition)

AND UPON the Order of this Court dated 29 October 2021 (Appointment Order) appointing Andrew Childe and Richard Lewis of FFP Limited, 10 Market Street, #769 Camana Bay, Grand Cayman, Cayman Islands and Mathew Clingerman of Krys Global, Chancery Hall, 1st Floor, 52 Reid Street, Hamilton, HM 12, PO Box 671, HM CX, Bermuda as Joint Provisional Liquidators (JPLs) of Point Investments, Ltd. (Company)

AND UPON reading the First Affidavit of Mathew Clingerman dated 2 December 2021, and the Second Affidavit of Mathew Clingerman dated 17 February 2022

AND UPON the Order of this Court dated 3 December 2021 adjourning the Amended Petition and expanding the JPLs' powers

AND UPON the Orders of this Court dated 17 December 2021, 14 January 2022 and 4 February 2022 adjourning the Amended Petition

AND UPON hearing counsel for the Petitioner and counsel for the Company and the JPLs

IT IS HEREBY ORDERED that:

1. The Company be wound up under the provisions of the Companies Act 1981 (Act).

2. That Andrew Childe and Richard Lewis of FFP Limited, 10 Market Street, #769 Camana Bay, Grand Cayman, Cayman Islands and Mathew Clingerman of Krys Global, Chancery Hall, 1st Floor, 52 Reid Street, Hamilton, HM 12, PO Box 671, HM CX, Bermuda be appointed to continue as JPLs.

3. The JPLs not be required to give security for their appointment.

4. The JPLs shall have the power to act jointly and severally in their capacity as joint provisional liquidators of the Company.

5. The powers granted to the JPLs shall include all of those under section 175 of the Act and shall not be limited, pursuant to section 170 (3) of the Act.

6. Without restricting the generality of paragraph 5 above, the JPLs shall be empowered to carry out the

following:

(a) to ascertain the assets of the Company and their location and take all steps necessary including Court actions where appropriate to obtain possession of such assets and to bring the same under their control and further, where appropriate, bring the same into the jurisdiction of this Honourable Court and, for this purpose, to seek the assistance of the Courts of the various jurisdictions in which assets of the Company are located;

(b) to incur and pay from the assets of the Company all reasonable expenses and disbursements in connection with the running, administration and management of the Company's records and affairs and offices (and this shall include all costs charges and expenses of attorneys, managers, accountants, auctioneers, brokers, and all other agents or other persons that the JPLs may engage or employ);

(c) if appropriate, in the discretion of the JPLs, to retain or employ such further professionals or other individuals, partnerships, associations or companies, to assist in running the affairs and business of the Company and for the purposes of ascertaining and quantifying the assets, records and liabilities of the Company, such employment being either in this jurisdiction or in any other jurisdiction of the world where the Company has conducted business or entered into contracts with third parties;

(d) to render invoices for their own remuneration at their usual and customary rates (and this shall include all costs charges and expenses of his attorneys, , managers, accountants, auctioneers, brokers, and all other agents or other persons that the JPLs may engage or employ);

(e) to see, review, secure, take possession of and copy any books, papers, writings, documents and records relating to the accounts and audit of the Company's accounts that are located in the offices of its auditors or any other person both in this jurisdiction and in any other jurisdiction;

(f) to see, review, secure, take possession of and copy the claims and financial records of the Company that are located in the offices of the Company or any company affiliated with the Company or any other person;

(g) to operate any existing bank, investment, or other financial accounts established in the name of the Company;

(h) to open and operate bank, investment, or other financial accounts in the name of the JPLs or the Company as may be necessary;

(i) to conduct such investigations and obtain such information as is necessary to identify, locate, protect, secure, take possession of, collect and get in the assets of the Company and determine the Company's liabilities, and/or to enable these proceedings to otherwise proceed in a speedy and efficient manner;

(j) to do all such things as may be necessary or expedient for the protection of the Company's property or assets;

(k) to employ and dismiss any employees of the Company;

(l) to discharge rent, salaries of any employees of the Company and other current expenses of the Company;

(m) to grant or accept a surrender of a lease or tenancy of any of the property of the Company and to

AP1919

take a lease or tenancy of any property required or convenient for the business of the Company;

(n)    to terminate, complete or perfect as advised any contracts or transactions relating to the business of the Company;

(o)    to effect insurance in connection with the management and maintenance of the business, property and assets of the Company;

(p)    to do all acts and to execute in the name and on behalf of the Company all deeds receipts or other documents and for that purpose using when necessary the Company's seal;

(q)    to rank and claim in the bankruptcy, liquidation or insolvency of any person (including but not limited to any body corporate) indebted to the Company and to receive dividends, and to accede to trust deeds for the creditors of any such person;

(r)    to change the situation of the Company's registered office;

(s)    to carry on all or any portion of the business of the Company so far the JPLs as may consider it beneficial to the winding-up of the Company;

(t)    to take control of and exercise all rights which the Company may have in relation to any subsidiaries, joint ventures, investments, associated companies, businesses, or other entities (collectively "Entities") in which the Company holds an interest (directly or indirectly) or such shares as are owned by the Company (directly or indirectly), as may be necessary to obtain control or management of any such Entities including, without prejudice to the generality of the foregoing, the rights relating to the appointment or removal of all or any directors and other officers (including legal representatives) and agents of any such Entities and to take all such steps as the thought fit to protect the interests of the Company;

(u)    to retain and employ barristers, attorneys, solicitors or other lawyers in Bermuda, the United States, Switzerland, the Cayman Islands, the United Kingdom and other jurisdictions as the JPLs see fit for the purpose of advising and assisting the JPLs in the execution of their powers or in any legal or arbitration proceedings and such professionals or other individuals, partnerships, associations or companies as they may consider necessary with regard to the execution of their powers and they shall in their discretion determine the quantum of remuneration to be paid to such attorneys, professionals or other individuals, partnerships, associations or companies as aforesaid;

(v)    to consider any legal or arbitration proceedings wherever situate in which the Company either is a party or of which the Company presently has conduct or which the Company would, but for these liquidation proceedings, take conduct and (for any purpose, including without restriction the purpose of preserving the *status quo* in relation to proceedings while the JPLs complete their own due diligence in relation to such proceedings) to pay all fees and expenses and to give all instructions in connection therewith and take such action as may be thought necessary to continue to prosecute or to defend such proceedings or to apply for a stay of such proceedings;

(w)    to consider and if thought advisable to commence such actions as may be necessary to protect, recover or obtain assets and or monies belonging or due to the Company and to commence all other proceedings, whether in Bermuda or in any other jurisdiction outside Bermuda as may be necessary to protect, recover or obtain assets and or monies belonging or due to the Company and/or have their appointment recognised;

(x)    to consider and if thought advisable to bring, participate in, or defend any action or other legal proceedings, whether in Bermuda or in any other jurisdictions outside of Bermuda, in the name and on behalf of the Company;

(y)    consider and if thought advisable commence such actions as may be necessary to have their appointment recognised in jurisdictions outside of Bermuda including for the avoidance of doubt the United States, the Cayman Islands, Switzerland, the United Kingdom and other jurisdictions as may be relevant;

(z)    to draw, accept, make and indorse any bill of exchange or promissory note in the name and on behalf of the Company, with the same effect with respect to the liability of the Company, with the same effect with respect to liability of the Company as if the bill or note had been drawn, accepted, made or indorsed by or on behalf of the Company in the course of its business;

(aa)    to raise on the security of its assets of the Company any money required;

(bb)    to do all things incidental to the exercise of the foregoing powers.

7.    The JPLs be at liberty to apply generally to this Honourable Court to make such orders for regulating the future conduct of the affairs of the Company as this Honourable Court shall see fit.

8.    The JPLs may bring or defend in their names any action or other legal proceedings which relate to the said property belonging to the said Company or which it is necessary to bring or defend for the purposes of effectually winding-up the Company and recovering its property as aforesaid as provided by section 174 of the Act. Notwithstanding paragraph 9 below, the costs charges and expenses of all persons retained or employed by the JPLs together with the costs charges and expenses of the JPLs and all other costs and expenses properly incurred in the course of the provisional liquidation of the Company shall be paid as bills are rendered out of the assets of the Company in accordance with Rule 140 of the Companies (Winding Up) Rules 1982.

9.    The time for the holding of the first meetings of creditors and contributories under section 171 of the Act be extended by three months, to six months from the date of this Order.

10.    The Second Affidavit of Mathew Clingerman dated 17 February 2022 be sealed on the Court file and not be open to inspection by any person unless upon further Order of this Court.

11.    The JPLs shall be at liberty to submit to the Registrar of the Supreme Court of Bermuda bills of costs for taxation for all costs charges and expenses of those persons or firms employed by them and that such taxation shall be on an attorney-and-own-client basis with respect to the costs charges and expenses of attorneys and on an equivalent basis for all managers, accountants, auctioneers or other persons.

12.    The Petitioner shall have its costs of this application as costs of preserving, realising, or getting in the assets of the Company pursuant to Rule 140 of the Companies (Winding Up) Rules 1982.

Dated the 18th day of February 2022.



Hon. Chief Justice (Puisne) Judge

IN THE SUPREME COURT OF BERMUDA

COMMERCIAL COURT

COMPANIES (WINDING UP)

2020: No. 300

IN THE MATTER OF POINT INVESTMENTS, LTD
(PROVISIONAL LIQUIDATORS APPOINTED)

AND IN THE MATTER OF THE COMPANIES ACT 1981

---

**ORDER**

---

SUPREME COURT BERMUDA

-2022 FEB 18 PM 3: 30

**CAREY OLSEN BERMUDA LIMITED**
Rosebank Centre, 5th Floor
11 Bermudiana Road
Pembroke HM 08
Bermuda

**Attorneys for the Petitioner**

IN THE SUPREME COURT OF BERMUDA

COMMERCIAL COURT

COMPANIES (WINDING-UP)

2020: No. 300

IN THE MATTER OF COMPANIES ACT 1981

AND IN THE MATTER OF POINT INVESTMENTS, LTD. (IN LIQUIDATION)

---

FORM 64 (rule 85)

NOTICE TO CREDITORS OF FIRST MEETING

---

NOTICE IS HEREBY GIVEN that the first meeting of creditors in the above matter will be held at the office of Harneys (Bermuda) Limited, Rose Cottage, 18 Parliament Street, Hamilton HM 12, Bermuda on 29 June 2022 (Wednesday) at 2 p.m. (Bermuda Time). Creditors may also attend the meeting remotely by way of Zoom conference. Please email the Joint Provisional Liquidators ("JPLs") at pointinvestments@ffp.ky for attendance details.

To entitle you to vote at the meeting of creditors, you must lodge your Proof of Debt together with supporting documents with the JPLs at c/o KRyS Global, Chancery Hall, 1st Floor, 52 Reid Street, Hamilton HM 12, Bermuda or by email to pointinvestments@ffp.ky no later than 24 June 2022 (Friday) at 2 p.m. (Bermuda Time).

Forms of general and special proxies are enclosed. For your nominated proxy to be entitled to act on your behalf at the meeting of creditors, your proxy form must also be lodged with the JPLs at c/o KRyS Global, Chancery Hall, 1st Floor, 52 Reid Street, Hamilton HM 12, Bermuda or by email to pointinvestments@ffp.ky no later than 24 June 2022 (Friday) at 2 p.m. (Bermuda Time).

A statement of the Company's affairs has been lodged by one of the directors of the Company, a summary of which is enclosed.

Dated this 15th day of June 2022

Andrew Childe
Joint Provisional Liquidator acting as
Agent of the Company without personal liability

Richard Lewis
Joint Provisional Liquidator acting as
Agent of the Company without personal liability

Mathew Clingerman
Joint Provisional Liquidator acting as
Agent of the Company without personal liability

**Note:**

At the first meeting of the creditors, they may amongst other things:

1. By resolution determine whether or not an application is to be made to the court to have the Joint Provisional Liquidators continue in office as liquidators.

2. By resolution determine whether or not an application shall be made to the court for the appointment of a committee of inspection to act with the liquidator(s), and who are to be the members of the committee if appointed.

---

NOTE: If a liquidator is not appointed by the court the Official Receiver will be the liquidator.

IN THE SUPREME COURT OF BERMUDA

COMMERCIAL COURT

COMPANIES (WINDING-UP)

2020:  No. 300

IN THE MATTER OF THE COMPANIES ACT 1981

AND IN THE MATTER OF POINT INVESTMENTS, LTD. (IN LIQUIDATION)

FORM 54 (rule 64)
PROOF OF DEBT

Please carefully review the directions in the notes and in italics.

I ........................................................................................................................................................................

*(enter name of the deponent, including all former names)*

of ......................................................................................................................................................................

*(enter the address of the deponent)*

MAKE OATH AND SAY* as follows:

1.  This is the proof of debt of .......................................................................................................................

   *(enter name of creditor)*

   of ..............................................................................................................................................................

   *(enter the address of the creditor)*

1A.  I am in the employ of the above-named creditor, and I am duly authorized by that creditor to
    make this affidavit, and it is within my own knowledge that the debt deposed to in this affidavit
    (the "**Debt**") was incurred and for the consideration stated, and to the best of my knowledge and
    belief the Debt still remains unpaid and unsatisfied. *See Note 1*

1B.  I am duly authorized under the seal of the above-named creditor, to make the proof of debt on
    its behalf. *See Note 1*

AP1925

2. Point Investments, Ltd. was, at the date of the winding-up order made against it, the 18 February 2022, and still is, justly and truly indebted to the above-named creditor in the amount of the Debt, being the sum of $ _____ for *(give particulars of the debt including consideration)*

..........................................................................................................................................................

..........................................................................................................................................................

3. I have not nor has the above-named creditor nor any person by my/his/its /their *(delete as applicable)* order to my knowledge or belief for my/his/its/their *(delete as applicable)* usehad or received any manner of satisfaction or security whatsoever for the Debt or any partof the Debt, save and except the following: *(Here state the particulars of all securities held, and where the securities are on the property of the company assess the value of the same, and if any bills or other negotiable securities be held specify them in the schedule)*–

..........................................................................................................................................................

..........................................................................................................................................................

Date            ......................................................

Drawer          ......................................................

Acceptor        ......................................................

Amount          ......................................................

Due Date        ......................................................

SWORN by                                    )
At                                          )
                                            )
this      day of          2022              )

BEFORE ME:

_____

A Commissioner for Oaths

*For purposes of voting at the First Meeting of Creditors, the Joint Provisional Liquidators will not reject a proof of debt solely on the basis of it being unsworn before a Commissioner of Oaths (or equivalent). For avoidance of doubt, the Joint Provisional Liquidators reserve their rights to require any creditor wishing to prove, to provide additional information or evidence substantiating their claim.*

---

**TO BE COMPLETED BY JOINT PROVISIONAL LIQUIDATOR ONLY**

---

Admitted to vote for $            the            day of            2022

_____

Joint Provisional Liquidator

**NOTES:**

1)  Delete 1A and 1B if proof made by creditor himself. If proof made by employee of creditor delete 1B.If proof made by agent or officer of creditor delete 1A.

2)  The proof cannot be admitted for voting at the first meeting unless it is properly completed and lodged with the Joint Provisional Liquidators at c/o KRyS Global, Chancery Hall, 1st Floor, 52 Reid Street, Hamilton HM 12, Bermuda or by email to pointinvestments@ffp.ky by the deadline specified at the Notice to Creditors of First Meeting.

3)  Bills of exchange or other negotiable instruments must be produced before the proof can be admitted.

IN THE SUPREME COURT OF BERMUDA

COMMERCIAL COURT

COMPANIES (WINDING-UP)

2020: No. 300

IN THE MATTER OF COMPANIES ACT 1981

AND IN THE MATTER OF POINT INVESTMENTS, LTD. (IN LIQUIDATION)

FORM 62 (rule 103)

General Proxy

I/We, .................................................................................................................................................................
*(Name of the creditor, including all former names)*

of ...................................................................................................................................................................
*(Enter the address of the creditor)*
being a creditor of Point Investments, Ltd. (In Liquidation) **HEREBY APPOINT**

the Chairman of the meeting or .......................................................................................................................
*(See notes below)* as my/our proxy to vote for me/us at the first meeting of creditors (*delete as applicable),*
to be held at the office of Harneys (Bermuda) Limited, Rose Cottage, 18 Parliament Street, Hamilton HM
12, Bermuda and by way of Zoom conference on 29 June 2022 (Wednesday) at 2 p.m. (Bermuda Time) or
any adjournment thereof.

Contact details of Proxy (including email address) ............................................................................................

Signature *(See notes below)* ...........................................................................................................................

Name *(In Block)* .............................................................................................................................................

Date ..............................................................................................................................................................

**The below certificate should only be signed where a person other than a creditor filling up the above proxy**

I, ................................................................................................................................................ *(name)*

of ............................................................................................................................................*(address)*

**Point Investments, Ltd. (In Liquidation)**

General proxy of ......................................................................................................................... (name of creditor)

being a *(See Note 3)* ..............................................................................................................................................

hereby certify that all insertions in the above proxy are in my own handwriting and have been made by me at the request of the above-named creditor and in his presence before he attached his signature (or mark) thereto.

Signature ...........................................................................................

Name ...............................................................................................

Date ................................................................................................

Contact details (including email address) ............................................

.........................................................................................................

.........................................................................................................

GENERAL PROXY NOTES:

1.  The Chairman of the meeting will either be one of the provisional liquidators or a representative of the provisional liquidators. If you wish to appoint a person other than the Chairman of the meeting as your proxy, delete the words, "the Chairman of the meeting" and enter the name of the person to be appointed. That person may be such other person as the creditor may approve. The proxy form when signed must be lodged by the time and at the address (or email address) named for that purpose in the notice convening the meeting at which it is to be used.

2.  If a firm, sign the firm's trading title, add "A,B., a partner in the said firm". If the appointer is a corporation, then the form of proxy must be under its common seal or under the hand of some officer duly authorized in that behalf, and the fact that he is so authorized must be stated thus:-

    For and on behalf of (Your Company Name)
    J.S. (duly authorized under the seal of the company)

3.  Here state whether clerk or manager in the regular employment of the creditor or the attorney employed by him in connection with the matter or a commissioner to administer oaths in the Supreme Court.

IN THE SUPREME COURT OF BERMUDA

COMMERCIAL COURT

COMPANIES (WINDING-UP)

2020: No. 300

IN THE MATTER OF COMPANIES ACT 1981

AND IN THE MATTER OF POINT INVESTMENTS, LTD. (IN LIQUIDATION)

---

FORM 63 (rule 103)

Special Proxy

---

I/We, ……………………………………………………………………………………………………………………………………………………
*(Name of the creditor, including all former names)*

of …………………………………………………………………………………………………………………………………………………………..
*(Enter the address of the creditor)*
being a creditor of Point Investments, Ltd. (In Liquidation) **HEREBY APPOINT**

the Chairman of the meeting or ………………………………………………………………………………………………………..
*(See notes below)* as my/our proxy to vote for me/us at the first meeting of creditors (*delete as applicable*),
to be held at the office of Harneys (Bermuda) Limited, Rose Cottage, 18 Parliament Street, Hamilton HM
12, Bermuda and by way of Zoom conference on 29 June 2022 (Wednesday) at 2 p.m. (Bermuda Time) or
any adjournment thereof.

Contact details of Proxy (including email address) ……………………………………………………………………………..

Signature *(See notes below)* ……………………………………………………………………………………………………………….

Name *(In Block)* …………………………………………………………………………………………………………………………………

Date …………………………………………………………………………………………………………………………………………………

If you wish to vote for a resolution or nomination, sign in the box "FOR". If you wish to vote against a
resolution or nomination, sign in the box marked "AGAINST".

| Resolution 1 | FOR | AGAINST |
|---|---|---|
| That an application be made to the Court for the Joint Provisional Liquidators to continue in office as liquidators of the Company | Signature | Signature |

**Point Investments, Ltd. (In Liquidation)**
Special proxy of ………………………………………………………………………………………………………… (name of creditor)

Note:  If no liquidator(s) is/are appointed by the Court, the Official Receiver of Bermuda will be the liquidator.

| Resolution 2 | FOR | AGAINST |
|---|---|---|
| That an application is to be made to the Court for the appointment of a Committee of Inspection to act with the liquidator(s) | | |
| | Signature | Signature |

**Constitution of the Committee of Inspection**

A Committee of Inspection is generally made up of representatives of creditors and/or contributories who represent all of the creditors/contributories' interests.  A Committee of Inspection is not mandatory in a liquidation; however, if a majority of the creditors decide that a committee should be appointed then you may wish to nominate yourself or some other creditor to sit on the committee.

You may indicate in the boxes set out below the names of any eligible creditors whom you wish to nominate to serve on the Committee of Inspection and for whom you wish your proxy to vote.  Please ensure that you sign in the box provided next to that nominee's name since failure to do so will invalidate the special proxy as regards that nomination.

Pursuant to section 218 of the Companies Act 1981, the Committee of Inspection, if any, shall consist of not more than five persons.

| | | FOR | AGAINST |
|---|---|---|---|
| 1. | | | |
| | | Signature | Signature |
| 2. | | | |
| | | Signature | Signature |
| 3. | | | |
| | | Signature | Signature |
| 4. | | | |
| | | Signature | Signature |
| 5. | | | |
| | | Signature | Signature |

**Point Investments, Ltd. (In Liquidation)**

Special proxy of ……………………………………………………………………………………………… (name of creditor)

**The below certificate should only be signed where a person other than a creditor filling up the above proxy**

I, ……………………………………………………………………………………………………………………….. *(name)*

of ……………………………………………………………………………………………………………………….*(address)*

being a *(See Note 3)* ……………………………………………………………………………………………….

hereby certify that all insertions in the above proxy are in my own handwriting and have been made by me at the request of the above-named creditor and in his presence before he attached his signature (or mark) thereto.

Signature ……………………………………………………………………………

Name ………………………………………………………………………………

Date ………………………………………………………………………………..

Contact details (including email address) ………………………………………

…………………………………………………………………………………………..

---

SPECIAL PROXY NOTES:

1. The Chairman of the meeting will either be one of the provisional liquidators or a representative of the provisional liquidators. If you wish to appoint a person other than the Chairman of the meeting as your proxy, delete the words, "the Chairman of the meeting" and enter the name of the person to be appointed. That person may be such other person as the creditor may approve. The proxy form when signed must be lodged by the time and at the address (or email address) named for that purpose in the notice convening the meeting at which it is to be used. A creditor may give a special proxy to any person to vote at any specified meeting or adjournment thereof on all or any of the following matters:

   a. for or against the appointment of any nominated liquidator or the continuance of the Joint Provisional Liquidators as liquidators of the Company;

   b. for or against the appointment of the Committee of Inspection and any specified person as member of the Committee of Inspection, if applicable;

   c. on all questions relating to any matter, other than those above referred to, arising at specified meeting or adjournment thereof.

2. If a firm, sign the firm's trading title, add "A,B., a partner in the said firm". If the appointer is a corporation, then the form of proxy must be under its common seal or under the hand of some officer duly authorized in that behalf, and the fact that he is so authorized must be stated thus:-

           For and on behalf of (Your Company Name)
           J.S. (duly authorized under the seal of the company)

3. Here state whether clerk or manager in the regular employment of the creditor or the attorney employed by him in connection with the matter or a commissioner to administer oaths in the Supreme Court.

### POINT INVESTMENTS, LTD. (IN LIQUIDATION)

### A summary of the Statement of Affairs as of 30 June 2021

| Assets (Estimated Realizable Value) | (USD) |
|---|---|
| Private Equity Investments | 1,252,572,999 |
| Redemption Received in Advance | 1,338,813,212 |
| Direct Investments | 513,056,659 |
| Investments, Cash and Derivatives | 127,305,506 |
| Withheld Cash Distributions | 23,652,211 |
| Loans and Accrued Interest | 8,484,255 |
| Cash | 1,225,484 |
| Dividends and Interest Receivable | 397,325 |
| Total Assets | 3,265,507,651 |
| | |
| Liabilities | |
| | |
| Unmet Capital Calls | 6,005,556 |
| Attorneys' fees | 338,403 |
| Directors' fees | 263,125 |
| Reimbursements | 139,270 |
| Other service providers | 101,067 |
| Total Liabilities | 6,847,421 |
| | |
| Net Estimated Realizable Assets | 3,258,660,230 |

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| POINT INVESTMENTS, LTD. (IN LIQUIDATION),[1] | Case No. 22-10261 (TMH) |
| | **Re: D.I. 57** |
| Debtor in a Foreign Proceeding. | |

### CERTIFICATE OF NO OBJECTION REGARDING MOTION OF THE FOREIGN REPRESENTATIVES FOR ENTRY OF AN ORDER AUTHORIZING THEM TO REDACT AND FILE UNDER SEAL CERTAIN INFORMATION CONTAINED IN (I) THE MOTION OF THE FOREIGN REPRESENTATIVES FOR ENTRY OF AN ORDER TO CONDUCT DISCOVERY PURSUANT TO 11 U.S.C. § 1521(a)(4), FED. R. BANKR. P. 2004, AND LOCAL RULE 2004-1 AND <u>(II) THE DECLARATION OF ANDREW CHILDE</u>

The undersigned counsel to Andrew Childe and Richard Lewis of FFP Limited, and Mathew Clingerman of Kroll Bermuda Ltd. (the "<u>Foreign Representatives</u>"), in their capacity as the foreign representatives of Point Investments, Ltd. (the "<u>Debtor</u>"), hereby certifies that no answer, objection, or other responsive pleading has been received with respect to the *Motion of the Foreign Representatives for Entry of an Order Authorizing them to Redact and File Under Seal Certain Information Contained in (I) the Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1 and (II) the Declaration of Andrew Childe* [D.I. 57] (the "<u>Motion</u>") filed by the Foreign Representatives with the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") on March 30, 2023. The undersigned further certifies that he has reviewed the Court's docket in this case and no answer, objection or other responsive pleading to the Motion appears

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

thereon. Pursuant to the *Notice of Motion* filed with the Motion, any objection or response to the Motion was to be filed and served no later than April 11, 2023 at 4:00 p.m. (ET).

WHEREFORE, the Foreign Representatives respectfully request that an order, substantially in the form attached hereto as **Exhibit A**, be entered at the earliest convenience of the Court.

Dated: May 18, 2023
      Wilmington, Delaware

Respectfully submitted,

*/s/   Stephen J. Astringer*
**KOBRE & KIM LLP**
Jacob R. Kirkham (No. 5768)
Stephen J. Astringer (No. 6375)
600 North King Street, Suite 501
Wilmington, Delaware 19801
Telephone: (302) 518-6451
Facsimile: (302) 518-6461
jacob.kirkham@kobrekim.com
stephen.astringer@kobrekim.com

-and-

Adriana Riviere-Badell (admitted *pro hac vice*)
Evelyn Baltodano Sheehan (admitted *pro hac vice*)
201 South Biscayne Boulevard, Suite 1900
Miami, Florida 33131
Telephone: (305) 967-6100
Facsimile: (305) 967-6120
adriana.riviere-badell@kobrekim.com
evelyn.sheehan@kobrekim.com

-and-

Adam M. Lavine (admitted *pro hac vice*)
John G. Conte (admitted *pro hac vice*)
800 Third Avenue
New York, New York 10022
Telephone: (212) 380-2580
Facsimile: (212) 488-1220
adam.lavine@kobrekim.com
john.conte@kobrekim.com

*Counsel to the Foreign Representatives*

AP1935

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| POINT INVESTMENTS, LTD.<br>(IN LIQUIDATION),[1] | Case No. 22-10261 (TMH) |
| Debtor in a Foreign Proceeding. | |

## STATUS REPORT

Andrew Childe and Richard Lewis of FFP Limited, and Mathew Clingerman of Kroll Bermuda Ltd. (the "<u>Foreign Representatives</u>"), in their capacity as the foreign representatives of Point Investments, Ltd. (the "<u>Debtor</u>") in respect of the winding up proceeding pending before the Supreme Court of Bermuda (the "<u>Bermuda Court</u>"), Commercial Court, Case 2020: No. 300, by and through the undersigned counsel, respectfully submit this status report.

1.     As set forth in the status report dated August 26, 2022 [D.I. 41], the Bermuda Court previously entered an order (the "<u>Appointment Order</u>") appointing the Foreign Representatives as permanent liquidators of the Debtor (the "<u>Joint Liquidators</u>").

2.     Pursuant to the powers granted to them by the Appointment Order and Bermuda law, the Joint Liquidators have commenced the process for calling for proofs of debt.

3.     Attached hereto as **Exhibit A** is a copy of the *Notice to Creditors of Intention to Declare a Dividend*, which was included in the online publication of the Royal Gazette, a Bermudian newspaper, on May 19, 2023 (the "<u>Notice</u>").

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

4.     The Notice states, among other things, that, (i) the Joint Liquidators intend to declare a first and final dividend to creditors of the Debtor, (ii) the Joint Liquidators request that all creditors send their full name, address, particulars and supporting evidence of their debts or claims to the Joint Liquidators pursuant to the procedures set forth therein and in the forms that have been submitted to known creditors, and (iii) any person who has not already filed a claim who is claiming to be a creditor of the Debtor must prove their debts on or before **June 9, 2023 at 6 p.m. (Bermuda time)**.

*[Remainder of Page Left Intentionally Blank]*

AP1937

Dated: May 19, 2023
     Wilmington, Delaware

Respectfully submitted,

*/s/ Stephen J. Astringer*
**KOBRE & KIM LLP**
Jacob R. Kirkham (No. 5768)
Stephen J. Astringer (No. 6375)
600 North King Street, Suite 501
Wilmington, Delaware 19801
Telephone: (302) 518-6451
Facsimile: (302) 518-6461
jacob.kirkham@kobrekim.com
stephen.astringer@kobrekim.com

-and-

Adriana Riviere-Badell (admitted *pro hac vice*)
Evelyn Baltodano Sheehan (admitted *pro hac vice*)
201 South Biscayne Boulevard, Suite 1900
Miami, Florida 33131
Telephone: (305) 967-6100
Facsimile: (305) 967-6120
adriana.riviere-badell@kobrekim.com
evelyn.sheehan@kobrekim.com

-and-

Adam M. Lavine (admitted *pro hac vice*)
John G. Conte (admitted *pro hac vice*)
800 Third Avenue
New York, New York 10022
Telephone: (212) 380-2580
Facsimile: (212) 488-1220
adam.lavine@kobrekim.com
john.conte@kobrekim.com

*Counsel to the Foreign Representatives*

AP1938

# EXHIBIT A

Notice to Creditors of Intention to Declare a Dividend

**IN THE SUPREME COURT OF BERMUDA**
**COMPANIES (WINDING UP)**
**COMMERICAL COURT 2020: NO. 300**
**IN THE MATTER OF POINT INVESTMENTS, LTD. (IN LIQUIDATION)**
**AND IN THE MATTER OF THE COMPANIES ACT 1981**

---

**NOTICE TO CREDITORS OF INTENTION**
**TO DECLARE A DIVIDEND**

---

**NOTICE IS HEREBY GIVEN** that the Joint Liquidators ("**JLs**") intend to declare a first and final dividend (the "**Dividend**") to creditors of Point Investments, Ltd. (the "**Company**"). Proof of Debt forms have been provided to all known creditors, however, any person who has not already filed a claim who is claiming to be a creditor of the Company must prove their debts on or before 9 June 2023 at 6.p.m Bermuda time (the "**Deadline**").  The JLs request all creditors to send full name, address, particulars and supporting evidence of their debts or claims including names and addresses of their representatives (if applicable) to the JLs of the Company, c/o Kroll Bermuda Ltd, Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM11 Bermuda or via Email at Point.Liquidation@kroll.com.

Any person wishing to receive a claim form and who does not yet have one should contact the JLs by emailing Point.Liquidation@kroll.com or by telephoning +1 441 279 9000.

Take further notice that if you do not establish your claim to the satisfaction of the court on or before the Deadline or such later day as the court may fix, your claim will be expunged, and the JLs shall proceed to make a final dividend without regard to such claim.

**Dated this 19th day of May 2023**

Mathew Clingerman
Joint Liquidator acting as
Agent of the Company without personal liability

AP1940

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| POINT INVESTMENTS, LTD. (IN LIQUIDATION),[1] | Case No. 22-10261 (TMH) |
| | **Re: D.I. 57** |
| Debtor in a Foreign Proceeding. | |

### ORDER AUTHORIZING FOREIGN REPRESENTATIVES TO REDACT AND FILE UNDER SEAL CERTAIN INFORMATION CONTAINED IN (I) THE MOTION OF THE FOREIGN REPRESENTATIVES FOR ENTRY OF AN ORDER TO CONDUCT DISCOVERY PURSUANT TO 11 U.S.C. § 1521(a)(4), FED. R. BANKR. P. 2004, AND LOCAL RULE 2004-1 AND (II) THE DECLARATION OF ANDREW CHILDE

Upon the motion (the "Motion") of the Foreign Representatives, for entry of an order authorizing them to redact and file under seal certain Confidential Information in connection with (i) *Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1* (the "Discovery Motion")[2] [D.I. 53], and (ii) *Declaration of Andrew Childe in Support of (I) Motion of Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1, and (II) Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and for Damages* [D.I. 54] (collectively, the "Sealed Documents") and this Court having reviewed the Motion; and this Court having found that it has jurisdiction to consider the Motion pursuant to 28 U.S.C. § 1334; and this Court having found that the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b), and that the Foreign

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

[2] Capitalized terms used herein but not defined shall have the meanings ascribed in the Discovery Motion.

Representatives consent to entry of a final order under Article III of the United States Constitution; and this Court having found that venue of this Chapter 15 Case and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and any objections to the relief requested in the Motion having been withdrawn or overruled on the merits; and after due deliberation thereon and good and sufficient cause appearing therefore,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted, as set forth herein.

2.      The Foreign Representatives are authorized to file the Confidential Information contained in the Sealed Documents under seal, including the unredacted version of the Sealed Documents.

3.      The Confidential Information should remain under seal and shall not be made available to anyone and any information derived from such documents including any exhibits thereto, shall remain confidential, be filed under seal, and shall be served on and made available only to: (i) the Court; (ii) the U.S. Trustee; (iii) counsel to the Foreign Representatives; (iv) counsel to the General Partner; and (iv) such other parties as ordered by this Court or as agreed to in writing by the Foreign Representatives.

4.      The Foreign Representatives are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

AP1942

5.    The Court retains jurisdiction with respect to all matters arising from or related to

the implementation, interpretation, and enforcement of this Order.

**Dated: May 22nd, 2023**
**Wilmington, Delaware**

                                   **THOMAS M. HORAN**
                                   **UNITED STATES BANKRUPTCY JUDGE**

3

AP1943

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| POINT INVESTMENTS, LTD.<br>(IN LIQUIDATION), | Case No. 22-10261 (TMH) |
| Debtor in a Foreign Proceeding.[1] | |

## FTI GP I, LLC ON BEHALF OF FALCATA TECH INVESTMENT FUND I, L.P. AND THE FOREIGN REPRESENTATIVES ON BEHALF OF POINT INVESTMENTS, LTD.'S JOINT EXHIBIT AND WITNESS LIST FOR THE EVIDENTIARY HEARING ON MAY 25, 2023 AT 10:00 A.M. (PREVAILING EASTERN TIME)

FTI GP I, LLC, a Delaware limited liability company (the "General Partner"), on behalf of Falcata Tech Investment Fund I, L.P. (the "Fund"), a Cayman Islands exempted limited partnership, together with Andrew Childe and Richard Lewis of FFP Limited, and Matthew Clingerman of Kroll Bermuda Ltd. (the "Foreign Representatives") in their capacity as the foreign representatives of Point Investments, Ltd. (the "Debtor") (together with the General Partner, the "Proponents"), in accordance with the *Chambers Procedures for Judge Thomas M. Horan* hereby jointly disclose that they intend to call and/or reserve the right to introduce the following witnesses and exhibits, at the May 25, 2023 evidentiary hearing (the "Hearing") in support of the (i) *Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination That There is No Automatic Stay, or in the Alternative Seeking Relief from the Automatic Stay to Proceed With Adversary Proceeding* [D.I. 47] (the "Stay Relief Motion"); (ii) *Motion of the Foreign Representatives For Entry of an Order Enforcing the Automatic Stay and for Damages* [D.I. 52] (the "Stay Enforcement Motion"); and (iii) *Motion of the Foreign Representatives for Entry of an Order*

---

[1] Point Investments, Ltd. (the "Debtor") is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is located at c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

*to Conduct Discovery Pursuant to 11 U.S.C. § 1521(A)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1* [D.I. 53] (the "2004 Motion", and together with the Stay Relief Motion and the Stay Enforcement Motion, the "Motions").

## WITNESSES

1.    Robert Burnett.  The General Partner intends to offer the testimony of Mr. Burnett and, in the first instance, will rely upon the *Declaration of Robert Burnett in Support of Objection of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. to the Motion of The Foreign Representatives For Entry of an Order Enforcing the Automatic Stay and For Damages* [D.I. 69-1].  Mr. Burnett will be available for cross-examination and any re-direct examination at the Hearing to the extent necessary. Mr. Burnett is the General Partner's representative in this proceeding. The scope of Mr. Burnett's testimony will be in support of the Stay Relief Motion and in opposition to the Stay Enforcement Motion. The General Partner reserves the right to call Mr. Burnett as a live witness.

2.    Andrew Childe. The Foreign Representatives intend to offer the testimony of Mr. Childe and, in the first instance, will rely upon the *[SEALED] Declaration of Andrew Childe in Support of (I) Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1 and (II) Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and for Damages* [D.I. 54] and the *Declaration of Andrew Childe in Support of Foreign Representatives' Objection to Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination that there is No Automatic Stay, or in the Alternative, Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding* [D.I. 67].  Mr. Childe will be available for cross-examination and re-direct examination at the Hearing to the extent necessary. Mr. Childe is one of the Foreign Representatives.  The scope of Mr. Childe's testimony will be in support of the Stay

AP1945

Enforcement Motion and the 2004 Motion and in opposition to the Stay Relief Motion. The Foreign Representatives reserve the right to call Mr. Childe as a live witness.

3. <u>Nicholas Miles</u>. Mr. Miles, who is the General Partner's proposed foreign law expert on Bermuda law, will be available at the Hearing virtually via Zoom and will be able to answer any questions of the Court in the event the Court has questions.[2] The Proponents have agreed that there will be no direct or cross-examination of foreign law experts. The scope of any potential testimony of Mr. Miles's will be in support of the Stay Relief Motion and in opposition to the Stay Enforcement Motion and will include the matters set forth in the *Declaration of Nicholas John Miles in Support of Objection of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. to the Motion of The Foreign Representatives For Entry of an Order Enforcing the Automatic Stay and For Damages* [D.I. 69-2] and the *Declaration of Nicholas John Miles* [D.I. 76].

4. <u>Christopher Levers</u>. Mr. Levers, who is the General Partner's proposed foreign law expert on Cayman Islands law, will be available at the Hearing virtually via Zoom and will be able to answer any questions of the Court in the event the Court has questions. The Proponents have agreed that there will be no direct or cross-examination of foreign law experts. The scope of any potential testimony of Mr. Levers will be in support of the Stay Relief Motion and in opposition to the Stay Enforcement Motion and will include the matters set forth in the *Declaration of Christopher Levers* [D.I. 75].

5. <u>Jayson Wood</u>. Mr. Wood, who is the Foreign Representatives' proposed foreign law expert on Bermuda and Cayman Islands law, will be available at the Hearing virtually via Zoom and will be able to answer any questions of the Court in the event the Court has questions.

---

[2] The Proponents hereby request permission for Mr. Miles, Mr. Levers, and Mr. Wood to appear at the Hearing virtually via Zoom.

AP1946

The scope of any potential testimony of Mr. Wood will be in support of the Stay Enforcement Motion and in opposition to the Stay Relief Motion and will include the matters set forth in the *Declaration of Jayson Wood in Support of Foreign Representatives' Objection to Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination that there is No Automatic Stay, or in the Alternative, Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding* [D.I. 68] and the *Declaration of Jayson Wood in Support of Foreign Representatives' Reply in Further Support of Motion for Entry of an Order Enforcing the Automatic Stay and for Damages* [D.I. 78].

6.      The Proponents reserve the right to call Mr. Burnett, Mr. Childe, or any other witness identified by any other party to this proceeding as a rebuttal witness. *See* Reservation of Rights, *infra*.

## EXHIBITS

| Ex. No. | Description | Docket No. (if available) |
|---------|-------------|---------------------------|
| 1. | Verified Petition For (I) Recognition of Foreign Main Proceeding, (II) Recognition Of Foreign Representatives, and (III) Related Relief Under Chapter 15 | 3 |
| 2. | Order Granting Petition For (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Related Relief Under Chapter 15 | 34 |
| 3. | Complaint: *FTI GP I, LLC, on behalf of Falcata Tech Investment Fund I, L.P. v. Point Investments, Ltd.*, Adversary Proceeding No. 23-50122-TMH | 45 |
| 4. | Stay Violation Letter | 52-3 |
| 5. | [SEALED] Subpoena | 53-3 |

AP1947

| Ex. No. | Description | Docket No. (if available) |
|---------|-------------|---------------------------|
| 6. | [SEALED] December 9 Letter and Discovery Requests | 53-6 |
| 7. | January 9, 2023 Letter from Counsel to the General Partner to Counsel for the Foreign Representatives | 58-7 |
| 8. | January 25, 2023 Letter from Counsel to the Foreign Representatives to Counsel for the General Partner | 58-8 |
| 9. | [SEALED] Declaration of Andrew Childe in Support of (I) Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(A)(4), Fed. R. Bankr. P. 2004, And Local Rule 2004-1 and (II) Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and For Damages | 54 |
| 10. | Declaration of Andrew Childe in Support of Foreign Representatives' Objection to Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination That There is No Automatic Stay, or in the Alternative, Seeking Relief from the Automatic Stay to Proceed With Adversary Proceeding | 67 |
| 11. | Declaration of Jayson Wood in Support of Foreign Representatives' Objection to Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination That There is No Automatic Stay, or in the Alternative, Seeking Relief From the Automatic Stay to Proceed With Adversary Proceeding | 68 |
| 12. | Cayman Islands Exempted Limited Partnership Act | 68-1 |
| 13. | Declaration of Robert Burnett in Support of Objection of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. to the Motion of The Foreign Representatives For Entry of an Order Enforcing the Automatic Stay and For Damages (With Exhibits) | 69-1 |
| 14. | Declaration of Nicholas John Miles in Support of Objection of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. to the Motion of The Foreign Representatives For Entry of an Order Enforcing the Automatic Stay and For Damages (With Exhibits) | 69-2 |
| 15. | Declaration of Christopher Levers (With Exhibits) | 75 |

AP1948

| Ex. No. | Description | Docket No. (if available) |
|---|---|---|
| 16. | Declaration of Nicholas John Miles (With Exhibits) | 76 |
| 17. | Letter from Foreign Representatives to the General Partner's Bermuda Counsel Providing Notice of the Foreign Representatives' Appointment (November 3, 2021) | 77-1 |
| 18. | Email from Foreign Representatives' Counsel to the General Partner's Bermuda Counsel Providing Notice of the Winding Up Order (March 16, 2022) | 77-2 |
| 19. | Email from Foreign Representatives to the General Partner's Bermuda Counsel Providing Notice of the First Meeting of Creditors (June 15, 2022) | 77-3 |
| 20. | Declaration of Jayson Wood in Support of Foreign Representatives' Reply in Further Support of Motion for Entry of an Order Enforcing the Automatic Stay and for Damages | 78 |
| 21. | November 17, 2021 Judgment: *In the matter of Point Investments, Limited*, 2020: No. 300 | 5-1 |
| 22. | October 29, 2021 Judgment: *In the matter of Point Investments, Limited*, 2020: No. 300 | 5-2 |
| 23. | Indictment Against Robert T. Brockman, dated October 1, 2020 in the United States District Court for the Northern District of California: *United States v. Robert T. Brockman*, Case No. 3:20-CR-371 (WHA) (N.D. Cal. October 1, 2020), Dkt. No. 1 | 5-3 |
| 24. | Internal Revenue Service Notices of Levy, dated March 21, 2022, March 22, 2022, and March 23, 2022 directed to Vista Equity Partners, LLC and Robert Smith, as founder, chairman and CEO of Vista Equity Partners, LLC | 5-4 |
| 25. | Amended and Restated Exempted Limited Partnership Agreement, dated April 20, 2018 | 45-1 |
| 26. | Master Transaction Agreement, dated as of July 1, 2019 | 45-2 |
| 27. | Email From the General Partner to the Debtor, dated July 2, 2020 | 45-3 |

AP1949

| Ex. No. | Description | Docket No. (if available) |
|---------|-------------|---------------------------|
| 28. | Default Letter, dated August 4, 2020 | 45-4 |
| 29. | June 15, 2022 Letter to All Known Creditors of the Debtor | 81-1 |
| 30. | Status Report dated May 19, 2023 | 84 |

7.     Additionally, the Proponents ask that the Court take judicial notice of all pleadings filed in this case. The Proponents reserve the right to use additional demonstrative exhibits as they deem appropriate in connection with the Hearing, subject to any objections of the party not seeking to use any such demonstrative exhibits.

8.     The Proponents reserve the right to submit any rebuttal exhibits or any exhibits identified by any other party to this contested matter. *See* Reservation of Rights, *infra.*

## RESERVATION OF RIGHTS

9.     The Proponents reserve the right to supplement this exhibit and witness list in all respects, including without limitation by using additional witnesses or exhibits, as necessary.  The Proponents reserve the right to submit all pleadings filed in this case. The Proponents further reserve the right to call rebuttal witnesses or any witnesses identified by any party in these contested matters. The Proponents also reserve the right to use exhibits not listed herein for purposes of rebuttal or impeachment.  The Proponents also reserve the right to add additional witnesses and additional exhibits upon notice to the Court and the other parties to these contested matters.

AP1950

Dated: May 23, 2023
Wilmington, Delaware

By: /s/ *Stephen J. Astringer*
Jacob R. Kirkham (No. 5768)
Stephen J. Astringer (No. 6375)
KOBRE & KIM LLP
600 North King Street, Suite 501
Wilmington, Delaware 19801
Telephone: (302) 518-6451
Facsimile: (302) 518-6461
jacob.kirkham@kobrekim.com
stephen.astringer@kobrekim.com

-and-

Adriana Riviere-Badell (admitted *pro hac vice*)
Evelyn Baltodano Sheehan (admitted *pro hac vice*)
KOBRE & KIM LLP
201 South Biscayne Boulevard, Suite 1900
Miami, Florida 33131
Telephone: (305) 967-6100
Facsimile: (305) 967-6120
adriana.riviere-badell@kobrekim.com
evelyn.sheehan@kobrekim.com

-and-

Adam M. Lavine (admitted *pro hac vice*)
John G. Conte (admitted *pro hac vice*)
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Telephone: (212) 380-2580
Facsimile: (212) 488-1220
adam.lavine@kobrekim.com
john.conte@kobrekim.com

*Attorneys for the Foreign Representatives*

By: /s/ *Eric D. Schwartz*
Eric D. Schwartz (No. 3134)
Daniel B. Butz (No. 4227)
Evanthea Hammer (No. 7061)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899
Telephone: (302) 658-9200
Email: eschwartz@morrisnichols.com
dbutz@morrisnichols.com
ehammer@morrisnichols.com

-and-

Paul Werner (admitted *pro hac vice*)
A. Joseph Jay III (admitted *pro hac vice*)
SHEPPARD, MULLIN, RICHTER &
HAMPTON, LLP
2099 Pennsylvania Avenue NW, Suite 100
Washington, D.C. 20006-6801
Telephone: (202) 747-1900
Email: pwerner@sheppardmullin.com
jjay@sheppardmullin.com

-and-

Edward H. Tillinghast, III (admitted *pro hac vice*)
SHEPPARD, MULLIN, RICHTER &
HAMPTON, LLP
30 Rockefeller Plaza
New York, New York 10112-0015
Telephone: (212) 653-8700
Email: etillinghast@sheppardmullin.com

*Attorneys for FTI GP I, LLC on behalf of Falcata
Tech Investment Fund I, L.P.*

AP1951

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| POINT INVESTMENTS, LTD.<br>(IN LIQUIDATION),[1] | Case No. 22-10261 (TMH) |
| Debtor in a Foreign Proceeding. | |

## NOTICE OF AGENDA OF MATTERS SCHEDULED
## FOR HEARING ON MAY 25, 2023 AT 10:00 A.M. (ET)

All hearings will take place in person other than status conferences, scheduling conferences, pretrial conferences, discovery hearings, fee hearings or first-day hearings, which will be conducted remotely (unless the Court directs otherwise). All participants at an in-person hearing are required to attend in person, except that remote participation at an in-person hearing is permitted for: (i) counsel for a party or a pro se litigant that files a responsive pleading and intends to make only a limited argument; (ii) a party or a representative of a party that has not submitted a pleading but is interested in observing the hearing; (iii) any party that is proceeding, in a claims allowance dispute, on a pro se basis; or (iv) extenuating circumstances that warrant remote participation as may be determined by the Court.

If you intend to appear via Zoom, you are required to register in advance. Please use the link below to register for the hearing. Please register no later than **4:00 p.m. (ET) on May 24, 2023**.

Registration link:

https://debuscourts.zoomgov.com/meeting/register/vJItceuurzMrHRJTdxh6RdL29DmWrWTqYBg

After registering your appearance by Zoom, you will receive a confirmation email containing information about joining the hearing. You must use your full name when registering and logging into Zoom or you will not be granted access to the hearing.

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

AP1952

**MATTER UNDER CNO**

1. Motion of the Foreign Representatives for Entry of an Order Authorizing them to Redact and File Under Seal Certain Information Contained in (I) the Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1 [D.I. 57; Filed: 03/30/2023]

   Response Deadline: April 11, 2023 at 4:00 p.m. (ET)

   Responses Received: None

   Related Documents:

   a. Certificate of No Objection Regarding Motion of the Foreign Representatives for Entry of an Order Authorizing them to Redact and File Under Seal Certain Information Contained in (I) the Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1 and (II) the Declaration of Andrew Childe [D.I. 83; Filed: 05/18/2023]

   b. Order Authorizing them to Redact and File Under Seal Certain Information Contained in (I) the Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1 and (II) the Declaration of Andrew Childe [D.I. 85; Entered: 05/22/2023]

   Status: An order has been entered. No hearing is necessary.

**CONTESTED MATTERS GOING FORWARD**

2. Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and for Damages [D.I. 52; Filed: 03/27/2023]

   Objection Deadline:           April 14, 2023

   Related Documents:

   a. [SEALED] Declaration of Andrew Childe in Support of (I) Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1 and (II) Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and for Damages [D.I. 54; Filed: 03/27/2023]

   b. [REDACTED] Declaration of Andrew Childe in Support of (I) Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1 and (II) Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and for Damages [D.I. 59; Filed: 03/30/2023]

AP1953

c.   Foreign Representatives' Reply in Further Support of Motion for Entry of an Order Enforcing the Automatic Stay and for Damages [D.I. 77; Filed: 05/09/2023]

d.   Declaration of Jayson Wood in Support of Foreign Representatives' Reply in Further Support of Motion for Entry of an Order Enforcing the Automatic Stay and for Damages [D.I. 78; Filed: 05/09/2023]

e.   FTI GP I, LLC on behalf of Falcata Tech Investment Fund I, L.P. and the Foreign Representatives on behalf of Point Investments, Ltd.'s Joint Exhibit and Witness List for the Evidentiary Hearing on May 25, 2023 at 10:00 a.m. (prevailing eastern time) [D.I. 86; Filed 05/23/2023]

Responses Received:

a.   Objection of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. to the Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and for Damages [D.I. 69; Filed: 04/14/23]

Status:      This matter will go forward on a contested basis.


3.   Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination that there is No Automatic Stay, or in the Alternative Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding [D.I. 47; Filed: 03/23/2023]

Objection Deadline:      April 14, 2023

Related Documents:

a.   Reply of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. in Support of Motion for Determination that there is No Automatic Stay, or in the Alternative Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding [D.I. 81; Filed: 05/10/2023]

b.   Declaration of Christopher Levers [D.I. 75; Filed: 05/09/2023]

c.   Declaration of Nicholas John Miles [D.I. 76; Filed: 05/09/2023]

d.   FTI GP I, LLC on behalf of Falcata Tech Investment Fund I, L.P. and the Foreign Representatives on behalf of Point Investments, Ltd.'s Joint Exhibit and Witness List for the Evidentiary Hearing on May 25, 2023 at 10:00 a.m. (prevailing eastern time) [D.I. 86; Filed 05/23/2023]

Responses Received:

a.   Foreign Representatives' Objection to Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination that there is No Automatic

AP1954

Stay, or in the Alternative, Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding [D.I. 66; Filed: 04/14/2023]

b.      Declaration of Andrew Childe in Support of Foreign Representatives' Objection to Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination that there is No Automatic Stay, or in the Alternative, Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding [D.I. 67; Filed: 04/14/2023]

c.      Declaration of Jayson Wood in Support of Foreign Representatives' Objection to Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination that there is No Automatic Stay, or in the Alternative, Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding [D.I. 68; Filed: 04/14/2023]

Status:      This matter will go forward on a contested basis.

4.   [SEALED] Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1 [D.I. 53; Filed: 03/27/2023]

Objection Deadline:      April 14, 2023

Related Documents:

a.      [REDACTED] Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1 [D.I. 58; Filed: 03/30/2023]

b.      [SEALED] Declaration of Andrew Childe in Support of (I) Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1 and (II) Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and for Damages [D.I. 54; Filed: 03/27/2023]

c.      [REDACTED] Declaration of Andrew Childe in Support of (I) Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1 and (II) Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and for Damages [D.I. 59; Filed: 03/30/2023]

d.      Foreign Representatives' Reply in Further Support of Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1 [D.I. 79; Filed: 05/09/2023]

AP1955

e.      FTI GP I, LLC on behalf of Falcata Tech Investment Fund I, L.P. and the Foreign Representatives on behalf of Point Investments, Ltd.'s Joint Exhibit and Witness List for the Evidentiary Hearing on May 25, 2023 at 10:00 a.m. (prevailing eastern time) [D.I. 86; Filed 05/23/2023]

Responses Received:

a.      Objection of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. to Motion of Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1 [D.I. 65; Filed: 04/14/2023]

Status:      This matter will go forward on a contested basis.

AP1956

Dated: May 23, 2023
      Wilmington, Delaware

Respectfully submitted,

/s/      *Stephen J. Astringer*
**KOBRE & KIM LLP**
Jacob R. Kirkham (No. 5768)
Stephen J. Astringer (No. 6375)
600 North King Street, Suite 501
Wilmington, Delaware 19801
Telephone: (302) 518-6451
Facsimile: (302) 518-6461
jacob.kirkham@kobrekim.com
stephen.astringer@kobrekim.com

-and-

Adriana Riviere-Badell (admitted *pro hac vice*)
Evelyn Baltodano Sheehan (admitted *pro hac vice*)
201 South Biscayne Boulevard, Suite 1900
Miami, Florida 33131
Telephone: (305) 967-6100
Facsimile: (305) 967-6120
adriana.riviere-badell@kobrekim.com
evelyn.sheehan@kobrekim.com

-and-

Adam M. Lavine (admitted *pro hac vice*)
John G. Conte (admitted *pro hac vice*)
800 Third Avenue
New York, New York 10022
Telephone: (212) 380-2580
Facsimile: (212) 488-1220
adam.lavine@kobrekim.com
john.conte@kobrekim.com

*Counsel to the Foreign Representatives*

AP1957

# IN THE UNITED STATES BANKRUPTCY
# COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| POINT INVESTMENTS, LTD. (IN LIQUIDATION),[1] | Case No. 22-10261 (TMH) |
| Debtor in a Foreign Proceeding. | |
| | **Re: D.I. 47, 66, 67, 68, 75, 76, 81** |

## ORDER DENYING MOTION OF FTI GP I, LLC ON BEHALF OF FALCATA TECH INVESTMENT FUND I, L.P. FOR DETERMINATION THAT THERE IS NO AUTOMATIC STAY, OR IN THE ALTERNATIVE SEEKING RELIEF FROM THE AUTOMATIC STAY TO PROCEED WITH ADVERSARY PROCEEDING

Upon consideration of the Motion of FTI GP I, LLC on behalf of Falcata Tech Investment Fund I, L.P. (the "Fund") for Determination that there is No Automatic Stay, or in the Alternative Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding [D.I. 47] (the "Motion")[2] for entry of an order determining that there is no stay of the adversary proceeding entitled *FTI GP I, LLC on behalf of Falcata Tech Investment Fund I, L.P. v. Point Investments, Ltd.*, Adv. Proc. No. 23-50122 (TMH) (the "Adversary Proceeding") currently pending in this Court, or in the alternative, seeking relief from the stay arising under section 1520(a) of the Bankruptcy Code to allow the Fund to proceed with the Adversary Proceeding; the Foreign Representatives' Objection to Motion of FTI GP I, LLC on Behalf of Falacta Tech Investment Fund I, L.P. for Determination that there is No Automatic Stay, or in the Alternative, Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding [D.I. 66] (the "Objection"); the Declarations of Andrew Childe and Jayson Wood in Support of

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

[2] Capitalized terms not defined herein are used as defined in the Motion.

1

AP1958

the Objection [D.I. 67 and 68]; the Declaration of Christopher Levers [D.I. 75]; the Declaration

of Nicholas John Miles [D.I. 76]; and the Reply of FTI GP I, LLC on Behalf of Falcata Tech

Investment Fund I, L.P. in Support of Motion for Determination that there is No Automatic Stay,

or in the Alternative Seeking Relief from the Automatic Stay to Proceed with Adversary

Proceeding [D.I. 81]; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§

157 and 1334; and  the Court having found that this is a core proceeding pursuant to 28 U.S.C. §

157(b)(2); and the Court having found that notice of the Motion was sufficient under the

circumstances and that no further notice need be given; and the Court having reviewed the legal

and factual bases set forth in the Motion, any responses thereto, and the evidence admitted and

the argument of counsel at the hearing on May 25, 2023; the Court hereby orders that:

1.      The Motion is denied for the reasons set forth on the record at the May 25, 2023

hearing.

2.      The Adversary Proceeding constitutes a violation of the stay set forth in Bankruptcy

Code sections 1520(a)(1) and 362(a)(1) and, therefore, is void *ab initio*.

3.      The Fund shall immediately cease prosecuting the Adversary Proceeding and shall

file a dismissal of such Adversary Proceeding, with prejudice, within 14 days of the entry of this

Order.

4.      Notwithstanding Bankruptcy Rule 4001, this Order shall be effectively

immediately upon entry.

AP1959

5.      The Court shall retain jurisdiction with respect to all matters arising from or related

to the implementation, interpretation, or enforcement of this Order.

Dated: May 26, 2023

_____
Thomas M. Horan
United States Bankruptcy Judge

AP1960

# IN THE UNITED STATES BANKRUPTCY
## COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| POINT INVESTMENTS, LTD.<br>(IN LIQUIDATION),[1] | Case No. 22-10261 (TMH) |
| Debtor in a Foreign Proceeding. | |
| | **Re: D.I. 52, 54, 59, 69, 77, and 78** |

## ORDER GRANTING IN PART, AND DENYING IN PART,
## THE MOTION OF FOREIGN REPRESENTATIVES FOR ENTRY OF
## AN ORDER ENFORCING THE ORDER STAY AND FOR DAMAGES

Upon consideration of the Motion of Foreign Representatives for Entry of an Order

Enforcing the Order Stay and for Damages [D.I. 52] (the "Motion");[2] the Declaration of

Andrew Child in Support of (I) Motion of the Foreign Representatives for Entry of an

Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004,

and Local Rule 2004-1 and (II) Motion of the Foreign Representatives for Entry of an Order

Enforcing the Automatic Stay and for Damages  [D.I. 54]; the Objection of FTI GP I, LLC

on Behalf of Falcata Tech Investment Fund I, L.P. (the "General Partner") to the Motion

of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and

for Damages [D.I. 69]; the Foreign Representatives' Reply in Further Support of the

Motion for Entry of an Order Enforcing the Automatic Stay and for Damages [D.I. 77]

and the Declaration of Jayson Wood in Support of Foreign Representatives' Reply n

Further Support of Motion for Entry of an Order Enforcing the Automatic Stay and for

Damages [D.I. 78]; and the Court having jurisdiction to consider the Motion and the relief

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

[2] Capitalized terms not defined herein shall have the meanings set forth in the Motion.

requested therein pursuant to 28 U.S.C.§§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and upon consideration of the Motion; and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and finding that adequate notice of the Motion having been given; and it appears that no other or further notice need be given; and upon the record of any hearing held to consider the relief requested in the Motion; and this Court having found and determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and the Court having considered the evidence admitted and the arguments of counsel at the hearing on May 25, 2023; and after due deliberation and sufficient cause appearing therefore; the Court hereby orders that:

1.      The Motion is granted in part, and denied in part, for the reasons set forth on the record at the May 25, 2023 hearing.

2.      The Adversary Proceeding constitutes a violation of sections 1520(a)(1) and 362(a)(1) of the Bankruptcy Code and, therefore, is void *ab initio*.

3.      The General Partner shall immediately cease prosecuting the Adversary Proceeding and shall file a dismissal of such Adversary Proceeding, with prejudice, within 14 days of the entry of this Order.

4.      Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon entry; (b) the Foreign Representatives are not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order; and (c) the Foreign Representatives and their agents are authorized and empowered and may, in their discretion and without further delay, take any action and perform any act

2

AP1962

necessary to implement and effectuate the terms of this Order.

     5.    This Court shall retain jurisdiction over any and all matters arising from the interpretation, implementation, or enforcement of this Order.


Dated: May 26, 2023

                              Thomas M. Horan
                              United States Bankruptcy Judge

AP1963

```
                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE


IN RE:                              ) Case No. 22-10261-JKS
                                    ) Chapter 15
                                    )
                                    )
                                    )
POINT INVESTMENTS, LTD.             )
(IN LIQUIDATION),                   )
                                    )
                                    )
                    Debtor.         )
                                    ) Wilmington, Delaware
                                    ) May 25, 2023
                                    ) 10:07 p.m.


                 TRANSCRIPT OF MOTIONS HEARING
            BEFORE THE HONORABLE THOMAS M. HORAN
              UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:


For the Foreign          JACOB R. KIRKHAM, ESQUIRE
Representatives:         STEPHEN ASTRINGER, ESQUIRE
                         KOBRE & KIM, LLP
                         600 North King Street, Suite 501
                         Wilmington, DE  19801

                         ADAM M. LAVINE, ESQUIRE
                         JOHN CONTE, ESQUIRE
                         KOBRE & KIM, LLP
                         800 Third Avenue
                         New York, NY  10022

For the General          EDWARD H. TILLINGHAST, ESQUIRE
Partner:                 SHEPPARD, MULLIN
                         30 Rockefeller Plaza
                         New York, NY 10112

For the United States    WARD W. BENSON, ESQUIRE
of America:              DEPT. OF JUSTICE, TAX DIVISION
                         Post Office Box 227
                         Washington, DC  20044

Audio Operator:          Leslie Murin
```

AP1964

2

```
Transcribed by:          DIANA DOMAN TRANSCRIBING, LLC
                         P.O. Box 129
                         Gibbsboro, New Jersey  08026-0129
                         Phone:   (856) 435-7172
                         Fax:     (856) 435-7124
                         Email:   dianadoman@comcast.net
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

3

1                          I N D E X

2     ARGUMENT:                                        PAGE

3     RE: ENFORCE AUTOMATIC STAY

4     By Mr. Lavine                               8, 23, 34

5     By Mr. Tillinghast                             16, 30

6     RE: MODIFY AUTOMATIC STAY

7     By Mr. Tillinghast                                 35

8     By Mr. Lavine                                      43

9     By Mr. Tillinghast                                 54

10    By Mr. Lavine                                      58

11    By Mr. Tillinghast                                 63

12    By Mr. Benson                                      64

13    By Mr. Lavine                                      65

14    By Mr. Tillinghast                                 66

15    RE: DAMAGES

16    By Mr. Lavine                                  68, 75

17    By Mr. Tillinghast                             72, 76

18    RE: 2004 DISCOVERY

19    By Mr. Lavine                                  77, 80

20    By Mr. Tillinghast                                 79

21    RULINGS:

22    By the Court                                       83

23

24

25

Colloquy                                                    4

1              (The following was heard at 10:07 a.m.:)

2              COURTROOM DEPUTY:  All rise.

3              THE COURT:  Good morning, please be seated.  We are

4    on the record in Point Investments, Case No. 22-10261.  I'd

5    just ask for Zoom participants, when you're not being heard,

6    please turn off your camera, and in the even that you'd like

7    to be heard, you can turn it on, and I will recognize you, so

8    thank you.  Good morning.  Good to see you.

9              MR. ASTRINGER:  Good morning, Your Honor.  Stephen

10   Astringer of Kobre and Kim, on behalf of the foreign

11   representatives.  With me today, from Kobre and Kim, are my

12   colleagues, Adam Levine and John Conte.

13             Also with us, Your Honor, is Andy Childe.  My Childe

14   is one of the founding members of the professional fiduciary

15   firm, FFP Cayman, Limited.  He is one of the joint liquidators

16   and foreign representatives in this case, who we represent.

17             THE COURT:  Okay, very good.  Thank you.

18             MR. TILLINGHAST:  Good morning, Your Honor.  Edward

19   Tillinghast from Sheppard, Mullin, and with me is Robert

20   Burnett --

21             THE COURT:  Good morning.

22             MR. TILLINGHAST:  -- the FTI GP 1, and Joe Day and

23   Damani Simms and Mr. Butz, our local counsel.

24             THE COURT:  Good morning, Gentlemen.

25             MR. TILLINGHAST:  Thank you.

1          THE COURT:  Okay.  Please step up to the podium.  I

2    have a couple of questions, and I'm not -- I'm not prejudging

3    anything or in no way do I want to dictate how the parties

4    present their cases.  But I do have a threshold question, and

5    that's whether the central issues that I have to decide today,

6    which, in my view, are whether the filing of the complaint

7    constituted a violation of the automatic stay, and relatably,

8    whether I have authority to adjudicate the claims presented in

9    the complaint.

10          Why aren't those legal issues?

11          MR. LAVINE:  Your Honor, we believe they are

12   predominantly legal issues, I think, and counsel and us met

13   and conferred about the conduct of the hearing today.  There

14   are predominantly legal issues.  I think there are just a

15   handful of potential fact issues, which would be prejudice to

16   the Debtor or prejudice to the creditor, here, in the event

17   that the automatic stay -- I'm sorry -- in the event you

18   determine that the automatic stay applies, and then the

19   question becomes whether it should be lifted or not, there

20   could be a threshold factual question about prejudice.

21          Having said that, we also tend to believe that the

22   prejudice is clear, from the papers that have already been

23   submitted, and, frankly, under the legal arguments,

24   themselves.  What we had discussed before coming here today is

25   that because, while there are many papers in front of you, and

1    there's three separate motions and three separate items on the

2    Agenda, there is really only three issues, as we see it, and

3    so, perhaps, we could proceed in oral argument in that order,

4    as opposed to in the order of the motions.

5           The issues, as we see it are, first, whether the

6    stay applies in this Chapter 15 case to the adversary

7    proceeding.  Assuming it does apply, the issue becomes -- and

8    so, we would be happy to present, if it's okay with you, that

9    issue as it's own separate oral argument.

10          The second issue would be, should the stay be

11   modified, and that is where Your Honor could, perhaps, give us

12   direction if Your Honor believes that that is not a factual

13   issue, and therefore, we don't need witnesses, but I think we

14   did both intend to submit declarations into evidence,

15   particularly on the prejudice point.

16          And then, third, there is the final motion, which is

17   Rule 2004 discovery, and then I think we would also want the

18   opportunity to explain why, under the circumstances of this

19   case, this violation of the stay actually warrants the

20   imposition of costs.

21          THE COURT:  Okay, thank you, and I appreciate that.

22   I do have one -- one factual question that I'd like to ask

23   now, and kind of get it out of the way, although I expect you

24   might get to it in your presentations.  In your reply in

25   support of a motion to enforce the automatic stay, you -- you

1    said that the parties had agreed, in principle, on a tolling

2    agreement.  Has that tolling agreement become memorialized?

3            MR. LAVINE:  Yes, it has, Your Honor.

4            THE COURT:  Okay.

5            MR. LAVINE:  And I know that, at least our side, has

6    executed it, and I don't -- I haven't been on my email for the

7    last couple of hours, so I'm not sure.

8            MR. TILLINGHAST:  Yes.  The simple answer is the

9    agreement, itself, has been agreed to.  We got it from counsel

10   this morning.  They've signed it.  We just have to sign it.

11           THE COURT:  Very good, okay.

12           MR. TILLINGHAST:  We don't expect any changes.

13           THE COURT:  Okay.  Thank you, Mr. Tillinghast.  I

14   appreciate that.  That's all I've got to say, at this point,

15   and I certainly don't mean to interfere with how you'd like to

16   present your cases, so I'll leave it to you from here.

17           MR. LAVINE:  Okay.  So, then, I do think we should

18   proceed, as I suggested, and as counsel agreed, which is to

19   begin the oral argument, effectively on the issue of, does the

20   stay apply to a Chapter 15 case.

21           THE COURT:  Very good.  Okay.  I appreciate that.

22   Thank you.

23           MR. LAVINE:  Your Honor, but, before we --

24           THE COURT:  And I'm sorry, just because we don't

25   know each other, you're Mr. Lavine?

1            MR. LAVINE:  Yes, apologies.

2            THE COURT:  Thank you.  Okay.

3            MR. LAVINE:  Adam Lavine of --

4            THE COURT:  It's good to meet you, Mr. Lavine.

5            MR. LAVINE:  -- of Kobre and Kim, for the record.

6            THE COURT:  Thank you.

7            MR. LAVINE:  And before I actually get to the legal

8    argument, I did -- you know, we're conscious that this case

9    was transferred to Your Honor fairly recently, and so, we

10   thought it would also be helpful to give a quick summary of

11   the events that led to the filing of the Chapter 15 case, as

12   well as some background concerning the foreign proceeding,

13   itself, if Your Honor thinks that would be helpful.

14           THE COURT:  Sure.  Thank you very much, Mr. Lavine.

15           MR. LAVINE:  So, prior to its winding up, the Debtor

16   acted as an investment vehicle for an entity by the name of

17   Spanish Steps.  Spanish Steps was the Debtor's sole economic

18   shareholder.

19           And in September, 2020, Spanish Steps filed a

20   petition to liquidate the Debtor in the Bermuda courts, and

21   that was due to mismanagement and misappropriation of Debtor

22   assets.  In short, Spanish Steps wanted to appoint independent

23   fiduciaries with court supervision to take over the affairs of

24   the company and wind it down and liquidate it, in accordance

25   with the Bermuda Winding-Up Act.

1          And so, that petition was highly contested, and it

2    took over a year to resolve, and it was resolved in October,

3    2021.  And that's when the Bermuda court granted the petition,

4    placed the Debtor into a winding-up -- provisional liquidation

5    and appointed provisional liquidators, including Mr. Childe.

6    And then, it was approximately four months later, in February

7    of '22 when the Bermuda court converted that provisional

8    liquidation into a permanent liquidation, and this Chapter 15

9    was commenced about a month after that.

10          And the Chapter 15 was commenced for a very specific

11   purpose or it had a very specific cause, and that was that a

12   single contingent creditor of the Debtor sought to immediately

13   levy and seize the Debtor's assets in the U.S.  That

14   contingent creditor was the Internal Revenue Service.  And the

15   IRS maintained that it could seize the Debtor's U.S. property

16   on the basis that the Debtor is an alleged alter-ego of a U.S.

17   taxpayer, and that U.S. taxpayer allegedly owes about 1.4

18   billion dollars to the IRS.

19          To this day, no court has ever found that the Debtor

20   is an alter-ego of this taxpayer, and to this day, no court

21   has ever made a finding as to the underlying alleged

22   liability, this 1.4 billion that I referenced.

23          And so, as this is an ancillary proceeding, the

24   Debtor only filed one first day motion.  The first day motion

25   was a motion to apply the automatic stay to the Chapter 15,

1    because, despite its name, in Chapter 15 world, an automatic

2    stay is actually not automatic.  It doesn't attach on the

3    first day.  And so, that motion was highly contested by the

4    IRS, and following a contested hearing, Judge Stickles granted

5    the Debtor's stay motion, and she held as follows, and I'm

6    going to quote from the Judge's ruling.

7         Judge Stickles said, "The Debtor's need to prevent

8    distribution of its assets to a creditor is an emergency

9    justifying relief because premature distribution of Debtor's

10   assets could negate the Bermuda insolvency proceeding.

11        The fact that the Debtor is liquidating does not

12   lessen the harm of seizure of the Debtor's assets because the

13   Debtor will need to distribute those funds to its creditors at

14   the direction of the Court in Bermuda."

15        And so, following that ruling, a few weeks later,

16   the IRS withdrew its levies, and Judge Stickles granted

17   recognition of the foreign main proceeding, at which point the

18   automatic stay became permanent by operation of Section 1520

19   of the Bankruptcy Code.

20        And since that time, this case has been relatively

21   quiet in the Chapter 15, at least.  Abroad, in Bermuda and

22   elsewhere, the foreign representatives have been exercising

23   their mandate, that is, investigating the Debtor's financial

24   affairs, collecting and preserving estate assets, and that

25   including seeking discovery from third parties, formally or

1    informally, and by obtaining, for example, recognition of the

2    Bermuda proceeding, also, in Switzerland, where the Debtor has

3    sizable assets.

4         And last Summer, the joint liquidators called what's

5    -- what's called the meeting of creditors, and it was at that

6    meeting that the creditors voted for the foreign

7    representatives to continue their service, and they went from

8    provisional liquidators to permanent liquidators.  And that

9    required 50 percent of the claims in number and 50 percent in

10   amount for voting purposes, as opposed to claims admission

11   purposes.

12        And just last week, the foreign representatives

13   commenced the process of calling for proofs of debt, which is

14   essentially like setting a bar date here in the U.S.  And so,

15   I think that brings us to today's matters, and the first

16   issue, as I mentioned, which was whether the automatic stay

17   applies.

18        This is docket index number, at least on the

19   Debtor's motion, 52.  The motion seeks to enforce the

20   fundamental protections of the stay and declare, as void, the

21   adversary proceeding that had been commenced.  The adversary

22   proceeding asserts claims, pre-petition claims that fall

23   squarely within the ambit of Section 362(a)(1).

24        The general partner advances two main arguments as

25   to why the stay is not barred -- sorry as why the adversary

1    complaint is not barred.  First, the general partner asserts

2    that the stay only to property of the Debtor located in the

3    United States.  This argument is clearly incorrect.  The plain

4    text of Section 1520 makes clear that the automatic stay

5    applies to both the Debtor "and the property of the Debtor"

6    located in the United States.  So, clearly, it applies to, not

7    just the property in the United States, but also the Debtor.

8         At bottom, we think this argument can be disposed of

9    fairly quickly, and I'm not sure if -- frankly, we think this

10   point has effectively been conceded by the general partner,

11   and it seems they have abandoned it by not further raising it

12   in their reply or in their objection to the Debtor's stay

13   enforcement motion.  And so, our understanding is that the

14   core issue is now the home court rule and whether that is an

15   exception to the filing of the adversary complaint.

16        With respect to the home court rule, this is an

17   implicit, i.e. not express in the Bankruptcy Code, it's an

18   implicit exception to the automatic stay that some courts have

19   found exists where the adversary proceeding is the equivalent

20   of filing a proof of claim.

21        But the home court rule doesn't apply in Chapter 15.

22   And that's because the "home court" is the court overseeing

23   the foreign main proceeding, the Bermuda case.  And we think

24   the inapplicability of the home court rule is clear here.

25   It's clear from the structure of the Bankruptcy Code.  It's

1    clear from the legislative history of Chapter 15.  As

2    mentioned, the home court rule is an implicit exception.

3    Courts who have applied it, they reference Section 501 of the

4    Bankruptcy Code.  Section 501, as Your Honor knows, deals with

5    the submission of proofs of claim.

6           But Section 103 of the Bankruptcy Code makes clear

7    that 501 does not apply in Chapter 15 cases.  This makes

8    sense, because Chapter 15 is ancillary, and claims are

9    supposed to be submitted in the home court, i.e. the foreign

10   main proceeding.  So, given that 501 does not apply, there's

11   really no statutory basis to argue that the home court rule

12   should apply in this case.

13          Furthermore, there is another indication in the

14   statute that the home court rule does not apply, and we

15   reference this in our papers, and that is Section 1520(b) of

16   the Bankruptcy Code.  And this provision indicates -- sorry --

17   this provision is an exception to the automatic stay in a

18   Chapter 15 case.

19          And the exception says that, it is not a violation

20   of the stay for a creditor to commence a lawsuit in a foreign

21   country.  So, the general partner's argument that the home

22   court rule allows for the commencement of an adversary

23   proceeding in the U.S. to preserve its claim, that should just

24   be rejected as a matter of statutory interpretation, because

25   that argument, if accepted as true, would effectively void and

Lavine - Argument                                    14

1    render meaningless the phrase found in Section 1520(b), which

2    says that there is an exception for creditors who commence a

3    case in a foreign country.

4          So, in addition to these statutory legislative

5    history points, we think case law is clear here, too.  As

6    detailed in our papers, multiple courts have found that the

7    automatic stay arising in a Chapter 15 case or the injunction

8    on proceedings arising under the old Section 304 of the

9    Bankruptcy Code, they stay the commencement of adversary

10   proceedings.

11         And the general partner does not cite any authority

12   from the Chapter 15 or from former Section 304 for its

13   argument that the home court rule applies.  Instead, it spends

14   pages citing cases from Chapter 7 and Chapter 11 that are all

15   distinguishable because they didn't involve a foreign

16   proceeding with the bankruptcy case being an ancillary

17   proceeding.

18         They do cite adversary proceedings filed in Chapter

19   15 cases, but these adversary proceedings do not involve the

20   adjudication of pre-petition claims, which is what is sought

21   here.  At most, they will sometimes cite cases where a

22   creditor seeks a threshold determination, and they come to the

23   court in advance and say, Judge, I want to bring this case;

24   does it violate the stay?  Of course, that wasn't done here,

25   and we'll get to that later.

1           Lastly, and this is the final point I'll make on the

2    application of the automatic stay, a lot is made in the

3    general partner's papers about how this seems unfair that they

4    need a place, they need an opportunity to bring their claim.

5    They shouldn't be forced to submit to the jurisdiction of a

6    foreign court in a foreign nation.

7           I would submit that there is -- not only is it fair

8    to require that, but it is the exact purpose of Chapter 15.

9    The enforcement -- stated otherwise, the enforcement of the

10   automatic stay, in these circumstances, is consistent with

11   principles of international commodity that underlie Chapter

12   15.  The entire purpose of Chapter 15 is to afford commodity

13   to the Bermuda proceeding and to channel claims to Bermuda to

14   promote an orderly and efficient liquidation in that court.

15          And so, for all of these reasons, declaring this

16   adversary proceeding void, in violation of the stay, and --

17   and, I guess, in this first threshold question, ruling that

18   the stay applies is entirely consistent with principles of

19   international commodity.

20          So, pending questions from Your Honor, I'll cede the

21   podium on this issue.

22          THE COURT:  Thank you.  I have no questions for you

23   now.

24          MR. TILLINGHAST:  Good morning, Your Honor.  Edward

25   Tillinghast from Sheppard, Mullin for the general partner.

1    In addition to the sort of background that counsel

2    has just laid out, there's a couple of things we would like to

3    point out.  In their recognition papers, they said that the

4    purpose of the filing was that the Debtor's corporate

5    structure was an -- this is a quote -- "was an untenable

6    situation that frustrated the Debtor's corporate purpose of

7    serving as an investment vehicle for Spanish Steps."

8    And Spanish Steps, it was alleged by the IRS, to be

9    an alter-ego for Robert Brockman on the tax levies for 1.4

10   billion dollars, which was the result of an indictment which

11   was attached by counsel for the Debtor as a massive tax fraud

12   scheme that was criminal nature.  Mr. Brockman died before the

13   trial started, so there was never a conviction.

14   And another thing that we think is important to

15   understand is that, in the Debtor's papers, they have attached

16   exhibits that show that the Debtor's assets are in excess of

17   3.2 billion dollars, and the claims are 6.8 million dollars.

18   And in the three years since the Bermuda case has been

19   proceeding, albeit, there was a period where the -- whether

20   there was going to be a liquidation was contested and one

21   thing or another.

22   Up until after all of the papers were due and filed

23   in this court for the motions before the Court today, they

24   never set a deadline for the proof of debt, which is the

25   equivalent of our bar date.  They then set it on May 19th,

1    several days after all of the papers were in, and they called

2    for claims to be filed in the Bermuda proceeding, I believe,

3    it's June 9th or 8th.

4          And that lack of a claims process is a point that

5    we've made in our papers.  And an important part of that is

6    the general partner nor the fund nor the manager have any

7    presence or ever have had a presence in Bermuda, so they're

8    not submit to Bermuda jurisdiction.  And something that I

9    understand from Bermuda counsel is that the claim process is

10   to adjudicate dollar claims against the Debtor in Bermuda.

11         The main thrust of the complaint is for declaratory

12   relief, which is an important difference, in terms of, as I'll

13   get to it, the lack of a forum for the general partner and to

14   have its claims adjudicated.  So, what we submit, and I'll get

15   to the specific arguments, that the Debtor is trying to do

16   here is argue that, unlike all of the other courts, where

17   there are adversary proceedings, and no one raises the issue

18   of the stay, because that -- the adversary proceeding in a

19   Chapter 15 is in front of -- just like this one -- in front of

20   the very court that administers the 362 stay.

21         And that's the whole purpose and background of the

22   362 stay and why the home court rule even exists, because it's

23   the very court, this court, one of its many responsibilities

24   is to administer the stay, the 362 stay.  And the home court

25   rule is premised upon, well, this court is administering the

1    stay, that is the bankruptcy case, that is the court that can

2    administer the stay.

3           And, although counsel seems to suggest that most --

4    that there are cases that are stayed or that the home court

5    rule doesn't apply, with very few exceptions, there are

6    adversary proceedings every day in this courthouse, in other

7    courthouse around the country where there are Chapter 15

8    debtors, and some party brings an adversary proceeding against

9    a debtor in a Chapter 15.  Granted, there are also ones in

10   Chapter 11 and Chapter 7, but I'll focus on the Chapter 15

11   ones, because that's the focus here.

12          So, what we would submit that the Debtor is trying

13   to do is create a new form of law that doesn't exist anywhere

14   else, and all the adversary proceedings in Chapter 15 would go

15   away, and that the distinction that they try to draw is not

16   factually accurate in all of the cases, but maybe more

17   importantly, it's, respectfully, a distinction without a

18   difference, because whether it's a pre-petition or whether

19   it's a declaratory judgment action, which ours is a

20   declaratory judgment action, the fact is, it's still an

21   adversary proceeding against a Chapter 15 debtor.

22          The 362 stay makes no distinction about -- the only

23   distinction it makes is as to post-petition things, but as to

24   pre-petition, it makes no distinction as to whether it's an

25   equitable relief or a law relief.  You know, is it for damages

1    or is it for declaratory judgment?

2             So, in getting to the home court rule and, I think,

3    the crux of the issue of whether the stay applies, 1520(a)(1)

4    says that 362 applies -- 362(a), where the stay is.  It

5    doesn't qualify it.  It just says, if there's recognition

6    under 1520(a)(1), 362 applies.  So, what we submit, as I am

7    sure Your Honor is well aware from our papers, is that once

8    you invoke 362, it's the whole 362.  It's the statute.  It's

9    the law that includes that, and it doesn't distinguish between

10   Chapter 7, Chapter 11, Chapter 9, Chapter 15.

11            So, it's well established with the 362 world, I'll

12   call it, that the home court rule exists.  And, as I said a

13   moment ago, the reason it exists is because, the very court

14   that's administering the case and the stay and whether there's

15   violations, whether there's not violations, the impact of it

16   and the exceptions to it and granting relief from the stay is

17   the court where the case is pending.  And essentially, an

18   adversary proceeding is a subpart of a bankruptcy case.  So,

19   we submit that it's this case, and it's Your Honor that

20   administers that stay, and therefore, the home court rule does

21   apply in a Chapter 15, just like in every other case.

22            And a second point is, is that the 362, under the

23   case law, as pointed out in our papers, is actually narrower

24   in a Chapter 15 than in a 7 and 11.  So, it would defy logic

25   to say that, somehow, it's not narrower in this case, and it's

1    broader, and it precludes all chapter -- all adversary

2    proceedings.  And we cite a number of cases, and by no means

3    do I intend the list in our papers to be exhaustive.  I mean,

4    we pulled up about 25 cases where there are adversary

5    proceedings in Chapter 15s brought against the debtor.  Some

6    of them are <u>Colonial Bankers</u>, <u>Wolverine Energy</u>, <u>Gyro Bank</u>,

7    <u>Volo Logistics</u>, <u>Aircraft Engine Lease</u>, <u>Duran</u>, <u>Peloton</u>, <u>CT</u>

8    <u>Investment</u>, <u>Hoch</u>, and they're all cited there in our papers as

9    examples of situations where adversary proceedings against a

10   Chapter 15 debtor have proceeded.

11            THE COURT:  Would it make a -- sorry to interrupt

12   you -- would it make a difference if the claims that you were

13   making in the complaint were purely declaratory in nature, and

14   you weren't seeking any legal relief, like, would that affect

15   the analysis at all?

16            MR. TILLINGHAST:  The way I would answer that, and

17   I've given a lot of thought to this, Your Honor, I think it

18   doesn't affect whether the home court rule applies, but it --

19   it -- the declaratory relief piece, when you look at it

20   holistically is probably stronger, if anything, if you follow

21   me, in terms of the fact that the home court rule applies.

22   Partially because, as I understand Bermuda law, the Bermuda --

23   and on its face, the notice for claims by June 9th is for

24   debt, and the declaratory relief is not really debt.  It's an

25   equitable remedy to determine, in this case, that there was a

1    default, that the Debtor has admitted in several places, and

2    that the partnership agreement provides certain rights, as a

3    result of being a defaulted partner.

4            So, I think it actually increases the -- or it

5    lessens the debatability, if you will, of the home court rule

6    applying.

7            THE COURT:  Right.  And maybe it's an issue to get

8    to when the evidence gets put on, and we have our Bermudian

9    experts, but the -- you know, the question to me of what sort

10   of relief may be available in a Bermudian proceeding to

11   determine equitable relief is something that I'm curious

12   about.

13           MR. TILLINGHAST:  Okay.  And, albeit, these are two

14   cases in the Ninth Circuit, and they are Chapter 11 cases --

15   one is Roxford Foods and one is North Coast -- where it talks

16   about -- and, granted, they are Chapter 11 cases -- but, as I

17   pointed out, whether it's Chapter 7, Chapter 11, chapter

18   whatever, Chapter 15, we submit it doesn't matter, because 362

19   doesn't differentiate between the chapters.

20           But the Ninth Circuit said, in Roxford Foods, the

21   stay does not operate against the court with jurisdiction over

22   the bankruptcy.  And, as I pointed out, we submit that this

23   court has jurisdiction over this case.  So, that's one point

24   that tries to -- we viewed it as Roxford Foods tries to

25   clarify, what is the home court.  And they follow -- Roxford

1    follows a case called <u>North Coast</u>, which is a Ninth Circuit

2    BAP decision, where it says, "it's illogical and would not

3    serve the purpose of the underlying automatic stay" to say

4    that the home court rule doesn't apply and that the stay

5    precludes adversary proceedings in the case.

6              So, when you take that all together, there is no

7    question that 362 incorporates this body of law, that 362 does

8    not stay adversary proceedings in the court that's

9    administering the case.  And, you know, for example, there is

10   -- there is a non-exclusion submission to jurisdiction in the

11   Cayman Islands.  If we had gone to the Cayman Islands --

12   that's not in this court -- presumably, we would have to come

13   to this court for relief from stay to proceed in the Cayman

14   Islands, and, but, we chose to commence it in this court

15   because of the home court rule.

16             So, those are the points on the home court rule and

17   the issue that we submit that the automatic stay does not

18   apply to preclude an adversary proceeding in the Chapter 15,

19   and I'll hold the rest for the second part of this --

20             THE COURT:  Okay.

21             MR. TILLINGHAST:  -- unless Your Honor has

22   questions.

23             THE COURT:  I don't.  Thank you.

24             MR. TILLINGHAST:  Thank you.

25             MR. LAVINE:  Your Honor, can I have a brief

1    rebuttal?

2             THE COURT:  Yes.

3             MR. LAVINE:  Thank you.

4             So, I'll take some of the issues in the order in

5    which they were just presented, and it started with the IRS

6    history.  We agree that's critically important here.  That's

7    why we provided the background, including Judge Stickles'

8    ruling.  I think what was left out of the presentation, of

9    course, is that our clients are professional fiduciaries,

10   independent of Mr. Brockman, now deceased, or the Brockman

11   Trust and Spanish Steps.

12            Moreover, they're overseen by a court, and they take

13   direction, frankly, from no one, because they're independent

14   fiduciaries.  That's point one on the IRS history.  Point two

15   on the IRS history is, it's a wonderful example of the danger

16   of modifying the automatic stay, and I think we'll get to

17   this, I guess, in the second part of the presentation today on

18   prejudice to the Debtor, but the IRS's position, at least

19   before the Chapter 15 was commenced, was that it can levy U.S.

20   assets, and -- and in IRS land, and I had to be taught this

21   when I first joined this team, a levy is not a lien.  It is

22   effectively an order of seizure, and it requires the person

23   holding the Debtor's property to turn it over, within 45 days

24   or effectively risk sanction.  And I forget if those were,

25   like, criminal or civil penalties, but it is dangerous for

1  anyone to disobey that IRS levy.

2          If we are to believe what Falcata is saying or the

3  general partner that they presumably don't intend to go to

4  Bermuda to submit to that court's jurisdiction to have its

5  claims adjudicated there, and it wants relief from stay from

6  this court, the question becomes, so where are -- where will

7  Falcata recover on its claims, because it does assert damage

8  claims here.  It does have that minimum $625,000 that it is

9  asserting, because that's the number they put in their papers.

10          And the fear that we would have, and, frankly, the

11  fear that Falcata should have, and the fear that all

12  creditors, depending on this ruling, could have is that the

13  IRS will come in, seek similar relief and not just adjudicate

14  claims, but start seizing assets.  And that's the risk that

15  Judge Sickles sought -- you know, did not want to occur, and

16  recognized that that is the precise reason why you have

17  orderly liquidation processes based out of a home court, this

18  case, the Bermuda.

19          And -- and to be clear, right, again, the reason

20  it's in Falcata's interest, as well, is because, again, a

21  levy, if it doesn't go through the Bermuda process, allows the

22  IRS, which has a 1.4 -- they maintain, a 1.4 billion dollar

23  claim, to seize all of the Debtor's -- effectively, all of the

24  Debtor's assets in the United States before all creditors,

25  including Falcata.  And that was the risk, of course, that the

1    judge was protecting against, and that risk exists, but it is

2    made meaningfully worse if Your Honor were to modify the stay

3    in this case.  That's the first rebuttal on the IRS.

4         The second is the bar date.  There was a lot of time

5    spent in the papers about how it's taken the foreign

6    representatives three years to commence that process.  I mean,

7    that's just incorrect.  As was conceded, it was about a year

8    before the case actually commenced.  If you will, that's

9    almost equivalent to, like, a chapter -- an involuntary, when

10   the bankruptcy case doesn't actually get started until the

11   involuntary becomes, like, an actual case, a bankruptcy case.

12        But, moreover, it wasn't -- and I mentioned this

13   earlier -- it wasn't until last Summer when the liquidators

14   became permanent liquidators, as opposed to provisional

15   liquidators.  And only permanent liquidators can commence a

16   proof of claim process.  So, there's not some sort of, like,

17   grand plan here or intentional delay by any means.  There's no

18   gamesmanship in commencing the bar date process last week,

19   when the briefing was filed.

20        It was the natural progression of a process, which

21   could not even start until last Summer, so, less than a year

22   ago.  Another point, and we'll probably get to this again

23   later in the presentation, where we talk about prejudice, the

24   general partner repeatedly says they have no presence in

25   Bermuda.  But let's back up for a second.  This is a fund that

1   has a single investor.  The single investor is a Bermuda

2   entity.  So, this "inherent unfairness" of having to force

3   them to go to Bermuda, the concept that that was, somehow,

4   unforeseeable when, actually, the only party that they were

5   doing business with and taking money from was a Bermuda

6   entity, I just don't -- we've never understood that argument,

7   Your Honor.

8          And, finally, declaratory relief.  Your Honor

9   mentioned this, too, like, this is not a declaratory judgment

10  action.  That's one of three claims here.  But I would like to

11  provide my answer to your question about --

12         THE COURT:  I'd like you to.

13         MR. LAVINE:  Yeah.  Would it impact it if it is a

14  purely declaratory relief complaint, the answer to that is,

15  no, because the same concerns that I have described exist,

16  including the floodgates concern of modifying the stay.  But

17  there is more.  What I belief the Bermuda law experts will say

18  is that, in a proof of debt -- and here's our understanding of

19  how the proof of debt process could work.  Even in the event

20  that the proof of debt forms are typically for money, and so,

21  perhaps, the general partner submits a proof of debt form for

22  $625,000, but it could also assert things like legal fees, and

23  it could also assert a four percent interest on a $625,000.

24         The basis for those two additional searches would be

25  the alleged default and the Debtor's status as a defaulting

1    partner.  And it would be up to the foreign representatives,

2    in their capacity as liquidators, to say, well, wait a minute;

3    the only reason they're claiming those monetary damages is

4    because of an alleged default.  And we, the liquidators, don't

5    believe that this default was properly noticed or properly

6    executed, and therefore, that is a natural place and

7    opportunity for the issue to be resolved in the Bermuda court.

8              And so, even if there -- all of that is asserted,

9    our money damages claim, through the proof of debt process, it

10   is highly likely, if not inevitable, that the declaratory

11   relief would be necessarily intertwined with the question of

12   money damages.

13             I would also add that, if money damages were not an

14   issue, an we're thinking about, like, future Chapter 15 cases,

15   because there's not a ton of case law, of course, in the

16   Chapter 15 world, it would -- it would also not be

17   inconsistent with Chapter 15 policies.  In fact, it would

18   promote Chapter 15 policies to say, under these circumstances,

19   the proper thing that someone doing international business, a

20   Cayman fund with a Bermuda investor, with a Delaware general

21   partner should do is respect foreign stays and moratoriums,

22   the same way that we, in Chapter 7 and Chapter 11 cases, would

23   like foreign creditors to respect our stays, including

24   extraterritorially.

25             And so, they are free to go to Bermuda and seek

Lavine - Argument                          28

1    relief from the Bermuda stay, the Bermuda moratorium and

2    commence their case in whichever jurisdiction they see fit,

3    under those circumstances.  That might be Cayman, where Cayman

4    -- where these contracts are governed by.  And so, I think

5    denying their relief, in this case, or -- or granting the

6    Debtor's motion to enforce the automatic stay will not close

7    them out from multiple avenues to adjudicate the -- the actual

8    declaratory relief.

9           Now, I do want to pause here, for a second, to talk

10   more about the declaratory relief, and we started our very

11   first motion with this point, but I think it's important to

12   understand, like, what's actually happening here economically.

13   Our clients, again, they are limited partners.  They

14   contributed capital to this investment vehicle.  I don't have

15   the number at my fingertips, but it's something -- and I don't

16   know if this is confidential, so I won't -- I -- well --

17          THE COURT:  Maybe that's for you to discuss, but --

18          MR. LAVINE:  Yes.

19          THE COURT:  -- but I think that that was information

20   that was redacted --

21          MR. LAVINE:  Okay.

22          THE COURT:  -- in the affidavit, but I'm familiar

23   with what the number was.

24          MR. LAVINE:  So --

25          THE COURT:  That was represented in the papers.

1          MR. LAVINE:  Well, and I think the particular

2    redacted number is the number that we believe is being

3    withheld or -- let me get to that.

4          There is a slightly smaller number, but it's in the

5    tens of millions that was -- that was actually the capital

6    that was contributed.  And our understanding is that nobody

7    else has contributed capital to this fund.  And what the

8    declaratory relief that they are seeking is to say, because of

9    the foot fault, of $625,000 -- of course, not by my clients,

10   but by former management who was kicked out for defrauding the

11   Debtor -- because of that foot fault, they would like to now

12   exercise Cayman law-governed remedies, including to -- to

13   take, effectively, significant amounts of the invested

14   capital, as well as upside.

15         Whereas, under normal circumstances, this was a

16   typical two-and-20 type of arrangement or I think it became

17   30, where -- and what I mean by that is, oftentimes, in

18   private equity, the general partner, as the manager, they get

19   an ordinary management fee, and then they get upside on the

20   profit.  But what they're trying to accomplish here is not

21   just to maintain their upside and get paid their $625,000

22   management fee, they actually want the return of our client's

23   capital.

24         That has wild implications for the value of this

25   estate.  And we put the number in the paper that you referred

1    to say that that issue, by the way, which is a pure Cayman

2    law-governed issue, and which is unsettled under Cayman and

3    Bermuda law, should be litigated in this court as opposed to a

4    Bermuda court is just something -- that's really why we're

5    here, Your Honor.  I think that's the economic point of why

6    we're all here today, with a lot of lawyers.

7                  This is not a $625,000 issue.

8                  THE COURT:  Thank you.

9                  MR. TILLINGHAST:  Your Honor, may I respond to the

10   points that were sort of outside what --

11                 THE COURT:  Yes, I'd like you to do that, please.

12                 MR. TILLINGHAST:  Thank you.

13                 First, as to the IRS, while I can't confess to being

14   a tax dispute lawyer, it's my understanding from the papers

15   that are on the docket, where the IRS agreed to certain

16   things, and from the law that the -- they are allowed to

17   proceed with an adversary proceeding under the Tax Anti-

18   Injunction Act.  So, that's a fact, as I understand the

19   papers, as well as the law.

20                 And, as a sort of aside, I mean, one of the things

21   the Debtor said in their papers that I found to be quite

22   interesting, I'll say, they say they have counterclaims

23   against the general partner.  A counterclaim is normally in a

24   lawsuit, so they're basically saying, the general partner

25   can't proceed here, but we can against them, in the same case

1    that we started, which, to me, doesn't make a lot of sense,

2    procedurally or otherwise, but that's for another day.

3         Second point is, while they -- the liquidators were

4    not appointed until last Summer, it's still basically a year

5    that they didn't start a claims adjudication process.

6         Another detail point is that counsel said that the

7    agreements are controlled by Cayman law.  That's not correct.

8    The limited partnership agreement is controlled by Cayman law.

9    The master transaction agreement, which the claims are under,

10   as well as the limited partnership agreement are controlled by

11   Delaware law.

12        Another point is that if -- if the Court sees that

13   there is a distinction between money damage claims, which

14   there are two in the complaint and a declaratory judgment

15   claim, which there is one, as we talked about in my comments

16   before, it's acceptable to FDI to just proceed under the

17   declaratory judgment piece and leave the damages, the money

18   damages, for either the Bermuda court or whatever is

19   appropriate and whatever the client -- whatever the general

20   partner decides.

21        And there is a fundamental piece of the liquidators'

22   argument that is seeking to force this Delaware General

23   partner out of the country to a place where it doesn't have an

24   office, doesn't do business, has no presence, to litigate

25   their claims there, and that's against the U.S. policy of

1    allowing U.S. citizens or entities to litigate in the United

2    States, because that's where they are.  And that's -- when you

3    go back historically, not to be a historian, but that was a

4    significant reason for the federal court system in its

5    inception was to allow U.S. parties to litigate against

6    foreign parties who were subject to U.S. jurisdiction.  Here,

7    they filed this Chapter 15 and availed themselves of the U.S.

8    Courts.

9         Much of counsel's arguments really go to what I

10   would call more the merits of the complaint.  I would submit

11   that's for another day.  The fact is, the liquidators have

12   acknowledged that they did not pay the capital contribution.

13   And -- and this concept that there is a windfall is really --

14   it has no place in the issue of whether there is a stay.

15        We submit there is not a windfall.  It's strictly a

16   contractual and legal issue as to what the results are.  The

17   liquidators do not step into some super right that throws the

18   partnership agreement away and the master transaction partner

19   agreement and applies equity to whatever they are.  This

20   entity, Point, entered into an agreement with certain rights

21   for both parties.  We submit that they're bound to those

22   rights, and that's the substance of the declaratory judgment

23   that there was a default, and that, as a result of that

24   default, whatever remedies apply, apply.

25        And this Court, as well as courts in this district

Tillinghast - Argument                          33

1   have routinely interpreted foreign law for relatively

2   straightforward things like this, be it a Delaware law -- I

3   mean, be it Cayman law or Bermuda law.  So, all those sort of

4   factual issues really aren't -- don't belong in the argument

5   about whether there is a stay or not.

6           Unless Your Honor has other questions, that was all

7   I had.

8           THE COURT:  Again, it's probably an issue for the

9   Bermudian law experts, but, Mr. Lavine made a point that you

10  could seek stay relief in Bermuda to commence an action,

11  wherever you need to commence it.  Is that your understanding

12  of the Bermudian proceedings, that there is a mechanism to

13  seek relief from their equivalent of the automatic stay to

14  proceed with litigation?

15          MR. TILLINGHAST:  My understanding is a slight

16  difference of that, actually.  My understanding of Bermuda law

17  -- and I'm not a Bermuda lawyer, but I've had a lot of

18  conversations with Bermuda counsel about this -- is the

19  Bermuda stay only applies to parties that are subject to

20  Bermuda jurisdiction, and it does not preclude a party from

21  litigating outside of Bermuda.  So, for us to proceed --

22  putting aside the Chapter 15, for the general partner to

23  proceed outside of Bermuda, it would not have to go to Bermuda

24  to get relief from the stay.

25          But to your specific question, if it wanted -- and,

1    actually, if it wanted to litigate the -- the declaratory

2    relief aspect or any claim, it would have to go to the Bermuda

3    court and ask permission to start an action.  So it's

4    actually, the stay would preclude it from -- and that's one of

5    the points that we made in our argument is we are precluded,

6    and counsel made the argument that the Bermuda stay precludes

7    us from litigating anywhere in the world, and which, I would

8    agree, it precludes us from litigating in Bermuda, but not

9    outside of Bermuda.

10           So, part of our argument that we have no forum,

11   other than this court, to litigate is that we are stayed in

12   Bermuda from even commencing an action in Bermuda.  It's not

13   -- it's not like a bankruptcy case here, where you can come

14   in, and parties can litigate before the court that administers

15   the stay, and if it's an adversary proceeding in the case, we

16   would submit that you're free to do that without violating the

17   stay.

18           THE COURT:  Okay.  Thank you.

19           MR. TILLINGHAST:  Thank you.

20           THE COURT:  Yes.

21           MR. LAVINE:  Your Honor, this time I will actually

22   be quick.  The first was a reference to the counterclaims.

23   When we referenced counterclaims in our paper, we were

24   referring to the counterclaims that could be brought, not in

25   this adversary proceeding, which we don't think belongs here,

1   but in any proceeding in any jurisdiction, so that could be

2   Bermuda.  So it's totally consistent for us to say that we --

3   this is not a simple breach of contract claim.  There are

4   counterclaims and other matters.

5           The LP -- there's the LPA, governed by Cayman law,

6   the MTA, governed by Delaware law.  It is the LPA that they

7   are seeking this Court's approval for to exercise the

8   draconian remedies that I referenced, which is Cayman law

9   remedies, because it's in a Cayman law contract, and for which

10  we believe Cayman law doesn't allow them to exercise those

11  remedies.

12          THE COURT:  Okay.  Thank you.

13          MR. LAVINE:  I think with that, we can proceed to

14  the next phase of the case, and I think that is the general

15  partner's motion to modify the stay, and so I'm happy to cede

16  the podium for them to present on that issue first.

17          THE COURT:  That'd be fine.

18          MR. TILLINGHAST:  So, with respect to relief from

19  the stay, which we have a motion seeking relief, and this is,

20  obviously, assuming arguendo that there is a stay, we've

21  obviously taken -- take the position that there is no stay, so

22  relief from the stay wouldn't be necessary.  But, if the Court

23  was to view it that there is a stay, that needs to be

24  addressed whether it should be modified or not and

25  potentially, it sort of bifurcates things between money damage

1    claims versus declaratory judgment, which I commented on a

2    minute ago.

3            But, so if -- if there was to be a stay, the

4    standard -- and it's well established, obviously, the Court

5    looks to cause, whether there is cause to lift the stay.  And

6    the law in this district, as well as the circuit is very clear

7    that you look to the totality of the circumstances to

8    determine whether there is cause.  And, as we've alluded to

9    before, which I think the argument about whether there is a

10   forum for the general partner to litigate is, really, most

11   relevant to this -- to this cause piece.

12           We submit that there is no place for -- given the

13   existence of the Bermuda proceeding, and the existence of the

14   Chapter 15, if, in fact, there is a stay under 362, there is

15   no place to litigate the claim for this Delaware general

16   partner, other than before Your Honor, so it's deprived of the

17   forum, particularly as to the declaratory relief aspect, other

18   than forcing it to go outside the country.

19           And, as I pointed out before, that would violate the

20   strong and well established U.S. policy which is referred to

21   in our papers of not forcing U.S. entities to leave the 50

22   states to let everyone have jurisdiction or federal courts to

23   leave -- leave our -- its home country and litigate elsewhere.

24   And the -- as I also pointed out, the Bermuda proceeding, the

25   notice for this June 9th date, it specifically says, for a

1    claimed amount.

2              The declaratory relief is not for a claimed amount.

3    It's for declaratory judgment.  And the Third Circuit favors

4    lifting the stay when the non-debtor has no forum.  So, when

5    you look at it from our perspective, there's no place else to

6    litigate this claim, particularly the declaratory relief, so

7    to deprive the general partner of the option to litigate it

8    here, would basically discharge the claim or preclude it from

9    seeking relief.

10             And the other part of that is, in Delaware, there is

11   a three-year statute of limitations on this claim, and the

12   statute of limitations is viewed as procedural, although,

13   obviously, missing one is substantive, but the -- the Delaware

14   law, and in many states in the U.S., the applicable statute of

15   limitations is not, in this case, Cayman or Bermuda or

16   someplace else, it's the statute of limitations for the Court

17   that's hearing the case.  So, what we submit is the three-year

18   limitation is, in fact, what's applicable to a -- to a

19   contested proceeding or an adversary proceeding in this court.

20             So, and that -- that would run in July/August

21   depending on which notice letter you -- you take as the date,

22   because the notice of default and cure was July and August of

23   2020.  So, the general partner would be forced to miss the

24   statute of limitations, and thereby, on a statute of

25   limitations basis, be precluded from asserting it.  And --

Tillinghast - Argument                          38

1          THE COURT:  But is -- is that -- and I -- is that

2     true anymore, given that the parties have entered into a

3     tolling agreement?

4          MR. TILLINGHAST:  Well, I mean, the tolling

5     agreement actually contemplates a stipulation, so Your Honor

6     will see it, but what the tolling agreement does, and I guess

7     there's -- this gets into it a little more complicated, but

8     I'll explain it.  We have served Point in Bermuda in

9     accordance with Bermuda law.  And we filed a certificate of

10     service in this Court of that service.

11          The tolling agreement tolls the time to serve, which

12     actually is academic, at this point, because we've served, but

13     it also provides an extension of Point's time to respond, so

14     it's a mutual thing between both parties.  And it ties it to

15     when this Court makes a decision on the stay issue.  And it's

16     -- I would call it a very practical solution to a problem,

17     because we understood that, you know, it would probably be --

18     it would not be condoned by this Court, I'll say.  If the

19     Court was trying to decide the motion, and we were trying to

20     hold them in default for failure to answer, because the

21     complaint's been served, and we also didn't -- the other part

22     of the agreement -- which I have no objection to the Court

23     seeing the agreement, and Your Honor can sort of determine

24     what it means for itself, but I think it's pretty evident --

25     the other part of it is, is under the Federal Rules, you have

1    to serve a complaint within 90 days of filing.

2         Now, there is a carve-out for foreign -- for service

3    in a foreign country.  And, to be perfectly frank, we observed

4    that one of the liquidator's declarations were both signed in

5    the State of Utah.  We don't know where he is, and frankly,

6    the general partner, more importantly, doesn't want to risk

7    losing the statute of limitations or having the complaint

8    dismissed, as the Federal Rules would permit, if you go past

9    the 90 days without prejudice, and then we'd be outside the

10   statute of limitations, so we're sort of caught in a mess.

11        So, in a, maybe it's an abundance of caution or but,

12   just in a -- in a -- I would call it more of a prudence thing,

13   the tolling agreement tolls the time for the statute of

14   limitation.  It also tolls the time to effectuate service, and

15   it also extends the time for Point to respond and tying it to

16   when there is a decision on the stay, because counsel, as you

17   know, for Point has taken the view that the complaint is not

18   valid, so why would they answer it.

19        So, we wrapped it all into this agreement.

20        THE COURT:  That makes sense.  You know, relatedly,

21   what is the affect of 108(a) and, I guess, its Bermudian

22   counterpart on extending statutes of limitations, the pendency

23   of those proceedings?

24        MR. TILLINGHAST:  We understand Bermuda law to only

25   stay the claims that are asserted in Bermuda, and it doesn't

Tillinghast - Argument                    40

1    apply to a claim that there is a basis or is, in fact,

2    asserted here, so it's narrowed to Bermuda.  And, as to 108,

3    it's -- I don't have the statute in front of me -- but I think

4    it's 30 days after the -- there's a -- 108 has a limit of 30

5    days -- I'm looking for my copy of it -- but it doesn't solve

6    our problem.

7        (Pause)

8            MR. LAVINE:  Do you want to borrow my Code?

9            MR. TILLINGHAST:  Sure.  May I?

10            MR. LAVINE:  Yes, please.

11            MR. TILLINGHAST:  Thank you.

12            MR. LAVINE:  Here you go.

13        (Pause)

14            MR. TILLINGHAST:  So, it's 108(b), and it goes to

15    the later of, and sub-one is, "The end of such period,

16    including any suspension for such period occurring on or after

17    the commencement of the case or 60 days after the order for

18    relief."

19            Now, there is no -- I was going to say, about 30

20    days -- there is no order for relief in a Chapter 15.  So,

21    it's the end of the period, including any suspension of such

22    period occurring on or after the commencement of the case.

23    So, our concern is, is we're not protected by 108.

24            THE COURT:  I understand.

25            MR. LAVINE:  Your Honor, I think the appropriate

1    reference, though, is 108(c).

2           THE COURT:  Thank you.  I know it is.

3           MR. LAVINE:  I have a copy of the tolling agreement,

4    if that --

5           THE COURT:  Yes.

6           MR. LAVINE:  -- would be helpful.

7           THE COURT:  And I'll apologize, because I directed

8    Mr. Tillinghast to 108(a) and not 108(c), so he was answering

9    my question.  It was just the wrong question.

10          MR. TILLINGHAST:  I should have had my Code with me.

11          THE COURT:  If you want to pass up a copy of the

12   tolling agreement --

13          MR. LAVINE:  Sure.

14          THE COURT:  -- that's okay.

15          MR. LAVINE:  Yes.

16          THE COURT:  I'd be happy to have a look at that.

17          MR. LAVINE:  May I approach?

18          THE COURT:  Yes, please.

19          Thank you.

20      (Pause)

21          THE COURT:  I'm ready when you are, Mr. Tillinghast.

22          MR. TILLINGHAST:  Okay.  So, going back, if I may,

23   to the grounds and the totality of the circumstances to lift

24   the stay, if there is one, with Rexene which sets out the

25   factors for this district, we submit that Point has no great

1   prejudice.  That's -- one of the evaluations is whether there

2   is great prejudice to the Debtor.  And we submit that they --

3   they have little or no prejudice.  And actually, in a strange

4   way, there's an advantage because they specifically -- I know

5   counsel tries to change the use of the word counterclaim --

6   they specifically said they have counterclaims.

7        And to me, maybe I'm a procedural geek, but a

8   counterclaim is a very specific thing that is filed in an

9   existing action.  So, by having the adversary proceeding,

10  ironically, there is no prejudice, because it gives them the

11  forum to -- if they have one, not that we're saying they do --

12  but to assert any counterclaims.

13       And, secondly, as to prejudice, they submitted

14  themselves to the jurisdiction of this court, there is no

15  prejudice to them litigating a legitimate claim in the court.

16  And secondly, there is a severe hardship to the general

17  partner, because, as we've discussed before, there is the

18  statute of limitations at issue that we're very concerned

19  about, and the ramifications of missing that are draconian,

20  and there's no place else for them to litigate it, as we've

21  talked about before.

22       And then, the third factor in <u>Rexene</u> is probability

23  of success on the merits.  In at least three places, they've

24  acknowledged missing and not making a capital contribution.

25  In one place, they're actually -- and these are in their

1    papers that are filed in this court -- they've acknowledged

2    not making a capital call to Falcata, the partnership here.

3              So, we submit that there is actually a good

4    probability of the general partner prevailing, and when the

5    courts in this district are evaluating probability of success,

6    it -- the only standard is a so-called slight probability is

7    enough, so we think we're far above that, but just for

8    measuring purposes.

9              So, we submit that we've satisfied the cause

10   requirements of Rexene, and the requirements in this district

11   for a modification of the stay to allow the proceeding to

12   proceed.  And I think that's it on the relief from stay,

13   unless Your Honor has questions.

14             THE COURT:  No, thank you.

15             MR. LAVINE:  Your Honor, I do intend to go through

16   the Rexene factors, but first, I want to get back to the

17   fundamental point -- fundamental question, is there a forum

18   for these claims?  The answer is yes.  There is the Bermuda

19   proceeding, and despite counsel's entreaties that it is

20   somehow unfair or unjust or against federal court history in

21   this case, in this country for that to be required, I want to

22   read from a decision from Judge Silverstein.  This is In re:

23   Energy Coal SPA.  We cite it in our papers.  582 BR 629 from

24   2018.

25             And this is the quote, "U.S. bankruptcy courts have

Lavine - Argument                    44

1    not hesitate to require foreign creditors to file their claims

2    and to litigate in our courts, if they wish a distribution

3    from a U.S. debtor's estate.  It is equally appropriate to

4    expect U.S. creditors to file and litigate their claims in a

5    foreign-named bankruptcy case."  So, again, this is a false

6    premise that there is no forum but this court to adjudicate

7    the claim.

8           To the tolling agreement, and I guess we'll get to

9    the factors then, and this is -- I'm going to go out of order,

10   but factor two, whether the general partner will suffer

11   prejudice.  There is no prejudice, if they are required to

12   participate in the Bermuda claim adjudication process and to

13   seek recoveries in Bermuda just like every other unsecured

14   creditor of the Debtor.

15          They, nevertheless, argue three forms of prejudice,

16   but all of them are either moot or lack merit, and so, we'll

17   start with the tolling agreement and statute of limitations.

18   And I'll just read from the tolling agreement on page three,

19   which says, "The parties" -- and, Your Honor, I don't know if

20   you --

21          THE COURT:  I've got it in front of me, yes.

22          MR. LAVINE:  -- you'd like to read along, but --

23          THE COURT:  Yeah.

24          MR. LAVINE:  -- I'm on page three, paragraph one,

25   towards the bottom third of the paragraph.  It says, "The

1   parties further agree that, in the event the Bankruptcy Court

2   rules that the automatic stay stays the adversary proceeding,

3   but grants the general partner relief from the stay to

4   continue the adversary proceeding, the time between the

5   general partner's original filing of the adversary complaint

6   on March 6th, 2023 and the date of the Bankruptcy Court's

7   order granting the general partner relief from the automatic

8   stay shall be tolled, and the general partner's adversary

9   complaint shall thereby be preserved."

10          And so, I honestly don't understand why we're

11  talking about statute of limitations here.  We made arguments

12  in our paper as to why they are covered, and the statute of

13  limitations is tolled under 108(c).  As a matter of statute,

14  we argue and explain that the statute of limitations is tolled

15  under Bermuda law by operation of the statute in Bermuda.

16  And, now, we have the foreign representatives agreement that

17  we are not seeking to prejudice their right to bring their

18  claim.  We just want it to be brought in the appropriate forum

19  in a way that won't disrupt the liquidation of this debtor.

20          The next argument made for prejudice to the general

21  partner is that there is no claims process in Bermuda.  I

22  mean, that's false, and I think we've covered this, and it's

23  moot, as well.  The foreign representatives commenced the

24  proof of debt process.  They provided notice to all known

25  potential creditors, including Falcata, and Falcata now has

1    the forums for which they may submit their claim.  They can

2    submit their damages claim, and we have submitted and stated,

3    on the record, that we believe that will necessarily invoke

4    the declaratory relief issue, as well.

5          We've also mentioned that they are free to go to

6    Bermuda, at any point in time, and they've been free this

7    whole time to seek relief from the stay in Bermuda.  And then

8    -- and then, I guess, and the same prejudice factor I read

9    from Judge Silverstein's opinion, and then <u>Energy Coal</u>, which

10   explains that there is no prejudice, particularly in Chapter

11   15 cases to force U.S. creditors to go to the foreign main

12   proceeding.

13         But let's, then -- so we submit that, on balance,

14   there is no prejudice, whatsoever, that can be established to

15   Falcata, but let's talk about the prejudice to the Debtor.

16   I'll start with the topic we haven't discussed, which is, if

17   the automatic stay is lifted, even for just declaratory

18   relief, there is a risk of inconsistent orders by courts of

19   different jurisdictions.

20         For example, if Falcata fails to submit a proof of

21   debt by June 9th, that could result in the Bermuda court order

22   -- a Bermuda court order expunging the general partner's

23   claim.  Or, if the Debtor seeks the foreign law equivalent of

24   a discharge, Falcata will be prohibited from collecting

25   against the Debtor, as a matter of Bermuda law.

1          Those types of orders would be difficult, if not

2     impossible, to reconcile with the continued pursuit by Falcata

3     of their claims in the adversary proceeding.  And this risk of

4     inconsistent judgments is the exact opposite of what is

5     intended by the enactment of Chapter 15.  Chapter 15 focuses

6     on cross-border cooperation and commodity among courts and

7     nations.  And, effectively, by modifying the stay to permit

8     litigation here, again, there's a risk of inconsistent

9     judgments, which can cause prejudice to the Debtor, because,

10    at that point, the Debtor will have to answer to two different

11    courts in two different jurisdictions.

12          You know, separately, there is some suggestion in

13    Falcata's papers that, because the Debtor's balance sheet is

14    solvent, there is a suggestion that the foreign

15    representatives should be less concerned with estate costs.

16    But we reject that premise.  The liquidators are mandated to

17    maximize the value of the estate for all stakeholders.  There

18    is no authority for the proposition that cost efficiencies

19    attendant to channeling claims to a single proceeding that

20    those savings -- cost savings are more important in a solvent

21    case than they are in an insolvent case or I think I had that

22    backwards.  But they're more important in the insolvent case

23    than a solvent case.

24          As this Court knows, solvency is not a prerequisite

25    to the application of the stay.  The other prejudice to the

1    Debtor would be the floodgates concern.  And, here, the record

2    reflects that the Debtor has an international mix of

3    creditors.  Some are located in the U.S.  Some are in

4    Australia.  Others are in Cayman.  In certain instances, there

5    are Cayman funds with U.S. investment managers.

6           The foreign representatives have a justifiable

7    concern that modification of the stay will encourage other

8    creditors to seek similar relief.  And while this is an

9    investment vehicle, and it's not an operating debtor, so it

10   doesn't have, you know, thousands of creditors, there are

11   significant creditors.  And there are hundreds of millions of

12   dollars at stake.  There are significant amounts at stake with

13   respect to Falcata, and as we've referenced before, there is

14   up to 1.4 billion at stake with respect to the IRS, which, at

15   this point in time, is a mere contingent creditor.

16          Finally, on the merits, we believe this adversary

17   proceeding, which has not even progressed beyond service is

18   doomed from the start.  So, the jurisdictional issues here are

19   substantial.  This is a non-core dispute, and as the foreign

20   representatives have set out in their papers, there are

21   serious questions as to whether this court can or should

22   assert jurisdiction under both the Mandatory and Permissive

23   Abstention Doctrines.

24          Relatedly, this is, because it's a non-core

25   proceeding, the parties, unless they consent, this Court could

1    not issue a final judgment.  And so, again, there is prejudice

2    here of the Debtor, who would not only be forced to litigate

3    in -- outside of its home court and that process, but also,

4    potentially litigate at multiple levels, effectively trial

5    court levels.

6            Relatedly, and we say this in our papers, this is

7    not a simple breach of contract case and particularly on the

8    declaratory relief.  First off, the damages claim, like, yes,

9    we have conceded that a payment was not made.  We have not

10   conceded that that constitutes a default or that we are a

11   defaulting partner as a result of that missed payment.

12           Falcata, or the general partner, has discretion to

13   declare a default or not, and our position is that by

14   exercising -- its actual exercise of its discretion under

15   these circumstances of declaring Point a defaulting partner is

16   actually a breach of fiduciary duty.  And that is a pure

17   Cayman law issue, a, frankly, unsettled Cayman law issue, as I

18   think both foreign law experts have stated, because as we

19   understand it, there's never been a case, under Cayman

20   Island's law involving an exempt limited partnership with a

21   single limited partner.

22           And so, it's hard to say that they have a

23   substantial likelihood of success on a Cayman law issue that's

24   never been litigated in any court.  It is -- but it is, you

25   know, also equally clear, from our perspective -- and this

1    goes to jurisdictional issues -- that I think, even if the

2    automatic stay were modified, that it is highly likely that

3    once this court got into the issues or had to assess these

4    Cayman questions, it would -- it would agree with our position

5    that the Court should be abstaining, because there are better

6    jurisdictions to grapple with these novel points of Cayman

7    law.

8            There is also a set-off issue, Your Honor, with

9    respect to the actual cash claim of the $625,000.  The

10   Debtor's books and records reflect that the Debtor paid

11   certain fund expenses in excess of the amount that's being

12   claimed here.  That's a set-off issue that is properly best

13   handled by the Bermuda court as part of that claims

14   proceeding, because as Your Honor knows from -- well, set-off

15   is a highly specific bankruptcy issue, at least in the U.S.

16   It is the same in Bermuda, where it's a core Bermuda

17   bankruptcy issue.

18           Finally, and separate from the <u>Rexene</u> factors, you

19   know, there are a number of other factors that courts

20   consider, like the <u>Sonnax</u> factors, and they, too, weigh in

21   favor of not modifying the stay.  First, and these are

22   repeating some of the themes that we've already hit, the

23   adversary proceeding would impede the Bermuda liquidation

24   process.  The Bermuda court has the expertise to determine

25   whether to admit or reject the claims.

Lavine - Argument                    51

1          This adversary proceeding could prejudice other

2     creditors.  Judicial economy here is undermined.  And far from

3     being ready for trial, Your Honor, this is a case that has

4     commenced, and all that's happened is an agreement as to

5     tolling and service of process.

6          And, again, the general partner has just not

7     provided any actual meaningful, specific examples of

8     prejudice.  So, with that, Your Honor, we would rest.  I do --

9     I do have a housekeeping item --

10         THE COURT:  Yes?

11         MR. LAVINE:  -- which is that we did submit a lot of

12    declarations, and we did submit a joint witness list, a

13    declarations list, exhibit list, and so, I think we might as

14    well move that into evidence, as it's relevant to these

15    issues.  First, the foreign representative submitted

16    declarations from Mr. Andrew Childe, who is one of the foreign

17    representatives.  That's at docket index numbers 54 and 67,

18    and the foreign representatives also submitted declarations

19    from Mr. Jayson Wood.

20         The foreign representatives proposed a foreign law

21    expert.  That's at docket index numbers 68 and 78.  So, we

22    would like to move those into evidence.

23         THE COURT:  It's consensual, but I'll just ask for

24    the record, does anybody object to the admission of those

25    declarations?

1            (No audible response)

2            THE COURT:  Okay, I hear no response.  They are

3    admitted, and where there be cross-examination of any of those

4    witnesses?

5            MR. TILLINGHAST:  No.

6            THE COURT:  No?  Okay.

7            MR. LAVINE:  So, the general -- I left out the

8    general partner's declarations, which, since it's consensual,

9    I'm happy to just make a record.

10            THE COURT:  Right.  I can -- I can say for the

11    record that I have read them.  They do appear on the docket,

12    and they are admitted.

13            MR. LAVINE:  Okay.  Thank you, Your Honor.

14            THE COURT:  Can I take one side on here?  I think

15    it's just important to note, especially because I am a new

16    judge, and everybody is becoming accustomed to my practices

17    and preferences?  In the event of witnesses who are not going

18    to be cross-examined, as long as we have Zoom available, I am

19    happy for them to appear by Zoom.  But it is an area where the

20    Court has to be apprised that this is going to happen, and

21    because the general rule and, certainly my chamber's

22    procedures, it says that all participants must be in-person

23    unless they're -- certain exceptions apply.

24            Those requests need to come to me in an explicit

25    way.  The requests that the witnesses who are abroad could

1  appear by Zoom was presented on page three, footnote two in

2  ten point font in the witness and exhibit list.  And we do

3  read things very closely, and we did note that it was there.

4  But I think the best way for you to get a response on such a

5  request would be to make it directly to chambers.  It could be

6  directed to my chambers' staff and in sufficient time so that

7  it really becomes a request, rather than a statement that the

8  witnesses are not going to be here.  But it does have to be

9  directed to us in an explicit way, rather than through a

10  footnote.

11            MR. LAVINE:  We apologize for that oversight.

12            THE COURT:  No, it's fine.  I just want to make sure

13  that everybody is familiar with my --

14            MR. LAVINE:  Yes.

15            THE COURT:  -- preferences and practices.

16            MR. LAVINE:  Thank you, Your Honor.

17            With respect to the general partner's witness, if

18  it's okay with Your Honor, I'd just like to confer with my

19  team and client about whether we intend to proceed with cross-

20  examination.

21            THE COURT:  Sure.  Take a moment.

22            MR. LAVINE:  Thank you.

23            MR. TILLINGHAST:  Your Honor, just while -- I have

24  some response to the arguments.

25            THE COURT:  Yes, of course.  Thank you.

Tillinghast - Argument                    54

1          (Pause)

2          MR. LAVINE:  Your Honor, we're not going to proceed

3    with any cross-examination.

4          THE COURT:  Okay.  Thank you.

5          Mr. Tillinghast?

6          MR. TILLINGHAST:  Thank you, Your Honor.  A few

7    points.  First -- I think they're in the order that counsel

8    addressed the Court -- first, as to inconsistent orders.  One

9    thing that I think is important to understand is, what I

10   understand from Bermuda counsel is that, in Bermuda in a

11   liquidation, there is no discharge or release.  And that sort

12   of completely negates the issue of inconsistent orders.

13         So, in other words, the way I understand Bermuda law

14   is that, if you don't file a claim, you don't get a dividend,

15   as we would call it, and interestingly, if you don't file a

16   claim by June 9th, you don't get a dividend, if one is made a

17   result of -- subsequent to that.  But if there is a subsequent

18   distribution, and you file a claim after June 9th, but before

19   the subsequent distribution, you get a distribution on that.

20         So, it's not like our system where it's kind of like

21   a statute of limitations, but most importantly, there is no

22   discharge on the liquidation, which is similar to our system.

23   And so, if, hypothetically, there is no claim filed in

24   Bermuda, because the general partner doesn't wish to submit to

25   jurisdiction and go through the expense and what not of

1   litigating in a foreign court, it doesn't -- the claim doesn't

2   get discharged, it just doesn't get a payment plan.  And then,

3   and obviously, it goes without saying that the general partner

4   has -- has made a calculated, thoughtful decision to litigate

5   in its home state, and the court that's in that state before

6   Your Honor, and it's not really a question of, if there a

7   better court; it's a question of, does the -- should the stay

8   be modified, not a question of what the <u>Rexene</u> factors aren't

9   looking at as, could it be litigated somewhere else that's

10  "better".  It's a question of, is there -- is there a basis to

11  modify the stay to allow this Court to hear it.

12       And as to the floodgates issue, the Debtor has been

13  quite clear in their -- in their filings and attachments that

14  -- and I've read them all.  The only thing that I see that

15  they have in the United States is an investment in Falcata,

16  which is a Cayman entity that the general partner is here in

17  the United States, and Falcata's place of business is in

18  Texas.

19       An entity called Vista, which is also in the United

20  States, and -- I mean creditors -- excuse me.  Let me rephrase

21  that.  The only creditors they have in the United States is

22  the IRS, which we've talked about, Vista and Falcata.  So,

23  this concept that thousands of cases are going to be filed or

24  hundreds or dozens, even, is just a misnomer.  It's just

25  hyperbole.

Tillinghast - Argument                    56

1          And as to abstention, which Point made this argument

2    kind of, in passing, I'll call it, in their papers, and we

3    have addressed it in our reply papers, there is obviously --

4    there is two types of abstention.  There is mandatory, where

5    the court must abstain, and that can only be done when there

6    is a pending action that's actually in existence and pending.

7    And there is no pending action that's pending, so mandatory

8    abstention is not an option.

9          The other option is permissive.  And, just going

10   back to mandatory, it's under 1334(c)(2).  And as to

11   permissive, which is 1334(c)(1), it specifically excludes

12   Chapter 15.  So, as we argued in our papers, this idea of

13   abstention isn't really an option for this situation.

14         THE COURT:  Well, on the issue of mandatory

15   abstention, wouldn't the foreign main proceeding be the

16   pending action?

17         MR. TILLINGHAST:  We would submit no, because there

18   is not an action to determine or, as we understand it, the

19   ability for declaratory judgment.

20         THE COURT:  Okay.  And then the issue about Cayman

21   law and the issues raised about it is complicated.  In our

22   foreign law expert opinion, and we have ones from Bermuda as

23   well as Cayman -- Point only has one from Bermuda -- they

24   address this issue of the default.  And it makes it very clear

25   that the first place to look is the agreement.  And then

1    Cayman law has, you know, there's other pieces of it, but the

2    first place to look is the actual agreement, which provides

3    the rights, so we would submit that it's not that complicated,

4    and this Court adjudicates Cayman law and other -- and Bermuda

5    law and other jurisdictions' laws on a regular basis.  And the

6    other thing is, and I believe it's in the Cayman law

7    declaration from Cayman counsel is that Cayman -- Cayman law

8    and judges often look to Delaware government's law as the

9    premier government's body of law.

10         So, we would submit that it's not such a big,

11   complicated issue.  It's reading an agreement, and evaluating,

12   to the extent Cayman law has applicability for the limited

13   partnership agreement, and then it's Delaware law for the

14   master transaction agreement, which are both referred to in

15   the complaint.  So, we don't think that's an issue, really.

16         And as to set-off, under Bermuda law, and, again,

17   the Bermuda law declaration covers this, under set-off in

18   Bermuda, as I understand it, it's something that automatically

19   is deemed to happen when the case is filed.  So, it's already

20   happened.  There's no argument, that the Court wouldn't have

21   to decide whatever set-off has to do with the case, if

22   anything at all.  And it's as to money damages only.  It's not

23   as to declaratory relief or equitable principles.

24         And, you know, much has been made in the papers and

25   in arguments about, well, the proceeding hasn't gone very far,

1    so it's going to take a long time.  That -- the proceeding was

2    filed in March, and we -- we're now in the end of May, and

3    we've been litigating this issue of the stay.  It's -- you

4    know, we're prepared to proceed as quickly as possible on it,

5    and I -- that's -- I would submit this issue of, well, it's

6    going to take a long time, and it really is in its infancy is

7    not an issue, there isn't even an action filed in Bermuda for

8    it.

9           So, it's even further behind.  At least it's framed.

10   The issues are framed before Your Honor in the complaint.  So,

11   that's what -- unless Your Honor has further questions?

12          THE COURT:  I don't.

13          MR. TILLINGHAST:  Thank you.

14          THE COURT:  Thank you.

15          MR. LAVINE:  Your Honor, we have a few rebuttal

16   points, and I'm going to stick largely to the Cayman and

17   Bermuda law declarations that were filed by the general

18   partner.  Before we get there, our -- we submitted a

19   declaration from a Cayman and Bermuda law expert.  It just

20   happens to be the same person, so I just wanted to correct the

21   record on that.

22          We stand by our position that this is not a simple

23   breach of contract claim, and that nothing about this case is

24   simple.  That is especially true under foreign law, and that

25   does go to the question of why it would be appropriate,

Lavine - Argument                     59

1    eventually, we believe, for this Court to abstain, but it also

2    goes to show that it's impossible for the general partner to

3    prove their likelihood of success on the merits, given the

4    scant case law on these issues.

5         And so, I'll read from the general partner's

6    experts.  The first is Bermuda law expert, Mr. Miles.  Counsel

7    has stated that set-off is clear cut and easy in Bermuda.  I

8    think that was a reference to an insolvent liquidation.  As

9    we've referenced, this is a solvent liquidation.  So, I'll

10   quote from Mr. Miles.  This is paragraph 23, "No reported

11   Bermuda authority that I have identified has determined the

12   question whether insolvency set-off applies in a solvent

13   liquidation."

14        So, this would be a -- if set-off issues arose in

15   the adversary in some sense, this would be an issue of first

16   impression in any court.

17        I'll turn to Cayman law issues.  Again, the critical

18   aspect of Cayman law is whether declaring the Debtor a

19   defaulting partner was a breach of fiduciary duty.  The second

20   issue will be -- and I don't think this has come up before.

21   It's critically important -- if Falcata or the general partner

22   seeks to exercise its draconian remedies, would that, too, be

23   a breach of the general partner's fiduciary duties since the

24   general partner has a fiduciary duty to our client, as the

25   only limited partner.

1          And I'll quote from Mr. Levers -- from his

2    declaration, where he states in paragraph five, "Case law in

3    exempted limited partnerships in the Cayman Islands is scant,

4    and those Cayman cases, on exempted limited partnerships that

5    are recorded in the CILR relate primarily to their winding-up

6    and dissolution.  There are, necessarily, no English cases

7    relating specifically to exempted limited partnerships since

8    English law has no equivalent to the ELP Act.  But where the

9    issues involved deals with matter of general principle,

10   English law may, nonetheless, assist with the interpretation

11   of the ELP Act."

12          And so the statements and the ultimate conclusion

13   reached by their foreign law expert, as to Cayman law, is

14   based, not on any reported Cayman law decisions, but it seems

15   to be based on analogies to English case law, when he's also

16   stating that English law doesn't even have exempt limited

17   partnerships.

18          I'll quote, further, paragraph 33, "Whilst this is

19   not a point which has arisen before the Cayman Islands courts

20   previously in the context of exempted limited partnerships, I

21   am confident that they would adopt a similar approach".  So,

22   again, an admission from their own expert that the Cayman

23   Islands courts have not dealt with these issues.

24          Paragraph 34, "For completeness, I note that while

25   there are no authorities in the Cayman Islands which have

1    considered the duties of a general partner in the context of

2    an exempted limited partnership with a sole limited partner

3    and as a general amount of legal principle, there is no reason

4    why the approach set out above should not be adopted in that

5    circumstance."

6              So, again, you have -- if this case were to proceed,

7    Falcata will be asking Your Honor to make new Cayman Island

8    law, and in some instances, make new English law.  Or, at

9    least, what they are saying is, you'd have to analogize the

10   English law, but there's no, even, case on point in England.

11   And, so, again, this goes to the permissive and mandatory

12   abstention -- abstention points.

13             I do -- following on, on permissive abstention,

14   there is an -- the general partner raises the argument that

15   permissive abstention does not apply here in the plain terms

16   of the statute.  They reference Section 1334(c)(1), which says

17   that it does not apply to a "case" under Chapter 15.

18             But then, this is not a case under Chapter 15 or, at

19   least, the adversary proceeding is not a case under Chapter

20   15.  What that statutory -- what that statute references is,

21   is that Congress wanted cases, i.e., the Chapter 15 main

22   proceeding to be a part -- to not allow courts to abstain from

23   those.

24             There is -- on this issue, too, I think, though

25   there is scant cases, but at least one case that they cite

1    holds precisely -- is on force with exactly with what I just

2    stated.  That case is the -- I think it's <u>Orams (ph) vs.</u>

3    <u>General Nutrition</u>, which confirms the view that I just

4    described, which is that case, under 1334(c)(1) can only be

5    read to mean, like, the ancillary case, not an adversary

6    proceeding or other proceeding that arises within that -- or I

7    guess in this case, that is related to that Chapter 15 case.

8            And we will -- again, I don't think it's an issue

9    for today that Your Honor has to decide issues of mandatory or

10   permissive abstention.  Your Honor need not write that into

11   any decision.  However, it clearly goes to the question of, is

12   it appropriate to lift the stay.  And when there are serious

13   jurisdictional questions, we submit that they cannot meet

14   their burden to show that it would be an efficient use of

15   resources and that cause would exist to lift the stay at this

16   time.

17           Thank you, Your Honor.

18           THE COURT:  Thank you.

19           MR. LAVINE:  I said thank you, Your Honor, as if we

20   were done for the day, but I don't think we are.

21           THE COURT:  We're not done for the day.  And I want

22   to check, first, to see if Mr. Tillinghast has anything he

23   would like to add in response to your recent comments.

24           MR. TILLINGHAST:  If I may have just a minute, Your

25   Honor?

1          THE COURT:  Yes, you may.  Yes.

2      (Pause)

3          MR. BENSON:  Your Honor, this is Ward Benson for the

4  Department of Justice, representing the IRS.  If possible,

5  could I be afforded the chance to speak on this issue?

6          THE COURT:  Yes, Mr. Benson.

7          MR. BENSON:  I'm happy to wait until everyone else

8  is done, but --

9          THE COURT:  Okay.  Let's just see.  We'll give Mr.

10 Tillinghast and his colleagues a moment to see if they'd like

11 to add anything else, and then we'll turn to you.

12     (Pause)

13         MR. TILLINGHAST:  Your Honor, really, I don't have

14 anything other than to just point out that under <u>Rexene</u>, and

15 this isn't to say that we don't think we have a high

16 probability of succeeding -- we actually do -- but the test is

17 a slight probability is sufficient.  And they have

18 acknowledged that they've missed a payment, and I would

19 respectfully submit that this Court determines difficult

20 issues all the time.  And just because that it might be --

21 which we don't think it's all that complicated -- but it may,

22 in argument, I'll say, be complicated, doesn't mean that this

23 Court isn't fully capable of doing that.

24         And to the extent it is complicated, it's going to

25 have to be adjudicated by a court.

Benson - Argument                          64

1          THE COURT:  Thank you.

2          MR. TILLINGHAST:  Thank you.

3          THE COURT:  Mr. Benson?

4          MR. BENSON:  Thank you, Your Honor.

5     We haven't taken and aren't going to take a formal

6 position on any of the disputes regarding this adversary

7 proceeding, the stay issue, in part because we want to

8 preserve our right to seek relief at some point in the future.

9          But I just wanted to alert Your Honor that, as in

10 many Chapter 15 cases, in this case, there is an issue as to

11 whether the foreign main proceeding is happening in a forum

12 that is actually fair to the foreign creditors.  Mr. Lavine

13 referenced prior management being removed for mismanagement,

14 and part of the mismanagement referenced by the Bermuda court

15 was his cooperation with the Department of Justice in its

16 investigation of Mr. Brockman.

17          And so, I would just ask that however Your Honor

18 chooses to rule, and we're taking a position on that, Your

19 Honor recognize that U.S. parties need to be able to come to

20 U.S. bankruptcy courts in Chapter 15 cases and seek relief,

21 premised on arguments that the foreign main proceeding is not

22 going to treat them fairly, and whatever kind of relief is

23 permissible, I'd just ask Your Honor recognize that we, at

24 least, need, as a matter of due process, and a matter of

25 international commodity Section 1506 of Chapter 15, we need to

1    be able to come and, at least, ask for some kind of relief

2    that may be contrary to the general principles of commodity.

3            THE COURT:  Great.  Thank you very much, Mr. Benson.

4    I appreciate those comments.

5            Does anybody wish to respond to Mr. Benson's

6    comments?

7            MR. LAVINE:  Yes, Your Honor.

8            I would just respond as follows, which is that what

9    Mr. Benson just described is not what Falcata is stating

10   today.  They are not stating that they believe the Bermuda

11   process to be unfair.  They haven't submitted any evidence to

12   that effect.  This case was commenced and premised, and the

13   Court necessarily found that the process was fair and

14   deserving of recognition.

15           Instead, Falcata is saying, they just don't want to

16   participate.  That is different than what Mr. Benson, DOJ or

17   IRS may choose to say in the future, and we may have that

18   debate in the future, but it's really not before Your Honor

19   today.  And, again, that's not an argument being made by the

20   general partner.

21           The next topic on --

22           THE COURT:  Well, hold on just a second.  I see Mr.

23   Tillinghast conferring with his colleagues, and I just want to

24   see if he has anything he wants to add to that discussion

25   about the fairness.

Tillinghast - Argument                    66

1          MR. TILLINGHAST:  Thank you, Your Honor.

2      (Pause)

3          MR. TILLINGHAST:  Just a brief comment, Your Honor.

4          THE COURT:  Yes.  Why don't you approach the podium,

5  Mr. Tillinghast?

6          MR. TILLINGHAST:  Thank you.

7          As Your Honor can probably sense, we view this

8  largely as a U.S. bankruptcy law issue, whether there is a

9  stay, whether it should be lifted, so we've never raised it,

10 but my understanding throughout the whole process is Bermuda

11 has not been particularly friendly to the general partner, and

12 if Your Honor wishes to have a separate set of briefings on

13 issues about Bermuda, we could certainly do that.

14         But, as we've said, we are firmly entrenched, and we

15 want this litigation decided in this court, where the general

16 partner is formed.

17         THE COURT:  Okay.  Thank you, Mr. Tillinghast.

18 Okay, Mr. Lavine?

19         MR. LAVINE:  Your Honor, would you be amenable to a

20 five minute recess?

21         THE COURT:  Yes.  Yeah.  Okay.  We're in recess.

22 We'll be back at 12:05.

23         MR. LAVINE:  Thank you.

24         (Recess, 11:57 a.m. to 12:06 p.m.)

25         COURTROOM DEPUTY:  All rise.

Tillinghast - Argument                    67

1          THE COURT:  Please be seated.

2          MR. TILLINGHAST:  Your Honor, if I may just clarify

3    one point, because I think I inferred something that's not

4    correct?

5          THE COURT:  Yes, please do.

6          MR. TILLINGHAST:  In sort of the tail end of my

7    statements, I think I suggested that that the Bermuda court

8    had -- had directed some unfairness to the general partner.

9    It wasn't to the general partner, because the general partner

10   has never been there, but what I was picking up on and

11   pointing out was, in the decision, I believe it was appointing

12   the provisional liquidators that became liquidators, which was

13   submitted by Point to Your Honor, there is discussion by the

14   Bermuda judge that they viewed it as, as essentially a breach

15   of fiduciary duty by the management of Point to cooperate with

16   the Department of Justice in the United States over the tax

17   claims they're billing for.

18         THE COURT:  Okay.  Thank you for clarifying that.

19   Okay, so I suspect your approaching the podium to talk about

20   what I'm about to ask you which is, where are we going?

21         MR. LAVINE:  Yes, Your Honor.  I think there are

22   still two issues which we haven't had oral argument on.  I

23   think they are significantly less complex and, hopefully,

24   easier -- quicker to get through than what we've had so far.

25   Those issues are, are the foreign representatives entitled to

1    damages for wilful violation of the stay, and then, finally,

2    the third item on the Agenda, which is the foreign

3    representatives' pending Rule 2004 discovery motion.

4              THE COURT:  All right.

5              MR. LAVINE:  So, if it's all right with Your Honor,

6    I can proceed on the damages point.

7              THE COURT:  Yes, let's do that.

8              MR. LAVINE:  Okay.  So, Your Honor, the procedural

9    history here is that we had served informal discovery -- the

10   foreign representatives had served informal discovery on the

11   general partner.  We were expecting -- we had received, months

12   earlier, responses and objections, which were, in our view,

13   deficient, but we were, nevertheless, in the process of

14   negotiating in what we believed to be good faith towards some

15   sort of consensual production.

16             On the same day that we were expecting more fulsome

17   responses to the discovery requests, we -- instead, the

18   general partner filed its adversary complaint.  Subsequent to

19   that, the foreign representatives, through counsel, sent a

20   letter to the general partner's counsel stating our belief

21   that the commencement of the adversary complaint was in breach

22   of the violation of the automatic stay, and we stated that,

23   unless you withdraw your complaint within 48 hours, we intend

24   to seek all remedies and relief that may be available to us,

25   including wilful violation of the automatic stay.

1          And we cited cases that we have continued to cite in

2     our briefing about how, you know, in Chapter 15 cases, it is

3     not appropriate to commence adversary complaints, and that one

4     should, instead, proceed through the foreign main proceeding.

5     Rather than respond to that letter, rather than narrow the

6     claims or seek to meet and confer, instead, they filed their

7     affirmative motion.  It wasn't a motion for relief from stay.

8     It was a motion to confirm that the stay doesn't apply or, in

9     the alternative, a motion for relief from stay.

10          We had, because we had been preparing it, we had our

11    motion for a stay violation ready to go, and then, subsequent

12    to their motion, we filed ours, and the reason you have two

13    pending motions is because there are slightly different

14    standards, one, and two, we needed our own relief.  And our

15    own relief was voiding of the actual adversary complaint, but

16    also damages for wilful violation.

17          The general partner has asserted a wilfulness

18    defense -- or a lack of wilfulness defense.  But to do that,

19    they must rely on statutory direction or "compelling,

20    persuasive authority that supports its position", and that

21    means that they can't simply rely on a lack of case law.  To

22    avoid a wilful violation of the stay, they need to actually

23    point to persuasive authority that justifies their position,

24    and we think that's particularly true in an instance where we

25    did not run to court to file a motion for violation of the

1    stay.  We actually gave them a warning via a stay violation

2    letter and put in our persuasive authority.

3           So, our view continues to be that the express terms

4    of Section 1520 and its legislative history make clear that

5    the automatic stay bars the adversary proceeding, and

6    moreover, every decision that the general partner cites for

7    support, with respect to the home court rule, those are cases

8    in either a Chapter 11 or Chapter 7 case.  That is not, in our

9    view, persuasive authority.

10          And so, that is the reason we are seeking our fees.

11   We are entitled to it under the statute and under the case

12   law, but also, you know, just, generally, Your Honor, it is

13   kind of doubly troublesome for our clients, as a practical

14   matter, because all of the fees that are currently being

15   incurred by the fund to defend this case and commence a

16   proceeding which we believe to be in violation of the statute.

17          All of their fees, meanwhile, get paid by the fund,

18   and, of course, who is the ultimate beneficiary of the fund?

19   It's the foreign representative, and so, by taking the actions

20   that they've taken, in violation of the automatic stay, they

21   are effectively charging us twice.  They are charging us our

22   legal fees to force them abide by the statute, and then

23   they're going to charge us again for their legal fees, because

24   there's no dispute that at the end of the day, once the asset

25   in the fund is sold, a significant -- and fees are undertaken

1    -- fees are netted, then we get the remainder.

2            And so, it's under those circumstances, too, that we

3    think it's appropriate to grant fees for this motion.

4            THE COURT:  Well, you know, on the issue of whether

5    they should have known or it should have been clear to them

6    that it would violate the automatic stay, I've got three of

7    these binders on my desk, most of which are dedicated to

8    arguing about this issue and evidence in support of that, and

9    we have been here for two hours discussing this.  How clear

10   can it be?

11           MR. LAVINE:  Well, frankly, Your Honor, I think 99

12   percent of -- well, maybe that number is exaggerated, but the

13   vast majority of time we've spent, all of the foreign law

14   issues that have arisen, all of the foreign declarations that

15   have been presented do not deal with the first issue that we

16   had oral argument on today, which is, does the stay apply.

17           Instead, we have spent most of the day talking

18   about, assuming it applies, should it be modified?  And so, I

19   think that's the response there, Your Honor.

20           THE COURT:  It's a good response.

21           MR. LAVINE:  Thank you.

22           THE COURT:  Thank you.

23           Mr. Tillinghast?

24           MR. TILLINGHAST:  Thank you, Your Honor.

25           First, to address the argument about so-called

1    informal discovery, yes, there was a document sent seeking a

2    very, very, very broad group of documents that covers

3    everything close to under the sun, including everything that

4    the general partner, the manager and the Falcata, the

5    partnership, gave to the Department of Justice.

6           It's very, very broad, far broader than anything

7    envisioned under Chapter 15-type discovery for the Debtor to,

8    what they claimed, was to find out what their assets were.  It

9    was -- it was seeking management decisions, on managing the

10   assets, all sorts of records.  And so, it was very, very

11   broad, and it's one of the exhibits.  And we could go into

12   specifics, but I don't think that's relevant to today.

13          And, secondly, it has to be put in the context of,

14   while much has been about the so-called unfairness and the

15   windfall and what not, Point entered into an agreement, and

16   that agreement provides a number of rights and obligations for

17   both parties, for all parties.  One of those things is, if

18   there is a -- if it's a defaulting partner, i.e., they default

19   on a capital call, as this -- as Point has acknowledged, their

20   information rights are cut off.  So, that was raised, as I'm

21   sure Your Honor probably saw that in the correspondence

22   between my firm and Point's counsel of -- of their information

23   rights contractually were cut off.

24          Now, that can be separate and apart from 2004, but

25   we were at what they have labeled as an informal phase.  There

1   was no 2004 order.  There was no -- under Delaware procedures,

2   you have an informal phase, and then, if you can't agree, you

3   come to the Court, and you seek a 2004 order.  But we weren't

4   at the phase of a 2004 order.  We, in good faith, worked

5   diligently to try to narrow the request and the production to

6   things that were relevant to value and things of that sort.

7        And we worked for several weeks on that, and

8   frankly, it seemed like it was going, it was one step forward

9   and three steps back.  It kept getting broad.  It would narrow

10  a little bit.  It kept getting broad, and the correspondence,

11  I would submit, suggests that.  And one thing that has been

12  left out is, throughout that whole process, all of -- both the

13  discussions that we had by phone and by Zoom and by email and

14  by letter were all without prejudice to everybody's rights.

15       So, I would submit that this whole piece about us

16  not operating in good faith is just false.  I mean, we

17  actually tried to come to a resolution of a rational amount of

18  documents to produce that addressed issues that were relevant

19  to the Estate and to Point, and we couldn't.  I mean, there's

20  -- you know, that's what courts are for, to be honest.  And we

21  knew that if they couldn't, inevitably, they would probably

22  seek a 2004.  We tried to work around that in good faith.  We

23  couldn't reach that Point, no pun intended.  And so, I would

24  submit that this bad faith argument doesn't really fly here,

25  and, also, keeping in mind here that the limited partnership

1    agreement, itself, holds that once they default, they're not

2    entitled to information.

3            Now, whether they should have entered into that

4    agreement or not, that's not an issue for the Court, but the

5    agreement is the agreement.  They're a sophisticated party.

6    They had counsel.  They entered into the agreement, and it

7    says what it says.

8            Second, as to the letter where after we -- after we

9    filed the complaint, we sent the complaint and asked if they

10   would accept service.  They didn't answer.  We then -- I sent

11   another email saying, will you accept service.  They answered

12   with their letter saying they were shocked and appalled and,

13   please, withdraw the complaint.  We had done research.  We

14   said, no.  They left the fact out that we said, no.  I mean,

15   we actually felt then, and we still feel right that the stay

16   does not apply, and we looked at cases.  We looked at the

17   statute, and we felt, and objectively and in fairness and in

18   good faith that the stay does not apply.

19           And, you know, as part of that, there are dozens, if

20   not hundreds of adversary proceedings in Chapter 15 cases

21   against Chapter 15 debtors in various districts, including

22   this district.  So, to say that there is no basis -- or no

23   cases is just not correct.  We've gone through the arguments,

24   and I'm not going to, you know, burden the Court with going

25   over it again, but, under Chapter 15, 1520 and 362 and the

Lavine - Argument                    75

1    home court rule and everything else, there is nothing that

2    says that what they are trying to say, namely that there

3    cannot ever be an adversary proceeding in a Chapter 15 against

4    the Debtor.  That's what they want this Court to hold.

5           And, if you actually look at what they're saying and

6    the way that they interpret 362, it sounds preposterous, but

7    if they make a motion, we couldn't even object to it.  That

8    would be a violation of the stay.  That seems to violate due

9    process.

10          So, as to damages, we think there is no basis,

11   because there is clearly -- we believe that it's right -- the

12   right decision is that there is no stay or it should be

13   modified, but certainly, it was not wilful or improper to

14   proceed as we did.

15          THE COURT:  Thank you.

16          MR. TILLINGHAST:  Thank you, Your Honor.

17          THE COURT:  Any response to that, Mr. Lavine?

18          MR. LAVINE:  Yes, Your Honor.

19          On the last point that somehow the stay would -- if

20   the foreign representatives made a motion, and somehow the

21   automatic stay would prevent responses to that motion, I mean,

22   that's not true.  That's a different set of facts than the

23   facts we have here, which is a creditor seeking recovery of a

24   pre-petition claim.

25          With respect to timing, to the extent there is case

1    law about creditors commencing adversary proceeding within

2    Chapter 15 against the Debtor, they follow a motion for relief

3    from the stay, and those were the cases that we had cited.

4    And so -- so, we think that should have been the approach

5    here, and because it wasn't, it has caused increased costs.

6            That's all I have to stay on that topic, and I think

7    we could turn to the Rule 2004 discovery motion, if that's

8    okay with Your Honor?

9            THE COURT:  Yeah, I just want to see if Mr.

10   Tillinghast has anything else in response?

11           MR. TILLINGHAST:  I'd just point out that many, if

12   not all of the cases that we referred to as Chapter 15 against

13   the Debtor do not involve stay relief motions.  They're just

14   -- they did the same thing we did.  They filed a complaint in

15   the home court that administers the stay.

16           THE COURT:  Do you mind approaching the podium,

17   please, just so I can hear you a little better?  In any of

18   those cases -- you may not know offhand, but in any of those

19   cases, was there a determination by the Court that the stay

20   did not apply or are we talking about cases where an adversary

21   proceeding was commenced, and the foreign representative

22   didn't object on stay violation grounds so it just went

23   forward?

24           MR. TILLINGHAST:  I don't specifically recall the

25   stay issue coming up in procedural history or otherwise.

1              THE COURT:  Okay.  Thank you, Mr. Tillinghast.  I

2    appreciate that.

3              MR. TILLINGHAST:  Thank you.

4              THE COURT:  Okay.

5              MR. LAVINE:  So, Your Honor, I think the last Agenda

6    item, and now, we actually are getting back to the Agenda, is

7    contested matter number three, which is Rule 2004 discovery.

8    The main point we want to make on this is that, it appears

9    there is no dispute between the parties that if the foreign

10   representatives are correct with respect to the stay, and that

11   the adversary proceeding is void ab initio, then there is no

12   pending proceeding, and Point and the foreign representatives

13   should be permitted to proceed with Rule 2004 discovery.

14             Now, in the alternative, if Your Honor were to

15   permit the adversary proceeding to commence, and we haven't --

16   we haven't received any indication yet about how quickly Your

17   Honor may rule, our concern remains that, you know, we have

18   been seeking discovery about Point's assets for -- for over a

19   year, and some of that was informal, but at least since

20   December of last year, that discovery was memorialized in

21   actual document requests, which were provided to counsel.

22             And so, our concern is that, you know, we continue

23   to be at an informational disadvantage with respect to assets

24   of the Debtor's estate for which there is kind of no -- no

25   dispute that the requests that were made, either relate to the

1   adversary proceeding or the Debtor's assets and affairs, and

2   therefore, Rule 2004 is appropriate.

3          But I would say this, right, we -- in the event that

4   this Court were to rule quickly that the adversary case should

5   proceed, which we certainly would disagree with, you know,

6   we'd be prepared to slap a document request together with an

7   adversary -- with the case caption of an adversary proceeding,

8   right.  We understand that, like, there is clearly a mechanism

9   for us to do that, but what we do want to reserve our rights

10  is that, there have been statements made by counsel, in their

11  papers, that everything we've asked about relates to the

12  adversary proceeding.

13         Well, if that's true, then once we have an adversary

14  proceeding, it seems only fair that we get all of the

15  documents that we're asking for.  So I just -- whatever

16  happens today, we don't -- we do want to reserve our rights,

17  either to proceed with the discovery we have sought in the

18  adversary proceeding or, in the alternative, if Rule 2004 is

19  determined not to be appropriate at the time or not

20  appropriate because of a pending proceeding, if it turns out

21  that they don't actually provide -- that they didn't mean what

22  they said when they said everything that we have asked for is

23  about the adversary proceeding, we do want to reserve our

24  rights to, then, file the Rule 2004 route.

25         And, just as an example, if there are particular

Tillinghast - Argument                              79

1    requests that we have made, which the general partner, in an

2    adversary proceeding says, well, wait a minute, this is not

3    relevant to the adversary proceeding, again, we just want to

4    reserve our right to say, okay, that's fine, but, therefore,

5    we have a Rule 2004 -- here's a Rule 2004 proceeding, because

6    it's not related to the adversary proceeding; it's related,

7    nevertheless, to our assets and affairs.

8            THE COURT:  Okay.  I understand.  Thank you.

9            MR. TILLINGHAST:  I mean, it's fairly

10   straightforward, and it's, obviously, on the papers, but once

11   the adversary proceeding was filed, we have taken the position

12   that the pending proceeding rule applies, and we've never said

13   that they're not going to get any discovery at all.  Actually

14   quite the contrary.  They would get discovery that's permitted

15   under the Federal Rules as adopted by the Federal Rules of

16   Bankruptcy Procedure in the adversary proceeding, and we don't

17   contest that.  That's the law.

18           But it is also very clear, which is the reason for

19   the pending proceeding rule that 2004 discovery is much --

20   much broader -- many courts have referred to it as a fishing

21   expedition -- than the Federal Rules.  So, we have asserted

22   the pending proceeding rule as -- and we obviously believe

23   that the adversary proceeding is proper, so that whatever

24   discovery should be confined or book-ended, however you want

25   to put it, by what the Federal Rules provide for.

1          And something to keep in mind, it's not as if

2     nothing has been given.  In the course of the so-called

3     informal exchange of documents and requests, we did actually

4     produce a series of documents, and again, and in a showing of

5     good faith and trying to work with them on their stated

6     purpose of, we just want to find out what our investments

7     were.  But we believe that the requests go far, far, far

8     beyond that.

9          And, also, the general partner gave them the audit.

10    So, even though they contractually didn't -- they lost their

11    informational rights, we have given them some documents.  We

12    do intend -- you know, if either the stay is modified or the

13    stay is held to not exist, we would proceed like any other

14    proceeding.

15         And under Washington Mutual, the inquiry is whether

16    2004 would lead to discovery unrelated to the pending

17    proceeding, and, you know, that's what we expect to happen.

18    We never tried to say, we're not going to give them anything,

19    and we're not going to give them discovery.

20         THE COURT:  Okay.

21         MR. TILLINGHAST:  You know, unless Your Honor has

22    questions, this is really all I have to say.

23         THE COURT:  I don't.  Thank you.

24         MR. LAVINE:  Your Honor, there certainly was a

25    production.  There was 139 documents that included 55

 1     duplicates.  That's not anywhere near what a dispute of this

 2     size and the assets of this entity, not our entity, the fund,

 3     would be sufficient for us, and that's why we continued to

 4     press.

 5          I also don't see why it can't be the case that,

 6     while the parties were meeting and conferring previously on

 7     things like search terms and an ESI protocol, that can't

 8     continue, because I think it's clear from the party

 9     submissions today that this -- regardless of the forum, the

10     dispute, itself, is not going away.

11          And so, we do prefer to push this forward.  Finally,

12     there was, you know, reference to the information rights under

13     the LPA and how that has been cut off.  Two points on that.

14     The first is, the documents we're seeking are in accordance

15     with statutory authority, like -- or bankruptcy law authority,

16     Rule 2004 has nothing to do with the LPA.

17          Secondly, that's a discretionary -- on the part of

18     the general partner, that's a discretionary limitation.  They

19     have the discretion to voluntarily give us documents that we

20     are asking for.  And, again, that just goes to the heart of

21     what I think we've been talking about today, which is that for

22     reasons that remain unknown to us, but we believe to be an

23     attempt to get a windfall of the foreign debtors capital

24     investment, we have been stonewalled when it comes to

25     discovery.  We have made entreaties to normalize the

1  relationship and meet capital contributions.  And that has

2  always been rebuffed.  And so -- and, yet, here we are

3  litigating, which is, you know, not the place that our clients

4  want to be in as fiduciaries.  And so, we would much prefer --

5  but if we are going to litigate, like, we have to get on with

6  it, and I see no reason why the general partner couldn't

7  negotiate with us on things, again, like search terms and ESI

8  protocol and the like.

9          Thank you.

10          MR. LAVINE:  Thank you.

11          THE COURT:  Anything else, Mr. Tillinghast?

12          MR. TILLINGHAST:  No, Your Honor.

13          THE COURT:  All right.  Okay.  So, is there -- there

14  is nothing else on the Agenda, right?  So, we can close the

15  record there.

16          Here's what we're going to do, I think I've been the

17  beneficiary of absolutely outstanding briefing and argument

18  today, and that's aided me a great deal in figuring out where

19  I want to go.

20          So, we're going to come back at 3:00, and I'll

21  deliver my rulings at that time.  Okay.  So, we are in recess

22  until 3:00.  Thank you.

23          (Recess, 12:34 p.m. to 3:06 p.m.)

24          THE COURT:  Please be seated.  First, if I keep

25  looking off to the side, that's where my notes are, so I

1    apologize if I seem to be looking away from all of you.

2    First, again, I want to emphasize how helpful I found the

3    briefing and today's arguments.  It really was outstanding

4    work, and made it -- all the issues very clear to me, and I

5    think really prepared me well to be able to rule speedily, as

6    has been my goal here today.

7             I don't think any of the relevant facts that are

8    material to my decision are in dispute, but I will note the

9    following facts for the record.  On March 29th, 2022, the

10   foreign representative filed this Chapter 15 petition for

11   recognition of a foreign main proceeding in Bermuda.

12            And on April 22, 2022, Judge Kate Stickles, who then

13   was presiding over the case entered an order granting

14   recognition of the Bermuda proceeding.  In the following 11

15   months or so, there was no substantive activity in this

16   bankruptcy case, or the Court is informed and understands that

17   the Bermuda proceeding progressed during that period.

18            On March 3rd, 2023, the general partner commenced an

19   adversary proceeding by filing a complaint in this court.  The

20   complaint contains three counts.  Two of the counts are breach

21   of contract claims under the limited partnership agreement and

22   the master transaction agreement, for which the general

23   partner seeks monetary relief.

24            The third count seeks declaratory relief regarding

25   the Debtor's alleged status as a defaulting partner under the

Ruling by the Court                              84

1    limited partnership agreement.  The general partner contends

2    that it filed the complaint in this court, because the proof

3    debt process had not yet commenced in the Bermuda proceeding,

4    among other reasons.  The statute of limitations on the claims

5    set forth in the complaint are expected to run by as early as

6    July of this year, therefore, the general partner reasoned

7    that this court provides the best venue to avoid forfeiture of

8    those claims that would be caused should the statute of

9    limitations expire, without the claims being asserted.

10         The foreign representative responded to the

11   complaint by sending a letter to the general partner, arguing

12   that the commencement of the adversary proceeding was a

13   violation of the automatic stay and demanding dismissal of the

14   complaint.  On March 23rd, 2023, the general partner filed its

15   motion for a determination that there is no automatic stay or,

16   in the alternative, seeking stay relief.

17         On March 27th of this year, this case was reassigned

18   to me, and later that day, the foreign representative filed

19   its motion to enforce the automatic stay and seeking damages

20   for the general partner for violation of the automatic stay.

21   Also, on March 27th, the foreign representative filed its

22   motion seeking a Rule 2004 examination of the general partner.

23         The parties have informed me that since the filing

24   of these three motions, the proof of debt process in the

25   Bermuda proceeding has opened, and that the proofs of debt are

Ruling by the Court                                   85

1    required to be filed by later than June 9, 2023.  I would

2    further note that neither party contends that the Bermuda

3    proceeding is unfair, and I assume, therefore, that the

4    Bermuda proceeding is fair as to foreign parties, including

5    United States parties.  Each of the motions has been fully

6    briefed, and earlier today, the Court conducted a hearing on

7    the three motions.

8              As I see it, there are four issues that I need to

9    decide, and I'll take them in turn.  The first issue is

10   whether the automatic stay applies.  I will note that I found

11   the automatic stay issues to be relatively difficult and

12   unclear, and that there is a lack of guidance or an ambiguous

13   guidance in the statutes and a lack of helpful case law

14   regarding the application of the automatic stay under

15   circumstances such as the ones that are presented to us today.

16             However, although the issues are complex and

17   unclear, my ruling on this point is going to be brief and to

18   the point.  I find that the automatic stay does apply to bar

19   the filing of the complaint, and that the filing of the

20   complaint is void.  Section 1520, read together with Section

21   362(a) provides for an automatic stay in this case.

22             While in a Chapter 7 or 11 case, the home court rule

23   might provide a safe harbor, that is not the case in Chapter

24   15, because the foreign main proceeding provides the home

25   court, not this court.  In getting to this determination, it

Ruling by the Court                          86

1   is significant to me that Section 501 does not apply in

2   Chapter 15.   There is no process for this Court to determine

3   claims.   That is the exclusive domain of the Bermudian court.

4           While I find that the statues compel this finding, I

5   also did not find it to be unfair.   The proof of debt process

6   is underway in the Bermudian proceeding, and the general

7   partner may file its proof of debt there.   I would note that

8   the general partner appears to have been diligent about

9   preserving its claims and avoiding the lapse of the applicable

10  statutes of limitation, and that the purpose of this complaint

11  was just this.   And I think that's what any responsible lawyer

12  would do to do something to try to preserve those claims.   By

13  filing a proof of debt, I expect, though, that any applicable

14  statute of limitation concerns should be satisfied.

15          As to relief from the automatic stay, I am denying

16  the general partner's request for relief from the automatic

17  stay.   I find that the Bermuda proceeding is the only venue

18  for resolutions of the claim issues, and this Court lacks

19  authority to do so.   After all, Section 501 of the Bankruptcy

20  Code does not apply in this Chapter 15 case.   Therefore, I

21  cannot determine the claims -- the monetary claims.

22          In addition, I find that the declaratory relief

23  issue presented under the complaint can be addressed through

24  the proof of debt process in the Bermuda proceeding.   I also

25  do not find it prejudicial for the general partner to have to

Ruling by the Court                        87

1   pursue its claims against the Debtor in the Bermuda

2   proceeding.  Accordingly, there is no prejudice to the general

3   partner if it's required to move forward in the Bermuda

4   proceeding.

5          On the other hand, the Debtor would be prejudiced if

6   it were required to address claims issues in two different

7   countries, particularly when this proceeding here is under

8   Chapter 15, and claims matters are not resolved here.

9   Instead, that is the exclusive domain of the foreign main

10  proceeding in Bermuda.

11         As to sanctions, I find that sanctions are not

12  appropriate here.  There are sufficiently difficult legal

13  issues presented whether the automatic stay applied to bar the

14  filing of the complaint.  I also note that the general partner

15  moved promptly to file its motion for determination that the

16  automatic stay does not apply, therefore, damages are not

17  warranted.

18         On the 2004 examination, the foreign representative

19  has sought a Rule 2004 examination of the general partner.

20  The general partner objected on the grounds that the adversary

21  proceeding gives rise to application of the pending proceeding

22  rule.  However, because I am finding the complaint to be void,

23  there is no pending proceeding, and therefore, I will grant

24  the motion for a Rule 2004 examination.

25         And that concludes my ruling.  Are there any

AP2050

Ruling by the Court                              88

1    questions?

2          (No audible response)

3                THE COURT:  Okay.  I hear no response, so with that,

4    we are adjourned.  I wish everyone a good afternoon.

5                (Proceedings concluded at 3:14 p.m.)

6                              *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3               **C E R T I F I C A T I O N**

4

5

6

7              I, Jacqueline Mullica, court approved transcriber,

8      certify that the foregoing is a correct transcript from the

9      official electronic sound recording of the proceedings in the

10     above-entitled matter on May 25, 2023 from 10:07 a.m. to 3:14

11     p.m.

12

13

14

15

16      ___/s/Jacqueline Mullica_____   May 28, 2023

17     JACQUELINE MULLICA

18     DIANA DOMAN TRANSCRIBING, LLC

19

20

21

22

23

24

25

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | **Chapter 15** |
| **POINT INVESTMENTS, LTD.** **(IN LIQUIDATION),** | **Case No. 22-10261 (TMH)** |
| **Debtor in a Foreign Proceeding.**[1] | **Re: D.I. 89 & 90** |

### CERTIFICATION OF COUNSEL REGARDING (I) ORDER DENYING MOTION OF FTI GP I, LLC ON BEHALF OF FALCATA TECH INVESTMENT FUND I, L.P. FOR DETERMINATION THAT THERE IS NO AUTOMATIC STAY, OR IN THE ALTERNATIVE SEEKING RELIEF FROM THE AUTOMATIC STAY TO PROCEED WITH ADVERSARY PROCEEDING AND (II) ORDER GRANTING IN PART, AND DENYING IN PART, THE MOTION OF FOREIGN REPRESENTATIVES FOR ENTRY OF AN ORDER ENFORCING THE ORDER STAY AND FOR DAMAGES

The undersigned counsel to  FTI GP I, LLC (the "General Partner") hereby certifies as follows:

1.       On May 26, 2023, the Court entered the *Order Denying Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination That There is no Automatic Stay, or in the Alternative Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding* (D.I. 89).

2.       On May 26, 2023, the Court entered the *Order Granting in Part, and Denying in Part, the Motion of Foreign Representatives for Entry of an Order Enforcing the Order Stay and for Damages* (D.I. 90) (together with D.I. 89, the "Orders").

3.       Upon review of the Orders, the General Partner noted that paragraph 3 of both Orders requires the General Partner to, *inter alia*, "file a dismissal of such Adversary

---

[1]        Point Investments, Ltd. (the "Debtor") is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769.  The Debtor's registered office is located at c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

Proceeding, *with prejudice*, within 14 days of the entry of this Order." (D.I. 89 at ¶3, 90 at ¶3) (Emphasis added).

4. Filing a notice of dismissal "with prejudice," as required by the Orders, could interfere with the General Partner's ability to bring the dismissed claims in other courts of competent jurisdiction—but it was the understanding of the General Partner that the intent of the Court's ruling on May 25, 2023, was to permit the General Partner to bring the dismissed claims in other jurisdictions.

5. To that end, the General Partner submits that the inclusion of the phrase "with prejudice" in the Orders was a clerical mistake, or oversight or omission, as set forth in Federal Rule of Civil Procedure 60(a) made applicable to this case by Federal Rule of Bankruptcy Procedure 9024, and that such phrase should be removed from the Orders.

6. After coming to this conclusion, counsel to the General Partner reached out to counsel to the Foreign Representatives to discuss the matter.

7. After discussing the matter, the General Partner and Foreign Representatives have agreed that the phrase "with prejudice" should be removed from both Orders.

8. The Foreign Representatives have reviewed the amended proposed Orders (collectively, the "Amended Proposed Orders") and do not object to their entry.

9. The Amended Proposed Order for the *Order Denying Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination That There is no Automatic Stay, or in the Alternative Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding* (D.I. 89) is attached hereto as **Exhibit A**. A redline comparing the Amended Proposed Order to the as-entered Order is attached hereto as **Exhibit B**.

2

10.     The Amended Proposed Order for the *Order Granting in Part, and Denying in Part, the Motion of Foreign Representatives for Entry of an Order Enforcing the Order Stay and for Damages* (D.I. 90) is attached hereto as **Exhibit C**.  A redline comparing the Amended Proposed Order to the as-entered Order is attached hereto as **Exhibit D**.

11.     The General Partner makes this request without prejudice to its rights to appeal or otherwise seek review of the Orders or the underlying decision set forth on the record in this case.

WHEREFORE, the General Partner respectfully requests that the Court enter the Amended Proposed Orders at its earliest convenience.

AP2055

Dated: May 31, 2023            By: */s/ Daniel B. Butz*                
    Wilmington, Delaware       Eric D. Schwartz (No. 3134)
                                    Daniel B. Butz (No. 4227)
                                    Evanthea Hammer (No. 7061)
                                    Morris, Nichols, Arsht & Tunnell LLP
                                    1201 North Market Street, 16th Floor

By: */s/ Daniel B. Butz*

Eric D. Schwartz (No. 3134)
Daniel B. Butz (No. 4227)
Evanthea Hammer (No. 7061)
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899
Telephone: (302) 658-9200
Email: eschwartz@morrisnichols.com
     dbutz@morrisnichols.com
     ehammer@morrisnichols.com

-and-

Paul Werner (admitted *pro hac vice*)
A. Joseph Jay III (admitted *pro hac vice*)
Sheppard, Mullin, Richter & Hampton, LLP
2099 Pennsylvania Avenue NW, Suite 100
Washington, D.C. 20006-6801
Telephone: (202) 747-1900
Email: pwerner@sheppardmullin.com
     jjay@sheppardmullin.com

-and-

Edward H. Tillinghast, III (admitted *pro hac vice*)
Sheppard, Mullin, Richter & Hampton, LLP
30 Rockefeller Plaza
New York, New York 10112-0015
Telephone:  (212) 653-8700
 Email:  etillinghast@sheppardmullin.com

*Attorneys for FTI GP I, LLC on behalf of Falcata Tech
Investment Fund I, L.P.*

AP2056

# Exhibit A

AP2057

**IN THE UNITED STATES BANKRUPTCY
COURT FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| POINT INVESTMENTS, LTD.<br>(IN LIQUIDATION),[11] | Case No. 22-10261 (TMH) |
| Debtor in a Foreign Proceeding. | **Re: D.I. 47, 66, 67, 68, 75, 76, 81** |

**AMENDED ORDER DENYING MOTION OF FTI GP I, LLC ON BEHALF
OF FALCATA TECH INVESTMENT FUND I, L.P. FOR DETERMINATION
THAT THERE IS NO AUTOMATIC STAY, OR IN THE
ALTERNATIVE SEEKING RELIEF FROM THE AUTOMATIC STAY TO
<u>PROCEED WITH ADVERSARY PROCEEDING</u>**

Upon consideration of the Motion of FTI GP I, LLC on behalf of Falcata Tech Investment

Fund I, L.P. (the "<u>Fund</u>") for Determination that there is No Automatic Stay, or in the

Alternative Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding [D.I.

47] (the "<u>Motion</u>")[2] for entry of an order determining that there is no stay of the adversary

proceeding entitled *FTI GP I, LLC on behalf of Falcata Tech Investment Fund I, L.P. v. Point

Investments, Ltd.*, Adv. Proc. No. 23-50122 (TMH) (the "<u>Adversary Proceeding</u>")

currently pending in this Court, or in the alternative, seeking relief from the stay arising under

section 1520(a) of the Bankruptcy Code to allow the Fund to proceed with the Adversary

Proceeding; the Foreign Representatives' Objection to Motion of FTI GP I, LLC on Behalf of

Falacta Tech Investment Fund I, L.P. for Determination that there is No Automatic Stay, or in

the Alternative, Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

[2] Capitalized terms not defined herein shall have the meanings set forth in the Motion.

AP2058

[D.I. 66] (the "Objection"); the Declarations of Andrew Childe and Jayson Wood in Support of the Objection [D.I. 67 and 68];  the Declaration of Christopher Levers [D.I. 75]; the Declaration of Nicholas John Miles [D.I. 76]; and the Reply of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. in Support of Motion for Determination that there is No Automatic Stay, or in the Alternative Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding [D.I. 81]; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and  the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that notice of the Motion was sufficient under the circumstances and that no further notice need be given; and the Court having reviewed the legal and factual bases set forth in the Motion, any responses thereto, and the evidence admitted and the argument of counsel at the hearing on May 25, 2023; the Court hereby orders that:

1.     The Motion is denied for the reasons set forth on the record at the May 25, 2023 hearing.

2.     The Adversary Proceeding constitutes a violation of the stay set forth in Bankruptcy Code sections 1520(a)(1) and 362(a)(1) and, therefore, is void *ab initio*.

3.     The Fund shall immediately cease prosecuting the Adversary Proceeding and shall file a dismissal of such Adversary Proceeding within 14 days of the entry of this Order.

4.     Notwithstanding Bankruptcy Rule 4001, this Order shall be effectively immediately upon entry.

AP2059

5. The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated: _____, 2023

_____
Thomas M. Horan
United States Bankruptcy Judge

AP2060

**Exhibit B**

AP2061

## IN THE UNITED STATES BANKRUPTCY
## COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| POINT INVESTMENTS, LTD. (IN LIQUIDATION),[11] | Case No. 22-10261 (TMH) |
| Debtor in a Foreign Proceeding. | **Re: D.I. 47, 66, 67, 68, 75, 76, 81** |

## <u>AMENDED</u> ORDER DENYING MOTION OF FTI GP I, LLC ON BEHALF OF FALCATA TECH INVESTMENT FUND I, L.P. FOR DETERMINATION THAT THERE IS NO AUTOMATIC STAY, OR IN THE ALTERNATIVE SEEKING RELIEF FROM THE AUTOMATIC STAY TO <u>PROCEED WITH ADVERSARY PROCEEDING</u>

Upon consideration of the Motion of FTI GP I, LLC on behalf of Falcata Tech Investment Fund I, L.P. (the "<u>Fund</u>") for Determination that there is No Automatic Stay, or in the Alternative Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding [D.I. 47] (the "<u>Motion</u>")[2] for entry of an order determining that there is no stay of the adversary proceeding entitled *FTI GP I, LLC on behalf of Falcata Tech Investment Fund I, L.P. v. Point Investments, Ltd.*, Adv. Proc. No. 23-50122 (TMH) (the "<u>Adversary Proceeding</u>") currently pending in this Court, or in the alternative, seeking relief from the stay arising under section 1520(a) of the Bankruptcy Code to allow the Fund to proceed with the Adversary Proceeding; the Foreign Representatives' Objection to Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. for Determination that there is No Automatic Stay, or in the Alternative, Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

[2] Capitalized terms not defined herein shall have the meanings set forth in the Motion.

AP2062

[D.I. 66] (the "Objection"); the Declarations of Andrew Childe and Jayson Wood in Support ~~of~~o

f

~~2~~

AP2063

the Objection [D.I. 67 and 68];  the Declaration of Christopher Levers [D.I. 75]; the

Declaration of Nicholas John Miles [D.I. 76]; and the Reply of FTI GP I, LLC on Behalf of

Falcata Tech Investment Fund I, L.P. in Support of Motion for Determination that there is No

Automatic Stay, or in the Alternative Seeking Relief from the Automatic Stay to Proceed with

Adversary Proceeding [D.I. 81]; and the Court having jurisdiction over this matter pursuant to

28 U.S.C. §§ 157 and 1334; and  the Court having found that this is a core proceeding pursuant

to 28 U.S.C. § 157(b)(2); and the Court having found that notice of the Motion was sufficient

under the circumstances and that no further notice need be given; and the Court having reviewed

the legal and factual bases set forth in the Motion, any responses thereto, and the evidence

admitted and the argument of counsel at the hearing on May 25, 2023; the Court hereby orders

that:

1. The Motion is denied for the reasons set forth on the record at the May 25, 2023

hearing.

2. The Adversary Proceeding constitutes a violation of the stay set forth in Bankruptcy

Code sections 1520(a)(1) and 362(a)(1) and, therefore, is void *ab initio*.

3. The Fund shall immediately cease prosecuting the Adversary Proceeding and shall

file a dismissal of such Adversary Proceeding, with prejudice, within 14 days of the entry of this

Order.

4. Notwithstanding Bankruptcy Rule 4001, this Order shall be effectively

immediately upon entry.

AP2064

5.      The Court shall retain jurisdiction with respect to all matters arising from or related

to the implementation, interpretation, or enforcement of this Order.

Dated: May 26, 2023

(Del)

*Thomas M. Horan*

United States Bankruptcy Judge

# **Exhibit C**

AP2066

**IN THE UNITED STATES BANKRUPTCY
COURT FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| POINT INVESTMENTS, LTD.<br>(IN LIQUIDATION),[1] | Case No. 22-10261 (TMH) |
| Debtor in a Foreign Proceeding. | **Re: D.I. 52, 54, 59, 69, 77, and 78** |

**AMENDED ORDER GRANTING IN PART, AND DENYING IN
PART, THE MOTION OF FOREIGN REPRESENTATIVES FOR
ENTRY OF AN ORDER ENFORCING THE AUTOMATIC STAY AND
FOR DAMAGES**

Upon consideration of the Motion of Foreign Representatives for Entry of an Order

Enforcing the Order Stay and for Damages [D.I. 52] (the "Motion");[2] the Declaration of Andrew

Child in Support of (I) Motion of the Foreign Representatives for Entry of an Order to

Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule

2004-1 and (II) Motion of the Foreign Representatives for Entry of an Order Enforcing the

Automatic Stay and for Damages [D.I. 54]; the Objection of FTI GP I, LLC on Behalf of

Falcata Tech Investment Fund I, L.P. (the "General Partner") to the Motion of the Foreign

Representatives for Entry of an Order Enforcing the Automatic Stay and for Damages [D.I.

69]; the Foreign Representatives' Reply in Further Support of the Motion for Entry of an

Order Enforcing the Automatic Stay and for Damages [D.I. 77]; and the Declaration of

Jayson Wood in Support of Foreign Representatives' Reply in Further Support of Motion

for Entry of an Order Enforcing the Automatic Stay and for Damages [D.I. 78]; and the

Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

[2] Capitalized terms not defined herein shall have the meanings set forth in the Motion.                          AP2067

U.S.C.§§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and upon consideration of the Motion; and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and finding that adequate notice of the Motion having been given; and it appears that no other or further notice need be given; and upon the record of any hearing held to consider the relief requested in the Motion; and this Court having found and determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and the Court having considered the evidence admitted and the arguments of counsel at the hearing on May 25, 2023; and after due deliberation and sufficient cause appearing therefore; the Court hereby orders that:

1.      The Motion is granted in part, and denied in part, for the reasons set forth on the record at the May 25, 2023 hearing.

2.      The Adversary Proceeding constitutes a violation of sections 1520(a)(1) and 362(a)(1) of the Bankruptcy Code and, therefore, is void *ab initio*.

3.      The General Partner shall immediately cease prosecuting the Adversary Proceeding and shall file a dismissal of such Adversary Proceeding within 14 days of the entry of this Order.

4.      Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon entry;  (b) the Foreign Representatives are not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order;  and (c) the Foreign Representatives and their agents are authorized and empowered and may, in their discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

5.      This Court shall retain jurisdiction over any and all matters arising from the interpretation, implementation, or enforcement of this Order.

AP2068

Dated: _____, 2023

_____
Thomas M. Horan
United States Bankruptcy Judge

AP2069

# **Exhibit D**

**IN THE UNITED STATES BANKRUPTCY**
**COURT FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| POINT INVESTMENTS, LTD. (IN LIQUIDATION),[11] | Case No. 22-10261 (TMH) |
| Debtor in a Foreign Proceeding. | **Re: D.I. 52, 54, 59, 69, 77, and 78** |

**AMENDED ORDER GRANTING IN PART, AND DENYING IN PART,**
**THE MOTION OF FOREIGN REPRESENTATIVES FOR ENTRY**
**OF AN ORDER ENFORCING THE ~~ORDER~~AUTOMATIC STAY AND**
**FOR DAMAGES**

Upon consideration of the Motion of Foreign Representatives for Entry of an Order Enforcing the Order Stay and for Damages [D.I. 52] (the "Motion");[2] the Declaration of Andrew Child in Support of (I) Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1 and (II) Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and for Damages [D.I. 54]; the Objection of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. (the "General Partner") to the Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and for Damages [D.I. 69]; the Foreign Representatives' Reply in Further Support of the Motion for Entry of an Order ~~Enforcing the Automatic Stay and for Damages~~ [D.I. 77]; and the Declaration of Jayson Wood in Support of Foreign Representatives' Reply ~~n~~in Further Support of Motion for Entry of an Order Enforcing the Automatic Stay and for Damages [D.I. 78]; and the Court having jurisdiction to consider the Motion and the relief

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

[2] Capitalized terms not defined herein shall have the meanings set forth in the Motion.

requested therein pursuant to 28 U.S.C.§§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and upon consideration of the Motion; and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and finding that adequate notice of the Motion having been given; and it appears that no other or further notice need be given; and upon the record of any hearing held to consider the relief requested in the Motion; and this Court having found and determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and the Court having considered the evidence admitted and the arguments of counsel at the hearing on May 25, 2023; and after due deliberation and sufficient cause appearing therefore; the Court hereby orders that:

1.     The Motion is granted in part, and denied in part, for the reasons set forth on the record at the May 25, 2023 hearing.

2.     The Adversary Proceeding constitutes a violation of sections 1520(a)(1) and 362(a)(1) of the Bankruptcy Code and, therefore, is void *ab initio*.

3.     The General Partner shall immediately cease prosecuting the Adversary Proceeding and shall file a dismissal of such Adversary Proceeding, ~~with prejudice,~~ within 14 days of the entry of this Order.

4.     Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon entry;  (b) the Foreign Representatives are not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order;  and (c) the Foreign Representatives and their agents are authorized and empowered and may, in their discretion and without further delay, take any action and perform any act

AP2072

necessary to implement and effectuate the terms of this Order.

5.      This Court shall retain jurisdiction over any and all matters arising from the

interpretation, implementation, or enforcement of this Order.


Dated: May 26, 2023

_____

(Del) *Thomas M. Horan*

Thomas M. Horan
United States Bankruptcy Judge

3

AP2073

# IN THE UNITED STATES BANKRUPTCY
# COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| POINT INVESTMENTS, LTD.<br>(IN LIQUIDATION),[1] | Case No. 22-10261 (TMH) |
| Debtor in a Foreign Proceeding. | **Re: D.I. 52, 54, 59, 69, 77, and 78** |

## AMENDED ORDER GRANTING IN PART, AND DENYING IN PART, THE MOTION OF FOREIGN REPRESENTATIVES FOR ENTRY OF AN ORDER ENFORCING THE AUTOMATIC STAY AND FOR DAMAGES

Upon consideration of the Motion of Foreign Representatives for Entry of an Order Enforcing the Order Stay and for Damages [D.I. 52] (the "Motion");[2] the Declaration of Andrew Child in Support of (I) Motion of the Foreign Representatives for Entry of an Order to Conduct Discovery Pursuant to 11 U.S.C. § 1521(a)(4), Fed. R. Bankr. P. 2004, and Local Rule 2004-1 and (II) Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and for Damages [D.I. 54]; the Objection of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. (the "General Partner") to the Motion of the Foreign Representatives for Entry of an Order Enforcing the Automatic Stay and for Damages [D.I. 69]; the Foreign Representatives' Reply in Further Support of the Motion for Entry of an Order Enforcing the Automatic Stay and for Damages [D.I. 77]; and the Declaration of Jayson Wood in Support of Foreign Representatives' Reply in Further Support of Motion for Entry of an Order Enforcing the Automatic Stay and for Damages [D.I. 78]; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C.§§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

[2] Capitalized terms not defined herein shall have the meanings set forth in the Motion.          AP2074

-1-

District Court for the District of Delaware, dated February 29, 2012; and upon consideration of

the Motion; and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and

venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and finding that

adequate notice of the Motion having been given; and it appears that no other or further notice

need be given; and upon the record of any hearing held to consider the relief requested in the

Motion; and this Court having found and determined that the legal and factual bases set forth in

the Motion establish just cause for the relief granted herein; and the Court having considered the

evidence admitted and the arguments of counsel at the hearing on May 25, 2023; and after due

deliberation and sufficient cause appearing therefore; the Court hereby orders that:

1.      The Motion is granted in part, and denied in part, for the reasons set forth on the

record at the May 25, 2023 hearing.

2.      The Adversary Proceeding constitutes a violation of sections 1520(a)(1) and

362(a)(1) of the Bankruptcy Code and, therefore, is void *ab initio*.

3.      The General Partner shall immediately cease prosecuting the Adversary Proceeding

and shall file a dismissal of such Adversary Proceeding within 14 days of the entry of this Order.

4.      Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this

Order shall be effective immediately and enforceable upon entry; (b) the Foreign

Representatives are not subject to any stay in the implementation, enforcement, or realization of

the relief granted in this Order; and (c) the Foreign Representatives and their agents are

authorized and empowered and may, in their discretion and without further delay, take any

action and perform any act necessary to implement and effectuate the terms of this Order.

5.      This Court shall retain jurisdiction over any and all matters arising from the

interpretation, implementation, or enforcement of this Order.

Dated: May 31, 2023

Thomas M. Horan
United States Bankruptcy Judge

AP2075

## IN THE UNITED STATES BANKRUPTCY
## COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| POINT INVESTMENTS, LTD. (IN LIQUIDATION),[1] | Case No. 22-10261 (TMH) |
| Debtor in a Foreign Proceeding. | **Re: D.I. 47, 66, 67, 68, 75, 76, 81** |

**AMENDED ORDER DENYING MOTION OF FTI GP I, LLC ON BEHALF OF FALCATA TECH INVESTMENT FUND I, L.P. FOR DETERMINATION THAT THERE IS NO AUTOMATIC STAY, OR IN THE ALTERNATIVE SEEKING RELIEF FROM THE AUTOMATIC STAY TO <u>PROCEED WITH ADVERSARY PROCEEDING</u>**

Upon consideration of the Motion of FTI GP I, LLC on behalf of Falcata Tech Investment Fund I, L.P. (the "<u>Fund</u>") for Determination that there is No Automatic Stay, or in the Alternative Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding [D.I. 47] (the "<u>Motion</u>")[2] for entry of an order determining that there is no stay of the adversary proceeding entitled *FTI GP I, LLC on behalf of Falcata Tech Investment Fund I, L.P. v. Point Investments, Ltd.*, Adv. Proc. No. 23-50122 (TMH) (the "<u>Adversary Proceeding</u>") currently pending in this Court, or in the alternative, seeking relief from the stay arising under section 1520(a) of the Bankruptcy Code to allow the Fund to proceed with the Adversary Proceeding; the Foreign Representatives' Objection to Motion of FTI GP I, LLC on Behalf of Falacta Tech Investment Fund I, L.P. for Determination that there is No Automatic Stay, or in the Alternative, Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding [D.I. 66] (the "<u>Objection</u>"); the Declarations of Andrew Childe and Jayson Wood in Support of

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

[2] Capitalized terms not defined herein shall have the meanings set forth in the Motion.

AP2076

the Objection [D.I. 67 and 68]; the Declaration of Christopher Levers [D.I. 75]; the Declaration of Nicholas John Miles [D.I. 76]; and the Reply of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. in Support of Motion for Determination that there is No Automatic Stay, or in the Alternative Seeking Relief from the Automatic Stay to Proceed with Adversary Proceeding [D.I. 81]; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that notice of the Motion was sufficient under the circumstances and that no further notice need be given; and the Court having reviewed the legal and factual bases set forth in the Motion, any responses thereto, and the evidence admitted and the argument of counsel at the hearing on May 25, 2023; the Court hereby orders that:

1.     The Motion is denied for the reasons set forth on the record at the May 25, 2023 hearing.

2.     The Adversary Proceeding constitutes a violation of the stay set forth in Bankruptcy Code sections 1520(a)(1) and 362(a)(1) and, therefore, is void *ab initio*.

3.     The Fund shall immediately cease prosecuting the Adversary Proceeding and shall file a dismissal of such Adversary Proceeding within 14 days of the entry of this Order.

4.     Notwithstanding Bankruptcy Rule 4001, this Order shall be effectively immediately upon entry.

AP2077

5.     The Court shall retain jurisdiction with respect to all matters arising from or related

to the implementation, interpretation, or enforcement of this Order.


Dated: May 31, 2023

_Thomas M. Horan_
Thomas M. Horan
United States Bankruptcy Judge

AP2078

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| **POINT INVESTMENTS, LTD.** **(IN LIQUIDATION),** | **Case No. 22-10261 (TMH)** |
| Debtor in a Foreign Proceeding.[1] | Re: D.I. 89 & 94 |

## NOTICE OF APPEAL FILED BY FTI GP I, LLC
## ON BEHALF OF FALCATA TECH INVESTMENT FUND I, L.P.

Pursuant to 28 U.S.C. § 158(a), FTI GP I, LLC, a Delaware limited liability company (the "General Partner"), on behalf of Falcata Tech Investment Fund I, L.P. (the "Fund"), a Cayman Islands exempted limited partnership, a party-in-interest in the above-captioned bankruptcy case, appeals from the (i) *Order Denying Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. For Determination That There is No Automatic Stay, or in the Alternative Seeking Relief From the Automatic Stay to Proceed With Adversary Proceeding* [D.I. 89], dated May 26, 2023, and (ii) *Amended Order Denying Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. For Determination That There is No Automatic Stay, or in the Alternative Seeking Relief From the Automatic Stay to Proceed With Adversary Proceeding* [D.I. 94], dated May 31, 2023, which were both entered on the docket in the above-captioned bankruptcy case, and are attached hereto as **Exhibit A.** Both these Orders are related to the same motion and decision; the later one amends the prior one.

The names of all parties to the orders from which the General Partner appeals, and the names, addresses, and telephone numbers of their respective attorneys are as follows:

---

[1] Point Investments, Ltd. (the "Debtor") is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is located at c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

**Counsel for Point Investments, Ltd.
(In Liquidation)**

Jacob R. Kirkham (No. 5768)
Stephen J. Astringer (No. 6375)
KOBRE & KIM LLP
600 North King Street, Suite 501
Wilmington, Delaware 19801
Telephone:  (302) 518-6451
Facsimile:  (302) 518-6461
Email:  jacob.kirkham@kobrekim.com
        stephen.astringer@kobrekim.com


Adriana Riviere-Badell (admitted *pro hac vice*)
Evelyn Baltodano Sheehan
(admitted *pro hac vice*)
KOBRE & KIM LLP
201 South Biscayne Boulevard, Suite 1900
Miami, Florida 33131
Telephone: (305) 967-6100
Facsimile:  (305) 967-6120
Email:  adriana.riviere-badell@kobrekim.com
        evelyn.sheehan@kobrekim.com


Adam M. Lavine (admitted *pro hac vice*)
John G. Conte (admitted *pro hac vice*)
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Telephone: (212) 380-2580
 Facsimile: (212) 488-1220
 Email:  adam.lavine@kobrekim.com
        john.conte@kobrekim.com


**Counsel for FTI GP I, LLC, on behalf of
Falcata Tech Investment Fund I, L.P.**

Eric D. Schwartz (No. 3134)
Daniel B. Butz (No. 4227)
Evanthea Hammer (No. 7061)
MORRIS,      NICHOLS,      ARSHT      &
TUNNELL LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899
Telephone: (302) 658-9200
Email: eschwartz@morrisnichols.com
        dbutz@morrisnichols.com
        ehammer@morrisnichols.com


Paul Werner (admitted *pro hac vice*)
A. Joseph Jay III (admitted *pro hac vice*)
SHEPPARD   MULLIN   RICHTER   &
HAMPTON, LLP
2099 Pennsylvania Avenue NW, Suite 100
Washington, D.C. 20006-6801
Telephone: (202) 747-1900
Email: pwerner@sheppardmullin.com
        jjay@sheppardmullin.com


Edward H. Tillinghast, III (admitted *pro hac
vice*)
SHEPPARD   MULLIN   RICHTER   &
HAMPTON, LLP
30 Rockefeller Plaza
New York, New York 10112-0015
Telephone:  (212) 653-8700
Email:  etillinghast@sheppardmullin.com


*[Signature Page Follows]*

AP2080

Dated: June 8, 2023

Wilmington, Delaware

By: /s/ *Eric D. Schwartz*
Eric D. Schwartz (No. 3134)
Daniel B. Butz (No. 4227)
Evanthea Hammer (No. 7061)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899
Telephone: (302) 658-9200
Email: eschwartz@morrisnichols.com
dbutz@morrisnichols.com
ehammer@morrisnichols.com

-and-

Paul Werner (admitted *pro hac vice*)
A. Joseph Jay III (admitted *pro hac vice*)
SHEPPARD MULLIN RICHTER & HAMPTON, LLP
2099 Pennsylvania Avenue NW, Suite 100
Washington, D.C. 20006-6801
Telephone: (202) 747-1900
Email: pwerner@sheppardmullin.com
jjay@sheppardmullin.com

-and-

Edward H. Tillinghast, III (admitted *pro hac vice*)
SHEPPARD MULLIN RICHTER & HAMPTON, LLP
30 Rockefeller Plaza
New York, New York 10112-0015
Telephone: (212) 653-8700
Email: etillinghast@sheppardmullin.com

*Attorneys for FTI GP I, LLC on behalf of Falcata Tech Investment Fund I, L.P.*

AP2081

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | **Chapter 15** |
| **POINT INVESTMENTS, LTD.** **(IN LIQUIDATION),** | **Case No. 22-10261 (TMH)** |
| Debtor in a Foreign Proceeding.[1] | **Re: D.I. 90 & 93** |

## NOTICE OF APPEAL FILED BY FTI GP I, LLC
## ON BEHALF OF FALCATA TECH INVESTMENT FUND I, L.P.

Pursuant to 28 U.S.C. § 158(a), FTI GP I, LLC, a Delaware limited liability company (the "General Partner"), on behalf of Falcata Tech Investment Fund I, L.P. (the "Fund"), a Cayman Islands exempted limited partnership, a party-in-interest in the above-captioned bankruptcy case, appeals from the (i) *Order Granting in Part, and Denying in Part, the Motion of Foreign Representatives For Entry of an Order Enforcing the Order Stay and For Damages* [D.I. 90], dated May 26, 2023, and (ii) *Amended Order Granting in Part, and Denying in Part, the Motion of Foreign Representatives For Entry of an Order Enforcing the Automatic Stay and For Damages* [D.I. 93], dated May 31, 2023, which were both entered on the docket in the above-captioned bankruptcy case, and are attached hereto as **Exhibit A.** Both these Orders are related to the same motion and decision; the later one amends the prior one.

The names of all parties to the orders from which the General Partner appeals, and the names, addresses, and telephone numbers of their respective attorneys are as follows:

---

[1] Point Investments, Ltd. (the "Debtor") is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is located at c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

AP2082

**Counsel for Point Investments, Ltd.
(In Liquidation)**

Jacob R. Kirkham (No. 5768)
Stephen J. Astringer (No. 6375)
KOBRE & KIM LLP
600 North King Street, Suite 501
Wilmington, Delaware 19801
Telephone:  (302) 518-6451
Facsimile:  (302) 518-6461
Email:  jacob.kirkham@kobrekim.com
            stephen.astringer@kobrekim.com


Adriana Riviere-Badell (admitted *pro hac vice*)
Evelyn Baltodano Sheehan
(admitted *pro hac vice*)
KOBRE & KIM LLP
201 South Biscayne Boulevard, Suite 1900
Miami, Florida 33131
Telephone: (305) 967-6100
Facsimile:  (305) 967-6120
Email:  adriana.riviere-badell@kobrekim.com
            evelyn.sheehan@kobrekim.com


Adam M. Lavine (admitted *pro hac vice*)
John G. Conte (admitted *pro hac vice*)
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Telephone: (212) 380-2580
Facsimile: (212) 488-1220
Email:  adam.lavine@kobrekim.com
            john.conte@kobrekim.com

**Counsel for FTI GP I, LLC, on behalf of
Falcata Tech Investment Fund I, L.P.**

Eric D. Schwartz (No. 3134)
Daniel B. Butz (No. 4227)
Evanthea Hammer (No. 7061)
MORRIS,        NICHOLS,        ARSHT        &
TUNNELL LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899
Telephone: (302) 658-9200
Email: eschwartz@morrisnichols.com
            dbutz@morrisnichols.com
            ehammer@morrisnichols.com


Paul Werner (admitted *pro hac vice*)
A. Joseph Jay III (admitted *pro hac vice*)
SHEPPARD    MULLIN    RICHTER    &
HAMPTON, LLP
2099 Pennsylvania Avenue NW, Suite 100
Washington, D.C. 20006-6801
Telephone: (202) 747-1900
Email: pwerner@sheppardmullin.com
            jjay@sheppardmullin.com


Edward H. Tillinghast, III (admitted *pro hac
vice*)
SHEPPARD    MULLIN    RICHTER    &
HAMPTON, LLP
30 Rockefeller Plaza
New York, New York 10112-0015
Telephone:  (212) 653-8700
Email:  etillinghast@sheppardmullin.com

*[Signature Page Follows]*

AP2083

Dated: June 8, 2023
Wilmington, Delaware

By: /s/ Eric D. Schwartz
    Eric D. Schwartz (No. 3134)
    Daniel B. Butz (No. 4227)
    Evanthea Hammer (No. 7061)
    MORRIS, NICHOLS, ARSHT & TUNNELL LLP
    1201 North Market Street, 16th Floor
    P.O. Box 1347
    Wilmington, DE 19899
    Telephone: (302) 658-9200
    Email: eschwartz@morrisnichols.com
          dbutz@morrisnichols.com
          ehammer@morrisnichols.com

    -and-

    Paul Werner (admitted *pro hac vice*)
    A. Joseph Jay III (admitted *pro hac vice*)
    SHEPPARD MULLIN RICHTER & HAMPTON, LLP
    2099 Pennsylvania Avenue NW, Suite 100
    Washington, D.C. 20006-6801
    Telephone: (202) 747-1900
    Email: pwerner@sheppardmullin.com
          jjay@sheppardmullin.com

    -and-

    Edward H. Tillinghast, III (admitted *pro hac vice*)
    SHEPPARD MULLIN RICHTER & HAMPTON, LLP
    30 Rockefeller Plaza
    New York, New York 10112-0015
    Telephone: (212) 653-8700
    Email: etillinghast@sheppardmullin.com

    *Attorneys for FTI GP I, LLC on behalf of Falcata Tech Investment Fund I, L.P.*

AP2084

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | **Chapter 15** |
| **POINT INVESTMENTS, LTD.**<br>**(IN LIQUIDATION)** | **Case No. 22-10261 (JKS)** |
| **Debtor in a Foreign Proceeding.**[1] | |
| **FTI GP I, LLC on behalf of FALCATA TECH INVESTMENT FUND I, L.P.,** | |
| **Plaintiff,** | **Adv. Proc. No. 23-____ (___)** |
| **v.** | |
| **POINT INVESTMENTS, LTD.,** | |
| **Defendant.** | |

## COMPLAINT

1.      Plaintiff FTI GP I, LLC (the "General Partner" or "Plaintiff") on behalf of Falcata Tech Investment Fund I, L.P. (the "Fund"), alleges for its complaint, based upon knowledge as to itself and its own acts, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

2.      This case is about chapter 15 debtor and defendant Point Investments, Ltd.'s ("Defendant's" or "Point's") clear and substantive violations of its agreements with Plaintiff.

3.      In particular, Point failed to make a payment required under the parties' Amended and Restated Exempted Limited Partnership Agreement, dated April 20, 2018 (the "Limited

---

[1] Debtor Point Investments, Ltd. (the "Debtor") is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is located at Chancery Hall, 1st Floor, 52 Reid Street, Hamilton HM 12, Bermuda.

Partnership Agreement") and the Master Transaction Agreement, dated July 1, 2019 (the "Master Transaction Agreement").

4.      As a result of Point's failure to make the required payment, Point was designated as a "Defaulting Partner" under and in accordance with the Limited Partnership Agreement.

5.      As a Defaulting Partner, the Limited Partnership Agreement expressly provides that: (1) Point is no longer entitled to certain distribution and information rights; and (2) Point is required to pay certain expenses, fees and costs in connection with enforcement of the Limited Partnership Agreement that results from the Defaulting Partner's default.

6.      Despite this, Point continues to demand documents and assert alleged rights that it is not entitled to and threaten legal action if it does not receive such information.

### THE PARTIES.

7.      The General Partner is a Delaware limited liability company.  The General Partner's corporate headquarters are located in Houston, Texas.

8.      On information and belief, Defendant Point is a Bermuda exempted corporation in liquidation.  Point's registered office is located in Hamilton, Bermuda.

### JURISDICTION AND VENUE

9.      Section 1334 of Title 28 grants the United States District Court for the District of Delaware original jurisdiction over this adversary proceeding.  This action has been referred to this Court pursuant to 28 U.S.C. § 157(a) and the *Amended Standing Order of Reference*, dated February 29, 2012.

10.    This adversary proceeding is a non-core proceeding under 28 U.S.C. § 157(c).

11.    Venue in this adversary proceeding is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

-2-

AP2086

12.     The legal predicates for the relief requested herein are 28 U.S.C. § 2201(a), 11 U.S.C. §§105 and 541, and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

13.     A real and justiciable controversy presently exists between the parties, and speedy relief is necessary to preserve the parties' respective rights.

## FACTUAL BACKGROUND

**The Limited Partnership Agreement and the Master Transaction Agreement**

14.     On April 20, 2018, the Limited Partnership Agreement was entered into by the General Partner and  Falcata Capital LLC (the "Initial Limited Partner").  A true and correct copy of the Limited Partnership Agreement is attached as Exhibit 1.

15.     On July 1, 2019, the Master Transaction Agreement was entered into by the Fund, the General Partner, Point, the Initial Limited Partner, *et al.*  A true and correct copy of the Master Transaction Agreement is attached as Exhibit 2.

16.     The Limited Partnership Agreement generally provides the rights, remedies and responsibilities of the entities involved with the Fund, including the General Partner and any limited partners.

17.     For example, Section 1.6 of the Limited Partnership Agreement provides that the General Partner is authorized and empowered on behalf of the Fund to, among other things, bring an "action, suit . . . or other proceeding."  *See* Exhibit 1, Section 1.6

18.     The Limited Partnership Agreement also provides that the Initial Limited Partner will no longer be involved with the Fund following the admission of the Limited Partner.  Section 1.8 of the Limited Partnership Agreement states:

> Immediately following the admission of the Limited Partner . . . the Initial Limited Partner shall cease to be a partner of the Fund and the Fund shall return the original capital contribution made by the Initial Limited Partner, who shall have no further rights or claims

-3-

AP2087

against, or obligations as a partner of, the Fund. A Person shall be admitted at the Initial Closing as a limited partner of the Fund at the time that *(a)* this Agreement or a counterpart hereof is executed by or on behalf of such Person and a Subscription Agreement or a counterpart thereof is executed by or on behalf of such Person and by the General Partner on behalf of the Fund and *(b)* such Person is listed by the General Partner as the limited partner of the Fund on the Register.

19.     The Limited Partnership Agreement defines "Limited Partner" as: "the Person admitted as a limited partner of the Fund, which limited partner shall be listed in the Cayman Register, and shall include its successors and permitted assigns to the extent admitted to the Fund as limited partners in accordance with the terms hereof, in their capacities as limited partners of the Fund, and shall exclude any Person that ceases to be a Partner in accordance with the terms hereof."

20.     After the Limited Partner is admitted to the Fund, the Limited Partner has certain obligations, such as making regular Capital Contributions.   Section 5.2(d) of the Limited Partnership Agreement provides:

> Each Partner shall pay the Capital Contributions determined in accordance with the provisions of this Section 5.2(d) and specified in the relevant Drawdown Notice, as the same may be revised pursuant to Section 5.2(c), by wire transfer in immediately available funds to the account specified therein. The required Capital Contribution of each Partner shall be made no later than the Drawdown Date specified in such Drawdown Notice and shall equal such Partner's pro rata share (based on Capital Commitments of all the Partners), in each case up to an amount not to exceed such Partner's Remaining Capital Commitment.

21.     The Limited Partnership Agreement defines "Capital Contribution" as: "the capital contributed pursuant to a single Drawdown or the aggregate capital so contributed, as the context may require, by such Partner to the Fund pursuant to this Agreement . . . ."

-4-

22. The Limited Partnership Agreement defines "Drawdowns" as: "the Capital Contributions made or to be made to the Fund pursuant to Section 5.2 from time to time by the Partners pursuant to a Drawdown Notice."

23. The Limited Partnership Agreement provides the definitions of "Drawdown Date" and "Drawdown Notice" in Section 5.2(a), which states: "The General Partner shall provide each Partner with a notice of each Drawdown (a 'Drawdown Notice') at least 10 Business Days prior to the date on which such Drawdown is due and payable (the 'Drawdown Date'). Each Drawdown may be used for any purpose authorized or contemplated by this Agreement."

24. The Master Transaction Agreement further provides that Point, as the Limited Partner, is responsible for Capital Contributions. *See* Exhibit 2, Sections 1.2, 1.3.

25. The Master Transaction Agreement incorporates the Limited Partnership Agreement's definition of "Capital Contribution." *See* Master Transaction Agreement ("Capitalized terms used herein without definition have the meaning set forth in the [Limited Partnership Agreement] . . . .")

26. The Limited Partnership Agreement also provides the procedure and remedies available to the General Partner in the event the Limited Partner fails to make a Capital Contribution. Section 5.4 of the Limited Partnership Agreement states:

> If the Limited Partner fails to make, in a timely manner, all or any portion of any Capital Contribution or any other amount required to be funded by the Limited Partner hereunder, and such failure continues for five Business Days after receipt of written notice thereof from the General Partner, or the Limited Partner purports to Transfer all or any part of its interest in the Fund other than in accordance with this Agreement (a "Default"), then the Limited Partner may be designated by the General Partner in its sole discretion as in Default under this Agreement (a "Defaulting Partner") and shall thereafter be subject to the provisions of this Section 5.4.

-5-

AP2089

27.     Following designation of the Limited Partner as a Defaulting Partner, Section 5.4(d) of the Limited Partnership Agreement provides that the General Partner can, among other things, reduce the amounts distributable to the Defaulting Partner (that are attributable to Capital Contributions) as of the date of default by 50%, and withhold 100% of any future distributions that would otherwise be payable to the Defaulting Partner until the dissolution of the Fund.  Section 5.4(d) also provides that the General Partner can require that the Defaulting Partner remain fully liable for payment of its pro rata share of certain expenses as if the default had not occurred.

28.     Further, under Section 5.4(e) of the Limited Partnership Agreement, all remedies at law or in equity are available to the General Partner to pursue with respect to the Defaulting Partner's default, including initiating a lawsuit against the Defaulting Partner.

29.     Once a Limited Partner is designated a Defaulting Partner, the Limited Partner also loses certain rights and aspects of its role in the Fund that it was previously responsible for and/or entitled to.

30.     For example, Section 5.4(f) of the Limited Partnership Agreement provides that once a Limited Partner is designated a Defaulting Partner, the Limited Partner is not permitted to vote, consent, or provide a decision in any circumstance it was required or permitted to prior to default under the terms of the Limited Partnership Agreement.

31.     In addition, Section 5.4(d) of the Limited Partnership Agreement provides that once a Limited Partner is designated a Defaulting Partner, the Limited Partner will have no right to make Capital Contributions to participate in any Portfolio Investment.

32.     Further, under Section 5.4(d) of the Limited Partnership Agreement, to the extent permitted by law, a Defaulting Partner is no longer treated as a Partner for purposes of the below Sections of the Limited Partnership Agreement:

AP2090

A. Section 5.2 of the Limited Partnership Agreement, which is stated above and sets forth the procedures for payment of Capital Contributions, including timing of drawdowns and notice procedures.

B. Section 8.1 of the Limited Partnership Agreement, which sets forth the procedures for maintenance of books and records. Under Section 8.1, the books and records of the Fund are available for inspection and copying by the Limited Partner or its duly authorized agents and representatives, upon five Business Days' notice to the General Partner.

C. Section 8.2 of the Limited Partnership Agreement, which sets forth the procedures for the auditing and reporting of the Fund's financials. This Section requires that the General Partner make certain reports available to the Limited Partner at designated times. Section 8.2(d) of the Limited Partnership Agreement also requires that the General Partner make commercially reasonable efforts to deliver to the Limited Partner information reasonably requested from time to time that is for any purpose reasonably related to the Limited Partner's interest in the Fund to the extent it does not impose undue cost or burden on the General Partner or the Fund.

D. Section 8.3 of the Limited Partnership Agreement, which sets forth the requirement that the General Partner hold an annual meeting with the Limited Partner.

33. Finally, under Section 5.4(e) of the Limited Partnership Agreement, the Defaulting Partner shall pay on demand all costs and expenses (including attorneys' fees and borrowing costs) incurred by or on behalf of the Fund in connection with enforcement of the Limited Partnership Agreement that results from the Defaulting Partner's default.

AP2091

**Point Becomes the Fund's Limited Partner and Defaults Under the Limited Partnership Agreement and the Master Transaction Agreement**

34.     On April 20, 2018, Point became the Limited Partner of the Fund when it entered into an agreement to purchase and subscribe to an interest as limited partner in the Fund with a Capital Contribution of $1,000,000,000.00, which was accepted on behalf of the Fund by the General Partner.

35.     As the Limited Partner, Point agreed to be bound by the terms and conditions set forth in the Limited Partnership Agreement and the Master Transaction Agreement.

36.     On June 16, 2020, the Manager sent Point a Demand Letter requesting a Capital Contribution in the amount of $625,000 due on July 1, 2020 and attaching the corresponding Drawdown Notice (the "July Capital Contribution").

37.     Point did not provide the July Capital Contribution.

38.     On July 2, 2020, a representative of the Fund sent an e-mail to a representative of Point, reminding them that the due date of the July Capital Contribution had passed, and requesting tracking information in the event payment had been remitted, but was delayed.  A true and correct copy of the July 2, 2020 e-mail is attached as Exhibit 3.

39.     On August 4, 2020, the Manager sent Point a default letter (the "Default Notice") stating that Point had not paid the Capital Contribution by the required date (the "Default"), and, in accordance with Section 5.4(a) of the Limited Partnership Agreement, Point had five business days to cure the Default.  The Default Notice further stated that if Point failed to pay the Capital Contribution within five days from the date of the Default Notice, Point would be designated as in Default by the Manager, and would be a "Defaulting Partner and [would] be subject to any all of the rights and remedies afforded to the General Partner and the Fund under the [Limited

-8-

Partnership Agreement]." A true and correct copy of the August 4, 2020 Default Notice is attached as Exhibit 4.

40.     Point failed to pay the Capital Contribution within five days of the Default Notice, and the Capital Contribution has never been paid.

41.     As a result, Point was designated as a Defaulting Partner on the expiration of the five day notice period.

42.     On September 16, 2020, the registered owner of Point's common shares, Spanish Steps Holdings Ltd., filed a petition in the Supreme Court of Bermuda seeking Point's wind up (the "Wind Up Petition"). The Supreme Court of Bermuda appointed Andrew Childe and Richard Lewis of FFP Limited and Mathew Clingerman of Krys & Associates (Bermuda) Ltd. as the Joint Provisional Liquidators on October 29, 2021. On February 18, 2022, the Supreme Court of Bermuda granted the Wind Up Petition.

43.     Point filed this chapter 15 proceeding on March 29, 2022. That same day, Point filed its Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Related Relief Under Chapter 15 (D.I. 3) ("Petition for Recognition"). This Court granted the Petition for Recognition on April 22, 2022 in the Order Granting Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Related Relief Under Chapter 15 (D.I. 34). Plaintiff did not receive notice of the Chapter 15 filing.

44.     Despite Point's designation as a Defaulting Partner, Point continues to seek information and seek to assert rights it no longer has and is no longer entitled to under the Limited Partnership Agreement.

AP2093

## COUNT I:
### Breach of Contract – the Limited Partnership Agreement

45.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 44 as though fully set forth herein.

46.    Plaintiff and Point entered into the Limited Partnership Agreement whereby Point agreed to abide by the terms of the Limited Partnership Agreement.

47.    The Limited Partnership Agreement is a valid and enforceable agreement.

48.    Plaintiff has fully complied with all of its rights and obligations under the Limited Partnership Agreement.

49.    Under the Limited Partnership Agreement, Point, as the Limited Partner to the Fund, was required to, among other things, pay Capital Contributions.

50.    Point failed to pay the July Capital Contribution.

51.    Point failed to cure its failure to pay the July Capital Contribution within five days of receiving the Default Notice.

52.    As a result of Point's breaches of the Limited Partnership Agreement, Plaintiff has suffered and will continue to suffer damages.

53.    Accordingly, Plaintiff is authorized to and seeks damages in an amount to be determined at trial.

## COUNT II:
### Breach of Contract – the Master Transaction Agreement

54.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 44 as though fully set forth herein.

55.    Plaintiff and Point entered into the Master Transaction Agreement whereby Point agreed to abide by the terms of the Master Transaction Agreement.

AP2094

56.     The Master Transaction Agreement is a valid and enforceable agreement.

57.     Plaintiff has fully complied with all of its rights and obligations under the Master Transaction Agreement.

58.     Under the Master Transaction Agreement, Point, as the Limited Partner, was required to, among other things, pay Capital Contributions.

59.     Point failed to pay the July Capital Contribution.

60.     As a result of Point's breaches of the Master Transaction Agreement, Plaintiff has suffered and will continue to suffer damages.

61.     Accordingly, Plaintiff is authorized to and seeks damages in an amount to be determined at trial.

## COUNT III:
### Declaratory Relief

62.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 44 as though fully set forth herein.

63.     There is an actual case and controversy between Plaintiff and Point regarding Point's status as a Defaulting Partner under the Limited Partnership Agreement.

64.     As set forth above, Point failed to pay the July Capital Contribution, failed to cure its failure to pay the July Capital Contribution within five days of receiving the Default Notice, and therefore was designated as a Defaulting Partner on the expiration of the five day notice period, pursuant to the Limited Partnership Agreement.

65.     Despite Point's status as a Defaulting Partner under the Limited Partnership Agreement, Point continues to seek information and attempt to assert rights it is no longer entitled to.

AP2095

66.     Point filed the underlying chapter 15 case in this Court and sought recognition of the chapter 15 case as a foreign non main proceeding under 11 U.S.C. section 1517, and was granted such relief in this Court's order granting Point's petition for recognition of a foreign main proceeding and recognition of foreign representatives, dated April 22, 2022, without notice to Plaintiff, and is seeking to obtain rights and information in the chapter 15 case that Point is not entitled to under the Limited Partnership Agreement.

67.     As such, the Plaintiff is entitled to a judgment declaring that: pursuant to the terms of the Limited Partnership Agreement, Point is a Defaulting Partner and is therefore subject to all of the General Partner's actions to seek rights and remedies under the Limited Partnership Agreement in connection therewith, including, but not limited to:

>    A.     Reducing amounts otherwise distributable to the Defaulting Partner (*see* Limited Partnership Agreement § 5.4(d));

>    B.     Apply all amounts withheld to satisfy any and all amounts payable by the Defaulting Partner, including Fund Expenses and attorneys' fees (*see* Limited Partnership Agreement §§ 5.4(d); 5.4(e));

>    C.     Charge the Defaulting Partner interest on the default amount (*see* Limited Partnership Agreement § 5.4(d)); and

>    D.     Pursue all remedies at law or in equity available to the General Partner (*see* Limited Partnership Agreement § 5.4(e)).

68.     A declaratory judgment is necessary and useful in resolving the actual, substantial, and justiciable controversy that has arisen between the parties as set forth above.

69.     A declaratory judgment is necessary, appropriate and useful at this time under all the circumstances to declare that Point is a Defaulting Partner under the Limited Partnership Agreement.

70.     A declaratory judgment would further the public interest and considerations of practicality and of efficient judicial administration.

-12-

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests entry of judgment in their favor and against Point as follows:

1.  An award of compensatory and exemplary damages as a result of the breach of contracts to the extent allowed under applicable law in an amount to be proven at trial;

2.  A judgment declaring Point a Defaulting Partner under the Limited Partnership Agreement and sanctioning all of the General Partner's rights and remedies in connection therewith; and

3.  Such other, further and different relief as this Court deems just and proper under the circumstances, including an award of fees and costs.

Dated: March 3, 2023

By: /s/ *Eric D. Schwartz*
Eric D. Schwartz (No.3134)
Daniel B. Butz (No. 4227)
Evanthea Hammer (No. 7061)
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899
Telephone: (302) 658-9200
Email: eschwartz@morrisnichols.com
        dbutz@morrisnichols.com
        ehammer@morrisnichols.com

-and-

Paul Werner (*pro hac vice* admission pending)
A. Joseph Jay III (*pro hac vice* admission pending)
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
2099 Pennsylvania Avenue NW, Suite 100
Washington, D.C. 20006-6801
Telephone: (202) 747-1900
Email: pwerner@sheppardmullin.com
        jjay@sheppardmullin.com

-13-

Edward H. Tillinghast, III (*pro hac vice* admission pending)
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
30 Rockefeller Plaza
New York, New York 10112-0015
Telephone: (212) 653-8700
etillinghast@sheppardmullin.com

-14-

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | **Chapter 15** |
| **POINT INVESTMENTS, LTD.** **(IN LIQUIDATION)** | **Case No. 22-10261 (JKS)** |
| **Debtor in a Foreign Proceeding.** [1] | |
| **FTI GP I, LLC on behalf of FALCATA TECH INVESTMENT FUND I, L.P.,** | |
| **Plaintiff,** | |
| **v.** | **Adv. Proc. No. 23-50122 (JKS)** |
| **POINT INVESTMENTS, LTD.,** | |
| **Defendant.** | |

## SUMMONS AND NOTICE OF PRETRIAL CONFERENCE
## IN AN ADVERSARY PROCEEDING

YOU ARE SUMMONED and required to file a motion or answer to the complaint which is attached to this summons with the clerk of the bankruptcy court within 30 days after the date of issuance of this summons, except that the United States and its offices and agencies shall file a motion or answer within 35 days.

| | |
|---|---|
| Address of Clerk: | United States Bankruptcy Court 824 N. Market Street, 3rd Floor Wilmington, Delaware 19801 |

At the same time, you must also serve a copy of the motion or answer upon the plaintiff's attorney.

| |
|---|
| Name and Address of Plaintiff's Attorney Eric D. Schwartz, Esq. Daniel B. Butz, Esq. Evanthea Hammer, Esq. Morris, Nichols, Arsht & Tunnell LLP 1201 North Market Street, P. O. Box 1347 |

---

[1]     Debtor Point Investments, Ltd. (the "Debtor") is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is located at Chancery Hall, 1st Floor, 52 Reid Street, Hamilton HM 12, Bermuda.

AP2099

Wilmington, DE 19899-1347

- and -

A. Joseph Jay III (admitted *pro hac vice*)
Paul A. Werner (admitted *pro hac vice*)
Sheppard, Mullin, Richter & Hampton, LLP
2099 Pennsylvania Avenue NW, Suite 100
Washington, D.C. 20006-6801

Edward H. Tillinghast, III (admitted *pro hac vice*)
Sheppard, Mullin, Richter & Hampton, LLP
30 Rockefeller Plaza
New York, NY 10112-0015

If you make a motion, your time to answer is governed by Fed. R. Bankr. P. 7012.

YOU ARE NOTIFIED that a pretrial conference of the proceeding commenced by the filing of the complaint will be held at the following time and place.

| United States Bankruptcy Court | Courtroom #6 |
|---|---|
| 824 N. Market Street | 5th Floor |
| Wilmington, DE 19801 | Date and Time: April 12, 2023 at 10:00 a.m. |

**IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE BANKRUPTCY COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.**

**United States
Bankruptcy Court for
the District
of Delaware**

Date: March 6, 2023

/s/ Una O'Boyle
*Clerk of the Bankruptcy Court*

AP2100

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | **Chapter 15** |
| **POINT INVESTMENTS, LTD.**<br>**(IN LIQUIDATION)** | **Case No. 22-10261 (JKS)** |
| **Debtor in a Foreign**<br>**Proceeding.** [1] | |
| **FTI GP I, LLC on behalf of FALCATA**<br>**TECH INVESTMENT FUND I, L.P.,** | |
| **Plaintiff,** | |
| **v.** | **Adv. Proc. No. 23-50122 (JKS)** |
| **POINT INVESTMENTS, LTD.,** | |
| **Defendant.** | |

### NOTICE OF DISPUTE RESOLUTION ALTERNATIVES

As party to litigation you have a right to adjudication of your matter by a judge of this Court. Settlement of your case, however, can often produce a resolution more quickly than appearing before a judge. Additionally, settlement can also reduce the expense, inconvenience, and uncertainty of litigation.

There are dispute resolution structures, other than litigation, that can lead to resolving your case. Alternative Dispute Resolution (ADR) is offered through a program established by this Court. The use of these services are often productive and effective in settling disputes. **The purpose of this Notice is to furnish general information about ADR.**

The ADR structures used most often are mediation, early-neutral evaluation, mediation/arbitration and arbitration. In each, the process is presided over by an impartial third party, called the "neutral."

In mediation and early neutral evaluation, an experienced neutral has no power to impose a settlement on you. It fosters an environment where offers can be discussed and exchanged. In the process, together, you and your attorney will be involved in weighing settlement proposals and crafting a settlement. The Court in its Local Rules requires all ADR processes, except threat of a potential criminal action, to be confidential. You will not be prejudiced in the event a settlement is not achieved because the presiding judge will not be advised of the content of any of your settlement discussions.

Mediation/arbitration is a process where you submit to mediation and, if it is unsuccessful, agree that the mediator will act as an arbitrator. At that point, the process is the same as arbitration. You, through your counsel, will present evidence to a neutral, who issues a decision. If the matter in controversy arises in the main bankruptcy case or arises from a subsidiary issue in an adversary proceeding, the arbitration, though voluntary, may be binding. If a party requests *de novo* review of an arbitration award, the judge will rehear the case.

**Your attorney can provide you with additional information about ADR and advise you as to whether and when ADR might be helpful in your case.**

---

[1]    Debtor Point Investments, Ltd. (the "Debtor") is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is located at Chancery Hall, 1st Floor, 52 Reid Street, Hamilton HM 12, Bermuda.

Dated: _____March 6, 2022_____          _____/s/ Una O'Boyle_____
                                                          *Clerk of Bankruptcy Court*

AP2102

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | **Chapter 15** |
| **POINT INVESTMENTS, LTD.** **(IN LIQUIDATION)** | **Case No. 22-10261 (JKS)** |
| Debtor in a Foreign Proceeding. [1] | |
| **FTI GP I, LLC on behalf of FALCATA TECH INVESTMENT FUND I, L.P.,** | |
| **Plaintiff,** | |
| **v.** | **Adv. Proc. No. 23-50122 (JKS)** |
| **POINT INVESTMENTS, LTD.,** | |
| **Defendant.** | |

**CERTIFICATION OF COUNSEL REGARDING**
**PRETRIAL CONFERENCE DATE**

The undersigned hereby certifies as follows:

1.      In response to the inquiries of the undersigned counsel to FTI GP I, LLC on behalf of Falcata Tech Investment Fund I L.P. (the "Plaintiff"), a pretrial conference has been scheduled for April 12, 2023, at 10:00 a.m. (Eastern Time) by the J. Kate Stickles, United States Bankruptcy Judge.

2.      Attached hereto is a proposed form of Order (the "Pretrial Conference Order") that states with specificity the date and time of the pretrial conference.

---

[1]      Debtor Point Investments, Ltd. (the "Debtor") is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769.  The Debtor's registered office is located at Chancery Hall, 1st Floor, 52 Reid Street, Hamilton HM 12, Bermuda.

AP2103

WHEREFORE, the Plaintiff hereby respectfully requests that the Court enter the

Pretrial Conference Order attached hereto at the Court's earliest convenience.


Dated: March 6, 2023

/s/ *Daniel B. Butz*
Eric D. Schwartz (No.3134)
Daniel B. Butz (No. 4227)
Evanthea Hammer (No. 7061)
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899
Telephone: (302) 658-9200
Email: eschwartz@morrisnichols.com
        dbutz@morrisnichols.com
        ehammer@morrisnichols.com

-and-

Paul Werner (admitted *pro hac vice*)
A. Joseph Jay III (admitted *pro hac vice*)
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
2099 Pennsylvania Avenue NW, Suite 100
Washington, D.C. 20006-6801
Telephone: (202) 747-1900
Email: pwerner@sheppardmullin.com
        jjay@sheppardmullin.com

Edward H. Tillinghast, III (admitted *pro hac vice*)
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
30 Rockefeller Plaza
New York, New York 10112-0015
Telephone: (212) 653-8700
etillinghast@sheppardmullin.com

AP2104

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re** | **Chapter 15** |
| **POINT INVESTMENTS, LTD. (IN LIQUIDATION)** | **Case No. 22-10261 (JKS)** |
| Debtor in a Foreign Proceeding. [1] | |
| **FTI GP I, LLC on behalf of FALCATA TECH INVESTMENT FUND I, L.P.,** | |
| Plaintiff, | |
| v. | **Adv. Proc. No. 23-50122 (JKS)** |
| **POINT INVESTMENTS, LTD.,** | |
| Defendant. | |

## PRETRIAL CONFERENCE ORDER

**IT IS HEREBY ORDERED** that a pretrial conference has been scheduled in the

above-captioned case for the following date and time:

| DATE | TIME |
|---|---|
| April 12, 2023 | 10:00 a.m. (ET) |

---

[1]     Debtor Point Investments, Ltd. (the "Debtor") is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769.   The Debtor's registered office is located at Chancery Hall, 1st Floor, 52 Reid Street, Hamilton HM 12, Bermuda.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | **Chapter 15** |
| **POINT INVESTMENTS, LTD.** **(IN LIQUIDATION)** | **Case No. 22-10261 (JKS)** |
| Debtor in a Foreign Proceeding. [1] | |
| **FTI GP I, LLC on behalf of FALCATA TECH INVESTMENT FUND I, L.P.,** | |
| Plaintiff, | |
| v. | **Adv. Proc. No. 23-50122 (JKS)** |
| **POINT INVESTMENTS, LTD.,** | **Re: A.D.I. 10** |
| Defendant. | |

## PRETRIAL CONFERENCE ORDER

IT IS HEREBY ORDERED that a pretrial conference has been scheduled in the above-captioned case for the following date and time:

| DATE | TIME |
|---|---|
| April 12, 2023 | 10:00 a.m. (ET) |

J. KATE STICKLES
UNITED STATES BANKRUPTCY JUDGE

**Dated: March 6th, 2023**
**Wilmington, Delaware**

---

[1]     Debtor Point Investments, Ltd. (the "Debtor") is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769.  The Debtor's registered office is located at Chancery Hall, 1st Floor, 52 Reid Street, Hamilton HM 12, Bermuda.

AP2106

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | **Chapter 15** |
| **POINT INVESTMENTS, LTD.**<br>**(IN LIQUIDATION)** | **Case No. 22-10261 (JKS)** |
| Debtor in a Foreign<br>Proceeding. [1] | |
| **FTI GP I, LLC on behalf of FALCATA**<br>**TECH INVESTMENT FUND I, L.P.,** | |
| **Plaintiff,** | |
| **v.** | **Adv. Proc. No. 23-50122 (JKS)** |
| **POINT INVESTMENTS, LTD.,** | |
| **Defendant.** | |

## NOTICE OF CANCELLED PRETRIAL CONFERENCE

PLEASE TAKE NOTICE that, by permission of the Court, the pretrial conference previously scheduled for April 12, 2023 at 10:00 a.m. (ET) to be held before the Honorable J. Kate Stickles, United States Bankruptcy Court Judge for the District of Delaware, has been cancelled.

---

[1] Debtor Point Investments, Ltd. (the "Debtor") is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is located at Chancery Hall, 1st Floor, 52 Reid Street, Hamilton HM 12, Bermuda.

Dated: March 23, 2023

 /s/ *Daniel B. Butz*
Eric D. Schwartz (No.3134)
Daniel B. Butz (No. 4227)
Evanthea Hammer (No. 7061)
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899
Telephone: (302) 658-9200
Email: eschwartz@morrisnichols.com
        dbutz@morrisnichols.com
        ehammer@morrisnichols.com

-and-

Paul Werner (admitted *pro hac vice*)
A. Joseph Jay III (admitted *pro hac vice*)
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
2099 Pennsylvania Avenue NW, Suite 100
Washington, D.C. 20006-6801
Telephone: (202) 747-1900
Email: pwerner@sheppardmullin.com
        jjay@sheppardmullin.com

Edward H. Tillinghast, III (admitted *pro hac vice*)
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
30 Rockefeller Plaza
New York, New York 10112-0015
Telephone: (212) 653-8700
etillinghast@sheppardmullin.com

AP2108

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 15** |
| | ) | |
| **Point Investments, Ltd., Debtor in a** | ) | **Case No. 22-10261 (TMH)** |
| **Foreign Proceeding** | ) | |
| | ) | |
| Debtors. | ) | |

## ORDER OF REASSIGNMENT OF JUDGE

**AND NOW, this 27th** day of **March 2023**, **it is hereby ORDERED** that the above

Chapter 15 case (and all associated cases including adversary proceedings) is **REASSIGNED**

to the **Honorable Thomas M. Horan** for all further proceedings and dispositions.[1]

_Laurie Selber Silverstein_
Laurie Selber Silverstein
Chief Judge

---

[1] When filing papers, please include the initials of the Judge assigned to the case.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | **Chapter 15** |
| **POINT INVESTMENTS, LTD.**<br>**(IN LIQUIDATION)** | **Case No. 22-10261 (TMH)** |
| **Debtor in a Foreign Proceeding.**[1] | |
| **FTI GP I, LLC on behalf of FALCATA TECH**<br>**INVESTMENT FUND I, L.P.,** | |
| **Plaintiff,** | **Adv. Pro. No. 23-50122 (TMH)** |
| **v.** | |
| **POINT INVESTMENTS, LTD.,** | |
| **Defendant.** | |

### NOTICE OF DISMISSAL OF ADVERSARY PROCEEDING WITHOUT PREJUDICE

**PLEASE TAKE NOTICE** that pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure, as made applicable herein by Rule 7041 of the Federal Rules of Bankruptcy Procedure; the *Amended Order Granting in Part, and Denying in Part, the Motion of Foreign Representatives For Entry of an Order Enforcing the Automatic Stay and For Damages* [Case No. 22-10261, D.I. 93], dated May 31, 2023; and the *Amended Order Denying Motion of FTI GP I, LLC on Behalf of Falcata Tech Investment Fund I, L.P. For Determination That There is No Automatic Stay, or in the Alternative Seeking Relief From the Automatic Stay to Proceed With Adversary Proceeding* [Case No. 22-10261, D.I. 94], dated May 31, 2023, FTI GP I, LLC, a

---

[1] Debtor Point Investments, Ltd. (the "Debtor") is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is located at Chancery Hall, 1st Floor, 52 Reid Street, Hamilton HM 12, Bermuda.

Delaware limited liability company, on behalf of Falcata Tech Investment Fund I, L.P., a Cayman

Islands exempted limited partnership, hereby dismisses its complaint against Point Investments,

Ltd. in the above-captioned adversary proceeding (Adv. No. 23-50122 (TMH)).[2]

Dated: June 8, 2023

By: _/s/ Eric D. Schwartz_
    Eric D. Schwartz (No. 3134)
    Daniel B. Butz (No. 4227)
    Evanthea Hammer (No. 7061)
    MORRIS, NICHOLS, ARSHT & TUNNELL LLP
    1201 North Market Street, 16th Floor
    P.O. Box 1347
    Wilmington, DE 19899
    Telephone: (302) 658-9200
    Email: eschwartz@morrisnichols.com
          dbutz@morrisnichols.com
          ehammer@morrisnichols.com

    -and-

    Paul Werner (admitted *pro hac vice*)
    A. Joseph Jay III (admitted *pro hac vice*)
    SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
    2099 Pennsylvania Avenue NW, Suite 100
    Washington, D.C. 20006-6801
    Telephone: (202) 747-1900
    Email: pwerner@sheppardmullin.com
          jjay@sheppardmullin.com

    -and-

    Edward H. Tillinghast, III (admitted *pro hac vice*)
    SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
    30 Rockefeller Plaza
    New York, New York 10112-0015
    Telephone:  (212) 653-8700
    Email:  etillinghast@sheppardmullin.com

    *Attorneys for FTI GP I, LLC on behalf of Falcata*
    *Tech Investment Fund I, L.P.*

---

[2] Pursuant to Rule 41(a)(1)(B) of the Federal Rules of Civil Procedure, as made applicable herein by Rule 7041 of the Federal Rules of Bankruptcy, unless the notice or stipulation states otherwise, the dismissal is without prejudice.

AP2111

## <u>AGREEMENT TO TOLL STATUTE OF LIMITATIONS</u>

This Agreement to Toll Statute of Limitations ("Tolling Agreement") is made and entered into as of May __, 2022 (the "Effective Date") by and between FTI GP I, LLC (the "General Partner"), on behalf of Falcata Tech Investment Fund I, L.P. (the "Fund"), on the one hand, and Andrew Childe and Richard Lewis of FFP Limited, and Mathew Clingerman of Kroll Bermuda Ltd. (the "Foreign Representatives"), in their capacity as the foreign representatives of Point Investments, Ltd. ("Point" or the "Debtor"), on the other hand.  The General Partner and the Foreign Representatives are sometimes referred to herein individually as "Party" and collectively as the "Parties."

## RECITALS

**WHEREAS:**

A.     On September 16, 2020, Spanish Steps Holding Ltd., the registered owner of all issued common shares in the Debtor, filed a petition with the Supreme Court of Bermuda (the "Bermuda Court") seeking to wind up the Debtor, Commercial Court Case 2020: No. 300 (the "Bermuda Proceeding"). On October 29, 2021, the Bermuda Court entered an order appointing the Foreign Representatives as the Joint Provisional Liquidators of the Debtor. On February 18, 2022, the Bermuda Court issued an order providing for the Debtor to be wound up under the provision of the Bermuda Companies Act of 1981.

B.     On March 29, 2022, the Foreign Representatives filed a Chapter 15 petition with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") seeking recognition of the Bermuda Proceeding and related relief [D.I. 3]. On April 22, 2022, the Bankruptcy Court recognized the Bermuda Proceeding as a foreign main proceeding under 11 U.S.C. § 1517 [D.I. 34].

C.     On March 6, 2023, the General Partner filed an adversary complaint (the "Adversary Complaint")[1] against Point in the Bankruptcy Court styled, *FTI GP I, LLC on behalf of Falcata Tech Investment Fund I, L.P. v. Point Investments, Ltd.*, Adv. Proc. No 23-50122 (JKS) (the "Adversary Proceeding"), in connection with Point's alleged failure to make certain capital contributions that the General Partner alleges is in violation of the Limited Partnership Agreement ("LPA") and Master Transaction Agreement ("MTA").

D.     On March 21, 2023, the Foreign Representatives informed the General Partner of its position that the Adversary Proceeding was a violation of the automatic stay. On March 23, 2023, the General Partner filed a motion seeking a determination that the automatic stay does not apply to the Adversary Proceeding or alternatively, modification of the automatic stay to permit the Adversary Proceeding to continue [D.I. 47]. On March 27, 2023, the Foreign Representatives filed a motion seeking to enforce the automatic stay [D.I. 52].

---

[1] All capitalized terms contained in this Tolling Agreement shall have the same meanings ascribed to them in the Adversary Complaint unless otherwise stated.

AP2112

E.     The Foreign Representatives contend the Adversary Complaint is void and therefore will not voluntarily accept service thereof unless and until the Bankruptcy Court determines that the General Partner is permitted to proceed with its Adversary Complaint.

F.     The Parties have agreed that, if (and only if) the Bankruptcy Court permits the Adversary Proceeding to proceed, the General Partner's delivery of the Adversary Complaint to the Foreign Representative's undersigned counsel, Kobre & Kim LLP, will be deemed to have been served on the Debtor as of May 31, 2023.  Any such acceptance of service will not effect and will be without prejudice to any other service of the Adversary Complaint and related summons. Furthermore, in the event the Bankruptcy Court rules that the automatic stay under 11 U.S.C. §§ 1520 and 362 stays the Adversary Proceeding but grants the General Partner relief from the automatic stay to proceed with the Adversary Proceeding, the time between the General Partner's original filing of the Adversary Complaint on March 6, 2023 and the date of the Bankruptcy Court's order granting the General Partner relief from stay shall be tolled and the General Partner's Adversary Complaint shall be thereby preserved.

G.     The tolling provision set forth in 11 U.S.C. § 108(c) also applies to the claims and relief sought in the Adversary Proceeding in the event the Adversary Complaint is brought in or transferred to another court other than a bankruptcy court.

H.     The Parties have also agreed to memorialize the tolling of the statute of limitations, as a matter of Bermuda law, attendant to the proof of debt process in the Bermuda Proceeding. However, this agreement to so memorialize the tolling of the statute of limitations shall not be construed by either Party as the General Partner waiving lack of personal jurisdiction, or submitting to jurisdiction, in Bermuda at this time.

I.     In exchange for the consideration set forth in Recitals F, G and H *supra*, the General Partner agrees that the deadline for the Foreign Representatives to answer or otherwise respond to the Adversary Complaint (including via a motion to dismiss on grounds other than service) is hereby extended to the later of:  (i) June 30, 2023; or (ii) thirty (30) days from entry of an order permitting the General Partner to proceed with its Adversary Complaint.  Moreover, any time limit for the service of the Adversary Proceeding under Rule 7004 of the Federal Rules of Bankruptcy Procedure or any other rule or statute, to the extent applicable, shall also be extended to (i) June 30, 2023; or (ii) thirty (30) days from entry of an order permitting the General Partner to proceed with its Adversary Complaint.

J.     The Parties desire to avoid any uncertainty regarding the tolling of the statute of limitations and desire to preserve their claims and defenses against one another, and to avoid any dismissal of the Adversary Proceeding for any delay in serving the Adversary Proceeding in violation of Rule 7004 of the Federal Rules of Bankruptcy Procedure.  Accordingly, the Parties enter into this Tolling Agreement.

**THEREFORE**, in consideration of the mutual promises and agreements made herein, the Parties hereto agree as follows:

AP2113

**AGREEMENT**

1.    <u>Tolling</u>.  The Parties agree that any statute of limitations or other applicable statutory, contractual or common law time limitations that may be applicable to the service of or answer to the Adversary Complaint shall be tolled and preserved from the Effective Date through and including the later of:  (i) June 30, 2023; or (ii) thirty (30) days from entry of an order permitting the General Partner to proceed with its Adversary Complaint (the "Tolling Period"); *provided*, that the Foreign Representatives and the General Partner may agree to further extension(s) of time for the Foreign Representatives to respond to the Adversary Complaint; *provided further*, that nothing in this Tolling Agreement shall be deemed to prohibit the Foreign Representatives from seeking a further extension of time to respond to the Adversary Complaint from the Bankruptcy Court should the General Partner not agree to any such further extension(s) requested by the Foreign Representatives. Moreover, the time for service of the Adversary Proceeding in accordance with Rule 7004 of the Federal Rules of Bankruptcy Procedure shall also be extended through (i) June 30, 2023; or (ii) thirty (30) days from entry of an order permitting the General Partner to proceed with its Adversary Complaint.  The Parties further agree that, in the event the Bankruptcy Court rules that the automatic stay under 11 U.S.C. §§ 1520 and 362 stays the Adversary Proceeding but grants the General Partner relief from the automatic stay to continue the Adversary Proceeding, the time between the General Partner's original filing of the Adversary Complaint on March 6, 2023 and the date of the Bankruptcy Court's order granting the  General Partner relief from the automatic stay shall be tolled and the General Partner's Adversary Complaint shall be thereby preserved.  The tolling provision set forth in 11 U.S.C. § 108(c) also applies to the claims and relief sought in the Adversary Proceeding in the event the Adversary Complaint is brought in or transferred to another court other than a bankruptcy court.

2.    <u>Termination of Tolling Period</u>.  This Tolling Agreement shall remain in full force and effect until the earlier of such time as the Tolling Period expires, or on the date the Bankruptcy Court determines that the General Partner is not permitted to proceed with the Adversary Complaint.

3.    <u>Tolling of Statute of Limitations For Purposes of The Bermuda Proceeding</u>. Should the General Partner and/or the Fund submit a proof of debt in the Bermuda Proceeding on or prior to the deadline established for creditors to submit proofs of debt against the Debtor, the statute of limitations on any claims asserted by the General Partner against the Debtor in the Bermuda Proceeding is hereby tolled and the General Partner's and the Fund's right to so assert a claim in the Bermuda Proceeding is hereby preserved.  The tolling of the General Partner's and the Fund's time to assert a claim in the Bermuda Proceeding in this Tolling Agreement shall not be construed as the General Partner or the Fund waiving lack of personal jurisdiction, or submitting to jurisdiction, in Bermuda at this time.  The General Partner and the Fund maintains that the courts of Bermuda cannot assert personal jurisdiction over the General Partner or the Fund at this time.

4.    <u>No Prejudice, Waiver, or Admission of Liability</u>.  Except as provided in this Tolling Agreement, the Parties enter into the Tolling Agreement without prejudice to any other rights, claims, or defenses.  The execution and delivery of this Tolling Agreement shall not constitute, nor shall it be construed as, any admission of liability by any Party or any waiver of any claim or defense by any Party, all of which are hereby expressly reserved.  This Tolling Agreement does

3

not and shall not (i) revive any claims that are or were already barred as of the Effective Date or (b) constitute an admission or implication that any conduct by any of the Parties was in violation of any federal, state or local statute or give rise to any common law cause of action.  No right of action is created by this Tolling Agreement (except for breach hereof) and no such action shall be asserted by any Party.

5.    Not in Evidence.  This Tolling Agreement shall not be offered or received in evidence, nor shall it be admissible or used in any proceeding, whether judicial, administrative or otherwise, except to enforce or construe its provisions.

6.    Successors.  This Tolling Agreement shall bind and inure to the benefit of each Party hereto and their predecessors, successors, assigns, partners, employees and agents.

7.    Governing Law; Jurisdiction.  This Tolling Agreement shall in all respects be governed by, enforced and construed in accordance with the law of the State of Delaware, without regard to Delaware's principles of conflicts of laws.  Each of the Parties irrevocably agrees that any action or proceeding with respect to any claim arising out of, related to, or in connection with this Tolling Agreement may be brought in the United States Bankruptcy Court for the District of Delaware located in Wilmington, Delaware, or the United States District Court for the District of Delaware located in Wilmington, Delaware.

8.    Jury Trial Waiver.  Each Party hereby irrevocably waives the right to trial by jury in any action to enforce or interpret the provisions of this Tolling Agreement.

9.    Modifications in Writing.  This Tolling Agreement may be modified only by an agreement in writing signed by each of the Parties.

10.    Counterparts.  This Tolling Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

11.    Entire Agreement.  This Tolling Agreement constitutes the complete agreement of the Parties hereto with respect to the subject matter referred to herein.  No other representations, understandings, promises, covenants, undertakings or other prior or contemporaneous agreements, oral or written, respecting those matters, which are not expressly incorporated herein, shall be enforceable.  Each of the Parties declares and represents that there are no oral or written promises or representations that induced such Party to enter into this Tolling Agreement.

12.    Settlement Privilege.  Each of the Parties understands and agrees that, for the purposes of either proving or disproving the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction (and subject to the exceptions in Federal Rule of Evidence 408(b)) and for the purposes of establishing personal jurisdiction, all discussions, negotiations and communications concerning the negotiation of this Tolling Agreement are privileged settlement communications and are protected by the provisions of Federal Rule of Evidence 408.

AP2115

13.     <u>Authority to Execute Agreement</u>.  Each of the Parties to this Tolling Agreement and the individual signatories executing this Tolling Agreement hereby represents and warrants that it/she/he has/have the full authority to execute this Tolling Agreement and to fully bind the respective Parties to each and all of the terms and conditions of this Tolling Agreement.

14.     <u>Notice</u>.  Any notice given under this Tolling Agreement shall be served via Overnight Courier, with a copy via electronic mail, as follows:

|  |  |
|---|---|
| To FTI GP I, LLC: | Edward H. Tillinghast, III<br>Sheppard, Mullin, Richter & Hampton LLP<br>30 Rockefeller Plaza<br>New York, New York 10112<br>Email:  etillinghast@sheppardmullin.com |
|  | Eric D. Schwartz<br>Morris, Nichols, Arsht & Tunnell LLP<br>1201 North Market Street<br>P.O. Box 1347<br>Wilmington, Delaware 19899-1347<br>Email:  eschwartz@mnat.com |
| To Point Investments, Ltd: | Stephen Astringer<br>Kobre & Kim LLC<br>600 North King Street, Suite 501<br>Wilmington, Delaware 19801<br>Email:  Stephen.Astringer@kobrekim.com |
|  | Adam Lavine<br>John Conte<br>Kobre & Kim LLC<br>800 Third Avenue<br>New York, New York 10022<br>Email: Adam.Lavine@kobrekim.com<br>John.Conte@kobrekim.com |

15.     <u>Preparation of Agreement</u>.  The Parties acknowledge that each Party has consulted with its own counsel and its representative counsel participated in the drafting of and has reviewed this Tolling Agreement and that no rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall be employed in the interpretation of this Tolling Agreement.

[Signature Page to Follow]

5

ON BEHALF OF FTI I GP, LLC

By: _____

Title: _____

Dated: _____

ON BEHALF OF THE FOREIGN REPRESENTATIVES.

By: _____

Title: _____

Dated: _____

AP2117

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| POINT INVESTMENTS, LTD. (IN LIQUIDATION),[1] | Case No. 22-10261 (TMH) |
| Debtor in a Foreign Proceeding. | **Hearing Date: September 8, 2023 at 10:00 a.m. (ET)** |
| | **Objection Deadline: September 1, 2023 at 4:00 p.m. (ET)** |

### MOTION OF FOREIGN REPRESENTATIVES FOR ENTRY OF AN ORDER (I) APPROVING KEY TERMS OF ARRANGEMENT AND (II) GRANTING RELATED RELIEF

Andrew Childe and Richard Lewis of FFP Limited, and Mathew Clingerman of Kroll Bermuda Ltd. (the "Liquidators" or "Foreign Representatives"), in their capacity as the joint liquidators and foreign representatives of Point Investments, Ltd. (the "Debtor") in respect of the winding up proceeding pending before the Supreme Court of Bermuda (the "Bermuda Court"), Commercial Court, Case 2020: No. 300 (the "Bermuda Proceeding"), by and through the undersigned counsel, hereby move, pursuant to sections 105, 363, and 1520 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 6004 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules" or "Rules"), for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), approving the *Key Terms of Arrangement* dated June 29, 2023 (the "Agreement"), a copy of which is attached hereto as **Exhibit B**, and granting related relief. In support of the Motion, the Foreign Representatives respectfully state as follows:

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

## PRELIMINARY STATEMENT

1.    After several months of arm's-length negotiations, the Foreign Representatives have reached a settlement and compromise of disputes arising from the Debtor's limited partnership investments into nearly a dozen private equity funds (the "Vista Funds") associated with Vista Equity Partners Management, LLC ("Vista").

2.    That settlement, which is memorialized in the Agreement, provides for the payment of over $100 million in cash distributions to the Debtor, which amounts had been previously withheld by the Vista Funds as a result of the Debtor's failure to make certain required capital contributions to the Vista Funds. ███████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████

3.    The Agreement additionally lays the foundation for the ultimate monetization of the Debtor's interests in the Vista Funds, as well as its minority interest in Solera Global Corp. ("Solera"), a company that is majority-owned by entities affiliated with Vista. Specifically, the Agreement provides that the parties will use commercially reasonable efforts to establish and facilitate the Debtor's sale of its limited partnership interests in the Vista Funds and its stockholder's interest in Solera in a coordinated and orderly fashion in accordance with the sale processes laid out in the Agreement.

4.    The Foreign Representatives believe that the resolution of their current disputes with Vista embodied in the Agreement provides significant value to the Debtor and is preferable to protracted and uncertain litigation with Vista. Those disputes are governed by foreign law,

AP2119

including as set out in the limited partnership agreements governing the Debtor's investments in the Vista Funds. The Agreement itself is likewise governed by foreign law.

5.       Although their disputes and settlement are governed by foreign law, certain property subject to the Agreement is currently located in the United States. As a result, the Foreign Representatives recognize that there are legitimate questions as to whether entry into the Agreement involves (a) the settlement or "transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States" under section 1520(a)(2) of the Bankruptcy Code, or (b) a use of the Debtor's property in the United States "other than in the ordinary course of business" under sections 363(b) and 1520(a)(3) of the Bankruptcy Code. Therefore, out of an abundance of caution, and to eliminate all doubt as to the validity and enforceability of the Agreement, the parties to the Agreement have conditioned effectiveness of certain key portions of the Agreement on approval by this Court.

6.       For all the reasons set forth herein, the Foreign Representatives respectfully request approval of the Agreement and entry of the Proposed Order.

## JURISDICTION AND VENUE

7.       The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b)(2).

8.       Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9.       The statutory predicates for the relief requested herein are sections 105, 363, and 1520(a)(2) and (a)(3) of the Bankruptcy Code, as well as Bankruptcy Rules 6004 and 9019.

AP2120

# BACKGROUND

## I.    General Background

10.    The Debtor is a private investment fund incorporated in Bermuda. On September 16, 2020, a petition was filed with the Bermuda Court seeking a winding up of the Debtor. The Foreign Representatives were appointed as joint provisional liquidators by the Bermuda Court on October 29, 2021 (the "Appointment Order"). On February 18, 2022, the Bermuda Court granted an amended petition and issued an order providing for the Debtor to "be wound up under the provisions of the Companies Act 1981 (Act)" and granted related relief (the "Winding Up Order").

11.    Pursuant to the terms of the Appointment Order and Winding Up Order, the Foreign Representatives are vested with certain powers, including the power to (a) "ascertain the assets of [the Debtor] and their location and take all steps necessary including Court actions where appropriate to obtain possession of such assets," (b) "carry on all or any portion of the business of [the Debtor] so far as may be necessary for the beneficial winding-up of [the Debtor]," (c) "bring or defend any action or other legal proceedings in the name and on behalf of [the Debtor]," and (d) "do all things incidental to the exercise of the foregoing powers."[2]

12.    On March 29, 2022, the Foreign Representatives commenced this case (the "Chapter 15 Case") by filing a voluntary petition for relief under Chapter 15 of the Bankruptcy Code. A detailed description of the facts and circumstances surrounding the Chapter 15 Case is set forth in the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Related Relief Under Chapter 15* [D.I. 3] (the "Verified Petition").

---

[2] A true and correct copy of the Winding Up Order is attached to the Foreign Representatives' Chapter 15 Petition [D.I. 1] as Exhibit 1.

4

13.     On April 22, 2022, the Court entered the *Order Granting Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Related Relief Under Chapter 15* [D.I. 34] (the "<u>Recognition Order</u>"). Among other things, the Recognition Order recognized the Bermuda Proceeding as a foreign main proceeding and recognized the Foreign Representatives as authorized to act on behalf of the Debtor in the Chapter 15 Case and in the United States. The Recognition Order also provided that "[a]ll relief and protection afforded to foreign main proceedings under section 1520 of the Bankruptcy Code is hereby granted to the Bermuda Proceeding, the Debtor, the Debtor's property located within the United States, and the foreign representatives, as applicable." Recognition Order ¶ 5.

14.     On August 15, 2022, the Bermuda Court appointed the Foreign Representatives as joint permanent liquidators of the Debtor. *See Status Report Regarding Appointment of Foreign Representatives as Permanent Liquidators of the Debtor* [D.I. 41].

15.     On May 19, 2023, the Foreign Representatives issued a notice, which, among other things, requested that all creditors submit proofs of debt by June 9, 2023. *See Status Report* [D.I. 84]. The Foreign Representatives are in the process of adjudicating the submitted proofs of debt.

## II.     The Vista Funds and Current Dispute

16.     Prior to the commencement of the Bermuda Proceeding and Chapter 15 Case, the Debtor became the limited partner in a number of Vista Funds. As of the date hereof, the Debtor holds limited partnership interests (the "<u>LP Interests</u>") in the following Vista Funds:

    (i)      Vista Equity Fund II, L.P.,

    (ii)     Vista Equity Partners Fund III (Parallel), L.P.,

    (iii)    Vista Equity Partners Fund IV (Parallel), L.P.,

    (iv)     Vista Equity Partners Fund VI-A, L.P.,

AP2122

(v)     Vista Foundation Fund I (Parallel), L.P.,

(vi)    Vista Foundation Fund II-A, L.P.,

(vii)   SD Rollover Vehicle, L.P.,

(viii)  VEPF IV Co-Invest 1A, L.P.,

(ix)    VEPF IV Co-Invest 2-A, L.P.,

(x)     VEPF V Co-Invest 1-B, L.P., and

(xi)    VEPF V Co-Invest 2-B, L.P.

17.     Additionally, the Debtor holds a direct minority stockholder's interest (the "Point Corporate Interest") in Solera. Solera is a Delaware corporation that is majority-owned by entities affiliated with Vista.

18.     Each of the Vista Funds is governed by a limited partnership agreement (each a "Vista LPA"). Although each Vista LPA is different, each Vista LPA generally requires that the Debtor, as a limited partner in the Vista Fund, periodically makes capital contributions to the applicable Vista Fund at such times and in such amounts as may be determined pursuant to the terms of each applicable Vista LPA. Generally, each Vista Fund would also make periodic distributions to the limited partners in the Vista Fund, including the Debtor, pursuant to the terms of the applicable Vista LPA.

19.     Beginning in 2021, the Debtor's former management requested that the Vista Funds withhold future distributions to the Debtor in respect of the Debtor's LP Interests (the "Withheld Distributions"). As a result, the Vista Funds held (and continue to hold) the Withheld Distributions in one or more bank accounts in the United States.

20.     The Foreign Representatives have maintained that the entirety of the Withheld Distributions constitutes property of the Debtor which the Vista Funds hold in trust for the Debtor as a matter of Cayman Islands law. On the other hand, the Vista Funds have instead maintained,

AP2123

among other things, that the Debtor failed to make certain required capital contributions to the Vista Funds (the "Missed Capital Contributions").

21.     As detailed in the Verified Petition, in March 2022, the Internal Revenue Service ("IRS") began serving purported notices of levy targeting the assets of the Debtor (the "Purported Levies"). *See* Verified Petition ¶ 40. Some of the Purported Levies were directed to Vista, and identify the taxpayer as "Point Investments, Ltd., as alter ego of Robert T. Brockman" or "Point Investments, Ltd. as nominee of Robert T. Brockman." *See Id.* at ¶¶ 41-43. The Debtor has never been determined to be an alter ego or nominee of Robert T. Brockman in this or any other court. The IRS has since withdrawn all of the Purported Levies.[3]

22.     On March 28, 2022, the day prior to the filing of this Chapter 15 Case, Vista sent the Foreign Representatives letters on behalf of certain of the Vista Funds, which, among other things, designated the Debtor as a "defaulting partner" under certain Vista LPAs. Generally, once a limited partner is designated as a "defaulting partner," certain of the limited partner's rights under the Vista LPAs are curtailed.

23.     As of June 23, 2023, the Vista Funds maintain, including through submission of proofs of debt in the Bermuda Proceeding, that (a) the Debtor owes the Vista Funds an aggregate amount of $13.06 million in Missed Capital Contributions, among other costs; and (b) the Vista Funds hold the aggregate amount of $139.81 million in Withheld Distributions.

## III.    The Agreement

24.     For the past several months, the Foreign Representatives and the Vista Funds, through their respective counsel, have engaged in good faith, arm's-length negotiations concerning a resolution of their disputes, including the mutual amounts owing between the parties. Those

---

[3] Based on the special instructions found in the Purported Levies, it has never been clear to the Foreign Representatives what specific property the IRS was seeking to levy via the Purported Levies.

AP2124

negotiations have included the sharing of significant diligence information that has permitted the parties to come to an agreement on the amount of Withheld Distributions and Missed Capital Contributions due and owing. The extensive negotiations and diligence culminated in the signing of the Agreement on June 29, 2023.

25.     In sum, the Agreement (i) 

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████, (ii) provides for payment of the Outstanding Capital calls, with the commensurate discharge of Vista's claims in the proof of debt process, (iii) provides for the creation of a reserve at the Vista Funds for anticipated future fees and expenses of the Vista Funds that would otherwise be payable by the Debtor in the ordinary course (the "Anticipated Expenses"), with such reserve for Anticipated Expenses to be funded from the Withheld Distributions, (iv) allows for the transfer of the Withheld Distributions to one or more segregated interest-bearing accounts for the benefit of the Debtor, paying a rate of interest at prevailing market rates, (v) provides for the eventual distribution of Withheld Distributions with any accrued interest thereon to the Foreign Representatives on behalf of the Debtor (net of the Missed Capital Contributions and Anticipated Expenses), and (vi) outlines a process for the sale of the LP Interests and Point Corporate Interest.

26.     The following is a summary of certain pertinent terms of the Agreement. The descriptions contained in this summary are for referential purposes to assist the Court and are qualified in their entirety by the terms of the Agreement.[4]

| 2. Effective Time and Subsequent Effective Time | The provisions of the Agreement are effective as of June 29, 2023 (the "Effective Time"), except as otherwise stated, and except for Sections 5 and 7-10, which are contingent upon the delivery of a notice by the Foreign Representatives that they have obtained: (i) approval of the Agreement by the |
| --- | --- |

---

[4] Capitalized terms used in this section, to the extent not defined herein, shall have the meanings given to them in the Agreement.

AP2125

| | |
|---|---|
| | Bermuda Court or an opinion from Bermuda counsel that such approval is not required, and (ii) approval of the Agreement by this Court (the "**Subsequent Effective Time**"). |
| **3. Treatment of Withheld Distributions** | As soon as reasonably practicable after the Effective Time, the Vista Funds will transfer all Withheld Distributions to one or more segregated interest-bearing accounts. |
| | No later than five business days after the Subsequent Effective Time, Vista will distribute the Withheld Distributions to an account nominated by the Foreign Representatives (the "**Nominated Account**"), less the Missed Capital Contributions and less the Anticipated Expenses (each as subject to adjustment as set out in the Agreement). |
| | At the Subsequent Effective Time, the Vista Funds shall irrevocably and unconditionally waive their right to the adjudication of the proofs of debt ("**POD**") submitted by Vista and the Vista Funds on or around June 8, 2023 to the extent such PODs relate to Capital Contributions (including Interim Period Capital Calls (as defined below)), any expenses allocable to Point's interests in the Co-Investment Vehicles, Future Capital Calls (as defined below), any other capital contributions that may be called by any of the Vista Funds following the Interim Period and Anticipated Expenses and agree that such claims will be settled pursuant to the terms of this Agreement. The parties acknowledge and agree that Vista has agreed to an extension of the JLs' obligation to adjudicate the Vista Funds' PODs until 6 October 2023, which date may be further extended upon mutual written agreement of the parties. |
| **4. Treatment of Future Capital Calls** | ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ capital calls by any of the Vista Funds in respect of deal funding ("**Future Capital Calls**") ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Following the sale by Point of any Point LP Interest, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ he transferee shall be required to fund such Future Capital Calls in accordance with the terms of the applicable partnership agreements. |
| **5. Future Dividends and Distributions** | Vista will ensure all future dividends and distributions in respect of the Point LP Interests are paid to the Nominated Account, provided that in the event actual ongoing fees and expenses that are to be funded by the limited partners in the applicable Vista Funds and that are allocable to the applicable Point LP Interests in accordance with the applicable partnership agreements exceed the Anticipated Expenses, such additional fees and expenses shall be paid by Point or, if not paid by Point, may be withheld from future distributions in respect of any Point LP Interests to pay for such excess fees and expenses on behalf of Point. |
| ▇▇▇▇▇ | ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ |

AP2126

| | |
|---|---|
| **7. Ongoing Fees and Expenses** | Annually, following the Subsequent Effective Time, Vista will review the projected ongoing fees and expenses for the Vista Funds. Vista will promptly following such annual review notify Point in writing and in accordance with the relevant partnership agreements (as applicable) if the projections for the ongoing fees or expenses for future periods that are allocable to Point exceed the Anticipated Expenses, and will concurrently provide any supporting calculations and documents evidencing the basis for the amended projections.<br><br>Point will fund any such additional amounts allocable to Point to the applicable Vista Fund (or such amounts may be withheld from future distributions to Point from any Vista Fund and applied to any other Vista Fund) at the same time as such additional fees and expenses are paid by the other limited partners in the applicable Vista Funds in accordance with the applicable partnership agreements. |
| **8. & 9. Process for the Sale of the Point LP Interests and Point Corporate Interest** | The Parties agree to work together in good faith and use commercially reasonable efforts to (i) establish and facilitate a sales process to achieve the sale and transfer of each of the Point LP Interests and the Point Corporate Interest and (ii) to document and effect the sale and transfer of each of the Point LP Interests and Point Corporate Interest pursuant to one or more negotiated purchase agreements (each, a "**Purchase Agreement**"). "Commercially reasonable efforts" will not require Point or the Foreign Representatives to accept any particular price or other terms with respect to any sale.<br><br>The Foreign Representatives and (with the consent of the Foreign Representatives) Vista and each relevant Vista GP and their Affiliates may enter into negotiations for the sale of the Point LP Interests with one or more permitted prospective purchasers to be agreed upon by Vista and the Foreign Representatives, acting reasonably (the "**Prospective Purchasers**"). The initial list of Prospective Purchasers for each of the Point LP Interests and the Point Corporate Interest will be agreed upon promptly following the execution of the Agreement, and such list may be supplemented from time to time in writing by mutual agreement of Vista and the Foreign Representatives, acting reasonably. Effective as of the Effective Time, Vista and its Affiliates shall not contact or engage in any such negotiations with any potential purchasers with respect to the sale of the Point LP Interests without the prior written consent of the Foreign Representatives. The Foreign Representatives and Point will run the sales process for the Point LP Interests and the Point Corporate Interest (with customary support from Vista and each relevant Vista GP as set forth in the Agreement) and may require that all offers or bids for Point LP Interests and/or the Point Corporate Interest from Prospective Purchasers be provided to the Foreign Representatives and Point (and not Vista or the Vista GPs). Vista and the Foreign Representatives agree that the sale of the Point Corporate Interest will be made in accordance with the Solera stockholders' agreement.<br><br>The Parties further agree that: (a) Point may not transfer any of the Point LP Interests without the prior written consent of the relevant Vista GP and (b) in accordance with the first paragraph of this Section 8, Vista shall and each |

AP2127

| | relevant Vista GP shall use commercially reasonable efforts (i) to provide and/or procure any necessary consents or approvals required under the relevant limited partnership agreement, and (ii) as soon as reasonably practicable, to make available to Point, the Foreign Representatives and the Prospective Purchasers such information customarily provided in connection with secondary limited partner interest transfers and to populate a customary virtual data room containing such information regarding the Vista Funds and their investments that are customarily provided in connection with secondary limited partner interest transfers or are reasonably requested by Prospective Purchasers, including, but not limited to, (1) the information required to be provided to the limited partners in Vista Funds pursuant to the terms of such limited partnership agreement of each of the Vista Funds and (2) the information set forth in Exhibit D to the Agreement. <br><br> Point's agreement to transfer the Point LP Interests and the Point Corporate Interest will be subject to the sale process being conducted in accordance with applicable bankruptcy, insolvency or similar laws. |
|---|---|
| **10. Court Approvals** | The Foreign Representatives will condition any sale of the Point Interests upon (a) the entry of one or more court orders approving the relevant Purchase Agreement in any jurisdiction, including, but not limited to, by the Supreme Court of Bermuda (each, a "**Sale Order**") and/or (b) the entry of one or more court orders recognizing a Sale Order in a jurisdiction other than where it was entered, which condition the Foreign Representatives, in their sole discretion, shall have the right to waive. |
| ■■■■ | ■■■■■■■■■ |
| **16. Governing Law** | The Agreement is governed by and will be construed in accordance with the laws of the Cayman Islands. |
| **17. Dispute Resolution and Jurisdiction** | The Parties irrevocably submit to the exclusive jurisdiction of the Cayman Islands to determine any disputes arising in respect of the Agreement. |
| **18. Termination** | (a) The Agreement may be terminated by the mutual written consent of the Parties. <br><br> ■■■■■■■■■■■■■ |

AP2128

## RELIEF REQUESTED

27.     By this Motion, pursuant to sections 105, 363, and 1520(a)(2) and 1520(a)(3) of the Bankruptcy Code and Bankruptcy Rules 6004 and 9019(a), the Foreign Representatives respectfully request entry of the Proposed Order approving the Agreement and granting related relief.

## BASIS FOR RELIEF

28.     Section 105(a) of the Bankruptcy Code provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after a hearing, the bankruptcy court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).

29.     Section 1520(a)(2) of the Bankruptcy Code makes section 363 applicable "to a transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States to the same extent that the sections would apply to property of an estate." 11 U.S.C. § 1520(a)(2). Section 1520(a)(3) of the Bankruptcy Code provides that the Foreign Representatives may "exercise the rights and powers of a trustee under and to the extent provided by section[] 363." 11 U.S.C. § 1520(a)(3). Section 363 of the Bankruptcy Code, in turn, provides that the trustee may use debtor property outside the ordinary course of business, after notice and a hearing. *See* 11 U.S.C. § 363(b).[5]

---

[5] Although the Foreign Representatives recognize there is a legitimate question as to whether Court approval of the Agreement is strictly necessary under sections 363 and 1520 of the Bankruptcy Code, approval by the Court (or a finding that no such approval is necessary) would promote certainty for all parties involved and ensure a commercially beneficial outcome for the Debtor. As such, the Foreign Representatives and Vista have chosen to condition the effectiveness of certain provisions of the Agreement upon approval thereof by the Court.

12

30.     "To minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'" *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 *Collier on Bankruptcy* ¶ 9019.03[1] (15th ed. 1993)). The Supreme Court has recognized that "[i]n administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts." *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S. Ct. 1157, 20 L. Ed. 2d 1 (1968) (applying the former Bankruptcy Act). Bankruptcy Rule 9019(a) has been applied in the context of chapter 15 cases. *See, e.g.*, *In re Cinque Terre Fin. Grp. Ltd*, No. 16-11086 (JLG), 2017 WL 4843738, at *10 (Bankr. S.D.N.Y. Oct. 24, 2017); *In re Grant Forest Prod. Inc*., No. 10-11132 (PJW), 2012 WL 3017090, at *1 (Bankr. D. Del. Apr. 11, 2012); *In re Grand Prix Assocs. Inc*., No. 09–16545 (DHS), 2009 WL 1850966, at *5 (Bankr. D.N.J. June 26, 2009); *In re CX Reinsurance Co. Ltd.*, No. 20-12156 (MG) [D.I. 25] (Bankr. S.D.N.Y. Mar. 11, 2022); *In re Unique Broadband Sys. Ltd.*, No. 19-11321 (BLS) [D.I. 27] (Bankr. D. Del. Apr. 15, 2020); *In re Innova Glob. Ltd.*, No. 19-10653-R [D.I. 271] (Bankr. N.D. Okla. Nov. 27, 2019). *See also In re Ace Track Co., Ltd.*, 556 B.R. 887, 909 (Bankr. N.D. Ill. 2016) ("[T]he court can find no good reason to conclude that Rule 9019 does not apply [in the Chapter 15 context], and no case that fails to apply it under similar circumstances.").

31.     "For purposes of determining whether to approve a settlement under Bankruptcy Rule 9019, courts rely on four factors: '(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation and the expense, inconvenience, and delay involved; (4) and the paramount interest of the creditors.'" *In re Scripsamerica, Inc.*, 634 B.R. 863, 869 (Bankr. D. Del. 2021) (quoting *In re Martin*, 91 F.3d at 393). *See also Motorola, Inc. v. Off. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d

AP2130

Cir. 2007) (holding that the following factors should be considered when determining whether a settlement is fair and equitable: "(1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, 'with its attendant expense, inconvenience, and delay,' including the difficulty in collecting on the judgment; (3) 'the paramount interests of the creditors,' including each affected class's relative benefits 'and the degree to which creditors either do not object to or affirmatively support the proposed settlement'; (4) whether other parties in interest support the settlement; (5) the 'competency and experience of counsel' supporting, and '[t]he experience and knowledge of the bankruptcy court judge' reviewing, the settlement; (6) 'the nature and breadth of releases to be obtained by officers and directors'; and (7) 'the extent to which the settlement is the product of arm's length bargaining.'") (quoting *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006)).

32.     The Court should approve a proposed settlement if it falls within a range of reasonableness. *See, e.g., In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 515 (Bankr. D. Del. 2010) ("The court need not decide the numerous questions of law or fact raised by litigation, but rather should canvas the issues to determine whether the settlement falls above the lowest point in the range of reasonableness."); *In re Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004) ("[T]he court does not have to be convinced that the settlement is the best possible compromise. . . Rather, the court must only conclude that the compromise or settlement falls within the reasonable range of litigation possibilities."). *See also In re Capmark Fin. Grp.*, 438 B.R. at 514-515 ("[T]he ultimate inquiry…[is] whether 'the compromise is fair, reasonable, and in the interest of the estate.'") (quoting *In re Marvel Ent. Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998)).

AP2131

33.     The Foreign Representatives believe, in their reasoned business judgment, that each of the *Martin* factors justifies approval of the Agreement and that the Agreement lies well within the range of reasonableness.

34.     <u>The Probability of Success in Litigation and the Complexity of the Litigation and the Attendant Expense, Inconvenience, and Delay</u>. There are bona fide disputes as to the validity and/or amounts of the claims between the Debtor and the Vista Funds and the ultimate resolution of the $139 million in Vista-held Withheld Distributions would be uncertain. ███████████

████████████████████████████████████

35.     Further complicating matters is the cross-border nature of the parties' disputes. Although the Withheld Distributions are being held by Vista in the United States, if the Foreign Representatives were to commence a turnover action in this Court, Vista might assert that such turnover action should be determined in the Cayman Islands (the place of the Vista Funds' formation and the jurisdiction that supplies the law for most aspects of the Vista LPAs). Any such venue and jurisdictional questions would undeniably result in delays, increased legal costs, and potentially concurrent disputes in multiple jurisdictions. The associated expense, inconvenience, and delay would prejudice the Foreign Representatives, Vista, and most importantly, the Debtor's stakeholders in the Bermuda Proceeding.

36.     The Agreement resolves two additional contested issues between the parties: (a) how the Vista Funds will be funded by the Debtor on a go-forward basis, and (b) how the Debtor's interests in the Vista Funds and Solera will ultimately be liquidated.

37.     First, with regard to the funding of the Vista Funds, the Agreement provides for a reserve of approximately $18.25 million for Anticipated Expenses. *See* Agreement, § 3 and Exhibit C. While the Foreign Representatives have maintained that the Debtor is entitled to the immediate

AP2132

release of the entirety of the $139 million in Withheld Distributions, it is an appropriate compromise to offset such amounts against the Missed Capital Contributions and the reserve for Anticipated Expenses. Ordinarily, under the Vista LPAs, the Debtor would be required to make capital contributions for fees and expenses in the ordinary course. The establishment of a reserve for Anticipated Expenses pre-funds the Debtor's obligations under the Vista LPAs, without requiring the Foreign Representatives to make out-of-pocket distributions from the Debtor at this time. *See* Agreement, § 3. Moreover, the reserve for Anticipated Expenses will be retained in one or more segregated interest-bearing accounts, thus protecting the interests of the Debtor's stakeholders. *See* Agreement, § 3.

38. Second, the Agreement provides a framework for the sale of the LP Interests and the Point Corporate Interest. *See* Agreement, §§ 8-10. Under the relevant agreements, including the Vista LPAs and the stockholders' agreement for Solera, Vista-related entities or personnel have certain consent or other rights with respect to certain sales to third parties. It was important to Vista that the Agreement acknowledge these rights. At the same time, it was important to the Foreign Representatives that the Agreement reflect their obligations—as fiduciaries for the Debtor's stakeholders and as officers of the Bermuda Court—to maximize recoveries for stakeholders. As such, the Foreign Representatives and Vista agreed that (a) the Foreign Representatives will oversee the sale process to obtain the highest and best prices for the LP Interests and Point Corporate Interest; (b) the Foreign Representatives are not required to accept any particular prices; and (c) all sales will be in accordance with applicable bankruptcy, insolvency or similar laws.

39. Although a mere agreement to pursue a sales process does not require this Court's approval under section 363 of the Bankruptcy Code, the Foreign Representatives wanted to make the Court, and all other parties in interest, aware of these potential sales, which is a critical aspect

AP2133

of the Agreement. The LP Interests and the Point Corporate Interest represent some of the Debtor's most valuable assets. By establishing a framework of cooperation with Vista in connection with the sales, the Agreement will undoubtedly help to ensure an efficient and effective liquidation of these valuable assets.

40.    In sum, given the uncertainty, complexity, expense, inconvenience, and delay of potential litigation with Vista, and the desire for Vista's cooperation in connection with the Debtor's liquidation of its assets, the Foreign Representatives have determined that entry into the Agreement is a prudent exercise of their business judgment.

41.    <u>The Likely Difficulties in Collection</u>. Even if the Foreign Representatives were eventually successful in litigating against Vista and the Vista Funds (*e.g.*, by obtaining turnover of the Withheld Distributions in this Court), the monetization and collection of proceeds from the sale of the LP Interests and Point Corporate Interest would be difficult absent this settlement. After all, protracted litigation with respect to the Debtor's interests might have chilled the Debtor's attempt to monetize the LP Interests and Point Corporate Interest. The Agreement eliminates those obstacles.

42.    <u>The Paramount Interests of the Debtor's Stakeholders</u>. For the reasons stated above, the Agreement is in the best interest of the Debtor and is in the paramount interests of the Debtor's stakeholders. Importantly, the Agreement provides for the eventual release of over $100 million in funds to the Debtor, and provides a framework for the Debtor to unlock additional value by monetizing the LP Interests and the Point Corporate Interest. The Agreement is well within the range of reasonableness, and the benefits provided by the Agreement will substantially advance the administration of the Bermuda Proceeding for the benefit of the Debtor's stakeholders.

AP2134

43. For all the foregoing reasons, the Agreement satisfies section 363 and Bankruptcy Rule 9019, and should be approved.

## WAIVER OF ANY APPLICABLE STAY

44. Bankruptcy Rule 6004(h) provides, in relevant part, that an order "authorizing the sale, use or lease of property … is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). For the reasons set forth herein, the Foreign Representatives submit that they have established cause to, and hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rule 6004(h), to the extent such a stay is applicable.

## CONSENT TO JURISDICTION

45. Pursuant to Local Rule 9013-1(f), the Foreign Representatives consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## NO PRIOR REQUEST

46. No previous motion or application for the relief sought herein has been made to this or any other court.

## NOTICE

47. Notice of this Motion will be provided to the following parties, through their counsel, if represented: (a) counsel to Vista; (b) the IRS; (c) the Office of the United States Trustee for the District of Delaware; and (d) all parties requesting notice pursuant to Rule 2002.

AP2135

## CONCLUSION

WHEREFORE, the Foreign Representatives respectfully request that the Court enter the

Proposed Order, in the form of which is attached as **Exhibit A** hereto approving the Agreement

and granting such other and further relief as is just and proper.

Dated: August 18, 2023
      Wilmington, Delaware

Respectfully submitted,

/s/     Stephen J. Astringer
**KOBRE & KIM LLP**
Jacob R. Kirkham (No. 5768)
Stephen J. Astringer (No. 6375)
600 North King Street, Suite 501
Wilmington, Delaware 19801
Telephone: (302) 518-6451
Facsimile: (302) 518-6461
jacob.kirkham@kobrekim.com
stephen.astringer@kobrekim.com

-and-

Adriana Riviere-Badell (admitted *pro hac vice*)
Evelyn Baltodano Sheehan (admitted *pro hac vice*)
201 South Biscayne Boulevard, Suite 1900
Miami, Florida 33131
Telephone: (305) 967-6100
Facsimile: (305) 967-6120
adriana.riviere-badell@kobrekim.com
evelyn.sheehan@kobrekim.com

-and-

Adam M. Lavine (admitted *pro hac vice*)
John G. Conte (admitted *pro hac vice*)
800 Third Avenue
New York, New York 10022
Telephone: (212) 380-2580
Facsimile: (212) 488-1220
adam.lavine@kobrekim.com
john.conte@kobrekim.com

*Counsel to the Foreign Representatives*

AP2136

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

In re:

POINT INVESTMENTS, LTD.
(IN LIQUIDATION),[1]

     Debtor in a Foreign Proceeding.

Chapter 15

Case No. 22-10261 (TMH)

**Hearing Date: September 8, 2023 at 10:00 a.m. (ET)**

**Objection Deadline: September 1, 2023 at 4:00 p.m. (ET)**

## NOTICE OF MOTION

    **PLEASE TAKE NOTICE** that Andrew Childe and Richard Lewis of FFP Limited, and Mathew Clingerman of Kroll Bermuda Ltd. (the "Foreign Representatives") have filed the attached *Motion of Foreign Representatives for Entry of an Order (I) Approving Key Terms of Agreement and (II) Granting Related Relief* (the "Motion").

    **PLEASE TAKE FURTHER NOTICE** that any objections or responses to the relief requested in the Motion must (a) be in writing; (b) be filed with the Clerk of the Bankruptcy Court, 824 Market Street, Third Floor, Wilmington, Delaware 19801, on or before **September 1, 2023 at 4:00 p.m. (ET)** (the "Objection Deadline"); and (c) be served so as to be received on or before the Objection Deadline by undersigned counsel to the Foreign Representatives.

    **PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion will be held on **September 8, 2023, at 10:00 A.M. (ET)** before the Honorable Thomas M. Horan, 3rd Floor, Courtroom # 7, 824 Market Street, Wilmington, Delaware 19801.

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

**PLEASE TAKE FURTHER NOTICE THAT IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THEN THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR A HEARING.**

Dated: August 18, 2023
      Wilmington, Delaware

Respectfully submitted,

*/s/      Stephen J. Astringer*
**KOBRE & KIM LLP**
Jacob R. Kirkham (No. 5768)
Stephen J. Astringer (No. 6375)
600 North King Street, Suite 501
Wilmington, Delaware 19801
Telephone: (302) 518-6451
Facsimile: (302) 518-6461
jacob.kirkham@kobrekim.com
stephen.astringer@kobrekim.com

-and-

Adriana Riviere-Badell (admitted *pro hac vice*)
Evelyn Baltodano Sheehan (admitted *pro hac vice*)
201 South Biscayne Boulevard, Suite 1900
Miami, Florida 33131
Telephone: (305) 967-6100
Facsimile: (305) 967-6120
adriana.riviere-badell@kobrekim.com
evelyn.sheehan@kobrekim.com

-and-

Adam M. Lavine (admitted *pro hac vice*)
John G. Conte (admitted *pro hac vice*)
800 Third Avenue
New York, New York 10022
Telephone: (212) 380-2580
Facsimile: (212) 488-1220
adam.lavine@kobrekim.com
john.conte@kobrekim.com

*Counsel to the Foreign Representatives*

AP2138

# **EXHIBIT A**

Proposed Order

AP2139

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| POINT INVESTMENTS, LTD. (IN LIQUIDATION),[1] | Case No. 22-10261 (TMH) |
| Debtor in a Foreign Proceeding. | **Re: Docket No. _____** |

## ORDER (I) APPROVING ENTRY INTO AGREEMENT AND (II) GRANTING RELATED RELIEF

Upon consideration of the *Motion of Foreign Representatives for Entry of an Order (I) Approving Key Terms of Agreement and (II) Granting Related Relief* (the "Motion");[2] and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and upon consideration of the Motion; and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and finding that adequate notice of the Motion having been given; and it appears that no other or further notice need be given; and upon the record of any hearing held to consider the relief requested in the Motion; and this Court having found and determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and any objections to the requested relief having been withdrawn, resolved or overruled on the merits; and after due deliberation and sufficient cause appearing therefore,

---

[1] The Debtor is a Bermuda exempted company registered with the Registrar of Companies in Bermuda under registration number 43769. The Debtor's registered office is c/o Kroll Bermuda, The Vallis Building, 4th Floor, 58 Par-La-Ville Road, Hamilton, HM 11, Bermuda.

[2] Capitalized terms not defined herein shall have the meanings set forth in the Motion.

AP2140

**IT IS HEREBY ORDERED THAT:**

1.    The Motion is granted as set forth herein.

2.    Pursuant to sections 105(a), 363, and 1520(a)(2) and (a)(3) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure, the Foreign Representatives are authorized to enter into, execute, deliver, perform under, and/or take all other actions necessary to fully implement the Agreement and all other documents and agreements related or ancillary thereto, in accordance with their terms, conditions, and agreements set forth or provided for therein, all of which are hereby approved.

3.    The Foreign Representatives are authorized to take all actions necessary to effectuate the relief granted in this Order and the settlement and compromise embodied by the Agreement, including entry into any amendments to, or waivers under, the Agreement, without seeking further Court approval.

4.    Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon entry; (b) the Foreign Representatives are not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order; and (c) the Foreign Representatives and their agents are authorized and empowered and may, in their discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

5.    This Court shall retain jurisdiction over any and all matters arising from the interpretation, implementation, or enforcement of this Order.

AP2141

# **EXHIBIT B**

Agreement

AP2142

<div align="right">**Execution Version**</div>

<div align="center">**Vista Equity Partners**</div>

<div align="center">
**Key Terms of Arrangement with**
**Point Investments, Ltd. ("Point")**
</div>

*This definitive agreement, dated as of June 29, 2023, between Vista Equity Partners Management, LLC ("**Vista**"), the general partners of each of the Vista Funds (as defined below), in their own capacity and in their capacity as general partners of each of the Vista Funds (together being the "**Vista GPs**"), and Point, acting through its liquidators, Andrew Childe, Richard Lewis and Mathew Clingerman (the "**JLs**" and, together with Vista and the Vista GPs, the "**Parties**") (this "**Agreement**") sets forth the agreement between the Parties in respect of the sale by Point of the Point Interests (as defined below) and the other matters addressed herein.*

| | | |
|---|---|---|
| **1.** | **Current Fund Interests held by Point:** | Point currently holds limited partner interests in the following Vista entities (collectively, the "**Point LP Interests**"): (i) Vista Equity Fund II, L.P. ("**VEF II**"), (ii) Vista Equity Partners Fund III (Parallel), L.P. ("**VEP III**"), (iii) Vista Equity Partners Fund IV (Parallel), L.P. ("**VEP IV**"), (iv) Vista Equity Partners Fund VI-A, L.P. ("**VEP VI**"), (v) Vista Foundation Fund I (Parallel), L.P. ("**VFF I**"), (vi) Vista Foundation Fund II-A, L.P. ("**VFF II**"), (vii) SD Rollover Vehicle, L.P. ("**VEP II Rollover**"), (viii) VEPF IV Co-Invest 1A, L.P. (the "**Finastra Interest**"), and (ix) VEPF IV Co-Invest 2-A, L.P., VEPF V Co-Invest 1-B, L.P., and VEPF V Co-Invest 2-B, L.P. (the entities in (i) through (ix), individually a "**Vista Fund**" and collectively, the "**Vista Funds**", and each Vista Fund in (viii) and (ix), a "**Co-Investment Vehicles**"). |
| **2.** | **Effective Time and Subsequent Effective Time** | Unless otherwise expressly provided herein, the provisions of this Agreement shall be effective as of the date hereof (the "**Effective Time**") except in the case of <u>Section 5</u> and <u>Sections 7-10</u> hereof, the effectiveness of which shall be contingent upon the JLs delivering notice (with evidence of the applicable court orders and/or opinions, as applicable) to Vista that they have obtained **<u>both</u>** of the following (collectively, the "**Bankruptcy Court Approvals**"): (i) approval of the transactions contemplated by this Agreement by the Bermuda Supreme Court (the "**Bermudan Court Order**") which supervises the liquidation of Point, or an opinion from Bermudan counsel that is acceptable to Vista (acceptance of which will not be unreasonably withheld, conditioned or delayed) that the Bermudan Court Order is not required under applicable law, and (ii) approval of the transactions contemplated by this Agreement (and recognition of the Bermudan Court Order, if obtained) by the United States Bankruptcy Court for the District of Delaware ("**US Bankruptcy Court Order**") (the time at which the JLs deliver notice hereunder that the Bankruptcy Court Approvals have been obtained, the "**Subsequent Effective Time**").<br><br>The JLs and Vista will consult in good faith with respect to any descriptions of the transactions or any of the subject matter contained herein set forth in public filings with the Bermuda Supreme Court or the United States Bankruptcy Court in connection with obtaining the Bermudan Court Order or US Bankruptcy Court Order. |
| **3.** | **Treatment of Withheld** | The distribution amounts declared by Vista Funds and currently withheld from distribution by Point by the Vista Funds are set forth in **Exhibit A** attached hereto |

<div align="right">AP2143</div>

| | |
|---|---|
| **Distributions:** | (the "**Withheld Distributions**"). The amounts in respect of previously called but unpaid capital contributions owing from Point to certain of the Vista Funds in respect of partnership expenses and management fees, in each case, in accordance with the applicable partnership agreements (the "**Capital Contributions**") are set forth in **Exhibit B** attached hereto. The amounts in respect of agreed reserves for anticipated future ongoing fees and expenses of the Vista Funds are set forth in **Exhibit C** attached hereto (the amounts for such anticipated ongoing fees and expense being the "**Anticipated Expenses**"). |

At the Subsequent Effective Time, the Vista Funds shall irrevocably and unconditionally waive their right to the adjudication of the proofs of debt ("**POD**") submitted by Vista and the Vista Funds on or around June 8, 2023 to the extent such PODs relate to Capital Contributions (including Interim Period Capital Calls (as defined below)), any expenses allocable to Point's interests in the Co-Investment Vehicles, Future Capital Calls (as defined below), any other capital contributions that may be called by any of the Vista Funds following the Interim Period and Anticipated Expenses and agree that such claims will be settled pursuant to the terms of this Agreement. The parties acknowledge and agree that Vista has agreed to an extension of the JLs' obligation to adjudicate the Vista Funds' PODs until 6 October 2023, which date may be further extended upon mutual written agreement of the parties.

As soon as is reasonably practicable after the Effective Time, all Withheld Distributions shall be transferred by the Vista Funds withholding such amounts to one or more segregated interest-bearing accounts, paying a rate of interest at prevailing market rates (the "**Interest-Bearing Account**"). For clarity and subject to the terms of Section 4, Point will not participate in any capital contributions called by any of the Vista Funds in respect of deal funding effective as of the Effective Time. For the avoidance of doubt, the Interest-Bearing Account may be subject to withholding taxes in respect of interest amounts under applicable law, and any accrued interest amounts that are subject to release from the Interest-Bearing Account to the Nominated Account or to Point in accordance with this Section 3 shall be net of any such withheld amounts.

During the period following the Effective Time and before the earlier of (x) the Payment Date (as defined below) and (y) the termination of this Agreement in accordance with Section 18(a) or (c) (the "**Interim Period**"):

    a) any distribution amounts declared and payable by Vista Funds in respect of the Point LP Interests shall constitute Withheld Distributions and shall be distributed by such Vista Funds to the Interest-Bearing Account at such time as such distributions become payable in accordance with the applicable partnership agreements and upon each such distribution becoming payable, Vista shall inform Point and the JLs of such amounts via Vista's LP portal in accordance with the applicable partnership agreements (and correspondingly, the amount of Withheld Distributions shall be deemed to be increased as of such date);

2

b) any capital contributions for expenses and management fees called and becoming payable from Point to the Vista Funds in accordance with the applicable partnership agreements (the "**Interim Period Capital Calls**") shall also constitute Capital Contributions that are owing as of such date but shall not be required to be funded by Point until the Payment Date in accordance with the paragraph below, and upon each Interim Period Capital Call, Vista shall inform Point and the JLs of such amounts via Vista's LP portal in accordance with the applicable partnership agreements (and correspondingly, the amount of Capital Contributions owing as of such date shall be deemed to be increased as of such date, and for clarity, the Anticipated Expenses will be deemed to be reduced dollar-for-dollar by the amount of each Interim Period Capital Call to the extent such Interim Period Capital Call related to Anticipated Expenses).

During the Interim Period, upon the request of the JLs, Vista will deliver to Point and the JLs updated **Exhibits A**, **B** and **C** reflecting the Withheld Distributions, Capital Contributions and Anticipated Expenses as of the end of the most recent fiscal quarter (reflecting any applicable increases or reductions thereto as described above in this <u>Section 3</u>). Notwithstanding the foregoing, Vista will deliver to Point and the JLs updated **Exhibits A**, **B** and **C** prior to the Payment Date reflecting the Withheld Distributions, Capital Contributions and Anticipated Expenses as of the Subsequent Effective Time. In each case, such updated exhibits shall be accompanied by supporting calculations and documents evidencing the basis of such updates and acceptable to Point and the JLs (acceptance of which shall not be unreasonably withheld, conditioned or delayed).

Vista agrees, no later than five business days after the Subsequent Effective Time (the "**Payment Date**"), to distribute from the Interest-Bearing Account to an account nominated by the JLs on behalf of Point (the "**Nominated Account**") the Withheld Distributions (as increased as described above in this <u>Section 3</u>, as applicable) with any accrued interest thereon as of the Payment Date (for clarity, such amount being the entirety of the amount, inclusive of interest, held in the Interest-Bearing Account as of the Payment Date) <u>less</u> (i) the Capital Contributions (as increased as described above in this <u>Section 3</u>, as applicable) and (ii) the Anticipated Expenses (as reduced as described above in this <u>Section 3</u>, as applicable) (the portion of the Withheld Distributions being retained for such purpose being the "**Funds Held for Anticipated Expenses**").

In respect of Point's interests in the Co-Investment Vehicles, the JLs acknowledge and agree that any expenses allocable to such interests in accordance with the applicable partnership agreements will be netted from any distributions (whether related to distributions, current income, or otherwise) in respect of such interests, as and when any distributions of proceeds are made in respect of such interests in the Co-Investment Vehicles, and, as such, such Co-Investment Vehicles do not require Funds Held for Anticipated Expenses to be set forth and agreed by the Parties on **Exhibit C** hereof.

AP2145

Following the Payment Date, to the extent any Funds Held for Anticipated Expenses are to be applied against actual fees and expenses incurred by the Vista Funds (which, for the avoidance of doubt, is permitted hereunder), Point will be entitled to receive the same notification provided to other limited partners in the applicable Vista Funds in connection with any such fees and expenses payable by them. All Funds Held for Anticipated Expenses will be retained by Vista in the Interest-Bearing Account, and any such amounts earmarked in **Exhibit C** for a particular Vista Fund that are not used at the date that (a) Point sells its limited partnership interests in such Vista Fund; or (b) the relevant Vista Funds are wound-up in accordance with the applicable partnership agreements, will be promptly returned to Point with any accrued interest, if any. For the avoidance of doubt, the Funds Held for Anticipated Expenses shall be available to fund any and all fees and expenses incurred by the Vista Funds and Funds Held for Anticipated Expenses in respect of any Vista Fund are **not** limited to be applied only in respect of such Vista Fund.

| | |
|---|---|
| **4. Treatment of Future Capital Calls:** | ███████████████████████████████ ██████████████████████ capital calls by any of the Vista Funds in respect of deal funding (**"Future Capital Calls"**) ████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ <br><br> ██████████████ Following the sale by Point of any Point LP Interest, ████ ████ ██████ ████ ██████████ ████████ ██████ ████████ the transferee shall be required to fund such Future Capital Calls in accordance with the terms of the applicable partnership agreements. |
| **5. Future Dividends and Distributions:** | Vista will and each Vista GP will ensure all future dividends and distributions in respect of the Point LP Interests are paid to the Nominated Account, provided that in the event actual ongoing fees and expenses that are to be funded by the limited partners in the applicable Vista Funds and that are allocable to the applicable Point LP Interests in accordance with the applicable partnership agreements exceed the Anticipated Expenses, such additional fees and expenses shall be paid by Point or, if not paid by Point, may be withheld from future distributions in respect of any Point LP Interests to pay for such excess fees and expenses on behalf of Point. |
| █ ████ | ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ |

4

| | █████████████████████ |
|---|---|
| **7. Ongoing Fees and Expenses:** | Annually, following the Subsequent Effective Time, Vista will and each Vista GP will review the projected ongoing fees and expenses for the Vista Funds. Vista will and each Vista GP will promptly following such annual review notify Point in writing and in accordance with the relevant partnership agreements (as applicable) if the projections for the ongoing fees or expenses for future periods that are allocable to Point exceed the Anticipated Expenses set forth in **Exhibit C** (and as adjusted as provided in Section 3), and will concurrently provide any supporting calculations and documents evidencing the basis for the amended projections.<br><br>Point will fund any such additional amounts allocable to Point to the applicable Vista Fund (or such amounts may be withheld from future distributions to Point from any Vista Fund and applied to any other Vista Fund) at the same time as such additional fees and expenses are paid by the other limited partners in the applicable Vista Funds in accordance with the applicable partnership agreements. |
| **8. Process for the Sale of the Point LP Interests:** | The Parties agree to work together in good faith and use commercially reasonable efforts to (i) establish and facilitate the sales process to achieve the sale and transfer of each of the Point LP Interests and (ii) to document and effect the sale and transfer of each of the Point LP Interests pursuant to one or more negotiated purchase agreements (each, a "**Purchase Agreement**"), such that following consummation of the sale(s), Point will no longer own, directly or indirectly, any of the Point LP Interests. It is understood that, for purposes of this Section 8, "commercially reasonable efforts" will not require Point or the JLs to accept any particular price or other terms with respect to the sale of any Point LP Interests.<br><br>The JLs and (with the consent of the JLs) Vista and each relevant Vista GP and their Affiliates may enter into negotiations for the sale of the Point LP Interests with one or more permitted prospective purchasers to be agreed upon by Vista and the JLs, acting reasonably (the "**Prospective Purchasers**"). The initial list of Prospective Purchasers will be agreed upon promptly following the execution of this Agreement, and such list may be supplemented from time to time in writing by mutual agreement of Vista and the JLs, acting reasonably. Effective as of the date hereof, Vista and its Affiliates shall not contact or engage in any such negotiations with any potential purchasers with respect of the sale of the Point LP Interests without the prior written consent of the JLs. The JLs and Point will run the sales process for the Point LP Interests (with customary support from Vista and each relevant Vista GP as set forth in this Agreement) and may require that all offers or bids for Point LP Interests from Prospective Purchasers be provided to the JLs and Point (and not Vista or the Vista GPs). For the avoidance of doubt, "Affiliate" means, with respect to any person, any person directly or indirectly controlling, controlled by or under common control with such person, which shall not include any pooled investment vehicle or other advisory client managed by Vista or its Affiliates nor any of their controlled affiliates. Prior to engaging with any Prospective Purchasers, the JLs, Vista and each relevant Vista GP will enter into appropriate confidentiality and non-disclosure agreements with the Prospective Purchaser (reasonably |

5

AP2147

<table>
<tr>
<td></td>
<td>satisfactory to Vista and the JLs) protecting any information to be provided by Vista, each relevant Vista GP, Point or the JLs relating to the Vista Funds, Point and/or their Affiliates. An Affiliate of Vista may be a purchaser of all or part of the Point LP Interests, provided that (a) full and accurate disclosure regarding the relationship between Vista and any such Affiliate is disclosed in writing to the JLs prior to entry into any Purchase Agreement, and (b) such purchase will be negotiated on an arms'-length basis.

The Parties further agree that: (a) Point may not transfer any of the Point LP Interests without the prior written consent of the relevant Vista GP and (b) in accordance with the first paragraph of this <u>Section 8</u>, Vista shall and each relevant Vista GP shall use commercially reasonable efforts (i) to provide and/or procure any necessary consents or approvals required under the relevant limited partnership agreement, and (ii) as soon as reasonably practicable, to make available to Point, the JLs and the Prospective Purchasers such information customarily provided in connection with secondary limited partner interest transfers and to populate a customary virtual data room containing such information regarding the Vista Funds and their investments that are customarily provided in connection with secondary limited partner interest transfers or are reasonably requested by Prospective Purchasers, including, but not limited to, (1) the information required to be provided to the limited partners in Vista Funds pursuant to the terms of such limited partnership agreement of each of the Vista Funds and (2) the information set forth in **Exhibit D** hereto. For clarity, in respect of item (b)(ii) of this paragraph, such information shall be made available to Point and the JLs and the virtual data room shall be populated, in each case promptly following the Effective Time but for greater clarity, shall not be shared with any Prospective Purchasers until the Subsequent Effective Time.

Point's agreement to transfer the Point LP Interests will be subject to the sale process being conducted in accordance with applicable bankruptcy, insolvency or similar laws. To the extent Vista, any relevant Vista GP or any of their respective Affiliates receives any offer from a Prospective Purchaser to purchase, or interest or expression of interests in purchasing, the Point LP Interests directly, Vista, such relevant Vista GP or their respective Affiliate, as applicable, shall share the terms of such offer as soon as reasonably practicable, or interest or expression of interests, including the offer price, directly with the JLs.</td>
</tr>
<tr>
<td>**9. Process for the Sale of the Point Corporate Interest:**</td>
<td>Vista and the JLs agree to work together in good faith and use commercially reasonable efforts to establish and facilitate a sale process for the sale and transfer of the shares held by Point in Solera Global Corp. (the "**Point Corporate Interest**" and together with the Point LP Interests, the "**Point Interests**") on the terms herein, and to document and effect the sale and transfer of the Point Corporate Interest pursuant to a negotiated purchase agreement to a Prospective Purchaser of the Point Corporate Interest (the initial list of Prospective Purchasers to be agreed upon promptly following the execution of this Agreement, which list may be supplemented from time to time in writing by mutual agreement of Vista and the JLs, acting reasonably) (the "**Point Corporate Interest Purchase**</td>
</tr>
</table>

AP2148

Agreement"), such that following consummation of any such sale, Point will no longer own, directly or indirectly, the Point Corporate Interest. Vista and the JLs agree that the sale process in respect of the Point Corporate Interest may substantially differ from the sale process in respect of the Point LP Interests. It is understood that, for purposes of this Section 9, "commercially reasonable efforts" will not require Point or the JLs to accept any particular price or other terms with respect to the sale of the Point Corporate Interest.

Prior to engaging any Prospective Purchaser, the applicable Vista Funds and Point will enter into appropriate confidentiality and non-disclosure agreements with the Prospective Purchaser (reasonably acceptable to Vista and the JLs) protecting information to be provided by Vista, Point or the JLs relating to the Point Corporate Interest and the Vista Funds, Point and/or their Affiliates. An Affiliate of Vista may be a purchaser of the Point Corporate Interest, provided that (a) full and accurate disclosure regarding the relationship between Vista and any such Affiliate is disclosed in writing to the JLs prior to entry into any Point Corporate Interest Purchase Agreement, and (b) such purchase will be negotiated on an arms'-length basis. The JLs and Point will run the sale process for the Point Corporate Interest (with customary support from Vista as set forth in this Agreement) and may require that all offers or bids for the Point Corporate Interest from Prospective Purchasers be provided to the JLs and Point (and not Vista).

Vista and the JLs agree that the sale of the Point Corporate Interest will be made in accordance with the Solera Global Corp. stockholders agreement.

Point's agreement to transfer the Point Corporate Interest will be subject to the sale process being conducted in accordance with applicable bankruptcy, insolvency or similar laws. To the extent Vista receives any offer from a Prospective Purchaser to purchase, or interest or expression of interests in purchasing, the Point Corporate Interest directly, Vista shall share the terms of such offer, or interest or expression of interests as soon as reasonably practicable, including the offer price, directly with the JLs.

| **10. Court Approvals** | The JLs will condition any sale of the Point Interests upon (a) the entry of one or more court orders approving the relevant Purchase Agreement in any jurisdiction, including, but not limited to, by the Supreme Court of Bermuda (each, a "**Sale Order**") and/or (b) the entry of one or more court orders recognizing a Sale Order in a jurisdiction other than where it was entered, which condition the JLs, in their sole discretion, shall have the right to waive. |
|---|---|
| **11. Representations and Warranties:** | Vista and each Vista GP (only with respect to itself and the applicable Vista Fund of such Vista GP) represents and warrants to Point as of the date hereof and as of the Subsequent Effective Time that: (a) Vista, each Vista GP and each Vista Fund is duly organized, validly existing and in good standing under the laws of its applicable state of formation or organization; (b) Vista and each Vista GP has all necessary applicable limited liability company or partnership power and authority to enter into this Agreement and to carry out its obligations hereunder; (c) this Agreement has been duly |

AP2149

executed and delivered by Vista and each Vista GP and (assuming due authorization, execution and delivery by Point) constitutes the legal, valid and binding obligation of, and is enforceable against, Vista and each Vista GP in accordance with its terms; (d) to the actual knowledge of Vista and each Vista GP, Point does not hold any limited partner interest or other equity interest in any pooled investment vehicle or managed account managed by Vista or its Affiliates other than the Point LP Interests in the respective Vista Funds and the Point Corporate Interest in Solera Global Corp.; and (e) the Withheld Distributions set forth in Exhibit A attached hereto comprise all distribution amounts previously declared in respect of the Point LP Interests by various Vista Funds that have not been paid to a Point account.

Point represents and warrants to Vista and each Vista GP as of the date hereof and as of the Subsequent Effective Time that: (a) Point is duly organized, validly existing under the laws of Bermuda; (b) the JLs have been appointed by the Supreme Court of Bermuda to liquidate Point under its supervision; (c) the JLs jointly and severally have on behalf of Point all necessary power and authority to enter into this Agreement and to carry out the obligations hereunder on behalf of Point; (d) this Agreement has been duly executed and delivered by Point and (assuming due authorization, execution and delivery by Vista and each Vista Fund) constitutes the legal, valid and binding obligation of, and is enforceable against, Point in accordance with its terms; and (e) subject to the approvals contemplated by Sections 2 and 10, the execution and delivery of this Agreement, and the performance of the terms hereof, do not contravene any bankruptcy law applicable to Point.

| 12. No Personal Liability: | None of the JLs shall be personally liable for the satisfaction of Point's obligations under this Agreement or any agreements related thereto. |
|---|---|
| ████████ | ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ██████████████████ |
| 14. Partnership Agreements: | Except as set forth explicitly herein, solely with respect to the Point LP Interests, the partnership agreements of each of the Vista Funds will continue to operate in the ordinary course, consistent with their terms after the signing of this Agreement. |
| 15. Confidentiality: | This Agreement is being delivered with the understanding that the Parties, together with their respective Affiliates and the Parties' and such Affiliates' respective officers, directors, managers, members, representatives, agents, advisors, owners, stakeholders and employees (collectively, "**Representatives**"), each agree to use their commercially reasonable efforts to keep the existence of this Agreement and its contents confidential; provided, that each of the Parties and their respective Affiliates and Representatives shall be permitted to disclose, and shall not be liable for disclosure, of the existence of this Agreement and its contents only if such disclosure is required (a) pursuant to any legal process |

| | (including pursuant to the assertion of rights under this Agreement), or (b) for purposes of compliance by such Party or any of its respective Affiliates or Representatives with applicable law or court order, which shall include, for the avoidance of doubt, any regulation, inquiry, investigation or other action by any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction. |
|---|---|
| **16. Governing Law:** | This Agreement will be governed by and construed in accordance with the laws of the Cayman Islands. |
| **17. Dispute Resolution and Jurisdiction:** | The Parties irrevocably submit to the exclusive jurisdiction of the Cayman Islands to determine any disputes arising in respect of this Agreement. |
| **18. Termination:** | (a) This Agreement may be terminated by the mutual written consent of the Parties.<br><br>███████████████████████████████████<br>███████████████████████████████████<br>███████████████████████████████████<br>███████████████████████████████████<br>███████████████████████████████████<br>███████████████████████████████████<br>███████████████████████████████████<br>███████████████████████████████████<br>███████████████████████████████████<br>████████████████████████<br><br>███████████████████████████████████<br>██████████████████████████████████ |
| **19. Vista and Vista GP Commitments:** | Each Vista GP will cause the applicable Vista Fund to comply with its obligations under this agreement. |
| **20. Miscellaneous:** | This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.<br><br>This Agreement, including each exhibit attached hereto, constitutes the entire agreement as between the Parties regarding the subject matter herein and supersedes all prior agreements and understandings regarding the same. This Agreement, including each exhibit attached hereto, is entered into by the Parties without reliance upon any oral or written representations, promise or warranty, except as specifically provided for herein. This Agreement, including each exhibit attached hereto, may only be modified by the Parties by an instrument in writing signed by all Parties; provided that, to the extent applicable, the JLs, on the one hand, |

AP2151

| | and Vista and the relevant Vista GP, on the other hand, may modify this Agreement by an instrument in writing with respect to the sale of the Point Interests pursuant to a Purchase Agreement or the Point Corporate Interest Purchase Agreement.
| | No Party may assign its obligations under this Agreement without the prior written consent of the other Parties, and any attempted assignment or assumption without such written consent shall be null and void without legal effect.
| | This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original copy and all of which, when taken together, shall be deemed to constitute one and the same agreement, and the exchange of copies of this Agreement and of signature pages by electronic mail with .pdf attachments or by other electronic signatures (including DocuSign) shall constitute effective execution and delivery of this Agreement as to the Parties.
| | When an obligation is imposed on a Vista GP hereunder, such obligation shall solely be in respect of the applicable Vista Fund(s) controlled by such Vista GP and in respect of the applicable Point LP Interests, and not in respect of any other Vista Fund or any other limited partner interest, as applicable.

[*Remainder of page intentionally left blank*]

AP2152

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by duly authorized representatives thereof as of the first date written above.



**VISTA EQUITY PARTNERS MANAGEMENT, LLC**

**Vista Equity Fund II, L.P.**

**Vista Equity Partners Fund III (Parallel), L.P.**

**Vista Equity Partners Fund IV (Parallel), L.P.**

**Vista Equity Partners Fund VI-A, L.P.**



**Vista Foundation Fund I (Parallel), L.P.**



**Vista Foundation Fund II-A, L.P.**



**SD Rollover Vehicle, L.P.**



**VEPF IV Co-Invest 1A, L.P.**



**VEPF IV Co-Invest 2-A, L.P.**



**VEPF V Co-Invest 1-B, L.P.**



**VEPF V Co-Invest 2-B, L.P.**



**POINT INVESTMENTS, LTD., acting through its joint liquidators, without personal liability**

**Exhibit "A"**

**Withheld Distributions**

(*See attached.*)

AP2157

**Exhibit A**

**Withheld Distributions (as of 6/23/2023)**

| | Point Interests in: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | VFF I [1] | VFF II | VEP III [1] | VEP IV | VEP VI | Co-Investment Vehicles | VEF II | VEP II Rollover | Total |
| Total Withheld Distributions | | | | | | | | | $ 139,815,673 |

AP2158

**Exhibit "B"**

**Outstanding Capital Contributions**

(*See attached*.)

AP2159

**Exhibit B**
**Outstanding Capital Contributions (as of 6/23/2023)**

*Point Interests in:*

| | *VFF I* | *VFF II* | *VEP III* | *VEP IV* | *VEP VI* | *Co-Investment Vehicles* | *VEF II* | *VEP II Rollover* | *Total* |
|---|---|---|---|---|---|---|---|---|---|
| **Total Outstanding Capital Contributions** | | | | | | | | | $ 13,061,481 |

AP2160

**Exhibit "C"**

**Anticipated Expenses**

(*See attached*.)

AP2161

**Exhibit C**
**Anticipated Expenses (as of 6/23/2023)**

| | _Point Interests in:_ | | | | | | | | _Total_ |
|---|---|---|---|---|---|---|---|---|---|
| | _VFF I_ | _VFF II_ | _VEP III_ | _VEP IV_ | _VEP VI_ | _Co-Investment Vehicles_ [1] | _VEF II_ | _VEP II Rollover_ | |
| **Total Anticipated Expenses** | | | | | | | | | $ 18,253,053 |

AP2162

**Exhibit "D"**

**Initial Diligence Information**

1. Formation and/or organizational documentation of each Vista Fund, including any limited partnership agreements and/or shareholders agreements

2. Organizational structure chart of the Vista Funds

3. Copies of such information as may be required for federal, state or non-United States income tax reporting purposes, including copies on Schedule K-1

4. To extent provided to limited partners of a Vista Fund, copies of the most recent quarterly financial report and the two most recent annual financial reports with respect to such fiscal year of each such Vista Fund, including each of the following:

    a. the financial statements for each Vista Fund prepared in accordance with U.S. GAAP;

    b. a balance sheet as of the end of such period;

    c. a statement of income or loss and a statement of Point's capital for such period;

    d. a schedule of changes in the capital account balances of Point;

    e. a schedule setting for each portfolio investment and the fair market value thereof as of the last day of such period; and

    f. in the case of an annual report with respect to such fiscal year, an opinion of a nationally recognized accounting firm based upon their audit of such financial statements.

AP2163